IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Richard Horton,                    :

      Plaintiff,          :
                      Case No. 2:23-cv-3888
      vs.                 :
                      Judge Algenon L. Marbley
City of Columbus,                  :
et al.,                              Magistrate Judge
                  : Elizabeth Preston Deavers
      Defendants.         :

- - - - -

VIDEOTAPED DEPOSITION OF RICHARD H. HORTON

- - - - -

Taken at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
December 19, 2024, 9:53 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

1           A P P E A R A N C E S

2

   ON BEHALF OF PLAINTIFF:
3
          Loevy & Loevy
4         311 North Aberdeen Street, Fl. 3
          Chicago, IL 60607
5         By Alyssa Martinez, Esq.

6

   ON BEHALF OF DEFENDANTS:
7
          Columbus City Attorney's Office
8         77 North Front Street, 4th Fl.
          Columbus, OH 43215
9         By Aaron D. Epstein, Esq.
             David J. Dirisamer, Esq.
10            Alana Valle Tanoury, Esq.
             Dexter W. Dorsey, Esq.
11

12
   ALSO PRESENT:
13
          Gregory Castetter - Videographer
14
          Douglas Girard - Paralegal, Columbus City
15        Attorney's Office

16

17

18

19

20

21

22

23

24

1                    Thursday Morning Session

2                     December 19, 2024, 9:53 a.m.

3                          - - - - -

4                      S T I P U L A T I O N S

5                          - - - - -

6          It is stipulated by counsel in attendance that

7     the deposition of Richard H. Horton, the Plaintiff

8     herein, called by the Defendants for

9     cross-examination, may be taken at this time by

10    the notary pursuant to notice and agreement of

11    counsel; that said deposition may be reduced to

12    writing in stenotypy by the notary, whose notes

13    may thereafter be transcribed out of the presence

14    of the witness; that proof of the official

15    character and qualification of the notary is

16    waived.

17                          - - - - -

18

19

20

21

22

23

24

1                        I N D E X

2   Examination By                                Page

3   Mr. Epstein - Cross                              7

4
    Exhibits                                       Page
5
    Exhibit 1 - First Amended Complaint             17
6
    Exhibit 2 - Transcript of Proceedings           19
7
    Exhibit 3 - Plaintiff's Responses to            38
8              Defendants' First Set of
               Discovery Requests
9
    Exhibit 4 - Defendant's Petition for            58
10             Post-Conviction Relief Pursuant
               to R.C. 2953.21
11
    Exhibit 5 - Application for DNA Testing          63
12
    Exhibit 6 - Defendant's First Amended Petition   68
13             for Post-Conviction Relief
               Pursuant to R.C. 2953.21
14
    Exhibit 7 - Complaint                           74
15
    Exhibit 8 - Entry                               77
16
    Exhibit 9 - Complaint                           78
17
    Exhibit 10 - Entry                              80
18
    Exhibit 11 - Investigation Report              111
19
    Exhibit 12 - Arrest Report                     131
20
    Exhibit 13 - Order of Release on Parole        136
21
    Exhibit 14 - Photograph                        154
22
    Exhibit 15 - Telhio Credit Union - Listing of  158
23              Transactions

24

1                    INDEX (CONT'D)

2     Exhibits                                    Page

3     Exhibit 16 - Earnings Statement              158

4     Exhibit 17 - Complaint                       168

5     Exhibit 18 - Complaint                       184

6     Exhibit 19 - Court Arraignment Sheet         189

7     Exhibit 20 - Copy of Piece of Cardboard with 198
                   Phone Number
8
      Exhibit 21 - Affidavit of LaKeon Horton      214
9
      Exhibit 22 - Judgment Entry                  224
10
      Exhibit 23 - Initial Medical/Mental Health/  236
11                 Substance Use Screening

12    Exhibit 24 - Mental Health Treatment Plan    243
                   Review
13
      Exhibit 25 - Handwritten Letter              246
14
      Exhibit 26 - Interdisciplinary Progress Notes 250
15
      Exhibit 27 - Handwritten Notes               258
16
      Exhibit 28 - Motion for Judicial Release     266
17
      Exhibit 29 - Motion for Judicial Release     284
18                 Pursuant to O.R.C. 2929.20

19    Exhibit 30 - Entry Granting Defendant's      321
                   4/16/21 Motion for New Trial
20
      Exhibit 31 - Motion for Nolle Prosequi       323
21
      Exhibit 32 - Entry - Nolle Prosequi          323
22
23
      (Exhibits attached electronically.)
24

1           THE VIDEOGRAPHER:  The following

2    deposition of Richard Horton is being taken on

3    December 19, 2024, at 77 North Front Street,

4    4th floor, Columbus, Ohio, in the case of Richard

5    Horton versus City of Columbus, et al., in the

6    United States District Court, Southern District of

7    Ohio, Eastern Division, Case No. 2:23-cv-3888.

8           The court reporter is Carolyn Burke,

9    and the videographer is Gregory Castetter.  This

10   deposition is being recorded by Spectrum Reporting

11   LLC.  We are on the record at 9:53 a.m.

12          Will counsel please announce their

13   presence.

14          MS. MARTINEZ:  Alyssa Martinez on

15   behalf of Plaintiff, Richard Horton.  And we're

16   appearing here in person today.

17          MR. EPSTEIN:  Aaron Epstein on behalf

18   of Brenda Walker and the City of Columbus, along

19   with Dexter Dorsey, Alana Tanoury, David

20   Dirisamer, and paralegal Douglas Girard, all in

21   person.

22

23

24

1                      - - - - -

2                  RICHARD H. HORTON

3    being first duly sworn, testifies and says as

4    follows:

5                  CROSS-EXAMINATION

6    BY MR. EPSTEIN:

7    Q.          Good morning, Mr. Horton.  My name is

8    Aaron Epstein, and as you heard, I'm here on

9    behalf of the Defendants, Brenda Walker and the

10   City of Columbus, for your deposition.  I'm going

11   to be asking you questions today.  Have you had

12   your deposition taken before?

13   A.          No, I have not.

14   Q.          And a deposition is different from

15   testifying in court.  I know you've testified in

16   court, but in a conference room setting like this,

17   you've never done this before?

18   A.          No, I have not.

19   Q.          Okay.  I'm going to start by laying out

20   some ground rules that are going to help this go

21   more smoothly.

22               As you can see, we have a court

23   reporter taking everything down, and it becomes

24   very difficult for her if you and I speak at the

1    same time.  So I'm going to ask, to the best of

2    your ability, even if you know where my question

3    is going, try to wait until I finish before you

4    begin giving your answer.  Okay?

5    A.          Okay.

6    Q.          And I will try to extend the same

7    courtesy to you.  I will let you finish your

8    answers before I begin to ask another question.

9              Another thing, it's very common in

10   conversation for us to communicate with head nods

11   or uh-huh.  Those are difficult to take down and

12   reflect in the transcript, so I would ask you to

13   try to remember to answer yes or no.  And if you

14   forget to do that, I may remind you.  Is that

15   okay?

16   A.          Yes, that seems okay.

17   Q.          Okay.  If I ask you a question that you

18   do not understand, please indicate that, ask me to

19   rephrase it, I will be happy to do that.  Okay?

20   A.          Okay.  For instance, like, "Could you

21   please rephrase"?

22   Q.          You can say, "Will you please

23   rephrase," or it's sufficient if you just say,

24   "I'm sorry, I don't understand."  Just anything to

1    communicate that you're not clear.  And here's the

2    reason why.  If I ask you a question and you

3    answer it and you don't indicate that you didn't

4    understand, I'm going to assume that you did.

5    A.        Uh-huh.

6    Q.        And I'm going to rely on your answer.

7    Would that be fair?

8    A.        I think I understand.

9    Q.        Okay.  Great.

10           We'll be here for a while today, so we

11   will take breaks at times.  If you need to take a

12   break, just please let me know.  We'll be happy to

13   accommodate that.  The only thing I ask is if I

14   have asked you a question, you answer the question

15   before we take the break.  Okay?

16   A.        I think I understand.

17   Q.        All right.  Is there any reason why you

18   would be unable to testify truthfully today?

19   A.        No, there would be no reason.

20   Q.        Are you on any medications that would

21   impair your ability to recall or understand?

22   A.        That's a good question.  No, I

23   don't -- I don't think that the medications that I

24   take will impair my -- my memory, no.

1    Q.          Do you have any mental illnesses that

2    would affect your ability to understand and answer

3    my questions?

4    A.          No, not at this time, I don't.  I don't

5    think so, no.  Just -- no, I don't think so.  I

6    think I'll be able to answer your questions

7    sufficiently.

8    Q.          You said not at this time.  Have you

9    had mental illnesses in the past?

10   A.          I haven't been properly diagnosed, so I

11   wouldn't be able to answer that question.

12   Q.          Okay.  That's fair.  Have you had

13   hallucinations, audio or visual hallucinations in

14   the past?

15   A.          Not that I can recall, no.

16   Q.          I think I neglected to ask you this.

17   Could you state your full legal name, please?

18   A.          Yes.  My name is Richard H. Horton.

19   Q.          And your current address?

20   A.          My current address is 1073 Urana

21   Avenue, Columbus, Ohio.

22   Q.          Do other people live at that address

23   with you?

24   A.          Yes.

1   Q.       Who?

2   A.       My wife currently lives with me on

3   1073.  Her name is Janette Horton.

4   Q.       And can you spell Janette's first name,

5   please?

6   A.       J-a-n-e-t-t-e.

7   Q.       Is it correct to say that you do not

8   have any children currently living in that

9   household with you?

10   A.       Yes, that would be correct.

11   Q.       What's your current telephone number?

12   A.       My current cell phone number is

13   614-619-9344.

14   Q.       Other than talking to your attorneys,

15   what did you do to prepare for this deposition

16   today?

17   A.       Just try to get a good night's sleep,

18   good breakfast.

19   Q.       Did you review any materials before you

20   came here today?

21   A.       Did I review any materials?  That's a

22   good question.  Yes.

23   Q.       What were those?

24   A.       So I -- I'm the type of person that

1    usually when I'm talking with my attorney, I take

2    notes.  So I definitely reviewed my notes.

3    Q.          We've taken some depositions of

4    witnesses in this case.  Have you read any of the

5    transcripts of those depositions?

6    A.          No.

7    Q.          You have not read Brenda Walker's

8    deposition testimony?

9    A.          No, I don't -- I don't -- no, I

10   haven't.

11   Q.          And we've also deposed Rhonda Curry

12   and -- have you read Rhonda Curry's deposition

13   testimony?

14   A.          No, I have not read Rhonda Curry's

15   deposition.

16   Q.          And we've deposed Kawanna Harris.  Have

17   you read her deposition?

18   A.          No, I have not.

19   Q.          Other than your attorneys, who have you

20   talked to about this lawsuit?

21   A.          I do not recall.  This has been a long,

22   hard process.  I don't -- I try to be pretty

23   private.  I don't know.  I don't recall.

24   Q.          Have you spoken with Kawanna Harris

1    about this lawsuit?

2    A.          Absolutely not.

3    Q.          Why do you say absolutely not?

4    A.          It doesn't seem like something I would

5    be -- that would be professional to discuss a

6    pending litigation with an ex-girlfriend.

7    Q.          Are you in communication with Kawanna

8    Harris?

9    A.          I am not.

10   Q.          When was the last time you talked to

11   her?

12   A.          I do not recall.  It's been that long.

13   Q.          Help me out with a pronunciation.

14   There's been a person identified in connection

15   with this case and the name is either LaKeon or

16   LaKeon.  Who is that?

17   A.          The correct way to pronounce LaKeon's

18   name is La-key-an.  LaKeon is -- he is my first

19   cousin.

20   Q.          His last name is Horton, too, as well;

21   is that correct?

22   A.          Yes, that's correct.

23   Q.          Have you spoken to him about this

24   lawsuit?

1    A.        I don't recall.

2    Q.        When was the last time you talked to

3    LaKeon?

4    A.        The last time I spoke with LaKeon,

5    maybe -- maybe -- I actually had a conversation

6    with LaKeon maybe -- it's been -- it's been a

7    while.  Maybe a month or two ago.

8    Q.        What did you talk about?

9    A.        I believe he was planning to move to

10   Cleveland.

11   Q.        Did he move to Cleveland?

12   A.        I'm not sure.

13   Q.        Would you be able to get in touch with

14   him if you needed to?

15   A.        Yes, I think that I would be able to

16   get in contact with him if I needed to.

17   Q.        Do you have a cell phone number for

18   him?

19   A.        Yes, I do.

20   Q.        Do you know an individual named Dwight

21   Dorsey?

22   A.        Yes, I do know Dwight Dorsey.

23   Q.        Who is Dwight Dorsey?

24   A.        Dwight Dorsey is my former supervisor

1  at my current place of employment.

2  Q.        And where is that?

3  A.        I work for a company named

4  DeBra-Kuempel.

5  Q.        Can you spell that?

6  A.        It's D-e-B-r-a-K-u-e-m-p-e-l.

7  Q.        What do you do there?

8  A.        I am a delivery driver/laborer.

9  Q.        All right.  We'll come back to that,

10 but in the meantime let's go back to Mr. Dorsey.

11 Have you spoken to him about this lawsuit?

12 A.        I have not spoken to Dwight Dorsey

13 about this lawsuit.

14 Q.        Did you have to take time off from work

15 today to be here?

16 A.        Yes, I did have to take time off.

17 Q.        Did you have to give an explanation for

18 why you were taking the time?

19 A.        No.  I told him it was personal

20 reasons.

21 Q.        And, finally, how many children do you

22 have?

23 A.        I have two children.

24 Q.        And what are their names?

1  A.          I have a son and a daughter.  My

2  daughter's name is Vantasia Williams, and my son's

3  name is Kobe Horton, H-o-r-t-o-n.

4  Q.          Can you spell Vantasia's first name,

5  please?

6  A.          V-a-n-t-a-s-i-a.

7  Q.          And how old are they?

8  A.          My son is 23.  And my daughter is

9  25 years of age.

10  Q.          Have you talked to them about this

11  lawsuit?

12  A.          I do not recall.

13  Q.          You are the Plaintiff in this lawsuit,

14  correct?  Do you understand what I mean when I say

15  the word "Plaintiff"?

16  A.          No.  Could you explain it to me?

17  Q.          Absolutely.  You understand that you're

18  here because there's a lawsuit, correct?

19  A.          I do understand that.

20  Q.          And you understand that you are the

21  person who brought the lawsuit, you are the person

22  suing; is that correct?

23  A.          I do understand that.

24  Q.          All right.  That makes you the

1  Plaintiff.  That's the term for that.  Okay.

2                    - - - - -

3            Thereupon, Exhibit 1 is marked for

4  purposes of identification.

5                    - - - - -

6  Q.          I'm handing you a document that I have

7  marked as Exhibit 1.  And I will represent to you

8  that --

9            MS. MARTINEZ:  Thank you.

10 Q.          -- this is the First Amended Complaint

11 that was filed in this lawsuit.  You can take a

12 minute to look it over if you need to.

13           MS. MARTINEZ:  Just for this one,

14 Counsel, if you ask him specific questions, will

15 you direct him to the part and just won't have him

16 review the whole --

17           MR. EPSTEIN:  I absolutely will.

18           MS. MARTINEZ:  -- thing.  Okay.

19 Q.          My only question at this point is going

20 to be, have you seen this document before?  Have

21 you seen this document before, Mr. Horton?

22 A.          No, this document does not look

23 familiar.

24 Q.          Have you seen any document similar to

1  that that you can recall?

2  A.          I can't recall.

3  Q.          Now, you understand that the source of

4  this entire lawsuit comes from a home invasion

5  robbery that occurred in October of 2004?  Do you

6  understand that?

7  A.          Yes, I understand that.

8  Q.          All right.  And you were tried as the

9  Defendant for committing that crime, correct?

10 A.          Yes, I was tried in 2004.

11 Q.          And you testified at that trial in your

12 own defense, correct?

13 A.          I testified in -- yes, because I didn't

14 commit the crime, so, yeah.

15 Q.          My question is, did you testify at that

16 trial?

17 A.          Yes, I testified at that trial because

18 I did not commit the crime.

19 Q.          Did you testify truthfully?

20 A.          I did testify truthfully at that trial.

21 Q.          And you were under oath when you gave

22 that testimony, correct?

23 A.          Yes, I remember just like in any other

24 proceeding they swore me in, so, yes --

1  Q.        Sure, yes.

2  A.        -- I was under oath.

3  Q.        Just like she swore you in this morning

4  the same way, correct?

5  A.        Yes.

6  Q.        Okay.  Since your trial, have you

7  looked at your trial testimony?

8  A.        Since my trial?  My trial was over

9  20 years ago, so that was a very long time, so

10  throughout that time period of between 2004 and

11  2024, have I looked at the trial transcripts?

12  Yes, I have.

13         MR. EPSTEIN:  Bear with me one minute.

14         THE VIDEOGRAPHER:  Mic, mic, mic.  Mic,

15  mic, mic.

16         MR. EPSTEIN:  Whoop.  I do that every

17  single time, every deposition.

18                    - - - - -

19         Thereupon, Exhibit 2 is marked for

20  purposes of identification.

21                    - - - - -

22  Q.        All right.  I am handing you what's

23  been marked as Exhibit 2, and I will represent to

24  you that this is the transcript of the

1    testimony --

2              MS. MARTINEZ:  Thank you.

3    Q.         -- from the trial.  I'm not going to

4    ask you to turn to it just yet, but if you're

5    interested, your testimony will begin on page 175.

6              My question now is, in the 20-some

7    years or however long since you gave the

8    testimony, and as you've looked at it over the

9    years or thought about it, were there any answers

10   that you gave that you would change?

11   A.         That's a very good question.  Seeing

12   that I was wrongly convicted and sentenced to

13   serve 23 years for a crime that I didn't commit,

14   and looking over the trial transcripts from

15   20 years ago, I believe that there's nothing in

16   there that I would change.  I was completely

17   truthful and I continue to stand by everything

18   that I said.

19   Q.         Was there any testimony that you gave

20   that was inaccurate?

21   A.         I do not recall.

22   Q.         Is it possible?

23   A.         I -- I do not recall.

24   Q.         The robbery occurred in October of

1   2004; is that your understanding?

2   A.          Is that my understanding?  I'm not sure

3   when the actual robbery occurred because I wasn't

4   there.

5   Q.          Well, I understand that, but you were

6   charged with the crime, so presumably they told

7   you what crime you were accused of, correct?

8   A.          They -- they did tell me what

9   time -- crime I was accused of, that is correct.

10  Q.          And did they tell you when the crime

11  occurred?

12  A.          They said it was October 9th, 2004.

13  Q.          And on October 9th, 2024, you were

14  living at 780 Reynolds Avenue in Columbus; is that

15  correct?

16  A.          No.  That is not correct.

17  Q.          That's not correct?

18  A.          No.

19  Q.          Where were you living on October 9th?

20  A.          I was living on -- well, first of all,

21  it was 20 years ago, so my memory is not crystal

22  clear, but in -- in 2004, I was paroled to a

23  Camden Avenue address.  I sometimes stayed at the

24  Reynolds Avenue address and I sometimes stayed at

1    the Grove City address that I talked about.  I

2    believe I talked about it somewhere throughout

3    these transcripts.

4    Q.          And -- and we'll talk about those.  The

5    Camden Avenue address, that was your aunt's house;

6    is that correct?

7    A.          Yes, that's correct.

8    Q.          And the Sonora Drive, that's where

9    Janette was living, correct?

10   A.          Man, that was a really long time ago,

11   but I believe that is correct.

12   Q.          Okay.  But in October 2004, you were

13   not living with Janette at Sonora Avenue yet,

14   correct?

15   A.          I do not recall.

16   Q.          Okay.  Let me direct your attention to

17   page 192 of the transcript.

18   A.          Give me one second.

19   Q.          Are you there?

20   A.          I am.

21   Q.          Okay.  Let me read for you.  Starting

22   on line 5.

23               "QUESTION:  During this time of

24   October 8th, October 9th, where were you living?

1          "ANSWER:  I was living at 780 Reynolds

2    Avenue.

3          "QUESTION:  And where was Janette

4    living?

5          "ANSWER:  2279 Sonora Drive, Grove

6    City, Columbus, Ohio."

7          Do you see that?

8    A.          I do see that.

9    Q.          Does that refresh your recollection of

10   where you were living on October 9th?

11   A.          No, it does not.

12   Q.          All right.  But you testified that you

13   were truthful at your trial, correct?

14   A.          Yes, that's correct.

15   Q.          And at your trial you testified that on

16   October 9th you were living at Reynolds Avenue,

17   correct?

18   A.          I testified -- this is -- this is just

19   one part.  I assume on somewhere in this paperwork

20   it's also written down where I said that I was

21   living with Janette and that I was staying -- I

22   was paroled to the Camden Avenue, so I kind of

23   moved around a little bit.

24   Q.          I understand.  But you were asked the

1  question here and this was the answer you gave,

2  correct?

3  A.          I've already answered that question.

4  Q.          What's your understanding of what the

5  crime was?

6  A.          My understanding?  My understanding of

7  what the crime was, was that someone broke into

8  these people's house, shot one of the victims in

9  the leg, and made off with $40, which is -- it was

10  just unthinkable.  It was a tragedy.

11  Q.          There were two -- I'm sorry.

12  A.          It was a tragedy.

13  Q.          The victims of the crime were Richard

14  McClanahan and Rhonda Curry, correct?

15  A.          I believe so.

16  Q.          Prior to that robbery, did you know

17  Richard McClanahan?

18  A.          I believe that -- I believe it says,

19  yes, I -- I did know Richard McClanahan.  The

20  neighborhood that we -- we -- we lived in is a

21  rather small neighborhood, so, yeah, I knew who he

22  was.  I know who he was.  I can say that with

23  confidence.

24  Q.          When you say the neighborhood, does

1   that neighborhood have a name?

2   A.          Yes, it does.  I believe it's called

3   the Milo-Grogan area.

4   Q.          And how long had you lived in that

5   area?

6   A.          Oh, that was -- that was a really long

7   time ago.  I believe I moved to the Milo --

8   Milo-Grogan area around 1989.

9   Q.          So during that time period between 1989

10  and 2004, you knew Mr. McClanahan, correct?

11              MS. MARTINEZ:  Object to the form.

12  Q.          Let me ask it this way:  During that

13  time period, did you know who Mr. McClanahan was?

14  A.          I'm not sure how to answer the

15  question.  I thought I already answered that

16  question.

17  Q.          Okay.  Well, what I want to get to is,

18  you saw him around the neighborhood, correct?

19  A.          Yes, I've seen him, yes.

20  Q.          Multiple times?

21  A.          Yes.

22  Q.          And you would recognize him when you

23  saw him; is that correct?

24  A.          Yes.  Yes, I would recognize

1  Mr. McClanahan.

2  Q.        Did you know him by name?

3  A.        I believe they used to call him Rick.

4  Q.        So that's how you knew him as that guy

5  is Rick?

6  A.        Yes.  Mr. McClanahan was -- may -- may

7  his soul rest in peace, he was a rather tall

8  gentleman.  He was very distinctive, yeah.  Rick.

9  Q.        Did you know his last name at the time?

10  A.        I do not recall.

11  Q.        Did you know what he did for a living?

12  A.        No, I don't recall.

13  Q.        Did you know where he lived?

14  A.        No.  I don't -- I don't recall.

15  Q.        Do you know Tracy McClanahan?

16  A.        That name -- do I know Tracy

17  McClanahan?  That name sounds familiar, but I

18  couldn't tell you.  I couldn't describe her to

19  you, what she looks like.  As I said, I was in

20  prison for 16 years.  And I -- I couldn't pick her

21  out in a crowd of people.

22  Q.        Can you tell me how you know her?

23  A.        No.  No, I do not recall how I know

24  her.  I'm actually drawing a blank.

1  Q.        At your trial you testified that you

2  bought a car from Tracy McClanahan.  Do you

3  remember that?

4  A.        I'm not sure at this point.  The trial

5  was so long ago.  I'm not exactly who -- I'm not

6  exactly sure who I bought the car off of.

7  Q.        Do you know the car I'm referring to?

8  A.        Yes.

9  Q.        What car?

10  A.        It was a -- it was a -- a Cutlass.  I

11  remember it distinctly because I remember the

12  color of it.  It was kind of like a -- like a

13  champagne-colored Cutlass.  It wasn't -- it wasn't

14  a great car.  It wasn't too fancy of a car, but it

15  was -- I distinctly remember the color of the car.

16  Q.        When did you buy it?

17  A.        What year did I buy it?

18  Q.        Yes.

19  A.        Oh, I -- I -- just -- my memory is not

20  as sharp as it -- as it once was.  Just, you know,

21  from being in prison for over 16 years for a crime

22  I didn't commit, my -- the PTSD, it kind of

23  affects my memory, so it -- I -- I do not recall

24  exactly what year it was when I bought a car.

1    That was -- that was over 20 years ago.

2    Q.          Fair enough.  Have you been diagnosed

3    with PTSD?

4    A.          By a professional?

5    Q.          Yes.

6    A.          No, I have not, but I've done a little

7    research and I believe that I exude some of the

8    same symptoms as -- some of the same symptoms as

9    other individuals with this ailment.

10   Q.          Okay.  We'll come back to that, but I

11   don't want to get off track.  You testified at the

12   trial that you bought the car from Tracy

13   McClanahan.  And your testimony today is you don't

14   remember that?

15   A.          I do not recall.

16   Q.          Did Rick McClanahan have any

17   involvement in that sale or transaction?

18   A.          Like I said, I -- I do not remember

19   exactly who I bought the car from, but I remember

20   one of the stipulations was that he was going to

21   do some work on the car to actually get it -- I

22   can't remember exactly what he was doing to it.

23   It was -- it was over 20 years ago.  But he was

24   supposed to do some work on the car, like fix

1    something.

2    Q.          Rick McClanahan was going to do some

3    work on it?

4    A.          Yes, sir.

5    Q.          Did you take the car to Mr. McClanahan?

6    A.          I -- I can't -- I can't remember that.

7    That's -- that's -- that was a long time ago.

8    Sorry.

9    Q.          Did Mr. McClanahan do the work?

10   A.          I believe he did, but I'm not

11   100 percent sure.  That was a long time ago.

12   Q.          I can't remember if I asked you this.

13   Did you know where Mr. McClanahan lived?

14   A.          I'm -- I'm not sure if I can remember.

15   I don't recall.

16   Q.          Did you ever go to Mr. McClanahan's

17   house?

18   A.          I don't recall.

19   Q.          Was Mr. McClanahan married?

20               MS. MARTINEZ:  Objection.  Foundation.

21               You can answer.

22   A.          Let me think for a second.  I knew

23   Mr. McClanahan, but I did not know his -- I didn't

24   know a lot about his -- his personal life, so I

1  don't recall if he was married or not.

2  Q.        Did you -- back in this period that

3  we're talking about, in the early '90s before the

4  robbery, did you know Rhonda Curry on sight?

5  A.        Back -- back then I do remember

6  Ms. Curry, yeah.  They were kind of like two peas

7  in a pod.

8  Q.        What do you mean by that?

9  A.        Usually when you would -- when you

10 would see one, you would see the other.

11 They're -- I believe, I'm not 100 percent sure,

12 but I believe she was a taller lady also.

13 Q.        Did you know her name?

14 A.        I do not recall if I knew her name, if

15 I knew her on a first name basis.  That's a good

16 question.  I'm not sure about that.

17 Q.        But you would be able to recognize her

18 if you saw her on the street back then?

19 A.        Yes.

20 Q.        And you did often see her on the

21 street?

22          MS. MARTINEZ:  Objection.  Form.

23 A.        I'm not sure if I was -- I'm not -- I'm

24 not -- I'm not sure about often.  I've seen her.

1   I do not recall.

2   Q.          But back during that time period you

3   saw her often enough that you knew her and

4   recognized her when you saw her; is that correct?

5   A.          I would say -- I would answer that

6   question that I -- I would be able to recognize

7   her back then.  She was a taller lady.  Kind of

8   stood out.

9   Q.          Did you ever see Rick McClanahan buy

10  drugs?

11  A.          I do not recall.

12  Q.          Did you ever sell Rick McClanahan

13  drugs?

14  A.          That was so long ago, I honestly don't

15  recall.

16  Q.          You did sell drugs back in that time

17  period, correct?

18              MS. MARTINEZ:  Objection.  Form.

19  A.          Back in those days, I was young and

20  dumb and really just trying to figure out my way.

21  Q.          Okay.  My question was --

22  A.          I didn't --

23  Q.          -- were you selling drugs?

24  A.          I didn't really have any positive role

1   models in my life at that time and I made some

2   mistakes, so I -- I did what I -- what I thought

3   was the cool thing to do, and I...

4   Q.      Is that a yes, you were selling drugs?

5   A.      I -- yeah, I made some mistakes.  Yeah,

6   that's a yes.

7   Q.      When did you start using drugs?

8          MS. MARTINEZ:  Objection.  Form.

9          You can answer.

10   A.      I've never really been a -- I would

11   never really describe myself as a drug user, so I

12   do not recall.

13   Q.      Well, let's start simple.  When you

14   were in high school or junior high, did you drink

15   alcohol?

16   A.      When I was -- yes.

17   Q.      How often?

18   A.      Not very often.  I was a -- I went to

19   high school in the '90s.  I graduated in 1995.  I

20   was an athlete.  I took pride in what I put in my

21   body and -- yeah.  So I would say not often.

22   Q.      When you were in junior high and high

23   school, did you smoke marijuana?

24   A.      Like I said, back in the -- in the

1    '90s, I would have -- yes, I would have definitely

2    experimented with marijuana in the '90s.

3    Q.         How often did you smoke marijuana when

4    you were in junior or high school?

5    A.         I would say not often.  But it was a

6    long time ago.  It's kind of hard for me to

7    remember --

8    Q.         Weekly?

9    A.         -- every single incident.

10   Q.         Weekly?

11   A.         Probably not.

12   Q.         Monthly?

13   A.         I'm not 100 percent sure.

14   Q.         When you were in high school or junior

15   high, did you use cocaine?

16   A.         When I was in high -- absolutely not.

17   Q.         Have you ever used cocaine?

18   A.         Have I ever used cocaine?  Yes.

19   Q.         When did you start using cocaine?

20   A.         I never actually started.  I kind of

21   experimented maybe sometime in the '90s.  It was

22   wild times.

23   Q.         What do you mean experimented?

24   A.         Like, experimented back in the '90s, I

1    would just kind of see -- see -- you know, it was

2    a popular drug in the '90s, just kind of see if I

3    liked it, and I don't recall liking it.

4    Q.        So is it your testimony that you tried

5    it only once or twice, or is it your testimony you

6    tried it more than that?

7    A.        I don't recall.

8    Q.        Before we follow that up, I need to ask

9    you, where did you go to high school?

10    A.        I went to high school on Bethel Road.

11    It's the -- the school is called Centennial High

12    School.

13    Q.        And when did you graduate?

14    A.        I graduated in the year 1995.

15    Q.        And while you were in high school, did

16    you have any nicknames?

17    A.        That was a really long time ago.  I did

18    have some -- a few different nicknames.

19    Q.        What were they?

20    A.        Back in high school I was a pretty

21    athletic young man, and I could -- I could jump

22    pretty high.  I can't jump high at all now.  They

23    used to call me the UPS man, because I could jump

24    pretty high.  That was before we really -- so,

1  just -- I remember -- I remember that nickname.

2  Q.        What about Richey Rich?

3  A.        Well, my first name is Richard, so

4  that's kind of been one of my nicknames my whole

5  life, whether I liked it or not, whether I was

6  rich or poor.

7  Q.        Did you have any other nicknames at any

8  time?

9  A.        I'm sure I did, but it, you know -- can

10  I remember all of the nicknames from my whole,

11  like, childhood into adulthood?  At this point, I

12  cannot.

13  Q.        Was Adidas boy one of your nicknames?

14  A.        No, I would never -- just being a black

15  man, I would never let nobody call me -- I would

16  never accept anybody calling me boy.

17  Q.        What about Adidas man?

18  A.        Maybe.  Maybe.

19  Q.        Do you recall anybody calling you the

20  nickname Adidas man?

21  A.        Yeah.

22  Q.        So that was your nickname?

23  A.        No.  I -- it might -- it might have

24  been one of the nicknames.  I had a lot of

1    different nicknames.  I was a pretty popular guy.

2    Good with the ladies.  Easy on the eyes.  So I

3    can't say, you know, exactly what each person and

4    each different clique or circle called me, but I

5    definitely remember that name.

6    Q.        You do remember that name?

7    A.        Yeah.

8    Q.        And you do remember that people

9    referred to you that way?

10    A.        Some people, I do remember.  Some

11    people.

12    Q.        Can you tell me who?

13    A.        No, I cannot.  I'm sorry.  I do not

14    recall who gave me a nickname in the '90s.

15    Q.        Was this nickname while you were still

16    in high school or after you graduated or both?

17    A.        I would venture to say that I'm not

18    100 percent sure, but I would assume it was around

19    high school, not after high school.

20    Q.        You were a basketball player in high

21    school, right?

22    A.        Yes, I was.

23    Q.        And I've always assumed that the Adidas

24    man nickname had something to do with you playing

1   basketball.  Is that a correct assumption?

2   A.          I'm not sure who -- who actually came

3   up, how it fit, but Adidas is a clothing brand, so

4   I'm -- I don't think it was -- had a lot to do

5   with sports.  I think it had more to do with the

6   clothing.

7   Q.          That's fair.  I think of it more in

8   connection with the shoes.  Did you wear Adidas

9   apparel?

10  A.          In high school?

11  Q.          Yes.

12  A.          I'm -- yes, I'm pretty sure I did.

13  Q.          I mean, was that sort of your look or

14  your image?

15  A.          The brand Adidas is a pretty affordable

16  brand and I grew up kind of poor, so I -- I had a

17  few pieces.  I assume that I had a few pieces, but

18  it wasn't like my whole wardrobe.

19  Q.          But is it fair to say you had enough

20  that people might associate you with Adidas

21  apparel?

22              MS. MARTINEZ:  Objection.  Form.

23              You can answer.

24  A.          Yeah, I think that's a fair assessment.

1   Q.          During the course of this litigation,

2   you've had to fill out some paperwork that your

3   lawyers have given you, correct?

4   A.          That's correct.

5   Q.          Do you remember that we sent questions

6   asking for information, your lawyers would give

7   that to you, and you would provide responses to

8   that?  Do you remember going through that

9   exercise?

10          MS. MARTINEZ:  Objection.  Form.

11  A.          This process has been long and drawn

12  out and at times difficult.  And I know I -- yes,

13  I filed out some paperwork.

14                    - - - - -

15          Thereupon, Exhibit 3 is marked for

16  purposes of identification.

17                    - - - - -

18  Q.          I'm handing you what I've marked as

19  Deposition Exhibit 3.

20  A.          Thank you.

21  Q.          You will see that it is captioned

22  Plaintiff's Responses to Defendants' First Set of

23  Discovery Requests.  Do you recognize this

24  document?

1   A.        I'm sorry.  I don't recognize this

2   document.

3   Q.        That's okay.  Do you see that they

4   are -- that the document is asking for information

5   and there are answers being provided?

6   A.        No, I don't see that.  What page is --

7   Q.        Okay.  Let --

8   A.        -- is that part --

9   Q.        Let me --

10   A.        -- of it asking?

11   Q.        Let me give you an example.  So, for

12   example, turn to page 10.

13   A.        Okay.

14   Q.        All right.  And do you see a bold

15   heading that says Interrogatory 8?

16   A.        Yes, I do.

17   Q.        Okay.  I will represent to you,

18   "interrogatory" is just the legal term for

19   question.

20   A.        Oh, okay.

21   Q.        So this is Question No. 8.

22   A.        Okay.

23   Q.        And it says:  Identify the addresses of

24   your residences during the time period of 1990 to

1   October 9th of 2004.

2              Okay?  Do you see that?

3   A.         I see it.

4   Q.         All right.  So this is us presenting a

5   question to you.  And then there's -- then in the

6   first paragraph there's some legal information.

7   And then in the second paragraph there is an

8   answer:  Without waiving objection, Plaintiff

9   responds that in 2004, he lived at 780 Reynolds

10  Avenue, Columbus, Ohio 43201, and 893 Camden

11  Avenue, Columbus, Ohio 43201.  And then it goes on

12  with some additional information.

13             Do you see that?

14  A.         I do see that.

15  Q.         Okay.  So this document is asking

16  questions and providing answers, right?

17  A.         Yes.

18  Q.         Okay.  Did you provide the information

19  to your lawyers to answer these questions?

20             MS. MARTINEZ:  You can answer that

21  question.

22  A.         I'm not sure if I understand the

23  question.

24  Q.         Were you ever shown these questions and

1    asked to answer them?

2    A.        Yes.

3    Q.        And did you give truthful answers?

4    A.        Yes.

5    Q.        All right.  Can you turn to page 4?

6    Now, the section on page 4, we're not in the

7    interrogatories anymore, these are called

8    admissions.  They're essentially yes or no

9    questions.  And if you'll turn to No. 6, the

10   question is:  Admit that your nickname has been

11   Adidas boy at some point in your life.

12            And the answer was you denied

13   Plaintiff's nickname was ever Adidas boy.

14            Do you see that?

15   A.        I see it.

16   Q.        Is that a correct answer?

17   A.        Yes, I believe that's a correct answer.

18   Q.        And is your objection to that being

19   your nickname the fact that it says Adidas boy?

20            MS. MARTINEZ:  Objection.  Form.

21            You can answer.

22   A.        Yes.

23   Q.        So if -- if the question was admit that

24   your nickname has been Adidas man, would you

1   answer yes?

2   A.          You -- are you asking me -- could

3   you -- could you state the question one more time?

4   I'm sorry.

5   Q.          Yeah.  Sure.  I'm saying if instead of

6   asking whether your nickname had ever been Adidas

7   boy, whether your nickname had ever been Adidas

8   man, would you have said yes, that has been my

9   nickname at some point?

10  A.          Yes.

11  Q.          Have you ever known anyone else to have

12  the nickname Adidas boy?

13  A.          I do not recall at this time.  That

14  was -- are you -- are you saying throughout my

15  whole life or are you saying during high school?

16  Because I'm -- I'm not sure how to answer that

17  question.  That's a really open-ended question.

18  Could you be --

19  Q.          That's fair.  And --

20  A.          Could you be more specific?

21  Q.          Well, it is an open-ended question.  My

22  question is, have you ever known anyone with the

23  nickname Adidas boy?

24  A.          I do not recall.

1  Q.          And specifically in high school, did

2  you ever know anyone with the nickname Adidas boy?

3  A.          I'm so sorry, man.  I don't recall.

4  That was -- that was a long time ago.

5  Q.          Okay.  All right.  I want to double

6  back now to a topic we started on and didn't go

7  into much depth and that is selling drugs.  You

8  were selling drugs at one point in time, correct?

9  A.          I made some mistakes in my life.

10 Q.          Is that --

11 A.          Yes.

12 Q.          -- a yes?  Is that a yes?

13 A.          Yes.

14 Q.          What drugs were you selling?

15 A.          Let me make sure I answer this question

16 truthfully.  I've sold marijuana, which is legal

17 now.  I've sold crack cocaine.

18 Q.          Did you sell powdered cocaine?

19 A.          I do not recall.

20 Q.          And just to be clear, marijuana was not

21 legal at the time you were selling it, correct?

22              MS. MARTINEZ:  Objection.  Foundation.

23 A.          Well, all this stuff happened, you

24 know, at earlier stages in my life when I was

1    young and dumb and making a lot of mistakes, so

2    this had to be before the year 2004, and I -- I do

3    not -- no, it was not legal before the year 2004.

4    Q.          When did you start selling drugs?

5    A.          It was -- it was around the time

6    period my mother passed away in the year 19 --

7    2 -- in the year 19 -- I do not recall.  It was

8    around the time when my mother passed away.  I was

9    trying to provide for my family.  Like, I didn't

10   have a father growing up, so I was trying to

11   provide for the family the only way I knew how.  I

12   didn't have a lot of role models in my life to

13   say, you know, to suggest, you know, go to school,

14   learn a trade.  And just being in the neighborhood

15   that I lived from, it just seemed like selling

16   drugs was the only route to go.

17   Q.          What did your mother die of?

18   A.          My mother, she passed away from heart

19   disease.

20   Q.          Was -- was she ill for a long period of

21   time or was it sudden?

22   A.          She -- she was ill for a while.

23   Q.          What did she do for a living before she

24   died?

1    A.        She was -- she was -- she worked at a

2    packaging plant.  Yeah.

3    Q.        And how old were you when she died?

4    A.        I was -- I believe I was 20 years old.

5    Just it was so long ago and just going through all

6    the trauma of being locked up in prison for

7    16 years for a crime I didn't commit, it's -- it's

8    almost embarrassing, but I just -- I don't know

9    the exact date and year.

10    Q.        But is it fair to say that you

11    were -- you had already graduated from high school

12    before she died?

13    A.        Yes.

14    Q.        What did you do when you graduated high

15    school for employment?

16    A.        You know what, that was -- that was a

17    real long time ago.  My first job out of high

18    school, at this time I don't recall.  I don't

19    recall.  A job I had in 1995?  I'm not sure if I

20    remember.

21    Q.        Well, let's -- let's try this.  In

22    roughly 2001, you were incarcerated in West

23    Virginia, correct?

24    A.        That's correct.

1    Q.          Okay.  Between the time you graduated

2    high school and the time that you were

3    incarcerated in West Virginia, can you recall any

4    employment that you had?

5    A.          Between -- yes, I can recall.

6    Q.          What can you tell me?

7    A.          I -- I worked as a roofer.  I worked

8    fast food.  I worked in the service industry.  I

9    had -- I had -- I had a couple of different jobs

10   between -- between 1995 and 2001.  A couple

11   different jobs, ventures.

12   Q.          Tell me about the roofing job.  Who did

13   you work for?

14   A.          I worked for a company named Urban

15   Roofing.  It was -- it was -- it was a nice job.

16   Decent money.  A little hard on the knees.  But I

17   can remember just -- just -- just having that

18   feeling of being part of a crew and, you know, at

19   the end of the day having a certain sense of

20   accomplishment, you know, putting a new -- taking

21   a roof off the house and putting a new roof on the

22   house.  And, you know, a couple of satisfied

23   customers along the way because we weren't

24   the burst -- we weren't the best roofing crew in

1    Columbus, Ohio, but we did pretty good work.  I

2    like to think that we made a difference.

3    Q.          Why was it hard on your knees?

4    A.          Just, you know, doing -- replacing the

5    roof and putting on the new shingles, you do a lot

6    of bending over and squatting.  And, you know,

7    taking stuff up and down the ladder can be -- can

8    be difficult on the body, especially the knees.

9               I had a leaking -- I had a leak in my

10   roof a couple of weeks ago, and, you know, now

11   that I'm 48 years of age, I wouldn't dare get on

12   that roof.

13   Q.          How long did you do that -- strike

14   that.

15              How long did you do that job for Urban

16   Roofing?

17   A.          I -- I -- I do not recall at this time.

18   It was -- it was a couple of years.

19   Q.          Why did you leave that job?

20   A.          The company moved to Florida.

21   They -- I believe that's why.  And I didn't want

22   to move to Florida.

23   Q.          Did you do any other kind of home

24   renovation, home repair work, during that time?

1    A.          I don't -- I don't recall.

2    Q.          Were you selling drugs at the same time

3    that you were working for Urban Roofing?

4    A.          No.  It was a -- it was a pretty

5    labor-intensive job.

6    Q.          So it is your testimony that you

7    started selling drugs after you lost the Urban

8    Roofing job?

9    A.          I do not recall.

10   Q.          And is it your testimony that you

11   stopped selling -- excuse me.

12              Is it your testimony that you started

13   selling drugs after your mother died?

14   A.          That's a good question.  I -- I'm not

15   exactly sure.  I do -- I do not recall exactly

16   when.  I don't have a specific date and time on

17   this day.  I just -- it's kind of all a blur.

18   That was -- that was my former life and I really

19   try hard to just forget about those times, and

20   you're asking me to remember specific dates and

21   times.  That's not the person who I am today.

22   Q.          How did you get started selling drugs?

23   A.          I believe I already answered that

24   question.

1    Q.          No, I don't believe you have.  I mean,

2    do you -- you have to get the drugs from

3    somewhere.  How do you -- how does one become a

4    drug dealer?

5              MS. MARTINEZ:  Objection.  Form.

6              You can answer.

7    A.          I don't recall.  It's, you know, it

8    was -- it was everywhere, so it wasn't really

9    particularly hard, you know, when you're coming

10   from the environment where I'm coming from, it

11   wasn't particularly hard to allocate, you know,

12   drugs to sell or to use.  You know, growing up in

13   the Black and Brown community, it's -- it was

14   everywhere.

15   Q.          Did you have a crew that you sold with?

16             MS. MARTINEZ:  Objection.  Form.

17             You can answer.

18   A.          I -- I don't recall.

19   Q.          Do you recall any of the people that

20   you sold drugs with?

21   A.          That's a good question.  Like I said,

22   that -- that was a part of my life that I really

23   tried over the years to try and forget, so I don't

24   recall.  That was a long time ago.

1    Q.          Do you recall the names of any of the
2    people you bought drugs from?
3    A.          That's -- that's another real good
4    question.  No, I don't recall.  It was mostly a
5    nickname basis like Jim.  I don't recall.
6    Q.          And I apologize if I asked you this
7    before.  I don't recall.  Did you sell drugs to
8    Rick McClanahan?
9    A.          That's a good question.  I -- I knew he
10   used drugs.  That's a good question.  I don't
11   recall.  It was so long ago.
12   Q.          How did you know he used drugs?
13   A.          Just by the crowd that he kept.
14   Q.          Who was in the crowd that he kept?
15   A.          Drug users.
16   Q.          Can you tell me their names?
17   A.          At this time, I -- I can't remember
18   specific names from -- from over 20 years ago.
19   These were not my friends or my associates, you
20   know.
21   Q.          Did you ever sell drugs to Rhonda
22   Curry?
23   A.          I can't recall.
24   Q.          Did you ever have a dispute with Rick

1    McClanahan about some drugs you sold him?

2    A.          I don't recall there being any bad

3    blood between me and Mr. McClanahan.

4    Q.          I believe you testified that you have

5    not read Rhonda Curry's deposition; is that

6    correct?

7    A.          Yes, that's correct.

8    Q.          All right.  I will represent to you

9    that in her deposition she testified that you sold

10   drugs to her and to Rick McClanahan.  Do you

11   dispute that?

12   A.          I don't dispute it.  I don't have a

13   recollection of it, I do not.  I do not recall.

14   I'm not sure what she might have said or what she

15   might have accused me of.

16              I don't know what this has to do with

17   me being wrongfully incarcerated for 16 years for

18   a robbery that I didn't commit.  You know, I'm not

19   sure how to even answer that question.

20   Q.          At any time were you affiliated with a

21   gang?

22              MS. MARTINEZ:  Objection to form.

23              You can answer.

24   A.          No, I was not affiliated with a gang.

1   Q.          All right.  I'm going to ask you a

2   couple of names.  I'd like to tell -- I'd like you

3   to tell me who they are, please.

4               Tor Hill?

5   A.          I have no recollection of that name.

6   Q.          Kyle Ramsey?

7   A.          Kyle Ramsey, I do know who that is --

8   Q.          Who is that?

9   A.          -- who that was.

10  Q.          Mr. Ramsey is deceased?

11  A.          Mr. Ramsey is deceased.

12  Q.          Who is Kyle -- who was Kyle Ramsey?

13  A.          Kyle Ramsey was a good father, a

14  good -- a good friend.  He just tried to help

15  everyone he could.  And he -- and he met his -- he

16  was gone too soon.

17  Q.          To your knowledge, did Kyle Ramsey sell

18  drugs?

19  A.          To my knowledge, Kyle Ramsey did

20  whatever he had to do.  It's not really my

21  business.

22  Q.          Can you give me an answer, yes or no,

23  please?  To your knowledge, did Kyle Ramsey sell

24  drugs?

```
1    A.         Yes.

2    Q.         Do you know what drugs he sold?

3    A.         No.

4    Q.         Are you aware of any conflict between

5    Kyle Ramsey and Rick McClanahan?

6    A.         No, I am not.

7    Q.         When did Kyle Ramsey die?

8    A.         I believe Kyle Ramsey passed away while

9    I was in prison, while I was in prison against my

10   will, while I was wrongly incarcerated, so I

11   believe it was during the first two years.  I

12   remember it being a particularly hard thing on a

13   lot of people from the neighborhood.  I believe it

14   was 2007.  And it always hurt me because I wished

15   that I could have been there to help him and help

16   his family in some way.

17   Q.         Was Kyle Ramsey a friend of yours?

18   A.         At one point we were pretty good

19   friends.

20   Q.         At what point was that?

21   A.         It was -- it was -- it was during the

22   '90s.  I --

23   Q.         Did you --

24   A.         -- distinctly remember him having a
```

1    laugh that would light up the whole room, man, you

2    know.  He wasn't a perfect individual, but he was

3    going through something.

4    Q.          Did you have a falling out with

5    Mr. Ramsey?

6    A.          Me, myself?  No.

7    Q.          What do you know about the

8    circumstances of his death?

9    A.          From what I can remember, from what I

10   read in the newspaper, the local newspaper,

11   he -- he got shot.  He was shot.  Somebody tried

12   to rob him or something like that.  I'm not

13   particularly sure what happened.  Like I said, I

14   was in prison at the time and...

15   Q.          Do you know an individual named Derrick

16   Greathouse?

17   A.          I do know that name.

18   Q.          Who is Derrick Greathouse?

19   A.          He was also somebody from the

20   neighborhood.

21   Q.          Did Derrick Greathouse sell drugs?

22   A.          I don't -- I don't recall that.

23   Q.          Was he a friend of yours?

24   A.          He was a -- he's a former associate,

1    somebody who I knew back in the day.  I wouldn't

2    describe him as a friend.

3    Q.          What do you mean when you describe him

4    as an associate?

5    A.          Somebody that I knew back before the

6    year 2004.  You know, when I came home in 2004, I

7    decided to change my life, so I didn't want to

8    associate with certain people.  So that's the

9    definition of associate.  He wasn't a friend.  He

10   wasn't somebody that I would invite over for

11   family dinner.

12   Q.          Have you ever been dependent on drugs?

13               MS. MARTINEZ:  Objection.  Form.

14               You can answer.

15   A.          Dependent on drugs?  No, I have not.

16   Q.          Did you ever sell drugs to finance your

17   own drug habit?

18   A.          No, I did not.

19               THE WITNESS:  Is it time for a break

20   yet?

21               MR. EPSTEIN:  Would you like a break?

22   We can take a break.

23               THE WITNESS:  We get a break every

24   hour, right?  And you want me --

1          MR. EPSTEIN:  Not necessarily every

2    hour, but if you would like a break --

3          THE WITNESS:  Yeah.

4          MR. EPSTEIN:  -- we'll take -- we'll

5    take 10 or 15 minutes.

6          THE WITNESS:  But you did want me to

7    make sure that I answered the question first,

8    right?  So I --

9          MR. EPSTEIN:  You did answer it and I

10   appreciate that.

11         THE WITNESS:  I wanted to make sure I

12   slipped that in right after.

13         MR. EPSTEIN:  I appreciate that.

14         THE WITNESS:  No sense in being rude,

15   right?

16         MR. EPSTEIN:  That's right.

17         THE VIDEOGRAPHER:  We are off the

18   record.  The time is 11:00.

19         (A short recess is taken.)

20         THE VIDEOGRAPHER:  This marks the

21   beginning of Media No. 2.  We are back on the

22   record.  The time is 11:15.

23   BY MR. EPSTEIN:

24   Q.        Mr. Horton, is it fair to say that

1   you've had a number of attorneys who've

2   represented you during the course of your criminal

3   proceedings?

4   A.          Yeah, I think that's a fair assessment.

5   Q.          And those attorneys were filing

6   pleadings in court on your behalf while you were

7   incarcerated, correct?

8   A.          Yes, that's correct.

9   Q.          When they would file those, did they

10  send you copies so you could see what you -- what

11  they were doing?

12  A.          Yes.  Yes, they would.

13  Q.          Because you wanted to keep up on your

14  case, right?

15  A.          I absolutely wanted to keep up on my

16  case.  There would be some instances where I would

17  have to -- you know, you got these shady appeal

18  lawyers and you would have to demand copies of the

19  paperwork or -- you know, I was pretty involved in

20  my case.  In some instances I would like to see

21  the paperwork before it was filed.  I must admit,

22  you know, being wrongfully incarcerated, I

23  really -- I had to be a handful with some of my

24  former attorneys.

1    Q.         So you would read the paperwork

2    sometimes before it was filed and definitely after

3    it was filed, correct?

4    A.         Yes.

5                    - - - - -

6               Thereupon, Exhibit 4 is marked for

7    purposes of identification.

8                    - - - - -

9    Q.         I'm going to hand you what I've marked

10   as Exhibit 4.  It's a document captioned

11   Defendant's Petition for Post-Conviction Relief

12   Pursuant to R.C. 2953.21.  Do you recognize this

13   document?

14   A.         Yes, I do recognize this.

15   Q.         This is a document that was filed on

16   your behalf by Brian Howe.  If you look at the

17   very last page, you'll see an electronic

18   signature.  Do you see Mr. Howe's name?

19   A.         Yes, I see it.

20   Q.         And he represents that he's from

21   The Ohio Innocence Project?

22   A.         Yes, that's correct.

23   Q.         Was Brian Howe one of your attorneys?

24   A.         Yes, Brian Howe from The Ohio Innocence

1  Project, he was one of my attorneys.

2  Q.          And this is a pleading that Mr. Howe

3  filed, asking for post-conviction relief, correct?

4  A.          It looks like it's -- yeah, it's a

5  petition for post-conviction relief, yeah.

6  Q.          Do you understand what post-conviction

7  relief means?

8  A.          I believe it means relief after I was

9  convicted.

10  Q.          Is this the sort of document that you

11  would have reviewed either before or after it was

12  filed?

13  A.          This -- this is an example of

14  something -- there was a lot of paperwork over

15  16 years.  This is -- yes, this is a pretty

16  accurate example.

17  Q.          All right.  Could you turn to page 15,

18  please.  Now, I haven't been using Bates numbers,

19  but this document begins at Horton 001190 and

20  page 15 is Horton 001204.  Are you with me on

21  page 15?

22  A.          I am.

23  Q.          All right.  I'd like to direct your

24  attention to the bottom of the page.  There's a

1    footnote 3, and it says, quote, Adidas boy was

2    Horton's nickname.

3            Do you see that?

4    A.       I see it.

5    Q.       So Mr. Howe told the court that your

6    nickname was Adidas boy, correct?

7    A.       That's what it says.  Is that what it

8    says right here, that Mr. Howe told them that?

9    I'm not --

10   Q.       Well, this is the pleading that

11   Mr. Howe wrote, correct?

12           MS. MARTINEZ:  Objection.  Foundation.

13   A.       I see -- there's no way for me to know

14   who wrote this.

15   Q.       Well, is it fair to assume that

16   somebody --

17   A.       From The Ohio Innocence Project?

18   Q.       -- from The Ohio Innocence Project

19   wrote --

20   A.       Oh, I'm sorry.

21   Q.       -- this?

22   A.       I'm sorry.  Yes, this looks like

23   paperwork filed by The Ohio Innocence Project.

24   Q.       And it was filed on your behalf,

1   correct?

2   A.          Yes.

3   Q.          And it was signed by Mr. Howe?

4   A.          Yes.

5   Q.          And he represented or the author of

6   this represented that Adidas boy was Horton's

7   nickname, correct?

8   A.          That's what it looks like here.

9   Q.          Did you ever reach out to Mr. Horton or

10  anyone else at The Innocence Project to tell them,

11  no, in fact, it was Adidas man?

12              MS. MARTINEZ:  Objection.  Just now you

13  said Mr. Horton.  I think you mean -- do you mean

14  Mr. Howe?

15              MR. EPSTEIN:  I'm sorry.  Did I

16  misspeak?

17              MS. MARTINEZ:  I think so.

18  BY MR. EPSTEIN:

19  Q.          Did you -- did you reach out to

20  Mr. Howe or anyone else at The Innocence Project

21  to tell them that it was Adidas man, not Adidas

22  boy?

23  A.          I do not recall.  When you're working

24  with -- when you're -- when you're fortunate

1    enough to have somebody like The Ohio Innocence

2    Project take on your case, you know, you really

3    try not to get into the way, you know.  So I'm not

4    sure if I would have tried to correct something

5    so -- something like this.

6    Q.          Well, that's a fair point, but you

7    testified earlier that you wouldn't let anyone

8    call you Adidas boy because that resonated badly

9    with you as a Black man, correct?

10   A.          Yes.  And it still does.

11   Q.          Okay.  But you didn't say anything

12   about this?

13   A.          Yeah.  This is -- I -- I'm -- I'm not

14   sure if I did or if I didn't.  I can't recall.

15   This -- this is -- there's a big difference

16   between it being in writing on a pea of -- on a

17   piece of paper than for a White man as yourself to

18   be calling me or suggesting, you know, calling me

19   boy in any shape or form.  There's a big

20   difference there.

21   Q.          I understand that.  But apart from the

22   racial implications, certainly if your lawyer had

23   submitted something that you knew was not

24   accurate, you would want to correct that, wouldn't

1  you?

2          MS. MARTINEZ:  Objection.  Form.

3  A.          Like I said, working with The Ohio

4  Innocence Project has been a great privilege, so I

5  do not recall if I would have tried to correct him

6  because I felt so fortunate, you know, for them to

7  even look at my case, much alone -- much let alone

8  actually get me out of prison for a crime I didn't

9  commit.

10  Q.          And I appreciate that, but I don't

11  think you answered my question.  My question was,

12  you would not want them submitting information

13  that was, in fact, not accurate?

14          MS. MARTINEZ:  Same objection.

15  A.          I'm not sure how to answer that

16  question because it, you know, I -- I wouldn't

17  want them -- no, I wouldn't want them putting

18  anything out there that was not factual.

19                  - - - - -

20          Thereupon, Exhibit 5 is marked for

21  purposes of identification.

22                  - - - - -

23  Q.          I'm going to hand you what I've marked

24  as Exhibit 5.  This is a document captioned

1    Application for DNA Testing.  It has our Bates

2    numbers beginning at 003514.  Are you familiar

3    with that document?  Do you recognize this

4    document?

5    A.          Give me one second, please.

6    Q.          Okay.

7              MS. MARTINEZ:  Make sure to flip

8    through it if you need to.

9    A.          It's a lot -- it's a lot of paper.

10   Give me one more second.

11             I do recognize this document.

12   Q.          What is this document?

13   A.          This document, it looks like it says an

14   Application for DNA Testing.

15   Q.          And if you turn to page 28.  You see a

16   signature line there for Brian Howe again,

17   correct?

18   A.          Correct.

19   Q.          And also Mark Godsey.  Do you see that?

20   A.          Correct.

21   Q.          Was Mark Godsey also representing you

22   from The Innocence Project?  Was Mr. Godsey one of

23   your attorneys?

24   A.          I'm not sure.  I'm not sure how to

1    answer that question.

2    Q.          All right.  But you were aware that

3    they submitted an application to have some

4    materials DNA tested, correct?

5    A.          Yes.

6    Q.          Did you review this application before

7    they filed it?

8    A.          I -- I'm not sure.

9    Q.          Did you review this application after

10   they filed it?

11   A.          I -- I -- I did review this application

12   after they filed it.

13   Q.          Can you turn to page 21, please.  At

14   the bottom of the page, do you see there's a

15   footnote 10?

16   A.          Yes.

17   Q.          Can you read that, please?

18   A.          Footnote 10.  It has Adidas boy in

19   quotation marks, was Horton's nickname.

20   Q.          So this is the second time that The

21   Innocence Project lawyers have filed a pleading

22   indicating that Adidas boy was your nickname,

23   correct?

24   A.          I believe that is correct.

1    Q.         Did you go back to them after they did

2    it a second time and tell them that was not

3    correct information?

4    A.         I do not recall.  This is such a minor

5    oversight, I don't think that I would.

6    Q.         Do you think the difference between

7    Adidas boy and Adidas man is a minor distinction?

8    A.         Well, when -- when you -- let me see

9    how I can answer the question.  I'm -- I'm not

10   100 percent sure.

11   Q.         You're not 100 percent sure about what?

12   A.         It depends on the perspective, would it

13   be a minor perspective or not, would it be a minor

14   issue or not.

15   Q.         Okay.  But what I'm trying to establish

16   is, was your nickname Adidas boy?  And it seems

17   like twice now your lawyers have told the court

18   that you were.  Were they mistaken?

19   A.         It looks like it was a mistake there.

20   Q.         But you never went back to them and

21   told them that was a mistake, correct?

22   A.         No.  Because --

23              MS. MARTINEZ:  Objection.

24              THE WITNESS:  Oh.  I'm sorry.

1          MS. MARTINEZ:  It's okay.  Objection.

2    A.          No.  Because --

3          MS. MARTINEZ:  You can answer.

4    A.          -- you know, like I said in the

5    beginning, you know, depending -- this was a

6    nickname from high school, whether it was man or

7    boy, and depending on what circle of people were

8    calling me this or saying this phrase, I have no

9    control who said what.  You know, I don't know

10   where this nickname originated from, so I can't be

11   completely sure, you know.

12   Q.          So was there a circle of people that

13   would have called you Adidas boy back in high

14   school?

15   A.          It's impossible for me to remember that

16   from so long ago.

17   Q.          Do you --

18   A.          I'm sorry.

19   Q.          -- know where your lawyers got the

20   information that Adidas boy was your nickname?

21          MS. MARTINEZ:  Objection.  Foundation.

22          You can answer.

23   A.          No, I do not.

24                    - - - - -

1          Thereupon, Exhibit 6 is marked for

2     purposes of identification.

3               - - - - -

4     Q.          I'm going to hand you what I've marked

5     as Exhibit 6.

6               MS. MARTINEZ:   Thanks.

7     Q.          This is a pleading captioned

8     Defendant's First Amended Petition for

9     Post-Conviction Relief Pursuant to Revised Code

10    2953.21.  Do you see that?

11    A.          I see it.

12    Q.          Okay.  And if you turn to the last

13    page, page 23.  It's signed once again by Brian

14    Howe of The Innocence Project?

15    A.          I see it.

16    Q.          And submitted to the court on the 22nd

17    day of May 2020.  It's at the bottom in the

18    Certificate of Service.  Do you see that?

19    A.          I see it.

20    Q.          So this would be another pleading that

21    was submitted to the court on your behalf by your

22    attorneys?

23    A.          Yes.

24    Q.          Do you recognize it?

1   A.          Let me look over it for one second,

2   please.  It looks familiar.

3   Q.          I direct your attention to page 15,

4   please.  Do you see footnote 3 at the bottom?

5   A.          Yes.

6   Q.          Can you read that, please?

7   A.          It has Adidas boy in quotation marks,

8   was Horton's nickname.

9   Q.          So this is now three times that your

10  attorneys have told the court that your nickname

11  was Adidas boy, correct?

12  A.          That's correct.

13  Q.          So I'll ask you again.  At least in

14  some --

15          MR. EPSTEIN:  Sorry.

16  Q.          At least in some circles was your

17  nickname Adidas boy?

18          MS. MARTINEZ:  Objection.  Asked and

19  answered.

20          You can answer.

21  A.          I do not recall.

22  Q.          At some point in time you started to

23  sell drugs in West Virginia, correct?

24  A.          I -- I made some mistakes in my life,

1   and that's -- that's a part of my past.  So to

2   answer --

3   Q.        Is that a yes?

4   A.        I was -- I was getting to it, sir.

5   Sorry if I'm not moving fast enough.  So I would

6   say it's safe to say yes.

7   Q.        What connection did you have to

8   Parkersburg, West Virginia?

9   A.        That was so long ago.  It's -- I -- I

10  honestly can't recall how I first established a

11  connection with Parkersburg, West Virginia.

12  Q.        Did you have family in Parkersburg,

13  West Virginia?

14  A.        No.

15  Q.        Did you have children in Parkersburg,

16  West Virginia?

17  A.        No.

18  Q.        Did you have friends in Parkersburg,

19  West Virginia?

20  A.        Yes.

21  Q.        Who were your friends in Parkersburg,

22  West Virginia?

23  A.        Oh, that was -- that was a really long

24  time ago.  I can't remember their names.  It

1    was -- it was a really long time ago.

2    Q.        Did someone ask you to transport drugs

3    from Columbus to Parkersburg for sale?

4    A.        No.

5    Q.        Did you buy drugs to sell in -- strike

6    that.

7              You sold drugs in Parkersburg, correct?

8    A.        In Parkersburg, West Virginia,

9    I -- yes.

10   Q.        The drugs that you sold in Parkersburg,

11   West Virginia, did you buy them in Parkersburg,

12   West Virginia?

13   A.        I do not recall.

14   Q.        Do you recall buying drugs in Ohio and

15   transporting them to West Virginia?

16   A.        I do not recall.

17   Q.        Eventually you were arrested in West

18   Virginia, correct?

19   A.        Yes.

20   Q.        Prior to your arrest in West Virginia,

21   how many drug convictions did you have?

22   A.        Man, that's a good question.  That's

23   a -- it was from so long ago.  One.

24   Q.        Are you telling me or are you guessing?

```
1    A.          I do not recall, honestly.

2    Q.          What do you recall about your prior

3    drug convictions before West Virginia?

4    A.          I -- I recall I've been in trouble.  I

5    can recall one instance for sure, but other than

6    that, it was so long ago, I'm not even sure -- I'm

7    not exactly sure -- I'm not exactly sure.  I

8    was -- I was a different person then.  I'm not

9    proud of who I was.  I honestly tried to really

10   forget that part of my life.

11   Q.          Is part of the reason that you can't

12   remember those events clearly because you were on

13   drugs at the time?

14               MS. MARTINEZ:  Objection.  Form.

15               You can answer.

16   A.          No.  It's just I'm really trying to

17   separate myself from that person I was as I turn

18   over a new leaf.

19   Q.          Well, I understand separating yourself

20   in terms of doing things differently, but explain

21   to me how separating yourself means not

22   remembering.

23               MS. MARTINEZ:  Objection.  Form.

24               You can answer.
```

1  A.          Just trying to -- just trying really

2  hard to forget about the -- about the -- that part

3  of my life and the mistakes that I made.  Just

4  really not trying to harp on them and talk about

5  them and just really -- you got to -- you got to

6  put forth a little effort.

7  Q.          So you made an effort to forget

8  everything that happened back in those days?  Is

9  that your testimony?

10              MS. MARTINEZ:  Objection.  Form.

11              You can answer.

12  A.          Yes, I have.

13  Q.          What do you remember about any of your

14  criminal drug arrests in Ohio back before the West

15  Virginia arrest?

16  A.          What do I remember?  I remember

17  just -- just the disappointment that I let my

18  family down.  I remember some of the pain that I

19  caused, you know, my relatives and people -- even

20  people who looked up to me.  I just remember how

21  disappointed they was.  And the shame that I

22  brought on my family's name at that time.

23  Q.          But what do you remember about the

24  circumstances of the crime?

1   A.          They were minor -- minor offenses from

2   what I can remember.

3   Q.          What were the offenses?

4   A.          I do remember one was a possession

5   charge.  It might have been, in the total of my

6   lifetime, two possession charges.

7   Q.          Two --

8   A.          Drug abuse.

9   Q.          I'm sorry?

10  A.          Maybe a drug abuse and a possession

11  charge.

12  Q.          And is that two plus West Virginia or

13  two including West Virginia?

14  A.          That would be two including West

15  Virginia, from what I can remember at this point.

16                      - - - - -

17              Thereupon, Exhibit 7 is marked for

18  purposes of identification.

19                      - - - - -

20  Q.          I'm going to hand you what I've marked

21  as Exhibit 7.  Can you identify that for the

22  record?

23  A.          This -- this looks like a criminal

24  complaint.

1    Q.        This is a criminal complaint against

2    Richard H. Horton, correct?

3    A.        That's correct.

4    Q.        And that's you?

5    A.        That is me.

6    Q.        And it is dated or at least the date of

7    the offense is August 31, 1995, correct?

8    A.        Yes, that's correct.

9    Q.        And the charge is knowingly possessing

10   a controlled substance included in Schedule II, to

11   wit: crack cocaine.  And then it goes on to talk

12   about the amount.

13            Do you see that?

14   A.        I do see that.

15   Q.        Do you remember anything of the

16   circumstances of this arrest?

17   A.        I do not recall.

18   Q.        Was this the first time you were

19   arrested for anything?

20   A.        No.

21   Q.        What had you been arrested for prior to

22   this?

23   A.        In my juvenile upbringing, being in the

24   environment I -- I was living, I grew up in, I was

1   hanging around the wrong crowd sometimes, and I

2   believe I was arrested for attempted joyriding.

3   Q.          And what was the disposition of that

4   charge?

5   A.          I believe -- I do not recall.  I don't

6   remember it having a significant impound -- impact

7   on my --

8   Q.          So was this --

9   A.          -- record.

10  Q.          Was this August 1995 event the second

11  time that you were arrested in your life?

12  A.          I believe so, but I can't -- I can't

13  recall, honestly.

14  Q.          Do you recall the disposition of this

15  case?  What ended up happening?

16             MS. MARTINEZ:  Objection.  Asked and

17  answered.

18             You can answer.

19  A.          When you say disposition, what exactly

20  do you mean?

21  Q.          I'm sorry.  The disposition of the case

22  is how it gets resolved.  It can get resolved by

23  being dismissed, or you go to trial and get

24  convicted and you go to jail.  Do you remember how

1   it -- how it -- what the outcome was?

2   A.          No, I do not recall.

3                    - - - - -

4               Thereupon, Exhibit 8 is marked for

5   purposes of identification.

6                    - - - - -

7   Q.          I'll hand you --

8               MS. MARTINEZ:  Thank you.

9   Q.          -- what I've marked as Exhibit 8.

10              MS. MARTINEZ:  I think, super quickly,

11  Counsel, on this one, I'll put for the record this

12  document was part of a production that was made

13  yesterday at 3:18, among a couple hundred other

14  pages.  Plaintiff objected to that production

15  since some of the documents were responsive to a

16  subpoena that was returnable over a month ago, but

17  Defendants identified this and another exhibit,

18  that I believe is also two pages, for the

19  deposition today.

20              MR. EPSTEIN:  Thank you, Counselor.

21  BY MR. EPSTEIN:

22  Q.          Can you identify Exhibit 8 for the

23  record, please?

24  A.          This says:  State of Ohio versus

1  Richard Horton.

2          I'm not sure exactly how to phrase the

3  title of the document.

4  Q.          Okay.  That's fair.  The actual caption

5  of the document just says:  Entry.

6          Do you see that?

7  A.          I see that.

8  Q.          All right.  And I will represent to you

9  that this is a sentencing entry.  If you look down

10  into the fourth paragraph, three lines from the

11  bottom, it says:  The court sentences the

12  Defendant to the Franklin County Corrections

13  Center for six months.

14          Do you see that?

15  A.          I do see that.

16  Q.          Do you remember serving six months on

17  this drug charge?

18  A.          I do.

19                  - - - - -

20          Thereupon, Exhibit 9 is marked for

21  purposes of identification.

22                  - - - - -

23  Q.          I'll hand you what I've marked as

24  Exhibit 9.

1          MS. MARTINEZ:  Thank you.

2     Q.          I'll ask if you can identify that for

3     the record.

4     A.          This looks like a criminal complaint.

5     Q.          And this is, again, a criminal

6     complaint against Richard Horton, correct?

7     A.          Yes, this looks like this is against

8     Richard Horton, me, yeah.  Is this the same?

9     Q.          Well, let's take a look at that.  If

10    you look at the first one.  Do you have the

11    previous one?  The date of that offense was

12    August 31st, 1995, correct?

13    A.          Correct.

14    Q.          What's the date of the offense on the

15    second one?

16    A.          It looks like the 30th day of November,

17    1995.

18    Q.          So these are not the same offense,

19    correct?

20    A.          It doesn't -- no, it's not the same.

21    Q.          And in the second one, the

22    November 30th one, it says you're accused of

23    knowingly possessing a substance, to wit: crack

24    cocaine.  Correct?

1    A.          That's what it says on the paper,

2    that's correct.

3    Q.          Do you recall a second crack cocaine

4    possession charge?

5    A.          I do not recall.  Sorry about that.

6                            - - - - -

7                Thereupon, Exhibit 10 is marked for

8    purposes of identification.

9                            - - - - -

10   Q.          I'll hand you Exhibit 10, which is

11   another sentencing entry.  I believe this is the

12   second document that Counsel just referred to a

13   minute ago as having been recently produced.

14               MS. MARTINEZ:  That's correct.

15   Q.          This is the sentencing entry for the

16   November offense that we just looked at, correct?

17   A.          That seems correct.

18   Q.          And here you were sentenced to a

19   sentence of 12 months.  Do you see that?

20   A.          It says:  The court orders payment of

21   the mandatory fine of $2,500 and sentences the

22   defendant to Ohio Department of Rehabilitation and

23   Corrections for 12 months.  That's what it says on

24   the paper.

1    Q.          Okay.  Do you recall serving 12 months

2    in the Department of Rehabilitation and

3    Corrections?

4    A.          No, I do not.

5                MS. MARTINEZ:  A belated form

6    objection.

7    Q.          Do you recall serving a lesser time?

8    A.          I do.

9    Q.          How much time did you serve total on

10   these charges?

11   A.          I do not recall the exact amount, but I

12   know that it wasn't six months and 12 months.

13   Sorry.

14   Q.          Well, I didn't mean to suggest that it

15   was six months plus 12 months.  If you -- if you

16   take a look at the first sentencing entry.  Do you

17   see that, where it says six months?

18   A.          Yes.

19   Q.          It says to be served concurrently with

20   the sentence imposed in, and it has another case

21   number.  Do you understand what that means when a

22   sentence is concurrent?

23   A.          Yes, I understand.

24   Q.          So your total sentence would be one

1     year, correct, because the six months runs at the

2     same time as the 12 months?  Is that your

3     understanding?

4     A.        Let me see.  It -- it says -- it says

5     that it's ran concurrent.  And it says, you know,

6     in theory it says that I would have served at

7     least 12 months, but I do not remember serving

8     12 months.

9     Q.        Do you --

10     A.        I don't --

11     Q.        -- remember getting out sometime

12     earlier than that?

13     A.        Yeah.  I believe it was early release

14     for good behavior or something like that.  I -- I

15     can't remember the exact reason why.  But it

16     wasn't a whole year.

17     Q.        Okay.  But is it fair to say that you

18     had two separate drug convictions in the state of

19     Ohio in the 1990s?

20     A.        I think that's fair to say.  That's

21     right here.

22     Q.        And so, West --

23     A.        I can't deny it.

24     Q.        And so, West Virginia would make a

1  total of three drug convictions, correct?

2  A.      Yes.

3  Q.      Let's go back to Exhibit 2, which is

4  the big binder, the transcript from the trial.

5  And if you would, turn to page 177.  I'm going to

6  read a little bit of this to you.  I want you to

7  follow along and make sure I read this correctly,

8  okay?  Starting at line 23.  Near the bottom.  I'm

9  sorry.  Line 21.

10          "QUESTION:  What does your criminal

11  record consist of?

12          "ANSWER:  My criminal record consists

13  of two drug abuse charges.

14          "QUESTION:  And when were those drug

15  abuse charges?

16          "ANSWER:  The first drug abuse charge

17  occurred somewhere between '95 and '97.

18          "QUESTION:  What about the second one?

19          "ANSWER:  The second one occurred in

20  the year of 2001."

21          Did I read that correctly?

22  A.      Yes.

23  Q.      Was that a correct answer?

24          MS. MARTINEZ:  Objection.  Form.

1          You can answer.

2   A.          I believe that was a correct answer,

3   because it seems like these two charges were ran

4   concurrent, so they equal one charge.

5   Q.          Well, they didn't ask you about the

6   sentence.  They asked you about how many charges

7   and convictions you had, correct?

8   A.          Let me go back and look at it, because

9   from my understanding, when they ran the two

10  charges convert -- concurrent, it's just equal to

11  one charge, so essentially I only went to prison

12  for one charge.

13  Q.          But you were convicted twice; is that

14  your understanding?

15  A.          No, that's not my understanding.

16  Q.          Okay.  At the time -- strike that.

17          You were arrested in West Virginia in

18  2000; is that correct?

19  A.          I'm -- I'm -- I can't recall exactly

20  what year it was.

21  Q.          Okay.  I will represent to you for now

22  that it was 2000.  We'll look at some documents

23  later just to make sure about that.  What I want

24  to know is, at the time that you were arrested in

1   West Virginia, what was your family status like?

2               MS. MARTINEZ:  Objection.  Form.

3   Q.          Were you married?

4   A.          No, I was not married.

5   Q.          Did you have children?

6   A.          I did have children.

7   Q.          How old were they at the time of your

8   arrest in West Virginia?

9   A.          That is a tough question, but I am

10  going to try to be a good father and say my son

11  wasn't born yet, so my daughter may have been the

12  age of 1.  Yeah, my son wasn't born yet, so...

13  Q.          Who is the mother of your daughter?

14  A.          Her name is Regina Johnson.

15  Q.          Where does she live?

16  A.          She lives in Columbus, Ohio.

17  Q.          Has she lived there the entire time

18  you've known her?

19  A.          I believe so, yes.

20  Q.          Were you involved in a relationship

21  with her for an extended period of time?

22              MS. MARTINEZ:  Objection.  Form.

23              You can answer.

24  A.          No.  We -- we coparented.

1   Q.          I'm sorry?

2   A.          We -- we coparented.  Not really a

3   relationship.  I wouldn't describe it as a

4   relationship.  Not any disrespect towards her.

5   She's a, you know, a good mother.  She tries

6   really hard, but we just never really -- never

7   really got along to categorize it as a

8   relationship.

9   Q.          Would you categorize it as a one-night

10  stand?

11  A.          No.  I wouldn't disrespect her like

12  that.

13  Q.          But is that what it was?

14  A.          No.

15  Q.          Okay.  Now, you said you coparent.

16  Back when your daughter was an infant, how did you

17  coparent?

18  A.          Well, I tried to -- I tried to be

19  involved in my child's life and help out where I

20  could, but it was, you know -- and play by her

21  rules, and her rules were very strict at the time.

22  And, you know, I would try to get, you know,

23  girlfriends to help me coparent because I was

24  young and dumb, I didn't really know what to do

1  with a baby girl in particular, so I tried to get

2  as much help from family and friends and

3  girlfriends, and I just kind of winged it a lot,

4  but my daughter, she turned out all right.

5  Q.        When you said that her mother had

6  strict rules, what were you referring to?

7  A.        It's kind of hard to remember all the

8  rules from 25 years ago, but I remember she

9  was -- she was pretty feisty back in the day.

10  Q.        Now, back at this time period, 1999,

11  2000, were you living in Columbus?

12  A.        That's a good question.  I was -- I was

13  back and forth between West Virginia and Columbus,

14  so...

15  Q.        Did you have a residence in West

16  Virginia?

17  A.        I -- I'm not -- I don't recall, because

18  when you say residence, was I staying with a

19  different girlfriend and --

20  Q.        Well, let me ask a different question

21  then.  Why were you back and forth between

22  Columbus and West Virginia?

23  A.        I had a couple girlfriends in Columbus

24  and a couple in West Virginia, just having a

1    little fun, just living.

2    Q.          Did they know about each other?

3    A.          I would like to think that they didn't,

4    but I'm not exactly sure.  I can't recall.

5    Q.          And were you transporting drugs at the

6    same time you were going back and forth?

7    A.          No.

8    Q.          Did you use cocaine when you were in

9    West Virginia?

10   A.          I don't recall.

11   Q.          Did you avoid using cocaine when you

12   were in Columbus?

13               MS. MARTINEZ:  Objection.  Form.

14               You can answer.

15   A.          I don't recall.  It's a tough one right

16   there.

17   Q.          Why is that a tough one?

18   A.          Just trying to remember something from

19   25 years ago.  That was -- you're asking me

20   questions about the year 2000, and it's 2025.

21   Q.          I understand.  Well, here's a question

22   you might remember.  When you would do cocaine,

23   did you do it alone or did you do it with other

24   people?

1              MS. MARTINEZ:  Objection.  Form.

2              You can answer.

3    A.        I don't recall.

4    Q.        Do you recall any people that you used

5    cocaine with?

6    A.        No, I don't recall.  Sorry.

7    Q.        Do you recall any people in West

8    Virginia that you sold drugs to?

9    A.        No, I don't recall.

10   Q.        What were the circumstances of your

11   arrest in West Virginia?

12   A.        It was -- it was so long ago.  It's a

13   blur.  I really don't -- I really don't recall the

14   exact particulars.  I know that was a -- like I

15   said before, that was a part of my former

16   life, you know.  I don't -- I don't see what that

17   has to do with me being wrongfully incarcerated

18   for 16 years for a crime that I didn't commit.

19   It's just so far removed from the person I am

20   today.  I just -- I can't remember exactly what

21   happened.

22   Q.        Do you remember anything about what

23   happened?

24   A.        I remember it was bad.  It was not a

1   good look for my family.  My girlfriend, I had let

2   her down.  And I believe my -- I believe -- I

3   believe -- how can I phrase this -- Kobe was

4   not yet -- hadn't yet -- not yet entered the

5   world.  So she was -- his mother was pregnant.

6   Yeah, I remember the shame.

7   Q.        Okay.  With all due respect,

8   Mr. Horton, my question wasn't about people's

9   reaction to it.  My question was about the

10  circumstances of the arrest.  What happened?

11  A.        I can't recall.

12  Q.        Can you recall anything?

13  A.        Around the circumstances of what

14  happened?  No.  That was a really long time ago.

15  Q.        What were you charged with?

16  A.        I -- possession.

17  Q.        Of what?

18  A.        I'm not sure how they worded it.  I

19  can't -- I can't recall.

20  Q.        Were you guilty of the offense?

21  A.        I was guilty.

22  Q.        Who were you with when you were

23  arrested?

24  A.        I can't recall.

1    Q.          Where were you when you were arrested?

2    A.          Parkersburg, West Virginia.

3    Q.          Can you be more specific than that?

4    Were you at somebody's house?  Were you at an

5    apartment?  Were you in a public place?

6    A.          I can't recall.

7    Q.          Is it possible that you have no recall

8    of these events because you were on drugs at the

9    time?

10                MS. MARTINEZ:  Objection.  Form.

11                You can answer.

12   A.          It's possible.

13   Q.          And those drugs would have been

14   cocaine?

15   A.          I don't recall.

16   Q.          What other drug could it have been?

17   A.          It could have been marijuana.  That...

18   Q.          In addition to cocaine, marijuana, and

19   alcohol, have you used any other illegal drugs in

20   your life?

21                MS. MARTINEZ:  Objection.  Form.

22                You can answer.

23   A.          I'm going to say that I was really a

24   scaredy-cat, kind of scared to experiment with

1  certain drugs, LSD, ecstasy, mushrooms, never

2  really sounded appealing to me, so I'm going to

3  say no.  But I'm -- I really don't recall.

4  Q.        When you were in Parkersburg, West

5  Virginia, did you spend time with Derrick

6  Greathouse?

7  A.        Did I spend time with Derrick

8  Greathouse?  No.

9  Q.        No?

10  A.        No.  I don't recall spending time with

11  Derrick Greathouse.

12  Q.        Do you know anything about Derrick

13  Greathouse being in Parkersburg, West Virginia?

14  A.        Yes.  He had got into some trouble.  I

15  believe he -- I believe he ran over somebody with

16  a car or something like that.

17  Q.        How did you hear about that?

18  A.        I knew his girlfriend.  She was a very

19  beautiful young lady.

20  Q.        What was her name?

21  A.        I do not recall.

22  Q.        And what did she tell you?

23  A.        That he had ran over somebody with a

24  car.

1   Q.          Did she tell you that it was

2   intentional?

3   A.          No, she didn't tell me that it was

4   intentional at all.  I believe she was very

5   sympathetic.

6   Q.          But was he in trouble with the law

7   because of that?

8               MS. MARTINEZ:  Objection.  Foundation.

9               You can answer.

10  A.          I do not recall.

11  Q.          Do you know what the resolution of that

12  was?

13  A.          Yes.  I believe he went to prison for

14  that.

15  Q.          Is he still in prison?

16              MS. MARTINEZ:  Objection.  Foundation.

17              You can answer.

18  A.          I'm not sure.  He's a former associate.

19  Q.          Are you friends with him on Facebook?

20  A.          I believe so.

21  Q.          How does that come to be?  I don't use

22  Facebook.  How does that work?

23  A.          So Facebook is mostly friends, you kind

24  of use it to rekindle relationships and check on

1   people from -- from high school.

2   Q.        Did you go to high school with him?

3   A.        That's a tough one.  I don't remember

4   him attending school a lot, so I'm going to say I

5   don't recall.

6   Q.        And how did you become Facebook

7   friends?  Did you reach out to him or did he

8   contact you?

9   A.        I don't recall.

10   Q.        And have you communicated with him,

11   say, in the last year, through Facebook?

12   A.        I believe -- I believe I have.

13   Q.        About what sorts of things?

14   A.        Well, when I was released in 2022, when

15   The Ohio Innocence Project got me out of prison,

16   there was kind of like a welcome wagon there.  So

17   it -- it was -- and there was also a big news crew

18   there, so it was like -- it was kind of broadcast

19   all over the news that I was being released from

20   prison after being wrongfully convicted.  So a lot

21   of people, you know, when I -- when I already came

22   home, I had a Facebook page that was already set

23   up, so a lot of people reached out and

24   congratulated me.  So I believe that might have

1    been the correspondence you're referring to.

2    Q.          Is Mr. Greathouse still incarcerated?

3    A.          I don't -- I don't know what

4    Mr. Greathouse is currently doing at this very

5    moment.

6                MS. MARTINEZ:  A belated objection to

7    foundation.

8    Q.          All right.  Since you brought up high

9    school, let me ask you a couple of other people

10   that you may or may not know from high school.  I

11   may have asked you this already, but we'll start

12   with Kawanna Harris.  Did you go to high school

13   with her?

14   A.          Yes.

15   Q.          What was your relationship with her in

16   high school?

17   A.          I actually don't remember Kawanna from

18   high school.  She was -- she must have been a

19   quiet and shy young lady, and I was kind of loud

20   and obnoxious, so I don't think our circles

21   collided.  She says differently, but I don't

22   remember her from high school.

23   Q.          How do you know she says differently?

24   A.          Because --

1             MS. MARTINEZ:  To the extent you can

2    answer without revealing communications with your

3    attorneys, you can answer the question.

4    Q.          Does that information come to you from

5    any other source besides your lawyers, what

6    Kawanna has said about you?

7    A.          No.  Me and Qui -- me and Kawanna

8    Harris are -- we're good friends, so we've talked

9    about this.

10   Q.          Tracy McClanahan, did you know her in

11   high school?

12   A.          I do not recall.  I can't -- I don't

13   know -- I knew the McClanahans.  And it's been so

14   long, I can't remember, is it Tracy or Nicole, I

15   do not recall.

16   Q.          Did you ever date either Tracy or

17   Nicole?

18   A.          Nicole who?

19   Q.          You just said Nicole.

20   A.          Oh.  I -- no, I did not.

21   Q.          Did you ever sell drugs to Tracy

22   McClanahan?

23   A.          No, I did not.

24   Q.          Do you know Richard Diggs?

```
1    A.        Yes.

2    Q.        Who is Richard Diggs?

3    A.        Richard Diggs, I know him from

4    elementary school.  He went to Everett Middle

5    School.  I believe I used to see him playing ball.

6    He was a pretty good athlete back in the '90s.

7    Q.        Is he the same age as you?

8    A.        I'm not sure how old he is.

9    Q.        I mean, was he in the same class?

10   A.        I don't remember him being in the same

11   class --

12   Q.        Did you --

13   A.        -- in the eighth grade.

14   Q.        Did you know his brother?

15   A.        I don't recall.

16   Q.        His brother's name is Riccardo.  Does

17   that ring a bell?

18   A.        No.

19   Q.        Do you know anything about the Diggs

20   brothers as adults?

21             MS. MARTINEZ:  Objection.  Form.

22             You can answer.

23   A.        I don't recall, no.

24   Q.        Well, you don't recall suggests maybe
```

1    at some time you did know.

2    A.          As adults?

3    Q.          Yeah.

4    A.          I don't recall.

5    Q.          Did you have any knowledge of them

6    trading identities with one another?

7    A.          I don't recall.

8    Q.          Is there anything that might refresh

9    your recollection about that?

10   A.          No.

11   Q.          What I'm trying to figure out,

12   Mr. Horton is, when you say "I don't recall," does

13   that mean "I may have known and I've forgotten,"

14   or "No, I don't know"?  Are you using "I don't

15   recall" in place of "I don't know"?

16               MS. MARTINEZ:  Objection to form.

17               You can answer.

18   A.          I'm using the statement "I don't

19   recall" in the place of "I do not know."

20   Q.          Who is Kobe's mother?

21   A.          Her name is Quiana Mathews.

22   Q.          And where does she live?

23   A.          Currently?

24   Q.          Yes.

1    A.          I'm not sure.

2    Q.          When was the last time you had an

3    address for her or knew where she was?

4    A.          Probably in the year 2022.

5    Q.          Where was she then?

6    A.          I believe she lived in Georgia.

7    Q.          Were you in regular contact with her up

8    until 2022?

9    A.          Yes.  She is the mother of my child, so

10   when I was in prison, I would reach out to her

11   because I wanted to try to have a relationship

12   with my son.  Even though I was in prison, I

13   always tried to at least attempt to reach out.

14   And her being the adult, I would have had to, you

15   know, get her permission to speak with my son.

16   You know, due to this wrongful incarceration, it

17   puts a big wedge between me and my kids, so I

18   would try to have -- I would -- I would definitely

19   have to speak with her to try to be able to speak

20   with my son.

21          It was -- it was definitely hard

22   sometimes, because he -- you know, everybody -- a

23   lot of people thought that I was in prison for

24   something that I did and, you know, trying to

1  convince your son that you're innocent but yet

2  you're still gone for so long, it was difficult,

3  man.  It -- it -- it wasn't easy.

4  Q.        Do you know what happened to her after

5  2022?

6  A.        Yes.

7  Q.        What happened to her?

8  A.        She went to prison.

9  Q.        What did she go to prison for?

10 A.        I -- I'm not exactly sure what it was.

11 It's not my business.

12 Q.        What state did she go to prison in?

13           MS. MARTINEZ:  Objection.  Foundation.

14           You can answer.

15 A.        Man, she lived in Georgia, so I'm not

16 exactly sure.  I'm sorry.

17 Q.        Let's back up.  Do you know when Kobe

18 was born?

19 A.        Yes.

20 Q.        When?

21 A.        He was born in 2001.

22 Q.        Were you in prison when he was born?

23 A.        No.

24 Q.        Was --

1    A.          When Kobe -- go ahead.  I'm sorry.

2    Q.          No.  Go ahead.

3    A.          Kobe was born at Ohio State hospital.

4    He was born with a form of heart disease.  We

5    didn't know he had heart disease until two or

6    three days later.  I remember it was a very

7    difficult birth.  But also I remember, you know,

8    his mother being triumphant and having a

9    successful birth.  And I remember, you know, the

10   time I was able to spend with him before I had to

11   turn myself in to go to West Virginia.

12          And he had to have open-heart surgery

13   at 8 months old.  And I remember still trying to

14   be a part of his life, you know, because, you

15   know, he hadn't, you know -- it wasn't his fault

16   that his father was messing up and not mature.

17   And just trying to, you know, tell him that I was

18   going to be a better person whenever I -- when I

19   got out in 2004.  And it was just a very difficult

20   beginning for his life.

21   Q.          So let me make sure I heard you

22   correctly.  At the time that he was born, you were

23   facing charges in West Virginia, correct?

24   A.          That's correct.

1    Q.          But at the time he was born, you were

2    not yet incarcerated on those charges?

3    A.          That's correct.  I was there for my

4    son's birth.

5    Q.          How long were you in prison in West

6    Virginia?

7    A.          I was in prison in West Virginia for, I

8    think it was 26 months.

9                MR. EPSTEIN:  Let's go off the record

10   for a second.

11               THE VIDEOGRAPHER:  We are off the

12   record.  The time is 12:14.

13               (A short recess is taken.)

14               THE VIDEOGRAPHER:  This marks the

15   beginning of Media No. 3.  We are back on the

16   record.  The time is 12:23.

17   BY MR. EPSTEIN:

18   Q.          Mr. Horton, how many -- excuse me.  How

19   many prison facilities were you in in West

20   Virginia?

21               MS. MARTINEZ:  Objection.  Form.

22               You can answer.

23   A.          That's a good question.  In West

24   Virginia, it's kind of like a tier system, so

1   I -- I honestly -- I don't want to give you an

2   incorrect answer.

3   Q.        I appreciate that.

4   A.        Three -- three or four.  I think.

5   Q.        What do you mean by a tier system?

6   A.        You get -- it's very different from the

7   Ohio prison system.  You get a better reward for

8   staying out of trouble.  So in West Virginia you

9   might start off as a -- at a higher level

10   facility, and the longer you stay out of trouble,

11   you work your way down to maybe even a work

12   release facility.

13   Q.        When you say a higher level facility,

14   you mean higher security?

15   A.        Yes.

16   Q.        Where did you start when you were first

17   incarcerated, what level of security?

18   A.        I started at a higher level security

19   facility.

20   Q.        What does that entail?

21   A.        Well, I always tell people prison is

22   just -- it's exactly how you see it in the movies.

23   It's cold, it's dark, it's uncomfortable, it's

24   steel, it's bricks.  And for the higher level

1    security, you're usually in a cell most of the

2    day, if not 20-plus hours a day.

3    Q.          Did you receive medical care while you

4    were in custody in West Virginia?

5    A.          Yes.

6    Q.          Do you remember any particular things

7    you were treated for?

8    A.          Yes.  A broken nose.

9    Q.          Did you, at some point in your life,

10   break an ankle?

11   A.          Yes.

12   Q.          When was that?

13   A.          That was in the '90s.  Well, I'm

14   not -- let me -- let me -- let me -- let me

15   correct that.  Sorry if I misspoke.

16            That was -- that was before -- that was

17   before the prison stay in West Virginia.  I'm not

18   sure exactly what year it was.  Man.  Sorry about

19   that.

20   Q.          When you would go to a new location in

21   West Virginia, did they do intake interviews?

22   A.          I can -- I -- I do not recall.  That's

23   a tough one right there.

24   Q.          Do you remember at all being

1    interviewed about your mental and physical health

2    by prison staff?

3             MS. MARTINEZ:  Objection to form.

4             You can answer.

5    A.        While incarcerated in West Virginia?

6    Q.        Correct.

7    A.        I do remember being interviewed.

8    Q.        Do you remember similar medical and

9    psychological interviews when you were

10   incarcerated in Ohio after the Loew Street

11   robbery?

12   A.        I do remember.  I do remember, like,

13   intake interviews in --

14            THE WITNESS:  I'm sorry.

15            THE VIDEOGRAPHER:  I'm sorry.

16   A.        -- in Ohio.

17   Q.        And what sorts of things would they ask

18   you in the intake interviews?

19   A.        They would ask you about your health,

20   do you have any underlying health issues, are you

21   on medication, those type of things.

22   Q.        Would they ask you about your

23   background more generally?

24   A.        Very generally, I believe they would.

1  Q.          Were you honest with them?

2  A.          I do not recall.

3  Q.          Can you think of any reason why you

4  would have given untruthful information to those

5  folks who were interviewing you?

6  A.          In prison, depending on how you answer

7  those questions, you'll be placed in certain

8  facilities in the -- in certain areas of the

9  facility.  So if I wasn't truthful, the reason

10 would have been because of I didn't want to get

11 placed in certain areas of the prison.  Maybe I

12 didn't want to be around people who might have

13 been perceived as weak because of various drug

14 addictions, or, you know, if I -- if my ankle

15 wasn't completely healed up, I didn't want to be

16 over here with the people who were fully healthy

17 because I would be, you know, possibly in danger

18 of my life.  So that would have been my logic at

19 that particular time in answering those questions

20 if I answered them untruthfully.

21 Q.          Can you give me an example of a

22 question that, depending on the answer, you

23 thought would get you assigned to a different

24 place?

1    A.        Well, if -- if -- like I said, I broke

2    my ankle before I turned myself in to go to prison

3    in 2001.  So I might have let them know that I

4    broke my ankle, my ankle was still healing up, I

5    didn't want to be placed in an area of the prison

6    that I would have had to walk a long way to get to

7    the chow hall, because, you know, they serve you

8    breakfast, lunch, and dinner, so that long walk

9    would have -- possibly that type of scenario, I

10   could see where somebody would say or where I

11   would say, yeah, my ankle is healed up pretty good

12   or my ankle is not healed up pretty good, you

13   know, put me over here.

14   Q.        What about questions about prior drug

15   use?

16   A.        I -- I do not recall specific

17   questions.

18   Q.        I'm not asking you about specific

19   questions.  I'm asking can you think of a reason

20   why giving an answer about prior drug use would

21   direct you into one area or another one depending

22   on what the answer was?

23   A.        Okay.  Let's -- I'll go with the

24   positive spin on it.  Let's say I was -- I wanted

1    to go get into a certain program, so I would say,

2    hey, I want to get into this program, I have a

3    drug problem.

4    Q.        So there's an incentive sometimes to

5    lie and say you have a drug program when you -- a

6    drug problem when you don't?  Not you

7    particularly, but an inmate might have an

8    incentive to claim a drug problem that he doesn't

9    have?

10   A.        Yes, yes.

11   Q.        What about the converse?  Is there an

12   incentive for an inmate to deny prior drug usage

13   when he does have a drug history?

14             MS. MARTINEZ:  Objection.  Form.

15             You can answer.

16   A.        I'm not sure.  Maybe -- I'm not sure.

17   That's a -- that's a tough one right there.  Maybe

18   he didn't want to be in -- in the program.  Maybe

19   he didn't want the incentives of possibly going

20   home early, or maybe he doesn't -- you know, maybe

21   he has a drug problem and says he doesn't have a

22   drug problem.  I'm not -- I'm not sure how to

23   answer that one.

24   Q.        Okay.  What about mental health?  You

1    were asked questions about a history of depression

2    and things like that, correct?

3    A.          I -- I believe so.

4    Q.          Are there incentives you can think of

5    where an inmate would either want to deny a

6    history of depression when he had one or admit a

7    history of depression when he didn't?

8    A.          Yes.  That type of scenario would be

9    someone in denial.  And the way that they

10   take care -- the way that they handle mental

11   health in prison is they kind of force-feed you

12   drugs.  So a person might not want to take the

13   drugs because some of the drugs, you know, they

14   have adverse effects.  Some of the drugs are so

15   high in -- in -- in volume, you know, I've seen

16   people actually change, you know, from who they

17   were, their posture, you know, I'm not sure

18   exactly what drugs, because, you know -- but I

19   could see -- I could see that scenario, a person

20   in denial about their mental health and they,

21   quite frankly, just don't want to be on drugs.

22   Q.          What about the opposite?  Is there any

23   benefit to the inmate to claiming a mental problem

24   when they don't have one?

1   A.          Yeah, I could -- I could see that

2   happening to somebody.

3   Q.          How would that work?

4   A.          Maybe -- maybe they -- they wanted to

5   get high off the drugs, so they would lie and

6   smear feces on the wall and have suicide attempts

7   just so they can get on the drugs.  And really it

8   might -- you know, I'm not a doctor, but that

9   might not even be the -- oh, sorry -- that might

10  not be the case, you know, they might be doing it

11  just for show.

12  Q.          Could you get a change in housing

13  depending upon your mental health state?

14  A.          In West Virginia?

15  Q.          Both West Virginia and Ohio, what was

16  your experience?

17  A.          Well, yes, you know, if you're in

18  prison, if you're smearing feces on the wall,

19  you're not going to be housed next to the same guy

20  who has never been in trouble, so, yeah, you're

21  going to be in --

22  Q.          But I'm talking --

23  A.          -- different facilities.

24  Q.          I'm talking about something a little

1  more benign than smearing your feces on the wall.

2  Just a general claim of depression.

3  A.        Just a general?  It might be a little

4  difficult, you know, because, you know, prison is

5  not a happy place.  It's a sad place.  So, you

6  know, if you just go in there and say you're

7  depressed, I mean, that probably happens 20 times

8  a day.

9  Q.        Okay.  Can you think of any instances

10  where you gave untrue information to prison

11  officials doing an assessment for strategic

12  reasons?

13            MS. MARTINEZ:  Objection.  Form.

14            You can answer.

15  A.        I do not recall.

16                    - - - - -

17            Thereupon, Exhibit 11 is marked for

18  purposes of identification.

19                    - - - - -

20  Q.        I'm going to hand you what's been

21  marked as Exhibit 11.  The Bates stamp again is at

22  City 007863.  The document is captioned State of

23  West Virginia, Division of Corrections, Parole

24  Services.  This is a document that we obtained

1   from the State of West Virginia, and I'll

2   represent to you that it includes intake

3   interviews from Richard Horton.  Do you see your

4   name on the front there?

5   A.          I see it.

6   Q.          I want to direct your attention to the

7   second page.  Specifically, the fourth paragraph

8   under Circumstances.  Five lines down, toward the

9   end, do you see where it begins:  The subject

10  indicated?

11          MS. MARTINEZ:  If you need to read the

12  whole paragraph, please do.

13  Q.          You can read the whole paragraph if you

14  want to.  Are you ready?

15  A.          Yes.

16  Q.          Okay.  So the paragraphs are describing

17  the circumstances of your arrest.  And the

18  paragraph begins that both the subject,

19  Mr. Horton, and Hill, which refers to Tor Hill,

20  were taken into custody.

21          And then the second line:  A more

22  complete body search revealed one small plastic

23  baggy with several tan yellowish chunks of

24  material inside.  It was found in the genital area

1    of the subject.

2              Reading that, does that refresh your

3    memory of the circumstances of your arrest in West

4    Virginia?

5    A.         No.  No, it doesn't.

6    Q.         Okay.  Then moving down a couple lines.

7    The subject indicated he had been dealing crack

8    cocaine between two to three years, selling it in

9    increments of 20's, 50's, and 100's.

10             Do you see that?

11   A.         I see it.

12   Q.         What are increments of 20's, 50's, and

13   100's?

14   A.         I do not recall.

15   Q.         You don't know what that phrase means?

16   A.         I'm not sure how to describe it to you.

17   No, I don't.  I don't.

18   Q.         Well, how would you sell crack cocaine

19   when you had a customer?

20   A.         I -- I can't remember.  That was part

21   of my past life.  I've since changed my ways.  You

22   know, this -- this -- you know, I -- I don't

23   remember any of this.

24   Q.         How much would you charge for crack

1    cocaine?

2    A.          I'm not sure.  It's not something that

3    I'm proud of.

4    Q.          I understand that, but I want to know

5    what you recall.  So this indicates that you made

6    this statement to -- to the intake interviewer.

7    And it's your testimony that you do not remember

8    making this statement, correct?

9    A.          That's correct.

10   Q.          Do you have any reason to doubt that

11   you made this statement?

12   A.          Yes.

13   Q.          Why?

14   A.          I've never seen this document before a

15   day in my life.

16   Q.          Well, I understand that you haven't

17   seen the document before.  My question is, do you

18   have any reason to doubt that you made this

19   statement back at the time of your arrest?

20   A.          I think I already answered that

21   question.  Because I've never seen this document.

22   Q.          That's the only basis for you doubting

23   that you made the statement is that you've never

24   seen the document before, correct?  Let me go on a

1    little bit more with the paragraph.  It says:  A

2    hundred would be somewhere near -- somewhere

3    around a gram.

4            Do you see that?

5    A.      I see it.

6    Q.      And that's in quotation marks, correct?

7    A.      Yes.

8    Q.      All right.  He also admitted to being a

9    crack cocaine user.  12 to 15 trips a year would

10   be made from Columbus to Parkersburg with, quote,

11   never more than half an ounce, end quote, being

12   delivered at a time.  The subject estimated having

13   made between 30 and 45 trips to Parkersburg during

14   the preceding three years.  The subject told Nohe

15   the names of some of the individuals to whom he

16   delivered the drug.

17           Is that information accurate?

18           MS. MARTINEZ:  Objection.  Form.

19           You can answer.

20   A.      There's a lot of information in here.

21   I -- I --

22   Q.      Okay.  Well, let's break it down.  Did

23   you, in fact, make between 30 and 45 trips to

24   Parkersburg during the preceding three years?

1    A.        I don't recall.

2    Q.        Were you a crack cocaine user?

3    A.        I don't recall that.  I don't recall

4    that, no.  I don't recall.

5    Q.        You don't recall or you were not?

6    A.        I don't recall.

7    Q.        You traveled 12 to 15 trips a year from

8    Columbus to Parkersburg with never more than half

9    an ounce at a time.  Is that an accurate

10   statement?

11   A.        It's a lot of information on here.  I'm

12   not proud of the person that I was a long time

13   ago, but I can't say who said this.  I've never

14   seen this document before.

15   Q.        Okay.  Well, if the officials from West

16   Virginia come in and say that you made this

17   statement, would you have any reason to contradict

18   them?

19   A.        Well, quite frankly, after being

20   wrongly incarcerated for 16 years for a crime that

21   I didn't commit, it kind of -- and, you know,

22   seeing some of the articles that's been on the

23   news for these last few years since I've been home

24   about police misconduct, it would -- that kind of

1     gives me a lot of reason to not necessarily trust

2     everything that the police department, especially

3     the Columbus Police Department, says.  So I

4     wouldn't --

5     Q.        But this is not the Columbus Police

6     Department, correct?

7     A.        I wouldn't bet my life on anything that

8     an officer from Columbus or West Virginia says.

9     Q.        Okay.  Let's turn to the next page.  Do

10    you see at the top of the page, subsection C,

11    Defendant's Statement?  It's at the top of the

12    third page.  Defendant's Statement.

13    A.        Yes.

14    Q.        The subject indicated he was bringing

15    crack cocaine into Parkersburg from Columbus,

16    Ohio, and had been doing it off and on for nearly

17    three years.  He made his living dealing drugs.

18    The subject estimates earning between $20,000 and

19    $30,000 per year on the sale of drugs.

20              Did I read that correctly?

21    A.        That's what it says on the paper.

22    Q.        Were you earning between 20,000 and

23    30,000 a year on the sale of drugs back in 1999

24    and 2000?

1    A.        I do not recall.

2    Q.        What's your best estimate of how much

3    you were earning from the sale of drugs back in

4    that time period?

5    A.        I don't even have an estimate.  It

6    was -- that was a long, long time ago.

7    Q.        The subject indicated he was bringing

8    crack cocaine into Parkersburg from Columbus,

9    Ohio, doing it on and off for nearly three years.

10            Is that an accurate statement?

11   A.        I -- I don't know who wrote this stuff

12   down.  I can't -- I can't remember.

13   Q.        Well, those are two different answers.

14   It doesn't matter who wrote it down.  My question

15   is, is it accurate?

16   A.        I have no idea.

17   Q.        Is it possible that it's accurate?

18   A.        I have no idea.

19   Q.        Can you turn to page 5 of this exhibit?

20   It's Bates No. 7867.  At the top, under section A,

21   Use of Alcohol or Drugs.  The subject's history

22   involves alcohol, cocaine, and marijuana.  The

23   subject does not believe he has an alcohol or drug

24   problem but indicated he, quote, had, end quote, a

1   problem with, quote, cocaine and weed, end quote.

2   He further stated it has taken him about six

3   months to get off drugs following his arrest.

4           Did I read that correctly?

5   A.      That's what it says on the paper.

6   Q.      All right.  Did you get off drugs after

7   your West Virginia arrest?

8           MS. MARTINEZ:  Belated form objection.

9           You can answer.

10  A.      I'm going to say yes.

11  Q.      You're going to say yes, that after

12  your arrest you got off drugs?  Is that your

13  testimony?

14  A.      I believe so, yes.

15  Q.      How did you do that?

16  A.      While incarcerated in West Virginia,

17  they have -- like I said before, there's -- it's

18  an incentive-based system, so I attended -- I do

19  remember attending AA and NA classes, and learning

20  a lot about how addiction works and learning a lot

21  about addiction, and learning, you know, the ups

22  and downs.  I heard some very good stories while

23  attending AA and -- yeah.

24  Q.      Based upon your experience in AA and NA

1  in West Virginia prison, did you come to believe

2  that you had an addiction?

3  A.         That's a good question.  No, I kind of

4  think it further cemented the fact that I wasn't

5  addicted because, you know, I don't know if you've

6  ever been to an AA meeting, but they have a

7  gentleman come in front of the class and basically

8  tell their life story about how alcohol or drugs

9  caused their demise.

10         And like I said before, I wasn't fully

11  mature at this time in my life and I think it had

12  the opposite effect of me believing that I had a

13  drug problem or alcohol problem.  I kind of

14  compared myself to those individuals and, you

15  know, seeing how alcohol and drugs and seeing what

16  it had done to their life, you know, I was -- I

17  was not mature enough to see it yet, not mature

18  enough to see it --

19  Q.         So at the --

20  A.         -- to go to those classes.

21  Q.         -- time you did not believe that you

22  had a drug problem?

23  A.         No, I didn't believe I did.

24  Q.         Did you come to understand later that

1  you had a drug problem?

2  A.          Looking back on it now, being more

3  mature now, being more involved in my faith and,

4  yeah, when I look back on it, it seems like I was

5  using it as a coping system and just really just

6  trying to escape the harsh realities of life, so,

7  you know, for lack of a better term, it seemed

8  like there definitely was a problem there.

9  Q.          It says:  The subject does not believe

10  he has an alcohol or drug problem but indicated he

11  had a problem with cocaine and weed.

12          Does that correctly reflect your

13  opinion about yourself at the time?

14  A.          At this time, I do not recall.

15  Q.          Jump down three paragraphs.  The

16  subject began using cocaine while living in

17  Parkersburg in 1999.

18          Does that sound correct to you?

19  A.          No.

20  Q.          When did you first start using cocaine?

21  A.          I cannot recall.

22  Q.          Who --

23  A.          This was -- just because it's written

24  here on this paper doesn't mean it to be true.

1    It's only like a sworn statement not in my

2    handwriting.

3    Q.          I understand.  I'm asking you whether

4    it's accurate.

5               Who first gave you cocaine?

6    A.          I do not recall.

7    Q.          Where were you when you first took

8    cocaine?

9    A.          I would probably say -- I -- I do not

10   recall.

11   Q.          And I apologize if we went over this.

12   Have you -- have you taken both powder and crack

13   cocaine?

14   A.          I've never done crack cocaine.

15   Q.          All right.  Back to that paragraph we

16   were looking at about you beginning to use it in

17   Parkersburg in 1999.  The paragraph continues:  He

18   used it on average of twice a week.

19               Does that sound like an accurate

20   estimation of how often you used cocaine in 1999?

21   A.          Like I said before, just because it's

22   written on this paper, it doesn't -- it doesn't

23   sound like something -- it doesn't sound like me,

24   no.

1   Q.       So your answer is no, that's not an

2  accurate statement?

3   A.       It doesn't sound like an accurate

4  statement. But I've never seen this document

5  before.

6   Q.       I understand that.

7            He denied using it in Columbus, saying,

8  quote, I have a reputation to keep up.

9            Did you make that statement?

10  A.       I'm not sure who made these statements.

11  Q.       Is it possible that you made that

12  statement?

13  A.       I'm not sure.

14  Q.       So it's possible?

15  A.       I'm really not sure. This -- I've

16  never seen this document before.

17  Q.       I understand you haven't seen the

18  document before. I'm asking you about the

19  statement.

20            MS. MARTINEZ: Objection. Asked and

21  answered.

22            You can answer.

23  Q.       Did you try to avoid using cocaine when

24  you were in Columbus because you had a reputation

1  to keep up?

2  A.          I don't recall.

3  Q.          So it's possible?

4  A.          It was a long time ago.  I honestly

5  don't recall.

6  Q.          And then once again, two sentences

7  later:  He brought crack cocaine from Columbus to

8  Parkersburg where he sold it.

9          Did you do that?

10  A.          No.

11  Q.          You never brought cocaine from Columbus

12  to Parkersburg to sell?

13  A.          No.

14  Q.          How do you recall that so clearly?

15  A.          It seemed -- doing something like that

16  would indicate that it seems pretty dangerous, you

17  know, there -- I could remember in Parkersburg

18  partying, being young and dumb, but something like

19  that seems like it would have been taboo because

20  of the ramifications.  You know, transporting

21  drugs is -- it's a little bit -- it seems kind

22  of -- kind of dangerous.

23  Q.          So you're making an assumption that you

24  wouldn't have done it because it was dangerous,

1  correct?

2  A.          No.  I'm -- I'm making the assertation

3  that I wouldn't have done it.

4  Q.          Turn to the next page.  Some of this is

5  repetition.  Again, when asked how he supports

6  himself -- this is in the third paragraph -- when

7  asked how he supports himself, he replied that

8  he's dealt drugs for several years and earned

9  between 20,000 and 30,000 per year, but not

10  consistently.

11          Again, did you tell them that that was

12  the case, that you sold drugs for several years

13  and earned between 20,000 and 30,000 dollars a

14  year?

15  A.          I do not recall.

16  Q.          All right.  Second paragraph from the

17  bottom, there's a sentence that says:  The subject

18  has a severe drug addiction to both marijuana and

19  crack cocaine which will need to be addressed

20  through counseling while incarcerated.

21          My question is, did anybody at the West

22  Virginia prison tell you that in their opinion you

23  had a severe drug addiction to marijuana and crack

24  cocaine?

1          MS. MARTINEZ:  I'll object to the form.

2          And if you need to read that section,

3    feel free.

4    A.          Can you repeat the question?

5    Q.          Sure.  You saw the sentence that I

6    read, correct?  The subject has a severe drug

7    addiction to both marijuana and crack cocaine

8    which will need to be addressed through counseling

9    while incarcerated.

10          Do you see that sentence?

11   A.          I see that sentence.

12   Q.          The question is, did anybody from the

13   West Virginia prison staff tell you that in their

14   opinion you had a severe drug addiction to both

15   marijuana and crack cocaine?

16   A.          Throughout the whole 26 years while I

17   was incarcerated, did they explain that?

18   Q.          You were not incarcerated for 26 years

19   in West --

20   A.          I mean --

21   Q.          -- Virginia.

22   A.          Sorry about that.  Strike that.

23          26 months.  I do not recall.

24   Q.          Do you recall anyone ever telling you

1  while you were incarcerated in West Virginia that

2  in their opinion you had a drug addiction?

3  A.          I do not recall.

4  Q.          You indicated that you participated in

5  NA and AA while you were in West Virginia prison,

6  correct?

7  A.          Yes, that's correct.

8  Q.          And when we say AA, we mean Alcoholics

9  Anonymous, correct?

10 A.          That is correct.

11 Q.          And NA would be Narcotics Anonymous?

12 A.          That is correct.

13 Q.          How does one get into a program like

14 that in prison?  Do you just say you want to go?

15 A.          The way it works, from what I can

16 remember, I do believe you -- some of it was

17 mandatory in some facilities and some of it was

18 voluntary.

19 Q.          Mandatory for all inmates?

20 A.          In certain facilities, I -- yes, it was

21 mandatory.

22 Q.          Did you attend sessions of those in

23 facilities where it was not mandatory?

24 A.          Yes, I did.

1  Q.         How did that come about?

2  A.         Well, in prison, there's not really a

3  lot to do, a lot of fun things to do, a lot of

4  entertaining things to do.  So on -- let's say on

5  a Tuesday night they would have AA.  And you start

6  to see, you know, the people who are attending the

7  classes it actually, you know, is making a

8  difference on how they thought and carry

9  themselves.

10         And so at some point I -- I attended a

11 few classes voluntarily, just, you know, to try to

12 escape from whatever madness was going on around

13 me and try to see, you know, what the -- what

14 this -- what the fuss was all about.

15 Q.         Well, clarify for me, because I thought

16 I heard two different answers in there.  Did you

17 attend because you saw the beneficial effects it

18 was having for the people who went or did you

19 attend because you were bored and you didn't have

20 anything better to do?

21 A.         I might have given two different

22 answers.  Sorry about that.  But it was probably a

23 mixture of both.  I mean, when you're sitting in

24 prison, it's a -- it's a dark place, you're

1    looking for some light, and on -- and on some
2    occasions I might just have went because I was
3    bored, you know.
4    Q.         What made you think that these programs
5    would do any good for you if you didn't think you
6    had a drug or alcohol problem?
7    A.         Because they're faith-based programs.
8    They started off with very much speaking about
9    faith, you know, and talking about the Lord and
10   God, so that was a good start for me right there.
11   That kind of piqued my interest right there.
12   Q.         Now, correct me if I'm wrong, but my
13   understanding is the first step in these programs
14   is acknowledging that you have a problem with a
15   substance; is that correct?
16   A.         I do not recall the 12 Steps.  Sorry.
17   Q.         Do you remember that -- that
18   acknowledgment of a problem being part of the
19   process?
20   A.         I -- I do.
21   Q.         How did you deal with that if you
22   didn't think you had a problem?
23              MS. MARTINEZ:  Objection.  Form.
24              You can answer.

1    A.          Like I said, I was young and immature

2    and I never, like I -- I never really believed I

3    had a problem, so I wasn't in there trying to earn

4    the badges and stuff.  I was just in there to hear

5    the life lessons.  And, you know, maybe sometimes

6    I was in there just to get out of my prison cell.

7              MR. EPSTEIN:  We're going to take a

8    lunch break at this point.  We will go off the

9    record.

10             THE VIDEOGRAPHER:  We're off the

11   record.  The time is 12:58.

12                        - - - - -

13             Thereupon, a luncheon recess is taken

14   at 12:58 p.m.

15                        - - - - -

16

17

18

19

20

21

22

23

24

1          Thursday Afternoon Session,

2          December 19, 2024.

3                - - - - -

4          THE VIDEOGRAPHER:  This marks the

5     beginning of Media No. 4.  We are back on the

6     record.  The time is 1:59.

7                - - - - -

8          Thereupon, Exhibit 12 is marked for

9     purposes of identification.

10               - - - - -

11    BY MR. EPSTEIN:

12    Q.        Okay.  Mr. Horton, I just want to ask

13    you a couple of more quick questions about your

14    experience in West Virginia.  I'm going to hand

15    you what I've marked as Exhibit 12.  It's a series

16    of documents from the Parkersburg Police

17    Department.  You can take your time looking over

18    the document if you want to, but I'm not going to

19    ask anything substantive really about it.  The

20    first page is an arrest report with your name on

21    it, correct?

22    A.        Correct.

23    Q.        And it indicates a height of 6'1",

24    correct?

1    A.          That's correct.

2    Q.          Is that your height?

3    A.          That's correct.

4    Q.          And then just for the record, this is

5    showing an arrest date of September 30th, 2000.

6    It's just before the dark line.  Just above the

7    dark line in the center.

8    A.          That's correct.

9    Q.          All right.  And does that sound right

10   for the date that you were arrested in West

11   Virginia?

12   A.          It sounds -- it -- it was so long ago.

13   Q.          Can you turn to the second page of the

14   exhibit?  The second page consists of four

15   photographs, correct?

16   A.          That's correct.

17   Q.          And who are those photographs of?

18   A.          The photographs are so dark, I almost

19   can't even tell.

20   Q.          Well, do you recognize the person in

21   the photograph?

22   A.          That is me, yeah.

23   Q.          It is you in all four photographs,

24   correct?

1    A.          Yeah.

2    Q.          Before we broke for lunch, you were

3    talking about the different levels of security in

4    the West Virginia system, and you had talked about

5    you can work your way up to a work release

6    program; is that correct?

7    A.          That's correct.

8    Q.          Did you, in fact, make it into a work

9    release program while you were incarcerated in

10   West Virginia?

11   A.          Yes, I did.

12   Q.          How did that work?

13   A.          Let me see, how did it.  The way work

14   release works is you essentially are granted a

15   privilege to leave the prison and go live in kind

16   of like a halfway house setting.  I think in

17   Columbus they refer to it as a halfway house.  So

18   it's a bunch of inmates living in essentially

19   what's like a dorm, a house.

20   Q.          Okay.  Well, if you could, confine your

21   description to the experience in West Virginia.

22   A.          Okay.  Sorry about that.

23               So it was you lived there, there's a

24   different set of rules, you get a job, you're

1   allowed to open up a bank account, you have to pay

2   a percentage of your salary to live there and

3   you're encouraged to save your money, they help

4   you find jobs, there's lots of programming offered

5   in there.  Yeah.  That's about it.

6   Q.          How long were you in that program?

7   A.          I was in two different work release

8   programs while being incarcerated in the state of

9   West Virginia and -- I do not recall.

10  Q.          When you say you were in two different

11  programs, what were the two different programs?

12  A.          One was in Huntington, West Virginia.

13  And the other one was in a different county in

14  West Virginia.  I want to say -- I'm not sure.

15  Was it Beckley, West Virginia?

16  Q.          What jobs did you have during that

17  time?

18  A.          The jobs that I had that I can

19  remember, I worked as a telemarketer and I worked

20  in a kitchen for the most part.

21  Q.          How much were you paid?

22  A.          I can't -- I can't recall the exact

23  amount, but it was -- I was able to -- I was able

24  to save more than what I spent.

1  Q.          So you had a bank account in West

2  Virginia where the money went into?

3  A.          I -- I can't -- I can't recall exactly

4  the name of the bank.  It was so long ago.

5  Q.          But you did have a bank account?

6  A.          There was a savings system in place.

7  Q.          Was it with a private bank or something

8  operated by the -- by the State or the penal

9  system?

10 A.          I'm not sure.  I can't -- I can't

11 remember.

12 Q.          Would the employer give you a physical

13 check or would they electronically deposit your

14 money?

15 A.          This was back in the early 2000s, so I

16 believe it was a physical check.

17 Q.          At the time of your release, how much

18 money did you have in that account?

19 A.          Oh, that's a good question.  Oh.

20 Maybe -- maybe about four or five thousand

21 dollars.

22 Q.          When you left the prison, that money

23 then reverts to you, correct?

24 A.          Yeah, they give it to you in the form

1   of a check.

2   Q.          When were you released from prison in

3   West Virginia?

4   A.          April of 2004, I believe.

5                    - - - - -

6               Thereupon, Exhibit 13 is marked for

7   purposes of identification.

8                    - - - - -

9   Q.          I'm handing you what's been -- excuse

10  me -- marked as Exhibit 13.  Can you identify that

11  for the record?  Do you recognize that?

12  A.          State of West Virginia, Division of

13  Corrections.  I'm sorry, I do not recognize this

14  paper.

15  Q.          All right.  Well, I will represent for

16  the record that the first page is a document from

17  the State of West Virginia, ordering of release.

18  It's an order of release on parole.  And you see

19  on the second line this is the order to release

20  Richard Horton, correct?

21  A.          I see it.

22  Q.          And the date of the release is

23  April 13th, 2004, correct?

24  A.          That's correct.

1   Q.          Which is consistent with what you said

2   a moment ago that you thought you had been

3   released in April of 2004?  Yeah?

4   A.          Yes.

5   Q.          Okay.  The second page is captioned

6   Parole Agreement.  And it appears to put forward

7   some conditions for people to abide to.  At the

8   bottom there's a signature above parolee.  Is that

9   your signature?

10  A.          That is my signature.

11  Q.          So you agreed to those conditions?  Did

12  you agree to those conditions?

13  A.          Yes, I would.

14  Q.          All right.  And then the third page are

15  the rules and regulations governing your release.

16  Do you see that?

17  A.          I see it.

18  Q.          And again, is that your signature at

19  the bottom?

20  A.          That is my signature.

21  Q.          Did you have a parole officer when you

22  were released?

23  A.          Yes.

24  Q.          Who was that?

1    A.          I do not recall.

2    Q.          Was it a man or a woman?

3    A.          I think it was a woman.

4    Q.          Can you turn to the fourth page?  In

5    the middle of the page it says you are instructed

6    to report your arrival immediately by phone or in

7    person to Senior Officer Robin Karim.

8              Does that refresh your recollection

9    about who your parole officer was?

10   A.          No.  I'm sorry.

11   Q.          That's okay.  This appears to suggest

12   that you were released to a parole officer in

13   Ohio, correct?

14   A.          Yes.

15   Q.          Did you have to get special permission

16   to have your parole in Ohio rather than West

17   Virginia?

18   A.          I can't recall.

19   Q.          Did you abide by these rules and

20   conditions while you were on parole?

21              MS. MARTINEZ:  You can look through

22   them again if you need to.

23   A.          To the best of my knowledge, I did

24   abide by all the rules.

1    Q.          Okay.  Let me ask you about a couple of

2    specific requirements.  On page 2, the Parole

3    Agreement, under item 5, there's a subpart 2.  Do

4    you see that?

5    A.          I see it.

6    Q.          You are -- excuse me.  Strike that.

7               You are to obtain a legitimate AA/NA

8    sponsor as approved and required by your parole

9    officer and attend meetings on a regular basis.

10              Did your parole officer require you to

11   get a sponsor?

12   A.          Not that I remember, no.

13   Q.          Okay.  On the third page, the first

14   part, section 2.1 and then there's subpart (a).

15   When released, you must proceed directly to the

16   place to which you have been paroled and report to

17   your parole officer within 24 hours unless

18   otherwise instructed.

19              Do you see that?

20   A.          I see that.

21   Q.          Did you do that?

22   A.          Yes, I believe I did abide by section

23   2.1(a).

24   Q.          Okay.  2.1(b).  You are to have written

1    permission of your parole officer before you leave

2    the prescribed area of supervision to which you

3    are paroled.

4           Did you have any occasion to leave the

5    prescribed area during the term of your parole?

6           MS. MARTINEZ:  Objection.  Form.

7           You can answer.

8    A.       I don't recall.

9    Q.       What did you understand the prescribed

10   area of your supervision to be?

11   A.       The -- the way I read it, it seems like

12   something that you would need permission to leave

13   the state for.  When they talk about area, I'm not

14   sure of the actual circumference of the area, it's

15   not stated here, but it just seems like that you

16   would need written permission from your parole

17   officer before you leave the prescribed area.

18   Q.       And you understood that to be the state

19   of Ohio?

20   A.       Yes, sir.

21   Q.       Between the time of your release in

22   2004 and the time of your incarceration in 2006,

23   did you leave the state of Ohio?

24   A.       Yes.

1   Q.          Where did you go?

2   A.          I went to -- I went to Alabama.

3   Q.          For what purpose?

4   A.          I wanted to go see my son.  My son with

5   heart disease, I wanted to go see him.

6   Q.          Did you get permission from your parole

7   officer to do that?

8   A.          I do not recall.

9   Q.          Subpart g.  You must report within

10  24 hours to your parole officer each time you are

11  arrested or questioned by officers of any law

12  enforcement agency.

13              Do you see that?

14  A.          I see it.

15  Q.          Did you ever have any occasion to

16  report to your parole officer that you had been

17  arrested or questioned by officers of a law

18  enforcement agency?

19  A.          Other than this case, yes, I did have

20  an instance where I would have -- I would have

21  wanted to report.

22  Q.          What incident was that?

23  A.          On the way -- wait a minute.  Oh, man,

24  my memory.  You know what, I don't recall.  I

1   think I'm getting a trip to Alabama confused.  I'm

2   trying to remember what year it was.  I -- I'm

3   drawing a blank right here.  Man, what year was

4   that?  Yeah, I do not recall.

5   Q.          Is there a specific incident you're

6   thinking of that you're not sure when it occurred?

7   A.          Yes.

8   Q.          What incident are you thinking of?

9   A.          It's an incident that happened in --

10  before all of this took place, so I'm -- I'm --

11  I'm mixing up the two dates.

12  Q.          Okay.

13  A.          This was something that happened

14  earlier and I was on my way to see my son.  Yeah,

15  I'm getting it a little bit mixed up.  Sorry about

16  that.

17  Q.          Well, that's okay.  Let's see if we can

18  tease it out.  You were on your way to your son

19  and what happened?

20  A.          Oh, this was before all of this.

21  Q.          Okay.  But still, you were on your way

22  to your son and what happened?

23  A.          I -- this -- this was before all this,

24  so I don't want to, you know, go into detail

1    because I'm mixing the details up.  I actually

2    don't even think -- I'm confusing two instances.

3    I don't even think my son was even born yet, so --

4    Q.        Okay.

5    A.        -- I'm sorry about that.

6    Q.        Well, but I want to be clear.  Did you

7    have an incident where you had an encounter with

8    police officers while you were on your way to see

9    your son?

10   A.        No.

11   Q.        Did you have -- strike that.

12             Was there an occasion where you were on

13   your way to see your son and something occurred

14   that if it happened in this time period would have

15   been a reportable incident?

16   A.        I do not recall.

17   Q.        You were still on parole when you were

18   arrested in 2004 for the Loew Street robbery,

19   correct?

20   A.        That's correct.

21   Q.        Did you report that to your parole

22   officer?

23   A.        Yes.

24   Q.        As you sit here today, can you remember

1    any other reports that you made to your parole

2    officer?

3    A.          Yes, I can.

4    Q.          What can you tell me?

5    A.          So as -- as the other document states,

6    I was paroled to a Camden Avenue address.

7    Q.          Uh-huh.

8    A.          So while I was on parole for the charge

9    in West Virginia, I -- I'm not sure exactly how

10   this came to light, but I found out there was a

11   warrant for my arrest for breaking down a door on

12   the Camden Avenue address.  So I told my parole

13   officer.  They said, figure it out.  And we

14   figured it out.

15           Since the alleged incident happened at

16   the place where I was currently living at, you

17   know, I'm assuming that it really wasn't a big

18   deal because it might have been some -- a mixup in

19   the paperwork or whatever it was.  But I don't

20   remember it being a serious enough offense or that

21   I did anything wrong because, like I said, this

22   was the exact same residence where I was living,

23   so it didn't seem like a big deal to him, and I

24   didn't make a big -- well, to her it didn't make a

1   big deal, so I didn't make a big deal out of it.

2   Q.          Well, how did you find out about this,

3   that there was some problem relating to your

4   entrance into Camden?

5   A.          Could you rephrase that, please?

6   Q.          I mean, was there -- was there a police

7   report, were you arrested, were you questioned,

8   how did this happen?

9   A.          This was -- this was from years

10  earlier.  I had a family dispute with someone,

11  with my aunt, at the -- at the Camden address, so

12  that's where it originated from.

13          I didn't know there was a warrant out

14  for my arrest because, you know, they let me

15  parole from West Virginia to Columbus, Ohio, so I,

16  you know, that's not -- that's not my

17  responsibility, I didn't even know.  They really

18  shouldn't -- they should have sent me straight to

19  jail because there was an active warrant for my

20  arrest, but they didn't, and we got it worked out.

21  Q.          Okay.  Let me see if I'm understanding

22  this.  So you had an aunt who lived at Camden,

23  correct?

24  A.          That's correct.

1    Q.        What was her name?

2    A.        Her name was Nancy Banner.

3    Q.        And at some point before you went to

4    prison in West Virginia, there was an incident

5    where you might have broken into that place or

6    they thought you had broken into that place?

7              MS. MARTINEZ:  Objection.  Form.

8              You can answer.

9    A.        There was an incident there, a family

10   dispute there, at the address on Camden Avenue,

11   between myself and Mrs. Banner, and it was a while

12   ago.

13   Q.        And so there was a warrant outstanding

14   from that incident?

15   A.        I believe so.

16   Q.        And that -- you became aware of that

17   warrant in 2004 while you were under parole

18   reporting obligations, correct?

19   A.        That's correct.

20   Q.        And so you reported that to your parole

21   officer?

22   A.        Yes, sir.

23   Q.        Okay.  So now we have two reports to

24   your parole officer, right, one for the Camden

1    Avenue warrant and one for Loew Street.  Were

2    there any other encounters with police or arrests

3    while you were on parole?

4    A.         Not that I can recall.

5    Q.         And you have no recollection of any

6    other reports to your parole officer?

7    A.         Not from the year of 2004 on, no, sir.

8    Q.         Where was your son living in 2004 when

9    you were paroled from West Virginia?

10   A.         I believe he was living with his mother

11   in, I'm not 100 percent sure, California, maybe.

12   Q.         Has he lived in multiple places?

13   A.         Yes, you know, and I don't -- I don't

14   fault her for that, you know, I'm the child's

15   father, but, you know, I don't -- he's lived in

16   California, Alabama, Georgia, Florida, lots of

17   different places while I was sitting in prison for

18   16 years for a crime that I didn't commit.

19   It's -- yeah, it's taken a toll on him.

20   Q.         Who did he live with in Alabama?

21   A.         I believe he stayed with his mother and

22   his grandma.

23   Q.         Is that where they're from?

24   A.         I believe that's where the grandmother

1    was from, but I'm not 100 percent sure.  She's a

2    very sweet lady, but I don't know all the

3    particulars about her.

4    Q.          Your son has medical problems or he did

5    anyway as a child, correct?

6    A.          Yes, he -- he has still to this day has

7    medical problems.

8    Q.          Was his residence in Alabama in any way

9    related to his medical condition?

10   A.          I -- that wasn't my decision, so I -- I

11   do not recall.  Sorry.

12   Q.          Do you know anything about your son

13   experiencing a life-threatening accident at some

14   time?

15   A.          Yeah.  This is while I was incarcerated

16   in the state of Ohio.  He -- he was at school,

17   trying to show off with some young ladies, and he

18   went into AFib.  And they had to -- they had to

19   lift him by helicopter from the school to a

20   hospital.

21          And that was a pretty tough time,

22   just, you know, just being so far away and not

23   being able to do anything, you know.  And there's

24   the guilt of, you know, did he get heart disease

1     from my side of the family.  It's just -- it

2     wasn't a good time.  But he was able to -- he was

3     able to -- the doctors did a fantastic job.  The

4     first responders did a fantastic job.

5     Q.        When you were released from prison,

6     were you able to go see your son?

7     A.        When I was released from prison?

8     Q.        In 2004.

9     A.        In 2004?  I do not recall.

10    Q.        You think he may have been in

11    California at that point, but you're not sure?

12    A.        That's correct.

13    Q.        You went back to prison in 2006,

14    correct, for the Loew Street robbery?

15    A.        For the Loew Street charge, yes.

16    Q.        You were incarcerated in 2006?

17    A.        Yes.

18    Q.        Where was Kobe living at that time?

19    A.        He -- at that time he was living in

20    Columbus, Ohio.

21    Q.        Who was he living with?

22    A.        Once again, I'm sorry, that was -- that

23    was 20 years ago.  I'm not even sure.  I'm not

24    sure.  You know, the trauma from what happened to

1    me right around that time, I'm not sure exactly

2    where he was living.

3    Q.          Was there any conversation about him

4    coming to live with you?

5    A.          Previous, before I got wrongfully

6    incarcerated, yes.  Yes.

7    Q.          Tell me about those conversations.

8    A.          Well, they were -- they were tough

9    because his mother, you know, like I said,

10   she's -- she's pretty feisty, but I knew that

11   she -- she had -- she had either just -- she had

12   just got out of prison, so I don't think she was

13   stable.

14          So, you know, I would see him, go to

15   see him throughout the week, but it was a delicate

16   situation because I was still kind of newly

17   married and, you know, just asking my wife, you

18   know, to take on a lot of that responsibility of,

19   you know, being a stepmom to a child with heart

20   disease, it was -- it was a little touch and

21   go, you know.  Some conversations went good, some

22   conversations didn't go so well, but, you know, we

23   did the best we could.

24   Q.          Okay.  Let's back up a second.  You

1    were paroled in April of 2004, correct?

2    A.          I was paroled, yes.

3    Q.          You came back to Columbus immediately

4    afterwards, correct?

5    A.          Yes.

6    Q.          And where did you live?

7    A.          Camden Avenue.

8    Q.          In Nancy Banner's house?

9    A.          That's correct.  In her basement.

10   Q.          In her basement.  How long did you stay

11   there before you moved out?

12   A.          I never really moved all the way out.

13   I kind of just stayed, you know, in between

14   places, just trying to really figure it out.

15               I'd say when Janette and I got married,

16   that was kind of -- that would probably be the

17   best date when I was officially moved all the way

18   out, and that was -- oh, I got to get this right

19   on camera -- July 5th, 2005.

20   Q.          Okay.  So you've jumped a year from

21   April of 2004 to July of 2005.  At some point in

22   that period of time you moved to Reynolds Avenue,

23   correct?

24               MS. MARTINEZ:  Objection.  Form.

1          You can answer.

2     A.          I stayed, like I said before, I stayed

3     in a couple of different spots.  I moved around a

4     little bit.

5     Q.          Well, you rented Reynolds Avenue,

6     correct?

7     A.          I was -- it was a couple of guys.  It

8     was kind of like a fraternity house.

9     Q.          Who lived there?

10    A.          A couple different guys.

11    Q.          What were their names?

12    A.          Their names -- I don't recall.  That

13    was a long time ago.

14    Q.          Do you remember any of their names?

15    A.          Do I remember who all names was on the

16    lease besides mine?  If my name was on the

17    lease -- I don't recall.

18    Q.          Who did you lease it from?

19    A.          The -- the gentleman's name, he was an

20    older Russian guy.  I can't remember his name.

21    Sorry.

22    Q.          How much was the rent?

23    A.          Maybe about 5 or -- maybe 600.

24    Q.          Now, is that $600 that you paid or $600

1    that got split amongst all the tenants?

2    A.          I would say it was split.

3    Q.          Why did you rent the Camden place if

4    you were -- I'm sorry.  Why did you rent the house

5    if you were still living in Camden?

6    A.          The reason I would, you know, I didn't

7    want to continue to live in my aunt's basement for

8    the rest of my life.  In the year 2004, I was

9    trying to get my life together and trying to

10   change and force that change.  And, you know, just

11   living in, you know, I was -- it's a blessing, you

12   know, I'm always forever thankful for my aunt to

13   give me the opportunity, but I didn't want to, you

14   know, being -- I forget how old I was at the

15   time -- 26, 25, 26, I didn't want to stay in her

16   basement forever.

17   Q.          What did the Everett [sic] Street house

18   look like?

19              MS. MARTINEZ:  Objection.  Form.

20              You can answer.

21   A.          You know, I don't know how long you've

22   lived in Columbus, Ohio, but it -- it's -- that

23   neighborhood is not a terrible neighborhood.  You

24   have doubles, duplexes, single-family homes.

1                    - - - - -

2              Thereupon, Exhibit 14 is marked for

3      purposes of identification.

4                    - - - - -

5      Q.        I'm going to hand you what's been

6      marked as Exhibit 14.  Is that a picture of the

7      Everett [sic] Street house?  I'm sorry.  I keep

8      saying Everett.  Is that a picture of the Reynolds

9      Avenue house?

10              MS. MARTINEZ:  Objection.  Form.

11              You can answer.

12     A.        I haven't seen that house in a long

13     time.

14     Q.        Does that look familiar to you?

15     A.        It does look familiar.

16     Q.        Do you think that might be a picture of

17     the house that you rented?

18     A.        I think it might be.

19     Q.        Did you have a job when you came back

20     from West Virginia?

21     A.        Yeah.  I worked at -- yes, I did.

22     Q.        And where did you work?

23     A.        I worked at Popeyes Chicken and

24     Biscuits on Livingston Avenue.

1    Q.          What did you do there?

2    A.          During my employment there, I was -- I

3    was a cook.

4    Q.          Did you have a regular shift?

5    A.          Yes, I did have a regular shift when I

6    was working at Popeyes.

7    Q.          What was your shift?

8    A.          I can't remember.  I'm not sure,

9    exactly sure what the shift was.  First shift.

10   Q.          Well, how many hours did you work?

11   A.          It varied.  It wasn't -- working, like

12   I said, being a certain age, working at a place

13   called Popeyes Chicken and Biscuits, it varied.  I

14   didn't, you know, really want to -- I never really

15   was striving to be employee of the month.  Just

16   have a job, have some income coming in, and keep

17   my parole officer happy.

18   Q.          Did you have any other jobs at the

19   time?

20   A.          I don't recall.

21   Q.          So it's possible you did?

22   A.          It's possible.

23   Q.          But you don't recall any of them?

24   A.          I don't recall because, you know,

1    sometimes -- yeah, I did have other jobs.  I would

2    do what's called residential cleanouts of homes

3    and stuff like that.

4    Q.        Who did you do that for?

5    A.        I've done it for various different

6    customers, just kind of cleaning out attics and

7    maybe stuff like that.

8    Q.        But were you working for a company or

9    were you self-employed?

10    A.        Self-employed.

11    Q.        And was this during 2004, 2005?

12    A.        Yeah.  Yes.

13    Q.        What other jobs did you have in that

14    time period?

15    A.        I -- I don't recall if I had any other

16    jobs at that time.

17    Q.        Did you sell drugs during that time?

18    A.        No.

19    Q.        When did you meet Janette?

20    A.        I met Janette shortly after my release

21    from prison in 2004.

22    Q.        Can you be specific about when you met

23    her?

24    A.        I got out in April, so I know it was

1  after that.  A couple months after that.

2  Q.          Where did you meet her?

3  A.          I met her at a bar.

4  Q.          Which bar?

5  A.          It was a bar on Sinclair and Morse

6  Road.

7  Q.          What time was it?  I mean, was it late,

8  early morning, dinnertime?

9  A.          That's a good question.  It was -- it

10  was after dinnertime.

11  Q.          Was this a bar you frequented?

12  A.          No.  I don't recall.  I've been there a

13  time or two.  It wasn't like -- there was nothing

14  wrong with it or anything illegal about it.  Yeah,

15  I've been there before.

16  Q.          Did you just meet her as another person

17  in the bar or was there a setup of any kind?

18  A.          Just met her.  Just bumped into her,

19  kind of.

20  Q.          And then you eventually married her?

21  A.          Yeah.  I can remember her having a

22  distinctive hairstyle and it kind of piqued my

23  interest, and the rest, they say, is history.

24  Q.          Did you have a bank account when you

1  came back to Columbus?

2  A.          Yes, I did have a bank account.

3  Q.          How many accounts did you have?

4  A.          I do not recall.  That's a good

5  question.

6  Q.          Was it possible that you set up

7  accounts at more than one bank?

8  A.          It is possible.

9  Q.          Why would you do that?

10  A.          You know, well, while -- while I was in

11  prison, I -- I learned a lot more about finances.

12  And I'm actually pretty good, pretty good with my

13  money now, a little bit better, a lot better, so I

14  really -- I'm really not sure why I would have had

15  more than one bank account if I had more than one

16  bank account.

17                    - - - - -

18          Thereupon, Exhibits 15 and 16 are

19  marked for purposes of identification.

20                    - - - - -

21  Q.          Okay.  I'm handing you what's been

22  marked as Exhibit 15 and Exhibit 16.  You may

23  recognize these.  These were exhibits at your

24  criminal trial.  Exhibit 15 is a bank statement

1    for an account at Telhio Credit Union in the name

2    of R. Horton.  Can you see that?

3    A.          Yeah.

4    Q.          Was this the bank account that you had

5    at the time?

6    A.          Yes.

7    Q.          All right.  And the -- the date for

8    this statement appears to cover the months of

9    September and October 2004.  Can you see that?

10   A.          Yes, I can see that.

11   Q.          So this would have been just before the

12   Loew Street robbery, correct?

13              MS. MARTINEZ:  I'm just going to

14   object.

15   Q.          Actually, a little before and a little

16   after.

17              MR. EPSTEIN:  Thank you.

18   A.          That's what the dates indicate on the

19   paper.

20   Q.          Okay.  So I just -- I need to walk you

21   through a couple of these because do you see

22   there's a column called Credits?

23   A.          Yes.

24   Q.          And there are amounts listed on there

1  with dates.  So, for example, on September 7th,

2  there's a $428.52 deposit into the account.  Do

3  you see that?

4  A.          I see it.

5  Q.          And then a $105 deposit three days

6  later.  Do you see that?

7  A.          I see it.

8  Q.          A $190 deposit into the account three

9  days later?

10  A.          I see it.

11  Q.          A $170 deposit into the account three

12  days later?

13  A.          I see it.

14  Q.          A $310 deposit into the account four

15  days later?

16  A.          I see it.

17  Q.          Where are these deposits coming from?

18             MS. MARTINEZ:  Objection.  Form.

19             You can answer.

20  A.          My answer to this question would be

21  this is proof that I didn't know a lot about

22  finances back then.  And I do not recall each and

23  every -- each and every deposit into a bank

24  account from the year 2004.  It's impossible for

1    me to remember exactly where every dollar came

2    from.

3    Q.          But what sources would you have had

4    deposits coming from?

5    A.          Well, my main source would be from my

6    job at Popeyes Chicken and Biscuits, but other

7    than that, I really can't speculate.

8    Q.          All right.  And that brings us to

9    Exhibit 16, which is an earnings statement from

10   SAPP Restaurant Enterprises.  Do you see that?

11   A.          I do see it.

12   Q.          And it's in the name of Richard

13   H. Horton?

14   A.          Yes.

15   Q.          All right.  Is it your understanding

16   that SAPP Restaurant Enterprises is the parent

17   company for Popeyes?

18   A.          It makes sense.

19   Q.          All right.  And this is an earnings

20   statement from work that you did between

21   September 26th, 2004 and October 9th, 2004,

22   correct?

23   A.          Correct.

24   Q.          And the net pay that you earned from

1    Popeyes in that period is $256.76, correct?

2    A.          That's correct.

3    Q.          And did Popeyes hand you a physical

4    paycheck?

5    A.          Well, this was 2004, so, yes, I believe

6    they were still doing physical checks.

7    Q.          And did you deposit that check into

8    your account?

9    A.          I'm not sure.  This -- this check was

10   on -- what date was it?

11   Q.          The check date is October 14th.

12   A.          Oh.  So I should be able to

13   cross-reference it and see.  I don't see an

14   October 14th deposit on here.

15   Q.          You'd agree with me there's no

16   indication that this check was deposited into this

17   account, correct?

18   A.          Not the whole check.  It could have

19   been -- part of the check could have been

20   deposited afterwards.  I see an October 25th.

21   Q.          Where do you see an October 25th?

22   A.          October 20th, was that a -- debits,

23   credits.  At the bottom, three up from the bottom.

24   It says credits, $1,007.

```
 1   Q.         I'm sorry.  I don't see where you are.
 2   A.         Right above the Exhibit, see right
 3   here?
 4   Q.         So you're talking about the credit for
 5   $1,000?
 6   A.         Yeah.  So --
 7   Q.         So you think that might have been
 8   partly the check?
 9   A.         I don't want to speculate.  Sorry.
10   Q.         Well, my question would be, where did
11   the other $750 come from?
12   A.         It could have come from various
13   different, but I'm not exactly sure where a check
14   came from over 20 years ago.  I'm sorry.
15   Q.         When you paid your landlord, did you
16   write him a check or did you pay him in cash?
17   A.         When I paid my landlord, we would kind
18   of come together and pay the young man in cash.
19   Q.         So would you pull the cash that you
20   needed out of this Telhio account?
21   A.         I assume that I would.
22   Q.         You assume that you would, but you
23   don't know?
24   A.         No, I can't -- I can't speculate.  You
```

1    know, it was, you know, it was -- this was over

2    20 years ago.

3    Q.          Okay.  And as you sit here today, you

4    have no explanation for the amounts of cash that

5    are being deposited into this account; is that

6    correct?

7                MS. MARTINEZ:  Objection.  Form.

8    A.          I know that -- I know that I didn't

9    commit this crime against these people.  I'm not

10   sure what this has --

11   Q.          Mr. Horton --

12   A.          -- to do with any of that stuff.

13   Q.          -- I didn't ask you about the crime.  I

14   asked about the money that was being put into your

15   account.  Where is it coming from, do you know?

16   A.          It would be impossible for me to

17   speculate other than the obvious check stubs.

18   Q.          But who would have been issuing you

19   check stubs?

20   A.          It looks like SAPP restaurants.

21   Q.          All right.  How often did you get paid

22   by Popeyes?

23   A.          I can't -- I can't recall.

24   Q.          And you got paid, for this two-week

1   period, $256, roughly?

2   A.          Every two weeks.

3   Q.          Every two weeks.  Okay.  So that's,

4   say, roughly $500 a month?

5   A.          Roughly, if I -- it all depends.  This

6   is just one snapshot of a period in time.

7   Q.          Okay.  So is it your testimony that you

8   were working enough hours at Popeyes to account

9   for all of the money being deposited into this

10  account?

11              MS. MARTINEZ:  Objection.  Form.

12              You can answer.

13  A.          No, the math wouldn't add up.

14  Q.          Let me ask you this:  Is it your habit

15  to walk around with large sums of money, cash?

16  A.          At this age, at this point in my life?

17  Q.          At this point in life, yeah.

18  A.          When I was making obvious terrible

19  financial decisions and I didn't understand the

20  power of credit and the power of having a credit

21  union behind you, yeah, I -- it was safe to say

22  that I was comfortable walking around with cash.

23  Q.          So, for example, on October 12th of

24  2004, there was a withdrawal of $800.  Do you see

1  that?

2  A.          October -- what date was it?  I'm

3  sorry.

4  Q.          October 12th.  It's two above the

5  dotted line.

6  A.          Yes, I see it.

7  Q.          So why would you have pulled $800 out

8  of the account?

9  A.          I -- I do not recall.  Sorry.

10  Q.          And then two weeks later, on

11  October 25th, you pulled a thousand dollars out.

12  Is that the sort of money that you used as

13  walk-around money then?

14  A.          At this point in my life, I'm not sure

15  what I was thinking.  It obviously wasn't too

16  smart.

17  Q.          When you started dating Janette, did

18  you tell her about your criminal history?

19  A.          That's a good question.  I do not

20  recall.

21  Q.          Did you tell her about your prior drug

22  use?

23  A.          That's another good question.  I do not

24  recall.  Was I honest and straightforward with

1    Janette and told her everything?  I do not recall.

2    I don't think that I came in knowing that she

3    would be, you know, the woman for me and that I

4    should disclose everything to her, you know.  I

5    didn't know she was a sweetheart the first day I

6    met her.  I just thought she was pretty.

7    Q.          Is it your position that you had

8    changed your life and your behavior from what it

9    was before West Virginia to what it was

10   afterwards?

11   A.          Yes.

12   Q.          In what respects?

13   A.          Well, there's a lot of different angles

14   and respects.  It's just not living the street

15   life anymore.  Just trying to be more mature, make

16   better decisions, just really --

17   Q.          What did --

18   A.          -- trying to be there for -- oh.

19   Excuse me.

20   Q.          No, no.  I didn't mean to interrupt.

21   You go ahead.

22   A.          Just trying to make better overall

23   decisions.  I had quite a rough upbringing.  As

24   you can see when you look through the documents, I

1    made some mistakes.  But in 2004, I believe I was

2    27, just trying to -- trying to get it -- trying

3    to get it right.

4    Q.          What do you mean by the street life?

5    A.          Being around drug dealers, dealing

6    drugs, using drugs.  Just trying to -- just trying

7    to change my atmosphere.

8    Q.          Did you use -- did you use -- I'm

9    sorry.  During this period in 2004, did you use

10   drugs at all?

11   A.          No.  I left all that life behind me.

12   Q.          And when I say drugs, I'm including

13   marijuana.

14   A.          Which is legal now.  No, I believe the

15   whole time I was on parole, I never had a dirty

16   urine.  The whole time I was in prison, I never

17   had a dirty urine.  I'm quite fond of those facts.

18                      - - - - -

19             Thereupon, Exhibit 17 is marked for

20   purposes of identification.

21                      - - - - -

22   Q.          I'm going to hand you what I have

23   marked as Exhibit 17.  I will represent for the

24   record that this is a criminal complaint against

1   Richard Horton, dated June 22nd, 2004, for

2   possessing a controlled substance,

3   to wit:  Marijuana, a schedule I controlled

4   substance, located in two plastic bags in right

5   front pants pocket, less than 100 grams in amount.

6           Do you recall being arrested by the

7   police in June of 2004 for marijuana possession?

8   A.          No, I don't recall.

9   Q.          It says the offense location was

10  3rd Street and St. Clair Avenue.  Do you know

11  where that is?

12  A.          3rd Street.  Yes.

13  Q.          Where is that?

14  A.          That is in the Milo-Grogan

15  neighborhood.  It's northeast of here.

16  Q.          The same neighborhood that you were

17  living in, correct?

18  A.          That's correct.

19  Q.          And could you take a look at the time

20  of the offense?  It's down here.

21  A.          31:40 [sic]?

22  Q.          3:40 a.m.  Do you see that?

23  A.          I see it.

24  Q.          All right.  Do you have any explanation

1    for why you were out at 3rd Street and St. Clair

2    Avenue at 3:40 in the morning?

3    A.          In looking over this document, and

4    you've shown me a lot of documents, if I was -- I

5    was probably high.

6    Q.          You were high?

7    A.          Probably.

8    Q.          And that's why you don't remember this

9    event happening?

10   A.          That along with a couple other

11   explanations, but, yeah.

12   Q.          What do you mean by that?

13   A.          Well, this was in 2004.

14   Q.          Correct.

15   A.          And like I -- I continue -- I continue

16   to state, you know, I've been through a lot, a lot

17   of trauma, a lot of PTSD, I don't -- I don't

18   remember every -- everything that you're asking me

19   about.  I'm doing my best to answer all the

20   questions as truthful as possible, but, you know,

21   I've been through a whole lot.  You know, this

22   complaint right here, I mean, weed is legal now,

23   so...

24   Q.          Was weed legal in 2004?

1          MS. MARTINEZ:  Objection.  Foundation.

2          You can answer.

3     A.        I don't think so.

4     Q.        You were continuing to use drugs during

5     2004?

6          MS. MARTINEZ:  Objection.  Form.

7          You can answer.

8     A.        I don't recall that.

9     Q.        Well, you just said that you might not

10    recall this because you were high.

11    A.        I must have been.  I was up at 3 in the

12    morning.  I never had a dirty urine, so it doesn't

13    seem like -- if and when this happened I was on

14    parole from West Virginia, and I don't remember

15    being -- getting in trouble for it, so...

16    Q.        How often did you have to do urine

17    screens?

18    A.        Every -- every time I saw my parole

19    officer.

20    Q.        How often was that?

21    A.        That was twice a month sometimes.  It

22    starts off very intensive in the beginning.  So if

23    I got out in April, he would probably -- I would

24    probably have to see her once a week.  And then

1    six months later, it might go down to once every

2    two weeks.  And, you know, if you continue to stay

3    out of trouble, work your job, not have any dirty

4    urines, it would go to maybe once a month, you

5    know.

6    Q.        Did you tell your parole officer about

7    this arrest?

8    A.        I don't recall.

9    Q.        Did you tell Janette about this arrest?

10   A.        I don't recall.

11   Q.        Do you recall anything about the

12   circumstances of this arrest?

13   A.        No, sir, I do not.  This was -- this

14   was a long time ago.  Where does it say on here I

15   was arrested?

16   Q.        Just below the middle of the page.

17   There's a check mark for arrest warrant.

18             I assume, by the way, that if a police

19   officer -- if you know -- if a police officer

20   stops you and finds you in possession of

21   marijuana, I assume that they arrest you, rather

22   than letting you go.  Is that your understanding?

23   A.        See, your different -- your experience

24   in dealing with police officers and my experience

1    in dealing with police officers is two separate

2    stories.

3    Q.          Okay.

4    A.          Even back then when marijuana was

5    illegal, you know, something like this could have

6    probably been overlooked because, you know, maybe

7    at the time they were giving me a warning, you

8    know, maybe at the time when they -- when they

9    stopped someone with this small amount of

10   marijuana on them, there was a more serious crime

11   happening and they had to go pursue a real

12   dangerous criminal, you know.

13   Q.          Is this a small amount of marijuana?

14   A.          It looks like it says less than

15   100 grams, so...

16   Q.          Would you consider that a small amount?

17   A.          Yeah.  I don't even think this was a

18   felony back then.

19   Q.          But clearly they didn't just let you

20   go.  They wrote a criminal complaint and issued an

21   arrest warrant.

22   A.          Clearly.

23   Q.          Right.  So they didn't just let it go.

24   A.          No, no.  I was just explaining my

1    experience and your experience, because, like, I

2    don't remember my parole officer violating my

3    parole and sending me back to prison for this, so

4    it doesn't really seem like it was that serious.

5    Q.        Right.  But my question wasn't whether

6    you were revoked, it was whether you fulfilled

7    your obligation to report it to him or her.

8    A.        Oh.  I can't recall.

9              MS. MARTINEZ:  Are we at a good time

10   for a quick -- for a break, Counsel?

11             MR. EPSTEIN:  Sure.

12             THE VIDEOGRAPHER:  We are off the

13   record.  The time is 2:56.

14             (A short recess is taken.)

15             THE VIDEOGRAPHER:  This marks the

16   beginning of Media No. 5.  We are back on the

17   record.  The time is 3:06.

18   BY MR. EPSTEIN:

19   Q.        Mr. Horton, is it fair to say that

20   going back to the period of, say, the 1990s, you

21   did not have a very good driving record?

22             MS. MARTINEZ:  Objection.  Form.

23             You can answer.

24   A.        Yes, it is -- it is fair to say that my

1    driving record was less than stellar, starting in

2    the '90s.

3    Q.          Tell me about that.

4    A.          Well, I was young and dumb.  I didn't

5    have a lot of respect for traffic laws and

6    restraints.  And it actually took me a long time

7    and a lot of people to -- to realize that, you

8    know, the rules are in place for a reason.

9                It took me a very long time to respect

10   the fact that the law in Ohio is that every driver

11   should have insurance.  I can remember just

12   thinking, you know, I didn't -- it felt like a

13   scam that you would just be paying your insurance

14   every month and what if you never get into an

15   accident, you know.

16   Q.          Speaking of insurance, was there a time

17   where you owed $4,000 to an insurance company?

18   A.          Yes.

19   Q.          What was that debt for?

20   A.          That debt was for a car accident that I

21   had gotten into in high school, a very, very long

22   time ago.

23   Q.          And how did that get resolved, that

24   debt?

1    A.        You know what, I don't -- I don't

2    recall.

3    Q.        So at some point in time, I think we

4    talked about this already, you purchased a car

5    from Tracy McClanahan; is that correct?

6              MS. MARTINEZ:  Object --

7    A.        I purchased --

8              MS. MARTINEZ:  Objection.  Form.

9              You can answer.

10             THE WITNESS:  Sorry about that.

11   A.        I purchased a car, but I'm not exactly

12   sure who I bought the car from.  I don't know if

13   it was Tracy McClanahan or Linda McClanahan, but I

14   did -- I do remember.

15   Q.        But you purchased the car from somebody

16   in the McClanahan family?

17   A.        Yes, sir.

18   Q.        And you took the car to Rick McClanahan

19   to do some work on it, correct?

20             MS. MARTINEZ:  Objection.  Form.

21   Restates previous testimony.

22             You can answer.

23   A.        I think I already answered this

24   question, but, yes, I believe one of the

1    stipulations was he was supposed to fix something

2    on the car.

3    Q.          Now, before you took the car to

4    Mr. McClanahan for him to work on it, did you

5    already know who he was?

6                MS. MARTINEZ:  Same objection.

7                You can answer.

8    A.          Yes, I knew who he was.

9    Q.          You had known him for some time?

10   A.          Yes, I did.

11   Q.          And in the process of doing that car

12   transaction, did you go to his house?

13   A.          I do not recall where he fixed the car,

14   was it -- I don't know, I can't remember, was it

15   at a garage, was it at his house, was it at my

16   house.

17   Q.          So you don't remember if you dropped

18   the car off at his house?

19   A.          I don't remember.

20   Q.          What happened to that car?

21   A.          As we spoke about earlier, I had a

22   very -- what's the word that I could use to

23   describe it -- I had a very colorful driving

24   record, so from what I can remember, the car got

1    impounded shortly after I bought the car.  I

2    didn't -- yeah, I was -- I was pretty young and

3    pretty reckless at that point in my life.

4    Q.          In 2004, after you were released from

5    prison in West Virginia and you came to Ohio, did

6    you have a car?

7    A.          I -- I did purchase a car.

8    Q.          Where did you purchase the car?

9    A.          In Columbus, Ohio.

10   Q.          I mean --

11   A.          From a family friend.

12   Q.          -- do you remember who you bought it

13   from?  Did you buy it from a dealer or from a

14   private seller?

15   A.          I bought it from a family friend,

16   private seller.

17   Q.          How much did you pay?

18   A.          That's a good question.  I believe I

19   paid around $1,000 for it.  It was -- it was not

20   the most -- not the nicest car.

21   Q.          What kind of car was it?

22   A.          It was a -- it was a green Cadillac.

23   It needed a lot of work on it.

24   Q.          Did you have a valid driver's license

1   in 2004?

2   A.          No, I did not.

3   Q.          Did you use that car to drive around in

4   2004 even though you didn't have a valid driver's

5   license?

6   A.          Yes.  Yes, I -- I drove it on

7   occasions.

8   Q.          What kinds of occasions would you use

9   it for?

10  A.          I would -- I would drive it when it was

11  functioning.  I might drive it -- I might take

12  Janette out to eat in it.  It was an older model

13  car, so it was pretty fun riding around in it when

14  it was in running condition.

15  Q.          So I take it there were times when it

16  was not in running condition?

17  A.          Yeah.  Yes, that's correct.  It was

18  a -- it was a -- I had quite a few problems out of

19  that car.  I can remember something about the heat

20  and the steering, the steering and -- it was -- it

21  was -- I actually remember getting rid of the car

22  because stuff just kept happening to it.

23  Q.          Well, did you put money into it to try

24  to fix it?

1  A.         I tried, but I didn't -- I didn't have

2  a lot of patience back then.

3  Q.         So there were times when it was

4  inoperable and then it would become operable and

5  then inoperable again; is that correct?

6  A.         Unfortunately, yes.

7  Q.         Before you found out that you were a

8  suspect in the Loew Street robbery, were you aware

9  that the robbery had taken place?

10 A.         That's a good question.  No, I was -- I

11 was not aware.

12 Q.         You didn't hear anything around the

13 neighborhood about Rick McClanahan getting shot?

14 A.         I don't -- I don't recall.  No.  I

15 don't recall hearing anything about

16 Mr. McClanahan.

17 Q.         How did you find out about the Loew

18 Street robbery?

19 A.         The way I found out about the Loew

20 Street robbery was I was at a -- I was at a child

21 custody hearing for my daughter.  Her mother had

22 got into some -- some type of problem, some type

23 of issue.  And I was actually there because the

24 children's protective services had taken custody

1    of my daughter, so I was in there actually just to

2    try to, you know, give support to her.  And if

3    need be, I would have, you know, took custody of

4    my child on the spot.

5    Q.          Did you --

6    A.          So --

7    Q.          Let me interrupt you for a second.  Did

8    you file anything at that time requesting custody

9    of your daughter?

10   A.          I don't recall.  I don't recall.  But,

11   like I was saying, so I show up to the court

12   proceedings and, you know, I'm telling them who I

13   am and why I'm here.  And one of the -- one of the

14   attorneys, he comes and pulls me to the side and

15   he says, you know, we -- we can't grant you

16   custody of your daughter because you have a

17   warrant out for your arrest.

18            And that's how I found out that the

19   warrant -- that I had a warrant out for my arrest.

20   I believe at the time it was just a warrant for

21   robbery.  But anyway, to confirm these

22   allegations, I have an aunt who used to be in the

23   Columbus police division.

24   Q.          Who is that?

1    A.        Her name is Barbara Horton Alomar.

2    Q.        What position did she have in the

3    police department?

4    A.        That was a long time ago.  I can't

5    recall.  But she -- she wasn't a cop anymore.  But

6    I knew that she could help me with the situation.

7    This is before the internet.  This is before

8    Google.

9              So I called her and told her, you know,

10   what had happened, because I was completely caught

11   off guard, completely shocked.  You know, somebody

12   says you got a warrant out for a robbery and you

13   know you didn't rob anybody, this is, you know,

14   kind of hysterical.

15             And I asked her what is -- was it true.

16   And she -- well, she did whatever she had to do

17   and called whoever she had.  She said it was true.

18   So that's how I found out about the robbery.

19   Q.        What did you do after she confirmed

20   there was a warrant?

21   A.        Well, since I -- I knew I didn't commit

22   the crime, I didn't take it as seriously.  So what

23   I did was I called -- I got a copy of the arrest

24   warrant and I called the detective, the name that

1    was on the arrest warrant, thinking, you know,

2    this was a minor issue, maybe we can, you know,

3    work this out.  And her name was Detective Brenda

4    Walker.

5                Well, she wasn't exactly happy to hear

6    from me and happy to hear that -- you know, she

7    didn't respect the fact I was taking the situation

8    so lightly.  And so she -- I remember she advised

9    me to -- that I had -- since I had a warrant, that

10   I needed to turn myself in.

11               And the conversation didn't go so well.

12   She was -- she was -- she was kind of mean.  And

13   I -- but I tried to assure her that, you know,

14   once I obtain counsel, I would turn myself in,

15   because, you know, I didn't do it.  I had a lot of

16   faith, at this point in my life I still had a lot

17   of faith in the justice system, I had a lot of

18   faith in the City of Columbus that, you know, this

19   was just a big misunderstanding.

20   Q.          How do you know that she was upset you

21   weren't taking it seriously?

22   A.          Because she was yelling at me.

23   Q.          She was yelling at you?

24   A.          And she told me that SWAT, SWAT was

1    looking for me or something, which I didn't, you

2    know, I didn't really take it as -- because I

3    didn't, you know, I didn't know the particulars or

4    I didn't know the particular details around -- I

5    didn't know that a guy had been robbed and shot, I

6    didn't know all of this at this time.  All I knew

7    there was a warrant out for my arrest and, you

8    know, let's just, let's take care of this.

9    Q.        Well, you knew more than that, though,

10   right?

11             MS. MARTINEZ:  Objection.  Form.

12                    - - - - -

13             Thereupon, Exhibit 18 is marked for

14   purposes of identification.

15                    - - - - -

16   Q.        I'm going to hand you what's been

17   marked as Exhibit 18.  That is the criminal

18   complaint, file stamped December 15th, 2004, State

19   of Ohio versus Richard Horton.  Is this the

20   document that your aunt got for you?

21   A.        I don't recall the exact document.

22   Q.        Okay.  This document has Brenda

23   Walker's name in it, correct?

24   A.        I see it right here.

1    Q.        Right.  And you testified that you

2    found out about Brenda Walker from a document --

3    A.        Yes.

4    Q.        -- correct?

5    A.        Yes.

6    Q.        Okay.  Are you aware of any other

7    document that was available to you at the time and

8    had Brenda Walker's name on it?

9            MS. MARTINEZ:  Objection.  Foundation.

10           You can answer.

11    A.        I do not recall.  I see what you're

12    saying, it says it right here in it, but you're

13    asking me about something from 20 years ago.

14    Q.        Okay.  The copy you have is a little

15    difficult to read, so you're welcome to look at

16    mine.  There's a narrative that describes the

17    crime, correct?

18    A.        That's correct.

19    Q.        And it identifies the victim as Rick

20    McClanahan, correct?

21    A.        That's correct.

22    Q.        And it also has the date of the

23    offense?

24    A.        That's correct.

1     Q.         All right. So when you talked to

2     Detective Walker, you did have some information

3     about the underlying facts of the crime, correct?

4     A.         I'm not sure exactly what I had, but I

5     just knew I didn't do it whatever it was.

6     Q.         Well, when did you find out that Rick

7     McClanahan was the victim?

8     A.         That took a long time because

9     his -- once I looked at the name, I didn't really

10    know him as Richard McClanahan, I kind of knew him

11    as Rick, so it took a while for me to actually

12    figure out who it was.

13    Q.         At what point did you figure out that

14    the person you knew as Rick and the complaining

15    victim, Richard McClanahan, were the same people?

16    A.         Like I said, it took a while for me to

17    put two and two together, so I'm not -- I don't

18    recall exactly how long it took. It took a while,

19    though.

20    Q.         How did you put it together?

21    A.         I believe I was -- I was asking a lot

22    of people in the neighborhood, you know, who is

23    this person. You know, I was contacting

24    re- -- various people. I was -- I was completely

1    panicked, so I was -- I was asking everybody.  I

2    actually -- yeah.

3    Q.          Back to your conversation with Brenda

4    Walker.  What did you tell her?

5    A.          I told her that I didn't commit this

6    crime.  She told me that, you know, I needed to

7    turn myself in.  And I told her -- you know, she

8    was -- she was quite irate with me, but I told

9    her, you know, I have no problem turning myself

10   in.  As soon as I obtain legal counsel, I'll do

11   just that.

12   Q.          Did you tell her that you couldn't have

13   committed the crime because you were with Janette

14   at the time?

15   A.          She -- she didn't ask a lot of

16   questions.  She kind of did a lot of the talking.

17   She didn't really ask.

18   Q.          Well, you could have volunteered that,

19   though, right?

20   A.          I -- I -- I could have.  I don't think

21   that I knew exactly where I was on October 9th of

22   2004.  I know I had a steady routine of stuff that

23   I liked to do.  And this seemed like this was on a

24   Saturday for some reason and, you know, I'm pretty

1    sure that according to my routine that Janette and

2    I were courting at the time, so, you know.  But I

3    really, really -- once I observed her tone, there

4    really wasn't a lot of back and forth with

5    Lieutenant -- Detective Brenda Walker.

6    Q.        What was the routine that you had at

7    the time?

8    A.        Well, I could remember trying to figure

9    out, you know, exactly where I was at this time.

10   I put a lot of thought into it.  And all I could

11   come up with was that, you know, I would work

12   during the week, and on the weekends I would kind

13   of sleep in, hang out with Janette, do the stuff

14   she liked to do kind of like shopping, maybe the

15   movies, spend time with my kids during the week.

16   And I would really try to spend -- oh, excuse

17   me -- time with Janette, you know.

18   Q.        Did you spend every weekend with

19   Janette at that time?

20   A.        I'm pretty sure that I did.  Janette

21   is -- you don't know Janette, you probably haven't

22   met her yet, but she was pretty demanding at this

23   stage, this early stage.  She is not as demanding

24   anymore, but...

1  Q.        Okay.  So you're pretty sure is what

2  you said?

3  A.        Yeah, I'm pretty sure.  But it's

4  impossible for me to remember.  This is from

5  20 years ago.

6  Q.        Sure.  Would your memory have been

7  fresher at your 2006 trial?

8  A.        I would like to think so.

9  Q.        Did you get a lawyer?

10  A.        I did.  And I turned myself in.

11  Q.        Who was the lawyer?

12  A.        Oh, I can't remember her name.  I'm

13  sorry.

14  Q.        Were you released on bail?

15  A.        Yes.

16                   - - - - -

17            Thereupon, Exhibit 19 is marked for

18  purposes of identification.

19                   - - - - -

20  Q.        I'll hand you what I've marked as

21  Exhibit 19.  This is the court arrangement sheet

22  for Richard Horton, dated December 28th, 2004.  It

23  shows a bond of $25,000, an appearance bond.  Do

24  you see that?

1  A.         I see it.

2  Q.         Did you post that bond?

3  A.         Yes.  Janette posted this bond for me.

4  Q.         And if you look in the description, it

5  has both Rick McClanahan's name and Rhonda

6  Curry's.  Well, it actually doesn't have

7  McClanahan's first name, but it has McClanahan and

8  Rhonda Curry.  Do you see that?

9             MS. MARTINEZ:  Just read that section.

10 Q.         Oh.  Yes, it does.  Victim, Richard

11 McClanahan, Jr.  In the center of the document.

12 So this document would have plainly told you the

13 names of the victims, correct?

14 A.         Yes, it has the names on here.

15 Q.         Would you have recognized Rhonda

16 Curry's name?

17 A.         No.

18 Q.         What did you --

19 A.         No, I did not.

20 Q.         What did you know her as?

21 A.         I -- I -- I do not recall her

22 particular nickname.

23 Q.         Okay.  And when the judge released you,

24 there were conditions imposed, correct?

1   A.        Yes.

2   Q.        What were those conditions?

3   A.        It looks like according -- it looks

4   like those conditions are written on this paper.

5   It says stay away from Rhonda Curry and Richard

6   McClanahan, Jr. at the top.  And no further acts

7   of violence.

8   Q.        Okay.  Did you understand that those

9   were the conditions of your release?

10  A.        Yes.  But I, you know, I just wanted to

11  get out of -- get out of jail.  After all, I

12  didn't commit this crime.  I just wanted to go

13  home.

14  Q.        Did you abide by those conditions?

15  A.        No, not one -- not the one where it

16  says stay away from Rhonda Curry and Richard

17  McClanahan.

18  Q.        You did not abide by that one?

19  A.        No.

20  Q.        Okay.  Tell me what happened.

21  A.        Well, as I believe I testified during

22  trial, it's a small neighborhood, so I actually

23  saw Mr. McClanahan on two separate occasions.

24  Q.        Okay.  Let's talk about the first

1    occasion first.

2    A.          The first occasion in which I saw

3    Mr. McClanahan, I had -- I believe I flagged him

4    down, you know.  I -- he was going one direction,

5    I was going in the other.  I believe I flagged him

6    down just to, you know, try to speak with him.

7              So me and him, we -- he stopped his

8    car.  I stopped my car.  We talked for a minute.

9    I informed him that I had a place just down the

10   street.  And I asked him, you know -- you know, I

11   believe it was raining, so I asked him would he

12   like to get out of the rain and come talk to me.

13             Mr. McClanahan, who wasn't in fear for

14   his life, came to the house on Reynolds Avenue

15   under his own free will and we talked about the

16   case.  I distinctly remember that he was on a cane

17   at this time.  So some of the things that we

18   talked about was him having multiple surgeries.

19             You know, he was able to look me in the

20   eye and assured me at the time, you know, that I

21   wasn't the guy who had done this -- this violent,

22   heinous thing to him.  And we talked for a while.

23             I remember I had a dog, and the dog

24   kept trying to jump on him.  I had, like, a puppy

1    and she tried to keep jumping, and I remember, you

2    know, shushing the dog away because he was -- he

3    was saying that he just healed up from one of the

4    surgeries.  And, you know, I felt terrible for

5    what had happened to him, but I'm not the one who

6    hurt him like this.

7    Q.          Okay.  Let's break this down into

8    smaller pieces.  You were driving in your car,

9    correct?

10   A.          Correct.

11   Q.          So it must have been one of those

12   periods where the car was operable?

13   A.          It must have been.

14   Q.          Were you driving in the car with

15   anybody else?

16   A.          I -- no.  I don't think so.

17   Q.          All right.  And you saw Mr. McClanahan

18   driving in his vehicle in the opposite direction?

19   A.          Yes, sir.

20   Q.          So you recognized Mr. McClanahan's

21   vehicle?

22   A.          I recognized his face, not his vehicle.

23   Q.          Okay.  Were you stopped at the

24   intersection?

1    A.           I believe I was exiting a gas station.

2    He was coming into a gas station.

3    Q.           So what did you do?  Did you get out of

4    your car?

5    A.           I believe -- I believe that I said -- I

6    got out of the car, I kind of flagged him down a

7    little bit, hey, wait a minute, stop, you know.

8    Q.           Before he was able to get into the gas

9    station?

10   A.           I'm not sure who was coming or going.

11   Q.           So it might have been that he was

12   leaving the gas station and you were pulling in?

13   A.           It's entirely possible.

14   Q.           Okay.  Was anyone with him?

15   A.           I don't remember anybody being with

16   him.

17   Q.           Okay.  So you flagged him down.  And

18   then did he get out of the car or did you talk to

19   him through the window?

20   A.           I believe I talked to him through the

21   window because I don't -- like I said before, he

22   didn't actually get out of the car until he came

23   into the house.  I didn't actually get to see him

24   on a cane until he came to the house.

1   Q.          All right.  When you're standing

2   outside the car talking to him, what did you say?

3   A.          I can't remember exactly what I said,

4   but I know that at some point I said, you know,

5   hey, man, I didn't commit this crime against you.

6   Can we go somewhere and talk?  It's raining out

7   here.

8   Q.          And what did he say?

9   A.          He said, cool, let's do it.

10  Q.          So you went to where?

11  A.          The house on Reynolds Avenue.

12  Q.          Was anyone else in the house on

13  Reynolds Avenue when the two of you arrived?

14  A.          Not the -- not on the first occasion,

15  no.

16  Q.          We'll get to the second one in a

17  minute.

18              All right.  So you went into the house

19  on the first occasion, the two of you?

20  A.          Yes.

21  Q.          And where in the house did you go?

22  A.          It was in the kitchen.

23  Q.          All right.  Tell me about the

24  conversation in the kitchen.

1   A.          It seemed, much to my surprise, it went

2   pretty smooth.  Like I said, if the shoe was on

3   the other foot, I would have been kind of leery to

4   be around the person who I thought shot me, but

5   Mr. McClanahan wasn't nervous, he wasn't agitated,

6   he was actually very calm.  So the conversation, I

7   can remember it went pretty smooth.  And I

8   actually, upon him leaving under his own free

9   will, I thought the whole ordeal would be over

10  with soon.

11  Q.          Did Mr. McClanahan tell you, I know you

12  are not the shooter?

13  A.          Yes.

14  Q.          Did he tell you who the shooter was?

15  A.          No, but I -- honestly, I didn't ask

16  him.

17  Q.          Did he tell you why, if he knew you

18  weren't the shooter, he told the police you were

19  the shooter?

20  A.          I don't recall.

21          MS. MARTINEZ:  A belated form objection

22  to that question.

23  Q.          How did that conversation conclude?

24  A.          As I said, it seemed like the

1    conversation concluded on good terms.  I thought

2    the whole ordeal would be over with in a matter of

3    days.

4    Q.         Was there any discussion of money?

5    A.         No.

6    Q.         Then you said there was a second

7    encounter.  How long after the first encounter was

8    the second?

9    A.         I can't -- I can't recall.  It

10   wasn't -- I can't recall.  It wasn't -- yeah, I

11   can't recall.

12   Q.         Where was the second?

13   A.         The second encounter where I saw

14   Mr. McClanahan, it happened down the street from

15   the actual Reynolds address.  I believe he had

16   some friends that were -- that had, like, a body

17   shop.  And so basically the same scenario, I

18   walked down there trying --

19   Q.         Well, what -- I'm sorry.  What prompted

20   you to walk down there?

21   A.         I had seen him from a distance.  Like I

22   said, he was a pretty tall guy, very distinctive,

23   and I jumped at the opportunity to speak with this

24   gentleman, you know.

1          And I was, you know, like I said,

2     trying not to -- I tried to talk to him in a calm

3     manner, you know, I didn't want it to be a yelling

4     match.  And we talked.  And he -- I talked.  You

5     know, I asked him, you know, you know, it doesn't

6     seem like you did what you said you was going to

7     do as far as, you know, talking to the detectives

8     and getting, you know, these charges dropped.

9          The conversation went pretty cool

10    again.  I gave -- that's when I actually gave him

11    my phone number, and said, listen, man, you can

12    call me any time and we can take care of this.

13              - - - - -

14          Thereupon, Exhibit 20 is marked for

15    purposes of identification.

16              - - - - -

17    Q.        I'll hand you what we've marked as

18    Exhibit 20.  Is that a copy of the piece of

19    cardboard you wrote your name and phone number on?

20    A.        I mean, this is a pretty bad copy, man.

21    Q.        It is a pretty bad --

22    A.        Come on, man.

23    Q.        -- copy.

24    A.        You -- come on, man.

1  Q.         All right.  I'm not -- it's not a

2  trick.  I just want to see if you can confirm it.

3  Let me see.  Is that one any better?  All right.

4  We'll set that aside.

5           Let me ask you something different.

6  You saw him at the auto shop.  Were you with

7  anyone when that happened?

8  A.         When -- when I saw him at the auto

9  shop, I was not with anyone.  When McClanahan came

10  back to my residence under his own free will,

11  there was someone in the house.

12  Q.         And we'll get to that.  But at the

13  point that you first approached him, you were

14  alone, correct?

15  A.         Correct.

16  Q.         Was he with other people?

17  A.         I do not recall.

18  Q.         Okay.  And you said, hey, you didn't do

19  what you said you were going to do, correct?

20  A.         Something along those lines, correct.

21  Q.         And what did he say?

22  A.         He kept assuring me that he was going

23  to get all the charges dropped.  He kept

24  assuring -- I believe the second conversation, one

1    of the things that went different was I was, you

2    know, telling him how much money I was spending on

3    a lawyer, you know, to -- to defend me.  And he

4    assured me that, you know, I didn't need to keep

5    paying a lawyer, he was going to take this piece

6    of paper and call me when he needed me, and we can

7    hopefully put this past us.

8    Q.          Now, did that conversation about the

9    lawyer and the money happen while you were at the

10   auto shop or later when you got back to the house?

11   A.          There was no conversation about money.

12   Q.          Well, you just mentioned money in terms

13   of paying -- that you were paying your lawyer.

14   I'm asking did you make that statement when you

15   were still at the auto body shop?

16   A.          No.  I believe -- I don't believe we

17   did a lot of talking at the barber -- at the

18   alley -- at the body shop.

19   Q.          Why did you go back to the house?  Why

20   not just have the conversation where you were?

21   A.          I do not recall.

22   Q.          Okay.  So you go back to the house.

23   And when you're arriving at the house, it's just

24   you and McClanahan, right?  He didn't bring

1  anybody with him?

2  A.        He didn't bring anybody with him.

3  Q.        Was there somebody at home in your

4  house?

5  A.        Yes.

6  Q.        Who was that?

7  A.        That gentleman's name would be LaKeon

8  Horton.

9  Q.        Okay.  Where was LaKeon in the house

10  when you came in?

11  A.        I believe he was upstairs.

12  Q.        Did LaKeon come downstairs to talk to

13  you guys at any point?

14  A.        I'm not sure.

15  Q.        Okay.  So tell me about the

16  conversation at the house.

17  A.        It was a pretty -- like I said, despite

18  the fact that this gentleman had thought that I

19  had done all these bad things to him, the

20  conversation went pretty well.

21          We talked.  You know, once again, he

22  assured me that, you know, he knew it wasn't me

23  once he was able to look me in the eye.  He

24  assured me, you know, that I didn't need to keep

1   paying a lawyer.  It went -- once again, I was

2   wrong, but I assumed the conversation went pretty

3   well.

4   Q.      Mr. McClanahan testified at trial that

5   in that conversation you tried to bribe him to

6   dismiss his claim against you.  Did you remember

7   him testifying to that?

8   A.      I do not recall.

9   Q.      You do not remember him testifying that

10   you offered him money?

11   A.      No, I don't.  I don't remember that.

12   That was a while ago.

13   Q.      Did you offer him money?

14   A.      No, I did not offer Mr. McClanahan

15   money.

16   Q.      Did Mr. McClanahan ask you for money in

17   return for him changing his story?

18   A.      No.  Mr. McClanahan didn't -- didn't

19   ask me for anything except patience.

20   Q.      And just to be clear, LaKeon was

21   present possibly for the second conversation, but

22   when you ran into him the first time in the two

23   cars, LaKeon was not there?

24   A.      He was not there, no.

1    Q.          Okay.  And then, obviously,

2    Mr. McClanahan did not change his testimony,

3    correct?

4               MS. MARTINEZ:  Objection.  Foundation.

5    A.          Mr. McClanahan did not change his

6    story.

7    Q.          He testified at trial that you were the

8    person who broke into the house and shot him,

9    correct?

10   A.          Yes.  Yes, I -- yes, he did.

11   Q.          And Rhonda Curry testified that you

12   were the person who broke in and shot Rick,

13   correct?

14   A.          Yes.

15   Q.          As you were listening to this testimony

16   at the trial, was it your belief that

17   Mr. McClanahan was mistaken or was it your belief

18   that Mr. McClanahan was lying?

19   A.          Could you -- can you explain the

20   question?

21   Q.          Mr. McClanahan is testifying that

22   Richard Horton shot me.  I recognize Richard

23   Horton as the man who shot me.

24               If you're sitting there saying to

1  yourself, he's wrong, I didn't shoot him, he's

2  either -- he's either honestly mistaken, or he's

3  deliberately lying, he knows you're not the

4  person.  Did you have a thought as to which of

5  those it was?  Did you believe he was mistaken or

6  did you believe he was lying?

7  A.          I -- I do not recall.  I can't figure

8  out which way, even -- even if it was one of those

9  theories, I don't -- I didn't know what -- it was

10  all happening so fast, and I don't know -- I don't

11  know what his motive was.

12  Q.          Well, you've now had quite a long time

13  to think about it.  Have you formulated a theory

14  over the years as to whether he was mistaken or

15  whether he was lying?

16          MS. MARTINEZ:  And I would say in

17  answering this, if you can answer it outside of

18  conversations with your attorneys, you can.

19  A.          I believe it was police misconduct.  I

20  don't believe McClanahan was malicious or -- I

21  don't -- I don't -- I don't have a theory for it.

22  Q.          Okay.  And do you know of any reason

23  why McClanahan would have a grudge against you?

24          MS. MARTINEZ:  Objection.  Foundation.

1          You can answer.

2    A.        No, I do not.

3    Q.        When you say it was police misconduct,

4    what do you mean?

5    A.          I believe that the police framed me for

6    this crime.  I believe something went terribly

7    wrong with the Columbus Police Department.  That's

8    why I'm sitting here, you know...

9    Q.        What's your understanding of how your

10   name first got raised in connection with this

11   robbery?

12   A.          I'm not entirely sure how my name was

13   first brought up.  I'm not entirely sure.

14   Q.        Do you have any reason to believe that

15   Brenda Walker came up with your name and suggested

16   your name to McClanahan and Curry?

17   A.          I'm not sure how to answer that

18   question.

19   Q.        It's a yes or no question.  Do you have

20   any basis to believe that she came up with the

21   name and told it to them?

22   A.          I'm not sure how to answer that

23   question.

24   Q.        So you have no idea who first suggested

1  your name as a suspect; is that correct?

2  A.          That's correct.  I wasn't -- I wasn't

3  there.

4  Q.          Do you have any evidence -- strike

5  that.

6            Are you aware of any facts to suggest

7  that Brenda Walker was the first person to suggest

8  your name?

9  A.          I don't want to violate attorney-client

10  privilege, so I'm not sure how to answer that

11  question.

12  Q.          All right.  Is it fair to say that any

13  facts that would implicate Brenda Walker as the

14  first person to raise your name, you're aware of

15  because your attorney told you?

16  A.          Once again, I'm not sure how to answer

17  that question.

18  Q.          Do you know of any facts implicating

19  Brenda Walker as the source of your name other

20  than things that were told to you by your

21  attorneys?

22  A.          Not at this time, no.

23  Q.          Before you saw Brenda Walker's name in

24  the paperwork and you called her, did you know

1  Brenda Walker?

2  A.          No.

3  Q.          Had you had any dealings with her?

4  A.          No.

5  Q.          Do you have any reason to believe that

6  she knew who you were?

7  A.          No.

8  Q.          Do you have any reason to believe she

9  had a grudge against you?

10  A.          Yes.

11  Q.          And what would that reason be?

12  A.          Well, just the way she was talking to

13  me from our initial phone conversation, she wanted

14  me to turn myself in without seeking legal counsel

15  first, and I didn't think that was the best way to

16  go about it.  She was yelling and not pleasant.

17  Q.          Okay.  But that communication with her

18  where she seemed to be angry, as you've testified,

19  happened after you had already been identified as

20  the suspect, correct?

21  A.          Yes, that is correct.

22  Q.          Right.  So what facts are you aware of

23  that would suggest that she had a grudge against

24  you that would lead her to identify you as the

1    perpetrator?

2              MS. MARTINEZ:  Outside of things you

3    might have learned from your attorneys.

4              THE WITNESS:  Say it one more time.

5              MS. MARTINEZ:  To the extent you can

6    answer that question outside of communications you

7    had with your attorneys.

8              MR. EPSTEIN:  Facts communicated from

9    an attorney are not privileged.

10   BY MR. EPSTEIN:

11   Q.        What facts are you aware of that would

12   suggest that Brenda Walker named you as the

13   suspect because she had a grudge against you?

14   A.         I'm not an attorney, so I'm not sure

15   how to answer that question.

16   Q.         Yes, you're perfectly aware of how to

17   answer that question, sir.  You know what a grudge

18   is.  You testified that you believe that she had a

19   grudge against you.  What's the basis for that

20   belief?

21             MS. MARTINEZ:  Objection.  Form.

22   Argumentative.

23             You can answer.

24   A.         Like I stated before, she was a bit

1    unpleasant on our first phone call conversation.

2    Q.          But you have no facts that predate that

3    interaction, correct?

4    A.          I'm not sure how to answer the

5    question.

6    Q.          You are either aware of facts involving

7    Brenda Walker that occurred before that or you are

8    not.  Are you aware of any?

9    A.          I'm not sure how to answer that

10   question.

11   Q.          I would try yes or no.  You are aware

12   of facts or you are not aware of facts.

13              MS. MARTINEZ:  Objection.  Form.

14   Argumentative.  Asked and answered.

15              You can answer.

16   Q.          Are you aware of any facts about Brenda

17   Walker from before that conversation that would

18   suggest she had a grudge against you?

19   A.          I'm not sure how to answer that

20   question.

21   Q.          Let's talk about Sam Sias.  Do you know

22   who that is?

23   A.          I believe he was another detective on

24   the case.

1    Q.         And do you believe he had a grudge

2    against you?

3    A.         No, I've never spoken with Mr. -- is it

4    Sykes or Sias?

5    Q.         Sias.

6    A.         Sias.  I've never spoken with this

7    gentleman.

8    Q.         To your knowledge did he know who you

9    were before this case?

10    A.         I have no knowledge of that.

11    Q.         Do you have any knowledge of a reason

12    why he would have a grudge against you?

13    A.         I do not.  I've never spoken to the

14    man, never -- I don't know what he looks like.  I

15    never met him before.

16    Q.         Okay.  You testified that you believe

17    Brenda Walker has a grudge against you.  Other

18    than the fact that she seemed angry or rude on the

19    telephone, what facts do you know that suggest she

20    had a grudge against you?

21            MS. MARTINEZ:  Objection.  Asked and

22    answered.

23            You can answer.

24            MR. EPSTEIN:  Asked but not answered.

1    A.          I don't know how to answer that

2    question.  I'm sorry, man.

3    Q.          Why do you not know how to answer it?

4    What is confusing you about the question?

5    A.          There's a lot.  It's just -- I

6    don't -- I'm not sure how to answer the question,

7    so...

8    Q.          Do you understand what I mean when I

9    say a grudge?

10   A.          Yes.

11   Q.          Do you understand what I mean when I

12   say facts?

13   A.          Yes.

14   Q.          Do you understand what I mean when I

15   say before your conversation with her on the

16   telephone?

17   A.          Yes.

18   Q.          What facts are you aware of that she

19   had a grudge against you before the conversation

20   on the telephone?

21              MS. MARTINEZ:  Same objection.

22              You can answer.

23   A.          I'm not sure how to answer that

24   question.

1    Q.         Do you know of any facts?

2    A.         I'm not sure how to answer that

3    question.

4    Q.         Why are you unsure?  Either you know of

5    facts or you don't.

6    A.         Because you keep badgering me, asking

7    me the same question.

8    Q.         But you haven't answered the question

9    and you're not explaining to me -- I'm happy to

10    rephrase it and clarify, but you're not telling me

11    what you don't understand about it.  So what don't

12    you understand about the question?

13    A.         I just don't understand how you want me

14    to answer the question.

15    Q.         I want you to tell me what facts you

16    know about Brenda Walker having a grudge against

17    you.

18    A.         I'm not a lawyer.  I'm not an attorney,

19    so, you know, I just -- I'm not sure where to go

20    from here.

21    Q.         All right.  So other than what you've

22    said, you're not going to answer my question; is

23    that correct?

24             MS. MARTINEZ:  Counsel, it's not that

1    he's not answering the question. He's answering

2    to the best of his ability. If there's a

3    different way to rephrase, or for him to clarify,

4    please --

5           MR. EPSTEIN: I've clarified. The

6    question is unambiguous. He's refusing to answer.

7    Q.       Will you answer my question?

8    A.       I've already answered the question to

9    the best of my ability.

10    Q.       Is it your testimony that you do not

11    recall Mr. McClanahan testifying at trial that you

12    offered him a bribe to change his testimony?

13    A.       Yes, I don't remember Mr. McClanahan

14    saying that. I don't remember anything about his

15    testimony. It was -- it was 20 years ago.

16    Q.       Do you remember your testimony?

17    A.       I remember some parts of my testimony.

18    Some parts --

19    Q.       Do you --

20    A.       -- I don't remember.

21    Q.       Do you remember testifying and denying

22    that you tried to bribe him?

23    A.       No.

24    Q.       Do you remember testifying about money

1    coming from him to you?

2    A.          I don't recall.

3    Q.          All right.  Last time, for the record,

4    you are unable to provide any facts to support

5    your statement that Brenda Walker had a grudge

6    against you, correct?

7    A.          I'm not a lawyer --

8              MS. MARTINEZ:  Just one second.

9    Objection.  Form.  Asked and answered.

10             You can answer.

11   A.          I'm not a lawyer, I'm not a detective,

12   I'm not an attorney, so I'm not sure how to answer

13   that question.

14   Q.          The answer is to tell me the facts that

15   are known to you.  You don't have to be a

16   detective to know facts.  You testified that she

17   had a grudge.  I want to know why you said that.

18             MS. MARTINEZ:  Same objection.

19             You can answer.

20   A.          I don't have an answer for you at this

21   time.

22                          - - - - -

23             Thereupon, Exhibit 21 is marked for

24   purposes of identification.

1                          - - - - -

2    Q.          I'm going to hand you what I've marked

3    as Exhibit 21.  It's an affidavit by LaKeon

4    Horton.  Tell me again what your relationship is

5    with LaKeon Horton.

6    A.          Let me read over this, first, please.

7    Q.          Sure.

8    A.          What was the question?

9    Q.          I'm sorry?

10   A.          What was the question?

11   Q.          I haven't asked you a question yet.

12   The question is, have you seen this before?

13   A.          Have I seen this document before?

14   Q.          Correct.

15   A.          There's so many documents.

16   Q.          All right.  Well, let me ask you a

17   different question.  Did you help draft this

18   document?

19   A.          No.

20   Q.          Did you discuss this with LaKeon when

21   he was writing it?

22   A.          No.  I don't think so.  This -- this

23   document has a stamp from a Carol Wright.  So this

24   had to have been something that he had --

1  Q.        Who is Carol Wright?

2  A.        Carol Wright was one of my appeal

3  lawyers.  I had a few over the 16 years I was

4  wrongfully incarcerated.  This -- I'm looking for

5  a date on here, but this had to have happened

6  after I was already incarcerated.

7  Q.        It says:  Sworn to and subscribed on

8  the 1st day of January, 2007.

9            It's on the second page.  Do you see

10  that?

11  A.        I see it.

12  Q.        All right.  I want to ask you about

13  some of the information in here.

14            Paragraph 2 says:  I lived with Richard

15  Horton on Reynolds Avenue, in Columbus, Ohio,

16  during the summer of 20 -- I'm sorry -- during the

17  summer of 2005.

18            Is that true?

19  A.        He stayed with me periodically.

20  Q.        Why was that?

21  A.        The house that I stayed in, there was a

22  couple gentlemen, different gentlemen staying in

23  there, in and out.  It was kind of like a frat

24  house.

1  Q.        Did he pay rent?

2  A.        No.

3  Q.        Paragraph 3.  On one occasion, during

4  the summer of 2005, I was in a car with Richard

5  Horton on our way back to the house on Reynolds

6  Avenue.  We saw Richard McClanahan traveling in a

7  car and he stopped to talk with Richard Horton.

8           Do you see that?

9  A.        I see it.

10 Q.        Is that a correct statement?

11 A.        He -- he swore to the statement.

12 Q.        Okay.  But you swore, too, when you

13 testified earlier that you were alone in the car,

14 correct?

15           MS. MARTINEZ:  Objection.  Misstates

16 his prior testimony.

17           You can answer.

18 Q.        So whose version is correct, LaKeon's

19 or yours?

20           MS. MARTINEZ:  Same objection.

21           You can answer.

22 A.        This was a long, long time ago.  Both

23 versions -- I'm not -- I'm not sure.  You know, I

24 might have been mistaken, he might have been

1    mistaken.  I'm not sure.

2    Q.          So is it fair to say that after seeing

3    this, you can't recall the details of your

4    conversation with -- that first conversation with

5    Mr. McClanahan?

6              MS. MARTINEZ:  Objection.  Form.

7    A.          No, it's not fair.  It's -- what I'm

8    not recalling is was LaKeon in the car with me.

9    Q.          Okay.

10   A.          Is this -- is this the first or the

11   second encounter?  I'm just -- it's kind of minor

12   details.  I didn't commit this crime.

13   Q.          Okay.  Well, you testified earlier that

14   you saw McClanahan on that first occasion and you

15   got out of the car and went to talk to him,

16   correct?  That's what you testified to earlier

17   today.

18   A.          Yes.

19   Q.          And in here, LaKeon says McClanahan

20   stopped and got out of the car to talk to you.

21   Now, would you agree with me that both of those

22   things can't be true?

23             MS. MARTINEZ:  Objection to the

24   characterization of the document.

1          You can answer.

2          THE WITNESS:  Oh.  Sorry about that.

3          MS. MARTINEZ:  That's okay.

4  A.          What I'm confused about is this -- I'm

5  confused on how to answer the question.  So, you

6  know, you're asking me about something that

7  happened over 20 years ago.  And regardless of the

8  fact, McClanahan came under his own free will, and

9  I believe he -- you know, that's -- that's the

10  point that really matters.  I'm -- I'm --

11  Q.          Can you speak with confidence right now

12  as to whether LaKeon was with you in the car when

13  you saw McClanahan?

14  A.          I do not recall.

15  Q.          Paragraph 4.  LaKeon writes:  We got

16  back to the house and I saw Richard McClanahan

17  enter the house.  I heard some of the conversation

18  he had with Richard Horton.  I heard Richard

19  McClanahan tell Richard Horton that if Richard

20  Horton gave him some sum of money, he would go to

21  the police station and tell the police that

22  Richard Horton had not been the man that robbed

23  him.

24          Do you see that?

1  A.        I see it.

2  Q.        Did Richard McClanahan tell you that he

3  would recant his testimony if you gave him money?

4  A.        I do not recall.

5  Q.        I asked you that earlier and you said

6  no.  Are you unsure now?

7  A.        Well, you know, I don't -- I thought

8  you asked me a different question, so I don't -- I

9  don't recall.

10  Q.        Did Richard Horton ask you for money in

11  exchange for changing his testimony?

12  A.        I don't recall.

13  Q.        Paragraph 5.  I spoke with Richard

14  Horton about this conversation and Richard told me

15  he was not going to pay any money because he was

16  not guilty.

17            Do you see that?

18  A.        I see paragraph 5.

19  Q.        Do you recall that conversation with

20  LaKeon?

21  A.        There was -- this is a real long time

22  ago.  I don't --

23  Q.        The answer is no, you don't recall?

24  A.        I don't recall.

1    Q.        Paragraph 7.  I was willing to testify

2    to these facts during Richard Horton's trial and

3    continue to be willing to testify.

4              Do you see that?

5    A.        I see that.

6    Q.        Did you tell your lawyer that LaKeon

7    Horton was willing to testify at trial?

8    A.        Yes.

9    Q.        Did LaKeon testify at trial?

10   A.        LaKeon did not testify at my trial.

11   Q.        Why not?

12             MS. MARTINEZ:  Objection.  Foundation.

13             You can answer.

14   A.        I'm not sure why we didn't have LaKeon

15   testify on my behalf during trial.  This is a

16   pretty big piece of evidence that might have

17   helped, but, you know...

18   Q.        So who made the decision for LaKeon not

19   to testify?  Was it you?

20   A.        I don't think it was me.

21   Q.        Was it LaKeon?

22   A.        I don't think it was LaKeon.

23   Q.        Was it your attorneys?

24   A.        It --

1          MS. MARTINEZ:  Excuse me.  Objection.

2     Foundation.

3          You can answer.

4     A.        It -- I assume this would have been one

5     of my lawyers' decisions.

6     Q.        Were there other witnesses you were

7     aware of that you wanted to call at trial that

8     your lawyers did not call?

9     A.        Oh, man.  I do not recall.  That's a

10    tough one right there.  You know, I spent so much

11    time trying to figure out how I got myself into

12    this situation, and I second-guess myself so many

13    times and my trial strategy so many times, but it

14    really had nothing to do with my lawyers or their

15    strategy because it's police misconduct that put

16    me in that situation.  So once I --

17    Q.        Did you feel that you and your defense

18    counsel made mistakes during the trial?

19    A.        We weren't perfect.

20    Q.        What mistakes?

21             MS. MARTINEZ:  Objection.  Foundation.

22             You can answer.

23    A.        We probably -- this -- well, starting

24    right here, this affidavit probably would have

1    been a good start, but I don't believe --

2    Q.         What do you mean the affidavit would

3    not have been a good start?

4    A.         No.  I thought I said it would have

5    been a good start.  I'm sorry --

6    Q.         Oh.

7    A.         -- if I misspoke.

8    Q.         You mean to call LaKeon.

9    A.         Yeah.  If I misspoke, I apologize.

10   This right here might have been a good start to

11   use this testimony, but I don't think even -- I'm

12   not sure what happened.

13   Q.         The jury found you guilty, correct?

14   A.         The jury did find me guilty.

15   Q.         What charges did the jury find you

16   guilty of?

17   A.         So the way -- the way a trial works is

18   when you go to trial and you lose, you get found

19   guilty of each and every count on the indictment.

20   And I'm not specific to know every -- I can't

21   remember every detail of the indictment, but I

22   remember it was a 11 -- 11 count indictment.

23          I remember when the -- when the bailiff

24   said the guilty verdict, my wife let out a scream.

```
1     And they had to stop the proceedings because,

2     quite frankly, we were all shocked because I

3     didn't commit the crime.  And they had to escort

4     my wife out of the courtroom.

5     Q.         Okay.  But the jury --

6     A.         Excuse me.  I'm not finished.

7     Q.         Uh-huh.

8     A.         And then once they was able to escort

9     my wife out of the courtroom, she was kind of

10    hysterical, they started back with the

11    proceedings.  And I just remember kind of going

12    numb because the judge just kept saying guilty,

13    guilty, guilty, guilty.

14                        - - - - -

15               Thereupon, Exhibit 22 is marked for

16    purposes of identification.

17                        - - - - -

18    Q.         I'm going to hand you what I've marked

19    as Exhibit 22.  Do you recognize this as the

20    judgment entry in your case?

21    A.         Let me read over it real quick.  Sorry.

22    Q.         Have you had an opportunity to read

23    that?

24    A.         Yes.  Sorry.  I'm -- just looking over
```

1    this -- this judgment entry, it's a little

2    triggering because as you can see --

3    Q.          I'm sorry.  It's a little what?

4    A.          It's a little triggering because as you

5    can see, they sentenced me to 23 years.

6    Q.          That's correct.  You were sentenced to

7    23 years.  You were found guilty of aggravated

8    burglary with a gun specification; is that

9    correct?

10   A.          That's correct.

11   Q.          Do you know what a gun specification

12   means?

13   A.          No.  No.  Could you explain it to me?

14   Q.          Sure.  It means that you committed the

15   offense using a firearm.  That adds to the

16   penalty.

17               You were found guilty of aggravated

18   robbery with a gun specification.  Do you see

19   that?

20   A.          I see it.

21   Q.          You were found guilty of kidnapping

22   with a gun specification?  Yes?

23   A.          I see it.

24   Q.          Felonious assault with a gun

1    specification?  Yes?

2    A.          Yes.  I see it.

3    Q.          Aggravated robbery with a gun

4    specification?

5    A.          I see it.

6    Q.          Another count of kidnapping with a gun

7    specification, correct?

8    A.          I see it.

9    Q.          And those are all felonies, correct?

10   A.          Yes.  Yes, they are.

11   Q.          All right.  And then, finally, you were

12   found guilty of weapon under disability.  Do you

13   see that?

14   A.          I see that.

15   Q.          Do you have an understanding of what a

16   count of weapon under disability means?

17   A.          I believe it's when a person has a gun

18   and they're already on parole or probation.

19   Q.          And that would have applied to you.  If

20   you had been using a gun, you would be guilty of

21   that, correct?

22   A.          If I would have -- yes, I was found

23   guilty --

24   Q.          Because you were under parole.

1    A.          Yes, I found -- I was found guilty of

2    all these charges.

3    Q.          Okay.  Now, for the weapon under

4    disability charge, if you recall, does the jury

5    find you guilty of that?

6    A.          I don't recall.

7    Q.          Okay.  And then, as you said, you were

8    sentenced to a total of 23 years, correct?

9    A.          Yes.  The 23-year sentence for this

10   crime was particularly devastating because

11   essentially it was a life sentence.  And now, you

12   know, when I go and when I talk about this

13   wrongful conviction, I always try to make sure

14   that I tell that to the crowd because essentially,

15   you know, they sentenced me to life for a crime I

16   didn't commit because when I started this prison

17   time I was 29 years old.

18          So 16 years was taken away from me,

19   taken away from time being with my family, and it

20   was particularly hard because it being such a long

21   sentence, something that -- it kind of seemed

22   insurmountable at the beginning.

23          MR. EPSTEIN:  Now, Alyssa, I'm going to

24   note for the record there's an amended sentencing

1    entry.  It just corrects some technical things.

2    I'm not going to mark it as an exhibit unless you

3    want me to, but I wanted to make sure you were

4    aware of that.

5                MS. MARTINEZ:  No.  It's okay.  Thank

6    you, Counsel.

7    BY MR. EPSTEIN:

8    Q.          I want to circle back to Brenda Walker

9    and the statement about police misconduct.  I

10   would like you to tell me in your words all of the

11   things you believe constitute police misconduct by

12   Brenda Walker.

13   A.          You would like for me to tell you all

14   of the things that I believe?  Is that what you

15   said?

16   Q.          This is your opportunity, yes.

17   A.          I'm going to let -- I'm going to let

18   the lawyers handle that.  I'm not sure how to

19   answer that question.

20               MR. EPSTEIN:  Okay.  In that case,

21   let's take five minutes.

22               MS. MARTINEZ:  Okay.

23               THE VIDEOGRAPHER:  We are off the

24   record.  The time is 4:10.

1          (A short recess is taken.)

2          THE VIDEOGRAPHER:  This marks the

3   beginning of Media No. 6.  We are back on the

4   record.  The time is 4:26.

5   BY MR. EPSTEIN:

6   Q.        Mr. Horton, before we move on to

7   another topic, I just want to make sure that you

8   have told me everything you recall about your

9   conversations with Mr. McClanahan.  Can you think

10  of any details, any facts about either of those

11  conversations that you have not told me?

12  A.        That -- that's a good question.  I hope

13  he's resting peacefully, but, no, I can't -- I

14  can't recall at this time any other conversations

15  that I've had with Mr. McClanahan.

16  Q.        Prior to your trial, did you try to

17  reach out to Tracy McClanahan?

18  A.        Tracy McClanahan, I can't even remember

19  who that is.  Is that -- is that the niece or the

20  daughter?

21  Q.        Well, would that make a difference?  Do

22  you remember going to someone's work to speak to

23  them?

24  A.        Not at this time, no.  With the last

1  name McClanahan, not at this time, I don't

2  remember.

3  Q.          Did you reach out to any family members

4  to try to talk to them before or during the trial?

5          MS. MARTINEZ:  Objection.  Form.

6          You can answer.

7  A.          Yes.  I remember -- so I went to a high

8  school named Centennial High School and our rival

9  was Whetstone High School, so I remember a

10  gentleman with the last name of McClanahan who was

11  a -- was a bigger rival, a better rival, better

12  basketball player, taller, more athletic.

13          And I can remember seeing him sometime

14  in between before I went to trial and talking to

15  him about his uncle.  And he didn't want to have

16  anything to do with it and he didn't want to

17  testify for me or against him or for him against

18  me.  He didn't want to have anything to do with

19  it.  I do remember that.

20  Q.          Anybody else in the family that you

21  reached out to?

22  A.          I can't recall at this time.

23  Q.          Did you try to talk to Rhonda Curry?

24  A.          Rhonda Curry.  I remember during the

1  court proceedings, I had attempted to speak with

2  Ms. Rhonda Curry one time during the court

3  proceedings and she was absolutely terrified.  And

4  it -- she was so terrified it scared me from me

5  even trying to reason with her or talk to her.

6            You know, you all come -- both the

7  accused and the accuser both go into and leave the

8  courtroom at the same time.  So I can remember

9  bumping into her a couple times and she was

10  absolutely terrified.  So I did try to talk to

11  her, but she was terrified, so I left that alone.

12  Q.          What did you say to her?

13  A.          Can we talk for a second?  And she

14  started getting hysterical.  So I said, you know

15  what, I apologize.  And I just moved on.

16  Q.          And you knew that was a violation of

17  the terms of your parole, correct?

18  A.          Since I hadn't been found guilty yet,

19  I -- no, I didn't know.

20  Q.          You didn't understand that the terms of

21  your release were that you have no contact with

22  Rhonda Curry or Rick McClanahan?

23  A.          I do not recall because, you know, we

24  was in such close quarters.

1   Q.          Did Mr. McClanahan step in when you

2   tried to talk to her?

3   A.          I don't believe so.  You know, at this

4   time I'm just trying to do anything that I can to

5   get this -- get this taken care of, you know,

6   without having the courts, you know, too involved.

7   I'm trying not to go to trial.  I didn't commit

8   this crime, so when I see them, you know, I'm just

9   trying to talk with them, just trying to reason

10  with them.

11  Q.          Are you aware that to this day, Rhonda

12  Curry insists that you are the attacker?

13  A.          I am aware.

14  Q.          If Rick McClanahan knew that you were

15  not the person, why did he testify that you were?

16              MS. MARTINEZ:  Objection.  Foundation.

17              You can answer.

18  A.          I don't have an answer for that

19  question.  I'm -- I'm not still to this day not

20  100 percent sure.  I know he passed away.  And I

21  don't want to speculate what he thought.

22  Q.          Once you were convicted, where were you

23  taken?

24  A.          I was taken to the -- sorry -- a

1    correctional receiving facility.  That's where

2    they -- that's where they shave your head.  Quite

3    frankly, they treat you like a animal.  They give

4    you your number.  They talk really bad to you.

5    And then on top of that fact that I was sentenced

6    to serve 23 years, it -- it -- like I always like

7    to tell people, prison is just exactly what you

8    think it is, what you see on the movies, that's

9    what it is, it's bad.

10   Q.        How long were you in the first facility

11   that you were taken to?

12   A.        Maybe about 60 days until they sent me

13   to my parent institution.

14   Q.        So before you were sent there, you were

15   actually in the county jail; is that your

16   understanding?

17   A.        I was -- yes.  For about three -- maybe

18   a couple of days, yeah.

19   Q.        What was your mood like then?

20   A.        You know, after I was found guilty and

21   then sentenced to 23 years for a crime that I

22   absolutely did not commit, my mood was -- it was

23   pretty low.  It was a really low point.  I

24   actually -- that's when the suicidal thoughts

1    began, but me being so much of a coward, I didn't

2    have -- I didn't have the guts to go through with

3    it.  But I often thought about suicide while I was

4    in prison, you know, just -- just I didn't want to

5    spend 23 years in prison for something I didn't

6    do.

7    Q.        Did you ever attempt suicide?

8    A.        No.  I was -- I was a coward.

9    Q.        Did you ever tell any of the prison

10   staff members that you had attempted suicide?

11   A.        Yes.

12   Q.        You did?

13   A.        I -- yes, when I first -- yes, when I

14   first -- before -- when I -- before I even got to

15   prison.  I don't want to -- excuse me.  Not prison

16   officials, the jail.  When I was at the county

17   jail before I went to the prison.  They said, are

18   you having any suicidal thoughts?  I said, as a

19   matter of fact, yes, I am.  And that's when they

20   put me on suicide watch.

21   Q.        No, I understand that.

22   A.        Sorry about that.

23   Q.        And by the way, they put you on

24   medication as well; is that correct?

|    |    |    |
|----|----|----|
| 1  | A. | I don't recall being on medication. |
| 2  | Q. | Do you recall taking Prozac? |
| 3  | A. | I don't recall. |
| 4  | Q. | So when you were in the jail, you told |

5   the jailers that you were having suicidal

6   thoughts, correct?

| 7  | A. | That's correct. |
| 8  | Q. | Did you actually attempt to carry those |

9   suicidal thoughts out?

| 10 | A. | Yes. |
| 11 | Q. | You did try to kill yourself? |
| 12 | A. | Yes.  It was -- it was a weak attempt. |

13  It was more --

| 14 | Q. | A minute ago -- |
| 15 | A. | -- of a cry for help. |
| 16 | Q. | Well, a minute ago, you said no. |
| 17 | A. | No.  A minute ago, I said that I was a |

18  coward.

| 19 | Q. | Did you try to kill yourself? |
| 20 | A. | Yes. |
| 21 | Q. | How? |
| 22 | A. | I tried to suffocate myself. |
| 23 | Q. | How? |
| 24 | A. | It's kind of hard to explain.  And to |

1    keep reliving the stuff and answering all these

2    questions is very difficult for me to do.  So I

3    just tried to suffocate myself with some plastic

4    from a sandwich.  It was -- it was -- it was a

5    cowardly move and -- man.

6    Q.          Did you report that attempt to the

7    authorities?

8    A.          No.  I was that much of a coward.  I

9    couldn't even tell nobody about my weak suicide

10   attempt.

11   Q.          Did you ever tell anybody?

12   A.          I don't think so.

13   Q.          We talked earlier about the fact that

14   when you'd go to a new institution, they would do

15   an intake and a medical review.  Do you recall

16   when we talked about that?

17   A.          I do recall.

18   Q.          All right.  I'm going to hand you a

19   sample of that.

20                          - - - - -

21              Thereupon, Exhibit 23 is marked for

22   purposes of identification.

23                          - - - - -

24   Q.          I'm handing you what I've marked as

1    Exhibit 23.  It's an Initial Medical/Mental

2    Health/Substance Use Screening for Richard Horton.

3    Do you see that?

4    A.          I do.

5    Q.          And it's dated March 8th of 2006,

6    correct?

7    A.          That's correct.

8    Q.          So this is one month after your

9    conviction, correct?

10   A.          Correct.

11   Q.          And it says Date of Arrival at

12   Institution, and it's the same date, March 8th,

13   2006, correct?

14   A.          Correct.

15   Q.          All right.  Can you tell from this what

16   institution you are arriving at?

17   A.          CRC.

18   Q.          And what is CRC?

19   A.          CRC is the -- it's the facility that I

20   spoke about earlier where they shave your head,

21   they take all your clothes, put you in prison

22   clothes, and they give you your prison number.

23   Q.          Do you know what CRC stands for?

24   A.          I can't remember.  I do not recall.

1    Correctional Receiving Center?  I can't -- I can't

2    remember.

3    Q.          Well, and it says in the line below

4    that, received from FCCC.

5    A.          That's correct.

6    Q.          So maybe --

7    A.          Sorry about that.

8    Q.          -- FCCC is the place you were thinking

9    of where they first take you in and shave you?

10   A.          No.  No.

11   Q.          No?

12   A.          FCC is -- that's the Franklin County

13   Correctional Center.

14   Q.          Okay.

15   A.          That's the jail.

16   Q.          Okay.  And then if you look in the

17   middle where it says Comments, it says that you're

18   on Prozac.  Does that refresh your recollection of

19   whether you were actually taking Prozac?

20   A.          No, it doesn't.  Not at this time it

21   doesn't.

22   Q.          All right.  And there's a line in the

23   middle top, History of Suicidal Thoughts, and you

24   checked yes, correct?

```
 1   A.        Yes.

 2   Q.        Because you gave them the information

 3   as they were filling this out, correct?

 4   A.        At this point in time, it would have

 5   been self-explanatory because once I go in -- once

 6   I'm found guilty -- this is the way it works.  Let

 7   me try to paint a picture for you.

 8             When they're taking my -- when they're

 9   admitting me into the county jail, that's when

10   they ask me the question, they say, are you having

11   suicidal thoughts?  And when I say yes, they put

12   me in the suicide wardrobe.  So there's -- you

13   know, it's obvious at this point that I'm

14   suicidal because I have the suicide wardrobe on,

15   so they didn't really need to ask me anything.  It

16   was --

17   Q.        Okay.  But I'm not asking --

18   A.        -- pretty apparent.

19   Q.        -- just about that line.  I'm talking

20   about all the information on this form.  Would

21   they have gone over it with you to get information

22   from you?

23             MS. MARTINEZ:  Objection.  Form.

24             You can answer.
```

1    A.          I can't recall at this time.

2    Q.          For example, under Mental Health

3    Disposition, the third line says Routine Housing

4    Requested.  And it's checked yes.

5               They would have to check with you to

6    see if you were requesting routine housing,

7    correct?

8    A.          Oh.  I'm sorry, sir.  Obviously, you've

9    never been to the county jail in Columbus, Ohio.

10   They don't ask you anything.  I had the suicide

11   vest on and I was in suicide watch all the way

12   until I left the county jail.

13   Q.          Okay.  Well, is it your testimony that

14   they didn't take any information from you when

15   they were filling out these forms?

16   A.          No, that's not my testimony.  I can't

17   recall what information was taken.

18   Q.          Okay.  Down toward the bottom it says

19   Substance Use Screening.  Do you see that?

20   History of Alcohol and Drug Problem, and it's

21   checked no.  Is that a correct answer?

22   A.          No.

23   Q.          Previous Alcohol and Drug Treatment is

24   checked no.  Is that a correct answer?

 1    A.          No.

 2    Q.          A few lines down from that, Cannabis,

 3    it's checked no.  Is that a correct answer?

 4    A.          No.

 5    Q.          Cocaine is checked no.  Is that a

 6    correct answer?

 7    A.          No, not at this time, no.  It looks

 8    like they pretty much just filled it out.

 9    Q.          Can you think of any reason why you

10    would have given incorrect information to them?

11                MS. MARTINEZ:  Objection.  Form.

12    Q.          I mean, we did talk earlier about there

13    are times where an inmate will strategically give

14    incorrect information, correct?

15    A.          Yes, we did discuss that.

16    Q.          Right.  So is there any reason why you

17    would have -- if this information came from you,

18    is there any reason why strategically you would

19    have given incorrect information?

20    A.          No, not -- not at this point in time

21    when this was getting filled out.  Like I said,

22    you've never been to the county jail in Columbus,

23    Ohio, which I believe they're getting ready to

24    close it because it has so much of a bad

1  reputation, but they don't ask you a lot of

2  questions.  You pretty much -- gladiator school

3  pretty much starts then and there.

4  Q.          Did you receive psychological

5  counseling while you were in prison?

6  A.          I believe I did.

7  Q.          Do you know any of the names of the

8  people who provided that?

9  A.          I can't recall at this time.

10          MR. EPSTEIN:  Bear with me one second.

11  Q.          Are you aware of when -- of receiving

12  any clinical diagnoses when you were admitted?

13  A.          Not at this time, I can't recall.  No.

14  I just -- I just want to keep going back to the

15  point that things in prison are handled a lot

16  different than they're handled out here in the

17  real world.  So, you know, it might not be as

18  simple as me just going to see a doctor, and a

19  doctor saying you suffer from depression

20  because, you know, you're saying that you're

21  having suicidal thoughts.  I think that you -- you

22  know, it's just not that simple.

23  Q.          Did you suffer from depression?

24  A.          Yes, I did suffer from depression.

1    It's hard enough being in prison, being around all

2    this madness and all these bad people and this

3    violence, gangs, but it was even harder knowing

4    that I was innocent.  It was even harder -- it was

5    even harder knowing that my family needed me and I

6    couldn't be there for them.  It was even harder

7    being away from my children.  So, yeah, I was -- I

8    definitely had some dark days.

9    Q.        Who is Ed Smith?

10   A.        I don't remember.  That name doesn't

11   sound familiar.

12   Q.        Okay.

13                  - - - - -

14             Thereupon, Exhibit 24 is marked for

15   purposes of identification.

16                  - - - - -

17   Q.        I'll hand you what's been marked as --

18             MR. GIRARD:  Exhibit 24.

19   Q.        -- Exhibit 24.

20             MR. EPSTEIN:  If you say so.

21   Q.        I'll represent to you that this is a

22   document we received from the Department of

23   Rehabilitation and Correction.  It's a Mental

24   Health Treatment Plan Review for you.  And it's

1    prepared by Michele Whaley and Ed Smith.  Do you

2    see those names in the top right corner?

3    A.          Top right corner.

4               MS. MARTINEZ:  I just want to clarify

5    super quickly, Counsel.  I'm sorry.  Was this

6    produced?  I just don't see a Bates stamp.  I'm

7    not sure if it was cut off on my copy.

8               MR. EPSTEIN:  I think it was cut off.

9               MS. MARTINEZ:  Okay.

10              MR. EPSTEIN:  It was produced.

11              MS. MARTINEZ:  Okay.  I trust you.  I

12   take your word.  I just want to make sure I'm not

13   missing it.

14              MR. EPSTEIN:  If you can't find it, let

15   me know and I'll direct you to the page -- to the

16   Bates number.

17              MS. MARTINEZ:  Okay.

18   BY MR. EPSTEIN:

19   Q.          Okay.  What I'd like to direct you to

20   is the top left.  And by the way, this is dated

21   January 17th of 2007, correct?

22   A.          Yes, I see that date.

23   Q.          Okay.  Do you see in the top left it

24   says:  Axis I, Adjustment Disorder with Mixed

1  Anxiety and Depressed Mood.  Do you see that?

2  A.          I see that.

3  Q.          Do you have any understanding of what

4  that means?

5  A.          No, I do not.  Would you care to

6  explain?

7  Q.          I will not because I am not a medical

8  doctor.  Axis Ia says:  Polysubstance Dependence.

9  Do you see that?

10  A.          I do see it.

11  Q.          Do you have an understanding of what

12  that means?

13  A.          No, I do not.

14  Q.          And, finally, Antisocial Personality

15  Disorder.  Do you see that under Axis II?

16  A.          I do see it.

17  Q.          All right.  And do you have any

18  understanding of what means?

19  A.          I do have a vague understanding of what

20  antisocial personality disorder means.

21  Q.          What is your understanding of

22  antisocial personality disorder?

23  A.          This sounds, and I'm guessing here, but

24  this sounds like somebody who doesn't necessarily

1  want to be around a whole lot of people, and the

2  cause of this person maybe feeling like that would

3  be because of this -- of this disorder.  But I'm

4  not, like you said, I'm not a doctor.  I probably

5  even shouldn't be trying to explain this.

6  Q.        Did you have sessions where you could

7  talk to staff and tell them how you were feeling?

8  A.        I don't recall at this time.  This

9  was -- I don't recall.

10         MS. MARTINEZ:  I just want to quickly

11  preserve an objection to Exhibit 24 to the extent

12  it wasn't produced.  I haven't been able to find

13  it.  It could be there, but I just want to

14  preserve that for right now.

15                    - - - - -

16         Thereupon, Exhibit 25 is marked for

17  purposes of identification.

18                    - - - - -

19  Q.        I'm going to hand you what I've marked

20  as Exhibit 25.

21         MS. MARTINEZ:  Thank you.

22  Q.        It's a handwritten letter that appears

23  to be directed to Ed Smith from Richard Horton.

24  Did you write this?

1   A.          This does look my -- look my -- look

2   like my handwriting.

3   Q.          Have you had an opportunity to read

4   it?

5   A.          I have.

6   Q.          Now that you've read it, do you

7   recognize it?

8   A.          I still don't recognize it, but --

9   Q.          Do you have any reason to dispute that

10  you wrote it?

11  A.          No, I don't have any reason to dispute

12  that I wrote this at this time.

13  Q.          Do you know why you would have been

14  writing this to Mr. Smith?

15  A.          It says on here that my concern was

16  that I had gotten into trouble in the visitation

17  room.  It says on here that I was only in the

18  visitation for five minutes, that I did not grab

19  my wife's backside, and I was -- it sounds in

20  here -- it says in here also that I was just more

21  concerned about my wife's mental health than my

22  own.

23  Q.          Okay.  But did you receive some

24  discipline for inappropriate touching with your

1  wife?

2  A.         It says on here what was -- what's on

3  here would indicate, yes, that I did.

4  Q.         Let's assume that you did.  If you had,

5  and you wanted to challenge it administratively,

6  is this the procedure you would use to handwrite a

7  letter to Mr. Smith?

8  A.         I don't know who Ed Smith is, but this

9  is -- this is not the correct form.

10  Q.         What would be the correct form?

11  A.         It's -- it's -- I'm not 100 percent

12  sure.  It was some type of appeal form like -- but

13  this is -- this doesn't have the correct format.

14  Maybe this was inside the form.

15  Q.         Now, you wrote:  In July '08, my wife

16  had a nervous breakdown.

17         Do you see that?

18  A.         Yeah.

19  Q.         What happened?

20  A.         I mean, my wife had so many nervous

21  breakdowns, especially at the beginning of my

22  wrongful incarceration, and just trying to deal

23  with me being snatched away for a crime I didn't

24  commit.  It's -- I can't recall exactly what the

1   circumstances surrounding this particular nervous

2   breakdown were.  I just -- it just -- it's kind of

3   hard for me to even talk about to this day that

4   she went through all that pain.

5           And then The Ohio Innocence Project

6   gets me out of prison, and it was all -- it was

7   all something she didn't have to go through, you

8   know.  It's a -- it's a testament to her strength

9   at the same time, but this -- this -- this

10  is -- this is -- this is kind of hard for me to

11  look at.

12  Q.          There's a notation in the margin that

13  says:  P.S., I need to talk with you, sir.

14          Do you see that?

15  A.          I see it.

16  Q.          All right.  Does that notation tell you

17  anything about who Mr. Smith might be?

18  A.          No.

19  Q.          Okay.  So if I were to represent to you

20  that Mr. Smith provided counseling, you wouldn't

21  know whether that was true or not?

22  A.          I would say that I do not recall at

23  this time because I still can't remember who Ed

24  Smith was or is.

1                    - - - - -

2            Thereupon, Exhibit 26 is marked for

3     purposes of identification.

4                    - - - - -

5     Q.        I'll hand you what I've marked as

6     Exhibit 26.  It's captioned Interdisciplinary

7     Progress Notes.

8            MS. MARTINEZ:  You don't have to read

9     through the whole thing, but just flip through the

10    pages so you know what you're looking at.

11    Q.        I just want to direct your attention

12    down to the bottom of the page.  Do you see

13    Mr. Smith's signature at the bottom right?

14    A.        Yes.

15    Q.        All right.  And these are dated and

16    timestamped notations.  Do you see that?

17    A.        Yes.

18    Q.        I want to direct your attention first

19    to an entry on the first page, dated

20    November 18th of 2008 at 9:30 a.m.  Brief

21    Psychology Note.  Do you see that?

22    A.        I do see it.

23    Q.        And if you read, I'm not going to read

24    the whole thing, but it talks about the incident

1  we just referred to, that there was inappropriate

2  contact with your wife.  Do you see that?

3  A.          I do see it.

4  Q.          And it says:  He received a ticket and

5  the visit was terminated.

6          What does it mean to receive a ticket?

7  A.          To receive a ticket would be, like,

8  similar to you driving and speeding, you would get

9  a ticket submitted against you by a traffic

10  officer, right?  So they would submit the ticket.

11  It seems like my visit was instantly terminated,

12  and I probably went back to my dorm and waited on

13  my day in court.

14          So after that, the next part of the

15  process would be my sergeant would probably call

16  me to his office and he would hear the ticket,

17  read over the ticket, see, you know, what -- what

18  details were inside the ticket, and then he would

19  make a ruling, did he believe the officer or did

20  he believe what I said.

21  Q.          Do you remember this particular ticket?

22  A.          No, I -- not at this time.  I don't

23  remember.

24  Q.          All right.  Back to the same section,

1   please.  The next sentence says:  He said that

2   she -- referring to Janette -- she is his only

3   support and is fearful of a possible visiting

4   restriction.

5          Do you see that?

6   A.          Where are you at?  I'm sorry.

7   Q.          In the same Brief Psychology Note of

8   November 18th, 2008.  Right after he received the

9   ticket.

10  A.          I see it.

11  Q.          He said that she is his only support

12  and is fearful of a possible visiting restriction.

13          Was Janette your only support at that

14  time?

15  A.          During this time in 2008, you know,

16  times are hard out here especially for my family.

17  I didn't have a lot of support, I didn't have a

18  lot of people who believed I was innocent in 2008.

19  I lost contact with some very good friends, good

20  people, family members.  Was Janette my one and

21  only support?  I can't -- I honestly can't recall.

22  Q.          Which family members did you lose

23  contact with as a result of your conviction?

24  A.          So many.  It's -- I just -- I don't

1    even talk to some of them to this day because, you

2    know, some of them passed away, some of them moved

3    on with their life.

4    Q.        Well, give me some names.

5    A.        Let me think of some names.  Some

6    aunts, some uncles, some relatives that live in

7    different states now.

8    Q.        Well, let's narrow it down.  Were there

9    people that you were close to before the

10   conviction that were no longer close with you, no

11   longer supportive of you after the conviction?

12   A.        Yes.

13   Q.        Who?

14   A.        People -- that's a tough question.

15   People like a cousin named Raheem Horton.  He

16   was -- he and I were very close.  He went on to

17   the military and kind of lived his life.

18   Q.        When did he go into the military?

19   A.        I'm not exactly sure of the year at

20   this time.

21   Q.        I mean, is he your age cohort or is he

22   younger?

23   A.        A little younger.

24   Q.        Where was he around the time of your

1  trial?

2  A.          I'm not -- I'm not sure at this time

3  where he was.  It would have been nice to have him

4  there for a little support.

5  Q.          Did you have a relationship with him

6  after you got out of the West Virginia prison?

7  A.          Yes.

8  Q.          Where was he at that time?

9  A.          In between service for the Navy.

10  Q.          He was here in Columbus?

11  A.          Here in Columbus, Ohio.

12  Q.          And where is he now?

13  A.          He lives here in Columbus, Ohio.

14  Q.          Have you reached out to him since

15  you've been released from prison?

16  A.          Yes.  He congratulated me, and I told

17  him thanks for the congratulations.

18  Q.          And what's your relationship like right

19  now?

20  A.          It's not quite the same because, you

21  know, I wish he would have been there and been a

22  little bit more supportive of me or my family

23  during this wrongful conviction.

24  Q.          Anybody else you can mention?

1    A.          Not at this time, no.  It's just --

2    it's just -- it's just kind of -- it's just hard

3    because, you know, you're asking me to relive

4    emotions and think about stuff that I haven't

5    thought about in a long time.  I really tried to

6    push forward, but with this wrongful -- this

7    wrongful conviction it's like dropping a bomb into

8    the family structure and a lot of people was hurt.

9    Q.          I'd like you to turn to -- it's the

10   same document.  It's Bates No. 7237.  Are you with

11   me?

12   A.          I think so.

13   Q.          No, that's not the page.

14               MS. MARTINEZ:  In the bottom right

15   corner is going to be 7237.

16   A.          37 -- 37 --

17   Q.          In the top left corner is a notation

18   dated July 11th of 2006.

19               MS. MARTINEZ:  That one looks right.

20   A.          Okay.

21   Q.          It says:  Psychiatry continued.

22               Do you see that?

23   A.          I see it.

24   Q.          All right.  And you see at the bottom

1  again there's Mr. Smith's signature?

2  A.        I see it.

3  Q.        All right.  I want to read you a

4  notation that's here.  It's the last one,

5  July 25th of '06 dated, 9:35 a.m.  Are you with

6  me?

7  A.        I'm with you.

8  Q.        Brief Psychology Note.  Horton spoke at

9  length of numerous mistakes at his trial.  He

10  denied the robbery, but admitted the bribery.

11          Do you see that?

12  A.        I see it.

13  Q.        Did you tell Mr. Smith that you

14  attempted to bribe Rick McClanahan?

15  A.        I do not recall at this time.

16  Q.        So it's possible you did?

17  A.        I do not recall at this time.

18  Q.        Can you think of any reason why

19  Mr. Smith would have written that down if you did

20  not say that?

21  A.        Well, at this time, you know,

22  it's -- it's easy to think that everyone is

23  against you, and everyone was against me.  I don't

24  know why it's written on here.  I don't -- these

1  documents don't look familiar to me.  I don't have

2  a complete answer for you at this time.  I do know

3  that I was never charged with a bribery charge.

4  Q.        This is true, but did you bribe him or

5  did you try to attempt to bribe him?

6  A.        No, I did not.

7  Q.        Did you tell Mr. Smith that you did?

8  A.        I did not recall at this time.

9  Q.        Before that, it says:  Horton spoke at

10  length of numerous mistakes at his trial.

11            Do you know what that's a reference to?

12  A.        I do not recall at this time.

13  Q.        Looking back on it now, what mistakes

14  do you see at your trial?

15  A.        Well, looking back on it now that I've

16  had The Ohio Innocence Project involved in my case

17  and they were the ones who ultimately freed me

18  from this wrongful conviction, I'm aware of a

19  records request where some evidence was not

20  presented or not available to me at my trial, and

21  then magically, once The Ohio Innocence Project

22  gets involved in my case, magically these court

23  papers are produced out of thin air.

24  Q.        What papers are those?

1  A.          I'm not sure how to explain the papers,

2  but...

3  Q.          I'm sorry?

4  A.          I'm not sure how to explain the papers.

5  I don't recall exactly what they said.  I'm not a

6  lawyer, but I know they weren't available for me

7  during trial.

8  Q.          And it's your belief that those papers

9  were deliberately concealed from you?

10 A.          I'm not sure how to answer the

11 question, but I'm going to say I do believe it was

12 done with malicious intent.

13 Q.          Do you have a theory as to why somebody

14 would do that?

15 A.          No, I don't have a theory right now.

16 I've thought about this numerous nights trying to

17 figure out, like I said, how I got myself into

18 this position, what was -- who was to blame, what

19 I could have done differently, but I just don't

20 know why this happened to me.

21                  - - - - -

22          Thereupon, Exhibit 27 is marked for

23 purposes of identification.

24                  - - - - -

1    Q.          I'm going to hand you what I have

2    marked as Exhibit 27.

3    A.          Thank you.

4    Q.          It's a collection of handwritten notes.

5    Are these the documents you were referring to a

6    minute ago that you believe were concealed from

7    you?

8    A.          I'm sorry, I do not recall at this

9    time.

10   Q.          Do you recognize this document?

11   A.          I've looked over so many documents over

12   the years and even today.  This --

13   Q.          Okay.  That's fine.  Would you turn to

14   the page that's Bates numbered 00048?

15   A.          Yes.

16   Q.          All right.  And do you see, starting in

17   the middle, there's some physical descriptions?

18   A.          Yes.

19   Q.          All right.  The first item is male,

20   black, 5'9" to 6'1".  Does that description match

21   you?

22   A.          No.

23              MS. MARTINEZ:  I'm going to object to

24   the characterization of the document as saying

1    6'1".

2              MR. EPSTEIN:  It does not.

3    Q.        Are you a male, black?

4    A.        I am a male, black.

5    Q.        Do you fall within the range of 5'9" to

6    6'1"?

7    A.        I do not.

8    Q.        Earlier you testified you were 6'1".

9    I'm sorry.  I misspoke.  It's 5'9" to 6'.

10   A.        Then you already have the answer to

11   your question.

12   Q.        Yes.  Okay.  So this does not describe

13   you because you are not 6', you are 6'1", correct?

14   A.        That would be correct.

15   Q.        Okay.  Light skin.  Do you consider

16   yourself to have light skin?

17   A.        Yes.

18   Q.        Short nappy hair?

19   A.        Well, wait a minute, wait a minute.

20   Wait a minute now.  Nappy.

21   Q.        I agree.  So let me ask you, what is

22   your understanding of the word "nappy" as a

23   descriptor for someone's hair?

24   A.        Hair unkempt.

1  Q.         Does it have another meaning?

2  A.         I'm not sure at this time.

3  Q.         Okay.  Bushy eyebrows?

4  A.         At -- well, not now.  I'm 48 years old.

5  They were a little more full around this time.

6  Q.         Okay.  And this time was back in 2004,

7  correct?  Well, I will represent to you these were

8  notes that were taken in 2004.

9  A.         Yes.

10  Q.         So I'll ask you to assume that.  So if

11  we're assuming that these notes were taken in

12  2004, and there's a notation here that says:  Just

13  out of prison, drugs.

14             Does that also describe you?

15  A.         This could describe anybody.

16  Q.         I understand that, but could it also

17  describe you?

18  A.         This -- this could describe anybody.

19  This --

20  Q.         Including --

21  A.         It's already --

22  Q.         Including --

23  A.         -- not saying my height.

24  Q.         -- you?

1    A.        It could -- lots of black men could be

2    profiled by this description.

3    Q.        Yes or no, Mr. Horton, do you fit that

4    description?

5    A.        I'm not sure how to answer the

6    question.

7    Q.        You can answer it, yes, that fits me,

8    or, no, that does not fit me.

9    A.        I'm going to let -- I'm going to have

10   to say I don't know how you want me to answer this

11   question.

12   Q.        Mr. Horton, you --

13   A.        I've already answered the question.

14   Q.        No.  You --

15   A.        You said -- you said does this fit me.

16   I said this could describe a number of black

17   males.

18   Q.        A number of black males, including you,

19   yes or no?  Were you out of prison recently in

20   2004?

21   A.        This is not a perfect description of

22   me.

23   Q.        Mr. Horton, were you out of prison

24   recently in 2004, yes or no?

1          MS. MARTINEZ:  Just a belated form

2    objection.

3          You can answer.

4    A.          Yes.

5    Q.          Were you in prison for drugs?

6    A.          Yes.

7    Q.          Down below it says again, male, black,

8    27 to 28.  How old were you in 2004?

9    A.          I believe I was in between -- I believe

10   I was 27 years old.

11   Q.          And it says Everett Middle School.  Did

12   you go to Everett Middle School?

13   A.          Yes, I did.

14   Q.          Below that it says Adidas boy.

15          You've already testified that some

16   people referred to you that way, correct?

17          MS. MARTINEZ:  Objection.  Form.

18   Mischaracterizes testimony.

19          You can answer.

20   A.          I testified that I don't remember being

21   called Adidas boy.  I don't take kindly to anybody

22   calling me boy, never did, never will.

23   Q.          Did people call you Adidas man?

24   A.          They called me all types of stuff.  I

1    think I've already answered that question.

2    Q.          Including Adidas boy that some people

3    called you?

4    A.          I don't --

5                MS. MARTINEZ:  Same objections.

6                You can answer.

7                THE WITNESS:  I'm sorry.

8                MS. MARTINEZ:  It's okay.

9    A.          I don't recall.

10   Q.          Did you live on Reynolds Avenue at this

11   time?

12   A.          I was staying in Reynolds Avenue and

13   Camden Avenue and Grove City.  I was --

14   Q.          And --

15   A.          -- staying around.

16   Q.          And Reynolds Avenue is a red brick

17   house, correct?

18   A.          I'm not sure.  I know I was paroled to

19   Camden Avenue.

20   Q.          All right.  Now, again, in the middle

21   of that it says Richard Diggs.

22                Did you ever hear in 2004 any

23   suggestion that Richard Diggs was involved in the

24   Loew Street robbery?

1    A.           No, I did not, because if I would have,

2    I'm -- I would have tried to have that evidence

3    brought forward or any hearsay evidence brought

4    forward during my trial.

5    Q.           Are you aware that at the time of the

6    Loew Street robbery, Richard Diggs was in prison?

7    A.           No, I'm not aware of that.

8    Q.           You were not aware of that until right

9    now?

10   A.           I wasn't aware.  I -- I wasn't aware of

11   it.

12   Q.           I want you to assume that Richard Diggs

13   was in prison at the time of the Loew Street

14   robbery.  Does that change your view about whether

15   you would have brought forth hearsay evidence to

16   try to prove that he committed the crime?

17   A.           Yes, that does change my view.  It

18   would have been pointless if he was incarcerated

19   at the time, and I didn't want to waste the

20   court's time.

21            MS. MARTINEZ:  A belated form objection

22   to that question.

23   Q.           While you were incarcerated, did you

24   file pleadings with the court, seeking release on

1    your own without a lawyer?

2    A.          Yes, I did.

3                    - - - - -

4               Thereupon, Exhibit 28 is marked for

5    purposes of identification.

6                    - - - - -

7    Q.          I'm going to hand you what I've marked

8    as Exhibit 28.  It's a document captioned Motion

9    for Judicial Release, and it is signed by Richard

10   Horton.  Do you see that?

11   A.          I do.

12   Q.          Is this a document that you filed with

13   the common pleas court, asking to be released from

14   prison?

15   A.          Give me one second to look over the

16   documents.

17   Q.          Absolutely.

18               Do you recognize this as a document

19   that you filed with the court?

20   A.          One more second.  Just let me read a

21   little bit more.

22               Okay.  What was the question again?

23   Q.          Do you recognize this as a document you

24   filed with the court?

1    A.          Yes, I do recognize this document.

2    Q.          And that's your signature on the first

3    page?

4    A.          Yes.

5    Q.          And that's your signature on the second

6    page?

7    A.          Yes.

8    Q.          And that's your signature on the third

9    page?

10   A.          I do recognize those signatures.

11   Q.          Okay.  And the last page, your

12   signature again?  The very last page.

13   A.          I do recognize it.

14   Q.          And the last signature is below a

15   Certificate of Service that represents that this

16   was mailed to the court on the 28th of September,

17   2017.  Do you see that?

18   A.          I do see it.

19   Q.          So did you compile and mail this entire

20   document together?

21   A.          I do not recall at this time.  This was

22   a document filed and I was in prison.  I forget

23   what year this was.  This was --

24   Q.          I just read it was 2017.

1   A.        Yeah, but as far as how many years I

2   had been in prison, this was the 16th -- 13th --

3   12th year of me being wrongfully incarcerated and

4   I was just surrounded by evil and just trying to

5   get out of prison early. I completed a lot of

6   certificates. And, you know, you got to

7   understand that prison is a vile place, and I

8   just -- I just wanted to come home, man. I didn't

9   do it. I just wanted to come home.

10   Q.        Let me direct your attention to the

11   third page. This is a letter that you wrote,

12   dated October 1st, 2017. Do you see that?

13   A.        I see it.

14   Q.        It was addressed to Judge John Bender,

15   correct?

16   A.        That's correct.

17   Q.        Judge Bender was the presiding judge in

18   your criminal case?

19   A.        Yes, he was.

20   Q.        I want to direct your attention to the

21   fifth paragraph of the letter. It says: If this

22   court does not find it appropriate to release me

23   directly back into society at this time, I

24   respectfully request release to the CBCF program

1  or some other prerelease program that this court

2  finds appropriate.

3          What is CBCF?

4  A.        CBCF -- oh.  CBCF is kind of like a

5  work release program.  They have a good -- good

6  standing.  I can't say exactly what CBCF -- CBCF

7  is at this time.

8  Q.        Okay.  The letter continues:  However,

9  there is a program that has accepted me upon my

10  release.  This program is in good standing with

11  the Department of Corrections and has a great

12  success rate.  The Exit Program, 614-253-8969,

13  will contact you with an assessment and

14  recommendation to enter into the program.

15          Do you see that?

16  A.        I see it.

17  Q.        What is The Exit Program?

18  A.        I do not recall at this time.

19  Q.        Did you apply to The Exit Program?

20  A.        I'm assuming that I did, yes.

21  Q.        But you have no independent memory of

22  having done so?

23  A.        Not from 2017, no.

24  Q.        And I take it you have no independent

1  memory of what steps you had to take to apply to

2  The Exit Program?

3  A.          I do not recall at this time.

4  Q.          To your knowledge did you have any

5  paperwork from The Exit Program showing your

6  acceptance?

7  A.          I do not recall at this time.

8  Q.          Is it fair to assume that if you had

9  had paperwork showing your acceptance, you would

10  have attached it to this document?

11  A.          It is safe to say that, but I'm not

12  sure if The Exit Program, if it even works like

13  that.  I provided a phone number there, so -- and

14  said they would be contacting.

15  Q.          Would it surprise you to learn that

16  The Exit Program says they have no record of you

17  applying?

18  A.          No, it wouldn't surprise me.

19  Q.          Why wouldn't it surprise you?

20  A.          Because I can't even -- I can't

21  remember them, so I assume there wouldn't be any

22  harm if they wouldn't be able to remember me.

23  Q.          Well, but I'm not asking them if they

24  remember you.  I'm asking if they have any records

1    of you.  They have nothing in writing about you.

2    Would that surprise you?

3    A.          No.

4              MS. MARTINEZ:  Objection to the form of

5    that question.

6              You can answer.

7    A.          That would not surprise me at this

8    time.

9    Q.          Is it possible that when you wrote that

10   you had not applied to The Exit Program?

11   A.          I don't -- I don't recall at this time.

12   I don't think so.  Why would I tell it to the

13   judge that The Exit Program was going to call the

14   judge?  It just doesn't seem productive.

15   Q.          Can you flip to Bates No. 3473?

16   A.          3473?

17   Q.          Yes, please.  Now, you earned a number

18   certificates for programs that you participated in

19   while in prison, correct?

20   A.          That's correct.

21   Q.          And these are some of those

22   certificates, correct?

23   A.          That is correct.

24   Q.          All right.  So this one is a

1    certificate for anger management.  Do you see

2    that?

3    A.        I see it.

4    Q.        And the next one, the next page, it

5    says that Horton has successfully

6    delivered -- strike that.

7            It says that Horton has successfully

8    completed the anger deliverations.  Do you see

9    that?

10    A.        I do see it.

11    Q.        Do you know what the word

12    "deliverations" means?

13    A.        I do not recall at this time.

14    Q.        Do you recall taking anger management

15    classes?

16    A.        Do I remember every class that I took

17    while I was locked up for 16 years --

18    Q.        No, that was not my question.

19    A.        -- for over 16 years?

20    Q.        That was not my question.

21    A.        I do not remember every class that I

22    took.

23    Q.        I did not ask if you remembered every

24    class.  I asked if you remembered taking anger

1    management classes.

2    A.          I don't remember taking them.

3    Q.          Do you remember any prison officials

4    telling you that you needed to take anger

5    management classes?

6    A.          Yeah, on more than one occasion I can

7    remember them telling me that.

8    Q.          Who told you that?

9    A.          A couple of different officials

10   throughout the time.

11   Q.          What were the circumstances?

12   A.          Well, being on -- being wrongfully

13   incarcerated and being in the type of environment

14   that prison is, I didn't always respond to

15   corrections favorably, and that might be a

16   circumstance where one of the officials or

17   officers might, you know, try to further correct

18   me and saying that I needed to remain calm, get

19   ahold of myself.  It was very difficult to do in

20   my younger years in the beginning of my wrongful

21   incarceration, but I learned some things along the

22   way to help control my anger.

23   Q.          Did you have an anger problem when you

24   were younger?

1   A.       I don't think --

2          MS. MARTINEZ:  Objection.  Form.

3          You can answer.

4          THE WITNESS:  Sorry.

5          MS. MARTINEZ:  It's okay.

6          THE WITNESS:  I did it again.  Sorry.

7   A.       I wouldn't classify -- classify myself

8   as one who had an anger problem.  We've all had

9   issues dealing with emotions and processing

10   emotions.  I've seen people with anger problems

11   and they made some bad mistakes.  So as I compare

12   myself to somebody like that, I don't -- I

13   wouldn't say it was a problem.  I had issues here

14   and there.

15   Q.       Do you recall an incident where when

16   you were in prison the guards claimed that they

17   were restraining a violent inmate, and while they

18   were in the process of doing that, you ran up and

19   kicked the inmate in the head?  Do you remember

20   that incident?

21   A.       Yes, I do remember that incident.

22   Q.       What happened?

23   A.       Actually, it's one of my proudest

24   moments during for my wrongful -- during my

1  wrongful incarceration.

2           In prison there are -- there are sports

3  in prison.  So this all stemmed from a basketball

4  game.  And a friend of mine had got into a verbal

5  altercation with another inmate.  And the inmate

6  left and came back with a knife.

7           Now, in prison, you can buy a knife for

8  $10.  I've seen people get assaulted, I've seen

9  people get killed with prison knives.

10          So when the gentleman came back with a

11 knife -- my friend, he was playing a basketball

12 game -- so he began running towards my friend with

13 the knife to do bodily harm.

14          Well, my friend ran as much as he

15 could, but when the altercation got close enough,

16 myself and another individual jumped into the

17 altercation to try to restrain the individual and

18 get the knife from him.

19          So, you know, as you can imagine in

20 prison, there's -- chaos ensues.  The officers

21 come, they begin beating us with the batons,

22 macing us, just restraining us, you know.  And so

23 once they put us in handcuffs and escort -- escort

24 each individual out of the gym and place us in the

1    hole, the next day that's when I hear the ticket

2    that we referred to earlier.

3         So on the ticket, I get confused with

4    the gentleman who kicked the person with the knife

5    in the head, but -- so while I'm trying to explain

6    myself and tell them, hey, you got the wrong guy,

7    I'm the hero here, you know, you should be -- you

8    should be giving me applause because I actually

9    saved the person's life.  But they weren't trying

10   to hear it like that.

11        And in prison, I'm not going to point

12   out the person who actually kicked the young man

13   in the head because if I'm labeled -- because then

14   I will be labeled a snitch.  So whenever I get out

15   of the hole from this incident, I will be labeled

16   as a snitch.  And snitches don't have a lot of

17   respect in prison, they're treated very badly by

18   the inmates and the officers, and I didn't want

19   that on my head.

20        So what I did was I pleaded my case,

21   they didn't believe me, so I just went ahead and

22   spent my time in the hole which was about 75 days.

23   So I spent 75 days in the hole.  Me and my wife

24   had some tough times during that period.  I almost

1    lost my marriage.  And I did the right thing.

2    Q.          Just so I'm clear, somebody did kick

3    the inmate in the head, correct?

4    A.          Yes, somebody definitely kicked him in

5    the head.

6    Q.          Did you see it happen?

7    A.          No.  I was trying to get the knife out

8    of the individual's hand.

9    Q.          Okay.  But the guards, who were also

10    trying to restrain that inmate, said that it was

11    you who kicked him in the head, correct?

12    A.          That's correct.

13    Q.          All right.  Same question for them that

14    I asked you about Rick McClanahan.  In your

15    opinion, were they wrong or were they lying?

16    A.          In my opinion, the officers were

17    incorrect.  It was so much chaos going on, they

18    made a mistake.  But my outlook was I'm not going

19    to point the finger at the guy who did it, it's

20    prison, I'm -- I'm already in prison, it doesn't

21    matter if you put me on the top of the prison or

22    the bottom of the prison.  So I went ahead and

23    spent the 75 days in the hole even though I was

24    the hero.

1    Q.          Now, I thought you said a minute ago

2    that this almost -- that the separation almost

3    cost you your marriage.  You did, in fact, get

4    divorced from Janette at some point; is that

5    right?

6    A.          That is correct.

7    Q.          What happened?

8    A.          Well, from the beginning, I was

9    sentenced to serve 23 years, and even though I was

10   innocent, even though Janette knows for a fact and

11   believes in my innocence, it's a -- it's a

12   heavy -- it takes a heavy toll on a marriage just

13   being gone or potentially being gone for so long.

14          So I do not blame Janette for not being

15   able to stick there with me and be at my side.

16   You know, she's actually a pretty good person, a

17   big heart, and things just didn't work out for us.

18   But when The Ohio Innocence Project got me out in

19   2022, we got remarried five days after that.

20   Q.          But before we get to that, there was a

21   relationship in between there, correct?

22   A.          Yeah.  Yeah.  There was a relationship

23   in between that.  I'm a decent looking guy and I

24   like to interact with the opposite sex, so, yeah,

1    there was a relationship in between there.

2    Q.        And who was that relationship with?

3    A.        That relationship was with Kawanna

4    Harris.

5    Q.        And you knew Kawanna Harris previously,

6    correct?

7    A.        I went to high school with her.

8    Q.        Between the time you left high school

9    and the time that this relationship with her

10   began, were you in communication with her?

11   A.        I -- I do not recall at this time.  I

12   don't -- I don't remember being in contact with

13   her.

14   Q.        How did you get back in contact with

15   her?

16   A.        Honestly, through a prison cell phone.

17   Q.        Did you reach out to her?

18   A.        I believe so.

19   Q.        When you say a prison cell phone,

20   is that -- that's a contraband cell phone?

21   A.        Yes, sir.

22   Q.        How did you get those?

23   A.        COs would bring them in.  They

24   don't -- you know, there's a lot of bad correction

1   officers in there and they'd bring stuff in.

2   Q.          What other types of contraband were you

3   caught with during your time in the Ohio prison

4   system?

5   A.          Well, I was just trying to survive.  I

6   was caught with various different kinds of

7   contraband.  Cell phones, drugs.  I was just

8   trying to survive in there.

9   Q.          What kind of drugs?

10  A.          Something called a Suboxone strip.

11  Q.          What is a Suboxone strip used for?

12  A.          I believe -- let me think for a second.

13  I believe it's to help -- help people get over

14  their heroin addiction.

15  Q.          How did you come to have possession of

16  Suboxone strips?

17  A.          Like I said before, the correction

18  officers bring drugs in the prison.  It doesn't

19  just magically appear in there.

20  Q.          No, I understand that they bring them

21  in, but that doesn't mean they hand them out to

22  everybody.  How did it come about that they handed

23  it to you?

24  A.          I don't recall.

1    Q.        Were you selling them?

2    A.        I was just doing what I had to do to

3    survive.

4    Q.        I don't know what that means.  How does

5    having the Suboxone strips help you survive in

6    prison?

7    A.        Prison is a -- it's a -- it's a -- it's

8    an environment in and of itself.  They can be used

9    for -- to barter with, to get high on, it's a form

10   of currency.

11   Q.        Did you use them to barter?

12   A.        I -- I can't recall at this time.

13   Q.        Did you use them to get high?

14   A.        I'm confident I didn't use them to get

15   high.  I'm scared of heroin.

16   Q.        Well, it's not heroin, though, right?

17   Suboxone is a different chemical.

18   A.        Yeah.  It's close enough.

19   Q.        Were there other times that you were

20   caught with drug contraband?

21   A.        Yes.  Yes.

22   Q.        Tell me what happened.

23   A.        The -- over 16 years, let's see.  There

24   was an incident where I worked in the laundry room

1   and drugs were found in the laundry room.  And,

2   once again, I couldn't point the finger of whose

3   drugs they were.  I was just getting off my shift.

4   And they blamed me and said everything was mine.

5           And I -- I disputed it, but I -- once

6   again, I couldn't say whose drugs they were

7   because then I would be labeled a snitch and I

8   didn't want anybody to kill me or harm me in any

9   way, so I ended up doing about 100 days -- 105

10  days in the hole for that one.  And that was

11  pretty rough mentally, but, you know, I just

12  couldn't go around -- I just couldn't say whose

13  drugs they was.  It was -- that was hard right

14  there.

15  Q.        What drugs --

16  A.        Once --

17  Q.        I'm sorry.  What drugs were they?

18  A.        I can't recall at this time.  It was a

19  lot.

20  Q.        A lot of different kinds of drugs or a

21  large quantity of drugs?

22  A.        I think it was a lot of different

23  kinds.

24  Q.        Was it a large quantity as well?

1    A.        No.

2    Q.        Were you the only inmate in the laundry

3    at the time of the search that turned up those

4    drugs?

5    A.        No, no.

6    Q.        Then why did the suspicion fall on you

7    instead of the other inmates in the laundry?

8    A.        Probably because I'm a black man.

9    Q.        The other inmates who were there were

10   white?

11   A.        Yeah.  I remember that they didn't find

12   anything in my bed area, they didn't find anything

13   on my person, so, you know, I can appeal it, but,

14   you know, the appeal success rate is kind of low

15   in prison, so I was just doing what I had to do to

16   survive.  Keep my mouth shut.

17   Q.        Let me shift gears on you.  We have

18   already looked at the first motion for judicial

19   release, correct?

20   A.        That's correct.

21   Q.        The court did not grant that motion,

22   correct?

23   A.        That's correct.

24   Q.        You filed a second motion for judicial

1  release; is that correct?

2  A.          I don't recall if that's how it went.

3                    - - - - -

4             Thereupon, Exhibit 29 is marked for

5  purposes of identification.

6                    - - - - -

7  Q.          I'll hand you what I've marked as

8  Exhibit 29.  I'll represent that this is a motion

9  for judicial release, and there's a certificate of

10 service on the very back page, with a date of

11 February 19th, 2019.  Do you see that?

12 A.          Yes.

13 Q.          And that's your signature underneath

14 it?

15 A.          Yes.

16 Q.          Did you file this document with the

17 court?

18 A.          Yes.

19 Q.          And it has a number of components,

20 right?  It has certificates again.  It has letters

21 from supporters.  Right?  Do you see that?

22 A.          Give me one second.

23 Q.          Sure.

24 A.          Okay.  What was the question again?

1   Q.        The question was, did you submit this

2   motion to the court?

3   A.        Yes.

4   Q.        Did you assemble all of the pieces

5   inside it?

6   A.        No.  Not all by myself.  I had some

7   help with this.

8   Q.        Okay.  Tell me the process by which

9   this was put together.

10  A.        I got some help from a guy in the law

11  library.  And this looks like this was -- I want

12  to say this was all the same thing.

13  Q.        What do you mean all the same thing?

14  A.        Where it was denied, and I appealed.

15  But I'm not 100 percent sure.

16  Q.        Okay.  Well, let's go through this a

17  little bit because it begins, you see on the

18  second page, with a memorandum in support?

19  A.        Yeah.

20  Q.        This is a statement that you wrote

21  possibly with support from somebody else in the

22  prison?

23            MS. MARTINEZ:  Objection.  Form.

24            You can answer.

1    Q.          Is that correct?

2    A.          Yes.

3    Q.          And it ends on page 8, with your

4    signature.  Correct?

5    A.          It -- I see on page 8, my signature is

6    there.

7    Q.          Okay.  And then following that are a

8    series of the certificates that we had talked

9    about before.  Do you see those?

10   A.          I do see the certificates.

11   Q.          And you would have had those in your

12   possession in prison, correct?

13   A.          Yes.

14   Q.          And moving deeper into the packet, go

15   to Bates No. 3785.  Do you see that there's a

16   two-page letter there?

17   A.          Yes.

18   Q.          And that is a letter to Judge Colleen

19   O'Donnell from you, correct?

20   A.          Let me read it.  Yes.

21   Q.          So this is also something that you

22   would have had in your possession to send to the

23   court, correct?

24   A.          I believe so.

1    Q.       Okay.  Then we turn to Bates No. 3787.

2    And this is a letter written by Furquan

3    McDonald -- I'm sorry -- Furquan McDougald.  Do

4    you see that?

5    A.       I do.

6    Q.       And Furquan is spelled F-u-r-q-u-a-n.

7    Who is Furquan McDonald [sic]?

8    A.       Furquan McDougald is a -- he's a

9    pretty -- pretty good guy.  He's kind of a

10   business mentor to me now and someone who -- who

11   was there for me and supported me and

12   always -- well, he didn't support me -- always

13   promised a job opportunity when and if -- whenever

14   I got out of prison.

15   Q.       Now, did Mr. McDougald write this

16   letter?

17   A.       I'm not sure who wrote the letter.

18   Q.       What do you know about this letter?

19   A.       I don't recall at this time.  I know

20   that I was filing paperwork, trying to get out of

21   prison as soon as possible.  I was locked up for a

22   crime I didn't commit.

23   Q.       Did you ask Mr. McDougald to write a

24   letter for you?

```
 1    A.          I do not recall.

 2    Q.          Do you recall him sending you a copy of

 3    a letter of that he had written in order to attach

 4    it to this pleading?

 5    A.          I do not recall.

 6    Q.          Did you sign this letter in Furquan

 7    McDougald's name?

 8    A.          No.

 9    Q.          The next page, 3789, is a letter from

10    Janette Horton.  Do you see that?

11    A.          I found it.

12    Q.          Is that Janette's signature?

13                MS. MARTINEZ:  Objection.  Foundation.

14                You can answer.

15    A.          I'm not sure what my wife's signature

16    looks like.

17    Q.          How did you come to have possession of

18    this letter?

19    A.          I'm not sure at this time how I came

20    to --

21    Q.          Do you --

22    A.          It was so long ago.

23    Q.          Do you remember asking any of these

24    people to write letters for this?
```

```
 1              MS. MARTINEZ:  You can look through it
 2      if you have to.
 3      A.           I do remember trying to get support,
 4      but the signature is just --
 5      Q.           What do you remember about your efforts
 6      to get support?
 7      A.           It was -- it was kind of rough.  I
 8      remember it was rough.
 9      Q.           In what ways was it rough?
10      A.           Just trying to get this many
11      different -- this looks like a few different
12      letters.  Just trying to get everybody on the same
13      page that was the difficult part because people
14      out here they have full-time jobs, full-time
15      families.  I can remember it being difficult.  I'm
16      not sure.
17      Q.           Did you ask them to send the letters to
18      you or did you ask them to send them to the court?
19      A.           I can't -- I can't recall where I had
20      them send them to.
21      Q.           I'm going to skip ahead a little bit to
22      3792 and 3793.  And this purports to be a letter
23      to Judge Colleen O'Donnell from Kawanna Harris.
24      Do you see that?
```

1    A.          I do see it.

2    Q.          And is this a letter that you submitted

3    as part of this package?

4    A.          Let me look over it for a second.

5    This -- this -- this letter does look familiar.

6    She's saying some really nice things about me.

7    Q.          Did you submit this letter to the court

8    as part of this motion?

9    A.          I think that I did.

10   Q.          Did you write this letter?

11   A.          No.

12   Q.          Who did?

13   A.          It says here that Kawanna Harris wrote

14   the letter.

15   Q.          Have you read Kawanna Harris's

16   deposition?

17   A.          I have not had a chance to read it.

18   Q.          I will represent to you that Kawanna

19   Harris testified that that is not her signature

20   and she did not write this letter.

21              MS. MARTINEZ:  I'm going to --

22   Q.          Can you explain who else could have

23   written this letter and signed it if she said she

24   did not?

1          MS. MARTINEZ:  I'm going to object as a

2   mischaracterization of the evidence in the record.

3          You can answer.

4   A.          No, I cannot explain.  If that's true,

5   I can't explain it.  It's a beautifully written

6   letter.

7   Q.          Speaking of Kawanna Harris, she has

8   children; is that right?

9   A.          That is correct.

10  Q.          Are they your children?

11  A.          No.  The children that Ms. Harris has

12  are not my biological children.

13  Q.          Do you consider them your children?

14  A.          No, I do not.

15  Q.          Do you know if she considers you a

16  parental figure for them?

17  A.          At this date and time today, I'm pretty

18  sure she does not consider those children my

19  children or stepchildren or --

20  Q.          To your knowledge has she ever

21  considered you as a father figure for her

22  children?

23  A.          To my knowledge, when we were together,

24  she considered me as a role model for her

1  children.

2  Q.          I didn't ask a role model.  I asked if

3  she considered you a father figure.

4  A.          When we were together, I'm pretty sure

5  that she considered me those things.

6  Q.          And during that time did you consider

7  yourself a father to those children?

8  A.          A stepfather maybe.  I was a long

9  way -- she'd come to visit me.  I wouldn't let her

10  bring the children.  I didn't believe prison

11  was -- maybe a stepfather, but not a father.

12  Q.          What would be the difference between a

13  stepfather and a father?

14  A.          Aside from -- from the obvious, you

15  know, just -- just those are not my children, so

16  at the end of the day they're not my biological

17  children where I could request or make rulings.

18  Those -- those -- those judgment calls should be

19  up to the father, the biological father.

20  Q.          By the way, at the time that you filed

21  this motion, if it had been granted, did you have

22  a plan as to where you were going to live?

23  A.          That's a good question.  Yes.

24  Q.          What was your plan?

1    A.           In 2019, I -- I would have preferred

2    probably to go to a halfway house, get a job, save

3    up some money and start my life.

4              I was -- in 2019, I was back with

5    Janette and -- yeah.  I mean, in the perfect

6    world, maybe go to a halfway house, get a job,

7    save up some money.

8              You know, when I was released from

9    prison, you know, when The Ohio Innocence Project

10   got my conviction overturned and I was released

11   from prison, I was kind of thrown out here.  I

12   applied for food stamps, but since I was

13   wrongfully convicted, I don't -- I don't qualify

14   for help from the government, so I really had to

15   get out here and find a job and -- and ride the

16   bus back and forth to work, you know, and just,

17   you know -- if this would have happened, I would

18   have went a different route, you know, in an ideal

19   situation.

20   Q.           Let me ask you the question in a

21   different way.  In 2017, when you filed the first

22   motion, did you have conversations with Janette

23   about coming to live with her if you were

24   released?

1    A.          Yes.

2    Q.          In 2017, did you have conversations

3    with Kawanna about coming to live with her if you

4    were released?

5    A.          Yes.

6    Q.          Was it your impression that they both

7    thought you might come live with them?

8    A.          They may have thought that, you know,

9    they may have thought that.  I'm not quite sure on

10   the actual date when me and Kawanna split and

11   parted ways.  We continued to stay in contact, but

12   it just -- unfortunately it didn't work out with

13   me and Ms. Harris.

14   Q.          Well, did you have a plan for how you

15   were going to finesse that if you were released

16   and had to live with one or the other?

17               MS. MARTINEZ:  Objection.  Form.

18               You can answer.

19   A.          That's -- that's a good question.

20   Looking back, I'm not sure exactly what I was

21   going to do.  Like I said, in an ideal situation,

22   I would have went to a halfway house, got myself

23   together before I tried to be a husband or a

24   father.

1    Q.         You've talked a great deal about prison

2    and how difficult it is.  And you've talked about

3    how plentiful knives are.  Have you ever been

4    stabbed?

5    A.         I have been stabbed, but not in prison.

6    Q.         How many times have you been stabbed?

7    A.         One time.

8    Q.         When and where?

9    A.         It was -- young -- during my younger

10   years, maybe about 8 or 9, in my chest.

11   Q.         You were 8 or 9 years old?

12   A.         Yeah.

13   Q.         Who stabbed you in the chest?

14   A.         I can't remember exactly who it was.

15   It was a kid from the neighborhood.

16              MR. EPSTEIN:  Let's take a break.

17              MS. MARTINEZ:  Okay.

18              THE VIDEOGRAPHER:  We are off the

19   record.  The time is 5:54.

20              (A short recess is taken.)

21              THE VIDEOGRAPHER:  This marks the

22   beginning of Media No. 7.  We are back on the

23   record.  The time is 6:06.

24   BY MR. EPSTEIN:

1  Q.          Mr. Horton, just a few quick

2  follow-ups.  We were speaking a few minutes ago

3  about your possible plans in 2017 if you were

4  released.  And there was the possibility of living

5  with Janette, and you also had conversations about

6  living with Kawanna.  Do you recall that

7  testimony?

8  A.          I do recall that testimony.

9  Q.          Did Janette know that you were having

10 those conversations with Kawanna?

11 A.          No, she did not.

12 Q.          Did Kawanna know that you were having

13 those conversations with Janette?

14 A.          No, she didn't.  She -- she did not.

15 Q.          Can you flip back to Exhibit 27, it's

16 the handwritten notes.  If you turn back to Bates

17 No. 48, this is the section we went through

18 together that has various descriptors along with

19 the name Richard Diggs.  Do you recall that?

20 A.          I recall you and I talking about it.

21 Q.          Yes.  My question for you is, do you

22 see anything in here, in the sections that we

23 talked about, do you see anything that suggests

24 Riccardo Diggs might have been involved in the

```
1   Loew Street robbery?

2   A.          Do I see anything -- could you repeat

3   the question?

4   Q.          Sure.  The name Richard Diggs appears,

5   correct?

6   A.          Correct.

7   Q.          And I've already asked you to assume

8   that Richard Diggs was in prison at the time of

9   the robbery.  Assuming that that's the case, do

10  you see anything that suggests that actually

11  Riccardo Diggs was the person who committed the

12  robbery?

13              MS. MARTINEZ:  I'll just put on a

14  belated objection to form and foundation.

15              You can answer.

16  A.          I -- I do.

17  Q.          You do?  And what is that?

18  A.          The discrepancy I see may be the

19  height.

20  Q.          Well, I understand -- well, let me back

21  up.  What do you mean by the discrepancy about the

22  height?

23  A.          I attended Everett Middle School with

24  Richard Diggs and Riccardo Diggs.  Riccardo Diggs
```

1    was a little older, but he was short -- shorter.

2    Q.          He was shorter, so --

3    A.          Shorter than Riccardo -- shorter then

4    Richard Diggs.  Sorry.

5    Q.          Do you know how tall he was?

6    A.          No, sir, I do not.

7    Q.          Okay.  So I understood you to say that

8    maybe that notation of 5'9" to 6' does not suggest

9    you, because you're an inch taller than that,

10   correct?  That was -- that was your position?

11   A.          That's correct.

12   Q.          But how does that lead you to Riccardo

13   Diggs?

14   A.          You asked me did I see anything on this

15   paper that would be anywhere in the realm of a

16   description of Riccardo Diggs, so that's how it

17   led me to it.  Riccardo Diggs is shorter.

18   Q.          I see.  Well, do you know how tall

19   Riccardo Diggs is?

20   A.          No, sir, I do not.

21   Q.          Anything else in here that might make

22   someone think Riccardo Diggs is the person who did

23   this?

24   A.          No, sir.

1    Q.         Do you know anything about Riccardo

2    Diggs's criminal history?

3    A.         I'm not sure how to answer that

4    question.  Not at this time.

5    Q.         I don't understand the answer.  Was

6    there a time when you knew something about his

7    criminal history?

8    A.         Well, we grew up in a pretty small

9    neighborhood, so I can remember the brothers going

10   to jail for drug -- drugs or something like that

11   back in the '90s.

12   Q.         Do you know anything more recent than

13   that?

14   A.         Not at this time I don't.  I don't

15   recall.

16   Q.         Do you know where Riccardo Diggs is

17   today?

18   A.         I believe he's deceased.

19   Q.         Do you know where Richard Diggs is

20   today?

21   A.         No, I do not know where Richard Diggs

22   is today.

23   Q.         We -- sitting here today, do you have

24   any personal knowledge that suggests that Richard

1    Diggs was involved in the robbery?

2    A.         Not at this time.

3    Q.         Sitting here today, do you have any

4    knowledge that Riccardo Diggs was involved in the

5    robbery?

6    A.         Not at this time.

7    Q.         We talked previously about police

8    misconduct and you spoke specifically about these

9    notes that you believe were concealed from you.

10   Do you recall that testimony?

11   A.         I recall stating that some notes were

12   kept from me during my trial testimony, but I'm

13   not sure if these are the notes.

14   Q.         Okay.  That's fair.  Apart from the

15   notes that you believe were concealed, what other

16   instances of police conduct do you believe there

17   were in this case?

18              MS. MARTINEZ:  Objection to the form.

19   Do you mean misconduct or conduct in general?

20              MR. EPSTEIN:  I thought I said police

21   misconduct.

22              MS. MARTINEZ:  I just heard conduct.  I

23   just want to make sure.

24              MR. EPSTEIN:  I'm sorry if I misspoke.

1   BY MR. EPSTEIN:

2   Q.         What examples of police misconduct were

3   there in your criminal case?

4   A.         I'm not sure at this time. I'm not a

5   lawyer.

6   Q.         Well, you don't have to be a lawyer.

7   You have an opinion about whether there was

8   misconduct. What is your opinion based on?

9   A.         I believe there was misconduct.

10   Q.         Can you cite me any examples of

11   something that an officer did or failed to do that

12   was improper?

13   A.         Beside the instances that I've already

14   stated?

15   Q.         Well, in addition to the notes. That's

16   the one. What else?

17   A.         I'm not sure at this time.

18   Q.         Have you ever been sure?

19             MS. MARTINEZ: Objection to form.

20             You can answer.

21   A.         No, I have not. I'm not a lawyer. I'm

22   not a detective. The Ohio Innocence Project is

23   the organization that got me out of prison, so I

24   remember when they submitted the evidence request,

1   I looked over the paperwork, and -- but I don't

2   know of any other instance at this moment.

3   Q.          So is it fair to say that your belief

4   that there was police misconduct in this case is

5   based entirely upon what the lawyers have told

6   you?

7            MS. MARTINEZ:  Objection to form.

8            You can answer.

9   A.          Yeah.  And they're The Ohio Innocence

10  Project.  They're pretty good at what they do.

11  Q.          Do you have an understanding of why you

12  were released from prison?

13  A.          Yes, I do.

14  Q.          What is that understanding?

15  A.          Well, first of all, I believe it

16  was -- I got to thank the good Lord above for

17  being released from prison for a crime I didn't

18  commit.

19            And I believe that when The Ohio

20  Innocence Project submitted the records request,

21  they found out that some stuff was missing that I

22  wasn't able to have with me during my trial.  And

23  the DA -- the DNA evidence to further submit the

24  fact that I did not commit this crime.  And

1  that -- and once The Ohio Innocence Project

2  submitted that evidence, that's why the judge

3  overturned my conviction and granted me a new

4  trial.

5  Q.          Tell me about the DNA evidence.  What's

6  your understanding of that?

7  A.          My understanding of that is very

8  limited.  What I can remember today at this point

9  is they used semen sperm to get a DNA sample off

10  of a fingerprint from the crime scene that

11  happened so long ago, and the DNA evidence did not

12  match with my DNA evidence and that's essentially

13  what cleared me of these heinous charges.

14              MR. EPSTEIN:  Can you read that back?

15              (The record is read back as requested.)

16              THE WITNESS:  (Indicating.)

17              THE REPORTER:  Yes.  Did I mishear --

18              MR. EPSTEIN:  Did she misunderstand the

19  word?

20              THE REPORTER:  Did I misunderstand the

21  word?

22              THE WITNESS:  If you did, it's not a

23  big deal.  Salmon sperm.

24              MS. MARTINEZ:  Like the fish.

1           THE REPORTER:  Salmon sperm.

2           MS. MARTINEZ:  Yeah.

3           THE WITNESS:  Yeah.

4           THE REPORTER:  Thank you.

5           THE WITNESS:  That's my fault.  I'm

6    sorry.

7           THE REPORTER:  That's my fault.  Sorry.

8    Thank you for correcting me.

9    BY MR. EPSTEIN:

10   Q.        What is that?

11   A.        What -- can you repeat the question?

12   Q.        I want to make sure I'm understanding

13   what you're saying correctly.  Are you actually

14   saying salmon sperm?

15   A.        I am saying salmon sperm.

16   Q.        Okay.  All right.  And it's your

17   understanding that the DNA evidence related to

18   some fingerprints that they had found?

19   A.        That is my understanding.

20   Q.        And do you know where those

21   fingerprints were found?

22   A.        Those fingerprints were taken from the

23   crime scene.

24   Q.        Can you be more specific about where

1  they were found?

2  A.          A foldout couch or a foldout bed from

3  the crime scene.

4  Q.          Do you know anything about testing on a

5  shell casing?

6  A.          I misspoke.  It was fingerprints from

7  the shell casing.  I misspoke.

8  Q.          All right.  Then let's back up.  What

9  is your understanding about the shell casing?

10  A.          The -- the fingerprint -- they used the

11  salmon sperm to get the DNA off the shell casing,

12  not the bed.  Oh, I --

13  Q.          That's okay.

14  A.          I was bound to mess up sooner or later.

15  Q.          That's okay.  I'm still stuck on salmon

16  sperm.

17  A.          It's okay.

18  Q.          What is your understanding of what the

19  DNA test on the shell casing showed?

20  A.          My understanding is that it completely

21  exonerated me.  And I'm thankful for that.  I'm

22  thankful for the work The Ohio Innocence Project

23  did.  I'm thankful for the judge that recognized

24  that throughout even though all these years --

1  Q.        Okay.  Excuse me --

2  A.        -- had went by --

3  Q.        -- Mr. Horton.

4  A.        -- it wasn't me.

5  Q.        I appreciate that.  But I asked you a

6  simple question, what's your understanding of what

7  it showed, and you said it completely exonerated

8  you, correct?

9  A.        That's correct.

10  Q.        What does the word "exonerate" mean?

11  A.        To my limited understanding, it means

12  that it set me free from the chains of bondage of

13  being incarcerated for this crime that I didn't

14  commit.  It was a -- it's -- it's a glorious word.

15  It's a -- it's a word of extreme vindication.  I

16  get to, you know -- it was so -- so joyful just,

17  you know, telling my children that I've been

18  exonerated and I'm coming home.

19  Q.        Okay.  But I want to be clear because

20  words matter.  Your understanding of exoneration

21  means it got you released; is that correct?

22  A.        To my limited understanding, yes.

23  Q.        Okay.  Are you using exoneration in the

24  sense of it affirmatively proved you did not

1    commit the crime?

2    A.          That's a good question.  Yes, I am

3    using that word.

4    Q.          So you believe that the DNA evidence

5    definitively proved that you did not commit the

6    crime; is that correct?

7    A.          I do believe that.

8    Q.          How did it prove that?

9    A.          I can't answer that question.  I'm not

10   a scientist.  I've explained the way that The Ohio

11   Innocence Project and trained scientists obtained

12   the DNA from a shell casing that was from the

13   crime scene.

14   Q.          I'm not asking you to explain how they

15   got it and how they tested it.  I'm asking you to

16   explain to me how it proves that you're innocent

17   and somebody else committed the crime.

18   A.          I'm not sure how to answer the

19   question.  I just -- I just said it wasn't -- it

20   proved that my DNA was not on the shell casing

21   used to commit this crime.  Somebody else's DNA

22   was on there.

23   Q.          Okay.  So that DNA testing shows that

24   maybe somebody else touched the shell casing,

1    correct?

2    A.          No, I believe it shows somebody else

3    committed the crime.

4              MS. MARTINEZ:  A belated form

5    objection.

6    Q.          Is it possible to fire a gun without

7    touching the shell casing?

8              MS. MARTINEZ:  Objection to foundation.

9              You can answer.

10   A.          I don't see a way it would be possible.

11   Q.          Do you have much experience with guns?

12   A.          No, I do not.

13   Q.          Have you ever owned a gun?

14   A.          No, I do not.

15   Q.          Have you ever fired a gun?

16   A.          Have I ever fired a gun?  I have fired

17   a gun.

18   Q.          Under what circumstances?

19   A.          Celebrating New Year's Eve.  Something

20   stupid like that.

21   Q.          Just firing into the air?

22   A.          Yeah.

23   Q.          What kind of --

24   A.          Just doing something stupid.

1   Q.          What kind of gun?

2   A.          I can't recall at this time.

3   Q.          When was that?

4   A.          A long, long time ago.

5   Q.          Okay.  So you have fired a gun, we've

6   established that.  I want you to assume that I

7   loaded a gun, handed it to you, and you fired it.

8   Is that a possible thing that can happen?

9   A.          Is it possible?  Anything is possible.

10  Q.          So the fact that the fingerprint on the

11  shell casing at the crime scene, you could argue,

12  proved you didn't load the gun, but it's still a

13  possibility that you fired the gun; isn't that

14  correct?

15          MS. MARTINEZ:  Objection.  Form.

16          You can answer.

17  A.          No, that's not -- that's not what got

18  me here.  What got me here is whoever fired the

19  gun left their DNA on the shell casing, and

20  that's --

21  Q.          Well, did --

22  A.          -- the way it boils down to.  That's

23  the only reason I'm here today.

24  Q.          Well, did the judge declare you

1    innocent?

2    A.          That's a --

3    Q.          Or did she --

4    A.          -- good question.

5    Q.          Or did she just order a new trial at

6    the end of which you might have gone back to jail?

7    A.          That's a good question.  I'm not sure

8    how to answer that question because I don't know

9    exactly -- I can't remember at this time

10   exactly -- man, that's a good question.

11   Q.          Okay.  I take it then you don't know

12   why the second trial never went forward; is that a

13   fair statement?

14   A.          Not at this time.  I can't definitively

15   say.

16   Q.          Do you recognize the number

17   614-404-8458?

18   A.          What exhibit is that?

19   Q.          I wasn't asking you to look for an

20   exhibit.  I was giving you a phone number and

21   asking you if you recognized it.

22   A.          What was the phone number again?

23   Q.          Yeah.  614-404-8458.

24   A.          8458.  I do not remember that phone

1  number.

2  Q.        You don't recognize that as a phone

3  number that you may have used at one time?

4  A.        I don't recognize that phone number.

5  Q.        How many attorneys represented you at

6  your criminal trial?

7  A.        Two attorneys.  Two attorneys

8  represented me at trial.  Myron Shwartz and his

9  granddaughter Alissa Holfinger, I believe her name

10  is.

11  Q.        How much did you pay Mr. Shwartz?

12  A.        I paid Mr. Shwartz over $5,000.

13  Q.        Did you pay the money or did somebody

14  pay the money for you?

15  A.        I had a little help from my fiancee,

16  but for the most part, I paid the money.

17  Q.        Do you know the name Rollin Hunter?

18  A.        Yes.  I do know the name Rollin Hunter.

19  Q.        Who is Rollin Hunter?

20  A.        Rollin Hunter is a childhood friend.

21  Q.        Did you go to school with Rollin

22  Hunter?

23  A.        Yes.  Rollin Hunter also attended

24  Centennial High School.

1    Q.          Do you have any communication with

2    Rollin Hunter as an adult?

3    A.          That's a good question.  Yes.

4    Q.          Tell me about your contact with Rollin

5    Hunter as an adult.

6    A.          Rollin Hunter is a sort of a business

7    mentor in a sense.  I would consider him an

8    associate, not quite a friend, but he's someone

9    that I went to school with back in the days and

10   somebody I went to high school with.

11   Q.          What does he do for a living?

12   A.          I believe Rollin works at Orkin Pest

13   Control.

14   Q.          I think you testified you consider him

15   something of a mentor; is that right?

16   A.          Yes.

17   Q.          Why?

18   A.          He has a pretty successful career

19   working over at Orkin, and somebody I might on

20   occasion ask for advice.

21   Q.          Does Rollin Hunter have a criminal

22   record of any kind to your knowledge?

23   A.          To my knowledge at this time, I

24   don't -- I have no idea.

1    Q.          Do you have a car now?

2    A.          Yes.

3    Q.          When you --

4    A.          Excuse me.  I'm sorry.  Actually, I

5    have a truck.

6    Q.          Fair enough.  When did you get the

7    truck?

8    A.          At the beginning of last year.  It

9    hasn't been a full year yet.

10   Q.          Before that, did you have a vehicle or

11   were you using public transportation?

12   A.          Before that, I actually had a van.  I

13   had a work van.  A Dodge van.

14   Q.          Did you ever use public transportation?

15   A.          I have used it, like I said, when I

16   first came out of prison.  I didn't have a valid

17   driver's license, I didn't have a mode of

18   transportation, so, yeah, I would frequently ride

19   the bus.  But as I, you know, started to save and

20   learn more about how to use credit, it's been a

21   while since I've been on the bus, but I don't mind

22   riding the bus.

23   Q.          Do you know what routes you would have

24   taken?

1    A.        Taken where?

2    Q.        Which bus routes?

3    A.        To where?

4    Q.        Well, that's what I'm asking.  Every

5    bus route in Columbus has a number.  Do you know

6    what bus routes you would have taken?

7    A.        Yes.  Depending on where I'm going.

8    Q.        Where would you have been going?

9    A.        Riding the bus, probably back and forth

10    to work.

11    Q.        Where was work at that time?

12    A.        Work is -- when I first came home from

13    prison, work was -- I worked for a company named

14    United Alloys & Metals, and that's located on

15    Joyce Avenue in Columbus, Ohio.

16    Q.        And where were you living at that time?

17    A.        At that time I was living on -- at 1073

18    Urana.

19    Q.        Can you spell that?

20    A.        Urana is U-r-a-n-a Avenue.

21    Q.        Do you know which bus you took to get

22    back and forth to work?

23    A.        Man.  Man, that's a tough question.

24    I'm -- I do -- I cannot recall.  Sorry.

1    Q.          Did you ever see Rhonda Curry on the

2    bus?

3    A.          No.

4    Q.          Have you seen Rhonda Curry since you've

5    been out of prison?

6    A.          I have not seen Rhonda Curry since I've

7    been out of prison.

8    Q.          Do you know Kim Curry?

9    A.          I do not recall Kim Curry.

10   Q.          Back in 2004, did you owe anybody any

11   money?

12   A.          Back in 2004, did I owe anybody any

13   money?  Honestly, I owed the City of Columbus for

14   unpaid traffic tickets, but that's all I can

15   remember at this time.

16   Q.          And speaking of owing money, is it

17   correct that before you went to prison in West

18   Virginia, you had a mortgage on a house?

19   A.          That would be incorrect.

20   Q.          Have you ever had a mortgage on a

21   house?

22   A.          I have one now.

23   Q.          Is that in your name or jointly with

24   Janette?

1 A.   That would be in my name.

2 Q.   Where do you have bank accounts?

3 A.   Where do I have -- I want to try and

4 get this correct.  I have a bank account at KEMBA

5 bank.  And I have my mortgage through U.S. Bank.

6 And I have a -- and I have a bank account at

7 Huntington Bank.  Yeah.

8 Q.   Which of those accounts are in your

9 name and which are joint with Janette?

10 A.   All those accounts are in my name.  I

11 have a savings account at Huntington Bank with my

12 wife.

13 Q.   Which account do you deposit your

14 paychecks into?

15 A.   I deposit my paychecks into a

16 Huntington account.  Huntington is also the bank

17 that my job uses, so it just makes it a lot

18 easier, direct deposit.

19 Q.   Now, you have spoken at length about

20 The Innocence Project.  Do you do appearances on

21 their behalf?

22 A.   Yes.  Yes, I do.  I'm quite proud of

23 that actually.  I actually go -- I'm able to go

24 around to different colleges and talk to aspiring

1   law students and college students and tell them

2   about this heinous experience, try to use a

3   negative and turn it into a positive, and

4   hopefully even inspire some lawyers to, you know,

5   become better lawyers, maybe even better human

6   beings.  I try to use my story to motivate the

7   next generation.

8   Q.        Do you get paid to do that?

9   A.        Yes.

10   Q.        Do you get paid by The Innocence

11   Project or do you get paid by the venue?

12   A.        I believe -- I believe I'm paid by the

13   venue.

14   Q.        What venues have paid you?

15   A.        Well, I've been doing this -- this work

16   for almost three years now.  And I've been

17   to -- I've been to Ohio State, Toledo, University

18   of Ohio.  I've been outside the state to the

19   University of Illinois.  I've been to Dayton

20   College.  I've been to some of these colleges

21   twice.

22   Q.        University of Cincinnati?

23   A.        I've been to the University of

24   Cincinnati to speak.

1  Q.        Have you been paid by all of those

2  schools to do that?

3  A.        Yes.

4  Q.        How much do you typically get paid?

5  A.        Typically, for a one-hour or two-hour

6  speaking engagement, the school will give us a

7  stipend of like $250, maybe $350.  It varies.

8  Q.        Does Janette get paid for doing that

9  too?

10  A.        She -- she -- she definitely has a

11  story to tell and this situation has

12  definitely, you know, provided her a way to vent,

13  and so, yes, she does get paid.

14  Q.        And where do those payments get

15  deposited from you and from Janette?

16  A.        Well, it's my wife's money, so I'm not

17  going to speak on where her money goes.  I know

18  that my money goes into a bank, the Huntington

19  Bank account.

20            MR. EPSTEIN:  Alyssa, if you'd give me

21  five minutes.  I think we're just about done.

22            MS. MARTINEZ:  Okay.  Sounds good.

23            THE VIDEOGRAPHER:  We are off the

24  record.  The time is 6:35.

1           (A short recess is taken.)

2           THE VIDEOGRAPHER:  We are back on the

3    record.  The time is 6:43.

4    BY MR. EPSTEIN:

5    Q.      Okay.  Mr. Horton, home stretch.  You

6    testified earlier that Myron Shwartz was your

7    attorney at your criminal trial, correct?

8    A.      Yes.

9    Q.      Did you ever see the paper file that

10   Myron Shwartz kept of your case?

11          MS. MARTINEZ:  Objection to form.

12          You can answer.

13   A.      Did I ever see the paperwork that

14   he -- that he kept?

15   Q.      Yeah.  If a lawyer --

16   A.      I'm not sure I understand the question.

17   Q.      If a lawyer has a case and there are

18   papers, the lawyer will keep them all together in

19   a file or a box or something.  Did you ever see

20   his files?

21          MS. MARTINEZ:  Same objection.

22          You can answer.

23   A.      I -- I don't recall at this time

24   because I was one of the fortunate ones that I was

1    able to get ahold of my paperwork pretty quickly,

2    so I don't know if he -- if it came from him or

3    came from -- I'm not -- I'm not -- I can't recall

4    at this time.

5    Q.        What are you referring to when you say

6    your paperwork?

7    A.        The trial transcripts.

8    Q.        I'm talking about before the trial.

9    Any --

10   A.        Oh.

11   Q.        Any evidence, any documents that he

12   had.  Did he provide copies of those to you?

13   A.        I don't recall at this time.

14   Q.        Do you know where his files are today?

15   A.        I do not know where they would be at

16   this time.  As I understand it, Mr. Shwartz passed

17   away a long time ago.

18   Q.        Did you read through the files in his

19   office during the preparation for the trial?

20   A.        No, I did not.  There wasn't a lot of

21   preparation.

22   Q.        What do you mean there wasn't a lot of

23   preparation?

24   A.        I don't remember us doing a lot of prep

1    work before the trial.  I don't remember us

2    talking about who we, you know, who I wanted to

3    send subpoenas to.  More than once we talked about

4    it, but I don't remember us talking about it more.

5    There wasn't a lot of prep work like how you see

6    in the movies.

7    Q.          Was that frustrating for you?

8    A.          At the time it was not, but looking

9    back on it, it was a little frustrating.

10   Q.          How come?

11   A.          Because I was thrown in prison for a

12   crime I didn't commit, so I -- it was frustrating.

13   A lot of different things were frustrating.

14   Q.          What else was frustrating?

15   A.          Just -- just trying to make sense of

16   it, just trying to figure out what happened, where

17   did I go wrong, if I went wrong, if I could have

18   done anything different, but it wasn't under my

19   control.

20                    - - - - -

21              Thereupon, Exhibit 30 is marked for

22   purposes of identification.

23                    - - - - -

24   Q.          I'm going to hand you what's been

1  marked as Exhibit 30.  It's an order from the

2  court captioned Entry Granting Defendant's 4/16/21

3  Motion for New Trial.  Have you seen this document

4  before?

5          MS. MARTINEZ:  Take time to look --

6          THE REPORTER:  I'm sorry.  What did you

7  say, Alyssa?

8          MS. MARTINEZ:  Oh.  I just said he can

9  take some time to look through it.

10  A.          This -- can you repeat the question?

11  Q.          I was simply asking if you've seen it

12  before.

13  A.          This does not look familiar.

14  Q.          Okay.  If you look at the top of the

15  front page, there's a timestamp showing that it

16  was filed on January 12th, 2022.  Do you see that?

17  A.          I do see that.

18  Q.          When were you released from prison?

19  A.          I was released on January 19th, 2022.

20  Q.          Do you know if this is the document

21  that caused you to be released from prison?

22  A.          There was so many documents.  I've

23  never seen this document before.  I don't know if

24  this is the particular document that set me free.

1    Q.          Okay.  Well, turn to page 11.  Page 11.

2    Do you see at the top it says this court hereby

3    grants Defendant's motion for a new trial?

4    A.          I do see that.

5    Q.          All right.  Do you see any language

6    that says this court hereby releases the

7    Defendant?

8    A.          No.  The only thing I see is it is so

9    ordered and copies to all parties.

10   Q.          Right.  And you understand that if

11   there had been a new trial, the result could be

12   not guilty, the result could be guilty, right?

13   It's a new trial.  That's your understanding?

14   A.          I mean, there's -- there's any -- I

15   don't -- I don't -- I'm not sure how to answer

16   because, you know, with the -- with the -- I mean,

17   The Ohio Innocence Project got this motion

18   granted, so I just don't -- I -- anything could

19   have happened, I guess.

20                        - - - - -

21               Thereupon, Exhibits 31 and 32 are

22   marked for purposes of identification.

23                        - - - - -

24   Q.          All right.  I'm going to hand you what

1    I've marked as Exhibits 31 and 32.

2              MR. EPSTEIN:  Did I fail to give you a

3    copy last time?

4              MS. MARTINEZ:  No.  I've got -- I've

5    got 30.  Thank you.

6              MR. EPSTEIN:  Okay.  I'm sorry.

7              MS. MARTINEZ:  It's okay.  Thank you.

8    Which one is which?  Okay.  Thanks.

9    BY MR. EPSTEIN:

10   Q.         So Exhibit 31 is another pleading.

11   It's captioned Motion for Nolle Prosequi.  Do you

12   see that?

13   A.         I do see that.

14   Q.         This is an entry that was filed -- I'm

15   sorry.  This is a motion that was filed on your

16   behalf by -- no.  I'm sorry.  Strike that.

17             Exhibit 32 is captioned Entry - Nolle

18   Prosequi.  Do you see that?

19   A.         Are you talking about Exhibit 32?

20   Q.         Yes, sir.

21   A.         Yes.

22   Q.         All right.  Have you seen Exhibit 31 or

23   Exhibit 32 before?  Have you seen Exhibit 31

24   before?

1    A.        Give me one more second.  I do not

2    recall seeing Exhibit 31 before.

3    Q.        Okay.  As you're looking at it now, do

4    you have any understanding of what Exhibit 31 is?

5    A.        I'm not a lawyer, so, no, I'm

6    not -- I'm not sure if I understand what this is.

7    Q.        Okay.  If you turn to the back, Bates

8    No. 4093.

9    A.        4093.

10   Q.        Yes.  You see the document is signed by

11   a number of prosecutors?

12   A.        Yes.

13   Q.        Okay.  So would that lead you to

14   believe that this is a pleading that was filed by

15   the prosecutors?

16   A.        It looks like it.

17   Q.        Okay.  Turn back one page, please, to

18   4092.  And I want to read you the first sentence

19   in the last paragraph:  We write this brief

20   synopsis to note that, upon a review of all of the

21   information known to the State at this time, it

22   remains the State's belief that this defendant

23   committed these crimes.

24            Were you aware at the time you were

1    released that the State still believed you were

2    guilty of the Loew Street robbery?

3              MS. MARTINEZ:  Objection.  Form.

4              You can answer.

5    A.        No, I was not.

6    Q.        They then write:  Our burden, however,

7    requires that we prove this belief, with the

8    available admissible evidence as it stands today,

9    to a jury beyond a reasonable doubt.  In light of

10   the court's recent ruling preventing the State

11   from introducing Mr. McClanahan's trial testimony,

12   we do not believe we can meet that burden.

13             Do you understand what's being said

14   there?

15   A.        I think that I do.

16   Q.        What is your understanding of that

17   paragraph?

18   A.        My limited understanding is that the

19   State -- it's the State's belief that I still

20   committed these heinous crimes despite all the

21   work that The Ohio Innocence Project put into my

22   case, all the hours, all the blood, sweat, and

23   tears.  And it says here that it's basically

24   saying that -- that the prosecution doesn't want

1  to retry the case.

2  Q.          And does it say why they're not going

3  to retry the case?

4  A.          It says the State -- it says that the

5  State -- it sounds like they're saying that the

6  State would have a hard time without

7  Mr. McClanahan's testimony.

8  Q.          And they don't have Mr. McClanahan's

9  testimony because he's since passed away; is that

10  correct?

11          MS. MARTINEZ:  Objection to form.

12          You can answer.

13  Q.          By the time this is all happening,

14  Mr. McClanahan is dead, right?

15  A.          Yes, Mr. McClanahan had passed away at

16  this time, 2023.

17  Q.          All right.  And then have you seen

18  Exhibit 32 before?

19  A.          No.  This does not look familiar.

20  Q.          From the caption of that, that's the

21  entry granting the motion that we just looked at,

22  correct?

23  A.          I --

24  Q.          If you can't tell, that's fine.

1    A.          Yeah, I can't tell.

2    Q.          Okay.  Mr. Horton, do you have a belief

3    as to who committed the Loew Street robbery?

4    A.          No, I do not.

5    Q.          Have you heard any --

6    A.          Not at this time, I do not.

7    Q.          I don't understand the preface "at this

8    time."  Does that mean at a different time you did

9    have a theory?

10   A.          I just -- at this -- at this time and

11   day, I -- I don't have a theory on what happened.

12   Q.          Have --

13   A.          I just know that I didn't commit the

14   crime.

15   Q.          Have --

16   A.          I just know that The Ohio Innocence

17   Project is the one who freed me from bondage.  I

18   just know, you know, there's so many things in

19   favor of -- so many things had to go right for me

20   to get out of prison for a crime I didn't commit.

21   I just --

22   Q.          Have you ever heard any rumors as to

23   who might have committed the Loew Street robbery?

24   A.          I'm -- I'm not sure what I've heard

1    over the years, you know...

2    Q.          Have you heard anything?

3    A.          I'm not sure what I've heard at this

4    point.  It's been such a long, long day.  You've

5    asked me so many questions.  I've cooperated to

6    the best of my knowledge.  It's -- I couldn't -- I

7    couldn't tell you what I've heard at this point.

8              MR. EPSTEIN:  All right.  Thank you.

9    We're done.

10              MS. MARTINEZ:  We'll reserve signature.

11              THE VIDEOGRAPHER:  This concludes the

12    deposition of Richard Horton.  We are off the

13    record at 6:57.

14              (Signature not waived.)

15                     - - - - -

16              Thereupon, the foregoing proceedings

17              concluded at 6:57 p.m.

18                     - - - - -

19

20

21

22

23

24

1    State of Ohio     :     C E R T I F I C A T E
     County of Franklin: SS
2
         I, Carolyn M. Burke, RPR, a Notary Public in
3    and for the State of Ohio, certify that Richard H.
     Horton was by me duly sworn to testify to the
4    whole truth in the cause aforesaid; testimony then
     given was reduced to stenotype in the presence of
5    said witness, afterwards transcribed by me; the
     foregoing is a true record of the testimony so
6    given; and this deposition was taken at the time
     and place specified on the title page.
7
         Pursuant to Rule 30(e) of the Federal Rules of
8    Civil Procedure, the witness and/or the parties
     have not waived review of the deposition
9    transcript.

10        I certify I am not a relative, employee,
     attorney or counsel of any of the parties hereto,
11   and further I am not a relative or employee of any
     attorney or counsel employed by the parties
12   hereto, or financially interested in the action.

13        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus,
14   Ohio, on January 6, 2025.

15

16

17

18

19        *Carolyn M. Burke*

20   _____
     Carolyn M. Burke, RPR, Notary Public - State of
21   Ohio.  My commission expires July 17, 2028.

22

23

24

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Richard H. Horton, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

Ref: CB313034RH

**Exhibits**

**313034 Exhib it 001** 4:5 17:3,7

**313034 Exhib it 002** 4:6 19:19,23 83:3

**313034 Exhib it 003** 4:7 38:15,19

**313034 Exhib it 004** 4:9 58:6,10

**313034 Exhib it 005** 4:11 63:20,24

**313034 Exhib it 006** 4:12 68:1,5

**313034 Exhib it 007** 4:14 74:17,21

**313034 Exhib it 008** 4:15 77:4,9,22

**313034 Exhib it 009** 4:16 78:20,24

**313034 Exhib it 010** 4:17 80:7,10

**313034 Exhib it 011** 4:18 111:17,21

**313034 Exhib it 012** 4:19 131:8,15

**313034 Exhib it 013** 4:20 136:6,10

**313034 Exhib it 014** 4:21 154:2,6

**313034 Exhib it 015** 4:22 158:22,24

**313034 Exhib it 016** 5:3 158:22 161:9

**313034 Exhib it 017** 5:4 168:19,23

**313034 Exhib it 018** 5:5 184:13,17

**313034 Exhib it 019** 5:6 189:17,21

**313034 Exhib it 020** 5:7 198:14,18

**313034 Exhib it 021** 5:8 214:23 215:3

**313034 Exhib it 022** 5:9 224:15,19

**313034 Exhib it 023** 5:10 236:21 237:1

**313034 Exhib it 024** 5:12 243:14,18, 19 246:11

**313034 Exhib it 025** 5:13 246:16,20

**313034 Exhib it 026** 5:14 250:2,6

**313034 Exhib it 027** 5:15 258:22 259:2 296:15

**313034 Exhib it 028** 5:16 266:4,8

**313034 Exhib it 029** 5:17 284:4,8

**313034 Exhib it 030** 5:19 321:21 322:1

**313034 Exhib it 031** 5:20 324:10,22, 23 325:2,4

**313034 Exhib it 032** 5:21 324:17,19, 23 327:18

————

**$**

**$1,000** 163:5 178:19

**$1,007** 162:24

**$10** 275:8

**$105** 160:5

**$170** 160:11

**$190** 160:8

**$2,500** 80:21

**$20,000** 117:18

**$25,000** 189:23

**$250** 318:7

**$256** 165:1

**$256.76** 162:1

**$30,000** 117:19

**$310** 160:14

**$350** 318:7

**$4,000** 175:17

**$40** 24:9

**$428.52** 160:2

**$5,000** 311:12

**$500** 165:4

**$600** 152:24

**$750** 163:11

**$800** 165:24 166:7

————

**(**

**(a)** 139:14

————

**0**

**00048** 259:14

**001190** 59:19

**001204** 59:20

**003514** 64:2

**007863** 111:22

**06** 256:5

**08** 248:15

————

**1**

**1** 17:3,7 85:12

**10** 39:12 56:5 65:15,18 80:7,10

**100** 29:11 30:11 33:13 36:18 66:10, 11 147:11 148:1 169:5 173:15 232:20 248:11 282:9 285:15

**100's** 113:9, 13

**105** 282:9

**1073** 10:20 11:3 314:17

**11** 111:17,21 223:22 323:1

**11:00** 56:18

**11:15** 56:22

**11th** 255:18

**12** 80:19,23 81:1,12,15 82:2,7,8 115:9 116:7 129:16 131:8,15

**12:14** 102:12

**12:23** 102:16

**12:58** 130:11,14

**12th** 165:23 166:4 268:3 322:16

**13** 136:6,10

**13th** 136:23 268:2

**14** 154:2,6

**14th** 162:11, 14

**15** 56:5 59:17,20,21 69:3 115:9 116:7 158:18,22, 24

**15th** 184:18

**16** 26:20 27:21 45:7 51:17 59:15 89:18 116:20 147:18 158:18,22 161:9 216:3 227:18 272:17,19 281:23

**16th** 268:2

**17** 168:19,23

**175** 20:5

**177** 83:5

**17th** 244:21

**18** 184:13,17

**18th** 250:20 252:8

**19** 6:3 44:6,7 131:2 189:17,21

**192** 22:17

**1989** 25:8,9

**1990** 39:24

**1990s** 82:19 174:20

**1995** 32:19 34:14 45:19 46:10 75:7 76:10 79:12, 17

**1999** 87:10 117:23 121:17 122:17,20

**19th** 284:11 322:19

**1:59** 131:6

**1st** 216:8 268:12

————

**2**

**2** 19:19,23 44:7 56:21 83:3 139:2,3 216:14

**2.1** 139:14

**2.1(a)** 139:23

**2.1(b)** 139:24

**20** 19:9 20:15 21:21 28:1, 23 45:4 50:18 111:7 149:23 163:14 164:2 185:13 189:5 198:14,18 213:15 216:16 219:7

**20's** 113:9,12

**20,000** 117:22 125:9,13

**20-plus** 104:2

**20-some** 20:6

**2000** 84:18, 22 87:11 88:20 117:24 132:5

**2000s** 135:15

**2001** 45:22 46:10 83:20 100:21 107:3

**2004** 18:5,10 19:10 21:1, 12,22 22:12 25:10 40:1,9 44:2,3 55:6 101:19 136:4,23 137:3 140:22 143:18 146:17 147:7,8 149:8,9 151:1,21 153:8 156:11,21 159:9 160:24 161:21 162:5 165:24 168:1,9 169:1,7 170:13,24 171:5 178:4 179:1,4 184:18 187:22 189:22 261:6,8,12 262:20,24 263:8 264:22 315:10,12

**2005** 151:19, 21 156:11 216:17 217:4

**2006** 140:22

149:13,16
189:7 237:5,
13 255:18

**2007** 53:14
216:8
244:21

**2008** 250:20
252:8,15,18

**2017** 267:17,
24 268:12
269:23
293:21
294:2 296:3

**2019** 284:11
293:1,4

**2020** 68:17

**2022** 94:14
99:4,8 100:5
278:19
322:16,19

**2023** 327:16

**2024** 6:3
19:11 21:13
131:2

**2025** 88:20

**20th** 162:22

**21** 65:13 83:9
214:23
215:3

**22** 224:15,19

**2279** 23:5

**22nd** 68:16
169:1

**23** 16:8 20:13
68:13 83:8
225:5,7
227:8 233:6,
21 234:5
236:21
237:1 278:9

**23-year**
227:9

**24** 139:17
141:10
243:14,18,
19 246:11

**25** 16:9 87:8
88:19
153:15
246:16,20

**25th** 162:20,
21 166:11
256:5

**26** 102:8
126:16,18,
23 153:15
250:2,6

**26th** 161:21

**27** 168:2
258:22
259:2 263:8,
10 296:15

**28** 64:15
263:8 266:4,
8

**28th** 189:22
267:16

**29** 227:17
284:4,8

**2953.21**
58:12 68:10

**2:23-cv-3888**
6:7

**2:56** 174:13

———

**3**

**3** 38:15,19
60:1 69:4
102:15
171:11
217:3

**30** 115:13,23
321:21
322:1 324:5

**30,000**
117:23
125:9,13

**30th** 79:16,
22 132:5

**31** 75:7
323:21
324:1,10,22,
23 325:2,4

**31:40** 169:21

**31st** 79:12

**32** 323:21
324:1,17,19,
23 327:18

**3473** 271:15,
16

**37** 255:16

**3785** 286:15

**3787** 287:1

**3789** 288:9

**3792** 289:22

**3793** 289:22

**3:06** 174:17

**3:18** 77:13

**3:40** 169:22
170:2

**3rd** 169:10,
12 170:1

———

**4**

**4** 41:5,6 58:6,
10 131:5
219:15

**4/16/21** 322:2

**4092** 325:18

**4093** 325:8,9

**43201** 40:10,
11

**45** 115:13,23

**48** 47:11
261:4
296:17

**4:10** 228:24

**4:26** 229:4

**4th** 6:4

———

**5**

**5** 22:22
63:20,24
118:19
139:3
152:23
174:16
220:13,18

**5'9"** 259:20
260:5,9
298:8

**50's** 113:9,12

**5:54** 295:19

**5th** 151:19

———

**6**

**6** 41:9 68:1,5
229:3

**6'** 260:9,13
298:8

**6'1"** 131:23
259:20
260:1,6,8,13

**60** 233:12

**600** 152:23

**614-253-8969**
269:12

**614-404-8458**
310:17,23

**614-619-9344**
11:13

**6:06** 295:23

**6:35** 318:24

**6:43** 319:3

**6:57** 329:13,
17

———

**7**

**7** 74:17,21
221:1
295:22

**7237** 255:10,
15

**75** 276:22,23
277:23

**77** 6:3

**780** 21:14
23:1 40:9

**7867** 118:20

**7th** 160:1

———

**8**

**8** 39:15,21
77:4,9,22
101:13
286:3,5
295:10,11

**8458** 310:24

**893** 40:10

**8th** 22:24
237:5,12

———

**9**

**9** 78:20,24
295:10,11

**90s** 30:3
32:19 33:1,
2,21,24 34:2
36:14 53:22
97:6 104:13
175:2
299:11

**95** 83:17

**97** 83:17

**9:30** 250:20

**9:35** 256:5

**9:53** 6:11

**9th** 21:12,13,
19 22:24
23:10,16
40:1 161:21
187:21

———

**A**

**a.m.** 6:11
169:22
250:20
256:5

**AA** 119:19,
23,24 120:6
127:5,8
128:5

**AA/NA** 139:7

**Aaron** 6:17
7:8

**abide** 137:7
138:19,24
139:22
191:14,18

**ability** 8:2
9:21 10:2
213:2,9

**absolutely**
13:2,3 16:17
17:17 33:16
57:15 231:3,
10 233:22
266:17

**abuse** 74:8,
10 83:13,15,
16

**accept** 35:16

**acceptance**
270:6,9

**accepted**
269:9

**accident**
148:13
175:15,20

**accommodat
e** 9:13

**accomplishm
ent** 46:20

**account**
134:1 135:1,
5,18 157:24
158:2,15,16
159:1,4
160:2,8,11,
14,24 162:8,
17 163:20
164:5,15
165:8,10
166:8 316:4,
6,11,13,16
318:19

**accounts**
158:3,7
316:2,8,10

**accurate**
59:16 62:24
63:13
115:17
116:9
118:10,15,
17 122:4,19
123:2,3

**accused**
21:7,9 51:15
79:22 231:7

**accuser**
231:7

**acknowledgi
ng** 129:14

**acknowledg
ment** 129:18

**active**
145:19

**acts** 191:6

**actual** 21:3
78:4 140:14
197:15
294:10

**add** 165:13

**addicted**
120:5

**addiction**
119:20,21
120:2
125:18,23
126:7,14
127:2
280:14

**addictions**
106:14

**addition**
91:18
301:15

**additional**
40:12

**address**
10:19,20,22
21:23,24
22:1,5 99:3
144:6,12
145:11
146:10
197:15

**addressed**
125:19
126:8

268:14

**addresses**
39:23

**adds** 225:15

**Adidas**
35:13,17,20
36:23 37:3,
8,15,20
41:11,13,19,
24 42:6,7,
12,23 43:2
60:1,6 61:6,
11,21 62:8
65:18,22
66:7,16
67:13,20
69:7,11,17
263:14,21,
23 264:2

**Adjustment**
244:24

**administrativ
ely** 248:5

**admissible**
326:8

**admissions**
41:8

**admit** 41:10,
23 57:21
109:6

**admitted**
115:8
242:12
256:10

**admitting**
239:9

**adult** 99:14
312:2,5

**adulthood**
35:11

**adults** 97:20
98:2

**adverse**
109:14

**advice**
312:20

**advised**
183:8

**affect** 10:2

**affects** 27:23

**affidavit**
215:3
222:24
223:2

**affiliated**
51:20,24

**affirmatively**
306:24

**affordable**
37:15

**AFIB** 148:18

**Afternoon**
131:1

**age** 16:9
47:11 85:12
97:7 155:12
165:16

**agency**
141:12,18

**aggravated**
225:7,17
226:3

**agitated**
196:5

**agree** 137:12
162:15
218:21
260:21

**agreed**
137:11

**Agreement**
137:6 139:3

**ahead** 101:1,
2 167:21
276:21
277:22
289:21

**ahold** 273:19
320:1

**ailment** 28:9

**air** 257:23
308:21

**Alabama**
141:2 142:1
147:16,20
148:8

**Alana** 6:19

**alcohol**
32:15 91:19
118:21,22,
23 120:8,13,
15 121:10
129:6
240:20,23

**Alcoholics**
127:8

**Alissa** 311:9

**allegations**
181:22

**alleged**
144:15

**alley** 200:18

**allocate**
49:11

**allowed**
134:1

**Alloys**
314:14

**Alomar**
182:1

**altercation**
275:5,15,17

**Alyssa** 6:14
227:23
318:20
322:7

**amended**
17:10 68:8
227:24

**amount**
75:12 81:11
134:23

169:5 173:9,
13,16

**amounts**
159:4
164:4

**anger** 272:1,
8,14,24
273:4,22,23
274:8,10

**angles**
167:13

**angry** 207:18
210:18

**animal** 233:3

**ankle** 104:10
106:14
107:2,4,11,
12

**announce**
6:12

**Anonymous**
127:9,11

**answering**
106:19
204:17
213:1 236:1

**answers** 8:8
20:9 39:5
40:16 41:3
118:13
128:16,22

**antisocial**
245:14,20,
22

**Anxiety**
245:1

**anymore**
41:7 167:15
182:5
188:24

**apartment**
91:5

**apologize**
50:6 122:11
223:9
231:15

**apparel** 37:9,
21

**apparent**
239:18

**appeal** 57:17
216:2
248:12
283:13,14

**appealed**
285:14

**appealing**
92:2

**appearance**
189:23

**appearances**
316:20

**appearing**
6:16

**appears**
137:6
138:11

159:8
246:22
297:4

**applause**
276:8

**application**
64:1,14
65:3,6,9,11

**applied**
226:19
271:10
293:12

**apply** 269:19
270:1

**applying**
270:17

**approached**
199:13

**approved**
139:8

**April** 136:4,
23 137:3
151:1,21
156:24
171:23

**area** 25:3,5,8
107:5,21
112:24
140:2,5,10,
13,14,17
283:12

**areas** 106:8,
11

**argue** 309:11

**Argumentati
ve** 208:22
209:14

**arrangement**
189:21

**arrest** 71:20
73:15 75:16
85:8 89:11
90:10
112:17
113:3
114:19
119:3,7,12
131:20
132:5
144:11
145:14,20
172:7,9,12,
17,21
173:21
181:17,19
182:23
183:1 184:7

**arrested**
71:17 75:19,
21 76:2,11
84:17,24
90:23 91:1
132:10
141:11,17
143:18
145:7 169:6
172:15

**arrests** 73:14
147:2

**arrival** 138:6

237:11

**arrived**
195:13

**arriving**
200:23
237:16

**articles**
116:22

**aspiring**
316:24

**assault**
225:24

**assaulted**
275:8

**assemble**
285:4

**assertation**
125:2

**assessment**
37:24 57:4
111:11
269:13

**assigned**
106:23

**associate**
37:20 54:24
55:4,8,9
93:18 312:8

**associates**
50:19

**assume** 9:4
23:19 36:18
37:17 60:15
163:21,22
172:18,21
222:4 248:4
261:10
265:12
270:8,21
297:7 309:6

**assumed**
36:23 202:2

**assuming**
144:17
261:11
269:20
297:9

**assumption**
37:1 124:23

**assure**
183:13

**assured**
192:20
200:4
201:22,24

**assuring**
199:22,24

**athlete** 32:20
97:6

**athletic**
34:21
230:12

**atmosphere**
168:7

**attach** 288:3

**attached**
270:10

**attacker**
232:12

**attempt**
99:13 234:7
235:8,12
236:6,10
257:5

**attempted**
76:2 231:1
234:10
256:14

**attempts**
110:6

**attend**
127:22
128:17,19
139:9

**attended**
119:18
128:10
297:23
311:23

**attending**
94:4 119:19,
23 128:6

**attention**
22:16 59:24
69:3 112:6
250:11,18
268:10,20

**attics** 156:6

**attorney**
12:1 206:15
208:9,14
212:18
214:12
319:7

**attorney-client** 206:9

**attorneys**
11:14 12:19
57:1,5,24
58:23 59:1
64:23 68:22
69:10 96:3
181:14
204:18
206:21
208:3,7
221:23
311:5,7

**audio** 10:13

**August** 75:7
76:10 79:12

**aunt** 145:11,
22 153:12
181:22
184:20

**aunt's** 22:5
153:7

**aunts** 253:6

**author** 61:5

**authorities**
236:7

**auto** 199:6,8
200:10,15

**Avenue**
10:21 21:14,
23,24 22:5,

13 23:2,16,
22 40:10,11
144:6,12
146:10
147:1 151:7,
22 152:5
154:9,24
169:10
170:2
192:14
195:11,13
216:15
217:6
264:10,12,
13,16,19
314:15,20

**average**
122:18

**avoid** 88:11
123:23

**aware** 53:4
65:2 146:16
180:8,11
185:6 206:6,
14 207:22
208:11,16
209:6,8,11,
12,16
211:18
222:7 228:4
232:11,13
242:11
257:18
265:5,7,8,10
325:24

**Axis** 244:24
245:8,15

___

**B**

**baby** 87:1

**back** 15:9,10
28:10 30:2,
5,18 31:2,7,
16,19 32:24
33:24 34:20
43:6 55:1,5
56:21 66:1,
20 67:13
73:8,14 83:3
84:8 86:16
87:9,10,13,
21 88:6 97:6
100:17
102:15
114:19
117:23
118:3 121:2,
4 122:15
131:5
135:15
149:13
150:24
151:3
154:19
158:1
160:22
173:4,18
174:3,16,20
180:2 187:3
188:4
199:10
200:10,19,
22 217:5
219:16

224:10
228:8 229:3
242:14
251:12,24
257:13,15
261:6
268:23
275:6,10
279:14
284:10
293:4,16
294:20
295:22
296:15,16
297:20
299:11
303:14,15
305:8 310:6
312:9 314:9,
22 315:10,
12 319:2
321:9 325:7,
17

**background**
105:23

**backside**
247:19

**bad** 51:2
89:24
198:20,21
201:19
233:4,9
241:24
243:2
274:11
279:24

**badgering**
212:6

**badges**
130:4

**badly** 62:8
276:17

**baggy**
112:23

**bags** 169:4

**bail** 189:14

**bailiff** 223:23

**ball** 97:5

**bank** 134:1
135:1,4,5,7
157:24
158:2,7,15,
16,24 159:4
160:23
316:2,4,5,6,
7,11,16
318:18,19

**Banner**
146:2,11

**Banner's**
151:8

**bar** 157:3,4,
5,11,17

**Barbara**
182:1

**barber**
200:17

**barter** 281:9,
11

**based**
119:24
301:8 302:5

**basement**
151:9,10
153:7,16

**basically**
120:7
197:17
326:23

**basis** 30:15
50:5 114:22
139:9
205:20
208:19

**basketball**
36:20 37:1
230:12
275:3,11

**Bates** 59:18
64:1 111:21
118:20
244:6,16
255:10
259:14
271:15
286:15
287:1
296:16
325:7

**batons**
275:21

**Bear** 19:13
242:10

**beating**
275:21

**beautiful**
92:19

**beautifully**
291:5

**Beckley**
134:15

**bed** 283:12
305:2,12

**began**
121:16
234:1
275:12
279:10

**begin** 8:4,8
20:5 275:21

**beginning**
56:21 64:2
67:5 101:20
102:15
122:16
131:5
171:22
174:16
227:22
229:3
248:21
273:20
278:8
295:22
313:8

**begins** 59:19
112:9,18
285:17

**behalf** 6:15,

17 7:9 57:6
58:16 60:24
68:21
221:15
316:21
324:16

**behavior**
82:14 167:8

**beings** 317:6

**belated** 81:5
95:6 119:8
196:21
263:1
265:21
297:14
308:4

**belief**
203:16,17
208:20
258:8 302:3
325:22
326:7,19
328:2

**believed**
130:2
252:18
326:1

**believes**
278:11

**believing**
120:12

**bell** 97:17

**Bender**
268:14,17

**bending** 47:6

**beneficial**
128:17

**benefit**
109:23

**benign** 111:1

**bet** 117:7

**Bethel** 34:10

**big** 62:15,19
83:4 94:17
99:17
144:17,23,
24 145:1
183:19
221:16
278:17
303:23

**bigger**
230:11

**binder** 83:4

**biological**
291:12
292:16,19

**birth** 101:7,9
102:4

**Biscuits**
154:24
155:13
161:6

**bit** 23:23
83:6 115:1
124:21
142:15
152:4

158:13
194:7
208:24
254:22
266:21
285:17
289:21

**black** 35:14
49:13 62:9
259:20
260:3,4
262:1,16,18
263:7 283:8

**blame**
258:18
278:14

**blamed**
282:4

**blank** 26:24
142:3

**blessing**
153:11

**blood** 51:3
326:22

**blur** 48:17
89:13

**bodily**
275:13

**body** 32:21
47:8 112:22
197:16
200:15,18

**boils** 309:22

**bold** 39:14

**bomb** 255:7

**bond** 189:23
190:2,3

**bondage**
306:12
328:17

**bored** 128:19
129:3

**born** 85:11,
12 100:18,
21,22 101:3,
4,22 102:1
143:3

**bottom**
59:24 65:14
68:17 69:4
78:11 83:8
125:17
137:8,19
162:23
240:18
250:12,13
255:14,24
277:22

**bought** 27:2,
6,24 28:12,
19 50:2
176:12
178:1,12,15

**bound**
305:14

**box** 319:19

**boy** 35:13,16
41:11,13,19

42:7,12,23
43:2 60:1,6
61:6,22
62:8,19
65:18,22
66:7,16
67:7,13,20
69:7,11,17
263:14,21,
22 264:2

**brand** 37:3,
15,16

**break** 9:12,
15 55:19,21,
22,23 56:2
104:10
115:22
130:8
174:10
193:7
295:16

**breakdown**
248:16
249:2

**breakdowns**
248:21

**breakfast**
11:18 107:8

**breaking**
144:11

**breaks** 9:11

**Brenda** 6:18
7:9 12:7
183:3
184:22
185:2,8
187:3 188:5
205:15
206:7,13,19,
23 207:1
208:12
209:7,16
210:17
212:16
214:5 228:8,
12

**Brian** 58:16,
23,24 64:16
68:13

**bribe** 202:5
213:12,22
256:14
257:4,5

**bribery**
256:10
257:3

**brick** 264:16

**bricks**
103:24

**bring** 200:24
201:2
279:23
280:1,18,20
292:10

**bringing**
117:14
118:7

**brings** 161:8

**broadcast**
94:18

**broke** 24:7
107:1,4
133:2 203:8,
12

**broken** 104:8
146:5,6

**brother**
97:14

**brother's**
97:16

**brothers**
97:20 299:9

**brought**
16:21 73:22
95:8 124:7,
11 205:13
265:3,15

**Brown** 49:13

**bumped**
157:18

**bumping**
231:9

**bunch**
133:18

**burden**
326:6,12

**burglary**
225:8

**Burke** 6:8

**burst** 46:24

**bus** 293:16
313:19,21,
22 314:2,5,
6,9,21 315:2

**Bushy** 261:3

**business**
52:21
100:11
287:10
312:6

**buy** 27:16,17
31:9 71:5,11
178:13
275:7

**buying** 71:14

———
**C**
———

**Cadillac**
178:22

**California**
147:11,16
149:11

**call** 26:3
34:23 35:15
62:8 198:12
200:6 209:1
222:7,8
223:8
251:15
263:23
271:13

**called** 25:2
34:11 36:4
41:7 67:13
155:13
156:2
159:22

182:9,17,23,
24 206:24
263:21,24
264:3
280:10

**calling**
35:16,19
62:18 67:8
263:22

**calls** 292:18

**calm** 196:6
198:2
273:18

**Camden**
21:23 22:5
23:22 40:10
144:6,12
145:4,11,22
146:10,24
151:7 153:3,
5 264:13,19

**camera**
151:19

**cane** 192:16
194:24

**Cannabis**
241:2

**caption** 78:4
327:20

**captioned**
38:21 58:10
63:24 68:7
111:22
137:5 250:6
266:8 322:2
324:11,17

**car** 27:2,6,7,
9,14,15,24
28:12,19,21,
24 29:5
92:16,24
175:20
176:4,11,12,
15,18 177:2,
3,11,13,18,
10,24 178:1,
6,7,8,20,21
179:3,13,19,
21 192:8
193:8,12,14
194:4,6,18,
22 195:2
217:4,7,13
218:8,15,20
219:12
313:1

**cardboard**
198:19

**care** 104:3
109:10
184:8
198:12
232:5 245:5

**career**
312:18

**Carol** 215:23
216:1,2

**Carolyn** 6:8

**carry** 128:8
235:8

**cars** 202:23

**case** 6:4,7
12:4 13:15
57:14,16,20
62:2 63:7
76:15,21
81:20
110:10
125:12
141:19
192:16
209:24
210:9
224:20
228:20
257:16,22
268:18
276:20
297:9
300:17
301:3 302:4
319:10,17
326:22
327:1,3

**cash** 163:16,
18,19 164:4
165:15,22

**casing**
305:5,7,9,
11,19
307:12,20,
24 308:7
309:11,19

**Castetter** 6:9

**categorize**
86:7,9

**caught**
182:10
280:3,6
281:20

**caused**
73:19 120:9
322:21

**CBCF** 268:24
269:3,4,6

**Celebrating**
308:19

**cell** 11:12
14:17 104:1
130:6
279:16,19,
20 280:7

**cemented**
120:4

**Centennial**
34:11 230:8
311:24

**center** 78:13
132:7
190:11
238:1,13

**certificate**
68:18
267:15
272:1 284:9

**certificates**
268:6
271:18,22
284:20
286:8,10

chains
306:12

challenge
248:5

champagne-
colored
27:13

chance
290:17

change
20:10,16
55:7 109:16
110:12
153:10
168:7 203:2,
5 213:12
265:14,17

changed
113:21
167:8

changing
202:17
220:11

chaos
275:20
277:17

characterizat
ion 218:24
259:24

charge 74:5,
11 75:9 76:4
78:17 80:4
83:16 84:4,
11,12
113:24
144:8
149:15
227:4 257:3

charged 21:6
90:15 257:3

charges 74:6
81:10 83:13,
15 84:3,6,10
101:23
102:2 198:8
199:23
223:15
227:2
303:13

check 93:24
135:13,16
136:1 162:7,
9,11,16,18,
19 163:8,13,
16 164:17,
19 172:17
240:5

checked
238:24
240:4,21,24
241:3,5

checks
162:6

chemical
281:17

chest
295:10,13

Chicken
154:23
155:13

161:6

child 99:9
148:5
150:19
180:20
181:4

child's 86:19
147:14

childhood
35:11
311:20

children 11:8
15:21,23
70:15 85:5,6
243:7 291:8,
10,11,12,13,
18,19,22
292:1,7,10,
15,17
306:17

children's
180:24

chow 107:7

chunks
112:23

Cincinnati
317:22,24

circle 36:4
67:7,12
228:8

circles 69:16
95:20

circumferenc
e 140:14

circumstanc
e 273:16

circumstanc
es 54:8 73:24
75:16 89:10
90:10,13
112:8,17
113:3
172:12
249:1
273:11
308:18

cite 301:10

City 6:5,18
7:10 22:1
23:6 111:22
183:18
264:13
315:13

claim 108:8
111:2 202:6

claimed
274:16

claiming
109:23

Clair 169:10
170:1

clarified
213:5

clarify
128:15
212:10
213:3 244:4

class 97:9,11
120:7
272:16,21,
24

classes
119:19
120:20
128:7,11
272:15
273:1,5

classify
274:7

cleaning
156:6

cleanouts
156:2

clear 9:1
21:22 43:20
143:6
202:20
277:2
306:19

cleared
303:13

Cleveland
14:10,11

clinical
242:12

clique 36:4

close 231:24
241:24
253:9,10,16
275:15
281:18

clothes
237:21,22

clothing
37:3,6

cocaine
33:15,17,18,
19 43:17,18
75:11 79:24
80:3 88:8,
11,22 89:5
91:14,18
113:8,18
114:1 115:9
116:2
117:15
118:8,22
119:1
121:11,16,
20 122:5,8,
13,14,20
123:23
124:7,11
125:19,24
126:7,15
241:5

Code 68:9

cohort
253:21

cold 103:23

collection
259:4

Colleen
286:18
289:23

college

317:1,20

colleges
316:24
317:20

collided
95:21

color 27:12,
15

colorful
177:23

Columbus
6:4,5,18
7:10 10:21
21:14 23:6
40:10,11
47:1 71:3
85:16 87:11,
13,22,23
88:12
115:10
116:8 117:3,
5,8,15 118:8
123:7,24
124:7,11
133:17
145:15
149:20
151:3
153:22
158:1 178:9
181:23
183:18
205:7
216:15
240:9
241:22
254:10,11,
13 314:5,15
315:13

column
159:22

comfortable
165:22

Comments
238:17

commit
18:14,18
20:13 27:22
45:7 51:18
63:9 89:18
116:21
147:18
164:9
182:21
187:5
191:12
195:5
218:12
224:3
227:16
232:7
233:22
248:24
287:22
302:18,24
306:14
307:1,5,21
321:12
328:13,20

committed
187:13
225:14
265:16

297:11
307:17
308:3
325:23
326:20
328:3,23

committing
18:9

common 8:9
266:13

communicat
e 8:10 9:1

communicat
ed 94:10
208:8

communicati
on 13:7
279:10
312:1

communicati
ons 96:2
208:6

community
49:13

company
15:3 46:14
47:20 156:8
161:17
175:17
314:13

compare
274:11

compared
120:14

compile
267:19

complaining
186:14

complaint
17:10 74:24
75:1 79:4,6
168:24
170:22
173:20
184:18

complete
112:22
257:2

completed
268:5 272:8

completely
20:16 67:11
106:15
182:10,11
186:24
305:20
306:7

components
284:19

concealed
258:9 259:6
300:9,15

concern
247:15

concerned
247:21

conclude

196:23

**concluded**
197:1
329:17

**concludes**
329:11

**concurrent**
81:22 82:5
84:4,10

**concurrently**
81:19

**condition**
148:9
179:14,16

**conditions**
137:7,11,12
138:20
190:24
191:2,4,9,14

**conduct**
300:16,19,
22

**conference**
7:16

**confidence**
24:23
219:11

**confident**
281:14

**confine**
133:20

**confirm**
181:21
199:2

**confirmed**
182:19

**conflict** 53:4

**confused**
142:1 219:4,
5 276:3

**confusing**
143:2 211:4

**congratulate
d** 94:24
254:16

**congratulatio
ns** 254:17

**connection**
13:14 37:8
70:7,11
205:10

**considered**
291:21,24
292:3,5

**considers**
291:15

**consist**
83:11

**consistent**
137:1

**consistently**
125:10

**consists**
83:12
132:14

**constitute**

228:11

**contact**
14:16 94:8
99:7 231:21
251:2
252:19,23
269:13
279:12,14
294:11
312:4

**contacting**
186:23
270:14

**continue**
20:17 153:7
170:15
172:2 221:3

**continued**
255:21
294:11

**continues**
122:17
269:8

**continuing**
171:4

**contraband**
279:20
280:2,7
281:20

**contradict**
116:17

**control** 67:9
273:22
312:13
321:19

**controlled**
75:10 169:2,
3

**conversation**
8:10 14:5
150:3
183:11
187:3
195:24
196:6,23
197:1 198:9
199:24
200:8,11,20
201:16,20
202:2,5,21
207:13
209:1,17
211:15,19
218:4
219:17
220:14,19

**conversation
s** 150:7,21,22
204:18
229:9,11,14
293:22
294:2 296:5,
10,13

**converse**
108:11

**convert**
84:10

**convicted**
20:12 59:9
76:24 84:13
94:20

232:22
293:13

**conviction**
227:13
237:9
252:23
253:10,11
254:23
255:7
257:18
293:10
303:3

**convictions**
71:21 72:3
82:18 83:1
84:7

**convince**
100:1

**cook** 155:3

**cool** 32:3
195:9 198:9

**cooperated**
329:5

**cop** 182:5

**coparent**
86:15,17,23

**coparented**
85:24 86:2

**copies**
57:10,18
320:12
323:9

**coping** 121:5

**copy** 182:23
185:14
198:18,20,
23 244:7
288:2 324:3

**corner**
244:2,3
255:15,17

**correct** 11:7,
10 13:17,21,
22 16:14,18,
22 18:9,12,
22 19:4
21:7,9,15,
16,17 22:6,
7,9,11,14
23:13,14,17
24:2,14
25:10,18,23
31:4,17 37:1
38:3,4
41:16,17
43:8,21
45:23,24
51:6,7 57:7,
8 58:3,22
59:3 60:6,11
61:1,7 62:4,
9,24 63:5
64:17,18,20
65:4,23,24
66:3,21
69:11,12,23
71:7,18
75:2,3,7,8
79:6,12,13,
19,24 80:2,
14,16,17

82:1 83:1,23
84:2,7,18
101:23,24
102:3
104:15
105:6 109:2
114:8,9,24
115:6 117:6
121:18
125:1 126:6
127:6,7,9,
10,12
129:12,15
131:21,22,
24 132:1,3,
8,15,16,24
133:6,7
135:23
136:20,23,
24 138:13
143:19,20
145:23,24
146:18,19
148:5
149:12,14
151:1,4,9,23
152:6
159:12
161:22,23
162:1,2,17
164:6
169:17,18
170:14
176:5,19
179:17
180:5
184:23
185:4,17,18,
20,21,24
186:3
190:13,24
193:9,10
199:14,15,
19,20 203:3,
9,13 206:1,2
207:20,21
209:3
212:23
214:6
215:14
217:10,14,
18 218:16
223:13
225:6,9,10
226:7,9,21
227:8
231:17
234:24
235:6,7
237:6,7,9,
10,13,14
238:5,24
239:3 240:7,
21,24 241:3,
6,14 244:21
248:9,10,13
260:13,14
261:7
263:16
264:17
268:15,16
271:19,20,
22,23
273:17
277:3,11,12
278:6,21
279:6

283:19,20,
22,23 284:1
286:1,4,12,
19,23 291:9
297:5,6
298:10,11
306:8,9,21
307:6 308:1
309:14
315:17
316:4 319:7
327:10,22

**correcting**
304:8

**correction**
243:23
279:24
280:17

**correctional**
233:1 238:1,
13

**corrections**
78:12 80:23
81:3 111:23
136:13
269:11
273:15

**correctly**
83:7,21
101:22
117:20
119:4
121:12
304:13

**corrects**
228:1

**corresponde
nce** 95:1

**COS** 279:23

**cost** 278:3

**couch** 305:2

**counsel** 6:12
17:14 77:11
80:12
174:10
183:14
187:10
207:14
212:24
222:18
228:6 244:5

**counseling**
125:20
126:8 242:5
249:20

**Counselor**
77:20

**count**
223:19,22
226:6,16

**county** 78:12
134:13
233:15
234:16
238:12
239:9 240:9,
12 241:22

**couple** 46:9,
10,22 47:10,
18 52:2
77:13 87:23,

24 95:9
113:6
131:13
139:1 152:3,
7,10 157:1
159:21
170:10
216:22
231:9
233:18
273:9

**court** 6:6,8
7:15,16,22
57:6 60:5
66:17 68:16,
21 69:10
78:11 80:20
181:11
189:21
231:1,2
251:13
257:22
265:24
266:13,19,
24 267:16
268:22
269:1
283:21
284:17
285:2
286:23
289:18
290:7 322:2
323:2,6

**court's**
265:20
326:10

**courtesy** 8:7

**courting**
188:2

**courtroom**
224:4,9
231:8

**courts** 232:6

**cousin** 13:19
253:15

**cover** 159:8

**coward**
234:1,8
235:18
236:8

**cowardly**
236:5

**crack** 43:17
75:11 79:23
80:3 113:7,
18,24 115:9
116:2
117:15
118:8
122:12,14
124:7
125:19,23
126:7,15

**CRC** 237:17,
18,19,23

**credit** 159:1
163:4
165:20
313:20

**credits**

159:22
162:23,24

**crew** 46:18,
24 49:15
94:17

**crime** 18:9,
14,18 20:13
21:6,7,9,10
24:5,7,13
27:21 45:7
63:8 73:24
89:18
116:20
147:18
164:9,13
173:10
182:22
185:17
186:3 187:6,
13 191:12
195:5 205:6
218:12
224:3
227:10,15
232:8
233:21
248:23
265:16
287:22
302:17,24
303:10
304:23
305:3
306:13
307:1,6,13,
17,21 308:3
309:11
321:12
328:14,20

**crimes**
325:23
326:20

**criminal** 57:2
73:14 74:23
75:1 79:4,5
83:10,12
158:24
166:18
168:24
173:12,20
184:17
268:18
299:2,7
301:3 311:6
312:21
319:7

**CROSS-
EXAMINATIO
N** 7:5

**cross-
reference**
162:13

**crowd** 26:21
50:13,14
76:1 227:14

**cry** 235:15

**crystal** 21:21

**currency**
281:10

**current**
10:19,20
11:11,12
15:1

**Curry** 12:11
24:14 30:4,6
50:22 190:8
191:5,16
203:11
205:16
230:23,24
231:2,22
232:12
315:1,4,6,8,
9

**Curry's**
12:12,14
51:5 190:6,
16

**custody**
104:4
112:20
180:21,24
181:3,8,16

**customer**
113:19

**customers**
46:23 156:6

**cut** 244:7,8

**Cutlass**
27:10,13

──────

**D**

**D-E-B-R-A-K-
U-E-M-P-E-L**
15:6

**DA** 302:23

**danger**
106:17

**dangerous**
124:16,22,
24 173:12

**dare** 47:11

**dark** 103:23
128:24
132:6,7,18
243:8

**date** 45:9
48:16 75:6
79:11,14
96:16 132:5,
10 136:22
151:17
159:7
162:10,11
166:2
185:22
216:5
237:11,12
244:22
284:10
291:17
294:10

**dated** 75:6
169:1
189:22
237:5
244:20
250:15,19
255:18
256:5
268:12

**dates** 48:20
142:11

159:18
160:1

**dating**
166:17

**daughter**
16:1,8
85:11,13
86:16 87:4
180:21
181:1,9,16
229:20

**daughter's**
16:2

**David** 6:19

**day** 46:19
48:17 55:1
68:17 79:16
87:9 104:2
111:8
114:15
148:6 167:5
216:8
232:11,19
249:3
251:13
253:1 276:1
292:16
328:11
329:4

**days** 31:19
73:8 101:6
160:5,9,12,
15 197:3
233:12,18
243:8
276:22,23
277:23
278:19
282:9,10
312:9

**Dayton**
317:19

**dead** 327:14

**deal** 129:21
144:18,23
145:1
248:22
295:1
303:23

**dealer** 49:4
178:13

**dealers**
168:5

**dealing**
113:7
117:17
168:5
172:24
173:1 274:9

**dealings**
207:3

**dealt** 125:8

**death** 54:8

**debits**
162:22

**Debra-
kuempel**
15:4

**debt** 175:19,
20,24

**deceased**
52:10,11
299:18

**December**
6:3 131:2
184:18
189:22

**decent** 46:16
278:23

**decided** 55:7

**decision**
148:10
221:18

**decisions**
165:19
167:16,23
222:5

**declare**
309:24

**deeper**
286:14

**defend** 200:3

**defendant**
18:9 78:12
80:22 323:7
325:22

**Defendant's**
58:11 68:8
117:11,12
322:2 323:3

**Defendants**
7:9 77:17

**Defendants'**
38:22

**defense**
18:12
222:17

**definition**
55:9

**definitively**
307:5
310:14

**deliberately**
204:3 258:9

**delicate**
150:15

**deliverations**
272:8,12

**delivered**
115:12,16
272:6

**delivery** 15:8

**demand**
57:18

**demanding**
188:22,23

**demise**
120:9

**denial** 109:9,
20

**denied** 41:12
123:7
256:10
285:14

**deny** 82:23
108:12

109:5

**denying**
213:21

**department**
80:22 81:2
117:2,3,6
131:17
182:3 205:7
243:22
269:11

**Dependence**
245:8

**dependent**
55:12,15

**depending**
67:5,7
106:6,22
107:21
110:13
314:7

**depends**
66:12 165:5

**deposed**
12:11,16

**deposit**
135:13
160:2,5,8,
11,14,23
162:7,14
316:13,15,
18

**deposited**
162:16,20
164:5 165:9
318:15

**deposition**
6:2,10 7:10,
12,14 11:15
12:8,12,15,
17 19:17
38:19 51:5,9
77:19
290:16
329:12

**depositions**
12:3,5

**deposits**
160:17
161:4

**depressed**
111:7 245:1

**depression**
109:1,6,7
111:2
242:19,23,
24

**depth** 43:7

**Derrick**
54:15,18,21
92:5,7,11,12

**describe**
26:18 32:11
55:2,3 86:3
113:16
177:23
260:12
261:14,15,
17,18
262:16

**describes**
185:16

**describing**
112:16

**description**
133:21
190:4
259:20
262:2,4,21
298:16

**descriptions**
259:17

**descriptor**
260:23

**descriptors**
296:18

**detail** 142:24
223:21

**details** 143:1
184:4 218:3,
12 229:10
251:18

**detective**
182:24
183:3 186:2
188:5
209:23
214:11,16
301:22

**detectives**
198:7

**devastating**
227:10

**Dexter** 6:19

**diagnosed**
10:10 28:2

**diagnoses**
242:12

**die** 44:17
53:7

**died** 44:24
45:3,12
48:13

**difference**
47:2 62:15,
20 66:6
128:8
229:21
292:12

**differently**
72:20 95:21,
23 258:19

**difficult** 7:24
8:11 38:12
47:8 100:2
101:7,19
111:4
185:15
236:2
273:19
289:13,15
295:2

**Diggs** 96:24
97:2,3,19
264:21,23
265:6,12
296:19,24
297:4,8,11,
24 298:4,13,

16,17,19,22
299:16,19,
21 300:1,4

**Diggs's**
299:2

**dinner** 55:11
107:8

**dinnertime**
157:8,10

**direct** 17:15
22:16 59:23
69:3 107:21
112:6
244:15,19
250:11,18
268:10,20
316:18

**directed**
246:23

**direction**
192:4
193:18

**directly**
139:15
268:23

**Dirisamer**
6:20

**dirty** 168:15,
17 171:12
172:3

**disability**
226:12,16
227:4

**disappointed**
73:21

**disappointment** 73:17

**discipline**
247:24

**disclose**
167:4

**Discovery**
38:23

**discrepancy**
297:18,21

**discuss** 13:5
215:20
241:15

**discussion**
197:4

**disease**
44:19 101:4,
5 141:5
148:24
150:20

**dismiss**
202:6

**dismissed**
76:23

**disorder**
244:24
245:15,20,
22 246:3

**disposition**
76:3,14,19,
21 240:3

**dispute**

50:24 51:11,
12 145:10
146:10
247:9,11

**disputed**
282:5

**disrespect**
86:4,11

**distance**
197:21

**distinction**
66:7

**distinctive**
26:8 157:22
197:22

**distinctly**
27:11,15
53:24
192:16

**District** 6:6

**division** 6:7
111:23
136:12
181:23

**divorced**
278:4

**DNA** 64:1,14
65:4 302:23
303:5,9,11,
12 304:17
305:11,19
307:4,12,20,
21,23
309:19

**doctor** 110:8
242:18,19
245:8 246:4

**doctors**
149:3

**document**
17:6,20,21,
22,24 38:24
39:2,4 40:15
58:10,13,15
59:10,19
63:24 64:3,
4,11,12,13
77:12 78:3,5
80:12
111:22,24
114:14,17,
21,24
116:14
123:4,16,18
131:18
136:16
144:5 170:3
184:20,21,
22 185:2,7
190:11,12
215:13,18,
23 218:24
243:22
255:10
259:10,24
266:8,12,18,
23 267:1,20,
22 270:10
284:16
322:3,20,23,
24 325:10

**documents**
77:15 84:22
131:16
167:24
170:4
215:15
257:1 259:5,
11 266:16
320:11
322:22

**Dodge**
313:13

**dog** 192:23
193:2

**dollar** 161:1

**dollars**
125:13
135:21
166:11

**door** 144:11

**dorm** 133:19
251:12

**Dorsey** 6:19
14:21,22,23,
24 15:10,12

**dotted** 166:5

**double** 43:5

**doubles**
153:24

**doubt**
114:10,18
326:9

**doubting**
114:22

**Douglas**
6:20

**downs**
119:22

**downstairs**
201:12

**draft** 215:17

**drawing**
26:24 142:3

**drawn** 38:11

**drink** 32:14

**drive** 22:8
23:5 179:3,
10,11

**driver** 175:10

**driver's**
178:24
179:4
313:17

**driver/
laborer** 15:8

**driving**
174:21
175:1
177:23
193:8,14,18
251:8

**dropped**
177:17
198:8
199:23

**dropping**

255:7

drove 179:6

drug 32:11
34:2 49:4
50:15 55:17
71:21 72:3
73:14 74:8,
10 78:17
82:18 83:1,
13,14,16
91:16
106:13
107:14,20
108:3,5,6,8,
12,13,21,22
115:16
118:23
120:13,22
121:1,10
125:18,23
126:6,14
127:2 129:6
166:21
168:5
240:20,23
281:20
299:10

drugs 31:10,
13,16,23
32:4,7 43:7,
8,14 44:4,16
48:2,7,13,22
49:2,12,20
50:2,7,10,
12,21 51:1,
10 52:18,24
53:2 54:21
55:12,15,16
69:23 71:2,
5,7,10,14
72:13 88:5
89:8 91:8,
13,19 92:1
96:21
109:12,13,
14,18,21
110:5,7
117:17,19,
23 118:3,21
119:3,6,12
120:8,15
124:21
125:8,12
156:17
168:6,10,12
171:4
261:13
263:5 280:7,
9,18 282:1,
3,6,13,15,
17,20,21
283:4
299:10

due 90:7
99:16

duly 7:3

dumb 31:20
44:1 86:24
124:18
175:4

duplexes
153:24

Dwight
14:20,22,23,

24 15:12

---
E
---

earlier 43:24
62:7 82:12
142:14
145:10
177:21
217:13
218:13,16
220:5
236:13
237:20
241:12
260:8 276:2
319:6

early 30:3
82:13
108:20
135:15
157:8
188:23
268:5

earn 130:3

earned
125:8,13
161:24
271:17

earning
117:18,22
118:3

earnings
161:9,19

easier
316:18

Eastern 6:7

easy 36:2
100:3
256:22

eat 179:12

ecstasy 92:1

Ed 243:9
244:1
246:23
248:8
249:23

effect 120:12

effects
109:14
128:17

effort 73:6,7

efforts 289:5

eighth 97:13

electronic
58:17

electronically
135:13

elementary
97:4

else's 307:21

embarrassing 45:8

emotions
255:4 274:9,
10

employee
155:15

employer
135:12

employment
15:1 45:15
46:4 155:2

encounter
143:7 197:7,
13 218:11

encounters
147:2

encouraged
134:3

end 46:19
112:9
115:11
118:24
119:1
292:16
310:6

ended 76:15
282:9

ends 286:3

enforcement
141:12,18

engagement
318:6

ensues
275:20

entail 103:20

enter 219:17
269:14

entered 90:4

Enterprises
161:10,16

entertaining
128:4

entire 18:4
85:17
267:19

entrance
145:4

entry 78:5,9
80:11,15
81:16
224:20
225:1 228:1
250:19
322:2
324:14,17
327:21

environment
49:10 75:24
273:13
281:8

Epstein 6:17
7:6,8 17:17
19:13,16
55:21 56:1,
4,9,13,16,23
61:15,18
69:15 77:20,
21 102:9,17
130:7
131:11
159:17
174:11,18

208:8,10
210:24
213:5
227:23
228:7,20
229:5
242:10
243:20
244:8,10,14,
18 260:2
295:16,24
300:20,24
301:1
303:14,18
304:9
318:20
319:4 324:2,
6,9 329:8

equal 84:4,
10

escape
121:6
128:12

escort 224:3,
8 275:23

essentially
41:8 84:11
133:14,18
227:11,14
303:12

establish
66:15

established
70:10 309:6

estimate
118:2,5

estimated
115:12

estimates
117:18

estimation
122:20

et al 6:5

Eve 308:19

event 76:10
170:9

events 72:12
91:8

eventually
71:17
157:20

Everett 97:4
153:17
154:7,8
263:11,12
297:23

evidence
206:4
221:16
257:19
265:2,3,15
291:2
301:24
302:23
303:2,5,11,
12 304:17
307:4
320:11
326:8

evil 268:4

ex-girlfriend
13:6

exact 45:9
81:11 82:15
89:14
134:22
144:22
184:21

examples
301:2,10

exchange
220:11

excuse
48:11
102:18
136:9 139:6
167:19
188:16
222:1 224:6
234:15
306:1 313:4

exercise
38:9

exhibit 17:3,
7 19:19,23
38:15,19
58:6,10
63:20,24
68:1,5
74:17,21
77:4,9,17,22
78:20,24
80:7,10 83:3
111:17,21
118:19
131:8,15
132:14
136:6,10
154:2,6
158:22,24
161:9 163:2
168:19,23
184:13,17
189:17,21
198:14,18
214:23
215:3
224:15,19
228:2
236:21
237:1
243:14,18,
19 246:11,
16,20 250:2,
6 258:22
259:2 266:4,
8 284:4,8
296:15
310:18,20
321:21
322:1
324:10,17,
19,22,23
325:2,4
327:18

exhibits
158:18,23
323:21
324:1

Exit 269:12,
17,19 270:2,
5,12,16
271:10,13

exiting 194:1

exonerate
306:10

exonerated
305:21
306:7,18

exoneration
306:20,23

experience
110:16
119:24
131:14
133:21
172:23,24
174:1
308:11
317:2

experiencing
148:13

experiment
91:24

experimented 33:2,21,23,
24

explain
16:16 72:20
126:17
203:19
225:13
235:24
245:6 246:5
258:1,4
276:5
290:22
291:4,5
307:14,16

explained
307:10

explaining
173:24
212:9

explanation
15:17 164:4
169:24

explanations
170:11

extend 8:6

extended
85:21

extent 96:1
208:5
246:11

extreme
306:15

exude 28:7

eye 192:20
201:23

eyebrows
261:3

eyes 36:2

— F —

F-U-R-Q-U-A-
N 287:6

face 193:22

Facebook

93:19,22,23
94:6,11,22

facilities
102:19
106:8
110:23
127:17,20,
23

facility
103:10,12,
13,19 106:9
233:1,10
237:19

facing
101:23

fact 41:19
61:11 63:13
115:23
120:4 133:8
175:10
183:7
201:18
210:18
219:8 233:5
234:19
236:13
278:3,10
302:24
309:10

facts 168:17
186:3 206:6,
13,18
207:22
208:8,11
209:2,6,12,
16 210:19
211:12,18
212:1,5,15
214:4,14,16
221:2
229:10

factual 63:18

fail 324:2

failed 301:11

fair 9:7 10:12
28:2 37:7,
19,24 42:19
45:10 56:24
57:4 60:15
62:6 78:4
82:17,20
174:19,24
206:12
218:2,7
270:8
300:14
302:3
310:13
313:6

faith 121:3
129:9
183:16,17,
18

faith-based
129:7

fall 260:5
283:6

falling 54:4

familiar
17:23 26:17
64:2 69:2

154:14,15
243:11
257:1 290:5
322:13
327:19

families
289:15

family 44:9,
11 53:16
55:11 70:12
73:18 85:1
87:2 90:1
145:10
146:9 149:1
176:16
178:11,15
227:19
230:3,20
243:5
252:16,20,
22 254:22
255:8

family's
73:22

fancy 27:14

fantastic
149:3,4

fast 46:8
70:5 204:10

father 44:10
52:13 85:10
101:16
147:15
291:21
292:3,7,11,
13,19
294:24

fault 101:15
147:14
304:5,7

favor 328:19

favorably
273:15

FCC 238:12

FCCC 238:4,
8

fear 192:13

fearful 252:3,
12

February
284:11

feces 110:6,
18 111:1

feel 126:3
222:17

feeling 46:18
246:2,7

feisty 87:9
150:10

felonies
226:9

Felonious
225:24

felony
173:18

felt 63:6
175:12
193:4

fiancee
311:15

figure 31:20
98:11
144:13
151:14
186:12,13
188:8 204:7
222:11
258:17
291:16,21
292:3
321:16

figured
144:14

file 57:9
181:8
184:18
265:24
284:16
319:9,19

filed 17:11
38:13 57:21
58:2,3,15
59:3,12
60:23,24
65:7,10,12,
21 266:12,
19,24
267:22
283:24
292:20
293:21
322:16
324:14,15
325:14

files 319:20
320:14,18

filing 57:5
287:20

fill 38:2

filled 241:8,
21

filling 239:3
240:15

finally 15:21
226:11
245:14

finance
55:16

finances
158:11
160:22

financial
165:19

find 134:4
145:2
180:17
186:6
223:14,15
227:5
244:14
246:12
268:22
283:11,12
293:15

finds 172:20
269:2

fine 80:21
259:13
327:24

finesse
294:15

finger 277:19
282:2

fingerprint
303:10
305:10
309:10

fingerprints
304:18,21,
22 305:6

finish 8:3,7

finished
224:6

fire 308:6

firearm
225:15

fired 308:15,
16 309:5,7,
13,18

firing 308:21

fish 303:24

fit 37:3
262:3,8,15

fits 262:7

fix 28:24
177:1
179:24

fixed 177:13

flagged
192:3,5
194:6,17

flip 64:7
250:9
271:15
296:15

floor 6:4

Florida
47:20,22
147:16

foldout
305:2

folks 106:5

follow 34:8
83:7

follow-ups
296:2

fond 168:17

food 46:8
293:12

foot 196:3

footnote
60:1 65:15,
18 69:4

force 153:10

force-feed
109:11

foregoing
329:16

forever
153:12,16

forget 8:14
48:19 49:23
72:10 73:2,7

153:14
267:22

**forgotten**
98:13

**form** 25:11
30:22 31:18
32:8 37:22
38:10 41:20
49:5,16
51:22 55:13
62:19 63:2
72:14,23
73:10 81:5
83:24 85:2,
22 88:13
89:1 91:10,
21 97:21
98:16 101:4
102:21
105:3
108:14
111:13
115:18
119:8 126:1
129:23
135:24
140:6 146:7
151:24
153:19
154:10
160:18
164:7
165:11
171:6
174:22
176:8,20
184:11
196:21
208:21
209:13
214:9 218:6
230:5
239:20,23
241:11
248:9,10,12,
14 263:1,17
265:21
271:4 274:2
281:9
285:23
294:17
297:14
300:18
301:19
302:7 308:4
309:15
319:11
326:3
327:11

**format**
248:13

**forms** 240:15

**formulated**
204:13

**fortunate**
61:24 63:6
319:24

**forward**
137:6 255:6
265:3,4
310:12

**found** 112:24
144:10
180:7,19

181:18
182:18
185:2
223:13,18
225:7,17,21
226:12,22
227:1
231:18
233:20
239:6 282:1
288:11
302:21
304:18,21
305:1

**foundation**
29:20 43:22
60:12 67:21
93:8,16 95:7
100:13
171:1 185:9
203:4
204:24
221:12
222:2,21
232:16
288:13
297:14
308:8

**fourth** 78:10
112:7 138:4

**framed** 205:5

**Franklin**
78:12
238:12

**frankly**
109:21
116:19
224:2 233:3

**frat** 216:23

**fraternity**
152:8

**free** 126:3
192:15
196:8
199:10
219:8
306:12
322:24

**freed** 257:17
328:17

**frequented**
157:11

**frequently**
313:18

**fresher**
189:7

**friend** 52:14
53:17 54:23
55:2,9
178:11,15
275:4,11,12,
14 311:20
312:8

**friends** 50:19
53:19 70:18,
21 87:2
93:19,23
94:7 96:8
197:16
252:19

**front** 6:3
112:4 120:7
169:5
322:15

**frustrating**
321:7,9,12,
13,14

**fulfilled**
174:6

**full** 10:17
261:5 313:9

**full-time**
289:14

**fully** 106:16
120:10

**fun** 88:1
128:3
179:13

**functioning**
179:11

**Furquan**
287:2,3,6,7,
8 288:6

**fuss** 128:14

---

**G**

**game** 275:4,
12

**gang** 51:21,
24

**gangs** 243:3

**garage**
177:15

**gas** 194:1,2,
8,12

**gave** 18:21
20:7,10,19
24:1 36:14
111:10
122:5
198:10
219:20
220:3 239:2

**gears** 283:17

**general**
111:2,3
300:19

**generally**
105:23,24

**generation**
317:7

**genital**
112:24

**gentleman**
26:8 120:7
197:24
201:18
210:7
230:10
275:10
276:4

**gentleman's**
152:19
201:7

**gentlemen**
216:22

**Georgia** 99:6
100:15
147:16

**get all**
199:23

**Girard** 6:20
243:18

**girl** 87:1

**girlfriend**
87:19 90:1
92:18

**girlfriends**
86:23 87:3,
23

**give** 15:17
22:18 38:6
39:11 41:3
52:22 64:5,
10 103:1
106:21
135:12,24
153:13
181:2 233:3
237:22
241:13
253:4
266:15
284:22
318:6,20
324:2 325:1

**giving** 8:4
107:20
173:7 276:8
310:20

**gladiator**
242:2

**glorious**
306:14

**God** 129:10

**Godsey**
64:19,21,22

**good** 7:7
9:22 11:17,
18,22 20:11
30:15 36:2
47:1 48:14
49:21 50:3,
9,10 52:13,
14 53:18
71:22 82:14
85:10 86:5
87:12 90:1
96:8 97:6
102:23
107:11,12
119:22
120:3 129:5,
10 135:19
149:2
150:21
157:9 158:4,
12 166:19,
23 174:9,21
178:18
180:10
197:1 223:1,
3,5,10
229:12
252:19
269:5,10
278:16
287:9

292:23
294:19
302:10,16
307:2 310:4,
7,10 312:3
318:22

**Google**
182:8

**governing**
137:15

**government**
293:14

**grab** 247:18

**grade** 97:13

**graduate**
34:13

**graduated**
32:19 34:14
36:16 45:11,
14 46:1

**gram** 115:3

**grams** 169:5
173:15

**granddaught
er** 311:9

**grandma**
147:22

**grandmother**
147:24

**grant** 181:15
283:21

**granted**
133:14
292:21
303:3
323:18

**granting**
322:2
327:21

**grants** 323:3

**great** 9:9
27:14 63:4
269:11
295:1

**Greathouse**
54:16,18,21
92:6,8,11,13
95:2,4

**green** 178:22

**Gregory** 6:9

**grew** 37:16
75:24 299:8

**ground** 7:20

**Grove** 22:1
23:5 264:13

**growing**
44:10 49:12

**grudge**
204:23
207:9,23
208:13,17,
19 209:18
210:1,12,17,
20 211:9,19
212:16
214:5,17

guard 182:11

guards
274:16
277:9

guess
323:19

guessing
71:24
245:23

guilt 148:24

guilty 90:20,
21 220:16
223:13,14,
16,19,24
224:12,13
225:7,17,21
226:12,20,
23 227:1,5
231:18
233:20
239:6
323:12
326:2

gun 225:8,
11,18,22,24
226:3,6,17,
20 308:6,13,
15,16,17
309:1,5,7,
12,13,19

guns 308:11

guts 234:2

guy 26:4
36:1 110:19
152:20
184:5
192:21
197:22
276:6
277:19
278:23
285:10
287:9

guys 152:7,
10 201:13

gym 275:24

———
H
———

H-O-R-T-O-N
16:3

habit 55:17
165:14

hair 260:18,
23,24

hairstyle
157:22

half 115:11
116:8

halfway
133:16,17
293:2,6
294:22

hall 107:7

hallucination
s 10:13

hand 58:9
63:23 68:4
74:20 77:7

78:23 80:10
111:20
131:14
154:5 162:3
168:22
184:16
189:20
198:17
215:2
224:18
236:18
243:17
246:19
250:5 259:1
266:7 277:8
280:21
284:7
321:24
323:24

handcuffs
275:23

handed
280:22
309:7

handful
57:23

handing 17:6
19:22 38:18
136:9
158:21
236:24

handle
109:10
228:18

handled
242:15,16

handwrite
248:6

handwriting
122:2 247:2

handwritten
246:22
259:4
296:16

hang 188:13

hanging 76:1

happen
145:8 200:9
277:6 309:8

happened
43:23 54:13
73:8 89:21,
23 90:10,14
100:4,7
142:9,13,19,
22 143:14
144:15
149:24
171:13
177:20
182:10
191:20
193:5
197:14
199:7
207:19
216:5 219:7
223:12
248:19
258:20
274:22
278:7

281:22
293:17
303:11
321:16
323:19
328:11

happening
76:15 110:2
170:9
173:11
179:22
204:10
327:13

happy 8:19
9:12 111:5
155:17
183:5,6
212:9

hard 12:22
33:6 46:16
47:3 48:19
49:9,11
53:12 73:2
86:6 87:7
99:21
227:20
235:24
243:1 249:3,
10 252:16
255:2
282:13
327:6

harder
243:3,4,5,6

harm 270:22
275:13
282:8

harp 73:4

Harris 12:16,
24 13:8
95:12 96:8
279:4,5
289:23
290:13,19
291:7,11
294:13

Harris's
290:15

harsh 121:6

head 8:10
233:2
237:20
274:19
276:5,13,19
277:3,5,11

heading
39:15

healed
106:15
107:11,12
193:3

healing
107:4

health 105:1,
19,20
108:24
109:11,20
110:13
240:2
243:24
247:21

Health/
substance
237:2

healthy
106:16

hear 92:17
130:4
180:12
183:5,6
251:16
264:22
276:1,10

heard 7:8
101:21
119:22
128:16
219:17,18
300:22
328:5,22,24
329:2,3,7

hearing
180:15,21

hearsay
265:3,15

heart 44:18
101:4,5
141:5
148:24
150:19
278:17

heat 179:19

heavy
278:12

height
131:23
132:2
261:23
297:19,22

heinous
192:22
303:13
317:2
326:20

helicopter
148:19

helped
221:17

hero 276:7
277:24

heroin
280:14
281:15,16

hey 108:2
194:7 195:5
199:18
276:6

high 32:14,
19,22 33:4,
14,15,16
34:9,10,11,
15,20,22,24
36:16,19,20
37:10 42:15
43:1 45:11,
14,17 46:2
67:6,13
94:1,2 95:8,
10,12,16,18,
22 96:11
109:15
110:5 170:5,

6 171:10
175:21
230:7,8,9
279:7,8
281:9,13,15
311:24
312:10

higher 103:9,
13,14,18,24

Hill 52:4
112:19

history
108:13
109:1,6,7
118:21
157:23
166:18
238:23
240:20
299:2,7

hole 276:1,
15,22,23
277:23
282:10

Holfinger
311:9

home 18:4
47:23,24
55:6 94:22
108:20
116:23
191:13
201:3 268:8,
9 306:18
314:12
319:5

homes
153:24
156:2

honest 106:1
166:24

honestly
31:14 70:10
72:1,9 76:13
103:1 124:4
196:15
204:2
252:21
279:16
315:13

hope 229:12

Horton 6:2,5,
15 7:2,7
10:18 11:3
13:20 16:3
17:21 56:24
59:19,20
61:9,13 75:2
78:1 79:6,8
90:8 98:12
102:18
112:3,19
131:12
136:20
159:2
161:13
164:11
169:1
174:19
182:1
184:19
189:22
201:8

203:22,23
215:4,5
216:15
217:5,7
219:18,19,
20,22
220:10,14
221:7 229:6
237:2
246:23
253:15
256:8 257:9
262:3,12,23
266:10
272:5,7
288:10
296:1 306:3
319:5 328:2
329:12

**Horton's**
60:2 61:6
65:19 69:8
221:2

**hospital**
101:3
148:20

**hour** 55:24
56:2

**hours** 104:2
139:17
141:10
155:10
165:8
326:22

**house** 22:5
24:8 29:17
46:21,22
91:4 133:16,
17,19 151:8
152:8 153:4,
17 154:7,9,
12,17
177:12,15,
16,18
192:14
194:23,24
195:11,12,
18,21
199:11
200:10,19,
22,23 201:4,
9,16 203:8
216:21,24
217:5
219:16,17
264:17
293:2,6
294:22
315:18,21

**housed**
110:19

**household**
11:9

**housing**
110:12
240:3,6

**Howe** 58:16,
23,24 59:2
60:5,8,11
61:3,14,20
64:16 68:14

**Howe's**
58:18

**human** 317:5

**hundred**
77:13 115:2

**Hunter**
311:17,18,
19,20,22,23
312:2,5,6,21

**Huntington**
134:12
316:7,11,16
318:18

**hurt** 53:14
193:6 255:8

**husband**
294:23

**hysterical**
182:14
224:10
231:14

——————
**I**
——————

**Ia** 245:8

**idea** 118:16,
18 205:24
312:24

**ideal** 293:18
294:21

**identification**
17:4 19:20
38:16 58:7
63:21 68:2
74:18 77:5
78:21 80:8
111:18
131:9 136:7
154:3
158:19
168:20
184:14
189:18
198:15
214:24
224:16
236:22
243:15
246:17
250:3
258:23
266:5 284:5
321:22
323:22

**identified**
13:14 77:17
207:19

**identifies**
185:19

**identify**
39:23 74:21
77:22 79:2
136:10
207:24

**identities**
98:6

**II** 75:10
245:15

**ill** 44:20,22

**illegal** 91:19
157:14
173:5

**Illinois**
317:19

**illnesses**
10:1,9

**image** 37:14

**imagine**
275:19

**immature**
130:1

**immediately**
138:6 151:3

**impact** 76:6

**impair** 9:21,
24

**implicate**
206:13

**implicating**
206:18

**implications**
62:22

**imposed**
81:20
190:24

**impossible**
67:15
160:24
164:16
189:4

**impound**
76:6

**impounded**
178:1

**impression**
294:6

**improper**
301:12

**inaccurate**
20:20

**inappropriate**
247:24
251:1

**incarcerated**
45:22 46:3
51:17 53:10
57:7,22
89:17 95:2
102:2
103:17
105:5,10
116:20
119:16
125:20
126:9,17,18
127:1 133:9
134:8
148:15
149:16
150:6 216:4,
6 265:18,23
268:3
273:13
306:13

**incarceration**
99:16
140:22
248:22
273:21
275:1

**incentive**
108:4,8,12

**incentive-
based**
119:18

**incentives**
108:19
109:4

**inch** 298:9

**incident** 33:9
141:22
142:5,8,9
143:7,15
144:15
146:4,9,14
250:24
274:15,20,
21 276:15
281:24

**included**
75:10

**includes**
112:2

**including**
74:13,14
168:12
261:20,22
262:18
264:2

**income**
155:16

**incorrect**
103:2
241:10,14,
19 277:17
315:19

**increments**
113:9,12

**independent**
269:21,24

**indicating**
65:22
303:16

**indication**
162:16

**indictment**
223:19,21,
22

**individual**
14:20 54:2,
15 275:16,
17,24

**individual's**
277:8

**individuals**
28:9 115:15
120:14

**industry**
46:8

**infant** 86:16

**information**
38:6 39:4
40:6,12,18
63:12 66:3
67:20 96:4
106:4
111:10
115:17,20
116:11

186:2
216:13
239:2,20,21
240:14,17
241:10,14,
17,19
325:21

**informed**
192:9

**initial** 207:13
237:1

**inmate**
108:7,12
109:5,23
241:13
274:17,19
275:5 277:3,
10 283:2

**inmates**
127:19
133:18
276:18
283:7,9

**innocence**
58:21,24
60:17,18,23
61:10,20
62:1 63:4
64:22 65:21
68:14 94:15
249:5
257:16,21
278:11,18
293:9
301:22
302:9,20
303:1
305:22
307:11
316:20
317:10
323:17
326:21
328:16

**innocent**
100:1 243:4
252:18
278:10
307:16
310:1

**inoperable**
180:4,5

**inside**
112:24
248:14
251:18
285:5

**insists**
232:12

**inspire** 317:4

**instance**
8:20 72:5
141:20
302:2

**instances**
57:16,20
111:9 143:2
300:16
301:13

**instantly**
251:11

institution
233:13
236:14
237:12,16

instructed
138:5
139:18

insurance
175:11,13,
16,17

insurmounta
ble 227:22

intake
104:21
105:13,18
112:2 114:6
236:15

intensive
171:22

intent 258:12

intentional
93:2,4

interact
278:24

interaction
209:3

Interdisciplin
ary 250:6

interest
129:11
157:23

interested
20:5

internet
182:7

interrogatori
es 41:7

interrogatory
39:15,18

interrupt
167:20
181:7

intersection
193:24

interviewed
105:1,7

interviewer
114:6

interviewing
106:5

interviews
104:21
105:9,13,18
112:3

introducing
326:11

invasion
18:4

invite 55:10

involved
57:19 85:20
86:19 121:3
232:6
257:16,22
264:23
296:24
300:1,4

involvement
28:17

involves
118:22

involving
209:6

irate 187:8

issue 66:14
180:23
183:2

issued
173:20

issues
105:20
274:9,13

issuing
164:18

item 139:3
259:19

___

J

J-A-N-E-T-T-
E 11:6

jail 76:24
145:19
191:11
233:15
234:16,17
235:4
238:15
239:9 240:9,
12 241:22
299:10
310:6

jailers 235:5

Janette 11:3
22:9,13
23:3,21
151:15
156:19,20
166:17
167:1 172:9
179:12
187:13
188:1,13,17,
19,20,21
190:3 252:2,
13,20 278:4,
10,14
288:10
293:5,22
296:5,9,13
315:24
316:9 318:8,
15

Janette's
11:4 288:12

January
216:8
244:21
322:16,19

Jim 50:5

job 45:17,19
46:12,15
47:15,19
48:5,8
133:24
149:3,4
154:19

155:16
161:6 172:3
287:13
293:2,6,15
316:17

jobs 46:9,11
134:4,16,18
155:18
156:1,13,16
289:14

John 268:14

Johnson
85:14

joint 316:9

jointly
315:23

Joyce
314:15

joyful 306:16

joyriding
76:2

Jr 190:11
191:6

judge 190:23
224:12
268:14,17
271:13,14
286:18
289:23
303:2
305:23
309:24

judgment
224:20
225:1
292:18

judicial
266:9
283:18,24
284:9

July 151:19,
21 248:15
255:18
256:5

jump 34:21,
22,23
121:15
192:24

jumped
151:20
197:23
275:16

jumping
193:1

June 169:1,7

junior 32:14,
22 33:4,14

jury 223:13,
14,15 224:5
227:4 326:9

justice
183:17

juvenile
75:23

___

K

Karim 138:7

Kawanna
12:16,24
13:7 95:12,
17 96:6,7
279:3,5
289:23
290:13,15,
18 291:7
294:3,10
296:6,10,12

KEMBA
316:4

kick 277:2

kicked
274:19
276:4,12
277:4,11

kid 295:15

kidnapping
225:21
226:6

kids 99:17
188:15

kill 235:11,19
282:8

killed 275:9

Kim 315:8,9

kind 23:22
27:12,22
30:6 31:7
33:6,20
34:1,2 35:4
37:16 47:23
48:17 87:3,7
91:24 93:23
94:16,18
95:19
102:24
109:11
116:21,24
120:3,13
124:21,22
129:11
133:15
150:16
151:13,16
152:8 156:6
157:17,19,
22 163:17
178:21
182:14
183:12
186:10
187:16
188:12,14
194:6 196:3
216:23
218:11
224:9,11
227:21
235:24
249:2,10
253:17
255:2 269:4
280:9
283:14
287:9 289:7
293:11

308:23
309:1
312:22

kindly
263:21

kinds 179:8
280:6
282:20,23

kitchen
134:20
195:22,24

knees 46:16
47:3,8

knew 24:21
25:10 26:4
29:22 30:14,
15 31:3
44:11 50:9
55:1,5 62:23
92:18 96:13
99:3 150:10
177:8 182:6,
21 184:6,9
186:5,10,14
187:21
196:17
201:22
207:6
231:16
232:14
279:5 299:6

knife 275:6,
7,11,13,18
276:4 277:7

knives 275:9
295:3

knowing
167:2 243:3,
5

knowingly
75:9 79:23

knowledge
52:17,19,23
98:5 138:23
210:8,10,11
270:4
291:20,23
299:24
300:4
312:22,23
329:6

Kobe 16:3
90:3 100:17
101:1,3
149:18

Kobe's 98:20

Kyle 52:6,7,
12,13,17,19,
23 53:5,7,8,
17

___

L

La-key-an
13:18

labeled
276:13,14,
15 282:7

labor-
intensive

48:5
lack 121:7
ladder 47:7
ladies 36:2
148:17
lady 30:12
31:7 92:19
95:19 148:2
Lakeon
13:15,16,18
14:3,4,6
201:7,9,12
202:20,23
215:3,5,20
218:8,19
219:12,15
220:20
221:6,9,10,
14,18,21,22
223:8
Lakeon's
13:17
217:18
landlord
163:15,17
language
323:5
large 165:15
282:21,24
late 157:7
laugh 54:1
laundry
281:24
282:1 283:2,
7
law 93:6
141:11,17
175:10
285:10
317:1
laws 175:5
lawsuit
12:20 13:1,
24 15:11,13
16:11,13,18,
21 17:11
18:4
lawyer 62:22
189:9,11
200:3,5,9,13
202:1
212:18
214:7,11
221:6 258:6
266:1 301:5,
6,21 319:15,
17,18 325:5
lawyers
38:3,6 40:19
57:18 65:21
66:17 67:19
96:5 216:3
222:8,14
228:18
302:5 317:4,
5
lawyers'
222:5
laying 7:19

lead 207:24
298:12
325:13
leaf 72:18
leak 47:9
leaking 47:9
learn 44:14
270:15
313:20
learned
158:11
208:3
273:21
learning
119:19,20,
21
lease 152:16,
17,18
leave 47:19
133:15
140:1,4,12,
17,23 231:7
leaving
194:12
196:8
led 298:17
leery 196:3
left 135:22
168:11
231:11
240:12
244:20,23
255:17
275:6 279:8
309:19
leg 24:9
legal 10:17
39:18 40:6
43:16,21
44:3 168:14
170:22,24
187:10
207:14
legitimate
139:7
length 256:9
257:10
316:19
lesser 81:7
lessons
130:5
let alone
63:7
letter 246:22
248:7
268:11,21
269:8
286:16,18
287:2,16,17,
18,24 288:3,
6,9,18
289:22
290:2,5,7,
10,14,20,23
291:6
letters
284:20
288:24

289:12,17
letting
172:22
level 103:9,
13,17,18,24
levels 133:3
library
285:11
license
178:24
179:5
313:17
lie 108:5
110:5
Lieutenant
188:5
life 29:24
32:1 35:5
41:11 42:15
43:9,24
44:12 48:18
49:22 55:7
69:24 72:10
73:3 76:11
86:19 89:16
91:20
101:14,20
104:9
106:18
113:21
114:15
117:7 120:8,
11,16 121:6
130:5 153:8,
9 165:16,17
166:14
167:8,15
168:4,11
178:3
183:16
192:14
227:11,15
253:3,17
276:9 293:3
life-
threatening
148:13
lifetime 74:6
lift 148:19
light 54:1
129:1
144:10
260:15,16
326:9
lightly 183:8
liking 34:3
limited 303:8
306:11,22
326:18
Linda 176:13
lines 78:10
112:8 113:6
199:20
241:2
listed 159:24
listen 198:11
listening
203:15

litigation
13:6 38:1
live 10:22
85:15 98:22
133:15
134:2
147:20
150:4 151:6
153:7 253:6
264:10
292:22
293:23
294:3,7,16
lived 24:20
25:4 26:13
29:13 40:9
44:15 85:17
99:6 100:15
133:23
145:22
147:12,15
152:9
153:22
216:14
253:17
lives 11:2
85:16
254:13
living 11:8
21:14,19,20
22:9,13,24
23:1,4,10,
16,21 26:11
44:23 75:24
87:11 88:1
117:17
121:16
133:18
144:16,22
147:8,10
149:18,19,
21 150:2
153:5,11
167:14
169:17
296:4,6
312:11
314:16,17
Livingston
154:24
LLC 6:11
load 309:12
loaded 309:7
local 54:10
located
169:4
314:14
location
104:20
169:9
locked 45:6
272:17
287:21
Loew 105:10
143:18
147:1
149:14,15
159:12
180:8,17,19
264:24
265:6,13
297:1 326:2

328:3,23
logic 106:18
long 12:21
13:12 19:9
20:7 22:10
25:4,6 27:5
29:7,11
31:14 33:6
34:17 38:11
43:4 44:20
45:5,17
47:13,15
49:24 50:11
67:16 70:9,
23 71:1,23
72:6 89:12
90:14 96:14
100:2 102:5
107:6,8
116:12
118:6 124:4
132:12
134:6 135:4
151:10
152:13
153:21
154:12
172:14
175:6,9,21
182:4 186:8,
18 197:7
204:12
217:22
220:21
227:20
233:10
255:5
278:13
288:22
292:8
303:11
309:4
320:17
329:4
longer
103:10
253:10,11
looked 19:7,
11 20:8
73:20 80:16
186:9
259:11
283:18
302:1
327:21
Lord 129:9
302:16
lose 223:18
252:22
lost 48:7
252:19
277:1
lot 29:24
35:24 37:4
44:1,12 47:5
53:13 59:14
64:9 87:3
94:4,20,23
99:23
115:20
116:11
117:1
119:20
128:3

150:18
158:11,13
160:21
167:13
170:4,16,17,
21 175:5,7
178:23
180:2
183:15,16,
17 186:21
187:15,16
188:4,10
200:17
211:5 242:1,
15 246:1
252:17,18
255:8 268:5
276:16
279:24
282:19,20,
22 316:17
320:20,22,
24 321:5,13

**lots** 134:4
147:16
262:1

**loud** 95:19

**low** 233:23
283:14

**LSD** 92:1

**lunch** 107:8
130:8 133:2

**luncheon**
130:13

**lying** 203:18
204:3,6,15
277:15

_____
**M**
_____

**macing**
275:22

**made** 24:9
32:1,5 43:9
47:2 69:24
73:3,7 77:12
114:5,11,18,
23 115:10,
13 116:16
117:17
123:10,11
129:4 144:1
168:1
221:18
222:18
274:11
277:18

**madness**
128:12
243:2

**magically**
257:21,22
280:19

**mail** 267:19

**mailed**
267:16

**main** 161:5

**make** 43:15
56:7,11 64:7
82:24 83:7
84:23

101:21
115:23
123:9 133:8
144:24
145:1
167:15,22
200:14
227:13
228:3 229:7,
21 244:12
251:19
292:17
298:21
300:23
304:12
321:15

**makes** 16:24
161:18
316:17

**making** 44:1
114:8
124:23
125:2 128:7
165:18

**male** 259:19
260:3,4
263:7

**males**
262:17,18

**malicious**
204:20
258:12

**man** 22:10
34:21,23
35:15,17,20
36:24 41:24
42:8 43:3
54:1 61:11,
21 62:9,17
66:7 67:6
71:22 100:3,
15 104:18
138:2
141:23
142:3
163:18
195:5
198:11,20,
22,24
203:23
210:14
211:2
219:22
222:9 236:5
263:23
268:8
276:12
283:8
310:10
314:23

**management**
272:1,14
273:1,5

**mandatory**
80:21
127:17,19,
21,23

**manner**
198:3

**March** 237:5,
12

**margin**
249:12

**marijuana**
32:23 33:2,3
43:16,20
91:17,18
118:22
125:18,23
126:7,15
168:13
169:3,7
172:21
173:4,10,13

**mark** 64:19,
21 172:17
228:2

**marked** 17:3,
7 19:19,23
38:15,18
58:6,9
63:20,23
68:1,4
74:17,20
77:4,9
78:20,23
80:7 111:17,
21 131:8,15
136:6,10
154:2,6
158:19,22
168:19,23
184:13,17
189:17,20
198:14,17
214:23
215:2
224:15,18
236:21,24
243:14,17
246:16,19
250:2,5
258:22
259:2 266:4,
7 284:4,7
321:21
322:1
323:22
324:1

**marks** 56:20
65:19 69:7
102:14
115:6 131:4
174:15
229:2
295:21

**marriage**
277:1 278:3,
12

**married**
29:19 30:1
85:3,4
150:17
151:15
157:20

**Martinez**
6:14 17:9,
13,18 20:2
25:11 29:20
30:22 31:18
32:8 37:22
38:10 40:20
41:20 43:22
49:5,16
51:22 55:13
60:12 61:12,
17 63:2,14
64:7 66:23

67:1,3,21
68:6 69:18
72:14,23
73:10 76:16
77:8,10 79:1
80:14 81:5
83:24 85:2,
22 88:13
89:1 91:10,
21 93:8,16
95:6 96:1
97:21 98:16
100:13
102:21
105:3
108:14
111:13
112:11
115:18
119:8
123:20
126:1
129:23
138:21
140:6 146:7
151:24
153:19
154:10
159:13
160:18
164:7
165:11
171:1,6
174:9,22
176:6,8,20
177:6
184:11
185:9 190:9
196:21
203:4
204:16,24
208:2,5,21
209:13
210:21
211:21
212:24
214:8,18
217:15,20
218:6,23
219:3
221:12
222:1,21
228:5,22
230:5
232:16
239:23
241:11
244:4,9,11,
17 246:10,
21 250:8
255:14,19
259:23
263:1,17
264:5,8
265:21
271:4 274:2,
5 285:23
288:13
289:1
290:21
291:1
294:17
295:17
297:13
300:18,22
301:19
302:7

303:24
304:2 308:4,
8 309:15
318:22
319:11,21
322:5,8
324:4,7
326:3
327:11
329:10

**match** 198:4
259:20
303:12

**material**
112:24

**materials**
11:19,21
65:4

**math** 165:13

**Mathews**
98:21

**matter**
118:14
197:2
234:19
277:21
306:20

**matters**
219:10

**mature**
101:16
120:11,17
121:3
167:15

**Mcclanahan**
24:14,17,19
25:10,13
26:1,6,15,17
27:2 28:13,
16 29:2,5,9,
13,19,23
31:9,12 50:8
51:1,3,10
53:5 96:10,
22 176:5,13,
16,18 177:4
180:13,16
185:20
186:7,10,15
190:7,11
191:6,17,23
192:3,13
193:17
196:5,11
197:14
199:9
200:24
202:4,14,16,
18 203:2,5,
17,18,21
204:20,23
205:16
213:11,13
217:6 218:5,
14,19 219:8,
13,16,19
220:2 229:9,
15,17,18
230:1,10
231:22
232:1,14
256:14
277:14
327:14,15

**Mcclanahan's** 29:16
190:5,7
193:20
326:11
327:7,8

**Mcclanahans** 96:13

**Mcdonald** 287:3,7

**Mcdougald** 287:3,8,15, 23

**Mcdougald's** 288:7

**meaning** 261:1

**means** 59:7, 8 72:21
81:21
113:15
225:12,14
226:16
245:4,12,18, 20 272:12
281:4
306:11,21

**meantime** 15:10

**Media** 56:21
102:15
131:5
174:16
229:3
295:22

**medical** 104:3 105:8
148:4,7,9
236:15
245:7

**Medical/ mental** 237:1

**medication** 105:21
234:24
235:1

**medications** 9:20,23

**meet** 156:19
157:2,16
326:12

**meeting** 120:6

**meetings** 139:9

**members** 230:3
234:10
252:20,22

**memorandu m** 285:18

**memory** 9:24
21:21 27:19, 23 113:3
141:24
189:6
269:21
270:1

**men** 262:1

**mental** 10:1, 9 105:1
108:24
109:10,20, 23 110:13
240:2
243:23
247:21

**mentally** 282:11

**mention** 254:24

**mentioned** 200:12

**mentor** 287:10
312:7,15

**mess** 305:14

**messing** 101:16

**met** 52:15
156:20,22
157:3,18
167:6
188:22
210:15

**Metals** 314:14

**mic** 19:14,15

**Michele** 244:1

**middle** 97:4
138:5
172:16
238:17,23
259:17
263:11,12
264:20
297:23

**military** 253:17,18

**Milo** 25:7

**Milo-grogan** 25:3,8
169:14

**mind** 313:21

**mine** 152:16
185:16
275:4 282:4

**minor** 66:4,7, 13 74:1
183:2
218:11

**minute** 17:12
19:13 80:13
141:23
192:8 194:7
195:17
235:14,16, 17 259:6
260:19,20
278:1

**minutes** 56:5
228:21
247:18
296:2
318:21

**mischaracter ization** 291:2

**Mischaracter izes** 263:18

**misconduct** 116:24
204:19
205:3
222:15
228:9,11
300:8,19,21
301:2,8,9
302:4

**mishear** 303:17

**missing** 244:13
302:21

**misspeak** 61:16

**misspoke** 104:15
223:7,9
260:9
300:24
305:6,7

**Misstates** 217:15

**mistake** 66:19,21
277:18

**mistaken** 66:18
203:17
204:2,5,14
217:24
218:1

**mistakes** 32:2,5 43:9
44:1 69:24
73:3 168:1
222:18,20
256:9
257:10,13
274:11

**misundersta nd** 303:18,20

**misundersta nding** 183:19

**mixed** 142:15
244:24

**mixing** 142:11
143:1

**mixture** 128:23

**mixup** 144:18

**mode** 313:17

**model** 179:12
291:24
292:2

**models** 32:1
44:12

**moment** 95:5
137:2 302:2

**moments** 274:24

**money** 46:16
134:3 135:2,
14,18,22
158:13
164:14
165:9,15
166:12,13
179:23
197:4 200:2,
9,11,12
202:10,13,
15,16
213:24
219:20
220:3,10,15
293:3,7
311:13,14,
16 315:11,
13,16
318:16,17,
18

**month** 14:7
77:16
155:15
165:4
171:21
172:4
175:14
237:8

**Monthly** 33:12

**months** 78:13,16
80:19,23
81:1,12,15,
17 82:1,2,7,
8 101:13
102:8 119:3
126:23
157:1 159:8
172:1

**mood** 233:19,22
245:1

**morning** 7:7
19:3 157:8
170:2
171:12

**Morse** 157:5

**mortgage** 315:18,20
316:5

**mother** 44:6,
8,17,18
48:13 85:13
86:5 87:5
90:5 98:20
99:9 101:8
147:10,21
150:9
180:21

**motion** 266:8
283:18,21,
24 284:8
285:2 290:8
292:21
293:22
322:3 323:3,
17 324:11,
15 327:21

**motivate** 317:6

**motive** 204:11

**mouth** 283:16

**move** 14:9,
11 47:22
229:6 236:5

**moved** 23:23
25:7 47:20
151:11,12,
17,22 152:3
231:15
253:2

**movies** 103:22
188:15
233:8 321:6

**moving** 70:5
113:6
286:14

**multiple** 25:20
147:12
192:18

**mushrooms** 92:1

**Myron** 311:8
319:6,10

—————

**N**

**NA** 119:19,
24 127:5,11

**named** 14:20
15:3 46:14
54:15
208:12
230:8
253:15
314:13

**names** 15:24
50:1,16,18
52:2 70:24
115:15
152:11,12,
14,15
190:13,14
242:7 244:2
253:4,5

**Nancy** 146:2
151:8

**nappy** 260:18,20,
22

**Narcotics** 127:11

**narrative** 185:16

**narrow** 253:8

**Navy** 254:9

**necessarily** 56:1 117:1
245:24

**needed** 14:14,16
163:20
178:23

183:10
187:6 200:6
243:5 273:4,
18

**negative**
317:3

**neglected**
10:16

**neighborhood** 24:20,21,
24 25:1,18
44:14 53:13
54:20
153:23
169:15,16
180:13
186:22
191:22
295:15
299:9

**nervous**
196:5
248:16,20
249:1

**net** 161:24

**newly** 150:16

**news** 94:17,
19 116:23

**newspaper**
54:10

**nice** 46:15
254:3 290:6

**nicest**
178:20

**nickname**
35:1,20,22
36:14,15,24
41:10,13,19,
24 42:6,7,9,
12,23 43:2
50:5 60:2,6
61:7 65:19,
22 66:16
67:6,10,20
69:8,10,17
190:22

**nicknames**
34:16,18
35:4,7,10,
13,24 36:1

**Nicole** 96:14,
17,18,19

**niece** 229:19

**night** 128:5

**night's** 11:17

**nights**
258:16

**nods** 8:10

**Nohe** 115:14

**Nolle** 324:11,
17

**North** 6:3

**northeast**
169:15

**nose** 104:8

**notation**
249:12,16

255:17
256:4
261:12
298:8

**notations**
250:16

**note** 227:24
250:21
252:7 256:8
325:20

**notes** 12:2
250:7 259:4
261:8,11
296:16
300:9,11,13,
15 301:15

**November**
79:16,22
80:16
250:20
252:8

**numb** 224:12

**number**
11:11,12
14:17 57:1
81:21
198:11,19
233:4
237:22
244:16
262:16,18
270:13
271:17
284:19
310:16,20,
22 311:1,3,4
314:5
325:11

**numbered**
259:14

**numbers**
59:18 64:2

**numerous**
256:9
257:10
258:16

---

## O

**O'DONNELL**
286:19
289:23

**oath** 18:21
19:2

**object** 25:11
126:1
159:14
176:6
259:23
291:1

**objected**
77:14

**objection**
29:20 30:22
31:18 32:8
37:22 38:10
40:8 41:18,
20 43:22
49:5,16
51:22 55:13
60:12 61:12

63:2,14
66:23 67:1,
21 69:18
72:14,23
73:10 76:16
81:6 83:24
85:2,22
88:13 89:1
91:10,21
93:8,16 95:6
97:21 98:16
100:13
102:21
105:3
108:14
111:13
115:18
119:8
123:20
129:23
140:6 146:7
151:24
153:19
154:10
160:18
164:7
165:11
171:1,6
174:22
176:8,20
177:6
184:11
185:9
196:21
203:4
204:24
208:21
209:13
210:21
211:21
214:9,18
217:15,20
218:6,23
221:12
222:1,21
230:5
232:16
239:23
241:11
246:11
263:2,17
265:21
271:4 274:2
285:23
288:13
294:17
297:14
300:18
301:19
302:7 308:5,
8 309:15
319:11,21
326:3
327:11

**objections**
264:5

**obligation**
174:7

**obligations**
146:18

**obnoxious**
95:20

**observed**
188:3

**obtain** 139:7
183:14
187:10

**obtained**
111:24
307:11

**obvious**
164:17
165:18
239:13
292:14

**occasion**
140:4
141:15
143:12
192:1,2
195:14,19
217:3
218:14
273:6
312:20

**occasions**
129:2 179:7,
8 191:23

**occurred**
18:5 20:24
21:3,11
83:17,19
142:6
143:13
209:7

**October** 18:5
20:24 21:12,
13,19 22:12,
24 23:10,16
40:1 159:9
161:21
162:11,14,
20,21,22
165:23
166:2,4,11
187:21
268:12

**offense** 75:7
79:11,14,18
80:16 90:20
144:20
169:9,20
185:23
225:15

**offenses**
74:1,3

**offer** 202:13,
14

**offered**
134:4
202:10
213:12

**office** 251:16
320:19

**officer** 117:8
137:21
138:7,9,12
139:9,10,17
140:1,17
141:7,10,16
143:22
144:2,13
146:21,24
147:6
155:17
171:19

172:6,19
174:2
251:10,19
301:11

**officers**
141:11,17
143:8
172:24
173:1
273:17
275:20
276:18
277:16
280:1,18

**officially**
151:17

**officials**
111:11
116:15
234:16
273:3,9,16

**Ohio** 6:4,7
10:21 23:6
40:10,11
47:1 58:21,
24 60:17,18,
23 62:1 63:3
71:14 73:14
77:24 80:22
82:19 85:16
94:15 101:3
103:7
105:10,16
110:15
117:16
118:9
138:13,16
140:19,23
145:15
148:16
149:20
153:22
175:10
178:5,9
184:19
216:15
240:9
241:23
249:5
254:11,13
257:16,21
278:18
280:3 293:9
301:22
302:9,19
303:1
305:22
307:10
314:15
317:17,18
323:17
326:21
328:16

**older** 152:20
179:12
298:1

**one-hour**
318:5

**one-night**
86:9

**open** 134:1

**open-ended**
42:17,21

open-heart
101:12

operable
180:4
193:12

operated
135:8

opinion
121:13
125:22
126:14
127:2
277:15,16
301:7,8

opportunity
153:13
197:23
224:22
228:16
247:3
287:13

opposite
109:22
120:12
193:18
278:24

ordeal 196:9
197:2

order
136:18,19
288:3 310:5
322:1

ordered
323:9

ordering
136:17

orders 80:20

organization
301:23

originated
67:10
145:12

Orkin
312:12,19

ounce
115:11
116:9

outcome
77:1

outlook
277:18

outstanding
146:13

overlooked
173:6

oversight
66:5

overturned
293:10
303:3

owe 315:10,
12

owed 175:17
315:13

owing
315:16

owned

308:13

**P**

p.m. 130:14
329:17

P.S. 249:13

package
290:3

packaging
45:2

packet
286:14

pages 77:14,
18 250:10

paid 134:21
152:24
163:15,17
164:21,24
178:19
311:12,16
317:8,10,11,
12,14 318:1,
4,8,13

pain 73:18
249:4

paint 239:7

panicked
187:1

pants 169:5

paper 62:17
64:9 80:1,24
117:21
119:5
121:24
122:22
136:14
159:19
191:4 200:6
298:15
319:9

papers
257:23,24
258:1,4,8
319:18

paperwork
23:19 38:2,
13 57:19,21
58:1 59:14
60:23
144:19
206:24
270:5,9
287:20
302:1
319:13
320:1,6

paragraph
40:6,7 78:10
112:7,12,13,
18 115:1
122:15,17
125:6,16
216:14
217:3
219:15
220:13,18
221:1
268:21
325:19
326:17

paragraphs
112:16
121:15

paralegal
6:20

parent
161:16
233:13

parental
291:16

Parkersburg
70:8,11,12,
15,18,21
71:3,7,8,10,
11 91:2
92:4,13
115:10,13,
24 116:8
117:15
118:8
121:17
122:17
124:8,12,17
131:16

parole
111:23
136:18
137:6,21
138:9,12,16,
20 139:2,8,
10,17 140:1,
5,16 141:6,
10,16
143:17,21
144:1,8,12
145:15
146:17,20,
24 147:3,6
155:17
168:15
171:14,18
172:6 174:2,
3 226:18,24
231:17

paroled
21:22 23:22
139:16
140:3 144:6
147:9 151:1,
2 264:18

parolee
137:8

part 17:15
23:19 39:8
46:18 49:22
70:1 72:10,
11 73:2
77:12 89:15
101:14
113:20
129:18
134:20
139:14
162:19
251:14
289:13
290:3,8
311:16

parted
294:11

participated
127:4
271:18

particulars
89:14 148:3
184:3

parties 323:9

partly 163:8

parts 213:17,
18

partying
124:18

passed 44:6,
8,18 53:8
232:20
253:2
320:16
327:9,15

past 10:9,14
70:1 113:21
200:7

patience
180:2
202:19

pay 134:1
161:24
163:16,18
178:17
217:1
220:15
311:11,13,
14

paycheck
162:4

paychecks
316:14,15

paying
175:13
200:5,13
202:1

payment
80:20

payments
318:14

pea 62:16

peace 26:7

peacefully
229:13

peas 30:6

penal 135:8

penalty
225:16

pending 13:6

people 10:22
26:21 36:8,
10,11 37:20
49:19 50:2
53:13 55:8
67:7,12
73:19,20
88:24 89:4,7
94:1,21,23
95:9 99:23
103:21
106:12,16
109:16
128:6,18
137:7 164:9
175:7
186:15,22,
24 199:16

particulars continued — omitted

233:7 242:8
243:2 246:1
252:18,20
253:9,14,15
255:8
263:16,23
264:2
274:10
275:8,9
280:13
288:24
289:13

people's
24:8 90:8

perceived
106:13

percent
29:11 30:11
33:13 36:18
66:10,11
147:11
148:1
232:20
248:11
285:15

percentage
134:2

perfect 54:2
222:19
262:21
293:5

perfectly
208:16

period 19:10
25:9,13 30:2
31:2,17
39:24 44:6,
20 85:21
87:10 118:4
143:14
151:22
156:14
162:1 165:1,
6 168:9
174:20
276:24

periodically
216:19

periods
193:12

permission
99:15
138:15
140:1,12,16
141:6

perpetrator
208:1

person 6:16,
21 11:24
13:14 16:21
36:3 48:21
72:8,17
89:19
101:18
109:12,19
116:12
132:20
138:7
157:16
186:14,23
196:4 203:8,
12 204:4

206:7,14
226:17
232:15
246:2 276:4,
12 278:16
283:13
297:11
298:22

**person's**
276:9

**personal**
15:19 29:24
299:24

**personality**
245:14,20,
22

**perspective**
66:12,13

**Pest** 312:12

**petition**
58:11 59:5
68:8

**phone** 11:12
14:17 138:6
198:11,19
207:13
209:1
270:13
279:16,19,
20 310:20,
22,24 311:2,
4

**phones**
280:7

**photograph**
132:21

**photographs**
132:15,17,
18,23

**phrase** 67:8
78:2 90:3
113:15

**physical**
105:1
135:12,16
162:3,6
259:17

**pick** 26:20

**picture**
154:6,8,16
239:7

**piece** 62:17
198:18
200:5
221:16

**pieces** 37:17
193:8 285:4

**piqued**
129:11
157:22

**place** 15:1
91:5 98:15,
19 106:24
111:5
128:24
135:6
139:16
142:10
144:16
146:5,6

153:3
155:12
175:8 180:9
192:9 238:8
268:7
275:24

**places**
147:12,17
151:14

**plainly**
190:12

**Plaintiff** 6:15
16:13,15
17:1 40:8
77:14

**Plaintiff's**
38:22 41:13

**plan** 243:24
292:22,24
294:14

**planning**
14:9

**plans** 296:3

**plant** 45:2

**plastic**
112:22
169:4 236:3

**play** 86:20

**player** 36:20
230:12

**playing**
36:24 97:5
275:11

**pleaded**
276:20

**pleading**
59:2 60:10
65:21 68:7,
20 288:4
324:10
325:14

**pleadings**
57:6 265:24

**pleas** 266:13

**pleasant**
207:16

**plentiful**
295:3

**pocket** 169:5

**pod** 30:7

**point** 17:19
27:4 35:11
41:11 42:9
43:8 53:18,
20 62:6
69:22 74:15
104:9
128:10
130:8 146:3
149:11
151:21
165:16,17
166:14
176:3 178:3
183:16
186:13
195:4
199:13

201:13
219:10
233:23
239:4,13
241:20
242:15
276:11
277:19
278:4 282:2
303:8 329:4,
7

**pointless**
265:18

**police**
116:24
117:2,3,5
131:16
143:8 145:6
147:2 169:7
172:18,19,
24 173:1
181:23
182:3
196:18
204:19
205:3,5,7
219:21
222:15
228:9,11
300:7,16,20
301:2 302:4

**Polysubstan
ce** 245:8

**poor** 35:6
37:16

**Popeyes**
154:23
155:6,13
161:6,17
162:1,3
164:22
165:8

**popular** 34:2
36:1

**position**
167:7 182:2
258:18
298:10

**positive**
31:24
107:24
317:3

**possessing**
75:9 79:23
169:2

**possession**
74:4,6,10
80:4 90:16
169:7
172:20
280:15
286:12,22
288:17

**possibility**
296:4
309:13

**possibly**
106:17
107:9
108:19
202:21
285:21

**post** 190:2

**post-
conviction**
58:11 59:3,
5,6 68:9

**posted** 190:3

**posture**
109:17

**potentially**
278:13

**powder**
122:12

**powdered**
43:18

**power**
165:20

**preceding**
115:14,24

**predate**
209:2

**preface**
328:7

**preferred**
293:1

**pregnant**
90:5

**prep** 320:24
321:5

**preparation**
320:19,21,
23

**prepare**
11:15

**prepared**
244:1

**prerelease**
269:1

**prescribed**
140:2,5,9,17

**presence**
6:13

**present**
202:21

**presented**
257:20

**presenting**
40:4

**preserve**
246:11,14

**presiding**
268:17

**pretty** 12:22
34:20,22,24
36:1 37:12,
15 47:1 48:4
53:18 57:19
59:15 87:9
97:6 107:11,
12 124:16
148:21
150:10
158:12
167:6 178:2,
3 179:13
187:24
188:20,22
189:1,3

196:2,7
197:22
198:9,20,21
201:17,20
202:2
221:16
233:23
239:18
241:8 242:2,
3 278:16
282:11
287:9
291:17
292:4 299:8
302:10
312:18
320:1

**preventing**
326:10

**previous**
79:11 150:5
176:21
240:23

**previously**
279:5 300:7

**pride** 32:20

**prior** 24:16
71:20 72:2
75:21
107:14,20
108:12
166:21
217:16
229:16

**prison** 26:20
27:21 45:6
53:9 54:14
63:8 84:11
93:13,15
94:15,20
99:10,12,23
100:8,9,12,
22 102:5,7,
19 103:7,21
104:17
105:2 106:6,
11 107:2,5
109:11
110:18
111:4,10
120:1
125:22
126:13
127:5,14
128:2,24
130:6
133:15
135:22
136:2 146:4
147:17
149:5,7,13
150:12
156:21
158:11
168:16
174:3 178:5
227:16
233:7 234:4,
5,9,15,17
237:21,22
242:5,15
243:1 249:6
254:6,15
261:13
262:19,23

263:5 265:6,
13 266:14
267:22
268:2,5,7
271:19
273:3,14
274:16
275:2,3,7,9,
20 276:11,
17 277:20,
21,22
279:16,19
280:3,18
281:6,7
283:15
285:22
286:12
287:14,21
292:10
293:9,11
295:1,5
297:8
301:23
302:12,17
313:16
314:13
315:5,7,17
321:11
322:18,21
328:20

**private** 12:23
135:7
178:14,16

**privilege**
63:4 133:15
206:10

**privileged**
208:9

**probation**
226:18

**problem**
108:3,6,8,
21,22
109:23
118:24
119:1
120:13,22
121:1,8,10,
11 129:6,14,
18,22 130:3
145:3
180:22
187:9
240:20
273:23
274:8,13

**problems**
148:4,7
179:18
274:10

**procedure**
248:6

**proceed**
139:15

**proceeding**
18:24

**proceedings**
57:3 181:12
224:1,11
231:1,3
329:16

**process**
12:22 38:11

129:19
177:11
251:15
274:18
285:8

**processing**
274:9

**produced**
80:13 244:6,
10 246:12
257:23

**production**
77:12,14

**productive**
271:14

**professional**
13:5 28:4

**profiled**
262:2

**program**
108:1,2,5,18
127:13
133:6,9
134:6
268:24
269:1,5,9,
10,12,14,17,
19 270:2,5,
12,16
271:10,13

**programming**
134:4

**programs**
129:4,7,13
134:8,11
271:18

**Progress**
250:7

**Project**
58:21 59:1
60:17,18,23
61:10,20
62:2 63:4
64:22 65:21
68:14 94:15
249:5
257:16,21
278:18
293:9
301:22
302:10,20
303:1
305:22
307:11
316:20
317:11
323:17
326:21
328:17

**promised**
287:13

**prompted**
197:19

**pronounce**
13:17

**pronunciation** 13:13

**proof** 160:21

**properly**
10:10

**prosecution**
326:24

**prosecutors**
325:11,15

**Prosequi**
324:11,18

**protective**
180:24

**proud** 72:9
114:3
116:12
316:22

**proudest**
274:23

**prove** 265:16
307:8 326:7

**proved**
306:24
307:5,20
309:12

**proves**
307:16

**provide** 38:7
40:18 44:9,
11 214:4
320:12

**provided**
39:5 242:8
249:20
270:13
318:12

**providing**
40:16

**Prozac** 235:2
238:18,19

**Psychiatry**
255:21

**psychological** 105:9 242:4

**Psychology**
250:21
252:7 256:8

**PTSD** 27:22
28:3 170:17

**public** 91:5
313:11,14

**pull** 163:19

**pulled** 166:7,
11

**pulling**
194:12

**pulls** 181:14

**puppy**
192:24

**purchase**
178:7,8

**purchased**
176:4,7,11,
15

**purports**
289:22

**purpose**
141:3

**purposes**
17:4 19:20
38:16 58:7

63:21 68:2
74:18 77:5
78:21 80:8
111:18
131:9 136:7
154:3
158:19
168:20
184:14
189:18
198:15
214:24
224:16
236:22
243:15
246:17
250:3
258:23
266:5 284:5
321:22
323:22

**Pursuant**
58:12 68:9

**pursue**
173:11

**push** 255:6

**put** 32:20
73:6 77:11
107:13
137:6
164:14
179:23
186:17,20
188:10
200:7
222:15
234:20,23
237:21
239:11
275:23
277:21
285:9
297:13
326:21

**puts** 99:17

**putting**
46:20,21
47:5 63:17

_____

**Q**

**qualify**
293:13

**quantity**
282:21,24

**quarters**
231:24

**question** 8:2,
8,17 9:2,14,
22 10:11
11:22 17:19
18:15 20:6,
11 22:23
23:3 24:1,3
25:15,16
30:16 31:6,
21 39:19,21
40:5,21,23
41:10,23
42:3,17,21,
22 43:15
48:14,24
49:21 50:4,

9,10 51:19
56:7 63:11,
16 65:1 66:9
71:22 83:10,
14,18 85:9
87:12,20
88:21 90:8,9
96:3 102:23
106:22
114:17,21
118:14
120:3
125:21
126:4,12
135:19
157:9 158:5
160:20
163:10
166:19,23
174:5
176:24
178:18
180:10
196:22
203:20
205:18,19,
23 206:11,
17 208:6,15,
17 209:5,10,
20 211:2,4,
6,24 212:3,
7,8,12,14,22
213:1,6,7,8
214:13
215:8,10,11,
12,17 219:5
220:8
228:19
229:12
232:19
239:10
253:14
258:11
260:11
262:6,11,13
264:1
265:22
266:22
271:5
272:18,20
277:13
284:24
285:1
292:23
293:20
294:19
296:21
297:3 299:4
304:11
306:6 307:2,
9,19 310:4,
7,8,10 312:3
314:23
319:16
322:10

**questioned**
141:11,17
145:7

**questions**
7:11 10:3,6
17:14 38:5
40:16,19,24
41:9 88:20
106:7,19
107:14,17,
19 109:1
131:13

170:20
187:16
236:2 242:2
329:5

**Qui** 96:7

**Quiana**
98:21

**quick** 131:13
174:10
224:21
296:1

**quickly**
77:10 244:5
246:10
320:1

**quiet** 95:19

**quotation**
65:19 69:7
115:6

**quote** 60:1
115:10,11
118:24
119:1 123:8

---

R

---

**R.C.** 58:12

**racial** 62:22

**Raheem**
253:15

**rain** 192:12

**raining**
192:11
195:6

**raise** 206:14

**raised**
205:10

**ramifications**
124:20

**Ramsey**
52:6,7,10,
11,12,13,17,
19,23 53:5,
7,8,17 54:5

**ran** 82:5
84:3,9
92:15,23
202:22
274:18
275:14

**range** 260:5

**rate** 269:12
283:14

**re-** 186:24

**reach** 61:9,
19 94:7
99:10,13
229:17
230:3
279:17

**reached**
94:23
230:21
254:14

**reaction** 90:9

**read** 12:4,7,
12,14,17

22:21 51:5
54:10 58:1
65:17 69:6
83:6,7,21
112:11,13
117:20
119:4 126:2,
6 140:11
185:15
190:9 215:6
224:21,22
247:3,6
250:8,23
251:17
256:3
266:20
267:24
286:20
290:15,17
303:14,15
320:18
325:18

**Reading**
113:2

**ready** 112:14
241:23

**real** 45:17
50:3 173:11
220:21
224:21
242:17

**realities**
121:6

**realize** 175:7

**realm** 298:15

**reason** 9:2,
17,19 72:11
82:15 106:3,
9 107:19
114:10,18
116:17
117:1 153:6
175:8
187:24
204:22
205:14
207:5,8,11
210:11
231:5 232:9
241:9,16,18
247:9,11
256:18
309:23

**reasonable**
326:9

**reasons**
15:20
111:12

**recall** 9:21
10:15 12:21,
23 13:12
14:1 16:12
18:1,2
20:21,23
22:15 26:10,
12,14,23
27:23 28:15
29:15,18
30:1,14
31:1,11,15
32:12 34:3,7
35:19 36:14
42:13,24

43:3,19 44:7
45:18,19
46:3,5 47:17
48:1,9,15
49:7,18,19,
24 50:1,4,5,
7,11,23
51:2,13
54:22 61:23
62:14 63:5
66:4 69:21
70:10 71:13,
14,16 72:1,
2,4,5 75:17
76:5,13,14
77:2 80:3,5
81:1,7,11
84:19 87:17
88:4,10,15
89:3,4,6,7,9,
13 90:11,12,
19,24 91:6,
7,15 92:3,
10,21 93:10
94:5,9
96:12,15
97:15,23,24
98:4,7,12,
15,19
104:22
106:2
107:16
111:15
113:14
114:5 116:1,
3,4,5,6
118:1
121:14,21
122:6,10
124:2,5,14
125:15
126:23,24
127:3
129:16
134:9,22
135:3 138:1,
18 140:8
141:8,24
142:4
143:16
147:4
148:11
149:9
152:12,17
155:20,23,
24 156:15
157:12
158:4
160:22
164:23
166:9,20,24
167:1 169:6,
8 171:8,10
172:8,10,11
174:8 176:2
177:13
180:14,15
181:10
182:5
184:21
185:11
186:18
190:21
196:20
197:9,10,11
199:17
200:21

202:8 204:7
213:11
214:2 218:3
219:14
220:4,9,12,
19,23,24
222:9 227:4,
6 229:8,14
230:22
231:23
235:1,2,3
236:15,17
237:24
240:1,17
242:9,13
246:8,9
248:24
249:22
252:21
256:15,17
257:8,12
258:5 259:8
264:9
267:21
269:18
270:3,7
271:11
272:13,14
274:15
279:11
280:24
281:12
282:18
284:2
287:19
288:1,2,5
289:19
296:6,8,19,
20 299:15
300:10,11
309:2
314:24
315:9
319:23
320:3,13
325:2

**recalling**
218:8

**recant** 220:3

**receive**
104:3 242:4
247:23
251:6,7

**received**
238:4
243:22
251:4 252:8

**receiving**
233:1 238:1
242:11

**recent**
299:12
326:10

**recently**
80:13
262:19,24

**recess** 56:19
102:13
130:13
174:14
229:1
295:20
319:1

**reckless**
178:3

**recognize**
25:22,24
30:17 31:6
38:23 39:1
58:12,14
64:3,11
68:24
132:20
136:11,13
158:23
203:22
224:19
247:7,8
259:10
266:18,23
267:1,10,13
310:16
311:2,4

**recognized**
31:4 190:15
193:20,22
305:23
310:21

**recollection**
23:9 51:13
52:5 98:9
138:8 147:5
238:18

**recommenda
tion** 269:14

**record** 6:11
56:18,22
74:22 76:9
77:11,23
79:3 83:11,
12 102:9,12,
18 130:9,11
131:6 132:4
136:11,16
168:24
174:13,17,
21 175:1
177:24
214:3
227:24
228:24
229:4
270:16
291:2
295:19,23
303:15
312:22
318:24
319:3
329:13

**recorded**
6:10

**records**
257:19
270:24
302:20

**red** 264:16

**refer** 133:17

**reference**
257:11

**referred** 36:9
80:12 251:1
263:16
276:2

**referring**

27:7 87:6
95:1 252:2
259:5 320:5

refers 112:19

reflect 8:12
121:12

refresh 23:9
98:8 113:2
138:8
238:18

refusing
213:6

Regina 85:14

regular 99:7
139:9 155:4,
5

regulations
137:15

Rehabilitatio
n 80:22 81:2
243:23

rekindle
93:24

related 148:9
304:17

relating
145:3

relationship
85:20 86:3,
4,8 95:15
99:11 215:4
254:5,18
278:21,22
279:1,2,3,9

relationships
93:24

relatives
73:19 253:6

release
82:13
103:12
133:5,9,14
134:7
135:17
136:17,18,
19,22
137:15
140:21
156:20
191:9
231:21
265:24
266:9
268:22,24
269:5,10
283:19
284:1,9

released
94:14,19
136:2 137:3,
22 138:12
139:15
149:5,7
178:4
189:14
190:23
254:15
266:13
293:8,10,24
294:4,15
296:4

302:12,17
306:21
322:18,19,
21 326:1

releases
323:6

relief 58:11
59:3,5,7,8
68:9

relive 255:3

reliving
236:1

rely 9:6

remain
273:18

remains
325:22

remarried
278:19

remember
8:13 18:23
27:3,11,15
28:14,18,19,
22 29:6,12,
14 30:5 33:7
35:1,10
36:5,6,8,10
38:5,8 45:20
46:17 48:20
50:17 53:12,
24 54:9
67:15 70:24
72:12 73:13,
16,18,20,23
74:2,4,15
75:15 76:6,
24 78:16
82:7,11,15
87:7,8
88:18,22
89:20,22,24
90:6 94:3
95:17,22
96:14 97:10
101:6,7,9,13
104:6,24
105:7,8,12
113:20,23
114:7
118:12
119:19
124:17
127:16
129:17
134:19
135:11
139:12
142:2
143:24
144:20
152:14,15,
20 155:8
157:21
161:1 170:8,
18 171:14
174:2
175:11
176:14
177:14,17,
19,24
178:12
179:19,21
183:8 188:8
189:4,12

192:16,23
193:1
194:15
195:3 196:7
202:6,9,11
213:13,14,
16,17,20,21,
24 223:21,
22,23
224:11
229:18,22
230:2,7,9,
13,19,24
231:8
237:24
238:2
243:10
249:23
251:21,23
263:20
270:21,22,
24 272:16,
21 273:2,3,7
274:19,21
279:12
283:11
288:23
289:3,5,8,15
295:14
299:9
301:24
303:8 310:9,
24 315:15
320:24
321:1,4

remembered
272:23,24

remembering
72:22

remind 8:14

removed
89:19

renovation
47:24

rent 152:22
153:3,4
217:1

rented 152:5
154:17

repair 47:24

repeat 126:4
297:2
304:11
322:10

repetition
125:5

rephrase
8:19,21,23
145:5
212:10
213:3

replacing
47:4

replied 125:7

report
131:20
138:6
139:16
141:9,16,21
143:21
145:7 174:7

236:6

reportable
143:15

reported
146:20

reporter 6:8
7:23 303:17,
20 304:1,4,7
322:6

reporting
6:10 146:18

reports
144:1
146:23
147:6

represent
17:7 19:23
39:17 51:8
78:8 84:21
112:2
136:15
168:23
243:21
249:19
261:7 284:8
290:18

represented
57:2 61:5,6
311:5,8

representing
64:21

represents
58:20
267:15

reputation
123:8,24
242:1

request
257:19
268:24
292:17
301:24
302:20

requested
240:4
303:15

requesting
181:8 240:6

Requests
38:23

require
139:10

required
139:8

requirements
139:2

requires
326:7

research
28:7

reserve
329:10

residence
87:15,18
144:22
148:8
199:10

residences
39:24

residential
156:2

resolution
93:11

resolved
76:22
175:23

resonated
62:8

respect 90:7
175:5,9
183:7
276:17

respectfully
268:24

respects
167:12,14

respond
273:14

responders
149:4

responds
40:9

responses
38:7,22

responsibilit
y 145:17
150:18

responsive
77:15

rest 26:7
153:8
157:23

Restates
176:21

Restaurant
161:10,16

restaurants
164:20

resting
229:13

restrain
275:17
277:10

restraining
274:17
275:22

restraints
175:6

restriction
252:4,12

result 252:23
323:11,12

retry 327:1,3

return
202:17

returnable
77:16

revealed
112:22

revealing
96:2

reverts
135:23

review
11:19,21
17:16 65:6,
9,11 236:15
243:24
325:20

reviewed
12:2 59:11

Revised 68:9

revoked
174:6

reward 103:7

Reynolds
21:14,24
23:1,16 40:9
151:22
152:5 154:8
192:14
195:11,13
197:15
216:15
217:5
264:10,12,
16

Rhonda
12:11,12,14
24:14 30:4
50:21 51:5
190:5,8,15
191:5,16
203:11
230:23,24
231:2,22
232:11
315:1,4,6

Riccardo
97:16
296:24
297:11,24
298:3,12,16,
17,19,22
299:1,16
300:4

rich 35:2,6

Richard 6:2,
4,15 7:2
10:18 24:13,
17,19 35:3
75:2 78:1
79:6,8 96:24
97:2,3 112:3
136:20
161:12
169:1
184:19
186:10,15
189:22
190:10
191:5,16
203:22
216:14
217:4,6,7
219:16,18,
19,22 220:2,
10,13,14
221:2 237:2
246:23
264:21,23
265:6,12
266:9
296:19

roofing
46:12,15,24
47:16 48:3,8

room 7:16
54:1 247:17
281:24
282:1

rough
167:23
282:11
289:7,8,9

roughly
45:22 165:1,
4,5

route 44:16
293:18
314:5

routes
313:23
314:2,6

routine
187:22
188:1,6
240:3,6

rude 56:14
210:18

rules 7:20
86:21 87:6,8
133:24
137:15
138:19,24
175:8

ruling 251:19
326:10

rulings
292:17

rumors
328:22

running
179:14,16
275:12

runs 82:1

Russian
152:20

—————
S
—————

sad 111:5

safe 70:6
165:21
270:11

salary 134:2

sale 28:17
71:3 117:19,
23 118:3

salmon
303:23
304:1,14,15
305:11,15

Sam 209:21

sample
236:19
303:9

sandwich
236:4

SAPP
161:10,16

297:4,8,24
298:4
299:19,21,
24 329:12

Richey 35:2

Rick 26:3,5,8
28:16 29:2
31:9,12
50:8,24
51:10 53:5
176:18
180:13
185:19
186:6,11,14
190:5
203:12
231:22
232:14
256:14
277:14

rid 179:21

ride 293:15
313:18

riding 179:13
313:22
314:9

ring 97:17

rival 230:8,
11

Road 34:10
157:6

rob 54:12
182:13

robbed
184:5
219:22

robbery 18:5
20:24 21:3
24:16 30:4
51:18
105:11
143:18
149:14
159:12
180:8,9,18,
20 181:21
182:12,18
205:11
225:18
226:3
256:10
264:24
265:6,14
297:1,9,12
300:1,5
326:2 328:3,
23

Robin 138:7

role 31:24
44:12
291:24
292:2

Rollin
311:17,18,
19,20,21,23
312:2,4,6,
12,21

roof 46:21
47:5,10,12

roofer 46:7

164:20

satisfied
46:22

Saturday
187:24

save 134:3,
24 293:2,7
313:19

saved 276:9

savings
135:6
316:11

scam 175:13

scared 91:24
231:4
281:15

scaredy-cat
91:24

scenario
107:9 109:8,
19 197:17

scene
303:10
304:23
305:3
307:13
309:11

schedule
75:10 169:3

school
32:14,19,23
33:4,14
34:9,10,11,
12,15,20
36:16,19,21
37:10 42:15
43:1 44:13
45:11,15,18
46:2 67:6,14
94:1,2,4
95:9,10,12,
16,18,22
96:11 97:4,5
148:16,19
175:21
230:8,9
242:2
263:11,12
279:7,8
297:23
311:21,24
312:9,10
318:6

schools
318:2

scientist
307:10

scientists
307:11

scream
223:24

Screening
237:2
240:19

screens
171:17

search
112:22
283:3

second-
guess
222:12

section 41:6
118:20
126:2
139:14,22
190:9
251:24
296:17

sections
296:22

security
103:14,17,
18 104:1
133:3

seeking
207:14
265:24

self-
employed
156:9,10

self-
explanatory
239:5

sell 31:12,16
43:18 49:12
50:7,21
52:17,23
54:21 55:16
69:23 71:5
96:21
113:18
124:12
156:17

seller
178:14,16

selling 31:23
32:4 43:7,8,
14,21 44:4,
15 48:2,7,
11,13,22
113:8 281:1

semen 303:9

send 57:10
286:22
289:17,18,
20 321:3

sending
174:3 288:2

Senior 138:7

sense 46:19
56:14
161:18
306:24
312:7
321:15

sentence
80:19 81:20,
22,24 84:6
125:17
126:5,10,11
227:9,11,21
252:1
325:18

sentenced
20:12 80:18
225:5,6
227:8,15
233:5,21
278:9

sentences 78:11 80:21 124:6

sentencing 78:9 80:11, 15 81:16 227:24

separate 72:17 82:18 173:1 191:23

separating 72:19,21

separation 278:2

September 132:5 159:9 160:1 161:21 267:16

sergeant 251:15

series 131:15 286:8

serve 20:13 81:9 107:7 233:6 278:9

served 81:19 82:6

service 46:8 68:18 254:9 267:15 284:10

services 111:24 180:24

serving 78:16 81:1,7 82:7

Session 131:1

sessions 127:22 246:6

set 38:22 94:22 133:24 158:6 199:4 306:12 322:24

setting 7:16 133:16

setup 157:17

severe 125:18,23 126:6,14

sex 278:24

shady 57:17

shame 73:21 90:6

shape 62:19

sharp 27:20

shave 233:2 237:20 238:9

she'd 292:9

sheet 189:21

shell 305:5, 7,9,11,19 307:12,20, 24 308:7 309:11,19

shift 155:4,5, 7,9 282:3 283:17

shingles 47:5

shocked 182:11 224:2

shoe 196:2

shoes 37:8

shoot 204:1

shooter 196:12,14, 18,19

shop 197:17 199:6,9 200:10,15, 18

shopping 188:14

short 56:19 102:13 174:14 229:1 260:18 295:20 298:1 319:1

shorter 298:1,2,3,17

shortly 156:20 178:1

shot 24:8 54:11 180:13 184:5 196:4 203:8,12,22, 23

show 110:11 148:17 181:11

showed 305:19 306:7

showing 132:5 270:5, 9 322:15

shown 40:24 170:4

shows 189:23 307:23 308:2

shushing 193:2

shut 283:16

Shwartz 311:8,11,12 319:6,10 320:16

shy 95:19

Sias 209:21 210:4,5,6

sic 153:17 154:7 169:21 287:7

side 149:1 181:14 278:15

sight 30:4

sign 288:6

signature 58:18 64:16 137:8,9,10, 18,20 250:13 256:1 267:2, 5,8,12,14 284:13 286:4,5 288:12,15 289:4 290:19 329:10,14

signatures 267:10

signed 61:3 68:13 266:9 290:23 325:10

significant 76:6

similar 17:24 105:8 251:8

simple 32:13 242:18,22 306:6

simply 322:11

Sinclair 157:5

single 19:17 33:9

single-family 153:24

sir 29:4 70:4 140:20 146:22 147:7 172:13 176:17 193:19 208:17 240:8 249:13 279:21 298:6,20,24 324:20

sit 143:24 164:3

sitting 128:23 147:17 203:24 205:8 299:23 300:3

situation

150:16 182:6 183:7 222:12,16 293:19 294:21 318:11

skin 260:15, 16

skip 289:21

sleep 11:17 188:13

slipped 56:12

small 24:21 112:22 173:9,13,16 191:22 299:8

smaller 193:8

smart 166:16

smear 110:6

smearing 110:18 111:1

Smith 243:9 244:1 246:23 247:14 248:7,8 249:17,20, 24 256:13, 19 257:7

Smith's 250:13 256:1

smoke 32:23 33:3

smooth 196:2,7

smoothly 7:21

snapshot 165:6

snatched 248:23

snitch 276:14,16 282:7

snitches 276:16

society 268:23

sold 43:16, 17 49:15,20 51:1,9 53:2 71:7,10 89:8 124:8 125:12

somebody's 91:4

someone's 229:22 260:23

son 16:1,8 85:10,12 99:12,15,20 100:1 141:4

142:14,18, 22 143:3,9, 13 147:8 148:4,12 149:6

son's 16:2 102:4

Sonora 22:8, 13 23:5

sooner 305:14

sort 37:13 59:10 166:12 312:6

sorts 94:13 105:17

soul 26:7

sound 121:18 122:19,23 123:3 132:9 243:11

sounded 92:2

sounds 26:17 132:12 245:23,24 247:19 318:22 327:5

source 18:3 96:5 161:5 206:19

sources 161:3

Southern 6:6

speak 7:24 99:15,19 192:6 197:23 219:11 229:22 231:1 317:24 318:17

speaking 129:8 175:16 291:7 296:2 315:16 318:6

special 138:15

specific 17:14 42:20 48:16,20 50:18 91:3 107:16,18 139:2 142:5 156:22 223:20 304:24

specifically 43:1 112:7 300:8

specification 225:8,11,18, 22 226:1,4,7

Spectrum
6:10

speculate
161:7 163:9,
24 164:17
232:21

speeding
251:8

spell 11:4
15:5 16:4
314:19

spelled
287:6

spend 92:5,7
101:10
188:15,16,
18 234:5

spending
92:10 200:2

spent 134:24
222:10
276:22,23
277:23

sperm 303:9,
23 304:1,14,
15 305:11,
16

spin 107:24

split 153:1,2
294:10

spoke 14:4
177:21
220:13
237:20
256:8 257:9
300:8

spoken
12:24 13:23
15:11,12
210:3,6,13
316:19

sponsor
139:8,11

sports 37:5
275:2

spot 181:4

spots 152:3

squatting
47:6

St 169:10
170:1

stabbed
295:4,5,6,13

stable
150:13

staff 105:2
126:13
234:10
246:7

stage 188:23

stages 43:24

stamp
111:21
215:23
244:6

stamped
184:18

stamps
293:12

stand 20:17
86:10

standing
195:1 269:6,
10

stands
237:23
326:8

start 7:19
32:7,13
33:19 44:4
95:11 103:9,
16 121:20
128:5
129:10
223:1,3,5,10
293:3

started 33:20
43:6 48:7,
12,22 69:22
103:18
129:8
166:17
224:10
227:16
231:14
313:19

starting
22:21 83:8
175:1
222:23
259:16

starts 171:22
242:3

state 10:17
42:3 77:24
82:18
100:12
101:3
110:13
111:22
112:1 134:8
135:8
136:12,17
140:13,18,
23 148:16
170:16
184:18
317:17,18
325:21
326:1,10,19
327:4,5,6

State's
325:22
326:19

stated 119:2
140:15
208:24
301:14

statement
98:18 114:6,
8,11,19,23
116:10,17
117:11,12
118:10
122:1 123:2,
4,9,12,19
158:24
159:8 161:9,
20 200:14
214:5

stamps
217:10,11
228:9
285:20
310:13

statements
123:10

states 6:6
144:5 253:7

stating
300:11

station
194:1,2,9,12
219:21

status 85:1

stay 103:10
104:17
151:10
153:15
172:2 191:5,
16 294:11

stayed
21:23,24
147:21
151:13
152:2
216:19,21

staying
23:21 87:18
103:8
216:22
264:12,15

steady
187:22

steel 103:24

steering
179:20

stellar 175:1

stemmed
275:3

step 129:13
232:1

stepchildren
291:19

stepfather
292:8,11,13

stepmom
150:19

steps 129:16
270:1

stick 278:15

stipend
318:7

stipulations
28:20 177:1

stood 31:8

stop 194:7
224:1

stopped
48:11 173:9
192:7,8
193:23
217:7
218:20

stops 172:20

stories
119:22

story 120:8
202:17
203:6 317:6
318:11

straight
145:18

straightforwa
rd 166:24

strategic
111:11

strategically
241:13,18

strategy
222:13,15

street 6:3
30:18,21
105:10
143:18
147:1
149:14,15
153:17
154:7
159:12
167:14
168:4
169:10,12
170:1 180:8,
18,20
192:10
197:14
264:24
265:6,13
297:1 326:2
328:3,23

strength
249:8

stretch 319:5

strict 86:21
87:6

strike 47:13
71:5 84:16
126:22
139:6
143:11
206:4 272:6
324:16

strip 280:10,
11

strips 280:16
281:5

striving
155:15

structure
255:8

stubs
164:17,19

stuck 305:15

students
317:1

stuff 43:23
47:7 118:11
130:4 156:3,
7 164:12
179:22
187:22
188:13
236:1 255:4
263:24

173:2

280:1
302:21

stupid
308:20,24

subject
112:9,18
113:1,7
115:12,14
117:14,18
118:7,23
121:9,16
125:17
126:6

subject's
118:21

submit
251:10
285:1 290:7
302:23

submitted
62:23 65:3
68:16,21
251:9 290:2
301:24
302:20
303:2

submitting
63:12

Suboxone
280:10,11,
16 281:5,17

subpart
139:3,14
141:9

subpoena
77:16

subpoenas
321:3

subscribed
216:7

subsection
117:10

substance
75:10 79:23
129:15
169:2,4
240:19

substantive
131:19

success
269:12
283:14

successful
101:9
312:18

successfully
272:5,7

sudden
44:21

suffer
242:19,23,
24

sufficient
8:23

sufficiently
10:7

suffocate
235:22

236:3

**suggest**
44:13 81:14
138:11
206:6,7
207:23
208:12
209:18
210:19
298:8

**suggested**
205:15,24

**suggesting**
62:18

**suggestion**
264:23

**suggests**
97:24
296:23
297:10
299:24

**suicidal**
233:24
234:18
235:5,9
238:23
239:11,14
242:21

**suicide**
110:6 234:3,
7,10,20
236:9
239:12,14
240:10,11

**suing** 16:22

**sum** 219:20

**summer**
216:16,17
217:4

**sums** 165:15

**super** 77:10
244:5

**supervision**
140:2,10

**supervisor**
14:24

**support**
181:2 214:4
252:3,11,13,
17,21 254:4
285:18,21
287:12
289:3,6

**supported**
287:11

**supporters**
284:21

**supportive**
253:11
254:22

**supports**
125:5,7

**supposed**
28:24 177:1

**surgeries**
192:18
193:4

**surgery**
101:12

**surprise**
196:1
270:15,18,
19 271:2,7

**surrounded**
268:4

**surrounding**
249:1

**survive**
280:5,8
281:3,5
283:16

**suspect**
180:8 206:1
207:20
208:13

**suspicion**
283:6

**SWAT**
183:24

**sweat** 326:22

**sweet** 148:2

**sweetheart**
167:5

**swore** 18:24
19:3 217:11,
12

**sworn** 7:3
122:1 216:7

**Sykes** 210:4

**sympathetic**
93:5

**symptoms**
28:8

**synopsis**
325:20

**system**
102:24
103:5,7
119:18
121:5 133:4
135:6,9
183:17
280:4

———

**T**

**taboo** 124:19

**takes** 278:12

**taking** 7:23
15:18 46:20
47:7 183:7,
21 235:2
238:19
239:8
272:14,24
273:2

**talk** 14:8
22:4 73:4
75:11
140:13
191:24
192:12
194:18
195:6 198:2
201:12

209:21
217:7
218:15,20
227:12
230:4,23
231:5,10,13
232:2,9
233:4
241:12
246:7 249:3,
13 253:1
316:24

**talked** 12:20
13:10 14:2
16:10 22:1,2
96:8 133:4
176:4 186:1
192:8,15,18,
22 194:20
198:4
201:21
236:13,16
286:8 295:1,
2 296:23
300:7 321:3

**talking** 11:14
12:1 30:3
110:22,24
129:9 133:3
163:4
187:16
195:2 198:7
200:17
207:12
230:14
239:19
296:20
320:8 321:2,
4 324:19

**talks** 250:24

**tall** 26:7
197:22
298:5,18

**taller** 30:12
31:7 230:12
298:9

**tan** 112:23

**Tanoury**
6:19

**tears** 326:23

**tease** 142:18

**technical**
228:1

**telemarketer**
134:19

**telephone**
11:11
210:19
211:16,20

**Telhio** 159:1
163:20

**telling** 71:24
126:24
181:12
200:2
212:10
273:4,7
306:17

**tenants**
153:1

**term** 17:1
39:18 121:7
140:5

**terminated**
251:5,11

**terms** 72:20
197:1
200:12
231:17,20

**terrible**
153:23
165:18
193:4

**terribly**
205:6

**terrified**
231:3,4,10,
11

**test** 305:19

**testament**
249:8

**tested** 65:4
307:15

**testified** 7:15
18:11,13,17
23:12,15,18
27:1 28:11
51:4,9 62:7
185:1
191:21
202:4 203:7,
11 207:18
208:18
210:16
214:16
217:13
218:13,16
260:8
263:15,20
290:19
312:14
319:6

**testifies** 7:3

**testify** 9:18
18:15,19,20
221:1,3,7,9,
10,15,19
230:17
232:15

**testifying**
7:15 202:7,9
203:21
213:11,21,
24

**testimony**
12:8,13
18:22 19:7
20:1,5,8,19
28:13 34:4,5
48:6,10,12
73:9 114:7
119:13
165:7
176:21
203:2,15
213:10,12,
15,16,17
217:16
220:3,11
223:11
240:13,16
263:18

296:7,8
300:10,12
326:11
327:7,9

**testing** 64:1,
14 305:4
307:23

**thankful**
153:12
305:21,22,
23

**theories**
204:9

**theory** 82:6
204:13,21
258:13,15
328:9,11

**thin** 257:23

**thing** 8:9
9:13 17:18
32:3 53:12
192:22
250:9,24
277:1
285:12,13
309:8 323:8

**things** 72:20
94:13 104:6
105:17,21
109:2 128:3,
4 192:17
200:1
201:19
206:20
208:2
218:22
228:1,11,14
242:15
273:21
278:17
290:6 292:5
321:13
328:18,19

**thinking**
142:6,8
166:15
175:12
183:1 238:8

**thought** 20:9
25:15 32:2
99:23
106:23
128:8,15
137:2 146:6
167:6
188:10
196:4,9
197:1
201:18
204:4 220:7
223:4
232:21
234:3 255:5
258:16
278:1 294:7,
8,9 300:20

**thoughts**
233:24
234:18
235:6,9
238:23
239:11
242:21

**thousand**
135:20
166:11

**thrown**
293:11
321:11

**Thursday**
131:1

**ticket** 251:4,
6,7,9,10,16,
17,18,21
252:9 276:1,
3

**tickets**
315:14

**tier** 102:24
103:5

**time** 8:1
10:4,8 13:10
14:2,4
15:14,16,18
19:9,10,17
21:9 22:10,
23 25:7,9,13
26:9 29:7,11
31:2,16 32:1
33:6 34:17
35:8 39:24
42:3,13
43:4,8,21
44:5,8,21
45:17,18
46:1,2
47:17,24
48:2,16
49:24 50:17
51:20 54:14
55:19 56:18,
22 65:20
66:2 69:22
70:24 71:1
72:13 73:22
75:18 76:11
81:7,9 82:2
84:16,24
85:7,17,21
86:21 87:10
88:6 90:14
91:9 92:5,7,
10 98:1 99:2
101:10,22
102:1,12,16
106:19
114:19
115:12
116:9,12
118:4,6
120:11,21
121:13,14
124:4
130:11
131:6,17
134:17
135:17
140:21,22
141:10
143:14
148:14,21
149:2,18,19
150:1
151:22
152:13
153:15
154:13
155:19

156:14,16,
17 157:7,13
159:5 165:6
168:15,16
169:19
171:18
172:14
173:7,8
174:9,13,17
175:6,9,16,
22 176:3
177:9 181:8,
20 182:4
184:6 185:7
186:8
187:14
188:2,7,9,
15,17,19
192:17,20
198:12
202:22
204:12
206:22
208:4 214:3,
21 217:22
220:21
222:11
227:17,19
228:24
229:4,14,24
230:1,22
231:2,8
232:4
238:20
239:4 240:1
241:7,20
242:9,13
246:8
247:12
249:9,23
251:22
252:14,15
253:20,24
254:2,8
255:1,5
256:15,17,
21 257:2,8,
12 259:9
261:2,5,6
264:11
265:5,13,19,
20 267:21
268:23
269:7,18
270:3,7
271:8,11
272:13
273:10
276:22
279:8,9,11
280:3
281:12
282:18
283:3
287:19
288:19
291:17
292:6,20
295:7,19,23
297:8 299:4,
6,14 300:2,6
301:4,17
309:2,4
310:9,14
311:3
312:23
314:11,16,

17 315:15
318:24
319:3,23
320:4,13,16,
17 321:8
322:5,9
324:3
325:21,24
327:6,13,16
328:6,8,10

**times** 9:11
25:20 33:22
38:12 48:19,
21 69:9
111:7
179:15
180:3
222:13
231:9
241:13
252:16
276:24
281:19
295:6

**timestamp**
322:15

**timestamped**
250:16

**title** 78:3

**today** 6:16
7:11 9:10,18
11:16,20
15:15 28:13
48:21 77:19
89:20
143:24
164:3
218:17
259:12
291:17
299:17,20,
22,23 300:3
303:8
309:23
320:14
326:8

**told** 15:19
21:6 60:5,8
66:17,21
69:10
115:14
144:12
167:1 182:9
183:24
187:5,6,7,8
190:12
196:18
205:21
206:15,20
220:14
229:8,11
235:4
254:16
273:8 302:5

**Toledo**
317:17

**toll** 147:19
278:12

**tone** 188:3

**top** 117:10,
11 118:20
191:6 233:5
238:23

244:2,3,20,
23 255:17
277:21
322:14
323:2

**topic** 43:6
229:7

**Tor** 52:4
112:19

**total** 74:5
81:9,24 83:1
227:8

**touch** 14:13
150:20

**touched**
307:24

**touching**
247:24
308:7

**tough** 85:9
88:15,17
94:3 104:23
108:17
148:21
150:8
222:10
253:14
276:24
314:23

**track** 28:11

**Tracy** 26:15,
16 27:2
28:12 96:10,
14,16,21
176:5,13
229:17,18

**trade** 44:14

**trading** 98:6

**traffic** 175:5
251:9
315:14

**tragedy**
24:10,12

**trained**
307:11

**transaction**
28:17
177:12

**transcript**
8:12 19:24
22:17 83:4

**transcripts**
12:5 19:11
20:14 22:3
320:7

**transport**
71:2

**transportatio
n** 313:11,14,
18

**transporting**
71:15 88:5
124:20

**trauma** 45:6
149:24
170:17

**traveled**
116:7

**traveling**
217:6

**treat** 233:3

**treated** 104:7
276:17

**Treatment**
240:23
243:24

**trial** 18:11,
16,17,20
19:6,7,8,11
20:3,14
23:13,15
27:1,4 28:12
76:23 83:4
158:24
189:7
191:22
202:4 203:7,
16 213:11
221:2,7,9,
10,15 222:7,
13,18
223:17,18
229:16
230:4,14
232:7 254:1
256:9
257:10,14,
20 258:7
265:4
300:12
302:22
303:4 310:5,
12 311:6,8
319:7 320:7,
8,19 321:1
322:3 323:3,
11,13
326:11

**trick** 199:2

**triggering**
225:2,4

**trip** 142:1

**trips** 115:9,
13,23 116:7

**triumphant**
101:8

**trouble** 72:4
92:14 93:6
103:8,10
110:20
171:15
172:3
247:16

**truck** 313:5,7

**true** 121:24
182:15,17
216:18
218:22
249:21
257:4 291:4

**trust** 117:1
244:11

**truthful**
20:17 23:13
41:3 106:9
170:20

**truthfully**
9:18 18:19,
20 43:16

Tuesday
128:5

turn 20:4
39:12 41:5,9
59:17 64:15
65:13 68:12
72:17 83:5
101:11
117:9
118:19
125:4
132:13
138:4
183:10,14
187:7
207:14
255:9
259:13
287:1
296:16
317:3 323:1
325:7,17

turned 87:4
107:2
189:10
283:3

turning
187:9

two-hour
318:5

two-page
286:16

two-week
164:24

type 11:24
105:21
107:9 109:8
180:22
248:12
273:13

types 263:24
280:2

typically
318:4,5

―――

U

―――

U-R-A-N-A
314:20

U.S. 316:5

uh-huh 8:11
9:5 144:7
224:7

ultimately
257:17

unable 9:18
214:4

unambiguous 213:6

uncle 230:15

uncles 253:6

uncomfortable 103:23

underlying
105:20
186:3

underneath
284:13

understand
8:18,24 9:4,
8,16,21 10:2
16:14,17,19,
20,23 18:3,
6,7 21:5
23:24 40:22
59:6 62:21
72:19 81:21,
23 88:21
114:4,16
120:24
122:3 123:6,
17 140:9
165:19
191:8 211:8,
11,14
212:11,12,
13 231:20
234:21
261:16
268:7
280:20
297:20
299:5
319:16
320:16
323:10
325:6
326:13
328:7

understanding 21:1,2
24:4,6 82:3
84:9,14,15
129:13
145:21
161:15
172:22
205:9
226:15
233:16
245:3,11,18,
19,21
260:22
302:11,14
303:6,7
304:12,17,
19 305:9,18,
20 306:6,11,
20,22
323:13
325:4
326:16,18

understood
140:18
298:7

union 159:1
165:21

United 6:6
314:14

University
317:17,19,
22,23

unkempt
260:24

unpaid
315:14

unpleasant
209:1

unsure 212:4
220:6

unthinkable

24:10

untrue
111:10

untruthful
106:4

untruthfully
106:20

upbringing
75:23
167:23

ups 34:23
119:21

upset 183:20

upstairs
201:11

Urana 10:20
314:18,20

Urban 46:14
47:15 48:3,7

urine 168:16,
17 171:12,
16

urines 172:4

usage
108:12

user 32:11
115:9 116:2

users 50:15

―――

V

―――

V-A-N-T-A-S-
I-A 16:6

vague
245:19

valid 178:24
179:4
313:16

van 313:12,
13

Vantasia
16:2

Vantasia's
16:4

varied
155:11,13

varies 318:7

vehicle
193:18,21,
22 313:10

vent 318:12

venture
36:17

ventures
46:11

venue
317:11,13

venues
317:14

verbal 275:4

verdict
223:24

version
217:18

versions
217:23

versus 6:5
77:24
184:19

vest 240:11

victim
185:19
186:7,15
190:10

victims 24:8,
13 190:13

view 265:14,
17

vile 268:7

vindication
306:15

violate 206:9

violating
174:2

violation
231:16

violence
191:7 243:3

violent
192:21
274:17

Virginia
45:23 46:3
69:23 70:8,
11,13,16,19,
22 71:8,11,
12,15,18,20
72:3 73:15
74:12,13,15
82:24 84:17
85:1,8
87:13,16,22,
24 88:9
89:8,11 91:2
92:5,13
101:11,23
102:6,7,20,
24 103:8
104:4,17,21
105:5
110:14,15
111:23
112:1 113:4
116:16
117:8 119:7,
16 120:1
125:22
126:13,21
127:1,5
131:14
132:11
133:4,10,21
134:9,12,14,
15 135:2
136:3,12,17
138:17
144:9
145:15
146:4 147:9
154:20
167:9
171:14
178:5 254:6
315:18

visit 251:5,

11 292:9

visitation
247:16,18

visiting
252:3,12

visual 10:13

volume
109:15

voluntarily
128:11

voluntary
127:18

volunteered
187:18

―――

W

―――

wagon 94:16

wait 8:3
141:23
194:7
260:19,20

waited
251:12

waived
329:14

waiving 40:8

walk 107:6,8
159:20
165:15
197:20

walk-around
166:13

walked
197:18

Walker 6:18
7:9 183:4
185:2 186:2
187:4 188:5
205:15
206:7,13,19
207:1
208:12
209:7,17
210:17
212:16
214:5 228:8,
12

Walker's
12:7 184:23
185:8
206:23

walking
165:22

wall 110:6,18
111:1

wanted
56:11 57:13,
15 99:11
107:24
110:4 141:4,
5,21 191:10,
12 207:13
222:7 228:3
248:5 268:8,
9 321:2

wardrobe
37:18

239:12,14

**warning**
173:7

**warrant**
144:11
145:13,19
146:13,17
147:1
172:17
173:21
181:17,19,
20 182:12,
20,24 183:1,
9 184:7

**waste** 265:19

**watch**
234:20
240:11

**ways** 113:21
289:9
294:11

**weak** 106:13
235:12
236:9

**weapon**
226:12,16
227:3

**wear** 37:8

**wedge** 99:17

**weed** 119:1
121:11
170:22,24

**week** 122:18
150:15
171:24
188:12,15

**weekend**
188:18

**weekends**
188:12

**Weekly** 33:8,
10

**weeks** 47:10
165:2,3
166:10
172:2

**West** 45:22
46:3 69:23
70:8,11,13,
16,19,22
71:8,11,12,
15,17,20
72:3 73:14
74:12,13,14
82:22,24
84:17 85:1,8
87:13,15,22,
24 88:9
89:7,11 91:2
92:4,13
101:11,23
102:5,7,19,
23 103:8
104:4,17,21
105:5
110:14,15
111:23
112:1 113:3
116:15
117:8 119:7,
16 120:1

**work** 15:3,14
28:21,24
29:3,9 46:13
47:1,24
93:22
103:11
110:3 133:5,
8,12,13
134:7
154:22
155:10
161:20
172:3
176:19
177:4
178:23
183:3
188:11
229:22
269:5
278:17
293:16
294:12
305:22
313:13
314:10,11,
12,13,22
317:15
321:1,5
326:21

**worked** 45:1
46:7,8,14
134:19
145:20
154:21,23
281:24
314:13

**working** 48:3
61:23 63:3
155:6,11,12
156:8 165:8
312:19

**works**
119:20
127:15
133:14
223:17
239:6
270:12
312:12

**world** 90:5
242:17
293:6

**Wright**
215:23
216:1,2

**write** 163:16
246:24
287:15,23
288:24
290:10,20
325:19
326:6

**writes**
219:15

**writing** 62:16
215:21
247:14
271:1

**written** 23:20
121:23
122:22
139:24
140:16

191:4
256:19,24
287:2 288:3
290:23
291:5

**wrong** 76:1
129:12
144:21
157:14
202:2 204:1
205:7 276:6
277:15
321:17

**wrongful**
99:16
227:13
248:22
254:23
255:6,7
257:18
273:20
274:24
275:1

**wrongfully**
51:17 57:22
89:17 94:20
150:5 216:4
268:3
273:12
293:13

**wrongly**
20:12 53:10
116:20

**wrote** 60:11,
14,19
118:11,14
173:20
198:19
247:10,12
248:15
268:11
271:9
285:20
287:17
290:13

— Y —

**year** 27:17,
24 34:14
44:2,3,6,7
45:9 55:6
82:1,16
83:20 84:20
88:20 94:11
99:4 104:18
115:9 116:7
117:19,23
125:9,14
142:2,3
147:7
151:20
153:8
160:24
253:19
267:23
268:3 313:8,
9

**Year's**
308:19

**years** 16:9
19:9 20:7,9,
13,15 21:21
26:20 27:21

125:21
126:13,19
127:1,5
131:14
132:10
133:4,10,21
134:9,12,14,
15 135:1
136:3,12,17
138:16
144:9
145:15
146:4 147:9
154:20
167:9
171:14
178:5 254:6
315:17

**Whaley**
244:1

**Whetstone**
230:9

**white** 62:17
283:10

**who've** 57:1

**Whoop**
19:16

**wife** 11:2
150:17
223:24
224:4,9
248:1,15,20
251:2
276:23
316:12

**wife's**
247:19,21
288:15
318:16

**wild** 33:22

**Williams**
16:2

**window**
194:19,21

**winged** 87:3

**wished**
53:14

**wit** 75:11
79:23 169:3

**withdrawal**
165:24

**witnesses**
12:4 222:6

**woman**
138:2,3
167:3

**word** 16:15
177:22
244:12
260:22
272:11
303:19,21
306:10,14,
15 307:3

**worded**
90:18

**words**
228:10
306:20

28:1,23
45:4,7
47:11,18
49:23 50:18
51:17 53:11
59:15 87:8
88:19 89:18
113:8
115:14,24
116:20,23
117:17
118:9 125:8,
12 126:16,
18 145:9
147:18
149:23
163:14
164:2
185:13
189:5
204:14
213:15
216:3 219:7
225:5,7
227:8,17,18
233:6,21
234:5
259:12
261:4
263:10
268:1
272:17,19
273:20
278:9
281:23
295:10,11
305:24
317:16
329:1

**yelling**
183:22,23
198:3
207:16

**yellowish**
112:23

**yesterday**
77:13

**young** 31:19
34:21 44:1
86:24 92:19
95:19
124:18
130:1
148:17
163:18
175:4 178:2
276:12
295:9

**younger**
253:22,23
273:20,24
295:9