1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO


RICHARD HORTON,           :
                          :
       Plaintiff,         :   Judge Marbley
                          :
vs.                       :   Case No. 2:23-cv-3888
                          :
CITY OF COLUMBUS,         :
et al.,                   :
                          :
       Defendants.        :
                          :
                          :


    The video deposition of BRIAN HOWE, a

witness herein, taken by the defendants as

upon cross-examination, pursuant to the

Federal Rules of Civil Procedure and pursuant

to Notice of counsel as to the time and place

and stipulations hereinafter set forth, at

the University of Cincinnati, 368 University

Hall, 51 Goodman Drive, Cincinnati, Ohio,

45219, at 10:00 a.m., Tuesday, March 11,

2025, before Julie Patrick, a Notary Public

within and for the State of Ohio.

- - -

2

1   APPEARANCES

2
    On behalf of Plaintiff:
3
    ALYSSA MARTINEZ, ESQ.
4   (Appearing by Zoom)
    Loevy & Loevy
5   311 North Aberdeen St.
    Ste. 3
6   Chicago, IL  60607

7   On behalf of Defendants - City of Columbus
    and Brenda Walker:
8
    AARON D. EPSTEIN, ESQ.
9   Assistant City Attorney - City of Columbus
    77 North Front St.
10  Fourth Fl.
    Columbus, OH  43215
11
    On behalf of Defendant - Ohio Attorney
12  General:

13  RORY CALLAHAN, ESQ.
    Assistant Attorney General
14  30 E. Broad St.
    23rd Fl.
15  Columbus, OH  43215

16  On behalf of Witness:

17  BRIAN SPIESS, ESQ.
    Associate General Counsel University of
18  Cincinnati
    368 University Hall
19  51 Goodman Drive
    Cincinnati, OH  45219
20

21  ALSO PRESENT:

22  Paul Jahn - videographer

23  Douglas Girard - paralegal

24

3

1                S T I P U L A T I O N S

2        It is stipulated by counsel for the

3    respective parties that the video deposition

4    of BRIAN HOWE, a witness herein, may be taken

5    at this time by the defendants as upon

6    cross-examination and pursuant to the Federal

7    Rules of Civil Procedure and Notice to take

8    deposition, all other legal formalities being

9    waived by agreement; that the deposition may

10   be taken in stenotype by the Notary Public

11   Reporter and transcribed by her out of the

12   presence of the witness; that the transcribed

13   deposition was made available to the witness

14   for examination and signature and that

15   signature may be affixed out of the presence

16   of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

4

1                          INDEX

2    WITNESS          DIRECT  CROSS  RE-     RE-
                                    DIRECT  CROSS
3
     BRIAN HOWE
4
     By Mr. Epstein:          6                203
5    By Ms. Martinez:        190

6    EXHIBIT IDENTIFIED                       PAGE

7    Defendants' Exhibit 1 Complaint          20
     Defendants' Exhibit 2 Rule 26(a)(1)      27
8    disclosures filed on Mr. Horton's
     behalf in this case
9    Defendants' Exhibit 3 Application for    45
     DNA Testing
10   Defendants' Exhibit 4 transcript of      71
     trial
11   Defendants' Exhibit 5 screenshot of      114
     Franklin County Clerk of Court's
12   website
     Defendants' Exhibit 6 screenshot of      115
13   Franklin County Clerk of Courts
     search for Ricardo Diggs
14   Exhibit 7 Joint Stipulations of Fact     197

15   OBJECTIONS                       PAGE LINE

16   MR. CALLAHAN:                     12   24
     MR. CALLAHAN:                     22   17
17   MR. CALLAHAN:                     24   23
     MR. CALLAHAN:                     42   16
18   MR. CALLAHAN:                     43   24
     MR. CALLAHAN:                     48   21
19   MR. CALLAHAN:                     50    4
     MR. CALLAHAN:                     51   10
20   MR. CALLAHAN:                     51   16
     MR. CALLAHAN:                     52    4
21   MR. CALLAHAN:                     52   10
     MR. CALLAHAN:                     55   18
22   MR. CALLAHAN:                     59   11
     MS. MARTINEZ:                     85    4
23   MR. CALLAHAN:                     94   22
     MS. MARTINEZ:                    100    5
24   MS. MARTINEZ:                    103   12
     MR. CALLAHAN:                    103   24

5

```
 1     MR. CALLAHAN:                    105    20
       MS. MARTINEZ:                    115    16
 2     MS. MARTINEZ:                    116     6
       MS. MARTINEZ:                    126     1
 3     MS. MARTINEZ:                    132    12
       MS. MARTINEZ:                    133    11
 4     MS. MARTINEZ:                    135    17
       MS. MARTINEZ:                    136     5
 5     MR. CALLAHAN:                    175    21
       MS. MARTINEZ:                    180     9
 6     MS. MARTINEZ:                    182    21
       MS. MARTINEZ:                    186    21
 7     MS. MARTINEZ:                    187     7
       MS. MARTINEZ:                    187    16
 8     MS. MARTINEZ:                    187    20
       MS. MARTINEZ:                    190    11
 9     MR. EPSTEIN:                     192    11
       MR. EPSTEIN:                     194    19
10     MR. EPSTEIN:                     197     2
       MR. EPSTEIN:                     202    14
11     MR. CALLAHAN:                    215     2

12

13

14

15

16

17

18

19

20

21

22

23

24
```

6

1              VIDEOGRAPHER:  We're on the

2    record.  Would the court reporter swear in

3    the witness in, please.

4                   BRIAN HOWE,

5    a witness herein, of lawful age, having been

6    first duly sworn as hereinafter certified,

7    was examined and testified as follows:

8                CROSS-EXAMINATION

9    BY MR. EPSTEIN:

10        Q.    Good morning, Mr. Howe.  My name

11    is Aaron Epstein.  I represent the defendants

12    in this lawsuit, the City of Columbus and

13    Brenda Walker.

14              MR. EPSTEIN:  Before we get

15    started, we have counsel here remotely.

16    Alyssa, can you see and hear okay?

17              MS. MARTINEZ:  Yes, I can hear.

18    Thank you, Counsel.  This is Alyssa Martinez

19    on behalf of Plaintiff Richard Horton,

20    appearing by Zoom.

21              MR. EPSTEIN:  Do you guys want

22    to enter an appearance?

23              MR. CALLAHAN:  Oh.  Rory

24    Callahan from the Ohio Attorney General's

7

1    Office, here with Brian Howe in his capacity

2    as an employee of the University of

3    Cincinnati.

4              MR. SPIESS:  Brian Spiess, the

5    University of Cincinnati.

6    BY MR. EPSTEIN:

7         Q.    Mr. Howe, would you state your

8    full legal name and your business address,

9    please.

10         A.    Brian Church Howe, the

11    University of Cincinnati, College of Law,

12    2925 Campus Green Drive.

13         Q.    You are a licensed attorney; is

14    that correct?

15         A.    Correct.

16         Q.    Have you taken depositions

17    before?

18         A.    I've second chaired.

19         Q.    So you've attended depositions?

20         A.    Yes.

21         Q.    Have you had your deposition

22    taken before?

23         A.    Yes.

24         Q.    How many times?

8

```
1              A.    Once prior to this.

2              Q.    What was the nature of the

3        lawsuit?

4              A.    It was a civil rights lawsuit

5        brought by Ricky Jackson back in 2016, give

6        or take.

7              Q.    Who is Ricky Jackson?

8              A.    Ricky Jackson was a man who was

9        wrongfully convicted in Cleveland in 1974,

10       exonerated in 2014.

11             Q.    And then he brought a

12       Section 1983 action?

13             A.    Yes.

14             Q.    Okay.  So you have some

15       experience with depositions, but I'm going to

16       go through the basic rules because they're

17       easy to forget.  The main one is that you and

18       I cannot talk over one another because it

19       causes problems for the court reporter.  So

20       even though you know exactly where my

21       question is going to go, please wait until I

22       finish it.  And even though I'm eager to ask

23       you my next question, I will try to hold off

24       until you've finish your answer.  Okay?
```

9

1          A.     Okay.

2          Q.     And that's the second rule.

3    Verbal answers, please.  Heads shake don't

4    work.  Uh-huh and so forth.  An easy habit to

5    get into and I will nudge you if you forget

6    at any time.  Okay?

7          A.     Okay.

8          Q.     If I ask a question that you do

9    not understand please ask for clarification.

10   I'm happy to do that.  And if you don't ask

11   for a clarification I'm going to assume that

12   you understood my question.  Fair?

13         A.     Sounds good.

14         Q.     Is there any reason that you are

15   unable to testify truthfully today?

16         A.     No.

17         Q.     If at any time you need a break

18   just let me know, I'll be happy to

19   accommodate that.  The only thing I ask is

20   that, if I have asked you a question that's

21   pending, you answer the question before we

22   adjourn.  Okay?

23         A.     Fair enough.

24         Q.     Other than speaking with your

1    attorneys, what did you do to prepare for the

2    deposition today?

3         A.    I briefly skimmed through

4    e-mails in response to a document subpoena

5    and that's basically it.

6         Q.    The plaintiff in this case is

7    Richard Horton; you're aware of that, yes?

8         A.    Yes.

9         Q.    Richard Horton has had his

10   deposition taken.  Have you read the

11   transcript of Mr. Horton's deposition?

12        A.    No.

13        Q.    Have you read the transcript of

14   Brenda Walker's deposition?

15        A.    No.

16        Q.    Have you read any depositions in

17   this case?

18        A.    No.

19        Q.    And I should ask, are you

20   counsel in this case, the civil rights case

21   brought by Mr. Horton?

22        A.    No.

23        Q.    What was the scope of your

24   representation of him?

1        A.    I represented Mr. Horton in

2    post-conviction proceedings.  Specifically

3    requests for post-conviction forensic testing

4    and other motions, including a motion for a

5    new trial and a petition for post-conviction

6    relief, I believe.

7        Q.    Is it fair to say that your

8    representation of Mr. Horton has terminated?

9        A.    Yes.

10        Q.    In preparation for this

11    deposition today did you have any

12    conversation with Ms. Martinez or any of the

13    attorneys at the Loevy firm who are

14    representing Mr. Horton in this civil rights

15    litigation?

16        A.    No.

17        Q.    What's your understanding of Mr.

18    Horton's claims in this lawsuit?

19        A.    I haven't read the Complaint or

20    even seen the Complaint.

21        Q.    Do you have any understanding of

22    his claims?

23        A.    I can -- do you want me to

24    speculate as to what he filed?

1          Q.    No, if it's purely speculation,

2    then that's probably not going to be

3    profitable.

4          A.    Okay.

5          Q.    All right.  Instead we'll get

6    into it another way.  But before we do that,

7    let's do obligatory background portion.  So

8    can you take me through your education and

9    legal employment?

10          A.    Sure.  I attend the University

11    of Cincinnati, College of Law, from 2007

12    through 2010.  I passed Ohio Bar in 2010.  At

13    that time I was working for the Legal Aid

14    Society of Southwest Ohio as an Equal Justice

15    Works fellow.  I was there then as a staff

16    attorney through 2014.  In 2014 I began work

17    for the Ohio Innocence Project.

18          Q.    What do you do for the Ohio

19    Innocence Project?

20          A.    My title is a Professor of

21    Clinical Law and I am a staff attorney.

22          Q.    Do you hold a joint appointment

23    with the University of Cincinnati?

24                MR. CALLAHAN:  Objection.  You

13

1    can answer.

2         A.    I'm not sure what you mean by

3    joint appointment.

4         Q.    Are you on the faculty of the

5    University?

6         A.    Yes.

7         Q.    Are you an employee of the

8    University?

9         A.    Yes.

10        Q.    And then maybe what I need is

11   some clarification of what the relationship

12   is between the University and the Ohio

13   Innocence Project?

14        A.    The Ohio Innocence Project is a

15   clinic.  So we have students who are taking

16   part in the clinic for credit and assisting

17   in investigation and litigation of cases.

18        Q.    Now, there's an entity known as

19   the National Innocence Project; is that

20   correct?

21        A.    I don't know that it's -- I

22   don't think there's an entity called the

23   National Innocence Project.

24        Q.    I guess what I'm asking is, are

1    there other, in quotes, "innocence projects"

2    entities besides the Ohio Innocence Project?

3          A.    Yes.   There is an entity called

4    just The Innocence Project that is, I

5    believe, a clinic out of Cardoza Law School

6    in New York.  And there are other, you know,

7    innocence projects that are either legal

8    clinics through universities or otherwise

9    independent organizations throughout the

10   country.

11         Q.    Is there any legal or

12   associational representation -- strike that.

13   It was a bad question.  Is there any

14   affiliation between the Ohio Innocence

15   Project and the Innocence Project at Cardoza

16   or the other entities?

17         A.    There is a -- there's an

18   organization called the Innocence Network

19   that is sort of -- I'm not exactly sure of

20   the status of that organization, but it is --

21   they host conferences where Innocence

22   Projects from across the country will come

23   and that's the Innocence Network.

24         Q.    Is there any financial

15

1    arrangement between these entities?

2         A.    I don't know.

3         Q.    What is the mission of the Ohio

4    Innocence Project?

5         A.    The mission of the Ohio

6    Innocence Project is to investigate and find

7    cases of wrongful conviction, innocent people

8    who are convicted for crimes they did not

9    commit and represent them in trying to seek

10   their freedom.

11        Q.    I take from it your answer that,

12   if you were to find an inmate who was wrongly

13   convicted whose constitutional rights were

14   defended, but the evidence nevertheless

15   strongly suggested the person was actually

16   guilty, that is not a case that the Innocence

17   Project would assume, or would it be?

18        A.    We are only interested in cases

19   of actual innocence.

20        Q.    How many attorneys does the Ohio

21   Innocence Project employ?

22        A.    Six.

23        Q.    And how many people in support

24   staff positions?

16

```
 1          A.    One support staff, with a second
 2   starting at the end of this month.
 3          Q.    Are those administrative support
 4   staff people?
 5          A.    Yes.
 6          Q.    What about investigators?
 7          A.    No.
 8          Q.    The Ohio Innocence Project does
 9   not employ investigators?
10          A.    That's correct.
11          Q.    Does the Ohio Innocence Project
12   use investigators?
13          A.    At times.
14          Q.    Is there a particular person or
15   entity in the Greater Cincinnati area that
16   you use for that purpose?
17          A.    I mean, we've used many
18   different investigators.
19          Q.    Where does the OIP get its
20   funding?
21          A.    We are partially funded through
22   the University and also from private
23   donations.
24          Q.    If in a particular case OIP
```

1    needs to employ the services of an

2    investigator, who pays the investigator?

3         A.    It would go through our accounts

4    payable department at the College of Law.

5         Q.    For a criminal defendant or

6    inmate that the Innocence Project has taken

7    on, are there any costs charged to that

8    person?

9         A.    No.  I should say there are

10   cases where we would suggest to a person

11   that, you know, if they wanted some

12   additional piece of forensic testing, that

13   they could pay for it themselves or something

14   along those lines.  But it's -- we don't

15   typically bill clients in any way for the

16   services that we provide.

17        Q.    So there are some forms of

18   forensic testing that OIP would carry the

19   cost for?

20        A.    Yes, or that the -- that would

21   be ordered by the court under state law.

22        Q.    Now, you mentioned earlier that

23   you had -- one of the things that you did for

24   Mr. Horton was file a motion for a new trial

18

1   for him, correct?

2         A.    Yes.

3         Q.    And we'll talk about that later,

4   but I think we can agree that motion was

5   granted, correct?

6         A.    Yes.

7         Q.    And then the case ultimately did

8   not go to trial?

9         A.    That's correct.

10        Q.    If the case had proceeded to

11  trial, would OIP lawyers have stayed on the

12  case to do the trial or do you step back at

13  that point because you've accomplished your

14  goal?

15        A.    We had -- in Mr. Horton's case

16  the court had appointed local counsel, Larry

17  Thomas.  I don't have any experience as a

18  criminal trial attorney, but we had stayed on

19  as co-counsel.

20        Q.    There was a point around when

21  Mr. Thomas was appointed that you withdrew

22  from the representation; do you remember

23  that?

24        A.    No.

19

1      Q.    I take it then you can't tell me

2  why?

3      A.    No.  I can tell you in fact we

4  did not withdraw from Mr. Horton's

5  representation.

6      Q.    And I don't mean to suggest that

7  the Innocence Project withdrew from

8  representation.  My question was I believe

9  there was a notice of withdraw of

10  representation on your behalf specifically?

11      A.    I don't recall that.  In fact, I

12  mean, we were continuing to work with Mr.

13  Thomas and counsel -- the prosecutor's

14  office, throughout the -- leading up to the

15  dismissal of the charges.

16      Q.    All right.  And we will return

17  to that part of the story in due course.

18      A.    Okay.

19      Q.    You indicated earlier that you

20  have not reviewed Mr. Horton's Complaint in

21  this Federal lawsuit, correct?

22      A.    That's correct.

23      Q.    He's also filed an Amended

24  Complaint.  You have not seen that either?

20

```
 1          A.    No.
 2          Q.    I take it then you had no role
 3   in drafting that Complaint; is that correct?
 4          A.    That's correct.
 5          Q.    Did Ms. Martinez or the
 6   attorneys from the Loevy firm discuss with
 7   you the potential claims in that Federal suit
 8   before it was filed?
 9          A.    I don't recall any specific
10   conversations with them.
11          Q.    Did they come to you for any
12   information?
13          A.    I don't recall a specific
14   conversation with them about this case.
15          Q.    Did you provide them documents?
16          A.    Yes.
17          Q.    What did they ask you for?
18          A.    I don't recall if they asked me
19   for anything specifically at all, other than,
20   you know, information that we had in the
21   file.
22       (Defendants' Exhibit 1 was marked for
23       identification.)
24          Q.    Mr. Howe, I am going to hand you
```

21

1    what we've marked as Exhibit 1.  It's a copy

2    of Mr. Horton's Complaint in this case.  As I

3    indicated, there is an Amended Complaint.

4    We're not going to go through that because

5    I'm not sure that it's relevant for the

6    purposes of these questions.

7          A.    Okay.

8          Q.    You're welcome to take any time

9    you want to go through it, but I'm not going

10   to ask you subsequent questions about it at

11   this time.

12         A.    Okay.

13         Q.    What I am interested in asking

14   you about is on the last page, page 26.

15         A.    Okay.

16         Q.    On last page there are three

17   attorneys listed as counsel for Mr. Horton;

18   do you see that?

19         A.    I only see two.

20         Q.    No.  I apologize, I assumed that

21   Ms. Martinez's name was on there, but in fact

22   it is not on this pleading.  So two.  The

23   first one is Michele Berry.  Do you know

24   Michele Berry?

1       A.    Yes.

2       Q.    Who is Michele Berry?

3       A.    She's an attorney in Cincinnati.

4       Q.    What is her practice area?

5       A.    I believe she does criminal

6  defense -- some criminal defense.  She also

7  does state compensation representation for

8  wrongful convictions.

9       Q.    Is she related to anyone at OIP?

10      A.    She's married to Mark Godsey.

11      Q.    Did Ms. Berry have any

12  involvement in the work that OIP did on Mr.

13  Horton's behalf?

14      A.    Not as far as I know.

15      Q.    How did Ms. Berry come to be

16  local counsel for Mr. Horton in this case?

17            MR. CALLAHAN:  Objection.  You

18  can answer.

19      A.    I have no idea.

20      Q.    When did Mr. Godsey and Ms.

21  Berry get married?

22      A.    I don't know.

23      Q.    The second name on there is Jon

24  Loevy of the Loevy & Loevy firm.  Do you know

23

1     Mr. Loevy?

2            A.    I've spoken with him before.

3            Q.    In connection with this case?

4            A.    I don't think so.

5            Q.    Was he counsel in the, is it

6     Ricky Jackson?  Is that the name you gave

7     before?

8            A.    Ricky Jackson, I don't know if

9     he was directly involved in that.  I believe

10    Loevy represented at least one of the

11    co-defendants and -- there were three

12    co-defendants in that case and I believe they

13    had different counsel.

14           Q.    And then Ms. Martinez's name is

15    not on there, but she's here on our computer

16    screen with us.  Do you know Ms. Martinez?

17           A.    I've spoken with her before.

18           Q.    How many times?

19           A.    I don't know.

20           Q.    In connection with Richard

21    Horton only or in connection with other cases

22    as well?

23           A.    I don't recall ever having

24    spoken with her before this case.

1          Q.    Does OIP have a relationship

2    with law firms where it refers cases to them?

3          A.    No.  Well, let me say, when a

4    client is released -- we may be getting into

5    a privileged area.

6          Q.    Let me see if I can ask some

7    questions that will help.

8          A.    Sure.

9          Q.    OIP has succeeded in winning

10   release of inmates, correct?

11         A.    Correct.

12         Q.    And at least with some of those

13   inmates there's the possibility of a

14   subsequent Federal lawsuit, correct?

15         A.    Sometimes, yes.

16         Q.    What role, if any, does OIP play

17   in the commencement of those Federal

18   lawsuits?

19         A.    None.

20         Q.    Does OIP assist the inmates in

21   finding counsel to handle the Federal

22   lawsuit?

23              MR. CALLAHAN:  Objection to the

24   extent that communicating with clients about

1    legal claims they might have would be within

2    the scope of attorney/client privilege

3    communications.

4              MR. EPSTEIN:  And that's fair.

5    I'm not asking about any conversations where

6    you would assess the strength of the claim or

7    what the legal theories might be.  I'm just

8    trying to figure out if, for example, OIP

9    communicates with specific lawyers and says,

10   hey, I might have a client for you?

11             MR. CALLAHAN:  Can he answer on

12   a high level of just --

13        Q.   As high level as you feel

14   comfortable with and then we'll see -- then

15   we'll see if we need to dig down or not.

16        A.   Our -- maybe I can say our

17   general practice would be to provide a list

18   of, you know, five, six, seven different

19   firms to clients and then -- and that's the

20   full extent of it.  I don't have any other

21   involvement in terms of communicating with

22   those people or recommending anyone

23   specifically.  I encourage -- well, that's

24   the general practice.

26

1        Q.    Okay.  That's helpful.  Thank

2  you.  Does OIP have any contractural

3  relationships with those law firms?

4        A.    Not that I know of.

5        Q.    Does OIP -- strike that.  OIP

6  secures the release of an inmate.  The inmate

7  finds other counsel, brings a Federal

8  lawsuit, gets a judgement of some kind.  Does

9  OIP receive any of that money?

10       A.    No.  I mean -- well, not in any

11  contractural way.  I assume at some point

12  clients have, you know -- well, I don't

13  actually know.  I have never seen any case

14  where a client has provided any money -- a

15  former client has provided any money to OIP

16  after a civil judgment.

17       Q.    Is there a scenario where that

18  might happen?

19       A.    You know, the situation I was

20  thinking of was, a former client named

21  Raymond Taller (phonetic) who has a -- who

22  used I believe part of his settlement money

23  to establish a house where people could live

24  in northeast Ohio who were released but still

1    trying to get on their feet.  And those are

2    not exclusively OIP clients, but at times I

3    have had clients who have gone to -- I think

4    he calls it the Freedom House -- where he

5    basically lets them stay rent free.  That

6    would be, I guess, an in-kind contribution to

7    an OIP client.

8        (Defendants' Exhibit 2 was marked for

9        identification.)

10        Q.    I'm going to hand you what I've

11    marked what is Exhibit 2.  These are the

12    Rule 26(a)(1) disclosures filed on Mr.

13    Horton's behalf in this case.  Have you seen

14    this document before?

15        A.    No.

16        Q.    All right.  Feel free to take

17    some time and look it over if you want.  Are

18    you ready?

19        A.    Yes.

20        Q.    The middle of page 3, that's

21    your name there, correct?

22        A.    Yes.

23        Q.    When did you become aware that

24    you were being listed as a potential witness?

```
1           A.    I believe when we received a

2    subpoena for documents.

3           Q.    From whom did you receive the

4    subpoena for documents?

5           A.    I don't remember the name

6    listed.  I think it was you.

7           Q.    But it was something on behalf

8    of the City?

9           A.    It was somebody on behalf of the

10   City of Columbus, yes.

11          Q.    Okay.  And if you'll bear with

12   me, I'm going to read the description of the

13   anticipated knowledge or testimony.  It says

14   that Brian Howe, Howe may have information

15   about plaintiff, meaning Richard Horton,

16   plaintiff's criminal proceedings and evidence

17   disclosed during those proceedings,

18   plaintiff's criminal defense, investigation

19   of the crimes at issue, the reversal of

20   plaintiff's conviction, plaintiff's

21   consistent declarations of innocence, as well

22   as plaintiff's wrongful prosecution and

23   conviction and the resulting damages; do you

24   see that?
```

1        A.    Yes.

2        Q.    Do you have information on those

3   topics?

4        A.    Yes.

5        Q.    Okay.  What I'm going to do is

6   we'll go through the deposition and then,

7   when we're done, I'm going to try to come

8   back to this to see if there's any

9   information that you have on these topics

10  that you haven't told me during the course of

11  the deposition.

12       A.    Okay.

13       Q.    Is that fair?

14       A.    Sure.

15       Q.    Okay.  Since we have Exhibit 2

16  in front of us, I would like to ask you about

17  some of the other names that appear on here

18  and see what you can tell me.

19       A.    Okay.

20       Q.    Let's start at the top of

21  page 2.  Kiley Beale, can you tell me who

22  Kiley Beale is?

23       A.    She's a former student at the

24  University of Cincinnati and a former OIP

1    clinic student.

2         Q.    Where is Ms. Beale now?

3         A.    She's practicing law in the

4    Cincinnati area.  I don't know exactly where.

5    I believe she's doing civil practice.

6         Q.    Is it your understanding that

7    she's working for a law firm?

8         A.    Yes.

9         Q.    At any time did Ms. Martinez or

10   a representative of the Loevy firm ask you if

11   you could locate Kiley Beale?

12        A.    I don't remember any such

13   request.

14        Q.    Did Ms. Beale work on Richard

15   Horton's case?

16        A.    Yes.

17        Q.    Just in general terms, what

18   would be the nature of her work on it?

19        A.    Students in general do a lot of

20   the initial sort of gathering of documents,

21   reading of documents.  They'll be the ones

22   who request police reports, review

23   transcripts, read through police reports.

24   They may interview witnesses, under

1    supervision of myself or another attorney.

2         Q.    Do the student participants in

3    the clinic do this for a semester or is this

4    a year long --

5         A.    It's a full-year clinic.

6         Q.    How many students per year?

7         A.    It varies, but between 16 and

8    22.

9         Q.    How many active cases does the

10   clinic have at one time?

11        A.    In terms of applications being

12   reviewed?

13        Q.    Well, I want to talk about

14   applications being reviewed separately.

15        A.    Okay.

16        Q.    Right now I'm talking about

17   applications that have been accepted for

18   representation.

19        A.    I see.  I don't know a firm

20   number, but it's probably in the range of a

21   dozen.

22        Q.    The next name on the list is

23   Jordan Blake.  Do you know who that is?

24        A.    Yes.

32

1        Q.   Can you tell me who that is?

2        A.   Yes.  She is, like Kiley, a

3  former OIP student, former University of

4  Cincinnati, College of Law graduate.

5        Q.   Did Ms. Blake work on Mr.

6  Horton's file?

7        A.   Yes.

8        Q.   As a student?

9        A.   Yes.

10       Q.   So her responsibilities in

11  general would have been similar to those of

12  Ms. Beale?

13       A.   Yes.

14       Q.   Where is Ms. Blake now?

15       A.   I believe she is at the Hamilton

16  County Prosecutor's Office.

17       Q.   And, again, did Ms. Martinez or

18  anyone from the Loevy firm ask you if you

19  could tell them Ms. Blake's current location?

20       A.   Not that I recall.

21       Q.   Still on page 2, the second from

22  the bottom is a name I think we've mentioned

23  already, Mark Godsey.  Can you tell me about

24  Mr. Godsey and his role at OIP?

33

1        A.    Mr. Godsey is the director of

2  the Ohio Innocence Project clinic and a

3  faculty member at the UC College of Law.

4        Q.    In that capacity, does he have

5  personal involvement in the specific cases?

6        A.    Less so than the other staff

7  attorneys.

8        Q.    Did Mr. Godsey work on the

9  Horton case in specific?

10       A.    Not that I recall.

11       Q.    Page 4, the second from the

12  bottom, Mallorie Thomas; do you know who that

13  is?

14       A.    Yes.

15       Q.    Who is Mallorie Thomas?

16       A.    Mallorie was a -- was an OIP

17  student, a UC College of Law graduate, and

18  then she was a postgraduate fellow as an

19  attorney with the Ohio Innocence Project

20  clinic for, I believe, two or three years.

21       Q.    Explain to me how the

22  postgraduate fellowships work.

23       A.    It's something we've started in

24  the last maybe five years.  They're -- we

1    would hire on a recent law graduate to do

2    casework supervising the students, with the

3    idea that, for people who want to do this

4    kind of work professionally, it can be hard

5    to find entry level positions and that giving

6    someone an opportunity to have a couple of

7    years experience may be good in terms of

8    giving them that experience to make them

9    potentially eligible for other jobs when they

10   become available.

11         Q.    Would it be fair to say then

12   that the work that Ms. Thomas did would be

13   more substantive than the work that the other

14   people we've talked about had done?

15         A.    Can you clarify what work you're

16   talking about?  On this case?

17         Q.    On Mr. Horton's case or on any

18   case in terms of -- I mean, I'm assuming that

19   she has the ability to do more advanced legal

20   work than they do; is that correct?

21         A.    She was a licensed attorney

22   during most of her postgraduate fellowship.

23         Q.    Now, on the list right above

24   Mallorie Thomas there's an attorney named

35

1  David Thomas, who we'll talk about later, but

2  my question right now is, are the two of them

3  related?

4       A.    Not as far as I know.

5       Q.    When did Mallorie Thomas leave

6  OIP?

7       A.    I don't recall the year.

8       Q.    And you may have told me this

9  already and I apologize if you did.  Where is

10  she now?

11       A.    I believe she's at the State of

12  Ohio Public Defender's Office.

13       Q.    Did anyone from the Loevy firm

14  ask you about her present location?

15       A.    Not that I remember.

16       Q.    I would like to run through a

17  quick list of other names of people that I

18  believe were at OIP and if you could let me

19  know who they are and what role, if any, they

20  had in the Horton case.

21       A.    Okay.

22       Q.    Riley Able?

23       A.    Riley was an OIP student.

24       Q.    Did she work on the Horton case?

36

1        A.    He.

2        Q.    He, I'm sorry.

3        A.    I believe that he did.

4        Q.    Norb Wessels?

5        A.    Yes.  Norb is also an OIP

6  student who was assigned to the Horton case,

7  among others.

8        Q.    Kanisha Ervin?

9        A.    Kanisha was a former OIP student

10  and also a postgraduate fellow herself.

11        Q.    Alisher Kassym?  Did I say that

12  right?

13        A.    Yeah.  We called him Alli.  He

14  was an OIP student as well.

15        Q.    Jefferson Kiser?

16        A.    An OIP student.

17        Q.    And I haven't been asking

18  specifically, but did each of these folks

19  work on the Horton file?

20        A.    Yes.

21        Q.    Ervin did?

22        A.    Yes.

23        Q.    Kassym did?

24        A.    Yes.

37

```
 1          Q.    And Kiser did?

 2          A.    Yes.

 3          Q.    Tyler Liston?

 4          A.    An OIP student who worked on the

 5    Richard Horton case, among others.

 6          Q.    Jack Duhon?

 7          A.    An OIP student.  That's going

 8    way back.  I can't say whether he -- for sure

 9    whether he worked on Richard Horton's case or

10    not.

11          Q.    When you say way back, do you

12    have a sense of how far back we're going?

13          A.    Eight years ago.  Nine years ago

14    maybe.

15          Q.    Max Moreland?

16          A.    He was the same class as Jack.

17    I believe he also worked -- he would have

18    worked on the same cases that Jack worked on.

19          Q.    So maybe Mr. Moreland worked on

20    the Horton file and maybe he did not?

21          A.    Yeah, I just don't remember for

22    sure.

23          Q.    Just a few more.

24          A.    Okay.
```

38

 1          Q.    Cate Douglas?

 2          A.    Cate Douglas, an OIP student and

 3   worked on Mr. Horton's case, among others.

 4                MR. EPSTEIN:  And for the record

 5   that's Cate with a C.

 6          A.    Yes.

 7          Q.    Julia Stern?

 8          A.    Julia was an OIP student who

 9   worked on the Horton case, among others.

10          Q.    Bailey Kalmbach?

11          A.    Bailey was an OIP student who

12   worked on the Horton -- I believe she worked

13   on the Horton case.  This is -- I believe she

14   worked on the Horton case.

15          Q.    Isabelle Weber?

16          A.    Isabelle Weber was an OIP

17   student who was at the clinic at the same

18   time as Bailey.  She would have worked on the

19   same cases as Bailey.

20          Q.    Now, let's talk about the

21   application process.  How do perspective

22   cases come to OIP?

23          A.    Typically a person will

24   request -- will write a letter requesting

1    assistance.  There's no particular form or

2    anything like that, it's just a letter.  When

3    we received a letter for assistance, we will

4    send the potential client a questionnaire to

5    fill out with some basic questions.  They

6    provide information.  When we receive back

7    the questionnaire it is assigned to a group

8    of students and an attorney and at that point

9    it goes in whatever direction, you know, the

10   facts call for.

11        Q.   What are the students told to

12   look for in assessing the application?

13        A.   I mean, we're looking for --

14   they're looking for -- they're, first of all,

15   trying to find out the basic facts of the

16   case.  I mean, they have a letter and a

17   questionnaire.  They -- so there's a baseline

18   knowledge that they need in order to evaluate

19   the case.  And so it may be transcripts or

20   appellate opinions, news reports.

21        Q.   And that was going to be my

22   question.  I mean, you would agree with me

23   that the applications and the survey answers

24   could be self-serving, correct?

1          A.    Yes.

2          Q.    So they need to get -- your

3    investigators need to get some information

4    outside of that -- those documents in order

5    to have a fair and realistic assessment of

6    it?

7          A.    Absolutely.

8          Q.    So you said that they would seek

9    out the trial transcripts?

10         A.    Yes.  Sometimes.

11         Q.    Some times appellate decisions?

12         A.    Those are pretty easy to come

13   by.

14         Q.    Would they ever go further in

15   terms of talking to witnesses?

16         A.    Occasionally.

17         Q.    Do they meet with the applicant?

18         A.    Often.

19         Q.    Do they meet with the applicant

20   with an attorney alongside?

21         A.    Typically, yes.  Not always, but

22   almost always.

23         Q.    Do the students who are doing

24   the assessment generate memos summarizing or

41

1    assessing the case?

2         A.    They will -- they do generate

3    memos at the end of their one-year

4    fellowship.  If a case might be an

5    investigation for five years.  When one group

6    hands the -- you know, their case load off to

7    a successor student group, they will do memos

8    on all of the cases that are currently open

9    or active applications.

10        Q.    What's the typical length of

11   time that it takes from receipt of an

12   application to a decision from OIP whether to

13   represent or not?

14        A.    You know, it varies so much.

15   Often we reject cases pretty quickly.  So it

16   could be less than a year.  It's sometimes

17   five, six years plus, seven years.

18        Q.    Who makes the decision whether

19   to accept or reject an application?

20        A.    Ultimately the attorney working

21   on the case in consultation with the other

22   attorneys in the office.

23        Q.    So each application is assigned

24   a specific attorney to oversee the work; is

1    that correct?

2         A.    That's correct.

3         Q.    We have established that OIP

4    accepted the application of Mr. Horton for

5    representation?

6         A.    Yes.

7         Q.    Who was the attorney assigned to

8    that?

9         A.    I was.

10        Q.    What investigation was

11   undertaken of Mr. Horton's case at the time

12   that it first came in the door?

13        A.    I'm concerned that it's going to

14   call for me to get into some of our work

15   product.

16             MR. CALLAHAN:  I'll note an

17   objection to the extent it involves Mr.

18   Howe's evaluation of the background of Mr.

19   Horton's criminal case.

20             MR. EPSTEIN:  Okay.  I haven't

21   asked him about his evaluation yet, although

22   I will in a way that I'm hoping won't draw an

23   objection.  I'm just trying to get a sense

24   of -- well, let me ask the question this way.

