IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RICHARD HORTON,**

      Case No. 2:23-cv-3888
      Judge Algenon L. Marbley
  **Plaintiff,**       Magistrate Judge Elizabeth P. Deavers

  v.

**CITY OF COLUMBUS**, *et al.*,

  **Defendants.**

## MEMORANDUM OPINION

This matter is before the Court to resolve the parties' discovery dispute presented by way of the attached letter briefing. The Court resolves the current issues as follows:

(1) The Court will conduct an *in camera* review of Plaintiff's retainer agreement.[1] Plaintiff is **DIRECTED** to submit a copy of the agreement to the chambers' mailbox **WITHIN THREE BUSINESS DAYS OF THE DATE OF THIS ORDER**;

(2) Plaintiff may schedule the depositions of the four defense witnesses confirmed on June 26, 2025;

(3) Plaintiff is **DIRECTED** to execute an additional medical release and allow another subpoena directed to Dr. Mayerson's records; and

(4) **WITHIN SEVEN DAYS OF THE DATE OF THIS ORDER**, the parties are **DIRECTED** to submit a joint motion requesting an extension of the discovery deadline which accounts for the above.

---

[1] To the extent Defendants are concerned regarding their exposure and requested information about Plaintiff's counsel's billing rates and number of hours worked, they could have asked for this information in quarterly reports in their Rule 26(f) Report, which the Court would have granted.

**IT IS SO ORDERED.**

Date: July 17, 2025  /s/ *Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE

# LOEVY + LOEVY

July 16, 2025

**The Honorable Magistrate Judge Elizabeth A. Preston Deavers**
Southern District of Ohio, Eastern Division
Joseph P. Kinneary Courthouse, Room 225
85 Marconi Boulevard
Columbus, Ohio 43215

**Re: Richard Horton v. Columbus, et al., No. 23-cv-3888-ALM-EPD — Plaintiff's Discovery Disputes Letter**

Dear Hon. Judge Deavers:

Plaintiff respectfully submits this letter brief in reference to the above-captioned case to inform the Court about two discovery disputes between the parties.

    **(1) Plaintiff Should Not Need to Disclose His Representation Agreement with Counsel**

The first issue that Plaintiff would like to bring to the Court's attention is whether Plaintiff is required to produce his representation agreement with counsel. Respectfully, Plaintiff submits that his retention agreement is neither relevant nor discoverable in this matter.

In September 2024, Defendants first demanded Plaintiff produce any fee agreement(s) between him and "any person or entity" related to his Amended Complaint. Defendants clarified via email that this demand included the total number of hours attorneys have worked on Plaintiff's case, and the hourly rate for each attorney on the case. Plaintiff objected and stated that the demand was overly broad, unduly burdensome, not relevant to the claims or defenses in the case, and potentially infringing upon the attorney-client and work-product privileges. Plaintiff reaffirmed this stance during a meet and confer, and Defendants never sought Court intervention at that time.

Ten months later, counsel for Defendants emailed Plaintiff stating that they believed Plaintiff's representation agreement with his counsel to be outstanding. Plaintiff responded, stating that the parties had conferred on this the previous year and maintained his objections. Without consulting Plaintiff, Defendants then emailed Magistrate Judge Deavers's chambers.[1]

Courts retain broad discretion to limit discovery where the information sought is irrelevant or where disclosure would be unduly burdensome or prejudicial. *See* Fed. R. Civ. P. 26(b)(1). Attorney retainer and fee agreements are generally irrelevant unless the attorney's fees are a material issue in the case and are thus relevant within the meaning of Fed. R. Civ. P. 26.

