**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD HORTON, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 23-cv-3888 |
| | ) | |
| v. | ) | Judge Algenon L. Marbley |
| | ) | |
| CITY OF COLUMBUS, *et al.*, | ) | Judge S. Courter Morris Shimeall |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Michele Berry-Godsey
**The Law Office of Michele Berry, LLC**
114 East 8th Street
Cincinnati, OH 45202
(513) 919-315
mberry@mberrylaw.com

*Counsel for Plaintiff*

Jon Loevy
Alyssa Martinez
**Loevy & Loevy**
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
alyssa@loevy.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

**INTRODUCTION**..................................................................................................1

**STATEMENT OF MATERIAL FACTS (SOMF)** ......................................3

I.    RICHARD HORTON IS INNOCENT ............................................................3

II.    THE LOEW STREET ROBBERY.................................................................9

III.    MCCLANAHAN AND CURRY GIVE FIRST DESCRIPTION OF LOEW STREET ROBBERY PERPETRATOR..................................................................10

IV.    MCCLANAHAN AND CURRY GIVE NEW DESCRIPTIONS OF THE PERPETRATOR.........................................................................................14

V.    RICHARD HORTON'S NAME IS FIRST INTRODUCED IN THE LOEW STREET ROBBERY INVESTIGATION ................................................... 19

VI.    DEFENDANT WALKER CONDUCTS UNDULY SUGGESTIVE PHOTO IDENTIFICATION PROCEDURES........................................................ 21

VII.    PROFESSOR DYSART'S OPINIONS REGARDING THE EYEWITNESS IDENTIFICATIONS OF RICHARD MCCLANAHAN AND RHONDA CURRY . 24

VIII.    DEFENDANTS' RETAINED REBUTTAL EXPERT, DR. JOHN WIXTED, OPINES ABOUT EYEWITNESS IDENTIFICATIONS……………………………………...32

IX.    RICHARD MCCLANAHAN AND RHONDA CURRY STRUGGLED WITH DAILY SUBSTANCE ABUSE AT THE TIME OF THE LOEW STREET ROBBERY.......................................................................................... 33

X.    HORTON CONTINUED SEEKING TO PROVE HIS INNOCENCE AFTER HIS ARREST ................................................................................................ 35

XI.    THE EVIDENCE DEFENDANT WALKER FABRICATED WAS USED IN CHARGING HORTON, CONTINUING HIS PROSECUTION, AND HIS CRIMINAL TRIAL ................................................................................ 36

XII.    DEFENDANT WALKER SUPPRESSES CERTAIN EXCULPATORY AND IMPEACHMENT EVIDENCE ................................................................ 41

XIII.    DEFENDANT WALKER CONCEALED FROM THE PROSECUTION AND DEFENSE THE TRUE CIRCUMSTANCES RELATED TO THE EVIDENCE USED TO IMPLICATE RICHARD HORTON........................................................ 45

XIV.    HORTON FIRST LEARNS OF DEFENDANT WALKER'S SUPPRESSIONS AND FABRICATIONS ................................................................................ 49

XV.    NEW DNA TESTING PROVES HORTON'S INNOCENCE ................................. 52

XVI.    THE CITY OF COLUMBUS AS THE MOVING FORCE BEHIND THE VIOLATION OF PLAINTIFF'S RIGHTS (*MONELL*) ............................................ 55

**LEGAL STANDARD** ...............................................................................62

**ARGUMENT**............................................................................................63

I.    **DEFENDANTS FORFEIT CHALLENGES TO HORTON'S THEORIES** ......65

Defendants are not entitled to summary judgment because they failed to move on multiple independent due process theories, including Walker's suppression of prior suggestive identification procedures, fabrication of key reports, and concealment of how Horton became a suspect, despite having clear notice of these claims. Under *Celotex Corp. v. Catrett*, the moving party bears the burden of affirmatively demonstrating the absence of evidence on each theory of liability, and a failure to do so precludes judgment as a matter of law. Courts consistently hold that when a movant advances only certain grounds, the nonmovant need not address others, and those unchallenged theories remain for trial, *see Titran v. Ackman*. Moreover, Defendants cannot cure this omission in reply, as raising new arguments at that stage is improper and forfeited because it deprives Plaintiff of a fair opportunity to respond, *see Cooper v. Shelby County* and *Helicopters v. City of Columbus*. Accordingly, because multiple due process theories remain unchallenged, summary judgment must be denied.

II.    **SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S FABRICATION OF EVIDENCE CLAIM** ...........................67

Summary judgment is unavailable on Plaintiff's fabrication claim because the record contains ample evidence from which a reasonable jury could conclude that Defendant Walker knowingly created false police reports and investigative summaries that shaped the prosecution, including misrepresentations about when Horton was identified, what witnesses actually said, and whether they saw the perpetrator's face. It is clearly established that such conduct violates due process where there is a reasonable likelihood the fabricated evidence affected the outcome, and that principle applies even if the false evidence was not formally introduced at trial but instead influenced charging decisions and the course of the case. *See Gregory v. City of Louisville*; *Spurlock v. Satterfield*; *Webb v. United States*. Because fabricated evidence can form the basis of charges and taint the entire prosecution, liability does not depend on lack of probable cause or formal admission at trial. *See Stemler v. City of Florence*; *Jackson v. City of Cleveland*. Moreover, the prohibition

on using knowingly false evidence has been clearly established for decades, tracing back to *Mooney v. Holohan* and its progeny, foreclosing qualified immunity. Given that Walker's alleged fabrications went directly to the only evidence in the case, a jury could readily find they caused Horton's prosecution and conviction, precluding summary judgment.

A.  There is Sufficient Evidence for a Reasonable Jury to Conclude That Defendant Walker Fabricated False Evidence Against Plaintiff............................................67

B.  It Was Clearly Established in 2004 that Fabrication of Evidence is a Due Process Violation, and Defendants Do Not Contest This Point........................................71

III.    **SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S BRADY CLAIM**.......................................................72

Summary judgment is unavailable on Plaintiff's *Brady* claim because the record supports a finding that Defendant Walker suppressed multiple categories of exculpatory and impeachment evidence, including an alternative suspect (Richard Diggs), inconsistent witness statements, undisclosed identification procedures, and forensic evidence, all of which were plainly favorable and material in a case that hinged entirely on eyewitness testimony. Under *Brady v. Maryland* and its progeny, suppression of such evidence violates due process where it undermines confidence in the verdict, and that obligation extends to police officers, not just prosecutors. *See Kyles v. Whitley*; *Jackson v. City of Cleveland*. Here, a reasonable jury could conclude the suppressed evidence was favorable because it both pointed to another perpetrator and would have significantly impeached the State's only witnesses, and that its cumulative suppression prejudiced Horton by undermining the reliability of the verdict. *See Strickler v. Greene*; *Wearry v. Cain*. Moreover, it was clearly established well before 2004 that police may not withhold such evidence, foreclosing qualified immunity. *See Moldowan v. City of Warren*. Given the volume and significance of the suppressed material in a case lacking any physical evidence, a jury could readily find a due process violation, precluding summary judgment.

A.  There is Sufficient Evidence for a Reasonable Jury to Conclude That Defendant Walker Violated Plaintiff's *Brady* Right to Exculpatory and Impeachment Evidence................................................................................ 73

B.  It Was Clearly Established by 2004 that Withholding of Exculpatory and Impeachment Evidence by Police Officers is a *Brady* Violation .....................92

IV.    **SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES CLAIM**.......................................................94

Summary judgment is improper because Defendant Walker's use of unduly

suggestive identification procedures presents a clear § 1983 claim under Sixth Circuit law. Courts recognize that while a police officer's mere violation of a procedural rule is not actionable, the use of an unreliable identification that taints a criminal trial violates the due process right to a fair trial. *See Stovall v. Denno*; *Simmons v. United States*; *Manson v. Brathwaite*; *Gregory v. City of Louisville*; *Ramsey v. Rivard*. Evidence here shows Walker primed witnesses with a single photo and multiple arrays, emphasized a suspect whose features matched only one consistent characteristic (light-skinned Black male), and made statements reinforcing their selections, creating an unduly suggestive process. Eyewitnesses lacked meaningful opportunity to view the perpetrator, gave inconsistent descriptions, and identified an innocent person, demonstrating unreliability. *See Neil v. Biggers*; *Haliym v. Mitchell*. Moreover, it was clearly established by 2004 that such conduct violated due process, and vacated state-court rulings regarding the December 4, 2004 photo array carry no preclusive or persuasive effect. *See Dodrill v. Ludt*; *Peterson v. Heymes*. A reasonable jury could thus conclude that Walker's actions were unconstitutional.

A. Defendant Walker Can Be Held Liable in the Sixth Circuit Under 42 U.S.C. § 1983 for Using Unduly Suggestive Identification Procedures ..............................94

B. A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Horton's Criminal Trial.................................... 98

C. A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Horton's Criminal Trial..................................110

D. A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Horton's Criminal Trial..................................113

V. **SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S FOURTH AMENDMENT DEPRIVATION OF LIBERTY CLAIM (COUNT II)** ..............................................................................................115

Summary judgment is inappropriate on Plaintiff's Fourth Amendment malicious prosecution claim against Defendant Walker because a reasonable jury could find that she knowingly fabricated evidence, suppressed exculpatory material, and manipulated eyewitness identifications to influence the decision to prosecute Horton, thereby depriving him of liberty without probable cause. Under Sixth Circuit law, a plaintiff must show that (1) the defendant participated in initiating the prosecution, (2) there was a lack of probable cause, (3) the plaintiff suffered a deprivation of liberty beyond the initial seizure, and (4) the criminal proceedings terminated in the plaintiff's favor. *See Sykes v. Anderson*. Here, Walker's deliberate fabrications and *Brady* violations rebut the presumption of probable cause, satisfying the first two

prongs. Horton's 16-year incarceration satisfies the third prong, and dismissal of charges satisfies the fourth. Moreover, by 2004, it was clearly established that officers violate the Fourth Amendment when they continue detention or prosecution without probable cause, particularly where the evidence is fabricated or identifications are knowingly unreliable. *See Jackson v. City of Cleveland*; *Sanders v. Jones*.

A Jury Could Reasonably Find Defendant Walker Maliciously Prosecuted Plaintiff In Violation of Constitutional Rights .................................... 115

It Was Clearly Established in 2004 That Police Officers Violate the Fourth Amendment When They Continue Detention Without Probable Cause ................................................................................................................... .124

VI.     **SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S STATE-LAW CLAIMS (COUNTS V & VI)**......................125

Summary judgment is improper on Plaintiff's Ohio state-law claims against Defendant Walker because there are genuine disputes of material fact regarding statutory immunity, malicious prosecution, and intentional infliction of emotional distress. Under O.R.C. § 2744.03(A)(6), Walker is not immune because her actions were allegedly outside the scope of employment, malicious, and reckless, and Ohio courts treat this immunity analysis consistently with federal qualified immunity. *See Wright v. City of Euclid; Hopper v. Plummer*. A reasonable jury could find she acted with malice, lacked probable cause, and that Horton's prosecution terminated in his favor, satisfying the elements of Ohio malicious prosecution. Similarly, Walker's intentional fabrication of evidence, suppression of exculpatory material, and pursuit of charges against an innocent person support a claim for intentional infliction of emotional distress, as her conduct was extreme and outrageous, directly caused serious harm, and foreseeably inflicted severe psychological trauma. *See Ayers v. City of Cleveland; Bolander v. BP Oil Co.* Taken together, the record demonstrates that these state-law claims present issues for a jury, precluding summary judgment.

A.  Defendant Walker is Not Immune from Suit Under O.R.C. § 2744.03(A)(6)...125

B. There Is Sufficient Evidence for a Reasonable Jury to Find Defendant Walker Violated Plaintiff's Right to be Free from Malicious Prosecution (Count V). ........126

C. There Is Sufficient Evidence for a Reasonable Jury to Find Defendant Walker Intentionally Inflicted Emotion Distress Upon Plaintiff (Count VI)........................128

VII.    **SUMMARY JUDGMENT IS NOT AVAILABLE TO DEFENDANT CITY OF COLUMBUS ON PLAINTIFF'S MONELL CLAIM (COUNT VIII)**..............131

Summary judgment is improper on Plaintiff's *Monell* claim against the City of Columbus because the record demonstrates multiple failures in policy, training, and supervision that directly caused constitutional violations. The City had no written or meaningful policies regarding *Brady* obligations, exculpatory evidence preservation,

or eyewitness identification procedures prior to 2010–2011, and its training—if any—was sporadic, informal, optional, and legally deficient. The City's own witnesses admitted no knowledge of policies, mandatory training, or supervisory enforcement concerning *Brady* or identification procedures, highlighting deliberate indifference to obvious constitutional risks. Courts in the Sixth Circuit, including *Jackson*, *Gregory*, and *Moldowan*, consistently hold that such deficiencies preclude summary judgment. Given the predictable consequences of these gaps—specifically the suppression of exculpatory evidence and the facilitation of unduly suggestive identifications—a reasonable jury could find the City's failures were the moving force behind Plaintiff's injury, making summary judgment inappropriate.

A.  Legal Standard for Lack of Policy and Failure to Train or Supervise .................133

B.  The Training Provided by the City of Columbus, to the Extent it Existed, Was Inadequate ....................................................................................................133

C.  The City Demonstrated Deliberate Indifference....................................................141

D.  A Reasonable Jury Could Find The City's Inadequacy Caused Plaintiff's Injury ....................................................................................................................143

VIII.  **PLAINTIFF AGREES TO DISMISS HIS COUNTS III, IV, AND VII AGAINST DEFENDANT WALKER**..................................................145

**CONCLUSION** .................................................................................146

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ......................................................... 66

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) ................................................... 117, 122

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................ 67

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................ 66, 67, 68, 100

*Ash v. Ash*, 72 Ohio St.3d 520, 651 N.E.2d 945 (1995) .............................................. 121

*Atkins v. Cty. of Riverside*, 151 F. App'x 501 (9th Cir. 2005) ....................................... 85

*Autrey v. Stair,* 512 F. App'x 572 (6th Cir. 2013) ........................................................ 118

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) ............................................ 71

*Ayers v. City of Cleveland*, 2013 WL 775359 (N.D. Ohio Feb. 25, 2013) ............................... 126

*Barber v. City of Salem*, 953 F.2d 232 (6th Cir. 1992) ................................................. 129

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) .......................................................... 115

*Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382 (6th Cir. 1993) .............................. 66

*Barton v. Warden*, 786 F.3d 450 (6th Cir. 2016) .......................................................... 85

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014) ........................................................ 85, 87

*Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025) ..................................................... 96, 104

*Bolander v. BP Oil Co.*, 128 Fed. Appx. 412 (6th Cir. 2005) ........................................... 126

*Bomar v. City of Pontiac*, Civil No. 08–12629, 2010 WL 3245798 (E.D. Mich. Aug. 17, 2010) ................................................................................................................ 136

*Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206 (1984) ............ 113

*Bowen v. Maynard*, 799 F.2d 593 (10th Cir.1986) ....................................................... 86

*Bradford v. Johnson*, 476 F.2d 66 (6th Cir. 1973) ....................................................... 74

*Brady v. Maryland,* 373 U.S. 83 (1963) ................................................................... 75

*Brown v. Mississippi*, 297 U.S. 278 (1936) ............................................................ 74, 95

*Buehner v. City of Cleveland*, 788 F. Supp. 3d 827 (N.D. Ohio 2025) ........................... 78, 86, 97

*California v. Trombetta*, 467 U.S. 479 (1984) ............................................................ 76

*Campbell v. Hamilton Cnty.,* No. 1:22CV315, 2023 WL 6295803 (S.D. Ohio Sept. 27, 2023) 115

*Campbell v. Hamilton Cnty.,* No. 22-cv-315, 2023 WL 6295803 (S.D. Ohio Sept. 27, 2023) .. 137

*Castleberry v. Brigano*, 349 F.3d 286 (6th Cir.2003)............................................................. 76, 84

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 66, 70

*Chavez v. Martinez*, 538 U.S. 760 (2003)...................................................................................... 95

*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006) .................................................................. 130

*Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571 (6th Cir. 2025)........ 75, 84, 87, 93

*Clark v. Warden*, 934 F.3d 483 (6th Cir. 2019) ................................................................ 79, 80, 82

*Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998)..................................................................................... 80

*Cooper v. Shelby County*, No. 07–2283, 2010 WL 3211677 (W.D. Tenn. Aug. 10, 2010)... 70, 74

*Courtney v. Rice*, 46 Ohio App. 3d 133 (1988) ........................................................................... 125

*Criss v. Springfield Twp*. (1990), 56 Ohio St.3d 82, 85............................................................... 124

*Crockett v. Cumberland Coll*., 316 F.3d 571 (6th Cir. 2003)............................................... 120, 125

*Curran v. Delaware*, 259 F.2d 707 (3rd Cir. 1958) ...................................................................... 75

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir.2014).................................................................... 76

*Dennis v. Sec'y, Pennsylvania Dep't of Corr*., 834 F.3d 263 (3d Cir. 2016) ............................... 80

*Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985)...................................................................... 113, 114

*Doe v. Sullivan Cnty*., 956 F.2d 545 (6th Cir. 1992) .................................................................. 129

*Doe v. Sullivan Cty*., 956 F.2d 545 (6th Cir 1992) ..................................................................... 129

*Ekunsumi v. Cincinnati Restoration, Inc*., 120 Ohio App.3d 557 , 698 N.E.2d 503 (Ohio Ct. App. 1997) ..................................................................................................................................... 126

*Elkins v. Summit Cty., Ohio*, 2009 WL 1150114 (N.D. Ohio Apr. 28, 2009) ............................ 125

*Est. of Andrews v. City of Cleveland, Ohio*, 112 F.4th 436 (6th Cir. 2024) ................................. 78

*Evans v. Smith* (1994), 97 Ohio App.3d 59, 646 N.E.2d 217 .................................................... 124

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002)......................................................................... 129

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) ......................................................................... 85

*France v. Lucas*, 836 F.3d 612 (6th Cir. 2016).................................................................... 71, 87

*Galloway v. United States*, 319 U.S. 372 (1943) ........................................................................ 67

*Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993) ......................................... 129

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................... 75, 82, 84, 85

*Gillispie v. City of Miami Twp.*, No. 3:13-CV-416, 2020 WL 5629677 (S.D. Ohio Sept. 21, 2020), *aff'd* No. 23-3999, 2025 WL 1276900 (6th Cir. May 2, 2025) ........... 102, 103, 110, 114

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................................. 115

*Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022).............. 104

*Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579 (6th Cir. 1998)........................................ 122

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006).................................................. passim

*Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014)................................................................. passim

*Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005)............................................................................ 120

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007).............................................................. passim

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)........................................................................ 73

*Harcz v. Boucher*, 763 F. App'x 536 (6th Cir. 2019)................................................................ 118

*Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008).......................................................... 120, 125

*Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009) ...................................................................... 79

*Harris v. Langley*, 647 F. App'x 585 (6th Cir. 2016) ............................................................. 123

*Helicopters v. City of Columbus,* 879 F. Supp. 2d 775 (S.D. Ohio 2012).............................. 70, 74

*Hernandez-Cuevas v. Taylor*, 723 F.3d 91 (1st Cir. 2013)......................................................... 115

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007).................................................................. 116

*Hutsell v. Sayre*, 5 F.3d 996,(6th Cir. 1993) ........................................................................... 111

*In re Siggers*, 615 F.3d 477 (6th Cir. 2010).............................................................................. 87

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)................................................... passim

*Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002)........................................................... 78, 79, 80

*Jefferson v. Lewis*, 594 F.3d 454 (6th Cir. 2010)...................................................................... 66

*Jells v. Mitchell*, 538 F.3d 478 (6th Cir.2008) ....................................................................... 102

*Jones v. City of Akron,* No. 5:14 CV 2618, 2018 WL 1912535 (N.D. Ohio Apr. 23, 2018)........ 82

*Jones v. City of Elyria*, 947 F.3d 905 (6th Cir. 2020) ................................................................. 116

*Jones v. Clark Cnty., Kentucky*, 959 F.3d 748 (6th Cir. 2020) ................................................... 117

*Jordan v. Blount Cnty.*, 458 F. Supp.3d 870 (E.D. Tenn. 2020) ................................................. 137

*Karsner v. Hardin Cnty.*, No. 3:20-CV-125-RGJ, 2021 WL 886233 (W.D. Ky. Mar. 9, 2021) 138

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................................................ 128

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017) ................................................................. 118, 119

*Kogut v. County of Nassau*, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009) ............................... 113

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................................... 75, 82, 84, 87

*Lazar v. Att'y Gen. of Pennsylvania*, 659 F. Supp. 3d 599 (E.D. Pa. 2023) ............................... 87

*LeFever v. Ferguson,* 2013 WL 3742530 (S.D. Ohio July 15, 2013), *rev'd in part on other grounds,* 567 F. App'x 426 (6th Cir. 2014) .............................................................................. 127

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004) ......................................................................... 122

*Lisker v. City of Los Angeles*, 780 F.3d 1237 (9th Cir. 2015) ..................................................... 72

*Malley v. Briggs*, 475 U.S. 335 (1986) ........................................................................................ 67

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ........................................................................ 104, 110

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ................................................................... 120, 125

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988) ........................................................... 141

*Mayer v. Mylod*, 988 F.2d 635 (6th Cir. 1993) .......................................................................... 120

*McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010) ....................................................................... 67

*McNeill v. Bagley*, 10 F.4th 588 (6th Cir. 2021) ......................................................... 77, 78, 79, 80

*Melanowski v. Judy* (1921), 102 Ohio St. 153, 131 N.E. 360 .................................................... 124

*Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017) ......................................................... 114, 117, 118

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ................................................. passim

*Mooney v. Holohan*, 294 U.S. 103 (1935) ................................................................................... 74

*Moore v. Rees*, 2007 WL 1035013 (E.D. Ky. Mar. 30, 2007) .................................................... 120

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................................. 74, 84

*Neil v. Biggers*, 409 U.S. 188 (1972) .................................................................................. 102, 104

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) ................................................................. 87

*Noonan v. Cty. of Oakland*, 683 F. App'x 455 (6th Cir. 2017) ................................................ 121

*O'Donnell v. Yezzo,* 2018 WL 6169283 (N.D. Ohio Nov. 26, 2018) ........................................ 127

*Obrycka v. City of Chicago*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ................................. 141

*Olsen v. Salter*, No. 25-378, 2026 WL 490553 (U.S. Feb. 23, 2026) ........................................ 98

*Owen v. City of Independence*, 445 U.S. 622 (1980) ............................................................... 129

*Pack v. Damon Corp.*, 434 F.3d 810 (6th Cir.2006) ................................................................ 136

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................... 67

*People v. Kenley*, 87 A.D.3d 518 (N.Y. App. Div. 2011) ......................................................... 102

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019) .................................................................. 113

*Phat's Bar & Grill v. Louisville Jefferson Cnty. Metro Gov't*, 918 F. Supp. 2d 654 (W.D. Ky. 2013) ...................................................................................................................................... 116

*Prince v. City of Shaker Heights*, No. 54397, 1989 WL 43393 (Ohio Ct. App. Apr. 20, 1989) 124

*Pyle v. Kansas*, 317 U.S. 213 (1942) ........................................................................................ 74

*Ramsey v. Rivard*, 110 F.4th 860 (6th Cir. 2024) ............................................................... 97, 99

*Reichle v. Howards*, 566 U.S. 658 (2012) ............................................................................... 110

*Richko v. Wayne Cnty.*, 819 F.3d 907 (6th Cir. 2016) ............................................................ 129

*Salter v. City of Detroit*, 133 F.4th 527 (6th Cir. 2025), *cert. denied sub nom. Olsen v. Salter*, No. 25-378, 2026 WL 490553 (U.S. Feb. 23, 2026) ................................................................ passim

*Sanders v. Jones*, 728 Fed. App'x. 563 (6th Cir. 2018) .......................................................... 122

*Selective Ins. Co. of the Se. v. RLI Ins. Co.*, 706 F. App'x 260 (6th Cir. 2017) ......... 120, 124, 125

*Shephard v. Metz*, 453 F. Supp. 3d 924 (E.D. Mich. 2020) ................................................ 78, 116

*Siggers v. Alex,* No. 19-CV-12521, 2022 WL 476069 (E.D. Mich. Feb. 16, 2022 ..................... 94

*Siggers v. Alex*, No. 22-1182, 2023 WL 5986603 (6th Cir. Sept. 12, 2023) .............................. 91

*Sigler v. Am. Honda Motor Co.*, 532 F.3d 469 (6th Cir.2008) ................................................ 136

*Simmons v. United States*, 390 U.S. 377 (1968) ................................................................. passim

*Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493 (W.D. Ky. 2021) ........................................ 137

*Slinger v. Pendaform Co.*, 2019 WL 3035589 (6th Cir. July 11, 2019) ..................................... 66

*Smith v. Cain*, 132 S. Ct. 627 (2012) ...................................................................... 84

*Smith v. Florida*, 410 F.2d 1349 (5th Cir. 1969) ................................................... 75

*Smith v. Prudential Ins. Co. of Am.*, 864 F. Supp. 2d 654 (M.D. Tenn. 2012).......................... 136

*Spurlock v. Fox,* No. 3:09–cv–0756, 2010 WL 3807167 (M.D. Tenn. Sept. 23, 2010)............. 136

*Spurlock v. Satterfield*, 167 F.3d 995, 998–99 (6th Cir. 1999)...................................... 71, 74, 121

*Steiner v. King*, 2023 WL 11758789 (6th Cir. Nov. 20, 2023)....................................... 105

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997) ............................................ 71

*Stovall v. Denno*, 388 U.S. 293 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982).............................................................................. 98

*Strickler v. Greene*, 527 U.S. 263 (1999) .................................................................. 76

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ................................................. 115, 116

*Tilberry v. McIntyre*, 733 N.E.2d 636 (Ohio App. 1999) ............................................ 125

*Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990)........................................................ 70

*Titus v. Werkema*, No. 1:23-CV-997, 2025 WL 3239831 (W.D. Mich. Nov. 20, 2025).............. 91

*Tolan v. Cotton*, 572 U.S. 650 (2014)................................................................ 14, 66

*Trussle v. Gen. Motors Corp.*, 53 Ohio St. 3d 142 (Ohio 1990)..................................... 123

*United Sates v. Warshak*, 631 F.3d 266 (6th Cir. 2010) .............................................. 67

*United States v. Agurs*, 427 U.S. 97 (1976)............................................................ 85

*United States v. Bagley*, 473 U.S. 667 (1989) ................................................... 74, 75

*United States v. Clark*, 499 F.2d 889 (6th Cir. 1974) ................................................ 102

*United States v. Crozier*, 259 F.3d 503 (6th Cir.2001)............................................... 102

*United States v. DeBose*, 433 F.2d 916 (6th Cir. 1970).............................................. 101

*United States v. Fernandez,* 456 F.2d 638 (2d Cir. 1972) ........................................... 102

*United States v. Five Persons*, 472 F.Supp. 64 (D.N.J.1979)....................................... 82

*United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007)........................................... 78

*United States v. Lanier*, 520 U.S. 259 (1997)......................................................... 75

*United States v. Lochmondy*, 890 F.2d 817 (6th Cir. 1989)......................................... 74

*United States v. McComb*, 249 F. App'x 429 (6th Cir. 2007) ...................................................... 99

*United States v. Radaker-Carter*, 151 F.4th 840 (6th Cir. 2025)..................................... 101, 108

*United States v. Reamey*, 132 F. App'x 613 (6th Cir. 2005) ...................................................... 101

*United States v. Sanchez*, 24 F.3d 1259 (10th Cir. 1994) ............................................................. 99

*United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005) ............................................................. 109

*United States v. Thai*, 29 F.3d 785 (2d Cir.) ............................................................................. 102

*United States v. Washington*, 714 F.3d 962 (6th Cir. 2013) ...................................................... 101

*Vega v. Tekoh*, 597 U.S. 134 (2022) ..................................................................................... 94, 95

*Vesey v. Connally*, 175 N.E.2d 876 (Ohio App. 1960)............................................................... 124

*Virgil v. City of Newport*, 545 F. Supp. 3d 444 (E.D. Ky. 2021), *aff'd sub nom. Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804 (6th Cir. Aug. 9, 2023) ....... 130, 132, 138, 140

*Waller v. Foxx*, 1982 WL 4753 (Ohio Ct. App. Oct. 6, 1982).................................................... 125

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ..................................................................................... 84

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015) ................................................................... 71

*Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007)........................................... 126

*Wheatt v. City of E. Cleveland*, 2017 WL 3174285 (N.D. Ohio July 26, 2017)......................... 126

*White v. McKinley*, 519 F.3d 806 (8th Cir. 2008)......................................................................... 80

*Wilson v. Mitchell*, 250 F.3d 388 (6th Cir. 2001) ........................................................................ 99

*Wingate v. United States*, 969 F.3d 251 (6th Cir. 2020)............................................................. 101

*Wright v. City of Euclid, Ohio*, 962 F.3d 852 (6th Cir. 2020) .................................. 116, 121, 123

*Yaeger v. Local Union* 20, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983) ...................................... 126

*Youngblood v. West Virginia*, 547 U.S. 867 (2006)...................................................................... 75

**Statutes**

*Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018)..................................................................... 123

*Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013) .......................................... 123

Ohio Revised Code § 2744.03(A)(6)(a)–(c) ............................................................................... 122

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................... 66

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................................................ 114

**INTRODUCTION**

This case presents a profound tragedy: Plaintiff Richard Horton spent more than 16 years in prison because he was framed for an armed robbery that he did not commit. The case against Horton rested solely on two purported eyewitness identifications—identifications that Defendant Brenda Walker knew were inherently unreliable: she knew neither witness actually saw the assailant's face, but she nevertheless took affirmative steps to shape and secure their identifications. The true perpetrator of the robbery went unpunished, and to this day the victims have been denied the justice they deserve.

