# Exhibit 3

Case: 2:23-cv-03888-ALM-SCS Doc #: 149-4 Filed: 03/28/26 Page: 2 of 285  PAGEID #: 9304

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Richard Horton,                :

        Plaintiff,        :

        vs.                :   Case No. 2:23-cv-3888
                               Judge Algenon L. Marbley
City of Columbus,          :   Magistrate Judge
et al.,                          Elizabeth Preston
                           :     Deavers
        Defendants.
                           :

- - - - -

VIDEOTAPED DEPOSITION OF JANETTE HORTON

- - - - -

Taken at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
January 23, 2025, 10:12 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

                    A P P E A R A N C E S


ON BEHALF OF PLAINTIFF:

     Loevy & Loevy
     311 North Aberdeen Street, 3rd Fl.
     Chicago, IL 60607
     By Alyssa Martinez, Esq.


ON BEHALF OF DEFENDANTS:

     Columbus City Attorney's Office
     77 North Front Street, 4th Fl.
     Columbus, OH 43215
     By David J. Dirisamer, Esq.
        Aaron D. Epstein, Esq.



ALSO PRESENT:

     Gregory Castetter - Videographer
     Doug Girard - Paralegal, Columbus City
        Attorney's Office

3

Thursday Morning Session

January 23, 2025, 10:12 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Janette Horton, a witness herein, called by the Defendants for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

4

I N D E X

Examination By                                          Page

Mr. Dirisamer - Cross                                      5


Exhibits                                                Page

Exhibit 1 - R. Horton Pay Stub, 9-26-2004               39

Exhibit 2 - Photograph of House                         46

Exhibit 3 - Photograph of House                         47

Exhibit 4 - Excerpts of R. Horton Criminal              56
       Trial Transcript

Exhibit 5 - R. Horton Telhio Credit Union Bank          60
       Statement, 7-2005

Exhibit 6 - R. Horton Franklin County                   76
       Municipal Court Documents

Exhibit 7 - Affidavit of LaKeon Horton,                 105
       1-1-2007

Exhibit 8 - J. Harmon Witness Statement,                122
       6-22-2005

Exhibit 9 - Division of Police, Progress of             124
       Investigation Form, 10-19-2004

Exhibit 10 - R. Horton Motion for Judicial              204
       Release

Exhibit 11 - R. Horton Inmate Visitation                218
       Record

Exhibit 12 - R. Horton Motion for Judicial              221
       Release

(.PDF exhibits attached.)

5

THE VIDEOGRAPHER:  We are on the record at 10:12 a.m.  Will counsel please announce their presence.

MR. DIRISAMER:  David Dirisamer, on behalf of the City of Columbus and Brenda Walker. Our paralegal, Doug Girard, is here, as is my cocounsel, Aaron Epstein.

MS. MARTINEZ:  Alyssa Martinez, on behalf of Plaintiff Richard Horton and on behalf of the deponent here today.

- - - - -

JANETTE HORTON

being first duly sworn, testifies and says as follows:

CROSS-EXAMINATION

BY MR. DIRISAMER:

Q.        All right.  Can you please state your name for the record.

A.        Janette Horton.

Q.        Okay.  And Horton is H-o-r-t-o-n?

A.        Yes.

Q.        Okay.  And Janette is J-a-n-e-t-t-e?

A.        Yes.

Q.        Thank you.

6

A.          Uh-huh.

Q.          Let me just kind of go over some, sort of, basics for today.  Obviously, this is a deposition.  It's a question-and-answer format.

We're on both video, but there is also a written record being taken of what we say.  And for that reason, I would ask that you try to do your best not to speak over me when I'm asking a question.  I'll do my best not to speak over you when you're answering a question, just to try and keep the record straight.

Does that make sense?

A.          Yes.

Q.          All right.  And I'll try and do this one, too.  I'm not always the best at it.  But I will try and speak slowly, again, so everything that I say can be captured, and I would ask that you do your best to speak slowly as well so we can get everything on the record.

Is that okay?

A.          Yes.

Q.          Again, for the same reason, the written transcript, I will need a verbal answer to a question.  So that could be "yes," it could be

7

"no," it could be something else.  But head nods, head shakes, "uh-huhs," "huh-uhs" can't really be captured in a written record.

So I may prompt you, is that a yes; is that a no?  If you do something like that, it's totally fine, but just explaining that that's the reason I may do that.  And if you could just try to do a verbal answer, it would -- it would be helpful.

A.        Okay.

Q.        Does that make sense?

A.        Yes.

Q.        And then we'll go for a little while today.  I don't know exactly how long, but we can certainly take a break at any time you want, if you want to go to the restroom or get food or anything else.  I would just ask that if I've asked you a question and you haven't yet answered it, that you answer the question before we take a break.

Does that make sense?

A.        Yes.

Q.        Okay.  And then I'm going to assume that if you answer a question of mine, that you've

8

both heard it and understood it.  So if you don't hear my question or don't understand my question, I ask that you ask me to restate it or rephrase it so that you do understand and do hear it.  But if you go ahead and answer, I'm going to assume that you both heard and understood.

Does that make sense?

A.        Yes.

Q.        All right.  Is there any reason that you can't testify truthfully and completely today?  Any medications that you're taking or anything else that might affect your memory?

A.        No.

Q.        All right.  You gave us your name a minute ago as Janette Horton.  Have you had any prior names in your life?

A.        Last name Harmon.  That was my maiden name.  Janette Harmon.

Q.        Okay.  And that's H-a-r-m-o-n, right?

A.        Yes.

Q.        All right.

A.        Uh-huh.

Q.        Is that the only other prior name you've had?

9

A.          Yes.

Q.          Okay.  And where do you live right now?

A.          1073 Urana Avenue.

Q.          And that's here in Columbus?

A.          Yes.  43224.

Q.          All right.  Do you own that home?

A.          We now do, yes.

Q.          Okay.  And as of when?  When did you purchase it?

A.          August, I believe, is when we closed on it.  August 2024.

Q.          Okay.  The way you said that, we now own it, did you live there before you owned it?

A.          Yes.  I was renting it for about 10 years.

Q.          Okay.

A.          Uh-huh.

Q.          So back -- 2014, roughly?

A.          Yes.

Q.          Okay.  All right.  And my understanding is your husband, Richard, lives with you there?

A.          Yes.

Q.          Does anyone else live with you there?

A.          No.

10

Q.          Okay.  And when you purchased the property, was that -- did you purchase it jointly with Richard or --

A.          Yes.

Q.          You're both on the mortgage?

A.          Uh-huh.

Q.          Okay.  All right.  What is your current phone number?

A.          614-284-4482.

Q.          Okay.  Is that a phone number that you've had for a long time?

A.          That's my only phone number I've had.

Q.          Okay.  So for 20-plus years?

A.          Pretty much, yeah.

Q.          Okay.  All right.  That makes it easy.

A.          Yep.

Q.          Do you have any social media accounts currently, like Facebook, Instagram, things like that?

A.          I do.

Q.          Okay.  Which ones?

A.          I have two Instagram accounts.

Q.          Okay.  What are your usernames on those?

11

A.          The first one is Darlene Marie Styling.

Q.          Okay.  What's the second one?

A.          And the other one is Blazers & Bottoms Boutique.

Q.          Okay.  And we'll, I think, talk about those in a little bit, but are those both businesses that you're associated with?

A.          Yes.

Q.          Okay.

A.          Uh-huh.

Q.          You don't have a personal Instagram?

A.          No.

Q.          Okay.  Do you have a Facebook or any other social media?

A.          No Facebook.

Q.          Okay.  And that's true for you personally, as well as for those businesses?

A.          You said is there Facebook for those businesses?  No.

Q.          Okay.  Are there Facebook -- is there a Facebook account for another business that you're associated with?

A.          No.

Q.          Okay.  And then do you have, like,

12

Twitter or Snapchat or any of that?

A.          No.

Q.          All right.

A.          Huh-uh.

Q.          Have you ever given a deposition like this before?

A.          No.

Q.          All right.  Have you ever testified in court before?

A.          Yes.

Q.          Okay.  And when was that?

A.          I don't remember the exact date.

Q.          Okay.  Well, let's -- how about this.

A.          It was back into the beginning of 2006.

Q.          Okay.  Right.  And that's the criminal trial related to this case, right?

A.          Yes.

Q.          Okay.  Separate from that, have you ever testified in court before?

A.          No.

Q.          Okay.  And we'll talk about that.

Have you ever either sued someone or been sued by someone?

A.          No.

13

Q.          Okay.  Were you born in Columbus?

A.          Yes.

Q.          And you've lived here your whole life?

A.          Yes.

Q.          All right.

A.          Uh-huh.

Q.          I won't make you go all the way back to the beginning, but do you remember what middle school you went to?

A.          Finland Middle.

Q.          Okay.  And then what high school?

A.          Franklin Heights High School.

Q.          Okay.  Did you graduate from high school?

A.          Yes.

Q.          What year was that?

A.          2000.

Q.          Okay.  Do you have any schooling beyond high school?

A.          No.

Q.          All right.  So you started -- did you start working right after --

A.          I started working right away.

Q.          -- you graduated?  Okay.

14

And so just kind of briefly, let's start -- let's take the first five years out of high school.  2000 to 2005, what were you doing for work in those years?

A.        When I first started working, I was cleaning houses part-time, and then I got into cooking at a nursing home up north.

Q.        Okay.  When you were -- and let me take a step back.

So were you cleaning houses for a period of time and then you switched to the job at the nursing home or were you doing both at the same time?

A.        No.  I wasn't doing both at the same time at that time.

Q.        Okay.

A.        I was cleaning houses prior to me moving out of my parents' house and then got a job at the nursing home, cooking.

Q.        Okay.  And so approximately when did you get the job at the nursing home?

A.        Approximately 2003, maybe.

Q.        Okay.  All right.  When you were cleaning houses, was that -- did you do that as

15

part of a business or was that just something you did, kind of --

A.          No.

Q.          -- self-employed?

A.          That was just what I did, self-employed.

Q.          Okay.  All right.  So then you started working about 2003 at the nursing home.  Do you remember the name of the nursing home?

A.          Broadview Health Center.

Q.          Okay.  And how long did you work there?

A.          All together?  Honestly, I cannot remember.

Q.          Okay.  More than two years?

A.          More than two years for sure.

Q.          Okay.

A.          Yes.

Q.          More than five years?

A.          I think so, but I'm not for sure.

Q.          Okay.  All right.  And then you worked there for some period of time.  Maybe more than five years, maybe not.  What did you start doing after that?

A.          I was doing the same thing.  I just

16

moved to a different nursing home.

Q.        Okay.  What was the name of that nursing home?

A.        Then it was The Village Westerville, which -- both of these have changed names, been bought out, things like that.

Q.        Okay.  And how long, approximately, did you work for The Village Westerville?

A.        Maybe a -- maybe seven years.

Q.        Okay.

A.        Maybe.

Q.        So now that takes us up through -- I know we're being a little approximate, but that's something in the neighborhood of 10 years ago that you would have stopped working there?

A.        Yes.  Yeah, that makes sense.

Q.        Okay.

A.        Approximately, yeah.

Q.        Okay.  And then, what have you done then in the last 10 years?

A.        So I have my own cleaning business.

Q.        Okay.  What's the name of that business?

A.        Horton Housekeeping, LLC.

17

Q.          Okay.  And how long have you had that business?

A.          Since 2017.

Q.          Okay.  And you've been doing that continuously since 2017?

A.          Uh-huh.  Yes.

Q.          There you go.  You corrected yourself. Thank you.

A.          Uh-huh.

Q.          And have you had any other jobs other than that since -- from 2017?

A.          I owned a clothing boutique with my sister.

Q.          What was the name of the boutique?

A.          Blazers & Bottoms Boutique.

Q.          Okay.  And was that here in town as well?

A.          Yes.  It was in Upper Arlington, off of West Fifth Avenue.

Q.          Okay.  And during what years did you own that?

A.          Oh, man.

Q.          I --

A.          2020 to 20 -- we had to close our doors

18

in 2023.

Q.        Okay.  And I won't hold you --

A.        So it was only open for, like, two years.

Q.        Okay.  I won't hold you to, you know, the exact dates, but roughly -- so, opened it maybe four or five years ago, closed it maybe two years ago?

A.        Yes.

Q.        Okay.  And then in the last two years, you've continued working with your housekeeping business?

A.        Yes.

Q.        Have you had any other jobs?

A.        No.

Q.        All right.  So that's your only current job?

A.        That's my only current job.

Q.        Okay.  Do you have employees as part of that business?

A.        No.  It's just me.

Q.        Okay.  Do you clean -- is it residential homes?

A.        Just residential homes, yes.

19

Q.      Okay.  All right.  Has your husband ever worked with you at any of those businesses that we've talked about?

A.      No.

Q.      Okay.  Obviously, we've said you're married to Richard Horton, currently?

A.      Yes.

Q.      And we'll talk a little bit about your marriage and things like that.

Have you had any other marriages?

A.      No.

Q.      Okay.  And do you have any children?

A.      No.

Q.      All right.  Did you do anything to prepare for this deposition today?

A.      I talked with my lawyer.

Q.      Okay.  And who's your lawyer?

A.      Alyssa Martinez.

Q.      Okay.  How long has Ms. Martinez represented you?

A.      You want, like, exact dates or...

Q.      To -- I mean, to the -- I mean, I suspect you probably can't get me month, day, and year.

20

A.        Right.

Q.        But, I mean, have they represented you for a year, two years, three years?

A.        About a year --

Q.        Okay.

A.        -- I guess.

Q.        Did you sign a contract that formalizes their relationship with you as your lawyer?

A.        I did not, but my husband did.

Q.        Okay.  And you said you met with Ms. Martinez to prepare for today.  Was that just one meeting or was there more than one?

A.        It was more than one meeting.

Q.        Okay.  When was the first time you met with Ms. Martinez to prepare for this deposition?

A.        Just yesterday.

Q.        Okay.  But you said --

A.        I'm sorry.  Tuesday.  Tuesday, because today is Thursday.

Q.        Okay.

A.        So, Tuesday.

Q.        So two days ago, on Tuesday --

A.        Yes.

Q.        -- you met with Ms. Martinez.  Have you

21

met with her other times to prepare for this deposition?

A.          And this morning.

Q.          Okay.  How long was the meeting on Tuesday?

A.          A little over an hour.

Q.          Okay.  And how long was the meeting this morning?

A.          Almost two hours.

Q.          Okay.  Good thing we didn't set this for 9 a.m., huh?

           Did you review any documents as part of preparation for this deposition?

A.          Yes, I did.

Q.          Okay.  What documents?

A.          I reviewed the interview that I had with Brenda Walker back in 2005, and then I reviewed my testimony for the trial that was from 2006.  And I also reviewed -- I think that's it.

Q.          Okay.

A.          Yeah.

Q.          And so let's take each of those in turn a little bit.  So you said you reviewed the interview with Brenda Walker?

22

A.          Uh-huh.

Q.          Do you mean -- there was a -- I know I've seen a handwritten statement that you gave and signed following that interview.  Is that what you mean you reviewed or was there something else related to that interview that you reviewed?

A.          That was in there, but it was also things that she had written as well.

Q.          Okay.  So it was a two- or three-page typed-out document --

A.          Uh-huh.

Q.          -- from her?

A.          And then my written --

Q.          And your --

A.          And then my written part.

Q.          And your written statement.  You reviewed both of those?  Okay.

A.          Uh-huh.

Q.          Did you review anything else related to your interview with Brenda Walker?

A.          No.

Q.          Okay.

A.          That was it.

Q.          All right.  And then you said you

23

reviewed your trial testimony from the 2006 trial.

A.        Yes.

Q.        Just your testimony?

A.        Yes.

Q.        So not the testimony of any other witness?

A.        No.  Just mine.

Q.        All right.  Did you review any deposition transcripts in preparation for today?

A.        No.

Q.        Did you review any videos of any depositions or anything else in preparation for today?

A.        No.

Q.        Okay.  Separate and apart from the two meetings we've talked about that were preparing for this deposition, have you previously met with Alyssa Martinez?

A.        No.

Q.        Okay.  Have you previously met with an attorney named Jon Loevy?

A.        No.

Q.        Okay.  Have you ever met with anyone named Cindy Chekingo?

24

A.        No.  I have no idea who that is.

Q.        Okay.  Have you ever met with anyone named Michele Berry?

A.        No.

Q.        All right.  Now, I can go through all of them, if I need to.  Is the answer any different if I change the question to have you ever spoken with any of those people?

A.        Say the names again.

Q.        Sure.  We'll do it -- we'll do it again.

A.        Please.

Q.        Yeah.  So apart from -- I understand you met with Ms. Martinez twice in the last two days, but have you ever spoken with Ms. Martinez prior to that --

A.        Yes.

Q.        -- over the phone?

A.        Uh-huh.

Q.        Okay.  How many times would you estimate?

A.        Maybe three or four times.

Q.        Okay.  And can you give me a sense of when the first time was.  Six months ago, a year

25

ago, 18 months ago?

A.      Maybe -- you said the first time?

Q.      Yep.

A.      Maybe six months ago.

Q.      Okay.  And then how long after that was the next time you spoke with her?

A.      I'm not sure.

Q.      Okay.

A.      I can't give you an exact -- I'm not sure.

Q.      All right.  Of those three or four times you spoke with her on the phone, when was the last time?

A.      The last time was just yesterday.

Q.      Okay.  All right.  I guess we'll go through the other folks, then.  Have you ever spoken with -- on the phone with Jon Loevy?

A.      No.

Q.      Have you ever spoken -- well, you said you didn't know who Cindy Chekingo was, so I'm going to assume --

A.      Yeah.  I don't know.

Q.      I'm going to assume you didn't speak on the phone with her.  Have you ever spoken on the

26

phone with Michele Berry?

A.    Michele Berry.  I don't think I know who that is.

Q.    All right.

A.    I don't think.

Q.    All right.  And then let me ask you this question:  For your meetings with Ms. Martinez, was anyone else present?

A.    No.

Q.    For your telephone conversations with Ms. Martinez, to the best of your knowledge, was anyone else present?

A.    No.

Q.    Okay.  All right.  Have you ever been represented by any attorney other than Ms. Martinez in connection with Richard Horton's criminal trial in 2006 or this civil lawsuit?

A.    Yes.

Q.    Okay.  And who was that attorney?

A.    Myron Shwartz.

Q.    Okay.  So Myron Shwartz represented you?

A.    Uh-huh.

Q.    Did you --

27

A.          Yes.  Sorry.

Q.          Okay.  Did you have a signed contract with Myron Shwartz?

A.          Yes, we did.

Q.          Okay.  Both -- and when you say --

A.          Yes.

Q.          -- "we," you mean yourself and Richard?

A.          I'm pretty sure.  Richard for sure, but I'm pretty sure I was a part of that signed contract.

Q.          Okay.  So you believe that Myron Shwartz represented you?

A.          Yes.

Q.          And did you meet with Myron Shwartz?

A.          Yes.

Q.          Okay.  Was anyone else present for those meetings?

A.          Besides Richard, his granddaughter, who was also in the practice.  Alissa -- I forget her last name.

Q.          Was it Alissa Holfinger?

A.          Yes.  That.

Q.          Okay.  So you had some meetings where Myron Shwartz, Alissa Holfinger, Richard Horton,

28

and yourself were all present?

A.        Yes.

Q.        Okay.

A.        Prior to his trial.

Q.        Okay.  And how many meetings did you have?

A.        I have no idea, honestly.  Twenty years ago, I can't even begin to tell you.

Q.        Fair enough.  Less than five?

A.        I am not sure.

Q.        All right.  Was anyone other than Myron, Alissa, Richard, and yourself present for those meetings?

A.        No.

Q.        Okay.  Did you ever meet with an attorney by the name of Carol Wright?

A.        I personally didn't meet with her. That was Richard's -- what am I trying to say -- State representation.  But I never personally met with her by myself.  He -- she represented him at some point.

Q.        Okay.  And she didn't represent you, though?

A.        No.

29

Q.        Did you ever speak with her?

A.        We had -- we never really had conversations.  She mostly spoke to Richard.

Q.        Okay.  Did you ever meet or speak with an attorney named David Thomas?

A.        No.  I don't know who that is.

Q.        All right.  Did you ever meet or speak with an attorney named Eric Allen?

A.        No.

Q.        Did you ever meet or speak with an attorney named Brian Howe?

A.        Yes.

Q.        Okay.  Do you believe that Brian Howe was your attorney and represented you?

A.        No.

Q.        Okay.  How many times did you meet with Brian Howe?

A.        To be completely honest with you, I never saw Brian Howe until the day of Richard going -- coming here to get out, so...

Q.        Okay.  So --

A.        I've never met with him.

Q.        So that was the first day you saw Brian Howe?

30

A.          That was the first day I saw Brian Howe.

Q.          Have you seen Brian Howe since then?

A.          Yes.

Q.          Okay.  How many times?

A.          I'm not sure how many times.  It's all in social settings.

Q.          Okay.  More than five?

A.          So -- I'm not even sure.

Q.          All right.  Have you ever spoken about the substance -- any of the substantive issues of Richard Horton's 2006 criminal trial or this civil lawsuit with Brian Howe?

A.          No.

Q.          All right.  You said the first time you met him was the day that Richard was released from prison.  Did you speak with Brian Howe prior to that?

A.          We spoke on the phone several times, just to talk about what was going to happen that day of him getting out.

Q.          So in the days leading up to that?

A.          Yes.

Q.          Okay.  And just about --

31

A.          Just basic information.

Q.          -- the specifics of --

A.          Yeah.  Just basic information about him getting out and what is going to happen that day.

Q.          Okay.  In any of those conversations, did you and Brian have -- discuss any substantive issues related to the 2006 criminal trial or this civil lawsuit?

A.          No.  This was all just really basic information about what was going to happen that day of him getting out.

Q.          All right.  Have you ever met or spoken with someone by the name of Mark Godsey?

A.          Yes.

Q.          Okay.  And when was the first time you met with spoke with Mark Godsey?

A.          2022, a couple months after Richard came home.

Q.          Okay.  And did you ever discuss with him any substantive issues related to the 2006 criminal trial of Richard or related to this civil litigation?

A.          No.  This was all social setting.

Q.          Okay.  All right.  I want to talk just

32

sort of briefly and at a high level about your

relationship with Richard and the timeline of

that, and then we'll get more into some of the --

some of the specifics.

A.         Okay.

Q.         But when did you first meet Richard?

A.         2004.

Q.         Okay.  Can you be more specific?  Do

you remember when within 2004?

A.         May.  April, May of 2004.

Q.         Okay.  And where did you meet?

A.         We met at a nightclub.

Q.         Do you happen to remember the name of

it?

A.         Studio 69, which is no longer there

anymore.

Q.         Okay. All right.  And that -- you

mentioned a little earlier about moving out of

your parents' house.  Did you meet him shortly

after you moved out?

A.         Yes.

Q.         Okay.  Like, within two months?

A.         I moved out about November of 2003.

Q.         So closer to six months, maybe?

33

A.          Yes.

Q.          Okay.  And then, when would you say that your relationship with Mr. Horton became a dating relationship, where you were boyfriend and girlfriend?

A.          About a month after I met him.

Q.          So by early June?

A.          By early June.

Q.          Okay.  And at the time, I think you were -- at the time you met him, you were about 23.  Does that sound right?

A.          Yes.

Q.          And he was about 28?

A.          Yes.

Q.          All right.  Now, the robbery that led to the 2006 criminal trial occurred on October 9th of 2004; is that right?

A.          Yes.

Q.          Okay.  Richard Horton turned himself into the police in connection with that robbery on December 27th of 2004; is that right?

A.          Can't remember the exact date.

Q.          Okay.  Does it -- it sounds approximately correct to you?

34

A.       I -- it could, yes.

Q.       Okay.  And then he was in jail for a short period of time, then he was released on bond.  Do you remember that?

A.       Uh-huh.  Yes.

Q.       Okay.  And that was approximately January of 2005?

A.       Yes.

Q.       That sounds right?

A.       (Indicates affirmatively.)

Q.       Okay.  And then you and Richard got married on July 1st of 2005.

A.       Yes.

Q.       Is that right?  All right.

         His criminal trial was -- I think it spanned the last day or two of January and the first few days of February of 2006.

A.       Yes.

Q.       Is that -- that's what you remember?

A.       (Indicates affirmatively.)

Q.       Okay.  And then you and Richard were divorced in April of 2013; is that correct?

A.       Yes.

Q.       Okay.  And he was released from prison

35

in January of 2022?

A.          Yes.

Q.          And then you and he got remarried very shortly thereafter, I think five days later or something like that?

A.          Yes.

Q.          All right.  Also in January of 2022?

A.          January 24th.

Q.          All right.  So tomorrow's your anniversary?

A.          Yes.

Q.          Okay.  All right.  Now I want to talk about -- so we've kind of -- I just wanted to get the timeline out there.

          I want to talk now about the period from when you met Richard up through October of 2004, the date of the robbery.  Were you aware of any nicknames that Richard had during that period?

A.          His family called him Richey.

Q.          Okay.  Anything else?

A.          That's all I can remember.

Q.          Okay.  There wasn't a nickname that his friends called him?

A.          Not that I know of.

36

Q.        Okay.

A.        And I didn't call him any nicknames. It was just Richard.

Q.        All right.  Was Richard working when you met him?

A.        Yes.

Q.        And where was that?

A.        Popeyes, off of Livingston.

Q.        Okay.  Do you know how he was getting to work?

A.        I don't remember.  I don't remember, like, early on how he was getting to work.

Q.        Okay.

A.        He was taking the bus sometimes at some point, but, like, the very first, I don't -- I don't know.

Q.        Okay.  Did you ever visit him at work at Popeyes?

A.        I picked him up sometimes from Popeyes, yes.

Q.        Okay.  Do you know the names of anyone that he worked with there?

A.        No.

Q.        I know it's been a long time.

37

A.          I would say no.  Huh-uh.

Q.          Okay.  Do you know if he worked with his aunt, Nancy Banner, there?

A.          I think she might have worked there then.  I'm just not sure.

Q.          Okay.

A.          I'm just not sure.

Q.          All right.  Do you have a memory of her working at Popeyes at some point?

A.          Yes, I do.

Q.          Okay.

A.          Uh-huh.

Q.          But you just don't know if she was there at the same time that Richard was?

A.          I don't know if she was at that one.

Q.          Okay.  Fair enough.  What was Richard's schedule when he was working at Popeyes?

A.          I don't remember.

Q.          Okay.  Do you remember if he worked weekends?

A.          He worked some weekends.

Q.          Okay.  Would that be, like, every other weekend or one weekend a month or do you have any sense of how often?

38

A.          I don't remember how often.

Q.          Okay.  But he did work some weekends?

A.          Yes.

Q.          All right.  And you don't -- you don't remember at all the days -- or the hours -- I'm sorry -- the hours that he would work in a given day?

A.          He worked different hours from me.  I worked 6 to 2:30.  So I know he went in later and got off, you know, a little later, but I'm not sure of the exact times.

Q.          Okay.  Do you know how many days a week he worked?  So if he worked on a weekend, does that mean he would work seven days that week or would he have days off during the week if he worked on weekends?

A.          That, I don't remember.

Q.          Okay.  And you said you picked him up a few times from work.  Do you recall what time of day that was that you'd pick him up?

A.          When I would pick him up, I remember it being -- it was always after I got off work.  I got off at 2:30, so maybe between 4 and 5.

Q.          Okay.

39

A.          Maybe.

Q.          All right.  Do you know what his hourly rate of pay was at Popeyes?

A.          No.

Q.          Do you know if he got -- how he was paid?  Was it a physical check, was it a direct deposit, something like that?

A.          I do not know that.

Q.          Okay.  Was Popeyes his -- to your knowledge, the only source of income that he had in October of 2004?

A.          Yes.

Q.          Okay.

            MR. DIRISAMER:  Can I have...

                  - - - - -

      Thereupon, Exhibit 1 is marked for purposes of identification.

                  - - - - -

Q.          Craig's handed you a document that's been marked as Exhibit 1.  This was an exhibit at Richard's criminal trial.

            Let me start with this:  Were you present for Richard's testimony at his trial?

A.          Yes.

40

Q.          Okay.  Do you recall there being testimony about a pay stub from Popeyes?

A.          I don't remember that.

Q.          Okay.  All right.  Well, I'll represent to you that this was an exhibit at his criminal trial.

Do you see it has his name, Richard H. Horton, kind of in the top middle?

A.          Yes.

Q.          It says Sapp Restaurant Enterprises. This is for a period from September 26th of 2004 to October 9th of 2004, so essentially a two-week period.  And do you see, under "Earnings," it says regular: 46.1 hours?

A.          Yes.

Q.          And the rate of $6.75?

A.          Yes.

Q.          Okay.  Would you agree, then, that this shows him working 46 hours in that two-week period?

A.          Yes.

Q.          And making 6.75 per hour?

A.          Yes.

Q.          Do you -- does 46 hours in a two-week

41

period -- does that sound right to you in terms of the normal hours that he was working?

MS. MARTINEZ: Objection; foundation.

You can answer.

THE WITNESS: Huh?

MS. MARTINEZ: You can answer.

THE WITNESS: I can answer?

A. I'm not even sure. It's so long ago. Like, I just don't know.

Q. Okay. So you don't recall if he worked three days a week, five days a week, seven days a week?

A. I mean, he worked a lot. He did work a lot, but I'm just not sure -- I just can't remember the exact days. I mean, we're talking over 20 years ago.

Q. Uh-huh. Yeah. But setting aside not knowing which days he worked, do you recall him working at least five days a week?

A. Yeah.

Q. Okay.

A. He worked -- he worked quite a bit. I mean, it's a restaurant, too, so it's just kind of like my job, you know, open seven days a week,

42

so...

Q.        Yeah.  But you recall him working at least five days a week?

A.        I'm pretty sure, yes.

Q.        And when he would work a shift, he would work something like an eight-hour shift?

A.        I believe so.

Q.        Okay.  All right.  Okay.  Would you agree that if he had worked five days a week and eight hours a shift for a two-week period, that that would have been more than 46.1 hours in a two-week period?

A.        Well, the numbers show -- I'm sure, yes.

Q.        Okay.  Were you working when you met Richard?

A.        Yes.

Q.        Okay.  And that was at the Broadview...

A.        Broadview Health Center.

Q.        Broadview Health Center.  And how many hours a week were you working?

A.        I was working 40 hours a week.

Q.        Okay.  Do you know what your hourly pay rate was?

43

A.          Not back then, no.

Q.          Okay.

A.          I can't remember that.

Q.          If I told you it was 10.75, would you -- would that sound about right?

A.          That sounds about right.

Q.          Okay.  I mean, we've got it if you want to see it, but -- okay.

And so if we assume 40 hours a week and 10.75 an hour, that works out to about $1,700 a month before taxes.  Does that sound about right --

A.          Yes.

Q.          -- at that point in time?  Okay.

Was that your only source of income in October of 2004?

A.          That was, yes.

Q.          Okay.  Did you receive a physical check or direct deposit?  How did you get paid?

A.          I think I was getting a check.

Q.          Okay.  And then did you deposit it in the bank?

A.          Yes.

Q.          And was that -- the bank account that

44

you deposited that in, was that separate from --
it wasn't a joint account with Richard?

A.        No.  I had my own account.

Q.        Okay.  All right.  Where was Richard
living when you met him?

A.        He was partly living with his aunt.

Q.        And when you say "his aunt," is that
Nancy Banner?

A.        Yes.

Q.        And do you recall where she lived?

A.        I can't remember the street name.

Q.        Okay.  Would you -- do you think you'd
recognize the house if you saw a picture of it?

A.        Probably not.

Q.        Okay.  You said he was "partly living
with his aunt."  Where else was he living?

A.        He would stay with friends.  He was
kind of, like, not really at the same place all
the time.

Q.        Okay.

A.        So it was just between two places.  I
can't remember the other place, the address or
anything like that.

Q.        Okay.

45

A.          I don't remember the exact place.

Q.          Do you remember which friends he was living with?

A.          No.  Huh-uh.

Q.          You don't know any of their names?

A.          No, I don't know any of their names.

Q.          Okay.

A.          It was so long ago.

Q.          When you would -- did you ever -- did you ever go into either of those places, either his aunt's house or his --

A.          I would go into his aunt's house, yes.

Q.          Okay.  Would you go into the place that he was sometimes staying with friends?

A.          I went in a couple times.

Q.          Okay.  Do you know if he was paying rent at the place where he was staying with friends?

A.          I am not even sure.

Q.          Okay.  And I assume, given that answer, you don't know, then, who his landlord was?

A.          No.

Q.          Or --

A.          I don't have any of that information.

46

Q.        Or how much he was paying in rent?

A.        No.

Q.        Okay.

A.        No.

Q.        All right.  I'll go ahead and show you -- we're going to mark a couple exhibits as Exhibit -- well, we'll start with Exhibit 2.

                    - - - - -

          Thereupon, Exhibit 2 is marked for purposes of identification.

                    - - - - -

A.        Okay.

Q.        I'm going to hand that to you.

          Does this house look at all familiar to you?

          MS. MARTINEZ:  Sorry, Counsel.  Can I have a copy?

          MR. DIRISAMER:  Oh, my apologies.

          MS. MARTINEZ:  Thank you.

A.        This looks like his aunt's house, I think.

Q.        Okay.  So that would be -- when you -- and, again, just so we're all on the same page, that would be Richard's aunt, Nancy Banner?

47

A.        Yes.

Q.        You think this looks like her house?

A.        Yes.

Q.        Okay.  And you don't recall the street address of that house, but you think this is that house?

A.        Yes.

Q.        All right.

                    - - - - -

        Thereupon, Exhibit 3 is marked for purposes of identification.

                    - - - - -

Q.        I'm going to hand you what's been marked as Exhibit 3.

A.        Uh-huh.

Q.        It's another house.  Does that house look familiar at all?

A.        That looks familiar.

Q.        Okay.

A.        Uh-huh.

Q.        Is it -- do you -- do you think that's the house that Richard was staying at with friends?

A.        Yes.  This is -- yeah.  This is the

48

house I would pick him up at sometimes.

Q.        Okay.  And you recall picking him up at that house?

A.        Sometimes.

Q.        Okay.

A.        Not all the time.

Q.        Okay.  And sometimes from his aunt's house?

A.        Yes.

Q.        Do you recall picking him up from any other places in -- let's, again, use that six-month period from April of 2004 until October of 2004.

A.        From the gym, Gold's Gym, downtown.

Q.        Okay.

A.        And then from his job.

Q.        And from his job.  Okay.  But no other -- no other houses?

A.        No.

Q.        So it would be either the house in Exhibit 2 or the house in Exhibit 3?

A.        Yes.

Q.        All right.  Do you know if Richard had a bank account from April 2004 to October 2004?

49

A.          Yes, he did.

Q.          Okay.  Do you know where that -- where his bank was?

A.          No.

Q.          Okay.  Do you know if he had more than one bank account?

A.          I don't know that.

Q.          Okay.  But you remember him having a bank account?

A.          Yes.

Q.          Okay.  And do you remember him depositing checks and withdrawing money?

A.          I don't remember that.  We were dating. So just like he didn't know a lot about me and my personal, you know -- those kind of things, we weren't at that point where we needed to know that information about each other.

Q.          Okay.  All right.  Where were you living when you met Richard?

A.          2279 Sonora Drive.

Q.          And that's in Grove City?

A.          That's in Grove City, yes.

Q.          Okay.  Were you living there with anyone?

50

A.          No.  I was there by myself.

Q.          Okay.  Did you -- was it a -- was it a house, a townhouse, an apartment?

A.          It was an apartment.

Q.          Okay.  Did you rent it?

A.          Yes.

Q.          All right.  Do you recall how much you were paying in rent?

A.          450 a month.

Q.          Okay.  Did you also pay utilities?

A.          I think I just paid electric.  It was all electric, and I want to say the water was included.

Q.          Okay.  All right.  And I know Richard started coming over and spending weekends with -- some weekends with you --

A.          Yes.

Q.          -- at that house.  Do you recall when that was?

A.          When he started, like, spending the night, like, on a regular basis is what you're asking me?

Q.          Yes.  When -- yes.  When he started spending an entire weekend with you, when was

51

that?

