Case: 2:23-cv-03888-ALM-SCS Doc #: 149-5 Filed: 03/28/26 Page: 1 of 392  PAGEID #: 9588

# Exhibit 4

IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

STATE OF OHIO,                      :

      PLAINTIFF,          :

    VS.                        :    CASE NO. 05CR-146

RICHARD HORTON,                  :

      DEFENDANT.       :

- - -

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN F. BENDER, JUDGE, ON JANUARY 30, 31, FEBRUARY 1, 2, 2006.

- - -

APPEARANCES:

      MESSERS. DOUGLAS STEAD AND NATHAN SMITH, ASSISTANT FRANKLIN COUNTY PROSECUTING ATTORNEYS, ON BEHALF OF THE PLAINTIFF, STATE OF OHIO.

      MR. MYRON SHWARTZ AND MS. ALISSA HOLFINGER, ON BEHALF OF THE DEFENDANT.

- - -

R. HORTON 001768

2

INDEX TO WITNESSES

PLAINTIFF'S: (MOTION TO SUPPRESS)                        PAGE

BRENDA WALKER

DIRECT EXAMINATION BY MR. STEAD.................12

CROSS-EXAMINATION BY MR. SHWARTZ.................21

                              - - -

RICHARD MCCLANAHAN

DIRECT EXAMINATION BY MR. STEAD.................43

CROSS-EXAMINATION BY MR. SHWARTZ.................67

                              - - -

RHONDA CURRY

DIRECT EXAMINATION BY MR. SMITH.................79

CROSS-EXAMINATION BY MR. SHWARTZ.................97/104

                              - - -

PAMELA RHODEBACK

DIRECT EXAMINATION BY MR. SMITH.................107

                              - - -

BRENDA WALKER

DIRECT EXAMINATION MR. STEAD.....................112

CROSS-EXAMINATION BY MR. SHWARTZ.................132/150

REDIRECT EXAMINATION BY MR. STEAD...............146

                              - - -

DEFENDANT'S:

JENNETTE HARMON-HORTON

DIRECT EXAMINATION BY MS. HOLFINGER..............163

R. HORTON 001769

3

CROSS-EXAMINATION BY MR. STEAD....................170

- - -

RICHARD HORTON

DIRECT EXAMINATION BY MS. HOLFINGER...............176

CROSS-EXAMINATION BY MR. STEAD....................202

REDIRECT EXAMINATION BY MS. HOLFINGER.............215

- - -

INDEX TO EXHIBITS

- - -

| PLAINTIFF'S: (MOTION) | IDENTIFIED | ADMITTED |
|---|---|---|
| 1: PHOTO ARRAY | 15 | 34 |
| 1-A: CPD PHOTO ARRAY PROCEDURE FORM | 17 | 34 |
| 2: PHOTO ARRAY | 15 | 34 |
| 2-A: CPD PHOTO ARRAY PROCEDURE FORM | 17 | 34 |

- - -

| | IDENTIFIED | ADMITTED |
|---|---|---|
| 1: PHOTO ARRAY | 62 | 156 |
| 1-A: CPD PROCEDURE FORM | 126 | 156 |
| 2: PHOTO ARRAY | 92 | 156 |
| 2-A: CPD PROCEDURE FORM | 131 | 156 |
| 3: JOURNAL ENTRY | 222 | 222 |
| 4: PHONE NUMBER ON PAPER | 65 | 156 |

- - -

| DEFENDANTS: | IDENTIFIED | ADMITTED |
|---|---|---|
| A: TELOHIO CREDIT UNION DOCUMENT | 188 | 222 |
| C: SAPP ENTERPRISES DOCUMENT | 182 | 222 |

R. HORTON 001770

4

MONDAY MORNING SESSION,

JANUARY 30, 2006.

- - -

THE COURT:  THIS IS STATE OF OHIO VERSUS RICHARD HORTON, CASE NUMBER 05CR-146.

ON THE RECORD BEFORE WE BRING THE JURY IN.

MR. STEAD:  DO YOU HAVE A JURY WAIVER FORM?

THE COURT:  WE NEED ONE FOR ONE OF THE COUNTS.

RICHARD HORTON, IS THAT YOU?

THE DEFENDANT:  YES, SIR.

THE COURT:  YOU'RE HERE TODAY WITH MR. SHWARTZ AND MISS HOLFINGER FOR TRIAL.

I HAVE BEEN SUPPLIED WITH A LIST OF PROSPECTIVE WITNESSES.  PRIOR TO GOING ON THE RECORD, WE DID DISCUSS EXHIBITS.

FIRST OF ALL, LET ME ASK BOTH SIDES, IS THERE ANY ADDITIONS OR DELETIONS FROM THE PROSPECTIVE LIST OF WITNESSES?

MR. STEAD:  NOT AT THIS POINT.

THE COURT:  MR. SHWARTZ?

MR. SHWARTZ:  NO.

THE COURT:  OKAY.

MR. STEAD:  IT IS COUNT 11 FOR THE WAIVER.

THE COURT:  WE HAVE DISCUSSED EXHIBITS.  THE

5

PROSECUTION WILL HAVE THEIRS MARKED --

MR. SHWARTZ, DO YOU HAVE ANY OBJECTIONS, OR HAVE YOU REVIEWED THEIR EXHIBITS AT THIS POINT IN TIME?

MR. SHWARTZ:  NO.

THE COURT:  HAVE YOU SEEN THEIR POTENTIAL EXHIBITS?

MR. SHWARTZ:  YES.

THE COURT:  ARE YOU GOING TO HAVE ANY OBJECTIONS TO THOSE?

MR. SHWARTZ:  NO.

THE COURT:  ALL RIGHT.  SO AT THIS POINT IN TIME THERE IS NO OBJECTION TO THEIR EXHIBITS.

YOU HAVE A COUPLE OF EXHIBITS, DO YOU NOT, MR. SHWARTZ?

MR. SHWARTZ:  YES.

THE COURT:  HAVE YOU SEEN THOSE, I THINK THEY ARE WORK RECORDS OR SOMETHING LIKE THAT, MR. STEAD?

MR. STEAD:  I HAVE.

THE COURT:  ANY OBJECTIONS TO THOSE IF THEY ARE PROPERLY IDENTIFIED BY THE DEFENDANT OR SOME OTHER PARTY?

MR. STEAD:  THE ONLY ISSUE WILL BE RELEVANCE.  BUT AS TO FOUNDATION, NO.

THE COURT:  NO OBJECTION AS TO FOUNDATION.

OKAY.  ANY OTHER EXHIBITS THAT WE ARE AWARE

R. HORTON 001772

6

OF AT THIS POINT THIS TIME?  NONE.

OKAY.  ANY MOTIONS IN LIMINE OR EVIDENTIARY ISSUES TO DISCUSS BEFORE WE BEGIN BY THE STATE?

MR. STEAD:  NO, THANK YOU.

THE COURT:  DEFENSE?

MR. SHWARTZ:  I BELIEVE WE HAVE A MOTION TO SUPPRESS.

THE COURT:  VERY WELL.  A MOTION TO SUPPRESS.  WHAT WE ARE GOING TO DO, WE ARE GOING TO GET OUR JURY, GO THROUGH VOIR DIRE, AND I WILL NOT SWEAR THE JURY, AND THEN WE WILL DO THE MOTION TO SUPPRESS, WHICH I THINK IS A PHOTO ARRAY; IS THAT CORRECT?

MR. STEAD:  YES.

THE COURT:  WE'LL DO THAT FIRST THING THIS AFTERNOON.

ALL RIGHT.  WE WILL HAVE A JURY WAIVED ON THE ISSUE OF THE WEAPON UNDER DISABILITY; IS THAT CORRECT?

MR. SHWARTZ:  YES, YOUR HONOR.

THE COURT:  YOU'RE FILLING THAT OUT NOW, ALISSA?

MS. HOLFINGER:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU ALL GOT COPIES OF THE QUESTIONNAIRES?

MR. STEAD:  YES.

R. HORTON 001773

7

MR. SHWARTZ: YES.

MS. HOLFINGER: MAY I APPROACH?

THE COURT: OF COURSE.

ALL RIGHT. MR. HORTON, I HAVE IN FRONT OF ME WHAT APPEARS TO BE A WAIVER. SIT DOWN. A WAIVER OF JURY TRIAL AS TO COUNT 11, WHICH IS A CHARGE OF HAVING A WEAPON UNDER DISABILITY. THAT CHARGE, YOU KNOW, INVOLVES PROVING THAT YOU HAD A PRIOR CONVICTION. AND SOIN THESE CASES IT'S FAIRLY NORMAL FOR COUNSEL AND CLIENTS TO WAIVE THAT ISSUE IN FRONT OF A JURY AND HAVE IT TRIED TO THE JUDGE. SO THE ISSUE OF THE PRIOR CONVICTION, AT LEAST AS IT IS RELEVANT TO THIS COUNT, DOES NOT COME INTO EVIDENCE IN FRONT OF THE JURY.

OKAY. I PRESUME THAT YOUR LAWYERS HAVE EXPLAINED THAT TO YOU?

THE DEFENDANT: YES, SIR.

THE COURT: ALL RIGHT. NOW, AS YOU UNDERSTAND, ON THAT COUNT, HOWEVER, YOU HAVE A PERFECT RIGHT TO HAVE A JURY RESOLVE THAT MATTER, DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES, SIR.

THE COURT: IN THAT CASE THERE WILL BE 12 PEOPLE SITTING UP HERE. THE STATE HAS TO PROVE EACH AND EVERY ELEMENT OF THAT CHARGE AGAINST YOU BEYOND A REASONABLE DOUBT BEFORE THAT JURY COULD CONVICT YOU.

8

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES, SIR.

THE COURT: NOW, TO CONVICT YOU, ALL 12 WOULD HAVE TO AGREE; THAT MEANS ALL 12 OF THEM HAVE TO REACH THE SAME CONCLUSION EITHER TO CONVICT OR ACQUIT.

DO YOU UNDERSTAND THAT?

THE DEFENDANT: YES, SIR.

THE COURT: NOW, IF YOU WAIVE A JURY AND THEN I DO THAT, I AM ONE, NOT 12. SO ALL THEY HAVE TO DO IS CONVINCE ME. AND IF THEY DON'T, THEN YOU ARE NOT GUILTY. BUT IT IS ONLY ONE PERSON AS OPPOSED TO 12. OKAY. SOME PEOPLE THINK YOU GET A BETTER SHOT IF YOU HAVE 12 PEOPLE MAKING A DECISION THAN ONE. THAT IS UP TO YOU.

DO YOU UNDERSTAND THAT DIFFERENCE?

THE DEFENDANT: YES, I DO.

THE COURT: ALL RIGHT. NOW, HAS ANYBODY FORCED YOU TO SIGN THIS FORM?

THE DEFENDANT: NO, THEY HAVE NOT.

THE COURT: YOU'RE DOING THIS OF YOUR OWN FREE WILL?

THE DEFENDANT: YES, SIR.

THE COURT: YOU BELIEVE THAT WAIVING A JURY AS TO THIS COUNT IS IN YOUR BEST INTEREST, I TAKE IT?

IN OTHER WORDS --

R. HORTON 001775

9

THE DEFENDANT: YES, SIR.

THE COURT: ALL RIGHT. SO YOU THINK THIS IS THE BEST THING FOR YOU, RIGHT?

THE DEFENDANT: YES, SIR, FOR COUNT NUMBER 11, YES.

THE COURT: ALL RIGHT. NOW, IS THERE ANY OTHER QUESTIONS THAT YOU HAVE CONCERNING THIS MATTER?

THE DEFENDANT: NO, SIR.

THE COURT: YOU HAVE CONSULTED WITH YOUR COUNSEL, CORRECT?

THE DEFENDANT: YES, SIR.

THE COURT: ALL RIGHT. I FIND THIS KNOWING, VOLUNTARILY, UNDERSTANDING AND INTELLIGENTLY WAIVED. I WILL APPROVE THE WAIVER OF JURY AS TO COUNT 12 -- COUNT 11. YOU WANT TO FILE THAT. I THINK IT HAS TO BE DONE BEFORE WE START.

ANY OTHER MATTERS TO BE DISCUSSED PRIOR TO BRINGING THE JURY?

MR. STEAD: NO.

MR. SHWARTZ: NO.

THE COURT: VERY WELL. WE ARE READY TO GO.

- - -

THEREUPON, VOIR DIRE WAS CONDUCTED ON BEHALF OF THE PLAINTIFF, STATE OF OHIO.

- - -

R. HORTON 001776

10

THE COURT: I'M GOING TO RELEASE YOU FOR THE LUNCH BREAK NOW, I HAVE SOME OTHER MATTERS TO TAKE CARE OF. SO DON'T DISCUSS THE CASE OR FORM ANY OPINIONS ABOUT IT. I WOULD LIKE YOU BACK AT 2:15.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS ADJOURNED UNTIL 1:30 O'CLOCK, P.M., OF THE SAME DAY, TO WIT: JANUARY 30, 2006.

- - -

MONDAY AFTERNOON SESSION,

JANUARY 30, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE PROSPECTIVE JURORS AS FOLLOWS:

THE COURT:  BACK ON THE RECORD IN STATE OF OHIO VERSUS HORTON PRIOR TO THE JURY COMING IN.

I TAKE IT THE BASIS OF YOUR MOTION IS THAT THIS WAS UNDULY SUGGESTIVE; IS THAT CORRECT?

MR. SHWARTZ:  YES.

THE COURT:  VERY WELL.

PROSECUTION READY TO PROCEED?

MR. STEAD:  WE ARE.  THE DETECTIVE IS ON HER WAY IN.

THE COURT:  VERY WELL.

(WITNESS IS SWORN.)

THE COURT:  GIVE US YOUR NAME AND OCCUPATION.

THE WITNESS:  BRENDA WALKER, COLUMBUS POLICE ROBBERY DETECTIVE.

THE COURT:  VERY WELL.  MR. STEAD.

R. HORTON 001778

12

MR. STEAD: THANK YOU.

- - -

BRENDA WALKER

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, STATE OF OHIO, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. STEAD:

Q. HOW LONG HAVE YOU BEEN A ROBBERY DETECTIVE?

A. ALMOST 12 YEARS.

Q. AND IN THE COURSE OF YOUR 12 YEARS IN ROBBERY, HAVE YOU HAD OCCASION TO USE PHOTO ARRAYS TO OBTAIN IDENTIFICATIONS OF POTENTIAL SUSPECTS?

A. YES.

Q. I WANT TO TURN YOUR ATTENTION BACK TO OCTOBER 9TH, 2004. DID YOU BECOME INVOLVED IN THE INVESTIGATION OF THE CASE IN WHICH RICHARD MCCLANAHAN AND RHONDA CURRY'S RESIDENCE AT 927 LOEW STREET WAS INVADED?

A. YES.

Q. AND, IN FACT, DURING THE COURSE OF THAT INVESTIGATION, DID YOU HAVE OCCASION TO TALK TO THOSE TWO INDIVIDUALS?

A. YES.

Q. DID THEY INDICATE TO YOU WHETHER OR NOT THEY KNEW THE PERSON WHO HAD DONE THIS CRIME?

A. YES.

13

Q.      ONE OR BOTH?

A.      CORRECT.  WELL, THE DAY ACTUALLY OF THE ROBBERY, I DIDN'T SPEAK TO THE GENTLEMAN BECAUSE HE WAS ALREADY AT THE HOSPITAL HAVING TREATMENT.  I TALKED TO THE FEMALE, AND SHE SAID SHE RECOGNIZED -- SHE THOUGHT HE LOOKED FAMILIAR, BUT THAT HE HAD TOLD HER THAT HE KNEW WHO HE WAS BUT COULDN'T REMEMBER WHO IT WAS.

Q.      OKAY.  AT SOME POINT DID YOU, IN FACT, TALK TO THE MALE VICTIM, MR. MCCLANAHAN?

A.      YES.

Q.      DID HE, IN FACT, PROVIDE INFORMATION WITH RESPECT TO WHO THE SUSPECT WAS?

A.      YES.  ORIGINALLY, THE VICTIM, I SPOKE TO HIM, HE HAD REMEMBERED THE NAME OF RICHARD BUT HE WAS NOT CERTAIN OF HIS LAST NAME BUT STATED HE WOULD BE ABLE TO OBTAIN IT.

Q.      HOW WAS HE GOING TO OBTAIN THAT?

A.      APPARENTLY THROUGH HIS NIECE.  HE HAD -- THE NIECE HAD SOLD A CAR TO A PERSON BY THE NAME OF RICHARD THAT NEEDED SOME BRAKE WORK DONE, AND HE HAD DONE THE BRAKE WORK.  AND THEN THE PERSON THAT BOUGHT THE CAR, RICHARD, PICKED IT UP AT HIS RESIDENCE.

Q.      OKAY.  THAT WAS HOW HE HAD KNOWN RICHARD AT LEAST INITIALLY?

A.      CORRECT, THAT IS WHAT HE TOLD ME.

R. HORTON 001780

14

Q.        DID YOU ASK HIM IF HE WOULD BE ABLE TO GET A LAST NAME FOR YOU?

A.        YES.

Q.        AND, ULTIMATELY, WAS HE ABLE TO GET A LAST NAME FOR YOU?

A.        YES.

Q.        SPECIFICALLY, ON OCTOBER 23RD OF THAT YEAR, DID HE CALL YOU AND PROVIDE YOU WITH A LAST NAME OF HORTON TO GO WITH RICHARD?

A.        YES.

Q.        HAVING OBTAINED THAT INFORMATION, DID YOU ATTEMPT TO PREPARE A PHOTO ARRAY THAT CONTAINED THE PHOTOGRAPH OF RICHARD HORTON?

A.        YES.  I SEARCHED THE POLICE DEPARTMENT'S COMPUTER SYSTEM AND OBTAINED A PERSON BY THE NAME OF RICHARD HORTON IN THE COMPUTER SYSTEM.  I DID PREPARE A PHOTO ARRAY.

Q.        OKAY.  HAVE YOU PREPARED PHOTO ARRAYS IN THE PAST?

A.        OH, YES.

Q.        WOULD YOU DESCRIBE BRIEFLY THE PROCESS THAT YOU FOLLOW IN PREPARING A PHOTO ARRAY.

A.        IT'S ALL DONE BY COMPUTER.  WHAT WE DO IS WE PULL UP THE PERSON'S PICTURE, AND WE PUT IN DESCRIPTORS, LIKE MALE BLACK, APPROXIMATE AGE, SHORT HAIR, LONG HAIR,

R. HORTON 001781

15

FACIAL HAIR, AND THEN YOU ENTER THE DISCRIPTORS AND THE COMPUTER RANDOMLY SELECTS FROM ALL THE OTHER PHOTOGRAPHS WITHIN PHOTOS, AND THEN YOU CHOOSE FROM THOSE PHOTOS.

Q.     ARE YOU LOOKING FOR PHOTOS OF INDIVIDUALS WITH SIMILAR CHARACTERISTICS?

A.     CORRECT.

Q.     WHY?

A.     TO MAKE IT A MORE FAIR PHOTO ARRAY, I GUESS. YOU DON'T WANT TO PUT FIVE WOMEN IN WITH ONE MAN.

Q.     OKAY.  DID YOU, IN FACT, PREPARE A PHOTO ARRAY OF RICHARD HORTON FOR THIS CASE?

A.     YES, I DID.

Q.     I'M SHOWING YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT 1 AND 2.

CAN YOU IDENTIFY THOSE FOR ME, PLEASE?

A.     YES.  THEY ARE COPIES OF THE PHOTO ARRAY.

Q.     IN FACT, ARE THEY THE SAME PHOTO ARRAY?

A.     YES, THEY ARE.

Q.     ONE WAS SHOWN TO ONE, AND ONE THAT WAS SHOWN TO THE OTHER?

A.     CORRECT.

Q.     DID YOU REVIEW THOSE PHOTO ARRAYS PRIOR TO PRESENTING THEM?

A.     YES.

Q.     AND DID THEY SATISFY YOU WITH RESPECT TO THE

R. HORTON 001782

16

SIMILAR CHARACTERISTICS TO THE PEOPLE IN ADDITION TO THE SUSPECT IN THIS ARRAY?

A.      YES.

Q.      AND WHAT POSITION WAS THE SUSPECT, MR. HORTON?

A.      POSITION NUMBER 5.

Q.      WHO DECIDES WHAT POSITION TO PUT THE SUSPECTS'S PHOTO?

A.      THE COMPUTER DOES.

Q.      SO IT IS RANDOM AS WELL?

A.      YES.

Q.      OKAY.  HAVING PREPARED THOSE PHOTO ARRAYS, DID YOU HAVE OCCASION ON DECEMBER 4TH OF 2004, TO SHOW THOSE PHOTO ARRAYS TO ONE OR BOTH WITNESSES IN THIS CASE?

A.      YES, I DID.

Q.      DO YOU RECALL WHERE YOU WERE WHEN YOU SHOWED THE PHOTOS?

A.      THE EXACT ADDRESS, I DON'T RECALL.  BUT IT WAS AT ONE OF THE TWO VICTIMS DAUGHTER'S RESIDENCES, I BELIEVE.

Q.      OKAY.  WERE BOTH VICTIMS THERE AT THAT TIME?

A.      THEY WERE BOTH AT THE RESIDENCE.

Q.      OKAY.  DID YOU SHOW THE ARRAYS TO THEM TOGETHER OR SEPARATE?

R. HORTON 001783

17

A.      NO, I DID NOT.  THEY WERE INDEPENDENT AND SEPARATE FROM EACH OTHER.  THEY DID NOT -- THEY WEREN'T IN THE ROOM, THEY WEREN'T ANYWHERE AROUND WHEN I SHOWED THE PHOTO ARRAYS TO EACH OF THEM.

Q.      WAS THIS TO DETERMINE THAT THE IDENTIFICATIONS, IF ANY WERE MADE, WOULD BE MADE INDEPENDENTLY?

A.      CORRECT.

Q.      AND YOU DO RECALL, IN FACT, SEPARATING THESE PEOPLE?

A.      OH, YEAH.

Q.      SO THAT THE SECOND PERSON DIDN'T HAVE A CHANCE TO SEE WHAT PHOTO THE FIRST PERSON PICKED OUT?

A.      NO.

Q.      OKAY.  DO YOU RECALL WHO YOU SHOWED THE ARRAY TO FIRST?

A.      RIGHT OFF THE TOP OF MY HEAD, NO.  BUT RICHARD BY THE TIME ON THE PHOTO ARRAY.

Q.      I'LL SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT 1-A AND 2-A.

CAN YOU IDENTIFY THOSE DOCUMENTS?

A.      THEY ARE THE COLUMBUS POLICE DEPARTMENT'S INVESTIGATIVE PHOTO ARRAY PROCEDURE FORMS.

Q.      ARE THOSE THE FORMS YOUR DEPARTMENT USES ON A REGULAR BASIS WITH RESPECT TO THE PRESENTATION OF PHOTO

R. HORTON 001784

18

ARRAYS?

A.        YES, THEY ARE.

Q.        AND, IN FACT, DID YOU FILL THESE DOCUMENTS OUT WHEN YOU PREPARED THESE ARRAYS TO THE TWO WITNESSES BACK ON DECEMBER 4TH?

A.        YES, I DID.

Q.        FROM REVIEWING THE PHOTO ARRAYS, AND THOSE DOCUMENTS, CAN YOU TELL ME WHO YOU FIRST SHOWED THE PHOTOGRAPHS TO?

A.        RICHARD.

Q.        DO YOU HAVE A PROCEDURE THAT YOU FOLLOW WHEN YOU PRESENT A PHOTO ARRAY?

A.        YES.

Q.        WHAT IS THAT PROCEDURE, PLEASE?

A.        WELL, BEFORE WE EVEN SHOW THEM THE PHOTOS, WE GO OVER THIS FORM WITH THEM.  AND YOU BASICALLY TELL THEM THAT THE PHOTO ARRAY -- READ IT TO THEM.  BUT IT SAYS THAT CONSISTS OF SIX PHOTOGRAPHS, NO PARTICULAR ORDER OF IMPORTANCE.  THE PERSON OF THE INVESTIGATION MAY OR MAY NOT BE INCLUDED IN THE PHOTOGRAPHS.  BUT LOOK CAREFULLY AT THE PHOTOGRAPHS, ALL SIX PEOPLE, THEN ADVISE WHETHER OR NOT THEY RECOGNIZE ANYONE.  AND THEY ARE NOT REQUIRED TO SELECT ANYONE.

Q.        DID YOU GO OVER THOSE INSTRUCTIONS WITH BOTH WITNESSES THAT DAY?

R. HORTON 001785

A.      YES.

Q.      AND, IN FACT, THEN DID YOU THEN ULTIMATELY PRESENT THE PHOTO ARRAY TO A MR. MCCLANAHAN?

A.      YES.  CORRECT.

Q.      CAN YOU TELL US WHAT HAPPENED WHEN YOU PRESENTED THAT ARRAY TO HIM?

A.      WELL, I MYSELF PERSONALLY WRITE DOWN EXACTLY WHAT THEY SAY, AND WHAT THEIR ACTIONS ARE, AND HE IMMEDIATELY POINTED TO NUMBER 5, THE RICHARD HORTON PHOTOGRAPH, AND HE SAID RIGHT HERE.  AND I ASKED HIM THEN TO DESCRIBE HIS LEVEL OF CERTAINTY, AND HE SAYS THE VOICE, THE SAME EYEBROWS, WEARING THE SAME PANTS FROM THE NIGHT BEFORE.  HE STARTED TO GO INTO WHY, YOU KNOW, HE FELT IT WAS HIM.  BUT HE SAYS THAT HE WAS A HUNDRED PERCENT CERTAIN THAT WAS HIM.

Q.      IN HIS DISCUSSION WITH YOU EARLIER CONCERNING THE EVENTS OF THIS CASE, HAD HE MENTIONED TO YOU HAVING CONTACT WITH MR. HORTON THE NIGHT BEFORE THE HOME INVASION?

A.      CORRECT.

Q.      IS THAT WHAT YOU ARE REFERRING TO WITH RESPECT TO THE CLOTHING?

A.      RIGHT.  BECAUSE HE JUST -- HE POINTED TO IT. I SAID DESCRIBE YOUR LEVEL OF CERTAINTY.  HE SAID THAT HE REMEMBERED THE VOICE FROM THE NIGHT BEFORE.  HE

R. HORTON 001786

20

REMEMBERED THE SAME EYEBROWS FROM THE NIGHT BEFORE. THE SAME -- HE SAID HE STILL HAD THE SAME CLOTHES ON. HE WAS A HUNDRED PERCENT CERTAIN THAT WAS HIM.

Q.      DID YOU DO ANYTHING TO SUGGEST TO OR INFLUENCE HIS IDENTIFICATION OF PHOTO NUMBER 5 AS THE INDIVIDUAL?

A.      NO.

Q.      TO YOUR KNOWLEDGE, WAS HIS IDENTIFICATION SOLELY AND EXCLUSIVELY THE RESULT OF HIS INDEPENDENT RECOLLECTION?

A.      ABSOLUTELY, YES.

Q.      DID YOU HAVE HIM SIGN AND DATE THE PHOTO ARRAY AND THE PHOTO THAT HE PICKED OUT?

A.      YES, I DID.

Q.      OKAY.  DID YOU FOLLOW THE SAME PROCEDURE WITH MISS CURRY?

A.      YES, I DID.

Q.      AND DID YOU, IN FACT, GO THROUGH THOSE SAME INSTRUCTIONS?

A.      CORRECT.

Q.      AND DID YOU ULTIMATELY SHOW HER THE PHOTO ARRAY?

A.      YES, I DID.

Q.      WHAT WAS THE RESULT WHEN YOU SHOWED HER THE PHOTO ARRAY?

R. HORTON 001787

A.      SHE POINTED TO PHOTO NUMBER 5 AND SAID THAT IS HIM.  AND THEN I ASKED HER TO DESCRIBE HER LEVEL OF CERTAINTY, SHE SAYS I SWEAR ON EVERYTHING THAT I LOVE. HE IS THE ONE.  I RECOGNIZE THE EYES.  I KNOW THOSE EYES, IT IS HIM.

Q.      DID YOU DO ANYTHING TO SUGGEST OR INFLUENCE HER IDENTIFICATION?

A.      NO.

Q.      TO YOUR KNOWLEDGE, WAS HER IDENTIFICATION OF PHOTOGRAPH NUMBER 5 SOLELY AND EXCLUSIVELY A RESULT OF HER INDEPENDENT RECOLLECTION?

A.      YES.

Q.      HAD YOU ALLOWED ANY COMMUNICATION BETWEEN THE TWO WITNESSES DURING THE VIEWING OF THESE PHOTO ARRAYS?

A.      NO.

Q.      SO THAT MISS CURRY DID NOT KNOW THE RESULTS OF MR. MCCLANAHAN'S ARRAY?

A.      NO.

MR. STEAD:  THANK YOU.

THE COURT:  MR. SHWARTZ.

- - -

CROSS-EXAMINATION

BY MR. SHWARTZ:

Q.      GOOD AFTERNOON.  WHAT WAS THE DATE OF THE INCIDENT?

22

A.      THE INCIDENT OF THE ACTUAL HOME INVASION?

Q.      YES.

A.      OCTOBER.  I WILL TELL YOU IN JUST A SECOND HERE.  OCTOBER 8TH OR 9TH.  9TH, 7:50 A.M.

Q.      AND WHAT IS THE DATE OF THIS SO-CALLED SHOWING?

A.      IT WAS DECEMBER 4TH.

Q.      WAS THERE ANY REASON FOR ALMOST TWO-MONTH DELAY?

A.      WELL, NUMBER ONE, WE DIDN'T HAVE THE DEFENDANT'S LAST NAME.  ALL WE HAD WAS RICHARD.  SO THE VICTIM WAS IN AND OUT OF THE HOSPITAL.  HE HAD SEVERAL DIFFERENT SURGERIES BECAUSE OF THE GUNSHOT.  BUT JUST NORMAL.  I MEAN, THAT IS WHY, COMMUNICATION, HEALING.

Q.      WHEN WAS THE FIRST TIME HE GAVE YOU THE NAME?

A.      I BELIEVE IT WAS IN OCTOBER AS WELL.

Q.      WHAT NAME DID HE GIVE YOU THEN?

A.      RICHARD.  FIRST TIME WAS RICHARD, JUST RICHARD.  HE CALLED ME BACK AND GAVE ME RICHARD HORTON.

Q.      THAT WAS TWO MONTHS LATER?

A.      NO.  IT WAS LATER IN OCTOBER.  LIKE THE INCIDENT HAPPENED OCTOBER 9TH.

Q.      HE GAVE YOU RICHARD HORTON'S NAME IN OCTOBER?

A.      LIKE THE END OF OCTOBER.

Q.      YOU DIDN'T HAVE A LINEUP UNTIL DECEMBER?

A.      WELL, NO.  THERE WAS SOME OTHER REASONS.  I SUBMITTED SOME PRINTS THAT WERE RECOVERED AT THE SCENE TO HAVE COMPARED TO OUR I.D. BUREAU.  HE WAS IN AND OUT OF THE HOSPITAL.  HE HAD LEFT WHERE THEY WERE STAYING AND WENT TO ONE OF THEIR DAUGHTER'S HOUSE.  AND SO THERE FOR A WHILE, I REALLY WASN'T SURE WHERE HE WAS EVEN AT, BUT JUST TIME.

Q.      NOW, YOU TOLD -- STATED SOME INFORMATION YOU GOT FROM HIM ABOUT HOW HE IDENTIFIED MY CLIENT?

A.      HOW HE REMEMBERED HIM FROM THE NIGHT BEFORE.

Q.      TELL US ABOUT THAT EVENING.

A.      THE NIGHT BEFORE?  YOU WANT ME TO TELL YOU ABOUT THE NIGHT BEFORE?

Q.      WHATEVER HE TOLD YOU.

A.      HE STATED THAT HE HAD RAN INTO RICHARD AT A CONVENIENCE STORE.

Q.      THE NIGHT BEFORE?

A.      THE NIGHT BEFORE THE INCIDENT OCCURRED.

Q.      WHAT STORE WAS THAT?

A.      THE ACTUAL NAME I DON'T RECALL.  IT WAS JUST A NEIGHBORHOOD CONVENIENCE STORE AT THE CORNER OF JOYCE AND -- I THINK IT WAS JOYCE, I HAVE TO LOOK.  IT WAS ON FOURTH -- HERE IT IS.  A CONVENIENCE STORE LOCATED AT FIFTH AND ST. CLAIR.

24

Q. DID YOU EVER GO TO THAT STORE?

A. YEAH, I WENT TO THE STORE AND LOOKED AT THE LOT, CORRECT, TO SEE WHERE THE PAY PHONE WAS THAT HE WAS USING.

Q. DOES IT HAVE LIGHTING AND SO FORTH?

A. NO, JUST TO SEE IF THEY -- AND I WENT IN AND ASKED IF THEY HAD ANY SURVEILLANCE ON THE PARKING LOT, THEY DID NOT.

Q. NO SURVEILLANCE?

A. NO, NOT ON THE PARKING LOT.

Q. DID YOU TALK ABOUT THE CASE AT ALL WITH HIM?

A. NO. I TOLD HIM THERE WAS AN INCIDENT THAT OCCURRED THAT I WANTED TO KNOW IF THEY HAD SURVEILLANCE ON THE PARKING LOTS.

Q. HE SUPPOSEDLY MET HIM ON THE PARKING LOT. WHAT DID THEY TELL YOU ABOUT THAT? WHERE DID HE CLAIM HE SAW --

A. HE STATED THAT HE WAS USING THE PAY PHONE ON THE PARKING LOT AND THAT HE RAN INTO, YOU KNOW, AS HE IS ON THE PHONE, MR. HORTON CAME, THEY EXCHANGED GREETINGS, HEY, WHAT IS HAPPENING.

Q. DID HE TELL YOU WHAT THE EXCHANGE WAS ABOUT?

A. THAT MY VICTIM WAS GETTING CHANGE OUT OF HIS POCKET TO USE THE PAY PHONE, WHEN HE WENT TO GET CHANGE OUT OF HIS POCKET HE HAD TO TAKE HIS BILLS OUT OF HIS

25

POCKET, BECAUSE HE'D JUST GOTTEN PAID, TO GET TO THE CHANGE PART. AND WHEN THERE WAS AN EXCHANGE OF WHEN RICHARD SEEN MY VICTIM'S MONEY, HE SAID, HEY, THAT IS A LOT, MAN, LEND ME $20. HE SAID, NO, MAN, I CAN'T. I HAVE TO PAY MY BILLS. HE SAID, YOU WON'T LEND ME $20? HE SAID, NO. I HAVE TO PAY MY BILLS.

Q.      THAT WAS THE TOTAL CONVERSATION?

A.      NO. THERE WAS CONVERSATION ABOUT THE PAY PHONE, LETTING HIM USE THE PAY PHONE. MY VICTIM SAYS I AM TRYING GET A HOLD OF THE ELECTRIC COMPANY BEFORE THEY CLOSE. I HAVE TO PAY MY BILL. AND THEN, YEAH, BUT THAT WAS --

Q.      THERE WAS AN ARGUMENT, WASN'T THERE?

A.      AN EXCHANGE OF WORDS.

Q.      YOU TALKED ABOUT CLOTHES. WHAT CLOTHES DID HE DESCRIBE?

A.      FROM THE NIGHT BEFORE, I HAVE TO GO IN AND LOOK. BUT WHEN HE WAS JUST -- WHAT I WAS REFERRING TO WAS WHEN HE LOOKED AT THE PHOTO ARRAY, HE WAS POINTING TO HIM IDENTIFYING HIM, HE WENT INTO HIS THOUGHTS FROM THE NIGHT PRIOR TO THE ROBBERY, MEANING HE WAS STILL WEARING THE SAME CLOTHES THE NEXT MORNING, FROM THE NEXT MORNING -- FROM THE NIGHT BEFORE DURING THE ROBBERY.

Q.      DID HE DESCRIBE THOSE CLOTHES TO YOU?

A.      YES, PROBABLY. I'M SURE HE DID. DID HE

26

DESCRIBE THEM TO ME RIGHT THEN WHEN HE WAS LOOKING AT THE PHOTO ARRAY, NO.

Q. WHEN?

A. WHEN I INTERVIEWED HIM OVER THE INCIDENT SEVERAL DIFFERENT TIMES. HERE IT IS. HE WORE A GRAY HOODED SWEAT SHIRT WITH HOOD TIED UP TIGHTLY AROUND HIS FACE.

Q. WHAT OTHER CLOTHING DID HE SAY?

A. THAT IS ALL IT SAYS. THAT IS --

Q. GRAY HOOD?

A. THAT WAS RICHARD MCCLANAHAN.

Q. HE SAID THE MAN WHO ROBBED ME WORE A GRAY HOODED?

A. RIGHT, THE DAY THAT I INTERVIEWED HIM ABOUT SEQUENCE OF EVENTS. HE DESCRIBED THE SUSPECT AS MALE, LIGHT-SKINNED, SIX FOOT TALL WITH BUSHY EYEBROWS, SHORT HAIR. DURING THE ROBBERY THE SUSPECT WORE A GRAY HOODED SWEAT SHIRT WITH A HOOD UP AND TIED TIGHTLY.

Q. MA'AM, YOU HAVE BEEN ON THE FORCE FOR 12 YEARS?

A. NO, I HAVE BEEN IN ROBBERY 12 YEARS, ON THE FORCE 20.

Q. TWENTY. I DON'T GET TO COURT VERY MUCH ANYMORE, SO I DON'T SEE PEOPLE.

AS I UNDERSTAND IT, WHEN YOU GO TO A

27

COMPUTER, YOU'RE TRYING TO GET SOMETHING THAT LOOKS LIKE A LINEUP OF INDIVIDUALS OF THE PERSON, DON'T YOU? ISN'T THAT THE IDEA? THEY DON'T HAVE A LINEUP LIKE THEY USED TO 20 YEARS AGO, BRING IN SIX PEOPLE?

A. NO, WE DON'T DO THAT ANYMORE. THEY USED TO STAND POLICEMEN UP, FROM WHAT I'M TOLD, WITH THE SUSPECT.

Q. PARDON?

A. THEY USED TO STAND POLICEMEN UP WITH THE SUSPECTS, FROM WHAT I HAVE BEEN TOLD, THAT WAS WAY BEFORE MY TIME. I'M NOT THAT OLD.

Q. WELL, I AM. IN YOUR TRAINING, WHEN YOU GO TO THIS COMPUTER AND GET THESE PICTURES, DO YOU MAKE AN ATTEMPT TO GET PICTURES THAT ARE SIMILAR TO ONE ANOTHER?

A. UH-HUH.

Q. HOW SIMILAR ARE THE FIVE PEOPLE ON THAT PICTURE TO MR. HORTON?

A. THEY ARE ALL MALE BLACK. THEY ALL HAVE SHORT HAIR. YOU KNOW, THEY HAVE --

Q. ONE OF THEM APPEARS TO BE MUCH LIGHTER THAN THE OTHER, WOULDN'T THAT BE SUGGESTIVE?

A. YOU KNOW, THAT IS THE BLACK AND WHITE PHOTOGRAPHS. WE HAVE NO CONTROL OVER THE QUALITY OF THE PHOTOGRAPH.

Q. WHAT DO YOU MEAN YOU DON'T HAVE CONTROL OVER

R. HORTON 001794

28

IT?  DON'T YOU HAVE OTHER PHOTOGRAPHS SIMILAR TO THESE?  THESE AREN'T SIMILAR.  WOULD YOU CALL THEM SIMILAR, ARE THEY, COLOR OF THE SKIN?

A.      I WOULD SAY THAT THEY ARE, YEAH, I WOULD SAY THEY ARE PRETTY SIMILAR.

Q.      YOU DON'T THINK MR. HORTON IS A LOT LIGHTER THAN --

A.      I THINK THAT PHOTO, THERE IS SOME LIGHTS SHINING ON HIS FACE.

Q.      LOOK, WHY DIDN'T YOU LOOK FOR OTHER PICTURES THAT WERE SHINING LIGHTS ON THEM?

ACTUALLY, YOU SHOWED A PHOTO HERE WHICH WAS A LINE UP.  WE HAVE SIX PEOPLE BEING SHOWN.  FIVE OF THEM DARK SKINNED, AND ONE LIGHT SKINNED.

A.      WELL, I ALWAYS TELL THE PEOPLE THAT TO REMEMBER THAT THE PHOTOGRAPHS ARE LIKE YOUR BMV PICTURE, AND THE QUALITY OF THE BMV PICTURE.

Q.      WHAT DOES THAT HAVE TO DO WITH IT?

A.      BECAUSE, YOU KNOW, IT IS THE QUALITY OF THE PHOTOS.

Q.      HOW MANY THOUSANDS OF PHOTOS DO YOU USE?

A.      I HAVE NO IDEA.

Q.      THERE IS HUNDREDS OF THEM, THOUSANDS OF THEM, AREN'T THERE?

A.      THERE IS QUITE A FEW.

R. HORTON 001795

Q.        THERE IS NO REASON YOU CAN'T FIND SIX PHOTOGRAPHS WITH LIGHT-SKINNED PEOPLE, WAS THERE?

A.        WELL, I AM NOT SAYING THAT THESE WEREN'T LIGHT-SKINNED PEOPLE.  I AM SAYING THAT IS THE WAY IT PRINTED OUT.  YOU KNOW, IT MIGHT BE JUST THE LIGHT, THE POSITIONING OF THE LIGHT WHEN THE PICTURE WAS TAKEN.

Q.        BUT YOU DIDN'T LOOK FOR POSITIONING OF THE LIGHT THAT SHOWED ALL LIGHT-SKINNED PEOPLE.  ACTUALLY, LOOK AT THE PHOTOGRAPHS, FIVE OF THEM ARE DARK, ONE IS LIGHT.  THAT'S A FACT, ISN'T IT?

A.        THAT'S A MATTER OF OPINION.

Q.        IS IT YOUR OPINION THAT -- ARE YOU --

A.        GO AHEAD.

Q.        IN YOUR OPINION, THOSE OTHER FIVE ARE THE SAME SKIN COLOR AS MR. HORTON IS?

A.        I WOULD SAY THEY ARE SIMILAR, ALL BUT ONE.

Q.        WHICH ISN'T THAT SUGGESTIVE?

A.        I WOULD SAY THERE IS ONLY ONE THAT IS PROBABLY A LITTLE TOO DARK.  THAT IS NUMBER TWO.  BUT I WOULDN'T SAY ALL OF THEM, NO.

Q.        THAT WAS NUMBER ONE IS LIGHT-SKINNED?

A.        I DON'T THINK HE IS ALL THAT DARK.

Q.        WHAT IS THE SHADE DIFFERENCE?

A.        I SEE THE LIGHT SHINING ON HIS FOREHEAD.

Q.        MA'AM, I AM SUGGESTING TO YOU THAT THAT

R. HORTON 001796

30

LINEUP IS SUGGESTIVE.  YOU DIDN'T SHOW A FAIR LINEUP IS WHAT I AM SUGGESTING.

A.        I AM NOT GOING SAY I DIDN'T SHOW A FAIR LINEUP.

Q.        I'M SURE YOU ARE NOT.  BUT I WILL LET THE COURT LOOK AT IT.

THE COURT:  ANY REDIRECT?

MR. STEAD:  NO, THANK YOU.

THE COURT:  THANK YOU FOR TESTIFYING.

THE WITNESS:  THANK YOU.

MR. STEAD:  DO YOU HAVE THE ORIGINALS WITH YOU?

THE WITNESS:  YES, I DO.

THE COURT:  ANYTHING FURTHER, MR. STEAD?

MR. STEAD:  NO.  JUDGE, WE HAD THE DETECTIVE -- THE ORIGINAL ARRAYS THAT WE MARKED WERE PHOTO COPIES WE MARKED PRIOR TO THE DETECTIVE SHOWING UP.  SHE HAS PROVIDED US NOW WITH THE ORIGINAL ARRAYS AND WE ARE GOING TO INTRODUCE AND REMARK THOSE AS STATE'S EXHIBITS 1 AND 2.

THE COURT:  ALL RIGHT.

FOR PURPOSES OF THIS MOTION, DO YOU HAVE ANY FURTHER EVIDENCE?

MR. STEAD:  WE MOVE FOR THE ADMISSION OF OUR EXHIBITS.

31

MR. SHWARTZ:  I WOULD MOVE THEY NOT BE PERMITTED, YOUR HONOR.  I THINK IF THE COURT LOOKS AT THEM, THEY REALLY ARE NOT A FAIR LINEUP.

THE COURT:  LET ME LOOK AT THE EXHIBITS.

MR. STEAD:  IF I MAY APPROACH?

THE COURT:  OF COURSE.

ANY FURTHER ARGUMENT BY EITHER SIDE ON THIS MOTION?

MR. SHWARTZ:  I WOULD DEFER TO THE COURT. THE COURT CAN LOOK AT THE PICTURES.

THE COURT:  ANYTHING FURTHER, MR. STEAD?

MR. STEAD:  JUDGE, THE STATE'S POSITION WOULD BE THAT IN REVIEWING THE PHOTO ARRAYS, THAT THEY, IN FACT, PICK INDIVIDUALS THAT WHO HAD SIMILAR CHARACTERISTICS, AND THAT THE PHOTO PROCEDURE THAT WAS USED IN THIS CASE WAS PROPER, AND THERE IS NO BASIS TO SUPPRESS THE IDENTIFICATIONS IN THIS CASE.

THE COURT:  WITHOUT QUESTION, THE TESTIMONY OF THE OFFICER, AND THE METHODS USED BY THE POLICE DEPARTMENT IN COMPRISING A PHOTO ARRAY, ARE TOTALLY RANDOM, GIVEN THE PARAMETERS THAT ARE PUT ON -- PUT IN, AND THE PARAMETERS THAT WERE USED IN THIS CASE ARE NONSUGGESTIVE.  BLACK MALE, CERTAIN AGE GROUP, WHATEVER.

THE QUESTION THEN BECOMES IN ANY PARTICULAR COMPUTER-GENERATED ARRAY IS THERE SOMETHING IN THAT

32

ARRAY THAT WOULD MAKE IT OVERLY SUGGESTIVE.  NOW, IN DETERMINING THAT ISSUE, ONE NOT ONLY HAS TO LOOK AT THE ARRAY ITSELF, ONE HAS TO BE AWARE OF THE CIRCUMSTANCES, THE ACTUAL PHYSICAL VIEWING BY THE VICTIMS, THEIR OPPORTUNITY TO VIEW AND IDENTIFY THE VICTIM WITHOUT OPPORTUNITY OR THE PRIOR KNOWLEDGE OF THE VICTIM -- OR OF THE ACCUSED IN THIS CASE.  ALL THOSE ARE FACTORS THAT ARE TAKEN INTO CONSIDERATION.

BUT WHEN I LOOK AT THIS ARRAY, I'M LOOKING AT SIX BLACK MALES OF DIFFERING DEGREES OF WHAT APPEARS TO BE DARKNESS IN A BLACK AND WHITE PHOTOGRAPH, NOT A COLOR PHOTOGRAPH OF THE SIX, OR OF THIS ACCUSED AND ANY OF THE OTHERS.

I AM LOOKING AT THREE THAT HAVE WHITE T-SHIRTS ON, APPEAR TO BE, AND THREE THAT HAVE DARK SWEATERS OR SHIRTS ON.

WITHOUT QUESTION, AND I WILL TELL YOU THIS, COUNSEL, IS THAT THE LIGHTEST OF THE PICTURES OVERALL, AND WHEN I SAY PICTURES, I MEAN INCLUDING THE BACKGROUND IN NUMBER 5, HOWEVER, NUMBER 4 IS VERY CLOSE TO THAT. AND NUMBER 1 IS VERY CLOSE TO IT ALSO.  IT APPEARS THAT THE PICTURES OF TWO, THREE AND SIX, THE INDIVIDUALS WHO WERE WEARING DARK SWEATERS OR SHIRTS, THAT THE BACKGROUND IN THOSE PICTURES IS SUBSTANTIALLY DARKER THAN THE THREE OTHER PICTURES.

R. HORTON 001799

33

I CAN FIND NONE OF -- I CAN FIND NONE OF THIS TO BE SUGGESTIVE. SO I FIND NO BASIS WHATSOEVER TO QUESTION THE ADMISSIBILITY OF THE IDENTIFICATION, AGAIN, IF PROPER FOUNDATION IS PROPERLY LAID BY THE INDIVIDUALS.

WE ARE GOING TO USE IT -- I TAKE IT YOU WILL USE THIS IN THE TESTIMONY OF THE WITNESSES; IS THAT CORRECT?

MR. STEAD: YES.

THE COURT: ALL RIGHT. THAT IS FINE.

SO EXHIBITS 1 AND 2 ARE ADMISSIBLE. EXHIBITS 1-A AND 2-A ARE ADMISSIBLE FOR PURPOSES OF FOUNDATION FOR THESE DOCUMENTS ONLY. THEY WILL NOT GO TO THE JURY UNLESS YOU WERE PLANNING TO HAVE SOME BASIS FOR ADMISSIBILITY OF THOSE.

MR. STEAD: WELL, THE STATEMENT OF A WITNESS AT THE TIME OF IDENTIFICATION, IF THE WITNESS TESTIFIES IN COURT, IS NOT HEARSAY UNDER THE EVIDENCE RULE 801(D).

THE COURT: OH, REALLY?

MR. STEAD: YES.

THE COURT: SO THAT WOULD NOT BE HEARSAY AND WE WOULD BE OFFERING THOSE DOCUMENTS TO THE JURY AS WELL?

MR. STEAD: IN ADDITION TO THE STATEMENTS OF WITNESSES, WE WOULD OR OFFER THE DOCUMENTS. THEY

R. HORTON 001800

34

EXPLAIN THE PROCEDURES THAT WERE USED IN THIS CASE, THE INSTRUCTIONS THAT WERE GIVEN TO THE WITNESSES AT THE TIME OF THE VIEWING THE ARRAYS, WE SPECIFICALLY -- WITH RESPECT TO THE STATEMENTS OF THE WITNESSES, THEY ARE NOT HEARSAY UNDER THE DEFINITION.

THE COURT:  ARE YOU OBJECTING TO THESE DOCUMENTS OR NOT, DEFENSE?

MR. SHWARTZ:  NO, WE WILL LET THEM IN.

THE COURT:  PARDON?

MR. SHWARTZ:  WE HAVE NO OBJECTION.

THE COURT:  YOU HAVE NO OBJECTION TO 1-A AND 1-B?

MR. SHWARTZ:  NO.

THE COURT:  THEY WILL BE ADMITTED.

- - -

THEREUPON, THE EXHIBITS LAST ABOVE OFFERED WERE OFFERED INTO EVIDENCE ON BEHALF OF THE PLAINTIFF AND IS HERETO MARKED STATE'S EXHIBITS 1, 1-A, 2, 2-A, AND MADE A PART HEREOF.

- - -

THE COURT:  I WILL SAY IF THE FACT OF THE IDENTIFICATION THAT I BELIEVE TO BE ADMISSIBLE UNDER 801(D), NOT THE EXTRANEOUS STATEMENTS THAT ARE MADE CONCERNING, BUT THERE IS NO OBJECTIONS SO THEY ARE ADMITTED.

R. HORTON 001801

35

OKAY.  ANYTHING FURTHER FOR THIS HEARING?

I WILL RETURN THESE TO YOU AT THIS POINT IN TIME.  WE TOLD THE JURY 2:15.

- - -

THEREUPON, A JURY WAS DULY EMPANELED AND SWORN.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS ADJOURNED UNTIL 9:00 O'CLOCK, A.M., JANUARY 31, 2006.

- - -

R. HORTON 001802

36

TUESDAY MORNING SESSION,

JANUARY 31, 2006.

- - -

THEREUPON, THE FURTHER HEARING OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

MR. STEAD:  WE HAVE A MOTION FOR SEPARATION OF WITNESSES.

THE COURT:  OBVIOUSLY.  YOU DON'T HAVE ANY IN THE COURTROOM, DO YOU?

MS. HOLFINGER:  YES, WE DO.

THE COURT:  YOU HAVE TO WAIT OUTSIDE, MA'AM.

- - -

THEREUPON, THE JURORS RESUMED THEIR POSITIONS IN THE JURY BOX AND THE FOLLOWING PROCEEDINGS WERE HAD AS FOLLOWS:

THD COURT:  GOOD MORNING.  THINGS HAVE CHANGED A LITTLE BIT.  I DO NOT HAVE AN APPOINTMENT THIS AFTERNOON.  I WAS SUPPOSED TO GO TESTIFY TO THE GENERAL ASSEMBLY.  IT HAS BEEN MOVED.  SO WE ARE GOING TO GET AS FAR AS WE CAN TODAY.  UNLESS, BASED ON MY REPRESENTATIONS, SOME JURORS THOUGHT MAYBE THIS AFTERNOON THEY HAD OTHER PLANS.  BUT WE WILL SEE.  WE'LL GO AS FAR AS WE CAN TODAY.

ARE YOU READY FOR OPENING STATEMENTS?

R. HORTON 001803

37

MR. STEAD:  WE ARE.

THE COURT:  THE PROSECUTION MAY PROCEED.

I, AGAIN, REMIND THE JURY, OPENING STATEMENTS ARE NOT EVIDENCE.

MR. STEAD:  JUDGE BENDER.  MR. SHWARTZ. MISS HOLFINGER.  MR. SMITH.  MEMBERS OF THE JURY.

ON OCTOBER 9TH, 2004, AT 927 LOEW STREET, RICHARD MCCLANAHAN AND RHONDA CURRY WERE RESIDING AT THAT ADDRESS.  THEY WERE BOYFRIEND AND GIRLFRIEND AND HAD BEEN LIVING -- DATING AND LIVING TOGETHER FOR ABOUT A 10-YEAR PERIOD.  THAT MORNING, THEY WERE AWAKENED BY A KNOCK AT THE DOOR.  RICHARD WENT TO THE DOOR AND ANSWERED THE DOOR.  AND WHEN HE ANSWERED THE DOOR, OPENED THE DOOR, AN INDIVIDUAL IS AT THE DOOR WHO FORCED HIS WAY IN.  THE MAN HAD A GUN.  HE STRUCK MR. MCCLANAHAN UPSIDE THE HEAD WITH THE GUN CAUSING AN INJURY.

HE CAME IN AND ANNOUNCED, THIS IS A ROBBERY. YOU KNOW WHAT THIS IS ABOUT, AND PROCEEDED TO DEMAND MONEY.  DURING THE COURSE OF THIS INCIDENT, HE MADE A NUMBER OF COMMENTS, SAYING, I KNOW YOU HAVE GOT MONEY. YOU JUST GOT PAID YESTERDAY.  HE MADE REFERENCE TO THE FACT, YOU KNOW, WHERE IS YOUR PHONE NOW?  WHERE IS YOUR PHONE NOW?  I KNOW YOU GOT MONEY.  YOU GOT PAID YESTERDAY.

R. HORTON 001804

38

AT SOME POINT HE TOOK THE GUN AND HE SHOT MR. MCCLANAHAN IN THE LEG TO CONVINCE HIM HOW SERIOUS HE WAS OF HIS INTENTIONS.  HE KEPT LOOKING AT MISS CURRY. HE TOLD THEM, DON'T LOOK AT ME.  DON'T LOOK AT ME.  MISS CURRY WOULD SNEAK A PEEK AND HE WOULD SEE HER, I TOLD YOU NOT TO LOOK AT ME.  DON'T MAKE ME SHOOT YOU.  YOU KNOW, AGAIN, LOOKING FOR MONEY.

HE DEMANDED MONEY FROM BOTH INDIVIDUALS. MISS CURRY TOLD HIM, I DON'T HAVE ANY MONEY.  MR. MCCLANAHAN SAID HE HAD SOME MONEY.  HE WENT AND GOT THE SMALL AMOUNT OF MONEY THAT HE HAD AND HE GAVE IT TO THE INDIVIDUAL.  ULTIMATELY, THE INDIVIDUAL FLED AS SOON AS THE INCIDENT WAS OVER.

THERE WAS A THIRD PERSON IN THE HOUSE, MISS CURRY'S SISTER WAS IN THE BACK OF THE HOUSE.  SHE WAS NEVER IN A POSITION TO SEE ANYTHING THAT WAS GOING ON. MISS CURRY, RHONDA CURRY, WAS OUT THERE.  MR. MCCLANAHAN WAS OUT THERE.  HE WILL DESCRIBE THE PERSON WAS WEARING A GRAY HOODIE SWEAT SHIRT PULLED UP TIGHT AROUND HIS FACE.  HE LEFT.  AS SOON AS THIS MAN LEFT, REALIZING MR. MCCLANAHAN WAS HURT PRETTY BADLY, THEY BUNDLED HIM UP AND TOOK HIM OVER TO ANOTHER HOUSE WHERE THEY CALLED THE POLICE BECAUSE THERE WAS NO PHONE IN THAT RESIDENCE.

THEY CALLED THE POLICE.  THEY CALLED AN AMBULANCE.  HE WAS TRANSPORTED TO THE HOSPITAL.  THE

R. HORTON 001805

39

POLICE RESPONDED TO THE SCENE OF THE CRIME AND THEY SECURED THE SCENE.  AND THE CRIME SCENE SEARCH UNIT CAME OUT AND PROCESSED THE SCENE AND TOOK SOME PHOTOGRAPHS, THEY COLLECTED THE SHELL CASING THAT WAS LEFT BEHIND AT THE SCENE.  DETECTIVE BRENDA WALKER FROM THE ROBBERY SQUAD GOT INVOLVED.

LADIES AND GENTLEMEN, THE ISSUE IN THIS CASE IS NOT GOING TO BE WERE THE CRIMES OF AGGRAVATED ROBBERY, KIDNAPPING, FELONIOUS ASSAULT COMMITTED, AGGRAVATED BURGLARY COMMITTED.  THE ISSUE IS GOING TO BE HAVE WE IDENTIFIED THE RIGHT PERSON.  AND WHAT YOU WILL LEARN IS WHEN YOU HEAR FROM THE TWO VICTIMS IN THIS CASE IS THAT THEY KNEW THE INDIVIDUAL WHO CAME INTO THE HOUSE ON THAT DAY.

MR. MCCLANAHAN WAS INTERVIEWED SEVERAL DAYS LATER BY THE POLICE WHEN HE HAD COME OUT OF SURGERY.  HE ULTIMATELY HAD SEVERAL SURGERIES, AND YOU WILL ACTUALLY SEE THE SCARS, AND HEAR HIM AT THAT POINT TALK ABOUT THE ROD THAT IS STILL IN HIS LEG.  WHEN HE CAME OUT AND THE DETECTIVE WAS FINALLY ABLE TO INTERVIEW HIM, HE TOLD THE DETECTIVE, LOOK, THE PERSON CAME IN THE HOUSE THAT DAY WAS A GUY THAT I KNOW AS RICHARD.  I DON'T KNOW HIS LAST NAME.  BUT IT WAS RICHARD.  RICHARD IS -- HE HAD BOUGHT A CAR FROM MY NIECE A NUMBER OF YEARS AGO.  I KNOW HIM FROM THE NEIGHBORHOOD.  I DON'T KNOW HIS LAST NAME.  I

40

CAN GET IT FOR YOU. HE HAD CONTACT WITH RICHARD THE DAY BEFORE. MR. MCCLANAHAN IS A TRUCKER, AND HE HAD GOTTEN PAID ON THAT FRIDAY.

THIS CRIME HAPPENED ON A SATURDAY MORNING. HE WILL TELL YOU HE WENT TO CASH HIS PAYCHECK AT A CONVENIENCE STORE. AND THEN HE DROVE TO A CONVENIENCE STORE DOWN AT ST. CLAIR AND JOYCE AVENUE. HE WENT TO THAT LOCATION NEAR HIS HOUSE. HE STOPPED TO BUY BEER, AND HE STOPPED TO MAKE A PHONE CALL. BECAUSE HE DOES NOT HAVE A PHONE AT HIS HOME, HE NEEDED TO TALK TO THE ELECTRIC COMPANY NOW THAT HE HAD MONEY TO PAY HIS BILLS.

AND HE WILL TELL YOU THAT IN THAT PARKING LOT, WHILE HE WAS THERE TO MAKE THE PHONE CALL, HE HAD CONTACT WITH THIS MAN. WHEN HE REACHED INTO HIS POCKET TO PULL OUT HIS CHANGE TO MAKE THE PHONE CALL, HE PULLED OUT THE WAD OF BILLS FROM HIS PAYCHECK THAT HE HAD JUST CASHED. AND THIS MAN ASKED HIM, COME ON, GIVE ME TWENTY BUCKS. HE SAID, NO, I'M NOT GOING TO LOAN YOU MONEY. YOU WILL HEAR ABOUT THE EXCHANGE THEY HAD.

BUT ON THAT DATE, FRIDAY, ABOUT 12 HOURS BEFORE THIS HAPPENED, THIS MAN SAW THE MONEY. THEY HAD A DISCUSSION ABOUT THE PHONE. HE WANTED -- MR. HORTON WANTED TO USE THE PHONE FIRST. RICHARD MCCLANAHAN SAID, NO, MAN. I HAVE TO GET A HOLD OF THE ELECTRIC COMPANY BEFORE THEY CLOSE. SO, YOU KNOW, AFTER THIS EXCHANGE,

R. HORTON 001807

41

AFTER BEING ASKED FOR MONEY ON SEVERAL OCCASIONS, AFTER REFUSING TO GIVE HIM $20 AT THAT TIME, HE ULTIMATELY MADE HIS PHONE CALL AND ACTUALLY, HE DIDN'T GET THROUGH. HE KEPT GETTING A BUSY SIGNAL.  HE FINALLY WENT HOME.

THE NEXT MORNING, MR. HORTON SHOWED UP AT THE DOOR STILL WEARING THE SAME CLOTHES THAT HE HAD BEEN WEARING IN THE CONVENIENCE STORE THE NIGHT BEFORE.  AND IT IS IMPORTANT, THIS CONTACT THE NIGHT BEFORE, BECAUSE OF THE WORDS THAT WERE SAID BY THE PERPETRATOR IN THE HOME THAT MORNING.  MR. MCCLANAHAN HEARD THEM, MISS CURRY HEARD THEM.  YOU KNOW, YOU JUST GOT PAID.  YOU GOT MONEY.  YOU JUST GOT PAID.  WHERE IS YOUR PHONE NOW?  IT ALL MAKES SENSE WHEN YOU REFER BACK TO THE INCIDENT THE DAY BEFORE.

MISS CURRY WAS ALSO QUESTIONED BY THE POLICE.  SHE INDICATED SHE KNEW THE PERSON; THAT SHE HAD SEEN HIM IN THE NEIGHBORHOOD BEFORE.  BASED UPON THIS INFORMATION, THE POLICE ASKED, WOULD YOU, PLEASE, MR. HORTON -- OR, I'M SORRY, MR. MCCLANAHAN, CAN YOU GET THE LAST NAME OF THIS RICHARD?  HE SAID, YES.

HE WILL TELL YOU HE CONTACTED HIS NIECE WHO HAD SOLD THE CAR, AND SHE PROVIDED THE LAST NAME OF HORTON.  HE THEN CONTACTED THE POLICE DEPARTMENT AND SAID THE LAST NAME -- RICHARD'S LAST NAME IS HORTON.

YOU WILL HEAR THAT BRENDA WALKER FROM THE

42

COLUMBUS POLICE DEPARTMENT WITH THAT INFORMATION PREPARED A PHOTO ARRAY.  A PHOTO ARRAY IS A SERIES OF PHOTOGRAPHS OF PEOPLE OF SIMILAR CHARACTERISTICS WHICH IS USED TO MAKE IDENTIFICATIONS BY THE COLUMBUS POLICE DEPARTMENT ON A DAILY BASIS.

SHE PREPARED THE PHOTO ARRAY OF RICHARD HORTON.  ON DECEMBER 4TH SHE SHOWED THAT PHOTO ARRAY TO RICHARD MCCLANAHAN, AND SHE SHOWED THE PHOTO ARRAY TO RHONDA CURRY.  BOTH PARTIES INSTANTLY SELECTED PHOTOGRAPH NUMBER 5, THE PHOTOGRAPH OF RICHARD HORTON, AND TOLD THE POLICE THEY WERE SURE, 100 PERCENT SURE THAT, IN FACT, THAT WAS THE MAN WHO HAD COME IN THEIR APARTMENT ON OCTOBER 9TH, 2004, AND COMMITTED THIS HORRIBLE CRIME.  AND WHEN YOU HEAR IT FROM THEM, YOU WILL KNOW WHO DID IT, TOO.

THE COURT:  THANK YOU.

DO YOU WISH TO MAKE AN OPENING STATEMENT OR RESERVE?

MR. SHWARTZ:  WE'LL RESERVE.

THE COURT:  ALL RIGHT.  THE DEFENSE HAS CHOSEN NOT GIVE YOU AN OPENING STATEMENT AT THIS TIME, BUT WILL RESERVE FOR THEIR SIDE OF THE CASE, WHICH IS TOTALLY PERMISSIBLE.

YOU MAY PROCEED.

MR. STEAD:  WE CALL RICHARD MCCLANAHAN.

R. HORTON 001809

43

(WITNESS IS SWORN.)

THE COURT:  HAVE A SEAT, SIR.

OKAY.  MR. MCCLANAHAN, LET'S START WITH YOUR FULL NAME.

THE WITNESS:  RICHARD MCCLANAHAN JUNIOR.

THE COURT:  AND YOUR ADDRESS, MR. MCCLANAHAN?

THE WITNESS:  1253 INDIANOLA AVENUE.

THE COURT:  HERE IN COLUMBUS?

THE WITNESS:  COLUMBUS, OHIO.

THE COURT:  AND WHAT DO YOU DO FOR A LIVING?

THE WITNESS:  I'M A TRUCK DRIVER.

THE COURT:  FOR WHOM?

THE WITNESS:  MISTER DEPENDABLE LANDSCAPING.

THE COURT:  THANK YOU.

YOUR WITNESS.

- - -

RICHARD MCCLANAHAN JR.

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, STATE OF OHIO, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. STEAD:

Q.    GOOD MORNING.

A.    HI.

Q.    HOW ARE YOU TODAY?

44

A.    FINE.

Q.    MR. MCCLANAHAN, HOW OLD ARE YOU?

A.    49.

Q.    HOW FAR DID YOU GO IN SCHOOL?

A.    TO THE SEVENTH GRADE.

Q.    AND WHAT WAS THE LAST SCHOOL YOU ATTENDED?

A.    MONROE JUNIOR HIGH SCHOOL.

Q.    DID YOU GROW UP HERE IN FRANKLIN COUNTY?

A.    YES.

Q.    HAVE YOU LIVED IN FRANKLIN COUNTY YOUR WHOLE LIFE?

A.    YES.

Q.    THE JUDGE ASKED YOU A MOMENT AGO ABOUT YOUR EMPLOYMENT.

A.    YES.

Q.    YOU'RE CURRENTLY EMPLOYED?

A.    YES, I AM.

Q.    HOW LONG HAVE YOU BEEN EMPLOYED BY THAT COMPANY?

A.    THREE, FOUR YEARS.

Q.    WERE YOU WORKING FOR THAT COMPANY BACK AT THE TIME OF THE INCIDENT WE ARE HERE TO DISCUSS?

A.    YES.

Q.    WHAT EXACTLY DO YOU DO FOR THAT COMPANY?

A.    I HALL SOD.  I DRIVE A TRACTOR TRAILER.  I

R. HORTON 001811

DRIVE THE TRUCK.

Q.    DO YOU HAVE TO GET A SPECIAL LICENSE TO DRIVE THE TRACTOR TRAILER?

A.    YES, I DO.

Q.    DO YOU KNOW A RHONDA CURRY?

A.    YES, I DO.

Q.    HOW DO YOU KNOW RHONDA CURRY?

A.    SHE'S A GIRLFRIEND OF MINE.

Q.    HOW LONG HAS SHE BEEN YOUR GIRLFRIEND?

A.    ABOUT 10, 11 YEARS, 13 YEARS.

Q.    OKAY.  AND DO YOU RESIDE TOGETHER?

A.    YES, WE DO.

Q.    HOW LONG HAVE YOU LIVED TOGETHER?

A.    TEN YEARS.

Q.    OKAY.  BACK ON OCTOBER 9TH, 2004, WERE YOU LIVING AT 927 LOEW STREET?

A.    YES, I WAS.

Q.    AND HOW LONG HAD YOU BEEN LIVING AT THAT ADDRESS?

A.    ABOUT 12 YEARS, I BELIEVE.  SOMEWHERE IN THERE.

Q.    DID YOU RENT THAT PLACE OR OWN THAT PLACE?

A.    IT BELONGED TO MY FATHER.  HE PASSED.  IT WAS GOING TO BE MINE, BUT IT WAS BURNT DOWN.

Q.    I WANT TO TURN YOUR ATTENTION BACK TO THE

R. HORTON 001812

46

MORNING OF OCTOBER 9TH, 2004.  DO YOU REMEMBER THAT MORNING?

A.     YES, I DO.

Q.     WHAT I WOULD LIKE YOU TO DO IN YOUR OWN WORDS --

FIRST OF ALL, WHO WAS IN THE HOUSE ON THAT FRIDAY NIGHT AND INTO THE SATURDAY MORNING OF OCTOBER 9TH?

A.     SHELLY CURRY, RHONDA CURRY, AND ME.

Q.     ALL THREE OF YOU SLEPT IN THE HOME THAT NIGHT?

A.     RIGHT.

Q.     WHERE DID YOU AND RHONDA SLEEP?

A.     ON A PULL-OUT COUCH BED IN THE FRONTROOM.

Q.     IF YOU COME IN THE FRONT DOOR, WOULD YOU COME INTO THE FRONTROOM?

A.     RIGHT.

Q.     WHERE DID RHONDA'S SISTER SPEND THE NIGHT?

A.     SHE WAS IN THE BACK ROOM, ALL THE WAY IN THE BACK OF THE HOUSE.

Q.     CAN YOU SEE THE FRONT ROOM FROM THE BACK ROOM?

A.     YES.

Q.     IS THERE A DOOR TO THE BACK ROOM?

A.     YES, THERE IS A DOOR.

R. HORTON 001813

47

Q.      WAS THE DOOR OPEN OR CLOSED THAT NIGHT?

A.      IT WAS CLOSED.

Q.      OKAY.  DO YOU RECALL WHAT WOKE YOU UP THAT SATURDAY MORNING?

A.      A KNOCK ON THE FRONT DOOR.

Q.      OKAY.  WHAT I WOULD LIKE YOU TO DO IS IN YOUR OWN WORDS TELL US WHAT HAPPENED WHEN THAT KNOCK CAME ON YOUR DOOR.

A.      THE KNOCK CAME, I TOLD RHONDA TO ANSWER.  SHE SAID, NO, YOU GET UP AND ANSWER IT.  SO I WENT TO THE DOOR AND I SAID, "WHO IS IT?"  I HEARD HIM SAY SOMETHING, SO I JUST OPENED THE DOOR UP.  WHEN I OPENED IT, I WAS HIT IN THE HEAD WITH A NINE MILLIMETER GUN SILVER.  I SEEN THE GUN BEFORE I GOT STRUCK, I JUST GOT HIT.  AND THEN I FELL BACK ON THE BED, PUSHED BACK ON THE BED AND I WAS ATTACKED AND SHOT IN THE LEG.

Q.      OKAY.  HOW MANY PEOPLE WERE AT THE DOOR WHEN YOU OPENED IT?

A.      ONE PERSON.

Q.      HOW MANY PEOPLE CAME IN THE HOUSE?

A.      ONE PERSON.

Q.      DID YOU EVER SEE A SECOND PERSON?

A.      NO.

Q.      SO, TO YOUR KNOWLEDGE, ONLY ONE PERSON WAS INVOLVED IN THIS CRIME?

R. HORTON 001814

48

A.      RIGHT.

Q.      OKAY.  DID YOU GIVE THEM PERMISSION TO COME INTO YOUR HOUSE?

A.      NO.

Q.      HOW DID THEY GET INTO YOUR HOUSE?

A.      THEY PUSHED -- FORCED THE DOOR OPEN.  WHEN I OPENED IT, PUSHED ME WITH IT, CAME IN, PUSHED ON IT, OPENED IT, AND KNOCKED ME ON DOWN.

Q.      YOU INDICATED YOU ARE STRUCK WITH A GUN?

A.      IN THE HEAD.

Q.      CAN YOU SHOW US WHERE YOU WERE HIT?

A.      RIGHT HERE IN THE HEAD (INDICATING).

Q.      WHAT INJURIES DID YOU SUFFER AS A RESULT OF THAT?

A.      HOLE IN MY HEAD (INDICATING)

Q.      OKAY.  WERE YOU BLEEDING?

A.      YES, I WAS BLEEDING.

Q.      WHEN THIS PERSON CAME IN THE HOUSE, DID HE SAY ANYTHING?

A.      YES.

Q.      TELL US IN YOUR OWN WORDS WHAT WAS GOING ON.

A.      WHEN I GOT HIT, AFTER HE HIT ME IN THE HEAD, HE SAID YOU KNOW WHAT THIS IS.  TO USE MY OWN WORDS, THE CUSS WORDS?

Q.      USE THE WORDS.  I WANT YOU TO TELL IT EXACTLY

R. HORTON 001815

49

THE WAY IT HAPPENED.

A.        WHEN HE HIT ME IN THE HEAD AFTER SHOOTING ME, "GET THE MONEY, MOTHERFUCKER, GET THE MONEY.  YOU JUST GOT PAID YESTERDAY.  GET THAT GOD DAMN MONEY."  AND HE KEPT THREATENING, YOU KNOW, HAD IT TO MY HEAD AND EVERYTHING.  I WAS ALREADY SHOT IN THE LEG.  IT WAS FIRST I WAS SHOT SOON RIGHT OFF THE BAT, AFTER I GOT HIT IN THE HEAD, AFTER I WAS SHOT.

Q.        OKAY.

A.        I KEPT SAYING, "I DON'T HAVE NO MONEY.  I DON'T HAVE NO MONEY."  HE SAID, "YOU GOT DAMN LIE, YOU KNOW WHERE THAT MONEY AT.  GET THAT MONEY, GET THAT MOTHERFUCKING MONEY."  HE JUST KEPT REPEATING THAT.  HE SAID, "WHERE IS YOUR TELEPHONE AT NOW, HUH?  WHERE IS YOUR TELEPHONE AT?"

SO I JUST LAYING THERE ON THE FLOOR GOING OUT OF IT BECAUSE I WAS LOSING BLOOD FROM MY LEG AND HEAD.  I WAS DIZZY AND WEAK.  I WAS DRUG AROUND THE HOUSE.  HE DRUG ME AROUND.  AND I REMEMBER I HAD SOME MONEY, BUT I GOT HIT SO HARD IN THE HEAD I COULDN'T REMEMBER WHERE MY MONEY WAS AT.  SO I HAD $40 IN MY BOOT.  HE SAID, "YOU GOT MORE MOTHERFUCKING MONEY THAN THAT.  YOU BETTER GET IT BEFORE I KILL YOU."  I SAID? "THAT'S ALL I HAVE.  GO AHEAD AND KILL ME."  I WAS JUST SCARED.  I WAS --

50

Q.        KEEP GOING.  TELL US WHAT HAPPENED.

A.        AFTER THAT, RHONDA, SHE WAS ON THE BED, BUT SHE WAS ALL NERVOUS AND EVERYTHING, SHE HAD GOT A GLANCE AT THE GUY.  AND HE SAID, "BITCH, DIDN'T I TELL YOU TO DON'T LOOK AT ME, AND NOW I GOT TO KILL YOU."  AND THE COUCH -- SHE WAS ON THE BED.  HE ROLLED HER IN THE MATTRESS AND PUT THE GUN LIKE HE WAS GOING TO SHOOT HER.

I SAID, "DON'T KILL HER, JUST KILL ME.  JUST KILL ME, MAN."  AND HE SAID, OH, YOU WANT IT, MOTHERFUCKER."  JUST LIKE HE PUT IT TO MY HEAD AND NEVER -- NEVER DID FIRE IT.  AND I COULDN'T GET NO MORE MONEY.  HE JUMPED UP -- THERE WAS A LITTLE BIT MORE KICKING ME.  HE JUMPED UP.  AND HE WAS ON THE FLOOR WITH ME.  I WAS ON THE FLOOR.  I COULDN'T STAND UP BECAUSE THE BULLET TORE MY LEG UP.  HE JUMPED UP AND SAID, "FUCK THIS SHIT," AND HE RAN OUT THE DOOR.

Q.        OKAY.  HOW MUCH MONEY DID YOU GIVE HIM?

A.        TWO $20 BILLS FOLDED UP, $40.

Q.        AFTER THAT, WHAT DOOR DID THE MAN RUN OUT?

A.        THE FRONT DOOR, SAME ONE HE CAME IN.

Q.        OKAY.  DURING THIS INCIDENT, DID MISS CURRY'S SISTER EVER COME OUT FROM THE BACK ROOM?

A.        NO.  SHE STAYED IN THE BACK.

Q.        DID SHE COME OUT AFTER THE INCIDENT WAS OVER?

A.        YES, SHE CAME OUT AFTER THAT HOLLERING AND

R. HORTON 001817

51

CRYING, "YOU ALL RIGHT?"  I SAID, "YEAH.  I HAVE BEEN SHOT.  TAKE ME TO THE HOSPITAL."  AND SHE SAID, OH, MY GOD.  YOU HAVE BEEN SHOT.  AND I TRIED TO STAND UP.  I FELL BACK DOWN BECAUSE OF MY BONE WAS BROKE.  I COULDN'T STAND UP.

SO THEY PICKED ME UP AND TOOK ME TO THE HOSPITAL IN MY TRUCK.  THEY TRIED TO TAKE ME TO THE HOSPITAL.  I WAS GOING IN THE TRUCK, BUT I COULDN'T.  I WAS GOING OUT IN THE TRUCK.  SO MY SISTER LIVED THREE MINUTES AWAY, TWO MINUTES AWAY.  WE GOT TO THE CORNER AND I SAID, "TAKE ME TO CYNTHIA'S HOUSE AND CALL THE EMERGENCY SQUAD.  I'M GOT GOING TO MAKE IT."  THEY TOOK ME THERE.  THAT IS WHERE THE EMERGENCY SQUAD PICKED ME UP.

Q.     WHY DIDN'T YOU CALL 911 FROM YOUR HOUSE?

A.     I DIDN'T HAVE A HOME PHONE.

Q.     DO YOU KNOW WHAT STREET YOU WENT TO TO MAKE THE CALL?

A.     1412 GIBBARD.

Q.     WERE THE POLICE AND EMERGENCY SQUAD CALLED FROM THAT LOCATION?

A.     YES, THEY WERE.

Q.     WERE YOU TRANSPORTED TO A HOSPITAL BY AMBULANCE FROM THAT LOCATION?

A.     YES, I WAS.

R. HORTON 001818

Q.    DESCRIBE FOR THE JURY YOUR INJURIES.

A.    FROM THE BULLET?

Q.    YES.  START WITH YOUR HEAD.

A.    THEY CLEANED IT UP, CUT SOME OF MY HAIR OUT AND GIVE ME X-RAYS SAYING IT WASN'T NO CONCUSSION OR NOTHING IN IT.  IT WAS JUST A BAD BLOW.  AND THEN THEY WENT TO MY LEG.  IT BROKE -- IT BROKE THE BONE.  IT TORE MY LEG UP.  AND I GOT IRON RODS IN IT NOW.  I HAVE A ROD RUNNING THROUGH IT, A STEEL PLATE IN ONE SIDE.  IT IS ALL TORE UP.  MY LEG IS JUST -- I CAN SHOW YOU.

Q.    HOW MANY SURGERIES DID YOU HAVE FOR YOUR LEG?

A.    I HAD FOUR SURGERIES.  I HAD A BAR ON THE OUTSIDE MY LEG RUNNING THROUGH TO MY BONE TO HOLD IT STRAIGHT AND PUT THE BONE BACK TOGETHER.

Q.    HOW LONG WERE YOU IN THE HOSPITAL FOR?

A.    I WAS IN THERE 10 DAYS.  THEN I WAS RELEASED WITH THE BAR ON MY LEG OUTSIDE.  I HAD TO COME BACK FOR ANOTHER SURGERY FOR ANOTHER -- FOR THEM TO TAKE THE BAR OUT OF MY LEG, THAT WAS THREE MORE DAYS.

MR. STEAD:  WITH THE COURT'S PERMISSION, I WOULD LIKE HIM SHOW THE JURY THE INJURY LOCATION.

THE COURT:  GO AHEAD.

BY MR. STEAD:

Q.    RICHARD, STEP DOWN AND ROLL THAT PANT LEG UP AND SHOW US WHAT YOU'RE DESCRIBING.

53

A.      HERE, WENT IN HERE AND CAME OUT HERE.  ALL THIS IS ALL METAL.  THERE IS NOTHING THERE (INDICATING).

Q.      IN FACT, IS THE TOP OF THE ROD VISIBLE THERE?

A.      THE ROD IS HERE AND THE TOP IS --

THE COURT:  YOU HAVE TO SPEAK UP, SIR.

THE WITNESS:  IT WENT IN HERE, COME OUT HERE.  THE ROD WENT HERE AND IT'S WAY UP HERE WHERE THE OTHER TWO HOLES IS.  IT WHAT HELD THE BONE TOGETHER.  MY LEG STAYED STRAIGHT OUT LIKE THAT, JUST A LOT OF PAIN (DEMONSTRATING).

BY MR. STEAD:

Q.      OKAY.  HAVE YOUR SEAT AGAIN.

YOU WERE WORKING AT THE TIME?

A.      YES.

Q.      WHEN HAD YOU GOTTEN PAID?

A.      THAT FRIDAY.  FRIDAY BEFORE THAT SATURDAY MORNING.

Q.      THE DAY BEFORE?

A.      RIGHT.

Q.      AND WHAT FORM DID YOU GET PAID, CASH OR CHECK?

A.      A CHECK.

Q.      WHAT DID YOU DO WITH THAT CHECK?

A.      I TOOK IT TO BOB'S MARKET WHERE WE ALL GO TO CASH OUR CHECKS.  I CASHED IT THERE, GOT IN MY VEHICLE

R. HORTON 001820

54

AND CAME BACK DOWN BY MY HOUSE TO THE CORNER STORE WHERE I BOUGHT MY BEER AT AND STOPPED TO USE THE TELEPHONE.

Q.      OKAY.  DID YOU STOP THERE TO USE THE TELEPHONE BECAUSE YOU DIDN'T HAVE ONE AT YOUR HOUSE?

A.      RIGHT, I DIDN'T HAVE A PHONE AT HOME.

Q.      WHO WERE YOU TO CALL?

A.      THE ELECTRIC COMPANY.  THEY WERE GOING TO SHUT MY ELECTRIC OFF.  I WAS CALLING THEM THEM.  I HAD A PAYMENT, I WAS BRINGING IT IN.

Q.      OKAY.  WHILE YOU WERE AT THE PARKING LOT MAKING YOUR PHONE CALL, DID YOU HAVE CONTACT WITH ANYONE?

A.      YES, I DID.

Q.      YOU WANT TO TELL US ABOUT THAT, PLEASE.

A.      WELL, WHEN I WENT TO THE PHONE BOOTH, RICHARD WAS STANDING OUTSIDE THE PHONE -- STANDING BY THE PHONE BOOTH, HIM AND ANOTHER GUY.  AND HE SAID RICKY -- I'M GOING IN MY POCKET TO GET MY MONEY OUT, I HAD CHANGE, AND I HAD SOME BILLS, TOO.  SO I PULLED IT OUT AND HE SAID, "LOAN ME $20, MAN."  I SAID, "MAN, I DON'T LOAN MONEY.  I LOSE FRIENDSHIPS LIKE THAT."

SO HE STATED IT A COUPLE TIMES.  "COME ON, MAN, LOAN ME $20."  HE SAID, "IT LOOKS LIKE YOU JUST GOT PAID."  I SAID, "I DID."  SO I WENT ON USING THE PHONE. HE SAID, "LET ME USE THE PHONE FIRST."  I SAID, "I HAVE

R. HORTON 001821

55

AN IMPORTANT CALL I HAVE TO MAKE." JUST LIKE THAT. SO I WENT ON AND MADE THE CALL. THEN I GOT IN MY TRUCK AND AFTER I GOT IN THE TRUCK I LEFT AND WENT HOME.

Q. OKAY. DID HE STICK AROUND WHILE YOU MADE THE PHONE CALL OR DID HE LEAVE?

A. HE WALKED OFF. HE WALKED OFF.

Q. OKAY. THIS PERSON THAT YOU HAD THE CONVERSATION WITH, DID HE, IN FACT, SEE THE MONEY THAT HAD BEEN IN YOUR POCKET?

A. YES, HE DID.

Q. HOW MUCH MONEY DID YOU HAVE IN YOUR POCKET AT THAT TIME?

A. ABOUT 4, $500.

Q. THIS PERSON WHO CAME UP TO YOU IN THE PARKING LOT, DID YOU KNOW HIM?

A. YES.

Q. HOW DID YOU KNOW HIM?

A. BACK SEVEN, EIGHT, 10 YEARS AGO, SOMETHING LIKE THAT, MY NIECE HAD A CAR SHE WANTED TO SELL, AND SHE SOLD IT TO HIM, TO RICHARD. SHE SAID IT WAS AT THE POLICE IMPOUND. THEY TOWED IT FROM THE POLICE IMPOUND TO MY HOUSE WHERE I PUT BRAKES ON THE CAR. BEFORE SHE WOULD LET HIM HAVE IT, I HAD TO PUT BRAKES ON THE CAR.

Q. OKAY. AND THE PERSON THAT SHE HAD SOLD THE CAR TO WAS THE MAN THAT YOU ENCOUNTERED IN THE PARKING

R. HORTON 001822

56

LOT?

A.      YES.

Q.      WHERE DID YOU GO AFTER THE CARRY OUT?

A.      TO MY HOUSE AT 927 LOEW STREET.

Q.      SIR, HOW MANY PEOPLE KNEW THAT YOU GOT PAID ON FRIDAY?

A.      JUST THE GUYS I WORK WITH, THE CREW I WORK WITH.

Q.      THEY ALL GET PAID THE SAME DAY, TOO?

A.      YES, EVERYBODY GOES TO THE STORE AND CASHES THEIR CHECKS UP THERE.

Q.      OKAY.  OTHER THAN THE PEOPLE THAT YOU WORK WITH, WHO ELSE KNEW YOU GOT PAID THAT DAY?

A.      RHONDA CURRY.

Q.      THAT IS YOUR GIRLFRIEND?

A.      AND THAT WAS THE ONLY ONE.

Q.      THE MAN IN THE PARKING LOT?

A.      THE MAN IN THE PARKING LOT KNEW, HE SEEN THE MONEY, AND HE SAID, YOU LOOKED LIKE YOU JUST GOT PAID. BECAUSE THE WAY IT WAS, YOU KNOW, LOOKED LIKE A LOT OF MONEY BUT IT WASN'T.

Q.      DID YOU TELL HIM YOU JUST GOT PAID?

A.      NO.

Q.      WHAT DID YOU SAY TO HIM TO EXPLAIN THE AMOUNT OF MONEY THAT YOU HAD?

R. HORTON 001823

57

A.     I DIDN'T SAY NOTHING TO HIM.  IT WAS MY MONEY.

Q.     YOU WENT HOME THAT FRIDAY NIGHT?

A.     YES.

Q.     DRINK SOME OF THE BEER THAT YOU HAD?

A.     YES.

Q.     DO YOU REMEMBER ABOUT WHAT TIME IT WAS YOU WENT TO BED?

A.     ABOUT 1:30, 2:00 O'CLOCK.  WE WATCHED SOMETHING, WE WAS WATCHING SOMETHING ON TELEVISION.

Q.     ANYTHING UNUSUAL HAPPEN THAT NIGHT?

A.     NO.

Q.     OKAY.  THE PERSON WHO CAME IN THE NEXT MORNING, DID YOU RECOGNIZE THAT PERSON?

A.     YES.

Q.     WHAT CLOTHES WAS THAT PERSON WEARING THE NEXT MORNING WHEN THEY CAME IN?

A.     GRAY HOODED SWEATER AND A PAIR OF BLUE JEANS.

Q.     OKAY.  THE PERSON THAT YOU HAD ENCOUNTERED IN THE PARKING LOT THE DAY BEFORE, WHAT WERE THEY WEARING AT THAT POINT?

A.     GRAY HOODED SWEATER AND BLUE JEANS.

Q.     DID YOU RECOGNIZE THE VOICE?

A.     YES, I DID.

Q.     HAD YOU HAD ANY OTHER DISCUSSIONS ABOUT THIS

R. HORTON 001824

58

WITH ANYONE PRIOR TO SATURDAY MORNING ABOUT GETTING PAID OR USING THE PHONE?

A.      NO.

Q.      ALL RIGHT.  AT SOME POINT DID YOU MEET A DETECTIVE BRENDA WALKER FROM THE COLUMBUS POLICE DEPARTMENT?

A.      YES, I DID.

Q.      DID SHE, IN FACT, COME TO THE HOSPITAL WHERE YOU WERE AND ATTEMPT TO INTERVIEW YOU AT THAT TIME?

A.      YES.

Q.      AND DID YOU, IN FACT, TALK TO HER?

A.      VERY LITTLE.  VERY LITTLE BECAUSE, YOU KNOW, I WAS UNDER MEDICATION.  I WAS OUT.  THEY GAVE ME MEDICATION TO PUT ME OUT, ALL THE WAY OUT.  I WAS IN PAIN BAD.  AND THEY HAD DONE IMMEDIATE SURGERY.  I WAS MAYBE TWO HOURS IN THERE, I WAS IN SURGERY.

Q.      DO YOU REMEMBER WHAT DAY IT WAS THAT SHE CAME TO SEE YOU?

A.      I AM THINKING THAT SAME SATURDAY.  I THINK I RECALL TALKING TO BRENDA THAT SATURDAY, I THINK.  I'M NOT SURE.

Q.      OKAY.  YOU WERE IN THE HOSPITAL FOR ABOUT 10 DAYS?

A.      10 DAYS ON THE FIRST TWO OR THREE SURGERIES, AND THEN WENT BACK AND TOOK THE BAR OUT, IT TOOK THREE

R. HORTON 001825

59

MORE DAYS AFTER THAT.

Q.     WHEN DETECTIVE WALKER CAME AND TALKED TO YOU, DID YOU INDICATE TO HER WHETHER OR NOT YOU COULD IDENTIFY THE PERSON WHO HAD DONE THIS TO YOU?

A.     YES.

Q.     WHAT DID YOU TELL HER?

A.     I TOLD HER I KNEW WHO IT WAS THROUGH THE VOICE, THROUGH THE VOICE AND WORDS THAT WAS SAID AT THE PHONE BOOTH, IT WAS USED AGAIN DURING THE ROBBERY.

Q.     WHAT WORDS WERE USED AGAIN DURING THE ROBBERY?

A.     LET ME USE THE PHONE.  WHERE'S YOUR PHONE AT NOW.  LOOKED LIKE YOU JUST GOT PAID.  THOSE WERE THE SAME WORDS THAT STAYED IN MY HEAD.

Q.     DID YOU TELL THE DETECTIVE THAT YOU KNEW WHO HAD DONE THIS?

A.     YES.

Q.     WERE YOU ABLE TO GIVE HER A COMPLETE NAME AT THAT POINT?

A.     NO, I WASN'T.

Q.     WHAT NAME WERE YOU ABLE TO GIVE HER AT THAT POINT?

A.     RICHARD.

Q.     OKAY.  DID YOU EXPLAIN TO HER HOW YOU KNEW RICHARD?

R. HORTON 001826

60

A.    YES.

Q.    THE PART ABOUT THE SELLING THE CAR?

A.    THE CAR, YEAH, I TOLD HER.

Q.    DID DETECTIVE WALKER ASK YOU TO ATTEMPT TO DETERMINE THE LAST NAME OF RICHARD?

A.    SHE ASKED ME DID I KNOW IT.  I TOLD HER, NO, I DIDN'T, BUT I COULD GET IT.

Q.    OKAY.  DID SHE ASK YOU TO DO THAT?

A.    YES, SHE ASKED ME TO GET THE LAST NAME.

Q.    DID YOU, IN FACT, WHEN YOU GOT OUT OF THE HOSPITAL, ATTEMPT TO GET THE LAST NAME OF RICHARD?

A.    YES, I DID.

Q.    WHO DID YOU CONTACT TO GET IT?

A.    MY NIECE WHO SOLD HIM THE CAR.

Q.    OKAY.  WAS YOUR NIECE ABLE TO PROVIDE YOU WITH A LAST NAME?

A.    YES, SHE WAS, THROUGH A YEAR BOOK.

Q.    AND THE LAST NAME WAS?

A.    HORTON, RICHARD HORTON.

Q.    WHEN YOU OBTAINED THE LAST NAME OF HORTON, DID YOU, IN FACT, CONTACT DETECTIVE WALKER TO PROVIDE HER WITH THAT INFORMATION?

A.    YES, I DID.

Q.    ONCE YOU GOT OUT OF THE HOSPITAL, WHERE WERE YOU LIVING?

R. HORTON 001827

61

A.        WITH MY STEPDAUGHTER AT 1250 INDIANOLA AVENUE.

Q.        YOU DIDN'T GO BACK TO THE LOEW STREET ADDRESS TO LIVE?

A.        NO, NEVER WENT BACK.

Q.        YOU WERE LIVING WITH IS IT YOUR --

A.        MY STEPDAUGHTER.

Q.        YOUR STEPDAUGHTER?

A.        RIGHT.

Q.        WHAT ABOUT RHONDA, WHERE WAS SHE SAYING?

A.        SHE WAS LIVING WITH HER DAUGHTER, THAT IS HER DAUGHTER.

Q.        OKAY.  SO YOU WERE STAYING WITH RHONDA'S DAUGHTER?

A.        RIGHT.

Q.        OKAY.  I ASSUME RHONDA WAS STAYING THERE WITH YOU?

A.        RIGHT.

Q.        IN EARLY DECEMBER, SPECIFICALLY DECEMBER 4TH OF 2004, DID DETECTIVE BRENDA WALKER COME TO THAT ADDRESS?

A.        YES, SHE DID.

Q.        DID SHE BRING SOME PHOTOS TO HAVE YOU TAKE A LOOK TO SEE WHETHER OR NOT YOU WOULD BE ABLE TO IDENTIFY THE INDIVIDUAL WHO CAME IN YOUR HOUSE THAT DAY?

R. HORTON 001828

62

A.      YES, SHE DID.

Q.      I WANT TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT NUMBER 1.

YOU RECOGNIZE THAT?

A.      YES.

Q.      WHAT IS THAT?

A.      THAT IS A PICTURE OF RICHARD HORTON.

Q.      THAT IS A SERIES OF PHOTOGRAPHS THE POLICE BROUGHT TO YOUR RESIDENCE?

A.      YES, SAME ONE.

Q.      WHEN THE POLICE CAME, DETECTIVE WALKER CAME TO YOUR RESIDENCE THAT DAY, WAS RHONDA THERE AS WELL?

A.      YES, SHE WAS.

Q.      OKAY.  DID THE DETECTIVE LET YOU LOOK AT THE PICTURES TOGETHER OR DID SHE SEPARATE YOU?

A.      SHE SEPARATED.  RHONDA WENT TO THE STORE WHILE I STAYED THERE, BECAUSE I COULDN'T WALK.  I WAS BY MYSELF WHEN I IDENTIFIED HIM.

Q.      SO THE DETECTIVE KEPT YOU A PART?

A.      RIGHT, WE WAS A PART AT ALL TIMES.

Q.      ALL RIGHT.  DID THE DETECTIVE GIVE YOU ANY INSTRUCTIONS THAT YOU RECALL PRIOR TO LOOKING AT THE PHOTOGRAPHS?

A.      NO.

Q.      OKAY.  DID SHE ULTIMATELY SHOW YOU THOSE

63

PHOTOGRAPHS?

A.      SHE SHOWED -- LAID IT DOWN JUST LIKE THAT.

Q.      OKAY.  WHEN SHE LAID THOSE PHOTOGRAPHS DOWN IN FRONT OF YOU, WHAT DID YOU DO?

A.      I POINTED HIM OUT.

Q.      WHAT PHOTOGRAPH DID YOU POINT OUT ON THIS?

A.      RIGHT HERE (INDICATING).

Q.      WOULD THAT BE PHOTOGRAPH NUMBER 5?

A.      YES.

Q.      DID THE DETECTIVE HAVE YOU SIGN AND DATE THAT PHOTOGRAPH?

A.      YES, SHE DID.

Q.      DID SHE ASK YOU HOW SURE YOU WERE?

A.      YES.

Q.      WHAT DID YOU TELL HER?

A.      A HUNDRED PERCENT SURE.

Q.      IS THERE ANY DOUBT IN YOUR MIND --

A.      NO.

Q.      -- THAT THE PERSON THAT YOU PICKED OUT IN THIS PHOTO ARRAY IS THE PERSON THAT CAME IN YOUR HOME THAT MORNING?

A.      THERE IS NO DOUBT.

Q.      AND YOU TOLD THE DETECTIVE THAT?

A.      YES, I DID.

Q.      DID THE DETECTIVE DO ANYTHING TO SUGGEST OR

R. HORTON 001830

64

INFLUENCE WHICH PICTURE YOU PICKED OUT?

A.      NO.

Q.      WHY DID YOU PICK OUT PICTURE NUMBER 5?

A.      BECAUSE I KNEW WHO IT WAS.  IF YOU TOOK A SHOT LIKE I TOOK, DRAGGED AROUND LIKE I WAS, I THOUGHT I WAS GOING TO DIE, I KNEW WHO IT WAS, I KNEW.

Q.      SIR, IS MR. HORTON HERE IN THE COURTROOM TODAY?

A.      YES, HE IS.

Q.      POINT TO HIM AND PLEASE DESCRIBE WHAT HE IS WEARING HERE IN THE COURTROOM.

A.      GRAY SUIT, WHITE SHIRT (INDICATING).

MR. STEAD:  LET THE RECORD REFLECT HE'S IDENTIFIED THE DEFENDANT.

THE COURT:  SO ORDERED.

BY MR. STEAD:

Q.      MR. MCCLANAHAN, AS YOU LOOK AT THAT MAN YOU JUST IDENTIFIED HERE IN THE COURTROOM TODAY, HOW SURE ARE YOU HE IS THE PERSON THAT CAME IN YOUR RESIDENCE?

A.      I'M A HUNDRED PERCENT SURE.

Q.      SIR, IS THERE ANY DOUBT IN YOUR MIND AT ALL?

A.      NO, THERE IS NOT.

Q.      ULTIMATELY, CHARGES WERE FILED IN THIS CASE, WERE THEY NOT?

A.      YES.

65

Q.      AT SOME POINT AFTER THE CHARGES -- AT SOME POINT AFTER THE CHARGES WERE FILED, DID YOU HAVE MR. -- CONTACT WITH MR. HORTON OUT ON THE STREET?

A.      YES, I DID.

Q.      TELL US ABOUT THAT.

A.      I WAS IN THE SUNOCO SERVICE STATION ON FIFTH AVENUE WHEN I SEEN HIM ONCE.  HE SAID, "RICH, YOU KNOW I DIDN'T DO THAT, MAN.  YOU KNOW I WOULDN'T HAVE SHOT YOU."  I SAID, "YEAH, IT WAS YOU, RICH.  YOU RAN OUT THE HOUSE.  I SAW YOU.  I KNOW IT WAS YOU BECAUSE THE WORDS YOU SAID AT THE PHONE BOOTH, AND YOU SAID IT WHEN YOU WAS ROBBING ME."  HE SAID, "I WOULD HAVE NEVER DONE IT. YOU GO DOWNTOWN AND TELL THEM YOU GOT THE WRONG MAN AND I WILL GIVE YOU $3,000 INSTEAD OF ME PAYING A LAWYER $5,000."

A.      I TOLD HIM I COULDN'T DO THAT BECAUSE OF THE PAIN I WAS IN.

Q.      OKAY.  AT THE POINT THAT HE OFFERED YOU MONEY TO COME DOWN AND SAY IT WASN'T HIM, DID HE GIVE YOU ANYTHING?

A.      NO, HE DIDN'T.  YEAH, HE DID.  A PHONE NUMBER.

Q.      I WANT TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT 4.

CAN YOU IDENTIFY THAT FOR ME, PLEASE?

66

A.     THAT IS THE NUMBER.

Q.     FLIP IT OVER.

A.     YES.

Q.     THAT IS PHONE NUMBER HE GAVE?

A.     HE WROTE IT DOWN AND GAVE ME AND HE TOLD ME WHEN I WANT THE MONEY, CALL HIM AND HE WILL GIVE ME THE MONEY.

Q.     DID HE PUT HIS NAME ON?

A.     NAME AND TELEPHONE NUMBER.

Q.     SIR, WHEN YOU GOT THIS PIECE OF PAPER FROM MR. HORTON, WHAT DID YOU DO WITH IT?

A.     WELL, I GAVE IT TO THE PROSECUTING ATTORNEY.

Q.     YOU BROUGHT IT DOWN AND GAVE IT TO MR. SMITH AND ME?

A.     RIGHT.

Q.     HAVE YOU EVER HAD -- HAD YOU EVER HAD PROBLEMS WITH MR. HORTON BEFORE THAT SATURDAY MORNING?

A.     NO, I NEVER.  I NEVER BEEN IN CONTACT WITH HIM OTHER THAN SEEING HIM IN THE CAR WHEN MY NIECE SOLD HIM THE CAR.  AND I SEEN HIM FROM TIME TO TIME IN THE SERVICE STATION BECAUSE ITS RIGHT IN THE NEIGHBORHOOD. I WOULD WALK THERE FROM MY HOUSE.  AND, NO, I NEVER HAD ANY PROBLEMS WITH HIM OR NOTHING LIKE THAT.

Q.     UNTIL THAT MORNING?

A.     UNTIL THAT MORNING.

R. HORTON 001833

67

Q.      SIR, IS THERE ANY DOUBT IN YOUR MIND THAT THAT MAN RIGHT THERE IS THE PERSON WHO HANDED YOU THE PIECE OF PAPER AND OFFERED YOU MONEY TO COME IN AND SAY IT WASN'T HIM?

A.      IT WAS HIM.  HE'S THE PERSON WHO GAVE IT TO ME.

MR. STEAD:  CAN I HAVE A MOMENT, PLEASE?

THE COURT:  YES.

BY MR. STEAD:

Q.      SIR, YOUR RESIDENCE AT 927 LOEW STREET, IS THAT IN THE CITY OF COLUMBUS?

A.      YES, IT IS.

Q.      COUNTY OF FRANKLIN?

A.      YES.

Q.      STATE OF OHIO?

A.      RIGHT.

MR. STEAD:  THANK YOU, SIR.

I DON'T HAVE ANY ADDITIONAL QUESTIONS.

THE COURT:  YOU MAY CROSS.

MR. SHWARTZ:  THANK YOU, YOUR HONOR.

- - -

CROSS-EXAMINATION

BY MR. SHWARTZ:

Q.      GOOD MORNING.

A.      HOW ARE YOU?

R. HORTON 001834

68

Q.        MY NAME IS MYRON SHWARTZ AND I REPRESENT RICHARD.

LET'S START WITH THE LAST THING YOU TALKED ABOUT WHEN YOU CLAIMED THAT MR. HORTON GAVE YOU THIS PHONE NUMBER AND SAID HE WOULD PAY YOU $3,000 OR $5,000; IS THAT CORRECT?

A.        3,000.

Q.        AND YOU IMMEDIATELY TOOK IT TO THE PROSECUTING ATTORNEY?

A.        RIGHT.

Q.        AND WHAT DID THE PROSECUTING ATTORNEY TELL YOU?

A.        ASKED ME WHY DID HE GIVE IT TO ME.  I EXPLAINED TO HIM, TOLD HIM WHY HE GAVE IT TO ME.

Q.        DID HE SUGGEST TO YOU THAT YOU CALL THAT NUMBER, PUT A TAPE ON YOU, SO THAT YOU COULD RECORD WHAT WAS SAID?

A.        NO.

Q.        HE NEVER SUGGESTED THAT TO YOU, DID HE?

A.        NO, SIR.

Q.        SO ALL WE HAVE RIGHT NOW IS YOUR SO-CALLED STATEMENT THAT HE OFFERED YOU $3,000?

A.        YES.

Q.        ISN'T IT A FACT YOU WENT TO HIS HOUSE AND TALKED TO HIM?

R. HORTON 001835

69

A.      NO.

Q.      YOU NEVER WENT TO HIS HOME?

A.      NO, SIR.  I WAS ON THE STREET BY THE WELDING SHOP.  THERE IS A WELDING SHOP.

Q.      DO YOU KNOW WHERE HE LIVES?

A.      I SEEN THE HOUSE OVER WHERE HE BE AT.

Q.      WHERE IS THAT?

A.      IT IS ON REYNOLDS AVENUE NEXT DOOR TO THE WELDING SHOP I GO TO.

Q.      YOU NEVER WENT THERE?

A.      NO, I NEVER BEEN THERE.

Q.      YOU NEVER WENT THERE AND TOLD THAT MAN YOU KNEW IT WASN'T HIM AND MAYBE HE COULD HELP YOU FIND THE MAN?

A.      NO.

Q.      YOU NEVER DID THAT?

A.      NO, I NEVER.

Q.      IN YOUR TESTIMONY YOU TALKED ABOUT KNOWING HIS VOICE; IS THAT CORRECT?

A.      YES.

Q.      WHAT DID YOU -- THE MAN THAT CAME INTO YOUR HOUSE THAT MORNING, DID YOU SEE HIS FACE?

A.      NO, HE HAD A HOOD DRAWN ALL THE WAY UP.  YOU COULD SEE THIS MUCH AROUND THE EYES ACTUALLY.  YOU CAN SEE THIS HERE (INDICATING).

R. HORTON 001836

70

Q.        SO THE MAN WHO ROBBED YOU HAD HIS FACE COMPLETELY COVERED; IS THAT CORRECT?

A.        NO.  YOU COULD SEE HIS EYES, EYEBROWS AND EYES RIGHT AROUND HERE (INDICATING).

Q.        YOU COULD SEE HIS EYES AND EYEBROWS?

A.        YES.  AND THE VOICE.

Q.        YOU COULD HEAR THE VOICE?

A.        YEAH, I COULD HEAR.

Q.        TELL US ABOUT THE PHONE CALL AGAIN THE DAY BEFORE.  HOW DID THAT COME ABOUT?

A.        THE PHONE -- WHAT PHONE CALL?

Q.        WHEN YOU WERE MAKING A PHONE CALL?

A.        AT THE STORE?

Q.        YEAH.

A.        I DROVE IN THERE TO GET ME SOME BEER AND USE THE PHONE.  I GOT THE BEER, PUT IT IN MY TRUCK.  MY TRUCK WAS PARKED OUT FRONT OF THE BUILDING.  I WALKED BACKWARD TO THE PHONE BOOTH WHERE HE WAS STANDING, HIM AND ANOTHER GUY.  AND I USED THE PHONE, PICKED THE PHONE UP TO USE.  HE SAID, "LET ME USE THE PHONE."

Q.        HE ASKED YOU TO USE THE PHONE?

A.        YES.

Q.        WAS THERE AN ARGUMENT ABOUT IT?

A.        NO.

Q.        DID YOU LET THIS MAN USE THE PHONE?

R. HORTON 001837

A.        NO, I DIDN'T.  I WENT ON AND USED IT.

Q.        YOU DIDN'T LET THAT MAN USE THE PHONE?

A.        NO.  I USED PHONE FIRST.  THAT IS WHEN HE SAID, "LET ME USE THE PHONE."  I SAID, "NO.  I HAVE AN IMPORTANT CALL.  LET ME MAKE MY CALL."  AND I MADE MY CALL.

Q.        THAT MAN, HE TOLD YOU THAT HE WANTED TO USE THE PHONE, DIDN'T HE?

A.        YES.

Q.        YOU HAVE KNOWN THIS MAN FOR A LONG TIME, HAVEN'T YOU?

A.        NO, I HAVEN'T.

Q.        YOU NEVER BOUGHT DRUGS FROM HIM?

A.        NO, SIR, I NEVER BOUGHT DRUGS FROM HIM.

Q.        YOU DON'T USE DRUGS?

MR. STEAD:  OBJECTION.

THE COURT:  BASIS?

MR. STEAD:  RELEVANCE.

THE COURT:  I WILL ALLOW A BRIEF INQUIRY.  BRIEF.

GO AHEAD.

THE WITNESS:  WHAT WAS THE QUESTION NOW?

BY MR. SHWARTZ:

Q.        DIDN'T, IN FACT, YOU BUY DRUGS FROM HIM AND YOU WERE A REGULAR CUSTOMER OF HIS?

R. HORTON 001838

72

A.      NO, SIR.

Q.      TELL US ABOUT THE CAR.

A.      THE CAR THAT HE BOUGHT FROM MY NIECE?

Q.      UH-HUH.

A.      IT WAS -- I BELIEVE IT WAS A CUTLESS.  IT WAS YEARS AGO, EIGHT YEARS AGO.

Q.      HOW MANY YEARS AGO?

A.      TEN OR EIGHT YEARS AGO HE BOUGHT A CUTLESS.

Q.      EIGHT OR 10 YEARS?

A.      EIGHT OR 10 YEARS AGO HE BOUGHT A CUTLESS FROM MY NIECE.

Q.      WERE YOU THERE WHEN HE PURCHASED IT?

A.      THEY BOUGHT IT -- HE BOUGHT IT, HIM AND HER, THEY DONE THE TRANSACTION.  I WAS AT MY HOUSE WHEN THE TOW TRUCK BROUGHT IT THERE.  IT DIDN'T HAVE BRAKES TO DRIVE IT OUT OF THE IMPOUND.  I PUT BRAKES ON THE CAR.

Q.      WHO WAS THERE?

A.      WHO WAS WHERE?

Q.      WITH THE CAR, WHO BROUGHT THE CAR OVER TO YOU?

A.      HIM AND MY NIECE BROUGHT IT OVER.  THE TOW TRUCK BROUGHT IT AND THEY PULLED UP IN MY NIECE'S CAR.

Q.      THAT WAS EIGHT OR 10 YEARS AGO?

A.      IT WAS A WHILE BACK.

Q.      DID YOU SEE -- THIS IS A SMALL NEIGHBORHOOD;

R. HORTON 001839

73

IS THAT RIGHT?

A.      WELL, THE STREET I LIVE ON WAS JUST TWO HOUSES.

Q.      JUST TWO HOUSES?

A.      YES, SIR.

Q.      HOW CLOSE IS THE HOUSE NEXT TO YOU?

A.      ABOUT FROM HERE TO THE DOORWAY, LITTLE FURTHER.  TWICE THAT AMOUNT.

Q.      THAT IS THE ONLY OTHER HOUSE ON THE STREET?

A.      YES, SIR.

Q.      WHO LIVES THERE?

A.      SOME LADY.  SHE'S DECEASED NOW.  MISS ROGERS OR SOMETHING, I THINK HER NAME WAS.  SHE WAS AN OLDER LADY.

Q.      FROM THE TIME YOU FIXED THE CAR UNTIL THIS DAY, HOW MANY TIMES HAVE YOU SEEN RICHARD HORTON?

A.      MAYBE 20, 30 TIMES IN THE SERVICE STATION, AS I AM WALKING DOWN LEXINGTON, OR AT THE PLAYGROUND.

Q.      HOW RECENTLY HAVE YOU SEEN HIM?

A.      WHAT DO YOU MEAN ABOUT, THE LAST TIME I SAW HIM?

Q.      YES?

A.      IT WAS DOWN HERE IN THE COURTS.

Q.      DID YOU SEE HIM FIVE YEARS AGO?

A.      I CAN'T RECALL THAT.

74

Q.    DID YOU EVER HAVE ANY CONVERSATIONS WITH HIM?

A.    THE LAST CONVERSATION I HAD WITH HIM WAS IN THE COURT RIGHT OUTSIDE THE LOBBY.  I WAS TELLING HIM TO -- HE WAS TELLING MY GIRLFRIEND SHE KNOWS HE WASN'T THE ONE WHO DONE IT OR SOMETHING.  HE WAS IN THERE SAYING THAT.  AND I ASKED HIM TO GET OUT OF HER FACE AND LEAVE HER ALONE.  SHE WAS UPSET.  THAT IS THE LAST CONVERSATION I HAD WITH HIM.

Q.    I DIDN'T HEAR THAT.  REPEAT THAT AGAIN.

A.    THE LAST CONVERSATION I HAD WITH HIM WAS OUTSIDE IN THE LOBBY WHEN HE TOLD MY GIRLFRIEND, HE WALKED UP THE FIRST TIME WE HAD TO GO TO COURT, HE CAME UP AND SAID, "YOU KNOW THAT WASN'T ME.  YOU KNOW I DIDN'T DO THAT.  WHY YOU ALL SAYING THAT?"  AND SHE STARTED CRYING.  I TOLD HIM GET OUT OF HER FACE AND ASKED HIM TO LEAVE BECAUSE HE UPSET HER.

Q.    GOING BACK TO THE PHONE CALL THE NIGHT BEFORE AGAIN.  THIS MAN TOLD YOU HE WANTED TO USE THE PHONE; IS THAT CORRECT?

A.    YES, HE SAID HE WANTED TO USE THE PHONE THAT DAY.  IT WASN'T NIGHT.

Q.    AND WHAT WAS HE WEARING?

A.    A GRAY HOODED SWEATER AND PAIR OF BLUE JEANS.

Q.    THE SAME THING THE MAN CAME THE NEXT DAY WAS IN, CORRECT?

R. HORTON 001841

75

A.        SAME CLOTHES.

Q.        DID YOU -- THE MAN THAT WAS AT THE PHONE, DID YOU CALL HIM BY HIS NAME?

A.        YEAH.

Q.        RICHARD?

A.        YES.

Q.        DID YOU CALL HIM RICHARD?

A.        YES, SAME AS MINE.

Q.        SAME NAME AS YOURS.

          WHAT DID YOU TELL HIM?

A.        I TOLD HIM I HAD TO USE IT.  I HAD AN IMPORTANT CALL TO MAKE, AND I WENT ON AND USED THE PHONE.  I COULDN'T LOAN HIM NO $20 BECAUSE THAT WOULD LOSE FRIENDSHIPS.

Q.        SO IS IT MY UNDERSTANDING THAT EIGHT YEARS AGO YOU FIXED HIS CAR, AND NOW YOU SAW HIM EIGHT YEARS LATER AND YOU REMEMBERED HIS NAME WAS RICHARD?

A.        NO.  I SEEN HIM IN THE NEIGHBORHOOD.  I SEEN HIM WALKING.  I ALWAYS DID KNOW HIS NAME.  EVERYBODY KNOWS HIS NAME.  I KNOW HIM BY NAME.

Q.        DIDN'T YOU KNOW HIM BECAUSE HE SOLD YOU DRUGS?

A.        NO, SIR.

Q.        YOU NEVER BOUGHT DRUGS FROM HIM?

A.        NO, SIR.

R. HORTON 001842

76

MR. STEAD: OBJECTION, ASKED AND ANSWERED.

THE COURT: I WILL ALLOW IT. THAT IS THE LAST TIME. I WILL ALLOW THE QUESTION. OVERRULED.

BY MR. SHWARTZ:

Q. DO YOU KNOW WHERE HE LIVES?

A. NO, I DON'T.

Q. YOU'VE NEVER KNOWN WHERE THE HOUSE IS?

A. NO, SIR.

Q. YOU NEVER WENT TO HIS HOUSE?

A. NO.

MR. SHWARTZ: JUST ONE MOMENT.

BY MR. SHWARTZ:

Q. DID YOU DESCRIBE RICHARD HORTON TO THE DETECTIVE?

A. ALL I TOLD THE DETECTIVE WAS WHAT I SAW WITH THE HOOD DRAWLED ALL THE WAY UP. I COULDN'T DESCRIBE HIM TO HER. I KNOW HE HAD A LOW HAIR CUT, LOW CUT HAIR, BECAUSE I SEEN HIM AROUND THE NEIGHBORHOOD. IN THE SUMMERTIME THEY BE OUT IN PLAYGROUND CALLED MILO. THEY SHOOT BASKETBALL THERE. I GOT A PICK-UP TRUCK, I GO IN THE ALLEYS AND I MIGHT GET JUNK OUT OF THE ALLEYS AND I SELL IT TO THE SCRAP YARD WHEN I AM NOT HAULING SOD. IF I CAN'T WORK, I HAVE TO HAVE MONEY, SO I DO THINGS LIKE THAT. I REPAIR CARS. I SEEN HIM AROUND. LIKE HIM AND A LOT OF OTHER GUYS I SEE AROUND.

R. HORTON 001843

77

Q.        ALL THESE YEARS, DID YOU EVER HAVE A
CONVERSATION WITH HIM FROM THE EIGHT YEARS BEFORE, DID
YOU EVER TALK TO HIM AT ALL?

A.        I MIGHT HAVE SPOKEN AND KEPT GOING, THAT WAS
IT.

Q.        YOU HAD NO CONVERSATION?

A.        NO, I NEVER HAD NO CONVERSATION.

Q.        DID YOU DESCRIBE -- HOW DID YOU DESCRIBE HIM
TO THE DETECTIVE?

A.        JUST HIS HEIGHT.  I DESCRIBED HIS HEIGHT, HIS
BUILD AND HIS SKIN COMPLECTION.

Q.        WHAT IS HIS SKIN COMPLECTION?

A.        LIGHT-SKINNED.

Q.        DID THE DETECTIVE SHOW YOU MORE THAN ONE
GROUP OF PICTURES OR ONLY ONE GROUP?

A.        I REALLY DON'T REMEMBER.

Q.        I WANT TO SHOW YOU STATE'S EXHIBIT NUMBER 1
AND ASK YOU WHO'S LIGHT-SKINNED ON THIS GROUP?

A.        RICHARD.

Q.        THE OTHER FIVE AREN'T LIGHT-SKINNED, ARE
THEY?

A.        NO.

MR. SHWARTZ:  THANK YOU.

THE COURT:  ANY REDIRECT?

MR. STEAD:  NO, THANK YOU.

R. HORTON 001844

78

THE COURT: ANY QUESTIONS OF THIS WITNESS BY ANY MEMBER OF THE PANEL?

SEEING NONE, THANK YOU FOR TESTIFYING. YOU MAY STEP DOWN.

THE WITNESS: YES, SIR.

(WITNESS IS SWORN.)

THE COURT: HAVE A SEAT. LET'S START WITH YOU FULL NAME.

THE WITNESS: RHONDA LYNN CURRY.

THE COURT: AND YOUR ADDRESS, MISS CURRY?

THE WITNESS: PRESENT ADDRESS?

THE COURT: YES.

THE WITNESS: 1283 INDIANOLA AVENUE, APARTMENT C.

THE COURT: COLUMBUS?

THE WITNESS: OHIO.

THE COURT: AND DO YOU WORK, MA'AM?

THE WITNESS: YES.

THE COURT: WHAT DO YOU DO?

THE WITNESS: I AM A CASHIER AT WENDY'S.

THE COURT: VERY WELL. YOUR WITNESS.

MR. SMITH: THANK YOU, YOUR HONOR.

- - -

RHONDA CURRY

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, STATE OF

79

OHIO, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. SMITH:

Q.    GOOD MORNING, MISS CURRY.

A.    HI.

Q.    COULD YOU TELL US HOW YOU KNOW RICHARD MCCLANAHAN?

A.    I HAVE BEEN KNOWING HIM FOR THE LAST -- WELL, IT'S BEEN ALMOST 15 YEARS WE HAVE BEEN TOGETHER, LIVING TOGETHER FOR 15 YEARS.

Q.    OKAY.  AND IN THIS TIME LIVING TOGETHER, HAVE YOU BEEN WORKING?

A.    OFF AND ON, YES.

Q.    ARE YOU PRESENTLY WORKING?

A.    YES, SIR.

Q.    WHERE IS THAT YOU'RE WORKING?

A.    WENDY'S ON OLENTANGY RIVER ROAD.

Q.    DO YOU RECALL WHERE YOU LIVED ON OR ABOUT OCTOBER 9TH, 2004?

A.    927 LOEW STREET.

Q.    WHO LIVED AT THIS ADDRESS WITH YOU?

A.    RICHARD MCCLANAHAN JUNIOR.

Q.    THIS IS THE PERSON YOU HAVE BEEN LIVING WITH FOR APPOXIMATELY 15 YEARS?

A.    YES, SIR.

R. HORTON 001846

80

Q.      THE DAY BEFORE, OCTOBER 8TH, 2004, DO YOU RECALL ANYTHING OUT OF THE ORIDINARY ABOUT THAT EVENING?

A.      YES, SIR.

Q.      WHAT DID YOU DO THE EVENING OF OCTOBER THE 8TH IN TERMS OF IN THE LATER EVENING?

A.      WE WAS OVER AT MY DAUGHTER'S HOUSE, MY SISTER CAME AND SURPRISED ME.  SHE CAME TO SEE ME.  RICHARD CAME AND PICKED ME UP WHEN HE GOT OFF WORK AND WE WENT HOME.

Q.      OKAY.  WHEN YOU GOT HOME, WHAT TIME DID YOU GO TO BED THAT EVENING?

A.      MAYBE ABOUT 12:30, 1:00 O'CLOCK.

Q.      AND HOW WERE YOU AWOKEN THE NEXT MORNING, OCTOBER 9TH, 2004?

A.      WITH A KNOCK ON THE DOOR.

Q.      AND WHAT DID YOU -- WHAT WAS YOUR REACTION TO THAT?  WHAT DID YOU DO?  DID YOU GO ANSWER THE DOOR?

A.      WELL, ME AND HIM WAS IN THE FRONT, MY SISTER SLEPT IN MY ROOM IN THE BACK.  AND I SAID -- RICKY SAID, "THAT GUY IS AT THE DOOR TO GET HIS BRAKES DONE."  HE SAID, "ANSWER IT."  I SAID, "NO, YOU ANSWER."

Q.      IT'S YOUR IMPRESSION IT WAS SOMEBODY COMING TO GET THEIR BRAKES DONE?

A.      EXACTLY.

Q.      OKAY.

R. HORTON 001847

81

Q.      JUST SO I AM CLEAR.  HOW CLOSE IS YOUR BED TO THE FRONT DOOR?

A.      ABOUT A FOOT AND A HALF.  MAYBE A FOOT AND A HALF.

Q.      SO VERY CLOSE TO THE FRONT DOOR?

A.      YES, SIR.

Q.      WHAT KIND OF BED IS THIS?

A.      IT WAS A ROLL-OUT BED.  IT WAS A COUCH BED.

Q.      SO RICHARD MCCLANAHAN WAS THE ONE WHO GOT THE OPPORTUNITY TO ANSWER THE DOOR?

A.      YES, SIR.  WHICH HE WAS ON THE COUCH ACROSS FROM ME.  I WAS IN THE BED, HE WAS ON THE COUCH.

Q.      SO WHEN RICHARD WENT TO THE DOOR, WHAT HAPPENED?

A.      HE DIDN'T LOOK -- WE HAD A PEEPHOLE, HE DIDN'T LOOK OUT THE DOOR.  HE SAID, "COME ON," WHOEVER THE PERSON THAT WAS ON THE OTHER END OF THE DOOR, HE SAID, "COME ON, SLIM, OPEN THE DOOR."  HE WENT AHEAD AND OPENED THE DOOR, AND HE GOT HIT ACROSS THE HEAD.  HE GOT THE -- YOU KNOW, HE OPENED THE DOOR LIGHTLY AND PEEKED OUT, AND HE FORCED HIS WAY IN AND HIT HIM ON THE HEAD WITH THE GUN AND HE FELL BACK.

Q.      WHERE DID HE FALL?

A.      ON THE BED NEAR ME.

Q.      AND WHAT DID THIS INDIVIDUAL WHO -- WAS IT

ONE PERSON OR MORE THAN ONE PERSON?

A.       ONE PERSON.

Q.       OKAY.  WHAT DID -- THIS INDIVIDUAL THAT HIT HIM ACROSS THE HEAD, DID THEY SAY ANYTHING?

A.       THEY SAID, "YOU KNOW WHAT THIS IS, MOTHERFUCKER.  THIS IS A ROBBERY.  GIVE ME YOUR MONEY."

Q.       AND WHAT HAPPENED NEXT?

A.       HE FELL.  AND I SAW THE GUN.  BUT I WAS -- I GUESS I WENT INTO SHOCK.  I NEVER HEARD THE GUN GO OFF. I DID SEE HIM HIT HIM IN THE HEAD WITH THE GUN.

Q.       WHO HAD THE GUN?

A.       THE ROBBER.

Q.       OKAY.  IMMEDIATELY UPON ENTERING THE DOOR, YOU SAW ENTERING THE DOOR, YOU SAW THE ROBBER HIT RICHARD MCCLANAHAN WITH THE GUN?

A.       YES, SIR.

Q.       OKAY.  WHAT HAPPENED NEXT?

A.       HE SHOT HIM.  HE SAID, "YOU KNOW WHAT THIS IS, MOTHERFUCKER."  HE YANKED HIM UP AND THREW HIM AROUND.  AND AS RICHARD GOT ON THE FLOOR AROUND FROM THE BED, AND I'M HOLLERING, "DON'T, DON'T.  SHUT UP, BITCH." HE SAID, "I WILL KILL YOU, TOO.  GIVE ME YOUR GOD DAMN MONEY.  I DON'T HAVE A JOB.  I DON'T HAVE NO MONEY", OR SOMETHING, SOME WORDS TO THAT.  "QUIT LOOKING AT ME", YOU KNOW.  AND HE SAID, "I OUGHT TO KILL HER."  RICK

R. HORTON 001849

83

SAID, "DON'T TOUCH HER.  GO AHEAD AND FINISH ME OFF, MAN.  LEAVE HER ALONE."

YOU KNOW, THAT IS WHEN I GUESS HE POINTED THE GUN AT RICK AGAIN AND SAID, "GIVE MY THE GOOD DAMN MONEY.  WHAT YOU LOOKING FOR?  WHAT YOU LOOKING FOR? WHAT IS UP UNDER THERE?  WHERE'S YOU PHONE AT NOW? WHERE'S YOUR PHONE AT NOW, MOTHERFUCKER?"  I THINK HE KICKED HIM, YOU KNOW.  RICK SAID, "I'M TRYING TO GET MY MONEY.  I'M TRYING TO GET MY MONEY.  THAT IS ALL I GOT. THAT IS ALL I GOT."

YOU KNOW, HE SNATCHED THAT.  AND HE -- I THINK HE MIGHT HAVE KICKED HIM AGAIN.  SO HE WALKED ON OUT.  AND THE STAND, HE JUST PUSHED ALL THAT STUFF OFF AND SAID, "FUCK THIS SHIT," AND WENT ON OUT THE DOOR.  I IMMEDIATELY JUMPED UP AND LOCKED THE DOOR.  WE USED TO PUT A KNIFE IN THE DOOR TO KIND OF BRACE IT.  I WENT TO RICKY AND SAID, "COME ON, GET UP."  YOU KNOW, I GOT TO GO TAKE CARE OF YOU.

WHEN I WENT TO GET HIM UP, HE FELL BACK DOWN.  I SAID, "WHAT IS WRONG?"  HE SAID, "I HAVE BEEN SHOT."  LIKE I SAID, I SAW THE GUN BUT I DON'T REMEMBER IT GOING OFF.

Q.        WHAT DID YOU DO THEN?

A.        I GOT HIM UP, AND MY SISTER CAME OUT OF THE ROOM.  SHE WAS STANDING THERE, SHE WAS JUST SHAKING.

R. HORTON 001850

84

AND I FORGOT SHE WAS EVEN BACK THERE. SHE KNEW NOT TO COME OUT THE ROOM BECAUSE HE PROBABLY WOULD HAVE SHOT US ALL, YOU KNOW. SO SHE STAYED BACK THERE. BUT SHE SAID IF SHE HAD HEARD ANOTHER GUNSHOT, SHE WOULD HAVE KNEW IT WAS ME, YOU KNOW. SO SHE STAYED BACK THERE. WHEN SHE HEARD HIM LEAVE AND I SHUT THE DOOR, I SAID, "COME ON, RICK." SHE CAME OUT. SHE WAS STANDING THERE. I SAID "OH, MY GOD. I FORGOT YOU WAS EVEN BACK THERE", YOU KNOW. YOU KNOW. AND SHE SAID, "YOU ALL ALL RIGHT?" WE PICKED HIM UP AND IMMEDIATELY TOOK HIM OUTSIDE THE DOOR TO WHERE HIS RED TRUCK WAS PARKED.

Q.      LET'S GO BACK HERE A LITTLE BIT. WE WILL GET TO WHAT YOU DID AFTER YOU PUT HIM IN THE RED TRUCK.

LET'S GO BACK. TWO THINGS THE PERSON WHO CAME INTO THE HOUSE WAS SAYING. YOU MENTIONED HE WAS SAYING SOMETHING ABOUT WHERE IS THE TELEPHONE?

A.      YEAH. HE SAID, "WHERE IS YOUR PHONE AT NOW? WHERE IS YOUR PHONE AT NOW?" I DIDN'T KNOW WHAT HE WAS TALKING ABOUT UNTIL I HAD TALKED TO RICK AFTER RICK GOT IN THE HOSPITAL. HE TOLD ME THAT EVENING HE HAD A RUN-IN WITH HIM AT THE TELEPHONE BOOTH. I DIDN'T KNOW THAT AT THAT TIME. THAT IS WHY I WAS WONDERING WHY HE WAS TALKING ABOUT A TELEPHONE. "I KNOW YOU JUST GOT PAID YESTERDAY."

I DIDN'T KNOW THAT, YOU KNOW, UNTIL RICK

R. HORTON 001851

TOLD ME THAT FRIDAY HE RAN INTO HIM, HE WANTED TO USE THE PHONE, AND SOMETHING ABOUT $20 HE ASKED HIM TO BORROW.  RICK TOLD HIM, NO, MAN.  LET ME USE THE PHONE. HE PULLED HIS MONEY OUT TO GET HIS CHANGE TO USE THE PHONE.

Q.        OKAY.  WHAT ABOUT THINGS THAT THE DEFENDANT SAID TO YOU?  I KNOW AT ONE POINT YOU HAD TALKED ABOUT HE TOLD YOU TO QUIT LOOKING?

MR. SHWARTZ:  OBJECTION.

THE COURT:  BASIS OF THE OBJECTION?

MR. SHWARTZ:  IT'S WHAT DID THE MAN SAY, NOT WHAT THE DEFENDANT SAID TO YOU.

BY MR. SMITH:

Q.        WHAT DID THE ROBBER OR MAN SAY TO YOU?

A.        HE SAID, "TELL THAT BITCH TO QUIT LOOKING AT ME.  QUIT LOOKING AT ME."  HE HAD THE GUN POINTED TO ME AT THAT TIME, AND I JUST QUIT LOOKING AT HIM.  AND I JUST TOOK THE PILLOW AND PUT IT OVER MY FACE SO I WOULDN'T KEEP LOOKING AT HIM BECAUSE I DIDN'T WANT TO GET SHOT MYSELF, YOU KNOW.  BUT AT THE SAME TIME, I WAS STILL TRYING TO KIND OF PEEP OUT THE CORNER OF MY EYE. HE CAUGHT ME LOOKING AGAIN AND HE SAID, "QUIT LOOKING AT ME, BITCH."  LIKE THAT.  THAT IS WHEN HE SAID -- WHEN HE ASKED ME, "I OUGHT TO KILL HER, AND GIVE ME YOUR MONEY." AND THAT IS WHEN I SAID, "I DON'T HAVE A JOB."  RICK

86

SAID, "DON'T BOTHER HER.  GO AHEAD AND FINISH ME OFF."
YOU KNOW, "LEAVE HER ALONE."

Q.        HOW MUCH OPPORTUNITY DID YOU GET TO LOOK AT
THE ROBBER?

A.        I GOT A GOOD OPPORTUNITY AT -- WHEN HE
REALIZED I WAS LOOKING AT HIM, THAT IS WHEN HE TOLD ME
TO QUIT LOOKING AT HIM.

Q.        HOW MANY TIMES --

A.        FROM THE TIME WHEN HE CAME --

            THE COURT:  MA'AM, YOU HAVE ANSWERED THE
QUESTION.

            THE WITNESS:  EXCUSE ME.
BY MR. SMITH:

Q.        HOW MANY TIMES DO YOU THINK YOU GOT A CHANCE
TO LOOK AT THE ROBBER?

A.        I'D SAY A GOOD TWO TO THREE TIMES.

Q.        WHAT DID THE ROBBER DO WHEN HE CAUGHT YOU
PEEKING AT HIM?

A.        THAT IS WHEN HE TOLD ME, "I WILL KILL YOU,
TOO.  QUIT LOOKING AT ME."  HE HAD THE GUN POINTED LIKE
SIDEWAYS, YOU KNOW WHAT I'M SAYING?  HE TURNED THE GUN.

Q.        HOW FAR WAS THE GUN FROM YOU?

A.        I WILL SAY FROM WHERE YOU ARE TO WHERE I AM
NOW.  MAYBE A LITTLE CLOSER.

Q.        THE WHOLE TIME THIS INCIDENT WAS GOING ON

R. HORTON 001853

INSIDE OF 927 LOEW STREET, WHERE WAS THE GUN?

A.          IN HIS HAND.

Q.          WHERE WAS THE GUN POINTED?

A.          BETWEEN ME AND HIM.  HE NEVER HELD IT DOWN LIKE THIS, YOU KNOW.  IT WAS ON EITHER HIM OR ME.

Q.          WHEN YOU SAY HIM, WHO YOU ARE YOU TALKING ABOUT?

A.          RICHARD MCCLANAHAN.

Q.          OKAY.

A.          RICHARD MCCLANAHAN.

Q.          WHAT HAPPENS AFTER YOU PUT RICHARD IN THE RED TRUCK?

A.          I WAS IMMEDIATELY GOING TO TAKE HIM TO OSU EAST, WHICH IS ON TAYLOR AVENUE.  WHICH ONCE I TURNED THE CORNER, YOU KNOW, ONCE I GOT TO THE CORNER OF GIBBARD, HE SAID?  NO, TAKE ME TO MY SISTER'S HOUSE, THAT WAY WE CAN CALL THE PARAMEDICS."  SO I TURNED, INSTEAD OF TURNING THIS WAY, INSTEAD OF TURNING RIGHT, I WENT LEFT TO GO DOWN GIBBARD AVENUE TO TAKE HIM TO HIS SISTER'S HOUSE WHICH IS THREE HOUSES FROM THE CORNER.

Q.          AND DID YOU GET TO HIS SISTER'S HOUSE?

A.          YES, SIR.

Q.          WHAT HAPPENED AT HIS SISTER'S HOUSE?

A.          I JUMPED OUT OF THE TRUCK.  I WAS ON THE -- I WAS DRIVING.  RICHARD WAS IN THE MIDDLE.  MY SISTER IS

88

ON THE OTHER END.  I IMMEDIATELY PUT THE TRUCK IN PARK, LEFT IT RUNNING, RAN TO THE DOOR, BANGED ON THE DOOR, "CINDY, CALL THE PARAMEDICS.  RICKY HAS BEEN SHOT."

Q.        WERE THE PARAMEDICS CALLED?

A.        YES.

Q.        DID YOU GO WITH RICHARD TO THE HOSPITAL?

A.        WHAT I DONE, I WAITED UNTIL THE PARAMEDICS GOT THERE, CYNTHIA GOT IN THE EMERGENCY SQUAD TRUCK WITH HIM TO TAKE HIM TO GRANT MEDICAL.  I WENT BACK TO LOEW STREET TO GET -- GIVE THE REPORT TO THE POLICE.

Q.        SO YOU AT THAT POINT TALKED TO THE POLICE ABOUT WHAT HAPPENED?

A.        YES.  I MEAN, I DIDN'T TALK TO THEM.  I WANTED THEM TO KNOW THIS IS WHERE IT HAPPENED.  THEY HAD IT ROPED AT THE -- HAD IT ALL ROPED OFF.  I WAS TOLD THEY WOULDN'T LET ME BACK IN THERE.  MY SISTER, YOU KNOW, SHE WAS FIXING TO HAVE AN ASTHMA ATTACK.  SHE WAS -- YOU KNOW, SHE TAKES THE BREATHING MACHINE.  AND SO I JUST ASKED HIM, CAN SHE PLEASE GET HER MEDICINE OUT OF THE BACK ROOM.  YOU KNOW, BECAUSE SHE COULDN'T GET IT.  SHE DID GET SOME.

THEN I HEARD THE POLICE SAY THEY WERE TAKING HIM TO OSU MAIN.  AND THEN THEY CALLED BACK AND SAID, NO, NO, WE'RE TAKING HIM TO GRANT MEDICAL.  IMMEDIATELY I JUMPED BACK IN THE TRUCK AND WENT AND GOT MY DAUGHTER,

R. HORTON 001855

89

BECAUSE MY SISTER HAD CALLED MY DAUGHTER AND WENT AND GOT MY DAUGHTER AND WENT TO THE HOSPITAL, WENT TO THE GAS STATION, WENT TO THE HOSPITAL, GRANT MEDICAL.

Q.     WHEN YOU WERE AT THE HOSPITAL, DID YOU HAVE CONTACT WITH ANY OTHER POLICE PERSONNEL, COLUMBUS DETECTIVES, OR ANYTHING LIKE THAT?

A.     BRENDA WALKER.

Q.     WHEN DID YOU SEE DETECTIVE WALKER?

A.     AFTER I TOOK -- AFTER I SEEN RICK WAS OKAY, HIS NICKNAME IS RICK.  AFTER I SEEN HE WAS OKAY, CYNTHIA, HIS SISTER, HAD TO GO BACK HOME BECAUSE HER GRANDSON WAS THERE.  SO SHE WANTED TO GET HIS -- GO GET HIS MOTHER SO SHE COULD COME GET THE BABY SO WE ALL COULD GO BACK AT THE HOSPITAL.

IN THE MEANTIME, I TOOK CYNTHIA BACK, AND MY DAUGHTER CALLED.  I HAD RICK'S CELL PHONE.  AND MY DAUGHTER CALLED ME AND SAID?  MOM, GET BACK DOWN HERE. THE DETECTIVE WANTED TO TALK TO YOU."  SO I IMMEDIATELY LEFT HER THERE AND WENT BACK TO THE HOSPITAL.

Q.     WHAT DID YOU -- WAS YOUR CONVERSATION WITH THE DETECTIVE?

A.     I TOLD HER WHAT HAPPENED.  THE SAME THING I TOLD YOU ALL.  AND SHE ASKED ME WHAT DID THE GUN LOOK LIKE.  I DESCRIBED IT TO HER.  SHE DREW A COUPLE PICTURES.  I DESCRIBED IT TO HER AND TOLD HER THE SAME

R. HORTON 001856

90

STORY I TOLD YOU ALL.

Q.        WHEN YOU TALKED TO THE DETECTIVE, DID YOU HAVE AN IDEA OF WHO YOU THOUGHT MIGHT HAVE BEEN THE PERSON WHO DID THIS?

A.        YES, I DID.

Q.        DID YOU -- WERE YOU ABLE TO EXPLAIN THAT TO THE DETECTIVE?

A.        I DID.  I KNEW, YOU KNOW, IN MY MIND, ON MY WAY TO THE HOSPITAL, WHO IT WAS.  BUT I JUST -- I WAS SO UPSET I JUST FORGOT.  I JUST DIDN'T REMEMBER UNTIL SHE CAME TO TAKE HER STATEMENT AT MY HOME, AT MY DAUGHTER'S HOME.  AND THAT IS WHEN I TOLD HER, YOU KNOW, I THINK I KNOW WHO IT WAS.  SHE SAID, "RHONDA, YOU DIDN'T TELL ME THAT MORNING."  I SAID, "I KNOW.  I JUST FORGOT."  I TOLD MY DAUGHTER ON THE WAY TO THE HOSPITAL, I TOLD HER I THINK I KNOW WHO IT WAS.  SHE SAID, "DO YOU?"  I SAID, "YEAH."

SHE WENT TO SCHOOL WITH HIM MAYBE A MONTH OR TWO WHEN HE FIRST MOVED TO COLUMBUS, OHIO.  AND I SAID, "YOU REMEMBER A GUY NAMED RICHARD?"  SHE SAID, "YES.  WE USED TO CALL HIM ADDIAS MAN OR SOMETHING."  I SAID, "KIM, I THINK THAT IS WHO IT WAS."  SHE SAID, "FOR REAL, MOMMY?"  I SAID, "YEAH."

WELL, AFTER RICK CAME OFF HIS MEDICINE AND STUFF MAYBE THAT SUNDAY EVENING OR MONDAY, AND I WAS

R. HORTON 001857

91

GOING TO WASH HIM UP, HE SAID THE SAME NAME.

YOU KNOW, WE WASN'T NOWHERE NEAR EACH OTHER WHEN I SAID IT FIRST, AND THEN HE TURNED AROUND AND SAID THE SAME NAME, YOU KNOW.  AND I SAID, WELL, I REALLY DO BELIEVE THAT IT WAS HIM.  AND I WOULD DIE AND KEEP SAYING IT UNTIL I DIE THAT IT WAS HIM.

Q.      DID YOU HAVE AN OPPORTUNITY TO MEET WITH THE DETECTIVE IN EARLY DECEMBER SEVERAL WEEKS AFTER THIS HAPPENED?

A.      YES, SIR.

Q.      OKAY.  DO YOU REMEMBER WHERE THIS MEETING OCCURRED?

A.      YES, SIR.

Q.      WHERE WAS THAT?

A.      1250 INDIANOLA AVENUE AT MY DAUGHTER'S HOUSE.

Q.      AND WHAT OCCURRED AT THIS MEETING WITH DETECTIVE WALKER?

A.      SHE CAME IN AND SHE TALKED -- ASKED HOW RICK WAS DOING AND EVERYTHING, AND WE TALKED TO HER.  AND SO SHE SAID I WANT TO SHOW YOU GUYS A PICTURE, YOU KNOW.

Q.      WHEN SHE TALKED TO YOU SHOWING YOU A PICTURE, WERE YOU AND RICHARD MCCLANAHAN TOGETHER AT THIS TIME?

A.      NO.  NO.

Q.      HOW DID SHE SHOW IT TO YOU?

A.      I WAS GOING TO THE STORE TO GET CIGARETTES, I

R. HORTON 001858

SAID, "I WILL GO AHEAD AND GO." SHE SAID, "YOU CAN LEAVE THE ROOM." I SAID, "NO, I WAS GOING TO THE STORE ANYWAY." BUT I KNEW SHE WAS COMING. I WAS TRYING TO GO BEFORE SHE CAME AND GET BACK. SO I SAID, "I'M GOING TO THE STORE." SO I WENT TO THE CORNER STORE, WHICH IS MAYBE SIX, SEVEN HOUSES DOWN THE STREET. AND I WALKED AND, YOU KNOW, CAME ON BACK. AND SHE SAID, "RHONDA," SHE SAID, "I WANT TO TALK TO YOU." SHE WANTED ME TO SEE THE PICTURE. SHE SAID RICHARD ALREADY SHOWED ME HIS, YOU KNOW. SHE ALREADY DONE HIS. SO I DON'T HAVE NO IDEA WHAT HE DONE OR WHO HE PICKED OR NOTHING, YOU KNOW.

Q.      OKAY.

A.      SO SHE TOOK ME IN ANOTHER ROOM, A WHOLE OTHER ROOM.

Q.      NOW, YOU'RE SPEAKING ABOUT A PICTURE, PICTURES THAT THE DETECTIVE SHOWED YOU?

A.      UH-HUH.

Q.      I WANT TO APPROACH YOU WITH STATE'S EXHIBIT NUMBER 2. TAKE A SECOND TO LOOK AT THAT.

A.      OKAY.

Q.      DO YOU RECOGNIZE THAT?

A.      YES, I DO.

Q.      WHAT IS THAT?

A.      IT IS THE PICTURES THAT DETECTIVE BRENDA WALKER SHOWED ME THE DAY SHE CAME TO MY DAUGHTER'S

HOUSE.

Q.      IS THAT A FAIR AND ACCURATE REPRESENTATION OF THE PICTURES SHE SHOWED YOU THAT DAY?

A.      YES, SIR.

Q.      WHAT WAS THE PROCESS IN WHICH SHE SHOWED YOU THE PICTURES?

DID SHE GIVE YOU ANY INSTRUCTIONS AS TO WHAT YOU WERE SUPPOSED TO DO WITH THE PICTURES?

A.      SHE TOLD ME TAKE MY TIME, LOOK IT OVER.  AND I DID.  AND EVEN TRIED LOOKING AT EACH ONE OF THEM WITH THE HOODIE, THE HOOD, THAT'S HOW HE HAD IT, TIED AROUND HIS FACE.  AND I PICTURED IT JUST AS PLAIN AS DAY.

Q.      AND WHAT DID -- AFTER YOU TOOK A LOOK AT THE PICTURES, WHAT DID YOU TELL THE DETECTIVE?

A.      THAT I KNEW WHO IT WAS.

Q.      DID YOU POINT OUT A CERTAIN PICTURE?

A.      YES, SIR.

Q.      AND WHICH PICTURE DID YOU POINT OUT?

A.      THAT ONE RIGHT THERE (INDICATING).

Q.      IS THAT PICTURE NUMBER 5?

A.      YES, SIR.

Q.      OKAY.  DID THE DETECTIVE HAVE YOU SIGN AND DATE THE PICTURE?

A.      YES, SIR.

Q.      AND YOU DID SO?

R. HORTON 001860

A.          YES, SIR.

Q.          IS THAT YOUR SIGNATURE, YOUR DATE ON THE PICTURE?

A.          YES, SIR.

Q.          WHEN YOU SIGNED AND DATED PHOTO NUMBER 5, HOW SURE WERE YOU THAT THE PHOTO THAT YOU IDENTIFIED WAS THE PERSON THAT WAS THE ROBBER?

A.          110 PERCENT.

Q.          DID YOU EXPLAIN THAT TO THE DETECTIVE?

A.          YES, SIR.

Q.          HOW SURE ARE YOU NOW THAT THE PERSON YOU IDENTIFIED IN PHOTO NUMBER 5 IS THE PERSON THAT WAS THE ROBBER?

A.          THE SAME AS THE DAY I IDENTIFIED IT THE FIRST DAY.

Q.          HOW SURE IS THAT?

A.          110 PERCENT.

Q.          IS THE PERSON THAT YOU IDENTIFIED AS NUMBER 5, IS THAT PERSON IN THE COURTROOM?

A.          CAN I TAKE A GLANCE AND LOOK AND SEE?

Q.          YES.

A.          YES, SIR.

Q.          COULD YOU POINT THAT PERSON OUT AND DESCRIBE WHAT THEY LOOK LIKE, WHAT THEY ARE WEARING?

A.          YES.  HE'S WEARING A -- WHAT COLOR SUIT, I

R. HORTON 001861

95

DON'T KNOW WHAT COLOR IT IS. BUT A GRAY AND WHITE TIE, I GUESS, AND WHITE SHIRT, GOLD WATCH. THIS SIR RIGHT HERE (INDICATING).

MR. SMITH: YOUR HONOR, THE STATE WOULD ASK THE RECORD TO REFLECT THAT THE WITNESS HAS IDENTIFIED THE DEFENDANT RICHARD HORTON.

THE COURT: SO ORDERED.

BY MR. SMITH:

Q. DID THE DETECTIVE DO ANYTHING TO INFLUENCE YOU IN WHO YOU PICKED OUT OF THIS GROUP OF PHOTOGRAPHS?

A. NO, SIR.

Q. AND THE PERSON THAT YOU PICKED OUT OF THIS GROUP OF PHOTOGRAPHS IS THE PERSON THAT WAS THE ROBBER ON OCTOBER 9TH, 2004?

A. YES, SIR.

Q. AND THAT SAME PERSON IS THE PERSON THAT YOU IDENTIFIED IN THE COURTROOM AS THE DEFENDANT RICHARD HORTON?

A. YES, SIR.

Q. IS THERE ANY DOUBT IN YOUR MIND THAT IT WAS THE DEFENDANT RICHARD HORTON WHO WAS THE ROBBER ON THE DATE OF OCTOBER 9TH, 2004?

A. NO, SIR, THERE IS NO DOUBT IN MY MIND.

Q. YOU SAID THIS OCCURRED AT 927 LOEW STREET?

A. YES, SIR.

R. HORTON 001862

Q.      IS THAT IN FRANKLIN COUNTY, STATE OF OHIO?

A.      YES, SIR.

Q.      HAVE YOU BEEN INVOLVED IN RICHARD MCCLANAHAN'S TRANSPORTATION AND MEDICAL CARE?

A.      YES, SIR.

Q.      TELL ME ABOUT THAT.

A.      HE HAD -- THE FIRST DAY HE HAD SURGERY, AND I THINK MAYBE THAT WEDNESDAY OR THURSDAY, FOLLOWING THAT HE HAD ANOTHER SURGERY, AND HE GOT OUT ON THE 10TH DAY. I TOOK CARE OF HIM TOTALLY. I HAD TO WASH HIM, WIPE HIM, AND EVERYTHING BECAUSE HE COULD NOT BEND HIS LEG. HE HAD A BAR IN HIS LEG, AND IT STAYED STRAIGHT OUT LIKE THIS FOR UP UNTIL NOVEMBER 18TH. HE WENT BACK IN AND HAD THE BAR TAKEN OFF. I DRESSED, UNDRESSED IT, CLEANED IT, MADE SURE HE TOOK HIS THERAPY (DEMONSTRATING).

Q.      SO SUFFICE TO SAY THIS HAS BEEN A LONG PROCESS AND THERE HAVE BEEN SEVERAL SURGERIES?

A.      EXACTLY.

Q.      I WANT TO GO BACK TO THE FIRST TIME YOU TALKED TO THE DETECTIVE.

        WHEN YOU TALKED TO THE DETECTIVE THAT FIRST DAY, YOU MENTIONED PREVIOUSLY THAT YOU DIDN'T GIVE A NAME. EVEN THOUGH YOU DIDN'T GIVE A NAME, WERE YOU ABLE TO TELL THE DETECTIVE THAT YOU RECOGNIZED THAT PERSON OR THAT YOU HAD SOME IDEA WHO THAT PERSON WAS?

R. HORTON 001863

97

A.      I THINK I DID.  I THINK I DID.  I'M PRETTY SURE I DID.  YOU KNOW, I THINK I SAID I KNOW WHO HE WAS, BUT I JUST CAN'T REMEMBER.

Q.      BUT THEN IN THE DECEMBER, YOU WERE ABLE TO POSITIVELY IDENTIFY HIM?

A.      YES.  YES.

MR. SMITH:  NOTHING FURTHER.

THE COURT:  MR. SHWARTZ.

MR. SHWARTZ:  THANK YOU, YOUR HONOR.

- - -

CROSS-EXAMINATION

BY MR. SHWARTZ:

Q.      GOOD MORNING, MA'AM.

A.      HI.

Q.      MY NAME IS MYRON SHWARTZ.  I REPRESENT RICHARD HORTON IN THIS CASE.

CAN YOU TELL ME WHAT THE MAN WAS WEARING THAT ROBBED YOU?

A.      EXCUSE ME?

Q.      COULD YOU TELL ME WHAT THE MAN WAS WEARING?

A.      HE WAS WEARING A GRAY HOODED SWEATER, A HOODIE.  HE HAD IT TIED, YOU KNOW, TIGHT, DREW THE STRINGS.  IT WAS FROM HERE DOWN TO HERE (INDICATING.) HE HAD IT LIKE -- YOU COULDN'T SEE HIS ACTUAL LIPS, YOU KNOW.  IT WAS TIED.  YOU COULD HEAR HIS VOICE.  IT

R. HORTON 001864

98

WASN'T TOTALLY COVERED.  HE HAD ON BLUE -- THEY WAS A DARK DENIM JEANS WITH WHITE STITCHING.  I DON'T RECALL THE SHOES.  BUT I'M SURE IT WAS PROBABLY A TENNIS SHOE. I DON'T KNOW WHAT COLOR THEY WERE OR NOTHING.  BUT I DO KNOW IT WAS A GRAY -- A LIGHT GRAY HOODED SWEATER AND DARK DENIM JEANS WITH WHITE STITCHING.

Q.      WAS HE WEARING GLOVES?

A.      NO, SIR.

Q.      WITHOUT SEEING HIS FACE, YOU HAVE TESTIFIED THAT YOU ARE A HUNDRED PERCENT SURE IT WAS HIM?

A.      YES, SIR.

Q.      YOU NEVER SAW HIS FACE?

A.      I SAW WHAT I COULD SEE, WHAT I TOLD YOU I SAW.

Q.      WHAT WAS THAT?

A.      JUST AROUND -- JUST AROUND THIS AREA HERE (INDICATING.)

Q.      WHAT WAS UNUSUAL ABOUT THAT?

A.      HIS EYES.

Q.      WHAT WAS UNUSUAL ABOUT HIS EYES?

A.      THEY JUST -- JUST SEEMED LIKE THEY JUST STOOD OUT, JUST -- JUST AN EVIL LOOK.

Q.      THE MAN WAS EVIL THAT DID THAT?

A.      OH, YEAH.

Q.      WAS THERE ANYTHING ELSE ABOUT HIM THAT YOU

R. HORTON 001865

99

RECOGNIZED?

A.     NO, SIR.

Q.     HOW LONG DID THIS WHOLE INCIDENT TAKE PLACE?

A.     EXCUSE ME?

Q.     HOW LONG DID THE INCIDENT TAKE PLACE?

A.     MAYBE 15 OR 20 MINUTES, 25 AT THE MOST.

Q.     25 MINUTES?

A.     AT THE MOST.

Q.     HOW ABOUT THE LEAST?

A.     15.

Q.     AND YOU'RE SURE ABOUT THE TIME AS YOU ARE SURE ABOUT HIS FACE, AREN'T YOU?

A.     YES, SIR.

Q.     HAVE YOU HAD ANY CONTACT WITH MR. HORTON?

A.     NOT -- NOT AT THAT TIME.  MAYBE YEARS PRIOR TO THAT.

Q.     HOW DID YOU KNOW HIM YEARS PRIOR TO THAT?

A.     HE BOUGHT A CAR FROM RICK'S NIECE.

Q.     DO YOU KNOW HIM ANY OTHER TIME?

A.     NO.

Q.     WERE YOU PRESENT WHEN HE BOUGHT THE CAR?

A.     YES.

Q.     WHERE WAS THAT?

A.     AT 927 LOEW STREET.

Q.     CAN YOU GIVE ANY MORE DETAILS ABOUT THAT?

R. HORTON 001866

A.      NO, NOT REALLY.  IT WAS JUST RICK SOLD THE CAR.  HIS NIECE TRACEY WAS THERE AND COLLECTED THE MONEY AND WAS GONE.

Q.      HOW LONG DID THAT TAKE?

A.      MAYBE AN HOUR FOR THEM TO GET IT STARTED AND CHECK THE OIL AND ALL.

Q.      DID YOU HAVE ANY OTHER CONTACT WITH MR. HORTON?

A.      NO.

Q.      DID YOU DISCUSS WITH YOUR HUSBAND OR BOYFRIEND AT ANY TIME ABOUT WHO IT MIGHT BE?

A.      THE ONLY -- MAYBE LIKE WHEN HE CAME OFF HIS MEDS AND CAME TO HIS SELF, WHICH IS, LIKE I SAID, THE SUNDAY OR MONDAY EVENING, LATE MONDAY EVENING, YOU KNOW, IS WHEN, YOU KNOW, WE DISCUSSED IT.  WE DIDN'T ACTUALLY DISCUSS IT.  HE JUST SAID THE SAME THING I SAID.  I SAID, "WHY WOULD HE DO SOMETHING LIKE THAT?"  HE SAID, "I DON'T KNOW."  SO IS THAT IS WHEN HE TOLD ME ABOUT IT, THAT FRIDAY, YOU KNOW.  AND I DIDN'T KNOW NOTHING ABOUT THAT FRIDAY.  YOU KNOW, HE NEVER TOLD ME WHEN HE CAME AND PICKED ME AND MY SISTER UP.  HE NEVER TOLD ME NOTHING ABOUT THAT UNTIL THAT DAY HE SAID THE SAME NAME I SAID.

Q.      HAVE YOU SEEN RICHARD HORTON ANY TIME SINCE THE SALE OF THE CAR?

R. HORTON 001867

101

A.      JUST MAYBE IN PASSING.

Q.      HAVE YOU EVER HAD ANY CONVERSATION WITH HIM?

A.      NO.

Q.      AND THAT WAS, IN FACT, EIGHT YEARS AGO, WASN'T IT?

A.      AROUND THAT TIME MAYBE.

        MR. SHWARTZ:  JUST ONE MINUTE.

BY MR. SHWARTZ:

Q.      THE PROSECUTOR SHOWED YOU A PHOTO ARRAY; IS THAT CORRECT?

A.      YES, SIR.

Q.      I HAVE WHAT IS MARKED STATE'S EXHIBIT 2. WHAT WAS THE DATE ON THAT?

A.      12/4/04.

Q.      WHAT WAS THE DATE OF THE INCIDENT?

A.      OCTOBER THE -- OCTOBER 9TH, 8TH, 2004.

Q.      DID YOU HAVE -- HOW MANY DISCUSSIONS DID YOU HAVE WITH YOUR HUSBAND OR BOYFRIEND ABOUT WHO IT WAS BETWEEN OCTOBER AND DECEMBER?

A.      ONE THAT I RECALL.

Q.      NONE?

A.      ONE.  ONE.  WHEN HE WAS IN THE HOSPITAL AND HE SAID --

Q.      THAT IS THE ONLY TIME YOU TALKED ABOUT IT?

A.      YES.

R. HORTON 001868

102

Q.        WERE YOU ABLE TO SEE THE COLOR OF THE SKIN OF THE MAN WHO ROBBED YOU?

A.        YES, SIR.

Q.        WHAT WAS THAT?

A.        LIGHT.  LIGHTER THAN I.

Q.        LIGHTER THAN YOU?

A.        YEAH.

Q.        THERE IS SIX PHOTOGRAPHS HERE.  HOW MANY OF THEM ARE LIGHT-SKINNED?

A.        ONE.

MR. SHWARTZ:  THANK YOU.

THE COURT:  ANYTHING FURTHER, MR. SHWARTZ?

MR. SHWARTZ:  NOTHING AT THIS TIME.

THE COURT:  ANY REDIRECT?

MR. SMITH:  NO, YOUR HONOR.

THE COURT:  ANY QUESTIONS BY ANY MEMBER OF THE PANEL?  ONE.  OKAY.

ANYBOSY ELSE?  WE HAVE ANOTHER ONE.

COUNSEL, APPROACH.

- - -

THEREUPON, COURT AND COUNSEL CONFER AT THE BENCH OUT OF THE HEARING OF THE JURY AND COURT REPORTER.

- - -

THE COURT:  MA'AM, A COUPLE OF THE JURORS HAVE QUESTIONS FOR YOU.

R. HORTON 001869

WHEN YOU WERE COMING BACK FROM THE HOSPITAL, DID YOU USE SOMEBODY'S PHONE TO CALL?

THE WITNESS:  TO CALL WHO?

THE COURT:  ANYBODY.  DID YOU USE A PHONE WHEN YOU WERE COMING BACK FROM THE HOSPITAL?

THE WITNESS:  NO.

THE COURT:  OKAY.  SO YOU DIDN'T USE ANYBODY'S CELL PHONE OR ANYTHING LIKE THAT?

THE WITNESS:  WE WOULD -- I HAD RICHARD'S PHONE, BUT, NO.

THE COURT:  RICHARD HAD A PHONE?

THE WITNESS:  HE HAD A CELL PHONE.

THE COURT:  RICHARD HAS A CELL PHONE?

THE WITNESS:  HE HAD ONE.

THE COURT:  HAD ONE?

THE WITNESS:  HAD ONE.

THE COURT:  AT THAT TIME?

THE WITNESS:  AT THAT TIME.

THE COURT:  ALL RIGHT.

THE WITNESS:  NO.  NO, HE DIDN'T.  HE DIDN'T OWN A PHONE, TO COME TO THINK OF IT.  THAT IS WHY WE HAD TO GO TO HIS SISTER'S HOUSE, TO USE THE PHONE.  WE DIDN'T HAVE A PHONE.

THE COURT:  SO RICHARD DIDN'T HAVE A PHONE?

THE WITNESS:  NO.

R. HORTON 001870

104

THE COURT:  ALL RIGHT.

NOW, GOING BACK TO THE TIME THE CAR WAS PURCHASED.

THE WITNESS:  YES.

THE COURT:  WAS RICK PRESENT WHEN THE CAR WAS PURCHASED?

THE WITNESS:  YES.

THE COURT:  ALL RIGHT.  DID HE RECEIVE ALL OR ANY OF THE MONEY FOR THE CAR?

THE WITNESS:  NO.  HIS NIECE DID.

THE COURT:  HIS WHO?

THE WITNESS:  NIECE.

THE COURT:  HIS NIECE RECEIVED THAT.

DOES THAT ANSWER THE QUESTIONS?

ALL RIGHT.  QUESTIONS IN LIGHT OF THOSE, MR. PROSECUTOR?

MR. SMITH:  NO, YOUR HONOR.

THE COURT:  MR. SHWARTZ?

MR. SHWARTZ:  ONE MINUTE, PLEASE.

THE COURT:  SURE.

- - -

RECROSS-EXAMINATION

BY MR. SHWARTZ:

Q.      CAN YOU TELL ME THE PHONE NUMBER OF RICHARD'S CELL PHONE?

105

A.        RICHARD'S CELL PHONE, HE DIDN'T HAVE A CELL PHONE AT THAT TIME.

Q.        WHEN DID HE HAVE A CELL PHONE?

A.        IT WAS -- I'M THINKING OF THIS -- IT WAS WHEN HIS DAD DIED, HE HAD A PHONE.  HE GOT IT TAKEN AWAY FROM HIM.  HIS DAD DIED IN SEPTEMBER OF 2003.  AND I THINK HE GOT RID OF THE PHONE MAYBE IN JANUARY OF 2004.

Q.        WHAT WAS THE NUMBER, IF YOU KNOW?

A.        I DON'T RECALL.  IT'S BEEN A WHILE AGO.  I CAN'T EVEN REMEMBER THE NUMBER.

Q.        DID YOU HAVE OCCASION TO USE THE PHONE, CELL PHONE?

A.        YES, I DID.  BUT I STILL CAN'T REMEMBER THE NUMBER.  IT'S BEEN A WHILE AGO.  NUMBERS COME AND GO IN MY HEAD.  I HAVE SO MANY.

MR. SHWARTZ:  THANK YOU.

THE COURT:  THANK YOU FOR TESTIFYING, MA'AM. YOU CAN STEP DOWN.

THE WITNESS:  THANK YOU.

THE COURT:  WHO IS YOUR NEXT WITNESS GOING TO BE?

MR. STEAD:  THE FIRST OFFICER ON THE SCENE.

THE COURT:  HOW LONG DO YOU EXPECT THAT MIGHT TAKE?

MR. STEAD:  I WOULD ASSUME OUR DIRECT WILL

106

BE LESS THAN 10 MINUTES.

THE COURT:  WELL, WHY DON'T WE DO THIS. LET'S TAKE NOW ABOUT A 15 MINUTE BREAK, AND THEN WE WILL COME BACK TO DO ONE MORE WITNESS AND WE WILL DO THE LUNCH BREAK.

SO PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES OR FORM ANY OPINION ABOUT IT, AND DON'T LET ANYONE TALK TO YOU ABOUT IT.

- - -

THEREUPON, A RECESS WAS TAKEN.

- - -

THE COURT:  PLEASE BE SEATED.  I DO APOLOGIZE.  THIS BUILDING'S TERRIBLE FOR HEATING AND AIR CONDITIONING.  THAT IS WHY THEY WILL BUILD US A NEW BUILDING.  THEY CAN'T REPAIR IT.  THIS BUILDINGS IS FULL OF ASBESTOS.

(WITNESS IS SWORN.)

THE COURT:  LET'S START WITH YOUR FULL NAME.

THE WITNESS:  MY NAME IS PAMELA RHODEBACK.

THE COURT:  AND YOUR OCCUPATION?

THE WITNESS:  COLUMBUS POLICE OFFICER.

THE COURT:  VERY WELL.  YOU MADE PROCEED.

MR. SMITH:  THANK YOU, YOUR HONOR.

- - -

PAMELA RHODEBACK

107

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, STATE OF OHIO, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. SMITH:

Q.        HOW LONG HAVE YOU BEEN WITH THE COLUMBUS POLICE DEPARTMENT?

A.        10 YEARS IN MAY.

Q.        AND WHAT IS YOUR RANK IN THE POLICE DEPARTMENT?

A.        OFFICER.

Q.        WHAT DO YOU DO AS AN OFFICER?

A.        STREET PATROL.

Q.        DID YOU HAVE OCCASION TO GET A DISPATCH CALL ON OCTOBER 9TH, 2004, TO GO TO A GIBBARD AVENUE ADDRESS?

A.        YES, SIR.

Q.        TELL US ABOUT WHAT HAPPENED.

A.        WELL, WE HAD RECEIVED A 911 CALL, WHICH CAME BACK TO THAT ADDRESS YOU STATED, THAT THERE HAD BEEN SOME TYPE OF A SHOOTING.  AND EN ROUTE TO THAT ADDRESS IS WHEN IT WAS CLARIFIED THROUGH THE RADIO THAT THE SHOOTING ACTUALLY HAPPENED AT A LOEW STREET ADDRESS.  I DON'T REMEMBER THE EXACT ADDRESS.

Q.        DID YOU THEN PROCEED TO 927 LOEW STREET?

A.        YES, THAT WOULD BE CORRECT.

Q.        WHAT DID YOU FIND WHEN YOU GOT TO 927 LOEW

R. HORTON 001874

108

STREET?

A. WELL, WHEN WE FIRST ARRIVED, AND THERE WERE PROBABLY THREE OR FOUR OFFICERS AND OUR SERGEANT, WE CHECKED THE HOUSE ITSELF. IT DIDN'T SEEM AS THOUGH ANYONE WAS HOME. WE WENT AROUND THE PROPERRTY, FOUND A DOOR THAT WE COULD ACCESS THE RESIDENCE. AND WE WENT INSIDE THE HOUSE TO SEE IF THERE WAS ANYBODY INSIDE, YOU KNOW, WHETHER THEY WERE INJURED OR WHAT HAVE YOU. AND THAT IS WHEN WE CAME ACROSS A FRONTROOM THAT HAD -- IT HAD A CRIME SCENE, AS THOUGH THERE WAS BLOOD. AND THERE WERE ITEMS THAT WERE, YOU KNOW, SCATTERED THROUGHOUT THE ROOM. SO WE COULD TELL SOMETHING HAD, INDEED, OCCURRED.

Q. AND WHAT DID YOU -- WHAT WAS YOUR -- WHAT DID YOU DO WHEN YOU REALIZED THIS WAS A CRIME SCENE?

A. BASICALLY, AT THAT POINT AFTER THE HOUSE WAS SECURE, AS FAR AS THERE WAS NO PEOPLE INSIDE THE HOUSE, WE WENT AHEAD AND WE LEFT THE RESIDENCE. AND WE WENT OUTSIDE AROUND THE RESIDENCE TO MAKE SURE THAT NOBODY COULD GET BACK INSIDE, SINCE IT WAS AT THIS POINT A CRIME SCENE.

Q. THIS IS PART OF THE PROCESS OF SECURING THE SCENE?

A. YES, THAT IS EXACT. AND THEN AT THAT POINT IN TIME A FEMALE, WHICH I LISTED IN MY REPORT AS VICTIM NUMBER TWO, RHONDA CURRY, I BELIEVE HER NAME IS, SHE HAD

R. HORTON 001875

SHOWN UP AT THE SCENE AND BEGAN TALKING TO ME ABOUT WHAT HAPPENED.

Q. AFTER YOU SPOKE WITH RHONDA CURRY, WHAT DID YOU DO NEXT?

A. WELL, AT THAT POINT IN TIME WE ASKED ROBBERY DETECTIVES TO RESPOND, AND CRIME SCENE WAS CALLED OUT. AND AFTER THEY ARRIVED, WE HAD ENOUGH OF WHAT HAPPENED THAT AT THAT POINT IN TIME I WAS ABLE TO LEAVE THE SCENE. AND I WENT TO GRANT JUST TO CHECK ON THE FIRST VICTIM, THE MALE, TO CHECK ON HIM TO MAKE SURE THAT HIS INJURY WAS NOT LIFE-THREATENING.

Q. AND WHAT DID YOU FIND OUT WHEN YOU WENT TO GRANT?

A. BASICALLY, JUST THAT THE INJURY WAS NOT LIFE-THREATENING. AND SO AT THAT POINT IN TIME I COULD GO AHEAD AND LEAVE. I WENT BACK TO THE SCENE. THAT IS WHEN I DID THE REPORT THAT YOU HAVE THERE.

Q. AND WHEN YOU WENT BACK, YOU WORKED ON THE REPORT, YOU STAYED TO HELP SECURE THE SCENE?

A. YES.

Q. WHEN YOU GOT TO THE SCENE THE FIRST TIME WHEN YOU CAME TO 927 LOEW STREET, DO YOU RECALL WHAT DOOR YOU WERE ABLE TO ENTER?

A. YES. IT WAS THE SIDE DOOR OF THE RESIDENCE, WHICH WAS ON THE NORTH SIDE OF THE HOUSE.

R. HORTON 001876

110

Q.      AND THAT IS HOW YOU OBTAINED ENTRANCE AND WERE ABLE TO SEE THE CRIME SCENE?

A.      YES.  WE WENT INTO THE HOUSE THROUGH THAT DOOR.  WE WENT THROUGH THE HOUSE.  THAT IS WHEN WE FOUND THE CRIME SCENE IN THE FRONTROOM.

MR. SMITH:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  MR. SHWARTZ, ANY QUESTIONS?

MR. SHWARTZ:  NO QUESTIONS.

THE COURT:  ANY QUESTIONS BY ANY MEMBER OF THE JURY?

THANK YOU FOR TESTIFYING.

THE WITNESS:  THANK YOU.

THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE WILL TAKE THE LUNCH BREAK NOW.  I WOULD LIKE YOU BACK AT 1:30.

PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES OR FORM ANY OPINION OF IT.  DON'T ALLOW ANYONE TO DISCUSS IT WITH YOU.

THANK YOU.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  I WANT TO GO ON THE RECORD FOR A MINUTE.  DURING MR. MCCLANAHAN'S TESTIMONY, HE ALLUDED

R. HORTON 001877

TO AN UNCHARGED ACT OF MISCONDUCT, THE BRIBERY OF A WITNESS.  NOW, I UNDERSTAND WHY YOU ELICITED IT.  AND IT IS ADMISSIBLE TO SHOW HIS KNOWLEDGE AND INTENT AND WHATEVER.  BUT IT IS AN UNCHARGED ACT OF MISCONDUCT IN THIS CASE.

THE QUESTION IS, DO YOU WANT ANY SORT OF A LIMITING INSTRUCTIONS, DEFENSE, OR DO YOU WISH TO LEAVE THAT ALONE?

YOU MAY WANT TO LEAVE IT ALONE.

MR. SHWARTZ:  LET ME DISCUSS IT.

THE COURT:  THINK ABOUT IT.  I WANTED TO RAISE IT WITH YOU BECAUSE, TECHNICALLY, IT HAS BEEN RAISED.  AND YOU MAY TACTICALLY SAY, HEY, I DON'T CARE ABOUT THAT.  SO THAT IS UP TO YOU GUYS.  IF YOU DO, I WILL GIVE YOU A LIMITING INSTRUCTION.  IF YOU DON'T, I WILL LET IT ALONE.

AND YOU HAVE HOW MANY MORE WITNESSES?

MR. STEAD:  ONE FOR SURE, MAYBE TWO.

THE COURT:  ALL RIGHT.  VERY WELL.

- - -

THEREUPON, A RECESS WAS TAKEN UNTIL 1:30 O'CLOCK, P.M., OF THE SAME DAY, TO WIT: JANUARY 31, 2006.

- - -

R. HORTON 001878

112

TUESDAY AFTERNOON SESSION,

JANUARY 31, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THE COURT:  ARE WE READY TO GO?

MR. STEAD:  YES.

THE COURT:  PLEASE BE SEATED, EVERYBODY.

WE ARE READY TO PROCEED.  YOU MAY CALL YOUR NEXT WITNESS.

MR. STEAD:  WE CALL DETECTIVE BRENDA WALKER.

(WITNESS IS SWORN.)

THE COURT:  LET'S START WITH YOUR FULL NAME.

THE WITNESS:  BRENDA WALKER.

THE COURT:  AND YOUR OCCUPATION?

THE WITNESS:  COLUMBUS POLICE OFFICER.

THE COURT:  THANK YOU.  YOUR WITNESS.

MR. STEAD:  THANK YOU.

- - -

BRENDA WALKER

CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, STATE OF OHIO, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MR. STEAD:

R. HORTON 001879

113

Q.        HOW LONG HAVE YOU BEEN A POLICE OFFICER?

A.        TWENTY YEARS.

Q.        WOULD YOU DESCRIBE FOR THE JURY THE DIFFERENT POSITIONS YOU HAVE HELD WITH THE POLICE DEPARTMENT.

A.        I WAS A PATROL OFFICER FOR EIGHT -- WELL, ABOUT SEVEN, AND THEN I WORKED IN THE AUTO THEFT UNIT FOR ABOUT 10 MONTHS, AND I WORKED IN SEXUAL ABUSE. WELL, THEN I WENT TO THE ROBBERY SQUAD AND WORKED THERE, AND THEN WENT TO SEXUAL ABUSE FOR ABOUT SEVEN MONTHS, AND THEN BACK TO THE ROBBERY SQUAD.

Q.        AND THIS MOST RECENT TOUR OF DUTY IN ROBBERY, HOW LONG HAS THAT BEEN?

A.        TOTAL IN ROBBERY BOTH TIMES COMBINED IS ABOUT 12 YEARS.

Q.        OKAY.  BRIEFLY EXPLAIN TO THIS JURY WHAT IT IS A ROBBERY SQUAD DETECTIVE DOES.

A.        WE INVESTIGATE ROBBERIES.

Q.        AND WHAT KINDS OF THINGS DO YOU DO IN INVESTIGATING ROBBERIES?

A.        RESPOND TO SCENES, INTERVIEW VICTIMS, WITNESSES, SUSPECTS.

Q.        OKAY.  ARE THERE DIFFERENT DIVISIONS WITHIN THE COLUMBUS POLICE DEPARTMENT?

A.        YES.

114

Q.      IS THERE A BURGLARY DIVISION AS WELL?

A.      YES.

Q.      ON THE CASE THAT WE ARE HERE ON TODAY, YOU ARE FAMILIAR WITH THE FACTS OF THAT CASE?

A.      CORRECT.

Q.      WHY IS THIS HANDLED BY THE ROBBERY SQUAD AS OPPOSED TO THE BURGLARY SQUAD?

A.      BECAUSE IT'S A CRIME AGAINST PERSONS, BECAUSE BURGLARY, THEY JUST GO INTO A HOUSE AND STEAL PROPERTY, LEAVE, USUALLY THE PEOPLE ARE ASLEEP, OR THEY ARE NOT AT HOME.  BECAUSE THERE WAS A CONFRONTATION AND A GUN USED, THE THREAT OF FORCE USED, ROBBERY SQUAD HANDLES IT.

Q.      THAT IS PER THE PARAMETERS OF THE COLUMBUS DIVISION OF POLICE?

A.      CORRECT.

Q.      I WANT TO TURN YOUR ATTENTION BACK TO OCTOBER 9TH, 2004, AND ASK IF YOU WERE WORKING ON THAT DATE?

A.      YES, I WAS.

Q.      AND DID YOU ULTIMATELY GET DISPATCHED TO A 927 LOEW STREET?

A.      CORRECT.

Q.      IS THAT HERE IN THE CITY OF COLUMBUS?

A.      YES.

Q.      AND DID YOU, IN FACT, RESPOND TO THAT LOCATION?

115

A.        YES, I DID.

Q.        WHEN YOU ARRIVED, HAD THE SCENE ALREADY BEEN SECURED BY UNIFORMED PERSONNEL OF THE COLUMBUS POLICE DEPARTMENT?

A.        YES, IT WAS.

Q.        WHEN WE TALK ABOUT A SCENE BEING SECURED, WHAT ARE WE TALKING ABOUT?

A.        NO ACCESS IN AND OUT.  THEY HAVE IT -- BECAUSE THIS HOUSE WAS AT THE END OF A STREET, DEAD END KIND OF, THEY DIDN'T -- A LOT OF TIMES THEY USE CRIME SCENE TAPE, SOMETIMES IT IS JUST OFFICERS AT THE DOORS, JUST SO THAT THERE IS NO ACCESS IN AND OUT SO TO PRESERVE WHATEVER EVIDENCE IS INSIDE.

Q.        WHEN YOU WERE AT THE SCENE, DID YOU HAVE AN OPPORTUNITY TO GO INSIDE THAT RESIDENCE?

A.        YES, I DID.

Q.        DESCRIBE WHAT YOU SAW IN THE FRONTROOM OF THE HOUSE.

A.        WELL, THERE WAS -- AS YOU WALK IN THE FRONT DOOR, THERE IS -- THERE WAS AN OPEN SOFA BED COUCH.  AND THEN THERE WAS ANOTHER COUCH THAT WAS NOT OPEN.  THERE WAS A LOT OF BLOOD ON THE OPENED BED.  THERE WAS A TV THAT HAD BEEN -- LOOKED LIKE IT WAS TOSSED ONTO THE OTHER CLOSED SOFA.  THERE WAS SOME CLOTHING STREWN ABOUT, JUST RANSACKED.

116

Q.      DID YOU SEE ANYTHING, ANY SIGNS IN THAT ROOM THAT WOULD INDICATE A STRUGGLE HAD TAKEN PLACE IN THERE?

A.      YES.

Q.      AT THE TIME THAT YOU ARRIVED AT THAT ADDRESS ON LOEW, WERE THERE ANY CIVILIANS PRESENT AT THAT LOCATION?

A.      NO.

Q.      DID YOU, IN FACT, BECOME AWARE SOMEONE HAD BEEN TRANSPORTED TO A HOSPITAL?

A.      YES.

Q.      AND DID YOU ULTIMATELY LEARN THAT WAS MR. RICHARD MCCLANAHAN?

A.      YES.

Q.      DID YOU GO TO THE HOSPITAL TO CHECK ON HIS CONDITION?

A.      YES, I DID GO TO THE HOSPITAL.

Q.      DO YOU RECALL WHAT HOSPITAL YOU WENT TO?

A.      GRANT.

Q.      AND WHERE WAS MR. MCCLANAHAN AT THE TIME THAT YOU GOT THERE?

A.      HE WAS ALREADY IN SURGERY.

Q.      DID YOU HAVE AN OPPORTUNITY TO TALK TO HIM ON THAT DATE?

A.      NOT ON THAT DATE, NO.

Q.      DID YOU BECOME AWARE OF A WOMAN NAMED RHONDA

R. HORTON 001883

117

CURRY?

A.    YES.

Q.    HOW DID YOU BECOME AWARE OF HER?

A.    SHE WAS -- THE PATROL OFFICERS GAVE ME HER INFORMATION.  SHE WAS THE SECOND VICTIM OF THE ROBBERY THAT WAS PRESENT DURING THE ROBBERY.

Q.    AND DID YOU HAVE A CHANCE TO TALK TO HER ON THAT DATE?

A.    YES, I DID.

Q.    WHERE WERE YOU WHEN YOU TALKED TO HER?

A.    AT GRANT HOSPITAL.

Q.    DID YOU HAVE A CHANCE TO INTERVIEW HER?

A.    YES, I DID.

Q.    DID YOU INQUIRE AS TO WHETHER OR NOT SHE WOULD BE ABLE TO IDENTIFY THE INDIVIDUAL WHO HAD DONE THIS CRIME?

A.    YES.

Q.    WHAT DID SHE TELL YOU?

A.    SHE SAID YES.

Q.    DID SHE INDICATE TO YOU WHETHER OR NOT SHE HAD EVER SEEN THIS PERSON BEFORE?

A.    YES, SHE DID.  SHE SAID THAT SHE THOUGHT SHE RECOGNIZED HIM AS SOMEBODY FROM THE NEIGHBORHOOD  THAT SHE HAD SEEN BEFORE BUT SHE COULDN'T PLACE WHERE AT THE TIME.

R. HORTON 001884

118

Q.    DESCRIBE HER DEMEANOR WHEN YOU'RE INTERVIEWING HER AT THE HOSPITAL.

A.    SHE WAS CLEARLY VISIBLY UPSET.  I MEAN, SHE WAS JUST TAKEN THROUGH A PRETTY TRAUMATIC EXPERIENCE. YOU KNOW, AT TIMES SHE WAS CRYING, OTHER TIMES SHE, YOU KNOW, SHE WOULD START ON ONE PART OF THE ROBBERY AND THEN BOUNCE BACK AND REMEMBER SOMETHING BEFORE THAT, AND SHE WAS JUST -- SHE WAS VERY UPSET.

Q.    IS THAT UNUSUAL IN YOUR LINE OF WORK TO ENCOUNTER THAT?

A.    NO, NOT UNUSUAL AT ALL.

Q.    DOES THAT MAKE IT EASIER OR DIFFICULT TO OBTAIN INFORMATION?

A.    IT JUST TAKES PATIENCE, THAT'S ALL.

Q.    SO YOU TALKED TO HER THAT DAY, GOT THAT INFORMATION FROM HER.  WHEN, ULTIMATELY, WERE YOU ABLE TO TALK TO MR. MCCLANAHAN?

A.    I DID NOT GET TO SPEAK TO HIM UNTIL I THINK IT WAS THE 13TH.

Q.    ABOUT FOUR DAYS AFTER THE INCIDENT?

A.    CORRECT.

Q.    WHERE WAS HE WHEN YOU TALKED TO HIM?

A.    HE WAS AT GRANT HOSPITAL STILL.

Q.    DID YOU HAVE OCCASION TO INTERVIEW HIM THERE AT THAT POINT?

R. HORTON 001885

119

A.      YES, I DID.

Q.      AND DID YOU INQUIRE OF HIM AS TO WHETHER OR NOT HE WOULD BE ABLE TO IDENTIFY THE INDIVIDUAL INVOLVED IN THIS CASE?

A.      YES, I DID.  AND HE SAID, YES, HE WOULD.

Q.      AND DID HE INDICATE TO YOU WHETHER OR NOT HE KNEW THE INDIVIDUAL --

A.      YES, HE DID.

Q.      -- THAT CAME IN THE HOUSE?

A.      YES.

Q.      WHAT DID HE TELL YOU?

A.      HE TOLD ME THAT THAT HE KNOWS THE PERSON AS RICHARD.  HE SAID HE HAD SEEN HIM THE DAY BEFORE, THE FRIDAY EVENING BEFORE PRIOR TO THE ROBBERY.  AND DURING THE INTERVIEW HE TOLD ME HE MADE MENTION OF THINGS ABOUT THAT FRIDAY.  AND THEN SO I HAD HIM START AT THE VERY BEGINNING.

AND HE SAID THAT HIS FIRST MEETING WITH HIM WAS PROBABLY, HE KNEW HIM FROM ABOUT FIVE OR SIX YEARS PREVIOUSLY.  HIS NIECE WAS SELLING A CAR, AND THAT IT NEEDED SOME BRAKE WORK DONE, SO MR. MCCLANAHAN HAD DONE THE BRAKE WORK.  AND APPARENTLY, SHE HAD, FROM MY UNDERSTANDING WAS, THAT SHE SOLD THE CAR TO THE DEFENDANT AND THE DEFENDANT HAD PICKED IT UP AT MR. MCCLANAHAN'S HOUSE.

R. HORTON 001886

120

BUT HE ALSO TOLD ME THAT HE HAD SEEN HIM OFF AND ON THROUGH, YOU KNOW, THE YEARS IN THE NEIGHBORHOOD, AND BUT HE ONLY KNEW HIM AS RICHARD. HE TOLD ME AT THAT TIME HE WOULD BE ABLE TO OBTAIN HIS FULL NAME FOR ME.

Q.      DID HE TALK TO YOU ABOUT ANYTHING THAT HAPPENED THE DAY BEFORE AT A CONVENIENCE STORE?

A.      YES.

Q.      AND DID YOU OBTAIN THAT INFORMATION FROM HIM?

A.      YOU MEAN THE DAY BEFORE THE ROBBERY?

Q.      THE DAY BEFORE THE ROBBERY.

A.      THE DAY BEFORE THE ROBBERY AT THE CONVENIENCE STORE, YES. HE TOLD ME HE HAD JUST GOT PAID, HE GOT HIS CHECK CASHED. AND HE WENT TO THE -- HE REFERRED TO IT AS THE ARAB STORE AT ST. CLAIR AND FIFTH. HE SAID HE WENT TO BUY SOME BEER. BUT HE HAD TO USE THE PAY PHONE. SO HE HAD RAN INTO THE DEFENDANT. AND HE -- THEY HAD EXCHANGED GREETINGS, HEY, WHAT'S GOING ON. HOW YOU DOING. HE'S OVER AT THE PHONE, AND HE WENT TO GET MONEY OUT OF HIS POCKET --

MR. SHWARTZ:  WE WILL OBJECT TO ALL THIS TESTIMONY. IT'S ALL HEARSAY.

THE COURT:  AN OBJECTION HAS BEEN LODGED AS TO HEARSAY. DO YOU WISH TO RESPOND?

MR. STEAD:  YOUR HONOR, THE INFORMATION THAT SHE OBTAINED WILL INDICATE THE NEXT STEP SHE TOOK IN THE

121

INVESTIGATION, WHY SHE TOOK THE NEXT STEPS IN THE INVESTIGATION.

THE COURT:  ALL RIGHT.  YOU ARE NOT OFFERING THIS AS A PRIOR IDENTIFICATION; IS THAT CORRECT, AT THIS POINT IN TIME?

MR. STEAD:  THAT'S CORRECT.

THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WHAT THIS WITNESS WAS TOLD BY MR. MCCLANAHAN AT THAT POINT IN TIME IS HEARSAY, WHICH MEANS IT IS AN OUT-OF-COURT STATEMENT NOT MADE UNDER OATH.  HOWEVER, IT IS ADMISSIBLE TO EXPLAIN THE ACTIONS OF THIS OFFICER. YOU MAY NOT, HOWEVER, CONSIDER STATEMENTS MADE TO THIS OFFICER AT THIS TIME FOR THE TRUTH OF THE MATTER.

DO YOU UNDERSTAND THAT, ONLY AS IT EXPLAINS WHAT SHE THEREAFTER DID IN HER INVESTIGATION, EVERYBODY UNDERSTAND THAT?

JURY PANEL:  YES.

THE COURT:  VERY WELL.  NOW YOU MAY PROCEED.

MR. STEAD:  THANK YOU.

BY MR. STEAD:

Q.      WITHOUT GETTING INTO ALL THE DETAILS AS TO WHAT HE SAID TO YOU, DID HE INDICATE -- HE INDICATED TO YOU HE HAD CONTACT WITH THIS PERSON THE DAY BEFORE AT A CERTAIN STORE?

A.      YES.

122

Q.      HAVING OBTAINED THAT INFORMATION FROM HIM, DID YOU GO TO THAT STORE?

A.      YES.

Q.      AND VERIFY ITS EXISTENCE AND ITS LOCATION?

A.      YES, BASED ON HIS DESCRIPTION.

Q.      DID YOU, IN FACT, LOCATE A PHONE IN THE PARKING LOT AT THAT LOCATION?

A.      THERE WAS A PHONE, YES.

Q.      DID YOU INQUIRE AS TO WHETHER OR NOT THERE WOULD BE ANY SURVEILLANCE VIDEO OR ANYTHING OF THAT TYPE BE AVAILABLE TO USE IN IDENTIFYING THE PEOPLE IN THE PARKING LOT?

A.      YES, I DID.

Q.      WAS THERE ANY AVAILABLE AT THAT LOCATION?

A.      THEY INDICATED TO ME THERE WAS NONE ON THE LOT, CORRECT.

Q.      BUT YOU TRIED?

A.      YEAH.

Q.      NOW, HE GAVE YOU THE FIRST NAME OF RICHARD. DID YOU ASK HIM TO DO ANYTHING?

A.      HE STATED THAT HE WOULD CHECK WITH HIS NIECE WHO THE CAR WAS PURCHASED OR WHATEVER, THE CAR, AND TRY AND OBTAIN A LAST NAME, AND HE TOLD ME HE WOULD AND GET BACK WITH ME.

Q.      DID HE, IN FACT, GET BACK WITH YOU AT SOME

R. HORTON 001889

123

LATER DATE?

A.      YES, HE DID.

Q.      DO YOU RECALL WHEN THAT WAS?

A.      IT WAS A COUPLE WEEKS LATER, END OF OCTOBER

MR. SHWARTZ:  I DIDN'T HEAR THE LAST ANSWER.

MR. STEAD:  SHE SAID A COUPLE WEEKS LATER.

THE WITNESS:  A COUPLE WEEKS LATER, END OF OCTOBER.

BY MR. STEAD:

Q.      END OF OCTOBER.  OKAY.  WHAT NAME WAS PROVIDED TO YOU AT THAT POINT?

A.      RICHARD HORTON.

Q.      HAVING RECEIVED THE NAME RICHARD HORTON, DID YOU ATTEMPT TO PREPARE A PHOTO ARRAY TO SEE WHETHER OR NOT AN IDENTIFICATION COULD BE MADE IN THIS CASE?

A.      CORRECT.

Q.      OKAY.  IN YOUR EXPERIENCE AS A ROBBERY DETECTIVE, HAVE YOU HAD OCCASION TO MAKE AND PREPARE PHOTO ARRAYS IN THE PAST?

A.      YES.

Q.      WOULD YOU EXPLAIN TO THE JURY THE PROCEDURE YOU PREPARE WHEN PREPARING A PHOTO ARRAY?

A.      IT'S THROUGH OUR IDENTIFICATION SYSTEM, WE HAVE A BIG COMPUTER.  AFIS IS WHAT IT'S CALLED.  BUT YOU PULL UP THE PERSON WHO YOU WANT TO INCLUDE IN THE PHOTO

124

ARRAY, IN THIS CASE MR. HORTON'S PHOTO, AND YOU PUT IN DISCRIPTORS, LIKE YOU PUT IN MALE BLACK, APPROXIMATE WEIGHT, STYLE OR SHORTNESS OF HAIR, FACIAL HAIR, GLASSES.

Q.     AGE?

A.     AGE.  YEAH, IT DOES WITHIN THREE YEARS ONE WAY OR ANOTHER.  AND THEN YOU JUST ENTER IT IN AND THEN THE COMPUTER RANDOMLY SELECTS PHOTOGRAPHS THROUGH OUR I.D. SYSTEM, SOME OF THE PHOTOS THAT ARE INCLUDED IN THERE, AND THEN YOU PREPARE THE ARRAY FROM THOSE.

Q.     OKAY.  WHY DO YOU OBTAIN -- WHY DO YOU BUILD THE PHOTO ARRAY OFF OF THE SUSPECT'S PHOTOGRAPH?

A.     SO THAT THERE IS SIMILAR ALIKE.

Q.     WHY DO YOU WANT TO DO THAT?

A.     SO THAT IT'S A FAIR PLAYING FIELD.

Q.     ARE THERE A NUMBER OF DIFFERENT CRITERIA THAT YOU USE IN PREPARING THE ARRAY?

A.     YES.

Q.     NOT JUST ONE?

A.     NO.

Q.     YOU DON'T LOOK AT JUST AGE OR RACE OR JUST HAIR COLOR?

A.     NO, NO.

Q.     OR FACIAL STYLE?

A.     RIGHT.

R. HORTON 001891

125

Q.    IT'S A COMBINATION?

A.    RIGHT.

Q.    AND THE COMPUTER THEN GENERATES THE ARRAY?

A.    JUST GENERATES SOME CANDIDATES, YES.

Q.    A PHOTO ARRAY CONSISTS OF HOW MANY PICTURES?

A.    SIX.

Q.    WHO DECIDES WHERE THE SUSPECT'S PHOTOGRAPH IS PLACED IN THE PHOTO ARRAY?

A.    THE COMPUTER RANDOMLY SELECTS THE POSITION.

Q.    SO ON ONE PHOTO ARRAY THE SUSPECT MAY BE IN THE FIRST POSITION?

A.    YES.

Q.    ON ANOTHER ARRAY THE THIRD POSITION?

A.    YES.

Q.    AND ANOTHER ARRAY THE SIXTH PERSON POSITION?

A.    CORRECT.

Q.    THE COMPUTER DECIDES IT?

A.    RIGHT.

Q.    OKAY.  WAS THAT, IN FACT, DONE IN THIS CASE?

A.    YES.

Q.    I WANT TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT NUMBER 1.

DO YOU RECOGNIZE THIS?

A.    YES.

Q.    IS THAT, IN FACT, THE PHOTO ARRAY THAT YOU

126

HAD PREPARED IN THIS CASE WITH RESPECT TO RICHARD HORTON?

A.      YES.

Q.      WHAT POSITION IS MR. HORTON'S PHOTOGRAPH?

A.      HE IS IN THE FIFTH POSITION.

Q.      IN YOUR EXPERIENCE AS A ROBBERY DETECTIVE, HAVE YOU HAD OCCASION TO PRESENT PHOTO ARRAYS TO WITNESSES AND/OR VICTIMS?

A.      YES.

Q.      AND DO YOU HAVE A PROCEDURE THAT YOU FOLLOW WHEN YOU PRESENT A PHOTO ARRAY?

A.      YES, WE HAVE A FORM THAT WE FOLLOW, AND READ AND COMPLETE.

Q.      I WANT TO SHOW WHAT HAS BEEN MARKED FOR IDENTIFICATION PURPOSES AS STATE'S EXHIBIT NUMBER 1-A.

CAN YOU TELL ME WHAT THAT IS?

A.      IT'S THE INVESTIGATIVE PHOTO ARRAY PROCEDURE FORM.

Q.      IN FACT, IS THAT THE DOCUMENT THAT YOU USED WHEN PRESENTING THE PHOTO ARRAYS IN THIS CASE?

A.      YES.

Q.      DOES THAT CONTAIN THE INSTRUCTIONS THAT YOU GIVE?

A.      YES.

Q.      DID YOU, IN FACT, GIVE THE INSTRUCTIONS IN

R. HORTON 001893

127

THIS CASE?

A.      YES.

Q.      WOULD YOU TELL US WHAT INSTRUCTIONS YOU GIVE, PLEASE?

A.      WE JUST READ THIS TO THEM BASICALLY.  IT SAYS, "THE PHOTO ARRAY YOU ARE ABOUT TO VIEW CONSISTS OF SIX PHOTOGRAPHS AND IN NO PARTICULAR ORDER OR IMPORTANCE.  THE SUBJECT OF THIS INVESTIGATION MAY OR MAY NOT BE INCLUDED IN THE PHOTOGRAPHS.  LOOK CAREFULLY AT THE PHOTOGRAPHS OF ALL SIX PEOPLE."  THEN I ALWAYS SAY LET ME KNOW WHETHER OR NOT YOU RECOGNIZE ANYONE FROM THE ROBBERY.

Q.      OKAY.  THAT IS THE WRITTEN WORDS.

DO YOU ADD ANYTHING ELSE WHEN YOU PRESENT PHOTO ARRAYS?

A.      WELL, I ALWAYS TELL THEM THAT THE PHOTOGRAPHS ARE, YOU KNOW, USUALLY IN BLACK AND WHITE, AND MOST ALWAYS THAT THEY ARE OF THE QUALITY -- THEY ARE, YOU KNOW, MUG SHOTS, WHICH ARE VERY SIMILAR TO YOUR BMV PHOTOGRAPH.  AND, YOU KNOW, TO LOOK AT ALL OF THEM CAREFULLY, GIVE EQUAL CONSIDERATION.

Q.      OKAY.  DID YOU HAVE A CHANCE TO SHOW THESE PHOTO ARRAYS TO MR. MCCLANAHAN?

A.      YES.

Q.      AND RHONDA CURRY?

R. HORTON 001894

128

A.        YES.

Q.        DID YOU, IN FACT, FOLLOW THAT PROCEDURE WHEN YOU SHOWED THE PHOTO ARRAYS TO THEM?

A.        YES.

Q.        YOU RECALL WHEN IT WAS THAT YOU SHOWED THE PHOTO ARRAYS TO THEM?

A.        DECEMBER 4TH.

Q.        AND DO YOU RECALL WHERE YOU WERE WHEN YOU SHOWED THE PHOTO ARRAYS TO THEM?

A.        I BELIEVE IT WAS MISS CURRY'S DAUGHTER'S HOUSE.

Q.        OKAY.  I THINK WHEN WE LOOK AT BOTH ARRAYS, YOU SHOWED THEM TO BOTH ON DECEMBER 4TH?

A.        CORRECT.

Q.        WHEN YOU SHOW PHOTO ARRAYS TO WITNESSES, DO YOU SHOW THEM ONE AT A TIME OR DO YOU SHOW THEM AS A GROUP, HOW DO YOU DO IT?

A.        INDEPENDENT --

Q.        WHY?

A.        -- OF EACH OTHER.

          SO THAT YOU HAVE SEPARATE INDEPENDENT OPINIONS.

Q.        DID YOU, IN FACT, SEPARATE MR. MCCLANAHAN AND MISS CURRY ON THE DAY THAT YOU PRESENTED THESE PHOTO ARRAYS TO THEM?

R. HORTON 001895

129

A.    YES.

Q.    SO THAT THEY WERE NOT IN THE ROOM TO SEE WHAT EACH OTHER WAS DOING?

A.    NO.

Q.    WHO DID YOU SHOW THE ARRAY TO FIRST?

A.    MR. MCCLANAHAN.

Q.    AND DID MR. MCCLANAHAN -- DID YOU SHARE WITH MISS CURRY MR. MCCLANAHAN'S RESULTS?

A.    NO.

Q.    TO YOUR KNOWLEDGE, WAS SHE MADE AWARE OF THE RESULTS OF HIS IDENTIFICATION --

A.    NO.

Q.    -- BEFORE MAKING IT HERSELF?

A.    NO.

Q.    ON DECEMBER 4TH, 2004, AT THE MISS CURRY'S DAUGHTER'S PLACE, DID YOU, IN FACT, SHOW STATE'S EXHIBIT NUMBER 1 TO MR. MCCLANAHAN?

A.    YES.

Q.    HAVING GONE THROUGH THE PROCEDURES THAT YOU EARLIER DESCRIBED?

A.    YES.

Q.    DID YOU, IN FACT -- DID HE LOOK AT THE PHOTOGRAPHS?

A.    OH, YEAH.

Q.    TELL US WHAT HAPPENED WHEN HE LOOKED AT THE

130

PHOTOS?

A.      HE IMMEDIATELY POINTED TO PHOTO NUMBER 5 AND HE SAID RIGHT HERE.  BECAUSE I WROTE THAT ON THE PROCEDURE FORM.  I ALWAYS WRITE DOWN EXACTLY WHAT THEY DO.  AND THEN I ASKED HIM TO DESCRIBE HIS LEVEL OF CERTAINTY.  AND HE SAID SAME EYES, EYEBROWS, WEARING THE SAME PANTS FROM THE NIGHT BEFORE, I'M A HUNDRED PERCENT CERTAIN THAT'S HIM.

Q.      OKAY.  DID YOU ASK HIM TO SIGN AND DATE THAT PHOTOGRAPH THAT HE HAD SELECTED?

A.      YES, I DID.

Q.      DID HE DO THAT IN YOUR PRESENCE?

A.      YES, HE DID.

Q.      AND YOU, IN FACT, RECORDED ON STATE'S EXHIBIT 1-A THE WORDS THAT HE SAID AT THE POINT HE LOOKED AT THE PHOTO ARRAY?

A.      YES.

Q.      DID YOU GIVE MISS CURRY A CHANCE TO LOOK AT THE PHOTOS?

A.      YES, I DID.

Q.      I'LL SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS STATE'S EXHIBIT 2.

A.      YES.

Q.      SAME PHOTO ARRAY?

A.      YES.  ANOTHER COPY OF IT.

R. HORTON 001897

131

Q.      OKAY.  WAS IT A CLEAN COPY?

A.      YEAH.

Q.      SO SHE DIDN'T SEE MR. MCCLANAHAN'S SIGNATURE ON THE COPY?

A.      NO.

Q.      OKAY.  AND DID YOU PREPARE STATE'S EXHIBIT 2-A AS WELL?

A.      YES.

Q.      WHICH IS, AGAIN, THE FORM THAT HAS THE INSTRUCTIONS AND THE PLACE TO WRITE DOWN WHAT THEY SAY?

A.      CORRECT.

Q.      TELL US WHAT HAPPENED WHEN SHE VIEWED THOSE PHOTOGRAPHS?

A.      SHE POINTED TO PHOTO NUMBER 5 AS WELL AND SAID THAT'S HIM.  AND I ASKED HER TO DESCRIBE HER LEVEL OF CERTAINTY.  AND SHE SAID I SWEAR TO EVERYTHING THAT I LOVE, HE'S THE ONE.  I RECOGNIZE THE EYES, THE NOSE, THOSE EYES, IT'S HIM.  SHE SIGNED AND DATED THE PHOTO ARRAY AS WELL.

Q.      DETECTIVE, DID YOU DO ANYTHING TO SUGGEST OR INFLUENCE WHICH PHOTOGRAPH EITHER OF THESE PEOPLE PICKED OUT?

A.      NO.

Q.      TO YOUR KNOWLEDGE, WERE THE PHOTO IDENTIFICATIONS MADE AS A RESULT OF THEIR OWN

132

INDEPENDENT RECOLLECTION IN THIS CASE?

A.    YES.

MR. STEAD:  ONE MOMENT, PLEASE.

BY MR. STEAD:

Q.    AS A RESULT OF THAT IDENTIFICATION, DID YOU FILE CHARGES IN THIS CASE?

A.    YES.

MR. STEAD:  THANK YOU.

I DON'T HAVE ANY ADDITIONAL QUESTIONS.

THE COURT:  MR. SHWARTZ.

MR. SHWARTZ:  THANK YOU, YOUR HONOR.

- - -

CROSS-EXAMINATION

BY MR. SHWARTZ:

Q.    GOOD AFTERNOON, DETECTIVE.

A.    HELLO.

Q.    I UNDERSTAND YOU HAVE BEEN ON THE ROBBERY SQUAD FOR ABOUT NINE YEARS?

A.    ABOUT A TOTAL OF 12 ALL TOTAL.

Q.    WHAT SPECIAL TRAINING DO YOU GET TO BE ON THE ROBBERY SQUAD?

A.    BASICALLY WHEN YOUR SENORITY NUMBER IS UP AND THERE'S A JOB AVAILABLE, YOU PUT IN FOR IT, YOU GET IT. BUT THEN ONCE YOU GO INSIDE, YOU DO SOME DETECTIVE BUREAU TRAINING.

R. HORTON 001899

133

Q.     WHAT KIND OF TRAINING?

A.     INTERVIEW AND INTERROGATION SCHOOLS.  THERE IS -- YOU KNOW, THERE HAS BEEN QUITE A BIT OF TRAINING OVER THE YEARS.

Q.     TELL ME ABOUT IT.

A.     WHAT THE --

Q.     DID YOU GO TO A CLASS ANYWHERE?  DID YOU GO OUT OF TOWN TO ANY SCHOOLS TO LEARN HOW TO BECOME A DETECTIVE?

A.     NOTHING OUT OF TOWN.  IT'S IN-HOUSE TRAINING WITH SENIOR DETECTIVES.

Q.     JUST LOCAL DETECTIVES?

A.     RIGHT.  COLUMBUS POLICE DETECTIVES.

Q.     IN THAT TRAINING DID YOU LEARN TO TRY TO SOLVE A CASE AS EARLY AS POSSIBLE?

A.     YEAH.

Q.     WHAT IS THE ADVANTAGE OF THAT?

A.     JUST, WELL, THERE IS A LOT OF ADVANTAGES TO IT.

Q.     ARE YOU TRAINED TO TRY AND SOLVE THOSE AS EARLY AS POSSIBLE?

A.     CORRECT.

Q.     BECAUSE ITS AN ADVANTAGE TO BOTH THE STATE AND TO WHOEVER IS CHARGED WITH IT; ISN'T THAT CORRECT?

A.     OKAY.

134

Q.        NOW, I UNDERSTAND THE MAN WHO WAS ROBBED TOLD YOU THREE WEEKS AFTER THE ROBBERY THAT HIS NIECE KNEW THE MAN?

A.        GAVE HIM A NAME.

Q.        WHEN DID YOU CALL HER?

A.        I DIDN'T CALL THE NIECE.

Q.        YOU DIDN'T CALL THAT PERSON, A PERSON WHO WOULD BE ABLE TO IDENTIFY HIM?

A.        WELL, SHE WASN'T PRESENT DURING THE ROBBERY.

Q.        WHO WAS NOT PRESENT DURING THE ROBBERY?

A.        THE NIECE.

Q.        SHE WAS SUPPOSED TO GIVE YOU THE NAME, WASN'T SHE?

A.        NO.  SHE GAVE HIM THE NAME.  HE GAVE ME THE NAME.

Q.        HOW MUCH LATER?

A.        THREE WEEKS AFTER THE ROBBERY.

Q.        YOU WAITED THREE WEEKS AFTER TO LEARN HIS NAME WAS RICHARD HORTON?

A.        CORRECT, AT THE END OF OCTOBER.

Q.        AND HOW MUCH LATER DID YOU SHOW A LINEUP?

A.        I THINK IT WAS LIKE FIVE WEEKS LATER.

Q.        IN DECEMBER?

A.        CORRECT, DECEMBER 4TH.  THAT IS WHAT THE FORM SAYS.

R. HORTON 001901

135

Q.    YOU FOUND OUT IN OCTOBER?

A.    UH-HUH.

Q.    YOU WAITED UNTIL DECEMBER TO PREPARE THOSE.
DID YOU EVER TALK TO THE NIECE IN PERSON?

A.    NO.

Q.    YOU NEVER TALKED TO HER?

A.    I HAD NO REASON TO.

Q.    IN YOUR OPINION, YOU DIDN'T HAVE ANY REASON
TO?

A.    SHE WASN'T PRESENT DURING THE ROBBERY.

Q.    BUT SHE WAS SUPPOSED TO HAVE KNOWN THE NAME,
WASN'T SHE?

A.    CORRECT.

Q.    AND YOU WANTED TO KNOW THE NAME, DIDN'T YOU?

A.    CORRECT.

Q.    BUT YOU DIDN'T BOTHER CALLING HER; ISN'T THAT
CORRECT?

A.    MR. MCCLANAHAN DID.

Q.    NOW, YOU PREPARED THESE, WHAT WE CALL A
PICTURE LINEUP, I SUPPOSE?

A.    YES.

Q.    YOU DO THAT WITH A COMPUTER?

A.    CORRECT.

Q.    SO YOU HAVE NO CONTROL OF WHAT COMES UP?

A.    OTHER THAN THE DISCRIPTORS THAT WE PUT IN.

R. HORTON 001902

136

Q.      WHAT DESCRIPTION DID YOU PUT IN?

A.      I WOULD HAVE PUT IN MALE BLACK, FACIAL HAIR, STYLE OF HAIR. I THINK THE HEIGHT AND WEIGHT WAS AUTOMATIC, ONCE YOU PULL UP A PHOTO, COMPLECTION, EYE COLOR, HAIR COLOR.

Q.      WHAT ON COMPLECTION, DETECTIVE --

MR. SHWARTZ: CAN I SEE THOSE PICTURES?

BY MR. SHWARTZ:

Q.      HOW MANY LIGHT-SKINNED PEOPLE DO YOU SHOW ON THAT PICTURE?

A.      WELL, I THINK THAT THERE IS A COUPLE, SEVERAL.

Q.      TELL ME WHICH ARE LIGHT-SKINNED.

A.      I WOULD SAY THE WHOLE BOTTOM ROW IS.

Q.      THE WHOLE BOTTOM ROW IS LIGHT-SKINNED?

A.      YES.

Q.      OKAY. HOW ABOUT AGE?

A.      THE AGE IS DONE AUTOMATIC WITH THE COMPUTER. ONCE YOU PULL UP HIS PICTURE, THE COMPUTER DOES PLUS OR MINUS THREE YEARS AUTOMATIC.

Q.      NOW, ISN'T IT PREFERABLE WHEN YOU'RE DOING THAT TO ALSO SHOW A LINEUP WITHOUT THE MAN'S PICTURE BEING THERE, IN OTHER WORDS, SHOWING TWO OR THREE DIFFERENT LINEUPS?

A.      NO, WE ONLY --

R. HORTON 001903

137

Q.      THAT IS NOT PREFERABLE?

A.      WE ALWAYS JUST SHOW YOU -- YOU MEAN -- ASK ME THAT QUESTION AGAIN.  LET ME HEAR IT AGAIN.

Q.      DO YOU SHOW A PICTURE WITHOUT THE SUSPECT IN THERE, SHOWING A LINEUP WITHOUT THE SUSPECT IN THERE?

A.      YOU MEAN --

Q.      WEREN'T YOU EVER TRAINED TO SHOW --

MR. STEAD:  OBJECTION.

BY MR. SHWARTZ:

Q.      -- MORE THAN ONE?

MR. STEAD:  HE ASKED A QUESTION, SHE'S ENTITLED TO ASK --

THE COURT:  I DON'T THINK SHE UNDERSTANDS IT.  REASK THE QUESTION.

THE WITNESS:  YOU'RE ASKING ME WHAT WOULD I SHOW?

THE COURT:  HOLD ON, MA'AM.

REASK THE QUESTION.

BY MR. SHWARTZ:

Q.      WELL, WOULD YOU SHOW TWO OR THREE SHEETS WITHOUT THE MAN BEING PRESENT, THE SUSPECT BEING PRESENT?

A.      NO.

Q.      YOU NEVER LEARNED THAT?

A.      NO.  IF YOU HAVE A PERSON IN -- MAY I ANSWER?

R. HORTON 001904

138

Q.      GO AHEAD.

A.      IF YOU HAVE A PERSON IN MIND, YOU ALWAYS INCLUDE THEM IN THE PHOTO ARRAY.  THE VICTIM TELLS YOU WHETHER OR NOT THE PERSON IS IN THERE THAT COMMITTED THE ROBBERY.

Q.      BUT INSTEAD OF SHOWING SIX PICTURES, YOU COULD SHOW 12, COULDN'T YOU, WITHOUT THE MAN BEING PRESENT?

A.      THERE WOULD BE NO NEED TO.

Q.      YOU NEVER WERE TRAINED TO DO THAT?

A.      NO.

Q.      YOU ISSUED AN ARREST WARRANT FOR MY CLIENT; IS THAT CORRECT?

A.      RIGHT.

Q.      AND WHEN WAS THAT?

A.      DECEMBER 15TH.

Q.      WHAT DATE?

A.      15TH.

Q.      DID YOU GO OUT AND ARREST HIM?

A.      THE INFORMATION WAS GIVEN TO OUR SWAT UNIT. BECAUSE IT WAS AN ARMED ROBBERY, THAT IS THEIR AREA OF EXPERTISE.  SO HIS INFORMATION AND MOST CURRENT ADDRESS THAT WE HAD WAS ALL PASSED ONTO THEM.

Q.      AND THEN YOUR SWAT TEAM GOES IN.  DO YOU GO WITH THEM?

139

A.      NO.

Q.      IS YOUR SWAT TEAM TRAINED TO DO ANYTHING WHEN THEY GO ARREST THE SUSPECT THAT YOU KNOW OF?

A.      THEY NOTIFY US WHEN THEY HAVE THE APPREHENSION.  IS THAT WHAT YOU MEAN?

Q.      NO.  ARE THEY TRAINED TO SEARCH THE HOUSE?

A.      I DON'T KNOW THEIR PROCEDURES WHAT THEY DO.

Q.      YOU DON'T KNOW THE PROCEDURES?

A.      NOT RIGHT OFFHAND.

Q.      WELL, WOULDN'T IT JUST -- AS A DETECTIVE, WOULDN'T YOU PREFER THAT THEY SEARCH THE HOUSE, SEE, NUMBER ONE, IF THERE IS A GUN IN THE HOUSE?

A.      IF HE'S ARRESTED IN A HOUSE, I MEAN, IT'S JUST -- I DON'T UNDERSTAND YOUR QUESTION.  ARE THEY GOING TO SEARCH THE HOUSE?  THEY ARE SEARCHING.  THEY ARE SERVING A SEARCH WARRANT FOR THE SUSPECT, AN ARREST WARRANT, THEY GO IN AND GET THE SUSPECT.

Q.      THEY NEVER SEARCH THE HOUSE?

A.      NO.  I MEAN, IF THERE IS SOMETHING IN PLAIN VIEW WHEN THEY GO IN, THEY WOULD HAVE TO HAVE A REASON TO SEARCH THE HOUSE.

Q.      CAN'T THEY GET A SEARCH WARRANT?

A.      YES.  AS A GENERAL, DO THEY SEARCH THE HOUSE? NO.

Q.      IS IT A GENERAL TO GET A SEARCH WARRANT IF

140

YOU'RE LOOKING FOR A GUN?

A.      IF YOU'RE LOOKING FOR A GUN.  BUT IT WAS NOT THE CASE IN THIS -- IN THIS INSTANCE.

Q.      THERE WASN'T A GUN INVOLVED?

A.      NO, THERE WAS A GUN INVOLVED.  BUT WHEN THERE --

MR. STEAD:  OBJECTION.

THE WITNESS:  HE TURNED HIMSELF IN AND ACKNOWLEDGED --

MR. SHWARTZ:  THANK YOU.

MR. STEAD:  LET HER FINISH HER ANSWER.

THE COURT:  HOLD ON.  EVERYBODY HAS TO BE QUIET FOR A MINUTE.  WE ARE GETTING CONFUSED HERE.

YOU MAY EXPLAIN YOUR ANSWER.  GO AHEAD, EXPLAIN YOUR ANSWER.

THE WITNESS:  OKAY.  THERE WAS -- HE WASN'T ARRESTED AT HIS RESIDENCE OR ANYBODY'S RESIDENCE.  HE TURNED HIMSELF INTO THE COUNTY JAIL.

BY MR. SHWARTZ:

Q.      SO YOU DIDN'T HAVE TO GO OUT AND ARREST HIM? OR NO ONE HAD TO GO OUT AND ARREST HIM, HE TURNED HIMSELF IN?

A.      HE TURNED HIMSELF IN LIKE DECEMBER 27TH.

Q.      DID YOU HAVE A CONVERSATION WITH HIM BEFORE HE TURNED HIMSELF IN?

R. HORTON 001907

141

A.        HE CALLED ON THE PHONE.

Q.        WHAT WAS THAT CONVERSATION?

A.        HE WANTED TO KNOW WHY THERE WAS AN ARREST WARRANT FOR HIM.  I TOLD HIM HE HAD BEEN IDENTIFIED AS BEING THE SUSPECT IN A RESIDENTIAL ROBBERY.

Q.        AND THAT HE IMMEDIATELY TURNED HIMSELF IN; IS THAT CORRECT?

A.        I DON'T KNOW THAT THE EXACT --

Q.        WITHIN A SHORT TIME?

A.        WITHIN A WEEK PROBABLY.  A FEW DAYS.

Q.        DID YOU EVER TRY AND SECURE A SEARCH WARRANT FOR HIS HOUSE?

A.        NO.

Q.        IN YOUR EXPERIENCE AS A DETECTIVE, HAVEN'T YOU EVER LOOKED FOR GUNS?

A.        YES, WE DO.  BUT THE ROBBERY HAD OCCURRED, YOU KNOW, TWO MONTHS PRIOR.  SO, NO.

Q.        SO IF THE ROBBERY OCCURS TWO MONTHS EARLIER YOU DON'T BOTHER LOOKING FOR THE GUN?

A.        NO, WE DO LOOK FOR THE GUN.  BUT, YOU KNOW, HE KNEW THERE WAS AN ARREST WARRANT.  HE KNEW -- IF THERE WAS ANY GUN IT WAS GONE.  YOU HAVE TO USE COMMON SENSE.

Q.        IN MY EXPERIENCE, I HAVE HAD A LOT OF PEOPLE GET ARRESTED AT THEIR HOUSE AND IT'S SEARCHED.  RATHER

R. HORTON 001908

142

THAN ISSUE A WARRANT AND HAVE THEM TURN HIMSELF IN, ISN'T THAT --

A.    I DIDN'T HAVE HIM TURN HIMSELF IN.  HE DID THAT ON HIS OWN.

Q.    BUT, MA'AM, YOU DID NOT GO OUT TO THE HOUSE TO ARREST HIM?

A.    DID I PERSONALLY?  IT IS NOT -- NO.

Q.    YOU DIDN'T SEND A SQUAD OUT TO ARREST HIM?

A.    I GAVE THE INFORMATION TO OUR SWAT OFFICERS.

Q.    DID YOU TELL THE SWAT OFFICER THERE WAS A GUN INVOLVED IN A ROBBERY AND YOU WANTED TO FIND OUT IF THERE WAS STILL A GUN IN THE HOUSE?

A.    THEY WERE AWARE OF THE ARREST WARRANT, AND THAT IT WAS AN AGGRAVATED ROBBERY, CORRECT.

Q.    NOW, AT THE SCENE OF THE ROBBERY, DID YOU HAVE THE SQUAD COME IN THAT INVESTIGATES THE LOCATION, YOU KNOW, CHECK OUT THE LOCATION?

A.    CRIME SCENE DETECTIVES.  YES, CRIME SCENE DETECTIVES WERE THERE.

Q.    AND WHO WERE THEY, DO YOU KNOW?

A.    DETECTIVE SEEVERS RESPONDED.

Q.    DO YOU KNOW WHAT THEY LOOKED FOR AT THE CRIME SCENE?

A.    PHYSICAL EVIDENCE.

Q.    WHAT TYPE OF EVIDENCE?

R. HORTON 001909

143

A.      I BELIEVE IN THIS CASE THEY RECOVERED A SHELL CASING, THEY TOOK SOME PHOTOGRAPHS, THEY PROCESSED FOUR LATENT PRINTS, FINGERPRINTS.

Q.      WERE THEY ABLE TO FIND ANY LATENT PRINTS?

A.      THEY DID RECOVER SOME LATENT PRINTS FROM A -- FROM THE ROLL-OUT BED.

Q.      WHO DO THOSE PRINTS BELONG TO?

A.      THEY REMAIN UNIDENTIFIED AT THIS TIME.

Q.      CERTAINLY DIDN'T BELONG TO MY CLIENT?

A.      NO, THEY DID NOT.

Q.      DID YOU GO INTO THE NEIGHBORHOOD AND TALK TO OTHER PEOPLE IN THE NEIGHBORHOOD TO SEE IF THEY SAW ANYTHING?

A.      RIGHT.  YES, WE DO A CANVAS.

Q.      WHO DID YOU CANVAS?

A.      WELL, BASED ON THE WAY THIS STREET AND THIS HOUSE SAT, THERE WAS JUST REALLY ONE RESIDENT ACROSS THE STREET.  AND, YOU KNOW, WHEN WE GOT THERE, I KNOCKED ON THE DOOR AND THERE WAS NO ANSWER.  AND THEN BEFORE I LEFT THE HOSPITAL, I ASKED DETECTIVE SEEVERS, I SAID, LOOK, IF YOU SEE ANY MOVEMENT OVER THERE BEFORE YOU LEAVE, COULD YOU PLEASE KNOCK ON THE DOOR, AND HE DID, AND DID GET A RESPONSE LATER IN THE MORNING, BUT THE WOMAN WAS SOUND ASLEEP AND DIDN'T SEE ANYTHING OR HEAR ANYTHING.

144

Q.        SO SHE DIDN'T HEAR ANYTHING?

A.        NO.

Q.        WHAT TYPE OF EVIDENCE DID YOU TRY TO OBTAIN TO BE SURE YOU HAVE THE RIGHT PERSON?  IS FINGERPRINTS ONE OF THEM?

A.        THAT IS ONE OF THEM.

Q.        WHAT ELSE?

A.        WELL, THE VICTIMS KNEW THIS PERSON.  I MEAN, THEY WEREN'T PERSONAL FRIENDS, THEY SEEN HIM IN THE NEIGHBORHOOD AND KNEW WHO HE WAS.  SO IN THIS CASE, JUST CONFIRMING HIS IDENTITY WITH THEM BECAUSE THEY KNEW HIM.

Q.        AND DID THE MAN WHO DID THE ROBBERY, WAS HIS FACE AVAILABLE TO THEM?

A.        DURING THE ROBBERY, YES.

Q.        HE WAS UNCOVERED?

A.        HE HAD A HOOD UP, BUT THEY COULD SEE THE CENTER PART OF HIS FACE.

Q.        COULD THEY SEE HIS NOSE?

A.        YES.

Q.        COULD THEY SEE HIS LIPS?

A.        LIPS, I'M NOT SURE.  THEY COULD SEE HIS EYES, THE CENTER PART OF HIS FACE.

Q.        INCLUDING HIS NOSE?

A.        FROM WHAT I REMEMBER -- I WOULD HAVE TO LOOK TO BE EXACT.

R. HORTON 001911

145

Q.      WOULD YOU MIND LOOKING?

A.      WHICH ONE, BOTH VICTIMS OR?

Q.      BOTH OF THEM.

A.      JUST THE FEMALE.

Q.      BOTH.

A.      MISS CURRY DESCRIBED HIM AS MALE BLACK, 25 TO 30, SIX-TWO, TALL, MEDIUM BUILD, LIGHT-SKINNED, WEARING A GRAY PULL OVER HOOD UP AND TIED TIGHTLY.  SHE COULDN'T REMEMBER IF HE WORE GLOVES.  SHE DESCRIBED THE GUN FLAT WITH A FIVE OR SIX INCH BARREL, BLUE JEANS.

        AND HE DESCRIBED HIM AS MALE BLACK, LIGHT-SKINNED, SIX FOOT WITH BUSHY EYEBROWS, SHORT NAPPY HAIR.  DURING THE ROBBERY, THE SUSPECT WORE A GRAY HOODED SWEAT SHIRT WITH A HOOD UP AND TIED TIGHTLY.

        THE COURT:  WHAT WAS THAT LAST PHRASE?  I DIDN'T HEAR THAT.

        THE WITNESS:  THE HOOD UP AND TIED TIGHTLY.

        THE COURT:  THANK YOU.

BY MR. SHWARTZ:

Q.      IS THERE ANY DESCRIPTION OF HIS NOSE?

A.      NO.

Q.      OKAY.  SO A ROBBERY -- AM I CORRECT, A ROBBERY OCCURRED ON OCTOBER 9TH AND YOU DIDN'T ISSUE AN ARREST WANT UNTIL WHAT?

A.      DECEMBER 15TH.

R. HORTON 001912

146

MR. SHWARTZ:  JUST ONE MINUTE.

THANK YOU.

THE COURT:  ANY REDIRECT?

MR. STEAD:  ONE MOMENT, PLEASE.

- - -

REDIRECT EXAMINATION

BY MR. STEAD:

Q.      DETECTIVE, IS THERE A DIFFERENCE BETWEEN AN ARREST WARRANT AND A SEARCH WARRANT?

A.      YES.

Q.      ARE YOU ALLOWED TO DO THE SAME THINGS WITH AN ARREST WARRANT THAT YOU'RE ALLOWED TO DO WITH A SEARCH WARRANT?

A.      NO.

Q.      MR. SHWARTZ HAS ASKED YOU SEVERAL QUESTIONS ABOUT THE LENGTH OF TIME IT TOOK TO MAKE -- DO THIS INVESTIGATION.  IN AN IDEAL WORLD, HOW MANY CASES WOULD YOU BE INVESTIGATING AT ONE TIME?

A.      ONE.

Q.      IN THE REAL WORLD, DETECTIVE, HOW MANY CASES ARE YOU INVESTIGATING AT ONE TIME?

A.      WE GET ASSIGNED ABOUT 25 CASES A MONTH.

Q.      SO THAT YOU HAD IN THAT -- IN THE MONTH OF OCTOBER 25TH, 2004, OTHER CASES TO WORK ON?

A.      GIVE OR TAKE.

R. HORTON 001913

147

Q.      AND IN NOVEMBER, YOU WOULD HAVE PICKED UP A LIKE NUMBER?

A.      CORRECT.

Q.      DOES THAT FRUSTRATE YOU SOMETIMES?

A.      YOU DON'T KNOW HOW BAD.  YOU JUST DON'T KNOW.

Q.      DO YOU WORK SEVEN DAYS A WEEK?

A.      NO, SIR.

Q.      ARE YOU ALLOWED TO TAKE SOME TIME OFF?

A.      ABSOLUTELY.

Q.      WAS MR. MCCLANAHAN AND MISS CURRY AT THE SAME LOCATION WHEN YOU FOUND THEM AS THE INCIDENT AS WHERE THEY WERE LIVING AT THE TIME OF THE INCIDENT?

A.      OKAY.  ASK ME THAT QUESTION AGAIN.

Q.      THAT WAS REALLY POORLY DONE.  AT THE TIME THAT YOU FOUND THEM TO SHOW THE PHOTO ARRAY, WERE THEY STILL LIVING AT THE LOEW STREET ADDRESS?

A.      NO, SIR, THEY WEREN'T.

Q.      IN FACT, HAD THEY CHANGED LOCATIONS?

A.      YES.

Q.      TO YOUR KNOWLEDGE, HAD MR. MCCLANAHAN BEEN IN AND OUT OF THE HOSPITAL ADDITIONAL TIMES BETWEEN THE TIME HE PROVIDED THE INFORMATION TO YOU OF THE SUSPECT'S LAST NAME?

A.      YES.

R. HORTON 001914

148

Q.      DID THAT COMPOUND THE DIFFICULTIES IN GETTING BACK TO THESE PEOPLE?

A.      WELL, IT DOES.  AND I WENT ON VACATION IN OCTOBER.  BUT --

Q.      DOES THE WORK STOP COMING IN WHEN YOU GO ON VACATION?

A.      WE DON'T GET ASSIGNED NEW CASES FOR THE WEEK WE ARE GONE, IF WE ARE GONE AT LEAST A WEEK.  BUT THEN YOU HAVE THE ONES THAT YOU ARE WORKING ON WHEN YOU CAME BACK, AND THEN YOU START GETTING THEM AGAIN THE VERY DAY YOU COME BACK.

Q.      AT ANY POINT IN THIS INVESTIGATION, DID EITHER VICTIM IN THIS CASE INDICATE ANY DOUBT TO YOU THAT THEY WERE FAMILIAR WITH THE PERSON WHO HAD DONE THIS CRIME?

A.      BOTH OF THEM SAID THEY WERE FAMILIAR WITH HIM.

Q.      WHETHER THEY GIVE YOU A WHOLE NAME INITIALLY OR NOT?

A.      CORRECT.

Q.      MR. SHWARTZ ASKED YOU ABOUT SIMILARITIES, ASKED YOU IF PRINTS WERE FOUND AT THIS LOCATION.  THEY WERE COMPARED TO MR. HORTON'S, WERE THEY NOT?

A.      THAT'S CORRECT.

Q.      THERE WERE TWO LIFTS TAKEN FROM THAT

R. HORTON 001915

149

LOCATION?

A.      CORRECT.

Q.      TWO LATENT LIFTS OUT OF THE HOUSE?

A.      YES.

Q.      WERE THEY COMPARED AGAINST A KNOWN PRINT OF THE VICTIMS?

A.      NO.

Q.      SO FOR ALL WE KNOW, THEY COULD BE THE VICTIMS' PRINTS?

A.      CORRECT.

MR. STEAD:  NOTHING FURTHER.

THE COURT:  BEFORE YOU STEP DOWN.  BEFORE WE ASK THE JURY IF THEY HAVE ANY QUESTIONS, COUNSEL APPROACH FOR JUST A SECOND.

- - -

THEREUPON, COURT AND COUNSEL CONFER AT THE BENCH OUT OF THE HEARING OF THE JURY AND COURT REPORTER.

- - -

THE COURT:  LADIES AND GENTLEMEN, DO ANY OF YOU HAVE QUESTIONS OF THIS WITNESS?

YOU DO.  VERY WELL.

MR. SHWARTZ:  I HAVE A COUPLE MORE QUESTIONS.

THE COURT:  I'M SORRY, I NORMALLY DO NOT ALLOW IT, MR. SHWARTZ.  BUT I'LL ALLOW IT, GIVEN THE

R. HORTON 001916

150

NATURE OF THE CROSS.

MR. SHWARTZ:  I APPRECIATE IT.

THE COURT:  GO AHEAD.

- - -

RECROSS-EXAMINATION

BY MR. SHWARTZ:

Q.  WHERE DID YOU GO ON YOUR VACATION?

A.  MY HUSBAND AND I DO GO ON A BEAUTIFUL FALL FOILAGE TRIP EVERY YEAR.  WHERE TO VARIES.

Q.  HOW LONG WERE YOU GONE?

A.  I TAKE A WEEK.

Q.  NOW, IT IS FRUSTRATING TO YOU, YOU SAID THE FACT YOU DIDN'T HAVE ENOUGH TIME TO REALLY INVESTIGATE CASES PROPERLY; ISN'T THAT TRUE?

A.  NO, I DIDN'T SAY THAT.

Q.  THAT'S WHAT YOU INSINUATED?

A.  NO.  IT IS JUST THAT THEY ARE ALL DONE PROPERLY.  IT IS JUST -- THAT IT TAKES TIME.  AND IN A PERFECT WORLD, WE COULD DO IT LIKE TV AND HAVE IT DONE IN ONE HOUR.  IT DOESN'T WORK THAT WAY.

Q.  HOW MANY DETECTIVES DO YOU HAVE ON THAT ROBBERY SQUAD?

A.  WE CURRENTLY HAVE 16.  ROBBERY -- NO, WE HAVE 18 NOW BECAUSE WE JUST ACQUIRED TWO NEW DETECTIVES. THEY WILL BE COVERING SOME MIDWATCH HOURS.  SO WE HAVE

R. HORTON 001917

151

18 ROBBERY DETECTIVES

Q.      CAN YOU JUST TELL US HOW YOU OBTAIN A SEARCH WARRANT?

A.      A SEARCH WARRANT?

Q.      YES.

A.      YOU WRITE IT UP, PRESENT IT TO A JUDGE AND GIVE REASONS TO SEARCH A PREMISE OR CAR OR WHATEVER IT IS, AND FOR WHAT PROPERTY YOU'RE LOOKING FOR.  AND THEN HE DETERMINES WHETHER OR NOT THERE IS ENOUGH PROBABLE CAUSE TO ISSUE A SEARCH WARRANT.

Q.      DID YOU ATTEMPT TO GET A SEARCH WARRANT IN THIS CASE?

A.      NO.  NO.

Q.      IN OTHER WORDS, YOU NEVER LOOKED FOR THE GUN OR YOU NEVER LOOKED FOR MATCHING CLOTHES?

A.      NO.

MR. SHWARTZ:  THANK YOU.

THE COURT:  ALL RIGHT.  NOW, QUESTIONS.  YOU HAVE ONE?  AND ANYBODY ELSE?  WE HAVE ONE QUESTION FROM THE JURY.

COUNSEL, APPROACH.

DID YOU HAVE AN ADDITIONAL QUESTION?

MR. STEAD:  I DID.

THE COURT:  LAST ONE, GO FOR IT.

- - -

R. HORTON 001918

152

FURTHER REDIRECT EXAMINATION

BY MR. STEAD:

Q.        DETECTIVE, ARE THERE RULES ABOUT THE FRESHNESS OF INFORMATION IN OBTAINING SEARCH WARRANTS, ITEMS THAT CAN BECOME STALE AT SOME POINT?

A.        YES.  THERE IS NO HARD, SET, CLEAR CUT RULES. BECAUSE THE ROBBERY OCCURRED WHEN IT DID, AND WHEN ALL OF THE INFORMATION AND EVERYTHING CAME TO LIGHT, AND HE KNEW HE HAD AN ARREST WARRANT, THEN A SEARCH WARRANT OF HIS RESIDENCE PRETTY MUCH WOULD HAVE BEEN A WASTE OF TIME BECAUSE HE HAD TIME TO GET RID OF ANY EVIDENCE THAT WOULD HAVE BEEN USED IN THE CASE.

Q.        IS A GUN A DISPOSABLE ITEM?

A.        YES.

Q.        MR. SHWARTZ ASKED IF YOU WENT TO LOOK FOR THE CLOTHING.  IS A GRAY HOODED SWEATSHIRT A DISTINCTIVE ITEM OF CLOTHING?

A.        NOT REALLY.  I HAVE ONE.

Q.        HOW ABOUT BLUE JEANS?

A.        NO.  I HAVE GOT SEVERAL.

MR. STEAD:  NOTHING FURTHER.

THE COURT:  I THINK WE HAVE EXHAUSTED THAT.

GO AHEAD, ANY OTHER QUESTIONS BASED UPON THOSE BY ANY MEMBER?

ARE YOU DONE, MA'AM?

R. HORTON 001919

153

A JUROR:  YES.

THE COURT:  COUNSEL, APPROACH.

- - -

THEREUPON, COURT AND COUNSEL CONFER AT THE BENCH OUT OF THE HEARING OF THE JURY AND COURT REPORTER.

- - -

THE COURT:  I HAVE A VERY GOOD QUESTION FROM A MEMBER OF THE JURY FOR YOU.

THE WITNESS:  THANK YOU.

THE COURT:  WHY WEREN'T THE PRINTS THAT WERE OBTAINED COMPARED TO THE VICTIMS?

THE WITNESS:  WE JUST DIDN'T DO IT.  I MEAN, IT IS JUST AN OVERSIGHT.

THE COURT:  WOULD THAT NORMALLY BE DONE?

THE WITNESS:  IT CAN BE DONE.  IT IS DONE USUALLY.  A LOT OF TIMES WHAT HAPPENS IS WHEN THE CRIME SCENE GUYS ARE THERE AND THEY'RE PROCESSING THE SCENE, THE VICTIMS ARE A LOT OF TIMES THERE, AND THEY WILL TAKE THEIR PRINTS RIGHT THEN THAT DAY WHILE THEY ARE THERE AND WE ARE INTERVIEWING THEM AND STUFF.  SO WHEN WE SUBMIT THE PRINTS RIGHT AT THE TIME, THE LATENT EXAMINERS CAN LOOK AT THEM AND SEE IF THEY DO BELONG TO THE VICTIMS.  BUT BECAUSE NEITHER VICTIM WAS THERE AND THEY WERE AT THE HOSPITAL AND THINGS, IT JUST WASN'T DONE.  SO THEY REMAIN UNIDENTIFIED.

R. HORTON 001920

154

THE COURT:  THANK YOU.  QUESTIONS IN LIGHT OF THOSE, PROSECUTION?

MR. STEAD:  NO, THANK YOU.

THE COURT:  ANYTHING, MR. SHWARTZ?

MR. SHWARTZ:  NO.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.

NEXT WITNESS.

MR. STEAD:  YOUR HONOR, I DON'T BELIEVE WE HAVE ANY ADDITIONAL WITNESSES AT THIS POINT.  WE WOULD MOVE FOR THE ADMISSION INTO EVIDENCE OF STATE'S EXHIBITS 1, 1-A, 2, 2-A AND 4.

THE COURT:  AND WE WILL TALK ABOUT THAT OUT OF THE HEARING OF THE JURY.

ARE YOU GOING TO PRESENT ANYTHING THIS AFTERNOON OR REQUESTING TO FOR TOMORROW?

MR. SHWARTZ:  I WOULD LIKE TO START TOMORROW.

THE COURT:  THE PROSECUTION HAS NOW RESTED. THE DEFENSE IS GOING TO PRESENT ITS CASE TOMORROW.  SO I AM GOING TO RELEASE YOU FOR THE DAY, AGAIN, WITH THE CAVEAT, PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES OR WITH ANYONE ELSE, OR ALLOW ANYONE TO DISCUSS IT WITH YOU, OR DON'T FORM ANY OPINIONS ABOUT IT.

THANK YOU, AND WE WILL SEE YOU AT 9:00 A.M.

155

                           - - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  1, 1-A, 1 AND 2 ARE THE PHOTOS AND THE SHEETS CONCERNING THEM, I TAKE IT?

MR. STEAD:  RIGHT.

THE COURT:  I THINK YOU HAD NO OBJECTION TO THEIR ADMISSION BEFORE.  THEY HAVE BEEN ADMITTED.  SO THOSE ARE ADMITTED, AND THE OTHER RECORD OR THE OTHER EXHIBIT IS 4?

MR. STEAD:  4.

THE COURT:  WHICH IS?

MR. STEAD:  THE PHONE NUMBER WITH A NAME ON IT.

THE COURT:  A PHONE NUMBER WITH A NAME ON IT.

ANY OBJECTION TO THAT?

MR. SHWARTZ:  NO.

THE COURT:  ALL RIGHT.  THAT WILL BE ADMITTED.

OKAY.  ANY OTHER EXHIBITS?

MR. STEAD:  NO.  WITH THE ADMISSION OF OUR EXHIBITS, THE STATE WOULD REST.

                           - - -

R. HORTON 001922

156

THEREUPON, THE EXHIBITS LAST ABOVE OFFERED WERE ADMITTED INTO EVIDENCE ON BEHALF OF THE PLAINTIFF AND IS HERETO MARKED STATE'S EXHIBITS 1, 1-A, 2, 2-A, 4 AND MADE A PART HEREOF.

- - -

THEREUPON, THE PLAINTIFF, STATE OF OHIO, RESTED.

- - -

THE COURT:  VERY WELL.  NOW, ARE THERE MOTIONS IN THIS CASE?

DEFENSE HAVE ANY MOTIONS AT THIS POINT IN TIME?

MR. SHWARTZ:  WE HAVE A MOTION.

THE COURT:  WOULD YOU CARE TO MAKE IT?

MR. SHWARTZ:  I WOULD MOVE THAT THE STATE HAS NOT PROVEN THE CASE BEYOND A REASONABLE DOUBT AT THIS POINT.  AND LOOKING AT IT IN THE BEST LIGHT, THEY DON'T HAVE ENOUGH DEFINITIVE PROOF TO TIE THIS MAN TO THIS.

THE COURT:  ALL RIGHT.  MR. STEAD, DO YOU WISH TO RESPOND, OR MR. SMITH?

MR. STEAD:  JUDGE, YOU HEARD THE EVIDENCE. THERE WAS CERTAINLY SUFFICIENT EVIDENCE FOR THIS CASE TO GO TO THE JURY AT THIS TIME.

THE COURT:  WELL, THE STANDARD IS ON A RULE

157

29, IS THERE EVIDENCE WHICH REASONABLE MINDS COULD FIND BEYOND A REASONABLE DOUBT EACH AND EVERY ELEMENT OF THE CHARGED OFFENSES IN THIS CASE.

WITHOUT GETTING INTO EACH OF THE CHARGED OFFENSES IN THIS CASE, AND WE WILL DISCUSS THAT, THERE IS EVIDENCE THAT, IF BELIEVED, COULD CONVINCE A REASONABLE MIND BEYOND A REASONABLE DOUBT OF EACH AND EVERY ELEMENT OF THE CHARGED OFFENSES. SO, THEREFORE, THAT MOTION IS DENIED.

NOW, I JUST WANT TO GIVE PEOPLE SOME GUIDANCE HERE, AND I HAVEN'T HEARD THE WHOLE CASE, FOR INSTRUCTIONAL PURPOSES ONLY, SOME THINGS TO DISCUSS.

I AM TAKING IT, AND I MAY BE WRONG, YOU NEVER KNOW HOW A CASE IS GOING TO TURN OUT FROM THE DEFENSE POINT OF VIEW, AS FAR AS WHEN THEY PUT THINGS ON, BUT, IF THIS CASE IS WHAT I BELIEVE IT IS, WHICH IS AN ALIBI CASE, WHICH I WASN'T THERE, I THINK YOU RECEIVED NOTICE OF THAT, SERVED NOTICE OF THAT, WE ARE LEFT WITH THE TESTIMONY OF THE TWO ALLEGED VICTIMS IN THIS CASE FOR THE PURPOSES OF ESTABLISHING INSTRUCTIONS.

IF THAT ENDS UP BEING THE CASE, IN MY VIEW AT THE PRESENT TIME, I WILL GIVE YOU TIME TO THINK ABOUT IT, BECAUSE YOU CAN ALSO COME BACK AND TALK TO ME AND TALK TO US LATER, IS THAT AS FAR AS THE SPECIFICATIONS GO, I WOULD ONLY INSTRUCT UPON SPEC ONE, THE THREE-YEAR

R. HORTON 001924

158

GUN SPEC.

MR. STEAD:  NO OBJECTION.

THE COURT:  ALL RIGHT.  NOW, THAT IS PRETTY EASY.  WE HAVE A COUPLE MORE INVOLVED THINGS HERE.  WE HAVE SEVERAL SUBSIDARY ROBBERY COUNTS OTHER THAN THE AGGRAVATED ROBBERY.

IN DETERMINING WHAT GOES TO A JURY, I HAVE GOT TO LOOK AT THE EVIDENCE AND DETERMINE WHAT IS REASONABLY RAISED.  FOR EXAMPLE, THE SUBSIDIARY ROBBERY CHARGES COULD HAVE BEEN LEFT ALONE, BEEN LESSER INCLUDEDS IF YOU WANTED THEM.  HOWEVER, THE EVIDENCE AS IT STANDS RIGHT NOW, MY INCLINATION WOULD BE JUST TO INSTRUCT ON AGGRAVATED ROBBERY AS IT APPLIES TO EACH OF THE VICTIMS.  DO YOU CARE?

MR. STEAD:  NO, WE HAVE NO OBJECTION TO THAT.

THE COURT:  I DIDN'T THINK YOU WOULD.  IT IS A LOT SIMPLER.

A MORE INTERESTING ISSUE HAS ARISEN IN THE KIDNAPPING INDICTMENT, WHICH I THINK ARE COUNTS 10 AND 5.  WHAT THE INDICTMENT DOES IS COMBINE IN ONE COUNT TWO SEPARATE AND DISTINCT OFFENSES, A AND B, PARAGRAPH A AND PARAGRAPH B.  AND THEY ARE SEPARATE AND DISTINCT.  THEY ARE NOT LESSER INCLUDEDS BECAUSE THE B INVOLVES AN ELEMENT THAT IS NOT PRESENT IN THE A.

R. HORTON 001925

159

TECHNICALLY, I WOULD THINK YOU WOULD HAVE INDICTED BOTH OF THOSE IF YOU FELT YOU WANTED TO AS SEPARATE COUNTS. IF ONE LOOKS AT 505.01 OF OJI, WHICH PROVIDES TWO TYPES OF KIDNAPPING. THE FIRST SECTION OF THE FOLLOWING INSTRUCTIONS REPRESENTS THAT TYPE OF KIDNAPPING. WE ARE TALKING ABOUT R.C. 2905.01(A).

MR. STEAD: JUDGE, I THINK I CAN SHORTEN THIS.

THE COURT: YOU CAN, YOU'RE GOING TO KICK B, I TAKE IT?

MR. STEAD: WE HAVE NO PROBLEM WITH PROCEEDING UNDER THE A.

THE COURT: I FIGURED YOU DIDN'T, BUT I HAD TO RAISE IT.

MR. STEAD: THAT'S FINE. I APPRECIATE IT.

THE COURT: GOOD. THAT IS FINE. ALSO, JUST A SMALL THING THAT WE WILL TALK ABOUT AT THE TIME OF THE INSTRUCTIONS, THE ALTERNATIVES CONTAINED WITHIN EACH COUNT AS FAR AS, FOR EXAMPLE, IN THE AGGRAVATED BURGLARY, FORCE, STEALTH OR DECEPTION. I DON'T SEE FORCE AT THIS POINT IN TIME.

I'LL ALSO BE VERY INTERESTED IN THE STATE'S VIEW OF THE FACTS TO SUPPORT THE KIDNAPPING IN THE CASE OF THE FEMALE VICTIM. I PRESUME IT'S GOING TO BE SOME FORM OF A RESTRAINT ON LIBERTY?

R. HORTON 001926

160

MR. STEAD:  CORRECT.

THE COURT:  I PRESUME IT'S GOING TO BE BY SHE WAS ON THE BED OR FORCING HER TO STAY ON THE BED OR SOMETHING LIKE THAT?

MR. STEAD:  YES.

THE COURT:  JUST AS LONG AS I UNDERSTAND WHERE YOU'RE GOING.

ALL RIGHT.  WELL, THAT IS ALL I HAVE FOR NOW.  I MAY HAVE SOMETHING MORE LATER ON, BUT WE WILL SEE.

ALL RIGHT.  THANK YOU SO MUCH.  WE WILL SEE YOU TOMORROW MORNING AT 9:00 A.M.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS ADJOURNED UNTIL 9:00 O'CLOCK, A.M., FEBUARY 1, 2006.

- - -

R. HORTON 001927

161

WEDNESDAY MORNING SESSION,

FEBRUARY 1, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  ON THE RECORD BEFORE THE JURY COMING IN.

MR. SHWARTZ, YOU INDICATED YOU ARE NOT MAKING AN OPENING STATEMENT?

MR. SHWARTZ:  YES.

THE COURT:  SO YOU HAVE GOT TWO WITNESSES?

MR. SHWARTZ:  TWO WITNESSES.

THE COURT:  WHO IS FIRST?

MS. HOLFINGER:  JENNETTE HARMON.

THE COURT:  VERY WELL.  LET'S PROCEED.

- - -

THEREUPON, THE JURORS RESUMED THEIR POSITIONS IN THE JURY BOX AND THE FOLLOWING PROCEEDINGS WERE HAD AS FOLLOWS:

THE COURT:  PLEASE BE SEATED, LADIES AND GENTLEMEN.

R. HORTON 001928

162

ALL RIGHT.  WE ARE READY TO PROCEED WITH THE DEFENSE SIDE OF THE CASE.

I INDICATED PRIOR TO THIS TIME BEFORE THAT MR. SHWARTZ WOULD RESERVE HIS OPENING STATEMENT UNTIL HIS SIDE OF THE CASE.  MR. SHWARTZ HAS DECIDED TO PROCEED WITHOUT MAKING AN OPENING STATEMENT.  AND SO THAT IS FINE.  THAT IS TOTALLY PERMISSIBLE.

YOU MAY PROCEED, MR. SHWARTZ.

MR. SHWARTZ:  THANK YOU, YOUR HONOR.

MS. HOLFINGER:  WE WILL CALL OUR FIRST WITNESS, JENNETTE HARMON.

(WITNESS IS SWORN.)

THE COURT:  MISS HARMON, HAVE A SEAT.

NOW, LET'S START WITH YOUR FULL NAME.

THE WITNESS:  JENNETTE DARLENE HARMON-HORTON.  I'M SORRY.

THE COURT:  ADDRESS?

THE WITNESS:  2279 SONORA DRIVE, GROVE CITY, OHIO 43123.

THE COURT:  ARE YOU EMPLOYED?

THE WITNESS:  YES.

THE COURT:  WHERE AT?

THE WITNESS:  BROADVIEW HEALTH CENTER.

THE COURT:  WHAT DO YOU DO THERE?

THE WITNESS:  I'M A COOK.

R. HORTON 001929

163

THE COURT:  OKAY.  YOUR WITNESS.

MS. HOLFINGER:  THANK YOU.

- - -

BE IT FURTHER REMEMBERED THAT THE DEFENDANT, TO MAINTAIN THE ISSUES TO HIS PART TO BE MAINTAINED, OFFERED AND INTRODUCED IN TESTIMONY ON HIS BEHALF THE FOLLOWING EVIDENCE, TO WIT:

JENNETTE HARMON-HORTON

CALLED AS A WITNESS ON BEHALF OF THE DEFENDANT, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. HOLFINGER:

Q.        JENNETTE, HOW LONG HAVE YOU BEEN EMPLOYED AT BROADVIEW HEALTH CENTER?

A.        IT WILL BE THREE YEARS IN SEPTEMBER OF THIS YEAR.

Q.        WHAT DO YOU DO THERE?

A.        I'M A COOK THERE.

Q.        ARE YOU MARRIED?

A.        YES.

Q.        WHO ARE YOU MARRIED TO?

A.        RICHARD HORTON.

Q.        AND WHEN DID YOU MEET RICHARD HORTON?

A.        MAY 1ST, 2004.

Q.        TELL ME THE CIRCUMSTANCES UNDER WHICH YOU MET

R. HORTON 001930

164

HIM.

A.    WE WERE BOTH AT A NIGHT CLUB.  WE MET THAT NIGHT.

Q.    AND DURING THIS PERIOD OF TIME IN YOUR LIFE, TELL ME A LITTLE BIT ABOUT WHAT YOU WERE DOING AT THAT TIME.

A.    I HAD JUST MOVED OUT OF MY PARENTS' HOUSE IN MARCH.  SO I HAVE BEEN BY MYSELF FOR ABOUT TWO MONTHS.

Q.    WHERE DO YOUR PARENTS LIVE?

A.    THEY LIVE ABOUT FIVE MINUTES AWAY FROM ME ON BROWN ROAD, COLUMBUS, OHIO.

Q.    AND YOU SAID YOU MOVED INTO THE PLACE THAT YOU WERE LIVING NOW?

A.    YES.

Q.    WHAT IS THAT ADDRESS?

A.    2279 SONORA DRIVE.

Q.    WHERE IS THAT LOCATED?

A.    IN GROVE CITY.

Q.    AFTER MEETING RICHARD, HOW LONG PASSED BEFORE YOU AND RICHARD BEGAN DATING?

A.    ABOUT A MONTH.  WE WERE CONSIDERED BOYFRIEND AND GIRLFRIEND AFTER THAT, SO AROUND JUNE.

Q.    I'M GOING TO MOVE TO THE TIME PERIOD OF OCTOBER OF 2004.  OKAY.  AROUND THAT TIME, HOW MUCH TIME WERE YOU AND RICHARD SPENDING TOGETHER?

R. HORTON 001931

165

A. WE HAD STARTED SPENDING A LOT OF TIME TOGETHER. ALL THE WEEKENDS WE SPENT TOGETHER. WE BOTH WORKED.

Q. WHERE WAS RICHARD WORKING DURING THAT TIME?

A. POPEYE'S OFF EAST LIVINGSTON.

Q. WHERE WAS RICHARD'S RESIDENCE AT THAT TIME?

A. HE LIVED OFF FIFTH AVENUE. I CAN'T REMEMBER THE ADDRESS.

Q. WAS THAT IN COLUMBUS?

A. YEAH, COLUMBUS.

Q. DURING THAT TIME, TELL ME A LITTLE BIT ABOUT WHAT YOUR WORK SCHEDULE IS?

A. HE WORKED MONDAY THROUGH FRIDAY, I THINK, 9:00 TO 4:30, SOME SATURDAYS, SOME SUNDAYS. THEN MY WORK SCHEDULE WAS STRICTLY MONDAY THROUGH FRIDAY 6:00 TO 2:30. I NEVER WORKED THE WEEKENDS THEN.

Q. AND YOU SAID RICHARD SOMETIME WORKED SATURDAYS AND SUNDAYS?

A. UH-HUH.

Q. HOW OFTEN WAS HE WORKING WEEKENDS?

A. MAYBE BACK THEN IT WAS EVERY OTHER WEEKEND.

Q. I WANT TO TALK TO YOU A LITTLE BIT ABOUT WEEKENDS THAT HE WAS NOT WORKING.

A. OKAY.

Q. ON THE WEEKEND, TYPICAL WEEKEND WHEN RICHARD

R. HORTON 001932

166

WAS NOT WORKING, WHEN WOULD YOU SEE HIM?

A.      HE WOULD COME OVER FRIDAY NIGHT AND WE SPENT THE WHOLE WEEKEND TOGETHER, JUST GO SHOPPING, OUT TO DINNER, JUST SPEND SOME TIME TOGETHER.

Q.      IS THERE A TYPICAL TIME OR HOUR THAT HE WOULD COME OVER TO YOUR ADDRESS?

A.      FRIDAY NIGHT, USUALLY LIKE AROUND 9:30, 10:00.

Q.      HOW WOULD HE USUALLY GET THERE?

A.      I WOULD GO GET HIM, YEAH.

Q.      DID YOU EVER SPEND SOME TIME AT HIS APARTMENT?

A.      NO, I DIDN'T LIKE STAYING UP THERE.

Q.      AND THEN FRIDAY, TYPICAL FRIDAY NIGHT, WHAT WOULD YOU DO?

A.      GO RENT A MOVIE, SEE A MOVIE, GO OUT TO DINNER, JUST TYPICAL STUFF.

Q.      AND ON THE WEEKEND THAT HE WAS NOT WORKING, WOULD HE STAY AT YOUR HOUSE, OR WHAT?

A.      YES, ALL THE TIME, HE STAYED THE WHOLE WEEKEND.

Q.      WHAT DO YOU TYPICALLY DO ON SATURDAYS?

A.      SLEEP IN LATE, AND I WAKE UP AND WE FIX BREAKFAST. WE MIGHT, IF WE HAVE PLANS FOR THE DAY, BUT NO SPECIFIC PLANS, JUST GO SHOPPING, OR WHATEVER I

R. HORTON 001933

167

WANTED TO DO USUALLY.

Q.      WOULD YOU TYPICALLY STAY AROUND GROVE CITY? WOULD YOU GO INTO COLUMBUS?  OR WHAT WOULD YOU DO? WHERE WOULD YOU TYPICALLY SPEND YOUR TIME?

A.      WE GO INTO COLUMBUS SOMETIMES, BUT GENERALLY STAYED IN GROVE CITY.

Q.      WHEN DID YOU FIND OUT THAT RICHARD HAD THESE CHARGES AGAINST HIM?

A.      HE WAS IN COURT FOR HIS DAUGHTER, IT WAS A CHILDREN'S SERVICE SITUATION WITH HER MOTHER, AND SO HE WENT THERE FOR THAT.  I WAS AT WORK AT THE TIME.  AND HE HAD CALLED ME BECAUSE HE WAS TRYING TO GET -- THEY WAS TRYING TO SET HIS DAUGHTER WITH HIM JUST IN CASE BECAUSE HE DIDN'T WANT HER TO GO INTO CHILDREN SERVICES, BUT HE HAD THIS WARRANT AGAINST HIM, HE COULDN'T DO ANYTHING ABOUT THAT.  HE CALLED ME FROM WORK.

Q.      DO YOU REMEMBER WHEN THAT WAS?

A.      IN DECEMBER, MIDDLE OF DECEMBER.

Q.      WHAT YEAR?

A.      2004.

Q.      WHAT WAS YOUR REACTION WHEN YOU HEARD THAT HE HAD THIS WARRANT OUT FOR HIM?

A.      KIND OF SUPRISED.  I DIDN'T KNOW WHAT WAS GOING ON, KIND OF CAUGHT ME OFF GUARD.

Q.      DURING THIS -- WELL, EVER SINCE YOU MET

168

RICHARD, DID YOU EVER SEE HIM USE DRUGS?

A.      NO.

Q.      DID YOU EVER SEE HIM SELL DRUGS?

A.      NO.

Q.      DID YOU EVER SEE RICHARD AT ANY TIME SINCE YOU HAVE KNOWN HIM WITH A GUN?

A.      NO.

Q.      WHEN YOU FOUND OUT THAT HE HAD THESE CHARGES AGAINST HIM, DID YOU THINK BACK AS TO WHAT HE OR YOU WERE DOING DURING THIS WEEKEND OF OCTOBER 9TH?

A.      YES.  I WAS TRYING TO THINK, I DIDN'T KNOW WHAT WAS GOING ON.

Q.      DID YOU LOOK TO SEE IF HE HAD BEEN WORKING THAT WEEKEND?

A.      YES.

Q.      WAS HE WORKING?

A.      NO, HE WASN'T.

Q.      WHEN YOU LOOK BACK AT THIS TIME PERIOD OF OCTOBER 2004, AND MAYBE A MONTH BEFORE AND A MONTH AFTER, COULD YOU THINK IN YOUR MIND OF ANY WEEKEND WHEN RICHARD WAS NOT WORKING WHERE HE WOULD HAVE NOT -- WHERE HE WOULD NOT HAVE BEEN IN GROVE CITY WITH YOU?

A.      NO.

Q.      SO COULD YOU THINK OF ANY TIME IN YOUR MIND ON A SATURDAY DURING THIS TIME PERIOD THAT RICHARD COULD

R. HORTON 001935

169

HAVE BEEN IN COLUMBUS ON A SATURDAY MORNING?

A.      NO, WE WERE ALWAYS TOGETHER ON THE WEEKENDS.

Q.      WHAT WOULD YOU TYPICALLY DO ON SUNDAYS?

A.      I WOULD GO TO CHURCH FOR A COUPLE HOURS, FROM 10 TO 12.

Q.      WERE DID YOU GO TO CHURCH?

A.      JEHOVAH KINGDOM HALL ON BROWN ROAD IN COLUMBUS.

Q.      DOES YOUR FAMILY ATTEND THAT CHURCH, TOO?

A.      YES, UH-HUH.

Q.      DID RICHARD EVER GO TO CHURCH WITH YOU?

A.      SOMETIMES HE GOES TO -- WITH ME A LOT MORE NOW.  BACK THEN WE WERE DATING, JUST SOMETIMES HE WOULD JUST STAY AT THE HOUSE, WAIT FOR ME TO COME BACK.

Q.      WHEN WOULD YOU TYPICALLY TAKE HIM BACK ON THE WEEKENDS THAT HE WOULD STAY WITH YOU?

A.      USUALLY SUNDAY NIGHT OR MONDAY MORNING, RIGHT BEFORE I WENT TO WORK BECAUSE HE HAD TO BE AT WORK LATER THAN ME.

Q.      WHEN YOU LOOK AT THIS DATE OF OCTOBER 9TH, 2004, IS THERE ANYTHING SPECIFIC OR SPECIAL ABOUT THIS DATE THAT YOU REMEMBER?

A.      NOT RIGHT OFFHAND, NO.  I COULDN'T REMEMBER ANYTHING SPECIFIC.

Q.      BUT BECAUSE YOU TESTIFIED THAT HE WAS NOT

R. HORTON 001936

170

WORKING, IS THERE ANY WAY THAT HE WOULD HAVE BEEN IN COLUMBUS TO COMMIT THIS ROBBERY?

A.      NO.

MS. HOLFINGER:  COULD I HAVE JUST A MINUTE, YOUR HONOR?

THE COURT:  YES.

MS. HOLFINGER:  I HAVE NO FURTHER QUESTIONS AT THIS TIME.

THE COURT:  CROSS.

MR. STEAD:  YES, PLEASE.

- - -

CROSS-EXAMINATION

BY MR. STEAD:

Q.      GOOD MORNING.

A.      GOOD MORNING.

Q.      IF I'M UNDERSTANDING YOU, YOU MET MR. HORTON BACK IN MAY OF 2004.

A.      UH-HUH.

Q.      STARTED DATING?

A.      YES.

Q.      IN JUNE?

A.      YES.

Q.      AND BY THE FALL HE WAS SPENDING EVERY WEEKEND WITH YOU DOWN IN GROVE CITY?

A.      YES.

R. HORTON 001937

171

Q. AND ALTHOUGH YOU HAVE NO SPECIFIC RECOLLECTION OF THE EVENTS OF OCTOBER 9TH, YOU JUST KNOW HE COULDN'T HAVE DONE THIS CRIME BECAUSE HE WAS ALWAYS WITH YOU ON SATURDAY MORNING?

A. WE WERE ALWAYS TOGETHER, UH-HUH.

Q. YOU SAID YOU DIDN'T LIKE SPENDING TIME AT HIS HOUSE, WHY NOT?

A. IT WAS A BACHELOR PAD. I DIDN'T LIKE IT OUT THERE.

Q. WHERE WAS HIS PLACE?

A. OFF FIFTH AVENUE. I CAN'T REMEMBER THE ADDRESS.

Q. DO YOU REMEMBER THE NAME OF THE STREET?

A. NO, I DON'T. IT'S BEEN A WHILE.

Q. OKAY. ARE YOU FAMILIAR WITH THE NEIGHBORHOOD AROUND HIS RESIDENCE?

A. NOT REALLY. I GREW UP ON THE WEST SIDE OF COLUMBUS. HE LIVES ON THE NORTH SIDE. SO I AM NOT REALLY FAMILIAR WITH THAT AREA TOO MUCH.

Q. WHEN YOU FOUND OUT RICHARD HAD BEEN CHARGED WITH A CRIME ON THAT WEEKEND, THIS WOULD HAVE BEEN THE WEEKEND OF OCTOBER 9TH, I'M ASSUMING THAT WOULD HAVE BEEN IN MID-DECEMBER?

A. YES.

Q. AND YOU, OF COURSE, THEN CONTACTED THE

R. HORTON 001938

172

COLUMBUS POLICE DEPARTMENT TO LET THEM KNOW THAT HE COULDN'T HAVE DONE THIS CRIME BECAUSE HE WAS WITH YOU, RIGHT?

A.      I DIDN'T PERSONALLY CONTACT THEM, NO.

Q.      WHY NOT?

A.      WHY DIDN'T I?  I DIDN'T FEEL IT WAS MY PLACE, REALLY.  I DIDN'T KNOW WHAT TO SAY OR ANYTHING.

Q.      HOW ABOUT HE DIDN'T DO IT.  HE COULDN'T HAVE DONE IT.  HE WAS WITH ME.

A.      THAT'S TRUE.

Q.      YOU DIDN'T DO THAT?

A.      I HAVE NEVER BEEN IN THIS SITUATION BEFORE SO, SIR, I DIDN'T KNOW WHAT TO DO.

Q.      WHEN DID YOU MARRY HIM?

A.      JULY 1ST OF 2005.

Q.      SO YOU KNEW ABOUT THIS CASE AT THE TIME THAT YOU MARRIED HIM?

A.      YES, I DID.

Q.      DO YOU KNOW RICHARD MCCLANAHAN?

A.      NO.

Q.      DO YOU KNOW RHONDA CURRY?

A.      NO, I DO NOT.

Q.      DO YOU HAVE A CELL PHONE?

A.      YES, I DO.

Q.      WHAT IS YOUR CELL PHONE NUMBER?

R. HORTON 001939

173

A.        284-4482.

Q.        DID YOU USED TO HAVE A DIFFERENT CELL PHONE NUMBER?

A.        NO, I HAVE HAD THIS SINCE I WAS IN HIGH SCHOOL, SAME NUMBER.

Q.        WHAT OTHER PHONE NUMBERS HAVE YOU HAD BESIDES A CELL PHONE?

A.        WHEN I IIVED WITH MY PARENTS, THEY HAD A PHONE.  I NEVER HAD A HOUSE PHONE BY MYSELF.

Q.        ARE YOU FAMILIAR WITH THE NUMBER 404-8558?

A.        8358?

Q.        WELL, YES, 8358?

A.        YES.

Q.        WHOSE NUMBER IS THAT?

A.        THAT IS RICHARD'S PHONE NUMBER.  IT'S IN MY NAME.  THAT IS HIS PHONE.

Q.        IT'S IN YOUR NAME?

A.        IT'S IN MY NAME, YES.

Q.        THAT WAS RICHARD'S PHONE NUMBER BACK LAST YEAR?

A.        UH-HUH.  IT'S ALWAYS BEEN HIS PHONE NUMBER, YEP.

Q.        WHY DID YOU PUT IT IN YOUR NAME?

A.        BECAUSE IT WAS CHEAPER.  GENERALLY, IF YOUR CREDIT IS NOT GOOD ENOUGH, YOU KNOW, THEY WILL MAKE YOU

R. HORTON 001940

174

PUT A BIG DOWN PAYMENT ON IT.  MY CREDIT WAS GOOD, SO I COULD GET IT ON MINE.

MR. STEAD:  ONE MOMENT, PLEASE.

THE COURT:  YES.

BY MR. STEAD:

Q.      YOU ULTIMATELY WERE INTERVIEWED BY THE COLUMBUS POLICE DEPARTMENT, WERE YOU NOT?

A.      UH-HUH, SHE HAD COME TO MY HOUSE, BUT I WASN'T THERE, AND SHE LEFT A NOTE AND HER PHONE NUMBER. I CALLED HER BACK.

Q.      AFTER AN ALIBI WAS PUT FORTH IN THIS CASE, THE POLICE CAME AND FOUND YOU?

A.      YEAH, THEY TRIED TO FIND ME, YEAH.

Q.      THEY INTERVIEWED YOU ABOUT WHAT YOU KNEW ABOUT THIS CASE?

A.      YES, SHE DID, UH-HUH.

Q.      YOU COULDN'T PROVIDE THEM WITH ANY SPECIFICS CONCERNING THE EVENTS OF THAT WEEKEND?

A.      NO.  SHE ASKED ME WHAT WAS GOING ON THAT MORNING, AND I TOLD HER I REALLY CAN'T THINK OF ANYTHING SPECIFIC.  IT WAS SO EARLY AND ON A SATURDAY, WE BOTH DON'T WORK.

MR. STEAD:  THANK YOU.

THE COURT:  REDIRECT?

MS. HOLFINGER:  I HAVE NO FURTHER QUESTIONS,

R. HORTON 001941

175

YOUR HONOR.

THE COURT:  ANY QUESTIONS OF THIS WITNESS BY ANY MEMBER OF THE PANEL?

SEEING NONE, THANK YOU FOR TESTIFYING.

MR. STEAD, DO YOU NEED A BREAK NOW?

MR. STEAD:  YES.  IF THE COURT WON'T MIND, I WOULD LIKE TO TAKE CARE OF THAT OTHER MATTER.

THE COURT:  ALL RIGHT.  WE WILL ALLOW THAT. WE WILL BE IN RECESS.

PLEASE DON'T DISCUSS THE CASE OR FORM ANY OPINION OF IT.  WE'LL BE BACK TO YOU AS SOON AS WE CAN.

THANK YOU.

- - -

THEREUPON, A RECESS WAS TAKEN.

- - -

THE COURT:  PLEASE BE SEATED, EVERYBODY.

THAT TURNED OUT TO BE A RATHER SHORT BREAK.

MR. SHWARTZ, ANYTHING FURTHER?

MS. HOLFINGER:  YOUR HONOR, WE WOULD CALL OUR NEXT WITNESS, RICHARD HORTON.

THE COURT:  MR. HORTON.

(WITNESS IS SWORN.)

THE COURT:  PLEASE HAVE A SEAT.  LET'S START WITH YOUR FULL NAME.

THE DEFENDANT:  MY NAME IS RICHARD HORTON.

R. HORTON 001942

176

THE COURT:  AND YOUR ADDRESS?

THE DEFENDANT:  MY CURRENT ADDRESS IS 2279 SONORA, GROVE CITY, COLUMBUS, OHIO.

THE COURT:  ARE YOU EMPLOYED?

THE DEFENDANT:  YES, I AM.

THE COURT:  WHERE DO YOU WORK?

THE DEFENDANT:  I WORK FOR A COMPANT CALLED K AND K BUILDERS.  IT IS A REMOLDING ORGANIZATION.  SOME DAYS I MIGHT BE PAINTING, OTHER DAYS I MIGHT BE OUT BUILDING YOU A NEW DECK FOR YOUR BACK PORCH.

THE COURT:  THANK YOU.

YOUR WITNESS.

MS. HOLFINGER:  THANK YOU, YOUR HONOR.

- - -

RICHARD HORTON

CALLED AS A WITNESS ON HIS OWN BEHALF, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. HOLFINGER:

Q.      RICHARD, HOW OLD ARE YOU?

A.      I AM 29 YEARS OF AGE.

Q.      AND HOW LONG HAVE YOU WORKED WITH K AND K BUILDERS?

A.      IT'S BEEN MAYBE ABOUT FIVE MONTHS.

Q.      AND ARE YOU MARRIED?

177

A.        YES, I AM.

Q.        WHO ARE YOU MARRIED TO?

A.        I AM MARRIED TO JENNETTE HORTON.

Q.        AND HOW LONG HAVE YOU BEEN MARRIED?

A.        WE HAVE BEEN MARRIED SIX MONTHS TODAY.

Q.        AND RICHARD, DO YOU HAVE ANY CHILDREN?

A.        YES, I DO.

Q.        HOW MANY CHILDREN DO YOU HAVE?

A.        I HAVE TWO CHILDREN.

Q.        AND HOW OLD ARE THEY?

A.        MY SON IS FIVE YEARS OF AGE, AND MY DAUGHTER
IS SEVEN YEARS OF AGE.

Q.        AND WHAT ARE THEIR NAMES?

A.        MY SON'S NAME IS KOBE HORTON, AND MY
DAUGHTER'S NAME IS FANTASIA WILLIAMS.

Q.        AND I WILL ASK YOU SOME MORE QUESTIONS ABOUT
YOUR CHILDREN IN A LITTLE BIT.  BUT FIRST, I'D LIKE TO
GET INTO YOUR RECORD.

          DO YOU HAVE A CRIMINAL RECORD?

A.        YES, I DO.

Q.        AND WHAT DOES YOUR CRIMINAL RECORD CONSIST
OF?

A.        MY CRIMINAL RECORD CONSISTS OF TWO DRUG ABUSE
CHARGES.

Q.        AND WHEN WERE THOSE DRUG ABUSE CHARGES?

R. HORTON 001944

A.      THE FIRST DRUG ABUSE CHARGE OCCURRED SOMEWHERE BETWEEN '95 AND '97.

Q.      WHAT ABOUT THE SECOND ONE?

A.      THE SECOND ONE OCCURRED IN THE YEAR OF 2001.

Q.      RICHARD, I'D LIKE FOR YOU TO TELL THE JURY WHAT WAS GOING ON WITH YOU AND YOUR LIFE DURING THAT TIME PERIOD AROUND 1996 THROUGH 2001 WHERE YOU GOT THESE CHARGES?

A.      I MADE SOME MISTAKES IN MY LIFE, THAT THE DRUG POSSESSION CHARGES THAT I HAVE, THE DRUG ABUSE CHARGES THAT I HAVE IS JUST, I WOULD LIKE TO SAY SIGNS OF ME MATURING, JUST GROWING INTO A MAN, JUST MISTAKES THAT I MADE.

Q.      DURING THAT TIME PERIOD PRIOR TO 2001 WHEN THESE CHARGES OCCURRED, DID YOU EVER COME INTO CONTACT WITH A RICHARD MCCLANAHAN?

A.      YES, I DID.

Q.      TELL THE JURY A LITTLE BIT ABOUT HOW YOU MET HIM, WHEN YOU WOULD SEE HIM.

A.      I WAS -- I WOULD SEE MR. MCCLANAHAN PERIODICALLY COMING AND GOING, USING AND BUYING DRUGS WITHIN THE NEIGHBORHOOD.  IT'S A FAIRLY SMALL NEIGHBORHOOD.  I HAVE LIVED IN THE NEIGHBORHOOD MOST OF MY ADULT LIFE.  I WENT TO HIGH SCHOOL.  I LIKE TO THINK I WAS A BASKETBALL STAR.  SO I HAD A LOT OF FRIENDS, NOT

179

MANY ENEMIES.  I HAVE SEEN HIM COME AND GOING THROUGHOUT THE YEARS, HIM AND HIS WIFE.

Q.       YOU SAID YOU GRADUATED FROM HIGH SCHOOL?

A.       YES, I DID.

Q.       WHAT HIGH SCHOOL DID YOU GRADUATE FROM?

A.       I GRADUATED FROM CENTENNIAL HIGH SCHOOL IN THE YEAR 1995.

Q.       YOU HEARD RICHARD MCCLANAHAN TESTIFY ABOUT A CAR THAT I BELIEVE YOU BOUGHT FROM HIS NIECE.  TELL THE JURY A LITTLE BIT ABOUT THAT, IF YOU REMEMBER IT.

A.       THE STORY ABOUT THE CAR IS, I HAD PURCHASED A -- I BELIEVE IT WAS A CUTLESS, I'M NOT SURE THE YEAR OF THE CAR.  I PURCHASED A CUTLESS OFF OF HER BETWEEN 1997 AND 1998.  PART OF THE DEAL WAS SHE WAS GOING TO TAKE IT TO HER UNCLE SO HE COULD FIX SOMETHING, I'M NOT SURE, THE CARBURETOR ON THE CAR.  ONCE HE FIXED THE CAR, WE WOULD EXCHANGE TITLES.  AND IT WAS A -- PRETTY MUCH TURNED OUT TO BE A PRETTY GOOD DEAL FOR ME.

Q.       WAS THAT AROUND THE SAME TIME PERIOD YOU RECALL SEEING MR. MCCLANAHAN AND THE DRUG DEALS?

A.       YES, MA'AM.

Q.       YOU SAID YOU HAD A CONVICTION IN 1996 THAT WAS DRUG ABUSE?

A.       YES, MA'AM.

Q.       IN THAT CASE, DID YOU HAVE A TRIAL LIKE THIS

R. HORTON 001946

180

OR DID YOU PLEAD GUILTY?

A.    JUST PLED GUILTY.

Q.    WHAT WAS THE OUTCOME OF THAT CASE?  WERE YOU TO GO TO PRISON, PLACED ON PROBATION, WHAT HAPPENED?

A.    I WAS SENTENCED TO GO TO PRISON.  I DIDN'T QUITE MAKE IT TO PRISON.  I WAS ON PAROLE.  I WAS ON PROBATION FOR A PERIOD OF TIME.

Q.    SO IN 1996, DID YOU GO TO PRISON?

A.    NO, I DID NOT.

Q.    AND THEN THE CONVICTION THAT YOU SAID YOU HAD IN 2001, AGAIN, DID YOU HAVE A TRIAL LIKE THIS OR DID YOU PLEAD GUILTY?

A.    I PLED OUT.  I PLED GUILTY.

Q.    AND IN THAT CASE, WHAT WAS THE OUTCOME?  DID YOU GO TO PRISON OR PLACED ON PROBATION?

A.    I WAS SENTENCED TO GO TO PRISON.  I DID GO TO PRISON.

Q.    AND HOW LONG DID YOU -- WERE YOU IN PRISON?

A.    26 MONTHS.

Q.    TELL THE JURY A LITTLE BIT ABOUT YOUR EXPERIENCE IN PRISON.

A.    THE EXPERIENCE IN PRISON, IT WAS NOT PLEASANT.  I LOST A LOT OF RESPECT FROM MY FAMILY.  I LOST SOME GOOD FRIENDS.  IT WAS NOT A PLEASANT EXPERIENCE AT ALL.

R. HORTON 001947

181

Q.      WHEN YOU GOT OUT OF PRISON, WERE YOU ON ANY TYPE OF SUPERVISION?

A.      YES.  I WAS AND STILL AM ON ADULT PAROLE.

Q.      AND TELL THE JURY A LITTLE BIT ABOUT WHAT PAROLE CONSISTS OF.  WHAT YOU NEED TO DO FOR PAROLE?

A.      BASICALLY ME BEING ON PAROLE FOR A DRUG CHARGE, I HAVE TO FIRST MAINTAIN EMPLOYMENT.  SECOND, STAY OFF DRUGS.  AND JUST TAKE NARCOTICS ANONYMOUS CLASSES, AA CLASSES, THINGS OF THAT NATURE.

Q.      AND UP TO THIS POINT, HAVE YOU HAD ANY PROBLEMS WITH YOUR PAROLE OFFICER?

A.      NO PROBLEMS.  I HAVE NOT HAD IN THE TWO YEARS I HAVE BEEN ON PAROLE, I HAVE NOT HAD A DIRTY URINE SCREEN.  I HAVE BEEN ABLE TO MAINTAIN EMPLOYMENT.  JUST BASICALLY, I HAVE BEEN ABLE TO DO THE THINGS THAT THEY ASKED ME TO DO.

Q.      AND SINCE BEING RELEASED FROM PRISON -- WHEN WAS IT EXACTLY YOU WERE RELEASED FROM PRISON?

A.      APRIL 17TH, 2004.

Q.      AND WHEN YOU WERE RELEASED FROM PRISON, WERE YOU ABLE TO SECURE EMPLOYMENT?

A.      YES, I WAS.

Q.      AND WHERE WAS THAT EMPLOYMENT?

A.      A PLACE CALLED POPEYE'S CHICKEN AND BISCUTS ON EAST LIVINGSTON AVENUE.

R. HORTON 001948

182

Q.      AND WHAT WERE YOU DOING AT POPEYE'S?

A.      I WAS A COOK THERE.

Q.      AND HOW LONG DID YOU WORK AT POPEYE'S?

A.      ALMOST A YEAR.

Q.      SO THROUGH WHAT DATES WERE YOU AROUND?  WHAT TIME DID YOU END YOUR EMPLOYMENT AT POPEYE'S?

A.      SHORTLY AFTER -- SHORTLY AFTER I FOUND OUT ABOUT THESE CHARGES.  IT WAS JUST -- IT WAS A BAD JUDGMENT CALL ON MY PART.  IT WAS A LOT OF PRESSURE AND I JUST SHORTLY AFTER I FOUND OUT THESE -- ABOUT THESE CHARGES, I KIND OF WAS ON THE EDGE OF GIVING UP, SO I KIND OF QUIT MY JOB.

Q.      SOMETIME AT THE VERY END OF 2004?

A.      YES, MA'AM.

Q.      I WILL HAND YOU WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT C.

COULD YOU TELL THE JURY WHAT THAT IS?

A.      THIS IS A CHECK STUB FROM MY EMPLOYER.  IT LOOKS LIKE IT HAD A STARTING DATE OF OCTOBER 9TH, AND HAD AN ENDING DATE OF -- ENDING DATE OF ON THE CHECK DATE FOR OCTOBER 14TH.

Q.      IS THAT A CHECK STUB THAT WOULD -- THAT YOU WOULD GET FROM YOUR EMPLOYMENT AT POPEYE'S?

A.      YES, MA'AM.

Q.      WHEN WAS IT THAT YOU MET JENNETTE HARMON,

183

YOUR WIFE?

A.        I MET JENNETTE IN JULY OF 2004, JUNE OR JULY.

Q.        AND AFTER YOU MET JENNETTE, HOW SHORTLY THEREAFTER WERE YOU DATING?

A.        IT TOOK A LITTLE LONGER THAN SHE SAID, SHE PUT UP A PRETTY GOOD FIGHT.  I WOULD SAY TWO MONTHS.

Q.        TELL ME A LITTLE BIT ABOUT HER AND HER LIFE, HOW THAT AFFECTED YOUR LIFE?

A.        JENNETTE -- I BELIEVE JENNETTE WAS AN ANGEL SENT TO ME FROM ABOVE.  SHE IS JUST A -- SHE'S A REAL GOOD PERSON, REAL GOOD SPIRITED.  OF COURSE, SHE GOES TO CHURCH THREE TIMES A WEEK.  HER BEING A JEHOVAH WITNESS, IT IS JUST REALLY STRICT FOR HER, AND EVEN A COUPLE OF MY FAMILY MEMBERS, THEY HONESTLY BELIEVED THAT I NEEDED TO MEET SOMEONE LIKE THAT IN ORDER FOR ME TO MATURE AND SLOW DOWN THE LIFE I WAS LIVING.

Q.        DO YOU EVER GO TO CHURCH WITH HER?

A.        YES, I DO.

Q.        AND HOW OFTEN DO YOU GO TO CHURCH WITH HER?

A.        SHE GOES TO CHURCH THREE TIMES A WEEK.  I USUALLY GO ON SUNDAYS IF THERE IS NOT A BIG GAME ON.

Q.        RICHARD, YOU MENTIONED YOU HAD TWO CHILDREN, ONE FIVE YEARS OLD AND ONE SEVEN YEARS OLD?

A.        THAT'S CORRECT.

Q.        AND THE SEVEN YEAR OLD, THAT IS YOUR

184

DAUGHTER, OR YOUR SON?

A.          THAT IS MY DAUGHTER.

Q.          WHERE DOES SHE LIVE?

A.          SHE STAYS WITH HER MOTHER IN GROVE CITY.

Q.          AND HOW OFTEN DO YOU SEE YOUR DAUGHTER?

A.          I LIKE TO SEE MY DAUGHTER AT LEAST FOUR TIMES A WEEK.  AFTER I GET OFF WORK, I USUALLY KEEP HER UNTIL HER BED TIME AND TAKE HER HOME.

Q.          DO YOU PICK HER UP FROM SCHOOL?  OR HOW DOES SHE GET TO YOUR HOUSE?

A.          NO, MA'AM.  I DON'T GET OFF USUALLY UNTIL ABOUT 5:30, 5:00 O'CLOCK.  I PICK HER UP FROM HER MOTHER'S HOUSE.

Q.          AND HOW OFTEN DID YOU SAY YOU DO THIS?

A.          AT LEAST FOUR TIMES A WEEK.

Q.          AND YOUR SON, WHERE DOES YOUR SON LIVE?

A.          CURRENTLY, MY SON IS LIVING WITH HIS GRANDMOTHER IN MONTGOMERY, ALABAMA.

Q.          DOES YOUR SON HAVE ANY MEDICAL CONDITION?

A.          YES, MY SON HAS, IT'S CALLED ATRIAL FIBULATION, A FORM OF HEART DISEASE.  MY SON HAD TWO SURGERIES BEFORE HE WAS EIGHT MONTHS OLD.  IT'S JUST BEEN A CONSTANT BATTLE.  BUT HE'S DOING OKAY.

Q.          DO YOU GET TO SEE YOUR SON?

A.          YES, I DO.

185

Q.      DOES HE EVER VISIT YOU OR DO YOU GO DOWN THERE?  HOW DO YOU SEE HIM?

A.      WITH ME BEING ON PAROLE, I'M NOT ALLOWED TO TRAVEL.  HE COMES UP HERE PERIODICALLY.  HE MIGHT COME UP HERE AND STAY FOR A MONTH AND THEN GO BACK TO MONTGOMERY, ALABAMA, FOR MAYBE -- HE'S BEEN GONE FOR NOW FOR ALMOST THREE MONTHS.  THEY BELIEVE WITH THIS CURRENT HEART DISEASE, THEY BELIEVE THAT THE WEATHER DOWN THERE, IT KEEPS HIM FROM GETTING THE CROUP COUGH.  SO OFTEN HE GETS IT A LOT HERE WITH THE FOUR SEASONS.  AND HE IS JUST DOING A LITTLE BIT BETTER DOWN THERE RIGHT NOW.

Q.      RICHARD, DO YOU FINANCIALLY SUPPORT YOUR TWO CHILDREN?

A.      YES, I DO.  I AM VERY PROUD OF THAT.

Q.      RICHARD, ARE YOUR PARENTS STILL ALIVE?

A.      NO, THEY ARE NOT.  MY MOTHER PASSED AWAY IN 1998.  AND I HAVE ONLY SEEN MY FATHER MAYBE ONCE OR TWICE IN MY WHOLE LIFE.

Q.      DO YOU HAVE ANY SIBLINGS?

A.      YES, I DO.  I HAVE A 14 YEAR OLD BROTHER.

Q.      AND WHO IS HE CURRENTLY LIVING WITH?

A.      MY BROTHER IS CURRENTLY LIVING WITH -- IN THE CUSTODY OF CHILDREN SERVICES.

Q.      AND DOES CHILDREN SERVICES, DO THEY HAVE PERMANENT CUSTODY OR TEMPORARY CUSTODY?

186

A.      I BELIEVE NOW IT'S PERMANENT CUSTODY.

Q.      DO THEY STILL HAVE COURT HEARINGS ABOUT WHO IS GETTING CUSTODY?

A.      YES, THEY DO.  YES, THEY DO.  WE HAVE THEM QUITE OFTEN.

Q.      WHAT IS YOUR INVOLVEMENT IN THOSE HEARINGS?

A.      THE SITUATION WITH MY BROTHER IS THAT I REALLY DON'T HAVE A TIGHT KNIT FAMILY, AND THE SITUATION WITH MY BROTHER IS I AM THE ONLY ONE WHO IS TRYING TO GET CUSTODY OF MY BROTHER.  HE WAS IN THE CUSTODY OF MY AUNT BEFORE.  AND HE, YOU KNOW, HE WAS A TEENAGER, THEY GOT INTO A COUPLE OF PROBLEMS, AND THEY JUST DECIDED IT WAS BEST HE GO BACK INTO THE CUSTODY.

Q.      HOW LONG HAVE YOU BEEN TRYING TO GET CUSTODY OF YOUR BROTHER?

A.      EVER SINCE I HAVE BEEN HOME FROM PRISON.

Q.      AND WHEN YOU GOT HOME FROM PRISON AND STARTED TO TRY AND GET CUSTODY OF HIM, WERE YOU IN CONTACT WITH CHILDREN SERVICES AT THAT POINT?

A.      YES, I FREQUENTLY -- I GET TO SEE MY BROTHER FOR ONE HOUR EVER MONDAY.  AND I FREQUENTLY TALK WITH HIS CASE WORKER.  THERE IS A PERSON WHO BRINGS HIM TO WHATEVER LOCATION WE ARE HAVING OUR VISITS.  AND I HAVE, YOU KNOW, EVEN WITH THE SERIOUSNESS OF THESE CHARGES, I WANTED TO BE UPFRONT WITH EVERYBODY, I LIKE TO MAKE HIM

R. HORTON 001953

187

AWARE OF EVERYTHING THAT IS GOING ON.

Q.        AND HAVE YOU SPOKEN TO THE CHILDREN SERVICES CASE WORKER ABOUT THE POSSIBILITIES OF YOU GETTING CUSTODY OF YOUR BROTHER?

A.        YES, I HAVE.

Q.        AND WHAT IS YOUR UNDERSTANDING AS TO THE POSSIBILITIES OF YOU GETTING CUSTODY?

A.        WELL, YOU KNOW, THEY KNOW I HAVE BEEN IN TROUBLE BEFORE.  AND THEY JUST SEEN THE STEPS I HAVE TAKEN TO GET HIM, AS FAR AS MAINTAINING A JOB, GETTING MARRIED, THEY JUST -- THEY GIVE ME THESE HOOPS TO JUMP THROUGH AND I TRY AND JUMP THROUGH THEM, BUT THEY WILL NOT MAKE A MOVE UNTIL I AM FINISHED WITH THIS CASE, AND I UNDERSTAND.

Q.        RICHARD, I'M GOING TO TALK TO YOU NOW ABOUT THE TIME PERIOD OF OCTOBER 2004.

A.        OKAY.

Q.        YOU WERE IN HERE WHEN RICHARD MCCLANAHAN TESTIFIED.  AND WE ALL HEARD HIM TESTIFY ABOUT A SITUATION THAT HE HAD AT A CONVENIENCE STORE AT ST. CLAIRE AND FIFTH WHERE HE SAID HE HAD A CONVERSATION WITH AN INDIVIDUAL THAT WAS ASKING HIM TO BORROW $20 FROM HIM, AND TO USE THE PAY PHONE WHERE HE WAS.

         DO YOU RECALL THAT TESTIMONY?

A.        YES, I DO.

R. HORTON 001954

188

Q.        DURING THAT TIME, WERE YOU WORKING AT POPEYE'S?

A.        YES, I WAS.

Q.        AT THAT TIME WERE YOU IN ANY TYPE OF FINANCIAL DIFFICULTIES?

A.        NO, I WAS NOT.

Q.        WAS JENNETTE YOUR GIRLFRIEND AT THAT TIME?

A.        YES.

Q.        WAS SHE WORKING AT THAT TIME?

A.        YES, MA'AM, SHE WAS.

Q.        RICHARD, DURING THAT TIME DID YOU HAVE A BANK ACCOUNT WHERE YOU TRIED TO SAVE UP SOME MONEY?

A.        YES, I DID.  AT THE TELOHIO CREDIT UNION.  I BELIEVE IT'S ON FOURTH AVENUE.

          MS. HOLFINGER:  MAY I APPROACH THE WITNESS?

          THE COURT:  OF COURSE.

BY MS. HOLFINGER:

Q.        RICHARD, I WILL HAND YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT A.

          COULD YOU TELL THE JURY WHAT THIS IS?

A.        THIS IS -- THIS IS A BANK STATEMENT FROM THE DATE OF SEPTEMBER OF -- SEPTEMBER 7, 2004, TO OCTOBER 27TH, 2004.

Q.        IF YOU LOOK AT THE PAPER YOU HAVE IN FRONT OF YOU, THE TOP LEFT-HAND CORNER, DOES IT HAVE A NAME?

189

A.        YES, IT DOES.  IT HAS -- SHOULD I GO AHEAD?

THE COURT:  YES.

THE DEFENDANT:  IT ACTUALLY HAD RICHARD HORTON, ███████████ ████████ ███████ ███,

AND ZIP CODE.

BY MS. HOLFINGER:

Q.        THAT IS YOUR ADDRESS?

A.        THAT IS MY CURRENT ADDRESS.

Q.        AND ON THE RIGHT-HAND SIDE, DO YOU SEE WHERE IT SAYS SOCIAL SECURITY NUMBER?

A.        YES, IT DOES.

Q.        IS THAT YOUR SOCIAL SECURITY NUMBER?

A.        THAT IS MY SOCIAL SECURITY NUMBER ████████.

Q.        AND IN LOOKING AT THIS BANK STATEMENT, WHAT IS THE FIRST DATE THAT IT GIVES?

A.        SEPTEMBER 7TH, 2004.

Q.        WHAT WAS THE BALANCE AT THAT TIME?

A.        THE CURRENT BALANCE?

Q.        ON THE DATE OF SEPTEMBER 7TH?

A.        $67.78.

Q.        AND SINCE THAT DATE, DOES IT SHOW A NUMBER OF OTHER TRANSACTIONS WHERE YOU MAKE DEPOSITS AND WITHDRAWALS?

A.        YES, IT DOES.

R. HORTON 001956

190

Q.        WHAT IS THE DATE THAT IT INDICATED ON THE
BANK STATEMENT THAT IS THE CLOSEST DATE TO OCTOBER 9TH,
2004?

A.        I WOULD SAY OCTOBER 7TH, 2004.

Q.        AT THAT TIME, WHAT WAS THE BALANCE?

A.        AT THAT TIME, THE CURRENT BALANCE WAS
$1,416.60.

Q.        AND YOU SAID THAT WAS ON OCTOBER 7TH,
CORRECT?

A.        THAT'S CORRECT.

Q.        WHEN WAS THE NEXT TRANSACTION MADE?

A.        OCTOBER 12TH, 2004.  IT WAS A CASH WITHDRAWAL
OF $800.

Q.        SO WHAT WOULD THE BALANCE HAVE BEEN ON
OCTOBER 8TH AND OCTOBER 9TH OF 2004?

A.        SOMEWHERE BETWEEN $1,400.

Q.        ON OCTOBER 8TH, 2004, RICHARD, WOULD YOU HAVE
HAD ANY REASON AT ALL TO BORROW $20 FROM ANYBODY?

A.        NO REASON AT ALL.

Q.        YOU HAD MONEY THAT WAS AVAILABLE TO YOU?

A.        YES, I DID.

Q.        I ALSO WANT TO TALK TO YOU ABOUT A CELL
PHONE.  AT THIS TIME, DID YOU OWN A CELL PHONE?

A.        YES, I DID.

Q.        AND WHAT KIND OF CELL PHONE WAS IT?

191

A.      I HAD ONE OF THOSE PREPAID WIRELESS CELL PHONE DEALS.

Q.      AND HOW WOULD YOU PAY FOR THE CELL PHONE?

A.      THE WAY THAT PREPAID PHONE WORKS IS THEY MAKE A -- THEY MAKE A CASH WITHDRAWAL ONCE A MONTH, AND THAT IS ESSENTIALLY MY PHONE BILL.

Q.      IS THIS THE ACCOUNT THAT WHICH YOU HAVE THE STATEMENT THAT THE WITHDRAWALS WOULD COME OUT OF?

A.      YES, MA'AM, IT IS.

Q.      DO YOU SEE ANY WITHDRAWALS ON THERE THAT RELATE TO YOUR CELL PHONE?

A.      YES, I DO.  WOULD YOU LIKE ME TO NAME THEM?

Q.      TELL US THE DATES.

A.      ON SEPTEMBER 7TH, 2004, THERE IS A TRANSACTION FROM AT&T WIRELESS.  IT'S A DEBIT OF $60.88. AND ON OCTOBER 7TH, 2004, THERE IS A TRANSACTION FROM AT&T WIRELESS, A DEBIT OF $60.88.

Q.      AND DURING THIS TIME PERIOD, RICHARD, WOULD YOU TYPICALLY KEEP YOUR PHONE WITH YOU?

A.      YES, I WOULD.  I DON'T THINK ANYONE WHO HAS A CELL PHONE JUST CARRIES IT WITH YOU EVERYWHERE.  I CAN'T LEAVE HOME WITHOUT MINE.

Q.      SO ON OCTOBER 8TH, 2004, WOULD YOU HAVE HAD ANY REASON TO HAVE TO USE A PAY PHONE?

A.      NO, NO REASON AT ALL.

R. HORTON 001958

192

Q.      RICHARD, ON OCTOBER 8TH, 2004, DID YOU HAVE A CONVERSATION WITH MR. MCCLANAHAN, RICHARD MCCLANAHAN, AT THE CONVENIENCE STORE?

A.      NO, I DID NOT.

Q.      DURING THIS TIME OF OCTOBER 8TH, OCTOBER 9TH, WHERE WERE YOU LIVING?

A.      I WAS LIVING AT 780 REYNOLDS AVENUE, COLUMBUS, OHIO.

Q.      AND WHERE WAS JENNETTE LIVING?

A.      2279 SONORA DRIVE, GROVE CITY, COLUMBUS, OHIO.

Q.      AND WHAT WAS YOUR SCHEDULE AT POPEYE'S DURING THAT TIME?

A.      MY SCHEDULE WAS, I WOULD WORK DURING THE WEEK, SOMETIMES WEEKENDS FROM -- I WAS A FIRST SHIFT COOK FROM 9:30 IN THE MORNING UNTIL MAYBE 4:30 IN THE AFTERNOON.

Q.      ON THE WEEKEND WHEN YOU WERE NOT WORKING, WHERE WOULD YOU BE?

A.      AT THIS TIME, AROUND THIS TIME OF OCTOBER, I I WAS COURTING JENNETTE.  SHE WOULD INSIST THAT I SPEND WEEKENDS WITH HER.  WE DO STUFF THAT SHE LIKED TO DO, GOING TO THE MOVIES, GOING OUT TO EAT.

Q.      DURING THIS TIME PERIOD, WAS THERE -- DURING THIS TIME PERIOD OF OCTOBER 9TH, WERE THERE EVER

193

WEEKENDS WHEN YOU WERE NOT WORKING THAT YOU WOULD NOT BE IN GROVE CITY WITH JENNETTE?

A.        NO, SHE WOULDN'T HAVE IT LIKE THAT.

Q.        WHEN WAS IT THAT YOU FOUND OUT YOU HAD THESE CHARGES AGAINST YOU?

A.        I BELIEVE IT WAS DECEMBER 16TH.

Q.        AND HOW -- TELL THE JURY ABOUT HOW YOU FOUND OUT THESE CHARGES WERE PENDING AGAINST YOU.

A.        I WAS IN COURT FOR A CUSTODY BATTLE WITH MY DAUGHTER, BETWEEN MY DAUGHTER AND BETWEEN -- WITH MY DAUGHTER, BETWEEN CHILDREN SERVICES AND THE MOTHER OF THE DAUGHTER.  THE CHILDREN SERVICES HAD COME IN TAKING CUSTODY OF MY DAUGHTER, AND I WAS IN THERE TRYING TO BE A GOOD FATHER SAYING, LISTEN, CAN SHE COME HOME WITH ME. AND --

Q.        HOW DID YOU COME TO FIND THAT THESE CHARGES WERE AGAINST YOU?

A.        AND THE GUY FROM CHILDREN SERVICES LET ME KNOW, NO, SHE WILL NOT BE ABLE TO COME HOME WITH ME BECAUSE I HAD A WARRANT OUT FOR MY ARREST FOR ROBBERY.

Q.        WHAT WAS YOUR REACTION WHEN YOU HEARD THERE WAS THIS WARRANT OUT FOR YOUR ARREST?

A.        I WAS SCARED, SHOCKED.  I KNOW I HAD NOT DONE ANYTHING WRONG, SO --

Q.        SO WHAT DID YOU DO WHEN YOU FOUND OUT THESE

R. HORTON 001960

194

CHARGES WERE AGAINST YOU?

A.        I IMMEDIATELY -- I HAVE AN AUNT WHO IS RETIRED FROM THE POLICE DEPARTMENT.  I IMMEDIATELY CALLED MY AUNT.  I TRIED TO USE MY RESOURCES THAT I HAD AT THE TIME.  I IMMEDIATELY CALLED MY AUNT AND HAD HER RUN A CHECK TO SEE IF, YOU KNOW, IF THERE WAS A MISTAKE.

Q.        DID SHE DO THAT?

A.        YES, SHE DID.

Q.        AND WHAT DID SHE TELL YOU?

A.        SHE TOLD ME THAT THERE WAS, IN FACT, A WARRANT FOR MY ARREST FOR ROBBERY.

Q.        SO WHAT DID YOU DO AT THAT POINT?

A.        WELL, AT THAT TIME IT REALLY HIT PRETTY HARD. I DIDN'T KNOW WHAT TO DO.  I KNOW I DIDN'T DO ANYTHING WRONG.  THERE WAS NO REASON FOR ME TO RUN.  I WAS JUST -- I KIND OF LET EVERYBODY DOWN.  I WAS JUST, YOU KNOW, I WAS JUST PRETTY, PRETTY, PRETTY DEPRESSED, PRETTY SHOCKED.  I WAS HURT.  IT KIND OF HURT AT THAT TIME.

Q.        AFTER SPEAKING TO YOUR AUNT, DID YOU SPEAK TO ANYBODY ELSE ABOUT THE WARRANT OR WHAT YOU SHOULD DO WITH THEM OR WHAT -- HOW DID YOU HANDLE THIS SITUATION?

A.        I HAD MY AUNT OBTAIN FOR ME A COPY OF THE ARREST WARRANT.  ON THE COPY OF THE ARREST WARRANT I SAW THE NAME OF THE DETECTIVE BRENDA WALKER.  SO I LOOKED IN

R. HORTON 001961

THE PHONE BOOK, GOT HER PHONE NUMBER, AND I CALLED HER UP. YOU KNOW, I TRIED TO SPEAK WITH HER, LET HER KNOW THAT, HEY, MY NAME IS RICHARD HORTON. THERE IS AN ARREST WARRANT OUT FOR MY ARREST. I DIDN'T DO THIS. IS THERE SOME WAY WE CAN HANDLE THIS. I AM WILLING TO DO WHATEVER YOU WANT ME TO DO.

SHE WAS A LITTLE -- SHE WAS A LITTLE IRRITATED WITH ME. I CAN UNDERSTAND SO. SHE WAS -- SHE SAID -- SHE LET ME KNOW THAT SWAT WAS LOOKING FOR ME, I BETTER TURN MYSELF IN. AND I TOLD HER THAT AS SOON AS I WAS ABLE TO OBTAIN LEGAL COUNSEL, I WOULD DO JUST THAT.

Q. AND IS THAT WHAT YOU DID?

A. THAT IS EXACTLY WHAT I DID.

Q. SO DID YOU CONTACT AN ATTORNEY?

A. YES, I DID.

Q. AND THEN YOU TURNED YOURSELF IN?

A. YES, THAT IS EXACTLY WHAT I DID.

Q. SO WHEN YOU FOUND OUT THAT YOU HAD THESE CHARGES AGAINST YOU, YOU FOUND OUT THE DATE THAT THEY WERE MAKING THESE ALLEGATIONS, CORRECT?

A. YES. WHEN I WAS ABLE TO LOOK AT A COPY OF THE ARREST WARRANT, I HAD THAT INFORMATION AVAILABLE TO ME, YES.

Q. WHAT DID YOU DO ABOUT FIGURING OUT WHERE YOU WOULD HAVE BEEN ON THAT DATE?

196

A.    THE FIRST THING THAT CAME TO ME WAS, YOU KNOW, TRY AND SEE IF I WAS AT WORK AND WE CAN TAKE CARE OF IT.  AND, HOPEFULLY, I WAS AT WORK.  LIKE I SAID, I DON'T USUALLY START WORK UNTIL 9:30.  SO THAT OPTION WAS OUT.

THE SECOND THING WAS JUST BASICALLY FIGURE OUT WHERE I WAS.  I KNEW I WOULDN'T HAVE ANYTHING ON PAPER, YOU KNOW, UNLESS I WAS AT WORK.  THERE WAS NOTHING ON PAPER.  I JUST TRIED TO THINK BACK TO THE DATE AND JUST TRY AND FIGURE OUT WHERE I WAS.  AND, YOU KNOW, I DON'T REALLY HAVE AN EXACT ANSWER FOR THAT TIME PERIOD OF TIME.

I JUST FIGURED THAT, WELL, I'M COURTING JENNETTE AROUND THIS TIME.  I'M LOOKING AT THE COPY OF THE ARREST WARRANT, IT'S SAYING THAT THE ALLEGED INCIDENT HAPPENED AT 7:50 A.M. ON A SATURDAY MORNING. SO THEN I JUST ASKED MYSELF, WHAT WOULD I BE DOING TYPICALLY ON A WEEKEND?  I WILL BE ASLEEP.  AND THAT IS THE BEST ANSWER I COULD COME UP WITH.

Q.    RICHARD, ON OCTOBER 9TH, 2004, DID YOU ENTER THE HOME OF RICHARD MCCLANAHAN AND RHONDA CURRY?

A.    NO, I DID NOT.

Q.    AFTER YOU FOUND OUT THAT YOU HAD THESE WARRANTS OUT FOR YOUR ARREST, AND YOU TALKED TO THE DETECTIVE, TURNED YOURSELF IN AND WAS RELEASED FROM

197

JAIL, DID YOU HAVE ANY FURTHER CONTACT WITH MR. MCCLANAHAN?

A.      YES, I DID.

Q.      WHY DON'T YOU TELL THE JURY HOW THAT CAME ABOUT?

A.      BETWEEN THE TIME OF -- BETWEEN THE TIME OF 2005, I HAVE HAD CONTACT WITH MR. MCCLANAHAN ON TWO SEPARATE OCCASIONS.  LIKE I SAID, IT'S A SMALL NEIGHBORHOOD.  ON THE FIRST OCCASION, I JUST HAPPENED TO SEE MR. MCCLANAHAN DRIVING DOWN THE STREET.  IN FACT, HE WAS ON MY STREET, REYNOLDS AVENUE, I WAS TURNING LEFT OFF ST. CLAIR AVENUE ONTO REYNOLDS AVENUE, AND I HAPPENED TO SEE MR. MCCLANAHAN EXITING THE STREET.

I IMMEDIATELY STOPPED MY CAR, JUMPED OUT OF MY CAR.  YOU KNOW, I GOT FRONT OF HIS CAR, I STARTED WAVING MY HANDS, GOT DOWN ON MY KNEES, I SAID, YOU KNOW, MR. -- I KNOW HIM AS RICK, I SAID, LISTEN, RICK, I DIDN'T DO THIS TO YOU, MAN.  YOU KNOW, I DON'T KNOW WHAT IS GOING ON.  I DIDN'T KNOW WHO DID THIS TO YOU.  BUT LISTEN, MAN, WE HAVE TO TALK ABOUT THIS BECAUSE, YOU KNOW, I DIDN'T DO THIS TO YOU.

MR. MCCLANAHAN, LIKE I SAID, THIS WAS ON MY STREET, MR. MCCLANAHAN COMES DOWN THE STREET TO MY RESIDENCE AT 780 REYNOLDS.  WE PROCEEDED TO DISCUSS WHAT IS GOING ON.  AT THIS TIME HE INFORMS ME THAT, YOU KNOW,

R. HORTON 001964

198

HE'S BEEN SHOT. HE'S HAD FOUR SURGERIES. HE SHOWS ME THE SCAR ON HIS LEG. AND WE JUST KIND OF TALK ABOUT THE INCIDENT. YOU KNOW, BECAUSE I'M LIKE, WHAT HAPPENED TO YOU? WHY ARE YOU -- WHY DO YOU THINK IT IS ME? I AIN'T DONE NOTHING WRONG TO YOU, MAN. I WANT -- I JUST WAS WANTING TO TAKE CARE OF IT. I'M SCARED, BUT I'M STILL BEING CAUTIOUS AT THIS TIME. HE MIGHT -- HE COULD SAY ANYTHING. HE SAID ALL THIS, HE COULD SAY ANYTHING. I'M JUST TRYING TO BE, YOU KNOW, AS GENTLE WITH HIM AS POSSIBLE. SO WE TALKED AND HE LEAVES.

ON THE SECOND OCCASION, I WAS TURNING INTO --

Q. LET ME STOP YOU THERE FOR JUST A MINUTE.

A. I'M SORRY.

Q. WHEN YOU ORIGINALLY STOPPED AND SPOKE WITH MR. MCCLANAHAN, DID HE APPEAR TO BE SCARED OF YOU?

A. NO, HE DID NOT. HE WAS NOT. HE DIDN'T -- THAT KIND OF SURPRISED ME.

Q. HOW IS IT THAT YOU ENDED UP GOING FROM YOUR CAR TO YOUR HOUSE?

A. I THINK MAYBE HE -- I CAN'T BE SURE WHO SUGGESTED, BUT I TOLD HIM, HEY, I STAY RIGHT DOWN THE STREET. AND HE WAS IN HIS OWN VEHICLE, AND I WAS IN MY OWN VEHICLE, HE HAD HIS OWN FREE WILL, I HAD MY OWN FREE WILL, HE JUST MET ME DOWN AT THE HOUSE.

R. HORTON 001965

199

Q. SO HE DROVE HIS CAR DOWN TO YOUR HOUSE?

A. YES, MA'AM, HE DID.

Q. DID HE ACTUALLY COME INTO YOUR HOUSE?

A. YES, HE DID. IT WAS -- I CAN REMEMBER IT WAS RAINING ON THAT DAY, AND HE WAS WALKING WITH A CANE.

Q. DID YOU AT ANY POINT DURING THIS CONVERSATION MAKE ANY THREATS TO HIM?

A. NO THREATS, NO THREATS AT ALL TO MR. MCCLANAHAN.

Q. DID YOU AT ANY TIME OFFER HIM ANY MONEY?

A. NO, NO BRIBES OR OFFERING OF MONEY AT ANY TIME. AT THIS POINT I KIND OF JUST FIGURED HE WOULD BE ABLE TO LOOK ME INTO THE EYE MAN-TO-MAN AND JUST BE ABLE TO FIGURE OUT THAT I DIDN'T DO THIS TO YOU. FIGURE OUT I DIDN'T DO THIS TO YOU. I THOUGHT IT MAYBE WOULD HAVE BEEN THAT EASY.

Q. AFTER THIS FIRST ENCOUNTER WITH MR. MCCLANAHAN, DID YOU CONTACT YOUR ATTORNEY AND TALK TO YOUR ATTORNEY ABOUT IT?

A. YES, I DID. I WAS KIND OF HYSTERICAL AT THE TIME. I CALLED MYRON AND I WAS LIKE -- I WAS LIKE -- I SAID SOMETHING LIKE, HEY, MR. SHWARTZ, I JUST TALKED TO THE VICTIM. I JUST TALKED TO THE VICTIM. I WILL TRY AND GET THIS GUY TO, YOU KNOW, HE WILL BE TELLING ME THE TRUTH. HE'S LIKE, LISTEN, RICHARD, I KNOW IT WASN'T

R. HORTON 001966

200

YOU. I'M NOT GOING TO LET YOU GO TO JAIL FOR THIS, AND SO ON.

Q. WHAT DID MYRON TELL YOU?

A. MYRON TOLD ME TO TRY AND GET THE CONVERSATION ON TAPE. IF I EVER SEEN HIM AGAIN, TRY AND GET IT ON TAPE, TRY AND RECORD THE CONVERSATION. AND, YOU KNOW, AND THAT IS THE ADVICE HE GAVE ME.

Q. SO YOU DID HAVE A SECOND ENCOUNTER WITH MR. MCCLANAHAN?

A. YEAH. ON THE SECOND ENCOUNTER, MR. MCCLANAHAN, I'M TURNING, AGAIN, ONTO MY STREET, REYNOLDS AVENUE. I THINK MR. MCCLANAHAN MENTIONED A WELDER'S SHOP A COUPLE HOUSES DOWN FROM MY HOUSE. I SAW HIM PARKED IN FRONT OF THE WELDER'S SHOP. I JUMPED OUT OF MY CAR, HEY, WHAT IS GOING ON? LET'S TALK ABOUT THIS A LITTLE FURTHER. AT THIS TIME HE DOES NOT ENTER MY RESIDENCE. HE KIND OF SITS IN HIS CAR. WE TALK. I AM TRYING TO USE MY CELL PHONE AS A TAPE RECORDER. I FAILED MISERABLY. AND WE TALKED JUST LIKE REGULAR GUYS.

HE WAS JUST -- LIKE I WAS EXPLAINING TO HIM, YOU KNOW, THIS IS REAL SERIOUS. THIS IS TAKING A HEAVY TOLL ON MY LIFE, MAN. I AM SPENDING A LOT OF MONEY ON A LAWYER. YOU KNOW, IT IS HURTING RIGHT NOW. HE ASSURED ME THAT STOP PAYING YOUR LAWYER. I AM GOING TO TAKE CARE OF IT.

R. HORTON 001967

Q.        YOU MENTIONED YOU WOULD TRY AND RECORD THIS ON YOUR CELL PHONE.  HOW WOULD YOU HAVE DONE THAT?

A.        I HAVE A CELL PHONE WITH MANY FEATURES ON IT. I CAN RECORD VIDEO CONVERSATIONS.  I CAN TAKE PICTURES WITH MY CELL PHONE.  I BELIEVE EVERYBODY THAT HAS A CELL PHONE CAN DO THESE FEATURES.

Q.        DID YOU HAVE ANY, AFTER THIS ENCOUNTER, DID YOU HAVE ANY CONTACT WITH MR. MCCLANAHAN AGAIN OTHER THAN COURT DATES?

A.        NO, I DIDN'T.  I JUST -- I ONLY SEEN MR. MCCLANAHAN ON THE TWO OCCASIONS THAT I SPOKE WITH HIM AND I SAW HIM HERE IN COURT.

MS. HOLFINGER:  CAN I HAVE JUST A MINUTE, YOUR HONOR?

THE COURT:  YES.

BY MS. HOLFINGER:

Q.        RICHARD, AGAIN, I'M GOING TO ASK YOU ON OCTOBER 9TH, 2004, DID YOU ROB MR. MCCLANAHAN AND RHONDA CURRY?

A.        NO, I DID NOT.

MS. HOLFINGER:  I HAVE NO FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

THE COURT:  THANK YOU.

YOU MAY CROSS.

MR. STEAD:  ONE MOMENT, PLEASE.

R. HORTON 001968

202

- - -

<u>CROSS-EXAMINATION</u>

BY MR. STEAD:

Q.      HOW OLD ARE YOU, SIR?

A.      29 YEARS OF AGE.

Q.      YOUR BIRTHDATE, WHAT YEAR?

A.      I WAS BORN -- I WAS BORN AUGUST 21ST, 1976.

Q.      I THINK YOU INDICATED ON DIRECT EXAMINATION THAT YOU HAD TWO PRIOR FELONY CONVICTIONS?

A.      THAT'S CORRECT.

Q.      FOR DRUGS?

A.      THAT'S CORRECT.

Q.      FIRST ONE WAS A DRUG ABUSE HERE IN THE STATE OF OHIO?

A.      THAT'S CORRECT.

Q.      AND WHAT WAS YOUR PENALTY ON THAT?

A.      THE PENALTY ON THAT WAS A SUSPENDED SENTENCE OF MAYBE A YEAR IN JAIL.

Q.      OKAY.  AND WHERE WAS YOUR SECOND CONVICTION FROM?

A.      IT WAS IN THE STATE OF WEST VIRGINIA.

Q.      THAT WAS A CONVICTION FOR POSSESSION OF A CONTROLLED SUBSTANCE WITH INTENT TO DELIVER?

A.      THAT'S CORRECT.

Q.      IT WASN'T MERELY DRUG ABUSE?

R. HORTON 001969

203

A.        POSSESSION, ABUSE, SPECIFICALLY THE SAME THE WAY I UNDERSTAND IT.

Q.        WELL, I THINK YOU INDICATED THOSE WERE MISTAKES YOU MADE WHILE GROWING INTO A MAN?

A.        YES, SIR, I MADE A FEW MISTAKES.

Q.        AT WHAT POINT DID YOU FINALLY GROW INTO BEING A MAN?

A.        I USED TO THINK THAT WHEN I WAS YOUNGER, BUT WITH THE PROGRESS I'VE MADE SINCE I'VE BEEN OUT OF PRISON, I BELIEVE NOW.

Q.        SO SINCE APRIL 17TH OF '04?

A.        YES, SIR.

Q.        YOU ARE CURRENTLY ON PAROLE?

A.        THAT'S CORRECT.

Q.        YOU WERE ASKED QUESTIONS ABOUT YOU ENTERED PLEAS BEFORE ON YOUR OTHER CASES, CORRECT?

A.        THAT'S CORRECT.

Q.        IN FACT, IF YOU ARE IN FACT CONVICTED IN THIS CASE, THAT WOULD BE A BASIS TO VIOLATE YOUR PAROLE?

A.        THAT'S CORRECT.

Q.        YOU WERE SERVING A ONE TO 15 YEARS?

A.        THAT'S CORRECT.

Q.        SO THE BALANCE OF THAT TIME -- YOU SAID YOU DID 26 MONTHS?

A.        THAT'S CORRECT.

204

Q.      THE BALANCE OF THAT TIME IS HANGING OVER YOUR HEAD?

A.      THAT'S CORRECT.

Q.      I KNOW YOU HAD A CAR BACK IN '97 WHEN YOU BOUGHT THE CUTLESS THAT WE HAVE TALKED ABOUT HERE IN THE COURTROOM.  WHEN DID YOU GET A CAR WHEN YOU GOT OUT OF PRISON?

A.      THAT'S KIND OF DIFFICULT TO SAY.  I BOUGHT THE CAR, AND I KIND OF LET IT SIT FOR SO LONG, IT IS KIND OF DIFFICULT TO SAY.  SOMETIME IN THE YEAR 2004, LATE 2004.  MAYBE IN OCTOBER.

Q.      OKAY.  WELL, I THINK WE HEARD MISS HARMON, OR MRS. HORTON NOW, TESTIFY THAT SHE ALWAYS HAD TO GO GET YOU BECAUSE YOU DIDN'T HAVE TRANSPORTATION.

YOU, IN FACT, DID HAVE TRANSPORTATION DURING THIS TIME PERIOD, DIDN'T YOU?

A.      LIKE I SAID, I BOUGHT THE CAR AND LET IT SIT.

Q.      YOU DID, IN FACT, HAVE TRANSPORTATION AVAILABLE TO YOU DURING THIS TIME PERIOD, DID YOU NOT?

A.      I'M GOING TO SAY NO.

Q.      SO YOU DIDN'T OWN A CAR?

A.      I DID OWN THE CAR, BUT THE MATTER IS IF IT WAS RUNNING OR NOT.

Q.      YOU INDICATED THAT YOU HAD NO FINANCIAL DIFFICULTIES DURING THIS TIME PERIOD?

R. HORTON 001971

205

A.      NONE WHATSOEVER.

Q.      YOU WERE WORKING AT POPEYE'S?

A.      THAT'S CORRECT.

Q.      HOW ELSE WERE YOU SUPPORTING YOURSELF?

A.      THAT WAS THE ONLY MEANS OF SUPPORT THAT I MADE.  TO A PERSON JUST COMING OUT OF PRISON, $7.25 AN HOUR IS A PRETTY GOOD START.

Q.      OKAY.  THIS PLACE ON REYNOLDS, IS THAT AN APARTMENT, A HOUSE?

A.      IT'S A HOUSE.

Q.      DO YOU OWN IT?

A.      NO, I DO NOT.

Q.      WHO OWNS IT?

A.      A MAN, A MR. MIKE BALDERENA (PHONETIC).

Q.      DO YOU PAY RENT?

A.      YES.

Q.      HOW MUCH RENT?

A.      I BELIEVE THE RENT THERE WAS $600 A MONTH.

Q.      $600 A MONTH.

A.      YES, SIR.

Q.      HOW MUCH WERE YOU MAKING AT POPEYE'S?

A.      $7.25 PER HOUR.

Q.      WELL, WORK WITH ME ON THIS.  BUT IN LOOKING AT DEFENSE EXHIBIT C, AGAIN, THIS IS THE PAY PERIOD FROM SEPTEMBER 26TH THROUGH OCTOBER 9TH?

R. HORTON 001972

206

A.       YES, SIR.

Q.       THAT WOULD BE FOR A TWO-WEEK PERIOD?

A.       YES, SIR.

Q.       THAT WOULD BE HALF A MONTH'S WORTH OF INCOME?

A.       YES, SIR, TWO WEEKS.

Q.       IN FACT, YOU TOOK HOME AT THAT TIME $256?

A.       THAT'S CORRECT.

Q.       FOR THAT TWO-WEEK PERIOD?

A.       THAT'S CORRECT.

Q.       FOR THAT TWO-WEEK PERIOD?

A.       THAT'S CORRECT.

Q.       HOW OFTEN WERE YOU WORKING?

A.       SEVEN DAYS A WEEK.  I MAY WORK FIVE DAYS OUT OF THE WEEK.

Q.       9:30 TO 4:30?

A.       THAT'S CORRECT.

Q.       WHEN I LOOK AT IT, IT APPEARS TO ME THAT YOU WORKED 46 HOURS DURING THAT TIME PERIOD; IS THAT CORRECT?

A.       THAT'S CORRECT.

Q.       AM I READING THIS RIGHT?

A.       YES.  46.11.

Q.       SO 46 HOURS IN A TWO-WEEK TIME PERIOD WOULD BE 23 HOURS A WEEK, RIGHT?

R. HORTON 001973

A.          46, HALF OF 46, YEAH.

Q.          HOW DO YOU GET 23 HOURS WORKING 9:30 TO 4:30 -- 9:30 TO 4:30 FIVE DAYS A WEEK?

A.          THE WAY I GET IT IS, YOU KNOW, ME -- BEING ME COMING OUT OF PRISON AND BEING 27 YEARS OF AGE WORKING AT POPEYE'S, IT WASN'T THE GREATEST JOB IN THE WORLD, SO, YOU KNOW, I WASN'T THERE SEVEN DAYS OUT OF THE WEEK.

Q.          WELL, YOU HAVE BEEN TELLING THIS JURY THAT YOU DIDN'T HAVE FINANCIAL DIFFICULTIES.  YOU HAVE BEEN INDICATING TO THIS JURY THAT YOU WERE BASICALLY WORKING FULL-TIME DURING THIS TIME PERIOD.

WOULD YOU AGREE WITH ME THIS DEFENSE EXHIBIT C DOES NOT SUPPORT THAT?

A.          NO, I WOULD NOT.

Q.          OKAY.  THEN EXPLAIN TO ME HOW IF YOU WORKED 9:30 TO 4:30 FIVE DAYS A WEEK, HOW YOU COULD ONLY WORK 46 HOURS IN A TWO-WEEK TIME PERIOD?

A.          THE ONLY WAY THAT I WOULD BE ABLE TO EXPLAIN THAT TO YOU IS TO TELL YOU TO LOOK AT EXHIBIT A WHERE IT SAYS ON THE BANK STATEMENT FROM MY BANK THAT I HAD $1,400.  THAT IS AS CLEAR AS I CAN GET.  IT IS THERE IN BLACK AND WHITE THAT I HAD MONEY.

Q.          WHERE DID THAT OTHER MONEY COME FROM IF YOU'RE ONLY BRINGING HOME $256 FOR A TWO-WEEK PERIOD? HOW DID YOUR BANK STATEMENT GO UP TO THAT?

R. HORTON 001974

208

A.        I CAN ANSWER THAT QUESTION.

Q.        THANK YOU.  PLEASE DO.

A.        THE WAY THE PRISON SYSTEM GOES IS, YOU GO TO PRISON, YOU GO TO PRISON, YOU ARE A SECURITY RISK, YOU JUST GO TO PRISON.  IT GOES DOWN IN LEVELS.  ONCE YOU GET CLOSE TO GOING HOME, YOU MAY GET SENT TO A DIFFERENT TYPE OF PRISON.  THE TYPE OF PRISON THAT I WAS IN DURING THE END OF MY PRISON SENTENCE IS CALLED WORK RELEASE.  I WAS ABLE TO GET A JOB AND START LEARNING HOW TO FUNCTION IN SOCIETY BEFORE I WAS SENT HOME.  I HAD A JOB AS A TELEMARKETER IN THE STATE OF WEST VIRGINIA, THE TOWN OF HUNTINGTON, WEST VIRGINIA.  AND I WAS ABLE TO SAVE UP MONEY, BUY MY OWN CLOTHES, WEAR MY OWN CLOTHES.  IT BASICALLY WAS SHOWING YOU THE STEPS ON, YOU KNOW, HOW TO TAKE CARE OF YOURSELF BEFORE YOU COME HOME.

Q.        OKAY.  SO HOW DOES THAT EXPLAIN DEPOSITS IN YOUR ACCOUNT IN SEPTEMBER OF 2004?

A.        I'M NOT SURE ABOUT THE QUESTION.

Q.        WELL, I THINK EARLIER ON YOU INDICATED IN RESPONSE TO A QUESTION THAT ON SEPTEMBER 7TH YOU HAD A BALANCE OF 67 BUCKS AND SOME CHANGE.  AND THAT ON OCTOBER 7TH, YOU THEN HAD A BALANCE OF $1,416 AND SOME CHANGE.

WHERE DID THE 1,300 AND SOME DOLLARS COME FROM IN SEPTEMBER?

R. HORTON 001975

209

A.      IN SEPTEMBER?

Q.      THAT IS NOT WORK RELEASE MONEY AT THAT POINT, IS IT?

A.      YES, IT IS.  I HAD SOME PROBLEMS WITH MY BANK ACCOUNT.  YOU COME HOME, YOU HAVE -- THE ONLY THING YOU COME HOME WITH IS CLOTHES.  YOU DON'T HAVE A CAR.  YOU HAVE A PLACE TO LIVE.  I WANTED SOME NICE THINGS.  I HAD SOME TROUBLE WITH MY MONEY.  I THINK THAT WE ALL DO AT SOME POINT IN TIME.

Q.      I THOUGHT YOU TOLD THIS JURY EARLIER THAT YOU WEREN'T HAVING ANY FINANCIAL DIFFICULTIES DURING THIS TIME PERIOD?

A.      THAT'S CORRECT.  I DIDN'T HAVE ANY FINANCIAL DEBTS.  I JUST MAY TAKE OUT A WHOLE BUNCH OF MONEY, AND I MIGHT PUT IT BACK WHEN I SEE THAT ALL THAT GLITTERS IS NOT GOLD.  I DON'T NEED THOSE SHINY THINGS.  I MIGHT HAVE PUT IT BACK.  I MIGHT HAVE TOOK SOME OUT AGAIN.  I WORKED HARD FOR THAT MONEY.

Q.      SIR, YOU WOULD AGREE WITH ME YOUR JOB AT POPEYE'S DID NOT ACCOUNT FOR THAT INCREASE IN YOUR BANK ACCOUNT, WON'T YOU?

A.      YES.

Q.      OKAY.  SO IF THE JOB AT POPEYE'S DIDN'T EXPLAIN WHERE THE MONEY WAS COMING FROM, FROM WHAT SOURCE DID IT COME?

R. HORTON 001976

210

A.      THAT WAS THE SOURCE THAT ALL THE MONEY COME FROM IS, LIKE I SAID, FROM THE WORK RELEASE MONEY. YOU GET OUT, YOU HAVE ALL THIS MONEY YOU SAVED UP. WHAT YOU DO WITH IT IS UP TO YOU. I AM PAROLED. THEY DON'T MONITOR MY FINANCIAL SITUATION. THAT IS UP TO ME, THAT IS TOTALLY UP TO ME.

Q.      SO I GUESS THAT WHAT YOU'RE TELLING US IS YOU EARNED ALL THIS MONEY BEFORE YOUR RELEASE IN APRIL. YOU JUST DIDN'T GET AROUND TO PUTTING IT INTO THE BANK UNTIL SEPTEMBER?

A.      NO. NO, THAT IS NOT WHAT I'M SAYING AT ALL.

Q.      OKAY. SO YOU'RE BRINGING IN $256, TAKE HOME $256 IN A TWO-WEEK PERIOD, YOU'RE PAYING $600 IN RENT.

CAN YOU EXPLAIN TO US HOW THAT ADS UP?

A.      THE WAY I CAN EXPLAIN IT IS, IT ADDED UP. LET'S SAY I MADE $500 A MONTH, I HAVE SOME MONEY SAVED OVER AND WISH TO -- WISH TO PAY MY GAS, ELECTRIC AND CELL PHONE BILL. AND, YOU KNOW, FOR A PERSON LIKE MYSELF JUST GETTING OUT OF PRISON, YOU HAVE TO MAKE IT WORK. YOU HAVE -- JUST HAVE NO CHOICE BUT TO MAKE IT WORK. WHEN YOU FIRST COME HOME FROM PRISON, I WAS PAROLED TO MY AUNT. I AM A 27-YEAR OLD MAN LIVING IN MY AUNT'S BASEMENT. I WANTED TO TAKE CARE OF THAT PROBLEM AS SOON AS POSSIBLE AND START TO LIVE ON MY OWN AND FUNCTION IN SOCIETY AND JUST MAKE IT WORK.

R. HORTON 001977

Q.      IF I'M UNDERSTANDING DIFFERENT PARTS OF YOUR TESTIMONY, YOU WOULD HAVE HAD CELL PHONE BILLS, RENT BILLS, UTILITY BILLS, YOU LIKE TO GO TO MOVIES AND OUT TO DINNER, AND YOU ARE TELLING US THAT YOU WERE ABLE TO DO ALL THOSE THINGS ON YOUR SALARY ON MONEY YOU MADE AT POPEYE'S?

A.      YES, I AM.

Q.      AND YOU ALSO WERE FINANCIALLY SUPPORTING BOTH OF YOUR CHILDREN AS WELL?

A.      I'M VERY PROUD OF THAT FACT, YES, I AM.

Q.      HOW MUCH WERE YOU PAYING IN THAT REGARD?

A.      I DON'T HAVE ANY SET AMOUNT.  I DON'T HAVE CHILD SUPPORT ON EITHER ONE OF THESE CHILDREN.  I BELIEVE THAT I DO A SUFFICIENT JOB, AND SO DO THEIR MOTHERS.

Q.      YOU TOLD ME -- HOW MUCH MONEY IN SEPTEMBER OF '04 WOULD YOU HAVE BEEN GIVING TO SUPPORT YOUR DAUGHTER?

A.      THERE IS NO WAY I CAN REMEMBER SOMETHING LIKE THAT.

Q.      I'M NOT ASKING FOR A SPECIFIC DOLLAR AMOUNT. GIVE ME A ROUGH GUESS.

A.      THERE IS NO WAY I CAN TELL YOU THAT.

Q.      10 BUCKS?  10 BUCKS A MONTH?

A.      IS THAT A QUESTION?

Q.      YES, THAT'S A QUESTION?

R. HORTON 001978

212

A.          THERE IS NO WAY I CAN ANSWER THAT.  IF SHE NEEDS SOMETHING HER MOTHER CALLS.  IN SEPTEMBER, SCHOOL WAS IN.  SHE MAY HAVE NEEDED SOMETHING FOR SCHOOL.  SHE MAY HAVE NEEDED MONEY JUST, YOU KNOW, JUST MAYBE SHE NEEDS SOME FOOD IN THE REFRIGERATOR, I DON'T KNOW WHAT IS GOING ON.  I DON'T KNOW.  I JUST DO WHAT I DO TO TAKE CARE OF MY CHILDREN.  THEY NEED SOMETHING, THEIR MOTHER INFORMS ME AND THAT WAY I TAKE CARE OF THEM.

Q.          HOW MUCH WERE YOU PAYING FOR YOUR SON BACK THEN?

A.          THERE'S NO WAY I CAN GIVE YOU A SET DOLLAR AMOUNT ON THAT, SIR.

Q.          AGAIN, ALL THAT MONEY, THE RENT AND UTILITIES AND THE PHONE AND THE CHILD SUPPORT, YOUR ONLY SOURCE OF INCOME IS FROM THE RESTAURANT?

A.          THAT'S CORRECT.

Q.          AND YOU WEREN'T IN ANY FINANCIAL DIFFICULTY BACK AT THIS TIME?

A.          SOMETIMES IT WAS TIGHT.  JUST BEING A MAN, YOU HAVE TO DO, YOU JUST GOT -- YOU KNOW, I'M A GROWN MAN, I JUST MAKE IT HAPPEN, WHATEVER I NEED TO DO.

Q.          I THINK YOU HAVE INDICATED SEVERAL TIMES THIS IS, IN FACT, A SMALL NEIGHBORHOOD?

A.          THAT'S CORRECT.

Q.          AND, IN FACT, YOU HAVE SEEN MR. MCCLANAHAN IN

R. HORTON 001979

THE NEIGHBORHOOD OVER THE YEARS?

A.    THAT'S CORRECT.

Q.    PROBABLY HE HAD SEEN YOU OVER THE YEARS, RIGHT?

A.    THAT'S CORRECT.

Q.    IN FACT, HE MENTIONED SOMETHING ABOUT SEEING YOU ON THE BASKETBALL COURT.  I THINK YOU INDICATED YOU DO LIKE TO PLAY BASKETBALL?

A.    I DO.  I DO ENJOY IT.

Q.    SO HE MAY HAVE VERY WELL SEEN YOU ON THE BASKETBALL COURT?

A.    IT IS ENTIRELY POSSIBLE.

Q.    AND YOU HAD SEEN MISS CURRY?

A.    I HAVE ALSO SEEN MISS CURRY AROUND THE NEIGHBORHOOD.

Q.    WHEN YOU SEE HER, DO YOU RECOGNIZE HER?

A.    EVERY TIME I SEE HER, I DO.

Q.    WHEN YOU SEE MR. MCCLANAHAN, DO YOU RECOGNIZE HIM?

A.    EVERY TIME.

Q.    SO YOU KNOW THEM WELL ENOUGH TO RECOGNIZE THEM?

A.    THAT'S CORRECT.

Q.    WHEN DID YOU GIVE MR. MCCLANAHAN STATE'S EXHIBIT NUMBER 4?

214

A.    I WOULD HAVE GIVEN THIS TO MR. MCCLANAHAN ON OUR SECOND OCCASION SPEAKING.  I'M JUST TRYING TO GET THE GUY TO COME AND TELL THE TRUTH.

Q.    AND IT IS YOUR TESTIMONY TO THESE PEOPLE THAT MR. MCCLANAHAN HAS COME UP TO YOU AND TOLD YOU HE KNOWS YOU ARE NOT THE PERSON RESPONSIBLE?

A.    TWICE, ON TWO SEPARATE OCCASIONS.  YES, SIR, THAT IS MY TESTIMONY.

Q.    OF COURSE, THERE WASN'T ANYBODY AROUND TO HEAR THAT, RIGHT?

A.    NO.

MR. STEAD:  CAN I HAVE A MOMENT, PLEASE?

BY MR. STEAD:

Q.    SO DID YOU HAVE TRANSPORTATION BACK AT THE TIME OF THIS HAPPENING?

A.    CAN YOU BE MORE SPECIFIC?

Q.    WERE YOU DRIVING, SIR, BACK WHEN THIS WAS HAPPENING?

A.    WHEN WHAT WAS HAPPENING, SIR?  CAN YOU --

Q.    OCTOBER 9TH, 2004?

A.    WAS I DRIVING?

Q.    UH-HUH.

A.    NO, I WAS NOT.

Q.    OKAY.  YOU OWNED A CAR BUT YOU WEREN'T DRIVING?

R. HORTON 001981

215

A.      THAT'S TRUE.

MR. STEAD:  THANK YOU.

I DON'T HAVE ANYTHING FURTHER.

THE COURT:  REDIRECT?

MS. HOLFINGER:  JUST ONE MOMENT, YOUR HONOR.

- - -

REDIRECT EXAMINATION

BY MS. HOLFINGER:

Q.      RICHARD, WHAT KIND OF CAR WAS IT THAT YOU HAD?

A.      IT'S A 1979 CADILLAC SEDAN DEVILLE.

Q.      DESCRIBE IT A LITTLE BIT FOR THE JURY.  IS IT IN WORKING CONDITION?

A.      IT'S AN OLDER MODEL CAR.  I HAVE HAD A FEW PROBLEMS WITH THE CAR.  SOMETIMES WHEN IT BREAKS DOWN, I JUST LET IT SIT.

Q.      AT THIS TIME PERIOD WAS IT BROKEN DOWN?

A.      I'M QUITE SURE.  IT'S BROKEN DOWN A FEW TIMES.

Q.      WAS THIS A CAR THAT YOU WOULD HAVE USED TO DRIVE OUT TO GROVE CITY?

A.      NO.  I HAVE A TERRIBLE DRIVING RECORD.  I JUST DIDN'T LIKE DRIVING IT THAT MUCH.

Q.      YOU SPOKE A LITTLE BIT ABOUT THIS WORK RELEASE PROGRAM THAT YOU WERE IN AFTER OR AT THE END OF

216

YOUR PRISON SENTENCE.

A.          THAT'S CORRECT.

Q.          WHEN YOU WERE FINISHED WITH WORK RELEASE, AND FINISHED WITH YOUR PRISON SENTENCE, HOW MUCH MONEY HAVE YOU SAVED UP THROUGH THE WORK RELEASE PROGRAM?

A.          SOMEWHERE AROUND $5,000, I BELIEVE.  THAT -- I BELIEVE THAT.  I CAN PROVIDE A BANK STATEMENT.

Q.          WAS THE BANK STATEMENT THAT WE HAVE HERE TODAY, DID THAT REPRESENT ALL OF THE MONEY THAT YOU HAD?

A.          NO.  NO, MA'AM, THAT WAS ONLY FOR A TWO-MONTH PERIOD.  NO, IT DIDN'T.

Q.          DID YOU USE THIS -- WAS THIS $5,000 THAT YOU HAD, WAS THAT USED TO HELP SUPPLEMENT THINGS THAT YOU NEEDED?

A.          YES, IT WAS.

Q.          AND THAT HELPED YOU SUPPLEMENT YOUR INCOME AND PAY FOR YOUR EXPENSES?

A.          YES.  YES, MA'AM, IF IT WASN'T FOR THE LITTLE BIT OF MONEY THAT I SAVED UP, I PROBABLY WOULD HAVE CRASHED AND BURNED LONG BEFORE I ACTUALLY DID CRASH AND BURN.

MS. HOLFINGER:  JUST ONE MOMENT, PLEASE. JUST ONE MOMENT, PLEASE.

YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

THE COURT:  THANK YOU.  ANY QUESTIONS BY ANY

MEMBER OF THE JURY?  WE HAVE ONE.  WE HAVE TWO.  NOW THREE.

COUNSEL, APPROACH.

- - -

THEREUPON, COURT AND COUNSEL CONFER AT THE BENCH OUT OF THE HEARING OF THE JURY AND COURT REPORTER.

- - -

THE COURT:  THESE ARE QUESTIONS FROM THE MEMBERS OF THE JURY.

FIRST QUESTION IS, ON THE BANK STATEMENT THAT YOU PRODUCED, THE ADDRESS AS YOUR ADDRESS, WAS THE SAME ADDRESS TO BE YOUR WIFE'S ADDRESS?  SHE WASN'T YOUR WIFE -- SHE WAS YOUR WIFE AT THE TIME, I GUESS, OR WASN'T.

WHY WAS THE BANK STATEMENT ADDRESS DIFFERENT THAN FROM THE ONE YOU CLAIMED AS YOUR OWN ADDRESS AT THAT TIME?

THE DEFENDANT:  I'M NOT SURE ABOUT THAT.  I JUST WENT -- I CALLED AND TRIED TO OBTAIN THE EVIDENCE FROM THE BANK.  I TOLD THEM TO SEND IT TO 2277 -- 2279 SONORA DRIVE.

THE COURT:  WHERE YOU GOT THAT BANK STATEMENT THERE, WHAT EXHIBIT IS THAT?

MR. STEAD:  DEFENSE EXHIBIT A.

THE COURT:  LOOK AT EXHIBIT A.  THAT IS FOR

218

THE SEPTEMBER TIME PERIOD, THAT INDICATES AN ADDRESS ON WHAT FOR YOU?

THE DEFENDANT:  2279 SONORA DRIVE, GROVE CITY, COLUMBUS, OHIO.

THE COURT:  AND AT THAT TIME WAS THAT YOUR ADDRESS?

THE DEFENDANT:  NO, SIR, IT WAS NOT.

THE COURT:  YOU HAD THE OTHER ADDRESS?

THE DEFENDANT:  YES, SIR.  780 REYNOLDS.

THE COURT:  DO YOU KNOW WHY THAT ADDRESS IS ON THAT BANK STATEMENT?

THE DEFENDANT:  NO, I DO NOT.  WHEN I CALLED AND TRIED TO OBTAIN THE INFORMATION, I JUST ASKED FOR THEM TO SEND IT TO MY CURRENT ADDRESS.

THE COURT:  OKAY.  THAT ANSWERS THAT QUESTION.  THERE IS A QUESTION HERE FOR THE ATTORNEYS. I DON'T KNOW THAT -- WHO THAT IS FROM.  BUT THAT ONE IS NOT PERMISSIBLE AND WE WILL NOT ASK THAT QUESTION.

NOW, I'M GOING TO REASK YOU A QUESTION THAT DEALS WITH CERTAIN PARTS OF YOUR TESTIMONY.

YOU INDICATED YOU MADE $5,000 FROM THIS WORK RELEASE PROGRAM?

THE DEFENDANT:  THAT'S CORRECT.

THE COURT:  DO YOU HAVE A DOCUMENT YOU SAVED FROM YOUR WORK IN PRISON THAT WOULD SUBSTANTIATE THAT?

219

THE DEFENDANT: NO, I DO NOT. THE ONLY THING I WOULD BE ABLE TO OBTAIN IS MAYBE THE FIRST BANK STATEMENT FROM THE MONTH OF APRIL 2004. THAT IS SAYING WELL, I GET OUT AND I GO OVER, AND THE FIRST THING I DO IS TAKE A LITTLE MONEY OUT, THAT WOULD BE THE ONLY TYPE OF EVIDENCE.

THE COURT: YOU DO NOT HAVE A DOCUMENT THAT SHOWS WHAT YOU MADE AT THE WORK RELEASE PROGRAM?

THE DEFENDANT: NO, I DO NOT.

THE COURT: OKAY. QUESTIONS IN LIGHT OF THOSE, COUNSEL?

MS. HOLFINGER: NO, YOUR HONOR.

MR. STEAD: NO, THANK YOU.

THE COURT: THANK YOU FOR TESTIFYING. YOU CAN STEP DOWN.

ANYTHING FURTHER FROM THE DEFENSE, SUBJECT TO THE INTRODUCTION OF YOUR EXHIBITS?

MS. HOLFINGER: THANK YOU, YOUR HONOR.

AT THIS TIME, WE WILL REST SUBJECT TO THE ADMISSION OF OUR EXHIBITS.

- - -

THEREUPON, THE DEFENDANT RESTED.

- - -

THE COURT: OKAY. WILL THERE BE ANY REBUTTAL FROM THE STATE ON THE CASE?

220

MR. STEAD: ONE MOMENT, PLEASE.

NO, THERE WILL BE NO REBUTTAL. THANK YOU.

THE COURT: WELL, LADIES AND GENTLEMEN, YOU HAVE HEARD ALL OF THE EVIDENCE THAT YOU WILL HEAR IN THIS CASE. NOW IT IS TIME FOR ME TO HAVE ANOTHER HEARING WITH THE LAWYERS CONCERNING LEGAL ISSUES IN THE CASE AND THE INSTRUCTIONS THAT I WILL GIVE YOU IN THIS TRIAL. AND SO I WILL GIVE YOU A RATHER EXTENDED BREAK. I DON'T NEED YOU BACK UNTIL ABOUT 2:00 O'CLOCK.

OKAY. SO, AGAIN, PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES OR FORM ANY OPINION OF IT. DO NOT ALLOW ANYONE TO DISCUSS IT WITH YOU.

THANK YOU. YOU'RE IN RECESS AT THIS TIME UNTIL 2:00.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT: BE SEATED. JUST FOR CLARITY, AND I WILL OFFER THIS OPPORTUNITY TO THE PROSECUTION, BUT I DON'T THINK YOU WILL PROBABLY TAKE ADVANTAGE OF IT, AND THAT IS ON COUNT 11, THE DEFENDANT HAS TESTIFIED TO HIS PRIOR DRUG CONVICTION FOR PURPOSES OF THAT COUNT AND ADMITTED THE SAME.

WERE YOU PLANNING ON INTRODUCING ANY FURTHER

EVIDENCE ON THAT MATTER?

MR. STEAD: WELL, WE HAVE TO INTRODUCE A CERTIFIED COPY OF THE PRIOR CONVICTION TO THE COURT. AND THEN I BELIEVE IT WAS AGREED THERE WOULD BE A STIPULATION BETWEEN THE PARTIES THAT HE WAS, IN FACT, RICHARD HORTON.

THE COURT: YOU GUYS DID AGREE TO THAT STIPULATION, AS I RECALL.

MR. STEAD: WE CAN DO IT NOW FORMALLY. WE DON'T -- WHENEVER THE COURT WANTS THAT.

THE COURT: SINCE I'M HEARING THAT CASE SEPARATELY, IF YOU WANT TO INTRODUCE IT, THAT IS FINE, GO RIGHT AHEAD.

MR. STEAD: WE HAVE NO OBJECTION TO THE DEFENSE EXHIBITS.

THE COURT: NO OBJECTION TO THE DEFENSE EXHIBITS. FOR THE RECORD, SPECIFY WHAT THEY ARE.

MR. STEAD: A AND C, I BELIEVE.

MR. SHWARTZ: A AND C.

MR. STEAD: THERE WAS NO B.

MR. SHWARTZ: YOU WANT ME TO IDENTIFY THEM?

THE COURT: JUST FOR THE RECORD, IDENTIFY THEM.

MR. SHWARTZ: OKAY. DEFENSE EXHIBIT A IS A BANK STATEMENT FOR RICHARD HORTON, AND DEFENSE EXHIBIT C

R. HORTON 001988

222

IS A CHECK STUB FROM SAPP RESTAURANT ENTERPRISES.

THE COURT:  OKAY.

- - -

THEREUPON, THE EXHIBITS LAST ABOVE OFFERED AND INTRODUCED WERE ADMITTED INTO EVIDENCE ON BEHALF OF THE DEFENDANT AND MARKED DEFENDANT'S EXHIBITS A, C AND MADE A PART HEREOF.

- - -

MR. STEAD:  YOUR HONOR, NOT FOR CONSIDERATION BY THE JURY, BUT FOR CONSIDERATION BY THE COURT, THE STATE WILL OFFER INTO EVIDENCE STATE'S EXHIBIT 3.  IT'S A CERTIFIED COPY OF A JOURNAL ENTRY FROM THE FRANKLIN COUNTY COURT OF COMMON PLEAS IN CASE NUMBER 96CR-202 IDENTIFYING THE DEFENDANT AS A RICHARD HORTON, AND WHICH THE INDIVIDUAL PLED GUILTY TO DRUG ABUSE, FELONY OF THE FOURTH DEGREE.

I BELIEVE IT'S FURTHER STIPULATED BETWEEN THE PARTIES THAT THE RICHARD HORTON IN STATE'S EXHIBIT 3 IS, IN FACT, THE DEFENDANT IN THIS CASE.

THE COURT:  IS THAT CORRECT, YOU ALL AGREED TO THAT STIPULATION?

MR. SHWARTZ:  YES.

THE COURT:  SO THAT WILL BE ADMITTED.

- - -

THEREUPON, THE EXHIBIT LAST ABOVE OFFERED

R. HORTON 001989

WAS ADMITTED INTO EVIDENCE ON BEHALF OF THE PLAINTIFF, STATE OF OHIO, MARKED STATE'S EXHIBIT 3 AND MADE A PART HEREOF.

- - -

THE COURT:  I WILL INFORM THE PARTIES THAT I WILL WITHHOLD ANY RULING ON COUNT 11 UNTIL THE JURY REACHES ITS VERDICTS.

ALL RIGHT.  WE ARE IN THE PROCESS -- WELL, LET ME ASK ABOUT IS THERE ANY OTHER MOTIONS, OR ANY OTHER ISSUES AT THIS TIME, OTHER THAN DISCUSSION OF JURY INSTRUCTIONS?

MR. STEAD:  NONE THAT I'M AWARE OF.

MR. SHWARTZ:  NO, YOUR HONOR.

MS. HOLFINGER:  NO, YOUR HONOR.

THE COURT:  WE ARE IN THE PROCESS OF AT THIS TIME PUTTING TOGETHER A DRAFT.  JUST FOR OUR PLANNING PURPOSES, OTHER THAN MY STANDARD BOILER PLATE INSTRUCTIONS, REASONABLE DOUBT, BURDENS, DIRECT AND CIRCUMSTANTIAL EVIDENCE, I WOULD ALSO PLAN TO GIVE -- COME ON OUT, RICHARD, SO YOU CAN HEAR THIS.

I AM PLANNING TO GIVE THE ALIBI INSTRUCTION, 411.03 OF OJI.  THERE IS A SPECIFIC EYEWITNESS IDENTIFICATION INSTRUCTION AT 405.

MR. STEAD:  WE ARE REQUESTING IT.

THE COURT:  YOU'RE REQUESTING THAT?  HAVE

R. HORTON 001990

224

YOU REVIEWED THAT?

MS. HOLFINGER:  WE HAVE REVIEWED IT.

THE COURT:  IT'S PART OF THE GENERAL -- OF A GENERAL CREDIBILITY INSTRUCTION, BUT IT IS SPECIFIC TO EYEWITNESS.

MR. SHWARTZ:  I WOULD LIKE TO --

THE COURT:  FEEL FREE TO LOOK AT IT.  WE'LL MAKE IT AVAILABLE.  AND ALSO, THE DEFENDANT TESTIFYING, CONCERNING PRIOR CONVICTION THAT HE HAD, THOSE WILL BE ADMISSIBLE ONLY FOR THE JURY'S CONCERNED AS FAR AS HIS CREDIBILITY.  AND I WOULD PLAN ON GIVING THE LIMITING INSTRUCTION ON THAT.

OKAY.  VERY WELL.  OTHER THAN THAT, I DON'T SEE ANY OTHER SPECIALLY REQUESTED INSTRUCTIONS, BUT PLEASE FEEL FREE BEFORE WE RECONVENE.

MR. STEAD:  MAYBE SAY IN THE INSTRUCTIONS ABOUT THE DEFENDANT TESTIFYING.

THE COURT:  YEAH.

MR. STEAD:  OKAY.

THE COURT:  DEFENDANT TESTIFIED.  YEAH.  AND I WILL JUST GIVE PRIOR CONVICTION CREDIBILITY LIMITING INSTRUCTION, THEY ARE TO CONSIDER IT FOR CREDIBILITY ONLY, NOT THAT HE COMMITTED THESE CRIMES.

MR. STEAD:  THANK YOU.

THE COURT:  LET'S SAY 1:15 WE SHOULD HAVE

R. HORTON 001991

225

DRAFTS AT THAT TIME THAT WE CAN GO OVER.

MR. STEAD: IF YOU CALL MY EXTENSION 6355 WHEN THE DRAFT IS READY, I WILL COME GRAB IT.

THE COURT: THIS IS A DRAFT ONLY. DO YOU HAVE A COPY OF THE INDICTMENT PRESENT?

MR. STEAD: I DO.

THE COURT: LET'S -- THERE ARE A COUPLE ALTERNATIVES I STILL WANT TO TALK ABOUT.

DO YOU HAVE A COPY?

MS. HOLFINGER: YES.

THE COURT: AS FAR AS COUNT ONE GOES, ON THE SECOND PAGE, RICHARD HORTON HAD PURPOSE TO COMMIT IN THE STRUCTURE A CRIMINAL OFFENSE, IN THIS CASE THE CRIMINAL OFFENSE WOULD BE THEFT. THE SAID RICHARD HORTON HAVING INFLICTED PHYSICAL HARM IN RELATION TO RICHARD MCCLANAHAN, AND THREATENED TO INFLICT PHYSICAL HARM IN RELATION TO RHONDA CURRY, SINCE YOU HAVE LISTED BOTH OF THEM IN THERE, UNLESS YOU WOULD RATHER HAVE ME STRIKE OUT RHONDA.

MR. STEAD: NO.

THE COURT: OKAY. SOME EVIDENCE SHOWS, IF YOU BELIEVE IT, AN ACTUAL INFLICTION ON HIM AND THREATENED TO INFLICT ON HER. THAT IS HOW I WOULD WORD THAT.

OKAY. NOW, AS FAR AS COUNT TWO GOES --

R. HORTON 001992

226

MR. STEAD: JUST FOR OUR PURPOSES, WE BELIEVE WITH RESPECT TO RICHARD, HE INFLICTED, HE ATTEMPTED TO INFLICT, AND HE THREATENED TO INFLICT, WE THINK THEY ALL APPLY WITH RESPECT TO RICHARD.

THE COURT: THE PROBLEM WITH THAT IS, THE EVIDENCE SUPPORTS THE ACTUAL INFLICTION, THEY EITHER BELIEVE THAT OR THEY DON'T. THE PROBLEM THEN BECOMES THAT YOU HAVE GOT ALTERNATIVE FINDINGS FOR THEM WHICH THEY HAVE TO UNANIMOUSLY AGREE ON. THAT IS NOT GOOD. I AM GOING TO INSTRUCT ON INFLICT BECAUSE THAT IS WHAT HE DID. IF THEY BELIEVE HIM, THEY BELIEVE THIS HAPPENED, HE INFLICTED THE HARM, SO WHEN IT COMES TO HIM THAT IS WHAT IT IS.

NOW, THE PROBLEM I HAVE IS IN COUNT TWO. IT IS NOT A PROBLEM, IT IS A CHOICE ON THE PART OF THE PROSECUTION. YOU ALLEGE IN THE AGGRAVATED ROBBERY, COMMITTING A THEFT OFFENSE, DID HAVE A DEADLY WEAPON, TO WIT: A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND DID IN THIS CASE USE THE WEAPON. AND THEN YOU HAVE GOT ANOTHER SEPARATE ALTERNATIVE, WHICH IS AND/OR DID INFLICT OR ATTEMPT TO INFLICT SERIOUS PHYSICAL HARM. BOTH OF THOSE ARE MAYBE TRUE IN THIS CASE. THE EVIDENCE WOULD SUPPORT IT IF THE JURY TENDS TO BELIEVE IT.

THE QUESTION IS, DO YOU WANT BOTH OF THOSE

227

ALTERNATIVES?

MR. STEAD: YES.

THE COURT: OKAY. THEN THERE WILL BE A SEPARATE INSTRUCTION THAT THE JURY MUST AGREE UNANIMOUSLY ON ONE OR THE OTHER OR BOTH. YOU CAN'T HAVE SIX SAYING HE USED IT BUT DIDN'T INFLICT HARM AND SIX SAYING THE OTHER THING.

MR. STEAD: I UNDERSTAND.

THE COURT: OKAY. JUST SO LONG AS YOU'RE CLEAR, IT IS SIMPLER TO DO IT THAT OTHER WAY, BUT I'M HAPPY TO DO IT THAT WAY.

MR. STEAD: THANK YOU.

THE COURT: SO WE WILL USE BOTH OF THOSE.

COUNT THREE IS OUT. WE HAVE DECIDED THAT ALREADY, THAT IS THE OTHER ROBBERY COUNT. COUNT FOUR, AGAIN, IS ANOTHER ROBBERY COUNT. THAT ONE IS OUT, TOO, ISN'T IT, RICHARD?

MR. PECK: SO FAR.

THE COURT: COUNT FIVE IS THE KIDNAPPING CHARGE. AND WE ARE GIVING A PORTION ONLY. SO IN THIS CASE IT'S GOING TO BE TO RESTRAIN, NOT REMOVE HIM FROM THE PLACE WHERE HE IS FOUND, BUT TO RESTRAIN HIM.

MR. STEAD: IT CAN BE BOTH.

THE COURT: WHAT DOES THE EVIDENCE SUPPORT HERE? THE EVIDENCE SUPPORTS A RESTRAINT, HE WAS NOT

R. HORTON 001994

228

REMOVED FROM THE AREA. HE WAS SHOT AND WENT DOWN.

MR. STEAD: HE INDICATED THAT HE WAS DRUG AROUND THE AREA. THE MAN DRUG HIM AROUND THE AREA.

THE COURT: I'M GOING TO GIVE RESTRAIN. I DON'T THINK THAT QUALIFIES AS REMOVE FROM THE PLACE WHERE HE WAS FOUND. HE MAY HAVE BEEN DRUG AROUND THE SAME ROOM, HE WAS NOT REMOVED FROM THE PLACE HE WAS FOUND.

MR. STEAD: JUDGE, I MEAN, THE DEFINITION OF REMOVE IS TO CHANGE A PERSON'S LOCATION. CLEARLY THIS MAN'S LOCATION WAS CHANGED.

THE COURT: OVER YOUR OBJECTION, I AM GIVING RESTRAIN WITH PURPOSE TO FACILITATE THE COMMISSION OF A FELONY, TO WIT: IN THIS CASE, WHICH ONE DO YOU WANT, THE AGGRAVATED BURGLARY OR AGGRAVATED ROBBERY? I DON'T WANT TO HAVE TO INSTRUCT ON BOTH.

MR. STEAD: WE WANT BOTH.

THE COURT: I'M GOING TO FORCE YOU TO ELECT, CHOOSE ONE.

MR. STEAD: WELL, JUDGE, WITH ALL DUE RESPECT, THE FACTS IN THIS CASE SUPPORT BOTH. I DON'T SEE WHERE WE HAVE TO MAKE AN ELECTION AT THIS POINT, IN LIGHT OF THE FACT THAT THE EVIDENCE WOULD SUPPORT EITHER ALTERNATIVE.

THE COURT: SO YOU WANT AGGRAVATED BURGLARY,

229

AGGRAVATED ROBBERY AND FELONIOUS ASSAULT?

MR. STEAD:  YEP.

THE COURT:  I WILL INSTRUCT ON AGGRAVATED ROBBERY.

MR. STEAD:  PLEASE NOTE OUR OBJECTION.

THE COURT:  SO NOTED.

COUNT SIX, KNOWINGLY CAUSE SERIOUS PHYSICAL HARM AND/OR CAUSE OR ATTEMPT TO CAUSE PHYSICAL HARM TO RICHARD MCCLANAHAN BY MEANS OF A DEADLY WEAPON.  IN THAT ONE YOU'RE ENTITLED TO BOTH.  I WILL GIVE BOTH IF YOU WANT THEM.  BUT, AGAIN, WITH THE INSTRUCTION THAT THEY MUST UNANIMOUSLY AGREE ON ONE OR THE OTHER.

MR. STEAD:  WE WOULD LIKE BOTH.

THE COURT:  ALL RIGHT.  COUNT SEVEN, THIS DEALS WITH MISS CURRY.  AGAIN, ATTEMPTING TO COMMIT A THEFT OFFENSE.  HE NEVER GOT ANY MONEY OFF HER.  AND I TAKE IT HE PROBABLY DID HAVE A DEADLY WEAPON, TO-WIT:  A FIREARM ON OR ABOUT HIS PERSON, AND IN THIS CASE DID BRANDISH, DISPLAY OR BRANDISHED THE WEAPON, I TAKE IT; IS THAT CORRECT?

MR. STEAD:  JUDGE, IT WOULD BE OUR POSITION THAT HE DISPLAYED IT, HE BRANDISHED IT, HE INDICATED POSSESSION, AND HE USED THE WEAPON, ALL OF THEM.

THE COURT:  YOU WANT THE USE IN THAT ONE ALSO?

R. HORTON 001996

230

MR. STEAD: WE WOULD LIKE ALL OF THEM.

THE COURT: I WILL GIVE THAT. AND, AGAIN, HERE WE ARE TALKING ABOUT THE ALTERNATIVES, AND IN THE SAME AS WE DID ABOUT MR. MCCLANAHAN VERSUS CURRY, ON OR ABOUT HIS CONTROL, AND DID ATTEMPT TO INFLICT OR THREATEN TO INFLICT PHYSICAL HARM ON HER, IS THE SECOND ALTERNATIVE. SO IT WOULD BE, DID HAVE A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL. OR THE ALTERNATIVE WILL BE, DID THREATEN TO INFLICT OR ATTEMPT TO INFLICT, I BELIEVE IN THIS CASE THREATENED.

MR. STEAD: I'M SORRY, JUDGE. WHAT COUNT ARE YOU ON?

THE COURT: EIGHT. THERE ARE ALTERNATIVES THERE AS TO THE ELEMENTS. ONE IS, DID HAVE A DEADLY WEAPON ON OR ABOUT HIS PERSON OR CONTROL. AND THE OTHER ALTERNATIVE IS IF YOU LOOK AT THE STATUTE, I BELIEVE --

MR. STEAD: I BELIEVE COUNT EIGHT IS A ROBBERY COUNT, AND WE HAD AGREED NOT TO PROCEED ON THAT.

THE COURT: THAT'S CORRECT. YOU'RE RIGHT, SO THAT ONE IS GONE. SORRY ABOUT THAT. THAT ONE IS OUT.

COUNT NINE IS, AGAIN, ANOTHER ROBBERY COUNT, IS IT NOT?

MR. STEAD: YES, SIR.

THE COURT: THAT ONE IS OUT. SO NOW WE ARE

R. HORTON 001997

231

DOWN TO COUNT 10.  AND, AGAIN, THE SAME AS I DID ON THE OTHER ONE, I WILL USE AGGRAVATED ROBBERY AS THE SUPPORTED ALTERNATIVE.

MR. STEAD:  AGAIN, NOTE OUR OBJECTION.

THE COURT:  SO NOTED.  COUNT 11 IS FOR MY DETERMINATION.  OKAY.  WE WILL PROCEED ACCORDINGLY.  WE WILL HAVE A DRAFT FOR YOU AND YOU CAN REVIEW IT WHEN IT IS READY.

- - -

THEREUPON, A RECESS WAS TAKEN UNTIL 1:30 O'CLOCK, P.M., OF THE SAME DAY, TO WIT: FEBRUARY 1, 2006.

- - -

R. HORTON 001998

232

WEDNESDAY AFTERNOON SESSION,

FEBRUARY 1ST, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT: WHAT I WANT TO DO HERE IS I WANT THESE RIGHT. YOU WILL ARGUE THIS AFTERNOON, AND I WILL SEND THEM HOME AND INSTRUCT THEM IN THE MORNING.

HOW'S THAT?

MR. STEAD: I WOULD OBJECT TO THAT.

THE COURT: WHY?

MR. STEAD: I WOULD LIKE TO KNOW WHAT THE INSTRUCTIONS ARE THAT THE COURT IS GOING TO GIVE PRIOR TO DOING ARGUMENT.

THE COURT: OKAY. NOW, IT'S GOING TO TAKE -- I HAVE HAD MAJOR CHANGES.

MR. STEAD: I BELIEVE THAT.

THE COURT: IT'S GOING TO TAKE PROBABLY ANOTHER HOUR TO DO THAT. THEN FOR US TO GO OVER THEM, IT WILL TAKE SOME TIME. SO MY VIEW WOULD BE LET'S DO THIS, LET'S SEND THEM HOME.

R. HORTON 001999

233

MR. STEAD: THAT'S PERFECT.

THE COURT: LET'S SEND THEM HOME AND COME BACK AND GO OVER THE INSTRUCTIONS, STICK AROUND AND GET THEM DONE TODAY, AND THEN TOMORROW MORNING YOU ARGUE AND WE SEND THEM OUT.

MR. STEAD: THAT'S FINE.

THE COURT: HOW'S THAT? IS THAT OKAY WITH YOU?

MR. SHWARTZ: THAT IS FINE.

THE COURT: GOOD.

BRING THEM OUT.

- - -

THEREUPON, THE JURORS RESUMED THEIR PLACES IN THE JURY BOX AND THE FOLLOWING PROCEEDINGS WERE HAD AS FOLLOWS:

THE COURT: PLEASE BE SEATED, LADIES AND GENTLEMEN. WELL, WE HAVE HAD A LITTLE CHANGE IN PLANS. IT IS, AS YOU KNOW, NECESSARY TO HAVE ACCURATE AND COMPLETE INSTRUCTIONS THAT YOU CAN UNDERSTAND. THIS CASE INVOLVES SOME RATHER COMPLICATED INSTRUCTIONS. AND I WANT TO MAKE SURE THEY ARE RIGHT BEFORE WE GO AHEAD WITH THIS. SO THE LAWYERS AND I STILL HAVE TO GO OVER THEM AND APPROVE THEM. AND SO WE WILL SPEND THE REST OF THE AFTERNOON DOING THAT. AND THEN I WILL SEND YOU HOME NOW.

R. HORTON 002000

234

YOU WILL COME BACK IN THE MORNING AND YOU WILL HAVE CLOSING ARGUMENTS IN THE MORNING, AND THEN YOU WILL GET THE CASE FOR DECISION.  THAT IS HOW WE WILL DO IT.  I WOULD RATHER BE RIGHT THAN WRONG.

OKAY.  SO PLEASE DON'T DISCUSS THE CASE AMONG YOURSELVES OR WITH ANYONE ELSE.  DO NOT ALLOW ANYONE TO DISCUSS IT WITH YOU.  AND WE WILL SEE YOU AT 9:00 A.M.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  I IMAGINE WE WILL HAVE THOSE BY 3:00 O'CLOCK.

MR. STEAD:  YOU WANT US BACK HERE AT 3:00?

THE COURT:  YES, COME BACK AT 3:15 TO GIVE YOU A LITTLE MORE TIME.  THIS IS OUR THIRD DRAFT.  THIS ONE SHOULD BE PRETTY GOOD.

MR. STEAD:  OKAY.  I ASSUME THE ONE I WAS LOOKING AT WAS DRAFT ONE?

THE COURT:  YES.  THAT IS GONE

- - -

THEREUPON, A RECESS WAS TAKEN.

- - -

THE COURT:  BACK ON THE RECORD.

235

WELL, GENTLEMEN, HAVE YOU COMPLETED READING IT, MS. HOLFINGER?

MS. HOLFINGER:  YES, YOUR HONOR.

THE COURT:  HAVE YOU FINISHED, MR. SHWARTZ?

MS. HOLFINGER:  HE'S FINISHED.

THE COURT:  ALL RIGHT.  LET'S BEGIN OUR DISCUSSION AS FOLLOWS:  YOU ARE DOWN TO ONE, TWO, SIX COUNTS AS PER OUR PRIOR DISCUSSION.

DOES EITHER SIDE SEE ANY LESSER INCLUDED OFFENSES OF ANY COUNT REASONABLY RAISED BY THE EVIDENCE?

MR. STEAD:  NO, YOUR HONOR.

THE COURT:  THANK YOU.

MR. SHWARTZ:  NO, YOUR HONOR.

THE COURT:  GOOD.  I AGREE.  THIS IS A CASE OF YOU EITHER BELIEVE THE STATE'S WITNESSES OR YOU DON'T.  THAT IS WHAT IT IS.  THAT IS WHAT IT IS.

ALL RIGHT.  LET'S BEGIN, IF IT IS NOT OBJECTIONABLE, I DON'T THINK ANYBODY WANTS TO COMPLAIN ABOUT THE BOILER PLATE INSTRUCTIONS, YOU DO?

MR. STEAD:  YES.

THE COURT:  WHAT WOULD YOU LIKE TO COMPLAIN ABOUT, MR. STEAD?

MR. STEAD:  WELL, PAGE 1, THE BOTTOM PARAGRAPH IS AN EXACT REPEAT OF THE SENTENCE TWO SENTENCES EARLIER.  WE HAVE NO OBJECTION TO A

R. HORTON 002002

236

PRESUMPTION OF INNOCENCE INSTRUCTION BEING CONTAINED IN THESE JURY INSTRUCTIONS.  WE THINK IT'S INAPPROPRIATE TO PUT IT TWICE IN THE THREE-SENTENCE TIME PERIOD, WE THINK, IS INAPPROPRIATE.

THE COURT:  WHERE ARE YOU AT?  READ IT TO ME WHAT YOU'RE TALKING ABOUT.

MR. STEAD:  AT THE LAST LINE OF THE FIRST PARAGRAPH, YOU MUST BEAR IN MIND THE DEFENDANT IS PRESUMED TO BE NOT GUILTY OF THE CHARGES AGAINST HIM, ET CETERA.  AND THE VERY LAST PARAGRAPH ON THAT PAGE IS A REPEAT OF THAT.  I DON'T SEE A NEED FOR THAT REPEAT PARAGRAPH.

THE COURT:  YOU WISH TO COMMENT, DEFENSE?

MR. SHWARTZ:  I THINK IT IS VERY IMPORTANT, OUR WHOLE SYSTEM OF LAW IS BASED ON THAT.  I KNOW OF NO REASON WHY THE COURT SHOULDN'T EMPHASIZE THAT.  THAT GIVES MY CLIENT A FAIR TRIAL.  IT SHOULD BE GIVEN.

MR. STEAD:  YOU NEVER HEARD THE STATE IN ANY WAY SUGGEST IN THIS CASE HE'S NOT ENTITLED TO THE PRESUMPTION OF INNOCENCE, BUT TO REPEAT IT WE THINK IS INAPPROPRIATE.

THE COURT:  WE ARE TALKING ABOUT HERE PRESUMPTION OF NONGUILT.  INNOCENCE IS A MORAL TERM. YOUR OBJECTION IS DULY NOTED AND OVERRULED.

MR. STEAD:  NEXT THING IS ON THE FIRST PAGE,

R. HORTON 002003

237

VERY FIRST LINE, IN ACCORDANCE WITH THE LAW, YOUR CONSCIENCE AND THE EVIDENCE SUBMITTED IN COURT, I'M NOT SURE WHERE THE YOUR CONSCIENCE STUFF COMES FROM.

THE COURT: WELL, I THINK IF YOU LOOK AT THE STANDARD BOILER PLATE IN OJI, IT IS THERE, AND IF NOT, IT IS FAIR.

GO AHEAD. NEXT OBJECTION.

MR. STEAD: OKAY. PAGE TWO, REASONABLE DOUBT INSTRUCTION. WE HAVE NO OBJECTION TO THE FIRST PARAGRAPH. IT WOULD BE OUR POSITION THE SECOND PARAGRAPH IS CONFUSING AND NOT NEEDED.

THE COURT: HAVE YOU EVER HAD A JUDGE SUSTAIN YOU ON THAT?

MR. STEAD: I HAVE NEVER HAD A JUDGE PUT THAT INSTRUCTION IN BEFORE.

THE COURT: REALLY?

MR. STEAD: YES.

THE COURT: WELL, IT'S A STATEMENT OF LAW THAT FAIRLY BENEFITS BOTH SIDES. THE RULES AS TO REASONABLE DOUBT EXTEND TO EVERY ESSENTIAL ELEMENT OF THE OFFENSE, ALTHOUGH EACH PARTICULAR FACT ADVANCED BY THE PROSECUTION WHICH DOES NOT CONSTITUTE AN ESSENTIAL ELEMENT NEED NOT BE ESTABLISHED BEYOND A REASONABLE DOUBT.

YOU ARE TELLING ME THAT IS NOT A FAIR

STATEMENT OF THE LAW?  YOU DON'T HAVE TO PROVE EVERY FACT, YOU JUST HAVE TO PROVE THE ELEMENTS.

MR. STEAD:  I AGREE WITH THAT.  I JUST THINK THE LANGUAGE IS CONFUSING, AND WE OBJECT TO THAT PARAGRAPH.

THE COURT:  REALLY.  DO YOU OBJECT ALSO?

MR. SHWARTZ:  NO, YOUR HONOR.

THE COURT:  YOUR OBJECTION IS DULY NOTED AND OVERRULED

GO AHEAD.  WHAT IS NEXT?

MR. STEAD:  IT WOULD BE A REPEAT ON WHAT WE HAVE EARLIER DISCUSSED, BUT, AGAIN, ON PAGE 3, RIGHT BEFORE THE TYPES OF EVIDENCE, THE LANGUAGE INTO YOUR OWN CONSCIENCE, WE THINK THAT ENCOURAGES JURY NULLIFICATION, THAT IS NOT APPROPRIATE IN THE STATE OF OHIO.

MR. SHWARTZ:  IS THE STATE ARGUING THAT THE JURY SHOULDN'T USE THEIR OWN CONSCIENCE?

MR. STEAD:  THEY ARE TO USE THEIR COMMON SENSE.

THE COURT:  WE'LL GET TO COMMON SENSE LATER.

COUNSEL, YOUR OBJECTION IS DULY NOTED AND OVERRULED.

NEXT ONE.

MR. STEAD:  THE BOTTOM OF PAGE 3, WE DON'T BELIEVE THAT DEFINITION OF CIRCUMSTANTIAL EVIDENCE IS

R. HORTON 002005

239

ACCURATE.

THE COURT:  WHY NOT?

MR. STEAD:  WE LIKE THE DEFINITION OF CIRCUMSTANTIAL EVIDENCE FROM OJI.

THE COURT:  HOW DOES THIS DIFFER?

MR. STEAD:  THE OJI DEFINITION OF CIRCUMSTANTIAL EVIDENCE IS THE PROOF OF FACTS OR CIRCUMSTANCES BY DIRECT EVIDENCE FROM WHICH YOU MAY REASONABLY INFER OTHER RELATED OR CONNECTED FACTS WHICH NATURALLY AND LOGICALLY FOLLOW ACCORDING TO THE COMMON EXPERIENCE OF MANKIND.

THERE IS ADDITIONAL LANGUAGE ABOUT INFERENCES, AND WE HAVE NO OBJECTION TO THAT AS WELL. TO INFER, TO MAKE AN INFERENCE IS TO REACH A REASONABLE CONCLUSION OF FACT WHICH YOU MAY BUT ARE NOT REQUIRED TO MAKE FROM OTHER FACTS WHICH YOU MAY -- YOU FIND HAVE BEEN ESTABLISHED BY DIRECT EVIDENCE.  WHETHER AN INFERENCE IS MADE RESTS ENTIRELY WITH YOU.  THAT IS LANGUAGE DIRECTLY OUT OF OJI.  WE WOULD REQUEST THAT LANGUAGE.

THE COURT:  COUNSEL FOR THE DEFENSE, DO YOU WISH TO RESPOND TO THAT?

MR. SHWARTZ:  WHAT PAGE?

MR. STEAD:  BOTTOM OF PAGE 3, ABOUT SIX LINES UP FROM THE BOTTOM, IT STARTS CIRCUMSTANTIAL

240

EVIDENCE.

MR. SHWARTZ:  WHAT IS YOUR OBJECTION TO IT?

MR. STEAD:  IT IS JUST I DON'T BELIEVE IT CORRECTLY STATES THE LAW.  I THINK THERE IS BETTER LANGUAGE DIRECTLY OUT OF OJI.  WE ARE ASKING FOR THE OJI LANGUAGE.

MR. SHWARTZ:  WHICH IS?

MR. STEAD:  THE OJI LANGUAGE IS CIRCUMSTANTIAL EVIDENCE IS PROOF OF FACTS OR CIRCUMSTANCES BY DIRECT EVIDENCE FROM WHICH YOU MAY REASONABLY INFER OTHER RELATED OR CONNECTED FACTS WHICH NATURALLY AND LOGICALLY FOLLOW ACCORDING TO THE COMMON EXPERIENCE OF MANKIND.  YOU CAN ADD TO THAT TO INFER, OR TO MAKE AN INFERENCE, IS TO REACH A REASONABLE CONCLUSION OF FACT WHICH YOU MAY BUT ARE NOT REQUIRED TO MAKE FROM OTHER FACTS WHICH YOU HAVE BEEN -- WHICH YOU FIND HAVE BEEN ESTABLISHED BY DIRECT EVIDENCE.  WHETHER AN INFERENCE IS MADE RESTS ENTIRELY WITH YOU.

MR. SHWARTZ:  I THINK THIS INSTRUCTION IS MUCH CLEARER TO A JURY AND THE OJI INSTRUCTION IS CONFUSING.

THE COURT:  I THINK BOTH INSTRUCTIONS ARE A CORRECT STATEMENT THE LAW.  OJI IS MEANT -- WE TELL TRIAL JUDGES THIS ALL THE TIME -- AS A GUIDE.  A TRIAL JUDGE IS URGED TO TAILOR THE INSTRUCTIONS AS HE SEES FIT

241

WITHIN THE LAW.  THIS INSTRUCTION IN MY VIEW IS MUCH CLEARER BUT IT EMBRACES THE SAME LEGAL CONCEPTS AND, THEREFORE, I WILL GIVE THIS INSTRUCTION I HAVE ALREADY AGREED TO.

NEXT.

MR. STEAD:  THE NEXT LINE, THERE IS NO SET RULE AS TO THE WEIGHT YOU GIVE TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  AND LANGUAGE FROM OJI IS DIRECT EVIDENCE AND CIRCUMSTANTIAL ARE OF EQUAL WEIGHT. WE ASK FOR THAT INSTRUCTION.

MR. SHWARTZ:  I HAVE NO OBJECTION TO THAT.

THE COURT:  I DO.  I OBJECT.  I WILL GIVE MY INSTRUCTION.

NEXT.  LET'S GO ONTO THE IMPORTANT THINGS, THE ELEMENTS.  COUNT ONE, AGGRAVATED BURGLARY. ADDITIONS OR CORRECTIONS FROM THE PROSECUTION?  WE WILL GO WITH YOU FIRST.

MR. STEAD:  PAGE 5.

THE COURT:  YES.

MR. STEAD:  UNDER THE DEFINITION OF PURPOSE. THIS WILL BE A CONTINUING OBJECTION TO THESE INSTRUCTIONS.  THERE ARE CERTAIN ELEMENTS THAT ARE LABELED ESSENTIAL ELEMENTS.  WE DON'T BELIEVE THERE IS ANY ELEMENT THAT IS MORE IMPORTANT THAN ANY OTHER.  WE MUST PROVE ALL ELEMENTS, AND ANY REFERENCE TO THINGS

242

BEING ESSENTIAL IS INAPPROPRIATE.

THE COURT: DULY NOTED. OVERRULED.

MR. STEAD: SECONDLY, ON THE PURPOSELY INSTRUCTION, WE WOULD REQUEST THE OJI INSTRUCTION THAT TALKS ABOUT THE DIFFERENT WAYS TO PROVE PURPOSE. ONE OF THE WAYS BEING THE DEFENDANT'S OWN WORDS AS HE EXPRESSES TO OTHERS. THERE IS NO MENTION OF THE DEFENDANT'S EXPRESSION TO OTHERS AS A SPECIFIC METHOD OF PROVING PURPOSE.

THE COURT: WELL, LET'S LOOK THERE.

MR. STEAD: SPECIFICALLY, A PERSON ACTS PURPOSELY WHEN IT IS HIS SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT. TO DO AN ACT PURPOSELY IS TO DO IT INTENTIONALLY AND NOT ACCIDENTALLY. PURPOSE AND INTENT MEAN THE SAME THING. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS KNOWN ONLY TO HIMSELF UNLESS HE EXPRESSES IT TO OTHERS OR INDICATES IT BY HIS CONDUCT. SINCE YOU CANNOT LOOK INTO THE MIND OF ANOTHER, YOU MUST DETERMINE PURPOSE FROM ALL THE FACTS AND CIRCUMSTANCES IN EVIDENCE. WE WOULD ASK FOR THAT INSTRUCTION.

THE COURT: LET'S SEE HERE. DO YOU HAVE A FEELING ON THAT?

MR. SHWARTZ: I THINK THIS IS FINE.

THE COURT: WELL, I THINK I WILL AGREE WITH THE PROSECUTION ON THIS ONE. IT'S AN ADDITIONAL

INSTRUCTION, IT'S NOT A REQUIRED INSTRUCTION.  PARAGRAPH 4, 409.14, IS AN ADDITIONAL INSTRUCTION.  BUT I THINK IN THIS CASE, BECAUSE WE DO HAVE EVIDENCE IF BELIEVED FROM THE DEFENDANT MAKING CERTAIN STATEMENTS, WHICH STATEMENTS COULD CONSTITUTE HIS PURPOSE, I THINK YOU'RE FAIRLY ENTITLED TO THAT.  SO I WILL GIVE PARAGRAPH 4, THE ADDITIONAL.  AND IT IS 409.14.  THAT WILL COME RIGHT AFTER THE PURPOSE PARAGRAPH, BEFORE THE PURPOSE TO COMMIT A THEFT OFFENSE AS AN ELEMENT PARAGRAPH.  THAT IS WHERE IT SHOULD GO.

MR. STEAD, IS THAT CLEAR?  IS THAT OKAY?

MR. STEAD:  YES.

THE COURT:  THAT WILL GO THERE THEN.

MR. STEAD:  I DON'T HAVE THE PARAGRAPH IN FRONT OF ME, BUT --

THE COURT:  PARAGRAPH 4 SAYS PURPOSE IS A DECISION OF THE MIND TO DO AN ACT WITH CONSCIOUS OBJECTIVE OF ENGAGING IN SPECIFIC CONDUCT.  TO DO AN ACT PURPOSELY IS TO DO IT INTENTIONALLY AND NOT ACCIDENTALLY.  PURPOSE AND INTENT MEAN THE SAME THING. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS KNOWN ONLY TO HIMSELF UNLESS HE EXPRESSES IT TO TO OTHERS OR INDICATES IT BY HIS CONDUCT.

MR. STEAD:  THANK YOU.  THAT IS WHAT WE WERE LOOKING FOR.

244

THE COURT:  UNLESS YOU JUST LIKE THE LAST SENTENCE.

MR. STEAD:  NO.  WE WILL TAKE IT ALL.  THANK YOU.

THE COURT:  YOU WILL GET IT ALL.

YOU GOT THAT, RICHARD?  PARAGRAPH 4.

I DO HAVE A CHANGE ON THE LAST PARAGRAPH. WE ARE TALKING ABOUT PURPOSE TO COMMIT A THEFT OFFENSE AS AN ELEMENT OF AGGRAVATED BURGLARY.  IN THE NEXT TO LAST LINE, THE DEFENDANT HAD THE PURPOSE TO KNOWINGLY DEPRIVE THE OWNER, KNOWINGLY IS AN ESSENTIAL ELEMENT OF THE OFFENSE OF THEFT AND SO WE WILL HAVE TO ADD KNOWINGLY IN THERE.  ALL RIGHT.

MR. STEAD:  WHERE ARE YOU PUTTING KNOWINGLY?

THE COURT:  PURPOSE TO COMMIT A THEFT OFFENSE IS AN ELEMENT OF AGGRAVATED BURGLARY.  BEFORE YOU CAN FIND THE DEFENDANT GUILTY OF AGGRAVATED BURGLARY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, IN FRANKLIN COUNTY, OHIO, THE DEFENDANT HAD PURPOSE TO KNOWINGLY DEPRIVE THE OWNER, IN THIS CASE RICHARD MCCLANAHAN, OF MONEY WITHOUT HIS CONSENT.

KNOWINGLY IS AN ELEMENT OF THEFT.  AND I MUST DESCRIBE ALL THE ESSENTIAL ELEMENTS OF THE UNDERLYING THEFT OFFENSE.  SO THAT IS WHY IT'S GOT TO BE

R. HORTON 002011

245

IN THERE.

MR. STEAD:  I GUESS THE LANGUAGE WE LOOK FOR WOULD BE THAT THE DEFENDANT KNOWINGLY OBTAINED OR EXERTED CONTROL OVER PROPERTY OF ANOTHER WITH A PURPOSE TO DEPRIVE THE OWNER OF SAID PROPERTY.

THE COURT:  TO KNOWINGLY WHAT?

MR. STEAD:  THE DEFENDANT KNOWINGLY OBTAINED OR EXERTED CONTROL OVER THE PROPERTY.

THE COURT:  YOU'RE RIGHT.  I WILL GO WITH THAT, OBTAINED OR EXERTED CONTROL.

MR. STEAD:  OVER THE PROPERTY OF ANOTHER.

THE COURT:  OVER THE PROPERTY OF ANOTHER.

MR. STEAD:  WITH PURPOSE TO DEPRIVE THE OWNER OF SAID PROPERTY.  IF YOU WANT TO CALL IT MONEY IN THIS CASE WE HAVE NO OBJECTION TO THAT.

THE COURT:  NO, THAT IS NOT CORRECT.  HE HAS TO HAVE THE PURPOSE -- HAS TO HAVE THE PURPOSE TO KNOWINGLY OBTAIN, DEPRIVE THE OWNER OF PROPERTY.

MR. STEAD:  HE HAS TO HAVE THE PURPOSE TO DEPRIVE.

THE COURT:  SO WE HAVE TO WORD THIS DEFENDANT HAD THE --

MR. STEAD:  JUDGE, THE LANGUAGE IS DIRECTLY OUT OF 2913.02 FOR THEFT IS NO PERSON WITH PURPOSE TO DEPRIVE THE OWNER OF PROPERTY SHALL KNOWINGLY OBTAIN OR

246

EXERT CONTROL OVER THE PROPERTY OR SERVICES OF ANOTHER WITHOUT THE CONSENT OF THE OWNER BEING THE ONE THAT IS APPLICABLE IN THIS CASE.

THE COURT:  WHAT I AM TRYING TO GET AROUND HERE, WE HAVE TWO PURPOSES HERE.

MR. STEAD:  ONE PURPOSE.

THE COURT:  NO, TWO.  WE HAVE A PURPOSE WITHIN A PURPOSE.  BECAUSE HERE WE ARE TALKING ABOUT THE BASIC OFFENSE IS WITH PURPOSE TO COMMIT A CRIMINAL OFFENSE THEREIN.  SO HE HAS TO HAVE A PURPOSE TO COMMIT THE CRIMINAL OFFENSE THEREIN, AND IN THIS CASE THAT OFFENSE IS THEFT, AND WITHIN THEFT IS A SECOND SPECIFIC PURPOSE.

MR. STEAD:  I AGREE.

THE COURT:  SEE WHAT I'M SAYING?  WHAT I'M TRYING TO DO IS WORD THIS SO I DON'T HAVE PURPOSE AND PURPOSE BACK TO BACK.

MR. STEAD:  WELL, MY SUGGESTION WITH RESPECT TO THIS PARAGRAPH --

THE COURT:  GO AHEAD.

MR. STEAD:  FIRST, VERY FIRST SENTENCE IN THE PARAGRAPH IS PURPOSE TO COMMIT A THEFT OFFENSE IS AN ELEMENT OF AGGRAVATED BURGLARY.  IN YOUR PARAGRAPH UP ABOVE, YOU HAVE REFERRED TO THE PURPOSE TO COMMIT A CRIMINAL OFFENSE.  I THINK IF WE SAY THE CRIMINAL

R. HORTON 002013

247

OFFENSE AT ISSUE IN THIS CASE IS THEFT, AND THEN SAY THEFT IS, AND THEN GIVE THE DEFINITION OF THEFT, WHICH IS KNOWINGLY OBTAIN OR EXERTING CONTROL OVER THE PROPERTY OF ANOTHER WITH THE PURPOSE --

THE COURT:  THIS IS THE WAY I WILL DO IT. THE LAST PARAGRAPH WILL SAY, DEFENDANT HAD THE PURPOSE TO COMMIT THE OFFENSE OF THEFT.  THEFT IS DEFINED AS, THAT'S HOW WE WILL DO THAT.  I THINK THAT SEPARATES THAT PURPOSE OUT SUFFICIENTLY.

MR. STEAD:  I DO, TOO.

THE COURT:  ANY OBJECTION TO THAT?

MR. SHWARTZ:  NO.

THE COURT:  THAT IS FAIR.  DO YOU HAVE THAT, RICHARD?

MR. PECK:  YES.

THE COURT:  WE'LL REWORK THAT LAST PARAGRAPH, THEN WE HAVE THE DEFINITIONS.

ANYTHING FURTHER ON COUNT ONE?

MR. STEAD:  YES.  WITH RESPECT TO THE DEFINITION OF KNOWINGLY AT THE TOP OF PAGE 6, AGAIN, THERE ARE WAYS TO PROVE THE ELEMENT OF KNOWINGLY JUST AS THERE ARE PURPOSELY, AND THE DEFENDANT'S OWN WORDS WOULD BE PART OF THAT.

THE COURT:  WHAT ARE YOU OBJECTING TO?

MR. STEAD:  WE'D LIKE THE REST OF THE

R. HORTON 002014

248

PARAGRAPH.  AGAIN, A PERSON ACTS KNOWINGLY REGARDLESS OF HIS PURPOSE WHEN HE IS AWARE HIS CONDUCT WILL PROBABLY CAUSE A CERTAIN RESULT OR WILL PROBABLY BE OF A CERTAIN NATURE.  A PERSON HAS KNOWLEDGE OF CIRCUMSTANCES WHEN HE IS AWARE THAT SUCH CIRCUMSTANCES PROBABLY EXIST.  SINCE YOU CANNOT LOOK INTO THE MIND OF ANOTHER, YOU MUST DETERMINE KNOWLEDGE FROM ALL THE FACTS AND CIRCUMSTANCES IN EVIDENCE.

THE COURT:  ANY OBJECTION TO THAT?

MS. HOLFINGER:  THAT WOULD BE THE LAST SENTENCE?

THE COURT:  YES.  WE'LL ADD THAT LAST SENTENCE, WHICH IS A FAIR STATEMENT OF THE LAW.

MS. HOLFINGER:  NO.

THE COURT:  THAT'S FINE.  WE WILL ADD THAT LAST SENTENCE.

MR. PECK:  WHICH SECTION?

MR. STEAD:  I'M NOT LOOKING AT OJI.

THE COURT:  409.11.

MR. PECK:  THANKS, JUDGE.

THE COURT:  THAT IS PARAGRAPH 3.  WE ARE ONLY GOING TO USE THE FIRST SENTENCE OF SUBPARAGRAPH 3, RICHARD.  SINCE YOU CANNOT LOOK INTO THE MIND OF ANOTHER SENTENCE.

MR. PECK:  OKAY.

R. HORTON 002015

249

THE COURT: ANY OTHERS ON THAT COUNT?

MR. STEAD: WELL, THERE ARE THROUGHOUT THESE INSTRUCTIONS, AND IN SOME CASES WHEN THERE IS ALTERNATIVE WAYS OF PROVING THINGS, YOU GIVE SPECIFIC EXAMPLES AND POINT OUT THEIR ALTERNATIVES. AND IN OTHER PLACES IN THESE INSTRUCTIONS WE DON'T DO THAT.

THE COURT: SUCH AS?

MR. STEAD: FOR EXAMPLE, ON THE FIREARM SPECIFICATION, THERE ARE FOUR DIFFERENT WAYS TO PROVE THE FIREARM SPECIFICATION, BRANDISH, INDICATE, POSSESSION, DISPLAY AND/OR USE. AND WE DON'T PUT THAT IN THE INSTRUCTIONS.

THE COURT: WE DO AS IT RELATES TO RHONDA.

MR. STEAD: WELL --

THE COURT: WE DON'T AS IT RELATES TO RICHARD.

MR. STEAD: WELL, WHAT I'M SAYING IS IN SOME PLACES WE ARE VERY SPECIFIC AS TO HOW TO DEAL WITH ALTERNATIVE OPTIONS AND SOME PLACES WE ARE NOT. IT IS THE STATE'S POSITION THAT WE OUGHT TO GIVE THEM THE INSTRUCTIONS ABOUT HOW TO DEAL WITH ALTERNATIVES ONE TIME AS OPPOSED TO IN SOME PLACES WE DO AND IN SOME PLACES WE DON'T.

THE COURT: NOW, ARE YOU TALKING ABOUT THAT THEY GOT TO FIND THE ALTERNATIVES BY UNANIMOUS VERDICTS,

R. HORTON 002016

250

IS THAT WHAT YOU'RE TALKING ABOUT?

MR. STEAD: YES, I AM.

THE COURT: TALKING ABOUT TWO DIFFERENT THINGS, TALKING ABOUT THE GUN SPECIFICATION. WE ARE TALKING ABOUT BRANDISH, DISPLAY, WHATEVER WE ARE TALKING ABOUT.

MY VIEW THERE IS THAT THOSE TERMS BASICALLY INCLUDE EACH OTHER IN MANY RESPECTS. AND, THEREFORE, I DON'T FORCE THE JURY, WHEN IT COMES TO THAT, TO PICKING BY A UNANIMOUS VERDICT ONE OF THOSE. I DON'T THINK THEY ARE REALLY ALTERNATIVES. OKAY.

SO I USE, WHEN IT COMES TO RICHARD, USE, BECAUSE THAT IS WHAT THE EVIDENCE SHOWS. HE EITHER USED THE GUN OR HE DIDN'T. THE OTHERS ARE, IN EFFECT, MEANINGLESS. WHEN IT COMES TO RHONDA, THE ALTERNATIVES BRANDISH, DISPLAY, WHATEVER, ARE RELEVANT THERE BECAUSE HE DIDN'T SHOOT HER. I'M TRYING TO DRAW THAT DISTINCTION FOR THE JURY.

NOW, WHEN WE TALK ABOUT ALTERNATIVES AS FAR AS SUBSTANTIVE ISSUES WITHIN A CHARGE, AND IN THIS CASE WHAT WE ARE TALKING ABOUT, FOR EXAMPLE, ON THE FIRST CHARGE, IS AS TO THIS CHARGE, THE AGGRAVATED BURGLARY, THE DEFENDANT, ONE, INFLICTED PHYSICAL HARM UPON RICHARD MCCLANAHAN AND/OR THREATENED TO INFLICT PHYSICAL HARM ON RHONDA CURRY, AND/OR, TWO, HAD A DEADLY WEAPON ON OR

R. HORTON 002017

251

ABOUT HIS PERSON OR UNDER HIS CONTROL.  THOSE ARE ALTERNATIVES WHICH REQUIRE THE UNANIMITY REQUIREMENT.

MR. STEAD:  I ABSOLUTELY AGREE WITH YOU.  I AM NOT IN DISAGREEMENT WITH THE STATEMENT OF LAW WITH RESPECT TO THAT LAST PARAGRAPH.

THE COURT:  WHAT ARE YOU DISAGREEING WITH?

MR. STEAD:  AGAIN, I BELIEVE THERE ARE PLACES WHERE ALTERNATIVES ARE THAT WE DON'T GIVE THEM THIS INSTRUCTION, AND THERE ARE OTHER PLACES THAT WE DO.

THE COURT:  LET'S FIRST OF ALL SIMPLY TALK ABOUT COUNT ONE.  DO YOU AGREE THAT COUNT ONE, AS FAR AS PAGE 6, LAST PARAGRAPH, THE TWO ALTERNATIVES HERE MUST REQUIRE A UNANIMOUS VERDICT AS TO ONE OR BOTH?

MR. STEAD:  YES, I DO.

THE COURT:  THAT ONE IS FINE.

MR. STEAD:  AGAIN, I DON'T DISAGREE THAT IS A CORRECT STATEMENT OF LAW.

THE COURT:  ALL RIGHT.  THEN LET'S GO TO PAGE 7.  DO YOU HAVE A PROBLEM WITH THE FIREARM SPECIFICATION?

MR. STEAD:  YES.

THE COURT:  WHERE?

MR. STEAD:  JUDGE, THE FIREARM SPECIFICATION IN THIS CASE, IT IS THE STATE'S POSITION THAT THE LANGUAGE ON THE FIREARM SPECIFICATION SHOULD BE THE SAME

252

ON EACH AND EVERY COUNT IN THIS INDICTMENT. THEY WERE INDICTED WITH THE SAME LANGUAGE, AND THE STATE BELIEVES THE EVIDENCE SUPPORTS EACH OF THE ALTERNATIVES IN A CONSISTENT INSTRUCTION AS TO THE FIREARM SPECIFICATION. ON MOST OF THE FIREARM -- ON SOME OF THE FIREARM SPECIFICATIONS, ALL THESE INSTRUCTIONS SAY IS USE. ON SOME OF THE FIREARM SPECIFICATIONS IT ALLOWS ALL THE DIFFERENT ALTERNATIVES.

IT'S THE STATE'S POSITION THAT ALL FOUR OPTIONS APPLY ON ALL COUNTS IN THIS CASE. YOU KNOW, CLEARLY HE USED IT, CLEARLY HE BRANDISHED IT, CLEARLY HE DISPLAYED IT, AND CLEARLY HE INDICATED POSSESSION, AND THAT APPLIES TO ALL COUNTS IN THIS CASE.

SO TO MAKE THIS SIMPLE FOR OUR JURY SO THAT IT IS CONSISTENT, WE THINK THE SAME LANGUAGE SHOULD BE USED ON EACH AND EVERY FIREARM SPECIFICATION IN THIS INSTRUCTION.

THE COURT: DOES THE DEFENSE HAVE A POSITION?

MR. SHWARTZ: I DON'T WANT THE JURY TO BE CONFUSED. I THINK YOU HAVE MADE IT PRETTY CLEAR ON SHOWING WHAT THEY ARE CHARGING HIM WITH.

MR. STEAD: THE FIREARM SPECIFICATIONS AS IT EXISTS ON PAGE 18 IS THE WAY THE STATE IS REQUESTING IT, SECOND FULL PARAGRAPH ON THE TOP OF 18.

R. HORTON 002019

253

THE COURT:  WE WILL BEGIN -- I HAVE GIVEN YOU MY REASONS FOR CHOOSING USE AS IT APPLIES TO RICHARD, AND I WILL STICK WITH THAT.  I WILL USE USE IN THIS ONE -- YOU WILL USE THE ALTERNATIVES AS FAR AS RHONDA GOES.

MR. STEAD:  WELL, AGAIN, NOTE OUR OBJECTION. WE THINK THE EVIDENCE SUPPORTS ALL THE ALTERNATIVES.

THE COURT:  SO NOTED.

MR. STEAD:  CONSISTENCY WOULD HELP IN THE CONFUSION ISSUE.

THE COURT:  I THINK IT WON'T.  THAT IS MY CHOICE.

MR. STEAD:  I UNDERSTAND.

THE COURT:  WHAT IS NEXT?

MR. STEAD:  AGAIN, THIS IS JUST HOUSEKEEPING, BUT ON THE TOP OF PAGE 7 IT TALKS ABOUT THE DEFENDANT IS CHARGED WITH A FIREARM SPECIFICATION AS TO THE AGGRAVATED BURGLARY OF, AND THEN LISTS TWO VICTIMS.  I DON'T UNDERSTAND WHY WE DON'T JUST SAY AS TO COUNT ONE OF THE INDICTMENT.

THE COURT:  BECAUSE I ALWAYS INCLUDE THE NAMES OF THE INDIVIDUALS INVOLVED.

MR. STEAD:  AGAIN, NOTE OUR OBJECTION.

THE COURT:  IF YOU HADN'T PUT BOTH NAMES IN THE INDICTMENT, I WOULDN'T HAVE USED BOTH NAMES.

R. HORTON 002020

254

MR. STEAD:  IF THERE WEREN'T TWO PEOPLE LIVING THERE.

THE COURT:  YOU WOULDN'T HAVE DONE IT.  ALL RIGHT.

MR. STEAD:  AGAIN, JUST SO I WON'T REPEAT IT, WE HAVE AN OBJECTION TO THE FIREARM INSTRUCTION ON ANY COUNT THAT DOES NOT READ AS IT DOES ON PAGE 18.

THE COURT:  UNDERSTOOD.  YOU'RE NOTED FOR THE RECORD.

MR. STEAD:  I HAVE NOTHING FURTHER WITH RESPECT TO COUNT ONE.

THE COURT:  LET'S TALK ABOUT COUNT TWO.

MR. STEAD:  OKAY.

THE COURT:  I PRESUME YOU LIKE THE PURPOSELY EXPANSION AS WE DID IN COUNT ONE?

MR. STEAD:  WELL, AGAIN, JUST FOR RECORD PURPOSES, ON THE FIRST COUNT, UNDER OPTION ONE, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL AND USED THE WEAPON, WE BELIEVE THE OTHER THREE ALTERNATIVES WERE INCLUDED IN THE INDICTMENT AND THE EVIDENCE SUPPORTS THEM.  SO WE OBJECT TO THE LIMITING OF THE INSTRUCTION TO JUST USE.  WE BELIEVE THE OTHER ALTERNATIVES SHOULD BE INCLUDED AS WELL.

THE COURT:  UNDERSTOOD.  GIVEN THE FACT THAT THE EVIDENCE IN THIS CASE SUPPORTS THE USE ALTERNATIVE

255

ONLY, IN MY VIEW, THE OTHERS ARE INCLUDED THEREIN, I WILL USE THE USE LANGUAGE.

GO AHEAD.

MR. STEAD: JUDGE, WITH RESPECT TO A LOT OF THE REST OF THIS, WITH RESPECT TO THE STATE'S POSITION, A NUMBER OF THESE THINGS ARE JUST REPEATS AND --

THE COURT: THAT IS WHAT I WILL GET TO CLARIFY.

MR. STEAD: TO SHORTEN THE JURY INSTRUCTIONS, I THINK WE OUGHT TO NOT REPEAT SOME OF THESE INSTRUCTIONS.

THE COURT: I APPRECIATE THAT. I HAVE A BASIC RULE. I DO IT TWICE, AND THEN I DON'T DO IT FROM THERE ON.

MR. STEAD: I STARTED SAYING THIS ON THE FIRST TIME THROUGH. SO -- BUT --

THE COURT: I ALWAYS REPEAT DEFINITIONS TWICE, AND THE THIRD, FOURTH AND FIFTH TIME I DO NOT.

MR. STEAD: OKAY. WELL THEN, OBVIOUSLY, WE WOULD ASK FOR THE ADDITIONAL LANGUAGE WITH THE PURPOSELY KNOWING ON THAT PAGE AS THE COURT INDICATED IT WOULD GIVE WITH RESPECT TO COUNT ONE.

THE COURT: I WILL MAKE THAT CHANGE. THAT IS AGREEABLE.

MR. STEAD: ON PAGE 9, THE SERIOUS PHYSICAL

R. HORTON 002022

256

HARM INSTRUCTION, I DON'T BELIEVE PARAGRAPH (A) APPLIES. IT CAN BE DELETED.

THE COURT: ANY OBJECTION BY THE DEFENSE, BECAUSE THESE ARE ALTERNATIVES?

DOES THE EVIDENCE AT ALL SUGGEST ANYTHING CONCERNING MENTAL ILLNESS OR CONDITION?

MR. SHWARTZ: NO, WE HAVE NO OBJECTION.

THE COURT: ALL RIGHT. WE WILL STRIKE OUT (A).

MR. STEAD: WE WILL RELETTER THEM THE ALTERNATIVES (A), (B), (C).

THE COURT: WE MAY NOT. YEAH, I THINK WE WILL. LET'S RENUMBER THOSE. SO ON PAGE 9 STRIKE OUT A, AND (B) BECOMES (A), (C), (B), ET CETERA.

THE COURT: DO YOU HAVE THAT, RICHARD?

MR. PECK: YES.

THE COURT: ANY OTHER OBJECTION TO THIS COUNT?

MR. STEAD: I BELIEVE MY OTHER OBJECTIONS HAVE ALREADY BEEN NOTED WITH RESPECT TO THE FIREARMS.

THE COURT: UNDERSTOOD. OBJECTION BY THE DEFENSE?

MS. HOLFINGER: NO, YOUR HONOR.

MR. SHWARTZ: NO, YOUR HONOR.

THE COURT: ALL RIGHT. COUNT FIVE,

R. HORTON 002023

257

KIDNAPPING.

MR. STEAD: WELL, YOU HAVE -- YOU DO PURPOSE AGAIN IN KIDNAPPING. THIS WOULD BE THE THIRD TIME.

THE COURT: GOOD POINT. KIDNAPPING. YOU KNOW, I REALLY DON'T -- I THINK IT IS IMPORTANT TO KEEP IT HERE WITHOUT THAT ADDITIONAL LANGUAGE. BECAUSE WHAT IT DOES IS IT HIGHLIGHTS THAT IT MUST BE ESTABLISHED IN THIS CASE THERE WAS PRESENT IN THE MIND OF THE DEFENDANT A SPECIFIC INTENTION TO FACILITATE THE COMMISSION OF THE OFFENSE OF AGGRAVATED ROBBERY AS PREVIOUSLY DEFINED FOR YOU IN COUNT TWO.

IF I REMOVE ANYTHING, IT WOULD BE THE SECOND SENTENCE OF A PERSON ACTS PURPOSELY WHEN IT IS HIS SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT, SINCE I HAVE ALREADY USED THAT TWO OR THREE TIMES PREVIOUSLY. BUT I THINK IT IS IMPORTANT TO TELL THEM HOW THAT THE PURPOSE HERE ONLY APPLIES TO THE FACILITATION OF THE KIDNAPPING OR OF THE AGGRAVATED ROBBERY.

MR. STEAD: SO IF I UNDERSTAND THEN, YOU WILL STRIKE THE SECOND SENTENCE FROM THAT?

THE COURT: I WILL STRIKE IT BECAUSE I AGREE IT IS PROBABLY REDUNDANT, GIVEN THE FACT WE DEFINED IT TWO OR THREE TIMES PREVIOUSLY. THE SECOND SENTENCE, THE LAST ONE, TWO, THREE, FOUR, FIVE, SIX WORDS AT THE BOTTOM OF PAGE 11, AND THE FIRST FEW WORDS AT THE TOP OF

258

PAGE 12.

MR. STEAD: AND JUST, AGAIN, FOR BREVITY PURPOSES, SINCE YOU'RE USING THE SAME FIREARM LANGUAGE WITH RESPECT TO RICHARD, IT SEEMS TO ME WE CAN JUST MAKE REFERENCE TO, I HAVE ALREADY DEFINED FIREARM, I HAVE ALREADY DEFINED THE SPECIFICATION, WITHOUT GOING THROUGH THOSE INSTRUCTIONS AGAIN AND AGAIN.

THE COURT: NO. IRRESPECTIVE, I AM REQUIRED TO READ THE SUBSTANTIVE ELEMENTS OF AN OFFENSE OR A SPECIFICATION. WHAT I AM NOT REQUIRED TO REPEAT OVER AND OVER AGAIN IS THE DEFINITIONS. NOW, FIREARM, I HAVE ALREADY DEFINED FIREARM. I ALREADY DEFINED ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL. AND I SAY THAT I HAVE ALREADY DEFINED THOSE. BUT I AM REQUIRED TO READ THE SUBSTANTIVE ELEMENTS OF EVERY CHARGED OFFENSE. THE DEFINITIONS I MAY OMIT OR REFER BACK TO, BUT NOT THE SUBSTANTIVE ELEMENTS, BY LAW.

MR. STEAD: THERE YOU GO.

THE COURT: OKAY.

MR. STEAD: WE HAVE NOTHING MORE WITH RESPECT TO COUNT FIVE.

THE COURT: COUNT SIX.

MR. STEAD: JUDGE, THE PARAGRAPH RIGHT UNDERNEATH KNOWINGLY CHARGES THAT THE ACT OR FAILURE TO ACT LANGUAGE IS NOT RELEVANT AS TO THIS CASE. WE WOULD

R. HORTON 002025

259

REQUEST IT BE STRICKEN.

THE COURT:  ANY OBJECTION TO THAT, DEFENSE?

MR. SHWARTZ:  NO.

THE COURT:  I WILL AGREE WITH YOU.  IN THIS CASE THERE IS NO ALLEGATION OF OMISSION.

MR. STEAD:  IT IS IN THAT PARAGRAPH TWICE, SO WE ASK IT BE STRICKEN IN BOTH PLACES.

MR. PECK:  GOT IT.

THE COURT:  OKAY.

MR. STEAD:  AT THE BOTTOM OF PAGE 13, I DON'T REMEMBER HOW MANY TIMES YOU HAVE DEFINED DEADLY WEAPON ALREADY.  SO I DON'T KNOW WHETHER THIS IS THE SECOND OR THIRD TIME.

THE COURT:  I WILL HAVE RICHARD GO BACK THROUGH IT.  IF IT IS MORE THAN A SECOND TIME WE WILL REFER TO IT PREVIOUSLY.

MR. STEAD:  I HAVE NOTHING ELSE WITH RESPECT TO THAT COUNT.

THE COURT:  COUNT SEVEN.  WAS THERE ANY OTHER OBJECTION OR CORRECTIONS BY THE DEFENSE?

MR. SHWARTZ:  NO.

MS. HOLFINGER:  NO.

MR. STEAD:  JUDGE, THE FIRST PARAGRAPH WE WOULD REQUEST UNDER THE LANGUAGE DID DISPLAY THE WEAPON AND/OR BRANDISHED THE WEAPON, AND/OR INDICATED THAT HE

R. HORTON 002026

260

DID POSSESS THE WEAPON, AND/OR USED THE WEAPON, SINCE THOSE ARE ALL ALTERNATIVES.

THE COURT:  WELL, IT MAKES IT A LITTLE CLEARER THAN IT IS AND/OR.  I WILL ADD ANDS THERE, THAT IS NO PROBLEM.

MR. STEAD:  AGAIN, THERE ARE OTHER DEFINITIONS ON THAT PAGE THAT I HAD MARKED AS ALREADY DEFINED.  WITHOUT GOING BACK, I DON'T KNOW HOW MANY TIMES.

THE COURT:  THEFT HAS BEEN PREVIOUSLY DEFINED.  AND IF WE HAVE DONE THAT MORE THAN TWICE, WE WILL DELETE IT.  HOWEVER, IF WE HAVE NOT, WE'LL USE THE REVISED DEFINITION THAT WE USED BEFORE.

MR. STEAD:  THAT WOULD BE MY OTHER REQUEST.

THE COURT:  ALL RIGHT.  THOSE DEFINITIONS, IF WE USED THOSE, WE WILL DELETE THEM.

MR. STEAD:  I KNOW FOR A FACT PAGE 16, TOP PARAGRAPH, WE HAVE DONE KNOWINGLY.

THE COURT:  I AGREE WITH YOU.

MR. STEAD:  PAGE 16 IT WOULD BE THE FIREARM SPECIFICATION PARAGRAPH.  AGAIN, WE REQUEST THE AND/OR LANGUAGE BE IN THE PARAGRAPH IN ORDER TO FIND THE DEFENDANT --

THE COURT:  GOT IT.  THAT IS WHAT THE STATUTE SAYS.  I WILL INCLUDE IT THERE.

R. HORTON 002027

261

MR. STEAD:  AGAIN, WE HAVE NOTHING FURTHER WITH RESPECT TO THAT COUNT.

THE COURT:  ALL RIGHT.  COUNT 10, DO YOU HAVE ANY OTHER CORRECTIONS OR ADDITIONS TO THAT COUNT?

MS. HOLFINGER:  NO, YOUR HONOR.

THE COURT:  YOU PROBABLY DON'T UNDERSTAND THIS, MR. HORTON.  THIS IS HOUSEKEEPING, LIKE BEING IN ENGLISH CLASS.

MR. STEAD:  COUNT 10, THE PURPOSE PARAGRAPH. I KNOW HOW THE COURT RULED ON THE PREVIOUS COUNT.  WE WOULD LIKE YOU TO BE CONSISTENT.  YOU HAVE ALREADY DEFINED PURPOSE.  I BELIEVE THAT SECOND SENTENCE SHOULD BE ELIMINATED.  I KNOW THE COURT WANTS TO --

THE COURT:  WHERE ARE YOU TALKING ABOUT?

MR. STEAD:  PURPOSE TO FACILITATE THE COMMISSION OF AN AGGRAVATED ROBBERY IS AN ESSENTIAL ELEMENT OF THE CRIME OF KIDNAPPING.  WE BELIEVE THE NEXT SENTENCE SHOULD BE ELIMINATED.  IT IS NOT A COMPLETE DEFINITION OF PURPOSE, AND THEN THE FOLLOWING SENTENCE. THAT IS HOW YOU DID IT ON THE PREVIOUS AGGRAVATED -- OR THE PREVIOUS KIDNAPPING COUNT.

THE COURT:  WHATEVER I DID ON THE PREVIOUS COUNT WE WILL DO HERE.

MR. STEAD:  AT LEAST THAT IS MY RECOLLECTION AS YOU TOOK OUT THE SECOND SENTENCE.

R. HORTON 002028

262

THE COURT: I THINK I DID. SO WE WILL DO THAT HERE, TOO.

MR. STEAD: WE HAVE NOTHING FURTHER WITH RESPECT TO THAT.

THE COURT: COUNT 10.

MR. STEAD: WITH RESPECT TO COUNT 10, YES, I'M SORRY.

THE COURT: ALL RIGHT. ANY OBJECTIONS ON COUNT 10 FROM THE DEFENSE?

MR. SHWARTZ: NO, YOUR HONOR.

THE COURT: MULTIPLE COUNT INSTRUCTION.

MR. STEAD: NO OBJECTION.

THE COURT: AND I WILL ADD THE WORD AND ON THE SECOND FULL LINE, YOU MUST CONSIDER EACH COUNT AND ITS SPECIFICATION.

ALIBI INSTRUCTION.

MR. STEAD: JUDGE, WE ARE CONCERNED ABOUT THE LAST SENTENCE IN THAT ALIBI INSTRUCTION. THE PART ABOUT IF YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT WAS PRESENT AT THE TIME IN QUESTION, THAT MAKES NO REFERENCES TO PRESENT WHERE. IS THAT PRESENT AT HIS ALIBI POSITION? OR PRESENT AT THE SITE OF THE CRIME? I BELIEVE THAT IS CONFUSING.

THE COURT: ANY THOUGHTS, MR. SHWARTZ?

MR. SHWARTZ: I THINK WE MIGHT CLARIFY IT.

R. HORTON 002029

263

THE COURT: I AGREE WITH YOU. PRESENT AT THE ALLEGED SITE OF THE -- HOW DO WE WANT TO WORD THAT, ALLEGED SITE? WHAT DO YOU WANT TO SAY? THE RESIDENCE OF? GIVE ME SOME IDEAS, GUYS.

MR. STEAD: I GUESS START WITH LET'S STRIKE THE SENTENCE.

THE COURT: NO, I WON'T DO THAT.

MR. STEAD: IF YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT THE DEFENDANT WAS PRESENT AT 927 LOEW, THAT IS THE LOCATION IN THIS CASE.

THE COURT: THEY WILL REMEMBER THAT.

MR. STEAD: THEN SAY, IF YOU ARE NOT CONVINCED THE DEFENDANT WAS PRESENT AT THE SCENE OF THE CRIME, OR --

THE COURT: THE ALLEGED SCENE OF THE ALLEGED CRIME.

MR. STEAD: THEY ARE NOT DISPUTING A CRIME HAPPENED IN THIS CASE.

THE COURT: I ALWAYS WORD IT LIKE THAT.

MR. STEAD: MAKE REFERENCE TO THE MCCLANAHAN/CURRY RESIDENCE.

THE COURT: ALL RIGHT. FOR THE RECORD, WE'LL WORD IT AS FOLLOWS: IT WILL BE, IF AFTER CONSIDERATION OF THE EVIDENCE AND OF ALIBI ALONG WITH ALL THE EVIDENCE YOU ARE NOT CONVINCED BEYOND A

R. HORTON 002030

264

REASONABLE DOUBT THAT THE DEFENDANT WAS PRESENT AT THE RESIDENCE OF MR. MCCLANAHAN AND MISS CURRY AT THE TIME OF THESE ALLEGED INCIDENTS, YOU MUST RETURN A VERDICT OF NOT GUILTY.  THAT SPECIFIES PLACE AND TIME.  I WILL USE THE WORD CRIMES.  I THINK IT'S FAIR.  THAT IS WHAT THEY ALLEGE.  WE ARE USING THE WORD ALLEGED.  OKAY.  THAT IS FINE.

OKAY.  THE CREDIBILITY INSTRUCTION WITH THE EYEWITNESS ADD ON?

MR. STEAD:  WE OBJECT TO THE CREDIBILITY INSTRUCTIONS.

THE COURT:  TELL ME WHY.

MR. STEAD:  WE DON'T BELIEVE IT COVERS ALL OF THE DIFFERENT ASPECTS OF CREDIBILITY THAT IS CONTAINED IN OJI.  WE WOULD SPECIFICALLY ASK THE COURT TO GIVE THE INSTRUCTION 405.20, PARTS ONE, TWO, THREE. I BELIEVE PART FOUR IS ALREADY INCORPORATED IN THE INSTRUCTIONS.

THE COURT:  FEELINGS, MR. SHWARTZ?

MR. SHWARTZ:  I DON'T HAVE THOSE.

MR. STEAD:  I CAN READ IT TO YOU.  YOU ARE THE SOLE JUDGES OF THE FACTS, THE CREDIBILITY OF THE WITNESSES AND THE WEIGHT OF THE EVIDENCE.  TO WEIGH THE EVIDENCE, YOU MUST CONSIDER THE CREDIBILITY OF THE WITNESSES, INCLUDING THE DEFENDANT.  YOU WILL APPLY THE

R. HORTON 002031

265

TESTS OF TRUTHFULNESS WHICH YOU APPLY IN YOUR DAILY LIVES.  THESE TESTS INCLUDE THE APPEARANCE OF EACH WITNESS UPON THE STAND; THE MANNER OF TESTIFYING; REASONABLENESS OF THE TESTIMONY; THE OPPORTUNITY HE HAD TO SEE, HEAR AND KNOW THE THINGS CONCERNING WHICH HE TESTIFIED; HIS ACCURACY OF MEMORY, FRANKNESS OR LACK OF IT; INTELLIGENCE; INTEREST AND BIAS, IF ANY; TOGETHER WITH ALL THE FACTS AND CIRCUMSTANCES SURROUNDING THE TESTIMONY.  APPLYING THESE TESTS, YOU WILL ASSIGN TO THE TESTIMONY OF EACH WITNESS SUCH WEIGHT AS YOU DEEM PROPER.  THAT IS I JUST READ OJI 405.20 PARAGRAPHS ONE, TWO, THREE.

THE COURT:  I HELPED DRAFT THAT.

MR. STEAD:  PARAGRAPH FOUR IS ALREADY INCLUDED IN THE INSTRUCTIONS.

THE COURT:  MR. SHWARTZ?

MR. SHWARTZ:  I THINK THE CREDIBILITY DEFINITION THAT YOU HAVE PROVIDED IS SUFFICIENT.

THE COURT:  SO DO I.  IT WILL BE GIVEN. OBJECTION IS NOTED.

MR. STEAD:  WE ASK THE COURT TO ADD AS ADDITIONAL FACTORS THE REASONABLENESS OF THE TESTIMONY. WE'D REQUEST THE COURT TO ADD THE PART CONCERNING FRANKNESS OR LACK OF IT.

THE COURT:  THAT IS COVERED WHEN I SAY

266

DECIDE WHETHER THE DIFFERENCES IN THE TESTIMONY GOES TO AN IMPORTANT PART OR TO A RELATIVELY UNIMPORTANT DETAIL, AND WHETHER IT RESULTS FROM AN INNOCENT ERROR OR UNTRUTHFULNESS.  I AM NOT ALTERING MY CREDIBILITY INSTRUCTIONS.

MR. STEAD:  NOTE OUR OBJECTIONS, PLEASE.

THE COURT:  SO NOTED.  ANYTHING ELSE?

MR. STEAD:  NO, YOUR HONOR.  YOUR EYEWITNESS INSTRUCTION IS RIGHT OUT OF OJI.  WE DON'T OBJECT TO THAT.

THE COURT:  PLEASE, MR. STEAD, NEVER FALL IN THE TRAP OF THINKING OJI SHOULD BE GIVEN WORD FOR WORD. IT WAS NEVER INTENDED TO DO THAT.  I APPRECIATE YOUR ALACRITY IN PUTTING THAT FORTH.

ALL RIGHT.  WE HAVE THE CHANGES.

MR. STEAD:  WE ARE NOT DONE YET.

THE COURT:  WE ARE NOT DONE YET.  YOU HAVE SOME ADDITIONAL REQUESTED INSTRUCTIONS?

MR. STEAD:  I DO.

THE COURT:  TELL ME WHAT DO YOU HAVE?

MR. STEAD:  JUDGE, ON THE PART ABOUT THE DEFENDANT TESTIFIES, IT SAYS EVIDENCE WAS RECEIVED THE DEFENDANT WAS CONVICTED OF DRUG POSSESSION.  I DON'T THINK -- I DON'T BELIEVE THAT IS WHAT THE TESTIMONY WAS IN THIS CASE.

267

THE COURT:  WHAT DO YOU THINK IT WAS?

MR. STEAD:  HE INDICATED ON CROSS-EXAMINATION THAT HIS CONVICTION WAS FOR POSSESSION WITH INTENT TO DISTRIBUTE.  THAT, TO ME, IS NOT DRUG ABUSE.  I DON'T BELIEVE IT IS APPROPRIATE TO GET SPECIFIC WITH RESPECT TO THE CRIMES.  I THINK WE ARE BETTER OFF SAYING EVIDENCE WAS RECEIVED THAT THE DEFENDANT WAS CONVICTED OF CRIMES, AND WITHOUT BEING SPECIFIC AS TO WHAT THE CRIMES WERE.  AND IF WE ARE GOING TO BE SPECIFIC, THEN I WOULD ASK THAT WE BE SPECIFIC AS TO THE NATURE OF HIS CRIMES.

THE COURT:  YOU AGREE?

MR. SHWARTZ:  WE WANT TO SHOW IT WAS DRUG RELATED, NOT ANY OTHER CRIME.  THEY CAN INFER THERE ARE OTHER CRIMES INVOLVED.

MR. STEAD:  IF THEY WANT TO HAVE THE SPECIFIC CRIMES, I HAVE NO OBJECTION.  BUT LET'S NOT CALL IT DRUG ABUSE WHEN IT WAS POSSESSION OF A CONTROLLED SUBSTANCE WITH INTENT TO DELIVER.

THE COURT:  I WILL AMEND IT TO SAY EVIDENCE WAS RECEIVED THAT THE DEFENDANT WAS CONVICTED OF DRUG OFFENSES PERIOD.  YOU CAN ARGUE WHATEVER YOU WANT TO ARGUE.

MR. STEAD:  THAT IS BETTER THAN DRUG POSSESSION.  THAT IS MORE ACCURATE.

R. HORTON 002034

268

THE COURT: MAKE SURE YOU ARGUE ONLY AS IT RELATES TO CREDIBILITY.

MR. STEAD: THAT IS NOT A PROBLEM, JUDGE.

THE COURT: ALL RIGHT. BECAUSE THAT IS ALL WE ARE TALKING ABOUT IN THIS CASE.

MR. STEAD: I UNDERSTAND. I'M DONE. I HAVE NO FURTHER OBJECTIONS.

THE COURT: MR. SHWARTZ, ANY REQUESTED INSTRUCTIONS?

MR. SHWARTZ: IT'S BEEN MY EXPERIENCE THAT THE EYEWITNESS TESTIMONY IS USUALLY REQUESTED BY THE DEFENSE.

THE COURT: I THOUGHT YOU DID?

MR. SHWARTZ: I NEVER REQUESTED IT.

THE COURT: WELL, IRRESPECTIVE, IF IT IS REASONABLY RAISED IN THIS CASE, IT IS, AND IF PROVIDING THE INSTRUCTIONS TO THE JURORS WOULD BE HELPFUL IN GUIDING THEM, WHEN I SAY GUIDING THEM AS TO HOW TO TREAT THE EVIDENCE, THEN IT IS A FAIR INSTRUCTION. AND IRRESPECTIVE OF WHICH SIDE REQUESTS IT, IF IT IS A FAIR STATEMENT OF LAW AND IT IS REASONABLY RAISED, I WILL GIVE IT. AND IT HAS BEEN IN THIS CASE AND, IN FACT, THAT IS WHAT THIS CASE IS ABOUT.

MR. SHWARTZ: I WANT THE RECORD TO SHOW THAT WE DID NOT REQUEST IT.

R. HORTON 002035

269

THE COURT:  UNDERSTOOD.  YOU DID NOT REQUEST IT.  THAT'S FINE.

ANY OTHER INSTRUCTIONS THAT THE DEFENSE WOULD REQUEST?

MR. SHWARTZ:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  ANYTHING ELSE?

MR. STEAD:  NO, THANK YOU.

THE COURT:  GOOD.  WE WILL MAKE THE APPROPRIATE CHANGES AND WE WILL HAVE VERDICT FORMS IN THE MORNING.  JUST SO YOU ARE AWARE, THERE'S TWO VERDICT FORMS FOR EACH COUNT.  ONE NOT GUILTY AND ONE GUILTY, AND THEN WITH THE ADDITIONAL SPECIFICATION.

MR. STEAD:  OKAY.

THE COURT:  WE, THE JURY, HAVING FOUND THE DEFENDANT GUILTY OF, DO FIND BEYOND A REASONABLE DOUBT, DO NOT FIND, IN PARENTHESIS.  THAT IS HOW I DO MY ADDITIONAL FINDINGS.

MR. STEAD:  DO YOU PUT IT ON THE SAME PAGE WITH THE GUILTY FORM?

THE COURT:  YES, I CERTAINLY DO.  BECAUSE THEY WILL STRIKE THROUGH THE ALTERNATIVES.  IT MAKES NO DIFFERENCE.

MR. STEAD:  I WOULD SAY IF NOT, I WOULD REQUEST THEY BE STAPLED TO THE APPROPRIATE FORMS.

THE COURT:  NO.  WE DO IT ALL IN ONE.  I

R. HORTON 002036

270

THINK I HAVE NEVER HAD JURORS SAY THAT THEY DON'T UNDERSTAND OR IT'S CONFUSING.

MR. STEAD:  I HAVE NO OBJECTION TO IT BEING ON ONE.

THE COURT:  OKAY.  I TAKE IT YOU DON'T HAVE ANY OBJECTION EITHER?

MR. SHWARTZ:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  THAT IS IT.  SEE YOU ALL IN THE MORNING.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS ADJOURNED UNTIL 9:00 O'CLOCK, A.M., FEBRUARY 2, 2006.

- - -

R. HORTON 002037

271

THURSDAY MORNING SESSION,

FEBRUARY 2, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  ON THE RECORD BEFORE WE BRING THEM IN.  I DON'T KNOW THAT YOU HAVE HAD A CHANCE TO REVIEW THOSE YET, BUT I HAVE MADE THE CHANGES THAT WE AGREED UPON LAST NIGHT IN THE JURY INSTRUCTIONS.  THERE IS REALLY ONLY TWO OTHER CHANGES.  I HAD ADDED THE WORD KNOWINGLY ON DEFINITIONS OF THEFT ON PAGE 6 AND PAGE 15, WHICH I HAD LEFT OUT.

MR. STEAD:  ON PAGE 6.

THE COURT:  GOT YOU.

MR. STEAD:  THE PARAGRAPH, FIRST PARAGRAPH, THE DEFENDANT HAS A PURPOSE TO KNOWINGLY COMMIT THE OFFENSE OF THEFT.  I DON'T UNDERSTAND WHY THE TWO KNOWINGLYS ARE IN THAT SENTENCE.

THE COURT:  PAGE 6?

MR. STEAD:  YES.

THE COURT:  YOU'RE RIGHT, THAT KNOWINGLY

R. HORTON 002038

SHOULD BE OUT.  AND IT GOES DOWN IN THE NEXT LINE.  THE THEFT IS DEFINED AS KNOWINGLY.

MR. STEAD:  THANK YOU.

THE COURT:  THAT IS CORRECT.

MR. STEAD:  I DON'T REMEMBER SEEING IT ON 15 IN THAT FASHION.

THE COURT:  YOU'RE RIGHT.  IT WOULD NOT BE THERE.  SO I THINK THAT IS THE ONLY OTHER CHANGE.

MR. STEAD:  THERE WAS A TYPO.

THE COURT:  WHERE?

MR. STEAD:  ON THE BOTTOM OF PAGE 10.  I DON'T KNOW IF IT'S BEEN CORRECTED.  THE LAST WORD I HAD AGGRAVATED BURGLARY, THAT SHOULD BE AGGRAVATED ROBBERY.

THE COURT:  THAT'S CORRECT.  YOU GOT THAT, RICHARD?

MR. PECK:  LAST PARAGRAPH.

THE COURT:  ON PAGE 10 THE LAST FULL PARAGRAPH, IT'S NOT AGGRAVATED BURGLARY, IT'S AGGRAVATED ROBBERY.

MR. PECK:  YES.

MR. STEAD:  THEN GOING BACK TO THE TOP OF PAGE 9, WE PUT IN -- THE SECOND PARAGRAPH IS THE SENTENCE ABOUT A PERSON ACTS PURPOSELY.  IF WE ARE GOING TO REDEFINE IT, I'D LIKE THE WHOLE DEFINITION OF PURPOSE, AGAIN, AS OPPOSED TO JUST ONE LINE.

R. HORTON 002039

273

THE COURT:  WELL, WE HAVE DEFINED IT PREVIOUSLY.  WHAT I WILL DO THERE, YOU KNOW, PURPOSELY HAS BEEN PREVIOUSLY DEFINED FOR YOU.

MR. STEAD:  YOU HAD TALKED ABOUT DOING IT TWICE.  I THINK THAT WAS THE SECOND SPOT.

THE COURT:  OH, IS THIS THE SPOT ON PAGE 9? YOU MAY BE RIGHT.

MR. STEAD:  YOU GO AHEAD AND DO KNOWINGLY AGAIN RIGHT BELOW.

THE COURT:  YOU WOULD BE RIGHT ON THAT ONE.

MR. STEAD:  IT'S ONLY COUNT TWO.  I SUSPECT IT'S THE SECOND ONE.

THE COURT:  YOU'RE RIGHT.  THAT IS CORRECT. LET'S SEE, WE WOULD BE ON PURPOSELY.

ALL RIGHT.  RICHARD, TAKE OUT THE DEFINITION ON PAGE 5 UNDER PURPOSE.

MR. STEAD:  THAT DEFINITION IS BOTH PARAGRAPHS.

THE COURT:  THAT'S CORRECT, BOTH PARAGRAPHS.

MR. PECK:  THAT GOES TO PAGE 9?

THE COURT:  WHERE A PERSON ACTS PURPOSELY WITH A SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT.

MR. PECK:  ALL RIGHT.

THE COURT:  JUST RE-DO THAT.

MR. STEAD:  ON PAGE 17, THE LAST FULL

274

PARAGRAPH ON THE PAGE, RIGHT AT THE THIRD LINE FROM THE BOTTOM WHERE IT SAYS KIDNAPPING OF RHONDA CURRY, AND THAT DISPLAYED, TO MAKE IT GRAMATICALLY CORRECT, IT SHOULD BE HE DISPLAYED.

THE COURT: HE DISPLAYED ON PAGE 17. GOT THAT, RICHARD?

MR. PECK: YES.

THE COURT: THAT'S CORRECT. JUST SAY AND HE DISPLAYED.

ANYTHING ELSE?

MR. STEAD: NO, THAT SATISFIES ME.

THE COURT: VERY WELL, MR. STEAD.

MR. STEAD: NOTING THE OBJECTION FROM YESTERDAY.

THE COURT: NOTING THE PREVIOUS OBJECTIONS. AND FOR THE RECORD, NOTING YOUR PREVIOUS OBJECTIONS, YOU DO NOT HAVE TO REMAKE THEM AFTER I GIVE THE INSTRUCTIONS. YOU ARE NOT REQUIRED TO DO THAT SINCE YOU MADE THEM ON THE RECORD HERE.

MR. STEAD: OKAY. THANK YOU.

THE COURT: ANY OTHER CORRECTIONS BY THE DEFENSE?

MS. HOLFINGER: I DON'T SEE ANY, YOUR HONOR.

THE COURT: I THINK THESE ARE BASICALLY TYPOS, THINGS LIKE THAT.

275

I THINK WE ARE READY.

- - -

THEREUPON, THE JURORS RESUMED THEIR PLACES IN THE JURY BOX AND THE FOLLOWING PROCEEDINGS WERE HAD AS FOLLOWS:

THE COURT: PLEASE BE SEATED, LADIES AND GENTLEMEN.

FIRST OF ALL, I WANT TO APOLOGIZE FOR YESTERDAY AFTERNOON. I THOUGHT WE WOULD BE ABLE TO COMPLETE OUR REVIEW OF THE PROPOSED INSTRUCTIONS AND DO THE ARGUMENTS YESTERDAY. AS YOU ALL WILL UNDERSTAND WHEN I GIVE YOU THESE INSTRUCTIONS, THERE ARE 21 PAGES OF THEM; RATHER LONG AND INVOLVED, AND IT TOOK LONGER THAN WE EXPECTED. SO IT IS BETTER TO TAKE THE TIME TO GET IT RIGHT THAN IT IS TO RUSH. THAT IS WHAT THE DELAY WAS YESTERDAY.

NOW, I DO HAVE TO INFORM YOU, AND THIS WILL BECOME OBVIOUS WHEN I READ YOU THE INSTRUCTIONS, THERE WERE ORIGINALLY FOR YOUR CONSIDERATION 10 COUNTS IN THIS CASE, WHICH WILL BE DESCRIBED DURING ARGUMENT, AND ALSO IN THE INSTRUCTIONS. FOUR OF THOSE COUNTS HAVE BEEN REMOVED FROM YOUR CONSIDERATION. THOSE WILL BE COUNTS THREE, FOUR, EIGHT AND NINE. THE FACT THOSE HAVE BEEN REMOVED IS OF NO CONCERN TO YOU, AND YOU SHALL NOT DRAW AN INFERENCE FROM THAT IN ANY WAY OR THE OTHER.

276

YOU WILL ONLY DEAL WITH THE COUNTS THAT YOU'RE CHARGED ON. THAT WILL BE IN THIS CASE COUNTS ONE, TWO, FIVE, SIX, SEVEN, AND 10. AND THOSE WILL BE EXPLAINED BY COUNSEL DURING THEIR ARGUMENTS, AND ALSO I WILL THEN GIVE YOU THE INSTRUCTIONS CONCERNING THEM.

ALL RIGHT. I THINK WE ARE READY FOR CLOSING ARGUMENTS. CLOSING ARGUMENTS, AGAIN, ARE NOT EVIDENCE.

YOU MAY PROCEED.

MR. SMITH: THANK YOU, YOUR HONOR.

THE COURT: I HAVE GIVEN COUNSEL HERE A CHANCE TO MOVE AROUND, IF THEY CARE TO, BECAUSE THEY ARE BLOCKED BY WHAT I PRESUME COUNSEL ARE GOING TO REFER TO ON THIS BLACKBOARD DURING ARGUMENT.

MR. SMITH: LADIES AND GENTLEMEN OF THE JURY. YOUR HONOR. MR. STEAD. MR. SHWARTZ. MS. HOLFINGER. THE DEFENDANT.

ALTHOUGH THE JURY INSTRUCTIONS ARE GOING TO BE SOMEWHAT INVOLVED, THIS CASE IS REALLY NOT THAT COMPLICATED. WE TOLD YOU FROM THE GET-GO THAT IT REALLY WOULDN'T BE THAT COMPLICATED. THAT IT REALLY -- THIS CASE IS ABOUT ONE ISSUE, AND THAT ISSUE IS EYEWITNESS IDENTIFICATION. SPECIFICALLY, WHETHER RICHARD MCCLANAHAN AND RHONDA CURRY CORRECTLY IDENTIFIED THE DEFENDANT AS THE PERSON WHO COMMITTED THE CRIMES THAT WE WILL BE TALKING ABOUT.

R. HORTON 002043

277

YOU WON'T HEAR ARGUMENT FROM THE DEFENSE THAT THE CRIMES OF AGGRAVATED BURGLARY AND TWO COUNTS OF AGGRAVATED ROBBERY, TWO COUNTS OF KIDNAPPING, AND TWO COUNTS OF FELONIOUS ASSAULT, OCCURRED.  THERE IS NO DISPUTE TO THAT.  THERE IS NO DISPUTE THAT A FIREARM WAS USED IN DOING ALL SIX OF THOSE CRIMES.

THE ONLY ISSUE THAT THE DEFENSE HAS, AND THE ONLY ISSUE THAT CONSEQUENTLY THE DEFENSE CAN ARGUE ABOUT, IS THE EYEWITNESS IDENTIFICATION.

THIS CASE IS LIKE A SIMPLE MATH PROBLEM REALLY.  ON ONE SIDE YOU HAVE GOT THE TESTIMONY OF RICHARD MCCLANAHAN AND RHONDA CURRY.  THEIR TESTIMONY ADDS UP.  THEIR TESTIMONY ADDS UP TO THE DEFENDANT'S GUILT OF ALL OF THESE CRIMES.  THE DEFENDANT IS GUILTY OF AGGRAVATED BURGLARY, TWO COUNTS OF AGGRAVATED ROBBERY, TWO COUNTS OF KIDNAPPING, AND TWO COUNTS OF FELONIOUS ASSAULT.  AND HE DID ALL THOSE USING A FIREARM TO COMMIT THESE CRIMES.

ON THE OTHER SIDE OF THINGS, THE DEFENDANT'S STORY DOESN'T EVEN COME CLOSE TO ADDING UP.  IT DOESN'T EVEN COME CLOSE TO ADDING UP.  AND WE WILL TALKING ABOUT ABOUT THAT.

FIRST, LET'S TALK ABOUT THE TESTIMONY OF OUR TWO VICTIMS IN THIS CASE, RICHARD MCCLANAHAN AND RHONDA CURRY.  YOU HEARD FROM BOTH OF THESE INDIVIDUALS.  THEY

R. HORTON 002044

278

CAME AND TESTIFIED. THEY SPOKE VERY PLAINLY ABOUT WHAT HAPPENED. THE TYPE -- THEY ARE THE TYPE OF PEOPLE THAT MEAN WHAT THEY SAY. AND THEY GOT UP ON THE STAND AND TOLD YOU EXACTLY WHAT HAPPENED ON OCTOBER THE 9TH, 2004, AT AROUND 7:30 IN THE MORNING.

YOU HEARD FROM THE TESTIMONY OF BOTH RICHARD MCCLANAHAN AND RHONDA CURRY THEY HEARD A KNOCK AT THE DOOR, AND THAT RICHARD MCCLANAHAN WENT AND ANSWERED THAT DOOR. AND WHEN HE WENT TO OPEN THE DOOR EVERY SO SLIGHTLY, THE DEFENDANT BURSTED THROUGH THE DOOR AND BURST INTO THEIR HOUSE, THAT HOUSE AT 927 LOEW STREET IN FRANKLIN COUNTY, STATE OF OHIO.

THAT IS OUR FIRST COUNT, AGGRAVATED BURGLARY. THE DEFENDANT TRESPASSED IN AN OCCUPIED STRUCTURE BY FORCE. THE OCCUPIED STRUCTURE, THAT HOUSE AT 927 LOEW STREET, IT'S THE HOUSE OF RICHARD MCCLANAHAN AND RHONDA CURRY. THE HOUSE THEY LIVE TOGETHER IN, AND HE DID THIS, THE DEFENDANT DID THIS, BY FORCE. HE DID THIS WHEN ANOTHER PERSON WAS PRESENT. THE PEOPLE THAT WERE PRESENT, OBVIOUSLY, ARE RICHARD MCCLANAHAN AND RHONDA CURRY. AND HE DID THIS WITH A PURPOSE TO COMMIT A THEFT OFFENSE.

YOU WILL HEAR AS WE GO THROUGH THESE FACTS, OBVIOUSLY, THE THEFT OFFENSE IS THE STEALING OF THE $40 FROM RICHARD MCCLANAHAN. OBVIOUSLY, THE DEFENDANT

R. HORTON 002045

279

WANTED MUCH MORE, BUT THAT WAS ALL THAT THE DEFENDANT WAS ABLE TO OBTAIN ON THAT DAY.

THE NEXT ELEMENT IS IF EITHER THE DEFENDANT INFLICTED PHYSICAL HARM TO RICHARD MCCLANAHAN AND/OR THREATENED TO INFLICT PHYSICAL HARM ON RHONDA CURRY. THAT IS ALTERNATIVE THEORIES TO FIND THE AGGRAVATED BURGLARY. AND/OR THE DEFENDANT HAD A DEADLY WEAPON ON HIS PERSON OR UNDER HIS CONTROL.

LET'S GO BACK TO THE TESTIMONY. YOU HEARD FROM BOTH RICHARD MCCLANAHAN AND RHONDA CURRY THAT THE DEFENDANT DID BURST THROUGH THAT FRONT DOOR. THE DEFENDANT AT THE POINT WHEN HE BURST THROUGH THE FRONT DOOR, HE HAD A FIREARM, A DEADLY WEAPON, IN HIS HAND, AND HE IMMEDIATELY HIT RICHARD MCCLANAHAN ACROSS THE FOREHEAD WITH THAT FIREARM CAUSING A GASH TO HIS FOREHEAD.

THE WHOLE TIME THAT HE WAS IN THIS HOUSE, THAT FIREARM WAS POINTED AT THESE TWO VICTIMS. THE DEFENDANT INFLICTED PHYSICAL HARM ON RICHARD MCCLANAHAN. WE ALREADY TALKED ABOUT THE GASH IN THE FOREHEAD. OBVIOUSLY, IF YOU RECALL THE TESTIMONY, YOU ALSO REMEMBER THE TESTIMONY OF RICHARD MCCLANAHAN IS THAT THE DEFENDANT SHOT HIM IN HIS LEG. YOU SAW THE SCAR FROM RICHARD MCCLANAHAN. THERE IS CERTAINLY PHYSICAL HARM, AND WE WILL GET TO IT. IT ALSO QUALIFIES AS SERIOUS

R. HORTON 002046

280

PHYSICAL HARM.  SO IN DOING THIS BURGLARY, THE DEFENDANT INFLICTED PHYSICAL ON RICHARD MCCLANAHAN.

AND YOU HEARD FROM THE TESTIMONY OF RHONDA CURRY, THE DEFENDANT THREATENED TO INFLICT PHYSICAL HARM ON RHONDA CURRY.  THE TESTIMONY WAS, STOP LOOKING AT ME OR I WILL HAVE TO KILL YOU.  YOU HEARD THAT TESTIMONY BY RHONDA CURRY.

IN THE ALTERNATIVE, THE DEFENDANT CLEARLY HAD A DEADLY WEAPON ON HIS PERSON OR UNDER HIS CONTROL. HE CLEARLY HAD A GUN THE WHOLE TIME THAT HE WAS IN THIS HOUSE COMMITTING THIS AGGRAVATED BURGLARY.  SO THE ELEMENTS OF THIS OFFENSE HAVE BEEN PROVED BEYOND A REASONABLE DOUBT.

AND AS WITH EVERY ONE OF THESE OFFENSES, WE HAVE TO PROVE THE ELEMENT OF VENUE TO YOU.  IN SHORT, THAT IT HAPPENED IN FRANKLIN COUNTY, STATE OF OHIO. THAT IS UNDISPUTED, 927 LOEW STREET IS IN FRANKLIN COUNTY, STATE OF OHIO.

NEXT, WHEN THE DEFENDANT GOT INTO THE HOUSE, YOU HEARD FROM THE TESTIMONY OF BOTH RICHARD MCCLANAHAN AND RHONDA CURRY, THAT IMMEDIATELY UPON ENETERING THE HOUSE, THE DEFENDANT WAS DEMANDING MONEY.  YOU HEARD FROM RICHARD MCCLANAHAN SAY THAT THE DEFENDANT SAID -- RICHARD STATED THE DEFENDANT SAID, "GET THE MONEY, MOTHERFUCKER.  YOU'VE GOT THE MONEY.  YOU JUST GOT PAID.

281

WHERE IS THE TELEPHONE NOW?"  IMMEDIATELY HE IS YELLING, "GET THE MONEY.  GIVE ME THE MONEY."

HE'S ATTEMPTING OR COMMITTING A THEFT OFFENSE.  AND, AGAIN, AS WE TALKED ABOUT IT, HE HAD THAT DEADLY WEAPON.  HE HAD THAT FIREARM IN HIS HANDS.  SO WHILE HAVING A DEADLY WEAPON ON OR ABOUT ABOUT HIS PERSON OR UNDER HIS CONTROL, AND THE DEFENDANT USED A DEADLY WEAPON.

WE HAVE TALKED ABOUT THE DEFENDANT NOT ONLY HAD THE DEADLY WEAPON, THE DEFENDANT SHOT RICHARD MCCLANAHAN IN THE LEG WITH THAT DEADLY WEAPON.  THAT'S ALSO WHERE THE ALTERNATIVE SECTION (B) ALSO APPLIES. THE DEFENDANT INFLICTED SERIOUS PHYSICAL HARM ON RICHARD MCCLANAHAN.

THE JUDGE WILL INSTRUCT YOU ON SEVERAL OF THESE THINGS.  THEY ARE ALTERNATIVES.  YOU MAY FIND THE DEFENDANT GUILTY OF A CRIME BY IF THERE IS PROOF BEYOND A REASONABLE DOUBT TO EITHER ONE OR BOTH OF THESE ALTERNATIVES.  THESE ARE ALTERNATIVE WAYS OF PROVING A SPECIFIC CRIME.  IF YOU FIND THAT THE STATE HAS PROVEN BEYOND A REASONABLE DOUBT ON EITHER ONE OF THESE ALTERNATIVES OR BOTH, YOU MAY FIND THE DEFENDANT GUILTY OF THE CRIME.

ON THIS AGGRAVATED ROBBERY COUNT, THE FIRST COUNT OF AGGRAVATED ROBBERY, IT APPLIES TO RICHARD

282

MCCLANAHAN.  THE SECOND COUNT OF AGGRAVATED ROBBERY APPLIES TO RHONDA CURRY.  RHONDA CURRY, AS YOU HEARD FROM THE TESTIMONY, WAS NOT SHOT.  THERE WAS NOT SERIOUS PHYSICAL HARM DONE TO RHONDA CURRY.  SO IN THE CASE OF RHONDA CURRY, ONLY SECTION -- ONLY THE TOP SECTION WOULD APPLY.  AND THAT THE DEFENDANT WHILE HAVING A DEADLY WEAPON ON OR ABOUT HIS PERSON AND UNDER HIS CONTROL, THE DEFENDANT EITHER DISPLAYED THE WEAPON, AND/OR BRANDISHED THE WEAPON, AND OR INDICATED THAT HE POSSESSED THE WEAPON, AND/OR USED THE WEAPON.

CERTAINLY EVERYONE REMEMBERS FROM THE TESTIMONY THAT THE DEFENDANT HAD THAT FIREARM POINTED ON BOTH RICHARD MCCLANAHAN AND RHONDA CURRY THE WHOLE TIME. THE WHOLE TIME HE WAS IN THAT APARTMENT, OR IN THAT HOUSE, AFTER HE BROKE IN, THAT GUN WAS ON THOSE TWO PEOPLE THE WHOLE TIME, HIM DEMANDING MONEY.

NEXT, AFTER THE DEFENDANT BUSTED INTO THE APARTMENT, BRANDISHED HIS WEAPON, HIT RICHARD MCCLANAHAN ACROSS THE HEAD WITH THE WEAPON, GASHED HIS HEAD, SHOT HIM IN THE LEG, DEMANDED MONEY, WHERE'S THE MONEY, MOTHERFUCKER?  YOU JUST GOT PAID.  WHERE IS THE TELEPHONE NOW?  HE REPEATED THOSE THREATS, THREATENING WORDS TO THE DEFENDANT.  IN DOING ALL THIS, AS I HAVE STATED THE WHOLE TIME THIS WENT ON, HE HAD A GUN POINTED AT BOTH RICHARD MCCLANAHAN AND RHONDA CURRY.  AND IN SO

R. HORTON 002049

DOING THAT, THE DEFENDANT, BY FORCE, RESTRAINED RICHARD MCCLANAHAN.

AND THERE IS A SECOND COUNT WHICH ALSO APPLIES TO RHONDA CURRY. HE RESTRAINED THEM OF THEIR LIBERTY. IN OTHER WORDS, BY THE DEFENDANT POINTING THAT GUN AT THEM, THEY COULD NOT MOVE. THEY WERE RESTRAINED FROM MOVING. IF SOMEONE HAS A GUN POINTED AT YOU AND IS DEMANDING MONEY, YOU CAN'T MOVE. AND RICHARD MCCLANAHAN AND RHONDA CURRY COULD NOT MOVE.

LASTLY, WE HAVE ALREADY TALKED ABOUT THIS IN SOME DETAIL, BUT, OBVIOUSLY, WHEN THE DEFENDANT SHOT RICHARD MCCLANAHAN IN THE LEG, HE CAUSED SERIOUS PHYSICAL HARM TO RICHARD MCCLANAHAN. YOU HEARD THE TESTIMONY FROM RICHARD MCCLANAHAN. RICHARD MCCLANAHAN HAD FOUR SURGERIES. HE HAD ONE STAY IN THE HOSPITAL FOR ABOUT 10 DAYS, AND ANOTHER STAY IN THE HOSPITAL FOR ABOUT THREE DAYS. YOU SAW THAT SCAR ON RICHARD MCCLANAHAN'S LEG. IT WASN'T A PRETTY SCAR. THAT SCAR WENT ALL THE WAY UP HIS LEG. THAT IS SERIOUS PHYSICAL HARM. RICHARD MCCLANAHAN SPENT A LOT OF TIME IN THE HOSPITAL, HAD SURGERY, HAS A DISFIGUREMENT OF HIS LEG FROM THIS.

YOU HAVE SEEN THE EVIDENCE UP CLOSE AND PERSONAL. YOU ALSO HEARD THE TESTIMONY. IN ADDITION, AN ALTERNATIVE WAY THAT THE DEFENDANT CAUSED OR

284

ATTEMPTED TO CASE PHYSICAL HARM TO RICHARD MCCLANAHAN BY MEANS OF A WEAPON, CERTAINLY THIS IS SERIOUS PHYSICAL HARM. BUT IT IS ALSO THE LESSER PHYSICAL HARM, HE DID THIS BY USING THE GUN; THAT WHICH IS THE DEADLY WEAPON IN THIS CASE.

AS I SAID FROM THE GET-GO, THE FIREARM SPECIFICATION APPLIES TO ALL SIX OF THESE COUNTS. THAT FIREARM SPECIFICATION BASICALLY SAYS THE DEFENDANT USED A FIREARM TO FACILITATE THE COMMISSION OF EACH OF THESE SPECIFIC OFFENSES. IF YOU FIND THE DEFENDANT GUILTY OF AN OFFENSE, YOU WOULD NEXT MAKE THE DETERMINATION WAS THERE -- DOES THE FIREARM SPECIFICATION APPLY.

AS YOU HEARD THE FACTS OF THIS CASE, WE WILL TALK ABOUT THAT A LITTLE MORE, CERTAINLY IN EVERY SINGLE ONE OF THESE WHEN THE GUN WAS OUT AT THE MINUTE THE DOOR WAS BROKEN INTO, AND THE GUN WAS POINTED THE WHOLE TIME THAT THIS WAS OCCURRING, CERTAINLY THE DEFENDANT -- THE FIREARM SPEC APPLIES TO ALL SIX OF THESE CRIMES.

LADIES AND GENTLEMEN, AS I SAID BEFORE, THERE IS NOT ANY DISPUTE, THERE WILL NOT BE AN ARGUMENT, THAT THESE CRIMES DID OCCUR; THAT THERE WAS AN AGGRAVATED BURGLARY AT 927 LOEW STREET. THERE WAS AN AGGRAVATED ROBBERY TO EACH OF OUR TWO VICTIMS; THAT EACH OF OUR TWO VICTIMS WAS KIDNAPPED. THAT RICHARD MCCLANAHAN AND RHONDA CURRY WERE ROBBED AND KIDNAPPED,

285

AND RICHARD MCCLANAHAN WAS FELONIOUSLY ASSAULTED. THESE CRIMES HAPPENED.

WHAT THE DEFENSE -- THE ONLY THING THE DEFENSE HAS TO ARGUE IS THAT IT IS NOT -- IT IS NOT THE DEFENDANT. IT IS NOT RICHARD HORTON. AS I SAID BEFORE, WHEN YOU LOOK AT THIS CASE ON THE ISSUE OF EYEWITNESS IDENTIFICATION, THE TESTIMONY OF RICHARD MCCLANAHAN AND RHONDA CURRY ADDS UP TO THE DEFENDANT BEING GUILTY OF ALL THESE CRIMES.

AND THE DEFENDANT'S TESTIMONY DOESN'T ADD UP TO MUCH AT ALL. FIRST OFF, WE HEARD FROM RICHARD MCCLANAHAN ON THE ISSUE OF EYEWITNESS IDENTIFICATION. YOU WILL REMEMBER RICHARD MCCLANAHAN TALKED ABOUT I HAD SEEN THE DEFENDANT APPROXIMATELY 20 TO 30 TIMES OVER THE LAST ABOUT EIGHT YEARS. THE DEFENDANT HIMSELF SAID THIS IS A SMALL NEIGHBORHOOD; THAT PEOPLE SEE EACH OTHER IN THE NEIGHBORHOOD. RICHARD MCCLANAHAN TALKED ABOUT SEEING THE DEFENDANT PLAYING BASKETBALL. THE DEFENDANT ACKNOWLEDGES THAT HE LIKES TO PLAY BASKETBALL. IT IS ENTIRELY POSSIBLE, BASED ON THIS TESTIMONY, THAT RICHARD MCCLANAHAN DID, IN FACT, SEE THE DEFENDANT PLAYING BASKETBALL.

FURTHER, RICHARD MCCLANAHAN HAD REASON TO MORE THAN JUST SEE THE DEFENDANT. RICHARD MCCLANAHAN HAD ACTUAL DEALINGS WITH THE DEFENDANT. IF YOU WILL

RECALL, THERE WAS TESTIMONY BY RICHARD MCCLANAHAN, AND BY THE DEFENDANT, ABOUT A TRANSACTION BETWEEN RICHARD MCCLANAHAN'S NIECE AND THE DEFENDANT IN WHICH I BELIEVE RICHARD MCCLANAHAN'S NIECE SOLD THE DEFENDANT A CAR. AND IN ORDER FOR THAT TRANSACTION TO BE COMPLETED, RICHARD MCCLANAHAN DID SOME BRAKE WORK ON THAT CAR; DID SOME AUTO WORK ON THAT CAR.  AND SO RICHARD MCCLANAHAN AND THE DEFENDANT HAD A CHANCE TO BECOME ACQUAINTED THROUGH THAT.

AND THEN TAKING THE TESTIMONY OF RICHARD MCCLANAHAN, RICHARD MCCLANAHAN SAID THEY SEEN EACH OTHER 20 TO 30 TIMES IN THAT -- FOR THE LAST EIGHT YEARS BASICALLY.  THE DEFENDANT ACKNOWLEDGES THAT HE HAS SEEN THEM, RICHARD MCCLANAHAN AND RHONDA CURRY.  HE ACKNOWLEDGES THAT HE KNOWS THEM ENOUGH TO RECOGNIZE THEM ON SIGHT.  NOW, IF THE DEFENDANT KNOWS THEM ENOUGH, KNOWS RICHARD MCCLANAHAN AND RHONDA CURRY ENOUGH TO RECOGNIZE THEM ON SIGHT, ISN'T IT LOGICAL THAT RICHARD MCCLANAHAN AND RHONDA CURRY KNOW THE DEFENDANT WELL ENOUGH TO RECOGNIZE THE DEFENDANT ON SIGHT?

IN ADDITION, RICHARD MCCLANAHAN TALKED ABOUT ALL THESE TIMES HE HAD SEEN THE DEFENDANT IN THE PAST YEAR, PAST EIGHT YEARS OR SO, 20 TO 30 TIMES.  BUT WHAT IS EVEN MORE IMPORTANT IS THAT RICHARD MCCLANAHAN SAW THE DEFENDANT THE NIGHT BEFORE THIS HAPPENED.

R. HORTON 002053

287

YOU ALL HEARD THE TESTIMONY FROM RICHARD MCCLANAHAN THAT AFTER HE GOT PAID, HE WENT TO A CONVENIENCE STORE. HE HAD THE SUM FROM HIS PAYCHECK IN HIS POCKET FOLDED UP, THE BILLS FOLDED UP IN HIS POCKET. HE WAS AT THAT CONVENIENCE STORE BECAUSE HE NEEDED TO MAKE A PHONE CALL. HE WENT TO A PAY PHONE WITH THOSE BILLS IN HIS POCKET AND WITH THE CHANGE UNDERNEATH THOSE BILLS IN HIS POCKET. TO GET THAT CHANGE, HE NEEDED TO PULL OUT HIS WAD OF BILLS FROM HIS POCKET IN ORDER TO GET THE CHANGE TO MAKE THAT PHONE CALL FROM A PAY PHONE.

WHEN HE DID THAT, RICHARD MCCLANAHAN STATED THE DEFENDANT WAS RIGHT THERE, AND THE DEFENDANT SAW HIM PULL OUT THIS WAD OF MONEY IN ORDER TO GET THE CHANGE. AND AT THAT POINT THE DEFENDANT ASKED IF HE COULD HAVE $20. RICHARD MCCLANAHAN DIDN'T GIVE THE DEFENDANT THE MONEY. WHEN RICHARD MCCLANAHAN WOULDN'T GIVE THE DEFENDANT THE MONEY, THE DEFENDANT MADE ANOTHER REQUEST FROM RICHARD MCCLANAHAN, HE WANTED TO USE THE PHONE. WELL, RICHARD MCCLANAHAN WAS AT THE PHONE FIRST. HE NEEDED TO MAKE THAT IMPORTANT CALL. SO RICHARD MCCLANAHAN WOULDN'T LET THE DEFENDANT USE THE PHONE UNTIL AFTER RICHARD MCCLANAHAN HAD USED THE PHONE.

RICHARD MCCLANAHAN'S TESTIMONY, THE TESTIMONY OF ALL THE WITNESSES, THAT IS THAT THERE WAS NO ONE ELSE THERE. NO ONE ELSE AROUND SAW RICHARD

R. HORTON 002054

MCCLANAHAN WITH THIS WAD OF MONEY.  NO ONE ELSE THERE HAD A CONVERSATION WITH RICHARD MCCLANAHAN ABOUT USING THE TELEPHONE.  NO ONE ELSE THERE ASKED FOR MONEY FROM RICHARD MCCLANAHAN.  IT WAS THE DEFENDANT WHO ASKED FOR MONEY FROM RICHARD MCCLANAHAN.  IT WAS THE DEFENDANT WHO USED THE PHONE -- OR ASKED RICHARD MCCLANAHAN TO USE THE PHONE.  THAT IS THE DEFENDANT WHO WAS AT THAT CONVENIENCE STORE THAT DAY.

SO THE NEXT MORNING WHEN THE DEFENDANT BURST INTO THAT APARTMENT AND COMMITS THE AGGRAVATED BURGLARY, BURST INTO THAT -- EXCUSE ME -- THAT HOUSE, AND THE FIRST WORDS OUT OF THE DEFENDANT'S MOUTH IS, "GET THE MONEY.  YOU GOT MONEY.  YOU JUST GOT PAID.  WHERE IS THE TELEPHONE NOW?"  YOU SEE HOW THAT MATCHES UP TO WHAT HAPPENED THE DAY BEFORE ON THAT FRIDAY?  NO ONE ELSE KNEW ABOUT THIS CONVERSATION ABOUT ASKING FOR MONEY, ASKING TO USE THE TELEPHONE.  THE ONLY PERSON WHO COULD HAVE KNOWN WAS THE DEFENDANT, RICHARD MCCLANAHAN -- EXCUSE ME, WAS THE DEFENDANT RICHARD HORTON.  THE ONLY PERSON WHO COULD HAVE KNEW WAS THE DEFENDANT ABOUT THIS.

EYEWITNESS IDENTIFICATION.  ONE OF THE MAJOR FACTORS IS IS THIS PERSON KNOWN TO THE WITNESS.  IS THERE FAMILIARITY BY THE WITNESS WITH THIS PERSON.  I WOULD SUGGEST I HAVE LAID OUT SEVERAL DIFFERENT FACTORS FROM THE FACT THAT HE, RICHARD MCCLANAHAN, HAS KNOWN HIM

OVER EIGHT YEARS.  HE'S SEEN HIM MULTIPLE TIMES.  HE HAD THE FINANCIAL CAR TRANSACTION.  HE HAD THE INTERACTION AT THE CONVENIENCE STORE.  SO IT IS NO SURPRISE WHEN THE DEFENDANT IS ASKED TO IDENTIFY -- WHEN RICHARD MCCLANAHAN IS ASKED TO IDENTIFY THE DEFENDANT IN A PHOTO ARRAY, IT IS NO SURPRISE RICHARD MCCLANAHAN IS CERTAIN THAT THE DEFENDANT IS THE PERSON WHO COMMITTED THE CRIMES THAT I HAVE TALKED ABOUT.  AND IT IS NO SURPRISE, BASED ON ALL THAT WE HAVE TALKED ABOUT, THAT RICHARD MCCLANAHAN IN THE COURTROOM WAS ABLE TO SAY THAT HE WAS A HUNDRED PERCENT CERTAIN IN COURT THAT THE DEFENDANT, THIS MAN SEATED AT THIS TABLE, THAT THE DEFENDANT WAS THE PERSON WHO COMMITTED THESE CRIMES.  AND MUCH THE SAME WAY WE HEARD FROM RHONDA CURRY.

THE DEFENDANT TOLD YOU RHONDA CURRY IS ALSO SOMEONE HE'S SEEN AROUND THE NEIGHBORHOOD.  HE WOULD RECOGNIZE RHONDA CURRY.  AS WE TALKED ABOUT BEFORE, IF HE WOULD RECOGNIZE RHONDA CURRY, SHE WOULD RECOGNIZE HIM.  AS YOU HEARD FROM RHONDA CURRY, RHONDA GOT A GOOD LOOK AT THE DEFENDANT MULTIPLE TIMES.  SHE WAS LAYING ON THIS HIDEAWAY BED WHEN THE DEFENDANT BURST THROUGH INTO THE HOUSE.  AND THE DEFENDANT'S ATTENTION WAS ORIGINALLY FOCUSED ON RICHARD MCCLANAHAN.  SO SEVERAL TIMES WHILE THE DEFENDANT WAS TRYING TO MAKE RICHARD MCCLANAHAN COME UP WITH THIS MONEY, ROBBING RICHARD MCCLANAHAN, SEVERAL

290

TIMES THE DEFENDANT -- SEVERAL TIMES RHONDA CURRY PEEKED AT THE DEFENDANT, LOOKED UP AT THE DEFENDANT, STUDIED THE DEFENDANT.  SO MUCH SO THAT THE DEFENDANT ACTUALLY CAUGHT RHONDA CURRY TAKING A LOOK AT HIM.  THE DEFENDANT, IF YOU WILL REMEMBER RHONDA CURRY'S TESTIMONY, IT WAS SOMETHING TO THE EFFECT THAT NOW I HAVE GOT TO KILL YOU.  THE DEFENDANT KNEW HE CAUGHT RHONDA CURRY LOOKING AT HIM.  THE DEFENDANT KNEW THAT SHE HAD SEEN HIM.  THE DEFENDANT KNEW THAT RHONDA CURRY COULD I.D. HIM.

RHONDA KNEW THAT SHE HAD PREVIOUSLY SEEN THE DEFENDANT.  SHE EVEN MENTIONED TO DETECTIVE WALKER ABOUT THAT, I KNOW I HAVE SEEN THIS MAN.  I JUST CAN'T COME UP WITH HIS NAME.  AND IN A FEW DAYS LATER, SHE WAS TALKING WITH HER SISTER, AS YOU REMEMBER HER TESTIMONY, SHE WAS TALKING WITH HER SISTER AND SHE REMEMBERED THAT IS RICHARD IN THE NEIGHBORHOOD.  SHE REMEMBERED THAT.

AND THEN BASED ON ALL THIS, OR HER FAMILIARITY WITH RICHARD HORTON, THE DEFENDANT IN THIS CASE, FROM THE NEIGHBORHOOD, AND HER ABILITY TO GET A LOOK AT HIM AND HIS ACKNOWLEDGING SHE HAD A LOOK AT HIM BY NOW, I WILL HAVE TO KILL YOU STATEMENT, IT IS NO SURPRISE THAT WHEN SHE DID HER -- SHE LOOKED AT THE PHOTO ARRAY SEPARATE AND AFTER RICHARD MCCLANAHAN, THAT SHE WAS ABLE TO BE CERTAIN THAT THE PERSON SHE PICKED

R. HORTON 002057

291

OUT WHO DID ALL THESE CRIMES WAS THE DEFENDANT. AND IT IS ALSO NO SURPRISE THAT SHE WAS ABLE TO IN COURT SAY THE PERSON WHO DID THESE CRIMES WAS THE DEFENDANT RICHARD HORTON.

BOTH VICTIMS IN THIS CASE HAD SUFFICIENT FAMILIARITY, IN FACT, LONGSTANDING FAMILIARITY WITH THE DEFENDANT RICHARD HORTON IN ORDER TO BE ABLE TO IDENTIFY HIM AS THE PERSON WHO COMMITTED ALL THESE CRIMES. THEIR STORIES ADD UP.

TO THE CONTRARY, THE DEFENDANT'S STORY DOESN'T ADD UP. THE DEFENDANT'S STORY DOESN'T MAKE SENSE. YOU HEARD THE DEFENDANT ON THE STAND. YOU SAW BOTH HIS DIRECT TESTIMONY, AND YOU SAW MR. STEAD'S CROSS-EXAMINATION OF THE DEFENDANT. YOU HEARD THE DEFENDANT SAY HE OWNS A CAR BUT HE DOESN'T HAVE TRANSPORTATION. HE DOESN'T LIKE DRIVING. BUT HE PICKS UP HIS DAUGHTER FOUR TIMES A WEEK. HE PROUDLY PAYS CHILD SUPPORT, BUT HE COULDN'T GIVE US EVEN THE MOST BASIC AMOUNT THAT HE MIGHT HAVE PAID. MR. STEAD SAID $10. I CAN'T SAY YES OR I CAN'T SAY NO. WE ARE LOOKING FOR A BALLPARK FIGURE. HE COULDN'T EVEN GIVE THE MOST BASIC AMOUNT. THESE ARE INDICATIVE OF THE DEFENDANT'S STORY NOT MAKING MUCH SENSE AT ALL.

YOU ALSO HEARD THE DEFENDANT TALK ABOUT THE ONLY INCOME HE HAD CAME FROM WORKING AT POPEYE'S

292

RESTAURANT.  HE STRAIGHT OUT SAID THIS IS ALL THE INCOME I HAVE IS FROM THIS ONE SOURCE.  THEN LATER ON DOWN THE ROAD, HE COMES UP WITH I HAVE GOT AN EXTRA $5,000 LAYING AROUND FROM SOME WORK RELEASE I DID DOWN IN WEST VIRGINIA.  BUT JUST MINUTES PRIOR TO THAT HIS TESTIMONY WAS, MY ONLY SOURCE OF INCOME IS FROM POPEYE'S.

YOU ALSO HEARD HIM SAY AT THE END OF HIS EXAMINATION THAT HE COULD PROVIDE SOME KIND OF DOCUMENTATION FOR THAT $5,000 FROM WORK RELEASE.  AND THEN THERE WAS A QUESTION, THAT WAS THE LAST QUESTION THAT WAS ADDRESSED TO THE DEFENDANT, CAN YOU PROVIDE DOCUMENTATION OF THE $5,000?  AND YOU SAW HE CHANGED HIS STORY.  I'M SURE YOU ALL PAID ATTENTION, HE SAID NO AT THAT POINT.  MINUTES EARLIER HE HAD SAID, YES, HE COULD PROVIDE DOCUMENTATION.

THIS STORY CONTRADICTS RIGHT AND LEFT ON SEVERAL DIFFERENT ISSUES.  IF IT'S NOT A CONTRADICTION, THEN IT IS VAGUE, NOT WITH ANY KIND OF SPECIFICITY KIND OF ANSWER.  BUT THE DEFENDANT WAS ASKED, THE DEFENDANT SAID HE DOESN'T HAVE AN EXACT ANSWER FOR WHERE HE WAS ON OCTOBER 9TH, 2004.  WELL, THE DEFENDANT IS SAYING THAT HE WAS NOT AT 927 LOEW STREET, AND HE DID NOT DO THESE CRIMES.  BUT HE CAN'T GIVE US, IN HIS WORDS, AN EXACT ANSWER FOR WHERE HE WAS THE MORNING OF OCTOBER 9TH, 2004, IN THE SAME WAY HIS GIRLFRIEND AT THE TIME, WIFE

293

NOW, YOU HEARD FROM HER AS WELL, IN THE SAME WAY SHE COULD TALK TO US ABOUT WHAT HER ROUTINE WAS, AND THAT IN THAT TIME THAT THEY WERE BOTH WORKING, AND THAT WHEN THEY WEREN'T WORKING ON THE WEEKEND THE ROUTINE WAS GOING OUT TO MOVIES, GOING TO RESTAURANTS, SLEEP IN, GO SHOPPING THE NEXT DAY, WHATEVER SHE WANTED TO DO.

RICHARD MCCLANAHAN (SIC) WAS COURTING HER. YOU HEARD ALL ALL THIS. BUT SHE SHE WASN'T ABLE TO GIVE --

THE COURT: I THINK YOU MISSTATED. YOU SAID RICHARD MCCLANAHAN.

MR. SMITH: OBVIOUSLY I MEANT TO SAY THE DEFENDANT RICHARD HORTON WAS COURTING HER. WITH BOTH NAMES BEING RICHARD IT'S SLIGHTLY CONFUSING WITH THE FIRST NAMES. THE DEFENDANT, RICHARD HORTON, WAS COURTING HER. AND YOU HEARD THAT SHE COULD TALK ABOUT WHAT THEIR ROUTINE WAS. SHE COULDN'T NAIL IT DOWN AS TO ANY SPECIFIC RECOLLECTION OF WHAT WAS GOING ON ON OCTOBER 9TH, THE MORNING OF OCTOBER 9TH, 2004.

THE LAST THING, AND I THINK THE MOST TELLING THING, ABOUT THE DEFENDANT'S STORY NOT ADDING UP, WAS THE DISCUSSION ABOUT HIS WORK FROM POPEYE'S. IF YOU RECALL, THE DEFENDANT WAS ASKED TO LOOK AT DEFENDANT'S EXHIBIT C, WHICH SHOWS A PAYCHECK FROM POPEYE'S WITH A NET AMOUNT FOR $256.76 FOR A TWO-WEEK PERIOD. WE TALKED

R. HORTON 002060

294

TO THE DEFENDANT, IT'S ABOUT -- SO ROUGHLY YOU MAKE APPROXIMATELY $500 A MONTH.  HE AGREED WITH THAT.  THE DEFENDANT THEN PROCEEDED TO TELL YOU, THE JURY, THAT HE HAS A HOUSE RENTAL PAYMENT OF $600 A MONTH.  HE HAS AN AT&T PREPAID CELL PHONE THAT IS ROUGHLY $60 THAT GETS TAKEN OUT OF HIS ACCOUNT PER MONTH.  HE HAS UTILITY BILLS.  HE HAS CHILD SUPPORT FOR TWO CHILDREN.  HE ALSO HAS ANOTHER CELL PHONE FOR WHICH WE HAVE THAT NUMBER ON THAT PIECE OF CARDBOARD PAPER.  WE HAVE TWO CELL PHONES, CHILD SUPPORT FOR TWO CHILDREN, AND UTILITIES, RENT PAYMENT OF $600, PLUS THE FACT THAT THE DEFENDANT IS COURTING HIS GIRLFRIEND AT THAT TIME, TAKING HER TO MOVIES, TAKING HER TO DINNER.  THESE ARE A LOT OF EXPENSES.  AND CERTAINLY THE RENT ALONE IS WELL OVER %%$500.

AND SHORT, THE STORY DOES NOT ADD UP.  WHEN THE DEFENDANT WAS PRESSED ON THIS, THAT THESE FIGURES JUST DON'T ADD UP.  WHAT HE CAN MUSTER WAS HOW HE AFFORDS THIS, WAS WHAT HE COULD SAY HOW HE AFFORDS THIS, I WANT YOU TO REMEMBER THESE WORDS.  HE SAYS, QUOTE, YOU JUST GOT TO MAKE IT HAPPEN.  WHATEVER I NEED TO DO.  REMEMBER THAT, YOU JUST GOT TO MAKE IT HAPPEN.  WHATEVER I NEED TO DO.

WELL, LADIES AND GENTLEMEN OF THE JURY, I WILL TELL YOU THE DEFENDANT DID MAKE IT HAPPEN.  THE

295

DEFENDANT DID WHAT HE NEEDED TO DO. YOU HEARD ON FRIDAY EVENING HE TRIED TO ASK FOR MONEY FROM RICHARD MCCLANAHAN. WELL, IN THAT WHEN THIS -- WHEN THAT DIDN'T WORK, THE DEFENDANT, ON SATURDAY MORNING, OCTOBER 9TH, 2004, HE MADE IT HAPPEN. HE DID WHAT HE NEEDED TO DO. HE BURGLARIZED, HE COMMITTED THE CRIME OF AGGRAVATED BURGLARY AGAINST RICHARD MCCLANAHAN AND RHONDA CURRY. HE COMMITTED THE CRIMES OF AGGRAVATED ROBBERY AGAINST RICHARD MCCLANAHAN AND RHONDA CURRY. HE KIDNAPPED BOTH THEM AND HE COMMITTED CRIMES OF FELONIOUS ASSAULT, THE CRIME OF FELONIOUS ASSAULT AGAINST RICHARD MCCLANAHAN.

LADIES AND GENTLEMEN, AS I HAVE SAID, THE DEFENDANT JUST MADE IT HAPPEN. THE DEFENDANT DID WHAT HE NEEDED TO DO. THAT IS THE ONLY WAY THAT THE DEFENDANT'S STORY ADDS UP. THE DEFENDANT JUST MADE IT HAPPEN BY COMMITTING ALL THESE CRIMES.

LADIES AND GENTLEMEN OF THE JURY, WHEN YOU DO THE MATH ON THIS CASE, YOU WILL FIND THE DEFENDANT GUILTY OF ALL THESE CRIMES. THE STATE HAS PROVEN BEYOND A REASONABLE DOUBT THAT THE DEFENDANT IS GUILTY OF ALL OF THESE CRIMES.

THANK YOU.

THE COURT: THANK YOU.

MR. SHWARTZ.

MR. SHWARTZ: PLEASE THE COURT. MR. STEAD.

296

MR. SMITH. MR. HORTON. ALISSA.

GOOD MORNING LADIES AND GENTLEMEN OF THE JURY.

JURY PANEL: GOOD MORNING.

MR. SHWARTZ: FIRST OF ALL, I WANT TO TAKE THIS OPPORTUNITY, AGAIN, TO THANK YOU FOR SERVING ON THE JURY, FOR PARTICIPATING IN OUR CRIMINAL JUSTICE SYSTEM. SERVING AS A JUROR IS ONE OF THE MOST IMPORTANT FUNCTIONS YOU CAN DO AS A CITIZEN. I WANT TO THANK YOU FOR WATCHING THE WITNESSES CAREFULLY. I HAVE A HABIT OF WATCHING THE JURY WHILE THE WITNESSES ARE ON THE STAND. AND I SAW ALL OF YOU PAY STRICT ATTENTION TO WHAT WAS GOING ON IN THIS COURTROOM.

YOU KNOW, I HAVE SPENT MANY YEARS IN THE CRIMINAL JUSTICE SYSTEM. AND WHENEVER I HAVE A CAPTIVE AUDIENCE LIKE YOU, I HAVE AN OPPORTUNITY TO BRIEFLY DISCUSS OUR CRIMINAL JUSTICE SYSTEM. THE UNITED STATES IS UNLIKE MANY COUNTRIES WHERE AN ACCUSED HAS NO RIGHTS, AND THE PARTICIPANTS IN THE TRIAL HAVE NO RESPONSIBILITY. IN OUR CRIMINAL JUSTICE SYSTEM, THE JURORS HAVE THE HEAVY RESPONSIBILITY OF DECIDING THE INNOCENCE OR GUILT OF A FELLOW CITIZEN. AND IN OUR CRIMINAL JUSTICE SYSTEM, HIS HONOR, JUDGE BENDER, HAS THE RESPONSIBILITY OF BEING FAIR AND FOLLOWING THE LAW.

IN OUR CRIMINAL JUSTICE SYSTEM, THE DEFENSE

R. HORTON 002063

297

ATTORNEY HAS THE RESPONSIBILITY OF ADVISING HIS CLIENT AND TO OBTAIN EVIDENCE IN HIS BEHALF.  IN OUR CRIMINAL SYSTEM THE PROSECUTORS HAVE A DUTY TO INVESTIGATE THE CASE THOROUGHLY, TO SUPPORT THE POLICE, AND TO ADVISE THE POLICE OF ANY POSSIBLE CRIMES.  IN OUR CRIMINAL JUSTICE SYSTEM, THE POLICE HAVE A HEAVY RESPONSIBILITY OF PROTECTING THE PUBLIC.

IN THIS CASE, IT IS CLEAR FROM THE TESTIMONY OF THE VICTIMS THAT A MAN CAME INTO THEIR HOUSE WITH A SHIRT COVERING -- SWEAT SHIRT COVERING HIS FACE EXCEPT FOR HIS EYES.  THE ONLY VISIBLE PART OF THE FACE WAS THE EYES OF THE PERPETRATOR.

HERE'S WHAT HAPPENED.  WITHIN DAYS OF THIS INCIDENT, THE MCCLANAHANS GAVE THE DETECTIVES THE FIRST NAME OF WHO THEY THOUGHT COMMITTED THE CRIME.  THEY TOLD THE DETECTIVE THAT THEY KNEW THEIR NIECE COULD PROVIDE THE LAST NAME.

LADIES AND GENTLEMEN, WHAT BOTHERS ME IS THAT THE DETECTIVES WAITED TWO MONTHS UNTIL THEY INVESTIGATED THIS NAME.  AND AFTER RECEIVING THE NAME, THE DETECTIVES DID NOT FURTHER INVESTIGATE TO CORROBORATE THIS IDENTIFICATION.  IN FACT, IT IS CLEAR IN THIS CASE THE POLICE MADE LITTLE OR NO EFFORT TO ARREST THE SUSPECTED PERPETRATOR.

WHAT HAPPENED WAS RICHARD HORTON, WHEN HE

298

WAS TRYING TO GET CUSTODY OF HIS SON -- OR HIS BROTHER, WAS TOLD BY THE PEOPLE AT JUVENILE COURT THERE WAS A WARRANT OUT FOR HIM.  HE IMMEDIATELY CONTACTED THE DETECTIVE AND TURNED HIMSELF IN.  THIS MAY NOT BE TOTALLY RELEVANT TO THIS CASE, BUT AS CITIZENS, YOU MUST CONSIDER, AND I MUST CONSIDER, THAT THE DUTY OF THE POLICE SHOULD BE TO PROTECT THE PUBLIC, AND TO ARREST A SUSPECTED VIOLENT CRIMINAL AS SOON AS POSSIBLE. PERMITTING A SUSPECTED VIOLENT CRIMINAL TO ROAM THE STREETS IS NOT WHAT I PERCEIVE, AND I TRUST YOU WILL PERCEIVE, IS NOT THE AMERICAN CRIMINAL JUSTICE SYSTEM.

IT'S THE DUTY OF THE POLICE TO NOTIFY A SUSPECT AS SOON AS POSSIBLE SO THE SUSPECT CAN REASONABLY OBTAIN EVIDENCE TO DEFEND HIMSELF.  THIS DIDN'T HAPPEN IN THIS CASE.  AND IT'S NOT WHAT I PERCEIVE TO BE THE AMERICAN CRIMINAL JUSTICE SYSTEM.

IN THIS CASE SOMETHING PECULIAR HAPPENED. TESTIMONY WAS ELICITED BY THE PROSECUTORS ABOUT AN ALLEGED BRIBERY.  RICHARD MCCLANAHAN PRODUCED A PIECE OF PAPER WITH RICHARD HORTON'S PHONE NUMBER ON THAT.  YOU REMEMBER THAT.  AND THEN ACCUSED RICHARD HORTON OF OFFERING TO BRIBE HIM FOR $3,000 TO $5,000 TO DISMISS THE CHARGES.

LADIES AND GENTLEMEN OF THE JURY, BRIBERY IS A SERIOUS FELONY.  BUT THE STATE OF OHIO FAILED TO

R. HORTON 002065

299

INVESTIGATE THIS. YOU KNOW, WE ALL KNOW ENOUGH, WE HAVE ALL WATCHED ENOUGH TELEVISION TO KNOW THERE IS TAPES AND PHONE CALLS. BUT THE STATE FAILED TO INVESTIGATE THE CHARGE BY HAVING MCCLANAHAN PHONE HORTON AND TAPE THE CONVERSATION. INSTEAD, THE STATE BRINGS UP THIS ACCUSATION BEFORE YOU LADIES AND GENTLEMEN OF THE JURY, AND I HOPE THIS ACCUSATION DOES NOT INFLUENCE YOU IN RESOLVING THIS CASE. I DO NOT PERCEIVE THIS TACTIC TO BE PART OF THE AMERICAN JUSTICE SYSTEM.

NOW, HIS HONOR, JUDGE BENDER, WILL INSTRUCT YOU ABOUT THE LAW. YOU MUST CAREFULLY FOLLOW THE LAW. IT'S YOUR DUTY TO LISTEN CAREFULLY TO THE EVIDENCE, AND AS YOU'RE ALSO -- IT'S ALSO YOUR DUTY TO CAREFULLY FOLLOW THE LAW. HE WILL TELL YOU THAT IN OUR SYSTEM OF JUSTICE YOU MUST RESOLVE THE ISSUE AS TO GUILT OR NONGUILT IN ACCORDANCE WITH THE EVIDENCE, THE LAW, AND YOUR OWN CONSCIENCE.

LADIES AND GENTLEMEN, YOU DETERMINE BEYOND A REASONABLE DOUBT THAT JENNETTE HORTON, A PRACTICING MEMBER OF JEHOVAH'S WITNESS KINGDOM HALL, CAME INTO THIS COURTROOM AND TOOK AN OATH AND THEN LIED TO YOU ABOUT SHE AND RICHARD HORTON BEING TOGETHER IN GROVE CITY ON THE MORNING OF THIS INCIDENT. YOU MUST LIVE WITH THAT DETERMINATION AND YOUR CONSCIENCE.

NOW, THE PROSECUTOR IN HIS CLOSING ARGUMENT

R. HORTON 002066

300

WILL TELL YOU SHE COULDN'T GIVE YOU THE EXACT DATE. THAT SHE COULDN'T GIVE YOU THE EXACT DATE. LADIES AND GENTLEMEN, IF THE POLICE ARRESTED THIS MAN PROMPTLY, WE COULD HAVE NAILED DOWN THE DATE. SHE WOULDN'T LIE TO YOU. SHE WOULDN'T SAY ON THIS DATE, BUT SHE SAID THE ENTIRE PERIOD THEY SPENT THE TIME IN GROVE CITY.

IF YOU DETERMINE BEYOND A REASONABLE DOUBT THAT RICHARD HORTON OWNED A CELL PHONE ON THE DATE OF THE INCIDENT, BUT NEVERTHELESS ARGUED ABOUT THE USE OF A PAY PHONE, IT DOESN'T MAKE SENSE, YOU MUST LIVE WITH THAT DETERMINATION.

IF YOU BELIEVE BEYOND A REASONABLE DOUBT THAT RICHARD HORTON POSSESSED A FIREARM WHILE ON PAROLE, AND YOU HEARD EVIDENCE THAT THE POLICE NEVER LOCATED A FIREARM IN HIS HOUSE, NEVER LOCATED A FIREARM IN HIS POSSESSION, AND HE TOLD YOU WHY HE COULDN'T HAVE A FIREARM AND WOULDN'T OWN A FIREARM, BECAUSE IF HE DID, HE WOULD BE BACK IN WEST VIRGINIA SERVING THE BALANCE OF HIS TIME. ONCE AGAIN, ACCORDING TO THE FIREARM, YOU MUST LIVE WITH THE DETERMINATION.

NOW, IF YOU THINK THAT RICHARD HORTON -- AND IF YOU DETERMINE THAT RICHARD HORTON SAT ON THAT STAND AND LIED TO YOU ABOUT RECEIVING $5,000 FOR HIS WORK RELEASE PROGRAM THE LAST YEAR IN WEST VIRGINIA, THE PROSECUTER ARGUED TO YOU THAT HE IS LYING ABOUT THAT,

R. HORTON 002067

301

THE STATE HAS A HEAVY RESPONSIBILITY, RATHER THAN TELL YOU HE IS LYING ABOUT IT, WHY DIDN'T THEY CALL WEST VIRGINIA AND FIND OUT IF THEY, INDEED, HAD A WORK RELEASE PROGRAM THE LAST YEAR OF PRISON. WHY DIDN'T THEY CALL WEST VIRGINIA TO DETERMINE WHETHER RICHARD HORTON, INDEED, WORKED THE LAST YEAR AND WALKED OUT OF THERE WITH $5,000. THAT IS THEIR RESPONSIBILITY. IT IS NOT HIS RESPONSIBILITY. IT'S THEIR RESPONSILIBLITY TO COME UP HERE AND TELL YOU THEY ARE LYING WHEN THEY WON'T CHECK OUT THE FACTS.

NOW, IF YOU DETERMINE THAT A RELIABLE IDENTIFICATION CAN BE MADE BEYOND A REASONABLE DOUBT OF A SUSPECT WHOSE FACE IS COVERED BY THE HOOD OF A SWEAT SHIRT EXCEPT FOR HIS EYES, IF YOU DETERMINE THAT IS A POSITIVE IDENTIFICATION, IT COULD BE MADE FROM THAT, YOU MUST LIVE WITH THAT DETERMINATION.

NOW, LADIES AND GENTLEMEN OF THE JURY, YOU KNOW ENOUGH ABOUT THE LAW, AND WE ALL WATCH TELEVISION, WE KNOW WHAT VOICE IDENTIFICATION IS. IF YOU DETERMINE THAT THE POLICE WERE NOT REQUIRED IN A CASE LIKE THIS TO USE VOICE IDENTIFICATION TO TEST THE RELIABILITY OF AN EYEWITNESS, THEN YOU MUST LIVE WITH THAT DETERMINATION.

LADIES AND GENTLEMEN, AS THE PROSECUTER TOLD YOU, RICHARD MCCLANAHAN AND RICHARD HORTON SAW EACH OTHER 20 TO 30 TIMES, MAYBE MORE, BECAUSE THERE WAS A

R. HORTON 002068

302

DRUG RELATIONSHIP BETWEEN THE TWO.

MR. STEAD: OBJECTION. THERE'S NO EVIDENCE OF THAT.

MR. SHWARTZ: HE TESTIFIED TO THAT. THAT WAS THE EVIDENCE. HE TESTIFIED THAT HE SAW --

THE COURT: COUNSEL. COUNSEL. COUNSEL.

THIS IS ARGUMENT. THE JURY WILL DETERMINE THE FACTS IN THE CASE. YOU WILL DETERMINE WHETHER OR NOT THERE IS EVIDENCE TO SUPPORT ANYTHING THAT HAS BEEN ARGUED.

PROCEED.

MR. SHWARTZ: YES, YOUR HONOR.

MR. RICHARD HORTON TOLD YOU, ADMITTED IN HIS YOUNGER DAYS HE WAS A DRUG DEALER. AND ONE OF HIS CUSTOMERS WAS RICHARD MCCLANAHAN. WHETHER THAT HAD ANY INFLUENCE ON THE TESTIMONY WE DON'T KNOW. I'M GOING TO ASK YOU TO CONSIDER IT. IF YOU DETERMINE BEYOND A REASONABLE DOUBT THAT IN THE YEAR 2004 A 1979 CADILLAC WAS RELIABLE AND THAT RICHARD HORTON LIED TO YOU ABOUT IT NOT BEING RELIABLE, THEN YOU MUST LIVE WITH THAT DETERMINATION.

LADIES AND GENTLEMEN OF THE JURY, IN CONCLUSION, I URGE YOU TO CAREFULLY FOLLOW THE INSTRUCTIONS OF THE COURT. YOU HAVE THE HEAVY RESPONSIBILITY OF DETERMINING THE ISSUE OF GUILT OR

R. HORTON 002069

303

NONGUILT IN ACCORDANCE WITH THE EVIDENCE, THE LAW AND YOUR CONSCIENCE.  I SINCERELY TRUST, I SINCERELY HOPE, THAT YOU WILL CAREFULLY CONSIDER THE EVIDENCE, YOU WILL FOLLOW THE LAW, YOU WILL FOLLOW YOUR OWN CONSCIENCE.

REMEMBER, THERE IS NO FINGERPRINTS IN THIS CASE.  THERE IS NO DNA EVIDENCE.  THERE IS NO GUNS.  IT'S JUST STRICTLY AN I.D. CASE OF A MAN WHO HAS HIS FACE COVERED WITH A SWEAT SHIRT AND ONLY HIS EYES SHOWING.  I CERTAINLY HOPE YOU WILL DO YOUR DUTY.  AND, OF COURSE, I SINCERELY HOPE YOU WILL FIND MY CLIENT RICHARD HORTON NOT GUILTY.

THE COURT:  THANK YOU, MR. SHWARTZ.

MR. STEAD.

MR. STEAD:  THANK YOU, YOUR HONOR.

YOUR HONOR.  JUDGE BENDER.  MR. SHWARTZ.  MS. HOLFINGER.  MR. SMITH.  MEMBERS OF THE JURY.

I HOPE AFTER THAT CLOSING ARGUMENT YOU ARE NOT AFRAID TO DO YOUR DUTY IN THIS CASE IF YOU CAN LIVE WITH YOURSELF.  PLEASE DON'T BE AFRAID TO DO YOUR DUTY IN THIS CASE, PLEASE.  THE INSTRUCTIONS IN THIS CASE, THE MOST IMPORTANT WORDS IN THE INSTRUCTIONS IN THIS CASE ARE THREE LITTLE WORDS, THEY ARE FOUND IN THE REASONABLE DOUBT INSTRUCTIONS.  YOU HEARD IT ALREADY.  REASONABLE DOUBT IS PRESENT WHEN, AFTER YOU HAVE CAREFULLY CONSIDERED AND COMPARED ALL THE EVIDENCE,

304

THOSE THREE WORDS, ALL THE EVIDENCE, YOU CANNOT SAY YOU ARE FIRMLY CONVINCED OF THE TRUTH OF THE CHARGE.

WE DO NOT LOOK AT THE TESTIMONY OF ONE WITNESS TO SAY DOES THAT PROVE IT?  WE DON'T LOOK TO ISOLATE IT FROM THE OTHER WITNESSES ITSELF.  IT IS THE TESTIMONY OF ALL THE WITNESSES IN THIS CASE ON BOTH SIDES.  ALL THE EVIDENCE.

MR. SHWARTZ SPENT A LOT TIME HERE TAKING ABOUT WHAT WE DIDN'T DO.  WHAT WE DON'T HAVE.  WE TOLD YOU UP FRONT THIS IS NOT A CSI CASE.  THIS IS AN EYEWITNESS IDENTIFICATION CASE.  HE TALKS ABOUT, WELL, THERE IS NO VOICE ANALYSIS.  WHY DO VOICE ANALYSIS, THE MAN TOLD THE POLICE THE FIRST TIME HE TALKED TO THEM I RECOGNIZED THE VOICE.  WHAT ARE YOU GOING TO DO VOICE ANALYSIS FOR?  YOU DO VOICE ANALYSIS AND THAT THEORETICAL TV STUFF IF YOU'RE TRYING TO IDENTIFY SOMEBODY THAT YOU DON'T KNOW.  HE KNEW HIM.  HE TALKED TO HIM THE DAY BEFORE.  HE RECOGNIZED THE VOICE.  HE RECOGNIZED THE WORDS, AND HE RECOGNIZED THE SUBJECT MATTER.

YOU KNOW, WE DIDN'T DO THOSE THINGS.  THEY WOULD BE WORTHLESS.  IF WE DO VOICE ANALYSIS, AND IT COMES BACK HE'S GOING TO SAY, OF COURSE HE RECOGNIZED HIM, HE KNOWS HIM.  WHAT IS THE PURPOSE OF IT?  DON'T BE FOOLED.  DON'T BE AFRAID.  IT'S A CREDIBILITY CASE.

THIS IS WHAT IT COMES DOWN TO. THEY SAY, OH, WE WERE IN BED TOGETHER. WE'RE ALWAYS IN BED TOGETHER ON SATURDAY MORNING. HE COULDN'T HAVE DONE IT. OUR WITNESSES COME IN AND SAY THIS IS WHAT HAPPENED ON THAT DAY. WE KNOW WHO THE PERSON IS. THIS IS THE MAN RESPONSIBLE.

YOU'RE GOING TO HAVE TO ASSESS THE CREDIBILITY. THERE IS A TEST THAT THE COURT WILL GIVE TO YOU. YOU KNOW, I ASK YOU THIS, WHY WOULD THOSE TWO PEOPLE COME IN HERE AND LIE TO YOU? WHY? CAN YOU IMAGINE A MORE TERRIFYING EVENT, AWAKENED IN YOUR HOME ANSWERING THE DOOR, PISTOL WHIPPED, SHOT, THREATENED TO BE KILLED, OH, I JUST THINK I WILL GO CAVALIERLY AND PICK OUT ANYBODY AND SAY THAT IS THE PERSON WHO DID IT BECAUSE I DON'T REALLY CARE WHO IT IS. PLEASE.

WHAT IS THEIR MOTIVE TO COME IN AND SAY THAT IS THE MAN WHO DID IT? WHAT POSSIBLE MOTIVE DO THEY HAVE TO COME IN AND SAY THAT? I'M A HUNDRED PERCENT SURE. I SWEAR ON EVERYTHING THAT I LOVE ON THIS EARTH. WHY WOULD THEY COME IN AND SAY THOSE THINGS? THEY JUST WANTED ANYBODY CAUGHT. OF COURSE NOT. OF COURSE NOT. THEY WANTED THE PERSON WHO DID THIS TO THEM, AND THEY KNEW HIM. THEY KNEW HIM.

THEY WILL TALK ABOUT WHAT WE DON'T HAVE. LET'S TALK ABOUT WHAT WE DO. THAT WOMAN, MISS CURRY, ON THE DAY OF THIS INCIDENT TOLD THE DETECTIVE I KNOW WHO

DID IT. I HAVE SEEN HIM IN THE NEIGHBORHOOD. I RECOGNIZED HIM. OKAY. THAT IS HER.

WHEN THE DETECTIVE GETS TO MR. MCCLANAHAN, WHAT DOES HE SAY? THE GUY'S NAME IS RICHARD. I KNOW HIM FROM THE NEIGHBORHOOD. AND HE DESCRIBES THE INCIDENT FROM THE NIGHT BEFORE. AND ONLY WHEN YOU PUT THAT INCIDENT FROM THE NIGHT BEFORE TOGETHER WITH THE EVENT OF THAT SATURDAY MORNING DOES THE WORDS AND ACTIONS OF THE PERSON WHO COMMITTED THIS CRIME MAKE SENSE.

YOU KNOW, MR. SHWARTZ CAN SIT HERE AND TALK TO YOU ABOUT ALL YOU SEE IS THE EYES. WELL, YOU KNOW, RELYING ON YOUR OWN MEMORY, I DON'T THINK THE TESTIMONY WAS JUST THE EYES. I THINK IT WAS MORE THERE. THERE WAS A QUESTION AS TO WHETHER OR NOT THERE WAS LIPS. FOLKS, WE ARE NOT TALKING ABOUT IDENTIFYING A STRANGER HERE. WE ARE TALKING ABOUT IDENTIFYING SOMEBODY THAT YOU KNEW. THIS IS SUFFICIENT TO IDENTIFY PEOPLE THAT YOU KNOW.

AND IT'S NOT JUST THIS THAT MAKES THE IDENTIFICATION. THAT IS WHERE WE GET TO THE ALL THE EVIDENCE. IT IS THE FACIAL I.D. FROM WHAT THEY WERE ABLE TO SEE THAT DAY. IT IS THE VOICE IDENTIFICATION. IT IS THE CLOTHES WERE THE SAME FROM THE NIGHT BEFORE. IT IS THE WORDS THAT THE PERSON USED. NOBODY ELSE KNEW

THAT THAT MAN GOT PAID ON FRIDAY, OTHER THAN HIS CO-WORKERS, AND HIS CO-WORKERS WEREN'T THERE AT THE CONVENIENCE STORE FOR THE DISCUSSION ABOUT THE PHONE.

THE PAY AND THE PHONE ARE ONLY ATTRIBUTABLE TO ONE MAN. IT IS NOT THE I.D. FROM JUST THE INCIDENT. IT IS THE I.D. FROM THE DAY BEFORE. A CONVERSATION HE WANTED TO CALL AN ARGUMENT. THAT IS NOT THE WAY I RECALL THE TESTIMONY. YOU USE YOUR MEMORY. HE HAD A CONVERSATION WITH THIS KNOWN PERSON THE DAY BEFORE. ADD IT ALL TOGETHER AND IT IS OVERWHELMING.

THE VICTIMS IN THIS CASE HAVE BEEN CONSISTENT. THEY CAME IN HERE AND WERE SUBJECT TO CROSS-EXAMINATION. DID THEY GET SHAKEN IN ANY WAY, SHAPE OR FORM? YOU KNOW, IT WAS SUGGESTED, YOU KNOW, YOU BOUGHT DRUGS OFF THIS MAN. MR. MCCLANAHAN SAID NO. NO. AND MR. SHWARTZ CAN GET UP HERE AND SAY THE DEFENDANT TESTIFIED HE SOLD HIM DRUGS. FOLKS, YOU USE YOUR MEMORY, BUT MY RECOLLECTION IS HE SAID HE WOULD SEE RICHARD BUYING DRUGS, NOT THAT HE WAS SELLING HIMSELF DRUGS. THAT HE WOULD SEE HIM BUYING DRUGS.

WHAT IS THE WHOLE PURPOSE OF THIS? YOU KNOW, TO TRY AND TURN HIM INTO SOMEBODY THAT YOU REALLY DON'T CARE ABOUT. HE SAID, NO, DIDN'T HAPPEN. AND THERE IS NOTHING IN THIS COURTROOM TO SUGGEST OTHERWISE. THEIR TESTIMONY IS REASONABLE. IT MAKES SENSE. WHY

308

WOULD THEY COME IN HERE AND LIE TO YOU? THESE WITNESSES CAME TO THEIR OWN INDEPENDENT CONCLUSIONS THAT THEY HAD SEEN THIS PERSON IN THE NEIGHBORHOOD. THEY KNEW WHO THIS PERSON WAS. RICHARD WAS ABLE TO GIVE THE FIRST NAME RICHARD, FACIAL I.D. VOICE I.D. CLOTHING I.D., WORDS THAT WERE USED, IT ALL ADDS UP TO A GOOD IDENTIFICATION IN THIS CASE. NOBODY ELSE POSSESSED THAT INFORMATION EXCEPT THIS MAN BECAUSE OF THE INCIDENT THE DAY BEFORE (INDICATING).

NOW, THEY PRESENTED AN ALIBI TO YOU. THEY CAN SIT HERE AND SAY IT'S JUST NOT FAIR BECAUSE HE DIDN'T GET ARRESTED FAST ENOUGH. WELL, YOU KNOW, IN AN IDEAL WORLD, A POLICE DETECTIVE WOULD GET ASSIGNED TO A CASE, THEY WOULD DO NOTHING BUT WORK THAT CASE UNTIL IT WAS SOLVED. IT IS NOT AN IDEAL WORD. PEOPLE HAVE FAMILIES, PEOPLE TAKE VACATIONS, THEY HAVE 25 OTHER ROBBERY CASES THAT THEY HAVE TO WORK ON. YOU KNOW, THAT CRITICISM JUST ISN'T FAIR. IT IS JUST NOT FAIR.

THEY PUT FORTH AN ALIBI TO YOU. WE KNOW WHERE WE WERE. WE ARE ALWAYS IN BED TOGETHER ON SATURDAY MORNING. THEIR STORIES WEREN'T CONSISTENT HERE IN THIS COURTROOM. WHEN SHE TESTIFIED, I HAVE TO PICK HIM UP BECAUSE HE DOESN'T HAVE A CAR AND HE DOESN'T DRIVE. OF COURSE, WHEN HE GETS ON THE STAND HE ACKNOWLEDGES HE HAS A CAR. HE ACKNOWLEDGED A NUMBER OF

309

DIFFERENT WAYS WHERE HE'S DRIVING, WHEN HE RUNS INTO RICHARD DRIVING, WHEN HE PICKS UP HIS DAUGHTER. YOU KNOW, HE DOESN'T HAVE A LICENSE, HE DOESN'T DRIVE. I HAVE A CAR AND I DO DRIVE. THEY ARE NOT CONSISTENT.

MY SUGGESTION IS SHE CAME IN HERE AND LIED TO YOU. YEAH, I'M SUGGESTING SHE CAME IN HERE AND LIED TO YOU. PEOPLE IN LOVE WILL DO THINGS LIKE THAT, AND YOU KNOW THAT FROM YOUR COMMON SENSE AND YOUR EVERY DAY EXPERIENCE.

THEY TRIED TO MAKE HIM COME -- THEY ARE THE ONES WHO CAME IN AND TRIED TO PRESENT THIS GOOD FINANCIAL PICTURE. I DON'T HAVE ANY FINANCIAL DIFFICULTIES, THEREFORE, I WOULDN'T DO A ROBBERY. THEY ARE THE ONES WHO BROUGHT IT FORTH.

THEY BRING IN THESE DOCUMENTS. WE TAKE THESE DOCUMENTS AND USE THEM. WE CROSS-EXAMINED HIM. DID HE HOLD UP ON CROSS-EXAMINATION LIKE THE TWO VICTIMS DID IN THIS CASE? DID YOU SEE HIM HOLD STEADY? NO, I HAVE NO FINANCIAL DIFFICULTIES. MY ONLY -- HE WORKS ALL THE TIME. HE WORKS ALL THE TIME. HE WORKED 23 HOURS A WEEK BACK IN THAT TIME PERIOD. I WORK 9:30 TO 4:30, I WORK ON WEEKENDS, AND I PAY MY MY CHILD SUPPORT, TRYING TO CREATE AND IMPRESSION FOR YOU. YOU STILL HAVE THAT IMPRESSION. IF YOU DON'T STILL HAVE THAT IMPRESSION, WHY WOULD THE MAN BE SITTING UP HERE TELLING YOU THAT?

R. HORTON 002076

310

WHY WOULD HE BE SELLING IT IF IT AIN'T TRUE?

YOU KNOW YOU CAN'T LIVE THE WAY HE WAS LIVING ON THAT INCOME. IT'S A SAD THING IN THIS WORLD. YOU KNOW, I UNDERSTAND WHAT HE SAYS WHEN HE SAYS IT'S TOUGH WHEN YOU GET OUT OF PRISON. I FEEL FOR HIM IN THAT REGARD. BUT THAT DOESN'T SUDDENLY CHANGE THE FACTS. YOU KNOW, YOU CAN'T HAVE A $600 MONTH RENT PAYMENT, PHONE BILLS, UTILITY BILLS, ENTERTAINMENT EXPENSES, CHILD SUPPORT, ON 500 AND SOME DOLLARS A MONTH, CAN'T DO IT. CAN'T DO IT. CAN'T DO IT.

WHY WOULD THEY COME IN AND TRY AND PRESENT THAT PICTURE? YOU KNOW, HE SAYS, WELL, THE STATE HAS THE RESPONSIBILITY OF GETTING THOSE DOCUMENTS. WE ARE NOT THE ONES WHO SUGGESTED HE WAS FINANCIALLY SECURE. THEY ARE. AND THEN WHEN WE SAY ARE THERE DOCUMENTS, NO. YEAH, THERE IS DOCUMENTS. THEN WE -- WHEN YOU ASK THE QUESTION, NO, NO, THERE IS NO DOCUMENTATION. COME ON. THEY TRIED TO SELL IT. ARE YOU BUYING IT?

YOU CAN CRITICIZE THE POLICE AND SAY YOU DIDN'T DO A SEARCH WARRANT. WELL, FOLKS, THERE ARE RULES TO GETTING SEARCH WARRANTS. THE DETECTIVE EXPLAINED THAT TO YOU. YOU KNOW, WHAT ADDRESS ARE WE GOING TO DO A SEARCH WARRANT AT, HIS RESIDENCE? HIS GIRLFRIEND'S RESIDENCE? THEY DIDN'T EVEN KNOW ABOUT THE GIRLFRIEND'S RESIDENCE UNTIL HE WAS ARRESTED. OKAY.

311

BUT AT THAT POINT HE'S KNOWN FOR TWO WEEKS WE ARE LOOKING FOR HIM FOR THIS CASE.  OH, HE WOULD CERTAINLY KEEP THE GUN AROUND.  RIGHT.  CRITICIZE US FOR NOT LOOKING FOR IT.

MR. SHWARTZ SAYS HE IMMEDIATELY SURRENDERED WHEN HE BECAME AWARE OF THE WARRANT.  THAT'S NOT THE EVIDENCE THAT I HEARD.  HE WAS MADE AWARE ON DECEMBER 16TH, HE TURNED HIMSELF IN AFTER CHRISTMAS.  10 DAYS. 10 DAYS.  YOU KNOW, WHAT IS THIS ABOUT HIS TESTIMONY THAT MAKES YOU BELIEVE HIM?  YOU ARE ALLOWED TO CONSIDER HIS CRIMINAL RECORD FOR THE PURPOSE OF JUDGING CREDIBILITY.  YOU KNOW, YOU DIDN'T HEAR ANY CRIMINAL RECORD WITH RESPECT TO MR. MCCLANAHAN AND MISS CURRY. HE'S GOT ONE.  THINK ABOUT THAT IN ASSESSING HIS CREDIBILITY.

THINK ABOUT THE PAROLE AS FAR AS A MOTIVE TO COME IN HERE AND MAYBE NOT TELL YOU GUYS THE TRUTH.  YOU KNOW, WE COULD STAND UP HERE FOR DAYS, BUT I WON'T.  YOU HAVE HEARD IT.  IT IS A VERY, VERY SIMPLE CASE.  WHEN YOU PUT TOGETHER ALL THE EVIDENCE IN THIS CASE, AND YOU CONSIDER THE CREDIBILITY OF THESE PEOPLE, THEY HAVE NO REASON TO COME IN HERE AND SAY WHAT THEY DID UNLESS IT'S THE TRUTH.  IT'S THE TRUTH.  IT'S NOT JUST THE I.D. FROM THE MORNING WITH THE HOODIE UP SHOWING THIS MUCH OF HIS FACE.  IT'S THE SIGHT THAT DAY, IT'S THE WORDS THAT DAY,

312

IT'S THE VOICE THAT DAY, IT'S THE CLOTHING THAT DAY, AND IT TIES INTO THE INCIDENT THE DAY BEFORE.  AND ONLY ONE MAN IN THIS WORLD, THAT MAN RIGHT THERE, KNEW THE THINGS THAT WERE SAID THAT DAY.

THE IDENTIFICATION IS OVERWHELMING IN THIS CASE.  DON'T BE AFRAID TO BACK IT.

THE COURT:  THANK YOU, MR. STEAD.  WELL, LADIES AND GENTLEMEN, THIS HAS GONE ON FOR ABOUT AN HOUR AND A HALF.  WOULD YOU ALL APPRECIATE A RECESS BEFORE I READ THE INSTRUCTIONS TO YOU?  THAT WILL TAKE ABOUT 20 MINUTES.

NOBODY WANTS A RECESS.

- - -

THEREUPON, THE COURT CHARGED THE JURY AS FOLLOWS:

313

IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

STATE OF OHIO,                    :

        PLAINTIFF,              :

    VS.                           : CASE NO. 05CR-146

RICHARD HORTON,                   :    CHARGE

        DEFENDANT.              :

- - -

BENDER, J.   WELL, MEMBERS OF THE JURY, WHEN YOU CLOSE TO DELIBERATE AND VOTE ON YOUR VERDICT IN THIS CASE, EACH OF YOU MUST RESOLVE THE ULTIMATE ISSUE OF GUILT OR NONGUILT IN ACCORDANCE WITH THE LAW AND YOUR CONSCIENCE AND EVIDENCE SUBMITTED IN COURT.  IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.  AND IT IS YOUR DUTY AS JURORS TO DETERMINE THE FACTS OF THE CASE, APPLY THE LAW THAT I GIVE YOU TO THOSE FACTS, AND DETERMINE THE GUILT OR NONGUILT OF THE DEFENDANT BEFORE YOU.  YOU ARE NOT PERMITTED TO CHANGE THE LAW OR TO APPLY YOUR OWN IDEA OF WHAT YOU THINK THE LAW SHOULD BE.  YOU MUST BEAR IN MIND THIS DEFENDANT IS PRESUMED TO BE NOT GUILTY OF ANY CHARGE AGAINST HIM UNTIL AND IF THE STATE PROVES BY LEGAL AND COMPETENT EVIDENCE THE GUILT OF THE DEFENDANT BEYOND A REASONABLE DOUBT.

        NOW, A CRIMINAL CASE SUCH AS THIS ONE BEGINS

R. HORTON 002080

314

WITH THE FILING OF AN INDICTMENT WHICH INFORMS THE DEFENDANT THAT HE HAS BEEN CHARGED WITH A CRIME OR CRIMES. NEITHER THE FACT THAT THIS INDICTMENT HAS BEEN FILED OR THAT HE IS HERE IN COURT IS ANY EVIDENCE OF GUILT.

NOW, AS I STATED EARLIER, THE DEFENDANT MUST BE PRESUMED TO BE NOT GUILTY UNTIL AND IF HIS GUILT IS ESTABLISHED BY LEGAL AND COMPETENT EVIDENCE BEYOND A REASONABLE DOUBT.

WE HAVE HEARD A LOT ABOUT REASONABLE DOUBT. I READ THE DEFINITION TO YOU BEFORE, AND I WILL READ IT AGAIN TO YOU NOW.

REASONABLE DOUBT IS PRESENT WHEN, AFTER YOU HAVE CAREFULLY CONSIDERED AND COMPARED ALL OF THE EVIDENCE, YOU CANNOT SAY YOU ARE FIRMLY CONVINCED OF THE TRUTH OF THE CHARGE. REASONABLE DOUBT IS A DOUBT BASED ON REASON AND COMMON SENSE. REASONABLE DOUBT IS NOT MERE POSSIBLE DOUBT, BECAUSE EVERYTHING RELATING TO HUMAN AFFAIRS OR DEPENDING ON MORAL EVIDENCE IS OPEN TO SOME POSSIBLE OR IMAGINARY DOUBT. PROOF BEYOND A REASONABLE DOUBT IS PROOF OF SUCH A CHARACTER THAT AN ORDINARY PERSON WOULD BE WILLING TO RELY AND ACT UPON IT IN THE MOST IMPORTANT OF HIS OR HER OWN AFFAIRS.

NOW, THE RULE AS TO REASONABLE DOUBT EXTENDS TO EVERY ESSENTIAL ELEMENT OF THE OFFENSES CHARGED,

315

ALTHOUGH EACH PARTICULAR FACT ADVANCED BY THE PROSECUTION WHICH DOES NOT CONSTITUTE AN ESSENTIAL ELEMENT OF THE CHARGED OFFENSES NEED NOT BE ESTABLISHED BEYOND A REASONABLE DOUBT.  THE BURDEN OF PROVING A CHARGE BEYOND A REASONABLE DOUBT RESTS AT ALL TIMES ON THE PROSECUTION, NEVER ON THE DEFENSE.

NOW, AS MEMBERS OF THE JURY, YOU SHOULD BEAR IN MIND ONLY EVIDENCE PROPERLY BEFORE YOU MAY BE CONSIDERED.  THAT IS WHAT IS MEANT BY LEGAL AND COMPETENT EVIDENCE.  THEREFORE, ARGUMENTS OF COUNSEL WHICH YOU JUST HEARD, ARE NOT EVIDENCE.  ARGUMENT IS MADE BY EACH SIDE TO HELP YOU IN UNDERSTANDING AND WEIGHING THE EVIDENCE AND SHOULD BE REGARDED BY YOU AS SUCH.  HOWEVER, YOU ARE NOT REQUIRED TO GIVE THEIR STATEMENTS ANY FURTHER CREDENCE OR ATTACH TO THEM ANY MORE IMPORTANCE THAN YOUR OWN RECOLLECTION OF THE EVIDENCE COMPELS.  LIKEWISE, STATEMENTS WHICH I HAVE INSTRUCTED YOU TO DISREGARD THROUGH THE SUSTAINING OF OBJECTIONS OR OTHERWISE ARE NOT EVIDENCE AND MAY NOT BE CONSIDERED BY YOU.  IN WEIGHING THE EVIDENCE, YOU ARE EXPECTED TO UTILIZE YOUR COMMON SENSE, AND YOUR KNOWLEDGE OF HUMAN NATURE, AND THE WAYS OF THE WORLD. IN LIGHT OF ALL THE CIRCUMSTANCES OF THE CASE, YOU SHOULD CONSIDER THE INHERENT PROBABILITY OR IMPROBABILITY OF THE EVIDENCE, AND WITH THIS IN MIND,

R. HORTON 002082

316

YOU MAY PROPERLY BELIEVE ONE WITNESS AND DISBELIEVE SEVERAL WITNESSES WHOSE TESTIMONY IS OR MAY BE IN CONFLICT WITH THE ONE.

THE FINAL DECISION AS TO THE WEIGHT OF THE EVIDENCE AND THE CREDIBILITY OF THESE WITNESSES RESTS SOLELY UPON YOU AS MEMBERS OF THIS JURY.  YOU MUST DISREGARD ANY COMMENT OR STATEMENT MADE BY ME DURING THE COURSE OF THIS TRIAL WHICH MAY SEEM TO INDICATE AN OPINION AS TO THE GUILT OR NONGUILT OF THIS DEFENDANT, FOR YOU AND YOU ALONE HAVE THE ULTIMATE INDEPENDENT RESPONSIBILITY OF DECIDING THIS ISSUE.  EACH OF YOU MUST RESOLVE THIS ISSUE AS TO GUILT OR NONGUILT OF THE DEFENDANT IN ACCORDANCE WITH THE EVIDENCE, AND THE LAW, AND YOUR OWN CONSCIENCE.

NOW, I HAVE TALKED A LOT ABOUT EVIDENCE. WHAT IS IT?  WELL, "EVIDENCE" IS ALL THE TESTIMONY RECEIVED FROM THE WITNESSES, THE EXHIBITS ADMITTED DURING THE TRIAL, ANY FACTS AGREED TO BY COUNSEL WHICH ARE CALLED STIPULATIONS.

EVIDENCE MAY BE OF TWO TYPES, DIRECT OR CIRCUMSTANTIAL, OR A COMBINATION THEREOF.

NOW, DIRECT EVIDENCE IS THE TESTIMONY GIVEN BY A WITNESS WHO HAS SEEN OR HEARD THE THINGS TO WHICH HE TESTIFIES.  IT INCLUDES THE EXHIBITS ADMITTED INTO EVIDENCE DURING THE TRIAL.  IT MAY ALSO INCLUDE OTHER

R. HORTON 002083

317

FORMS OF EVIDENCE WHICH TEND TO DIRECTLY PROVE A FACT OR ISSUE IN THE CASE.

CIRCUMSTANTIAL EVIDENCE, ON THE OTHER HAND, IS EVIDENCE WHICH DOES NOT DIRECTLY PROVE OR DISPROVE A FACT OR ISSUE, BUT MAY PROVE A FACT OR CIRCUMSTANCE FROM WHICH YOU MAY INFER, WHICH MEANS TO DRAW A CONCLUSION, IF YOU CARE TO, AS TO ITS EXISTENCE OR NONEXISTENCE OF AN ISSUE.  THERE IS NO SET RULE AS TO THE WEIGHT YOU GIVE TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.  YOU MUST DECIDE FROM ALL OF THE EVIDENCE, WHETHER IT BE DIRECT OR CIRCUMSTANTIAL, WHO OR WHAT TO BELIEVE.

IN FACT, I WILL TELL YOU, THE ONLY REASON I EVEN BOTHER TO GIVE THIS INSTRUCTION IS BECAUSE SOME PEOPLE COME IN HERE THINKING THAT ONE KIND OF EVIDENCE IS BETTER THAN ANOTHER KIND.  THAT IS JUST NOT THE CASE. YOU DECIDE WHAT KIND OF EVIDENCE IT IS, AND YOU DECIDE HOW MUCH WEIGHT TO GIVE IT.  YOU DECIDE WHO AND WHAT TO BELIEVE.

NOW, AS I STATED BEFORE, THE STATE MUST PROVE EACH AND EVERY ESSENTIAL ELEMENT OF THE CHARGED OFFENSES IN THIS CASE, OR ANY OFFENSE, BEYOND A REASONABLE DOUBT.  THERE ARE SIX COUNTS, OR CHARGES, IN THIS CASE FOR YOU TO CONSIDER.  THERE IS ALSO ONE SPECIFICATION FOR YOU TO CONSIDER IN CONNECTION WITH EACH CHARGED OFFENSE.

R. HORTON 002084

318

BEFORE I BEGIN WITH THE ELEMENTS, I WANT TO ADVISE YOU THIS IS GOING TO BE RATHER LONG AND COMPLICATED. YOU WILL HAVE IT WITH YOU IN THE JURY ROOM, COPIES OF THESE INSTRUCTIONS, TO REFER TO. I WANT YOU TO LISTEN VERY CLOSELY AS I READ THIS TO YOU. BUT IF YOU HAPPEN TO MISS SOMETHING, IT WILL BE CONTAINED IN THE WRITTEN INSTRUCTIONS WHICH WILL BE PROVIDED TO YOU.

LET'S START WITH COUNT ONE. COUNT ONE IS A COUNT OF AGGRAVATED BURGLARY.

THE DEFENDANT IS CHARGED WITH AGGRAVATED BURGLARY IN COUNT ONE. BEFORE YOU CAN FIND THE DEFENDANT GUILTY OF THIS COUNT, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT, WITH PURPOSE TO COMMIT A THEFT OFFENSE, AND IN THIS CASE THAT OFFENSE IS THEFT, OR ALLEGED TO BE THEFT, TRESPASSED BY FORCE IN AN OCCUPIED STRUCTURE WHEN RICHARD MCCLANAHAN AND/OR RHONDA CURRY WAS PRESENT IN THAT STRUCTURE, AND THE DEFENDANT, ONE, EITHER INFLICTED PHYSICAL HARM UPON RICHARD MCCLANAHAN, OR THREATENED TO INFLICT PHYSICAL HARM ON RHONDA CURRY, AND/OR, TWO, HAD A DEADLY WEAPON, TO WIT: A FIREARM ON HIS OR ABOUT HIS PERSON OR UNDER HIS CONTROL.

I'M NOW GOING TO DEFINE FOR YOU SEVERAL OF THE TERMS THAT I HAVE USED IN THAT FIRST PARAGRAPH.

R. HORTON 002085

319

NOW, I USED THE WORD TREPASS.  WHAT IS IT?

A "TRESPASS" IS KNOWINGLY ENTERING ON THE LAND OR PREMISES OF ANOTHER WITHOUT PRIVILEGE TO DO SO.

"LAND AND PREMISES" INCLUDES ANY LAND, BUILDING, STRUCTURE, OR PLACE BELONGING TO, CONTROLLED BY, OR IN THE CUSTODY OF ANOTHER, INCLUDING A PUBLIC AGENCY, AND ANY SEPARATE ENCLOSURE OR ROOM, OR PORTION THEREOF.

NOW, IN RELATION TO THE WORD TRESPASS, I INDICATED A PERSON MUST KNOWINGLY ENTER ON THOSE LANDS OR PREMISES WITHOUT THE PRIVILEGE TO DO SO.

WHAT DOES PRIVILEGE MEAN?  "PRIVILEGE" MEANS IMMUNITY, LICENSE, OR RIGHT CONFERRED BY LAW, BESTOWED BY EXPRESS OR IMPLIED GRANT, OR ARISING OUT OF STATUS, POSITION, OFFICE OR RELATIONSHIP, OR GROWING OUT OF NECESSITY.

NOW, I INDICATED THAT THE TRESPASS MUST BE BY FORCE IN AN OCCUPIED STRUCTURE.

WHAT IS FORCE?  "FORCE" MEANS ANY VIOLENCE, COMPULSION OR CONSTRAINT PHYSICALLY EXERTED BY ANY MEANS UPON OR AGAINST A PERSON OR THING.

WHAT IS AN OCCUPIED STRUCTURE?  WELL, AN "OCCUPIED STRUCTURE" IN THE LAW MEANS ANY HOUSE, BUILDING, OR ANY PORTION THEREOF, WHICH AT THE TIME IS OCCUPIED AS THE PERMANENT OR TEMPORARY HABITATION OF ANY

PERSON, WHETHER OR NOT ANY PERSON IS ACTUALLY PRESENT.

NOW, I INDICATED THAT ONE OF THE ALTERNATIVE ELEMENTS HERE IS THAT THE DEFENDANT INFLICTED PHYSICAL HARM UPON RICHARD MCCLANAHAN OR THREATED TO INFLICT PHYSICAL HARM ON RHONDA CURRY.

WHAT IS PHYSICAL HARM?  "PHYSICAL HARM TO PERSONS" MEANS ANY INJURY, ILLNESS OR OTHER PHYSIOLOGICAL IMPAIRMENT REGARDLESS OF ITS GRAVITY OR DURATION.

I INDICATED THE SECOND ALTERNATIVE IS THAT AT THE TIME OF THE TRESPASS, THAT THE DEFENDANT HAD A DEADLY WEAPON, TO WIT:  A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL.

A "DEADLY WEAPON" IS DEFINED AS ANY INSTRUMENT, DEVICE, OR THING CAPABLE OF INFLICTING DEATH, AND DESIGNED OR SPECIALLY ADAPTED FOR USE AS A WEAPON, OR POSSESSED, CARRIED OR USED AS A WEAPON.  IN THIS CASE, I AM INSTRUCTING YOU AS A MATTER OF LAW THAT A FIREARM IS A DEADLY WEAPON.

NOW, AS PART OF THE ELEMENTS IN THIS CASE I INDICATED THE DEFENDANT MUST TRESPASS IN AN OCCUPIED STRUCTURE WITH THE PURPOSE TO COMMIT A THEFT OFFENSE THEREIN.

WHAT DOES PURPOSE MEAN?  WELL, IN THIS CASE AS TO THIS PARTICULAR COUNT, "PURPOSE" TO COMMIT A

R. HORTON 002087

321

CRIMINAL OFFENSE IS AN ELEMENT OF A CRIME OF AGGRAVATED BURGLARY. A PERSON ACTS PURPOSELY WHEN IT IS HIS SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT. IT MUST BE ESTABLISHED IN THIS CASE THAT AT THE TIME IN QUESTION THERE WAS PRESENT IN THE MIND OF THE DEFENDANT A SPECIFIC INTENTION TO COMMIT A THEFT OFFENSE. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS DETERMINED FROM THE MANNER IN WHICH IT IS DONE, THE MEANS USED, AND ALL THE OTHER FACTS AND CIRCUMSTANCES IN EVIDENCE.

PURPOSE IS A DECISION OF THE MIND TO DO AN ACT WITH A CONSCIOUS OBJECTIVE OF ENGAGING IN SPECIFIC CONDUCT. TO DO AN ACT PURPOSELY IS TO DO IT INTENTIONALLY AND NOT ACCIDENTALLY. PURPOSE AND INTENT MEAN THE SAME THING. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS KNOWN ONLY TO HIMSELF, UNLESS HE EXPRESSES IT TO OTHERS OR INDICATES IT BY HIS CONDUCT.

NOW, THE PURPOSE TO COMMIT A THEFT OFFENSE, AS I HAVE INDICATED, IS AN ELEMENT OF THIS CHARGE OF AGGRAVATED BURGLARY. BEFORE YOU CAN FIND THE DEFENDANT GUILTY OF AGGRAVATED BURGLARY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, IN FRANKLIN COUNTY, THAT THE DEFENDANT HAD THE PURPOSE TO COMMIT AN OFFENSE OF THEFT.

NOW, WHAT IS A THEFT OFFENSE? "THEFT" IS DEFINDED AS KNOWINGLY OBTAINING OR EXERTING CONTROL OVER

R. HORTON 002088

THE PROPERTY OF ANOTHER WITH THE PURPOSE TO DEPRIVE THE OWNER OF SAID PROPERTY.

WHAT DOES DEPRIVE MEAN?  "DEPRIVE" MEANS TO ACCEPT, USE, OR APPROPRIATE MONEY, IN THIS CASE, WITH PURPOSE NOT TO GIVE PROPER CONSIDERATION IN RETURN FOR THE MONEY AND WITHOUT REASONABLE JUSTIFICATION OR EXCUSE FOR NOT GIVING PROPER CONSIDERATION.

WHAT DOES AN OWNER MEAN?  "OWNER" MEANS ANY PERSON, OTHER THAN THE DEFENDANT, WHO IS THE OWNER OF, OR WHO HAS POSSESSION OF OR CONTROL OF, OR ANY LICENSE OR INTEREST IN THE PROPERTY OR SERVICES.

NOW, I HAVE INDICATED THAT PART OF THIS DEFINITION OF THEFT IS KNOWINGLY OBTAIN OR EXERTING CONTROL.

WHAT DOES KNOWINGLY MEAN?  A PERSON ACTS "KNOWINGLY", REGARDLESS OF HIS PURPOSE, WHEN HE IS AWARE THAT HIS CONDUCT WILL PROBABLY BE OF A CERTAIN NATURE. A PERSON HAS KNOWLEDGE OF CIRCUMSTANCES WHEN HE IS AWARE THAT SUCH CIRCUMSTANCES PROBABLY EXIST.  SINCE YOU CANNOT LOOK INTO THE MIND OF ANOTHER, KNOWLEDGE IS DETERMINED FROM ALL THE FACTS AND CIRCUMSTANCES IN EVIDENCE.

NOW, PART OF THIS DEFINITION OF THEFT IS TO TAKE THE PROPERTY WITHOUT CONSENT.  "CONSENT" MAY BE EITHER EXPRESSED OR IMPLIED.  EXPRESS CONSENT IS

R. HORTON 002089

323

DETERMINED BY THE WRITTEN OR SPOKEN WORDS OF THE PERSONS INVOLVED.  IMPLIED CONSENT IS DETERMINED BY THE FACTS AND CIRCUMSTANCES WHICH SURROUND THOSE INVOLVED, INCLUDING THEIR WORDS AND ACTS, FROM WHICH YOU MAY INFER CONSENT WAS GIVEN TO THE DEFENDANT OR NOT GIVEN.

IF YOU FIND THE STATE PROVED -- NOW I HAVE GIVEN ALL THE DEFINITIONS THAT ARE NECESSARY IN RELATION TO THIS OFFENSE.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL THE ESSENTIAL ELEMENTS OF THE OFFENSE OF AGGRAVATED BURGLARY, YOUR VERDICT MUST BE GUILTY OF AGGRAVATED BURGLARY.  IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OF THE ESSENTIAL ELEMENTS OF THE OFFENSE OF AGGRAVATED BURGLARY, THEN YOUR VERDICT MUST BE NOT GUILTY OF AGGRAVATED BURGLARY.

NOW, AS TO THIS CHARGE, AND AS TO EACH OF THE OTHER CHARGES, THE STATE ALLEGES -- EXCUSE ME, NOT AS TO EACH OTHER CHARGE, BUT AS TO THIS CHARGE, THE STATE ALLEGES THE DEFENDANT, ONE, INFLICTED PHYSICAL HARM UPON RICHARD MCCLANAHAN, AND/OR THREATENED TO INFLICT PHYSICAL HARM ON RHONDA CURRY, AND/OR, TWO, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL.  THESE ARE ALTERNATIVES.  YOU MUST UNANIMOUSLY AGREE ON ONE OR BOTH OF THESE ALTERNATIVES BEYOND A

R. HORTON 002090

324

REASONABLE DOUBT IN ORDER TO FIND THE DEFENDANT GUILTY OF AGGRAVATED BURGLARY.  YOU ALL UNDERSTAND THAT?

JURY PANEL:  YES.

THE COURT:  VERY WELL.

THE DEFENDANT IS ALSO CHARGED WITH A FIREARM SPECIFICATION AS TO THE AGGRAVATED BURGLARY OF RICHARD MCCLANAHAN AND/OR RHONDA CURRY.  HERE, THIS FIREARM SPECIFICATION IS ALSO CHARGED AS TO EACH AND EVERY COUNT AS I SHALL SO INSTRUCT YOU.  IF AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF AGGRAVATED BURGLARY WILL YOU THEN CONSIDER WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE FIREARM SPECIFICATION.

IN ORDER TO FIND THE DEFENDANT GUILTY OF THE FIREARM SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL WHILE COMMITTING THE AGGRAVATED BURGLARY OF RICHARD MCCLANAHAN AND/OR RHONDA CURRY, AND THAT HE USED THE FIREARM TO FACILITATE THE AGGRAVATED BURGLARY OF RICHARD MCCLANAHAN AND/OR RHONDA CURRY.

NOW, A FIREARM IS DEFINED IN THE LAW AS FOLLOWS:  A "FIREARM" MEANS ANY DEADLY WEAPON CAPABLE OF EXPELLING OR PROPELLING ONE OR MORE PROJECTILES BY THE ACTION OF AN EXPLOSIVE OR COMBUSTIBLE PROPELLANT. "FIREARM" INCLUDES ANY UNLOADED FIREARM AND ANY FIREARM

R. HORTON 002091

325

WHICH IS INOPERABLE, BUT WHICH CAN BE READILY RENDERED OPERABLE.

I HAVE USED THE TERM "ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" MEANS THAT THE FIREARM WAS EITHER CARRIED ON THE DEFENDANT'S PERSON OR WAS SO NEAR THE DEFENDANT'S PERSON AS TO BE CONVENIENTLY ACCESSIBLE AND WITHIN HIS IMMEDIATE PHYSICAL REACH.

NOW, IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL THE ESSENTIAL ELEMENTS OF THIS FIREARM SPECIFICATION, YOUR VERDICT MUST BE GUILTY AS TO THE FIREARM SPECIFICATION.  IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THAT FIREARM SPECIFICATION.

NOW, LET'S PROCEED TO COUNT TWO.  I CAN TELL YOU I DON'T THINK COUNT TWO WILL BE QUITE AS LONG AS COUNT ONE.

THE DEFENDANT IS CHARGED WITH AGGRAVATED ROBBERY OF RICHARD MCCLANAHAN IN COUNT TWO.  BEFORE YOU CAN FIND THE DEFENDANT GUILTY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT, WHILE COMMITTING OR ATTEMPTING TO COMMIT THEFT, ONE, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON

OR UNDER HIS CONTROL AND USED THE WEAPON, AND/OR, TWO, INFLICTED SERIOUS PHYSICAL HARM ON RICHARD MCCLANAHAN.

NOW, COMMITTING OR ATTEMPTING TO COMMIT A THEFT IS AN ESSENTIAL ELEMENT OF THE OFFENSE OF AGGRAVATED ROBBERY. BEFORE YOU CAN FIND THE DEFENDANT GUILTY OF AGGRAVATED ROBBERY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT, WITH PURPOSE TO DEPRIVE THE OWNER OF MONEY IN THIS CASE, KNOWINGLY OBTAINED THE MONEY WITHOUT THE CONSENT OF THE OWNER.

NOW, DEPRIVE, AGAIN, I WILL DEFINE IT FOR YOU. "DEPRIVE," AGAIN, IT MEANS TO ACCEPT, USE, OR APPROPRIATE MONEY WITH THE PURPOSE NOT TO GIVE PROPER CONSIDERATION IN RETURN FOR THE MONEY AND WITHOUT REASONABLE JUSTIFICATION OR EXCUSE FOR NOT GIVING PROPER CONSIDERATION.

"OWNER" IS, AGAIN, AS DEFINED, MEANS ANY PERSON, OTHER THAN THE DEFENDANT, WHO IS THE OWNER OF, OR WHO HAS POSSESSION OF OR CONTROL OF, OR ANY LICENSE OR INTEREST IN THE PROPERTY OR SERVICES, IN THIS CASE THE MONEY.

NOW, AGAIN, THE PERSON MUST ACT WITH PURPOSE. AND IN THIS CASE, AGAIN, I WILL REPEAT THE DEFINITION OF PURPOSE FOR YOU. "PURPOSE" TO DEPRIVE IS

327

AN ELEMENT OF THE CRIME OF THEFT. A PERSON ACTS PURPOSELY WHEN IT IS HIS SPECIFIC INTENTION TO CAUSE A CERTAIN RESULT. IT MUST BE ESTABLISHED IN THIS CASE THAT AT THE TIME IN QUESTION THERE WAS IN THE MIND OF THE DEFENDANT A SPECIFIC INTENTION TO DEPRIVE MR. MCCLANAHAN OF PROPERTY, IN THIS CASE MONEY. NOW, THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS DETERMINED FROM THE MANNER IN WHICH IT IS DONE, THE MEANS USED, AND ALL THE OTHER FACTS AND CIRCUMSTANCES IN EVIDENCE.

PURPOSE IS A DECISION OF THE MIND TO DO AN ACT WITH A CONSCIOUS OBJECTIVE OF ENGAGING IN SPECIFIC CONDUCT. TO DO AN ACT PURPOSELY IS TO DO IT INTENTIONALLY AND NOT ACCIDENTALLY. PURPOSE AND INTENT MEAN THE SAME THING. THE PURPOSE WITH WHICH A PERSON DOES AN ACT IS KNOWN ONLY TO HIMSELF, UNLESS HE EXPRESSES IT TO OTHERS OR INDICATES IT BY HIS CONDUCT.

NOW, I HAVE ALSO USED THE TERM "KNOWINGLY" IN RELATION TO THIS ALLEGED OFFENSE. AGAIN, A PERSON ACTS KNOWINGLY, REGARDLESS OF HIS PURPOSE, WHEN HE IS AWARE THAT HIS CONDUCT WILL PROBABLY BE OF A CERTAIN NATURE. A PERSON HAS KNOWLEDGE OF CIRCUMSTANCES WHEN HE IS AWARE THAT SUCH CIRCUMSTANCES PROBABLY EXIST. SINCE YOU CANNOT LOOK INTO THE MIND OF ANOTHER, KNOWLEDGE IS DETERMINED FROM ALL THE FACTS AND CIRCUMSTANCES IN EVIDENCE.

R. HORTON 002094

328

AGAIN, IN RELATION TO THE THEFT OFFENSE, ONE OF THE ISSUES IS CONSENT. CONSENT MAY BE EITHER EXPRESSED OR IMPLIED. EXPRESS CONSENT IS DETERMINED BY THE WRITTEN OR SPOKEN WORDS OF THE PERSONS INVOLVED. APPLIED CONSENT IS DETERMINED BY THE FACTS AND CIRCUMSTANCES WHICH SURROUND THOSE INVOLVED, INCLUDING THEIR WORDS AND ACTS, FROM WHICH YOU MAY INFER THAT CONSENT WAS GIVEN TO THE DEFENDANT.

NOW, AS TO THIS COUNT OF AGGRAVATED ROBBERY, I PREVIOUSLY INSTRUCTED YOU THE DEFENDANT, WHILE COMMITTING OR ATTEMPTING TO COMMIT THEFT, ONE, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND USED THAT WEAPON.

AGAIN, THE DEFINITION OF "DEADLY WEAPON", THAT MEANS ANY INSTRUMENT, DEVICE OR THING CAPABLE OF INFLICTING DEATH, AND DESIGNED OR SPECIALLY ADAPTED FOR USE AS A WEAPON, OR POSSESSED, CARRIED, OR USED AS A WEAPON. IN THIS CASE, I AM INSTRUCTING YOU, AGAIN, AS A MATTER OF LAW, THAT A FIREARM IS A DEADLY WEAPON.

"ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" MEANS THAT THE FIREARM WAS EITHER CARRIED ON THE DEFENDANT'S PERSON OR WAS SO NEAR THE DEFENDANT'S PERSON AS TO BE CONVENIENTLY ACCESSIBLE AND WITHIN HIS IMMEDIATE PHYSICAL REACH.

NOW, FOR PURPOSES OF THE OFFENSE OF

R. HORTON 002095

329

AGGRAVATED ROBBERY, I INSTRUCTED YOU THAT THE DEFENDANT, AS I SAID, WHILE COMMITTING OR ATTEMPTING TO COMMIT THEFT, EITHER HAD THE DEADLY WEAPON "ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL," AND/OR INFLICTED SERIOUS PHYSICAL HARM TO RICHARD MCCLANAHAN.

NOW, THE ACT OF INFLICTING SERIOUS PHYSICAL HARM, OR OF HAVING A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, THOSE ACTS OR ACT MUST OCCUR DURING OR IMMEDIATELY AFTER THE ALLEGED THEFT OFFENSE IN THIS CASE. IT CAN'T BE SOME OTHER TIME. IT HAS TO BE DURING OR IMMEDIATELY AFTER THE THEFT.

NOW, WHAT IS "SERIOUS PHYSICAL HARM"? AGAIN, THAT MEANS ANY PHYSICAL HARM THAT CARRIES A SUBSTANTIAL RISK OF DEATH; ANY PHYSICAL HARM THAT INVOLVES SOME PERMANENT INCAPACITY, WHETHER PARTIAL OR TOTAL, OR THAT INVOLVES SOME TEMPORARY SUBSTANTIAL INCAPACITY; AND ANY PHYSICAL HARM THAT INVOLVES SOME PERMANENT DISFIGUREMENT; OR THAT INVOLVES SOME TEMPORARY, SERIOUS DISFIGUREMENT; OR D, ANY PHYSICAL HARM THAT INVOLVES ACUTE PAIN OF SUCH DURATION AS TO RESULT IN SUBSTANTIAL SUFFERING OR THAT INVOLVES ANY DEGREE OF PROLONGED OR INTRACTABLE PAIN.

"SUBSTANTIAL RISK" MEANS A STRONG POSSIBILITY, AS CONTRASTED WITH THE REMOTE OR SIGNIFICANT POSSIBILITY, THAT A CERTAIN RESULT MAY OCCUR

R. HORTON 002096

330

OR THAT CERTAIN CIRCUMSTANCES MAY EXIST.

NOW, I HAVE USED, AGAIN, THE WORLD "KNOWINGLY" IN RELATION TO THIS OFFENSE. THAT TERM HAS ALREADY BEEN DEFINED FOR YOU IN THE PREVIOUS COUNT. YOU SHOULD REFER TO IT.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE OFFENSE OF AGGRAVATED ROBBERY OF RICHARD MCCLANAHAN, YOUR VERDICT MUST BE GUILTY OF AGGRAVATED ROBBERY. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OF THE ESSENTIAL ELEMENTS OF AGGRAVATED ROB -- OFFENSE OF AGGRAVATED ROBBERY, THEN YOUR VERDICT MUST BE NOT GUILTY OF AGGRAVATED ROBBERY.

NOW, AS TO THIS CHARGE, AS TO -- AS LIKE THE FIRST COUNT, THE STATE ALLEGES ALTERNATIVES. THE STATE ALLEGES THAT THE DEFENDANT, WHILE COMMITTING OR ATTEMPTING TO COMMIT THEFT, EITHER, ONE, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL AND USED THE WEAPON, AND/OR, TWO, INFLICTED SERIOUS PHYSICAL HARM ON RICHARD MCCLANAHAN. AGAIN, THESE ARE ALTERNATIVES. YOU MUST UNANIMOUSLY AGREE ON ONE OR BOTH OF THESE ALTERNATIVES BEYOND A REASONABLE DOUBT IN ORDER TO FIND THE DEFENDANT GUILTY OF AGGRAVATED ROBBERY.

THE DEFENDANT IS ALSO CHARGED, AGAIN, WITH A FIREARM SPECIFICATION AS TO THIS AGGRAVATED ROBBERY. IF

R. HORTON 002097

331

AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF THE AGGRAVATED ROBBERY, WILL YOU THEN CONSIDER WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE FIREARM SPECIFICATION.

IN ORDER TO FIND THE DEFENDANT GUILTY OF THE FIREARM SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL WHILE COMMITTING THE AGGRAVATED ROBBERY OF RICHARD MCCLANAHAN, AND THAT HE USED THE FIREARM TO FACILITATE THE AGGRAVATED ROBBERY OF RICHARD MCCLANAHAN.

A "FIREARM" MEANS, AGAIN, ANY DEADLY WEAPON CAPABLE OF EXPELLING OR PROPELLING ONE OR MORE PROJECTILES BY THE ACTION OF AN EXPLOSIVE OR COMBUSTIBLE PROPELLANT. "FIREARM" INCLUDES ANY UNLOADED FIREARM AND ANY FIREARM WHICH IS INOPERABLE, BUT WHICH CAN BE READILY RENDERED OPERABLE.

"ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" HAS ALREADY BEEN DEFINED FOR YOU IN THE PREVIOUS COUNT.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE GUILTY AS TO THE FIREARM SPECIFICATION. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF

332

THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THE FIREARM SPECIFICATION.

THAT CONCLUDES THE INSTRUCTIONS AS TO COUNT TWO.

WE WILL NOW TURN TO COUNT FIVE, WHICH IS THE KIDNAPPING COUNT.

THE DEFENDANT IS CHARGED WITH KIDNAPPING IN COUNT FIVE. BEFORE YOU CAN FIND THE DEFENDANT GUILTY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, IN FRANKLIN COUNTY, OHIO, THE DEFENDANT BY FORCE DID RESTRAIN RICHARD MCCLANAHAN OF HIS LIBERTY FOR THE PURPOSE OF FACILITATING THE COMMISSION OF A FELONY, IN THIS CASE THE OFFENSE OF AGGRAVATED ROBBERY WHICH I HAVE JUST INSTRUCTED YOU ON.

NOW, AGGRAVATED ROBBERY HAS ALREADY BEEN DEFINED FOR YOU IN COUNT TWO. AND YOU SHALL REFER TO THAT DEFINITION AND THAT INSTRUCTION IN DETERMINING THE DEFENDANT'S GUILT OR NONGUILT AS TO THIS COUNT.

NOW, I INDICATED THAT PART OF THE ALLEGED ELEMENTS IN THIS OFFENSE ARE THE DEFENDANT BY FORCE DID RESTRAIN RICHARD MCCLANAHAN OF HIS LIBERTY.

"FORCE" MEANS ANY VIOLENCE, COMPULSION OR CONSTRAINT PHYSICALLY EXERTED BY ANY MEANS UPON OR AGAINST A PERSON OR THING.

333

NOW, THE "PURPOSE" TO FACILITATE THE COMMISSION OF THE OFFENSE OF AGGRAVATED ROBBERY IS AN ELEMENT OF THE CRIME OF KIDNAPPING. IT MUST BE ESTABLISHED IN THIS CASE THAT AT THE TIME IN QUESTION THERE WAS PRESENT IN THE MIND OF THE DEFENDANT A SPECIFIC INTENTION TO FACILITATE THE COMMISSION OF THE OFFENSE OF AGGRAVATED ROBBERY, AS PREVIOUSLY DEFINED FOR YOU IN RELATION TO COUNT TWO, SO YOU MAY REFER BACK TO THE DEFINITIONS OF PURPOSE THAT I GAVE YOU IN COUNT TWO.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL THE ESSENTIAL ELEMENTS OF THE OFFENSE OF KIDNAPPING OF RICHARD MCCLANAHAN, YOUR VERDICT MUST BE GUILTY OF KIDNAPPING. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OF THE ESSENTIAL ELEMENTS OF THE OFFENSE OF KIDNAPPING, THEN YOUR VERDICT MUST BE NOT GUILTY OF KIDNAPPING.

THE DEFENDANT IN THIS CASE IS ALSO CHARGED WITH A FIREARM SPECIFICATION. IF AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF KIDNAPPING WILL YOU THEN CONSIDER WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE FIREARM SPECIFICATION.

IN ORDER TO FIND THE DEFENDANT GUILTY OF THE FIREARM SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL WHILE COMMITTING THE

334

KIDNAPPING OF RICHARD MCCLANAHAN, AND THAT HE USED THE FIREARM TO FACILITATE THE KIDNAPPING OF RICHARD MCCLANAHAN.

"FIREARM" HAS ALREADY BEEN DEFINED FOR YOU.

"ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" HAVE ALREADY BEEN DEFINED FOR YOU.

NOW, ONE TERM I DID NOT DEFINE FOR YOU, WHICH I AM GOING TO DEFINE FOR YOU, IS RESTRAIN ONE OF THEIR LIBERTY. "TO RESTRAIN ONE OF HIS OR HER LIBERTY" MEANS TO LIMIT OR RESTRAIN, IN THIS CASE MR. MCCLANAHAN, FREEDOM OF MOVEMENT. THE RESTRAINT NEED NOT BE FOR ANY SPECIFIC DURATION OF TIME OR IN ANY SPECIFIC MANNER.

NOW, IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT, OF COURSE, AS TO THE FIREARM SPECIFICATION MUST BE GUILTY. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THAT SPECIFICATION.

NOW, LET'S TURN TO THE SIXTH COUNT, THAT IS THE FELONIOUS ASSAULT COUNT.

THE DEFENDANT IS CHARGED WITH FELONIOUS ASSAULT. BEFORE YOU CAN FIND THE DEFENDANT GUILTY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE

R. HORTON 002101

335

9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT KNOWINGLY, AGAIN, WE HAVE ALTERNATIVES, ONE, CAUSED SERIOUS PHYSICAL HARM TO RICHARD MCCLANAHAN, AND/OR, TWO, CAUSED OR ATTEMPTED TO CAUSE PHYSICAL HARM TO RICHARD MCCLANAHAN BY MEANS OF A DEADLY WEAPON.

"KNOWINGLY" HAS ALREADY BEEN DEFINED FOR YOU ON AT LEAST TWO OCCASIONS.

THE STATE CHARGES THAT THE ACT OF THE DEFENDANT CAUSED PHYSICAL HARM TO RICHARD MCCLANAHAN. CAUSE IS AN ESSENTIAL ELEMENT OF THE OFFENSE.  CAUSE IS AN ACT WHICH IN THE NATURAL AND CONTINUOUS SEQUENCE DIRECTLY PRODUCES THE PHYSICAL HARM TO RICHARD MCCLANAHAN, AND WITHOUT WHICH IT WOULD NOT HAVE OCCURRED.

NOW, I HAVE ALREADY DEFINED FOR YOU IN TERMS OF THE PREVIOUS COUNT SERIOUS PHYSICAL HARM.  YOU SHALL REFER TO THAT DEFINITION.

"PHYSICAL HARM TO PERSONS" MEANS ANY INJURY, ILLNESS, OR OTHER PHYSIOLOGICAL IMPAIRMENT, REGARDLESS OF ITS GRAVITY OR DURATION.

"DEADLY WEAPON" HAS PREVIOUSLY BEEN DEFINED FOR YOU.

NOW, AS TO THIS CHARGE, THE STATE ALLEGES THAT THE DEFENDANT KNOWINGLY EITHER CAUSED SERIOUS PHYSICAL HARM TO RICHARD MCCLANAHAN AND/OR, TWO, CAUSED

R. HORTON 002102

336

OR ATTEMPTED TO CAUSE PHYSICAL HARM TO RICHARD MCCLANAHAN BY MEANS OF A DEADLY WEAPON. THESE ARE, AGAIN, ALTERNATIVES. YOU MUST UNANIMOUSLY AGREE ON ONE OR BOTH OF THESE ALTERNATIVES BEYOND A REASONABLE DOUBT IN ORDER TO FIND THE DEFENDANT GUILTY OF THE CHARGE OF FELONIOUS ASSAULT.

NOW, IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL THE ESSENTIAL ELEMENTS OF THE OFFENSE OF FELONIOUS ASSAULT OF RICHARD MCCLANAHAN, YOUR VERDICT MUST BE GUILTY OF THE FELONIOUS ASSAULT. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS ALSO OF THE OFFENSE OF FELONIOUS ASSAULT, THEN YOUR VERDICT MUST BE NOT GUILTY AS TO FELONIOUS ASSAULT.

THE DEFENDANT'S ALSO, AGAIN, CHARGED WITH A FIREARM SPECIFICATION AS TO THIS FELONIOUS ASSAULT CHARGE.

IF AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF FELONIOUS ASSAULT WILL YOU THEN CONSIDER WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE FIREARM SPECIFICATION.

IN ORDER TO FIND THE DEFENDANT GUILTY OF THE FIREARM SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL WHILE COMMITTING THE

FELONIOUS ASSAULT OF RICHARD MCCLANAHAN, AND THAT HE USED THE FIREARM TO FACILITATE THE FELONIOUS ASSAULT OF RICHARD MCCLANAHAN.

"FIREARM" HAS ALREADY BEEN DEFINED FOR YOU.

SO HAS THE TERMS "ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL."

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE GUILTY AS TO THAT SPECIFICATION. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THE FIREARM SPECIFICATION.

NOW, WE ARE GOING TO TURN TO THE ALLEGED COUNTS INVOLVING RHONDA CURRY.

COUNT SEVEN, AS WITH COUNT TWO, THE DEFENDANT IS CHARGED WITH, IN RELATION TO RHONDA CURRY, WITH A COUNT OF AGGRAVATED ROBBERY IN COUNT SEVEN. BEFORE YOU CAN FIND THE DEFENDANT GUILTY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT, WHILE ATTEMPTING TO COMMIT THEFT, HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND DID DISPLAY THE WEAPON, BRANDISHED THE

338

WEAPON, OR INDICATED THAT HE DID POSSESS THE WEAPON, AND/OR USED THE WEAPON.

NOW, I SAID ATTEMPT HERE.  THE DIFFERENCE BETWEEN COUNT TWO AND COUNT SEVEN IS THIS INVOLVES AN ATTEMPT, BECAUSE THE ALLEGATION IS NO MONEY WAS RECOVERED.

AN "ATTEMPT" OCCURS WHEN A PERSON KNOWLINGLY ENGAGES IN CONDUCT THAT, IF SUCCESSFUL, WOULD RESULT IN, IN THIS CASE, A THEFT.

"THEFT" IS AN ELEMENT OF AGGRAVATED ROBBERY. "THEFT" IS DEFINED AS KNOWINGLY OBTAINING OR EXERTING CONTROL OVER THE PROPERTY OF ANOTHER WITH THE PURPOSE TO DEPRIVE THE OWNER OF SAID PROPERTY.  BEFORE YOU CAN FIND OF THE DEFENDANT COMMITTED AGGRAVATED ROBBERY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT, WITH THE PURPOSE TO DEPRIVE THE OWNER OF MONEY, KNOWINGLY ATTEMPTED TO OBTAIN MONEY FROM RHONDA CURRY WITHOUT THE CONSENT OF HER OR BY THREAT.

NOW, I HAVE PREVIOUSLY DEFINED FOR YOU THE TERMS "DEPRIVED, "OWNER", "CONSENT", "THREAT", AND "KNOWINGLY" ON AT LEAST TWO OCCASIONS.  YOU SHALL REFER BACK TO THOSE DEFINITIONS FOR PURPOSES OF THIS COUNT.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF AGGRAVATED ROBBERY OF RHONDA CURRY, YOUR VERDICT MUST BE

339

GUILTY OF AGGRAVATED ROBBERY. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE OFFENSE OF AGGRAVATED ROBBERY OF RHONDA CURRY, YOUR VERDICT MUST BE NOT GUILTY OF THIS COUNT OF AGGRAVATED ROBBERY.

THE DEFENDANT IS ALSO CHARGED WITH A FIREARM SPECIFICATION AS TO THE AGGRAVATED ROBBERY OF RHONDA CURRY. IF AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF AGGRAVATED ROBBERY OF RHONDA CURRY, WILL YOU THEN CONSIDER WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY OF THE FIREARM SPECIFICATION.

IN ORDER, AGAIN, TO FIND THE DEFENDANT GUILTY OF THE FIREARM SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL WHILE COMMITTING THE AGGRAVATED ROBBERY OF RHONDA CURRY, AND THAT HE DID DISPLAY THE WEAPON, BRANDISHED THE WEAPON, AND/OR INDICATED THAT HE DID POSSESS THE WEAPON, AND/OR USED THE WEAPON TO FACILITATE THE AGGRAVATED ROBBERY OF RHONDA CURRY.

"FIREARM" HAS ALREADY BEEN DEFINED FOR YOU.

SO HAS THE TERM OF "ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" HAS BEEN DEFINED FOR YOU.

WHAT DOES BRANDISH MEAN? "BRANDISH" MEANS TO WAVE OR EXHIBIT IN A MENACING OR CHALLENGING MANNER.

R. HORTON 002106

340

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE GUILTY AS TO THE FIREARM SPECIFICATION.  IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THAT FIREARM SPECIFICATION.

NOW WE COME TO COUNT 10, THE LAST COUNT FOR YOUR CONSIDERATION.

THE DEFENDANT IS CHARGED IN THIS COUNT WITH KIDNAPPING, IN THIS CASE RHONDA CURRY.  AGAIN, THIS IS VERY SIMILAR TO THE KIDNAPPING CHARGE THAT HAS ALREADY BEEN DESCRIBED FOR YOU.  BEFORE YOU CAN FIND THE DEFENDANT GUILTY, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT ON OR ABOUT THE 9TH DAY OF OCTOBER, 2004, AND IN FRANKLIN COUNTY, OHIO, THE DEFENDANT BY FORCE DID RESTRAIN RHONDA CURRY OF HER LIBERTY FOR THE PURPOSE OF FACILITATING THE COMMISSION OF ANY FELONY, IN THIS CASE, TO WIT:  AGGRAVATED ROBBERY, AS PREVIOUSLY DEFINED FOR YOU IN COUNT SEVEN.

AGGRAVATED ROBBERY HAS ALREADY BEEN DEFINED FOR YOU, AS I HAVE SO INDICATED.  YOU MAY REFER BACK TO THOSE DEFINITIONS.

"FORCE", AGAIN, MEANS ANY VIOLENCE,

R. HORTON 002107

341

COMPULSION OR CONSTRAINT PHYSICALLY EXERTED BY ANY MEANS UPON OR AGAINST A PERSON OR THING.

TO RESTRAIN ONE OF THEIR LIBERTY, I WILL REPEAT THAT DEFINITION FOR YOU. "TO RESTRAIN ONE OF HIS OR HER LIBERTY" MEANS TO LIMIT OR RESTRAIN, IN THIS CASE RHONDA CURRY, FREEDOM OF MOVEMENT. THE RESTRAINT NEED NOT BE OF ANY SPECIFIC DURATION OF TIME OR ANY SPECIFIC MANNER.

NOW, THE PURPOSE TO FACILITATE THE COMMISSION OF AN AGGRAVATED ROBBERY IS AN ESSENTIAL ELEMENT OF THE CRIME OF KIDNAPPING. IN OTHER WORDS, TO RESTRAIN ONE BY FORCE OF THEIR LIBERTY FOR THE PURPOSE OF FACILITATING A CRIME OF AGGRAVATED ROBBERY. IT MUST BE ESTABLISHED IN THIS CASE THAT AT THE TIME IN QUESTION THERE WAS PRESENT IN THE MIND OF THE DEFENDANT A SPECIFIC INTENTION TO FACILITATE THE COMMISSION OF THE AGGRAVATED ROBBERY AND IN REGARD TO RHONDA CURRY.

NOW, I HAVE ALREADY DEFINED PURPOSE FOR YOU ON AT LEAST TWO OCCASIONS, AND YOU ARE TO REFER BACK TO THAT DEFINITION.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE OFFENSE OF KIDNAPPING OF RHONDA CURRY, YOUR VERDICT MUST BE GUILTY OF KIDNAPPING. IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF

342

THE ESSENTIAL ELEMENTS OF THE OFFENSE OF KIDNAPPING, THEN YOUR VERDICT MUST BE NOT GUILTY OF KIDNAPPING.

THE DEFENDANT IN RELATION TO THIS COUNT IS ALSO CHARGED WITH A FIREARM SPECIFICATION.

IN ORDER TO FIND THE DEFENDANT GUILTY OF THIS SPECIFICATION, YOU MUST FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD A FIREARM ON OR ABOUT HIS PERSONAL OR UNDER HIS CONTROL WHILE COMMITTING THE KIDNAPPING OF RHONDA CURRY, AND THAT HE DISPLAYED AND/OR BRANDISHED AND/OR INDICATED THAT HE POSSESSED A FIREARM, AND/OR THAT HE USED THE FIREARM TO FACILITATE THE KIDNAPPING OF RHONDA CURRY.

"FIREARM" HAS ALREADY BEEN DEFINED FOR YOU.

"ON OR ABOUT HIS PERSON" OR "UNDER HIS CONTROL" HAS ALREADY BEEN DEFINED FOR YOU.

AND "BRANDISH" AND "DISPLAYED" HAVE ALREADY BEEN DEFINED FOR YOU.

IF YOU FIND THE STATE PROVED BEYOND A REASONABLE DOUBT ALL OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE GUILTY AS TO THAT SPECIFICATION.  IF YOU FIND THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT ANY ONE OR MORE OF THE ESSENTIAL ELEMENTS OF THE FIREARM SPECIFICATION, YOUR VERDICT MUST BE NOT GUILTY AS TO THE FIREARM SPECIFICATION.

R. HORTON 002109

THAT CONCLUDES THE INSTRUCTIONS CONCERNING THE SUBSTANTIVE ELEMENTS OF EACH OF THESE ALLEGED COUNTS AND THE DEFINITIONS APPLICABLE THERETO.

NOW, THE CHARGES SET FORTH IN EACH OF THESE COUNTS AND SPECIFICATIONS ATTACHED THERETO IN THE INDICTMENT CONSTITUTE SEPARATE AND DISTINCT MATTERS. YOU MUST CONSIDER EACH COUNT AND ITS SPECIFICATION AND THE EVIDENCE APPLICABLE TO EACH COUNT AND ITS SPECIFICATION SEPARATELY, AND YOU MUST STATE YOUR FINDINGS AS TO EACH COUNT AND SPECIFICATION UNINFLUENCED BY YOUR VERDICT AS TO ANY OTHER COUNT AND SPECIFICATION. THE DEFENDANT MAY BE FOUND GUILTY OR NOT GUILTY OF ANY ONE OR MORE OR NONE OF THE OFFENSES AND SPECIFICATIONS CHARGED IN EACH COUNT.

NOW, IN THIS CASE, THE DEFENDANT CLAIMS THAT HE WAS AT SOME OTHER PLACE AT THE TIME OF THE OFFENSE OR OFFENSES OCCURRED. THIS IS KNOWN IN THE LAW AS WHAT IS CALLED AN ALIBI. THE WORLD "ALIBI" MEANS ELSEWHERE OR A DIFFERENT PLACE. IF THE EVIDENCE FAILS TO ESTABLISH THAT THE DEFENDANT WAS ELSEWHERE, SUCH FAILURE DOES NOT CREATE AN INFERENCE THAT THE DEFENDANT WAS PRESENT AT THE TIME WHEN AND AT THE PLACE WHERE THESE OFFENSES MAY HAVE BEEN COMMITTED. IF, AFTER A CONSIDERATION OF THE EVIDENCE OF ALIBI ALONG WITH ALL OF THE EVIDENCE IN THE CASE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

344

THAT THE DEFENDANT WAS PRESENT AT THE RESIDENCE OF RICHARD MCCLANAHAN AND RHONDA CURRY AT THE TIME OF THE ALLEGED CRIMES, YOU MUST THEN RETURN A VERDICT OF NOT GUILTY.

NOW, IN THIS CASE, YOU HAVE HEARD THE TESTIMONY OF SEVERAL WITNESSES, INCLUDING THE DEFENDANT. THE FINAL DECISION ON THE WEIGHT OF THE EVIDENCE AND THE CREDIBILITY OF THE WITNESSES RESTS ON YOU AS MEMBERS OF THIS JURY. IN DECIDING THE WEIGHT AND VALUE OF THE TESTIMONY, PLEASE TAKE INTO ACCOUNT THE FOLLOWING FACTORS: THE TESTIMONY ITSELF; THE INTELLIGENCE OF THESE WITNESSES; THEIR ABILITY TO OBSERVE THE THINGS THEY TESTIFIED TO; THE QUALITY OF THEIR MEMORIES; APPEARANCES AND DEMEANOR; FRIENDSHIPS AND PREJUDICES, IF ANY WERE EXPRESSED; HOW EACH MAY BE AFFECTED BY THE VERDICT; AND WHETHER THE TESTIMONY IS SUPPORTED OR CONTRADICTED BY OTHER EVIDENCE.

NOW, IN THIS CASE, TWO OF THE WITNESSES ARE CALLED IDENTIFYING WITNESSES OR EYEWITNESSES. SOMETHINGS YOU MAY CONSIDER IN WEIGHING THE TESTIMONY OF IDENTIFYING WITNESSES ARE:

ONE, THE CAPACITY OF THE WITNESS, THAT IS, THE AGE OR INTELLIGENCE AND THE OPPORTUNITY THAT THE WITNESS HAD TO OBSERVE.

TWO, THE WITNESS' DEGREE OF ATTENTION HE

R. HORTON 002111

345

OBSERVED THE ALLEGED OFFENDER.

THREE, THE ACCURACY OF WITNESS' PRIOR DESCRIPTIONS OR IDENTIFICATIONS, IF ANY.

FOUR, WHETHER THE WITNESS HAD AN OCCASION TO OBSERVE THE DEFENDANT IN THE PAST.

FIVE, THE INTERVAL OF TIME BETWEEN THE EVENT AND THE IDENTIFICATION.

SIX, ALL SURROUNDING CIRCUMSTANCES UNDER WHICH THE WITNESSES HAD IDENTIFIED THE DEFENDANT INCLUDING DEFICIENCIES, IF ANY, IN ANY LINEUP, PHOTO ARRAY OR ONE-ON-ONE SHOW UP.

NOW, IF YOU FIND INCONSISTENCIES OR DIFFERENCES IN THE TESTIMONY OF A WITNESS OR AS BETWEEN THE TESTIMONY OF DIFFERENT WITNESSES IN THIS CASE, DECIDE WHETHER THE DIFFERENCE GOES TO AN IMPORTANT MATTER OR A RELATIVELY UNIMPORTANT DETAIL AND WHETHER IT RESULTS FROM AN INNOCENT ERROR OR UNTRUTHFULNESS.  IF YOU DO FIND DIFFERENCES OR CONFLICT IN THE TESTIMONY, YOU MUST RESOLVE IT AND DECIDE WHERE THE TRUTH LIES.

YOU ARE NOT REQUIRED TO BELIEVE THE TESTIMONY OF ANY WITNESS SIMPLY BECAUSE HE OR SHE WAS UNDER OATH.  YOU MAY BELIEVE OR DISBELIEVE ALL OR ANY PART OF THE TESTIMONY OF A WITNESS.  IT IS YOUR PROVINCE TO DETERMINE WHAT TESTIMONY IS WORTHY OF BELIEF AND WHAT TESTIMONY IS NOT WORTHY OF BELIEF.  THE TESTIMONY OF ONE

R. HORTON 002112

346

WITNESS, IF BELIEVED BY YOU, MAY BE SUFFICIENT TO CONVICT IF, FROM THAT TESTIMONY, AND ALL THE OTHER EVIDENCE IN THE CASE, YOU CAN FIND EACH AND EVERY ELEMENT OF ANY CHARGED OFFENSE BEYOND A REASONABLE DOUBT.

NOW, AS I INDICATED IN THIS CASE, THE DEFENDANT TESTIFIED. THE TESTIMONY OF THE DEFENDANT IS TO BE WEIGHED BY THE SAME RULES THAT APPLY TO ANY OTHER WITNESS. HOWEVER, IN THIS CASE, EVIDENCE WAS RECEIVED THAT THE DEFENDANT WAS CONVICTED OF DRUG OFFENSES. THAT EVIDENCE WAS RECEIVED ONLY FOR A SPECIFIC LIMITED PURPOSE TO TEST CREDIBILITY. IT WAS NOT RECEIVED, AND YOU MAY NOT CONSIDER IT, TO PROVE THE CHARACTER OF THE DEFENDANT IN ORDER TO SHOW HE ACTED IN CONFORMITY WITH THAT CHARACTER IN THIS CASE. IF YOU FIND THE DEFENDANT WAS CONVICTED OF THE DRUG OFFENSES, YOU MAY CONSIDER THAT EVIDENCE ONLY FOR THE PURPOSE OF TESTING THE DEFENDANT'S CREDIBILITY AND THE WEIGHT TO BE GIVEN TO HIS TESTIMONY. IT CANNOT BE CONSIDERED FOR ANY OTHER PURPOSE. AND IF YOU DO CONSIDER IT FOR THAT PURPOSE, YOU MAY GIVE IF WHATEVER WEIGHT YOU THINK IT DESERVES.

WELL, THAT CONCLUDES ALL THE INSTRUCTIONS. I THINK YOU NOW UNDERSTAND WHY WE TOOK SO LONG ON THESE THINGS. THEY ARE LONG AND COMPLICATED.

IT IS NOW TIME FOR YOU TO RENDER VERDICTS IN

THIS CASE. THE FIRST THING YOU MUST DO WHEN YOU RETIRE IS SELECT A FOREPERSON WHO WILL MAKE SURE YOUR DELIBERATIONS WILL BE CONDUCTED IN AN ORDERLY MANNER.

PLEASE TAKE ALL THE TIME YOU NEED FOR FULL AND FREE DISCUSSION. LISTEN TO EACH OTHER'S OPINIONS CAREFULLY, AND REFRAIN FROM DOMINATION BY ANY PARTICULAR MEMBER OF YOUR GROUP. EACH OF YOU MUST BE GUIDED BY YOUR OWN RECOLLECTION OF THE FACTS AND YOUR CONSCIENCE. SINCE THIS IS A CRIMINAL CASE, YOUR VERDICT MUST BE UNANIMOUS ONE WAY OR THE OTHER.

YOU WILL BE HANDED TWO VERDICT FORMS FOR EACH COUNT, ONE FOR GUILTY AND ONE FOR NOT GUILTY. AFTER REACHING YOUR VERDICT, EACH OF YOU MUST SIGN THE APPROPRIATE FORM, WHICH WILL BE PART OF THE RECORD IN THIS CASE.

DURING THE DELIBERATIONS, IF YOU SHOULD HAVE ANY QUESTIONS CONCERNING THESE INSTRUCTIONS, PLEASE INFORM THE BAILIFF AND WE WILL TRY AND ANSWER YOU. WHEN YOU HAVE REACHED YOUR VERDICT, INFORM THE BAILIFF AND WE WILL RECONVENE.

THERE ARE CERTAIN RULES CONCERNING YOUR DELIBERATIONS. YOU MUST ALL STAY TOGETHER DURING THAT TIME. IF YOU TAKE BREAKS, GO OUT IN THE HALL, DOWNSTAIRS, WHATEVER, YOU MUST STOP YOUR DELIBERATIONS. EVERYBODY MUST BE TOGETHER WHEN YOU DELIBERATE. WHEN

348

YOU GO TO LUNCH, YOU MUST STOP YOUR DELIBERATIONS. DO NOT DISCUSS THE CASE AMONG YOURSELVES SEPARATELY. IF YOU GO HOME TONIGHT, IF YOU DON'T RESOLVE IT TODAY, YOU GO HOME TONIGHT, THE SAME RULES APPLY. NO DISCUSSION WITH FAMILY OR FRIENDS. SO I THINK THAT IS PRETTY CLEAR.

NOW, I WANT TO GO OVER ONE SET OF THE VERDICT FORMS WITH YOU. THESE VERDICT FORMS ARE IN NO PARTICULAR ORDER. IN FACT, WE ALTERNATE NOT GUILTY AND GUILTY VERDICT FORMS FROM ONE COUNT TO THE OTHER. WE DON'T WANT ANYONE TO GET ANY IMPRESSION THERE IS ANY PREFERENCE HERE.

FOR EXAMPLE, I WILL JUST DESCRIBE FOR YOU COUNT ONE VERDICT FORM. VERDICT OF NOT GUILTY. WE, THE JURY IN THIS CASE, BEING DULY EMPANELED AND SWORN, FIND THE DEFENDANT NOT GUILTY AS TO COUNT ONE OF THE INDICTMENT, TO WIT: AGGRAVATED BURGLARY. THAT IS WHAT YOU WOULD SIGN IF YOU FIND THE STATE FAILED TO PROVE EACH AND EVERY ELEMENT OF THAT OFFENSE OR ANY ONE OR MORE ELEMENTS BEYOND A REASONABLE DOUBT.

NOW, HOWEVER, IF YOU FIND THE DEFENDANT GUILTY, IN OTHER WORDS, THE STATE DID PROVE EACH AND EVERY ELEMENT OF COUNT ONE BEYOND A REASONABLE DOUBT, YOU WILL THEN USE VERDICT FORM TWO, WHICH IS THE GUILTY VERDICT FORM. THAT STARTS OFF BY SAYING, WE, THE JURY

349

IN THIS CASE, BEING DULY EMPANELED AND SWORN, FIND THE DEFENDANT RICHARD HORTON GUILTY AS TO COUNT ONE OF THE INDICTMENT, TO WIT:  AGGRAVATED BURGLARY.

IF AND ONLY IF YOU FIND THE DEFENDANT GUILTY OF THAT COUNT, AND, AGAIN, IN RELATION TO ALL OF THE OTHER COUNTS, WILL YOU THEN CONSIDER THE SPECIFICATION, THE GUN SPECIFICATION THAT HAS BEEN REFERRED TO.  AND THAT IS CONTAINED IN THE SECOND PARAGRAPH, WHICH STATES, WE, THE JURY IN THIS CASE, BEING DULY EMPANLED AND SWORN, HAVING FOUND RICHARD HORTON GUILTY BEYOND A REASONABLE DOUBT OF AGGRAVATED BURGLARY AS CHARGED IN COUNT ONE OF THE INDICTMENT, AND THEN THERE ARE PARENS, FURTHER FIND BEYOND A REASONABLE DOUBT, IN PARENS, DO NOT FIND, THAT THE DEFENDANT, WHILE COMMITTING THE OFFENSE OF AGGRAVATED BURGLARY, HAD A FIREARM ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND THAT HE USED THE FIREARM TO FACILITATE THE AGGRAVATED BURGLARY.

IF YOU FIND THE DEFENDANT GUILTY OF THE AGGRAVATED BURGLARY ALONG WITH ALL THE OTHER COUNTS, YOU WILL CONSIDER THE SPECIFICATION.  IF YOU FIND BEYOND A REASONABLE DOUBT THE STATE PROVED EACH AND EVERY ELEMENT OF THAT SPECIFICATION, YOU WILL CROSS OUT DO NOT FIND. HOWEVER, IF YOU FIND THE STATE FAILED TO PROVE ANY ONE OR MORE ESSENTIAL ELEMENTS OF THAT SPECIFICATION, YOU WILL CROSS OUT FURTHER FIND BEYOND A REASONABLE DOUBT.

R. HORTON 002116

350

IS THAT CLEAR TO EVERYBODY?

IT SHOULD BE. IF NOT, I WILL GO OVER IT WITH YOU.

ANY QUESTIONS AT THIS POINT IN TIME CONCERNING THE INSTRUCTIONS?

AS I SAID, WE'LL HAVE COPIES FOR YOU WHEN YOU DELIBERATE. I WILL GIVE YOU THREE COPIES. I WON'T GIVE YOU 12 BECAUSE EACH OF YOU WILL SIT THERE AND READ EACH COPY. I THINK IT IS BETTER TO HAVE THREE.

IT IS NOW QUARTER TILL 12:00. IT IS APPROPRIATE THAT WE TAKE THE BUNCH BREAK, IF THAT IS AGREEABLE WITH ALL OF YOU.

JURY PANEL: YES.

THE COURT: YOU ARE EXCUSED UNTIL LET'S SAY 1:00 O'CLOCK.

MR. STEAD: MAY WE APPROACH?

THE COURT: OF COURSE. LET ME, FIRST OF ALL, ASK ARE THERE ANY OBJECTIONS OTHER THAN THE ONES THAT HAVE PREVIOUSLY BEEN NOTED?

MR. STEAD: MAY WE APPROACH?

THE COURT: PLEASE APPROACH.

- - -

THEREUPON, COURT AND COUNSEL CONFER AT THE BENCH OUT OF THE PRESENCE AND HEARING OF THE JURY AND COURT REPORTER.                                                - - -

351

                        - - -

THE COURT:  I WILL CORRECT ONE SMALL THING FOR YOU.  IN RELATION TO COUNT SEVEN WHEN I SAID I HAD DEFINED ALL THE TERMS BEFORE, THERE WAS ONE I DID NOT DEFINE FOR YOU, THAT IS THREAT.

"THREAT INCLUDES A DIRECT OR INDIRECT THREAT."

SO IT IS HERE.

MR. STEAD:  NOTHING FURTHER.

THE COURT:  I'M SUPRISED.

MR. SHWARTZ, ANY OBJECTIONS?

MR. SHWARTZ:  I HAVE NO OBJECTION.

THE COURT:  ALL RIGHT.  WHEN YOU GET BACK FROM LUNCH, YOU WILL HAVE THESE WRITTEN INSTRUCTIONS FOR YOU.

VERY WELL.

THE ALTERNATES GET YOUR THINGS AND COME BACK OUT.

                        - - -

THEREUPON, THE FOLLOWING PROCEEDINGS WERE HAD OUT OF THE PRESENCE AND HEARING OF THE JURY AS FOLLOWS:

THE COURT:  SIT DOWN.  WELL, FOLKS, I JUST WANT TO THANK YOU SO MUCH FOR YOUR SERVICE.  IT LOOKS LIKE ALL THESE PEOPLE WILL BE ABLE TO DELIBERATE.  AND I

352

WILL EXCUSE YOU NOW.  YOU'RE EXCUSED NOW AND YOU CAN GO BACK DOWNSTAIRS.  I DO ASK FOR YOU TO DO ONE THING. THAT IS DON'T DISCUSS THE CASE OR TELL ANYBODY ELSE WHAT YOUR FEELINGS ARE UNTIL AFTER THEY REACH A VERDICT.

OKAY.  WHETHER THAT WILL BE TODAY OR TOMORROW, WHENEVER.  BUT YOU DID A GREAT JOB.  EVERYBODY WAS SO ATTENTIVE IN THIS CASE.  I DIDN'T SEE ANYBODY DOSING OFF OR ANYTHING LIKE THAT.  YOU DID A GREAT JOB. SO WE APPRECIATE YOUR SERVICE.

THE LAWYERS MAY WISH TO TALK TO YOU ABOUT THE CASE AT SOME POINT IN TIME DURING YOUR STAY HERE. AGAIN, DON'T DISCUSS IT WITH THEM.  THEY WON'T APPROACH YOU UNTIL AFTER THE JURY HAS REACHED ITS VERDICT. THEREFORE, THEREAFTER YOU ARE FREE TO DISCUSS THE CASE WITH THEM IF YOU WANT TO.  ALTHOUGH, NO ONE CAN FORCE YOU TO.  OKAY.  THANK YOU AGAIN.

- - -

THEREUPON, A RECESS WAS TAKEN UNTIL 1:00 O'CLOCK, P.M., OF THE SAME DAY, TO WIT: FEBRUARY 2, 2006.

- - -

R. HORTON 002119

353

TUESDAY AFTERNOON SESSION,

FEBRUARY 2, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THEREUPON, THE JURY RETIRED TO DELIBERATE UPON THE CASE.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS ADJOURNED UNTIL 9:00 O'CLOCK, A.M., FEBRUARY 3, 2006.

- - -

354

CERTIFICATE

- - -

I DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS TAKEN ON JANUARY 30, 31, FEBRUARY 1, 2, 2006, TAKEN BY ME AND TRANSCRIBED FROM MY STENOGRAPHIC NOTES.

_____

MARK W. NEAL, ASSISTANT

OFFICIAL COURT REPORRTER.

- - -

R. HORTON 002121

IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

State of Ohio,                    :

        Plaintiff,         :

  vs.                             :    Case Number 05CR-01-146

Richard H. Horton,                :

        Defendant.         :

- - -

CONTINUED TRANSCRIPT OF PROCEEDINGS

Before the Honorable John F. Bender, Judge, on Friday, February 3, 2006.

- - -

APPEARANCES:

    Messrs. Douglas P. Stead and Nathan T. Smith, Assistant Prosecuting Attorneys,

        On behalf of the Plaintiff, State of Ohio.

    Ms. Alissa R. Holfinger, Attorney at Law,

        On behalf of the Defendant, Richard H. Horton.

- - -

R. HORTON 002122

2

Friday Afternoon Session,

February 3, 2006.

- - -

Thereupon, at 12:20 p.m. the jurors resumed their places in the jury box.

- - -

THE COURT:  All right, we're back on the record, all parties are present except Mr. Shwartz, who is not with us this morning, but I take it that's okay with everybody at that table.

MS. HOLFINGER:  Yes, Your Honor.

THE COURT:  Very well, okay, you are here, Ms. Holfinger, we only need one.

So, I see they've elected you the forelady of the jury; is that correct?

JURY FOREPERSON:  That is correct.

THE COURT:  Have you reached verdicts in this case?

JUROR FOREPERSON:  Yes, we have.

THE COURT:  Would you please hand the forms to the bailiff.

All right.  Defendant and counsel, please rise.

State of Ohio versus Richard Horton, Count One:  "We, the jury in this case, being duly impaneled

3

and sworn, find the Defendant Richard H. Horton guilty as to Count One of the indictment, to wit: Aggravated burglary.

"We, the jury in this case, being duly impaneled and sworn, having found Richard Horton guilty beyond a reasonable doubt of aggravated burglary as charged in Count One of the indictment further find beyond a reasonable doubt that the Defendant, while committing the offense of aggravated burglary, had a firearm on or about his person or under his control and that he used the firearm to facilitate the aggravated burglary."

Why don't you have her go on outside, it might be best.

Count Two: "We, the jury in this case, being duly impaneled and sworn, find the Defendant Richard H. Horton guilty as to Count Two of the indictment, to wit: Aggravated robbery of Richard McClanahan.

"We, the jury in this case, being duly impaneled and sworn, having found Richard Horton guilty beyond a reasonable doubt of aggravated robbery as charged in Count Two of the indictment, further find beyond a reasonable doubt that the Defendant, while committing the offense of aggravated robbery,

R. HORTON 002124

4

had a firearm on or about his person or under his control and that he used the firearm to facilitate the aggravated robbery.

"Each of us jurors concurring in this verdict signs his/her name hereto this 3rd day of November, 2005."  Appears to be signed by all members of this jury.

Ladies and gentlemen, in relation to Count One, I didn't ask you this, but is that your verdict --

THE JURY:  Yes.

THE COURT:  -- as to that count, you all agree on that?

THE JURY:  Yes.

THE COURT:  As to Count Two which I've just read, ladies and gentlemen, is that your verdict?

THE JURY:  Yes, it is.

THE COURT:  You all agree on that verdict?

THE JURY:  Yes.

THE COURT:  Very well.

Count Five:  "We, the jury in this case, being duly impaneled and sworn, find the Defendant Richard H. Horton guilty as to Count Five of the indictment, to wit:  Kidnapping of Richard McClanahan.

"We, the jury in this case, being duly

5

impaneled and sworn, having found Richard H. Horton guilty beyond a reasonable doubt of kidnapping as charged in Count Five of the indictment, further find beyond a reasonable doubt that the Defendant, while committing the offense of kidnapping, had a firearm on or about his person or under his control and that he used the firearm to facilitate the kidnapping.

"Each of us jurors concurring in this verdict signs his or her name hereto this 3rd day of February 2006."  Appears to be signed by all members of the jury.

Ladies and gentlemen, is that your verdict as to Count Five?

THE JURY:  Yes.

THE COURT:  Count Six, felonious assault: "We, the jury in this case, being duly impaneled and sworn, find the Defendant Richard Horton guilty as to Count Six of the indictment, to wit:  Felonious assault of Richard McClanahan.

"We, the jury in this case, being duly impaneled and sworn, having found Richard Horton guilty beyond a reasonable doubt of felonious assault as charged in Count Six of the indictment, further find beyond a reasonable doubt that the Defendant, while committing the offense of felonious assault, had

R. HORTON 002126

6

a firearm on or about his person or under his control and that he used the firearm to facilitate the felonious assault." Appears to be signed by each member of the jury.

Ladies and gentlemen, is this your verdict as to Count Six?

THE JURY: Yes.

THE COURT: Very well.

Count Seven, aggravated robbery of Rhonda Curry: "We, the jury in this case, being duly impaneled and sworn, find the Defendant Richard H. Horton guilty as to Count Seven of the indictment, to wit: Aggravated robbery of Rhonda Curry.

"We, the jury in this case, being duly impaneled and sworn, having found Richard Horton guilty beyond a reasonable doubt of aggravated robbery as charged in Count Seven of the indictment, further find beyond a reasonable doubt that the Defendant, while committing the offense of aggravated robbery, had a firearm on or about his person or under his control and that he displayed the firearm, and/or brandished the firearm, and/or indicated that he possessed the firearm, and/or used the firearm to facilitate the aggravated robbery.

"Each of us jurors concurring signs this

7

verdict."

Ladies and gentlemen, is this your verdict as to Count Seven?

THE JURY:  Yes.

THE COURT:  Count Ten:  "We, the jury in this case, being duly impaneled and sworn, find the Defendant Richard H. Horton guilty as to Count Ten of the indictment, to wit:  Kidnapping of Rhonda Curry.

"We, the jury in this case, being duly impaneled and sworn, having found Richard H. Horton guilty beyond a reasonable doubt of kidnapping as charged in Count Ten of the indictment, further find beyond a reasonable doubt that the Defendant, while committing the offense of kidnapping, had a firearm on or about his person or under his control and that he displayed the firearm, and/or brandished the firearm, and/or indicated that he possessed the firearm, and/or used the firearm to facilitate the kidnapping."

Each of the jurors appears to have signed this form.

Ladies and gentlemen, is this your verdict as to Count Ten?

THE JURY:  Yes.

THE COURT:  Thank you.  You may be seated.

Do you wish to have the jury polled?

R. HORTON 002128

8

MS. HOLFINGER:  No, Your Honor.

THE COURT:  Very well.

Ladies and gentlemen, I want to thank you very much for your service here.  This was not a lengthy trial but a very difficult trial I think in many respects, and I know that you all worked very hard before arriving at this verdict.  I'm going to excuse you now and ask you to wait back there and I will come back and talk to you.  Thereafter, if you care to, the lawyers may wish to talk to you, they may not.  If they do, that is solely your decision whether or not you wish to talk to anybody about this case.  But, you are free once you are excused to discuss the case and your jury experience if you so desire so.  I'll be with you shortly.  Thank you.

- - -

Thereupon, at 12:28 p.m. the jurors retired from the courtroom, and the following proceedings were held in open court outside their presence and hearing:

THE COURT:  Well, as to Count Eleven, having a weapon while under disability, the Court having reviewed the evidence thoroughly enters a finding of guilty as to that count.

Now, you want a PSI?

MS. HOLFINGER:  I don't think that we need a

9

PSI in this case, Your Honor.

THE COURT:  All right.  We are going to set sentencing --

THE BAILIFF:  Monday, Tuesday, Wednesday, take your pick.

THE COURT:  Which day works for you, Ms. Holfinger?

MS. HOLFINGER:  Any day should be fine, I think we'll be here.

THE COURT:  Why don't we do it Wednesday, is that okay with you, the 8th?

MR. STEAD:  I have a pretty busy grand jury morning.  If it's at 1:30 in the afternoon, that will be fine.

THE BAILIFF:  We can do that.

THE COURT:  We can do that.

MR. STEAD:  The morning is pretty busy for me.

THE COURT:  Please be seated for a moment.

What I would like from counsel on both sides, some idea of what they view the maximum penalty in this case to be, given all of the counts and given the provision of 2941.25.  In other words, do we have offenses that are allied offenses of similar import and, therefore, for purposes of sentencing merge?

R. HORTON 002130

10

MR. STEAD: Kidnappings, on behalf of the State, we feel would merge since it was only restrain language on the kidnappings, the removal language having been removed.

THE COURT: Thank you. I was going to suggest that.

MR. STEAD: We would think the maximum in this case would be 38 years.

THE COURT: All right. Well, again, I leave it up to you. If you wish to present anything concerning that matter as far as the merging of offenses based on allied offenses of similar import, I will be willing to listen to that at that time.

MS. HOLFINGER: Okay, thank you, Your Honor.

THE COURT: And if you wish --

THE BAILIFF: Revoke bond?

THE COURT: Yes.

And if you wish to present additional evidence at that time, please feel free. Also, my view is that on the kidnapping of Rhonda Curry, that -- and I'll listen to argument on this Wednesday -- that I will probably on my own motion reduce that to an F-2.

MR. STEAD: In light of the fact that they would merge --

R. HORTON 002131

11

THE COURT:  You don't care?

MR. STEAD:  -- I don't care.

THE COURT:  I wouldn't think you would.

MR. STEAD:  We would ask for bond to be revoked in this case.

THE COURT:  And it will be revoked.  All right.  We will back here next Wednesday at 1:30.

MR. STEAD:  Thank you, Your Honor.

THE DEFENDANT:  All I want to do is just, I want to get my cell phone to my mother-in-law.

A DEPUTY:  We'll go back there.

THE DEFENDANT:  I'm sorry, Your Honor, I didn't do it, I swear I didn't do it.

- - -

Thereupon, at 12:30 p.m. the sentencing of this cause was adjourned until 1:30 p.m., Wednesday, February 8, 2006.

- - -

R. HORTON 002132

12

                          CERTIFICATE

          I do hereby certify that the foregoing is a
true, correct, and complete transcript of the
proceedings in this matter on Friday, February 3,
2006, taken by me and transcribed from my original
stenographic notes.

                                _____
                                Jan Shenk, RMR, Official
                                Court Reporter.

R. HORTON 002133

IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO

CRIMINAL DIVISION

- - -

STATE OF OHIO,                    :

      PLAINTIFF,          :

  VS.                            : CASE NO. 05CR-146

RICHARD HORTON,                   :

      DEFENDANNT.     :

- - -

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN F. BENDER, JUDGE, ON WEDNESDAY, MARCH 1, 2006.

- - -

APPEARANCES:

      MESSERS. DOUGLAS STEAD, AND NATHAN SMITH, ASSISTANT FRANKLIN COUNTY PROSCEUTING ATTOTRNEYS, ON BEHALF OF THE PLAINTIFF, STATE OF OHIO.

      MR. MYRON SHWARTZ AND ALISSA HOLFINGER, ON BEHALF OF THE DEFENDANT.

- - -

R. HORTON 002134

2

WEDNESDAY MORNING SESSION,

MARCH 1ST, 2006.

- - -

THEREUPON, THE FURTHER TRIAL OF THIS CAUSE WAS RESUMED PURSUANT TO ADJOURNMENT.

- - -

THE COURT: PLEASE BE SEATED. THIS IS 05CR-01-146. STATE OF OHIO VERSUS RICHARD HORTON.

A JURY TRIAL WAS HELD IN THIS CASE AT WHICH TIME, MR. HORTON, YOU WERE CONVICTED OF COUNT ONE OF THE INDICTMENT, AGGRAVATED BURGLARY, COUNT TWO OF THE INDICTMENT, AGGRAVATED ROBBERY WITH REGARD TO MR. MCCLANAHAN. COUNT FIVE OF THE INDICTMENT, KIDNAPPING WITH REGARD TO MR. MCCLANAHAN. AND COUNT SIX OF THE INDICTMENT, FELONIOUS ASSAULT, IN REGARD TO MR. MCCLANAHAN. AND COUNT SEVEN OF THE INDICTMENT, AGGRAVATED ROBBERY IN REGARD TO MISS CURRY. COUNT 10 OF THE INDICTMENT, KIDNAPPING IN REGARD TO MISS CURRY. AND THE COURT, UPON WAIVER OF THE JURY TRIAL, ENTERED A FINDING OF GUILTY TO A WEAPON UNDER DISABILITY CHARGE.

AM I CORRECT IN WHAT I STATED?

MR. STEAD: YES.

MR. SHWARTZ: YES, YOUR HONOR.

THE COURT: ALL RIGHT. NOW, WE ARE HERE TODAY FOR SENTENCING IN THIS MATTER. THE FIRST ISSUE I

R. HORTON 002135

3

WISH TO RAISE WITH THE STATE IS THE ISSUE OF WHAT THEY VIEW THE MAXIMUM PERMISSIBLE PENALTY IS IN THIS CASE.

AND I AM TAKING IT THAT THE STATE DOES AGREE WITH THE PROPOSITION THAT THE GUN SPECIFICATIONS, AND THERE WERE SPECIFICATIONS HERE, AS I RECALL, THREE-YEAR SPECIFICATIONS, THAT THOSE DO ALL MERGE; IS THAT CORRECT?

MR. STEAD:  YES, THERE WILL BE ONE THREE-YEAR FIREARM SPECIFICATION.

THE COURT:  ONE THREE-YEAR FIREARM SPECIFICATION.  THE DEFENDANT WAS FOUND GUILTY THEREAFTER WITH REGARD TO VARIOUS OFFENSES.  I TAKE IT THE STATE AGREES THAT THE KIDNAPPING CHARGES REALLY ARE ALLIED OFFENSES OF SIMILAR IMPORT?

MR. STEAD:  IN LIGHT OF THE LANGUAGE USED IN THE INSTRUCTIONS, YES, THE STATE WOULD AGREE WITH THAT.

THE COURT:  YOU AGREE WITH THAT?

MR. SHWARTZ:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  GIVEN THAT AGREEMENT, THAT THEY, IN EFFECT, MERGE, THE KIDNAPPINGS MERGE WITH THE ROBBERY CHARGES, I THINK IN THIS CASE. IT DOESN'T MATTER.  BUT THAT IS WHERE I AM GOING TO MERGE THEM.  THEN THERE WILL BE NO CONVICTIONS ENTERED UNDER 2941.25 FOR THE KIDNAPPING CHARGES BECAUSE OF THAT FACT.

R. HORTON 002136

4

NOW, THAT LEAVES US WITH THE ISSUE OF WHETHER OR NOT THE AGGRAVATED ROBBERY AND THE FELONIOUS ASSAULT CHARGE IN REGARD TO MR. MCCLANAHAN ARE ALLIED OFFENSES OF SIMILAR IMPORT, WHICH IS SOMETHING I HAVE RAISED WITH COUNSEL.

DOES THE STATE HAVE A POSITION?

MR. STEAD: YES. THE STATE STRONGLY BELIEVES THOSE OFFENSES DO NOT MERGE. WE PROVIDED YOU WITH CASE LAW TO SUPPORT OUR POSITION.

THE COURT: DOES THE DEFENSE HAVE A POSITION?

MS. HOLFINGER: YOUR HONOR, WE WOULD ARGUE THAT THEY DO MERGE.

THE COURT: WHY?

MS. HOLFINGER: I HAVEN'T SEEN THE CASE LAW THAT'S BEEN PROVIDED BY THE STATE, BUT I FOUND A CASE, IT IS STATE OF OHIO VERSUS MICKENS, WHICH DEALS SPECIFICALLY WITH THIS ISSUE OF AGGRAVATED ROBBERY AND FELONIOUS ASSAULT.

THE COURT: IT SAYS THEY DO MERGE, RIGHT?

MS. HOLFINGER: IT SAYS THEY DO MERGE.

THE COURT: WHAT'S THE DATE?

MS. HOLFINGER: 2002 MAYBE THERE. I'M SORRY. 1992.

THE COURT: I THINK YOU BOTH -- HAVE EITHER

R. HORTON 002137

5

SIDE READ STATE OF OHIO VERSUS RANCE, SUPREME COURT CASE 85 OHIO ST. 3D 362, A 1999 CASE?

MR. STEAD:  I ONLY LOOKED AT THE MATERIAL WE PROVIDED TO YOU.

THE COURT:  WELL, RANCE IS THE LEAD CASE ON HOW WE DEAL WITH THESE ISSUES.  AND I WILL GIVE EACH PARTY A FEW MINUTES TO LOOK AT THE DECISION OR COPY IT AND REVIEW IT, IF THEY CARE TO.

MS. HOLFINGER:  I WILL LOOK IT OVER.

THE COURT:  HAVE YOU HAD A CHANCE TO REVIEW THIS, COUNSEL?

THE REASON I RAISE THIS ISSUE IS BECAUSE IN TERMS OF THE FACTS OF THIS CASE, FROM THE FACTS PRESENTED AT TRIAL, WHAT THE JURY FOUND IS THAT THE DEFENDANT COMMITTED THE FELONIOUS ASSAULT SHOOTING OF MR. MCCLANAHAN AS PART OF THE AGGRAVATED ROBBERY.  IT WAS PART OF THAT.

NOW, THE WAY THIS CASE WAS INDICTED, IT WAS INDICTED ON THE AGGRAVATED ROBBERY, THAT EITHER THE DEFENDANT HAD A DEADLY WEAPON ON OR ABOUT HIS PERSON OR UNDER HIS CONTROL, AND DISPLAYED THAT WEAPON, BRANDISHED OR INDICATED THAT HE POSSESSED IT, AND/OR INFLICTED OR ATTEMPTED TO INFLICT SERIOUS PHYSICAL HARM ON ANOTHER, IN THIS CASE MR. MCCLANAHAN.  AND THE JURY I INSTRUCTED ON BOTH, BECAUSE THE PROSECUTION DIDN'T WANT TO PICK,

R. HORTON 002138

6

AND THE JURY RETURNED A FINDING ON BOTH, IN MY VIEW.

UNDER 2903.11 OF FELONIOUS ASSAULT, THE ELEMENTS OF THAT OFFENSE ARE NO PERSON SHALL DO ANY OF THE FOLLOWING:  CAUSE SERIOUS PHYSICAL HARM TO ANOTHER OR TO ANOTHER'S UNBORN.

SO WHAT WE HAVE HERE IS THE ACT OF INFLICTING SERIOUS PHYSICAL HARM AS AN ELEMENT, THE SAME ACT AS AN ELEMENT, AN ESSENTIAL ELEMENT OF BOTH OFFENSES.  THAT, TO ME, RAISES A SERIOUS ISSUE.

HOWEVER, THE RANCE CASE APPEARS TO RESOLVE THAT ISSUE.  AND I WOULD LIKE TO HEAR FROM THE PROSECUTION AND THE DEFENSE WHETHER THEY THINK IT DOES.

MR. STEAD:  I THINK THE RANCE OPINION IS CONSISTENT WITH THE STATE'S BELIEF THAT YOU CAN SENTENCE ON BOTH IN THIS CASE.

THE COURT:  THEY'RE NOT ALLIED OFFENSES?

MR. STEAD:  THEY ARE NOT.

THE COURT:  NOT JUST SENTENCE ON BOTH, BUT CAN BE CONVICTED OF BOTH AND SENTENCED?

MR. STEAD:  YES.

THE COURT:  OKAY.

MR. STEAD:  YOU MAY IMPOSE A SENTENCE FROM THREE TO 10 ON THE AGGRAVATED ROBBERY, AND YOU MAY IMPOSE A SENTENCE OF TWO TO EIGHT ON THE FELONIOUS ASSAULT.

R. HORTON 002139

7

THE COURT:  WHY IS THAT?

MR. STEAD:  BECAUSE, WELL, CONSISTENT WITH YOUR CASE YOU JUST SHOWED US, BUT WHEN HE CAME IN THE DOOR WITH THE DEADLY WEAPON AND SAID GIVE ME YOUR MONEY, THE OFFENSE OF AGGRAVATED ROBBERY WAS COMMITTED AT THAT POINT.  THE SUBSEQUENT SHOOTING OF MR. MCCLANAHAN IS A SEPARATE ACT, AND THEREFORE --

THE COURT:  SEPARATE ANIMUS?

MR. STEAD:  YES.  HE CAN BE PUNISHED FOR BOTH.

THE COURT:  LET'S SAY I DON'T FIND A SEPARATE ANIMUS, COULD I STILL DO IT UNDER RANCE?

I THINK UNDER RANCE I COULD.

MR. STEAD:  I BELIEVE YOU CAN UNDER BOTH THEORIES THAT YOU CAN DO THIS.  AND, YOU KNOW, OBVIOUSLY, IF YOU DON'T, IT IS SOMETHING THAT -- I MEAN, IT IS YOUR DECISION.

THE COURT:  UNDERSTOOD.

MR. STEAD:  BUT I -- THE STATE IS CONFIDENT ON APPELLATE BASIS WE WOULD PREVAIL ON THIS ISSUE.

THE COURT:  DEFENSE, YOU WANT TO COMMENT?

MR. SHWARTZ:  WE HAVE NOTHING TO ADD, YOUR HONOR.

THE COURT:  ALL RIGHT.  WELL, I THINK RANCE WAS DECIDED BY THE SUPREME COURT TO CLEAR UP ALL THE

8

CONFUSION THAT HAD PREVIOUSLY EXISTED UNDER 2941.25 AS TO WHAT WAS AN ALLIED OFFENSE, WHICH WASN'T A SEPARATE ANIMUS AND ALL THAT SORT OF THING, BY BASICALLY FALLING BACK AND SAYING FORGET ABOUT THAT, LET'S LOOK REALLY AT THE ELEMENTS OF THE OFFENSE IN MOST CASES. AND IF THE ELEMENTS ARE DIFFERENT THAN, GUESS WHAT? YOU DON'T HAVE, YOU KNOW, A BLACKENBURGER (PHONETIC) PROBLEM. I AM NOT SO SURE THAT WAS A GOOD DECISION. IT'S THE DECISION THAT IT IS.

FOR EXAMPLE, WHAT IT DOES, IS ALLOW THE GENERAL ASSEMBLY, IT SEEMS TO ME, TO CREATE THESE COMPOUND OFFENSES, WHICH THEY HAVE DONE IN AGGRAVATED ROBBERY, BY HAVING ALTERNATIVE ELEMENTS, ALTERNATIVE ELEMENTS THAT ALSO CONSTITUTE THE DISTINCT SEPARATE OFFENSES. IN THIS CASE, THE FELONIOUS ASSAULT. AND DEPENDING UPON HOW THE STATE THEN CHOOSES TO CHARGE, OR DEPENDING UPON HOW THE STATE THEN CHOOSES TO PROCEED ON ITS THEORIES UNDER ONE SCENARIO, IT IS VERY CLEAR IF YOU HAD NOT PROCEEDED ON THE AGGRAVATED ROBBERY WITH THE INFLICTION OR ATTEMPT TO INFLICT SERIOUS PHYSICAL HARM, YOU WOULD CLEARLY NOT HAVE UNDER RANCE A PROBLEM. I MEAN, YOU HAVE TO HAVE SEPARATE ELEMENTS -- OR EXCUSE ME, UNDER TRADITIONAL LAW YOU WOULD NOT HAVE A PROBLEM BECAUSE YOU WOULD HAVE TOTALLY SEPARATE AND DISTINCT ELEMENTS.

9

BUT BY CHOOSING BOTH, YOU END UP HAVING THE ONE OFFENSE, IN EFFECT, LIKE AN INCLUDED OFFENSE OF THE OTHER, IN MY VIEW.  HOWEVER, I THINK THAT GIVES PROSECUTORS A LOT OF DISCRETION TO GET AROUND 2941.25. AND I THINK THE GENERAL ASSEMBLY HAS DONE THAT UNINTENTIONALLY.  THEY DON'T THINK ABOUT THESE THINGS. THESE PEOPLE HAVE NO CONCEPTION OF THESE THINGS, BUT THEY PASS THEM.

BUT I GUESS WHAT I AM SAYING HERE IS GIVEN RANCE, AND GIVEN COMPOUND OFFENSES AND HOW THEY ARE VIEWED, IT GIVES PROSECUTORS A LOT OF DISCRETION TO SKIRT WHAT WAS OBVIOUSLY THE INTENT OF 2941.25.  THAT IF YOU REALLY HAVE THE SAME ACTS WHICH CONSTITUTES TWO OR MORE OFFENSES AND THERE IS NOT A SEPARATE ANIMUS, AND I WILL TELL AS A MATTER OF LAW, I DON'T THINK THERE IS A SEPARATE ANIMUS IN THIS CASE, IT DOES GIVE YOU THE ABILITY TO, IN EFFECT, OBVIATE 2941.25.

BUT YOU KNOW WHAT?  YOU'RE RIGHT.  THAT IS THE LAW.  THAT IS WHAT RANCE SAYS.  SO I AM STUCK WITH RANCE, EVEN THOUGH I DON'T LIKE IT.

SO I AM GOING TO HOLD IN THIS CASE THAT FOR PURPOSES UNDER RANCE THAT THE FELONIOUS ASSAULT, COUNT SIX, IS NOT AN ALLIED OFFENSE OF SIMILAR IMPORT TO COUNT TWO, THE ROBBERY.  AND THEY ARE SEPARATE AND DISTINCT, AND THE DEFENDANT MAY BE CONVICTED OF BOTH AND SENTENCED

10

SEPARATELY ON BOTH.

WHAT DOES THAT MAKE THE MAXIMUM PENALTY, IN YOUR VIEW?

MR. STEAD: 10 FOR THE AG BURG, 20 FOR THE TWO AG ROBS, EIGHT FOR THE FELONIOUS ASSAULT, FIVE FOR THE WEAPON UNDER DISABILITY.

THE COURT: AND THREE FOR THE SPEC.

MR. STEAD: THREE FOR THE SPEC.

THE COURT: THAT WOULD BE 46 YEARS, AS I CALCULATE IT.

MR. STEAD: THREE TENS AND EIGHT AND -- YES, 46.

THE COURT: DEFENSE, DO YOU HAVE A VIEW OF WHAT THE MAXIMUM PERMISSIBLE PENALTY IS?

MR. SHWARTZ: NO, YOUR HONOR.

THE COURT: IN OTHER WORDS, YOU DON'T DISAGREE THAT IF THAT WAS IMPOSED THAT WOULD BE THE PENALTY?

MR. SHWARTZ: YES.

THE COURT: OKAY. NOW, I WANT TO SAY ONE OTHER THING, GIVEN THE DECISION IN STATE VERSUS FOSTER YESTERDAY, IT IS NO LONGER NECESSARY FOR THIS COURT IN IMPOSING EITHER MAXIMUM SENTENCES OR CONSECUTIVE SENTENCES TO MAKE ANY SPECIAL FINDINGS.

WOULD THE STATE AGREE WITH THAT?

11

MR. STEAD: JUDGE, I HAVE NOT HAD A CHANCE TO READ THE FOSTER OPINION YET. I AM SEEING IT FOR THE FIRST TIME HERE. I DID READ ABOUT IT IN THE NEWSPAPER. I HAVE NOT HAD A CHANCE TO DIGEST THAT OPINION.

THE COURT: HAVE YOU READ THE FOSTER DECISION?

MR. SHWARTZ: NO. JUST WHAT THE NEWSPAPERS HAVE ON IT.

THE COURT: I HAVE READ THE DECISION THREE TIMES, AND I HAD TO DEAL WITH THIS IN A MURDER CASE I HAVE GOT. SO I THINK I AM FAIRLY FAMILIAR WITH IT. AND I THINK IT'S VERY CLEAR THAT GIVEN THAT DECISION, THE COURT -- THERE IS NO REQUIREMENT IN THE IMPOSITION OF MAXIMUM OR CONSECUTIVE SENTENCES FOR THE COURT TO MAKE ANY SPECIAL OR ADDITIONAL FINDINGS.

IN FACT, IT WOULD BE IMPERMISSIBLE FOR THE COURT TO DO THAT, AND SO I AM NOT DOING THAT.

DOES THE PROSECUTION HAVE ANYTHING FURTHER TO PRESENT ON SENTENCING IN THIS CASE?

MR. STEAD: I DO HAVE COPY OF HIS PRIOR RECORD.

THE COURT: I DO NOT.

MR. STEAD: WE WOULD NOTE -- WE WILL PRESENT YOU WITH THAT COMPLETE COPY OF HIS PRIOR RECORD. BUT HE HAS TWO PRIOR FELONY CONVICTIONS. HE WAS ON PAROLE OUT

R. HORTON 002144

12

OF THE STATE OF WEST VIRGINIA AT THE TIME OF THIS OFFENSE FOR A CRIME INVOLVING DEALING IN CONTROLLED SUBSTANCES.

JUDGE, THIS MAN WENT INTO A HOME AT 7:30 IN THE MORNING, FORCED HIS WAY IN AT GUNPOINT AND ENDED UP SHOOTING ONE INDIVIDUAL AND TERRORIZING TWO PEOPLE AND IN A WAY JUST HARD TO IMAGINE.  YOUR HOME IS YOUR CASTLE.  YOU SHOULD BE ABLE TO WAKE UP IN YOUR HOME ON A SATURDAY MORNING SAFELY AND SOUNDLY.  THESE TWO PEOPLE WERE DENIED THAT BECAUSE THIS MAN DID NOT WANT TO MEET HIS RESPONSIBILITY TO THE COMMUNITY.

IN LIGHT OF THE PHYSICAL HARM SUFFERED IN THIS CASE BY MR. MCCLANAHAN, AND IN LIGHT OF THE EMOTIONAL HARM SUFFERED BY BOTH VICTIMS IN THIS CASE, IN LIGHT OF THE PRIOR RECORD, WHICH I WILL PRESENT TO THE COURT AT THIS POINT --

THE COURT:  HAVE YOU SEEN THE PRIOR RECORD?

MR. SHWARTZ:  YES, YOUR HONOR.

MR. STEAD:  -- WE FEEL THAT ANY SENTENCE IN THIS CASE THAT DOES NOT BEGIN WITH A TWO IS INAPPROPRIATE.  THIS MAN DESERVES TO DO AT LEAST 20 YEARS IN THE PENITENTIARY.

THE COURT:  DO YOU HAVE ANY VICTIMS PRESENT TO TESTIFY OR ANY IMPACT STATEMENT?

MR. STEAD:  JUDGE, WE SPOKE TO

R. HORTON 002145

13

MR. MCCLANAHAN THIS MORNING.  HE CHOSE NOT TO COME DOWN HERE TODAY.

THE COURT:  GOT YOU.  AND MISS CURRY ALSO, I TAKE IT?

MR. STEAD:  YES.

THE COURT:  VERY GOOD.

MISS HOLFINGER OR MR. SHWARTZ.

MR. SHWARTZ:  PLEASE THE COURT.  MY CLIENT, OF COURSE, STILL MAINTAINS HIS INNOCENCE IN THIS.

THE COURT:  WITHOUT QUESTION.  I UNDERSTAND THAT.

MR. SHWARTZ:  AND IT WAS A -- IT WAS AN IDENTIFICATION CASE.  AND, OF COURSE, THEY ARE ALWAYS THE MOST DIFFICULT TO DEFEND.  AND THERE IS ALWAYS A QUESTION ON IDENTIFICATION CASES AS TO WHETHER IN FACT MY CLIENT ACTUALLY COMMITTED THESE CRIMES.  AND WE ARE BEFORE THE COURT, I RESPECTFULLY ASK THE COURT TO BE AS LENIENT AS POSSIBLE IN THAT.  I THINK MY CLIENT DOES WANT TO MAKE A STATEMENT.

THE COURT:  I WOULD VERY MUCH APPRECIATE HEARING FROM MR. HORTON.  YOU CAN REMAIN SEATED, MR. HORTON.

THE DEFENDANT:  I WOULD RATHER STAND UP AND TESTIFY.  YOUR HONOR, I'D JUST LIKE FOR YOU TO CONSIDER A FEW THINGS.  FOR YOU TO CONSIDER THE FACT THAT I HAVE

14

TWO CHILDREN. MY SON, HE SUFFERS FROM A FORM OF HEART DISEASE. HE HAD OPEN HEART SURGERY WHEN HE WAS TWO MONTHS OLD. HE'S HAD -- THEY HAD TO PERFORM SURGERY AGAIN ON HIM A COUPLE MONTHS AFTER THAT TO PUT A PACEMAKER IN HIM. I'D LIKE FOR YOU TO CONSIDER THE FACT THAT I DO HAVE A WIFE, AND WE HAVE ONLY BEEN MARRIED A SHORT TIME. SHE KNEW ME AT THE TIME OF THIS OFFENSE WHEN THIS OFFENSE HAPPENED. AND, YOU KNOW, SHE STUCK BY ME THROUGH THE WHOLE THING. YOU KNOW, JUST BELIEVING IN ME, JUST BELIEVING IN THE SYSTEM.

AND I'D LIKE FOR YOU TO CONSIDER THE FACT THAT I AM STANDING HERE TODAY AND ASKING FOR THE COURT TO ORDER A POLYGRAPH TEST. THE REASON BEING THAT I HAD -- ME AND MY COUNSELOR, WE JOSTLED WITH THIS FOR A COUPLE MONTHS. I JUST THOUGHT THAT WAS AN IMPORTANT PIECE OF EVIDENCE THAT SHOULD HAVE BEEN PRESENTED IN THIS TYPE OF CASE. AND HE JUST -- HE JUST CHOOSE NOT TO GO WITH THAT STYLE OF OR METHOD, JUST MAINTAINING THAT, YOU KNOW, THAT HE HAD BAD EXPERIENCES WITH IT IN THE PAST.

THE COURT: LET ME TELL YOU RIGHT NOW, I HAVE NO AUTHORITY TO DO WHAT YOU'RE ASKING.

THE DEFENDANT: OKAY. YOUR HONOR, I WOULD JUST LIKE YOU TO CONSIDER -- JUST CONSIDER A FEW OTHER THINGS THAT, YOU KNOW, THAT THE EVIDENCE THAT I

15

PRESENTED HERE IN THIS CASE. I ACTUALLY ONLY PRESENTED TWO PIECES OF EVIDENCE, AND I JUST WANT YOU TO CONSIDER THE FACT THAT I COULD HAVE PRESENTED MORE PIECES OF EVIDENCE. A POLYGRAPH TEST, I COULD HAVE PRESENTED.

I NEVER ACTUALLY GOT TO SEE A BALLISTICS TEST ON THE BULLET THAT WAS FOUND IN THE HOUSE. JUST MAYBE CONSIDERING THAT THE ACTUAL PERSON WHO COMMITTED THIS CRIME MAYBE BETWEEN THIS TIME AND NOW, MAYBE THAT PERSON WAS CAUGHT WITH THE WEAPON AND MAYBE IT MATCHES UP, MAYBE THE GUY FITS THE SAME DESCRIPTION. YOU KNOW, MAYBE. I JUST NEVER GOT TO SEE AN ACTUAL BALLISTICS REPORT FROM THE BULLET.

I WOULD LIKE FOR YOU TO CONSIDER THE FACT THAT I DIDN'T HAVE ANY CHARACTER WITNESSES SPEAK UPON MY BEHALF. THAT WAS DUE TO ADVICE FROM MY COUNSEL. HE STRONGLY ADVISED AGAINST THIS. AND I HAD -- YOU KNOW, I HAD FROM WHAT I FEEL A PRETTY DECENT CHARACTER WITNESS THAT CAN -- YOU KNOW, COULD VERIFY MY CHARACTER, VERIFY THAT I AM NOT THE TYPE OF PERSON THAT WOULD USE VIOLENCE TO OBTAIN MONEY. YOU KNOW, PEOPLE THAT HAS KNOWN ME AND JUST KNOWN THAT I HAVE -- YOU KNOW, THAT I HAVE ALWAYS LIVED A DECENT TYPE OF LIFE CONCERNING, YOU KNOW, MONEY.

I ALSO HAD A SUFFICIENT AMOUNT OF MONEY IN MY LIFE. I NEVER -- YOU KNOW, I LET THE RECORD SHOW THAT I NEVER USED VIOLENCE PRIOR TO THESE FINDINGS OF

R. HORTON 002148

16

THE COURT. AND I'D JUST LIKE FOR YOU TO CONSIDER, YOUR HONOR, THE FACT THAT, YOU KNOW, THE STATE -- THE STATE HAS PUT TRUST FORTH IN YOU, AND I BELIEVE THE STATE, YOU KNOW, THEY BELIEVE IN YOU, AND THEY TRUST IN YOU TO DO YOUR JOB.

AND, YOUR HONOR, I'D JUST LIKE FOR YOU TO LOOK IN YOUR HEART AND USE YOUR WISDOM, SIR. AND, YOU KNOW, I DON'T KNOW HOW LONG YOU HAVE BEEN DOING THIS, YOU HAVE BEEN DOING THIS, BUT I AM REALLY -- I AM WILLING TO BELIEVE THAT YOU KNOW AN INNOCENT MAN WHEN YOU SEE ONE. AND, YOU KNOW, WITH THAT RESPECT, YOUR HONOR, YOU KNOW, I JUST -- I JUST LIKE FOR YOU TO CONSIDER THOSE THINGS THAT I ALWAYS SHOWED UP HERE CLEAN CUT. I ALWAYS HAD ON A SUIT AND TIE. I NEVER COME DISRESPECTFUL TO THE COURT, BECAUSE, YOU KNOW, IN MY OPINION, I HAD NOTHING TO HIDE.

AND IN MY OPINION, I ALWAYS BELIEVED THAT THE JUSTICE SYSTEM WOULD DO ITS JOB, AND THAT THE TRUTH WOULD COME OUT. AND I JUST LOOK FOR YOU TO CONSIDER -- WOULD LIKE FOR YOU TO CONSIDER THOSE THINGS, YOUR HONOR.

THAT IS IT.

THE COURT: THANK YOU. DO YOU HAVE ANY FURTHER WITNESSES?

MR. SHWARTZ: NO. HIS FAMILY IS HERE.

DO YOU WANT TO SPEAK?

R. HORTON 002149

17

HIS FAMILY.

THE COURT: YOU MAY BE SEATED.

IDENTIFY YOURSELF.

MR. HARMON: ARTHUR HARMON. I'M EMPLOYED FOR AMERICAN ELECTRIC POWER. I KNOW RICHARD FROM MARRIAGE TO MY DAUGHTER. I HAVE HAD A LOT OF TRUST IN HIM. AND RICHARD CAME TO ME AND ASKED TO MARRY MY DAUGHTER. AND WE ARE VERY RELIGIOUS PEOPLE. AND I QUESTIONED HIM AS FAR AS I COULD ON THAT. I AM THAT SERIOUS WITH MY CHILDREN. MY DAUGHTER CAME IN AS A WITNESS TO WHERE HE WAS AT THAT TIME. I DON'T TEACH MY CHILDREN TO LIE. I BELIEVE HER AND WITH EVERYTHING SHE HAS TO SAY.

RICHARD'S TESTIMONY THAT HE'S GIVEN IS VERY TRUE. HE IS -- RICHARD HAS, SINCE HE'S BEEN OUT, HE'S TAKEN RESPONSIBILITY TO TAKE CARE OF HIS CHILDREN. HE'S DONE EXPENDABLY WELL WITH CHILD SUPPORT. I EVEN HAD TO ARGUE WITH HIM, YOU DON'T HAVE TO GO SO FAR. BUT HE WAS VERY MUCH UPON TAKING CARE OF HIS CHILDREN AND HIS WIFE. I TOLD HIM YOU WANT TO MARRY MY DAUGHTER, YOU TAKE CARE OF HER. I WILL LEAVE HER IN YOUR HANDS, AND I TRUSTED HIM WITH THAT. HE'S BEEN THE TYPE OF PERSON THAT'S ALWAYS BEEN RESPECTABLE TO ME. I APPRECIATE THAT. I AM AN HONEST MAN. AND, SIR, I BELIEVE THAT YOU'RE LIKE ME IN THAT WAY, YOU'RE HONEST, AND I SEE THE INNOCENCE IN

18

HIM, AND I TRUST THAT YOU WILL TOO.

THAT IS ALL.

THE COURT:  ANYBODY ELSE?

MR. SHWARTZ:  NO, YOUR HONOR.

THE COURT:  LET ME SAY IN THIS CASE, MR. HORTON, WHAT YOU SAID, AND FROM WHAT THIS GENTLEMAN HAS SAID, YOU HAVE RAISED ISSUES CONCERNING THE FINDINGS IN THE CASE, AND HAVE ASKED ME TO CONSIDER THOSE AS PART OF THE SENTENCING IN THE CASE.  I CAN'T DO THAT.

THOSE ARE ISSUES ONCE THE JURY HAS FOUND YOU GUILTY, WHICH THEY HAVE, THEN I AM -- I MUST SENTENCE YOU ON THAT BASIS.  AND I CANNOT CONSIDER ANY ISSUES CONCERNING YOUR CLAIMED INNOCENCE IN THIS MATTER IN REACHING THAT SENTENCE, BECAUSE THOSE ISSUES HAVE BEEN RESOLVED.

IF THERE ARE ISSUES FOR APPEAL HERE, THAT IS WHAT A HIGHER COURT IS FOR, AS I THINK YOU UNDERSTAND. SO I MUST SENTENCE YOU BASED UPON THE FACTS OF THIS OFFENSE AS THE JURY HAS DETERMINED THEM, BASED UPON YOUR PRIOR RECORD IN THIS CASE.

NOW, ALONG THOSE LINES, YOU HAVE TWO PRIOR FELONY CONVICTIONS WHICH YOU SERVED TIME.  ONE, YOU WERE ON PAROLE, IN EFFECT, WHEN THIS OFFENSE WAS COMMITTED. THAT IS A SERIOUS MATTER.  THERE IS NO EXPLANATION OR JUSTIFICATION FOR THE VICIOUSNESS OF THESE OFFENSES.  TO

R. HORTON 002151

19

BREAK INTO SOMEBODY'S HOUSE AT 7:30 IN THE MORNING WITH A GUN AND TO TERRORIZE THEM, WHICH IS EXACTLY WHAT YOU DID, AND TO SHOOT ONE OF THEM, WHICH IS EXACTLY WHAT YOU DID, IS HEINOUS. THERE IS NO JUSTIFICATION FOR THAT. THIS WAS A BOLDFACE VICIOUS ROBBERY AND BURGLARY AND FELONIOUS ASSAULT ON TWO PEOPLE.

THIS VIOLATES THE SANCITY OF OUR HOME. TO ME, THIS IS AMONG THE MOST SERIOUS OF OFFENSES. GIVEN YOUR PAST RECORD, AND GIVEN THE VICIOUSNESS OF THESE OFFENSES, I HAVE NO ALTERNATIVE, IN MY MIND, AND WOULD NOT BE DOING MY JOB UNLESS I PASSED A SEVERE SENTENCE IN THIS CASE.

NOW, I DO COMMEND YOU BECAUSE YOU MADE A VERY GOOD APPEARANCE IN COURT. YOU WERE ALWAYS VERY RESPECTFUL. AND I UNDERSTAND YOU HAVE FAMILY, PEOPLE WHO LOVE YOU AND CARE ABOUT YOU. AND I THINK YOUR WIFE, I THINK YOU CARE. BUT THE PROBLEM HERE IS, RICHARD, THAT YOUR CONDUCT OUTWEIGHS ALL OF THAT. IT OUTWEIGHS ALL OF THAT. BUT THERE IS ENOUGH THERE FROM THESE PEOPLE THAT CARE ABOUT YOU, FROM YOUR DEMEANOR IN COURT, THAT I AM NOT IMPOSING MAXIMUM SENTENCES IN THIS CASE ON THE COUNTS. BUT I WILL IMPOSE CONSECUTIVE SENTENCES ON SEVERAL OF THESE COUNTS.

IT IS THE JUDGMENT OF THIS COURT AS TO COUNT ONE, THE AGGRAVATED BURGLARY, THAT YOU BE CONFINED IN

20

THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS FOR A PERIOD OF EIGHT YEARS.

AS TO COUNT TWO, THE AGGRAVATED ROBBERY IN RELATIONSHIP TO MR. MCCLANAHAN, THAT YOU BE CONFINED IN THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS FOR A PERIOD OF NINE YEARS.

AS TO COUNT SIX, THE FELONIOUS ASSAULT ON MR. MCCLANAHAN, WHICH IS AN F-2, THAT YOU BE CONFINED IN THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS FOR A PERIOD OF THREE YEARS.

ON COUNT SEVEN, WHICH IS THE AGGRAVATED ROBBERY IN RELATION TO MISS CURRY, THAT YOU BE CONFINED IN THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS FOR A PERIOD OF SIX YEARS.

ON COUNT 11, THE WEAPONS UNDER DISABILITY CHARGE, THAT YOU BE CONFINED TO THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS FOR A PERIOD OF THREE YEARS.

AND ON THE SPECIFICATION, THAT YOU BE CONFINED FOR A PERIOD OF THREE YEARS.

NOW, THE SENTENCES IN RELATION TO MR. MCCLANAHAN ARE MORE SEVERE THAN IN RELATION TO MISS CURRY BECAUSE THERE WAS NO PHYSICAL HARM IMPOSED ON HER.

AS FAR AS CONCURRENCY OR CONSECUTIVENESS, I AM ORDERING COUNT TWO AND SEVEN, WHICH ARE THE TWO

21

AGGRAVATED ROBBERY COUNTS, TO RUN CONCURRENT WITH EACH OTHER, BUT CONSECUTIVE WITH ALL OTHER COUNTS.

COUNT 11, THE WEAPONS UNDER DISABILITY, IT WILL RUN CONCURRENT WITH ALL OTHER COUNTS.

THE SPECIFICATION WILL RUN CONSECUTIVE WITH ALL OTHER COUNTS.

SO THAT LEAVES US WITH A TOTAL SENTENCE OF 23 YEARS, AS I CALCULATE IT.

MR. STEAD:  AGREED.

THE COURT:  SO YOUR TOTAL SENTENCE IS 23 YEARS AT THE OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS.  I WILL NOT IMPOSE A FINE.  I WILL NOT IMPOSE COURT COSTS IN THIS CASE.

I DO ADVISE YOU THAT YOU HAVE A RIGHT TO APPEAL THIS SENTENCE.  IF YOU ARE UNABLE TO PAY THE COSTS OF APPEAL, YOU HAVE A RIGHT TO APPEAL WITHOUT PAYMENT.  IF YOU ARE UNABLE TO OBTAIN COUNSEL, THE COURT WILL APPOINT YOU COUNSEL FOR APPEAL PURPOSES.  AND YOU HAVE 30 DAYS TO EFFECT AN APPEAL.

DO YOU WISH TO EXERCISE THAT RIGHT AND HAVE THE COURT APPOINT YOU COUNSEL?

THE DEFENDANT:  YES, YOUR HONOR.

THE COURT:  WE'LL DO THAT.

I ALSO ADVISE YOU THAT YOU WILL BE SUBJECT TO A PERIOD OF POST RELEASE CONTROL UPON YOUR RELEASE ON

R. HORTON 002154

22

SEVERAL OF THESE OFFENSES FOR A PERIOD OF FIVE YEARS. IF YOU WOULD VIOLATE THE TERMS AND CONDITIONS OF YOUR POST RELEASE CONTROL, THEN YOU COULD BE RETURNED TO THE INSTITUTION FOR A PERIOD OF NINE MONTHS EACH FOR VIOLATIONS TO A TOTAL OF UP TO ONE HALF OF YOUR ORIGINAL SENTENCE ON THOSE COUNTS.

MR. HORTON, I'M SORRY ABOUT WHAT HAPPENED HERE. IT WAS YOUR FAULT. YOU DID IT. I AM SORRY BECAUSE THERE HAS BEEN A LOT OF PEOPLE HURT BY YOUR CONDUCT OTHER THAN YOURSELF. THESE PEOPLE SITTING BACK HERE, MR. MCCLANAHAN AND MISS CURRY. AND IT WAS UNNECESSARY. YOU HAD A LOT OF ABILITY. YOU HAD A LOT OF ABILITY. I THINK YOU DO HAVE A LOT OF ABILITY, BUT YOU HAVE WASTED IT. I ONLY HOPE THAT WHEN YOU'RE RELEASED FROM PRISON, THAT YOU MAKE SOMETHING POSITIVE OF YOUR LIFE, BECAUSE I THINK YOU HAVE THE ABILITY TO DO THAT.

I HAVE NOTHING MORE TO SAY.

MR. STEAD: JUDGE, THE STATUS OF THIS SENTENCE WITH RESPECT TO THE SENTENCE OUT OF WEST VIRGINIA, CONCURRENT OR CONSECUTIVE?

THE COURT: DO I HAVE THAT AUTHORITY?

MR. STEAD: I BELIEVE YOU HAVE THAT AUTHORITY BECAUSE YOU WERE THE FINAL SENTENCER. WE WOULD ASK IT BE A CONSECUTIVE SENTENCE.

R. HORTON 002155

23

THE COURT:  IS THAT CONTROLLING OVER AN OUT-OF-STATE?  IF IT'S IN-STATE, I WOULD AGREE WITH YOU.

MR. STEAD:  WE ARE ASKING YOU TO DO IT.  IT IS YOUR CALL.

THE COURT:  WHAT IS THE LENGTH OF THE SENTENCE OUT-OF-STATE?

MR. STEAD:  TWO TO 15 YEAR SENTENCE OUT OF THE STATE OF WEST VIRGINIA.

THE COURT:  I AM NOT GOING TO EXERCISE THAT AUTHORITY IN THIS CASE.  I AM NOT GOING TO DO THAT BECAUSE I REALLY DO NOT BELIEVE THAT OHIO CAN DICTATE UNDER ITS STATUTES WHETHER OR NOT A SENTENCE IN WEST VIRGINIA IS CONCURRENT OR CONSECUTIVE TO THAT.  I THINK THAT IS UP TO THE WEST VIRGINIA AUTHORITIES.

BUT I WILL SAY THIS, I EXPECT HIM TO SERVE EVERY DAY OF THIS SENTENCE FIRST.

MR. STEAD:  JAIL-TIME CREDIT?

THE COURT:  WHAT DO WE HAVE?

MS. HOLFINGER:  WE WILL NEED TO CALCULATE IT.

THE COURT:  YOU CALCULATE IT UP AND WHATEVER YOU AGREE TO IS FINE WITH THE COURT.  ROUND IT OFF FOR 40 DAYS AND WE WILL GO WITH IT.

I WANT TO THANK YOU FOLKS FOR COMING IN.  I APPRECIATE YOU COMING IN.

24

- - -

THEREUPON, THE HEARING WAS CONCLUDED.

- - -

R. HORTON 002157

25

<u>CERTIFICATE</u>

- - -

I DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE AND COMPLETE TRANSCRIPT OF THE PROCEEDINGS TAKEN ON MARCH 1, 2006, BY ME AND TRANSCRIBED FROM MY STENOGRAPH NOTES.

_____

MARK W. NEAL, ASSISTANT

OFFICIAL COURT REPORTER.

- - -

R. HORTON 002158