# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Richard Horton,                   :

     Plaintiff,            :

     vs.                   :   Case No. 2:23-cv-3888
                                      Chief Judge Algenon
City of Columbus,         :     L. Marbley
et al.,                         Magistrate Judge
                          :     Elizabeth Preston
     Defendants.           Deavers
                          :

- - - - -

VIDEOTAPED DEPOSITION OF RHONDA W. CURRY
VIA VIDEOCONFERENCE

- - - - -

Witness located at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
September 27, 2024, 10:01 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

                          A P P E A R A N C E S


     ON BEHALF OF PLAINTIFF:

          Loevy & Loevy
          311 North Aberdeen Street, 3rd Fl.
          Chicago, IL 60607
          By Jon Loevy, Esq.
               (Via videoconference)
             Alyssa C. Martinez, Esq.
               (Via videoconference)


     ON BEHALF OF DEFENDANTS:

          Columbus City Attorney's Office
          77 North Front Street, 4th Fl.
          Columbus, OH 43215
          By Alana Valle Tanoury, Esq.
             (Via videoconference)
             David J. Dirisamer, Esq.
             (Via videoconference)
             Dexter W. Dorsey, Esq.
             (Via videoconference)


     ALSO PRESENT:

          Michael Lane - Videographer
          Doug Girard - Paralegal, Columbus City
               Attorney's Office

3

Friday Morning Session

September 27, 2024, 10:01 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Rhonda W. Curry, a witness herein, called by the Defendants for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

4

I N D E X

Examination By                                              Page

Mr. Loevy - Cross                                              5
Ms. Tanoury - Cross                                          126
Mr. Loevy - Further Cross                                    237
Ms. Tanoury - Further Cross                                  287
Mr. Loevy - Further Cross                                    297
Ms. Tanoury - Further Cross                                  300


Exhibits                                                    Page

Exhibit 1 - Six-Pack Photos for Curry                       108

Exhibit 2 - Investigation Report, Curry                     143
      Interview

Exhibit 3 - State of Ohio vs. Richard Horton -              148
      Trial Transcript

Exhibit 4 - Horton DNA Final Report, 11-8-2019              171

Exhibit 5 - CPD Investigative Photo Array                   195
      Procedure Form, Curry

Exhibit 6 - CPD Investigative Photo Array                   197
      Procedure Form, McClanahan

Exhibit 7 - Six-Pack Photos for McClanahan                  198

Exhibit 8 - Photocopy                                       220

(Exhibits attached electronically.)

5

THE VIDEOGRAPHER: We're on the record at 10:01. Will counsel please announce their presence.

MR. LOEVY: Hello. Jon Loevy here, for the plaintiff.

MS. TANOURY: Alana Tanoury, for Defendants.

MR. DORSEY: Dexter Dorsey, for Defendants.

MR. DIRISAMER: David Dirisamer, for Defendants.

MS. TANOURY: And we also have a paralegal from our office, the City Attorney's Office, Doug Girard.

- - - - -

RHONDA W. CURRY

being first duly sworn, testifies and says as follows:

DIRECT EXAMINATION

BY MR. LOEVY:

Q.      All right. We'll begin. If you could, state and spell your name for the record, please.

THE WITNESS: Me?

MS. TANOURY: (Indicates

6

affirmatively.)

A.          Rhonda W. Curry.

          MS. TANOURY:  Just a moment.  Does Ms. Curry need to put the microphone on?

          THE VIDEOGRAPHER:  Oh, I'm so sorry. Yes, she does.

          Do you mind grabbing that?

          THE WITNESS:  This?

          THE VIDEOGRAPHER:  Yep.  Just clip it to your sweater.

          (Ms. Martinez joined the videoconference.)

          MR. LOEVY:  Okay.  Well, the record can reflect that Alyssa Martinez is also here for the plaintiff's side.

BY MR. LOEVY:

Q.          I'll tell you what:  Let's begin again. Ms. Curry, if you'd state and spell your name for the record.

A.          Rhonda, R-h-o-n-d-a, Curry, C-u-r-r-y.

Q.          And where do you live, Ms. Curry?

A.          1730 Old Leonard Avenue, Columbus, Ohio 43219.

Q.          And what do you do for a living?

7

A.            Nothing.  I retired in 2020 at the pandemic.  I didn't go back to work.

Q.            What was your career before that?

A.            Wendy's.

Q.            How long did you work at Wendy's?

A.            Eighteen years.

Q.            What was your position there?

A.            Cashier.

Q.            Did you have different positions over the years?

A.            Yes.

Q.            Tell us a little bit about that.

A.            I worked in the -- I made sandwiches. I did salads.  I prepped food.  I cleaned.  I just did it all.

Q.            And after the pandemic, you did not go back to Wendy's?

A.            No, sir.

Q.            What do you do with your time these days?

A.            I just help with my grand -- help finish raising my grandchildren and just do my normal everyday duties at home and go to -- back and forth to West Virginia to visit my sister and

8

my family there.

Q.          How old are you now?

A.          This is my sister right here calling.

THE WITNESS:  Let me call you back. I'm in court.  I'm in court, baby.  Let me call you back.

A.          She's been ill, so, you know, we've been keeping contact.

But excuse me, sir?  What did you say?

THE WITNESS:  Did he say something else?

Q.          Okay.  I guess not.

You were saying about your sister?

A.          I just go -- like I said, I go to, you know, Huntington, West Virginia, to visit my family.  I have more family there than I have here.  It's just me and my daughter and her kids here.  I do take trips to go to West Virginia.  My son is there and my sister.  I have two deceased siblings, you know.  So I just visit with family.

Q.          And how old are you now?

A.          I'm 67 years old.

Q.          All right.  I want to back you up to the time frame that concerns this lawsuit.  Do you

9

remember the incident that gave rise to the prosecution of Richard Horton?

A.          I do.

Q.          Where were you living at the time?

A.          927 Loew Street.

Q.          How long had you been living there?

A.          We was there, I want to say, anywhere from seven to nine years.

Q.          And how old were you at the time?

A.          I want to say 47.

Q.          All right.  About 20 years ago?

A.          Yes.

Q.          And who were you living with?

A.          Richard McClanahan, Jr.

Q.          And how --

A.          -- AKA Ricky.

Q.          Ricky.  How long had you known Ricky before all this happened?

A.          I was -- I had been with Ricky at least 12 years prior to that, and we was together for 22 before he even passed.  So about 12, 13 years, maybe.  I can't really say.  I know it was a while.

Q.          And you guys were a couple?

10

A.          Yes.

Q.          Did you have children together?

A.          No.

Q.          What did he do?

A.          He was a truck driver.  He drove trucks -- he drove tandem truck and hauled gravel and dirt for his dad.  His dad had a company called Richards & Sons Hauling.  But his dad passed away a year prior to what happened to Rick, so he really was just like a hustler.  He was a junker. He junked.

He used to retrieve carts for Kroger's that they left in the neighborhood.  He did that. He -- like I said, he would junk.  He would work on cars.  He would just do whatever it took to, you know, survive, to make a dollar.

Q.          And what did that mean, to junk?

A.          Just, you know, going picking up scrap metal, things like that, you know.

Q.          All right.  And when the two of you were living there on Loew Street, how long had you been living there before this incident happened?

A.          Maybe about -- sir, that's really vague to me right now.  I don't know, because we lived

11

in a -- like an efficiency at first that was on his dad's property, then we moved into another house that was his dad's off of Joyce Avenue, and then we moved to that one.

My oldest granddaughter was born when we were living there.  That's when my daughter was living with me, and she was born in '97.  So I want to say -- I think we moved there in, like, '96.

Q.       All right.  And this incident, I'll represent to you, happened on October the 9th, 2004.  How many children did you have in 2004?

A.       I only have the two children.

Q.       Okay.  And who are they?

A.       My daughter, Kimberly Curry, and my son, William Curry.

Q.       And what do they do now?

A.       My son works at Marshall University in Huntington, West Virginia.  My daughter works at Nationwide Children's Hospital.

Q.       All right.  Returning your attention to October the 9th, 2004, do you remember what day of the week it was?

A.       I want to say it was a Saturday.

12

Q.          Do you remember what was going on that week before this happened?

A.          No.

Q.          And it's been a long time --

A.          Yeah.

Q.          -- and you don't have to remember everything.  That's for sure.

Do you remember if this happened in the morning, night, or evening?

A.          It was in the morning.  I do remember that.  I do --

Q.          What --

A.          -- remember Rick saying that night, when we had -- I think I had picked up my grand -- my two grandkids from day -- from the home that they used to go to when they were getting baby-sitted, and we picked them up and took them to my daughter's house.  By then, she had moved to 1250 Indianola Avenue.

Q.          So on the morning of October 9th, 2004, what do you -- what's the first thing you remember about what happened?

A.          I remember my dog barking on the front porch.

13

Q.        Do you --

A.        And I remember me turning over saying, Rick, I said, I think that's your client.  He told me he had a brake job to do that morning.  And I said, Rick, I said, I think that's your customer out there trying to, you know, get on the porch, I said, but the dog is barking.  And he said, no.  He said, I don't think he was going to come this early.

We still chilling, you know.  He laid back down or whatever.  Well, then next thing you know, a bang, bang, bang came on the door, but I didn't hear the dog.  So I'm thinking that he left once he heard the dog and gave the dog something to get back on that porch.  And he -- bang, bang, bang.  You know how -- it's a saying.  You knocking like a policeman, you know.

Q.        Uh-huh.

A.        He banging on the door.  Rick gets up and goes to the door.  When he -- as soon as he -- and where -- the way my bed was and the way the door was, he couldn't open it all the way.  He just opened it enough to see who it was or -- whoever it was to get in.

14

Well, next thing you know, bam, he hit him upside the head with the gun, and he fell back.  Well, that's when he drug -- he took him and drug him around the bed.

Q.        Well, let's slow down a little bit there.  So the bed was up real close to the door?

A.        Yes.  It was like -- you know, there was room enough to get, you know -- not a bigger person, but a person to get in that door, because we had a TV stand here and the door was here, and my bed went out this way, so...

Q.        Understood.  So there wasn't a whole lot of room, and --

A.        No.

Q.        -- this man is in your apartment -- in your apartment?

A.        Yeah.

Q.        And the man was wearing what?

A.        A gray hoodie and blue jeans.  And the hoodie was tied around -- you know how you can just tie it tight and you -- like, your lips are not really showing, but you can see a movement and his eyes.

Q.        So you could see through the hoodie.

15

You could see eyes?

A.          Yes.

Q.          You couldn't see his mouth?

A.          No, not really.

Q.          Was it tied up that way, from what you could see, so that he wouldn't -- he wouldn't let you recognize who he was?

A.          I think so.

Q.          And --

A.          But why did he tell me, bitch, quit looking at me?  Because he knew I knew -- I knew them -- those eyes just told the whole story, for one.  Then I knew his --

Q.          Well, let's slow down, because we've got to go question/answer, okay?

A.          Okay.

Q.          So you could see his eyes through the hoodie opening.

A.          Uh-huh.

Q.          And you couldn't see his mouth?

A.          Huh-uh.

Q.          And I take it you couldn't see his -- too much more of his face, then?

A.          Huh-uh.

16

Q.      Just his eyes?

A.      No.

Q.      All right.  And --

A.      The color of his skin.

Q.      Color of his skin.  Could you see his nose?

A.      I can't recall.

Q.      Okay.  Now, he said something to you about -- don't look at me?

A.      Yeah.

Q.      What did you understand what he meant when he said, don't look at me?

A.      I figured that, you know, he knew I knew who he was, because like I said, the voice, for one, and for the other, why did he say that if I didn't know who he was?

Q.      Well, maybe he didn't want you to recognize him even if you never met him in your life, right?

A.      I guess.  I don't know.

Q.      So you're guessing that maybe he thought you knew him.  That's your guess?

A.      I'm -- yeah.

Q.      But is it possible that he was just --

17

didn't want to be recognized in the future even,

if he didn't know you?

MS. TANOURY:  Objection.

Q.         There's no judge here, Ms. Curry, so
counsel's going to make a record, then you answer
the question.

Is that also possible, that he just
didn't want to be recognized in the future?

A.         I guess.  That's all I can say is I
guess.  I don't --

Q.         All right.  Was there something about a
pillow?  You put a pillow on your face?

A.         I put the pillow on my face.  Like I
said when he said that, quit looking at me, you
know, that's when I, like, did -- like, I, you
know, kind of kept peeking, you know, when I did
that, and then --

Q.         Before we get to the peeking, you did
put a pillow to cover your eyes?

A.         Yes.  Yes.  Okay.  That's when he
pointed the gun to me and Rick told him, no, man,
leave her alone.  Just go ahead and finish me off,
you know.  Just leave her alone, you know.

And that's when he drug him to the

18

shelf and said, man, where the money at?  Where the money at?  You know, I do remember him saying that.  And that's when he drug him to -- I had a -- it was his dad's recliner chair that we moved in the house after his dad passed away.  And I remember Rick put his -- always put his shoes behind there, you know, when he took them off.

And he drug him over there -- after he shot him, drug him all the way over there and said, man, where the money at?  Where the money at?  And Rick grabbed his shoe, you know, and he had 40-some dollars in his shoe, you know.

Q.      All this over 40 bucks, huh?

A.      All this over $40.

Q.      All right.  But I'm going to back up and just make sure we get the questions asked -- answered.

At some point during this encounter, you've got the pillow covering your face so that you can't see the intruder, right?

A.      Right.

Q.      And you said you were able to sneak some peeks, though?

A.      Yeah.

19

Q.          All right.  But were you trying to give him the impression you weren't looking at him?

A.          Right.

Q.          Why did you want to give him the impression you weren't looking at him?

A.          Because I didn't want to get shot. Like I said, he pointed the gun at me.

Q.          All right.  So when you had the pillow on your face, except when you were peeking, you couldn't see?

A.          No.

Q.          And I understand --

A.          I -- you know, like I said, I was peeking because I remember him dragging Rick to the chair.

Q.          Right.

A.          So I didn't hear no dragging.  I saw him drag him to that chair after Rick said, no, man, just go ahead and finish me off.  So I don't know whether he drug him over there to get the money or drug him over there to shoot him.  So, you know, I wouldn't be involved in that part.  I don't know.  But he didn't ever shoot him again.

Q.          Well, all I'm asking is:  While the

20

pillow was on -- covering your face, except for the times that you took your peeks, you couldn't see the man?

A.        No.

Q.        No, you agree with me, right?

A.        Right.

Q.        Because you said "no," but it probably is a "yes" on that.

A.        Well, yes.  I'm sorry.

Q.        That's okay.  We're all doing the best we can.  It's not really a natural format.

And I read your testimony.  It sounds like you're not clear if you actually saw him shoot Rick.  Is that accurate?

A.        Yes, I saw him shoot him.  He laid him on -- like I said, when he hit him in the head and drug him around, like, you know, Rick, like, wobbling around when he made it to the end of the bed, and that's when he fell back, and that's when he took that gun and put it to his leg and shot it.

That's -- maybe when I heard the shot, I blacked out or whatever.  I don't know.  But then instantly I woke up once Rick said, no, man,

21

don't do her, do me, you know, or don't -- you know, leave her alone.  However he said it.  He was protecting me.  He was ready to take his life for mine.

Q.        That was a brave thing.

A.        Yes, it was.

Q.        Now, what about the part about blacking out?  What do you -- what do you remember?

A.        I don't remember.  I saw the gun, but I don't remember hearing the shot.  I don't know whether it was because it was -- he put it to his leg.  It didn't -- it wasn't like it was in the air.  He put it to his leg and shot him in his leg.

Q.        And do you remember, when you testified back at the criminal trial, you said you didn't remember the gun going off, right?

A.        No.

Q.        No, you agree with me, or --

A.        Yeah.  I don't remember the gun going off, because like I said, I was -- you know, I don't remember whether I just blacked out or didn't hear the gun or what.  I don't know, but I don't remember hearing that gunshot.

22

And like I said, when it was all said and done, he said, Rhonda, I've got to go to the hospital.  I've been shot.  And I'm like, what?  You know, I didn't even -- like I said, I didn't even know he had got shot.  I do remember seeing the gun, though.

Q.          You saw the gun?

A.          Yes, I did.

Q.          So -- and you knew, when it was all over, he was bleeding, so he had been shot, right?

A.          Yeah.  I knew he was bleeding from his head.  Like I said, he got a -- he had a big whop on his head.

Q.          Got it.

A.          You know, I mean, it actually split his head, you know, when he hit him.  So there was blood running down his face.  Like I said, I didn't hear no gunshot, but then once, you know, I saw the gun -- like I said, when he came to the door, that's when he had the gun in his hand, and that's when he got Rick over the head.

Q.          So at some point early in the encounter, you definitely saw that gun?

A.          Yes, I did.

23

Q.          And when the man left, you realized Rick had been shot, right?

A.          Right.

Q.          But you didn't actually see Rick get shot in between?

A.          No.

Q.          All right.  And --

A.          I do know he laid him down and put that gun on his leg.  Like I said, I didn't ever hear the gun go off or nothing, so he had to shoot him, you know.

Q.          It --

A.          I mean, I'm just saying, all the blood and stuff, once I get Rick, you know, to the car and stuff -- like, I had to drag -- my sister, like I said, she was there.  But once she heard the scuffling and carrying on, she backed out. She was in a totally different room of the -- you know, section of the house.  She backed out because she felt that if she -- if he saw her, he would have shot her.

Q.          Right.

A.          So she never said a word, but when -- once he left and she came out, she said, what's

24

going on, you know?  I said, just help me get Rick to the truck, to his father's truck that he had in his custody at the time, you know.  I said, help me get him to the truck.

I didn't have a phone.  Rick didn't have a phone.  She didn't have a phone.  The only person I knew that had a phone was his sister that lived down the street once you pass Pepsi and all that off of Gibbard, she lived across the street from where their dad lived.  That's how far I had to travel with him.

Well, I kept saying Rick, hold on, hold on, hold on.  I'm getting you, you know, some help.  I'm driving the truck.  He's in the middle, my sister on the end.  So when we got to his sister's house, I holler, Cynthia, call the paramedics.  So they came to get him from there.  They didn't come to Loew Street.  That's where I took him.

So when he got out -- when he got out the truck, you know, my sister got out, and he wanted -- he said, I want to get out.  I've got to get some air.  He wanted to smoke a cigarette.  He was standing there smoking a cigarette, blood

25

running down his face, you know, and the paramedics came and got him or whatever, put him in the -- they was going to take him to OSU main. They turned it around, took him to Grant trauma.

That's where he was for what -- 16 or 17 hours in surgery getting that bullet -- well, I don't know if they removed the bullet. I don't even know if the bullet went in there. But to do his leg, he was in a bar on his leg for, I want to say, four weeks from the shot, because it was so -- it broke all the bone -- the bones in his leg.

So they had to take his muscle from his back leg and put it around to stitch it up or however they had to do it, and he had to wear a bar on his leg from that gunshot.

Q.      I want to return to the question.  It sounds like, when the intruder entered the house, you did see a gun, correct?

A.      Yes.

Q.      Correct?

A.      Yes.

Q.      And then when he left, you realized or you knew that Rick had been shot in the leg --

26

A.          Uh-huh.

Q.          -- at some point -- at --

A.          Uh-huh.

Q.          -- some point?

A.          Uh-huh.

Q.          But you didn't actually see the shooting in between, correct?

A.          I just saw him pointing the leg -- the gun to his leg, like I said.

Q.          All right.

A.          I do remember that.

Q.          But you don't remember the gun shooting?

A.          (Indicates negatively.)

Q.          You have to answer out loud.

A.          No.

Q.          Do you remember --

A.          No, I don't.

Q.          Okay.  And is it possible that that was during one of the times you had your face covered up by the pillow?

A.          It may have been.

Q.          All right.  When the man left, what did you -- were you able to provide of his

27

description?  You had seen his clothes, right?

A.         The -- like I said, he had on a gray hoodie and blue jeans.  They wasn't dark denim. They were kind of light denim.

Q.         And you knew that you had seen his eyes?

A.         Uh-huh.

Q.         And you had heard his voice?

A.         Uh-huh.

Q.         Do you remember how tall he was?

A.         He was about the same height as Rick.

Q.         How tall was Rick?

A.         I think Rick was about 6'2" and a half, maybe 6'3".

Q.         Have you reviewed your trial testimony before this morning's --

A.         No.

Q.         -- deposition?

A.         I had not heard nothing for over 20 years up until here lately.  They sending me all this paperwork and -- blah, blah, blah, blah, this and that and the other.  And I'm like, why is this coming up now?  You know -- and like I said, how they found where I was, I'll never know, because

28

I've been in this house that I'm in now with my daughter for 15 years after she left 1250 Indianola. We've been in this house for 15 years.

As a matter of fact, Rick found a house for us, okay? We all moved in there together because her baby's dad was ill, and, you know, she needed some help at the time. So we like, okay, Kim, we going to help you out. We're going to move with you. So she found a house -- he helped her find a house where the basement was finished. You know, Maverick was in the basement. Her and her kids was upstairs.

Q. Who sent you paperwork, Ms. Curry?

A. I don't know.

Q. What paperwork do you --

A. Right here. It says Zach -- whoever. This is the subpoena, but I had got a letter. And you know what? I was really ignoring the fact -- because I said I didn't want to -- you know, I didn't want to go through this again or whatever, so I was actually throwing them away because I'm like, why are they asking me questions now, when I gave my testimony that day? You know -- so why are they bringing this stuff up?

Well, I didn't know he was trying to sue the County.  I didn't know that.  So I'm, like, ditching them.  I'm like, I ain't got nothing to do with that.  I don't -- you know, because I got a strong faith, you know, in the Lord and I'm like, Lord, please get me out of this mess.  I said, I don't want to be involved in it no more.  I'm tired.  He's gone, you know.

Well, they said I was the only living witness, so then that's when I start reading the paper, you know, and stuff.  And then I'm like -- and then, like I said, this last one -- not this one, but the one before that, she just knocked on my door.  She said, Rhonda Curry?  And just handed me the paper.  I'm like, what?

Q.         All right.  Let me slow you down.  Who told you --

A.         I don't know.  She didn't say no names. She didn't say nothing.  She just gave me a paper. That was for, I want to say -- in August, okay? In August.

Q.         All right.  We've got to do better with the question/answer, okay?

A.         Okay.

30

Q.          Somebody told you you were the only living witness.  Who was that?

A.          I don't know who they were.

Q.          Is it anybody that's in the room with you right now?

A.          I don't know.  No.

Q.          Have you ever spoken to anybody that's in the room with you?

A.          No, I have not.

Q.          Have you had conversations on the phone with anybody in the room with you?

A.          I don't know.  It was -- it was a prosecuting attorney.

Q.          So can you think of the name of that person?

A.          No.

Q.          How long ago was that?

A.          I don't know, because I have a new phone.  And what I had -- I think I did keep their number in my old phone, but once I broke my phone, they couldn't get but so much information out of that phone.

Q.          All right.  Was this a month ago, two months ago?  How long ago were you talking to the

31

attorney for the prosecutor?

A.          I don't know, but -- what was her name?
Was it Marsha?  I really can't say.  It's been a
long -- it's been over a year since I talked to
that prosecuting attorney.

Q.          Okay.

A.          And I got emotional then, and she said,
well, ma'am, she said, I don't want to upset you
or whatever, you know, but she asked me the same
questions over and over and over again.

Q.          All right.  Ms. Curry, you said that
they sent you the papers and you started reading
them before you threw them away.  What did you
start reading before you threw them away?

A.          What did I read?  I read that, you know
-- that he was out, that he was trying to sue the
County or whatever.  And I'm like, well, what does
that have to do with me?

Q.          Understood.  Did you see any police
reports or --

A.          No.

Q.          -- any transcripts of --

A.          No, none.

Q.          All right.  When's the last time you've

32

seen your testimony or your police reports?

A.        That day, I guess, when I was on the stand.

Q.        So, 20 years ago?

A.        Yeah.

Q.        You have -- nobody -- has anybody given you a copy of your testimony?

A.        No.

Q.        And nobody --

A.        Not that I know of, no.  If they had -- like I said, us moving or whatever, if they did, you know how you just trash stuff?  I might have threw it away.  I don't know, but I didn't keep none of that.

Q.        Got it.  All right.  At the time --

A.        After he passed away anyway.  I just, like --

Q.        Sure.  At the time that this man was in your apartment, you didn't know that you knew him, correct?

A.        Right.

Q.        Either way.  He was just --

A.        I didn't -- I knew I knew him by his eyes.  Like I said, you know, I -- you know, I

33

knew him prior to this situation here.

Q. So what you're saying, when you saw this man come in your apartment, you believe you knew him?

A. Yes.

Q. Did you tell that to Rick?

A. Once we -- once we talked about it and the detective talked to him first, and then she talked to me at 1250 Indianola, she said, you and Rick have the same testimony, you know, the same thing. Rick said he knew who -- you know, he believed he knew who it was, too.

And he wasn't with me, and I -- she did him in the hospital. She did me at the house. Then she said, do you remember seeing the gun? And I told her, yes. And she drew a couple of guns -- or she showed me a picture of a couple of guns, and I picked the gun --

Q. All right. We've got to -- it's got to be not so much a conversation, Ms. Curry. It's a question/answer format, okay?

A. Okay.

Q. So I'm just focusing on this idea that you believe you knew the person in your apartment.

34

A.        Yes, I do.

Q.        Did you speak about that with Rick?

A.        Once -- yeah, I did.

Q.        All right.  Tell me about the conversation you and Rick had about who you believe the person in your apartment --

A.        I told him -- I said, Rick, I said, why would he come and do that?  He said, because he was trying to rob me, because he saw him earlier at the store.

Q.        So Rick's telling you he had seen the man in the apartment?

A.        He didn't see -- he saw him, yes.

Q.        So he knew --

A.        I knew him prior to going to the store and seeing this man.  I'm going to tell you he said, oh, man, Rick, you've got some money.  He said, give me that money, you know, like that.  Rick said, no, man, I don't --

Q.        Did Rick --

A.        Huh?

Q.        Did Rick tell you the name of that person?

A.        Yeah.  He said, guess what, right?  You

35

know, I said, what?  He said, I ran into Richard Horton today.  He up telling me, man, give me some of that money.  And Rick said, no, man, I don't loan nobody no money because it breaks up a friendship.  Well -- which they wasn't friends, but, you know, Rick was a joker.  But anyway --

Q.          So Rick told you --

A.          -- Rick was calling --

Q.          -- the name Richard Horton?

A.          Yes.

Q.          When did Rick tell you the name Richard Horton?

A.          That night that he's -- you know, he said, he tried to get my money, you know.  Because he just got paid.  As a matter of fact, it was on a Friday.  Sorry.  It's --

Q.          Okay.

A.          -- not a Saturday.  It was on a Friday, because Rick had got paid from his dad.

Q.          Right.

A.          He was calling the electric company at the store around the corner to get -- to pay the bill over the -- something he was doing.  He was on the phone, and he walked --

36

Q.      Well, your testimony -- all right. Because I'm just going to focus on the part about Richard Horton, okay?  Rick told you the night of the shooting that the shooter was Richard Horton?

A.      No, not at that night.  That next day.

Q.      When did he tell --

A.      That next day, once he came out of surgery and we was talking about it.  And he said, Rhonda --

Q.      Got it.

A.      -- he said, I believe that was Richard. Now -- but he didn't say Richard Horton, because we had to figure out Richard Horton's last name.

Q.      Who figured out Richard Horton's last name?

A.      We didn't know his last name.  His niece did.

Q.      Whose niece?

A.      Rick's niece.

Q.      Rick's niece --

A.      Yeah.

Q.      -- came up with the name Richard Horton?

A.      Richard Horton.

37

Q.         How did Rick's niece come up with the name Richard Horton?

A.         Because we was trying to figure out Richard -- we was trying to figure out the Richard, and she did.  Because he sell --

Q.         Do you know --

A.         -- drugs.  He sell drugs, okay?

Q.         Ms. Curry, we've really got to stay on the questions, okay?  I didn't --

A.         Okay.

Q.         -- ask you about that.

A.         Well, I'm just telling you that's how we came up with the name.

Q.         Oh, I see.  Then maybe it's my mistake.

So do you know how -- because that's actually what I am asking.  Do you know how Rick's niece came up with the name Richard Horton?

A.         Because he sold drugs.

Q.         So did you speak to Rick's niece?

A.         No, I didn't.

Q.         So you heard from Rick --

A.         She told Rick.

Q.         You heard from Rick that Rick's niece came up with the name Richard Horton?

38

A.        Yes.

Q.        What's Richard --

A.        He was asking -- he was asking his niece, you know -- because he lived in the area, and his niece lived in the area at the time. Well, not at the time, but I think they went to school together.  Blah, blah -- I don't know.

          But anyway, she said, I know a Richard Horton that sells drugs.  So at the time, like I said, he was around in that area.

Q.        I gotcha.  So who is Rick's niece? What's her name?

A.        Tracy.

Q.        Tracy what?

A.        Tracy McClanahan.

Q.        All right.  And it sounds like you guys were trying to figure out who this Richard was that could have been in the apartment?

A.        Right.

Q.        And Richard's -- and Rick's niece said, oh, I know a Rick who sells drugs --

A.        Uh-huh.

Q.        -- and he was him?

A.        Uh-huh.

39

Q.        And you didn't know the name Richard
Horton, right?

A.        No, not at the time.

Q.        Did you --

A.        And then when his -- I think they did a
lineup.  The detective did a lineup.

Q.        We'll get to -- there later, if it's
okay.

A.        Okay.

Q.        But the name -- when Rick's niece --
when you heard that she knew a Richard Horton who
sold drugs, that name didn't mean anything to you,
Richard Horton?

A.        Yeah, it did.

Q.        Oh.  You knew the name Richard Horton?

A.        Yeah.  After she said it.  Then I said,
well, that got to be him.  That's the only Richard
I ever knew other than Ricky.  I never knew --

Q.        All right.

A.        -- another Richard.

Q.        Had you ever bought drugs from --

A.        Yes.

Q.        -- Richard Horton?

A.        Yes, I did.

40

Q.          When did you buy drugs from Richard Horton?

A.          I cannot remember them dates, sir.  I'm sorry that I cannot.  It -- like I said, it was a long time ago.

Q.          All right.  Did you tell the police that you had ever bought drugs from --

A.          Yeah.

Q.          -- Richard Horton?

A.          I didn't talk to no policeman.  I never even seen a policeman come to that area or nothing.  I never saw a policeman until I went to court.

Q.          Well, I'm talking about the detectives that were investigating --

A.          Oh.

Q.          -- the shooting.

A.          Yeah, I did.

Q.          All right.  Tell me about that conversation.

A.          But we didn't have any drugs that particular night.  We did not deal with him none that night.  Like I said, Rick was tired.  My grandkids wanted to come home with us.  We didn't

41

want to take them.  Luckily, we didn't.

So he said, Rhonda, he said we just going to eat, you know -- get some food, eat, go, you know, watch movies or whatever, and chill.  So we didn't even deal with him that evening.  As a matter of fact, we didn't deal with him for, like, a month -- a month or two, you know.  Because I said, he was shady.  He didn't -- you know, he just would play tricks and everything, you know.  So like I said -- but I'm 13 years clean, so that's out the picture.

But anyway, we did not have any drugs in our system that night.  And like I said, I was fine with it.  You know, once I came -- like I said, he had to pay a couple bills, so we really didn't have it to even buy any drugs.  So, therefore, I don't know why Richard even come to -- there, you know.  I don't know.  Like I said, prior to that, I don't know why he came over there to -- like I said, I think he just wanted to rob Rick, because he saw --

Q.        Right.

A.        -- Rick with that money.

Q.        So let's back up.  Tell me about the

42

conversation you had with the investigating
detectives about telling them, hey, I think it was
Richard Horton because he sold us drugs. Tell me
what you remember.

A.        I -- like I said, I just told her, I
said, it had to have been him, because like I
said, I didn't know another Richard at all. I
told her, yes, we did buy drugs from him at one
point in time, but it wasn't that night.

Q.        All right. Did the detective ask you
questions about Richard Horton?

A.        Yeah. I just told him he was a tall,
light-skinned man.

Q.        You told -- what else did you tell the
detective?

A.        I think she showed me --

Q.        Let me ask the question.

A.        Oh.

Q.        Let me ask the question. When the
detective and you were talking about Richard
Horton, this man you had believed had sold drugs,
what did you tell the detective about that Richard
Horton?

A.        That he sold drugs.

43

Q.        Did you describe him physically?

A.        Yeah.  I told him he was a tall, light-skinned man that sold drugs, but he was very, very nasty.  He was a dealer -- a wannabe dealer.  That's what he was, really, you know --

Q.        How many times would you say --

A.        -- and then would get mad if you didn't want to get from him.  He would cop an attitude.

Q.        How many times would you say you bought drugs from this man that --

A.        Maybe two or three times, because like I said, he just wasn't right.

Q.        All right.  How much before the shooting incident -- how long before had you last bought drugs from the person you believe was Richard Horton?

A.        Probably about two or three months before.  A long time ago.  Like I said, we quit dealing with him.

Q.        Right.  So when -- the person who you believe was Richard Horton who you bought drugs from, where would you buy drugs from him when you bought drugs?

A.        On Second Avenue.  On -- right around

44

the corner from me.  On Star, Second, over in that area.

Q.        And did you tell all this to the detective?

A.        Yes.  And he never came to my house to sell drugs.  We would go to him.

Q.        All right.  But I'm asking if you explained all this to the detective.

A.        Yeah.  I think I did.

Q.        Which detective?  A man or a woman?

A.        It was a woman detective.

Q.        A woman detective.  All right.  What else did you tell her about this drug dealer who you believe --

A.        That's it.  All she asked me.  That's it.

Q.        And you told her you believe that the drug dealer was the one who came in your apartment?

A.        Yes.

Q.        And did you tell her how she might be able to find the drug dealer?

A.        No.  Because I guess once the word got out that he shot Rick -- he knew Rick had a son

45

that was very, very crazy about his dad, for one. He was going to kill him, and he knew that, because I think he knew Rick's son. And -- well, Rick's two sons. He had a stepson.

Then he had a nephew out as well that probably would have killed him if they came across him. So I -- from what I could understand, he was on the run.

Q. How did you learn all that?

A. I don't know. Somebody told me that they heard Richard Horton shot Rick.

Q. Who told you someone --

A. I can't remember, sir. It's been 20 years. I really can't remember.

Q. Okay. Did you tell that to the police officers?

A. No. Because I didn't talk no police officers.

Q. I'm sorry. Did you tell it to the detectives who were investigating the shooting?

A. No. They the one told me that he was on the run.

Q. All right. So tell me about that.

A. They -- I mean, she just said, we can't

46

locate him.  Wherever he lived or whatever --
however they found his address or whatever, I
don't know, but they said he was on the run.  Next
thing I knew, they said they had arrested Richard
Horton.

Q.        So let me slow you down right there.
The police were telling you, we're looking for
Richard Horton, but we can't find him --

A.        Right.

Q.        -- he's on the run?

A.        Right.

Q.        And were you helping them with clues on
where they might find Richard Horton?

A.        Yeah.  I told him where he would, you
know, be or whatever.  I didn't know his address.
I didn't know if he even had a home.

Q.        Right.

A.        You know, but I knew his location where
he used to sell the drugs at.  Well, I guess they
went looking or whatever and never found -- I
don't know.

Q.        Got it.

A.        But -- they never told me, but I just
remember them saying that -- you know, when they

47

did talk to me again before the -- or however it went, that he was arrested. I -- like I said, I don't know.

Q.      So was this all at the first interview or a later interview that you were --

A.      It was later. It was way later.

Q.      Do you remember how much longer --

A.      No.

Q.      -- until they were looking for Richard Horton?

A.      No. No, I do not.

Q.      All right. How quickly did you figure out that the person in your apartment -- you believed it was Richard Horton? Did you figure it out at the time he was in the apartment?

A.      Yeah.

Q.      Did you figure -- did you discuss that with Rick?

A.      I did at one point, but I don't know when I did.

Q.      Okay.

A.      Like I said, I think it was once he came, like -- I don't know if it was when he came home or when he got better in the hospital. Like

48

I said, he was in the hospital for nine day -- nine, ten, eleven, twelve days.  He was in the hospital for a minute.

Q.          All right.  Well, let me ask you this: When you were in the truck driving to the hospital, did you and Rick talk about --

A.          No.

Q.          Let me just ask the question.

When you and Rick were in the truck driving to the hospital, was there any discussion about who it was that shot him?

A.          No, none at all.

Q.          Didn't come up at all?

A.          None.

Q.          All right.  So in the truck with you and Rick, there was no discussion that Richard Horton was the one in the apartment, correct?

A.          Nope.

Q.          That must have come later?

A.          It did.

Q.          All right.  When you were in the truck with Rick, was there any discussion about -- that you knew the guy who was in the apartment?

A.          No.

49

Q.        When you were in the truck with Rick, did Rick give you any indication he knew the guy who shot him?

A.        No.

Q.        When you were in the truck with Rick on the way to the hospital, did you give Rick any indication that you knew who it was who shot him?

A.        No.

Q.        How about at the hospital?  Did you give Rick any indication you knew who shot him?

A.        Yes.

Q.        Tell me about that conversation.

A.        I just told Rick, I said, Rick, I said, I think it was Richard.

Q.        And what did Rick say?

A.        And at the time, I didn't know his last name, you know.

Q.        Well, actually, let me interrupt that.

Wasn't Rick telling you he thought it was someone named Richard Diggs?

A.        No.  I never heard that name until I spoke to Ms. Martinez on my front porch that day her and Cindy came to my house.  I never heard of a Richard Diggs before.  I never saw -- I wouldn't

50

even know a Richard Diggs if he came in this room and smacked me in my face right now.  I would not know him.

I had been with Rick, like I said, 22 years prior to his death.  I never even heard Rick even say Richard Diggs.

Q.        I --

A.        And that's the --

Q.        Ms. Curry, at any point, did Rick ever say the name Richard Diggs to you as the person he believed was in the apartment?

A.        No.

Q.        All right.  You now know that Rick told the police Richard Diggs/Adidas man was the suspect, right?  You now know that --

MS. TANOURY:  Objection.

Q.        -- or you don't know that?

MS. TANOURY:  Objection.

Q.        You do or don't know that now?

A.        I know now, but not then.

Q.        All right.  Now you understand that -- you didn't know then, but you know now, that the police know, say Rick was talking about someone named Richard Diggs, right?

51

MS. TANOURY:  Objection.

A.        No, I didn't.

Q.        You didn't know it then, and you --

A.        No, I did not.

Q.        All right.  But you know it now?

A.        I know now.

Q.        All right.  And do you know who Richard Diggs is?

A.        No, I do not.  I've never even heard of the name before.  So how would I know a Richard Diggs if I never even heard of that name?

Q.        All right.  Well, let me --

A.        Never.

Q.        -- ask -- let me ask you this:  Is it possible 20 years ago, Rick said he thought he got shot by someone named Richard?

A.        No, I do not.

MS. TANOURY:  And --

A.        No.  That's a no.

Q.        All right.  Let me --

A.        All the way around the board, no.

Q.        All right.  Let me ask it again just so we're clear.

In the hospital or in the truck on the

52

way to the hospital, Rick never said, boy, I think the guy who shot me is named Richard? He never said that?

A. He did say Richard --

Q. Okay. So --

A. -- but he never said the last name.

Q. Okay.

A. I never heard of a Diggs. Never.

Q. I gotcha. Let's just make sure that we all understand each other, then.

When did he say the name Richard without saying the name Diggs?

A. In the hospital.

Q. Did he say it in the truck, too?

A. No.

Q. On the way -- so in the hospital, he told you he thought he'd been shot by someone named Richard?

A. Right.

Q. And did the name Richard ring a bell with you when he said he thought he'd been --

A. Yeah. Like I said, we knew Richard Horton.

Q. Right. Well, you didn't know Richard

53

Horton by last name, did you?

A.          No, not at the time.

Q.          All right.  So when he said, I think I've been shot by someone named Richard, that name had no meaning to you --

          MS. TANOURY:  Objection.

Q.          -- when he said it, right?

A.          Excuse me?

Q.          When Rick said to you, I believe the guy who shot me was named Richard, at the time he said it, the name Richard didn't mean anything to you?

          MS. TANOURY:  Objection.

Q.          You --

A.          Yes, it did.

Q.          You didn't know who Richard was, right?

A.          I didn't know Richard Diggs, but I knew a Richard Horton.

Q.          All right.  This person who you believe was a drug dealer who sold you drugs, you didn't know his name, did you?

A.          I knew Richard.  That's it.

Q.          So you knew the drug dealer was a guy named Richard?

54

A.          Yeah.

Q.          You didn't know his last name?

A.          No.

Q.          All right.  So when Rick told you in the truck on the way to the hospital or at the hospital that he thought the shooter was named Richard, did the name Richard mean anything to you?

A.          Uh-huh.  Yes.

Q.          And so you assumed he was talking about the drug dealer named Richard?

A.          Right.

Q.          But you didn't know the drug dealer Richard's last name?

A.          Huh-uh.  Not at all at the time.

Q.          You know, at the time you were buying drugs from this drug dealer named Richard, you really didn't have much reason to know his last name, right?

A.          Right.

Q.          He's --

A.          I was more --

Q.          -- not --

A.          -- interested in the drugs.

55

Huh?

Q.      Right.  Did you know him by a nickname or what did you know --

A.      No.  Just by Richard.

Q.      Just by Richard?

A.      Yeah.

Q.      So you don't personally know if the drug -- what the drug dealer's last name is, right?

A.      No, I do not.  I didn't --

Q.      You just know --

A.      -- at the time.

Q.      -- what people had told you?

A.      No.

Q.      You know -- who told you that the drug dealer's last name was Horton?

A.      I told you, his niece.  We was looking through a yearbook or whatever, and I said, you know -- and then she said, it got to be Richard Horton, you know, because I described him to her.

Q.      So she figured it out?

A.      Yeah.

Q.      Did you tell the police that that's how you got the name Richard Horton --

56

A.          Yeah.

Q.          -- is through your niece?

Who did you explain it to, the female officer?

A.          The detective at the time.

Q.          And you told her that the reason you came up with the name Horton was because your niece -- you described the guy -- the niece.  The niece went to a yearbook, found the name Richard Horton, and that's how Richard Horton's name got into this?

A.          Yeah.

Q.          And you -- did the police officer understand that's how Richard Horton --

A.          I guess he did.  She didn't ask no more.

Q.          I gotcha.  Did the niece ever speak to the police?

A.          Did who?

No.

Q.          The niece.

A.          No.

Q.          Well, you don't know if the police spoke to the niece, right?

57

A.        I'm sure -- she wasn't there.  She just, you know, was helping us out finding this Richard person.

Q.        But you told the police about that, right?

A.        Yeah.  I told him his name was Richard Horton.

Q.        All right.  Back to the hospital, when you're talking to Rick, were you and Rick trying to figure out who shot him?

A.        Yeah.

Q.        Tell me what you remember about that.

A.        It's vague.

Q.        Tell us what you remember.

A.        I think that's when he told me that Richard was trying to get money from him, because when he came in the door and, you know, tried to do what he did, he said, man, where the money at? Where the money at?  You know, like I said, he kept saying that.

Q.        See -- but the thing -- the notes talk about Rick talking about a guy with a phone booth, not Rick talking about a drug dealer.

A.        It was the same guy.

58

Q.       How do you know?

A.       I guess he thought he was going to get some drugs from him or whatever.  I don't know.

Q.       How do you know it's the same guy, that Rick's talking about a --

A.       Because he said it was.

Q.       He said it was?

A.       But Rick -- I think Rick knew Richard Horton.  I think he knew his last name.  I'm not sure for, sir.  Like I said, it's been so long ago.

Q.       Sure.

A.       And like I said, I just really remember Rick getting shot, we going to the hospital, and like I said -- I remember him because, like I said, he kept saying, you know, he was going to do me.  I covered my face.

Like I said, it's -- all the other outside stuff is just vague to me, what was said and when it was said and who it was said to and all that.  It's vague to me because, like I said, after 20 years, I'm sure you forgot a lot of stuff as well.  But after 20 years, you know, me going through that and being on drugs and stuff, I'm

59

like -- I can't remember all that.

Q.      Okay.

A.      I'm sorry.  I cannot.  But I just know it was him, because like I said, I didn't know another Richard.  I never had no dealings with another Richard other than his dad.  His dad's name's was Richard, but Rick's name -- I never called him Richard, either.  I called him Rick. So it had to have been him.

Q.      I gotcha.  So you heard that the person in the apartment was named Richard, and you were doing some detective work to try to figure out which Richard that was?

A.      Yeah, which Richard it was.  Like I said, I only knew the other Richard, and that was my husband Richard.  I didn't know no other Richards but him.

Q.      All right.  But when you found out the man in the apartment was named Richard, the only other Richard you knew was the drug dealer named Richard?

A.      Right.

Q.      All right.  So that's why you made the assumption that that drug dealer was the one in

60

the apartment?

A.      It wasn't no assumption.  It was him.

Q.      I gotcha.  Well, you now know that the fingerprints and the DNA don't match, right?

A.      It's not a problem to me.  I don't know how the other fingerprints got in there.  I -- like I said, I didn't know another Richard.  I didn't know a Richard Diggs.  I don't know how his fingerprints or whatever got into my house, because I did not know him.  And how they got in there, I can never tell you.

So, evidently, Richard Diggs went by Richard Horton as well.  That's the only thing I can come up with.  Maybe it was a Richard Diggs Horton.  Who knows?

Q.      Maybe it was a Richard Diggs Horton.

A.      Right.  But like I said, I didn't know how -- I didn't know a Richard Diggs.  I never even heard of that name before.

Q.      Understood.  Your daughter, was she involved in --

A.      No.

Q.      -- figuring out --

A.      She was not.  She was no longer living

61

Q. All right. Was she at all --

A. She was waiting on the house to get finished.

Q. Was she at all involved in figuring out who Richard was?

A. She said she went to school with a Richard Horton and she knew -- she didn't know -- she knew a Richard Horton. They went to school at the same school, Everett Middle School on Fifth Avenue.

Q. How did you figure out that she knew who -- Richard Horton she went to school with?

A. I don't know. But anyway, she knew that we bought drugs from him. But anyway, when Ms. Martinez mentioned the name Diggs, she said, Mom, she said, I went to school with a Richard Diggs. So that's what I'm saying. Richard Diggs Horton has to be Richard Horton.

Q. So you believe Richard Diggs and Richard Horton are the --

A. Yes.

Q. -- same person?

62

A.          I really, honestly do.

Q.          And why do you believe that?

A.          Because that's the only way it could be, if his DNA was in my house and that bastard was in there.

Q.          All right.  What did your daughter say about going to school with Richard?

A.          She went to school.  She had no associates with him.  She just knew of the name. That's it.  My daughter's 46 years old.

Q.          So --

A.          So they all probably went to the same school together by living in the same area.

Q.          Did you tell the police that your daughter went to school?

A.          No.  Because she had nothing to do with it.  She didn't say nothing to -- she said something to Ms. Martinez when he -- when the name Diggs came up.  That's when she said something. Other than that, she was more concerned about me and my well-being with all this mess going on.

Q.          When you were in the truck going to the hospital, did you tell Rick that you thought that the guy who shot him was the drug dealer?

63

A.      No.

Q.      Did you tell --

A.      We didn't have any conversation about the shot at all.  I was more interested in getting him help, because he was bleeding.

Q.      All right.

A.      I didn't want him to pass out on me or nothing.  I kept saying, Rick, hold on, hold on, hold on.  Don't you leave me right now.  You know, that's all I kept saying.  I ain't going nowhere, girl, you know.  That's all he kept saying.  I said, Rick, do not go nowhere.  I said, hold on.  I said, I'm getting you there as fast as I can get you there.

If it hadn't been for me, I would have took him to the hospital in the truck, but he was bleeding so bad, so I said, no, let me go down to Sister's house and call the paramedics.

Q.      Understood.  At the hospital, over the course of the next days, was Richard -- I'm sorry -- was Rick trying to figure out who shot him?

A.      Kind of, sort of, he was.  And then that's when he came up, like I said, with the name

64

Richard Horton.

Q. Oh, he came up the name Richard --

A. Yeah. He came up with the name Richard Horton. Come to think of it, he did, because -- I guess he knew his last name. I didn't at the time. And then --

Q. So Rick --

A. -- I said, so that's his last name?

Q. Let me slow you down.

A. Huh?

Q. Let me slow you down. So Rick is the one who told you that or --

A. Not unless Tracy had got there and talked to him before I did.

Q. But your memory is that Rick was the one who told you, the guy who shot me was Richard Horton?

A. Well, Richard. No. He said Richard, okay? That's -- like I said, that's the only Richard I knew at the time, was Richard Horton. Well, that's when I got to asking around. What is Richard's last name, y'all? What's Richard's last name? That's when his niece came up with Horton.

Q. I gotcha. But now we're just talking

65

about Rick. Were you and Rick trying to figure out who shot Rick?

A.       Yeah, we were. But I told him. I said, I --

Q.       Who did Rick think --

A.       Huh?

Q.       Who did Rick think -- who did Rick think --

A.       He said Richard.

Q.       Did Rick think it was a drug dealer?

A.       Yeah.

Q.       And he did not tell you the name Diggs?

A.       No, he did not. I never heard the name Diggs, once again, until Ms. Martinez said the name Richard Diggs.

So my thing is, if his DNA was in my house and I knew it was Richard Horton, how did his DNA get in my house if it was Richard Diggs? I never knew a Richard Diggs. I never dealt with a Richard Diggs. I never even heard Rick talk about a Richard Diggs.

Q.       How many times in your life would you estimate you've spoken to this drug dealer that you believe was named Richard Horton?

66

A.          Oh, five or six times, maybe.

Q.          Could it have been just a couple?

A.          Maybe.  I mean, like I said, I never --
I wasn't asking no last names about the drugs.  I
wanted the drugs.  Damn the last name.

Q.          Did you have multiple people that would
sell you drugs during this time?

A.          His same crew.

Q.          Who is the crew?

A.          You know, I mean, I don't know the
crew.  Half of them are dead.  A lot of them got
killed.

Q.          Do you know the name of anybody else
who --

A.          No, I do not.  Like I said, I'm 13
years clean, so I left all that stuff behind me.
I don't even want to know, but I do know a couple
times, you know, my daughter read, oh, Mom, did
you know such-and-such got killed?  That was one
of his friends, you know.  I'm like, I don't know.

Q.          I gotcha.  So it sounds like there was
a period of your life where drugs were beating
you.  You weren't --

A.          Oh, my goodness, yes.  Thanks the Lord

67

I'm done with all that mess.  And like I said, I was hoping to be done with all this mess, too.

Q.          Understood.  And it sounds like it's -- congratulations for being clean for so long.

A.          Yes.

Q.          Tell us about when you weren't clean, you know.  When did you start, and how long did you do it?

A.          Shoot.  Over 20 years.

Q.          What kinds of drugs?

A.          Crack cocaine.

Q.          It sounds like you got addicted?

A.          Very much so.

Q.          How old were you when you first tried?

A.          I was still in West Virginia.

Q.          So what -- how old would that have made you?

A.          Oh, God.  I moved up here before my 30th birthday.  My daughter was 10.  I had her when I was 22, so how old would that make me?  In my 30s.  Well, no, if I was 22 and she was 10 when we moved here -- so I've been here 30-some years.  Over 36 years -- 35, something.

             If I'm 60 -- so I was here in my

68

late 30s, so I want to say I started in my early 30s.

Q.        How did you get started?

A.        Oh, boy.  Oh, boy.  Oh, boy.  That's a long story, but I -- does that have something to do with this?

Q.        I guess not --

A.        Okay.

Q.        -- but I am interested -- what does have a little bit to do about it is your struggle, so it's -- you started it, and then you -- it's hard to stop it, huh?

A.        Well, no, because when I moved up here with my mother, I actually stopped.  I was off of it for a good two years -- two or three years, and -- I don't know.  I think it was the people I was hanging around or something once I moved here, and then I met Rick.

          And, you know, like I said, we had our ins and outs, but then finally, when we did get together, you know, he was doing it, you know.  So maybe that's how I got back on it and was on it, you know, up until 13 years ago, like I said.

Q.        And you and Rick would do crack

69

together?

A.          Yeah.

Q.          How often?

A.          Almost every day.

Q.          And where would you guys get the money to do it?

A.          Like I said, he was a hustler.

Q.          All right.  And --

A.          I mean, I worked temp jobs, you know. At the time that I met Rick, I was working at the convention center.  That's where my mother worked. She was in security.  I worked in the housekeeping for over five years.

Q.          So when you were using it, how would you get the drugs?

A.          Go buy them.

Q.          Where would you buy them?

A.          From where I said I -- where I lived.

Q.          On the corner?

A.          Yes.

Q.          And how many people would sell you the drugs?

A.          Three or four.

Q.          But at different times, there was --

70

you know, you were probably buying it from different people over the years, right?

A.        Uh-huh.

Q.        How many people would you estimate you've bought drugs from over the years?

A.        Probably 50.

Q.        Anybody -- how many regular drug dealers did you -- would you say you had?

A.        I didn't go to a regular drug dealer until maybe once we moved -- like I said, when Rick got out the hospital, we took him to 1250 Indianola.  Well, I got a job.  I was working -- I wasn't working then.  I've always had a job.

After we moved -- we moved down the street from Kim in an apartment building of our own.  There was maybe one or two regular people.

Q.        All right.  And how did you finally defeat the drugs and get clean?

A.        Well, it's a long story, but after Rick passed away and -- it was my daughter's cousin. And she was in the church real heavy, and she lived down -- which Rick helped her move into her house, which -- I could look out my front door and see her car where he moved -- you know, she was

71

closer to us, and it was her and my niece.

I just lost her daughter, my great niece.  It was my niece, Kim's cousin, and Kim and her best friend.  And when I came home, you know -- after, you know, they pronounced him dead or whatever and I came home, and I'm just, like, pacing the floor, like what in the world am I going to do without him?  You know, because he told me he'd never leave me or whatever, you know, and I'm like, what in the world am I going to do?

And my daughter's cousin told me, she said -- she called me TT.  She said, TT, she said, you're going to pick yourself up and dust yourself off and keep on moving.  Well, when she said that, I'm like, what?  She said, that's exactly what you're going to do.

Well, that following couple weeks, she said, TT, you ready to go to church?  Because she was heavy in the church.  And I said, no, not really.  She said, yeah, you are.  She bought me everything to wear to church but my undergarments because she wanted me to get better.

Well, after that, you know -- and I start going -- after Rick, you know -- we had his

72

service or whatever, and that's -- you know, after all that happened, and she asked me, and I said, yeah.  I said, I'm ready.

Well, I went, enjoyed it, you know, because I was a church girl, you know, years ago. I was raised in the church.  My grandmother raised me.  She raised me in a church, but, you know, you fall short of God's glory.  Everyone do.  And I said, okay, yeah, I'm ready.

So I went, you know.  We all went.  My daughter went, everybody, you know, and I actually start going.  One day, just -- I just woke up and just said, I'm so sick of this mess, I don't know what to do.  And I threw everything -- what you call it, paraphernalia?  I threw everything away, everything, you know, and I just haven't looked back since.

Q.        Wow.  Some people, you know, step forward, step back, step forward, step back.

A.        Uh-huh.

Q.        You were just done with it, huh?

A.        I was just determined, because I'm looking -- I ain't even got a shoestring, you know.  I had to smoke butts out the ashtray, you

73

know, to get to nico -- you know what I mean?  I
didn't have a dime, and I'm working every day.
I'm like, I'm so sick of this mess, I don't know
what to do.  And I just -- I just quit.  I just
quit, and I have not looked back since.  I have
not touched it in 13 years.

Q.        Doesn't sound like you're going to blow
it in the future, huh?

A.        No, sir.  And believe me, I will never
go back down that road again.

Q.        All right.  Well, congratulations.

I have to ask you, though, about --
some questions about, you know, when you were
still stuck in it.  Can you remember the names of
anybody who sold you drugs?  Anybody.

A.        His name was -- I do remember an
incident that happened at my house one night.  His
name was Kyle Ramsey.

Q.        All right.  Before you tell me about
that incident, just list for me all the people who
have bought -- sold you drugs over the years.

A.        I remember a Kyle Ramsey and a Derrick
Greathouse.  Kyle Ramsey's dead.  I can't remember
them other guys' names.

74

Q.        There was about 50 of them, though?

A.        Oh, no.  It was -- back in the day, when I was getting it from them, it was just, like, maybe four or five of them.  I know it was Richard Horton, Kyle Ramsey.

Q.        Well, you said Richard Horton was only a few times.

A.        Yeah, it was.  But he was always in that loop with these guys, you know.  And I quit dealing with him because, like I said, a couple times, he sold me some fake stuff, you know, and then my money went down the drain.  And then when I go back, he's nowhere to be found.  So like I said, he was very shady, you know.  He was just -- always just weird.

Q.        All right.  So this man that you know -- believe to know as Richard Horton sold you drugs a few times, and you've had negative experience with that?

A.        Yeah.

Q.        And it sounds like, if you were smoking crack every day, that you were, you know, dealing with a lot of drug dealers?

A.        Well, I mean, if I was smoking every

75

day, it wasn't like it was all day.  I would get a
couple, you know, chill out or whatever, you know,
and then go away to the next day or whatever.  It
was no all-day thing where I was going to them
multiple times that day.

Q.          But when you would buy crack, I mean,
would you buy a stash that was, like, a one-use at
a time or --

A.          Well, it all depends on the finances.

Q.          Well, tell me about that.

A.          Well, I mean, if we had enough money,
we would get enough to last, you know, that
evening or whatever.  But like I said, we wasn't
in and out, in and out, in and out, in and out, in
and out, you know, all day, every day.  I mean,
maybe every day sometimes, but, like, most of the
time, maybe three or four times a week, you know.
We did eat and chill and clean, and, you know,
like I said, I worked.  He worked.

Q.          Some people just weren't even eating
and cleaning, huh?  They were just --

A.          Right.  I mean, I'm just saying I was
doing my normal thing.  I just liked the high.  I
can't lie.

76

Q.        Yeah.  Well, it's very powerful.

But I'm just trying to understand how much people would buy.  Like, if you go to a crack dealer, would you buy enough for one use or two uses or three uses or --

A.        Well, maybe two or three, you know. Like I said, it was just me and him, so we shared everything.  You know what I mean?  It wasn't like it a whole room full of people and we had to -- you know, it was always just me and him.

Q.        All right.  So you'd buy sometimes for one use, sometimes for two use --

A.        Yeah.

Q.        -- sometimes for three use.

How much would it cost?

A.        40, 50, $60.

Q.        All right.  I want to return to the first time you were interviewed by the police. Where were you when you were interviewed by the police for the first time?

A.        1250 Indianola Avenue.

Q.        They came to your home or --

A.        They came to my daughter's --

Q.        -- to your sister's home?

77

A.          It was my daughter's home.

Q.          Your daughter's home.  And tell me what you told the police.

A.          What I'm telling you now.  He got shot.

Q.          What else did you tell the police?

A.          Then she asked me, did I see the gun? It wasn't the police or detective, because I never even talked to a blue suit, never.  Not once.

Q.          All right.  That's where the confusion was.  When I say "the police," I'm talking about the female detective.  Tell --

A.          Okay.

Q.          -- me what -- tell me what you told the female detective.

A.          And I just told -- you know, she said can you tell me -- you know, I said, I saw him.  I said, he had on a gray hoodie.  Like I said, she showed me pictures of the gun, and she drew the gun, and she said, did it look like this one or this one?  I showed her, you know, and -- I mean, like I said, I came up with the name Richard.

Q.          And you told her that?

A.          Yeah.  It had to -- I said, it had to have been Richard.  Like I said, I didn't know his

78

last name.  I knew the color of the skin because he was very -- he was lighter than me.

Q.      How did you know, in this first meeting with the detective, that it had to be Richard?

A.      Because the color and -- like I said, his voice, and he just kept saying, bitch, quit looking at me, quit looking at me, you know.

Q.      So the color and the voice made you realize --

A.      That it was him, and his eyes.

Q.      -- that it was the drug dealer named Richard?

A.      Yes.

Q.      And you told that to the police officer?

A.      Uh-huh.

Q.      Did you explain why you thought it was the drug dealer named Richard?

A.      No.

Q.      I'm trying to understand the interview. Tell me what you remember about the interview.

A.      It's -- like I said, it's very vague. I just remember her showing me the gun.  And I want to say she showed me a picture.

79

Q.          Tell me about that.

A.          And I picked him out.

Q.          I'm talking about the first interview.

A.          That's the first one.

Q.          All right.  She showed you --

A.          But she didn't come to see me.  Rick
was in the hospital.

Q.          Yeah.  So when she -- did she --

A.          When did you say this happened?  What
was the date?

Q.          October 9th is the shooting.

A.          Okay.  On October the 10th -- she
didn't come to see me until, like, maybe two days
after that.

Q.          So two days after, she showed you a
picture or a number of pictures?

A.          A picture.

Q.          A single picture?

A.          A single picture --

Q.          And what --

A.          -- of Richard.

Q.          And what did you --

A.          Okay.  I don't know if the name was on
that paper, Richard Horton, or -- I can't

80

remember.

Q.        When the female detective came to you a couple days after the shooting and showed you a single picture of Richard, did it look like the guy who was in the apartment?

A.        Yeah, it did.

Q.        And did you tell her that?  Did you make the identification at that time?

A.        Yes, I did.

Q.        Do you know how she got this picture --

A.        No.

Q.        -- of Richard?

A.        I do not.  I think he was in trouble before, though, because he was a -- he was a troublemaker.

Q.        Got it.  And do you remember if the name Richard came up when she showed you this picture?

A.        I can't remember.

Q.        All right.  When she showed you this picture a couple of days after the shooting, was Rick there?

A.        No.  He was still in the hospital.

Q.        Do you know how she got this picture?

81

A.          No.

Q.          What did you tell her when you saw the photo?

A.          Yes.  It was him.

Q.          And what did she say?

A.          She said, well, she -- and then she said, we're looking for Richard Horton.  I think -- I don't know.  I can't -- like I said, I don't know whether she said the name Horton or the name was on the picture.  Like I said, he's been in trouble before, so, evidently, it was a -- whatever you call it, lineup or whatever.  I don't know.  But, evidently -- it --

Q.          Either she --

A.          -- was one of those pictures.

            Huh?

Q.          Either she said the name Horton or it was written on the paper?

A.          Or it was written on the paper.

Q.          Well --

A.          I can't remember which.  Like I said, it's all vague, you know, all of it is, other than me seeing, you know, my husband bleeding to death.

Q.          Right.

82

A.          Well not to death, but...

Q.          So when she showed you this picture a couple days after the shooting, either the name Richard Horton was written on the picture or she told you the name Richard Horton?

A.          Right.

Q.          Was that before or after your niece had told you the name Richard Horton?

A.          It was before.

Q.          All right.  Did you ever talk about that with Rick?

A.          Yeah.  I told her what -- you know, she -- he said, Rhonda, he said, I said the same thing.  Now, whether she showed him the picture and asked him the same questions she asked me -- but we wasn't together, however it went.  But she did say that y'all's testimony matched, so --

Q.          So the female told you about Rick saying the same thing?

A.          Yeah.

Q.          All right.  So had she told you that Rick identified the same person?

A.          Yes.

Q.          So she must have spoke to Rick before

83

she spoke to you?

A.        She must have.

Q.        And she told you, this is the guy that Rick picked out, too?

A.        Yes, she did.

Q.        All right.  Did you recognize the picture as the drug dealer?

A.        Uh-huh.

Q.        How was it if you only saw his eyes --

A.        Because I pictured the hoodie around his face.  I envisioned that, you know, because like I said, it was still fresh in my head.  Like I said, still to this day, I can close my eyes and see that man standing there with that gray hoodie on.

Q.        But all --

A.        I freaked -- yes.  I freak out every time.  And, like, you know, I -- my grandson -- and he loved gray.  I told him, do not wear a gray hoodie around me because -- like I said, he was young.  He was only four, you know.  The other one -- the one that turned 23, she was only two, and the other one was six.

So I -- you know, once he got old, you

84

know, and -- like I said, he's coming in town today, as a matter of fact, coming from Mississippi.  But I asked him -- I call him Mookie.  Mook, do not wear a gray hoodie around me.  And I explained to him why, and he will not, you know.

Q.        But my question, Ms. Curry, is:  If all you could see of the guy that was in the apartment was the eyes --

A.        Because I dealt with this man before, and I've looked at his eyes.  And they were the same shape eyes, devious-looking eyes, devilish-looking eyes that he had in that gray hoodie.

Q.        I gotcha.  Did you tell --

A.        Like I say, he was devilish.  He was just -- he was just rotten from the core.  You asked me -- like I said, once he, you know, got me that one time or whatever, you know, I just quit dealing with him, which -- I think he got mad because we didn't deal with him no more.

Q.        So this drug dealer named Richard who you believe was Richard Horton, you and him didn't get along?

85

A.        No.

Q.        Tell me what happened --

A.        Couldn't stand him.

Q.        -- that made you --

A.        I could not stand him.  I could not stand him.

Q.        Tell me why not.

A.        Because like I said, he was devious. He was rotten.  He just wasn't -- and still to this day, if I'm spending my money with you -- I don't give a hell what it is.  If it's a bubble gum, it's my money that I worked hard for.  So, therefore, I want the satisfaction that I'm spending my money for.

Q.        So this drug dealer named Richard who you believe was Richard Horton had ripped you off?

A.        Right.

Q.        Tell me how he ripped you off.

A.        Well, just -- I mean, it wasn't but maybe 30 or $40, but like I said, it was my money. Whether I shined shoes --

Q.        You --

A.        -- for it, whether I spray poop for it or what, it was mine.  What I did with it, it was

86

my money.

Q.        Well --

A.        And I still stand on that today.

Q.        Well, I don't understand what he did. You gave him 30 bucks, and he gave you something that wasn't what it was supposed to be?

A.        Right.

Q.        Can you tell us a little more about that.

A.        It was probably candlewax or soap or something.

Q.        So you tried to buy crack from him, and he ripped you off --

A.        Uh-huh.

Q.        -- with something that wasn't --

A.        Well, it wasn't within that period that he did that to Rick.  It was before.  So like I said, once again, we stopped dealing with him, period.

Q.        How long before the shooting had it been that this person -- drug dealer named Richard who you believe was Richard Horton had sold you crack that turned out to be not crack?

A.        Maybe about --

87

Q.        How much longer --

A.        About two months before, you know. Like I said, we quit dealing with him, you know. He'd run up -- you know, like, you know, you go down the street or whatever.  I got it, I got it, I got it, whatever, whatever, you know.  Pass him on by, you know.

So I don't know if he had an attitude about that or what.  But I can tell you about an incident -- an incident that involved him -- excuse me -- at my house.  Well, it didn't involve him.  It involved his friend.

Q.        Tell me about that.

A.        Okay.  One night, my nephew -- you know, and I'm, like, asleep, and it was Rick's nephew, which was Tracy's brother.  You know, they wanted some drugs, him and Rick.  I'm like, I'm tired.  I don't want none, you know.

So I'm in the back room where my sister was.  Well, anyway, I'm hearing this rambling going on.  Well, it was Kyle Ramsey that came to my house to sell Ricky and his nephew some drugs. Well, they end up robbing him.  Not robbing him but taking the dough.  You know, because he wasn't

88

-- he was a pushover, really.

But everybody dealt from him.  He was giving the posses, you know, stuff to sell.  He was the head man, might as well say.  So they end up taking the dough from him, and he -- when he left -- you know, he whined or whatever, you know.  That's all right.  I'm going to get you.  I'm going to get you.  I'm going to get you.

Well, I think that he -- like I said, him and Richard Horton was cool, and I think that he told Richard Horton, you know, to do that to Rick.  That's why I said --

Q.      Richard Horton did it or --

A.      Yes.

Q.      -- somebody else did it?

A.      Kyle Ramsey told Richard Horton --

Q.      Okay.

A.      -- to come into Rick's house and rob him.

Q.      That's your guess?

A.      Right.  That's how it end up Richard Horton, because I think Kyle Ramsey -- like I said, they was just like this (indicating).  That, I do remember, you know, but it was way before the

89

shooting. You see what I'm saying? It was like -- they did this, like, one night, and then the shooting happened maybe a couple -- three months later.

Q. All right. But the thing that happened in the house with Kyle, that had nothing to do with Richard Horton? He wasn't there?

A. No. But I think Kyle went and told -- you know, man, you know what they did? Blah, blah, blah, blah, blah, you know.

Q. Okay.

A. And I think that Richard Horton just maybe even took on himself or whatever to do this to Rick, you know, to get back for Kyle. Well, shortly after that, Kyle Ramsey got killed.

Q. All right. So you -- that's your belief on why this all went down?

A. Yeah.

Q. With the -- did you explain that to the female detective?

A. No.

Q. Why not?

A. Well, I didn't think it was necessary, for one, because Richard Horton wasn't involved in

90

that incident, you know.

MR. LOEVY: Okay. Why don't -- we've been going a while. Do you need a break, Ms. Curry? I've got some more questions, and then they're going to get a chance. How do you want to time this? Do you want to keep going or do you want a little short break?

THE WITNESS: We can go on a short break.

MR. LOEVY: Let's do that. We'll be back in -- what do you guys say, 10 minutes.

THE WITNESS: Yeah. Do I got time to smoke a cigarette?

MR. LOEVY: Let's do that.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are off the record. The time is 11:19.

(A short recess is taken.)

THE VIDEOGRAPHER: This marks the beginning of media No. 2. We're back on the record. The time is 11:31.

BY MR. LOEVY:

Q. All right, Ms. Curry. You said your daughter, you thought, went to school with

91

Richard?

A.          Yeah.

Q.          How old is your daughter?

A.          She's now 46 -- will be 46 in October.

Q.          Do you remember if she thought the person she thought was Richard was her age, older, or younger?

A.          Probably about the same age.

Q.          Do you remember anything about, you know, if she was in class with him or just --

A.          I don't have the foggiest idea.  She had her own people, you know.  She was never into any -- she was more into dancing and, you know, singing and, you know, stuff like that.  She just wasn't into no riff-raff people.  And like I said, he was always in trouble doing something.

Q.          "He" being the person you believe was Richard Horton?

A.          Yeah.

Q.          But you don't have any firsthand knowledge of that?

A.          No.  Like I said, I never had to go to school for her or, you know, none of that.  She was -- she would go to class, come home, do her

92

homework, hang with her friends, like I said, dancing or whatever it was she was doing, you know.

Q.        Was she friends with this person you believe was Richard?

A.        No, absolutely not.

Q.        She was doing the right things?

A.        Yeah.  She wasn't -- like I said, she had her own group of friends, but she did have a friend that stayed over in that area -- you know, over in that area somewhere.  So she knew about him and probably what he'd done or whatever, you know.

But as far as, you know, being one-on-one or any connections or whatever -- maybe a house party or two or something, you know. Something like that, but never hang out, you know, no.  That was -- no.

Q.        All right.  How many times did you speak to the female detective?

A.        I only -- to my recollection, it was only once.

Q.        That's the time a few days after the shooting --

93

A.          Yeah.

Q.          -- you're talking about?

Well, what about the time when you looked at the photo IDs and --

A.          That was the same day.  I think that was on the same day.

Q.          Do you remember if -- on December 4th, about six weeks later, going and signing a photo ID with -- a photo array with six people on it?

A.          No, I can't say that I do.

Q.          All right.  You only remember talking to this female detective the one time?

A.          Yeah.

Q.          What about the night of the shooting? Did you speak to any detectives the night of the shooting?

A.          No.  I left, like I said, took Rick in the truck, and I never entered the grounds -- after I came from the hospital, his sister -- his oldest sister, her and her husband took me by the house.  I went in the side door to get something, probably some night clothes or something, to go over to my daughter's house to sleep, and that was the last time I entered that house.

94

Q.          Well, there's a police report, Ms. Curry, that says that on October 9th at 10 a.m., which would have been shortly after the shooting, you -- someone named -- a detective named Brenda Walker conducted an interview with Ms. Curry at Grant Hospital regarding the robbery. Do you remember that interview at Grant Hospital?

A.          If I do, sir, I'm telling you I was so upset.  I don't remember.

Q.          Okay.  At that time, at 10 a.m., did you know who the intruder was?

A.          No.  I didn't --

Q.          Why not?

A.          -- figure it out until, like I said, after I got to thinking about it and thinking about it.  And I said, it had to have been Richard, because like I said, that was the only man I knew at the time that was tall and light-skinned and with them devilish eyes.  Them devilish eyes, if they was bullets, they could have killed you.

Q.          All right.  So when you were -- when it first happened when he's in the apartment, you didn't realize it was Richard?

95

A.          I kind of did, but like I said, it was so -- and I was so scared, you know, until --

Q.          Yeah.

A.          I'm like, I'm not thinking clearly, you know.  But then once I kept closing my eyes and seeing this over and over and over and over and over again, it came to me, you know.

Q.          I think I understand, but, you know, it sounds like when the shooting was happening -- it was happening too fast.  You didn't realize it was Richard?

A.          Right.

Q.          And then later you were thinking about it, thinking about it, thinking about it, and other people were talking about it, and then maybe it occurred to you that that was Richard?

A.          Right.  That's -- you know, the conclusion I can come up with, because like I said, every time I -- still sometime when I get restless or whatever and I go to lay down, you know, and I begin to look at something of Rick's, you know, or something and it -- when I go to go to sleep or whatever, then it all just comes back, you know, to that day, you know.

96

Q.          And it was a very traumatic day?

A.          Yes.

Q.          And it sounds like Rick was never quite the same after this, huh?

A.          He wasn't.  He -- like I said, one thing happened after another, you know.  He walked with a limp, and I took him to every physical therapy there was, every doctor's appointment there was, every -- like I said, he wouldn't even let nurses and stuff do nothing for him.  He -- I mean, we wasn't legally married, but -- and we never got to that point, because once we did get to that point, he got so sick until it was just impossible for him to go through that.

So I just never -- but like I said, he always recognized me as his wife, and I recognized him as my husband.  My name was on everything he had.  If the nurses come to wash him, no, no, no. My wife is coming, you know.  I washed him up.  I took care of him until he got the brace off of his leg and went to all of his appointments, you know, and everything, you know.

I literally took care of him before -- I mean, dinner was always ready whatever.  Like I

97

said, we didn't do that every day.  I cooked for
him.  I washed his clothes.  I made sure his
clothes was clean.  Everything, I did for that
man.

And like I said, when he -- when it
happened, I took care of him then and after, too,
you know.  Like I said, he drank his beer, but
like I said, after that happened, actually, we cut
down, you know.  We wasn't doing it near as -- you
know, not near as much, you know.  Maybe he'll
come home maybe once a week, you know, you want to
do a little something, something, you know?  Yeah.

You know, so like I said, it was -- you
know, then after he got -- and then he -- even
when he was on Indianola and he had went to the
doctor for something and he said, Rhonda, he said,
I've got to have a heart surgery.  I'm like, quit
lying.  He got up that next morning ready to go to
the hospital to have this surgery.

Well, like I said, he was a big kidder,
so I really didn't believe him.  But once he
started getting ready, I'm like, you're telling
the truth.

Q.        When did he pass, Ms. Curry?

98

A.          11-11-11 at 11:31.

Q.          Wow.  What was it that was the cause of his death?

A.          He just went to sleep, and I think it was his heart.

Q.          How old was he?

A.          When I took him to the emergency room that night, it was on a Wednesday, and I stayed with him the whole night.  And about 11:30, 12:00, he said, Rhonda, he said, you can go home.  He said, but make sure the security guards walk you to the car, because I was in the garage.  And I said, okay.  I'll see you tomorrow.

But when he went in and they said, Ms. Curry, what's wrong?  You know, I said, he's breathing funny, you know.  He couldn't get his breath for some reason or another.  Well, usually, when I took him to the hospital or whatever, he rode in the front seat.  This particular time, he opened the back door.  I said, why you getting in the back door?  He said, because I want to lay down.

So I pulled up to the emergency room, you know, went in.  I left him in there.  I had

99

the hospital people to come and get him to put him in a wheelchair. Well, when I got him in there, they start taking pictures of his heart, and each picture that came out that machine -- I'm sitting there watching everything. Every little thing they did, I was -- you know, I was always right there for him. And each picture they took of his heart that particular day was different, you know, and it was -- it was shallow, you know. His heartbeat was very shallow.

Well, they came in and they gave him -- I remember them giving him some baby aspirins, you know, to -- I guess to regulate his heart or whatever. They knew what they were doing. Well, they finally put him in the room -- in the emergency room. Well, he told me to go ahead and leave. But some kind of way, he called me that night, and he said, Rhonda, he said, I'm in a room now. I said, okay. I'll be there first thing in the morning.

I'm getting up, you know, helping with the kids, get to school or whatever. I'm on the bus to go to Grant, which was every day that -- like I said, it was on a Wednesday. All day

100

Thursday, I was there. All day Friday, I was there.

No. I had to do something with my daughter on that Friday, but I called him. I said, I'll be there as soon as Kim get finished, you know, because we only had the one car. I was driving, but she was driving as well. We only had the one car.

When we finish, she dropped me off at the hospital, and I think went and picked up his sister that day. Well, anyway, that next day, she had a photo shoot on Main Street. And she took the kids, and she said, Mom, she said, go ahead and take the car. You and Aunt Cynthia -- because Cynthia had made it to my house and decided to go to hospital with me that day.

She said, you and Aunt Cynthia take the car and go on to the hospital, and I'll be down -- I'll just catch the bus and, you know, walk the kids up on to the hospital so they can see Poppy, because that's what they called him.

Well, they got there. You know, we chatting or whatever, you know, and I'm straightening up his little table, you know,

101

because he always wanted candy and snacks and stuff, so I would make sure he had that.  I would ask, could he have it first?  And I straightened up his table, put his tissues -- you know, made sure he -- I asked him, did he eat, he said, yeah, you know.  So I'm like, you ate.

So that day, like I said, I sat with him.  My sister even showed up down there that day.  His daughter-in-law showed up that day, and his son was out of town, I want to say.  But anyway, so when I got ready -- so my daughter went ahead and was taking the kids to the car, you know, and she kissed him, told him, I love you, Pops, you know.  I'll be glad when you get out of here.

And the three -- you know, they said, see you, Poppy, you know.  We'll be glad when you come home, you know.  Well, the little one that's now 17 -- and she -- when she was walking down the hallway and she turned around, she said, Poppy, she said, see you later.  And he said, okay, Little Head.  I'm going to see you tomorrow, because I'm coming home, you know.

Well, that night, Grant Hospital called

102

me -- because I had them programmed in my phone, and they called me.  Well, I had took my shower and everything, and I ran back up the steps, and I'm looking around.  I'm like, I know Rick ain't here.  I said, they ain't released him this time of night.  But I heard -- I heard him breathe, and I heard him go -- plain as day.

Well, the time I got back downstairs and -- I heard it louder.  No sooner than I heard that, my phone rang, and it was Grant Hospital.  And they said, Ms. Curry, how far are you away?  And I said, I'm about seven or eight minutes.  By the time I got there, he was gone.  And my daughter was in disbelief.  And she said, I'm going back here.  They said, no, ma'am.  You can't.  I'm still cleaning him up.

And the time she got back there, he was still warm.  And I'm sitting there like, no.  This ain't -- I said, they made a mistake, you know.  I'm, like, in belief -- in disbelief.  I said, they made a mistake.  I said, that ain't him.  I said, he's coming home.  And they said, Ms. Curry, you know -- they opened the door for me, you know, let me go back there and seen him.  He was gone.

103

Q.        I'm sorry about that.  Sounds like you were close.

A.        We were.  We had so much -- he could have us laughing so hard, you know, until it would just make me cry.  I'm like, will you please be behave?  You know -- and like I said, there wasn't nothing he wouldn't do for them kids.  You know, always told Kim, he said, I don't care what you say.  These are my grandkids.  Though his son -- him and his son -- after his son and his mom broke up, you know, they wasn't cool as they were, but he still cared about his dad.

And then once I became, you know, a part of his life, you know, he, like, kind of kept his distance.  And Rick just told them, he said, man, you know, me and your mom, we wasn't together.  She didn't break us up, you know.  So I -- you know, I guess he took it with a grain of salt or whatever, you know, so he finally came around, too.

And, you know, like I said, we called him and told him -- well, his daughter-in-law -- like I said, he passed away at 11:31.  His daughter-in-law, which was his son's wife, had

104

just left at about -- I think on the last visit. She got in there in time to see the -- you know, for the last visit.  When he passed away, she was the first person my daughter called, and she said, huh-uh.  She said, Kim, I just left him, you know. She said, well, he's gone, you know.

So, like I said, I believe it was his heart.  Like I said, he never got well.  And the only thing he really done then was drink his beer, but then I wouldn't let him drink it.  He'd get mad because he was on medication.  He was on the little tiny pill.  What's it called?  He was on that, but he still wanted to drink beer.  I'm like, no.  You cannot do that, you know.  You have to take your medicine, you know.

And like I said, my one granddaughter, she would, like -- you know, when he was laying down, she would, like, read to him and stuff, you know, and make him feel better, like rubbing his head or whatever.  But like I said, I feel that that shot just -- once he got shot, he just never came back from that.

Q.        Yeah, it sounds like it.

Well, I want to just go over what we've

105

talked about here to make sure that we got it all straight, and then I'll be wrapping up my questions. It sounds to me like, you know, on the night this happened, you saw his eyes. You had the pillow covering your face for parts of it, and he was telling you not to look at him. So that night, you didn't recognize who it was. Is that accurate?

MS. TANOURY: Objection.

A. That's true.

Q. And then it sounds like there may have been an interview at the hospital within a few hours later and you were kind of in shock, and you didn't really have too much to tell the police --

A. No.

Q. -- detectives?

A. No.

Q. And then it sounds like you -- over time, you were speaking to Rick and your niece and your daughter, and you kind of pieced together who you believed it was. You believe it was a drug dealer who you knew as Richard Horton?

A. Yes.

Q. Is that accurate?

106

A.          Yes.

Q.          And then a few days later, you explained that to a detective.  That's the interview that you remember?

A.          Yes.

Q.          You explained to the detective that, hey, I think I knew who it was, and you explained how and why you believed that it was Richard Horton?

A.          Right.

Q.          And that was -- involved the help from your niece and your daughter in piecing together who you thought it was?

A.          Uh-huh.  Yes.

Q.          And then she showed you a photograph at some point, the detective, of the person you believe was Richard Horton?

A.          Uh-huh.

Q.          And you made the identification in that photograph of Richard Horton?

A.          Yep.

Q.          And that must have been hard to do, though, because you only saw the intruder's eyes?

A.          Yeah.  But then like I said, once I

kept closing my eyes and just seeing his eyes, you know, and then the eyes in that photo was the same eyes that was in, you know -- wrapped up in that hoodie.

Q.      All right.

A.      I mean, you know, eyes are different on everybody, I guess, but his eyes just -- like I said, they were just like the devil.

Q.      Got it.  So there is a document -- and I'm going to go low-tech on you here because I don't know how to put it on the screen.  So I'm going to show you this.  You can't --

A.      I can't see.  It's blurry.

Q.      It's blurry?  All right.  Let me see if I can un-blur it.

MR. LOEVY:  And, actually, I could ask counsel.  You guys probably are going to have this as an exhibit.  Do you have the six-pack handy, defense counsel?

MS. TANOURY:  I do.  Let me grab it.

MR. LOEVY:  That would be great, because I assume you're going to use it as an exhibit.  I'll mark it as Exhibit 1.

- - - - -

108

Thereupon, Exhibit 1 is marked for purposes of identification.

- - - - -

MR. LOEVY: And if you could give the witness a copy, I'd appreciate it.

A. I can get a copy?

Q. You'll get a copy from them.

MR. LOEVY: Are we working on that?

MS. TANOURY: Yes.

MR. LOEVY: Great. I can't see you, so I appreciate that.

MS. TANOURY: Oh. Just so -- can you see this?

MR. LOEVY: I can see. So we only have a black-and-white too, guys?

MS. TANOURY: Yes. I think that's all.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Ms. Curry, can you take that document from counsel.

MR. LOEVY: Thanks again, defense counsel.

MS. TANOURY: Uh-huh.

Q. Is that your handwriting at the bottom?

109

A.          Yes, it is.

Q.          All right.  Does that refresh your recollection about --

A.          Yes, it does.

Q.          -- what happened on 12-4-2004 at 9:15?

A.          Uh-huh.

Q.          Do you remember where you were?

A.          12-4-04?

Q.          Do you remember where you were?

A.          Probably at 1250 Indianola Avenue.

            Let me see.  How long did we stay there?

Q.          You believe you were at your house when this happened or at the police station or you're not sure?

A.          No.  I wasn't at the police station, because I never went to the police station.  I never showed up down there until the court date.

Q.          I understand.  Okay.

A.          And he walked up on me that day, and I freaked out then, you know.  And they -- I said, why would they let me see him?  You know -- and when he was -- you know, like I said, I'd never been in a courtroom before.  I'd never been on

110

trial before, never.  None of that, you know.
Even during my drug days, I never went through no
stuff like that.  I never got arrested or nothing.

Q.         All right.

A.         And he walked up on me that day, and
they pulled him -- they made him come back to
wherever they had him put up at or whatever, you
know, that day, on the court date.

Q.         So we'll get back to that, but you and
him were in the -- before he testified, he and you
were in the same place?

A.         Yeah.

Q.         All right.  We'll get back to that.
Let's go back to the photo ID, if we can.

           Do you remember selecting a photograph?

A.         Yeah.  Now I do.

Q.         Would you -- you know, it's been 20
years.  Do you recognize anybody in the --

A.         This right here.  Richard Horton.

Q.         Yeah.  But I'm saying -- you know it is
because you can see your writing on it.

A.         Yeah.

Q.         Do you actually remember it 20 years
later?

111

A.          Yes.

Q.          Would you agree with me that there's only one light-skinned guy in the photo ID?

A.          I would.

Q.          All right.  Did that help you pick out Richard Horton?

A.          Yes.

Q.          When you -- what were you told, you know?  Were you told, hey, pick out Richard Horton or were you told, pick out the intruder or what --

A.          They told me to pick out the face that you thought it was in that hoodie, and it was him.

Q.          I gotcha.  And you can see more of the face than you could see in the hoodie, right?

A.          Yeah, I can.  But like I said, once again, sir, the eyes.  His eyes are different from everybody's on here.

Q.          Tell me why his eyes are different.

A.          Because they look like the devil.  He just looked devilish.  He looked like he was just always ready to do some devilment.

Q.          Right.  How about the guy to left of him, does he look -- does his eyes look like the devil?

112

A.        No.  I mean, like I said, I wouldn't know, because I never had to -- I had never been around this guy.  I wouldn't even know his face -- like I said, if he came in this door -- any of them other than him come through this door, I wouldn't know if they knocked me down --

Q.        All right.  You --

A.        -- because I never had to look in nobody's eyes.  I looked into people's eyes, you know.  I mean...

Q.        Yeah.  When you looked at this photo array with these six pictures on it, were you picking out the guy you knew to be the drug dealer?

A.        Yes.

Q.        Because you knew -- you were able to recognize the drug dealer?

A.        Yes.

Q.        Did you know any of the other people in the --

A.        No.  I never seen them before a day in my life.  If I had, I wouldn't know them.

Q.        Did you explain to the police that you were able to pick out Horton because you knew him

113

as a drug dealer?

A.          Yes.

Q.          What did they tell you?

A.          They didn't say anything.  They just --
you know, like I said, I knew it was him.

Q.          All right.  You --

A.          And like I said, he must have used the
name Richard Diggs Horton or something, but it was
him.  And I'll swear and die and go to hell right
now, because it was him.

Q.          Did -- well, did they tell you that
Rick had also picked him out?

A.          Yeah.

Q.          At what point did they tell you that?

A.          I can't remember.

Q.          All right.  Did you ever talk to Rick
about going to look at photographs --

A.          No.

Q.          -- or looking at photographs at your
house?

A.          No.

Q.          How did you -- how did you know that
you were going to look at photographs on that day
on December 4th?

114

A.          I didn't know.  I didn't know.

Q.          What happened?

A.          They just showed me the pictures.  I didn't know -- ma'am, you have to find a photo -- I don't remember if she told me that I have to pick him out in a photograph or what.  I cannot remember.  But when she showed me the picture, it was him.

Q.          Was the picture you picked out of the six-pack here the same picture that she had showed you the single picture of?

A.          Yes, I believe it was.

THE VIDEOGRAPHER:  Watch your mic.

Q.          Had you spoken to Rick before the six-pack identification about who you believe the intruder was?

A.          No, not that I recall.

Q.          I mean, six weeks had gone by between October 8th and December 4th -- I'm sorry -- October 9th and December 4th.  Some time had gone by, right?

A.          Uh-huh.  I can't --

Q.          And you had talked to your niece and your daughter?

115

A.          Like I said, we didn't really talk

about it anymore.  After the court date and all,

you know, we just -- but like I said, if it wasn't

him, why did he run?  I mean, why was he on the

run?  You know, after he heard that, you know,

yeah, man, I heard you shot Rick, blah, blah,

blah, blah, blah, why was he running if he knew it

wasn't him?

Q.          Tell me more about that, because I

didn't --

A.          Well, I heard that he was on the run.

A friend of ours, you know -- I don't know how he

put it, but he said he saw him, and he said, hey,

man, let me talk to you for a minute, and he took

off running.  I think --

Q.          Was this shortly after the shooting

or --

A.          It was, like, maybe a couple -- two or

three weeks, you know.

Q.          All right.  And tell me what happened.

A.          He lived down the street from where his

dad lived.

Q.          And what do you remember?  The friend

told you about the --

116

A.        Yeah.  He said, man, I saw him, but he ran.  I think he was telling Rick that.  He ran.

Q.        And so that made Rick think that maybe this Richard guy was the intruder?

A.        Yes, I want to say.  I'm not for sure.

Q.        Would that --

A.        Like I said, it's all so old, and...

Q.        Well, let's slow down on it, then, to make sure we understand.  So there's some -- do you remember who it was that said Richard went on the run?

A.        A friend of his.  It was a friend of ours, not his.

Q.        All right.  So the friend -- do you remember the friend's name?

A.        No.  I haven't even --

Q.        So this --

A.        -- seen him around.

Q.        What's that?

A.        I haven't seen him.

Q.        What do you remember about him so we can identify, just who he was?

A.        Who?

Q.        Was he a work friend?

117

A.        Huh?

Q.        Was he a work friend, a social friend?

A.        No.  He was just a social friend down the street.  Like I said, he lived down the street from his dad.

Q.        All right.  So this guy's telling you and Rick a story about one time that he wanted to talk to the drug dealer that you knew as Richard and Richard ran?

A.        Yeah.  Or he saw him and he knew -- he knew that the guy knew us and he took off running or something or other.  I can't remember, but I did hear that he was running from the police after he was --

Q.        Do you --

A.        -- known to shoot Rick.

Q.        So Rick's friend --

A.        Where I heard it from other than his friend, I don't know.  I can't remember.

Q.        Well, let's slow down.  I want to ask you about the time a few weeks after the shooting where Rick's friend told you, hey, this guy Richard, he was running from the police.  That might have had something to do with your shooting.

118

A.          Maybe it was said like that.  I'm not for sure.  But like I said --

Q.          Tell me what you remember.

A.          Like I said, we just heard that he was on the run after he --

Q.          Richard --

A.          -- you know, got word that he's the one who shot Rick.

Q.          I gotcha.  So the word on the street was, a couple weeks after the shooting, that the drug dealer that you knew as Richard was on the run after the shooting?

A.          Yeah.  That's...

Q.          That made you believe that the drug dealer you knew as Richard might have been the one who did it?

A.          Yeah.

Q.          Did you explain this to the police?

A.          I ain't never talked to the police, I said.

Q.          Well, you talked to them when --

A.          I didn't -- it didn't come up, so I didn't say nothing.

Q.          I gotcha.  So that helped you to

119

believe that the drug dealer named Richard must

have been the intruder?

A.          Right.

Q.          So, back to the identification

procedure.  If you had only seen the eyes and had

not seen the nose or the mouth or the hair or

anything else, how could you be sure that you were

making the right identification?

A.          His eyes.  It was his eyes.

Q.          If you --

A.          Like I said, if you tie a thing around

this right here (indicating), like, maybe part of

his nose was covered, but all this was, you know,

under the hoodie, and his eyes was -- like, stuck

out.

Q.          All right.  So you could see part of

his nose and his eyes?

A.          Yes.

Q.          Would it be fair to say that you

couldn't have bet your life that that's who you

saw in the apartment, right?

A.          I could.

Q.          So there's just no doubt in your mind

that you recognize those eyes?

120

A.          No, not a doubt at all.

Q.          Is there anything you could --

A.          That's what I said I went on, was his eyes.  His eyes and his -- you know.

Q.          Well, Ms. Curry, I mean, it's -- what you might be saying is, look, I really think it was his eyes.  I'm not totally sure because I -- you know, I can only see his eyes, but I believe it was him.  Or you can say there's just no doubt in my mind, and there's no --

A.          There's no doubt in my mind that it was him.

Q.          All right.  And there's nothing that you could learned that would change your opinion that --

A.          Not at all.

Q.          Let me ask the question.

            There's nothing that could ever change your mind that the eyes that you saw in the apartment through that hoodie -- through the peeks in the pillow are the eyes of the man in this photograph?  You're 100 percent sure, and there's just no way anybody could convince you otherwise?

A.          100 percent.  No way in hell.

121

Q.        How about if there was DNA evidence showing that was somebody else?  Could that convince you that those weren't the same eyes?

A.        If it was --

MS. TANOURY:  Objection.  Objection.

A.        If it was...

THE WITNESS:  I can't answer?

MS. TANOURY:  You can answer.

A.        If it was a different DNA in that house, how did he get in there?  That's what I want to know.

Q.        Well, I'm just asking if that --

A.        I don't know.  No.  No.  No.

Q.        DNA would not change your mind?

A.        No, it will not.

Q.        And would a different -- if the person that had intruded in your house had touched the bed and they lifted that fingerprint and it wasn't Richard Horton, could that ever cause you to doubt that those are the eyes that you saw?

MS. TANOURY:  Objection.

A.        No.

MS. TANOURY:  You can answer.

Q.        No?

122

A.    No.

Q.    All right.  So there's just -- you're quite firm in your memory, and there's nothing that would ever change your mind that you made the right identification?

A.    Never.

Q.    Would you feel bad if you put the wrong guy in prison?

A.    No.

Q.    Why not?

A.    Because I know it was him.

Q.    All right.  But let's say it wasn't him, because you --

A.    Well, I'm sorry.  But like I said, if it wasn't him, can you tell me how somebody else's DNA got into my house that morning?  It was only one person.  So how in the world can another person's DNA get in my house that wasn't even in there?  That's what I want to know.

Q.    But my question --

A.    And like I said, we never had a drug dealer come there.  We always went to them.

Q.    Would you feel badly if your testimony inadvertently, accidently put the wrong guy in

123

prison for 20 years?

A.        No.

Q.        How come?

A.        Because it was him, and I will stake my life on -- it was him.

Q.        All right.  It would -- so you're pretty emotionally invested in having got this right.  Is that a fair statement?

A.        Yes.

MR. LOEVY:  All right.  I don't have any other questions right now, but I may have some questions after the defense attorneys get their chance.

So it's their turn, Ms. Curry, and let's see how -- what happens next.  Thank you for your time this morning.

THE WITNESS:  Uh-huh.

MS. TANOURY:  And, Ms. Curry, it is noon.  We probably will have a couple hours of questioning as well.  Do you want to take a lunch break?

THE WITNESS:  Is there a lunchroom down here anywhere?

MS. TANOURY:  There's a, like, vending

124

room in the basement, where there are some, like, you know, items that you could grab or there's, you know, places in the vicinity --

THE WITNESS:  Uh-huh.

MS. TANOURY:  -- across the street.  I just want to make sure you get a lunch break if you would like one.

THE WITNESS:  Okay.

MS. TANOURY:  It is noon here.

THE WITNESS:  Okay.

MR. LOEVY:  Why don't you tell us, Ms. Curry, you know, how long you want to -- you know, the faster we're done, the faster we're done.  So what's your timing?  What's your preference?

THE WITNESS:  Like I said, my grandson is supposed to arrive here from Mississippi.  I don't know exactly what time, but I was cooking him -- he wanted Grandma's cooking, and I was cooking him a meal.  And it's my granddaughter's singing -- I mean -- not singing night.  Her homecoming night.

And we were all going to go to the game or whatever, you know.  She's captain of her

125

squad. She dances. She's the drill team, you know, and she's the captain, so she will march down the street, and I like to see her. This is her last year. She's been doing it since she was eight, and --

MR. LOEVY: Well, I'll tell you what, Ms. Curry: Do you want to take a 15-minute break, a half-hour break, or an hour?

THE WITNESS: Well, we can take a -- like a 15-minute -- I just want to get something to -- you know, like I said, smoke my last little cigarette, you know, because I'm a smoker. I smoke cigarettes. If -- I don't do nothing else.

MR. LOEVY: All right. We'll see --

THE WITNESS: Like I told -- you know, like I said, I'll be glad when this is done and over with. I don't want to -- I don't even come downtown, you know. I don't -- I don't like talking to people, for one. But like I said, I will die and go to hell today if I'm not -- if I'm lying, you know, about this man.

MR. LOEVY: All right. Let's take that break. We'll be back here at 12:21.

THE WITNESS: Okay.

126

MR. LOEVY: Sounds good, everybody?

MS. TANOURY: Sounds good.

THE VIDEOGRAPHER: We are off the record.

MR. LOEVY: Thank you.

THE VIDEOGRAPHER: The time is 12:06.

(A short recess is taken.)

THE VIDEOGRAPHER: This marks the beginning of media No. 3. We're back on the record. The time is 12:31.

- - - - -

CROSS-EXAMINATION

BY MS. TANOURY:

Q.        Ms. Curry, thank you. My name's Alana Tanoury. I represent Defendant Detective Brenda Walker and the City of Columbus in this lawsuit.

I am going to be asking you some questions. I'm going to try really hard not to recover ground that Plaintiff Horton's attorney has already covered, so bear with me as I kind of jump around from topic to topic.

First, I just want to make sure. You do understand that you're here today for a deposition related to the lawsuit Richard Horton

127

filed against the City of Columbus and Detective Brenda Walker --

A.        Uh-huh.

Q.        -- correct?  Okay.

Are you aware of what the claims are in that lawsuit?

A.        No.

Q.        Okay.  Are you aware that Richard Horton alleges that he was wrongfully convicted of the robbery that occurred at 927 Loew Street?

A.        Am I aware of it?

Q.        Yes.

A.        That he was wrongly --

Q.        Or that he alleges that he was.

A.        I don't understand the question.

Q.        Okay.  Are you aware that Richard Horton claims in this lawsuit that he did not commit the 9 -- the robbery?

A.        Yeah.  I understand --

Q.        Okay.

A.        -- but he did.

Q.        Okay.  So I want to talk briefly about -- you mentioned a conversation with Ms. Martinez. When did that occur?

128

A.         Man, I don't know.  I put it down -- I don't even know if I wrote the date down.  I don't know.  But I was -- I just hadn't been outside, and I seen these two ladies pulling up, you know, where my daughter park her car.  And I'm like, I wonder who they looking for?

Q.         Uh-huh.

A.         And they start walking up my walkway, and I'm like, yes, may I help?  And they said, are you Rhonda Curry?  Yes, I am.  You know, I don't know what date it was.  It might have been -- what was last month?  August.  Maybe about the middle of August.  I don't know.  Somewhere in August, I do know that.

Q.         Okay.  So --

A.         And they proceed to tell me who they were, what they were for, and...

Q.         Okay.  Who did they -- who did they tell you they were?

A.         One was an attorney, and one was an investigator.

Q.         Okay.  Did they tell you who they were an attorney for?

A.         Yes.

129

Q.        Who did they say they were an attorney --

A.        Richard Horton.

Q.        Okay.  And can you tell me what you talked about with Ms. Martinez and --

A.        We talked about the whole incident, you know, and I told them the same thing I've been telling him, everything, you know, that I do -- it was him, and I would state my life on -- like I say, I would die and go to hell right today saying that I was him, and it was, you know, and what all happened and whatever, you know, and told him about the one -- I'm looking at different times, and I missed -- I think it was one that he canceled and one that I missed, that -- because like I said, I just wasn't interested in it, you know, I mean, until the one lady came and gave me the deposition.

          Like I said, she just said, you're Rhonda Curry?  I'm like, yeah, here you go.  It's a deposition.  That's all -- she said it's a -- she didn't say that.  She said a summon to come to court or whatever.  Okay.

          She didn't say her name or whatever, so

130

I looked at it.  So, I mean -- so when Ms. Martinez and them was there, I was hoping that when they came back -- because they said -- I told them, I said, I'm trying to use my own money to do this, blah, blah, blah.  They said, you shouldn't need to have to, you know.  They should pay for you to do all this, because they want you; you don't want them, blah, blah.

Q.          And I'm sorry.  Who told you that?

A.          Ms. Martinez, you know.  So this one right here that they gave me, it was a $40 -- 40-some dollar --

Q.          And --

A.          -- check or money order or whatever.

Q.          And for the record, do you mind handing me the documents that you're looking at?

A.          (Witness complies with request.)

Q.          Okay.

A.          I just put Ms. Cindy's card on there so I could keep it.

Q.          Okay.  So this is the -- a cover letter and a subpoena that was issued --

A.          A subpoena, yeah.

Q.          -- by Aaron -- the subpoena was -- the

131

letter was from -- the cover letter is signed by me from the City Attorney's Office, and the subpoena is signed by Aaron Epstein.

A.        So whoever gave me the $40 money order, I had to put where I get my lift and put it in, you know, where -- my card.

Q.        Okay.  And was the $40 money order that you received with this subpoena?

A.        Yes.

Q.        Did you receive any other money order?

A.        Yes.

Q.        Okay.  And when did you receive that money order?

A.        The day that they came to see me.

Q.        Okay.  So they --

A.        They didn't know -- I guess didn't know whether you was going to give me one or not, but they must have mentioned it to you.  So, yes, they did.

Q.        Okay.  And then is that business card the card you said was --

A.        Ms. Cindy's the investigator.

Q.        Okay.  Could I see that as well.

A.        (Witness complies with request.)

132

Q.        Okay.  So for the record, this is a business card from Cindy Chekingo --

A.        Yes.

Q.        -- investigator at Loevy & Loevy?

A.        Yeah.  And I just put her name on the back of that card, Ms. Martinez.  But I -- because I -- like I said, this is a new phone, so I really didn't know my number.

Q.        Okay.

A.        So she called -- I gave her my phone number, and she called me so I could have it in my phone, you know.  So it's programmed in my phone as of right now --

Q.        Okay.

A.        -- Ms. Martinez.

Q.        And the conversation -- what was the conversation that you had with Ms. Martinez and the investigator when they were at your house --

A.        The same --

Q.        -- in August?

A.        -- conversation we're having now that I just told her lawyer -- her associate.  The same, identical one.  And then when -- she said a Richard Diggs, and I told her that day that was

133

the first time I've ever heard that last name,
Diggs.  The very first time.  I never heard it
before, during me and Rick's relationship, or
nothing else.  I never heard that name before.

Q.         And when you talked to Ms. Martinez,
what did they tell you about the name Richard
Diggs?

A.         They said that's whose DNA it was.

Q.         So you were told, when they came to
your house, that the DNA that was found --

A.         In the home --

Q.         -- in the home --

A.         -- was Richard Diggs'.  And my question
was, to them, the same that I asked her associate:
How did it get in there?  That's what I want --
that's the whole thing that I want to know.  How
did someone else's DNA get in my house when I
never knew that person, never seen that person,
never heard of that person?

Q.         Okay.  So I just want to be very clear
for the record.  Ms. Martinez told you that
Richard Diggs' DNA was found in your house?

A.         Yes.

Q.         Okay.  Are you aware that Richard Diggs

134

was in prison on October 9th, 2004 when this robbery occurred?

A.          I don't know, because I didn't know him.

Q.          Okay.  So you never have heard the name --

A.          No.

Q.          -- Richard Diggs before?

A.          For the last time, no, I have not.

Q.          Okay.  Were you told anything about the fingerprints?

A.          They said it was Richard Diggs'.  Okay. My question is, once again:  When did the policemen go in there to find these fingerprints and all this?  Because like I said, when I left that house that day, I never went back in there. So how did they get in to get the DNA?  That's what I want to know.

How did they get in my house without my permission -- and my husband in the hospital, without our permission in our home where we resided at?  How did they get in there to get that DNA when it didn't happen that day?  That's what I want to know.

135

In order to get that DNA -- if he was in the hospital -- the prison, how did they get the DNA off of my furniture in my home that day? That's what I want to know.  Why does this keep going on?  Because it's puzzling to me about -- that one part of this puzzle.  Let's find this piece to this puzzle.

Q.          I understand.  I just wanted to make sure I understood the entirety of the conversation that you had --

A.          Yes.

Q.          -- with Ms. Martinez.  Was there anything else that was discussed that day?

A.          No, there wasn't.  And we just sat there and chatted, I mean about everyday things, really.  And she asked me how -- you know, and I got emotional.  She hugged on me.  She loved on me.  I've never had nobody to treat me from a courtroom, a lawyer or nothing the way she did. She understood everything I said to her.  She would sympathize with me and everything.

Q.          Uh-huh.

A.          And I really appreciate her doing that.

Q.          I understand.

136

A.        You know, but like I said, I didn't hear nothing about him being -- they never said him being in the penitentiary on that day or jail or incarcerated or whatever.

But I -- once again, what -- how in the world did his DNA or how did the City, police -- whoever did the DNA to get the bullet -- the fragments or whatever they got out of my house that day, how did they get in there to get that without my permission?

Q.        I --

A.        That's what's puzzling me.  How can they do that?  You know -- and it never was roped off or nothing.  That scene was never roped off or nothing, because Rick had to go -- like he told me, he said, somebody was in there.  And like I said, if they did it that way, then they would have found Richard Horton's --

Q.        Uh-huh.

A.        -- DNA in there.  Okay.  Somebody was in there, and there was a small fire.  I don't know where the fire was.  I don't know whether it was in that room or what, because like I said, I never went back over there.

137

Rick got a few things out of there. When we moved into the apartment that we moved in, we didn't have none of the furniture or -- I think we just had a few of our -- we had to start all over again, because he didn't want to go in there, either.

Q.          Uh-huh.

A.          So we didn't --

Q.          I understand.

A.          -- taking nothing out of that house but a few things that was -- one room -- this room in the front was where it happened, so it had a kitchen and -- because he had tore the wall down to make it one big room.

Q.          Uh-huh.

A.          This room and this room was together, like I said.  It was really actually one, two, three, four --

Q.          Uh-huh.

A.          -- and a back room.  Okay.  The room that he tore down, there was a -- there was a wall.  He tore that down and made one big room. Then there was the kitchen.  There was a bathroom on the side.  It was like an office, but it was

138

his dad's.

Q.          Uh-huh.

A.          It was like an office.  There was a bathroom, the kitchen, and a back room with a door and another back room, okay?  My sister's -- she was way back there.  Like I said, he didn't even know --

Q.          Uh-huh.

A.          -- she was in that area.  He didn't know she was even in the house --

Q.          Right.

A.          -- because she never said a word once she heard the scuffling and stuff.

So my thing is, if -- the police or detective or whoever went in that house to get the bullet fragments or whatever they had to get out of there, how in the hell did they get in there without my permission or me knowing that they went in that house to get the DNA or whatever?  That's what I want to know.

Q.          Understood.

A.          Because it's all under the City now.  You know what I mean?  I know I didn't shoot him, and I know Richard Horton did.  So there that's my

139

-- that's my testimony right there.

Q.      Uh-huh.  And so still today, you know -- it's now September 27, 2024.  You're still 100 percent certainty that it was Richard Horton that shot him?

A.      Yes, I am.

Q.      Okay.  And you're 100 percent certain that he was the robber --

A.      Yeah.

Q.      -- during the --

A.      Yes.

Q.      -- Loew Street robbery?

A.      Yes.

Q.      And that robbery occurred on October 9th, 2004?

A.      Uh-huh.

Q.      Okay.  Do you recall testifying at the -- at Richard Horton's criminal trial?

A.      Yeah.

Q.      And does it sound like January 31st of 2006 was --

A.      I --

Q.      -- when the criminal trial --

A.      I don't know when it was, but like I

140

said, I had never stepped in a courtroom.  I had never been on a seat to give a testimony for nothing in my life.

Q.      Okay.

A.      You know -- and like I said, I was in my mid-40s or whatever, but I still never -- even through my drug addiction or whatever, I never got in no trouble, never arrested, you know.  Just -- I was just out there.

Q.      Okay.

A.      And like I said, when I had to go to the courtroom, I was so nervous and upset that I went to the bathroom about 14 times before I even got on the stand, you know, because I'm just -- I get nervous like that, you know.

And then when he walked up on me saying, you know, why you keep saying this, why you -- because it was you, and get away from me. My sister stood in -- my sister-in-law stood in between us, you know.  She said, sir, you need to move.  You need to go on, you know.

Q.      Uh-huh.

A.      Leave her alone, because I instantly got emotional.

141

Q.        Yeah.  Can you tell me everything that happened with that interaction with Richard Horton at the courthouse.

A.        He just -- I don't know why he would walk up on me, you know, and say that, knowing that he'd done it, you know, trying to get out of it.  But like I said, if they arrested him and if the DNA was out then, why in the heck did they incarcerate him anyway, when it wasn't his DNA?  That's what's getting -- that's what's puzzling me.

So can you tell me:  Whoever did the investigation on that behalf, how did they come up with the DNA that wasn't his?  That's what I want to know.  And if so, leave me out of it, take me -- let me go home and just drop the whole stuff.  Whatever y'all do to him, fine well and good.  It's well -- it's all right with me.  I don't care.

But like I said, it's him.  I would die and go to hell and say it was him, and I want out of it.  Because like I said, if the DNAs ain't matching, then there's no way that y'all should have -- they should have arrested him anyway.

142

If he was on the run and turned himself in, why did they incarcerate him? Because they didn't have no damn DNA then. They come up with the DNA. How they went in the house, I don't know, because the house was sold, and everything was out of it two years later. Two or three years later.

The man that's in there right now, he has a trucking company. It's -- the house is still there, but I'm sure -- I would state my life on that it's not the same, you know. So when did they go in there and get that DNA? Can you answer me that?

Q.        Unfortunately, I can't answer questions. This is your deposition.

A.        Oh. Well --

Q.        And I'm sorry. We're on the record --

A.        Uh-huh.

Q.        -- as far as that goes. I, you know, would be happy to provide the investigative packet for you to review, if you would like to.

A.        Well, no, because like I said, I want this over and done with as of today. What is today? September the 27th, 2024.

143

Q.          Uh-huh.

A.          I want it done and over with.

Q.          Yeah.

A.          I don't even want to see y'all no more.

Q.          Let me -- let me hand you what I'll mark as Exhibit 2.

                    - - - - -

          Thereupon, Exhibit 2 is marked for purposes of identification.

                    - - - - -

A.          And it was earlier than 10 a.m.

Q.          Can you talk a look at what I've identified as Exhibit 1 [sic].  Do you know what this document is?

A.          No.  What --

Q.          2.  I'm sorry.

          MR. LOEVY:  Counsel, I --

Q.          Document No. 2.

          MR. LOEVY:  I've got to interrupt here, because we need some kind of procedure where you make it available to me, too, or at least describe it.  What are we talking about?

          MS. TANOURY:  Okay.  We're looking at informational summary 1, which is the progress of

144

investigation report, which is the summary of Rhonda Curry's interview.

MR. LOEVY:  This is the two-page police report?

MS. TANOURY:  Yes.  Informational summary No. 1.

MR. LOEVY:  Got it.  Okay.  Thank you for clarifying that.  I have a copy, so we don't need to do anything technological here.

MS. TANOURY:  Okay.

A.         I told them that the dog was barking first.  So he had to come before 7:30, for one.

Q.         Okay.  Sorry.  I just -- I just want to slow down for just a second here.

This is an informational summary that is signed by Detective Brenda Walker.  I just want to clarify.  Did you talk to -- this says that you were interviewed by robbery Detective Brenda Walker at Grant Hospital at around 10 a.m.  Does that sound correct?

A.         What now?

Q.         Sorry.  This says that you were interviewed on the day of the robbery, which was October 9th, 2004, at approximately 10 a.m. at

145

Grant Hospital.

A.          I can't remember her being there.  I really don't know.  I can't -- like I said, I can't remember, but I was more interested in him getting -- like I said, they took him immediately to the trauma room.  I'm pacing up and down the floor.  If I talked to her, I don't remember even what I said.  As a matter of fact, I don't even remember talking to her.

Q.          Okay.

A.          Like I said, I was, you know -- my sister was sitting there holding me, you know, trying to keep me calm during this whole thing, because she was with me the whole time.

Q.          Go ahead and take a look at the summary, and --

A.          Okay.  A male calling Mr. McClanahan by his nickname, Slim.

            No.  No.  I don't know how y'all got this.  He hit him in the head with the gun when he opened the door.

Q.          The last sentence of the second paragraph:  "Mr. McClanahan was immediately struck in the forehead with a handgun."

146

Is that accurate?

A.        Yeah.  But y'all didn't put it in before, when he -- at which time he was -- forced open the door.  "This caused Mr. McClanahan to lose his balance."

He didn't lose his balance when he opened the door.  He immediately hit him on the head when he opened the door.

Q.        Okay.

A.        That's how he lost his balance.

Q.        Okay.  So based on this informational summary, do you recall -- this doesn't refresh your memory as to whether you gave an interview to the police on October 9th, 2004?

A.        No, I did not.  Not the police at all.  I never saw a blue suit that day.

Q.        I'm sorry.  Detective Brenda Walker --

A.        Okay.  I --

Q.        -- the female detective.

A.        Like I said, I think I do.  I don't remember.

Q.        Okay.

A.        But I do remember her coming to my daughter's home once I got there, and Rick was

147

still in the hospital.

Q.       Okay.  So if -- but you have no reason to dispute that you did talk to the detective at the hospital?

A.       I said I don't remember, but if I did, I mean, I just -- I don't remember what I said if I did talk to her.

Q.       Okay.  I want to now -- I'm going to -- again, you recall that you did testify at Mr. Horton's criminal trial?

A.       Uh-huh.

Q.       And that was at -- here in Franklin County.

A.       Uh-huh.

Q.       And that was in 2006, a couple years after the robbery, correct?

A.       I can't remember the dates, but probably.

Q.       Okay.

A.       Once they sent us -- sent -- you know, sent the thing to come to court.

Q.       I'm going to hand you what I will mark as Exhibit 3.

- - - - -

148

Thereupon, Exhibit 3 is marked for purposes of identification.

- - - - -

MS. TANOURY:  And this is the trial transcript.

MR. LOEVY:  Thanks, counsel.  I have a copy of this, too, so we're good on that.

MS. TANOURY:  Okay.  And it appears to be 354 pages.  Is that the document you have as well?

MR. LOEVY:  No.  I have Ms. Curry's testimony, but I suspect that's where your questioning is going to be.

MS. TANOURY:  Yes.

BY MS. TANOURY:

Q.        Okay.  So, Ms. Curry, I'm handing you a binder and I've marked as Exhibit 3.  Can you take a look at the first page in there.  You can see that it says State of Ohio versus Richard Horton, correct, at the top?

A.        Yeah.

Q.        And then it says transcript of proceedings before the Honorable John F. Bender, judge, on January 30th, 31st, February 1st,

149

and 2nd, 2006?

A.      Like I said, I can't remember no dates.

Q.      Okay.  If you see, there's a little Post-it note towards the middle.

A.      Right there (indicating)?

Q.      And as counsel suggested, I'm really just interested in looking at your testimony.  If you can, flip to where that little Post-it note is on the page.  So your test --

A.      Where?

Q.      The little pink Post-it note on the side.

A.      Okay.

Q.      So your testimony will begin on page 79 of the transcript.

A.      Okay.  I got 78.

Q.      Okay.  Yeah.  And if you look -- well, if you look at the very bottom on page 78, it says Rhonda Curry.

A.      Uh-huh.

Q.      Do you see that?

A.      Uh-huh.

Q.      And then on line 25, it says, "...called as a witness on behalf of the

150

plaintiff, State of Ohio, being first duly sworn, testifies as follows."

Do you see that?

A.        Yeah.

Q.        Okay.  I want you to go ahead and read your -- read your testimony.

A.        Okay.  It says Mr. Smith.

MR. LOEVY:  Counsel, do you want her to read the entire 30 pages?

MS. TANOURY:  Yes.

MR. LOEVY:  Should we take a break for that?

MS. TANOURY:  Yeah, we can do that.  We can do that.

THE VIDEOGRAPHER:  We are off the record.  The time is 12:54.

(A short recess is taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:58.

BY MS. TANOURY:

Q.        Okay.  Ms. Curry, you began reading your testimony from Richard Horton's criminal trial, correct?  And you read the first couple pages?

151

A.        Uh-huh.

Q.        Okay.  And this is, in fact, your testimony that you provided at trial, correct?

A.        (Indicates affirmatively.)

Q.        And were you telling the truth during that testimony?

A.        Yes, I was.

Q.        Okay.  And did you testify truthfully about what happened during the robbery?

A.        Uh-huh.

Q.        Okay.  And, specifically, when you testified at trial, you identified Mr. Horton in the courtroom as the perpetrator of the robbery, correct?

A.        Uh-huh.

Q.        Okay.  And were you telling the truth when you identified him in the courtroom?

A.        (Indicates affirmatively.)

Q.        And was that the individual that you ID'd as the robber?

A.        Uh-huh.

Q.        Okay.  And was he also the person that you had described as the drug dealer?

A.        Uh-huh.

152

Q.      Okay.  And can you do verbal responses for the record?  I'm sorry.  Just -- "uh-huhs" don't --

A.      Oh.

Q.      -- always come up.  Just "yes" or "no."

A.      Yes.  Okay.

Q.      I'm sorry.

A.      I'm sorry.

Q.      Those are helpful.

A.      I'm sorry.

Q.      Okay.  So was the person that you ID'd in the courtroom the person who committed the robbery?

A.      Yes, it was.

Q.      And was it the same person that is also the drug dealer that you know?

A.      Yes, it was.

Q.      Okay.  Now, I do want to talk about some specific points from your testimony.

        Okay.  So turning to page 90 of your testimony -- can you take a look at page 90 through 91.

A.      So that's where the name "Adidas man" came from.

153

Q.        Okay.  So we just -- you just looked at page -- are you still on page 90?

A.        Yeah.

Q.        Page 90 of your testimony.  And in there, there's a conversation between you and your daughter.  Does that -- were you testifying truthfully at trial when you --

A.        Yeah.

Q.        Okay.

A.        Yes.

Q.        And can you explain that conversation that you had with your daughter.

A.        I just told her, you know who I thought it was?  Because she knew I was on drugs.  You know what I'm saying?  That, she knew -- and like she said, she went to school with him maybe a month, you know, after it all happened, and she remember a name Richard Horton.  She said they called him Adidas man.

          Well, I didn't know, you know, at the time -- I mean, you know, like I said, I never heard that until she said it, but we never called him that on the street, you see.

Q.        Adidas boy?

154

A.          Right.

Q.          Or man?

A.          Yeah.  I never knew that on the street.
I just knew him by Richard.

Q.          Okay.  So she told you that Richard
Horton also went by Adidas boy -- man?

A.          Well, yeah, I guess.

Q.          Okay.

A.          I mean....

Q.          And then you also discussed -- sorry.
The next conversation -- you said, "...after Rick
came off his medicine and stuff maybe that Sunday
evening or Monday, and I was going to wash him up,
he said the same name."

A.          Yeah.

Q.          Does that refresh --

A.          Yes.  That --

Q.          -- your recollection --

A.          Yes, it does.

Q.          -- about what happened?

A.          Yes.

Q.          Okay.  And so was it -- was that when
you first had the conversation -- so when you were
at -- on the way at the hospital -- or at the

155

hospital the first day, he was there?

A.          What?

Q.          Is that --

A.          Talking to me and Rick -- about me and Rick talking?

Q.          Yes.  Yes.

A.          No.  It was the day after.  It was the day -- after he got in the room and everything and they did the surgery or whatever he got in the room, like I said, he never let no one wash him up because he knew I was going to be there.

Q.          Uh-huh.

A.          You know, so that morning, that's when I went there.  So when I was running the water and stuff, he said, Rhonda, he said -- you know, told me the -- he said the same thing.

Q.          Okay.  So that was the day after --

A.          Yeah.

Q.          -- the robbery?

A.          It had to have been the day after.  I can't say it was two days after.  I want to say it was the very next day.

Q.          Okay.  So the day after the robbery, you were in the car with your daughter, and you

156

stated that you thought it was Richard?

A.      Yeah.

Q.      And was that how you figured out the last name or how did you figure out --

A.      She --

Q.      -- Horton's last name?

A.      She said Adidas man.  Well, then when she said that -- and like I said, I knew a couple people that knew him and would have known his last name, and that's who I was asking.  I can't remember who I asked.  I don't know if it was Tracy or who I asked.  But when they said Richard Horton, I -- I said, could that be his last name, Kim?  And she said, Mom, I think it was.

Q.      Okay.

A.      When -- you know, I said, you said Adidas man.  I said, well, could his name have been Richard Horton?  And she said, yes.  I said Horton, as in, like, Tim Horton?  And she said, yes.

Q.      Okay.  So was that how you first determined the robber's last name?

A.      Yeah.

Q.      Okay.  And then can you tell me

157

everything you remember about the conversation
that day with Rick about who the robber was.

A.          I just -- like I said, I said, Rick, I
said, I'm down here to -- you know, he said, yeah,
them nurses tried to come in here, you know, but
he was, like, still groggy or whatever, you know,
because he was on -- he was on highly sedative
medicine, but he was woke that morning.  I think
he had -- well, he never drank coffee or tea or
nothing, you know.  I want to say he did eat his
breakfast.

The time I got down there, it was
always -- you know, like I said, once I got the
kids off to school, I'm out, you know.  So when I
got there, he was, you know, still kind of groggy,
but he was -- you know, he was talking his normal
talk, you know, his -- you know, he wasn't, like,
slurring or nothing, you know.  And that's when,
you know -- after I ran his little wash-up water
and stuff, he told me, he said, Rhonda, he said,
you know, I think it was Richard, and I said, me,
too.  I said, wow.  You said that.  You know, I
said, because I thought it, you know, once
everything --

158

Q.         Uh-huh.

A.         You know, after the tears and, you know, the worrying up and down, pacing and all that, you know, like I said, that's who came to mind to me as well.

Q.         Uh-huh.

A.         And he said, well, he said, we've just got to go through whatever we've got to go through now, you know, to get this done.

Q.         Okay.  And --

A.         And then he also told me -- I remember him saying, you know, and don't tell Jermaine. That was his son.  Well, when Jermaine finally did come around, he said, Mom, he said, I want you to show me what is -- he is, you know.  And I said, no, I ain't going to do that.  He said, oh, you won't have to worry about it.  You ain't going to see him no more.  I said, well, no.  I said, just leave it alone.  Let the law handle it whatever's going to happen.

But like I said, I never saw a blue suit or nothing.  It was just a detective, you know.  The blue suits didn't come or -- like I said, whoever went in the house to do the DNA or

159

whatever, they didn't get any permission from me, which I think they should have if they didn't.  It seems like there should be something done about that, because like I said, how did his DNA get in my house?

Q.        And before we continue on with the trial transcript, I want to go back to the conversation about the DNA that you had with Ms. Martinez.  What were you told about the investigation and the DNA testing and all that?

A.        She told me that the DNA came out as Richard Diggs.  And I'm like, what?  I said, ma'am, I said, I've never heard -- until this day, I've never heard of that name before in my life.

And like I said, once she brought the money order back to me, I was praying that my daughter would pull up.  She got off at 3:00.  And I said, Lord, I said, I don't want to hold them up, I said, but I pray that Kim comes so she can talk to them, too, because me getting upset upsets her, you know.  Like I said --

Q.        Uh-huh.

A.        -- she's, like, everything to me.  And, like, when it come to her mom -- which I'm sure

160

every person in here is crazy about their

mother --

Q.          Right.

A.          -- and look out for their mother.  But

-- so she said, Mom, she said, what's going on?

And she did pull up.  And I told -- they

introduced themselves, you know, and she talked to

them.  You know, she was telling them, you know --

she said, what does my mom have to do with all

this?  Blah, blah, blah, blah, you know.  And they

was telling her.  And I said, Kim, I said, did you

ever hear a name of Richard Diggs before --

Q.          Uh-huh.

A.          -- while all this was going on?  And

she said, no.  She said, but I did go to school

with a Richard Diggs.  But like I said, she wasn't

out there in the "in" crowd, you know.

Q.          Uh-huh.

A.          She had her own few little girlfriends

she hung around with, but one of her friends did

stay over in that area, between Star Avenue and

Second, you know, over in there.  That's where all

the stuff was going on.

Q.          Uh-huh.

161

A.        Like I said, I stayed off of Gibbard, which was Loew Street.

Q.        Uh-huh.

A.        You know, so all that was still in the same area.

Q.        Okay.

A.        So I said, well, did you know him in person?  She said, no, I didn't.  So that's what -- you know, when Ms. Martinez said when Kim has to go to court, tell them that she didn't have no -- you know, nothing to do with him.  She just knew his name, Richard Diggs.

Well, I never knew a Richard Diggs.  I said, I knew a Richard McClanahan, Jr., and a Richard McClanahan, Sr.

Q.        Did --

A.        That's the only Richards I knew.  And Richard Horton.

Q.        Did you ever hear Richard McClanahan talk about a Richard Diggs?

A.        No, I didn't.  After -- the whole 22 years we was together, never.

Q.        Okay.

A.        Not even after he got shot, you know.

162

I never heard him say that name. And he -- we told each other everything.

Q.		Uh-huh.

A.		I mean, we not only smoked crack together; we talked. We, you know, had conversations. We laughed. We sang. We, you know, did everything together.

Q.		Okay. So do you -- so when you went to the hospital, do you remember police -- like, calling the police or them ever going to the house --

A.		No.

Q.		-- right after the robbery?

		Okay. You only remember --

A.		I called the -- I went to his sister's house, like I said. Here's Gibbard Avenue down this way, past Pepsi-Cola, you know, all that, and here's Loew Street, okay? I come out of Loew Street. He always parked the truck on the side because it was gravel. Like, you could cut through my --

Q.		Uh-huh.

A.		-- yard, like, to go to Fifth Avenue --

Q.		Okay.

163

A.          -- if you really wanted to, okay?  So he always parked the truck right there because that's where he parked his big truck at.

Q.      Okay.

A.          He parked his car -- his truck on the side.  I pulled out, come around, you know, the house, go down the street, come out to Gibbard, and go down.

Q.      Okay.

A.          I went all the way down to Joyce Avenue, made a left on Joyce Avenue.  I went down the street to Gibbard.

Q.      Okay.

A.          That's how far we had to go.  No police showed up.  The paramedics did.  Like I said, if the police did -- which they had to because of the paramedics, I'm sure, but they never asked me no questions.  Now, if they asked Rick some questions, I don't know, because like I said, he was alert.  He wasn't --

Q.      Uh-huh.

A.          He wasn't knocked out.  He wasn't asleep.  He wasn't -- nothing.  And they -- by the time he got to the hospital and they, you know,

164

got to doing whatever, he still was aware until the surgery occurred.

Q.        Uh-huh.

A.        You know what I mean?

Q.        Okay.  But you -- and don't recall talking to Detective --

A.        Not --

Q.        -- Walker that day --

A.        Not --

Q.        -- at the hospital?

A.        No, I don't.

Q.        Okay.

A.        Like I said, if the blue -- if the blue suits came and talked to Rick about it once he got in the hospital -- in the trauma room, which I'm sure they did, they never -- they came -- they never came to me.  And like I said, I was -- like y'all saying, I'm the witness.

Q.        Okay.  I want to turn to your trial testimony on page 88.  And I'm going to start reading on line 6.

          The question was:  "Did you go with Richard to the hospital?"

A.        Yes, I did.

165

Q.        And the answer you provided at trial was:  "What I done I waited until the paramedics got there, Cynthia got in the emergency squad truck with him to take him to Grant Medical.  I went back to the Loew Street to get -- give the report to the police."

Question:  "So you at that point talked to the police about what happened?"

Answer:  "Yes.  I mean, I didn't talk to them.  I wanted them to know this is where it happened.  They had it roped at the -- had it all roped off.  I was told they wouldn't let me back in there.  My sister, you know, she was fixing to have an asthma attack.  She was -- you know, she takes the breathing machine.

And so I just asked him, can she please get her medicine out of the back room?  You know, because she couldn't get it.  She did get some. Then I heard the police say they were taking him to OSU main.  And then they called back and said, no, no, we're taking him to Grant Medical." Immediately, I jumped back in the truck, and I went and got my daughter.

Continuing on --

166

A.            No, I did not.  I don't know why they put that on the witness stand, because I didn't have to go get my daughter.  I called my -- I think somebody called her from the -- I don't know how my daughter knew, but the same little girl I was telling you about that took me to church after Rick passed away, her cousin --

Q.            Uh-huh.

A.            It was her and her cousin.  And I want to say I used the hospital's phone to call her.

Q.            Okay.  So continuing on 89, your testimony said:  Because my sister had called my daughter -- and my sister had called my daughter and went and got my daughter and went to the hospital --

A.            No.  Because she didn't even drive.

Q.            -- went to the gas station, went to the hospital, Grant Medical.

A.            No.  I don't know why -- they must have typed that wrong or something, because I don't even remember saying no stuff like that.  Because like I said, my sister didn't drive, for one.

             Now, if -- once the paramedics got there to Rick and Cynthia knew that I had the

167

truck -- I could drive, and I had Rick's -- the truck that his dad left.  He had that truck, and she knew I could drive.  I told her to go on in the paramedics with her brother and I would be down there shortly.  I don't even remember going back to Loew Street to get my sister's medicine.

Q.        Okay.

A.        I don't -- like I said, I don't remember.  I know she -- and like I said, she's even worse off now than she was then, or even telling -- you know, talking to the police, I just don't remember.  I can't say that it was yea or nay.  I just do not remember.

Q.        So if you testified to this in 2006 at the criminal trial, would you have been telling the truth then --

A.        I'm --

Q.        -- about what you did?

A.        -- sure.  I mean, maybe that day, but now, I just -- like I said, I just -- if I did talk to them, I don't remember.

Q.        Okay.  And at trial, you did testify that --

A.        I mean, as of right now, I don't

168

remember.  But if I said it on the trial, I was telling the truth.

Q.        Okay.

A.        You know, but other than me going to get my daughter -- because I didn't have to go get her.  The time I got to the hospital after -- if I did take the police back down to Loew Street and show them where it happened and had to get my sister's medicine or whatever, the time I got to the hospital, her and her cousin was already there waiting on me.  She just kept saying, where's my mom?  Where's my mom?

Q.        Okay.  Do you agree that you testified at trial that when you went back to the house, it was roped off?

A.        I don't remember that.

Q.        Okay.

A.        I don't --

Q.        But I'm asking about, like, what you testified to at trial.

A.        If it was, it's -- like I said, I don't remember.  If I did say it -- and like I said, I swore on child that it was the truth, nothing but the truth, so help me God -- then I don't remember

169

it to this day --

Q.        Okay.

A.        -- you know.

Q.        But you were telling the truth at trial?

A.        Oh, yes.  Definitely.

Q.        Okay.  And going to page 89, starting at line 4, the question was:  "When you were at the hospital, did you have contact with any other police personnel, Columbus detectives, or anything like that?"

A.        No.

Q.        And your answer was, "Brenda Walker."

A.        Brenda Walker was the only one.

Q.        Okay.  And so you talked to Brenda Walker at the hospital?

A.        Right.

Q.        Okay.  And then going to line 8, it said:  "When did you see Detective Walker?"

And line 9, your answer was:  "After I took -- after I seen Rick was okay, his nickname is Rick.  After I seen he was okay, Cynthia, his sister, had to go back home because her grandson was there.  So she wanted to get his -- go get his

170

mother so she could come get the baby so we all could go back at the hospital.

In the meantime, I took Cynthia back, and my daughter called. I had Rick's cell phone." I think -- "And my daughter called me and said? Mom, get back down here. The detective wanted to talk to you. So I immediately left her there and went back to the hospital."

Is that what you testified to at trial?

A.     Yeah. But I don't even remember Rick having a cell phone. That's why I took him to his sister's house, because we didn't have a phone.

Q.     I think later in the trial you clarified that he didn't have a phone, so --

A.     Right. And that's what I'm saying. I had to take him out the house because I didn't -- had I had a phone, he would have been there until the paramedics came to 927 and not where I had to take him on Gibbard Avenue, across from his dad. I can't even remember the address.

Q.     But does your trial test -- you were telling the truth at trial?

A.     Yes.

Q.     And so does this refresh your memory

171

that you did talk to Brenda Walker --

A.        Yeah.

Q.        -- the detective, at the hospital?

A.        Yeah.  I do remember her now.

Q.        Okay.

A.        So if what -- my question is:  Is if they went to 927, where it happened, did they do the DNA stuff then and it just didn't come out at the time or -- like I said, I don't know.  I don't recall.  It seemed like to me they would have came to me and said, well, Ms. Curry, we're going to go in your house and, you know, do the detective work or whatever.  They never did that.

So my question is:  Did they do it that morning that it happened or when did they do that?

- - - - -

Thereupon, Exhibit 4 is marked for purposes of identification.

- - - - -

Q.        Well, hopefully, this will help.  I'm going to hand a copy of Exhibit 4, which is the DNA testing, final --

MR. DIRISAMER:  There's a Bates number.

Q.        -- report.  It's Bates No. City 005898.

172

MR. LOEVY: Is there an easy way you can guys could email it to me? We forgot to set up a protocol how we're going to do exhibits. Is there -- is that -- would that be easy or hard?

Counsel?

MS. TANOURY: We could have someone run and email it to you.

MR. LOEVY: I'd appreciate it. It's not -- you know, we've got to just figure out some way to do this, some protocol, because I don't have the exhibit you're showing. Email would be just fine. I'm by my emails.

Are there other exhibits, counsel?

MS. TANOURY: There are. We've already gone through the photo array, the -- I'll probably show her the photo array procedure.

Yeah, there are other exhibits.

MR. LOEVY: Well, I'd appreciate the courtesy of sending them to me, if that's possible, if you have them on a PDF or something.

MS. TANOURY: Yes, we can do that.

MR. LOEVY: Thank you, counsel.

MS. TANOURY: Do you want to go off the record to do that or...

173

MR. LOEVY: Well, I know you've got multiple attorneys there. Somebody could do it while you're talking. I'm not trying to slow this down.

MS. TANOURY: Okay. Well, I -- do you want me to wait to ask about the document until you have a copy of it?

MR. LOEVY: I tell you what, for this one, since it's just the DNA, let's roll through it, and, you know, I'll have it shortly, I assume.

A.      Okay. So it says Richard Horton unexcluded. So --

Q.      Okay. And what I've handed you -- can you identify what the document says.

A.      No. Because I don't understand it.

Q.      Okay. What I've handed you is a copy of the DNA testing that was performed by the Ohio Attorney General's Bureau of Criminal Investigations, and this was done in 2019 at the request of Richard Horton.

I just want you to see the results because -- I want you to see if you see anywhere on the results where it says that the DNA conclusion was that it was Richard Diggs.

174

A.          I don't see that part.

Q.          Yeah.  And this was the final result of the DNA test.

A.          Well, I'm just saying it's not on this paper here.

Q.          Right.  Because that wasn't the conclusion.  There was no -- there was no finding that the DNA was Richard Diggs' from the DNA testing.

A.          So it wasn't Richard Diggs?  It was Richard Horton?

Q.          No.  The DNA conclusion, which you can see -- please take a look at "1.1 Cartridge Case," and then it says DNA conclusion:  "Unknown male - sufficient for comparison."  So it --

A.          It don't say that here.

            Oh.  No, it don't say that.

Q.          Under D...

A.          DNA.  Okay.  Unknown male.  Okay.

            But still, if they did a DNA test in 2018, 2019, or whenever, how in the hell was they supposed to get DNA off of something that happened in 2004 or whenever it happened?

Q.          I understand.

175

A.          I can't even remember the dates. That's what I don't understand.  Why is it so late in the DNA, when the DNA should have came out when it first happened?

MR. LOEVY:  Is somebody working on getting me this exhibit?  Because I still don't have it.

MR. DIRISAMER:  Yes.

MS. TANOURY:  Yes.  We can -- let's just take a pause, then, for a second so you can have the exhibit.

MR. LOEVY:  Thanks.  And I -- you know, to be clear, I'm not faulting you.  We forgot to set up a protocol in advance.  I could have done something about it, too, but it's nice if I'd have them.

MR. DIRISAMER:  Jon --

THE VIDEOGRAPHER:  We are --

MR. DIRISAMER:  -- this is David Dirisamer.  I'm told that you should have it in your email, so I don't know if it's -- maybe it will be there in the next five or ten seconds.

MR. LOEVY:  Oh, it just showed up. There it is.  Doug Girard.  Got it.  Thanks, guys.

176

But that is just this exhibit. If you were going to -- you can obviously just them as you roll on. I appreciate it. That's fine.

THE WITNESS: Is that...

THE VIDEOGRAPHER: We are still on the record. Do we still want to go off the record?

MR. LOEVY: Let's stay on the record. It's working.

MS. TANOURY: Okay.

MR. LOEVY: I got the exhibit.

MS. TANOURY: Okay.

BY MS. TANOURY:

Q. So the conclusions from this were that an unknown male was on the DNA?

MR. LOEVY: Well, objection.

A. So where they do come up with Richard Diggs at?

MR. LOEVY: Well, hold on. Hold on. Objection. It says -- the conclusion was an unknown male, but Richard Horton was excluded. That was the conclusion.

A. Right. So I'm still confused --

Q. I understand.

A. -- of how -- I mean, why did they wait

177

so long to get the DNA out?  If it -- you know, I mean, I'm just saying, I don't get this.  I don't get none of this at all.

Q.          I understand.  And I just want to -- I just -- I'll just clarify again.  Were you told that the results of this DNA testing --

A.          No.

Q.          -- was that --

A.          I was not until this day.  Until the other day, until Ms. Martinez --

Q.          And were you --

A.          -- said the DNA -- no.

Q.          Were you told that the DNA conclusion matched Richard Diggs?

A.          No, I was not.

Q.          Okay.

A.          Not until Ms. Martinez and Ms. Cindy came to my house and sit on my front porch --

Q.          Okay.

A.          -- in the steaming heat.

Q.          And did they tell you that the DNA conclusion matched Richard Diggs?

A.          No.

Q.          Okay.  What did they -- what did they

178

tell you?

A.            They said it was Richard Diggs.  Yes, they did.  They said the DNA matched Richard Diggs and not Richard Horton.

Q.            Okay.

A.            That's the first I ever heard of that name of the DNA and all that, that day.  It was September -- I can't -- Ms. Martinez can probably tell you the day.  I don't know.  I can't remember the day, but I know it was here recently.  And then that's when I received the sum -- the thing to come to court, the one I got in my purse right now.

Q.            Okay.  Understood.  I just want -- I just want -- because I know you had questions, I wanted to you see what the conclusions were, because the conclusion does not match to Richard Diggs.

A.            I'm sorry it don't, but I -- like I said, how did Richard Diggs' DNA get in my house?

            MR. LOEVY:  Objection.  Asked and answered at this point.

A.            Yeah.  I mean, I just -- I don't understand none of this.  But like I said, he done

179

it. I don't care what you do to him -- what y'all do or whatever. I just want this to be done today. I don't want to hear no more from the City of Columbus of this here situation. I really, honestly don't.

I hate to be rude and nasty, but it's just -- you know, like I said, it's just bringing up old memories. Let sleeping dogs lie, honey. That's the way I see it.

Q.      Okay. I understand that this is not easy to be here at all, let alone to talk about something as difficult as this situation. So I understand your frustrations.

Okay. We -- earlier, you were discussing putting a pillow over your face during the robbery. When did you put the pillow over your face?

A.      When he asked me, bitch, why you keep looking at me?

Q.      Before he did that, did you have an opportunity to see the robber?

A.      Yes.

Q.      Okay. And about how many times do you think throughout the incident you were able to see

180

his face?

A.          About three or four, because like I said, when he came in the door and when he hit Rick, I kind of scooted up in the bed.  I wasn't laying down no more.  I kind of sat up, you know, and I grabbed a pillow.  I said, oh, my God, you know, like that.  I said, what is going on?  You know, and that's when, like I said, Rick fell.

Q.          Okay.

A.          You know, and I seen the gun.

Q.          And you also earlier testified that you saw the gun pointed at Rick's leg?

A.          Uh-huh.

Q.          Okay.  And he was, in fact, shot in the leg, correct?

A.          Uh-huh.

Q.          Okay.  So during that time, were you able to get a good look at the robber?

A.          Yes.

Q.          Okay.

A.          His eyes.  His -- like I said, his eyes, his color, his skin.

Q.          Okay.  And can you describe, I guess, everything that you remember about what the robber

181

looked like.

A.      Mainly, his eyes, like I said, and the gray hoodie and them jeans.

Q.      Okay.

A.      I don't know -- I didn't see the shoe -- you know, what kind of shoes he had on.

Q.      Okay.  Is there anything else you remember about the robber's physical appearance?

A.      No.

Q.      Okay.  Do you recall mentioning height and skin color as well?

A.      Like I said, his skin color was very light.

Q.      Okay.

A.      His height -- he may have been an inch taller -- shorter than Rick or maybe the same height, you know.  Like I said, I don't know, but I know he was tall.

Q.      Did you recognize the robber's voice at all?

A.      Yeah.  Kind of, sort of, I did.

Q.      Okay.  And how did you recognize the voice?

A.      Just when he said, bitch, quit looking

182

at me.  What you looking at me for?  However he said it.  I can't say the exact words, you know, how he said it, but I know he told me to quit looking -- he said, why are you looking at me? Quit looking at me.  You know, bitch, quit looking at me, you know.

Q.        And who did you recognize the voice to be?

A.        Richard Horton.

Q.        Okay.  Did you notice if there were any tattoos on the robber?

A.        No.  He had on -- it was a long-sleeve hoodie.

Q.        Okay.  Were the only people at the house at the time of the robbery you, Richard McClanahan, and your sister, Shelly Curry?

A.        (Indicates affirmatively.)

Q.        Okay.

A.        Yes.  I'm sorry.

Q.        That's okay.

          And did your -- have you had conversations with your sister Shelly about this?

A.        Absolutely.

Q.        Okay.

183

A.          That's my sister.

Q.          Did she know Richard Horton?

A.          No.

Q.          Okay.

A.          She lived in Huntington.  She was here visiting me.

Q.          Okay.

A.          I think we were going -- we were supposed to do something.  At the time, my mother living here as well.  I think we was going to do something with our mother and our oldest sister or something, and she came.  Well, she surprised me, because I didn't think she was going to make it, and she came.

            And I want to say my daughter picked her up in the bus -- I don't know.  However it went, you know, we got together anyway that night, you know.  Like I said, we was chilling, because we was supposed to do something either that next day or the next -- you know, something with my mom and my sister.  I can't even remember what it was.  But that's why she was up here, because she had moved back to West Virginia.

Q.          Okay.  So did your sister -- so she

184

didn't -- did she see anything?

A.         She just heard the ruckus.  And like I told them, I told -- whoever it was that was going to try to go to her house, I advised them don't go.  Well, here recently, she just fell and broke her hip and her elbow.

So I told Ms. Martinez, you know -- I don't know how they got her address, because she had moved several times since that happened.  How they got her address where she is now, I don't know, but I advised them don't go to her door because you're going to have a problem.  Y'all can't do nothing to her, because she's going to give you the business.  I said, not only her, her daughter, because her daughter takes care of her.

She's not in the best of health, you know.  And like I said, she couldn't tell you nothing no way because she wasn't there.  Like I said, once she heard the ruckus, there was a door -- from the kitchen to that room, there was a door.  She eased that door shut --

Q.         Uh-huh.

A.         -- you know --

Q.         Okay.

185

A.      -- so he wouldn't even come back there. Like I said, when he left, he didn't go out the side door because he would have to lift that board.  When I took Rick out that side door, I had to take the board off the door to open the door. So he went back out the front door.  Where he went after that, I don't know, but what he did to my dog for my dog to stop barking for him to even get up on the porch was a mystery to me at that.

Q.      Okay.  So other -- so you were the only three at the house during the robbery?

A.      Yes.

Q.      When you took Richard to his sister's house before you called the paramedics, was there anybody else at his sister's house?

A.      His sister and -- well, she had smaller kids as well, but she had her grandson.  He was just a baby.  I would say he was walking, maybe, you know.  But her daughter and her other little boy was there.  So they had him while Cynthia went, you know, to do what she needed to do, you know.

Q.      Okay.  So was it just Cynthia and then the kids?

186

A.        Yeah.

Q.        Okay.  And has Cynthia also passed --

A.        Uh-huh.

Q.        -- at this time?  Okay.

And was Cynthia's address at the time -- I just want to confirm it -- 1425 Gibbard?

A.        Uh-huh.

Q.        Does that sound right?

A.        And their father stayed across the street, which -- that was his house, too, that Cynthia stayed in.  And their dad stayed across the street, which -- he passed prior to that getting done to Rick, because if he hadn't had of, oh, Lord, he'd have killed him, probably, you know.  But he had passed the year before that.

Q.        And just to clarify now, before we went over your trial testimony of going back to the house and it being roped off, at this point, do you remember talking to anybody when you were -- went back --

A.        I don't --

Q.        -- to 927 Loew Street?

A.        I don't even remember the house being roped off or none of that.

187

Q.      Okay.

A.      I don't remember none of that.

Q.      Okay.  So I'm guessing, then, the answer's "no," but do you remember talking to an officer, Pam Rhodeback, at all?

A.      No.

Q.      Okay.

A.      I don't even remember what I had for breakfast yesterday, and you're going to ask me something that happened 20 years ago?

Q.      Is the only person from the Columbus Division of Police you remember talking to Brenda Walker --

A.      That's --

Q.      -- the detective?

A.      That's it.

Q.      Okay.  Did you ever talk to a detective, Sam Sias, a male detective?

A.      I don't remember.  If I did, I do not remember.

Q.      Is the --

A.      But I do remember Brenda Walker.

Q.      Okay.  So we talked about talking to her at the hospital.  I'm going to turn to page 91

188

of your trial testimony. On page -- or on line 7, it says: "Did you have an opportunity to meet with the detective in early December several weeks after this happened?"

And your answer was: "Yes, sir."

And then the question was: "Okay. Do you remember where that meeting occurred?"

Answer: "Yes, sir."

Question: "Where was that?"

Answer: "1250 Indianola Avenue at my daughter's house."

Question: "And what occurred at this meeting with Detective Walker?"

At line 18, answer: "She came in, and she talked -- asked how Rick was doing and everything, and we talked to her. And so she said I want to show you guys a picture, you know."

Line 21. Question: When she talked to you, showing -- "When she talked to you showing you a picture, were you and Richard McClanahan together at this time?"

23. Answer: "No. No."

24. Question: "How did she show it to you?"

189

25. Answer: "I was going to the store to get cigarettes, I said, I will go ahead and go. She said, you can leave the room. I said, no. I was going to the store anyway. But I knew she was coming. I was trying to go before she came and get back. So I said, I'm going to the store.

So I went to the corner store, which is maybe six, seven houses down the street. And I walked and, you know, came on back. And she said, Rhonda, she said, I want to talk to you. She wanted me to see the picture. She said Richard already showed me his, you know. She already done his. So I don't have no idea what he done or who he picked or nothing, you know."

Does that -- so I ended on page 92, line 11. Does that refresh --

A.          Yeah, it does.

Q.          -- your memory of --

A.          Because like I said, when Rick identified --

Q.          Sorry. Can I just --

A.          Oh, sorry.

Q.          I just want to finish.

Does that refresh your recollection --

190

A.      Yeah.

Q.      -- about meeting with Brenda --

A.      Yeah.

Q.      -- in December --

A.      It does.

Q.      -- of 2004?

A.      Yeah.

Q.      Okay.  And can you tell me about that meeting.

A.      So like I said, she asked me -- you know, like I was going to -- because she -- I think she phoned -- I think by then, I had got a cell phone.  I can't remember.  I don't know if my daughter had a house phone or what.  But I remember her reaching out and saying that she was coming to talk to me and had some photos, and I said, okay.  I think Rick was -- what day was it? Rick came home...

Q.      December 4th, 2004.

A.      So if this happened in October -- I think he came home, like, the middle of November, maybe.  And I was -- like I said, I was going to the store to get cigarettes so she could talk to him by himself because she said, you know, she has

191

-- she can't do us together.  I said, okay.

So when she came back -- when I came back, she had already done Rick, and she done me as well, you know.  And like I said, while we -- you know, she said, wow.  Y'all picked out the same person, you know.  So like I said, I know it was him.  I just -- like I said, deep down inside, I will die and go to hell to this day saying that it was him, and it was him.

Q.        Do you still have Exhibit 1 in front of you?  It was the photos.

A.        No.  I don't know what I did with it. I might have -- oh.

Q.        Let's take a look at Exhibit 1.  Was this what Brenda Walker showed you on December 4th, 2004?

A.        I want to say it was in a different form.  I want to say it was -- it wasn't two rows. It was just one.  I can't remember, but I know I picked him out of the lineup.

Q.        Okay.

A.        I can't remember.  It may have been this, you know -- the same, but it was just, like, one row.

192

Q.          If you testified at trial that that was the photo array that you were shown, would you have been telling the truth at trial?

A.          Yeah.

Q.          Okay.

A.          Yeah.  I mean, like I said, it was the same photo.  It was just formed different.  I don't know if it was a Xerox machine or whatever it was, but I remember it being two rows -- I remember it being in one row.

Q.          Is that your signature at the bottom of --

A.          Yes, it is.

Q.          And where is your signature located?

A.          Right here (indicating).

Q.          And what picture is that?

A.          Richard Horton.

Q.          And what number is that?

A.          9:27 A.

Q.          Or --

A.          Oh, a.m.  What picture number is it?

Q.          Yes.

A.          2.

Q.          Is it --

193

A.    It says 2 right here.

Oh, 3.

5.

Q.    Sorry.

A.    I --

Q.    Where your signature is --

A.    Right.

Q.    -- what number is --

A.    5.

Q.    Okay.  And then that's your signature next to the number 5 --

A.    Yes, it is.

Q.    -- Rhonda Curry?

And the date is 12-4-04?

A.    Uh-huh.

Q.    And the time was 9:27 a.m.?

A.    Uh-huh.

Q.    Okay.  And is that when Detective Walker showed you the picture?

A.    Yes.

Q.    Did she ever show you a picture any other time?

A.    No.

Q.    And this was the only photo?

194

A.            That's the only one I can recall, yes.

Q.            Okay.  And when she showed you this, was there a name on the photo or was it just the pictures?

A.            No.  It was -- it was just the picture. I knew his name by then.

Q.            Okay.  But I just want to clarify from earlier when you testified.  So Brenda Walker never -- when she showed you the pictures, she never -- there were never names on the pictures?

A.            No.

Q.            Okay.  And this was the only time -- this date on September 4th, 2004 was the only time she ever showed you any pictures?

A.            Uh-huh.  That I can recall.

Q.            Okay.

MS. TANOURY:  Jon, do you have the investigative photo array procedure form?

MR. LOEVY:  I don't think I do.

MS. TANOURY:  Okay.  Let's take a quick break, then, so I can make sure you have all the other exhibits before we keep going.

MR. LOEVY:  Okay.  Thank you.

MS. TANOURY:  Okay.  Thank you.

195

THE VIDEOGRAPHER:  We are off the record.  The time is 1:44.

(A short recess is taken.)

THE VIDEOGRAPHER:  This marks the beginning of media No. 4.  We're back on the record.  The time is 1:52.

BY MS. TANOURY:

Q.        Okay.  I'm going to hand you what has been marked as Exhibit 5, which is the Columbus Division of Police investigative photo array procedure.

- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.

- - - - -

Q.        Ms. Curry, do you recognize your signature on this document?

A.        Yeah.

Q.        Where is that?

A.        Right here, on viewer's signature.

Q.        Okay.  And that is your signature?

A.        Yes.

Q.        And the date is December 4th, 2004?

A.        Uh-huh.

196

Q.    At 9:27 a.m.?

A.    Uh-huh.

Q.    And under viewer statement, it says that you pointed to photo 5.  "That's him." "Describe level of certainty."  I swear on everything I love he's the one.  I recognize the eyes.  I know those eyes.  It's him."

Is that what you --

A.    Yes.

Q.    -- said?

Is that -- would you agree that that's an accurate description of how the photo array procedure went?

A.    Yeah.

Q.    And those were the things that you said after you identified him?

A.    Yes.

Q.    So you swear on everything you -- everything you love that he is the one still?

A.    Uh-huh.

Q.    And you still recognize that those were his eyes?

A.    Yes.

- - - - -

197

Thereupon, Exhibit 6 is marked for purposes of identification.

- - - - -

Q.        Okay.  I'm going to hand you what I'll mark as Exhibit 6.  Now, this is the same form, but do you -- this is the Columbus Division of Police investigative photo array procedure form.

Do you recognize the signature under viewer signature there?

A.        Richard McClanahan, Jr.

Q.        Okay.  And is that how -- is that Richard McClanahan's signature?

A.        Yeah.

Q.        And how do you recognize that signature?

A.        Because he never -- he would always print "JR."  He never made a capital "JR."  He always made it just like this.  Always.

Q.        Okay.

A.        That's why I start laughing.  Always.

Q.        Okay.  So you're certain that that's his signature --

A.        I'm certain.

Q.        -- under the viewer statement?

198

A.         I'm certain.

Q.         Okay.  And I am going to hand you what we'll mark as Exhibit 7.

                - - - - -

           Thereupon, Exhibit 7 is marked for purposes of identification.

                - - - - -

Q.         And this is the -- another six-pack.

A.         Same one.  No. 5.

Q.         And do you -- can you identify the signature on --

A.         Yes.

Q.         -- No. 5?

A.         It's the same as this right here.  I told you he always put "JR."  He never wrote it.  He always printed it.

Q.         Okay.  So who's signature is that?

A.         Richard McClanahan, Jr.

Q.         Okay.  And that says December 4th, 2004 again?

A.         Uh-huh.

Q.         Okay.  Did Detective Walker say anything to you when she showed you these photographs?

199

A.          She just said, can you put -- can you pick him out of these photographs?  And I said, yeah.  Him.

Q.          And when she said pick him, who -- was she referring to the robber or who she was referring to?

A.          The one who did the assault or whatever that came in my house.  And I said, yes, him.

Q.          When you first met with Detective Walker, did you provide the name of the robber?

A.          I can't remember.

Q.          Okay.  What do you remember about what Detective Walker said to you when you met with her?

A.          She just asked me about the gun.  Did I see the gun?  She said, did you see what kind of gun he had?  And I said, yeah.  I remember it being silver.  And like I said, she kind of sketched the picture of, you know, the shape of the gun, and I said, I want to say -- that's the shape of it, I want to say.  But I do remember the gun being silver.  A silver -- it was kind of big handgun.  It wasn't small.  It was about this big (indicating), and it was silver.

200

Q.          Okay.  Do you remember Detective Walker saying anything else to you about -- saying anything else about the robbery when you met with her or was she just asking you questions?

A.          She was just asking me questions.  I mean, you know, like I said, she asked me about the gun, and then she said -- I want to ask -- I want her to -- I wanted to know.  I wondered if she was asking me, did I know who he was at the time?  I can't even remember.  I can't remember what all she said.  I just know we talked about the gun.

Q.          Okay.  Do you recall talking to Detective Walker about Tracy McClanahan selling a car to Richard Horton?

A.          No.  And I don't know where that even came up at, because didn't nobody know he even had a niece named Tracy.  Not no detective, no way.

Q.          You don't remember talking to --

A.          No.

Q.          -- the detective about that?

A.          No.  Like I said, when I talked to Tracy, it was me and Tracy.  When I asked her about the name, you know, did she know, you know

201

-- did she know -- did she know the name?  Like I said, she had a yearbook, because my daughter -- I don't even think she knew his last name.  Like I said, she said Adidas man --

Q.        Okay.

A.        -- when, you know, they was talking about Richard.  So I said, I've got to find out his last name.

Q.        And what does Adidas man mean to you?

A.        I don't know.  I'm guessing he wore Adidas.

Q.        Okay.  So you don't recall you or Richard McClanahan ever talking to the detective about knowing Horton from him purchasing a car?

A.        No.  Ricky -- like I said, he worked on cars, but I never know him to sell a car.

Q.        Or the niece sold the car?

A.        No.  Because she would have contacted her uncle first, because she knew he worked on cars.  So, no, not at all.  I don't even know where that came -- now, if -- listen, if he did buy a car from Tracy, it was way before me and Ricky even met, because like I said, they all lived in the same area.  Tracy, at the time I met

202

Rick, she was living on Lexington, okay?

Q.        Okay.

A.        Lexington is right around the corner from Second Avenue and Star Avenue.  You know what I'm saying?  It was across Fifth Avenue.

Q.        Uh-huh.

A.        So where you cross Fifth Avenue back this way, you're on Second, Third.  You know what I'm saying?  So it was all in the same area, but Tracy is older than my daughter.  So I don't know if she had dealings with him, you know, during that time or -- I don't know.

But like I said, it had to have been way before if she did even try to sell him a car or whatever.  But if she did while me and Rick was together, it was between her and Rick, because he worked on cars.  So she probably asked him, well, Rick, can I sell this car for such-and-such price?  You know, whatever.  Like I said, I never heard nothing about no car sellings or nothing.

Q.        Okay.  Do you -- were you at the whole criminal trial?

A.        Yeah.

Q.        Okay.  And do you remember Rick

203

testifying about -- he knew Richard Horton because Horton bought a car from his niece?

A.        No.

Q.        Okay.

A.        I wasn't in the -- I wasn't in there when he was on trial.  I don't think I was.

Q.        You weren't in there when Richard Horton was on trial?

A.        Right.

            MR. LOEVY:  Well, objection.  She would have been excluded from other witnesses testifying.

A.        Yeah.  I wasn't in there when he was on trial.

Q.        Okay.  I'm going back to your testimony on page 99.  When you were being examined by Richard Horton's attorney, Mr. Schwartz, you were asked, on line 14:  "Have you had any contact with Mr. Horton?"

            You answered:  "Not -- not at that time.  Maybe years prior to that."

A.        What was it?  99?

Q.        I'm sorry.  Page 99, line 14.

A.        Okay.

204

Q.        When he asked have you had any contact with Mr. Horton, you said, "Not -- not at that time.  Maybe years prior to that."

And then the question was:  "How did you know him years prior to that?"

And the answer was:  "He bought a car from Rick's niece."

A.        I don't remember saying no stuff like that.  I don't know where that came from, because like I said, this is the first I ever heard about a car by -- anything about a car, with Rick involved with a car, selling it to niece, or buying it from his niece or however.  This is the first day I've ever heard about that, too.

Q.        Okay.

A.        Like I said, my memory is not that bad where -- I would know whether they talked about buying a car or selling a car or not.  But let me just clear this up, because -- when I got on the stand and he said something -- I don't even remember him asking me a question about this.  I said drugs.  We bought -- so Rick said, Rhonda, why did he tell him drugs?  I told him we didn't do drugs.  I said, I wasn't going to lie, because

205

I didn't know nothing about no car.  And I didn't, you know.

So maybe that's why they said I said about a car.  I don't know nothing about no car, and didn't know nothing about a car.  I didn't even have a car.  So why would I say Rick sold him or his niece sold him a car when I didn't know nothing about it?  You know what I'm saying?  If they did it, they did it between them three, not me.

Q.        Okay.  This -- I'm looking at your testimony here when you said you knew him from -- he bought a car from Rick's niece.  So are you saying that's not accurate?  You knew --

A.          No.  No.  Because I don't even remember saying that.  And that's the truth right there.  You can give me a truth serum right now.  I don't remember saying nothing about no car.  Like I said, my memory has slipped a little bit, but I sure don't remember talking about no car.

Q.        Okay.

A.          And if he did sell him a car, why would he come back and shoot him?  That's -- I don't understand none of this.  I wish to just hurry up

206

and get this over with so I can get out of this place, because I'm getting a headache right now, and I'm getting upset.

Q.          I understand.  I'm sorry we have to go over this.

So this is your testimony, and so -- is it your memory now that you testified that you knew Horton from --

A.          Drugs.

Q.          -- drugs?

A.          Not a car.

Q.          Okay.  So when Brenda Walker, the detective, showed you the photo array, you were separated from Mr. McClanahan?

A.          Excuse me?

Q.          When Brenda Walker showed you the photo array --

A.          Uh-huh.

Q.          -- that we were talking about, you were separated from Mr. McClanahan?

A.          Yes.

Q.          Did the detective do or say anything to try and suggest the name of the robber or which picture you should identify?

207

A.          No.

Q.          Okay.  At any point when you talked to the detective, did she ever do or say anything to suggest who the robber was --

A.          No.

Q.          -- to you?

Were you always adamant to her who the robber was?

A.          Yeah.

Q.          And was that Richard Horton?

A.          Uh-huh.

Q.          Did the detective do anything at all to influence who you picked out of the group of photos?

A.          No.

Q.          And you're still certain that the person you picked in the photos was the robber?

A.          Yes.

Q.          And, again, when you testified at trial, you saw the robber in the courtroom, correct?

A.          Uh-huh.

Q.          And --

A.          I saw him in the hallway or whatever.

208

I wasn't in the courtroom when he was in there.

Q.        When you were on the stand testifying, were you asked to identify --

A.        Yes.

Q.        -- the robber in the courtroom?

          And were you able to do that?

A.        Yep.

Q.        And was that Richard Horton?

A.        Yes.

Q.        Do you have any doubt in your mind that Richard Horton was the robber on October 9th, 2024 --

A.        No.

Q.        -- at 927 Loew Street?

A.        I'm not.

Q.        I'm sorry.  I...

A.        No.

Q.        -- was the robber on October 9th, 2004 at 927 Loew Street?

A.        Do I have any doubt that --

Q.        Yes?

A.        -- it was him?

          I don't have a doubt.  I know it was him.

209

Q.    Okay.  There was a mention of Richard McClanahan's nickname being Slim.

A.    Not that I know of.

Q.    Not that you know of?

A.    Uh-huh.  I always knew it was Rick.

Q.    Okay.

A.    Now, maybe some of his friends or whatever he did, you know, prior me meeting him -- like I said, I don't even know if he knew Richard before we met or not.  I don't know.

Q.    Okay.  How -- you said that you had met Richard Horton, you said, what, a handful of -- how many times?

A.    Just like a handful.

Q.    Okay.

A.    You know, I didn't meet him.  I was just dealing with him, you know.

Q.    Okay.  Do you know how many times that Richard McClanahan had dealt with him?

A.    No, I do not.

Q.    Do you think --

A.    Like I said, I don't know.  If he dealt with him prior to us getting together, I don't know, because he was out there way before I was.

210

Like I said, I was working at the convention center.  I was doing me by my -- you know, I didn't have nobody.  You know, I just -- like I said, I get me a little -- whatever and go home, after work, chill, do my little stuff, go to bed, get up and go to work the next day.  That was me. I wasn't a street person.

Q.          Uh-huh.

A.          I was a home person, but I did my own thing.  So once I got with him, you know, we did it together, which -- we was never out in the street.  We just did it, you know, at home.  But like I said, prior to me meeting him, I don't know what he done.

Q.          Okay.

A.          I can't say yea or nay on that.

Q.          So you don't know if he, even during the time that you knew him, dealt with Richard Horton more or less than you did?

A.          He -- about the same.

Q.          Okay.

A.          About the same.

Q.          So do you remember when you first met Richard Horton?

211

A.          Probably when we moved on Loew Street. Like I said, we lived beside his dad for a couple years when we lived on Joyce Avenue, that -- his dad had a house out there across from Joyce.  We lived out there for maybe five, then we moved to Loew Street.  So that's when, you know, like I said -- in the area, you know.

Q.          Did you know where Richard Horton lived?

A.          I didn't know if he even had a house.

Q.          Okay.

A.          I just knew where he hung out at.

Q.          And where did he hang out?

A.          On Star Avenue or Second or over in there off of St. Clair.  Over in there, you know.

Q.          Was it a specific house or --

A.          It was a house.

Q.          Do you know what the house looked like?

A.          I couldn't tell you now.

Q.          Okay.

A.          Mostly, it was the street.

Q.          In the street?

A.          He was always out on the street.  You know how guys hang on the corner.  Well, it was

212

mostly on the street.

Q.        And that was Star and --

A.        Between Star and Second and St. Clair, all around in that area.

Q.        So you don't remember any car purchase between Richard Horton --

A.        No.

Q.        -- and --

A.        No.

Q.        -- McClanahan?

A.        No, again.

MR. LOEVY:  Objection.  Asked and answered.

Q.        And for Tracy McClanahan, do you know her current address?

A.        No, I do not.

Q.        Okay.  Do you recall whether Richard Horton had ever been at 927 Loew Street prior to the robbery?  Was he ever at your house?

A.        Not that I know of, no.

Q.        Okay.

A.        Not by me inviting him or Rick, no. No.  No.  Like I said, we didn't have no one to come there.  We went to them.

213

Q.        Uh-huh.  You had mentioned some friends -- that you thought were friends of Horton.

(Ms. Feldkamp joined the videoconference.)

A.        Yeah.

Q.        Had they been at your house before --

A.        I told you.

Q.        -- the robbery?

A.        Kyle Ramsey had came there because they lured him to get -- come there, saying they was going to give such-and-such amount, him and his nephew.

Q.        Okay.

A.        And they end up take -- you know, just, like, strong-arming him, taking it.  They didn't harm him.  He didn't harm them.  But then he said, I'm going get you, MF-ers, you know.  I'm going to get both of y'all, you know.

Q.        Uh-huh.

A.        Well, his nephew, he moved on somewhere.  I don't even know where he is now. And, you know, like I said, then shortly -- maybe three or four months after that happened.

So that's why, you know, when it

214

happened -- and I saw him, you know, and he kept -- stop looking at me. Stop -- you know, bitch, why you looking at me? Why you looking at me? It was him, because I figure by him and Ramsey guy being in cahoots, he told him to come in there and do it, you know.

Because like I said, when he came in -- and then he kept saying, where the money at? Where the money at? He's wanting that money for -- to get to pay to his buddy, you know, I guess or whatever. I don't know. But that's what he kept saying. Where's the money? Where's the money?

You know -- so he purposely came there to rob him, and, like, I guess Rick was putting up a fight, you know, because, like, when he hit him with the gun -- I think Rick tried to swing on him or something, and that's when he pushed him down. He didn't fall. He pushed him down and put that gun to his leg and shot him.

Q.      Do you recall ever having a conversation with Richard McClanahan about the evening before the robbery?

A.      No. I remember him saying, yeah, these

215

niggas trying to get my money.  You know, I told him I don't give no niggas no money, because it breaks up a friendship.  I said, who?  And he said, that damn Richard, you know.  And I said, oh, yeah, like that.  I said, where was you, at the store?  He said, I probably was at the store getting some beer, but he went to use the phone and pulled out his money to get to the change, I guess, or whatever.

Q.          And when did he tell you that, about that interaction?

A.          That evening, you know.  Like I said --

Q.          That evening?

A.          -- that evening.  He drunk beer every day.  I mean, like I said, he didn't smoke every day, but he drank his beer every day.

Q.          So he told you about that interaction with Richard --

A.          Yeah.

Q.          -- on the night before the robbery?

A.          Yeah.

Q.          Okay.  And --

A.          So he knew Rick had some money because he saw it.  So that's -- like I said, when he came

216

in the door, he just kept saying, man, where the
money at?  Where the money at?  You know, because
he seen Rick with that money.  But, see, little do
he know, Rick had gave me the money, and he just
kept some money in his shoe, you know.

Q.        So on the night before the robbery,
Rick told you about the interaction with --

A.        Yeah.

Q.        -- Richard --

A.        Yeah.

Q.        -- at the corner store?

          And do you know what corner store that
was at?

A.        Over an Fifth Avenue.  The little spot
right there across from the little car place that
fix cars.  Right there when you turn off of
St. Clair.

Q.        Do you know what it was called?

A.        I can't remember.

Q.        Okay.

A.        But that was the store he went to all
the time.

Q.        On Fifth and St. Clair?

A.        Yeah.  Well, it wasn't right on

217

St. Clair, but like I said, when you turn off of St. Clair either way, there was a store that sit over there. It's still there, as a matter of fact, you know, but it's -- you know, I don't know. I don't remember the name.

Q. Okay. And when he said "Richard" in that interaction, did you take him to mean the same Richard Horton?

A. No. Because that's the only Richard we knew. That's the only Richard I knew.

Q. Okay.

A. And I said, what did he want, to try to sell you something? He said, yeah, but I wasn't interested in that stuff, you know. I'm trying to get this bill paid. That's why I said we didn't do nothing, you know. He would have got it. I mean, even by him just standing there, he wouldn't have had to go get it.

So he said, no, man, he said, I ain't want -- you know, he didn't say that. He just asked him for money, you know. So like I said, either he was trying to get some money from Rick or wanting to sell some -- you know, then he was going to -- I've got that -- you know, whatever.

218

You know what I'm saying?  So Rick said he wasn't interested, so he just went on.

Q.        Okay.  I'm sorry.  I think I asked a bad question.  I was just trying to say:  When he told you that story and he said the name Richard, who did you think he was talking about?

A.        I don't know.  He just said Richard.

Q.        Okay.

A.        So like I said, the only Richard we knew was Richard Horton.

Q.        Okay.

A.        And his dad, like I said.  He was already deceased.

Q.        Other than that interaction where you said you saw Richard Horton at the courthouse, did you have any other interactions with him --

A.        No.

Q.        -- after the robbery?

A.        No.

Q.        Okay.  Did Rick ever mention any other interactions that he had with Richard Horton after the robbery?

A.        No.

Q.        Okay.  Did you ever see, like, a note

219

that contained a phone number and a name on it at any point?

A.        No.

Q.        Okay.

A.        Why?  Where did that come from?

Q.        I'm just asking you if you ever saw --

A.        No.

Q.        -- if you ever saw it.

A.        No.  Because like I said, we moved out of the area.

Q.        Okay.

A.        And we was totally out of the area until we moved where we at now, which is Old Leonard.  We moved out of that area, period.  We was in the Short North.

Q.        Okay.  Where were you living, then, in the Short North?

A.        On 1250 Indianola Avenue.

Q.        Okay.  I'm going to mark this as Exhibit 8.

                    - - - - -

          Thereupon, Exhibit 8 is marked for purposes of identification.

                    - - - - -

220

Q.          It's very blurry.  This is --

A.          Hell no.

Q.          Have you ever seen this before?

A.          No.

Q.          Okay.  Did Rick ever tell you about any conversations that he had with Richard Horton before the trial, like, if Horton ever --

A.          No.

Q.          -- reached out to him or anything like that?

A.          No.

Q.          Okay.

A.          I don't believe so.

Q.          So as far as your -- you know, there was no -- you don't know of any communications between Richard Horton and Richard McClanahan --

A.          No.

Q.          -- after the robbery?

A.          No.

Q.          Okay.  Have you seen Richard Horton since he was released from prison?

A.          I want to say I was on -- I catch No. 9, which is caught at Brentnell, and I catch it right -- I go through the alley from my house

221

and go to Fifth Avenue.  I don't have to walk all the way around the block.  And I get on it right there at Old -- well, Leonard Avenue, and there's a bus stop right there on St. Clair and Gibbard.

Well, this man got on the bus, and I sit in the handicap spot.  And I kind of looked up, you know, and glanced and, like, my heart dropped.  And I said, oh, my God, and I instantly got nervous.

So me not knowing nobody, you know -- I'm like, everybody at work or whatever.  I called my son, and he said, Mom, what's up?  And I told him.  And he said, well, stay on the phone with me.  I said, I'm just praying that he don't get off at the same bus stop as -- I'm not 100 percent certain that it was him, but when he sit down, like, in a seat -- there was a space, and he sat down in that next seat, which -- he shouldn't have sat in the handicap spot.

But the stare.  I could feel him staring at me, you know, just like, I see you now, you know, something like that.  I see you now, you know, something.

But like I said, I was scared to even

222

look directly at him, because like I said, when he got on the bus, it really looked like him.  He just had grew a thick beard.  So I'm like -- I'm still talking on my phone.  He said, Mom, he said, just hold on.  Hold on.  I'll tell you what to do.  When you get off this bus and you hang up with me, if he does get off at that same stop, call 911.  I said, okay.

He said, Mom, he said, are you -- oh.  He said, I can't get there, you know.  I'm in West Virginia.  But he was the only person I could call to comfort -- you know, comfort me.  And, you know, so I'm like, okay, you know, I'm good.  He said, Mom, he said, but if he don't get off the same bus stop, will you call me right back?  And I did, you know.  I said, no.  I said, thank God he didn't, you know.

So I was cool, but I haven't seen him since.  Like I said, I'm not 100 percent sure it was him, but when I glanced and looked, I'm like, oh, my God, you know.  And then like I said, the vibes that I got and -- after him sitting down, the vibes that got it and the way he was staring at me, you know -- I mean, I don't look no

223

different from anybody else.  He was staring at me like he -- I was a piece of meat.

You know, so that vibe -- it just gave me bad vibes.  You see what I'm saying?  So, no, actually, I haven't had that interaction, you know, no more.  And it was maybe -- I would say it would probably be about -- it might have been the end of last year, you know.  Like in the fall, you know.  Because like I said, I'm getting on the bus, and I go.  I catch COTA.  I go everywhere, you know, on COTA.

Q.       Yeah.

A.       So, you know...

Q.       Has he attempted to contact you at all?

A.       Not that I know of.

Q.       Okay.

A.       And I'm so glad he haven't, because I swear on everything I know and love I'll be on trial next, because I'm going to kill him.  If he say anything to me, by my nerves being the way they are and I can get a firearm -- for being in an armed robbery, I might just get me one.

My dad said, Rhonda, it ain't that easy.  I said, I got friends that work at Vance

224

that will give me -- I'm telling you, you know --
and I have thought about it before, because now
that my -- you know, because my grandkids done got
older, you know, and stuff just happen. And I'm
like -- it's just women in our house now, you
know. And I just -- I really have thought about
it.

But I'm going to tell you something. I
get so nervous. When any of them leave and they
not at home at a certain time, I'm worrying. When
they go out to empty the trash, I lock the door.
I'm just -- you know, like I said, I still fear
him, you know, and I'm not lying. Like I said, if
I'm ever driving, Lord help me.

I mean, that's my feelings. I can't
change my feelings toward nobody, you know. But
like I said, after this, I -- you know, I don't
ever want to see him again.

Q.        I understand. How far -- you talked
about this convenience store on Fifth and
St. Clair. The convenience store on Fifth and
St. Clair, about how far was that from your house?

A.        Like I said, you could -- here's my
house, and it was like gravel, you know, right in

225

here (indicating).  And you can come from Gibbard -- like, when you come down the street to my house, it was a street.

Q.        Uh-huh.

A.        But then when you turn in, it was, like, an alley-like.  You can take that alley and curve and curve and curve and go to the Certified filling station.  Well, the Certified filling station is right there on St. Clair and Gibbard, but across the street caddy corner was the store.

Q.        What was the filling station called?

A.        Certified.

Q.        Oh, Certified.

A.        Uh-huh.

Q.        Okay.

A.        Because that's the way his dad would drive, you know, through there, you know, checking -- he said, here come Dad through his runs, you know, and he'd ride on through and ride on through, you know, and go on to Certified, you know, from the back way.

Q.        Okay.  Did you ever go to a Popeyes on Livingston?

A.        No.

226

Q.    Okay.  Just --

A.    We went to the Popeyes on Broad.

Q.    Okay.  And was Bob's Market near --

A.    That's what it was.

No.  Bob's Market was on Agler.

Q.    Okay.

A.    That's where Rick used to cash his checks when he worked for the man who had the sod company.

Q.    Okay.

A.    He used to go to Bob's Market with his friends.

Q.    Okay.  And do you know where Bob's Market is at?

A.    Agler Road.

Q.    Sorry.  You already said that.

And he would go there to cash his checks?

A.    With his -- with the whole crew.

Q.    Okay.

A.    The man that drove the sod truck.  Rick drove the truck, but he also laid sod as well.

Q.    Okay.  Did you ever --

A.    But that's --

227

Q.        Oh.

A.        -- where they always would go to cash their checks.

Q.        Did you ever go to Bob's Market?

A.        A couple times with him.

Q.        Okay.  Did you ever see Horton at the convenience store at Bob's Market or any of those places?

A.        If I did, he was tucked away.  He saw me, but I never saw him.

Q.        Okay.

A.        And like I said, I haven't changed other than my teeth gone.  You know what I mean? But I have -- my looks haven't changed.  I wear glasses, but that's it.

Q.        Okay.

A.        My hair got a little grayer.

Q.        Are you -- I'm sure you're aware now that there were, after the criminal trial, post-trial proceedings about the case.  Did you ever participate or attend any other hearings other than the trial that you testified in?

A.        (Indicates negatively.)

Q.        I'm sorry.  You have to respond

228

verbally.

A.          I'm sorry.  No, I haven't.

Q.          So the only proceedings that you were involved in was the criminal trial that you testified in on -- in 2006?

A.          Yes, ma'am.

Q.          Okay.  Do you know Jeanette Harmon?

A.          No.

Actually, he had someone to contact me -- she said that she was his wife -- while he was still locked up to see if I could do something, you know, to -- I don't know, to help get him out early or -- I don't know what it was, but I didn't know her from Adam's house cat.

Then he sent a pastor.  I don't know if she was the pastor or -- however it went, but he had two people to contact me, and this is while I'm in the house now.  I brushed them off.  I said, I don't want to hear it.  I don't want to hear nothing about Richard Horton.  Please leave my premises.

But now the lady, on the other hand, I never -- I can't say that I met her face-to-face. I don't know how she contacted me or if she

229

contacted me through my niece.  She contacted me through somebody.  I want to say -- was it the pastor?  I don't know.

But I told them I don't want to have anything to do with it.  It's said and done.  My husband is gone.  Leave me alone when it comes to him.  So, therefore, I didn't give them no answer, no questions.  When they asked questions, I'm like, please leave my premises.

Q.        What questions were they asking?

A.        I don't know.  Like I said, I brushed them off so fast until they flew off my porch.

Q.        Okay.  Is there anything else that you --

A.        When they mentioned his name, that's when I told him, I do not want to hear nothing you have to say in his behalf.  Goodbye.

Q.        Is there anything else that --

A.        I don't think I even came out the screen door.

Q.        Is there anything else that you remember from when they said to you?

A.        No.  I just know when they mentioned his name, that's when I blew up --

230

Q. Okay.

A. -- and said, I do not want to hear nothing he has to say, and I would appreciate it if you wouldn't mention it no more, and goodbye. However I said it, I brushed them off, and they left.

Q. Okay. Do you know Barbara Horton?

A. No.

Q. How about Furquan McDougald?

A. Nope.

Q. Kiawanna Harris?

A. Nope.

Q. Lakeon Horton?

A. Nope.

Q. Okay.

A. Are they saying I know them?

Q. No. No. I'm just asking --

A. Oh. No.

Q. I'm just asking if you know them.

A. No.

Q. You mentioned that you've never heard of or know of a Richard Diggs. Do you know a Ricardo Diggs?

A. Nope.

231

MS. TANOURY: I might be done. Can we just take a quick break, and then...

MR. LOEVY: I'm going to have some questions when you are finished, but I think a break is a good idea.

MS. TANOURY: Okay.

THE VIDEOGRAPHER: We are off the record. The time is 2:31.

(A short recess is taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:44.

MR. LOEVY: All right, Ms. Curry. I want to follow up on --

MS. TANOURY: Oh, no. We were -- we had a couple more questions.

MR. LOEVY: Oh, I'm sorry.

BY MS. TANOURY:

Q.        Okay. Back on the record. Just wanted to follow up. I know we talked about the conversation that you had with Ms. Martinez at your house. Did you have any other conversations with Ms. Martinez or...

A.        Cindy?

Q.        Cindy.

232

A.        No.  No, not prior to that day.  But like I said, she called me and checked on me to see if I had a way to get here.  If I needed anything, just let her know, you know.  She was just, like, concerned about my emotional state, you know.  And I appreciate that, because like I said, she -- you know, she seen that I got very emotional when I talked about it.  So she was just merely being a friend.

Q.        And who was that?

A.        Ms. Martinez.

Q.        Okay.  And when was that call?

A.        It was last night.  Yesterday evening.

Q.        Was anything else discussed on that call?

A.        No.

Q.        Okay.  And you had mentioned that Ms. Martinez was hugging and loving up on you.  Can you describe --

A.        Well, not hugging, but she was just, like I said, concerned about my mental state, for one, you know, because like I said, even when I was talking to her about it, I got emotional.  Anytime I talk about it, I get emotional, you

233

know.

I mean, even with the grandkids, you know, they say, oh, you know, well, I didn't need to bring up -- you know, but like I said, those grandkids was our life.  We did for them.  They look for us, you know, to do everything.  Take them trick or treating, take them to the fair, you know.  Different things we done with them.  So anytime that I talk about him, I get emotional.

So she was just saying, you know, basically, you know -- she said, Ms. Curry, she said, if you can't go through this, she said, we can see if we can set another date.  Like I said, I just put away my great niece on -- the other day from a freak accident.  She passed away instantly, you know.  I mean, you -- we couldn't say our goodbyes or nothing to her in the hospital.  She passed away right then and there.  The accident happened at 2:30.

Q.      Oh, wow.

A.      She passed away at 2:37.

Q.      When did that happen?

A.      That happened last Sunday, on the 15th.

Q.      Okay.  I'm sorry.

234

A.          You know, on 270, Sunday morning.

Q.          I'm sorry.

A.          And like I said, we just put her away, so I was still emotional about that.  But she just -- like I said, she just called -- she was merely -- she wasn't being an attorney.  She wasn't being nosey.  She was being a friend, you know, who -- we just met that day on my porch, but still.  To have somebody just -- you just now meeting and for them to care about you the way she did and reached out to me was just awesome to me.  So that will always stay in my heart, always.

Q.          And this was just last night --

A.          Yeah.

Q.          -- that you spoke?  Okay.

And you mentioned a conversation about if you couldn't go through with it today.  Were you considering rescheduling the deposition?

A.          Well, I was.  But I told her, I said, I'm ready for war, you know, and I did -- I meant that.  Because like I said, once I said -- 20 years ago.  I hope I can say it again, but some things did get vague to me.  You know, like I said, sometimes I don't even remember what I had

235

the day before, but then some days, I do, you know. I don't know. My mother had dementia, and so did my father.

Q. Uh-huh.

A. So I don't know if I'm getting a touch of it or not. But like I said, some things, I remember very well, and some things, I don't.

Q. And when you say you're "ready for war," what did you mean by that?

A. Whatever y'all was going to ask me, I was going to come back with an answer.

Q. And what -- and based on your conversation, what is -- what is your understanding of the defendant and City of Columbus' position in this lawsuit?

A. I just wanted to know how y'all got a different DNA from a person that was in there. And how did they go in the house? Like I said, if they done it that day, I didn't know they done it that day. Like I said, I should have known when they -- well, Ms. Curry, we went in the house, and we found this, we found that, we found the other -- I never knew none of that until today, you know.

236

So I don't know how that would occur -- you know, that occurred or whatever, because like I said, if they roped it off and went in there to do DNA or whatever, I never was notified, me or Rick, because like I said, Rick would have told me, and like I said, all his mail came to the same place I was. So nothing ever came.

Even once his dad -- you know, they settled his dad's paperwork and stuff, and once they sold that house, by them selling that house, I put in a change of address so my mail would no longer go to that house. So even if they mailed me any kind of thing or whatever, I never got anything from the Columbus Police Department --

Q. Uh-huh.

A. -- the investigators or nothing.

Q. Okay. When you talked to Ms. Martinez, did she say she believed you?

A. Yeah. She said -- I mean, she -- you know, she said, Ms. Curry, she said -- like she said -- like I said, it happened 20 years ago, you know. So she said, your word means everything, you know.

And, I mean, you have to believe me

237

because I'm telling the truth.  Like I said, you can hook me up to a machine right now, and what I don't remember, I don't remember.  But what I do, it was about the same thing I said on -- you know what I mean?

Q.          Uh-huh.  And when you testified at that -- at the criminal trial of Richard Horton on October -- or back in 2006 -- I'm sorry -- were you -- when you testified about the robbery and your identification of Richard Horton, were you telling the truth about everything?

A.          Yes, I was.

MS. TANOURY:  Okay.  I have no further questions at this time.

- - - - -

FURTHER CROSS-EXAMINATION

BY MR. LOEVY:

Q.          All right.  I'm going to do some follow-up, including starting with the opportunity to see the robber.

Ms. Curry, you mentioned to defense counsel that you thought maybe you saw the intruder's face three or four times.

A.          Yes.

238

Q.        Do you remember actually testifying at the criminal trial that it may have been as few as two times -- two or three times?

A.        Yeah.  I mean --

Q.        This is page 86 of your testimony. Question:  "How many times do you think you got a chance to look at the robber?"

          Answer:  "I'd say a good two or three times."

          Did you give those answers under oath?

A.        Yeah, I believe I did.

Q.        So it could have been just as few as just twice that you got a chance to see the robber's face, right?

A.        Could have been.  I mean, like I said --

Q.        And --

A.        -- it wasn't his face; it was his eyes, but yeah.

Q.        Okay.  Because, actually, you couldn't see his face at all.  His face was mostly covered by that hoodie, but you could see his eyes --

          MS. TANOURY:  Objection.

Q.        -- those two times, correct?

239

A.          Yeah.

Q.          And that's accurate, isn't it?  His face was mostly covered by that tied string hoodie, but you were only -- you were able to see his eyes?

A.          Uh-huh.  Yes, sir.

Q.          And the way you were able to see it, you sort of peeked around the corner of that pillow.  Is that a fair way to describe it?

A.          Yes, I would say.

Q.          Do you remember testifying at the criminal trial:  I just took the pillow put it over my face so I wouldn't keep looking at him.  I didn't want to get shot.  Just kind of peep out of the corner of my eye?

Is that how you were trying to see him that one or -- two or three times?

A.          Yes.

Q.          And he -- what was your understanding, if he saw you, what he was going to do?   If he saw you looking at his --

A.          He saw me, and he was going to shoot me.  He pointed the gun to me, and that's when Rick said, no, man, finish me off.  Don't -- leave

240

her alone.  Leave her alone.

Q.        All right.  So you weren't trying to
make yourself a witness -- an eyewitness, were
you?

A.        I wasn't.  I wanted to live.  I mean, I
was more concerned about Rick, really, you know.

Q.        All right.

A.        Because like I said, I wasn't -- I
can't say for sure that I knew he got shot.  I
knew he got hit in his head.  And like I said,
blood was just running down -- like water, you
know.  His face was just practically covered with
blood.

Q.        All right.  I think we established
that.  But, you know, if he did got shot in the
leg, it wasn't when you were looking?

A.        Right.

Q.        Is that accurate?

A.        I mean, like I said, I saw the gun, and
I saw him push him down on the bed.

Q.        All right.  Let me --

A.        And I saw the gun come --

Q.        All right.  Let me just get the
questions out.

241

Partly -- when you did take these two or three peeks, partly what your attention was focused on was the gun, right?

A.    Yes.

Q.    And you saw the gun well enough to be able to describe it later?

A.    Uh-huh.

Q.    So these peeks that you got from his face, that could have been more than a few seconds, right?

A.    Right.  Once he stood up, after he bent down on Rick to shoot him, that -- and like I said, he drug Rick to the chair.  That's when he stood up, and that's when he said, bitch, what you looking at me for?  What do you keep looking at me for?  And drew the gun on me.

Q.    All right.

A.    But that's when --

Q.    So just to be clear, you only would have had a few seconds --

A.    Right.

Q.    -- to see what you could see?  Okay.

A.    Right.

Q.    And defense counsel just asked you if

242

there was anything else you recall about, you
know, your memory of his eyes, and your answer was
no?

A.          I remember his eyes.  That's what I
remember most, is --

Q.          All right.

A.          -- his eyes.

Q.          And you've described his eyes as
appearing evil.  I'm not going to make you testify
to that again.  But in words, are you able to
describe anything else about his eyes, the color
of his eyes --

A.          No.

Q.          -- you know, anything like that?

A.          No.  Just --

Q.          Was there --

A.          They was --

Q.          Was there ever a time you were able to
describe his eyes?

A.          Was I able to?

Q.          Was there ever -- other than saying,
boy, I look at his eyes and they look like evil to
me, you know, back then, were you able to say the
color or --

243

A.          No.

Q.          -- can you describe --

A.          No.  It was still kind of -- we didn't have any lights on in the house, for one, you know, but it was daylight, you know.  The light was coming in from the window.  So like I said, I could see the color of his skin and that gray hoodie and them blue jeans --

Q.          But there wasn't --

A.          -- and his evil eyes.

Q.          There wasn't enough light to see the color of his eyes?

A.          No.

Q.          All right.  Now I'm going to switch topics.  You said, in response to counsel's questioning, that you kind of, sort of recognized his voice.  Was that your words, "kind of, sort of"?

A.          Yeah.

Q.          All right.  Did you tell the police that you kind of, sort of recognized his voice?

A.          Yeah.  I told the detective.

Q.          Was that at the hospital or in the --

A.          I can't remember.

244

Q.          Let me just ask the question.

A.          I want to say --

Q.          Ms. Curry, we've got to -- we've got to do the question/answer better, and you -- you know, defense question was right, too.  I'll ask the question.  Let me finish the question.

A.          Okay.

Q.          Do you remember if you told the police detective that you kind of, sort of recognized the voice?

A.          No.  No, I don't remember --

Q.          All right.  Did it --

A.          -- saying that.

Q.          All right.  Did you tell her at the hospital that you kind of, sort of recognized the voice?

A.          I may have.  I don't quite remember.

Q.          All right.  How about in this interview that you described that was, like, a day or two later at your home?  Did you say you kind of recognized the voice to be someone you knew?

A.          Yes.

Q.          All right.  Did you tell the detective how --

245

A.          I didn't see the detective no more.

Q.          No.  At the time you told the detective -- if you told the detective that you kind of, sort of recognized the voice, did you tell the detective who you kind of, sort of recognized the voice to be?

A.          I can't remember.

Q.          Any reason -- if you did kind of, sort of recognize the intruder's voice, any reason you wouldn't have told the detective that, who you recognized it to be?

A.          I don't know if I told the detective or I told Rick.  I don't know.

Q.          All right.  Is there any reason you wouldn't have told the detective if it was, in fact, true that you --

A.          Maybe because he didn't ask.

Q.          Let me ask the question.  I didn't finish.

            Any reason -- I'll ask it again.  Any reason you wouldn't have told the police detective that you kind of, sort of recognized the voice if, in fact, that was true?

A.          Well, once I told him that he was

246

calling me a bitch and they didn't ask did I
detect the voice, no.

Q.       Okay.  Changing topics again.  We're
pretty clear you never bought a car from Richard
Horton, right?

A.       No.  I wasn't even driving then.

Q.       And your niece, to your knowledge --
you didn't have anything to do with it if she
bought a car --

A.       No.

Q.       -- from Richard Horton?

And, you know, you -- that, you're
certain of?

A.       That, I'm positive of.

Q.       All right.  Now, at your -- at the --
Richard Horton's criminal trial, you did testify
that you hadn't had any interactions with him for
six to eight years, didn't you?

A.       Excuse me?

Q.       Take a look at your -- do you still
have your trial testimony?

A.       Yeah.

Q.       Take a look at page 99 and 100.

On page 99, you're talking about this

247

car thing.  Are you on those pages, Ms. Curry?

A.          Wait a minute.  Wait a minute.

           I am now.  Okay.  99.

Q.          99, you're talking about this car thing
with the niece.  And then on 100 -- page 100, you
were asked the following question and gave the
following answers.  Question:  "Did you have any
other contact with Mr. Horton?"

           Answer:  "No."

           Do you see that on line 7 and 9?

A.          Did you have any other contact with --
yeah.  Okay.  I see that.  No. 9.

Q.          All right.  Did you give that answer
under oath?

A.          Did you discuss...

Q.          I'm focused on lines 7 to 9, Ms. Curry.
Did you give that answer under oath?  You've had
no other contact with Mr. Horton other than this
alleged car incident?

A.          Right.  No.

Q.          That's what you testified to?

A.          No, I did not.

Q.          Well, that's what you testified to,
correct?

248

A.          Right.

Q.          All right.  But is it true that you had no contact with Horton?

A.          True.

Q.          All right.

A.          I had no contact with him at all.

Q.          Now, take a look at page 101.

A.          Okay.  In passing.

            No, not even in passing.

Q.          Yeah.  And so it looks that you -- if you back up to page 100:  Have you ever seen Richard Horton anytime since the sale of the car?

            Just in passing.

            "Have you ever had any conversation with him?"

            "No."

            And that was eight years ago, maybe around that time.

            Did you give those answers?

A.          Right.  No.  I -- yes, I did.

Q.          So at the trial, you said you hadn't really spoken to Richard Horton at least eight years before the shooting, right?

A.          No.  I -- no.

249

Q.        Well, let's read the testimony again. On page 100, line 24, did you give this answer: Have you ever seen Richard Horton anytime since the sale of the car?

          Answer:  "Just maybe in passing."

          Question:  "Have you ever had any conversation with him?"

          Answer:  No.

          "And that was, in fact, eight years ago, wasn't it?"

          Answer:  "Around that time maybe."

          Did you give those answers under oath, ma'am?

A.        I don't -- I don't see how I could give an answer like that when -- like I said, prior to us going to court, it wasn't even eight years.  If y'all --

Q.        All right.

A.        -- look back on the time, it couldn't have been no eight years that I recently saw him or whatever.  So that's what I'm saying.  They just put that in there some kind of way.  I don't know how that got in there, but no.  I had no contact with him after that shooting.  No contact

250

until I just told this lady here that I thought I saw him on COTA bus.  None.

Q.        All right.  Well, let's break that down, Ms. Curry.  At the trial, we've just gone over your testimony that you testified you were -- saw Richard Horton at the sale of an automobile eight years before and that you hadn't had a conversation with him since that time.

A.        Did I say --

Q.        That's what you testified to at the trial.

A.        Did I say, yes, I saw him or, no, I didn't see him?  No, I did not -- I never even been to an automobile -- I had never been to none of that.

Q.        Well, the thing is you did describe knowing Richard Horton from an auto sale about eight years earlier at Horton's criminal trial.

A.        No.

Q.        If I now understand your testimony, it's that that wasn't true, right?

A.        No, it wasn't.

Q.        All right.  But you did give that testimony, Ms. Curry.

251

A.        Well, I don't know how I gave it.  I mean, he must have switched them questions up or something, because I don't even remember nothing about no auto sale or nothing.

Q.        All right.  Now, my next question is: You also testified that you hadn't had any conversations with Horton in eight years prior to the trial, right?  That's what the testimony says on the page.

A.        Okay.  That's what it say.

Q.        All right.  Was that true?

A.        Yes, it's true, because I didn't know -- eight years?

Q.        All right.  So you had not --

A.        No.

Q.        At the time you --

A.        I had not.

Q.        All right.  Let me ask the question.

At the time you testified at Richard Horton's trial, you had not had a conversation with Richard Horton, to your knowledge, in at least eight years?

A.        Right.  No, I have not.

Q.        All right.  So that means you hadn't

252

had a conversation with him in the months prior to the shooting, correct?

A.          No.

Q.          "No," that is correct, right?

A.          That is correct.

Q.          So you hadn't had a conversation with him in a year prior to the shooting?

A.          No.

Q.          The "no" is confusing.  You mean "no," you agree with me, right?

A.          Yeah.  No.  I agree with you.

Q.          All right.  So you would not have had any conversations with him to buy drugs prior to the shooting, either.  Isn't that true?

A.          That's true.

Q.          So you did not, in fact, buy drugs from Richard in the months before the shooting?

A.          No, I did not.

Q.          All right.  Let's now go to the bus. When was the bus?

A.          What bus?  The bus I saw him on?

Q.          Or the bus you saw someone you believe was Richard Horton.

A.          I don't know.  It was probably this

253

time last year, maybe.  I don't know.

Q.          This is a guy who had a beard, I think you said?

A.          Uh-huh.

Q.          Describe what --

A.          But like I said, the vibes that he gave me when he got on that bus -- when he turned away from the money slot thing and turned to where I was at sitting at, we had a small, slight eye contact, okay?

After that, I said I can't really stare at him to see, because then he'll know that I know it's him.  So I didn't look at him no more.  I immediately called my son, got on the phone with him, and told him, you know -- like, I was, like, kind of whispering, like -- you know, and he could hear me.  I said, hey, can you hear me?  And he said, yeah, you know, and I was kind of whispering.  Well, then, I said, no, I'm going to hang up, and I texted him.  So then I --

Q.          I --

A.          So then I called him back, I think I did, and that's when we started talking.  He said, Mom, he said, just stay on the phone with me.  He

254

said, you don't have to say nothing.  I'll do the talking or whatever.  And he did, you know.  And he said, I tell what you, he said, just -- once y'all get off the bus stop that you getting off at and he get off with you, call 911.  If not, call me back.

Q.        All right.  So if I understand what you're saying is you were on a bus and a guy got on with a big beard?

A.        Right.

Q.        And he -- you didn't get a good look at him, but you got a vibe that this guy might be Richard Horton?

A.        Him.  Right.  Because I said, I haven't changed, but he may have.  But like I said, when the eye contact -- you know, like, when he was getting on the bus and I'm looking, I'm like, oh, my God, you know.  Because, like, where I sit -- you can see everybody getting on the bus, you know, and paying their fare or whatever where I sit, if the seat is available.

Q.        I gotcha.

A.        You know, so --

Q.        So this guy, you didn't really get a

255

good look at him, but you just really had a feeling --

A.        Yeah.  Because like I said, here I am at the end of the seat, and here's the seat, and here was at seat.  So he sit down there, and the way -- he didn't sit this way.  He turned this way (indicating).

Q.        All right.  But you interrupted me, so I didn't get the question out.

A.        Oh.

Q.        When the guy got on the bus, you didn't get a good look at him, but the vibe you -- he gave you, the way he looked at you, the way he sat made you think it might have been Richard Horton.

A.        Right.

Q.        Is that accurate?

A.        Yes.

Q.        All right.  And he had a big beard or -- describe the beard.

A.        A big, thick one, you know, all the way around, you know, like he hadn't shaved -- like he was a caveman.

Q.        And you said your appearance hadn't changed much in --

256

A.          No.

Q.          -- the 20 years that --

A.          Only this right here (indicating).

Q.          When did you have the trouble with the teeth?

A.          I've been having trouble with them for a while.

Q.          But you wouldn't have -- last time Richard Horton saw you, you didn't have any trouble with the teeth?

A.          Oh, I had a mouthful of teeth.

Q.          All right.  Back then, you had a mouthful of teeth --

A.          Yeah.

Q.          -- but the person you saw on the bus would have seen someone who did not have a mouthful of teeth?

A.          I didn't have my mouth open.

Q.          Okay.  But you -- otherwise, you looked similar?

A.          I looked the same.  The exact same.

Q.          You --

A.          Like I said, my hair is just grayer.  I used to wear two braids, you know.  Sometime I

257

still do, but this time, I didn't.  I just decided to put a hat on.  I still wear my hats.  I wore my hats then, you know, but -- I wear glasses, but I still look the same.

Q.        I gotcha.  Where was the bus?  It was in town?

A.        It was in -- on St. Clair Avenue.

Q.        All right.  And if Richard -- if I told you that Richard drives a truck and doesn't take the bus, would that change your belief that --

A.        I mean, it could, you know, but like I said, strange people get on the bus all the time. They look at you strange.  But like I said, it was just something about this man.  When he got on the bus and passed by me to go sit down, he instantly looked --

Q.        Got it.

A.        -- you know...

Q.        All right.  You gave some testimony to counsel that, you know, this drug dealer -- and you were calling him Richard Horton.  But just to be clear, you did not know the drug dealer to be Richard Horton, right?  You knew him to be Richard?

258

A.          I just knew him to be Richard.  Right.

Q.          When's the first time in your life you ever heard the name Richard Horton?

A.          I can't say.

Q.          Who is the first person who ever told you that the suspect's name was Horton?

A.          I want to say it was his niece or his nephew, because I think his nephew was out, you know, around at the same time.

Q.          Rick's nephew?

A.          Uh-huh.

Q.          So Rick's nephew is the first person who told you the suspect's name was Horton?

A.          It was his niece or his nephew.

Q.          All right.  Your daughter was talking about a Richard Diggs.

A.          She said that she heard of the name Richard Diggs in school when --

Q.          You --

A.          -- Ms. Martinez and Ms. Cindy was at my house.

Q.          Did you tell the police that you --

A.          So I never --

Q.          Did you --

259

A.         -- knew that she -- you know, like I said, they all went to Everett Middle School. That was on Fifth Avenue, behind Doctors North.

Q.         Did you tell the detectives that your daughter went to school with Richard Diggs?

A.         No.  Because I didn't know him then.  I didn't know she knew him then.

Q.         But back then, your daughter said she thought she knew Richard, right?

A.         Yeah.  And they called him Adidas man. But the day that they mentioned --

Q.         All right.  That's the only thing I'm asking.

A.         Okay.

Q.         Back then, 20 years ago, when you were trying to figure out who Richard was, your daughter said, oh, I think I know who Richard was, right?  She said, I think I went to school with him.

A.         Right.  She said Richard --

Q.         All right.

A.         -- but she didn't ever say --

Q.         That answers my question.

A.         -- Richard Horton.

260

Q.        She just -- when you guys --

A.        Right.  Okay.

Q.        Back then, when you guys were trying to figure out who Richard was, your daughter said, oh, I know Richard, I went to school with him, right?

A.        Yeah.

Q.        Back then, when you were trying to figure out who Richard was and she said she went to school with him, did she mention Adidas man back then?

A.        Once.  Once, she did.  Just once.

Q.        All right.

A.        But that slipped my mind, I guess, because like I said, I didn't know it again until I read it just now.

Q.        All right.  Back then, when you were talking to the detective, did you mention the suspect might have been called Adidas man?

A.        No.  Because I didn't know then that they call him Adidas man until I read it in this paper.

Q.        All right.  But I thought your daughter said back then that the suspect --

261

A.        She said it in the -- she said it in the -- when we had the conversation going to -- I mean at the hospital, whatever.  Like I said, I didn't know then, when I talked to the detective. I had already talked to the detective, I believe. Like I said, I didn't know nothing about no Adidas man.  I never --

Q.        We --

A.        -- even heard it before until she said it in this paper or whatever she said it -- whenever we was talking or whatever and she mentioned, you know, Adidas -- I didn't know.

Q.        All right.  Let's --

A.        And like I said, the name Slim, I never knew that, either.

Q.        Take a look at your testimony on pages 90 and 91.  You have the testimony there.

A.        Oh, God.

Q.        And you were talking to defense counsel -- while you're looking for pages 90 and 91, you were talking to defense counsel about your daughter talking about Richard Horton.  Do you remember defense counsel asking you questions about that?

262

A.          I think.

Q.          Now, taking a look at page 90 and 91, does that refresh your recollection that your daughter was not talking about Richard Horton; she was just talking about Richard, someone named Richard?

A.          Oh, God.  90, 91.  Okay.

I didn't say his name then.

Q.          Yeah.  So all I'm asking you is:  You testified at the criminal trial that as you were trying to figure out who the suspect was, your daughter was talking about someone named Richard, not Richard Horton, correct?

A.          Right.

Q.          And she was saying, hey, they used to call him Adidas man or something, the suspect, right?

A.          Right.

Q.          And you told the police that -- the police detective that the suspect's name was Adidas man, right?

A.          I don't recall saying that to her.

Q.          All right.  And then your testimony at the bottom of page 90 says, Rick came off his

263

medicine, and he was saying the same thing, right? You see the bottom of page 90 and into page 91?

A.        He didn't say Adidas man.

Q.        He said the same name, Richard.

A.        Yes.

Q.        So if I understood your testimony to defense counsel, Rick had been talking about someone named Richard in a phone thing before the robbery even happened, right?

A.        No.

Q.        The night before, didn't you just tell us --

A.        Yeah.  Yeah, he did.  Richard.  Okay. That's the Richard he was talking about.  That's the only Richard that I knew he knew.

Q.        All right.  So Rick and your daughter were talking about the name Richard, but without a last name?

A.        Right.

Q.        When the police detectives interviewed you, did you tell the detective that, hey, Rick was talking about a Richard the night before?

A.        I think he told the detective that.

Q.        Did you tell the detective that?

264

A.          No.

Q.          Well, if it had happened the night before the robbery, why not share that with the detective if you learned it?

A.          Because I -- like I said, I think Rick had already told them that he had a conversation. Or did he just tell me?  I can't remember, sir. I'm sorry.  I cannot.

Q.          Okay.  Is there any reason you would have withheld that from the detectives --

A.          No.

Q.          -- if you --

A.          Because I --

Q.          I didn't get -- let me get the question out.

            Is there any reason you would have withheld from the detective that you had reason to believe the suspect's name was Richard based on what you were told by Rick?

A.          No.  I wouldn't have no reason not to tell her.

Q.          That's all I'm asking.  All right.

            And then there was this business about the -- with Kyle and, you know -- that you had

265

reason to believe that Kyle's friends had it out for Rick and that might have been why they robbed him.

A.        Yes.

Q.        Do you remember that testimony?

A.        Yes.

Q.        Any reason you wouldn't have told the detective about that?

A.        No.  I don't know why I didn't, because --

Q.        Because you -- weren't you trying to catch the robber?

A.        Yes, I was.  But like I said, at the time, they didn't know nothing about the drugs. Rick didn't want -- he didn't want me to mention no drugs involved, you know.

Q.        All right.

A.        But like I said, it wasn't no drugs involved in that night, but we did do drugs.  So he didn't want me to say anything.  When I said something about drugs, he said, why would you say that?  I said, because they need to know why it happened.

Q.        All right.  Did you tell the detective

266

about why it happened?

A.          No.  I never told her that story.

Q.          All right.  About Kyle.  Got it.

A.          Right.

Q.          So would it be fair to say that when the incident happened, you did not know -- you know, you had -- weren't aware of who it was when it was ongoing?

MS. TANOURY:  Objection.

Q.          You hadn't yet put it together?

A.          Right.  I mean, I -- like I said, I got to putting it together shortly, you know, after everything -- you know, like I said, I knew Rick was okay and everything, I start putting things together.

Q.          That's all I'm asking --

A.          And then --

Q.          -- Ms. Curry.  That's all I'm asking.

A.          Yes.

Q.          While it was happening, you didn't know who was doing it, right?

A.          No.

Q.          And then later you put it together, right?

267

A.          Right.

Q.          When you put it together, that was after your daughter told you about Richard, the niece told you about Richard --

A.          Right.

Q.          -- and Rick told you about Richard, right?

A.          Right.

Q.          So a lot of people were talking about Richard before you put it together, correct?

A.          I'm pretty sure, because they said he was running, you know.  Like I said, my stepson even asked a couple people he knew, you know, to go in that area and ask about him or whatever.  He said, well, they don't know where he is, you know, blah, blah, blah, blah, blah, so...

Q.          Well, that's a fourth reason.  You've got your daughter talking about Richard, you've got Rick's niece talking about Richard, you've got Rick talking about Richard, and you also got the thing about being told that Richard went on the run.

A.          Uh-huh.

Q.          All four of those things you learned

268

about before you put it together that the intruder was Richard?

A.          Right.

Q.          That's true, right?

A.          But like I said, his face just -- you know, and then like I said --

Q.          I understand.  But I was just asking if --

A.          Yeah.

Q.          -- all -- let me ask it again.  Let me ask it again so the record's clear.

While the robbery was happening, you weren't sure who was doing the robbery, correct?

A.          I was sure that it was him.  I just --

Q.          All right.

A.          -- didn't know why it was him --

Q.          Got it.

A.          -- until I got to piecing all this together, you know.  Like, I remember --

Q.          When you pieced it all together and realized -- when you pieced it all together and realized that Richard was the suspect...

MR. LOEVY:  Sorry.  The dog is -- isn't usually a problem at Zooms.  Give me one second to

269

get rid of the dog.

All right.  We're going to risk it with the dog.

Q.        My question was:  Before you pieced it together that Richard was the suspect, you had been told by Rick that Richard was the suspect, Rick's niece that Richard was the suspect, your daughter, and this friend whose name you don't remember --

A.        No.

MS. TANOURY:  Objection.

Q.        -- that Richard was --

A.        I never said he said he --

MS. TANOURY:  Objection.

A.        -- was the suspect.

MS. TANOURY:  Sorry.  Objection.

A.        She just gave me his name.

Q.        Okay.  Then I'll ask it again so that we ask it better, then.

Before you pieced it together that Richard was the intruder, you had been told by Rick about Richard, Rick's niece about Richard, your daughter about Richard, and the unknown friend or the friend whose name you don't remember

270

that Richard had gone on the run. All those things had happened before you pieced together that Richard was the intruder, correct?

A. Right.

MS. TANOURY: Objection.

Q. All right. You were asked some questions about DNA -- Richard Diggs' DNA. Is it possible -- first of all, when you believe you were told that Richard Diggs' DNA was found in your apartment, was Mr. Martinez and the investigator both present?

A. Yes.

Q. So they would -- either one of them would have heard the conversation, then, right?

A. Either one of them would have heard the conversation?

Q. Yeah. It's not -- it wasn't just like you and Ms. Martinez. It was --

A. No.

Q. -- all three of you?

A. Yes, it was.

Q. All right. And is it possible you misunderstood that what they were telling you was that Mr. Horton was excluded from the DNA and

271

nobody else was excluded?

A.          Right.

Q.          Is that possibly what they were communicating to you?

A.          Yeah.  I mean --

Q.          All right.  That's fair.  And then if Richard Diggs was in prison on October 9th, then it wouldn't have made a whole lot of sense for them to have told you that Richard Diggs was in your apartment, would it have?

A.          It wouldn't.  Like I said, that was the first time I heard of anything about that.

Q.          Did anybody from the State ever communicate to you that the DNA had excluded Richard Horton?

A.          No, sir, they did not.  I didn't know that until today.

Q.          Does that cause you any concern?

MS. TANOURY:  Objection.

A.          Yes, it does.

MS. TANOURY:  Sorry.  Objection.

Q.          Why is that?

MS. TANOURY:  Objection to the previous question.  I didn't get to raise my objection

272

before the witness started answering.

Q.         Okay.  Why does it cause you concern?

A.         Because how in the world could it be a different DNA when, you know, it was Richard Horton?  I can't understand it.  They said -- they're saying it was Richard Diggs and he was locked up.  How did they get to that -- come to that conclusion?

Q.         Well, if that was a misunderstanding that -- nobody is saying it tied to Richard Diggs. What they're saying is it wasn't -- the DNA is saying it's not Richard Horton and it's an unknown person, who could be anybody.  Could be Richard Diggs, could be you, could be me.

If you learned that, would that cause you to have some doubt about whether maybe your memory's playing some tricks on you?

MS. TANOURY:  Objection.  You can answer.

A.         No, it don't.

Q.         You said that, at the trial, Mr. Horton approached you and said something to the effect of, why are you lying about me or something like that?

273

A.          Not that I know of.

Q.          I thought you said he approached you and he was like, why are --

A.          Oh, yeah.  Why are you doing this to me or something?  You know, before court even came about, you know.

Q.          Right.

A.          You know, where he came from, I don't know.  Which -- whoever came out there and got him said that he shouldn't have never been able to have that much contact with me that day.

Q.          Got it.  But he came up to you, and he's like, why are you doing this?

A.          Yeah, something.  Something to that nature.

Q.          Was he saying, like, why are you lying and saying I was in your apartment when I wasn't?

A.          Something like that.  Like I said, I know it was some words, you know, and I said, please get away from me, you know.  And like I said, my sister --

Q.          Did he respect that?

A.          Huh?

Q.          Did he respect that when you said --

274

A.          Yes, he did.  He backed off.

Q.          All right.  You did testify on direct examination with me that a couple of days after the shooting, the female detective showed you a single photo of Richard Horton?

A.          Yes.

Q.          You testified to that this morning, correct?

A.          Yes.

Q.          Do you stand by that?

A.          Yes, I do.

Q.          And that single photo, you thought either had Richard Horton's name on it or the paperwork had Richard Horton's name on it, correct?

A.          Either the paperwork had his name on it or something.  I don't even know if I knew his name then, the day that she showed me that picture.

Q.          All right.  When --

A.          I can't remember.

Q.          And the day that she showed you the picture, we're talking about a couple days after the shooting, right?

275

A.          Yeah.

Q.          Did you recognize that photo?

A.          Yes.

Q.          Did you tell the police detective that you recognized the photo?

A.          Yes.  His name was Richard.  That's just what I said.

Q.          And was that photo the same photo that was later -- that we showed you on that six that you looked at in December?

A.          Uh-huh.  Yes.

Q.          All right.  When that -- when you looked at that six-photograph array in December, the one that you signed, do you know who went first, you or Rick?

A.          No.  I think Rick did, because I went to the store that day.

Q.          Well, it looks like you guys were doing it to go -- or not together literally, but if you look at the times -- do you have those documents still in front of you?  There's two six-pack photos, and they each have a date and a time on them, or maybe I'm thinking of the -- and I don't have the exhibits anymore, but I'm thinking of

276

the --

A.        The same day.  They the same day.  One is 9:15, and one is 1:27 [sic].  So like I said, I went to the store.

Q.        All right.  So who was first, you or Richard?

A.        I can't remember, but I know I went to the store.  I left the whole room.  I left the vicinity, period.  So I don't know who went first.  I would say Richard went first.

Q.        Why do you say that?

A.        Because it's 9:15 a.m., and the other one is 9:27 a.m.

Q.        All right.  So he -- yours is at 9:27; his is at 9:15?

A.        Yeah.

Q.        And did they tell you that Rick picked the same person you picked?

A.        She did.  Once I picked his picture, she said, wow, she said, you and Rick got the same, you know, person.

Q.        Now, are you positive it was after as opposed to before?

          MS. TANOURY:  Objection.

277

Q.          You can answer, notwithstanding the objection.

A.          You said after or before?

Q.          Yeah.  Are you positive she didn't tell you who Rick picked before you picked?

A.          No, she did not.

Q.          All right.  If you look at Rick's identification -- and counsel showed you the thing where you said, I swear on everything I love, you know, that document.

A.          Yes.

Q.          Can you pull that document out.

A.          Oh, shoot.  I'm ready to walk out of here.

Q.          We don't got too much more to go.

            All right.  It looks like, on Rick's page, you recognized his signature?

A.          Yep.

Q.          Rick is making an identification based on voice and eyebrows.  Do you see that?

A.          I can't hardly read the writing.

Q.          Let me pull my copy up.

A.          I can't say 100 percent certain, and his signature...

278

Q.          Let me pull the document up.

A.          And I put his eyes.  So what --

Q.          You --

A.          -- are you saying now?

            But, see, the detective didn't even sign mine.  They signed his, but they didn't sign mine.  You see that?

Q.          Yeah, it looks like it.  I'm look at the second page, where it says, "Describe level of certainty."  And it says, quote, voice and same eyebrows.

            Do you see that?

A.          Yeah.

Q.          "Wearing same pants from nights before."

            Do you see that?

A.          Yeah.

Q.          Did they show you Richard Horton that day?

A.          That day of what?

Q.          12-4-2004.

A.          No.

Q.          Do you have any idea what wearing the same pants from night before means?

279

A.            No, I don't.  But like I said, he saw them the night before, so that --

Q.            So that could be that, yeah.

A.            Right.

Q.            But how would -- do you have any understanding for why he would have been able to make a voice identification in a photo array?

A.            Because he said, bitch, why are you looking at me?  Rick got ears, so he heard his voice that day, that day he shot him.  He kept talking to me, and then he kept saying, man, where's the money?  Where's the money?  So it's coming out the same person, the same voice.  So if he said --

Q.            If --

A.            -- certain -- if he said multiple things that day out of the same voice, then why couldn't he recognize the voice?

Q.            So was there conversation with the police about an incident that had happened the night before?

A.            Not that I know of.

Q.            Okay.  When you were looking at the photos, did you tell the police -- now, we're in

280

December now.  12-4, all right?  This is lots of weeks after the shooting.  Are you with me, on 12-4, when you made the photo -- signed --

A.        Uh-huh.

Q.        -- it -- signed the photo?

A.        I believe I am.

Q.        Okay.  On 12-4, when you signed the photo, had you told the detectives that you knew the guy in the photo?

A.        Yes.

Q.        And were they asking you to pick out the guy you knew?

A.        Yes.

Q.        And were you able to pick out the guy you knew?

A.        Yes.  Which was Richard Horton.

Q.        And you made it very clear that you were picking out somebody you knew?

A.        Yes.

Q.        All right.  Your testimony at the trial -- well, I'll strike that.

          Well, I'll ask it.  At the trial, you gave the impression that you had made the ID based on what you saw in the apartment that night,

281

didn't you?

A.        Uh-huh.  Yes, sir.

Q.        And you did not let on at the trial that you were identifying someone that you knew to be a neighborhood drug dealer?

A.        Right.

Q.        Correct?

A.        Right.

Q.        But you had told the police that you knew him to be the neighborhood drug dealer?

MS. TANOURY:  Objection.

Q.        That's true?

A.        I told the detective that, I think.

Q.        The female detective?

A.        I think so.  I -- like I said, it's all kind of vague.  All that is, you know, just...

Q.        Okay.

A.        I can't remember who I talked to, what I said, or nothing, come to think of it, yeah.

Q.        Most of your dealings -- or all of your dealings that you remember were with the female detective, Detective Walker, right?

A.        Yep.  Yep.

Q.        All right.  Just a few more here.

282

Q.        Were you honest with the detectives?

A.        Yes.

Q.        Anything you told the detectives that wasn't true?

A.        No.

Q.        So you told the detectives that Richard Horton was someone you knew from purchasing drugs?

A.        Uh-huh.  I think I did.  I'm not sure.

Q.        And you told the detectives that you never were part of any car transaction with Richard Horton?

A.        No.

Q.        That "no" is ambiguous.  You did tell the detectives that?

A.        I told the -- I don't know nothing about no car.

Q.        And so you certainly did not tell the detectives anything --

A.        It never come up.  I never knew nothing about a car.

Q.        Okay.

A.        So she never asked the question about a car, because I never heard nothing about no car.

Q.        All right.

283

A.          No sell, no buy, no trade, no --
nothing about no damn car.

Q.          All right.  I want to ask you some
questions about counsel's questions about whether
you're 100 percent certain of your identification
and you swear on everything you love.  The
identification that you made was based on just
being able to see the eyes for a few seconds,
correct?

MS. TANOURY:  Objection.

Q.          Correct?

A.          Yes.  And the voice.

Q.          And it was based on a few peeks that
you got from around the pillow while the guy was
saying, if you look at me, I'm going to kill you,
right?

A.          He didn't say he was going to kill me.
He was going to kill me with the gun.  If he
pointed at me, that mean he was going to shoot me,
and that's when Rick told him, no, man, go ahead
and finish me off.  He never said --

Q.          And that's --

A.          -- I'm going to tell you.  He just
pointed the gun at me, so what did that mean?

284

Q.      Well --

A.      That he wanted to kill -- he wanted to shoot me or he wanted to kill me?

Q.      You did testify at the criminal trial that what he said was, if you look at me, I'm going to kill you, right?

A.      He didn't say that.  I did not say that.  Now, I don't know if they put words in my mouth or she did it wrong or something.  He said, quit looking at me.  Stop looking at me, bitch. What you looking at me for?  What you looking at me for, okay?

He had the gun pointed at me the whole time he was saying that.  That's when Rick said, no, man, leave her alone.  Leave her alone, man. Go ahead and finish me off.

Q.      All right.  So you weren't --

A.      That's what he pulled him to the chair to get the money out the shoe.

Q.      And you weren't trying hard to make yourself a witness by looking at --

A.      I sure wasn't, because like I said, I didn't know whether that trigger was going to go off or not.

285

Q.          All right.  And so you hid behind the pillow?

A.          Yes.

Q.          And these were your drug addiction days?

A.          Yeah.  But I wasn't drugged up yet that morning.

Q.          All right.  But this was a time of your life when you were suffering a serious crack addiction, right?

A.          Yes.

Q.          And your niece -- and I'm sorry. Rick's niece, your daughter, and Rick all came up with the theory that Richard was the intruder, right?

A.          Yes.

MS. TANOURY:  Objection.

Q.          And then the detective showed you a single photo of a person you believe is Richard Horton, right?

A.          Yes.

MS. TANOURY:  Objection.

Q.          And you made an identification based on that single photo of the man you believe was

286

Richard Horton, correct?

A.          Yes.

            MS. TANOURY:  Objection.

Q.          And then later, you testified at the trial that you're 100 percent positive that Mr. Horton was the one in the apartment?

A.          Yes.

Q.          And the police also told you or the detective told you that Rick identified the same person you identified, right?

A.          Yes.

Q.          Wouldn't it be fair to say that maybe at best you believe it was Richard Horton, but you can't be totally sure?

            MS. TANOURY:  Objection.

A.          No.

Q.          You're saying you're 100 percent positive?  There's no chance it's anybody other than Richard Horton?

A.          No.

Q.          It doesn't matter what --

A.          It's 100 percent certain that it was him.

Q.          The DNA doesn't change your mind?

287

A.          No, it does not.

Q.          Would it make you upset if, in fact, you got it wrong?

A.          What you mean I got it wrong?  Hell no, I didn't get it wrong.  I know it was him.  And like I said, I'll die and go to hell right now saying it was him.

MR. LOEVY:  All right.  I don't have any other questions.  Thank you very much.

THE WITNESS:  You're welcome.  Can I go?

- - - - -

FURTHER CROSS-EXAMINATION

BY MS. TANOURY:

Q.          Just a brief follow-up.

A.          Shit, I'm getting mad.  I'm really getting mad, and I'm fixing to blow up.

Q.          When counsel just asked about getting the name Richard from your daughter, how did it even come up that you were talking to your daughter about the name Richard?

A.          Like I said, she knew I knew -- she knew I did drugs, okay?  She knew the area where the guys was at.  Like I said, she would see them

288

periodically all around in the neighborhood --

Q.        Uh-huh.

A.        -- where she would be with her friends, in that same neighborhood, because she didn't live with me at the time.

Q.        Uh-huh.

A.        But she would be -- like I said, when she was in school, she lived with me, okay?  When she had her first daughter and moved to West Virginia, she came back home to have her baby in '79.

Q.        Uh-huh.

A.        '78, '79, one of the two.  But prior to that, that's when she went to Everett Middle School and hung out on Second Avenue.  Like I said, that was his homies, whatever you want to call them.

Q.        When you say "his," do you mean -- who you mean?

A.        What'd you say?

Q.        When you say "his homies," who you talking about?

A.        His homies that he hung around, the Ramsey guy and all them.

289

Q.        When you say "his," though, do you mean Richard Horton?

A.        I guess.  Did I say that?

Q.        No.  I'm asking you who you mean when you say "his."

A.        Yeah.  I said homies.

Q.        Yeah.  But when you say "his homies," whose homies?

A.        I didn't say his homie.  I said homies.

Q.        Okay.

A.        When he was around his homies.  That's what I said, you know.

Q.        Okay.

A.        When she was with her friends, you know, hanging out on the same -- you know, they playing curb ball and all that, you know, but them boys was still selling drugs even at a young.

Q.        And which boy?  Who are you referring to?

A.        Richard Horton.

Q.        Okay.  And when you -- we talked about your trial testimony where you had a conversation with your daughter and the name Adidas man came up.  Was that -- what was the context of that

290

conversation?

A.        When she said she knew a Richard Horton hanging out on Second Avenue, Star or whatever, she said, Mom, she said, I went to school with a Richard Horton, and they called him Adidas man.

Q.        Okay.

A.        That's it.

Q.        And why --

A.        That's all she said.

Q.        And why did she say that name?

A.        Ask her when y'all get her to court on October the 7th --

Q.        Okay.

A.        -- or whatever.  Ask her.  Do that.

Q.        Okay.

A.        Because she going to give you the business, just like I am now.

Q.        When people -- counsel asked you about people providing you the name Richard Horton, when you knew the person as Richard, did you ever have any doubt about who they were talking about?

A.        No, I didn't.  But I told him he was light-skinned, and Kim -- that's when Kim said, Mom, she said, I knew a Richard -- light-skinned

291

Richard Horton, you know, that went to Everett

Middle School.

Q.          Uh-huh.

A.          But then, like I said, when

Ms. Martinez and them was there and they said

Diggs -- she said, there was also a Richard Diggs

there.  Like I said, either he used the name

Richard Diggs and Richard Horton or however --

y'all said Richard Horton was in -- Richard Diggs

was in the penitentiary.  I don't know.  I don't

know no Ricardo Diggs or nobody else.  I did

happen to interact with a Richard Horton.

Q.          Okay.  And --

A.          That's the end of that conversation.

Q.          And going back to the conversation you

had with Ms. Martinez about the DNA testing, can

you tell me exactly what you were told about the

DNA testing that was performed --

A.          She said, Ms. Curry, she said --

Q.          -- that was performed in -- I'm sorry.

-- that was --

A.          Oh.

Q.          -- performed as part of Mr. Horton's

case.

292

A.          She said, Ms. Curry, did you know a Richard Diggs?  And I said, no.  I said, today is the first day I've heard that name, Richard Diggs. And she said, well, his DNA was the one found in your home.  And I said, how, when it was just one man in there with one gun after me and Rick, you know?  Like I said, my sister was way in the back. She had nothing to do with none of it.

Q.          So was the first time you ever heard the name Richard Diggs when you talked to Ms. Martinez?

A.          Ain't that what I just said?

Q.          I'm just clarifying the record.

A.          Okay.  Well, clarify real good.  Yes, that's the first day I heard that name.

Q.          And then counsel also asked you about communications that you had with Richard Horton and talked about your trial testimony where you said that it had been eight years since you talked to him.  You also testified, though, that he came up to you at the courthouse, correct?

A.          Yes.

Q.          And earlier today, you testified that -- when was the last time you had dealt with

293

Mr. Horton with drugs prior to the robbery?

A.        Excuse me.

Maybe about a year, two years.  It all -- like I said, I quit dealing with him because he was sheisty.

Q.        Uh-huh.

A.        He wasn't -- he was always just devilish, and like I said, he always was cocky. Put it that way.

Q.        Uh-huh.

A.        He was just cocky.  Like, you know, he knew that we was going to get our drugs from him or whatever, you know, because he -- you know, maybe they were bigger pieces or -- I don't know. But, you know, like, he was, like, a demanding drug dealer.  Oh, you going to get my -- drugs from me, you know, or something like that.  Well, no, I'm not --

Q.        Uh-huh.

A.        -- because this is my money.  I work hard for my money.  I'm going to spend it the way I want to spend it.

Q.        Okay.  So if you had to estimate, would -- the last time you dealt with them, how long was

294

that before the robbery?

A.     Like I said, maybe a year or two.

Q.     Okay.  And then you also -- I'm going to hand you back Exhibit 1, okay, the photo array that you signed.  I just want to be crystal clear on this.

Did the detective ever show you a different photo other than this one?

A.     No.

Q.     Okay.  So when you described to Plaintiff's counsel about a photograph that was shown to you by Detective Brenda Walker, what photograph was that?

A.     Like I said, it wasn't like this.  It was, like, a longer sheet of paper, and it was just a roll.  It wasn't these numbers and the numbers was under them then.  I don't know what number it was, but it was the same picture.

Q.     Okay.  But was there always multiple pictures or was it just a picture --

A.     I said it was a row of them.  I don't know how many it was, but I picked him out immediately out of that row.  It wasn't two rows.  It was just one, I do believe.

295

Q.        And just to clarify, did she ever show you just a picture of only Richard Horton?

A.        Not that I recall.

Q.        Okay.  So whenever you saw photos, it was photos of multiple people --

A.        Yes.

Q.        -- not just Richard Horton?

And do you recall ever meeting with Brenda and looking at photos other than December 4th --

A.        No, I do not.

Q.        Okay.  And the person that you identified in this photo array, was that the drug dealer in the neighborhood that you'd been referring to?

A.        Uh-huh.

Q.        And is that also the person that was the robber on --

A.        Uh-huh.

Q.        -- October of 2004?

A.        Uh-huh.

Okay.  Can I ask a question?

Q.        We're almost -- we're almost done here, Ms. Curry.  I'm sorry.  Just bear with us for just

296

a second.

And do you remember now whether -- I think you said you weren't sure. Are you not sure whether you mentioned the -- that Richard Horton was a drug dealer to the police?

A. No, I don't think I mentioned it. I don't know.

Q. So you don't think you mentioned that to police?

A. I can't remember, but I'm sure they knew.

Q. Okay. But I'm asking: Do you --

A. No. No, I don't. That's my answer. No, I don't.

Q. You don't remember or you didn't --

A. I don't remember.

Q. Okay. So you don't remember mentioning that Richard Horton was a drug dealer to the police?

A. No.

Q. Okay.

MS. TANOURY: Okay. That's all I have.

THE WITNESS: Okay.

- - - - -

297

                    FURTHER CROSS-EXAMINATION

BY MR. LOEVY:

Q.          I just have one follow-up inquiry area,
and it will be very short.

          Ms. Curry, you have testified about the
photographs you were shown of Richard Horton, and
you said you only remember picking them out among
other photographs the one time, right?

A.          Yeah.

Q.          And that's when you signed it?

A.          Yep.

Q.          But you've also testified twice now
about an occasion a couple of days after the
shooting where the female detective came to your
house and showed you a single photograph, not an
array like the one where you have to pick somebody
out.

A.          It wasn't a single.  It wasn't a
single.  It was just -- it was on a sheet of
paper, but it was just a single row.  It wasn't a
double row.

Q.          All right.  Did you testify twice,
earlier this morning and earlier this afternoon,
that she showed you a single photo?

298

A.          Yeah.

No, she didn't show me a single photo. It was the same photos but just on a single row.

Q.          Okay.

A.          I didn't say that.  I said it was the single row.  I didn't say it was a single picture.

Q.          Well, the record --

A.          I said it was a single row.

Q.          The record will reflect what the record reflects.  But let me ask you this:  When you did do -- look at a picture a few days after the shooting, and long before you picked out the photo from the six-pack on December 4th, you were shown a different format of photos of Richard.  Do you --

A.          Yes.

            MS. TANOURY:  Objection.

Q.          That's true, right?

A.          Yeah.

Q.          And it was either a single row, as you're saying now or -- well, you've already said twice at this deposition it was a single photo.

            MS. TANOURY:  Objection.

Q.          Do you acknowledge that you testified

299

to that under oath not two, three hours ago?

A.          That -- what now?

Q.          That you were shown a single photo a few hour -- a few days after --

A.          I never said it was a single photo.  I said it was a single line.  I never said it was no single photo.

Q.          I guess we'll have to count on the court reporter to get it right.

And --

A.          Well, I guess so, because I said it was a single -- it wasn't a double picture like this.  It wasn't two rows.  It was only one row with probably the same pictures on here, but I remember this one right here.

Q.          Let me ask you this.  Are you 100 percent --

A.          Yes, I am.  I'm 1,000 percent sure.

Q.          Let me ask the question.

Are you 110 percent certain, swear on everything you love, that you have not testified at this deposition that you were shown a single photo?

A.          I --

300

MS. TANOURY:  Objection.

A.          I will.

Q.          What's the answer?

A.          I mean, whatever.  I agree that I did not see a single -- see as single photo.

Q.          You did testify that you saw a single photo, right?

A.          I did not.

Q.          Are you 100 percent certain that --

A.          Yes, I am.

MR. LOEVY:  All right.  Then I have no further questions.

                    - - - - -

              FURTHER CROSS-EXAMINATION

BY MS. TANOURY:

Q.          Just the last -- sorry.  My last -- just -- I just want to clarify.

            Can you describe anytime -- like, can you just describe when you saw pictures or if there was more than one time or only one time.

A.          I want to say it was one time, other than today, that I seen that picture again.

Q.          And was the one time other than today when you did the photo array with --

301

A.        Ms. Walker or whoever she was showed me the picture.

Q.        And was that on the day that you signed the photo array?

A.        Uh-huh.  And the day he was in the courtroom when I had to point him out.

Q.        Okay.  Were there any other times where you were --

A.        No.

Q.        -- shown the photograph?

MS. TANOURY:  Okay.  No further questions.

MR. LOEVY:  No further questions.

THE VIDEOGRAPHER:  This concludes the deposition.  We are off the record.  The time is 3:45.

(Signature not waived.)

- - - - -

Thereupon, the foregoing proceedings
concluded at 3:45 p.m.

- - - - -

302

State of Ohio     :          C E R T I F I C A T E
County of Franklin: SS

I, Craig Ross, RPR, CRR, a Notary Public in and for the State of Ohio, certify that Rhonda W. Curry was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on October 10, 2024.

_Craig Ross_

_____

Craig Ross, RPR, CRR, Notary Public-State of Ohio
My commission expires July 7, 2026.

303

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

I, Rhonda W. Curry, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

Ref: CR312319RC

**Exhibits**

**312319 Exhibit 001** 4:8
107:23
108:1
143:13
191:10,14
294:4
**312319 Exhibit 002** 4:9
143:6,8
**312319 Exhibit 003** 4:10
147:23
148:1,17
**312319 Exhibit 004** 4:12
171:17,21
**312319 Exhibit 005** 4:13
195:9,13
**312319 Exhibit 006** 4:14
197:1,5
**312319 Exhibit 007** 4:16
198:3,5
**312319 Exhibit 008** 4:17
219:20,22

**$**

**$40** 18:14
85:20
130:11
131:4,7
**$60** 76:16

**0**

**005898**
171:24

**1**

**1** 107:23
108:1
143:13,24
144:6
191:10,14
294:4
**1,000** 299:18
**1.1** 174:13
**10** 67:19,21
90:11 94:2,
10 143:11
144:19,24
**100** 120:22,
24 139:4,7
221:15
222:19
246:23
247:5
248:11
249:2
277:23
283:5 286:5,

17,22
299:16
300:9
**101** 248:7
**10:01** 5:2
**10th** 79:12
**11** 189:16
**11-11-11**
98:1
**110** 299:20
**11:19** 90:17
**11:30** 98:9
**11:31** 90:21
98:1 103:23
**12** 9:20,21
**12-4** 280:1,3,
7
**12-4-04**
109:8
193:14
**12-4-2004**
109:5
278:21
**1250** 12:19
28:2 33:9
61:2 70:11
76:21
109:10
188:10
219:18
**12:00** 98:9
**12:06** 126:6
**12:21** 125:23
**12:31** 126:10
**12:54** 150:16
**12:58** 150:19
**13** 9:21 41:10
66:15 68:23
73:6
**14** 140:13
203:18,23
**1425** 186:6
**15** 28:2,3
**15-minute**
125:7,10
**15th** 233:23
**16** 25:5
**17** 25:6
101:19
**1730** 6:22
**18** 188:14
**1:27** 276:3
**1:44** 195:2
**1:52** 195:6
**1st** 148:24

**2**

**2** 90:20
143:6,8,16,
18 192:23
193:1

**20** 9:11 27:19
32:4 45:13
51:15 58:22,
23 67:9
110:17,23
123:1
187:10
234:21
236:21
256:2
259:15
**2004** 11:12,
22 12:20
134:1
139:15
144:24
146:14
174:23
190:6,19
191:16
194:13
195:23
198:19
208:18
295:20
**2006** 139:21
147:15
149:1
167:14
228:5 237:8
**2018** 174:21
**2019** 173:19
174:21
**2020** 7:1
**2024** 139:3
142:24
208:12
**21** 188:18
**22** 9:21 50:4
67:20,21
161:21
**23** 83:22
188:22
**24** 188:23
249:2
**25** 149:23
189:1
**27** 139:3
**270** 234:1
**27th** 142:24
**2:30** 233:19
**2:31** 231:8
**2:37** 233:21
**2:44** 231:11
**2nd** 149:1

**3**

**3** 126:9
147:23
148:1,17
193:2
**30** 85:20 86:5
150:9
**30-some**
67:22
**30s** 67:21

**68**:1,2
**30th** 67:19
148:24
**31st** 139:20
148:24
**35** 67:23
**354** 148:9
**36** 67:23
**3:00** 159:17
**3:45** 301:16,
20

**4**

**4** 169:8
171:17,21
195:5
**40** 18:13
76:16
**40-some**
18:12
130:12
**43219** 6:23
**46** 62:10 91:4
**47** 9:10
**4th** 93:7
113:24
114:19,20
190:19
191:16
194:13
195:23
198:19
295:10
298:13

**5**

**5** 193:3,9,11
195:9,13
196:4 198:9,
13
**50** 70:6 74:1
76:16

**6**

**6** 164:21
197:1,5
**6'2"** 27:13
**6'3"** 27:14
**60** 67:24
**67** 8:22

**7**

**7** 188:1
198:3,5
247:10,16
**78** 149:16,18
288:13
**79** 149:14
288:11,13
**7:30** 144:12

**7th** 290:12

**8**

**8** 169:18
219:20,22
**86** 238:5
**88** 164:20
**89** 166:11
169:7
**8th** 114:19

**9**

**9** 127:18
169:20
220:23
247:10,12,
16
**90** 152:20,21
153:2,4
261:17,20
262:2,7,24
263:2
**91** 152:22
187:24
261:17,20
262:2,7
263:2
**911** 222:7
254:5
**92** 189:15
**927** 9:5
127:10
170:18
171:7
186:22
208:14,19
212:18
**96** 11:9
**97** 11:7
**99** 203:16,22,
23 246:23,
24 247:3,4
**9:15** 109:5
276:3,12,15
**9:27** 192:19
193:16
196:1
276:13,14
**9th** 11:11,22
12:20 79:11
94:2 114:20
134:1
139:15
144:24
146:14
208:11,18
271:7

**A**

**a.m.** 94:3,10
143:11
144:19,24
192:21
193:16
196:1
276:12,13

**Aaron** 130:24 131:3

**absolutely** 92:6 182:23

**accident** 233:15,18

**accidently** 122:24

**accurate** 20:14 105:8, 24 146:1 196:12 205:14 239:2 240:18 255:16

**acknowledge** 298:24

**Adam's** 228:14

**adamant** 207:7

**addicted** 67:12

**addiction** 140:7 285:4, 10

**address** 46:2,15 170:20 184:8,10 186:5 212:15 236:11

**Adidas** 152:23 153:19,24 154:6 156:7, 17 201:4,9, 11 259:10 260:10,19, 21 261:6,12 262:16,21 263:3 289:23 290:5

**advance** 175:14

**advised** 184:4,11

**affirmatively** 6:1 151:4,18 182:17

**afternoon** 297:23

**age** 91:6,8

**Agler** 226:5, 15

**agree** 20:5 21:19 111:2 168:13 196:11 252:10,11 300:4

**ahead** 17:22 19:19 99:16 100:13 101:12

145:15 150:5 189:2 283:20 284:16

**air** 21:13 24:23

**AKA** 9:16

**Alana** 5:6 126:14

**alert** 163:20

**all-day** 75:4

**alleged** 247:19

**alleges** 127:9,14

**alley** 220:24 225:6

**alley-like** 225:6

**Alyssa** 6:14

**ambiguous** 282:13

**amount** 213:11

**announce** 5:2

**answer's** 187:4

**answering** 272:1

**answers** 238:10 247:7 248:19 249:12 259:23

**anymore** 115:2 275:24

**anytime** 232:24 233:9 248:12 249:3 300:18

**apartment** 14:15,16 32:19 33:3, 24 34:6,12 38:18 44:19 47:13,15 48:17,23 50:11 59:11, 19 60:1 70:15 80:5 84:8 94:23 119:21 120:20 137:2 270:10 271:10 273:17 280:24 286:6

**appearance** 181:8 255:23

**appearing**

242:9

**appears** 148:8

**appointment** 96:8

**appointments** 96:21

**approached** 272:22 273:2

**approximately** 144:24

**area** 38:4,5, 10 40:11 44:2 62:13 92:10,11 138:9 160:21 161:5 201:24 202:9 211:7 212:4 219:10,12, 14 267:14 287:23 297:3

**armed** 223:22

**array** 93:9 112:12 172:15,16 192:2 194:18 195:10 196:12 197:7 206:13,17 275:13 279:7 294:4 295:13 297:16 300:24 301:4

**arrested** 46:4 47:2 110:3 140:8 141:7,24

**arrive** 124:17

**ashtray** 72:24

**asleep** 87:15 163:23

**aspirins** 99:12

**assault** 199:7

**associate** 132:22 133:14

**associates** 62:9

**assume** 107:22 173:10

**assumed** 54:10

**assumption** 59:24 60:2

**asthma** 165:14

**ate** 101:6

**attack** 165:14

**attempted** 223:14

**attend** 227:21

**attention** 11:21 241:2

**attitude** 43:8 87:8

**attorney** 30:13 31:1,5 126:19 128:20,23 129:2 173:18 203:17 234:6

**Attorney's** 5:13 131:2

**attorneys** 123:12 173:2

**August** 29:20,21 128:12,13 132:20

**Aunt** 100:14, 17

**auto** 250:17 251:4

**automobile** 250:6,14

**Avenue** 6:22 11:3 12:19 43:24 61:2, 12 76:21 109:10 160:21 162:16,23 163:11 170:19 188:10 202:4,5,7 211:3,14 216:14 219:18 221:1,3 257:7 259:3 288:15 290:3

**aware** 127:5, 8,11,16 133:24 164:1 227:18 266:7

**awesome** 234:11

———

**B**

**baby** 8:5 99:12 170:1 185:18 288:10

**baby's** 28:6

**baby-sitted** 12:17

**back** 7:2,17, 23 8:4,6,23 13:11,15 14:3 18:15 20:19 21:16 25:14 41:24 57:8 68:22 72:17,19 73:5,10 74:2,13 87:19 89:14 90:11,20 95:23 98:20, 21 102:3,8, 15,17,24 104:22 110:6,9,13, 14 119:4 125:23 126:9 130:3 132:6 134:16 136:24 137:20 138:4,5,6 150:18 159:7,16 165:5,12,17, 20,22 167:6 168:7,14 169:23 170:2,3,6,8 183:23 185:1,6 186:17,20 189:6,9 191:2,3 195:5 202:7 203:15 205:23 222:15 225:21 231:10,18 235:11 237:8 242:23 248:11 249:19 253:22 254:6 256:12 259:8,15 260:3,8,11, 17,24 288:10 291:15 292:7 294:4

**backed** 23:17,19 274:1

**bad** 63:17 122:7 204:16 218:4 223:4

**badly** 122:23

**balance** 146:5,6,10

**ball** 289:16

**bam** 14:1

**bang** 13:12, 15,16

banging 13:19
bar 25:9,16
Barbara 230:7
barking 12:23 13:7 144:11 185:8
based 146:11 235:12 264:18 277:19 280:23 283:7,13 285:23
basement 28:10,11 124:1
basically 233:11
bastard 62:4
Bates 171:23,24
bathroom 137:23 138:4 140:13
bear 126:20 295:24
beard 222:3 253:2 254:9 255:18,19
beating 66:22
bed 13:21 14:4,6,11 20:19 121:18 180:4 210:5 240:20
beer 97:7 104:9,13 215:7,14,16
began 150:21
begin 5:21 6:17 95:21 149:14
beginning 90:20 126:9 195:5
behalf 141:13 149:24 229:17
behave 103:6
belief 89:17 102:20 257:10
believed 33:12 42:21 47:14 50:11 105:21 106:8 236:18

bell 52:20
Bender 148:23
bent 241:11
bet 119:20
big 22:12 97:20 137:14,22 163:3 199:22,23 254:9 255:18,20
bigger 14:8 293:14
bill 35:23 217:15
bills 41:15
binder 148:17
birthday 67:19
bit 7:12 14:5 68:10 205:19
bitch 15:10 78:6 179:18 181:24 182:5 214:2 241:14 246:1 279:8 284:10
black-and-white 108:15
blacked 20:23 21:22
blacking 21:7
blah 27:21 38:7 89:9,10 115:6,7 130:5,8 160:10 267:16
bleeding 22:10,11 63:5,17 81:23
blew 229:24
block 221:2
blood 22:17 23:13 24:24 240:11,13
blow 73:7 287:17
blue 14:19 27:3 77:8 146:16 158:21,23 164:13 243:8
blurry 107:13,14 220:1
board 51:21 185:4,5
Bob's 226:3, 5,11,13

227:4,7
bone 25:11
bones 25:11
booth 57:22
born 11:5,7
bottom 108:24 149:18 192:11 262:24 263:2
bought 39:21 40:7 43:9,15,21, 23 61:16 70:5 71:20 73:21 203:2 204:6,22 205:13 246:4,9
boy 52:1 68:4 153:24 154:6 185:20 242:22 289:18
boys 289:17
brace 96:20
braids 256:24
brake 13:4
brave 21:5
break 90:3,7, 9 103:17 123:21 124:6 125:7, 8,23 150:11 194:21 231:2,5 250:3
breakfast 157:11 187:9
breaks 35:4 215:3
breath 98:17
breathe 102:6
breathing 98:16 165:15
Brenda 94:5 126:15 127:2 144:16,18 146:17 169:13,14, 15 171:1 187:12,22 190:2 191:15 194:8 206:12,16 294:12 295:9
Brentnell 220:23
briefly

127:22
bring 233:4
bringing 28:24 179:7
Broad 226:2
broke 25:11 30:20 103:10 184:5
brother 87:16 167:4
brought 159:15
brushed 228:18 229:11 230:5
bubble 85:11
bucks 18:13 86:5
buddy 214:10
building 70:15
bullet 25:6,7, 8 136:7 138:16
bullets 94:20
Bureau 173:18
bus 99:23 100:19 183:16 221:4,5,15 222:2,6,15 223:10 250:2 252:19,20, 21,22 253:7 254:4,8,17, 19 255:11 256:15 257:5,10,12, 15
business 131:20 132:2 184:14 264:23 290:17
butts 72:24
buy 40:1 41:16 42:8 43:22 69:16, 17 75:6,7 76:3,4,11 86:12 201:22 252:13,16 283:1
buying 54:16 70:1 204:13, 18

**C**

C-U-R-R-Y 6:20

caddy 225:10
cahoots 214:5
call 8:4,5 24:16 63:18 72:15 81:12 84:3 166:10 222:7,11,15 232:12,15 254:5 260:21 262:16 288:17
called 10:7 59:8 71:12 99:17 100:4, 21 101:24 102:2 103:21 104:4,12 132:10,11 149:24 153:19,22 162:15 165:20 166:3,4,12, 13 170:4,5 185:14 216:18 221:11 225:11 232:2 234:5 253:14,22 259:10 260:19 290:5
calling 8:3 35:8,21 145:17 162:10 246:1 257:21
calm 145:13
canceled 129:15
candlewax 86:10
candy 101:1
capital 197:17
captain 124:24 125:2
car 23:14 70:24 98:12 100:6,8,14, 18 101:12 128:5 155:24 163:5 200:15 201:14,16, 17,22 202:14,18, 20 203:2 204:6,11,12, 18 205:1,4, 5,6,7,13,18, 20,22 206:11 212:5 216:15

246:4,9
247:1,4,19
248:12
249:4
282:10,16,
20,23 283:2

**card** 130:19
131:6,20,21
132:2,6

**care** 96:20,
23 97:6
103:8
141:19
179:1
184:15
234:10

**cared** 103:12

**career** 7:3

**carrying**
23:17

**cars** 10:15
201:16,20
202:17
216:16

**Cartridge**
174:13

**carts** 10:12

**case** 174:13
227:20
291:24

**cash** 226:7,
17 227:2

**Cashier** 7:8

**cat** 228:14

**catch** 100:19
220:22,23
223:10
265:12

**caught**
220:23

**caused**
146:4

**caveman**
255:22

**cell** 170:4,11
190:13

**center** 69:11
210:2

**certainty**
139:4 196:5
278:10

**Certified**
225:7,8,12,
13,20

**chair** 18:4
19:15,18
241:13
284:18

**chance** 90:5
123:13
238:7,13
286:18

**change**
120:14,18
121:14
122:4 215:8
224:16
236:11

257:10
286:24

**changed**
227:12,14
254:15
255:24

**Changing**
246:3

**chatted**
135:15

**chatting**
100:23

**check**
130:14

**checked**
232:2

**checking**
225:17

**checks**
226:8,18
227:3

**Chekingo**
132:2

**child** 168:23

**children** 10:2
11:12,13

**Children's**
11:20

**chill** 41:4
75:2,18
210:5

**chilling**
13:10
183:18

**church** 70:21
71:18,19,21
72:5,6,7
166:6

**cigarette**
24:23,24
90:13
125:12

**cigarettes**
125:13
189:2
190:23

**Cindy** 49:23
132:2
177:17
231:23,24
258:20

**Cindy's**
130:19
131:22

**City** 5:13
126:16
127:1 131:2
136:6
138:22
171:24
179:3
235:14

**claims**
127:5,17

**Clair** 211:15
212:3
216:17,23
217:1,2

221:4
224:21,22
225:9 257:7

**clarified**
170:14

**clarify**
144:17
177:5
186:16
194:7
292:14
295:1
300:17

**clarifying**
144:8
292:13

**class** 91:10,
24

**clean** 41:10
66:16 67:4,6
70:18 75:18
97:3

**cleaned** 7:14

**cleaning**
75:21
102:16

**clear** 20:13
51:23
133:20
175:13
204:19
241:19
246:4
257:22
268:11
280:17
294:5

**client** 13:3

**clip** 6:9

**close** 14:6
83:13 103:2

**closer** 71:1

**closing** 95:5
107:1

**clothes** 27:1
93:22 97:2,3

**clues** 46:12

**cocaine**
67:11

**cocky** 293:8,
11

**coffee** 157:9

**color** 16:4,5
78:1,5,8
180:22
181:11,12
242:11,24
243:7,12

**Columbus**
6:22 126:16
127:1
169:10
179:4
187:11
195:9 197:6
236:14

**Columbus'**
235:15

**comfort**
222:12

**commit**
127:18

**committed**
152:12

**communicat
e** 271:14

**communicati
ng** 271:4

**communicati
ons** 220:15
292:17

**company**
10:7 35:21
142:9 226:9

**comparison**
174:15

**complies**
130:17
131:24

**concern**
271:18
272:2

**concerned**
62:20 232:5,
21 240:6

**concerns**
8:24

**concluded**
301:20

**concludes**
301:14

**conclusion**
95:18
173:24
174:7,12,14
176:19,21
177:13,22
178:17
272:8

**conclusions**
176:13
178:16

**conducted**
94:5

**confirm**
186:6

**confused**
176:22

**confusing**
252:9

**confusion**
77:9

**congratulatio
ns** 67:4
73:11

**connections**
92:15

**contact** 8:8
169:9
203:18
204:1
223:14
228:9,17
247:8,11,18
248:3,6
249:24

253:10
254:16
273:11

**contacted**
201:18
228:24
229:1

**contained**
219:1

**context**
289:24

**continue**
159:6

**continuing**
165:24
166:11

**convenience**
224:20,21
227:7

**convention**
69:11 210:1

**conversation**
33:20 34:5
40:20 42:1
49:12 63:3
127:23
132:16,17,
21 135:9
153:5,11
154:11,23
157:1 159:8
214:22
231:20
234:16
235:13
248:14
249:7 250:8
251:20
252:1,6
261:2 264:6
270:14,16
279:19
289:22
290:1
291:14,15

**conversation
s** 30:10 162:6
182:22
220:6
231:21
251:7
252:13

**convicted**
127:9

**convince**
120:23
121:3

**cooked** 97:1

**cooking**
124:18,19,
20

**cool** 88:10
103:11
222:18

**cop** 43:8

**copy** 32:7
108:5,6,7
144:8 148:7
171:21
173:7,16
277:22

core 84:17

corner 35:22 44:1 69:19 189:7 202:3 211:24 216:11,12 225:10 239:8,15

correct 25:19,21 26:7 32:20 48:17 127:4 144:20 147:16 148:20 150:23 151:3,14 180:15 207:21 238:24 247:24 252:2,4,5 262:13 267:10 268:13 270:3 274:8, 15 281:7 283:9,11 286:1 292:21

cost 76:15

COTA 223:10,11 250:2

counsel 5:2 107:17,19 108:20,22 143:17 148:6 149:6 150:8 172:5, 13,22 237:22 241:24 257:20 261:19,21, 23 263:7 277:8 287:18 290:18 292:16 294:11

counsel's 17:5 243:15 283:4

count 299:8

County 29:2 31:17 147:13

couple 9:24 33:16,17 41:15 66:2, 17 71:17 74:10 75:2 80:3,21 82:3 89:3 115:18 118:10 123:19 147:15 150:23 156:8 211:2 227:5 231:15 267:13 274:3,23

297:13

court 8:5 40:13 109:18 110:8 115:2 129:23 147:21 161:10 178:12 249:16 273:5 290:11 299:9

courtesy 172:19

courthouse 141:3 218:15 292:21

courtroom 109:24 135:19 140:1,12 151:13,17 152:12 207:20 208:1,5 301:6

cousin 70:20 71:3,11 166:7,9 168:10

cover 17:19 130:21 131:1

covered 26:20 58:17 119:13 126:20 238:21 239:3 240:12

covering 18:19 20:1 105:5

crack 67:11 68:24 74:22 75:6 76:3 86:12,23 162:4 285:9

crazy 45:1 160:1

crew 66:8,9, 11 226:19

criminal 21:16 139:18,23 147:10 150:22 167:15 173:18 202:22 227:19 228:4 237:7 238:2 239:12 246:16 250:18 262:10 284:4

cross 202:7

CROSS-EXAMINATION 126:12 237:16 287:13 297:1 300:14

crowd 160:17

cry 103:5

crystal 294:5

curb 289:16

current 212:15

Curry 5:16 6:2,4,18,20, 21 11:15,16 17:4 28:13 29:14 31:11 33:20 37:8 50:9 84:7 90:4,23 94:2,6 97:24 98:15 102:11,22 108:19 120:5 123:14,18 124:12 125:7 126:14 128:10 129:20 148:16 149:19 150:21 171:11 182:16 193:13 195:16 231:12 233:11 235:21 236:20 237:21 244:3 247:1, 16 250:4,24 266:18 291:19 292:1 295:24 297:5

Curry's 144:2 148:11

curve 225:7

custody 24:3

customer 13:5

cut 97:8 162:20

Cynthia 24:16 100:14,15, 17 165:3 166:24 169:22 170:3 185:20,23 186:2,11

Cynthia's 186:5

———
D

dad 10:7,8 18:5 24:10 28:6 35:19 45:1 59:6 103:12 115:22 117:5 167:2 170:19 186:11 211:2,4 218:12 223:23 225:16,18 236:8

dad's 11:2,3 18:4 59:6 138:1 236:9

damn 66:5 142:3 215:4 283:2

dances 125:1

dancing 91:13 92:2

dark 27:3

date 79:10 109:18 110:8 115:2 128:2,11 193:14 194:13 195:23 233:13 275:22

dates 40:3 147:17 149:2 175:1

daughter 8:17 11:6, 15,19 28:2 60:20 62:6, 15 66:18 67:19 71:2 72:11 90:24 91:3 100:4 101:11 102:14 104:4 105:20 106:12 114:24 128:5 153:6, 12 155:24 159:17 165:23 166:3,5,13, 14 168:5 170:4,5 183:15 184:15 185:19 190:14 201:2 202:10 258:15 259:5,8,17 260:4,23 261:22 262:4,12 263:16 267:3,18

269:8,23 285:13 287:19,21 288:9 289:23

daughter's 12:18 62:10 70:20 71:11 76:23 77:1,2 93:23 146:24 188:11

daughter-in-law 101:9 103:22,24

David 5:10 175:19

day 11:22 12:15 28:23 32:2 36:5,7 48:1 49:22 69:4 72:12 73:2 74:2,22 75:1,3,5,15, 16 83:13 85:10 93:5,6 95:24 96:1 97:1 99:8, 23,24 100:1, 11,16 101:7, 9 102:7 109:20 110:5,8 112:21 113:23 131:14 132:24 134:16,23 135:3,13 136:3,9 144:23 146:16 155:1,7,8, 17,20,22,23 157:2 159:13 164:8 167:19 169:1 177:9, 10 178:7,9, 10 183:20 190:17 191:8 204:14 210:6 215:15,16 232:1 233:14 234:8 235:1, 19,20 244:19 259:11 273:11 274:18,22 275:17 276:2 278:19,20 279:10,17 292:3,15 301:3,5

daylight 243:5

days 7:20 48:2 63:20 79:13,15

80:3,21 82:3
92:23 106:2
110:2
155:21
235:1 274:3,
23 285:5
297:13
298:11
299:4

**dead** 66:11
71:5 73:23

**deal** 40:22
41:5,6 84:21

**dealer** 43:4,5
44:13,18,22
53:20,23
54:11,13,17
57:23 59:20,
24 62:24
65:10,23
70:9 76:4
78:11,18
83:7 84:22
85:15 86:21
105:22
112:14,17
113:1 117:8
118:11,15
119:1
122:22
151:23
152:16
257:20,22
281:5,10
293:16
295:14
296:5,18

**dealer's**
55:8,16

**dealers** 70:8
74:23

**dealing**
43:19 74:10,
22 84:20
86:18 87:3
209:17
293:4

**dealings**
59:5 202:11
281:20,21

**dealt** 65:19
84:10 88:2
209:19,22
210:18
292:24
293:24

**death** 50:5
81:23 82:1
98:3

**deceased**
8:19 218:13

**December**
93:7 113:24
114:19,20
188:3 190:4,
19 191:16
195:23
198:19
275:10,13
280:1
295:10
298:13

**decided**
100:15
257:1

**deep** 191:7

**defeat** 70:18

**defendant**
126:15
235:14

**Defendants**
5:7,9,11

**defense**
107:19
108:21
123:12
237:21
241:24
244:5
261:19,21,
23 263:7

**demanding**
293:15

**dementia**
235:2

**denim** 27:3,4

**Department**
236:14

**depends**
75:9

**deposition**
27:18
126:24
129:18,21
142:15
234:18
298:22
299:22
301:15

**Derrick**
73:22

**describe**
43:1 143:21
180:23
196:5
232:19
239:9 241:6
242:11,19
243:2
250:16
253:5
255:19
278:9
300:18,19

**description**
27:1 196:12

**detect** 246:2

**detective**
33:8 39:6
42:10,15,20,
22 44:4,8,
10,11,12
56:5 59:12
77:7,11,14
78:4 80:2
89:20 92:20
93:12 94:4
106:3,6,16
126:15
127:1
138:15
144:16,18
146:17,19

147:3
158:22
164:6
169:19
170:6 171:3,
12 187:15,
18 188:3,13
193:18
198:22
199:9,13
200:1,14,18,
21 201:13
206:13,22
207:3,12
243:22
244:9,23
245:1,2,3,5,
10,12,15,21
260:18
261:4,5
262:20
263:21,23,
24 264:4,17
265:8,24
274:4 275:4
278:5
281:13,14,
22 285:18
286:9 294:7,
12 297:14

**detectives**
40:14 42:2
45:20 93:15
105:16
169:10
259:4
263:20
264:10
280:8 282:1,
3,6,9,14,18

**determined**
72:22
156:22

**devil** 107:8
111:19,24

**devilish**
84:16 94:19,
20 111:20
293:8

**devilish-
looking**
84:13

**devilment**
111:21

**devious** 85:8

**devious-
looking**
84:12

**Dexter** 5:8

**die** 113:9
125:20
129:10
141:20
191:8 287:6

**difficult**
179:12

**Diggs** 49:20,
24 50:1,6,
10,24 51:8,
11 52:8,12
53:17 60:8,
12,14,16,18

61:17,19,21
62:19 65:12,
14,15,18,19,
20,21 113:8
132:24
133:2,7,24
134:8
159:12
160:12,16
161:12,13,
20 173:24
174:10
176:17
177:14,22
178:2,3,18
230:22,23
258:16,18
259:5 271:7,
9 272:6,10,
14 291:6,8,
9,11 292:2,
3,10

**Diggs'**
133:13,22
134:12
174:8
178:20
270:7,9

**Diggs/adidas**
50:14

**dime** 73:2

**dinner** 96:24

**direct** 5:19
274:2

**directly**
222:1

**Dirisamer**
5:10 171:23
175:8,17,19,
20

**dirt** 10:7

**disbelief**
102:14,20

**discuss**
47:17
247:15

**discussed**
135:13
154:10
232:14

**discussing**
179:15

**discussion**
48:10,16,22

**dispute**
147:3

**distance**
103:15

**ditching** 29:3

**Division**
187:12
195:10
197:6

**DNA** 60:4
62:4 65:16,
18 121:1,9,
14 122:16,
18 133:8,10,
17,22
134:17,23

135:1,3
136:6,7,20
138:19
141:8,9,14
142:3,4,12
158:24
159:4,8,10,
11 171:8,22
173:9,17,23
174:3,8,12,
14,19,20,22
175:3
176:14
177:1,6,12,
13,21 178:3,
7,20 235:17
236:4 270:7,
9,24 271:14
272:4,11
286:24
291:16,18
292:4

**DNAS**
141:22

**doctor** 97:16

**doctor's**
96:8

**Doctors**
259:3

**document**
107:9
108:19
143:14,18
148:9 173:6,
14 195:17
277:10,12
278:1

**documents**
130:16
275:20

**dog** 12:23
13:7,13,14
144:11
185:8
268:23
269:1,3

**dogs** 179:8

**dollar** 10:16
130:12

**dollars** 18:12

**door** 13:12,
19,20,22
14:6,9,10
22:20 29:14
57:17 70:23
93:21 98:20,
21 102:23
112:4,5
138:4
145:21
146:4,7,8
180:3
184:11,19,
21 185:3,4,
5,6 216:1
224:11
229:20

**Dorsey** 5:8

**double**
297:21
299:12

doubt 119:23
120:1,9,11
121:19
208:10,20,
23 272:16
290:21

Doug 5:14
175:24

dough 87:24
88:5

downstairs
102:8

downtown
125:18

drag 19:18
23:15

dragging
19:14,17

drain 74:12

drank 97:7
157:9
215:16

drew 33:16
77:18
241:16

drill 125:1

drink 104:9,
10,13

drive 166:16,
22 167:1,3
225:17

driver 10:5

drives 257:9

driving 24:14
48:5,10
100:7
224:14
246:6

drop 141:16

dropped
100:9 221:8

drove 10:5,6
226:21,22

drug 14:3,4
17:24 18:3,
8,9 19:20,21
20:17 44:13,
18,22 53:20,
23 54:11,13,
17 55:8,15
57:23 59:20,
24 62:24
65:10,23
70:7,9 74:23
78:11,18
83:7 84:22
85:15 86:21
105:21
110:2
112:13,17
113:1 117:8
118:11,14
119:1
122:21
140:7
151:23
152:16
241:13
257:20,22

281:5,10
285:4
293:16
295:13
296:5,18

drugged
285:6

drugs 37:7,
18 38:9,21
39:12,21
40:1,7,21
41:12,16
42:3,8,21,24
43:3,10,15,
21,22,23
44:6 46:19
53:20 54:17,
24 58:3,24
61:16 66:4,
5,7,22 67:10
69:15,22
70:5,18
73:15,21
74:18 87:17,
22 153:14
204:22,23,
24 206:9,10
252:13,16
265:14,16,
18,19,21
282:7
287:23
289:17
293:1,12,16

drunk 215:14

duly 5:17
150:1

dust 71:13

duties 7:23

___

**E**

earlier 34:9
143:11
179:14
180:11
194:8
250:18
292:23
297:23

early 13:9
22:22 68:2
188:3
228:13

ears 279:9

eased
184:21

easy 172:1,4
179:11
223:24

eat 41:3
75:18 101:5
157:10

eating 75:20

effect 272:22

efficiency
11:1

Eighteen 7:6

elbow 184:6

electric
35:21

eleven 48:2

else's 122:15
133:17

email 172:2,
7,11 175:21

emails
172:12

emergency
98:7,23
99:16 165:3

emotional
31:7 135:17
140:24
232:5,8,23,
24 233:9
234:4

emotionally
123:7

empty
224:11

encounter
18:18 22:23

end 20:18
24:15 87:23
88:4,21
213:14
223:8 255:4
291:14

ended
189:15

enjoyed 72:4

entered
25:18 93:18,
24

entire 150:9

entirety
135:9

envisioned
83:11

Epstein
131:3

established
240:14

estimate
65:23 70:4
293:23

evening 12:9
41:5 75:13
154:13
214:23
215:12,13,
14 232:13

Everett
61:11 259:2
288:14
291:1

everybody's
111:17

everyday
7:23 135:15

evidence
121:1

evidently
60:12 81:11,
13

evil 242:9,22
243:10

exact 182:2
256:21

examination
5:19 274:3

examined
203:16

excluded
176:20
203:11
270:24
271:1,14

excuse 8:9
53:8 87:11
206:15
246:19
293:2

exhibit
107:18,23
108:1 143:6,
8,13 147:23
148:1,17
171:17,21
172:11
175:6,11
176:1,10
191:10,14
195:9,13
197:1,5
198:3,5
219:20,22
294:4

exhibits
172:3,13,17
194:22
275:24

experience
74:19

explain 56:3
78:17 89:19
112:23
118:18
153:11

explained
44:8 84:5
106:3,6,7

eye 239:15
253:9
254:16

eyebrows
277:20
278:11

eyes 14:23
15:1,12,17
16:1 17:19
27:6 32:24
78:10 83:9,
13 84:9,11,
12,13 94:19,
20 95:5
105:4
106:23
107:1,2,3,6,
7 111:16,18,
23 112:9
119:5,9,14,
17,24 120:4,
7,8,19,21
121:3,20
180:21,22
181:2 196:7,

22 238:18,
22 239:5
242:2,4,7,8,
11,12,19,22
243:10,12
278:2 283:8

eyewitness
240:3

___

**F**

face 15:23
17:12,13
18:19 19:9
20:1 22:17
25:1 26:20
50:2 58:17
83:11 105:5
111:11,14
112:3
179:15,17
180:1
237:23
238:14,18,
21 239:3,13
240:12
241:9 268:5

face-to-face
228:23

fact 28:4,18
35:15 41:6
84:2 145:8
151:2
180:14
217:4
245:16,23
249:9
252:16
287:2

fair 119:19
123:8 233:7
239:9 266:5
271:6
286:12

faith 29:5

fake 74:11

fall 72:8
214:19
223:8

family 8:1,
16,20

fare 254:20

fast 63:13
95:10
229:12

faster 124:13

father 186:9
235:3

father's 24:2

faulting
175:13

fear 224:12

February
148:24

feel 104:19,
20 122:7,23
221:20

feeling 255:2

| | | | | |
|---|---|---|---|---|
| **feelings** 224:15,16 | 284:16 | **frame** 8:24 | 269:17 280:23 | **goodbyes** 233:17 |
| **Feldkamp** 213:3 | **finished** 28:10 61:5 100:5 231:4 | **Franklin** 147:12 | **General's** 173:18 | **goodness** 66:24 |
| **fell** 14:2 20:19 180:8 184:5 | **fire** 136:21, 22 | **freak** 83:17 233:15 | **get along** 84:24 | **gotcha** 38:11 52:9 56:17 59:10 60:3 64:24 66:21 84:15 111:13 118:9,24 254:22 257:5 |
| **felt** 23:20 | **firearm** 223:21 | **freaked** 83:17 109:21 | **Gibbard** 24:9 161:1 162:16 163:7,12 170:19 186:6 221:4 225:1,9 | |
| **female** 56:3 77:11,14 80:2 82:18 89:20 92:20 93:12 146:19 274:4 281:14,21 297:14 | **firm** 122:3 | **fresh** 83:12 | | |
| | **firsthand** 91:20 | **Friday** 35:16, 18 100:1,4 | | |
| | **fix** 216:16 | **friend** 71:4 87:12 92:10 115:12,23 116:12,14, 24 117:2,3, 17,19,22 232:9 234:7 269:8,24 | **Girard** 5:14 175:24 | **grab** 107:20 124:2 |
| | **fixing** 165:13 287:17 | | **girl** 63:11 72:5 166:5 | **grabbed** 18:11 180:6 |
| **fight** 214:16 | **flew** 229:12 | | | **grabbing** 6:7 |
| **figure** 36:13 37:3,4 38:17 47:12,14,17 57:10 59:12 61:13 63:21 65:1 94:14 156:4 172:9 214:4 259:16 260:4,9 262:11 | **flip** 149:8 | | **girlfriends** 160:19 | **grain** 103:18 |
| | **floor** 71:7 145:7 | **friend's** 116:15 | **give** 19:1,4 34:18 35:2 49:2,6,10 85:11 108:4 131:17 140:2 165:5 184:14 205:17 213:11 215:2 224:1 229:7 238:10 247:13,17 248:19 249:2,12,14 250:23 268:24 290:16 | **grand** 7:21 12:14 |
| | **focus** 36:2 | **friends** 35:5 66:20 92:1, 4,9 160:20 209:7 213:1, 2 223:24 226:12 265:1 288:3 289:14 | | **grandchildren** 7:22 |
| | **focused** 241:3 247:16 | | | **granddaughter** 11:5 104:16 |
| | **focusing** 33:23 | | | **granddaughter's** 124:20 |
| **figured** 16:13 36:14 55:21 156:3 | **foggiest** 91:11 | **friendship** 35:5 215:3 | | **grandkids** 12:15 40:24 103:9 224:3 233:2,5 |
| **figuring** 60:23 61:6 | **follow** 231:13,19 | **front** 12:23 49:22 70:23 98:19 137:12 177:18 185:6 191:10 275:21 | | **Grandma's** 124:19 |
| **filed** 127:1 | **follow-up** 237:19 287:15 297:3 | | | **grandmother** 72:6 |
| **filling** 225:8, 11 | | | **giving** 88:3 99:12 | **grandson** 83:18 124:16 169:23 185:17 |
| **final** 171:22 174:2 | **food** 7:14 41:3 | **frustrations** 179:13 | **glad** 101:14, 17 125:16 223:17 | |
| **finally** 68:20 70:17 99:15 103:19 158:13 | **forced** 146:3 | **full** 76:9 | | |
| | **foregoing** 301:19 | **funny** 98:16 | **glanced** 221:7 222:20 | **Grant** 25:4 94:6,7 99:23 101:24 102:10 144:19 145:1 165:4, 21 166:18 |
| **finances** 75:9 | **forehead** 145:24 | **furniture** 135:3 137:3 | | |
| | **forgot** 58:22 172:2 175:13 | **Furquan** 230:9 | **glasses** 227:15 257:3 | |
| **find** 28:10 44:22 46:8, 13 114:4 134:14 135:6 201:7 | | **future** 17:1,8 73:8 | **glory** 72:8 | **gravel** 10:6 162:20 224:24 |
| | **form** 191:18 194:18 197:5,7 | | **God** 67:18 168:24 180:6 221:8 222:16,21 254:18 261:18 262:7 | |
| | | ———— | | |
| | **format** 20:11 33:21 298:14 | **G** | | **gray** 14:19 27:2 77:17 83:14,19 84:4,13 181:3 243:7 |
| **finding** 57:2 174:7 | | ———— | | |
| **fine** 41:14 141:17 172:12 176:3 | **formed** 192:7 | **game** 124:23 | | |
| | **forward** 72:19 | **garage** 98:12 | **God's** 72:8 | **grayer** 227:17 256:23 |
| **fingerprint** 121:18 | **found** 27:24 28:4,9 46:2, 20 56:9 59:18 74:13 133:10,22 136:18 235:22 270:9 292:4 | **gas** 166:17 | **good** 68:15 126:1,2 141:17 148:7 180:18 222:13 231:5 238:8 254:11 255:1,12 292:14 | |
| **fingerprints** 60:4,6,9 134:11,14 | | **gave** 9:1 13:14 28:23 29:19 86:5 99:11 129:17 130:11 131:4 132:10 146:13 216:4 223:3 247:6 251:1 253:6 255:13 257:19 | | **great** 71:2 107:21 108:10 233:14 |
| | | | | **Greathouse** 73:23 |
| **finish** 7:22 17:22 19:19 100:9 189:23 239:24 244:6 245:19 283:21 | **fourth** 267:17 | | | **grew** 222:3 |
| | **fragments** 136:8 138:16 | | **goodbye** 229:17 230:4 | **groggy** 157:6,15 |

**ground** 126:19

**grounds** 93:18

**group** 92:9 207:13

**guards** 98:11

**guess** 8:12 16:20,22 17:9,10 32:2 34:24 44:23 46:19 56:15 58:2 64:5 68:7 88:20 99:13 103:18 107:7 131:16 154:7 180:23 214:10,15 215:9 260:14 289:3 299:8, 11

**guessing** 16:21 187:3 201:10

**gum** 85:12

**gun** 14:2 17:21 19:7 20:20 21:9, 17,20,23 22:6,7,19, 20,23 23:9, 10 25:19 26:9,12 33:15,18 77:6,18,19 78:23 145:20 180:10,12 199:15,16, 17,20,22 200:7,12 214:17,20 239:23 240:19,22 241:3,5,16 283:18,24 284:13 292:6

**guns** 33:17, 18

**gunshot** 21:24 22:18 25:16

**guy** 48:23 49:2 52:2 53:10,23 56:8 57:22, 24 58:4 62:24 64:16 80:5 83:3 84:8 111:3, 22 112:3,13 116:4 117:11,22 122:8,24 214:4 253:2 254:8,12,24 255:11 280:9,12,14

283:14 288:24

**guy's** 117:6

**guys** 9:24 38:16 69:5 74:9 90:11 107:17 108:15 172:2 175:24 188:17 211:24 260:1,3 275:18 287:24

**guys'** 73:24

---

**H**
---

**hair** 119:6 227:17 256:23

**half** 27:13 66:11

**half-hour** 125:8

**hallway** 101:20 207:24

**hand** 22:20 143:5 147:22 171:21 195:8 197:4 198:2 228:22 294:4

**handed** 29:14 173:13,16

**handful** 209:12,14

**handgun** 145:24 199:23

**handicap** 221:6,19

**handing** 130:15 148:16

**handle** 158:19

**handwriting** 108:24

**handy** 107:18

**hang** 92:1,17 211:13,24 222:6 253:20

**hanging** 68:17 289:15 290:3

**happen** 134:23 158:20 224:4 233:22

291:12

**happened** 9:18 10:9,22 11:11 12:2, 8,22 72:2 73:17 79:9 85:2 89:3,5 94:23 96:6 97:6,8 105:4 109:5,14 114:2 115:20 129:12 137:12 141:2 151:9 153:17 154:20 165:8,11 168:8 171:7, 15 174:22, 23 175:4 184:9 187:10 188:4 190:20 213:23 214:1 233:19,23 236:21 263:9 264:2 265:23 266:1,6 270:2 279:20

**happening** 95:9,10 266:20 268:12

**happy** 142:20

**hard** 68:12 85:12 103:4 106:22 126:18 172:4 284:20 293:21

**harm** 213:16

**Harmon** 228:7

**Harris** 230:11

**hat** 257:2

**hate** 179:6

**hats** 257:2,3

**hauled** 10:6

**Hauling** 10:8

**he'll** 97:10 253:12

**head** 14:2 20:16 22:12, 13,16,21 83:12 88:4 101:22 104:20 145:20 146:8 240:10

**headache** 206:2

**health** 184:16

**hear** 13:13 19:17 21:23 22:18 23:9 117:13 136:2 160:12 161:19 179:3 228:19,20 229:16 230:2 253:17

**heard** 13:14 20:22 23:16 27:8,19 37:21,23 39:11 45:11 49:21,23 50:5 51:9,11 52:8 59:10 60:19 65:13, 20 102:6,7,9 115:5,6,11 117:18 118:4 133:1, 2,4,19 134:5 138:13 153:22 159:13,14 162:1 165:19 178:6 184:2, 19 202:19 204:10,14 230:21 258:3,17 261:9 270:14,15 271:12 279:9 282:23 292:3,9,15

**hearing** 21:10,24 87:20

**hearings** 227:21

**heart** 97:17 98:5 99:3,8, 13 104:8 221:7 234:12

**heartbeat** 99:10

**heat** 177:20

**heavy** 70:21 71:19

**heck** 141:8

**height** 27:11 181:10,15, 17

**hell** 85:11 113:9 120:24 125:20 129:10 138:17 141:21 174:21 191:8 220:2 287:4,6

**helped** 28:9 70:22 118:24

**helpful** 152:9

**helping** 46:12 57:2 99:21

**hey** 42:2 106:7 111:9 115:13 117:22 253:17 262:15 263:21

**hid** 285:1

**high** 75:23

**highly** 157:7

**hip** 184:6

**hit** 14:1 20:16 22:16 145:20 146:7 180:3 214:16 240:10

**hold** 24:12, 13 63:8,9,12 159:18 176:18 222:5

**holding** 145:12

**holler** 24:16

**home** 7:23 12:15 40:24 46:16 47:24 71:4,6 76:22,24 77:1,2 91:24 97:11 98:10 101:18,23 102:22 133:11,12 134:21 135:3 141:16 146:24 169:23 190:18,21 210:4,9,12 224:10 244:20 288:10 292:5

**homecoming** 124:22

**homework** 92:1

**homie** 289:9

**homies** 288:16,21, 23 289:6,7, 8,9,11

**honest** 282:1

**honestly** 62:1 179:5

**honey** 179:8

**Honorable** 148:23

**hoodie**
14:19,20,24
15:18 27:3
77:17 83:10,
14,20 84:4,
14 107:4
111:12,14
119:14
120:20
181:3
182:13
238:22
239:4 243:8

**hook** 237:2

**hope** 234:22

**hoping** 67:2
130:2

**Horton** 9:2
35:2,9,12
36:3,4,12,
23,24 37:2,
17,24 38:9
39:2,11,13,
15,23 40:2,9
42:3,11,21,
23 43:16,21
45:11 46:5,
8,13 47:10,
14 48:17
52:23 53:1,
18 55:16,20,
24 56:7,10,
14 57:7 58:9
60:13,15,16
61:9,10,14,
20,22 64:1,
4,17,20,23
65:17,24
74:5,6,17
79:24 81:7,
9,17 82:4,5,
8 84:23
85:16 86:22
88:10,11,13,
16,22 89:7,
12,24 91:18
105:22
106:9,17,20
110:19
111:6,9
112:24
113:8
121:19
126:24
127:9,17
129:3
138:24
139:5 141:2
148:19
151:12
153:18
154:6
156:13,18,
19 161:18
173:11,20
174:11
176:20
178:4 182:9
183:2
192:17
200:15
201:14
203:1,2,8,19
204:2 206:8
207:10
208:8,11

209:12
210:19,24
211:8 212:6,
18 213:2
217:8
218:10,15,
21 220:6,7,
16,20 227:6
228:20
230:7,13
237:7,10
246:5,11
247:8,18
248:3,12,22
249:3 250:6,
17 251:7,21
252:23
254:13
255:14
256:9
257:21,23
258:3,6,13
259:24
261:22
262:4,13
270:24
271:15
272:5,12,21
274:5
278:18
280:16
282:7,11
285:20
286:1,6,13,
19 289:2,20
290:2,5,19
291:1,8,9,12
292:17
293:1 295:2,
7 296:4,18
297:6

**Horton's**
36:13,14
56:10
126:19
136:18
139:18
147:10
150:22
156:6
203:17
246:16
250:18
251:20
274:13,14
291:23

**hospital**
11:20 22:3
33:14 47:24
48:1,3,6,10
49:6,9 51:24
52:1,13,16
54:5,6 57:8
58:14 62:23
63:16,19
70:11 79:7
80:23 93:19
94:6,7 97:19
98:18 99:1
100:10,16,
18,20
101:24
102:10
105:12
134:20
135:2
144:19

145:1 147:1,
4 154:24
155:1 162:9
163:24
164:10,15,
23 166:15,
18 168:6,10
169:9,16
170:2,8
171:3
187:24
233:17
243:23
244:15
261:3

**hospital's**
166:10

**hour** 125:8
299:4

**hours** 25:6
105:13
123:19
299:1

**house** 11:3
12:18 18:5
23:19 24:16
25:18 28:1,
3,4,9,10
33:14 44:5
49:23 60:9
61:1,4 62:4
63:18 65:17,
18 70:23
73:17 87:11,
22 88:18
89:6 92:16
93:21,23,24
100:15
109:13
113:20
121:10,17
122:16,18
132:18
133:10,17,
22 134:16,
19 136:8
137:10
138:10,15,
19 142:4,5,9
158:24
159:5
162:11,16
163:7
168:14
170:12,16
171:12
177:18
178:20
182:15
184:4
185:11,14,
15 186:10,
18,23
188:11
190:14
199:8 211:4,
10,16,17,18
212:19
213:6
220:24
224:5,22,24
225:3
228:14,18
231:21
235:18,21
236:10,12

243:4
258:21
297:15

**housekeepin
g** 69:12

**houses**
189:8

**hugged**
135:17

**hugging**
232:18,20

**huh-uh**
15:21,24
54:15 104:5

**hung** 160:20
211:12
288:15,23

**Huntington**
8:15 11:19
183:5

**hurry** 205:24

**husband**
59:16 81:23
93:20 96:17
134:20
229:6

**hustler** 10:10
69:7

———————
**I**
———————

**ID** 93:9
110:14
111:3
280:23

**ID'D** 151:20
152:11

**idea** 33:23
91:11
189:13
231:5
278:23

**identical**
132:23

**identification**
80:8 106:19
108:2
114:15
119:4,8
122:5 143:9
148:2
171:18
195:14
197:2 198:6
219:23
237:10
277:8,19
279:7 283:5,
7 285:23

**identified**
82:22
143:13
151:12,17
189:20
196:16
286:9,10
295:13

**identify**
116:22
173:14

198:10
206:24
208:3

**identifying**
281:4

**IDS** 93:4

**ignoring**
28:18

**ill** 8:7 28:6

**immediately**
145:5,23
146:7
165:22
170:7
253:14
294:23

**impossible**
96:14

**impression**
19:2,5
280:23

**inadvertently**
122:24

**incarcerate**
141:9 142:2

**incarcerated**
136:4

**inch** 181:15

**incident** 9:1
10:22 11:10
43:14 73:17,
20 87:10
90:1 129:6
179:24
247:19
266:6
279:20

**including**
237:19

**Indianola**
12:19 28:3
33:9 61:2
70:12 76:21
97:15
109:10
188:10
219:18

**indicating**
88:23
119:12
149:5
192:15
199:24
225:1 255:7
256:3

**indication**
49:2,7,10

**individual**
151:19

**influence**
207:13

**information**
30:21

**informational**
143:24
144:5,15
146:11

**inquiry** 297:3

ins 68:20

inside 191:7

instantly 20:24 140:23 221:8 233:15 257:15

interact 291:12

interaction 141:2 215:11,17 216:7 217:7 218:14 223:5

interactions 218:16,21 246:17

interested 54:24 63:4 68:9 129:16 145:4 149:7 217:14 218:2

interrupt 49:18 143:19

interrupted 255:8

interview 47:4,5 78:20,21 79:3 94:5,7 105:12 106:4 144:2 146:13 244:18

interviewed 76:18,19 144:18,23 263:20

introduced 160:7

intruded 121:17

intruder 18:20 25:18 94:11 111:10 114:16 116:4 119:2 268:1 269:21 270:3 285:14

intruder's 106:23 237:23 245:9

invested 123:7

investigating 40:15 42:1 45:20

investigation 141:13 144:1 159:10

Investigations 173:19

investigative 142:20 194:18 195:10 197:7

investigator 128:21 131:22 132:4,18 270:11

investigators 236:16

inviting 212:22

involve 87:11

involved 19:22 29:7 60:21 61:6 87:10,12 89:24 106:11 204:12 228:4 265:16,19

issued 130:22

items 124:2

___

**J**

jail 136:3

January 139:20 148:24

Jeanette 228:7

jeans 14:19 27:3 181:3 243:8

Jermaine 158:12,13

job 13:4 70:12,13

jobs 69:9

John 148:23

joined 6:11 213:3

joker 35:6

Jon 5:4 175:17 194:17

Joyce 11:3 163:10,11 211:3,4

Jr 9:14 161:14 197:10,17 198:15,18

judge 17:4 148:24

jump 126:21

jumped 165:22

junk 10:14, 17

junked 10:11

junker 10:10

___

**K**

keeping 8:8

Kiawanna 230:11

kidder 97:20

kids 8:17 28:12 99:22 100:13,20 101:12 103:7 157:14 185:17,24

kill 45:2 223:19 283:15,17, 18 284:2,3,6

killed 45:6 66:12,19 89:15 94:21 186:14

Kim 28:8 70:15 71:3 100:5 103:8 104:5 156:14 159:19 160:11 161:9 290:23

Kim's 71:3

Kimberly 11:15

kind 17:16 27:4 63:23 95:1 99:17 103:14 105:13,20 126:20 143:20 157:15 180:4,5 181:6,21 199:16,18, 22 221:6 236:13 239:14 243:3,16,17, 21 244:9,15, 20 245:3,5, 8,22 249:22 253:16,18 281:16

kinds 67:10

kissed 101:13

kitchen 137:13,23 138:4 184:20

knew 15:11, 13 16:13,14, 22 22:9,11 24:7 25:24 27:5 32:19,

23 33:1,4, 11,12,24 34:14,15 39:11,15,18 44:24 45:2,3 46:4,18 48:23 49:2, 7,10 52:22 53:17,22,23 58:8,9 59:15,20 61:9,10,13, 15 62:9 64:5,20 65:17,19 78:1 92:11 94:18 99:14 105:22 106:7 112:13,16, 24 113:5 115:7 117:8, 10,11 118:11,15 133:18 153:14,15 154:3,4 155:11 156:8,9 161:12,13, 14,17 166:5, 24 167:3 189:4 194:6 201:3,19 203:1 205:12,14 206:8 209:5, 9 210:18 211:12 215:23 217:10 218:10 235:23 240:9,10 244:21 257:23 258:1 259:1, 7,9 261:15 263:15 266:13 267:13 274:17 280:8,12,15, 18 281:4,10 282:7,19 287:22,23 290:2,20,24 293:12 296:11

knocked 29:13 112:6 163:22

knocking 13:17

knowing 138:18 141:5 201:14 221:10 250:17

knowledge 91:21 246:7 251:21

Kroger's 10:12

Kyle 73:18, 22,23 74:5 87:21 88:16, 22 89:6,8, 14,15 213:9 264:24 266:3

Kyle's 265:1

___

**L**

ladies 128:4

lady 129:17 228:22 250:1

laid 13:10 20:15 23:8 226:22

Lakeon 230:13

late 68:1 175:2

laughed 162:6

laughing 103:4 197:20

law 158:19

lawsuit 8:24 126:16,24 127:6,17 235:15

lawyer 132:22 135:19

lay 95:20 98:21

laying 104:17 180:5

learn 45:9

learned 120:14 264:4 267:24 272:15

leave 17:22, 23 21:2 63:9 71:9 99:17 140:23 141:15 158:19 189:3 224:9 228:20 229:6,9 239:24 240:1 284:15

left 10:13 13:13 23:1, 24 25:23 26:23 28:2 66:16 88:6 93:17 98:24 104:1,5 111:22 134:15 163:11 167:2 170:7 185:2 230:6

276:8

**leg** 20:20
21:12,13,14
23:9 25:9,
12,14,16,24
26:8,9 96:21
180:12,15
214:20
240:16

**legally** 96:11

**Leonard**
6:22 219:14
221:3

**let alone**
179:11

**letter** 28:17
130:21
131:1

**level** 196:5
278:9

**Lexington**
202:1,3

**lie** 75:24
179:8
204:24

**life** 16:19
21:3 65:22
66:22
103:14
112:22
119:20
123:5 129:9
140:3
142:10
159:14
233:5 258:2
285:9

**lift** 131:5
185:3

**lifted** 121:18

**light** 27:4
181:13
243:5,11

**light-skinned**
42:13 43:3
94:19 111:3
290:23,24

**lighter** 78:2

**lights** 243:4

**limp** 96:7

**lines** 247:16

**lineup** 39:6
81:12
191:20

**lips** 14:21

**list** 73:20

**listen** 201:21

**literally**
96:23
275:19

**live** 6:21
240:5 288:4

**lived** 10:24
24:8,9,10
38:4,5 46:1
69:18 70:22
115:21,22

117:4 183:5
201:24
211:2,3,5,9
288:8

**living** 6:24
9:4,6,13
10:21,22
11:6,7 29:9
30:2 60:24
62:13
183:10
202:1
219:16

**Livingston**
225:23

**loan** 35:4

**locate** 46:1

**located**
192:14

**location**
46:18

**lock** 224:11

**locked**
228:11
272:7

**Loevy** 5:4,20
6:13,16
90:2,10,14,
22 107:16,
21 108:4,8,
10,14,17,18,
21 123:10
124:11
125:6,14,22
126:1,5
132:4
143:17,19
144:3,7
148:6,11
150:8,11
172:1,8,18,
22 173:1,8
175:5,12,23
176:7,10,15,
18 178:21
194:19,23
203:10
212:12
231:3,12,16
237:17
268:23
287:8 297:2
300:11
301:13

**Loew** 9:5
10:21 24:18
127:10
139:12
161:2
162:18
165:5 167:6
168:7
186:22
208:14,19
211:1,6
212:18

**long** 7:5 9:6,
17 10:21
12:4 30:17,
24 31:4 40:5
43:14,18
58:10 67:4,7
68:5 70:19

86:20
109:11
124:12
177:1
293:24
298:12

**long-sleeve**
182:12

**longer** 47:7
60:24 87:1
236:12
294:15

**looked** 72:16
73:5 84:11
93:4 111:20
112:9,11
130:1 153:1
181:1
211:18
221:6 222:2,
20 255:13
256:19,21
257:16
275:10,13

**loop** 74:9

**Lord** 29:6
66:24
159:18
186:14
224:14

**lose** 146:5,6

**lost** 71:2
146:10

**lot** 14:13
58:22 66:11
74:23 267:9
271:8

**lots** 280:1

**loud** 26:15

**louder** 102:9

**love** 101:13
196:6,19
223:18
277:9 283:6
299:21

**loved** 83:19
135:17

**loving**
232:18

**low-tech**
107:10

**Luckily** 41:1

**lunch** 123:20
124:6

**lunchroom**
123:22

**lured** 213:10

**lying** 97:18
125:21
224:13
272:23
273:16

---

**M**
---

**machine**
99:4 165:15
192:8 237:2

**mad** 43:7
84:20
104:11
287:16,17

**made** 7:13
20:18 59:23
67:16 78:8
85:4 97:2
100:15
101:4
102:19,21
106:19
110:6 116:3
118:14
122:4
137:22
163:11
197:17,18
255:14
271:8 280:3,
17,23 283:7
285:23

**mail** 236:6,
11

**mailed**
236:12

**main** 25:3
100:12
165:20

**make** 10:16
17:5 18:16
52:9 67:20
80:8 98:11
101:2 103:5
104:19
105:1 116:9
124:6
126:22
135:8
137:14
143:21
183:13
194:21
240:3 242:9
279:7
284:20
287:2

**making**
119:8
277:19

**male** 145:17
174:14,19
176:14,20
187:18

**man** 14:15,
18 17:21
18:1,10
19:19 20:3,
24 23:1
26:23 32:18
33:3 34:12,
16,17,19
35:2,3
42:13,21
43:3,10
44:10 50:14
57:18 59:19
74:16 83:14
84:10 88:4
89:9 94:18
97:4 103:16
115:6,14
116:1
120:21

125:21
128:1 142:8
152:23
153:19
154:2,6
156:7,17
201:4,9
216:1
217:19
221:5 226:8,
21 239:24
257:14
259:10
260:10,19,
21 261:7
262:16,21
263:3
279:11
283:20
284:15
285:24
289:23
290:5 292:6

**march** 125:3

**mark** 107:23
143:6
147:22
197:5 198:3
219:19

**marked**
108:1 143:8
148:1,17
171:17
195:9,13
197:1 198:5
219:22

**Market**
226:3,5,11,
14 227:4,7

**marks** 90:19
126:8 195:4

**married**
96:11

**Marsha** 31:3

**Marshall**
11:18

**Martinez**
6:11,14
49:22 61:17
62:18 65:14
127:23
129:5 130:2,
10 132:6,15,
17 133:5,21
135:12
159:9 161:9
177:10,17
178:8 184:7
231:20,22
232:11,18
236:17
258:20
270:10,18
291:5,16
292:11

**match** 60:4
178:17

**matched**
82:17
177:14,22
178:3

**matching**

141:23

**matter** 28:4 35:15 41:6 84:2 145:8 217:3 286:21

**Maverick** 28:11

**Mcclanahan** 9:14 38:15 145:17,23 146:4 161:14,15, 19 182:16 188:20 197:10 198:18 200:14 201:13 206:14,20 209:19 212:10,14 214:22 220:16

**Mcclanahan's** 197:12 209:2

**Mcdougald** 230:9

**meal** 124:20

**meaning** 53:5

**means** 236:22 251:24 278:24

**meant** 16:11 234:20

**meantime** 170:3

**meat** 223:2

**media** 90:20 126:9 195:5

**Medical** 165:4,21 166:18

**medication** 104:11

**medicine** 104:15 154:12 157:8 165:17 167:6 168:9 263:1

**meet** 188:2 209:16

**meeting** 78:3 188:7,13 190:2,9 209:8 210:13 234:9 295:8

**memories** 179:8

**memory** 64:15 122:3 146:13 170:24

189:18 204:16 205:19 206:7 242:2

**memory's** 272:17

**mental** 232:21

**mention** 209:1 218:20 230:4 260:10,18 265:15

**mentioned** 61:17 127:23 131:18 213:1 229:15,23 230:21 232:17 234:16 237:21 259:11 261:12 296:4,6,8

**mentioning** 181:10 296:17

**mess** 29:7 62:21 67:1,2 72:13 73:3

**met** 16:18 68:18 69:10 199:9,13 200:3 201:23,24 209:10,11 210:23 228:23 234:8

**metal** 10:19

**MF-ERS** 213:17

**mic** 114:13

**microphone** 6:4

**mid-40s** 140:6

**middle** 24:14 61:11 128:12 149:4 190:21 259:2 288:14 291:2

**mind** 6:7 119:23 120:10,11, 19 121:14 122:4 130:15 158:5 208:10 260:14 286:24

**mine** 21:4 85:24 278:6, 7

**minute** 48:3 115:14 247:2

**minutes** 90:11 102:12

**missed** 129:14,15

**Mississippi** 84:3 124:17

**mistake** 37:14 102:19,21

**misunderstanding** 272:9

**misunderstood** 270:23

**mom** 61:18 66:18 100:13 103:10,16 156:14 158:14 159:24 160:5,9 168:12 170:6 183:20 221:12 222:4,9,14 253:24 290:4,24

**moment** 6:3

**Monday** 154:13

**money** 18:1, 2,10 19:21 34:17,18 35:3,4,14 41:23 57:16, 18,19 69:5 74:12 75:11 85:10,12,14, 20 86:1 130:4,14 131:4,7,10, 13 159:16 214:8,9,12, 13 215:1,2, 8,23 216:2, 3,4,5 217:21,22 253:8 279:12 284:19 293:20,21

**month** 30:23 41:7 128:12 153:17

**months** 30:24 43:17 87:2 89:3 213:23 252:1,17

**Mook** 84:4

**Mookie** 84:4

**morning** 12:9,10,20 13:4 97:18 99:20 122:16

123:16 155:13 157:8 171:15 234:1 274:7 285:7 297:23

**morning's** 27:16

**mother** 68:14 69:11 160:2,4 170:1 183:9, 11 235:2

**mouth** 15:3, 20 119:6 256:18 284:9

**mouthful** 256:11,13, 17

**move** 28:9 70:22 140:21

**moved** 11:2, 4,8 12:18 18:4 28:5 61:1 67:18, 22 68:13,17 70:10,14,24 137:2 183:23 184:9 211:1, 5 213:20 219:9,13,14 288:9

**movement** 14:22

**movies** 41:4

**moving** 32:11 71:14

**multiple** 66:6 75:5 173:2 279:16 294:19 295:5

**muscle** 25:13

**mystery** 185:9

---

**N**

**name's** 59:7 126:14

**named** 49:20 50:24 51:16 52:2,18 53:4,10,24 54:6,11,17 59:11,19,20 65:24 78:11, 18 84:22 85:15 86:21 94:4,5 119:1 200:18 262:5,12 263:8

**names** 29:18 66:4 73:14, 24 194:10

**nasty** 43:4 179:6

**Nationwide** 11:20

**natural** 20:11

**nature** 273:15

**nay** 167:13 210:16

**needed** 28:7 185:21 232:3

**negative** 74:18

**negatively** 26:14 227:23

**neighborhood** 10:13 281:5,10 288:1,4 295:14

**nephew** 45:5 87:14,16,22 213:12,20 258:8,10,12, 14

**nerves** 223:20

**nervous** 140:12,15 221:9 224:9

**nice** 175:15

**nickname** 55:2 145:18 169:21 209:2

**nico** 73:1

**niece** 36:17, 18,19,20 37:1,17,19, 23 38:4,5, 11,20 39:10 55:17 56:2, 8,9,17,21,24 64:23 71:1,3 82:7 105:19 106:12 114:23 200:18 201:17 203:2 204:7, 12,13 205:7, 13 229:1 233:14 246:7 247:5 258:7,14 267:4,19 269:7,22 285:12,13

**niggas** 215:1,2

**night** 12:9,13 35:13 36:3,5 40:22,23 41:13 42:9 73:17 87:14 89:2 93:14, 15,22 98:8,9 99:18

101:24
102:6 105:4,
7 124:21,22
183:17
215:20
216:6
232:13
234:13
263:11,22
264:2
265:19
278:24
279:2,21
280:24

**nights**
278:14

**nobody's**
112:9

**noon** 123:19
124:9

**normal** 7:23
75:23
157:16

**North**
219:15,17
259:3

**nose** 16:6
119:6,13,17

**nosey** 234:7

**note** 149:4,8,
11 218:24

**notes** 57:21

**notice**
182:10

**notified**
236:4

**notwithstand
ing** 277:1

**November**
190:21

**number**
30:20 79:16
132:8,11
171:23
192:18,21
193:8,11
219:1
294:18

**numbers**
294:16,17

**nurses**
96:10,18
157:5

———
**O**
———

**oath** 238:10
247:14,17
249:12
299:1

**objection**
17:3 50:16,
18 51:1
53:6,13
105:9 121:5,
21 176:15,
19 178:21
203:10
212:12

238:23
266:9
269:11,14,
16 270:5
271:19,21,
23,24
272:18
276:24
277:2
281:11
283:10
285:17,22
286:3,15
298:17,23
300:1

**occasion**
297:13

**occur** 127:24
236:1

**occurred**
95:16
127:10
134:2
139:14
164:2 188:7,
12 236:2

**October**
11:11,22
12:20 79:11,
12 91:4 94:2
114:19,20
134:1
139:15
144:24
146:14
190:20
208:11,18
237:8 271:7
290:12
295:20

**office** 5:13,
14 131:2
137:24
138:3

**officer** 56:4,
13 78:15
187:5

**officers**
45:16,18

**Ohio** 6:22
148:19
150:1
173:17

**older** 91:6
202:10
224:4

**oldest** 11:5
93:20
183:11

**one-on-one**
92:15

**one-use** 75:7

**ongoing**
266:8

**open** 13:22
146:4 185:5
256:18

**opened**
13:23 98:20
102:23
145:21

146:7,8

**opening**
15:18

**opinion**
120:14

**opportunity**
179:21
188:2
237:19

**opposed**
276:23

**order** 130:14
131:4,7,10,
13 135:1
159:16

**OSU** 25:3
165:20

**outs** 68:20

———
**P**
———

**p.m.** 301:20

**pacing** 71:7
145:6 158:3

**packet**
142:20

**pages** 148:9
150:9,24
247:1
261:17,20

**paid** 35:15,
19 217:15

**Pam** 187:5

**pandemic**
7:2,16

**pants**
278:14,24

**paper** 29:11,
15,19 79:24
81:18,19
174:5
260:22
261:10
294:15
297:20

**papers** 31:12

**paperwork**
27:21 28:13,
15 236:9
274:14,16

**paragraph**
145:23

**paralegal**
5:13

**paramedics**
24:17 25:2
63:18
163:15,17
165:2
166:23
167:4
170:18
185:14

**paraphernali
a** 72:15

**park** 128:5

**parked**
162:19
163:2,3,5

**part** 19:22
21:7 36:2
103:14
119:12,16
135:6 174:1
282:10
291:23

**participate**
227:21

**partly** 241:1,
2

**parts** 105:5

**party** 92:16

**pass** 24:8
63:7 87:6
97:24

**passed** 9:21
10:8 18:5
32:16 70:20
103:23
104:3 166:7
186:2,12,15
233:15,18,
21 257:15

**passing**
248:8,9,13
249:5

**past** 162:17

**pastor**
228:15,16
229:3

**pause**
175:10

**pay** 35:22
41:15 130:6
214:10

**paying**
254:20

**PDF** 172:20

**peeked**
239:8

**peeking**
17:16,18
19:9,14

**peeks** 18:23
20:2 120:20
241:2,8
283:13

**peep** 239:14

**penitentiary**
136:3
291:10

**people** 55:13
66:6 68:16
69:21 70:2,
4,16 72:18
73:20 75:20
76:3,9
91:12,15
93:9 95:15
99:1 112:19
125:19
156:9
182:14
228:17
257:12

267:9,13
290:18,19
295:5

**people's**
112:9

**Pepsi** 24:8

**Pepsi-cola**
162:17

**percent**
120:22,24
139:4,7
221:15
222:19
277:23
283:5 286:5,
17,22
299:17,18,
20 300:9

**performed**
173:17
291:18,20,
23

**period** 66:22
86:16,19
219:14
276:9

**periodically**
288:1

**permission**
134:20,21
136:10
138:18
159:1

**perpetrator**
151:13

**person** 14:9
24:7 30:15
33:24 34:6,
23 43:15,20
47:13 50:10
53:19 57:3
59:10 61:24
82:22 86:21
91:6,17 92:4
104:4
106:16
121:16
122:17
133:18,19
151:22
152:11,12,
15 160:1
161:8
187:11
191:6
207:17
210:7,9
222:11
235:17
256:15
258:5,12
272:13
276:18,21
279:13
285:19
286:10
290:20
295:12,17

**person's**
122:18

**personally**
55:7

**personnel** 169:10

**phone** 24:5, 6,7 30:10, 19,20,22 35:24 57:22 102:1,10 132:7,10,12 166:10 170:4,11,12, 14,17 190:13,14 215:7 219:1 221:13 222:4 253:14,24 263:8

**phoned** 190:12

**photo** 81:3 93:4,8,9 100:12 107:2 110:14 111:3 112:11 114:4 172:15,16 192:2,7 193:24 194:3,18 195:10 196:4,12 197:7 206:13,16 274:5,12 275:2,5,8 279:7 280:3, 5,8,9 285:19,24 294:4,8 295:13 297:24 298:2,12,22 299:3,5,7,23 300:5,7,24 301:4

**photograph** 106:15,20 110:15 114:6 120:22 294:11,13 297:15 301:10

**photographs** 113:17,19, 23 198:24 199:2 297:6, 8

**photos** 190:16 191:11 207:14,17 275:22 279:24 295:4,5,9 298:3,14

**physical** 96:7 181:8

**physically** 43:1

**pick** 71:13 111:5,9,10,

11 112:24 114:6 199:2, 4 280:11,14 297:16

**picked** 12:14,17 33:18 79:2 83:4 100:10 113:12 114:9 183:15 189:14 191:5,20 207:13,17 276:17,18, 19 277:5 294:22 298:12

**picking** 10:18 112:13 280:18 297:7

**picture** 33:17 41:11 78:24 79:16,17,18, 19 80:4,10, 18,21,24 81:10 82:2, 4,14 83:7 99:4,7 114:7,9,10, 11 188:17, 20 189:11 192:16,21 193:19,21 194:5 199:19 206:24 274:19,23 276:19 294:18,20 295:2 298:6, 11 299:12 300:22 301:2

**pictured** 83:10

**pictures** 77:18 79:16 81:15 99:3 112:12 114:3 194:4, 9,10,14 294:20 299:14 300:19

**piece** 135:7 223:2

**pieced** 105:20 268:20,21 269:4,20 270:2

**pieces** 293:14

**piecing** 106:12 268:18

**pill** 104:12

**pillow** 17:12, 13,19 18:19 19:8 20:1

26:21 105:5 120:21 179:15,16 180:6 239:9, 12 283:14 285:2

**pink** 149:11

**place** 110:11 206:2 216:15 236:7

**places** 124:3 227:8

**plain** 102:7

**plaintiff** 5:5 126:19 150:1

**plaintiff's** 6:15 294:11

**play** 41:9

**playing** 272:17 289:16

**point** 18:18 22:22 26:2,4 42:9 47:19 50:9 96:12, 13 106:16 113:14 165:7 178:22 186:18 207:2 219:2 301:6

**pointed** 17:21 19:7 180:12 196:4 239:23 283:19,24 284:13

**pointing** 26:8

**points** 152:19

**police** 31:19 32:1 40:6 45:15,17 46:7 50:14, 23 55:23 56:13,18,23 57:4 62:14 76:18,20 77:3,5,7,10 78:14 94:1 105:14 109:14,16, 17 112:23 117:13,23 118:18,19 136:6 138:14 144:3 146:14,15 162:9,10 163:14,16 165:6,8,19 167:11 168:7 169:10 187:12 195:10

197:7 236:14 243:20 244:8 245:21 258:22 262:19,20 263:20 275:4 279:20,24 281:9 286:8 296:5,9,19

**policeman** 13:17 40:10, 11,12

**policemen** 134:14

**poop** 85:23

**Popeyes** 225:22 226:2

**Poppy** 100:20 101:17,20

**Pops** 101:14

**porch** 12:24 13:6,15 49:22 177:18 185:9 229:12 234:8

**position** 7:7 235:15

**positions** 7:9

**positive** 246:14 276:22 277:4 286:5, 18

**posses** 88:3

**possibly** 271:3

**Post-it** 149:4,8,11

**post-trial** 227:20

**powerful** 76:1

**practically** 240:12

**pray** 159:19

**praying** 159:16 221:14

**preference** 124:15

**premises** 228:21 229:9

**prepped** 7:14

**presence** 5:3

**present** 270:11

**pretty** 123:7 246:4

267:11

**previous** 271:23

**price** 202:18

**print** 197:17

**printed** 198:16

**prior** 9:20 10:9 33:1 34:15 41:19 50:5 186:12 203:21 204:3,5 209:8,23 210:13 212:18 232:1 249:15 251:7 252:1, 7,13 288:13 293:1

**prison** 122:8 123:1 134:1 135:2 220:21 271:7

**problem** 60:5 184:12 268:24

**procedure** 119:5 143:20 172:16 194:18 195:11 196:13 197:7

**proceed** 128:16

**proceedings** 148:23 227:20 228:3 301:19

**programmed** 102:1 132:12

**progress** 143:24

**pronounced** 71:5

**property** 11:2

**prosecuting** 30:13 31:5

**prosecution** 9:2

**prosecutor** 31:1

**protecting** 21:3

**protocol** 172:3,10 175:14

**provide** 26:24 142:20 199:10

**provided**
151:3 165:1

**providing**
290:19

**pull** 159:17
160:6
277:12,22
278:1

**pulled** 98:23
110:6 163:6
215:8
284:18

**pulling** 128:4

**purchase**
212:5

**purchasing**
201:14
282:7

**purposely**
214:14

**purposes**
108:2 143:9
148:2
171:18
195:14
197:2 198:6
219:23

**purse** 178:12

**push** 240:20

**pushed**
214:18,19

**pushover**
88:1

**put** 6:4
17:12,13,19
18:6 20:20
21:11,13
23:8 25:2,14
99:1,15
101:4
107:11
110:7
115:13
122:7,24
128:1
130:19
131:5 132:5
146:2 166:2
179:16
198:15
199:1
214:19
233:14
234:3
236:11
239:12
249:22
257:2
266:10,23
267:2,10
268:1 278:2
284:8 293:9

**putting**
179:15
214:15
266:12,14

**puzzle** 135:6,
7

**puzzling**
135:5
136:12

141:10

---

**Q**

---

**question**
17:6 25:17
42:17,19
48:8 84:7
120:17
122:20
127:15
133:13
134:13
164:22
165:7 169:8
171:6,14
188:6,9,12,
18,23 204:4,
21 218:4
238:6 244:1,
5,6 245:18
247:6,7
249:6 251:5,
18 255:9
259:23
264:14
269:4
271:24
282:22
295:22
299:19

**question/
answer**
15:15 29:23
33:21 244:4

**questioning**
123:20
148:13
243:16

**questions**
18:16 28:22
31:10 37:9
42:11 73:13
82:15 90:4
105:3
123:11,12
126:18
142:15
163:18,19
178:15
200:4,5
229:8,10
231:4,15
237:14
240:24
251:2
261:23
270:7 283:4
287:9
300:12
301:12,13

**quick** 194:20
231:2

**quickly**
47:12

**quit** 15:10
17:14 43:18
73:4,5 74:9
78:6,7 84:19
87:3 97:17
181:24
182:3,5
284:10
293:4

**quote** 278:10

---

**R**

---

**R-H-O-N-D-A**
6:20

**raise** 271:24

**raised** 72:6,7

**raising** 7:22

**rambling**
87:20

**Ramsey**
73:18,22
74:5 87:21
88:16,22
89:15 213:9
214:4
288:24

**Ramsey's**
73:23

**ran** 35:1
102:3 116:2
117:9
157:19

**rang** 102:10

**reached**
220:9
234:10

**reaching**
190:15

**read** 20:12
31:15 66:18
104:18
150:5,6,9,23
249:1
260:16,21
277:21

**reading**
29:10 31:12,
14 150:21
164:21

**ready** 21:3
71:18 72:3,9
96:24 97:18,
22 101:11
111:21
234:20
235:8
277:13

**real** 14:6
70:21
292:14

**realize** 78:9
94:24 95:10

**realized** 23:1
25:23
268:21,22

**reason** 54:18
56:6 98:17
147:2 245:8,
9,14,20,21
264:9,16,17,
20 265:1,7
267:17

**recall** 16:7
114:17
139:17
146:12
147:9 164:5

171:10
181:10
194:1,15
200:13
201:12
212:17
214:21
242:1
262:22
295:3,8

**receive**
131:10,12

**received**
131:8
178:11

**recently**
178:10
184:5
249:20

**recess** 90:18
126:7
150:17
195:3 231:9

**recliner** 18:4

**recognize**
15:7 16:18
83:6 105:7
110:18
112:17
119:24
181:19,22
182:7
195:16
196:6,21
197:8,14
245:9 275:2
279:18

**recognized**
17:1,8 96:16
243:16,21
244:9,15,21
245:4,5,11,
22 275:5
277:17

**recollection**
92:21 109:3
154:18
189:24
262:3

**record** 5:1,
22 6:13,19
17:5 90:17,
21 126:4,10
130:15
132:1
133:21
142:17
150:16,19
152:2
172:24
176:6,7
195:2,6
231:8,11,18
292:13
298:7,9
301:15

**record's**
268:11

**recover**
126:19

**referring**
199:5,6

289:18
295:15

**reflect** 6:14
298:9

**reflects**
298:10

**refresh**
109:2
146:12
154:16
170:24
189:16,24
262:3

**regular** 70:7,
9,16

**regulate**
99:13

**related**
126:24

**relationship**
133:3

**released**
102:5
220:21

**remember**
9:1 11:22
12:1,6,8,10,
13,21,23
13:2 18:2,6
19:14 21:8,
9,10,15,17,
20,22,24
22:5 26:11,
12,17 27:10
33:15 40:3
42:4 45:13,
14 46:24
47:7 57:12,
14 58:13,15
59:1 73:14,
16,22,23
78:21,23
80:1,16,19
81:21 88:24
91:5,9 93:7,
11 94:7,9
99:12 106:4
109:7,9
110:15,23
113:15
114:5,7
115:23
116:10,15,
21 117:12,
19 118:3
145:2,4,7,9
146:21,23
147:5,6,17
149:2
153:18
156:11
157:1
158:11
162:9,14
166:21
167:5,9,12,
13,21 168:1,
16,22,24
170:10,20
171:4 175:1
178:9
180:24
181:8
183:21

186:19,23
187:2,4,8,
12,19,20,22
188:7
190:13,15
191:19,22
192:9,10
199:11,12,
17,21 200:1,
10,19
202:24
204:8,21
205:15,18,
20 210:23
212:5
214:24
216:19
217:5
229:22
234:24
235:7 237:3
238:1
239:11
242:4,5
243:24
244:8,11,17
245:7 251:3
261:23
264:7 265:5
268:19
269:9,24
274:21
276:7
281:18,21
296:2,10,15,
16,17 297:7
299:14

**removed**
25:7

**report** 94:1
144:1,4
165:6
171:24

**reporter**
299:9

**reports**
31:20 32:1

**represent**
11:11
126:15

**request**
130:17
131:24
173:20

**rescheduling**
234:18

**resided**
134:22

**respect**
273:22,24

**respond**
227:24

**response**
243:15

**responses**
152:1

**restless**
95:20

**result** 174:2

**results**
173:21,23

177:6

**retired** 7:1

**retrieve**
10:12

**return** 25:17
76:17

**Returning**
11:21

**review**
142:21

**reviewed**
27:15

**Rhodeback**
187:5

**Rhonda** 5:16
6:2,20 22:2
29:14 36:9
41:2 82:13
97:16 98:10
99:18
128:10
129:20
144:2
149:19
155:15
157:20
189:10
193:13
204:22
223:23

**Ricardo**
230:23
291:11

**Richard** 9:2,
14 35:1,9,11
36:3,4,11,
12,13,14,22,
24 37:2,4,5,
17,24 38:2,
8,17 39:1,
11,13,15,17,
20,23 40:1,9
41:17 42:3,
7,11,20,22
43:16,21
45:11 46:4,
8,13 47:9,14
48:16 49:14,
20,24 50:1,
6,10,14,24
51:7,10,16
52:2,4,11,
18,20,22,24
53:4,10,11,
16,17,18,22,
24 54:7,11,
17 55:4,5,
19,24 56:9,
10,14 57:3,
6,16 58:8
59:5,6,7,8,
11,13,14,15,
16,19,20,21
60:7,8,12,
13,14,16,18
61:7,9,10,
14,18,19,20,
21,22 62:7
63:20 64:1,
2,3,16,18,20
65:9,15,17,
18,19,20,21,
24 74:5,6,17

77:21,24
78:4,12,18
79:21,24
80:4,12,17
81:7 82:4,5,
8 84:22,23
85:15,16
86:21,22
88:10,11,13,
16,21 89:7,
12,24 91:1,
6,18 92:5
94:17,24
95:11,16
105:22
106:8,17,20
110:19
111:6,9
113:8 116:4,
10 117:8,9,
23 118:6,11,
15 119:1
121:19
126:24
127:8,16
129:3
132:24
133:6,13,22,
24 134:8,12
136:18
138:24
139:4,18
141:2
148:19
150:22
153:18
154:4,5
156:1,12,18
157:21
159:12
160:12,16
161:12,13,
14,15,18,19,
20 164:23
173:11,20,
24 174:8,10,
11 176:16,
20 177:14,
22 178:2,3,
4,17,20
182:9,15
183:2
185:13
188:20
189:11
192:17
197:10,12
198:18
200:15
201:7,13
203:1,7,17
207:10
208:8,11
209:1,9,12,
19 210:18,
24 211:8
212:6,17
214:22
215:4,18
216:9 217:6,
8,9,10
218:5,7,9,
10,15,21
220:6,16,20
228:20
230:22
237:7,10

246:4,11,16
248:12,22
249:3 250:6,
17 251:19,
21 252:17,
23 254:13
255:14
256:9 257:8,
9,21,23,24
258:1,3,16,
18 259:5,9,
16,17,20,24
260:4,5,9
261:22
262:4,5,6,
12,13 263:4,
8,13,14,15,
17,22
264:18
267:3,4,6,
10,18,19,20,
21 268:2,22
269:5,6,7,
12,21,22,23
270:1,3,7,9
271:7,9,15
272:4,6,10,
12,13 274:5,
13,14 275:6
276:6,10
278:18
280:16
282:6,11
285:14,19
286:1,13,19
287:19,21
289:2,20
290:2,5,19,
20,24 291:1,
6,8,9,12
292:2,3,10,
17 295:2,7
296:4,18
297:6
298:14

**Richard's**
38:20 54:14
64:22

**Richards**
10:8 59:17
161:17

**Rick** 10:9
12:13 13:3,
5,19 17:21
18:6,11
19:14,18
20:14,17,24
22:21 23:2,
4,14 24:1,5,
12 25:24
27:11,12,13
28:4 33:6,
10,11 34:2,
5,7,17,19,
20,22 35:3,
6,7,8,11,19
36:3 37:21,
22,23 38:21
40:23 41:21,
23 44:24
45:11 47:18
48:6,9,16,22
49:1,2,5,6,
10,13,15,19
50:4,5,9,13,
23 51:15

52:1 53:9
54:4 57:9,
22,23 58:8,
14 59:8
62:23 63:8,
12,21 64:7,
11,15 65:1,
2,5,7,10,20
68:18,24
69:10 70:11,
19,22 71:24
79:6 80:22
82:11,18,22,
24 83:4
86:17 87:17
88:12 89:14
93:17 96:3
102:4
103:15
105:19
113:12,16
114:14
115:6 116:2,
3 117:7,16
118:8
136:15
137:1
146:24
154:11
155:4,5
157:2,3
163:18
164:14
166:7,24
169:21,22
170:10
180:4,8
181:16
185:4
186:13
188:15
189:19
190:17,18
191:3 202:1,
15,16,18,24
204:11,22
205:6 209:5
212:22
214:15,17
215:23
216:3,4,7
217:22
218:1,20
220:5 226:7,
21 236:5
239:24
240:6
241:12,13
245:13
262:24
263:7,16,21
264:5,19
265:2,15
266:13
267:6,20
269:6,22
275:15,16
276:17,20
277:5,19
279:9
283:20
284:14
285:13
286:9 292:6

**Rick's** 34:11
36:19,20
37:1,16,19,

23 38:11,20 39:10 45:3,4 58:5 59:7 87:15 88:18 95:21 117:17,22 133:3 167:1 170:4 180:12 204:7 205:13 258:10,12 267:19 269:7,22 277:7,16 285:13

**Ricky** 9:16, 17,19 39:18 87:22 201:15,23

**rid** 269:1

**ride** 225:19

**riff-raff** 91:15

**ring** 52:20

**ripped** 85:16, 18 86:13

**rise** 9:1

**risk** 269:2

**road** 73:10 226:15

**rob** 34:9 41:20 88:18 214:15

**robbed** 265:2

**robber** 139:8 151:20 157:2 179:21 180:18,24 182:11 199:5,10 206:23 207:4,8,17, 20 208:5,11, 18 237:20 238:7 265:12 295:18

**robber's** 156:22 181:8,19 238:14

**robbery** 94:6 127:10,18 134:2 139:12,14 144:18,23 147:16 151:9,13 152:13 155:19,23 162:13 179:16 182:15 185:11 200:3 212:19 213:8 214:23 215:20

216:6 218:18,22 220:18 223:22 237:9 263:9 264:3 268:12,13 293:1 294:1

**robbing** 87:23

**rode** 98:19

**roll** 173:9 176:3 294:16

**room** 14:8,13 23:18 30:4, 8,11 50:1 76:9 87:19 98:7,23 99:15,16,18 124:1 136:23 137:11,14, 16,20,22 138:4,5 145:6 155:8, 10 164:15 165:17 184:20 189:3 276:8

**roped** 136:13,14 165:11,12 168:15 186:18,24 236:3

**rotten** 84:17 85:9

**row** 191:24 192:10 294:21,23 297:20,21 298:3,6,8,20 299:13

**rows** 191:18 192:9 294:23 299:13

**rubbing** 104:19

**ruckus** 184:2,19

**rude** 179:6

**run** 45:8,22 46:3,10 87:4 115:4,5,11 116:11 118:5,12 142:1 172:6 267:22 270:1

**running** 22:17 25:1 115:7,15 117:11,13, 23 155:14 240:11 267:12

**runs** 225:18

———
**S**
———

**salads** 7:14

**sale** 248:12 249:4 250:6, 17 251:4

**salt** 103:19

**Sam** 187:18

**sandwiches** 7:13

**sang** 162:6

**sat** 101:7 135:14 180:5 221:17,19 255:13

**satisfaction** 85:13

**Saturday** 11:24 35:18

**scared** 95:2 221:24

**scene** 136:14

**school** 38:7 61:8,10,11, 14,18 62:7, 8,13,15 90:24 91:23 99:22 153:16 157:14 160:15 258:18 259:2,5,18 260:5,10 288:8,15 290:4 291:2

**Schwartz** 203:17

**scooted** 180:4

**scrap** 10:18

**screen** 107:11 229:20

**scuffling** 23:17 138:13

**seat** 98:19 140:2 221:17,18 254:21 255:4,5

**seconds** 175:22 241:10,20 283:8

**section** 23:19

**security** 69:12 98:11

**sedative** 157:7

**selecting** 110:15

**sell** 37:5,7 44:6 46:19 66:7 69:21 87:22 88:3 201:16 202:14,18 205:22 217:13,23 283:1

**selling** 200:14 204:12,18 236:10 289:17

**sellings** 202:20

**sells** 38:9,21

**sending** 27:20 172:19

**sense** 271:8

**sentence** 145:22

**separated** 206:14,20

**September** 139:3 142:24 178:8 194:13

**serum** 205:17

**service** 72:1

**set** 172:2 175:14 233:13

**settled** 236:9

**shady** 41:8 74:14

**shallow** 99:9,10

**shape** 84:12 199:19,21

**share** 264:3

**shared** 76:7

**shaved** 255:21

**sheet** 294:15 297:19

**sheisty** 293:5

**shelf** 18:1

**Shelly** 182:16,22

**shined** 85:21

**Shit** 287:16

**shock** 105:13

**shoe** 18:11, 12 181:5 216:5 284:19

**shoes** 18:6 85:21 181:6

**shoestring**

72:23

**shoot** 19:21, 23 20:14,15 23:10 67:9 100:12 117:16 138:23 205:23 239:22 241:12 277:13 283:19 284:3

**shooter** 36:4 54:6

**shooting** 26:7,13 36:4 40:17 43:14 45:20 79:11 80:3,21 82:3 86:20 89:1,3 92:24 93:14, 16 94:4 95:9 115:16 117:21,24 118:10,12 248:23 249:24 252:2,7,14, 17 274:4,24 280:2 297:14 298:12

**short** 72:8 90:7,8,18 126:7 150:17 195:3 219:15,17 231:9 297:4

**shorter** 181:16

**shortly** 89:15 94:3 115:16 167:5 173:10 213:22 266:12

**shot** 18:9 19:6 20:20, 22 21:10,13 22:3,5,10 23:2,5,21 25:10,24 44:24 45:11 48:11 49:3, 7,10 51:16 52:2,17 53:4,10 57:10 58:14 62:24 63:4, 21 64:16 65:2 77:4 104:21 115:6 118:8 139:5 161:24 180:14 214:20 239:14 240:9,15 279:10

**show** 107:12 158:15

168:8
172:16
188:17,23
193:21
278:18
294:7 295:1
298:2
**showed**
33:17 42:16
77:18,20
78:24 79:5,
15 80:3,17,
20 82:2,14
101:8,9
106:15
109:18
114:3,7,10
163:15
175:23
189:12
191:15
193:19
194:2,9,14
198:23
206:13,16
274:4,18,22
275:9 277:8
285:18
297:15,24
301:1
**shower**
102:2
**showing**
14:22 78:23
121:2
172:11
188:19
**shown** 192:2
294:12
297:6
298:13
299:3,22
301:10
**shut** 184:21
**Sias** 187:18
**siblings** 8:20
**sic** 143:13
276:3
**sick** 72:13
73:3 96:13
**side** 6:15
93:21
137:24
149:12
162:19
163:6 185:3,
4
**sign** 278:6
**signature**
192:11,14
193:6,10
195:17,20,
21 197:8,9,
12,15,22
198:11,17
277:17,24
301:17
**signed**
131:1,3
144:16
275:14
278:6 280:3,

5,7 294:5
297:10
301:3
**signing** 93:8
**silver**
199:18,22,
24
**similar**
256:20
**singing**
91:14
124:21
**single** 79:18,
19 80:4
114:11
274:5,12
285:19,24
297:15,18,
19,20,24
298:2,3,6,8,
20,22 299:3,
5,6,7,12,22
300:5,6
**sir** 7:18 8:9
10:23 40:3
45:13 58:10
73:9 94:8
111:16
140:20
188:5,8
239:6 264:7
271:16
281:2
**sister** 7:24
8:3,13,19
23:15 24:7,
15,21 87:19
93:19,20
100:11
101:8
140:19
145:12
165:13
166:12,13,
22 169:23
182:16,22
183:1,11,21,
24 185:16
273:21
292:7
**sister's**
24:16 63:18
76:24 138:5
162:15
167:6 168:9
170:12
185:13,15
**sister-in-law**
140:19
**sit** 177:18
217:2 221:6,
16 254:18,
21 255:5,6
257:15
**sitting** 99:4
102:18
145:12
222:22
253:9
**situation**
33:1 179:4,
12

**six-pack**
107:18
114:10,15
198:8
275:21
298:13
**six-**
**photograph**
275:13
**sketched**
199:19
**skin** 16:4,5
78:1 180:22
181:11,12
243:7
**sleep** 93:23
95:23 98:4
**sleeping**
179:8
**slight** 253:9
**Slim** 145:18
209:2
261:14
**slipped**
205:19
260:14
**slot** 253:8
**slow** 14:5
15:14 29:16
46:6 64:9,11
116:8
117:20
144:14
173:3
**slurring**
157:18
**smacked**
50:2
**small** 136:21
199:23
253:9
**smaller**
185:16
**Smith** 150:7
**smoke** 24:23
72:24 90:13
125:11,13
215:15
**smoked**
162:4
**smoker**
125:12
**smoking**
24:24 74:21,
24
**snacks**
101:1
**sneak** 18:22
**soap** 86:10
**social** 117:2,
3
**sod** 226:8,
21,22
**sold** 37:18
39:12 42:3,
21,24 43:3
53:20 73:15,

21 74:11,17
86:22 142:5
201:17
205:6,7
236:10
**son** 8:19
11:16,18
44:24 45:3
101:10
103:9,10
158:13
221:12
253:14
**son's** 103:24
**sons** 10:8
45:4
**sooner** 102:9
**sort** 63:23
181:21
239:8
243:16,17,
21 244:9,15
245:4,5,8,22
**sound** 73:7
139:20
144:20
186:8
**sounds**
20:12 25:18
38:16 66:21
67:3,12
74:21 95:9
96:3 103:1
104:23
105:3,11,18
126:1,2
**space**
221:17
**speak** 34:2
37:19 56:17
92:20 93:15
**speaking**
105:19
**specific**
152:19
211:16
**specifically**
151:11
**spell** 5:22
6:18
**spend**
293:21,22
**spending**
85:10,14
**split** 22:15
**spoke** 49:22
56:24 82:24
83:1 234:15
**spoken** 30:7
65:23
114:14
248:22
**spot** 216:14
221:6,19
**spray** 85:23
**squad** 125:1
165:3

**Sr** 161:15
**St** 211:15
212:3
216:17,23
217:1,2
221:4
224:21,22
225:9 257:7
**stake** 123:4
**stand** 14:10
32:3 85:3,5,
6 86:3
140:14
166:2
204:20
208:2
274:10
**standing**
24:24 83:14
217:17
**Star** 44:1
160:21
202:4
211:14
212:2,3
290:3
**stare** 221:20
253:11
**staring**
221:21
222:23
223:1
**start** 29:10
31:14 67:7
71:24 72:12
99:3 128:8
137:4
164:20
197:20
266:14
**started** 31:12
68:1,3,11
97:22
253:23
272:1
**starting**
169:7
237:19
**stash** 75:7
**state** 5:22
6:18 129:9
142:10
148:19
150:1 232:5,
21 271:13
**stated** 156:1
**statement**
123:8 196:3
197:24
**station**
109:14,16,
17 166:17
225:8,9,11
**stay** 37:8
109:11
160:21
176:7
221:13
234:12
253:24

**stayed** 92:10 98:8 161:1 186:9,11

**steaming** 177:20

**step** 72:18, 19

**stepped** 140:1

**steps** 102:3

**stepson** 45:4 267:12

**stitch** 25:14

**stood** 140:19 241:11,14

**stop** 68:12 185:8 214:2 221:4,15 222:7,15 254:4 284:10

**stopped** 68:14 86:18

**store** 34:10, 15 35:22 189:1,4,6,7 190:23 215:6 216:11,12, 21 217:2 224:20,21 225:10 227:7 275:17 276:4,8

**story** 15:12 68:5 70:19 117:7 218:5 266:2

**straight** 105:2

**straightened** 101:3

**straightening** 100:24

**strange** 257:12,13

**street** 9:5 10:21 24:8, 9,18 70:15 87:5 100:12 115:21 117:4 118:9 124:5 125:3 127:10 139:12 153:23 154:3 161:2 162:18,19 163:7,12 165:5 167:6 168:7 186:10,12, 22 189:8 208:14,19 210:7,12 211:1,6,21, 22,23 212:1, 18 225:2,3, 10

**strike** 280:21

**string** 239:3

**strong** 29:5

**strong-arming** 213:15

**struck** 145:23

**struggle** 68:10

**stuck** 73:14 119:14

**stuff** 23:14, 15 28:24 29:11 32:12 58:19,22,24 66:16 74:11 88:3 91:14 96:10 101:2 104:18 110:3 138:13 141:16 154:12 155:15 157:20 160:23 166:21 171:8 204:8 210:5 217:14 224:4 236:9

**subpoena** 28:17 130:22,23, 24 131:3,8

**such-and-such** 66:19 202:18 213:11

**sue** 29:2 31:16

**suffering** 285:9

**sufficient** 174:15

**suggest** 206:23 207:4

**suggested** 149:6

**suit** 77:8 146:16 158:22

**suits** 158:23 164:14

**sum** 178:11

**summary** 143:24 144:1,6,15 145:16 146:12

**summon** 129:22

**Sunday** 154:12 233:23 234:1

**supposed** 86:6 124:17 174:22 183:9,19

**surgery** 25:6 36:8 97:17, 19 155:9 164:2

**surprised** 183:12

**survive** 10:16

**suspect** 50:15 148:12 260:19,24 262:11,16 268:22 269:5,6,7,15

**suspect's** 258:6,13 262:20 264:18

**swear** 113:9 196:5,18 223:18 277:9 283:6 299:20

**sweater** 6:10

**swing** 214:17

**switch** 243:14

**switched** 251:2

**swore** 168:23

**sworn** 5:17 150:1

**sympathize** 135:21

**system** 41:13

_____

**T**
_____

**table** 100:24 101:4

**takes** 165:15 184:15

**taking** 87:24 88:5 99:3 101:12 137:10 165:19,21 213:11 262:2

**talk** 40:10 45:17 47:1 48:6 57:21 65:20 82:10 113:16 115:1,14 117:8 127:22 143:12 144:17 147:3,7 152:18

157:17 159:20 161:20 165:9 167:21 170:7 171:1 179:11 187:17 189:10 190:16,23 232:24 233:9

**talked** 31:4 33:7,8,9 64:14 77:8 105:1 114:23 118:19,21 129:5,6 133:5 145:7 160:7 162:5 164:14 165:7 169:15 187:23 188:15,16, 18,19 200:11,22 204:17 207:2 224:19 231:19 232:8 236:17 261:4,5 281:18 289:21 292:10,18, 19

**talking** 30:24 36:8 40:14 42:20 50:23 54:10 57:9, 22,23 58:5 64:24 77:10 79:3 93:2,11 95:15 125:19 143:22 145:9 155:4, 5 157:16 164:6 167:11 173:3 186:19 187:4,12,23 200:13,19 201:6,13 205:20 206:19 218:6 222:4 232:23 246:24 247:4 253:23 254:2 258:15 260:18 261:11,19, 21,22 262:4, 5,12 263:7, 14,17,22 267:9,18,19, 20 274:23 279:11 287:20 288:22

290:21

**tall** 27:10,12 42:12 43:2 94:18 181:18

**taller** 181:16

**tandem** 10:6

**Tanoury** 5:6, 12,24 6:3 17:3 50:16, 18 51:1,18 53:6,13 105:9 107:20 108:9,12,16, 23 121:5,8, 21,23 123:18,24 124:5,9 126:2,13,15 143:23 144:5,10 148:4,8,14, 15 150:10, 13,20 172:6, 14,21,23 173:5 175:9 176:9,11,12 194:17,20, 24 195:7 231:1,6,14, 17 237:13 238:23 266:9 269:11,14, 16 270:5 271:19,21, 23 272:18 276:24 281:11 283:10 285:17,22 286:3,15 287:14 296:22 298:17,23 300:1,15 301:11

**tattoos** 182:11

**tea** 157:9

**team** 125:1

**tears** 158:2

**technological** 144:9

**teeth** 227:13 256:5,10,11, 13,17

**telling** 34:11 35:2 37:12 42:2 46:7 49:19 77:4 94:8 97:22 105:6 116:2 117:6 129:8 151:5,16 160:8,11 166:6 167:11,15 168:2 169:4 170:22 192:3 224:1 237:1,11

270:23

**temp** 69:9

**ten** 48:2
175:22

**test** 149:9
170:21
174:3,20

**testified**
21:15
110:10
151:12
167:14
168:13,20
170:9
180:11
192:1 194:8
206:7
207:19
227:22
228:5 237:6,
9 247:21,23
250:5,10
251:6,19
262:10
274:7 286:4
292:20,23
297:5,12
298:24
299:21

**testifies** 5:17
150:2

**testify** 147:9
151:8
167:22
242:9
246:16
274:2 284:4
297:22
300:6

**testifying**
139:17
153:6 203:1,
12 208:2
238:1
239:11

**testimony**
20:12 27:15
28:23 32:1,7
33:10 36:1
82:17
122:23
139:1 140:2
148:12
149:7,14
150:6,22
151:3,6
152:19,21
153:4
164:20
166:12
186:17
188:1
203:15
205:12
206:6 238:5
246:21
249:1 250:5,
20,24 251:8
257:19
261:16,17
262:23
263:6 265:5
280:20
289:22

292:18

**testing**
159:10
171:22
173:17
174:9 177:6
291:16,18

**texted**
253:20

**theory**
285:14

**therapy** 96:8

**thick** 222:3
255:20

**thing** 12:21
13:11 14:1
21:5 33:11
46:4 57:21
60:13 65:16
75:4,23
82:14,19
89:5 96:6
99:5,19
104:9
119:11
129:7
133:16
138:14
145:13
147:21
155:16
178:11
210:10
236:13
237:4 247:1,
4 250:16
253:8
259:12
263:1,8
267:21
277:8

**things** 10:19
92:7 135:15
137:1,11
196:15
233:8
234:23
235:6,7
266:14
267:24
270:2
279:17

**thinking**
13:13 94:15
95:4,13,14
275:23,24

**thought**
16:22 49:19
51:15 52:17,
21 54:6 58:2
62:23 78:17
90:24 91:5,6
106:13
111:12
153:13
156:1
157:23
213:2 224:2,
6 237:22
250:1 259:9
260:23
273:2
274:12

**threw** 31:13,
14 32:13
72:14,15

**throwing**
28:21

**Thursday**
100:1

**tie** 14:21
119:11

**tied** 14:20
15:5 239:3
272:10

**tight** 14:21

**Tim** 156:19

**time** 7:19
8:24 9:4,9
12:4 24:3
28:7 31:24
32:15,18
38:5,6,9
39:3 40:5
42:9 43:18
47:15 49:16
53:2,10
54:15,16
55:12 56:5
64:6,20 66:7
69:10 75:8,
17 76:18,20
80:8 83:18
84:19 90:6,
12,17,21
92:23 93:3,
12,24 94:10,
18 95:19
98:19 102:5,
8,13,17
104:2
105:19
114:20
117:7,21
123:16
124:18
126:6,10
133:1,2
134:9
145:14
146:3
150:16,19
153:21
157:12
163:24
168:6,9
171:9
180:17
182:15
183:9 186:4,
5 188:21
193:16,22
194:12,13
195:2,6
200:10
201:24
202:12
203:21
204:3
210:18
216:22
224:10
231:8,11
237:14
242:18
245:2
248:18

249:11,19
250:8
251:16,19
253:1 256:8
257:1,12
258:2,9
265:14
271:12
275:22
284:14
285:8 288:5
292:9,24
293:24
297:8
300:20,21,
23 301:15

**times** 20:2
26:20 43:6,
9,11 65:22
66:1,18
69:24 74:7,
11,18 75:5,
17 92:19
129:13
140:13
179:23
184:9
209:13,18
227:5
237:23
238:3,6,9,24
239:17
275:20
301:7

**timing**
124:14

**tiny** 104:12

**tired** 29:8
40:23 87:18

**tissues**
101:4

**today** 35:2
84:2 86:3
125:20
126:23
129:10
139:2
142:23,24
179:3
234:17
235:23
271:17
292:2,23
300:22,23

**told** 13:3
15:12 17:21
29:17 30:1
33:16 34:7
35:7 36:3
37:22 42:5,
8,12,14 43:2
44:17 45:10,
12,21 46:14,
23 49:13
50:13 52:17
54:4 55:13,
15,17 56:6
57:4,6,15
64:12,16
65:3 71:9,11
77:3,13,15,
22 78:14
82:5,8,12,
18,21 83:3,

19 88:11,16
89:8 99:16
101:13
103:8,15,22
111:8,9,10,
11 114:5
115:24
117:22
125:15
129:7,12
130:3,9
132:22,24
133:9,21
134:10
136:15
144:11
153:13
154:5
155:15
157:20
158:11
159:9,11
160:6 162:2
165:12
167:3
175:20
177:5,13
182:3 184:3,
7 198:15
204:23
213:7 214:5
215:1,17
216:7 218:5
221:12
229:4,16
234:19
236:5
243:22
244:8 245:2,
3,10,12,13,
15,21,24
250:1
253:15
257:8 258:5,
13 262:19
263:23
264:6,19
265:7 266:2
267:3,4,6,21
269:6,21
270:9 271:9
280:8 281:9,
13 282:3,6,
9,15 283:20
286:8,9
290:22
291:17

**tomorrow**
98:13
101:22

**top** 148:20

**topic** 126:21

**topics**
243:15
246:3

**tore** 137:13,
21,22

**totally** 23:18
120:7
219:12
286:14

**touch** 235:5

**touched** 73:6
121:17

**town** 84:1
101:10
257:6

**Tracy** 38:13,
14,15 64:13
156:12
200:14,18,
23 201:22,
24 202:10
212:14

**Tracy's**
87:16

**trade** 283:1

**transaction**
282:10

**transcript**
148:5,22
149:15
159:7

**transcripts**
31:22

**trash** 32:12
224:11

**trauma** 25:4
145:6
164:15

**traumatic**
96:1

**travel** 24:11

**treat** 135:18

**treating**
233:7

**trial** 21:16
27:15 110:1
139:18,23
147:10
148:4
150:23
151:3,12
153:7 159:7
164:19
165:1
167:15,22
168:1,14,20
169:5 170:9,
13,21,22
186:17
188:1 192:1,
3 202:22
203:6,8,14
207:20
220:7
223:19
227:19,22
228:4 237:7
238:2
239:12
246:16,21
248:21
250:4,11,18
251:8,20
262:10
272:21
280:20,22
281:3 284:4
286:5
289:22
292:18

**trick** 233:7

**tricks** 41:9
272:17

**trigger**
284:23

**trips** 8:18

**trouble**
80:13 81:11
91:16 140:8
256:4,6,10

**troublemaker**
80:15

**truck** 10:5,6
24:2,4,14,21
48:5,9,15,21
49:1,5 51:24
52:14 54:5
62:22 63:16
93:18
162:19
163:2,3,5
165:4,22
167:1,2
226:21,22
257:9

**trucking**
142:9

**trucks** 10:5

**true** 105:10
245:16,23
248:2,4
250:21
251:11,12
252:14,15
268:4
281:12
282:4
298:18

**truth** 97:23
151:5,16
167:16
168:2,23,24
169:4
170:22
192:3
205:16,17
237:1,11

**truthfully**
151:8 153:7

**TT** 71:12,18

**tucked** 227:9

**turn** 123:14
164:19
187:24
216:16
217:1 225:5

**turned** 25:4
83:22 86:23
101:20
142:1 253:7,
8 255:6

**turning** 13:2
152:20

**TV** 14:10

**twelve** 48:2

**two-page**
144:3

**typed** 166:20

―――
**U**
―――

**Uh-huh**

13:18 15:19
26:1,3,5
27:7,9
38:22,24
54:9 70:3
72:20 78:16
83:8 86:14
106:14,18
108:23
109:6
114:22
123:17
124:4 127:3
128:7
135:22
136:19
137:7,15,19
138:2,8
139:2,16
140:22
142:18
143:1
147:11,14
149:20,22
151:1,10,15,
21,24
155:12
158:1,6
159:22
160:13,18,
24 161:3
162:3,22
163:21
164:3 166:8
180:13,16
184:22
186:3,7
193:15,17
194:15
195:24
196:2,20
198:21
202:6
206:18
207:11,22
209:5 210:8
213:1,19
225:4,14
235:4
236:15
237:6 239:6
241:7 253:4
258:11
267:23
275:11
280:4 281:2
282:8 288:2,
6,12 291:3
293:6,10,19
295:16,19,
21 301:5

**uh-huhs**
152:2

**un-blur**
107:15

**uncle** 201:19

**undergarmen
ts** 71:21

**understand**
16:11 19:12
45:7 50:21
52:10 56:14
76:2 78:20
86:4 95:8
109:19

116:9
126:23
127:15,19
135:8,24
137:9
173:15
174:24
175:2
176:23
177:4
178:24
179:10,13
205:24
206:4
224:19
250:20
254:7 268:7
272:5

**understandin
g** 235:14
239:19
279:6

**understood**
14:12 31:19
60:20 63:19
67:3 135:9,
20 138:21
178:14
263:6

**unexcluded**
173:12

**University**
11:18

**unknown**
174:14,19
176:14,20
269:23
272:12

**upset** 31:8
94:9 140:12
159:20
206:3 287:2

**upsets**
159:20

**upside** 14:2

**upstairs**
28:12

―――
**V**
―――

**vague** 10:23
57:13 58:19,
21 78:22
81:22
234:23
281:16

**Vance**
223:24

**vending**
123:24

**verbal** 152:1

**verbally**
228:1

**versus**
148:19

**vibe** 223:3
254:12
255:12

**vibes**
222:22,23

223:4 253:6

**vicinity**
124:3 276:9

**videoconfere
nce** 6:12
213:4

**viewer** 196:3
197:9,24

**viewer's**
195:20

**Virginia** 7:24
8:15,18
11:19 67:15
183:23
222:11
288:10

**visit** 7:24
8:15,20
104:1,3

**visiting**
183:6

**voice** 16:14
27:8 78:6,8
181:19,23
182:7
243:17,21
244:10,16,
21 245:4,6,
9,22 246:2
277:20
278:10
279:7,10,13,
17,18
283:12

―――
**W**
―――

**wait** 173:6
176:24
247:2

**waited** 165:2

**waiting** 61:4
168:11

**waived**
301:17

**walk** 98:11
100:19
141:5 221:1
277:13

**walked** 35:24
96:6 109:20
110:5
140:16
189:9

**Walker** 94:5
126:16
127:2
144:16,19
146:17
164:8
169:13,14,
16,19 171:1
187:13,22
188:13
191:15
193:19
194:8
198:22
199:10,13
200:1,14
206:12,16

281:22
294:12
301:1

**walking**
101:19
128:8
185:18

**walkway**
128:8

**wall** 137:13, 22

**wannabe**
43:4

**wanted**
24:22,23
40:24 41:20
66:5 71:22
87:17 101:1
104:13
117:7
124:19
135:8 163:1
165:10
169:24
170:6
178:16
189:11
200:8
231:18
235:16
240:5 284:2, 3

**wanting**
214:9
217:23

**war** 234:20
235:9

**warm** 102:18

**wash** 96:18
154:13
155:10

**wash-up**
157:19

**washed**
96:19 97:2

**watch** 41:4
114:13

**watching**
99:5

**water** 155:14
157:19
240:11

**wear** 25:15
71:21 83:19
84:4 227:14
256:24
257:2,3

**wearing**
14:18
278:14,23

**Wednesday**
98:8 99:24

**week** 11:23
12:2 75:17
97:11

**weeks** 25:10
71:17 93:8
114:18
115:19

117:21
118:10
188:3 280:2

**weird** 74:15

**well-being**
62:21

**Wendy's** 7:4,
5,17

**West** 7:24
8:15,18
11:19 67:15
183:23
222:10
288:9

**What'd**
288:20

**whatever's**
158:19

**wheelchair**
99:2

**When's**
31:24 258:2

**whined** 88:6

**whispering**
253:16,19

**whop** 22:12

**wife** 96:16,19
103:24
228:10

**William**
11:16

**window**
243:6

**withheld**
264:10,17

**witnesses**
203:11

**wobbling**
20:18

**woke** 20:24
72:12 157:8

**woman**
44:10,11,12

**women**
224:5

**wondered**
200:8

**word** 23:23
44:23 118:7,
9 138:12
236:22

**words** 182:2
242:10
243:17
273:19
284:8

**wore** 201:10
257:2

**work** 7:2,5
10:14 59:12
116:24
117:2
171:12
210:5,6
221:11
223:24
293:20

**worked** 7:13
69:9,11,12
75:19 85:12
201:15,19
202:17
226:8

**working**
69:10 70:12,
13 73:2
108:8 175:5
176:8 210:1

**works** 11:18,
19

**world** 71:7,
10 122:17
136:6 272:3

**worry** 158:17

**worrying**
158:3
224:10

**worse**
167:10

**wow** 72:18
98:2 157:22
191:5
233:20
276:20

**wrapped**
107:3

**wrapping**
105:2

**writing**
110:21
277:21

**written**
81:18,19
82:4

**wrong** 98:15
122:7,24
166:20
284:9 287:3,
4,5

**wrongfully**
127:9

**wrongly**
127:13

**wrote** 128:2
198:15

---

**X**

---

**Xerox** 192:8

---

**Y**

---

**y'all** 64:22
141:17,23
143:4
145:19
146:2
164:18
179:1
184:12
191:5
213:18
235:10,16
249:17
254:4
290:11

291:9

**y'all's** 82:17

**yard** 162:23

**yea** 167:12
210:16

**year** 10:9
31:4 125:4
186:15
223:8 252:7
253:1 293:3
294:2

**yearbook**
55:18 56:9
201:2

**years** 7:6,10
8:22 9:8,11,
20,22 27:20
28:2,3 32:4
41:10 45:14
50:5 51:15
58:22,23
62:10 66:16
67:9,22,23
68:15,23
69:13 70:2,5
72:5 73:6,21
110:18,23
123:1 142:6
147:15
161:22
187:10
203:21
204:3,5
211:3
234:22
236:21
246:18
248:17,23
249:9,16,20
250:7,18
251:7,13,22
256:2
259:15
292:19
293:3

**yesterday**
187:9
232:13

**young** 83:21
289:17

**younger**
91:7

---

**Z**

---

**Zach** 28:16

**Zooms**
268:24