# Exhibit 11

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Richard Horton,                  :

     Plaintiff,              :
                         Case No. 2:23-cv-3888
     vs.                     :
                         Judge Algenon L. Marbley
City of Columbus,                :
et al.,                            Magistrate Judge
                  : Elizabeth Preston Deavers
     Defendants.             :

- - - - -

VIDEOTAPED DEPOSITION OF RICHARD H. HORTON

- - - - -

Taken at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
December 19, 2024, 9:53 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

                          A P P E A R A N C E S


ON BEHALF OF PLAINTIFF:

        Loevy & Loevy
        311 North Aberdeen Street, Fl. 3
        Chicago, IL 60607
        By Alyssa Martinez, Esq.


ON BEHALF OF DEFENDANTS:

        Columbus City Attorney's Office
        77 North Front Street, 4th Fl.
        Columbus, OH 43215
        By Aaron D. Epstein, Esq.
           David J. Dirisamer, Esq.
           Alana Valle Tanoury, Esq.
           Dexter W. Dorsey, Esq.


ALSO PRESENT:

        Gregory Castetter - Videographer

        Douglas Girard - Paralegal, Columbus City
        Attorney's Office

3

Thursday Morning Session

December 19, 2024, 9:53 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Richard H. Horton, the Plaintiff herein, called by the Defendants for cross-examination, may be taken at this time by the notary pursuant to notice and agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

4

I N D E X

Examination By                                          Page

Mr. Epstein - Cross                                        7


Exhibits                                                Page

Exhibit 1 - First Amended Complaint                      17

Exhibit 2 - Transcript of Proceedings                    19

Exhibit 3 - Plaintiff's Responses to                     38
            Defendants' First Set of
            Discovery Requests

Exhibit 4 - Defendant's Petition for                     58
            Post-Conviction Relief Pursuant
            to R.C. 2953.21

Exhibit 5 - Application for DNA Testing                   63

Exhibit 6 - Defendant's First Amended Petition           68
            for Post-Conviction Relief
            Pursuant to R.C. 2953.21

Exhibit 7 - Complaint                                     74

Exhibit 8 - Entry                                         77

Exhibit 9 - Complaint                                     78

Exhibit 10 - Entry                                        80

Exhibit 11 - Investigation Report                        111

Exhibit 12 - Arrest Report                               131

Exhibit 13 - Order of Release on Parole                  136

Exhibit 14 - Photograph                                  154

Exhibit 15 - Telhio Credit Union - Listing of            158
             Transactions

5

INDEX (CONT'D)

Exhibits                                                        Page

Exhibit 16 - Earnings Statement                                 158

Exhibit 17 - Complaint                                          168

Exhibit 18 - Complaint                                          184

Exhibit 19 - Court Arraignment Sheet                            189

Exhibit 20 - Copy of Piece of Cardboard with                    198
             Phone Number

Exhibit 21 - Affidavit of LaKeon Horton                         214

Exhibit 22 - Judgment Entry                                     224

Exhibit 23 - Initial Medical/Mental Health/                     236
             Substance Use Screening

Exhibit 24 - Mental Health Treatment Plan                       243
             Review

Exhibit 25 - Handwritten Letter                                 246

Exhibit 26 - Interdisciplinary Progress Notes                   250

Exhibit 27 - Handwritten Notes                                  258

Exhibit 28 - Motion for Judicial Release                        266

Exhibit 29 - Motion for Judicial Release                        284
             Pursuant to O.R.C. 2929.20

Exhibit 30 - Entry Granting Defendant's                         321
             4/16/21 Motion for New Trial

Exhibit 31 - Motion for Nolle Prosequi                          323

Exhibit 32 - Entry - Nolle Prosequi                             323

(Exhibits attached electronically.)

6

THE VIDEOGRAPHER: The following deposition of Richard Horton is being taken on December 19, 2024, at 77 North Front Street, 4th floor, Columbus, Ohio, in the case of Richard Horton versus City of Columbus, et al., in the United States District Court, Southern District of Ohio, Eastern Division, Case No. 2:23-cv-3888.

The court reporter is Carolyn Burke, and the videographer is Gregory Castetter. This deposition is being recorded by Spectrum Reporting LLC. We are on the record at 9:53 a.m.

Will counsel please announce their presence.

MS. MARTINEZ: Alyssa Martinez on behalf of Plaintiff, Richard Horton. And we're appearing here in person today.

MR. EPSTEIN: Aaron Epstein on behalf of Brenda Walker and the City of Columbus, along with Dexter Dorsey, Alana Tanoury, David Dirisamer, and paralegal Douglas Girard, all in person.

7

- - - - -

RICHARD H. HORTON

being first duly sworn, testifies and says as follows:

CROSS-EXAMINATION

BY MR. EPSTEIN:

Q.        Good morning, Mr. Horton.  My name is Aaron Epstein, and as you heard, I'm here on behalf of the Defendants, Brenda Walker and the City of Columbus, for your deposition.  I'm going to be asking you questions today.  Have you had your deposition taken before?

A.        No, I have not.

Q.        And a deposition is different from testifying in court.  I know you've testified in court, but in a conference room setting like this, you've never done this before?

A.        No, I have not.

Q.        Okay.  I'm going to start by laying out some ground rules that are going to help this go more smoothly.

          As you can see, we have a court reporter taking everything down, and it becomes very difficult for her if you and I speak at the

8

same time.  So I'm going to ask, to the best of
your ability, even if you know where my question
is going, try to wait until I finish before you
begin giving your answer.  Okay?

A.          Okay.

Q.          And I will try to extend the same
courtesy to you.  I will let you finish your
answers before I begin to ask another question.

            Another thing, it's very common in
conversation for us to communicate with head nods
or uh-huh.  Those are difficult to take down and
reflect in the transcript, so I would ask you to
try to remember to answer yes or no.  And if you
forget to do that, I may remind you.  Is that
okay?

A.          Yes, that seems okay.

Q.          Okay.  If I ask you a question that you
do not understand, please indicate that, ask me to
rephrase it, I will be happy to do that.  Okay?

A.          Okay.  For instance, like, "Could you
please rephrase"?

Q.          You can say, "Will you please
rephrase," or it's sufficient if you just say,
"I'm sorry, I don't understand."  Just anything to

9

communicate that you're not clear.  And here's the reason why.  If I ask you a question and you answer it and you don't indicate that you didn't understand, I'm going to assume that you did.

A.        Uh-huh.

Q.        And I'm going to rely on your answer. Would that be fair?

A.        I think I understand.

Q.        Okay.  Great.

We'll be here for a while today, so we will take breaks at times.  If you need to take a break, just please let me know.  We'll be happy to accommodate that.  The only thing I ask is if I have asked you a question, you answer the question before we take the break.  Okay?

A.        I think I understand.

Q.        All right.  Is there any reason why you would be unable to testify truthfully today?

A.        No, there would be no reason.

Q.        Are you on any medications that would impair your ability to recall or understand?

A.        That's a good question.  No, I don't -- I don't think that the medications that I take will impair my -- my memory, no.

10

Q.      Do you have any mental illnesses that would affect your ability to understand and answer my questions?

A.      No, not at this time, I don't.  I don't think so, no.  Just -- no, I don't think so.  I think I'll be able to answer your questions sufficiently.

Q.      You said not at this time.  Have you had mental illnesses in the past?

A.      I haven't been properly diagnosed, so I wouldn't be able to answer that question.

Q.      Okay.  That's fair.  Have you had hallucinations, audio or visual hallucinations in the past?

A.      Not that I can recall, no.

Q.      I think I neglected to ask you this. Could you state your full legal name, please?

A.      Yes.  My name is Richard H. Horton.

Q.      And your current address?

A.      My current address is ███████████ ████████████████████████.

Q.      Do other people live at that address with you?

A.      Yes.

11

Q.        Who?

A.        My wife currently lives with me on 1073.  Her name is Janette Horton.

Q.        And can you spell Janette's first name, please?

A.        J-a-n-e-t-t-e.

Q.        Is it correct to say that you do not have any children currently living in that household with you?

A.        Yes, that would be correct.

Q.        What's your current telephone number?

A.        My current cell phone number is 614-619-9344.

Q.        Other than talking to your attorneys, what did you do to prepare for this deposition today?

A.        Just try to get a good night's sleep, good breakfast.

Q.        Did you review any materials before you came here today?

A.        Did I review any materials?  That's a good question.  Yes.

Q.        What were those?

A.        So I -- I'm the type of person that

12

usually when I'm talking with my attorney, I take notes.  So I definitely reviewed my notes.

Q.      We've taken some depositions of witnesses in this case.  Have you read any of the transcripts of those depositions?

A.      No.

Q.      You have not read Brenda Walker's deposition testimony?

A.      No, I don't -- I don't -- no, I haven't.

Q.      And we've also deposed Rhonda Curry and -- have you read Rhonda Curry's deposition testimony?

A.      No, I have not read Rhonda Curry's deposition.

Q.      And we've deposed Kawanna Harris.  Have you read her deposition?

A.      No, I have not.

Q.      Other than your attorneys, who have you talked to about this lawsuit?

A.      I do not recall.  This has been a long, hard process.  I don't -- I try to be pretty private.  I don't know.  I don't recall.

Q.      Have you spoken with Kawanna Harris

13

about this lawsuit?

A.          Absolutely not.

Q.          Why do you say absolutely not?

A.          It doesn't seem like something I would be -- that would be professional to discuss a pending litigation with an ex-girlfriend.

Q.          Are you in communication with Kawanna Harris?

A.          I am not.

Q.          When was the last time you talked to her?

A.          I do not recall.  It's been that long.

Q.          Help me out with a pronunciation. There's been a person identified in connection with this case and the name is either LaKeon or LaKeon.  Who is that?

A.          The correct way to pronounce LaKeon's name is La-key-an.  LaKeon is -- he is my first cousin.

Q.          His last name is Horton, too, as well; is that correct?

A.          Yes, that's correct.

Q.          Have you spoken to him about this lawsuit?

14

A.          I don't recall.

Q.          When was the last time you talked to LaKeon?

A.          The last time I spoke with LaKeon, maybe -- maybe -- I actually had a conversation with LaKeon maybe -- it's been -- it's been a while.  Maybe a month or two ago.

Q.          What did you talk about?

A.          I believe he was planning to move to Cleveland.

Q.          Did he move to Cleveland?

A.          I'm not sure.

Q.          Would you be able to get in touch with him if you needed to?

A.          Yes, I think that I would be able to get in contact with him if I needed to.

Q.          Do you have a cell phone number for him?

A.          Yes, I do.

Q.          Do you know an individual named Dwight Dorsey?

A.          Yes, I do know Dwight Dorsey.

Q.          Who is Dwight Dorsey?

A.          Dwight Dorsey is my former supervisor

15

at my current place of employment.

Q. And where is that?

A. I work for a company named DeBra-Kuempel.

Q. Can you spell that?

A. It's D-e-B-r-a-K-u-e-m-p-e-l.

Q. What do you do there?

A. I am a delivery driver/laborer.

Q. All right. We'll come back to that, but in the meantime let's go back to Mr. Dorsey. Have you spoken to him about this lawsuit?

A. I have not spoken to Dwight Dorsey about this lawsuit.

Q. Did you have to take time off from work today to be here?

A. Yes, I did have to take time off.

Q. Did you have to give an explanation for why you were taking the time?

A. No. I told him it was personal reasons.

Q. And, finally, how many children do you have?

A. I have two children.

Q. And what are their names?

16

A.            I have a son and a daughter.  My daughter's name is Vantasia Williams, and my son's name is Kobe Horton, H-o-r-t-o-n.

Q.            Can you spell Vantasia's first name, please?

A.            V-a-n-t-a-s-i-a.

Q.            And how old are they?

A.            My son is 23.  And my daughter is 25 years of age.

Q.            Have you talked to them about this lawsuit?

A.            I do not recall.

Q.            You are the Plaintiff in this lawsuit, correct?  Do you understand what I mean when I say the word "Plaintiff"?

A.            No.  Could you explain it to me?

Q.            Absolutely.  You understand that you're here because there's a lawsuit, correct?

A.            I do understand that.

Q.            And you understand that you are the person who brought the lawsuit, you are the person suing; is that correct?

A.            I do understand that.

Q.            All right.  That makes you the

17

Plaintiff. That's the term for that. Okay.

- - - - -

Thereupon, Exhibit 1 is marked for purposes of identification.

- - - - -

Q.        I'm handing you a document that I have marked as Exhibit 1. And I will represent to you that --

MS. MARTINEZ: Thank you.

Q.        -- this is the First Amended Complaint that was filed in this lawsuit. You can take a minute to look it over if you need to.

MS. MARTINEZ: Just for this one, Counsel, if you ask him specific questions, will you direct him to the part and just won't have him review the whole --

MR. EPSTEIN: I absolutely will.

MS. MARTINEZ: -- thing. Okay.

Q.        My only question at this point is going to be, have you seen this document before? Have you seen this document before, Mr. Horton?

A.        No, this document does not look familiar.

Q.        Have you seen any document similar to

18

Q.	that that you can recall?

A.	I can't recall.

Q.	Now, you understand that the source of this entire lawsuit comes from a home invasion robbery that occurred in October of 2004?  Do you understand that?

A.	Yes, I understand that.

Q.	All right.  And you were tried as the Defendant for committing that crime, correct?

A.	Yes, I was tried in 2004.

Q.	And you testified at that trial in your own defense, correct?

A.	I testified in -- yes, because I didn't commit the crime, so, yeah.

Q.	My question is, did you testify at that trial?

A.	Yes, I testified at that trial because I did not commit the crime.

Q.	Did you testify truthfully?

A.	I did testify truthfully at that trial.

Q.	And you were under oath when you gave that testimony, correct?

A.	Yes, I remember just like in any other proceeding they swore me in, so, yes --

19

Q.      Sure, yes.

A.      -- I was under oath.

Q.      Just like she swore you in this morning the same way, correct?

A.      Yes.

Q.      Okay.  Since your trial, have you looked at your trial testimony?

A.      Since my trial?  My trial was over 20 years ago, so that was a very long time, so throughout that time period of between 2004 and 2024, have I looked at the trial transcripts? Yes, I have.

        MR. EPSTEIN:  Bear with me one minute.

        THE VIDEOGRAPHER:  Mic, mic, mic.  Mic, mic, mic.

        MR. EPSTEIN:  Whoop.  I do that every single time, every deposition.

                - - - - -

        Thereupon, Exhibit 2 is marked for purposes of identification.

                - - - - -

Q.      All right.  I am handing you what's been marked as Exhibit 2, and I will represent to you that this is the transcript of the

20

testimony --

MS. MARTINEZ:  Thank you.

Q.          -- from the trial.  I'm not going to ask you to turn to it just yet, but if you're interested, your testimony will begin on page 175.

My question now is, in the 20-some years or however long since you gave the testimony, and as you've looked at it over the years or thought about it, were there any answers that you gave that you would change?

A.          That's a very good question.  Seeing that I was wrongly convicted and sentenced to serve 23 years for a crime that I didn't commit, and looking over the trial transcripts from 20 years ago, I believe that there's nothing in there that I would change.  I was completely truthful and I continue to stand by everything that I said.

Q.          Was there any testimony that you gave that was inaccurate?

A.          I do not recall.

Q.          Is it possible?

A.          I -- I do not recall.

Q.          The robbery occurred in October of

21

2004; is that your understanding?

A.          Is that my understanding?  I'm not sure when the actual robbery occurred because I wasn't there.

Q.          Well, I understand that, but you were charged with the crime, so presumably they told you what crime you were accused of, correct?

A.          They -- they did tell me what time -- crime I was accused of, that is correct.

Q.          And did they tell you when the crime occurred?

A.          They said it was October 9th, 2004.

Q.          And on October 9th, 2024, you were living at 780 Reynolds Avenue in Columbus; is that correct?

A.          No.  That is not correct.

Q.          That's not correct?

A.          No.

Q.          Where were you living on October 9th?

A.          I was living on -- well, first of all, it was 20 years ago, so my memory is not crystal clear, but in -- in 2004, I was paroled to a Camden Avenue address.  I sometimes stayed at the Reynolds Avenue address and I sometimes stayed at

22

the Grove City address that I talked about. I believe I talked about it somewhere throughout these transcripts.

Q. And -- and we'll talk about those. The Camden Avenue address, that was your aunt's house; is that correct?

A. Yes, that's correct.

Q. And the Sonora Drive, that's where Janette was living, correct?

A. Man, that was a really long time ago, but I believe that is correct.

Q. Okay. But in October 2004, you were not living with Janette at Sonora Avenue yet, correct?

A. I do not recall.

Q. Okay. Let me direct your attention to page 192 of the transcript.

A. Give me one second.

Q. Are you there?

A. I am.

Q. Okay. Let me read for you. Starting on line 5.

"QUESTION: During this time of October 8th, October 9th, where were you living?

23

"ANSWER:  I was living at 780 Reynolds Avenue.

"QUESTION:  And where was Janette living?

"ANSWER:  2279 Sonora Drive, Grove City, Columbus, Ohio."

Do you see that?

A.        I do see that.

Q.        Does that refresh your recollection of where you were living on October 9th?

A.        No, it does not.

Q.        All right.  But you testified that you were truthful at your trial, correct?

A.        Yes, that's correct.

Q.        And at your trial you testified that on October 9th you were living at Reynolds Avenue, correct?

A.        I testified -- this is -- this is just one part.  I assume on somewhere in this paperwork it's also written down where I said that I was living with Janette and that I was staying -- I was paroled to the Camden Avenue, so I kind of moved around a little bit.

Q.        I understand.  But you were asked the

24

question here and this was the answer you gave, correct?

A.        I've already answered that question.

Q.        What's your understanding of what the crime was?

A.        My understanding?  My understanding of what the crime was, was that someone broke into these people's house, shot one of the victims in the leg, and made off with $40, which is -- it was just unthinkable.  It was a tragedy.

Q.        There were two -- I'm sorry.

A.        It was a tragedy.

Q.        The victims of the crime were Richard McClanahan and Rhonda Curry, correct?

A.        I believe so.

Q.        Prior to that robbery, did you know Richard McClanahan?

A.        I believe that -- I believe it says, yes, I -- I did know Richard McClanahan.  The neighborhood that we -- we -- we lived in is a rather small neighborhood, so, yeah, I knew who he was.  I know who he was.  I can say that with confidence.

Q.        When you say the neighborhood, does

25

that neighborhood have a name?

A.          Yes, it does.  I believe it's called the Milo-Grogan area.

Q.          And how long had you lived in that area?

A.          Oh, that was -- that was a really long time ago.  I believe I moved to the Milo -- Milo-Grogan area around 1989.

Q.          So during that time period between 1989 and 2004, you knew Mr. McClanahan, correct?

MS. MARTINEZ:  Object to the form.

Q.          Let me ask it this way:  During that time period, did you know who Mr. McClanahan was?

A.          I'm not sure how to answer the question.  I thought I already answered that question.

Q.          Okay.  Well, what I want to get to is, you saw him around the neighborhood, correct?

A.          Yes, I've seen him, yes.

Q.          Multiple times?

A.          Yes.

Q.          And you would recognize him when you saw him; is that correct?

A.          Yes.  Yes, I would recognize

26

Mr. McClanahan.

Q.        Did you know him by name?

A.        I believe they used to call him Rick.

Q.        So that's how you knew him as that guy is Rick?

A.        Yes.  Mr. McClanahan was -- may -- may his soul rest in peace, he was a rather tall gentleman.  He was very distinctive, yeah.  Rick.

Q.        Did you know his last name at the time?

A.        I do not recall.

Q.        Did you know what he did for a living?

A.        No, I don't recall.

Q.        Did you know where he lived?

A.        No.  I don't -- I don't recall.

Q.        Do you know Tracy McClanahan?

A.        That name -- do I know Tracy McClanahan?  That name sounds familiar, but I couldn't tell you.  I couldn't describe her to you, what she looks like.  As I said, I was in prison for 16 years.  And I -- I couldn't pick her out in a crowd of people.

Q.        Can you tell me how you know her?

A.        No.  No, I do not recall how I know her.  I'm actually drawing a blank.

27

Q.        At your trial you testified that you bought a car from Tracy McClanahan.  Do you remember that?

A.        I'm not sure at this point.  The trial was so long ago.  I'm not exactly who -- I'm not exactly sure who I bought the car off of.

Q.        Do you know the car I'm referring to?

A.        Yes.

Q.        What car?

A.        It was a -- it was a -- a Cutlass.  I remember it distinctly because I remember the color of it.  It was kind of like a -- like a champagne-colored Cutlass.  It wasn't -- it wasn't a great car.  It wasn't too fancy of a car, but it was -- I distinctly remember the color of the car.

Q.        When did you buy it?

A.        What year did I buy it?

Q.        Yes.

A.        Oh, I -- I -- just -- my memory is not as sharp as it -- as it once was.  Just, you know, from being in prison for over 16 years for a crime I didn't commit, my -- the PTSD, it kind of affects my memory, so it -- I -- I do not recall exactly what year it was when I bought a car.

28

That was -- that was over 20 years ago.

Q.        Fair enough.  Have you been diagnosed with PTSD?

A.        By a professional?

Q.        Yes.

A.        No, I have not, but I've done a little research and I believe that I exude some of the same symptoms as -- some of the same symptoms as other individuals with this ailment.

Q.        Okay.  We'll come back to that, but I don't want to get off track.  You testified at the trial that you bought the car from Tracy McClanahan.  And your testimony today is you don't remember that?

A.        I do not recall.

Q.        Did Rick McClanahan have any involvement in that sale or transaction?

A.        Like I said, I -- I do not remember exactly who I bought the car from, but I remember one of the stipulations was that he was going to do some work on the car to actually get it -- I can't remember exactly what he was doing to it. It was -- it was over 20 years ago.  But he was supposed to do some work on the car, like fix

29

something.

Q.        Rick McClanahan was going to do some work on it?

A.        Yes, sir.

Q.        Did you take the car to Mr. McClanahan?

A.        I -- I can't -- I can't remember that. That's -- that's -- that was a long time ago. Sorry.

Q.        Did Mr. McClanahan do the work?

A.        I believe he did, but I'm not 100 percent sure.  That was a long time ago.

Q.        I can't remember if I asked you this. Did you know where Mr. McClanahan lived?

A.        I'm -- I'm not sure if I can remember. I don't recall.

Q.        Did you ever go to Mr. McClanahan's house?

A.        I don't recall.

Q.        Was Mr. McClanahan married?

          MS. MARTINEZ:  Objection.  Foundation.

          You can answer.

A.        Let me think for a second.  I knew Mr. McClanahan, but I did not know his -- I didn't know a lot about his -- his personal life, so I

30

don't recall if he was married or not.

Q.          Did you -- back in this period that we're talking about, in the early '90s before the robbery, did you know Rhonda Curry on sight?

A.          Back -- back then I do remember Ms. Curry, yeah.  They were kind of like two peas in a pod.

Q.          What do you mean by that?

A.          Usually when you would -- when you would see one, you would see the other. They're -- I believe, I'm not 100 percent sure, but I believe she was a taller lady also.

Q.          Did you know her name?

A.          I do not recall if I knew her name, if I knew her on a first name basis.  That's a good question.  I'm not sure about that.

Q.          But you would be able to recognize her if you saw her on the street back then?

A.          Yes.

Q.          And you did often see her on the street?

          MS. MARTINEZ:  Objection.  Form.

A.          I'm not sure if I was -- I'm not -- I'm not -- I'm not sure about often.  I've seen her.

31

I do not recall.

Q.      But back during that time period you saw her often enough that you knew her and recognized her when you saw her; is that correct?

A.      I would say -- I would answer that question that I -- I would be able to recognize her back then.  She was a taller lady.  Kind of stood out.

Q.      Did you ever see Rick McClanahan buy drugs?

A.      I do not recall.

Q.      Did you ever sell Rick McClanahan drugs?

A.      That was so long ago, I honestly don't recall.

Q.      You did sell drugs back in that time period, correct?

        MS. MARTINEZ:  Objection.  Form.

A.      Back in those days, I was young and dumb and really just trying to figure out my way.

Q.      Okay.  My question was --

A.      I didn't --

Q.      -- were you selling drugs?

A.      I didn't really have any positive role

32

models in my life at that time and I made some mistakes, so I -- I did what I -- what I thought was the cool thing to do, and I...

Q.        Is that a yes, you were selling drugs?

A.        I -- yeah, I made some mistakes.  Yeah, that's a yes.

Q.        When did you start using drugs?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.        I've never really been a -- I would never really describe myself as a drug user, so I do not recall.

Q.        Well, let's start simple.  When you were in high school or junior high, did you drink alcohol?

A.        When I was -- yes.

Q.        How often?

A.        Not very often.  I was a -- I went to high school in the '90s.  I graduated in 1995.  I was an athlete.  I took pride in what I put in my body and -- yeah.  So I would say not often.

Q.        When you were in junior high and high school, did you smoke marijuana?

A.        Like I said, back in the -- in the

33

'90s, I would have -- yes, I would have definitely experimented with marijuana in the '90s.

Q.        How often did you smoke marijuana when you were in junior or high school?

A.        I would say not often.  But it was a long time ago.  It's kind of hard for me to remember --

Q.        Weekly?

A.        -- every single incident.

Q.        Weekly?

A.        Probably not.

Q.        Monthly?

A.        I'm not 100 percent sure.

Q.        When you were in high school or junior high, did you use cocaine?

A.        When I was in high -- absolutely not.

Q.        Have you ever used cocaine?

A.        Have I ever used cocaine?  Yes.

Q.        When did you start using cocaine?

A.        I never actually started.  I kind of experimented maybe sometime in the '90s.  It was wild times.

Q.        What do you mean experimented?

A.        Like, experimented back in the '90s, I

34

would just kind of see -- see -- you know, it was a popular drug in the '90s, just kind of see if I liked it, and I don't recall liking it.

Q. So is it your testimony that you tried it only once or twice, or is it your testimony you tried it more than that?

A. I don't recall.

Q. Before we follow that up, I need to ask you, where did you go to high school?

A. I went to high school on Bethel Road. It's the -- the school is called Centennial High School.

Q. And when did you graduate?

A. I graduated in the year 1995.

Q. And while you were in high school, did you have any nicknames?

A. That was a really long time ago. I did have some -- a few different nicknames.

Q. What were they?

A. Back in high school I was a pretty athletic young man, and I could -- I could jump pretty high. I can't jump high at all now. They used to call me the UPS man, because I could jump pretty high. That was before we really -- so,

just -- I remember -- I remember that nickname.

Q.        What about Richey Rich?

A.        Well, my first name is Richard, so that's kind of been one of my nicknames my whole life, whether I liked it or not, whether I was rich or poor.

Q.        Did you have any other nicknames at any time?

A.        I'm sure I did, but it, you know -- can I remember all of the nicknames from my whole, like, childhood into adulthood?  At this point, I cannot.

Q.        Was Adidas boy one of your nicknames?

A.        No, I would never -- just being a black man, I would never let nobody call me -- I would never accept anybody calling me boy.

Q.        What about Adidas man?

A.        Maybe.  Maybe.

Q.        Do you recall anybody calling you the nickname Adidas man?

A.        Yeah.

Q.        So that was your nickname?

A.        No.  I -- it might -- it might have been one of the nicknames.  I had a lot of

36

different nicknames.  I was a pretty popular guy.
Good with the ladies.  Easy on the eyes.  So I
can't say, you know, exactly what each person and
each different clique or circle called me, but I
definitely remember that name.

Q.          You do remember that name?

A.          Yeah.

Q.          And you do remember that people
referred to you that way?

A.          Some people, I do remember.  Some
people.

Q.          Can you tell me who?

A.          No, I cannot.  I'm sorry.  I do not
recall who gave me a nickname in the '90s.

Q.          Was this nickname while you were still
in high school or after you graduated or both?

A.          I would venture to say that I'm not
100 percent sure, but I would assume it was around
high school, not after high school.

Q.          You were a basketball player in high
school, right?

A.          Yes, I was.

Q.          And I've always assumed that the Adidas
man nickname had something to do with you playing

37

basketball.  Is that a correct assumption?

A.          I'm not sure who -- who actually came up, how it fit, but Adidas is a clothing brand, so I'm -- I don't think it was -- had a lot to do with sports.  I think it had more to do with the clothing.

Q.          That's fair.  I think of it more in connection with the shoes.  Did you wear Adidas apparel?

A.          In high school?

Q.          Yes.

A.          I'm -- yes, I'm pretty sure I did.

Q.          I mean, was that sort of your look or your image?

A.          The brand Adidas is a pretty affordable brand and I grew up kind of poor, so I -- I had a few pieces.  I assume that I had a few pieces, but it wasn't like my whole wardrobe.

Q.          But is it fair to say you had enough that people might associate you with Adidas apparel?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.          Yeah, I think that's a fair assessment.

38

Q.         During the course of this litigation, you've had to fill out some paperwork that your lawyers have given you, correct?

A.         That's correct.

Q.         Do you remember that we sent questions asking for information, your lawyers would give that to you, and you would provide responses to that?  Do you remember going through that exercise?

MS. MARTINEZ:  Objection.  Form.

A.         This process has been long and drawn out and at times difficult.  And I know I -- yes, I filed out some paperwork.

- - - - -

Thereupon, Exhibit 3 is marked for purposes of identification.

- - - - -

Q.         I'm handing you what I've marked as Deposition Exhibit 3.

A.         Thank you.

Q.         You will see that it is captioned Plaintiff's Responses to Defendants' First Set of Discovery Requests.  Do you recognize this document?

39

A.          I'm sorry.  I don't recognize this document.

Q.          That's okay.  Do you see that they are -- that the document is asking for information and there are answers being provided?

A.          No, I don't see that.  What page is --

Q.          Okay.  Let --

A.          -- is that part --

Q.          Let me --

A.          -- of it asking?

Q.          Let me give you an example.  So, for example, turn to page 10.

A.          Okay.

Q.          All right.  And do you see a bold heading that says Interrogatory 8?

A.          Yes, I do.

Q.          Okay.  I will represent to you, "interrogatory" is just the legal term for question.

A.          Oh, okay.

Q.          So this is Question No. 8.

A.          Okay.

Q.          And it says:  Identify the addresses of your residences during the time period of 1990 to

40

October 9th of 2004.

Okay? Do you see that?

A. I see it.

Q. All right. So this is us presenting a question to you. And then there's -- then in the first paragraph there's some legal information. And then in the second paragraph there is an answer: Without waiving objection, Plaintiff responds that in 2004, he lived at 780 Reynolds Avenue, Columbus, Ohio 43201, and 893 Camden Avenue, Columbus, Ohio 43201. And then it goes on with some additional information.

Do you see that?

A. I do see that.

Q. Okay. So this document is asking questions and providing answers, right?

A. Yes.

Q. Okay. Did you provide the information to your lawyers to answer these questions?

MS. MARTINEZ: You can answer that question.

A. I'm not sure if I understand the question.

Q. Were you ever shown these questions and

41

asked to answer them?

A.        Yes.

Q.        And did you give truthful answers?

A.        Yes.

Q.        All right.  Can you turn to page 4?
Now, the section on page 4, we're not in the
interrogatories anymore, these are called
admissions.  They're essentially yes or no
questions.  And if you'll turn to No. 6, the
question is:  Admit that your nickname has been
Adidas boy at some point in your life.

          And the answer was you denied
Plaintiff's nickname was ever Adidas boy.

          Do you see that?

A.        I see it.

Q.        Is that a correct answer?

A.        Yes, I believe that's a correct answer.

Q.        And is your objection to that being
your nickname the fact that it says Adidas boy?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.        Yes.

