# Exhibit 19

92

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Richard Horton,                    :

        Plaintiff,           :

        vs.                  : Case No. 2:23-cv-3888
                               Chief Judge
City of Columbus,            : Algenon L. Marbley
et al.,
                             :

        Defendants.

                             :

- - - - -

VIDEOTAPED DEPOSITION OF RICHARD D. DIGGS,

VOLUME 2

- - - - -

Taken at Columbus City Attorney's Office
77 North Front Street, 4th Fl.
Columbus, OH 43215
June 17, 2025, 9:03 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

93

A P P E A R A N C E S


ON BEHALF OF PLAINTIFF:

        Loevy & Loevy
        311 North Aberdeen Street, FL. 3
        Chicago, IL 60607
        By Alyssa Martinez, Esq.
          (Via videoconference)


ON BEHALF OF DEFENDANTS:

        Columbus City Attorney's Office
        77 North Front Street, 4th Fl.
        Columbus, OH 43215
        By Aaron D. Epstein, Esq.
          David J. Dirisamer, Esq.
          Alana Valle Tanoury, Esq.
          (Via videoconference)




ALSO PRESENT:

        Gregory Castetter - Videographer
        Doug R. Girard

94

Tuesday Morning Session

June 17, 2025, 9:03 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by counsel in attendance that the deposition of Richard D. Diggs, Volume 2, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and subsequent agreement of counsel that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived; that the signature of the witness to the transcript of said deposition is expressly waived by counsel and the witness; said deposition to have the same force and effect as though signed by the said Richard D. Diggs, Volume 2.

- - - - -

95

I N D E X

Examination By                                          Page

Ms. Martinez - Cross                                      97
Mr. Epstein - Further Cross                              145
Ms. Martinez - Further Cross                            155


Exhibits                                                Page

Exhibit 7 - Photo                                        98

Exhibit 8 - Two photos                                   99

Exhibit 9 - ODRC Offender Information Details           105

Exhibit 10 - ODRC Transitional Control Program          111
             Request/Waiver, 7-25-06

(PDF exhibits attached to the transcript.)

96

THE VIDEOGRAPHER:  The following deposition of Richard D. Diggs, Volume 2, is being taken on June 17th, 2025, at 77 North Front Street, Fourth Floor, Columbus, Ohio, in the case of Richard Horton versus City of Columbus, et al., in the United States District Court, Southern District of Ohio, Eastern Division.  Case No. 2:23-cv-3888.

The court reporter is Stacy Upp, and the videographer is Gregory Castetter.  This deposition is being recorded by Spectrum Reporting LLC.

We are on the record at 9:03 a.m.  Will counsel please announce their presence.

MR. EPSTEIN:  Aaron Epstein and David Dirisamer, as well as via Zoom Alana Tanoury, for the defendants, City of Columbus and Detective Brenda Walker.  Also with us is Douglas Girard, our paralegal.

MS. MARTINEZ:  Alyssa Martinez on behalf of plaintiff, Richard Horton, appearing via Zoom.

97

- - - - -

RICHARD D. DIGGS, VOLUME 2

being first duly sworn, testifies and says as follows:

MR. EPSTEIN: Good morning, Mr. Diggs.

THE WITNESS: Good morning.

MR. EPSTEIN: Thank you very much for coming back for a second day.

THE WITNESS: Yeah.

MR. EPSTEIN: We appreciate that.

I do not have any questions for you right now. I believe Ms. Martinez may have some questions she wants to ask you.

THE WITNESS: Okay.

- - - - -

CROSS-EXAMINATION

BY MS. MARTINEZ:

Q.        I do have a few questions for you, sir. And I apologize in advance, I may jump around a little bit. So let's see.

So, sir, your full name is Richard Devon Diggs?

A.        Yes.

Q.        Okay. And your date of birth is July

98

16th, 1997?

A.          No.   1977.

Q.          Oh, I'm sorry about that.  I -- words came out wrong this morning.

          Okay.  So your date of birth is July 16th, 1977?

A.          Yes.

Q.          Okay.  And so in October of 2004, you would have been 27 years old?

A.          Yes.

          MR. MARTINEZ:  Okay.  And I'm just going to quickly show you what we'll mark as -- Madam Court Reporter, are we on Exhibit 7?

          THE REPORTER:  Yes.

          MS. MARTINEZ:  Okay.  Great.  Thank you.

BY MS. MARTINEZ:

Q.          I'll show what we'll mark as Exhibit 7, which is Bates stamped R. Horton 1594.  And, sir, you testified that this is a photograph of yourself, correct?

                    - - - - -

          Thereupon, Exhibit 7 is marked for purposes of identification.

99

- - - - -

A.        Yes.

Q.        Okay.  And your brother's full name is Riccardo Lamont Diggs; is that correct?

A.        Yes.

Q.        Okay.  And his date of birth is August 5th, 1976?

A.        Yes.

Q.        So in October of 2004, he would have been 28 years old?

A.        Yes.

Q.        Okay.  I'm going to show you, sir, what we will mark as Exhibit 8, which is Bates stamped R. Horton 1586.  And, sir, is this a picture of your brother?

- - - - -

Thereupon, Exhibit 8 is marked for purposes of identification.

- - - - -

A.        Yes.

Q.        Okay.  And, sir, you testified previously that as children, people would get the two of you confused?

A.        Yes.

100

Q.            Okay.  And you testified that as adults, people who knew the two of you did not get you confused?

MR. EPSTEIN:  Objection.

A.            Right.

MR. EPSTEIN:  Go ahead.  You -- you can answer --

A.            I said right.

MR. EPSTEIN:  -- the question.

BY MS. MARTINEZ:

Q.            Okay.  And, sir, is it possible that people who did not know you both well may have gotten you confused as adults and you just didn't know it?

A.            Well, they -- they got confused on the documents on the -- downtown.

Q.            Yes.  Yes.

And we'll talk about that in just a moment.

My question is more is it possible that people who had gone to school with you or things of that nature who didn't know you as well as adults may have still gotten you confused?

A.            Yes.

101

Q.        Okay.  And you testified, sir, that there was the one instance in which you gave your brother's name to police as your name when you tried to be fingerprinted; is that correct?

A.        Yes.

Q.        Okay.

A.        That's where the whole --

Q.        And that's --

A.        Yes.  That's where the whole Richard and Riccardo thing got all messed up is because they didn't fix it because I put -- I tried to use his name so I wouldn't get in trouble, and it didn't work.  But it -- it was still in the system like that because it even has his name on my name on the paperwork.

Q.        Uh-huh.  And do you know if your brother ever did the same thing and tried to give your name to police for something that he may have done?

A.        I -- I don't know.

Q.        Okay.  And as you sit here today, sir, are you aware of any time that your brother may have used your identity in any context?

A.        I don't know.

102

Q.      Okay.  And did you at any point, sir, ever get in trouble for something because people thought you were your brother?

A.      Not got in trouble.  But, like, when it came down to the court system, a couple times I couldn't -- I missed court because they had his name on my name, they had -- and it was like switch -- mixed up.

Q.      Okay.  And is that the -- was it the Riccardo Devon Diggs that we looked at last time?

A.      Right.  Yeah.  My name ain't Riccardo.

Q.      Right.

A.      You know what I'm saying?  My name is, yeah, Richard.  His name is Riccardo.

Q.      Okay.  And as you sit here today, sir, do you know for a fact one way or the other whether your brother has ever been stopped or arrested under your name?

A.      I don't know.  I -- I don't know.

Q.      Okay.  And are you aware of any tickets, arrests or criminal records that are in your name but pertain to something your brother might have done?

A.      Well, that's -- that's what I was

103

saying about on the document.  It has his name,
but it wasn't him.  It was, like, me, like, on my
-- remember that -- the paperwork, it had --

Q.        Yeah.

A.        It had Riccardo, but Riccardo is me,
you know.

Q.        Okay.  Are you aware of any instances
where the flip happened, you know, where it said
something like Richard Lamont Diggs or something
like that where it was the opposite flip?

A.        No.

Q.        Okay.  And do you know if your brother
has ever tried to give your name when he was being
fingerprinted?

A.        I -- I don't think so.  Like, like,
like I said, that's the one -- you know, when I
was a juvenile when I had just turned 18, I --
that was a little stupid mistake that I had tried
to do.  It was little -- kind of a little goofy
mistake, you know, as a teenager, you know, I
tried to use his name.  But it didn't work
because, you know, when they fingerprinted me, you
know, they found out, you know, and -- but they
didn't clear up the error.  I guess it -- it was

104

like an error that -- you know, that happened.
The error with the Richard and Riccardo thing.
And then it came back to be major later because
they said Riccardo Diggs, the court, I show my
thing and it's Richard, you know what I'm saying
and?  And, you know, I couldn't -- a few times, I
couldn't -- it was like a discrepancy.

Q.        Uh-huh.

          And so sometimes you weren't able to go
to court because of that discrepancy?

A.        Yeah.  Yeah.  Before it happens --
yeah, it happened before.

Q.        Okay.  And I'm sorry, I should have
said this at the outset.  And I apologize that I'm
going to be asking you some questions about your
brother.  And I am very sorry for your loss.

A.        Uh-huh.  Thank you.

Q.        Now, sir, in your opinion, did you and
your brother have similar voices?

A.        I'd say no.

Q.        No.  Okay.

          Do you believe his -- or strike that,
please.

          Was his voice a little higher pitched

105

than yours, a little deeper?

A.        Yeah.  My -- my voice is like way, like, deeper.  His is like lighter.

Q.        Okay.  Okay.  I'm going to show you, sir, what we will mark as Exhibit 9, which is Bates stamped City 16432 to 16451.  I'll show you the entire document, and I'll scroll through it.  But the parts I want to ask you about are very brief, and I'm going to direct you right to those, okay?

- - - - -

Thereupon, Exhibit 9 is marked for purposes of identification.

- - - - -

A.        Okay.

Q.        I'll scroll through the whole thing so you've got a chance to look at it to get a feel for what the document is.

MR. EPSTEIN:  Alyssa, what document is this?

MS. MARTINEZ:  This is Bates stamped City 16432 to 16451.

MR. EPSTEIN:  Okay.

BY MS. MARTINEZ:

106

Q.          This says "Ricardo Diggs."

A.          Exactly.

Q.          And that's going to be what I ask you about.  But I'm going to scroll down quickly just so you can see the whole document and then I'll come back up, okay?