43

1      Q.    Mr. Horton submitted an

2  application to OIP asking you to take his

3  case, correct?

4      A.    Yes.

5      Q.    And some students were assigned

6  to work on that, correct?

7      A.    Yes.

8      Q.    They gathered up the transcripts

9  from his proceedings?

10     A.    Yeah, at sometime point they had

11  the transcripts.

12     Q.    At some point OIP served a

13  public records request on the Columbus

14  Division of Police for records, correct?

15     A.    Correct.

16     Q.    Did OIP send that application

17  before or after it had accepted Mr. Horton as

18  a client?

19     A.    Before.

20     Q.    So is it fair to say that the

21  decision to accept him as a client was based

22  at least in part on what you saw when you

23  received the documents from CPD?

24          MR. CALLAHAN:  I'll note an

1    objection based on his evaluation of

2    documents.  Is there something procedurally

3    you can confirm on that point or --

4         A.   I mean, you know, the police

5    reports feature prominently in our motion for

6    a new trial.

7         Q.   All right.  What is your

8    understanding of the underlying crime that

9    Mr. Horton was charged with?

10        A.   It was an aggravated robbery,

11   which, to me, was sort of the central crime.

12   There were other charges as well.  I don't

13   recall exactly what they were.

14        Q.   And what was your understanding

15   of the evidence that was presented against

16   him at trial?

17        A.   So I'll try and recall what I

18   remember from the transcripts.  There was

19   testimony from both of the victims in the

20   case, McClanahan and Curry.  And I believe

21   that was -- I mean, that was the primary

22   piece of evidence that I recall, was

23   identifications from -- well, I'm struggling

24   to remember, but I believe specifically

45

1    McClanahan's identification was the primary

2    piece of evidence that the State presented

3    against him.

4        (Defendants' Exhibit 3 was marked for

5        identification.)

6           Q.    I'm going to hand you what I've

7    marked as Exhibit 3.  Can you identify that

8    for the record, please?

9                 MS. MARTINEZ:  I'm sorry, do you

10   have a Bates stamp for this one?

11                MR. EPSTEIN:  Give me a second,

12   please.  It begins with City 3514.

13                MS. MARTINEZ:  Okay.  Thank you.

14          A.    This is the application for

15   statute --

16                MR. CALLAHAN:  I apologize, our

17   Bates stamps are different.

18                MR. EPSTEIN:  Oh, I'm sorry.

19                MR. CALLAHAN:  The one for the

20   witness and that you provided us is R. Horton

21   000021 through R. Horton 000197.

22                MR. EPSTEIN:  Yeah, we produced

23   it with our Bates stamp.  You have a copy

24   from --

1             MR. CALLAHAN:  The plaintiff

2    produced?

3             MR. EPSTEIN:  That the plaintiff

4    produced.  So let's get both Bates numbers

5    into the record again.  I've got a copy that

6    is the City's Bates number 3514.  And you

7    have a copy that is --

8             MR. CALLAHAN:  It starts 000021

9    and it looks like it's consecutive to R.

10   Horton 000197.

11            MR. EPSTEIN:  So take a quick

12   look and just make sure that we're talking

13   abut the same document.

14            MR. CALLAHAN:  About 175 pages.

15            MR. EPSTEIN:  You don't have to

16   read them all.

17            MR. CALLAHAN:  I'm not reading

18   them all.  Yeah, it starts with, Mike DeWine,

19   Ohio Attorney General, in the Court of Common

20   Pleas of Franklin County, Ohio, the State

21   versus Richard Horton, Application for DNA

22   testing.  And that's R. Horton 000021 and the

23   last page of the Exhibit Number 3 that we've

24   been handed is R. Horton 000197, and it's an

1    affidavit of Kiley Beale in that same Court

2    of Common Pleas, Franklin County, State of

3    Ohio versus Richard Horton case.

4         MR. EPSTEIN:  All right.  What I'm

5    going to suggest is, Alyssa, if it's fine

6    with you, let's go off the record, take a

7    five-minute break and make sure that

8    everybody's on the same page with the

9    document and then we'll resume.

10             VIDEOGRAPHER:  We're off the

11   record at 10:52:59.

12          (Off the record.)

13             VIDEOGRAPHER:  We're on the

14   record 11:03:25.

15        Q.    Mr. Howe, before I ask you some

16   questions about the application that we just

17   marked, I want to go back to the application

18   process for Mr. Horton's representation.  Did

19   you meet personally with Mr. Horton before

20   his case was accepted?

21        A.    Before we agreed to represent

22   him?

23        Q.    Correct.

24        A.    Yes.

1          Q.    Where did that take place?

2          A.    I know for a fact I met with him

3     at least I think twice at Chillicothe

4     Correctional and I may have met with him

5     before that, but I'm not certain where he

6     was.

7          Q.    In addition to you and Mr.

8     Horton, who was present for those

9     conversations?

10         A.    There were at least -- the

11    meeting that I most remember was just myself

12    and -- but I believe -- I know that there

13    were students at prior meetings.

14         Q.    Anyone else connected with OIP

15    present for those meetings?

16         A.    No.

17         Q.    During those conversations did

18    Mr. Horton tell you that he was innocent of

19    these crimes?

20         A.    Just to be clear --

21              MR. CALLAHAN:  Objection,

22    subject to attorney/client privilege.  What

23    can you share consistent with that?

24         A.    My understanding is that there's

1    some sort of limited privilege waiver that

2    allows us to discuss certain subjects?  I

3    haven't been told anything so far about

4    exactly the bounds of that, but --

5                 MR. EPSTEIN:  Alyssa, do you

6    want to speak to that?

7                 MS. MARTINEZ:  Yeah, I can

8    clarify for the record.  Plaintiff is making

9    a subject matter limited waiver as to Brady

10   evidence in this case, particularly the

11   handwritten notes by Detective Walker

12   containing the name Richard Diggs, the

13   fingerprint analysis that was run during Mr.

14   Horton's criminal trial, and a potential

15   photo show up Detective Walker made with

16   Rhonda Curry of only plaintiff's photo.  And

17   he is also making a subject matter waiver as

18   to his attestations of innocence.

19                 THE WITNESS:  Okay.

20        Q.    With that understanding, when

21   you -- during these meetings with Mr. Horton,

22   did he tell you that he was innocent of these

23   crimes?

24        A.    Yes, he has always unequivocally

1     maintained his innocence to me.

2          Q.    What else did he tell you during

3     those meetings?

4               MR. CALLAHAN:  Objection,

5     subject to the attorney/client privilege.  Is

6     there any other information that you collect

7     as a procedural matter that you can share

8     outside of the attestations of innocence?

9          A.    You're asking for what my client

10    told me during multiple privileged meetings

11    at Chillicothe Correctional?  Just everything

12    that he said during that time?

13         Q.    Correct.  I want to know, when

14    he told you that he was innocent, I want to

15    know what else he told you, I want to know

16    what else you asked him, and I want to know

17    what else you talked about.

18              MS. MARTINEZ:  Counsel, I think

19    that goes outside the bounds of the subject

20    matter waiver.

21              MR. EPSTEIN:  Well, then my next

22    point would be -- I would normally ask, are

23    you instructing the witness not to answer,

24    but I'm not sure who to direct that to.

51

```
 1                    MR. CALLAHAN:  I'll -- because
 2      the witness was an attorney representing Mr.
 3      Horton, I'm instructing him not to answer
 4      questions about attorney/client privilege
 5      communications.
 6           Q.    During your meetings with Mr.
 7      Horton, did Mr. Horton tell you about his
 8      prior drug use?
 9           A.    I --
10                    MR. CALLAHAN:  Objection.  The
11      same -- the same objection based on
12      privilege.  And instruct you not to answer.
13           Q.    During your meeting with Mr.
14      Horton, did Mr. Horton tell you about his
15      past history selling drugs?
16                    MR. CALLAHAN:  The same
17      objection.  Instruct the witness not to
18      answer based on privilege.
19           Q.    Are you aware that during the
20      trial there was an allegation by Mr.
21      McClanahan, the victim, that Mr. Horton had
22      tried to bribe him; are you aware that that
23      allegation was made?
24           A.    Yes.
```

52

1        Q.    During your meetings with Mr.

2    Horton, did Mr. Horton tell -- did Mr. Horton

3    discuss the bribery allegation with you?

4          MR. CALLAHAN:  Objection as to

5    attorney/client privilege communications and

6    instruct the witness not to answer.

7        Q.    At any time did Mr. Horton admit

8    to you that he had in fact attempted to bribe

9    Mr. McClanahan?

10         MR. CALLAHAN:  The same

11    objection.  Assertion of privilege.  Instruct

12    you not answer.

13         MR. EPSTEIN:  Alyssa, have we

14    made a sufficient record that you've asserted

15    privilege or -- I don't want to go to the

16    court and feel that I haven't laid the

17    groundwork sufficiently.  Can we agree that

18    he has been sufficiently instructed that he's

19    not going to answer my questions about

20    conversations with Mr. Horton other than

21    protestations of innocence?

22         MS. MARTINEZ:  As I stated

23    earlier on the record, Mr. Horton has also

24    made a waiver as to the specific subject

53

1    matter of the Brady evidence.  So outside of

2    the Brady evidence and the attestations of

3    innocence he does retain that privilege

4    and -- so the foundation as to the questions

5    you've asked has been laid.

6              MR. EPSTEIN:  Thank you.

7         Q.   Now, let's turn back to

8    Exhibit 3.

9              MR. GIRARD:  3.

10        Q.   Exhibit 3, the Application for

11   DNA Testing.  Is this a pleading that the

12   Innocence Project filed on Mr. Horton's

13   behalf in Common Pleas Court?

14        A.   Yes.

15        Q.   And if you turn to page 28 of

16   the document --

17        A.   The Bates number?

18        Q.   Setting aside the Bates stamps,

19   the actual page numbering.

20        A.   Okay.  Of the memorandum?

21        Q.   Of the memorandum, correct.

22        A.   Okay.

23        Q.   Is that your name on the

24   electronic signature?

54

```
 1          A.    Yes.

 2          Q.    And it indicates that the

 3    application was filed on April 6, 2018?

 4          A.    Yes.

 5          Q.    Did you write this document?

 6          A.    Yes.

 7          Q.    Did you, to the best of your

 8    ability, verify the information that was

 9    contained in this document?

10          A.    Yes.

11          Q.    Are you familiar with the

12    contents of this document?

13          A.    I haven't looked at it in

14    several years, but I was at one point.

15          Q.    Now, I want to start by doing

16    just some housekeeping.  You had indicated

17    that one of the things the Innocence Project

18    did on Mr. Horton's behalf was to serve a

19    public records request on the Columbus

20    Division of Police, correct?

21          A.    Yes.

22          Q.    Did you receive documents in

23    response to that request?

24          A.    Yes.
```

1          Q.    Are those documents attached to

2     the application that we've been looking at?

3          A.    I believe they are.

4          Q.    And I will refer you to

5     Exhibit 1 -- or, I'm sorry, A, beginning

6     right after the end of the text portion of

7     the application.

8          A.    Yes.

9          Q.    Are these the documents that you

10    received pursuant to your public records

11    request?

12         A.    Yes.

13         Q.    Did OIP also attempt to locate

14    the files that Mr. Horton's counsel had at

15    prior stages of the case?

16         A.    Yes.

17         Q.    Tell me about those efforts.

18              MR. CALLAHAN:  Objection as to

19    work product for investigative proposes and

20    representation.  Is there some procedural

21    information you could share in response to

22    the question that doesn't involve your own

23    attorney assessment of documents?

24         Q.    Let me try it this way.  Were

56

1    you able to obtain records from Mr. Horton's

2    prior counsel?

3            A.    We were able to obtain records

4    from David Thomas.

5            Q.    Who is David Thomas?

6            A.    David Thomas I believe

7    represented Mr. Horton in earlier

8    postconviction proceedings.

9            Q.    And I'll refer you to Exhibit D.

10           A.    Okay.

11           Q.    Have you found it?

12           A.    Yes.

13                 MR. CALLAHAN:  I have not.  What

14    Bates stamp are you looking at, Mr. Howe?

15                 THE WITNESS:  000119.

16                 MR. CALLAHAN:  Thank you.

17           Q.    Are these the documents you

18    received from Mr. Thomas?

19           A.    I mean, I wouldn't remember on

20    sight the full contents of the documents that

21    we received from him, but I believe that they

22    were attached.

23           Q.    Let me refer you back

24    two pages -- three pages to the Exhibit B,

57

1    the affidavit of Jordan Blake.  Do you see

2    that?

3            A.    Yes.

4            Q.    And specifically paragraph 7.

5    Paragraph 7 states, On February 28th, 2018,

6    OIP received an e-mail document from Dave

7    Thomas called State's Discovery.  A true and

8    accurate copy of this document is attached as

9    Exhibit D to the application; do you see

10   that?

11           A.    Yes.

12           Q.    So can we assume for purposes of

13   our discussion today that Exhibit D is the

14   documents that Mr. Thomas provided to OIP?

15           A.    Yes.

16           Q.    Okay.  Do you have any personal

17   knowledge as to whether the documents in

18   Exhibit D are the sum total of what documents

19   were provided to Mr. Horton's criminal

20   defense attorneys by the State?

21           A.    Do I have any personal knowledge

22   about the documents that were provided to Mr.

23   Horton during the original trial?

24           Q.    Correct.

58

1      A.    No.

2      Q.    Is it your belief that the

3  documents you received from Mr. Thomas are

4  the sum total of what the State gave to Mr.

5  Horton during the criminal trial?

6      A.    Yes.

7      Q.    What is that belief based on?

8      A.    Based on representations from

9  both Mr. Thomas and I believe the Franklin

10  County Prosecutor's Office.

11      Q.    By the way, the public records

12  request that you submitted to CPD for its

13  file on Mr. Horton, was that request in

14  writing?

15      A.    I believe so.

16          MR. EPSTEIN:  I will note for

17  the record that that request would be

18  responsive to our subpoena and we've never

19  received it.  So I would ask OIP to provide

20  us a copy of that when you can, please.

21          MR. SPIESS:  Okay.

22      Q.    What is Brady material?

23      A.    Brady material is used or at

24  least I would understand it to be evidence

59

```
 1    that was both material and not disclosed at
 2    the time of trial.
 3          Q.    When you received the public
 4    record responses from the Columbus Division
 5    of Police, did you believe that it contained
 6    Brady material?
 7          A.    Yes.
 8          Q.    What Brady material did you
 9    believe was contained in the public record
10    responses?
11                MR. CALLAHAN:  Objection to the
12    extent it's work product subject to, I guess,
13    the limited waive as it's been represented on
14    behalf of Mr. Horton.
15          A.    You know, I believe this is
16    pretty well laid out in our filings.  There
17    are a number of, I believe, handwritten notes
18    from -- that we believe to be from Detective
19    Walker and that we believed to be from
20    Detective Walker's initial interview with Mr.
21    McClanahan.
22                And those interview notes are we
23    believe materially different from the
24    information that was in the typed reports and
```

1    that the handwritten notes contain

2    exculpatory information, including

3    identifying a different suspect, including

4    what we believe are material differences in

5    the description of the victim -- or, I'm

6    sorry, the description of the perpetrator.

7         Q.    In addition to those two things,

8    the name of possibly a different suspect and

9    differences in the description of the

10   perpetrator, are there any other Brady

11   material in the handwritten notes of

12   Detective Walker's interview with Mr.

13   McClanahan?

14        A.    Those are the two that I most

15   remember of the top of my head.  You know,

16   anything that we found would have been in our

17   pleadings, in our filings.

18        Q.    Fair enough.  Let me ask you a

19   question about your pleadings.  The public

20   records response included handwritten notes

21   of an interview that Detective Walker

22   conducted with Rhonda Curry, the other

23   victim; is that correct?

24        A.    My recollection is that the

1    public records request -- yes.  Yes, did

2    include interview notes with Ms. Curry.

3         Q.    Did you consider those notes to

4    be Brady material?

5         A.    I don't believe so for the

6    reason that -- again this is all just off of

7    my -- based on my memory, so I'm going to

8    defer back to my pleadings.  But my

9    recollection is that the handwritten notes

10   for the Rhonda Curry interview were in the

11   discovery document that we got from Mr.

12   Thomas.

13        Q.    And I'll refer you to page

14   number 13 of your application.

15        A.    Okay.

16        Q.    At the bottom do you see the

17   sentence beginning, Eventually?

18        A.    I'm sorry, page 13?

19        Q.    Yes, page 13, four lines from

20   the bottom, Eventually in March of 2018?

21        A.    Yes.

22        Q.    This is discussing what we've

23   been discussing, correct, the documents that

24   came from Mr. Thomas?

1          A.     Yes.

2          Q.     And the last sentence says,

3    Those documents included handwritten notes of

4    the interview with Rhonda Curry, but not

5    Detective Walker's handwritten notes of her

6    interview with McClanahan?

7          A.     Yes, that's my -- yes.

8          Q.     Is that significant?

9          A.     The fact that what we believed

10   to be the original trial discovery included

11   handwritten notes from one witness, but not

12   the other?

13         Q.     Yes.  Is that significant?

14         A.     Yes.

15         Q.     Why?

16         A.     It indicates to me, or at least

17   is strong evidence, that the handwritten

18   notes from Mr. McClanahan were not turned

19   over to the defense attorney at trial.

20         Q.     So it's suggestive to you that

21   there was a particular reason to withhold

22   those notes but turn over Rhonda Curry's?

23         A.     I suppose so.

24         Q.     And that's a point you made to

63

1    the court in your application for a new trial

2    and application for DNA testing, correct?

3         A.    Something along those lines.

4         Q.    Now, we've already identified

5    the documents that were given to the defense

6    counsel as Exhibit D, correct?

7         A.    Yes.

8         Q.    So these would be the documents

9    that would include the handwritten notes of

10   Rhonda Curry?

11        A.    Do you want me to look

12   through --

13        Q.    Yes, I do.  I would like you to

14   help me find in Exhibit D where the

15   handwritten notes of Rhonda Curry -- of the

16   Rhonda Curry interview are.

17        A.    I don't see them in Exhibit D.

18        Q.    Is it fair to say then that the

19   statement in the brief that the Rhonda Curry

20   notes were turned over and the McClanahan

21   notes deliberately withheld is not accurate?

22        A.    I don't know why they're not in

23   Exhibit D, but my recollection is that we

24   received handwritten notes from the public

1    records request that did not include the

2    handwritten notes of Mr. -- the interview

3    with Mr. McClanahan.

4         Q.    So is it possible --

5              MR. EPSTEIN:  I'm sorry, can you

6    read that back?

7       (Record read by Reporter.)

8         Q.    I think you may have misspoken.

9    The documents that you -- that you received

10   from the public records request did include

11   the McClanahan notes, correct?

12        A.    I'm sorry, yes.  Yes, the public

13   records request did include -- was the more

14   inclusive of the handwritten notes.  My

15   recollection is that the documents we got

16   from David Thomas contained handwritten

17   notes, but not the handwritten notes from the

18   McClanahan interview specifically.

19        Q.    Is it your recollection that you

20   saw the interview notes with Rhonda Curry

21   outside the contents of the public records

22   request?

23        A.    I mean, again it's been six

24   years, but that is my recollection.

1          Q.    And that's what you represented

2     to the court?

3          A.    Yes.

4          Q.    If that were true then is it

5     fair to say that Exhibit D is not a complete

6     record of everything that was given by the

7     State to the defense?

8          A.    That was given to the State --

9     that was given by the State to the original

10    trial defense?

11         Q.    Correct.

12         A.    Yes.

13         Q.    I would like to direct your

14    attention now specifically to the McClanahan

15    interview notes.  And maybe once we find them

16    somebody can help me with the Bates number.

17    They're in Exhibit D.

18         A.    They're in Exhibit D, you said?

19         Q.    Exhibit -- no, I may have

20    misspoken.  That would be Exhibit A.  Exhibit

21    A is the public records response.  That's

22    when you got the McClanahan notes, correct?

23         A.    Correct.

24         Q.    Yeah.

1          MR. EPSTEIN:  And again I

2     apologize to counsel for the confusion on the

3     Bates numbers.

4          A.    No problem.  What's the page

5     preceding where you are, Counselor?

6          Q.    You're getting close.  It's the

7     end of those copy pages.  So just two more.

8     Now the notes begin.  And then go about three

9     pages in.

10          A.    This?

11          Q.    It should have Mr. McClanahan's

12     name up top.

13          A.    The second line, drive

14     tractor-trailer, Mr. Dependable?

15          Q.    That's the one.

16          A.    This is what I have as R. Horton

17     000102.

18          Q.    Okay.  Do you -- and then these

19     notes continue for roughly four pages?

20          A.    Okay.

21          Q.    Do you recognize these as the

22     interview notes with Mr. McClanahan that

23     you've been referring to?

24          A.    On first glance that's what they

1    appear to be.

2           Q.    And I will refer you to the

3    third page of those notes.

4           A.    Okay.

5           Q.    Towards the bottom is where the

6    name Richard Diggs appears --

7           A.    Yes.

8           Q.    -- do you see that?

9           A.    I do.

10          Q.    So we all agree that the

11   interview notes contain the name Richard

12   Diggs?

13          A.    Okay.

14          Q.    Before I ask you my follow-up,

15   do you have an understanding of when this

16   interview took place?

17          A.    I don't recall off the top of my

18   head.  Some time shortly after the robbery.

19          Q.    Do you know if this is the first

20   interview that Detective Walker conducted

21   with Mr. McClanahan?

22          A.    I don't recall if I ever knew.

23          Q.    To your knowledge, did Detective

24   Walker interview Mr. McClanahan on the day of

1    the shooting?

2        A.    I don't know.

3        Q.    All right.  And just so we're

4    clear, the crime that we're talking about,

5    what we've been calling the Loew Street

6    robbery, that involved a shooting, correct?

7        A.    Yes.

8        Q.    And Mr. McClanahan was the one

9    who was shot?

10        A.    Yes.

11        Q.    I want to refer you back to the

12    application itself.

13        A.    Okay.

14        Q.    Keep a finger on the notes

15    because we're coming back to that.

16        A.    What page?

17        Q.    Six, please.

18        A.    Okay.

19        Q.    The top of the page, the second

20    paragraph, the third sentence reads,

21    Detective Walker stated that she did not

22    interview McClanahan the day of the crime; do

23    you see that?

24        A.    Yes.

69

```
 1              Q.    And then there's a footnote that

 2     says, This claim is contradicted by both

 3     police reports and by McClanahan's testimony

 4     at trial; do you see that?

 5              A.    Yes.

 6              Q.    What police reports are you

 7     referring to?

 8              A.    I don't recall what I was

 9     specifically referring to in this footnote.

10     I mean, I would have to go back and --

11              Q.    What about Mr. McClanahan -- Mr.

12     McClanahan's testimony at trial that

13     supposedly contradicts Detective Walker, do

14     you remember where that appears?

15              A.    I'm sorry, can you restate what

16     you're referring to?

17              Q.    Yeah.

18              A.    Oh, you're at footnote three?

19              Q.    Yeah, in footnote three there's

20     a representation that Mr. McClanahan's

21     testimony contradicts Detective Walker, but

22     there's no page citation.

23              A.    I don't recall off the top of my

24     head.
```

70

1          Q.    All right.  If you turn the page

2     to page 7, the first sentence of the last

3     paragraph, McClanahan contradicted Detective

4     Walker and said he remembered talking to her

5     briefly the same day he was shot; do you see

6     that?

7          A.    Yes.

8          Q.    Is that the information you're

9     talking about?

10         A.    I mean, again, this is the first

11    time I've seen this document in six years.

12    It seems as though that would contradict the

13    statement that Detective Walker did not talk

14    to him the same day.

15              MR. EPSTEIN:  Can I get the

16    trial transcript, please.

17         Q.    Do you recall -- hold on.  Do

18    you recall what Detective Walker's statement

19    was about her attempts to talk to Mr.

20    McClanahan on the day of the shooting?

21         A.    I don't remember exactly what

22    she said.

23         Q.    But at least according to the

24    memo she stated that she did not interview

71

1    him on the day of the shooting, correct?

2          A.    What page are you on?

3          Q.    That's back to page 6.

4          A.    Yes.

5       (Defendants' Exhibit 4 was marked for

6       identification.)

7          Q.    Let me hand you what we've

8    marked as Exhibit 4 and I'll represent to you

9    this is a complete transcript of the trial.

10   So page 7 of the memo the sentence was,

11   McClanahan contradicted Detective Walker and

12   said he remembered talking to her briefly the

13   same day he was shot, correct?

14         A.    Yes.

15         Q.    Citing to page 58.  So let's

16   turn to page 58 of the transcript, please.

17   I'm going to read a little bit of this

18   starting on line four.  Please follow along

19   and let me know if I read anything wrong.

20              Question:  All right.

21              And by the way, I should preface

22   this.  This is the testimony of Mr.

23   McClanahan.

24         A.    Okay.

72

1          Q.    Question:  All right.  At some

2    point did you meet a Detective Brenda Walker

3    from the Columbus Police Department?

4                    Answer:  Yes, I did.

5                    Question:  Did she in fact come

6    to the hospital where you were and attempt to

7    interview you at that time?

8                    Answer:  Yes.

9                    Question:  And did you in fact

10   talk to her?

11                   Answer:  Very little.  Very

12   little because, you know, I was under

13   medication.  I was out.  They gave me

14   medication to put me out, all of the way out.

15   I was in pain bad.  They had done immediate

16   surgery.  I was maybe two hours in there, I

17   was in surgery.

18                   Question:  Do you remember what

19   day it was that she came to see you?

20                   Answer:  I'm thinking that same

21   Saturday.  I think I recall talking to Brenda

22   that Saturday.  I think.  I'm not sure.

23                   Did I read that correctly?

24        A.    Yes.

73

1      Q.   Is that testimony consistent

2  with or inconsistent with Brenda Walker's

3  testimony that she did not interview

4  McClanahan on Saturday, the day of the

5  shooting?

6      A.   You're asking me if his

7  testimony is consistent with Brenda Walker's

8  claim that she did not talk to him on

9  Saturday?

10      Q.   Well, the representation in the

11  brief was not whether she talked to him.  If

12  you look at page 6 it's Detective Walker

13  stated that she did not interview Mr.

14  McClanahan the day of the crime.  Is that

15  consistent or inconsistent with Mr.

16  McClanahan's testimony?

17      A.   Are you asking if there's a

18  difference between talking to and

19  interviewing?

20      Q.   Is there a difference between

21  talking to and interviewing?

22      A.   I suppose that there could be,

23  but I don't think that there necessarily is.

24  To me this is -- I don't know what they would

74

1    have been talking about if it wasn't the

2    robbery.

3            Q.    Well, do you get the sense from

4    Mr. McClanahan's testimony that they had a

5    substantive conversation about anything?

6            A.    He's not clear about what they

7    talked about.  That they talked that

8    Saturday.

9            Q.    Well, in fact, he's not even

10   clear if it happened on Saturday; isn't that

11   right?

12           A.    That's fair.

13           Q.    And is it possible that he

14   remembered having some conversation with her,

15   but from her perspective there was nothing

16   coherent coming from him?

17           A.    I mean, that's possible.

18           Q.    He was under a lot of

19   medication, correct?

20           A.    That's what he says.

21           Q.    Because he was just shot in the

22   leg?

23           A.    That is correct.

24           Q.    So it's at least possible that,

1    in fact, there is no contradiction between

2    the testimony?

3         A.    I mean, to me the most plausible

4    reading is that they talked about the crime

5    on the Saturday that he initially went to the

6    hospital, but it's I suppose not the only

7    possible interpretation.

8         Q.    Why is that most plausible?

9         A.    Well, he says that he recalls

10   talking to her that Saturday and she says she

11   did not talk to him on Saturday.  So, I mean,

12   I think that's a contradiction.  It may be

13   explained by other things, as you said, but

14   to me that's a contradiction.

15        Q.    And did you understand that when

16   you cited in your brief as evidence that

17   Detective Walker was lying?

18        A.    I mean, I don't recall

19   exactly -- can you point to where in the

20   brief you're --

21        Q.    No, I'm asking -- I'm asking --

22   this was presented to make a specific point.

23   Was there a relevant point if it was simply

24   inconsistent recollections?

1          A.    Is there a point if it's

2    inconsistent recollections.  You know, it --

3    I don't know that the -- I mean, one

4    explanation for the contradiction is that

5    Brenda Walker was lying, I suppose.  One

6    explanation for the contradiction, it may

7    just be important for the fact that some of

8    this information was fairly recent after the

9    crime.  I think that's, you know, when the

10   interview took place is an important point.

11   So -- but I don't recall the purpose for

12   specifically footnote three in my briefing.

13          Q.    Okay.  Let's go back to the

14   other side of this, the representation in

15   footnote three on page 6 that -- Brenda

16   Walker's statement that she did not interview

17   McClanahan the day of the crime is

18   contradicted by police reports?

19          A.    Okay.

20          Q.    Do you know sitting here what

21   police reports that was referring to?

22          A.    I do not.

23          Q.    Let's go back to the McClanahan

24   interview notes.  Let me know when you're

1    with me.

2            A.    I'm at R. Horton 102.

3            Q.    Yes.  And you see at the top

4    line next to Mr. McClanahan's name there's a

5    date of October 13th, 2004, and a time of

6    12:10 p.m.; do you see that?

7            A.    Yes.

8            Q.    Do you have any reason to doubt

9    that that was the date and time of the

10    interview?

11            A.    No.

12            Q.    When was October 13th in

13    relation to the Loew Street robbery?

14            A.    I don't remember.

15            Q.    Now, it begins the interview

16    with a description, and you can take your

17    time to read it through, of an incident that

18    allegedly occurred the night before at a

19    convenience store; do you see that?

20            A.    Yes.

21            Q.    Do you recall the significance

22    of that incident?

23            A.    If I'm remembering his testimony

24    correctly, I think he at some point came to

```
 1    believe that the person he talked to the

 2    night before was potentially the person who

 3    had committed the robbery.

 4          Q.    How did he come to that

 5    conclusion?

 6          A.    I don't recall exactly.  There

 7    was a lot of conversation between him and

 8    Rhonda and their niece, I think it was, in

 9    the sort of immediate period after the crime.

10    So I don't exactly remember when this theory

11    came up.

12          Q.    And then proceeding down on that

13    same first page, there's a line item that

14    says, Niece sold, and there's a triangle, I

15    assume that that refers to defendant

16    possibly.  Niece sold defendant car, and then

17    the name Richard in quotation marks; do you

18    see that?

19          A.    Yes.  I don't think there was a

20    defendant in October 2014, but I see the line

21    you're talking about.

22          Q.    Right.

23          A.    Or, I'm sorry, 2004.

24          Q.    No, I agree with you.  What was
```

1    the significance of the niece selling a car?

2         A.    From what -- I mean, this is all

3    just me trying to recall the trial testimony,

4    so I may not get it exactly right.  But my

5    recollection is that, after the crime, Rhonda

6    had been talking to her niece and they were

7    trying to figure out -- I think the way that

8    she described it in her trial testimony was

9    that she was asking about, wasn't there

10    someone who you went to middle school with

11    named Richard, and then the niece says, maybe

12    his -- like refers to some nickname and then

13    the car comes up, but I'm not sure who

14    mentioned the car or at what point.

15           You know, there was a

16    conversation where they were trying to find

17    out -- they had someone in their minds and

18    they were trying to figure out who that was.

19         Q.    Who did the niece sell her car

20    to?

21         A.    I don't know.  I don't remember.

22         Q.    Is it your belief that Mr.

23    McClanahan identified Richard Diggs as his

24    attacker?

80

1        A.    You know, I would have to

2   speculate about exactly who he was

3   identifying.  But, yeah, I mean, I think at

4   some point the reason -- the reason in my

5   mind that Richard Diggs is written down in

6   this interview note is because he identified

7   Richard Diggs as the attacker.

8        Q.    Is it your understanding that

9   these three or four pages of notes were all

10  taken at the same time?

11       A.    I think that would make sense.

12       Q.    Do you have any reason to think

13  that that's not the case?

14       A.    I don't believe there's any

15  other dates on the notes.

16       Q.    Do you have any reason to

17  believe that there was anyone present during

18  this conversation other than Mr. McClanahan

19  and Detective Walker?

20       A.    I don't know.

21       Q.    So back to that line we were

22  looking at, niece sold a car, and then it has

23  Richard in quotations.

24       A.    Yes.

1        Q.    I'm assuming that Richard is the

2   person who purchased the car; is that your

3   assumption as well?

4        A.    Yes.

5        Q.    And that we're identifying

6   Richard because Richard is the person at the

7   convenience store the night before; is that

8   your assumption?

9        A.    Actually, no.  The way I read

10  their testimony, it was never clear that they

11  were all talking about the same person.

12       Q.    I understand that.  And we'll

13  get to that.  But I'm just going through what

14  the notes appear to say.

15       A.    Okay.  I don't know the

16  connection between this sort of line and the

17  portion of it above.

18       Q.    Can you think of any reason why

19  the name Richard would appear here other than

20  to identify Richard as the suspect?

21       A.    I think it's -- no, that makes

22  sense.

23       Q.    Can you think of any reason why

24  Mr. McClanahan would just say Richard in

1    quotation marks at the beginning and then

2    give the name Richard Diggs two pages later?

3         A.    My understanding is that they

4    went through a yearbook at some point and

5    were trying to identify the person who --

6    again this is sort of a game of telephone,

7    but there's -- someone believes that the

8    perpetrator was someone named Richard who the

9    niece had gone to middle school with.  They

10   pulled out a yearbook apparently at some

11   point that they're going through looking at

12   pictures.

13           You know, I -- my assumption is

14   that that's where the Diggs part came from,

15   but again I'm not sure a hundred percent.  I

16   mean, the notes aren't themselves very clear

17   about the source of it.

18        Q.    Okay.  But we've established

19   that the conversation memorialized in the

20   notes took place in a single setting,

21   correct?

22        A.    I don't know that we've

23   established it.

24        Q.    We have no reason to think

1    otherwise?

2         A.    I -- looking on the face of the

3    notes, I don't recall any reason to think

4    that they would have taken place on different

5    days.

6         Q.    And we have no reason to think

7    that there was anybody else presented other

8    than Detective Walker and Mr. McClanahan,

9    correct?

10        A.    I have no idea who was present.

11        Q.    Okay.  So hypothetically, if

12   there was nobody else present except the two

13   of them, then this exercise of going to look

14   at the yearbook to get a name would logically

15   have had to have happened before this

16   interview or after this interview, correct?

17        A.    Can you repeat the question?

18        Q.    Sure.  If Brenda Walker and

19   Richard McClanahan sat down for a single

20   conversation and it was only the two of them

21   present and there was an episode where the

22   niece went to the yearbook and got this

23   information about Richard Horton or Richard

24   Diggs and gave it to Mr. McClanahan, that

1    going to the yearbook would have had to occur

2    either before this conversation or after the

3    conversation.  If they're not there it

4    couldn't have happened during the

5    conversation?

6         A.    If they are not there then it

7    had to be before or after, yes, I think

8    that's logically true.

9         Q.    Right.  And again you have no

10   reason to believe that they were actually

11   present at the time?

12        A.    I have no idea who was present

13   at the time.

14        Q.    Right.  And is it your

15   understanding that the interview occurred at

16   the hospital?

17        A.    You're asking me to remember

18   trial testimony from back then.  But I think

19   that was the testimony of Brenda Walker.

20   Again not having seen it in several years.

21        Q.    So this circles back then to my

22   original question which is, if at the end of

23   the conversation Rick McClanahan was able to

24   identify Richard Diggs, why was he uncertain

1    and only able to say Richard at the beginning

2    of the conversation?

3            A.    I don't know.

4            MS. MARTINEZ:  I'm just going to

5    object to form and foundation on that one.

6            A.    Yeah, it's possible he

7    remembered over the course of the interview.

8            Q.    And if that were the scenario,

9    then the name Richard Diggs would not have

10   come from the yearbook, correct, it would

11   have come from Mr. Horton?

12           A.    Yeah, I mean, we're -- it's --

13   there's a lot of assumptions that we're all

14   including still in the line of questioning

15   here about no one else being there and about

16   when the interview took place and it's all

17   happened in one sitting.  If you add all --

18   if you put all of those assumptions into it

19   then, yes.