Here, Defendants have not articulated any legitimate basis for seeking Plaintiff's fee representation

---

[1] It is worth noting that this is not the first time in this case in which Defendants have sent an email replete with argument to judge's chambers when the parties had a discovery dispute without first notifying Plaintiff or giving Plaintiff an opportunity to include his argument.

agreement. The manner in which Plaintiff is compensating his attorneys has no bearing on the claims or defenses in this case, which involve constitutional violations and damages arising from Plaintiff's wrongful conviction. Courts in this Circuit routinely deny similar fishing expeditions on fee agreements absent a showing that the agreement is itself relevant to a disputed issue. *See Green v. Nevers*, 196 F.3d 627 (6th Cir. 1999) (holding that denial of a motion seeking discovery of an attorney retainer/fee agreement was proper as it was "irrelevant," even though the gravamen of the case was the reasonableness of those attorney fees).

Defendants identify two arguments in their July 11, 2025 email to the Court—which were not previously raised with Plaintiff—to justify why Plaintiff should be required to disclose his fee agreement with counsel in this case. First, Defendants argue that Plaintiff's fee agreement is relevant for Defendants to assess their financial exposure in this case. However, Plaintiff's representation agreement has no bearing on that issue whatsoever.

This case is a fee-shifting case pursuant to 42 U.S.C. § 1988. As such, fees and costs must be sought by petition or agreement under usual fee-shifting standards—not by reference to any agreement between Plaintiff and his counsel. *See Venegas v. Mitchell*, 495 U.S. 82, 92 1679 (1990) ("In sum, § 1988 controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer."); *Sandler v. McGraw-Edison Co.*, 92 F.R.D. 463, 464 (S.D. Ohio 1981) (held that a fee agreement is not discoverable; the fact that the plaintiff asked for attorney's fees does not change the result, because "the amount of attorney's fees to be awarded should be determined from the view of the trial judge, not from the view of the attorney and client.").

Plaintiff has also made clear what he seeks from this wrongful conviction lawsuit in his settlement demand, and Plaintiff's counsel included many previous verdicts they have won in similar cases in this, and other, jurisdictions to make clear what the City's exposure is. Plaintiff additionally included examples of such fee-shifting petition awards pursuant to 42 U.S.C. § 1988 for attorney's fees and costs, so the proposition that Defendants are unaware of their exposure in this case, or that Plaintiff's fee agreement with counsel would somehow elucidate such exposure, is unavailing.

Second, Defendants suggest that the retainer agreement between Plaintiff and his counsel is somehow relevant to the credibility or independence of third-party witnesses who are offering damages testimony in this case. That premise is mistaken. The retainer agreement pertains solely to Plaintiff and does not address or implicate the representation of any third-party witnesses. Defendants' argument to the contrary is unfounded and should be rejected.

To clarify, Plaintiff's counsel agreed to represent certain third-party witnesses—namely, Mr. Horton's friends and family members—at their depositions because these individuals lacked access to other legal representation. These witnesses did not agree to pay Plaintiff's counsel, nor did they offer anything of value in exchange for that representation. Nor is there any requirement for them to have signed a written retainer agreement, which they did not. There is no contingency fee relationship with these third parties, or any other circumstance which would have required a written retainer agreement. There was an understanding by both sides that Plaintiff's counsel would be representing them—in line with federal rules and the Ohio Rules of Professional Conduct. Much like a witness who consults an attorney and reasonably expects attorney-client privilege to apply, these witnesses were entitled to the protections afforded by such representation.

If the Court allows it, Defendants remain free to cross-examine these individuals at trial about the fact that Mr. Horton's attorney represented them at their depositions. But beyond that, there is nothing in Mr. Horton's retainer agreement that bears in any respect on these third-party attorney-client relationships. Accordingly, Defendants have not overcome the strong presumption against discovery of a party's fee agreement where, as here, it is irrelevant to any claim or defense.

Separately, Plaintiff is particularly concerned by Defendants' repeated attacks on the attorney-client privilege of Plaintiff's damages witnesses (along with that of Plaintiff).[2]

At the outset of this litigation, Plaintiff's counsel made clear that they were representing Plaintiff's damages witnesses in his FRCP 26(a)(1) disclosures. As part of that representation, Plaintiff coordinated the depositions of each of these individuals. The first such deposition, of Plaintiff's wife Janette Horton, proceeded without incident. However, during the subsequent depositions of Alfred Harmon, Barbara Horton-Alomar, and Dwight Dorsey, Defendants posed a series of intrusive and inappropriate questions aimed at undermining the witnesses' attorney-client privilege, without any good-faith basis to do so. Although Plaintiff's counsel permitted questioning while preserving objections for the record, counsel properly instructed the witnesses not to answer questions that would violate the attorney-client privilege.