This tragedy was no accident; it was the result of the intentional actions of Defendant Brenda Walker, taken pursuant to the practices, policies, and customs of Defendant City of Columbus.

No real evidence ever implicated Horton in the crime. Horton never said anything to anyone suggesting he was involved. He had no motive to commit the crime. None of the physical evidence implicated him. No weapon ever connected him to the crime. In fact, fingerprints lifted both from the scene and from the bullet casing recovered from the scene excluded him, and DNA evidence later confirmed his innocence. Horton also had a rock-solid alibi: He was with his then-girlfriend—his now-wife—miles away at her home in Grove City, Ohio without a car. In short, there was no legitimate basis to suspect Horton—let alone prosecute and convict him.

Nevertheless, Defendant Walker pursued Horton and only Horton—regardless of the facts. Defendant Walker's misconduct in this case was not a matter of mistake or mere negligence—it was a deliberate effort to manufacture a case against an innocent man. Faced with evidence that excluded Horton, including fingerprint evidence and an initial identification of a different suspect, Walker abandoned any objective search for the truth. Instead, she employed

1

unduly suggestive identification procedures designed to produce a predetermined result, fabricated reports to bolster those false identifications, and suppressed critical exculpatory evidence that directly undermined her theory of the case. This misconduct was not only unconstitutional; it was the driving force behind Plaintiff's wrongful arrest, prosecution, and conviction.

Horton served more than 16 years in prison before his release. Throughout, Horton maintained his innocence and fought to clear his name. In 2022, based on the newly acquired DNA evidence, a state court vacated Horton's conviction and ordered a new trial. After nearly 18 years of fighting to clear his name, Horton was finally freed. In 2023, state prosecutors dropped all charges against him.

At summary judgment, the Court must view the evidence in the light most favorable to Horton and may not resolve disputed facts in Defendants' favor. Yet Defendants ask it to do the opposite. Rather than acknowledge the extensive record evidence of misconduct and the numerous disputes of material fact, Defendants recast contested issues in their favor and ask this Court to credit their version of events and ignore Plaintiff's copious contrary evidence. The law does not permit that approach.

The sheer scope of Defendants' briefing underscores the point. Their sprawling factual recitation and argument—totaling 101 pages—reflect not clarity, but the existence of pervasive and material factual disputes that must be resolved by a jury. Because a reasonable jury could readily find that Defendants violated Horton's constitutional rights, summary judgment is not only inappropriate—it would be improper. Defendants' motion should be denied.

## STATEMENT OF MATERIAL FACTS ("SOMF")

Defendants' motion depends on a factual account that impermissibly construes the evidence and draws inferences in their favor. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Many of their facts have no support or citation to the record. Properly viewing the record in Horton's favor, the facts are as follows:

### I.      RICHARD HORTON IS INNOCENT

#### *Richard Horton Did Not Rob or Shoot Richard McClanahan or Rhonda Curry*

1.      Plaintiff Richard Horton was 28 years old in October 2004 when he was arrested for the Loew Street robbery.[1] At that time, he was in a relationship with his then-girlfriend, now wife, Janette Harmon Horton. He was also actively seeking custody of his daughter, Vantasia, after she had been removed from her mother's care, and pursuing custody of his younger brother, Skylar, after the tragic death of their mother. Horton has a second child he was helping care for—his young son who had heart problems that required multiple surgeries throughout his childhood. Horton was employed at a Popeye's restaurant on Livingston Avenue in Columbus, Ohio. Ex. 1 at 1 (listing Horton's DOB as 8/21/1976); Ex. 2 at 45 (detailing Horton seeking custody of his children and younger brother); Ex. 3 at 94 (Horton in court seeking custody of daughter); Ex. 4 at 165, 181-82 (Horton working at Popeye's off Livingston); Ex. 9 (son's heart condition).

2.      Horton did not rob Richard McClanahan or Rhonda Curry, and he did not shoot Richard McClanahan. Ex. 5 at 6 (Response to Interrogatory No. 2).

3.      No evidence connected Horton to the Loew Street robbery:

---

[1] Throughout this brief, the robbery for which Plaintiff was wrongfully convicted, which occurred at 927 Loew Street in Columbus, Ohio on October 9, 2004, will be referred to as the "Loew Street robbery."

3

- Defendant Walker never located the weapon used in the robbery and made no effort whatsoever to do so, nor did she uncover any evidence connecting Horton to any weapon. Ex. 1 (absence of such evidence in entire police file).

- There was no physical evidence—such as a fingerprint, a fiber, a shred of DNA evidence, or any other forensic evidence—that connected Horton to the robbery. Ex. 1 (absence of such evidence in entire police file); Ex. 4 (absence of such evidence in entire trial transcript).

- Horton never made any incriminating statement, confession, or admission. Ex. 1 (absence of such evidence in entire police file); Ex. 4 (absence of such evidence in entire trial transcript).

4.      To the contrary, the available forensic evidence affirmatively excluded Horton. Fingerprints recovered from surfaces the perpetrator touched at the scene did not match Horton. Ex. 1 at 35 (negative latent fingerprint comparison results).

5.      Subsequent DNA testing of a cartridge casing recovered from the scene— conducted years later—also excluded Horton as the source, further confirming that he was not the perpetrator. Ex. 6 at 12-14 (DNA results); Ex. 7 at 1-3 (analyst affidavit).

6.      In the face of this complete lack of inculpatory evidence—and affirmative evidence of innocence—the only purported evidence against Horton consisted of eyewitness identifications that were deeply unreliable: they were made by individuals who had no meaningful opportunity to view the assailant's face, struggled with daily substance abuse, and had grudges against Horton. Ex. 8 at 68-69, 74-76, 84-87; *see generally* Ex. 1 & Ex. 4.

### *Horton Has Always Maintained His Innocence*

7.      Horton proclaimed his innocence from the very beginning, and has steadfastly denied any involvement for the last 22 years. Ex. 5 at 6 (Response to Interrogatory No. 2); Ex. 4 at 176-220 (trial testimony); Ex. 9 at 13-16 (sentencing hearing testimony).

8.      Horton refused to enter into a plea deal of any kind in exchange for a shorter sentence and instead went to trial. Ex. 4 (complete trial transcript).

4

9.     Horton testified to his innocence at his criminal trial. After the guilty verdict was read, he again professed his innocence, telling the Court: "I'm sorry your honor. I didn't do it. I swear I didn't do it." Ex. 4 at 176-220 (trial testimony); Ex. 10 at 11 (post-verdict proceedings testimony).

10.     At his sentencing hearing, Horton again testified to his innocence and requested that the court order a polygraph examination so he could prove he was telling the truth. The Court explained that it had no authority to order a polygraph test and that it had to accept the jury's findings of guilt. Horton continued to assert his innocence:

> And, Your Honor, I'd just like for you to look in your heart and use your wisdom, sir. And you know, I don't know how long you have been doing this, you have been doing this [sic], but I am really—I am willing to believe that you know an innocent man when you see one . . . . I always believed that the justice system would do its job, and that the truth would come out. And I just look for you to consider—would like for you to consider those things, your honor.

Ex. 9 at 13-14, 16.

11.     Horton's father-in-law, Alfred Harmon, also spoke at the sentencing hearing to Plaintiff's innocence. Ex. 9 at 17-18.

12.     Horton has continued to assert his innocence for more than two decades, including throughout his post-conviction proceedings, in this civil case, and in his forthcoming declaration of innocence proceedings. Ex. 5 at 6 (Response to Interrogatory No. 2); Ex. 4 at 176-220 (trial testimony); Ex. 9 at 13-16 (sentencing hearing testimony).

13.     Since his release, Horton has worked to raise awareness about wrongful convictions and the profound harm they inflict. Ex. 11 at 316-17.

### *Richard Horton Had an Alibi*

14.     The Loew Street robbery and shooting at issue in this case occurred at 7:30am on October 9, 2004 at 927 Loew Street in Columbus, Ohio. Ex. 1 at 5.

15. At the time of the robbery, Horton was at his girlfriend Janette Harmon Horton's house at 2279 Sonora Drive, Grove City, Ohio 43123. Horton did not have a car at the time, and he did not have a valid driver's license Ex. 4 at 176-220 (Horton trial testimony), 163-176 (Janette trial testimony); Ex. 3 at 65, 69, 108-09, 113, 117.

16. In October 2004, Horton worked every weekday at Popeye's, and he worked alternating weekends. On Fridays, Horton would take a bus from work to the gym, and Janette Harmon Horton would pick him up from the gym around 9:30pm and take him to her house in Grove City for them to spend the weekend together. They did this every weekend during that time except for weekends when Horton worked. Around the time of the Loew Stret robbery, Janette had injured herself at work, so Horton would also assist her with things she needed done around the house. Ex. 1 at 59; Ex. 3 at 37-38, 48, 50-51, 68-70, 117, 127-29, 142-149; Ex. 4 at 165-169; Ex. 11 at 188.

17. Horton did not work the weekend of October 9, 2004. Consistent with their routine, Janette picked Horton up on the evening of October 8, 2004, and he remained with her at her home throughout the weekend, including the morning of the robbery. Ex. 4 at 168; Ex. 5 at 4 (Response to Request to Admit Nos. 9 & 10).

18. Janette Harmon Horton told police that Horton was with her at the time of the robbery and she signed a statement averring as much. She also testified at Plaintiff's trial that he was with her the day of the robbery. Ex. 1 at 52-59; Ex. 4 at 168.

### Horton Learns of Loew Street Robbery and Charges Against Him

19. Horton first learned that a warrant had been issued for his arrest in December 2004 while he was in court pursuing custody of his daughter. He had no prior notice of any investigation or allegation connecting him to the Loew Street robbery. It was the court—rather

than law enforcement—that informed him of the outstanding warrant. Ex. 3 at 94-95; Ex. 11 at 180-81.

20.     Immediately after learning of the warrant, Horton contacted his aunt, Barbara Horton-Alomar, a former officer with the Columbus Division of Police, to inquire about the warrant. Horton-Alomar learned and relayed to Horton that the warrant was for the Loew Street robbery—marking the first time Horton became aware of the incident. Until that moment, Horton had no knowledge of the incident, had never been contacted by police about it, and had no reason to believe he was a suspect in any criminal investigation. Ex. 11 at 180-82.

21.     Horton then contacted Defendant Walker, the lead (and only) investigator on the Loew Street robbery investigation. He asked her why there was an arrest warrant out for him. She told him that he was identified as a robbery suspect and that he better turn himself in. He told her that he was innocent and she proceeded to yell at him. Ex. 4 at 141; Ex. 11 at 182-84, 187-88.

22.     On December 27, 2004, Horton went to the Columbus police to address the warrant and was arrested. Despite the lack of evidence against him, Horton was tried and convicted in 2006 and sentenced to 23 years in prison. Ex. 1 at 6; Ex. 11 at 189; Ex. 9 at 21.

### *Horton's Conviction Was Vacated, and Charges Against Him Were Dropped*

23.     In January 2022, Horton's robbery conviction was vacated based on newly obtained DNA evidence excluding him as the contributor. The court found that this evidence was material to Horton's claim of innocence and carried "significant probative value and evidentiary weight" for the critical issue of the perpetrator's identity, such that a new trial was required—

7

particularly when considered alongside the fingerprint evidence from the shell casing, which also excluded Horton.[2] Ex. 12 at 10 (Entry Granting Motion for New Trial).

24.     The Franklin County Prosecutor's Office then dropped all charges against Horton. Ex. 13 (Motion for *Nolle Prosequi*); Ex. 14 (Entry – *Nolle Prosequi*).

## II.     THE LOEW STREET ROBBERY

25.     Around 7:30am on October 9, 2004, a lone robber knocked on the door of the home of Richard McClanahan and his long-time girlfriend Rhonda Curry. Curry and McClanahan had been asleep on a fold-out sofa in the living room when the robber knocked. The individual called out asking for "Slim"—which was McClanahan's nickname. The knock woke McClanahan and Curry, who were expecting McClanahan's nephew to stop by that morning, and McClanahan went to answer the door. Curry's sister was also in the home in a bedroom but did not exit the bedroom during the robbery and did not see the robber. Ex. 1 at 2-20, 44-48.

26.     When McClanahan opened the door, the robber, who was wearing a gray hooded sweatshirt with the hood pulled tightly around his face so that only his eyes (and perhaps part of his nose) was visible, forced his way inside. The assailant immediately struck McClanahan on the head with his gun, causing his head to begin bleeding and McClanahan to become dizzy. When McClanahan was struck in the head, he fell onto the sofa where Curry was still laying. Ex. 1 at 2-20, 44-48.

27.     The robber began demanding money and yelling at the victims, asking McClanahan where the money was. Shortly after entering the home, and after McClanahan had fallen back onto the sofa, the robber shot McClanahan in the knee. Ex. 1 at 2-20, 44-48.

---

[2] The Court was unable to grant relief based on Plaintiff's *Brady* claim because it did not have certain information that has now been attained in this civil case, discussed *infra*.

28.     Curry tried looking at the robber but he screamed at her that he would kill her if she looked at him. She covered her eyes with a pillow and ultimately got a few glances at him. The robber then dragged McClanahan around the front room, demanding money and shouting that he knew McClanahan had been paid recently. He was ultimately given $40 that McClanahan had stashed in a boot. The robber searched for more money and grabbed the bars at the end of the fold-out bed Curry was still laying on with his bare hands and attempted to close the bed on her before leaving the home. Ex. 1 at 2-20, 44-48.

29.     After leaving, Curry's sister emerged from the back room she had been sleeping in, and they took McClanahan to his sister's home so they could call 911. McClanahan was taken to the hospital by ambulance and had several surgeries over the next few days as a result of the gunshot wound. Ex. 1 at 2-20, 44-48.

### III.    MCCLANAHAN AND CURRY GIVE FIRST DESCRIPTION OF LOEW STREET ROBBERY PERPETRATOR

30.     Officer Pamela Rhodeback was one of the first responding officers to the crime scene. She assisted with securing the scene before heading to the hospital to interview McClanahan.[3] After speaking with McClanahan, she returned to the house where the crime had occurred. There, she interviewed Curry who had returned to the home. Then Rhodeback wrote a general offense report. Ex. 4 at 107-109; Ex. 15 at 134-36; Ex. 1 at 8-12.

31.     According to Officer Rhodeback's October 9, 2004 report, McClanahan said the offender was 40 years old, a Black male, 6'2", 150 pounds, had brown eyes, unknown hair color, and a thin build. According to her report, McClanahan did not offer any information about hair style or length. Ex. 1 at 9.

---

[3] McClanahan confirms at trial that he spoke to police the day of the robbery. Ex. 4 at 58.

32. At the time of the robbery, McClanahan himself was 48 years old, 6'3", and 165 pounds. At the time of the robbery, Horton was 28 years old, 6'1", and 202 pounds. Ex. 1 at 1 (Horton's age, height, and weight), 9 (McClanahan age, height, and weight).

33. Officer Rhodeback's October 9, 2004 report also reflects that McClanahan told her that the offender was wearing a grey hoodie, pulled tight over his face, and that he could not see the face of the perpetrator. He said he might have recognized the voice and believes he knows the suspect. McClanahan did not provide to Officer Rhodeback any name of who he believed the perpetrator was and did not state that anything about the perpetrator was familiar except for his voice. Ex. 1 at 8-9.

34. In addition to providing that description of the perpetrator, the victims provided the following information to Officer Rhodeback about what occurred during the robbery:

> VICTIM STATES **AN UNKNOWN MALE** KNOCKED ON THE FRONT DOOR OF HIS HOME. VICTIM OPENED THE DOOR THEN WAS "PISTOL WHIPPED" ON THE HEAD BY THE SUSPECT, KNOCKING VICTIM TO THE GROUND. SUSPECT KEPT SCREAMING AT THE VICTIM, USING VICTIM'S NICKNAME, SAYING "I KNOW YOU JUST GOT PAID BITCH, GIMME THE MONEY". SUSPECT WAS STANDING OVER THE VICTIM, THEN SHOT VICTIM'S LEG. VICTIM GAVE THE SUSPECT $40. SUSPECT BECAME EVEN MORE IRATE, WANTING THE REST OF THE MONEY AND BEGAN RANSACKING THE FRONT ROOM, TURNING OVER MISC. ITEMS. SUSPECT THEN WENT TO THE GIRLFRIEND (ALSO LISTED AS A VICTIM), WHO WAS LAYING ON A HIDE-A-BED AND BEGAN SLAMMING THE BED CLOSED ON HER, OVER AND OVER AGAIN, SCREAMING "WHERE'S THE MONEY BITCH?" SUSPECT EVENTUALLY LEFT, RUNNING OUT THE FRONT DOOR OF THE RESIDENCE. VICTIMS DROVE OVER TO A SISTER'S HOME AT 1412 GIBBARD AVE WHERE THEY CALLED 911." (emphasis added)

Ex. 1 at 8.

35. Defendant Walker did not get to interview McClanahan on October 9, 2004, but she did interview Curry. Curry described the perpetrator as a Black male, 25-30 years old, 6'2"-6'3", with "light skin – yellow," a medium build, and a gray hoodie tied tight around his face.

She also described the gun as having a silver barrel that was five to six inches and had a black handle. Curry told Defendant Walker that she had tried to peek at the perpetrator a couple of times but he had told her to quit looking at him, so she hid her face in a pillow. Curry did not mention that she believed she knew who the perpetrator was or that she had any prior familiarity with him. She confirmed in her deposition she did not know who it was. Ex. 1 at 44-45; Ex. 8 at 266-67.

36.     Neither Curry nor McClanahan provided any name of who they believed the perpetrator to be the day of the robbery. The only familiarity either of them expressed was McClanahan saying he may have recognized the voice of the perpetrator. Ex. 1 at 8-12, 44-45 (absence in notes and reports from October 9, 2004).

37.     Neither Curry nor McClanahan made any statement to police on the day of the robbery that the perpetrator was someone McClanahan had a previous interaction with, and neither made any statement to police on the day of the robbery that the perpetrator referenced any previous interaction. Ex. 1 at 8-12, 44-45 (absence in notes and reports from October 9, 2004).

38.     On the day of the robbery, Crime Scene Search Unit (CSSU) detective Tom Seevers photographed the crime scene, lifted two latent fingerprints from the home—including the fold-out bed that the perpetrator touched with his bare hand—and recovered a 9mm spent Winchester cartridge casing from where McClanahan had been shot. The fingerprints were determined to not be of AFIS quality but were both "of value" and could be compared to specific prints. Ex. 1 at 13, 27-34.

11

#### IV.     MCCLANAHAN AND CURRY GIVE NEW DESCRIPTIONS OF THE PERPETRATOR

#### *October 13, 2004 Interview of Rick McClanahan*

39.     Four days after the robbery, on October 13, 2004, Defendant Walker went to the hospital to interview McClanahan. This was the second time he was interviewed by police. Ex. 1 at 46-48.

40.     According to Walker's handwritten notes, during this interview McClanahan told a new story he had not told police on the day of the robbery. Walker's note states that McClanahan told her that he had an interaction the previous day with an individual at the store on the corner of 5th and St. Clair. McClanahan first said he was at the store to pay for beer and then said he was there to call the electric company so they did not cut off power to his home.[4] He stated that when he was at the payphone, a man came up to him and asked to use the phone before him, which McClanahan refused. He then said the individual saw him pull out money and asked to borrow $20, which McClanahan also refused. According to McClanahan, the person again asked to use the phone first, which McClanahan again refused, before the person walked away. Ex. 1 at 46-48.

41.     According to Walker's handwritten notes, McClanahan then detailed what happened the morning of the robbery when the robber knocked on his door. In contradiction to Curry's version from her October 9, 2004 interviews, McClanahan stated he asked who was at the door and believed the person answered "Rob"—which is the name of the nephew that Curry and McClanahan were expecting. McClanahan then reiterated what he told Officer Rhodeback about how the moment he opened the door, the robber pistol whipped him and rushed into the

---

[4] Curry testified at trial that McClanahan had a cell phone at the time, so it is not clear why he would be using a payphone instead.

12

home. However, again deviating from McClanahan's and Curry's previous accounts, the handwritten notes reflect that McClanahan then said that the robber began to reference an interaction the day before, asking about "all the money [McClanahan] had" and how McClanahan said he didn't have that money anymore because he used it for bills and "told [the robber] that yesterday." The handwritten notes also include McClanahan saying the robber said "where's that telephone at now?" McClanahan also said that the robber threatened to kill them before leaving because they did not have money. In this account, the robber never tried to fold Curry up into the fold-out bed. Ex. 1 at 46-48.

42.     During this interview, McClanahan also gave a new, different description of the perpetrator. He described him as a Black male, 27-28 years old, 5'9"-6'0", light skin, with short nappy hair, bushy eyebrows. The only consistency between his first and second description of the perpetrator is that it was a light-skinned Black male. At trial, McClanahan testified that the perpetrator's height was the thing he was most certain of. Ex. 1 at 48.

43.     According to Walker's handwritten notes, McClanahan had also said during the interview that he had fixed the brakes for a car that his niece, Tracy McClanahan, had sold to someone named Richard 5-6 years ago and that Richard had not been to McClanahan's home in 5-6 years. The notes do not clearly explain what that information is in reference to, but the information is contradicted by evidence in the record. When asked about selling a car to someone named Richard at her deposition, Tracy McClanahan had no memory whatsoever of ever selling a car to someone named Richard. She testified that she had her uncle fix a few of her cars, but does not recall ever selling a car he worked on. Further, the only car she could remember him working on was a vehicle that needed a number of fixes, including adding wheels and installing a stereo system, not fixing brakes. Ex. 16 at 26-27, 28-29, 95.

44. At the time of the Loew Street robbery—and when McClanahan had this supposed interaction with an individual at a payphone requesting $20—Horton had a cell phone, had been working at Popeye's for eight months, and had over $1,400 in his bank account. Ex. 4 at 181-182, 190-192.

### *Richard McClanahan Gives the Name "Richard Diggs" to Detective Walker*

45. According to Walker's handwritten notes, McClanahan also told Defendant Walker on October 13, 2004 that he could identify the individual that robbed him and gave her the name "Richard Diggs." Richard Diggs was an individual who had grown up in the Milo-Grogan neighborhood—the neighborhood where the robbery occurred. It is not clear if Curry was also present for this conversation and also gave the name Diggs. Ex. 1 at 48.

46. McClanahan also said that he believed the perpetrator lived on Reynolds Avenue, in a red brick house next to an alley, was just out of prison for drugs, was nicknamed Adidas Boy, and that he had attended Everett Middle School. Ex. 1 at 48.

47. At the time of the Loew Street robbery, Richard Horton lived with his aunt on Camden Avenue, and his nickname was not Adidas Boy. Ex. 1 at 1, 2, 23, 25, 36 (listing Horton and his aunt's address as 893 Camden Ave.); Ex. 11 at 21-23, 35, 61-62, 151, 153; Ex. 67 at 4 (Response to Request to Admit No. 14); Ex. 5 at 4 (Response to Request to Admit No. 6).

### *Defendant Walker Does Not Conduct Any Investigation Into Richard Diggs*

48. Despite McClanahan naming Richard Diggs as the person he believed shot and robbed him, and Defendant Walker admitting in her deposition the first full name McClanahan gave her of who he believed the perpetrator to be was Richard Diggs, Defendant Walker admitted in her deposition that she did not do anything to investigate Richard Diggs or any of the other information McClanahan gave her on October 13, 2004. She did not try to contact him. She

14

did not look up his name or run a background check. She did not request any latent fingerprint comparison. She did not create a photo array with him in it. Ex. 17 at 113, 120-21, 135-37, 160-61; Ex. 1 (absence of any investigation in police file); Ex. 68 (Response to Request to Admit Nos. 28 & 29).

49.     At the time of the Loew Street robbery, Richard Diggs was incarcerated for, among other things, robbery. However, even if Defendant Walker had run a search of Richard Diggs' name, she would not have seen that he was incarcerated at the time because he was incarcerated under his brother's (Riccardo Diggs) name. Defendant Walker also did not conduct any investigation into Riccardo Diggs. *See generally* Ex. 20, Ex. 21, Ex. 32, Ex. 35; Ex. 17 at 113, 120-21, 135-37, 160-61; Ex. 18 at 45-49, 71-72; Ex. 19 at 25, 100-01, 108-09, 118; Ex. 68 (Response to Request to Admit No. 29).

### *Richard Diggs and Riccardo Diggs*

50.     Richard Diggs had a brother named Riccardo Diggs. Individuals often confused Richard and Riccardo Diggs for each other, even McClanahan's niece, Tracy. In addition to being confused for one another, the Diggs brothers would also pose as each other—even to police. Richard Diggs confirmed as much in his deposition. Records for Richard Diggs, Riccardo D. Diggs, and Riccardo L. Diggs all provide the same address on 4th Avenue (less than a mile from Loew St.). Furthermore, "Riccardo D. Diggs" and "Richard D. Diggs" have several Franklin County felony convictions under the same 1977 date of birth—including multiple arrests for aggravated robbery, robbery, gang conspiracy charges,' and receiving stolen property. Franklin County records also show several felony convictions for "Riccardo L. Diggs" under a 1976 date of birth. There is at least one charge, however, where "Riccardo D. Diggs" appears

15

with the same August 1976 date of birth that appears elsewhere for Riccardo L. Diggs.[5] *See*
*generally* Ex. 20, Ex. 21, Ex. 32, Ex. 35; Ex. 36 at 19; Ex. 16 at 51, 101; Ex. 18 at 45-46, 72; Ex.
19 at 99-100, 114-115, 151.

51.     Additionally, except for their height, Richard Diggs, Riccardo Diggs, and Richard
Horton all have similar features. All three are light skinned Black men, between 27-28 at the
time of the crime, and all had short cropped hair. Richard Horton is the tallest of the group at
6'1", Richard Diggs is 5'11", and Riccardo Diggs was 5'9". Ex. 1 at 1 (height and picture of
Horton); Ex. 21 at 5, 17 (height of Richard and Riccardo Diggs); Ex. 33 (Picture of Richard
Diggs); Ex. 34 (Picture of Riccardo Diggs).

52.     In 2002, Richard Diggs was charged with participation in a criminal gang, two
counts of robbery, one count of aggravated robbery, one count of receiving stolen property, and
one count of trafficking in drugs. He received a five-year prison sentence and was still
incarcerated when McClanahan and Curry were robbed in October 2004. At the time, Richard
Diggs was incarcerated under his brother's, Riccardo Diggs, name. Riccardo Diggs was not
incarcerated at the time of the Loew Street robbery. The year after the Loew Street robbery,
Riccardo Diggs was also arrested, charged, and incarcerated for aggravated robbery. *See*
*generally* Ex. 20, Ex. 21, Ex. 32, Exs. 35-37; Ex. 18 at 21, 45-46, 72; Ex. 19 at 99-100, 114-115,
151; Ex. 22 at 1 (Joint Stipulation).

53.     Riccardo Diggs passed away in 2016. Ex. 23.

54.     Tracy McClanahan, Richard McClanahan's niece, testified in her deposition that
based on what she knew of the brothers and had heard about the robbery over the years, she

---

[5] The two brothers were so good at passing for each other, and did it so successfully, that even
Defendants' police practices expert did not know they were two distinct individuals. Ex. 27 at 224.

would not be surprised to learn that one of the Diggs brothers committed the robbery. Ex. 16 at 103.

55.    An investigator retained by the Ohio Innocence Project located and interviewed Richard Diggs in April 2018. Richard Diggs informed the investigator that Riccardo Diggs was his brother. Richard confirmed that he and his brother looked alike and were sometimes confused for one another. He denied any involvement in the Loew Street robbery, and he claimed he was in prison at the time. He also confirmed that both he and Riccardo went to Everett Middle School. Ex. 24 at 1 (Rook affidavit).

56.    In his deposition, Richard Diggs testified that he did not know whether or not his brother committed the Loew Street robbery. He also testified that Riccardo could have been in the Columbus area at the time, but he was incarcerated so he did not know for sure. Ex. 19 at 118, 119-121.

**V.    RICHARD HORTON'S NAME IS FIRST INTRODUCED IN THE LOEW STREET ROBBERY INVESTIGATION**

57.    There are competing facts in the record on how Richard Horton's name was first introduced into the Loew Street robbery investigation.

58.    At her deposition, Curry testified that within days of the robbery, Defendant Walker either told her the name Richard Horton or the name was written on a single photo of Horton that Defendant Walker showed her within days of the robbery, described *infra.* She testified that this occurred before hearing the name from anyone else. It is not clear if this occurred before or after the October 13, 2004 interview with McClanahan. Defendant Walker did not document this interaction in any report. Ex. 8 at 82.

59.    Instead, according to Defendant Walker's December 30, 2004 police report, Walker says McClanahan gave the name Richard Horton on October 28, 2004—3 weeks after

17

the crime, after getting the last name from McClanahan's niece. However, at her deposition, his niece Tracy McClanahan (now Tracy Smith), had no recollection of ever searching any yearbook for her uncle, or him ever asking her to do so, and testified she did not even know if she would have had any yearbooks from her time in school. Her deposition was also the first time she learned that her uncle had told police and testified at trial that he got the last name Horton from her. Further, Defendant Walker testified at trial that this conversation with McClanahan actually happened on October 23, 2004. At her deposition, Walker had no explanation for the discrepancy. Regardless, Defendant Walker did not conduct any investigation into Horton in the weeks following supposedly receiving his name. Ex. 1 (absence of any such investigation); Ex. 1 at 6 (October 28, 2004 reference); Ex. 16 at 57, 77, 98-99; Ex. 4 at 14; Ex. 17 at 179, 198-99.