A.          Entire weekend with me?  That probably started, like, around July --

Q.          Okay.

A.          -- of 2004.

Q.          Okay.  All right.  And at some point in time, did Richard start living at 2279 Sonora with you full-time?

A.          Yes.

Q.          Okay.  When was --

A.          At some point.

Q.          When was that?

A.          Oh, man.  I don't remember the exact date.

Q.          Well, let's try this.  We know you got married July 1st of 2005.

A.          Uh-huh.

Q.          Did Richard start living with you at 2279 Sonora before or after you got married?

A.          Before.

Q.          Okay.  How long before?

A.          I'm not sure.  Like I said, I don't have exact dates, so I'm not really sure.  But it was definitely before we got married.

52

Q.        Okay.  Did he start living with you at 2279 Sonora as soon as he got out of jail in January of 2005?

A.        That, I'm not sure.  That, I'm not sure.

Q.        Okay.  So sometime between --

A.        It was sometime between -- yeah.  It was definitely --

Q.        So sometime --

A.        Definitely before we got married.

Q.        Okay.

A.        But I'm just not sure when it just was, like, he was -- moved all his stuff in.

Q.        Okay.  But sometime between January and June of 2005, he was living with you full-time --

A.        Yes.

Q.        -- at 2279 Sonora?

A.        Yes.

Q.        Okay.  All right.  How many children did Richard have when you met him?

A.        Two.

Q.        And what are their -- what are their names?

A.        Kobe Horton and Vantasia Williams.

53

Q.          Okay.  How old were they at -- when you first met Richard?

A.          When I first met him, they were five and two.

Q.          And his daughter, Vantasia, is older, correct?

A.          Yes.

Q.          So she would have been five, and Kobe, two?

A.          Yes.

Q.          All right.  And where -- we'll start with Vantasia.  Where was she living when you first met Richard?

A.          She was also living with her mother in Grove City.

Q.          Okay.  And where was Kobe living?

A.          He was living with his grandmother, I believe, in Alabama at the time.

Q.          Okay.  So in 2004, he was living in Alabama?

A.          I'm pretty sure, yes.

Q.          Okay.  All right.  Was -- but neither of them lived with Richard --

A.          No.

54

Q.          -- in 2004?

Was he making child support payments for either of them?

A.          That, I'm not sure.

Q.          Okay.  Did Richard have a cell phone when you met him and started dating?

A.          When I met him, he did not.  When I first met him, he did not.

Q.          Okay.  Did he get a cell phone then shortly after?

A.          Yes.

Q.          So by October of 2004, did he have a cell phone?

A.          He definitely had a cell phone.

Q.          Okay.  And that was a cell phone that he was paying for?

A.          Yes.

Q.          Okay.  Do you know how much he was paying for it?

A.          I don't remember.

Q.          All right.  At this point, in October of 2004, were you also paying for a phone for Richard?

A.          No.

55

Q.          Do you remember ever paying for a phone for Richard?

A.          No.

Q.          Okay.

A.          He was on my phone plan, but he was paying the bill.

Q.          All right.  Let's unpack that a little bit.  So he was on your phone plan?

A.          Yes.

Q.          There were two phone numbers?

A.          Yes.

Q.          One for you and one for him?

A.          Yes.

Q.          And your phone number was the one that you gave me earlier?

A.          Uh-huh.

Q.          Was the phone number that Richard used as part of your phone plan 614-404-8358?

A.          I don't remember the phone number --

Q.          Okay.

A.          -- from back then.

Q.          All right.  Let me...

          MR. DIRISAMER:  Let's go with the binder.

56

- - - - -

Thereupon, Exhibit 4 is marked for purposes of identification.

- - - - -

Q.        Okay.  I'm handing you what we've marked as Exhibit 4.

A.        Uh-huh.

Q.        This is a binder, and I'll represent to you that it has -- the first few pages are the beginning of the trial transcript for Richard Horton's 2006 criminal trial, just for context purposes.

And then the meat of it -- it begins at page -- let me get this right -- 162 of that transcript, which is where your testimony begins.

A.        Okay.

Q.        And it includes your testimony and Richard Horton's testimony.

All right.  If you could turn to -- let's just go to page 17 -- and there's multiple page numbers on here, but let's -- it's page No. 172 in the top right corner.

A.        Uh-huh.

Q.        Which is also City 004459 in the bottom

57

right corner.

All right.  Are you on that page?

A.        You said 172?

Q.        Yes.

A.        Okay.

Q.        Okay.  I'm going to start reading near the bottom of page 172, line 23.

Question:  "Do you have a cell phone?"

Answer:  "Yes, I do."

Question:  "What is your cell phone number?"

Answer:  "284-4482."

First of all, did I read that correctly?

A.        Yes.

Q.        And is -- that's the -- I think that's the same number that you gave me earlier today as your current phone number?

A.        Yes.

Q.        So you've had it going back all that way.

Okay.  I'm going to pick up reading with that next line, and we're now on page 173, which is City 004460, beginning at line 2.

58

Question: "Did you used to have a different cell phone number?"

Answer: "No. I've had this since I was in high school, same number."

Question: "What other phone numbers have you had besides a cell phone?"

Answer: "When I lived with my parents, they had a phone. I never had a house phone by myself."

Question: "Are you familiar with the number 404-8558?"

Answer: "8358?"

Question: "Well, yes, 8358."

Answer: "Yes."

Question: "Whose number is that?"

Answer: "That is Richard's phone number. It's in my name. That is his phone."

Question: "It's in your name?"

Answer: "It's in my name, yes."

Question: "That was Richard's phone number back last year?"

Answer: "Uh-huh. It's always been his phone number. Yep."

Did I read that all correctly?

59

A.          Yes.

Q.          Okay.  So that phone number -- and was that testimony all truthful?

A.          Yes.

Q.          Okay.  So Richard was using the phone number 614-404-8358, correct?

A.          Yes.

Q.          Okay.  And that phone number was in your name?

A.          Yes.

Q.          Were you paying the bill for that phone number or was he?

A.          No.  He was giving me money to pay for his phone.

Q.          Okay.  So you paid the bill, but he was giving you money for it?

A.          Yes.

Q.          Okay.  Do you recall how much money he was giving you?

A.          I don't remember that.

Q.          Okay.  Do you recall who the carrier was for that phone number?

A.          AT&T.

Q.          Okay.

60

A.          It's always been my carrier.

Q.          Okay.  Was it ever Cingular?

A.          What was Cingular?

Q.          Was your carrier ever Cingular?

A.          No.

Q.          Okay.  When did you add Richard to your phone plan?

A.          Not too long after we started dating. I'm not sure the exact time --

Q.          Okay.

A.          -- or date.

Q.          Before October of 2004?

A.          Yes.

Q.          Okay.  Are you aware that...

            MR. DIRISAMER:  Well, let's go -- let's do the bank statement.

                    - - - - -

        Thereupon, Exhibit 5 is marked for purposes of identification.

                    - - - - -

Q.          Okay.  I'm handing you a document that we've marked as Exhibit 5.

A.          Uh-huh.

Q.          And I will represent to you that this

61

is a -- well, it's a -- it says "Telhio Credit Union" at the top and gives an address, and then it says, top left, R. Horton and gives a Sonora Drive address in Grove City.

Do you see that?

A.        Yes.

Q.        And that -- and there's a date on it of 08 July 2005 on the top right.  Do you see that, too?

A.        Yes.

Q.        And at that time, that was your address, correct?

A.        Yes.

Q.        And Richard Horton was living there, correct?

A.        Yes.

Q.        Okay.  And I'll represent to you that this was a document that was introduced into evidence at Richard Horton's criminal trial in January and February of 2006.  Do you recall testimony regarding this at that trial?

A.        I don't remember this, no.

Q.        Okay.  Do you see -- do you see a -- well, okay.  And this is a series of credits and

62

debits, correct?

A.        Yes, from what I can see.

Q.        All right.  And the first one listed has a posted date of 07 September '04, 2004.  And it says "ATT WS/ATT WS/040902" and debit: $60.88.  Do you see that?

A.        I do see that.

Q.        Okay.  And then if you go down, there's a dotted line across the page, about maybe two-thirds of the way down, and three lines up from that is an entry that says 07 October, O-c-t, '04, 2004, and it says "ATT WS/ATT WS/041005."  It's another debit in the amount of 60.88.  Do you see that?

A.        Yes, I do see that.

Q.        Okay.  So from that, does it appear that Richard Horton was paying, himself, an AT&T phone bill in September and October of 2004?

        MS. MARTINEZ:  Objection; foundation.

        You can answer.

        Answer if you know.

A.        I mean, it looks like it may be for a cell phone, but AT&T does a lot of things, so I'm not even sure.

63

Q.        Okay.

A.        I can't, you know, attest to that being what it is.

Q.        Okay.  But your --

A.        It just says AT&T.

Q.        But your recollection is that Richard used the cell phone --

A.        Uh-huh.

Q.        -- that was part of your cell phone plan, right?

A.        Right.

Q.        And that it was in -- it was in your name?

A.        Right.

Q.        And that you paid for that cell phone, along with your own cell phone?

A.        Right.

Q.        And then Richard gave you money -- cash, I assume -- for that?

A.        Yeah.

Q.        Okay.  And you don't recall him having another cell phone or paying AT&T directly?

A.        I can't say that I do.

Q.        All right.  So in this -- let's take

64

this -- that same six-month period from April 2004
to October 2004.  In that period, did you and
Richard go out to eat often?

A.        Yes, we did.

Q.        Okay.  How many times a week would you
say you went out to eat?

A.        I can't remember.

Q.        Okay.

A.        I'm not sure.  But we liked to go out
on the weekends, so maybe twice.

Q.        Okay.  And what kind of restaurants did
you go to?

A.        All types.

Q.        All right.  I mean, were these fast
food restaurants?  Were they sit-down restaurants?

A.        Sometimes sit-down.

Q.        Okay.  Do you recall what an average
meal would cost?

A.        No.

Q.        All right.  Who paid --

A.        Not what it -- not what it costs today.

Q.        Who paid for those dinners?

A.        He did, usually.  Sometimes I would
pick up the tab.

65

Q.          Okay.  And when you went out to dinner, who drove?

A.          I drove.

Q.          Always?

A.          I always drove.

Q.          Richard never took you out to dinner?

A.          He did not have a license at this time, so I drove.

Q.          Okay.  So you never -- you never went out to eat in a green Cadillac that Richard Horton had?

A.          No.

Q.          And Richard never drove that car down to Grove City to see you?

A.          No.

Q.          All right.  Do you recall him having a green Cadillac?

A.          I recall him having it.

Q.          Do you recall him driving it?

A.          I don't recall him driving it.  I didn't want to ride in it.

Q.          Okay.  Do you know if he was making payments on that green Cadillac?

A.          I'm not sure.

66

Q.          All right.  Do you recall Richard picking up his daughter, Vantasia, in the evenings?

A.          When are we talking about?

Q.          Well, let's take this same 2004 period.

A.          2004.

Q.          April 2004.

A.          He wouldn't usually do it.  We would usually do it together, because if we had her, it would usually be on the weekend.

Q.          Okay.

A.          So we would get her together.

Q.          Okay.  So you recall having her sometimes --

A.          She didn't live that far.

Q.          You recall having her sometimes on the weekends, but not him going to pick her up during the week?

A.          That, I don't know.  That, I don't know.

Q.          Okay.

A.          Because I worked, so I wasn't with him 24/7.

Q.          Would you see him at all during the

67

week?

A.         I would see him during the week, but I wasn't with him all the time, like, every hour of the day.  So I can't attest to saying that he, you know, picked her up or didn't pick her up.

Q.         Okay.  But you don't recall ever being with him when he picked her up during the week in 2004?

A.         I'm not sure.  I'm not sure.  Like I said, over 20 years ago.

Q.         All right.

A.         I mean, she's 26 years old.  I can't remember like that.

Q.         In October of 2004, did you have a car?

A.         Yes.

Q.         Do you recall what kind?

A.         I believe it was a blue Sebring then. I think I had already -- yeah.  I think it was a blue Sebring, because I had a red Cherokee before that.

Q.         All right.

A.         So I think I had traded in already.

Q.         And were you making payments on that car?

68

A.          Yes, I was.

Q.          And what was the monthly payment?

A.          Oh, I don't remember.

Q.          All right.  When you were dating -- so this same April to October 2004 period -- did you and Richard go out to the movies often?

A.          We did.

Q.          Every weekend?

A.          Not every weekend.

Q.          Most weekends?

A.          Most weekends.

Q.          Okay.

A.          We'd do something along those lines.

Q.          All right.  And who paid for those tickets?

A.          He did sometimes, and so did I.

Q.          Was it an even split or did he usually pay?

A.          I don't remember the exact, but sometimes he did; sometimes I did.

Q.          All right.  And, again, during this same April to October 2004 period, did you go shopping with Richard often?

A.          We went shopping sometimes.

69

Q.        Okay.  What sorts of things did you go shopping for?

A.        I like clothes and shoes.

Q.        Okay.  Were you buying the clothes and shoes for yourself?  Did he buy them for you?

A.        I was buying most of it, but he would buy me stuff sometimes.

Q.        Okay.  All right.  When Richard started coming to stay with you --

A.        Uh-huh.

Q.        -- overnight in Grove City, did he ever bring his dog with him?

A.        No.

Q.        Did Richard ever have a dog?

A.        I don't think so.

Q.        You have no memory of him having a dog?

A.        I have no memory of him having a dog, and he was -- you can't -- I couldn't have dogs at my place anyway, so...

Q.        And you said that when he was not working at Popeyes in the fall of 2004, he would -- he would stay with you in Grove City?

A.        Yes.

Q.        But on the weekends that he was

70

working, he would not come down and stay with you, correct?

A.        No.  He still would.  I would go get him from work, and he would stay sometimes.  It'd just depend.  I -- you know, I can't say what specific dates he stayed with me, but he usually stayed with me on the weekends.  And even when he did work, I would go get him, because I didn't work on the weekends.

Q.        So even when he was working, he would still stay with you those weekends?

A.        Sometimes, yes.

Q.        Sometimes, but not all the time?

A.        Just sometimes.

Q.        Okay.  And when -- on a weekend when he was working and he would stay with you, would he stay with you Friday night and Saturday night or sometimes just one and just the other?

A.        Friday and Saturday night.

Q.        Okay.  And then you would take him to work?

A.        Yes.

Q.        When he stayed with you, were you together all weekend?

71

A.          Yes.  Uh-huh.

Q.          Weren't there times that you would go to church and that he wouldn't go?

A.          Sometimes, but he usually tried to come with me.  I mean, sometimes he just wanted to stay there, and I didn't go every Sunday.

Q.          Okay.

A.          So sometimes I stayed as well.

Q.          But you do recall there being instances where he stayed at your house while you went to church?

A.          I don't specifically remember, but I'm sure that did happen a couple times.

Q.          Okay.  Go ahead and grab the binder that's in front of you --

A.          Uh-huh.

Q.          -- what's been labeled as Exhibit 4. If you could, turn to page -- it will be 169 in the top right-hand corner.  And I'm going to start -- this is page No. City 004456.

A.          Uh-huh.

Q.          I'm going to read at line 11.

            Question:  "Did Richard ever go to church with you?"

72

Answer: Sometimes he goes to -- with me a lot more now. Back then we were dating, just sometimes he would stay -- he would just stay at the house, wait for me to come back.

Did I read that right?

A. Uh-huh.

Q. Okay.

A. Yes.

Q. So there were times when he would stay at your house --

A. Yes. I said that.

Q. -- when you went to --

A. Sometimes he would.

Q. Okay. All right.

MR. DIRISAMER: We've been going for about an hour. Is it a good time for -- let's take a quick break.

THE VIDEOGRAPHER: We are off the record. The time is 11:16.

(A short recess is taken.)

THE VIDEOGRAPHER: This marks the beginning of media No. 2. We are back on the record. The time is 11:27.

BY MR. DIRISAMER:

73

Q.          All right.  I want to just talk about a
few things, maybe clean up a few things that we
had talked about already today.

You said that at -- the red house
that's depicted there in Exhibit 3 --

A.          Uh-huh.

Q.          -- you think that's where Richard lived
with some friends in 2004; is that right?

A.          I believe so, yes.

Q.          Okay.  And I think I asked you if you
knew any of their names, and you said you did not.

A.          I don't remember.

Q.          Do you recall how many friends there
were?

A.          No.  Huh-uh.

Q.          Do you recall any physical description
of any of them?

A.          No.

Q.          Or any nicknames?

A.          No.

Q.          Okay.  All right.  Do you recall any of
the people that lived at that house having a dog
at any time?

A.          No.

74

Q.        Okay.

A.        I remember there was a dog next door, that small house --

Q.        Okay.

A.        -- only because it was in the front sometimes.

Q.        Okay.  But not a dog in that house?

A.        No.

Q.        All right.  And then we talked a little bit about a green Cadillac that Richard had --

A.        Uh-huh.

Q.        -- in 2004.  Where did he keep that car?

A.        That, I'm not sure.

Q.        Okay.

A.        I just know it wasn't at my house.

Q.        Okay.  Where was it when you saw it?

A.        Where did I see it?  I honestly don't remember.  I don't remember.

Q.        All right.  Now, let's stick with -- we're sticking with this April through October of 2004 period.

A.        Uh-huh.

Q.        During that period, you never saw

75

Richard use drugs, correct?

A.        No.

Q.        You never saw him sell drugs?

A.        No.

Q.        And you never saw him have a gun?

A.        No.

Q.        All right.  Did he regularly have a lot of cash on him when you were dating?

A.        Not that I remember.

Q.        Okay.  If you look at the -- I think the bank statement is...

A.        Uh-huh.

Q.        Is that Exhibit 5?

          MS. MARTINEZ:  I think 5.

Q.        Yeah.  If you could, pull out Exhibit 5.

A.        Okay.

Q.        All right.  And if you -- and this is, again, for the record, Bates-stamped City 004245.

          Again, there's that dotted line kind of, you know, maybe two-thirds or so of the way -- maybe a little more than that -- down the page. Two lines up from that, it says 12 OCT October '04, 2004, cash withdrawal of $800.

76

Q.        Can you think of any reason why Richard would have made --

A.        Are we on the second page?

Q.        I'm sorry.  No.  The first page.

A.        The first page?

Q.        Yeah.

A.        Okay.  I see it now.

Q.        Yeah.  The $800 cash withdrawal.  Can you think of any reason why he would have needed that kind of cash at that point?

A.        No.

Q.        Okay.

A.        Not that I can think of.

Q.        All right.  Now, I'm going to hand you another document -- or I should say a collection of documents that we've labeled as Exhibit 6.

- - - - -

Thereupon, Exhibit 6 is marked for purposes of identification.

- - - - -

A.        Uh-huh.

Q.        And these are Franklin County Municipal Court records related to Richard Horton.  I know it's a little bit of a thick packet, but if you go

77

-- if you look at the numbers on the bottom, the first page is City 006087.

A.          Uh-huh.

Q.          So if you could go about 10 pages in, it's City -- it will be 6097.

Are you there?

A.          Yes.

Q.          Okay.  And so it says Franklin County Municipal Court on the top left.  There's a date stamp on the top right that says June 22, '04. Richard H. Horton, it says at the top, and then it says "Complaint."  I'm just going to read that.

"Complainant, being duly sworn, states that the above-named defendant at Franklin County/Columbus, Ohio, on or about the 22nd day of June 2004, did: possess a controlled substance, to wit, marijuana, a schedule 1 controlled substance, located in two plastic bags in right front pants pocket, which was less than 100 grams in amount."

Did I read that right?

A.          Yes, you did.

Q.          Okay.  Did Richard Horton ever tell you that he was arrested for possession of marijuana on June 22nd, 2004?

78

A.        I don't recall this, no.

Q.        Okay.  Do you see, in the bottom left, it says -- there's the name of an issuing officer. Charge:  Drug abuse - marijuana.  It gives an ORC section number, gives the offense date again.  And then it says, offense time: 3:40, and then "AM" is circled.  Do you see that?

A.        Yes.

Q.        Okay.  Can you -- I'll represent to you that June 22nd of 2004 was a Tuesday.  Can you think of any reason why Richard Horton would be out at 3:40 a.m. on a Tuesday in June of 2004?

A.        I'm not sure.

Q.        Okay.  Mr. Horton -- Richard Horton testified during his deposition that he was probably high during this arrest.  Does that surprise you?

          MS. MARTINEZ:  Objection to the form.

          You can answer.

          THE WITNESS:  I can?

          MS. MARTINEZ:  Uh-huh.

A.        Ask the question again for me.

Q.        Yeah.

A.        Sorry.

79

Q.      You testified -- Richard testified during his deposition that he was probably high during this arrest.  Does that surprise you?

MS. MARTINEZ:  Same objection.

You can answer.

A.      I mean, I'm not going to say it surprises me or doesn't surprise me, but this was kind of early in our relationship, so I -- you know what I mean?  Like, I don't -- I don't know. I didn't know everything.  You know what I mean?

Q.      Uh-huh.

A.      Somebody doesn't a know a whole lot what's going on the first month of their relationship, so...

Q.      Okay.  But regardless, you -- until today, you've never heard about that?

A.      No.  I've heard about this -- I've heard about this before, but not back then, no. We're talking years later.

Q.      Oh, okay.

A.      Like, years later.  Years, years later. So this is something that happened.  I didn't know at the time or even close to it.

Q.      Okay.  But you did -- you did find out

80

about it at some point?

A.          At some point, yes.

Q.          And I --

A.          We're talking 20 years later, yeah.

Q.          And how did you find out about it?

A.          I think it was -- I mean, I can't remember exactly what the conversation was with me and him, but we talked about it.  I can't remember what the conversation was.  Just talking about -- just stuff.

Q.          Okay.  And when you're talking -- you just said something about 20 years later.  So would this be within the last few years that you found out about this?

A.          No.  No.  I'm just talk -- I was just saying 20 years later, like, you know, this stuff coming up again.  But, I mean, I don't remember when, like, we specifically talked about it, but I found out about this later, after it happened.

Q.          Okay.

A.          I will say that.

Q.          But years after it happened?

A.          Years after it happened, yes.

Q.          Okay.  All right.  What do you know

81

about Richard's criminal record before you met him?

MS. MARTINEZ:  Objection to form.

You can answer.

A.        I mean, I know the basics.  He told me very soon in the relationship that he just got out of prison, but I don't -- didn't know, like, all the logistics of it.

Q.        Okay.  So he told you around the time you started dating that he just got out of prison in West Virginia?

A.        Right.

Q.        Right.  So you knew about that?

A.        I knew about that.

Q.        Did he tell you what he was in prison for?

A.        At the time, no, but later -- just a little bit later, yes.

Q.        And --

A.        Because he told me, I just got out, like, literally a day after we met, so -- but he didn't get into the specifics, yes.

Q.        Okay.  And when he told you about the time that he was in prison in West Virginia, what

82

did he tell you about why he'd gone to prison?

A.        He just told me what everybody else can find out by going -- the charges that were against him.

Q.        Do you remember specifically what --

A.        There were some drug charges.

Q.        Okay.  Did he tell you about any other prior arrests or jail or prison time that he had done when you started dating?

A.        No.

Q.        Okay.  Did he tell you -- what did he tell you about his prior drug use around the time that you started dating?

A.        He didn't tell me anything about any of that, if it even -- he didn't say anything about that.

Q.        Okay.  Are you aware that he was arrested multiple times in Franklin County before going to prison in West Virginia?

A.        No.

Q.        He's never told you that?

A.        No.

Q.        Okay.

A.        But that also really wasn't none of my

83

business.  His past is none of my business, just like a lot of my past is really none of his business.  I mean...

Q.          But if his past is none of your business, why did you talk about the June 2004 arrest?

A.          Why did I talk about the June --

Q.          Because that happened during your relationship?

A.          You said June 4?

Q.          The June 2004 arrest.

A.          The June -- why did I talk about it?

Q.          Uh-huh.

A.          What do you -- when did I talk about it?

Q.          That's what we just looked at.

A.          Do you mean why did I answer your question about it?  Because that's --

Q.          No.

A.          -- really all I did.

Q.          Why did you talk to him about it?

A.          Why did I talk to him about it?  Because -- I mean, what I'm trying to tell you is, is that in the beginning of the relationship, it

84

was really none of my -- like, he didn't have to share all his past with me. We're talking 20 years later, and now we're husband and wife.

Q. Uh-huh.

A. So these conversations do come up now.

Q. Okay.

A. You know what I mean?

Q. Okay. So --

A. So it's different from back then.

Q. I think I understand. So what you're saying is from April to October of 2004, you had not talked to him about his criminal -- his prior criminal charges in Franklin County?

A. I'm not saying specifically, and I'm not going to specifically give dates as to when I didn't talk to him about it. I'm just saying that if he didn't want to talk about certain things, that was his business. It wasn't -- he didn't have to talk to me about it.

Q. Okay. But as you sit here today, have you talked to him about his prior arrests in Franklin County before he went to prison in West Virginia?

A. I don't remember specifics about

85

arrests, okay?  I'm just telling you that I do know about him going to prison in West Virginia, but I don't know every specific time that he was arrested before that.  Like, I can't sit here and tell you specific dates or when.  You know what I mean?  I can't do that.

Q.        Okay.

A.        Because that's over 20 years ago.  I am 43 years old.  I do not remember like I used to.

Q.        All right.  What do you know about Richard's history of selling drugs before you started dating?

A.        I don't know a whole lot at all.

Q.        Has he ever told you that he sold drugs before you started dating?

A.        Well, yes, because that's what he went to prison for, so we definitely had that conversation.

Q.        Okay.  So you were aware that he went to prison for selling drugs in West Virginia?

A.        Yeah.  I told you that when I said he had the charges -- were drug charges, yes.

Q.        Okay.  All right.  But he never told --

86

he's never told you that he used drugs prior to you starting to date?

A.        I know he doesn't.  I mean, yeah.

Q.        You know that he never used drugs before you started to date?

A.        I'm not talking about before; I'm talking about when we were dating and while we were together.  Before, that's his past.  I don't know for sure.

Q.        Okay.  But that's my question, then.  Has he ever told you that he used drugs prior to you starting to date?

A.        He's never told me --

Q.        Okay.

A.        -- whether he has or not.

Q.        All right.  So as you sit here today, right now --

A.        Uh-huh.

Q.        -- are you aware that Richard was arrested on August 31st of 1995 for possessing crack cocaine?

A.        No.

Q.        Okay.  And that he pled guilty and was sentenced to prison time for that?

87

A.        No.

Q.        Are you aware that he was arrested on November 30th, 1995 for possessing crack cocaine?

A.        No.

Q.        And that he pled guilty and was sentenced to time in prison for that?

A.        No.

Q.        Are you aware that there was a warrant for his arrest in 2001 for breaking down the door at his aunt, Nancy Banner's, house?

A.        I actually have heard about that charge.

Q.        Okay.  What have you heard about it?

A.        Exactly what you just said.  That's all I know about it.

Q.        All right.  When did you hear about it?

A.        I mean, I'm not sure.

Q.        Okay.  From who did you hear about it?

A.        Richard himself.

Q.        But you don't recall when that was?

A.        I don't.

Q.        And as you sit here today, are you aware that he was arrested in 2000 for a felony charge of possession with intent to distribute

88

crack cocaine in West Virginia?

A.          No.

Q.          So you knew that he had been arrested in West Virginia and served prison time, but you didn't know the specifics of his arrest?

A.          Yeah.  I still don't know the specifics to this day.

Q.          Okay.  All right.  And as you sit here today, are you aware that as of September 2000, he had made a total of 30 to 45 trips to Parkersburg, West Virginia, to sell crack can cocaine over a period of two to three years?

A.          No.

Q.          Okay.  Do you have any idea -- I mean, did you know -- strike that.

Have you ever gone to Parkersburg, West Virginia, with Richard?

A.          No.

Q.          Do you have any idea why he was going there before you started dating?

A.          No.

Q.          Do you know of any friends of Richard's that have ever lived in Parkersburg?

A.          No.

89

Q.           Okay.  All right.  You are aware that he was released from prison in West Virginia very shortly before you met?

A.           Yes.

Q.           And are you aware that he spent about two and a half years in prison there?

A.           Yes.

Q.           Okay.  And you knew that he was on parole in West Virginia at the time that you met him?

A.           Yes.

Q.           He told you that?

A.           You mean parole -- okay.  So he was living in Columbus, but he was on parole from West Virginia.

Q.           Correct?

A.           Yes.

Q.           You were aware of that?

A.           Yes, I was.

Q.           Did he tell you that?

A.           He told me that.

Q.           Okay.  Do you know how often he met with a probation officer?

A.           He regularly met with her, but I can't

90

remember, like, what day or specifics about it.
But he did regularly meet with her.

Q.          Okay.  And it was a -- it was a female?

A.          It was a female at that point.

Q.          Do you know her name?

A.          No.

Q.          Okay.  Did you ever meet with her?

A.          No.

Q.          Were you ever present when Richard went
with her?

A.          No.

Q.          All right.  Did you know that part of
the conditions of his parole was that he
maintained employment?

A.          Yes.

Q.          Okay.  And did you know that part of
the conditions of his parole was that he go to
Narcotics Anonymous classes?

A.          I wasn't sure about that.

Q.          Okay.  Do you know if he went to
Narcotics Anonymous classes from April 2004 to
October of 2004?

A.          I'm not sure.  I don't know.

Q.          He never told you that he did?

91

A.          He never told me anything about it.

Q.          Did you know that he was under travel restrictions as a result of his parole in 2004?

A.          I'm not sure, but I just figure he was, because that's usually what happens.

Q.          To your knowledge, did he ever travel out of state, from the state of Ohio, from April 2004 to October 2004?

A.          No.

Q.          Did Richard ever tell you that he got some money from a work release program that he did while incarcerated in West Virginia?

A.          Yeah.  He told me about that.

Q.          Okay.  What did he tell you about it?

A.          He just said he had some money from that program.

Q.          Did he say how much money?

A.          No.

Q.          When did he tell you that?

A.          I don't know.  Not too long after we were together.

Q.          Do you recall anything more about that conversation?

A.          No.

92

Q.        All right.  Do you know -- I asked you now about nicknames that Richard may have had while you were dating.

A.        Uh-huh.

Q.        Do you know of any nicknames that Richard had before you started dating?

A.        No.  Huh-uh.

Q.        Do you know whether anyone ever called him Adidas Boy or Adidas Man?

A.        No.

Q.        Okay.  Who were some of Richard's friends while you and he were dating, again, that six-month period, April to October 2004?

A.        I don't remember their names --

Q.        Okay.

A.        -- at all.

Q.        Not even first names?

A.        No.  Huh-uh.

Q.        Okay.

A.        Nope.

Q.        Did you spend a lot of time with them?

A.        With his friends or Richard?

Q.        With his friends.

A.        No.  Huh-uh.  No.

93

Q.        Okay.  Where would you -- where would you see his friends?

A.        I really never saw them, to be honest with you.

Q.        Okay.  As you sit here today, are you aware that at one point, Richard owed $4,000 to an insurance company as a result of a car accident?

A.        Was that, like, part of his -- to get his license back --

Q.        It --

A.        -- eventually?  Because if that's what that's part of, then yes.

Q.        Okay.  So you recall him making a -- you know, owing a sizable amount of money to get his license back?

A.        I did know that, yes.

Q.        Okay.  And do you know how he paid that amount off?

A.        He never did.  It just disappeared, because he -- when he got wrongfully incarcerated, and then when he got back out, it just wasn't in the system anymore.  So I think it just went away.

Q.        Okay.  So to your knowledge, he never paid that amount?

94

A.          He never -- no.  He never paid all of it.  Huh-uh.

Q.          Okay.  All right.  When did you first become aware that an arrest warrant had been issued for Richard in connection with the October 2004 robbery?

A.          I think it was in December, when he had went to a court hearing for his daughter.

Q.          So that's Vantasia?

A.          Yes, Vantasia.

Q.          And it was -- was it a custody?  What was the court matter about?

A.          The court matter, I believe, was -- somebody had -- it was something had to do with Children's Services.  I'm not sure of the exact situation, but he was trying to see if she could come live with us.

Q.          Okay.  So when you say "us" -- this is December of 2004.

A.          Uh-huh.

Q.          Where would Vantasia have been going to live with you and Richard?

A.          2279.

Q.          Okay.

95

A.        It would just -- we would have just made it more permanent for all of us --

Q.        Okay.

A.        -- at that point.

Q.        All right.  And so Richard was in court, and then how did you hear from him about this?

A.        He called me and told me when I was at work.

Q.        Okay.  And you said it was approximately the middle of December of 2004?

A.        I just -- yeah.  I just remember December.

Q.        Okay.  Did you know that Richard called Detective Brenda Walker regarding his arrest warrant?

A.        I can't remember if he did call her or not.

Q.        But you don't recall Richard ever telling you anything about a call that he had with Detective Walker?

A.        No.

Q.        All right.  Did you know that Richard was going to turn himself in for that arrest

96

warrant on December 27th, 2004?

A.          Yes.

Q.          Okay.  And what did he tell you about that?

A.          Well, he didn't have to tell me anything, because I had went to the -- see the lawyer with him.

Q.          Okay.  And what lawyer was that?

A.          Her first name was Melissa.  I can't remember her last name.

Q.          Okay.  And this is before he turned himself in?

A.          Uh-huh.

Q.          You and he went to see this lawyer?

A.          Yes.  So that she could get us a good bond, a good amount.

Q.          Do you recall how much this lawyer, Melissa, was paid?

A.          I can't remember.

Q.          Okay.

A.          Huh-uh.

Q.          And do you know if that -- whatever she was paid, do you know if that would have come from Richard or from you?

97

A.          It came from Richard.

Q.          Okay.  Was the lawyer, Melissa -- did she ever represent you?

A.          No.

Q.          Okay.  Do you recall what you spoke to her about for the portion of the meeting that you were present for?

A.          I can't remember.

Q.          Okay.  Just -- you mentioned something about bond earlier, but that's really all you remember?

A.          That's all I remember.

Q.          All right.  Are you aware that Richard spoke with Detective Brenda Walker after he turned himself in?

A.          I really don't remember.  I really don't remember that, specifically.

Q.          Okay.  Has he ever told you anything about any conversation he's had with Detective Brenda Walker?

A.          I mean, I'm sure he's had conversations, yes, but I don't know -- I don't know the timelines of the conversation, because I've had -- I'd had a conversation with her, too.

98

Q.      Yeah.

A.      But I can't remember, like, the -- when he had a conversation with her.

Q.      Yeah.  And I understand that.  And I guess I'm not looking for you to give me dates of it.  I'm just wondering, has he -- has Richard ever told you anything about any conversation he's had with Detective Brenda Walker?

A.      That he talked to her, but that's -- like, specifically, I don't remember, like, specifics.

Q.      Okay.

A.      But he talked to her, yes.

Q.      Okay.  So he told you that he talked to you, but he didn't tell you anything about what they discussed or --

A.      Well, I don't remember.

Q.      You don't?  Okay.

A.      Yeah.  I don't remember that.

Q.      Okay.  Did he ever tell you that he thought she had a grudge against him?

A.      He's -- I mean, he's never expressed that -- he's never expressed that to me, but I just remember having my conversation with her, and

99

she was very rude.

Q.    And we'll talk about your conversation with her --

A.    Uh-huh.

Q.    -- in just a moment.  I want to stay on Richard's conversations with her.

A.    Okay.

Q.    So you do not recall him ever telling you that he thought she had a grudge against him?

A.    I don't remember specific, but he told me that.

Q.    Okay.

A.    But, you know, he was very -- I mean, I don't remember.  I really don't remember that --

Q.    Okay.

A.    -- you know.

Q.    Do you recall Richard ever saying that -- during any conversation with Brenda Walker, that she ever yelled at him?

A.    I don't remember.

Q.    Do you recall Richard ever saying that he thought, during any conversation with Brenda Walker, that she was rude to him?

A.    Yes.

100

Q.        Okay.  What did he --

A.        Because I experienced the same thing.

Q.        All right.

A.        Because she's just rude and wasn't really interested in anything that he had to say.

Q.        And he told you that?

A.        Yes.

Q.        Okay.  When did he tell you that?

A.        This was days in -- I mean, going into this whole -- I mean, I don't remember.  This is -- like I said, this is probably back in 2005.  So I really don't remember when.

Q.        Okay.

A.        But I do know, because we had the same experience with her, that she was rude and really wasn't trying to hear what we had to say.

Q.        Okay.  But you don't recall exactly what he told you about his conversations with Brenda?

A.        No.

Q.        But that his -- but you do recall him expressing to you that his perception was that she didn't want to hear what he had to say?