Q.        So if -- if the question was admit that
your nickname has been Adidas man, would you

42

answer yes?

A.          You -- are you asking me -- could you -- could you state the question one more time? I'm sorry.

Q.          Yeah.  Sure.  I'm saying if instead of asking whether your nickname had ever been Adidas boy, whether your nickname had ever been Adidas man, would you have said yes, that has been my nickname at some point?

A.          Yes.

Q.          Have you ever known anyone else to have the nickname Adidas boy?

A.          I do not recall at this time.  That was -- are you -- are you saying throughout my whole life or are you saying during high school? Because I'm -- I'm not sure how to answer that question.  That's a really open-ended question. Could you be --

Q.          That's fair.  And --

A.          Could you be more specific?

Q.          Well, it is an open-ended question.  My question is, have you ever known anyone with the nickname Adidas boy?

A.          I do not recall.

43

Q.        And specifically in high school, did you ever know anyone with the nickname Adidas boy?

A.        I'm so sorry, man.  I don't recall. That was -- that was a long time ago.

Q.        Okay.  All right.  I want to double back now to a topic we started on and didn't go into much depth and that is selling drugs.  You were selling drugs at one point in time, correct?

A.        I made some mistakes in my life.

Q.        Is that --

A.        Yes.

Q.        -- a yes?  Is that a yes?

A.        Yes.

Q.        What drugs were you selling?

A.        Let me make sure I answer this question truthfully.  I've sold marijuana, which is legal now.  I've sold crack cocaine.

Q.        Did you sell powdered cocaine?

A.        I do not recall.

Q.        And just to be clear, marijuana was not legal at the time you were selling it, correct?

MS. MARTINEZ:  Objection.  Foundation.

A.        Well, all this stuff happened, you know, at earlier stages in my life when I was

44

young and dumb and making a lot of mistakes, so
this had to be before the year 2004, and I -- I do
not -- no, it was not legal before the year 2004.

Q.        When did you start selling drugs?

A.        It was -- it was around the time
period my mother passed away in the year 19 --
2 -- in the year 19 -- I do not recall.  It was
around the time when my mother passed away.  I was
trying to provide for my family.  Like, I didn't
have a father growing up, so I was trying to
provide for the family the only way I knew how.  I
didn't have a lot of role models in my life to
say, you know, to suggest, you know, go to school,
learn a trade.  And just being in the neighborhood
that I lived from, it just seemed like selling
drugs was the only route to go.

Q.        What did your mother die of?

A.        My mother, she passed away from heart
disease.

Q.        Was -- was she ill for a long period of
time or was it sudden?

A.        She -- she was ill for a while.

Q.        What did she do for a living before she
died?

45

A.          She was -- she was -- she worked at a packaging plant.  Yeah.

Q.          And how old were you when she died?

A.          I was -- I believe I was 20 years old. Just it was so long ago and just going through all the trauma of being locked up in prison for 16 years for a crime I didn't commit, it's -- it's almost embarrassing, but I just -- I don't know the exact date and year.

Q.          But is it fair to say that you were -- you had already graduated from high school before she died?

A.          Yes.

Q.          What did you do when you graduated high school for employment?

A.          You know what, that was -- that was a real long time ago.  My first job out of high school, at this time I don't recall.  I don't recall.  A job I had in 1995?  I'm not sure if I remember.

Q.          Well, let's -- let's try this.  In roughly 2001, you were incarcerated in West Virginia, correct?

A.          That's correct.

46

Q.        Okay.  Between the time you graduated high school and the time that you were incarcerated in West Virginia, can you recall any employment that you had?

A.        Between -- yes, I can recall.

Q.        What can you tell me?

A.        I -- I worked as a roofer.  I worked fast food.  I worked in the service industry.  I had -- I had -- I had a couple of different jobs between -- between 1995 and 2001.  A couple different jobs, ventures.

Q.        Tell me about the roofing job.  Who did you work for?

A.        I worked for a company named Urban Roofing.  It was -- it was -- it was a nice job. Decent money.  A little hard on the knees.  But I can remember just -- just -- just having that feeling of being part of a crew and, you know, at the end of the day having a certain sense of accomplishment, you know, putting a new -- taking a roof off the house and putting a new roof on the house.  And, you know, a couple of satisfied customers along the way because we weren't the burst -- we weren't the best roofing crew in

47

Columbus, Ohio, but we did pretty good work.  I like to think that we made a difference.

Q.      Why was it hard on your knees?

A.      Just, you know, doing -- replacing the roof and putting on the new shingles, you do a lot of bending over and squatting.  And, you know, taking stuff up and down the ladder can be -- can be difficult on the body, especially the knees.

I had a leaking -- I had a leak in my roof a couple of weeks ago, and, you know, now that I'm 48 years of age, I wouldn't dare get on that roof.

Q.      How long did you do that -- strike that.

How long did you do that job for Urban Roofing?

A.      I -- I -- I do not recall at this time.  It was -- it was a couple of years.

Q.      Why did you leave that job?

A.      The company moved to Florida.  They -- I believe that's why.  And I didn't want to move to Florida.

Q.      Did you do any other kind of home renovation, home repair work, during that time?

48

A.          I don't -- I don't recall.

Q.          Were you selling drugs at the same time that you were working for Urban Roofing?

A.          No.  It was a -- it was a pretty labor-intensive job.

Q.          So it is your testimony that you started selling drugs after you lost the Urban Roofing job?

A.          I do not recall.

Q.          And is it your testimony that you stopped selling -- excuse me.

Is it your testimony that you started selling drugs after your mother died?

A.          That's a good question.  I -- I'm not exactly sure.  I do -- I do not recall exactly when.  I don't have a specific date and time on this day.  I just -- it's kind of all a blur. That was -- that was my former life and I really try hard to just forget about those times, and you're asking me to remember specific dates and times.  That's not the person who I am today.

Q.          How did you get started selling drugs?

A.          I believe I already answered that question.

49

Q.      No, I don't believe you have.  I mean, do you -- you have to get the drugs from somewhere.  How do you -- how does one become a drug dealer?

        MS. MARTINEZ:  Objection.  Form.

        You can answer.

A.      I don't recall.  It's, you know, it was -- it was everywhere, so it wasn't really particularly hard, you know, when you're coming from the environment where I'm coming from, it wasn't particularly hard to allocate, you know, drugs to sell or to use.  You know, growing up in the Black and Brown community, it's -- it was everywhere.

Q.      Did you have a crew that you sold with?

        MS. MARTINEZ:  Objection.  Form.

        You can answer.

A.      I -- I don't recall.

Q.      Do you recall any of the people that you sold drugs with?

A.      That's a good question.  Like I said, that -- that was a part of my life that I really tried over the years to try and forget, so I don't recall.  That was a long time ago.

50

Q.        Do you recall the names of any of the people you bought drugs from?

A.        That's -- that's another real good question.  No, I don't recall.  It was mostly a nickname basis like Jim.  I don't recall.

Q.        And I apologize if I asked you this before.  I don't recall.  Did you sell drugs to Rick McClanahan?

A.        That's a good question.  I -- I knew he used drugs.  That's a good question.  I don't recall.  It was so long ago.

Q.        How did you know he used drugs?

A.        Just by the crowd that he kept.

Q.        Who was in the crowd that he kept?

A.        Drug users.

Q.        Can you tell me their names?

A.        At this time, I -- I can't remember specific names from -- from over 20 years ago.  These were not my friends or my associates, you know.

Q.        Did you ever sell drugs to Rhonda Curry?

A.        I can't recall.

Q.        Did you ever have a dispute with Rick

51

McClanahan about some drugs you sold him?

A. I don't recall there being any bad blood between me and Mr. McClanahan.

Q. I believe you testified that you have not read Rhonda Curry's deposition; is that correct?

A. Yes, that's correct.

Q. All right. I will represent to you that in her deposition she testified that you sold drugs to her and to Rick McClanahan. Do you dispute that?

A. I don't dispute it. I don't have a recollection of it, I do not. I do not recall. I'm not sure what she might have said or what she might have accused me of.

I don't know what this has to do with me being wrongfully incarcerated for 16 years for a robbery that I didn't commit. You know, I'm not sure how to even answer that question.

Q. At any time were you affiliated with a gang?

MS. MARTINEZ: Objection to form.

You can answer.

A. No, I was not affiliated with a gang.

52

Q.        All right.  I'm going to ask you a couple of names.  I'd like to tell -- I'd like you to tell me who they are, please.

Tor Hill?

A.        I have no recollection of that name.

Q.        Kyle Ramsey?

A.        Kyle Ramsey, I do know who that is --

Q.        Who is that?

A.        -- who that was.

Q.        Mr. Ramsey is deceased?

A.        Mr. Ramsey is deceased.

Q.        Who is Kyle -- who was Kyle Ramsey?

A.        Kyle Ramsey was a good father, a good -- a good friend.  He just tried to help everyone he could.  And he -- and he met his -- he was gone too soon.

Q.        To your knowledge, did Kyle Ramsey sell drugs?

A.        To my knowledge, Kyle Ramsey did whatever he had to do.  It's not really my business.

Q.        Can you give me an answer, yes or no, please?  To your knowledge, did Kyle Ramsey sell drugs?

53

A.          Yes.

Q.          Do you know what drugs he sold?

A.          No.

Q.          Are you aware of any conflict between Kyle Ramsey and Rick McClanahan?

A.          No, I am not.

Q.          When did Kyle Ramsey die?

A.          I believe Kyle Ramsey passed away while I was in prison, while I was in prison against my will, while I was wrongly incarcerated, so I believe it was during the first two years.  I remember it being a particularly hard thing on a lot of people from the neighborhood.  I believe it was 2007.  And it always hurt me because I wished that I could have been there to help him and help his family in some way.

Q.          Was Kyle Ramsey a friend of yours?

A.          At one point we were pretty good friends.

Q.          At what point was that?

A.          It was -- it was -- it was during the '90s.  I --

Q.          Did you --

A.          -- distinctly remember him having a

54

laugh that would light up the whole room, man, you know.  He wasn't a perfect individual, but he was going through something.

Q.        Did you have a falling out with Mr. Ramsey?

A.        Me, myself?  No.

Q.        What do you know about the circumstances of his death?

A.        From what I can remember, from what I read in the newspaper, the local newspaper, he -- he got shot.  He was shot.  Somebody tried to rob him or something like that.  I'm not particularly sure what happened.  Like I said, I was in prison at the time and...

Q.        Do you know an individual named Derrick Greathouse?

A.        I do know that name.

Q.        Who is Derrick Greathouse?

A.        He was also somebody from the neighborhood.

Q.        Did Derrick Greathouse sell drugs?

A.        I don't -- I don't recall that.

Q.        Was he a friend of yours?

A.        He was a -- he's a former associate,

55

somebody who I knew back in the day.  I wouldn't describe him as a friend.

Q.        What do you mean when you describe him as an associate?

A.        Somebody that I knew back before the year 2004.  You know, when I came home in 2004, I decided to change my life, so I didn't want to associate with certain people.  So that's the definition of associate.  He wasn't a friend.  He wasn't somebody that I would invite over for family dinner.

Q.        Have you ever been dependent on drugs?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.        Dependent on drugs?  No, I have not.

Q.        Did you ever sell drugs to finance your own drug habit?

A.        No, I did not.

          THE WITNESS:  Is it time for a break yet?

          MR. EPSTEIN:  Would you like a break? We can take a break.

          THE WITNESS:  We get a break every hour, right?  And you want me --

56

MR. EPSTEIN: Not necessarily every hour, but if you would like a break --

THE WITNESS: Yeah.

MR. EPSTEIN: -- we'll take -- we'll take 10 or 15 minutes.

THE WITNESS: But you did want me to make sure that I answered the question first, right? So I --

MR. EPSTEIN: You did answer it and I appreciate that.

THE WITNESS: I wanted to make sure I slipped that in right after.

MR. EPSTEIN: I appreciate that.

THE WITNESS: No sense in being rude, right?

MR. EPSTEIN: That's right.

THE VIDEOGRAPHER: We are off the record. The time is 11:00.

(A short recess is taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 2. We are back on the record. The time is 11:15.

BY MR. EPSTEIN:

Q. Mr. Horton, is it fair to say that

57

you've had a number of attorneys who've represented you during the course of your criminal proceedings?

A.          Yeah, I think that's a fair assessment.

Q.          And those attorneys were filing pleadings in court on your behalf while you were incarcerated, correct?

A.          Yes, that's correct.

Q.          When they would file those, did they send you copies so you could see what you -- what they were doing?

A.          Yes.  Yes, they would.

Q.          Because you wanted to keep up on your case, right?

A.          I absolutely wanted to keep up on my case.  There would be some instances where I would have to -- you know, you got these shady appeal lawyers and you would have to demand copies of the paperwork or -- you know, I was pretty involved in my case.  In some instances I would like to see the paperwork before it was filed.  I must admit, you know, being wrongfully incarcerated, I really -- I had to be a handful with some of my former attorneys.

58

Q.          So you would read the paperwork sometimes before it was filed and definitely after it was filed, correct?

A.          Yes.

                    - - - - -

            Thereupon, Exhibit 4 is marked for purposes of identification.

                    - - - - -

Q.          I'm going to hand you what I've marked as Exhibit 4.  It's a document captioned Defendant's Petition for Post-Conviction Relief Pursuant to R.C. 2953.21.  Do you recognize this document?

A.          Yes, I do recognize this.

Q.          This is a document that was filed on your behalf by Brian Howe.  If you look at the very last page, you'll see an electronic signature.  Do you see Mr. Howe's name?

A.          Yes, I see it.

Q.          And he represents that he's from The Ohio Innocence Project?

A.          Yes, that's correct.

Q.          Was Brian Howe one of your attorneys?

A.          Yes, Brian Howe from The Ohio Innocence

59

Project, he was one of my attorneys.

Q.        And this is a pleading that Mr. Howe filed, asking for post-conviction relief, correct?

A.        It looks like it's -- yeah, it's a petition for post-conviction relief, yeah.

Q.        Do you understand what post-conviction relief means?

A.        I believe it means relief after I was convicted.

Q.        Is this the sort of document that you would have reviewed either before or after it was filed?

A.        This -- this is an example of something -- there was a lot of paperwork over 16 years.  This is -- yes, this is a pretty accurate example.

Q.        All right.  Could you turn to page 15, please.  Now, I haven't been using Bates numbers, but this document begins at Horton 001190 and page 15 is Horton 001204.  Are you with me on page 15?

A.        I am.

Q.        All right.  I'd like to direct your attention to the bottom of the page.  There's a

60

footnote 3, and it says, quote, Adidas boy was Horton's nickname.

Do you see that?

A.        I see it.

Q.        So Mr. Howe told the court that your nickname was Adidas boy, correct?

A.        That's what it says.  Is that what it says right here, that Mr. Howe told them that? I'm not --

Q.        Well, this is the pleading that Mr. Howe wrote, correct?

MS. MARTINEZ:  Objection.  Foundation.

A.        I see -- there's no way for me to know who wrote this.

Q.        Well, is it fair to assume that somebody --

A.        From The Ohio Innocence Project?

Q.        -- from The Ohio Innocence Project wrote --

A.        Oh, I'm sorry.

Q.        -- this?

A.        I'm sorry.  Yes, this looks like paperwork filed by The Ohio Innocence Project.

Q.        And it was filed on your behalf,

61

correct?

A.          Yes.

Q.          And it was signed by Mr. Howe?

A.          Yes.

Q.          And he represented or the author of this represented that Adidas boy was Horton's nickname, correct?

A.          That's what it looks like here.

Q.          Did you ever reach out to Mr. Horton or anyone else at The Innocence Project to tell them, no, in fact, it was Adidas man?

          MS. MARTINEZ:  Objection.  Just now you said Mr. Horton.  I think you mean -- do you mean Mr. Howe?

          MR. EPSTEIN:  I'm sorry.  Did I misspeak?

          MS. MARTINEZ:  I think so.

BY MR. EPSTEIN:

Q.          Did you -- did you reach out to Mr. Howe or anyone else at The Innocence Project to tell them that it was Adidas man, not Adidas boy?

A.          I do not recall.  When you're working with -- when you're -- when you're fortunate

62

enough to have somebody like The Ohio Innocence

Project take on your case, you know, you really

try not to get into the way, you know. So I'm not

sure if I would have tried to correct something

so -- something like this.

Q.        Well, that's a fair point, but you

testified earlier that you wouldn't let anyone

call you Adidas boy because that resonated badly

with you as a Black man, correct?

A.        Yes.  And it still does.

Q.        Okay.  But you didn't say anything

about this?

A.        Yeah.  This is -- I -- I'm -- I'm not

sure if I did or if I didn't.  I can't recall.

This -- this is -- there's a big difference

between it being in writing on a pea of -- on a

piece of paper than for a White man as yourself to

be calling me or suggesting, you know, calling me

boy in any shape or form.  There's a big

difference there.

Q.        I understand that.  But apart from the

racial implications, certainly if your lawyer had

submitted something that you knew was not

accurate, you would want to correct that, wouldn't

63

you?

MS. MARTINEZ: Objection. Form.

A. Like I said, working with The Ohio Innocence Project has been a great privilege, so I do not recall if I would have tried to correct him because I felt so fortunate, you know, for them to even look at my case, much alone -- much let alone actually get me out of prison for a crime I didn't commit.

Q. And I appreciate that, but I don't think you answered my question. My question was, you would not want them submitting information that was, in fact, not accurate?

MS. MARTINEZ: Same objection.

A. I'm not sure how to answer that question because it, you know, I -- I wouldn't want them -- no, I wouldn't want them putting anything out there that was not factual.

- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.

- - - - -

Q. I'm going to hand you what I've marked as Exhibit 5. This is a document captioned

64

Application for DNA Testing.  It has our Bates numbers beginning at 003514.  Are you familiar with that document?  Do you recognize this document?

A.        Give me one second, please.

Q.        Okay.

          MS. MARTINEZ:  Make sure to flip through it if you need to.

A.        It's a lot -- it's a lot of paper. Give me one more second.

          I do recognize this document.

Q.        What is this document?

A.        This document, it looks like it says an Application for DNA Testing.

Q.        And if you turn to page 28.  You see a signature line there for Brian Howe again, correct?

A.        Correct.

Q.        And also Mark Godsey.  Do you see that?

A.        Correct.

Q.        Was Mark Godsey also representing you from The Innocence Project?  Was Mr. Godsey one of your attorneys?

A.        I'm not sure.  I'm not sure how to

65

answer that question.

Q.          All right.  But you were aware that they submitted an application to have some materials DNA tested, correct?

A.          Yes.

Q.          Did you review this application before they filed it?

A.          I -- I'm not sure.

Q.          Did you review this application after they filed it?

A.          I -- I -- I did review this application after they filed it.

Q.          Can you turn to page 21, please.  At the bottom of the page, do you see there's a footnote 10?

A.          Yes.

Q.          Can you read that, please?

A.          Footnote 10.  It has Adidas boy in quotation marks, was Horton's nickname.

Q.          So this is the second time that The Innocence Project lawyers have filed a pleading indicating that Adidas boy was your nickname, correct?

A.          I believe that is correct.

66

Q.        Did you go back to them after they did it a second time and tell them that was not correct information?

A.        I do not recall.  This is such a minor oversight, I don't think that I would.

Q.        Do you think the difference between Adidas boy and Adidas man is a minor distinction?

A.        Well, when -- when you -- let me see how I can answer the question.  I'm -- I'm not 100 percent sure.

Q.        You're not 100 percent sure about what?

A.        It depends on the perspective, would it be a minor perspective or not, would it be a minor issue or not.

Q.        Okay.  But what I'm trying to establish is, was your nickname Adidas boy?  And it seems like twice now your lawyers have told the court that you were.  Were they mistaken?

A.        It looks like it was a mistake there.

Q.        But you never went back to them and told them that was a mistake, correct?

A.        No.  Because --

          MS. MARTINEZ:  Objection.

          THE WITNESS:  Oh.  I'm sorry.

67

MS. MARTINEZ:  It's okay.  Objection.

A.          No.  Because --

MS. MARTINEZ:  You can answer.

A.          -- you know, like I said in the beginning, you know, depending -- this was a nickname from high school, whether it was man or boy, and depending on what circle of people were calling me this or saying this phrase, I have no control who said what.  You know, I don't know where this nickname originated from, so I can't be completely sure, you know.

Q.          So was there a circle of people that would have called you Adidas boy back in high school?

A.          It's impossible for me to remember that from so long ago.

Q.          Do you --

A.          I'm sorry.

Q.          -- know where your lawyers got the information that Adidas boy was your nickname?

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.          No, I do not.

- - - - -

68

Thereupon, Exhibit 6 is marked for purposes of identification.

- - - - -

Q.          I'm going to hand you what I've marked as Exhibit 6.

MS. MARTINEZ:  Thanks.

Q.          This is a pleading captioned Defendant's First Amended Petition for Post-Conviction Relief Pursuant to Revised Code 2953.21.  Do you see that?

A.          I see it.

Q.          Okay.  And if you turn to the last page, page 23.  It's signed once again by Brian Howe of The Innocence Project?

A.          I see it.

Q.          And submitted to the court on the 22nd day of May 2020.  It's at the bottom in the Certificate of Service.  Do you see that?

A.          I see it.

Q.          So this would be another pleading that was submitted to the court on your behalf by your attorneys?

A.          Yes.

Q.          Do you recognize it?

69

A.        Let me look over it for one second, please.  It looks familiar.

Q.        I direct your attention to page 15, please.  Do you see footnote 3 at the bottom?

A.        Yes.

Q.        Can you read that, please?

A.        It has Adidas boy in quotation marks, was Horton's nickname.

Q.        So this is now three times that your attorneys have told the court that your nickname was Adidas boy, correct?

A.        That's correct.

Q.        So I'll ask you again.  At least in some --

         MR. EPSTEIN:  Sorry.

Q.        At least in some circles was your nickname Adidas boy?

         MS. MARTINEZ:  Objection.  Asked and answered.

         You can answer.

A.        I do not recall.

Q.        At some point in time you started to sell drugs in West Virginia, correct?

A.        I -- I made some mistakes in my life,

70

and that's -- that's a part of my past.  So to answer --

Q.        Is that a yes?

A.        I was -- I was getting to it, sir. Sorry if I'm not moving fast enough.  So I would say it's safe to say yes.

Q.        What connection did you have to Parkersburg, West Virginia?

A.        That was so long ago.  It's -- I -- I honestly can't recall how I first established a connection with Parkersburg, West Virginia.

Q.        Did you have family in Parkersburg, West Virginia?

A.        No.

Q.        Did you have children in Parkersburg, West Virginia?

A.        No.

Q.        Did you have friends in Parkersburg, West Virginia?

A.        Yes.

Q.        Who were your friends in Parkersburg, West Virginia?

A.        Oh, that was -- that was a really long time ago.  I can't remember their names.  It

71

was -- it was a really long time ago.

Q.        Did someone ask you to transport drugs from Columbus to Parkersburg for sale?

A.        No.

Q.        Did you buy drugs to sell in -- strike that.

          You sold drugs in Parkersburg, correct?

A.        In Parkersburg, West Virginia, I -- yes.

Q.        The drugs that you sold in Parkersburg, West Virginia, did you buy them in Parkersburg, West Virginia?

A.        I do not recall.

Q.        Do you recall buying drugs in Ohio and transporting them to West Virginia?

A.        I do not recall.

Q.        Eventually you were arrested in West Virginia, correct?

A.        Yes.

Q.        Prior to your arrest in West Virginia, how many drug convictions did you have?

A.        Man, that's a good question.  That's a -- it was from so long ago.  One.

Q.        Are you telling me or are you guessing?

72

A.          I do not recall, honestly.

Q.          What do you recall about your prior drug convictions before West Virginia?

A.          I -- I recall I've been in trouble.  I can recall one instance for sure, but other than that, it was so long ago, I'm not even sure -- I'm not exactly sure -- I'm not exactly sure.  I was -- I was a different person then.  I'm not proud of who I was.  I honestly tried to really forget that part of my life.

Q.          Is part of the reason that you can't remember those events clearly because you were on drugs at the time?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          No.  It's just I'm really trying to separate myself from that person I was as I turn over a new leaf.

Q.          Well, I understand separating yourself in terms of doing things differently, but explain to me how separating yourself means not remembering.

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

73

A.          Just trying to -- just trying really hard to forget about the -- about the -- that part of my life and the mistakes that I made.  Just really not trying to harp on them and talk about them and just really -- you got to -- you got to put forth a little effort.

Q.          So you made an effort to forget everything that happened back in those days?  Is that your testimony?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.          Yes, I have.

Q.          What do you remember about any of your criminal drug arrests in Ohio back before the West Virginia arrest?

A.          What do I remember?  I remember just -- just the disappointment that I let my family down.  I remember some of the pain that I caused, you know, my relatives and people -- even people who looked up to me.  I just remember how disappointed they was.  And the shame that I brought on my family's name at that time.

Q.          But what do you remember about the circumstances of the crime?

74

A.      They were minor -- minor offenses from what I can remember.

Q.      What were the offenses?

A.      I do remember one was a possession charge.  It might have been, in the total of my lifetime, two possession charges.

Q.      Two --

A.      Drug abuse.

Q.      I'm sorry?

A.      Maybe a drug abuse and a possession charge.

Q.      And is that two plus West Virginia or two including West Virginia?

A.      That would be two including West Virginia, from what I can remember at this point.

                - - - - -

        Thereupon, Exhibit 7 is marked for purposes of identification.

                - - - - -

Q.      I'm going to hand you what I've marked as Exhibit 7.  Can you identify that for the record?

A.      This -- this looks like a criminal complaint.

75

Q.        This is a criminal complaint against Richard H. Horton, correct?

A.        That's correct.

Q.        And that's you?

A.        That is me.

Q.        And it is dated or at least the date of the offense is August 31, 1995, correct?

A.        Yes, that's correct.

Q.        And the charge is knowingly possessing a controlled substance included in Schedule II, to wit: crack cocaine.  And then it goes on to talk about the amount.

          Do you see that?

A.        I do see that.

Q.        Do you remember anything of the circumstances of this arrest?

A.        I do not recall.

Q.        Was this the first time you were arrested for anything?

A.        No.

Q.        What had you been arrested for prior to this?

A.        In my juvenile upbringing, being in the environment I -- I was living, I grew up in, I was

76

hanging around the wrong crowd sometimes, and I believe I was arrested for attempted joyriding.

Q.        And what was the disposition of that charge?

A.        I believe -- I do not recall.  I don't remember it having a significant impound -- impact on my --

Q.        So was this --

A.        -- record.

Q.        Was this August 1995 event the second time that you were arrested in your life?

A.        I believe so, but I can't -- I can't recall, honestly.

Q.        Do you recall the disposition of this case?  What ended up happening?

MS. MARTINEZ:  Objection.  Asked and answered.

You can answer.

A.        When you say disposition, what exactly do you mean?

Q.        I'm sorry.  The disposition of the case is how it gets resolved.  It can get resolved by being dismissed, or you go to trial and get convicted and you go to jail.  Do you remember how

77

it -- how it -- what the outcome was?

A.          No, I do not recall.

                - - - - -

            Thereupon, Exhibit 8 is marked for

purposes of identification.

                - - - - -

Q.          I'll hand you --

            MS. MARTINEZ:  Thank you.

Q.          -- what I've marked as Exhibit 8.

            MS. MARTINEZ:  I think, super quickly,

Counsel, on this one, I'll put for the record this

document was part of a production that was made

yesterday at 3:18, among a couple hundred other

pages.  Plaintiff objected to that production

since some of the documents were responsive to a

subpoena that was returnable over a month ago, but

Defendants identified this and another exhibit,

that I believe is also two pages, for the

deposition today.

            MR. EPSTEIN:  Thank you, Counselor.

BY MR. EPSTEIN:

Q.          Can you identify Exhibit 8 for the

record, please?

A.          This says:  State of Ohio versus

78

Richard Horton.

I'm not sure exactly how to phrase the title of the document.

Q.      Okay.  That's fair.  The actual caption of the document just says:  Entry.

Do you see that?

A.      I see that.

Q.      All right.  And I will represent to you that this is a sentencing entry.  If you look down into the fourth paragraph, three lines from the bottom, it says:  The court sentences the Defendant to the Franklin County Corrections Center for six months.

Do you see that?

A.      I do see that.

Q.      Do you remember serving six months on this drug charge?

A.      I do.

- - - - -

Thereupon, Exhibit 9 is marked for purposes of identification.

- - - - -

Q.      I'll hand you what I've marked as Exhibit 9.

79

MS. MARTINEZ: Thank you.

Q. I'll ask if you can identify that for the record.

A. This looks like a criminal complaint.

Q. And this is, again, a criminal complaint against Richard Horton, correct?

A. Yes, this looks like this is against Richard Horton, me, yeah. Is this the same?

Q. Well, let's take a look at that. If you look at the first one. Do you have the previous one? The date of that offense was August 31st, 1995, correct?

A. Correct.

Q. What's the date of the offense on the second one?

A. It looks like the 30th day of November, 1995.

Q. So these are not the same offense, correct?

A. It doesn't -- no, it's not the same.

Q. And in the second one, the November 30th one, it says you're accused of knowingly possessing a substance, to wit: crack cocaine. Correct?

80

A.            That's what it says on the paper, that's correct.

Q.            Do you recall a second crack cocaine possession charge?

A.            I do not recall.  Sorry about that.

- - - - -

Thereupon, Exhibit 10 is marked for purposes of identification.

- - - - -

Q.            I'll hand you Exhibit 10, which is another sentencing entry.  I believe this is the second document that Counsel just referred to a minute ago as having been recently produced.

MS. MARTINEZ:  That's correct.

Q.            This is the sentencing entry for the November offense that we just looked at, correct?

A.            That seems correct.

Q.            And here you were sentenced to a sentence of 12 months.  Do you see that?

A.            It says:  The court orders payment of the mandatory fine of $2,500 and sentences the defendant to Ohio Department of Rehabilitation and Corrections for 12 months.  That's what it says on the paper.

81

Q.        Okay.  Do you recall serving 12 months in the Department of Rehabilitation and Corrections?

A.        No, I do not.

          MS. MARTINEZ:  A belated form objection.

Q.        Do you recall serving a lesser time?

A.        I do.

Q.        How much time did you serve total on these charges?

A.        I do not recall the exact amount, but I know that it wasn't six months and 12 months. Sorry.

Q.        Well, I didn't mean to suggest that it was six months plus 12 months.  If you -- if you take a look at the first sentencing entry.  Do you see that, where it says six months?

A.        Yes.

Q.        It says to be served concurrently with the sentence imposed in, and it has another case number.  Do you understand what that means when a sentence is concurrent?

A.        Yes, I understand.

Q.        So your total sentence would be one

82

year, correct, because the six months runs at the same time as the 12 months? Is that your understanding?

A.    Let me see. It -- it says -- it says that it's ran concurrent. And it says, you know, in theory it says that I would have served at least 12 months, but I do not remember serving 12 months.

Q.    Do you --

A.    I don't --

Q.    -- remember getting out sometime earlier than that?

A.    Yeah. I believe it was early release for good behavior or something like that. I -- I can't remember the exact reason why. But it wasn't a whole year.

Q.    Okay. But is it fair to say that you had two separate drug convictions in the state of Ohio in the 1990s?

A.    I think that's fair to say. That's right here.

Q.    And so, West --

A.    I can't deny it.

Q.    And so, West Virginia would make a

83

total of three drug convictions, correct?

A.        Yes.

Q.        Let's go back to Exhibit 2, which is the big binder, the transcript from the trial. And if you would, turn to page 177.  I'm going to read a little bit of this to you.  I want you to follow along and make sure I read this correctly, okay?  Starting at line 23.  Near the bottom.  I'm sorry.  Line 21.