A.          Okay.

Q.          And let me know if you want me to slow down.

A.          Oh, yeah.  Yeah.  Go back.  Go back.

Q.          Right here?

A.          Go back down.

Q.          This way?

A.          All right.  All right.  Now go.

Q.          Okay.

A.          Stop.  Yeah.  That's my brother right there.

Q.          Uh-huh.  And I'm going to ask you about that, too, in just a moment.  But I want to make sure you've got a chance to see all of it first.

A.          Okay.  All right.  Stop.  Now this one has my name on it.

Q.          Uh-huh.  Am I okay to keep scrolling?

A.          Yeah.  Well, the other three have

107

Riccardo.  This one got Richard.

Q.        Uh-huh.  And my questions for you is going to be just for the ones up top.  I just want to make sure you've had a chance to look at the entirety of the document, okay?

A.        Okay.

Q.        It's a nice young picture of you right there.

A.        Yes.

Q.        Okay.  So I'm going to scroll all the way back up to the top, sir.  And I'm going to represent to you that these are documents from the Department of Rehabilitation and Correction.  And so this is a photograph of you on that first page; is that correct?

A.        Yes.

Q.        And it has your date of birth down here?

A.        Yes.

Q.        But it's got your brother's name "Ricardo Diggs"?

A.        Yes.

Q.        And then -- and it's got your height as 5-11.  Does that sound accurate for how tall you

108

would have been in 2003?

A.           I'd say probably six foot.  But --

Q.           Okay.  So maybe you were a little taller?

A.           Yes.

Q.           Okay.  And it has your weight at 160. Does that sound about right for 2003?

A.           Yes.

Q.           Okay.  And then quickly scrolling down, do you see where it has Offense Data?

A.           Yes.

Q.           And we looked at those documents last time.  Do you see where it says "participating in a criminal gang" and "robbery"?

A.           Yes.

Q.           Okay.  So these documents then are for that 2002 to 2007 incarceration that you testified to?

A.           Yes.  Yep.

Q.           Okay.  And do you know if for the entirety of that time you were incarcerated, did you have to go under the name Riccardo Diggs?  Did they ever fix it at any point?

A.           Back and forth.  I mean, they did, but

it -- like I said, it's like a -- a -- you know, a major error, for real. Because like I said, you know, little small things like that has made a big difference, you know, because I can't tell them I'm Richard if it says Riccardo on the -- my ID. But --

Q.        Uh-huh.

A.            -- eventually, I -- yeah, they got it together. But it's -- it's -- it got to be fixed, like, downtown, you know, because it's coming from in the computer system. So I don't know who could have taken out or -- I don't know.

Q.        Uh-huh. And do you recall filling out any parole paperwork where you had to use your brother's name but you signed as your name?

A.        No. Huh-uh.

Q.        No. Okay. Okay.

          I'm going to quickly scroll down to page five, sir, which is Bates stamped City 16436. Is this a photograph of your brother, sir?

A.        Yes.

Q.        Okay. And this one also has the name "Ricardo Diggs"?

A.        Yes.

110

Q.         But it's got his birthday of August 5th, 1976?

A.         Yes.

Q.         Okay.  And do you see where it says it's got his height at 5-9?

A.         Yeah.  Yeah.  He's shorter than me.

Q.         Okay.  And does 5-9 -- you testified the previous day that you -- that he was shorter than you.  Does 5-9 sound about accurate?

A.         Yeah.

Q.         Okay.  And does 170 pounds sound about accurate?

A.         No.  He wasn't that big.  He was probably about, like, 150.

Q.         Okay.

A.         Because he's shorter than me.

Q.         Okay.  So he would have been around that height, but weighed slightly less?

A.         Yeah.

Q.         Okay.  Okay.  So I'm going to stop sharing this document.  And I'm just going to really quickly show you what we'll mark as Exhibit 10, which is Bates stamped City 16399. And this one is only a single page, but I'm going

111

to try to make it so you can see the whole page on one.  Are you able to read that, sir?

- - - - -

Thereupon, Exhibit 10 is marked for purposes of identification.

- - - - -

A.        Yes.

Q.        Okay.  And do you see where it's got the name "Ricardo Diggs"?

A.        Yes.

Q.        For the --

A.        I didn't write that.  Somebody else had to write that.

Q.        Oh, okay.  This doesn't look like your handwriting right here?

A.        No.

Q.        Okay.  Does this look like your signature down here at the bottom?

A.        Yeah, that's cursive.  I signed, yeah, in cursive.

Q.        Okay.  So in 2006, somebody at the facility at least was still referring to you as Riccardo Diggs?

A.        Yeah.

112

Q.        Okay.  So I'll stop sharing that and,
sir, you testified that you, your brother and
Richard Horton all went to Everett Middle School?

A.        I don't know if he went to Everett.  I
know me and my brother did.  We went to --

Q.        Okay.

A.        Me -- me, my brother and him, we went
to Centennial together.  Centennial --

Q.        Okay.

A.        -- high school.

Q.        And to the best of your knowledge, were
Riccardo and Richard Horton in the same grade?

A.        He could have been.  One got flunked
because he's, like, a -- Richard, he's older.
He's, like, a year older than me.

Q.        Okay.  And were you and your brother in
the same grade or was your brother a grade above
you?

A.        No.  My brother was a grade above me.
He was older than me.

Q.        Okay.  So it could be the case that
since your brother was a year older and Mr. Horton
was a year older, they may have been in the same
grade?

113

A.          Possibly.  Possible.  Because I wasn't in class with Richard.  We always just, like, rode the bus.  So he might have been -- yeah, I don't know.

Q.          Okay.  And do you know if your brother and Mr. Horton were both on the Centennial basketball team?

A.          I'm not going to say definitely, because I know they both -- they liked basketball.  We used to play in the -- at the rec center at the Boys Club.  But I'm not going to stamp that.

Q.          Okay.

A.          Yeah.

Q.          And I apologize.  Some of these names you were asked about last time.  I just want to make sure I've got your testimony clear.

Do you remember anyone named Tracy McClanahan?

A.          No.

Q.          Okay.  And do you know whether Ms. McClanahan has given a deposition in this case?

A.          I -- I don't know.

Q.          And if Ms. McClanahan has testified

114

that she sometimes got you and your brother confused, would that surprise you?

MR. EPSTEIN:  Objection.  You can go ahead and answer.

A.        Sometimes -- every now and then, but it's -- I mean, we don't -- some people, like, that don't hardly know us, they're like Richard -- you know what I'm saying?  But, yeah, people that know us, they -- they know he's -- he's shorter, I'm tall.  He's a year older than me, he -- like, uh-huh.

Q.        And do you remember anyone by the name of Quianna Harris?

A.        No.  Quianna Harris?

Q.        And if Ms. Harris testified that she sometimes got you and your brother confused, same as Ms. McClanahan, would that surprise you?

MR. EPSTEIN:  Objection.

A.        Not really.  Because like I said, like people that don't know us, they would be like, oh, well, you know, because we brothers.  Like Richard and Riccardo or whatever, you know what I'm saying?  You know, but, like, people that don't know us, like, they're oh, which one?  Whatever.

115

Oh, Richard, I thought he was -- you know what I'm saying? They get us -- it's pretty simple --

Q. Yeah.

A. -- you know, the brothers to mix up. But the people that know us, they wouldn't.

Q. Okay. And do you remember anyone by the name of Kim Curry?

A. No.

Q. Do you remember anyone by the name of Rowland Hunter?

A. I don't know by -- I don't know.

Q. Okay. And so would it be fair to say that -- or sorry. Strike that, please.

Did you ever learn at any point that -- and I'm sorry I have to ask this, sir. Did you ever learn at any point that your brother may have committed a crime and given Mr. Hunter's name to police?

A. Are you saying, like, is that possible?

Q. Uh-huh.

MR. EPSTEIN: Objection.

A. I don't know. Because I don't know, like, what -- because, I mean, I did it, you know what I'm saying? Like, I did it before, like,

116

with, you know with the whole Richard and Riccardo thing.  So I don't know.  You know, like when I was a teenager, you know, that's what -- trying the little goofy things, you know.  I found out the hard way that was, like, not the right thing to do.  But it's still -- 30 years later, it still hasn't, you know, changed basically, you know?  Because I thought, like, that's something they could, like, clear up pretty -- pretty easy, but obviously not.  Because we still talking about it this day about the, you know, the Richard and Riccardo thing.

Q.          I see.

A.          Yeah.

Q.          Okay.  Just a few more lines of questions for you, sir.

So you've testified that you were in fact incarcerated on October 9th, 2004; is that correct?

A.          Yes.

Q.          And you were not permitted to leave at any point between your -- strike that, please.

You were not permitted to leave at any point during your incarceration?

117

A.          No.

Q.          Okay.  So you were not able to commit the Loew Street robbery?

A.          Well, I had to -- I was locked up from '02 to '07.  They don't let you go out and come back to do the time.  You've got to do the whole time.

Q.          Okay.  And, sir, do you have any knowledge as you sit here today of what you were doing on October 9th, 2004?

A.          Yes.  I was in Chillicothe Correctional facility watching TV.

Q.          Is that -- is that what your pattern would have been in 2004 when you were incarcerated at Chillicothe?

A.          Yes.  Well, you had to work in the kitchen also.  They make you work.  You've got to, like -- you have to work in there or go to the -- to the hole.  So, yeah, I was working in the kitchen or stuff like that.

Q.          Okay.  And then slightly different but similar question, sir.  As you sit here today, do you have any specific memory of that day or is that just what your routine was at the time, so

that's what you would have been doing that day?

A.      That's -- that's what I'm kind of like -- it's my job, so that's what I'm kind of like forced to do or --

Q.      Uh-huh.

A.      -- you get disciplined.  So I got kind of -- it was like a habit.  So it's, like, pretty much, you know, it's -- you do the same thing, it's like routine.

Q.      Okay.  And, sir, did police ever speak with you about the Loew Street robbery while you were incarcerated?

A.      No.

Q.      And, sir, as you sit here today, do you have any knowledge as to where exactly your brother Riccardo Diggs was on October 9th, 2004?

A.      No.

Q.      Okay.  And did you ever ask your brother where he was on October 9th, 2004?

A.      Actually, I think he -- he might have been in Dayton.  That's when he might have been in Dayton then.  He might have been.  It's possible.  Because, like, remember I told you, like, he sent me food boxes and stuff from -- that was, like,

119

all from Dayton, Kettering.

Q.          Okay.  Do you know for a fact whether he was there on October 9th, 2004 or had he just been sending you boxes from there around that time?