20           Q.    Okay.  Let me ask you a bigger

21   picture question.  The name Richard Diggs on

22   the third page, why is that Brady material?

23           A.    We read it as the victim having

24   identified a last name for a suspect and it

1    doesn't appear that that was turned over to

2    the defense.

3         Q.    Does it say in the notes that

4    Richard Diggs is a suspect?

5         A.    It says, Can ID MB, which I

6    understand to be male black, 27 to 28, which

7    I understand to be an age, Everett Middle

8    School, which I understand to be the place

9    where they thought that they had seen him,

10   and then it's just the name Richard Diggs, so

11   I assume that that is identifying a suspect,

12   yes.

13        Q.    Is there another way to construe

14   this language?  For example, can I -- Rick

15   McClanahan says, you know who can ID, Richard

16   Diggs, a witness.  Is it possible to read the

17   note that way?

18        A.    And they would be identifying

19   that he also went to Everett Middle School,

20   which was the main information they thought

21   that they had on the suspect, where they

22   recognized him from.  I mean, it would just

23   be a really stilted way, in my opinion, to

24   identify a witness.

1          Q.    Did Richard Horton attend

2     Everett Middle School?

3          A.    I believe that he did.

4          Q.    Did Richard Diggs attend Everett

5     Middle School?

6          A.    My understanding is they both

7     went to the same middle school and it was

8     called Everett.

9          Q.    Now, in a little bit we're going

10    to be talking about Ricardo Diggs; are you

11    familiar with that name?

12         A.    Yes.

13         Q.    Who's Ricardo Diggs?

14         A.    Ricardo Diggs, again my

15    understanding is, the brother of Richard

16    Diggs.

17         Q.    Did Ricardo Diggs also attend

18    Everett Middle School?

19         A.    I believe so.  I don't -- I'm

20    not a hundred percent certain, but we had

21    looked into that at one time.

22         Q.    So it's at least possible that

23    the notation Everett Middle School could

24    describe Richard Diggs, Ricardo Diggs, or

1    Richard Horton, correct?

2         A.    That the designation Everett

3    Middle School would describe the place that

4    all three of them went to middle school?

5    Yeah, that is possible.

6         Q.    Up above there's a descriptor

7    male black five-nine to six-one; do you see

8    that?

9         A.    Yes.

10             MR. EPSTEIN:  I'm sorry.  I keep

11   doing that, Alyssa, and I apologize.

12        Q.    Five-nine to six foot?

13        A.    Six foot, yeah.

14        Q.    Does that description describe

15   Richard Horton?

16        A.    No.

17        Q.    How tall is Richard Horton?

18        A.    I know he's over -- I believe

19   he's over six foot.  I don't know his exact

20   height off the top of my head.

21        Q.    Does that description apply to

22   Richard Diggs -- to Richard Diggs?

23        A.    I've never seen either of them

24   in person either, but I think from what I

1    recall of arrest reports or booking

2    information, they were listed as five-nine,

3    five-eleven.

4         Q.    When you say "they" are you

5    referring --

6         A.    I've referring to the Diggs

7    brothers.

8         Q.    Both Diggs brothers?

9         A.    I don't -- one maybe was

10   five-nine and one was five-eleven.  Again

11   this is -- I'm remembering other sources and

12   so it's the best of my recollection.

13        Q.    In your experience, are victim

14   estimations of height reliable?

15        A.    I think it depends on -- it

16   depends on the circumstances probably.

17        Q.    Suppose it's circumstances where

18   that you've just been hit in the head with a

19   gun and then shot in the leg?

20        A.    I mean, assuming that you're

21   referring to this case, my recollection is

22   that the height was the thing that he was

23   most certain about or at least that's how he

24   responded to questions about it at trial.

1        Q.    Okay.  But my question was,

2   under those circumstances, would you expect

3   the victim's estimation of height to be

4   reliable?

5        A.    You know, depending on the

6   certainty level, it's definitely possibility

7   that the height was the most certain thing

8   that a victim may be about a suspect.

9        Q.    And do you know the certainty

10  level he expressed?

11       A.    I -- again basing my

12  recollection off of the trial testimony, I

13  believe he said that he -- that when he was

14  asked if he could provide a description he

15  said at first just a height, which, you know,

16  to me was that that was the fact that he was

17  most certain of.

18       Q.    Okay.  The Diggs brothers and

19  Mr. Horton, they are all male blacks,

20  correct?

21       A.    Yes.

22       Q.    The descriptor five-nine to 6

23  foot, it's your testimony that that could

24  potentially apply to Ricardo Diggs and to

1    Richard Diggs, but not to Richard Horton,

2    correct?

3          A.    Yes, again never having seen the

4    Diggs brothers in person, it's based of other

5    information, but that's my understanding.

6          Q.    All right.  The description

7    continues, Light skin, short nappy hair,

8    bushy eyebrows; does that describe Richard

9    Horton?

10          A.    In -- today, in 2004, in 2005?

11          Q.    At the time of -- that's a fair

12    clarification.  At the time of the Loew

13    Street robbery, does that describe Richard

14    Horton?

15          A.    I don't know exactly.  I don't

16    think I've seen a picture of him at that

17    time.

18          Q.    And at the time of the Loew

19    Street robbery does this description apply to

20    the Diggs brothers?

21          A.    We had found pictures of them

22    and I'm not sure exactly when those pictures

23    are dated, but they're included in the files.

24          Q.    The next descriptor is, just out

92

1    of prison, drugs.  Does that apply to Richard

2    Horton?

3         A.    Yes, I believe that would have

4    applied to Mr. Horton.

5         Q.    What's your recollection about

6    that?

7         A.    If I -- he had prior charges,

8    prior convictions, that I believe had

9    something to do with either drug possession

10   or trafficking.  And obviously he was not in

11   prison at the time.  So I don't know exactly

12   how his release date lined up with this or

13   what the word "just" means in this context,

14   but --

15        Q.    But it's your understanding

16   that, prior to the Loew Street robbery, Mr.

17   Horton served time in prison for drug

18   offenses?

19        A.    Yes.

20        Q.    What about the Diggs brothers,

21   what do you know about their incarceration

22   for drug offenses prior to the Loew Street

23   robbery?

24        A.    I don't recall off the top of my

93

1   head except that they both had pretty

2   extensive criminal histories.

3        Q.   Is that something that the

4   Innocence Project would have looked into to

5   see whether that descriptor applied to

6   Richard Diggs?

7        A.   Potentially.

8        Q.   Do you know sitting here today

9   whether that was done?

10        A.   I don't recall.  I mean, I

11   remember seeing that they had extensive

12   criminal histories in multiple counties

13   across the state.

14        Q.   Okay.  We've already talked

15   about Everett Middle School a couple of lines

16   down.  Male black, 27 to 28, does that

17   describe Mr. Horton at the time of the Loew

18   Street robbery?

19        A.   I don't know how old he was

20   actually in 2004.

21        Q.   Do you know how old Richard

22   Diggs was at the time of the Loew Street

23   robbery?

24        A.   Not off the top of my head.

94

1          Q.    Do you know how old Ricardo

2    Diggs was at the time of the Loew Street

3    robbery?

4          A.    No.

5          Q.    The next line down is obviously

6    Richard Diggs and then it says, Adidas Boy?

7          A.    Yes.

8          Q.    Was Adidas Boy Richard Horton's

9    nickname?

10         A.    I believe that it was, but I

11   don't know where I'm getting that from.  I

12   don't know if I'm recalling from the

13   testimony or from this report or from a

14   different --

15              (Reporter asked for

16   clarification.)

17         A.    I guess the answer then is, I

18   don't know.

19         Q.    So as you sit here today you

20   can't remember whether Mr. Horton told you

21   that his nickname was Adidas Boy?

22              MR. CALLAHAN:  Objection to the

23   extent that would be covered by

24   attorney/client privilege.

1          MR. EPSTEIN:  I think that goes

2     to the Brady issue and the exculpatory nature

3     of these notations.

4          MR. CALLAHAN:  If you think you

5     can, answer, Mr. Howe.

6          MS. MARTINEZ:  The sound is

7     cutting out a little bit.  Can you repeat

8     what you said, Counsel?  I apologize.

9          MR. EPSTEIN:  The question was

10    whether Mr. Horton told Mr. Howe that his

11    nickname was Adidas Boy.  There was an

12    attorney/client privilege raised.  And I

13    responded that the Adidas Boy nickname was

14    relevant to the exculpatory nature of the

15    Brady notes.

16          MR. CALLAHAN:  And so I had made

17    the objection, but I looked to Mr. Howe, if

18    he thinks he can answer consistent with what

19    his knowledge is.

20          MS. MARTINEZ:  Okay.  Yeah, I

21    think -- I think that falls within the

22    perimeters of the subject matter waiver.

23      A.    I don't recall him specifically

24    telling me that, but it's possible.  Again I

1    don't remember the source.

2        Q.    Okay.  Can you turn to page 21

3    of the application.  Do you see footnote 10

4    at the bottom?  It says, Adidas Boy was

5    Horton's nickname?

6        A.    Yes.

7        Q.    Do you see that?  And that was a

8    statement that you put in your pleading to

9    the court, correct?

10       A.    Correct.

11       Q.    So is it fair to say that at the

12   time you believed that Adidas Boy was

13   Horton's nickname?

14       A.    Yes.

15       Q.    And you got that information

16   from somewhere, you wouldn't have just made

17   it up?

18       A.    No.  I wouldn't have just made

19   it up.  And again, you know, there's a

20   conversation that I recall from trial

21   testimony where the -- either the niece is

22   testifying or Rhonda Curry is testifying

23   about a conversation they had and the -- I

24   think Rhonda Curry says, did you go to school

1     with a person named Richard?  And the niece

2     says, yes, Adidas Boy.

3          Q.    To be clear, in asking this

4     question I'm not trying to insinuate that the

5     source of your information was Richard

6     Horton.

7          A.    Okay.

8          Q.    I'm simply asking, at the time

9     that you wrote this, you felt you had it on

10    good authority from some source that Mr.

11    Horton's nickname was Adidas Boy?

12         A.    I wouldn't have put it in the

13    briefing if I didn't think that it was

14    correct.

15         Q.    Does the Adidas Boy nickname

16    describe Ricardo Diggs?

17         A.    I don't know what nicknames he

18    had, if any.

19         Q.    Do you have any reason to

20    believe that it did?

21         A.    I don't know his nicknames.

22         Q.    Do you have any reason to

23    believe that Adidas Boy was a nickname that

24    referred to Richard Diggs?

98

```
 1          A.    I don't have any reason to
 2    believe anything about any of his nicknames.
 3                VIDEOGRAPHER:  Pardon me,
 4    Counsel, we're off the record to change DVDs
 5    at 12:07:39.
 6                     (Off the record.)
 7                VIDEOGRAPHER:  We're on the
 8    record at 12:25:13.
 9          Q.    Mr. Howe, before we broke we
10    were going through some of the identifying
11    information in the McClanahan notes.  I
12    believe the last thing we had talked about
13    was the notation Adidas Boy.  So I'm going
14    refer you to the next line which is, Reynolds
15    Avenue; do you see that?
16          A.    Yes.
17          Q.    To your knowledge, did Richard
18    Horton live on Reynolds Avenue?
19          A.    I don't recall where he lived.
20          Q.    Do you know where Richard Diggs
21    lived at the time of the Loew Street robbery?
22          A.    It may have been in a booking
23    information that we had, but I don't recall
24    right now.
```

99

1        Q.    And do you know where Ricardo

2  Diggs lived at the time of the Lowe Street

3  robbery?

4        A.    The same answer as Richard

5  Diggs.

6        Q.    Okay.  So as we've gone through

7  these identifiers I've tried to piece out

8  which ones could refer to Richard Horton,

9  which one to Richard Diggs, which one to

10  Richard -- I'm sorry, Ricardo Diggs, and

11  which ones could refer to more than one

12  person?

13        A.    Okay.

14        Q.    And as I understood your

15  testimony, and I want you to correct me if

16  I'm wrong, the only thing we talked about

17  that you maintain could refer to the Diggs

18  brothers, but not Richard Horton, was the

19  height?

20        A.    Besides his name.

21        Q.    Besides his name.  Thank you.

22        A.    That's a big one.

23        Q.    Yes, that is a big one.  So the

24  name Richard Diggs and the height are the

1    only two items here that you feel confident

2    saying could refer to one or both of the

3    Diggs brothers, but not to Richard Horton?

4           A.    Yes.

5                 MS. MARTINEZ:  Object to the

6    form.

7           A.    As far as I know.  Well, and

8    the -- I'm sorry, you said not to Mr. Horton.

9           Q.    Not to Mr. Horton, correct.

10          A.    I don't know anyone's age.  So

11   those are the only two that I feel confident

12   in right now.

13          Q.    How did Richard Horton's name

14   get into this investigation?

15          A.    Are you asking me from the --

16   from the Columbus Police Department

17   perspective?

18          Q.    I'm asking you -- yeah, from --

19   the police were conducting an investigation

20   of the Loew Street robbery.  Somewhere along

21   the line somebody said Richard Horton.

22          A.    Right.

23          Q.    Do you know who said Richard

24   Horton first?

1        A.    No.

2        Q.    Do you have any reason to

3  believe that it was Detective Brenda Walker

4  who first came up with the name Richard

5  Horton?

6        A.    I wouldn't want to speculate

7  about the process of the Columbus Police

8  Department investigation other than what's in

9  the trial transcripts and what's in the

10  police reports.

11        Q.    I'm not asking you to speculate.

12  I'm asking if you are aware of anything?

13        A.    No.

14        Q.    There's a description in the

15  application of these notes and it sort of

16  describes them as -- information put in that

17  describes the Diggs brother mushed together

18  with information that describes Richard

19  Horton; is that a fair characterization?

20        A.    Sure.

21        Q.    Do you have any understanding of

22  how that happened?

23        A.    I don't have any direct personal

24  knowledge of how that happened.

1          Q.    Well, I didn't ask for your
2     direct personal knowledge, because obviously
3     you weren't there.
4          A.    Right.
5          Q.    But you have spoken to people,
6     you've read the transcript, you've read other
7     pleadings, and you've written about this.
8     You mentioned earlier the yearbook.  I'm
9     trying to figure out what you think the
10    sequence of events was?
11         A.    You know, I mean, it is just
12    guessing or speculating, but I can give you a
13    theory, I suppose, if that's proper.
14         Q.    I'll take what you can give me.
15         A.    Okay.  Well, I mean, it is --
16    again I'm trying to remember the transcripts
17    so -- but, you know, one possibility is that
18    there was some recollection, either by Rhonda
19    or McClanahan, about someone, either the
20    person they talked to the night before or the
21    perpetrator being connected somehow to this
22    middle school and then a process where the
23    niece provides information about a person
24    named Richard that she went to middle school

1    with.  And throughout the course of this

2    conversation they're building up information

3    from different places and different sources

4    and potentially talking past each other.  I

5    mean, I think that's a plausible way to

6    interpret the information that we have.

7            Q.    When the niece went to the

8    yearbook, did she come back with the name

9    Diggs or did she come back with the name

10   Horton?

11           A.    I have no idea.

12               MS. MARTINEZ:  A belated form

13   objection.

14           Q.    Assuming that the name Diggs is

15   presented in the notes as a potential

16   suspect, are you able to tell from the notes

17   the degree of certainty with which Mr.

18   McClanahan said the name Diggs?

19           A.    Other than the word, can ID,

20   there's nothing in about a level of

21   certainty.

22           Q.    Once OIP had the notes and saw

23   the name Richard Diggs, what did OIP do?

24               MR. CALLAHAN:  Objection, based

1    on work product, except you think you can

2    answer to the extent there's been this

3    partial waiver on a Brady issue.

4                MR. EPSTEIN:  And I would submit

5    that, asking what they did and what evidence

6    they brought up to support this will go

7    ultimately to the materiality of the name and

8    the notes, so I think it's squarely within

9    the realm of the waiver.

10                MS. MARTINEZ:  I think we're

11    slowly starting to get away from, but I think

12    maybe preliminary initial steps after

13    receiving the Brady evidence falls within the

14    perimeters, but I think if we get much

15    further afield I would also jump in and

16    instruct the witness not to answer, but I

17    think we're still within the perimeters.

18          A.    We would --

19                THE WITNESS:  I'm sorry, just to

20    be clear, you're instructing me to answer?

21                MR. CALLAHAN:  I say -- we've

22    raised the objection, but you can answer

23    because we're dealing with this waiver on the

24    specific subject matter of Brady evidence.

```
 1                  THE WITNESS:  Okay.

 2                  MR. CALLAHAN:  If you can,

 3      answer.

 4          A.    After we received the police

 5      reports, we would have attempted to find out

 6      whether this was turned over at the time of

 7      the trial, the best that they could.  We

 8      would have reviewed the information at trial

 9      to see whether this information contradicted

10      or supplemented any important information

11      that was in the trial.  And ultimately in

12      this case we filed a motion for leave to file

13      a motion for a new trial based on what we

14      believed were Brady violations.

15          Q.    Did you talk to Richard Horton

16      about the name Richard Diggs?

17          A.    Yes.

18          Q.    What did Richard Horton tell you

19      about Richard Diggs?

20                  MR. CALLAHAN:  Objection.  I'll

21      to do an assertion of privilege.  To the

22      extent that you think you can answer

23      consistent with this limited waiver for Brady

24      purposes, you can answer.
```

```
 1          A.    I honestly don't remember
 2   exactly what he said.  I mean, I think that
 3   he was familiar with the Diggs brothers, like
 4   very loosely, but I don't think -- I mean, he
 5   didn't have a lot of information, as far as I
 6   can recall.
 7          Q.    Did he tell you about Ricardo
 8   Diggs?
 9          A.    I don't -- I believe that we
10   found Ricardo Diggs separately.
11          Q.    How did you find Ricardo Diggs?
12   And let me --
13               MR. EPSTEIN:  Before you object,
14   let me clarify the question.
15          Q.    How did you become aware that
16   Richard Diggs had a brother named Ricardo
17   Diggs?
18          A.    My -- I believe that it was
19   through searching Richard Diggs on the
20   Franklin County Common Pleas docket and
21   Municipal Court docket.  I typically only put
22   in the first two to three letters of a
23   person's name.
24          Q.    So you put those letters in and
```

1    Richard and Ricardo popped up?

2         A.    R-I-C Diggs returns everyone.

3         Q.    Did you discover in your

4    investigation that someone under the name of

5    Richard Diggs was in prison at the time of

6    the Loew Street robbery?

7         A.    Under the name -- under which

8    name?  Richard?

9         Q.    Richard Diggs.

10        A.    I don't believe they were in --

11   I don't remember prison or jail, but they

12   were incarcerated in some way.

13        Q.    So it's your understanding that

14   Richard and Ricardo Diggs are brothers,

15   correct?

16        A.    Correct.

17        Q.    Is it fair to say that one thing

18   we do know is that at least one of the Diggs

19   brothers could not have committed the Loew

20   Street robbery?

21        A.    I believe one of the Diggs

22   brothers was somehow in state custody at the

23   time that this would have happened.  Whether

24   in county jail or in state prison, I don't

 1    know.

 2           Q.    And therefore could not have

 3    committed the crime?

 4           A.    Correct.

 5           Q.    Is it your position that we are

 6    unsure as to which Diggs brother was in

 7    custody?

 8           A.    Yes.

 9           Q.    What is the basis for your

10    belief that, as represented in your

11    pleadings, that Richard Diggs and Ricardo

12    Diggs would use one another's identities?

13           A.    So the -- from what I recall,

14    the times where they have been arrested and

15    provided a date of birth, the dates of birth

16    are not -- are swapped around.  So you will

17    have Richard Diggs -- just for example, I

18    don't remember the specifics.

19           Q.    That's fair.

20           A.    But for example, one of the

21    Diggs brothers is going to be in the Franklin

22    County Municipal Court system with both his

23    own date of birth and his brother's date of

24    birth, and I think the same for both

1    brothers, combined just with sort of common

2    knowledge that it's not unusual for people to

3    use a sibling as an alias if they're arrested

4    for something while say on probation for

5    something else.

6         Q.    What's the basis for that common

7    knowledge?

8         A.    I mean, it's again just

9    something that I've seen multiple times over

10   the years.  I don't think I have a specific

11   source for it.  It's just something that

12   happens.

13        Q.    So is it fair to say that you --

14   I'm sorry, did you have something else?

15        A.    Yeah, I will also say, I mean,

16   this wasn't part of the pleadings at this

17   time, but later in DNA testing my

18   recollection was that BCI had the DNA -- had

19   multiple DNA profiles for the brothers.

20   There was some issue -- there was some

21   indication that the brothers may have been in

22   the BCI's system under -- one brother was in

23   under the other brother's name basically,

24   according to BCI's records.

110

1          Q.     How did you come to learn that?

2          A.     In conversations with BCI after

3    DNA testing.

4          Q.     Do you know who you were having

5    that conversation with?

6          A.     The only person I talked to at

7    BCI I believe was Elizabeth Benzinger.

8                 (Reporter asked for

9    clarification.)

10                THE WITNESS:  Elizabeth

11   Benzinger, B-E-N-Z-I-N-G-E-R.

12         Q.     Do you have any documents from

13   BCI that confirm what you described about the

14   DNA?

15         A.     Potentially it -- I don't know.

16   I would want to look through -- we were

17   corresponding by e-mail with the Franklin

18   County Prosecutor's Office and BCI.  It may

19   be somewhere in there.

20         Q.     Okay.  So as I understand your

21   testimony, you went to do a search of Richard

22   Diggs on the Franklin County Courthouse

23   website and discovered Ricardo as well?

24         A.     That's the best of my -- I can't

1    swear that's the first time that I ever saw

2    that there was a brother, but that's how I

3    remember it happening.

4         Q.   Do you have a -- strike that.

5    Has anyone told you that the Diggs brothers

6    would swap identities?

7         A.   We had -- there was an

8    investigator who had talked to the Diggs

9    brother that I believe we had attached to

10   this pleading who said that they were

11   confused for one another.  They looked very

12   similarly.  And -- but I don't recall whether

13   he -- whether -- whichever Diggs brother he

14   had talked to admitted to having used the

15   other one as an alias.

16        Q.   I believe, and you can tell me

17   if it's true, you're referring to the

18   affidavit attached as Exhibit H.  It is the

19   third to last page in the exhibit.

20        A.   Yes, that's correct.

21        Q.   And would you give me the Bates

22   numbers for the record, please.

23        A.   This is -- I have R. Horton

24   000195.

1          Q.    The document is captioned

2     Affidavit of Investigator Mark Rooks.  Who is

3     Mark Rooks?

4          A.    Mark Rooks is an investigator.

5          Q.    Who does he work for?

6          A.    I believe at the time he was

7     working for the State Public Defender's

8     Office.

9          Q.    And he indicates that, on

10    Monday, April 2nd, 2018, he went to what he

11    believed to be the home of Richard Diggs.  Do

12    you know how Mr. Rooks located that address?

13         A.    I don't.

14         Q.    And then paragraph 3, Mr. Diggs

15    reported that Ricardo Diggs was his brother

16    and that Ricardo is now deceased; do you see

17    that?

18         A.    Yes.

19         Q.    Is that your understanding that

20    one of the Diggs brothers has passed away?

21         A.    I get them mixed up myself,

22    between one and the other, but, yeah, one of

23    them is passed away.

24         Q.    Mr. Diggs also reported that he

1    and his brother, Ricardo, were sometimes

2    confused for one another.  That's

3    paragraph 4; do you see that?

4         A.    Yes.

5         Q.    Is that the source that you were

6    referring to for when I asked you if someone

7    had told you that they would change

8    identities?

9         A.    Yes.

10        Q.    Other than that statement, has

11   anyone ever told you that information, that

12   the Diggs brothers would change identities?

13        A.    I don't recall anyone else.

14        Q.    I believe you testified that one

15   of the Diggs brothers was incarcerated at the

16   time of the Loew Street robbery, but that

17   you're not sure which one it was?

18        A.    Correct.

19        Q.    In paragraph 5 Mr. Rooks writes,

20   Mr. Diggs reported that he was in prison

21   between 2002 and 2007; do you see that?

22        A.    Yes.

23        Q.    And the Loew Street robbery was

24   in 2004, correct?

```
 1          A.    Correct.
 2          Q.    So does that settle the question
 3     of whether -- of which brother was
 4     incarcerated at the time?
 5          A.    I mean, you would have to assume
 6     that Richard Diggs is telling the truth.
 7          Q.    Do we have any reason to doubt
 8     that Richard Diggs was telling the truth?
 9          A.    I would be cautious about
10     believing either Diggs brother about
11     something like this.
12        (Defendants' Exhibit 5 was marked for
13        identification.)
14          Q.    I'm going to hand you what I've
15     marked as Exhibit 5.  This is a screenshot
16     that I took of the Franklin County Clerk of
17     Court's website after I did a search for
18     Richard Diggs.  And you'll see that there are
19     line items for Richard Diggs and then Robert
20     Diggs and other people; do you see that?
21          A.    Yes.
22          Q.    Is this the sort of screenshot
23     that you were looking at when you started to
24     look at the question of the brothers?
```

1          A.    I mean, it's -- when you say,

2     the sort of things.

3          Q.    Well, is this one of the pages

4     that you looked at?

5          A.    We would have looked at the

6     Franklin County, as well as the Municipal

7     clerk, yes.

8          Q.    Okay.  And it looks to me like

9     this page is pretty consistent in the sense

10    that it says, Richard D. Diggs, and they all

11    have the same date of birth, July 16, 1997,

12    correct?

13         A.    The page that you're showing me,

14    yes.

15         Q.    Okay.

16              MS. MARTINEZ:  Just a belated

17    objection to this exhibit to the extent that

18    it's not yet produced in the civil matter.

19              MR. EPSTEIN:  Yes, and I

20    apologize for that.  I pulled it off the

21    website just before I came down here.  Yeah.

22        (Defendants' Exhibit 6 was marked for

23        identification.)

24         Q.    Now, I'm going to hand you what

1    I've marked as Exhibit 6, which is the same

2    thing, a screenshot from the Franklin County

3    Clerk of Courts, but this time the search

4    term is Ricardo Diggs; do you see that?

5            A.    Okay.

6                  MS. MARTINEZ:   The same

7    objection.

8            A.    Yes.

9            Q.    And I'm wondering if this is the

10   sort of thing that you had in mind, because

11   if you look down there'll be Ricardo Diggs --

12   the first two lines are -- strike that.   The

13   first line is Ricardo Diggs with a birth date

14   of July 16, 1997, the second line is Ricardo

15   D. Diggs with a birthday of July 16, 1997,

16   the third line is Ricardo D. Diggs with a

17   birth date of August 5th, 1976; do you see

18   that?

19           A.    Yes.

20           Q.    Is that the sort of information

21   that made you start thinking that the two of

22   them were changing identities?

23           A.    I believe that there was -- I

24   mean, you know, we were looking at -- well, I

1    don't know where you searched this

2    specifically, but it was something similar to

3    this.  I believe we were at the Municipal

4    Court, not the Common Pleas Court starting.

5         Q.    Okay.

6         A.    But it's something similar to

7    this.

8         Q.    Something akin to this where the

9    Ricard D. has two different dates of birth.

10   Do you know what those dates of birth,

11   August 5th, 1976, and July 16, 1977, do you

12   know who those refer to?

13        A.    No.

14        Q.    And then if you go down farther,

15   maybe eight or ten lines down, there's a

16   Ricardo L. Diggs with the same August date of

17   birth; do you see that?

18        A.    Yes.

19        Q.    Okay.  So even though I don't

20   have the Municipal one, is that the sort of

21   information that made you start thinking that

22   there was an identity sharing problem?

23        A.    It was a -- it was a search on

24   an online clerk's website where their dates

1    of birth were interposed.

2          Q.    I see.  And you represent in

3    your brief to the court that if you go to the

4    drop down box, the address for all of the

5    Ricardos and all of the Richards is the same

6    in Columbus.  And I will tell you that I've

7    gone to the drop down boxes and I agree with

8    you, the address is always the same.

9          A.    Okay.

10          Q.    Is that a significant fact to

11    you?

12          A.    Sure.

13          Q.    Why?

14          A.    You know, there's a lot of

15    different potential explanations, but, you

16    know, the fact that they have the -- that

17    both names are using the same address is

18    consistent with them having used each other

19    as aliases.  It's possible to come -- I mean,

20    it's possible a lot of things, but it's

21    consistent with them using -- having used

22    each other as aliases.

23          Q.    For that single address, do you

24    know which of the Diggs brothers was living

1    there?

2         A.    No.

3         Q.    Do you know whether both of them

4    were?

5         A.    I don't know.

6         Q.    Did the Innocence Project do any

7    investigation to find out which Diggs brother

8    was living at that address in 2004?

9         A.    I mean, unless it was the same

10   address that the investigator talked to him

11   at, I don't know the address that you're

12   referring to.

13        Q.    I believe the address is in your

14   pleading.  We'll try and get down later.  So

15   you've mentioned the Municipal Court website

16   and possibly some documents from BCI and a

17   conversation with someone from BCI.  Other

18   than that, are you aware of any other

19   evidence to suggest that the Diggs brothers

20   exchanged identities?

21        A.    I don't remember whether we had

22   booking information from them, but those are

23   the -- those are the sources of that I recall

24   right now.

1          Q.   Do you have any information to

2     suggest that it was both brothers using one

3     another's identity rather than one of the

4     brothers using multiple identities?

5          A.   I don't recall.  It would

6     depend -- I don't recall the details.

7          Q.   To your knowledge, did Detective

8     Brenda Walker do any investigation into

9     Richard Diggs?

10         A.   I'm not aware of any.

11         Q.   Does that suggest anything to

12    you?

13         A.   Could you clarify your question?

14         Q.   Does it suggest anything to you

15    about how seriously she took the case?

16         A.   I don't know -- I mean, there's

17    a lot of different explanations I suppose for

18    why she wouldn't have investigated the Diggs

19    brothers.

20         Q.   Does it suggest to you that she

21    did not consider Richard Diggs an identified

22    suspect?

23         A.   I wouldn't want to guess at what

24    her state of mind was.

1          Q.    Is it a possibility?

2          A.    I mean, is what a possibility?

3          Q.    Is it a possibility that

4    Detective Walker never considered Richard

5    Diggs a suspect in the Loew Street robbery?

6          A.    That's a possibility.

7          Q.    Now, if we assume that a Diggs

8    brother committed this offense then there are

9    two possible scenarios, right?  Richard is in

10   prison, Ricardo commits the offense.  Ricardo

11   is in prison, Richard commits the offense.

12   Do you have an opinion as to which of those

13   it is?

14         A.    No.

15         Q.    Let's assume that Richard is in

16   prison --

17         A.    Okay.

18         Q.    -- and Ricardo commits the

19   offense.  We know from this -- the notes that

20   Mr. McClanahan knew the name Richard Diggs,

21   correct?  At a minimum he knew the name

22   Richard Diggs?

23         A.    He provided the name Richard

24   Diggs to Brenda Walker.

122

1      Q.    Do we have any evidence to
2   suggest that he knew what Richard Diggs
3   looked like?
4      A.    When you say, do we have any
5   evidence to suggest that he knew what Richard
6   Diggs looked like, are you asking whether I'm
7   aware of specific evidence that was
8   introduced at trial?  I mean --
9      Q.    Or that you turned up in your
10  own investigation.  There's an assumption
11  that, because he gave the name Richard Diggs
12  in the notes, he must have known what Richard
13  Diggs looked like.  Do we know that to be
14  true?
15     A.    You know, it's not clear to me
16  where the source of Richard Diggs came from,
17  other than it appears to have been McClanahan
18  to Detective Walker.  I don't know whether he
19  saw it in a yearbook and identified him that
20  way or whether he got it from some other
21  source.  I mean, not being there, I just
22  don't think there's enough information that I
23  have to speculate on it.
24     Q.    And if he knew Richard Diggs,

1  and in the hypothetical we had set up Ricardo

2  Diggs is the one committing the offense, are

3  you aware of any evidence to suggest that

4  Rick McClanahan was unable to tell the two of

5  them apart?

6         A.    I don't know whether he was or

7  wasn't.

8         Q.    Okay.  The purpose of your work

9  was to get Mr. Horton a new trial and

10  possibly released from prison, correct?

11        A.    In the course of our

12  representation?

13        Q.    Yes.

14        A.    Initially our -- yes.  Yes.  I

15  mean, our purpose was to try to get to the

16  truth as best we could.  And ultimately

17  having gone as far as we could, yes, it was

18  in pursuing his postconviction release.

19        Q.    Right.  And do you understand

20  that the purpose of the present lawsuit is a

21  different aim, correct?

22        A.    Correct.

23        Q.    And therefore different

24  questions may be relevant?

```
 1          A.    Okay.

 2          Q.    And different standards may

 3    apply?

 4          A.    Okay.

 5          Q.    Okay.  So I want to figure out,

 6    since I represent Detective Walker, what you

 7    believe she did wrong in this scenario.  I

 8    know that you believe that the note was Brady

 9    material and so you believe it should have

10    been turned over to the prosecutor, correct?

11          A.    Yes.

12          Q.    A Brady violation is more or

13    less a strict liability offense, correct?

14          A.    I don't know what the standard

15    is, especially in the civil context.

16          Q.    Fair enough.  Setting aside the

17    failure to turn over the Diggs name, are you

18    aware of any other misconduct by Detective

19    Walker?

20          A.    In my opinion, I think she

21    testified falsely or very close to it about

22    how she came upon the name Richard Horton or

23    at least very misleadingly in terms of not

24    having mentioned the Diggs name at all in
```

1    that conversation.  I think when she typed

2    the typed notes, where she's talking about

3    McClanahan's description of the suspect, I

4    think she intentionally left off -- this is

5    just -- I'm just speculating, but she did in

6    fact leave off the lower range of the height

7    description and otherwise copied it over

8    identically.

9              Those notes, if I recall

10   correctly, were typed up after Horton had

11   been developed as a suspect.  So -- I mean,

12   those are the things that come to mind off

13   the top of my head.

14        Q.    Okay.  Let's take those in

15   reverse order.  Detective Walker takes

16   handwritten notes of her interviews, correct?

17        A.    Correct.

18        Q.    And then at some point those

19   become typed summaries for use by the

20   prosecutors, correct?

21        A.    At least some of them, yes.

22        Q.    What can you tell me about the

23   process by which notes are converted into

24   summaries?

```
 1                MS. MARTINEZ:  Objection to form
 2    and foundation.
 3         A.    When you're asking about the
 4    process, you're asking about the process
 5    within the Columbus Police Department?
 6         Q.    Correct.  Do you have any
 7    information about that?
 8         A.    Other than what happened in this
 9    case, no.
10         Q.    All right.  Do you know whether
11    Brenda Walker was actually the person who
12    typed that summary?
13         A.    I would have to look at the
14    document itself and see if there's an
15    indication there.
16         Q.    Is it possible that the
17    exclusion of the lower range on the height
18    was a typographical error?
19         A.    You know, the height description
20    was other -- or the description of the
21    suspect was almost, if I'm recalling
22    correctly, word for word from the handwritten
23    notes, except that the portion that we talked
24    about that happens to exclude Mr. Horton was
```

1    excised from the description of the

2    handwritten notes between -- the description

3    of the handwritten and the description in the

4    typed report.  Is it theoretically possible

5    that that exclusion of the height range that

6    excludes Horton was a typo?  I mean, I

7    supposed it's theoretically possible.

8            Q.    And by the way, since we're

9    talking about height estimates, Rhonda Curry

10   offered an estimation of the height of her

11   attacker, too; is that right?

12           A.    I don't recall.

13           Q.    Flip back to the handwritten

14   notes of the McClanahan interview.

15           A.    Do you have a Bates number?

16           Q.    Of course I don't.

17           A.    Does anyone remember the Bates

18   number?

19               MR. CALLAHAN:  Is it R. Horton

20   102?  Is that the handwritten -- I'm sorry.

21               MR. EPSTEIN:  No, I appreciate

22   the help.

23           A.    Is this the one?

24           Q.    Yes.

1        A.    Okay.  R. Horton 102.

2        Q.    All right.  So now let's go back

3    to R. Horton 99.  Do you recognize these

4    notes?