Despite these accommodations, Defendants continued to press the issue in a manner that became increasingly harassing. In each deposition transcript, Plaintiff's counsel clearly stated that Defendants were improperly attempting to pierce the attorney-client privilege, despite having long been on notice that Plaintiff's counsel represented these individuals. Plaintiff's counsel also warned that they would seek sanctions should Defendants proceed with frivolous filings challenging the legitimacy of that representation.

Based on their email to chambers on July 11, 2025, Defendants again appear to be attacking this privilege. Although they ultimately declined to file a formal motion disputing that privilege, Defendants now appear to be repurposing the same improper and harassing lines of questioning in an attempt to justify their renewed demand for Plaintiff's representation agreement, which (as stated above) is a nonstarter and should not be permitted.

In addition to the foregoing, disclosure of the fee agreement could create a sideshow of unnecessary disputes, potentially inviting arguments about the propriety of the litigation or counsel's motivation, which are wholly collateral to the merits. This risk of prejudice underscores why courts are cautious in permitting such discovery.[3]

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' demand for production of Plaintiff's representation agreement.

---

[2] There is a concerning trend in this case whereby Defendants are attempting to invade the privacy and attorney-client privilege of Plaintiff and that of each of his damages witnesses. *See* Dkt. Nos. 64, 71, 73-75 76, 81, 88, 93.

[3] Often, courts will delay such adjudications on discovery of fee agreements until the pre-trial order or conclusion of liability proceedings and, if the court requires disclosure of the agreement, will enter it under a protective order and/or redact portions that may implicate the attorney-client or work-product privileges. *See Price v. Miami Cnty./Bd. of Cnty. Comm'rs*, No. 3:12-CV-388, 2013 WL 8226845, at *1 (S.D. Ohio June 27, 2013).

### (2) Plaintiff Should Be Allowed to Depose the Four Identified Witnesses

The second issue Plaintiff respectfully raises for the Court's attention concerns whether he may depose four witnesses identified by Defendants in their June 26, 2025 Rule 26(a)(1) disclosures.

At the outset of discovery, Plaintiff served an interrogatory requesting that Defendants identify all individuals with knowledge of facts relevant to the claims or defenses in this action. On May 27, 2025—less than four weeks before the close of fact discovery—Defendants supplemented their response to this interrogatory, identifying 25 new individuals, along with unnamed members of the Robbery Division's chain of command, as persons with knowledge relevant to this case.[4]

In response, Plaintiff requested that Defendants provide sufficient detail regarding the nature of these individuals' knowledge to evaluate whether depositions would be necessary or whether a motion to strike might be warranted. On June 26, 2025, Defendants stated that they might rely on six of those individuals to support their defenses—two of whom had already been deposed as Rule 30(b)(6) witnesses. That same day, Defendants also produced nearly 300 pages of documents from one of these witnesses—just four days before the close of fact discovery—and agreed they would not object to Plaintiff deposing these individuals after the close of fact discovery.

In light of various outstanding fact and expert discovery issues, the parties jointly sought a modest two-week extension of the discovery deadline. There was no discussion at any point regarding how the brief extension would alter the agreement between the parties on these four depositions—which would certainly take more than two weeks to coordinate and conduct. Nevertheless, on July 14, 2025, Defendants informed Plaintiff that they would no longer honor their agreement and would object to the depositions proceeding—despite Plaintiff having agreed to accommodate Defendants' request to depose one of Plaintiff's damages witnesses after the close of fact discovery.