60.     Rhonda Curry never gave the name Richard Horton to police. At trial, she testified that she had gotten the name Richard Horton from her daughter and the nickname "Adidas Boy."[6] However, her daughter denied ever having that conversation with her mother, denied knowing anyone with the nickname "Adidas Boy," and testified she does not know how her mother or McClanahan came up with the name Richard Horton. Ex. 1 (absence of Curry giving name Horton in police file); Ex. 4 at 90; Ex. 25 at 33, 53, 71-72.

61.     Curry testified that she went along with the last name Horton because that was the only person she knew named Richard, and she had eventually heard the name Richard from Defendant Walker, McClanahan, Tracy McClanahan, and Kim Curry. Ex. 8 at 38-39, 79-80, 156, 161, 217-18.

---

[6] Many witnesses have testified that they never knew Horton to go by "Adidas Boy." Horton explained that it appears in some of his post-conviction petitions because he either did not see it or was grateful for the representation and did not want to add work onto his attorneys. He testified at his deposition that he would not be comfortable with any nickname that included "Boy" because of the racial implications. Ex. 11 at 35; Ex. 16 at 55; Ex. 3 at 92.

## VI.    DEFENDANT WALKER CONDUCTS UNDULY SUGGESTIVE PHOTO IDENTIFICATION PROCEDURES

*Defendant Walker Shows A Single Photograph of Horton to Curry*

62.    According to Curry, Defendant Walker showed Curry a photograph of Horton within a few days of the robbery—before anyone had given the name Richard Horton to police. It may have had his name written on it as well. This single-photo identification procedure is not documented in any police report. Ex. 8 at 79-80.

*Defendant Walker Shows A Single-Line Photo Array with Horton*

63.    According to Curry, Defendant Walker showed Curry a single-line photo spread that contained Horton and several other photographs before showing her the separate array on December 4, 2004. This photo identification procedure is not documented in any police report. McClanahan could not recall if he had also seen a second group of photos. Ex. 8 at 298-300; Ex. 4 at 77.

*Defendant Walker Shows A Suggestive Photo Array with Horton*
*As the Only One to Match the Descriptions Given of the Perpetrator*

64.    Weeks after the Loew Street robbery investigation, Defendant Walker assembled a photo array that contained Horton and five other men. Defendant Walker was in charge of assembling the array and chose the individuals to include as fillers. At the time, Defendant Walker knew the only consistent physical descriptor that both victims had given of the perpetrator is that he had light Black skin, and she admitted as much in her deposition. *See generally* Ex. 1 (various descriptions of perpetrator); Ex. 17 at 164-65; Ex. 26 (photo arrays – State's Trial Exs. 1 & 2).

65.    Horton has the lightest skin in the array (#5) and is the only photo with a stark glare on his face. Additionally, several of the fillers do not have light Black skin at all. None are

as light as Horton, and none have the yellow undertone that the victims told police the

perpetrator had—except for Horton. Defendant Walker chose each photograph that was included

in the array, and intentionally made it so that Horton would stand out. *See generally* Ex. 1

(consistent description of perpetrator having light skin); Ex. 26; Ex. 17 at 147-49.



LINE UP - COLUMBUS DIVISION OF POLICE 16079

66.     On December 4, 2004, Defendant Walker showed this array to McClanahan and

Curry. McClanahan testified he was not given any instruction prior to viewing the array. Curry,

testified that the only instruction she received was to take her time and look it over. Curry and

McClanahan both identified Richard Horton from the array. Both testified at trial, and Curry

again testified during her deposition, that Horton was the only light-skinned Black male in the

array and that assisted them in identifying him. This was also not the first time Curry was shown

Horton's picture by Defendant Walker. Ex. 4 at 62, 77, 93, 102; Ex. 1 at 21-22; Ex. 26 at 1-2; Ex. 8 at 79-80, 111, 298-300.

67. Other Columbus Division of Police personnel testified in their depositions that it is critical that fillers match the physical description given of a suspect. They further testified that Horton is the lightest in the array and that would cause them concern. Ex. 38 at 60-63; Ex. 39 at 70-71; Ex. 40 at 45-47.

68. Defendant's police practices expert, Timothy Dixon, agreed Horton was had the lightest skin in the array. Ex. 27 at 200.

69. On December 4, 2004, Defendant Walker again interviewed Curry who now gave a different physical description of the perpetrator than she had on October 9, 2004. She reiterated that the perpetrator was a Black male with "light skin – yellow," but she now said he was 6'1", 185 pounds, had strange and evil eyes, was holding the gun in his left hand, and that she did not recognize the voice. Ex. 1 at 51.

## VII. PROFESSOR DYSART'S OPINIONS REGARDING THE EYEWITNESS IDENTIFICATIONS OF RICHARD MCCLANAHAN AND RHONDA CURRY

70. By 1992, the International Association of Chiefs of Police ("IACP") Law Enforcement Policy Center was releasing papers and model policies that were premised on the inherent unreliability of eyewitness identification procedures. As the IACP papers in 1992 and 1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often the result. Misidentifications by eyewitnesses are normally the result of a combination of factors." Both papers explained the primary reasons that eyewitness identifications were "frequently unreliable": frailties of human memory and perception, especially under stress; and

the ease with which eyewitnesses could be influenced by suggestion. Ex. 28 at 24-25 (Expert report); Ex. 29 (Expert declaration).

71.     Dr. Jennifer Dysart, Plaintiff's retained expert in eyewitness identifications, identified several factors that rendered the identifications of McClanahan and Curry unreliable and generally increased the likelihood that they would identify an innocent person—assuming a good faither attempt and not bad faith on behalf of Defendant Walker or themselves. Each of these factors alone would negatively impact the identifications, but taken in combination, they further undermine the identifications. *See generally* Ex. 28.

72.     First, both McClanahan and Curry had a limited opportunity to view the shooter's face. Dr. Dysart referenced the following: (1) McClanahan saying to Officer Rhodeback that he did not see the face of the perpetrator, (2) McClanahan testifying at trial that he did not see the face of the perpetrator, (3) Curry telling police she covered her face with a pillow during the robbery, (4) Curry saying she only peeked at the robber a few times for a few seconds, and (5) Curry telling police she could only see the robber's eyes and nose. According to Dysart, these factors make it extremely difficult for a witness to observe/remember (encode) a perpetrator's face and make an accurate identification. Ex. 28 at 8-9.

73.     Second, both McClanahan and Curry had a limited opportunity to view the robber's face because of the lighting at the time. Dr. Dysart observed that (1) 927 Loew Street faces East meaning the perpetrator would have been backlit by the window on the front of the house, (2) sunrise on October 9, 2004 in Columbus, Ohio was at 7:36am, (3) and Curry's testimony that there was not enough light in the room to even see the color of the perpetrator's eyes. According to Dysart, the poor lighting conditions served to reduce the ability to see clearly and see the perpetrator in any detail. Ex. 28 at 9.

74.     Third, both McClanahan and Curry had limited opportunity to view and identify the robber's face because they observed the robber's weapon, which created a weapon focus effect. McClanahan testified he saw the gun—a 9mm silver gun—right before he was struck in the head and while it was being held to his head and waived in his face. Curry testified that she saw the gun very early in the robbery and was looking at the gun when she was peeking her head from behind the pillow. In other words, Dr. Dysart observed, it appears that both victims looked at the gun or toward the gun for a period of time during their observations, and "attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited." Ex. 28 at 10.

75.     Fourth, both McClanahan and Curry had limited opportunity to view and identify the robber's face because of his disguise—namely, the hoodie he had tightened over his face so only his eyes were visible. According to Dysart, this factor likely had a negative impact on the witnesses' abilities to see the robber clearly and subsequently make an accurate identification of his face. Ex. 28 at 10.

76.     Fifth, Dr. Dysart addresses how, generally, people are more likely to recognize people that they are familiar with—with the understanding that familiarity is a spectrum—but that errors still can, and do, happen. She observes how the critical question is the opportunity to view the perpetrator at the time of the crime so that a "sufficient opportunity to see that person's face exists." Ex. 28 at 11-13.

77.     Sixth, Dr. Dysart cites to the fear McClanahan and Curry testified to feeling during the robbery and the trauma of the day. The stress/arousal experienced by McClanahan and

Curry, and the impact such emotions have on memory and eyewitness performance, could have significantly reduced the reliability of their eyewitness identification. Ex. 28 at 13.

78.     Seventh, there was a significant time delay between the robbery and when McClanahan and Curry identified Horton from a photo array. The robbery occurred on October 9, 2004, and the photo array was not utilized until December 4, 2004—8 weeks later. Dr. Dysart noted that "memory decreases relatively quickly after an event and then continues to decrease with the passage of time." Ex. 28 at 13-14.

79.     Dysart also noted a number of variables that occurred during the identification procedures themselves that rendered the identifications unreliable and inflated the witness's confidence in their own identifications. Ex. 28 at 14-26. Those include:

80.     *Post-event contamination*: Ms. Curry testified that within days of the robbery, Defendant Walker either told her the name Richard Horton or showed it to her on a photograph—before Tracy McClanahan had identified that name. She also stated that Defendant Walker told her Horton was on the run, and shortly thereafter she was informed he had been arrested. At trial, Ms. Curry said she initially believed the robber was someone named Richard based on information from her daughter, who referred to a person nicknamed "Adidas Man," though multiple individuals named Richard—including Richard Diggs—were known to the family. According to her testimony, Ms. Curry and Mr. McClanahan discussed the robbery at the hospital and agreed the perpetrator was likely named Richard, but the last name was later suggested by Tracy McClanahan after reviewing a middle school yearbook, where multiple individuals named Richard, including Horton and Diggs, would have appeared. Tracy also supposedly told them Horton sold drugs in the neighborhood. Ms. Curry later told Defendant Walker that the robber "had to have been" Richard Horton, in part because she did not know

24

other individuals named Richard and testified that Defendant Walker confirmed Horton's involvement in drug activity. Witness memories can be altered by information learned after the event. The record reflects that Ms. Curry's identification of Richard Horton developed after exposure to information from law enforcement and third parties, rather than from an independent, contemporaneous identification. Further, given that both witnesses' descriptions of the offender changed over time, this suggests their memories were contaminated. Ex. 28 at 14-16.

81.     *Description "Accuracy"*: There is very little description of the perpetrator associated with the two witnesses who ultimately identified Horton from the photo array, and their descriptions change over time: McClanahan first said the perpetrator was 40 years old, 6'2", 150 pounds, with brown eyes, an unknown hair color, and a thin build. He then changed his description days later to describe the offender as a light-skinned Black male, 27-28 years old, between 5'9-6'0', bushy eyebrows, and short nappy hair. Curry initially described the perpetrator as a light-skinned Black male (yellow), 25-30 years old, 6'2"-6'3" tall with a medium build. Curry then changed her description to the offender being a light-skinned Black male (yellow), 6'1", 185 pounds. Dr. Dysart states that "The lack of detail and consistency in the two witnesses' descriptions of the robber as well as their description of the events should have been a concern for Det. Walker that these witnesses did not have a strong memory for the robber and therefore would not likely be reliable eyewitnesses in the investigation based on their observations at the time of the robbery." Ex. 28 at 16.

82.     *Showup/Single Photograph*: Ms. Curry testified in her deposition that within days of the robbery, Det. Walker showed her a single photograph of a person identified as "Richard," whom she identified as the robber, although there is no record of this procedure in the police file

25

or Defendant Walker's notes. Ms. Curry also stated that Defendant Walker either told her the name Richard Horton or that the name was written on the photograph. The record thus reflects that Ms. Curry may have been exposed to a single-photo identification procedure shortly after the robbery, which, if it occurred, preceded and may have influenced her later identification of Mr. Horton in a formal photo array. Ex. 28 at 17.

83.     *Lineup Bias*: At trial, both Ms. Curry and Mr. McClanahan testified that the robber was a light-skinned Black male and that Mr. Horton was the only individual in the photo array matching that description, with Ms. Curry further stating in her deposition that this feature helped her select him. In contrast, Det. Walker testified that she believed multiple individuals in the array were light-skinned Black males and that the array was properly constructed, though she could not recall how she selected the fillers from the AFIS-generated options or whether she considered skin tone specifically. The record thus reflects a direct conflict between the witnesses' account—that Mr. Horton uniquely matched a key descriptor—and the detective's testimony regarding the array's composition. If the array appeared as described by the witnesses, it would have made Mr. Horton stand out based on complexion, a central feature of their description, and, when combined with the earlier identification procedures described by Ms. Curry, would have increased the likelihood that he would be selected and that subsequent identifications would carry limited independent evidentiary value. Ex. 28 at 17-18.

84.     Further, Dr. Dysart states "After being selected from an unnecessarily suggestive procedure (here, possibly a showup procedure followed by a photo array where Mr. Horton was the only light-skinned Black male), the results from any subsequent procedure (e.g., in court) are relatively meaningless. That is, the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy. Ex. 28 at 18.

26

85.     *Pre-Identification Warnings/Instructions*: The Columbus Division of Police photo array procedure included written pre-identification instructions consistent with best practices, but the form did not require witnesses to acknowledge that those instructions were read or understood. At trial, Mr. McClanahan testified that he received no instructions before viewing the array, while Ms. Curry testified she was told only to "take [her] time" and, in her deposition, testified that she was instructed to pick the person she thought was the perpetrator. The record therefore reflects that neither witness was clearly advised that the perpetrator might not be present in the array, and that the instructions given may have implied that a selection should be made—which encourages witnesses to make a selection and leads to an increase in identification errors. Ex. 28 at 19.

86.     *Non-Blind Lineup Administration*: Det. Walker both constructed the photo array containing Mr. Horton and administered it to Mr. McClanahan and Ms. Curry, meaning she knew the identity of the suspect during the identification procedures. The record reflects that no "blind" or independent administrator was used, leaving open the possibility that the administering officer could have influenced the witnesses' selections, whether intentionally or unintentionally. As a result, the identification procedures in this case lacked a safeguard designed to prevent administrator influence, and any resulting identifications may have been affected by that risk. Ex. 28 at 19-21.

87.     *Repeated Identification Procedures, Unconscious Transference and Commitment Effects*: Ms. Curry testified that shortly after the robbery, Det. Walker showed her a single photograph of "Richard," whom she identified, and that she believes the same photograph of Richard Horton later appeared in the photo array. If so, Ms. Curry was exposed to repeated identification procedures involving Mr. Horton as the suspect. The record also indicates that both

witnesses had some prior familiarity with Mr. Horton and were attempting to determine the robber's identity after the fact, including relying on the name "Richard." Under these circumstances, repeated exposure to Mr. Horton's image and prior familiarity with him could have reinforced his selection across subsequent identification procedures, such that later identifications—including in court—were not independent of earlier ones and may reflect prior exposure rather than an original memory of the perpetrator. Ex. 28 at 21-23.

88.     *Witness Confidence*: Witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met, including pristine photo identification procedures and knowing confidence from the beginning. One of the major and primary concerns with interpreting confidence, however, is that research shows confidence is easily changed. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For this reason, Dr. Dysart states that "Expressions of confidence at trial, however, are relatively meaningless because confidence is malleable, and easily affected by external sources." This confidence inflation is also present here: McClanahan initially told police that he may have recognized the voice of the perpetrator, but by the time of the photo array and trial, he was confident. Curry started off not knowing at all who the perpetrator was beyond a 25–30-year-old Black male, 6'2"-6'3" tall, with "light skin – yellow," medium build, and a gray hoodie tied tight around his face. By the time of the photo array, she was 110% certain of the identity of the robber, and by the time of her deposition, co confident in her identification that she would stake her life on it and not even DNA evidence proving the contrary could change her mind. Ex. 28 at 23-24.

28

89. *Post-Identification Feedback*: Ms. Curry testified that Det. Walker told her, both before and after the photo array, that she and Mr. McClanahan had the "same" testimony and had identified the same person. The record therefore reflects that, after Ms. Curry selected Mr. Horton, she was informed that her identification matched Mr. McClanahan's, effectively confirming her choice. This confirmation occurred after the identification and could have reinforced Ms. Curry's confidence in her selection and her perception of its accuracy. Defendant Walker also told Curry that Horton was supposedly on the run from police which could have further impacted her perception of accuracy. Ex. 28 at 24-25.

90. *Voice Identification*: McClanahan told Officer Rhodeback and Defendant Walker and testified at trial that he believed he recognized the robber's voice, though it is unclear whether this recognition was based on the robbery itself, an interaction McClanahan claims he had the day before the robbery, or something else altogether. He stated that he identified the person through the voice and the words spoken during the incident, but the record does not indicate that his ability to recognize the voice was ever tested or verified. Identification testimony based on the sound of a person's voice is also less reliable than eyewitness accuracy. Further, it is unclear what prior familiarity, if any, Mr. McClanahan had with Mr. Horton's voice, leaving the basis and reliability of this identification uncertain. Ex. 28 at 25-26.

## VIII. DEFENDANTS' RETAINED REBUTTAL EXPERT, DR. JOHN WIXTED, OPINES ABOUT EYEWITNESS IDENTIFICATIONS

91. Defendants retained expert in eyewitness identifications and memory, Dr. John Wixted, opines that the identifications from the photo array are not probative of guilt. Wixted observes that after a suspect's face is shown to a witness—*i.e.,* yearbook photos, single-photo show ups, multiple photo arrays—all subsequent identification procedures are necessarily contaminated. Ex. 30 at 163-64, 174, 269-70.

29

92. Dr. Wixted additionally opines that a growing confidence in familiarity with the perpetrator and details of a crime, *i.e.,* telling police you only peeked at someone but testifying at trial that you actually stared at them, are hallmarks of memory contamination and confidence inflation. Ex. 30 at 217.

93. He further opines that post-identification feedback, such as police saying a witness had the same story as another (as happened here), can cause memory contamination. Ex. 30 at 221-23.

94. He further opines that when a witness says they do not recognize a face but then tells police they do actually recognize the face, that is an example of memory contamination. He acknowledged that the "first tests"—first time a witness talks to police to recall details of a crime or first views a photo identification procedure—of McClanahan and Curry do not have any indicators that they know who the perpetrator is beyond McClanahan saying his voice may have been familiar, and Wixted would have expected them to if they recognized the perpetrator. On this point, Wixted opined that facial recognition is "undoubtedly" more reliable than vocal recognition because faces are more unique than voices. Ex. 30 at 72-85, 103, 144, 163-64, 174, 269-70.

## IX. RICHARD MCCLANAHAN AND RHONDA CURRY STRUGGLED WITH DAILY SUBSTANCE ABUSE AT THE TIME OF THE LOEW STREET ROBBERY

95. In addition to all the conditions that would make recognition of the perpetrator and encoding difficult, McClanahan and Curry had serious substance abuse issues in 2004. Ex. 8 at 66-69.

96. In her deposition, Tracy McClanahan testified that Curry and McClanahan had very serious substance abuse issues in 2004 and lived in the center of a drug area. She testified

30

that she went to their home to find them high with "relative frequency" in 2004. She testified that their struggle with addiction was something "everyone knew" and that it was so bad that she "never understood" from the time Horton was convicted that police "would go off of two testimonies of two drug addicts." Ex. 16 at 44, 79-82, 109.

97.     Curry confirmed in her deposition that she and McClanahan were addicted to crack cocaine before, during, and after the Loew Street robbery and that they were daily users. Ex. 8 at 66-69 (also referenced throughout the deposition).

98.     McClanahan lied under oath about his drug usage during Horton's criminal trial and told Curry not to mention the drugs. Ex. 4 at 75; Ex. 8 at 265.

99.     Curry also lied under oath and testified at trial that she had no contact with Horton other than "maybe in passing" and at the supposed car sale 8-9 years previous. At her deposition, Curry instead testified that she had bought drugs from Horton two or three times and had a grudge against him because she did not like him.[7] Ex. 4 at 100-01; Ex. 8 at 39-40, 42-44, 292-93.

## X.     HORTON CONTINUED SEEKING TO PROVE HIS INNOCENCE AFTER HIS ARREST

100.     Horton ran into McClanahan two separate times after being arrested and before trial. The first time, Horton saw McClanahan driving down the street. He got down on his knees in front of McClanahan's car and said "listen, Rick, I didn't do this to you man. You know, I don't know what is going on. I didn't know who did this to you. But listen man, we have to talk about this because . . . I didn't do this to you." McClanahan followed him to a nearby house and they spoke. McClanahan showed Horton the scar on his leg and the two talked. During this conversation, McClanahan told Horton he knew he was not the one who robbed him and that he

---

[7] Horton does have previous charges for drugs but committed after his release to turning his life around. Ex. 11 at 167-68.

31

was not going to let him go to jail for something he did not do. Horton then went to his attorney, Myron Schwartz, and told him about the conversation. Schwartz said if he talked to McClanahan again, to try and record the conversation. Ex. 4 at 197-99.

101. The second time, Horton again saw McClanahan in the neighborhood and tried to speak with him. Horton tried to record the second interaction on his cell phone for use at his criminal trial, but was unable to. During this second interaction, McClanahan again told Horton that he would take care of everything and to stop paying his lawyer. During this conversation, Horton gave his phone number to McClanahan on a slip of paper. McClanahan took the slip of paper Horton gave him to prosecutors and alleged that Horton had tried to bribe him to change his story. In rebuttal, Horton's cousin, Lakeon Horton, who was present for the exchange, signed an affidavit attesting to what he heard and that McClanahan had, in fact, tried to blackmail Horton in exchange for the truth. Ex. 4 at 199-201; Ex. 31.

102. Horton also went to Tracy McClanahan, who he had known since school, and begged her to ask her uncle to tell the truth that Horton did not rob him. In her deposition, Tracy recalled Horton visiting her workplace and pleading, "please, please, please talk to your uncle, I did not do it," and emphasizing, "you know me" and that he was "about to get sent away for something [he] didn't do." She stated she would "never forget the look on his face," observing that Horton was desperately trying to "get the real story" from her uncle because "Richard knows [her] and knows [she's] for what's right." Tracy testified that Horton was always a kind, caring, non-violent jokester. She said he was a "softie" and not a "street" guy. Ex. 16 at 87-89.

## XI. THE EVIDENCE DEFENDANT WALKER FABRICATED WAS USED IN CHARGING HORTON, CONTINUING HIS PROSECUTION, AND HIS CRIMINAL TRIAL

103. Defendant Walker created her first typed police report of the Loew Street robbery

32

investigation on December 29, 2004—two days after Horton's arrest and nearly three months after the robbery occurred. Ex. 1 at 2-7.

104. Defendant Walker created five typed police reports in total. The first report is dated December 29, 2004 and is a Criminal Investigation Summary ("CIS Report"). A CIS Report is a summary sent to the prosecutor's office after an arrest and is read to the grand jury in securing an indictment against the criminal defendant. The CIS Report would contain the basis for the probable cause for the arrest and prosecution of the criminal defendant. Ex. 1 at 2-7; Ex. 17 at 47, 57-58.

105. The second report is dated December 30, 2004 and is a Preliminary Progress Report that again describes the investigation—but with less detail than the CIS Report. The final three reports are Informational Summaries. Informational Summary #1 reflects Defendant Walker's interviews of Curry and is dated December 30, 2004. Informational Summary #2 reflects Defendant Walker's interviews of McClanahan and is dated December 30, 2004. Informational Summary #3 reflects Defendant Walker's interview of Janette Harmon Horton and is dated June 30, 2005. None of the reports are signed off by a supervisor. Ex. 1 at 13-20, 58-59.

106. These reports often reiterate her handwritten notes verbatim, except on several key pieces of evidence: (1) the name Richard Diggs, (2) how Richard Horton was introduced to the investigation, (3) the description McClanahan gives of the attacker's height, (4) the fact that Curry did not recognize the robber the day of the crime, and (5) that the perpetrator had the gun in his left hand. Ex. 1 at 2-7, 13-20, 44-48, 51, 58-59; Ex. 8 at 79-80.

***Defendant Walker Fabricated that McClanahan Never Gave Name of Alternative Suspect***

107. In her CIS Report, Preliminary Progress Report, and Informational Summary #2, Defendant Walker fabricated that McClanahan only gave her the name "Richard" during their

33

October 13, 2004 interview. She fabricated that he told her he was not sure of his last name but would be able to get it. That information is not reflected anywhere in the contemporaneous notes Walker took during the conversation three months previous and is instead actively rebutted by those notes, which show McClanahan provided the last name "Diggs." Ex. 1 at 2-7, 13-20, 46-48.

### *Defendant Walker Fabricated that McClanahan Gave Her the Name Richard Horton on October 28, 2004*

108.    According to her CIS Report, Defendant Walker first got a last name for the perpetrator on October 28, 2004 when McClanahan called her to give the name Richard Horton. This is false in two respects: Walker had gotten a last name earlier, and evidence in the record supports Walker actually being the one to introduce Horton's name into the investigation. First, McClanahan gave the last name Diggs to Detective Walker before the last name Horton was ever involved in the Loew Street robbery investigation. Second, Curry testified that Defendant Walker was the one who gave her the last name Horton, either having it written down or a photo of him, within days of the robbery. McClanahan and Curry testified at trial that they got the name from McClanahan's niece, Tracy, and also from Curry's daughter, Kim, but both Tracy and Kim disavow this account. Ex. 1 at 2-7, 44-48; Ex. 4 at 60, 90-91; Ex. 8 at 79-80; Ex. 16 at 57, 77, 98-99; Ex. 25 at 33, 53, 71-72.

### *Defendant Walker Fabricated the Height McClanahan Reported of the Perpetrator*

109.    In her Informational Summary #2, Defendant Walker states that McClanahan described the perpetrator as a Black male, with light skin, 6'0" tall, with bushy eyebrows and short, nappy hair. Her handwritten notes memorializing the interview make clear that this is not the description McClanahan gave. In addition to providing additional information about who he

34

believed the perpetrator to be, he told Defendant Walker that he believed the perpetrator was 5'9"-6'0". Ex. 1 at 18-20, 46-48.

### *Defendant Walker Fabricated that Curry Said She Could Identify the Perpetrator*

110. In her CIS Report, Preliminary Progress Report, and Informational Summary #1, Defendant Walker fabricated that Curry told her she recognized the suspect, was trying to figure out where she knew him from, and could identify him if she saw him again. That information is not contained in her handwritten notes of the October 9, 2004 conversation with Curry. In fact, Curry did not ever say those statements to her. In her deposition, Defendant Walker **admitted that Curry never actually told her she recognized the perpetrator or that she could identify the perpetrator if she saw him again**. This contradicts Walker's typed police reports, trial testimony, and Curry's trial testimony. Ex. 1 at 2-7, 13-17, 44-45; Ex. 17 at 102.

### *Defendant Walker Fabricated that McClanahan Saw the Face of the Robber*

111. In her Informational Summary #2, Defendant Walker states that McClanahan saw the face of the perpetrator during the robbery. This is not contained anywhere in her handwritten notes and is contradicted by what McClanahan told Officer Rhodeback on the day of the robbery. Ex. 1 at 8-12, 18-20, 46-48.

### *Defendant Walker's Fabricated Information Was Used to Charge Horton*

112. Despite the severity of the crime, Defendant Walker was the only detective assigned to investigate the Loew Street robbery. As such, she was the only one who investigated the case and created the investigative file that was used to approve charges against Horton. *See generally* Ex. 1.

113. Defendant Walker knew her typed police reports would be presented to the grand jury. She filed the criminal complaint and oversaw a warrant being issued for Horton's arrest on

35

December 15, 2004 and noted in her criminal investigative summary: "It is respectfully requested that the Franklin County Grand Jury indict Richard H. Horton for his involvement in the above-described offense for one count of Aggravated Robbery, 2911.01 (A-1) O.R.C., a felony of the first degree, and any and/or all other indictable offenses." Defendant Walker knew that her CIS Report would be read to the grand jury when deciding to indict Horton, and she knew that her fabricated statements would impact that decision. Ex. 1 at 2-7; Ex. 17 at 47, 57-58.

*Defendant Walker's Fabricated Information Was Used at Trial*

114. Defendant Walker testified in line with her fabricated reports that McClanahan only gave her the name "Richard, just Richard" during the October 13, 2004 interview. She never once mentioned that he had given the name of an altogether different person, Richard Diggs. Ex. 4 at 22, 119-20, 122-23.

115. Defendant Walker testified in line with her fabricated reports that she received a call from McClanahan saying the last name of the perpetrator was Horton. Ex. 4 at 122-23, 134.

116. Defendant Walker testified in line with her fabricated reports that McClanahan told her the perpetrator was 6'0" tall. Ex. 4 at 145.

117. Defendant Walker testified in line with her fabricated reports that Curry told her on the day of the robbery that she recognized the perpetrator and could identify him if she saw him again. Ex. 4 at 117.

118. Defendant Walker testified in line with her fabricated reports that the victims saw the face of the perpetrator during the robbery. Ex. 4 at 144.