A.        Yes.  We had the same experience.

101

Q.          All right.  Are you aware that one of the issues that Richard has raised in this case are handwritten notes from Detective Walker that he claims he was unaware of at the time of his criminal trial?

A.          Handwritten notes from who?

Q.          From Detective Walker.

A.          I don't know anything about that.

Q.          Okay.  And so after Richard turned himself in, he was -- he was arrested, correct?

A.          After he turned himself in?

Q.          Yes.

A.          Yeah.  He went to the county.

Q.          Yeah.  And you did not contact the Columbus Police at that point, did you?

A.          No.

Q.          And we talked very briefly about this, but after his arrest, he was in jail for a period of time, and then he was released on bond, correct?

A.          Yes.

Q.          Was it a $25,000 bond?

A.          No.  It was what they call a recognizance bond.  So it's that, but only 10

102

percent of it, I think.

Q.        Okay.  So you --

A.        Something.  It was -- I did not pay $25,000.

Q.        Okay.  But do you recall paying 2,500?

A.        Yes.

Q.        Which would be 1/10th of --

A.        Yeah.

Q.        -- 25,000.

          Okay.  And you paid that?

A.        I did.

Q.        Without any assistance from anyone else?

A.        Yeah.

Q.        It was all you?  Okay.

A.        I had very good credit back then, so...

Q.        Okay.  Do you know the conditions of Richard's -- or let me rephrase.

          Did you know the conditions of his release on bond in January of 2005?

A.        Yes.

Q.        And how did you learn of those conditions?

A.        Just from the paperwork that he had.

103

Q.        Okay.  So you recall seeing --

A.        And just -- yeah.  Just --

Q.        Paperwork?

A.        -- paperwork that he had, you know.

Q.        Okay.

A.        Basically, I guess, the normal stuff, you would say.

Q.        Okay.  And so you're aware that part of the conditions of his bond was that he stay away from Rhonda Curry and Richard McClanahan?

A.        I don't remember that part.  I just remember traveling, stuff like that.  I don't remember that, specifically.

Q.        Okay.  Do you know if he had any contact with Rhonda Curry and Richard McClanahan in 2005?

A.        That, I don't know.

Q.        Okay.  He's never told you about that?

A.        We never talked about that.  Huh-uh.

Q.        Okay.  And you don't recall his testimony in his criminal trial regarding his communications with Richard McClanahan in 2005?

A.        Gosh.  That whole trial was just a nightmare.  So, I mean, a lot of it I don't

104

remember, honestly.

Q.          But you specifically don't remember his testimony regarding his 2005 communications with Richard McClanahan?

A.          No, I don't remember that part.

Q.          All right.  I'll represent to you that Richard claims to have encountered Mr. McClanahan twice near a home on Reynolds Avenue in 2005.  Was he -- was Richard still living on Reynolds Avenue in 2005?

MS. MARTINEZ:  Objection to foundation.

You can answer.

A.          You said -- give me the date again.

Q.          Uh-huh.  Well, in --

A.          What date were you talking about that he --

Q.          I don't have an exact date, but in 2005 -- so after his -- let's do this.  So go to -- I think it's Exhibit 3.

A.          Uh-huh.  The house right here?

Q.          Yeah.  The red house.

A.          Yeah.

Q.          Do you recall -- I know you said you picked Richard up from that house and dropped him

105

off at that house at times.

A.        Right.

Q.        And that was prior to his arrest, correct?

A.        Yes.

Q.        Okay.  Do you ever recall picking him up or dropping him off at that house after his arrest and after he was released on bond?

A.        No.

Q.        Okay.  All right.

MR. DIRISAMER:  Can I have...

Q.        All right.  We're going to mark the next exhibit, which I believe is going to be Exhibit 7, if my --

MS. MARTINEZ:  Yes.

Q.        -- count is correct.

- - - - -

Thereupon, Exhibit 7 is marked for purposes of identification.

- - - - -

MR. DIRISAMER:  Here's a copy of Exhibit 7 for you.

A.        Okay.

Q.        All right.  Take a moment to look that

106

over.  It's fairly short.

A.          Okay.

Q.          Okay.  So looking at the first page --

A.          Uh-huh.

Q.          -- which has a Bates stamp of R. Horton 001689 in the bottom right corner, it's an affidavit of LaKeon Horton.  And it says, "I, LaKeon Horton, after being duly cautioned and sworn, depose and state the following."  No. 2, first sentence, says, "I lived with Richard Horton on Reynolds Avenue, in Columbus, Ohio during the summer of 2005."

           To the best of your knowledge, is that true?

A.          No.  We got married on July 1st, 2005.  So he lived at 2279 Sonora Drive.

Q.          Okay.  All right.  Do you know LaKeon Horton?

A.          I mean, I know him because he's family, you know.  That's Richard's cousin, yes.

Q.          Okay.  And when did you first meet him?

A.          I mean, pretty early in our relationship, because he's lived with his mom.  His mom is Nancy Banner.

107

Q.      Okay.

A.      So...

Q.      So at some point in --

A.      The first few months.

Q.      -- 2004?

A.      Uh-huh.

Q.      You know, late spring, early summer.

Okay.  Have you ever spoken with LaKeon about this affidavit?

A.      No.

Q.      Have you ever spoken with LaKeon about why he didn't testify at Richard's 2006 criminal trial?

A.      No.

Q.      Were you aware of the existence of this affidavit before I just showed it to you?

A.      That was the first time I've read it.

Q.      All right.  How often do you speak with LaKeon Horton now?

A.      Not often at all.

Q.      Okay.  When was the last time you spoke with him?

A.      It's -- I mean, it's been a while.  And even if I did, it was maybe to say hi.  You know

108

what I mean?  Just in passing.

Q.        Yeah.  Is "a while" a six months, a year, two years?

A.        Yeah.  Like, six months.  But like I said, no long conversation.  Just in passing --

Q.        Okay.

A.        -- because just -- you know, around family, so...

Q.        All right.  Now, we've talked a little bit about Richard Horton and the fact that, in 2004, he did not have a driver's license, correct?

A.        Right.

Q.        In 2005, did he have a driver's license?

A.        No.

Q.        Okay.  In 2005, did he have the green Cadillac that we've talked about?

A.        I don't think so.

Q.        Okay.  Did he have another --

A.        No.

Q.        Did have another --

A.        I don't think so.

Q.        -- car in 2005?

A.        No.

109

Q.      So to the best of your knowledge, he had no car and no driver's license in 2005?

A.      No.  Huh-uh.  Nope.  Because that was -- yeah.  Because that was my thing.  I wanted him to start driving, because I had to take him everywhere.

Q.      Okay.  Where was he working in 2005 after he got out of prison?

A.      I can't remember the date, but he started working for a remodel -- home remodeling company that was out of Grove City.  I can't remember when he started and all that.

Q.      Would that company be K&K Builders?

A.      Yes.

Q.      Okay.

A.      That was it.

Q.      And so at some point in 2005, he started working for them?

A.      Right.

Q.      You're not sure when?

A.      I'm not sure when.

Q.      Did he ever work for Popeyes in 2005 after he was released from jail on bond?

A.      I don't know, but I don't -- I don't

110

think so, but I can't say for sure.

Q.            Okay.  And do you have -- do you recall him having any other jobs between Popeyes and then K&K Builders, whenever that started?

A.            No.

Q.            Okay.

A.            Huh-uh.

Q.            Prior to the 2006 criminal trial, you did not know Richard McClanahan, correct?

A.            No.

Q.            And you didn't know Rhonda Curry?

A.            No.

Q.            Did you know anyone else with the last name McClanahan?

A.            No.

Q.            Any of his family members?

A.            No.

Q.            Did you know anyone else with the last name Curry, any of her family members?

A.            No.

Q.            Okay.  Did Richard ever talk to you about Richard McClanahan or Rhonda Curry?

A.            Before all this happened, no.  Before the case happened, no.

111

Q.          Before his criminal trial?

A.          No.

Q.          Okay.  Has he talked to about them since?

A.          It's come up in conversation just because of the case, yes.

Q.          Yeah.  And what has he told you about them?

A.          Nothing specific.  Just -- I mean, we'll just be talking in casual conversation about the case.  Nothing specific, though.

Q.          Okay.  So I think -- I just want to be clear.  I think you told me that Richard did not -- to your knowledge, did not work at all between when he stopped working for Popeyes and when he started working for K&K Builders, right?

A.          You said that did he not work at all --

Q.          Yeah.

A.          -- in between Popeyes and K -- no.  I'm not saying he didn't work at all.  I don't know when -- I don't remember, like, when he -- I can't tell you when he stopped working at Popeyes and started working at K&K Builders.  I'm just saying that's the two jobs that I know of that he did

112

have.

Q.          Right.  So my question is not the timing of either of those things.

A.          Right.

Q.          It's just:  Did he work for anyone else in between when he worked for Popeyes and when he worked for K&K Builders?

A.          No.

Q.          Okay.  Are you aware of any source of income that he had in the period after he stopped working for Popeyes and before he started working for K&K Builders?

A.          He -- you know what?  He did some jobs for a temp service, but like I said, I don't remember those, because they weren't full-time, like, everyday employment.  But he did do some work at temp services.

Q.          Okay.  What's --

A.          I just don't remember.

Q.          I'm sorry.  What sort of things did he do --

A.          Oh.  I --

Q.          -- for the temp service?

A.          I don't remember that.

113

Q.        You don't?

A.        Huh-uh.

Q.        And do you remember the name of the temp service?

A.        It was in Grove City.  That's all I can tell you.

Q.        Okay.  In 2005, when he started living with you --

A.        Uh-huh.

Q.        -- in Grove City, was he helping you pay rent?

A.        At first, no, because I decided that because my rent was 450 and I could take care of it.  I had been.  But later on, yes.

Q.        Okay.  Did he help you pay utilities?

A.        That all came into him helping pay the rent, yes.

Q.        Okay.  Did he -- when he moved in with you in Grove City, did he bring a car with him?

A.        No.  Because he didn't have one.

Q.        Okay.  Did he ever drive your car?

A.        No.

Q.        And we've talked about the cell phone issue and your testimony that he had a cell phone

114

that was part of your plan that you would pay and he would give you cash for?

A.        He's paid, yes.

Q.        And he continued doing that after he moved in with you, right?

A.        Yes.

Q.        Okay.  And after he moved in with you, would he still pay when you guys went out to dinner?

A.        I mean, we split it up.

Q.        But did he pay more often?

A.        I don't remember.

Q.        Okay.  And he would still pay when you guys went out to the movies?

A.        Sometimes.  We split it up.  We do that now.

Q.        He would pay at least sometimes when you would go out shopping?

A.        Sometimes.

Q.        Okay.  Now, you mentioned the lawyer with the first name Melissa --

A.        Yes.

Q.        -- whose last name you don't recall. And you spoke with her prior to him turning

115

himself in in December of 2004.

To your knowledge, did she continue representing him after he was released from jail on bond in January of 2005?

A.        No.

Q.        Okay.  Did he get a different lawyer in January of 2005?

A.        Yes.

Q.        Who was that?

A.        Myron Shwartz.

Q.        Okay.  Who paid for Myron Shwartz to be Richard's lawyer?

A.        He did, and he was making payments.  It wasn't all up front.

Q.        Okay.  So Richard handled that?

A.        Uh-huh.

Q.        That's a yes?

A.        Yes.  Sorry.

Q.        No.  That's okay.  We've been doing good.  We got this far in, and I think that was the first one.

Do you recall how much Richard paid Myron Shwartz?

A.        I don't remember that.

116

Q.          Okay.  All right.  Did either of Richard's kids ever come to live with you in 2005?

A.          No, not permanently.

Q.          Did they stay with you?

A.          They stayed with us sometimes, yes.

Q.          Okay.  How often was that?

A.          We tried to have them stay every weekend, but sometimes that didn't work out.  It just all depended on their mom's schedule.

Q.          And that's both Vantasia and Kobe?

A.          Vantasia, yes.  Kobe was still -- he wasn't permanently here in Columbus yet.

Q.          Okay.  Was he still in Alabama?

A.          I think he was still in Alabama with his grandmother, and I think they were kind of back and forth, from what I can remember.

Q.          Okay.  So you recall Kobe coming to stay at your apartment in Grove City --

A.          Yes.

Q.          -- at some point in 2005?

A.          Yes.

Q.          Did he stay for a week or a month?  Do you recall how long?

A.          No.  Just maybe a couple days.

117

Q.          Just a couple days?

A.          Yeah.

Q.          And was it just one time?

A.          No.  It was a couple times.

Q.          Okay.  So they would come up from Alabama, and he'd stay for a few days?

A.          Uh-huh.  Yes.

Q.          And that happened a few times?

A.          A few times.

Q.          All right.  And then you said you tried to have Vantasia every weekend.  How often was she actually staying with you and Richard in Grove City?

A.          At least every other weekend.

Q.          Okay.  And to your knowledge, in 2005, was Richard making child support payments for Vantasia?

A.          That, I don't know.

Q.          Or for Kobe?

A.          That, I don't know.

Q.          All right.  Do you recall him buying -- do you recall him buying them school supplies or clothes or anything like that?

A.          We both did, yes.

118

Q.        Okay.  Do you know if Richard ever went to visit Kobe in Alabama in 2005?

A.        No.

Q.        Or in the brief period of 2006 prior to his criminal trial?

A.        Not that I know of.

Q.        All right.  Okay.  You mentioned a few times that you were interviewed by Detective Brenda Walker.

A.        Yes.

Q.        So let's talk about that.  That interview occurred on June 22nd of 2005, right?

A.        Yes.

Q.        Okay.  You talked with Detective Walker, so I know she was there.  Was anyone else present for that interview?

A.        Not that I can remember, no.

Q.        Okay.  So your recollection is just yourself, Detective Walker?

A.        I just remember it being me and her.

Q.        Okay.  Had you ever seen Brenda Walker prior to that?

A.        No.

Q.        Had you ever spoken with her prior to

119

that?

A.            No, not that I can remember.

Q.            Okay.  How long, if you remember, was that interview?

A.            I'm not even sure.  I honestly -- I don't even want to give an answer, because I don't know.

Q.            That's fine.  And just to sort of set the stage within the timeline here, it was June 22nd, 2005.  So this is after Mr. Horton's arrest, right?

A.            Yes.

Q.            After Richard's arrest --

A.            Uh-huh.

Q.            -- but before the criminal trial?

A.            Yes.

Q.            Okay.  And that was the first time that you'd spoken with Columbus Police regarding Richard Horton, the 2004 robbery, anything like that?

A.            Yes.

Q.            And this was also just a few days before you and Richard got married on July 1st of 2005?

120

A.          Yes.

Q.          Okay.  Did you talk to Richard about the interview before the interview?

A.          Did I talk to him about the interview before the interview?  Yes.  Because he's the one that said it's okay to talk to her.

Q.          Okay.  So you told him you were going down there?

A.          Yes.

Q.          And he told you it was okay to talk to her?

A.          Yes.

Q.          Was there -- do you recall anything else about your conversation with Richard about you going to talk to Detective Walker?

A.          No.

Q.          Okay.  Did you talk to anyone else other than Richard about the fact that you were going to talk to Detective Walker?

A.          Not that I can remember, no.

Q.          Okay.  I apologize if I've asked this already.  Myron Shwartz was not -- was never your attorney, correct?

A.          No.  He was never officially my

121

attorney.

Q.        Okay.  Did you ever talk to Myron Shwartz about going to speak with Detective Walker?

A.        That's what I can't remember, because if -- that's the one person I would have talked to, but I can't remember whether I did or not.

Q.        Okay.  Possible you did; you don't remember?

A.        I don't remember.

Q.        All right.  Did you talk to Alissa Holfinger about -- also an attorney, about going to speak with Detective Walker?

A.        That, I don't remember, either.

Q.        All right.  Do you recall providing a written statement to Detective Walker at the end of that interview?

A.        Yes.

Q.        Okay.

A.        And I seen that earlier.

Q.        All right.  Let's get that.  We'll mark that as -- I think we're up to 8.

                MS. MARTINEZ:  Yeah.

                        - - - - -

122

Thereupon, Exhibit 8 is marked for purposes of identification.

- - - - -

Q.      Okay.  I'm handing you what's been marked as Exhibit 8.

A.      Thanks.

Q.      Okay.  And is this -- so this, just for the record, has Bates stamp City 000057 in the bottom right corner.  Do you recognize this?

A.      Yes, I do.

Q.      Okay.  And this is the written statement that you provided to Detective Walker after the interview, correct?

A.      Yes.

Q.      All right.  And it has -- at the bottom, do you see it says date 6-22-05?

A.      Yes, I see that.

Q.      And then above that, that's your signature, right?

A.      Yes, it is.

Q.      Okay.  And then what's written here above, that's your handwriting?

A.      Yes, that is.

Q.      Okay.  Let's -- I'm just going to read

123

this for the record.

A.          Uh-huh.

Q.          On October 9th, 2004, Richard Horton was with me, Janette Harmon, doing our normal routine on that Saturday morning.  I did not work on that Saturday morning, so we were asleep at this time and then spent the rest of the day together.

Did I read that accurately?

A.          You did, yes.

Q.          All right.  Is everything that is in there accurate?

A.          Yes, it is.

Q.          Okay.  Is there anything that you -- is there anything you recall telling the police -- telling Detective Walker during this interview that's not part of this written statement?

A.          Not that I can remember right now.

Q.          Okay.  So to the best of your recollection, this is exactly what you told her?

A.          Yes.  To the best of my recollection, yes.

Q.          All right.  Do you recall if Detective Walker was taking notes during your interview?

124

A.          I can't remember that.

Q.          Okay.

A.          I'm sure she probably was.

Q.          But you don't specifically remember?

A.          But I don't remember, specifically.

Q.          All right.  Let's show -- oh, I'm sorry.  One more thing before we move on.  This is -- we talked earlier about documents that you had reviewed in preparation for today's deposition.

A.          Uh-huh.

Q.          And this, Exhibit 8 that's in front of you, this is one of those documents, right?

A.          Yes.  Uh-huh.

Q.          Okay.

                    - - - - -

          Thereupon, Exhibit 9 is marked for purposes of identification.

                    - - - - -

Q.          All right.  Now I'm going to hand you another document --

A.          Okay.

Q.          -- that we've labeled as Exhibit 9. And this is a document -- for the record, it has a Bates stamp of City 0000458 in the bottom right

125

corner. It says "Division of Police, "Progress of Investigation" at the top. It has Detective Brenda Walker's name on it. And it says informational summary No. 3, interview with Janette Harmon.

It gives a date of birth. Is that your date of birth?

A.      Yes. Uh-huh.

Q.      And it lists the Sonora Drive address. That was your address at the time?

A.      Yes.

Q.      And it lists the cell phone and a work phone, and those were your phone numbers, right?

A.      Yes, that's it.

Q.      Okay. All right. Now, I want you to -- oh. Before we get into it, this -- is this also a document that you looked at in preparation for today's deposition?

A.      Yes.

Q.      Okay. Yeah. I believe it's just two pages.

A.      Uh-huh. That's it.

Q.      All right. Let's start with the first paragraph on the first page. It -- I'm sorry.

126

Let me -- actually, let's go to the second paragraph. Second sentence of the second paragraph says, "Ms. Harmon identified herself as Richard Horton's fiancee," right?

A.          Uh-huh.

Q.          And that was correct?

A.          Yes.

Q.          You were at the time. It says, "She has known him for approximately 14 months."

And that would be back to approximately, you know, late April of 2004, so that's correct, right?

A.          Uh-huh.

Q.          All right. And then it says, "They have lived together at the above-listed address since his release from jail in January"; is that correct?

A.          Yes. We had talked about that, that it was between -- yeah.

Q.          Okay. So since January -- so since January, you and Richard have lived together at Sonora Drive in Grove City?

A.          Yes.

Q.          All right. And then it talks about the

127

-- your plan to get married on July 1st, and then that's correct as well?

A.        Yes.  Uh-huh.

Q.        Okay.  Now, on the -- let's go to the next paragraph.  The third paragraph.  Skip to the second sentence.

          Well, actually, I'll read the first sentence, too.  It says, "Ms. Harmon started by saying that Mr. Horton was at home with her on October 9, 2004.  She knew that, because it was a Saturday, and they do not work weekends."

          Okay.  Is that correct?

A.        Yes.

Q.        So you told Detective Walker that you and Richard Horton do not work weekends?

A.        Well, we usually -- I don't work weekends, but I don't know.  She might have got this wrong.  I don't work weekends, but he works some weekends.

Q.        Okay.  So Richard did work some weekends?

A.        Yeah.

Q.        But you --

A.        And I said that somewhere else, so she

128

-- but I work -- I don't work weekends, so...

Q.          Okay.  Do you recall specifically telling Detective Walker that Richard Horton worked some weekends?

A.          I don't -- I don't specifically remember.

Q.          Okay.

A.          No.

Q.          All right.  The next sentence, "She remembered that October 9, 2004, was around the time she had burned her leg at work, but she couldn't remember the exact date of the injury."

Is that accurate?

A.          That's accurate.

Q.          Okay.

A.          Uh-huh.

Q.          I'm going to the next paragraph. "Ms. Harmon continued by saying that on Saturdays, they always sleep in.  Detective Walker asked if she would have noticed if Mr. Horton had gotten up and left.  She said she's a very light sleeper and would have known if he had got out of bed.  She could not remember any specifics about that day; only that they might have gone shopping.  She

129

could not say where or for what, nor could she provide any receipts."

Is that accurate?

A.        Yes.

Q.        Okay.  Next paragraph.  "Detective Walker asked Ms. Harmon if she could remember what they had done the night before on Friday, October 8.  Again, she could not remember specifics but stated she would get off work at 2:30 p.m. and go home and take a nap.

Mr. Horton got off work that day at 4:30 p.m. from Popeyes Chicken, located at 2135 E. Livingston Avenue.  Mr. Horton would take the COTA bus and go to the World Gym downtown and work out.  She would pick him up at the gym around 9:30 and they would go home.  Again, she could not say specifically, only that that was what they always did - their normal routine."

Did -- first of all, did I read that correctly?

A.        Yes, you did.

Q.        And then is that accurate?

A.        Yes, that's accurate.

Q.        All right.  And you remember telling

130

her those things?

A.          Yes, I do.

Q.          All right.  All right.  We'll skip the paragraph right after that and go to the next paragraph.  It says, "Ms. Harmon stated she drives a 2002 Sebring.  She said that Richard Horton has never driven her car, as he does not have a valid driver's license."

          Did I read that correctly?

A.          Yes.

Q.          And is that accurate?

A.          That's accurate.

Q.          Okay.  And then it says after that, "Ms. Harmon was aware of some of Richard Horton's criminal history."

          Did I read that right?

A.          Yes.

Q.          And is that accurate?

A.          Yes.

Q.          Okay.  All right.  So we went through a lot of things in here.  Is there anything in here that you believe inaccurately reflects what you told detectives or that you believe is untrue?

A.          Not that I know of right now.

131

Q.        Okay.  And we've gone through a lot of it.  You can take your time --

A.        Uh-huh.

Q.        -- and read the rest, if you want.  But as you sit here today, you're not aware of anything in there that inaccurately reflects what you told Detective Walker or that you believe was untrue?

A.        Just what I said about him working some weekends.

Q.        Okay.

A.        I'm the one who didn't work weekends.

Q.        Okay.  So there's the issue of the working on weekends.  Let's set that aside for a second.

A.        Okay.

Q.        Other than that, are you aware of anything in there that inaccurately reflects what you told detectives or that -- or Detective Walker or that you believe is untrue?

A.        Not that I can see right now, no.

Q.        Okay.  Did you talk to Richard about your interview with Detective Walker after it occurred?

132

A.          Yes, I did.

Q.          Okay.  Tell me about that.  What did you tell him about the interview?

A.          That she was extremely rude and kind of seemed like she made her decision before I even walked in the door.

Q.          Why -- what makes you say that she was extremely rude?

A.          First of all, I am not the one that...

THE WITNESS:  Sorry.  I keep tapping this.

A.          To me, she should have just been a little more readily wanting to talk to me in a calm manner, because I am not the one that's -- it wasn't me.  You know what I mean?  We're talking about Richard Horton, first of all.  So I was there to give assistance, so I felt like she could have came at me a whole different way, and I wasn't expecting that.

Q.          Okay.  So when you say she was rude --

A.          Uh-huh.

Q.          -- is that based on her demeanor or something specifically that she said?

A.          It's based on her demeanor, and it's

133

based on some of the things she said.

Q.    Okay.

A.    At this time, we were engaged, and she was saying repeatedly that I should not marry this man.  He's going to prison for a very long time.

Q.    Okay.  So you recall -- you specifically recall her saying that to you?

A.    Oh, yeah.

Q.    Okay.

A.    I definitely recall that.

Q.    Do you recall her saying anything else to you that you believe was rude?

A.    That he did it.  The evidence is all here.

Q.    You recall her saying that?

A.    I do.  Uh-huh.

Q.    Okay.

A.    I do.

Q.    Do you recall her saying anything else that you believe was rude?

A.    I mean, specifically, I can't remember. Those are things that stood out to me because I felt they were very -- I didn't feel like she had to say those things.  But it was just the way she

134

was talking to me.  Kind of talking down to me, like -- yeah, talking down to me.  I didn't appreciate that, either.

But, specifically, the rude things, I don't -- you know, I can't pinpoint -- I just remember those two things because they stood out to me, even after 20 years gone by.

Q.        Okay.  So we've talked about those two things.

A.        Uh-huh.

Q.        And you thought those things were rude. You can't -- as you sit here, you can't remember anything else that she said that you thought was rude?

A.        Not specifically.

Q.        Okay.  And then you said just a second ago that you felt like she was talking down to you.

A.        Yes.

Q.        Was that based on her demeanor or based on something that she said?

A.        That was mostly based on her demeanor.

Q.        Okay.  Describe her demeanor and why you felt that she was talking down to you.

135

A.          She came off very headstrong.  She came

off very -- like, I know what I'm talking about

kind of attitude.

Q.          Okay.  Do you recall anything specific

that she said that you -- led you to believe that

she was talking down to you?

A.          I mean, I don't really need anything

specific for somebody to feel like they're talking

down to me.  I mean, if you come off -- it's just

-- to me, it's your tone of voice and your

attitude.  You know what I mean?  Like, I could

say many people have talked down to me.  It's just

the way they kind of look down and -- it's just

your whole body language, and I felt like that's

what she was exhibiting the whole time.

Q.          Okay.  What specific body language do

you recall her exhibiting that made you feel like

she was talking down to you?

A.          Oh, for a woman, just going like this

(indicating), rolling her head and just -- you

know.  Like, well, this is what -- this is what --

you know, this is what this says, and this is that

and -- it was her body language.

Q.          Okay.  Do you recall her yelling at you

136

at any point?

A.          She didn't yell.  She didn't yell.

Q.          Okay.  Do you believe she was mean to you at any point?

A.          I believe -- I wouldn't use the word "mean," but I believe she was very just -- I wouldn't use the word "mean."  I'm not sure what other word I would use.  I really can't think of one right now, but it was very -- I can't think of the word.

She was just very -- to me, if you're trying to figure out -- if you're a detective trying to figure out the truth, there's a certain way you should come at people.  I felt like she should have never approached me the way that she did.  I don't know you; she doesn't know me.  So you should have came into the room like that instead of making -- by her body language, instead of making a judgment, you know, when you first see me, just because this is what's on the record as far as what you think Richard did.

And I felt like that's how she came at me, because -- this is what the case was, yada, yada, yada.  I'm just his, you know -- I may not

137

be a credible witness because we're in love, so to speak. You know what I mean? And I felt like that's she how came at me, that I may not be credible because I'm in love, and that's just what it was about.

Q.        Okay. And she didn't say that to you, but that was your perception?

A.        She didn't have to. That was exactly what I got from that.

Q.        Okay. All the things that we just talked about -- her body language, the things that she said, all those things, did you tell anyone about those things in the time between the -- her interview of you --

A.        Uh-huh.

Q.        -- in June of 2005 and Richard Horton's criminal trial that ended in February of 2006?

A.        I mean, I told Richard about it.

Q.        Okay.

A.        Yes.

Q.        How soon after the interview happened did you tell her?

A.        Right after it happened.

Q.        Okay. Did you ever tell Myron Shwartz

138

about that?

A.            I'm pretty sure I did.  I can't say for sure --

Q.            Okay.

A.            -- but I'm pretty sure I did.

Q.            And that would have been --

A.            Because it's part of, yeah, the whole case.

Q.            Uh-huh.  Yes.  And that would have been close in time to the date of the interview in June of 2005?

A.            Yes.

Q.            Okay.  Did you ever tell Alissa Holfinger about these concerns that you had about your interview with Detective Walker?

A.            I don't remember.

Q.            Okay.  All right.  Have you ever -- other than what we've talked about so far and setting aside -- well, outside of any of the attorneys we've talked about so far today --

A.            Uh-huh.

Q.            -- have you ever spoken with an attorney or investigator regarding the October 9th, 2004 robbery or Richard Horton's 2006

139

criminal trial?

A.          No.

Q.          Okay.

MR. DIRISAMER:  All right.  Let me see what -- is this a good -- yeah.  Let's go off the record.

THE VIDEOGRAPHER:  We are off the record.  The time is 12:29.

(A short recess is taken.)

THE VIDEOGRAPHER:  This marks the beginning of media No. 3.  We are back on the record.  The time is 12:44.

BY MR. DIRISAMER:

Q.          All right.  We've talked about this already, but you obviously testified at Richard's criminal trial in 2006, right?

A.          Yes.

Q.          And you told us earlier today that you reviewed your trial testimony as part of preparation for this deposition?

A.          Yes.

Q.          In your review of your trial testimony, did you see anything that you believe was inaccurate?

140

A.          No, not that I could see.

Q.          Okay.  You were also present for Richard's testimony of this trial, right?

A.          Yes, I was.

Q.          Okay.  You were not present for the testimony of any of the other witnesses?

A.          I cannot remember, actually.

Q.          Okay.  You remember being present for Richard's --

A.          Yes.

Q.          -- but you don't remember whether you were present for any others?

A.          I don't remember.

Q.          Okay.  And I think I asked this question earlier, but you have not reviewed Richard's trial testimony --

A.          No.

Q.          -- at any point?

A.          I may have before, but as of recently, no.

Q.          Okay.  So not in preparation for this deposition, possibly earlier?

A.          Possibly earlier.

Q.          Okay.  All right.  Well, if you -- I

141

guess if you don't recall for sure whether you looked at it or not, you wouldn't recall whether or not you thought there was anything in there that might be inaccurate?

A.          Yeah.  I don't know.

Q.          Okay.

A.          Huh-uh.

Q.          All right.  Has Richard ever discussed his 2006 trial testimony with you?

A.          I'm sure we have at one point in time, but, you know, not for me to remember anything right now.

Q.          Okay.  You don't remember any specific conversations about it?

A.          No.  No, I don't remember anything specific.

Q.          Okay.  All right.  Let's -- you've got the trial testimony binder in front of you.

A.          Uh-huh.

Q.          I believe it's Exhibit 4.  If you could, turn to page 165, please.

So that is -- and just for the record, it's 165 in the top right corner, and the bottom right corner says City 004452.  Are you on that

142

page?

A.        Yes.

Q.        All right.

A.        I am.

Q.        And I'm going to start reading from line 11 near the middle of the page.

A.        Okay.

Q.        During that time -- and I'll represent to you that "that time" is referring to October of 2004.  "...tell me a little bit about what your work schedule is."  That was the question.

Answer:  "He worked Monday through Friday, I think, 9:00 to 4:30, some Saturdays, some Sundays.  Then my work schedule was strictly Monday through Friday, 6:00 to 2:30.  I never worked the weekends then."

And -- question:  "And you said Richard sometime worked Saturdays and Sundays?"

Answer:  "Uh-huh."

Question:  "How often was he working weekends?"

Answer:  "Maybe back then it was every other weekend."

Did I read that correctly?

143

A.        Yes.

Q.        And as you sit here today, do you believe that that testimony is accurate?

A.        Yes.

Q.        Okay.  When it says "every other weekend," does that literally mean every other weekend or just 50 percent of weekends?

A.        I mean, it just means -- I think it was every other weekend.

Q.        Okay.

A.        Like I said, this was a whole year after, so it was kind of just speculation.

Q.        Okay.

A.        It was some weekends.

Q.        Okay.  But, again -- but you think this is accurate?

A.        I think it's pretty accurate.

Q.        Okay.  All right.  Sorry.  Give me a moment.

          Okay.  Let's continue on page 165 --

A.        Uh-huh.

Q.        -- from right where we left off.

          Question:  "I want to talk to you a little bit about weekends that he was not

144

working."

Answer:  "Okay."

Question:  "On the weekend, typical weekend when Richard was not working, when would you see him?"

Answer:  He would come over Friday night, and he spent the whole weekend -- and we spent the whole weekend together, just go shopping, out to dinner, just spend some time together.

Question:  "Is there a typical time or hour that he would come over to your address?"

Answer:  "Friday night, usually like around 9:30, 10:00."

Question:  "How would he usually get there?"

Answer:  "I would go get him, yeah."

Did I read that correctly?

A.      Yes.

Q.      Okay.  And those questions were about weekends when he was not working, right?

A.      Right.

Q.      But your testimony today is even on weekends when he was working, he would come over

145

for at least part of the weekend?

A.          Well, when he was over there for the weekend, he would stay the whole weekend, so -- but he just specifically asked me about the weekends he doesn't work.

Q.          Okay.  All right.  All right.  Okay. Let's go to page 167, starting at -- well, I'll give the Bates page, just so we're all on the same page.  It's 167 in the top right; City 004454 in the bottom right.

A.          Uh-huh.

Q.          Starting at line 7.

Question:  "When did you find out that Richard had these charges against him?"

Answer:  "He was in court for his daughter.  It was a Children's Service situation with her mother, and so he went there for that.  I was at work at the time.  And he had called me because he was trying to get -- they was trying to set his daughter with him just in case because he didn't want her to go into Children's Services, but he had this warrant against him.  He couldn't do anything about that.  He called me from work."

Did I read that correctly?

146

A.        Yes.

Q.        Okay.  And is -- do you believe that's accurate?

A.        That's accurate.

Q.        Do you remember anything more about that call that -- beyond what is stated here?

A.        No.

Q.        Okay.

A.        It was a pretty quick call, so that's pretty much what was said.

Q.        Okay.  And do you know -- it was a Children's Service situation, is what you say in here.  Do you know anything more about what was going on and why he was in court?

A.        No.  That's what I said before.  It was just a Children's Services -- I don't know the specifics of the case, but yeah.  Just what was said here.  We didn't want her to go into the system.

Q.        Okay.  Do you know if Richard made any filings with the court in connection with that Children's Services situation?

A.        No, I don't --

Q.        Okay.

147

A.          -- know about that.

Q.          All right.  Now, let's move ahead to page 168, the next page.

A.          Uh-huh.

Q.          Starting at line 8.  Okay.

            Question:  "When you found out that he had these charges against him, did you think back as to what he or you were doing during this weekend of October 9th?"

            Answer:  "Yes.  I was trying to think. I didn't know what was going on."

            Question:  "Did you look to see if he had been working that weekend?"

            Answer:  "Yes."

            Question:  "Was he working?"

            Answer:  "No, he wasn't."

            Did I read that correctly?

A.          Yes.

Q.          Is that accurate?

A.          That seems accurate.

Q.          Okay.  Where did you look to see whether or not Richard was working at Popeyes on October 9th, 2004?

A.          I think we looked at his work schedule

148

that he had back then.

Q.        So there was a physical document that had his schedule on it?

A.        I believe so.

Q.        Okay.

A.        Uh-huh.

Q.        And you looked at that at some point in this, roughly, December 2004 time frame?

A.        Yes.

Q.        Okay.  Do you know if -- and Myron Shwartz was hired as Richard's attorney in January of 2005, correct?

A.        Yes, I believe so.

Q.        Do you know if that work schedule was ever given to Myron Shwartz?

A.        That, I don't know.

Q.        Okay.  Have you ever seen a physical copy of that work schedule at any time after this December of 2004 time frame?

A.        Not that I can remember.

Q.        Okay.  Did you -- as part of your efforts to figure out what you and Richard may have been doing on October 9th of 2004, did you ever check your credit card records?