          "QUESTION:  What does your criminal record consist of?

          "ANSWER:  My criminal record consists of two drug abuse charges.

          "QUESTION:  And when were those drug abuse charges?

          "ANSWER:  The first drug abuse charge occurred somewhere between '95 and '97.

          "QUESTION:  What about the second one?

          "ANSWER:  The second one occurred in the year of 2001."

          Did I read that correctly?

A.        Yes.

Q.        Was that a correct answer?

          MS. MARTINEZ:  Objection.  Form.

84

You can answer.

A.      I believe that was a correct answer, because it seems like these two charges were ran concurrent, so they equal one charge.

Q.      Well, they didn't ask you about the sentence.  They asked you about how many charges and convictions you had, correct?

A.      Let me go back and look at it, because from my understanding, when they ran the two charges convert -- concurrent, it's just equal to one charge, so essentially I only went to prison for one charge.

Q.      But you were convicted twice; is that your understanding?

A.      No, that's not my understanding.

Q.      Okay.  At the time -- strike that.

You were arrested in West Virginia in 2000; is that correct?

A.      I'm -- I'm -- I can't recall exactly what year it was.

Q.      Okay.  I will represent to you for now that it was 2000.  We'll look at some documents later just to make sure about that.  What I want to know is, at the time that you were arrested in

85

West Virginia, what was your family status like?

MS. MARTINEZ:  Objection.  Form.

Q.        Were you married?

A.        No, I was not married.

Q.        Did you have children?

A.        I did have children.

Q.        How old were they at the time of your arrest in West Virginia?

A.        That is a tough question, but I am going to try to be a good father and say my son wasn't born yet, so my daughter may have been the age of 1.  Yeah, my son wasn't born yet, so...

Q.        Who is the mother of your daughter?

A.        Her name is Regina Johnson.

Q.        Where does she live?

A.        She lives in Columbus, Ohio.

Q.        Has she lived there the entire time you've known her?

A.        I believe so, yes.

Q.        Were you involved in a relationship with her for an extended period of time?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.        No.  We -- we coparented.

86

Q.          I'm sorry?

A.          We -- we coparented.  Not really a relationship.  I wouldn't describe it as a relationship.  Not any disrespect towards her.  She's a, you know, a good mother.  She tries really hard, but we just never really -- never really got along to categorize it as a relationship.

Q.          Would you categorize it as a one-night stand?

A.          No.  I wouldn't disrespect her like that.

Q.          But is that what it was?

A.          No.

Q.          Okay.  Now, you said you coparent. Back when your daughter was an infant, how did you coparent?

A.          Well, I tried to -- I tried to be involved in my child's life and help out where I could, but it was, you know -- and play by her rules, and her rules were very strict at the time. And, you know, I would try to get, you know, girlfriends to help me coparent because I was young and dumb, I didn't really know what to do

87

with a baby girl in particular, so I tried to get
as much help from family and friends and
girlfriends, and I just kind of winged it a lot,
but my daughter, she turned out all right.

Q.          When you said that her mother had
strict rules, what were you referring to?

A.          It's kind of hard to remember all the
rules from 25 years ago, but I remember she
was -- she was pretty feisty back in the day.

Q.          Now, back at this time period, 1999,
2000, were you living in Columbus?

A.          That's a good question.  I was -- I was
back and forth between West Virginia and Columbus,
so...

Q.          Did you have a residence in West
Virginia?

A.          I -- I'm not -- I don't recall, because
when you say residence, was I staying with a
different girlfriend and --

Q.          Well, let me ask a different question
then.  Why were you back and forth between
Columbus and West Virginia?

A.          I had a couple girlfriends in Columbus
and a couple in West Virginia, just having a

88

little fun, just living.

Q.        Did they know about each other?

A.        I would like to think that they didn't, but I'm not exactly sure.  I can't recall.

Q.        And were you transporting drugs at the same time you were going back and forth?

A.        No.

Q.        Did you use cocaine when you were in West Virginia?

A.        I don't recall.

Q.        Did you avoid using cocaine when you were in Columbus?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.        I don't recall.  It's a tough one right there.

Q.        Why is that a tough one?

A.        Just trying to remember something from 25 years ago.  That was -- you're asking me questions about the year 2000, and it's 2025.

Q.        I understand.  Well, here's a question you might remember.  When you would do cocaine, did you do it alone or did you do it with other people?

89

MS. MARTINEZ: Objection. Form.

You can answer.

A.        I don't recall.

Q.        Do you recall any people that you used cocaine with?

A.        No, I don't recall. Sorry.

Q.        Do you recall any people in West Virginia that you sold drugs to?

A.        No, I don't recall.

Q.        What were the circumstances of your arrest in West Virginia?

A.        It was -- it was so long ago. It's a blur. I really don't -- I really don't recall the exact particulars. I know that was a -- like I said before, that was a part of my former life, you know. I don't -- I don't see what that has to do with me being wrongfully incarcerated for 16 years for a crime that I didn't commit. It's just so far removed from the person I am today. I just -- I can't remember exactly what happened.

Q.        Do you remember anything about what happened?

A.        I remember it was bad. It was not a

90

good look for my family.  My girlfriend, I had let her down.  And I believe my -- I believe -- I believe -- how can I phrase this -- Kobe was not yet -- hadn't yet -- not yet entered the world.  So she was -- his mother was pregnant.  Yeah, I remember the shame.

Q.          Okay.  With all due respect, Mr. Horton, my question wasn't about people's reaction to it.  My question was about the circumstances of the arrest.  What happened?

A.          I can't recall.

Q.          Can you recall anything?

A.          Around the circumstances of what happened?  No.  That was a really long time ago.

Q.          What were you charged with?

A.          I -- possession.

Q.          Of what?

A.          I'm not sure how they worded it.  I can't -- I can't recall.

Q.          Were you guilty of the offense?

A.          I was guilty.

Q.          Who were you with when you were arrested?

A.          I can't recall.

91

Q.          Where were you when you were arrested?

A.          Parkersburg, West Virginia.

Q.          Can you be more specific than that?
Were you at somebody's house?  Were you at an
apartment?  Were you in a public place?

A.          I can't recall.

Q.          Is it possible that you have no recall
of these events because you were on drugs at the
time?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          It's possible.

Q.          And those drugs would have been
cocaine?

A.          I don't recall.

Q.          What other drug could it have been?

A.          It could have been marijuana.  That...

Q.          In addition to cocaine, marijuana, and
alcohol, have you used any other illegal drugs in
your life?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          I'm going to say that I was really a
scaredy-cat, kind of scared to experiment with

92

certain drugs, LSD, ecstasy, mushrooms, never really sounded appealing to me, so I'm going to say no.  But I'm -- I really don't recall.

Q.        When you were in Parkersburg, West Virginia, did you spend time with Derrick Greathouse?

A.        Did I spend time with Derrick Greathouse?  No.

Q.        No?

A.        No.  I don't recall spending time with Derrick Greathouse.

Q.        Do you know anything about Derrick Greathouse being in Parkersburg, West Virginia?

A.        Yes.  He had got into some trouble.  I believe he -- I believe he ran over somebody with a car or something like that.

Q.        How did you hear about that?

A.        I knew his girlfriend.  She was a very beautiful young lady.

Q.        What was her name?

A.        I do not recall.

Q.        And what did she tell you?

A.        That he had ran over somebody with a car.

93

Q.        Did she tell you that it was intentional?

A.        No, she didn't tell me that it was intentional at all.  I believe she was very sympathetic.

Q.        But was he in trouble with the law because of that?

          MS. MARTINEZ:  Objection.  Foundation.

          You can answer.

A.        I do not recall.

Q.        Do you know what the resolution of that was?

A.        Yes.  I believe he went to prison for that.

Q.        Is he still in prison?

          MS. MARTINEZ:  Objection.  Foundation.

          You can answer.

A.        I'm not sure.  He's a former associate.

Q.        Are you friends with him on Facebook?

A.        I believe so.

Q.        How does that come to be?  I don't use Facebook.  How does that work?

A.        So Facebook is mostly friends, you kind of use it to rekindle relationships and check on

94

people from -- from high school.

Q.          Did you go to high school with him?

A.          That's a tough one.  I don't remember him attending school a lot, so I'm going to say I don't recall.

Q.          And how did you become Facebook friends?  Did you reach out to him or did he contact you?

A.          I don't recall.

Q.          And have you communicated with him, say, in the last year, through Facebook?

A.          I believe -- I believe I have.

Q.          About what sorts of things?

A.          Well, when I was released in 2022, when The Ohio Innocence Project got me out of prison, there was kind of like a welcome wagon there.  So it -- it was -- and there was also a big news crew there, so it was like -- it was kind of broadcast all over the news that I was being released from prison after being wrongfully convicted.  So a lot of people, you know, when I -- when I already came home, I had a Facebook page that was already set up, so a lot of people reached out and congratulated me.  So I believe that might have

95

been the correspondence you're referring to.

Q.        Is Mr. Greathouse still incarcerated?

A.        I don't -- I don't know what Mr. Greathouse is currently doing at this very moment.

MS. MARTINEZ:  A belated objection to foundation.

Q.        All right.  Since you brought up high school, let me ask you a couple of other people that you may or may not know from high school.  I may have asked you this already, but we'll start with Kawanna Harris.  Did you go to high school with her?

A.        Yes.

Q.        What was your relationship with her in high school?

A.        I actually don't remember Kawanna from high school.  She was -- she must have been a quiet and shy young lady, and I was kind of loud and obnoxious, so I don't think our circles collided.  She says differently, but I don't remember her from high school.

Q.        How do you know she says differently?

A.        Because --

96

MS. MARTINEZ:  To the extent you can answer without revealing communications with your attorneys, you can answer the question.

Q.        Does that information come to you from any other source besides your lawyers, what Kawanna has said about you?

A.        No.  Me and Qui -- me and Kawanna Harris are -- we're good friends, so we've talked about this.

Q.        Tracy McClanahan, did you know her in high school?

A.        I do not recall.  I can't -- I don't know -- I knew the McClanahans.  And it's been so long, I can't remember, is it Tracy or Nicole, I do not recall.

Q.        Did you ever date either Tracy or Nicole?

A.        Nicole who?

Q.        You just said Nicole.

A.        Oh.  I -- no, I did not.

Q.        Did you ever sell drugs to Tracy McClanahan?

A.        No, I did not.

Q.        Do you know Richard Diggs?

97

A.          Yes.

Q.          Who is Richard Diggs?

A.          Richard Diggs, I know him from elementary school.  He went to Everett Middle School.  I believe I used to see him playing ball. He was a pretty good athlete back in the '90s.

Q.          Is he the same age as you?

A.          I'm not sure how old he is.

Q.          I mean, was he in the same class?

A.          I don't remember him being in the same class --

Q.          Did you --

A.          -- in the eighth grade.

Q.          Did you know his brother?

A.          I don't recall.

Q.          His brother's name is Riccardo.  Does that ring a bell?

A.          No.

Q.          Do you know anything about the Diggs brothers as adults?

             MS. MARTINEZ:  Objection.  Form.

             You can answer.

A.          I don't recall, no.

Q.          Well, you don't recall suggests maybe

98

at some time you did know.

A.          As adults?

Q.          Yeah.

A.          I don't recall.

Q.          Did you have any knowledge of them
trading identities with one another?

A.          I don't recall.

Q.          Is there anything that might refresh
your recollection about that?

A.          No.

Q.          What I'm trying to figure out,
Mr. Horton is, when you say "I don't recall," does
that mean "I may have known and I've forgotten,"
or "No, I don't know"?  Are you using "I don't
recall" in place of "I don't know"?

          MS. MARTINEZ:  Objection to form.

          You can answer.

A.          I'm using the statement "I don't
recall" in the place of "I do not know."

Q.          Who is Kobe's mother?

A.          Her name is Quiana Mathews.

Q.          And where does she live?

A.          Currently?

Q.          Yes.

99

A.          I'm not sure.

Q.          When was the last time you had an address for her or knew where she was?

A.          Probably in the year 2022.

Q.          Where was she then?

A.          I believe she lived in Georgia.

Q.          Were you in regular contact with her up until 2022?

A.          Yes.  She is the mother of my child, so when I was in prison, I would reach out to her because I wanted to try to have a relationship with my son.  Even though I was in prison, I always tried to at least attempt to reach out. And her being the adult, I would have had to, you know, get her permission to speak with my son. You know, due to this wrongful incarceration, it puts a big wedge between me and my kids, so I would try to have -- I would -- I would definitely have to speak with her to try to be able to speak with my son.

It was -- it was definitely hard sometimes, because he -- you know, everybody -- a lot of people thought that I was in prison for something that I did and, you know, trying to

100

convince your son that you're innocent but yet you're still gone for so long, it was difficult, man. It -- it -- it wasn't easy.

Q. Do you know what happened to her after 2022?

A. Yes.

Q. What happened to her?

A. She went to prison.

Q. What did she go to prison for?

A. I -- I'm not exactly sure what it was. It's not my business.

Q. What state did she go to prison in?

MS. MARTINEZ: Objection. Foundation.

You can answer.

A. Man, she lived in Georgia, so I'm not exactly sure. I'm sorry.

Q. Let's back up. Do you know when Kobe was born?

A. Yes.

Q. When?

A. He was born in 2001.

Q. Were you in prison when he was born?

A. No.

Q. Was --

101

A.          When Kobe -- go ahead.  I'm sorry.

Q.          No.  Go ahead.

A.          Kobe was born at Ohio State hospital. He was born with a form of heart disease.  We didn't know he had heart disease until two or three days later.  I remember it was a very difficult birth.  But also I remember, you know, his mother being triumphant and having a successful birth.  And I remember, you know, the time I was able to spend with him before I had to turn myself in to go to West Virginia.

And he had to have open-heart surgery at 8 months old.  And I remember still trying to be a part of his life, you know, because, you know, he hadn't, you know -- it wasn't his fault that his father was messing up and not mature. And just trying to, you know, tell him that I was going to be a better person whenever I -- when I got out in 2004.  And it was just a very difficult beginning for his life.

Q.          So let me make sure I heard you correctly.  At the time that he was born, you were facing charges in West Virginia, correct?

A.          That's correct.

102

Q.        But at the time he was born, you were not yet incarcerated on those charges?

A.        That's correct.  I was there for my son's birth.

Q.        How long were you in prison in West Virginia?

A.        I was in prison in West Virginia for, I think it was 26 months.

            MR. EPSTEIN:  Let's go off the record for a second.

            THE VIDEOGRAPHER:  We are off the record.  The time is 12:14.

            (A short recess is taken.)

            THE VIDEOGRAPHER:  This marks the beginning of Media No. 3.  We are back on the record.  The time is 12:23.

BY MR. EPSTEIN:

Q.        Mr. Horton, how many -- excuse me.  How many prison facilities were you in in West Virginia?

            MS. MARTINEZ:  Objection.  Form.

            You can answer.

A.        That's a good question.  In West Virginia, it's kind of like a tier system, so

103

I -- I honestly -- I don't want to give you an incorrect answer.

Q.        I appreciate that.

A.        Three -- three or four.  I think.

Q.        What do you mean by a tier system?

A.        You get -- it's very different from the Ohio prison system.  You get a better reward for staying out of trouble.  So in West Virginia you might start off as a -- at a higher level facility, and the longer you stay out of trouble, you work your way down to maybe even a work release facility.

Q.        When you say a higher level facility, you mean higher security?

A.        Yes.

Q.        Where did you start when you were first incarcerated, what level of security?

A.        I started at a higher level security facility.

Q.        What does that entail?

A.        Well, I always tell people prison is just -- it's exactly how you see it in the movies. It's cold, it's dark, it's uncomfortable, it's steel, it's bricks.  And for the higher level

104

security, you're usually in a cell most of the day, if not 20-plus hours a day.

Q.        Did you receive medical care while you were in custody in West Virginia?

A.        Yes.

Q.        Do you remember any particular things you were treated for?

A.        Yes.  A broken nose.

Q.        Did you, at some point in your life, break an ankle?

A.        Yes.

Q.        When was that?

A.        That was in the '90s.  Well, I'm not -- let me -- let me -- let me -- let me correct that.  Sorry if I misspoke.

          That was -- that was before -- that was before the prison stay in West Virginia.  I'm not sure exactly what year it was.  Man.  Sorry about that.

Q.        When you would go to a new location in West Virginia, did they do intake interviews?

A.        I can -- I -- I do not recall.  That's a tough one right there.

Q.        Do you remember at all being

105

interviewed about your mental and physical health by prison staff?

MS. MARTINEZ:  Objection to form.

You can answer.

A.        While incarcerated in West Virginia?

Q.        Correct.

A.        I do remember being interviewed.

Q.        Do you remember similar medical and psychological interviews when you were incarcerated in Ohio after the Loew Street robbery?

A.        I do remember.  I do remember, like, intake interviews in --

THE WITNESS:  I'm sorry.

THE VIDEOGRAPHER:  I'm sorry.

A.        -- in Ohio.

Q.        And what sorts of things would they ask you in the intake interviews?

A.        They would ask you about your health, do you have any underlying health issues, are you on medication, those type of things.

Q.        Would they ask you about your background more generally?

A.        Very generally, I believe they would.

106

Q.        Were you honest with them?

A.        I do not recall.

Q.        Can you think of any reason why you would have given untruthful information to those folks who were interviewing you?

A.        In prison, depending on how you answer those questions, you'll be placed in certain facilities in the -- in certain areas of the facility.  So if I wasn't truthful, the reason would have been because of I didn't want to get placed in certain areas of the prison.  Maybe I didn't want to be around people who might have been perceived as weak because of various drug addictions, or, you know, if I -- if my ankle wasn't completely healed up, I didn't want to be over here with the people who were fully healthy because I would be, you know, possibly in danger of my life.  So that would have been my logic at that particular time in answering those questions if I answered them untruthfully.

Q.        Can you give me an example of a question that, depending on the answer, you thought would get you assigned to a different place?

107

A.          Well, if -- if -- like I said, I broke my ankle before I turned myself in to go to prison in 2001.  So I might have let them know that I broke my ankle, my ankle was still healing up, I didn't want to be placed in an area of the prison that I would have had to walk a long way to get to the chow hall, because, you know, they serve you breakfast, lunch, and dinner, so that long walk would have -- possibly that type of scenario, I could see where somebody would say or where I would say, yeah, my ankle is healed up pretty good or my ankle is not healed up pretty good, you know, put me over here.

Q.          What about questions about prior drug use?

A.          I -- I do not recall specific questions.

Q.          I'm not asking you about specific questions.  I'm asking can you think of a reason why giving an answer about prior drug use would direct you into one area or another one depending on what the answer was?

A.          Okay.  Let's -- I'll go with the positive spin on it.  Let's say I was -- I wanted

108

to go get into a certain program, so I would say, hey, I want to get into this program, I have a drug problem.

Q.          So there's an incentive sometimes to lie and say you have a drug program when you -- a drug problem when you don't?  Not you particularly, but an inmate might have an incentive to claim a drug problem that he doesn't have?

A.          Yes, yes.

Q.          What about the converse?  Is there an incentive for an inmate to deny prior drug usage when he does have a drug history?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.          I'm not sure.  Maybe -- I'm not sure. That's a -- that's a tough one right there.  Maybe he didn't want to be in -- in the program.  Maybe he didn't want the incentives of possibly going home early, or maybe he doesn't -- you know, maybe he has a drug problem and says he doesn't have a drug problem.  I'm not -- I'm not sure how to answer that one.

Q.          Okay.  What about mental health?  You

109

were asked questions about a history of depression
and things like that, correct?

A.          I -- I believe so.

Q.          Are there incentives you can think of
where an inmate would either want to deny a
history of depression when he had one or admit a
history of depression when he didn't?

A.          Yes.  That type of scenario would be
someone in denial.  And the way that they
take care -- the way that they handle mental
health in prison is they kind of force-feed you
drugs.  So a person might not want to take the
drugs because some of the drugs, you know, they
have adverse effects.  Some of the drugs are so
high in -- in -- in volume, you know, I've seen
people actually change, you know, from who they
were, their posture, you know, I'm not sure
exactly what drugs, because, you know -- but I
could see -- I could see that scenario, a person
in denial about their mental health and they,
quite frankly, just don't want to be on drugs.

Q.          What about the opposite?  Is there any
benefit to the inmate to claiming a mental problem
when they don't have one?

110

A.        Yeah, I could -- I could see that happening to somebody.

Q.        How would that work?

A.        Maybe -- maybe they -- they wanted to get high off the drugs, so they would lie and smear feces on the wall and have suicide attempts just so they can get on the drugs.  And really it might -- you know, I'm not a doctor, but that might not even be the -- oh, sorry -- that might not be the case, you know, they might be doing it just for show.

Q.        Could you get a change in housing depending upon your mental health state?

A.        In West Virginia?

Q.        Both West Virginia and Ohio, what was your experience?

A.        Well, yes, you know, if you're in prison, if you're smearing feces on the wall, you're not going to be housed next to the same guy who has never been in trouble, so, yeah, you're going to be in --

Q.        But I'm talking --

A.        -- different facilities.

Q.        I'm talking about something a little

111

more benign than smearing your feces on the wall.
Just a general claim of depression.

A.          Just a general?  It might be a little difficult, you know, because, you know, prison is not a happy place.  It's a sad place.  So, you know, if you just go in there and say you're depressed, I mean, that probably happens 20 times a day.

Q.          Okay.  Can you think of any instances where you gave untrue information to prison officials doing an assessment for strategic reasons?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          I do not recall.

                    - - - - -

          Thereupon, Exhibit 11 is marked for purposes of identification.

                    - - - - -

Q.          I'm going to hand you what's been marked as Exhibit 11.  The Bates stamp again is at City 007863.  The document is captioned State of West Virginia, Division of Corrections, Parole Services.  This is a document that we obtained

112

from the State of West Virginia, and I'll represent to you that it includes intake interviews from Richard Horton. Do you see your name on the front there?

A.        I see it.

Q.        I want to direct your attention to the second page. Specifically, the fourth paragraph under Circumstances. Five lines down, toward the end, do you see where it begins: The subject indicated?

            MS. MARTINEZ:  If you need to read the whole paragraph, please do.

Q.        You can read the whole paragraph if you want to. Are you ready?

A.        Yes.

Q.        Okay. So the paragraphs are describing the circumstances of your arrest. And the paragraph begins that both the subject, Mr. Horton, and Hill, which refers to Tor Hill, were taken into custody.

            And then the second line:  A more complete body search revealed one small plastic baggy with several tan yellowish chunks of material inside. It was found in the genital area

113

of the subject.

Reading that, does that refresh your memory of the circumstances of your arrest in West Virginia?

A.          No.  No, it doesn't.

Q.          Okay.  Then moving down a couple lines. The subject indicated he had been dealing crack cocaine between two to three years, selling it in increments of 20's, 50's, and 100's.

Do you see that?

A.          I see it.

Q.          What are increments of 20's, 50's, and 100's?

A.          I do not recall.

Q.          You don't know what that phrase means?

A.          I'm not sure how to describe it to you. No, I don't.  I don't.

Q.          Well, how would you sell crack cocaine when you had a customer?

A.          I -- I can't remember.  That was part of my past life.  I've since changed my ways.  You know, this -- this -- you know, I -- I don't remember any of this.

Q.          How much would you charge for crack

114

cocaine?

A.        I'm not sure.  It's not something that I'm proud of.

Q.        I understand that, but I want to know what you recall.  So this indicates that you made this statement to -- to the intake interviewer. And it's your testimony that you do not remember making this statement, correct?

A.        That's correct.

Q.        Do you have any reason to doubt that you made this statement?

A.        Yes.

Q.        Why?

A.        I've never seen this document before a day in my life.

Q.        Well, I understand that you haven't seen the document before.  My question is, do you have any reason to doubt that you made this statement back at the time of your arrest?

A.        I think I already answered that question.  Because I've never seen this document.

Q.        That's the only basis for you doubting that you made the statement is that you've never seen the document before, correct?  Let me go on a

115

little bit more with the paragraph.  It says:  A hundred would be somewhere near -- somewhere around a gram.

Do you see that?

A.        I see it.

Q.        And that's in quotation marks, correct?

A.        Yes.

Q.        All right.  He also admitted to being a crack cocaine user.  12 to 15 trips a year would be made from Columbus to Parkersburg with, quote, never more than half an ounce, end quote, being delivered at a time.  The subject estimated having made between 30 and 45 trips to Parkersburg during the preceding three years.  The subject told Nohe the names of some of the individuals to whom he delivered the drug.

Is that information accurate?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.        There's a lot of information in here. I -- I --

Q.        Okay.  Well, let's break it down.  Did you, in fact, make between 30 and 45 trips to Parkersburg during the preceding three years?

116

A.            I don't recall.

Q.            Were you a crack cocaine user?

A.            I don't recall that.  I don't recall that, no.  I don't recall.

Q.            You don't recall or you were not?

A.            I don't recall.

Q.            You traveled 12 to 15 trips a year from Columbus to Parkersburg with never more than half an ounce at a time.  Is that an accurate statement?

A.            It's a lot of information on here.  I'm not proud of the person that I was a long time ago, but I can't say who said this.  I've never seen this document before.

Q.            Okay.  Well, if the officials from West Virginia come in and say that you made this statement, would you have any reason to contradict them?

A.            Well, quite frankly, after being wrongly incarcerated for 16 years for a crime that I didn't commit, it kind of -- and, you know, seeing some of the articles that's been on the news for these last few years since I've been home about police misconduct, it would -- that kind of

117

gives me a lot of reason to not necessarily trust everything that the police department, especially the Columbus Police Department, says.  So I wouldn't --

Q.          But this is not the Columbus Police Department, correct?

A.          I wouldn't bet my life on anything that an officer from Columbus or West Virginia says.

Q.          Okay.  Let's turn to the next page.  Do you see at the top of the page, subsection C, Defendant's Statement?  It's at the top of the third page.  Defendant's Statement.

A.          Yes.

Q.          The subject indicated he was bringing crack cocaine into Parkersburg from Columbus, Ohio, and had been doing it off and on for nearly three years.  He made his living dealing drugs. The subject estimates earning between $20,000 and $30,000 per year on the sale of drugs.

            Did I read that correctly?

A.          That's what it says on the paper.

Q.          Were you earning between 20,000 and 30,000 a year on the sale of drugs back in 1999 and 2000?

118

A.          I do not recall.

Q.          What's your best estimate of how much you were earning from the sale of drugs back in that time period?

A.          I don't even have an estimate.  It was -- that was a long, long time ago.

Q.          The subject indicated he was bringing crack cocaine into Parkersburg from Columbus, Ohio, doing it on and off for nearly three years.
            Is that an accurate statement?

A.          I -- I don't know who wrote this stuff down.  I can't -- I can't remember.

Q.          Well, those are two different answers.  It doesn't matter who wrote it down.  My question is, is it accurate?

A.          I have no idea.

Q.          Is it possible that it's accurate?

A.          I have no idea.

Q.          Can you turn to page 5 of this exhibit?  It's Bates No. 7867.  At the top, under section A, Use of Alcohol or Drugs.  The subject's history involves alcohol, cocaine, and marijuana.  The subject does not believe he has an alcohol or drug problem but indicated he, quote, had, end quote, a

119

problem with, quote, cocaine and weed, end quote.

He further stated it has taken him about six

months to get off drugs following his arrest.

Did I read that correctly?

A.      That's what it says on the paper.

Q.      All right.  Did you get off drugs after your West Virginia arrest?

MS. MARTINEZ:  Belated form objection.

You can answer.

A.      I'm going to say yes.

Q.      You're going to say yes, that after your arrest you got off drugs?  Is that your testimony?

A.      I believe so, yes.

Q.      How did you do that?

A.      While incarcerated in West Virginia, they have -- like I said before, there's -- it's an incentive-based system, so I attended -- I do remember attending AA and NA classes, and learning a lot about how addiction works and learning a lot about addiction, and learning, you know, the ups and downs.  I heard some very good stories while attending AA and -- yeah.

Q.      Based upon your experience in AA and NA

120

in West Virginia prison, did you come to believe that you had an addiction?

A.          That's a good question.  No, I kind of think it further cemented the fact that I wasn't addicted because, you know, I don't know if you've ever been to an AA meeting, but they have a gentleman come in front of the class and basically tell their life story about how alcohol or drugs caused their demise.

           And like I said before, I wasn't fully mature at this time in my life and I think it had the opposite effect of me believing that I had a drug problem or alcohol problem.  I kind of compared myself to those individuals and, you know, seeing how alcohol and drugs and seeing what it had done to their life, you know, I was -- I was not mature enough to see it yet, not mature enough to see it --

Q.          So at the --

A.          -- to go to those classes.

Q.          -- time you did not believe that you had a drug problem?

A.          No, I didn't believe I did.

Q.          Did you come to understand later that

121

you had a drug problem?

A.          Looking back on it now, being more mature now, being more involved in my faith and, yeah, when I look back on it, it seems like I was using it as a coping system and just really just trying to escape the harsh realities of life, so, you know, for lack of a better term, it seemed like there definitely was a problem there.

Q.          It says:  The subject does not believe he has an alcohol or drug problem but indicated he had a problem with cocaine and weed.

Does that correctly reflect your opinion about yourself at the time?

A.          At this time, I do not recall.

Q.          Jump down three paragraphs.  The subject began using cocaine while living in Parkersburg in 1999.

Does that sound correct to you?

A.          No.

Q.          When did you first start using cocaine?

A.          I cannot recall.

Q.          Who --

A.          This was -- just because it's written here on this paper doesn't mean it to be true.

122

It's only like a sworn statement not in my handwriting.

Q.      I understand.  I'm asking you whether it's accurate.

Who first gave you cocaine?

A.      I do not recall.

Q.      Where were you when you first took cocaine?

A.      I would probably say -- I -- I do not recall.

Q.      And I apologize if we went over this. Have you -- have you taken both powder and crack cocaine?

A.      I've never done crack cocaine.

Q.      All right.  Back to that paragraph we were looking at about you beginning to use it in Parkersburg in 1999.  The paragraph continues:  He used it on average of twice a week.

Does that sound like an accurate estimation of how often you used cocaine in 1999?

A.      Like I said before, just because it's written on this paper, it doesn't -- it doesn't sound like something -- it doesn't sound like me, no.

123

Q.          So your answer is no, that's not an
accurate statement?

A.          It doesn't sound like an accurate
statement.  But I've never seen this document
before.

Q.          I understand that.

He denied using it in Columbus, saying,
quote, I have a reputation to keep up.

Did you make that statement?

A.          I'm not sure who made these statements.

Q.          Is it possible that you made that
statement?

A.          I'm not sure.

Q.          So it's possible?

A.          I'm really not sure.  This -- I've
never seen this document before.

Q.          I understand you haven't seen the
document before.  I'm asking you about the
statement.

MS. MARTINEZ:  Objection.  Asked and
answered.

You can answer.

Q.          Did you try to avoid using cocaine when
you were in Columbus because you had a reputation

124

to keep up?

A.        I don't recall.

Q.        So it's possible?

A.        It was a long time ago.  I honestly don't recall.

Q.        And then once again, two sentences later:  He brought crack cocaine from Columbus to Parkersburg where he sold it.

Did you do that?

A.        No.

Q.        You never brought cocaine from Columbus to Parkersburg to sell?

A.        No.

Q.        How do you recall that so clearly?

A.        It seemed -- doing something like that would indicate that it seems pretty dangerous, you know, there -- I could remember in Parkersburg partying, being young and dumb, but something like that seems like it would have been taboo because of the ramifications.  You know, transporting drugs is -- it's a little bit -- it seems kind of -- kind of dangerous.