A.          I'm pretty sure -- I'm pretty sure I think -- I'm just guessing.  I'm pretty sure he was -- he was there, you know, because that -- he had to get established with his baby's mom and all that.  So I would say, yeah, he was in Dayton then at that time.

Q.          And just to make sure I'm understanding.  That would be your guess based on where his life was at at the time?

A.          Yes.  Because he had to -- that's where he got established at.  That's where Natasha Bowles, all that, that's where they are at. They're not from Columbus.  They're in Kettering. They're -- that's only way he would know them is going down to Dayton.  They're not from Columbus.

Q.          Okay.  And I believe you testified during the previous day, sir, that in 2002 when you were first incarcerated, your brother lived in Columbus.  But by the time you were released in

120

2007, he was permanently in Dayton?

A.        Yes.

Q.        Okay.  And I want to make sure I'm getting your testimony right.  You don't know exactly during that time frame when that happened, but it did happen at some point in that time frame?

A.        Yes.  Because that's how I know exactly where it's at because when he would send me money orders and -- and food boxes, it had a name on it, it's Ketterington, Ohio.  I never heard of Ketterington, Ohio until then.  You know, because it show where it -- what city it comes from, is Kettering.  When they would send me money orders as Kettering, Kettering, Ohio.

Q.        Okay.

A.        Which is in Dayton.

Q.        Today is the first time I'm hearing of Ketterington, so --

A.        Yeah.

Q.        Okay.  And so as you sit here today, sir, you have no knowledge as to who was involved in the Loew Street robbery; is that correct?

A.        Correct.  I never -- I never heard

121

about it until they had me coming down here. I didn't -- Loew -- I don't even know where Loew Street -- I don't even know -- yeah.

Q.          Okay.

A.          I don't know until they got the name thing somehow messed up and then it's easily proven that I was in -- I was in jail. I didn't want to be there, but now I'm kind of glad I was there. Because if I wasn't -- if I wasn't in prison, literally in prison, I probably would be maybe getting in trouble for something I didn't do again.

I literally was in prison and I'm still being questioned for it, even though it said that I literally was in prison. If anybody did their homework, I was in prison. So if you didn't do your homework, you wouldn't know that. But if you had done research, you would know that I was in prison. So how would I -- my name even be come up or involved.

If you done the research, you would see, like, oh, Richard Diggs. You said Richard Diggs did it? Okay. Well, we done our research. Richard Diggs is locked up, so that can't be true.

122

You know what I'm saying?  When they first did the investigation with whoever was saying whatever, they didn't do their research.  It's just flat out to make it simple.  If they done their research, Richard Diggs is locked up for another robbery, participating in criminal gang activity in the robbery.  Not that one.  I didn't even do the one that they said I did for real, but I was already locked up.  And if they would have checked, they would have knew.  So obviously they didn't check or they'd have interviewed me or talked to me in -- you said 2004?  They didn't talk to me then.  I would have had to go down to wherever.  I would -- you know what I'm saying?  I would have talked to them to make it simple.

Q.          Uh-huh.

A.          Then I wouldn't even have had to come down here or nothing because I wouldn't be involved.

Q.          Do you know, sir, if police ever spoke with your brother about the Loew Street robbery?

A.          I don't think so.  Because he never -- if -- if they did, he -- he would have mentioned it to me.  You know what I'm saying?  He would

123

have mentioned it to me, like, you know, like, when he -- he was sending me, writing me.  And when he was sending me food boxes, he never said nothing about none of that.  You know what I'm saying?  All he tried to do was, like, get girls for me and stuff to write me and keep my mind -- you know what I'm saying? -- straight.  And that's all -- that's all in Kettering, it's all when he was sending me, you know --

Q.        Uh-huh.

A.        -- to keep me cool.

Q.        Uh-huh.  Okay.  Just a few more quick questions for you, sir, and then I'm done with my questioning.

And, sir, at any point -- and again I apologize for having to ask this question.  At any point, did your brother Riccardo Diggs tell you about him being arrested and charged for a robbery that resulted in the -- in an injury to a man named Raymond Sinclair a year after the Loew Street robbery?

A.        I don't know.  Because -- I mean, I don't know.  He ain't mentioned it to me.  I don't know.  What -- what year was it again?

124

Q.        2005.

A.        Once again, yeah, I -- no.  Because he was in Dayton and he was sending me stuff from Kettering from Dayton.

Q.        Is that the type of information -- sorry.  Strike that, please.

If that was something your brother had involved -- been involved in, do you think that that is something he would have shared with you or would he have tried to protect you?

A.        Yeah, he would have told me.  He would have told me.

Q.        Uh-huh.

A.        He would have told me, like, bro, man, so X, Y, Z happened.  You feel me?  And they trying to do whatever, whatever.  You know what I'm saying?  He'd have, like, man, I messed up.  I -- I used -- or whatever, he'd -- yeah, want me. But it wasn't even -- he never talked or -- about that or nothing.  He was all the way in Kettering in Dayton.

Q.        And, sir, do you know if -- or strike that, please.

As you sit here today, do you know

125

whether he was convicted of that aggravated

robbery or if he served any prison time for it?

A.        You said do I know?

Q.        Uh-huh.

A.        No.  He hadn't -- he hadn't served no

prison time after -- while I was in there, he was

on the street.  That's how he was able to do stuff

for me.

Q.        Okay.

A.        Yeah.  Because when I was locked up,

when I was doing my -- my -- from '02 to '07, you

know, he was, like -- you know, because time was

hard, so he was having his girl send me food boxes

and stuff and -- and, yeah, he was all the way

established down there in Kettering.

Q.        Okay.  And, sorry, I apologize.  You

may have been asked about these people already,

too.  I just want to make sure I'm understanding.

As you sit here today, do you have any

idea who Richard McClanahan is?

A.        No.

Q.        Okay.  Do you know who Rhonda Curry is?

A.        No.

Q.        Do you know who Kyle Ramsay is?

126

A.          I heard of Kyle's name before.  I don't know him.

Q.          Okay.  And did you ever learn about any potential grudges Mr. Ramsey may have against Mr. McClanahan?

A.          No.  I don't know them personally.  I just heard the name before.  I don't -- I don't know.

Q.          Okay.  And you were asked a series of questions, sir, by counsel during the previous deposition about the bus that you went on with Mr. Horton and where you would see him get off the bus during high school.  Do you remember those questions?

A.          Yes.

Q.          Okay.  And you testified that he would sometimes get off at a street that could have been Reynolds, but you're not sure what the name of that street is; is that correct?

A.          Yeah.  I don't know because we stayed on Fourth.  I guess it's the next street after Fourth.  I don't know exactly the name of it.

Q.          Okay.  And, sir, as you sit here today, do you know for a fact where Mr. Horton lived

127

during high school?

A.          I think so.

Q.          But would it be a guess or had you been to his house and knew for a fact that he lived there?

A.          No.  I never been inside his house or nothing like that.

Q.          Okay.

A.          I just -- just where you see him walking.  So I don't know exactly.  I haven't been to inside his house.  We wasn't cool like that.

Q.          Okay.  And do you know for a fact where Mr. Horton lived in 2004?

A.          I was locked up.  I was in Chillicothe Correctional Facility in '04.

Q.          Fair.  Super fair.  Yeah.  I apologize. I should have gone with 2002.

Sir, do you know for a fact where Mr. Horton lived in 2002 before you were incarcerated?

A.          No, ma'am.

Q.          Okay.

A.          Because -- because then, like, I was -- like, I wasn't even, like, over there.  I was,

128

like, that's when I started being in like the Short North. That's -- I should have never went out there, but that's how I end up, you know, getting caught up in the wrong -- being around the wrong people at the wrong time. And, yeah, it's the wrong crowd. It was a long, bad experience I want to forget that part of my life, but it happened.

Q. Yeah. Do you know -- strike that, please.

Do you know, sir, if back in the early 2000s if there were any gangs in Columbus, including in the Short North that were committing home robberies?

A. Do you mean, like, a group -- no. No. A lot of them they was just -- I don't know. I tried to stay away from them kind of people for real. Like -- like, kind of scaring me for real, like, kind of unpredictable. Because one minute they shake your hand, and then they'll stab you in the back, so.

Q. Uh-huh.

A. Them kind of people, like, is short and sweet. I don't like being around people like

129

that.

Q. Would it be fair to say then that that could have been happening and that you weren't involved in those circles?

A. Oh, no. No. Huh-uh.

Q. Okay.

A. I'm too -- I'm too paranoid for stuff like that.

Q. Okay. And now, sir, you testified during the previous day of your deposition that Mr. Horton was a jokestery guy?

A. Yeah. Yeah. He's funny.

Q. And I want -- and I want to ask you, sir, have you ever in any of your interactions with Mr. Horton seen him be violent?

A. No. He was always joking. Like, even the girls, the girls would be, like, joking -- joking around with him. Like, pushing him around and stuff, like, you know what I'm saying? In like -- in a playful manner. You know what I'm saying? Like he is, like, very -- a lot of people they all -- they all loved him, all the people I know. It wasn't nobody like that I know was, like, hating on him or, like, oh, man, I don't

130

like him or -- well, I take that back. I don't know if he might have messed with somebody's girlfriend or something like that, so -- because that would make people hate you right there. Like if you mess with their girl or be involved with the same girl, that could have, like, bad consequences. They make up rumors about you and all kind of stuff when you -- when you do that, so.

Q.          And from what you know of Mr. Horton, do you think he is the type of person that would commit an aggravated robbery and shoot someone?

MR. EPSTEIN:  Objection.

A.          No.  He would be too scared to do that. He's scared to go to jail.  He wasn't never no -- no -- some guys -- you know how some guys, like, when you're young, like, they be going out of DH? I never even known him to go to juvenile, you know, detention center or none of that.  He was like -- he was scared and stuff like that.  You feel me?

Like I said, he wasn't -- all I know him to do is, like, try to work.  I never known him to try to -- no hustling or -- he would

131

probably try to live off a girl, have a girl, like, buying some shoes or something like that. But as far as, like, he would be scared to rob somebody or anything like that. He wouldn't -- I never even known him to have no gun. Because he didn't need to carry a gun. He wasn't, like, a type of person to, oh, I've got to carry a gun with me where I go. He don't -- he -- I never seen him with one. Never. Because didn't nobody want to do nothing to him because he was, like, a prankster, joke around, laugh. Hey, come over here, make my girl laugh. Like, people -- you could trust him with your girlfriend while you're right there to entertain her. Because you might not be able to know how to crack jokes or make her laugh. You will use him, hey, come over here, you know, make her laugh. So guys usually don't like other guys around their girl. But with him, he's a jokester, so you had the girls laughing and mission accomplished, you know.