5        A.    Not by sight, but they appear to

6    be the same handwriting as the Walker notes

7    of the McClanahan interview.

8        Q.    And they're describing the

9    events of the Loew Street robbery, correct?

10       A.    Yes.

11       Q.    Are these the notes of the

12   Rhonda Curry interview that we earlier talked

13   about whether they were or were not produced?

14   I know her name is not on it, but I think you

15   can glean it from the context.

16       A.    Without a name and not having

17   seen it in a long time -- I mean, I can

18   assume for the sake of discussion or

19   questions that it was Rhonda Curry's

20   interview.

21       Q.    That's fine.  And I will

22   represent to you that in fact that's what it

23   is.

24       A.    Okay.

```
1          Q.    So if you turn to page Richard
2    Horton 100, there's information at the top
3    and then there's a break?
4          A.    Yes.
5          Q.    And then there is a description
6    of the suspect, male black, 25 to 30, six
7    foot two to six foot three; do you see that?
8          A.    Correct.  Yes.
9          Q.    Does that description apply to
10   Richard Diggs?
11         A.    I don't remember the height of
12   either of them, but again my recollection is
13   that one was five-eleven and one was
14   five-nine.
15         Q.    It's your recollection that
16   neither one of them tops six feet, correct?
17         A.    Yes.
18         Q.    So would this description apply
19   to either one of them?
20         A.    No.
21         Q.    Would this description apply to
22   Richard Horton?
23         A.    It's in the range.
24         Q.    Is it in the range or is it spot
```

1  on?

2         A.    Again I don't remember his exact

3  height.  I believe he's north of six foot,

4  but -- it's in the range.

5         Q.    All right.  I asked you about

6  Detective Walker's behavior and you also made

7  reference to her testimony.  I don't want to

8  mischaracterize what you said, but what I

9  understood was you were saying that she was

10  not honest or accurate about her conversation

11  with Mr. McClanahan because she did not

12  mention the name Richard Diggs.  Does that

13  capture what you were saying?

14         A.    I think it was misleading at

15  least.

16         Q.    It was misleading because she

17  did not mention Richard Diggs?

18         A.    Again, I mean, I'm recalling

19  specific trial testimony from, you know,

20  multiple years' recollection, but my

21  recollection of the testimony was that she

22  was asked how she came about getting the name

23  and that she said, at first she had just had

24  Richard, and then there was some period of

1    time that went by, and then she was given

2    Richard Horton.  So to me by implication

3    that's misleading if the victim had given

4    her, in fact, Richard Diggs in that first

5    interview.

6         Q.    Now, let's take a piece of that.

7    She testified that, at first she had a name,

8    and later she was given the name Richard

9    Horton.  Do you believe that portion of the

10   testimony to be true?

11        A.    At first she was given a name --

12        Q.    And we'll get into what the name

13   was later.  I'm focusing on the fact that

14   somebody gave her the name Richard Horton

15   later; is that your understanding?

16        A.    Someone did eventually give her

17   the name Richard Horton.

18        Q.    Do you know who that was?

19        A.    I don't -- I believe it was

20   another Rhonda or -- Curry or McClanahan, but

21   I don't know who.

22        Q.    All right.  And I will, since

23   you haven't read Brenda's deposition, I will

24   represent to you that what she testified to

1    was that McClanahan told her, I know his name

2    is Richard.  I can't remember his last name.

3    It could be Diggs, I'm not sure.  I will

4    check.  Have you ever heard that narrative

5    before?

6          A.    No.

7          Q.    If that narrative were true,

8    would there be any reason to inform the

9    police of the name Richard Diggs once Mr.

10    McClanahan comes back and says, yeah, I

11    checked, I didn't mean Diggs, it's Horton?

12              MS. MARTINEZ:  Object to the

13    form.

14          A.    I think it would really depend

15    on the context.  I mean, if he's saying, I

16    think it's this person and then changes his

17    mind later on, I think that undermines the

18    subsequent identification.  So if he was

19    really -- or, you know, if he's saying, I

20    have no idea who it is and maybe it's -- you

21    know, I'll just pick a random name -- you

22    know, random Richard that I know.  Maybe it's

23    Richard -- you know.  I think a lot depends

24    on the context of that initial confidence

1    level.  At minimum it undermines the

2    subsequent identification.

3         Q.    Well, I want you to assume that

4    the original statement was, I know it's

5    Richard.  I don't know the last name.  It

6    could be Diggs.  I don't have any confidence

7    in that.  I will check with my niece to get

8    you the right name.  In that scenario, does

9    the name Diggs still have the same probative

10   value -- exculpatory value?

11              MS. MARTINEZ:  Objection.

12        A.    The same as if he had said with

13   confidence that it was Richard Diggs --

14        Q.    Correct.

15        A.    -- and then changed his mind?  I

16   mean, no.  Obviously the more confident that

17   he is in the initial description -- or the

18   initial identification of Diggs, the more

19   probative that is.

20        Q.    Okay.  At that point does it

21   have any exculpatory value?

22        A.    Again I think that having

23   identified someone else with whatever level

24   of certainty undermines a subsequent

1    different identification.  You know, the more

2    confidently Diggs is identified, the more

3    probative it is.  But I do think identifying

4    anyone initially and then changing your

5    mind -- you know, typically memories don't

6    get better with time.

7         Q.   And again the scenario also

8    assumes, not just that he changed his mind

9    later on, but that he expressly told her, I'm

10   not sure.  I will get back to you once I

11   check?

12        A.   I mean, again, if he's initially

13   not sure and tentatively identifying someone

14   and then comes back later and supposedly

15   definitively identifies a different person, I

16   think the tentative identification of a

17   different person is probative and relevant to

18   the overall soundness of the subsequent

19   identification.

20        Q.   And how does the fact that

21   Richard Diggs was at least apparently in

22   prison at the time of the offense, how does

23   that weigh in the calculus?

24        A.   Well, again, one of the Diggs

1    brothers was probably in State custody.  I

2    don't have any confidence in terms of which

3    one it was at the time or which one, you

4    know, he was potentially identifying.  They

5    both look very similar to each other.  And as

6    I think we talked about, I don't know how

7    well he knew the Diggs brothers and whether

8    he got them mixed up.  So it's really -- I

9    don't think the fact that one of them was in

10   State custody affects the probative value

11   that much.

12        Q.    What basis do you have to

13   believe that the name Richard Diggs in the

14   notes would have led trial counsel to look at

15   the possibility that Ricardo Diggs was

16   involved?

17             MS. MARTINEZ:  Object to the

18   form.

19        A.    You're asking me to speculate

20   about the trial strategy or about what the

21   trial strategy would have been in 2004 with

22   this --

23        Q.    Not trial strategy.  What I'm

24   wondering about is, if this information about

1    Richard Diggs had been provided to the

2    defense in 2004, what confidence do we have

3    that it would have led them to be thinking

4    about Ricardo Diggs?

5              MS. MARTINEZ:  The same

6    objection.

7         A.    You know, I can't put a number

8    on a counter factual, but we found Ricardo

9    Diggs so --

10        Q.    You found Ricardo Diggs more or

11    less accidentally, right?  By virtue of the

12    way in which you input data into the system?

13        A.    I don't know if I would say

14    that's an accident, but, you know, yeah, it

15    was -- it was fortuitous, but the kind of

16    thing that you would -- that wasn't a freak

17    occurrence.

18        Q.    No, it wasn't a freak

19    occurrence, but if someone doing a search

20    actually spelled out the whole name and wrote

21    Richard then that information never would

22    become apparent, correct?

23        A.    Or if you go do some research

24    and interview Richard Diggs or maybe

1   interview the people who know him, you know,

2   and you find out that he has a brother who

3   he's using as aliases or who he's often

4   confused with -- you know, there's a million

5   different paths that could -- you know,

6   speculatively could have happened in the

7   counter factual that this name was turned

8   over.

9          Q.    Right.  But we can't know for

10   sure whether any of those things would have

11   happened, correct?

12         A.    No.

13         Q.    And we can't be sure that the

14   defense had the time to do that

15   investigation, correct?

16         A.    You know, I think some

17   investigation would have been

18   constitutionally required of defense counsel

19   having been given the name of an alternate

20   suspect.  Again, we can't say what would or

21   wouldn't have happened if things had been

22   different.

23         Q.    And we all know that sometimes

24   trial counsel don't necessarily rise to their

1    constitutional obligations?

2          A.    Unfortunately, yes.

3          Q.    That's part of what keeps you in

4    business.

5          A.    If you want to call it a

6    business, but, yeah.

7          Q.    Nor do we know sitting here

8    whether they would have had the budget to do

9    any kind of investigation; is that correct?

10         A.    I mean, again, you should be

11   constitutionally entitled to an investigator

12   budget from the county, even in the case of

13   indigent defendant, you know.  So, you know,

14   budgetary concerns, at least in theory,

15   shouldn't matter for investigative resources

16   in a felony criminal trial.

17         Q.    But you never located the Diggs

18   brothers in -- no, I'm sorry.  Strike that.

19   You located one of the Diggs brothers in

20   2018, correct?

21         A.    Yes.  Yes.

22         Q.    And I apologize if I asked you

23   this before.  Do you know how that was

24   accomplished?

1          A.     No.

2          Q.     Who should I talk to to find out

3    how that was accomplished?

4          A.     I don't know if Mr. Brooks would

5    have used his own databases or if he would

6    have gone to an address that we had found.

7    So, I mean, he may know.

8               MR. EPSTEIN:  Can I hear that

9    again, please.

10      (Record read by Reporter.)

11         Q.     What are you referring to when

12   you say, his databases?

13         A.     Private investigators often have

14   databases that they have subscriptions for

15   that are typically not available to the

16   general public.  Often they're commercial

17   databases.  I'm, frankly, not super well

18   versed in all of the weeds of that, but if

19   you hire a private investigator to find

20   someone, you know, sometimes you can provide

21   them an address and sometimes that helps, but

22   oftentimes they have their own sources for

23   finding people's addresses.  Just like a skip

24   tracer would or someone serving a process,

1    you know, they have access to these sources.

2         Q.    And you said alternatively, you

3    didn't know if he used his own resources or

4    if he used some resources that OIP had.  What

5    resources were those?

6         A.    We would have -- I mean -- well,

7    I don't know that we -- I don't know that we

8    used any resources to find his address in

9    this case.  I don't recall anything

10   specifically about his address.

11        Q.    And I'm not asking what you

12   actually did.  I'm asking what resources you

13   have available if you wanted to do a search

14   of that nature?

15        A.    Typically we'll use just

16   publicly available sources.  The Municipal

17   Court website is one of the best places to

18   find current addresses from, you know, civil

19   lawsuits or speeding tickets.  And so if you

20   have a fairly recent Municipal Court case,

21   often that's a good source for an address.

22             Right now we will sometimes use

23   Spokeo for addresses.  I don't think that we

24   had that in 2018, but I'm not a hundred

1    percent sure.  And, frankly, the publicly

2    available sources, the court websites, are

3    the better sources of information.  Are more

4    reliable in my experience.

5            Q.    Let me switch gears on you.

6    There's something that's been puzzling me

7    about this case.  There's an effort at trial

8    to impeach the reliability of the eyewitness

9    identification, correct?

10           A.    Yes.

11           Q.    There were suggestions that he

12   had a sweatshirt hood over his face and that

13   he ordered Ms. Curry not to look at him.

14   I've heard some suggestions about the

15   lighting being poor or rapidity of the

16   attack.  Those are all things that a defense

17   lawyer would point to to challenge whether

18   these people could really identify the

19   person, correct?

20           A.    Typically.

21           Q.    Okay.  On the other hand there's

22   the suggestion that Mr. McClanahan was able

23   to make an identification and he identified

24   or he recognized Mr. Diggs, correct?  That's

1    at least another potential line of defense if

2    you have that note, correct?

3         A.    Correct.

4         Q.    Isn't there on a tension between

5    those two lines of defense?  If he couldn't

6    recognize the attacker and say it was Mr.

7    Horton, he couldn't recognize the attacker

8    and say it was Mr. Diggs either, correct?

9         A.    Well, I don't know if he's

10   identifying him from the pay phone from the

11   night before or if he's identifying him from

12   what little he saw, you know, the sort of

13   circle around the nose, which I understood to

14   be more than a suggestion that was both of

15   their reports as to what part of the face

16   they actually saw.

17             So, you know -- and

18   fundamentally the -- even if there's some

19   uncertainty about the identification of

20   Richard Diggs, it undermines this idea that

21   they're certain that it was Richard Horton.

22   This was the State's closing argument.  This

23   was the State's primary argument to the jury

24   was that, this is not a bad eyewitness ID

1    case because they recognized Richard Horton.

2    They knew it was Richard Horton.  They knew

3    him from the neighborhood.

4              This is not a -- you know, this

5    is like recognizing your cousin or something.

6    And the fact that he had initially identified

7    a different person, even if there's some

8    uncertainty in that that's inherent with only

9    seeing a part of their face, it undermines

10   the certainty of the identification for Mr.

11   Horton, even if he was wrong about both

12   identifications.

13        Q.    Okay.

14        A.    Is it a good time to use the

15   restroom?

16        Q.    Absolutely, a perfect time.

17              VIDEOGRAPHER:  We're off the

18   record at 1:20:32.

19              (Off the record.)

20              VIDEOGRAPHER:  We're on the

21   record at 1:26:04.

22              MR. EPSTEIN:  Oh, Alyssa is not

23   with us.

24              MR. CALLAHAN:  Alyssa?  Okay,

1    there we go.

2                MS. MARTINEZ:  Sorry, I just got

3    back.  I'm a little slower with my injured

4    leg.  Thank you all for waiting.

5                MR. EPSTEIN:  All right.

6    Everybody ready?

7                MS. MARTINEZ:  Yes, I'm ready.

8         Q.    Mr. Howe, up to this point we've

9    talked a great deal about what I'll call the

10   Brady component of this case and your work

11   for Mr. Horton.  I would like to shift gears

12   and talk a little bit about the DNA side of

13   it.

14        A.    Okay.

15        Q.    Let me just give you an

16   open-ended question and tell you to talk.

17   Tell me about the DNA component of the case.

18        A.    Well, there was a single spent 9

19   millimeter casing that was recovered from the

20   scene and that was DNA tested as part of our

21   involvement in the case.  A single male

22   profile was produced that excluded Richard

23   Horton.

24        Q.    What do we know about the source

1    of the DNA?

2            A.    Can you be more specific?

3            Q.    Well, DNA can be on a shell

4    casing, a piece of material, in a number of

5    different ways.  It can be blood.  It can be

6    human touch.  It can be semen.  It can be all

7    kinds of things.

8            A.    Correct.

9            Q.    What do you know about the DNA

10   source in this case?

11           A.    It was recovered from the

12   cartridge, the spent cartridge casing.  And

13   we know that there was a some sort of

14   fingerprint on the casing.  The details I'm

15   struggling onto remember a bit.  If I'm

16   remembering correctly, there was some ridge

17   detail identified, but it wasn't enough to

18   analyze for a fingerprint comparison.  So

19   there is a some indication it was touched.

20                There's also I believe -- there

21   were stipulations in the postconviction

22   litigation about the evidence handling

23   procedures that would have been in place

24   by -- or would have been used by Columbus

1    police at the time, which I don't recall off

2    the top of my head, but are in the record

3    so --

4         Q.    Okay.  Well, we're going to look

5    at the stipulation in a little bit.  So let's

6    set that aside for a moment.  So you

7    testified that there was a fingerprint found

8    on the shell casing, I assume you meant in

9    2004?

10        A.    I don't know when the print was

11   first identified.  I think there may have

12   been some -- I don't recall whether the

13   original investigation noticed that there was

14   ridge detail there.  I do know that, at least

15   in 2004, they identified the ridge detail and

16   said it wasn't enough to do a comparison.

17        Q.    Okay.  So just to repeat, there

18   was some fingerprint on the shell casing, but

19   not usable as fingerprint evidence?

20        A.    Correct.

21        Q.    Do we know that the DNA that was

22   tested came from that fingerprint?

23        A.    To me it seems likely, but, you

24   know, there's no way to, with 100 percent

1    certainty, identify the source of a DNA

2    profile that's recovered off of any piece of

3    evidence.

4            Q.    And you indicated that the

5    results of the test excluded Mr. Horton as

6    the DNA donor, correct?

7            A.    Correct.

8            Q.    Would you regard that as

9    exculpatory evidence?

10           A.    Yes.

11           Q.    Would you regard that as

12   exonerating Mr. Horton?

13           A.    Can you say what you mean by

14   exonerating?

15           Q.    Well, that's a fair question.

16   Let me turn it around.  What do you

17   understand the term exonerate to mean?

18           A.    You know, it's a -- it's a folk

19   term that's used by people in different ways.

20   You know, to me it means that there -- that

21   the conviction has been overturned or that

22   there's strong evidence of a person's

23   innocence in -- with regards to a crime

24   they've been convicted of.

1     Q.    Okay.  Applying those

2   definitions, is it your opinion that the DNA

3   evidence exonerated Mr. Horton?

4     A.    In combination with the evidence

5   undermining the eyewitness identification, I

6   think that both of those pieces of evidence

7   together in my mind are exonerating, yes.

8     Q.    I'm asking about the DNA

9   standing alone.

10     A.    Obviously, you know, the more

11   putting the evidence together makes it

12   stronger, but it's not a sharp line to me in

13   terms of -- you know, I don't know how you

14   draw a sharp -- epistemological threshold on

15   an exonerating question.  So it's certainly

16   exculpatory.

17     Q.    What is NIBIN testing?

18     A.    So NIBIN is -- I hope I get this

19   right.  I think it's the National Integrated

20   Ballistic Information Network.  This is a

21   system used by law enforcement to capture

22   certain information about spent cartridge

23   casings and I believe spent -- fired

24   projectiles in a database that can be

1    compared against new entries and against

2    other entries in the database.

3         Q.    Do you know how a NIBIN test is

4    conducted?

5         A.    I don't know the details, no.

6         Q.    Do you know if there's any

7    sequencing that has to be done if you're

8    going to do a DNA test and an NIBIN test?  Is

9    it significant which order you do them in?

10        A.    I would want advice from -- the

11   DNA person is the person to get the advice

12   from on that question.  So I would defer to a

13   DNA analyst on that.

14        Q.    Okay.  That's fair.  What's your

15   understanding of the NIBIN testing in this

16   case?

17        A.    From what I recall, we had

18   requested the prosecutor's office compare the

19   casing ballistically or to both -- not only

20   the NIBIN database, but I believe there are

21   state and local databases as well that have

22   some of the same information.  And that there

23   was some search done against one of those

24   databases.  I'm not -- I can't remember off

1    the top of my head which one it was.  That it

2    got a single hit back, but that hit was to

3    the prior entry of the same casing in the

4    original investigation.

5            Q.    Is it your understanding that

6    the NIBIN testing you requested was the first

7    time NIBIN testing had been done on the shell

8    casing in this case?

9            A.    I mean, I -- can you ask the

10   question again?

11           Q.    Yeah.  Before you asked for the

12   NIBIN testing in 2018 or whatever year it

13   was, had there been a prior NIBIN test on

14   this particular shell casing?

15           A.    Well, the casing was -- appears

16   to have been in the database, or at least

17   that's what we were told as the result of the

18   testing that was done in 2018.  I don't know

19   what all of the possibilities are about

20   entering some information in the database and

21   how often it's compared or whether it's run

22   at some stage.  That's all sort of above my

23   head, but I can say that when the casing was

24   compared to the database in 2018 my

1    understanding is we were told that it hit to

2    a previous entry, which was that same casing

3    entered into the database from before.

4         Q.    I understand that.  Does the

5    Ohio Innocence Project have scientific or

6    technical people on their own staff?

7         A.    No.

8         Q.    Do you reach out to other people

9    in the University for this sort of

10   information?

11        A.    You know, the ballistics

12   database information, you know, the very sort

13   of surface level understanding that I have

14   comes from articles and from other casework.

15   But, yes, I mean, you know, we will sometimes

16   reach out to experts if there's a question

17   that we have beyond the scope of what we

18   think we understand or have access to.

19        Q.    There's also fingerprint

20   evidence in this case; do you remember that?

21        A.    Yes.

22        Q.    What can you tell me about that?

23        A.    Again this is going off of

24   recollection from something six years ago.

1    So I may not have all of the details.  But I

2    believe there was either a fingerprint or

3    palm print or perhaps multiple prints

4    identified on the foldaway bed that the

5    perpetrator had touched when -- in the course

6    of the robbery.  And my recollection is that

7    those were unidentified at the time of trial,

8    at the time of Mr. Horton's trial.

9         Q.    And when you say unidentified,

10   were at least some of those prints usable?

11        A.    Yes, I believe so.  Although

12   from -- there are terms of art that I'm not a

13   hundred percent familiar with myself that you

14   would have to ask a fingerprint examiner

15   about.  But at various points I think they

16   were described as of value or, you know,

17   sufficient for comparison and I can't

18   remember.  There was some other word that

19   they had used to describe it.

20              And in the course of the

21   proceedings I believe the Franklin County

22   Prosecutor's Office had tried to get more or

23   run more information on those prints and we

24   were being told that they were -- they were

1    not suitable for comparison, that whatever of

2    value note had been in the original reports

3    was somehow either a typo or wrong.  That's

4    about as much as I remember about the

5    fingerprints.

6         Q.    All right.  Let me break that

7    down and make sure I understand.  So the

8    employees recovered some fingerprint evidence

9    from the crime scene, correct?

10        A.    Yes.

11        Q.    And at least some of those

12   fingerprints were usable in some sense?

13        A.    It's not -- I think that they

14   were described at the time as usable in some

15   sense.

16        Q.    Okay.  And is it your

17   understanding that more fingerprint testing

18   occurred after the start of trial?

19        A.    I was told as part of the

20   postconviction proceedings that testing had

21   occurred during the trial.  That some

22   comparison was made during the trial.

23        Q.    During the trial, meaning after

24   the start of the trial?

1          A.     Yes.

2          Q.     Who told you that?

3          A.     Kim -- it was during the course

4    of conversations with Kim Bond, who was the

5    prosecuting attorney we were working with at

6    the time.

7          Q.     And Kim Bond told you that the

8    fingerprints that they were testing were not

9    usable; is that correct?

10         A.     Well, no.  She was relaying

11   information -- again, this is from my

12   recollection.  So -- but I believe that she

13   was relaying information from whatever latent

14   print lab they were -- she was talking to and

15   that the comparisons that we wanted to have

16   done in 2018 they could not do supposedly

17   because the prints were not of sufficient

18   value.  Or I can't remember the exact

19   terminology that they used.  There are terms

20   of art involved here that I just don't

21   recall.

22         Q.     Was that purely an oral

23   conversation or did Kim Bond provide you any

24   of the testing records?

1      A.    A good question.  I don't

2  recall.

3      Q.    Approximately how long did OIP

4  represent Mr. Horton?

5      A.    We would have begun our

6  representation probably some time in 2018 and

7  ended our representation shortly after the

8  case was dismissed, the criminal case.

9      Q.    And during that period of time

10  the Ohio Innocence Project was filing

11  pleadings and motions in court on his behalf?

12      A.    Yes.

13      Q.    Are you aware that during the

14  period of time of that representation Mr.

15  Horton was simultaneously filing pleadings

16  pro se?

17      A.    That rings a bell.  I believe he

18  had also had a -- I don't know if it was

19  pro se, but there was a judicial release

20  motion I think he had a different attorney

21  on.

22      Q.    I mean, is that a problem?  This

23  must come up a lot for you when you're

24  representing inmates who then take it upon

1    themselves to file things on their own?

2         A.    I mean, it obviously depends on

3    the -- on the subject matter of whatever the

4    pro se filing is, you know.  If it's over a

5    conditions issue in a state prison, you know,

6    we're not going to represent someone on that

7    anyway.  So, I mean, it really depends on the

8    subject matter.

9         Q.    I believe Mr. Horton was filing

10   for judicial release; is that correct?

11        A.    I mean, that's the one that I

12   recall, yeah.

13        Q.    And that would be in the scope

14   of what you were doing for him, correct?

15        A.    No, we typically don't -- I

16   don't know that we -- I won't say that we've

17   never done before, but I have never filed a

18   judicial release motion for a client.  My

19   understanding, and I'm not very familiar with

20   the law around judicial release, but my

21   understanding is that it has to do sort of

22   more with time served and the calculation

23   of -- it's sort of completely independent of

24   a person's claim of innocence.  You know, and

1    so in that sense it's, you know, behavior in

2    prison and time served and other factors that

3    I'm probably not aware of.

4            Q.    Do you know what the basis for

5    his judicial release motion was?

6            A.    I don't recall.

7            Q.    Were you aware of those filings

8    at the time that they were being filed?

9            A.    I -- yes, I was -- yes, I was

10   aware that there were judicial release

11   motions that were going to be filed.

12           Q.    When you would file pleadings on

13   behalf of Mr. Horton, would you show him the

14   drafts before you filed them?

15           A.    I don't specifically recall a

16   time that I did.

17           Q.    Is that your practice to do so?

18           A.    It really -- I defer a lot to

19   clients on that question.  Some clients are

20   very much involved and want to see everything

21   that comes in.  Other clients are not really

22   interested in the details and are willing to

23   say, I trust whatever you have and I want it

24   filed.  I don't want to wait a month and a

1    half for the prison mail system to go back

2    and forth.

3           Q.    How would you characterize Mr.

4    Horton on that spectrum?

5           A.    Well, it's going to involve

6    discussing some privileged conversations

7    so --

8           Q.    Well, I'm not asking, for

9    example, for topics where he took a hand.  I

10   just want a general characterization of, was

11   he the type of person who wanted to be kept

12   in the loop and shown things and be active or

13   was he the type of person to just sit back

14   and let you do your work?

15          A.    I don't recall him ever asking

16   to see a specific pleading.  But he was on

17   the spectrum, you know, interested in making

18   sure that he understood all of the details

19   or, you know, at least as best as I could

20   explain them.

21          Q.    Okay.  And I want to be very

22   precise with my next question.  The question

23   is going to be whether Mr. Horton ever came

24   back to you after you had filed a pleading to

1  tell you that something you had said was

2  inaccurate?  I am not asking you what it was,

3  just whether he came to you to say, something

4  you said is wrong?

5          A.     I don't recall that.

6          Q.     Do you know who Sam Sias is?

7          A.     The name does not -- isn't

8  familiar to me.

9          Q.     All right.  Let's go all of the

10 way back to Exhibit 1, which was the

11 Complaint.  And I would like you to turn --

12 do you have it?

13         A.     Yes.

14         Q.     I would like you to turn to

15 paragraph 42, please.  Paragraph 42 says,

16 Defendants chose not to pursue further

17 fingerprint analysis because they were

18 concerned that it would result in additional

19 evidence pointing away from plaintiff as the

20 perpetrator of the Loew Street robbery; do

21 you see that?

22         A.     Yes.

23         Q.     Are you aware of any facts to

24 suggest that that's true?

1          A.    The prints were subject -- the

2     prints at the scene were suitable for

3     comparison, from what I remember, prior to

4     trial and those comparisons were not made.

5     My understanding is that some time after

6     trial or during trial I was told that there

7     was a comparison made and that it matched one

8     of the victims.  The other print that they

9     said was usable and comparable we were told

10    in 2018 that was some sort of typo and that

11    in fact it wasn't comparable.

12               But in my mind, you know,

13    depending on what you're saying is the scope

14    of time here, that it's perfectly plausible

15    that they decided not to conduct the

16    fingerprint analysis prior to trial because

17    they didn't want to potentially undermine

18    their case.

19          Q.    Are you aware that there was

20    fingerprint analysis done prior to trial and

21    that the results were that the fingerprint

22    did not match Richard Horton?

23          A.    I mean, that sounds familiar,

24    but I don't know when or where I'm getting

1    that from.

2          Q.    Okay.  Let's try it this way.

3    Let's try it as a hypothetical.  A number of

4    fingerprints are collected at least one of

5    them is of usable value and it's tested and

6    it does not match Richard Horton.  And I want

7    you to assume that that information, those

8    test results, is turned over to the defense.

9    You would agree with me that that information

10   should be turned over to the defense,

11   correct?

12         A.    Yes, absolutely.

13         Q.    I want you to assume that it was

14   turned over to the defense.

15         A.    Okay.

16         Q.    Other prints were not tested.

17         A.    Okay.

18         Q.    We don't know if they were

19   suitable for testing or not, but they were

20   not tested.

21         A.    Okay.

22         Q.    All right.  Given that fact, do

23   you see a problem?

24         A.    I mean, the way that

1    fingerprints that are of value are typically

2    used in these investigations, at least from

3    what I've seen, is that they can be

4    compared -- one way that you can do it is

5    compare it to a specific known suspect.  The

6    other way to use fingerprints is to enter

7    them in a database like NIBIN, but for

8    fingerprints.  AFIS or some other source.

9            And oftentimes, if you have a

10   good quality print and you will get a hit to,

11   you know, someone who's in the database for

12   other reasons.  Typically because they've

13   been arrested on some sort of prior charge.

14       Q.    And if you get a hit like that,

15   would you consider that potentially

16   exculpatory evidence?

17       A.    If you had -- if the -- I'm

18   sorry.  So if the print from the scene where

19   the perpetrator -- where we believe the

20   perpetrator had touched had been entered in

21   AFIS or a fingerprint database and there had

22   been a hit to someone else, would that have

23   been exculpatory?

24       Q.    Would you regard that as

1   potentially exculpatory?

2          A.    Yes.  Yeah, absolutely.

3          Q.    Okay.  Now, I want you to assume

4   that they tested one of the fingerprints

5   during trial and it matched Rick McClanahan,

6   the victim and the resident of the house.

7          A.    Okay.

8          Q.    Would you consider that

9   exculpatory evidence?

10         A.    The fact that the print -- that

11  the print matched McClanahan?

12         Q.    Yes.

13         A.    If it isn't I'm not seeing the

14  connection right now off the top of my head.

15         Q.    What do you mean the connection?

16         A.    I mean, you know, it's possible

17  that it's exculpatory in a way that I'm not

18  putting together right now.  I've only

19  thought about it for five seconds.  But, you

20  know, nothing is jumping to mind as to the

21  exculpatory value of a fingerprint belonging

22  to the resident.

23         Q.    Now, you said something, and

24  maybe I misunderstood, but it sounded to me

1    like you were saying that there was possibly

2    usable prints, possibly AFIS quality prints

3    in 2004 that were no longer of quality in

4    2018; is that what you were suggesting?

5         A.   My recollection is that the --

6    there were multiple prints identified at the

7    time of the original investigation.  I

8    shouldn't say identified.  That were found,

9    collected, and that were of value in some

10   sense.  And again the terminology here

11   escaped me and --

12        Q.   Do you have an understanding of

13   what "of value" means in this context?

14        A.   It means -- I would interpret it

15   as meaning sufficient for a comparison.  I

16   don't know if there's a separate term that

17   would be required for AFIS upload or other

18   terminology.  Again this is -- I'm trying to

19   recall, you know, interactions from six years

20   ago.

21        Q.   And just for the record, what's

22   the difference between a print that -- I

23   can't remember the term that you just used --

24   but that you could evaluate versus an AFIS

1    quality print?

2         A.    I don't know that there is one,

3    but it may be the case, this is the case in

4    other kinds of forensics, that you can in

5    some cases compare some piece of evidence to

6    a specific person and potentially exclude

7    that person and at the same time maybe not

8    have enough evidence to upload that same

9    information into a database to conduct a

10   search.  You see it in DNA quite -- I mean,

11   you see it in the DNA in this case so --

12        Q.    Do fingerprints deteriorate over

13   time, collected evidentiary fingerprints?

14        A.    I wouldn't want to guess.  I'm

15   not an expert on fingerprints.

16        Q.    All right.  Do you know about

17   DNA deterioration?  Does that deteriorate

18   over time?

19        A.    It does.  To be clear, I'm not a

20   DNA expert either, but my understanding is

21   that it does.

22        Q.    And that's why I'm not going any

23   further with the question.

24        A.    Thank you.

1        Q.    All right.  There was also an

2   issue in this case regarding a photo array;

3   do you recall that?

4        A.    Can you be more specific?

5        Q.    That Detective Walker showed

6   Curry and McClanahan a six-pack of photos

7   that included Mr. Horton.

8        A.    Okay.

9        Q.    And there was some objection to

10  the six-pack; do you remember anything about

11  that?

12       A.    I vaguely recall there being an

13  objection that Mr. Horton's photo was the

14  only light-skinned black man in the array.

15       Q.    Was the issue of the photo array

16  part of your postconviction pleadings?

17       A.    I don't recall that -- I mean,

18  you know, it is context for -- everything

19  that happened in the original trial is

20  context for the value of the evidence that we

21  found in 2017 and 2018, but, you know, we

22  didn't have any new evidence on that specific

23  the issue, as far as I remember.

24       Q.    So I would like you to take a

1    look at paragraphs 43 and 44 of the

2    Complaint.  Defendants decided to conduct a

3    photo array identification procedure to try

4    to bolster their evidence against plaintiff.

5    Defendants knew that the photo array

6    identification procedure would not actually

7    yield any legitimate evidence with any

8    probative value to aid the investigation; do

9    you see that?

10          A.    Yes.

11          Q.    Do you have any information to

12    suggest that those allegations are true?

13          A.    You know, I mean, doing a photo

14    array where the suspect is materially

15    different from all of the other people in the

16    photo array is consistent with that, but I

17    don't have any special knowledge of what

18    anyone was doing or intending with regards to

19    the array in this case.

20          Q.    There seems to be an underlying

21    allegation here that this was not simply

22    sloppy police work or, you know, a failure to

23    understand Brady, but this was an intentional

24    effort to convict Richard Horton of a crime

1    he did not commit.  Are you aware of any

2    reason why Detective Walker would have done

3    that?

4           A.    I mean, speaking generally, what

5    we'll often see is, you know, an earnest

6    attempt initially to develop a suspect by law

7    enforcement and then, once they have a

8    suspect, their sort of thinking changes in

9    some cases and it's no longer necessarily

10   about the truth, but about bolstering the

11   case against the suspect that they already

12   have.

13                And when there is intentional

14   misconduct, in my experience at least, it's

15   typically in that second phase, you know.  So

16   I don't know if I would call it malicious

17   or -- you know, in the sense that they're

18   trying to frame Richard Horton, someone off

19   the street that they dislike for some reason,

20   but oftentimes intentional misconduct is

21   meant to bolster the changes of conviction in

22   an otherwise weak case.

23          Q.    So they may -- the officer may

24   have sincerely identified a suspect at the

169

1    outset, correct?

2            A.    (Affirmative head shake.)

3            Q.    And then felt the need to

4    bolster the case because there's some

5    weakness in the case, the case is crumbling

6    in some fashion, is that the scenario that

7    you've seen?

8            A.    Yes, give or take.

9            Q.    Are you aware of anything that

10    occurred in this case that parallels that

11    where the case was crumbling?

12            A.    I mean, to me it's sort of the

13    entire veracity of the identification.  You

14    know, you have the -- what to me looks like a

15    change in the height description, which is

16    the thing that he says he's the most certain

17    about, and that change isn't a neutral

18    change, it's a change that happens to make

19    the description better line up with Richard

20    Horton.

21            You have a photo array procedure

22    that, you know, wasn't just sloppy, but

23    singles out Horton in some way where he has

24    the sort of specific features there.  You

1    know, you have this idea that the mention of

2    Diggs is hidden or not turned over.  That's

3    not a neutral fact.  I mean, that is --

4    that's something that I think would have

5    really seriously undermined the

6    identification.

7              And if the case is all about

8    how -- how a jury should feel about their

9    eyewitness identification, then I think there

10   are a lot of questions about what was done

11   here that I think improperly bolstered

12   that -- the strength of that identification,

13   at least in the -- for display to the jury.

14        Q.    Well, you're correct that Mr.

15   McClanahan, when he was asked to describe the

16   person, the thing that he seized on most was

17   the height, correct?

18        A.    Right.

19        Q.    But is that what led him to make

20   the identification of Mr. Horton, the height?