Given the late disclosure of these witnesses, Defendants' prior express agreement, and the importance of the proposed testimony, Plaintiff respectfully requests leave to proceed with these depositions. Denying Plaintiff the opportunity to examine witnesses whom Defendants have designated as potentially supporting their defenses would result in significant prejudice, particularly as the listed knowledge is extremely broad. For instance, Defendants' Fifth Supplemental Rule 26(a)(1) disclosure states that Shaun Laird has "knowledge of Detective Brenda Walker's work in the Robbery Unit as well as the policies, practices, customs, and training of detectives in the Columbus Division of Police's Robbery Unit."

Plaintiff has acted reasonably and cooperatively throughout discovery. He even agreed to an allotment of 13 depositions per side, enabling Defendants to depose all individuals they deemed necessary from Plaintiff's Rule 26(a)(1) disclosures. It would be inequitable and prejudicial to deny Plaintiff the opportunity to depose four of the more than 56 individuals identified in Defendants' most recent Rule 26(a)(1) disclosures—particularly where those individuals were identified just days before the close of discovery and with the understanding that their depositions could proceed thereafter.

For these reasons, Plaintiff respectfully requests that the Court grant leave for Plaintiff to take the depositions of these four witnesses.

---

[4] Defendants claim in their letter that they supplemented these responses prior to Plaintiff issuing his 30(b)(6) notice. This is incorrect. In fact, Plaintiff issued his 30(b)(6) notice *months* before this. This is just one example of mischaracterizations of what has occurred up to this point from Defendants' letter to the Court.

July 16, 2025 Page **5** of **5**

### (3) Defendants Should Not Be Allotted More Time to Conduct Discovery

Third, Plaintiff respectfully raises the issue of whether Defendants should be permitted to conduct expansive additional discovery on matters they have long had the opportunity to explore. The Court did not authorize the parties to brief this issue in their letters; however, because Defendants chose to raise it, Plaintiff is compelled to respond.

During her deposition, Plaintiff's wife, Janette Horton, testified that she believed Plaintiff briefly saw a mental health professional following his release from prison. Similarly, Dwight Dorsey testified that he believed Plaintiff may have sought mental health treatment at some point. On July 7, 2025, Defendants requested that Plaintiff supplement his interrogatory responses on this topic. Plaintiff, who was questioned extensively during his nearly seven-hour deposition about his mental and emotional damages, has already provided comprehensive responses to interrogatories on this subject and executed full medical authorizations for all known medical providers post-release.

Prior to the close of discovery, Plaintiff identified the mental health professional he briefly spoke with after his release: Dr. Donna Mayerson, a psychologist affiliated with the Ohio Innocence Project (OIP). Defendants have already issued multiple subpoenas to OIP and conducted extensive discovery regarding Plaintiff's damages, including through depositions, interrogatories, and subpoenas. Nevertheless, as a compromise, Plaintiff agreed to execute an additional medical authorization and allow another subpoena to OIP regarding Dr. Mayerson, conditioned on Defendants' agreement not to oppose the four above-referenced witness depositions.[5]

Defendants declined this compromise. Instead, they now seek to dramatically expand discovery—after both fact and expert discovery have closed—by: (1) re-opening Plaintiff's deposition, despite having fully examined him on the subject of damages; (2) deposing Dr. Mayerson, even though they have reached the 13-deposition limit, have not deposed any other medical provider, and no medical provider appears on any party's 26(a)(1)(A) or 26(a)(2)(C) disclosures; (3) requesting an independent medical examination (IME), which they could have sought at any time earlier in the case but did not; and (4) retaining an expert on Plaintiff's mental health, despite not disclosing any such expert during the discovery period and Plaintiff not designating any mental health expert.[6] This clearly runs afoul of the rules of discovery—particularly for topics that Defendants have had notice of from day one. Should the Court wish to hear more on this matter, Plaintiff would request briefing on the subject.

We thank the Court for the opportunity to address these issues and for its consideration.