119. Defendant Walker was reviewing her fabricated reports during her testimony. Ex. 4 at 145.

## XII. DEFENDANT WALKER SUPPRESSES CERTAIN EXCULPATORY AND IMPEACHMENT EVIDENCE

120. In addition to her fabrications, Defendant Walker suppressed certain exculpatory and impeachment evidence.

### *Defendant Walker Admits to Suppressing the Interview Notes Containing the Name "Richard Diggs"*

121. Walker's handwritten notes from her October 13, 2004 interview with McClanahan—containing the name Richard Diggs and the other descriptors of the perpetrator—were suppressed. In fact, as part of Plaintiff's post-conviction proceedings, the Franklin County Prosecutor's office investigated its own files and what the defense had at the time of Horton's criminal trial and entered into a stipulation stating:

- The Columbus Division of Police have created and maintained a file containing notes, reports and other documents related to the October 9, 2004 aggravated robbery of Richard McClanahan and Rhonda Curry. ("Police Reports" attached as Exhibit A to Defendant's Motion for New Trial.) This file includes handwritten notes that appear to reference interviews with Rhonda Curry and Richard McClanahan. The handwritten notes labelled as pages OJP 000048-000051 state, inter alia, "Can ID—Richard Diggs" and contain a description of the suspect as "5'9" — 6'0"." (Pages OIP 000048-000050, hereafter referred to as "Alleged Brady Material.").
- The .pdf file labelled "State's discovery," printed and attached to Defendant's Motion for New Trial as Exhibit D, is a complete and accurate account of all reports and notes from Columbus Division of Police that were in defense counsel's file at the time of Defendant's trial.
- If called to testify, Detective Brenda Walker would state that she has no recollection regarding why she wrote Richard Diggs's name in her notes.
- The parties stipulate and agree that Alleged Brady Material was not in defense counsel's file at the time of trial.
- The parties stipulate and agree that the Alleged Brady Material was not in the prosecutor's file at the time of trial.

Ex. 22 at 2.

122. At no point did Defendant Walker give her handwritten notes containing the name Richard Diggs to prosecutors or the defense. This includes all of the other information contained

37

in those handwritten notes such as the fact that according to McClanahan, the perpetrator lived in a red brick house on Reynolds Avenue—perhaps suppressed because Horton was listed as living on Camden Avenue at the time. Ex. 22 at 2; Ex. 17 at 235-36; Ex. 68 (Response to Request to Admit Nos. 10, 30).

123.    In her deposition, Defendant Walker admitted that she intentionally kept out her handwritten notes from the Loew Street robbery investigation—including the "Richard Diggs" notes. When asked why she did not disclose the notes or testify at trial that McClanahan had given her the name Richard Diggs, she said it was because Diggs wasn't the focus of her investigation and "because he's not the one that committed the offense." She was locked in on Richard Horton to such a degree that not even the fingerprints coming back excluding him changed her focus. Ex. 17 at 122, 135, 141, 235-36.

124.    Defendant Walker also never disclosed her handwritten notes memorializing her interview with Curry on October 9, 2004—including the information that the perpetrator held the gun in his left hand—to prosecutors or the defense. Ex. 17 at 235-36.

125.    In fact, the only handwritten notes that Defendant Walker provided to the prosecution were her handwritten notes from her interview of Janette Harmon Horton for Horton's alibi—which she conducted six months after his arrest at the direction of the Franklin County Prosecutor's Office. Ex. 41 at 31-33 (criminal defense file).

### Defendant Walker Suppresses Yet Additional Exculpatory and Impeachment Evidence

126.    Defendant Walker suppressed the additional photo identification procedures she conducted as part of the Loew Street robbery investigation, described *supra,* including the single photo showup she performed with Curry and single-line photo array. Nowhere in the investigative file did Defendant Walker document that she had shown a single photograph of

38

Horton to Curry, before Horton had ever been a suspect in the investigation, or a single-line photo array before showing her the December 4, 2004 photo array. The prosecution file contains no records indicating that such information was disclosed to them by the police, and this information is not mentioned at any point during the criminal trial. Ex. 1 (absence of any such documentation); Ex. 8 at 79-80, 298-300; *see generally* Ex. 42 (prosecutor's file).

127.    Defendant Walker also suppressed a latent print comparison that she requested be run during Horton's criminal trial. At the end of Defendant Walker's trial testimony, after the prosecution implied during re-direct that the latent prints could have simply belonged to the victims, a member of the jury contacted the Court to ask why the fingerprints had not been compared to the victims. The Court allowed Defendant Walker to answer, and she testified it was simply an oversight. The same day, Defendant Walker requested a latent print comparison between the victims and the two fingerprints. One came back as a match to McClanahan, but the other remained unidentified.[8] The results were sent directly to Defendant Walker. Defendant Walker never provided these latent print comparison results to prosecutors or the defense. Ex. 4 at 153; Ex. 43; Ex. 17 at 211-215.

128.    Defendant Walker suppressed the fact that she is the one who introduced the name Horton into the Loew Street robbery investigation by giving the name, or showing a single photograph of Horton, to Curry within days of the robbery. Ex. 1 (absence of any such documentation); Ex. 8 at 79-80; Ex. 41 (absence of any such documentation); Ex. 42 (absence of any such documentation).

---

[8] There is a disagreement in the record about whether the second print was sufficiently of value to compare. Ex. 1 at 14, 34; Ex. 43.

## XIII. DEFENDANT WALKER CONCEALED FROM THE PROSECUTION AND DEFENSE THE TRUE CIRCUMSTANCES RELATED TO THE EVIDENCE USED TO IMPLICATE RICHARD HORTON

129. At no point did Detective Walker disclose the above enumerated facts to the prosecution or defense. Ex. 41 (absence of any such documentation); Ex. 42 (absence of any such documentation); *see also* SOMF ¶¶107-28.

130. Nowhere in the investigative file did Defendant Walker document any of the circumstances or interactions with Curry that cast doubt on her identification of Plaintiff, including that she never told police she could identify the perpetrator, that she had a serious drug addiction, and that Walker had shown Curry multiple photographs of Horton prior to the December 4, 2004 array. The prosecution file contains no records indicating that such information was disclosed to them by the police, and this information is not mentioned at any point during the criminal trial. Ex. 1 (absence of any such documentation); Ex. 41 (absence of any such documentation); Ex. 42 (absence of any such documentation); Ex. 4 (absence of any such information); *see also* SOMF ¶¶107-28.

131. Nowhere in the investigative file did Defendant Walker document any of the circumstances or interactions with McClanahan that cast doubt on his identification of Plaintiff, including that he had identified someone else, that he had a serious drug addiction, that he gave a different height of the perpetrator, that he never told police he could see the face of the perpetrator, and that he never called her to give her the last name Horton. The prosecution file contains no records indicating that such information was disclosed to them by the police, and this information is not mentioned at any point during the criminal trial. Ex. 1 (absence of any such documentation); Ex. 41 (absence of any such documentation); Ex. 42 (absence of any such

40

documentation); Ex. 4 (absence of any such information); Ex. 68 (Response to Request to Admit Nos. 9, 10, 30); *see also* SOMF ¶¶107-28.

132. The State told the jury both its case and the defense's case hinged upon the accuracy of McClanahan and Curry's identifications:

> This case is about one thing—eyewitness identification. Specifically, whether Richard McClanahan and Rhonda Curry correctly identified the Defendant as the person who committed the crimes that we will be talking about . . . . The only issue the defense has, and the only issue that consequently the defense can argue about, is the eyewitness identification.

Ex. 4 at 276-277.

133. Prosecutors repeatedly emphasized that the identifications made by McClanahan and Curry were "consistent" and "added up." Ex. 4 at 276-277.

134. Had any of the above enumerated suppressed evidence or fabrications been brought to light, the prosecution's argument would have been severely undercut.

### *Despite Their Best Efforts, Plaintiff's Defense Attorneys Did Not Learn the Exculpatory and Impeaching Evidence Discussed Above*

135. Myron Schwartz and his granddaughter, Alissa Holfinger, were criminal defense attorneys who represented Horton during his criminal trial in 2006. In 2006, Schwartz and Holfinger were experienced defense attorneys who regularly defended murder cases. Ex. 44 at 13, 58-59.

136. During their representation of Horton, Schwartz and Holfinger served discovery requests and issued subpoenas for documents to the Columbus Division of Police and Franklin County Prosecutor's Officer seeking all the police reports, records, and any other evidence they had. The Franklin County Prosecutor's Officer served reciprocal discovery requests on Horton's defense team. Ex.44 at 18-19; Ex. 42 at 228-232.

41

137. Schwartz and Holfinger believed and trusted that they received all the evidence and documents that prosecutors had. Holfinger testified she does not believe the Franklin County Prosecutor's Officer would have withheld any exculpatory documents or evidence. Ex. 44 at 59-63.

138. Once they submitted discovery requests and subpoenas, Horton's defense counsel had no way of knowing whether CPD had produced all responsive documents. Ex. 44 at 59.

139. Holfinger and Schwartz would review all of the evidence they received and conduct follow-up investigations that they thought might aid their client, including investigating a potential alternative perpetrator or conferring with prosecutors about why a certain individual's name appeared in discovery. Ms. Holfinger confirmed they would "do everything that we can to obtain any information available for his defense." Ex. 44 at 43-46.

140. Despite their diligent investigation and discovery requests, Schwartz and Holfinger did not have the handwritten notes containing the name Richard Diggs or the different description McClanahan gave of the height of the perpetrator. If they would have had the handwritten notes, they would have investigated the information and would have used it several ways at trial—including during cross examinations of witnesses, opening statements, closing statements, and cross examinations of detectives. None of that happened here because Holfinger and Schwartz did not have the handwritten notes. They also did not have the handwritten notes containing the information that Curry saw the perpetrator with the gun in his left hand. Ex. 41 (suppressed information not in defense file); Ex. 17 at 235-36; Ex. 44 at 43-46, 60; Ex. 22 at 2.

141. Holfinger and Schwartz also did not receive the fingerprint comparison run by Defendant Walker during trial during which only one set of prints was matched to the victims. If they had, they would have introduced that evidence or addressed it in some way with the jury

42

because they knew the jury was interested in the results. Ex. 44 at 46-47, 61-62; *see also* SOMF ¶127.

142.    Schwartz and Holfinger defended Horton at trial to the best of their ability. If Schwartz and Holfinger had learned about the name Richard Diggs being given to police, McClanahan giving a shorter height for the perpetrator, Curry saying the perpetrator had the gun in his left hand, or had they learned about any other information favorable to Horton, they would have used it at trial. *See* SOMF ¶¶135-141.

## XIV.    HORTON FIRST LEARNS OF DEFENDANT WALKER'S SUPPRESSIONS AND FABRICATIONS

143.    Following his conviction, Horton continued to fight to prove his innocence with appeals, petitions for post-conviction relief, and evidentiary hearings.

144.    As part of his appeals and challenges to the eyewitness identifications, Horton was represented by an attorney named Carol Wright. In her deposition, Ms. Wright stated that it was her process to talk with whoever brought her the case, talk with the trial attorney and get their file, review the trial attorney's file, review the trial transcript, talk with the client and witnesses, and do a complete reinvestigation of the case. Ms. Wright testified that she took her job as a criminal defendant's advocate seriously and if she became aware of a *Brady* violation that she could use in her petition for post-conviction relief, she would have absolutely included it—regardless of what form it took, *i.e.*, typed police report vs. handwritten notes. She further testified that had she had the suppressed evidence, she would have investigated the information by talking to Horton, talking to the prosecutors, talking to trial defense counsel, talking with the detectives who investigated the case, talking with the alleged alternative perpetrator, and having an investigator run a background check. Ex. 45 at 12-13, 50-51, 67-68, 70-72.

43

145.    Ms. Wright also testified that while many clients claim innocence, Mr. Horton's claims stood out: "a few clients claim they're innocent and have . . . there was a difference in how he maintained his innocence. There was a certainty. There was a sincerity. He was very believable. My gut believed him." She testified she had only felt that way for two or three clients, and each was subsequently exonerated. Ex. 45 at 42-43.

146.    Horton's post-conviction petition was taken over by an attorney named David Thomas. Mr. Thomas testified that he reviewed all the documents he received from Ms. Wright and received the original file that Schwartz and Holfinger had at the time of trial. When he received those materials, it was not clear to him from his review that any documents were missing. His assessment at the time was that "this was one of those cases that unfortunately are more common than is, I think, known in the general public, which is there was an incomplete investigation, there was a shoddy identification process completed by the police, you know, the police investigation was incomplete." He testified that there was no way for him to know about police misconduct from the documents or his investigation. Ex. 46 at 16-17, 33-35, 61-63, 69, 117; Ex. 50 (Thomas affidavit).

147.    Mr. Thomas further testified that he would have expected all handwritten and field notes to be included in discovery—especially if they contained potentially exculpatory or impeaching information. He further testified that any omission of a victim's identification of a perpetrator's name from a police report would be exculpatory and something he would have done something about "regardless of the scope of [his] representation" because of the importance of being able to pursue third-party guilt. Even in the instance where a witness gives one name and then corrects it to another, Mr. Thomas testified he would still pursue that as exculpatory because it "affects the witness's credibility." The analysis is the same even if the alternative

44

perpetrator could not have committed the crime because it shows "confusion in the identification." Mr. Thomas testified that he did not have the suppressed evidence in this case because if he had, he would have used it. Mr. Thomas's representation of Horton ended when his petition was denied. Ex. 46 at 49-50, 61, 87-92, 109-11.

148.     In 2016, the Ohio Innocence Project took on Horton's representation. On April 10, 2017, in response to a March 2016 public records request, the Ohio Innocence Project received 61 pages of police reports from the Columbus Police Department for the Loew Street robbery. These reports included several pages that were missing from the original discovery at trial. Ex. 47 at 1-2 (Blake affidavit); Ex. 41 (absence of handwritten notes of interviews with McClanahan and Curry); Ex. 48 (Public Records Request response).

149.     Specifically, the reports contained the handwritten notes of Defendant Walker from her October 13, 2004 interview of McClanahan wherein he described the height of the attacker as somewhere in a range *under* six feet tall ("5'9" to 6'0" tall"). Walker's typed notes (created after Horton's arrest) stated that McClanahan described the attacker as 6'0" tall. Ex. 48 at 50; *see also* SOMF ¶¶42, 109, 116, 121-134.

150.     The handwritten notes also stated "Can ID" and then the following description: "M/B, 27-28, Everett Middle School. Richard Diggs—Adidas Boy. Reynolds Avenue." The fact that at least one of the victims apparently initially identified a different Richard—Richard Diggs—does not appear in the typed version of Walker's notes, anywhere in the defense's discovery file, anywhere in the prosecutor's file at the time of trial, or the testimony at trial. Ex.1 (absence of any such documentation in typed police reports); Ex. 4 (absence of any such testimony); Ex. 41 (absence of any such documentation); Ex. 42 (absence of any such documentation at time of trial); Ex. 48 at 50; *see also* SOMF ¶¶45-56, 108, 114, 121-134.

151.    The new documents also included the handwritten notes of Walker's interviews with Curry documenting that she never said she could identify the perpetrator the day of the offense—in contradiction to Defendant Walker's reports—and Curry said that the perpetrator was holding the gun in his left hand—something that was never included in Walker's reports or his trial testimony. Ex.1 (absence of any such documentation in typed police reports); Ex. 4 (absence of any such testimony); Ex. 41 (absence of any such documentation); Ex. 48 at 45-46, 53; *see also* SOMF ¶¶35, 110, 117-18.

152.    After reviewing the police file, the Ohio Innocence Project conducted a reasonably diligent investigation to determine whether the new information in the police reports had been disclosed. Horton confirmed that he "never heard the names Richard Diggs or Ricardo Diggs mentioned with anything involving [his] case until Summer 2017," and that if he had known that a different Richard had been named in the investigation, he would have "used this info to prove my innocence." Ex. 47 at 1; Ex. 49.

153.    After the public records request, the Ohio Innocence Project then received a latent print comparison that was run during Horton's criminal trial at the request of Defendant Walker. On January 31, 2006, Defendant Walker was asked by the jury who police did not run the fingerprints against the victims. Walker responded it was merely an oversight. That very day she requested the crime lab run the comparison. The results were that one set of prints was a match to McClanahan, and the other remained unidentified. The results were sent to her during Horton's criminal trial. Walker acknowledged in her deposition that it would have been her responsibility to send these results to prosecutors, but she did not provide these results to the prosecution or defense. Ex. 43 at 2-14; *see also* SOMF ¶127.

**XV.    NEW DNA TESTING PROVES HORTON'S INNOCENCE**

154.    In 2018, after the advancement in DNA testing technology, the Ohio Innocence Project filed an application on behalf of Horton for DNA testing to be performed on the bullet casing that was recovered from the Loew Street robbery crime scene. Ex. 36 (Application for DNA Testing); Ex. 63 (Elizabeth Benzinger affidavit).

155.    In 2019, Ohio Bureau of Criminal Investigation ("BCI") observed a latent fingerprint on the 9mm casing recovered from the scene. Although the fingerprint was not suitable for analysis or widespread comparison, BCI was able to conduct DNA testing on the surface of the casing. DNA testing produced a single, partial, male DNA profile. The profile does not match Richard Horton. The profile was also run against all BCI staff and through BCI's local database of DNA samples. No match was made. *See generally* Ex. 6; Ex. 51 at 1; *see also* SOMF ¶5.

156.    As part of the testing, Elizabeth Benzinger, the Director of Research, Development, and Training in the Laboratory Division at BCI, confirmed that the sample was degraded along the lines of what they would expect for a sample of that age. Ex. 51 at 1.

157.    As part of their investigation, the Franklin County Prosecutor's Officer entered into this stipulation with Horton's defense team concerning the DNA evidence:

  a. A single 9mm cartridge casing ("Casing") was collected from the scene of the crime on October 9, 2004. The parties stipulate and agree that this casing came from a 9mm pistol fired by the actual perpetrator in this matter.

  b. The Ohio Bureau of Criminal Investigation ("BCI") confirmed a single latent fingerprint on the surface of the Casing. The ridge detail on this fingerprint was not clear enough for comparison purposes.

  c. The parties stipulate and agree that Columbus police officers would have used proper evidence-handling techniques in collecting and storing the Casing, including wearing latex gloves and taking steps to minimize contamination. The parties stipulate and agree that a proper chain of custody concerning the Casing was maintained between its collection and its testing at BCI. The parties stipulate and agree that no law enforcement or court staff handled the Casing with their

bare hands between the time the casing was collected from the scene and the time it was swabbed for DNA at BCI.

d.  DNA testing was performed on the Casing in 2019. DNA testing used in this matter included new methods that were developed by BCI to recover touch-DNA from old cartridge casings. The parties stipulate and agree that these methods were not available to either party prior to 2019.

e.  As per the BCI report issued November 8, 2019 (attached to Exhibit J to Defendant's Motion for New Trial), DNA testing on the Casing revealed a single male profile. The parties stipulate and agree that Richard Horton was excluded as the source of this DNA.

Ex. 22 at 2-3.

### *Horton's Conviction Finally Vacated*

158.  Based on the newly-learned suppressed evidence and the DNA testing results, Horton's counsel moved for vacatur of his conviction and a new trial—which was granted. *See generally* Ex. 12; Ex. 52.

159.  Richard McClanahan had passed away prior to Horton's vacatur, so Horton's criminal counsel moved to exclude his testimony in any re-trial. The trial court agreed to exclude the testimony because (1) he could not be asked about the name Richard Diggs that he gave police but was not memorialized in any police report; (2) he could not be asked about the 5'9"-6'0" description he gave police but was not memorialized in any police report; (3) he could not be questioned about the "Reynolds Avenue" information when the police reports and complaint listed Horton as living on Camden Avenue; and (4) the parties stipulated that if Defendant Walker were called to testify, she would say she had no recollection as to why she wrote the name Richard Diggs in her handwritten notes. Horton also moved to exclude the prior testimony of Curry and Walker, but that was held in abeyance. Ex. 53 (McClanahan's obituary); Ex. 54 (Horton's Motion to Exclude Testimony); Ex. 55 (State's Response to Motion to Exclude); Ex. 56 (Horton's Reply in Support of Motion); Ex. 57 (Order granting Motion).

160. Rather than retry Horton, the State dropped all charges against him. Ex. 13; Ex. 14.

### XVI. THE CITY OF COLUMBUS AS THE MOVING FORCE BEHIND THE VIOLATION OF PLAINTIFF'S RIGHTS (*MONELL*)

161. Plaintiff's *Monell* allegations center on the City of Columbus's failure to train, supervise, and discipline. Plaintiff is pursuing multiple theories of liability, including the following: (a) the failure to train, supervise, and discipline Columbus police officers who engage in investigative misconduct of all types, including eyewitness manipulation, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations; and (b) deficient policies—both in express terms and through obvious omissions— that authorized Columbus police officers to engage in investigative misconduct of all types, including witness coercion, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations.

#### *The City's Admissions Regarding Policy Deficiencies*

162. The City of Columbus designated Sergeant Kirk Alt of the Research and Development Unit as the City's 30(b)(6) witness on, among others, the following topics: (a) the existence, content, and history of policies and practices governing the identification, documentation, preservation, and disclosure of exculpatory and impeachment evidence; (b) policies and practices governing report writing and investigative documentation; (c) policies governing eyewitness identification procedures; and (d) training provided to officers on these subjects. *See generally* Ex. 58 (Deposition of Kirk Alt); Ex. 59 (Plaintiff's 30(b)(6) Notice; Sgt. Kirk designated as the representative for Topics 1-7 [excluding Topic 1(b)]).

163.    The Research and Development Unit is responsible for writing and revising all division-wide publications, directives, and the emergency operations manual for the Columbus Division of Police. Ex. 58 at 9.

164.    Despite *Brady v. Maryland* being decided in 1963, Sgt. Alt admitted that the City of Columbus did not adopt any division-wide policy requiring officers to disclose exculpatory evidence to prosecutors until 2010 or 2011—more than half a decade after Plaintiff's arrest. Prior to that time, the City had no written policy governing officers' *Brady* obligations in criminal investigations. Ex. 58 at 20-38.

165.    *No Policy on Documentation or Timely Reporting*. Sgt. Alt testified that he is not aware of any policy—written or unwritten—requiring officers to memorialize exculpatory information in police reports or to ensure that investigative information is documented completely and accurately. He likewise could not identify any policy governing the timeliness of report writing or requiring officers to document all material information learned during an investigation. Ex. 58 at 20-38, 46-48.

166.    *No Policy on Preservation or Disclosure of Evidence*. The City's designee admitted that he is unaware of any policy requiring officers to turn over handwritten notes to prosecutors, to preserve such notes, or to otherwise ensure that exculpatory or impeachment material is disclosed. Nor is he aware of any policy defining what constitutes exculpatory evidence in practice or instructing officers how to identify it. Ex. 58 at 20-38, 58-60.

167.    *No Policies Governing Core Investigative Practices*. Sgt. Alt further testified that, during the relevant time period, the City lacked division-wide policies governing eyewitness identification procedures, including how photo arrays should be constructed or administered. The only guidance consisted of a basic form, not a policy or directive. He also confirmed that the

City could not locate Detective Bureau SOPs from the relevant period and could not determine whether any such policies existed or what they required. Ex. 58 at 39-41, 47-52, 60-61.

168.    *No Training on Brady Obligations*. Sgt. Alt testified that he is not aware of any training on Brady obligations during the relevant time period, nor any records establishing that such training occurred. At most, the City can point to generalized references requiring officers to follow the law, without any concrete guidance on how to comply with constitutional disclosure obligations. Ex. 58 at 56-59.

### *Lack of Training, Supervision, or Monitoring on Documentation Procedures and Identification Procedures*

169.    The City's 30(b)(6) witness could not identify any training provided to officers on their obligation to identify, document, preserve, or disclose exculpatory evidence. He likewise could not identify any training governing report writing practices to ensure completeness and accuracy, or any training governing eyewitness identification procedures. *See* SOMF ¶¶162-68.

170.    Nor could the City identify any system of supervision or monitoring designed to ensure compliance with constitutional requirements. The absence of policies defining what must be documented or disclosed necessarily precludes any meaningful supervision or discipline for failing to do so. *See* SOMF ¶¶162-68.

### *Defendant Walker's Admissions on CPD Policies & Practices*

171.    Defendant Walker testified that she did not recall receiving any specific training regarding exculpatory evidence or *Brady* obligations during her time with the department. Although she had a general understanding that exculpatory evidence should be disclosed, she could not recall being trained on what constitutes such evidence or the scope of her disclosure

51

obligations. Indeed, Walker testified that she had not heard of *Brady* or was unsure whether she had heard of it at all. Ex. 17 at 233-34.

172.    Consistent with this lack of training, Walker described departmental practices that systematically resulted in the non-disclosure of exculpatory material. She testified that detectives maintained two versions of investigative files: an "office copy," which included handwritten notes, and a separate file sent to prosecutors. Critically, Walker confirmed that it "wasn't practice" to provide handwritten notes to prosecutors—even where those notes contained substantive information—and that she "just never did it." As a result, material information recorded in handwritten notes routinely remained in police files and was never transmitted to the prosecution. Ex. 17 at 65-66, 235-36.

173.    Walker acknowledged that failing to disclose relevant or exculpatory information contained in notes would be improper. Nevertheless, she adhered to the department's standard practice of withholding handwritten notes from prosecutors. At the same time, Walker testified that she believed her legal obligation was satisfied so long as she provided the materials contained in the version of the investigative file she chose to send—demonstrating a fundamental misunderstanding of *Brady* obligations consistent with a lack of training. Ex. 17 at 235-40.

174.    The absence of policies and training extended beyond note disclosure. Walker could not recall any departmental policies or trainings governing notetaking, record retention, investigative file management, interviewing witnesses, interviewing suspects, photo identification procedures, or the disclosure of evidence to prosecutors. She did not recall there being any policies on photo identification procedures beyond reading the single-page Photo Array Procedure Form. She further testified that handwritten drafts of reports were routinely discarded after being typed, eliminating original source material. Supervisory review of reports

was inconsistent, and there were no clear requirements regarding when or how investigative steps had to be documented. Ex. 17 at 32, 53-54, 63, 67, 71, 233-34.

175.    Walker admitted that critical investigative information was omitted from formal reports, including in this case, such as investigative steps, inconsistencies in witness descriptions, limitations on the witnesses' ability to observe the perpetrator, and investigative leads that were not pursued. These omissions were consistent with a system in which detectives exercised unfettered discretion over what information to document and disclose, without guidance, training, or oversight. Ex. 17 at 115-16, 128, 200, 204-05.

### *Report of Plaintiff's Retained Expert Thomas Tiderington*

176.    Plaintiff retained Thomas Tiderington, a police practices expert with over forty years of experience in law enforcement, to provide opinion testimony about the Columbus Division of Police's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as well as the police investigation in this case. Ex. 60 (Tiderington Report); Ex. 61 (Tiderington Rebuttal Report); Ex. 62 (Tiderington Declaration).

177.    Tiderington spent 44 years as a law enforcement officer, including serving as a Police Chief for two decades. He served with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. Tiderington has trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations, and has been an instructor and lecturer at numerous regional, national, and international law enforcement training events on a wide variety of police practices and criminal investigations. In his capacity as Police Chief over twenty years, Tiderington reviewed and approved policy and procedures relating to every aspect of police

53

operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. *See generally* Ex. 60; Ex. 62 at 60-68 (CV).

178.    Tiderington concluded that the City's policies and practices governing the documentation, preservation, and disclosure of investigative information were "woefully inadequate" and contrary to generally accepted police practices. He found no evidence that the City had any policy, practice, or training requiring officers to document all investigative information, memorialize exculpatory evidence, or ensure its disclosure to prosecutors. His findings are consistent with, and corroborated by, the testimony of the City's 30(b)(6) witness. Ex. 60 at 29-32.

179.    Tiderington further opines that the City's failure to adopt *Brady*-compliant policies and training was a direct and substantial factor in the suppression of exculpatory evidence in this case. According to Tiderington, the absence of such policies left officers without guidance or accountability, making it far more likely that critical exculpatory information would not be documented or disclosed. Ex. 60 at 29-32.

180.    Chief Tiderington's opinions regarding these failures went entirely unrebutted. During expert discovery, the Defendants disclosed two retained experts and two rebuttal experts. Among them, they disclosed one former law enforcement practitioner, Timothy Dixon, to opine about the underlying investigation in this matter. Mr. Dixon does not express any opinions about CPD's lack of policies regarding documentation and disclosure generally. In addition, the City also disclosed the lead prosecutor in Plaintiff's criminal trial, Doug Stead, as a rebuttal "expert" ostensibly to opine about criminal discovery in Franklin County;[9] Mr. Stead has never worked in

---

[9] Along with a number of other matters that are either not proper rebuttal or are beyond the scope of proper expert testimony that Plaintiff will be moving to bar. Stead is a fact witness. His "report" is largely

a police department, has never served as an expert before, is not an expert in police

policymaking, and is not offering any opinions about the lack of documentation and disclosure

policies or training on those topics. *See* Dkt. 142-3 (Stead Report) at PAGEID #: 8991-8993.

## LEGAL STANDARD

Summary judgment is warranted only where "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears this initial

burden of showing no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir.

1993).