149

A.          I don't remember doing that.

Q.          Okay.  Or your bank records?

A.          Yeah.  I don't remember doing that.

Q.          Okay.  Did you check your phone records?

A.          I'm sure we did something like that, because that would probably be the first thing somebody would do, to check any kind of records of anything, but I just can't specifically tell you what records we checked or anything like that.

Q.          Okay.  But regardless, you don't remember coming across any records that would have indicated where you or Richard were on October 9th of 2004?

A.          All I'm saying is I didn't have any, like, receipts is what was stated in the -- my -- when I was talking to Brenda Walker.  And I couldn't -- I didn't have any receipts or anything to specifically say where we were and what we were doing.

Q.          Okay.

A.          That was just our routine every weekend.  We were always together.

Q.          Okay.  All right.  If you could go

150

ahead to -- if you would, go ahead to page 195.

A.          Uh-huh.

Q.          And that's the number on the top right-hand corner.  The bottom right-hand corner, it says City 004482.  Are you on that?

A.          Yes, I am.

Q.          Okay.

A.          Uh-huh.

Q.          Starting at line 24.  Question -- this is at the very bottom.

          Question:  "What did you do about figuring out where you would have been on that date?"

          And I think I already said this, but this is part of Richard's testimony at trial, just to be clear.

A.          Oh, okay.

Q.          Moving to page 196.

          Answer:  "The first thing that came to me was, you know, trying and see if I was at work and we can take care of it.  And, hopefully, I was at work.  Like I said, I don't usually start work until 9:30.  So that option was out.

          The second thing was just basically

151

figure out where I was.  I knew I wouldn't have anything on paper, you know, unless I was at work. There was nothing on paper.  I just tried to think back to the date and just try and figure out where I was.  And, you know, I don't really have an exact answer for that period of time."

Did I read that correctly?

A.          You read that correctly.

Q.          Okay.  And is that accurate?

MS. MARTINEZ:  Objection; form, foundation.

You can answer.

A.          I mean, it's Richard's testimony, so...

Q.          So you believe it's accurate?

A.          I mean, it seems like it is, yes.

Q.          Okay.  Richard never actually says in what I just read that he confirmed he wasn't working that morning, right?

A.          I don't see where it's a confirmation.

Q.          Okay.  So --

A.          But also -- it also says that it didn't even matter because he started work at 9:30.  So this crime happened at 7 a.m., is what the paper said, right?  Correct?

152

Q.		Yeah.  I think --

A.		Yeah.  So --

Q.		The next paragraph in, he -

A.		So what he's trying to say is, is that he didn't -- I mean, yeah.

Q.		Okay.

A.		It says it right there.

Q.		Let me ask you this question.

A.		Uh-huh.

Q.		Do you recall seeing a piece of paper that showed Richard's work schedule and showed that he wasn't working on October 9th of 2004 or do you recall Richard telling you that he wasn't working on October 9th of 2004?

A.		I never saw a paper, but that wouldn't be what I would -- because I'm not the one -- it's not my job.

Q.		Okay.

A.		So that would just be like if he was -- if the tables were turned, I would be the one to get that information.

Q.		Okay.  So -- but that's a no, then? You did not see a piece of paper that --

A.		So I don't remember ever -- I'm not

153

saying that I didn't see one.

Q.      Yeah.

A.      But I don't remember -- I can't tell you right now that I physically saw one.

Q.      Okay.  Do you recall Richard telling you that he didn't work on October 9th of 2004?

A.      Yeah.  He said he didn't work, yeah.

Q.      Okay.

A.      Yeah.  I do remember him saying that he did not work.

Q.      And he told you that before your trial testimony in February of 2006?

A.      Oh, I don't remember, like, when that conversation happened.  I'm not sure.

Q.      All right.  Let's go back to page 173.

Well, you know what?  I don't know that we need to look at this.  I think we -- I think we talked a little bit about the cell phone earlier.

A.      Uh-huh.

Q.      Why was it that you added Richard to your cell phone plan?

A.      Because it was just cheaper for him.

Q.      Okay.

A.      You know, back then, before they did

154

all this -- well, now it's all nice and improved, but you had to have pretty good credit or there was, like, a huge down payment for a phone.

Q.        Okay.  Did he ask you to add him to his phone plan?

A.        No.  I offered.

Q.        Okay.  All right.  Let's go to -- let's go to line -- or page 190, line 22.  So it will be 190 in the top right corner and City 004477 in the bottom right corner.

A.        Okay.

Q.        Are you there?

A.        Yes.

Q.        Okay.  Line 22 near the bottom of the page, it says -- and this is, again, during Richard's testimony.

Question:  "I also want to talk to you about a cell phone.  At this time, did you own a cell phone?"

Answer:  "Yes, I did."

Question:  "And what kind of cell phone was it?"

Answer:  "I had one of those prepaid wireless cell phone deals."

155

Question:  "And how would you pay for the cell phone?"

Answer:  "The way that prepaid phone works is they make a -- they make a cash withdrawal once a month, and that is essentially my phone bill."

Question:  "Is this the account that which you have the statement that the withdrawals would come out of?"

"Yes, ma'am, it is."

Question:  "Do you see any withdrawals on there that relate to your cell phone?"

Answer:  "Yes, I do.  Would you like me to name them?"

Question:  "Tell us the dates."

Answer:  "On September 7th, 2004, there is a transaction from AT&T Wireless.  It's a debit of $60.88.  And on October 7th, 2004, there is a transaction from AT&T Wireless, a debit of $60.88."

Okay.  Did I read that correctly?

A.        You did.

Q.        Okay.  Do you believe that's accurate?

A.        I don't know.

156

Q.        Do you think that's referring to the cell phone that was part of your phone plan or do you think it's referring to another cell phone?

A.        I honestly don't know.

Q.        Okay.  Was your cell phone plan a prepaid wireless cell phone?

A.        I can't remember, honestly.

Q.        Okay.

A.        I've changed it quite a few times.  And like said, this is back in 2004, so...

Q.        Okay.  All right.  Let's go back to 166.  And so that's 166 in the top right, City 004453 in the bottom right.  Are you there?

A.        Yes.

Q.        Okay.  I'm going to start at line 11, which is pretty close to the middle of the page. And this is back now in your trial testimony.

Question:  Did you ever spend some time at his -- and I'll represent to you that's referring to Richard's -- apartment?

Answer:  "No, I didn't like staying up there."

Question -- I'm sorry.  I think that's all that was.

157

When you said you "didn't like staying up there," that's referring to those -- the house that we talked about before where all the friends were, right?

A.     Yes.  It wasn't an apartment.

Q.     Okay.

A.     That's what they got wrong.

Q.     It was -- it was a house?

A.     Uh-huh.

Q.     Okay.

A.     Yes.  Sorry.

Q.     And at a different point in your -- a different point in your trial testimony, you referred to the place where Richard was living as a bachelor pad.

A.     Yes.

Q.     Is that --

A.     I remember that.

Q.     And you believe -- that was a reference to the -- that red house that we've looked at earlier?

A.     Yes.

Q.     Okay.  I just wanted to make sure. That's not a different residence?

158

A.          No.  No.  It's just -- they said apartment --

Q.          Okay.

A.          -- but there's never been an apartment.

Q.          Okay.  So there's the red house we looked at, and then there's another house.  I think they're Exhibits 2 and 3.

A.          Yes.

Q.          I think one was his aunt's house?

A.          Uh-huh.

Q.          And then there were -- okay.  All right.  Now let's go to page 181.  This is Richard's testimony again.  Page 181, starting with line 1.

Are you there?

A.          Yes, I'm here.

Q.          Okay.

Question:  "When you got out of prison, were you on any type of supervision?"

And this is a reference to -- I'll represent to you when he got out of prison in West Virginia.

"When you got out of prison, were you on any type of supervision?"

Answer: "Yes. I was and still am on adult parole."

Question: "And tell the jury a little bit about what parole consists of. What you need to do for parole."

Answer: "Basically me being on parole for a drug charge, I have to first maintain employment. Second, stay off drugs. And just take Narcotics Anonymous classes, AA classes, things of that nature."

Did I read that right?

A.        Yes.

Q.        To the best of your knowledge, is that accurate?

A.        I wouldn't even know, because I didn't know some of these things were part of his parole. So I don't know.

Q.        Okay. Do you know whether Richard was, in fact, continuously employed throughout 2005?

A.        Yes.

Q.        Okay.

A.        I do know he was with K&K Builders, yes.

Q.        Okay. So you believe -- so you believe

160

there was no gap in his employment from Popeyes to
K&K Builders?

A. Well, we talked about that.

Q. Okay.

A. Like, he was with -- I told you he'd work some for the -- you made me lose my word. The agency. Unemployment -- not unemployment, but --

Q. A temp service --

A. There you go. A temp service, yes.

Q. -- I believe you said? Okay.

A. So that's what I said in between then, but K&K Builders up until he was wrongfully incarcerated, yes.

Q. Okay. So your understanding is that he worked for Popeyes for a period of time, stopped working there?

A. Yes.

Q. Okay. Then began working for the temp service for some period of time --

A. Yes.

Q. -- immediately?

A. Uh-huh.

Q. Stopped working for the temp service,

161

and then immediately after that, began working at
K&K Builders?

A.          Yes.

Q.          So that there was no period where he
was out of work?

A.          There was no gap.

Q.          Okay.  All right.  Okay.  Let me --
let's go to page 183.  So, again, that will be the
page number in the top right.  And then the -- in
the bottom right, it says City 004470.

A.          Uh-huh.

Q.          Do you see that?

A.          I do see that, yes.

Q.          Okay.  Line 22.

A.          Uh-huh.

Q.          It says, question:  "Richard, you
mentioned you had two children, one five years old
and one seven years old?"

          Answer:  "That's correct."

          Question:  And the seven year old, that
is your daughter or your son?"

          Answer:  "That is my daughter."

          Question:  "Where does she live?"

          Answer:  "She stays with her mother in

162

Grove City."

Question:  "And how often do you see your daughter?"

Answer:  "I like to see my daughter at least four times a week.  After I get off work, I usually keep her until her bed time and take her home."

Did I read that right?

A.        Yes, you did.

Q.        Okay.  And is that accurate as of February 2006?

MS. MARTINEZ:  Objection to form and foundation.

You can answer.

A.        You said February?

Q.        Uh-huh.  Yes.

A.        Yes.

Q.        This --

A.        Yeah.  This -- yeah.  Because we were married and -- because once we got married, we would try to keep the kids more often -- or sorry -- her daughter -- his daughter more often.

Q.        Okay.  And so you believe this is accurate as of February of 2006?

163

A.          Yes.

Q.          And when he says "I usually keep her until her bedtime and take her home," that's -- he's taking her to your house in Grove City and then back to her mother's house?

A.          Yes.  We are.

Q.          Okay.  And you're driving?

A.          Yes, we are.

Q.          Okay.

A.          And her mom was -- even if he was able to get other transportation, because she was right around the corner from us.

Q.          Okay.

A.          So...

Q.          And so it says, "I usually keep her until her bedtime and take her home," but it's actually the two of you together?

A.          Yeah.  We're married then.

Q.          Okay.

A.          And we stayed in the same house, so it was the two of us.

Q.          Okay.  And then down in line 12, same page, it says, "I pick her up from her mother's house."

164

Do you see that?

A.        Yes.

Q.        But it was actually the two of you that would, together, pick her up from your mother's house -- from her mother's house?

A.        Yes.  Yes.

Q.        Okay.

A.        Because sometimes I would just go pick her up by myself, so...

Q.        But Richard would never go by himself?

A.        No.  Huh-uh.

Q.        Okay.

A.        I mean, unless he had another ride. Sometimes he did, you know, so -- but, usually, it was the both of us or just me.

Q.        Okay.  And I asked you whether this was accurate as of 2006.  Would this have been -- was this the same thing that you-all were -- was he doing this in October of 2004 as well?

A.        No.  Because our relationship was not at that point yet.  We would get her sometimes, and we'd spend time with her.  But it wasn't as regular as it says in here in February of 2006.

Q.        Okay.  All right.  Let's go to

165

page 193.  And just for the record, the Bates stamp on this is City 004480.  I'm going to start on the very bottom of the page, line 25.

A.        Uh-huh.

Q.        Question:  "So what did you do when you found out these charges were against you?"

And I'll represent this is part of Richard's trial testimony.

Answer:  "I immediately -- I have an aunt who is retired from the police department.  I immediately called my aunt.  I tried to use my resources that I had at the time.  I immediately called my aunt and had her run a check to see if, you know, if there was a mistake."

Question:  "Did she do that?"

Answer:  "Yes, she did."

Question:  "And what did she tell you?"

Answer:  "She told me that there was, in fact, a warrant for my arrest for robbery."

Did I read that right?

A.        Yes.

Q.        Do you -- were you present at all for Richard's -- this conversation that he had with his aunt about the warrant?

166

A.          No.  I wasn't in the room.

Q.          Okay.  Did he ever tell you about that conversation?

A.          Yes, he told me about it.

Q.          Okay.  What did he tell you about that conversation?

A.          Exactly what he said here.  He called her and asked her to do a check, and she did.

Q.          Okay.  And he told you about that at the time, before he turned himself in?

A.          Yes.  This is before he turned himself in.

Q.          Okay.  All right.  All right.  Let's go to -- let's go to page 205.

Okay.  Let's -- are you -- you're on page 205?

A.          Yes, I am.

Q.          Okay.  And that's, for the record, City 0004492.

All right.  So page 205, line 8, and this is, again, part of Richard's trial testimony.

It says, "Okay.  This place on Reynolds, is that an apartment, a house?"

That was the question.

167

Answer:  "It's a house."

Question:  "Do you own it?"

Answer:  "No, I do not."

Question:  "Who owns it?"

Answer:  "A man, a Mr. Mike Balderena."

Question:  "Do you pay rent?"

Answer:  "Yes."

Question:  "How much rent?"

Answer:  "I believe the rent there was
$600 a month."

Question:  "$600 a month?"

Answer:  "Yes, sir."

Did I -- did I read that correctly?

A.         You read that correctly.

Q.         Okay.  And do you believe that to be
accurate?

A.         I honestly don't know, because I don't
-- didn't know how much the rent was.  You didn't
know I don't know who that guy was, so I don't
know.

Q.         Okay.  Do you have any reason to
believe it's inaccurate?

A.         No, I do not.

Q.         Okay.  Let's go to page 208.

168

All right.  So you're at page 208, and the Bates is City 000495.  Do you see that?

A.          Yes.

Q.          Okay.  I'll start at line 19.  Question:  Well -- and, again, this is Richard's trial testimony.

Question:  "Well, I think earlier on, you indicated in response to a question that on September 7th you had a balance of 67 bucks and some change.  And that on October 7th, you then had a balance of $1,416 and some change.  Where did the 1,300 and some dollars come from in September?"

Answer:  "In September?"

Question:  "That is not work release money at that point, is it?"

Answer:  "Yes, it is.  I had some problems with my bank account.  You come home, you have -- the only thing you come home with is clothes.  You don't have a car.  You have a place to live.  I wanted some nice things.  I had some trouble with my money.  I think that we all do at some point in time."

Did I read that right?

169

A.          Yes, you did.

Q.          Okay.  And to the best of your knowledge, is that accurate?

A.          I'm not sure.

Q.          Okay.  Do you know whether Richard had some problems with his bank account in 2004?

A.          I honestly don't remember.

Q.          Did he ever tell you about that?

A.          No.

Q.          Do you know if he had some trouble with his money in 2004?

A.          I don't remember.  I didn't think so, but I don't remember.

Q.          Okay.  And did he ever tell you about that?

A.          I don't remember him telling me.

Q.          All right.  There was a mention in here of the work release, that he may or may not have gotten some money from work release.  And I know we talked about that a little bit.  Did he ever tell you anything about what he did as part of the West Virginia prison work release program?

A.          No.

Q.          Or who he worked with?

170

A.          No.  He never told me that.

Q.          Or where he worked?

A.          No.

Q.          Okay.  All right.  Are you aware that Richard appealed his conviction and, over the years, filed a variety of motions seeking his release from prison?

A.          Yes, I was aware he did.

Q.          Okay.  Did you attend any -- did you attend in person any proceedings related to his criminal trial or any of the appeals or anything like that after the trial itself?

A.          No.

Q.          Okay.  Richard was released from prison in January of 2022.

A.          Yes.

Q.          I think we covered that earlier. Right.

            What do you know about the circumstances surrounding his release from prison?

A.          As far as what?  Like --

Q.          Well --

A.          -- can you be more specific?

Q.          Yeah.  What do you know about why he

171

was released from prison?

A.          That his conviction was overturned.

Q.          Okay.  Do you know why his conviction was overturned?

A.          I can't tell you the circumstances, because I'll probably get it all mixed up.  So I can't tell you the specifics of it, like, what exactly -- yeah.

Q.          Okay.  Do you know anything about DNA testing that was performed related to the October 9th, 2004 robbery?

A.          I've heard about it, yes.

Q.          Okay.  Who have you heard about it from?

A.          Well, I mean, I heard about it from Richard, just when this -- the case started coming along a little more.  But as part of our relationship, we decided that, when we got back together and rekindled our relationship, that I wouldn't really be in the forefront of his case because it'd just stress me out.  So we really didn't talk about it that much.

Q.          Okay.  So he has talked to you a little bit about DNA testing?

172

A.          Just basic stuff.

Q.          Okay.

A.          Really basic.

Q.          All right.  And do you recall exactly what he's told you about the DNA testing?

A.          No.  Not word for word, no.

Q.          Okay.  And do you recall anyone else talking to you about DNA testing related to the October 9th, 2004 robbery?

A.          No.

Q.          Okay.  Were you aware, after Richard was released from prison in January of 2022, that he was facing the possibility of a retrial?

A.          Yes, I did know that.

Q.          Okay.  What do you know about that?

A.          All I know is that from being in the courtroom at that point, that they could basically recharge the charges, and then that would be where it started again.  Basically, the whole thing would start all over again.

Q.          Okay.  So you just said you were in the courtroom, so you were present for some proceedings in 2022 and 2023?

A.          Oh.  So you were talking about then?

173

So I was present -- which I told you -- I told you this before this is the first time I met Brian.

Q.      Okay.

A.      So I was there on January 19th, 2022, yes.

Q.      And that's the day that he was released from prison?

A.      Yes.

Q.      Okay.

A.      Yes.

Q.      And then, subsequent to that, were you present in person for court proceedings?

A.      No.

Q.      Okay.

A.      That was the first and only one.

Q.      Okay.  Got it.  Okay.  All right.  Do you believe that Richard has been exonerated from the October 9th, 2004 robbery?

A.      Yes.

Q.      Okay.  Why do you believe that?

A.      Because it's all in his paperwork, and it's official.  I mean...

Q.      What paperwork is that?

A.      I don't know how else to say that.  I

174

mean, I don't -- I guess I don't know how to answer that question.  Are you talking about, like -- ask the question again for me, please.

Q.          Sure.  I asked you if you believe he's been exonerated --

A.          Yes.

Q.          -- from the October 9th --

A.          Yes.

Q.          -- 2004 robbery, and you said yes.  And the question was simply:  Why do you believe he's been exonerated?

A.          Because we were in the courtroom.  That's what the judge -- that's what her ruling was.

Q.          Okay.  So you believe that the judge ruled that he's been exonerated?

A.          So are you -- are you saying -- okay.  So I do know -- I do know enough to ask you -- official exoneration is different from -- help me out.

Q.          Well, I --

A.          Official.  So are you talking about an official exoneration?  Like, official, official?

Q.          Well, I mean, you --

175

A.          Because I want to know how deep you want me to get, because I'm --

Q.          Well --

A.          -- I'm confused by the question.

Q.          Yeah.  So -- I mean, let's take it from here.  So, I mean, I asked the question.

A.          Because I know it takes years --

Q.          Yeah.

A.          -- to be officially exonerated.

Q.          Yeah.

A.          I do know enough to say that.

Q.          So --

A.          So I don't know what part you want me to answer.

Q.          Okay.  So let's start with this, because I asked the question about exoneration.  What does exonerated mean to you?

A.          It means that all your charges have been dropped and you are officially -- oh, gosh.  I didn't go to school -- lawyer school, so you've got to -- you've got to, you know -- your record is officially clean --

Q.          Okay.

A.          -- from those charges.

176

Q.          Right.  Okay.  So under that meaning of exonerated --

A.          Yes.

Q.          -- you believe Richard's been exonerated?

A.          Yes, in that meaning.

Q.          Okay.

A.          But the official -- like, the paperwork has to be filed and stuff, and I know that has not happened yet.

Q.          Okay.  So you believe that there's a difference between exonerated and officially exonerated?

A.          Well, when you put it like that, I mean --

Q.          I'm just trying to understand.  I'm not -- this is -- you used the phrase "officially exonerated," so I just want to --

A.          Well --

Q.          -- figure out what that is.

A.          -- I'm not a lawyer, like I said.  So I'm just saying that I know they haven't filed that paperwork to where it's like, you know, this is -- but -- and I know that's not just in

177

Richard's case.  That's in everybody's cases that goes through these cases.

Q.        Okay.

A.        That's what I will say.

Q.        Okay.  So in -- you believe that in the sense of pending criminal charges, there are none, so he's been exonerated in that sense?

A.        Yes.

Q.        But that there is some other step, additional paperwork that would be an official exoneration, and that hasn't happened.  That's your understanding?

A.        That's my understanding.

Q.        Okay.  All right.  Let's -- okay.  So -- and, again, we've talked about these dates, but Richard's criminal trial ended in February of 2006.

A.        Yes.

Q.        Right.  And then he was sentenced -- there was a sentencing proceeding in March of 2006.

A.        I believe so, yes.

Q.        Okay.

A.        I can't remember the date, but I think

178

so.

Q.          But shortly after the criminal trial?

A.          Right.

Q.          And at that point, he was sentenced to prison?

A.          Yes.

Q.          And went to prison, right?

A.          Yes.

Q.          You visited him often in prison for several years?

A.          Yes.

Q.          Okay.  Were other people also visiting him in prison in those first -- let's say the first five years that he was incarcerated?

A.          Always me.

            MS. MARTINEZ:  One second.  Sorry.

            Objection to form and foundation.

            You can answer.

            THE WITNESS:  Okay.

A.          Always me.  Sometimes his daughter would come with me.  A couple times, my parents would go.  And my younger sister.

Q.          Okay.  So let's unpack that a little bit.  So his daughter -- that's Vantasia --

179

A.       Yes.

Q.       -- would go with you?

A.       Yes.

Q.       Did she ever go by herself or with anyone else?

A.       No.  She couldn't go by herself.  She was only seven.

Q.       Okay.

A.       And no one else, no.

Q.       Okay.  Did Kobe ever go with you to visit Richard?

A.       No.

Q.       Okay.  Do you know if Kobe went with anyone else to visit Richard?

A.       No.

Q.       Okay.  And then you mentioned your parents.  What are their names?

A.       Cassandra Harmon and Alfred Harmon.

Q.       Okay.  And I think you also said your sister.  What's your sister's name?

A.       Elise, E-l-i-s-e.

Q.       E-l...

A.       i-s-e.

Q.       i-s-e.  Sorry.

180

A.        That's okay.

Q.        I wasn't writing fast enough.

          And what's her last name?

A.        Holley.

Q.        Is that H-o-l-l-y or e-y?

A.        I think it's e-y.

Q.        Okay.

A.        That's her married name, so --

Q.        No.  That's fine, but Craig's going to ask you if I don't, so that's --

A.        Something like that.

Q.        -- for his benefit.

A.        That's close.

Q.        All right.  Are you aware of Richard ever getting disciplined in prison as a result of your visits with him?

A.        I'm aware.

Q.        Okay.  What are you -- what are you aware of related to that?

A.        I just know that his video visits were suspended, and so were in person.

Q.        Okay.  Do you have any understanding of why that happened?

A.        I understand.

181

Q.        And what is your understanding?

A.        That they were inappropriate visits.

Q.        Do you have an understanding of why they were inappropriate?

A.        I understand.

Q.        Okay.  And does that come from something that Richard told you or something that someone else told you?

A.        No.  I'm just not stupid.  I know why they were -- I'd kind of come to that conclusion on my own.

Q.        Okay.  Are you aware of other discipline that he received while he was in prison?

A.        I really don't remember or can talk about any that I remember, specifically.

Q.        Okay.  Are you aware that he was repeatedly found with drugs, including Suboxone, in prison?

          MS. MARTINEZ:  Objection to form.

          You can answer.

A.        I'm not aware of that.  I don't know.

Q.        Okay.  He never told you that?

A.        No.  I don't know.

182

Q.          Okay.  Are you aware that at one point,
Richard was disciplined for kicking another
prisoner in the head?

A.          I don't remember that.

Q.          Okay.  He never told you anything about
that?

A.          Not that I know of, no.

Q.          Okay.  And I said the first -- the
first five years, but it -- from the records, it
looks like you visited him fairly consistently
through April of 2012, which is about six years.

A.          Yes.

Q.          Does that sound right?

A.          That's right.

Q.          Okay.  And then around that time, you
stopped visiting him?

A.          Yes.

Q.          Does that sound right?

A.          That's about the time.

Q.          Okay.  And why did you stop visiting
him around that time?

A.          Our relationship was just not working
out.

Q.          Okay.  Why was that?

183

A.        Well, being married and having someone that's incarcerated -- I mean, it's hard to be married out here in the real word.  So there was just a lot going on.

Q.        Okay.  Was there any specific event that precipitated the end of your relationship?

A.        Yes.  I was unfaithful.

Q.        And was that approximately in the April 2012 time frame?

A.        You said 2012?  Maybe a little bit before that, but about.

Q.        Okay.  And then you and Richard got divorced, right?

A.        Yes.

Q.        And you filed for that divorce?

A.        I had to, yes.

Q.        Okay.  And the -- when you say you "had to," what do you mean by that?

A.        So we decided to get a divorce, but he obviously could not do it from in there, so I had to file.

Q.        Okay.

A.        But it was a mutual decision.

Q.        Okay.  All right.  And you filed in

184

March of 2023.  Does that sound right?

A.          Yes.

Q.          And a divorce decree was entered in April of 2013?

A.          Yes.

Q.          Okay.  All right.  And prior to your filing, you had come to the, you said, mutual decision that you were going to get a divorce?

A.          Yes.

Q.          Okay.  And was that something you discussed in an in-person meeting or in a phone call?

A.          I can't remember that.

Q.          Okay.

A.          But we did discuss it.

Q.          All right.  Well -- and the reason I ask that question is from April of 2012 to March of 2013, there's almost a one-year gap.  And so I'm just wondering about the gap between the -- when the visits -- when your visits stopped --

A.          Uh-huh.

Q.          -- and when you filed for divorce.  Did you have any --

A.          I mean, I can't remember --

185

Q.          -- reason why there was 11 months there?

A.          You mean why I wasn't visiting him for 11 months?

Q.          Yeah.

A.          Because -- I already told you that we were going -- it was already -- our relationship was already going downhill.

Q.          Uh-huh.

A.          So I wasn't making as many visits then.

Q.          Got it.  Okay.  And it just took time to file for divorce?

A.          Uh-huh.  It took time and money.

Q.          Okay.  Did you remain in touch with Richard while -- after your divorce?

A.          No, not for a while.

Q.          Okay.  So from 2013, the time of your divorce --

A.          Uh-huh.

Q.          -- when was your next contact with Richard?

A.          Gosh; I can't honestly remember.  I can't remember, really.

Q.          Was it, you know, two years, four

186

years, six years?

A.        It might have been two years later.

Q.        Okay.  So something like 2015?

A.        Yes.  Around 2015.  Sounds about right.

Q.        Okay.  And -- all right.  During your divorce from Richard, were you in a relationship with Jerry Horton?

A.        Yes.

Q.        Okay.  And is Jerry Horton related to Richard Horton?

A.        Yes.

Q.        How?

A.        It's his cousin.

Q.        Okay.  How long were you in a relationship with Jerry Horton?

A.        Maybe a year and a half.

Q.        And do you know approximately when that relationship began?

A.        After our divorce, but I can't remember.  I don't really -- I don't remember the time.

Q.        Okay.  So somewhere maybe 2013, 2014, something like that?

A.        2013 for sure.

187

Q.      Okay.

A.      I just don't remember the date.

Q.      Fair enough.  And then -- so you said it was about a year-and-a-half relationship, so ended sometime in 2014?

A.      I believe so.  I think so.

Q.      Okay.  All right.  Were the police ever called to your residence during your relationship with Jerry Horton?

A.      Which residence was that?

Q.      To the Urana Avenue address.

A.      Yes.

Q.      Okay.

A.      Yes.

Q.      And I guess, let me take a step back.

A.      I believe so.

Q.      Did Jerry Horton live with you at the Urana Avenue address?

A.      That was not his official address, no.

Q.      Okay.

A.      That was not.

Q.      So -- but did he stay there?

A.      He stayed there a couple times, but that was not his official address.

188

Q.      Okay.  But you said that the police were called to that Urana Avenue address at some point during your relationship with Jerry Horton; is that right?

A.      Yes.

Q.      Okay.  Do you know how many times they were called?

A.      I can't remember.

Q.      Okay.  Do you know who called them?

A.      I want to say a neighbor, but I'm not sure.

Q.      Okay.  Did you ever call the police?

A.      I don't think I ever had to, because somebody already did before me.

Q.      Okay.  Did you ever make a report to the Columbus Police regarding Jerry Horton?

A.      I believe so.

Q.      Okay.  And do you recall when that was?

A.      No, I don't.

Q.      Okay.  Do you recall what you reported to the Columbus Police?

A.      I think it's because he put his hands on me.  I think so.

Q.      Was it just the one report?

189

A.          I can't remember, honestly.

Q.          Okay.  There was at least one, if not more?

A.          Yeah.

Q.          Okay.  And were you truthful in everything that you reported to the police?

A.          Yes.

Q.          Okay.  Do you know what came of that?

A.          I can't remember the exact -- I can't remember what happened, exactly.  Obviously, the relationship ended, but I can't remember if -- I think I tried to file -- I'm trying to think. Help me think of the word when somebody stays away from you.

Q.          Like a protection order?

A.          Yeah.  I tried to file that, but he didn't have an address so I never --

Q.          Okay.

A.          It never happened.

Q.          All right.  So that incident led to the end of your relationship with Jerry Horton?

A.          Yes.

Q.          Okay.  Did you ever tell Richard Horton about your relationship with Jerry Horton?

190

A.        Yes.

Q.        Okay.  Did he ever tell Richard Horton about the incident that you reported to the Columbus Police involving Jerry Horton?

A.        I think I might have just -- yeah. Just a little.  It wasn't, like, details, but just -- yeah.

Q.        Okay.  And that wouldn't have been at the time it happened, but it would have been sometime later, when you --

A.        Sometime later.

Q.        -- reconnected?

A.        Because we weren't even talking then.

Q.        Yeah.  Okay.  How did you and Richard reconnect?

A.        I had -- I can't remember exactly what happened, but it had something to do with his daughter.  And I was the only one that could reach out to him, so I reached out to him.  Something regarding his daughter.  And so it led us to start talking again.

Q.        Okay.  You don't recall what it was regarding his daughter?

A.        I don't remember.

191

Q.          And you said that you were the only one that could reach out to him.  Why was that?

A.          So because of -- so I'm always the one who wrote him, I'm always the one who visited him, and I always took his daughter to visit him.  And, basically, I was the communication between the two of them.  So her mom reached out to me, actually, to get ahold of him.  She doesn't have any of his information.

Q.          So if you were the communication link for his daughter, does that mean that you believe his daughter did not have contact with Richard during the period that you didn't have contact with him?

A.          That -- I'm not saying that he didn't, because I'm not sure, because we weren't together. But I just know she reached out to me at that particular time to get ahold of him, so...

Q.          All right.  And so you reconnected. How did you reconnect?  Was it a phone call?  Was it a letter?  How did that actually happen?

A.          It was a letter and then a phone call after that.

Q.          Okay.  And then after that, did -- you

192

entered back into a relationship with him?

A.          It took a while, but slowly, yes.

Q.          Okay.  And when do you think you were back in that sort of relationship with him?

A.          I don't know.  Late 2015, maybe.

Q.          Okay.  Are you aware that while you were divorced --

A.          Uh-huh.

Q.          -- from Richard, that he had a relationship with Kawanna Harris?

A.          I was aware.

Q.          Okay.  And what do you know about that relationship?

A.          That they were together.  That's all I basically know.

Q.          Okay.  And is it your understanding that his relationship with Kawanna Harris had ended before he resumed his relationship with you?

A.          I wasn't sure.  We're all grown, so whatever happened, happened.  I'm not sure of timelines or whatever else, but everybody was okay with whatever was going on, so...

Q.          Okay.  So you resumed --

A.          It wasn't --

193

Q.          -- a relationship -- I'm sorry.

A.          Go ahead.

Q.          No.  Finish your --

A.          I'm done.

Q.          Okay.  You resumed your relationship with Richard Horton without knowing whether or not his relationship with Kawanna Harris was over?

A.          I'm not saying I didn't know, but I just know that, you know, we weren't official yet. So things were just kind of, you know, going as they were.

Q.          Okay.  All right.  Do you recall him telling you at any point that his relationship with Kawanna Harris had ended?

A.          He had told me -- he had told me that it had ended, yes.

Q.          Okay.

A.          Yes.

Q.          And was that before or after you resumed your relationship with him?

A.          I honestly can't remember.  I don't know.

Q.          Okay.

            MR. DIRISAMER:  How's our time looking?

194

MS. MARTINEZ:  I'm ready for a break, if...

MR. DIRISAMER:  Yeah, let's take another break.  Let's go off the record.

THE VIDEOGRAPHER:  We are off the record.  The time is 1:35.

(A short recess is taken.)

THE VIDEOGRAPHER:  This marks the beginning of media No. 4.  We are back on the record.  The time is 1:48.

BY MR. DIRISAMER:

Q.        Okay.  I asked questions about this earlier, but I think I might have asked an imprecise question, so I just want to follow up. You said that Kobe never went with you to visit Richard, right, in person?

A.        No.  I don't think he -- no, he didn't.

Q.        Did Kobe go with anyone else to visit Richard in prison?

A.        No, he didn't.

Q.        Okay.  Were you ever diagnosed with any medical or psychological conditions while Richard was in prison?

A.        Yes.  Depression.

195

Q.      Okay.  And when were you diagnosed with depression?

A.      It actually started before his trial.

Q.      Did it start after his arrest?

A.      Yes.

Q.      Okay.

A.      The stress of everything.

Q.      All right.  And --

A.      I didn't really figure out what it was until after he was incarcerated.

Q.      When was --

A.      So, 2006.

Q.      I'm sorry.

A.      That's okay.  2006.

Q.      It was 2006 that you were diagnosed?

A.      Uh-huh.

Q.      Okay.  And who was it that diagnosed you with depression?

A.      Primary care doctor, Dr. Boezi.

Q.      Dr. -- I'm sorry.

A.      Boezi, B-o-e-z-i.

Q.      B-o-e-z-i?

A.      Uh-huh.

Q.      Okay.  You were diagnosed with

196

depression.  Have you been treated for depression since 2006?

A.          Yes.

Q.          Okay.  And how were you treated?

A.          Well, I'm on Celexa for that.

Q.          Still today?

A.          Still today.

Q.          Okay.  Have you taken any other medications for that?

A.          Yes.  I was on Wellbutrin at some point, another one that I really -- I can't remember at the time.  It's been a while.  But Celexa has been the one I've been on since day one.

Q.          Okay.  You're no longer on Wellbutrin?

A.          No.

Q.          And are you current -- other than Celexa, are you currently on any medication for depression?

A.          No.

Q.          Okay.  Did you ever receive any inpatient treatment for depression?

A.          I did.

Q.          Okay.  When was that?

197

A.          I can't remember the year.

Q.          Okay.  Was it after 2006, I assume?

A.          It was after 2006, yes.

Q.          Okay.  Was it prior to -- I'm trying to find a point of reference.  Was it prior to 2013, your divorce?

A.          It was prior to that.

Q.          Okay.  So sometime between 2006 and 2013, you received inpatient treatment for depression?

A.          Yes.

Q.          Where was that?

A.          It was at a hospital in Marysville that's no longer there.

Q.          Okay.  And how long were you there?

A.          I can't remember, exactly.  Maybe a week, but I can't remember, exactly.

Q.          Okay.  All right.  We've talked about depression.  Have you -- were you -- have you been diagnosed with any other medical or psychological conditions -- I'll back up and say since December of 2004?