Q.        So you're making an assumption that you wouldn't have done it because it was dangerous,

125

correct?

A.          No.  I'm -- I'm making the assertation that I wouldn't have done it.

Q.          Turn to the next page.  Some of this is repetition.  Again, when asked how he supports himself -- this is in the third paragraph -- when asked how he supports himself, he replied that he's dealt drugs for several years and earned between 20,000 and 30,000 per year, but not consistently.

Again, did you tell them that that was the case, that you sold drugs for several years and earned between 20,000 and 30,000 dollars a year?

A.          I do not recall.

Q.          All right.  Second paragraph from the bottom, there's a sentence that says:  The subject has a severe drug addiction to both marijuana and crack cocaine which will need to be addressed through counseling while incarcerated.

My question is, did anybody at the West Virginia prison tell you that in their opinion you had a severe drug addiction to marijuana and crack cocaine?

126

MS. MARTINEZ:  I'll object to the form.

And if you need to read that section, feel free.

A.        Can you repeat the question?

Q.        Sure.  You saw the sentence that I read, correct?  The subject has a severe drug addiction to both marijuana and crack cocaine which will need to be addressed through counseling while incarcerated.

Do you see that sentence?

A.        I see that sentence.

Q.        The question is, did anybody from the West Virginia prison staff tell you that in their opinion you had a severe drug addiction to both marijuana and crack cocaine?

A.        Throughout the whole 26 years while I was incarcerated, did they explain that?

Q.        You were not incarcerated for 26 years in West --

A.        I mean --

Q.        -- Virginia.

A.        Sorry about that.  Strike that.

26 months.  I do not recall.

Q.        Do you recall anyone ever telling you

127

while you were incarcerated in West Virginia that in their opinion you had a drug addiction?

A.          I do not recall.

Q.          You indicated that you participated in NA and AA while you were in West Virginia prison, correct?

A.          Yes, that's correct.

Q.          And when we say AA, we mean Alcoholics Anonymous, correct?

A.          That is correct.

Q.          And NA would be Narcotics Anonymous?

A.          That is correct.

Q.          How does one get into a program like that in prison?  Do you just say you want to go?

A.          The way it works, from what I can remember, I do believe you -- some of it was mandatory in some facilities and some of it was voluntary.

Q.          Mandatory for all inmates?

A.          In certain facilities, I -- yes, it was mandatory.

Q.          Did you attend sessions of those in facilities where it was not mandatory?

A.          Yes, I did.

128

Q.        How did that come about?

A.        Well, in prison, there's not really a lot to do, a lot of fun things to do, a lot of entertaining things to do.  So on -- let's say on a Tuesday night they would have AA.  And you start to see, you know, the people who are attending the classes it actually, you know, is making a difference on how they thought and carry themselves.

And so at some point I -- I attended a few classes voluntarily, just, you know, to try to escape from whatever madness was going on around me and try to see, you know, what the -- what this -- what the fuss was all about.

Q.        Well, clarify for me, because I thought I heard two different answers in there.  Did you attend because you saw the beneficial effects it was having for the people who went or did you attend because you were bored and you didn't have anything better to do?

A.        I might have given two different answers.  Sorry about that.  But it was probably a mixture of both.  I mean, when you're sitting in prison, it's a -- it's a dark place, you're

129

looking for some light, and on -- and on some occasions I might just have went because I was bored, you know.

Q.          What made you think that these programs would do any good for you if you didn't think you had a drug or alcohol problem?

A.          Because they're faith-based programs. They started off with very much speaking about faith, you know, and talking about the Lord and God, so that was a good start for me right there. That kind of piqued my interest right there.

Q.          Now, correct me if I'm wrong, but my understanding is the first step in these programs is acknowledging that you have a problem with a substance; is that correct?

A.          I do not recall the 12 Steps.  Sorry.

Q.          Do you remember that -- that acknowledgment of a problem being part of the process?

A.          I -- I do.

Q.          How did you deal with that if you didn't think you had a problem?

            MS. MARTINEZ:  Objection.  Form.

            You can answer.

130

A.          Like I said, I was young and immature and I never, like I -- I never really believed I had a problem, so I wasn't in there trying to earn the badges and stuff.  I was just in there to hear the life lessons.  And, you know, maybe sometimes I was in there just to get out of my prison cell.

MR. EPSTEIN:  We're going to take a lunch break at this point.  We will go off the record.

THE VIDEOGRAPHER:  We're off the record.  The time is 12:58.

- - - - -

Thereupon, a luncheon recess is taken at 12:58 p.m.

- - - - -

131

                              Thursday Afternoon Session,

                              December 19, 2024.

                         - - - - -

              THE VIDEOGRAPHER:  This marks the

beginning of Media No. 4.  We are back on the

record.  The time is 1:59.

                         - - - - -

              Thereupon, Exhibit 12 is marked for

purposes of identification.

                         - - - - -

BY MR. EPSTEIN:

Q.          Okay.  Mr. Horton, I just want to ask

you a couple of more quick questions about your

experience in West Virginia.  I'm going to hand

you what I've marked as Exhibit 12.  It's a series

of documents from the Parkersburg Police

Department.  You can take your time looking over

the document if you want to, but I'm not going to

ask anything substantive really about it.  The

first page is an arrest report with your name on

it, correct?

A.          Correct.

Q.          And it indicates a height of 6'1",

correct?

132

A.          That's correct.

Q.          Is that your height?

A.          That's correct.

Q.          And then just for the record, this is showing an arrest date of September 30th, 2000. It's just before the dark line.  Just above the dark line in the center.

A.          That's correct.

Q.          All right.  And does that sound right for the date that you were arrested in West Virginia?

A.          It sounds -- it -- it was so long ago.

Q.          Can you turn to the second page of the exhibit?  The second page consists of four photographs, correct?

A.          That's correct.

Q.          And who are those photographs of?

A.          The photographs are so dark, I almost can't even tell.

Q.          Well, do you recognize the person in the photograph?

A.          That is me, yeah.

Q.          It is you in all four photographs, correct?

133

A.          Yeah.

Q.          Before we broke for lunch, you were talking about the different levels of security in the West Virginia system, and you had talked about you can work your way up to a work release program; is that correct?

A.          That's correct.

Q.          Did you, in fact, make it into a work release program while you were incarcerated in West Virginia?

A.          Yes, I did.

Q.          How did that work?

A.          Let me see, how did it.  The way work release works is you essentially are granted a privilege to leave the prison and go live in kind of like a halfway house setting.  I think in Columbus they refer to it as a halfway house.  So it's a bunch of inmates living in essentially what's like a dorm, a house.

Q.          Okay.  Well, if you could, confine your description to the experience in West Virginia.

A.          Okay.  Sorry about that.

So it was you lived there, there's a different set of rules, you get a job, you're

134

allowed to open up a bank account, you have to pay a percentage of your salary to live there and you're encouraged to save your money, they help you find jobs, there's lots of programming offered in there.  Yeah.  That's about it.

Q.        How long were you in that program?

A.        I was in two different work release programs while being incarcerated in the state of West Virginia and -- I do not recall.

Q.        When you say you were in two different programs, what were the two different programs?

A.        One was in Huntington, West Virginia. And the other one was in a different county in West Virginia.  I want to say -- I'm not sure. Was it Beckley, West Virginia?

Q.        What jobs did you have during that time?

A.        The jobs that I had that I can remember, I worked as a telemarketer and I worked in a kitchen for the most part.

Q.        How much were you paid?

A.        I can't -- I can't recall the exact amount, but it was -- I was able to -- I was able to save more than what I spent.

135

Q.       So you had a bank account in West Virginia where the money went into?

A.       I -- I can't -- I can't recall exactly the name of the bank.  It was so long ago.

Q.       But you did have a bank account?

A.       There was a savings system in place.

Q.       Was it with a private bank or something operated by the -- by the State or the penal system?

A.       I'm not sure.  I can't -- I can't remember.

Q.       Would the employer give you a physical check or would they electronically deposit your money?

A.       This was back in the early 2000s, so I believe it was a physical check.

Q.       At the time of your release, how much money did you have in that account?

A.       Oh, that's a good question.  Oh. Maybe -- maybe about four or five thousand dollars.

Q.       When you left the prison, that money then reverts to you, correct?

A.       Yeah, they give it to you in the form

136

of a check.

Q.         When were you released from prison in West Virginia?

A.         April of 2004, I believe.

- - - - -

Thereupon, Exhibit 13 is marked for purposes of identification.

- - - - -

Q.         I'm handing you what's been -- excuse me -- marked as Exhibit 13.  Can you identify that for the record?  Do you recognize that?

A.         State of West Virginia, Division of Corrections.  I'm sorry, I do not recognize this paper.

Q.         All right.  Well, I will represent for the record that the first page is a document from the State of West Virginia, ordering of release. It's an order of release on parole.  And you see on the second line this is the order to release Richard Horton, correct?

A.         I see it.

Q.         And the date of the release is April 13th, 2004, correct?

A.         That's correct.

137

Q.          Which is consistent with what you said a moment ago that you thought you had been released in April of 2004?  Yeah?

A.          Yes.

Q.          Okay.  The second page is captioned Parole Agreement.  And it appears to put forward some conditions for people to abide to.  At the bottom there's a signature above parolee.  Is that your signature?

A.          That is my signature.

Q.          So you agreed to those conditions?  Did you agree to those conditions?

A.          Yes, I would.

Q.          All right.  And then the third page are the rules and regulations governing your release. Do you see that?

A.          I see it.

Q.          And again, is that your signature at the bottom?

A.          That is my signature.

Q.          Did you have a parole officer when you were released?

A.          Yes.

Q.          Who was that?

138

A.          I do not recall.

Q.          Was it a man or a woman?

A.          I think it was a woman.

Q.          Can you turn to the fourth page?  In the middle of the page it says you are instructed to report your arrival immediately by phone or in person to Senior Officer Robin Karim.

Does that refresh your recollection about who your parole officer was?

A.          No.  I'm sorry.

Q.          That's okay.  This appears to suggest that you were released to a parole officer in Ohio, correct?

A.          Yes.

Q.          Did you have to get special permission to have your parole in Ohio rather than West Virginia?

A.          I can't recall.

Q.          Did you abide by these rules and conditions while you were on parole?

MS. MARTINEZ:  You can look through them again if you need to.

A.          To the best of my knowledge, I did abide by all the rules.

139

Q.          Okay.  Let me ask you about a couple of specific requirements.  On page 2, the Parole Agreement, under item 5, there's a subpart 2.  Do you see that?

A.          I see it.

Q.          You are -- excuse me.  Strike that.

You are to obtain a legitimate AA/NA sponsor as approved and required by your parole officer and attend meetings on a regular basis.

Did your parole officer require you to get a sponsor?

A.          Not that I remember, no.

Q.          Okay.  On the third page, the first part, section 2.1 and then there's subpart (a).  When released, you must proceed directly to the place to which you have been paroled and report to your parole officer within 24 hours unless otherwise instructed.

Do you see that?

A.          I see that.

Q.          Did you do that?

A.          Yes, I believe I did abide by section 2.1(a).

Q.          Okay.  2.1(b).  You are to have written

140

permission of your parole officer before you leave

the prescribed area of supervision to which you

are paroled.

Did you have any occasion to leave the

prescribed area during the term of your parole?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.        I don't recall.

Q.        What did you understand the prescribed

area of your supervision to be?

A.        The -- the way I read it, it seems like

something that you would need permission to leave

the state for.  When they talk about area, I'm not

sure of the actual circumference of the area, it's

not stated here, but it just seems like that you

would need written permission from your parole

officer before you leave the prescribed area.

Q.        And you understood that to be the state

of Ohio?

A.        Yes, sir.

Q.        Between the time of your release in

2004 and the time of your incarceration in 2006,

did you leave the state of Ohio?

A.        Yes.

141

Q. Where did you go?

A. I went to -- I went to Alabama.

Q. For what purpose?

A. I wanted to go see my son. My son with heart disease, I wanted to go see him.

Q. Did you get permission from your parole officer to do that?

A. I do not recall.

Q. Subpart g. You must report within 24 hours to your parole officer each time you are arrested or questioned by officers of any law enforcement agency.

Do you see that?

A. I see it.

Q. Did you ever have any occasion to report to your parole officer that you had been arrested or questioned by officers of a law enforcement agency?

A. Other than this case, yes, I did have an instance where I would have -- I would have wanted to report.

Q. What incident was that?

A. On the way -- wait a minute. Oh, man, my memory. You know what, I don't recall. I

142

think I'm getting a trip to Alabama confused.  I'm trying to remember what year it was.  I -- I'm drawing a blank right here.  Man, what year was that?  Yeah, I do not recall.

Q.        Is there a specific incident you're thinking of that you're not sure when it occurred?

A.        Yes.

Q.        What incident are you thinking of?

A.        It's an incident that happened in -- before all of this took place, so I'm -- I'm -- I'm mixing up the two dates.

Q.        Okay.

A.        This was something that happened earlier and I was on my way to see my son.  Yeah, I'm getting it a little bit mixed up.  Sorry about that.

Q.        Well, that's okay.  Let's see if we can tease it out.  You were on your way to your son and what happened?

A.        Oh, this was before all of this.

Q.        Okay.  But still, you were on your way to your son and what happened?

A.        I -- this -- this was before all this, so I don't want to, you know, go into detail

143

because I'm mixing the details up. I actually don't even think -- I'm confusing two instances. I don't even think my son was even born yet, so --

Q. Okay.

A. -- I'm sorry about that.

Q. Well, but I want to be clear. Did you have an incident where you had an encounter with police officers while you were on your way to see your son?

A. No.

Q. Did you have -- strike that.

Was there an occasion where you were on your way to see your son and something occurred that if it happened in this time period would have been a reportable incident?

A. I do not recall.

Q. You were still on parole when you were arrested in 2004 for the Loew Street robbery, correct?

A. That's correct.

Q. Did you report that to your parole officer?

A. Yes.

Q. As you sit here today, can you remember

144

any other reports that you made to your parole officer?

A.          Yes, I can.

Q.          What can you tell me?

A.          So as -- as the other document states, I was paroled to a Camden Avenue address.

Q.          Uh-huh.

A.          So while I was on parole for the charge in West Virginia, I -- I'm not sure exactly how this came to light, but I found out there was a warrant for my arrest for breaking down a door on the Camden Avenue address.  So I told my parole officer.  They said, figure it out.  And we figured it out.

Since the alleged incident happened at the place where I was currently living at, you know, I'm assuming that it really wasn't a big deal because it might have been some -- a mixup in the paperwork or whatever it was.  But I don't remember it being a serious enough offense or that I did anything wrong because, like I said, this was the exact same residence where I was living, so it didn't seem like a big deal to him, and I didn't make a big -- well, to her it didn't make a

145

big deal, so I didn't make a big deal out of it.

Q.        Well, how did you find out about this, that there was some problem relating to your entrance into Camden?

A.        Could you rephrase that, please?

Q.        I mean, was there -- was there a police report, were you arrested, were you questioned, how did this happen?

A.        This was -- this was from years earlier.  I had a family dispute with someone, with my aunt, at the -- at the Camden address, so that's where it originated from.

I didn't know there was a warrant out for my arrest because, you know, they let me parole from West Virginia to Columbus, Ohio, so I, you know, that's not -- that's not my responsibility, I didn't even know.  They really shouldn't -- they should have sent me straight to jail because there was an active warrant for my arrest, but they didn't, and we got it worked out.

Q.        Okay.  Let me see if I'm understanding this.  So you had an aunt who lived at Camden, correct?

A.        That's correct.

146

Q.          What was her name?

A.          Her name was Nancy Banner.

Q.          And at some point before you went to prison in West Virginia, there was an incident where you might have broken into that place or they thought you had broken into that place?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          There was an incident there, a family dispute there, at the address on Camden Avenue, between myself and Mrs. Banner, and it was a while ago.

Q.          And so there was a warrant outstanding from that incident?

A.          I believe so.

Q.          And that -- you became aware of that warrant in 2004 while you were under parole reporting obligations, correct?

A.          That's correct.

Q.          And so you reported that to your parole officer?

A.          Yes, sir.

Q.          Okay.  So now we have two reports to your parole officer, right, one for the Camden

147

Avenue warrant and one for Loew Street.  Were there any other encounters with police or arrests while you were on parole?

A.          Not that I can recall.

Q.          And you have no recollection of any other reports to your parole officer?

A.          Not from the year of 2004 on, no, sir.

Q.          Where was your son living in 2004 when you were paroled from West Virginia?

A.          I believe he was living with his mother in, I'm not 100 percent sure, California, maybe.

Q.          Has he lived in multiple places?

A.          Yes, you know, and I don't -- I don't fault her for that, you know, I'm the child's father, but, you know, I don't -- he's lived in California, Alabama, Georgia, Florida, lots of different places while I was sitting in prison for 16 years for a crime that I didn't commit. It's -- yeah, it's taken a toll on him.

Q.          Who did he live with in Alabama?

A.          I believe he stayed with his mother and his grandma.

Q.          Is that where they're from?

A.          I believe that's where the grandmother

148

was from, but I'm not 100 percent sure. She's a very sweet lady, but I don't know all the particulars about her.

Q. Your son has medical problems or he did anyway as a child, correct?

A. Yes, he -- he has still to this day has medical problems.

Q. Was his residence in Alabama in any way related to his medical condition?

A. I -- that wasn't my decision, so I -- I do not recall. Sorry.

Q. Do you know anything about your son experiencing a life-threatening accident at some time?

A. Yeah. This is while I was incarcerated in the state of Ohio. He -- he was at school, trying to show off with some young ladies, and he went into AFib. And they had to -- they had to lift him by helicopter from the school to a hospital.

And that was a pretty tough time, just, you know, just being so far away and not being able to do anything, you know. And there's the guilt of, you know, did he get heart disease

149

from my side of the family. It's just -- it wasn't a good time. But he was able to -- he was able to -- the doctors did a fantastic job. The first responders did a fantastic job.

Q.        When you were released from prison, were you able to go see your son?

A.        When I was released from prison?

Q.        In 2004.

A.        In 2004?  I do not recall.

Q.        You think he may have been in California at that point, but you're not sure?

A.        That's correct.

Q.        You went back to prison in 2006, correct, for the Loew Street robbery?

A.        For the Loew Street charge, yes.

Q.        You were incarcerated in 2006?

A.        Yes.

Q.        Where was Kobe living at that time?

A.        He -- at that time he was living in Columbus, Ohio.

Q.        Who was he living with?

A.        Once again, I'm sorry, that was -- that was 20 years ago.  I'm not even sure.  I'm not sure.  You know, the trauma from what happened to

150

me right around that time, I'm not sure exactly where he was living.

Q.        Was there any conversation about him coming to live with you?

A.        Previous, before I got wrongfully incarcerated, yes.  Yes.

Q.        Tell me about those conversations.

A.        Well, they were -- they were tough because his mother, you know, like I said, she's -- she's pretty feisty, but I knew that she -- she had -- she had either just -- she had just got out of prison, so I don't think she was stable.

So, you know, I would see him, go to see him throughout the week, but it was a delicate situation because I was still kind of newly married and, you know, just asking my wife, you know, to take on a lot of that responsibility of, you know, being a stepmom to a child with heart disease, it was -- it was a little touch and go, you know.  Some conversations went good, some conversations didn't go so well, but, you know, we did the best we could.

Q.        Okay.  Let's back up a second.  You

151

were paroled in April of 2004, correct?

A.          I was paroled, yes.

Q.          You came back to Columbus immediately afterwards, correct?

A.          Yes.

Q.          And where did you live?

A.          Camden Avenue.

Q.          In Nancy Banner's house?

A.          That's correct.  In her basement.

Q.          In her basement.  How long did you stay there before you moved out?

A.          I never really moved all the way out. I kind of just stayed, you know, in between places, just trying to really figure it out.

I'd say when Janette and I got married, that was kind of -- that would probably be the best date when I was officially moved all the way out, and that was -- oh, I got to get this right on camera -- July 5th, 2005.

Q.          Okay.  So you've jumped a year from April of 2004 to July of 2005.  At some point in that period of time you moved to Reynolds Avenue, correct?

MS. MARTINEZ:  Objection.  Form.

152

You can answer.

A.        I stayed, like I said before, I stayed in a couple of different spots.  I moved around a little bit.

Q.        Well, you rented Reynolds Avenue, correct?

A.        I was -- it was a couple of guys.  It was kind of like a fraternity house.

Q.        Who lived there?

A.        A couple different guys.

Q.        What were their names?

A.        Their names -- I don't recall.  That was a long time ago.

Q.        Do you remember any of their names?

A.        Do I remember who all names was on the lease besides mine?  If my name was on the lease -- I don't recall.

Q.        Who did you lease it from?

A.        The -- the gentleman's name, he was an older Russian guy.  I can't remember his name. Sorry.

Q.        How much was the rent?

A.        Maybe about 5 or -- maybe 600.

Q.        Now, is that $600 that you paid or $600

153

that got split amongst all the tenants?

A.          I would say it was split.

Q.          Why did you rent the Camden place if you were -- I'm sorry.  Why did you rent the house if you were still living in Camden?

A.          The reason I would, you know, I didn't want to continue to live in my aunt's basement for the rest of my life.  In the year 2004, I was trying to get my life together and trying to change and force that change.  And, you know, just living in, you know, I was -- it's a blessing, you know, I'm always forever thankful for my aunt to give me the opportunity, but I didn't want to, you know, being -- I forget how old I was at the time -- 26, 25, 26, I didn't want to stay in her basement forever.

Q.          What did the Everett [sic] Street house look like?

            MS. MARTINEZ:  Objection.  Form.

            You can answer.

A.          You know, I don't know how long you've lived in Columbus, Ohio, but it -- it's -- that neighborhood is not a terrible neighborhood.  You have doubles, duplexes, single-family homes.

154

- - - - -

Thereupon, Exhibit 14 is marked for purposes of identification.

- - - - -

Q.        I'm going to hand you what's been marked as Exhibit 14.  Is that a picture of the Everett [sic] Street house?  I'm sorry.  I keep saying Everett.  Is that a picture of the Reynolds Avenue house?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.        I haven't seen that house in a long time.

Q.        Does that look familiar to you?

A.        It does look familiar.

Q.        Do you think that might be a picture of the house that you rented?

A.        I think it might be.

Q.        Did you have a job when you came back from West Virginia?

A.        Yeah.  I worked at -- yes, I did.

Q.        And where did you work?

A.        I worked at Popeyes Chicken and Biscuits on Livingston Avenue.

155

Q.          What did you do there?

A.          During my employment there, I was -- I was a cook.

Q.          Did you have a regular shift?

A.          Yes, I did have a regular shift when I was working at Popeyes.

Q.          What was your shift?

A.          I can't remember.  I'm not sure, exactly sure what the shift was.  First shift.

Q.          Well, how many hours did you work?

A.          It varied.  It wasn't -- working, like I said, being a certain age, working at a place called Popeyes Chicken and Biscuits, it varied.  I didn't, you know, really want to -- I never really was striving to be employee of the month.  Just have a job, have some income coming in, and keep my parole officer happy.

Q.          Did you have any other jobs at the time?

A.          I don't recall.

Q.          So it's possible you did?

A.          It's possible.

Q.          But you don't recall any of them?

A.          I don't recall because, you know,

156

sometimes -- yeah, I did have other jobs.  I would do what's called residential cleanouts of homes and stuff like that.

Q.          Who did you do that for?

A.          I've done it for various different customers, just kind of cleaning out attics and maybe stuff like that.

Q.          But were you working for a company or were you self-employed?

A.          Self-employed.

Q.          And was this during 2004, 2005?

A.          Yeah.  Yes.

Q.          What other jobs did you have in that time period?

A.          I -- I don't recall if I had any other jobs at that time.

Q.          Did you sell drugs during that time?

A.          No.

Q.          When did you meet Janette?

A.          I met Janette shortly after my release from prison in 2004.

Q.          Can you be specific about when you met her?

A.          I got out in April, so I know it was

157

after that.  A couple months after that.

Q.          Where did you meet her?

A.          I met her at a bar.

Q.          Which bar?

A.          It was a bar on Sinclair and Morse Road.

Q.          What time was it?  I mean, was it late, early morning, dinnertime?

A.          That's a good question.  It was -- it was after dinnertime.

Q.          Was this a bar you frequented?

A.          No.  I don't recall.  I've been there a time or two.  It wasn't like -- there was nothing wrong with it or anything illegal about it.  Yeah, I've been there before.

Q.          Did you just meet her as another person in the bar or was there a setup of any kind?

A.          Just met her.  Just bumped into her, kind of.

Q.          And then you eventually married her?

A.          Yeah.  I can remember her having a distinctive hairstyle and it kind of piqued my interest, and the rest, they say, is history.

Q.          Did you have a bank account when you

158

came back to Columbus?

A.        Yes, I did have a bank account.

Q.        How many accounts did you have?

A.        I do not recall.  That's a good question.

Q.        Was it possible that you set up accounts at more than one bank?

A.        It is possible.

Q.        Why would you do that?

A.        You know, well, while -- while I was in prison, I -- I learned a lot more about finances. And I'm actually pretty good, pretty good with my money now, a little bit better, a lot better, so I really -- I'm really not sure why I would have had more than one bank account if I had more than one bank account.

                    - - - - -

          Thereupon, Exhibits 15 and 16 are marked for purposes of identification.

                    - - - - -

Q.        Okay.  I'm handing you what's been marked as Exhibit 15 and Exhibit 16.  You may recognize these.  These were exhibits at your criminal trial.  Exhibit 15 is a bank statement

159

for an account at Telhio Credit Union in the name
of R. Horton.  Can you see that?

A.          Yeah.

Q.          Was this the bank account that you had
at the time?

A.          Yes.

Q.          All right.  And the -- the date for
this statement appears to cover the months of
September and October 2004.  Can you see that?

A.          Yes, I can see that.

Q.          So this would have been just before the
Loew Street robbery, correct?

            MS. MARTINEZ:  I'm just going to
object.

Q.          Actually, a little before and a little
after.

            MR. EPSTEIN:  Thank you.

A.          That's what the dates indicate on the
paper.

Q.          Okay.  So I just -- I need to walk you
through a couple of these because do you see
there's a column called Credits?

A.          Yes.

Q.          And there are amounts listed on there

160

with dates.  So, for example, on September 7th, there's a $428.52 deposit into the account.  Do you see that?

A.          I see it.

Q.          And then a $105 deposit three days later.  Do you see that?

A.          I see it.

Q.          A $190 deposit into the account three days later?

A.          I see it.

Q.          A $170 deposit into the account three days later?

A.          I see it.

Q.          A $310 deposit into the account four days later?

A.          I see it.

Q.          Where are these deposits coming from?

            MS. MARTINEZ:  Objection.  Form.

            You can answer.

A.          My answer to this question would be this is proof that I didn't know a lot about finances back then.  And I do not recall each and every -- each and every deposit into a bank account from the year 2004.  It's impossible for

161

me to remember exactly where every dollar came from.

Q.          But what sources would you have had deposits coming from?

A.          Well, my main source would be from my job at Popeyes Chicken and Biscuits, but other than that, I really can't speculate.

Q.          All right.  And that brings us to Exhibit 16, which is an earnings statement from SAPP Restaurant Enterprises.  Do you see that?

A.          I do see it.

Q.          And it's in the name of Richard H. Horton?

A.          Yes.

Q.          All right.  Is it your understanding that SAPP Restaurant Enterprises is the parent company for Popeyes?

A.          It makes sense.

Q.          All right.  And this is an earnings statement from work that you did between September 26th, 2004 and October 9th, 2004, correct?

A.          Correct.

Q.          And the net pay that you earned from

162

Popeyes in that period is $256.76, correct?

A.          That's correct.

Q.          And did Popeyes hand you a physical paycheck?

A.          Well, this was 2004, so, yes, I believe they were still doing physical checks.

Q.          And did you deposit that check into your account?

A.          I'm not sure.  This -- this check was on -- what date was it?

Q.          The check date is October 14th.

A.          Oh.  So I should be able to cross-reference it and see.  I don't see an October 14th deposit on here.

Q.          You'd agree with me there's no indication that this check was deposited into this account, correct?

A.          Not the whole check.  It could have been -- part of the check could have been deposited afterwards.  I see an October 25th.

Q.          Where do you see an October 25th?

A.          October 20th, was that a -- debits, credits.  At the bottom, three up from the bottom. It says credits, $1,007.

163

Q.          I'm sorry.  I don't see where you are.

A.          Right above the Exhibit, see right here?

Q.          So you're talking about the credit for $1,000?

A.          Yeah.  So --

Q.          So you think that might have been partly the check?

A.          I don't want to speculate.  Sorry.

Q.          Well, my question would be, where did the other $750 come from?

A.          It could have come from various different, but I'm not exactly sure where a check came from over 20 years ago.  I'm sorry.

Q.          When you paid your landlord, did you write him a check or did you pay him in cash?

A.          When I paid my landlord, we would kind of come together and pay the young man in cash.

Q.          So would you pull the cash that you needed out of this Telhio account?

A.          I assume that I would.

Q.          You assume that you would, but you don't know?

A.          No, I can't -- I can't speculate.  You

164

know, it was, you know, it was -- this was over 20 years ago.

Q.      Okay.  And as you sit here today, you have no explanation for the amounts of cash that are being deposited into this account; is that correct?

            MS. MARTINEZ:  Objection.  Form.

A.      I know that -- I know that I didn't commit this crime against these people.  I'm not sure what this has --

Q.      Mr. Horton --

A.      -- to do with any of that stuff.

Q.      -- I didn't ask you about the crime.  I asked about the money that was being put into your account.  Where is it coming from, do you know?

A.      It would be impossible for me to speculate other than the obvious check stubs.

Q.      But who would have been issuing you check stubs?

A.      It looks like SAPP restaurants.

Q.      All right.  How often did you get paid by Popeyes?

A.      I can't -- I can't recall.

Q.      And you got paid, for this two-week

165

period, $256, roughly?

A.        Every two weeks.

Q.        Every two weeks.  Okay.  So that's,
say, roughly $500 a month?

A.        Roughly, if I -- it all depends.  This
is just one snapshot of a period in time.

Q.        Okay.  So is it your testimony that you
were working enough hours at Popeyes to account
for all of the money being deposited into this
account?

        MS. MARTINEZ:  Objection.  Form.

        You can answer.

A.        No, the math wouldn't add up.

Q.        Let me ask you this:  Is it your habit
to walk around with large sums of money, cash?

A.        At this age, at this point in my life?

Q.        At this point in life, yeah.

A.        When I was making obvious terrible
financial decisions and I didn't understand the
power of credit and the power of having a credit
union behind you, yeah, I -- it was safe to say
that I was comfortable walking around with cash.

Q.        So, for example, on October 12th of
2004, there was a withdrawal of $800.  Do you see

166

that?

A.      October -- what date was it?  I'm sorry.

Q.      October 12th.  It's two above the dotted line.

A.      Yes, I see it.

Q.      So why would you have pulled $800 out of the account?

A.      I -- I do not recall.  Sorry.

Q.      And then two weeks later, on October 25th, you pulled a thousand dollars out.  Is that the sort of money that you used as walk-around money then?

A.      At this point in my life, I'm not sure what I was thinking.  It obviously wasn't too smart.

Q.      When you started dating Janette, did you tell her about your criminal history?

A.      That's a good question.  I do not recall.

Q.      Did you tell her about your prior drug use?

A.      That's another good question.  I do not recall.  Was I honest and straightforward with

167

Janette and told her everything?  I do not recall.
I don't think that I came in knowing that she
would be, you know, the woman for me and that I
should disclose everything to her, you know.  I
didn't know she was a sweetheart the first day I
met her.  I just thought she was pretty.