Q.          And very quickly, just for the record, you said DH?

A.          Yeah. Juvenile, that's, like, where you go when you -- you know, when you juvenile

132

when you locked up. I never known him to even go there for nothing. You know, juvenile, some kids be unruly and stuff, you have to go there for a couple days. I never known him to even go there. When you don't listen to your parents and stuff. And he was -- he was a jokester -- well, not -- is, because he's still alive. Yeah. He's -- yeah, it's funny.

Q.        Just a few more quick questions for you, sir.

As you sit here today, do you have any knowledge as to how Richard McClanahan knew your name to give it to police?

A.        My name? How would he know my name?

Q.        That's -- that's my question. Do you have any idea as to how he would know your name?

A.        I don't even believe that. I don't even believe he gave them my name because I don't know him.

Q.        Do you remember from the previous day of the deposition when you were shown a set of police notes that had your name at the bottom?

A.        Yeah.

Q.        And -- and counsel represented to you

133

that those were the interview notes of

Mr. McClanahan?

A.          Uh-huh.

Q.          So at that part, I'm asking do you have
any knowledge, belief, anything of the sort as to
how your name was on those notes or -- sorry,
strike that, please, as to why your name was right
there?

MR. EPSTEIN:  Objection.

A.          Well, it would be virtually -- it would
be impossible.  So I don't even know -- it's
impossible for him to even give him my name,
that's impossible.  For one, he wouldn't have gave
him my name because I'm already locked up.  I'm
already locked up.  He couldn't have, it's
impossible.  That's why I wasn't even worried
about coming down here or nothing like that,
worried about no robbery.  Like, I was locked up.
Y'all got to figure out I guess who did it because
I was locked up.  You know, I -- blame it on him,
like, Rich.  I was locked up.  That's why I was
like that's one time I'm glad I was locked up.
Because from now how it's looking, it's not
looking good, you know.  That's why I'm glad I

134

wasn't even there.  I was locked up, stamped,

signed, sealed and delivered.  So I don't get

caught up in nothing that I didn't do again.

Again.

Q.          And I'm going to ask you about that in

a moment, sir.

            But a quick question about the

Milo-Grogan area.  Were you extremely popular

there for any reason, to the extent that people

you don't know would know your name?

            MR. EPSTEIN:  Objection.

A.          Yeah.  To be honest with you, yep,

that's the only way I know how to be is honest.

Me, my brother and my sister, we was all known

individually, you know, for, like, having nice

stuff because my dad, he used to get us nice

clothes and shoes.  And then, like, a lot of times

like if you had, like, nice clothes and stuff like

that when you go to school, that right there, that

make you popular because that's the whole reason

they went to uniform.  Because all the kids they

can't dress fly, so they dress bummy, like that's

how Richard dressed.  You know what I'm saying?

He was bummy.  He was -- you know what I'm saying?

135

Like I said before.  You know, but we dressed fly. You know what I'm saying?  That's how we got known, like, oh, they've got the Jordans, this and that.  That's where the love and the hate came from, you know.  Because --

Q.         Uh-huh.

A.         -- it just all -- it's all part of the game.  But, yeah, my -- you know what I'm saying? My mom and dad, they made sure we -- we, you know, dress right.  Because if y'all dress bummy, the kids be like, you know, cracking jokes on you and stuff.  So that's how we was known, known for dressing.  And my brother -- like I stated previously, my brother, a lot of girls liked him and stuff and, you know, he could, like, live off girls and stuff like that.  You know, so he was, like, popular with people on his own.  Me, we was all popular on our own.  So, yeah, we was known.

Q.         And, sir, a quick follow-up question to those police reports that you were shown during the previous day of deposition.  As you sit here today, you have no information about how those reports were -- strike that, please.  How those notes were created, when they were made, anything

136

like that?

A.        No.  Because it -- it ain't -- it's really not supposed to have nothing to do with me because, you know, by me being locked up and stuff, nobody came down there, you know, when I was locked up to see me and ask me.  You know what I'm saying?  I could have just scratched my name off or whatever, whatever I would have had to do.  You know what I'm saying?  Y'all could have got information from me, good or bad, you know?  I would have gave it to them, you know.  But nobody came to ask me was I there or do I know Richard Horton, do I know Riccardo -- anybody, you know, nobody they -- they didn't come and ask me none of that.  Just now it's 2025.

Q.        Uh-huh.

A.        I don't know when it happened.  But now, you know, getting interrogated -- is this an interrogation?  Getting a deposition, now I'm giving a deposition about it.  I don't even know what year it happened in.

Q.        Okay.

A.        You know, you said '04?  '04?  So that's --

137

Q.          Yes, sir.  It's October of 2004.

A.          21 -- 21 years later.  You know what I
mean?  Like I'm -- you know?  Like 21 years.
Like, if they'd have came back then when it
happened in '04 -- you know what I'm saying? -- I
would have been -- I'm already locked up.  You
know, I'd have been, like, what, do y'all know
anything?  You know what I'm saying?  Y'all going
to help get me out?  You feel me?

            Like, I'm in prison, you know.  Like,
the only thing -- if they'd have came and asked
me, you know what I'm saying, like, y'all -- like
we're doing now, you know, y'all going to help me
get out?  I'm doing five years, that's the first
thing I'd have asked them.  You know what I mean?
But they didn't come ask me nothing or none of
that, you know.

Q.          And then my last line of questioning
for you, sir, is that in 2023, you were arrested
and charged for a string of robberies; is that
correct?

A.          Yes.

Q.          Okay.  And they accused your daughter
of participating with those robberies?

138

A.        Yes.

Q.        Do you need a moment, sir?  I'm very sorry to ask you these questions.  And we can take a break at any point, too, sir, okay?

MS. MARTINEZ:  Can we go off the record for a moment.

THE VIDEOGRAPHER:  We are off the record.  The time is 9:52.

(A short recess is taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 9:54.

BY MS. MARTINEZ:

Q.        Sir, before the break, we were talking about robbery charges that were brought against you in 2023.  Did you commit those robberies, sir?

A.        No.

Q.        Okay.  And what was the outcome of the charges?

A.        I had to go to trial.  I stayed in jail for, like, a year and a half, like 15 months, fighting my case.  I -- I had to -- they wanted me to -- my lawyer, she said she don't care if I did it or not, just go ahead and take, like, five or 10 years.  I'm like I ain't doing it.  And I'm

139

like I'm just going to put it in the power of God's hands.  So my inmate friend, he wrote the ninth -- ninth district circuit court, he said get rid of her.

By the grace of God, I got rid of her and I got a different lawyer.  God blessed me with another lawyer, Stacy Sydow.  Stacy Sydow.  I got blessed by the grace of God with her, yeah.  And we went to trial, it all came out not guilty.  Not guilty.

They charged me with nine robberies and -- because it was three people, three for each one, and then a gun specification on each one. Then the lawyer I had, she end up being a -- she end up turning into a prosecutor, like, after she was my lawyer.  And the one that was, like, well, we're going to give you five to 10ish.  I'm like, nah, I ain't going for that.  I ain't do it.

I put my faith in God.  He blessed me with Stacy Sydow, a good lawyer, good lawyer firm, good law firm.  It's down here somewhere.  Stacy Sydow.  And she fought for my life.  That's why I'll never forget her name.  She fought for my life.  She's -- she saved my life, you know.

140

And it was, like, triggering, you know what I'm saying? Because I went through the same thing, but it just went away, so it ain't a big deal I guess. But it's a big deal to me. Because you know, all that -- the time, you know what I'm saying -- I did, I ain't -- I ain't do it. You feel me?

I had to go through -- I had to go to trial and 12 jurors, they said not guilty, you know. And that was all God's work. You know what I'm saying? Because the lawyer, my lawyer she wanted me to go ahead and plead guilty. I'm like why would I do that for something I ain't do?

I told her -- do you know what? I told her, do you know what, I'm going to put my life in God's hands. I told her we're going to take it to trial. I told her we're going to take it all the way to -- we're going to take it to trial.

And she is, like, no, just go ahead and plead to five or 10ish. I'm like no. You're crazy. And then I -- he went to the -- all the steps. He went to ninth circuit district court, filed a complaint on her, they fired her. Then they blessed me with Stacy Sydow. Do you feel me?

141

That's the one that saved my life. And that's how it went.

I had to fire -- they said fire her. Went to the ninth district court, filed a complaint on her. All these is facts, you can all -- it's all documented. Just like it was documented that I was locked up, but people ain't want to go check. You can go check what I'm saying. Y'all do the research and, like, oh, yeah, you know. It's all research homework.

Q.    Uh-huh.

A.    Do your homework.

Q.    And, sir, I didn't mean to cut you off, sir.

A.    If you don't do your homework, you ain't going to get the tests right. Homework. That's why your teachers always made you do your homework so you could prepare for the test. How are you going to pass the test if you ain't doing your homework? That's all. I was, like, just triggered by the whole thing for real. You know --

Q.    Yeah.

A.    -- because I went through it myself.

142

You know what I'm saying?  And I usually don't cry in front of people for real.  You know what I mean?  But, you know, it happened, so I'm still a man.  You know, it's all good.

Q.        Okay.  And, sir, just a few follow-up questions about those charges.  Were you ever interviewed by detectives about the charges?

          MR. EPSTEIN:  Objection.

A.        I don't know.  I don't know.  Y'all have to ask my -- my lawyer, Stacy, Stacy Sydow.  Because Stacy Sydow was my lawyer at the time.  You know, her -- her and her dad, she -- they got a family, they got a law firm.  They got a law firm down here.

Q.        For the record is that Sydow -- is that S-Y-D-O-W?

A.        Yeah.  S-Y-D-O-W, the whole family is in the -- are lawyers.  As a matter of fact, I think their building is right down here somewhere.

Q.        And during the course of your trial, sir, were there ever any allegations of misconduct by robbery detectives for the Columbus Division of Police?

A.        Misconduct as far as, like, what?

143

Q.        Either interviewing witnesses or --

A.        Oh.

Q.        -- evidence?

A.        Oh, yeah.  Yeah.  My lawyer told me that all three witnesses met up at a house.  She said you ain't allowed to do that.  I'm not a lawyer.  She told me that you're not allowed to do that.  She said with all the witnesses coming together, their statement can be tainted because they interacted with each other.  She said when you interviewing somebody for rob, you've got to interview them individually, one by one.  And she said you can't -- they can't group huddle up and all that, and she said you can't do that.  That's illegal.