21        A.    Well, no, but the height was the

22   feature about which he seemed to be the most

23   certain and it was the feature that was --

24   appears to have been changed between the

1    handwritten notes and the typed reports and,

2    you know, Detective Walker's testimony at

3    trial.

4         Q.    Right.  But he also expressed

5    confidence about the voice, correct?

6         A.    I don't recall -- I mean, the

7    portion of his testimony that I'm recalling

8    is when -- is that he was asked, did you --

9    you know, did you -- were you able to provide

10   information or something like that about the

11   suspect to the investigators and he said

12   something like, just the height.  I gave them

13   just like the skin color and the height and

14   the build, and that was his initial sort of

15   statement.  That's what I'm basing this on.

16        Q.    And he also testified that he

17   recognized the perpetrator's clothing from

18   the evening before, correct?

19        A.    I don't recall one way or the

20   other, but it's possible.

21        Q.    And are you aware whether

22   Richard Horton and Rick McClanahan knew each

23   other before this?

24        A.    I don't know for a fact.  I

172

1    think there was -- there was testimony at

2    trial that they did.

3         Q.    And they both conceded that

4    fact, correct?

5         A.    I would defer to whatever the

6    trial -- whatever the trial testimony was.

7         Q.    All right.  That's fair.  Okay.

8    Mr. Horton participates in speeches or

9    seminars sponsored by OIP; is that correct?

10        A.    Yes.

11        Q.    Can you tell me about those?

12        A.    I don't really have much

13   involvement in those, but OIP does different

14   like education and outreach events, usually

15   like high school classes or, you know,

16   college classes or that kind of like lawyer

17   CLE events.  And oftentimes former clients

18   will come to speak at those types of events.

19        Q.    Is Mr. Horton paid for

20   participating in that?

21        A.    Again I'm not involved in that

22   process, but I think there's a small

23   honorarium.

24        Q.    Have you attended any of the --

1    I don't know what the right term is.

2           A.    Like an event.

3           Q.    All right.  Have you attended

4    any of the events where Mr. Horton spoke?

5           A.    I don't recall ever having been

6    at an event where he spoke.  It's possible,

7    but I just -- it doesn't sound familiar.

8           Q.    When we first started out I

9    showed you the description of your possible

10   testimony; do you recall that?

11          A.    Yes.

12          Q.    And one of the things that is on

13   that list at the very end is, plaintiff's

14   wrongful prosecution and conviction and the

15   resulting damages; do you see that?

16          A.    Yes.

17          Q.    All right.  What can you tell me

18   about that?

19          A.    Are you talking about damages?

20          Q.    Specifically the damages, yeah.

21          A.    All right.  Sure.

22          Q.    We've talked about the other

23   things.

24          A.    I mean, you know, the -- I can

1    talk -- I mean, I could talk about the, like,

2    pure time that he was wrongfully imprisoned.

3    I can talk about the generally terrible

4    conditions in my experience of imprisonment

5    in the State of Ohio.  I can talk about, you

6    know -- I mean, I think those would be the

7    main things.  I mean, I can talk about his --

8    you know, he is a really, in my experience,

9    warm and caring person.  So I can talk about

10   that and the harm that I imagine that has

11   been done to him as a result of everything

12   that's happened here.

13        Q.    Are you able to speak about his

14   experiences readjusting after leaving prison?

15        A.    I mean, I've had limited

16   interactions with him since then.  So I

17   wouldn't be the -- I wouldn't be a good

18   source of information probably.

19        Q.    To your knowledge, has Mr.

20   Horton been diagnosed with PTSD?

21        A.    This is getting into a area

22   where we have potentially privileged issues.

23             MR. CALLAHAN:  If there's a

24   privilege area that's outside of the waive I

1    think --

2        Q.    Well, let me back up a little

3    because I'm not sure I understand what the

4    privilege is.  So let's start again and come

5    another way.  Do you know whether Mr. Horton

6    is seeing a psychiatrist?

7        A.    I don't.

8        Q.    So if Mr. Horton had PTSD or

9    another type medical condition, would you

10   have any other way of finding that other than

11   hearing it from Mr. Horton?

12       A.    No, unless there were a prison

13   record or something along those lines, but,

14   no, nothing that I can think of right now.

15       Q.    Do you know Jeanette Horton?

16       A.    Yes.

17       Q.    You've spoken with her?

18       A.    Yes.

19       Q.    Has she told you that Mr. Horton

20   has PTSD?

21            MR. CALLAHAN:  I object still to

22   the extent he's collecting information about

23   his client without a timeframe about when

24   there might have been this information

1   communicated.  Again what I'll say is, I'm

2   here representing to protect that privilege.

3   You know, Mr. Howe, if you think there's

4   something that you can speak to that doesn't

5   violate attorney/client information.

6        Q.   Well, I think I can clarify this

7   because I'm specifically asking about his

8   post-release experience.  It's my

9   understanding that the representation would

10  have been over by that time.  I don't believe

11  I've heard anything to suggest you have an

12  attorney/client relationship with Mr. Horton,

13  so I don't see the privilege over those

14  statements.

15            MR. CALLAHAN:  Again, speaking

16  to a spouse could be collecting information

17  about representation.

18            MR. EPSTEIN:  But their

19  representation is over at this point.

20            MR. CALLAHAN:  I don't want to

21  argue with you too much or get into speaking

22  objections.  I don't think there's like a

23  foundation to say when any diagnosis might

24  have been made or anything like that.  So I'd

```
 1    leave that to Mr. Howe, other than I want to

 2    make that objection so that it can be

 3    preserved if it's appropriate that it should

 4    be preserved.

 5                   MR. EPSTEIN:  Are you

 6    instructing him --

 7                   MS. MARTINEZ:  I'm sorry, I

 8    can't --

 9                   MR. EPSTEIN:  Are you

10    instructing him to answer or is there some

11    semblance of the question he can answer?

12                   MR. CALLAHAN:  I'm trying to

13    respect the rights of the parties to use Mr.

14    Howe as a witness and to question him as a

15    witness and also protect the privilege that

16    attorneys with the Ohio Innocence Project

17    maintain in their representation of

18    individuals.  So I'm saying I think the

19    question raises attorney/client privilege

20    issues.

21                   Mr. Howe is far more familiar

22    with the circumstance of the case than I and

23    he's an attorney.  If there's some

24    information he can share, I'm saying he can
```

178

1    share that.  If he feels like there's a

2    privilege issue then let's talk about that

3    and we can talk about that more off the

4    record if you want.

5                    MR. EPSTEIN:  Okay.

6                    MR. CALLAHAN:  But I'm raising

7    that issue as a possible objection.

8                    MR. EPSTEIN:  Okay.  Well, let's

9    start and see if Mr. Howe feels there's

10   something he can give me.

11       A.    It may be a quick answer,

12   because I don't specifically remember what

13   I've heard from Jeanette versus what I've

14   heard from Mr. Horton.  You know, I don't

15   recall a specific instance of us -- of me

16   having discussed this with Jeanette.  And

17   otherwise it's tough for me to pinpoint a

18   source of my beliefs on that without -- in

19   terms of where it came from.

20                   MR. EPSTEIN:  All right.  If

21   everyone will indulge me, we'll go off the

22   record for a few minutes, I'll go through my

23   notes, and we'll finish up.

24                   VIDEOGRAPHER:  We're off the

1    record at 2:08:59.

2              (Off the record.)

3              VIDEOGRAPHER:  We're on the

4    record at 2:18:27.

5         Q.    Mr. Howe, I just have one more

6    topic I want to cover with you very briefly.

7    If I could have you go back to, I think it's

8    Exhibit 2, but it's the application that

9    we've been looking at.

10        A.    Okay.

11        Q.    And specifically, and I have the

12   Bates number this time, Horton 62.

13        A.    Sixty-two.  Okay.

14        Q.    Have you seen this document

15   before?

16        A.    I don't recognize it on sight,

17   but it seems like the kind of thing that we

18   received in response to the public records

19   request.

20        Q.    All right.  Can you tell me

21   looking at it what it appears to be?

22        A.    It is a copy of a document

23   entitled Columbus Division of Police

24   Preliminary Investigation, a report dated

1    10/9/2004 at 9:30 -- 9:29 a.m.

2         Q.    And if I represented to you that

3    the Loew Street robbery occurred on

4    October 9th of 2004, would you have any

5    reason to disagree with that?

6         A.    No.

7         Q.    So what is the function of these

8    types of reports?

9              MS. MARTINEZ:  I'm going to

10   object to form and foundation.

11        A.    Yeah, this is a -- you know, I

12   think that would be a question for the

13   Columbus Division of Police in terms of its

14   intended purpose.

15        Q.    Let me rephrase the question.

16   You've seen this type of report before,

17   correct?

18        A.    Yes.

19        Q.    Are these the types of reports

20   that are prepared by responding officers to a

21   crime scene?

22        A.    Oftentimes.

23        Q.    And if you look to the -- on the

24   left side of the page, maybe four or five

1    lines down, it says, Location, 927 Loew

2    Street?

3          A.    Yes.

4          Q.    Which is the address of the Loew

5    Street robbery, correct?

6          A.    I believe so.

7          Q.    Yeah.  Okay.  Here's the

8    question I wanted to ask you.  Hold that

9    page, flip back to page 20 of the application

10   itself, not Bates number 20 but actual

11   page 20.

12         A.    Okay.

13         Q.    The second full paragraph.

14         A.    Okay.

15         Q.    The second sentence, it reads,

16   In police reports taken the morning of the

17   attack McClanahan does not mention knowing

18   his attacker or mention the name Richard at

19   all; do you see that?

20         A.    Yes.

21         Q.    And then it cites to police

22   reports at 9?

23         A.    Yes.

24         Q.    Let's go back now to the police

1    report that we were just looking at from the

2    morning of the Loew Street robbery.

3            A.    Okay.

4            Q.    And you see at the bottom of the

5    page there is a narrative of the events,

6    correct?

7            A.    Yes.

8            Q.    And if you look on the next page

9    in the middle of the page do you see it says,

10   Suspect Notes?

11           A.    Yes.

12           Q.    Gray hoodie pulled tight over

13   the face, light blue jeans.  Victim states he

14   couldn't see the face, but the voice did

15   sound familiar.  Believes he knows suspect.

16   Do you see that?

17           A.    Yes.

18           Q.    So is it accurate to say as the

19   application does, that McClanahan did not

20   mention knowing his attacker?

21                 MS. MARTINEZ:  Object to the

22   form.

23           A.    I don't see any indication as to

24   when the suspect notes were put into this

1     report and -- so I don't know when those were

2     added, but the --

3          Q.    Well, if I can stop you for a

4     second.  At the top of page on both pages it

5     says, Report Date, October 9th, 2004, 9:29:49

6     a.m.?

7          A.    Yeah.  And I don't know

8     Columbus' system specifically, but I do know

9     that there are systems that allow people to

10    update and add to, supplement, change

11    information after the fact but that keep the

12    original date of the report.  And so you

13    can't always just look at the date of the

14    report in terms of the contents of when

15    things were put in.

16         Q.    Okay.  Well, then for this

17    statement you cited to police reports at 9?

18         A.    Right.

19         Q.    Can you show me what you were

20    citing to?

21         A.    I mean, I would say an unknown

22    male knocked on the front door of his home

23    and he certainly didn't say -- there's

24    nothing in this initial narrative from him

184

1    that says anything about knowing or

2    recognizing the victim that I can see.  So --

3    and if I recall correctly, that's consistent

4    with the testimony from the victims at trial.

5         Q.    What is consistent with the

6    testimony of the victims at trial?

7         A.    That -- I'm specifically

8    thinking of testimony from Ms. Curry where

9    she sort of comes -- it's -- my recollection

10   is that she comes to this idea that she knows

11   the suspect over time.  You know, she's

12   thinking about it and she's turning it over

13   and she doesn't initially say anything to

14   Brenda Walker, but maybe she does later,

15   because the more that she thinks about it,

16   the more maybe she thinks that she knows the

17   person.

18              That's my recollection of the --

19   sort of the initial reports to police and

20   that's consistent with what I see as a

21   narrative here on page -- what's labeled OIP

22   9 in the preliminary investigation report.

23        Q.    But you've switched from talking

24   about Rick McClanahan to talking about Rhonda

185

1    Curry, correct?

2         A.    Well, yes.

3         Q.    Because in the context here in

4    page 20 of the application we were talking

5    specifically about Rick McClanahan?

6         A.    Well, that's true.  I guess are

7    you saying that you believe Mr. McClanahan

8    provided this to the detectives on the day of

9    the -- on the day of the shooting?

10        Q.    I'm saying that's what the

11   document appears to suggest.  I'm asking why

12   you think that's not the case?

13        A.    My understanding was that he --

14   well, I don't know.  I had thought from

15   before that he -- that the -- that your

16   position was that there was no interview that

17   took place on the day of the -- on the day of

18   the robbery.

19        Q.    Well, I'm glad you brought that

20   up.  We were talking about whether Brenda

21   Walker had interviewed him on the day of the

22   robbery, correct?

23        A.    Correct.

24        Q.    Is Brenda Walker's name on this

1    document?

2         A.    I don't see it in the pages that

3    I'm reviewing.

4         Q.    Does the -- if you go back to

5    the first two pages of the report that we

6    were looking at, does it indicate who the

7    reporting officer is?

8         A.    Under reporting officer it says

9    Pamela --

10        Q.    It's pronounced Rhodaback.

11        A.    Rhodaback.

12        Q.    Do you know who Pamela Rhodaback

13   is?

14        A.    The name doesn't sound familiar.

15        Q.    So if Pamela Rhodaback

16   interviewed Mr. McClanahan on the morning of

17   the robbery, that fact would still be

18   consistent with Brenda Walker's testimony

19   that she, Brenda Walker, did not interview

20   him, correct?

21             MS. MARTINEZ:  Objection,

22   assumes facts not in evidence.

23        A.    I mean, it's possible that --

24   are you saying it's possible that somebody

1    else interviewed him, not Brenda Walker?

2         Q.    Yes, I'm suggesting the

3    possibility that a responding officer spoke

4    to him at the scene at a time when Brenda

5    Walker was not there?

6         A.    I mean, that's possible.

7              MS. MARTINEZ:  The same

8    objection.

9         Q.    All right.  My last question for

10   you, sir, is the one that I promised at the

11   outset.  We've seen the description of your

12   potential testimony in the disclosure.  Is

13   there information or topics that you know

14   about this case that we've not talked about

15   that are not privileged?

16             MS. MARTINEZ:  Objection to

17   form.

18             MR. CALLAHAN:  I'm sorry,

19   Alyssa, did you say something?

20             MS. MARTINEZ:  Yeah, I'm sorry,

21   I just lodged a form objection.

22        A.    I mean, these -- each of these

23   subjects I think implicates and ties in a lot

24   of our formal filings and the things that OIP

1    has either filed or done in court.  We've

2    touched on some of that in the deposition

3    today, but I don't think we've talked about

4    every filing and the full extent of every

5    filing.

6           Q.   On the topic of the plaintiff's

7    consistent declarations of innocence, is it

8    your testimony that Mr. Horton has declared

9    his innocence to you on more than one

10   occasion?

11          A.   I don't specifically recall, but

12   he has never wavered from -- I mean, you

13   know, he's never waved from his insistence on

14   being innocent.  He's certainly never said

15   anything to me that would let me think that

16   he's not innocent or that he's not asserting

17   his innocence.

18               MR. EPSTEIN:  I asked earlier

19   about a specific conversation where he

20   declared his innocence and a privilege

21   objection was interposed as to the remainder

22   of that conversation.  Would that be true of

23   any other conversations that you had with him

24   where he spoke about his innocence?  If I

1    asked you about the substance of those

2    conversations will there be a privilege

3    objection?

4              MR. CALLAHAN:  Probably.

5              MR. EPSTEIN:  I just want to

6    make a record.

7              MR. CALLAHAN:  You just want to

8    make a record?

9              MR. EPSTEIN:  Yeah.

10             MR. CALLAHAN:  I think in

11   general, just for that specific piece of

12   information is what the waiver is and we'd

13   want to assert attorney/client privilege for

14   other topics that might have co-mingled with

15   those conversations.

16             MR. EPSTEIN:  Okay.  We have

17   served a subpoena on OIP.  I understand that

18   there is some responsive documents that are

19   here today?

20             MR. SPIESS:  Yes.  It's a third

21   of these.  There's three sets.

22             MR. EPSTEIN:  Okay.  Are they

23   Bates numbered?

24             MR. SPIESS:  They are not.

190

```
 1              MR. EPSTEIN:  Well, if I can
 2   take those.  I am not going to go through
 3   them now.  I am going to hold the deposition
 4   open until we get a resolution of
 5   attorney/client privilege issues and then, if
 6   we reconvene we'll deal with these documents
 7   at the same time.
 8              Subject to that, Mr. Howe, I am
 9   done.  I don't know whether Ms. Martinez
10   intends to question you or not.
11              MS. MARTINEZ:  First I'm just
12   going to state our general objection to
13   holding this deposition open but that's going
14   to be dependent upon the court's ruling.  But
15   I do have two very brief lines of follow up,
16   for you, sir.
17                   CROSS-EXAMINATION
18   BY MS. MARTINEZ:
19        Q.    The first is, and I'm not sure
20   if you still have it in front of you, but the
21   police reports that you just looked at that
22   counsel showed you Bates stamped R. Horton
23   62.
24        A.    Okay.
```

191

1          Q.    And let me know if I should

2    speak up.  I'm trying to get a little closer

3    to my mic.

4               So my first question is just

5    very briefly on that first page Detective

6    Walker's name does appear about halfway down,

7    right?

8          A.    Yes, you're right.

9          Q.    Okay.  All right.  So she is on

10   the document somewhere?

11         A.    Yes.

12         Q.    And then actually could you look

13   at the top, please.  Do you see where it says

14   Case Number?

15         A.    Yes.

16         Q.    And then Report Number right

17   below that?

18         A.    Yes.

19         Q.    And you see there's a .1 at the

20   very end?

21         A.    Yes.

22         Q.    Do you know what that signifies

23   in relation to the case number?

24         A.    I do not.

1          Q.    Okay.  And do you have any

2     personal knowledge as you sit here today of

3     how certain Columbus Division of Police

4     personnel were able to update police reports

5     back in 2004?

6          A.    I do not.

7          Q.    All right.  But would you agree

8     that there is some evidence that this report

9     was updated after October 9, 2004, at 9:29

10    a.m.

11               MR. EPSTEIN:  Objection.

12         A.    You know, if you point me to

13    somewhere specific and ask me, I may have

14    more information, but I just -- it's hard for

15    me six years after the fact to sort all of

16    this information into when it was obtained

17    according to other sources.

18         Q.    Okay.  And I guess actually

19    taking a very quick step back.  As you sit

20    here today, do you recall seeing -- or strike

21    that, please.  Do you recall looking at any

22    other police reports that have this same

23    information, but a different report number?

24         A.    You know, I recall that sort of,

1    give or take, the same information appeared

2    in multiple reports in the response, you

3    know, some handwritten, some typed.

4         Q.    Okay.  And maybe it's just

5    easier if we go through one at a time.  So I

6    think first if you could please look at the

7    report narrative section, which is about

8    halfway down that first page.

9         A.    Yes.

10        Q.    Where it states, Victim states

11   he was robbed, CSSU responded?

12        A.    Yes.

13        Q.    And then on the second page the

14   part that counsel had you look at where it

15   says, Suspect notes he couldn't see the face,

16   but the voice did sound familiar.  Believes

17   he knows the suspect?

18        A.    Yes.

19        Q.    So as you sit here today, do you

20   know who made the call to 911 following the

21   Loew Street robbery?

22        A.    I don't remember.

23        Q.    If I represent that it was not

24   Mr. McClanahan, do you have any reason to

194

1    doubt that statement?

2         A.   No, I don't have any

3    recollection of who called 911.

4         Q.   Okay.  And do you have any

5    recollection as to whether Mr. McClanahan was

6    at the Loew Street property when officers

7    arrived?

8         A.   I don't know if he had already

9    been transported to the hospital or not.

10        Q.   Okay.  And so if I represent

11   that he had already been transported to the

12   hospital, would that then help refresh your

13   recollection -- actually strike that, please.

14   And so if I represent that he had already

15   been transferred to the hospital, would that

16   make you think that perhaps this report was

17   updated after the fact when someone was able

18   to speak with him?

19             MR. EPSTEIN:  Objection.

20        A.   I mean, it would mean that it

21   was unlikely that he talked to the officer

22   who was reporting at the scene if he was in

23   the hospital when officers arrived.

24        Q.   And as you sit here today, do

1  you have any personal knowledge of what time

2  Mr. McClanahan entered surgery after he got

3  to the hospital on October 9, 2004?

4         A.    I have no idea.

5         Q.    Okay.  And at the very bottom of

6  the last page, sir, it's Bates stamped R.

7  Horton 66; do you see where it says Printed

8  December 30th, 2004?

9         A.    Yes.

10        Q.    As you sit here today, do you

11  have any personal knowledge of what that

12  stamp means?

13        A.    I mean, I -- taken at face value

14  it means that it was printed on

15  December 30th, 2004, otherwise, no.

16        Q.    And as you sit here today, do

17  you have any personal knowledge of how the

18  computer system for police reports like

19  this -- actually strike that, please.

20             The other brief line of

21  questions I would like to ask you about,

22  sir --

23             MS. MARTINEZ:  I've got a

24  different Bates stamped document in front of

1    front of me, but, Counsel, do you have

2    printout of City 4022?  It's the stipulation.

3                 MR. EPSTEIN:  Yes.

4                 VIDEOGRAPHER:  Pardon me.

5                 MS. MARTINEZ:  It just might be

6    easier than me sharing my screen and zooming

7    in to 400 percent so you can see it.

8                 MR. CALLAHAN:  From one second.

9    Hold on.  Hold on, Alyssa.

10                MR. EPSTEIN:  What's the

11   question from the videographer?

12                VIDEOGRAPHER:  Pardon me,

13   Counsel, we're off the record to change DVDs

14   at 2:36:40.

15                (Off the record.)

16                VIDEOGRAPHER:  We're on the

17   record with DVD number three at 2:38:22.

18        Q.    A very quick step back, sir, to

19   wrap up my questions about the police report

20   you were just looking at.  So it was dated

21   for October 9th, 2004, and printed date

22   stated December 30th, 2004.  So would it be

23   fair to say that information in that report

24   could have been inserted at any point between

197

1    October 9th and December 30th of 2004?

2                    MR. EPSTEIN:  Objection.

3            A.    Again, I don't know the

4    specifics of the system, but it's often the

5    case that these record systems allow people

6    to update it after the fact and so anything

7    before the printed on date is what I would

8    intuitively cap that at.

9            Q.    Okay.

10                   MS. MARTINEZ:  And now if

11   Counsel could please tender to the witness

12   what we'll mark as Exhibit 7.  I think we're

13   on 7.  And this is Bates stamp either City

14   4022 or I have it as OB 561 B72 through 74.

15                   MR. EPSTEIN:  The copy that I'm

16   giving the witness has the City 4022 Bates

17   stamp.

18                   MS. MARTINEZ:  Thank you,

19   Counsel.

20      (Exhibit 7 was marked for identification.)

21           Q.    And, sir, take as much time as

22   you need to look over this document and I'm

23   just going to ask you a few quick questions.

24           A.    Okay.

1          Q.   So, sir, I will represent that

2     this is the Joint Stipulations of Fact that

3     was entered into in this case and I'm just

4     going to read -- actually, strike that,

5     please.

6               MR. EPSTEIN:  Just for

7     clarification, Alyssa, it wasn't entered into

8     in this case, meaning our case today.

9               MS. MARTINEZ:  Yeah, yeah,

10    that's where the strike is coming from.  Let

11    me -- a different way.

12         Q.   So I will represent to you, sir,

13    that this is the Joint Stipulations of Fact

14    that was entered into as part of Mr. Horton's

15    postconviction proceedings and I'm going to

16    be very briefly reading two separate sections

17    if you'd like to follow along.

18               The first is just right there at

19    the very top where it says, Plaintiff the

20    State of Ohio, and Defendant Richard Horton,

21    by and through counsel, hereby stipulate and

22    agree to the following joint stipulations of

23    fact to be considered in furtherance of

24    Defendant's First Amended Motion for Leave to

1    File a Motion for New Trial and Motion for

2    New Trial?

3              And very briefly, sir, can you

4    flip to the last page.  Is that your

5    electronic signature?

6         A.    Yes.

7         Q.    Okay.  So you filed this on

8    behalf of OIP for Richard Horton?

9         A.    I don't remember whether I filed

10   it or whether Seth filed it, but we entered

11   into it on behalf of Mr. Horton and OIP.

12        Q.    Okay.  And by Seth are you

13   referring to Seth Gilbert who was the

14   assistant prosecuting attorney?

15        A.    Yes.

16        Q.    Okay.  And this was entered into

17   on September 17th of 2021?

18        A.    Yes.

19        Q.    Okay.  Now, if I can direct your

20   attention to page 2, I'm just going to

21   briefly read the section underneath police

22   files and discovery and then ask you a few

23   questions.

24              The document says, The Columbus

1    Division of Police have created and

2    maintained a file containing notes, reports

3    and other documents related to the

4    October 9th, 2004, aggravated robbery of

5    Richard McClanahan and Rhonda Curry, ("Police

6    Reports" attached as Exhibit A to Defendant's

7    Motion for New Trial.)  This file includes

8    handwritten notes that appear to reference

9    interviews with Rhonda Curry and Richard

10   McClanahan.  The handwritten notes labeled as

11   pages OIP 48 through 51 state, inter alia,

12   "Can ID - Richard Diggs" and contain a

13   description of the suspect as "5'9" to 6'".

14   And it's got the reference hereafter referred

15   to as Alleged Brady Material.  The pdf file

16   labeled "State's discovery," printed and

17   attached to Defendant's Motion for New Trial

18   as Exhibit D, is a complete and accurate

19   account of all reports and notes from

20   Columbus Division of Police that were in

21   defense counsel's file at the time of

22   Defendant's trial.  If called to testify,

23   Detective Walker would state that she has no

24   recollection regarding why she wrote Richard

1    Diggs' name in her notes.  The parties

2    stipulate and agree that Alleged Brady

3    Material was not in defense counsel's file at

4    the time of trial.  The parties stipulate and

5    agree that the Alleged Brady Material was not

6    in the prosecutor's file at the time of

7    trial?

8              So you were asked a few

9    questions earlier in your deposition about

10   what documents may or may not have been in

11   the defense counsel's file at Mr. Horton's

12   criminal trial.  Do you recall those

13   questions?

14        A.    The gist of them, yes.

15        Q.    Okay.  And this document

16   essentially represents an agreement between

17   the parties that the handwritten notes

18   containing the name Richard Diggs were in

19   neither the defense counsel's file nor the

20   procecutor's file at the time of this trial,

21   correct?

22        A.    That's correct.

23        Q.    Okay.  And it was your

24   understanding entering into this agreement

1    that the prosecutor's office searched the

2    entirety of their file for this document

3    before making this representation?

4         A.    I don't recall what the

5    prosecutors -- what Mr. Gilbert had said that

6    he did, but they were willing to enter into

7    -- they were willing to stipulate to the fact

8    that this information was not in their file.

9         Q.    Okay.  And would it be fair to

10   say that the prosecutor's office would likely

11   not to enter into this stipulation if they

12   hadn't done some kind of due diligence to

13   check?

14              MR. EPSTEIN:  Objection.

15        A.    I wouldn't assume that they

16   would.

17              MS. MARTINEZ:  And those are all

18   of the questions that I have for you, sir.  I

19   apologize that I jumped around a little bit.

20   But thank you so much for your time today.

21              MR. EPSTEIN:  Unfortunately I

22   have a couple more.

23              THE WITNESS:  All right.

24              MR. EPSTEIN:  But I will be

1    brief.

2                    RECROSS-EXAMINATION

3    BY MR. EPSTEIN:

4         Q.    Ms. Martinez asked you some

5    questions about these police reports and the

6    possibility that they might have been updated

7    after the initial date of their creation; do

8    you recall that testimony?

9         A.    Yes.

10        Q.    Assuming for a moment that the

11   reports have been updated, is there anything

12   on the face of the report that would tell you

13   who did the updating?

14        A.    Can you guide me to the reports

15   again.  61?

16        Q.    I believe it starts on 62.

17        A.    62.  It says he -- I'm sorry,

18   can you tell me the question again.

19        Q.    Yeah, the question is, is

20   there -- assuming that there was some

21   updating of the reports after the initial

22   date of their creation, is there anything on

23   the face of the report that would tell you

24   who did the updating?

1          A.    I don't see anything on the face

2     of the report that tells me.  There's -- at

3     least that's legible.

4          Q.    Okay.  I want to ask you some

5     questions quickly about the Joint

6     Stipulations of Fact that Ms. Martinez had us

7     show to you.

8          A.    Okay.

9          Q.    How did those come to be?

10          A.    From what I recall, we had -- we

11    were in discussions with the prosecutor's

12    office about whether or not and the extent to

13    which we thought an evidentiary hearing was

14    necessary.

15          Q.    What would the evidentiary

16    hearing have been about if you had had it, do

17    you recall?

18          A.    I would want to go back and

19    double check where we were in the

20    proceedings.  If I recall, the court had

21    granted leave, and so then this would have

22    been on the motion for new trial.

23          Q.    Leave to file the motion

24    requesting a new trial?

1          A.     Again I believe so, but I'm not

2     a hundred percent sure on the timing.  So --

3     but the evidentiary hearing would have been

4     on one of the -- on the issues that were

5     raised by one of our filings at that time.

6               And Seth Gilbert and I had

7     discussed whether and how to hold that

8     hearing and in the course of those

9     discussions we sort of arrived at the point

10    that we -- where we pretty much agreed on

11    what the facts were and we -- and the only

12    disagreement between us was about the

13    legal -- about the application of the law to

14    the facts.

15         Q.     And was that the point at which

16    you and Mr. Gilbert decided simply to submit

17    a stipulation to the court?

18         A.     Yes.

19         Q.     Did one or the other of you take

20    the lead in drafting this stipulation?

21         A.     I don't recall.

22         Q.     Was the stipulation something

23    that was drafted over a period of time or did

24    it come together quickly?

1        A.    I don't recall exactly how long

2    it took.

3        Q.    I want to go back to the

4    paragraphs on the second page that Ms.

5    Martinez has already read into the record.

6    So, for example, paragraph 7, regarding

7    Detective Brenda Walker, you have no personal

8    knowledge as to whether that statement is

9    true or not, correct?

10        A.    It was a stipulation as to what

11    she would state.  So it's -- you know, it's a

12    hypothetical statement.

13        Q.    It's a hypothetical statement,

14    but do you know whether that's true?

15        A.    Do I know what she would have

16    testified to had we had the hearing?

17        Q.    Correct.

18        A.    No.

19        Q.    You never spoke to her about

20    this?

21        A.    I believe I spoke to her once.

22        Q.    What can you tell me about that

23    conversation?

24        A.    We had called her at some point.

1          Q.    Who's we?

2          A.    Myself and the students working

3     on the case.  I don't remember which

4     students.  It was a very brief conversation

5     and we asked whether she remembered anything

6     about the case.  And she said that she didn't

7     know and she wanted to check with the

8     prosecutor's office before she talked to us

9     and that was it.

10         Q.    So that was a cold call?

11         A.    Yes.

12         Q.    Do you remember when that call

13    was?

14         A.    No.  I mean, it was -- it would

15    have been -- no.

16         Q.    Do you know whether Seth Gilbert

17    had a subsequent conversation with Brenda

18    Walker?

19         A.    I believe that he did, but I'm

20    not positive.

21         Q.    Do you recall him telling you

22    that he did?

23         A.    I'm not a hundred percent sure.

24    I believe that he represented to me that he

1    had communications with her.  I'm just -- I'm

2    not a hundred percent sure.

3        Q.    And just so I'm clear, in your

4    brief conversation with Detective Walker, did

5    she represent to you that, if she were called

6    to testify, she would have no recollection of

7    why she wrote Richard Diggs' name in the

8    notes?

9        A.    I don't recall her saying

10   anything really substantive at all about the

11   case.

12       Q.    She just said she wanted to talk

13   to the prosecutor?

14       A.    Yes.

15       Q.    And I want to make sure I'm

16   reading this document correctly.  So in

17   paragraph 8, The parties stipulate and agree

18   that Alleged Brady Material was not in

19   defense counsel's file at the time of trial.

20   The phrase Alleged Brady Material is all

21   capitalized; do you see that?

22       A.    Yes.

23       Q.    If I'm reading this right, it's

24   specifically designed -- defined as OIP pages

1    48 to 50, correct?

2         A.    Yes.

3         Q.    Okay.  So that's all that that

4    paragraph is talking about is the handwritten

5    notes with the Richard Diggs' name?

6         A.    Correct.

7         Q.    I just wanted to be clear about

8    that.  Paragraph 6, which represents that

9    Exhibit D -- and you've talked about Exhibit

10   D this morning.

11        A.    Yes.

12        Q.    Exhibit D is a complete and

13   accurate account of all reports and notes

14   from CDP (sic) that were in defense counsel's

15   file at the time of defendant's trial.  Where

16   did the information come from to put that

17   statement in the stipulation?

18        A.    Well, I can say what our belief

19   was is -- was based on the file that we had

20   received from Mr. Thomas, the discovery file

21   that we received from Mr. Thomas.  I don't

22   know exactly where the prosecutor's office

23   got their information from, but presumably

24   they had access to whatever they had

1    disclosed at the time of trial as well.

2         Q.    Do you know whether Mr. Gilbert

3    did an investigation of this?

4         A.    I do not.

5         Q.    Who proposed including

6    paragraph 6 in the stipulations?

7         A.    I assume it was -- I assume that

8    was from myself or OIP.

9         Q.    You, meaning OIP.  OIP would be

10   the one that would have an interest in having

11   that in the stipulation, correct?

12        A.    Yes.

13        Q.    Who proposed paragraph 7?

14        A.    I don't know.  Again my

15   understanding is that this was where we had

16   arrived based on conversations with --

17   between Seth and myself.  And I believe that

18   he had talked to her.  And again this was --

19   she would have been the main witness at an

20   evidentiary hearing if we'd had one and so --

21   and we weren't in any position to say what

22   she would have testified to.  So I assume

23   that this is based on information from Mr.

24   Gilbert's conversations.

1      Q.    I would like to ask you about

2  one more paragraph in the stipulation.  And

3  this is one I don't think Ms. Martinez read

4  into the record but stop me if you've heard

5  this one before.

6            Paragraph 12, The parties

7  stipulate and agree the Columbus police

8  officers would have used proper evidence

9  handling techniques in collecting and storing

10  the casing, including wearing latex gloves

11  and taking steps to minimize contamination.

12  The parties stipulate and agree that a proper

13  chain of custody concerning the casing was

14  maintained between its collection and its

15  testing at BCI.  The parties stipulate and

16  agree that no law enforcement or court staff

17  handled the casing with their bare hands

18  between the time the casing was collected

19  from the scene and the time it was swabbed

20  for DNA at BCI.

21            Did I read that correctly?

22      A.    Yes.

23      Q.    Who proposed the inclusion of

24  those statements in the stipulation?

212

1          A.    I don't recall exactly.  I had

2     suggested it and I believe Mr. Gilbert

3     agreed.  Prior to these stipulations we had

4     been in discussions about -- or we had

5     suggested that we were going to have to call

6     quite a few witnesses to prove all of these

7     facts and I think Seth agreed that these were

8     all correct statements, so they were included

9     in the stipulations.

10         Q.    Is it fair to say that OIP would

11    not have any information of its own to say

12    whether these statements were true or not?

13         A.    In terms of whether or not

14    Columbus police officers used proper evidence

15    handling techniques and that they wore latex

16    gloves and took steps to minimize

17    contamination.  I mean, I suppose that we

18    would have called witnesses from the Columbus

19    Police Department and I would have been

20    surprised if they testified that they did not

21    use proper evidence techniques and that

22    they --

23         Q.    You would certainly hope that

24    they would be using these --

1          A.    Yeah.  I think it's a reasonable

2    thing to suggest that we stipulate to and

3    Seth stipulated to it.

4          Q.    Right.  But at the time OIP

5    didn't have any independent knowledge one way

6    or the other, correct?