    Sincerely,

    /s/ Alyssa Martinez
    *One of Plaintiff's Attorneys*

---

[5] On this point, Defendants plainly misstate Plaintiff's agreement. Plaintiff made no offer to "provide" these treatment records because he does not have any in his possession, custody, or control. If he had, he would have already produced them subject to his discovery obligations.

[6] Defendants also cite to Plaintiff's "voluminous" supplemental interrogatory responses when in fact, the vast majority of those responses are the exact same as the previous responses, merely copied over for consistency. They are not new responses. Plaintiff merely supplemented his responses to include Ms. Mayerson's information (as requested by Defendants), payment information for his delivery job (as requested by Defendants), and updated one contention interrogatory response to include what discovery has borne out in this case (since Plaintiff made clear during the January 2025 meet and confer that he would be seeking to bar at trial any evidence not included in such responses).



July 16, 2025

**Via email**

The Honorable Magistrate Judge Elizabeth Preston Deavers
Joseph P. Kinneary Courthouse, Room 225
85 Marconi Boulevard
Columbus, Ohio 43215

Re: *Richard Horton v. City of Columbus*, et al., Case No. 2:23-cv-3888

Judge Deavers,

Pursuant to the Court's instruction, Defendants Brenda Walker and the City of Columbus respectfully submit the following letter to address two discovery matters.

I. **Plaintiff's retainer agreement(s)**

Almost one year ago, the City served Request for Production of Documents No. 55 upon Plaintiff Richard Horton for his representation/fee agreements with the attorneys representing him in this action (The Law Office of Michele Berry and Loevy and Loevy). The City reasonably believed that the agreement(s) would contain information relevant to Defendants' potential damages exposure (such as billing rates).

In response, Plaintiff objected that the agreements were protected by the attorney-client privilege. He withheld them in their entirety and did not submit a privilege log.

In fact, retainer agreements are not *per se* privileged. In response to claims of attorney-client privilege, the Sixth Circuit has held that "the fact of legal consultation or employment, clients' identities, attorney's fees, and the scope and nature of employment are not deemed privileged." *Humphrey, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985). Likewise, the work product privilege does not extend to fee agreements. *Robinson v. Wells Fargo Bank, N.A.*, No. 3:17-cv-261, 2018 U.S. Dist. LEXIS 37311, *10 (S.D. Ohio March 7, 2018). To the extent the records contain arguably privileged material, the remedy is redaction, rather than a blanket assertion of privilege. *Thompson v. City of Oakwood*, Case No. 3:16-cv-169, 2016 U.S. Dist. LEXIS 102581, *3 (S.D. Ohio Aug. 4, 2016); *Lucas v. Gregg Appliances, Inc.*, Case No. 1:14-cv-70, 2014 U.S. Dist. LEXIS 168751, *12 (S.D. Ohio Dec. 5, 2014). During a meet-and-confer call, Defendants specifically requested that Plaintiff produce the retainer agreements with any arguably privileged material redacted, but Plaintiff has not done so.

As discovery has progressed, however, the retainer agreements have become relevant for a more immediate reason. Plaintiff's counsel, Alyssa Martinez, has asserted that she represents at least a half-dozen third-party witnesses in this case. Some of these witnesses are Plaintiff's family

| Civil Division | Claims Section | Prosecution Division | Real Estate Section | Police Legal Advisor |
|---|---|---|---|---|
| 77 N. Front Street | 77 N. Front Street | 375 S. High Street | 77 N. Front Street | 120 Marconi Blvd. |
| Columbus, OH 43215 | Columbus, OH 43215 | Columbus, OH 43215 | Columbus, OH 43215 | Columbus, OH 43215 |
| 614-645-7385 | 614-645-7717 | 614-645-7483 | 614-645-7712 | 614-645-4530 |
| Fax: 614-645-6949 | Fax: 614-724-6503 | Fax: 614-645-8902 | Fax: 614-645-3913 | Fax: 614-645-4551 |

ColumbusCityAttorney.org

members (Alfred Harmon, Jeanette Horton, LaKeon Horton, Barbara Horton-Alomar), while others are friends or employers of Plaintiff (Dwight Dorsey, Furquon McDougald).  Ms. Martinez, who is only admitted to the Southern District of Ohio for this case (she is barred in California), obviously has no prior legal or personal relationship with these witnesses, all of whom live in Ohio.  Assertions of attorney-client privilege have limited defense counsel's ability to explore these privilege claims during depositions, but enough information has come to light to raise legitimate questions concerning the independence and credibility of these witnesses that Defendants should be entitled to further explore.