"In making that determination, a court must view the evidence '"in the light most

favorable to the opposing party.'" *Tolan*, 572 U.S. at 657 (quoting *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157 (1970)). As a consequence, this Court may not blindly accept Defendants'

denials of liability; it "must look at the circumstantial evidence that, if believed, would tend to

discredit the police officer's story" *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (citation

omitted); *see Slinger v. Pendaform Co.*, 2019 WL 3035589, at *3 (6th Cir. July 11, 2019) (noting

that a defendant's "subjective belief cannot overcome a dispute of material fact in the face of a

reasonable inference to the contrary in the non-movant's favor" because [c]rediting the movant's

gloss on or subjective belief about the facts does not satisfy Rule 56.") (citing *Tolan*, 572 U.S. at

659) ("Considered together, these facts lead to the inescapable conclusion that the court below

credited the evidence of the party seeking summary judgment and failed properly to

---

his musings on Plaintiff's conviction and his relationship with Defendant Walker. Further, no expert proffered by Defendants provided any declaration of sworn testimony regarding their report and, as such, it is not proper evidence to consider at summary judgment as discussed *infra.*

acknowledge key evidence offered by the party opposing that motion.")). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255.

A plaintiff can prove her case with both direct and circumstantial evidence, *United Sates v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010), as "a jury is 'allowed to make reasonable inferences from facts proven in evidence having a reasonable tendency to sustain them.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019) (quoting *Galloway v. United States*, 319 U.S. 372, 396 (1943)).

When a defendant invokes qualified immunity, the Court assesses whether: (1) the facts make out the violation of a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A defendant is not entitled to immunity if it is obvious that no reasonably competent law enforcement officer would have concluded that the defendant's actions were lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010) (internal quotation marks and citation omitted).

## ARGUMENT

This is not a case that can be resolved on summary judgment. When the record is viewed—as it must be—in the light most favorable to Plaintiff, it supports a straightforward and deeply troubling conclusion: Defendant Walker fabricated evidence to secure Plaintiff's arrest

56

and conviction, suppressed copious and powerful exculpatory and impeachment material that would have led to a different result at trial, and employed unduly suggestive identification procedures that irreparably tainted the case against Plaintiff from the start. Substantial evidence likewise supports Plaintiff's claim that this misconduct was the product of the City of Columbus's policies and practices. At minimum, the record reveals pervasive and material factual disputes that only a jury can resolve. Defendants' motions should be denied.

Defendants' briefing largely ignores the governing standard. Summary judgment is appropriate only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Courts may not weigh evidence, assess credibility, or draw inferences in favor of the moving party—those are functions reserved for the jury. *Anderson,* 477 U.S. at 255. Yet Defendants' arguments repeatedly depend on precisely that impermissible approach, advancing a version of events that conflicts with record evidence and asking the Court to do what it cannot: credit their account, disregard contrary evidence, and short-circuit the jury's role.

This brief proceeds in four parts. First, it outlines those of Plaintiff's theories on which Defendants do not move for summary judgment, on which there will be a trial. Second, it explains that Sixth Circuit law holds that this Court need not parse sub-theories of liability and items of evidence at summary judgment in a case like this one, where it is clear the case will proceed to trial on a due process claim against Defendants. Third, it sets out why each of Defendant Walker's legal arguments must be rejected and outlines the hotly disputed facts that preclude summary judgment for Defendant Walker. Each turns on disputed facts and competing inferences that cannot be resolved as a matter of law. And fourth, it explains why genuine disputes of fact preclude summary judgment on Plaintiff's *Monell* claims that the City's (lack of)

policies and failure to train and supervise caused the suppression of evidence in this case, and let Walker fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings, as occurred in Horton's criminal case.

In short, this case presents precisely the kind of fact-intensive disputes that preclude summary judgment. Examining the record in the light most favorable to Plaintiff and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved—save for Plaintiff's below concessions on his conspiracy and failure to intervene claims. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' legal arguments lack merit and contradict deeply established Supreme Court and Sixth Circuit cases. Because genuine issues of material fact pervade every claim and because Defendants' legal arguments lack merit, their motion must be denied as described below.

## I.  DEFENDANTS FORFEIT CHALLENGES TO HORTON'S THEORIES

It is first important to note that Defendants do not include any argument in their motion for summary judgment on the following due process theories:

- Walker's suppression of the unduly suggestive single-line photo array shown to Rhonda Curry before the December 4, 2004 photo array;

- Walker's suppression of the fact that Horton was made a suspect by Defendant Walker before any evidence implicated him;

- Walker's fabrication of the December 29, 2004 CIS Report saying she got the name Richard Horton from Richard McClanahan on October 28, 2004, when she introduced the name;

- Walker's fabrication of her Informational Summary #2 saying Richard McClanahan told her he could see the face of the perpetrator, when he did not say that.

Defendants had ample notice of these theories of liability. *See* Ex. 69 at 9-12 (Response to Interrogatory No. 24).

Because Defendants do not move for summary judgment on a number of Plaintiff's theories that they violated his right to a fair trial, they are not entitled to summary judgment. Defendants bear the burden of showing there is no evidence on which a reasonable jury could find for Plaintiff on any of his claims against each of them. *Celotex Corp.*, 477 U.S. at 331-32. The fact that Defendants have not moved for summary judgment on several theories supporting Horton's claims, means that those uncontested theories must be tried, and that Defendants are not entitled to judgment on any claim. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient . . . . [A] party who moves for summary judgment . . . must affirmatively show the absence of evidence in the record."); *see also Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]").

Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. It is well settled that a movant cannot raise new issues for the first time in a reply brief because consideration of such issues "deprives the non-moving party of its opportunity to address the new arguments." *Cooper v. Shelby County*, No. 07–2283, 2010 WL 3211677, at *3 n. 14 (W.D. Tenn. Aug. 10, 2010) (collecting Sixth Circuit and district court cases discussing this principle); *see also Helicopters v. City of Columbus,* 879 F. Supp. 2d 775, 779 (S.D. Ohio 2012) ("This

59

Court has explained time and again that 'a reply brief is not the proper place to raise an issue for the first time.'").

## II. SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S FABRICATION OF EVIDENCE CLAIM

### A. There is Sufficient Evidence for a Reasonable Jury to Conclude That Defendant Walker Fabricated False Evidence Against Plaintiff

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006); *see also id*. at 744–45 (denying qualified immunity to police lab analyst for fabricating notes); *Spurlock v. Satterfield*, 167 F.3d 995, 998–99, 1005–06 (6th Cir. 1999) (police fabrication of witness testimony violates due process and is not entitled to qualified immunity); *Webb v. United States*, 789 F.3d 647, 667–70 (6th Cir. 2015) (false statements in police reports give rise to a due process fabrication of evidence claim). Moreover, "a claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997); *France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016). "[C]onvictions premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017).

To be actionable, fabricated evidence need not be actually admitted at trial; police reports are rarely actually admitted in criminal proceedings. Instead, where evidence is the result of "pretrial fabrication efforts by [the officers]," due process is implicated where the evidence "affected the course of the criminal proceedings" because it "comprise[d] part of the documentary record before the prosecution and defense." *Gregory*, 444 F.3d at 741. The "very

60

existence" of fabricated evidence, "even if not introduced as evidence at trial," can impact a

"criminal prosecution independent of the officers' testimony." *Id*. Indeed, "police investigative

materials have evidentiary value wholly apart from assisting trial testimony—they 'comprise part

of the documentary record before the prosecution and defense' and affect charging decisions,

plea bargaining, and cross examination of the investigating officers." *Lisker v. City of Los

Angeles*, 780 F.3d 1237, 1242 (9th Cir. 2015) (quoting *Gregory*, 444 F.3d at 741); see *Jackson*,

925 F.3d at 821-22 (holding fabricated evidence need not be admitted to implicate due process).

Thus, it is well established that a fabrication of evidence claim can be based on false police

reports, so long as "a reasonable likelihood exists that the false evidence would have affected the

decision of the jury." *Gregory*, 444 F.3d at 737.

Viewing the evidence and inferences in Plaintiff's favor, there is more than enough

evidence for a jury to conclude that Defendant Walker fabricated the following pieces of

evidence, which affected the course of the prosecution:

- (1) *No Last Name.* McClanahan only gave Defendant Walker the first name Richard in his October 13, 2004 interview and no last name. *See* CIS Report, Preliminary Progress Report, and Informational Summary #2. Ex. 1 at 2-7, 13-15, 18-20.

- (2) *Horton Name Introduced.*[10] Defendant Walker first received a last name of the perpetrator on October 28, 2004 when McClanahan called her to give the name Richard Horton. *See* CIS Report. Ex. 1 at 2-7.

- (3) *Height of Perpetrator.* McClanahan said the height of the perpetrator was 6'0" during his October 13, 2004 interview. *See* Informational Summary #2. Ex. 1 at 18-20.

- (4) *Curry Recognized Perpetrator.* Curry said she could see the face of the perpetrator during her October 9, 2004 interview with Defendant Walker. *See* CIS Report, Preliminary Progress Report, and Informational Summary #1. Ex. 1 at 2-7, 13-17.

---

[10] Defendants do not challenge this theory of liability.

- (5) *McClanahan Saw Face of Perpetrator*.[11] McClanahan said he saw the face of the robber during his October 13, 2004 interview. *See* Informational Summary #2. Ex. 1 at 18-20.

Defendant Walker knowingly fabricated each of these items of evidence, and all five speak to the reliability of the witnesses and the ability of the witnesses to identify the perpetrator. In a case where the only evidence against the criminal defendant is eyewitness identifications introduced at trial, it is obvious that a reasonable likelihood exists that the false evidence affected the decision of the jury. Walker also testified in line with her reports and had them available in front of her, visible to the jury. SOMF ¶¶114-19. Horton took the stand to try and defend himself and rebut the false identifications but was hampered by this false evidence.

Moreover, fabricated evidence that is used as the "basis for a criminal charge" can also form the basis for a § 1983 claim because, absent that evidence, there would have been no jury. *Jackson,* 925 F.3d at 816 (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)). It is without question that Defendant Walker's fabricated reports were used as the basis for charging Horton. She is the only detective who worked the Loew Street robbery, and she directly oversaw the criminal complaint being issued against Horton. SOMF ¶¶103-19. She is also the one who ordered CPD to arrest Horton and included fabricated statements in her CIS Report *knowing* that it would be read to the grand jury and was the basis for the indictment. SOMF ¶¶103-13. Put simply, without her fabricated statements, there would have been no jury.

This is sufficient for a reasonable jury to conclude that Defendant Walker's fabrications deprived Horton of his liberty in some way and thus violated due process, making summary judgment inappropriate. *Gregory*, 444 F.3d at 741.

---

[11] Defendants do not challenge this theory of liability.

62

**B. It Was Clearly Established in 2004 that Fabrication of Evidence is a Due Process Violation, and Defendants Do Not Contest This Point**

Defendants make no argument that Defendant Walker is entitled to qualified immunity on Horton's fabrication claims. As such, that argument is waived. *Cooper*, 2010 WL 3211677, at *3 n. 14; *Helicopters,* 879 F. Supp. 2d at 779.

Out of an abundance of caution, Plaintiff makes clear that the Supreme Court has long held that the due process clause of the Fourteenth Amendment prohibits the use of false evidence, including fabrications by police officers, in state criminal prosecutions. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (*per curiam*) (state actors violate due process rights when they "depriv[e] a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured"); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (same); *Pyle v. Kansas*, 317 U.S. 213, 215–16 (1942) (allegations of false statements and perjured testimony made under threat by local police violates due process); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same principle).

The circuit courts, of course, apply this binding guidance. *See, e.g., Spurlock*, 167 F.3d at 1005 (relying on *Mooney* and *Pyle* when holding that police fabrication and coercion of witness testimony violated due process in 1990); *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) ("The knowing use of false or perjured testimony constitutes a denial of due process" where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury") (relying on *United States v. Bagley*, 473 U.S. 667, 679 n.8 (1989), which in turn relied on *Mooney*, *Pyle*, and *Napue*); *Jackson,* 925 F.3d at 825-26 (citing *Mooney* and citing *Mooney* and *Pyle* when recognizing that the it was clearly established in 1975, and in fact going as far back as 1935, that fabrication of evidence for use in a criminal case violates due process); *Bradford v. Johnson*, 476 F.2d 66, 66 (6th Cir. 1973) (finding it has long been

63

established that the use of fabricated evidence violates a defendant's "Constitutional right to due process of law."); *see also, e.g., Curran v. Delaware*, 259 F.2d 707, 713 (3rd Cir. 1958) (stating that when law enforcement officers procure false testimony it violates the right described in *Mooney* and *Pyle*); *Smith v. Florida*, 410 F.2d 1349, 1350–51 (5th Cir. 1969) (same).

These decisions would have put a reasonable officer in Walker's position on notice that any participation in fabricating evidence was unlawful. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *United States v. Lanier*, 520 U.S. 259, 271 (1997).

### III. SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S *BRADY* CLAIM

**A. There is Sufficient Evidence for a Reasonable Jury to Conclude That Defendant Walker Violated Plaintiff's *Brady* Right to Exculpatory and Impeachment Evidence**

Under *Brady v. Maryland* and its progeny, suppression of evidence favorable to the defense violates due process where that evidence is material either to guilt or to punishment regardless of the good or bad faith of the prosecution. 373 U.S. 83 (1963); *Youngblood v. West Virginia*, 547 U.S. 867 (2006) (*per curiam*); *Giglio v. United States*, 405 U.S. 150 (1972); *Clark v. Louisville-Jefferson Cnty. Metro Gov't*, 130 F.4th 571, 579 (6th Cir. 2025). Due Process requires disclosure of impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1976). Prosecutors are not the only state actors bound by *Brady*, and "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Jackson*, 925 F.3d at 814; *see also Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Where the police are concerned, the exculpatory value of the evidence must be "apparent," meaning the officer must be "aware that the evidence 'could form a basis for

64

exonerating the defendant.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir.2014) (quoting *Moldowan*, 578 F.3d at 384, 388); *see also California v. Trombetta*, 467 U.S. 479, 489 (1984). "This additional burden, however, merely reflects that materiality is a legal question that the police are not trained to make, and thereby accounts for the practical concern that the police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence." *Moldowan*, 578 F.3d at 388.

As the Sixth Circuit makes clear, *Brady* claims have three elements: "'[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.'" *Jackson*, 925 F.3d at 814 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *see also Salter v. City of Detroit*, 133 F.4th 527, 536 (6th Cir. 2025), *cert. denied sub nom. Olsen v. Salter*, No. 25-378, 2026 WL 490553 (U.S. Feb. 23, 2026).[12]

### 1. The Evidence Suppressed by Defendant Walker Was Favorable to Plaintiff

"Favorable" evidence under *Brady* includes both directly exculpating evidence and impeachment material. *See Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir.2003) ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"); *Strickler,* 527 U.S. at 282 (it is well established that evidence can be favorable "either because it is exculpatory, or because it is impeaching."). Favorability is a "relatively low

---

[12] The format of the *Brady* evidence is irrelevant. *Bell v. Bell*, 512 F.3d 223, 236 (6th Cir. 2008) (analyzing whether prosecutor's informal notes from meeting with a witness constituted *Brady* material); *Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015) (analyzing therapist's handwritten notes); *Provience v. City of Detroit*, 529 F. App'x 661, 667 (6th Cir. 2013) (handwritten notes are *Brady* material); *Jackson v. Anderson*, 141 F. Supp. 2d 811, 832 (N.D. Ohio 2001) (suggesting *Brady* violation would be found where there is evidence that police officer's "handwritten notes contained material evidence which differs from the typed summary").

threshold to meet." *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021). Plaintiff meets that burden here.

As described above, the record indicates that Defendant Walker suppressed the following evidence:

- (1) *Richard Diggs.*[13] Richard McClanahan provided the name Richard Diggs, along with other identifying information to Defendant Walker on October 13, 2004. She did not include it in any report or disclose it to prosecutors or Horton's defense. SOMF ¶¶39-56, 103-25.

- (2) *Gun in Left Hand.*[14] Curry told Defendant Walker that the perpetrator was holding the gun in his left hand. Walker did not include it in any report or disclose it to prosecutors or Horton's defense. SOMF ¶¶69, 106, 124, 140-142.

- (3) *Latent Fingerprint Comparison.*[15] Defendant Walker received latent print comparison results during Horton's criminal trial that indicated one set of lifted prints remained unidentified and could have yet still belonged to the real perpetrator. Walker did not disclose this report to prosecutors or Horton's defense. SOMF ¶¶127, 153.

- (4) *Single Photo Identification Procedure.*[16] Curry testified that Defendant Walker showed her a single photograph of Horton that may have had his name written on it within days of the robbery. Walker did not include it in any report or disclose it to prosecutors or Horton's defense. SOMF ¶¶58, 62, 126.

- (5) *Single-Line Photo Array.*[17] Curry testified that Defendant Walker showed her a single-line photo array containing Horton prior to the December 4, 2004 array. Walker did not include it in any report or disclose it to prosecutors or Horton's defense. SOMF ¶¶63, 126.

- (6) *Walker Introduces Name Horton.*[18] Curry testified that she first heard the name Horton from Defendant Walker within days of the robbery. Walker did not

---

[13] Defendants only challenge the favorability and materiality of this evidence. *See* Dkt. 142 at 60-72.

[14] Defendants only challenge the materiality of this evidence. *See* Dkt. 142 at 72-73.

[15] Defendants only challenge the factual record—namely whether a set of fingerprints remained unidentified. *See* Dkt. 142 at 73-74.

[16] Defendants do not challenge this item of suppressed evidence at summary judgment. *See generally* Dkt. 142.

[17] Defendants do not challenge this item of suppressed evidence at summary judgment. *See generally* Dkt. 142.

[18] Defendants do not challenge this item of suppressed evidence at summary judgment. *See generally* Dkt. 142.

include this information in any report or disclose it to prosecutors or Horton's defense. SOMF ¶¶58, 62, 126.

All of the foregoing was material and favorable to Horton's defense.

Information that indicates another perpetrator is favorable. *Buehner v. City of Cleveland*, 788 F. Supp. 3d 827, 906 (N.D. Ohio 2025) (finding information indicating an alternative suspect favorable); *Est. of Andrews v. City of Cleveland, Ohio*, 112 F.4th 436, 444 (6th Cir. 2024) (same); *Jamison v. Collins*, 291 F.3d 380, 389 (6th Cir. 2002) ("identification of different suspects by an eyewitness to the crime is undoubtedly the sort of favorable evidence contemplated by *Brady*.") (citations omitted); *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) ("[w]ithholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'") (second alteration in original) (quoting *United States v. Jernigan*, 492 F.3d 1050, 1056–57 (9th Cir. 2007) (*en banc*)). As such, the evidence pointing to another perpetrator—including the Diggs notes, that the perpetrator may have been left-handed when Horton is not, and that one set of fingerprints did not belong to Curry or McClanahan—would also be favorable to Horton's defense.

Information that can impeach a witness is also favorable. *Shephard v. Metz*, 453 F. Supp. 3d 924, 937 (E.D. Mich. 2020) (finding evidence favorable because plaintiff could have used it to impeach an individual's trial testimony). Confusion or error in the identification of a criminal defendant is favorable. *McNeill*, 10 F.4th at 598–99 (finding evidence that witness did not immediately correctly identify criminal defendant as favorable). As such, the suppressed evidence of the suggestive photo identification procedures and Defendant Walker being the one

67

to introduce the name Richard Horton into the investigation instead of the victims would clearly be favorable to Horton's defense.

Defendants only challenge the favorability of Walker's handwritten notes containing the name Richard Diggs. Defendants erroneously argue that because Richard Diggs was incarcerated at the time of the Loew Street robbery, the handwritten notes containing his name and the other identifying information cannot be favorable. That argument is faulty.

"'[A] positive identification of different suspects by an eyewitness to the crime' is undoubtedly the sort of favorable evidence contemplated by *Brady*." *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019) (quoting *Jamison*, 291 F.3d at 389). This prior inconsistent identification need not have been of a plausible alternative suspect to be favorable to Plaintiff. An important prosecution witness's incorrect prior identification of a different suspect is valuable impeachment evidence whether or not the identified person is ultimately a credible alternative suspect or not. *See Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) ("Considerable authority from the Supreme Court and our court indicates that a defendant suffers [*Brady*] prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness" (collecting cases)). Because of the importance of McClanahan's testimony at trial, the prior identification is both favorable and material. *See Jamison,* 291 F.3d at 389. And here, unlike in *McNeill v. Bagley*, there was not such "unusually powerful" inculpatory evidence that impeachment of a key prosecution witness would not create a reasonable probability of a different result. 10 F.4th at 602. Aside from Curry and McClanahan's testimony, there was no other inculpatory evidence in the case. Also distinguishing this case from *McNeill* is the fact that McClanahan initially identified someone

68

else entirely, whereas the witness there initially failed to make an identification but had very clear recollections about the defendant's appearance and actions. *See id*. at 599–600.

Critically, Walker *did not know at the time that Richard Diggs was not a credible alternative suspect*. She performed no investigation whatsoever into Diggs and did not know he was incarcerated at the time, so the inclusion of his name in her handwritten notes was undeniably exculpatory from her perspective. While officers are not required to "turn over every last suspect considered in the course of an investigation," they must disclose "legitimate suspects" even if there is not strong evidence of their guilt. *Jamison*, 291 F.3d at 390–91. It is only when the police have "substantial exculpatory evidence to conclude that" an alternate suspect is innocent does *Brady* cease requiring disclosure. *See Coe v. Bell*, 161 F.3d 320, 345 n. 4 (6th Cir. 1998); *see also McNeill*, 10 F.4th at 599 (finding a police report not favorable because the alternative perpetrator was "definitively eliminated . . . . The quick removal of this suspect from the investigation means that this report is not, in fact, favorable."); *Clark*, 934 F.3d at 492 (finding that a witness identifying an alternative perpetrator is *Brady* material even if the identification is not credible); *Dennis v. Sec'y, Pennsylvania Dep't of Corr*., 834 F.3d 263, 306 (3d Cir. 2016) ("There is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the [State] fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material."); *Moldowan*, 519 F. Supp. 3d at 814 (police have a "*Brady*-derived responsibility to turn over *potentially* exculpatory evidence to the prosecutor's office." (quoting *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (emphasis added)).

Defendants concede this in their brief when they clarify the difference between *Siggers* and *Moldowan*. *See* Dkt. 142 at 70 ("The Court in *Moldowan* had little trouble holding that these

69

facts, if proven at trial, would constitute a *Brady* violation. But as *Siggers* noted, '[t]here was no evidence in *Moldowan* that the police investigation had eliminated any of the undisclosed persons as suspects.'"). That is exactly the case here.

There is absolutely no evidence in the record that Defendant Walker performed any kind of investigation into Richard Diggs. SOMF ¶¶48-49. She did not run his prints against the latent fingerprints recovered. *Id.* She has no memory of ever conducting any investigation into him, and there is no evidence in the record that she did. *Id.* She admitted as much in her deposition. *Id.* As such, she would not have known he was incarcerated. Further, even if she had investigated him, his incarceration would not have appeared as he was incarcerated under his brother's name at the time—meaning he would not have been excluded anyway. *Id.* Defendants attempt to construe the facts their way and argue that McClanahan only ever gave the name Diggs as a placeholder for Horton, but that is improper at summary judgment and is properly reserved for the jury to decide. Construing the facts in Plaintiff's favor as a court must at summary judgment, a jury could reasonably conclude that McClanahan gave the name Richard Diggs firmly intending to identify him as the person who robbed him. And McClanahan may have actually meant Richard's brother Riccardo, who was not in prison at the time and is a legitimate alternative suspect still today.

Even if Walker had subjectively believed that Diggs was not a legitimate suspect, that would not justify withholding the information about the identification given the weight that was later put on McClanahan's identification of Plaintiff. "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that the criminal trial, as distinct from the prosecutor's [or police's] private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations." *Gumm*, 775 F.3d at 364 (cleaned up) (citing *Kyles*, 514

70

U.S. at 440). Favorable evidence is not limited to "evidence that is ultimately deemed credible." *Clark*, 934 F.3d at 492. Additionally, "the fact that police had received reports about multiple other suspects" would also have been material evidence that "could have been introduced at trial to call into question the thoroughness of the investigation." *Gumm*, 775 F.3d at 370.

Defendants' reliance on *Jones v. City of Akron* is inapposite. In that case, there was no evidence whatsoever that any of the information contained in the "field notes" was exculpatory or impeachment evidence. *See* No. 5:14 CV 2618, 2018 WL 1912535, at *10 (N.D. Ohio Apr. 23, 2018). In *Jones*, the only information contained in the notes was that the perpetrator may have looked like Person B but only if Person B had shorter hair and was clean shaven. If not, it was Person A. The conditional qualifiers convinced the court that the description was not actually an attempt to identify the perpetrator because it provided specific parameters under which it would be Person A or B, and those parameters dictated it was not Person B. *See id.* That is not the case here. McClanahan did not give any such qualifiers or make any conditional statements. Rather, he gave an affirmative statement to Defendant Walker about who he believed committed this heinous crime against him. And *Jones* still made clear that all *Brady* material needed to be disclosed to prosecutors, regardless of whether it was in a police report or a field note. *See id.*

McClanahan's naming a different person as who he believed the perpetrator to be four days after the crime is clearly favorable (and material). "[I]t is difficult to imagine information more material to the preparation of the defense than credibility items for critical or major government witnesses." *United States v. Five Persons*, 472 F.Supp. 64, 67 (D.N.J.1979) (emphasis supplied). In *Giglio*, 405 U.S. at 154, the Court held that "[w]hen the 'reliability of a

given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady* rule]." (citation omitted).

Witness credibility was the most important issue in Horton's criminal trial because it was the only evidence that implicated him in the robbery. The prosecution stated as such. The fact that one of the two key witnesses originally gave the name of someone else is obviously impeaching. A jury could find that McClanahan did not make up a last name or equivocate but actually believed that a man he knew as Richard Diggs was his assailant. Even if he was wrong, or if he confused Richard Diggs for someone else like Riccardo Diggs, it would still be impeaching because one of the two eyewitnesses, who provided the *only* evidence against Horton, said early on in the investigation that it was someone else. That is ripe grounds for cross examination and calls the witness's credibility and ability to identify the perpetrator into question.

Finally, contrary to Defendants' argument the suppressed evidence is in no way cumulative. McClanahan giving the first name Richard and providing his last name later is in no way the same as him giving the name of *a completely different person* who lived in the same neighborhood he was robbed in. They do not have the same implications for his credibility or ability to identify the perpetrator and are thus not cumulative.

Construing the record in a favorable way to Plaintiff, there is sufficient evidence for a jury to find the suppressed information was favorable to Horton.

### 2. The Evidence Was Intentionally Suppressed by Defendant Walker

It is not in dispute that the evidence listed above was suppressed by Defendant Walker, and this prong is satisfied. Defendant Walker admitted in her deposition that she suppressed her handwritten notes of her interviews with McClanahan and Curry. She also admitted it would

72

have been her responsibility to send the latent print comparison results to the prosecution, and they did not receive them. Defendants do not contest this prong in their brief. *See generally* Dkt. 142. Defendant Walker claims she did not conduct any photo identification procedure with McClanahan or Curry outside of the December 4, 2004 photo array, but Curry testified that she did and a jury will need to resolve that question. If Walker did conduct additional photo showups, then her failure to document that was yet another suppression of exculpatory evidence.

Moreover, Plaintiff does not need to show any act of malice or bad faith in Walker's suppressing the evidence. *Clark*, 130 F.4th at 579 (citing *Moldowan*, 578 F.3d at 388). It also does not matter if the exculpatory information was not provided pursuant to some policy or practice, *i.e.*, not providing handwritten notes.[19] *Id.* The focus is on whether the *Brady* information was suppressed by the officer, and Defendants do not dispute it was in this case.

### 3. Suppression of Evidence Prejudiced Plaintiff's Defense

To show prejudice, Plaintiff "need not show that he 'more likely than not' would have been acquitted had the evidence been admitted. . . . He must only show that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); *see also Kyles*, 514 U.S. at 434. To undermine confidence, a plaintiff must show there is "any reasonable likelihood" the evidence could have "affected the judgment of the jury." *Wearry*, 577 U.S. at 392 (quoting *Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 271). In determining reasonable probability, the question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Castleberry*, 349 F.3d at 291

---

[19] Defendants provide a lengthy argument about Rule 16, but state criminal procedural rules do not supersede *Brady* obligations. Further, Mr. Thomas testified in his deposition that there was language in the old version of Rule 16 in effect during Plaintiff's criminal trial that tracked the language of *Brady*. Ex. 46 at 55-56.

(quoting *Kyles*, 514 U.S. at 434). The prejudice prong is sometimes referred to as the "materiality" requirement. *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014).

Less evidence is required to show materiality of suppressed evidence when the conviction is already on shaky grounds. *See United States v. Agurs*, 427 U.S. 97, 113 (1976). The materiality of this suppressed evidence must also be viewed cumulatively. *Gumm*, 775 F.3d at 370 (explaining that "the prosecution fails to turn over numerous pieces of favorable evidence, the proper focus of *Brady's* materiality inquiry is on the cumulative effect of the unsuppressed evidence on the jury's verdict"); *Bies*, 775 F.3d at 399 ("When the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of *Brady's* materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial.").

There can be no doubt that a reasonable jury could conclude Walker's suppression of this wealth of evidence—witness statements, handwritten notes, photo identification procedures, etc.—could have affected the judgment of the jury. *E.g., Barton v. Warden*, 786 F.3d 450, 465-67 (6th Cir. 2016) (finding a *Brady* violation based upon police suppression of witness statements); *Atkins v. Cty. of Riverside*, 151 F. App'x 501, 505 (9th Cir. 2005) (*Brady* violation for suppressing evidence that "would have cast a shadow across" the police investigation).