A.          Do you want me to, like, go through my whole history of health?

198

Q.        Well --

A.        Or are you talking about, like, more mental health things?

Q.        Yeah.  Let's -- well, yeah.  Let's start with the mental health.  Are there any other mental health issues you've been diagnosed with since December of 2004?

A.        No.

Q.        Okay.  Have you ever had panic attacks?

A.        I have, yes.

Q.        Okay.  When did you have panic attacks?

A.        Those started before I was diagnosed, because I really didn't know what was going on.

Q.        When you say before you were diagnosed, they started --

A.        For depression.

Q.        -- before your depression diagnosis?

A.        Yes.

Q.        Okay.  Did they start before or after December 2004?

A.        They started after December of 2004.

Q.        All right.  Have you continued to have panic attacks after you were diagnosed with depression?

199

A.        I did for a while.  And every now and then -- I do to this day still.

Q.        Okay.  Have you received any specific medical treatment for panic attacks?

A.        No.  That's what the Wellbutrin was for, mostly.

Q.        Okay.  Have you had any -- apart -- other than the one we've talked about in Marysville, have you had any inpatient treatment for panic attacks?

A.        Inpatient treatment?  I don't believe so.

Q.        Okay.  Have you ever had what you would describe as a nervous breakdown?

A.        I'm not sure how to answer that question.  When you would speak of a nervous breakdown, like, what would that consist of?  Just, like...

Q.        Would you describe -- would you say that you've had that at any time?

A.        I mean, close to it, I'm sure.

Q.        Okay.  And when was that?

A.        After he went to prison.

Q.        So sometime after 2006?

200

A.          Yes.

Q.          Can you be any more specific than that?

A.          I can't really be that specific.  It just all started -- like I just said, that I started getting these symptoms prior to him -- or after December 2004 and couldn't figure out what was wrong with me, because my depression affects me physically.  So I was very physically sick.  I mean, on from there, it didn't get any better.  So to give you a specific date, I can tell you after December 2004.

Q.          All right.  And -- okay.  All right.  You said -- well, let me ask this question:  Have you had any other inpatient treatment for any mental health issues other than the single one we've talked about since December of 2004?

A.          There was a time I had a bad bout with it, and I don't remember the date.  But it was definitely after 2013.

            Or no.  No, it wasn't.  I don't remember the date, but just to say it was after my stay in Marysville.

Q.          Okay.

A.          It was a couple -- or several years

201

after that.

Q.        Okay.  Where -- I'm sorry.

A.        No.  You're fine.  I checked myself into Netcare off of Central Avenue.

Q.        Okay.  And so that was -- you received inpatient treatment there?

A.        Yes.  I was only there for maybe three days.

Q.        Okay.  And it was after your treatment in Marysville, but you don't know when?

A.        I don't know when.  I don't remember.

Q.        Okay.  Other than those two instances now that we've talked about, Marysville and Netcare, any other inpatient mental health treatments since --

A.        That was it --

Q.        Okay.

A.        -- for inpatient.

Q.        All right.  You said that your depression affected you physically.

A.        Uh-huh.

Q.        How so?

A.        I wasn't eating because it just made me sick.  So I lost a lot of weight.

202

Q.         Okay.  Were there any other physical effects of your depression?

A.         Mine -- like I said, mine just always made me very physically sick.

Q.         Okay.

A.         So it was just hard to -- just hard to go to work, hard to do daily life.

Q.         Okay.  Are there any other mental or physical conditions that you've had since December of 2004 that you believe relate to Richard Horton's incarceration?

A.         That relate to his incarceration?  I mean, yeah.  You want me to just, like, start talking about it?  I feel like a lot of -- I feel like I dealt with a lot of sicknesses just from stress, just from stress alone, you know.  I've always been told stress will kill you if you let it, and I feel like that's so true.

Also -- I mean, I don't know if this is how I'm going talk about it.  You know, before he was incarcerated, we planned on having kids.  And, of course, I was 23 then.  I'm 43 now.  When he came home, and I was 40, my health started going downhill a lot.  And I was in the hospital quite a

203

bit for different things, and then I recently had to have a hysterectomy -- a full hysterectomy last year in 2023, so now I can't have children.

And I believe a lot of that's because of this.  I was taken -- those years were taken away from me.

Q.        You just mentioned being in the hospital.

A.        Yes.

Q.        Is that within the last three years?

A.        Yes.

Q.        Okay.

A.        Uh-huh.  Yes.

Q.        All right.  Okay.  All right.  I want to go back for a second to your conversations with Richard while he was in prison.  Did -- you had phone calls with him, right?

A.        Yes.

Q.        Did he always -- did those phone calls always come from the same number?

A.        Pretty much, yes.

Q.        And was it an official prison phone?  Were you able to tell that?

A.        Yes.  Until they got tablets, then you

204

-- like, from your tablet and stuff like that.

But yeah.  You could always tell that, because of

the recording on there.

Q.        Okay.

A.        Yeah.

Q.        And so every time he called you, it had

that recording where you knew it was coming in

person?

A.        Yes.  I knew every time.

Q.        Okay.  So to your knowledge, he never

called you from a cell phone while in prison?

A.        Not to my knowledge, no.

Q.        Okay.  Are you aware -- did he use

prison -- did he use a cell phone while in prison

to call anyone else?

A.        I don't know that.

Q.        All right.  Let's move on.

          MR. DIRISAMER:  Can we get the 2017

motion, please.

                    - - - - -

     Thereupon, Exhibit 10 is marked for

purposes of identification.

                    - - - - -

Q.        Okay.  I'm handing you what's been

205

marked as Exhibit 10.

A.          Okay.

            MR. DIRISAMER:  Thank you.

Q.          For the record, the Bates stamp in the bottom right corner is City 003459.  Do you see that?

A.          Uh-huh.

Q.          Okay.

A.          Yes, I do.

Q.          And it says, "Motion for Judicial Release" in the, sort of, top middle.  And across the very top, there's a date stamp, Franklin County Court of Common Pleas, 2017 November 08. Do you see that?

A.          Yes.

Q.          Okay.  Are you aware that Richard Horton filed a motion for judicial release on November 8th of 2017?

A.          Yes, I believe so.

Q.          Okay.  And is this that motion?

            MS. MARTINEZ:  Objection; form and foundation.

            MR. DIRISAMER:  All right.

            MS. MARTINEZ:  You can answer.

206

A.          I believe so.

Q.          Okay.

A.          This is what it says, so yes.

Q.          Have you seen this before?

A.          I don't remember ever seeing this.

Q.          Okay.

A.          But I'm not sure.

Q.          Okay.  So you knew he filed a motion for judicial release in 2017, but you haven't seen this?

A.          I believe he did, but I can't say that I set my eyes on this.

Q.          All right.  Let's -- this is a fairly large document, I know, but we won't go through that much of it.

Flip to about two or three pages in from the end.  It's City 0003497.

A.          Okay.

Q.          And I'm going to -- there's a section there that says "Family Support."  Do you see that?

A.          Uh-huh.

Q.          Okay.  A few sentences in, maybe three or four sentences in on the right-hand side, it

207

says, "My family has provided me a place to live and with a car to drive."

Do you see that?

A.      Yes.

Q.      Was that true in November of 2017?

MS. MARTINEZ:  Objection; form and foundation.

You can answer.

A.      I mean, he definitely had a place to live, and at that time, I did have an extra car.

Q.      Had you -- in November of 2017, had you offered for him to come live with you if he was released?

A.      Yes.

Q.      Okay.

A.      That was always the plan.

Q.      And had you offered to provide a car for him to drive if he was released?

A.      Yes.  Upon him getting his license, yes.

Q.      Okay.  Next sentence says, "Currently, I am engaged to be married."

Do you see that?

A.      Yes.

208

Q.          Is that true?

A.          Yes.  We were already planning to get married.

Q.          In November of 2017?

A.          Uh-huh.

Q.          Okay.  If you go down a little bit, under community programming, it says, "I have been accepted into the Exit Program upon my release."

Do you see that?

A.          Yes, I do.

Q.          Do you know anything about the exit program?

A.          Nope.

Q.          Okay.  Did Richard ever tell you that he had been accepted into the exit program?

A.          He might have in conversation, but I don't remember.

Q.          Okay.  Let's go back up to the "Family Support" portion.

A.          Uh-huh.

Q.          The second sentence.  "My family has been very supportive both emotionally and financially throughout my incarceration."

Was that true in November of 2017?

209

A.          That's true.

            MS. MARTINEZ:  Objection to form and
foundation.

Q.          Okay.

            MS. MARTINEZ:  You can answer.

            THE WITNESS:  Oh, sorry.

Q.          Who was it that was providing him with
financial support throughout his incarceration?

            MS. MARTINEZ:  Same objection.

            You can answer.

A.          That would be me.

Q.          Okay.  And can you tell me about that.
What -- how did you provide him with financial
support while he was incarcerated?

A.          I would send him money so that he could
support himself better --

Q.          Okay.

A.          -- while in there.

Q.          Did he have an account for that while
he was in prison?  You would send money to the
account?

A.          Yeah.  Everybody does.  Uh-huh.

Q.          Okay.  All right.  And I can -- you can
look through it all if you want.  I'll represent

210

to you that there's no letter -- there are letters from certain people attached to this motion.

A.      Uh-huh.

Q.      I'll represent that there's no letter from you attached to this motion.  Did Richard ask you to provide a letter in support of this motion in 2017?

A.      Well, like we had talked about before, he -- we decided to not really involve me in a whole lot of -- just for my stress level.  You see all the mental things that I was going through myself mentally, so we decided not to -- he'd just rather use his family for that support.  I supported him other ways.

Q.      Okay.  But just to get back to my question, do you recall whether or not he asked you to provide a letter in support of this motion in 2017?

A.      I don't remember, honestly.

Q.      If you could, turn to -- it's closer to the beginning.

A.      Uh-huh.

Q.      It's City 0003464.  Do you see -- are you on that page?

211

A.        I am.  Uh-huh.

Q.        Okay.  It's a letter.  It says July 10, 2017 at the top, and it says, "To whom this may concern."  Do you see that?

A.        Yes, I do.

Q.        And then if we flip to the next page, City 0003465, it says, "Sincerely, Kawanna N. Harris."  Do you see that?

A.        I do see that.

Q.        Okay.  And in this letter, Ms. Harris describes herself as Richard Horton's -- well, sorry.  Let me strike that.  Let's take a step back.

          Have you ever seen this letter before?

A.        I have not.

Q.        Okay.  Did Richard ever tell you about it?

A.        I'm sure he has, yes.

Q.        Okay.  Do you recall what he told you about it?

A.        No.

Q.        Do you know if Richard asked Kawanna to write the letter?

A.        I'm not even sure.

212

Q.        Do you know if he helped her write it?

A.        I am not sure about that, either.

Q.        Let me ask a better question.  Did Kawanna help Richard write this?

MS. MARTINEZ:  Objection to form and foundation.

You can answer.

THE WITNESS:  I can answer?

MS. MARTINEZ:  Yeah.

A.        I have no clue.

Q.        Okay.  You see there's a stamp across the top of the page that says 2017 November 08?

A.        Uh-huh.

Q.        Okay.  That's the day that it was filed with the court.  Do you have any idea why it was filed more than two years after the July 10, 2015 date of the letter?

A.        I wouldn't have the -- I wouldn't know how to answer that question.  I don't know the answer to that.  I mean, stuff gets filed later than when it's put out there, right?  Like, that's how this whole system works, so I don't know.  I'm not sure.

Q.        Okay.  In the letter, Ms. Harris

213

describes herself as Richard Horton's significant other.

A.        Uh-huh.

Q.        Was that true in November of 2017?

A.        No.

Q.        Okay.  And in the letter, Ms. Harris says, "I need him home too just as much as our children and his family does."

          Was your understanding in 2017 that if Richard was released from prison, he would go live with Kawanna Harris?

A.        Okay.  So that says 2017 up here.

Q.        Uh-huh.

A.        But the letter was written in 2015.

Q.        Uh-huh.

A.        So I can't really -- like, when you're -- I don't know what you're trying to say.

Q.        Okay.

A.        But, I mean, the dates tell it may have been filed then, right?

Q.        Yeah.

A.        But she wrote this in July of 2015.

Q.        Uh-huh.

A.        So maybe that was the --

214

Q.    Well --

A.    Maybe that was what was going to happen, but we got into a relationship, and things changed.

Q.    Uh-huh.

A.    Okay?  So maybe that was.  I don't know for sure.

Q.    Okay.  Let --

A.    It wasn't my place to know that in 2015.

Q.    Okay.  Let me ask a different question, though.  Separate and apart from this letter -- okay?

A.    Uh-huh.

Q.    On November 8th of 2017, was it your understanding that if Richard was released from prison, he would go live with Kawanna Harris?

A.    No.

Q.    Was it your understanding that on November 8th, 2017, if Richard was released from prison, that he would go live with you?

A.    Yes.

Q.    Okay.  And you had discussed that with him?

215

A.        Yes.  Because like I said, this was -- just because it was filed in 2017, things were different, but you can't take back what she said on July 10th, 2015.  Am I right?

Q.        So your testimony is there are things in here that were accurate on July 10th of 2015 but were not accurate on November 8th of 2017?

A.        Very clearly, yes.

Q.        Okay.

A.        I mean, it just all speaks for itself right there.

Q.        Okay.  As of November 8th of 2017, had Richard Horton told you that he would come live with you if he was released from prison?

A.        You said -- say it one more time.

Q.        Uh-huh.

A.        Because you were talking kind of fast.

Q.        Sure.  And I do do that sometimes. I'll try to slow down.

A.        Okay.

Q.        On or before October 8th of 2017, had Richard Horton told you that if he was released from prison, he would come live with you?

A.        He didn't tell me anything.  Let's be

216

clear.  We decided that that's what was going to be, because we were planning on getting married again.

Q.        Okay.

A.        So, yes, this was -- this was what was going to happen.

Q.        And you had decided that prior to November 8th of 2017?

A.        Well, I don't know the exact dates. I'm not going to say anything about that.  But this is where we were in November 2017.  We were planning on spending the rest of our lives together again, so yes.

Q.        Right.  And you told me a few minutes ago that you were -- you considered yourself to be engaged to him on November 8th of 2017?

A.        I don't remember telling you that date.

Q.        All right.

A.        I want to see that, just so I make sure --

Q.        Okay.  Sure.

A.        -- I'm answering your question.

Q.        Sure.  Let's go back.

A.        That was back here?

217

Q.      Yep.  That was at the first page of this that we looked at.

A.      Okay.

Q.      Okay.

A.      Okay.  Yes.  Yeah, I see where it says that.

Q.      On page, yeah, 3497.

A.      Uh-huh.

Q.      "Currently, I am engaged to be married."

A.      Yeah.

Q.      And, again, at the top --

A.      Yeah.

Q.      -- it says 2017 November 08.

A.      Right.

Q.      So that was true on November 8th of 2017, right?

A.      Yes.

Q.      And it was you --

A.      That was true.

Q.      And it was you that he was engaged to?

A.      Yes, it was definitely me.

Q.      Okay.  And so because he was engaged to you on November 8th of 2017, you believed on

218

November 8th of 2017 that if he was released, he would come live with you?

A.        Yes.

Q.        All right.  Did you know that Kawanna Harris visited Richard Horton in prison in August of 2018?

A.        Where do you see that at?

          MR. DIRISAMER:  Can I have the visitation records, please.

          We will mark these as Exhibit 11.

                    - - - - -

     Thereupon, Exhibit 11 is marked for purposes of identification.

                    - - - - -

Q.        I'm handing you what's been marked as Exhibit 11.

A.        Thank you.

Q.        Okay.  This is a several-page document.

A.        Uh-huh.

Q.        At the top, it says "Ohio Department of Rehabilitation & Correction," and then underneath that, it says inmate visitation history for Horton, Richard H.

A.        Okay.

219

Q.          Do you see that?

A.          I do.

Q.          Okay.  And then for the record, on the bottom right, the Bates stamp is City 007516.  Do you see that?

A.          I do.

Q.          Okay.  And then if you turn to the next page, City 007517 --

A.          Uh-huh.

Q.          -- there's an entry, the very first entry.  8-26-2018.  Harris, Kawanna N.  Do you see that?

A.          I do.  Uh-huh.

Q.          Okay.  And do you see the next entry below that?

A.          Right.

Q.          It's 8-25-2018, Janette Horton.

A.          Right.

Q.          Okay.  And then the third entry on this second page, 6-27-18, Harris, Kawanna N.  Do you see that?

A.          I do.

Q.          Okay.  Were you aware that Richard -- that Kawanna Harris visited Richard Horton on

220

June 27th of 2018?

A.      I mean, I wasn't aware, but, you know, I can't say that I was aware.

Q.      Okay.  Are you aware that Kawanna Harris visited Richard Horton on August 26th, 2018?

A.      No, I wasn't aware.

Q.      Okay.  One day after you visited him on August 25th, 2018?

A.      Right.

Q.      Okay.  You weren't aware at the time and he -- you have not -- you didn't know that at any point before today?

A.      No, I can't say that I do.

Q.      All right.  Are you aware that Richard filed a second motion for judicial release in February of 2019?

A.      I'm not sure.

Q.      Okay.

A.      I'm not sure if I remember that.

Q.      Let me -- let me take the "2019" part off of that question.  Are you aware that at any point after the motion -- 2017 motion we looked at, that Richard filed a second motion for

221

judicial release?

A.          I honestly don't know, because I just didn't know a whole lot.

Q.          All right.  I'm going to hand you a document that we've marked as Exhibit 12.

                    - - - - -

          Thereupon, Exhibit 12 is marked for purposes of identification.

                    - - - - -

A.          Okay.

Q.          All right.  This is -- for the record, the Bates stamp on it is City 003748.  Do you see that in the bottom right corner?

A.          I do.

Q.          Okay.

A.          Uh-huh.

Q.          And it says motion for judicial release, and there's a -- it says "Respectfully Submitted, Richard Horton," and there's a signature on it.  Is that Richard Horton's signature?

A.          That is.

Q.          All right.  Have you ever seen this before?

222

A.          I can't say that -- I don't remember.
I don't believe I have.

Q.          Okay.

A.          But I'm not sure.  I'll just be honest
with you.  A lot of things have come through the
pipeline in the last 20 years, so I...

Q.          Okay.

A.          I can't say for sure.

Q.          But as you sit here today, you don't
recall having seen this before?

A.          Not to my knowledge at this time.

Q.          Okay.  Let's go to -- let's go to the
page that's Bates-stamped City 003789.  Are you
there?

A.          I am.

Q.          Okay.  This is a letter that has your
name on it?

A.          Uh-huh.

Q.          Is that correct?

A.          Yep.  That's true.

Q.          And your address?

A.          Yes.

Q.          Okay.  And it's dated September 20th
at 8:30 p.m.  Do you see that?

223

A.          I do.

Q.          Okay.  Do you recall writing this letter?

A.          I've written several things for him, so I'm not sure.  I've written several things for him, though --

Q.          Okay.

A.          -- in the last 20 years.  So I can't --

Q.          So --

A.          -- say for sure.

Q.          -- you recall writing -- I'm sorry.

A.          I recall writing many things, yeah.

Q.          So you recall writing several things. You don't --

A.          As requested.

Q.          You don't specifically recall writing this letter?

A.          Not specifically.

Q.          Okay.  Let me ask you this question: Is that your signature?

A.          No, that's not my signature.

Q.          Okay.  Let's go to -- all right.  When -- you said you recall writing things in support of Richard.

224

A.          Uh-huh.

Q.          When you would do that, would you send them to him in prison or would you send them directly to the court?

A.          I don't remember, honestly.

Q.          Okay.  You're not sure?

A.          I'm not sure.  Huh-uh.

Q.          Okay.  All right.  Let's go to the page after the page -- I'm sorry.

A.          No.  You're fine.

Q.          It's City 003790.  This is a letter. It has your parents' name on it, Alfred and Cassandra Harmon.  Do you see that?

A.          Uh-huh.  I do.

Q.          At 1017 Brown Road.  Is that their address?

A.          Yes, it is.

Q.          Okay.  And there's two signatures on here, Alfred Harmon and Cassandra Harmon.  Is that Alfred's signature?

A.          I have no clue.

            MS. MARTINEZ:  Objection; form.

            THE WITNESS:  Sorry.

A.          I have no clue.

225

Q.          Okay.  Is that Cassandra Harmon's signature?

MS. MARTINEZ:  Same objection.

You can answer.

A.          I also have no clue.

Q.          Okay.  Let's turn back to the page we were on a minute ago, 3789.

A.          Uh-huh.

Q.          You said that's not your signature.  Do you recognize that handwriting?

A.          I do not recognize the handwriting.

Q.          Okay.  You have no idea who wrote that -- who wrote your name there?

A.          I do not.

Q.          All right.  Let's -- okay.  Let's go to 3785 in the same exhibit.

Are you there?

A.          I'm here.

Q.          Okay.

A.          Uh-huh.

Q.          And this is a letter submitted in support of the same February 2019 motion.  Do you see the -- at the top left, it says Richard Horton, and it gives a PO Box in Chillicothe,

226

Ohio?

A.        Yes.

Q.        Okay.  Let's go into the third paragraph, the last sentence.  It says, "The likelihood of a 42 year old married, christian, to contribute to recidivism is very unlikely."

          Do you see that?

A.        Yes.  The last sentence right there?

Q.        Yes.

A.        Uh-huh.

Q.        And did I read that correctly?

A.        Yes.

Q.        Okay.  And the date of the letter, if you look up just under Richard Horton's name, is December 12th of 2018.  Do you see that?

A.        Yes.

Q.        Was Richard Horton married on December 12th of 2018?

A.        No.

Q.        Okay.  Please turn to City 003792.

          This is a letter and it has Kawanna Harris' name on it.  Do you see that?

A.        Uh-huh.

Q.        And below her name, it says

227

December 14th, 2018, 8:27 p.m. Do you see that?

A. I see that.

Q. Okay. Let's go to page -- the next page, 3793.

Second paragraph of this letter, first sentence, "I'm here for him for all the moral support and love he can receive."

Do you see that?

A. I see that.

Q. Okay. To your knowledge, was that accurate as of February 28th of 2019?

MS. MARTINEZ: Objection to form and foundation.

You can answer.

A. I'm not sure. I don't think so, but I'm not sure.

Q. Okay.

A. I'm not sure.

Q. And then --

A. And it really doesn't even matter.

Q. And then the next paragraph below that, the first sentence, "I need him home too just as much as our children and his family does."

Do you see that?

228

A.          I see that.

Q.          Did I read that correctly?

A.          You did.

Q.          Okay.  To the best of your knowledge, was that accurate as of February 28th of 2019?

A.          No.

          MS. MARTINEZ:  Objection to form, foundation.

          You can answer.

          THE WITNESS:  I'm sorry.

A.          No.

Q.          Okay.  Have you ever seen that letter before?

A.          No.

Q.          Were you aware that Ms. Harris submitted a letter in support of this 2019 motion or that was dated December of 2018?

A.          No, I don't know.  I don't really care. It seems like you're trying to put me up against her, and at the time, that was his support, and it is what it is.

Q.          In 2018, that was his support?

A.          It could have been his support.  It doesn't even matter.  That's the thing.  Because

229

we're together now.  Me and her have never had words.  Because when you are wrongfully incarcerated, you're just trying to get home.  You're trying to find whatever way you can get to home, okay?  He wasn't doing anything wrong.

So I'm just saying, as much as you're going to try to put me up against her, it's not going to work, because she did what she had to do, and I actually support that.

Q.        You've testified that you were engaged to Richard Horton as of November 8th of 2017, right?

A.        Yes.  Not officially, because -- I mean, we were engaged with words, yes, but there was no ring, obviously, because I can't do that in prison.

Q.        Okay.  And you were still engaged to him as of December 14th of 2018, right?

A.        Yes.

Q.        Okay.

THE WITNESS:  I need a break.

MS. MARTINEZ:  Is now a good time?

MR. DIRISAMER:  Sure.

THE VIDEOGRAPHER:  We are off the

230

record.  The time is 2:23.

(A short recess is taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:37.

BY MR. DIRISAMER:

Q.          Okay.  Was it your understanding, as of the date that you became engaged to Richard Horton while he was in prison, that he was no longer in contact with Kawanna Harris?

A.          I mean, I didn't know for sure.  We really didn't talk about it.

Q.          You didn't know one way or the other?

A.          I wasn't sure.

Q.          Okay.  What's your understanding of this lawsuit?

A.          What is my understanding of this particular lawsuit?

Q.          Yes.

A.          It's for my husband to get justice.

Q.          What does that mean?

A.          For him to get justice, just what I said.  I don't know how else to say it.  That's all that matters, that he gets his justice.

Q.          Okay.  What would be justice?

231

A.          His name being cleared and understand that this is a wrongful conviction, okay?  You can't -- you can't erase all of this hurt and time, because I know you're speaking of probably money, but you can't erase any of this, any of this hurt, any of this hurt I've been through.

So for him to get justice, someone needs to be held accountable.  I don't know who that's going to be, but someone does.  There's a lot of hurt in this case.  I know, you know, nobody's going to look at it like I do, like he does, but there's a lot of hurt in this case. We've been through a whole lot.

I just told you that I wanted to have children for the longest, and I can no longer have children, and I blame that on this case 100 percent.  I was perfectly healthy when we got married the first time, and now I'm not.

Q.          You just said in that answer -- and you said several times -- that this is about a wrongful conviction.  Why do you believe Richard Horton was wrongfully convicted?

A.          Because he was.  That's just the truth. He was.  He was wrongfully convicted for sure.

232

Q.        Okay.  Why do you believe that happened?

A.        Because I know it happened.  It's not that I believe or that I think.  I know it -- I know he was.  Are you trying to get me to word it a different way?

Q.        Well --

A.        I don't know how you want me to answer that question.

Q.        What do you believe caused him to be wrongfully convicted?

A.        The fact that he didn't do it.  So I believe you're trying to trip me up in my words, and I don't appreciate it.  But it's because he didn't do it.

Q.        Okay.

A.        And the proof shows that.

Q.        Okay.  Are you aware -- do you believe there were errors in the police's investigation?

A.        Most definitely.

Q.        Okay.  What were those errors?

A.        I don't know.  I'm not a police officer.  I don't work for the law.  All I know is, is that they did not do their job correctly.

233

I can't sit here and go back and forth with you on words.  All I know is my husband should have never went to prison.

Q.        Okay.

A.        I am trying not to cry, but you're making this so hard, okay?

Q.        Okay.  We'll get you some tissues, ma'am.

A.        Thank you.

Q.        Take your time.  Let me know when you're ready.

A.        I'm ready.

Q.        Okay.  Let's go back to some of the things we've talked about from 2004.  We talked about the fact that Richard stopped working at Popeyes.  Do you know why?

A.        Because he wanted to make more money, I'm sure.  That was the main reason.

        THE VIDEOGRAPHER:  I'm sorry.  Could you say that again.

        THE WITNESS:  Oh, I'm sorry.  Hold on a second.

A.        The main reason him -- being wanting to make more money, I'm sure.

234

Q.        Okay.  We talked earlier about Richard's June 2004 marijuana arrest.  What exactly did he tell you about that?

A.        When I actually found out about it, I don't remember.  I don't remember.

Q.        Did he tell you if he was using drugs at that time?

A.        No.

Q.        Did he tell you if he was selling the marijuana that --

A.        No.

Q.        -- he had on him at that time?

A.        No.

Q.        Did you ask him if he was using drugs at that time?

A.        I don't remember.

Q.        Did you ask him if he was selling drugs at that time?

A.        I don't remember that, either.  I probably didn't.

Q.        Okay.  We looked earlier today at the written statement that you gave following your interview with Detective Brenda Walker.  Do you remember that?

235

A.        I do.

Q.        Okay.  Were you able to write whatever you wanted to on that paper?

          MS. MARTINEZ:  Objection to form.

          You can answer.

A.        She asked me to wrote -- give my statement on what happened that night.

Q.        Okay.  Were you limited --

A.        Or day.  Whatever.

Q.        Sorry.  Were you limited in any way in terms of the time you had to write that statement?

A.        I don't believe so, but I'm not sure.

Q.        Were you limited in any way by the space you had to write that statement?

A.        I don't believe so.

Q.        Okay.  We've talked earlier today about the fact that you paid the bond for Richard to get out of prison in January of 2005.

A.        Yes.

Q.        Did you borrow that money or was that money that you already had?

A.        No.  I got it from one of my credit cards.  It was my money.

Q.        Okay.  All right.  We've spoken a

236

little bit about Richard's children today.  How many times have you seen Vantasia in the last three years?

A.          The last three years?

Q.          Yeah.

A.          She lived with us for a little bit when Richard came home.

Q.          When was that, that she lived with you?

A.          February 2022 up until -- I don't know -- she either moved out sometime after September, I believe.

Q.          Of --

A.          Of the same year.

Q.          Of 2022?

A.          Uh-huh.

Q.          Okay.  Have you ever spoken with her about this lawsuit?

A.          About this lawsuit, like, what we're going through right now?

Q.          Yes.

A.          No, not personally.

Q.          Has Richard ever spoken with her about this lawsuit?

A.          I'm not sure.

237

MS. MARTINEZ:  Objection to form and foundation.

Q.      When was the last time that you saw Vantasia?

A.      Maybe -- we had dinner at our house maybe three weeks ago.

Q.      And how often have you seen Kobe in the last three years?

A.      He moved from Florida back here to Columbus in January of last year.  And so -- and he moved with us, so I saw him all the time.

Q.      Okay.  How long did he live with you?

A.      Until May of last year, when he got his own place.

Q.      All right.  So four or five months, roughly?

A.      Uh-huh.

Q.      All right.  Have you ever spoken with Kobe about this lawsuit?

A.      No, not personally.

Q.      Has Richard ever spoken with Kobe about this lawsuit?

MS. MARTINEZ:  Objection to form and foundation.

238

You can answer.

A.        I'm not sure.

Q.        And when was the last time you saw Kobe?

A.        The Ohio State game against the Ducks. I don't know what date that was.

Q.        All right.

A.        But you get where I'm going with that.

Q.        Yep.

A.        It was on a Friday evening.

Q.        Yep.  October, I think.

A.        No.  Well, not October.  Just -- who did they play before the championship?

Q.        Oh.  They played them twice.

A.        Okay.  It was --

Q.        New Year's Day.  It was the second time.

A.        There you go.  Right there, yeah.

Q.        Okay.  There you go.  All right.  What was Richard's first job when he was released from prison in January of 2022?

A.        He worked at Alloy Metals off of -- I forget which street it was on.  It's on the north side of Columbus.

239

Q.          Okay.  How did he get there?

A.          How did he get there?  He would take the -- he would take the bus.

No.  No.  No.  I'm sorry.  I would drop him off, because I don't really have a work schedule.  So I would drop him off, and he would take the bus home.

Q.          Okay.

A.          Because, usually, I couldn't pick him up.

Q.          Do you know what bus route that was?

A.          The COTA.

Q.          Yeah.  But they have numbers, like --

A.          I don't know that.

Q.          -- 1 through 40.  Okay.

A.          I don't know.

Q.          All right.  You've talked -- we talked earlier about some -- well, you have one business currently, right, the Horton Housekeeping?

A.          Uh-huh.

Q.          Is there a bank account for that business?

A.          Yeah, there is.

Q.          And is that separate and apart from

240

your personal bank account?

A.          Uh-huh.

Q.          Okay.

A.          Yes.

Q.          And is it separate and apart from Richard's personal bank account?

A.          Yes.

Q.          All right.  Do you have -- I understand that there's a Huntington bank account that your husband has.  Are you on that account as well?

A.          Not on his checking accounts, no.

Q.          Okay.  Does he also have an account with KEMBA Financial?

A.          I don't know.  I think that's his -- yeah.  I think that's his car payment.

Q.          Okay.  And is -- are you on that account?

A.          No.

Q.          Okay.  Are there any joint accounts that you're both on?

A.          We have a savings together.

Q.          Okay.  Is that with Huntington?

A.          Yes.

Q.          Okay.  I think when we were talking

241

about -- back at the very beginning about social media things. You mentioned a Darlene Marie...

A. Darlene Marie Styling.

Q. Okay. Is that an ongoing business of yours?

A. No, it's not. It's -- I do it on the side, but it's not ongoing to where I file taxes for it anymore.

Q. Okay. All right.

A. I kind of closed that down around the time I closed down -- we closed down Blazers & Bottoms.

Q. Okay. So -- and I think you said that was 2023, maybe, something like that?

A. Yes.

Q. Okay. I think -- I mean, I know we've seen documents and things that reflect that you have spoken on behalf of the Ohio Innocence Project; is that right?

A. I have.

Q. Okay. And are you paid by the Ohio Innocence Project for those engagements?

A. Yes.

Q. Okay. How much?

242

A.          I haven't done one in a while, so I think 250.

Q.          $250?

A.          Uh-huh.

Q.          For...

A.          For just one speaking engagement.

Q.          And that would be an hour-long event or two-hour-long event?

A.          Usually, yes.

Q.          Okay.  Do you -- how many times did you speak on behalf of the Ohio Innocence Project in 2024?

A.          I want to say twice.

Q.          Were those events -- was Richard there as well?

A.          Yes, he was.

Q.          All right.  Do you recall where those two events were in 2024?

A.          One was at the -- in New Orleans at the Ohio -- or the Innocence Network Conference, and the second one, OSU, I believe.

Q.          All right.  And those are the only two you can think of?

A.          Those are the only two I can think of.

243

Q.        Okay.  Has Richard ever told you what the conditions were like in prison?

A.        Not really.  He didn't want to scare me.  He didn't want to make me nervous or -- I already worried about him anyway, so he really didn't tell me a whole lot.

Q.        That's not something you talked about?

A.        Not on a regular basis, no.

Q.        Okay.  Are you aware of any medical conditions that Richard was diagnosed with while in prison?

A.        High blood pressure.

Q.        Okay.  Any others?

A.        And now he's dealing with things with his hip.

Q.        Okay.  What exactly is he dealing with with his hip?

A.        It's just -- he has a lot of constant pain.  He's had to get cortisone shots in his hip.

Q.        Has he been diagnosed with anything related to the hip?

A.        Yes.  I just don't know what, but he's definitely been to several places.

Q.        Okay.  And do you know where he's going

244

for treatment related to that?

A.     No.  I don't know the -- I don't know the exact places.

Q.     Okay.  To your knowledge, has Richard ever been diagnosed with adjustment disorder with mixed anxiety and depressed mood?

A.     Not that I'm sure of.

Q.     You never heard that?

A.     Not that I'm sure of, no.

Q.     Okay.  To your knowledge, has he been diagnosed with polysubstance dependence?

A.     I don't even know what that is.

Q.     Okay.  So that would be a no, then?

A.     That would be a no.

Q.     To your knowledge, has he been diagnosed with antisocial personality disorder?

A.     Not that I know of.

Q.     Are you aware of any -- we talked about the hip, so let's set that aside for the moment.

Other than that, are you aware of any physical injuries or physical pain that Richard has suffered while he was incarcerated or after his incarceration?

A.     He has problems with his back as well.

245

Sciatic nerve.

Q.    Did you say sciatic nerve?

A.    Uh-huh.

Q.    Okay.  Do you know when that started?

A.    I mean, he's been dealing with it since he's been home and before that.  I'm just not sure of when it started.

Q.    Okay.  So it started at some point while he was in prison?

A.    Yes.

Q.    Is he actively treating for that now?

A.    I mean, do you mean going to a doctor or just, like, doing -- he did some physical therapy.  He's been to the doctor's a few times about it.  That's about the extent.

Q.    Okay.  And with the hip issues that you spoke about, when did those start?

A.    I'm not sure when they started, but like I said, ever since he's been home, it's been a continuous problem.  But I'm not sure when, in prison, it started.  It definitely started, though, in prison.

Q.    All right.  Has the -- you said he went to physical therapy for his back issues?

246

A.          Several times, yes.

Q.          Okay.  All right.  Are you aware of any other physical injuries?

A.          Not at this time, but, you know, I'm not aware of any other ones right now.

Q.          All right.  What about mental health, psychological issues?  Are you aware of any of those that Richard suffered while he was incarcerated for, after?

A.          He deals with -- he deals with a lot of emotional problems, a lot of dreams and -- bad dreams and things like that.