Q.          Is it your position that you had
changed your life and your behavior from what it
was before West Virginia to what it was
afterwards?

A.          Yes.

Q.          In what respects?

A.          Well, there's a lot of different angles
and respects.  It's just not living the street
life anymore.  Just trying to be more mature, make
better decisions, just really --

Q.          What did --

A.          -- trying to be there for -- oh.
Excuse me.

Q.          No, no.  I didn't mean to interrupt.
You go ahead.

A.          Just trying to make better overall
decisions.  I had quite a rough upbringing.  As
you can see when you look through the documents, I

168

made some mistakes.  But in 2004, I believe I was 27, just trying to -- trying to get it -- trying to get it right.

Q.          What do you mean by the street life?

A.          Being around drug dealers, dealing drugs, using drugs.  Just trying to -- just trying to change my atmosphere.

Q.          Did you use -- did you use -- I'm sorry.  During this period in 2004, did you use drugs at all?

A.          No.  I left all that life behind me.

Q.          And when I say drugs, I'm including marijuana.

A.          Which is legal now.  No, I believe the whole time I was on parole, I never had a dirty urine.  The whole time I was in prison, I never had a dirty urine.  I'm quite fond of those facts.

                    - - - - -

          Thereupon, Exhibit 17 is marked for purposes of identification.

                    - - - - -

Q.          I'm going to hand you what I have marked as Exhibit 17.  I will represent for the record that this is a criminal complaint against

169

Richard Horton, dated June 22nd, 2004, for

possessing a controlled substance,

to wit: Marijuana, a schedule I controlled

substance, located in two plastic bags in right

front pants pocket, less than 100 grams in amount.

Do you recall being arrested by the

police in June of 2004 for marijuana possession?

A.        No, I don't recall.

Q.        It says the offense location was

3rd Street and St. Clair Avenue. Do you know

where that is?

A.        3rd Street. Yes.

Q.        Where is that?

A.        That is in the Milo-Grogan

neighborhood. It's northeast of here.

Q.        The same neighborhood that you were

living in, correct?

A.        That's correct.

Q.        And could you take a look at the time

of the offense? It's down here.

A.        31:40 [sic]?

Q.        3:40 a.m. Do you see that?

A.        I see it.

Q.        All right. Do you have any explanation

170

for why you were out at 3rd Street and St. Clair Avenue at 3:40 in the morning?

A.        In looking over this document, and you've shown me a lot of documents, if I was -- I was probably high.

Q.        You were high?

A.        Probably.

Q.        And that's why you don't remember this event happening?

A.        That along with a couple other explanations, but, yeah.

Q.        What do you mean by that?

A.        Well, this was in 2004.

Q.        Correct.

A.        And like I -- I continue -- I continue to state, you know, I've been through a lot, a lot of trauma, a lot of PTSD, I don't -- I don't remember every -- everything that you're asking me about.  I'm doing my best to answer all the questions as truthful as possible, but, you know, I've been through a whole lot.  You know, this complaint right here, I mean, weed is legal now, so...

Q.        Was weed legal in 2004?

171

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.          I don't think so.

Q.          You were continuing to use drugs during 2004?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.          I don't recall that.

Q.          Well, you just said that you might not recall this because you were high.

A.          I must have been.  I was up at 3 in the morning.  I never had a dirty urine, so it doesn't seem like -- if and when this happened I was on parole from West Virginia, and I don't remember being -- getting in trouble for it, so...

Q.          How often did you have to do urine screens?

A.          Every -- every time I saw my parole officer.

Q.          How often was that?

A.          That was twice a month sometimes.  It starts off very intensive in the beginning.  So if I got out in April, he would probably -- I would probably have to see her once a week.  And then

172

six months later, it might go down to once every two weeks. And, you know, if you continue to stay out of trouble, work your job, not have any dirty urines, it would go to maybe once a month, you know.

Q.      Did you tell your parole officer about this arrest?

A.      I don't recall.

Q.      Did you tell Janette about this arrest?

A.      I don't recall.

Q.      Do you recall anything about the circumstances of this arrest?

A.      No, sir, I do not. This was -- this was a long time ago. Where does it say on here I was arrested?

Q.      Just below the middle of the page. There's a check mark for arrest warrant.

        I assume, by the way, that if a police officer -- if you know -- if a police officer stops you and finds you in possession of marijuana, I assume that they arrest you, rather than letting you go. Is that your understanding?

A.      See, your different -- your experience in dealing with police officers and my experience

173

in dealing with police officers is two separate stories.

Q.      Okay.

A.      Even back then when marijuana was illegal, you know, something like this could have probably been overlooked because, you know, maybe at the time they were giving me a warning, you know, maybe at the time when they -- when they stopped someone with this small amount of marijuana on them, there was a more serious crime happening and they had to go pursue a real dangerous criminal, you know.

Q.      Is this a small amount of marijuana?

A.      It looks like it says less than 100 grams, so...

Q.      Would you consider that a small amount?

A.      Yeah.  I don't even think this was a felony back then.

Q.      But clearly they didn't just let you go.  They wrote a criminal complaint and issued an arrest warrant.

A.      Clearly.

Q.      Right.  So they didn't just let it go.

A.      No, no.  I was just explaining my

174

experience and your experience, because, like, I don't remember my parole officer violating my parole and sending me back to prison for this, so it doesn't really seem like it was that serious.

Q.          Right.  But my question wasn't whether you were revoked, it was whether you fulfilled your obligation to report it to him or her.

A.          Oh.  I can't recall.

MS. MARTINEZ:  Are we at a good time for a quick -- for a break, Counsel?

MR. EPSTEIN:  Sure.

THE VIDEOGRAPHER:  We are off the record.  The time is 2:56.

(A short recess is taken.)

THE VIDEOGRAPHER:  This marks the beginning of Media No. 5.  We are back on the record.  The time is 3:06.

BY MR. EPSTEIN:

Q.          Mr. Horton, is it fair to say that going back to the period of, say, the 1990s, you did not have a very good driving record?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.          Yes, it is -- it is fair to say that my

175

driving record was less than stellar, starting in the '90s.

Q.      Tell me about that.

A.      Well, I was young and dumb.  I didn't have a lot of respect for traffic laws and restraints.  And it actually took me a long time and a lot of people to -- to realize that, you know, the rules are in place for a reason.

It took me a very long time to respect the fact that the law in Ohio is that every driver should have insurance.  I can remember just thinking, you know, I didn't -- it felt like a scam that you would just be paying your insurance every month and what if you never get into an accident, you know.

Q.      Speaking of insurance, was there a time where you owed $4,000 to an insurance company?

A.      Yes.

Q.      What was that debt for?

A.      That debt was for a car accident that I had gotten into in high school, a very, very long time ago.

Q.      And how did that get resolved, that debt?

176

A.          You know what, I don't -- I don't recall.

Q.          So at some point in time, I think we talked about this already, you purchased a car from Tracy McClanahan; is that correct?

MS. MARTINEZ:  Object --

A.          I purchased --

MS. MARTINEZ:  Objection.  Form.

You can answer.

THE WITNESS:  Sorry about that.

A.          I purchased a car, but I'm not exactly sure who I bought the car from.  I don't know if it was Tracy McClanahan or Linda McClanahan, but I did -- I do remember.

Q.          But you purchased the car from somebody in the McClanahan family?

A.          Yes, sir.

Q.          And you took the car to Rick McClanahan to do some work on it, correct?

MS. MARTINEZ:  Objection.  Form. Restates previous testimony.

You can answer.

A.          I think I already answered this question, but, yes, I believe one of the

177

stipulations was he was supposed to fix something on the car.

Q.     Now, before you took the car to Mr. McClanahan for him to work on it, did you already know who he was?

MS. MARTINEZ:  Same objection.

You can answer.

A.     Yes, I knew who he was.

Q.     You had known him for some time?

A.     Yes, I did.

Q.     And in the process of doing that car transaction, did you go to his house?

A.     I do not recall where he fixed the car, was it -- I don't know, I can't remember, was it at a garage, was it at his house, was it at my house.

Q.     So you don't remember if you dropped the car off at his house?

A.     I don't remember.

Q.     What happened to that car?

A.     As we spoke about earlier, I had a very -- what's the word that I could use to describe it -- I had a very colorful driving record, so from what I can remember, the car got

178

impounded shortly after I bought the car.  I didn't -- yeah, I was -- I was pretty young and pretty reckless at that point in my life.

Q.        In 2004, after you were released from prison in West Virginia and you came to Ohio, did you have a car?

A.        I -- I did purchase a car.

Q.        Where did you purchase the car?

A.        In Columbus, Ohio.

Q.        I mean --

A.        From a family friend.

Q.        -- do you remember who you bought it from?  Did you buy it from a dealer or from a private seller?

A.        I bought it from a family friend, private seller.

Q.        How much did you pay?

A.        That's a good question.  I believe I paid around $1,000 for it.  It was -- it was not the most -- not the nicest car.

Q.        What kind of car was it?

A.        It was a -- it was a green Cadillac. It needed a lot of work on it.

Q.        Did you have a valid driver's license

179

in 2004?

A.          No, I did not.

Q.          Did you use that car to drive around in 2004 even though you didn't have a valid driver's license?

A.          Yes.  Yes, I -- I drove it on occasions.

Q.          What kinds of occasions would you use it for?

A.          I would -- I would drive it when it was functioning.  I might drive it -- I might take Janette out to eat in it.  It was an older model car, so it was pretty fun riding around in it when it was in running condition.

Q.          So I take it there were times when it was not in running condition?

A.          Yeah.  Yes, that's correct.  It was a -- it was a -- I had quite a few problems out of that car.  I can remember something about the heat and the steering, the steering and -- it was -- it was -- I actually remember getting rid of the car because stuff just kept happening to it.

Q.          Well, did you put money into it to try to fix it?

180

A.           I tried, but I didn't -- I didn't have a lot of patience back then.

Q.           So there were times when it was inoperable and then it would become operable and then inoperable again; is that correct?

A.           Unfortunately, yes.

Q.           Before you found out that you were a suspect in the Loew Street robbery, were you aware that the robbery had taken place?

A.           That's a good question.  No, I was -- I was not aware.

Q.           You didn't hear anything around the neighborhood about Rick McClanahan getting shot?

A.           I don't -- I don't recall.  No.  I don't recall hearing anything about Mr. McClanahan.

Q.           How did you find out about the Loew Street robbery?

A.           The way I found out about the Loew Street robbery was I was at a -- I was at a child custody hearing for my daughter.  Her mother had got into some -- some type of problem, some type of issue.  And I was actually there because the children's protective services had taken custody

181

of my daughter, so I was in there actually just to try to, you know, give support to her. And if need be, I would have, you know, took custody of my child on the spot.

Q.        Did you --

A.        So --

Q.        Let me interrupt you for a second. Did you file anything at that time requesting custody of your daughter?

A.        I don't recall. I don't recall. But, like I was saying, so I show up to the court proceedings and, you know, I'm telling them who I am and why I'm here. And one of the -- one of the attorneys, he comes and pulls me to the side and he says, you know, we -- we can't grant you custody of your daughter because you have a warrant out for your arrest.

         And that's how I found out that the warrant -- that I had a warrant out for my arrest. I believe at the time it was just a warrant for robbery. But anyway, to confirm these allegations, I have an aunt who used to be in the Columbus police division.

Q.        Who is that?

182

A.        Her name is Barbara Horton Alomar.

Q.        What position did she have in the police department?

A.        That was a long time ago.  I can't recall.  But she -- she wasn't a cop anymore.  But I knew that she could help me with the situation. This is before the internet.  This is before Google.

So I called her and told her, you know, what had happened, because I was completely caught off guard, completely shocked.  You know, somebody says you got a warrant out for a robbery and you know you didn't rob anybody, this is, you know, kind of hysterical.

And I asked her what is -- was it true. And she -- well, she did whatever she had to do and called whoever she had.  She said it was true. So that's how I found out about the robbery.

Q.        What did you do after she confirmed there was a warrant?

A.        Well, since I -- I knew I didn't commit the crime, I didn't take it as seriously.  So what I did was I called -- I got a copy of the arrest warrant and I called the detective, the name that

183

was on the arrest warrant, thinking, you know, this was a minor issue, maybe we can, you know, work this out. And her name was Detective Brenda Walker.

Well, she wasn't exactly happy to hear from me and happy to hear that -- you know, she didn't respect the fact I was taking the situation so lightly. And so she -- I remember she advised me to -- that I had -- since I had a warrant, that I needed to turn myself in.

And the conversation didn't go so well. She was -- she was -- she was kind of mean. And I -- but I tried to assure her that, you know, once I obtain counsel, I would turn myself in, because, you know, I didn't do it. I had a lot of faith, at this point in my life I still had a lot of faith in the justice system, I had a lot of faith in the City of Columbus that, you know, this was just a big misunderstanding.

Q.       How do you know that she was upset you weren't taking it seriously?

A.       Because she was yelling at me.

Q.       She was yelling at you?

A.       And she told me that SWAT, SWAT was

184

looking for me or something, which I didn't, you know, I didn't really take it as -- because I didn't, you know, I didn't know the particulars or I didn't know the particular details around -- I didn't know that a guy had been robbed and shot, I didn't know all of this at this time.  All I knew there was a warrant out for my arrest and, you know, let's just, let's take care of this.

Q.        Well, you knew more than that, though, right?

          MS. MARTINEZ:  Objection.  Form.

                    - - - - -

          Thereupon, Exhibit 18 is marked for purposes of identification.

                    - - - - -

Q.        I'm going to hand you what's been marked as Exhibit 18.  That is the criminal complaint, file stamped December 15th, 2004, State of Ohio versus Richard Horton.  Is this the document that your aunt got for you?

A.        I don't recall the exact document.

Q.        Okay.  This document has Brenda Walker's name in it, correct?

A.        I see it right here.

185

Q.          Right.  And you testified that you found out about Brenda Walker from a document --

A.          Yes.

Q.          -- correct?

A.          Yes.

Q.          Okay.  Are you aware of any other document that was available to you at the time and had Brenda Walker's name on it?

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.          I do not recall.  I see what you're saying, it says it right here in it, but you're asking me about something from 20 years ago.

Q.          Okay.  The copy you have is a little difficult to read, so you're welcome to look at mine.  There's a narrative that describes the crime, correct?

A.          That's correct.

Q.          And it identifies the victim as Rick McClanahan, correct?

A.          That's correct.

Q.          And it also has the date of the offense?

A.          That's correct.

186

Q.          All right.  So when you talked to Detective Walker, you did have some information about the underlying facts of the crime, correct?

A.          I'm not sure exactly what I had, but I just knew I didn't do it whatever it was.

Q.          Well, when did you find out that Rick McClanahan was the victim?

A.          That took a long time because his -- once I looked at the name, I didn't really know him as Richard McClanahan, I kind of knew him as Rick, so it took a while for me to actually figure out who it was.

Q.          At what point did you figure out that the person you knew as Rick and the complaining victim, Richard McClanahan, were the same people?

A.          Like I said, it took a while for me to put two and two together, so I'm not -- I don't recall exactly how long it took.  It took a while, though.

Q.          How did you put it together?

A.          I believe I was -- I was asking a lot of people in the neighborhood, you know, who is this person.  You know, I was contacting re- -- various people.  I was -- I was completely

187

panicked, so I was -- I was asking everybody. I actually -- yeah.

Q.          Back to your conversation with Brenda Walker. What did you tell her?

A.          I told her that I didn't commit this crime. She told me that, you know, I needed to turn myself in. And I told her -- you know, she was -- she was quite irate with me, but I told her, you know, I have no problem turning myself in. As soon as I obtain legal counsel, I'll do just that.

Q.          Did you tell her that you couldn't have committed the crime because you were with Janette at the time?

A.          She -- she didn't ask a lot of questions. She kind of did a lot of the talking. She didn't really ask.

Q.          Well, you could have volunteered that, though, right?

A.          I -- I -- I could have. I don't think that I knew exactly where I was on October 9th of 2004. I know I had a steady routine of stuff that I liked to do. And this seemed like this was on a Saturday for some reason and, you know, I'm pretty

188

sure that according to my routine that Janette and I were courting at the time, so, you know.  But I really, really -- once I observed her tone, there really wasn't a lot of back and forth with Lieutenant -- Detective Brenda Walker.

Q.        What was the routine that you had at the time?

A.        Well, I could remember trying to figure out, you know, exactly where I was at this time. I put a lot of thought into it.  And all I could come up with was that, you know, I would work during the week, and on the weekends I would kind of sleep in, hang out with Janette, do the stuff she liked to do kind of like shopping, maybe the movies, spend time with my kids during the week. And I would really try to spend -- oh, excuse me -- time with Janette, you know.

Q.        Did you spend every weekend with Janette at that time?

A.        I'm pretty sure that I did.  Janette is -- you don't know Janette, you probably haven't met her yet, but she was pretty demanding at this stage, this early stage.  She is not as demanding anymore, but...

189

Q.        Okay.  So you're pretty sure is what you said?

A.        Yeah, I'm pretty sure.  But it's impossible for me to remember.  This is from 20 years ago.

Q.        Sure.  Would your memory have been fresher at your 2006 trial?

A.        I would like to think so.

Q.        Did you get a lawyer?

A.        I did.  And I turned myself in.

Q.        Who was the lawyer?

A.        Oh, I can't remember her name.  I'm sorry.

Q.        Were you released on bail?

A.        Yes.

                    - - - - -

          Thereupon, Exhibit 19 is marked for purposes of identification.

                    - - - - -

Q.        I'll hand you what I've marked as Exhibit 19.  This is the court arrangement sheet for Richard Horton, dated December 28th, 2004.  It shows a bond of $25,000, an appearance bond.  Do you see that?

190

A.          I see it.

Q.          Did you post that bond?

A.          Yes.  Janette posted this bond for me.

Q.          And if you look in the description, it has both Rick McClanahan's name and Rhonda Curry's.  Well, it actually doesn't have McClanahan's first name, but it has McClanahan and Rhonda Curry.  Do you see that?

MS. MARTINEZ:  Just read that section.

Q.          Oh.  Yes, it does.  Victim, Richard McClanahan, Jr.  In the center of the document.  So this document would have plainly told you the names of the victims, correct?

A.          Yes, it has the names on here.

Q.          Would you have recognized Rhonda Curry's name?

A.          No.

Q.          What did you --

A.          No, I did not.

Q.          What did you know her as?

A.          I -- I -- I do not recall her particular nickname.

Q.          Okay.  And when the judge released you, there were conditions imposed, correct?

191

A.         Yes.

Q.         What were those conditions?

A.         It looks like according -- it looks like those conditions are written on this paper. It says stay away from Rhonda Curry and Richard McClanahan, Jr. at the top.  And no further acts of violence.

Q.         Okay.  Did you understand that those were the conditions of your release?

A.         Yes.  But I, you know, I just wanted to get out of -- get out of jail.  After all, I didn't commit this crime.  I just wanted to go home.

Q.         Did you abide by those conditions?

A.         No, not one -- not the one where it says stay away from Rhonda Curry and Richard McClanahan.

Q.         You did not abide by that one?

A.         No.

Q.         Okay.  Tell me what happened.

A.         Well, as I believe I testified during trial, it's a small neighborhood, so I actually saw Mr. McClanahan on two separate occasions.

Q.         Okay.  Let's talk about the first

192

occasion first.

A.        The first occasion in which I saw Mr. McClanahan, I had -- I believe I flagged him down, you know.  I -- he was going one direction, I was going in the other.  I believe I flagged him down just to, you know, try to speak with him.

So me and him, we -- he stopped his car.  I stopped my car.  We talked for a minute. I informed him that I had a place just down the street.  And I asked him, you know -- you know, I believe it was raining, so I asked him would he like to get out of the rain and come talk to me.

Mr. McClanahan, who wasn't in fear for his life, came to the house on Reynolds Avenue under his own free will and we talked about the case.  I distinctly remember that he was on a cane at this time.  So some of the things that we talked about was him having multiple surgeries.

You know, he was able to look me in the eye and assured me at the time, you know, that I wasn't the guy who had done this -- this violent, heinous thing to him.  And we talked for a while.

I remember I had a dog, and the dog kept trying to jump on him.  I had, like, a puppy

193

and she tried to keep jumping, and I remember, you know, shushing the dog away because he was -- he was saying that he just healed up from one of the surgeries.  And, you know, I felt terrible for what had happened to him, but I'm not the one who hurt him like this.

Q.          Okay.  Let's break this down into smaller pieces.  You were driving in your car, correct?

A.          Correct.

Q.          So it must have been one of those periods where the car was operable?

A.          It must have been.

Q.          Were you driving in the car with anybody else?

A.          I -- no.  I don't think so.

Q.          All right.  And you saw Mr. McClanahan driving in his vehicle in the opposite direction?

A.          Yes, sir.

Q.          So you recognized Mr. McClanahan's vehicle?

A.          I recognized his face, not his vehicle.

Q.          Okay.  Were you stopped at the intersection?

194

A.       I believe I was exiting a gas station.
He was coming into a gas station.

Q.       So what did you do?  Did you get out of
your car?

A.       I believe -- I believe that I said -- I
got out of the car, I kind of flagged him down a
little bit, hey, wait a minute, stop, you know.

Q.       Before he was able to get into the gas
station?

A.       I'm not sure who was coming or going.

Q.       So it might have been that he was
leaving the gas station and you were pulling in?

A.       It's entirely possible.

Q.       Okay.  Was anyone with him?

A.       I don't remember anybody being with
him.

Q.       Okay.  So you flagged him down.  And
then did he get out of the car or did you talk to
him through the window?

A.       I believe I talked to him through the
window because I don't -- like I said before, he
didn't actually get out of the car until he came
into the house.  I didn't actually get to see him
on a cane until he came to the house.

195

Q.          All right.  When you're standing outside the car talking to him, what did you say?

A.          I can't remember exactly what I said, but I know that at some point I said, you know, hey, man, I didn't commit this crime against you. Can we go somewhere and talk?  It's raining out here.

Q.          And what did he say?

A.          He said, cool, let's do it.

Q.          So you went to where?

A.          The house on Reynolds Avenue.

Q.          Was anyone else in the house on Reynolds Avenue when the two of you arrived?

A.          Not the -- not on the first occasion, no.

Q.          We'll get to the second one in a minute.

            All right.  So you went into the house on the first occasion, the two of you?

A.          Yes.

Q.          And where in the house did you go?

A.          It was in the kitchen.

Q.          All right.  Tell me about the conversation in the kitchen.

196

A.          It seemed, much to my surprise, it went pretty smooth.  Like I said, if the shoe was on the other foot, I would have been kind of leery to be around the person who I thought shot me, but Mr. McClanahan wasn't nervous, he wasn't agitated, he was actually very calm.  So the conversation, I can remember it went pretty smooth.  And I actually, upon him leaving under his own free will, I thought the whole ordeal would be over with soon.

Q.          Did Mr. McClanahan tell you, I know you are not the shooter?

A.          Yes.

Q.          Did he tell you who the shooter was?

A.          No, but I -- honestly, I didn't ask him.

Q.          Did he tell you why, if he knew you weren't the shooter, he told the police you were the shooter?

A.          I don't recall.

            MS. MARTINEZ:  A belated form objection to that question.

Q.          How did that conversation conclude?

A.          As I said, it seemed like the

197

conversation concluded on good terms.  I thought the whole ordeal would be over with in a matter of days.

Q.          Was there any discussion of money?

A.          No.

Q.          Then you said there was a second encounter.  How long after the first encounter was the second?

A.          I can't -- I can't recall.  It wasn't -- I can't recall.  It wasn't -- yeah, I can't recall.

Q.          Where was the second?

A.          The second encounter where I saw Mr. McClanahan, it happened down the street from the actual Reynolds address.  I believe he had some friends that were -- that had, like, a body shop.  And so basically the same scenario, I walked down there trying --

Q.          Well, what -- I'm sorry.  What prompted you to walk down there?

A.          I had seen him from a distance.  Like I said, he was a pretty tall guy, very distinctive, and I jumped at the opportunity to speak with this gentleman, you know.

198

And I was, you know, like I said, trying not to -- I tried to talk to him in a calm manner, you know, I didn't want it to be a yelling match. And we talked. And he -- I talked. You know, I asked him, you know, you know, it doesn't seem like you did what you said you was going to do as far as, you know, talking to the detectives and getting, you know, these charges dropped.

The conversation went pretty cool again. I gave -- that's when I actually gave him my phone number, and said, listen, man, you can call me any time and we can take care of this.

- - - - -

Thereupon, Exhibit 20 is marked for purposes of identification.

- - - - -

Q.      I'll hand you what we've marked as Exhibit 20. Is that a copy of the piece of cardboard you wrote your name and phone number on?

A.      I mean, this is a pretty bad copy, man.

Q.      It is a pretty bad --

A.      Come on, man.

Q.      -- copy.

A.      You -- come on, man.

199

Q.        All right.  I'm not -- it's not a trick.  I just want to see if you can confirm it. Let me see.  Is that one any better?  All right. We'll set that aside.

Let me ask you something different. You saw him at the auto shop.  Were you with anyone when that happened?

A.        When -- when I saw him at the auto shop, I was not with anyone.  When McClanahan came back to my residence under his own free will, there was someone in the house.

Q.        And we'll get to that.  But at the point that you first approached him, you were alone, correct?

A.        Correct.

Q.        Was he with other people?

A.        I do not recall.

Q.        Okay.  And you said, hey, you didn't do what you said you were going to do, correct?

A.        Something along those lines, correct.

Q.        And what did he say?

A.        He kept assuring me that he was going to get all the charges dropped.  He kept assuring -- I believe the second conversation, one

200

of the things that went different was I was, you know, telling him how much money I was spending on a lawyer, you know, to -- to defend me.  And he assured me that, you know, I didn't need to keep paying a lawyer, he was going to take this piece of paper and call me when he needed me, and we can hopefully put this past us.

Q.      Now, did that conversation about the lawyer and the money happen while you were at the auto shop or later when you got back to the house?

A.      There was no conversation about money.

Q.      Well, you just mentioned money in terms of paying -- that you were paying your lawyer. I'm asking did you make that statement when you were still at the auto body shop?

A.      No.  I believe -- I don't believe we did a lot of talking at the barber -- at the alley -- at the body shop.

Q.      Why did you go back to the house?  Why not just have the conversation where you were?

A.      I do not recall.

Q.      Okay.  So you go back to the house. And when you're arriving at the house, it's just you and McClanahan, right?  He didn't bring

201

anybody with him?

A.    He didn't bring anybody with him.

Q.    Was there somebody at home in your house?

A.    Yes.

Q.    Who was that?

A.    That gentleman's name would be LaKeon Horton.

Q.    Okay.  Where was LaKeon in the house when you came in?

A.    I believe he was upstairs.

Q.    Did LaKeon come downstairs to talk to you guys at any point?

A.    I'm not sure.

Q.    Okay.  So tell me about the conversation at the house.

A.    It was a pretty -- like I said, despite the fact that this gentleman had thought that I had done all these bad things to him, the conversation went pretty well.

We talked.  You know, once again, he assured me that, you know, he knew it wasn't me once he was able to look me in the eye.  He assured me, you know, that I didn't need to keep

202

paying a lawyer.  It went -- once again, I was wrong, but I assumed the conversation went pretty well.

Q.          Mr. McClanahan testified at trial that in that conversation you tried to bribe him to dismiss his claim against you.  Did you remember him testifying to that?

A.          I do not recall.

Q.          You do not remember him testifying that you offered him money?

A.          No, I don't.  I don't remember that. That was a while ago.

Q.          Did you offer him money?

A.          No, I did not offer Mr. McClanahan money.

Q.          Did Mr. McClanahan ask you for money in return for him changing his story?

A.          No.  Mr. McClanahan didn't -- didn't ask me for anything except patience.

Q.          And just to be clear, LaKeon was present possibly for the second conversation, but when you ran into him the first time in the two cars, LaKeon was not there?

A.          He was not there, no.

203

Q.          Okay.  And then, obviously, Mr. McClanahan did not change his testimony, correct?

          MS. MARTINEZ:  Objection.  Foundation.

A.          Mr. McClanahan did not change his story.

Q.          He testified at trial that you were the person who broke into the house and shot him, correct?

A.          Yes.  Yes, I -- yes, he did.

Q.          And Rhonda Curry testified that you were the person who broke in and shot Rick, correct?

A.          Yes.

Q.          As you were listening to this testimony at the trial, was it your belief that Mr. McClanahan was mistaken or was it your belief that Mr. McClanahan was lying?

A.          Could you -- can you explain the question?

Q.          Mr. McClanahan is testifying that Richard Horton shot me.  I recognize Richard Horton as the man who shot me.

          If you're sitting there saying to

204

yourself, he's wrong, I didn't shoot him, he's either -- he's either honestly mistaken, or he's deliberately lying, he knows you're not the person.  Did you have a thought as to which of those it was?  Did you believe he was mistaken or did you believe he was lying?

A.          I -- I do not recall.  I can't figure out which way, even -- even if it was one of those theories, I don't -- I didn't know what -- it was all happening so fast, and I don't know -- I don't know what his motive was.

Q.          Well, you've now had quite a long time to think about it.  Have you formulated a theory over the years as to whether he was mistaken or whether he was lying?

          MS. MARTINEZ:  And I would say in answering this, if you can answer it outside of conversations with your attorneys, you can.

A.          I believe it was police misconduct.  I don't believe McClanahan was malicious or -- I don't -- I don't -- I don't have a theory for it.

Q.          Okay.  And do you know of any reason why McClanahan would have a grudge against you?

          MS. MARTINEZ:  Objection.  Foundation.

205

You can answer.

A.        No, I do not.

Q.        When you say it was police misconduct, what do you mean?

A.        I believe that the police framed me for this crime.  I believe something went terribly wrong with the Columbus Police Department.  That's why I'm sitting here, you know...

Q.        What's your understanding of how your name first got raised in connection with this robbery?

A.        I'm not entirely sure how my name was first brought up.  I'm not entirely sure.

Q.        Do you have any reason to believe that Brenda Walker came up with your name and suggested your name to McClanahan and Curry?

A.        I'm not sure how to answer that question.

Q.        It's a yes or no question.  Do you have any basis to believe that she came up with the name and told it to them?

A.        I'm not sure how to answer that question.

Q.        So you have no idea who first suggested

206

your name as a suspect; is that correct?

A.      That's correct.  I wasn't -- I wasn't there.

Q.      Do you have any evidence -- strike that.

        Are you aware of any facts to suggest that Brenda Walker was the first person to suggest your name?

A.      I don't want to violate attorney-client privilege, so I'm not sure how to answer that question.

Q.      All right.  Is it fair to say that any facts that would implicate Brenda Walker as the first person to raise your name, you're aware of because your attorney told you?

A.      Once again, I'm not sure how to answer that question.

Q.      Do you know of any facts implicating Brenda Walker as the source of your name other than things that were told to you by your attorneys?

A.      Not at this time, no.

Q.      Before you saw Brenda Walker's name in the paperwork and you called her, did you know

207

Brenda Walker?

A.          No.

Q.          Had you had any dealings with her?

A.          No.

Q.          Do you have any reason to believe that she knew who you were?

A.          No.

Q.          Do you have any reason to believe she had a grudge against you?

A.          Yes.

Q.          And what would that reason be?

A.          Well, just the way she was talking to me from our initial phone conversation, she wanted me to turn myself in without seeking legal counsel first, and I didn't think that was the best way to go about it.  She was yelling and not pleasant.