Q.        So the detectives interviewed the witnesses together?

A.        Yeah.

Q.        Okay.

A.        That's what she said.  I don't know.  That's what she said it was all -- all documented, Stacy Sydow.

Q.        Okay.

A.        I don't have, like, all the -- the

144

information.  She do.  She was my lawyer.

Q.          And as you sit here today, sir, do you know the names of any of the detectives who were involved in the investigation into those robberies?

A.          Nope.

Q.          Okay.

A.          I let her handle everything.  I just put it in God's hands and I let her -- she -- she did a phenomenal job by the grace of God.  You know, he blessed me with her.  Like I told you, I had to fire my one lawyer because she tried to get me to plead guilty to something I ain't do.  And then they turned her into a prosecutor.  Because I seen her, like, she was a -- a -- she was a public defender, now she's a -- a prosecutor or something like that.  I don't know.

Q.          Okay.

A.          But once -- Stacy Sydow, once again that was my lawyer.  She got all the information that y'all could want.  I'm not retarded.  I know this is recorded.  I know you have to tell the truth.  I know that.  Why do you think I'm telling the truth?

145

Q.        It's okay.

My final question for you, sir, as you sit here today, do you know of any other -- actually, strike that, please.

As you sit here today, sir, do you know of any other men in your neighborhood or people that you're friends with who have been wrongly accused of committing robberies in the Columbus area?

A.        I don't know of -- I don't know.  I don't know of any.  I'm talking about me, myself, that's enough.  You know what I'm saying?  Me, my personal experience.  I ain't worried about what nobody else been through.  You know what I'm saying?  Like I went through it myself.  You know what I mean?  That's what I'm giving y'all the names, the receipts, facts.  My lawyer got all the receipts.

MS. MARTINEZ:  Okay.  Those are all of the questions that I have for you, sir.  Thank you so much for your time.  I'm going to turn it over to the attorneys there in the room with you.

THE WITNESS:  All right.

- - - - -

146

FURTHER CROSS-EXAMINATION

BY MR. EPSTEIN:

Q.          Mr. Diggs, I just have a couple of quick topics to cover with you when you are ready.

A.          I'm ready.

Q.          Okay.  Ms. Martinez asked you some questions about Richard Horton, and you were describing what he was like.

A.          Yeah.

Q.          Do you remember that testimony?

A.          Yeah.

Q.          Was that testimony all based upon your encounters with him in high school?

A.          Yeah.

Q.          You didn't have any contact with him after you left high school, correct?

A.          No.

Q.          No, you did not?

A.          No, I didn't.

Q.          And so if he had changed over the intervening years, you wouldn't know that, correct?

A.          Correct.

Q.          And you would agree with me that it's

147

possible for people to change?

A.          Yeah, it's possible.  But y'all just said you wanted me to go on what I -- what I know.

Q.          Absolutely.

A.          So I ain't going to say, like, something.

Q.          I'm not asking you whether he did.

A.          Right.

Q.          Because you're telling me you don't know one way or another.

A.          I'm just going by what I personally seen, what I know firsthand --

Q.          Sure.

A.          -- about the comedian, about him not being something -- you know, doing different things and stuff.

Q.          Yeah.

            Did you know that Richard Horton served time in prison in West Virginia for distributing drugs?

A.          What?  No.

Q.          You didn't know that?

A.          No.

Q.          And that surprises you, correct?

148

A.        Yeah.

Q.        Yeah.

A.        Because he was always -- you remember I told you, he was kind of like -- kind of like bummy and stuff, like, in high school. But, you know, like you said, I don't -- I don't know. You know what I mean? You said he's got convicted of selling drugs or whatever. But I -- I wouldn't know that from, you know, high school, he wasn't doing that then.

Q.        Right.

          And to your knowledge, he wasn't using drugs in high school, correct?

A.        No. Huh-uh.

Q.        But if he admitted in his deposition that later on he was using drugs, would that surprise you?

          MS. MARTINEZ:  Object to the form.

Q.        You --

A.        Would it surprise me?

Q.        Yeah.

A.        Like, it all depends what kind of drugs you're talking about. Like if weed, if -- I wouldn't be surprised if he smoked weed.

149

Q.          What if it was something like more than weed?

A.          I would like his -- yeah, I would be surprised.  I would be very surprised.

Q.          You talked a lot about money orders and packages of food that your brother sent you during the time you were incarcerated.

A.          Yeah.

Q.          And you indicated that you remembered those packages coming from Kettering, Ohio?

A.          Yeah.

Q.          Did you ever receive a money order or a food package from your brother shipped from Columbus?

A.          No.

Q.          Ms. Martinez showed you a document that had your brother's name on it and a height of -- excuse me, and a height of 5-9.  Do you remember that?

A.          Yeah.

Q.          And you I think testified that it was possible that that was his height.  Do you remember that?

A.          Yeah.

150

Q.        Do you remember that the last time you were here, you estimated that his height was 5-7? Do you remember saying that?

A.        Roughly.  I -- I don't know exactly.  I don't -- two inches off, I don't know.

MS. MARTINEZ:  I'm -- I'm so sorry, the street -- the zoom froze.  Madam court reporter, can you just read back the previous question?  I missed that whole part.  I apologize.

(The record is read as requested.)

MS. MARTINEZ:  Okay.  Thank you.

BY MR. EPSTEIN:

Q.        Mr. Diggs, do you know precisely how tall your brother was?

A.        Shorter than me.

Q.        How much shorter?  If you're going to stand up, be careful you don't yank the microphone.

A.        Yeah.

Q.        But keep it on so we can hear you.

So he came to your shoulder, correct?

A.        Yeah.

Q.        And that's when you were adults?

A.        Yeah.

151

Q.         Okay.  And I just want to be clear.
You talked about how people might mix up you and
your brother?

A.         Uh-huh.  Yes.  Sorry.

Q.         Did that happen when you were adults to
your knowledge, other -- other than the issue of
the court records?  But in terms of people who
knew you or knew who you were, are you aware of
any time as adults where people confused you?

A.         Every once in a while.

MS. MARTINEZ:  Objection.

A.         The people that don't know us.

Q.         Can you give me an example of that?

A.         Like, if somebody be like, like, Rick,
I thought that -- people that don't know us, they
would get us mixed up because they don't know
which one from the other.  That's why the people
that know us, they wouldn't get us confused like I
was saying earlier.

Q.         But how do you know that, that the
people who didn't know you well got you confused?

A.         I mean, because our names is -- you
know what I'm saying? -- similar.  But I'm -- I'm
tall.  You know what I'm saying?  He's -- he's

152

shorter.

Q.        Right.  But I'm asking how do you know that people confused you?

A.        Besides the paperwork stuff?

Q.        Correct.

A.        How do I know they con -- how do I know that?

Q.        Yes.  How do you know that?  Did people tell you that?

MS. MARTINEZ:  Objection.

Q.        Did you experience it?  How did you know that?

A.        I -- I told you the ways I experienced it with the -- you know what I'm saying?  With the paperwork, with the documents.

Q.        Correct.

A.        And briefly here and there growing -- you know what I'm saying, growing up.

Q.        Growing up.

A.        Yeah.

Q.        But did --

MS. MARTINEZ:  I'll make a form objection.

MR. EPSTEIN:  I'm sorry?

153

MS. MARTINEZ: I'm sorry. I'm going to put a belated form objection to that question.

BY MR. EPSTEIN:

Q.        Let's set the court records aside.

A.        Okay.

Q.        We understand we're not talking about that, okay?

And we understand that when you were kids, people would confuse you and your brother, correct?

A.        Yeah.

Q.        All right. Did that same thing happen of people confusing the two of you when you were adults?

A.        No.

MS. MARTINEZ: Objection. Asked and answered.

A.        Not far as -- not far as us seeing -- them seeing us like, oh, you Riccardo, no. As far as the paperwork, yes.

Q.        Ms. Martinez asked you some questions about a criminal case that you were involved in in 2003?

A.        Uh-huh.

154

Q.          Did that happen in Columbus?

A.          How would I be able to commit a case in 2003?

MS. MARTINEZ:  2003.

BY MR. EPSTEIN:

Q.          I'm sorry.  Did I mess up the dates again?  She asked --

A.          Because you told me I got to be on point.

Q.          Yeah.  No.  No.  No.  You're --

A.          So I can't make no mistakes.

Q.          You're more on the ball than I am today.

In 2023 there were robbery charges brought against you, correct?

A.          The one -- yes.  The ones I -- that got beat.

Q.          The robbery that you were accused of committing, did that happen in Columbus?

A.          Yeah.

Q.          And it was investigated by Columbus Police Department?

A.          Yes.

Q.          Ms. Martinez asked you about an

individual named Kyle Ramsay.  Do you remember that?

A.      Yeah.

Q.      And it wasn't clear to me, were you saying that you knew Kyle Ramsay or you knew of Kyle Ramsay?

A.      I know of him.  It's -- if it's the one I know of, he's not -- the one I know of, if it's still the same one, he's -- I think he died or something.

Q.      How did you know of Mr. Ramsay?

A.      Well, everybody knew him in the -- in the neighborhood.

Q.      He lived in Milo-Grogan, too?

A.      It's if the same one, yeah.

Q.      Did he have a brother?

A.      I don't think so.

Q.      Was Mr. Ramsay black?

A.      Yeah.

MR. EPSTEIN:  Those are all my questions.  Thank you.

THE WITNESS:  Okay.

- - - - -

FURTHER CROSS-EXAMINATION

156

BY MS. MARTINEZ:

Q.          I have question line of follow-up for you, sir.

Counsel asked you a number of different ways that you have experienced people confusing your brother and yourself.

A.          Yes.

Q.          Do you recall -- or strike that, please.

Any time as an adult, has anyone ever accidentally called Riccardo?

A.          Yes.

Q.          Okay.  Did you ever witness anyone accidentally call your brother Richard?

A.          I don't think so.  It's just -- like I said, the people that don't -- sometimes they can get our names confused, that's all.

Q.          Okay.  And that happened even as you were both adults?

A.          Not -- not -- not so much.  It was mainly, like, when we was kids.  But like I said, as far as paperwork and paper trails and all that, I'm still tied into him.  You know what I'm saying?  Like even, you know, to this day.

157

Q.          And then outside of the paperwork, sir -- and I apologize.  I believe I already asked you this, but is it possible that as adults people were still confusing you and you just don't know about it?

MR. EPSTEIN:  Objection.

A.          I -- I don't know.  That's a, like, tough -- if they they're confusing us and I don't know about it.  It's possible.