7          A.    Correct.

8          Q.    Did Mr. Gilbert ever tell you

9    what steps he took to investigate whether all

10   of these claims were true?

11         A.    I don't specifically recall.

12         Q.    Was this something that you

13   proposed to him and he agreed to on the spot

14   or did he take some time to think about it?

15         A.    The way that I remember is that

16   we had had a couple, at least, of telephone

17   conversations about different issues that we

18   expected to be -- to come up in an

19   evidentiary hearing and that, over the course

20   of those conversations, and again I don't

21   remember exactly how it went, but my

22   recollection is, over the course of those

23   conversations, we sort of came to an

24   understanding that we all agreed on what the

214

1    facts were that we were going to have the

2    evidentiary hearing to prove and that the

3    main disagreement between us was over the

4    legal implication of those facts.

5         Q.    Do you know what the timeframe

6    of those discussions was?

7         A.    I assume it would have -- I

8    mean, it would have been leading up to an

9    evidentiary hearing.  So I assume that would

10   have been around the time that the motion for

11   new trial was pending.

12        Q.    Are there prior drafts of this

13   stipulation?

14        A.    I don't -- I mean, again, I

15   don't recall who -- one of us created it and

16   sent it to the other one to review.  I don't

17   remember exactly how that went.  So I just --

18   I don't recall.

19        Q.    Would you expect that to be

20   reflected in the e-mail communications

21   between your office and Mr. Gilbert's?

22        A.    Presumably, yes.

23             MR. EPSTEIN:  Thank you for your

24   time.  Subject to leaving it open, I have no

1    more questions.

2              MR. CALLAHAN:  I'll note an

3    objection to keeping his deposition open, not

4    because I'm saying we won't work with you,

5    but just so nobody says I waived it.  Are you

6    guys going to order this transcription?

7              MR. EPSTEIN:  Yes, we are.

8              MR. CALLAHAN:  Okay.  Mr. Howe,

9    you've got a right to read this transcript

10   when it's prepared.  Do you want an

11   opportunity to read it or do you waive that

12   right?

13             THE WITNESS:  I'll defer to you,

14   your advice, so we can --

15             MR. CALLAHAN:  He'll read.

16   Nothing else.

17             VIDEOGRAPHER:  No further

18   questions, Counsel, that concludes Mr. Howe's

19   deposition at 2:59:56.

20

21

22                    * * *

23        (DEPOSITION CONCLUDED AT 2:59 P.M.)

24                    * * *

216

1                     C E R T I F I C A T E

2

    STATE   OF   OHIO
3                : SS
    COUNTY OF HAMILTON

4

        I, Julie Patrick, the undersigned, a
5   duly qualified notary public within and for
    the State of Ohio, do hereby certify that
6   BRIAN HOWE was by me first duly sworn to
    depose the truth and nothing but the truth;
7   foregoing is the deposition given at said
    time and place by said witness; deposition
8   was taken pursuant to stipulations
    hereinbefore set forth; deposition was taken
9   by me in stenotype and transcribed by me by
    means of computer; that the transcribed
10  deposition was made available to the witness
    for examination and signature and that
11  signature may be affixed out of the presence
    of the Notary Public-Court Reporter. I am
12  neither a relative of any of the parties or
    any of their counsel; I am not, nor is the
13  court reporting firm with which I am
    affiliated, under a contract as defined in
14  Civil Rule 28(D) and have no financial
    interest in the result of this action.
15      IN WITNESS WHEREOF, I have hereunto set my
    hand and official seal of office at
16  Cincinnati, Ohio this 14th day of March,
    2025.

17

18

19                          _Julie Patrick_

20  My commission expires:        Julie Patrick
    March 13, 2029      Notary Public - State of Ohio
21

22

23

24

```
                  Witness Errata and Signature Sheet
                    Correction or Change Reason Code
           1-Misspelling  2-Word Omitted  3-Wrong Word
            4-Clarification  5-Other (Please explain)

    Page/Line        Correction or Change        Reason Code

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____

    _____    _____    _____
```

I, Brian Howe, have read the entire transcript of my deposition taken in this matter, or the same has been read to me. I request that the changes noted on my errata sheet(s) be entered into the record for the reasons indicated.

Date_____Signature_____

The witness has failed to sign the deposition within the time allowed.
.

Date_____Signature_____

                              Ref: FO313919

**Exhibits**

**313919 Exhibit 001** 4:7
20:22 21:1
55:5 159:10
**313919 Exhibit 002** 4:7
27:8,11
29:15 179:8
**313919 Exhibit 003** 4:9
45:4,7 46:23
53:8,10
**313919 Exhibit 004** 4:10
71:5,8
**313919 Exhibit 005** 4:11
114:12,15
**313919 Exhibit 006** 4:12
115:22
116:1
**313919 Exhibit 007** 4:14
197:12,20

_____

**0**

**000021** 45:21
46:8,22
**000102** 66:17
**000119** 56:15
**000195**
111:24
**000197** 45:21
46:10,24

_____

**1**

**1** 20:22 21:1
55:5 159:10
191:19
**10** 96:3
**10/9/2004**
180:1
**100** 129:2
146:24
**102** 77:2
127:20
128:1
**10:52:59**
47:11
**11:03:25**
47:14
**12** 211:6
**12:07:39**
98:5
**12:10** 77:6
**12:25:13**
98:8
**13** 61:14,18,
19
**13th** 77:5,12

**16** 31:7
115:11
116:14,15
117:11
**175** 46:14
**17th** 199:17
**1974** 8:9
**1976** 116:17
117:11
**1977** 117:11
**1983** 8:12
**1997** 115:11
116:14,15
**1:20:32**
143:18
**1:26:04**
143:21

_____

**2**

**2** 27:8,11
29:15,21
32:21 179:8
199:20
**20** 181:9,10,
11 185:4
**2002** 113:21
**2004** 77:5
78:23 91:10
93:20
113:24
119:8
135:21
136:2 146:9,
15 164:3
180:4 183:5
192:5,9
195:3,8,15
196:21,22
197:1 200:4
**2005** 91:10
**2007** 12:11
113:21
**2010** 12:12
**2014** 8:10
12:16 78:20
**2016** 8:5
**2017** 166:21
**2018** 54:3
57:5 61:20
112:10
138:20
140:24
150:12,18,
24 154:16
155:6
160:10
164:4
166:21
**2021** 199:17
**21** 96:2
**22** 31:8
**25** 129:6
**26** 21:14
**26(a)(1)**
27:12

**27** 86:6 93:16
**28** 53:15 86:6
93:16
**28th** 57:5
**2925** 7:12
**2:08:59**
179:1
**2:18:27**
179:4
**2:36:40**
196:14
**2:38:22**
196:17
**2:59** 215:23
**2:59:56**
215:19
**2nd** 112:10

_____

**3**

**3** 27:20 45:4,
7 46:23
53:8,9,10
112:14
**30** 129:6
**30th** 195:8,
15 196:22
197:1
**3514** 45:12
46:6

_____

**4**

**4** 33:11 71:5,
8 113:3
**400** 196:7
**4022** 196:2
197:14,16
**42** 159:15
**43** 167:1
**44** 167:1
**48** 200:11
209:1

_____

**5**

**5** 113:19
114:12,15
**5'9"** 200:13
**50** 209:1
**51** 200:11
**561** 197:14
**58** 71:15,16
**5th** 116:17
117:11

_____

**6**

**6** 54:3 71:3
73:12 76:15
90:22
115:22
116:1 209:8
210:6

**6'"** 200:13
**61** 203:15
**62** 179:12
190:23
203:16,17
**66** 195:7

_____

**7**

**7** 57:4,5 70:2
71:10
197:12,13,
20 206:6
210:13
**74** 197:14

_____

**8**

**8** 208:17

_____

**9**

**9** 144:18
181:22
183:17
184:22
192:9 195:3
**911** 193:20
194:3
**927** 181:1
**99** 128:3
**9:29** 180:1
192:9
**9:29:49**
183:5
**9:30** 180:1
**9th** 180:4
183:5
196:21
197:1 200:4

_____

**A**

**a.m.** 180:1
183:6
192:10
**Aaron** 6:11
**ability** 34:19
54:8
**absolutely**
40:7 143:16
161:12
163:2
**abut** 46:13
**accept** 41:19
43:21
**accepted**
31:17 42:4
43:17 47:20
**access** 140:1
151:18
209:24
**accident**
136:14
**accidentally**
136:11

**accommodate** 9:19
**accomplished** 18:13
138:24
139:3
**account**
200:19
209:13
**accounts**
17:3
**accurate**
57:8 63:21
130:10
182:18
200:18
209:13
**action** 8:12
**active** 31:9
41:9 158:12
**actual** 15:19
53:19
181:10
**add** 85:17
183:10
**added** 183:2
**addition** 48:7
60:7
**additional**
17:12
159:18
**address** 7:8
112:12
118:4,8,17,
23 119:8,10,
11,13 139:6,
21 140:8,10,
21 181:4
**addresses**
139:23
140:18,23
**Adidas** 94:6,
8,21 95:11,
13 96:4,12
97:2,11,15,
23 98:13
**adjourn** 9:22
**administrative** 16:3
**admit** 52:7
**admitted**
111:14
**advanced**
34:19
**advice**
149:10,11
215:14
**affects**
135:10
**affidavit** 47:1
57:1 111:18
112:2
**affiliation**
14:14
**affirmative**
169:2

**afield** 104:15

**AFIS** 162:8, 21 164:2,17, 24

**age** 6:5 86:7 100:10

**aggravated** 44:10 200:4

**agree** 18:4 39:22 52:17 67:10 78:24 118:7 161:9 192:7 198:22 201:2,5 208:17 211:7,12,16

**agreed** 47:21 205:10 212:3,7 213:13,24

**agreement** 201:16,24

**aid** 12:13 167:8

**aim** 123:21

**akin** 117:8

**alia** 200:11

**alias** 109:3 111:15

**aliases** 118:19,22 137:3

**Alisher** 36:11

**allegation** 51:20,23 52:3 167:21

**allegations** 167:12

**Alleged** 200:15 201:2,5 208:18,20

**allegedly** 77:18

**Alli** 36:13

**alongside** 40:20

**alternate** 137:19

**alternatively** 140:2

**Alyssa** 6:16, 18 47:5 49:5 52:13 88:11 143:22,24 187:19 196:9 198:7

**Amended** 19:23 21:3 198:24

**analysis** 49:13 159:17 160:16,20

**analyst** 149:13

**analyze** 145:18

**another's** 108:12 120:3

**answers** 9:3 39:23

**anticipated** 28:13

**anyone's** 100:10

**apologize** 21:20 35:9 45:16 66:2 88:11 95:8 115:20 138:22 202:19

**apparent** 136:22

**apparently** 82:10 134:21

**appearance** 6:22

**appeared** 193:1

**appearing** 6:20

**appears** 67:6 69:14 122:17 150:15 170:24 179:21 185:11

**appellate** 39:20 40:11

**applicant** 40:17,19

**application** 38:21 39:12 41:12,19,23 42:4 43:2,16 45:14 46:21 47:16,17 53:10 54:3 55:2,7 57:9 61:14 63:1,2 68:12 96:3 101:15 179:8 181:9 182:19 185:4 205:13

**applications** 31:11,14,17 39:23 41:9

**applied** 92:4 93:5

**apply** 88:21 90:24 91:19 92:1 124:3 129:9,18,21

**Applying** 148:1

**appointed** 18:16,21

**appointment** 12:22 13:3

**Approximately** 155:3

**April** 54:3 112:10

**area** 16:15 22:4 24:5 30:4 174:21, 24

**argue** 176:21

**argument** 142:22,23

**arrangement** 15:1

**array** 166:2, 14,15 167:3, 5,14,16,19 169:21

**arrest** 89:1

**arrested** 108:14 109:3 162:13

**arrived** 194:7,23 205:9 210:16

**art** 152:12 154:20

**articles** 151:14

**assert** 189:13

**asserted** 52:14

**asserting** 188:16

**assertion** 52:11 105:21

**assess** 25:6

**assessing** 39:12 41:1

**assessment** 40:5,24 55:23

**assigned** 36:6 39:7 41:23 42:7 43:5

**assist** 24:20

**assistance** 39:1,3

**assistant** 199:14

**assisting** 13:16

**associational** 14:12

**assume** 9:11 15:17 26:11 57:12 78:15 86:11 114:5

**appointed** 121:7,15 128:18 133:3 146:8 161:7,13 163:3 202:15 210:7,22 214:7,9

**assumed** 21:20

**assumes** 134:8 186:22

**assuming** 34:18 81:1 89:20 103:14 203:10,20

**assumption** 81:3,8 82:13 122:10

**assumptions** 85:13,18

**attached** 55:1 56:22 57:8 111:9, 18 200:6,17

**attack** 141:16 181:17

**attacker** 79:24 80:7 127:11 142:6,7 181:18 182:20

**attempt** 55:13 72:6 168:6

**attempted** 52:8 105:5

**attempts** 70:19

**attend** 12:10 87:1,4,17

**attended** 7:19 172:24 173:3

**attention** 65:14 199:20

**attestations** 49:18 50:8 53:2

**attorney** 6:24 7:13 12:16,21 18:18 22:3 31:1 33:19 34:21,24 39:8 40:20 41:20,24 42:7 46:19 51:2 55:23 62:19 154:5 155:20 177:23 199:14

**attorney/ client** 25:2

**appointed** 48:22 50:5 51:4 52:5 94:24 95:12 176:5,12 177:19 189:13 190:5

**attorneys** 10:1 11:13 15:20 20:6 21:17 33:7 41:22 57:20 177:16

**August** 116:17 117:11,16

**authority** 97:10

**Avenue** 98:15,18

**aware** 10:7 27:23 51:19, 22 101:12 106:15 119:18 120:10 122:7 123:3 124:18 155:13 157:3,7,10 159:23 160:19 168:1 169:9 171:21

---

**B**

**B-E-N-Z-I-N-G-E-R** 110:11

**B72** 197:14

**back** 8:5 18:12 29:8 37:8,11,12 39:6 47:17 53:7 56:23 61:8 64:6 68:11,15 69:10 71:3 76:13,23 80:21 84:18, 21 103:8,9 127:13 128:2 132:10 134:10,14 144:3 150:2 158:1,13,24 159:10 175:2 179:7 181:9,24 186:4 192:5, 19 196:18 204:18 206:3

**background** 12:7 42:18

**bad** 14:13 72:15 142:24

**Bailey** 38:10, 11,18,19

**Ballistic** 148:20

**ballistically** 149:19

**ballistics** 151:11

**Bar** 12:12

**bare** 211:17

**based** 43:21 44:1 51:11, 18 58:7,8 61:7 91:4 103:24 105:13 209:19 210:16,23

**baseline** 39:17

**basic** 8:16 39:5,15

**basically** 10:5 27:5 109:23

**basing** 90:11 171:15

**basis** 108:9 109:6 135:12 157:4

**Bates** 45:10, 17,23 46:4,6 53:17,18 56:14 65:16 66:3 111:21 127:15,17 179:12 181:10 189:23 190:22 195:6,24 197:13,16

**BCI** 109:18 110:2,7,13, 18 119:16, 17 211:15, 20

**BCI's** 109:22,24

**Beale** 29:21, 22 30:2,11, 14 32:12 47:1

**bear** 28:11

**bed** 152:4

**began** 12:16

**begin** 66:8

**beginning** 55:5 61:17 82:1 85:1

**begins** 45:12 77:15

**begun** 155:5

**behalf** 6:19 19:10 22:13 27:13 28:7,9 53:13 54:18 59:14 155:11

157:13 199:8,11

**behavior** 130:6 157:1

**belated** 103:12 115:16

**belief** 58:2,7 79:22 108:10 209:18

**beliefs** 178:18

**believed** 59:19 62:9 96:12 105:14 112:11

**believes** 82:7 182:15 193:16

**believing** 114:10

**bell** 155:17

**belonging** 163:21

**Benzinger** 110:7,11

**Berry** 21:23, 24 22:2,11, 15,21

**big** 99:22,23

**bigger** 85:20

**bill** 17:15

**birth** 108:15, 23,24 115:11 116:13,17 117:9,10,17 118:1

**birthday** 116:15

**bit** 71:17 87:9 95:7 144:12 145:15 146:5 202:19

**black** 86:6 88:7 93:16 129:6 166:14

**blacks** 90:19

**Blake** 31:23 32:5,14 57:1

**Blake's** 32:19

**blood** 145:5

**blue** 182:13

**bolster** 167:4 168:21 169:4

**bolstered** 170:11

**bolstering** 168:10

**Bond** 154:4, 7,23

**booking** 89:1 98:22 119:22

**bottom** 32:22 33:12 61:16,20 67:5 96:4 182:4 195:5

**bounds** 49:4 50:19

**box** 118:4

**boxes** 118:7

**Boy** 94:6,8, 21 95:11,13 96:4,12 97:2,11,15, 23 98:13

**Brady** 49:9 53:1,2 58:22,23 59:6,8 60:10 61:4 85:22 95:2,15 104:3,13,24 105:14,23 124:8,12 144:10 167:23 200:15 201:2,5 208:18,20

**break** 9:17 47:7 129:3 153:6

**Brenda** 6:13 10:14 72:2, 21 73:2,7 76:5,15 83:18 84:19 101:3 120:8 121:24 126:11 184:14 185:20,24 186:18,19 187:1,4 206:7 207:17

**Brenda's** 131:23

**Brian** 6:4 7:1,4,10 28:14

**bribe** 51:22 52:8

**bribery** 52:3

**briefing** 76:12 97:13

**briefly** 10:3 70:5 71:12 179:6 191:5 198:16 199:3,21

**brings** 26:7

**broke** 98:9

**Brooks** 139:4

**brother** 87:15 101:17 106:16 108:6 109:22 111:2,9,13 112:15 113:1 114:3, 10 119:7 121:8 137:2

**brother's** 108:23 109:23

**brothers** 89:7,8 90:18 91:4,20 92:20 99:18 100:3 106:3 107:14,19, 22 108:21 109:1,19,21 111:5 112:20 113:12,15 114:24 118:24 119:19 120:2,4,19 135:1,7 138:18,19

**brought** 8:5, 11 10:21 104:6 185:19

**budget** 138:8,12

**budgetary** 138:14

**build** 171:14

**building** 103:2

**bushy** 91:8

**business** 7:8 138:4,6

———
**C**
———

**calculation** 156:22

**calculus** 134:23

**call** 39:10 42:14 138:5 144:9 168:16 193:20 207:10,12 212:5

**Callahan** 6:23,24 12:24 22:17 24:23 25:11 42:16 43:24 45:16,19 46:1,8,14,17 48:21 50:4 51:1,10,16 52:4,10 55:18 56:13, 16 59:11 94:22 95:4,

16 103:24 104:21 105:2,20 127:19 143:24 174:23 175:21 176:15,20 177:12 178:6 187:18 189:4,7,10 196:8 215:2, 8,15

**called** 13:22 14:3,18 36:13 57:7 87:8 194:3 200:22 206:24 208:5 212:18

**calling** 68:5

**calls** 27:4

**Campus** 7:12

**cap** 197:8

**capacity** 7:1 33:4

**capitalized** 208:21

**captioned** 112:1

**capture** 130:13 148:21

**car** 78:16 79:1,13,14, 19 80:22 81:2

**Cardoza** 14:5,15

**caring** 174:9

**carry** 17:18

**cartridge** 145:12 148:22

**case** 10:6,17, 20 15:16 16:24 18:7, 10,12,15 20:14 21:2 22:16 23:3, 12,24 26:13 27:13 30:15 33:9 34:16, 17,18 35:20, 24 36:6 37:5,9 38:3, 9,13,14 39:16,19 41:1,4,6,21 42:11,19 43:3 44:20 47:3,20 49:10 55:15 80:13 89:21 105:12 120:15 126:9 138:12

140:9,20
141:7 143:1
144:10,17,
21 145:10
149:16
150:8
151:20
155:8
160:18
165:3,11
166:2
167:19
168:11,22
169:4,5,10,
11 170:7
177:22
185:12
187:14
191:14,23
197:5 198:3,
8 207:3,6
208:11

**cases** 13:17
15:7,18
17:10 23:21
24:2 31:9
33:5 37:18
38:19,22
41:8,15
165:5 168:9

**casework**
34:2 151:14

**casing**
144:19
145:4,12,14
146:8,18
149:19
150:3,8,14,
15,23 151:2
211:10,13,
17,18

**casings**
148:23

**Cate** 38:1,2,5

**cautious**
114:9

**CDP** 209:14

**central** 44:11

**certainty**
90:6,9
103:17,21
133:24
143:10
147:1

**certified** 6:6

**chain** 211:13

**chaired** 7:18

**challenge**
141:17

**change** 98:4
113:7,12
169:15,17,
18 183:10
196:13

**changed**
133:15
134:8
170:24

**changing**
116:22
134:4

**characterizat
ion** 101:19
158:10

**characterize**
158:3

**charge**
162:13

**charged** 17:7
44:9

**charges**
19:15 44:12
92:7

**check** 132:4
133:7
134:11
202:13
204:19
207:7

**checked**
132:11

**Chillicothe**
48:3 50:11

**chose**
159:16

**Church** 7:10

**Cincinnati**
7:3,5,11
12:11,23
16:15 22:3
29:24 30:4
32:4

**circle** 142:13

**circles** 84:21

**circumstanc
e** 177:22

**circumstanc
es** 89:16,17
90:2

**citation**
69:22

**cited** 75:16
183:17

**cites** 181:21

**citing** 71:15
183:20

**City** 6:12
28:8,10
45:12 196:2
197:13,16

**City's** 46:6

**civil** 8:4
10:20 11:14
26:16 30:5
115:18
124:15
140:18

**claim** 25:6
69:2 73:8
156:24

**claims**
11:18,22
20:7 25:1
213:10

**clarification**
9:9,11 13:11
91:12 94:16
110:9 198:7

**clarify** 34:15
49:8 106:14
120:13
176:6

**class** 37:16

**classes**
172:15,16

**CLE** 172:17

**clear** 48:20
68:4 74:6,10
81:10 82:16
97:3 104:20
122:15
165:19
208:3 209:7

**clerk** 114:16
115:7 116:3

**clerk's**
117:24

**Cleveland**
8:9

**client** 24:4
25:10 26:14,
15,20 27:7
39:4 43:18,
21 50:9
156:18
175:23

**clients** 17:15
24:24 25:19
26:12 27:2,3
157:19,21
172:17

**clinic** 13:15,
16 14:5 30:1
31:3,5,10
33:2,20
38:17

**Clinical**
12:21

**clinics** 14:8

**close** 66:6
124:21

**closer** 191:2

**closing**
142:22

**clothing**
171:17

**co-counsel**
18:19

**co-
defendants**
23:11,12

**co-mingled**
189:14

**coherent**
74:16

**cold** 207:10

**collect** 50:6

**collected**
161:4 164:9
165:13
211:18

**collecting**
175:22
176:16
211:9

**collection**
211:14

**college** 7:11
12:11 17:4
32:4 33:3,17
172:16

**color** 171:13

**Columbus**
6:12 28:10
43:13 54:19
59:4 72:3
100:16
101:7 118:6
126:5
145:24
179:23
180:13
192:3
199:24
200:20
211:7
212:14,18

**Columbus'**
183:8

**combination**
148:4

**combined**
109:1

**comfortable**
25:14

**commencem
ent** 24:17

**commercial**
139:16

**commit** 15:9
168:1

**commits**
121:10,11,
18

**committed**
78:3 107:19
108:3 121:8

**committing**
123:2

**common**
46:19 47:2
53:13
106:20
109:1,6
117:4

**communicat
ed** 176:1

**communicat
es** 25:9

**communicati
ng** 24:24
25:21

**communicati
ons** 25:3
51:5 52:5
208:1
214:20

**comparable**
160:9,11

**compare**
149:18
162:5 165:5

**compared**

**collection**
149:1
150:21,24
162:4

**comparison**
145:18
146:16
152:17
153:1,22
160:3,7
164:15

**comparisons**
154:15
160:4

**compensatio
n** 22:7

**Complaint**
11:19,20
19:20,24
20:3 21:2,3
159:11
167:2

**complete**
65:5 71:9
200:18
209:12

**completely**
156:23

**component**
144:10,17

**computer**
23:15
195:18

**conceded**
172:3

**concerned**
42:13
159:18

**concerns**
138:14

**CONCLUDED**
215:23

**concludes**
215:18

**conclusion**
78:5

**condition**
175:9

**conditions**
156:5 174:4

**conduct**
160:15
165:9 167:2

**conducted**
60:22 67:20
149:4

**conducting**
100:19

**conferences**
14:21

**confidence**
132:24
133:6,13
135:2 136:2
171:5

**confident**
100:1,11
133:16

confidently
134:2

confirm 44:3
110:13

confused
111:11
113:2 137:4

confusion
66:2

connected
48:14
102:21

connection
23:3,20,21
81:16
163:14,15

consecutive
46:9

considered
121:4
198:23

consistent
28:21 48:23
73:1,7,15
95:18
105:23
115:9
118:18,21
167:16
184:3,5,20
186:18
188:7

constitutiona
l 15:13 138:1

constitutiona
lly 137:18
138:11

construe
86:13

consultation
41:21

contained
54:9 59:5,9
64:16

contaminatio
n 211:11
212:17

contents
54:12 56:20
64:21
183:14

context
92:13
124:15
128:15
132:15,24
164:13
166:18,20
185:3

continue
66:19

continues
91:7

continuing
19:12

contractural
26:2,11

contradict

70:12

contradicted
69:2 70:3
71:11 76:18
105:9

contradiction
75:1,12,14
76:4,6

contradicts
69:13,21

contribution
27:6

convenience
77:19 81:7

conversation
11:12 20:14
74:5,14 78:7
79:16 80:18
82:19 83:20
84:2,3,5,23
85:2 96:20,
23 103:2
110:5
119:17
125:1
130:10
154:23
188:19,22
206:23
207:4,17
208:4

conversation
s 20:10 25:5
48:9,17
52:20 110:2
154:4 158:6
188:23
189:2,15
210:16,24
213:17,20,
23

converted
125:23

convict
167:24

convicted
8:9 15:8,13
147:24

conviction
15:7 28:20,
23 147:21
168:21
173:14

convictions
22:8 92:8

copied 125:7

copy 21:1
45:23 46:5,7
57:8 58:20
66:7 179:22
197:15

correct 7:14,
15 13:20
16:10 18:1,
5,9 19:21,22
20:3,4
24:10,11,14
27:21 34:20
39:24 42:1,2
43:3,6,14,15
47:23 50:13

53:21 54:20
57:24 60:23
61:23 63:2,6
64:11 65:11,
22,23 68:6
71:1,13
74:19,23
82:21 83:9,
16 85:10
88:1 90:20
91:2 96:9,10
97:14 99:15
100:9
107:15,16
108:4
111:20
113:18,24
114:1
115:12
121:21
123:10,21,
22 124:10,
13 125:16,
17,20 126:6
128:9 129:8,
16 133:14
136:22
137:11,15
138:9,20
141:9,19,24
142:2,3,8
145:8
146:20
147:6,7
153:9 154:9
156:10,14
161:11
169:1
170:14,17
171:5,18
172:4,9
180:17
181:5 182:6
185:1,22,23
186:20
201:21,22
206:9,17
209:1,6
210:11
212:8 213:6,
7

Correctional
48:4 50:11

correctly
72:23 77:24
125:10
126:22
145:16
184:3
208:16
211:21

cost 17:19

costs 17:7

counsel
6:15,18
10:20 18:16
19:13 21:17
22:16 23:5,
13 24:21
26:7 50:18
55:14 56:2
63:6 66:2
95:8 98:4
135:14
137:18,24

190:22
193:14
196:1,13
197:11,19
198:21
215:18

counsel's
200:21
201:3,11,19
208:19
209:14

Counselor
66:5

counter
136:8 137:7

counties
93:12

country
14:10,22

county 32:16
46:20 47:2
58:10
106:20
107:24
108:22
110:18,22
114:16
115:6 116:2
138:12
152:21

couple 34:6
93:15
202:22
213:16

court 6:2
8:19 17:21
18:16 46:19
47:1 52:16
53:13 63:1
65:2 96:9
106:21
108:22
117:4 118:3
119:15
140:17,20
141:2
155:11
188:1
204:20
205:17
211:16

court's
114:17
190:14

Courthouse
110:22

Courts 116:3

cousin 143:5

cover 179:6

covered
94:23

CPD 43:23
58:12

created
200:1
214:15

creation
203:7,22

credit 13:16

crime 44:8,
11 68:4,22
73:14 75:4
76:9,17 78:9
79:5 108:3
147:23
153:9
167:24
180:21

crimes 15:8
28:19 48:19
49:23

criminal 17:5
18:18 22:5,6
28:16,18
42:19 49:14
57:19 58:5
93:2,12
138:16
155:8
201:12

CROSS-
EXAMINATIO
N 6:8 190:17

crumbling
169:5,11

CSSU 193:11

current
32:19
140:18

Curry 44:20
49:16 60:22
61:2,10 62:4
63:10,15,16,
19 64:20
96:22,24
127:9
128:12
131:20
141:13
166:6 184:8
185:1 200:5,
9

Curry's
62:22
128:19

custody
107:22
108:7 135:1,
10 211:13

cutting 95:7

_____

D

damages
28:23
173:15,19,
20

data 136:12

database
148:24
149:2,20
150:16,20,
24 151:3,12
162:7,11,21
165:9

databases
139:5,12,14,
17 149:21,
24

**date** 77:5,9
92:12
108:15,23
115:11
116:13,17
117:16
183:5,12,13
196:21
197:7 203:7,
22

**dated** 91:23
179:24
196:20

**dates** 80:15
108:15
117:9,10,24

**Dave** 57:6

**David** 35:1
56:4,5,6
64:16

**day** 67:24
68:22 70:5,
14,20 71:1,
13 72:19
73:4,14
76:17 185:8,
9,17,21

**days** 83:5

**deal** 144:9
190:6

**dealing**
104:23

**deceased**
112:16

**December**
195:8,15
196:22
197:1

**decided**
160:15
167:2
205:16

**decision**
41:12,18
43:21

**decisions**
40:11

**declarations**
28:21 188:7

**declared**
188:8,20

**defendant**
17:5 78:15,
16,20
138:13
198:20

**defendant's**
198:24
200:6,17,22
209:15

**defendants**
6:11 159:16
167:2,5

**defendants'**
20:22 27:8
45:4 71:5
114:12
115:22

**defended**
15:14

**Defender's**
35:12 112:7

**defense** 22:6
28:18 57:20
62:19 63:5
65:7,10 86:2
136:2
137:14,18
141:16
142:1,5
161:8,10,14
200:21
201:3,11,19
208:19
209:14

**defer** 61:8
149:12
157:18
172:5
215:13

**defined**
208:24

**definitions**
148:2

**definitively**
134:15

**degree**
103:17

**deliberately**
63:21

**department**
17:4 72:3
100:16
101:8 126:5
212:19

**depend**
120:6
132:14

**Dependable**
66:14

**dependent**
190:14

**depending**
90:5 160:13

**depends**
89:15,16
132:23
156:2,7

**deposition**
7:21 10:2,
10,11,14
11:11 29:6,
11 131:23
188:2 190:3,
13 201:9
215:3,19,23

**depositions**
7:16,19 8:15
10:16

**describe**
87:24 88:3,
14 91:8,13
93:17 97:16
152:19
170:15

**describes**
101:16,17,
18

**describing**
128:8

**description**
28:12 60:5,
6,9 77:16
88:14,21
90:14 91:6,
19 101:14
125:3,7
126:19,20
127:1,2,3
129:5,9,18,
21 133:17
169:15,19
173:9
187:11
200:13

**descriptor**
88:6 90:22
91:24 93:5

**designation**
88:2

**designed**
208:24

**detail** 145:17
146:14,15

**details** 120:6
145:14
149:5 152:1
157:22
158:18

**Detective**
49:11,15
59:18,20
60:12,21
62:5 67:20,
23 68:21
69:13,21
70:3,13,18
71:11 72:2
73:12 75:17
80:19 83:8
101:3 120:7
121:4
122:18
124:6,18
125:15
130:6 166:5
168:2 171:2
191:5
200:23
206:7 208:4

**detectives**
185:8

**deteriorate**
165:12,17

**deterioration**
165:17

**develop**
168:6

**developed**
125:11

**Dewine**
46:18

**diagnosed**
174:20

**diagnosis**
176:23

**difference**
73:18,20
164:22

**differences**
60:4,9

**dig** 25:15

**Diggs** 49:12
67:6,12
79:23 80:5,7
82:2,14
83:24 84:24
85:9,21
86:4,10,16
87:4,10,13,
14,16,17,24
88:22 89:6,8
90:18,24
91:1,4,20
92:20 93:6,
22 94:2,6
97:16,24
98:20 99:2,
5,9,10,17,24
100:3
101:17
103:9,14,18,
23 105:16,
19 106:3,8,
10,11,16,17,
19 107:2,5,
9,14,18,21
108:6,11,12,
17,21
110:22
111:5,8,13
112:11,14,
15,20,24
113:12,15,
20 114:6,8,
10,18,19,20
115:10
116:4,11,13,
15,16
117:16
118:24
119:7,19
120:9,18,21
121:5,7,20,
22,24 122:2,
6,11,13,16,
24 123:2
124:17,24
129:10
130:12,17
131:4 132:3,
9,11 133:6,
9,13,18
134:2,21,24
135:7,13,15
136:1,4,9,
10,24
138:17,19
141:24
142:8,20
170:2
200:12
201:18

**Diggs'** 201:1
208:7 209:5

**diligence**
202:12

**direct** 50:24
65:13
101:23
102:2
199:19

**direction**
39:9

**directly** 23:9

**director** 33:1

**disagree**
180:5

**disagreement** 205:12
214:3

**disclosed**
28:17 59:1
210:1

**disclosure**
187:12

**disclosures**
27:12

**discover**
107:3

**discovered**
110:23

**discovery**
57:7 61:11
62:10
199:22
200:16
209:20

**discuss** 20:6
49:2 52:3

**discussed**
178:16
205:7

**discussing**
61:22,23
158:6

**discussion**
57:13
128:18

**discussions**
204:11
205:9 212:4
214:6

**dislike**
168:19

**dismissal**
19:15

**dismissed**
155:8

**display**
170:13

**Division**
43:14 54:20
59:4 179:23
180:13
192:3 200:1,
20

**DNA** 46:21
53:11 63:2
109:17,18,
19 110:3,14
144:12,17,
20 145:1,3,9
146:21
147:1,6
148:2,8
149:8,11,13
165:10,11,
17,20
211:20

**docket**
106:20,21

**document** 10:4 27:14 46:13 47:9 53:16 54:5, 9,12 57:6,8 61:11 70:11 112:1 126:14 179:14,22 185:11 186:1 191:10 195:24 197:22 199:24 201:15 202:2 208:16

**documents** 20:15 28:2,4 30:20,21 40:4 43:23 44:2 54:22 55:1,9,23 56:17,20 57:14,17,18, 22 58:3 61:23 62:3 63:5,8 64:9, 15 110:12 119:16 189:18 190:6 200:3 201:10