For example, Barbara Horton-Alomar testified that her first contact with Ms. Martinez occurred when Ms. Martinez left her a voicemail message. [Transcript, ECF No. 95-1, pp. 19-20, 122]  Ms. Horton-Alomar was not expecting the call. [*Id.* at 122]  But when counsel inquired into the substance of this solicitation call, Ms. Martinez asserted privilege over every aspect of the call, including whether she identified herself to Ms. Horton-Alomar, whether she identified herself as Richard Horton's attorney, and whether she stated in the message why she wanted to meet with Ms. Horton-Alomar.  [*Id.* at 122-124]

Ms. Horton-Alomar had no prior relationship with Ms. Martinez, did not sign a written representation agreement, has not paid Ms. Martinez for her services, and has no idea who is paying Ms. Martinez for the representation.  [*Id.* at 20-21]  Therefore, an attorney-client relationship could only have existed from the very first moment of contact (as Ms. Martinez has asserted) if someone else arranged that representation.

Much the same can be said for the attorney-client relationship Ms. Martinez claimed to have with Alfred Harmon.  Mr. Harmon testified that he "didn't hire any attorney."  [Transcript, ECF No. 94-1, p. 203]  According to Mr. Harmon, Richard Horton is paying the fees for Ms. Martinez to represent him. [*Id.*]  When counsel asked whether Mr. Harmon had any conversations with Ms. Martinez *before* she represented him, Ms. Martinez instructed the witness not to answer based on privilege. [*Id.* at 202]  Again, in order for the privilege to exist before Mr. Harmon spoke to her, someone else must have contracted for the representation.

The deposition of Plaintiff's friend, Dwight Dorsey, was similar.  Ms. Martinez called him, not the other way around.  [Transcript, ECF No. 96-1, p. 16]  Mr. Dorsey is not paying for the representation and does not know who is.  [*Id.* at 20]  Once again, the attorney-client relationship apparently existed before Mr. Dorsey met Ms. Martinez, because she asserted privilege when counsel asked Mr. Dorsey, "when [Ms. Martinez] first called you, did she say she was representing you?"  [*Id.* at 18][1]

Given this testimony, the Defendants believe that the representation agreements, specifically any portions discussing representation of third-parties and payment of fees therefor,

---

[1] Two other witnesses, Furquon McDougald and LaKeon Horton, have not yet been deposed.  Mr. McDougald's deposition was scheduled by agreement three separate times, and each time Plaintiff's counsel canceled it at the last moment.  His deposition is now re-scheduled for July 24, 2025.  Similarly, Lakeon Horton's deposition was scheduled by agreement, but Plaintiff's counsel canceled it the night before.  Plaintiff's counsel now claims to be unaware of Lakeon's location, so the deposition has never been rescheduled.

are relevant to the independence and credibility of these third-party witnesses, and are not privileged. *Libertarian Party of Ohio v. Husted*, No. 2:13-cv-953, 2014 U.S. Dist. LEXIS 111338, *9 (S.D. Ohio Aug. 12, 2014) ("In almost every situation where one person pays the legal fees of another, the fact of the arrangement is fair game for disclosure and no privilege to withhold that fact exists").

For these reasons, the Defendants believe their discovery request for Plaintiff's representation agreement(s) seeks nonprivileged information.

II. **Plaintiff's request for four additional depositions**

Plaintiff's counsel asked to add a second issue for the Court's consideration. Unfortunately, this situation requires a bit of backstory.