It is firmly established that evidence that would impeach a key witness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Bowen v.*

74

*Maynard*, 799 F.2d 593, 610–13 (10th Cir.1986) (holding there was a *Brady* violation when the "only identification evidence against the defendant was significantly impeachable" with the evidence of the other suspect that was withheld).

The case against Horton could not have been thinner—consisting of two eyewitness identifications from individuals who had no opportunity to see the perpetrator's face, whose descriptions of the perpetrator changed drastically over time, and who were subject to suggestive identification processes manufactured by Defendant Walker. Even McClanahan and Curry's own family members were shocked that police believed the identifications of Horton. SOMF ¶96. No forensic or physical evidence linked Horton to the crimes; in fact, every single item of forensic evidence recovered from the crime scene—including two sets of fingerprints and DNA, excluded him. SOMF ¶¶1-6, 154-57. There was no evidence implicating Horton other than the witness's fabricated identifications discussed above. The prosecutors themselves made clear in closing statements that this case hinged on the eyewitness identifications of McClanahan and Curry. SOMF ¶¶132-33.

As such, any evidence that would call their credibility into question would undoubtedly be material. *Buehner*, 788 F. Supp. 3d at 908 (finding that withholding evidence that could undermine the credibility of an eyewitness is "undeniably prejudicial" when two eyewitness identifications are the only evidence against the criminal defendant); *Clark*, 131 F.4th at 456 ("And a defendant undoubtedly 'suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness.'"); *Andrews*, 112 F.4th at 444 (finding page in police report that contained evidence suggesting that "someone else may have committed the murder" constituted favorable material *Brady* evidence); *Harris*, 553 F.3d at 1034 ("Considerable authority from the Supreme Court and our court

75

indicates that a defendant suffers [*Brady*] prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness.") (collecting cases); *Clark*, 934 F.3d at 492 (same). In fact, the state decided not to retry the case because it felt that without McClanahan's testimony, it could not meet its burden. Ex. 13. That is a clear concession of materiality. *See Bies*, 775 F.3d at 399 ("When the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of Brady's materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial.").

The Defendants analogize to *France v. Lucas*, 836 F.3d 612, 630 (6th Cir. 2016) in arguing that the prior identification is not material impeachment evidence. But the evidence about the eyewitness in *France* was not about their prior inconsistent identification but was instead evidence of their own "misdeeds" and did not, therefore, go directly to the key issue: the reliability of the witnesses' identification.

The suppressed reports would have also been available to impeach the integrity of Walker's investigation. *Kyles*, 514 U.S. at 445-46 (with the impeachment evidence, the defense could have cross-examined the police and "so have attacked the reliability of the investigation"); *In re Siggers*, 615 F.3d 477, 480 (6th Cir. 2010) (finding prima facie evidence of *Brady* claim where evidence: was "exculpatory because it centers on witness statements"; provided a basis to impeach trial testimony; and illustrated "police misconduct"); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred"); *Lazar v. Att'y Gen. of Pennsylvania*, 659 F. Supp. 3d 599, 616 (E.D. Pa. 2023) (finding that suppressed evidence of alternative perpetrators not investigated could call a detective's

investigation into question). Horton's defense team could have cross examined Defendant Walker on each of these pieces of suppressed evidence to call both the investigation and the subsequent manufactured identifications into question, but they were prohibited from doing so by her misconduct.

Defendants specifically challenge the materiality of three pieces of suppressed evidence: (1) the handwritten notes containing the name Richard Diggs, (2) the handwritten notes reflecting Curry said the perpetrator was holding the gun in his left hand, and (3) the latent fingerprint comparison. Plaintiff addresses each in turn:

First, Defendants' argument that the Diggs information is both immaterial and not *Brady* evidence at all is a nonstarter and infringes on the province of the jury. The crux of Defendants' argument is that the descriptors given could also apply to Richard Horton making the fact that McClanahan gave a completely different name meaningless. Such an approach would gut *Brady* and the procedural safeguards it and its progeny were meant to instill. To be clear, according to Walker's handwritten notes, McClanahan gave the following information about the perpetrator to her on October 13, 2004: a Black male, 5'9"-6'0", light skin, short nappy hair, bushy eyebrows, just out of prison for drugs, wearing a gray hoodie tied up tight, 27-28 years old, went to Everett Middle School, named Richard Diggs – Adidas Boy (presumably a nickname), Reynolds Avenue (presumably where he lived), 1 house from alley, red brick." Plaintiff concedes that some of these descriptors may apply to him, but some do not. Some of these descriptors apply to Richard Diggs, some do not. Some descriptors apply to Riccardo Diggs, some do not.

It is also a reality that these descriptors belonged to many young Black men in the Milo-Grogan area—where this robbery occurred. The Milo-Grogan neighborhood is less than one square mile, but according to the 2000 census, there were 2,579 residents in the Milo-Grogan

77

neighborhood at the time.[20] According to the 2000 census, 87.8 % of the population were Black, and 55% of the population was between the ages of 9 and 44. *Id.* And, as multiple witnesses testified, it was a drug hot spot where many individuals were arrested for drug possession or distribution—including individuals who McClanahan himself had robbed and might have reason to want to get back at him like Kyle Ramsey. Many of these young men also attended Everett Middle School, and perhaps some of them also lived in a red brick house—Horton did not. According to Google Maps images taken in 2007, there are two red brick homes on Reynolds Avenue—both of which are even adjacent to an alley—and another red brick structure.

---

[20] Information pulled from Milo-Grogan Neighborhood Plan, *available at* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.columbus.gov/files/sharedassets/city/v/1/building-and-zoning/bzs-boards-and-commissions/planning-document-library/milo-grogan-neighborhood-plan-2007.pdf (last accessed March 27, 2026).

78



(1) Corner of Reynolds Ave. and St. Clair



(2) 474 Reynolds Ave.



(3) 555 Reynolds Ave.

Horton did not live in those homes. He lived on Camden Ave. He would sometimes stay with friends at 780 Reynolds, but that house was not a red brick home nor was it adjacent to an alley.

That is why it is so critical that Walker suppressed these notes. The name Richard Diggs itself is exculpatory and impeaching because, as already discussed, one of the two key eyewitnesses gave the name of a completely different person before identifying Horton, and police had no idea that Richard Diggs was incarcerated at the time. But furthermore, all of the additional information could have gone to actually identifying who the perpetrator was and testing McClanahan's belief in Horton's guilt. All of those disputes cannot be settled at summary judgment. This is a question properly put before a jury.

While police are not required to disclose the identities of suspects they "have eliminated based on substantial exculpatory evidence," that does not apply in this case because Walker never eliminated Diggs based on any "exculpatory evidence" pertaining to him. *Titus v. Werkema*, No. 1:23-CV-997, 2025 WL 3239831, at *17 (W.D. Mich. Nov. 20, 2025). Walker does not even assert that she did. Instead, she argues that once she "confirmed the attacker was . . . Richard Horton" she eliminated Diggs. In their brief, Defendants do not cite to anywhere in the record for any affirmative action Walker took to eliminate Diggs. *See generally* Dkt. 142. It is undisputed that McClanahan first identified a man named "Diggs" and not "Horton" and Walker never investigated Diggs as a suspect. Thus, like in *Moldowan*, 578 F.3d 351, the *Brady* violation here is clearly established because there is "no evidence . . . that the police investigation had eliminated  . . . the undisclosed person[] as suspects." *Siggers v. Alex*, No. 22-1182, 2023 WL 5986603, at *6 (6th Cir. Sept. 12, 2023).

Second, Defendants concede that the handwritten notes about the perpetrator holding the gun in his left hand have some materiality but argue it is vastly outweighed by the other

80

suppressed evidence. This again infringes on the province of the jury. Evidence that a perpetrator is left-handed when Horton is right-handed has extreme exculpatory value and is material in that it goes both to Plaintiff's innocence and the reliability of Curry's identification. In a case where the only evidence is eyewitness identification, any evidence that calls those identifications into question could undermine Horton's conviction—especially when taken together with the other evidence. As such, Defendants are not entitled to summary judgment on the suppression of this evidence. And Defendants are wrong to analyze the materiality of each piece of evidence in isolation. *See Gumm*, 775 F.3d at 370.

Third, Defendants contest the materiality of the suppressed latent print comparison results. Plaintiff acknowledges that the result form lists only one set of prints as of value and identifiable. However, there is other evidence in the record that both prints are of value. As such, taking the evidence in Plaintiff's favor, a jury could find that the fact that there is still one set of prints—from a spot that the perpetrator touched with his bare hand—that does not belong to Horton or the victims is material under *Brady*.

Any one of the pieces of exculpatory evidence suppressed by Defendant Walker would have undermined confidence in Horton's prosecution and conviction. Any piece of it would have impeached key witnesses at trial—the eyewitnesses and Defendant Walker. When the suppressed evidence is considered collectively, there is no avenue through which Defendant Walker is entitled to summary judgment on Horton's suppression claim. This is sufficient for a reasonable jury to conclude that Defendant Walker suppressed material evidence and deprived Horton of right to a fair trial and thus due process.

81

**B. It Was Clearly Established by 2004 that Withholding of Exculpatory and Impeachment Evidence by Police Officers is A *Brady* Violation**

The Sixth Circuit has made clear that it was a clearly established right of a criminal defendant to be free from suppression of exculpatory and impeachment evidence in 2004. *See Moldowan*, 578 F.3d at 382 (finding that by 1990 "any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights"); *Clark*, 130 F.4th at 582 (we have held that pre-1990 cases clearly established that the police also have a "*Brady*-derived" duty to disclose material exculpatory evidence to the prosecution); *Jackson*, 925 F.3d at 823−24 (same); *Salter*, 113 F.4th 536-37 (same). In fact, the court in *Moldowan* noted that decisions from other circuits recognized that this right was clearly established as far back as 1964:

> Decisions from other circuits recognizing the type of "Brady-derived" claims that Moldowan asserts here date back as far as 1964. *See Barbee*, 331 F.2d at 846. In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established. *See, e.g., id.*; *Geter*, 882 F.2d at 171; *Jones*, 856 F.2d at 995. Although our recognition of this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights.

578 F.3d at 382.

> The Court in *Siggers v. Alex* further made clear:

> [I]t was clearly established by 1984 that the exculpatory value of evidence suggesting the existence of an alternative suspect is apparent. *See* [*Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1224–1225 (9th Cir. 2015)] (holding that it was clearly established—before a murder investigation began in January 1984—that withholding alternative[-]suspect evidence violates *Brady*). Likewise, it was clearly established by 1984 that "impeachment evidence . . . qualifies as exculpatory." *Jackson v. City of Cleveland*, 925 F.3d 793, 824 (6th Cir. 2019) (holding that this was clearly established by 1975) (citing *Giglio v. United States*, 405 U.S. 150, 153–155 (1972)). Thus, a reasonable police officer in 1984 would

82

have understood that he was violating *Brady* by withholding and suppressing alternative-suspect evidence from the prosecutor.

No. 19-CV-12521, 2022 WL 476069, at *2 (E.D. Mich. Feb. 16, 2022).

Against this backdrop, Defendant Walker cannot plausibly claim that the constitutional violation alleged here was not clearly established. By 2004, the law was unequivocal: police officers may not withhold materially exculpatory or impeaching evidence from prosecutors, particularly where, as here, the evidence directly undermines the credibility of key witnesses or points to an alternative perpetrator. The Sixth Circuit's precedent, reinforced by decades of consistent authority across other circuits and the Supreme Court, leaves no room for qualified immunity. Any reasonable officer in Defendant Walker's position would have understood that suppressing such evidence violated Plaintiff's constitutional rights.

## IV. SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S UNDULY SUGGESTIVE IDENTIFICATION PROCEDURES CLAIM

### A. Defendant Walker Can Be Held Liable in the Sixth Circuit Under 42 U.S.C. § 1983 for Using Unduly Suggestive Identification Procedures

Defendants argue that, following the Supreme Court's decision in *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), § 1983 does not render a state actor liable for using unduly suggestive identification procedures to obtain a false identification that taints a criminal case. Defendants are wrong on the merits, but this Court should reject the argument before even reaching the merits, because it is not within this Court's prerogative to overrule Sixth Circuit precedents rejecting that very contention, *see Salter*, 133 F.4th at 540, and the sole case Defendants cite that would support it doing so was denied certiorari.

#### 1. Vega *Does Not Affect This Type of § 1983 Claim*

On the merits, Defendants are wrong that *Vega* changes anything. In fact, quite contrary to Defendants' argument, the logic of *Vega* is already applied to § 1983 due process claims

83

asserting that a police officer's improper identification techniques resulted in an unreliable identification that is used in and taints a criminal case. To be sure, a police officer's violation of a prophylactic rule does not by itself violate the Constitution and is not actionable under § 1983, but where manipulated, unreliable evidence is actually used in and taints a criminal case, there is a due process violation, and a corresponding claim under § 1983.

*Vega* holds that there is no § 1983 claim for a mere violation of *Miranda's* prophylactic rules. 597 U.S. at 150. The Court reasoned that *Miranda's* prophylactic rules exist to guard against Fifth Amendment violations in criminal cases but emphasized that a police officer's violation of those rules does not automatically violate the Fifth Amendment. *Id*. at 149-50. As a result, the violation of *Miranda's* prophylactic rules is not necessarily a violation of the Fifth Amendment actionable under § 1983. *Id.* However, the Court was careful to say that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different," *id*. at 141, and it said that because a long line of Supreme Court cases recognizes that statements that are illegally compelled by police interrogations and then are used in a criminal case violate the Fifth Amendment, *see Brown v. Mississippi*, 297 U.S. 278 (1936), and are actionable under § 1983, *see Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003). As the Court emphasized throughout its opinion in *Vega*, it was not breaking any new ground. 597 U.S. at 142. Just as the Court has held that compulsive questioning without use of the resulting confession in the criminal case does not violate the Fifth Amendment and is not actionable under § 1983, *Chavez*, 538 U.S. at 767, a mere violation of *Miranda's* prophylactic rules without a showing of actual coercion does not violate the Fifth Amendment and is not actionable under § 1983, *Vega*, 597 U.S. at 149-50.

84

*Vega's* logic governing Fifth Amendment § 1983 claims is identical to the law that governs due process suggestive identification § 1983 claims. In *Vega* and *Chavez*, a violation of a prophylactic rule alone is not actionable under § 1983, but the use of a coerced confession in the criminal case, in violation of the core Fifth Amendment right against self-incrimination, is actionable under § 1983. In the context of suggestive identification procedures, the use of improper identification procedures is not alone actionable under § 1983, but the use of an unreliable identification obtained from such procedures that taints a criminal trial, in violation of the core due process right to a fair trial, is actionable under § 1983. Because the law governing § 1983 suggestive identification claims is already in harmony with *Vega*, this Court should reject Defendants' argument that *Vega* eliminates this type of § 1983 claim.

Defendants reference a Seventh Circuit case, *Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025), to have this Court find otherwise. However, that is premised on an incorrect reading of *Blackmon.* In *Blackmon*, rather than finding that no § 1983 right of action exists for an unduly suggestive identification claim, it stands for the narrow proposition that police are not liable when the plaintiff's claim is only that "an unduly suggestive photo array or lineup by itself entitles" them to damages because the prosecution's use of that suggestive identification is an intervening cause. *Id*. at 526. However, it remains the law—and *Blackmon* reaffirms—that police are liable and do not have immunity when they fabricate an identification, manipulate witness identifications, coerce a witness to testify to a false identification, or suppress from prosecutors the true nature of identification procedures they have conducted. *See id.*

### 2. *The Sixth Circuit Recognizes This Type of § 1983 Claim Post-***Vega**

In relying on *Blackmon*, Defendants ignore that the Sixth Circuit, a mere one day after the decision in *Blackmon*, held just the opposite. *See Salter*, 133 F.4th at 541 n.4 (citing *Gregory*,

444 F.3d at 747) ("The prosecutor's decision to use the identification does not shield [the officer] from liability if he reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial."); *see also Ramsey v. Rivard*, 110 F.4th 860, 869 (6th Cir. 2024) ("Nor does the prosecutor's decision to move forward shield [the police sergeant] from liability."). As such, Plaintiff has a viable § 1983 suggestive identification claim in this Circuit especially because the December 4, 2004 photo array was introduced at trial (and the prior show up and array tainted the subsequent array).

The Sixth Circuit recently reiterated, post-*Vega*, that "suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." *Ramsey*, 110 F.4th at 868–69 (citing *Gregory*, 444 F.3d at 746). "It is true that an unduly suggestive identification does not, in and of itself, violate constitutional rights." *Salter*, 133 F.4th at 540 (citing *Gregory*, 444 F.3d at 747). "But the admission at trial of such an identification, unless harmless, can violate a criminal defendant's core due process rights." *Id.*; *see also Gregory*, 444 F.3d at 746 ("Plaintiff has a due process right which includes the right to be free from unduly suggestive and unreliable identification procedures.").

Notwithstanding the Supreme Court's decision in *Vega*, the Sixth Circuit has continued to permit plaintiffs to bring § 1983 actions based on unduly suggestive identifications that taint a criminal trial. *See Ramsey*, 110 F.4th at 869 (denying qualified immunity regarding § 1983 claim for unduly suggestive identification); *Salter*, 133 F.4th at 542 (same); *Buehner*, 788 F. Supp. 3d at 896 (finding plaintiff not barred under *Vega* from pleading a § 1983 claim based on unduly suggestive identifications). In a concurring opinion, Judge Nalbandian questioned whether "recent Supreme Court precedent fatally undermines 42 U.S.C. § 1983 suits based on unduly

86

suggestive identification procedures," *see Salter*, 133 F.4th at 542 (Nalbandian J., concurring), but recognized that the Court was bound by precedent that permits plaintiffs to bring § 1983 claims for unduly suggestive identifications.

### 3.   *Olsen v. Salter Was Denied Certiorari*

Defendants cite to that very concurrence in *Salter* and the petition by Defendant Olson for Supreme Court review as reason why this Court should suspend its holding or overrule established Sixth Circuit precedent. However, this argument is a nonstarter. The Supreme Court denied granting cert in that case on February 23, 2026. Ex. 64 at 3; *see also Olsen v. Salter*, No. 25-378, 2026 WL 490553, at *1 (U.S. Feb. 23, 2026).

### B.  **A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Horton's Criminal Trial**

As noted, a criminal suspect has a constitutional right to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law. *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982); *Perry v. New Hampshire*, 565 U.S. 228, 238-239 (2012) (holding that a suggestive identification procedure violates due process when law enforcement officers use an identification procedure that is both suggestive and unnecessary.). The Supreme Court noted in *Stovall* that the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, "has been widely condemned." 388 U.S. at 302. *See also Simmons v. United States*, 390 U.S. 377, 383-384 (1968) (holding that the danger that a witness may make an incorrect identification is increased if the police show the witness "only the picture of a single individual who generally resembles the person he saw."). Moreover, police actions such as "indicat[ing] to the witness that

87

they have other evidence that one of the persons pictured committed the crime" can meet this standard. *Simmons*, 390 U.S. at 383-384.

When analyzing a suggestive identification claim, courts first "assess whether the identification procedure was 'unnecessarily suggestive.'" *Salter*, 133 F.4th at 538 (citing *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007)). "If so, we then consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Id*.

### 1. A Reasonable Jury Could Find the Photo Identification Procedures Were Unnecessarily Suggestive

Regarding the first step, "[u]nnecessary suggestiveness depends upon whether the witness's attention was directed to a suspect because of police conduct." *Haliym*, 492 F.3d at 704 (internal quotation marks omitted) (pre-trial identification was procured by an unnecessarily suggestive lineup where petitioner was the only one in the photo lineup who was bandaged or dressed in prison clothing); *see also Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (the first step "questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection"). The inquiry focuses on pre-identification encounters. *Wilson*, 250 F.3d at 397. In the context of photo lineup identifications, it "is a fact-specific determination, and the court may consider the size of the [photographic] array, the manner of its presentation by the officers, and the details of the photographs themselves." *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007) (quoting *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)) (alteration in original); *Ramsey*, 694 F. Supp.3d at 988 ("A pretrial identification procedure is unduly suggestive if it 'steered the witness to one suspect or another, independent of the witness's honest recollection.'") (citing *Wilson*, 250 F.3d at 397).

As to the first step of the inquiry, there is evidence from which a jury could reasonably find that the victims' "attention was directed to a suspect because of police conduct" that resulted in an impermissibly suggestive identification procedure. *Haliym*, 492 F.3d at 704; *Anderson*, 477 U.S. at 252. *See Simmons*, 390 U.S. at 383 (although there is always a danger that a witness may make an incorrect identification, that danger is increased if the police show the witness "the pictures of several persons among which the photograph of a single such individual … is in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime").

Addressing each photo identification procedure in turn, a jury could reasonably find that Walker directed the attention of Curry to Horton by showing her the lone photograph of Horton within days of the robbery—before there was any reason to believe he was involved in the robbery. McClanahan testified at trial that he did not recall whether he saw additional photographs during the investigation and, drawing inference in Horton's behalf, it is reasonable that he could have also been shown this single photo. Identification procedures that consist of a single photograph are inherently suggestive. *Salter*, 605 F. Supp. 3d at 1009 ("[C]ourts have found that single-photo identifications are unnecessarily suggestive"); *Stovall*, 388 U.S. at 302 (same). They direct the witness to a single person, and that's exactly what happened here before there was any reason to suspect that person was guilty of any crime.

Turning to the single-line photo array: Defendants do not contest this piece of evidence, but out of an abundance of caution, Plaintiff addresses it as well. While a single-line photo array may not be inherently suggestive, it could be. We do not have the array, and Curry did not recall who else was included in the array save for Horton, so there is no way to know one way or the other whether the fillers, instructions, or format made it suggestive or directed the witnesses to

89

Horton. However, when taken cumulatively, the fact that Walker showed the witnesses a single photograph of Horton, and then a photo array, and then *another* photo array—with the last array being the only thing documented—could very reasonably cause a jury to find that the procedure was unduly suggestive and a way for Defendant Walker to make sure the attention of McClanahan and Curry were on Horton.

Lastly, for the December 4, 2004 photo array, the suggestiveness is clear. Numerous Sixth Circuit decisions establish that similar skin tone is important to ensure a photo lineup is not unduly suggestive. *See United States v. Reamey*, 132 F. App'x 613, 616 (6th Cir. 2005) (concluding lineup was not suggestive because the participants were "all African-American males of similar build, color, complexion and hairstyle"); *Haliym*, 492 F.3d at 704 ("Quite properly, the line-up contained five males of the same race who were of approximately the same age and stature."); *United States v. Washington*, 714 F.3d 962, 967 (6th Cir. 2013) (noting that despite a glare "there is not a drastic difference between the defendant's skin tone" and those of any other people pictured); *Wingate v. United States*, 969 F.3d 251, 261 (6th Cir. 2020) (noting that the people in the photo lineup "all had similar skin tone"); *United States v. Radaker-Carter*, 151 F.4th 840, 848 (6th Cir. 2025) (same despite glare). And it was established well before 2004 that a "great discrepancy" in the physical appearance of the defendant from the other participants in a lineup makes the lineup unduly suggestive. *United States v. DeBose*, 433 F.2d 916, 918 (6th Cir. 1970); *Simmons,* 390 U.S. at 383. Only two years after the events in this case, the Sixth Circuit denied qualified immunity to an officer who had conducted an unduly suggestive lineup in 1993. *See Gregory*, 444 F.3d at 746–47. It is rare that officers create a lineup with such stark differences in skin tone, but when they do, courts, including the Sixth Circuit, do not hesitate to find such a lineup violates due process. *See United States v. Clark*, 499 F.2d 889, 892 (6th Cir.

90

1974) (procedure was unduly suggestive where five fillers were dark-skinned Black men and suspect was light-skinned Black man and the description of the perpetrator was a light-skinned Black man); *United States v. Fernandez*, 456 F.2d 638 (2d Cir. 1972) (similar); *United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 513 U.S. 977 (1994) (A photo array is improperly suggestive if "the picture of an accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit."); *People v. Kenley*, 87 A.D.3d 518, 518 (N.Y. App. Div. 2011) ("a lineup is unduly suggestive when only the defendant matches a key aspect of the description of the perpetrator provided by a witness or witnesses"); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Simmons*, 390 U.S. at 384, 88 S.Ct. at 971. *Clark* alone clearly establishes the wrongfulness and inherent suggestibility of Defendant's conduct.

The Sixth Circuit has made clear (including prior to 2004) that stark disparities in a photo array can violate due process. *Jells v. Mitchell*, 538 F.3d 478, 512–513 (6th Cir.2008) (holding pretrial identification procedure was unduly suggestive, but concluding that the witness identification was nonetheless reliable); *Haliym*, 492 F.3d at 704 (same); *United States v. Crozier*, 259 F.3d 503, 510–12 (6th Cir.2001) (same).

Here, because Horton's complexion was obviously lighter than all the other participants in the lineup, "there is evidence from which a jury could reasonably find that the victims' 'attention was directed to a suspect because of police conduct' that resulted in an impermissibly suggestive identification procedure." *Gillispie v. City of Miami Twp.*, No. 3:13-CV-416, 2020 WL 5629677, at *14 (S.D. Ohio Sept. 21, 2020) (quoting *Haliym*, 492 F.3d at 704), *aff'd* No. 23-3999, 2025 WL 1276900 (6th Cir. May 2, 2025).

91

Horton's retained expert, Chief Tiderington, also notes that the inclusion of only one person in an array who matches the given description of a perpetrator goes against generally accepted police practices in 2004. He also raised concerns about how Defendant Walker constructed and administered the array, how Walker primed the witnesses with the earlier identification procedures, and the risk of memory distortion due to the amount of time that had passed since the crime—culminating in his opinion that there was a substantial risk of misidentification due to influence on the memories of the witnesses rather than a true testing of their independent recollection.[21]

The jury could make the same finding with respect to the in-court identifications, particularly given Walker's statements to the victims prior to their identifications of Horton in court (*e.g.,* telling McClanahan and Curry that they had picked out the same suspect, that they had told the same story, and that Horton was on the run from police). *See Gillispie*, 2020 WL 5629677, at *13 (denying summary judgment on unduly suggestive claim, in part, because jury could find officer's conduct directed witnesses on who to choose by telling then they had picked out the same suspect).

The record viewed in Horton's favor shows that both eyewitnesses identified Horton as the robber even though Horton had nothing to do with the crime and was not at the scene, and even though neither witness got a look at the robber's face that would have allowed them to make an identification. The two incorrectly picked an innocent person, and so of course the identification of Horton cannot be said to be reliable. This factor of the suggestive identification due process analysis is meant to assess whether the suggestiveness of the identification

---

[21] Defendants make a confusing argument about Chief Tiderington not being able to opine on the photo array because he apparently saw a blurry copy, but his list of materials reviewed included in his report makes clear he saw the clean copy from the prosecutor's file.

procedure created a substantial likelihood of *misidentification*. *Neil*, 409 U.S. at 198-201. In a case where the record reflects an actual misidentification of an innocent person, it is established that the identification was not reliable.

Second, the extreme misconduct laid out by Defendant Walker is far more than enough at summary judgment to establish that the identification procedures were improperly suggestive. *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (denying summary judgment where the police defendants convinced a witness to select a particular photo); *see also Blackmon*, 2023 WL 7160639, at *17 (holding that evidence that Defendants intended to obtain an identification of a suspect relevant to dispute of fact about whether the identification procedures were unduly suggestive); *Hampton*, 2017 WL 2985743, at *23 (denying summary judgment where the officer suggested who the witness should pick). Indeed, on this view of the facts, Defendants did all the things (and more) that the Supreme Court said in 1968 would make an identification procedure unduly suggestive in *Simmons*, 390 U.S. at 382-83. But even pretending for a moment that this blatant misconduct was not in the record— so, construing some of the facts in Defendants' favor, for purposes of this argument only—there would still be sufficient evidence to show that the identification procedures Defendant Walker used were unduly suggestive.

### 2. A Reasonable Jury Could Find the Identifications Were Not Reliable

Regarding the second step (reliability despite impermissible suggestiveness), the Sixth Circuit has held that "reliability is judged under the totality of the circumstances." *Haliym*, 492 F.3d at 706. Courts "must ask 'whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.'" *Id*. at 704 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)). The Supreme Court in *Manson v. Brathwaite*

set forth "five factors for consideration in determining whether a suggestive identification was nevertheless reliable:  (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification." *Id*. (citing *Brathwaite*, 432 U.S. at 114); *Steiner v. King*, 2023 WL 11758789, at *2 (6th Cir. Nov. 20, 2023) (same).  However, the Sixth Circuit has held that there may be additional factors that are relevant to the inquiry where such other factors "go to the reliability of the eyewitness identification." *Id*. at 706.

Disregarding their suggestiveness, a jury could reasonably find that the identifications of Horton were unreliable. Evaluating the *Brathwaite* factors in turn:

First, the record has established that neither witness had a meaningful opportunity to view the perpetrator at the time of the crime. McClanahan told police he could not see the face of the perpetrator and Curry told police she only got a few peeks in and that his face was obscured by the gray hoodie that covered everything except for the perpetrator's eyes and part of his nose. SOMF ¶¶25-47, 70-90. Both testified that they were focused on the gun. The only familiarity they had with the perpetrator was McClanahan thinking he recognized the voice. At the time of the robbery, there were no lights on in the home and the robber was backlit by whatever pre-sunrise light was entering the home. Curry testified that she had her face hidden in a pillow for most of the encounter. McClanahan had been struck harshly on the head at the beginning of the ordeal and was bleeding and dizzy throughout. There was no opportunity for the witnesses to view the perpetrator at the time of the crime.