Q.          Okay.  Has he been diagnosed with anything related to that by a medical professional?

A.          I'm not sure.

            MS. MARTINEZ:  Objection; foundation.

Q.          Do you --

            THE WITNESS:  I can answer?

            MS. MARTINEZ:  Yeah.  Yeah.

Q.          Has he been treated for any of those issues?

A.          That, I'm --

            MS. MARTINEZ:  Same objection.

247

You can answer.

A.        That, I'm not sure.

Q.        We talked about bad dreams.  Have you observed Richard experiencing sleeplessness?

A.        Yes, many times.

Q.        Okay.  How often?

A.        I mean, they're maybe not as often now, but they still happen quite a bit.  A lot more often when he first came home.

Q.        Has he received treatment for that?

A.        I'm not sure.

Q.        Have you observed Richard experiencing depression?

A.        I can't say that, you know -- I can't say that I observed it.  I know he deals with it.  I can't say that I observe it.  He hides things very well because he wants to be strong for me.  He's always done that.  So I know my depression definitely shows faster, but I know for a fact that he deals with something.  I mean, this situation, anybody would.

Q.        Do you know if he's been diagnosed with depression by a medical professional?

A.        That, I don't know.

248

Q.          Has he been treated for depression by a medical professional?

A.          That, I do not know.

Q.          Have you observed Richard experiencing anxiety?

A.          Yes.

Q.          Okay.  When has he experienced anxiety?

A.          When it's just -- a lot of times, when maybe the situation is too stressful or there's just a lot going on.  Just like any of us. Anxiety happens when we're just overwhelmed sometimes.  And life is overwhelming.

Q.          Did you ever observe him experiencing anxiety prior to his incarceration in 2006?

A.          No.

Q.          Did you ever observe him experiencing depression prior to his incarceration in 2006?

A.          A little -- you said 2006.  So while the -- I take back what I said the first time you said 2006.  So while he was awaiting for trial and things, yes, he was -- it was very stressful.

Q.          Okay.  Let me rephrase the question, then, in terms of dates.

            Prior to his arrest in December of

249

2004, did you ever observe Richard experiencing anxiety?

A.          No.

Q.          Prior to his arrest in December of 2004, did you ever observe Richard experiencing depression?

A.          No.

Q.          Prior to his arrest in December of 2004, did you ever observe Richard experiencing sleeplessness?

A.          No.  Prior to 2004, we were both pretty normal.

Q.          Have you experienced Richard having difficulty trusting people?

A.          Yes.

Q.          Okay.  In what circumstances?

A.          Various circumstances.  I can't sit here and tell you all of them, but dealing with the people that he dealt with while incarcerated and just being around those type of people, it's hard to trust people when you're on the other side of that.

Q.          Has --

A.          He trusts me.

250

Q.        Has this been -- has he been diagnosed with anything related to that?

A.        No.

Q.        And to your -- has he been treated for anything related to that?

A.        Related to not being able to trust people?  I didn't know there was a diagnosis. Then I don't think so.

Q.        All right.  Does he have issues being in large groups of people?

MS. MARTINEZ:  Objection to form, foundation.

You can answer.

A.        He seems to do okay.

Q.        Do you believe Richard's experienced PTSD?

A.        Yes.

Q.        Okay.  Is that something that you've witnessed?

A.        Yes, I have witnessed it.

Q.        Okay.

A.        Yeah.

Q.        Can you describe what you've witnessed that makes you believe he has PTSD.

251

A.        Just some situations that come up. Like I said, I can't sit here and pinpoint everything, but just certain -- he has certain triggers that just kind of, you know, may bring him back to when he was incarcerated.  Do you want an example?

Q.        If you have one.

A.        Okay.  I have a good example.  When we're in a public place and somebody just starts running out of nowhere for no reason, it kind of triggers him a little bit because those things happened in prison.  When people started running, something bad was going to happen.  So those type of situations, it triggers certain things, yes.

Q.        And what does it trigger?

A.        It triggers him trying to get up out of there because something's about to happen.  So he just -- he gets very closed off, and he just -- we have to get out the area.

Q.        Okay.  Has he been diagnosed with PTSD?

A.        I mean, not officially.  I don't think you need a doctor to tell you you have PTSD.  It shows just in his -- in his behavior sometimes.

Q.        Has he been treated for PTSD?

252

A.          He talks to a counselor sometimes.

Q.          Do you know the name of the counselor?

A.          No.

Q.          Do you know where the counselor's located?

A.          No.

Q.          Do you know when he started talking to a counselor?

A.          He started talking to somebody as soon as he got home, off and on.  It's not a regular thing, but off and on, yes.

Q.          So in or beginning close to January of 2022?

A.          Exactly.

Q.          And continuing until then?

A.          Yes.

Q.          All right.  There's a few folks whose names have come up at various times around this case.  I just want to know if you know any of them.

            Did you know anyone named Kyle Ramsey?

A.          No.

Q.          Okay.  Do you know anyone named Derek Greathouse?

253

A.	No.

Q.	Did you know anyone named Sam Sias?

A.	Sam Sias?  No.

Q.	Okay.  We've spoken a little bit about your parents.  Are they both still living?

A.	They are.

Q.	Okay.  And do you see them regularly?

A.	I see them all the time.

Q.	Okay.  With Richard?

A.	Uh-huh.  Or by myself.

Q.	All right.  Have either of your parents lived with you in the last three years?

A.	No.

Q.	Okay.  Do you know Barbara Horton-Alomar?

A.	Yes, I do.

Q.	Okay.  And who's she?

A.	That's Richard's aunt.  One of his aunts.

Q.	Okay.  Do you know if she's still living?

A.	Yes, she is.

Q.	Do you know where she lives?

A.	I don't know her address by heart, but

254

it's not too far from us.

Q.          Okay.  Do you know, like, what street it is or anything like that?

A.          I can't remember.

Q.          Okay.  But you and Richard are still in touch with her?

A.          Yes.

Q.          Do you -- I think we talked a little bit about Nancy Banner, and that's Richard's aunt as well?

A.          Yes.

Q.          Do you know if she's still living?

A.          She is.

Q.          Do you know where she lives?

A.          She lives on the east side.

Q.          You don't know the address?

A.          No.

Q.          Okay.  Are you and Richard still in contact with her?

A.          Yes.

Q.          Okay.  Do you know someone named Furquan McDougald?

A.          I do.

Q.          Okay.  Who's he?

255

A.          A long-time friend of Richard's.

Q.          Did you know him in 2004?

A.          I did.  Uh-huh.

Q.          Okay.  And are you and Richard still in contact with him?

A.          Yes, we are.

Q.          Okay.  Do you know where he lives?

A.          East side.  I don't know his address.

Q.          Okay.  Do you know someone named Dwight Dorsey?

A.          Yes.

Q.          Who is Dwight Dorsey?

A.          Dwight Dorsey is a long-time friend of mine, and he -- Richard used to work for him.  He moved on to another job, but Richard still works there.

Q.          When you said Mr. Dorsey's a long-time friend of yours, when did you first meet him?

A.          Oh, man.  I don't know if his kids were born yet.  So it's probably been like 17 years -- 16, 17 years ago.

            (Mr. Epstein left the conference room.)

A.          His kids -- I'm trying to go off -- his kids weren't born yet, so --

256

Q.        Yeah.  So, like, 2008 or something like that?

A.        Something like that, yeah.

Q.        All right.

A.        I grew up with his wife, so -- but I just know he got married.

Q.        All right.  But after 2004?

A.        Yes.

Q.        All right.  And you said he worked for a time with Richard.  Where was that?

A.        DeBra-Kuempel.

Q.        And when did Richard work there?

A.        No.  Richard still works there.

Q.        Oh.

A.        I said he moved on to another job.

Q.        Okay.

A.        Dwight did.

Q.        Dwight left; Richard's still there?

A.        Yes.

Q.        All right.

A.        Uh-huh.

Q.        Okay.  Do you know anyone named Roland Hunter or Rolland Hunter?

A.        I've heard of the name, but I don't

257

know him.

Q.       Never met him, as far as you know?

A.       No.  I just know he was a friend from high school.  That's all I know.

Q.       Okay.  Do you -- do you know anyone named Richard Diggs?

A.       No.

Q.       Never heard the name?

A.       I've heard the name before, but I have no idea who he is.

Q.       Okay.  When have you heard the name Richard Diggs?

A.       I've heard it in this case at one point, and I don't know what point that was.  It's kind of -- yeah.

Q.       You heard it, but you don't remember the context?

A.       I don't remember the context, no.

Q.       And to your knowledge, you've never met Richard Diggs?

A.       No.

Q.       Okay.  Have you ever known anyone named Ricardo Diggs?

A.       No.

258

Q.      Ever heard the name Ricardo Diggs?

A.      I don't actually think I've heard that name before.

Q.      All right.  Do you know anyone by the name of Tor Hill?

A.      No.

Q.      Okay.  And I apologize.  I don't recall if you've mentioned.  Do you know anyone name Alysia Jackson?

A.      Alysia Jackson is my sister.

Q.      I'm sorry.

A.      That's okay.

Q.      Maybe I had it wrong.

        How's her first name spelled?

A.      A-l-y-s-i-a.

Q.      Okay.  That's my mistake.

A.      That's okay.

Q.      I spelled it right, pronounced it wrong.

        And she's your sister.  You've known her your whole life, I assume?

A.      Yes.  Uh-huh.

Q.      Is she younger than you or older?

A.      She's younger.

259

Q.        Okay.  Have you ever spoken with her about this case or Richard Horton's incarceration?

A.        She has come to visit him before.  So she definitely knows, you know, just as much as I know.

Q.        Okay.  But do you recall any specific conversations with her about this case?

A.        The civil case we're in now?  No.  Huh-uh.

Q.        Okay.  Have you had any conversations about this civil case with either of your parents?

A.        They know it's going on.

Q.        Just the fact there is a case?

A.        The fact there is a case.  They do know that, yeah.

Q.        Okay.  But you've never talked to them about any specifics related to this case?

A.        No specifics.  Just this case is going on.

Q.        Okay.  Do you have any other siblings?

A.        Yes.

Q.        All right.  Who are your other siblings?

A.        Evette.  I don't know her last name

260

now.  I haven't spoken to her in years.  She lives in Florida, so I don't know.

Q.        Okay.

A.        And then Elise Holley.

Q.        Okay.

A.        E-l-i-s-e and then Holley.

Q.        Okay.  We talked about her earlier?

A.        Yes.

Q.        Have you spoken with her about this civil case?

A.        She knows it's going on.

Q.        Okay.  But you haven't spoken to her about any of the specifics?

A.        No specifics, no.

Q.        Okay.  And those are your only siblings?

A.        Yeah.  Just three sisters.  That's it.

Q.        All right.  Is there anyone that we have not talked about today that you have spoken to related to -- regarding this civil case?

A.        No.

Q.        Okay.

A.        Not that I can think of, no.

Q.        All right.

261

MR. DIRISAMER: Let's take a break. I think I'm very close to being done, but I want to check my notes and --

MS. MARTINEZ: Yeah.

MR. DIRISAMER: -- speak with cocounsel, so...

THE VIDEOGRAPHER: We are --

MS. MARTINEZ: Five minutes sounds good?

THE VIDEOGRAPHER: We are off the record. The time is 3:07.

(A short recess is taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:20.

BY MR. DIRISAMER:

Q.         All right. I know you've said that you were not -- well, I guess you said you weren't sure whether you were present for portions of Richard's criminal trial other than your testimony and his testimony, right?

A.         I was present for a lot of it. I just can't remember, you know, actually hearing and -- all the testimony.

Q.         Okay. But you are aware that both

262

Richard McClanahan and Rhonda Curry testified at his criminal trial, right?

A.        Yes, I'm aware of that.

Q.        And you're aware that during the testimony, they identified him as the person who committed the home invasion robbery on October 9th, 2004?

A.        I'm aware of that.

Q.        Okay.  Do you believe that when they gave that testimony, they were lying or they were mistaken?

A.        I'm not sure whether lying or mistaken, but it was one or the other.

Q.        Okay.  You don't know which one?

A.        I'm not sure.

MR. DIRISAMER:  Okay.  All right. That's all I have.

MS. MARTINEZ:  All right.  We'll reserve signature.

THE VIDEOGRAPHER:  This concludes the deposition of Janette Horton.  We are off the record at 3:21.

(Signature not waived.)

- - - - -

263

Thereupon, the foregoing proceedings

concluded at 3:21 p.m.

- - - - -

264

State of Ohio        :        C E R T I F I C A T E
County of Franklin: SS

I, Craig Ross, RPR, CRR, a Notary Public in and for the State of Ohio, certify that Janette Horton was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on February 5, 2025.

*Craig Ross*

_____

Craig Ross, RPR, CRR, Notary Public, State of Ohio
My commission expires July 7, 2026.

265

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line          Correction or Change          Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Janette Horton, have read the entire transcript
of my deposition taken in this matter, or the same
has been read to me.  I request that the changes
noted on my errata sheet(s) be entered into the
record for the reasons indicated.

Date_____Signature_____

Ref: CR313366JH

**Exhibits**

**313366 Exhibit 001** 4:5 39:16,20

**313366 Exhibit 002** 4:6 46:7,9 48:21

**313366 Exhibit 003** 4:7 47:10,14 48:21 73:5 104:19

**313366 Exhibit 004** 4:8 56:2,6 71:17 141:20

**313366 Exhibit 005** 4:10 60:18,22 75:13,16

**313366 Exhibit 006** 4:11 76:16,18

**313366 Exhibit 007** 4:13 105:14,18,22

**313366 Exhibit 008** 4:14 122:1,5 124:11

**313366 Exhibit 009** 4:16 124:16,22

**313366 Exhibit 010** 4:17 204:21 205:1

**313366 Exhibit 011** 4:19 218:10,12,16

**313366 Exhibit 012** 4:20 221:5,7

**$**

**$1,416** 168:11

**$1,700** 43:10

**$25,000** 101:22 102:4

**$250** 242:3

**$4,000** 93:6

**$6.75** 40:16

**$60.88** 62:5 155:18,20

**$600** 167:10,11

**$800** 75:24 76:8

**0**

**0000458** 124:24

**000057** 122:8

**0003464** 210:23

**0003465** 211:7

**0003497** 206:17

**0004492** 166:19

**000495** 168:2

**001689** 106:6

**003459** 205:5

**003748** 221:12

**003789** 222:13

**003790** 224:11

**003792** 226:20

**004245** 75:19

**004452** 141:24

**004453** 156:13

**004454** 145:9

**004456** 71:20

**004459** 56:24

**004460** 57:24

**004470** 161:10

**004477** 154:9

**004480** 165:2

**004482** 150:5

**006087** 77:2

**007516** 219:4

**007517** 219:8

**04** 62:4,12 75:24 77:10

**07** 62:4,11

**08** 61:8 205:13 212:12 217:14

**1**

**1** 39:16,20 77:17 158:14 239:15

**1,300** 168:12

**1/10th** 102:7

**10** 9:14 16:14,20 77:4 101:24 204:21 205:1 211:2

212:16

**10.75** 43:4,10

**100** 77:19 231:16

**1017** 224:15

**1073** 9:3

**10:00** 144:14

**10:12** 5:2

**10th** 215:4,6

**11** 71:22 142:6 156:15 185:1,4 218:10,12,16

**11:16** 72:19

**11:27** 72:23

**12** 75:23 163:22 221:5,7

**12:29** 139:8

**12:44** 139:12

**12th** 226:15,18

**14** 126:9

**14th** 227:1 229:18

**16** 255:21

**162** 56:14

**165** 141:21,23 143:20

**166** 156:12

**167** 145:7,9

**168** 147:3

**169** 71:18

**17** 56:20 255:20,21

**172** 56:22 57:3,7

**173** 57:23 153:15

**18** 25:1

**181** 158:12,13

**183** 161:8

**19** 168:4

**190** 154:8,9

**193** 165:1

**195** 150:1

**196** 150:18

**1995** 86:20 87:3

**19th** 173:4

**1:35** 194:6

**1:48** 194:10

**1st** 34:12 51:16 106:15 119:23 127:1

**2**

**2** 46:7,9 48:21 57:24 72:22 106:9 158:7

**2,500** 102:5

**20** 17:24 41:16 67:10 80:4,12,16 84:2 85:8 134:7 222:6 223:8

**20-plus** 10:13

**2000** 13:17 14:3 87:23 88:9

**2001** 87:9

**2002** 130:6

**2003** 14:22 15:8 32:23

**2004** 32:7,9, 10 33:17,21 35:17 39:11 40:11,12 43:16 48:12, 13,24 51:5 53:19 54:1, 12,22 60:12 62:4,12,18 64:1,2 66:5, 6,7 67:8,14 68:5,22 69:21 73:8 74:12,22 75:24 77:16, 24 78:10,12 83:5,11 84:11 90:21, 22 91:3,8 92:13 94:6, 19 95:11 96:1 107:5 108:11 115:1 119:19 123:3 126:11 127:10 128:10 138:24 142:10 147:23 148:8,19,23 149:14 152:12,14 153:6 155:16,18 156:10 164:19 169:6,11 171:11 172:9 173:18 174:9 197:22 198:7,20,21 200:6,11,16 202:10 233:14 234:2 249:1, 5,9,11 255:2

256:7 262:7

**2005** 14:3 21:17 34:7, 12 51:16 52:3,15 61:8 100:11 102:20 103:16,22 104:3,8,10, 17 106:12, 15 108:13, 16,23 109:2, 7,17,22 113:7 115:4, 7 116:2,20 117:15 118:2,12 119:10,24 137:16 138:11 148:12 159:19 235:18

**2006** 12:14 21:19 23:1 26:17 30:12 31:7,20 33:16 34:17 56:11 61:20 107:12 110:8 118:4 137:17 138:24 139:16 141:9 153:12 162:11,24 164:17,23 177:17,21 195:12,14, 15 196:2 197:2,3,8 199:24 248:14,17, 18,20

**2008** 256:1

**2012** 182:11 183:9,10 184:17

**2013** 34:22 184:4,18 185:17 186:22,24 197:5,9 200:19

**2014** 9:18 186:22 187:5

**2015** 186:3,4 192:5 212:16 213:14,22 214:10 215:4,6

**2017** 17:3,5, 11 204:18 205:13,18 206:9 207:5, 11 208:4,24 210:7,18 211:3 212:12 213:4,9,12 214:15,20

**215**:2,7,12, 21 **216**:8,11, 16 **217**:14, 17,24 **218**:1 **220**:23 **229**:11

**2018** 218:6 220:1,6,9 226:15,18 227:1 228:17,22 229:18

**2019** 220:17, 21 225:22 227:11 228:5,16

**2020** 17:24

**2022** 31:17 35:1,7 170:15 172:12,23 173:4 236:9, 14 238:21 252:13

**2023** 18:1 172:23 184:1 203:3 241:14

**2024** 9:11 242:12,18

**205** 166:14, 16,20

**208** 167:24 168:1

**20th** 222:23

**2135** 129:12

**22** 77:10 154:8,14 161:14

**2279** 49:20 51:7,19 52:2,17 94:23 106:16

**22nd** 77:15, 24 78:10 118:12 119:10

**23** 33:11 57:7 202:22

**24** 150:9

**24/7** 66:23

**24th** 35:8

**25** 165:3

**25,000** 102:9

**250** 242:2

**25th** 220:9

**26** 67:12

**26th** 40:11 220:5

**27th** 33:21 96:1 220:1

**28** 33:13

**284-4482** 57:12

**28th** 227:11 228:5

**2:23** 230:1

**2:30** 38:9,23 129:10 142:15

**2:37** 230:4

———
**3**
———

**3** 47:10,14 48:21 73:5 104:19 125:4 139:11 158:7

**30** 88:10

**30th** 87:3

**31st** 86:20

**3497** 217:7

**3785** 225:16

**3789** 225:7

**3793** 227:4

**3:07** 261:11

**3:20** 261:14

**3:21** 262:22

**3:40** 78:6,12

———
**4**
———

**4** 38:23 56:2, 6 71:17 83:10 141:20 194:9

**40** 42:22 43:9 202:23 239:15

**404-8558** 58:11

**42** 226:5

**43** 85:9 202:22

**43224** 9:5

**45** 88:10

**450** 50:9 113:13

**46** 40:19,24

**46.1** 40:14 42:11

**4:30** 129:12 142:13

———
**5**
———

**5** 38:23 60:18,22 75:13,14,16

**50** 143:7

———
**6**
———

**6** 38:9 76:16, 18

**6-22-05** 122:16

**6-27-18** 219:20

**6.75** 40:22

**60.88** 62:14

**6097** 77:5

**614-284-4482** 10:9

**614-404-8358** 55:18 59:6

**67** 168:9

**69** 32:15

**6:00** 142:15

———
**7**
———

**7** 105:14,18, 22 145:12 151:23

**7th** 155:16, 18 168:9,10

———
**8**
———

**8** 121:22 122:1,5 124:11 129:8 147:5 166:20

**8-25-2018** 219:17

**8-26-2018** 219:11

**8358** 58:12, 13

**8:27** 227:1

**8:30** 222:24

**8th** 205:18 214:15,20 215:7,12,21 216:8,16 217:16,24 218:1 229:11

———
**9**
———

**9** 21:11 124:16,22 127:10 128:10

**9:00** 142:13

**9:30** 129:15 144:14 150:23 151:22

**9th** 33:16 40:12 123:3 138:24 147:9,23 148:23 149:13 152:12,14 153:6 171:11 172:9

**173**:18 174:7 262:7

———
**A**
———

**A-L-Y-S-I-A** 258:15

**a.m.** 5:2 21:11 78:12 151:23

**AA** 159:9

**Aaron** 5:7

**above-listed** 126:15

**above-named** 77:14

**abuse** 78:4

**accepted** 208:8,15

**accident** 93:7

**account** 11:21 43:24 44:2,3 48:24 49:6,9 155:7 168:18 169:6 209:19,21 239:21 240:1,6,9, 10,12,17

**accountable** 231:8

**accounts** 10:17,22 240:11,19

**accurate** 123:12 128:13,14 129:3,22,23 130:11,12, 18 143:3,16, 17 146:3,4 147:19,20 151:9,14 155:23 159:14 162:10,24 164:17 167:16 169:3 215:6, 7 227:11 228:5

**accurately** 123:9

**actively** 245:11

**add** 60:6 154:4

**added** 153:20

**additional** 177:10

**address** 44:22 47:5 61:2,4,12 125:9,10 126:15 144:12

**187**:11,18, 19,24 **188**:2 **189**:17 **222**:21 **224**:16 **253**:24 **254**:16 **255**:8

**Adidas** 92:9

**adjustment** 244:5

**adult** 159:2

**affect** 8:12

**affected** 201:20

**affects** 200:7

**affidavit** 106:7 107:9, 16

**affirmatively** 34:10,20

**agency** 160:7

**agree** 40:18 42:9

**ahead** 8:5 46:5 71:14 147:2 150:1 193:2

**ahold** 191:8, 18

**Alabama** 53:18,20 116:13,14 117:6 118:2

**Alfred** 179:18 224:12,19

**Alfred's** 224:20

**Alissa** 27:19, 21,24 28:12 121:11 138:13

**Allen** 29:8

**Alloy** 238:22

**Alysia** 258:9, 10

**Alyssa** 5:8 19:18 23:18

**amount** 62:13 77:19 93:14,18,24 96:16

**anniversary** 35:10

**announce** 5:2

**Anonymous** 90:18,21 159:9

**answering** 6:10 216:22

**antisocial** 244:16

**anxiety** 244:6 248:5, 7,11,14 249:2

**anymore** 32:16 93:22 241:8

**apartment** 50:3,4 116:18 156:20 157:5 158:2, 4 166:23

**apologies** 46:18

**apologize** 120:21 258:7

**appealed** 170:5

**appeals** 170:11

**approached** 136:15

**approximate** 16:13

**approximately** 14:20,22 16:7,18 33:24 34:6 95:11 126:9, 11 183:8 186:17

**April** 32:10 34:22 48:12, 24 64:1 66:7 68:5,22 74:21 84:11 90:21 91:8 92:13 126:11 182:11 183:9 184:4, 17

**area** 251:19

**Arlington** 17:18

**arrest** 78:16 79:3 83:6,11 87:9 88:5 94:4 95:15, 24 101:18 105:3,8 119:11,13 165:19 195:4 234:2 248:24 249:4,8

**arrested** 77:23 82:18 85:4 86:20 87:2,23 88:3 101:10

**arrests** 82:8 84:21 85:1

**asleep** 123:6

**assistance** 102:12 132:17

**assume** 7:23 8:5 25:21,23 43:9 45:20 63:19 197:2 258:21

**AT&T** 59:23 62:17,23 63:5,22 155:17,19

**ATT** 62:5,12

**attached** 210:2,5

**attacks** 198:9,11,23 199:4,10

**attend** 170:9, 10

**attest** 63:2 67:4

**attitude** 135:3,11

**attorney** 23:21 26:15, 19 28:16 29:5,8,11,14 120:23 121:1,12 138:23 148:11

**attorneys** 138:20

**August** 9:10, 11 86:20 218:6 220:5, 9

**aunt** 37:3 44:6,7,16 46:24 87:10 165:10,11, 13,24 253:18 254:9

**aunt's** 45:11, 12 46:20 48:7 158:9

**aunts** 253:19

**Avenue** 9:3 17:19 104:8, 9 106:11 129:13 187:11,18 188:2 201:4

**average** 64:17

**awaiting** 248:20

**aware** 35:17 60:14 82:17 85:20 86:19 87:2,8,23 88:9 89:1,5, 18 93:6 94:4 97:13 101:1 103:8 107:15 112:9 130:14 131:5,17 170:4,8 172:11

180:14,17, 19 181:12, 17,22 182:1 192:6,11 204:13 205:16 219:23 220:2,3,4,7, 11,15,22 228:15 232:18 243:9 244:18,20 246:2,5,7 261:24 262:3,4,8

---

**B**

**B-O-E-Z-I** 195:21,22

**bachelor** 157:15

**back** 9:18 12:14 13:7 14:9 21:17 43:1 55:21 57:20 58:21 72:2,4,22 79:18 84:9 93:9,15,21 100:11 102:16 116:16 126:10 139:11 142:22 147:7 148:1 151:4 153:15,24 156:10,11, 17 163:5 171:18 187:15 192:1,4 194:9 197:21 203:15 208:18 210:15 211:13 215:3 216:23,24 225:6 230:3 233:1,13 237:9 241:1 244:24 245:24 248:19 251:5 261:13

**bad** 200:17 246:11 247:3 251:13

**bags** 77:18

**balance** 168:9,11

**Balderena** 167:5

**bank** 43:22, 24 48:24 49:3,6,9 60:16 75:11

149:2 168:18 169:6 239:21 240:1,6,9

**Banner** 37:3 44:8 46:24 106:24 254:9

**Banner's** 87:10

**Barbara** 253:14

**based** 132:22,24 133:1 134:20,22

**basic** 31:1,3, 9 172:1,3

**basically** 103:6 150:24 159:6 172:17,19 191:6 192:15

**basics** 6:3 81:5

**basis** 50:21 243:8

**Bates** 106:5 122:8 124:24 145:8 165:1 168:2 205:4 219:4 221:12

**Bates-stamped** 75:19 222:13

**bed** 128:22 162:6

**bedtime** 163:3,16

**began** 160:19 161:1 186:18

**begin** 28:8

**beginning** 12:14 13:8 56:10 57:24 72:22 83:24 139:11 194:9 210:21 241:1 252:12

**begins** 56:13,15

**behalf** 5:5,9 241:18 242:11

**behavior** 251:23

**believed** 217:24

**benefit** 180:12

**Berry** 24:3 26:1,2

**bill** 55:6 59:11,15 62:18 155:6

**binder** 55:24 56:8 71:14 141:18

**birth** 125:6,7

**bit** 11:6 19:8 21:23 41:22 55:8 74:10 76:24 81:18 108:10 142:10 143:24 153:18 159:4 169:20 171:24 178:24 183:10 203:1 208:6 236:1,6 247:8 251:11 253:4 254:9

**blame** 231:16

**Blazers** 11:3 17:15 241:11

**blood** 243:12

**blue** 67:17, 19

**body** 135:14, 16,23 136:18 137:11

**Boezi** 195:19,21

**bond** 34:4 96:16 97:10 101:19,22, 24 102:20 103:9 105:8 109:23 115:4 235:17

**born** 13:1 255:20,24

**borrow** 235:20

**bottom** 56:24 57:7 77:1 78:2 106:6 122:9, 16 124:24 141:23 145:10 150:4,10 154:10,14 156:13 161:10 165:3 205:5 219:4 221:13

**Bottoms** 11:3 17:15

241:12

**bought** 16:6

**bout** 200:17

**boutique** 11:4 17:12, 14,15

**Box** 225:24

**Boy** 92:9

**boyfriend** 33:4

**break** 7:15, 20 72:17 194:1,4 229:21 261:1

**breakdown** 199:14,17

**breaking** 87:9

**Brenda** 5:5 21:17,24 22:20 95:15 97:14,20 98:8 99:18, 22 100:19 118:9,21 125:3 149:17 234:23

**Brian** 29:11, 13,17,19,23 30:1,3,13,17 31:6 173:2

**briefly** 14:1 32:1 101:17

**bring** 69:12 113:19 251:4

**Broadview** 15:10 42:18, 19,20

**Brown** 224:15

**bucks** 168:9

**Builders** 109:13 110:4 111:16,23 112:7,12 159:22 160:2,13 161:2

**burned** 128:11

**bus** 36:14 129:14 239:3,7,11

**business** 11:21 15:1 16:21,23 17:2 18:12, 20 83:1,3,5 84:18 239:18,22 241:4

**businesses** 11:7,17,19 19:2

**buy** 69:5,7

**buying** 69:4, 6 117:21,22

**C**

**Cadillac** 65:10,17,23 74:10 108:17

**call** 36:2 95:17,20 101:23 146:6,9 184:12 188:12 191:20,22 204:15

**called** 35:19, 23 92:8 95:8,14 145:18,23 165:11,13 166:7 187:8 188:2,7,9 204:6,11

**calls** 203:17, 19

**calm** 132:14

**captured** 6:17 7:3

**car** 65:13 67:14,24 74:13 93:7 108:23 109:2 113:19,21 130:7 168:20 207:2,10,17 240:15

**card** 148:24

**cards** 235:23

**care** 113:13 150:21 195:19 228:18

**Carol** 28:16

**carrier** 59:21 60:1,4

**case** 12:16 101:2 110:24 111:6,11 136:23 138:8 145:20 146:17 171:16,20 177:1 231:10,12, 16 252:19 257:13 259:2,7,8, 11,13,14,17, 18 260:10, 20

**cases** 177:1, 2

**cash** 63:19

75:8,24 76:8,10 114:2 155:4

**Cassandra** 179:18 224:13,19 225:1

**casual** 111:10

**caused** 232:10

**cautioned** 106:8

**Celexa** 196:5,13,18

**cell** 54:5,9, 13,14,15 57:8,10 58:2,6 62:23 63:7,9,15, 16,22 113:23,24 125:12 153:18,21 154:18,19, 21,24 155:2, 12 156:2,3, 5,6 204:11, 14

**Center** 15:10 42:19,20

**Central** 201:4

**championship** 238:13

**change** 24:7 168:10,11

**changed** 16:5 156:9 214:4

**charge** 78:4 87:12,24 159:7

**charges** 82:3,6 84:13 85:23 145:14 147:7 165:6 172:18 175:18,24 177:6

**cheaper** 153:22

**check** 39:6 43:18,20 148:24 149:4,8 165:13 166:8 261:3

**checked** 149:10 201:3

**checking** 240:11

**checks** 49:12

**Chekingo** 23:24 25:20

**Cherokee** 67:19

**Chicken** 129:12

**child** 54:2 117:16

**children** 19:12 52:19 161:17 203:3 213:8 227:23 231:15,16 236:1

**Children's** 94:15 145:16,21 146:12,16, 22

**Chillicothe** 225:24

**christian** 226:5

**church** 71:3, 11,24

**Cindy** 23:24 25:20

**Cingular** 60:2,3,4

**circled** 78:7

**circumstances** 170:20 171:5 249:16,17

**City** 5:5 49:21,22 53:15 56:24 57:24 61:4 65:14 69:11, 22 71:20 75:19 77:2,5 109:11 113:5,10,19 116:18 117:13 122:8 124:24 126:22 141:24 145:9 150:5 154:9 156:13 161:10 162:1 163:4 165:2 166:19 168:2 205:5 206:17 210:23 211:7 219:4, 8 221:12 222:13 224:11 226:20

**civil** 26:17 30:12 31:8, 21 259:8,11 260:10,20

**claims** 101:4 104:7

**classes** 90:18,21

159:9

**clean** 18:22 73:2 175:22

**cleaning** 14:6,10,17, 24 16:21

**clear** 111:13 150:16 216:1

**cleared** 231:1

**close** 17:24 79:23 138:10 156:16 180:13 199:21 252:12 261:2

**closed** 9:10 18:7 241:10, 11 251:18

**closer** 32:24 210:20

**clothes** 69:3, 4 117:23 168:20

**clothing** 17:12

**clue** 212:10 224:21,24 225:5

**cocaine** 86:21 87:3 88:1,11

**cocounsel** 5:7 261:6

**collection** 76:15

**Columbus** 5:5 9:4 13:1 89:14 101:15 106:11 116:12 119:18 188:16,21 190:4 237:10 238:24

**committed** 262:6

**Common** 205:13

**communication** 191:6,10

**communications** 103:22 104:3

**community** 208:7

**company** 93:7 109:11, 13

**Complainant** 77:13

**Complaint** 77:12

completely
8:10 29:18

concern
211:4

concerns
138:14

concludes
262:20

conclusion
181:10

conditions
90:13,17
102:17,19,
23 103:9
194:22
197:21
202:9 243:2,
10

conference
242:20
255:22

confirmation
151:19

confirmed
151:17

confused
175:4

connection
26:16 33:20
94:5 146:21

considered
216:15

consist
199:17

consistently
182:10

consists
159:4

constant
243:18

contact
101:14
103:15
185:20
191:12,13
230:9
254:19
255:5

context
56:11
257:17,18

continue
115:2
143:20

continued
18:11 114:4
128:18
198:22

continuing
252:15

continuous
245:20

continuously
17:5 159:19

contract
20:7 27:2,10

contribute

226:6

controlled
77:16,17

conversation
80:7,9 85:19
91:23 97:19,
23,24 98:3,
7,24 99:2,
18,22 108:5
111:5,10
120:14
153:14
165:23
166:3,6
208:16

conversation
s  26:10 29:3
31:5 84:5
97:22 99:6
100:18
141:14
203:15
259:7,10

convicted
231:22,24
232:11

conviction
170:5 171:2,
3 231:2,21

cooking
14:7,19

copy  46:17
105:21
148:18

corner  56:22
57:1 71:19
106:6 122:9
125:1
141:23,24
150:4 154:9,
10 163:12
205:5
221:13

correct
33:24 34:22
53:6 59:6
61:12,15
62:1 70:2
75:1 89:16
101:10,20
105:4,16
108:11
110:9
120:23
122:13
126:6,12,17
127:2,12
148:12
151:24
161:19
222:19

corrected
17:7

Correction
218:21

correctly
57:14 58:24
129:20
130:9
142:24
144:18
145:24

147:17
151:7,8
155:21
167:13,14
226:11
228:2
232:24

cortisone
243:19

cost  64:18

costs  64:21

COTA
129:14
239:12

counsel  5:2
46:16

counselor
252:1,2,8

counselor's
252:4

count  105:16

county  76:22
77:8 82:18
84:13,22
101:13
205:13

County/
columbus
77:15

couple  31:17
45:15 46:6
71:13
116:24
117:1,4
178:21
187:23
200:24

court  12:9,19
76:23 77:9
94:8,12,13
95:6 145:15
146:14,21
173:12
205:13
212:15
224:4

courtroom
172:17,22
174:12

cousin
106:20
186:13

covered
170:17

crack  86:21
87:3 88:1,11

Craig's
39:19 180:9

credible
137:1,4

credit  61:1
102:16
148:24
154:2
235:22

credits  61:24

crime  151:23

criminal
12:15 26:17
30:12 31:7,
21 33:16
34:15 39:21
40:5 56:11
61:19 81:1
84:12,13
101:5
103:21
107:12
110:8 111:1
118:5
119:15
130:15
137:17
139:1,16
170:11
177:6,16
178:2
261:19
262:2