Q.          Okay.  But that communication with her where she seemed to be angry, as you've testified, happened after you had already been identified as the suspect, correct?

A.          Yes, that is correct.

Q.          Right.  So what facts are you aware of that would suggest that she had a grudge against you that would lead her to identify you as the

208

perpetrator?

MS. MARTINEZ:  Outside of things you might have learned from your attorneys.

THE WITNESS:  Say it one more time.

MS. MARTINEZ:  To the extent you can answer that question outside of communications you had with your attorneys.

MR. EPSTEIN:  Facts communicated from an attorney are not privileged.

BY MR. EPSTEIN:

Q.        What facts are you aware of that would suggest that Brenda Walker named you as the suspect because she had a grudge against you?

A.        I'm not an attorney, so I'm not sure how to answer that question.

Q.        Yes, you're perfectly aware of how to answer that question, sir.  You know what a grudge is.  You testified that you believe that she had a grudge against you.  What's the basis for that belief?

MS. MARTINEZ:  Objection.  Form. Argumentative.

You can answer.

A.        Like I stated before, she was a bit

209

unpleasant on our first phone call conversation.

Q. But you have no facts that predate that interaction, correct?

A. I'm not sure how to answer the question.

Q. You are either aware of facts involving Brenda Walker that occurred before that or you are not. Are you aware of any?

A. I'm not sure how to answer that question.

Q. I would try yes or no. You are aware of facts or you are not aware of facts.

MS. MARTINEZ: Objection. Form. Argumentative. Asked and answered.

You can answer.

Q. Are you aware of any facts about Brenda Walker from before that conversation that would suggest she had a grudge against you?

A. I'm not sure how to answer that question.

Q. Let's talk about Sam Sias. Do you know who that is?

A. I believe he was another detective on the case.

210

Q.        And do you believe he had a grudge against you?

A.        No, I've never spoken with Mr. -- is it Sykes or Sias?

Q.        Sias.

A.        Sias.  I've never spoken with this gentleman.

Q.        To your knowledge did he know who you were before this case?

A.        I have no knowledge of that.

Q.        Do you have any knowledge of a reason why he would have a grudge against you?

A.        I do not.  I've never spoken to the man, never -- I don't know what he looks like.  I never met him before.

Q.        Okay.  You testified that you believe Brenda Walker has a grudge against you.  Other than the fact that she seemed angry or rude on the telephone, what facts do you know that suggest she had a grudge against you?

        MS. MARTINEZ:  Objection.  Asked and answered.

        You can answer.

        MR. EPSTEIN:  Asked but not answered.

211

A.          I don't know how to answer that question.  I'm sorry, man.

Q.          Why do you not know how to answer it? What is confusing you about the question?

A.          There's a lot.  It's just -- I don't -- I'm not sure how to answer the question, so...

Q.          Do you understand what I mean when I say a grudge?

A.          Yes.

Q.          Do you understand what I mean when I say facts?

A.          Yes.

Q.          Do you understand what I mean when I say before your conversation with her on the telephone?

A.          Yes.

Q.          What facts are you aware of that she had a grudge against you before the conversation on the telephone?

          MS. MARTINEZ:  Same objection.

          You can answer.

A.          I'm not sure how to answer that question.

212

Q.        Do you know of any facts?

A.        I'm not sure how to answer that question.

Q.        Why are you unsure?  Either you know of facts or you don't.

A.        Because you keep badgering me, asking me the same question.

Q.        But you haven't answered the question and you're not explaining to me -- I'm happy to rephrase it and clarify, but you're not telling me what you don't understand about it.  So what don't you understand about the question?

A.        I just don't understand how you want me to answer the question.

Q.        I want you to tell me what facts you know about Brenda Walker having a grudge against you.

A.        I'm not a lawyer.  I'm not an attorney, so, you know, I just -- I'm not sure where to go from here.

Q.        All right.  So other than what you've said, you're not going to answer my question; is that correct?

MS. MARTINEZ:  Counsel, it's not that

213

he's not answering the question.  He's answering to the best of his ability.  If there's a different way to rephrase, or for him to clarify, please --

MR. EPSTEIN:  I've clarified.  The question is unambiguous.  He's refusing to answer.

Q.       Will you answer my question?

A.       I've already answered the question to the best of my ability.

Q.       Is it your testimony that you do not recall Mr. McClanahan testifying at trial that you offered him a bribe to change his testimony?

A.       Yes, I don't remember Mr. McClanahan saying that.  I don't remember anything about his testimony.  It was -- it was 20 years ago.

Q.       Do you remember your testimony?

A.       I remember some parts of my testimony. Some parts --

Q.       Do you --

A.       -- I don't remember.

Q.       Do you remember testifying and denying that you tried to bribe him?

A.       No.

Q.       Do you remember testifying about money

214

coming from him to you?

A.          I don't recall.

Q.          All right.  Last time, for the record, you are unable to provide any facts to support your statement that Brenda Walker had a grudge against you, correct?

A.          I'm not a lawyer --

MS. MARTINEZ:  Just one second. Objection.  Form.  Asked and answered.

You can answer.

A.          I'm not a lawyer, I'm not a detective, I'm not an attorney, so I'm not sure how to answer that question.

Q.          The answer is to tell me the facts that are known to you.  You don't have to be a detective to know facts.  You testified that she had a grudge.  I want to know why you said that.

MS. MARTINEZ:  Same objection.

You can answer.

A.          I don't have an answer for you at this time.

                         - - - - -

Thereupon, Exhibit 21 is marked for purposes of identification.

215

Q.    I'm going to hand you what I've marked as Exhibit 21.  It's an affidavit by LaKeon Horton.  Tell me again what your relationship is with LaKeon Horton.

A.    Let me read over this, first, please.

Q.    Sure.

A.    What was the question?

Q.    I'm sorry?

A.    What was the question?

Q.    I haven't asked you a question yet. The question is, have you seen this before?

A.    Have I seen this document before?

Q.    Correct.

A.    There's so many documents.

Q.    All right.  Well, let me ask you a different question.  Did you help draft this document?

A.    No.

Q.    Did you discuss this with LaKeon when he was writing it?

A.    No.  I don't think so.  This -- this document has a stamp from a Carol Wright.  So this had to have been something that he had --

216

Q.        Who is Carol Wright?

A.        Carol Wright was one of my appeal lawyers.  I had a few over the 16 years I was wrongfully incarcerated.  This -- I'm looking for a date on here, but this had to have happened after I was already incarcerated.

Q.        It says:  Sworn to and subscribed on the 1st day of January, 2007.

It's on the second page.  Do you see that?

A.        I see it.

Q.        All right.  I want to ask you about some of the information in here.

Paragraph 2 says:  I lived with Richard Horton on Reynolds Avenue, in Columbus, Ohio, during the summer of 20 -- I'm sorry -- during the summer of 2005.

Is that true?

A.        He stayed with me periodically.

Q.        Why was that?

A.        The house that I stayed in, there was a couple gentlemen, different gentlemen staying in there, in and out.  It was kind of like a frat house.

217

Q.        Did he pay rent?

A.        No.

Q.        Paragraph 3.  On one occasion, during the summer of 2005, I was in a car with Richard Horton on our way back to the house on Reynolds Avenue.  We saw Richard McClanahan traveling in a car and he stopped to talk with Richard Horton.

          Do you see that?

A.        I see it.

Q.        Is that a correct statement?

A.        He -- he swore to the statement.

Q.        Okay.  But you swore, too, when you testified earlier that you were alone in the car, correct?

          MS. MARTINEZ:  Objection.  Misstates his prior testimony.

          You can answer.

Q.        So whose version is correct, LaKeon's or yours?

          MS. MARTINEZ:  Same objection.

          You can answer.

A.        This was a long, long time ago.  Both versions -- I'm not -- I'm not sure.  You know, I might have been mistaken, he might have been

218

mistaken.  I'm not sure.

Q.          So is it fair to say that after seeing this, you can't recall the details of your conversation with -- that first conversation with Mr. McClanahan?

MS. MARTINEZ:  Objection.  Form.

A.          No, it's not fair.  It's -- what I'm not recalling is was LaKeon in the car with me.

Q.          Okay.

A.          Is this -- is this the first or the second encounter?  I'm just -- it's kind of minor details.  I didn't commit this crime.

Q.          Okay.  Well, you testified earlier that you saw McClanahan on that first occasion and you got out of the car and went to talk to him, correct?  That's what you testified to earlier today.

A.          Yes.

Q.          And in here, LaKeon says McClanahan stopped and got out of the car to talk to you. Now, would you agree with me that both of those things can't be true?

MS. MARTINEZ:  Objection to the characterization of the document.

219

You can answer.

THE WITNESS:  Oh.  Sorry about that.

MS. MARTINEZ:  That's okay.

A.        What I'm confused about is this -- I'm confused on how to answer the question.  So, you know, you're asking me about something that happened over 20 years ago.  And regardless of the fact, McClanahan came under his own free will, and I believe he -- you know, that's -- that's the point that really matters.  I'm -- I'm --

Q.        Can you speak with confidence right now as to whether LaKeon was with you in the car when you saw McClanahan?

A.        I do not recall.

Q.        Paragraph 4.  LaKeon writes:  We got back to the house and I saw Richard McClanahan enter the house.  I heard some of the conversation he had with Richard Horton.  I heard Richard McClanahan tell Richard Horton that if Richard Horton gave him some sum of money, he would go to the police station and tell the police that Richard Horton had not been the man that robbed him.

Do you see that?

220

A.          I see it.

Q.          Did Richard McClanahan tell you that he would recant his testimony if you gave him money?

A.          I do not recall.

Q.          I asked you that earlier and you said no.  Are you unsure now?

A.          Well, you know, I don't -- I thought you asked me a different question, so I don't -- I don't recall.

Q.          Did Richard Horton ask you for money in exchange for changing his testimony?

A.          I don't recall.

Q.          Paragraph 5.  I spoke with Richard Horton about this conversation and Richard told me he was not going to pay any money because he was not guilty.

            Do you see that?

A.          I see paragraph 5.

Q.          Do you recall that conversation with LaKeon?

A.          There was -- this is a real long time ago.  I don't --

Q.          The answer is no, you don't recall?

A.          I don't recall.

221

Q.          Paragraph 7.  I was willing to testify to these facts during Richard Horton's trial and continue to be willing to testify.

Do you see that?

A.          I see that.

Q.          Did you tell your lawyer that LaKeon Horton was willing to testify at trial?

A.          Yes.

Q.          Did LaKeon testify at trial?

A.          LaKeon did not testify at my trial.

Q.          Why not?

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.          I'm not sure why we didn't have LaKeon testify on my behalf during trial.  This is a pretty big piece of evidence that might have helped, but, you know...

Q.          So who made the decision for LaKeon not to testify?  Was it you?

A.          I don't think it was me.

Q.          Was it LaKeon?

A.          I don't think it was LaKeon.

Q.          Was it your attorneys?

A.          It --

222

MS. MARTINEZ: Excuse me. Objection. Foundation.

You can answer.

A. It -- I assume this would have been one of my lawyers' decisions.

Q. Were there other witnesses you were aware of that you wanted to call at trial that your lawyers did not call?

A. Oh, man. I do not recall. That's a tough one right there. You know, I spent so much time trying to figure out how I got myself into this situation, and I second-guess myself so many times and my trial strategy so many times, but it really had nothing to do with my lawyers or their strategy because it's police misconduct that put me in that situation. So once I --

Q. Did you feel that you and your defense counsel made mistakes during the trial?

A. We weren't perfect.

Q. What mistakes?

MS. MARTINEZ: Objection. Foundation.

You can answer.

A. We probably -- this -- well, starting right here, this affidavit probably would have

223

been a good start, but I don't believe --

Q.        What do you mean the affidavit would not have been a good start?

A.        No.  I thought I said it would have been a good start.  I'm sorry --

Q.        Oh.

A.        -- if I misspoke.

Q.        You mean to call LaKeon.

A.        Yeah.  If I misspoke, I apologize. This right here might have been a good start to use this testimony, but I don't think even -- I'm not sure what happened.

Q.        The jury found you guilty, correct?

A.        The jury did find me guilty.

Q.        What charges did the jury find you guilty of?

A.        So the way -- the way a trial works is when you go to trial and you lose, you get found guilty of each and every count on the indictment. And I'm not specific to know every -- I can't remember every detail of the indictment, but I remember it was a 11 -- 11 count indictment.

I remember when the -- when the bailiff said the guilty verdict, my wife let out a scream.

224

And they had to stop the proceedings because, quite frankly, we were all shocked because I didn't commit the crime.  And they had to escort my wife out of the courtroom.

Q.        Okay.  But the jury --

A.        Excuse me.  I'm not finished.

Q.        Uh-huh.

A.        And then once they was able to escort my wife out of the courtroom, she was kind of hysterical, they started back with the proceedings.  And I just remember kind of going numb because the judge just kept saying guilty, guilty, guilty, guilty.

                    - - - - -

          Thereupon, Exhibit 22 is marked for purposes of identification.

                    - - - - -

Q.        I'm going to hand you what I've marked as Exhibit 22.  Do you recognize this as the judgment entry in your case?

A.        Let me read over it real quick.  Sorry.

Q.        Have you had an opportunity to read that?

A.        Yes.  Sorry.  I'm -- just looking over

225

this -- this judgment entry, it's a little triggering because as you can see --

Q.      I'm sorry.  It's a little what?

A.      It's a little triggering because as you can see, they sentenced me to 23 years.

Q.      That's correct.  You were sentenced to 23 years.  You were found guilty of aggravated burglary with a gun specification; is that correct?

A.      That's correct.

Q.      Do you know what a gun specification means?

A.      No.  No.  Could you explain it to me?

Q.      Sure.  It means that you committed the offense using a firearm.  That adds to the penalty.

        You were found guilty of aggravated robbery with a gun specification.  Do you see that?

A.      I see it.

Q.      You were found guilty of kidnapping with a gun specification?  Yes?

A.      I see it.

Q.      Felonious assault with a gun

226

specification?  Yes?

A.          Yes.  I see it.

Q.          Aggravated robbery with a gun specification?

A.          I see it.

Q.          Another count of kidnapping with a gun specification, correct?

A.          I see it.

Q.          And those are all felonies, correct?

A.          Yes.  Yes, they are.

Q.          All right.  And then, finally, you were found guilty of weapon under disability.  Do you see that?

A.          I see that.

Q.          Do you have an understanding of what a count of weapon under disability means?

A.          I believe it's when a person has a gun and they're already on parole or probation.

Q.          And that would have applied to you.  If you had been using a gun, you would be guilty of that, correct?

A.          If I would have -- yes, I was found guilty --

Q.          Because you were under parole.

227

A.        Yes, I found -- I was found guilty of all these charges.

Q.        Okay.  Now, for the weapon under disability charge, if you recall, does the jury find you guilty of that?

A.        I don't recall.

Q.        Okay.  And then, as you said, you were sentenced to a total of 23 years, correct?

A.        Yes.  The 23-year sentence for this crime was particularly devastating because essentially it was a life sentence.  And now, you know, when I go and when I talk about this wrongful conviction, I always try to make sure that I tell that to the crowd because essentially, you know, they sentenced me to life for a crime I didn't commit because when I started this prison time I was 29 years old.

So 16 years was taken away from me, taken away from time being with my family, and it was particularly hard because it being such a long sentence, something that -- it kind of seemed insurmountable at the beginning.

MR. EPSTEIN:  Now, Alyssa, I'm going to note for the record there's an amended sentencing

228

entry.  It just corrects some technical things.
I'm not going to mark it as an exhibit unless you
want me to, but I wanted to make sure you were
aware of that.

MS. MARTINEZ:  No.  It's okay.  Thank
you, Counsel.

BY MR. EPSTEIN:

Q.          I want to circle back to Brenda Walker
and the statement about police misconduct.  I
would like you to tell me in your words all of the
things you believe constitute police misconduct by
Brenda Walker.

A.          You would like for me to tell you all
of the things that I believe?  Is that what you
said?

Q.          This is your opportunity, yes.

A.          I'm going to let -- I'm going to let
the lawyers handle that.  I'm not sure how to
answer that question.

MR. EPSTEIN:  Okay.  In that case,
let's take five minutes.

MS. MARTINEZ:  Okay.

THE VIDEOGRAPHER:  We are off the
record.  The time is 4:10.

229

(A short recess is taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 6. We are back on the record. The time is 4:26.

BY MR. EPSTEIN:

Q.        Mr. Horton, before we move on to another topic, I just want to make sure that you have told me everything you recall about your conversations with Mr. McClanahan. Can you think of any details, any facts about either of those conversations that you have not told me?

A.        That -- that's a good question. I hope he's resting peacefully, but, no, I can't -- I can't recall at this time any other conversations that I've had with Mr. McClanahan.

Q.        Prior to your trial, did you try to reach out to Tracy McClanahan?

A.        Tracy McClanahan, I can't even remember who that is. Is that -- is that the niece or the daughter?

Q.        Well, would that make a difference? Do you remember going to someone's work to speak to them?

A.        Not at this time, no. With the last

230

name McClanahan, not at this time, I don't remember.

Q.        Did you reach out to any family members to try to talk to them before or during the trial?

MS. MARTINEZ:  Objection.  Form.

You can answer.

A.        Yes.  I remember -- so I went to a high school named Centennial High School and our rival was Whetstone High School, so I remember a gentleman with the last name of McClanahan who was a -- was a bigger rival, a better rival, better basketball player, taller, more athletic.

And I can remember seeing him sometime in between before I went to trial and talking to him about his uncle.  And he didn't want to have anything to do with it and he didn't want to testify for me or against him or for him against me.  He didn't want to have anything to do with it.  I do remember that.

Q.        Anybody else in the family that you reached out to?

A.        I can't recall at this time.

Q.        Did you try to talk to Rhonda Curry?

A.        Rhonda Curry.  I remember during the

231

court proceedings, I had attempted to speak with Ms. Rhonda Curry one time during the court proceedings and she was absolutely terrified.  And it -- she was so terrified it scared me from me even trying to reason with her or talk to her.

You know, you all come -- both the accused and the accuser both go into and leave the courtroom at the same time.  So I can remember bumping into her a couple times and she was absolutely terrified.  So I did try to talk to her, but she was terrified, so I left that alone.

Q.        What did you say to her?

A.        Can we talk for a second?  And she started getting hysterical.  So I said, you know what, I apologize.  And I just moved on.

Q.        And you knew that was a violation of the terms of your parole, correct?

A.        Since I hadn't been found guilty yet, I -- no, I didn't know.

Q.        You didn't understand that the terms of your release were that you have no contact with Rhonda Curry or Rick McClanahan?

A.        I do not recall because, you know, we was in such close quarters.

232

Q.        Did Mr. McClanahan step in when you tried to talk to her?

A.        I don't believe so.  You know, at this time I'm just trying to do anything that I can to get this -- get this taken care of, you know, without having the courts, you know, too involved. I'm trying not to go to trial.  I didn't commit this crime, so when I see them, you know, I'm just trying to talk with them, just trying to reason with them.

Q.        Are you aware that to this day, Rhonda Curry insists that you are the attacker?

A.        I am aware.

Q.        If Rick McClanahan knew that you were not the person, why did he testify that you were?

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.        I don't have an answer for that question.  I'm -- I'm not still to this day not 100 percent sure.  I know he passed away.  And I don't want to speculate what he thought.

Q.        Once you were convicted, where were you taken?

A.        I was taken to the -- sorry -- a

233

correctional receiving facility.  That's where
they -- that's where they shave your head.  Quite
frankly, they treat you like a animal.  They give
you your number.  They talk really bad to you.
And then on top of that fact that I was sentenced
to serve 23 years, it -- it -- like I always like
to tell people, prison is just exactly what you
think it is, what you see on the movies, that's
what it is, it's bad.

Q.        How long were you in the first facility
that you were taken to?

A.        Maybe about 60 days until they sent me
to my parent institution.

Q.        So before you were sent there, you were
actually in the county jail; is that your
understanding?

A.        I was -- yes.  For about three -- maybe
a couple of days, yeah.

Q.        What was your mood like then?

A.        You know, after I was found guilty and
then sentenced to 23 years for a crime that I
absolutely did not commit, my mood was -- it was
pretty low.  It was a really low point.  I
actually -- that's when the suicidal thoughts

234

began, but me being so much of a coward, I didn't have -- I didn't have the guts to go through with it.  But I often thought about suicide while I was in prison, you know, just -- just I didn't want to spend 23 years in prison for something I didn't do.

Q.          Did you ever attempt suicide?

A.          No.  I was -- I was a coward.

Q.          Did you ever tell any of the prison staff members that you had attempted suicide?

A.          Yes.

Q.          You did?

A.          I -- yes, when I first -- yes, when I first -- before -- when I -- before I even got to prison.  I don't want to -- excuse me.  Not prison officials, the jail.  When I was at the county jail before I went to the prison.  They said, are you having any suicidal thoughts?  I said, as a matter of fact, yes, I am.  And that's when they put me on suicide watch.

Q.          No, I understand that.

A.          Sorry about that.

Q.          And by the way, they put you on medication as well; is that correct?

235

A.          I don't recall being on medication.

Q.          Do you recall taking Prozac?

A.          I don't recall.

Q.          So when you were in the jail, you told the jailers that you were having suicidal thoughts, correct?

A.          That's correct.

Q.          Did you actually attempt to carry those suicidal thoughts out?

A.          Yes.

Q.          You did try to kill yourself?

A.          Yes.  It was -- it was a weak attempt. It was more --

Q.          A minute ago --

A.          -- of a cry for help.

Q.          Well, a minute ago, you said no.

A.          No.  A minute ago, I said that I was a coward.

Q.          Did you try to kill yourself?

A.          Yes.

Q.          How?

A.          I tried to suffocate myself.

Q.          How?

A.          It's kind of hard to explain.  And to

236

keep reliving the stuff and answering all these

questions is very difficult for me to do.  So I

just tried to suffocate myself with some plastic

from a sandwich.  It was -- it was -- it was a

cowardly move and -- man.

Q.          Did you report that attempt to the

authorities?

A.          No.  I was that much of a coward.  I

couldn't even tell nobody about my weak suicide

attempt.

Q.          Did you ever tell anybody?

A.          I don't think so.

Q.          We talked earlier about the fact that

when you'd go to a new institution, they would do

an intake and a medical review.  Do you recall

when we talked about that?

A.          I do recall.

Q.          All right.  I'm going to hand you a

sample of that.

                    - - - - -

            Thereupon, Exhibit 23 is marked for

purposes of identification.

                    - - - - -

Q.          I'm handing you what I've marked as

237

Exhibit 23. It's an Initial Medical/Mental
Health/Substance Use Screening for Richard Horton.
Do you see that?

A.          I do.

Q.          And it's dated March 8th of 2006,
correct?

A.          That's correct.

Q.          So this is one month after your
conviction, correct?

A.          Correct.

Q.          And it says Date of Arrival at
Institution, and it's the same date, March 8th,
2006, correct?

A.          Correct.

Q.          All right. Can you tell from this what
institution you are arriving at?

A.          CRC.

Q.          And what is CRC?

A.          CRC is the -- it's the facility that I
spoke about earlier where they shave your head,
they take all your clothes, put you in prison
clothes, and they give you your prison number.

Q.          Do you know what CRC stands for?

A.          I can't remember. I do not recall.

238

Correctional Receiving Center?  I can't -- I can't remember.

Q.        Well, and it says in the line below that, received from FCCC.

A.        That's correct.

Q.        So maybe --

A.        Sorry about that.

Q.        -- FCCC is the place you were thinking of where they first take you in and shave you?

A.        No.  No.

Q.        No?

A.        FCC is -- that's the Franklin County Correctional Center.

Q.        Okay.

A.        That's the jail.

Q.        Okay.  And then if you look in the middle where it says Comments, it says that you're on Prozac.  Does that refresh your recollection of whether you were actually taking Prozac?

A.        No, it doesn't.  Not at this time it doesn't.

Q.        All right.  And there's a line in the middle top, History of Suicidal Thoughts, and you checked yes, correct?

239

A.         Yes.

Q.         Because you gave them the information as they were filling this out, correct?

A.         At this point in time, it would have been self-explanatory because once I go in -- once I'm found guilty -- this is the way it works.  Let me try to paint a picture for you.

When they're taking my -- when they're admitting me into the county jail, that's when they ask me the question, they say, are you having suicidal thoughts?  And when I say yes, they put me in the suicide wardrobe.  So there's -- you know, it's obvious at this point that I'm suicidal because I have the suicide wardrobe on, so they didn't really need to ask me anything.  It was --

Q.         Okay.  But I'm not asking --

A.         -- pretty apparent.

Q.         -- just about that line.  I'm talking about all the information on this form.  Would they have gone over it with you to get information from you?

MS. MARTINEZ:  Objection.  Form.

You can answer.

240

A.          I can't recall at this time.

Q.          For example, under Mental Health Disposition, the third line says Routine Housing Requested.  And it's checked yes.

They would have to check with you to see if you were requesting routine housing, correct?

A.          Oh.  I'm sorry, sir.  Obviously, you've never been to the county jail in Columbus, Ohio. They don't ask you anything.  I had the suicide vest on and I was in suicide watch all the way until I left the county jail.

Q.          Okay.  Well, is it your testimony that they didn't take any information from you when they were filling out these forms?

A.          No, that's not my testimony.  I can't recall what information was taken.

Q.          Okay.  Down toward the bottom it says Substance Use Screening.  Do you see that? History of Alcohol and Drug Problem, and it's checked no.  Is that a correct answer?

A.          No.

Q.          Previous Alcohol and Drug Treatment is checked no.  Is that a correct answer?

241

A.        No.

Q.        A few lines down from that, Cannabis, it's checked no.  Is that a correct answer?

A.        No.

Q.        Cocaine is checked no.  Is that a correct answer?

A.        No, not at this time, no.  It looks like they pretty much just filled it out.

Q.        Can you think of any reason why you would have given incorrect information to them?

MS. MARTINEZ:  Objection.  Form.

Q.        I mean, we did talk earlier about there are times where an inmate will strategically give incorrect information, correct?

A.        Yes, we did discuss that.

Q.        Right.  So is there any reason why you would have -- if this information came from you, is there any reason why strategically you would have given incorrect information?

A.        No, not -- not at this point in time when this was getting filled out.  Like I said, you've never been to the county jail in Columbus, Ohio, which I believe they're getting ready to close it because it has so much of a bad

242

reputation, but they don't ask you a lot of questions.  You pretty much -- gladiator school pretty much starts then and there.

Q.          Did you receive psychological counseling while you were in prison?

A.          I believe I did.

Q.          Do you know any of the names of the people who provided that?

A.          I can't recall at this time.

MR. EPSTEIN:  Bear with me one second.

Q.          Are you aware of when -- of receiving any clinical diagnoses when you were admitted?

A.          Not at this time, I can't recall.  No. I just -- I just want to keep going back to the point that things in prison are handled a lot different than they're handled out here in the real world.  So, you know, it might not be as simple as me just going to see a doctor, and a doctor saying you suffer from depression because, you know, you're saying that you're having suicidal thoughts.  I think that you -- you know, it's just not that simple.

Q.          Did you suffer from depression?

A.          Yes, I did suffer from depression.

243

It's hard enough being in prison, being around all this madness and all these bad people and this violence, gangs, but it was even harder knowing that I was innocent. It was even harder -- it was even harder knowing that my family needed me and I couldn't be there for them. It was even harder being away from my children. So, yeah, I was -- I definitely had some dark days.

Q.      Who is Ed Smith?

A.      I don't remember. That name doesn't sound familiar.

Q.      Okay.

                - - - - -

        Thereupon, Exhibit 24 is marked for purposes of identification.

                - - - - -

Q.      I'll hand you what's been marked as --

        MR. GIRARD:  Exhibit 24.

Q.      -- Exhibit 24.

        MR. EPSTEIN:  If you say so.

Q.      I'll represent to you that this is a document we received from the Department of Rehabilitation and Correction. It's a Mental Health Treatment Plan Review for you. And it's

244

prepared by Michele Whaley and Ed Smith.  Do you see those names in the top right corner?

A.        Top right corner.

MS. MARTINEZ:  I just want to clarify super quickly, Counsel.  I'm sorry.  Was this produced?  I just don't see a Bates stamp.  I'm not sure if it was cut off on my copy.

MR. EPSTEIN:  I think it was cut off.

MS. MARTINEZ:  Okay.

MR. EPSTEIN:  It was produced.

MS. MARTINEZ:  Okay.  I trust you.  I take your word.  I just want to make sure I'm not missing it.

MR. EPSTEIN:  If you can't find it, let me know and I'll direct you to the page -- to the Bates number.

MS. MARTINEZ:  Okay.

BY MR. EPSTEIN:

Q.        Okay.  What I'd like to direct you to is the top left.  And by the way, this is dated January 17th of 2007, correct?

A.        Yes, I see that date.

Q.        Okay.  Do you see in the top left it says:  Axis I, Adjustment Disorder with Mixed

245

Anxiety and Depressed Mood.  Do you see that?

A.          I see that.

Q.          Do you have any understanding of what that means?

A.          No, I do not.  Would you care to explain?

Q.          I will not because I am not a medical doctor.  Axis Ia says:  Polysubstance Dependence. Do you see that?

A.          I do see it.

Q.          Do you have an understanding of what that means?

A.          No, I do not.

Q.          And, finally, Antisocial Personality Disorder.  Do you see that under Axis II?

A.          I do see it.

Q.          All right.  And do you have any understanding of what means?

A.          I do have a vague understanding of what antisocial personality disorder means.

Q.          What is your understanding of antisocial personality disorder?

A.          This sounds, and I'm guessing here, but this sounds like somebody who doesn't necessarily

246

want to be around a whole lot of people, and the cause of this person maybe feeling like that would be because of this -- of this disorder.  But I'm not, like you said, I'm not a doctor.  I probably even shouldn't be trying to explain this.

Q.          Did you have sessions where you could talk to staff and tell them how you were feeling?

A.          I don't recall at this time.  This was -- I don't recall.

MS. MARTINEZ:  I just want to quickly preserve an objection to Exhibit 24 to the extent it wasn't produced.  I haven't been able to find it.  It could be there, but I just want to preserve that for right now.

- - - - -

Thereupon, Exhibit 25 is marked for purposes of identification.

- - - - -

Q.          I'm going to hand you what I've marked as Exhibit 25.

MS. MARTINEZ:  Thank you.

Q.          It's a handwritten letter that appears to be directed to Ed Smith from Richard Horton.  Did you write this?

247

A.        This does look my -- look my -- look like my handwriting.

Q.        Have you had an opportunity to read it?

A.        I have.

Q.        Now that you've read it, do you recognize it?

A.        I still don't recognize it, but --

Q.        Do you have any reason to dispute that you wrote it?

A.        No, I don't have any reason to dispute that I wrote this at this time.

Q.        Do you know why you would have been writing this to Mr. Smith?

A.        It says on here that my concern was that I had gotten into trouble in the visitation room.  It says on here that I was only in the visitation for five minutes, that I did not grab my wife's backside, and I was -- it sounds in here -- it says in here also that I was just more concerned about my wife's mental health than my own.

Q.        Okay.  But did you receive some discipline for inappropriate touching with your

248

wife?

A.          It says on here what was -- what's on here would indicate, yes, that I did.

Q.          Let's assume that you did.  If you had, and you wanted to challenge it administratively, is this the procedure you would use to handwrite a letter to Mr. Smith?

A.          I don't know who Ed Smith is, but this is -- this is not the correct form.

Q.          What would be the correct form?

A.          It's -- it's -- I'm not 100 percent sure.  It was some type of appeal form like -- but this is -- this doesn't have the correct format. Maybe this was inside the form.