Q.          I can rephrase.  Okay.

Would it -- and is it particularly likely if they don't know the two of you very well?

MR. EPSTEIN:  Objection.

A.          Yes.

MS. MARTINEZ:  Okay.  And those are all the questions that I have for you, sir.

THE WITNESS:  Okay.

MR. EPSTEIN:  Thank you, Mr. Diggs.  I think the court reporter is going to ask you some questions and then we're done.

THE WITNESS:  Okay.  Leave this on?

MR. EPSTEIN:  Yes, please.

THE WITNESS:  Okay.

158

THE REPORTER:  I don't have any questions.

THE VIDEOGRAPHER:  This concludes the deposition of Richard D. Diggs.  We are off the record is 10:17.

(Signature waived.)

- - - - -

Thereupon, the foregoing proceedings concluded at 10:17 a.m.

- - - - -

159

State of Ohio     :        C E R T I F I C A T E
County of Franklin: SS

I, Stacy M. Upp, a Notary Public in and for the State of Ohio, certify that Richard D. Diggs, Volume 2 was by me duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was reduced to stenotype in the presence of said witness, afterwards transcribed by me; the foregoing is a true record of the testimony so given; and this deposition was taken at the time and place specified on the title page.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness and/or the parties have waived review of the deposition transcript.

I certify I am not a relative, employee, attorney or counsel of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on August 13, 2025.

_____
Stacy M. Upp, Notary Public - State of Ohio
My commission expires August 6, 2026.

**Exhibits**

314859 Exhibit 007 95:6 98:13,18,23
314859 Exhibit 008 95:7 99:13,17
314859 Exhibit 009 95:8 105:5,12
314859 Exhibit 010 - CONFIDENTIAL 95:9 110:23 111:4

**0**

02 117:5 125:11
04 127:15 136:23 137:5
07 117:5 125:11

**1**

10 110:23 111:4 138:24
10:17 158:5,9
10ish 139:17 140:20
12 140:9
15 138:20
150 110:14
1586 99:14
1594 98:19
160 108:6
16399 110:23
16432 105:6,22
16436 109:19
16451 105:6,22
16th 98:1,6
170 110:11
17th 96:3
18 103:17
1976 99:7 110:2
1977 98:2,6
1997 98:1

**2**

2 96:2 97:2
2000s 128:12
2002 108:17 119:22 127:17,19
2003 108:1,7 153:23 154:3,4
2004 98:8 99:9 116:18 117:10,14 118:16,19 119:3 122:12 127:13 137:1
2005 124:1
2006 111:21
2007 108:17 120:1
2023 137:19 138:15 154:14
2025 96:3 136:15
21 137:2,3
27 98:9
28 99:10
2:23-cv-3888 96:8

**3**

30 116:6

**5**

5-11 107:24
5-7 150:2
5-9 110:5,7,9 149:18
5th 99:7 110:2

**7**

7 98:13,18,23
77 96:3

**8**

8 99:13,17

**9**

9 105:5,12
9:03 96:13
9:52 138:8
9:54 138:11
9th 116:18 117:10 118:16,19 119:3

**A**

a.m. 96:13 158:9
Aaron 96:15
Absolutely 147:4
accidentally 156:11,14
accomplished 131:20
accurate 107:24 110:9,12
accused 137:23 145:8 154:18
activity 122:6
admitted 148:15
adult 156:10
adults 100:2,13,23 150:23 151:5,9 153:14 156:19 157:3
advance 97:19
aggravated 125:1 130:12
agree 146:24
ahead 100:6 114:4 138:23 140:12,19
Alana 96:16
alive 132:7
allegations 142:21
allowed 143:6,7
Alyssa 96:20 105:19
announce 96:14
apologize 97:19 104:14 113:14 123:16 125:16 127:16 150:9 157:2
appearing 96:21
area 134:8 145:9
arrested 102:18 123:18 137:19

arrests 102:21
attorneys 145:22
August 99:7 110:1
aware 101:22 102:20 103:7 151:8

**B**

baby's 119:9
back 97:8 104:3 106:6,10,12 107:11 108:24 117:6 128:11,21 130:1 137:4 138:10 150:8
bad 128:6 130:6 136:10
ball 154:12
based 119:13 146:12
basically 116:7
basketball 113:7,9
Bates 98:19 99:13 105:6,21 109:19 110:23
beat 154:17
behalf 96:21
belated 153:2
belief 133:5
big 109:3 110:13 140:3,4
birth 97:24 98:5 99:6 107:17
birthday 110:1
bit 97:20
black 155:18
blame 133:20
blessed 139:6,8,19 140:24 144:11
bottom 111:18 132:22
Bowles 119:17
boxes

118:24 119:4 120:10 123:3 125:13
Boys 113:11
break 138:4,13
Brenda 96:18
briefly 152:17
bro 124:14
brother 99:15 101:17,22 102:3,17,22 103:12 104:16,19 106:16 109:20 112:2,5,7,16,17,19,22 113:5 114:1,16 115:16 118:16,19 119:23 122:21 123:17 124:7 134:14 135:13,14 149:6,13 150:14 151:3 153:9 155:16 156:6,14
brother's 99:3 101:3 107:20 109:15 149:17
brothers 114:21 115:4
brought 138:14 154:15
building 142:19
bummy 134:22,24 135:10 148:5
bus 113:3 126:11,13
buying 131:2

**C**

call 156:14
called 156:11
care 138:22
careful 150:17
carry 131:6,7
case 96:4,7 112:21

113:22
138:21
153:22
154:2

**Castetter**
96:10

**caught** 128:4
134:3

**Centennial**
112:8 113:6

**center**
113:10
130:19

**chance**
105:17
106:20
107:4

**change**
147:1

**changed**
116:7
146:20

**charged**
123:18
137:20
139:11

**charges**
138:14,18
142:6,7
154:14

**check**
122:10
141:8

**checked**
122:9

**children**
99:22

**Chillicothe**
117:11,15
127:14

**circles** 129:4

**circuit** 139:3
140:22

**city** 96:5,17
105:6,22
109:19
110:23
120:13

**class** 113:2

**clear** 103:24
113:16
116:9 151:1
155:4

**clothes**
134:17,18

**Club** 113:11

**Columbus**
96:4,5,17
119:18,20,
24 128:12
142:22
145:8
149:14
154:1,19,21

**comedian**
147:14

**commit**
117:2

130:12
138:15
154:2

**committed**
115:17

**committing**
128:13
145:8
154:19

**complaint**
140:23
141:5

**computer**
109:11

**con** 152:6

**concluded**
158:9

**concludes**
158:3

**confuse**
153:9

**confused**
99:23 100:3,
13,15,23
114:2,16
151:9,18,21
152:3
156:17

**confusing**
153:13
156:5 157:4,
8

**consequence
s** 130:7

**contact**
146:15

**context**
101:23

**convicted**
125:1 148:7

**cool** 123:11
127:11

**correct**
98:21 99:4
101:4
107:15
116:19
120:23,24
126:19
137:21
146:16,22,
23 147:24
148:13
150:21
152:5,16
153:10
154:15

**Correction**
107:13

**Correctional**
117:11
127:15

**counsel**
96:14
126:10
132:24
156:4

**couple** 102:5
132:4 146:3

**court** 96:6,9
98:13 102:5,
6 104:4,10
139:3
140:22
141:4 150:7
151:7 153:4
157:20

**cover** 146:4

**crack** 131:15

**cracking**
135:11

**crazy** 140:21

**created**
135:24

**crime** 115:17

**criminal**
102:21
108:14
122:6
153:22

**CROSS-
EXAMINATIO
N** 97:16
146:1
155:24

**crowd** 128:6

**cry** 142:1

**Curry** 115:7
125:22

**cursive**
111:19,20

**cut** 141:13

___

**D**

**dad** 134:16
135:9
142:12

**Data** 108:10

**date** 97:24
98:5 99:6
107:17

**dates** 154:6

**daughter**
137:23

**David** 96:15

**day** 97:8
110:8
116:11
117:23
118:1
119:22
129:10
132:20
135:21
156:24

**days** 132:4

**Dayton**
118:21,22
119:1,10,20
120:1,17
124:3,4,21

**deal** 140:4

**deeper**
105:1,3

**defendants**
96:17

**defender**
144:16

**delivered**
134:2

**Department**
107:13
154:22

**depends**
148:22

**deposition**
96:2,11
113:21
126:11
129:10
132:21
135:21
136:19,20
148:15
158:4

**describing**
146:8

**Detective**
96:17

**detectives**
142:7,22
143:16
144:3

**detention**
130:19

**Devon** 97:22
102:10

**DH** 130:17
131:22

**died** 155:9

**difference**
109:4

**Diggs** 96:2
97:2,5,22
99:4 102:10
103:9 104:4
106:1
107:21
108:22
109:23
111:9,23
118:16
121:22,23,
24 122:5
123:17
146:3
150:13
157:19
158:4

**direct** 105:9

**Dirisamer**
96:16

**disciplined**
118:6

**discrepancy**
104:7,10

**distributing**
147:19

**district** 96:6,
7 139:3
140:22
141:4

**Division** 96:7
142:22

**document**
103:1 105:7,
18,19 106:5
107:5
110:21
149:16

**documented**
141:6,7
143:21

**documents**
100:16
107:12
108:12,16
152:15

**Douglas**
96:18

**downtown**
100:16
109:10

**dress** 134:22
135:10

**dressed**
134:23
135:1

**dressing**
135:13

**drugs** 147:20
148:8,13,16,
22

**duly** 97:3

___

**E**

**earlier**
151:19

**early** 128:11

**easily** 121:6

**Eastern** 96:7

**easy** 116:9

**encounters**
146:13

**end** 128:3
139:14,15

**entertain**
131:14

**entire** 105:7

**entirety**
107:5
108:21

**Epstein**
96:15 97:5,
7,10 100:4,
6,9 105:19,
23 114:3,18
115:21
130:13
133:9
134:11
142:8 146:2
150:12
152:24
153:3 154:5
155:20
157:6,14,19,
23