**donations** 16:23

**donor** 147:6

**door** 42:12 183:22

**double** 204:19

**doubt** 77:8 114:7 194:1

**Douglas** 38:1,2

**dozen** 31:21

**drafted** 205:23

**drafting** 20:3 205:20

**drafts** 157:14 214:12

**draw** 42:22 148:14

**drive** 7:12 66:13

**drop** 118:4,7

**drug** 51:8 92:9,17,22

**drugs** 51:15 92:1

**due** 19:17 202:12

**Duhon** 37:6

**duly** 6:6

**DVD** 196:17

**DVDS** 98:4 196:13

---

**E**

**e-mail** 57:6 110:17 214:20

**e-mails** 10:4

**eager** 8:22

**earlier** 17:22 19:19 52:23 56:7 102:8 128:12 188:18 201:9

**earnest** 168:5

**easier** 193:5 196:6

**easy** 8:17 9:4 40:12

**education** 12:8 172:14

**effort** 141:7 167:24

**efforts** 55:17

**electronic** 53:24 199:5

**eligible** 34:9

**Elizabeth** 110:7,10

**employ** 15:21 16:9 17:1

**employee** 7:2 13:7

**employees** 153:8

**employment** 12:9

**encourage** 25:23

**end** 16:2 41:3 55:6 66:7 84:22 173:13 191:20

**ended** 155:7

**enforcement** 148:21 168:7 211:16

**enter** 6:22 162:6 202:6, 11

**entered** 151:3 162:20 195:2 198:3, 7,14 199:10, 16

**entering** 150:20 201:24

**entire** 169:13

**entirety** 202:2

**entities** 14:2, 16 15:1

**entitled** 138:11 179:23

**entity** 13:18, 22 14:3 16:15

**entries** 149:1,2

**entry** 34:5 150:3 151:2

**episode** 83:21

**epistemological** 148:14

**Epstein** 6:9, 11,14,21 7:6 25:4 38:4 42:20 45:11, 18,22 46:3, 11,15 47:4 49:5 50:21 52:13 53:6 58:16 64:5 66:1 70:15 88:10 95:1,9 104:4 106:13 115:19 127:21 139:8 143:22 144:5 176:18 177:5,9 178:5,8,20 188:18 189:5,9,16, 22 190:1 192:11 194:19 196:3,10 197:2,15 198:6 202:14,21, 24 203:3 214:23 215:7

**Equal** 12:14

**error** 126:18

**Ervin** 36:8,21

**escaped** 164:11

**essentially** 201:16

**establish** 26:23

**established** 42:3 82:18, 23

**estimates** 127:9

**estimation** 90:3 127:10

**estimations** 89:14

**evaluate** 39:18 164:24

**evaluation** 42:18,21 44:1

**evening** 171:18

**event** 173:2, 6

**events** 102:10 128:9 172:14,17, 18 173:4 182:5

**eventually** 61:17,20 131:16

**Everett** 86:7, 19 87:2,4,8, 18,23 88:2 93:15

**everybody's** 47:8

**evidence** 15:14 28:16 44:15,22 45:2 49:10 53:1,2 58:24 62:17 75:16 104:5,13,24 119:19 122:1,5,7 123:3 145:22 146:19 147:3,9,22 148:3,4,6,11 151:20 153:8 159:19 162:16 163:9 165:5, 8 166:20,22 167:4,7 186:22 192:8 211:8 212:14,21

**evidentiary** 165:13 204:13,15 205:3 210:20 213:19 214:2,9

**exact** 88:19 130:2 154:18

**examined** 6:7

**examiner** 152:14

**exchanged** 119:20

**excised** 127:1

**exclude** 126:24 165:6

**excluded** 144:22 147:5

**excludes** 127:6

**exclusion** 126:17 127:5

**exclusively** 27:2

**exculpatory** 60:2 95:2,14 133:10,21 147:9 148:16 162:16,23 163:1,9,17, 21

**exercise** 83:13

**exhibit** 20:22 21:1 27:8,11 29:15 45:4,7 46:23 53:8, 10 55:5 56:9,24 57:9,13,18 63:6,14,17, 23 65:5,17, 18,19,20 71:5,8 111:18,19 114:12,15 115:17,22 116:1 159:10 179:8 197:12,20 200:6,18 209:9,12

**exonerate** 147:17

**exonerated** 8:10 148:3

**exonerating** 147:12,14 148:7,15

**expect** 90:2 214:19

**expected** 213:18

**experience** 8:15 18:17 34:7,8 89:13 141:4 168:14 174:4,8 176:8

**experiences** 174:14

**expert** 165:15,20

**experts** 151:16

**explain** 33:21 158:20

**explained** 75:13

**explanation** 76:4,6

**explanations** 118:15

120:17

**expressed**
90:10 171:4

**expressly**
134:9

**extensive**
93:2,11

**extent** 24:24
25:20 42:17
59:12 94:23
104:2
105:22
115:17
175:22
188:4
204:12

**eyebrows**
91:8

**eyewitness**
141:8
142:24
148:5 170:9

——————
F
——————

**face** 83:2
141:12
142:15
143:9
182:13,14
193:15
195:13
203:12,23
204:1

**fact** 19:3,11
21:21 48:2
52:8 62:9
72:5,9 74:9
75:1 76:7
90:16
118:10,16
125:6
128:22
131:4,13
134:20
135:9 143:6
160:11
161:22
163:10
170:3
171:24
172:4
183:11
186:17
192:15
194:17
197:6 198:2,
13,23 202:7
204:6

**factors** 157:2

**facts** 39:10,
15 159:23
186:22
205:11,14
212:7 214:1,
4

**factual** 136:8
137:7

**faculty** 13:4
33:3

**failure**
124:17

**fair** 9:12,23
11:7 25:4
29:13 34:11
40:5 43:20
60:18 63:18
65:5 74:12
91:11 96:11
101:19
107:17
108:19
109:13
124:16
147:15
149:14
172:7
196:23
202:9
212:10

**fairly** 76:8
140:20

**falls** 95:21
104:13

**falsely**
124:21

**familiar**
54:11 87:11
106:3
152:13
156:19
159:8
160:23
173:7
177:21
182:15
186:14
193:16

**farther**
117:14

**fashion**
169:6

**feature** 44:5
170:22,23

**features**
169:24

**February**
57:5

**Federal**
19:21 20:7
24:14,17,21
26:7

**feel** 25:13
27:16 52:16
100:1,11
170:8

**feels** 178:1,9

**feet** 27:1
129:16

**fellow** 12:15
33:18 36:10

**fellowship**
34:22 41:4

**fellowships**
33:22

**felony**
138:16

**felt** 97:9
169:3

**figure** 25:8
79:7,18
102:9 124:5

**file** 17:24
20:21 32:6
36:19 37:20
58:13
105:12
156:1
157:12
199:1 200:2,
7,15,21
201:3,6,11,
19,20 202:2,
8 204:23
208:19
209:15,19,
20

**filed** 11:24
19:23 20:8
27:12 53:12
54:3 105:12
156:17
157:8,11,14,
24 158:24
188:1 199:7,
9,10

**files** 55:14
91:23
199:22

**filing** 155:10,
15 156:4,9
188:4,5

**filings** 59:16
60:17 157:7
187:24
205:5

**fill** 39:5

**financial**
14:24

**find** 15:6,12
34:5 39:15
63:14 65:15
79:16 105:5
106:11
119:7 137:2
139:2,19
140:8,18

**finding** 24:21
139:23
175:10

**finds** 26:7

**fine** 47:5
128:21

**finger** 68:14

**fingerprint**
49:13
145:14,18
146:7,18,19,
22 151:19
152:2,14
153:8,17
159:17
160:16,20,
21 162:21
163:21

**fingerprints**
153:5,12
154:8 161:4
162:1,6,8
163:4

165:12,13,
15

**finish** 8:22,
24 178:23

**fired** 148:23

**firm** 11:13
20:6 22:24
30:7,10
31:19 32:18
35:13

**firms** 24:2
25:19 26:3

**five-eleven**
89:3,10
129:13

**five-minute**
47:7

**five-nine**
88:7,12
89:2,10
90:22
129:14

**flip** 127:13
181:9 199:4

**focusing**
131:13

**foldaway**
152:4

**folk** 147:18

**folks** 36:18

**follow** 71:18
190:15
198:17

**follow-up**
67:14

**foot** 88:12,
13,19 90:23
129:7 130:3

**footnote**
69:1,9,18,19
76:12,15
96:3

**forensic** 11:3
17:12,18

**forensics**
165:4

**forget** 8:17
9:5

**form** 39:1
85:5 100:6
103:12
126:1
132:13
135:18
180:10
182:22
187:17,21

**formal**
187:24

**forms** 17:17

**fortuitous**
136:15

**found** 56:11
60:16 91:21
106:10
136:8,10
139:6 146:7

164:8
166:21

**foundation**
53:4 85:5
126:2
176:23
180:10

**frame** 168:18

**Franklin**
46:20 47:2
58:9 106:20
108:21
110:17,22
114:16
115:6 116:2
152:21

**frankly**
139:17
141:1

**freak** 136:16,
18

**free** 27:5,16

**freedom**
15:10 27:4

**front** 29:16
183:22
190:20
195:24
196:1

**full** 7:8 25:20
56:20
181:13
188:4

**full-year** 31:5

**function**
180:7

**fundamentally** 142:18

**funded** 16:21

**funding**
16:20

**furtherance**
198:23

——————
G
——————

**game** 82:6

**gathered**
43:8

**gathering**
30:20

**gave** 23:6
58:4 72:13
83:24
122:11
131:14
171:12

**gears** 141:5
144:11

**general**
25:17,24
30:17,19
32:11 46:19
139:16
158:10
189:11
190:12

**General's** 6:24

**generally** 168:4 174:3

**generate** 40:24 41:2

**Gilbert** 199:13 202:5 205:6, 16 207:16 210:2 212:2 213:8

**Gilbert's** 210:24 214:21

**GIRARD** 53:9

**gist** 201:14

**give** 8:5 45:11 82:2 102:12,14 111:21 131:16 144:15 169:8 178:10 193:1

**giving** 34:5,8 197:16

**glad** 185:19

**glance** 66:24

**glean** 128:15

**gloves** 211:10 212:16

**goal** 18:14

**Godsey** 22:10,20 32:23,24 33:1,8

**good** 6:10 9:13 34:7 97:10 140:21 143:14 155:1 162:10 174:17

**graduate** 32:4 33:17 34:1

**granted** 18:5 204:21

**Gray** 182:12

**great** 144:9

**Greater** 16:15

**Green** 7:12

**groundwork** 52:17

**group** 39:7 41:5,7

**guess** 13:24 27:6 59:12 94:17 120:23 165:14

---

185:6 192:18

**guessing** 102:12

**guide** 203:14

**guilty** 15:16

**gun** 89:19

**guys** 6:21 215:6

---

**H**

---

**habit** 9:4

**hair** 91:7

**half** 158:1

**halfway** 191:6 193:8

**Hamilton** 32:15

**hand** 20:24 27:10 45:6 71:7 114:14 115:24 141:21 158:9

**handed** 46:24

**handle** 24:21

**handled** 211:17

**handling** 145:22 211:9 212:15

**hands** 41:6 211:17

**handwriting** 128:6

**handwritten** 49:11 59:17 60:1,11,20 61:9 62:3,5, 11,17 63:9, 15,24 64:2, 14,16,17 125:16 126:22 127:2,3,13, 20 171:1 193:3 200:8, 10 201:17 209:4

**happen** 26:18

**happened** 74:10 83:15 84:4 85:17 101:22,24 107:23 126:8 137:6, 11,21 166:19 174:12

**happening** 111:3

**happy** 9:10, 18

---

**hard** 34:4 192:14

**harm** 174:10

**He'll** 215:15

**head** 60:15 67:18 69:24 88:20 89:18 93:1,24 125:13 146:2 150:1, 23 163:14 169:2

**Heads** 9:3

**hear** 6:16,17 139:8

**heard** 132:4 141:14 176:11 178:13,14 211:4

**hearing** 175:11 204:13,16 205:3,8 206:16 210:20 213:19 214:2,9

**height** 88:20 89:14,22 90:3,7,15 99:19,24 125:6 126:17,19 127:5,9,10 129:11 130:3 169:15 170:17,20, 21 171:12, 13

**helpful** 26:1

**helps** 139:21

**hereinafter** 6:6

**hey** 25:10

**hidden** 170:2

**high** 25:12, 13 172:15

**hire** 34:1 139:19

**histories** 93:2,12

**history** 51:15

**hit** 89:18 150:2 151:1 162:10,14, 22

**hold** 8:23 12:22 70:17 181:8 190:3 196:9 205:7

**holding** 190:13

**home** 112:11 183:22

**honest** 130:10

---

**honestly** 106:1

**honorarium** 172:23

**hood** 141:12

**hoodie** 182:12

**hope** 148:18 212:23

**hoping** 42:22

**Horton** 6:19 10:7,9,21 11:1,8,14 17:24 21:17 22:16 23:21 28:15 33:9 35:20,24 36:6,19 37:5,20 38:9,12,13, 14 42:4 43:1,17 44:9 45:20,21 46:10,21,22, 24 47:3,19 48:8,18 49:21 51:3, 7,14,21 52:2,7,20,23 56:7 57:23 58:5,13 59:14 66:16 77:2 83:23 85:11 87:1 88:1,15,17 90:19 91:1, 9,14 92:2,4, 17 93:17 94:20 95:10 97:6 98:18 99:8,18 100:3,8,9, 21,24 101:5, 19 103:10 105:15,18 111:23 123:9 124:22 125:10 126:24 127:6,19 128:1,3 129:2,22 131:2,9,14, 17 132:11 142:7,21 143:1,2,11 144:11,23 147:5,12 148:3 155:4, 15 156:9 157:13 158:4,23 160:22 161:6 166:7 167:24 168:18 169:20,23 170:20 171:22 172:8,19 173:4 174:20 175:5,8,11, 15,19

---

176:12 178:14 179:12 188:8 190:22 195:7 198:20 199:8,11

**Horton's** 10:11 11:18 18:15 19:4, 20 21:2 22:13 27:13 30:15 32:6 34:17 37:9 38:3 42:11, 19 47:18 49:14 53:12 54:18 55:14 56:1 57:19 94:8 96:5,13 97:11 100:13 152:8 166:13 198:14 201:11

**hospital** 72:6 75:6 84:16 194:9,12,15, 23 195:3

**host** 14:21

**hours** 72:16

**house** 26:23 27:4 163:6

**housekeeping** 54:16

**Howe** 6:4,10 7:1,7,10 20:24 28:14 47:15 56:14 95:5,10,17 98:9 144:8 176:3 177:1, 14,21 178:9 179:5 190:8 215:8

**Howe's** 42:18 215:18

**human** 145:6

**hundred** 82:15 87:20 140:24 152:13 205:2 207:23 208:2

**hypothetical** 123:1 161:3 206:12,13

**hypothetically** 83:11

---

**I**

---

**ID** 86:5,15 103:19 142:24 200:12

**idea** 22:19

34:3 83:10
84:12
103:11
132:20
142:20
170:1
184:10
195:4

**identically**
125:8

**identification**
20:23 27:9
45:1,5 71:6
114:13
115:23
132:18
133:2,18
134:1,16,19
141:9,23
142:19
143:10
148:5 167:3,
6 169:13
170:6,9,12,
20 197:20

**identifications** 44:23
143:12

**identified**
63:4 79:23
80:6 85:24
120:21
122:19
133:23
134:2
141:23
143:6
145:17
146:11,15
152:4 164:6,
8 168:24

**identifiers**
99:7

**identifies**
134:15

**identify** 45:7
81:20 82:5
84:24 86:24
141:18
147:1

**identifying**
60:3 80:3
81:5 86:11,
18 98:10
134:3,13
135:4
142:10,11

**identities**
108:12
111:6 113:8,
12 116:22
119:20
120:4

**identity**
117:22
120:3

**imagine**
174:10

**impeach**
141:8

**implicates**
187:23

**implication**
131:2 214:4

**important**
76:7,10
105:10

**imprisoned**
174:2

**imprisonment** 174:4

**improperly**
170:11

**in-kind** 27:6

**inaccurate**
159:2

**incarcerated**
107:12
113:15
114:4

**incarceration**
92:21

**incident**
77:17,22

**include** 61:2
63:9 64:1,
10,13

**included**
60:20 62:3,
10 91:23
166:7 212:8

**includes**
200:7

**including**
11:4 60:2,3
85:14 210:5
211:10

**inclusion**
211:23

**inclusive**
64:14

**inconsistent**
73:2,15
75:24 76:2

**independent**
14:9 156:23
213:5

**indication**
109:21
126:15
145:19
182:23

**indigent**
138:13

**individuals**
177:18

**indulge**
178:21

**inform** 132:8

**information**
20:12,20
28:14 29:2,9
39:6 40:3
50:6 54:8
55:21 59:24
60:2 70:8
76:8 83:23
86:20 89:2
91:5 96:15
97:5 98:11,

23 101:16,
18 102:23
103:2,6
105:8,9,10
106:5
113:11
116:20
117:21
119:22
120:1
122:22
126:7 129:2
135:24
136:21
141:3
148:20,22
149:22
150:20
151:10,12
152:23
154:11,13
161:7,9
165:9
167:11
171:10
174:18
175:22,24
176:5,16
177:24
183:11
187:13
189:12
192:14,16,
23 193:1
196:23
202:8
209:16,23
210:23
212:11

**inherent**
143:8

**initial** 30:20
59:20
104:12
132:24
133:17,18
171:14
183:24
184:19
203:7,21

**initially** 75:5
123:14
134:4,12
143:6 168:6
184:13

**injured** 144:3

**inmate** 15:12
17:6 26:6

**inmates**
24:10,13,20
155:24

**innocence**
12:17,19
13:13,14,19,
23 14:1,2,4,
7,14,15,18,
21,23 15:4,
6,16,19,21
16:8,11 17:6
19:7 28:21
33:2,19
49:18 50:1,8
52:21 53:3,
12 54:17

93:4 119:6
147:23
151:5
155:10
156:24
177:16
188:7,9,17,
20,24

**innocent**
15:7 48:18
49:22 50:14
188:14,16

**input** 136:12

**inserted**
196:24

**insinuate**
97:4

**insistence**
188:13

**instance**
178:15

**instruct**
51:12,17
52:6,11
104:16

**instructed**
52:18

**instructing**
50:23 51:3
104:20
177:6,10

**Integrated**
148:19

**intended**
180:14

**intending**
167:18

**intends**
190:10

**intentional**
167:23
168:13,20

**intentionally**
125:4

**inter** 200:11

**interactions**
164:19
174:16

**interest**
210:10

**interested**
15:18 21:13
157:22
158:17

**interposed**
118:1
188:21

**interpret**
103:6
164:14

**interpretation** 75:7

**interview**
30:24 59:20,
22 60:12,21
61:2,10
62:4,6 63:16
64:2,18,20

65:15 66:22
67:11,16,20,
24 68:22
70:24 72:7
73:3,13
76:10,16,24
77:10,15
80:6 83:16
84:15 85:7,
16 127:14
128:7,12,20
131:5
136:24
137:1
185:16
186:19

**interviewed**
185:21
186:16
187:1

**interviewing**
73:19,21

**interviews**
125:16
200:9

**introduced**
122:8

**intuitively**
197:8

**investigate**
15:6 213:9

**investigated**
120:18

**investigation**
13:17 28:18
41:5 42:10
100:14,19
101:8 107:4
119:7 120:8
122:10
137:15,17
138:9
146:13
150:4 164:7
167:8
179:24
184:22
210:3

**investigations** 162:2

**investigative**
55:19
138:15

**investigator**
17:2 111:8
112:2,4
119:10
138:11
139:19

**investigators**
16:6,9,12,18
40:3 139:13
171:11

**involve**
55:22 158:5

**involved**
23:9 68:6
135:16
154:20
157:20
172:21

involvement
22:12 25:21
33:5 144:21
172:13

involves
42:17

Isabelle
38:15,16

issue 28:19
95:2 104:3
109:20
156:5 166:2,
15,23 178:2,
3

issues
174:22
177:20
190:5 205:4
213:17

item 78:13

items 100:1
114:19

___ J ___

Jack 37:6,16,
18

Jackson 8:5,
7,8 23:6,8

jail 107:11,24

Jeanette
175:15
178:13,16

jeans 182:13

Jefferson
36:15

jobs 34:9

joint 12:22
13:3 198:2,
13,22 204:5

Jon 22:23

Jordan 31:23
57:1

judgement
26:8

judgment
26:16

judicial
155:19
156:10,18,
20 157:5,10

Julia 38:7,8

July 115:11
116:14,15
117:11

jump 104:15

jumped
202:19

jumping
163:20

jury 142:23
170:8,13

Justice
12:14

___ K ___

Kalmbach
38:10

Kanisha
36:8,9

Kassym
36:11,23

keeping
215:3

Kiley 29:21,
22 30:11
32:2 47:1

Kim 154:3,4,
7,23

kind 26:8
34:4 136:15
138:9
172:16
179:17
202:12

kinds 145:7
165:4

Kiser 36:15
37:1

knew 67:22
121:20,21
122:2,5,24
135:7 143:2
167:5
171:22

knocked
183:22

knowing
181:17
182:20
184:1

knowledge
28:13 39:18
57:17,21
67:23 95:19
98:17
101:24
102:2 109:2,
7 120:7
167:17
174:19
192:2 195:1,
11,17 206:8
213:5

___ L ___

lab 154:14

labeled
184:21
200:10,16

laid 32:6
53:5 59:16

language
86:14

Larry 18:16

latent 154:13

latex 211:10
212:15

law 7:11
12:11,21

14:5 17:4,21
24:2 26:3
30:3,7 32:4
33:3,17 34:1
148:21
156:20
168:6
205:13
211:16

lawful 6:5

lawsuit 6:12
8:3,4 11:18
19:21 24:14,
22 26:8
123:20

lawsuits
24:18
140:19

lawyer
141:17
172:16

lawyers
18:11 25:9

lead 205:20

leading
19:14 214:8

learn 110:1

leave 35:5
105:12
125:6 177:1
198:24
204:21,23

leaving
174:14
214:24

led 135:14
136:3
170:19

left 125:4
180:24

leg 74:22
89:19 144:4

legal 7:8
12:9,13
14:7,11
25:1,7 34:19
205:13
214:4

legible 204:3

legitimate
167:7

length 41:10

lets 27:5

letter 38:24
39:2,3,16

letters
106:22,24

level 25:12,
13 34:5
90:6,10
103:20
133:1,23
151:13

liability
124:13

licensed
7:13 34:21

light 91:7
182:13

light-skinned
166:14

lighting
141:15

limited 49:1,
9 59:13
105:23
174:15

lined 92:12

lines 17:14
61:19 63:3
93:15
116:12
117:15
142:5
175:13
181:1
190:15

list 25:17
31:22 34:23
35:17
173:13

listed 21:17
27:24 28:6
89:2

Liston 37:3

litigation
11:15 13:17
145:22

live 26:23
98:18

lived 98:19,
21 99:2

living 118:24
119:8

load 41:6

local 18:16
22:16
149:21

locate 30:11
55:13

located
112:12
138:17,19

location
32:19 35:14
181:1

lodged
187:21

Loevy 11:13
20:6 22:24
23:1,10
30:10 32:18
35:13

Loew 68:5
77:13 91:12,
18 92:16,22
93:17,22
94:2 98:21
100:20
107:6,19
113:16,23
121:5 128:9
159:20
180:3 181:1,
4 182:2
193:21

194:6

logically
83:14 84:8

long 31:4
128:17
155:3 206:1

longer 164:3
168:9

looked 54:13
87:21 93:4
95:17
111:11
115:4,5
122:3,6,13
190:21

loop 158:12

loosely
106:4

lot 30:19
74:18 78:7
85:13 106:5
118:14,20
120:17
132:23
155:23
157:18
170:10
187:23

Lowe 99:2

lower 125:6
126:17

lying 75:17
76:5

___ M ___

made 49:15
51:23 52:14,
24 62:24
95:16 96:16,
18 116:21
117:21
130:6
153:22
160:4,7
176:24
193:20

mail 158:1

main 8:17
86:20 174:7
210:19
214:3

maintain
99:17
177:17

maintained
50:1 200:2
211:14

make 34:8
46:12 47:7
75:22 80:11
141:23
153:7
169:18
170:19
177:2 189:6,
8 194:16
208:15

makes 41:18
81:21

148:11

making 49:8,
17 158:17
202:3

male 86:6
88:7 90:19
93:16 129:6
144:21
183:22

malicious
168:16

Mallorie
33:12,15,16
34:24 35:5

man 8:8
166:14

March 61:20

mark 22:10
32:23 112:2,
3,4 197:12

marked
20:22 21:1
27:8,11
45:4,7 47:17
71:5,8
114:12,15
115:22
116:1
197:20

marks 78:17
82:1

married
22:10,21

Martinez
6:17,18
11:12 20:5
23:16 30:9
32:17 45:9,
13 49:7
50:18 52:22
85:4 95:6,20
100:5
103:12
104:10
115:16
116:6 126:1
132:12
133:11
135:17
136:5 144:2,
7 177:7
180:9
182:21
186:21
187:7,16,20
190:9,11,18
195:23
196:5
197:10,18
198:9
202:17
203:4 204:6
206:5 211:3

Martinez's
21:21 23:14

match
160:22
161:6

matched
160:7 163:5,
11

material
58:22,23
59:1,6,8
60:4,11 61:4
85:22 124:9
145:4
200:15
201:3,5
208:18,20

materiality
104:7

materially
59:23
167:14

matter 49:9,
17 50:7,20
53:1 95:22
104:24
115:18
138:15
156:3,8

Max 37:15

MB 86:5

Mcclanahan
44:20 51:21
52:9 59:21
60:13 62:6,
18 63:20
64:3,11,18
65:14,22
66:22 67:21,
24 68:8,22
69:11 70:3,
20 71:11,23
73:4,14
76:17,23
79:23 80:18
81:24 83:8,
19,24 84:23
86:15 98:11
102:19
103:18
121:20
122:17
123:4
127:14
128:7
130:11
131:20
132:1,10
141:22
163:5,11
166:6
170:15
171:22
181:17
182:19
184:24
185:5,7
186:16
193:24
194:5 195:2
200:5,10

Mcclanahan'
s 45:1 66:11
69:3,12,20
73:16 74:4
77:4 125:3

meaning
28:15
153:23
164:15
198:8 210:9

means 92:13
147:20
164:13,14
195:12,14

meant 146:8
168:21

medical
175:9

medication
72:13,14
74:19

meet 40:17,
19 47:19
72:2

meeting
48:11 51:13

meetings
48:13,15
49:21 50:3,
10 51:6 52:1

member 33:3

memo 70:24
71:10

memorandu
m 53:20,21

memorialized
82:19

memories
134:5

memory 61:7

memos
40:24 41:3,7

mention
130:12,17
170:1
181:17,18
182:20

mentioned
17:22 32:22
79:14 102:8
119:15
124:24

met 48:2,4

mic 191:3

Michele
21:23,24
22:2

middle 27:20
79:10 82:9
86:7,19
87:2,5,7,18,
23 88:3,4
93:15
102:22,24
182:9

Mike 46:18

millimeter
144:19

million 137:4

mind 80:5
116:10
120:24
125:12
132:17
133:15
134:5,8
148:7
160:12

means 163:20

minds 79:17

minimize
211:11
212:16

minimum
121:21
133:1

minutes
178:22

mischaracter
ize 130:8

misconduct
124:18
168:14,20

misleading
130:14,16
131:3

misleadingly
124:23

mission
15:3,5

misspoken
64:8 65:20

misundersto
od 163:24

mixed
112:21
135:8

moment
146:6
203:10

Monday
112:10

money 26:9,
14,15,22

month 16:2
157:24

Moreland
37:15,19

morning
6:10 181:16
182:2
186:16
209:10

motion 11:4
17:24 18:4
44:5 105:12,
13 155:20
156:18
157:5
198:24
199:1 200:7,
17 204:22,
23 214:10

motions 11:4
155:11
157:11

multiple
50:10 93:12
109:9,19
120:4
130:20
152:3 164:6
193:2

Municipal
106:21
108:22

115:6 117:3,
20 119:15
140:16,20

mushed
101:17

_____

N

named 26:20
34:24 79:11
82:8 97:1
102:24
106:16

names 29:17
35:17
118:17

nappy 91:7

narrative
132:4,7
182:5
183:24
184:21
193:7

National
13:19,23
148:19

nature 8:2
30:18 95:2,
14 140:14

necessarily
73:23
137:24
168:9

neighborhoo
d 143:3

Network
14:18,23
148:20

neutral
169:17
170:3

news 39:20

NIBIN
148:17,18
149:3,8,15,
20 150:6,7,
12,13 162:7

nickname
79:12 94:9,
21 95:11,13
96:5,13
97:11,15,23

nicknames
97:17,21
98:2

niece 78:8,
14,16 79:1,
6,11,19
80:22 82:9
83:22 96:21
97:1 102:23
103:7 133:7

night 77:18
78:2 81:7
102:20
142:11

Norb 36:4,5

north 130:3

**northeast**
26:24

**nose** 142:13

**notation**
87:23 98:13

**notations**
95:3

**note** 42:16
43:24 58:16
80:6 86:17
124:8 142:2
153:2 215:2

**notes** 49:11
59:17,22
60:1,11,20
61:2,3,9
62:3,5,11,
18,22 63:9,
15,20,21,24
64:2,11,14,
17,20 65:15,
22 66:8,19,
22 67:3,11
68:14 76:24
80:9,15
81:14 82:16,
20 83:3 86:3
95:15 98:11
101:15
103:15,16,
22 104:8
121:19
122:12
125:2,9,16,
23 126:23
127:2,14
128:4,6,11
135:14
171:1
178:23
182:10,24
193:15
200:2,8,10,
19 201:1,17
208:8 209:5,
13

**notice** 19:9

**noticed**
146:13

**nudge** 9:5

**number**
31:20 46:6,
23 53:17
59:17 61:14
65:16
127:15,18
136:7 145:4
161:3
179:12
181:10
191:14,16,
23 192:23
196:17

**numbered**
189:23

**numbering**
53:19

**numbers**
46:4 66:3
111:22

---

**O**
---

**OB** 197:14

**object** 85:5
100:5
106:13
132:12
135:17
175:21
180:10
182:21

**objection**
12:24 22:17
24:23 42:17,
23 44:1
48:21 50:4
51:10,11,17
52:4,11
55:18 59:11
94:22 95:17
103:13,24
104:22
105:20
115:17
116:7 126:1
133:11
136:6 166:9,
13 177:2
178:7
186:21
187:8,16,21
188:21
189:3
190:12
192:11
194:19
197:2
202:14
215:3

**objections**
176:22

**obligations**
138:1

**obligatory**
12:7

**obtain** 56:1,3

**obtained**
192:16

**occasion**
188:10

**Occasionally**
40:16

**occur** 84:1

**occurred**
77:18 84:15
153:18,21
169:10
180:3

**occurrence**
136:17,19

**October**
77:5,12
78:20 180:4
183:5 192:9
195:3
196:21
197:1 200:4

**offense**
121:8,10,11,
19 123:2

---

124:13
134:22

**offenses**
92:18,22

**offered**
127:10

**office** 7:1
19:14 32:16
35:12 41:22
58:10
110:18
112:8
149:18
152:22
202:1,10
204:12
207:8
209:22
214:21

**officer**
168:23
186:7,8
187:3
194:21

**officers**
180:20
194:6,23
211:8
212:14

**oftentimes**
139:22
162:9
168:20
172:17
180:22

**Ohio** 6:24
12:12,14,17,
18 13:12,14
14:2,14
15:3,5,20
16:8,11
26:24 33:2,
19 35:12
46:19,20
47:3 151:5
155:10
174:5
177:16
198:20

**OIP** 16:19,24
17:18 18:11
22:9,12
24:1,9,16,20
25:8 26:2,5,
9,15 27:2,7
29:24 32:3,
24 33:16
35:6,18,23
36:5,9,14,16
37:4,7 38:2,
8,11,16,22
41:12 42:3
43:2,12,16
48:14 55:13
57:6,14
58:19
103:22,23
140:4 155:3
172:9,13
184:21
187:24
189:17
199:8,11
200:11

---

208:24
210:8,9
212:10
213:4

**one-year**
41:3

**online**
117:24

**open** 41:8
190:4,13
214:24
215:3

**open-ended**
144:16

**opinion**
86:23
121:12
124:20
148:2

**opinions**
39:20

**opportunity**
34:6 215:11

**oral** 154:22

**order** 39:18
40:4 125:15
149:9 215:6

**ordered**
17:21
141:13

**organization**
14:18,20

**organizations** 14:9

**original**
57:23 62:10
65:9 84:22
133:4
146:13
150:4 153:2
164:7
166:19
183:12

**outreach**
172:14

**outset** 169:1
187:11

**oversee**
41:24

**overturned**
147:21

---

**P**
---

**p.m.** 77:6
215:23

**pages** 46:14
56:24 66:7,
9,19 80:9
82:2 115:3
183:4 186:2,
5 200:11
208:24

**paid** 172:19

**pain** 72:15

**palm** 152:3

**Pamela**

---

186:9,12,15

**paragraph**
57:4,5 68:20
70:3 112:14
113:3,19
159:15
181:13
206:6
208:17
209:4,8
210:6,13
211:2,6

**paragraphs**
167:1 206:4

**parallels**
169:10

**Pardon** 98:3
196:4,12

**part** 13:16
19:17 26:22
43:22 82:14
109:16
138:3
142:15
143:9
144:20
153:19
166:16
193:14
198:14

**partial** 104:3

**partially**
16:21

**participants**
31:2

**participates**
172:8

**participating**
172:20

**parties**
177:13
201:1,4,17
208:17
211:6,12,15

**passed**
12:12
112:20,23

**past** 51:15
103:4

**paths** 137:5

**pay** 17:13
142:10

**payable** 17:4

**pays** 17:2

**pdf** 200:15

**pending** 9:21
214:11

**people** 15:7,
23 16:4
25:22 26:23
34:3,14
35:17 102:5
109:2
114:20
137:1
141:18
147:19
151:6,8
167:15

183:9 197:5

**people's**
139:23

**percent**
82:15 87:20
141:1
146:24
152:13
196:7 205:2
207:23
208:2

**perfect**
143:16

**perfectly**
160:14

**perimeters**
95:22
104:14,17

**period** 78:9
130:24
155:9,14
205:23

**perpetrator**
60:6,10 82:8
102:21
152:5
159:20
162:19,20

**perpetrator's**
171:17

**person** 15:15
16:14 17:8,
10 38:23
78:1,2 81:2,
6,11 82:5
88:24 91:4
97:1 99:12
102:20,23
110:6
126:11
132:16
134:15,17
141:19
143:7
149:11
158:11,13
165:6,7
170:16
174:9
184:17

**person's**
106:23
147:22
156:24

**personal**
33:5 57:16,
21 101:23
102:2 192:2
195:1,11,17
206:7

**personally**
47:19

**personnel**
192:4

**perspective**
38:21 74:15
100:17

**petition** 11:5

**phase**
168:15

**phone**
142:10

**phonetic**
26:21

**photo** 49:15,
16 166:2,13,
15 167:3,5,
13,16
169:21

**photos** 166:6

**phrase**
208:20

**pick** 132:21

**picture** 85:21
91:16

**pictures**
82:12 91:21,
22

**piece** 17:12
44:22 45:2
99:7 131:6
145:4 147:2
165:5
189:11

**pieces** 148:6

**pinpoint**
178:17

**place** 48:1
67:16 76:10
82:20 83:4
85:16 86:8
88:3 145:23
185:17

**places** 103:3
140:17

**plaintiff** 6:19
10:6 28:15
46:1,3 49:8
159:19
167:4
198:19

**plaintiff's**
28:16,18,20,
22 49:16
173:13
188:6

**plausible**
75:3,8 103:5
160:14

**play** 24:16

**pleading**
21:22 53:11
96:8 111:10
119:14
158:16,24

**pleadings**
60:17,19
61:8 102:7
108:11
109:16
155:11,15
157:12
166:16

**Pleas** 46:20
47:2 53:13
106:20
117:4

**point** 18:13,
20 26:11

39:8 43:10,
12 44:3
50:22 54:14
62:24 72:2
75:19,22,23
76:1,10
77:24 79:14
80:4 82:4,11
125:18
133:20
141:17
144:8
176:19
192:12
196:24
205:9,15
206:24

**pointing**
159:19

**points**
152:15

**police** 30:22,
23 43:14
44:4 54:20
59:5 69:3,6
72:3 76:18,
21 100:16,
19 101:7,10
105:4 126:5
132:9 146:1
167:22
179:23
180:13
181:16,21,
24 183:17
184:19
190:21
192:3,4,22
195:18
196:19
199:21
200:1,5,20
203:5 211:7
212:14,19