The parties appeared before the Court on January 31, 2025, at which time Plaintiff's counsel asked for an extension of discovery. She specifically asked for time to serve a Civil Rule 30(b)(6) deposition notice, and told the Court the notice would be served that very day.

However, six weeks passed before counsel sent the 30(b)(6) request. The request was extraordinary in its breadth, seeking testimony and documents concerning policies, record-retention schedules, training, emails, metadata, and a host of other topics going back *almost thirty years*, to 1999. It took a while to compile the information, locate witnesses with institutional knowledge stretching back that far, and take the depositions. In the course of reviewing Plaintiff's requests, Defendants learned about new issues that the Plaintiff intended to litigate.

Defendants had previously, in response to an interrogatory, provided a list of approximately 25 people who might have relevant knowledge on specific topics. Plaintiff's counsel asked for clarification as to whether Defendants intended to call all 25 witnesses. On June 26, 2025, Defendants made clear that there were only four new people on that list they intended to call. (Most of the four names had arisen at earlier points in the litigation, but had not been specifically identified as potential witnesses.)

June 26 was shortly before the then-scheduled close of fact discovery (June 30). So, to avoid unfairness to Plaintiff, Defendants volunteered that if Plaintiff wished to depose any of the people on the list, Defendants would not object to doing so after the close of fact discovery. Plaintiff did not respond to that suggestion.

Instead, Plaintiff approached the Court for a two-week extension of fact discovery, a request Defendants did not oppose. Once the Court granted the additional time Plaintiff sought, the Defendants assumed the matter was resolved. But weeks went by without any further word from Plaintiff about depositions of these four witnesses. Not until July 11, one business day before the close of the extended discovery period, did Plaintiff's counsel identify who they wanted to depose and ask for deposition dates. At that point, Defendants were not sure they had the ability to agree to extend discovery *again* for that many depositions, plus any follow-on discovery arising therefrom. Plaintiff then approached the Court without trying to discuss the matter with defense counsel.

3

Plaintiff knew about these four witnesses before he requested the most recent discovery extension; only Plaintiff can explain why he did not ask for a long enough extension to complete the discovery he now says he needs. The City is not trying to conceal evidence or ambush Plaintiff. So far, the City has produced more than 17,000 pages of documents and multiple deposition witnesses, including retirees and out-of-state witnesses the City had to track down.

### III.   Plaintiff's offer to resolve the dispute over depositions

On October 9, 2024, Plaintiff wrote in an interrogatory response concerning his mental-health treatment that he "has not received any treatment for the psychological, emotional, and mental injuries resulting from Defendants' conduct." That was nine months before fact discovery ended at midnight on July 14-15, 2005.

At 10:27 p.m. on the night of July 14, ninety-three minutes before the close of discovery, Plaintiff sent a voluminous "Supplement" to his interrogatory responses. In that Supplement, he revealed for the first time that he "has received treatment for the psychological, emotional, and mental injuries resulting from Defendant's conduct from Dr. Donna Mayerson, a psychologist with the Ohio Innocence Project." At 11:47 p.m., thirteen minutes before the close of fact discovery, Plaintiff sent a second voluminous "Supplement," which Defendants are still reviewing.

Defendants contacted Plaintiff's counsel to confer about how to handle the late disclosure of Plaintiff's mental-health treatment. This morning, Ms. Martinez offered to provide Dr. Mayerson's treatment records in exchange for the Defendants dropping their objection to the four additional depositions she wishes to take. Given that emotional distress is a central component of Plaintiff's alleged damages, Defendants declined this proposal because securing Dr. Mayerson's records is not enough to cure the prejudice.

If additional informal efforts to resolve the problem are unsuccessful, Defendants will separately approach the Court to ask for discovery regarding Plaintiff's mental-health treatment, including reopening Plaintiff's deposition, deposing Dr. Mayerson, and possibly arranging for an IME and an expert of their own.

Thank you for the opportunity to address the Court.

Sincerely,

/s/ Aaron D. Epstein
Aaron D. Epstein
Assistant City Attorney
adepstein@columbus.gov
(614) 645-7385