94

Second, relatedly, the witnesses' focus was not on the perpetrator's face or searching for things they recognized. Their focus was on survival, protecting each other, and on the gun that was being waived in their face and pressed to their heads. SOMF ¶¶25-47, 70-90.

Third, the record is clear that the descriptions of the perpetrator fluctuate drastically between the different accounts of McClanahan and Curry. Every single feature (height, age, hair style, body build, weight) changes between descriptions except for one core feature: that the perpetrator was a Black male with light skin. Horton at 6'1" does not fall in any of the range brackets the victims give, and his weight is more than 50 pounds above what McClanahan first tells police the weight of the robber was. He's also 12 years younger than the initial description McClanahan gives of the perpetrator.

Fourth, the certainty of the witnesses has also fluctuated drastically as time has gone on. The day of the robbery, Curry did not identify anything about the robber that was familiar and thus expressed no level of certainty. McClanahan expressed some familiarity with the voice of the robber but only stated he "believes" he knows the perpetrator. Neither witness was confident enough in any identification on the day of the robbery to provide a name of who they believed the perpetrator was. By the time of the December 4, 2004 photo array, both witnesses are suddenly absolutely positive in their identification. In her deposition, Curry testified that even DNA evidence proving someone else committed the robbery would not change her mind.[22] Such confidence inflation is not surprising given the allegations of misconduct in the case and further underscore that the identifications were not reliable. *See Haliym*, 492 F.3d at 705-06 (finding that

---

[22] Defendants include reference to testimony from Curry that she believed counsel for Horton represented to her that DNA collected from the scene was a match to one of the Diggs brothers. That is inaccurate. Curry corrects herself in that same deposition and her daughter, who was present for the conversation, makes clear that no such representation was made. Dkt. 142 at 17, fn. 2; Ex. 8 at 270-71; Ex. 25 at 78-79.

the "suggestiveness of the lineup belies any certainty demonstrated by [the witness] because the procedure itself suggested a clear result").

Fifth, the length of time between the crime and the identification further supports the identification's unreliability. Putting aside the single photo or single-line photo array Walker showed Curry, nearly three months had passed between the original crime and the December 4, 2004 photo array. Three months during which witnesses are talking to each other, to family, to police, ruminating on what happened, who could have done it, whether police had any suspects, what evidence police had against suspects, who might have wanted to take money from them, etc. is certainly more than enough time to affect memory and the reliability of an identification coming months later for individuals who only saw the eyes of the perpetrator—in conditions that were too dark to even be able to make out their color. SOMF ¶¶70-90.

Analyzing the identifications and applying eyewitness expert science, Horton's largely unchallenged expert, Dr. Dysart, explains how these variables reduce the risk of accurate identifications, according to established, peer-reviewed eyewitness science. She opined that they were obtained using suggestive techniques from eyewitnesses who could not have made identifications.

For one, Dr. Dysart notes that both of the witnesses had limited opportunities to see the robber's face and form memories of it that would allow them to make accurate identifications. SOMF ¶¶70-90. This is either because they did not have enough time, their attention was not on the robber's face, or the robber's face was obstructed by the gray hoodie. For example, both testified that they were looking at the gun and focusing on the gun the robber was waiving around which would "impair[] memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the

96

opportunity to see the perpetrator is short or limited." Ex. 28 at 10. Finally, neither of the witnesses provided accurate or detailed descriptions of the robber, which should have been a red flag that these witnesses did not have a strong memory for the shooter and would therefore not likely be reliable eyewitnesses. That is in addition to all of the factors that occurred during the identification procedures themselves that impacted the witnesses' identifications. SOMF ¶¶70-90

And because the witnesses were shown an unduly suggestive photo, the results from any subsequent procedure were relatively meaningless. That is, the bias from the first suggestive procedure renders the outcomes of the subsequent lineup procedures' irrelevant for the purposes of determining witness accuracy. After these identification procedures, the risk of unconscious transference and commitment—the phenomena where witnesses believe that the suspect's face is familiar from the crime, but it has merely been encoded as the result of repeated identification procedures—was high, explaining the view held by the victims that they had selected the right person. SOMF ¶¶70-90. For this reason, even Defendants' retained expert opined that Curry's identification of Horton from any procedure after the first had little probative value because she had already seen a photo of Horton. SOMF ¶¶91-94.

Defendants' reliance on *Radaker-Carter* is misplaced because the circumstances here bear none of the safeguards that led the Sixth Circuit to conclude the lineup in that case was not suggestive. In *Radaker-Carter*, the court repeatedly emphasized both the relative uniformity of the array and the absence of any police conduct that directed the witness toward the suspect. Critically, there was no evidence that law enforcement singled out the defendant through instructions, comments, or administration of the procedure; to the contrary, the record demonstrated that the witness's attention was not steered toward any particular photograph and that the identification was based on an independent feature the witness recognized.

97

Here, by contrast, the record reflects that Defendant Walker did not take comparable precautions to ensure a neutral identification procedure and, instead, failed to provide the types of instructions designed to prevent suggestiveness. Unlike in *Radaker-Carter*, there is no evidence that the witness was properly admonished that the suspect may or may not be present, that the administrator would not know the suspect's identity, or that the witness should not feel compelled to make an identification. Nor did Walker employ procedures to guard against implicit cues or confirmatory feedback. The absence of these basic safeguards materially distinguishes this case from *Radaker-Carter*, where the court's holding rested in part on the lack of any indication that the witness's attention had been directed toward the defendant. Moreover, in that case the court emphasized that the witness did not identify the defendant because of the photos' differences whereas here both McClanahan and Curry testified that Horton being the only light-skinned Black male was what helped them identify him.

Even where the Sixth Circuit has concluded no relief should flow from a potentially suggestive lineup, it has never blessed including only a single picture in a lineup that matches the salient characteristic an eyewitness described of the suspect. *See United States v. Sullivan*, 431 F.3d 976, 985 (6th Cir. 2005) (affirming conviction even though defendant was only "suspect in lineup with noticeably blue eyes and a majority of the witnesses described the robber as having blue eyes" based on waiver from defendant's failure to challenge magistrate judge's factual finding "that 'the eye color is not easily ascertained by looking at either array.'").

Accordingly, the totality of circumstances reveals a robust dispute about whether the identification procedures used with McClanahan and Curry were unduly suggestive. Defendants' arguments otherwise are nothing more than a statement of their own version of the facts, which the Court cannot accept at this stage.

### C. It Was Clearly Established by 2004 that Utilizing Unduly Suggestive Identification Procedures Is A Due Process Violation

A constitutional right is "clearly established" if it is sufficiently clear that every reasonable official "would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). To demonstrate that a right is clearly established, a plaintiff need not provide a case directly on point, but "existing precedent must have placed the . . . constitutional question beyond debate." *Id*. The dispositive question is whether the officer had notice that the "particular conduct" violated the Constitution. *Id*.

Relying on the Sixth Circuit's holding in *Stovall*, the Sixth Circuit in *Gregory* specifically rejected a defendant's argument that there was no well-established constitutional right in 1992 to be free of impermissibly suggestive identification procedures. *Gregory*, 444 F.3d at 745-746; *see also Gillispie*, 18 F.4th at 918, n.2 (noting that, as early as 1967, it was clearly established that a person the police suspected of committing a crime had a constitutional right to be free from identification procedures "so unnecessarily suggestive and conducive to irreparable mistaken identification" that the identification's use violates due process of law.).

In issuing this holding, the Sixth Circuit in *Gregory* rejected the defendant's argument, similar to the argument raised by Defendant Walker here, that the defendant officer's procurement of the identification itself did not lead to the plaintiff's injury. 444 F.3d at 747. The *Gregory* Court held that while the unduly suggestive identification does not, in and of itself, violate constitutional rights, the prosecutor's decision to use the identification did not shield the defendant officer from liability if he reasonably should have known that the use of the identification would lead to a violation of the right to a fair trial:

> It is true that an unduly suggestive identification does not, in and of itself, violate constitutional rights. *See Manson v. Brathwaite*, 432 U.S. 98, 113, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). It is also true that the prosecution's use of the identification

99

at trial is a necessary intervening act for injury to occur and liability for any party to attach. *Id*. It is not true, however, that the prosecutor's discretion to control the state's case at trial is such an intervening act to excuse [a police officer] from the "natural consequences" of his actions and therefore any tort liability. In constitutional-tort cases, "a man [is] responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). This principle led the Supreme Court in *Malley v. Briggs* to hold that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (footnote omitted). The Supreme Court's reasoning is directly applicable here. The prosecutor's decision to use the identification does not shield Tarter from liability if he reasonably should have known that use of the identification would lead to a violation of Plaintiff's right to a fair trial.

444 F.3d at 747. Moreover, the *Gregory* Court found that it had entertained allegations of suggestive identification procedures as viable constitutional tort claims as far back as 1993. 444 F.3d at 746, citing *Hutsell v. Sayre*, 5 F.3d 996, 1003-1005 (6th Cir. 1993). The Sixth Circuit also made clear in *Salter* that a criminal defendant's right to be free from unduly suggestive identification procedures was established in 2003—a year before the Loew Street robbery. *Salter*, 605 F. Supp. 3d at 1011 (further holding "it was clearly established [in 2003] that a single photo identification—without any exigent circumstances—is unnecessarily suggestive.").

As such, a reasonable officer in 2004 would be on notice that the identification procedures utilized here would be unconstitutional. In *Gregory*, the Sixth Circuit held that "this Court has never found that an identification arising from a suggestive format was anything but unreliable when the witness' prior description of the suspect was significantly inconsistent with the suspect's actual appearance." *Gregory*, 444 F.3d at 756 (emphasis in original). The witness's descriptions of the perpetrator were inconsistent and far-ranging. According to McClanahan and Curry, the perpetrator was between the ages of 25-40, 5'9"-6'3", thin or medium build, their description of his hair style changed, whether they recognized him changed, what they

100

recognized about him changed. The only consistency was that he was a light-skinned Black male, and that is what Defendant Walker took advantage of. Not only did the evidence establish that the victims' description was inconsistent over time and inconsistent with Horton but McClanahan and Curry testified multiple times that Horton being the only light-skinned Black male in the photo array is what helped them identify him.

Under these circumstances, an officer in Defendant Walker's position would have been on notice that showing a single photograph of a suspect to the victims would violate his right to a fair trial. The same facts would put her on notice that showing a photo array containing Horton to the victims, before showing yet another photo array with the same suspect, would similarly violate his right to a fair trial. Moreover, she would have been on notice that the statements she made to Curry after the array, such as the fact that her and McClanahan gave the same story and that Horton was on the run, would have affected her identification and confidence in her identification. As held by the court in *Simmons*, 390 U.S. at 383-384, the chance of misidentification of a suspect is increased "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."

### D. Vacated State Court Rulings Are Entirely Irrelevant

Defendants repeatedly invoke the original trial court's denial of suppression and the subsequent appellate rulings concerning the December 4, 2004 photo array as though those determinations carry legal or evidentiary weight in this case. They do not. Those references are legally irrelevant and should be disregarded.

It is undisputed that Horton's conviction was vacated and that all charges against him were dismissed. SOMF ¶¶159-60. That procedural posture is dispositive of any argument that prior state-court rulings have preclusive or persuasive force here. As courts have consistently

held, once a criminal judgment is vacated, it is rendered a legal nullity: "The reversal vacated the judgment entirely, technically leaving nothing to which we may accord preclusive effect . . . When [the plaintiff] won his appeal and the judgment was vacated, all such factual determinations were vacated with it, and their preclusive effects surrendered." *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985). Likewise, "'[a] vacated judgment, by definition, cannot have any preclusive effect in subsequent litigation.'" *Kogut v. County of Nassau*, 2009 WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (quoting *Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206, 1211 (1984)).

This principle applies with full force not only to final judgments, but also to all interlocutory rulings that merged into that judgment—including suppression determinations regarding identification procedures. As the Sixth Circuit explained, where a conviction is vacated, "the trial court's interlocutory rulings—including those which the court made at the [pretrial] hearing—have merged with the final judgment, which means those interlocutory rulings have been vacated too." *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019). Thus, the trial court's ruling admitting the photo array, and any affirmance of that ruling on appeal, no longer exist for legal purposes. They cannot be invoked to establish the constitutionality of the identification procedure, to collaterally estop Plaintiff's claims, or to otherwise insulate Defendants from liability.

Nor can Defendants salvage these vacated rulings by repackaging them as persuasive authority or evidence of reasonableness. Allowing Defendants to rely on nullified rulings would improperly reintroduce findings that have been stripped of all legal effect and would undermine the fundamental principle that a vacated conviction leaves the parties as though no trial had ever taken place. The question before this Court is not how a now-vacated state court once ruled on a

102

limited pretrial record, but whether, based on the full evidentiary record developed here, Defendants employed identification procedures that were unduly suggestive and violated Plaintiff's constitutional rights.

Indeed, courts addressing § 1983 claims premised on suggestive identification procedures routinely recognize that prior suppression rulings—particularly those tied to vacated convictions—do not resolve the constitutional question as a matter of law. *Dodrill*, 764 F.2d 442; *Gillispie*, 2020 WL 5629677, at *18. The inquiry is fact-intensive and turns on the totality of the circumstances surrounding the identification procedure, including the composition of the array, the instructions given, and any cues or pressures applied to the witness. Those are classic jury questions.

Accordingly, Defendants' repeated reliance on vacated state-court rulings is misplaced and legally irrelevant. Those rulings carry no preclusive effect, no evidentiary weight, and no bearing on the issues before this Court. The admissibility and constitutionality of the December 4, 2004 photo array must be evaluated anew on the present record, and it will ultimately be up to the jury to determine whether the procedure was unduly suggestive and whether it caused Plaintiff's constitutional injury.

###### V. SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S FOURTH AMENDMENT DEPRIVATION OF LIBERTY CLAIM (COUNT II)

#### A. A Jury Could Reasonably Find Defendant Walker Maliciously Prosecuted Plaintiff In Violation of Constitutional Rights

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Amongst other protections, this guarantee affords people the right to be free of unjust prosecution. *See Mills v. Barnard*, 869 F.3d 473, 479-80 (6th Cir. 2017).

To establish a Fourth Amendment malicious prosecution claim, a plaintiff must prove that: (1) a criminal prosecution was initiated against the plaintiff and the defendants made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable case for the criminal prosecution; (3) that the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Campbell v. Hamilton Cnty.,* No. 1:22CV315, 2023 WL 6295803, at *6 (S.D. Ohio Sept. 27, 2023); *see also Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010).

Importantly, a Fourth Amendment malicious prosecution claim is not simply the same thing as a common law or state-law "malicious prosecution" action. *Sykes*, 625 F.3d at 308 (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006)) ("A better name [for a constitutional malicious prosecution claim] that would perhaps grasp the essence of this cause of action…might be 'unreasonable prosecutorial seizure.'") (citations omitted)); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) ("The rights guaranteed by the Fourth Amendment are not superseded by the common law, and we see no principled reason why plaintiffs alleging a constitutional injury should be entitled to relief only if they can demonstrate that their claim meets all the elements of a common law claim."). For example, malice is not an element of a federal Fourth Amendment claim concerning wrongful prosecution, in part, because the notion of subjective intent or malice is inconsistent with the Fourth Amendment. *Sykes*, 625 F.3d at 309-10; *Graham v. Connor*, 490 U.S. 386, 398 (1989) (rejecting reference inquiry of malice under the Fourth Amendment).

### 1. *Defendant Walker Influenced and Participated in the Decision to Prosecute*

The first element of the malicious-prosecution claim is met when an officer "could reasonably foresee that his misconduct would contribute to an independent decision that results

104

in a deprivation of liberty" and the misconduct actually does so. *Sykes*, 625 F.3d at 316 (quoting

*Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)). An officer need not testify before a

grand jury to meet this prong. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 876 (6th Cir. 2020).

Instead, this element is met when an officer includes "misstatements and falsehoods in his

investigatory materials" and those materials influence a prosecutor's decision to bring charges.

*Sykes*, 625 F.3d at 316 (quoting *Higazy*, 505 F.3d at 177). *See also Shepherd*, 453 F. Supp. 3d at

932.

Liability for malicious prosecution is also "not limited solely to those who made the

decision to prosecute the plaintiff." *Jackson*, 925 F.3d at 820-21 (citing *Sykes*, 625 F.3d at 316);

*see also Jones v. City of Elyria*, 947 F.3d 905, 918 (6th Cir. 2020). Rather:

> liability also extends to those who significantly impacted that decision. For
> instance, liability extends to an officer who included falsehoods in her
> investigatory materials, knowing that prosecutorial reliance is likely, where those
> materials actually influenced the prosecutor's ultimate decision to bring charges.

*Id.* And, fabrication of evidence presented to prosecutors automatically satisfies this

prong. *See Phat's Bar & Grill v. Louisville Jefferson Cnty. Metro Gov't*, 918 F. Supp. 2d

654, 661 (W.D. Ky. 2013) (stating that the first factor in the analysis is satisfied if an

officer presents false information to prosecuting authorities (citing *Sykes*, 625 F.3d at

312)).

Here, Defendant Walker meets this threshold. She was the sole investigator of the Loew

Street robbery, was responsible for attaining the criminal complaint, and intentionally included

fabricated information in (and left out suppressed exculpatory and impeachment evidence) her

CIS Report that she knew would be read to the grand jury when seeking an indictment. *See*

*Shephard,* 453 F. Supp. 3d at 932, (finding first prong of malicious prosecution prong met where

105

police officer was in charge of investigation and presented the investigative materials to

prosecutors to secure an authorization of charges).

### 2. There Was A Lack of Probable Cause to Prosecute Plaintiff

The Sixth Circuit sets forth the standard for probable cause as follows:

[a] probable cause determination is based upon the "totality of the circumstances" and must consider "both the inculpatory and exculpatory evidence." *Wesley*, 779 F.3d at 429 (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). That means an officer cannot "'simply turn a blind eye' toward evidence favorable to the accused," *id*. (quoting *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999)), nor "ignore information which becomes available in the course of routine investigations," *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002). That said, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371. However, [a plaintiff] need only make a "minimal showing of credibility ... that the defendants did not have probable cause." *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). Unless "there is only one reasonable determination possible," this is a jury question. *Fridley*, 291 F.3d at 872 (citations omitted).

*Jones v. Clark Cnty., Kentucky*, 959 F.3d 748, 757 (6th Cir. 2020). In addition,

[a]n eyewitness identification constitutes probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted).

*Skousen*, 305 F.3d at 528.

An indictment by a grand jury is "not a talisman that always wards off a malicious-

prosecution claim." *Mills*, 869 F.3d at 480. There is a "long-held exception" that applies where:

(1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as affidavits or investigative reports) or falsifies or fabricates evidence;

(2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and

(3) the false statements, evidence, and omission do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

106

*King v. Harwood*, 852 F.3d 568, 588 (6th Cir. 2017); *see also Miller*, 866 F.3d at 391. As such, "pre-indictment nontestimonial acts that were material to the prosecution of a plaintiff [can] rebut the presumption of probable cause established by a grand-jury indictment." *Mills*, 869 F.3d at 480 (citing *King*, 852 F.3d at 587-80).

Here, the record indicates that each of the conditions for finding the presumption is rebuttable is satisfied. First, as described above, the evidence illustrates that Walker fabricated evidence, not only through her police reports but also through intentionally manufacturing identification evidence against Plaintiff as a result of her suggestion and influence. In addition, Walker committed a *Brady* violation in suppressing the exculpatory evidence described above. This is sufficient to create an issue of fact for the jury. Second, the identification evidence and fabricated information are material to the prosecution; the December 4, 2004 array was evidence in Horton's criminal trial, and Defendant Walker referenced her fabricated reports on the stand and testified in line with her fabrications during Horton's trial. Third, these fabrications do not consist solely of grand jury testimony or information read to the grand jury.

Fabricated evidence used in a probable-cause determination can also be the foundation to challenge that determination. *Autrey v. Stair* sets forth that if "a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action." 512 F. App'x 572, 579 (6th Cir. 2013); *see also Harcz v. Boucher*, 763 F. App'x 536, 544 (6th Cir. 2019) ("[A] prior probable cause finding does not prevent a plaintiff from relitigating probable cause where the plaintiff claims that the witness who testified at the state proceeding misstated or knowingly misrepresented the facts used to establish probable cause

. . . . A plaintiff can bring malicious prosecution claims against police officers if the plaintiff alleges . . . that a misleading police report influenced the state court's determination of probable cause for arrest and prosecution." (cleaned up)).

Plaintiff meets the "minimal showing" laid out in *Jones* that there was no probable cause for his arrest and prosecution. Defendant Walker laid out in her CIS Report the evidence that she believed provided probable cause to prosecute Horton, knowing it would be read to the grand jury. In that report, she conceals key exculpatory and impeachment evidence and includes material falsehoods to try and bolster the identifications of McClanahan and Curry. Walker also had reason to know that the eyewitness identifications were not reliable and were, in fact, mistaken. She knew from her review of the materials that neither had gotten a good look at the perpetrator. She knew McClanahan had originally named someone else as the perpetrator. She knew that she had been the one to insert Horton's name into the investigation. Even taking McClanahan's story of the October 8, 2004 interaction with the perp as credible, Walker would have had reason to doubt it being the same individual who robbed McClanahan because he was hiding his face but then making reference to an interaction he had with the victim the date before when his face was shown. She knew that she had intentionally manipulated the photo identification procedures to get identifications of Horton. She knew she had to fabricate the descriptors McClanahan and Curry gave her of the perpetrator in order to acquire charges against Horton. Each of this seriously undercuts whether probable cause existed to charge Horton and collectively, they necessitate resolution by a jury.

All of this is sufficient to deny summary judgment, and find that the presumption of probable cause has been rebutted. *See Miller*, 866 F.3d at 392 (finding disputes of material fact concerning the rebuttability of the presumption precluded summary judgment); *King*, 852 F.3d at

108

591 (same); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 919-20 (2017) (holding that probable cause cannot be based upon fabricated evidence); *Jackson*, 925 F.3d at 821 (summary judgment improper on malicious prosecution claim where record illustrated evidence, including an identification, was fabricated); *Harris v. Bornhorst*, 513 F.3d 503, 521 (6th Cir. 2008) (*Brady* violation can rebut the presumption of probable cause).

Summary judgement is also particularly inappropriate here for two additional reasons. First, in a § 1983 action, the existence of probable cause is a question of fact. *Gregory*, 444 F.3d 725. Where the facts underlying probable cause are in dispute, they question must be sent to the jury. *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005); *see Selective Ins. Co. of the Se. v. RLI Ins. Co.*, 706 F. App'x 260, 266 (6th Cir. 2017) (citing *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003) (noting that the "existence of probable cause is often a question for a fact-finder").

Second, despite Defendants' argument to the contrary, none of the Sixth Circuit's recent cases on this issue require, as a prerequisite to rebutting the presumption of probable cause, a plaintiff to obtain the grand jury transcripts. If that were the case, denial of a request for those transcripts would become a default judgment for defendants; a result certainly not contemplated by these cases or consistent with the Federal Rules of Civil Procedure. *Cf. Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993) (fundamental tenant of the Federal Rules is to "allow cases to be decide on the merits"); *Moore v. Rees*, 2007 WL 1035013, at *12 (E.D. Ky. Mar. 30, 2007) ("[T]he Federal Rules do not require the creation of the best evidence, nor does the absence of the 'best evidence' inhibit this Court's jurisdiction to decide this case on the merits."). There is sufficient evidence in the record of steps Defendant Walker took in preparing the case for

109

presentation to the grand jury, evidence she suppressed, and fabrications she authored to ensure prosecution of Plaintiff that a jury could find in favor of Plaintiff.

### 3. Plaintiff Suffered a Severe Deprivation of Liberty

In order to meet this prong, a plaintiff must show that they suffered some additional deprivation of liberty beyond the initial seizure. *See, e.g., Noonan v. Cty. of Oakland*, 683 F. App'x 455, 463 (6th Cir. 2017); *Wright*, 962 F.3d at 876. That has certainly been met here. Plaintiff spent over 16 years incarcerated for a crime he did not commit so Defendants do not, and cannot, contest this point.

### 4. The Criminal Proceedings Resolved in Plaintiff's Favor

In order to meet this prong, a plaintiff needs to show that their criminal proceedings resolved in their favor. Because the criminal charges against Plaintiff were dismissed, this prong is also not in dispute and undoubtedly met. *See Ash v. Ash*, 72 Ohio St.3d 520, 651 N.E.2d 945, 947–48 (1995) ("[A]n unconditional, unilateral dismissal of criminal charges or an abandonment of a prosecution by the prosecutor or the complaining witness that results in the discharge of the accused generally constitutes a termination in favor of the accused."); *Wright*, 962 F.3d at 877 (finding prong four of malicious prosecution analysis met because prosecution dropped all charges against the plaintiff).

### B. It Was Clearly Established in 2004 That Police Officers Violate the Fourth Amendment When They Continue Detention Without Probable Cause

It was well settled in 2004 that individuals have a clearly established right to be free from malicious prosecution. *Jackson*, 925 F.3d at 825-26 (discussing the fact that it was clearly established in 1975 that "maliciously prosecuting" someone violated the constitution); *see also Spurlock*, 167 F.3d at 1005-07 (citing authorities from 1988 and 1990, in concluding that malicious prosecution violates the constitution, concerning an investigation that began in 1990);

*Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). "[I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

It is further well established that individuals had a clearly established right to be free "from malicious prosecution based on knowing or reckless misidentification." *Sanders v. Jones*, 728 Fed. App'x. 563, 565 (6th Cir. 2018) (citing *Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579, 582–83 (6th Cir. 1998)). "While a law enforcement officer is generally entitled to rely on another's eyewitness identification to establish probable cause, he cannot rely on eyewitness identification where he has serious reason to doubt the identification based on other evidence within his knowledge." *Id*. (citing *Ahlers v. Schebil*, 188 F.3d 365, 370–71 (6th Cir. 1999)); *see also Gillispie*, 18 F.4th at 918 n.2 (summarizing clearly established law and finding such "rights were clearly established by 1990"); *Buehner*, 788 F.Supp.3d at 112 (denying qualified immunity on federal malicious prosecution claim because the officer had reason to know the identifications were false).

As such, by 2004, it was clearly established that officers violate the Fourth Amendment when they continue to detain or prosecute an individual in the absence of probable cause— particularly where that detention rests on fabricated evidence or identifications the officers had reason to know were unreliable—precluding any claim to qualified immunity here.

## VI.    SUMMARY JUDGMENT IS UNAVAILABLE TO DEFENDANT WALKER ON PLAINTIFF'S STATE-LAW CLAIMS (COUNTS V & VI)

### A.  Defendant Walker is Not Immune from Suit Under O.R.C. § 2744.03(A)(6)

Ohio Revised Code § 2744.03(A)(6)(a)–(c) provides police officers immunity from civil suit unless their "acts or omissions were manifestly outside the scope of their employment or official responsibilities;" their "acts or omissions were with malicious purpose, in bad faith, or in

111

a wanton or reckless manner;" or "civil liability is expressly imposed by a section of the Revised Code."

"When federal qualified immunity and Ohio state-law immunity under [Ohio Rev. Code] § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense through the lens of federal qualified immunity analysis." *Wright*, 962 F.3d at 878 (quoting *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018)). The officers' state-law statutory-immunity defense therefore "stands or falls with their federal qualified immunity defense." *Hopper*, 887 F.3d at 760; *cf. Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (holding that "[a]s resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims").

As laid out above, qualified immunity is not available to Defendant Walker on any of Plaintiff's federal claims and, as such, neither is officer tort immunity. *Harris v. Langley*, 647 F. App'x 585, 592 (6th Cir. 2016) (denying Cleveland police officer tort immunity at summary judgment under § 2744.03(A)(6)(a-c) because the officer did not have qualified immunity); *Wright*, 962 F.3d at 878 (finding reversible error when trial court granted statutory immunity to officers because they were not afforded federal qualified immunity).

### B. There Is Sufficient Evidence for a Reasonable Jury to Find Defendant Walker Violated Plaintiff's Right to be Free from Malicious Prosecution (Count V)

Ohio state-law malicious prosecution claims require proof of: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) favorable termination of the prosecution. *Trussle v. Gen. Motors Corp.*, 53 Ohio St. 3d 142, 559 N.E.2d 732, 735 (Ohio 1990). Summary judgment cannot be granted on any of these elements.

112

The first element of a malicious prosecution action requires that appellant set forth evidence that his prosecution was instituted or continued with malice. The Ohio Supreme Court has defined "malice" for purposes of a claim of malicious criminal prosecution as "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Twp*. (1990), 56 Ohio St.3d 82, 85. In determining whether a criminal prosecution was instituted or continued for an improper purpose, inquiry must be made into the basis for the decision to prosecute. In the absence of evidence showing a basis for the decision, it will appear to have been made without any basis, *i.e.*, maliciously. *Id*. at 85, 564 N.E.2d at 443. Thus, the absence of probable cause is the gist of an action for malicious prosecution, and malice may be inferred from the absence of probable cause. *Melanowski v. Judy* (1921), 102 Ohio St. 153, 131 N.E. 360; *see also, Evans v. Smith* (1994), 97 Ohio App.3d 59, 646 N.E.2d 217.