CROSS-
EXAMINATIO
N  5:15

cry  233:5

current  10:7
18:16,18
57:18
196:17

Curry
103:10,15
110:11,19,
22 262:1

custody
94:11

―――――

D

―――――

daily  202:7

Darlene  11:1
241:2,3

date  12:12
33:22 35:17
51:14 60:11
61:7 62:4
77:9 78:5
86:2,5,12
104:13,15,
17 109:9
122:16
125:6,7
128:12
138:10
150:13
151:4
177:24
187:2
200:10,18,
21 205:12
212:17
216:17
226:13
230:7 238:6

dated  222:23
228:17

dates  18:6
19:21 51:23
70:6 84:15
85:5 98:5
155:15
177:15
213:19

216:9
248:23

dating  33:4
49:13 54:6
60:8 68:4
72:2 75:8
81:10 82:9,
13 85:13,16
86:7 88:20
92:3,6,12

daughter
53:5 66:2
94:8 145:16,
20 161:21,
22 162:3,4,
22 178:20,
24 190:18,
20,23 191:5,
11,12

David  5:4
29:5

day  19:23
29:19,23
30:1,16,21
31:4,11
34:16 38:7,
20 67:4
77:15 81:21
88:7 90:1
123:7
128:23
129:11
173:6
196:13
199:2
212:14
220:8 235:9
238:16

days  20:22
24:15 30:22
34:17 35:4
38:5,12,14,
15 41:11,15,
18,19,24
42:3,9 100:9
116:24
117:1,6
119:22
201:8

dealing
243:14,16
245:5
249:18

deals  154:24
246:10
247:15,20

dealt  202:15
249:19

debit  62:5,13
155:17,19

debits  62:1

Debra-
kuempel
256:11

December
33:21 94:7,
19 95:11,13
96:1 115:1
148:8,19
197:22
198:7,20,21
200:6,11,16

202:10
226:15,18
227:1
228:17
229:18
248:24
249:4,8
**decided**
113:12
171:18
183:19
210:9,12
216:1,7
**decision**
132:5
183:23
184:8
**decree** 184:3
**deep** 175:1
**defendant**
77:14
**demeanor**
132:22,24
134:20,22,
23
**department**
165:10
218:20
**depend** 70:5
**depended**
116:9
**dependence**
244:11
**depicted**
73:5
**deponent**
5:10
**depose**
106:9
**deposit** 39:7
43:19,21
**deposited**
44:1
**depositing**
49:12
**deposition**
6:4 12:5
19:15 20:15
21:2,13
23:9,17
78:15 79:2
124:9
125:18
139:20
140:22
262:21
**depositions**
23:12
**depressed**
244:6
**depression**
194:24
195:2,18
196:1,19,22
197:10,19
198:16,17,
24 200:7
201:20
202:2

247:13,18,
23 248:1,17
249:6
**Derek** 252:23
**describe**
134:23
199:14,19
250:23
**describes**
211:11
213:1
**description**
73:16
**details** 190:6
**detective**
95:15,21
97:14,19
98:8 101:3,7
118:8,14,19
120:15,19
121:3,13,16
122:12
123:16,23
125:2
127:14
128:3,19
129:5 131:7,
19,23
136:12
138:15
234:23
**detectives**
130:23
131:19
**diagnosed**
194:21
195:1,15,17,
24 197:20
198:6,12,14,
23 243:10,
20 244:5,11,
16 246:13
247:22
250:1
251:20
**diagnosis**
198:17
250:7
**difference**
176:12
**difficulty**
249:14
**Diggs** 257:6,
12,20,23
258:1
**dinner** 65:1,6
114:9 144:9
237:5
**dinners**
64:22
**direct** 39:6
43:19
**directly**
63:22 224:4
**Dirisamer**
5:4,16 39:14
46:18 55:23
60:15 72:15,
24 105:11,
21 139:4,13

193:24
194:3,11
204:18
205:3,23
218:8
229:23
230:5 261:1,
5,15 262:16
**disappeared**
93:19
**discipline**
181:13
**disciplined**
180:15
182:2
**discuss**
31:6,19
184:15
**discussed**
98:16 141:8
184:11
214:23
**disorder**
244:5,16
**distribute**
87:24
**Division**
125:1
**divorce**
183:15,19
184:3,8,22
185:12,15,
18 186:6,19
197:6
**divorced**
34:22
183:13
192:7
**DNA** 171:9,
24 172:5,8
**doctor**
195:19
245:12
251:22
**doctor's**
245:14
**document**
22:10 39:19
60:21 61:18
76:15
124:20,23
125:17
148:2
206:14
218:18
221:5
**documents**
21:12,15
76:16 124:8,
12 241:17
**dog** 69:12,
14,16,17
73:22 74:2,7
**dogs** 69:18
**dollars**
168:12
**door** 74:2
87:9 132:6

**doors** 17:24
**Dorsey**
255:10,12,
13
**Dorsey's**
255:17
**dotted** 62:9
75:20
**Doug** 5:6
**downhill**
185:8
202:24
**downtown**
48:14
129:14
**dreams**
246:11,12
247:3
**drive** 49:20
61:4 106:16
113:21
125:9
126:22
207:2,18
**driven** 130:7
**driver's**
108:11,13
109:2 130:8
**drives** 130:5
**driving**
65:19,20
109:5 163:7
**drop** 239:4,6
**dropped**
104:24
175:19
**dropping**
105:7
**drove** 65:2,3,
5,8,13
**drug** 78:4
82:6,12
85:23 159:7
**drugs** 75:1,3
85:12,15,21
86:1,4,11
159:8
181:18
234:6,14,17
**Ducks** 238:5
**duly** 5:13
77:13 106:8
**Dwight**
255:9,12,13
256:17,18

_____

**E**
_____

**E-L** 179:22
**E-L-I-S-E**
179:21
260:6
**e-y** 180:5,6
**earlier** 32:18
55:15 57:17
97:10

121:20
124:8
139:18
140:15,22,
23 153:18
157:21
168:7
170:17
194:13
234:1,21
235:16
239:18
260:7
**early** 33:7,8
36:12 79:8
106:22
107:7
**Earnings**
40:13
**east** 254:15
255:8
**easy** 10:15
**eat** 64:3,6
65:10
**eating**
201:23
**effects** 202:2
**efforts**
148:22
**eight-hour**
42:6
**electric**
50:11,12
**Elise** 179:21
260:4
**emotional**
246:11
**emotionally**
208:22
**employed**
159:19
**employees**
18:19
**employment**
90:14
112:16
159:8 160:1
**encountered**
104:7
**end** 121:16
183:6
189:21
206:17
**ended**
137:17
177:16
187:5
189:11
192:18
193:14,16
**engaged**
133:3
207:22
216:16
217:9,21,23
229:10,14,
17 230:7
**engagement**

242:6

**engagements** 241:22

**entered** 184:3 192:1

**Enterprises** 40:10

**entire** 50:24 51:2

**entry** 62:11 219:10,11, 14,19

**Epstein** 5:7 255:22

**erase** 231:3, 5

**Eric** 29:8

**errors** 232:19,21

**essentially** 40:12 155:5

**estimate** 24:21

**evening** 238:10

**evenings** 66:3

**event** 183:5 242:7,8

**events** 242:14,18

**eventually** 93:11

**everybody's** 177:1

**everyday** 112:16

**Evette** 259:24

**evidence** 61:19 133:13

**exact** 12:12 18:6 19:21 25:9 33:22 38:11 41:15 45:1 51:13, 23 60:9 68:19 94:15 104:17 128:12 151:6 189:9 216:9 244:3

**exhibit** 39:16,20 40:5 46:7,9 47:10,14 48:21 56:2,6 60:18,22 71:17 73:5 75:13,16 76:16,18 104:19 105:13,14, 18,22 122:1, 5 124:11,16, 22 141:20 204:21

205:1 218:10,12, 16 221:5,7 225:16

**exhibiting** 135:15,17

**exhibits** 46:6 158:7

**existence** 107:15

**exit** 208:8, 11,15

**exonerated** 173:17 174:5,11,16 175:9,17 176:2,5,12, 13,18 177:7

**exoneration** 174:19,23 175:16 177:11

**expecting** 132:19

**experience** 100:15,24

**experienced** 100:2 248:7 249:13 250:15

**experiencing** 247:4,12 248:4,13,16 249:1,5,9

**explaining** 7:6

**expressed** 98:22,23

**expressing** 100:22

**extent** 245:15

**extra** 207:10

**extremely** 132:4,8

**eyes** 206:12

———
**F**
———

**Facebook** 10:18 11:13, 15,18,20,21

**facing** 172:13

**fact** 108:10 120:18 159:19 165:19 232:12 233:15 235:17 247:19 259:13,14

**Fair** 28:9 37:16 187:3

**fairly** 106:1 182:10 206:13

**fall** 69:21

**familiar** 46:14 47:17, 18 58:10

**family** 35:19 106:19 108:8 110:16,19 206:20 207:1 208:18,21 210:13 213:8 227:23

**fast** 64:14 180:2 215:17

**faster** 247:19

**February** 34:17 61:20 137:17 153:12 162:11,15, 24 164:23 177:16 220:17 225:22 227:11 228:5 236:9

**feel** 133:23 135:8,17 202:14,18

**felony** 87:23

**felt** 132:17 133:23 134:17,24 135:14 136:14,22 137:2

**female** 90:3, 4

**fiancee** 126:4

**figure** 91:4 136:12,13 148:22 151:1,4 176:20 195:9 200:6

**figuring** 150:12

**file** 183:21 185:12 189:12,16 241:7

**filed** 170:6 176:9,22 183:15,24 184:22 205:17 206:8 212:14,16, 20 213:20 215:2 220:16,24

**filing** 184:7

**filings** 146:21

**financial** 209:8,13

240:13

**financially** 208:23

**find** 79:24 80:5 82:3 145:13 197:5 229:4

**fine** 7:6 119:8 180:9 201:3 224:10

**Finish** 193:3

**Finland** 13:10

**flip** 206:16 211:6

**Florida** 237:9 260:2

**folks** 25:16 252:17

**follow** 194:14

**food** 7:16 64:15

**forefront** 171:20

**forget** 27:19 238:23

**form** 78:18 81:3 151:10 162:12 178:17 181:20 205:21 207:6 209:2 212:5 224:22 227:12 228:7 235:4 237:1,23 250:11

**formalizes** 20:7

**format** 6:4

**found** 80:14, 19 147:6 165:6 181:18 234:4

**foundation** 41:3 62:19 104:11 151:11 162:13 178:17 205:22 207:7 209:3 212:6 227:13 228:8 237:2, 24 246:17 250:12

**frame** 148:8, 19 183:9

**Franklin** 13:12 76:22 77:8,14 82:18 84:13, 22 205:12

**Friday** 70:17, 19 129:7 142:13,15 144:6,13 238:10

**friend** 255:1, 13,18 257:3

**friends** 35:23 44:17 45:2, 14,18 47:23 73:8,13 88:22 92:12, 22,23 93:2 157:3

**front** 71:15 74:5 77:18 115:14 124:11 141:18

**full** 203:2

**full-time** 51:8 52:15 112:15

**Furquan** 254:22

———
**G**
———

**game** 238:5

**gap** 160:1 161:6 184:18,19

**gave** 8:14 22:3 55:15 57:17 63:18 234:22 262:10

**Girard** 5:6

**girlfriend** 33:5

**give** 24:23 25:9 84:15 98:5 104:13 114:2 119:6 132:17 143:18 145:8 200:10 235:6

**giving** 59:13, 16,19

**Godsey** 31:13,16

**Gold's** 48:14

**good** 21:10 72:16 96:15, 16 102:16 115:20 139:5 154:2 229:22 251:8 261:9

**gosh** 103:23 175:19 185:22

**grab** 71:14

**graduate** 13:13

**graduated** 13:24

grams 77:19

granddaughter 27:18

grandmother 53:17 116:15

Greathouse 252:24

green 65:10, 17,23 74:10 108:16

grew 256:5

groups 250:10

Grove 49:21, 22 53:15 61:4 65:14 69:11,22 109:11 113:5,10,19 116:18 117:12 126:22 162:1 163:4

grown 192:19

grudge 98:21 99:9

guess 20:6 25:15 98:5 103:6 141:1 174:1 187:15 261:17

guilty 86:23 87:5

gun 75:5

guy 167:19

guys 114:8, 14

gym 48:14 129:14,15

---

**H**

---

H-A-R-M-O-N 8:19

H-O-L-L-Y 180:5

H-O-R-T-O-N 5:20

half 89:6 186:16

hand 46:13 47:13 76:14 124:19 221:4

handed 39:19

handing 56:5 60:21 122:4 204:24 218:15

handled 115:15

hands 188:22

handwriting 122:22 225:10,11

handwritten 22:3 101:3,6

happen 30:20 31:4, 10 32:13 71:13 191:21 214:3 216:6 247:8 251:13,17

happened 79:22 80:19, 22,23 83:8 110:23,24 117:8 137:21,23 151:23 153:14 176:10 177:11 180:23 189:10,19 190:9,17 192:20 232:2,3 235:7 251:12

hard 183:2 202:6,7 233:6 249:21

Harmon 8:17,18 123:4 125:5 126:3 127:8 128:18 129:6 130:5, 14 179:18 224:13,19

Harmon's 225:1

Harris 192:10,17 193:7,14 211:8,10 212:24 213:6,11 214:17 218:5 219:11,20, 24 220:5 228:15 230:9

Harris' 226:22

head 7:1,2 135:20 182:3

headstrong 135:1

health 15:10 42:19,20 197:24 198:3,5,6 200:15 201:14 202:23 246:6

healthy

231:17

hear 8:2,4 87:16,18 95:6 100:16, 23

heard 8:1,6 79:16,17,18 87:11,13 171:12,13, 15 244:8 256:24 257:8,9,11, 13,16 258:1, 2

hearing 94:8 261:22

heart 253:24

Heights 13:12

held 231:8

helped 212:1

helpful 7:9

helping 113:10,16

hides 247:16

high 13:11, 12,13,19 14:3 32:1 58:4 78:16 79:2 243:12 257:4

Hill 258:5

hip 243:15, 17,19,21 244:19 245:16

hired 148:11

history 85:12 130:15 197:24 218:22

hold 18:2,5 233:21

Holfinger 27:21,24 121:12 138:14

Holley 180:4 260:4,6

home 9:6 14:7,12,19, 21 15:8,9 16:1,3 31:18 104:8 109:10 127:9 129:10,16 162:7 163:3, 16 168:18, 19 202:23 213:7 227:22 229:3,5 236:7 239:7 245:6,19 247:9 252:10 262:6

homes 18:23,24

honest 29:18 93:3 222:4

honestly 15:12 28:7 74:18 104:1 119:5 156:4, 7 167:17 169:7 185:22 189:1 193:21 210:19 221:2 224:5

Horton 5:9, 12,19,20 8:15 16:24 19:6 27:24 33:3,19 40:8 52:24 61:3, 14 62:17 65:10 76:23 77:11,22 78:11,14 106:6,7,8, 10,18 107:19 108:10 119:19 123:3 127:9, 15 128:3,20 129:11,13 130:6 132:16 186:7,9,10, 15 187:9,17 188:3,16 189:21,23, 24 190:2,4 193:6 205:17 215:13,22 218:5,23 219:17,24 220:5 221:19 225:24 226:17 229:11 230:7 231:22 239:19 262:21

Horton's 26:16 30:12 56:11,18 61:19 119:10 126:4 130:14 137:16 138:24 202:11 211:11 213:1 221:20 226:14 259:2

Horton-alomar 253:15

hospital 197:13 202:24

203:8

hour 21:6 40:22 43:10 67:3 72:16 144:12

hour-long 242:7

hourly 39:2 42:23

hours 21:9 38:5,6,8 40:14,19,24 41:2 42:10, 11,21,22 43:9

house 14:18 32:19 44:13 45:11,12 46:14,20 47:2,5,6,16, 22 48:1,3,8, 20,21 50:3, 18 58:8 71:10 72:4, 10 73:4,22 74:3,7,16 87:10 104:20,21, 24 105:1,7 157:2,8,20 158:5,6,9 163:4,5,20, 24 164:5 166:23 167:1 237:5

housekeeping 16:24 18:11 239:19

houses 14:6, 10,17,24 48:18

How's 193:24 258:14

Howe 29:11, 13,17,19,24 30:2,3,13,17

huge 154:3

Huh-uh 12:4 37:1 45:4 73:15 92:7, 18,24 94:2 96:21 103:19 109:3 110:7 113:2 141:7 164:11 224:7 259:9

huh-uhs 7:2

Hunter 256:23

Huntington 240:9,22

hurt 231:3,6, 10,12

husband 9:21 19:1 20:9 84:3 230:19 233:2

240:10

**hysterectomy** 203:2

---
**I**
---

**i-s-e** 179:23, 24

**idea** 24:1 28:7 88:14, 19 212:15 225:12 257:10

**identification** 39:17 46:10 47:11 56:3 60:19 76:19 105:19 122:2 124:17 204:22 218:13 221:8

**identified** 126:3 262:5

**immediately** 160:22 161:1 165:9, 11,12

**imprecise** 194:14

**improved** 154:1

**in-person** 184:11

**inaccurate** 139:24 141:4 167:22

**inaccurately** 130:22 131:6,18

**inappropriate** 181:2,4

**incarcerated** 91:12 93:20 160:14 178:14 183:2 195:10 202:21 209:14 229:3 244:22 246:9 249:19 251:5

**incarceration** 202:11,12 208:23 209:8 244:23 248:14,17 259:2

**incident** 189:20 190:3

**included** 50:13

**includes** 56:17

**including** 181:18

**income** 39:10 43:15 112:10

**indicating** 135:20

**information** 31:1,3,10 45:24 49:17 152:21 191:9

**informational** 125:4

**injuries** 244:21 246:3

**injury** 128:12

**inmate** 218:22

**Innocence** 241:18,22 242:11,20

**inpatient** 196:22 197:9 199:9, 11 200:14 201:6,14,18

**Instagram** 10:18,22 11:11

**instances** 71:9 201:12

**insurance** 93:7

**intent** 87:24

**interested** 100:5

**interview** 21:16,24 22:4,6,20 118:12,16 119:4 120:3, 4,5 121:17 122:13 123:16,24 125:4 131:23 132:3 137:14,21 138:10,15 234:23

**interviewed** 118:8

**introduced** 61:18

**invasion** 262:6

**investigation** 125:2 232:19

**investigator** 138:23

**involve** 210:9

**involving** 190:4

**issue** 113:24 131:13

**issued** 94:5

**issues** 30:11 31:7,20 101:2 198:6 200:15 245:16,24 246:7,22 250:9

**issuing** 78:3

---
**J**
---

**J-A-N-E-T-T-E** 5:22

**Jackson** 258:9,10

**jail** 34:2 52:2 82:8 101:18 109:23 115:3 126:16

**Janette** 5:12, 19,22 8:15, 18 123:4 125:5 219:17 262:21

**January** 34:7,16 35:1,7,8 52:3,14 61:20 102:20 115:4,7 126:16,20, 21 148:12 170:15 172:12 173:4 235:18 237:10 238:21 252:12

**Jerry** 186:7, 9,15 187:9, 17 188:3,16 189:21,24 190:4

**job** 14:11,18, 21 18:17,18 41:24 48:16, 17 152:17 232:24 238:20 255:15 256:15

**jobs** 17:10 18:14 110:3 111:24 112:13

**joint** 44:2 240:19

**jointly** 10:2

**Jon** 23:21 25:17

**judge**

174:13,15

**judgment** 136:19

**judicial** 205:10,17 206:9 220:16 221:1,17

**July** 34:12 51:3,16 61:8 106:15 119:23 127:1 211:2 212:16 213:22 215:4,6

**June** 33:7,8 52:15 77:10, 16,24 78:10, 12 83:5,7, 10,11,12 118:12 119:10 137:16 138:11 220:1 234:2

**jury** 159:3

**justice** 230:19,21, 23,24 231:7

---
**K**
---

**K&k** 109:13 110:4 111:16,23 112:7,12 159:22 160:2,13 161:2

**Kawanna** 192:10,17 193:7,14 211:7,22 212:4 213:11 214:17 218:4 219:11,20, 24 220:4 226:21 230:9

**KEMBA** 240:13

**kicking** 182:2

**kids** 116:2 162:21 202:21 255:19,23, 24

**kill** 202:17

**kind** 6:2 14:1 15:2 35:13 40:8 41:23 44:18 49:15 64:11 67:16 75:20 76:10 79:8 116:15 132:4 134:1 135:3,13 143:12

149:8 154:21 181:10 193:10 215:17 241:10 251:4,10 257:15

**knew** 73:11 81:13,14 88:3 89:8 127:10 151:1 204:7, 9 206:8

**knowing** 41:18 193:6

**knowledge** 26:11 39:10 91:6 93:23 106:13 109:1 111:14 115:2 117:15 159:13 169:3 204:10,12 222:11 227:10 228:4 244:4, 10,15 257:19

**Kobe** 52:24 53:8,16 116:10,11, 17 117:19 118:2 179:10,13 194:15,18 237:7,19,21 238:4

**Kyle** 252:21

---
**L**
---

**labeled** 71:17 76:16 124:22

**Lakeon** 106:7,8,17 107:8,11,19

**landlord** 45:21

**language** 135:14,16, 23 136:18 137:11

**large** 206:14 250:10

**late** 107:7 126:11 192:5

**law** 232:23

**lawsuit** 26:17 30:13 31:8 230:15, 17 236:17, 18,23 237:19,22

**lawyer** 19:16,17

20:8 96:7,8, 14,17 97:2 114:20 115:6,12 175:20 176:21

**leading** 30:22

**learn** 102:22

**led** 33:15 135:5 189:20 190:20

**left** 61:3 77:9 78:2 128:21 143:22 225:23 255:22 256:18

**leg** 128:11

**letter** 191:21, 22 210:1,4, 6,17 211:2, 10,14,23 212:17,24 213:6,14 214:12 222:16 223:3,17 224:11 225:21 226:13,21 227:5 228:12,16

**letters** 210:1

**level** 32:1 210:10

**license** 65:7 93:9,15 108:11,14 109:2 130:8 207:19

**life** 8:16 13:3 202:7 248:12 258:21

**light** 128:21

**likelihood** 226:5

**limited** 235:8,10,13

**lines** 62:10 68:13 75:23

**link** 191:10

**listed** 62:3

**lists** 125:9, 12

**literally** 81:21 143:6

**litigation** 31:22

**live** 9:2,13,23 66:15 94:17, 22 116:2 161:23 168:21 187:17 207:1,10,12 213:10

214:17,21 215:13,23 218:2 237:12

**lived** 13:3 44:10 53:23 58:7 73:7,22 88:23 106:10,16, 23 126:15, 21 236:6,8 253:12

**lives** 9:21 216:12 253:23 254:14,15 255:7 260:1

**living** 44:5,6, 15,16 45:3 49:19,23 51:7,18 52:1,15 53:12,14,16, 17,19 61:14 89:14 104:9 113:7 157:14 253:5,21 254:12

**Livingston** 36:8 129:13

**LLC** 16:24

**located** 77:18 129:12 252:5

**Loevy** 23:21 25:17

**logistics** 81:8

**long** 7:14 10:11 15:11 16:7 17:1 19:19 21:4,7 25:5 36:24 41:8 45:8 51:21 60:8 91:20 108:5 116:23 119:3 133:5 186:14 197:15 237:12

**long-time** 255:1,13,17

**longer** 32:15 196:15 197:14 230:8 231:15

**longest** 231:15

**looked** 83:16 125:17 141:2 147:24 148:7 157:20 158:6 217:2 220:23 234:21

**lose** 160:6

**lost** 201:24

**lot** 41:13,14 49:14 62:23 72:2 75:7 79:12 83:2 85:14 92:21 103:24 130:21 131:1 183:4 201:24 202:14,15, 24 203:4 210:10 221:3 222:5 231:10,12, 13 243:6,18 246:10,11 247:8 248:8, 10 261:21

**love** 137:1,4 227:7

**lying** 262:10, 12

---

**M**

---

**made** 76:2 88:10 95:2 132:5 135:17 146:20 160:6 201:23 202:4

**maiden** 8:17

**main** 233:18, 23

**maintain** 159:7

**maintained** 90:14

**make** 6:12 7:11,21 8:7 13:7 155:4 157:23 188:15 216:19 233:17,24 243:4

**makes** 10:15 16:16 132:7 250:24

**making** 40:22 54:2 65:22 67:23 93:13 115:13 117:16 136:18,19 185:10 233:6

**man** 17:22 51:13 92:9 133:5 167:5 255:19

**manner** 132:14

**March** 177:20 184:1,17

**Marie** 11:1 241:2,3

**marijuana** 77:17,23 78:4 234:2, 10

**mark** 31:13, 16 46:6 105:12 121:21 218:10

**marked** 39:16,20 46:9 47:10, 14 56:2,6 60:18,22 76:18 105:18 122:1,5 124:16 204:21 205:1 218:12,15 221:5,7

**marks** 72:21 139:10 194:8

**marriage** 19:9

**marriages** 19:10

**married** 19:6 34:12 51:16, 19,24 52:10 106:15 119:23 127:1 162:20 163:18 180:8 183:1, 3 207:22 208:3 216:2 217:10 226:5,17 231:18 256:6

**marry** 133:4

**Martinez** 5:8 19:18,19 20:11,15,24 23:18 24:14, 15 26:8,11, 16 41:3,6 46:16,19 62:19 75:14 78:18,21 79:4 81:3 104:11 105:15 121:23 151:10 162:12 178:16 181:20 194:1 205:21,24 207:6 209:2, 5,9 212:5,9 224:22 225:3 227:12 228:7 229:22 235:4 237:1,

23 246:17, 20,24 250:11 261:4,8 262:18

**Marysville** 197:13 199:9 200:22 201:10,13

**matter** 94:12, 13 151:22 227:20 228:24

**matters** 230:23

**Mcclanahan** 103:10,15, 22 104:4,7 110:9,14,22 262:1

**Mcdougald** 254:22

**meal** 64:18

**meaning** 176:1,6

**means** 143:8 175:18

**meat** 56:13

**media** 10:17 11:14 72:22 139:11 194:9 241:2

**medical** 194:22 197:20 199:4 243:9 246:14 247:23 248:2

**medication** 196:18

**medications** 8:11 196:9

**meet** 27:14 28:15,17 29:4,7,10,16 32:6,11,19 90:2,7 106:21 255:18

**meeting** 20:12,13 21:4,7 97:6 184:11

**meetings** 23:16 26:7 27:17,23 28:5,13

**Melissa** 96:9, 18 97:2 114:21

**members** 110:16,19

**memory** 8:12 37:8 69:16, 17

**mental** 198:3,5,6

200:15
201:14
202:8
210:11
246:6

**mentally**
210:12

**mention**
169:17

**mentioned**
32:18 97:9
114:20
118:7
161:17
179:16
203:7 241:2
258:8

**met** 20:10,
14,24 21:1
23:17,20,23
24:2,14
28:19 29:22
30:16 31:12,
16 32:12
33:6,10
35:16 36:5
42:15 44:5
49:19 52:20
53:2,3,13
54:6,7,8
81:1,21
89:3,9,22,24
173:2 257:2,
19

**Metals**
238:22

**Michele** 24:3
26:1,2

**middle** 13:8,
10 40:8
95:11 142:6
156:16
205:11

**Mike** 167:5

**mine** 7:24
23:7 202:3
255:14

**minute** 8:15
225:7

**minutes**
216:14
261:8

**mistake**
165:14
258:16

**mistaken**
262:11,12

**mixed** 171:6
244:6

**mom** 106:23,
24 163:10
191:7

**mom's** 116:9

**moment** 99:5
105:24
143:19
244:19

**Monday**
142:12,15

**money** 49:12
59:13,16,18
63:18 91:11,
15,17 93:14
168:16,22
169:11,19
185:13
209:15,20
231:5
233:17,24
235:20,21,
23

**month** 19:23
33:6 37:23
43:11 50:9
79:13
116:22
155:5
167:10,11

**monthly** 68:2

**months**
24:24 25:1,4
31:17 32:22,
24 107:4
108:2,4
126:9 185:1,
4 237:15

**mood** 244:6

**moral** 227:6

**morning**
21:3,8
123:5,6
151:18

**mortgage**
10:5

**mother**
53:14
145:17
161:24

**mother's**
163:5,23
164:4,5

**motion**
204:19
205:10,17,
20 206:8
210:2,5,6,17
220:16,23,
24 221:17
225:22
228:16

**motions**
170:6

**move** 124:7
147:2
204:17

**moved** 16:1
32:20,23
52:13
113:18
114:5,7
236:10
237:9,11
255:15
256:15

**movies** 68:6
114:14

**moving**
14:18 32:18
150:18

**multiple**
56:20 82:18

**Municipal**
76:22 77:9

**mutual**
183:23
184:7

**Myron** 26:20,
21 27:3,11,
14,24 28:12
115:10,11,
23 120:22
121:2
137:24
148:10,15

---

**N**

**named**
23:21,24
24:3 29:5,8,
11 252:21,
23 253:2
254:21
255:9
256:22
257:6,22

**names** 8:16
16:5 24:9
36:21 45:5,6
52:23 73:11
92:14,17
179:17
252:18

**Nancy** 37:3
44:8 46:24
87:10
106:24
254:9

**nap** 129:10

**Narcotics**
90:18,21
159:9

**nature**
159:10

**needed**
49:16 76:9

**neighbor**
188:10

**neighborhoo
d** 16:14

**nerve** 245:1,
2

**nervous**
199:14,16
243:4

**Netcare**
201:4,14

**Network**
242:20

**nice** 154:1
168:21

**nickname**
35:22

**nicknames**
35:18 36:2
73:19 92:2,5

**night** 50:21
70:17,19

129:7 144:7,
13 235:7

**nightclub**
32:12

**nightmare**
103:24

**nobody's**
231:11

**nods** 7:1

**normal** 41:2
103:6 123:4
129:18
249:12

**north** 14:7
238:23

**notes** 101:3,
6 123:24
261:3

**noticed**
128:20

**November**
32:23 87:3
205:13,18
207:5,11
208:4,24
212:12
213:4
214:15,20
215:7,12
216:8,11,16
217:14,16,
24 218:1
229:11

**number**
10:8,10,12
55:14,17,19
57:11,17,18
58:2,4,11,
15,17,21,23
59:2,6,8,12,
22 78:5
150:3 161:9
203:20

**numbers**
42:13 55:10
56:21 58:5
77:1 125:13
239:13

**nursing**
14:7,12,19,
21 15:8,9
16:1,3

---

**O**

**O-C-T** 62:12

**objection**
41:3 62:19
78:18 79:4
81:3 104:11
151:10
162:12
178:17
181:20
205:21
207:6 209:2,
9 212:5
224:22
225:3
227:12
228:7 235:4

237:1,23
246:17,24
250:11

**observe**
247:16
248:13,16
249:1,5,9

**observed**
247:4,12,15
248:4

**occurred**
33:16
118:12
131:24

**OCT** 75:23

**October**
33:16 35:16
39:11 40:12
43:16 48:13,
24 54:12,22
60:12 62:11,
18 64:2
67:14 68:5,
22 74:21
75:24 84:11
90:22 91:8
92:13 94:6
123:3
127:10
128:10
129:8
138:24
142:9 147:9,
23 148:23
149:13
152:12,14
153:6
155:18
164:19
168:10
171:11
172:9
173:18
174:7
215:21
238:11,12
262:7

**offense** 78:5,
6

**offered**
154:6
207:12,17

**officer** 78:3
89:23
232:23

**official**
173:22
174:19,22,
23 176:8
177:10
187:19,24
193:9
203:22

**officially**
120:24
175:9,19,22
176:12,17
229:13
251:21

**Ohio** 77:15
91:7 106:11
218:20
226:1 238:5

241:18,21
242:11,20

**older** 53:5
258:23

**one-year**
184:18

**ongoing**
241:4,7

**open** 18:3
41:24

**opened** 18:6

**option**
150:23

**ORC** 78:4

**order** 189:15

**Orleans**
242:19

**OSU** 242:21

**overnight**
69:11

**overturned**
171:2,4

**overwhelmed**
248:11

**overwhelmin
g** 248:12

**owed** 93:6

**owing** 93:14

**owned** 9:13
17:12

**owns** 167:4

_____
**P**
_____

**p.m.** 129:10,
12 222:24
227:1

**packet** 76:24

**pad** 157:15

**pages** 56:9
77:4 125:21
206:16

**paid** 39:6
43:19 50:11
59:15 63:15
64:20,22
68:14 93:17,
24 94:1
96:18,23
102:10
114:3
115:11,22
235:17
241:21

**pain** 243:19
244:21

**panic** 198:9,
11,23 199:4,
10

**pants** 77:18

**paper** 151:2,
3,23 152:10,
15,23 235:3

**paperwork**
102:24

103:3,4
173:21,23
176:8,23
177:10

**paragraph**
125:24
126:2,3
127:5
128:17
129:5 130:4,
5 152:3
226:4 227:5,
21

**paralegal** 5:6

**parents** 58:7
178:21
179:17
253:5,11
259:11

**parents'**
14:18 32:19
224:12

**Parkersburg**
88:10,16,23

**parole** 89:9,
13,14 90:13,
17 91:3
159:2,4,5,6,
16

**part** 15:1
18:19 21:12
22:15 27:9
55:18 63:9
90:12,16
93:8,12
103:8,11
104:5 114:1
123:17
138:7
139:19
145:1
148:21
150:15
156:2
159:16
165:7
166:21
169:21
171:17
175:13
220:21

**part-time**
14:6

**partly** 44:6,
15

**passing**
108:1,5

**past** 83:1,2,4
84:2 86:8

**pay** 39:3
40:2 42:23
50:10 59:13
68:18 102:4
113:11,15,
16 114:1,8,
11,13,17
155:1 167:6

**paying** 45:16
46:1 50:8
54:16,19,22
55:1,6 59:11
62:17 63:22

102:5

**payment**
68:2 154:3
240:15

**payments**
54:2 65:23
67:23
115:13
117:16

**pending**
177:6

**people** 24:8
73:22
135:12
136:14
178:12
210:2
249:14,19,
20,21 250:7,
10 251:12

**percent**
102:1 143:7
231:17

**perception**
100:22
137:7

**perfectly**
231:17

**performed**
171:10

**period** 14:11
15:21 34:3
35:15,18
40:11,13,20
41:1 42:10,
12 48:12
64:1,2 66:5
68:5,22
74:22,24
88:12 92:13
101:18
112:10
118:4 151:6
160:16,20
161:4
191:13

**permanent**
95:2

**permanently**
116:3,12

**person** 121:6
170:10
173:12
180:21
194:16
204:8 262:5

**personal**
11:11 49:15
240:1,6

**personality**
244:16

**personally**
11:17 28:17,
19 236:21
237:20

**phone** 10:8,
10,12 24:18
25:12,17,24
26:1 30:19
54:5,9,13,
14,15,22

55:1,5,8,10,
14,17,18,19
57:8,10,18
58:2,5,6,8,
16,17,20,23
59:2,5,8,11,
14,22 60:7
62:18,23
63:7,9,15,
16,22
113:23,24
125:12,13
149:4
153:18,21
154:3,5,18,
19,21,24
155:2,3,6,12
156:2,3,5,6
184:11
191:20,22
203:17,19,
22 204:11,
14

**phrase**
176:17

**physical**
39:6 43:18
73:16 148:2,
17 202:1,9
244:21
245:13,24
246:3

**physically**
153:4 200:8
201:20
202:4

**pick** 38:20,
21 48:1
57:22 64:24
66:17 67:5
129:15
163:23
164:4,8
239:9

**picked** 36:19
38:18 67:5,7
104:24

**picking** 48:2,
10 66:2
105:6

**picture** 44:13

**piece**
152:10,23

**pinpoint**
134:5 251:2

**pipeline**
222:6

**place** 44:18,
22 45:1,13,
17 69:19
157:14
166:22
168:20
207:1,9
214:9
237:14
251:9

**places** 44:21
45:10 48:11
243:23
244:3

**Plaintiff** 5:9

**plan** 55:5,8,
18 60:7
63:10 114:1
127:1
153:21
154:5 156:2,
5 207:16

**planned**
202:21

**planning**
208:2 216:2,
12

**plastic** 77:18

**play** 238:13

**played**
238:14

**Pleas** 205:13

**pled** 86:23
87:5

**PO** 225:24

**pocket** 77:19

**point** 28:21
36:15 37:9
43:14 49:16
51:6,11
54:21 76:10
80:1,2 90:4
93:6 95:4
101:15
107:3
109:17
116:20
136:1,4
140:18
141:10
148:7
157:12,13
164:21
168:16,23
172:17
178:4 182:1
188:3
193:13
196:11
197:5
220:13,23
245:8
257:14