Q.          Now, you wrote:  In July '08, my wife had a nervous breakdown.

            Do you see that?

A.          Yeah.

Q.          What happened?

A.          I mean, my wife had so many nervous breakdowns, especially at the beginning of my wrongful incarceration, and just trying to deal with me being snatched away for a crime I didn't commit.  It's -- I can't recall exactly what the

249

circumstances surrounding this particular nervous breakdown were. I just -- it just -- it's kind of hard for me to even talk about to this day that she went through all that pain.

And then The Ohio Innocence Project gets me out of prison, and it was all -- it was all something she didn't have to go through, you know. It's a -- it's a testament to her strength at the same time, but this -- this -- this is -- this is -- this is kind of hard for me to look at.

Q. There's a notation in the margin that says: P.S., I need to talk with you, sir.

Do you see that?

A. I see it.

Q. All right. Does that notation tell you anything about who Mr. Smith might be?

A. No.

Q. Okay. So if I were to represent to you that Mr. Smith provided counseling, you wouldn't know whether that was true or not?

A. I would say that I do not recall at this time because I still can't remember who Ed Smith was or is.

250

- - - - -

Thereupon, Exhibit 26 is marked for purposes of identification.

- - - - -

Q.      I'll hand you what I've marked as Exhibit 26.  It's captioned Interdisciplinary Progress Notes.

MS. MARTINEZ:  You don't have to read through the whole thing, but just flip through the pages so you know what you're looking at.

Q.      I just want to direct your attention down to the bottom of the page.  Do you see Mr. Smith's signature at the bottom right?

A.      Yes.

Q.      All right.  And these are dated and timestamped notations.  Do you see that?

A.      Yes.

Q.      I want to direct your attention first to an entry on the first page, dated November 18th of 2008 at 9:30 a.m.  Brief Psychology Note.  Do you see that?

A.      I do see it.

Q.      And if you read, I'm not going to read the whole thing, but it talks about the incident

251

we just referred to, that there was inappropriate contact with your wife.  Do you see that?

A.          I do see it.

Q.          And it says:  He received a ticket and the visit was terminated.

What does it mean to receive a ticket?

A.          To receive a ticket would be, like, similar to you driving and speeding, you would get a ticket submitted against you by a traffic officer, right?  So they would submit the ticket. It seems like my visit was instantly terminated, and I probably went back to my dorm and waited on my day in court.

So after that, the next part of the process would be my sergeant would probably call me to his office and he would hear the ticket, read over the ticket, see, you know, what -- what details were inside the ticket, and then he would make a ruling, did he believe the officer or did he believe what I said.

Q.          Do you remember this particular ticket?

A.          No, I -- not at this time.  I don't remember.

Q.          All right.  Back to the same section,

252

please.  The next sentence says:  He said that she -- referring to Janette -- she is his only support and is fearful of a possible visiting restriction.

Do you see that?

A.            Where are you at?  I'm sorry.

Q.            In the same Brief Psychology Note of November 18th, 2008.  Right after he received the ticket.

A.            I see it.

Q.            He said that she is his only support and is fearful of a possible visiting restriction.

Was Janette your only support at that time?

A.            During this time in 2008, you know, times are hard out here especially for my family. I didn't have a lot of support, I didn't have a lot of people who believed I was innocent in 2008. I lost contact with some very good friends, good people, family members.  Was Janette my one and only support?  I can't -- I honestly can't recall.

Q.            Which family members did you lose contact with as a result of your conviction?

A.            So many.  It's -- I just -- I don't

253

even talk to some of them to this day because, you know, some of them passed away, some of them moved on with their life.

Q.        Well, give me some names.

A.        Let me think of some names.  Some aunts, some uncles, some relatives that live in different states now.

Q.        Well, let's narrow it down.  Were there people that you were close to before the conviction that were no longer close with you, no longer supportive of you after the conviction?

A.        Yes.

Q.        Who?

A.        People -- that's a tough question. People like a cousin named Raheem Horton.  He was -- he and I were very close.  He went on to the military and kind of lived his life.

Q.        When did he go into the military?

A.        I'm not exactly sure of the year at this time.

Q.        I mean, is he your age cohort or is he younger?

A.        A little younger.

Q.        Where was he around the time of your

254

trial?

A.      I'm not -- I'm not sure at this time where he was.  It would have been nice to have him there for a little support.

Q.      Did you have a relationship with him after you got out of the West Virginia prison?

A.      Yes.

Q.      Where was he at that time?

A.      In between service for the Navy.

Q.      He was here in Columbus?

A.      Here in Columbus, Ohio.

Q.      And where is he now?

A.      He lives here in Columbus, Ohio.

Q.      Have you reached out to him since you've been released from prison?

A.      Yes.  He congratulated me, and I told him thanks for the congratulations.

Q.      And what's your relationship like right now?

A.      It's not quite the same because, you know, I wish he would have been there and been a little bit more supportive of me or my family during this wrongful conviction.

Q.      Anybody else you can mention?

255

A.          Not at this time, no.  It's just --
it's just -- it's just kind of -- it's just hard
because, you know, you're asking me to relive
emotions and think about stuff that I haven't
thought about in a long time.  I really tried to
push forward, but with this wrongful -- this
wrongful conviction it's like dropping a bomb into
the family structure and a lot of people was hurt.

Q.          I'd like you to turn to -- it's the
same document.  It's Bates No. 7237.  Are you with
me?

A.          I think so.

Q.          No, that's not the page.

            MS. MARTINEZ:  In the bottom right
corner is going to be 7237.

A.          37 -- 37 --

Q.          In the top left corner is a notation
dated July 11th of 2006.

            MS. MARTINEZ:  That one looks right.

A.          Okay.

Q.          It says:  Psychiatry continued.

            Do you see that?

A.          I see it.

Q.          All right.  And you see at the bottom

256

again there's Mr. Smith's signature?

A.          I see it.

Q.          All right.  I want to read you a notation that's here.  It's the last one, July 25th of '06 dated, 9:35 a.m.  Are you with me?

A.          I'm with you.

Q.          Brief Psychology Note.  Horton spoke at length of numerous mistakes at his trial.  He denied the robbery, but admitted the bribery.

Do you see that?

A.          I see it.

Q.          Did you tell Mr. Smith that you attempted to bribe Rick McClanahan?

A.          I do not recall at this time.

Q.          So it's possible you did?

A.          I do not recall at this time.

Q.          Can you think of any reason why Mr. Smith would have written that down if you did not say that?

A.          Well, at this time, you know, it's -- it's easy to think that everyone is against you, and everyone was against me.  I don't know why it's written on here.  I don't -- these

257

documents don't look familiar to me.  I don't have a complete answer for you at this time.  I do know that I was never charged with a bribery charge.

Q.        This is true, but did you bribe him or did you try to attempt to bribe him?

A.        No, I did not.

Q.        Did you tell Mr. Smith that you did?

A.        I did not recall at this time.

Q.        Before that, it says:  Horton spoke at length of numerous mistakes at his trial.

Do you know what that's a reference to?

A.        I do not recall at this time.

Q.        Looking back on it now, what mistakes do you see at your trial?

A.        Well, looking back on it now that I've had The Ohio Innocence Project involved in my case and they were the ones who ultimately freed me from this wrongful conviction, I'm aware of a records request where some evidence was not presented or not available to me at my trial, and then magically, once The Ohio Innocence Project gets involved in my case, magically these court papers are produced out of thin air.

Q.        What papers are those?

258

A.          I'm not sure how to explain the papers, but...

Q.          I'm sorry?

A.          I'm not sure how to explain the papers. I don't recall exactly what they said. I'm not a lawyer, but I know they weren't available for me during trial.

Q.          And it's your belief that those papers were deliberately concealed from you?

A.          I'm not sure how to answer the question, but I'm going to say I do believe it was done with malicious intent.

Q.          Do you have a theory as to why somebody would do that?

A.          No, I don't have a theory right now. I've thought about this numerous nights trying to figure out, like I said, how I got myself into this position, what was -- who was to blame, what I could have done differently, but I just don't know why this happened to me.

                    - - - - -

          Thereupon, Exhibit 27 is marked for purposes of identification.

                    - - - - -

259

Q.          I'm going to hand you what I have
marked as Exhibit 27.

A.          Thank you.

Q.          It's a collection of handwritten notes.
Are these the documents you were referring to a
minute ago that you believe were concealed from
you?

A.          I'm sorry, I do not recall at this
time.

Q.          Do you recognize this document?

A.          I've looked over so many documents over
the years and even today.  This --

Q.          Okay.  That's fine.  Would you turn to
the page that's Bates numbered 00048?

A.          Yes.

Q.          All right.  And do you see, starting in
the middle, there's some physical descriptions?

A.          Yes.

Q.          All right.  The first item is male,
black, 5'9" to 6'1".  Does that description match
you?

A.          No.

MS. MARTINEZ:  I'm going to object to
the characterization of the document as saying

260

6'1".

MR. EPSTEIN: It does not.

Q. Are you a male, black?

A. I am a male, black.

Q. Do you fall within the range of 5'9" to 6'1"?

A. I do not.

Q. Earlier you testified you were 6'1". I'm sorry. I misspoke. It's 5'9" to 6'.

A. Then you already have the answer to your question.

Q. Yes. Okay. So this does not describe you because you are not 6', you are 6'1", correct?

A. That would be correct.

Q. Okay. Light skin. Do you consider yourself to have light skin?

A. Yes.

Q. Short nappy hair?

A. Well, wait a minute, wait a minute. Wait a minute now. Nappy.

Q. I agree. So let me ask you, what is your understanding of the word "nappy" as a descriptor for someone's hair?

A. Hair unkempt.

261

Q.          Does it have another meaning?

A.          I'm not sure at this time.

Q.          Okay.  Bushy eyebrows?

A.          At -- well, not now.  I'm 48 years old.
They were a little more full around this time.

Q.          Okay.  And this time was back in 2004,
correct?  Well, I will represent to you these were
notes that were taken in 2004.

A.          Yes.

Q.          So I'll ask you to assume that.  So if
we're assuming that these notes were taken in
2004, and there's a notation here that says:  Just
out of prison, drugs.

            Does that also describe you?

A.          This could describe anybody.

Q.          I understand that, but could it also
describe you?

A.          This -- this could describe anybody.
This --

Q.          Including --

A.          It's already --

Q.          Including --

A.          -- not saying my height.

Q.          -- you?

262

A.          It could -- lots of black men could be profiled by this description.

Q.          Yes or no, Mr. Horton, do you fit that description?

A.          I'm not sure how to answer the question.

Q.          You can answer it, yes, that fits me, or, no, that does not fit me.

A.          I'm going to let -- I'm going to have to say I don't know how you want me to answer this question.

Q.          Mr. Horton, you --

A.          I've already answered the question.

Q.          No.  You --

A.          You said -- you said does this fit me. I said this could describe a number of black males.

Q.          A number of black males, including you, yes or no?  Were you out of prison recently in 2004?

A.          This is not a perfect description of me.

Q.          Mr. Horton, were you out of prison recently in 2004, yes or no?

263

MS. MARTINEZ:  Just a belated form objection.

You can answer.

A.        Yes.

Q.        Were you in prison for drugs?

A.        Yes.

Q.        Down below it says again, male, black, 27 to 28.  How old were you in 2004?

A.        I believe I was in between -- I believe I was 27 years old.

Q.        And it says Everett Middle School.  Did you go to Everett Middle School?

A.        Yes, I did.

Q.        Below that it says Adidas boy.

You've already testified that some people referred to you that way, correct?

MS. MARTINEZ:  Objection.  Form. Mischaracterizes testimony.

You can answer.

A.        I testified that I don't remember being called Adidas boy.  I don't take kindly to anybody calling me boy, never did, never will.

Q.        Did people call you Adidas man?

A.        They called me all types of stuff.  I

264

think I've already answered that question.

Q.      Including Adidas boy that some people called you?

A.      I don't --

MS. MARTINEZ:  Same objections.

You can answer.

THE WITNESS:  I'm sorry.

MS. MARTINEZ:  It's okay.

A.      I don't recall.

Q.      Did you live on Reynolds Avenue at this time?

A.      I was staying in Reynolds Avenue and Camden Avenue and Grove City.  I was --

Q.      And --

A.      -- staying around.

Q.      And Reynolds Avenue is a red brick house, correct?

A.      I'm not sure.  I know I was paroled to Camden Avenue.

Q.      All right.  Now, again, in the middle of that it says Richard Diggs.

Did you ever hear in 2004 any suggestion that Richard Diggs was involved in the Loew Street robbery?

265

A.           No, I did not, because if I would have, I'm -- I would have tried to have that evidence brought forward or any hearsay evidence brought forward during my trial.

Q.           Are you aware that at the time of the Loew Street robbery, Richard Diggs was in prison?

A.           No, I'm not aware of that.

Q.           You were not aware of that until right now?

A.           I wasn't aware.  I -- I wasn't aware of it.

Q.           I want you to assume that Richard Diggs was in prison at the time of the Loew Street robbery.  Does that change your view about whether you would have brought forth hearsay evidence to try to prove that he committed the crime?

A.           Yes, that does change my view.  It would have been pointless if he was incarcerated at the time, and I didn't want to waste the court's time.

            MS. MARTINEZ:  A belated form objection to that question.

Q.           While you were incarcerated, did you file pleadings with the court, seeking release on

266

your own without a lawyer?

A.          Yes, I did.

                   - - - - -

          Thereupon, Exhibit 28 is marked for purposes of identification.

                   - - - - -

Q.          I'm going to hand you what I've marked as Exhibit 28.  It's a document captioned Motion for Judicial Release, and it is signed by Richard Horton.  Do you see that?

A.          I do.

Q.          Is this a document that you filed with the common pleas court, asking to be released from prison?

A.          Give me one second to look over the documents.

Q.          Absolutely.

          Do you recognize this as a document that you filed with the court?

A.          One more second.  Just let me read a little bit more.

          Okay.  What was the question again?

Q.          Do you recognize this as a document you filed with the court?

267

A.          Yes, I do recognize this document.

Q.          And that's your signature on the first page?

A.          Yes.

Q.          And that's your signature on the second page?

A.          Yes.

Q.          And that's your signature on the third page?

A.          I do recognize those signatures.

Q.          Okay.  And the last page, your signature again?  The very last page.

A.          I do recognize it.

Q.          And the last signature is below a Certificate of Service that represents that this was mailed to the court on the 28th of September, 2017.  Do you see that?

A.          I do see it.

Q.          So did you compile and mail this entire document together?

A.          I do not recall at this time.  This was a document filed and I was in prison.  I forget what year this was.  This was --

Q.          I just read it was 2017.

268

A.          Yeah, but as far as how many years I had been in prison, this was the 16th -- 13th -- 12th year of me being wrongfully incarcerated and I was just surrounded by evil and just trying to get out of prison early. I completed a lot of certificates. And, you know, you got to understand that prison is a vile place, and I just -- I just wanted to come home, man. I didn't do it. I just wanted to come home.

Q.          Let me direct your attention to the third page. This is a letter that you wrote, dated October 1st, 2017. Do you see that?

A.          I see it.

Q.          It was addressed to Judge John Bender, correct?

A.          That's correct.

Q.          Judge Bender was the presiding judge in your criminal case?

A.          Yes, he was.

Q.          I want to direct your attention to the fifth paragraph of the letter. It says: If this court does not find it appropriate to release me directly back into society at this time, I respectfully request release to the CBCF program

269

or some other prerelease program that this court finds appropriate.

What is CBCF?

A.      CBCF -- oh.  CBCF is kind of like a work release program.  They have a good -- good standing.  I can't say exactly what CBCF -- CBCF is at this time.

Q.      Okay.  The letter continues:  However, there is a program that has accepted me upon my release.  This program is in good standing with the Department of Corrections and has a great success rate.  The Exit Program, 614-253-8969, will contact you with an assessment and recommendation to enter into the program.

Do you see that?

A.      I see it.

Q.      What is The Exit Program?

A.      I do not recall at this time.

Q.      Did you apply to The Exit Program?

A.      I'm assuming that I did, yes.

Q.      But you have no independent memory of having done so?

A.      Not from 2017, no.

Q.      And I take it you have no independent

270

memory of what steps you had to take to apply to The Exit Program?

A.      I do not recall at this time.

Q.      To your knowledge did you have any paperwork from The Exit Program showing your acceptance?

A.      I do not recall at this time.

Q.      Is it fair to assume that if you had had paperwork showing your acceptance, you would have attached it to this document?

A.      It is safe to say that, but I'm not sure if The Exit Program, if it even works like that. I provided a phone number there, so -- and said they would be contacting.

Q.      Would it surprise you to learn that The Exit Program says they have no record of you applying?

A.      No, it wouldn't surprise me.

Q.      Why wouldn't it surprise you?

A.      Because I can't even -- I can't remember them, so I assume there wouldn't be any harm if they wouldn't be able to remember me.

Q.      Well, but I'm not asking them if they remember you. I'm asking if they have any records

271

of you.  They have nothing in writing about you. Would that surprise you?

A.           No.

MS. MARTINEZ:  Objection to the form of that question.

You can answer.

A.           That would not surprise me at this time.

Q.           Is it possible that when you wrote that you had not applied to The Exit Program?

A.           I don't -- I don't recall at this time. I don't think so.  Why would I tell it to the judge that The Exit Program was going to call the judge?  It just doesn't seem productive.

Q.           Can you flip to Bates No. 3473?

A.           3473?

Q.           Yes, please.  Now, you earned a number certificates for programs that you participated in while in prison, correct?

A.           That's correct.

Q.           And these are some of those certificates, correct?

A.           That is correct.

Q.           All right.  So this one is a

272

certificate for anger management.  Do you see
that?

A.          I see it.

Q.          And the next one, the next page, it
says that Horton has successfully
delivered -- strike that.

         It says that Horton has successfully
completed the anger deliverations.  Do you see
that?

A.          I do see it.

Q.          Do you know what the word
"deliverations" means?

A.          I do not recall at this time.

Q.          Do you recall taking anger management
classes?

A.          Do I remember every class that I took
while I was locked up for 16 years --

Q.          No, that was not my question.

A.          -- for over 16 years?

Q.          That was not my question.

A.          I do not remember every class that I
took.

Q.          I did not ask if you remembered every
class.  I asked if you remembered taking anger

273

management classes.

A.          I don't remember taking them.

Q.          Do you remember any prison officials telling you that you needed to take anger management classes?

A.          Yeah, on more than one occasion I can remember them telling me that.

Q.          Who told you that?

A.          A couple of different officials throughout the time.

Q.          What were the circumstances?

A.          Well, being on -- being wrongfully incarcerated and being in the type of environment that prison is, I didn't always respond to corrections favorably, and that might be a circumstance where one of the officials or officers might, you know, try to further correct me and saying that I needed to remain calm, get ahold of myself.  It was very difficult to do in my younger years in the beginning of my wrongful incarceration, but I learned some things along the way to help control my anger.

Q.          Did you have an anger problem when you were younger?

274

A.          I don't think --

MS. MARTINEZ:  Objection.  Form.

You can answer.

THE WITNESS:  Sorry.

MS. MARTINEZ:  It's okay.

THE WITNESS:  I did it again.  Sorry.

A.          I wouldn't classify -- classify myself as one who had an anger problem.  We've all had issues dealing with emotions and processing emotions.  I've seen people with anger problems and they made some bad mistakes.  So as I compare myself to somebody like that, I don't -- I wouldn't say it was a problem.  I had issues here and there.

Q.          Do you recall an incident where when you were in prison the guards claimed that they were restraining a violent inmate, and while they were in the process of doing that, you ran up and kicked the inmate in the head?  Do you remember that incident?

A.          Yes, I do remember that incident.

Q.          What happened?

A.          Actually, it's one of my proudest moments during for my wrongful -- during my

275

wrongful incarceration.

In prison there are -- there are sports in prison. So this all stemmed from a basketball game. And a friend of mine had got into a verbal altercation with another inmate. And the inmate left and came back with a knife.

Now, in prison, you can buy a knife for $10. I've seen people get assaulted, I've seen people get killed with prison knives.

So when the gentleman came back with a knife -- my friend, he was playing a basketball game -- so he began running towards my friend with the knife to do bodily harm.

Well, my friend ran as much as he could, but when the altercation got close enough, myself and another individual jumped into the altercation to try to restrain the individual and get the knife from him.

So, you know, as you can imagine in prison, there's -- chaos ensues. The officers come, they begin beating us with the batons, macing us, just restraining us, you know. And so once they put us in handcuffs and escort -- escort each individual out of the gym and place us in the

276

hole, the next day that's when I hear the ticket that we referred to earlier.

So on the ticket, I get confused with the gentleman who kicked the person with the knife in the head, but -- so while I'm trying to explain myself and tell them, hey, you got the wrong guy, I'm the hero here, you know, you should be -- you should be giving me applause because I actually saved the person's life.  But they weren't trying to hear it like that.

And in prison, I'm not going to point out the person who actually kicked the young man in the head because if I'm labeled -- because then I will be labeled a snitch.  So whenever I get out of the hole from this incident, I will be labeled as a snitch.  And snitches don't have a lot of respect in prison, they're treated very badly by the inmates and the officers, and I didn't want that on my head.

So what I did was I pleaded my case, they didn't believe me, so I just went ahead and spent my time in the hole which was about 75 days. So I spent 75 days in the hole.  Me and my wife had some tough times during that period.  I almost

277

lost my marriage.  And I did the right thing.

Q.          Just so I'm clear, somebody did kick
the inmate in the head, correct?

A.          Yes, somebody definitely kicked him in
the head.

Q.          Did you see it happen?

A.          No.  I was trying to get the knife out
of the individual's hand.

Q.          Okay.  But the guards, who were also
trying to restrain that inmate, said that it was
you who kicked him in the head, correct?

A.          That's correct.

Q.          All right.  Same question for them that
I asked you about Rick McClanahan.  In your
opinion, were they wrong or were they lying?

A.          In my opinion, the officers were
incorrect.  It was so much chaos going on, they
made a mistake.  But my outlook was I'm not going
to point the finger at the guy who did it, it's
prison, I'm -- I'm already in prison, it doesn't
matter if you put me on the top of the prison or
the bottom of the prison.  So I went ahead and
spent the 75 days in the hole even though I was
the hero.

278

Q.          Now, I thought you said a minute ago that this almost -- that the separation almost cost you your marriage.  You did, in fact, get divorced from Janette at some point; is that right?

A.          That is correct.

Q.          What happened?

A.          Well, from the beginning, I was sentenced to serve 23 years, and even though I was innocent, even though Janette knows for a fact and believes in my innocence, it's a -- it's a heavy -- it takes a heavy toll on a marriage just being gone or potentially being gone for so long.

So I do not blame Janette for not being able to stick there with me and be at my side. You know, she's actually a pretty good person, a big heart, and things just didn't work out for us. But when The Ohio Innocence Project got me out in 2022, we got remarried five days after that.

Q.          But before we get to that, there was a relationship in between there, correct?

A.          Yeah.  Yeah.  There was a relationship in between that.  I'm a decent looking guy and I like to interact with the opposite sex, so, yeah,

279

there was a relationship in between there.

Q.          And who was that relationship with?

A.          That relationship was with Kawanna Harris.

Q.          And you knew Kawanna Harris previously, correct?

A.          I went to high school with her.

Q.          Between the time you left high school and the time that this relationship with her began, were you in communication with her?

A.          I -- I do not recall at this time.  I don't -- I don't remember being in contact with her.

Q.          How did you get back in contact with her?

A.          Honestly, through a prison cell phone.

Q.          Did you reach out to her?

A.          I believe so.

Q.          When you say a prison cell phone, is that -- that's a contraband cell phone?

A.          Yes, sir.

Q.          How did you get those?

A.          COs would bring them in.  They don't -- you know, there's a lot of bad correction

280

officers in there and they'd bring stuff in.

Q.        What other types of contraband were you caught with during your time in the Ohio prison system?

A.        Well, I was just trying to survive.  I was caught with various different kinds of contraband.  Cell phones, drugs.  I was just trying to survive in there.

Q.        What kind of drugs?

A.        Something called a Suboxone strip.

Q.        What is a Suboxone strip used for?

A.        I believe -- let me think for a second. I believe it's to help -- help people get over their heroin addiction.

Q.        How did you come to have possession of Suboxone strips?

A.        Like I said before, the correction officers bring drugs in the prison.  It doesn't just magically appear in there.

Q.        No, I understand that they bring them in, but that doesn't mean they hand them out to everybody.  How did it come about that they handed it to you?

A.        I don't recall.

281

Q.          Were you selling them?

A.          I was just doing what I had to do to survive.

Q.          I don't know what that means.  How does having the Suboxone strips help you survive in prison?

A.          Prison is a -- it's a -- it's a -- it's an environment in and of itself.  They can be used for -- to barter with, to get high on, it's a form of currency.

Q.          Did you use them to barter?

A.          I -- I can't recall at this time.

Q.          Did you use them to get high?

A.          I'm confident I didn't use them to get high.  I'm scared of heroin.

Q.          Well, it's not heroin, though, right?  Suboxone is a different chemical.

A.          Yeah.  It's close enough.

Q.          Were there other times that you were caught with drug contraband?

A.          Yes.  Yes.

Q.          Tell me what happened.

A.          The -- over 16 years, let's see.  There was an incident where I worked in the laundry room

282

and drugs were found in the laundry room.  And, once again, I couldn't point the finger of whose drugs they were.  I was just getting off my shift. And they blamed me and said everything was mine.

And I -- I disputed it, but I -- once again, I couldn't say whose drugs they were because then I would be labeled a snitch and I didn't want anybody to kill me or harm me in any way, so I ended up doing about 100 days -- 105 days in the hole for that one.  And that was pretty rough mentally, but, you know, I just couldn't go around -- I just couldn't say whose drugs they was.  It was -- that was hard right there.

Q.        What drugs --

A.        Once --

Q.        I'm sorry.  What drugs were they?

A.        I can't recall at this time.  It was a lot.

Q.        A lot of different kinds of drugs or a large quantity of drugs?

A.        I think it was a lot of different kinds.

Q.        Was it a large quantity as well?

283

A.          No.

Q.          Were you the only inmate in the laundry at the time of the search that turned up those drugs?

A.          No, no.

Q.          Then why did the suspicion fall on you instead of the other inmates in the laundry?

A.          Probably because I'm a black man.

Q.          The other inmates who were there were white?

A.          Yeah.  I remember that they didn't find anything in my bed area, they didn't find anything on my person, so, you know, I can appeal it, but, you know, the appeal success rate is kind of low in prison, so I was just doing what I had to do to survive.  Keep my mouth shut.

Q.          Let me shift gears on you.  We have already looked at the first motion for judicial release, correct?

A.          That's correct.

Q.          The court did not grant that motion, correct?

A.          That's correct.

Q.          You filed a second motion for judicial

284

release; is that correct?

A.        I don't recall if that's how it went.

                - - - - -

          Thereupon, Exhibit 29 is marked for purposes of identification.

                - - - - -

Q.        I'll hand you what I've marked as Exhibit 29.  I'll represent that this is a motion for judicial release, and there's a certificate of service on the very back page, with a date of February 19th, 2019.  Do you see that?

A.        Yes.

Q.        And that's your signature underneath it?

A.        Yes.

Q.        Did you file this document with the court?

A.        Yes.

Q.        And it has a number of components, right?  It has certificates again.  It has letters from supporters.  Right?  Do you see that?

A.        Give me one second.

Q.        Sure.

A.        Okay.  What was the question again?

285

Q.          The question was, did you submit this motion to the court?

A.          Yes.

Q.          Did you assemble all of the pieces inside it?

A.          No.  Not all by myself.  I had some help with this.

Q.          Okay.  Tell me the process by which this was put together.

A.          I got some help from a guy in the law library.  And this looks like this was -- I want to say this was all the same thing.

Q.          What do you mean all the same thing?

A.          Where it was denied, and I appealed. But I'm not 100 percent sure.

Q.          Okay.  Well, let's go through this a little bit because it begins, you see on the second page, with a memorandum in support?

A.          Yeah.

Q.          This is a statement that you wrote possibly with support from somebody else in the prison?

MS. MARTINEZ:  Objection.  Form.

You can answer.

286

Q.          Is that correct?

A.          Yes.

Q.          And it ends on page 8, with your signature.  Correct?

A.          It -- I see on page 8, my signature is there.

Q.          Okay.  And then following that are a series of the certificates that we had talked about before.  Do you see those?

A.          I do see the certificates.

Q.          And you would have had those in your possession in prison, correct?

A.          Yes.

Q.          And moving deeper into the packet, go to Bates No. 3785.  Do you see that there's a two-page letter there?

A.          Yes.

Q.          And that is a letter to Judge Colleen O'Donnell from you, correct?

A.          Let me read it.  Yes.

Q.          So this is also something that you would have had in your possession to send to the court, correct?

A.          I believe so.

287

Q.          Okay.  Then we turn to Bates No. 3787. And this is a letter written by Furquan McDonald -- I'm sorry -- Furquan McDougald.  Do you see that?

A.          I do.

Q.          And Furquan is spelled F-u-r-q-u-a-n. Who is Furquan McDonald [sic]?

A.          Furquan McDougald is a -- he's a pretty -- pretty good guy.  He's kind of a business mentor to me now and someone who -- who was there for me and supported me and always -- well, he didn't support me -- always promised a job opportunity when and if -- whenever I got out of prison.

Q.          Now, did Mr. McDougald write this letter?

A.          I'm not sure who wrote the letter.

Q.          What do you know about this letter?

A.          I don't recall at this time.  I know that I was filing paperwork, trying to get out of prison as soon as possible.  I was locked up for a crime I didn't commit.

Q.          Did you ask Mr. McDougald to write a letter for you?

288

A.          I do not recall.

Q.          Do you recall him sending you a copy of a letter of that he had written in order to attach it to this pleading?

A.          I do not recall.

Q.          Did you sign this letter in Furquan McDougald's name?

A.          No.

Q.          The next page, 3789, is a letter from Janette Horton.  Do you see that?

A.          I found it.

Q.          Is that Janette's signature?

MS. MARTINEZ:  Objection.  Foundation.

You can answer.

A.          I'm not sure what my wife's signature looks like.

Q.          How did you come to have possession of this letter?

A.          I'm not sure at this time how I came to --

Q.          Do you --

A.          It was so long ago.

Q.          Do you remember asking any of these people to write letters for this?

289

MS. MARTINEZ: You can look through it if you have to.

A.        I do remember trying to get support, but the signature is just --

Q.        What do you remember about your efforts to get support?

A.        It was -- it was kind of rough. I remember it was rough.

Q.        In what ways was it rough?

A.        Just trying to get this many different -- this looks like a few different letters. Just trying to get everybody on the same page that was the difficult part because people out here they have full-time jobs, full-time families. I can remember it being difficult. I'm not sure.

Q.        Did you ask them to send the letters to you or did you ask them to send them to the court?

A.        I can't -- I can't recall where I had them send them to.

Q.        I'm going to skip ahead a little bit to 3792 and 3793. And this purports to be a letter to Judge Colleen O'Donnell from Kawanna Harris. Do you see that?

290

A.          I do see it.

Q.          And is this a letter that you submitted as part of this package?

A.          Let me look over it for a second. This -- this -- this letter does look familiar. She's saying some really nice things about me.

Q.          Did you submit this letter to the court as part of this motion?

A.          I think that I did.

Q.          Did you write this letter?

A.          No.

Q.          Who did?

A.          It says here that Kawanna Harris wrote the letter.

Q.          Have you read Kawanna Harris's deposition?

A.          I have not had a chance to read it.

Q.          I will represent to you that Kawanna Harris testified that that is not her signature and she did not write this letter.