**error** 103:24 104:1,2 109:2

**established** 119:9,16 125:15

**estimated** 150:2

**et al** 96:5

**eventually** 109:8

**Everett** 112:3,4

**evidence** 143:3

**excuse** 149:18

**Exhibit** 98:13,18,23 99:13,17 105:5,12 110:23 111:4

**experience** 128:6 145:13 152:11

**experienced** 152:13 156:5

**extent** 134:9

**extremely** 134:8

---

**F**

---

**facility** 111:22 117:12 127:15

**fact** 102:16 116:18 119:2 126:24 127:4,12,18 142:18

**facts** 141:5 145:17

**fair** 115:12 127:16 129:2

**faith** 139:19

**family** 142:13,17

**feel** 105:17 124:15 130:21 137:9 140:7, 24

**fighting** 138:21

**figure** 133:19

**filed** 140:23 141:4

**filling** 109:13

**final** 145:2

**fingerprinted** 101:4 103:14,22

**fire** 141:3 144:12

**fired** 140:23

**firm** 139:20, 21 142:13, 14

**firsthand** 147:12

**fix** 101:11 108:23

**fixed** 109:9

**flat** 122:3

**flip** 103:8,10

**Floor** 96:4

**flunked** 112:13

**fly** 134:22 135:1

**follow-up** 135:19 142:5 156:2

**food** 118:24 120:10 123:3 125:13 149:6,13

**foot** 108:2

**forced** 118:4

**foregoing** 158:8

**forget** 128:7 139:23

**form** 148:18 152:22 153:2

**fought** 139:22,23

**found** 103:23 116:4

**Fourth** 96:4 126:21,22

**frame** 120:5, 7

**friend** 139:2

**friends** 145:7

**front** 96:3 142:2

**froze** 150:7

**full** 97:21 99:3

**funny** 129:12 132:8

---

**G**

---

**game** 135:8

**gang** 108:14 122:6

**gangs** 128:12

**gave** 101:2 132:18 133:13 136:11

**Girard** 96:18

**girl** 125:13 130:5,6 131:1,12,18

**girlfriend** 130:3 131:13

**girls** 123:5 129:17 131:19 135:14,16

**give** 101:17 103:13 132:13 133:12 139:17 151:13

**giving** 136:20 145:16

**glad** 121:8 133:22,24

**God** 139:5,6, 8,19 144:10

**God's** 139:2 140:10,16 144:9

**good** 97:5,6 133:24 136:10 139:20,21 142:4

**goofy** 103:19 116:4

**grace** 139:5, 8 144:10

**grade** 112:12,17, 19,24

**Great** 98:15

**Gregory** 96:10

**group** 128:15 143:13

**growing** 152:17,18, 19

**grudges** 126:4

**guess** 103:24 119:13 126:21 127:3 133:19 140:4

**guessing** 119:7

**guilty** 139:9, 10 140:9,12 144:13

**gun** 131:5,6, 7 139:13

**guy** 129:11

**guys** 130:16 131:17,18

---

**H**

---

**habit** 118:7

**half** 138:20

**hand** 128:20

**handle** 144:8

**hands** 139:2 140:16 144:9

**handwriting** 111:15

**happen** 120:6 151:5 153:12 154:1,19

**happened** 103:8 104:1, 12 120:5 124:15 128:8 136:17,21 137:5 142:3 156:18

**happening** 129:3

**hard** 116:5 125:13

**Harris** 114:13,14, 15

**hate** 130:4 135:4

**hating** 129:24

**hear** 150:20

**heard** 120:11,24 126:1,7

**hearing** 120:18

**height** 107:23 110:5,18 149:17,18, 22 150:2

**hey** 131:11, 16

**high** 112:10 126:13 127:1 146:13,16 148:5,9,13

**higher** 104:24

**hole** 117:19

**home** 128:14

**homework** 121:16,17 141:10,12, 15,16,18,20

**honest** 134:12,13

**Horton** 96:5, 21 98:19 99:14 112:3, 12,22 113:6 126:12,24 127:13,19 129:11,15 130:10 136:13 146:7 147:18

**house** 127:4, 6,11 143:5

**huddle** 143:13

**Huh-uh** 109:16 129:5 148:14

**Hunter** 115:10

**Hunter's** 115:17

**hustling** 130:24

---

**I**

---

**ID** 109:5

**idea** 125:20 132:16

**identification** 98:24 99:18 105:13 111:5

**identity** 101:23

**illegal** 143:15

**impossible** 133:11,12, 13,16

**incarcerated** 108:21 116:18 117:14 118:12 119:23 127:20 149:7

**incarceration** 108:17 116:24

**inches** 150:5

**including** 128:13

**individual** 155:1

**individually** 134:15 143:12

**information** 124:5 135:22 136:10 144:1,20

**injury** 123:19

**inmate** 139:2

inside 127:6, 11

instance 101:2

instances 103:7

interacted 143:10

interactions 129:14

interrogated 136:18

interrogation 136:19

intervening 146:21

interview 133:1 143:12

interviewed 122:11 142:7 143:16

interviewing 143:1,11

investigated 154:21

investigation 122:2 144:4

involved 120:22 121:20 122:19 124:8 129:4 130:5 144:4 153:22

issue 151:6

**J**

jail 121:7 130:15 138:19

job 118:3 144:10

joke 131:11

jokes 131:15 135:11

jokester 131:19 132:6

jokestery 129:11

joking 129:16,17, 18

Jordans 135:3

July 97:24 98:5

jump 97:19

June 96:3

jurors 140:9

juvenile 103:17 130:18

131:23,24 132:2

**K**

Kettering 119:1,18 120:14,15 123:8 124:4, 20 125:15 149:10

Ketterington 120:11,12, 19

kids 132:2 134:21 135:11 153:9 156:21

Kim 115:7

kind 103:19 118:2,3,6 121:8 128:17,18, 19,23 130:8 148:4,22

kitchen 117:17,20

knew 100:2 122:10 127:4 132:12 151:8 155:5, 12

knowledge 112:11 117:9 118:15 120:22 132:12 133:5 148:12 151:6

Kyle 125:24 155:1,5,6

Kyle's 126:1

**L**

Lamont 99:4 103:9

laugh 131:11,12, 16,17

laughing 131:19

law 139:21 142:13

lawyer 138:22 139:6,7,14, 16,20 140:11 142:10,11 143:4,7 144:1,12,20 145:17

lawyers 142:18

learn 115:14, 16 126:3

leave 116:21, 23 157:22

left 146:16

life 119:14 128:7 139:22,24 140:15 141:1

lighter 105:3

lines 116:15

listen 132:5

literally 121:10,13, 15

live 131:1 135:15

lived 119:23 126:24 127:4,13,19 155:14

LLC 96:12

locked 117:4 121:24 122:5,9 125:10 127:14 132:1 133:14,15, 18,20,21,22 134:1 136:4, 6 137:6 141:7

Loew 117:3 118:11 120:23 121:2 122:21 123:20

long 128:6

looked 102:10 108:12

loss 104:16

lot 128:16 129:21 134:17 135:14 149:5

love 135:4

loved 129:22

**M**

Madam 98:13 150:7

made 109:3 135:9,24 141:17

major 104:3 109:2

make 106:19 107:4 111:1 113:16 117:17 119:12 120:3 122:4,

15 125:18 130:4,7 131:12,15, 17 134:20 152:22 154:11

man 123:19 124:14,17 129:24 142:4

manner 129:20

mark 98:12, 18 99:13 105:5 110:22

marked 98:23 99:17 105:12 111:4

Martinez 96:20 97:12, 17 98:11,15, 17 100:10 105:21,24 138:5,12 145:19 146:6 148:18 149:16 150:6,11 151:11 152:10,22 153:1,16,21 154:4,24 156:1 157:16

matter 142:18

Mcclanahan 113:18,21, 24 114:17 125:20 126:5 132:12 133:2

memory 117:23

men 145:6

mentioned 122:23 123:1,23

mess 130:5 154:6

messed 101:10 121:6 124:17 130:2

met 143:5

microphone 150:18

Middle 112:3

Milo-grogan 134:8 155:14

mind 123:6

minute 128:19

misconduct 142:21,24

missed 102:6 150:9

mission 131:20

mistake 103:18,20

mistakes 154:11

mix 115:4 151:2

mixed 102:8 151:16

mom 119:9 135:9

moment 100:19 106:19 134:6 138:2, 6

money 120:9,14 149:5,12

months 138:20

morning 97:5,6 98:4

**N**

nah 139:18

named 113:17 123:20 155:1

names 113:14 144:3 145:17 151:22 156:17

Natasha 119:16

nature 100:22

neighborhood 145:6 155:13

nice 107:7 134:15,16, 18

ninth 139:3 140:22 141:4

North 96:3 128:2,13

notes 132:22 133:1,6 135:24

number 156:4

**O**

Object 148:18

**objection** 100:4 114:3, 18 115:21 130:13 133:9 134:11 142:8 151:11 152:10,23 153:2,16 157:6,14

**October** 98:8 99:9 116:18 117:10 118:16,19 119:3 137:1

**Offense** 108:10

**Ohio** 96:4,7 120:11,12, 15 149:10

**older** 112:14, 15,20,22,23 114:10

**opinion** 104:18

**opposite** 103:10

**order** 149:12

**orders** 120:10,14 149:5

**outcome** 138:17

**outset** 104:14

___

**P**

**package** 149:13

**packages** 149:6,10

**paper** 156:22

**paperwork** 101:15 103:3 109:14 152:4,15 153:20 156:22 157:1

**paralegal** 96:19

**paranoid** 129:7

**parents** 132:5

**parole** 109:14

**part** 128:7 133:4 135:7 150:9

**participating** 108:13 122:6 137:24

**parts** 105:8

**pass** 141:19

**pattern** 117:13

**people** 99:22 100:2,12,21 102:2 114:6, 8,20,23 115:5 125:17 128:5,17,23, 24 129:21, 22 130:4 131:12 134:9 135:17 139:12 141:7 142:2 145:6 147:1 151:2,7,9, 12,15,17,21 152:3,8 153:9,13 156:5,16 157:3

**permanently** 120:1

**permitted** 116:21,23

**person** 130:11 131:7

**personal** 145:13

**personally** 126:6 147:11

**pertain** 102:22

**phenomenal** 144:10

**photograph** 98:20 107:14 109:20

**picture** 99:14 107:7

**pitched** 104:24

**plaintiff** 96:21

**play** 113:10

**playful** 129:20

**plead** 140:12,20 144:13

**point** 102:1 108:23 115:14,16 116:22,24 120:6 123:15,17 138:4 154:9

**police** 101:3, 18 115:18 118:10 122:20 132:13,22 135:20 142:23

154:22

**popular** 134:8,20 135:17,18

**Possibly** 113:1

**potential** 126:4

**pounds** 110:11

**power** 139:1

**prankster** 131:11

**precisely** 150:13

**prepare** 141:18

**presence** 96:14

**pretty** 115:2 116:9 118:7 119:6,7

**previous** 110:8 119:22 126:10 129:10 132:20 135:21 150:8

**previously** 99:22 135:14

**prison** 121:10,13, 15,16,19 125:2,6 137:10 147:19

**proceedings** 158:8

**prosecutor** 139:15 144:14,16

**protect** 124:10

**proven** 121:7

**public** 144:15

**purposes** 98:24 99:18 105:13 111:5

**pushing** 129:18

**put** 101:11 139:1,19 140:15 144:9 153:2

___

**Q**

**question** 100:9,20 117:22 123:16 132:15 134:7

135:19 145:2 150:8 153:2 156:2

**questioned** 121:14

**questioning** 123:14 137:18

**questions** 97:11,13,18 104:15 107:2 116:16 123:13 126:10,14 132:9 138:3 142:6 145:20 146:7 153:21 155:21 157:17,21 158:2