**poor** 141:15

**popped**
107:1

**portion** 12:7
55:6 81:17
126:23
131:9 171:7

**position**
108:5
185:16
210:21

**positions**
15:24 34:5

**positive**
207:20

**possession**
92:9

**possibilities**
150:19

**possibility**
24:13 90:6
102:17
121:1,2,3,6
135:15
187:3 203:6

**possibly**
60:8 78:16
119:16

123:10
164:1,2

**post-
conviction**
11:2,3,5

**post-release**
176:8

**postconvicti
on** 56:8
123:18
145:21
153:20
166:16
198:15

**postgraduate**
33:18,22
34:22 36:10

**potential**
20:7 27:24
39:4 49:14
103:15
118:15
142:1
187:12

**potentially**
34:9 78:2
90:24 93:7
103:4
110:15
135:4
160:17
162:15
163:1 165:6
174:22

**practice** 22:4
25:17,24
30:5 157:17

**practicing**
30:3

**preceding**
66:5

**precise**
158:22

**preface**
71:21

**preliminary**
104:12
179:24
184:22

**preparation**
11:10

**prepare** 10:1

**prepared**
180:20
215:10

**present**
35:14 48:8,
15 80:17
83:10,12,21
84:11,12
123:20

**presented**
44:15 45:2
75:22 83:7
103:15

**preserved**
177:3,4

**pretty** 40:12
41:15 59:16

93:1 115:9
205:10

**previous**
151:2

**primary**
44:21 45:1
142:23

**print** 146:10
152:3
154:14
160:8
162:10,18
163:10,11
164:22
165:1

**printed**
195:7,14
196:21
197:7
200:16

**printout**
196:2

**prints** 152:3,
10,23
154:17
160:1,2
161:16
164:2,6

**prior** 8:1
48:13 51:8
55:15 56:2
92:7,8,16,22
150:3,13
160:3,16,20
162:13
212:3
214:12

**prison** 92:1,
11,17 107:5,
11,24
113:20
121:10,11,
16 123:10,
16 123:10,
134:22
156:5 157:2
158:1
174:14
175:12

**private** 16:22
139:13,19

**privilege**
25:2 48:22
49:1 50:5
51:4,12,18
52:5,11,15
53:3 94:24
95:12
105:21
174:24
175:4 176:2,
13 177:15,
19 178:2
188:20
189:2,13
190:5

**privileged**
24:5 50:10
158:6
174:22
187:15

**pro** 155:16,
19 156:4

**probation**
109:4

**probative**
133:9,19
134:3,17
135:10
167:8

**problem**
66:4 117:22
155:22
161:23

**problems**
8:19

**procecutor's**
201:20

**procedural**
50:7 55:20

**procedurally**
44:2

**procedure**
167:3,6
169:21

**procedures**
145:23

**proceeded**
18:10

**proceeding**
78:12

**proceedings**
11:2 28:16,
17 43:9 56:8
152:21
153:20
198:15
204:20

**process**
38:21 47:18
101:7
102:22
125:23
126:4
139:24
172:22

**produced**
45:22 46:2,4
115:18
128:13
144:22

**product**
42:15 55:19
59:12 104:1

**professionall
y** 34:4

**Professor**
12:20

**profile**
144:22
147:2

**profiles**
109:19

**profitable**
12:3

**Project**
12:17,19
13:13,14,19,
23 14:2,4,15
15:4,6,17,21
16:8,11 17:6
19:7 33:2,19

53:12 54:17
93:4 119:6
151:5
155:10
177:16

**projectiles**
148:24

**projects**
14:1,7,22

**prominently**
44:5

**promised**
187:10

**pronounced**
186:10

**proper**
102:13
211:8,12
212:14,21

**property**
194:6

**proposed**
210:5,13
211:23
213:13

**proposes**
55:19

**prosecuting**
154:5
199:14

**prosecution**
28:22
173:14

**prosecutor**
124:10
208:13

**prosecutor's**
19:13 32:16
58:10
110:18
149:18
152:22
201:6 202:1,
10 204:11
207:8
209:22

**prosecutors**
125:20
202:5

**protect**
176:2
177:15

**protestations**
52:21

**prove** 212:6
214:2

**provide**
17:16 20:15
25:17 39:6
58:19 90:14
139:20
154:23
171:9

**provided**
26:14,15
45:20 57:14,
19,22
108:15
121:23

136:1 185:8

**psychiatrist**
175:6

**PTSD** 174:20
175:8,20

**public** 35:12
43:13 54:19
55:10 58:11
59:3,9 60:19
61:1 63:24
64:10,12,21
65:21 112:7
139:16
179:18

**publicly**
140:16
141:1

**pulled** 82:10
115:20
182:12

**purchased**
81:2

**pure** 174:2

**purely** 12:1
154:22

**purpose**
16:16 76:11
123:8,15,20
180:14

**purposes**
21:6 57:12
105:24

**pursuant**
55:10

**pursue**
159:16

**pursuing**
123:18

**put** 72:14
85:18 96:8
97:12
101:16
106:21,24
136:7
182:24
183:15
209:16

**putting**
148:11
163:18

**puzzling**
141:6

———
**Q**
———

**quality**
162:10
164:2,3
165:1

**question**
8:21,23 9:8,
12,20,21
14:13 19:8
35:2 39:22
42:24 55:22
60:19 71:20
72:1,5,9,18
83:17 84:22
85:21 90:1

95:9 97:4
106:14
114:2,24
120:13
144:16
147:15
148:15
149:12
150:10
151:16
155:1
157:19
158:22
165:23
177:11,14,
19 180:12,
15 181:8
187:9
190:10
191:4
196:11
203:18,19

**questioning**
85:14

**questionnair
e** 39:4,7,17

**questions**
21:6,10 24:7
39:5 47:16
51:4 52:19
53:4 89:24
123:24
128:19
170:10
195:21
196:19
197:23
199:23
201:9,13
202:18
203:5 204:5
215:1,18

**quick** 35:17
46:11
178:11
192:19
196:18
197:23

**quickly**
41:15 204:5
205:24

**quotation**
78:17 82:1

**quotations**
80:23

**quotes** 14:1

———
**R**
———

**R-I-C** 107:2

**raised** 95:12
104:22
205:5

**raises**
177:19

**raising** 178:6

**random**
132:21,22

**range** 31:20
125:6
126:17

127:5
129:23,24
130:4

**rapidity**
141:15

**Raymond**
26:21

**reach** 151:8,
16

**read** 10:10,
13,16 11:19
28:12 30:23
46:16 64:6,7
71:17,19
72:23 77:17
81:9 85:23
86:16 102:6
131:23
139:10
198:4
199:21
206:5 211:3,
21 215:9,11,
15

**reading**
30:21 46:17
75:4 198:16
208:16,23

**readjusting**
174:14

**reads** 68:20
181:15

**ready** 27:18
144:6,7

**realistic** 40:5

**realm** 104:9

**reason** 9:14
61:6 62:21
77:8 80:4,
12,16 81:18,
23 82:24
83:3,6 84:10
97:19,22
98:1 101:2
114:7 132:8
168:2,19
180:5
193:24

**reasonable**
213:1

**reasons**
162:12

**recall** 19:11
20:9,13,18
23:23 32:20
33:10 35:7
44:13,17,22
67:17,22
69:8,23
70:17,18
72:21 75:18
76:11 77:21
78:6 79:3
83:3 89:1
92:24 93:10
95:23 96:20
98:19,23
106:6
108:13
111:12
113:13

119:23
120:5,6
125:9
127:12
140:9 146:1,
12 149:17
154:21
155:2
156:12
157:6,15
158:15
159:5
164:19
166:3,12,17
171:6,19
173:5,10
178:15
184:3
188:11
192:20,21,
24 201:12
202:4 203:8
204:10,17,
20 205:21
206:1
207:21
208:9 212:1
213:11
214:15,18

recalling
94:12
126:21
130:18
171:7

recalls 75:9

receipt 41:11

receive 26:9
28:3 39:6
54:22

received
28:1 39:3
43:23 55:10
56:18,21
57:6 58:3,19
59:3 63:24
64:9 105:4
179:18
209:20,21

receiving
104:13

recent 34:1
76:8 140:20

recognize
66:21 128:3
142:6,7
179:16

recognized
86:22
141:24
143:1
171:17

recognizing
143:5 184:2

recollection
60:24 61:9
63:23 64:15,
19,24 79:5
89:12,21
90:12 92:5
102:18
109:18
129:12,15
130:20,21

151:24
152:6
154:12
164:5 184:9,
18 194:3,5,
13 200:24
208:6
213:22

recollections
75:24 76:2

recommendi
ng 25:22

reconvene
190:6

record 6:2
38:4 45:8
46:5 47:6,
11,12,14
49:8 52:14,
23 58:17
59:4,9 64:7
65:6 98:4,6,
8 111:22
139:10
143:18,19,
21 146:2
164:21
175:13
178:4,22
179:1,2,4
189:6,8
196:13,15,
17 197:5
206:5 211:4

records
43:13,14
54:19 55:10
56:1,3 58:11
60:20 61:1
64:1,10,13,
21 65:21
109:24
154:24
179:18

recovered
144:19
145:11
147:2 153:8

RECROSS-
EXAMINATIO
N 203:2

refer 55:4
56:9,23
61:13 67:2
68:11 98:14
99:8,11,17
100:2
117:12

reference
130:7 200:8,
14

referred
97:24
200:14

referring
66:23 69:7,
9,16 76:21
89:5,6,21
111:17
113:6
119:12
139:11
199:13

refers 24:2
78:15 79:12

reflected
214:20

refresh
194:12

regard
147:8,11
162:24

reject 41:15,
19

related 22:9
35:3 200:3

relation
77:13
191:23

relationship
13:11 24:1
176:12

relationships
26:3

relaying
154:10,13

release
24:10 26:6
92:12
123:18
155:19
156:10,18,
20 157:5,10

released
24:4 26:24
123:10

relevant 21:5
75:23 95:14
123:24
134:17

reliability
141:8

reliable
89:14 90:4
141:4

relief 11:6

remainder
188:21

remember
18:22 28:5
30:12 35:15
37:21 44:18,
24 48:11
56:19 60:15
69:14 70:21
72:18 77:14
78:10 79:21
84:17 93:11
94:20 96:1
102:16
106:1
107:11
108:18
111:3
119:21
127:17
129:11
130:2 132:2
145:15
149:24
151:20
152:18
153:4

154:18
160:3
164:23
166:10,23
178:12
193:22
199:9 207:3,
12 213:15,
21 214:17

remembered
70:4 71:12
74:14 85:7
207:5

remembering
77:23 89:11
145:16

remotely
6:15

rent 27:5

repeat 83:17
95:7 146:17

rephrase
180:15

report 94:13
127:4
179:24
180:16
182:1 183:1,
5,12,14
184:22
186:5
191:16
192:8,23
193:7
194:16
196:19,23
203:12,23
204:2

reported
112:15,24
113:20

reporter 6:2
8:19 64:7
94:15 110:8
139:10

reporting
186:7,8
194:22

reports
30:22,23
39:20 44:5
59:24 69:3,6
76:18,21
89:1 101:10
105:5
142:15
153:2 171:1
180:8,19
181:16,22
183:17
184:19
190:21
192:4,22
193:2
195:18
200:2,6,19
203:5,11,14,
21 209:13

represent
6:11 15:9
41:13 47:21
71:8 118:2

124:6
128:22
131:24
155:4 156:6
193:23
194:10,14
198:1,12
208:5

representatio
n 10:24 11:8
14:12 18:22
19:5,8,10
22:7 31:18
42:5 47:18
55:20 69:20
73:10 76:14
123:12
155:6,7,14
176:9,17,19
177:17
202:3

representatio
ns 58:8

representativ
e 30:10

represented
11:1 23:10
56:7 59:13
65:1 108:10
180:2
207:24

representing
11:14 51:2
155:24
176:2

represents
201:16
209:8

request
30:13,22
38:24 43:13
54:19,23
55:11 58:12,
13,17 61:1
64:1,10,13,
22 179:19

requested
149:18
150:6

requesting
38:24
204:24

requests
11:3

required
137:18
164:17

research
136:23

resident
163:6,22

resolution
190:4

resources
138:15
140:3,4,5,8,
12

respect
177:13

responded

89:24 95:13
193:11
**responding**
180:20
187:3
**response**
10:4 54:23
55:21 60:20
65:21
179:18
193:2
**responses**
59:4,10
**responsibiliti
es** 32:10
**responsive**
58:18
189:18
**restate** 69:15
**restroom**
143:15
**result** 150:17
159:18
174:11
**resulting**
28:23
173:15
**results** 147:5
160:21
161:8
**resume** 47:9
**retain** 53:3
**return** 19:16
**returns**
107:2
**reversal**
28:19
**reverse**
125:15
**review** 30:22
214:16
**reviewed**
19:20 31:12,
14 105:8
**reviewing**
186:3
**Reynolds**
98:14,18
**Rhodaback**
186:10,11,
12,15
**Rhonda**
49:16 60:22
61:10 62:4,
22 63:10,15,
16,19 64:20
78:8 79:5
96:22,24
102:18
127:9
128:12,19
131:20
184:24
200:5,9
**Ricard** 117:9
**Ricardo**
87:10,13,14,

17,24 90:24
94:1 97:16
99:1,10
106:7,10,11,
16 107:1,14
108:11
110:23
112:15,16
113:1 116:4,
11,13,14,16
117:16
121:10,18
123:1
135:15
136:4,8,10
**Ricardos**
118:5
**Richard** 6:19
10:7,9 23:20
28:15 30:14
37:5,9 46:21
47:3 49:12
67:6,11
78:17 79:11,
23 80:5,7,23
81:1,6,19,
20,24 82:2,8
83:19,23
84:24 85:1,
9,21 86:4,
10,15 87:1,
4,15,24
88:1,15,17,
22 91:1,8,13
92:1 93:6,21
94:6,8 97:1,
5,24 98:17,
20 99:4,8,9,
10,18,24
100:3,13,21,
23 101:4,18
102:24
103:23
105:15,16,
18,19
106:16,19
107:1,5,8,9,
14 108:11,
17 110:21
112:11
114:6,8,18,
19 115:10
120:9,21
121:4,9,11,
15,20,22,23
122:2,5,11,
12,16,24
124:22
129:1,10,22
130:12,17,
24 131:2,4,
8,14,17
132:2,9,22,
23 133:5,13
134:21
135:13
136:1,21,24
142:20,21
143:1,2
144:22
160:22
161:6
167:24
168:18
169:19
171:22
181:18

198:20
199:8 200:5,
9,12,24
201:18
208:7 209:5
**Richards**
118:5
**Rick** 84:23
86:14 123:4
163:5
171:22
184:24
185:5
**Ricky** 8:5,7,8
23:6,8
**ridge** 145:16
146:14,15
**rights** 8:4
10:20 11:14
15:13
177:13
**Riley** 35:22,
23
**rings** 155:17
**rise** 137:24
**robbed**
193:11
**robbery**
44:10 67:18
68:6 74:2
77:13 78:3
91:13,19
92:16,23
93:18,23
94:3 98:21
99:3 100:20
107:6,20
113:16,23
121:5 128:9
152:6
159:20
180:3 181:5
182:2
185:18,22
186:17
193:21
200:4
**Robert**
114:19
**role** 20:2
24:16 32:24
35:19
**Rooks** 112:2,
3,4,12
113:19
**Rory** 6:23
**roughly**
66:19
**rule** 9:2
27:12
**rules** 8:16
**ruling** 190:14
**run** 35:16
49:13
150:21
152:23

———————
**S**

**sake** 128:18
**Sam** 159:6
**sat** 83:19
**Saturday**
72:21,22
73:4,9 74:8,
10 75:5,10,
11
**scenario**
26:17 85:8
124:7 133:8
134:7 169:6
**scenarios**
121:9
**scene**
144:20
153:9 160:2
162:18
180:21
187:4
194:22
211:19
**school** 14:5
79:10 82:9
86:8,19
87:2,5,7,18,
23 88:3,4
93:15 96:24
102:22,24
172:15
**scientific**
151:5
**scope** 10:23
25:2 151:17
156:13
160:13
**screen** 23:16
196:6
**screenshot**
114:15,22
116:2
**search**
110:21
114:17
116:3
117:23
136:19
140:13
149:23
165:10
**searched**
117:1 202:1
**searching**
106:19
**seconds**
163:19
**section** 8:12
193:7
199:21
**sections**
198:16
**secures** 26:6
**seek** 15:9
40:8
**seized**
170:16

**self-serving**
39:24
**sell** 79:19
**selling** 51:15
79:1
**semblance**
177:11
**semen** 145:6
**semester**
31:3
**seminars**
172:9
**send** 39:4
43:16
**sense** 37:12
42:23 74:3
80:11 81:22
115:9
153:12,15
157:1
164:10
168:17
**sentence**
61:17 62:2
68:20 70:2
71:10
181:15
**separate**
164:16
198:16
**separately**
31:14
106:10
**September**
199:17
**sequence**
102:10
**sequencing**
149:7
**serve** 54:18
**served** 43:12
92:17
156:22
157:2
189:17
**services**
17:1,16
**serving**
139:24
**set** 123:1
146:6
**Seth** 199:10,
12,13 205:6
207:16
210:17
212:7 213:3
**sets** 189:21
**setting** 53:18
82:20
124:16
**settle** 114:2
**settlement**
26:22
**shake** 9:3
169:2
**share** 48:23

50:7 55:21
177:24
178:1

**sharing**
117:22
196:6

**sharp**
148:12,14

**shell** 145:3
146:8,18
150:7,14

**shift** 144:11

**shooting**
68:1,6 70:20
71:1 73:5
185:9

**short** 91:7

**shortly** 67:18
155:7

**shot** 68:9
70:5 71:13
74:21 89:19

**show** 49:15
157:13
183:19
204:7

**showed**
166:5 173:9
190:22

**showing**
115:13

**shown**
158:12

**Sias** 159:6

**sibling** 109:3

**sic** 209:14

**side** 76:14
144:12
180:24

**sight** 56:20
128:5
179:16

**signature**
53:24 199:5

**significance**
77:21 79:1

**significant**
62:8,13
118:10
149:9

**signifies**
191:22

**similar** 32:11
117:2,6
135:5

**similarly**
111:12

**simply** 75:23
97:8 167:21
205:16

**simultaneou**
**sly** 155:15

**sincerely**
168:24

**single** 82:20
83:19

118:23
144:18,21
150:2

**singles**
169:23

**sir** 187:10
190:16
195:6,22
196:18
197:21
198:1,12
199:3
202:18

**sit** 94:19
158:13
192:2,19
193:19
194:24
195:10,16

**sitting** 76:20
85:17 93:8
138:7

**situation**
26:19

**six-one** 88:7

**six-pack**
166:6,10

**Sixty-two**
179:13

**skimmed**
10:3

**skin** 91:7
171:13

**skip** 139:23

**sloppy**
167:22
169:22

**slower** 144:3

**slowly**
104:11

**small** 172:22

**Society**
12:14

**sold** 78:14,
16 80:22

**sort** 14:19
30:20 44:11
49:1 78:9
81:16 82:6
101:15
109:1
114:22
115:2
116:10,20
117:20
142:12
145:13
150:22
151:9,12
156:21,23
160:10
162:13
168:8
169:12,24
171:14
184:9,19
192:15,24
205:9
213:23

**sound** 95:6
173:7
182:15
186:14
193:16

**sounded**
163:24

**soundness**
134:18

**sounds** 9:13
160:23

**source** 82:17
96:1 97:5,10
109:11
113:5
122:16,21
140:21
144:24
145:10
147:1 162:8
174:18
178:18

**sources**
89:11 103:3
119:23
139:22
140:1,16
141:2,3
192:17

**Southwest**
12:14

**speak** 49:6
172:18
174:13
176:4 191:2
194:18

**speaking**
9:24 168:4
176:15,21

**special**
167:17

**specific**
20:9,13 25:9
33:5,9 41:24
52:24 75:22
104:24
109:10
122:7
130:19
145:2
158:16
162:5 165:6
166:4,22
169:24
178:15
188:19
189:11
192:13

**specifically**
11:2 19:10
20:19 25:23
36:18 44:24
57:4 64:18
65:14 69:9
76:12 95:23
117:2
140:10
157:15
173:20
176:7
178:12
179:11
183:8 184:7

185:5
188:11
208:24
213:11

**specifics**
108:18
197:4

**spectrum**
158:4,17

**speculate**
11:24 80:2
101:6,11
122:23
135:19

**speculating**
102:12
125:5

**speculation**
12:1

**speculatively**
137:6

**speeches**
172:8

**speeding**
140:19

**spelled**
136:20

**spent** 144:18
145:12
148:22,23

**Spiess** 7:4
58:21
189:20,24

**spoke** 173:4,
6 187:3
188:24
206:19,21

**spoken** 23:2,
17,24 102:5
175:17

**Spokeo**
140:23

**sponsored**
172:9

**spot** 129:24
213:13

**spouse**
176:16

**squarely**
104:8

**staff** 12:15,
21 15:24
16:1,4 33:6
151:6
211:16

**stage** 150:22

**stages** 55:15

**stamp** 45:10,
23 56:14
195:12
197:13,17

**stamped**
190:22
195:6,24

**stamps**
45:17 53:18

**standard**
124:14

**standards**
124:2

**standing**
148:9

**start** 29:20
54:15
116:21
117:21
153:18,24
175:4 178:9

**started** 6:15
33:23
114:23
173:8

**starting** 16:2
71:18
104:11
117:4

**starts** 46:8,
18 203:16

**state** 7:7
17:21 22:7
35:11 45:2
46:20 47:2
57:20 58:4
65:7,8,9
93:13
107:22,24
112:7
120:24
135:1,10
149:21
156:5 174:5
190:12
198:20
200:11,23
206:11

**State's** 57:7
142:22,23
200:16

**stated** 52:22
68:21 70:24
73:13
196:22

**statement**
63:19 70:13,
18 76:16
96:8 113:10
133:4
171:15
183:17
194:1 206:8,
12,13
209:17

**statements**
176:14
211:24
212:8,12

**states** 57:5
182:13
193:10

**status** 14:20

**statute** 45:15

**stay** 27:5

**stayed**
18:11,18

**step** 18:12
192:19

196:18

**steps** 104:12
211:11
212:16
213:9

**Stern** 38:7

**stilted** 86:23

**stipulate**
198:21
201:2,4
202:7
208:17
211:7,12,15
213:2

**stipulated**
213:3

**stipulation**
146:5 196:2
202:11
205:17,20,
22 206:10
209:17
210:11
211:2,24
214:13

**stipulations**
145:21
198:2,13,22
204:6 210:6
212:3,9

**stop** 183:3
211:4

**store** 77:19
81:7

**storing**
211:9

**story** 19:17

**strategy**
135:20,21,
23

**street** 68:5
77:13 91:13,
19 92:16,22
93:18,22
94:2 98:21
99:2 100:20
107:6,20
113:16,23
121:5 128:9
159:20
168:19
180:3 181:2,
5 182:2
193:21
194:6

**strength**
25:6 170:12

**strict** 124:13

**strike** 14:12
26:5 111:4
116:12
138:18
192:20
194:13
195:19
198:4,10

**strong** 62:17
147:22

**stronger**
148:12

**strongly**
15:15

**struggling**
44:23
145:15

**student**
29:23 30:1
31:2 32:3,8
33:17 35:23
36:6,9,14,16
37:4,7 38:2,
8,11,17 41:7

**students**
13:15 30:19
31:6 34:2
39:8,11
40:23 43:5
48:13 207:2,
4

**subject**
48:22 49:9,
17 50:5,19
52:24 59:12
95:22
104:24
156:3,8
160:1 190:8
214:24

**subjects**
49:2 187:23

**submit** 104:4
205:16

**submitted**
43:1 58:12

**subpoena**
10:4 28:2,4
58:18
189:17

**subscription
s** 139:14

**subsequent**
21:10 24:14
132:18
133:2,24
134:18
207:17

**substance**
189:1

**substantive**
34:13 74:5
208:10

**succeeded**
24:9

**successor**
41:7

**sufficient**
52:14
152:17
154:17
164:15

**sufficiently**
52:17,18

**suggest**
17:10 19:6
47:5 119:19
120:2,11,14,
20 122:2,5
123:3
159:24
167:12

176:11
185:11
213:2

**suggested**
15:15 212:2,
5

**suggesting**
164:4 187:2

**suggestion**
141:22
142:14

**suggestions**
141:11,14

**suggestive**
62:20

**suit** 20:7

**suitable**
153:1 160:2
161:19

**sum** 57:18
58:4

**summaries**
125:19,24

**summarizing**
40:24

**summary**
126:12

**super** 139:17

**supervising**
34:2

**supervision**
31:1

**supplement**
183:10

**supplemente
d** 105:10

**support**
15:23 16:1,3
104:6

**suppose**
62:23 73:22
75:6 76:5
89:17
102:13
120:17
212:17

**supposed**
127:7

**supposedly**
69:13
134:14
154:16

**surface**
151:13

**surgery**
72:16,17
195:2

**surprised**
212:20

**survey** 39:23

**suspect**
60:3,8 81:20
85:24 86:4,
11,21 90:8
103:16
120:22
121:5 125:3,

11 126:21
129:6
137:20
162:5
167:14
168:6,8,11,
24 171:11
182:10,15,
24 184:11
193:15,17
200:13

**swabbed**
211:19

**swap** 111:6

**swapped**
108:16

**swear** 6:2
111:1

**sweatshirt**
141:12

**switch** 141:5

**switched**
184:23

**sworn** 6:6

**system**
108:22
109:22
136:12
148:21
158:1 183:8
195:18
197:4

**systems**
183:9 197:5

—————

**T**

**takes** 41:11
125:15

**taking** 13:15
192:19
211:11

**talk** 8:18
18:3 31:13
35:1 38:20
70:13,19
72:10 73:8
75:11
105:15
139:2
144:12,16
174:1,3,5,7,
9 178:2,3
208:12

**talked** 34:14
50:17 73:11
74:7 75:4
78:1 93:14
98:12 99:16
102:20
110:6 111:8,
14 119:10
126:23
128:12
135:6 144:9
173:22
187:14
188:3
194:21
207:8 209:9
210:18

**talking** 31:16
34:16 40:15
46:12 68:4
70:4,9 71:12
72:21 73:18,
21 74:1
75:10 78:21
79:6 81:11
87:10 103:4
125:2 127:9
154:14
173:19
184:23,24
185:4,20
209:4

**tall** 88:17

**Taller** 26:21

**technical**
151:6

**techniques**
211:9
212:15,21

**telephone**
82:6 213:16

**telling** 95:24
114:6,8
207:21

**tells** 204:2

**ten** 117:15

**tender**
197:11

**tension**
142:4

**tentative**
134:16

**tentatively**
134:13

**term** 116:4
147:17,19
164:16,23
173:1

**terminated**
11:8

**terminology**
154:19
164:10,18

**terms** 25:21
30:17 31:11
34:7,18
40:15
124:23
135:2
148:13
152:12
154:19
178:19
180:13
183:14
212:13

**terrible**
174:3

**test** 147:5
149:3,8
150:13
161:8

**tested**
144:20
146:22
161:5,16,20

163:4

**testified** 6:7
113:14
124:21
131:7,24
146:7
171:16
206:16
210:22
212:20

**testify** 9:15
200:22
208:6

**testifying**
96:22

**testimony**
28:13 44:19
69:3,12,21
71:22 73:1,
3,7,16 74:4
75:2 77:23
79:3,8 81:10
84:18,19
90:12,23
94:13 96:21
99:15
110:21
130:7,19,21
131:10
171:2,7
172:1,6
173:10
184:4,6,8
186:18
187:12
188:8 203:8

**testing** 11:3
17:12,18
46:22 53:11
63:2 109:17
110:3
148:17
149:15
150:6,7,12,
18 153:17,
20 154:8,24
161:19
211:15

**text** 55:6

**theoretically**
127:4,7

**theories** 25:7

**theory** 78:10
102:13
138:14

**there'll**
116:11

**thing** 9:19
89:22 90:7
98:12 99:16
107:17
116:2,10
136:16
169:16
170:16
179:17
213:2

**things** 17:23
54:17 60:7
75:13 115:2
118:20
125:12

137:10,21
141:16
145:7 156:1
158:12
173:12,23
174:7
183:15
187:24

**thinking**
26:20 72:20
116:21
117:21
136:3 168:8
184:8,12

**thinks** 95:18
184:15,16

**Thomas**
18:17,21
19:13 33:12,
15 34:12,24
35:1,5 56:4,
5,6,18 57:7,
14 58:3,9
61:12,24
64:16
209:20,21

**thought**
86:9,20
163:19
185:14
204:13

**threshold**
148:14

**tickets**
140:19

**ties** 187:23

**tight** 182:12

**time** 9:6,17
12:13 21:8,
11 27:17
30:9 31:10
38:18 41:11
42:11 50:12
52:7 59:2
67:18 70:11
72:7 77:5,9,
17 80:10
84:11,13
87:21 91:11,
12,17,18
92:11,17
93:17,22
94:2 96:12
97:8 98:21
99:2 105:6
107:5,23
109:17
111:1 112:6
113:16
114:4 116:3
128:17
131:1 134:6,
22 135:3
137:14
143:14,16
146:1 150:7
152:7,8
153:14
154:6 155:6,
9,14 156:22
157:2,8,16
160:5,14
164:7 165:7,
13,18 174:2

176:10
179:12
184:11
187:4 190:7
193:5 195:1
197:21
200:21
201:4,6,20
202:20
205:5,23
208:19
209:15
210:1
211:18,19
213:4,14
214:10,24

**timeframe**
175:23
214:5

**times** 7:24
16:13 23:18
27:2 40:11
108:14
109:9

**timing** 205:2

**title** 12:20

**today** 9:15
10:2 11:11
57:13 91:10
93:8 94:19
188:3
189:19
192:2,20
193:19
194:24
195:10,16
198:8
202:20

**told** 29:10
35:8 39:11
49:3 50:10,
14,15 94:20
95:10 111:5
113:7,11
132:1 134:9
150:17
151:1
152:24
153:19
154:2,7
160:6,9
175:19

**top** 29:20
60:15 66:12
67:17 68:19
69:23 77:3
88:20 92:24
93:24
125:13
129:2 146:2
150:1
163:14
183:4
191:13
198:19

**topic** 179:6
188:6

**topics** 29:3,9
158:9
187:13
189:2

**tops** 129:16

**total** 57:18
58:4

**touch** 145:6

**touched**
145:19
152:5
162:20
188:2

**tough** 178:17

**tracer** 139:24

**tractor-trailer**
66:14

**trafficking**
92:10

**transcript**
10:11,13
70:16 71:9,
16 102:6
215:9

**transcription**
215:6

**transcripts**
30:23 39:19
40:9 43:8,11
44:18 101:9
102:16

**transferred**
194:15

**transported**
194:9,11

**trial** 11:5
17:24 18:8,
11,12,18
40:9 44:6,16
49:14 51:20
57:23 58:5
59:2 62:10,
19 63:1
65:10 69:4,
12 70:16
71:9 79:3,8
84:18 89:24
90:12 96:20
101:9 105:7,
8,11,13
122:8 123:9
130:19
135:14,20,
21,23
137:24
138:16
141:7 152:7,
8 153:18,21,
22,23,24
160:4,6,16,
20 163:5
166:19
171:3 172:2,
6 184:4,6
199:1,2
200:7,17,22
201:4,7,12,
20 204:22,
24 208:19
209:15
210:1
214:11

**triangle**
78:14

**true** 57:7
65:4 84:8

111:17
122:14
131:10
132:7
159:24
167:12
185:6
188:22
206:9,14
212:12
213:10

**trust** 157:23

**truth** 114:6,8
123:16
168:10

**truthfully**
9:15

**turn** 53:7,15
62:22 70:1
71:16 96:2
124:17
129:1
147:16
159:11,14

**turned** 62:18
63:20 86:1
105:6 122:9
124:10
137:7 161:8,
10,14 170:2

**turning**
184:12

**Tyler** 37:3

**type** 158:11,
13 175:9
180:16

**typed** 59:24
125:1,2,10,
19 126:12
127:4 171:1
193:3

**types** 172:18
180:8,19

**typical** 41:10

**typically**
17:15 38:23
40:21
106:21
134:5
139:15
140:15
141:20
156:15
162:1,12
168:15

**typo** 127:6
153:3
160:10

**typographical** 126:18

---

**U**

**UC** 33:3,17

**Uh-huh** 9:4

**ultimately**
18:7 41:20
104:7
105:11
123:16

unable 9:15
123:4
uncertain
84:24
uncertainty
142:19
143:8
underlying
44:8 167:20
undermine
160:17
undermined
170:5
undermines
132:17
133:1,24
142:20
143:9
undermining
148:5
underneath
199:21
understand
9:9 58:24
75:15 81:12
86:6,7,8
110:20
123:19
147:17
151:4,18
153:7
167:23
175:3
189:17
understandin
g 11:17,21
30:6 44:8,14
48:24 49:20
67:15 80:8
82:3 84:15
87:6,15 91:5
92:15
101:21
107:13
112:19
131:15
149:15
150:5 151:1,
13 153:17
156:19,21
160:5
164:12
165:20
176:9
185:13
201:24
210:15
213:24
understood
9:12 99:14
130:9
142:13
158:18
undertaken
42:11
unequivocall
y 49:24
unidentified
152:7,9
universities
14:8

University
7:2,5,11
12:10,23
13:5,8,12
16:22 29:24
32:3 151:9
unknown
183:21
unsure 108:6
unusual
109:2
update
183:10
192:4 197:6
updated
192:9
194:17
203:6,11
updating
203:13,21,
24
upload
164:17
165:8
usable
146:19
152:10
153:12,14
154:9 160:9
161:5 164:2

_____

V

vaguely
166:12
varies 31:7
41:14
veracity
169:13
Verbal 9:3
verify 54:8
versed
139:18
versus 46:21
47:3 164:24
178:13
victim 51:21
60:5,23
85:23 89:13
90:8 131:3
163:6
182:13
184:2
193:10
victim's 90:3
victims
44:19 160:8
184:4,6
violate 176:5
violation
124:12
violations
105:14
virtue 136:11
voice 171:5
182:14
193:16

_____

W

wait 8:21
157:24
waiting
144:4
waive 59:13
174:24
215:11
waived 215:5
waiver 49:1,
9,17 50:20
52:24 95:22
104:3,9,23
105:23
189:12
Walker 6:13
49:11,15
59:19 60:21
67:20,24
68:21 69:13,
21 70:4,13
71:11 72:2
73:12 75:17
76:5 80:19
83:8,18
84:19 101:3
120:8 121:4,
24 122:18
124:6,19
125:15
126:11
128:6 166:5
168:2
184:14
185:21
186:19
187:1,5
200:23
206:7
207:18
208:4
Walker's
10:14 59:20
60:12 62:5
70:18 73:2,7
76:16 130:6
171:2
185:24
186:18
191:6
wanted
17:11
140:13
154:15
158:11
181:8 207:7
208:12
209:7
warm 174:9
waved
188:13
wavered
188:12
ways 145:5
147:19
weak 168:22
weakness
169:5
wearing

211:10
Weber 38:15,
16
website
110:23
114:17
115:21
117:24
119:15
140:17
websites
141:2
weeds
139:18
weigh
134:23
Wessels
36:4
whichever
111:13
winning 24:9
withdraw
19:4,9
withdrew
18:21 19:7
withheld
63:21
withhold
62:21
witnesses
30:24 40:15
212:6,18
wondering
116:9
135:24
word 92:13
103:19
126:22
152:18
wore 212:15
work 9:4
12:16 19:12
22:12 30:14,
18 32:5
33:8,22
34:4,12,13,
15,20 35:24
36:19 41:24
42:14 43:6
55:19 59:12
104:1 112:5
123:8
144:10
158:14
167:22
215:4
worked 37:4,
9,17,18,19
38:3,9,12,
14,18
working
12:13 30:7
41:20 112:7
154:5 207:2
Works 12:15
wrap 196:19
write 38:24
54:5

writes
113:19
writing 58:14
written 80:5
102:7
wrong 71:19
99:16 124:7
143:11
153:3 159:4
wrongful
15:7 22:8
28:22
173:14
wrongfully
8:9 174:2
wrongly
15:12
wrote 97:9
136:20
200:24
208:7

_____

Y

year 31:4,6
35:7 41:16
150:12
yearbook
82:4,10
83:14,22
84:1 85:10
102:8 103:8
122:19
years 33:20,
24 34:7
37:13 41:5,
17 54:14
64:24 70:11
84:20
109:10
151:24
164:19
192:15
years'
130:20
yield 167:7
York 14:6

_____

Z

Zoom 6:20
zooming
196:6