At a minimum, there is deeply disputed issue of material fact about what Walker's motivations were. Extensive record evidence would easily enable a jury to find that, despite her protestations otherwise, Walker intentionally set Horton up for which Horton would spend over 16 years wrongfully imprisoned. *See generally* SOMF ¶¶57-142. Walker interprets the evidence differently. And, that is the point: "The existence of malice" is a "question[] of fact which should be determined by the jury where the evidence submitted is susceptible to different inferences by reasonable minds." *Prince v. City of Shaker Heights*, No. 54397, 1989 WL 43393, at *3 (Ohio Ct. App. Apr. 20, 1989) (citation omitted).

Second, as explained more fully above, there was no probable cause to charge Plaintiff. The presumption of probable cause from an indictment or conviction can be rebutted when, among other instances, it is the product of "fraud or unlawful means." *Selective Ins.,* 706 F. App'x at 266 (citing *Vesey v. Connally*, 175 N.E.2d 876, 878 (Ohio App. 1960), and *Tilberry v.*

113

*McIntyre*, 733 N.E.2d 636, 641 (Ohio App. 1999)). A *Brady* violation such as the one alleged here can constitute such 'fraud or unlawful means.'" *Id*. (quoting, respectively, *Vesey*, 175 N.E.2d at 878, and *Harris*, 513 F.3d at 520). Accordingly, at summary judgment, the court must examine the record "to determine whether" plaintiff's "convictions were secured by fraud or unlawful means." *Courtney v. Rice*, 46 Ohio App. 3d 133, 136 (1988).

Here, properly construed, the record illustrates that Horton's conviction was procured through "fraud or unlawful means." Thus, only a rebuttable presumption applies, and the *Brady* violation itself rebuts the presumption of probable cause. *Id*.; *see also, e.g., Harris*, 513 F.3d at 521 (*Brady* violation constitutes fraud that can rebut the presumption of probable cause); *Elkins v. Summit Cty., Ohio*, 2009 WL 1150114, at \*11 (N.D. Ohio Apr. 28, 2009) (finding *Brady* violation constituted fraud that rebuts the presumption and further rebutted presumption under Ohio law). On this basis alone, summary judgment can be denied on this issue.

Assuming *arguendo* reference to other evidence was relevant, Walker's argument still fails, given that the evidence to support probable cause was fabricated. SOMF ¶¶103-28. *See Manuel v. City of Joliet*, 137 S. Ct. 911, 919-20 (2017) (holding that probable cause cannot be based upon fabricated evidence); *Jackson*, 925 F.3d at 821 (summary judgment improper where evidence illustrated evidence, including eyewitness identification, was fabricated).

Finally, the "existence of probable cause is often a question for a fact-finder." *Selective Ins.*, 706 F. App'x at 266 (citing *Crockett v. Cumberland Coll.*, 316 F.3d 571, 581 (6th Cir. 2003)); *see also Waller v. Foxx*, 1982 WL 4753, at \*1 (Ohio Ct. App. Oct. 6, 1982) ("Under the law of Ohio the issue of probable cause is a question of fact for the jury to decide."). That is the case here.

114

Third, Horton's conviction was absolutely terminated in is favor: the charges were dismissed with prejudice based on new evidence. SOMF ¶¶159-60. That is more than sufficient to constitute favorable termination. *Wheatt v. City of E. Cleveland*, 2017 WL 3174285, at \*6 (N.D. Ohio July 26, 2017); *Ayers v. City of Cleveland*, 2013 WL 775359, at \*10 (N.D. Ohio Feb. 25, 2013).

### C. There Is Sufficient Evidence for a Reasonable Jury to Find Defendant Walker Intentionally Inflicted Emotion Distress Upon Plaintiff (Count VI)

"Under Ohio law, a plaintiff must demonstrate that: (1) the defendant intended to cause emotional distress, or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was outrageous and extreme beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community; (3) the defendant's conduct was the proximate cause of plaintiff's psychic injuries; and (4) the plaintiff's emotional distress was serious, and of such a nature that no reasonable person could be expected to endure it." *Bolander v. BP Oil Co.*, 128 Fed. Appx. 412, 419 (6th Cir. 2005) (citing *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App.3d 557, 561, 698 N.E.2d 503 (Ohio Ct. App. 1997) and *Yaeger v. Local Union* 20, 6 Ohio St.3d 369, 375, 453 N.E.2d 666 (1983) (abrogated on other grounds by *Welling v. Weinfeld*, 113 Ohio St.3d 464, 866 N.E.2d 1051 (2007)).

That standard, while high, is readily met here. A reasonable jury could conclude that Defendant Walker either intended to cause Plaintiff severe emotional distress or, at a minimum, knew that her conduct would do so. Walker did not merely make a mistake or exercise poor judgment; she deliberately withheld exculpatory evidence, relied on identifications she had reason to know were unreliable, and fabricated evidence to arrest Plaintiff and bring about his prosecution despite the absence of probable cause. Conduct of that nature—knowingly

115

subjecting an innocent person to arrest, prosecution, and prolonged loss of liberty—carries an obvious and foreseeable risk of severe psychological harm.

Defendant Walker's actions were also sufficiently "extreme and outrageous" to satisfy Ohio law. Courts routinely recognize that fabricating evidence, suppressing exculpatory material, and pursuing charges against an individual known to be innocent constitutes conduct "beyond all bounds of decency." *Ayers*, 2013 WL 775359, at *14 (citations omitted). Here, Walker's conduct fits squarely within that category. By advancing a case built on tainted identifications while concealing evidence that undermined those identifications and pointed away from Plaintiff, Walker engaged in precisely the type of abuse of official power that is "shocking and outrageous to average members of the community." *Id.* at *15; *see also, e.g., O'Donnell v. Yezzo,* 2018 WL 6169283, at *10 (N.D. Ohio Nov. 26, 2018); *LeFever v. Ferguson,* 2013 WL 3742530, at *15 (S.D. Ohio July 15, 2013), *rev'd in part on other grounds,* 567 F. App'x 426 (6th Cir. 2014).

There is likewise ample evidence of causation. Walker's misconduct directly resulted in Plaintiff's arrest and prosecution. Those events, in turn, foreseeably caused Plaintiff to suffer profound emotional and psychological harm, including the trauma associated with incarceration while innocent, the stigma of being accused of a serious crime, and the disruption of every aspect of his personal and professional life. A jury could readily find that, but for Walker's actions, Plaintiff would not have endured these injuries.

Finally, Plaintiff's emotional distress was unquestionably "serious" within the meaning of Ohio law. The distress arising from being wrongfully accused, detained, and prosecuted for a crime one did not commit is not the type of fleeting or trivial harm that individuals are expected to endure. Rather, it is the kind of severe, enduring psychological injury—marked by anxiety, humiliation, fear, and lasting trauma—that no reasonable person could be expected to withstand.

116

Indeed, courts have repeatedly recognized that wrongful detention and prosecution are paradigmatic examples of conduct giving rise to severe emotional distress. *Id*.

Accordingly, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that each element of intentional infliction of emotional distress is satisfied, precluding summary judgment on this claim.

## VII. SUMMARY JUDGMENT IS NOT AVAILABLE TO DEFENDANT CITY OF COLUMBUS ON PLAINTIFF'S *MONELL* CLAIM (COUNT VIII)

Municipalities that fail to implement adequate policies, training, supervision, or other procedural safeguards, cannot obtain summary judgment in spite of these choices. The Sixth Circuit has addressed three similar cases involving *Monell* claims for failing to adopt policies or training on officers' *Brady* obligations, and concluded each time that such cases are inappropriate for summary judgment. *Jackson*, 925 F.3d at 837; *Gregory*, 444 F.3d at 752-57 (concerning both *Brady* obligations and flawed identifications); *Moldowan*, 578 F.3d at 393-94. The same result is mandated here.

"[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citations and internal quotation marks omitted).

There are four methods of proving a municipality's illegal policies or customs: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson*, 925 F.3d at 828.

117

Notably, while it is true that a jury must find Plaintiff's constitutional rights were violated in order for the City to be liable, it need not find Walker responsible in order to reach such a conclusion. *See, e.g., Garner v. Memphis Police Department*, 8 F.3d 358, 365 (6th Cir. 1993) (where the Sixth Circuit rejected the city's argument that because the only defendant officer in the case had been dismissed by the district court, the city should also be dismissed); *Doe v. Sullivan Cty.*, 956 F.2d 545, 554 (6th Cir 1992) (same); *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983."). For example, if an officer were entitled to qualified immunity (which is not the case here), a municipality—which does not enjoy that immunity—may "nevertheless be liable if the actions complained of rise to the level of constitutional violations in light of present law." *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992) (citing *Owen v. City of Independence*, 445 U.S. 622, 657-58 (1980)); *see also Richko v. Wayne Cnty.*, 819 F.3d 907, 920 (6th Cir. 2016); *Doe v. Sullivan Cnty.*, 956 F.2d 545, 553–54 (6th Cir. 1992). Or, as the Seventh Circuit noted in *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2010), a municipality can be liable due to its deficient policies and practices concerning the preservation and production of *Brady* material even if the fault did not lie with a particular named officer and perhaps by an officer that might be unknown.

Plaintiff is entitled to a jury trial against the City in the following ways: (1) the City's lack of any policy regarding (a) *Brady* obligations, file maintenance, and the production of documents to the prosecution or (b) implementation of identification procedures and avoiding undue suggestion and contamination of eyewitness identifications; (2) the City's failure to train its detectives in (a) the preservation and production of documents/*Brady* material, (b) conducting

118

identifications in a manner that was not unduly suggestive, and (c) avoiding contamination/influence before and after administering identification procedures; and (3) the City's failure to supervise its detectives concerning (a) the preservation and production of *Brady* material and (b) in administering identification procedures, in light of the obvious need to do so.

### A. Legal Standard for Lack of Policy and Failure to Train or Supervise

"In order to show that a municipality is liable for a failure to train its employees, a plaintiff 'must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

### B. The Training Provided by the City of Columbus, to the Extent it Existed, Was Inadequate

The Sixth Circuit has made explicitly clear that failure to have adequate *Brady* policies can amount to *Monell* liability under failure-to-train. *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 490–91 (E.D. Ky. 2021), *aff'd sub nom. Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804 (6th Cir. Aug. 9, 2023) (denying the defendant city's motion for summary judgment on failure-to-train theory because the city's written policies did not provide guidance on what constitutes exculpatory evidence); *Jackson*, 925 F.3d at 835 (denying summary judgment to defendant city on failure-to-train claim because the policies "could be read as insufficient to inform officers of their disclosure obligations, as none . . . explicitly mandated disclosure of exculpatory witness statements to prosecutors.").

The City's own Rule 30(b)(6) witness confirms a near-total absence of policy guidance—let alone training—on officers' obligations to identify, preserve, and disclose exculpatory evidence during the relevant time period. SOMF ¶¶162-70.

119

Plaintiff's expert, Chief Tiderington, confirms that these deficiencies were not merely suboptimal—they were "woefully inadequate" and contrary to generally accepted police practices. In particular, he explains that, by 2004, it was standard nationwide for police agencies to require officers to: (1) identify potentially exculpatory or impeaching evidence, (2) document and preserve that information in written reports, and (3) ensure its timely disclosure to prosecutors. SOMF ¶¶176-80. The City did none of these things.

Most critically, the City admits that prior to 2010 or 2011, it had **no division-wide policy requiring officers to disclose exculpatory evidence to prosecutors at all**. SOMF ¶¶162-70. The only references to "exculpatory evidence" in any written materials were confined to two narrow and irrelevant contexts: (1) a complaints directive concerning whether to charge civilians with false complaints, and (2) a supervisor's manual addressing administrative investigations of officers. SOMF ¶¶162-70. Neither addressed criminal investigations, disclosure obligations, or the handling of exculpatory evidence in cases like Plaintiff's.

Equally telling, the City's designee testified that:

- He is unaware of any written or unwritten policy requiring officers to memorialize exculpatory information in police reports;

- He is unaware of any policy requiring officers to turn over handwritten notes to prosecutors;

- He is unaware of any policy defining what qualifies as exculpatory evidence in practice; and

- He is unaware of any division-wide policy governing eyewitness identification procedures, beyond a basic form. SOMF ¶¶162-70.

Further, the City could not even produce the relevant Detective Bureau SOPs from the time period, and its 30(b)(6) witness could not testify as to whether those SOPs contained any *Brady*-related requirements. Ex. 58 at 38-41.

120

This is precisely the kind of "policy vacuum" the Sixth Circuit has held sufficient to support *Monell* liability. *See Jackson*, 925 F.3d at 835 (policies insufficient where they fail to clearly mandate disclosure); *Virgil*, 545 F. Supp. 3d at 490–91 (same). Here, the City did not merely provide unclear guidance—it provided no meaningful guidance at all on one of the most fundamental constitutional obligations governing criminal investigations.

The absence of policy is mirrored by the absence of training. The City's designee testified that he has no knowledge of any *Brady* training during the relevant period, no records reflecting such training, and no basis to conclude that officers were instructed on their disclosure obligations. SOMF ¶¶162-70. At most, he could point to vague "legal advisor training"—that came years after the Loew Street robbery—that may have referenced rules of evidence, without any indication of substance or scope. Ex. 58 at 58.

The absence of any semblance of adequate training is another factor that supports denial of summary judgment. In *Virgil v. City of Newport*, the court maintained that:

> A reasonable jury could further conclude that Newport's training program failed to compensate for the city's inadequate written policies on the handling of exculpatory evidence. Defendant Wagner testified that he did not receive formal training by the Newport Police Department on how to interview witnesses or suspects in a criminal investigation and could not recall receiving formal training on how to document exculpatory or impeachment evidence in a police report. (Doc. # 234-7 at 71). Similarly, Defendant Desentz testified that she had not received training on report-writing beyond documenting "who, what, when, where, and how." (Doc. # 234-54 at 26). Desentz also had not received training on note-taking. (Id. at 29). And Defendant Brandt could not recall whether he had received formal training on the types of information that needed to be disclosed to prosecutors in a criminal investigation. (Doc. # 223-3 at 194). Testimony to this effect has been held sufficient to create a dispute of fact as to whether a municipality adequately trained its police officers in their Brady disclosure obligations. See Jackson, 925 F.3d at 835-36.

545 F. Supp. 3d at 491.

121

That is exactly the case here. Defendant Walker testified that she not only does not recall receiving training on disclosure of exculpatory evidence, she also does not recall receiving training on notetaking, interviewing witnesses, or interviewing suspects. SOMF ¶¶171-75.

Defendants' reliance on generalized testimony about training does not establish the existence of constitutionally adequate policies or training in 2004. To the contrary, the record—particularly Detective Thomas's and Officer Farbacher's own testimony—demonstrates that any purported training on *Brady* obligations was informal, inconsistent, and largely optional. Ex. 40 (Bradley Thomas deposition); Ex. 65 (Dana Farbacher deposition).

First, while Defendants emphasize Detective Bureau School, that program was brief and limited in scope. Detective Thomas testified that the training lasted only approximately two weeks and primarily covered topics such as interview techniques, crime scene procedures, and courtroom testimony—not *Brady* obligations or the disclosure of exculpatory or impeachment evidence. Moreover, the actual training materials and agenda from that course contain no reference to "exculpatory evidence" or *Brady* obligations whatsoever (outside of undated notes that merely say "exculpatory evidence"). Indeed, Thomas could not recall any specific instruction on disclosure obligations during that training and had no independent memory of the topic being meaningfully covered. Ex. 40 at 23-24, 55-57, 70-72, 83-88.

On this point, the City's own instructor, Dana Farbacher, testified that the curriculum was assembled informally, with instructors simply "tak[ing] a subject," without any standardized or centrally enforced content. Farbacher himself taught topics such as *Miranda*, case file preparation, crime scene procedures, and courtroom testimony—but did not identify any structured instruction on *Brady* obligations or the disclosure of exculpatory or impeachment evidence. Critically, he testified that he was "not familiar" with *Brady v. Maryland* by name and

122

did not recall ever teaching it. This absence is not incidental; it reflects that the program's content was neither comprehensive nor constitutionally grounded. Ex. 65 at 33-37, 39-41, 52-56, 75, 81-85.

Second, and critically, there was no mandatory, ongoing training specific to detectives on *Brady* or disclosure obligations. The training that did occur was sporadic and not reliably administered. Thomas testified that while some trainings existed, they were optional and detectives could elect whether to attend them. He further confirmed that there was no mandatory training specific to detectives at all. Farbacher testified that detective school was only offered intermittently—nominally every six months, but sometimes with gaps of a year or more—and that he did not even know whether the training occurred in 2004, the relevant time period. Moreover, Farbacher acknowledged that even instructors had no consistent awareness of what others were teaching, underscoring the absence of any coordinated or standardized curriculum. This alone defeats any suggestion that CPD maintained a consistent or enforced training program on constitutional disclosure requirements. Ex. 40 at 23-24, 55-57, 70-72, 83-88; Ex. 65 at 33-37, 39-41, 52-56, 59-69, 75, 81-85.

Third, the absence of formal policy or structured training is confirmed by Thomas's repeated admissions that he was unaware of any CPD policy in 2004 governing exculpatory evidence. He testified that he did not know of any directive requiring detectives to document exculpatory evidence, any policy requiring its disclosure to prosecutors, or any rule addressing impeachment evidence. He was similarly unfamiliar with *Brady* itself—having only heard of it "very briefly"—and did not recall ever being trained that disclosure obligations continue through trial. Such testimony underscores that whatever "training" existed was not only minimal, but failed to convey the most basic constitutional requirements. Ex. 40 at 33-37, 42.

123

Farbacher's testimony confirms that, even where disclosure was discussed, it was done in a vague, legally deficient manner that failed to convey detectives' independent constitutional duties. He explained that his approach to "exculpatory evidence" was simply to instruct detectives to "give the prosecutor everything" and allow the prosecutor to decide what should be disclosed. But he admitted that this training did not focus on what exculpatory evidence actually is, nor did it provide guidance on officers' obligations to identify and preserve such evidence. More troubling, Farbacher testified that detectives were not expected to turn over handwritten notes—even if those notes contained exculpatory information—and he could not answer whether such material would need to be disclosed if it was not captured in a report. He further confirmed that he did not teach that handwritten notes containing exculpatory evidence must be turned over. A reasonable jury could conclude from this testimony that CPD's training affirmatively misinformed detectives about their obligations, creating a substantial risk that exculpatory evidence would be lost or withheld. Ex. 65 at 79-85.

Fourth, even the limited exposure Thomas recalls underscores the ad hoc nature of CPD's approach. His understanding of exculpatory evidence came generally from a coaching period or informal, early-career exposure—not from any structured curriculum. And the only documentary evidence of any such *Brady* training is a handwritten note containing the words "exculpatory evidence," without any explanation, guidance, or instruction as to what officers were required to do. There is not even an indicator as to when this note was written because there are materials in his evidence binder that span years—including after 2004. This falls far short of constitutionally adequate training on an issue as fundamental as *Brady* compliance. Ex. 40 at 23-26, 75-77, 83-88.

124

In short, Defendants' own evidence establishes that CPD did not provide meaningful, mandatory, or policy-driven training on *Brady* obligations in 2004. At most, detectives received fragmentary and optional exposure to the concept of exculpatory evidence, without clear guidance, enforcement, or accountability. A reasonable jury could therefore conclude that the City's training program was plainly insufficient and reflected deliberate indifference to the constitutional rights of criminal suspects.

Nor can Defendants salvage their position through the opinion of prosecutor Doug Stead. As an initial matter, Stead's Rule 26(a)(2)(B) report cannot properly be considered at summary judgment. It is not valid rebuttal within the meaning of Rule 26, and Defendants failed to submit any declaration or sworn testimony establishing that Stead would testify consistently with the report. Accordingly, it is not competent evidence for purposes of Rule 56. *Smith v. Prudential Ins. Co. of Am.*, 864 F. Supp. 2d 654, 659 (M.D. Tenn. 2012) (refusing to consider unsworn expert reports at the summary judgment state as they "constitute hearsay and may not be considered."); *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 479–80 (6th Cir.2008) (finding that district court improperly relied on defendant's unsworn expert reports in rendering summary judgment for defendant); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir.2006) (excluding unsworn expert report from consideration at summary judgment stage); *Spurlock v. Fox,* No. 3:09–cv–0756, 2010 WL 3807167, at *14–*15 (M.D. Tenn. Sept. 23, 2010) (granting motion to strike plaintiffs' expert witness reports as inadmissible hearsay); *Bomar v. City of Pontiac*, Civil No. 08–12629, 2010 WL 3245798, at *10 (E.D. Mich. Aug. 17, 2010) (excluding unsworn psychological report from consideration at summary judgment stage).

In any event, even if the Court considers Stead's disclosed Rule 26(a)(2)(C) testimony, it is exceedingly limited—he merely asserts in conclusory fashion that training from "Stead and

125

others in the Prosecutor's Office" was provided prior to 2004. Ex. 66 at 2. That assertion falls far short of establishing the existence of mandatory, adequate, or constitutionally sufficient training, and does nothing to rebut the substantial record evidence demonstrating the absence of any meaningful *Brady* training or policy within CPD.

Regardless, the question is not whether any training existed whatsoever—which is a question the jury will need to decide. *See Jordan v. Blount Cnty.*, 458 F. Supp.3d 870, 884 (E.D. Tenn. 2020) (whether a municipality's *Brady* training was adequate is a jury question). The question is whether the training that did exist was sufficient such that officers were adequately informed of their duties and constitutional obligations. *Jackson*, 925 F.3d at 835 (focusing on whether policies and training sufficiently inform officers of disclosure duties).

On this record and on Defendant Walker's own admissions, a reasonable jury could easily conclude that the City's training program was not merely inadequate—it was effectively nonexistent with respect to *Brady* obligations making summary judgment inappropriate.

## C. The City Demonstrated Deliberate Indifference

As to the second element of the failure-to-train theory, an allegation of deliberate indifference must include either "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it," or else "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 500 (W.D. Ky. 2021) (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)); *see also Campbell v. Hamilton Cnty.,* No. 22-cv-315, 2023 WL 6295803, at *9 (S.D. Ohio Sept. 27, 2023).

126

To state a failure-to-train claim based on a theory of "single incident" liability, a plaintiff must "allege 'a complete failure to train the [officers], training that is so reckless or grossly negligent that future ... misconduct is almost inevitable or would properly be characterized as substantially certain to result.'" *Sistrunk*, 545 F. Supp. 3d at 500 (quoting *Karsner v. Hardin Cnty.*, No. 3:20-CV-125-RGJ, 2021 WL 886233, at *15 (W.D. Ky. Mar. 9, 2021)).

"Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations." *Gregory*, 444 F.3d at 753 (citing *Brown v. Bd. of Commis*, 520 U.S. at 409); *see also Virgil v. City of Newport*, No. CV 16-224-DLB-CJS, 2018 WL 344986, at *15 (E.D. Ky. Jan. 9, 2018) ("Given the known frequency with which police" obtain exculpatory evidence and their obligation to collect reliable evidence, the City of Newport's alleged failure to train constitutes deliberate indifference to the "highly predictable consequence" of the violations of criminal defendants' constitutional rights), *aff'd*, 745 F. App'x 618 (6th Cir. 2018); *Jackson*, 925 F.3d at 836 (quoting *Gregory*, 444 F.3d at 752) ("a 'custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the municipality' for a deliberate-indifference claim.").

This is the paradigmatic "obvious risk" case. Officers routinely encounter potentially exculpatory information in the course of investigations. Yet the City admits it had no policy defining such evidence, no requirement to document it, no requirement to preserve or disclose it, and no training on disclosure obligations. As Tiderington explains, the absence of these safeguards predictably results in exculpatory evidence being "suppressed, overlooked, or intentionally withheld." That is precisely the "highly predictable consequence" the Sixth Circuit warned about in *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006). The risk of constitutional violations under such circumstances is not speculative—it is inevitable.

The City's own conduct confirms its indifference. It did not adopt a policy requiring disclosure of exculpatory evidence until 2010–2011—nearly five decades after *Brady v. Maryland*—and only after a court decision prompted its legal advisor to recommend changes. A reasonable jury could conclude that the City consciously chose to operate without necessary constitutional safeguards until external pressure forced action—but not done in time to help Plaintiff. Further, the only policy the City had on photo identification procedures was reading off a single-page form which, as McClanahan testified to at trial, Defendant Walker did not even do in this case. Such "safeguard" falls far short of the training and supervision required to procedurally safeguard criminal defendants from unduly suggestive identification procedures.

To the extent Defendants suggest that some form of training may have existed—such as generalized "legal advisor training" or other optional instruction—that argument does not entitle them to summary judgment. Even the City's designee could not identify the content of any such training, confirm that it addressed *Brady* obligations in any meaningful way, or establish that officers were actually required to attend or understand it. And, as noted above, any other training the City attempts to rely on to rebut the showing of deliberate indifference cannot. A vague possibility that officers could have received some undefined instruction—untethered to any requirement, content, or enforcement—cannot satisfy that standard.

At minimum, this evidence creates a classic jury question. A reasonable jury could conclude that optional, undocumented, or content-unknown training is no training at all when measured against the constitutional duty at issue. And where, as here, the City cannot show that officers were actually trained to identify and disclose exculpatory evidence, summary judgment is inappropriate.

**D.  A Reasonable Jury Could Find The City's Inadequacy Caused Plaintiff's Injury**

Finally, both the factual record and the expert testimony establish causation. Chief Tiderington identified multiple categories of critical exculpatory evidence in the Loew Street investigation that were not documented, not preserved, and not disclosed, including handwritten notes identifying an alternate suspect, investigative notes reflecting inconsistent witness accounts, and other material impeachment evidence. These are precisely the types of information that generally accepted police practices require officers to document and disclose.

He further concludes that these failures were a direct result of the City's lack of policies and training, explaining that had the City implemented standard Brady-compliant procedures, "it is far more likely that this evidence would have been properly recorded and provided to prosecutors." The absence of any such policy "left officers to their own devices," fostering a system in which exculpatory evidence could be concealed—whether intentionally or negligently—without accountability.

That is exactly what occurred here. The suppression of exculpatory evidence was not an isolated deviation from policy; it was the predictable product of a system with no meaningful rules governing documentation, preservation, or disclosure.

Under Sixth Circuit law, that is sufficient. Where the risk of constitutional violations is obvious and the municipality fails to act, and where that failure results in the very harm that made the risk obvious in the first place, causation is established. *See Jackson*, 925 F.3d at 834; *Virgil*, 545 F. Supp. 3d at 492 ("were Plaintiff to prove at trial that Defendant Wagner violated *Brady* by failing to disclose the pretrial payment to Joe Womack, a jury could easily conclude that the violation resulted from inadequate training on proper report writing or the rules governing what constitutes exculpatory evidence."). The suggestion that officers may have had

129

access to optional or generalized training does nothing to break this causal chain. Where a municipality fails to require, implement, or ensure meaningful training on a constitutional obligation, it cannot later rely on the theoretical availability of training to avoid liability for the predictable consequences of that failure.

As it relates to the absence of written directives, it takes little to see how failure to have rules governing police conduct concerning producing *Brady* material and identification evidence can allow a wrongful conviction like Plaintiff's. These failures are only magnified by the failures to train and supervise. As it relates to training, this Case is on all fours with *Gregory* and is stronger than *Jackson* (where the municipality at least had some written policies concerning the production of material evidence to criminal defendants, and was able to actually identify some training provided to its officers). As in those cases, the evidence is sufficient to allow a reasonable jury to find that the City's deficient policies were the moving force behind both the *Brady* violation here and for allowing Walker unfettered and unsupervised discretion in intentionally creating suggestive identification procedures and then continuing to influence victim-witnesses even after the fact. As it relates to supervision, the complete lack of oversight and guiding instructions on proper *Brady* evidence handling and photo identification safeguards, officers were left to their own devices and allowed to run rogue.

Finally, causation is a quintessential jury question, and the evidence submitted here is sufficient to send this issue to the trier of fact. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) ("The matter of causation is an issue of fact which must be decided by the jury."); *Obrycka v. City of Chicago*, 2012 WL 601810, at *9 (N.D. Ill. Feb. 23, 2012) (evidence, including expert testimony, created dispute of material fact on causation). Summary judgment must be denied.

130

## VIII.  PLAINTIFF AGREES TO DISMISS HIS COUNTS III, IV, AND VII AGAINST DEFENDANT WALKER

Plaintiff agrees to voluntarily dismiss his Counts III (failure to intervene), IV (federal conspiracy), and VII (state-law civil conspiracy) against Defendant Walker.

### CONCLUSION

Construing the record in the light most favorable to Horton and drawing inferences in his favor, Defendants are not entitled to summary judgment on any of the theories on which they have moved for summary judgment, save for the three that Plaintiff has voluntarily dismissed. Horton is entitled to a trial against Defendants on all of his other claims. For all of these reasons, Defendants' motion for summary judgment should be denied as laid out above.

RESPECTFULLY SUBMITTED,

/s/ Michele Berry
*One of Plaintiff's Attorneys*

Michele L. Berry (0018939)
THE LAW OFFICE OF MICHELE BERRY, LLC
114 East 8th Street
Cincinnati, OH 45202
Tel: 513.919.5315
Fax: 513.376.8752
mberry@mberrylaw.com

*Counsel for Plaintiff*

Jon Loevy
Alyssa Martinez
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900
alyssa@loevy.com

*Counsel for Plaintiff*

132

## CERTIFICATE OF SERVICE

I, Alyssa Martinez, an attorney, certify that a copy of the foregoing was filed electronically on March 27, 2026 by using the Court's CM/ECF System, and that notice of this filing was sent that same day to the other parties to this case by operation of the Court's CM/ECF System.

/s/ Alyssa Martinez
*One of Plaintiff's Attorneys*

133