**police** 33:20
101:15
119:18
123:15
125:1
165:10
187:7 188:1,
12,16,21
189:6 190:4
232:22

**police's**
232:19

**polysubstan
ce** 244:11

**Popeyes**
36:8,18,19
37:9,17
39:3,9 40:2
69:21
109:22
110:3
111:15,19,

22 112:6,11
129:12
147:22
160:1,16
233:16

**portion** 97:6
208:19

**portions**
261:18

**possess**
77:16

**possessing**
86:20 87:3

**possession**
77:23 87:24

**possibility**
172:13

**possibly**
140:22,23

**posted** 62:4

**practice**
27:19

**precipitated**
183:6

**prepaid**
154:23
155:3 156:6

**preparation**
21:13 23:9,
12 124:9
125:17
139:20
140:21

**prepare**
19:15 20:11,
15 21:1

**preparing**
23:16

**presence** 5:3

**present** 26:8,
12 27:16
28:1,12
39:23 90:9
97:7 118:16
140:2,5,8,12
165:22
172:22
173:1,12
261:18,21

**pressure**
243:12

**pretty** 10:14
27:8,9 42:4
53:21
106:22
138:2,5
143:17
146:9,10
154:2
156:16
203:21
249:11

**previously**
23:17,20

**Primary**
195:19

**prior** 8:16,23
14:17 24:16

28:4 30:17
82:8,12
84:12,21
86:1,11
105:3 110:8
114:24
118:4,22,24
184:6 197:4,
5,7 200:5
216:7
248:14,17,
24 249:4,8,
11

**prison** 30:17
34:24 81:7,
10,15,24
82:1,8,19
84:22 85:2,
18,21 86:24
87:6 88:4
89:2,6 109:8
133:5
158:18,21,
23 169:22
170:7,14,20
171:1
172:12
173:7 178:5,
7,9,13
180:15
181:14,19
194:19,23
199:23
203:16,22
204:11,14
209:20
213:10
214:17,21
215:14,23
218:5 224:3
229:16
230:8 233:3
235:18
238:21
243:2,11
245:9,21,22
251:12

**prisoner**
182:3

**probation**
89:23

**problem**
245:20

**problems**
168:18
169:6
244:24
246:11

**proceeding**
177:20

**proceedings**
170:10
172:23
173:12

**professional**
246:15
247:23
248:2

**program**
91:11,16
169:22
208:8,12,15

**programmin
g** 208:7

**Progress**
125:1

**Project**
241:19,22
242:11

**prompt** 7:4

**pronounced**
258:18

**proof** 232:17

**property**
10:2

**protection**
189:15

**provide**
129:2
207:17
209:13
210:6,17

**provided**
122:12
207:1

**providing**
121:15
209:7

**psychologica
l** 194:22
197:20
246:7

**PTSD**
250:16,24
251:20,22,
24

**public** 251:9

**pull** 75:15

**purchase** 9:9
10:2

**purchased**
10:1

**purposes**
39:17 46:10
47:11 56:3,
12 60:19
76:19
105:19
122:2
124:17
204:22
218:13
221:8

**put** 176:14
188:22
212:21
228:19
229:7

---

**Q**

---

**question** 6:9,
10,24 7:18,
19,24 8:2
24:7 26:7
57:8,10
58:1,5,10,
13,15,18,20
71:23 78:22
83:18 86:10
112:2

140:15
142:11,17,
20 143:23
144:3,11,15
145:13
147:6,12,15
150:9,11
152:8
154:17,21
155:1,7,11,
15 156:18,
23 158:18
159:3
161:16,20,
23 162:2
165:5,15,17
166:24
167:2,4,6,8,
11 168:5,7,
8,15 174:2,
3,10 175:4,
6,16 184:17
194:14
199:16
200:13
210:16
212:3,19
214:11
216:22
220:22
223:19
232:9
248:22

**question-
and-answer**
6:4

**questions**
144:20
194:12

**quick** 72:17
146:9

---

**R**

---

**raised** 101:2

**Ramsey**
252:21

**rate** 39:3
40:16 42:24

**reach** 190:18
191:2

**reached**
190:19
191:7,17

**read** 57:13
58:24 71:22
72:5 77:12,
20 107:17
122:24
123:9 127:7
129:19
130:9,16
131:4
142:24
144:18
145:24
147:17
151:7,8,17
155:21
159:11
162:8
165:20
167:13,14

168:24
226:11
228:2

**readily**
132:13

**reading** 57:6,
22 142:5

**ready** 194:1
233:11,12

**real** 183:3

**reason** 6:7,
22 7:7 8:9
76:1,9 78:11
167:21
184:16
185:1
233:18,23
251:10

**recall** 38:19
40:1 41:10,
18 42:2
44:10 47:4
48:2,10
50:7,18
59:18,21
61:20 63:21
64:17 65:16,
18,19,20
66:1,13,16
67:6,16 71:9
73:13,16,21
78:1 87:20
91:22 93:13
95:19 96:17
97:5 99:8,
17,21
100:17,21
102:5 103:1,
20 104:23
105:6 110:2
114:23
115:22
116:17,23
117:21,22
120:13
121:15
123:15,23
128:2 133:6,
7,10,11,15,
19 135:4,17,
24 141:1,2
152:10,13
153:5 172:4,
7 188:18,20
190:22
193:12
210:16
211:19
222:10
223:2,11,12,
13,16,23
242:17
258:7 259:6

**receipts**
129:2
149:16,18

**receive**
43:18
196:21
227:7

**received**
181:13
197:9 199:3
201:5

247:10

**recently**
140:19
203:1

**recess** 72:20
139:9 194:7
230:2
261:12

**recharge**
172:18

**recidivism**
226:6

**recognizance**
101:24

**recognize**
44:13 122:9
225:10,11

**recollection**
63:6 118:18
123:20,21

**reconnect**
190:15
191:20

**reconnected**
190:12
191:19

**record** 5:1,
18 6:6,11,19
7:3 72:19,23
75:19 81:1
122:8 123:1
124:23
136:20
139:6,8,12
141:22
165:1
166:18
175:21
194:4,6,10
205:4 219:3
221:11
230:1,4
261:11,14
262:22

**recording**
204:3,7

**records**
76:23
148:24
149:2,5,8,
10,12 182:9
218:9

**red** 67:19
73:4 104:21
157:20
158:5

**reference**
157:19
158:20
197:5

**referred**
157:14

**referring**
142:9 156:1,
3,20 157:2

**reflect**
241:17

**reflects**
130:22
131:6,18

**regular**
40:14 50:21
164:23
243:8
252:10

**regularly**
75:7 89:24
90:2 253:7

**Rehabilitatio
n** 218:21

**rekindled**
171:19

**relate** 155:12
202:10,12

**related** 12:16
22:6,19
31:7,20,21
76:23
170:10
171:10
172:8
180:19
186:9
243:21
244:1
246:14
250:2,5,6
259:17
260:20

**relationship**
20:8 32:2
33:3,4 79:8,
14 81:6
83:9,24
106:23
164:20
171:18,19
182:22
183:6 185:7
186:6,15,18
187:4,8
188:3
189:11,21,
24 192:1,4,
10,13,17,18
193:1,5,7,
13,20 214:3

**release**
91:11
102:20
126:16
168:15
169:18,19,
22 170:7,20
205:11,17
206:9 208:8
220:16
221:1,18

**released**
30:16 34:3,
24 89:2
101:19
105:8
109:23
115:3
170:14
171:1
172:12
173:6
207:13,18
213:10
214:16,20
215:14,22
218:1

238:20

**remain**
185:14

**remarried**
35:3

**remember**
12:12 13:8
15:9,13
32:9,13
33:22 34:4,
19 35:21
36:11 37:18,
19 38:1,5,
17,21 40:3
41:15 43:3
44:11,22
45:1,2 49:8,
11,13 51:13
54:20 55:1,
19 59:20
61:22 64:7
67:13 68:3,
19 71:12
73:12 74:2,
19 75:9
80:7,8,17
82:5 84:24
85:9 90:1
92:14 95:12,
17 96:10,19
97:8,11,12,
16,17 98:2,
10,17,19,24
99:10,14,20
100:10,12
103:11,12,
13 104:1,2,5
109:9,12
111:21
112:15,19,
24 113:3
114:12
115:24
116:16
118:17,20
119:2,3
120:20
121:5,7,9,
10,14
123:18
124:1,4,5
128:6,12,23
129:6,8,24
133:21
134:6,12
138:16
140:7,8,11,
13 141:11,
13,15 146:5
148:20
149:1,3,12
152:24
153:3,9,13
156:7
157:18
169:7,12,13,
16 177:24
181:15,16
182:4
184:13,24
185:22,23
186:20
187:2 188:8
189:1,9,10,
11 190:16,
24 193:21

196:12
197:1,16,17
200:18,21
201:11
206:5
208:17
210:19
216:17
220:20
222:1 224:5
234:5,16,19,
24 254:4
257:16,18
261:22

**remembered**
128:10

**remodel**
109:10

**remodeling**
109:10

**rent** 45:17
46:1 50:5,8
113:11,13,
17 167:6,8,
9,18

**renting** 9:14

**repeatedly**
133:4
181:18

**rephrase** 8:3
102:18
248:22

**report**
188:15,24

**reported**
188:20
189:6 190:3

**represent**
28:22 40:4
56:8 60:24
61:17 78:9
97:3 104:6
142:8
156:19
158:21
165:7
209:24
210:4

**representatio
n** 28:19

**represented**
19:20 20:2
26:15,21
27:12 28:20
29:14

**representing**
115:3

**requested**
223:15

**reserve**
262:19

**residence**
157:24
187:8,10

**residential**
18:23,24

**resources**
165:12

**Respectfully**

221:18

**response**
168:8

**rest** 123:7
131:4
216:12

**restate** 8:3

**restaurant**
40:10 41:23

**restaurants**
64:11,15

**restrictions**
91:3

**restroom**
7:16

**result** 91:3
93:7 180:15

**resumed**
192:18,23
193:5,20

**retired**
165:10

**retrial** 172:13

**review** 21:12
22:19 23:8,
11 139:22

**reviewed**
21:16,18,19,
23 22:5,6,17
23:1 124:9
139:19
140:15

**Reynolds**
104:8,9
106:11
166:23

**Rhonda**
103:10,15
110:11,22
262:1

**Ricardo**
257:23
258:1

**Richard** 5:9
9:21 10:3
19:6 26:16
27:7,8,18,24
28:12 29:3,
19 30:12,16
31:17,21
32:2,6 33:19
34:11,21
35:16,18
36:3,4 37:14
40:7 42:16
44:2,4 47:22
48:23 49:19
50:14 51:7,
18 52:20
53:2,13,23
54:5,23
55:2,17
56:10,18
59:5 60:6
61:14,19
62:17 63:6,
18 64:3
65:6,10,13
66:1 68:6,23
69:8,14

71:23 73:7 74:10 75:1 76:1,23 77:11,22 78:11,14 79:1 86:19 87:19 88:17 90:9 91:10 92:2,6,22 93:6 94:5,22 95:5,14,19, 23 96:24 97:1,13 98:6 99:17,21 101:2,9 103:10,15, 22 104:4,7, 9,24 106:10 108:10 110:9,21,22 111:13 115:15,22 117:12,16 118:1 119:19,23 120:2,14,18 123:3 126:4, 21 127:15, 20 128:3 130:6,14 131:22 132:16 136:21 137:16,18 138:24 141:8 142:17 144:4 145:14 146:20 147:22 148:22 149:13 151:16 152:13 153:5,20 157:14 159:18 161:16 164:10 169:5 170:5, 14 171:16 172:11 173:17 179:11,14 180:14 181:7 182:2 183:12 185:15,21 186:6,10 189:23 190:2,14 191:12 192:9 193:6 194:16,19, 22 202:11 203:16 205:16 208:14 210:5 211:11,16, 22 212:4 213:1,10 214:16,20 215:13,22 218:5,23 219:23,24

220:5,15,24 221:19,20 223:24 225:23 226:14,17 229:11 230:7 231:21 233:15 235:17 236:7,22 237:21 242:14 243:1,10 244:4,21 246:8 247:4, 12 248:4 249:1,5,9,13 253:9 254:5, 18 255:4,14, 15 256:10, 12,13 257:6, 12,20 259:2 262:1

**Richard's** 28:18 37:16 39:21,23 46:24 58:16, 20 81:1 85:12 88:22 92:11 99:6 102:18 106:20 107:12 115:12 116:2 119:13 139:15 140:3,9,16 148:11 150:15 151:13 152:11 154:16 156:20 158:13 165:8,23 166:21 168:5 176:4 177:1,16 234:2 236:1 238:20 240:6 250:15 253:18 254:9 255:1 256:18 261:19

**Richey** 35:19
**ride** 65:21 164:13
**right-hand** 71:19 150:4 206:24
**ring** 229:15
**Road** 224:15
**robbery** 33:15,20 35:17 94:6 119:19 138:24 165:19 171:11 172:9

173:18 174:9 262:6
**Roland** 256:22
**Rolland** 256:23
**rolling** 135:20
**room** 136:17 166:1 255:22
**roughly** 9:18 18:6 148:8 237:16
**route** 239:11
**routine** 123:5 129:18 149:22
**rude** 99:1,23 100:4,15 132:4,8,20 133:12,20 134:4,11,14
**ruled** 174:16
**ruling** 174:13
**run** 165:13
**running** 251:10,12

—— S ——

**Sam** 253:2,3
**Sapp** 40:10
**Saturday** 70:17,19 123:5,6 127:11
**Saturdays** 128:18 142:13,18
**savings** 240:21
**scare** 243:3
**schedule** 37:17 77:17 116:9 142:11,14 147:24 148:3,14,18 152:11 239:6
**school** 13:9, 11,12,14,19 14:3 58:4 117:22 175:20 257:4
**schooling** 13:18
**sciatic** 245:1,2
**Sebring** 67:17,19 130:6
**section** 78:5 206:19

**seeking** 170:6
**self-employed** 15:4,6
**sell** 75:3 88:11
**selling** 85:12,21 234:9,17
**send** 209:15, 20 224:2,3
**sense** 6:12 7:11,21 8:7 16:16 24:23 37:24 177:6, 7
**sentence** 106:10 126:2 127:6, 8 128:9 207:21 208:21 226:4,8 227:6,22
**sentenced** 86:24 87:6 177:19 178:4
**sentences** 206:23,24
**sentencing** 177:20
**separate** 12:18 23:15 44:1 214:12 239:24 240:5
**September** 40:11 62:4, 18 88:9 155:16 168:9,13,14 222:23 236:10
**series** 61:24
**served** 88:4
**service** 112:14,23 113:4 145:16 146:12 160:9,10,20, 24
**services** 94:15 112:17 145:21 146:16,22
**set** 21:10 119:8 131:14 145:20 206:12 244:19
**setting** 31:23 41:17 138:19
**settings** 30:7

**several-page** 218:18
**shakes** 7:2
**share** 84:2
**shift** 42:5,6, 10
**shoes** 69:3,5
**shopping** 68:23,24 69:2 114:18 128:24 144:9
**short** 34:3 72:20 106:1 139:9 194:7 230:2 261:12
**shortly** 32:19 35:4 54:10 89:3 178:2
**shots** 243:19
**show** 42:13 46:5 124:6
**showed** 107:16 152:11
**shows** 40:19 232:17 247:19 251:23
**Shwartz** 26:20,21 27:3,12,14, 24 115:10, 11,23 120:22 121:3 137:24 148:11,15
**Sias** 253:2,3
**siblings** 259:20,23 260:16
**sick** 200:8 201:24 202:4
**sicknesses** 202:15
**side** 206:24 238:24 241:7 249:21 254:15 255:8
**sign** 20:7
**signature** 122:19 221:20,21 223:20,21 224:20 225:2,9 262:19,23
**signatures** 224:18
**signed** 22:4 27:2,9
**significant** 213:1

simply 174:10

Sincerely 211:7

single 200:15

sir 167:12

sister 17:13 178:22 179:20 258:10,20

sister's 179:20

sisters 260:17

sit 84:20 85:4 86:16 87:22 88:8 93:5 131:5 134:12 143:2 222:9 233:1 249:17 251:2

sit-down 64:15,16

situation 94:16 145:16 146:12,22 247:21 248:9

situations 251:1,14

six-month 48:12 64:1 92:13

sizable 93:14

skip 127:5 130:3

sleep 128:19

sleeper 128:21

sleeplessness 247:4 249:10

slow 215:19

slowly 6:16, 18 192:2

small 74:3

Snapchat 12:1

social 10:17 11:14 30:7 31:23 241:1

sold 85:15

something's 251:17

son 161:21

Sonora 49:20 51:7, 19 52:2,17 61:3 106:16 125:9 126:22

sort 6:2 32:1

112:20 119:8 192:4 205:11

sorts 69:1

sound 33:11 41:1 43:5,11 182:13,18 184:1

sounds 33:23 34:9 43:6 186:4 261:8

source 39:10 43:15 112:9

space 235:14

spanned 34:16

speak 6:8,9, 16,18 25:23 29:1,4,7,10 30:17 107:18 121:3,13 137:2 199:16 242:11 261:5

speaking 231:4 242:6

speaks 215:10

specific 32:8 70:6 85:3,5 99:10 111:9, 11 135:4,8, 16 141:13, 16 170:23 183:5 199:3 200:2,3,10 259:6

specifically 71:12 80:18 82:5 84:14, 15 97:17 98:10 103:13 104:2 124:4, 5 128:2,5 129:17 132:23 133:7,21 134:4,15 145:4 149:9, 19 181:16 223:16,18

specifics 31:2 32:4 81:22 84:24 88:5,6 90:1 98:11 128:23 129:9 146:17 171:7 259:17,18 260:13,14

speculation 143:12

spelled 258:14,18

spend 92:21 144:9 156:18 164:22

spending 50:15,20,24 216:12

spent 89:5 123:7 144:7, 8

split 68:17 114:10,15

spoke 25:6, 12 29:3 30:19 31:16 97:5,14 107:21 114:24 245:17

spoken 24:8, 15 25:17,19, 24 30:10 31:12 107:8, 11 118:24 119:18 138:22 235:24 236:16,22 237:18,21 241:18 253:4 259:1 260:1,9,12, 19

spring 107:7

stage 119:9

stamp 77:10 106:5 122:8 124:24 165:2 205:4, 12 212:11 219:4 221:12

start 13:22 14:2 15:22 39:22 46:7 51:7,18 52:1 53:11 57:6 71:19 109:5 125:23 142:5 150:22 156:15 165:2 168:4 172:20 175:15 190:20 195:4 198:5, 19 202:13 245:17

started 13:21,23 14:5 15:7 50:15,20,23 51:3 54:6 60:8 69:8 81:10 82:9, 13 85:13,16 86:5 88:20 92:6 109:10, 12,18 110:4 111:16,23 112:11 113:7 127:8

151:22 171:16 172:19 195:3 198:12,15, 21 200:4,5 202:23 245:4,7,8, 18,21 251:12 252:7,9

starting 86:2,12 145:7,12 147:5 150:9 158:13

starts 251:9

state 5:17 28:19 91:7 106:9 238:5

stated 129:9 130:5 146:6 149:16

statement 22:3,16 60:16 75:11 121:16 122:12 123:17 155:8 234:22 235:7,11,14

states 77:13

stay 44:17 69:9,22 70:1,4,11, 16,17 71:5 72:3,9 99:5 103:9 116:4, 7,18,22 117:6 145:3 159:8 187:22 200:22

stayed 70:6, 7,23 71:8,10 116:5 163:20 187:23

staying 45:14,17 47:22 117:12 156:21 157:1

stays 161:24 189:13

step 14:9 177:9 187:15 211:12

stick 74:20

sticking 74:21

stood 133:22 134:6

stop 182:20

stopped 16:15 111:15,22 112:10

160:16,24 182:16 184:20 233:15

straight 6:11

street 44:11 47:4 238:23 254:2

stress 171:21 195:7 202:16,17 210:10

stressful 248:9,21

strictly 142:14

strike 88:15 211:12

strong 247:17

stub 40:2

Studio 32:15

stuff 52:13 69:7 80:10, 16 103:6,12 172:1 176:9 204:1 212:20

stupid 181:9

Styling 11:1 241:3

submitted 221:19 225:21 228:16

Suboxone 181:18

subsequent 173:11

substance 30:11 77:16, 17

substantive 30:11 31:6, 20

sued 12:22, 23

suffered 244:22 246:8

summary 125:4

summer 106:12 107:7

Sunday 71:6

Sundays 142:14,18

supervision 158:19,24

supplies 117:22

support 54:2 117:16 206:20

208:19
209:8,14,16
210:6,13,17
223:23
225:22
227:7
228:16,20,
22,23 229:9

**supported**
210:14

**supportive**
208:22

**surprise**
78:17 79:3,7

**surprises**
79:7

**surrounding**
170:20

**suspect**
19:23

**suspended**
180:21

**switched**
14:11

**sworn** 5:13
77:13 106:9

**symptoms**
200:5

**system**
93:22
146:19
212:22

———
**T**
———

**tab** 64:24

**tables**
152:20

**tablet** 204:1

**tablets**
203:24

**takes** 16:12
175:7

**taking** 8:11
36:14
123:24
163:4

**talk** 11:5
12:21 19:8
30:20 31:24
35:12,15
73:1 80:15
83:5,7,12,
14,21,22
84:16,17,19
99:2 110:21
118:11
120:2,4,6,
10,15,17,19
121:2,11
131:22
132:13
143:23
154:17
171:22
181:15
202:20
230:11

**talked** 19:3,
16 23:16
73:3 74:9
80:8,18
84:12,21
98:9,13,14
101:17
103:19
108:9,17
111:3
113:23
118:14
121:6 124:8
126:18
134:8
135:12
137:11
138:18,20
139:14
153:18
157:3 160:3
169:20
171:23
177:15
197:18
199:8
200:16
201:13
210:8
233:14
234:1
235:16
239:17
243:7
244:18
247:3 254:8
259:16
260:7,19

**talking** 41:15
66:4 79:19
80:4,9,11
84:2 86:6,7
104:15
111:10
132:15
134:1,2,17,
24 135:2,6,
8,18 149:17
172:8,24
174:2,22
190:13,21
198:2
202:14
215:17
240:24
252:7,9

**talks** 126:24
252:1

**tapping**
132:10

**taxes** 43:11
241:7

**telephone**
26:10

**Telhio** 61:1

**telling** 85:1
95:20 99:8
123:15,16
128:3
129:24
152:13
153:5
169:16
193:13

216:17

**temp** 112:14,
17,23 113:4
160:9,10,19,
24

**terms** 41:1
235:11
248:23

**testified**
12:8,19
78:15 79:1
139:15
229:10
262:1

**testifies** 5:13

**testify** 8:10
107:12

**testimony**
21:18 23:1,
3,5 39:23
40:2 56:15,
17,18 59:3
61:21
103:21
104:3
113:24
139:19,22
140:3,6,16
141:9,18
143:3
144:23
150:15
151:13
153:12
154:16
156:17
157:13
158:13
165:8
166:21
168:6 215:5
261:19,20,
23 262:5,10

**testing**
171:10,24
172:5,8

**therapy**
245:14,24

**thick** 76:24

**thing** 15:24
21:10 100:2
109:4 124:7
149:7
150:19,24
164:18
168:19
172:19
228:24
252:11

**things** 10:18
16:6 19:9
22:8 49:15
62:23 69:1
73:2 84:17
112:3,20
130:1,21
133:1,22,24
134:4,6,9,11
137:10,11,
12,13
159:10,16
168:21
193:10

198:3 203:1
210:11
214:3 215:2,
5 222:5
223:4,5,12,
13,23
233:14
241:2,17
243:14
246:12
247:16
248:21
251:11,14

**Thomas** 29:5

**thought**
98:21 99:9,
22 134:11,
13 141:3

**three-page**
22:9

**Thursday**
20:19

**tickets** 68:15

**time** 7:15
10:11 14:11,
13,15 15:21
20:14 24:24
25:2,6,13,14
30:15 31:15
33:9,10 34:3
36:24 37:14
38:19 43:14
44:19 48:6
51:7 53:18
60:9 61:11
65:7 67:3
70:13 72:16,
19,23 73:23
78:6 79:23
81:9,17,24
82:8,12 85:3
86:24 87:6
88:4 89:9
92:21 101:4,
19 107:17,
21 117:3
119:17
123:7
125:10
126:8
128:11
131:2 133:3,
5 135:15
137:13
138:10
139:8,12
141:10
142:8,9
144:9,11
145:18
148:8,18,19
151:6
154:18
156:18
160:16,20
162:6
164:22
165:12
166:10
168:23
173:2
182:15,19,
21 183:9
185:11,13,
17 186:21

190:9
191:18
193:24
194:6,10
196:12
199:20
200:17
204:6,9
207:10
215:15
220:11
222:11
228:20
229:22
230:1,4
231:4,18
233:10
234:7,12,15,
18 235:11
237:3,11
238:3,17
241:11
246:4
248:19
253:8
256:10
261:11,14

**timeline** 32:2
35:14 119:9

**timelines**
97:23
192:21

**times** 21:1
24:20,22
25:12 29:16
30:5,6,19
38:11,19
45:15 64:5
71:2,13 72:9
82:18 105:1
117:4,8,9
118:8 156:9
162:5
178:21
187:23
188:6
231:20
236:2
242:10
245:14
246:1 247:5
248:8
252:18

**timing** 112:3

**tissues**
233:7

**today** 5:10
6:3 7:14
8:10 19:15
20:11,19
23:9,13
57:17 64:21
73:3 79:16
84:20 86:16
87:22 88:9
93:5 131:5
138:20
139:18
143:2
144:23
196:6,7
220:13
222:9
234:21
235:16

236:1
260:19

**today's**
124:9
125:18

**told** 43:4
81:5,9,20,23
82:2,21
85:15,22,24
86:1,11,13
89:12,21
90:24 91:1,
13 95:8
97:18 98:7,
14 99:10
100:6,18
103:18
111:7,13
120:7,10
123:20
127:14
130:23
131:7,19
137:18
139:18
153:11
160:5
165:18
166:4,9
170:1 172:5
173:1 181:7,
8,23 182:5
185:6
193:15
202:17
211:19
215:13,22
216:14
231:14
243:1

**tomorrow's**
35:9

**tone** 135:10

**top** 40:8
56:22 61:2,
3,8 71:19
77:9,10,11
125:2
141:23
145:9 150:3
154:9
156:12
161:9
205:11,12
211:3
212:12
217:12
218:20
225:23

**Tor** 258:5

**total** 88:10

**totally** 7:6

**touch** 185:14
254:6

**town** 17:16

**townhouse**
50:3

**traded** 67:22

**transaction**
155:17,19

**transcript**

6:23 56:10,
15

**transcripts**
23:9

**transportatio
n** 163:11

**travel** 91:2,6

**traveling**
103:12

**treated**
196:1,4
246:21
248:1 250:4
251:24

**treating**
245:11

**treatment**
196:22
197:9 199:4,
9,11 200:14
201:6,9
244:1
247:10

**treatments**
201:15

**trial** 12:16
21:18 23:1
26:17 28:4
30:12 31:7,
21 33:16
34:15 39:21,
23 40:6
56:10,11
61:19,21
101:5
103:21,23
107:13
110:8 111:1
118:5
119:15
137:17
139:1,16,19,
22 140:3,16
141:9,18
150:15
153:11
156:17
157:13
165:8
166:21
168:6
170:11,12
177:16
178:2 195:3
248:20
261:19
262:2

**trigger**
251:15

**triggers**
251:4,11,14,
16

**trip** 232:13

**trips** 88:10

**trouble**
168:22
169:10

**true** 11:16
106:14
202:18
207:5 208:1,

24 209:1
213:4
217:16,20
222:20

**trust** 249:21
250:6

**trusting**
249:14

**trusts** 249:24

**truth** 136:13
231:23

**truthful** 59:3
189:5

**truthfully**
8:10

**Tuesday**
20:18,21,22
21:5 78:10,
12

**turn** 21:22
56:19 71:18
95:24
141:21
210:20
219:7 225:6
226:20

**turned** 33:19
96:11 97:14
101:9,11
152:20
166:10,11

**turning**
114:24

**Twenty** 28:7

**Twitter** 12:1

**two-** 22:9

**two-hour-
long** 242:8

**two-thirds**
62:10 75:21

**two-week**
40:12,19,24
42:10,12

**type** 158:19,
24 249:20
251:13

**typed-out**
22:10

**types** 64:13

**typical**
144:3,11

---

**U**

---

**Uh-huh** 6:1
8:22 9:17
10:6 11:10
13:6 17:6,9
22:1,11,18
24:19 26:23
34:5 37:12
41:17 47:15,
20 51:17
55:16 56:7,
23 58:22
60:23 63:8
69:10 71:1,
16,21 72:6

73:6 74:11,
23 75:12
76:21 77:3
78:21 79:11
83:13 84:4
86:18 92:4
94:20 96:13
99:4 104:14,
20 106:4
107:6 113:9
115:16
117:7
119:14
123:2
124:10,13
125:8,22
126:5,13
127:3
128:16
131:3
132:21
133:16
134:10
137:15
138:9,21
141:19
142:19
143:21
145:11
147:4 148:6
150:2,8
152:9
153:19
157:9
158:10
160:23
161:11,15
162:16
165:4
184:21
185:9,13,19
192:8
195:16,23
201:21
203:13
205:7
206:22
208:5,20
209:22
210:3,22
211:1
212:13
213:3,13,15,
23 214:5,14
215:16
217:8
218:19
219:9,13
221:16
222:18
224:1,14
225:8,20
226:10,23
236:15
237:17
239:20
240:2 242:4
245:3
253:10
255:3
256:21
258:22

**uh-huhs** 7:2

**unaware**
101:4

**underneath**

218:21

**understand**
8:2,4 24:13
84:10 98:4
176:16
180:24
181:5 231:1
240:8

**understandin
g** 9:20
160:15
177:12,13
180:22
181:1,3
192:16
213:9
214:16,19
230:6,14,16

**understood**
8:1,6

**unemployme
nt** 160:7

**unfaithful**
183:7

**Union** 61:2

**unpack** 55:7
178:23

**untrue**
130:23
131:8,20

**Upper** 17:18

**Urana** 9:3
187:11,18
188:2

**usernames**
10:23

**utilities**
50:10
113:15

---

**V**

---

**valid** 130:7

**Vantasia**
52:24 53:5,
12 66:2
94:9,10,21
116:10,11
117:11,17
178:24
236:2 237:4

**variety** 170:6

**verbal** 6:23
7:8

**video** 6:5
180:20

**videos** 23:11

**Village** 16:4,
8

**Virginia**
81:11,24
82:19 84:23
85:2,21
88:1,4,11,17
89:2,9,15
91:12
158:22
169:22

**visit** 36:17 118:2 179:11,14 191:5 194:15,18 259:3

**visitation** 218:9,22

**visited** 178:9 182:10 191:4 218:5 219:24 220:5,8

**visiting** 178:12 182:16,20 185:3

**visits** 180:16,20 181:2 184:20 185:10

**voice** 135:10

---

**W**

---

**wait** 72:4

**waived** 262:23

**walked** 132:6

**Walker** 5:5 21:17,24 22:20 95:15, 21 97:14,20 98:8 99:18, 23 101:3,7 118:9,15,19, 21 120:15, 19 121:4,13, 16 122:12 123:16,24 127:14 128:3,19 129:6 131:7, 19,23 138:15 149:17 234:23

**Walker's** 125:3

**wanted** 35:13 71:5 109:4 157:23 168:21 231:14 233:17 235:3

**wanting** 132:13 233:23

**warrant** 87:8 94:4 95:16 96:1 145:22 165:19,24

**water** 50:12

**ways** 210:14

**week** 38:12, 14,15 41:11, 12,19,24

42:3,9,21,22 43:9 64:5 66:18 67:1, 2,7 116:22 162:5 197:17

**weekend** 37:23 38:13 50:24 51:2 66:10 68:8,9 70:15,24 116:8 117:11,14 142:23 143:6,7,9 144:3,4,7,8 145:1,3 147:9,13 149:23

**weekends** 37:20,21 38:2,16 50:15,16 64:10 66:17 68:10,11 69:24 70:7, 9,11 127:11, 15,17,18,19, 21 128:1,4 131:10,12, 14 142:16, 21 143:7,14, 24 144:21, 24 145:5

**weeks** 237:6

**weight** 201:24

**Wellbutrin** 196:10,15 199:5

**West** 17:19 81:11,24 82:19 84:22 85:2,21 88:1,4,11,16 89:2,9,14 91:12 158:21 169:22

**Westerville** 16:4,8

**wife** 84:3 256:5

**Williams** 52:24

**wireless** 154:24 155:17,19 156:6

**wit** 77:17

**withdrawal** 75:24 76:8 155:5

**withdrawals** 155:8,11

**withdrawing** 49:12

**witnessed** 250:19,20, 23

**witnesses** 140:6

**woman** 135:19

**wondering** 98:6 184:19

**word** 136:5, 7,8,10 160:6 172:6 183:3 189:13 232:5

**words** 229:2, 14 232:13 233:2

**work** 14:4 15:11 16:8 36:10,12,17 38:2,6,14, 19,22 41:13 42:5,6 70:4, 8,9,21 91:11 95:9 109:22 111:14,17, 20 112:5,17 116:8 123:5 125:12 127:11,15, 16,18,20 128:1,11 129:9,11,14 131:12 142:11,14 145:5,18,23 147:24 148:14,18 150:20,22 151:2,22 152:11 153:6,7,10 160:6 161:5 162:5 168:15 169:18,19, 22 202:7 229:8 232:23 239:5 255:14 256:12

**worked** 15:20 19:2 36:22 37:2, 4,19,21 38:8,9,13,16 41:10,13,18, 22 42:9 66:22 112:6, 7 128:4 142:12,16, 18 160:16 169:24 170:2 238:22 256:9

**working** 13:22,23 14:5 15:8 16:15 18:11 36:4 37:9,17 40:19 41:2, 19 42:2,15, 21,22 69:21 70:1,10,16 109:7,10,18

111:15,16, 22,23 112:11 131:9,14 142:20 144:1,4,21, 24 147:13, 15,22 151:18 152:12,14 160:17,19, 24 161:1 182:22 233:15

**works** 43:10 127:18 155:4 212:22 255:15 256:13

**World** 129:14

**worried** 243:5

**Wright** 28:16

**write** 211:23 212:1,4 235:2,11,14

**writing** 180:2 223:2,11,12, 13,16,23

**written** 6:6, 22 7:3 22:8, 13,15,16 121:16 122:11,21 123:17 213:14 223:4,5 234:22

**wrong** 127:18 157:7 200:7 229:5 258:13,19

**wrongful** 231:2,21

**wrongfully** 93:20 160:13 229:2 231:22,24 232:11

**wrote** 191:4 213:22 225:12,13 235:6

**WS/040902** 62:5

**WS/041005** 62:13

**WS/ATT** 62:5,12

---

**Y**

---

**yada** 136:23, 24

**year** 13:16 19:24 20:3,4

24:24 58:21 108:3 143:11 161:20 186:16 197:1 203:3 226:5 236:13 237:10,13

**Year's** 238:16

**year-and-a-half** 187:4

**years** 9:15 10:13 14:2,4 15:14,15,18, 22 16:9,14, 20 17:20 18:4,7,8,10 20:3 28:7 41:16 67:10, 12 79:19,21 80:4,12,13, 16,22,23 84:3 85:8,9 88:12 89:6 108:3 134:7 161:17,18 170:6 175:7 178:10,14 182:9,11 185:24 186:1,2 200:24 203:5,10 212:16 222:6 223:8 236:3,4 237:8 253:12 255:21 260:1

**yell** 136:2

**yelled** 99:19

**yelling** 135:24

**yesterday** 20:16 25:14

**you-all** 164:18

**younger** 178:22 258:23,24