         MS. MARTINEZ:  I'm going to --

Q.          Can you explain who else could have written this letter and signed it if she said she did not?

291

MS. MARTINEZ: I'm going to object as a mischaracterization of the evidence in the record.

You can answer.

A. No, I cannot explain. If that's true, I can't explain it. It's a beautifully written letter.

Q. Speaking of Kawanna Harris, she has children; is that right?

A. That is correct.

Q. Are they your children?

A. No. The children that Ms. Harris has are not my biological children.

Q. Do you consider them your children?

A. No, I do not.

Q. Do you know if she considers you a parental figure for them?

A. At this date and time today, I'm pretty sure she does not consider those children my children or stepchildren or --

Q. To your knowledge has she ever considered you as a father figure for her children?

A. To my knowledge, when we were together, she considered me as a role model for her

292

children.

Q.        I didn't ask a role model.  I asked if she considered you a father figure.

A.        When we were together, I'm pretty sure that she considered me those things.

Q.        And during that time did you consider yourself a father to those children?

A.        A stepfather maybe.  I was a long way -- she'd come to visit me.  I wouldn't let her bring the children.  I didn't believe prison was -- maybe a stepfather, but not a father.

Q.        What would be the difference between a stepfather and a father?

A.        Aside from -- from the obvious, you know, just -- just those are not my children, so at the end of the day they're not my biological children where I could request or make rulings. Those -- those -- those judgment calls should be up to the father, the biological father.

Q.        By the way, at the time that you filed this motion, if it had been granted, did you have a plan as to where you were going to live?

A.        That's a good question.  Yes.

Q.        What was your plan?

293

A.          In 2019, I -- I would have preferred probably to go to a halfway house, get a job, save up some money and start my life.

I was -- in 2019, I was back with Janette and -- yeah.  I mean, in the perfect world, maybe go to a halfway house, get a job, save up some money.

You know, when I was released from prison, you know, when The Ohio Innocence Project got my conviction overturned and I was released from prison, I was kind of thrown out here.  I applied for food stamps, but since I was wrongfully convicted, I don't -- I don't qualify for help from the government, so I really had to get out here and find a job and -- and ride the bus back and forth to work, you know, and just, you know -- if this would have happened, I would have went a different route, you know, in an ideal situation.

Q.          Let me ask you the question in a different way.  In 2017, when you filed the first motion, did you have conversations with Janette about coming to live with her if you were released?

294

A.          Yes.

Q.          In 2017, did you have conversations with Kawanna about coming to live with her if you were released?

A.          Yes.

Q.          Was it your impression that they both thought you might come live with them?

A.          They may have thought that, you know, they may have thought that.  I'm not quite sure on the actual date when me and Kawanna split and parted ways.  We continued to stay in contact, but it just -- unfortunately it didn't work out with me and Ms. Harris.

Q.          Well, did you have a plan for how you were going to finesse that if you were released and had to live with one or the other?

          MS. MARTINEZ:  Objection.  Form.

          You can answer.

A.          That's -- that's a good question.  Looking back, I'm not sure exactly what I was going to do.  Like I said, in an ideal situation, I would have went to a halfway house, got myself together before I tried to be a husband or a father.

295

Q.        You've talked a great deal about prison and how difficult it is.  And you've talked about how plentiful knives are.  Have you ever been stabbed?

A.        I have been stabbed, but not in prison.

Q.        How many times have you been stabbed?

A.        One time.

Q.        When and where?

A.        It was -- young -- during my younger years, maybe about 8 or 9, in my chest.

Q.        You were 8 or 9 years old?

A.        Yeah.

Q.        Who stabbed you in the chest?

A.        I can't remember exactly who it was. It was a kid from the neighborhood.

            MR. EPSTEIN:  Let's take a break.

            MS. MARTINEZ:  Okay.

            THE VIDEOGRAPHER:  We are off the record.  The time is 5:54.

            (A short recess is taken.)

            THE VIDEOGRAPHER:  This marks the beginning of Media No. 7.  We are back on the record.  The time is 6:06.

BY MR. EPSTEIN:

296

Q.          Mr. Horton, just a few quick
follow-ups.  We were speaking a few minutes ago
about your possible plans in 2017 if you were
released.  And there was the possibility of living
with Janette, and you also had conversations about
living with Kawanna.  Do you recall that
testimony?

A.          I do recall that testimony.

Q.          Did Janette know that you were having
those conversations with Kawanna?

A.          No, she did not.

Q.          Did Kawanna know that you were having
those conversations with Janette?

A.          No, she didn't.  She -- she did not.

Q.          Can you flip back to Exhibit 27, it's
the handwritten notes.  If you turn back to Bates
No. 48, this is the section we went through
together that has various descriptors along with
the name Richard Diggs.  Do you recall that?

A.          I recall you and I talking about it.

Q.          Yes.  My question for you is, do you
see anything in here, in the sections that we
talked about, do you see anything that suggests
Riccardo Diggs might have been involved in the

297

Loew Street robbery?

A.          Do I see anything -- could you repeat the question?

Q.          Sure.  The name Richard Diggs appears, correct?

A.          Correct.

Q.          And I've already asked you to assume that Richard Diggs was in prison at the time of the robbery.  Assuming that that's the case, do you see anything that suggests that actually Riccardo Diggs was the person who committed the robbery?

MS. MARTINEZ:  I'll just put on a belated objection to form and foundation.

You can answer.

A.          I -- I do.

Q.          You do?  And what is that?

A.          The discrepancy I see may be the height.

Q.          Well, I understand -- well, let me back up.  What do you mean by the discrepancy about the height?

A.          I attended Everett Middle School with Richard Diggs and Riccardo Diggs.  Riccardo Diggs

298

was a little older, but he was short -- shorter.

Q.            He was shorter, so --

A.            Shorter than Riccardo -- shorter then Richard Diggs.  Sorry.

Q.            Do you know how tall he was?

A.            No, sir, I do not.

Q.            Okay.  So I understood you to say that maybe that notation of 5'9" to 6' does not suggest you, because you're an inch taller than that, correct?  That was -- that was your position?

A.            That's correct.

Q.            But how does that lead you to Riccardo Diggs?

A.            You asked me did I see anything on this paper that would be anywhere in the realm of a description of Riccardo Diggs, so that's how it led me to it.  Riccardo Diggs is shorter.

Q.            I see.  Well, do you know how tall Riccardo Diggs is?

A.            No, sir, I do not.

Q.            Anything else in here that might make someone think Riccardo Diggs is the person who did this?

A.            No, sir.

299

Q.        Do you know anything about Riccardo Diggs's criminal history?

A.        I'm not sure how to answer that question.  Not at this time.

Q.        I don't understand the answer.  Was there a time when you knew something about his criminal history?

A.        Well, we grew up in a pretty small neighborhood, so I can remember the brothers going to jail for drug -- drugs or something like that back in the '90s.

Q.        Do you know anything more recent than that?

A.        Not at this time I don't.  I don't recall.

Q.        Do you know where Riccardo Diggs is today?

A.        I believe he's deceased.

Q.        Do you know where Richard Diggs is today?

A.        No, I do not know where Richard Diggs is today.

Q.        We -- sitting here today, do you have any personal knowledge that suggests that Richard

300

Diggs was involved in the robbery?

A.          Not at this time.

Q.          Sitting here today, do you have any knowledge that Riccardo Diggs was involved in the robbery?

A.          Not at this time.

Q.          We talked previously about police misconduct and you spoke specifically about these notes that you believe were concealed from you. Do you recall that testimony?

A.          I recall stating that some notes were kept from me during my trial testimony, but I'm not sure if these are the notes.

Q.          Okay.  That's fair.  Apart from the notes that you believe were concealed, what other instances of police conduct do you believe there were in this case?

          MS. MARTINEZ:  Objection to the form. Do you mean misconduct or conduct in general?

          MR. EPSTEIN:  I thought I said police misconduct.

          MS. MARTINEZ:  I just heard conduct.  I just want to make sure.

          MR. EPSTEIN:  I'm sorry if I misspoke.

301

BY MR. EPSTEIN:

Q.        What examples of police misconduct were there in your criminal case?

A.        I'm not sure at this time.  I'm not a lawyer.

Q.        Well, you don't have to be a lawyer. You have an opinion about whether there was misconduct.  What is your opinion based on?

A.        I believe there was misconduct.

Q.        Can you cite me any examples of something that an officer did or failed to do that was improper?

A.        Beside the instances that I've already stated?

Q.        Well, in addition to the notes.  That's the one.  What else?

A.        I'm not sure at this time.

Q.        Have you ever been sure?

          MS. MARTINEZ:  Objection to form.

          You can answer.

A.        No, I have not.  I'm not a lawyer.  I'm not a detective.  The Ohio Innocence Project is the organization that got me out of prison, so I remember when they submitted the evidence request,

302

I looked over the paperwork, and -- but I don't know of any other instance at this moment.

Q.        So is it fair to say that your belief that there was police misconduct in this case is based entirely upon what the lawyers have told you?

MS. MARTINEZ:  Objection to form.

You can answer.

A.        Yeah.  And they're The Ohio Innocence Project.  They're pretty good at what they do.

Q.        Do you have an understanding of why you were released from prison?

A.        Yes, I do.

Q.        What is that understanding?

A.        Well, first of all, I believe it was -- I got to thank the good Lord above for being released from prison for a crime I didn't commit.

And I believe that when The Ohio Innocence Project submitted the records request, they found out that some stuff was missing that I wasn't able to have with me during my trial.  And the DA -- the DNA evidence to further submit the fact that I did not commit this crime.  And

303

that -- and once The Ohio Innocence Project submitted that evidence, that's why the judge overturned my conviction and granted me a new trial.

Q.          Tell me about the DNA evidence.  What's your understanding of that?

A.          My understanding of that is very limited.  What I can remember today at this point is they used semen sperm to get a DNA sample off of a fingerprint from the crime scene that happened so long ago, and the DNA evidence did not match with my DNA evidence and that's essentially what cleared me of these heinous charges.

MR. EPSTEIN:  Can you read that back?

(The record is read back as requested.)

THE WITNESS:  (Indicating.)

THE REPORTER:  Yes.  Did I mishear --

MR. EPSTEIN:  Did she misunderstand the word?

THE REPORTER:  Did I misunderstand the word?

THE WITNESS:  If you did, it's not a big deal.  Salmon sperm.

MS. MARTINEZ:  Like the fish.

304

THE REPORTER:  Salmon sperm.

MS. MARTINEZ:  Yeah.

THE WITNESS:  Yeah.

THE REPORTER:  Thank you.

THE WITNESS:  That's my fault.  I'm sorry.

THE REPORTER:  That's my fault.  Sorry. Thank you for correcting me.

BY MR. EPSTEIN:

Q.         What is that?

A.         What -- can you repeat the question?

Q.         I want to make sure I'm understanding what you're saying correctly.  Are you actually saying salmon sperm?

A.         I am saying salmon sperm.

Q.         Okay.  All right.  And it's your understanding that the DNA evidence related to some fingerprints that they had found?

A.         That is my understanding.

Q.         And do you know where those fingerprints were found?

A.         Those fingerprints were taken from the crime scene.

Q.         Can you be more specific about where

305

they were found?

A.        A foldout couch or a foldout bed from the crime scene.

Q.        Do you know anything about testing on a shell casing?

A.        I misspoke.  It was fingerprints from the shell casing.  I misspoke.

Q.        All right.  Then let's back up.  What is your understanding about the shell casing?

A.        The -- the fingerprint -- they used the salmon sperm to get the DNA off the shell casing, not the bed.  Oh, I --

Q.        That's okay.

A.        I was bound to mess up sooner or later.

Q.        That's okay.  I'm still stuck on salmon sperm.

A.        It's okay.

Q.        What is your understanding of what the DNA test on the shell casing showed?

A.        My understanding is that it completely exonerated me.  And I'm thankful for that.  I'm thankful for the work The Ohio Innocence Project did.  I'm thankful for the judge that recognized that throughout even though all these years --

306

Q.        Okay.  Excuse me --

A.        -- had went by --

Q.        -- Mr. Horton.

A.        -- it wasn't me.

Q.        I appreciate that.  But I asked you a simple question, what's your understanding of what it showed, and you said it completely exonerated you, correct?

A.        That's correct.

Q.        What does the word "exonerate" mean?

A.        To my limited understanding, it means that it set me free from the chains of bondage of being incarcerated for this crime that I didn't commit.  It was a -- it's -- it's a glorious word.  It's a -- it's a word of extreme vindication.  I get to, you know -- it was so -- so joyful just, you know, telling my children that I've been exonerated and I'm coming home.

Q.        Okay.  But I want to be clear because words matter.  Your understanding of exoneration means it got you released; is that correct?

A.        To my limited understanding, yes.

Q.        Okay.  Are you using exoneration in the sense of it affirmatively proved you did not

307

commit the crime?

A.        That's a good question.  Yes, I am using that word.

Q.        So you believe that the DNA evidence definitively proved that you did not commit the crime; is that correct?

A.        I do believe that.

Q.        How did it prove that?

A.        I can't answer that question.  I'm not a scientist.  I've explained the way that The Ohio Innocence Project and trained scientists obtained the DNA from a shell casing that was from the crime scene.

Q.        I'm not asking you to explain how they got it and how they tested it.  I'm asking you to explain to me how it proves that you're innocent and somebody else committed the crime.

A.        I'm not sure how to answer the question.  I just -- I just said it wasn't -- it proved that my DNA was not on the shell casing used to commit this crime.  Somebody else's DNA was on there.

Q.        Okay.  So that DNA testing shows that maybe somebody else touched the shell casing,

308

correct?

A.          No, I believe it shows somebody else committed the crime.

          MS. MARTINEZ:  A belated form objection.

Q.          Is it possible to fire a gun without touching the shell casing?

          MS. MARTINEZ:  Objection to foundation.

          You can answer.

A.          I don't see a way it would be possible.

Q.          Do you have much experience with guns?

A.          No, I do not.

Q.          Have you ever owned a gun?

A.          No, I do not.

Q.          Have you ever fired a gun?

A.          Have I ever fired a gun?  I have fired a gun.

Q.          Under what circumstances?

A.          Celebrating New Year's Eve.  Something stupid like that.

Q.          Just firing into the air?

A.          Yeah.

Q.          What kind of --

A.          Just doing something stupid.

309

Q.      What kind of gun?

A.      I can't recall at this time.

Q.      When was that?

A.      A long, long time ago.

Q.      Okay.  So you have fired a gun, we've established that.  I want you to assume that I loaded a gun, handed it to you, and you fired it. Is that a possible thing that can happen?

A.      Is it possible?  Anything is possible.

Q.      So the fact that the fingerprint on the shell casing at the crime scene, you could argue, proved you didn't load the gun, but it's still a possibility that you fired the gun; isn't that correct?

        MS. MARTINEZ:  Objection.  Form.

        You can answer.

A.      No, that's not -- that's not what got me here.  What got me here is whoever fired the gun left their DNA on the shell casing, and that's --

Q.      Well, did --

A.      -- the way it boils down to.  That's the only reason I'm here today.

Q.      Well, did the judge declare you

310

innocent?

A.          That's a --

Q.          Or did she --

A.          -- good question.

Q.          Or did she just order a new trial at the end of which you might have gone back to jail?

A.          That's a good question.  I'm not sure how to answer that question because I don't know exactly -- I can't remember at this time exactly -- man, that's a good question.

Q.          Okay.  I take it then you don't know why the second trial never went forward; is that a fair statement?

A.          Not at this time.  I can't definitively say.

Q.          Do you recognize the number 614-404-8458?

A.          What exhibit is that?

Q.          I wasn't asking you to look for an exhibit.  I was giving you a phone number and asking you if you recognized it.

A.          What was the phone number again?

Q.          Yeah.  614-404-8458.

A.          8458.  I do not remember that phone

311

number.

Q.    You don't recognize that as a phone number that you may have used at one time?

A.    I don't recognize that phone number.

Q.    How many attorneys represented you at your criminal trial?

A.    Two attorneys.  Two attorneys represented me at trial.  Myron Shwartz and his granddaughter Alissa Holfinger, I believe her name is.

Q.    How much did you pay Mr. Shwartz?

A.    I paid Mr. Shwartz over $5,000.

Q.    Did you pay the money or did somebody pay the money for you?

A.    I had a little help from my fiancee, but for the most part, I paid the money.

Q.    Do you know the name Rollin Hunter?

A.    Yes.  I do know the name Rollin Hunter.

Q.    Who is Rollin Hunter?

A.    Rollin Hunter is a childhood friend.

Q.    Did you go to school with Rollin Hunter?

A.    Yes.  Rollin Hunter also attended Centennial High School.

312

Q.          Do you have any communication with Rollin Hunter as an adult?

A.          That's a good question.  Yes.

Q.          Tell me about your contact with Rollin Hunter as an adult.

A.          Rollin Hunter is a sort of a business mentor in a sense.  I would consider him an associate, not quite a friend, but he's someone that I went to school with back in the days and somebody I went to high school with.

Q.          What does he do for a living?

A.          I believe Rollin works at Orkin Pest Control.

Q.          I think you testified you consider him something of a mentor; is that right?

A.          Yes.

Q.          Why?

A.          He has a pretty successful career working over at Orkin, and somebody I might on occasion ask for advice.

Q.          Does Rollin Hunter have a criminal record of any kind to your knowledge?

A.          To my knowledge at this time, I don't -- I have no idea.

313

Q.          Do you have a car now?

A.          Yes.

Q.          When you --

A.          Excuse me.  I'm sorry.  Actually, I have a truck.

Q.          Fair enough.  When did you get the truck?

A.          At the beginning of last year.  It hasn't been a full year yet.

Q.          Before that, did you have a vehicle or were you using public transportation?

A.          Before that, I actually had a van.  I had a work van.  A Dodge van.

Q.          Did you ever use public transportation?

A.          I have used it, like I said, when I first came out of prison.  I didn't have a valid driver's license, I didn't have a mode of transportation, so, yeah, I would frequently ride the bus.  But as I, you know, started to save and learn more about how to use credit, it's been a while since I've been on the bus, but I don't mind riding the bus.

Q.          Do you know what routes you would have taken?

314

A.       Taken where?

Q.       Which bus routes?

A.       To where?

Q.       Well, that's what I'm asking.  Every bus route in Columbus has a number.  Do you know what bus routes you would have taken?

A.       Yes.  Depending on where I'm going.

Q.       Where would you have been going?

A.       Riding the bus, probably back and forth to work.

Q.       Where was work at that time?

A.       Work is -- when I first came home from prison, work was -- I worked for a company named United Alloys & Metals, and that's located on Joyce Avenue in Columbus, Ohio.

Q.       And where were you living at that time?

A.       At that time I was living on -- at 1073 Urana.

Q.       Can you spell that?

A.       Urana is U-r-a-n-a Avenue.

Q.       Do you know which bus you took to get back and forth to work?

A.       Man.  Man, that's a tough question. I'm -- I do -- I cannot recall.  Sorry.

315

Q.        Did you ever see Rhonda Curry on the bus?

A.        No.

Q.        Have you seen Rhonda Curry since you've been out of prison?

A.        I have not seen Rhonda Curry since I've been out of prison.

Q.        Do you know Kim Curry?

A.        I do not recall Kim Curry.

Q.        Back in 2004, did you owe anybody any money?

A.        Back in 2004, did I owe anybody any money?  Honestly, I owed the City of Columbus for unpaid traffic tickets, but that's all I can remember at this time.

Q.        And speaking of owing money, is it correct that before you went to prison in West Virginia, you had a mortgage on a house?

A.        That would be incorrect.

Q.        Have you ever had a mortgage on a house?

A.        I have one now.

Q.        Is that in your name or jointly with Janette?

316

A.            That would be in my name.

Q.            Where do you have bank accounts?

A.            Where do I have -- I want to try and get this correct.  I have a bank account at KEMBA bank.  And I have my mortgage through U.S. Bank. And I have a -- and I have a bank account at Huntington Bank.  Yeah.

Q.            Which of those accounts are in your name and which are joint with Janette?

A.            All those accounts are in my name.  I have a savings account at Huntington Bank with my wife.

Q.            Which account do you deposit your paychecks into?

A.            I deposit my paychecks into a Huntington account.  Huntington is also the bank that my job uses, so it just makes it a lot easier, direct deposit.

Q.            Now, you have spoken at length about The Innocence Project.  Do you do appearances on their behalf?

A.            Yes.  Yes, I do.  I'm quite proud of that actually.  I actually go -- I'm able to go around to different colleges and talk to aspiring

317

law students and college students and tell them about this heinous experience, try to use a negative and turn it into a positive, and hopefully even inspire some lawyers to, you know, become better lawyers, maybe even better human beings. I try to use my story to motivate the next generation.

Q. Do you get paid to do that?

A. Yes.

Q. Do you get paid by The Innocence Project or do you get paid by the venue?

A. I believe -- I believe I'm paid by the venue.

Q. What venues have paid you?

A. Well, I've been doing this -- this work for almost three years now. And I've been to -- I've been to Ohio State, Toledo, University of Ohio. I've been outside the state to the University of Illinois. I've been to Dayton College. I've been to some of these colleges twice.

Q. University of Cincinnati?

A. I've been to the University of Cincinnati to speak.

318

Q.          Have you been paid by all of those schools to do that?

A.          Yes.

Q.          How much do you typically get paid?

A.          Typically, for a one-hour or two-hour speaking engagement, the school will give us a stipend of like $250, maybe $350.  It varies.

Q.          Does Janette get paid for doing that too?

A.          She -- she -- she definitely has a story to tell and this situation has definitely, you know, provided her a way to vent, and so, yes, she does get paid.

Q.          And where do those payments get deposited from you and from Janette?

A.          Well, it's my wife's money, so I'm not going to speak on where her money goes.  I know that my money goes into a bank, the Huntington Bank account.

MR. EPSTEIN:  Alyssa, if you'd give me five minutes.  I think we're just about done.

MS. MARTINEZ:  Okay.  Sounds good.

THE VIDEOGRAPHER:  We are off the record.  The time is 6:35.

319

(A short recess is taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 6:43.

BY MR. EPSTEIN:

Q.        Okay.  Mr. Horton, home stretch.  You testified earlier that Myron Shwartz was your attorney at your criminal trial, correct?

A.        Yes.

Q.        Did you ever see the paper file that Myron Shwartz kept of your case?

MS. MARTINEZ:  Objection to form.

You can answer.

A.        Did I ever see the paperwork that he -- that he kept?

Q.        Yeah.  If a lawyer --

A.        I'm not sure I understand the question.

Q.        If a lawyer has a case and there are papers, the lawyer will keep them all together in a file or a box or something.  Did you ever see his files?

MS. MARTINEZ:  Same objection.

You can answer.

A.        I -- I don't recall at this time because I was one of the fortunate ones that I was

320

able to get ahold of my paperwork pretty quickly, so I don't know if he -- if it came from him or came from -- I'm not -- I'm not -- I can't recall at this time.

Q.        What are you referring to when you say your paperwork?

A.        The trial transcripts.

Q.        I'm talking about before the trial. Any --

A.        Oh.

Q.        Any evidence, any documents that he had.  Did he provide copies of those to you?

A.        I don't recall at this time.

Q.        Do you know where his files are today?

A.        I do not know where they would be at this time.  As I understand it, Mr. Shwartz passed away a long time ago.

Q.        Did you read through the files in his office during the preparation for the trial?

A.        No, I did not.  There wasn't a lot of preparation.

Q.        What do you mean there wasn't a lot of preparation?

A.        I don't remember us doing a lot of prep

321

work before the trial.  I don't remember us talking about who we, you know, who I wanted to send subpoenas to.  More than once we talked about it, but I don't remember us talking about it more. There wasn't a lot of prep work like how you see in the movies.

Q.        Was that frustrating for you?

A.        At the time it was not, but looking back on it, it was a little frustrating.

Q.        How come?

A.        Because I was thrown in prison for a crime I didn't commit, so I -- it was frustrating. A lot of different things were frustrating.

Q.        What else was frustrating?

A.        Just -- just trying to make sense of it, just trying to figure out what happened, where did I go wrong, if I went wrong, if I could have done anything different, but it wasn't under my control.

                - - - - -

          Thereupon, Exhibit 30 is marked for purposes of identification.

                - - - - -

Q.        I'm going to hand you what's been

322

marked as Exhibit 30. It's an order from the court captioned Entry Granting Defendant's 4/16/21 Motion for New Trial. Have you seen this document before?

MS. MARTINEZ: Take time to look --

THE REPORTER: I'm sorry. What did you say, Alyssa?

MS. MARTINEZ: Oh. I just said he can take some time to look through it.

A.        This -- can you repeat the question?

Q.        I was simply asking if you've seen it before.

A.        This does not look familiar.

Q.        Okay. If you look at the top of the front page, there's a timestamp showing that it was filed on January 12th, 2022. Do you see that?

A.        I do see that.

Q.        When were you released from prison?

A.        I was released on January 19th, 2022.

Q.        Do you know if this is the document that caused you to be released from prison?

A.        There was so many documents. I've never seen this document before. I don't know if this is the particular document that set me free.

323

Q.        Okay.  Well, turn to page 11.  Page 11.
Do you see at the top it says this court hereby
grants Defendant's motion for a new trial?

A.        I do see that.

Q.        All right.  Do you see any language
that says this court hereby releases the
Defendant?

A.        No.  The only thing I see is it is so
ordered and copies to all parties.

Q.        Right.  And you understand that if
there had been a new trial, the result could be
not guilty, the result could be guilty, right?
It's a new trial.  That's your understanding?

A.        I mean, there's -- there's any -- I
don't -- I don't -- I'm not sure how to answer
because, you know, with the -- with the -- I mean,
The Ohio Innocence Project got this motion
granted, so I just don't -- I -- anything could
have happened, I guess.

                    - - - - -

          Thereupon, Exhibits 31 and 32 are
marked for purposes of identification.

                    - - - - -

Q.        All right.  I'm going to hand you what

324

I've marked as Exhibits 31 and 32.

MR. EPSTEIN:  Did I fail to give you a copy last time?

MS. MARTINEZ:  No.  I've got -- I've got 30.  Thank you.

MR. EPSTEIN:  Okay.  I'm sorry.

MS. MARTINEZ:  It's okay.  Thank you. Which one is which?  Okay.  Thanks.

BY MR. EPSTEIN:

Q.      So Exhibit 31 is another pleading. It's captioned Motion for Nolle Prosequi.  Do you see that?

A.      I do see that.

Q.      This is an entry that was filed -- I'm sorry.  This is a motion that was filed on your behalf by -- no.  I'm sorry.  Strike that.

Exhibit 32 is captioned Entry - Nolle Prosequi.  Do you see that?

A.      Are you talking about Exhibit 32?

Q.      Yes, sir.

A.      Yes.

Q.      All right.  Have you seen Exhibit 31 or Exhibit 32 before?  Have you seen Exhibit 31 before?

325

A.          Give me one more second.  I do not recall seeing Exhibit 31 before.

Q.          Okay.  As you're looking at it now, do you have any understanding of what Exhibit 31 is?

A.          I'm not a lawyer, so, no, I'm not -- I'm not sure if I understand what this is.

Q.          Okay.  If you turn to the back, Bates No. 4093.

A.          4093.

Q.          Yes.  You see the document is signed by a number of prosecutors?

A.          Yes.

Q.          Okay.  So would that lead you to believe that this is a pleading that was filed by the prosecutors?

A.          It looks like it.

Q.          Okay.  Turn back one page, please, to 4092.  And I want to read you the first sentence in the last paragraph:  We write this brief synopsis to note that, upon a review of all of the information known to the State at this time, it remains the State's belief that this defendant committed these crimes.

            Were you aware at the time you were

326

released that the State still believed you were guilty of the Loew Street robbery?

MS. MARTINEZ: Objection. Form.

You can answer.

A.      No, I was not.

Q.      They then write: Our burden, however, requires that we prove this belief, with the available admissible evidence as it stands today, to a jury beyond a reasonable doubt. In light of the court's recent ruling preventing the State from introducing Mr. McClanahan's trial testimony, we do not believe we can meet that burden.

Do you understand what's being said there?

A.      I think that I do.

Q.      What is your understanding of that paragraph?

A.      My limited understanding is that the State -- it's the State's belief that I still committed these heinous crimes despite all the work that The Ohio Innocence Project put into my case, all the hours, all the blood, sweat, and tears. And it says here that it's basically saying that -- that the prosecution doesn't want

327

to retry the case.

Q.          And does it say why they're not going to retry the case?

A.          It says the State -- it says that the State -- it sounds like they're saying that the State would have a hard time without Mr. McClanahan's testimony.

Q.          And they don't have Mr. McClanahan's testimony because he's since passed away; is that correct?

MS. MARTINEZ:  Objection to form.

You can answer.

Q.          By the time this is all happening, Mr. McClanahan is dead, right?

A.          Yes, Mr. McClanahan had passed away at this time, 2023.

Q.          All right.  And then have you seen Exhibit 32 before?

A.          No.  This does not look familiar.

Q.          From the caption of that, that's the entry granting the motion that we just looked at, correct?

A.          I --

Q.          If you can't tell, that's fine.

328

A.        Yeah, I can't tell.

Q.        Okay.  Mr. Horton, do you have a belief as to who committed the Loew Street robbery?

A.        No, I do not.

Q.        Have you heard any --

A.        Not at this time, I do not.

Q.        I don't understand the preface "at this time."  Does that mean at a different time you did have a theory?

A.        I just -- at this -- at this time and day, I -- I don't have a theory on what happened.

Q.        Have --

A.        I just know that I didn't commit the crime.

Q.        Have --

A.        I just know that The Ohio Innocence Project is the one who freed me from bondage.  I just know, you know, there's so many things in favor of -- so many things had to go right for me to get out of prison for a crime I didn't commit. I just --

Q.        Have you ever heard any rumors as to who might have committed the Loew Street robbery?

A.        I'm -- I'm not sure what I've heard

329

over the years, you know...

Q.          Have you heard anything?

A.          I'm not sure what I've heard at this point. It's been such a long, long day. You've asked me so many questions. I've cooperated to the best of my knowledge. It's -- I couldn't -- I couldn't tell you what I've heard at this point.

MR. EPSTEIN: All right. Thank you. We're done.

MS. MARTINEZ: We'll reserve signature.

THE VIDEOGRAPHER: This concludes the deposition of Richard Horton. We are off the record at 6:57.

(Signature not waived.)

- - - - -

Thereupon, the foregoing proceedings concluded at 6:57 p.m.

- - - - -

330

State of Ohio    :      C E R T I F I C A T E
County of Franklin: SS

I, Carolyn M. Burke, RPR, a Notary Public in and for the State of Ohio, certify that Richard H. Horton was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have not waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on January 6, 2025.

*Carolyn M. Burke*

_____
Carolyn M. Burke, RPR, Notary Public - State of Ohio.  My commission expires July 17, 2028.

331

Witness Errata and Signature Sheet
Correction or Change Reason Code
1-Misspelling  2-Word Omitted  3-Wrong Word
4-Clarification  5-Other (Please explain)

Page/Line        Correction or Change        Reason Code

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____


I, Richard H. Horton, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

Ref: CB313034RH





























Case: 2:23-cv-03888-ALM-SCS Doc #: 150-1 Filed: 03/28/26 Page: 348 of 363  PAGEID #: 10785



Realtime - Videoconferencing - Trial Presentation - Video
Spectrum Reporting LLC | 614-444-1000





















Spectrum Reporting LLC | 614-444-1000