**Quianna** 114:13,14

**quick** 123:12 132:9 134:7 135:19 146:4

**quickly** 98:12 106:4 108:9 109:18 110:22 131:21

___

**R**

**Ramsay** 125:24 155:1,5,6, 11,18

**Ramsey** 126:4

**Raymond** 123:20

**read** 111:2 150:8,10

**ready** 146:4, 5

**real** 109:2 122:8 128:18 141:21 142:2

**reason** 134:9,20

**rec** 113:10

**recall** 109:13 156:8

**receipts** 145:17,18

**receive** 149:12

**recess** 138:9

**record** 96:13 131:21 138:5,8,11 142:15

150:10 158:5

**recorded** 96:11 144:22

**records** 102:21 151:7 153:4

**referring** 111:22

**Rehabilitation** 107:13

**released** 119:24

**remember** 103:3 113:17 114:12 115:6,9 118:23 126:13 132:20 146:10 148:3 149:18,23 150:1,3 155:1

**remembered** 149:9

**rephrase** 157:10

**reporter** 96:9 98:13,14 150:7 157:20 158:1

**Reporting** 96:11

**reports** 135:20,23

**represent** 107:12

**represented** 132:24

**requested** 150:10

**research** 121:18,21, 23 122:3,4 141:9,10

**resulted** 123:19

**retarded** 144:21

**Reynolds** 126:18

**Rhonda** 125:22

**Ricardo** 106:1 107:21 109:23 111:9

**Riccardo** 99:4 101:10 102:10,11, 14 103:5 104:2,4

107:1
108:22
109:5
111:23
112:12
114:22
116:1,12
118:16
123:17
136:13
153:19
156:11

**Rich** 133:21

**Richard**
96:2,5,21
97:2,21
101:9
102:14
103:9 104:2,
5 107:1
109:5 112:3,
12,14 113:2
114:7,21
115:1 116:1,
11 121:22,
24 122:5
125:20
132:12
134:23
136:12
146:7
147:18
156:14
158:4

**Rick** 151:14

**rid** 139:4,5

**rob** 131:3
143:11

**robberies**
128:14
137:20,24
138:15
139:11
144:5 145:8

**robbery**
108:14
117:3
118:11
120:23
122:5,7,21
123:18,21
125:2
130:12
133:18
138:14
142:22
154:14,18

**rode** 113:2

**room** 145:22

**Roughly**
150:4

**routine**
117:24
118:9

**Rowland**
115:10

**rumors**
130:7

___
**S**
___

**S-Y-D-O-W**
142:16,17

**saved**
139:24
141:1

**scared**
130:14,15,
20 131:3

**scaring**
128:18

**school**
100:21
112:3,10
126:13
127:1
134:19
146:13,16
148:5,9,13

**scratched**
136:7

**scroll** 105:7,
16 106:4
107:10
109:18

**scrolling**
106:23
108:9

**sealed** 134:2

**selling** 148:8

**send** 120:9,
14 125:13

**sending**
119:4 123:2,
3,9 124:3

**series** 126:9

**served**
125:2,5
147:18

**set** 132:21
153:4

**shake**
128:20

**shared** 124:9

**sharing**
110:21
112:1

**shipped**
149:13

**shoes** 131:2
134:17

**shoot** 130:12

**short** 128:2,
13,23 138:9

**shorter**
110:6,8,16
114:9
150:15,16
152:1

**shoulder**
150:21

**show** 98:12,
18 99:12
104:4 105:4,
6 110:22

120:13

**showed**
149:16

**shown**
132:21
135:20

**signature**
111:18
158:6

**signed**
109:15
111:19
134:2

**similar**
104:19
117:22
151:23

**simple** 115:2
122:4,15

**Sinclair**
123:20

**single**
110:24

**sir** 97:18,21
98:19 99:12,
14,21
100:11
101:1,21
102:1,15
104:18
105:5
107:11
109:19,20
111:2 112:2
115:15
116:16
117:8,22
118:10,14
119:22
120:22
122:20
123:13,15
124:22
126:10,23
127:18
128:11
129:9,14
132:10
134:6
135:19
137:1,19
138:2,4,13,
15 141:13,
14 142:5,21
144:2 145:2,
5,20 156:3
157:2,17

**sister** 134:14

**sit** 101:21
102:15
117:9,22
118:14
120:21
124:24
125:19
126:23
132:11
135:21
144:2 145:3,
5

**slightly**
110:18

117:21

**slow** 106:8

**small** 109:3

**smoked**
148:24

**somebody's**
130:2

**sort** 133:5

**sound**
107:24
108:7 110:9,
11

**Southern**
96:6

**speak**
118:10

**specific**
117:23

**specification**
139:13

**Spectrum**
96:11

**spoke**
122:20

**stab** 128:20

**Stacy** 96:9
139:7,20,21
140:24
142:10,11
143:22
144:19

**stamp**
113:11

**stamped**
98:19 99:13
105:6,21
109:19
110:23
134:1

**stand** 150:17

**started** 128:1

**stated**
135:13

**statement**
143:9

**States** 96:6

**stay** 128:17

**stayed**
126:20
138:19

**steps** 140:22

**stop** 106:16,
21 110:20
112:1

**stopped**
102:17

**straight**
123:7

**street** 96:4
117:3
118:11
120:23
121:3
122:21
123:21

125:7
126:17,19,
21 150:7

**strike** 104:22
115:13
116:22
124:6,22
128:9 133:7
135:23
145:4 156:8

**string** 137:20

**stuff** 117:20
118:24
123:6 124:3
125:7,14
129:7,19
130:8,20
132:3,5
134:16,18
135:12,15,
16 136:5
147:16
148:5 152:4

**stupid**
103:18

**Super**
127:16

**supposed**
136:3

**surprise**
114:2,17
148:17,20

**surprised**
148:24
149:4

**surprises**
147:24

**sweet** 128:24

**switch** 102:8

**sworn** 97:3

**Sydow**
139:7,20,22
140:24
142:10,11,
15 143:22
144:19

**system**
101:13
102:5
109:11

___
**T**
___

**tainted** 143:9

**talk** 100:18
122:12

**talked**
122:11,14
124:19
149:5 151:2

**talking**
116:10
138:13
145:11
148:23
153:6

**tall** 107:24
114:10
150:14

151:24

**taller** 108:4

**Tanoury**
96:16

**teachers**
141:17

**team** 113:7

**teenager**
103:20
116:3

**telling**
144:23
147:9

**terms** 151:7

**test** 141:18,
19

**testified**
98:20 99:21
100:1 101:1
108:17
110:7 112:2
113:24
114:15
116:17
119:21
126:16
129:9
149:21

**testifies** 97:3

**testimony**
113:16
120:4
146:10,12

**tests** 141:16

**thing** 101:10,
17 104:2,5
105:16
116:2,5,12
118:8 121:6
137:11,15
140:3
141:21
153:12

**things**
100:21
109:3 116:4
147:16

**thought**
102:3 115:1
116:8
151:15

**tickets**
102:21

**tied** 156:23

**time** 101:22
102:10
108:13,21
113:15
117:6,7,24
119:5,11,14,
24 120:5,6,
18 125:2,6,
12 128:5
133:22
138:8,11
140:5
142:11
145:21
147:19
149:7 150:1

151:9
156:10

**times** 102:5
104:6
134:17

**today** 101:21
102:15
117:9,22
118:14
120:18,21
124:24
125:19
126:23
132:11
135:22
144:2 145:3,
5 154:13

**told** 118:23
124:11,12,
14 140:14,
16,17 143:4,
7 144:11
148:4
152:13
154:8

**top** 107:3,11

**topics** 146:4

**tough** 157:8

**Tracy** 113:17

**trails** 156:22

**trial** 138:19
139:9 140:9,
17,18
142:20

**triggered**
141:21

**triggering**
140:1

**trouble**
101:12
102:2,4
121:11

**true** 121:24

**trust** 131:13

**truth** 144:23,
24

**turn** 145:21

**turned**
103:17
144:14

**turning**
139:15

**TV** 117:12

**type** 124:5
130:11
131:7

———
**U**
———

**uh-huh**
101:16
104:8,17
106:18,23
107:2 109:7,
13 114:11
115:20
118:5
122:16

123:10,12
124:13
125:4
128:22
133:3 135:6
136:16
141:11
151:4
153:24

**understand**
153:6,8

**understandin
g** 119:13
125:18

**uniform**
134:21

**United** 96:6

**unpredictabl
e** 128:19

**unruly** 132:3

**Upp** 96:9

———
**V**
———

**versus** 96:5

**violent**
129:15

**Virginia**
147:19

**virtually**
133:10

**voice** 104:24
105:2

**voices**
104:19

**Volume** 96:2
97:2

———
**W**
———

**waived** 158:6

**Walker** 96:18

**walking**
127:10

**wanted**
138:21
140:12
147:3

**watching**
117:12

**ways** 152:13
156:5

**weed** 148:23,
24 149:2

**weighed**
110:18

**weight** 108:6

**West** 147:19

**witnesses**
143:1,5,8,17

**words** 98:3

**work** 101:13
103:21
117:16,17,
18 130:23

140:10

**working**
117:19

**worried**
133:16,18
145:13

**write** 111:12,
13 123:6

**writing** 123:2

**wrong** 98:4
128:4,5,6

**wrongly**
145:7

**wrote** 139:2

———
**Y**
———

**y'all** 133:19
135:10
136:9 137:7,
8,12,13
141:9 142:9
144:21
145:16
147:2

**yank** 150:17

**year** 112:15,
22,23
114:10
123:20,24
136:21
138:20

**years** 98:9
99:10 116:6
137:2,3,14
138:24
146:21

**young** 107:7
130:17

———
**Z**
———

**zoom** 96:16,
22 150:7