# Exhibit 27

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## —COURT REPORTERS—

## CASE NO. 23-CV-3888

## RICHARD HORTON

## V.

## CITY OF COLUMBUS, ET AL.

## DEPONENT:

## TIMOTHY DIXON

## DATE:

## DECEMBER 29, 2025


a courtroom
powerhouse

schedule@kentuckianareporters.com

877.808.5856  |  502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

CHIEF JUDGE ALGENON L. MARBLEY

MAGISTRATE JUDGE ELIZABETH P. DEAVERS

CASE NO. 23-CV-3888

RICHARD HORTON,

Plaintiff

V.

CITY OF COLUMBUS, COLUMBUS DIVISION

OF POLICE OFFICERS BRENDA K. WALKER

(BADGE #1176), MIEKO SIAS AS PERSONAL

REPRESENTATIVE OF THE ESTATE OF SAM SIAS

(BADGE #1871), AND AS-YET UNKNOWN

COLUMBUS POLICE OFFICERS,

Defendants

DEPONENT:   TIMOTHY DIXON

DATE:       DECEMBER 29, 2025

REPORTER:   MADISON BOOKS



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

APPEARANCES

ON BEHALF OF THE PLAINTIFF, RICHARD HORTON:

Alyssa Martinez, Esquire

Loevy & Loevy

311 North Aberdeen

Third Floor

Chicago, Illinois 60607

Telephone No.: (312) 243-5900

E-mail: alyssa@loevy.com

(Appeared via videoconference)



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

3

APPEARANCES (CONTINUED)


ON BEHALF OF THE DEFENDANTS, CITY OF COLUMBUS AND

BRENDA K. WALKER:

Samantha J. Scherger, Esquire

David J. Dirisamer, Esquire

Sarah Feldkamp, Esquire

Alana V. Tanoury, Esquire

Aaron D. Epstein, Esquire

Assistant City Attorneys

City of Columbus, Department of Law

77 North Front Street

Columbus, Ohio 43215

Telephone No.: (614) 645-7385

E-mail: adepstein@columbus.gov

        vtanoury@columbus.gov

        snfeldkamp@columbus.gov

        djdirisamer@columbus.gov

        sjscherger@columbus.gov

(Appeared via videoconference)


Also Present: Doug, Paralegal of Assistant City

Attorneys, City of Columbus, Department of Law

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

INDEX

Page

PROCEEDINGS                                             6

DIRECT EXAMINATION BY MS. MARTINEZ                      7


EXHIBITS

Exhibit                                             Page

1 - Curriculum Vitae                                  14

2 - Defendant's Expert Report - July 11, 2025         63

3 - Defendant's Expert Rebuttal Report                64

    November 19, 2025

4 - Columbus Division of Police Preliminary          147

    Investigation Report

5 - Handwritten Notes with Ms. Curry                 154

6 - Handwritten Notes 10-13-2004                     163

    Richard Mclanahan

7 - Photograph Line Up                               194

8 - Witness List                                     228

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of TIMOTHY DIXON, taken on December 29, 2025

5

STIPULATION

The deposition of TIMOTHY DIXON was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40202, via videoconference in which all participants attended remotely, on MONDAY the 29TH day of DECEMBER 2025 at 11:03 a.m. (ET); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was sworn remotely pursuant to FRCP 30.

It is agreed that MADISON BOOKS, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

6

PROCEEDINGS

THE REPORTER: Okay. We're now on record, and will all parties, except for the witness, please state your appearance, how you're attending, and the location you're attending from?

MS. MARTINEZ: Alyssa Martinez on behalf of Plaintiff Richard Horton, and I'm appearing remotely via Zoom from Chicago.

MS. SCHERGER: This is Samantha Scherger here, on behalf of the City of Columbus and Brenda Walker. And I'm appearing remotely in Columbus.

THE REPORTER: All right. And then can I have the witness please state your full name?

THE WITNESS: I'm Timothy Dixon.

THE REPORTER: Thank you so much. And can I have all parties agree or stipulate the witness is, in fact, who he says he is?

MS. MARTINEZ: Yes.

MS. SCHERGER: Yes.

THE REPORTER: Thank you so much. And then sir, will you please raise your right hand for me? Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

7

THE WITNESS: I do.

THE REPORTER: Thank you so much.

DIRECT EXAMINATION

BY MS. MARTINEZ:

Q. Good morning, sir.

A. Good morning. How are you?

Q. I'm doing well. How are you this morning?

A. I'm doing fine.

Q. Good. Like I said, my name is Alyssa Martinez and I represent the plaintiff, Richard Horton, in this case. Can you please state and spell your name for the record?

A. Timothy Monroe Dixon, T-I-M-O-T-H-Y, M-O-N-R-O-E, D-I-X-O-N.

Q. Thank you. And I'm sure you're familiar with these, sir, as you're also an attorney, but I'm going to go over some ground rules at the outset just to make sure we're on the same page for the deposition here today, okay?

A. Sure.

Q. Okay. So there's obviously a court reporter that's taking down everything that we say. So please, to the best of your ability, try to give loud verbal answers. Head nods or shakes don't translate very well for the record, okay?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

8

A.   Okay.

Q.   And again, because we're trying to build out that record, I ask that we please do our best to try to talk one at a time.  I know it can be hard with Zoom and buffering.  I'm going to do my absolute best to not cut off your answer.  If you feel like I have at any point, please let me know.  I want to make sure you have the opportunity to get out your full answer and I ask that you please extend me the same courtesy even if you know where my question is going, please let me get out the full question before you start your response, okay?

A.   That's no problem.

Q.   Okay.  Thank you.  If any question that I ask at any point doesn't make sense, please let me know. I'm more than happy to rephrase.  If you answer my question, I'm going to assume you understood my question; is that fair?

A.   It is.

Q.   Okay.  From time to time counsel may object, unless you're specifically instructed not to answer a question I ask that you please answer all of my questions, okay?

A.   Okay.

Q.   And if you need a break at any point, please feel free to ask.  I'm more than happy to take a break,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I just ask that it please not be while a question is pending; is that fair?

A. Sure. No problem.

Q. Okay. Now, sir, are you under the influence of any medication or do you have any condition that affects your memory?

A. No.

Q. Okay. And is there anything that would prevent you from answering my questions here today truthfully?

A. No.

Q. Okay. And where are you currently located, sir?

A. I'm in Woodstock, Maryland, just outside of Baltimore.

Q. And do you have anything in front of you? Any documents?

A. I have my two reports that I wrote.

Q. Okay. And we'll go over those in a second. I just want to clarify, is that your initial report from July of '25 and then your rebuttal report from November of 2025?

A. Yes.

Q. Okay.

A. And a pad that's blank.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. Understood.

A. And a pen.

Q. Okay. I appreciate that -- that makes sense. Did you -- actually, strike that please. I want to caveat my next set of questions with I'm not asking for any communications that you had between yourself and counsel who retained to you for my next set of questions, okay?

A. All right.

Q. Okay. Did you prepare for your deposition today?

A. I did.

Q. Okay. And what did you do to prepare?

A. I reviewed my reports. I reviewed the materials.

Q. Okay. And when you say reviewed your reports, that's both the initial report and the rebuttal report?

A. Yes.

Q. Okay. And when you say you reviewed materials, which materials specifically?

A. I went through the entire file and looked at things that I thought might be relevant.

Q. Okay. And when you say entire file, is that the entire police file?

A. That's all the items that are listed in my

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11

reports.

Q.    Okay.  So we'll get to that in a moment, but there are a number of documents that are listed in your report, and I just want to get a sense of what you reviewed specifically in preparation for today.  So is it that you clicked through all 400 plus of those documents or were there certain area -- excuse me, areas you focused on?

A.    I don't remember every document that I looked at.

Q.    Do you remember specifically any document you looked at?

A.    I know I looked at Mr. Tiderington's report. I looked through some aspects of the files and the investigative file, but I -- I can't remember each document.

Q.    And then just to clarify it, when you -- I believe you said you looked through parts of the investigative file, or did you look through the entirety of the investigative file?

A.    Again, there were a lot of pages in there, so I don't remember specifically which page numbers, but yeah, I did go through the file again.

Q.    And as we go through the deposition today, if there's any point, and this is true for any question

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

where, you know, you remember something later on or we're looking at a document and you recall that you did review that document in preparation, please feel free to let me know, you know, I want to make sure you have the opportunity to go back and clarify all of your answers as you remember new things and new things come up, okay?

A. Sure.

Q. So outside of your reports and then some of the materials you just testified to, did you review any other documents that you can recall right now that you reviewed in preparation for your deposition today?

A. No.

Q. And did you meet with attorneys in preparation for your deposition today?

A. Yes.

Q. Okay. How many times?

A. In particular regarding the deposition, once.

Q. Okay. And when was that meeting, sir?

A. About a week ago, I think.

Q. And approximately how long was that meeting?

A. A little less than an hour, I think.

Q. And was that in person? Was it a phone call? Was it Zoom?

A. I believe it was Zoom. Excuse me. My apologies.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

13

Q. Bless you. It's okay. Bless you. And was anyone present for that meeting outside of yourself or your counsel?

A. No. Not that I'm aware of.

Q. Okay. And did you review any materials during that meeting or was your review time outside of that meeting?

A. I'm sorry, I don't think I understand the question.

Q. Sure. Let me -- it was a poorly worded question. So you testified to materials you reviewed in preparation for your deposition. And actually, maybe a better question, approximately how much time did you spend reviewing materials in preparation for your deposition today?

A. Oh. I'd probably say, I haven't calculated it all, but probably over three, but less than five hours.

Q. Okay. And was all of that time spent reviewing materials outside of that meeting you just testified to you had with counsel?

A. It would've been after the meeting.

Q. Okay. And outside of that one meeting, did you meet with counsel at any other time, specifically in preparation for your deposition today?

A. No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

14

Q. Have you spoken with anyone else outside of counsel about your deposition here today?

A. I told my wife I had a deposition.

Q. Anyone else?

A. No. Oh, yes. I told my aunt in Nashville that I couldn't speak to her last night very long because I had a deposition this morning.

Q. Okay. And I should -- let me -- I should have clarified. Have you spoken with anyone outside of counsel about what the substance of your testimony would be here today?

A. No.

Q. Okay. Outside of what you've already testified to, sir, have you done anything else to -- deposition today?

A. No.

Q. So I'd like to jump to a couple of background questions for you, sir. So to do that I'm going to show you what we'll mark as Exhibit 1, which is the CV that was provided along with your report. Okay. Can you see my screen, sir?

(Exhibit 1 was marked for identification.)

A. Yes.

BY MS. MARTINEZ:

Q. Okay. I'm just going to scroll through so you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

have a chance to see the entirety of the document, and let me know if you'd like me to slow down. Okay. Is this your current CV, sir?

A. It looks like it.

Q. Okay. Are you aware of any changes to this CV since you submitted it in this case?

A. Not that I can tell.

Q. And it reflects your current experience?

A. It certainly looks like it, yes.

Q. And can you think of any relevant experience or publications that -- or, sorry, strike that please. Can you think of any relevant experience or publications that pertain to your opinions in this case that are not listed in your CV?

A. No. Not at this time.

Q. I'm going to stop sharing and I just want to ask you a couple of follow-up questions based on your experience. So starting with your education, sir, what years did you attend law school at the University of Baltimore?

A. I think '97 to 2000 -- 2000, yeah, I think it was '97 to 2000, around there.

Q. Okay. And --

A. It was a while ago.

Q. Okay. Fair. Were you attending school

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

full-time or were you working a full-time job at the same time?

A. I was doing both.

Q. Good for you. Okay. And, sir, when did you attend the University of Maryland?

A. I think I started in '87. I left, became a Baltimore police officer, and I think I finished in '96. I went back. I had a few credits left and I went back when I was a police officer, and I finished.

Q. So for some chunk of that time you were again working full time and also going to school?

A. Yes.

Q. And I see that you received a Bachelor's of Arts in U.S. History and an undergraduate certificate in African American studies?

A. Yes. Uh-huh.

Q. In what year did you receive your bachelor's degree?

A. I think it was '96. Again, it was a while ago.

Q. And again, I promise this is not a memory test. I'm just trying to get general dates to understand your experience and how you got to this point, okay?

A. I understand. No problem.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And did you receive the certificate in African American studies at the same time as your bachelor's degree?

A. I -- I think so.

Q. And I see that you also received a master's degree in professional studies, specifically public safety leadership and administration, along with two graduate certificates?

A. Yes.

Q. Okay. And what year did you receive your master's degree?

A. It was about -- I think it was about two, three years ago. I -- I can't remember the exact date. I'd have to go look at them.

Q. That's okay.

A. I got them after I came back to the Baltimore Police Department.

Q. Okay. And we'll get to that in a second. But you came back to the Baltimore Police Department in 2020; is that correct?

A. Yes. Uh-huh.

Q. And would you have received your graduate certificates the same time as you received your master's degree?

A. Yes.


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

18

Q. Outside of those degrees and certifications, have you attained any other post high school degree or certification?

A. Yeah. I assume you're talking about the law degree as well.

Q. Yeah. Sorry, outside of all of the degrees and certificates you've just testified to including your law degree, have you received any other post high school degree or certification?

A. Certifications. Multiple ones in the Baltimore Police Department, I don't remember all of those.

Q. Okay.

A. Took continuing education classes as an attorney. So I -- I don't remember every single one of them, but no, those come to mind.

Q. Okay. So during on the job training, you received certificates with the Baltimore Police Department?

A. Yes.

Q. Okay. And then as an attorney, you received additional training as part of the mandatory CLEs?

A. In addition to some voluntary ones.

Q. Did you receive any other degree or certification from any college or university?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.  Not that I can think of at the moment that we haven't talked about or that's not mentioned on there.

Q.  Now, sir, can you please walk me through your employment with the Baltimore Police Department?

A.  Okay.  Which tenure?

Q.  So could you please walk me through the entirety of your employment the first time?  So before you came back in 2020, by department you were assigned to and time periods in that capacity?

A.  Joined the Baltimore Police Department in January of 1993.  I went to the Police Academy.  I graduated, I don't remember the exact date, but I think it was the fall of '93.  I was assigned to the Northern District patrol.  I had worked patrol in the Northern District for about a year.  Then I was assigned to the Northern District Drug Enforcement Unit where we did investigations of mid-level drug trafficking from the Northern District Drug Unit.  I volunteered to go to the Eastern District.

That was -- how can I put it?  It was a very busy district with crime and violent crime, so I volunteered to go there so I could go back to school. The drug enforcement unit wasn't conducive to that. Went to the Eastern District Patrol.  I worked there for a while.  Then I went to the Eastern District, I think

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

they called it SET-Flex and drug enforcement units.  I worked there.  Those were plain clothes units as well. After the Eastern District patrol, drugs, SET-Flex, I was promoted to sergeant.  I went to the Southwestern District as a patrol supervisor.

And after the Southwestern District I went to the Southern District where I worked patrol as well.  In addition to being what we would call a SET-Flex, a plain clothes crime suppression supervisor.  Following the Southwestern District I -- I'm sorry, the Southern District, I went back to the Eastern District on a violent crimes task force.  I worked that supervising a plain clothes unit there.  And then I was sent to legal affairs and worked legal affairs.  And following legal affairs I went to the Baltimore City state's attorney's office as a prosecutor.

Q.  Okay.

A.  Forgive me.  I think I have a bit of a cold, so if you hear me sniffling.

Q.  Oh, no worries at all.  And I apologize you have to sit for a deposition with a cold.  I don't think I can think of anything worse.

A.  It's no problem.

Q.  So I just want to quickly break these down a little bit more so I'm going to ask a few follow up

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

questions, okay?

A.    Sure.

Q.    So I wanted to make sure I got the timelines correct.  You were with the Northern District patrol for about a year?

A.    Yeah.  Thereabouts.

Q.    Okay.  And what were your responsibilities as a patrol officer in the Northern District?

A.    We responded to the calls for service, also crime prevention, handling investigations.  The patrol officers were handled back then, they were certainly a little different than they are now, but we handled initial investigations of violent crime, property crimes, person crimes, accidents.

Q.    Okay.  And just so I'm understanding, when you say things were a little different now, are you referring to who investigates certain crimes or are you referring to something else?

A.    Yeah.  The -- the duties were different then.

Q.    Okay.

A.    Things change over 30 years.  I'm sure you can understand that.

Q.    Yes.  And as part of the initial investigations you would conduct, would you ever have occasion to create a photo array?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22

A.   Yes.

Q.   Was it something that you did with relative frequency, specifically as a patrol officer in the Northern District, or was it generally more rare?

A.   It wasn't something that was done every day. No.

Q.   And then sometime around 1994, that's when you were transferred into the drug unit in the Northern District?

A.   Yeah.  I think it was '94.

Q.   Okay.  What were your responsibilities in the drug unit?

A.   I guess I'd summarize them as investigating mid-level drug trafficking.  Street and mid-level, like drug trafficking.

Q.   And how big was the drug unit in the Northern District at the time?

A.   You mean its number of personnel?

Q.   Yes, sir.

A.   There were two different squads.  I don't remember the exact number of people, but I think there were five to six people in each squad as I recall.

Q.   Okay.

A.   I -- I don't remember the exact number or the people.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay.

MS. MARTINEZ: Counsel, are you able to hear us?

MS. SCHERGER: Yeah. I think I missed the question, but

MS. MARTINEZ: Oh, okay. I had just a -- just so -- I don't want to have any questions that you missed. I asked about the number of people that were in the drug unit in the Northern District at the time.

MS. SCHERGER: Okay.

BY MS. MARTINEZ:

Q. And apologies, sir, I should have asked this: As a patrol officer with the Northern District, did you ever have occasion to investigate robberies?

A. Yes.

Q. Okay. And would you conduct the entirety of the investigation, or would you do that initial investigation you talked about before the case was handed off?

A. Sometimes the entirety of the investigation, depending on how in depth it was.

Q. Okay. So if it were an investigation that could be conducted in one shift you would stay on it, or did it just depend on staffing at the time?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.  There were a lot of other factors, not just the time or the shift, but how complicated the investigation was, were the suspects initially found, just how intensive it was.  There were a lot of other factors that went in to determine who would complete the investigation.

Q.  And during your time with the drug unit in the Northern District, did you ever have occasion to create photo arrays?

A.  Yeah.  And I'm sorry, with the drug unit?

Q.  Yes.

A.  No.

Q.  And did you ever investigate any robberies as part of the drug unit?

A.  No.

Q.  And how long were you with the drug unit in the Northern District before you volunteered to go to the Eastern District?

A.  I don't remember exactly.  I'd say it was probably less than a year.

Q.  Were your responsibilities as a patrol officer with the Eastern District any different than your responsibilities as a patrol officer in the Northern District?

A.  By definition, no.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. In that capacity did you have occasion to create a photo array?

A. I think I did. I don't remember the specific cases, but I think I did.

Q. Okay. And did you have occasion to investigate robberies with the Eastern District?

A. Yes.

Q. And is it similar to when you were with the Northern District where you might do the initial investigation or you might do the entirety of the investigation depending on the circumstances?

A. I'd say yes.

Q. Okay. And how long were you a patrol officer with the Eastern District?

A. I don't remember exactly. I -- I don't remember.

Q. Okay. Would it be fair to say -- actually, let's strike that, please. When did you become a member of SET-Flex in the Eastern District?

A. I -- I don't remember the exact date. It was after patrol.

Q. Okay. Did you become a member of SET-Flex prior to starting law school?

A. Yes.

Q. Okay. So you would've been in SET-Flex prior



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to that 1997 date you testified to a little earlier when you started law school?

A. Yes.

Q. Okay. So you -- or sorry, strike that, please.

And so, you would've started with the Eastern District as a patrol officer around 1995, and you were at SET-Flex by 1997?

A. No. I think it would've been before then.

Q. Okay. So you were maybe with the Eastern District patrol for about a year?

A. I -- I think thereabouts, give or take a few months here or there.

Q. And what were your responsibilities as an officer with SET-Flex in the Eastern District?

A. We did violent crime suppression, a combination of investigations of robberies, drugs, shootings. That's the best way I could characterize it.

Q. And just make sure I'm understanding. When you say violent crime suppression, is that an active thing you were doing?

A. I -- I don't think I understand your question.

Q. Sure. You -- I believe you said violent crime suppression, and I just want to understand what you mean by that?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   I'm sorry.  I'm confused.

Q.   So when I -- and maybe I misheard you.  When I asked what your responsibilities were as an officer with SET-Flex, I believe the first point you mentioned was violent crime suppression?

A.   Yes.

Q.   And I'm asking, what does that entail?

A.   Oh, again, it's a combination of investigations of drug crimes, robberies, shootings, violent crime suppression.  It's -- it's, I guess for lack of a better description, it's some of our policing involves violent crimes.

Q.   Okay.

A.   And people who are out there to stop the people from committing those violent crimes.

Q.   And in that capacity, when you would investigate robberies, would you be in charge of the entirety of the investigation?

A.   Sometimes.  Depends on the complexity of it.

Q.   Okay.  And for a particularly complex case would that be something that was handed off to detectives or would it just be multiple individuals from SET-Flex would be working it?

A.   I'm sorry, could you repeat the question?

Q.   Yeah, sure.  So you said depending on the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

complexity, you would sometimes investigate the entirety of a robbery as opposed to just some part of it. So my question is: If it were a particularly complex case such that you did not investigate the entirety, what would happen to that case? Who would investigate it?

A. Detectives from the criminal investigation division.

Q. Okay.

A. That's what they were called back then.

Q. Okay. And during your time with SET-Flex, were there any markers of a robbery that would automatically elevate that case to going to the criminal investigative division, for example, if someone were shot, or was it just a case-by-case determination?

A. Yeah. There were some markers. If -- if someone was shot or killed, if it were a commercial robbery, if it involved a sex offense, if it involved a police officer or a child, vulnerable child victim who was hurt or injured badly, if someone died.

Q. And how long were you with SET-Flex at the Eastern District?

A. Again, I don't remember the exact dates.

Q. Do you recall when you were promoted to sergeant?

A. I believe that was '96 or '97.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And sorry to keep making you use benchmarks, do you recall if you were promoted to sergeant prior to starting law school?

A. Yes.

Q. Okay.

A. Just prior, I think.

Q. So assuming my math is not wrong, which it could be, you were an officer with SET-Flex for a little under a year?

A. In which location?

Q. In the Eastern District?

A. I -- I don't know that to be accurate. I -- I just don't remember the dates that I went from SET-Flex to drugs and from patrol to SET-Flex.

Q. I see. Okay. At the Eastern District were SET-Flex and drug enforcement two separate units?

A. Yes.

Q. Okay. That's where my hangup was. What were your responsibilities as an officer with the drug enforcement unit in the Eastern District?

A. I'd say that by description they were very similar to the Northern District. Investigation of street and mid-level drug trafficking.

Q. Okay. And taking a quick step back. For SET-Flex at the Eastern District, did you ever have an

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

30

occasion to create and show photo array?

A. I believe I did. I don't remember a specific case, but.

Q. And then as an officer with the drug enforcement unit at the Eastern District, did you ever have occasion to assemble and show a photo array?

A. In drug enforcement? No.

Q. Yes. Okay. And did you ever investigate any robberies with drug enforcement at the Eastern District?

A. No.

Q. Okay. And as you sit here today, sir, do you have any approximation for how long you were with drug enforcement in the Eastern District?

A. Approximation, probably say between the two things, they probably bled over into a year or so. I was -- I was --

Q. And -- sorry. Please continue.

A. I was going to say I -- I was promoted to sergeant a little after three years, so

Q. And just to clarify for the record, when you said between the two things about a year, you're referring to SET-Flex and drug enforcement?

A. Yes.

Q. Sir, what were your responsibilities as a sergeant in the Southwest District?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   I supervised a patrol squad and acted as shift commander in absence of the lieutenant.

Q.   And in that capacity, did you have any occasion to create and show a photo array?

A.   I would help my officers who were investigating robberies do that, but that's not something I would've done as a supervisor.

Q.   Okay.  It's just if an officer came to you seeking assistance of some kind, you would assist the officer?

A.   Yes.

Q.   Okay.  And as a -- strike that, please.  As a sergeant, did you ever have occasions to investigate robberies yourself?

A.   I would help my officers do it.  I normally didn't respond to the calls of service myself unless it was something on view and even then, I would assign it to an officer.

Q.   And for the record, what do you mean by "on view"?

A.   That's, you come upon it yourself.  It's not a call for service.  I'm riding down the street, and someone says a crime happened.  That's on view.

Q.   Okay.  And again, in that instance where you're helping the officers, is that if they contact you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

seeking assistance?

A. Or if I heard the call come out and I supervised them. If it came to my knowledge they need assistance, I would help them.

Q. Okay. In your experience, sir, as a sergeant, how frequently would robberies come into -- actually, sorry. Strike that, please.

During your time as a sergeant, how frequently were your officers investigating robberies?

A. That's not something I would have the data on to know.

Q. Okay. Is it fair to say that it's not something that's happening every day?

A. No, I wouldn't say that either. I think robberies happen frequently in the Northern, Eastern, Southwest, Southern. It's a daily occurrence.

Q. Yes. My question was more aimed toward how frequently would the officers under your purview be conducting the investigations into those robberies?

A. I -- I'm sorry. I'm not trying to be rude, Counsel. Was -- was -- did I -- did I not answer the question or was there --

Q. No. I just -- I want to make sure that we're not talking past each other. With the understanding that robberies are unfortunately very frequent

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

occurrences, particularly in bigger metropolitan areas, including Baltimore, my question was more: How frequently would officers under your purview be assigned to investigate those robberies?

A.   So patrol officers aren't really assigned to investigate robberies.  They can get the call for service.  For instance, when I was in the Northern as a patrol officer, I investigated a commercial robbery, showed a photo array to the victims, got a tag number.  Ended up being a homicide.  Got detailed to homicide to investigate the murder that came out of it.  They were frequent and the circumstances of them were frequent.  They -- they range from all kinds of varieties and circumstances.  So it's -- patrol officers aren't necessarily assigned to the robbery.  It could be a call for service or something on view that they get.

Q.   And during your time as a sergeant, when a robbery is sent to the criminal investigative division, would any officers under your purview stay on the case to assist in the investigation, or was it once it was sent out, that was the end of your department's involvement?

A.   Sometimes they would stay on the investigation.  Like I said, I got the opportunity to -- to be detailed a homicide as a result of a commercial

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

34

robbery that I investigated as a patrol officer.  So it depends.  I've supervised people who stayed on the case if they wanted to or if they had a special skill or knowledge about the case.  It really depended on the circumstances.  But you -- you weren't always detached from it.  It really depended on the circumstance of each individual case.

Q.  And how long were you a sergeant with the Southwest District?

A.  More than a year but less than two years, if memory serves me correct.

Q.  Okay.  So approximately 1998, 1999?

A.  No.  I think I went there in '97.

Q.  Oh, sorry.  I should have clarified.  You were a sergeant with the Southwest District until approximately 1998, 1999?

A.  Yeah, I think so.

Q.  And is that when you went to SET-Flex at the Southern District?

A.  I went to patrol in the Southern District first.

Q.  Okay.  And were you a sergeant in that capacity as well?

A.  Yes.

Q.  Were your responsibilities the same as when

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

35

you were a sergeant with the Southwest District?

A.   Yes.

Q.   Did you have any additional responsibilities?

A.   The job description is pretty much the same. Now, what you do in each district certainly depends.

Q.   Sure.  But in that capacity, you still were not investigating crimes unless they were on view, or one of your officers needed assistance in some way?

A.   I'm sorry.  Which job are you referring to?

Q.   As a sergeant with the Southern District.

A.   Well, I was a sergeant in patrol, and I was a sergeant in SET-Flex, so the job descriptions were different then.

Q.   Okay.  So first as a sergeant with the Southern District of patrol, was it still the case that you were only investigating crimes if they were on view or one of the officers under your purview needed assistance?

A.   No.  Sometimes we would get calls for service, sometimes they were on view, and sometimes they were even follow-ups.  I mean, it -- it really depended on the circumstance of how we came into contact with the crime victim.

Q.   Sure.  And maybe I should have clarified.  I'm not talking about your unit.  I'm talking about you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

yourself, sir, as the sergeant and when you would have occasion to go out --

A. Oh.

Q. -- and investigate crimes.

A. Okay. Perhaps you can repeat the question because maybe I did not understand what you meant?

Q. Yes. No. And it absolutely could have been on me, but I'm happy to repeat the question. During your time as a sergeant with Southern District patrol, was it the case that -- or strike that, please. During your time as a sergeant with Southern District patrol, was it still the case that you yourself would only investigate crimes if they were on view or an officer under your purview needed assistance?

A. Generally, I -- I would say that's true unless someone from another unit asked me for help.

Q. And how long were you a sergeant with Southern District patrol?

A. I -- I don't remember exact dates. I -- I don't remember. I just know that was my first assignment, the Southern.

Q. Okay. And then at some point you were transferred to SET-Flex in the Southern District?

A. Yes.

Q. And you were the sergeant of SET-Flex --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

37

strike that, please. You were a sergeant in that capacity as well?

A.   Yes.

Q.   What were your responsibilities as a sergeant of SET-Flex in the Southern District?

A.   I supervised a uniform and plainclothes violent crime suppression unit.

Q.   And in that capacity, under what circumstances would you yourself go and investigate crimes?

A.   Any crimes?

Q.   Yes, sir.

A.   Daily.

Q.   Was it the case that you are investigating there every day on the street with the uniformed and plainclothes officers, or were there certain circumstances under which you yourself would go out and investigate?

A.   Well, we -- we would never go out by ourselves. And in that position as a supervisor, almost like patrol, you'd be out there working with your officers. It's not an administrative position.

Q.   And in that capacity, did you have occasion to investigate robberies?

A.   Yes.

Q.   And were the parameters or -- sorry. Strike

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that, please. During your time with SET-Flex in the Southern District, were there the same markers which would justify a robbery being sent to the criminal investigative division as there were when you were with SET-Flex in the Eastern District?

A. I would say generally, yes.

Q. And during your time as a sergeant with SET-Flex, did you ever have occasion to create and show a photo array?

A. I believe I did with my officers.

Q. And just to make sure I'm not conflating departments again, are SET-Flex and your plainclothes supervisory position two separate positions? The sergeant of SET-Flex and then the plainclothes supervisor, are those two separate positions that you held in the Southern District?

A. No. That's the same job in the Eastern and the Southern and the Southwest. It's the same job throughout the city at that time.

Q. Okay.

A. And you're using the term department. I -- I'd say that they're units and sections. The department is a much larger organization.

Q. Yes. That is fair. And do you recall approximately how long you were the sergeant of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

SET-Flex?

A. In which position?

Q. At the Southern District.

A. No, I don't remember. I think -- I -- I can't remember the exact time. I know I was reassigned to another plainclothes crime suppression task force back in the Eastern while I was supervising that unit.

Q. Okay. And when that happened, were you working in both capacities, or was that a transfer to that Eastern task force, such that you were no longer a sergeant of SET-Flex?

A. Yeah, it was a transfer.

Q. And do you recall were you transferred to the Eastern District task force before or after you graduated from law school?

A. During

Q. During? Okay. So you would've been transferred prior to 2000?

A. Yes. Or sometime during that year.

Q. Okay. What were your responsibilities with the Eastern District violent crimes task force?

A. Violent crime suppression.

Q. Was it similar work to what you were doing in SET-Flex?

A. Similar, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-7 Filed: 03/28/26 Page: 42 of 307 PAGEID #: 11752

40

Q. Okay. Did you still have occasion to investigate robberies with the Eastern District violent crime task force?

A. Yes.

Q. And did you have occasion to create and show photo arrays in that task force?

A. Me personally, or people who worked for me?

Q. You, sir.

A. No. I don't think that's something I would've personally done.

Q. Okay.

A. I was a supervisor at that point.

Q. And was your title still sergeant or were you a lieutenant by that point?

A. I was a sergeant.

Q. And how long were you with the Eastern District violent crime task force?

A. I don't remember exactly the amount of time without looking at my CV, and I think I laid it out on there as best as I could.

Q. Okay. I will say I promise I would not be asking you this if I already had the dates from your CV. I would not do that to you. I'm just trying to, again, get a general time frame.

A. I understand. It's no problem. I'll do my



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

41

best to answer you.

Q. I appreciate it. Were you with the Eastern District violent crime task force when you graduated from law school?

A. I don't remember. I think -- I think so.

Q. Okay.

A. It -- it could have overlapped here or there a few weeks, a few months.

Q. But not more than that?

A. No. I -- I -- I don't remember the exact date of my tenure ending there.

Q. Okay.

A. I know I graduated from law school in December of 2000, I think it was.

Q. And then at some point you transferred back to being a supervisor of a plainclothes unit after being with the task force; is that correct?

A. That was the supervisory position.

Q. Got it.

A. It was plainclothes and uniform, depending on the task we had.

Q. Okay. And after you graduated law school, is that when you were transferred to Legal Affairs?

A. I believe it was afterward.

Q. And you were with Legal Affairs until 2001



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Q.   when you left the Baltimore Police Department?

A.   Yes.

Q.   So you were there about a year?

A.   I don't know if it was a complete year or not.

Q.   Could've been less than a year?

A.   It could have been.

Q.   Okay.  And what were your responsibilities with Legal Affairs?

A.   Policy development, administrative discipline for officers who committed acts of misconduct or violate the rules and regulations, Public Information Act requests, civil forfeitures, subpoenas.  You mean the legal responsibilities?

Q.   Yes, sir.  Any responsibilities that were part of your job description.

A.   I was also a lieutenant, so I think rarely it happened, but I may have to pop in and fill in for another lieutenant in patrol or something like that.  I think I remember that happening a few times, having to be a shift commander.

Q.   Okay.  And in that capacity, did you ever have occasion to create a photo array?

A.   Yes.

Q.   With the Legal Affairs -- sorry, not department.  With the Legal Affairs unit you had



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

43

occasion to assemble photo arrays?

A. Yes. Assisting others in doing it. Again, I was a lieutenant.

Q. Okay. So it would be when you're filling in as a shift commander?

A. No. Sometimes police officers were accused of acts of misconduct, and we'd have to show photo arrays of them.

Q. I see. Okay. And did you ever have occasion to investigate robberies during your time with Legal Affairs?

A. No.

Q. And super quickly before I transition to your time as a prosecutor, and I promise this -- that will go faster, I believe you said that you were detailed to a homicide unit at some point?

A. Yes. Uh-huh.

Q. When was that?

A. When I was a patrol officer investigating a robbery in the Northern. I did a photo array, locate the suspects, wrote arrest warrants for them, and one of them was murdered. And the investigation was transferred to the homicide unit, and I was detailed there to further the investigation of the robbery and the homicide.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

44

Q. Okay. And then after the completion of that investigation, did that detail end?

A. It did.

Q. Okay. Were you at any point ever a detective with the criminal investigative division?

A. No.

Q. And were you ever a supervisor of detectives in the criminal investigative division?

A. No.

Q. Did you have any other detail or assignment during your time with the Baltimore Police Department that we haven't already discussed?

A. I'm sure I had plenty. I -- I think you'd have to ask me the question, but I'm sure day to day we had various assignments and duties that police officers just do that you haven't asked me about but aren't on my CV either. I tried to summarize my career --

Q. Sure. And let me --

A. -- the best I could.

Q. Oh, sorry. I didn't mean to cut you off, sir.

A. No -- no worries.

Q. I should have clarified. I don't mean assignments as in responsibilities that you had as an officer because I completely understand those can vary day to day, and you can be asked to do different things.

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I mean specifically assignments to different units as -- for example, you were detailed to the homicide division. Did you have any other details or assignments out to other units that we haven't already discussed?

A. Again, I'm sure I did.

Q. Okay.

A. It's just something police officers do. I'm not trying to be short with you. It's -- police officers are detailed and assigned to various jobs depending on the need.

Q. Okay. Can you think of any of those other details or assignments as you sit here today?

A. I -- I could be detailed -- I remember being detailed to a prostitution detail for human trafficking. I remember being detailed to a security detail because the president and the Pope were visiting, I remember being detailed to look for wanted people. I remember being detailed to look for someone suspected in the shooting in a homicide. It -- again, there -- there's a wide variety of things. I -- probably take a while if I sat down here and tried to remember every single one, and I'd probably need the entire personnel file, but I just want to be candid with you.

Q. Yeah. No. And I appreciate that. And again, like I said, this isn't -- it's a memory test and it's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

not, right?  You're not being held to these.  I just --
again, I'm trying to get a full picture of your
experience with the Baltimore Police Department with the
understanding that it probably changed a lot day to day.
And so, I appreciate your efforts to try to remember all
of this for me.

A.    Sure.

Q.    And my last -- promise last set of follow-up
questions on your career with the Baltimore Police
Department prior to coming back in 2020.  When you were
a sergeant in the Southwest District, how many officers
were under your purview?

A.    In a squad there could be anywhere from ten to
14.  As shift commander, three sectors, there could be
anywhere from 30 to 40-some.  Sometimes as shift
commander on the midnight shift, you'd have the entire
district.  So you'd be in charge of could be -- could be
dozens, not -- maybe not 100 but shift commanders,
you're in charge of the entire district in absence of
the major back then.  So I'd say in that range, if that
makes sense to you.

Q.    It does.  Thank you.  And during your time as
a sergeant in the Southern District patrol, how many
officers were under your purview?

A.    I'd say the same.  The Southern, I think had



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

four sectors, so there'd be an extra squad if you were the shift commander.

Q. During your time as a sergeant of SET-Flex in the Southern District, how many officers were under your purview?

A. I'd probably say four to six, five to seven. Those were smaller units -- or squads, rather.

Q. And during your time as a sergeant with the Eastern District violent crimes task force, how many officers were under your purview?

A. Probably say four to six. Those were smaller, too. Give or take. Sometimes you'd have to act as the shift commander in the absence of the lieutenant and then you'd supervise the other squads and units.

Q. And then during your time as a lieutenant with Legal Affairs -- actually, strike that, please. During your time as a lieutenant with Legal Affairs, how many officers were under your purview?

A. I didn't supervise officers as a lieutenant in Legal Affairs. Now, if I was detailed outside of Legal Affairs, then I would.

Q. Okay.

A. Yeah.

Q. And to the best of your knowledge, sir, prior to leaving the Baltimore Police Department in 2001, were

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

any complaints ever filed against you?

A. I'm sure there were some.

Q. Can you think of any specific ones as you sit here today?

A. No.

Q. Okay.

A. Yes. I can think of one involving one of my subordinates who I wrote up for discipline. That officer complained.

Q. And was the complaint that the discipline was unfair or something like that?

A. Yes. It centered around that.

Q. And now the next bit I've got dates for, so it should go a little bit faster. You were a prosecutor with the Baltimore City State's Attorney's Office from 2001 to 2003; is that correct?

A. Yes.

Q. Okay. And you were not working as a police officer at that point, right?

A. No.

Q. Okay. What were your responsibilities as a prosecutor with the State's Attorney's Office?

A. Prosecuted criminal cases on behalf of the state and victims.

Q. Were you assigned to any specific unit within

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the State's Attorney's Office if they had units?  Were there certain crimes that you were assigned to prosecute?

A.    Yes.  I was assigned to District Court where we prosecuted everything from traffic violations to misdemeanors to serious misdemeanors to felonies to drug crimes to handguns, anything that was within the jurisdiction of the District Court of Maryland.  And we did preliminary hearings on felonies as well.

Q.    And then from 2003 to 2008, you went -- strike that, please.  From 2003 to 2008, you were then an attorney with the law offices of Janey & Dixon, P.C.; is that correct?

A.    Yes.

Q.    Okay.  And just for clarification, is that Dixon referring to you, sir?

A.    Yes.

Q.    Okay.  And so, during that time, from 2003 to 2008, you're again not working as a police officer at that time, correct?

A.    No.

Q.    Okay.  And what type of -- or strike that, please.  Did your practice have any specialty in terms of the law it practiced?

A.    In Maryland, we -- we don't have -- we didn't



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

have specialties then, so I'm not sure how to answer that question.

Q. I think you did just answer it. And who is the Janey in Janey & Dixon, P.C.?

A. Oh, my former law partner, Neal Janey, Jr., and his father, Neal Janey, Sr., was a partner there for a while, too.

Q. And so, during your time as an attorney at Janey & Dixon, P.C., you would've worked on a range of cases?

A. I'd say that's true.

Q. And then from 2008 to 2019, you were an attorney at the Law Offices of Timothy Dixon?

A. Uh-huh. Yes.

Q. Okay. And during your -- strike that, please. Did any other attorneys work with you at your law office?

A. Throughout the years?

Q. Yes, sir.

A. Yes.

Q. Okay. And during that time, was your practice, again, a general practice? You were working on a wide range of cases?

A. I wouldn't call it a general practice. No.

Q. Okay. What was your specialty?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

51

A. We didn't have specialties. Maryland didn't allow them back then, but I -- I wouldn't say it was a general practice either. Like, there's some things that I never done, so

Q. Was there a certain type of law that you focused on?

A. Did a lot of criminal law, criminal defense, civil rights work, representing police officers who were accused of misconduct. Also represented plaintiffs who had their rights violated by police officers. I'd probably say that was majority of the focus for a good part of that time, but we -- we did other things, too.

Q. And during -- oh, sorry. Strike that, please. During that time period, 2008 to 2019, you are not working as a police officer, correct?

A. No.

Q. Sorry, let me reword that because I think we got caught on a negative. From 2008 to 2019, at any point, were you working as a police officer?

A. No.

Q. Okay. And then from 2014 to 2019, so while you had your own practice, you were also working as the Chief of Compliance at Alliance Transportation?

A. Yeah. It was a company that did become Alliance Transportation, so yeah.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. What were your responsibilities in that capacity?

A. General legal counsel work, advisement to the owners.

Q. And then in 2020, that's when you returned to the Baltimore Police Department?

A. Yes.

Q. And did you return as an operations officer in the Legal Education unit?

A. Yeah, that's the civil service job description. I supervise the Legal Education unit.

Q. And is that still your job today, sir?

A. When I returned, I think my first job there was law instructor, and then I became the supervisor after. I don't remember how long it was.

Q. Okay.

A. A year, or so, I became the supervisor, a couple years maybe. I can't remember, but I became the supervisor of the other attorneys there.

Q. First, as a law instructor, what were your responsibilities?

A. You mean my initial job there?

Q. Yes, sir.

A. We taught law, and entry level, the academy, also in-service training for veteran officers, I would

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

53

say every aspect of criminal law, criminal procedure, to include investigations, we consult, and collaborate on policies, and policy development, mock trial, court trial prep. Trying to think if I left anything out, but that -- that was the -- that's the job, initial law instructor. Also, we give, I don't want to say advice, but counsel, and guidance to supervisors, commanders, executive command of the Baltimore Police Department, and other city agencies, on a variety of issues concerning policing.

Q. But in that capacity, you were never acting as a police officer investigating cases; is that right?

A. No.

Q. Again, sir, I think we're --

A. No, it is correct. No, I --

Q. Okay. Thank you, sir. And then how did your responsibilities change as a supervisor?

A. I supervise the other lawyers who are law instructors, in addition to my training, and teaching obligations. And the collaboration with other units, I tend to coordinate that more. I'd also say, called upon more by the other lawyers for the city, and the police department, and giving counsel, and guidance regarding policing, and legal issues that might arise.

Q. And then in that capacity, you were not



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

54

working as a police officer in investigating crimes; is that correct?

A. That is correct.

Q. Okay.

MS. SCHERGER: Alyssa, if we're going to change topics, can we take a short break?

MS. MARTINEZ: Yeah, I've got a few more questions just on this line, and then I'm ready to change.

MS. SCHERGER: Okay.

BY MS. MARTINEZ:

Q. Now, sir, of the -- actually, sorry. Strike that, please. Have you ever been dismissed, or fired from any job?

A. Yes.

Q. Okay. And can you tell me just a little bit about that?

A. I was in college. I had a job at a warehouse. And at the end of the first day, it was a temporary job, and I was in line getting a hot dog, and the guy told me that he didn't need me the next day.

Q. Okay.

A. That's one I remember.

Q. Okay. Other than that instance, have you ever been dismissed, or fired from any job?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Not that I can recall.

Q.   Okay.  And to the best of your knowledge, have you ever had a complaint filed against you in your capacity as an attorney?

A.   Yes.

Q.   Okay.  And can you please tell me a little bit about that?

A.   I was on the trustee board of my church.  And I found another -- well, not another, but an employee was stealing, and I reported him.  And he complained to the bar.  And I told the bar why I reported him.  And I also told the bishop what he did.

Q.   And were you cleared by the bar of any wrongdoing?

A.   Yes.

Q.   And outside of that instance, are you aware of any complaints being filed against you in your capacity as an attorney?

A.   Not a complaint, I was post-convicted once, and that was unsuccessful.

Q.   When you say, "post-convicted," what do you mean by that?

A.   I represented a defendant in a school shooting, a mass shooting, and he was convicted on four of -- of 14 counts, and he got a 100-year sentence.  And



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

he hired another lawyer to try to seek a new trial, and he was unsuccessful.

Q. Okay. I see. So there was some kind of ineffective assistance of counsel claim in his post-conviction proceedings?

A. I think that was one of his claims.

Q. Okay. And outside of those two instances, can you think of any other complaint that's ever been lodged against you in your capacity as an attorney?

A. No.

Q. And my last question for you, sir, before we take a break: I asked briefly about any relevant publications that you made in connection with your opinions in this case, but have you written any articles, or publications in any capacity?

A. You mean like for public consumption?

Q. Yes, sir.

A. Not that I can recall.

Q. Okay. But you may have written internal memos as part of your duties with either legal affairs, or during your legal career; is that a fair statement?

A. I'm sure I've written hundreds of motions, and dozens, if not hundreds of lesson plans, and training.

Q. Okay. I am ready to take a break if everybody else is.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

57

THE REPORTER: All right. I'll get us off record. Time is 12:20.

(A recess was taken.)

THE REPORTER: We are back on record. Time is 12:27.

BY MS. MARTINEZ:

Q. Okay. Just a few more background questions for you, sir, before we jump into your report. During your career, have you ever been involved in the prosecution of someone that you later found out was innocent?

A. No.

Q. And do you think wrongful convictions are a problem in our justice system?

A. Yes.

Q. Okay. And in your own words, can you please explain why?

A. Well, how much time do I have?

Q. As long as you need.

A. Well, I -- I've represented folks who've had their civil rights violated. And I think that if someone is wrongfully convicted, it -- it erodes our criminal justice system. From police, who may often commit acts of misconduct, and those who don't, it erodes their legitimacy as well. It erodes legitimacy



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

of prosecutions, the justice system, and erodes people's trust in it. I think books have been written on it, let alone the damage, and harm it does to the individual who is wrongfully convicted, who may spend time in jail, lose their reputation, may cause some -- economically, their family, the stress, the trauma of it. I can't explain in enough ways or terms in this deposition how I think it harms people. So if you ask me if I think it's a problem, yes, I do think it's a problem.

Q. And at any point, have you ever seen any news articles, or broadcasts about this case specifically?

A. No.

Q. And during your career, have you ever worked with an officer, or supervised an officer who committed misconduct?

A. Yes.

Q. And have you ever investigated an officer for committing misconduct?

A. Yes.

Q. Okay. And has any officer that you've investigated ever been disciplined for committing misconduct?

A. Yes.

Q. And during your time as an expert, have you ever offered the opinion that someone in law enforcement

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

committed misconduct?

A. Yes.

Q. And we're going to talk about some of your previous cases in just a moment, but what specific cases can you recall that you've offered an opinion that someone in law enforcement committed misconduct?

A. I've been involved in a lot of cases. I think maybe you should be a little more specific about what you're asking me because I'm not sure I understand the question.

Q. Sure. I'm happy to rephrase. And like I said, we're going to go over some of the cases you've offered opinions on in just a moment, but my question for you is: As you sit here today, can you think of any specific cases in which you have offered the opinion that someone in law enforcement did in fact commit misconduct?

A. I think I'd have to refer to each of the cases.

Q. Okay. So as you sit here today, you can't think of a specific one?

A. I can think of several, but I -- I think the -- do you just want one example?

Q. I'm just asking for the names of the specific cases. And again, obviously, we have the list of the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testimony that you've provided, and we also have the list of the cases you've been retained for the last four years. I'm just asking you specifically, right now, if you can remember the names of any cases in which you gave the opinion that a law enforcement officer committed misconduct?

A. Yes. Now, if you want me to give you the actual case caption, I'd have to refer to the case list that -- I guess that's what I'm saying.

Q. Okay.

A. You -- you are asking me for a case, and in order to refer to the case, I'd need to look at the case list.

Q. So -- and we'll quickly put a pin in this. I have a few other questions I want to ask you before we do go over that list, okay?

A. Sure.

Q. Sir, are you on social media?

A. I'm on LinkedIn. I don't know if that counts as social media. And --

Q. We'll count it.

A. -- I think I have a Facebook account, although I rarely check it. I think I have an Instagram account, but I rarely check it, or use it. I think that's it --

Q. Are each of --



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   -- as I can recall.

Q.   Oops.  Are each of those accounts under your name?

A.   Yeah, they would be under my name.

Q.   Okay.  And lastly, sir, where do you typically get your news?

A.   I'd say from a variety of places.

Q.   And what are those sources?

A.   I get my local news from local news networks. I get my national news from YouTube channels that I particularly watch, online newspapers that I read.  I can't think of every place I probably get it.  Podcasts that I have an interest in, and some that I don't have much of an interest in, but I watch.  And probably from people that I speak to, individuals.

Q.   And quickly breaking those down, when you say, "YouTube channels," which channels?

A.   God, I don't know everyone that I subscribe to, but yeah, I have subscriptions of channels that I -- I watch with different areas of interest that I have.

Q.   Sure.  I'm sorry.  And maybe I should have clarified.  My question is just: Can you name any of the YouTube channels that you watch as sources for news?

A.   Okay.  I'm not trying to be short with you, but when you say, "news," are you talking about

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

62

politics, economics, hobbies? I'm -- I'm not an interesting person, I don't think, but I -- I do have different areas of interest.

Q.  Sure.  I would not say hobbies, but I would include the first two.  So anything pertaining to politics, economics, the state of the country, the state of the world, but not including hobbies you may have, or interests that you're pursuing?

A.  On YouTube?

Q.  Yes, sir.

A.  I think I -- I subscribe to -- to the Meiselas Report, Legal AF, CNN, CBS, NBC.  I can't remember all of them because it's curated.  So I subscribe so that the algorithms bring me the news I want.  And there are cultural things I subscribe to as well, things about history, about African American history, sports, technology, law, policing.  Again, I -- I can't remember everything I subscribe to.

Q.  Okay.  And that's fair.  I'm not asking for the full range of anything that you can remember that -- any sources that you can recall just as you sit here today of places that you do regularly get your news.  For online newspapers, are there any specific sources?

A.  That I subscribe to, or that I read or peruse?

Q.  That you read or peruse.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

63

A.   The New York Times, Washington Post sometimes, The Baltimore Banner for local news.  I'm sure there's others, I just can't think of all of them.

Q.   And then any specific podcasts?

A.   I think I named a few of them, Meiselas Report, CNN technology reports, or podcasts rather. There's some on History that I -- I subscribe to.  I don't always listen to the subscription, sometimes they pop up on my feed, but I don't listen to them.  CNN, sometimes, MSNBC, or MS NOW.

Q.   So I'm going to show you, sir, what we'll mark as Exhibit 2, which is the initial report you submitted in this case.  And I'm going to quickly scroll through it just so you have a chance to look at the document, and make sure we're talking about the same document, okay?

(Exhibit 2 was marked for identification.)

A.   Sure.  Could you make it a little larger possibly?

BY MS. MARTINEZ:

Q.   Yes, of course.

A.   Okay.  Is it okay if I look at my copy?

Q.   Yeah, you can also absolutely look at your copy, that may even be easier.  I just want to quickly scroll through this so that you have a chance to look at



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

64

it, confirm we're looking at the same document. And then you can absolutely use your copy. I just ask that if you're looking at it to answer any of my questions, you just let me know that you're looking at your report, okay?

A. Okay.

Q. But I just want to scroll through to make sure that we're talking about the same document here. And this report is dated for July 11, 2025, correct?

A. Yes.

Q. Okay. And that's your electronic signature right there?

A. Yes.

Q. Okay.

A. Looks like it.

Q. Okay. And then I'm just going to quickly go through the appendix. So this is the report that you submitted in this case in July of 2025?

A. It -- it looks like it, yes.

Q. Okay. And then I'm going to quickly share what we'll mark as Exhibit 3, which is, and I'll again zoom in, the rebuttal report. And I just, again, want to make sure that we are looking at the same document, so I'm going to scroll through again, so you have a chance to look. And this report is dated November 19,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

2025?

(Exhibit 3 was marked for identification.)

A.   Yes.

BY MS. MARTINEZ:

Q.   And is that your electronic signature there on the left?

A.   It looks like it.

Q.   Okay.  So this is the rebuttal report that you issued in this case?

A.   It -- it certainly looks like it.

Q.   Okay.  I will stop sharing.  Now, all of the opinions you intend to offer in this case are contained within one of these two reports; is that correct?

A.   I assume so, unless someone asked me a question that was outside of it.

Q.   When you say, if "someone asked you a question outside of it," do you mean me asking you questions here today?

A.   Yes, for example.

Q.   Okay.  But prior to the beginning of the deposition today, all of your opinions in this case were enshrined in one of these two reports?

A.   Yes.

Q.   Okay.  And did you arrive at any opinions, prior to issuing your initial report, that you chose to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

exclude from that report?

A. No.

Q. Okay. And the appendix beginning on Page 35 of your initial report lists the materials you reviewed, correct?

A. Yes.

Q. Are these all the materials that you relied upon in arriving at the opinions expressed in your report?

A. Yes.

Q. Okay. Did you receive any additional documents other than those listed in your report?

A. Not that I'm aware of.

Q. Well, starting with your first report, sir, did you write this report?

A. Yes, I put it together. There's things in here that aren't my writings.

Q. Okay. So certain portions may have been written for you, but you assembled it all at the end?

A. I don't understand what you mean.

Q. Sure. Let me rephrase. When you say certain parts are not your writing, what do you mean by that?

A. Like there -- there are screenshots of documents, things like that. There's references to other items that I didn't author. Anybody --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. I see. Oh, I'm sorry, I didn't mean to cut you off, sir.

A. Yeah, there -- there -- there's materials referenced in the report that I didn't author.

Q. Okay.

A. But if you're asking me if I put the report together, yes.

Q. Okay. Was any portion of your report written for you?

A. No.

Q. Did anyone tell you what to write?

A. No.

Q. Did you type this report in its entirety?

A. No, because there's things in here that -- that aren't typed. I -- I guess I'm confused as to what you're asking me. Like, there's screenshots, things that I would not have typed, there's graphics in here, there's subscripts. So no, I didn't type those things.

Q. Outside of the inserts, so the screenshots --

A. Uh-huh.

Q. -- and all the graphics, all of the typed out words, were they all typed by you?

A. Yes, initially. Of course, I used spell check, and things like that in my computer, but yes, no one else wrote it.


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

68

Q.   Okay.  Did anyone tell you to make any assumptions in drafting this report?

A.   No.

Q.   Did anyone provide you with any facts that are not included in the materials you reviewed that you included in the report?

A.   No.

Q.   And now, for your rebuttal report, sir, did you write this report?

A.   Yeah.  In the same way as I mentioned the first one, yes.

Q.   Did anyone write any part of it for you?

A.   No.

Q.   Did anyone tell you what to write?

A.   No.

Q.   And outside of the inserts, you typed up the entirety of the report, correct?

A.   Yes.  Now, of course, I used my computer, but yes, in the same way as I described the first one.

Q.   Did anyone tell you to make any assumptions in drafting this report?

A.   No.

Q.   Did anyone provide you -- oh, sorry, actually, I got this.  And so, in addition to the materials reviewed listed in your first report, you then also,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

obviously, reviewed Chief Tiderington's report before issuing your rebuttal; is that correct?

A. Yes.

Q. Did you review any other documents that are not listed in the appendix to your first report prior to issuing your rebuttal report?

A. I'm sorry, could you just repeat the question?

Q. Yeah. Sure. So there's the appendix of documents that you reviewed for your initial report, right?

A. Uh-huh.

Q. And then in addition to that, you also reviewed Chief Tiderington's report prior to issuing your rebuttal report; is that correct?

A. Yes.

Q. Did you review any other documents outside of those listed in the appendix, or Chief Tiderington's report prior to issuing your rebuttal report?

A. I may have looked at the references that he listed in his report. I'd have to go back, and look at what he listed. But as a practice, I normally try to look at what the other person has listed in their report as their references.

Q. Okay. And if there were references in Chief Tiderington's reports to documents that you did not

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

have, would it be your practice to ask for them, or would you only check the documents you did have?

A.     If I couldn't locate it, I -- I probably asked for it.

Q.     Do you recall asking for any documents in this case prior to issuing your rebuttal report?

A.     I don't recall, no.

Q.     Okay.  And did --

A.     But again, I -- I don't recall what Chief -- Chief Tiderington, I think I referred to him as Mr. Tiderington, put in his report.  I don't remember every document that he listed.

Q.     Okay.  And did you receive any documents from counsel, other than Chief Tiderington's report, between issuing your initial report, and issuing your rebuttal report?

A.     I don't recall if I got any other materials or not.

Q.     If you had received additional materials, would it have been your practice to include those additional materials in your rebuttal report?

A.     Yes.

Q.     And does your rebuttal report, sir, contain the full extent of your rebuttal of Chief Tiderington's report?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.  At that time, yes.

Q.  All right.  When you say "at that time," what do you mean by that?

A.  It means when I wrote the report, that was my rebuttal.

Q.  Do you have additional rebuttal of Chief Tiderington's reports as you sit here today?

A.  No, not unless you ask me.

Q.  Okay.  Understood.  And again, just to clarify, when you say not unless I ask you, do you mean if I ask you about specific parts of -- actually, sorry, strike that, please.

Have you reviewed Chief Tiderington's rebuttal report?

A.  Yes.  I think that was the subject of my reply.

Q.  All right.  Here, let me -- I'll clarify.  So I'll represent to you, sir, that Chief Tiderington submitted an initial report, and then he also submitted a rebuttal report in response to your initial report. And so I understand from your testimony that you reviewed Chief Tiderington's initial report, that was around 50-some pages.  My question is: Did you review his rebuttal report, which is around six or seven pages?

A.  You know, I don't remember if I have, or have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

not.

Q. Okay. But outside of any additional questions that I may ask you, as you sit here today, your rebuttal contains the full extent of your rebuttal to Chief Tiderington's report?

A. My reply does, yes.

Q. Okay. And since issuing your rebuttal report, have you reviewed any additional documents pertaining to this case that are not memorialized in that appendix, or that you've already testified to here today?

A. I'm sorry. I -- again, I'm not trying to be short with you -- you mean since I replied to Mr. Tiderington's, or Chief Tiderington's initial report, have I reviewed anything else?

Q. Yes, sir.

A. I don't know if I received other materials since then, but if I had, I would've reviewed them. So I -- I think that's the best way I can answer that question for you.

Q. Okay. Would it be fair to say then that as you sit here today, you have no memory of reviewing documents that are not already listed somewhere -- oh, sorry, strike -- yeah, strike that, please.

Let me reformulate that question. So you've testified here today that you reviewed the materials

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

contained in the appendix in your initial report, and you've reviewed Chief Tiderington's report, and you did all of that prior to issuing your rebuttal report; is that correct?

A. Yes. I replied after reading, and reviewing Chief Tiderington's initial report. Again, I don't remember if I've seen his rebuttal of my reply or not.

Q. Okay. And then so my last question on this point, sir, is: Since issuing your rebuttal report, you testified that you reviewed some documents in preparation for your deposition today, have you reviewed any documents that are not memorialized in the appendix provided in your initial report?

A. If I reviewed something different, I would've put it in my reply. I -- I think we're saying the same things, and it could be because we're in different states, but I normally refer to the defendant's reply to the plaintiff's report, and the plaintiff's rebuttal to my reply. So maybe we're saying the same thing, I don't know or not, but whatever I reviewed to respond to Plaintiff's expert report, I would've placed in the defendant's reply --

Q. Okay.

A. -- or I would've incorporated it by saying I incorporate the materials that I use in the first

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

74

report.

Q. Okay.

A. I try to be specific.

Q. I promise, I'm not -- I'm not trying to be confusing. I do think, you know, there is some oddities to the language that may have us speaking past each other. So let me try one more time to clarify, and if it's not helpful, we'll just move on. So I completely hear and understand your testimony that you listed your materials reviewed in your initial report, and you would've put in your rebuttal report everything you reviewed, which includes Chief Tiderington's initial report. My question for you, sir, is: After you submitted your rebuttal report, so after both reports are out, and issued in this case, outside of preparation for your deposition, did you then review any other documents that are not listed somewhere as having already been reviewed by you?

A. No, I don't think I would've.

Q. Okay. Now, sir, you are serving as an expert in this case, correct?

A. Yes.

Q. And you are serving specifically as a police practices expert?

A. Yes.


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And it's for the robbery investigation that occurred in 2004?

A. Yes, the subject matter of this case.

Q. Yes. How many times in your career, sir, have you been retained to consult as a police practices expert?

A. Do you mind if I look at the case list on my report?

Q. No, please. And I believe on Page 6 of your report you also state that you've been retained 20 times as an expert witness since beginning to work as an expert, I just don't know if that information is still accurate.

A. I think it's been a few more times since I did this initial report. I think as of July it was 25 times, and I think I might have been retained two or three more times since then. If you -- if you really want to know I can try to find out for you, but

Q. No, that approximation is helpful, I appreciate it.

A. I'd say between 25 and 30 times.

Q. Okay. And was every time as a police practices expert?

A. Yes.

Q. And how many times, sir, have you testified as



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

an expert in this area?

A.    I think seven times not counting today.

Q.    Okay.  And was each of those instances again as a police practices expert?

A.    Yes.

Q.    Generally, sir, how many cases do you serve as an expert on at a time?

A.    I don't think I've ever put a minimum or maximum, it's never been an issue for me to place a minimum or a maximum on.

Q.    And to the best of your knowledge, sir, what is the general breakdown in cases that you've served as an expert on between the criminal system and the civil system?

A.    I think I've served as an expert in one criminal case.

Q.    And the rest are all in civil cases?

A.    I believe so.

Q.    And to the best of your knowledge, sir --
actually strike that, please.  For the one case in the criminal system were you an expert for the prosecution or the criminal defense?

A.    For the defendant.

Q.    And to the best of your knowledge for the cases in which you've served as an expert in the civil

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

77

system what is the breakdown between plaintiff and defendant?

A.   I've served as experts for both.  I haven't counted the breakdown, but I did try to list them in the case list that I gave you.  Do you want me to go through and count them?

Q.   No, that's okay, I'm just seeing if you have a general idea of if it's 50/50, 60/40, or it just kind of plays out how it plays out?

A.   Yeah, I think that folks contact me if they think I can be of some use to them, they retain me, and if they think I may not they probably don't.

Q.   Okay, if you could please, sir, go to Page 32 of your report, and then just let me know once you're there, I've got a couple of questions.

A.   Yes, I have it.

Q.   Okay.  So circling back to our conversation a little bit earlier about cases that you've provided opinions for, I'd like to ask you about these seven different cases that are listed here.  So first for Officer Clink v. Town of Minersville Pennsylvania Police Department, you served as an expert for the defense; is that correct?

A.   Yes.

Q.   Okay.  And what was your assignment in that



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case?

A. I was an expert for the Town of Minersville.

Q. Okay. And can you please summarize your opinions from that case?

A. I don't remember all of my opinions from that case, it was an administrative proceeding where the officers were accused of misconduct.

Q. And did you sit for a deposition in that case?

A. It was a hearing for both officers.

Q. And --

A. I testified against the two officers.

Q. And that case pertained to the use of force; is that correct?

A. Yes.

Q. Okay, Sir, for the second testimony listed, Officer Brown v. Town of Minersville, that's the same case, correct, that's just the second officer?

A. Yeah, it is the second officer, yes.

Q. Okay. For the third case, and I may butcher this, Riggio et al. v. Thomas Jefferson University Hospital, you testified as an expert for the defense?

A. Yes.

Q. Okay. And can you please summarize your opinions in that case?

A. I don't remember all of my opinions in that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

case without having my report.

Q. Okay. This is a medical malpractice case; is that right?

A. No, I don't think it was. I -- I think my testimony is centered around the use of force by the officers that worked for Thomas Jefferson University Hospital Police Department. At least that was my portion of the testimony.

Q. Understood. For the fourth case, Gloria Merritt v. Baltimore County Police Department et al., you served as an expert for the defense?

A. Yes.

Q. Okay. And can you please summarize your opinions from that case?

A. Again, I -- I don't remember everything I testified to at trial, but I testified on behalf of the county. The police officer was defendant, and it was a use of force case.

Q. Okay. For Number 5, Porcha Woodruff v. City of Detroit and Detective LaShauntia Oliver, you testified as an expert for the plaintiff?

A. I did.

Q. Okay. And that is a wrongful conviction case; is that correct?

A. That wasn't the scope of my testimony, it was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

regarding policing practices in a robbery case. I testified for the plaintiff. She was -- the -- the complaint was involving her being wrongfully arrested.

Q. Okay. But you were retained to speak to the policies and practices, not the specifics of her case?

A. I'm not sure I understand your question.

Q. It's my understanding that you just testified that you were retained to speak to the policies and practices of the City of Detroit in that case; is that correct?

A. No, it was involving the investigation.

Q. I see.

A. The plaintiff was wrongfully arrested for a robbery similar -- similar to this but not the same fact pattern, but it was involving a robbery investigation.

Q. Okay. And Number 6 is Green, et al., v. City of Monroe, et al., and you testified as an expert on behalf of the plaintiff?

A. Yes.

Q. Was this another use of force case?

A. If memory serves me correct, I think involved use of force and someone dying in police custody, and I testified for the plaintiff.

Q. And lastly, sir, Natividad v. Raley, et al., you testified as an expert on behalf of the plaintiff?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. Yes.

Q. Okay. And can you please summarize your opinions from that case?

A. I don't remember all my opinions without having referred to the reports, and I wasn't asked to bring the reports, so I didn't try to go back and review them. But if memory serves me correct, this involved a wrongful conviction. Brady allegations involving the Philadelphia Police Department, and a person who was wrongfully incarcerated, and I testified for the plaintiff at that deposition.

Q. Have you at any point testified at trial in a wrongful conviction case?

A. No, I don't think I've had to testify at trial.

Q. And outside of those two cases, Porcha Woodruff and Natividad, can you think of any other cases you've been retained to give an opinion on that are wrongful conviction cases also outside of this one?

A. You -- you mean arrest and conviction, or just simply conviction?

Q. We'll do both, we'll be over expansive.

A. Again, I -- I don't have all the cases in front of me and -- and I wasn't asked to review them in preparation, but going down the list, Clink and Brown

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

involved a wrongful arrest and use of force. Number 5 for the plaintiff, Murph, involved an arrest I believe. Number 7, Roger Brown, I believe involved that. You're asking just for the plaintiffs?

Q. Or for the defense, sir.

A. I'm sorry?

Q. Or for the defense.

A. I -- I -- I think I'm confused a little bit. I thought your initial question were -- was cases where I've testified for the plaintiff involving wrongful conviction, and I asked you, are you referring to arrests and conviction or just conviction, and you said both. And now I'm just clarifying that almost every case involving the police involves either some aspect of not just use of force, but arrest. So are you asking me to go in depth in each of the 25 cases listed here or -- I'm -- I'm just confused as a question, I'm not trying to be difficult, but

Q. No, it's okay, and I will clarify. So my question was -- right, we talked about Porcha Woodruff's case, and we talked about Natividad, which are two wrongful conviction cases that you have opined as an expert in, right?

A. No, that's what I'm asking you. Some cases -- Natividad, the person had been convicted. Some cases

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the person has been arrested, and that's why I was asking you, are you talking about arrest and conviction or just conviction, and you said both, and so I was going through the cases where I've testified regarding a wrongful arrest or a conviction, so maybe I'll just -- could you just tell me what you'd like me to answer so I can try to answer as best as I can because I'm a little confused at this point.

Q. Sure. You know, it actually -- it doesn't matter, the cases speak for themselves so I will just skip that question. Have you ever at any point prior to this case served as an expert for the City of Columbus?

A. No, not that I'm aware of, or not that I remember.

Q. And you testified a few minutes ago that you may have been retained in two or three additional cases since issuing your initial report in this case?

A. Yes.

Q. Do you know the captions of those cases?

A. I don't have them with me, I -- I wasn't asked to bring them.

Q. Okay. But that's information you could get?

A. Yes.

Q. Okay. I'm not asking you to do that right now, I'm just making sure it's information that's



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

84

available to you. Okay. Have you sat for any additional deposition that's outside of what's encompassed in this graphic outside of the deposition today?

A. I don't think I have.

Q. Okay. And have you given any testimony at trial or any arbitration hearing that's not encompassed by this graph of the list?

A. I don't believe so, no.

Q. Or have you ever served as an expert on any cases evaluating the quality of an entire robbery investigation start to finish?

A. Can I review my report?

Q. Yes.

A. Yes.

Q. Okay. And which cases?

A. Number 15 on the list, Porcha Woodruff involved a robbery. I think -- I think number 10, Frierson, involved a robbery as well. Those are two that come to my mind involving robberies.

Q. Okay. And any others from this list?

A. Not -- not just from looking at the list, I'd have to go look at the entire file.

Q. And of the two to three new cases you've been retained on do any pertain to evaluating the quality of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

an entire robbery investigation start to finish?

A.   Honestly, I'd have to look at the cases, I -- I don't remember what they are sitting here.

Q.   And taking a quick step back, for Porcha Woodruff's case was -- strike that, please.  In Porcha Woodruff's case did you also opine on the use of facial recognition technology or was that beyond the parameters of your opinion?

A.   I did offer an opinion about the detective's use of it in the case, but not the technology, the facial recognition technology itself.

Q.   Okay.  Now expanding the perimeters a little bit, have you served as an expert on any cases evaluating the quality of any investigation start to finish?  So not robbery specific, but the entirety of an investigation into a crime?

A.   Yes.

Q.   Okay, which cases?

A.   I -- I'll tell you all of them in some way deal with I think what your question is, but if you're -- to try to answer as best as I can I -- I think I understand your question.  Almost every case involving the police encompasses the entire investigation, not just some snapshot in time, so I don't -- I don't know how to answer that other than I think every one of those

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

86

cases involving policing practices I was asked to evaluate either for the plaintiff or the defendant, or the -- the town in case of Clink and Brown, the officer's conduct during -- during the entire investigation.  So I -- I -- I hope I'm answering your question, I'm not sure I understand it, but

Q.    No, you are, and I will say -- actually, sorry, strike that, please.  I think use of force cases are kind of their own category because you need the full investigative picture in order to give that opinion, so I think I understand what you're saying, that they all touch on the full investigation to some capacity.  Have you ever been retained as an expert on any cases that involve evaluating a photo array?

A.    Yes.

Q.    Okay.  Which cases?

A.    Woodruff comes to mind, that's number 15. Number 23, Natividad, comes to mind.  I think number 14 may have involved a photo array, I'd have to go back and look.  Again, without having the files in front of me I think those come to mind as having involved a photo array or identification.

Q.    And during your time as an expert have you ever come to the opinion that a photo array was unduly suggestive?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

87

A. That would call for a legal conclusion so it's not something that I would express an opinion about.

Q. And during your career as an expert have you ever opined on any officer misconduct pertaining specifically to a photo array?

A. Yes.

Q. Okay. And lastly, sir, have you ever been retained as an expert on any cases evaluating potentially exculpatory or impeaching evidence?

A. Yes.

Q. Which cases?

A. Oh, I'll tell you again, most cases that involve an arrest or a conviction there's usually some aspect of exculpatory impeachment evidence that comes up. If you want me to go through the list, I'll try?

Q. I don't think that's necessary, I understand your answers and the -- and what that means for the cases you've served as an expert in. Would it be a fair statement to say that the majority of your expert opinions deal with searches, seizures and/or the use of force?

A. I'd probably say that every policing practice case in some way deals with a search, seizure or use of force because if the person's not arrested or stopped, or taken into custody, then you wouldn't have that. So

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

88

yeah, even this case deals with a seizure.

Q. Okay. And would it be fair to say that the majority of your expert opinions specifically deal with the use of force?

A. No, I don't think that's a fair assessment. Because again, every one of the cases involves various aspects of policing practices, it's not just simply the use of force. Use of force is a seizure, arrest is -- are seizures. Someone who's wrongfully incarcerated like in the Natividad case involves various aspects of not just the Fourth Amendment, but others. So no, I don't think that's a fair assessment. I think each case has distinct differences between the others, so I think your generalizations are respectfully a bit off.

Q. How many times have you been qualified by a court as an expert?

A. I think I've been asked -- you mean as an expert?

Q. Yes, sir.

A. I testified at two trials, two hearings, so four times that I -- I count.

Q. And to the best of your knowledge have you ever not been qualified as an expert?

A. No.

Q. Okay. And have you ever been excluded from

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

89

giving testimony by a court?

A.   No.

Q.   And have you, sir, ever -- or sorry, strike that, please.  Have you ever been sued?

A.   I think I got sued once as a police officer.

Q.   And --

A.   I don't remember what it was for, but

Q.   You're predicting my questions.  Do you remember approximately when that lawsuit was filed?

A.   No.  I think I was a younger officer in the Northern and I don't remember what it was about.  I turned the lawsuit into Legal Affairs and I was -- I think I was told it was dismissed or something.

Q.   Now, sir, your compensation rate for document review, statement preparation, attorney consultation and testimony is listed in your report, correct?

A.   Yes.

Q.   Okay.  And your rate for those things is $250 an hour; is that correct?

A.   Yes.

Q.   And your rate for giving testimony is also currently $250 per hour; is that correct?

A.   My rate is 250 an hour, if it goes past four hours it's -- it goes to the entire day.

Q.   Okay.  So you do block billing for the first

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

90

four hours and then beyond that's the full day?

A.    Yes.

Q.    Okay.

A.    And that's deposition and trial.

Q.    Okay.  As you work on a project, sir, how do you keep track of your hours?

A.    I use.

Q.    And then what is your general billing practice?

A.    I don't know how to answer that other than I bill at my hourly rate and the block rate as I stated.

Q.    Sure, and I can, you know, clarify with some follow-up questions.  Do you issue a bill to people who retain you once a month?  Is it upon completion of a report?  When do you typically issue bills?

A.    I think it varies.  I normally either bill as I do the work, or I may ask for a retainer upfront, depending.  With some governmental entities or with some lawyers they'll ask me, can I invoice, but I -- I try to invoice not necessarily monthly, but when I think there's a substantial work completed.

Q.    Okay.

A.    I think that's the best I can tell you.

Q.    And what is the approximate number of hours you have spent working on this case, sir?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Oh, I don't know, I'd have to look.

Q.   How many -- or strike that, please.  To the best of your recollection how many bills have you issued to the City of Columbus for your work in this case?

A.   I don't recall exactly, maybe two or three.  And I -- I wasn't asked to be prepared for that, so

Q.   Okay.  Do you have an approximation of your total bill for this case thus far?

A.   No.  Again, I -- I wasn't asked to have that information.

Q.   Okay.  Are those bills something that you have access to?

A.   Would I?

Q.   Yes, sir.

A.   Yeah.

Q.   Okay.  And are they something that you could easily get on a break, or would you need to go somewhere, or go to a different computer or anything like that?

A.   I could probably get them during the break.

Q.   Okay.  I just want to make sure it's not, you know, this big hassle and you have to go somewhere else or anything like that.  Okay.  And in your typical bill printouts do you include itemized descriptions of your work, or do you do more block billing, like, three hours

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

document review?

A. I think it's itemized based on the categories that the software gives me.

Q. Okay. And, sir, will you bill for every hour you've worked on this case?

A. Yes. Now, there are times when I'm doing something that's just for my own edification, no, I probably wouldn't bill for that. Like, if I want to pick up the report because I haven't looked at it in a while I don't bill for that. But if I'm doing work for the defendant, then yes, I bill for that just like I'll bill you for this deposition, because everybody gets the same bill.

Q. Okay, understood. And now turning back again to your report, sir. Starting on Page 35, that is the appendix that lists all of the materials you reviewed in preparing for your initial report. And I believe you testified that there are no documents that you reviewed prior to disclosing this report that are not listed here in this appendix, right?

A. Not that I recall.

Q. Okay. For the materials you did receive, did you receive them all at one time or did you receive them in batches?

A. My -- my instincts tell me I probably wouldn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

have received all of them at one time, usually I get various downloads.

Q. Okay. And I -- you kind of just answered this, but do you receive the documents in physical copies, like the papers themselves, or do you receive them all electronically?

A. I prefer electronically.

Q. And when you're doing -- strike that, please. When you're doing your review, do you review all the documents electronically or will you print some out to write on them and take notes?

A. I try to review them electronically.

Q. Okay. To the best of your recollection were there any materials you asked for either in preparing this report or your rebuttal report that you did not receive?

A. Not that I recall.

Q. Okay. And so, according to this appendix, sir, you've reviewed over 460 documents; is that correct?

A. I don't think each one of them is a different document because some of them are connected in the same file, but what I tried to do was list the file names. And if they had sub folders and files, I tried to list them, too.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay.

A. But some of them are part of the same actual document.

Q. Okay. But would you agree that there's over 460 listings, at least, of separate documents in this appendix?

A. I have 246 on my list.

Q. I'll represent to you that I went through, and I counted all of the sub documents to get to above 460.

A. Okay.

Q. But --

A. I -- I tried to -- I tried to be specific about what each file was, so I get the sub-documents there that are in sub-folders. And if you're going to ask me, did I review each and every one of those, I will tell you I tried to look at them, but when I saw that it was something that didn't have use for me, I didn't spend a lot of time on it.

Q. Okay. So that was going to be my next question because there's obviously a lot of materials here. And so my question was going to be: Did you review every page of every document?

A. If I saw something and I began reviewing it, and I recognized that it didn't have a use for me, then I did not continue reading it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. And so, would it be a fair statement to say that every single one of these files, you at least clicked open to see if it pertained to you; is that accurate?

A. I -- I would say that I reviewed it to see if it had use for what I was asked to do.

Q. Okay. And if in that initial review, you did not believe it had use, you would not read the rest of that document; you would go on to the next document?

A. In my initial review, yes. Now, there might be something later that I would go back and look at, because initially, I might not have thought it was relevant. So it wouldn't mean it was excluded forever, but it's not just a single review. It's -- it's a work.

Q. Sure. And is there any way to tell, from looking at this appendix, the documents you did review, as opposed to those you looked at, thought did not pertain, so did not review the entirety of the document?

A. I'm not sure I understand your question. I do an initial review of everything. That's when I look through it to see what it is, what it's about. And then I do more of a review as I begin to form opinions. And then as I begin writing, I have to do more and more reviews. And sometimes I go back, and I look and refer to things and find that they have use, and sometimes

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

they don't.  So I -- I think my answer to your question is, no, I can't tell by the list, specifically, what had a use and when it had a use to me.

Q.  Okay.  And I'll rephrase.  Some of these documents, you obviously reviewed more than one time, right?

A.  I'd probably say yes.

Q.  Okay.  My question is just more facially from this appendix, is there any way to tell which documents you reviewed in their entirety and which ones you just looked at as part of that initial review and never came back to?

A.  I -- I can't say there would've been a document that I looked at initially and never came back to.  There's an initial review just so I can see what the documents are and make sure that they're complete.  For instance, if I get a page that's blank or blackened out, I probably would've written an e-mail saying, hey, I don't know what this is.  Can you send it to me?  So I -- I think the way you're characterizing my initial review is probably a little different than I would, so I don't think there's anything I would've looked at and just said, oh, I'm never going to need this again.

Q.  Okay.  I think I may be getting confused now. I thought you testified earlier that you did not



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

necessarily read every single page of every single one of these documents; is that accurate?

A. I'm pretty sure that's true, that I didn't read every single page of every one of the documents.

Q. Okay. So my question is very basic. It's just, is there a way from -- strike that, please. Is there a way to tell, from looking at this appendix, which documents you read the entirety of and which ones you did not?

A. I wouldn't all that from looking at the list.

Q. Now, you did review each page of the police file; is that correct?

A. I believe I did.

Q. Okay. Did you review each page of the prosecutor's file?

A. I believe I did.

Q. Okay. At any point, did anyone instruct you on which documents to review?

A. No.

Q. Okay. At any point, were you provided summaries or notes of any of the materials?

A. No.

Q. And your invoices will reflect how much time you spent reviewing materials; is that accurate?

A. Yes, realizing that sometimes even doing a



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

material review, I might be taking notes or something.

Q. Okay.

A. I might do multiple things, but I may characterize it as a document review or a material --

Q. Okay.

A. -- review, but they could be the same thing.

Q. Sir, have you reviewed any expert reports offered in this case by any party other than Chief Tiderington's?

A. Don't think I have. I -- I'd have to go back and look at the file, though, but I -- I don't remember reviewing someone else's. I -- I just don't remember, to be frank.

Q. And your report does not rely on any academic paper, article, or other publication on standard policing practices; is that correct?

A. You mean an academic journal report or something?

Q. Yes, sir.

A. No more than what's listed in here. I mean, I -- I do think there's some portions of perhaps the policy that makes references to things, but not what's -- not other than what's listed in the appendix --

Q. Okay.

A. -- and within the report.

Kentuckiana Reporters
118 North Wacker Drive, Suite 2580
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

99

Q. And now, sir, you did not review the deposition transcript of Kim Curry, who's the daughter of Rhonda Curry, that was given in this case; is that correct?

A. You mean when I wrote this report?

Q. Either of your reports, sir.

A. No, I don't think I had that at the time I wrote the report.

Q. Okay. And you did not review the deposition transcript of Tracy Smith, who is the niece of Richard McClanahan, prior to either report; is that also correct?

A. I don't think I did.

Q. Okay. And sir, did you review the deposition transcript of Sergeant Kurk Alt, who I'll represent to you as the 30(b)(6) witness identified by the city of Columbus to testify about the city's policies and trainings on Brady?

A. I don't remember if I reviewed that or not.

Q. Okay. If you had, would it be either in this appendix or in your rebuttal report?

A. If it were used to prepare to report, and I -- I think that's important. If I used it to prepare the report, I put it in the list, but I may have received materials and not used them to prepare to report and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

still reviewed them.

Q.   Okay.   I thought it was your testimony earlier today that you did not receive any additional documents outside of everything listed in this appendix; is that still accurate?

A.   No, that's not what you asked me.   You asked me, did I receive documents when I -- and used them to prepare to report, but I may have received a document and not used to prepare the report.

Q.   Oh, I -- okay.   I see.   I thought I asked about that, but I may not have.

A.   Like, I may have received the depositions that you mentioned, but I might not have gotten them until the report was done.

Q.   Okay.   And by that, do you mean by the time both reports were done or just your initial report?

A.   I think it would depend on the item.   I mean, I -- to my understanding, like, some of the depositions were done after I completed my report, so I wouldn't have had an opportunity to review them before preparing it, so they wouldn't be on the list.

Q.   Sure.   My question is more, if you had received these deposition transcripts between your two reports, would you have listed those additional materials in your rebuttal report?

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. If I used it to prepare the report.

Q. Okay. But as you sit here today, sir, do you have any memory of reviewing the deposition transcript of Sergeant Kurk Alt?

A. I don't, but again, I'd have to look at it and see if it is something I looked at. If I receive materials, I generally look at them. But if my report's already been prepared, unless it's something I would use to supplement it, then it wouldn't be in the report, and there wouldn't be a supplement.

Q. Okay. And sir, have you reviewed the deposition transcript of Jonathan Gillis, who I'll represent to you as another 30(b)(6) witness identified by the City of Columbus to speak to the Division of Police's document software?

A. Again, I may have. I just don't remember at this moment.

Q. Okay. Did you review the deposition transcript of Sean Lared, who is the supervisor of Detective Walker?

A. I may have, but I -- I don't remember.

Q. Okay. Have you reviewed the deposition transcript of Pamela Rhodeback, who was the responding officer to the robbery?

A. I think I did review hers.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.  Okay.

A.  I think.  Yeah, I --

Q.  And I'll represent to -- oh, sorry.

A.  I think it may -- I was going to say, I think it may have been after I wrote my report --

Q.  Okay.

A.  -- if it's not on the list.

Q.  And I'll represent to you, sir, Officer Rhodeback also testified at trial.  So there's her trial testimony, and then she also sat for a deposition in this case.

A.  Yeah.  I -- I'd have to look at her deposition.

Q.  Okay.  And to the best of your recollection, have you reviewed the deposition transcript from Bradley Thomas, who was another officer in the robbery division who testified about the Division of Police's detective school?

A.  I don't recall it, but I'd have to look at the deposition to see if I looked at it, but I didn't use it to prepare the report because I would've listed that on -- in the appendix.

Q.  Okay.  So for each of these that we're talking about, you either did receive it, but did not rely on it in creating your report, or you did not receive it?  Is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that a fair statement?

A. I'm sorry, could you repeat your question?

Q. Yes. So for each of the depositions that we're talking about, where you don't recall if you reviewed the transcript, is it that you either received it, but did not rely on it in your report and that's why it's not listed, or you did not receive it?

A. No, I could've received it and reviewed it, but didn't rely on my report, and I just don't remember it because I didn't use it to prepare for the deposition today. I mean, there's a variety of reasons why I don't recall.

Q. Yes. I think we're saying the same thing. So that is one possibility. Is it also a fair statement to say it's a possibility you just did not receive these transcripts?

A. I -- I wouldn't know if I didn't receive it. I'll put it that way. I would not know something I don't have.

Q. Yeah. No, completely understood. I think my question is more almost administrative, right? So you could have received it and reviewed it and not used it, or received it and not reviewed it. My question is purely administratively, some of these deposition transcripts, you may have just not have received, right?

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

And you don't know to ask for what you don't know exists. Is that a fair statement?

A.   I -- I think you're asking me to speculate on why I don't recall, and, you know, I'd rather not do that because I just don't recall. And that's as candid as I can be regarding each one of them.

Q.   Yeah. And that's -- you know, I should be clear. That's all that I want in this deposition. I don't want you to guess. I don't want you to, you know, reach, to speculate, any of those things. I'm strictly asking if it's a possibility that you did not receive some of these documents we're discussing.

A.   Counselor, if you're going to ask me what's a possibility, I -- I don't think that's a fair question for me to be able to answer. I don't recall means I don't recall why. I don't remember it. I don't recall if I did look at it. I don't recall if I received it. It's just not something that comes up on my radar at this moment. It doesn't mean I didn't get it, okay? It doesn't mean I did get it. I just don't remember. That's -- that's as frank as I can be. I -- I don't want to speculate on other things if that's what you're asking me. I just don't know why I don't remember each of those.

Q.   Okay. I don't think that's an answer to my

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

question, but I will move on.  Do you have any recollection, as you sit here today, of reviewing the deposition transcript of Janette Horton, who is Mr. Horton's alibi witness?

A.    I don't remember if I reviewed her deposition or not.

Q.    Okay.

A.    If it's not on the list.

Q.    But you reviewed -- oh, yeah.  I'll represent to you that none of these deposition transcripts are on -- are in your appendix.

A.    Yeah.  Then that means I would not have reviewed it by the time I wrote this report.

Q.    Okay. According to your appendix, sir, you did not review any deposition testimony outside of -- actually, let me rephrase that.  Strike that, please. According to your appendix, the only three depositions you reviewed and relied on in this case are that of Detective Walker, Richard Horton, and Rhonda Curry; is that correct?

A.    The review of the actual full deposition?

Q.    Yes, sir.

A.    At the time I wrote this report, I'd say that -- that's truthful.  Now, that doesn't include, like, if

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

there's references by name or something in other documents. But yeah, I think that's probably accurate.

Q. Were there any depositions that you remember reviewing that you did not rely on so intentionally left them out of the appendix?

A. Not that I recall.

Q. Okay. And at any point, sir, do you recall reviewing an affidavit signed by a man named Laqion Horton?

A. In preparation for my initial report?

Q. At any point, sir.

A. I can't remember. So I don't recall reviewing it, but I'd have to look at it.

Q. I'll represent to you Mr. Horton is a man who claims he was present for the conversation about money that happened between Mr. Horton and Mr. McClanahan, in case that refreshes your recollection?

A. I do remember reading some material about him, yes.

Q. Okay.

A. I -- I think I did, yes.

Q. Okay. And at any point, sir, have you ever spoken with a witness involved in this case?

A. No.

Q. Okay. Well, sir, is it fair to say that you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

are giving opinions only on whether the defendant officers comported with standard policing practices in the robbery investigation in this case?

A. You use standard. I use generally accepted policing practices, but I -- I think the language amounts to similar, but I think my conclusory statement in my report kind of encompasses exactly what I mean and what my opinions are, yeah. But regarding generally accepted policing practice and her behavior in this investigation, yes.

Q. Okay. And just to clarify, you're not giving any opinions in your report about why widespread CPD policies or practices as being appropriate or not; is that correct?

A. Yeah, I -- I -- if you're asking me if I'm expressing opinion about the policies at the time, were they appropriate or -- and I -- I -- I don't think I understand the question specifically, so maybe if you could repeat it and I can try to answer.

Q. Yeah. And I'm happy to rephrase. So your report obviously touches on CPD policies from 2004, right?

A. It does in some ways, yes.

Q. Right. But you are not giving an opinion in your report about widespread CPD practices as being

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

appropriate or not; is that correct?

A.   I guess my question would be, appropriate in what way?

Q.   Any kind of value judgment or determination. Like, your opinion pertains to the facts of this case and the applicable policies.  Is that a fair statement?

A.   Yeah.  My -- my opinion does encompass the policies of the agency at the time of this incident and Detective Walker's compliance with the policies and how she carried out her duties relative to the policies. So I -- I don't know if I can answer the question any better than that.

Q.   Okay.  I think you did answer the question, so I will move on.  And now, sir, you are -- I'll make it a little more specific.  You're not giving any opinion in this case about what the pattern and practice was among CPD detectives generally regarding investigation note-taking; is that correct?

A.   Yeah, I think that's correct.

Q.   And you are not giving any opinion in this case about what the pattern and practice was among CPD detectives, generally, regarding file keeping and maintenance of robbery files; is that correct?

A.   I think that's correct.

Q.   Okay.  And you are not giving any opinion in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

this case about what the pattern and practice was among CPD detectives, generally, on the search and production of robbery files; is that correct?

A.    I'm not giving an opinion on pattern and practice, period. And again, that -- that assumes that -- I -- I think the form of your question assumes there is one. I wouldn't know if there was one or was not one. That's not within the scope of what I was asked to -- to review.

Q.    And sir, you are not giving opinions in your report about the handling of physical evidence in this case after it was recovered on the scene by the CSSU detective; is that correct?

A.    I'm sorry, could you repeat that?

Q.    Sure. You're not giving opinions in this case about the handling of physical evidence after it was recovered from the scene by the CSSU detective; is that correct?

A.    I think in my report, I -- I do touch upon that in some way, and the relevance it had to the investigation.

Q.    My question is specifically about -- actually, strike that, please.

The extent of the knowledge you have about the handling of the physical evidence comes from the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

materials you reviewed, correct?

A. Yes.

Q. Okay. And now, sir, you testified to this briefly earlier, but you're not offering an opinion on any ultimate legal issue that's reserved for the jury, correct?

A. That would be inappropriate.

Q. And sir, you are not giving opinions in your report about whether or not Richard McClanahan and Rhonda Curry accurately identified the person who robbed them, correct?

A. I'm sorry. Again, I'm not trying to be difficult, but could you repeat the question?

Q. Sure. So you are not giving an opinion in your report about whether or not Mr. McClanahan and Ms. Curry accurately identified the person who robbed them, correct?

A. I -- I think I do express in my report that they did identify the plaintiff several times as the person who robbed him.

Q. Sure. My question for you, sir, is: As an expert witness, you are not opining on the veracity of that identification, correct?

A. That -- that is correct.

Q. Okay. And at a more general level, as an



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

111

expert witness, you are not giving any opinion in your report about the veracity of any of the facts in Richard Horton's case; is that correct?

A. When you say veracity of any of the facts, I'm not sure I understand.

Q. Sure. Your -- in your capacity as an expert, you are not opining on who is telling the truth, what is accurate, or anything like that, correct?

A. I'm not opining on who is telling the truth. I do express opinions regarding the facts that came out at the trial and during the investigation, but those are from the materials I reviewed.

Q. And those facts are cabined to whether or not Detective Walker's actions comported with generally accepted police practices at the time; is that correct?

A. Yeah, the -- that's how I relate to those facts, yes.

Q. And so, you're not giving any opinion on the motive of the robber, correct?

A. No, I wouldn't know the motive.

Q. And you're not giving an opinion on the motive of any of the parties involved in this case; is that correct?

A. I wouldn't know their motive for what their actions were.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   And you're not giving any opinion in your report about who the individual who did in fact shoot and rob Mr. McClanahan is; is that correct?

A.   I -- I can only base my opinion on what's in the materials.  In the materials, there's evidence that the plaintiff did it, and the plaintiff says he didn't do it.  So again, I'm not expressing an opinion on who's telling the truth.

Q.   And sir, you're not giving an opinion in your report about whether or not there was probable cause to arrest Mr. Horton; is that correct?

A.   I do express an opinion that the detective had a reason to belief that she had probable cause, and there was an arrest warrant issued.  But as far as why the Court found probable cause, why the grand jury found probable cause, no, I can't express an opinion about that, but there were findings of probable cause against the plaintiff.  Those seem to be facts.

Q.   Okay.  And you testified to this earlier, sir, but you understand that experts cannot provide opinions on legal questions that are meant for the jury, correct?

A.   I do.  I'm not expressing whether or not there was probable cause, but I'm saying the Court found probable cause, and that's a fact.  And that did weigh into my opinion.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. I understand. Okay. And sir, you are not giving an opinion in your report about whether the inclusion of the name Richard Diggs on Detective Walker's handwritten notes from her conversation with Mr. McClanahan is Brady material or not, correct?

A. I think in my report, I do indicate that I thought that Detective Walker's actions were reasonable regarding her handling of the information regarding someone named Richard Diggs. So I'm not sure that I would agree with that.

Q. Okay. But you understand that the ultimate determination on whether or not that inclusion of the name is Brady material is a question for the ultimate fact finder?

A. I don't know if it is or isn't.

Q. Okay.

A. I think a judge would've to decide that.

Q. Okay. And if it is, would you agree that -- that is beyond the parameters of what an expert witness can then testify to?

A. If -- if what is? I'm sorry.

Q. If the determination of whether or not the name Richard Diggs appearing in those notes is Brady material or not, if that is properly within the province of the jury, would you agree that -- that is beyond the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

114

parameters of what an expert can opine on?

A. I think a legal conclusion is beyond an expert's purview. I don't think I express that in my report. I think that my report expresses the reasonableness of Detective Walker's actions and why she explains -- and what she did and why she did it. That -- that's my -- the scope of my review, not determining whether or not something is in fact Brady material. I hope we're saying the same thing.

Q. I think we are. And just to clarify, what you just spoke about, Detective Walker's actions, your opinion is comparing those to generally accepted policing standards and not explaining certain things or her motivation, right?

A. Yes. I wouldn't know her motivations.

Q. And, sir, you're not giving an opinion in your report about whether Mr. Horton was wrongly prosecuted or convicted, correct?

A. No. I -- I don't have an expression on why he was convicted, other than the fact that he had a trial and what occurred at the trial, and from my review of the materials.

Q. And lastly, sir, you've kind of already spoken to this, but I want to make sure I clarify each point. You're not giving an opinion in this case about whether



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Richard Horton is innocent or guilty, correct?

A. No, I -- I don't have an opinion about it, other than what the Courts found and the facts of the case, and what's in the materials regarding guilt or innocence.

Q. I just want to make sure we're saying the same thing. You've obviously reviewed the materials, but you, yourself, as an expert witness in this case, are not opining on Mr. Horton's guilt or innocence; is that correct?

A. No, I'm not.

Q. Okay. And you have opinions in your report about Detective Walker and her compliance with CPD policy against dishonesty, and you referenced the photo array procedure form. Are you giving any other opinion in this case about Detective Walker's compliance with policies outside of what is referenced in your reports?

A. No. My -- my opinions are encompassed in my reports, other than when you ask me questions, I try to answer them.

Q. Which I appreciate. And now, sir, in your review of documents, did you come upon the name Ricardo Diggs?

A. Yes.

Q. Okay. But you do not opine on Ricardo Diggs

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

in either of your reports, correct?

A. I don't think I did.

Q. And now -- I promise we're now actually at your reports and the opinions you did give. Sir, can you please describe the methodology you used to prepare this report, beginning with your assignment?

A. You're referring to the first report?

Q. Yes, sir.

A. May I refer to the report?

Q. Yes, absolutely.

MS. SCHERGER: Alyssa, it's been about 90 minutes since our last break. I think it's --

MS. MARTINEZ: I think this is a good -- yeah, this is a good break point.

THE REPORTER: All right. Going off record. Time is 2:01 p.m.

(A recess was taken.)

THE REPORTER: Back on record. Time is 2:14 p.m.

BY MS. MARTINEZ:

Q. Okay. Before we dive into your report, sir, did you have a chance to look at the bills you've issued in this case?

A. Yes.

Q. Okay. And so, how many hours have you billed,



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to date, for your work in this case?

A. 69.66 hours.

Q. 69.66. Okay. And was all of that time billed at your 250 rate?

A. Yes.

Q. Okay. So your bill to date is approximately $17,000-plus?

A. Yes.

Q. Okay. And that is not including your bill for the deposition today?

A. No, it's not.

Q. Thank you for checking on that. Now, sir, turning to your report, can you please describe the methodology you used to prepare your initial report, beginning with your assignment?

A. I'll refer to the report as much as I can.

Q. Okay.

A. And I'll -- I'll try to summarize and not read word for word. I was asked to consider the reasonableness of Detective Walker's actions at the time she took them. I looked at the policing procedures that were in place in her agency at the time. I looked at the allegations made in the complaint. I compared her actions to generally accepted policing practices at the time. I took into consideration her training. I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reviewed her training records, departmental policies, circumstances of the investigation based on the police reports, based on the other things that were in the file.

Also, based on the allegation of the complaint. I considered the agency's practices at the time. I also considered my experiences in training regarding police, today and at the time that it occurred. I utilized the materials, including the exhibits, the trial transcripts, depositions that I had at the time. I did mention I would refer to publicly available documents, however, I think, in forming this initial opinion, I didn't have any need to. That's, kind of, a summary of what I did. I looked at the testimony of each of the people and listened to them carefully in coming up to my opinion. That's the summary of it, rather than reading it word for word for the few pages.

Q. Which I appreciate. And just for the record, when you say the -- or strike that, please. For the record, when you talk about reading the few pages, you're referring to the section that's titled Materials Reviewed and Methodology, in your report on Pages 7 and 8?

A. Yeah, 7 and 8. And it actually goes into

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

getting into the background, too.

Q. Answer. What is your methodology for resolving disputes between contradicting facts?

A. I don't think it's my role to -- to -- to resolve the dispute. I think it's my role to analyze it, consider it and form my opinion, but I -- I don't think it's the role of the expert to resolve the dispute.

Q. And in that vein, you are not making witness credibility determinations; is that correct?

A. No, that -- that's -- that's not my role. I -- I mean, for the criminal case, that was done by the trier of fact, and I assume, in this case, it'll be done by the judge, and I don't know if it's a jury trial or court trial, but whoever is the trier of fact.

Q. And as part of your methodology, sir, you assume that the police reports are an accurate reflection of what the witnesses told the officer who generated the report?

A. No, I -- I don't make that assumption. I -- I make the presumption that what they wrote is what they wrote at the time. I again, I wouldn't know that the witness said something or didn't say it, but that's -- I -- I make a presumption that those were the impressions that whoever wrote the report wrote at the time. Again,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

120

I -- I can't -- I can't cast an opinion, or doubt, or concern, or anything else on whether, or not it's accurate. It's what the person wrote at the time.

Q. So I'd like to start by looking at your initial report and I'm going to start on Page 7, if you'd like to flip there in your copy, since that's a little easier than me sharing my screen. But I'm happy to share my screen if you'd rather I do it that way, okay?

A. I think I have Page 7.

Q. Okay. So Page 7, in your section that's titled Materials Reviewed and Methodology, you stated about two thirds to three quarters of the way down -- you stated DNA testing was not as widely available. Do you see that part, sir?

A. I do.

Q. Okay. Just to clarify, is that in reference to 2004, which the year of the Loew Street robbery investigation?

A. Yes.

Q. Okay. And what is this information based on?

A. It's based on my professional experience as a law enforcement officer, prosecutor and a defense attorney -- a criminal defense attorney who's tried homicide cases and I -- I think it's common knowledge in



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

-- for folks who practice law, or were in law enforcement, between 2004 and now, that there's been a lot of changes in the technology and the use of it.

Q. And in your review of the materials, did you see any information about the timeline of the rollout of DNA testing at the Columbus Division of Police Crime Lab?

A. No, I don't recall specifically that. No.

Q. Okay. And then on that same page, the first sentence of the next paragraph you state, "Each of the CPD officer's actions in this matter as claimed in the amended complaint, including those of Detective Brenda Walker, were objectively reasonable and within generally accepted policing practices." Do you see that, sir?

A. Yes. I see that.

Q. Okay. We're going to talk about Detective Walker in a moment, but is there anyone else specifically that you're referring to?

A. No one specifically, but my -- my conclusion was that I didn't see any actions from the CPD officers that I thought were outside of generally accepted policing practices.

Q. Okay. Now, sir, on the bottom of Page 8 is where the background section starts. At the bottom of Page 8, and going into Page 9, you begin to recount some

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

of the background, which includes an interaction that Mr. McClanahan claimed that he had with an individual on October 8, 2004, the day before the robbery. Do you see that?

A. Yes.

Q. Okay. And a few follow-up questions on this point, sir, from your review of the materials, you are aware that Mr. McClanahan had severe substance-use issues in 2004 and was a daily crack cocaine user, correct?

A. No. That -- I'm not aware of that. I'm not saying he was, or was not. I'm just saying I'm not aware of that.

Q. Okay. You didn't see that in any of the materials you reviewed?

A. No, not -- not to the description that you gave. No.

Q. Okay. And you don't recall seeing anything like that in the deposition transcript of Rhonda Curry?

A. I did see some indications from Ms. Curry that she engaged in drug-use, and that was part of how she knew the Plaintiff, from local drug dealer. So I was aware of that, but the extent that you described it, I didn't understand that to be the case.

Q. Okay. And I believe I asked you this earlier,



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

but you have no recollection of reviewing the deposition transcript of Tracy Smith, Mr. McClanahan's niece, correct?

A. No, I don't remember reviewing it. I can't say that I did, or didn't.

Q. Okay. And so, sir, did you see anything in your review of the materials that would indicate whether, or not Mr. McClanahan was under the influence of any kind of substance on October 8, 2004?

A. I'm sorry, Counsel. Would you repeat the question?

Q. Sure. From your review of the materials, did you see anything that identified whether, or not Mr. McClanahan was under the influence of any type of drug on October 8, 2004?

A. I -- I didn't see anything that indicated that he would've been, from my reading of it. I -- I think he was coming from work, and I think he was operating an automobile at the time, when he encountered the person who asked him for money at the location. He was going to make a phone call. So I didn't have any reason to believe he was under the influence of drugs, or alcohol, at least to affect his ability to understand what was going on. I mean, and he did give a recount to the investigating officers after the robbery about it, too.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And if Mr. McClanahan were under the influence of some kind of drug on October 8, 2004, would that in any way affect your -- actually strike that, please. As an expert, you are not opining on whether this October 8, 2004, interaction actually occurred or not; is that correct?

A. No, I'm -- I'm not opining on whether it occurred. I -- I'm opining that it's in the reporting materials and that Detective Walker recounted it, that it's, also, was testified to at trial and that it's -- it -- it doesn't seem to be a -- it didn't seem to be a disputed fact, based on my review of the materials.

Q. But you're not opining on whether, or not it happened?

A. No.

Q. Okay. And sir, you know, from your review of the record that Mr. Horton and his now-wife, Jeannette Horton, both testified that he was not, in fact, the person that had that October 8, 2004, interaction with Mr. McClanahan, right?

A. I'm sorry. I -- I -- I don't think I heard the entire question.

Q. Oh, sorry. I turned away from my microphone. You know, from your review of the record that Mr. Horton and his now-wife, Janette Horton, both testified that it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

125

was not, in fact, Mr. Horton who was at the payphone on October 8, 2004, right?

A.   I -- I don't know that to be the case.  I'm not saying they did, or didn't, but no, I don't know that to be the case.

Q.   Okay.  You didn't see that in any of the materials you reviewed?

A.   I -- I don't recall seeing Mrs. Horton's comments about this particular incident.

Q.   Okay.

A.   And --

Q.   You -- oh, I'm sorry, sir.  I didn't mean to cut you off.

A.   Yeah.  And I don't remember, in the materials I reviewed, whether Mr. Horton denied having this interaction.  I just don't remember him denying it.  I'm not saying he did.  I just don't remember him denying it, the scene, to be a fact that Mr. McClane [sic] said that he had this interaction with an individual.

Q.   And you reviewed the entirety of the trial transcript; is that correct?

A.   I -- I did my best to, yes.

Q.   Now, sir, if the individual Mr. McClanahan said he spoke to on October 8, 2004, was not, in fact, Richard Horton, would that mean that his subsequent

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

identification was wrong?

A.   I -- I think you're asking me to speculate on some things that just aren't in the materials that I was given.  And I -- if you're going to ask me to speculate, I still wouldn't say that -- that means his subsequent identification is wrong.  He -- he actually drew on several reasons why he felt that Mr. Horton was the person, and it wasn't just based on the interaction the day before.  It was based on the fact that he had had previous interactions with him, including selling a car.

Ms. Curry had interactions with him, some of which include -- some of the instability came from her substance-use issues.  She characterized Mr. Horton as being a local drug dealer.  I don't remember the exact number, but it seems that they, cumulatively, had more than 20, perhaps even 30 interactions with him in their life and not just the day before.  So the fact that, even if he wasn't that person that day, Mr. McClanahan said he believed he was.

Q.   From your review of the record, sir, you're aware that Richard Horton had a cell phone on October 8, 2004, correct?

A.   I -- I don't recall whether he did, or didn't. It wasn't something that went into my calculations, or analysis.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

127

Q. Okay. And just so I'm making sure that I understand, it's you don't recall seeing anywhere in the documents whether he did, or did not?

A. No, I don't recall that.

Q. Okay. If I represent to you that Mr. Horton did have a cell phone on October 8, 2004, does it change your opinion in any way?

A. No.

Q. Okay. And, sir, are you aware from your review of the record that Mr. Horton had a job in October of 2004?

A. I -- I don't know whether he had a job, or not. It -- no.

Q. Okay. I'll represent to you that he did, in fact, have a job in October of 2004; does that change your opinion in any way?

A. My -- my opinion regarding what I was asked to review and come to a conclusion about?

Q. Yes, sir.

A. No -- no, it does not.

Q. Okay. And I apologize, I may have already asked you this, but you have no opinion as to whether or not Richard Horton was that individual Mr. McClanahan said he spoke to on October 8, 2004; is that correct?

A. No, I -- I don't have an opinion of the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

128

veracity of Mr. McClanahan's statements, only that he made statements. He made them to the detective and investigating officers. He made them in court, and he said that he believed that Mr. Horton was the same person.

MS. MARTINEZ: Oh, shoot.

THE WITNESS: The --

MS. MARTINEZ: Counsel, can you -- oh, I'm sorry, sir. I didn't mean to cut you off. I wanted to make sure your counsel is here. Oh, you're back? Okay.

MS. SCHERGER: We're back. I think I missed the question, and the last thing I heard was your opinion of what you both reviewed, and then it sounded like there was some type of undue questions.

MS. MARTINEZ: Madam Court Reporter, could you please read back the last question and answer pair?

THE REPORTER: Yeah, give me just a second.

MS. MARTINEZ: Okay.

(The requested question and answer were played back.)

THE REPORTER: Okay. Did you need me to go back a little further than that?

MS. SCHERGER: Right, because I -- that's when I came back.

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE REPORTER:  Okay.

MS. MARTINEZ:  I think all you missed, then, was my question about whether it's within his province as an expert to opine on whether -- or strike.  My question was whether or not, as an expert, it's within his province to opine on whether, or not the person Mr. McClanahan did have that interaction with on October 8th was Mr. Richard Horton.

MS. SCHERGER:  Okay.

MS. MARTINEZ:  And then that was the answer that he gave.

MS. SCHERGER:  I apologize for the internet instability.  This is not usually a problem in the office, which is why I'm here.

MS. MARTINEZ:  It's one of the joys of the Zoom deps, for sure.

BY MS. MARTINEZ:

Q.   Okay.  From your review of -- actually, strike that, please.  You testified, sir, that you were not aware that Mr. Horton had a job, so it would be fair to say you were not aware, from your review of the record, that he worked Monday through Fridays, 9:30 to 4:30?

A.   No, I -- it -- it did not come into my analysis whether or not Mr. Horton had a job at the time



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

130

of the robbery.

Q. And do you know for a fact, sir, as you sit here today, whether or not you reviewed Janette Horton's testimony from Richard Horton's trial?

A. I recall reviewing the trial testimony. I don't specifically remember Mrs. Horton. If memory serves me, correct, I'm -- I'm not sure she was Mrs. Horton at the time of the trial, but I don't recall her specific testimony, word for word, at the trial.

Q. Okay. But it's your testimony that you did review the entirety of the trial transcript?

A. Yes.

Q. Okay. So I'll represent to you that she testifies at trial that she would've picked Richard up on Friday and drove him up to Grove City where she lived. Over Grove City. Can you think of any reason that you did not include that information in your background section?

A. I don't think it's relevant to what I was asked to consider.

Q. Part of your analysis of police practices does pertain to the investigation of a potential alibi, right?

A. Yes.

Q. And so, would it be a fair statement that the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testimony of Mr. Horton's alibi witness would, in fact, pertain to your opinions?

A. It would, if, in fact, it was an alibi to the crime, but I wasn't asked to make a determination about the veracity of witnesses. And I'm not making a determination of the veracity of Mr. McClanahan, only that he made the statement, he testified to it at trial. I do recognize, again, now -- now Mrs. Horton, I believe she was his girlfriend at the time, made statements regarding Mr. Horton and their relationship and their interactions and their usual practices. Whether or not it's true is not a determination for me. The determination for me, regarding the trial testimony, is what folks said and the fact that the outcome of it was that the jury believed that Mr. Horton had, in fact, committed the crimes. The weight of an alibi witness is not something that I would be tasked with reviewing.

Q. And then so a quick follow-up question that you, kind of, just touched on, but -- I understand her testimony about October 8, 2004, potentially being outside of your purview, but she also testifies that Mr. Horton would've been with her on October 9th when the crime happened. And so, sir, is there a reason that testimony is not included in your background section?

A. Well, yes, because I didn't include everything

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

132

that was testified to at the trial. Again, that's Mrs. Horton's offering of an alibi. Seems like that she said it at trial, but I'm not asked to review, again, the veracity of Mrs. Horton's statements, or her conduct, or even Mr. McClanahan, or Ms. Curry's. I was asked to review the practices of Detective Walker.

Q. And Detective Walker did interview Mrs. Horton about Richard Horton's alibi at the request of the prosecutor's office; is that correct?

A. I think she did, at some point, speak to -- I think she referred to her by her maiden name, Janette and I can't remember what her last name was, but uh-huh.

Q. I'll represent to you it was Harmon.

A. Ms. Harmon.

Q. Yes.

A. Yes, I -- as I understood it, Detective Walker did speak to her.

Q. And is it your understanding, sir, that Detective Walker attempted to speak with Richard Horton after he turned himself in?

A. From my understanding, she did and Mr. Horton declined to speak with her.

Q. From your review of the records, is it that he declined to speak with her, or he declined to speak with her without an attorney present?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

133

A.    I think that's he said he wanted a lawyer, and I think most trained police officers know that -- that means that's the end of the conversation, unless there's an attorney present.  So I -- I think we're saying the same thing.

Q.    Did you see any evidence in the record of Detective Walker going back and trying to question Mr. Horton after he had attained counsel?

A.    I -- I -- if -- if I'm understanding your question correctly, no, I didn't -- I don't recall seeing any information that led me to believe that Detective Walker attempted an interrogation, is what I would call, of Mr. Horton after he had retained Counsel. It -- no, I don't recall seeing that.

Q.    Sir, did you see evidence in the record about the electricity potentially being out at the Loew Street address when the robbery occurred?

A.    I -- I don't recall seeing any information about that, and I -- I'm not sure that it would've mattered in my analysis.

Q.    That was going to be my next question.  Does if the electricity had been out, would that affect your opinions in any way?

A.    I don't know how it would've.

Q.    Would it be a fair statement, sir, to say that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

part of a detective's job in 2004 would've been determining witness credibility?

A.   Yes.

Q.   And would that include evaluating a victim's ability to see the face of their -- strike that, please.

Would that include evaluating a victim's ability to see the face of their attacker?

A.   Yes.

Q.   On Page 9, sir, you state that Mr. McClanahan opened the door after hearing a voice say, "Slim."  He thought he'd recognized the voice as belonging to his nephew; is that correct?

A.   Yes, I wrote, "At approximately 7:30 a.m., there was a knock at the door and man's voice calling Slim, which Mr. McClanahan's nickname.  Thinking it was his nephew.  Mr. McClanahan answered the door."

Q.   Then later, Mr. McClanahan says he thinks he recognizes that voice as Mr. Horton's, not his nephew's; is that correct?

A.   I -- I'm not sure where you got that statement from, that it was the voice alone that was his reasoning for recognizing Mr. Horton.  That -- that's not the way I took the facts.  I thought that he had a variety of reasons for believing it was Mr. Horton, not just voice alone.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   One of the reasons was voice, though; is that a fair statement?

A.   I don't recall where he says that voice alone or voice contributed to the belief.  What -- what I gathered from the materials was that it was a cumulative reason that he believed it was Mr. Horton, ranging from the interaction the day before, the fact that he was expecting his nephew to come over to the house that he believed it might be his nephew.  But in his determination of it being Mr. Horton, it was the numerous contacts that he believed he had had with him, including the day before and those other interactions. The -- the niece selling him the car.  And it also seemed to me that he and Ms. Curry had conversations as well.  During the interim time before he went back to the detective, he talked to his niece.  There was even the use of a yearbook in which they came to a conclusion that they believed that the individual that Mr. McClanahan and Ms. Curry were referring to was Mr. Horton, so it wasn't just voice.  Not to ramble on.

Q.   Definitely not rambling.  You know, I posed the question.  You're free to give the answer you want to give.  What is your understanding, sir, of the first time Mr. McClanahan spoke with police about the Loew Street robbery?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. My understanding, it was after the -- after the shooting at the hospital.

Q. And who did he speak to?

A. I can't remember if he spoke to Officer Rhodeback first, or if it was Detective Walker. I can't remember who he spoke to first, but my understanding is it -- it was at the hospital.

Q. Okay. And you testified earlier that you reviewed the entirety of the police file; is that right?

A. I believe I did. Yes.

Q. Do you recall reviewing the General Offense Case Report?

A. I'd have to see the report.

Q. Okay. We are going to look at it in a moment, so I will show it to you.

A. Okay. There were a lot of documents, so the exact title of each of them --

Q. That --

A. -- I -- I don't remember --

Q. -- is more than fair. But so to quickly put a cap in what we're talking about right now, it did not affect your opinion, in any way, that Rick McClanahan said he thought the voice belonged to his nephew and then said he thought it belonged to Richard Horton; is that correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. I'm -- I'm sorry. Could you repeat the question? I want to be careful because I -- I don't think I heard all of it.

Q. Sure. So it did not affect your opinions that Mr. McClanahan first said he thought the voice belonged to his nephew and then told police that he thought it actually belonged to Richard Horton? That didn't affect your analysis in any way; is that correct?

A. Regarding Detective Walker's conduct and her conforming with generally accepted policing practices? No, it did not.

Q. Okay. In your review of the material search, did you see any evidence of an investigation into the nephew?

A. You mean Mr. McClanahan's nephew?

Q. Yes, sir.

A. As to him being the robber?

Q. Yes, sir.

A. No, and I -- I would not have expected to, based on the other information.

Q. When you say based on the other information, what do you mean?

A. Based on the cumulative information in the case file, the investigative file, the police file, the prosecution's file. Even based on the transcripts of



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the Court trial, there -- there was no indication that anyone believed that Mr. McClanahan was robbed by his nephew.

Q. Okay. And I --

A. And I --

Q. -- want to -- oh, sorry. I didn't mean to cut you off, sir.

A. Yeah. I -- I just didn't have any reason to believe that anyone suspected that he robbed and shot his uncle.

Q. Okay. And I want to clarify. I don't want to -- I'm not asking from a place of hindsight. I'm asking from day one, the robbery occurs, the nephew is supposed to be there. The nephew's not there. Instead, the two of them are robbed. In your professional experience, would you expect a detective to do any kind of investigation into this person who was supposed to be there? And -- sorry, strike that, please. Let me reword that question. At the time the robbery occurs, would you expect a detective to investigate an individual who was supposed to be at the home without any of that extra information or hindsight that you just testified to?

A. Again, it -- it sounds like you're -- you're asking me to speculate on would an ordinary reasonable

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

detective -- do I think an ordinary reasonable detective would've investigated Mr. McClanahan's nephew?  No.  Even if he were supposed to be there.  If the robbery occurred before he would've gotten there, I don't see how that inculcates Mr. McClanahan's nephew as the robber.  Certainly, they saw him afterward. Certainly, they had conversation with him.  Neither Mr. McClanahan, Ms. Curry, or Ms. Curry's sister was present during the robbery, all of which presumably would know the nephew, thought it was him.  And again, the -- the circumstantial reasons that Mr. McClanahan stated he believed it was the plaintiff.  None of them seemed to relate to the nephew in the same way as they relate to the plaintiff as having been the person who robbed and shot him.  So no, I don't see any reason why Detective Walker would have investigated Mr. McClanahan's nephew as the suspect in this case.

Q.    One quick point that you just referenced.  You talked about them talking to the nephew and meeting with the nephew.  Do you see any evidence of that anywhere in the record?

A.    No, I didn't feel like it would be needed.  Just he's his nephew.  So I assume that if my uncle got shot, and I had a relationship with him, that at some point in his life, if he weren't killed, that we

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

would've had a discussion about it. I mean, everyone -- this -- this is a big event in some family -- in this family's life. So if his nephew was supposed to come by that day, or even if he weren't supposed to come by, if he had minimal contact with Mr. McClanahan, I assume that he knew that he had gotten robbed and shot during this home invasion. So I -- I just think it's a fair inference that he had some contact with his nephew afterward that would need to be said in the record.

Q. I understand you're a lawyer, so the inference -- I understand what you're saying. But these are assumptions at the end of the day that you are making; is that correct?

A. Whether or not that Mr. McClanahan had contact with his nephew afterward?

Q. Yes, sir.

A. Is that an assumption?

Q. Uh-huh.

A. Yeah. I -- I think it's a fair assumption that he and many members of his family found out about this. Yes.

Q. Okay. And so, for Mr. McClanahan and for the rest of the family, you are operating off of the assumption that they learned about and/or spoke with him about it? We don't have evidence of that in the record,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

right?

A. We -- we know that several members of his family were aware of it, including Mrs. Curry's sister. Folks drove him to the hospital. He -- he recuperated afterwards. So yeah, I -- I'll say it's -- I'll call it a fair assumption in my mind. Yes. I'll agree with you.

Q. Okay. And on Page 10, you state in the fourth full paragraph, that very last sentence, "By the time police arrived, Mr. McClanahan was transported to Grant Hospital where he was immediately taken to surgery." But, like we just talked about, he did have a conversation with Officer Rhodeback first; is that right?

A. I don't know if it was before surgery or -- or after. I -- I don't recall. I -- my understanding is the first conversation was at the hospital.

Q. Okay. But it was sometime the day of the robbery?

A. I believe so.

Q. And now, sir, on Page 11, in that first paragraph, you state, "Detective Walker met with Ms. Curry at Grant Hospital. She told Detective Walker that she recognized the suspect but could not remember from where she recognized him." That information is not

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

142

contained in any of the -- strike that, please.  That information is not contained in any contemporaneous notes of that conversation, correct?

A.  I think it's in the report.  I can't remember which of Detective Walker's reports it's in.

Q.  But it's in one of the reports that was typed up sometime after the interview.  It's not in her actual handwritten notes of the conversation?

A.  I -- I don't know if it's in her handwritten notes or not.  I -- I think I got it from one of the incident reports.

Q.  Okay.  Well, we're going to look at the handwritten notes, so I will circle back to this when we get there.  And now, sir, your report places a strong emphasis on the connection between the interaction Mr. McClanahan said he had with someone on October 8, 2004, and his subsequent identification of the person he believed robbed and shot him on October 9, 2004.  Is that a fair statement?

A.  I'm sorry, could you repeat that?

MS. MARTINEZ:  Madam Court Reporter, could you please repeat the question back?

THE WITNESS:  Yes.  I'm sorry.  I'm not trying to be difficult.  I don't --

MS. MARTINEZ:  No.  Don't --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE WITNESS: -- I don't think I got all of it.

MS. MARTINEZ: Don't apologize. I want to make sure you are able to understand the question. I just forgot the full question.

THE REPORTER: Completely okay. Give me just a second.

(The requested question was played back.)

THE WITNESS: I -- I don't think that's what I'm saying. I'm saying that Mr. McClanahan said that he believed that the conversation he had the day before was related to the robbery and he believes that -- that person who asked him for money the day before, in fact, was the robber. And that Mr. McClanahan believes that even some of the conversations during the robbery led him to believe it was the same person. So I -- I don't think it's the fact that I'm focused on it. I think it's Mr. McClanahan's statements that he made during the time of this incident, that he drew those beliefs and he expressed those beliefs to Detective Walker. And he also expressed them at trial.

BY MS. MARTINEZ:

Q. Would you agree, sir, that neither Mr. McClanahan nor Ms. Curry stated anything to police in their initial interviews that connected something the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

144

perpetrator said with -- sorry.  Strike that, please.
Let me reword the question.

Would you agree that neither Mr. McClanahan nor Ms. Curry stated anything -- any statement that the perpetrator said in their initial conversations with police that reference a previous interaction between Mr. McClanahan and someone else the day before?

A.    I would agree that the statement seems accurate.  But I would qualify it with that Mr. McClanahan had minimal contact with the police because he was getting emergency care.  And that Ms. Curry also had minimal contact the day of the incident.  But yes, I -- I would agree that -- that -- that does seem accurate with the qualifications as to why.

Q.    When you say minimal contact, what is the basis for that belief?

A.    That Mr. McClanahan had surgery.  He was rushed to the hospital.  He was getting emergency care because he had been shot.  I don't see how he could have had a lengthy conversation with the detectives as he was able to have during the follow-ups.  And based on the reporting, it seems like Ms. Curry had I would call it minimal compared to her -- her later contacts with the detective and investigators.  Are less the day of the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

incident than it was later in the investigation.

Q.   So I want to -- I'm going to separate the two of them out for just a moment.  You testified earlier, sir, that you do not know if Officer Rhodeback spoke with Mr. McClanahan before or after his first surgery; is that correct?

A.   Yes.

Q.   And are you aware, from your review of the record, that Mr. McClanahan only had a single surgery on the Saturday of the robbery?

A.   I don't know how many surgeries he had.  Based on the information, it seemed like he had subsequent care.  I -- I would be surprised if he hadn't if he had been shot.  So again, I don't know how many surgeries he had.

Q.   Okay.  And you don't know how long those surgeries lasted, right?

A.   No.  I -- I would have no way of knowing that.

Q.   Okay.  So would it be fair to say you do not have a timeline for how long Officer Rhodeback spoke with Mr. McClanahan on the day of the robbery?

A.   I -- I don't.  I -- I can only express that from my experiences as a police officer and as a prosecutor and a defense attorney, that someone who has had surgery might be under the influence of drugs or

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

medications and that may not be the best time to speak with them. So that -- that's why I just draw the inferences that I don't know when she spoke to him and why I thought it probably would've been minimal that day relating to Mr. McClanahan.

Q. And you have no knowledge about any medications that he may have -- or -- strike that, please. You have no knowledge of any drugs that may have been administered to him at the time or what his headspace was when he had that conversation with Officer Rhodeback; is that correct?

A. No. I wouldn't know if it were before or after he got the care. I -- I just can't remember if it was before or after he got the care. I assume if it were after he gotten care that he had been given some sort of medications. Being shot is a very serious injury, as we all can agree I think.

Q. Again, I'm just trying to separate out facts that we have in the record and assumptions that you're making, even if based on your experience. That's kind of where I'm trying to separate out here. Okay. And then for Ms. Curry, would you agree that there's nothing in the record that says how long she spoke with Detective Walker on the day of the robbery?

A. Yes. I -- I couldn't draw any reasoning or --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

147

or any idea of how long she actually spoke to her, no. And length of time, no.

Q. Yes. Okay. I'd like to show you, sir, what we will mark as Exhibit 4. Since we've been talking about it, I want to show it to you. And I'll represent that this is the general offense case report. And the Bates stamp is City 8 through 12. Let me zoom in a bit. Are you able to see this document, sir?

(Exhibit 4 was marked for identification.)

A. Yes, I can see it.

BY MS. MARTINEZ:

Q. Okay. I'm going to scroll through the entire thing, so you have a chance to look at the entire document. And then I'm going to ask you a few questions, okay?

A. All right.

Q. And let me know if you'd like me to slow down. And I will tell you any part that I want to ask you questions about I'm going to first read. So you don't have to try to get everything in right now, but I want you to have a chance to look at the entire document. Do you recognize this document, sir?

A. Yeah. I -- I believe this was in the materials I received.

Q. Okay. And I'll represent to you that this is



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the general offense case report that is issued by Officer Pamela Rhodeback. And the date entered is October 9, 2004, at 9:30 a.m. And the date approved is October 9, 2004, 10:43 a.m.

A. I -- I'm sorry, Counsel, and maybe I'm mistaken, but I -- I thought this was like a -- a generative report, not the original. I'm -- I'm not sure if my memory's correct or not, but I thought this was a -- a generated report based on the data that was collected at -- back in 2004 as opposed to having been generated in 2004.

Q. So I will represent to you that Officer Rhodeback was deposed about this report as well as the 30(b)(6) witness was designated on this topic. And the date entered and date approved are the marks that the system they use would stamp reports when they were created and then approved. So this report is from back in 2004. Okay.

A. Okay.

Q. So I'm going to scroll down. Do you see where it says, "Offense notes"?

A. Yes.

Q. Okay. I'm going to read this section. Let me make it a little bigger if you'd like to follow. So the offense note state, "The victim states an unknown male



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

149

knocked on the front door of his home. Victim opened the door then was pistol-whipped on the head by the suspect, knocking victim to the ground. Suspect kept screaming at the victim using victim's nickname. Saying, 'I know you just got paid, expletive, give me the money.' Suspect was standing over the victim then shot victim's leg. Victim gave the suspect $40.

Suspect became even more irate, wanting the rest of the money and began ransacking the front room, turning over miscellaneous items. Suspect then went to the girlfriend, also listed as a victim, who was laying on her hide-a-bed and began slamming the bed closed on her over and over again, screaming, 'Where is the money, expletive?' Suspect eventually left, running out the front door of the residence. Victims drove over to his sister's home at 1412 Gibbard Avenue where they called 911." Did I read that correctly, sir?

A.   Yes.

Q.   Okay.  So according to this narration of Mr. McClanahan, he told police that the perp seemed to know he had gotten paid the day before, right?

A.   I -- I think that's reasonable from what's in the report.

Q.   But there is no --

A.   That -- that he knew -- not that he knew he'd


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

gotten paid, but he knew that he'd had money.

Q.   But there's no explicit reference to any previous interaction the day before, right?

A.   I'm sorry.  Are you asking me does the statement in the offense notes indicate that Mr. McClanahan believed that he had had interaction or that the person referenced an interaction?

Q.   So my question for you, sir, is: Based on this report, does Mr. McClanahan say that the perpetrator made any reference to an interaction they had the day before?

A.   Yes.  He says, "I know you just got paid, B, give me the money."

Q.   Based on your review of the trial testimony, there are other people who were aware that Mr. McClanahan had been paid the day before; is that correct?

A.   I don't recall reading that.  I'm not saying it's not in there.  But that -- that was not something that drew my attention, whether or not other people knew he'd gotten paid.  Again, the assumption that sure other people would've known he had gotten paid.  My -- my attention was drawn by the individual who asked him for money the day before, the fact that the robber asked for money and references it to knowing he got paid, and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mr. McClanahan connecting it to his other interactions with the plaintiff.  So that -- that's the best answer I can give you on that -- that, yeah, I assume other people would've known.

Q.    Two quick points to follow up.  I understand you're not an expert in pay cycles, but is it fair to say that Friday is a common day for people to be paid?

A.    Yeah.  I -- I think a lot of people do get paid on Friday.  I -- I don't know how it's relevant to this case.

Q.    Okay.  So that information does not affect your opinion in any way?

A.    The fact that people get paid on Friday?

Q.    Yes, sir.

A.    It -- it doesn't.  It's the fact that -- that the person Mr. McClanahan believed robbed him, okay, saw him the day before.  And I got to be honest, I can't even, again, remember if October the 8th was Friday. But whoever it was saw Mr. McClanahan with money, based on Mr. McClanahan's statements, and he believes this is the same person that robbed him.

Q.    My question --

A.    I'm sorry.

Q.    No.  Please continue.

A.    And he says the robber made the statement,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

152

"I know you just got paid, B."

Q. Right. Beyond that language, do you see any reference that the perpetrator makes, according to this police report, to an interaction he had with Mr. McClanahan the day before?

A. He says the suspect became irate, wanting the rest of the money under the belief that the $40 wasn't all. That this person somehow knew that he had more money than that. The fact that whoever this person is came to his house to rob him. So he certainly believed that he had what would've been enough money to want to rob him. It -- it seems that Mr. McClanahan believed that this was related to the conduct the day before. So yeah, I do think that his -- his initial statements in this report do relate back to what he does say was the incident the day before. If -- if I'm understanding your question correctly.

Q. I will try to rephrase because I'm just trying to ask about things that do fall within your purview. Right. So you're not making any opinions in this case as to what the beliefs of the robber were when they decided to rob Mr. McClanahan, right?

A. No. I'm -- I'm talking about what Mr. McClanahan said. And --

Q. Right.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

153

A.  -- that's in the report.  I'm -- I'm not even expressing whether or not -- I -- I don't know why he believed what he believed.  I'm just saying that's what's in the report.

Q.  Right.

A.  And that's what you asked me.  Based on what's in the report, is there -- is there evidence or a reason to believe that it's related to the conduct from the day before?  And I think it is.

Q.  So that's actually not what I asked you, so I will re-ask it.

A.  Okay.

Q.  I'll try to be a little more specific.

A.  Maybe I misunderstood, Counsel.

Q.  It's okay.  My question for you -- and I'll caveat this with the statement that the document obviously speaks for itself.  But my question for you, sir, is -- is there any reference in here that the perpetrator allegedly makes to an interaction he and Mr. McClanahan had the day before?  Outside of the, I know you just got paid expletive, because we've already talked about that.

A.  Again, the fact that he said he wanted the rest of the money.  And Mr. McClanahan said the day before he was getting change to make a phone call and he



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

154

pulled out his paycheck and the person made a comment about it, okay, and asked him for money.  And Mr. McClanahan said, no, he had bills to pay.  So yeah, I -- I do take it that way.  That he is making further statements about how much money the robber believed that Mr. McClanahan had.  That the $40 he gave him wasn't all of the money he had.

Q.   So that -- the whole story you just told about the being at the phone booth, seeing his money, none of that is contained in this police report, right?

A.   Not in that portion of it, no.

Q.   It's not in the entire report, right?

A.   Okay.  I -- I think when you call the police report something, I'm not thinking of it in the same way.  I don't consider the single document the police report.  I consider each of those documents a report, but the entire police report is encompassed in the file. So if you're asking me if it's in this document, no, I don't see it specifically in this document.  But is it in later reports?  Yes, it is.  This specific exhibit, no.  I'm agreeing with you.

Q.   I'm going to show you now, sir, what we'll mark as Exhibit 5.  Which is Bates stamped City 44 to 45.  As with the previous exhibit, I'm going to give you a chance to look at the document and then any parts I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

want to ask you about I will read in.  But this one's just a two pager, so I'll scroll through.  Okay.  Do you recognize this document, sir?

(Exhibit 5 was marked for identification.)

A.  Yes.

BY MS. MARTINEZ:

Q.  Okay.  And these are the handwritten notes of Detective Walker's interview of Rhonda Curry at the day of the robbery, right?

A.  I'm not sure if they're all Rhonda Curry's statements, but I do think that she does -- she does recount some of her conversation with Ms. Curry.  I -- I -- I believe they're Detective Walker's handwritten notes.  I'm not sure if all of them are from Ms. Curry or not.

Q.  Okay.  In this document, the statement from Ms. Curry, would you agree that there's no mention of the perp making any allusion to an interaction from the day before?

A.  I can't see all of it.

Q.  I will zoom in.

A.  If you want to -- yeah.  If we could stroll -- scroll down, that -- that would be helpful.

Q.  Yes.

A.  I'm sorry, can you start from the top?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Yes, of course.

A.   And -- and your question is: Does the person who committed the robbery make reference to the conversation from the day before?

Q.   Uh-uh.  My question is: According to these notes, would you agree that Ms. Curry makes no mention of the perpetrator making an allusion to an interaction the day before?

A.   Well, again, I -- I don't know that all of these notes are from Ms. Curry's discussion with Detective Walker.  So I -- I'm not sure I can answer that question.  I -- I believe she recounts some of her discussions with Ms. Curry, but I don't know that all the notes are from Ms. Curry.

Q.   Just so I'm understanding, is it your belief that only some of these notes are from Ms. Curry and some may be from someone else, or that there are additional pages of notes pertaining to this first conversation?

A.   I -- I'm saying I don't know where Detective Walker got all of this information from.  I don't know Ms. Curry being the only source of what's in the notes.  So when you ask me to presume that they all came from Ms. Curry, I'm -- I'm not sure I can do that for you.

Q.   Okay.  You reviewed the entirety of Detective



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Walker's deposition transcript, right?

A. I believe I did, yes.

Q. Okay. And you don't recall seeing it in her testimony about these notes?

A. I do recall she said that those were her notes. I don't recall in her deposition her saying that everything that's in these notes came from Ms. Curry. Based on reading the notes, I do believe some of the information did. But I don't know that all of the information did.

Q. Okay. I mean, I will represent to you that these are the handwritten notes of that interview --

MR. EPSTEIN: Alyssa --

MS. MARTINEZ: -- for -- oh, yeah.

MR. EPSTEIN: -- I'm sorry to interrupt. I think Sam may be frozen.

MS. MARTINEZ: Oh, shoot. Sorry. Okay. What did we leave off on?

MS. SCHERGER: You guys were discussing whether or not these notes had -- through reassuring, you asked if this -- if you've reviewed the deposition of --

MS. MARTINEZ: Detective Walker?

MS. SCHERGER: -- Walker, yeah.

MS. MARTINEZ: Okay. Yeah. You -- I don't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

think you've missed anything then. We're still on that point.

MS. SCHERGER: What was the question pending?

MS. MARTINEZ: Oh, no, there wasn't one. I had represented to Mr. Dixon that these are the handwritten notes of the interview between Detective Walker and Rhonda Curry.

BY MS. MARTINEZ:

Q. But for my next few set of questions, if it would assuage your concerns, I can say, please assume that these are the handwritten notes of Detective Walker's interview with Rhonda Curry and that the information came from Ms. Curry, okay?

A. Again, I -- I'm not trying to be difficult, but I didn't see anywhere where Detective Walker said that everything that was in these notes came specifically and only from Ms. Curry. And that's -- that's what I'm saying. I'm not telling you that I don't believe some of it did, because it does appear that some of it did, where she recounts statements and -- and her calling Mr. McClanahan Ricky, but I don't know that all of it came from there. So if you're asking me to operate under an assumption that, you know -- I -- I'm not sure that -- that's -- that's something that I should be doing.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

159

Q. Okay. Well then, we can put that issue aside because that is properly for Detective Walker and Ms. Curry, which they have both testified about. But my question for you then is: Anywhere in these notes do you see any reference to the perpetrator of the robbery saying anything about an interaction he had with Mr. McClanahan the day before?

A. Could we start at the top and --

Q. Yes, we can. Let me know when you're ready for me to scroll.

A. Okay. Thank you.

Q. Uh-huh.

A. Okay. Could we scroll down please?

Q. Yes.

A. And gave me -- "Man, give me the GD money. Where's that? I know you got it. I know you got paid yesterday."

Q. All right. So there's the same reference to being paid the day before that we saw in Officer Rhodeback's report, right?

A. Yeah. I -- I think, again, he's recounting that the person is referring to what Mr. McClanahan believes is the -- the -- the interaction the day before.

Q. Right. My question, and it's the same



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

160

question I had for the previous report, do you see anything else in these notes that attributes any statement the perpetrator made to an interaction they had with Mr. McClanahan the day before?

A. Well, I -- I don't think it's just the perpetrator's statements. I think Mr. McClanahan's also recounting what he said the day before. The day before, he told the person who asked him for money that he had bills to pay. And in the notes, we see him saying, I paid bills. I got $40. Which he told the guy the day before that he had bills to pay.

Q. But there's no reference here to any conversation the previous day, right?

A. Those that I mentioned. But yeah, that -- that's what I see so far, based on your question. I think those two do refer to the interaction the day before.

Q. And what qualifications do you have as an expert to opine on that?

A. I think that my years of policing experience, my years as a prosecutor, a defense attorney, and today as a trainer of police officers in policing practices that -- and a review of the file, that it's the -- it's the same subject matter, the conversation that Mr. McClanahan said occurred the day before, when the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

individual asked him about money. He asked him for money. He commented on how much money it was. Mr. McClanahan declined to give him any money. He said he had bills to pay. The robber comes the next day, says, I know you have money.

Okay. He gives him $40. And he asked where the rest of it is, and he said, "I paid my bills," meaning, I paid bills with the money. So it -- it does seem that this is about this matter, at least in Mr. McClanahan's mind, okay, the day before, based on the statements that Mr. McClanahan, okay, made. Now, I don't know if this is Mr. McClanahan, or Ms. Curry, or who made these statements, but they seem consistent with the statements that Mr. McClanahan made regarding the interaction with the person.

Q. Okay. I want to try to separate these out, because again, I think we're conflating a lot of the reports. But just to clarify, so that is the basis for your qualification to opine on what Ms. Curry is referring to here in these statements?

A. Again, you're saying, Ms. Curry is referring. I don't know, but whoever -- whoever told Detective Walker, or however she got this information that she placed in here, seems consistent with what Mr. McClanahan -- that doesn't seem to be in dispute

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

what Mr. McClanahan said occurred the day before.

Q. Sure. And would you agree, sir, that whatever the witnesses intended in making these statements, and whatever Officer Walker intended in writing these down, is beyond your purview?

A. I'm only answering the questions you asked me, Counsel. I didn't put that in my report because that wasn't what I was asked to review and offer an opinion about. You asked me about this, and that's why I answered it.

Q. Sure. My question, though, is that -- that determination, right, of intent in giving a statement to police, and intent in writing down what she wrote down, those are questions that are beyond the parameters of expert testimony, right?

A. Counsel, you -- you asked me the question and I answered it. That -- that's why I gave you the opinion.

Q. Okay.

MS. SCHERGER: Can we take a break soon?

MS. MARTINEZ: Yeah. I just want to finish up --

MS. SCHERGER: Yep.

MS. MARTINEZ: -- this point. I'm almost done with this exhibit. Actually, I have no follow-up on

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that point, so we can take a break.

THE WITNESS: When should we return?

MS. MARTINEZ: How much time would you like, Counsel?

THE REPORTER: I'll get us off record really quick. Time is 3:26 p.m.

(A recess was taken.)

THE REPORTER: Back on record. Time is 3:34.

BY MS. MARTINEZ:

Q. I do actually have one more question for you on Exhibit 5 before we turn to Exhibit 6, and it was what I said we were going to circle back to since you did not recall. On Page 11 of your report, you stated that, "Detective Walker met with Ms. Curry at Grant Hospital. She told Detective Walker that she recognized the suspect but could not remember from where she recognized him." I then asked you that this information is not contained in the contemporaneous notes of that conversation, but instead is from a subsequent police report. Now that you have the notes in front of you, is that a correct statement?

A. That Detective Walker met with Ms. Curry at the hospital? And that she's --

Q. No.

A. I'm sorry. I --



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

164

Q.   No, it's okay.

A.   -- I -- go ahead.  I'm sorry.  My apologies.

Q.   No, it's okay.  So my question for you is that what you wrote on Page 11, about Ms. Curry telling Detective Walker that she recognized the suspect but couldn't remember from where she recognized him, that does not come from the contemporaneous notes of the conversation, right?

A.   That my -- what I wrote, did it come from this that we're --

Q.   Right.

A.   -- looking at?

Q.   Right.

A.   No.  I -- I think I said I thought it came from a -- a different report.  I think that's where I got it from.

Q.   Okay.  I am going to stop sharing my screen. And then I will show you what we'll mark as Exhibit 6, which is Bates stamped City 46 through 49, and are the Handwritten Notes of Detective Walker's Conversation with Mr. McClanahan on October 13, 2004.  Can you see my screen, sir?

(Exhibit 6 was marked for identification.)

A.   Yes.  It would be helpful if it was a little bigger, but I can see it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. MARTINEZ:

Q. Of course. Let me do that. Is this okay, or one more?

A. Sure. Let's try one more.

Q. Okay.

A. Thank you.

Q. Yeah. No problem. Are these the notes that you reviewed of the conversation between Detective Walker and Mr. McClanahan?

A. Those are the notes I reviewed that I understood were Detective Walker's notes. It does say, "Interview." I believe that at least some of that did come from Mr. McClanahan. What portions, again, I don't know, but I did believe those to be Detective Walker's notes.

Q. Did you see anything in the record that would lead you to believe that certain sections of this were from someone else?

A. No. Not explicitly.

Q. And, I guess, same question for the notes of her conversation with Ms. Curry, did you see anything in the record that would lead you to believe any part of those notes were from someone else?

A. Not explicitly, no.

Q. Okay. So in these notes, four days after the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

robbery, this is where Mr. McClanahan first gives the narrative of the October 8, 2004, interaction to police, right?

A. I don't know that. I just know that -- that's when Detective Walker says, in her writing, that she talked to Mr. McClanahan.

Q. Did you see any evidence, in the record, of Mr. McClanahan giving the story to a different officer before Detective Walker?

A. I'm not sure. But I -- I think he may have spoken to Officer Rhodeback on the day of the incident.

Q. And we --

A. So --

Q. -- just looked at the report that she issued, and this narrative was not in that report, correct?

A. I think it makes references to portions of the narrative, the story. But I'm not trying to be contentious with you. I just think that, again, he did recount of it before this formal interview, it seems like, from what I -- what I -- what I derived, that he did have -- he did give some statements. But this was a more formal discussion and a lengthier discussion. That's what I got from this.

Q. Okay. I'm going to go back to Exhibit 4, just to make sure I'm understanding your testimony. Can you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

direct me to where in this document you believe shows that Mr. McClanahan had already told this story about the interaction on October 8, 2004, to Officer Rhodeback?

A.   When he says that the person said, I know you just got paid, B, give me the money.

Q.   I see.  So it's from that section right there that makes you believe he gave some version of that narrative of the October 8, 2004, interaction to Officer Rhodeback?

A.   Yes.  I -- I believe these are notes, but I don't think that he recounted everything that the person said.  And -- and notes like this, they often don't recount every single word the person says.  That's why they're called notes.  And I'm not trying to be short with you, but it's -- it's more of a summary of important things that the officer would put in the report, and they believe that to be important.  But yeah, that's -- that's where I got it from.

Q.   Okay.  And I just -- again, I want to clarify between things you found in the record and assumptions that you're making based on your experience.  You reviewed Officer Rhodeback's Deposition Transcript; is that right?

A.   I think I did.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

168

Q. Okay. And so, do you have any basis -- or strike that, please. What is your basis for believing that this section that says, "Offense notes," is only certain portions of what Mr. McClanahan told Officer Rhodeback?

A. Well, the officer doesn't say, "I asked him this, he told me that, I asked him this and then he told me that." It doesn't recount the entire conversation, just says what the victim stated. The officer doesn't say what she stated. I -- I think there's -- there's a lot of reason to believe that this is not, verbatim, the entire conversation between the officer and -- and -- and the victims.

Q. Okay. So it's coming from an assumption you're making based on your experience rather than somewhere you can identify in the record; is that an accurate statement?

A. Again, I -- I don't think it's an accurate statement. I -- I don't see how anyone would believe that this is the entire conversation, what's contained in the offense notes, because it says, "Notes." Doesn't say, narrative, the entire conversation. People don't speak like that, so I don't -- I don't think it's just my experience. I think a layperson would believe that this is a summary or -- or what the person thinks is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

169

most important from their conversation with them.

Q. And so, you have extrapolated from that -- that Mr. McClanahan did talk about this October 8, 2004, interaction in some capacity with Officer Rhodeback?

A. Yeah.

Q. Okay. But you cannot identify anywhere in her trial transcript or her deposition testimony where she affirmatively says that or confirms that idea, right?

A. Yeah. I -- I don't have it in front of me. There's thousands of pages of documents, and -- and as to Officer Rhodeback, there's -- there's a lot of writings that she did, and reporting, as well as her deposition and trial testimony. So without it in front of me, no, I wouldn't be able to do that for you at this moment. But that -- that's my belief based on what's -- what's in front of me.

Q. When you say, a lot of writings and reportings, what are you referring to?

A. I'm referring to the report she wrote in reference to this. There was also follow-ups that I believe Officer Rhodeback commented on, or even some changes in the reporting system where some information that she was written -- that she had written was regenerated in other reports. And also, she testified in a deposition at trial. So I -- I think there's a lot

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

of statements and information that Officer Rhodeback gave in reference to this incident, that I don't have in front of me. So if you're asking me to go to the specific line, I wouldn't be able to do that.

Q. But it would be somewhere in the record, the statements that she gave, and the different reports, if multiple, that she authored, right?

A. I believe so.

Q. Okay. Yeah. I guess -- we didn't -- we don't have to go back and forth on the facts. We've got the documents, we've got the records. So I don't want to make any assumptions, so I am going to ask you the question. Did it affect your opinion in any way that the notes of the October 13, 2004, interview between Detective Walker and Mr. McClanahan are the first time we're seeing a description of this October 8, 2004, interaction he says he had?

A. Again, Counsel, I -- I don't agree with the premise that this is the first time he's mentioned it. So I -- I can't answer the question the way you're asking it. I don't agree with the premise.

Q. And that's based on your interpretation of documents in the record?

A. Yes.

Q. Okay. I'm going to stop sharing my screen



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

because we do not need those for the moment.  Actually, no, I was wrong.  I'm going to bring it back up.  But looking at your report, sir, on Page 11, you stated that, "She," referring to Ms. Curry, "stated she would be able to identify the suspect if she saw him again." That is not -- strike that, please.  That does not come from the Contemporaneous Notes of Detective Walker's Interview with Ms. Curry, right?

A.   You're referring to the previous exhibit?

Q.   Yes.  To Exhibit 5.

A.   I -- I'd have to see it again.  I don't remember everything that was on there.

Q.   I'm happy to scroll back through.  And then let me know when you've had a chance to look at the document?

A.   Okay.  Can you scroll down, please?

Q.   Yes, of course.

A.   Can you scroll down a little more, please?

Q.   Yes.  And then just let me know when you're ready for the next page?

A.   And I'm sorry.  And your question again specifically was --

Q.   My question was, the statement that you give in your report, which says that, "She," referring to Ms. Curry, "stated she would be able to identify the



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

suspect if she saw him again," does not come from the Contemporaneous Notes of Detective Walker's Interview with Ms. Curry, right?

A. No, she doesn't specifically say that here. She does say that she tried to peep at the person. She says the person recognized she was looking at him. And the person even made the remark, B, quit looking at me. We do see that.

Q. Right. And again, this is another -- again, like, the document speaks for itself. My question is just, that information that you put in your report, about stating she'd be able to identify the suspect if she saw him again --

A. Did -- did I get it from here? No. I'm sorry. I didn't mean to interrupt you, Counsel. My apologies.

Q. No, it's okay. You answered the question. But then I want to compare that to the handwritten notes of her conversation with Mr. McClanahan, and I'm going to scroll to the third page where she does write, "Can ID." Do you see that, sir?

A. Yes, I do see where she wrote that.

Q. When you were formulating your opinions, did it concern you at all that Detective Walker wrote down that information for one witness but did not write it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

down for another?

A.   No, it didn't.  The -- this was days later. She was speaking to Mr. -- Mr. McClanahan at this point. No, it -- it didn't -- didn't bother me at all.

Q.   Okay.  In your opinion, in 2004, do you think it would be generally-accepted best practice to document when a victim states that they can identify the perpetrator?

A.   I'm -- I'm sorry, Counsel.  I -- I don't think I understand the question.

MS. MARTINEZ:  Madam Court Reporter, can you please read the question back?

THE REPORTER:  Yes.  Just one second.

(The requested question was played back.)

THE REPORTER:  Okay.

THE WITNESS:  Okay.  No.  Yes, I -- I think it would be prudent in 2004, to answer your question, and now.

BY MS. MARTINEZ:

Q.   Fair.  Do you agree that it would be generally-accepted best practice in 2004 to contemporaneously document that when you receive the information?

A.   That the person can identify them?

Q.   Yes, sir.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

174

A.    Yes, I would say that's -- that's accurate.

Q.    And in your own words and your own experience, why is that important?

A.    I -- I think a detective or any law enforcement officer investigating any crime or incident should take, as best as they can, contemporaneous notes of what's occurring. Today, police officers have body-worn cameras, so it's a lot easier. But I think contemporaneous notes have -- have a -- a higher level of veracity, value. You don't worry about the officers forgetting things later. There's an assortment of reasons. That's just to name a few. It also undermines legitimacy and trust in the investigative process to ensure things aren't missed.

Q.    I am going to stop sharing, because if I don't now, I will forget. On Page 11 of your report, sir, you then go on to say that, "At first, Mr. McClanahan identified the robber as Richard. Mr. McClanahan stated that he was not sure of his last name, but would be able to get it." That is another statement that does not come from the contemporaneous notes, right?

A.    It doesn't come from the note that you showed me specifically --

Q.    Okay.

A.    -- in that way. But could you put the note

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

back up?  Because I just want to --

Q.  Yes.

A.  -- make sure that --

Q.  Of course.

A.  -- I'm answering it in -- in the way you mean it.

Q.  Yes.  And I'm happy to go back to the top, I'm happy to go down.

A.  So from this interview, we -- we can see that he called the person Richard Diggs.  From the other reporting, we see that he was unsure, and he indicated to the detective that he was going to go back and check.  But he did mention a Richard Diggs.

Q.  Okay.

A.  I also think, in some of her other reporting, the detective mentions that he -- he said the name, Richard.  I can't see the top here, but --

Q.  I'm happy to scroll anywhere you need me so you can review the entire thing?

A.  Right there.  "Niece sold car to Richard."

Q.  But there's no reference, specifically in these handwritten notes, that Mr. McClanahan said he wasn't sure of the last name but would be able to get it, right?  That comes from subsequent police reports?

A.  I'd have to look at these notes a little



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

closer, but I do think that -- that's -- this is the conversation where he says that he's not sure, but he believes the person's name is Richard. Then he also mentions Richard Diggs, that both are in the same conversation. Do you mind going to the top?

Q. No, not at all. And then just with the previous document, let me know when you'd like me to scroll?

A. Yes. Could you scroll down, please?

Q. Yes.

A. Okay. Can you scroll down a little more, please?

Q. Yes.

A. Okay. And your question specifically again was --

Q. My question specifically was, the statement that you put in your report, that Mr. McClanahan said he wasn't sure of the last name, but he'd be able to get it, that information does not appear in these contemporaneous notes, right?

A. Could you scroll down again, please? I'm -- I'm sorry. Could you scroll down?

Q. Yeah. Definitely don't apologize. I want to make sure you have a chance to read the full document if I'm going to ask you a question about the document.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. And could you scroll? And could you scroll? Does he use those words specifically? No, I don't think he does in this document.

Q. And so, my question for you, sir, is: Did it affect your opinion in any way that certain facts appear in Detective Walker's typed police reports, that do not appear in the contemporaneous handwritten notes?

A. You said, did it concern me?

Q. No. Did it affect your opinions in any way?

A. No -- no. And -- and that report, he says he can ID the person, which I certainly think goes to the fact that, in her other reports, Detective Walker says that he's going to go back and he's going to try to figure out who the person actually is, that he knows the person from the prior interactions he's had with them in the neighborhood, and with the vehicle that his niece sold, and that he knows the person's name is Richard. He even at some point says, "Richard Diggs, Adidas boy." But no, it didn't concern me that everything that's in her notes was not in her report. Some -- some things are known to detectives that they don't have to reiterate in their notes, but I -- I thought the notes were consistent with the reporting.

Q. Okay. I just -- I want to make sure that the causal chain is going the right way. So my question was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. not about whether it affected your opinions that there was additional information in the handwritten notes that didn't make it to the police reports, the type of --

A. Oh.

Q. -- reports.

A. I thought that was --

Q. My --

A. -- your question. My apologies.

Q. No. My -- that's okay. My question for you was the opposite. Did it affect your opinions in any way that facts appear in the typed police reports, that do not appear in the contemporaneous handwritten notes?

A. No, it -- it didn't affect me, because my opinion came from the -- the cumulative report, the notes, the handwritten reports, and also the other materials that you gave me -- or, that I received. So it wasn't just one item that made me form the opinions that I formed.

Q. Okay. And would you agree that none of the typed police reports contain the name, Richard Diggs?

A. I -- I don't remember specifically if the -- contained the name, Richard Diggs, or not.

Q. Okay. I will represent to you that they do not contain the name, Richard Diggs. Does that affect your opinions that you give in this case in any way?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. No.

Q. And I believe you testified, in response to a previous question a minute or two ago, that it is your belief that the contemporaneous handwritten notes and the typed police reports are fully consistent?

A. You used the word, "fully consistent." I -- I think we may be saying the same thing. When I say, I believe they're consistent, I -- I don't believe that they're inconsistent as to what Detective Walker found when she investigated this crime. I believe they are consistent.

Q. Okay.

A. They don't have to have everything word for word in each item. Notes and reports are -- are different often.

Q. And did it affect your opinion in any way that, according to the handwritten notes of her conversation with Mr. McClanahan, he said the perpetrator was between 5'9" and 6', but in her typed report, she lists that Mr. McClanahan said the perpetrator was only 6'. Did that affect your opinion in any way?

A. No. That -- that -- that didn't -- it didn't affect my -- when you say, opinion, I mean my conclusion. No, because again, Mr. McClanahan may very

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

180

well have said those things. I would wonder why they would be in the report, had -- in her notes and report, had he not said them, but victims are often -- give a range of heights and weights and descriptions depending on the time. But that wasn't the only thing that caused Detective Walker to identify the suspect that she identified.

Q. Okay. And I -- maybe I should've been a little more specific. I'm talking about strictly that one example, right, of Mr. McClanahan telling Detective Walker the perp was between 5'9" and 6', and then Detective Walker documenting that he said the perpetrator was 6' tall, not including the 5'9" range.

A. Uh-huh.

Q. Is it your opinion that -- that is within generally-accepted best practices in 2004?

A. Yeah. I -- I -- I would've expected Detective Walker to write down specifically what Mr. McClanahan said. I think it goes to the fact that she take detailed notes, and she did try to record what he said specifically, as opposed to imposing, you know, her own views or -- or something different. I took it as, he gave two different descriptions.

Q. Oh. I see. Okay. So it's your belief that Mr. McClanahan first gave the 5'9" to 6' description,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

and then in a different setting, just said 6', and that's why Detective Walker only wrote 6' in her report?

A.    I think -- I -- I think we're saying the same thing.  I took it as if Detective Walker got the information from Mr. McClanahan, and what she placed in her report was the information she got from Mr. McClanahan that she believed that he had clarified.

Q.    I see.  Okay.

A.    And that at one point, he made a statement, 5'9", and another time, he made the statement, 6'.  And from her discussions with him, she believed that he had settled on the perpetrator being approximately 6', and that's what she put in the report.  But again, that was one piece of the puzzle of identifying the individuals.

Q.    I see.  Just a follow-up question on that point, did you see any handwritten notes or other evidence in the record that would support Mr. McClanahan being the one to clarify the height of the perpetrator?

A.    Well, she said that she spoke to Mr. McClanahan, and that was the recount of what he said.  She says that in the notes, and in the reporting, it indicates that she had again spoken to Mr. McClanahan.

Q.    So it's your belief that in her police reports, where she memorializes the 6' information, that -- that is in the context of another conversation with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mr. McClanahan, not the October 13, 2004, conversation?

A. I don't know if it was the result of multiple conversations with him or the cumulative effect of that single conversation, that he may have changed his statement during that conversation. But I drew from it that she had received information from Mr. McClanahan.

Q. Okay. So your assumption is that -- that information is coming from him. Okay.

A. Yes.

Q. Understood. Okay. Moving on -- on Page 13, in that first full paragraph, the very last sentence, you state, "Proof of the bribe in the form of a handwritten note bearing Mr. Horton's phone number was offered before the jury during the trial and may have affected the outcome." You were not retained to opine on what did or did not affect the outcome the jury reached in Mr. Horton's criminal case, right?

A. Yeah, that's true. Yes.

Q. Okay. And from your review of the record, you're aware Mr. Horton has denied ever attempting to bribe Mr. McClanahan?

A. Yes, I'm aware that Mr. Horton denied it.

Q. Okay. And so, there's obviously tension between Mr. McClanahan's statement of what happened and Mr. Horton's statement of what happened, right?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

183

A.   That's my understanding.

Q.   And it is not within your purview to opine on who is telling the truth and who is not, right?

A.   Yes.   And -- and I don't think that I am.

Q.   All right.   On Page 14, sir -- kind of, already touched on this, but I still want to ask you the question.   On Page 14, you state, "Police officers are trained to memorialize and document discussions with witnesses, as such discussions are important evidence, and to utilize such evidence to determine whether probable cause exists to charge the suspect with a crime."   It's the last sentence in that first half-paragraph on Page 14.   Do you see that, sir?

A.   Yes.

Q.   Okay.   And that practice would include writing down all the important information you receive as soon as possible, right?

A.   When I say, "memorialize," it could be writing, it could be recording, it could be typing, but memorializing it, yes.

Q.   Okay.

A.   And as soon as possible versus practical, I -- I would distinguish there's a difference.   I don't necessarily think as soon as possible is always the standard.   Sometimes they collect notes.   Sometimes they

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

collect other information from other officers. Sometimes they collect reports from forensics and other laboratory reports. And that's when they might memorialize it. So I wouldn't say as soon as possible. I think practical is -- is the word I would use.

Q. Okay. And practical for each individual officer or detective is going to be a judgment call, right?

A. Yes. I would say that's within their discretion. Now, I do think their supervisors expect that they will prepare the reports in a timely fashion.

Q. And is one of the reasons that you want to memorialize that kind of information as soon as possible because you don't want to have to try to rely on memory to recreate an investigation?

A. I -- I -- I think that's the dire circumstance of not recording things when -- when it's practicable. I think that the -- the initial reason would be it's your job to do it because other people may depend on those reports. How do you further the investigation? How -- how do your supervisors know the investigation is being furthered so that the perpetrator of a crime like this is -- is arrested and -- and gets their due process and justice is done? I mean, it's just part of the criminal justice system. To end up relying on your

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory to support an investigation is -- I -- solely on your memory, I would think, would be a failure on many levels. And not just the detective, but their supervisor as well and that person's supervisor and administrator.

Q. Okay. And then your Summary of Opinions begins on Page 15, right?

A. Yes.

Q. Okay. On Page 15, about halfway through that first paragraph, under Summary of Opinions, you state -- actually, sorry. That's wrong. In the first paragraph, under Opinion Number 1, which is, "Detective Walker's actions were consistent with police training practices and agency policy," you state that, "It should be noted that there is no evidence that Plaintiff was wrongfully convicted." Do you see that, sir?

A. Yes.

Q. Okay. And as you testified to earlier, whether Plaintiff was wrongfully convicted or not is a legal question for the jury in this case, right?

A. It is. I'm saying, in the materials I reviewed, I'm not making a determination. I was asked to review the materials. The amended complaint is part of those materials. And in the materials I reviewed, doesn't say -- I didn't see anything that said the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Plaintiff had been wrongfully convicted.

Q. Okay. I see what I skipped now. Okay. In the Summary of the Opinion Section, so before we get to Opinion 1, taking a quick step back, you state that, "The policies and practices of CP and generally accepted policing practices, and all CPD members were mandated to follow those policies." Do you see that, sir?

A. I'm sorry. You're on Page 15?

Q. Yes.

A. And which paragraph are you in again? My apologies.

Q. No, you're good. I may have marked this down wrong.

A. Okay. The first paragraph?

Q. Yes.

A. In the last sentence?

Q. Yes, exactly. Thank you for finding that because my eyes just jumped right over it. Okay. So my question for you, sir, is: A mandate to follow department policy and policing practices is generally mandated for all law enforcement personnel, right?

A. Yes, I'd say that's general.

Q. Okay. But that doesn't mean it's impossible for law enforcement personnel to then commit misconduct, right?



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    It does not.

Q.    Okay.  And then jumping ahead to Page 17, sir, the very bottom of 17, going into the top of 18, you state, "The citywide policy in Section G of this document makes clear that making false or untrue statements regarding work-related matters to management, fellow employees, or a member of the public are prohibited.  The citywide policy in place at the time also prohibited Detective Walker from violating not just city policy, but also departmental policy."  And my question for you, again, sir: Is that different municipalities and police departments have policies against dishonesty, right?

A.    Okay.  I'm sorry.  I -- I went to Page 18.  My apologies, Counsel.  Your question was?

Q.    My question was: Different municipalities and police departments will have policies against dishonesty, right?

A.    I -- I think every police department has a policy against dishonesty.  Of the approximately 18,000 law enforcement agencies in the country, I've not seen -- I haven't seen all 18,000, but I've seen what I would call several of them, and I think they all have a policy against dishonesty.

Q.    But it can still happen, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

188

A.    I think it does happen.

Q.    And then I'd like to talk to you quickly, sir, about the photo array that was generated and introduced in this case, okay?

A.    Yes.

Q.    Can you please describe for me the training that you received on photo arrays?

A.    The last training I received as a police officer?

Q.    Any training that you received on photo arrays as a police officer?

A.    The initial training I recall was in the academy, where we were taught to try to get the description of the suspect relating to age, physical description, ethnicity, race, all of those indexing information, to determine if the victim or witness was able to identify -- if they felt they could reliably identify the suspect, based on that description, to try to gain an identity for the suspect.  And if the victim believed that they might be able to identify the person, again, to put together an initial photo array.  The photo arrays have changed from my initial training, from it being a single card to the six-pack photo array.  The initial card had six photos on there, where you would get photographs of the individual.  They could be taken

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

189

from arrest photos.  They could be taken from other photographs obtained.  But the people should be similar in appearance.

And the initial photo arrays, that at least my generation of police were taught, the person would be asked if they could identify the person.  They'd be presented the photo array with another officer or their supervisor present, and they'd be asked if they could identify the person. And if they could identify the person, they'd be asked to record it on the photo array whether they could identify the person.  They'd then be asked to state why or where they remembered the person from and if they had any other additional information to add.  If they could not identify the person, they'd be asked to record that as well on the photo array.  The six-pack photo arrays came a little later, and I believe that's what was used in this situation.

Q. And I just want to very quickly pause, just so I'm separating out your training.  So you had a training at the academy in 1993 on photo arrays, right?

A. Uh-huh.

Q. Okay.  And it comprised of the topics that you just discussed?

A. Yes.

Q. Okay.  And then did you have any supplemental



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

trainings on the job pertaining to photo arrays?

A. Supervisors, as -- as I went along, helped me understand how to put the photo arrays together, and other colleagues who had experience --

Q. Okay. So --

A. -- including my tenure, my short tenure, in homicide.

Q. Okay. So it may not have been, you know, a structured, mandatory in-service training, but you had training from the people you worked with on photo arrays. Is that a fair representation?

A. I'd say yes. And I also think there -- there was some in-service training, but I -- I think I learned how to put the photo arrays together in the academy and with help of colleagues and supervisors.

Q. Okay. And during your career, you both made photo arrays yourself and assisted officers under your purview in creating photo arrays?

A. Yes.

Q. Okay. And you testified to this a little bit earlier, but I, kind of, want to separate it out. It's your understanding that the fillers inserted in a photo array should match, to the extent possible, the physical description given of the perpetrator?

A. Yes, they -- they should closely resemble the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

person.

Q. Okay. And in your own words and experience, why is it important to have fillers match the physical description given of the perpetrator or the physical descriptions of the suspect?

A. When -- when I say "filler," we're referring to the initial photo arrays that police officers used to use as opposed to the six-pack photo array, where they're in different folders.

Q. I'll --

A. So when you -- when -- when I said "filler," I -- I want to be clear that we're talking about -- the photo -- photo arrays have changed over time. And I -- I believe -- in this particular one, I -- I believe she used a -- a six-pack photo array.

Q. Yes, there is a six-pack photo array with five fillers in it.

A. Yes. So they're -- they're -- they're different folders, so they're not next to each other. They're in different photos, but they still should resemble each other.

Q. Okay.

A. Yes. I think we're saying the same thing. I just want to be clear.

Q. Yes. I think so, too. I think I was maybe

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

misunderstanding that first circumstance you were talking about, where it's a photograph of multiple people --

A. Yes.

Q. -- in the photo. I see. Okay. So then, in your own words and experience, can you please explain why it's important, in the six-pack, for the fillers to match the physical description given of the perpetrator?

A. Well, outside the fact that it -- it might be suggestive, if they don't resemble each other, for the victim to pick out the person who they suspect, or the detective suspects, they should pick out, if people don't resemble each other, it -- I -- I can -- I can characterize it in many ways. I think, as a lawyer, it's a due process violation. I also think that it may affect admissibility of a trial. It is suggestive.

It's liking to pointing out the individual for the victim to target. It's improper. Police aren't trained to do that. They're trained to pick people. We can call them fillers, whether they're on the same card or if they're in different folders. It's part of legitimacy process to ensure that it's as impartial as it can be for the officers. And even having a different detective present the array I think aids in that. So I hope I answered your question.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. You did. Thank you.

A. It's -- I -- I can't say every reason why. We'd be here for quite a while, if you wanted me to do that.

Q. No, I think that -- that answer was sufficient. Thank you. And so, at the time a photo array was assembled in this case, we know, from both Ms. Curry and Mr. McClanahan, that the perpetrator had that hoodie pulled up tight so you could only see really the eyes and part of the nose, and that it was a light-skinned Black male; is that correct?

A. Well, that's part of the description they gave.

Q. Do you recall seeing, in any of the reports or handwritten notes, other physical descriptions they could give of the perpetrator's face?

A. Well, I think in the -- in -- in some of the subsequent reporting, not the date of, but later, they -- they said they -- they knew him. They recognized him from previous interactions. So they -- they said they knew it was the plaintiff, Mr. Horton.

Q. Okay. I'm going to re-ask my question because I don't think you answered it, but I want to make it really clear what it is, okay? My question for you, sir, is: In addition to the light-skinned Black male,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that they both provided to officers, did you see in your review of the notes or interviews with them, from before the photo array being made, any other physical descriptions of the features of the face of the perpetrator?

A. I -- I think I answered the question as best I could. No, they did not say specific physical features because they gave his full identity to the detectives and they indicated how they arrived at his identity, that they recognized him from prior contact. So there would've been no need to give a description. If -- if I know the person is Tim Dixon, I simply say, it's Tim Dixon; I know it's him rather than give a description. I -- I would've expected a description initially when they had not concluded that it was him. So I'm trying to answer the question, but I -- I think I need to qualify with not just a no answer.

Q. Okay. In your experience, does the fact that victims may know the perpetrator change the importance of having fillers that match the physical description?

A. No.

Q. Okay. So now I'm going to show you the photo array that was created and used in this case and shown to the victims. We'll mark it as Exhibit 7. And it's Bates Stamped FCPO2554. Are you able to see this, sir?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

(Exhibit 7 was marked for identification.)

A. Yes.

BY MS. MARTINEZ:

Q. I'll try to -- there we go. Okay. So like we've discussed, at this point, a consistent description of the perpetrator is that it is a light-skinned Black male, right?

A. I think that's one of the descriptors. Again, I think they said, that by the time the photo array is shown, that they know -- well, they -- that Mr. McClanahan and Ms. McCurry [sic] believe that is Mr. Horton.

Q. Sure. My question for you, sir, is: Can you please identify for me which of these six men, in your opinion, qualify as light-skinned Black males?

A. It would be very difficult for me to use a photograph copy that's been scanned in. I'd -- I'd rather see the actual original one before I expressed this opinion. I'm looking at a black and white copy of it. So honestly, I can't say that using a black and white copy is something I would recommend. So if -- if you wanted me to answer that, I'd like to see the original, and then I'd be able to express an opinion. I don't know how many times this has been enhanced, digitized.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

196

Q.   Sure.  I will represent to you this is a copy of the original from the prosecutor's office --

A.   Yes.

Q.   -- and that the original, it's my understanding, is in black and white.  That was the version that was shown to both of the victims.

A.   Yeah.  I'd like to see the original.  But if -- if you're going to ask me, do these men all look alike?  No.  And in a photo array, they -- they shouldn't look alike.  The purpose isn't to confuse the victim either, but it's to ensure that the victim can either pick out the person that the -- that is believed to be the suspect or not.  But I -- I can't determine, from this copy, which people you would consider light-skinned.  But if you're going to ask me, I think some are lighter complected than others.

Q.   Okay.  And I will clarify, sir.  I don't want you to guess what my opinion is.  I obviously have my thoughts on the array.  I'm strictly asking your opinion --

A.   Uh-huh.

Q.   -- just like I did for Detective Walker, which you read and noted in your report, in her deposition transcript.  I'm asking you, sir, which of these individuals, to you, appears to be a light-skinned

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

197

Black male?

A. I think that some of them are lighter than others, yes. So you're asking me who is -- who is light-skinned and who is not?

Q. Yes, in your opinion, sir. And if your testimony is that you believe they all qualify, then that is your testimony. I'm not trying to --

A. Oh, no.

Q. -- trip you up here or anything. I'm just curious, which of these six young men would you qualify as being light-skinned Black men?

A. I -- I don't think the individual in the upper right-hand corner, Number 1, looks, in this depiction, like a light-skinned Black male. In this depiction, number 4, some people may not consider him a light-skinned Black male, but I can't tell because the picture is discolored. I -- I think the other -- I think the others are what some people may consider a light-skinned Black male.

Q. Okay. And I don't want you to speculate for some people, right, because everyone's going to have a different opinion when they look at this. I strictly want to know, is it your opinion, as you sit here today, that two, three, four, and six could be characterized as light-skinned Black men?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. I think they could be.

Q. Okay.

A. Again, I want to qualify it with the quality of this photo array and that this is a copy from 20 -- more than 20 years ago. I'd -- I'd like to see the original, if you were going to ask me my opinion about the actual photo array presented to the victims.

Q. Yeah.

A. You're asking me about this image, looking at it on my computer over Zoom.

Q. Understood. You reviewed Mr. McClanahan's trial testimony, right?

A. Yes, I reviewed the trial testimony.

Q. And you saw then, that in his trial testimony, he testified that Mr. Horton, who is in Slot 5 in this array, is the only light-skinned Black male, right?

A. I don't remember that specifically from his trial testimony.

Q. Okay. But --

A. I'm not saying it's not in there. I'm just saying I don't remember that specifically from his trial testimony.

Q. I'll represent to you that it is there. But does that mean then, that it did not factor into your opinions in this, case since it's not in your report?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Again, I don't know that it's in there.  But Mr. Horton making the statement at trial, did it factor into my opinion about Detective Walker following generally accepted policing practices?  No, because I don't remember it being in there.  Would it have changed my opinion?  No.

Q.   Okay.  I was going to say, I can show it to you, but if it wouldn't change your opinion, then I don't think we need to do that.  Okay.  And sir, did you review the deposition transcript of a man named Sergeant Greene, who was deposed in this case and was the supervisor of Officer Rhodeback?

A.   I -- I don't think I had it by the time I prepared this report.

Q.   Okay.  Do you know if you reviewed it at any point?

A.   I don't remember if I looked at it or not because I think I had already prepared to report.

Q.   Okay.  I'll represent to you that, in his deposition, he also looked at this photo array and identified Mr. Horton in Slot 5 as the only light-skinned Black male.  Do you recall reviewing that testimony?

A.   Again, I don't recall.  I don't remember if I saw Sergeant Greene's testimony.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.   And would you agree that, based on this copy of the array, Mr. Horton does appear to be the lightest skinned?

A.   Yes, I would agree with that.

Q.   And Mr. McClanahan also testified at trial that he was not given any instructions prior to looking at this array.   Do you recall reviewing that?

A.   No, I don't recall seeing that.

Q.   Does that affect your opinions, in any way, that you reached in the case, that he was not given an instruction prior to being shown this photo array?

A.   I think there's evidence that he was given the instructions.   The instructions are on the array, and he -- he was asked to consider those things.   So no, it wouldn't change my opinion.   I -- I think that the trial testimony of Mr. McClanahan, if he said that, is -- is different than what's indicated in the rest of the file, but it would not change my opinion.

Q.   And I just want to quickly clarify.   You said that the instructions were on the array.   This is the array.   Are you referring to the photo array sign-off form?

A.   Yes, which is presented at the same time.   The two items are presented at the same time.   Like, what you're presenting to me is -- this is a digital image of



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the array. It's not the actual array. It's an image of the array. There's a sign-off form that, my understanding, was presented to each of the victims at the time, where they were read the instructions and they acknowledged the instructions, and they also acknowledged the results of having been given the photo array. And I believe Mr. McClanahan did that at the time.

Q. And it's your belief that -- that second form was given prior to both victims looking at the photo array?

A. The arrays they were presented? That's my understanding, yes.

Q. Okay. And is there anywhere, that you can point to in the record, that supports that specific ordering, getting that form first and then getting the array?

A. When you say, "the record," you mean the thousands of pages of materials?

Q. Yes, sir.

A. Okay. I -- I think it's on the form and I think it's also recounted in Detective Walker's reporting, that she presented them with the array and the form.

Q. Okay. Actually, both forms are dated, so I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

can show you them both in a second, but I want to see if I have any other -- this photo array appears to have been created on November 18, 2004, right?

A.   No.  I -- I think that's when the file was downloaded.  I -- I -- I think we're saying the same thing.  This is not the actual array.  This is a digital image of the array.  So when you ask me about people's complexions and how they look, some -- some things are obvious.  I do agree.  The -- the -- the -- the gentleman who is number 1 is darker than everyone else. The gentleman who is number 4 is darker, okay?  Those things are obvious.  And I can tell, as a Black man, that they do not look the same.  But when you ask me other people's complexions, and what they look like in the actual photo that was presented to them, I'm not able to do that from this array.

Q.   Okay.  And I --

A.   Because it's -- because it's --

Q.   -- think I --

A.   -- an image -- it's an image of the array. It's not the actual one presented.

Q.   I think I understand where our confusion is coming from now.  Is it your belief that the victims were shown a different formatting of these six photographs, and they weren't shown this piece of paper

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

with the six photos laid out like that?

A.   I think they were shown a different document with the actual pictures from that time rather than a digital image that's been synthesized by a computer, that I'm looking at now.  So that's why I have some speculation as to your questions.  Some things are obvious, okay?  Like I said about the complexion of number 1 and number 4 in the array, I can clearly see, okay, that they look darker.  But when you're going to ask me, is anyone else light-skinned, I don't know what was in the photo -- what was in the arrays presented to Ms. Curry and Mr. McClanahan.  These are digital images. They're not the actual arrays.

Q.   Okay.  Really quickly, sir, do you see the signature underneath Image Number 5 right here?

A.   I do see it.

Q.   That appears to say Richard McClanahan, Jr., and then December 4, 2004, 9:15 a.m.?

A.   Yes.

Q.   Is it your belief that -- that signature and information was written down by Mr. McClanahan?

A.   I believe he signed the array.  I believe this is a digital image of it.  For instance, if I wanted to change his handwriting to purple, I could do that.  If I wanted to make Number 1 light complexion, lighter than


Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mister -- Mr. Horton, I could do that.  This is a digital -- this is a digital rendering of the actual array.  That's a digitized scan of his signature.  But it's not the actual array.  So when you're asking me to express opinions about the actual array, I -- I think it's a bit of an unfair question because this is not the actual array.  You're asking me to express opinions about the digital image that you're presenting.

Q.  I just want to make sure that we're not talking past each other because we may have completely different understandings of what was shown to the victims.  I just want to make sure I'm fully understanding what your understanding is.  And so, I'll present to you, that this was the State's Exhibit 1 that was introduced at trial, as the photo array -- as the original photo array that was shown to the victims. This is what was introduced.

A.  It -- it is not, Counsel.

Q.  What --

A.  It is -- it is a digital image of that -- that is not the actual exhibit.  We know it is not the actual exhibit, because it is printed on a piece of paper, scanned into a computer, and we can even see the file number at the bottom.  And we can see this was produced, okay, at a different time.  So it is -- it is not the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

205

actual array. It is an image of the array. So when --
when we start talking about things like suggestiveness,
and the policing practice of suggestiveness, the actual
array would be the better document to ask me about.

Q. Let me -- yeah, let me try going about this a
different way. I don't want to -- I feel like I'm
trying to put words in your mouth. Let me just ask you,
what do you believe was shown to the victims on
December 4, 2004?

A. I think a photo array.

Q. And what did that look like? Was it on some
kind of computer, and they were shown people's faces?
Was it a physical printout with six pictures? Was it
six individual photos that Detective Walker brought?
What did that look like?

A. I think it resembled this, okay? And -- but
I think it was an actual piece of paper, because they
signed it.

Q. Okay. And --

A. Or they may -- they may have signed a screen.
I'd actually have to go back and look. Some agencies
had actual screens for them to initial.

Q. Okay.

A. But this -- this is not the actual array that
you are showing me, because it certainly wouldn't have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

had a state's exhibit sticker on there either, or it wouldn't have had stamps on there.

Q. Yes. Okay. I understand. I understand what you're saying. Okay. You reviewed Detective Walker's deposition testimony about her assembling the array, right?

A. Yes.

Q. Okay. And so, you have no opinion, sir, on when this photo array was generated, right?

A. By Detective Walker?

Q. Yes, sir.

A. I -- I'd have to look at her deposition testimony again. I don't remember everything she said about what she did to generate the array, and -- and I don't have it in front of me. The only thing I have in front of me are my two reports and this computer screen.

Q. Okay. So as you sit here today, you don't recall specific testimony about when this array was created? Is that a fair statement?

A. I don't recall everything about it, no.

Q. Okay. And did it affect your -- or strike that, please. Did the time that elapsed between the creation of the photo array and when it was shown to the victims affect your opinions in any way?

A. I don't remember the exact date it was



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

207

generated or -- or put together.

Q. So it -- is that a no, or is that you would need to --

A. I -- I -- I can't express an opinion, because I don't remember the exact date that it was generated or -- or made.

Q. Okay. If you had taken issue with the time frame, would you have put it in your report?

A. I think I would've, if I'd taken issue with it or -- or if I thought it mattered in the assessment of generally accepted policing practices.

Q. Okay. On Page 26 to 27, you -- oh, wait, let me make sure that is right. Yeah, on Page 26 to 27, you detail how the name Richard Diggs was seemingly introduced into the Loew Street robbery investigation, right?

A. You said 26th and 27th?

Q. Yes, sir.

A. I discuss it there. There is other places I discuss it, but I do discuss it there, yes.

Q. Okay. And this narrative on Page 27 -- we've talked about this a little bit already -- this narrative on Page 27 comes from Detective Walker's typed police reports, right?

A. Which portion? I'm sorry.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

208

Q. The portion on Page 27 that says, "Well, Mr. McClanahan had mentioned Richard Diggs to her, and she recorded in her notes, Mr. McClanahan was clear that he did not remember the last name of the person, but would get it." That comes from her typed police reports, right?

A. Yeah. I -- I think I got it from one of Detective Walker's follow-up reports.

Q. And that is also where the information about Mr. McClanahan telling Detective Walker that he'd get the last name and then give it to her once he got it came from, right?

A. I think he said the name, as opposed to last name. He -- he mentions Richard. He also says, Richard Diggs. And from what I gather from Detective Walker's notes, he wasn't clear about the identity of the person, but he believed he knew who it was and told Detective Walker he would get the information. And then a couple of weeks later, he followed up and mentioned Mr. Horton's name, and explained why he came to that conclusion.

Q. Yes. My question for you, sir, is: That information came from her typed police reports, right? Not the contemporary handwritten notes?

A. Okay. I -- I think that, yes, I think I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

gathered that from her follow-up reports that were typed.

Q. Okay. Thank you, sir. And I know you testified earlier that you don't recall if you did review the deposition transcript of Tracy Smith or not, who is Mr. McClanahan's niece. I'll represent to you that she testified in her deposition in this case that she did not recall ever searching through a yearbook to get the last name Horton. Does that refresh your recollection on whether or not you reviewed her deposition transcript?

A. Like I said, I don't recall if I reviewed her transcript.

Q. Okay. Does that information change your opinions in any way?

A. No. Because -- I don't recall if I reviewed it. So even if it is factual, I -- I don't know if she said it. I don't know the context. I don't know when she said it. I don't know what may have happened since then. That there is a lot of reasons why I can't express an opinion on that right now.

Q. And whether or not she is telling the truth in her deposition testimony is beyond your purview, right?

A. Yeah. I -- I would not have an opinion on it, and nor was I asked to express one.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. On Page 27 -- this is just a clarification question. On Page 27, you state, "Plaintiff alleges that Detective Walker should have known that the mention of the name Richard Diggs, as the potential name of the suspect Mr. McClanahan was describing to Detective Walker, was exculpatory evidence, and it should have been disclosed. He also suggests that the failure to do so was the cause of the conviction. I will not express an opinion as to the claims." What did you mean, sir, by "I will not express an opinion as to the claims"?

A. I meant that -- that is not my job to express an opinion as to Plaintiff's claims, whether they're valid or not. I think that is a -- that is a legal conclusion, and the finder of fact can make that determination. And I try, throughout the report, not to express opinions on those things.

Q. Okay. And then in the following sentence, you say, "Materials are clear that an ordinary reasonable police investigator in the same situation as Detective Walker would've taken the initial statements of Mr. McClanahan as inculpatory towards Plaintiff, not exculpatory." Do you see that, sir?

A. I do.

Q. When you say, "initial statements," you're not



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

referring to his first statement to Officer Rhodeback, right?

A.   No, I'm -- I'm referring to the statements where Mr. McClanahan stated that he believed that Mr. Horton was the suspect.

Q.   And so, would that be the October 28, 2004, phone call where he gives the name Richard Horton?

A.   I think.  It is not just one actual incident. It is initial statements, where he says, Richard, I'm going to go back and find out more information for you. Then there is the phone call.  And then there is -- there is follow-up conversations where he reconfirms it. I think that those statements, again, it is cumulative in a way.  But yes, those things I think that Detective Walker would've taken as inculpatory, meaning that it goes toward the belief that Mr. Horton is the person who committed the crime.

Q.   It is beyond the scope of your expert testimony to opine on whether -- strike that, please. It is beyond the scope of your expert testimony to opine on the credibility of the name Richard Diggs in the handwritten notes, right?

A.   I'm sorry.  I don't think I understand the question.  Could you repeat it?

Q.   Sure.  You state in your report on Page 27,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

212

that the mere mentioning of Richard Diggs would not have been seen as a credible identification of Diggs. And you -- obviously, you're speaking within the parameters of Detective Walker. My question for you, sir, is: The credibility of information contained in police reports, in this case, is beyond your purview to opine on as an expert witness, right?

A. No. That is not what I'm saying. I'm saying that the statement, even if made to Detective Walker, okay, an ordinary, reasonable police officer in the same situation -- an ordinary, reasonable police detective investigating this robbery -- would not have taken the initial statement of Mr. McClanahan mentioning Mr. Diggs' name as a credible identification, because he made it clear that he wasn't sure, and that he was going to go back, and he was going to check, and he was going to follow up back with her with more information. That's what I know.

Q. And that is based on her police report, not the handwritten notes, right?

A. I think her report certainly says, but I think the handwritten notes indicate too, that he said, Richard, he said Richard Diggs, he mentions Adidas boy, that it -- it seems to support what is in the typed report that he was unsure at that time. And it is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

supported by the facts that he actually did go back and followed up with her with more information. And he explained what he did during that period. That he talked to his niece. He talked to Mrs. Curry. And they both came to the same conclusion that it was Mr. Horton that committed the robbery.

Q. The handwritten notes don't express any uncertainty, right, or any promise to follow up?

A. I think the handwritten notes do express some uncertainty, because in one part he says Richard, and another part he says Richard Diggs. And then he says Adidas boy. If -- if it were simply one individual, then I would've thought that it would've just said the name of one individual. And it would've been clear. So I -- I don't agree with that statement.

Q. So your interpretation of those handwritten notes is that those different portions are expressing uncertainty?

A. Yes. And -- and it is not based on isolating the notes into -- and compartmentalizing the notes. It -- it is looking at them under -- under a microscope with the rest of the information and materials.

Q. Sure. Okay. On Page 28, you state, "It would've been hasty and imprudent for Detective Walker to have considered Richard Diggs a suspect, knowing that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mr. McClanahan was unsure of the suspect's last name and told her that he could verify the suspect's identity shortly." If Mr. McClanahan had not, in fact, told Detective Walker he was unsure of a last name when he gave the name Richard Diggs, would it still be hasty and imprudent to investigate him?

A. Are you suggesting that in a hypothetical head, Mr. McClanahan said Richard Diggs was the person, and he -- he was sure, or he believed that he was the person, that he was not uncertain?

Q. Yes, sir.

A. Should -- should Detective Walker have investigated Mr. Diggs?

Q. Yes, sir.

A. I think had Mr. McClanahan not expressed uncertainty that Richard Diggs was the person; that he was going to find out who the actual person was; and he had said Mr. Diggs was the suspect, or was possibly the suspect; then yeah, it would've been prudent for Detective Walker to then investigate Mr. Diggs, as opposed to what actually occurred, where he mentioned Mr. Diggs' name. But he also said that he was going to find out who the suspect was, that he was unsure.

Q. Sorry. I think I froze out for a second, but I think I caught the rest of that answer. It is beyond

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

215

your purview, as an expert, to opine on what actually happened, right?

A. I -- I -- I think that my opinion is based on what actually happened. But if you're asking me, am I -- am I going to -- the facts were determined before I was engaged. I mean, this happened 21 years ago, so the facts are the facts. Now, the interpretation of the facts, and perhaps we differ on them, but the -- the facts are the facts. Some things are not in dispute.

Q. That is true. I would agree with that. Now, sir, in your experience, considering someone a suspect, or investigating a person of interest, doesn't necessarily mean arresting them right away, right?

A. I -- I would distinguish that a suspect and a person of interest are different things. So there -- there'd be no reason to arrest a person of interest.

Q. Okay. And considering someone strictly a suspect also does not necessarily mean arresting them right away, right?

A. No, it does not.

Q. Okay. It can simply mean --

A. Not always.

Q. It can simply mean including them in the investigative focus, right?

A. It can, under certain circumstances, yes.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay. And in your experience, sir, is it fair to say that officers are frequently working with incomplete or uncertain information?

A. Yes.

Q. Okay. And is it then fair to say that -- that uncertainty does not prevent officers from beginning investigative steps, right?

A. Well, under your premise, they're already conducting the investigation. That is -- that is why they have incomplete information. So I -- I don't know how to answer that question other than I would assume that the officer would continue their investigation to its -- its logical and -- and reasonable conclusions.

Q. Okay. And then that investigation can then also help to confirm or rule out possible suspects, right?

A. That -- that is the ultimate result of an investigation. It should, but it doesn't always do that.

Q. Okay. And is it a fair statement to say that even if -- strike that, please. Is it fair to say that even if Mr. McClanahan had said that he would try to find a different last name, he'll confirm the person and let Detective Walker know that she would have no guarantee that -- that information was coming, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. That -- when Mr. McClanahan made the statement, that Detective Walker would have no guarantee that he would be able to do that?

Q. Yes.

A. Yeah. I -- I think, certainly, anything could have happened, or he may not have been able to find out.

Q. **And that does not mean that she shouldn't have performed any kind of investigation, right.**

A. I -- I -- I think your -- your premise assumes that Detective Walker wasn't doing anything while she was waiting for Mr. McClanahan's contact. And I -- I didn't perceive that from the file that she wasn't doing anything. And I also didn't assume or conclude that she didn't have other cases she was working on. I don't know if she was on leave. I mean, I know most people get some time off. So the time period in between Mr. McClanahan saying that he was going to try to find out with more certainty who the suspect was and the date that he actually contacted her, I have no idea what occurred in between. But I have no information that would lead me to conclude that Detective Walker did nothing during that time.

Q. **Would it be a fair statement to say that, just as you have no evidence she didn't do anything, we also don't have evidence in the record that she did do**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

something, specifically for this case, during that two-week time?

A. I don't know specifically what she did or didn't do. But some things we do know occurs during investigations. Reports are written. Forensics are done if -- if necessary. There could have been other contacts with attempts to reach Mr. McClanahan, or he could have tried to reach her. I don't know. So if the question is, what I know and don't know, I don't know.

Q. Would it be a fair statement to say that officers often identify provisional or tentative suspects pending confirmation?

A. I have -- I have to be frank. I've not heard that term in my 30-some years, provisional or tentative suspects. So I -- I don't know how to answer that. I've never heard that term.

Q. Okay. Let me try to reword it. Would it be fair to say that officers often identify potential suspects, but that is pending confirmation?

A. Okay. Again, a person is a suspect or they're not a suspect. A person of interest is not the same as a suspect. A person of interest may end up becoming a suspect or not. I -- I think that they're -- they're terms used in policing, but they're not always used the same way. So I -- I would not agree with the statement

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

in the way you made it. I'm not sure that I -- maybe I'm misunderstanding it, but I -- I don't know how to answer that question, because that's not the terminology that I would use.

Q. Okay. In your words, sir, what is the difference between a person of interest and a suspect?

A. A person of interest could be someone that the police want to talk to because they could lead them to information that you -- that they could use during their investigation. It could lead them to suspects. Or the person could, in fact, be someone that they think might end up being a suspect. It is a person they have an interest in speaking with. But I would not call them a suspect. The suspect is someone that the police believe may have committed the crime at the time they had the interaction with them, or is about to commit a crime, or has committed a crime.

MS. SCHERGER: Honestly, it is 5:00. We've been going about 90 minutes since the last break. So when you're in a good spot --

MS. MARTINEZ: Actually -- sorry, one quick line of questioning on this, and then I'll be able to pivot to something else.

BY MS. MARTINEZ:

Q. Sir, from your review of the record, did you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

see any evidence that Detective Walker was aware that a man named Richard Diggs was incarcerated on October 9, 2004?

A. Did I see any indication that she was aware that he was in jail? No.

Q. And did you see any evidence in the record of Detective Walker performing any kind of investigation into the name Richard Diggs?

A. You mean, throughout the file?

Q. Yes, sir.

A. Well, she did follow back up with Mr. McClanahan. She had the information. He said that he would follow back up with her. And I think she prudently waited until she spoke to mister -- to Mr. McClanahan before she followed up on that. And he clarified that he wasn't talking about Richard Diggs. He was, in fact, talking about Mr. Horton.

Q. So you have not seen any evidence in the record of an investigation into Mr. Diggs, right?

A. I think that -- with -- with all due respect, Counsel, I think that is part of the investigation: the fact that she -- he told her that he was unsure, and she waited until she heard from the victim, the person with firsthand knowledge, okay, as to who the suspect might be; the victim of the crime, the person who saw the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

221

person, the person who was there, the person who was shot, the -- the -- the other victim who was there at the time, she followed up with them.  And I -- I think that -- that is part of the investigation.

Q.    No photo array was ever created of Mr. Diggs, right?

A.    Not that I saw.

Q.    Okay.  And there are no records -- or strike that, please.  There are no documents in the record to indicate that Detective Walker did any prison search for Mr. Diggs, right?

A.    Not that I saw.

Q.    Okay.  And my last set of questions, sir, before we take a quick break: As you sit here today, do you recall reviewing any documents from the record about what name Mr. Diggs was incarcerated under on October 9, 2004?

A.    I don't remember.  I -- for some reason, I -- I thought he was incarcerated -- I remember seeing documents that said that he was incarcerated, and they were certified records, or verified records, and, in my opinion, that was sufficient.  That -- and I also recall seeing that it was stipulated by Plaintiff's counsel and the prosecutor's office that Mr. Diggs was incarcerated. So I didn't feel the need to delve deeper into it,

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

222

because it seemed that it was not in dispute that Mr. Diggs could not have been the person who committed this robbery, and why -- I -- I -- I didn't see any reason why I would delve further into it when it did not seem to be a disputed fact that he could not have been the person who committed the robbery.

Q. Did you see any documents in the record, sir, that show that --

MS. SCHERGER: Records --

MS. MARTINEZ: Oh, are you back?

MS. SCHERGER: -- certified records, and I came back at the prosecutor's office. I don't know how long that was.

MS. MARTINEZ: Oh, no, that is -- it -- that was a -- we're just talking about Mr. Diggs and -- Madam Court Reporter, if you'd like to play it back, we can do that, but you didn't miss anything.

THE REPORTER: Yeah. Did you want me to do the -- I mean, it was a pretty lengthy question and answer. Did you get the question and just not the answer on that one?

MS. SCHERGER: So he was answering something about had he seen certified record.

THE REPORTER: Okay. Absolutely. I'll play that back really quick.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

(The requested answer was played back.)

MS. MARTINEZ: Okay. You can stop playing it, Madam Court Reporter.

THE REPORTER: Thank you.

BY MS. MARTINEZ:

Q. My follow-up question for you, sir, is: Did you review anything in the record that would tell you that Mr. Diggs was incarcerated under the name Ricardo Diggs in October of 2004?

A. I think I do remember seeing a name Ricardo Diggs, but I don't recall if Richard Diggs had used that as an alias. Once I saw the stipulation on the record between the prosecution and Plaintiff's counsel that the Richard Diggs that everyone was referring to was, in fact, incarcerated, and could not have committed the crime.

As far as my -- the scope of my involvement in the case, whether Detective Walker followed generally accepted policing practices, I felt the information I had was sufficient for me to formulate my opinion that Detective Walker did not follow up on Richard Diggs being a suspect because of a couple of reasons: number one, Mr. McClanahan said he wasn't sure, okay, and he would get back to her, which was, in my mind, prudent police work. And even as she -- even if he had, that it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

224

would've something -- it would've been something that would've been inevitable because he was in jail.  So I didn't feel like -- that either of the things would have changed my opinion about not pursuing the idea that Mr. Diggs may have been a suspect.

Q.   Okay.

A.   I -- I hope that answers your question.

Q.   Yes.  In your opinion, sir, if Detective Walker had performed some kind of search for Richard Diggs, and had seen that either Richard Diggs or Ricardo Diggs had been incarcerated on October 9, 2004, but not both, do you think she would've had some obligation to investigate?

A.   I'm sorry.  Are -- are you suggesting that there are two different people?

Q.   Yes.  I'll represent to you, sir, that Richard Diggs has a brother named Ricardo Diggs, and they are two separate individuals.

A.   Okay.  You're not talking about the use -- that Richard Diggs using Ricardo Diggs as an alias. You're saying that, in the hypothetical, that you're giving me that Detective Walker finds out -- maybe I'm confused.  Could you repeat it?

Q.   Yeah, no, I'll provide a little more context. Did you review the deposition transcript of Richard



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Diggs from this case?

A.   I think I did look at it, but I think it was after the report had been completed.

Q.   Okay.

A.   I think.

Q.   Okay.

A.   I'd have to go back and look at it.

Q.   I'll represent to you, sir, that he had given his brother's name to police, being Ricardo, instead of his own name.  And so that is part of the reason he was in incarcerated under Ricardo Diggs, and there was a confusion with the name.  So my question for you, sir, is: If Detective Walker had looked up Richard Diggs and seen that there was either a Richard or a Ricardo Diggs incarcerated on October 9, 2004, but not both, do you think she would've had an obligation to investigate?

A.   I think that your -- the premise of your statement underestimates the criminal justice system, that when someone is arrested, it is not just their name that identifies them.  There is many identifiers and indexes.  People use aliases all the time.  I've seen people use dozens of aliases.  It is -- it is not just the use of the name that makes a determination who is incarcerated.  It is their name.  Even back then, their fingerprints, their physical description, their palm

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

prints, that there is a variety of identifiers that would've determined whether or not Richard Diggs was in jail. He could have said his name was Tim Dixon and they would've had the correct person.

You may have taken him a while to figure it out, but I -- I just don't accept the premise that you are offering, that she would've had some duty to investigate. If -- if she had looked or checked, that is a form of investigation. As I said before, her actions in this case, I didn't see a need for her -- her to check to see if Richard Diggs was, in fact, the person, because Mr. McClanahan made it clear that he was unsure. Why -- why would she take the investigative steps of interrogating someone if the victim says he's not sure about it? Why would -- why would she take the steps of contacting family members, or friends, or going to his place of work, or -- or running a -- a criminal check on him, if in fact the victim is saying, I'm unsure, I'm going to find out who the person is. So again, you're hypothetical, I think is illogical under these circumstances, with all due respect. And I don't mean that in a cliche way either.

Q. No.

A. I actually mean it.

Q. I appreciate it. You know, you obviously have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

227

your opinions and I've got mine, but

A. Sure.

Q. I'm not the expert here. So very quick follow-up, because I know I'm going to forget this if we take the break now. I already forgot it during the answer. I asked you this earlier, sir, but you would agree that the notes containing the name Richard Diggs were not turned over to the prosecutor, right?

A. I can't agree with that. I don't know if the initial prosecutor had them or not.

Q. But you reviewed Detective Walker's deposition transcript where she said she did not turn them over?

A. I -- I did see that, but I -- I don't know what the prosecutor had in their file, and oftentimes prosecutors have things and don't have them, so

Q. You reviewed the prosecutor's file in this case, right?

A. I reviewed what I -- what I received as the prosecution's file.

Q. Okay. And you reviewed the joint stipulation that you referenced a moment ago, right?

A. You mean regarding Mr. Diggs?

Q. Yes, sir.

A. Yeah. Uh-huh.

Q. Okay. That stipulation also says that the



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

handwritten notes containing the name Richard Diggs were not in the prosecutor's file or the defense file at the time of trial, right?

A. I'd have to go back and look at it, but -- yeah. I -- I don't remember. I'm not saying it wasn't, but

Q. I'll bring it up after the break.

A. Okay.

THE REPORTER: We can --

MS. MARTINEZ: Yeah -- let's -- we can --

THE REPORTER: Sorry.

MS. MARTINEZ: Yeah. We can take a break. Just trying to remember what -- no. You're good. We're good. We're good to take a break. I'm just trying to remember what my follow-up question was.

THE REPORTER: Off record. Time is 5:14.

(A recess was taken.)

THE REPORTER: Time is 5:25.

BY MS. MARTINEZ:

Q. I am going to share with you, sir, what we'll mark as Exhibit 8, which is that Joint Stipulations of Fact. Just so you have a chance to see it before we move onto the next topic. Is this the Joint Stipulations you were referencing earlier about Mr. Diggs?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

(Exhibit 8 was marked for identification.)

A.   If I could take a look at it.  I'm sorry.  It's --

BY MS. MARTINEZ:

Q.   Yes, of course.  I'll go up to the part in question.

A.   I'm sorry.  Could you make it a little bigger please?

Q.   Of course.  Sorry.  No, of course I forgot.  Is this okay or one more?

A.   Yes, it's good.  Thank you.

Q.   You're welcome.

A.   Okay.  Are -- are you able to scroll down please?

Q.   Yes.  But is this the document you're referring to?

A.   I -- I think so.

Q.   Okay.

A.   I just would like to look at all of it.

Q.   Yes.  And the part that I would like you to read in particular is this Police Files in Discovery, okay?  I'll give you a chance to read the whole thing, but I want to make sure you read that full part.

A.   Okay.  Are -- are you able to scroll down please?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

230

Q.   Yes.   I'm not going to ask you questions about any of this stuff, but if you want to quickly skim it just to make sure it's the same stipulation we're talking about.

A.   Okay.   I -- I think it is.   We can scroll down to the bottom.

Q.   Oh, okay.   Great.   So my question for you, sir, is: Based on this document, the alleged Brady material, which is the document, the handwritten notes that had the name Richard Diggs, were not in defense counsel's file at the time of trial, nor were they in the prosecutor's file, right?

A.   Okay.   I -- I think it's referring to the -- the handwritten notes.   Yes.

Q.   Okay.   And I'm going to stop sharing.   Would you agree, sir, that it is -- strike that, please. Would you agree that in 2004, it was generally accepted policing procedure to turn over all exculpatory evidence to the prosecution?

A.   I think if the investigator believed it was exculpatory.

Q.   Okay.   And so, in your opinion, that determination comes from the investigator?

A.   The investigator, the supervisor, and even prosecutors, sometimes -- often felonies are reviewed,

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

there's a -- there's a discussion.  So I -- I think it's the belief that it's exculpatory.  If it's -- if it's regarding the note with Richard Diggs on there, I -- I think I --

Q.    I'm not asking you about that one, sir.

A.    Oh, okay.  All right.

Q.    Just in a -- in a general sense, would it be a fair statement to say that sometimes law enforcement may not know what is exculpatory until later down the line during a prosecution or something like that?

A.    I -- I -- I'm not sure if I understand the question correctly, but I think that if -- if -- if your question is are -- can information become exculpatory at some point, and the person does not believe it?  Yes.  Or the investigator doesn't know it's exculpatory until later?  Yes.

Q.    Okay.  That was my question.  So thank you, sir.  And would it be a -- or strike that, please.  Would you agree that it was generally accepted policing procedures in 2004 to turn over all impeaching evidence to the prosecution?

A.    I would not agree with that.  I think exculpatory and impeachment information are two different things.  I -- I -- I would not agree with that.  I -- I think that many police officers are not --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

even in 2004 and before, were not trained what impeachment information is, if we're talking about Gilio information. So I -- I would not agree with that. I think exculpatory Brady information is something different. And I think in this case, the idea of what's impeachment and what's Brady are two different things.

Q. Okay. Just to make sure I'm understanding. It is your opinion, as you say it here today, that impeaching information does not qualify as Brady materials?

A. Everything that's impeachment information is not exculpatory information, which is Brady, and -- but everything that is Brady is not always impeachment information. Brady material can prove innocence, it can lessen guilt, can lessen severity of charges. Even if the person's found guilty, and police officers are trained to understand that. Impeachment information, it's just information that can cast doubt on evidence or witnesses. And they're -- they're not necessarily the same thing. If you're asking me if I think that the Richard Diggs information is --

Q. I'm not.

A. Okay.

Q. I'm not, sir.

A. Fair. Good.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Because yeah, I recognize that's for the jury. It's not for me to say, it's not for anybody to say. Okay. On Page 28 of your report, sir, you lay out Ms. Curry's testimony that her daughter is the one who gave her the name Richard Horton. Do you see that? It's about midway through that first full paragraph on Page 28.

A. I -- I wouldn't characterize it in the way that you said it, but they discussed Mr. Horton, not that he gave her the -- that she gave him the identity.

Q. Okay. I will represent to you, sir, that in her deposition, Kim Curry, the daughter, testified that this conversation did not happen. If that is true, does that affect your opinion at all in this case?

A. It does not affect my opinion relating to Detective Walker's actions.

Q. Okay. On Page 29, sir, you state, "The amended complaint" -- or actually sorry, let me find where so you can follow along. So in that first full paragraph about halfway down, you state, "The amended complaint alleges that completing progress reports weeks or months later is somehow unusual and is evidence of the allegations in the amended complaint. It is not." In your experience, sir, is there a point at which a delay in completing a progress report would be unusual?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. I don't think there's a specific time frame. I think it's always circumstantial based on the information that the person intends to put in the progress report.

Q. So would -- strike that, please.

Do you think waiting a year could be appropriate?

A. I'd be hard-pressed to find an investigation where waiting a year to place information in the file would be prudent.

Q. What about -- and I -- it's -- sorry. Strike that, please. What about six months?

A. In a progress report?

Q. Yes, sir.

A. I've seen situations where the investigator comes into contact with information, but the information isn't deemed to be relevant until sometime later, and then the information is placed in a progress or follow up report that goes into the file. But if the -- if the question is the investigator knows the information is -- is relevant and believes it should be in the file and just is not diligent and does not write the report for six months, I would find that to be outside of generally accepted policing practices and -- and the -- the detective is not doing their job properly.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

235

Q.   And in your opinion, sir, is there any benchmark past which -- in that second scenario where the detective knows the information is relevant and it's just not memorializing it in a report, is there any specific amount of time beyond which -- strike that, please.

I didn't word the question right.  In your experience, sir, in the case where a detective knows information is relevant and is just not getting around to memorializing that information in a progress report, is there any benchmark of time beyond which you would think that is outside of generally accepted policing practices and procedures?

A.   Again, I -- I don't think it's a length of time.  It's -- it's circumstantial based on the information.  Do I think some detectives are more diligent than others?  Yes.  Just like any job.  Are there some people who complete their work before they go home every night?  I'm sure there is someone somewhere who does that, but the mere fact that someone doesn't do that doesn't mean that they're less than diligent, or not prudent in their work, or shirking their duties.  As to this case, I -- I didn't see any length of time regarding the report writing of Detective Walker that I thought was to the extent that you described, being

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

outside of generally accepted policing practices.

Q. Sir, can you identify any written policy, standard operating procedure, or training material you reviewed that expressly permits completing progress reports weeks or months after the event?

A. No, but I didn't see any that said when they had to be completed, either. I -- I think it -- from -- from my reviewing of the materials, it seemed like it was left up to the discretion of the detective and her supervisor, who I assume was -- would've been doing their job, or there would've been some documentation to support that -- that they weren't doing their job.

Q. Would it be fair to say that delayed report writing can increase the risk of memory loss or reconstruction?

A. Okay. I'm not sure what you mean by reconstruction, but are you saying --

Q. That's fair. I can't -- let me -- yeah. Please let me rephrase. Would it be fair to say that delayed report writing can increase the risk of memory loss and then the officer or detective then has to go back and try to reconstruct what they did?

A. If they don't write the report?

Q. Yes, sir.

A. I -- I would -- I guess I could assume that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

if they hadn't written it down or documented it in some other fashion -- if they'd not memorialized it at all, like no recordings, no handwritten notes, no typed notes, no -- nothing memorializing it, then I could see that happening. I -- I didn't see that in this case where things weren't memorialized at all. I -- I think the contention that I'm hearing, and the questions you're asking me is, should the -- should the memorialization been formalized in the follow-up report as opposed to being in notes? And again, I -- I think that's discretion based on the detective and their supervisor, and how things are done in their agency.

Q. You then in your report, sir, go on to say -- this is the very bottom of Page 29. "It would be a waste of time to complete a progress report containing unreliable or not credible information." Do you see that, sir?

A. I do.

Q. Okay. Would it be fair to say that different officers could reasonably disagree about whether information is credible or not?

A. I -- I think that is fair to say.

Q. And would it be fair to say that officers are often required to document information even when its accuracy is uncertain?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. I -- I think uncertain versus not reliable or not credible are two different things. I think that she did document -- detective Walker did document information that wasn't certain. For instance, the name Richard Diggs, she did document it.

Q. Sure. I'll just quickly say my questions for you, sir. If I am asking about Detective Walker, I'll make sure to say it, just so you don't -- I'm not trying to conflate the two or trip you up on one. Right now, I'm just asking about generally accepted police practices in 2004, okay? I should have clarified with that.

A. Okay.

Q. Okay. So let me try to re-ask that question taking the answer you just gave into account. Would it be fair to say that officers are still required to document certain information, even when that information is not 100 percent reliable?

A. Okay. So I -- I don't think we're saying the same thing. Okay. Unreliable and not credible information is not the same as what -- it's either -- there's no 100 percent reliable. It's either reliable or it's not reliable. If it's reliable information, then it should be documented, because certainly it's -- it -- it -- it has some usefulness to it, even if it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

turns out to be not pertinent to leading the person to the suspect or solving the crime, and as it stands in this case, but unreliable or incredible information are things that why would someone document it?

Q. Would it be fair to say that sometimes an officer does not know if the information is reliable or unreliable when they're receiving it?

A. I think that's an assessment that the officer and the investigator has to make at the time, whether or not something is reliable or credible. Some things you know are not credible. If some witness said that Detective Walker herself had committed the crime, why would she document that? She knows it's not credible, she knows it's not reliable. So that -- there is a difference between that and something that the person -- the -- the investigator doesn't know whether or not it's true or is going to place in the file so they can investigate it further, not credible and not reliable information. Yeah.

An -- an alien came down and committed the crime. Why would she document that? That's not credible and not reliable, unless in fact Mr. McClanahan or Ms. Curry told him, she should document that -- that is information that should be in the file, that the victim believes they were robbed by an alien. So not to



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

belabor the point, I think it depends on whether or not the investigator at the time believes the information is credible and reliable. If they don't believe that it's credible information, then it's why document it? It -- it can't be impeachment, it can't be exculpatory, it can't be inculpatory. It has no use to the investigation.

Q. Would it be a fair statement to say that sometimes information that initially seems not credible can then later become credible based on subsequent investigating?

A. Okay. If -- if you're using the term credible to mean truthful, I would agree with you, that sometimes investigators get information they don't believe the person's being truthful, that can be credible that the person's lying. So to answer your question in short, it is possible. Okay. A -- a witness says something, or a victim, or someone says something to the investigator that's not truthful, that doesn't mean it's not credible. It's a credible lie, and they should document it. The person is lying to them. So I think -- I -- I hope I've answered your question.

Q. Police reports often include conflicting accounts, right?

A. Yes.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. And under generally accepted police practices in 2004, officers would not wait until information is proven true before documenting it, right?

A. Depends on what the information is.

Q. Under what circumstances would it be appropriate to wait to document information until you know it's correct.

A. You want me to give you a hypothetical?

Q. Just -- sure.

A. The spelling of someone's name. Why -- why would someone record the name incorrectly, only to cross it out and later on find out when you could simply ask them, how do you spell your name, your date of birth, where you live, your address? Some -- some things are so important that why wouldn't you simply get the information correct before you write it down? It could mislead someone because they could see something and believe that it's relevant, when in fact you knew it was wrong when you wrote it down. And it also depends on what the documentation is -- is the documentation the officer's handwritten notes or is the documentation a report, an incident report, a follow-up report? So all of it is circumstantial based on what the documentation is and the circumstances under which they're documenting it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   All right.  On Page 30, you state, "Notably, they were not compared to the victims or others who might have been allowed into the home."  And that's in reference to the latent prints that were lifted.  Do you see that, sir?

A.   Yes.

Q.   Okay.  The latent prints that were taken from the scene in this case were compared to the victims, right?

A.   I did not think they were.

Q.   I'll represent to you, sir, that -- that comparison was run during Mr. Horton's criminal trial and the results of that comparison --

A.   I -- I'm sorry.  Yes, it was after the arrest.

Q.   Yes.  It was during the criminal trial.  And I'll represent to you that those -- the results of that comparison were not tendered to the defense.  Does that change your opinions in this case in any way?

A.   No.

Q.   Okay.

A.   Not -- not regarding Detective Walker's actions.

Q.   Okay.  I should clarify, the latent comparison, according to the document, the results were sent to Detective Walker, and those results did not make



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

243

their way to the defense. Does that change your opinion in this case in any way?

A. No, it -- it doesn't.

Q. Okay.

A. The -- what I was asked to examine regarding Detective Walker's conduct, the comparison to victims, the victims, and also Mrs. Curry's sister being in the household, those -- they -- they would not have been suspects in the crime. So no, it -- it didn't change my opinion regarding Detective Walker's actions and regarding whether she conformed her actions to generally accepted policing practices.

Q. Okay. On Page 31, you state -- and this is in that first half paragraph. I think it's the first full sentence on this page. "It would be an unreasonable assumption to consider the print recovered as belonging to the suspect when at least three people lived in the household and presumably had guests, and either they or their guests may have left the prints." Do you see that, sir?

A. I do.

Q. Okay. My first question for you, sir, is: What is your source for believing three people lived in the household?

A. Mr. McClanahan, Ms. Curry, and her sister.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Is it your belief that her sister, Shelly Curry, lived with them there at that home?

A. That she apparently stayed there at times, and she was there that morning of the robbery. That's where I got the conclusion from.

Q. Okay. And from your review of the record, you know that the prints -- strike that, please. From your review of the record, you know that the latent prints were recovered from where the perpetrator had grabbed the hideaway bed, right?

A. I understand that a print was recovered, and I think it was from one of the rails of the bed.

Q. Okay. Would it be a fair statement, sir, to say that it's always possible that prints could belong to someone other than a suspect?

A. Yes.

Q. Okay. And the mere existence of alternative possibilities does not render the results of the prints completely unusable, right?

A. I'm sorry. I don't think I understand the question.

Q. Sure. So the fact that other people could have left this print does not -- actually, sorry. Strike that, please. Let me reword it. The fact that multiple people could have left the prints does not

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

245

render the use of latent prints as physical evidence meaningless, right?

A.   I think I understand your question.  And I would say generally, no, it doesn't necessarily mean it's meaningless.  By the same token, doesn't necessarily mean it's the suspect's print either.

Q.   And would it be fair to say that in 2004, it was generally accepted policing practice to compare recovered prints to a suspect's known prints?

A.   I would say that -- that's generally true, yes.

Q.   Okay.  And was it generally accepted policing practice to compare recovered prints to the people who lived in the home to exclude them as well?

A.   I -- I would say that those things are true.  Yes.  But you don't need to exclude the people in the home in this crime because the people who seemed to reside there at the time were -- two of them were victims and the other were the victim's sister.  So they would not have been suspects.  So there -- there would be no need to exclude them as suspects.  The exclusion is not excluding the prints, it's excluding them as suspects.

Q.   Okay.  So just to make sure I'm understanding, because I asked about exclusion in general.  So would it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

be generally accepted police practices in 2004 to compare latent prints against the people who lived there to exclude them as the person who left that print?

A.    Yes, you could certainly do that.  And would it have been a practice then?  Yeah, I could -- I could see it as a practice then, but you wouldn't need to --

Q.    I'm just asking you general practices, sir.

A.    Yeah.  I -- I guess you're -- you're applying the general practices to this incident, which is what I'm trying to do.  I don't think you can use a -- a broad general comment in every one of the questions you're asking.  Could -- could they have eliminated Mr. McClanahan, Ms. Curry, and her sister?  Yes.  Would it have been outside of generally accepted policing practices?  No.

Q.    Okay.

A.    It would not have been

Q.    I'd like to turn to your rebuttal report now, sir, if you have a second to bring that up in front of you.  I have less questions on this one than I did on your first, so it should go quickly.

A.    No problem.

Q.    Okay.  And then let me know once you're ready for me to ask you a few questions.

A.    I have it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

247

Q.   Okay.   So -- okay.   On Page 5, sir, under Subsection 2, titled Critical Contact, that third paragraph, you state "Horton's direct observation of the money, the case materials established, the Defendant was right there, and the Defendant saw him pull out the money.   The trial record shows Horton asked to borrow $20, and when refused asked to use the payphone first, which McClanahan also refused."   Now, sir, you reviewed testimony in the record that Mr. Horton disputes this narrative, right?

A.   Yes.

Q.   Okay.   And it is beyond your purview as an expert to determine what the case materials definitively establish when there is a conflict, right?

A.   No, I don't agree with that.   I'm -- I'm not saying that Mr. Horton is incorrect.   I'm saying the case materials say that.   I'm quoting what the fact -- what the materials say.   I'm not taking one person's side or the other.

Q.   Okay.   So would it be fair to say that the case materials also established that Mr. Horton did not ask to borrow $20 and was not the person there?

A.   Yes, I do think that's fair.

Q.   Okay.   Is there a reason you didn't include that in your rebuttal?



Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

248

A.   Because I believe Mr. Tiderington says that.

Q.   Okay.  I see.  And you are not retained, sir, to speak to the relationship and scope of familiarity between Mr. Horton and Mr. McClanahan, right?

A.   I'm sorry.  Could you repeat the question?

Q.   Yes.  No problem.  You -- it is beyond the scope of your opinions -- actually, sorry.  Strike that as well, please.  You were not retained, sir, to speak to the level of familiarity and the relationship between Mr. Horton and Mr. McClanahan, right?

A.   That's not the scope of my opinions that I was asked to render.  I -- I do think that the relationship is part of the materials and evidence that I was asked to examine, because it's -- it's part of the records that are here that I was presented with.

Q.   Sure.  My question is just more, it's beyond your purview to opine on the extent of that relationship and who's telling the truth and who's not, right?

A.   No.  I -- I do not know who's telling the truth and who is not.

Q.   Okay.  And you are not a voice recognition expert, right, sir?

A.   No.

Q.   Okay.  And would you agree that there's no evidence in the record that a voice lineup was



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

249

performed?

A. Not that I recall seeing.

Q. Okay. In your experience, in 2004, if an initial police report a witness said that they thought they recognized the voice of the perpetrator, would you expect to see some kind of voice lineup performed at some point?

A. No, not necessarily. I'm trying to remember the 30-some years I've been a police officer or practicing law if I remember a case where the voice recognition in a criminal case was done. No -- no. And I definitely wouldn't have expected in this case, because it wasn't the voice that was the issue here, it -- it was -- it was the other factors in which Mr. McClanahan and Ms. Curry identified Mr. Horton.

Q. And in your rebuttal report, sir, there are multiple sections where, again, you touch on the conversation that was had between Mr. McClanahan and Mr. Horton about money after his arrest, right?

A. I'm sorry. Could -- could you repeat that again?

Q. Yeah, no problem.

A. Maybe there's a little -- it could be the --

Q. Yeah. Sorry. Sometimes when I talk fast, I kind of -- I put my words together. In your rebuttal

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

report, sir, in multiple different points, you touch on the conversation between Mr. Horton and Mr. McClanahan about money that happened after Mr. Horton was arrested, right?

A. You mean the alleged bribe?

Q. Yes, sir.

A. Uh-huh.

Q. And as you testified to earlier, it is beyond your scope to opine on who is telling the truth and if this was a bribe or blackmail, right?

A. It -- it is.

Q. Okay. And additionally, this conversation also happened completely after the police investigation, right?

A. After the -- you mean after his initial arrest? Yes.

Q. Yes, sir. Okay.

A. I assume that the police, if they found other information, they would continue.

Q. Okay. And now, sir, the decisions that the prosecutors made are also beyond the scope of your opinions in this case, right?

A. Yes.

Q. Okay. And on Page 9, you reference the photo array procedure and the instructions being read. We've

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

already discussed that Mr. McClanahan, in his trial testimony, said no instructions were read. And you testified, I believe, that there were other materials in the record that indicated perhaps it was read. Is that what your testimony was earlier?

A. I -- I -- I think that summarizes it. But yeah, I -- from -- from what I gathered, that he was given some instructions at the time that he was given the photo array.

Q. Okay. And do you have any explanation for why in -- actually, strike that, please. On Page 10, sir, at -- it's right under the two bullet points, that first paragraph that starts "non-suggestive array"?

A. Yes.

Q. Okay. I guess first and foremost, the suggestibility of the array is a question for the jury in this case, right?

A. I'm sorry. Whether the photo array is suggestive?

Q. Yes, sir.

A. I think that's something that would settle at the criminal trial.

Q. And understanding that the motion to suppress was what it was and it played out the criminal trial. My question for you here, sir, in this civil case, is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that the question of whether that photo array is suggestive is a question for the jury, right?

A. Again, I -- I don't know that it's the question here in -- in the civil case. I -- I don't know.

Q. Would it be fair to say that it is a legal conclusion and therefore not a question for you to answer?

A. I think that's true.

Q. Okay. And then at the very end of that little paragraph, did you see where you wrote, "She explicitly," in reference to Detective Walker, "denied showing a single photo, which would be improper"?

A. Yeah.

Q. Is that in reference to the single photo show up that Chief Tiderington talks about in his report?

A. Yes.

Q. Okay. And do you agree, sir, that showing a single photograph of a suspect prior to showing that person in a photo array to the same people would be improper?

A. I believe it would be against generally accepted policing practices? Yes.

Q. Okay. And that would've --

A. If the -- if the -- if the purpose was for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

identification, yes.

Q. Okay. And that would've been true in 2004 as well?

A. I would think so, yes.

Q. Okay. All right. On Page 11, sir.

MS. SCHERGER: I'm back, but I'm missed everything after, "if the purpose were."

MS. MARTINEZ: Oh. He said if the purpose were for identification, then yes.

MS. SCHERGER: Thank you.

MS. MARTINEZ: Yeah.

BY MS. MARTINEZ:

Q. On Page 11, sir, you state that -- let me find where it is for you. Oh, it's at the very top. It's the bullet point on digital evidence and record management. Do you see that, sir?

A. Yes.

Q. You state that "digital access, searching, and archiving of police records and evidence was not available online." Do you have any recollection of reviewing the deposition of the 30(b)(6) witness on this topic?

A. What is the witness's name?

Q. The witness's name is Jonathan Gillis, Giles?

A. I -- I don't think I read his deposition.

Kentuckiana Reporters
118 North Wacker Drive, Suite 1500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  So this --

A.   I don't recall reading it.  I'll put it that way.

Q.   So this section is based on your experience and not review of his testimony where he talks about the digital access and archiving of police records at the Columbus Division of Police in 2004; is that correct?

A.   I -- I don't recall reading his deposition, so I based it on the information that I saw in the file and my experiences.  And I probably should have -- I probably should have worded it a little differently. It's not available in the same way it is today.

Q.   Okay.  I see.

A.   Because my -- my point there is that I think Mr. Tiderington or Chief Tiderington is comparing the process today, is -- is using the processes that we have today as if they all were available in 2004.  And that's where I think he and I have some disagreement.

Q.   Okay.  I see.  And then on that same Page 11, slightly further down in that first bullet point under temporal limitations about halfway through the paragraph you state, "No ordinary reasonable police officer would expedite an investigation by rushing traumatized victims such as Mr. McClanahan and Ms. Curry."  Do you see that, sir?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Yes, I do.

Q.   Okay.  And would it be fair to say that all crime victims are traumatized to some degree?

A.   I -- I think it depends on the crime.  I mean, someone who has someone trespass on their property is a crime victim, but they may not be traumatized.  I think in this case, Mr. McClanahan and Ms. Curry were extremely traumatized, particularly Mr. McClanahan.  Well, both of them.  Ms. Curry had a gun placed to head and Mr. McClanahan was shot, so

Q.   Would it be fair to say that officers are generally trained to be sensitive to trauma?

A.   I think the training today is different than the training then.  Do I think that they had some training in victimology?  I don't recall from reviewing Detective Walker's training file -- training in victimology, but I would assume that there would be some discussions on how to deal with crime victims and not rushing them to make statements or interviews is certainly part of that training or should have been part of that training.

Q.   A victim being traumatized does not mean that officers must always delay interviews indefinitely, right?

A.   Oh no.  And -- and I don't think that happened

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

in this case.  I -- I think there were initial interviews.

Q.   Okay.  And -- actually, strike that, please. And as a general matter, would it be fair to say that timely interviews can be important to preserve accurate information?

A.   Yes.

Q.   Okay.  And so, would it be fair to say -- actually, sorry, strike that, please.

Would it be fair to say that officers sometimes have to balance victim sensitivity with investigative needs?

A.   Yes.

Q.   Okay.  And that balance can depend on multiple factors, right?  Like public safety, evidence preservation, suspect flight, things like that?

A.   Yes.

Q.   Okay.  And would it be fair to say that different reasonable officers could make different judgments about timing, right?

A.   Yes.

Q.   Okay.  And so, there's no universal rule requiring officers to delay interviews of traumatized victims?

A.   I -- I think there -- there are some.  For



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

instance, if the victim is not capable of giving you credible and reliable information because they're so traumatized, then you -- you may not need to or you may not be prudent to interview them. I think there's a difference between a patrol officer who arrives at the scene of say this incident, interviewing the victims and saying what happened is different than Detective Walker who is investigating to try to find out who the suspect is and -- and to arrest them, as opposed to the initial officer respond to the scene or different types of interviews. So I -- I -- I do think there -- it's different depending on the circumstances.

Q. Would it be fair to say that the longer an officer waits to conduct an interview, the more time is available for witness's memory to become contaminated?

A. I -- I think, again, it depends on the circumstances. Sometimes it can help the witness clarify their understanding or -- or what occurred. In this case, it seemed to help by waiting because Mr. McClanahan determined who he believed the suspect to be the and told Detective Walker. In other circumstances, the person might forget, or might conflate information, or -- or something could happen to this. And -- and they're -- they're no longer reliable, like they're hurt or injured, you know? So it depends

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

258

on the circumstances.  I don't think that happened in this case, no.

Q.   Okay.  And I understand your testimony is preserved.  I'm going to re-ask the question because I don't feel like you answered the question, but I'll find a way to reword it to make sure we're on the same page, okay?  My question for you, sir, is: Would it be fair to say that the longer an officer waits to interview a witness, the more time that is available for that witness's memory to be contaminated?

A.   No, I -- I don't think that's fair.  As I -- as I said before, I think it's circumstantial.  It depends on the facts of the case.  Depends on the -- who the witness is.  Depends on what's occurred in the -- in -- in the incident.  Suppose the witness is unconscious or under the influence.  They may be a better person to interview later.  So again, it -- there's a lot of factors here, so I -- I -- I can't accept the -- the general premise.

Q.   Okay.  You're not a memory expert, right?

A.   The older I get, I'd say no, I'm not.

Q.   And you're not an eyewitness ID expert?

A.   No more than any other law enforcement officer, or former law enforcement officer, or trainer is.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

259

Q. Okay.

A. If those people exist? I -- I don't know if they exist.

Q. On Page 12, sir -- where is this from? You state that "the incident involving the phone call the day before was also a key factor in establishing a nexus between him and the crime. This led to the victims performing their own processes for identifying

Mr. Horton as the person committing the crime." Do you see that, sir? It's in the Section B: Inadequate Evaluation of Identification Reliability. It's about two thirds of the way down.

A. Yes. Uh-huh.

Q. Okay. I'm just wondering, what do you mean by perform their own processes?

A. Well, Mr. McClanahan said that he went back, he talked to his niece. He said they produced a yearbook. It seemed like a reasonable inference that he talked to Ms. Curry as well. And that's how they came to the conclusion they did that Mr. Horton was a suspect.

Q. Okay. Understood. And then on that same page, sir, you state, "According to the materials, Mr. McClanahan and Ms. Curry began to do this quickly. This is evident based on not only their statement that his

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

260

facial features were visible and they could see through his hood, but also his voice was recognized." When you say, "facial features are visible," are you just referring to what they told Detective Walker, the eyes and part of the nose, and I think part of the eyebrows?

A. I -- I think they said a little more than that. I -- I also think they talked about his skin complexion. But yeah, based on the statements they gave the detectives.

Q. Okay. So whatever is in those reports are what they told the detectives they could see and what you're referencing here for facial features being visible, right?

A. I'm -- I'm talking about what they said. Yes.

Q. Okay. And then the part where you say, "they could see through his hood," what do you mean by that?

A. That he had a hood on, but they could still see around it. Apparently the hood didn't cover the whole face. Ms. Curry mentions how she saw his eyes, his skin complexion.

Q. Okay. So you mean see what's not covered by the hood? They're not magically seeing through the hood, right?

A. I hope not.

Q. Okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

261

A.   Because it -- it's not indicated in the file and that would give me some concern.

Q.   Okay.  That would also give me some concern. Okay.  I'd also like to quickly circle back to Exhibit 4, and I'll share my screen so that you're able to see it.  This is the original report by Officer Rhodeback. And I just want to quickly go to the suspect section right here.  Do you see where suspect notes it says, "Gray hoodie pulled tight over the face, light blue jeans.  Victim states he couldn't see the face, but the voice did sound familiar, believes he knows suspect."  Do you see that, sir?

A.   I do.

Q.   Okay.  And then do you see up here in the information that was given about the suspect where it says, unknown suspect here, but then, "Age, 40; sex, male; race, Black; ethnicity, not of Hispanic origin; height, 6'2"; weight, 150 pounds; eye color, brown; hair color, unknown; and build, a thin build."  Do you see that, sir?

A.   I do.

Q.   Okay.  Many of these do not apply to Richard Horton, right?

A.   I don't know what would've applied to him at the time.  I don't think based on the information I had

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that he would've been 40, but --

Q.    Right.  Okay.

A.    -- other than that, I -- I wouldn't know.

Q.    Okay.  So the age is off, right?

A.    I -- I don't think he would've been 40 at the time.

Q.    Okay.  And I'll represent to you that at the time of his arrest in December, Mr. Horton was, I believe, 6'0" or 6'1", so that's close to 6'2", but then he was 200 pounds.  So the weight does also not describe Mr. Horton, right?

A.    If -- if he were 200 pounds, I'd say that, no, it doesn't.

Q.    Okay.  And did you review this section in coming to your opinions in this case?

A.    I did look at it.

Q.    Okay.  And did it affect your opinions at all that the victim who states he knows who the perpetrator is -- is giving information about a person who is older and smaller than Richard Horton?

A.    It -- it did not affect my opinion.  Again, I don't know why -- I think it's Officer Rhodeback or Detective Rhodeback put that in there.  I have no idea how it got in there.  I -- I don't know that it's relevant.  What was relevant to me was that he knew who

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Mr. Horton was.  And it was clear in his mind who Mr. Horton was.  It was clear to Ms. Curry.  They knew him.  They had had numerous contacts with him.  Collectively?  More than two dozen contacts with him, so --

Q.   And you weren't concerned by the fact that according to this report, Mr. McClanahan said he could not see the perpetrator's face, but then later on in the investigation is able to make an identification based on facial features?

A.   I -- I don't accept your premise that he made the identification solely based on facial features.  In fact, he said he believed he knew who he was, and he also believed that not just because of the contact that day, he believed that Mr. Horton was the same person that he had had contact with him the day before, and he'd had numerous contacts with him before October 8th of that year.  So it wasn't solely based on the robbery that he said he knew who Mr. Horton was and believed he was the suspect.  It was based on the -- the numerous contacts over a period of time.  This wasn't -- this wasn't a stranger identification.  They were acquaintances.

And that's what made it, at least based on my opinion of Detective Walker's actions, credible.  They



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

264

were acquaintances. They knew each other before then. And he said it was him. Detective or Officer Rhodeback's miss description of him in the police report? Sadfully [sic] it's common and I don't know the reason, okay? Perhaps they did say it to him and they're wrong about his height and weight.

But knowing who he is from being an acquaintance, I found to be very -- very credible. And credible in the fact that Detective Walker taking the actions she took based on that, I thought were within generally accepted policing practices. I'm not saying Mr. Horton did this or he committed the crime. That's not for me to say. But as to the reasonableness of her actions, based on what Mr. McClanahan and Ms. Curry said, that's the opinion that I expressed, and that's why it does not change it.

Q. Okay. I just want to follow up on something you just said. You said the miss description here, and then I think you walked it back. You have no --

A. No I didn't. I'm not trying to be rude, Counsel. If you say he is 200 pounds and it's 150, I do agree that -- that's inaccurate. So I'm not trying to be rude to you.

Q. Okay. No, I'm just trying to make sure I understand. It's your opinion that Detective Rhodeback



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

wrote down the wrong information in this report?

A.    If that's what she put in the report and if he was 200 pounds at the time he's arrested, then that is inaccurate.

Q.    And that's because you're operating off of the assumption that Mr. Horton is the person who committed the crime?

A.    I'm not operating under that assumption.  I'm saying that Mr. McClanahan and Ms. Curry said that Mr. Horton is the person who committed the crime.  I have no idea who committed the crime.  I just know what's in the materials and what the witnesses say. It's not my place to express an opinion on who committed the crime and who did not.

Q.    It's also not within your purview to opine on witness credibility, right?

A.    That is true.

Q.    Okay.  And so, your opinions on the reasons that this information are in -- or sorry, strike that, please.  So it is beyond the scope of your purview to opine on why or how this information got into this report, right?

A.    It is -- I -- well, I wouldn't have an opinion on how or why because I wasn't asked to -- excuse me, to consider that.  So yes, I would say that -- that's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

beyond it.

Q. Okay.

A. But did it have -- did it have an effect on Detective Walker's actions or the reasonableness of it? Not in my opinion.

Q. Okay. Understood.

MS. MARTINEZ: Okay. Can we take a quick two-minute break just so I can see what I've got left for you?

THE WITNESS: Sure.

MS. SCHERGER: And I think we only have 21 minutes left on the seven hours.

MS. MARTINEZ: Oh, it's more than I thought. So, okay. Perfect.

THE REPORTER: Okay. Going off record. Time is 6:21.

(A recess was taken.)

THE REPORTER: Back on record. Time is 6:27.

BY MS. MARTINEZ:

Q. Okay. Sir, would it be a fair statement to say that in 2004, it was generally accepted police practices to follow up on credible leads?

A. Yes.

Q. And would that include alternative suspects?

A. Yes.

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.  And sir, your last year or as a police officer with the Baltimore Police Department was in 2001; is that correct?

A.   Yes.

Q.   Okay.  And you have not been a police officer at any point since 2001?

A.   That's correct.

Q.   Okay.  And, sir, would it be an accurate statement to say that all of your opinions pertaining to this case are either contained in your two reports or in this deposition transcript?

A.   Yes.

Q.   Those are all of the questions that I have for you, sir.  Thank you so much for your time today.  I'm going to turn it over to your counsel on the call.

A.   Sure.

Q.   And I hope you feel better soon.

A.   Thank you.

MS. SCHERGER:  --

THE REPORTER:  I'm sorry.  Was that no questions from you?

MS. SCHERGER:  That was no questions from me.

THE REPORTER:  Okay, perfect.  And then before I get us off record, would either of you like to order the transcripts?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

268

MS. MARTINEZ:  We -- yeah, we'll order.

THE REPORTER:  Okay.  Do you usually do electronic?

MS. MARTINEZ:  Yeah.  Electronic is fine.

THE REPORTER:  Okay.

MS. MARTINEZ:  We don't need a copy of the video.

THE REPORTER:  Perfect.  Absolutely.  And then Mrs. Scherger, would you like one?

MS. SCHERGER:  Yeah, we'll get a copy.

THE REPORTER:  Oh, sorry.  I just think you're cutting out a little bit.  Is that a no?

MS. SCHERGER:  We'll take a copy.

THE REPORTER:  Oh, okay.

MS. MARTINEZ:  I think it was a yes.

THE REPORTER:  Okay.  I got the yes.  An electronic for you too?

MS. SCHERGER:  Yes, please.

MS. MARTINEZ:  And sir, would you like to read or waive?

THE WITNESS:  I'll read and sign.

MS. MARTINEZ:  Okay, perfect.

THE REPORTER:  Okay.  And then did you want me to send that to your counsel, or to your e-mail?

THE WITNESS:  You can send it to Ms. Scherger.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

THE REPORTER: Okay. Absolutely.

(Deposition was concluded at 6:30 p.m. ET)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

270

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page here of by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to type written form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

*Madison Books*

MADISON BOOKS,

COURT REPORTER / NOTARY

MY COMMISSION EXPIRES ON: 11/08/2027

SUBMITTED ON: 01/06/2026

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_**
**Dixon** 14:19,22
204:14

**Exhibit 2_**
**Dixon** 63:12,17

**Exhibit 3_**
**Dixon** 64:21
65:2

**Exhibit 4_**
**Dixon** 147:4,9
166:24 261:5

**Exhibit 5_**
**Dixon** 154:23
155:4 163:11
171:10

**Exhibit 6_**
**Dixon** 163:11
164:18,23

**Exhibit 7_**
**Dixon** 194:24
195:1

**Exhibit 8_**
**Dixon** 228:21
229:1

**$**

**$17,000-plus**
117:7

**$20** 247:7,22

**$250** 89:18,22

**$40** 149:7
152:7 154:6
160:10 161:6

**1**

**1** 14:19,22
185:12 186:4
197:13 202:10
203:8,25
204:14

**10** 84:18 141:8
251:11

**100** 46:18
238:18,22

**100-year** 55:25

**10:43** 148:4

**11** 64:9 141:21
163:13 164:4
171:3 174:16
253:5,13
254:19

**12** 147:7 259:4

**12:20** 57:2

**12:27** 57:5

**13** 164:21
170:14 182:1,
10

**14** 46:14 55:25
86:18 183:5,7,
13

**1412** 149:16

**15** 84:17 86:17
185:7,9 186:8

**150** 261:18
264:21

**17** 187:2,3

**18** 187:3,14
202:3

**18,000** 187:20,
22

**19** 64:25

**1993** 19:11
189:20

**1994** 22:7

**1995** 26:7

**1997** 26:1,8

**1998** 34:12,16

**1999** 34:12,16

**2**

**2** 63:12,17
247:2

**20** 75:10 126:16
198:4,5

**200** 262:10,12
264:21 265:3

**2000** 15:21,22
39:18 41:14

**2001** 41:25
47:25 48:16
267:3,6

**2003** 48:16
49:10,11,18

**2004** 75:2
107:21 120:18
121:2 122:3,9
123:9,15 124:2,
5,19 125:2,24
126:22 127:6,
11,15,24
131:20 134:1
142:17,18
148:3,4,10,11,
18 164:21
166:2 167:3,9
169:3 170:14,
16 173:5,17,21
180:16 182:1
202:3 203:18
205:9 211:6
220:3 221:17
223:9 224:11
225:15 230:17
231:20 232:1
238:11 241:2
245:7 246:1
249:3 253:2
254:7,17
266:21

**2008** 49:10,11,
19 50:12 51:14,
18

**2014** 51:21

**2019** 50:12
51:14,18,21

**2020** 17:20
19:8 46:10 52:5

**2025** 9:22 64:9,
18 65:1

**21** 215:6 266:11

**23** 86:18

**246** 94:7

**25** 9:21 75:15,
21 82:16

**250** 89:23
117:4

**26** 207:12,13

**26th** 207:17

**27** 207:12,13,
21,23 208:1
210:1,2 211:25

**27th** 207:17

**28** 211:6 213:23
233:3,7

**29** 233:17
237:14

**2:01** 116:16

**2:14** 116:19

**3**

**3** 64:21 65:2

**30** 21:21 46:15
75:21 126:16
242:1

**30(b)(6)** 99:16
101:13 148:14
253:21

**30-some**
218:14 249:9

**31** 243:13

**32** 77:13

**35** 66:3 92:15

**3:26** 163:6

**3:34** 163:8

**4**

**4** 147:4,9
166:24 197:15
202:11 203:8,
18 205:9 261:5

**40** 261:16
262:1,5

**40-some** 46:15

**400** 11:6

**44** 154:23

**45** 154:24

**46** 164:19

**460** 93:19 94:5,
9

**49** 164:19

**4:30** 129:23

**5**

**5** 79:19 82:1
154:23 155:4
163:11 171:10
198:15 199:21
203:15 247:1

**5'9"** 179:19
180:11,13,25
181:10

**50-some** 71:23

**50/50** 77:8

**5:00** 219:18

**5:14** 228:16

**5:25** 228:18

**6**

**6** 75:9 80:16
163:11 164:18,
23

**6'** 179:19,21
180:11,13,25
181:1,2,10,12,
24

**6'0"** 262:9

**6'1"** 262:9

**6'2"** 261:18
262:9

**60/40** 77:8

**69.66** 117:2,3

**6:21** 266:16

**6:27** 266:18

**6:30** 269:2



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of TIMOTHY DIXON, taken on December 09, 2020

272

**7**

7 82:3 118:23, 25 120:5,10,11 194:24 195:1

7:30 134:13

**8**

8 118:24,25 121:23,25 122:3 123:9,15 124:2,5,19 125:2,24 126:21 127:6, 24 131:20 142:16 147:7 166:2 167:3,9 169:3 170:16 228:21 229:1

87 16:6

8th 129:8 151:18 263:17

**9**

9 121:25 134:9 142:18 148:3,4 220:2 221:16 224:11 225:15 250:24

90 116:11 219:19

911 149:17

93 19:13

94 22:10

96 16:7,19 28:25

97 15:21,22 28:25 34:13

9:15 203:18

9:30 129:23 148:3

9th 131:22

**A**

a.m. 134:13 148:3,4 203:18

ability 7:23 123:23 134:5,7

absence 31:2 46:19 47:13

absolute 8:5

absolutely 36:7 63:23 64:2 116:10 222:24 268:8 269:1

academic 98:14,17

academy 19:11 52:24 188:13 189:20 190:14

accept 226:6 258:18 263:11

accepted 107:4,9 111:15 114:12 117:24 121:14,21 137:10 186:5 199:4 207:11 223:19 230:17 231:19 234:24 235:12 236:1 238:10 241:1 243:12 245:8, 12 246:1,14 252:23 264:11 266:21

access 91:12 253:18 254:6

accidents 21:14

account 60:22, 23 238:15

accounts 61:2 240:24

accuracy 237:25

accurate 29:12 75:13 95:4

97:2,24 100:5 106:2 111:8 119:17 120:3 144:9,14 168:17,18 174:1 256:5 267:8

accurately 110:10,16

accused 43:6 51:9 78:7

acknowledged 201:5,6

acquaintance 264:8

acquaintances 263:23 264:1

act 42:11 47:12

acted 31:1

acting 53:11

actions 111:14,25 113:7 114:5,11 117:20,24 121:11,20 185:13 226:10 233:16 242:22 243:10,11 263:25 264:10, 14 266:4

active 26:20

acts 42:10 43:7 57:24

actual 60:8 94:2 105:22 142:7 195:18 198:7 201:1 202:6,15,21 203:3,13 204:2, 4,5,7,21 205:1, 3,17,22,24 211:8 214:17

add 189:14

addition 18:23 20:8 53:19 68:24 69:12 193:25

additional 18:22 35:3 66:11 70:19,21 71:6 72:2,8 83:16 84:2 100:3,24 156:18 178:2 189:13

additionally 250:12

address 133:17 241:14

Adidas 177:18 212:23 213:12

administered 146:9

administration 17:7

administrative 37:21 42:9 78:6 103:21

administratively 103:24

administrator 185:5

admissibility 192:16

advice 53:6

advisement 52:3

AF 62:12

affairs 20:14, 15 41:23,25 42:8,24,25 43:11 47:16,17, 20,21 56:20 89:12

affect 123:23 124:3 133:22 136:22 137:4,7 151:11 170:13 177:5,9 178:10, 13,24 179:16, 21,24 182:16 192:16 200:9 206:21,24 233:14,15 262:17,21

affected 178:1 182:15

affects 9:6

affidavit 106:8

affirm 6:23

affirmatively 169:8

African 16:15 17:2 62:16

afterward 41:24 139:6 140:9,15

age 188:14 261:16 262:4

agencies 53:9 187:21 205:21

agency 108:8 117:22 185:14 237:12

agency's 118:6

agree 6:17 94:4 113:10,18, 25 141:6 143:23 144:3,8, 13 146:17,22 155:17 156:6 162:2 170:18, 21 173:20 178:19 200:1,4 202:9 213:15 215:10 218:25 227:7,9 230:16, 17 231:19,22, 24 232:3 240:13 247:15 248:24 252:18 264:22

agreeing 154:21

ahead 164:2 187:2

aids 192:24

aimed 32:17

alcohol 123:22

algorithms 62:14



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

273

alias 223:12 224:20

aliases 225:21, 22

alibi 105:4 130:22 131:1,3, 16 132:2,8

alien 239:20,25

alike 196:9,10

allegation 118:5

allegations 81:8 117:23 233:23

alleged 230:8 250:5

allegedly 153:19

alleges 210:3 233:21

Alliance 51:23, 25

allowed 242:3

allusion 155:18 156:7

Alt 99:15 101:4

alternative 244:17 266:24

Alyssa 6:7 7:9 54:5 116:11 157:13

amended 121:12 185:23 233:18,20,23

Amendment 88:11

American 16:15 17:2 62:16

amount 40:18 235:5

amounts 107:6

analysis 126:25 129:25 130:21 133:20

137:8

analyze 119:5

and/or 87:20 140:24

answering 9:9 86:5 162:6 175:5 222:22

answers 7:24 12:5 87:17 224:7

apologies 12:25 23:13 164:2 172:16 178:8 186:11 187:15

apologize 20:20 127:21 129:13 143:2 176:23

apparently 244:3 260:18

appearance 6:5 189:3

appearing 6:8, 12 113:23

appears 196:25 202:2 203:17

appendix 64:17 66:3 69:5,8,17 72:9 73:1,12 92:16, 20 93:18 94:6 95:16 96:9 97:7 98:23 99:21 100:4 102:22 105:11,15,18 106:5

applicable 108:6

applied 261:24

apply 261:22

applying 246:8

approved 148:3,15,17

approximate 90:24

approximately 12:20 13:13 34:12,16 38:25 89:9 117:6 134:13 181:12 187:20

approximation 30:12,14 75:19 91:7

arbitration 84:7

archiving 253:19 254:6

area 11:7 76:1

areas 11:7 33:1 61:20 62:3

arise 53:24

array 21:25 25:2 30:1,6 31:4 33:9 38:9 42:22 43:20 86:14,19,22,24 87:5 115:15 188:3,21,23 189:7,10,15 190:23 191:8, 15,16 192:24 193:7 194:3,23 195:9 196:9,19 198:4,7,16 199:20 200:2,7, 11,13,20,21 201:1,2,7,11, 17,23 202:2,6, 7,16,20 203:8, 22 204:3,4,5,7, 15,16 205:1,4, 10,24 206:5,9, 14,18,23 221:5 250:25 251:9, 13,16,18 252:1, 20

arrays 24:9 40:6 43:1,7 188:7,10,22 189:4,16,20 190:1,3,11,14, 17,18 191:7,13 201:12 203:11, 13

arrest 43:21

81:20 82:1,2,15 83:2,5 87:13 88:8 112:11,14 189:1 215:16 242:14 249:19 250:16 257:9 262:8

arrested 80:3, 13 83:1 87:24 184:23 225:19 250:3 265:3

arresting 215:13,18

arrests 82:12

arrive 65:24

arrived 141:10 194:9

arrives 257:5

arriving 66:8

article 98:15

articles 56:15 58:11

Arts 16:14

aspect 53:1 82:14 87:14

aspects 11:14 88:7,10

assemble 30:6 43:1

assembled 66:19 193:7

assembling 206:5

assessment 88:5,12 207:10 239:8

assign 31:17

assigned 19:8, 13,15 33:3,5,15 45:9 48:25 49:2,4

assignment 36:21 44:10 77:25 116:6 117:15

assignments 44:15,23 45:1, 3,12

assist 31:9 33:20

assistance 31:9 32:1,4 35:8,18 36:14 56:4

assisted 190:17

Assisting 43:2

assortment 174:11

assuage 158:10

assume 8:16 18:4 65:14 119:13,17 139:23 140:5 146:14 151:3 158:10 216:11 217:13 236:10, 25 250:18 255:17

assumes 109:5,6 217:9

assuming 29:7

assumption 119:20 140:17, 19,24 141:6 150:21 158:23 168:14 182:7 243:16 265:6,8

assumptions 68:2,20 140:12 146:19 167:21 170:12

attacker 134:7

attained 18:2 133:8

attempted 132:19 133:12

attempting 182:20

attempts 218:7



Kentuckiana Reporters
110 North Wacker Drive, Suite 1500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

attend 15:19 16:5

attending 6:5, 6 15:25

attention 150:20,23

attorney 7:16 18:15,21 49:12 50:8,13 55:4,18 56:9 89:15 120:24 132:25 133:4 145:24 160:21

attorney's 20:15 48:15,22 49:1

attorneys 12:13 50:16 52:19

attributes 160:2

aunt 14:5

author 66:25 67:4

authored 170:7

automatically 28:12

automobile 123:19

Avenue 149:16

aware 13:4 15:5 55:16 66:13 83:13 122:8,11,13,23 126:21 127:9 129:21,22 141:3 145:8 150:15 182:20, 22 220:1,4

—— B ——

bachelor's 16:13,17 17:3

back 12:5 16:8 17:16,19 19:8, 22 20:11 21:11

28:9 29:24 39:6 41:15 46:10,20 51:2 57:4 69:20 77:17 81:6 85:4 86:19 92:14 95:11,24 96:12, 14 98:10 116:18 128:10, 12,17,21,23,25 133:7 135:15 142:13,22 143:7 148:10, 17 152:15 163:8,12 166:24 170:10 171:2,13 173:12,14 175:1,7,12 177:13 186:4 205:21 211:10 212:16,17 213:1 220:11, 13 222:10,12, 16,25 223:1,24 225:7,24 228:4 236:22 253:6 259:16 261:4 264:19 266:18

background 14:17 57:7 119:1 121:24 122:1 130:18 131:24

badly 28:19

balance 256:11,14

Baltimore 9:15 15:20 16:7 17:16,19 18:11, 18 19:4,10 20:15 33:2 42:1 44:11 46:3,9 47:25 48:15 52:6 53:8 63:2 79:10 267:2

Banner 63:2

bar 55:11,13

base 112:4

based 15:17 92:2 118:2,3,5 120:21,22 124:12 126:8,9

137:20,21,23, 25 144:22 145:11 146:20 148:9 150:8,14 151:19 153:6 157:8 160:15 161:10 167:22 168:15 169:15 170:22 188:18 200:1 212:19 213:19 215:3 230:8 234:2 235:15 237:11 240:10 241:23 254:4,9 259:25 260:8 261:25 263:9,12,18,20, 24 264:10,14

basic 97:5

basis 144:17 161:18 168:1,2

batches 92:24

Bates 147:7 154:23 164:19 194:25

bearing 182:13

bed 149:12 244:10,12

began 94:23 149:9,12 259:24

begin 95:22,23 121:25

beginning 65:20 66:3 75:11 116:6 117:15 216:6

begins 185:7

behalf 6:7,11 48:23 79:16 80:18,25

behavior 107:9

belabor 240:1

belief 112:13 135:4 144:17 152:7 156:15 169:15 179:4

180:24 181:23 201:9 202:23 203:20 211:16 231:2 244:1

beliefs 143:19, 20 152:21

believed 126:19 128:4 131:15 135:6,9, 11,18 138:2 139:12 142:18 143:10 150:6 151:16 152:10, 12 153:3 154:5 181:7,11 188:20 196:12 208:17 211:4 214:9 230:20 257:20 263:13, 14,15,19

believes 143:12,14 151:20 159:23 176:3 234:21 239:25 240:2 261:11

believing 134:24 168:2 243:23

belong 244:14

belonged 136:23,24 137:5,7

belonging 134:11 243:16

benchmark 235:2,11

benchmarks 29:1

big 22:16 91:22 140:2

bigger 33:1 148:24 164:25 229:7

bill 90:11,13,16 91:8,23 92:4,8, 10,11,12,13 117:6,9

billed 116:25 117:3

billing 89:25 90:8 91:25

bills 90:15 91:3,11 116:22 154:3 160:9,10, 11 161:4,7,8

birth 241:13

bishop 55:12

bit 20:18,25 48:13,14 54:16 55:6 77:18 82:8 85:13 88:14 147:7 190:20 204:6 207:22 268:12

black 193:11, 25 195:6,15,19, 20 196:5 197:1, 11,14,16,19,25 198:16 199:22 202:12 261:17

blackened 96:17

blackmail 250:10

blank 9:25 96:17

bled 30:15

Bless 13:1

block 89:25 90:11 91:25

blue 261:10

board 55:8

body-worn 174:8

books 58:2

booth 154:9

borrow 247:6, 22

bother 173:4

bottom 121:23, 24 187:3 204:24 230:6



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

237:14

boy 177:18
212:23 213:12

Bradley
102:15

Brady 81:8
99:18 113:5,13,
23 114:8 230:8
232:4,6,9,12,
13,14

break 8:24,25
20:24 54:6
56:12,24 91:17,
20 116:12,14
162:20 163:1
219:19 221:14
227:5 228:7,12,
14 266:8

breakdown
76:12 77:1,4

breaking
61:16

Brenda 6:11
121:12

bribe 182:12,
21 250:5,10

briefly 56:12
110:4

bring 62:14
81:6 83:21
171:2 228:7
246:19

broad 246:11

broadcasts
58:11

brother 224:17

brother's
225:9

brought
205:14

brown 78:16
81:25 82:3 86:3
261:18

buffering 8:5

build 8:2
261:19

bullet 251:12
253:15 254:20

busy 19:21

butcher 78:19

---

**C**

cabined
111:13

calculated
13:16

calculations
126:24

call 12:22 20:8
31:22 32:2
33:6,16 50:24
87:1 123:21
133:13 141:5
144:23 153:25
154:13 184:7
187:23 192:20
211:7,11
219:13 259:5
267:15

called 20:1
28:9 53:21
149:16 167:15
175:10

calling 134:14
158:21

calls 21:9
31:16 35:19

cameras 174:8

candid 45:23
104:5

cap 136:21

capable 257:1

capacities
39:9

capacity 19:9
25:1 27:16 31:3
34:23 35:6
37:2,8,22 42:21
52:2 53:11,25
55:4,17 56:9,15
86:12 111:6
169:4

caption 60:8

captions 83:19

car 126:10
135:13 175:20

card 188:23,24
192:20

care 144:11,19
145:13 146:13,
14,15

career 44:17
46:9 56:21 57:9
58:13 75:4 87:3
190:16

careful 137:2

carefully
118:16

carried 108:10

case 7:11 15:6,
13 23:19 27:20
28:3,5,12 30:3
33:19 34:2,4,7
35:15 36:10,12
37:13 56:14
58:11 60:8,11,
12 63:13 64:18
65:9,12,21 70:6
72:9 74:15,21
75:3,7 76:16,20
77:5 78:1,4,6,8,
12,17,19,24
79:1,2,9,14,18,
23 80:1,5,9,20
81:3,13 82:14,
21 83:12,17
85:5,6,10,22
86:3 87:23
88:1,10,12
90:25 91:4,8
92:5 98:8 99:3
102:11 105:19
106:17,23
107:3 108:5,16,
21 109:1,12,15
111:3,22
114:25 115:4,8,
16 116:23
117:1 119:12,
13 122:24
125:3,5 136:12
137:24 139:17
147:6 148:1

151:10 152:20
178:25 182:17
185:20 188:4
193:7 194:23
198:25 199:11
200:10 209:7
212:6 218:1
223:18 225:1
226:10 227:17
232:5 233:14
235:8,23 237:5
239:3 242:8,18
243:2 247:4,13,
17,21 249:10,
11,12 250:22
251:17,25
252:4 255:7
256:1 257:19
258:2,13
262:15 267:10

case-by-case
28:14

cases 25:4
48:23 50:10,23
53:12 59:4,7,
12,15,19,25
60:2,4 76:6,12,
17,25 77:18,20
81:16,17,19,23
82:9,16,22,24,
25 83:4,10,16,
19 84:11,16,24
85:2,13,18
86:1,8,13,16
87:8,11,12,18
88:6 120:25
217:14

cast 120:1
232:18

categories
92:2

category 86:9

caught 51:18
214:25

causal 177:25

caused 180:5

caveat 10:5
153:16

CBS 62:12

cell 126:21
127:6

centered
48:12 79:5

certainty
217:18

certificate
16:14 17:1

certificates
17:8,23 18:7,18

certification
18:3,9,25

certifications
18:1,10

certified
221:21 222:11,
23

chain 177:25

chance 15:1
63:14,25 64:25
116:22 147:13,
21 154:25
171:14 176:24
228:22 229:22

change 21:21
53:17 54:5,9
127:6,15
153:25 194:19
199:8 200:15,
18 203:24
209:14 242:18
243:1,9 264:16

changed 46:4
182:4 188:22
191:13 199:5
224:4

channels
61:10,17,19,23

characterize
26:18 98:4
192:14 233:8

characterized
126:13 197:24

characterizing
96:20

charge 27:17
46:17,19



Kentuckiana Reporters
110 North Wacker Drive, Suite 1500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charges 232:15

check 60:23,24 67:24 70:2 175:12 212:16 226:11,18

checked 226:8

checking 117:12

Chicago 6:9

Chief 51:23 69:1,13,17,24 70:9,10,14,24 71:6,13,18,22 72:4,13 73:2,6 74:12 98:8 252:16 254:15

child 28:18

chose 65:25

chunk 16:10

church 55:8

circle 142:13 163:12 261:4

circling 77:17

circumstance 34:6 35:22 184:16 192:1

circumstances 25:11 33:12, 14 34:5 37:8,16 118:2 215:25 226:21 241:5, 24 257:12,17, 22 258:1

circumstantial 139:11 234:2 235:15 241:23 258:12

city 6:11 20:15 38:19 48:15 53:9,22 79:19 80:9,16 83:12 91:4 99:16 101:14 130:15, 16 147:7 154:23 164:19

187:10

city's 99:17

citywide 187:4,8

civil 42:12 51:8 52:10 57:21 76:13,17,25 251:25 252:4

claim 56:4

claimed 121:11 122:2

claims 56:6 106:15 210:10, 11,13

clarification 49:15 210:2

clarified 14:9 34:14 35:24 44:22 61:22 181:7 220:16 238:11

clarify 9:20 11:17 12:5 30:20 71:10,17 74:7 82:19 90:12 107:11 114:10,24 120:17 138:11 161:18 167:20 181:18 196:17 200:19 242:23 257:18

clarifying 82:13

classes 18:14

clear 104:8 187:5 191:12, 24 193:24 208:3,16 210:19 212:15 213:14 226:12 263:1,2

cleared 55:13

CLES 18:22

cliche 226:22

clicked 11:6 95:3

Clink 77:21 81:25 86:3

close 262:9

closed 149:12

closely 190:25

closer 176:1

clothes 20:2,9, 13

CNN 62:12 63:6,9

cocaine 122:9

cold 20:18,21

collaborate 53:2

collaboration 53:20

colleagues 190:4,15

collect 183:25 184:1,2

collected 148:10

Collectively 263:4

college 18:25 54:18

color 261:18, 19

Columbus 6:11,12 83:12 91:4 99:17 101:14 121:6 254:7

combination 26:17 27:8

command 53:8

commander 31:2 42:20 43:5 46:14,16 47:2, 13

commanders 46:18 53:7

comment

154:1 246:11

commented 161:2 169:21

comments 125:9

commercial 28:16 33:8,25

commit 57:24 59:16 186:24 219:16

committed 42:10 58:14 59:1,6 60:6 131:16 156:3 211:17 213:6 219:15,17 222:2,6 223:15 239:12,20 264:12 265:6, 10,11,13

committing 27:15 58:18,21 259:9

common 120:25 151:7 264:4

communications 10:6

company 51:24

compare 172:18 245:8, 13 246:2

compared 117:23 144:24 242:2,8

comparing 114:12 254:15

comparison 242:12,13,17, 24 243:6

compartmentalizing 213:20

compensation 89:14

complained 48:9 55:10

complaint 48:10 55:3,19 56:8 80:3 117:23 118:6 121:12 185:23 233:18,21,23

complaints 48:1 55:17

complected 196:16

complete 24:5 42:4 96:16 235:18 237:15

completed 90:21 100:19 225:3 236:7

completely 44:24 74:8 103:20 143:5 204:10 244:19 250:13

completing 233:21,25 236:4

completion 44:1 90:14

complex 27:20 28:3

complexion 203:7,25 260:8, 20

complexions 202:8,14

complexity 27:19 28:1

compliance 51:23 108:9 115:13,16

complicated 24:2

comported 107:2 111:14

comprised 189:22

computer 67:24 68:18 91:18 198:10



Kentuckiana Reporters
110 North Wacker Drive, Suite 1500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

203:4 204:23 205:12 206:16

**concern** 120:2 172:24 177:8, 19 261:2,3

**concerned** 263:6

**concerns** 158:10

**conclude** 217:13,21

**concluded** 194:15 269:2

**conclusion** 87:1 114:2 121:19 127:18 135:17 179:25 208:21 210:15 213:5 244:5 252:7 259:20

**conclusions** 216:13

**conclusory** 107:6

**condition** 9:5

**conducive** 19:23

**conduct** 21:24 23:17 86:4 132:5 137:9 152:13 153:8 243:6 257:14

**conducted** 23:24

**conducting** 32:19 216:9

**confirm** 64:1 216:15,23

**confirmation** 218:12,19

**confirms** 169:8

**conflate** 238:9 257:23

**conflating** 38:11 161:17

**conflict** 247:14

**conflicting** 240:23

**conformed** 243:11

**conforming** 137:10

**confuse** 196:10

**confused** 27:1 67:15 82:8,17 83:8 96:24 224:23

**confusing** 74:5

**confusion** 202:22 225:12

**connected** 93:22 143:25

**connecting** 151:1

**connection** 56:13 142:15

**consideration** 117:25

**considered** 118:6,7 213:25

**consistent** 161:13,24 177:23 179:5,6, 8,11 185:13 195:5

**consult** 53:2 75:5

**consultation** 89:15

**consumption** 56:16

**contact** 31:25 35:22 77:10 140:5,8,14 144:10,12,16 194:10 217:11 234:16 247:2 263:14,16

**contacted**

217:19

**contacting** 226:16

**contacts** 135:11 144:24 218:7 263:3,4, 17,21

**contained** 65:12 73:1 142:1,2 154:10 163:18 168:20 178:22 212:5 267:10

**contaminated** 257:15 258:10

**contemporane ous** 142:2 163:18 164:7 171:7 172:2 174:6,9,21 176:20 177:7 178:12 179:4

**contemporane ously** 173:22

**contemporary** 208:24

**contention** 237:7

**contentious** 166:18

**context** 181:25 209:18 224:24

**continue** 30:17 94:25 151:24 216:12 250:19

**continuing** 18:14

**contradicting** 119:3

**contributed** 135:4

**conversation** 77:17 106:15 113:4 133:3 139:7 141:13, 17 142:3,8 143:10 144:21 146:10 155:12

156:4,19 160:13,24 163:19 164:8, 20 165:8,21 168:8,12,20,22 169:1 172:19 176:2,5 179:18 181:25 182:1,4, 5 233:13 249:18 250:2, 12

**conversations** 135:14 143:15 144:5 182:3 211:12

**convicted** 55:24 57:22 58:4 82:25 114:18,20 185:16,19 186:1

**conviction** 79:23 81:8,13, 19,20,21 82:11, 12,22 83:2,3,5 87:13 210:9

**convictions** 57:13

**coordinate** 53:21

**copies** 93:5

**copy** 63:22,24 64:2 120:6 195:17,19,21 196:1,14 198:4 200:2 268:6,10, 13

**corner** 197:13

**correct** 17:20 21:4 34:11 41:17 48:16 49:13,20 51:15 53:15 54:2,3 64:9 65:13 66:5 68:17 69:2,14 73:4 74:21 77:23 78:13,17 79:24 80:10,21 81:7 89:16,19, 22 93:20 97:12 98:16 99:4,12

105:21 107:14 108:1,18,19,23, 24 109:3,13,18 110:1,6,11,17, 23,24 111:3,8, 15,19,23 112:3, 11,21 113:5 114:18 115:1, 10 116:1 119:10 122:10 123:3 124:6 125:21 126:22 127:24 130:7 132:9 134:12, 19 136:25 137:8 140:13 142:3 145:6 146:11 148:8 150:17 163:21 166:15 193:11 226:4 241:7,16 254:7 267:3,7

**correctly** 133:10 149:17 152:17 231:12

**could've** 42:5 103:8

**counsel** 8:19 10:7 13:3,20,23 14:2,10 23:2 32:21 52:3 53:7,23 56:4 70:14 123:10 128:8,10 133:8, 13 148:5 153:14 162:7, 16 163:4 170:18 172:15 173:9 187:15 204:18 220:21 221:23 223:13 264:21 267:15 268:24

**counsel's** 230:11

**Counselor** 104:13

**count** 60:21 77:6 88:21

**counted** 77:4 94:9



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

counting 76:2

country 62:6 187:21

counts 55:25 60:19

county 79:10, 17

couple 14:17 15:17 52:18 77:15 208:19 223:22

court 7:21 49:4,8 53:3 88:16 89:1 112:15,23 119:15 128:3, 16 138:1 142:21 173:11 222:16 223:3

courtesy 8:9

Courts 115:3

cover 260:18

covered 260:21

CP 186:5

CPD 107:12,21, 25 108:17,21 109:2 115:13 121:11,20 186:6

crack 122:9

create 21:25 24:8 25:2 30:1 31:4 38:8 40:5 42:22

created 148:17 194:23 202:3 206:19 221:5

creating 102:25 190:18

creation 206:23

credibility 119:10 134:2 211:21 212:5 265:16

credible 212:2, 14 237:16,21 238:2,20 239:10,11,13, 18,22 240:3,4, 9,10,12,15,20 257:2 263:25 264:8,9 266:22

credits 16:8

crime 19:21 20:9 21:10,13 26:16,20,23 27:5,10 31:23 35:23 37:7 39:6,22 40:3,17 41:3 85:16 121:6 131:4,23 174:5 179:10 183:12 184:22 211:17 219:15, 16,17 220:25 223:16 239:2, 12,21 243:9 245:17 255:3,4, 6,18 259:7,10 264:12 265:7, 10,11,14

crimes 20:12 21:14,17 27:9, 12,15 35:7,16 36:4,13 37:9,10 39:21 47:9 49:2,7 54:1 131:16

criminal 28:6, 12 33:18 38:3 44:5,8 48:23 51:7 53:1 57:23 76:13,16,21,22 119:12 120:24 182:17 184:25 225:18 226:17 242:12,15 249:11 251:22, 24

Critical 247:2

cross 241:11

CSSU 109:12, 17

cultural 62:15

cumulative

135:5 137:23 178:14 182:3 211:13

cumulatively 126:15

curated 62:13

curious 197:10

current 15:3,8

Curry 99:2,3 105:20 110:10, 16 122:19,20 126:11 135:14, 19 139:8 141:23 143:24 144:4,12,23 146:22 155:8, 12,14,17 156:6, 13,14,16,22,24 157:7 158:7,12, 13,17 159:3 161:12,19,21 163:14,22 164:4 165:21 171:4,8,25 172:3 193:8 203:12 213:4 233:12 239:23 243:25 244:2 246:13 249:15 254:24 255:7,9 259:19,24 260:19 263:2 264:14 265:9

Curry's 132:5 139:8 141:3 155:10 156:10 233:4 243:7

custody 80:22 87:25

cut 8:5 44:20 67:1 125:13 128:9 138:6

cutting 268:12

CV 14:19 15:3, 5,14 40:19,22 44:17

cycles 151:6

**D**

D-I-X-O-N 7:14

daily 32:16 37:12 122:9

damage 58:3

darker 202:10, 11 203:9

data 32:10 148:9

date 17:13 19:12 25:20 26:1 41:10 117:1,6 148:2, 3,15 193:18 206:25 207:5 217:18 241:13

dated 64:9,25 201:25

dates 16:22 28:22 29:13 36:19 40:22 48:13

daughter 99:2 233:4,12

day 22:5 32:13 37:14 44:14,25 46:4 54:19,21 89:24 90:1 122:3 126:9,17, 18 135:7,12 138:13 140:4, 12 141:18 143:11,13 144:7,12,25 145:21 146:4, 24 149:21 150:3,10,16,24 151:7,17 152:5, 13,16 153:8,20, 24 155:8,19 156:4,8 159:7, 19,23 160:4,7, 10,13,16,25 161:4,10 162:1 166:11 259:6 263:15,16

days 165:25 173:2

deal 85:20 87:20 88:3 255:18

dealer 122:22 126:14

deals 87:23 88:1

December 41:13 203:18 205:9 262:8

decide 113:17

decided 152:22

decisions 250:20

declined 132:22,24 161:3

deemed 234:17

deeper 221:25

defendant 55:23 76:23 77:2 79:17 86:2 92:11 107:1 247:4,5

defendant's 73:17,22

defense 51:7 76:22 77:22 78:21 79:11 82:5,7 120:23, 24 145:24 160:21 228:2 230:10 242:17 243:1

definition 24:25

definitively 247:13

degree 16:18 17:3,6,11,24 18:2,5,8,9,24 255:3

degrees 18:1,6

delay 233:25 255:23 256:23



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

delayed 236:13,20

delve 221:25 222:4

denied 125:15 182:20,22 252:12

denying 125:16,17

department 17:17,19 18:11, 19 19:4,8,10 38:21,22 42:1, 25 44:11 46:3, 10 47:25 52:6 53:8,23 77:22 79:7,10 81:9 186:20 187:19 267:2

department's 33:21

departmental 118:1 187:10

departments 38:12 187:12, 17

depend 23:25 100:17 184:19 256:14

depended 34:4,6 35:21

depending 23:22 25:11 27:25 41:20 45:10 90:18 180:4 257:12

depends 27:19 34:2 35:5 240:1 241:4,19 255:4 257:16,25 258:13,14

depiction 197:13,14

deposed 148:13 199:11

deposition 7:18 10:10 11:24 12:11,14,

17 13:12,15,24 14:2,3,7,15 20:21 58:7 65:21 73:11 74:16 78:8 81:11 84:2,3 90:4 92:12 99:2,9,14 100:23 101:3, 12,18,22 102:10,13,15, 20 103:10,24 104:8 105:3,5, 10,16,22 117:10 122:19 123:1 157:1,6, 21 167:23 169:7,13,25 196:24 199:10, 20 206:5,12 209:5,7,11,23 224:25 227:11 233:12 253:21, 25 254:8 267:11 269:2

depositions 100:12,18 103:3 105:18 106:3 118:10

deps 129:17

depth 23:22 82:16

derived 166:20

describe 116:5 117:13 188:6 262:10

describing 210:6

description 27:11 29:21 35:4 42:15 52:11 122:16 170:16 180:25 188:14,15,18 190:24 191:4 192:8 193:12 194:11,13,14, 20 195:5 225:25 264:3, 18

descriptions 35:12 91:24

180:4,23 191:5 193:15 194:4

descriptors 195:8

designated 148:14

detached 34:5

detail 44:2,10 45:14,15 207:14

detailed 33:10, 25 43:15,23 45:2,9,13,14, 15,17,18 47:20 180:20

details 45:3,12

detective 44:4 79:20 101:20 102:17 105:20 108:9 109:13, 17 111:14 112:12 113:3,7 114:5,11 115:13,16 117:20 121:12, 16 124:9 128:2 132:6,7,16,19 133:7,12 135:16 136:5 137:9 138:16, 20 139:1,15 141:22,23 142:5 143:20 144:25 146:24 155:8,13 156:11,20,25 157:23 158:6, 11,15 159:2 161:22 163:14, 15,22 164:5,20 165:8,11,14 166:5,9 170:15 171:7 172:2,24 174:4 175:12, 16 177:6,12 179:9 180:6,10, 12,17 181:2,4 184:7 185:3,12 187:9 192:12, 24 196:22 199:3 201:22 205:14 206:4,

10 207:23 208:8,10,15,18 210:3,6,21 211:14 212:4,9, 11 213:24 214:4,12,20 216:24 217:2, 10,21 220:1,7 221:10 223:18, 21 224:8,22 225:13 227:11 233:16 234:25 235:3,8,24 236:9,21 237:11 238:3,7 239:12 242:21, 25 243:6,10 252:12 255:16 257:7,21 260:4 262:23 263:25 264:2,9,25 266:4

detective's 85:9 134:1

detectives 27:22 28:6 44:7 108:17,22 109:2 144:21 177:21 194:8 235:16 260:9, 11

determination 28:14 108:4 113:12,22 131:4,6,12,13 135:10 162:12 185:22 210:16 225:23 230:23

determinations 119:10

determine 24:5 183:10 188:16 196:13 247:13

determined 215:5 226:2 257:20

determining 114:7 134:2

Detroit 79:20 80:9

development 42:9 53:3

died 28:19

differ 215:8

difference 183:23 219:6 239:15 257:5

differences 88:13

differently 254:11

difficult 82:18 110:13 142:24 158:14 195:16

Diggs 113:3,9, 23 115:23,25 175:10,13 176:4 177:18 178:20,22,24 207:14 208:2, 15 210:4 211:21 212:1,2, 23 213:11,25 214:5,8,13,16, 18,20 220:2,8, 16,19 221:5,11, 16,24 222:2,15 223:8,9,11,14, 21 224:5,10,11, 17,20 225:1,11, 13,14 226:2,11 227:7,22 228:1, 25 230:10 231:3 232:21 238:5

Diggs' 212:14 214:22

digital 200:25 202:6 203:4,12, 23 204:2,8,20 253:15,18 254:6

digitized 195:25 204:3

diligent 234:22 235:17,21

dire 184:16

direct 7:3 167:1 247:3

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

disagree 237:20

disagreement 254:18

discipline 42:9 48:8,10

disciplined 58:21

disclosed 210:7

disclosing 92:19

discolored 197:17

Discovery 229:21

discretion 184:10 236:9 237:11

discuss 207:19,20

discussed 44:12 45:4 189:23 195:5 233:9 251:1

discussing 104:12 157:19

discussion 140:1 156:10 166:22 231:1

discussions 156:13 181:11 183:8,9 255:18

dishonesty 115:14 187:13, 18,20,24

dismissed 54:13,25 89:13

dispute 119:5, 8 161:25 215:9 222:1

disputed 124:12 222:5

disputes 119:3 247:9

distinct 88:13

distinguish 183:23 215:14

district 19:14, 15,16,18,19,21, 24,25 20:3,5,6, 7,10,11 21:4,8 22:4,9,17 23:9, 14 24:8,17,18, 22,24 25:6,9, 14,19 26:7,11, 15 28:21 29:11, 15,20,22,25 30:5,9,13,25 34:9,15,19,20 35:1,5,10,15 36:9,11,18,23 37:5 38:2,5,16 39:3,14,21 40:2,17 41:3 46:11,17,19,23 47:4,9 49:4,8

dive 116:21

division 28:7, 13 33:18 38:4 44:5,8 45:2 101:14 102:16, 17 121:6 254:7

Dixon 6:15 7:13 49:12,16 50:4,9,13 158:5 194:12,13 226:3

DNA 120:14 121:6

document 11:9,11,16 12:2,3 15:1 63:14,15 64:1, 8,23 70:12 89:14 92:1 93:22 94:3,22 95:9,18 96:14 98:4 100:8 101:15 147:8, 14,21,22 153:16 154:15, 18,19,25 155:3, 16 167:1 171:15 172:10 173:6,22 176:7, 24,25 177:3

183:8 187:5 203:2 205:4 229:15 230:8,9 237:24 238:3,5, 17 239:4,13,21, 23 240:4,20 241:6 242:24

documentatio n 236:11 241:20,21,23

documented 237:1 238:24

documenting 180:12 241:3, 24

documents 9:17 11:3,7 12:10 66:12,24 69:4,9,16,25 70:2,5,13 72:8, 22 73:10,12 74:17 92:18 93:4,10,19 94:5,9 95:16 96:5,9,16 97:2, 4,8,18 100:3,7 104:12 106:2 115:22 118:12 127:3 136:16 154:16 169:10 170:11,23 221:9,15,20 222:7

dog 54:20

door 134:10, 14,16 149:1,2, 15

doubt 120:1 232:18

downloaded 202:5

downloads 93:2

dozen 263:4

dozens 46:18 56:23 225:22

drafting 68:2, 21

draw 146:2,25

drawn 150:23

drew 126:6 143:19 150:20 182:5

drove 130:15 141:4 149:15

drug 19:16,17, 18,23 20:1 22:8,12,14,15, 16 23:9 24:7, 10,14,16 27:9 29:16,19,23 30:4,7,9,12,22 49:6 122:22 123:15 124:2 126:14

drug-use 122:21

drugs 20:3 26:17 29:14 123:22 145:25 146:8

due 184:23 192:15 220:20 226:21

duties 21:19 44:15 56:20 108:10 235:22

duty 226:7

dying 80:22

_____ E _____

e-mail 96:18 268:24

earlier 26:1 77:18 96:25 100:2 110:4 112:19 122:25 136:8 145:3 185:18 190:21 209:4 227:6 228:24 250:8 251:5

easier 63:24 120:7 174:8

easily 91:17

Eastern 19:19, 24,25 20:3,11 24:18,22 25:6, 14,19 26:6,10, 15 28:21 29:11, 15,20,25 30:5, 9,13 32:15 38:5,17 39:7, 10,14,21 40:2, 16 41:2 47:9

economically 58:5

economics 62:1,6

edification 92:7

education 15:18 18:14 52:9,11

effect 182:3 266:3

efforts 46:5

elapsed 206:22

electricity 133:16,22

electronic 64:11 65:5 268:3,4,17

electronically 93:6,7,10,12

elevate 28:12

eliminated 246:12

else's 98:12

emergency 144:11,19

emphasis 142:15

employee 55:9

employees 187:7

employment 19:4,7

encompass 108:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

encompassed 84:3,7 115:18 154:17

encompasses 85:23 107:7

encountered 123:19

end 33:21 44:2 54:19 66:19 133:3 140:12 184:25 218:22 219:12 252:10

Ended 33:10

ending 41:11

enforcement 19:16,23 20:1 29:16,20 30:5, 7,9,13,22 58:25 59:6,16 60:5 120:23 121:2 174:5 186:21, 24 187:21 231:8 258:23, 24

engaged 122:21 215:6

enhanced 195:24

enshrined 65:22

ensure 174:14 192:22 196:11

entail 27:7

entered 148:2, 15

entire 10:21, 23,24 45:22 46:16,19 84:11, 23 85:1,23 86:4 89:24 124:22 147:12,13,21 154:12,17 168:8,12,20,22 175:19

entirety 11:19 15:1 19:7 23:17,21 25:10 27:18 28:1,4

67:13 68:17 85:15 95:18 96:10 97:8 125:20 130:11 136:9 156:25

entities 90:18

entry 52:24

EPSTEIN 157:13,15

erodes 57:22, 25 58:1

establish 247:14

established 247:4,21

establishing 259:6

et al 78:20 79:10 80:16,17, 24

ethnicity 188:15 261:17

evaluate 86:2

evaluating 84:11,25 85:14 86:14 87:8 134:4,6

Evaluation 259:11

event 140:2 236:5

eventually 149:14

everyone's 197:21

evidence 87:9, 14 109:11,16, 25 112:5 133:6, 15 137:13 139:20 140:25 153:7 166:7 181:17 183:9, 10 185:15 200:12 210:7 217:24,25 220:1,6,18 230:18 231:20

232:18 233:22 245:1 248:13, 25 253:15,19 256:15

evident 259:25

exact 17:13 19:12 22:21,24 25:20 28:22 36:19 39:5 41:10 126:14 136:17 206:25 207:5

EXAMINATIO N 7:3

examine 243:5 248:14

exclude 66:1 245:14,16,21 246:3

excluded 88:25 95:13

excluding 245:22

exclusion 245:21,25

exculpatory 87:9,14 210:6, 23 230:18,21 231:2,9,13,15, 23 232:4,12 240:5

excuse 11:7 12:24 265:24

executive 53:8

exhibit 14:19, 22 63:12,17 64:21 65:2 147:4,9 154:20, 23,24 155:4 162:25 163:11 164:18,23 166:24 171:9, 10 194:24 195:1 204:14, 21,22 206:1 228:21 229:1 261:5

exhibits 118:10

exist 259:2,3

existence 244:17

exists 104:2 183:11

expanding 85:12

expansive 81:22

expect 138:16, 20 184:10 249:6

expected 137:19 180:17 194:14 249:12

expecting 135:8

expedite 254:23

experience 15:8,10,12,18 16:23 32:5 46:3 120:22 138:15 146:20 160:20 167:22 168:15, 24 174:2 190:4 191:2 192:6 194:18 215:11 216:1 233:24 235:8 249:3 254:4

experiences 118:7 145:23 254:10

expert 58:24 73:21 74:20,24 75:6,11,12,23 76:1,4,7,13,15, 21,25 77:22 78:2,21 79:11, 21 80:17,25 82:23 83:12 84:10 85:13 86:13,23 87:3, 8,18,19 88:3, 16,18,23 98:7 110:22 111:1,6 113:19 114:1 115:8 119:7 124:4 129:4,6

151:6 160:19 162:15 211:18, 20 212:7 215:1 227:3 247:13 248:22 258:20, 22

expert's 114:3

experts 77:3 112:20

explain 57:17 58:7 192:6

explained 208:20 213:3

explaining 114:13

explains 114:6

explanation 251:10

expletive 149:5 153:21

expletive?" 149:14

explicit 150:2

explicitly 165:19,24 252:12

express 87:2 110:18 111:10 112:12,16 114:3 145:22 195:23 204:5,7 207:4 209:21, 25 210:9,10,12, 17 213:7,9 265:13

expressed 66:8 143:20,21 195:18 214:15 264:15

expresses 114:4

expressing 107:16 112:7, 22 153:2 213:17

expression 114:19



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

expressly 236:4

extend 8:9

extent 70:24 72:4 109:24 122:23 190:23 235:25 248:17

extra 47:1 138:22

extrapolated 169:2

extremely 255:8

eye 261:18

eyebrows 260:5

eyes 186:18 193:10 260:4, 19

eyewitness 258:22

---

**F**

face 134:5,7 193:16 194:4 260:19 261:9, 10 263:8

Facebook 60:22

faces 205:12

facial 85:6,11 260:1,3,12 263:10,12

facially 96:8

fact 6:18 59:16 80:14 112:2,24 113:14 114:8, 20 119:13,15 124:12,18 125:1,18,24 126:9,17 127:15 130:2 131:1,3,14,15 135:7 143:13, 17 150:24 151:13,15 152:9 153:23

177:12 180:19 192:9 194:18 210:15 214:3 219:11 220:17, 22 222:5 223:15 226:11, 18 228:22 235:20 239:22 241:18 244:22, 24 247:17 263:6,13 264:9

factor 198:24 199:2 259:6

factors 24:1,5 249:14 256:15 258:18

facts 68:4 108:5 111:2,4, 10,13,17 112:18 115:3 119:3 134:23 146:18 170:10 177:5 178:11 213:1 215:5,7, 8,9 258:13

factual 209:17

failure 185:2 210:8

fair 8:17 9:2 15:25 25:17 32:12 38:24 56:21 62:19 72:20 87:18 88:2,5,12 95:1 103:1,14 104:2, 14 106:25 108:6 129:21 130:25 133:25 135:2 136:20 140:7,19 141:6 142:19 145:19 151:6 173:20 190:11 206:19 216:2,5,20,21 217:23 218:10, 18 231:8 232:25 236:13, 18,19 237:19, 22,23 238:16 239:5 240:8 244:13 245:7 247:20,23 252:6 255:2,11

256:4,8,10,18 257:13 258:7, 11 266:20

fall 19:13 152:19

false 187:5

familiar 7:15 261:11

familiarity 248:3,9

family 58:6 140:2,20,23 141:3 226:16

family's 140:3

fashion 184:11 237:2

fast 249:24

faster 43:15 48:14

father 50:6

FCPO2554 194:25

features 194:4, 7 260:1,3,12 263:10,12

feed 63:9

feel 8:6,25 12:3 139:22 205:6 221:25 224:3 258:5 267:17

fellow 187:7

felonies 49:6,9 230:25

felt 126:7 188:17 223:19

figure 177:14 226:5

file 10:21,23,24 11:15,19,20,23 45:22 84:23 93:23 94:13 97:12,15 98:11 108:22 118:4 136:9 137:24, 25 154:17 160:23 200:17

202:4 204:23 217:12 220:9 227:14,16,19 228:2 230:11, 12 234:9,19,21 239:17,24 254:9 255:16 261:1

filed 48:1 55:3, 17 89:9

files 11:14 86:20 93:24 95:2 108:23 109:3 229:21

fill 42:17

filler 191:6,11

fillers 190:22 191:3,17 192:7, 20 194:20

filling 43:4

find 75:18 95:25 211:10 214:17,23 216:23 217:6, 17 226:19 233:18 234:8, 23 241:12 253:13 257:8 258:5

finder 113:14 210:15

finding 186:17

findings 112:17

finds 224:22

fine 7:8 268:4

fingerprints 225:25

finish 84:12 85:1,15 162:21

finished 16:7,9

fired 54:13,25

firsthand 220:24

flight 256:16

flip 120:6

focus 51:11 215:24

focused 11:8 51:6 143:17

folders 93:24 191:9,19 192:21

folks 57:20 77:10 121:1 131:14 141:4

follow 20:25 148:24 151:5 186:7,19 212:17 213:8 220:11,13 223:21 233:19 234:18 264:17 266:22

follow-up 15:17 46:8 90:13 122:6 131:18 162:25 181:15 208:8 209:1 211:12 223:6 227:4 228:15 237:9 241:22

follow-ups 35:21 144:22 169:20

force 20:12 39:6,10,14,21 40:3,6,17 41:3, 17 47:9 78:12 79:5,18 80:20, 22 82:1,15 86:8 87:21,24 88:4,8

foremost 251:15

forensics 184:2 218:5

forever 95:13

forfeitures 42:12

forget 174:16 227:4 257:22

forgetting

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

174:11

Forgive 20:18

forgot 143:4
227:5 229:9

form 95:22
109:6 115:15
119:6 178:17
182:12 200:22
201:2,9,16,21,
24 226:9

formal 166:19,
22

formalized
237:9

formatting
202:24

formed 178:18

forming
118:12

forms 201:25

formulate
223:20

formulating
172:23

found 24:3
55:9 57:10
112:15,23
115:3 140:20
167:21 179:9
232:16 250:18
264:8

fourth 79:9
88:11 141:8

frame 40:24
207:8 234:1

frank 98:13
104:21 218:13

free 8:25 12:3
135:22

frequency
22:3

frequent 32:25
33:12

frequently
32:6,8,15,18
33:3 216:2

Friday 130:15
151:7,9,13,18

Fridays 129:23

friends 226:16

Frierson 84:19

front 9:16
81:24 86:20
149:1,9,15
163:20 169:9,
13,16 170:3
206:15,16
246:19

froze 214:24

frozen 157:16

full 6:14 8:8,11
16:11 46:2
62:20 70:24
72:4 86:9,12
90:1 105:22
141:9 143:4
176:24 182:11
194:8 229:23
233:6,19
243:14

full-time 16:1

fully 179:5,6
204:12

furthered
184:22

**G**

gain 188:19

gather 208:15

gathered
135:5 209:1
251:7

gave 60:5 77:5
122:17 129:12
149:7 154:6
159:15 162:17
167:8 170:2,6
178:16 180:23,
25 193:13
194:8 214:5
233:5,10
238:15 260:8

GD 159:15

general 16:22
40:24 50:22,24
51:3 52:3 76:12
77:8 90:8
110:25 136:11
147:6 148:1
186:22 231:7
245:25 246:7,9,
11 256:4
258:19

generalization
s 88:14

generally 22:4
36:15 38:6 76:6
101:7 107:4,8
108:17,22
109:2 111:14
114:12 117:24
121:13,21
137:10 186:5,
20 199:4
207:11 223:18
230:17 231:19
234:23 235:12
236:1 238:10
241:1 243:11
245:4,8,10,12
246:1,14
252:22 255:12
264:11 266:21

generally-
accepted
173:6,21
180:16

generate
206:14

generated
119:19 148:9,
11 188:3 206:9
207:1,5

generation
189:5

generative
148:7

gentleman
202:10,11

Gibbard
149:16

Giles 253:24

Gilio 232:2

Gillis 101:12
253:24

girlfriend
131:9 149:11

give 6:24 7:23
26:12 47:12
53:6 60:7 81:18
86:10 116:4
123:24 128:18
135:22,23
143:5 149:5
150:13 151:3
154:24 159:15
161:3 166:21
167:6 171:23
178:25 180:3
193:16 194:11,
13 208:11
229:22 241:8
261:2,3

giving 53:23
89:1,21 107:1,
11,24 108:15,
20,25 109:4,10,
15 110:8,14
111:1,18,21
112:1,9 113:2
114:16,25
115:15 162:12
166:8 224:22
257:1 262:19

Gloria 79:9

God 61:18

good 7:5,6,9
16:4 51:11
116:13,14
186:12 219:20
228:13,14
229:11 232:25

governmental
90:18

grabbed 244:9

graduate 17:8,
22

graduated
19:12 39:15
41:3,13,22

grand 112:15

Grant 141:10,
23 163:14

graph 84:8

graphic 84:3

graphics
67:17,21

Gray 261:9

Great 230:7

Green 80:16

Greene 199:11

Greene's
199:25

ground 7:17
149:3

Grove 130:15,
16

guarantee
216:25 217:2

guess 22:13
27:10 60:9
67:15 104:9
108:2 165:20
170:9 196:18
236:25 246:8
251:15

guests 243:18,
19

guidance 53:7,
23

guilt 115:4,9
232:15

guilty 115:1
232:16

gun 255:9

guy 54:20
160:10

guys 157:19

**H**

hair 261:19

half 243:14



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

half-paragraph 183:13

halfway 185:9 233:20 254:21

hand 6:22

handed 23:20 27:21

handguns 49:7

handled 21:11, 12

handling 21:10 109:11,16,25 113:8

handwriting 203:24

handwritten 113:4 142:8,9, 13 155:7,13 157:12 158:6, 11 164:20 172:18 175:22 177:7 178:2,12, 15 179:4,17 181:16 182:13 193:15 208:24 211:22 212:20, 22 213:7,9,16 228:1 230:9,14 237:3 241:21

hangup 29:18

happen 28:5 32:15 187:25 188:1 233:13 257:23

happened 31:23 39:8 42:17 106:16 124:14 131:23 182:24,25 209:19 215:2,4, 6 217:6 250:3, 13 255:25 257:7 258:1

happening 32:13 42:19 237:5

happy 8:15,25 36:8 59:11 107:20 120:7 171:13 175:7,8, 18

hard 8:4

hard-pressed 234:8

harm 58:3

Harmon 132:13,14

harms 58:8

hassle 91:22

hasty 213:24 214:5

he'll 216:23

head 7:24 149:2 214:8 255:9

headspace 146:10

hear 20:19 23:2 74:9

heard 32:2 124:21 128:13 137:3 218:13, 16 220:23

hearing 78:9 84:7 134:10 237:7

hearings 49:9 88:20

height 181:18 261:18 264:6

heights 180:4

held 38:16 46:1

helped 190:2

helpful 74:8 75:19 155:23 164:24

helping 31:25

hey 96:18

hide-a-bed 149:12

hideaway 244:10

high 18:2,8

higher 174:9

hindsight 138:12,22

hired 56:1

Hispanic 261:17

history 16:14 62:16 63:7

hobbies 62:1, 4,7

home 138:21 140:7 149:1,16 235:19 242:3 244:2 245:14, 17

homicide 33:10,25 43:16, 23,25 45:2,19 120:25 190:7

honest 151:17

honestly 85:2 195:20 219:18

hood 260:2,16, 17,18,22,23

hoodie 193:9 261:9

hope 86:5 114:9 192:25 224:7 240:22 260:24 267:17

Horton 6:8 7:10 105:3,20 106:9,14,16 112:11 114:17 115:1 124:17, 18,24,25 125:1, 15,25 126:7,13, 21 127:5,10,23 128:4 129:9,21, 25 130:6,8 131:8,10,15,22 132:7,19,21 133:8,13 134:22,24 135:6,10,20

136:24 137:7 182:20,22 193:21 195:12 198:15 199:2, 21 200:2 204:1 209:9 211:5,7, 16 213:5 220:17 233:5,9 247:6,9,16,21 248:4,10 249:15,19 250:2,3 259:9, 20 261:23 262:8,11,20 263:1,2,15,19 264:12 265:6, 10

Horton's 105:4 111:3 115:9 125:8 130:3,4 131:1 132:2,4,8 134:18 182:13, 17,25 208:20 242:12 247:3

hospital 78:21 79:7 136:2,7 141:4,11,17,23 144:19 163:15, 23

hot 54:20

hour 12:21 89:19,22,23 92:4

hourly 90:11

hours 13:17 89:24 90:1,6,24 91:25 116:25 117:2 266:12

house 135:8 152:10

household 243:8,18,24

human 45:14

hundreds 56:22,23

hurt 28:19 257:25

hypothetical 214:7 224:21

226:20 241:8

———

I

ID 172:21 177:11 258:22

idea 77:8 147:1 169:8 217:19 224:4 232:5 262:23 265:11

identification 14:22 63:17 65:2 86:22 110:23 126:1,6 142:17 147:9 155:4 164:23 195:1 212:2,14 229:1 253:1,9 259:11 263:9, 12,22

identified 99:16 101:13 110:10,16 123:13 174:18 180:7 199:21 249:15

identifiers 225:20 226:1

identifies 225:20

identify 110:19 168:16 169:6 171:5,25 172:12 173:7, 24 180:6 188:17,18,20 189:6,9,11,14 195:14 218:11, 18 236:2

identifying 181:14 259:8

identity 188:19 194:8,9 208:16 214:2 233:10

illogical 226:20

image 198:9 200:25 201:1 202:7,20 203:4, 15,23 204:8,20



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

205:1

images 203:12

immediately
141:11

impartial
192:22

impeaching
87:9 231:20
232:9

impeachment
87:14 231:23
232:2,6,11,13,
17 240:5

importance
194:19

important
99:23 167:17,
18 169:1 174:3
183:9,16 191:3
192:7 241:15
256:5

imposing
180:21

impossible
186:23

impressions
119:24

improper
192:18 252:13,
21

imprudent
213:24 214:6

in-service
52:25 190:9,13

inaccurate
264:22 265:4

Inadequate
259:11

inappropriate
110:7

incarcerated
81:10 88:9
220:2 221:16,
19,20,24 223:8,
15 224:11
225:11,15,24

incident 108:8
125:9 142:11
143:19 144:13
145:1 152:16
166:11 170:2
174:5 211:8
241:22 246:9
257:6 258:15
259:5

include 53:2
62:5 70:20
91:24 105:25
126:12 130:17
131:25 134:4,6
183:15 240:23
247:24 266:24

included 68:5,
6 131:24

includes 74:12
122:1

including 18:7
33:2 62:7 117:9
118:9 121:12
126:10 135:12
141:3 180:13
190:6 215:23

inclusion
113:3,12

incomplete
216:3,10

inconsistent
179:9

incorporate
73:25

incorporated
73:24

incorrect
247:16

incorrectly
241:11

increase
236:14,20

incredible
239:3

inculcates
139:5

inculpatory
210:22 211:15

240:6

indefinitely
255:23

indexes
225:21

indexing
188:15

indication
138:1 220:4

indications
122:20

individual 34:7
58:3 112:2
122:2 125:19,
23 127:23
135:18 138:21
150:23 161:1
184:6 188:25
192:17 197:12
205:14 213:12,
14

individuals
27:22 61:15
181:14 196:25
224:18

ineffective
56:4

inevitable
224:2

inference
140:8,10
259:18

inferences
146:3

influence 9:4
123:8,14,22
124:1 145:25
258:16

information
42:11 75:12
83:22,25 91:10
113:8 120:21
121:5 130:17
133:11,18
137:20,21,23
138:22 141:25
142:2 145:12
151:11 156:21
157:9,10

158:13 161:23
163:17 169:22
170:1 172:11,
25 173:23
176:19 178:2
181:5,6,24
182:6,8 183:16
184:1,13
188:16 189:13
203:21 208:9,
18,23 209:14
211:10 212:5,
17 213:2,22
216:3,10,25
217:20 219:9
220:12 223:19
231:13,23
232:2,3,4,9,11,
12,14,17,18,21
234:3,9,16,18,
20 235:3,9,10,
16 237:16,21,
24 238:4,17,21,
23 239:3,6,19,
24 240:2,4,9,14
241:2,4,6,16
250:19 254:9
256:6 257:2,23
261:15,25
262:19 265:1,
19,21

initial 9:20
10:17 21:13,23
23:18 25:9
52:22 53:5
63:12 65:25
66:4 69:9 70:15
71:19,20,22
72:13 73:1,6,13
74:10,12 75:15
82:9 83:17
92:17 95:7,10,
20 96:11,15,20
100:16 106:10
117:14 118:13
120:5 143:25
144:5 152:14
184:18 188:12,
21,22,24 189:4
191:7 205:22
210:21,25
211:9 212:13
227:10 249:4
250:15 256:1
257:9

initially 24:3
67:23 95:12
96:14 194:14
240:9

injured 28:19
257:25

injury 146:17

innocence
115:5,9 232:14

innocent 57:11
115:1

inserted
190:22

inserts 67:19
68:16

instability
126:12 129:14

Instagram
60:23

instance 31:24
33:7 54:24
55:16 96:17
203:23 238:4
257:1

instances 56:7
76:3

instincts 92:25

instruct 97:17

instructed
8:20

instruction
200:11

instructions
200:6,13,20
201:4,5 250:25
251:2,8

instructor
52:14,20 53:6

instructors
53:19

intend 65:12

intended
162:3,4

intends 234:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

intensive 24:4

intent 162:12, 13

intentionally 106:4

interaction 122:1 124:5,19 125:16,19 126:8 129:8 135:7 142:15 144:6 150:3,6, 7,10 152:4 153:19 155:18 156:7 159:6,23 160:3,16 161:15 166:2 167:3,9 169:4 170:17 219:16

interactions 126:10,11,16 131:11 135:12 151:1 177:15 193:20

interest 61:13, 14,20 62:3 215:12,15,16 218:21,22 219:6,7,13

interesting 62:2

interests 62:8

interim 135:15

internal 56:19

internet 129:13

interpretation 170:22 213:16 215:7

interrogating 226:14

interrogation 133:12

interrupt 157:15 172:15

interview 132:7 142:7 155:8 157:12 158:6,12 165:12 166:19

170:14 171:8 172:2 175:9 257:4,14 258:8, 17

interviewing 257:6

interviews 143:25 194:2 255:19,23 256:2,5,23 257:11

introduced 188:3 204:15, 17 207:15

invasion 140:7

investigate 23:15 24:13 25:6 27:17 28:1,4,5 30:8 31:13 33:4,6,11 36:4,13 37:9, 17,23 40:2 43:10 138:20 214:6,20 224:13 225:16 226:8 239:18

investigated 33:8 34:1 58:17,21 139:2, 16 179:10 214:13

investigates 21:17

investigating 22:13 31:6 32:9 35:7,16 37:13 43:19 53:12 54:1 123:25 128:3 174:5 212:12 215:12 240:11 257:8

investigation 23:18,19,21,23 24:3,6 25:10,11 27:18 28:6 29:22 33:20,24 43:22,24 44:2 75:1 80:11,15 84:12 85:1,14, 16,23 86:5,12 107:3,10

108:17 109:21 111:11 118:2 120:19 130:22 137:13 138:17 145:1 184:15, 20,21 185:1 207:15 216:9, 12,14,18 217:8 219:10 220:7, 19,21 221:4 226:9 234:8 240:7 250:13 254:23 263:9

investigations 19:17 21:10,13, 24 26:17 27:9 32:19 53:2 218:5

investigative 11:15,19,20 28:13 33:18 38:4 44:5,8 86:10 137:24 174:13 215:24 216:7 226:13 256:12

investigator 210:20 230:20, 23,24 231:15 234:15,20 239:9,16 240:2, 18

investigators 144:25 240:14

invoice 90:19, 20

invoices 97:23

involve 86:14 87:13

involved 28:17 57:9 59:7 80:21 81:7 82:1,2,3 84:18,19 86:19, 21 106:23 111:22

involvement 33:22 223:17

involves 27:12 82:14 88:6,10

involving 48:7 80:3,11,15 81:8 82:10,14 84:20 85:22 86:1 259:5

irate 149:8 152:6

isolating 213:19

issue 76:9 90:13,15 110:5 159:1 207:7,9 249:13

issued 65:9 74:15 91:3 112:14 116:22 148:1 166:14

issues 53:9,24 122:9 126:13

issuing 65:25 69:2,6,13,18 70:6,15 72:7 73:3,9 83:17

item 100:17 178:17 179:14

itemized 91:24 92:2

items 10:25 66:25 149:10 200:24

_____

J

jail 58:4 220:5 224:2 226:3

Janette 105:3 124:25 130:3 132:11

Janey 49:12 50:4,5,6,9

January 19:11

Jeannette 124:17

jeans 261:10

Jefferson 78:20 79:6

involving 48:7

job 16:1 18:17 35:4,9,12 38:17,18 42:15 52:10,12,13,22 53:5 54:14,18, 19,25 127:10, 12,15 129:21, 25 134:1 184:19 190:1 210:12 234:25 235:17 236:11, 12

jobs 45:9

Joined 19:10

joint 227:20 228:21,23

Jonathan 101:12 253:24

journal 98:17

joys 129:16

Jr 50:5 203:17

judge 113:17 119:14

judgment 108:4 184:7

judgments 256:20

July 9:21 64:9, 18 75:15

jump 14:17 57:8

jumped 186:18

jumping 187:2

jurisdiction 49:8

jury 110:5 112:15,21 113:25 119:14 131:15 182:14, 16 185:20 233:1 251:16 252:2

justice 57:14, 23 58:1 184:24, 25 225:18

justify 38:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**K**

keeping 108:22

key 259:6

killed 28:16 139:25

Kim 99:2 233:12

kind 31:9 56:3 77:8 86:9 93:3 107:7 108:4 114:23 118:14 123:9 124:2 131:19 138:16 146:20 183:5 184:13 190:21 205:12 217:8 220:7 224:9 249:6,25

kinds 33:13

knew 122:22 140:6 149:25 150:1,20 152:8 193:19,21 208:17 241:18 262:25 263:2, 13,19 264:1

knock 134:14

knocked 149:1

knocking 149:3

knowing 145:18 150:25 213:25 264:7

knowledge 32:3 34:4 47:24 55:2 76:11,19, 24 88:22 109:24 120:25 146:6,8 220:24

Kurk 99:15 101:4

**L**

Lab 121:7

laboratory 184:3

lack 27:11

laid 40:19 203:1

language 74:6 107:5 152:2

Laqion 106:8

Lared 101:19

larger 38:23 63:18

Lashauntia 79:20

lasted 145:17

lastly 61:5 80:24 87:7 114:23

latent 242:4,7, 23 244:8 245:1 246:2

law 15:19 18:4, 8 25:23 26:2 29:3 39:15 41:4,13,22 49:12,24 50:5, 13,16 51:5,7 52:14,20,24 53:1,5,18 58:25 59:6,16 60:5 62:17 120:23 121:1 174:4 186:21,24 187:21 231:8 249:10 258:23, 24

lawsuit 89:9,12

lawyer 56:1 133:1 140:10 192:14

lawyers 53:18, 22 90:19

lay 233:3

laying 149:11

layperson 168:24

lead 165:17,22

217:21 219:8, 10

leadership 17:7

leading 239:1

leads 266:22

learned 140:24 190:13

leave 157:18 217:15

leaving 47:25

led 133:11 143:15 259:7

left 16:6,8 42:1 53:4 65:6 106:4 149:14 236:9 243:19 244:23, 25 246:3 266:9, 12

leg 149:7

legal 20:13,14 41:23,25 42:8, 13,24,25 43:10 47:16,17,20,21 52:3,9,11 53:24 56:20,21 62:12 87:1 89:12 110:5 112:21 114:2 185:20 210:14 252:6

legitimacy 57:25 174:13 192:22

length 147:2 235:14,23

lengthier 166:22

lengthy 144:21 222:19

lessen 232:15

lesson 56:23

level 52:24 110:25 174:9 248:9

levels 185:3

lie 240:20

lieutenant 31:2 40:14 42:16,18 43:3 47:13,15,17,19

life 126:17 139:25 140:3

lifted 242:4

light 203:25 261:9

light-skinned 193:11,25 195:6,15 196:15,25 197:4,11,14,16, 19,25 198:16 199:22 203:10

lighter 196:16 197:2 203:25

lightest 200:3

liking 192:17

limitations 254:21

lineup 248:25 249:6

Linkedin 60:19

list 59:25 60:2, 8,13,16 75:7 77:4,5 81:25 84:8,17,21,22 87:15 93:23,24 94:7 96:2 97:10 99:24 100:21 102:7 105:8

listed 10:25 11:3 15:14 66:12 68:25 69:5,17,20,21, 22 70:12 72:22 74:9,17 77:20 78:15 82:16 89:16 92:19 98:20,23 100:4, 24 102:21 103:7 149:11

listen 63:8,9

listened 118:15

listings 94:5

lists 66:4 92:16 179:20

live 241:14

lived 130:16 243:17,23 244:2 245:14 246:2

local 61:9 63:2 122:22 126:14

locate 43:20 70:3

located 9:12

location 6:6 29:10 123:20

lodged 56:8

Loew 120:18 133:16 135:24 207:15

logical 216:13

long 12:20 14:6 24:16 25:13 28:20 30:12 34:8 36:17 38:25 40:16 52:15 57:19 145:16,20 146:23 147:1 222:13

longer 39:10 257:13,24 258:8

looked 10:21 11:9,12,13,14, 18 69:19 92:9 95:17 96:11,14, 22 101:6 102:20 117:21, 22 118:14 166:14 199:17, 20 225:13 226:8

lose 58:5

loss 236:14,21

lot 11:21 24:1,4 46:4 51:7 59:7 94:18,20 121:3



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

288

136:16 151:8 161:17 168:11 169:11,17,25 174:8 209:20 258:17

loud 7:23

lying 240:16,21

**M**

M-O-N-R-O-E 7:14

Madam 128:16 142:21 173:11 222:16 223:3

made 56:13 117:23 128:2,3 131:7,9 143:18 150:10 151:25 154:1 160:3 161:11,13,14 172:7 178:17 181:9,10 190:16 194:3 207:6 212:9,15 217:1 219:1 226:12 250:21 263:11,24

magically 260:22

maiden 132:11

maintenance 108:23

major 46:20

majority 51:11 87:19 88:3

make 7:17 8:7, 14 12:4 21:3 26:19 32:23 38:11 63:15,18 64:7,23 68:1,20 91:21 96:16 108:14 114:24 115:6 119:20, 21,24 123:21 128:10 131:4 143:2 148:24 153:25 156:3 166:25 170:12 175:3 176:24

177:24 178:3 193:23 203:25 204:9,12 207:13 210:15 229:7,23 230:3 232:7 238:8 239:9 242:25 245:24 255:19 256:19 258:6 263:9 264:24

makes 10:3 46:21 98:22 152:3 153:19 156:6 166:16 167:8 187:5 225:23

making 29:1 83:25 119:9 127:1 131:5 140:12 146:20 152:20 154:4 155:18 156:7 162:3 167:22 168:15 185:22 187:5 199:2

male 148:25 193:11,25 195:7 197:1,14, 16,19 198:16 199:22 261:17

males 195:15

malpractice 79:2

man 106:8,14 159:15 199:10 202:12 220:2

man's 134:14

management 187:6 253:16

mandate 186:19

mandated 186:6,21

mandatory 18:22 190:9

mark 14:19 63:11 64:21 147:4 154:23 164:18 194:24

228:21

marked 14:22 63:17 65:2 147:9 155:4 164:23 186:12 195:1 229:1

markers 28:11, 15 38:2

marks 148:15

Martinez 6:7, 19 7:4,9 14:24 23:2,6,12 54:7, 11 57:6 63:20 65:4 116:13,20 128:6,8,16,19 129:2,11,16,18 142:21,25 143:2,22 147:11 155:6 157:14,17,23, 25 158:4,8 162:21,24 163:3,9 165:1 173:11,19 195:3 219:21, 24 222:10,14 223:2,5 228:10, 12,19 229:4 253:8,11,12 266:7,13,19 268:1,4,6,15, 19,22

Maryland 9:14 16:5 49:8,25 51:1

mass 55:24

master's 17:5, 11,23

match 190:23 191:3 192:8 194:20

material 98:1,4 106:18 113:5, 13,24 114:8 137:12 230:9 232:14 236:3

materials 10:15,20 12:9 13:5,11,14,19 66:4,7 67:3

68:5,24 70:17, 19,21 72:16,25 73:25 74:10 92:16,22 93:14 94:20 97:21,24 99:25 100:25 101:7 110:1 111:12 112:5 114:22 115:4,7 118:9,22 120:12 121:4 122:7,15 123:7, 12 124:9,12 125:7,14 126:3 135:5 147:24 178:16 185:21, 23,24 201:19 210:19 213:22 232:10 236:8 247:4,13,17,18, 21 248:13 251:3 259:23 265:12

math 29:7

matter 75:3 83:10 121:11 160:24 161:9 256:4

mattered 133:20 207:10

matters 187:6

maximum 76:9,10

Mcclanahan 99:11 106:16 110:9,15 112:3 113:5 122:2,8 123:8,14 124:1, 20 125:23 126:18 127:23 129:7 131:6 132:5 134:9,16, 17 135:19,24 136:22 137:5 138:2 139:7,11 140:5,14,22 141:10 142:16 143:9,14,24 144:3,7,10,18 145:5,9,21 146:5 149:20 150:6,9,16 151:1,16,19

152:5,12,22,24 153:20,24 154:3,6 158:21 159:7,22 160:4, 25 161:3,11,12, 14,25 162:1 164:21 165:9, 13 166:1,6,8 167:2 168:4 169:3 170:15 172:19 173:3 174:17,18 175:22 176:17 179:18,20,25 180:10,18,25 181:5,7,17,20, 22 182:1,6,21 193:8 195:11 200:5,16 201:7 203:12,17,21 208:2,3,10 210:5,22 211:4 212:13 214:1,3, 8,15 216:22 217:1,17 218:7 220:12,15 223:23 226:12 239:22 243:25 246:13 247:8 248:4,10 249:15,18 250:2 251:1 254:24 255:7,8, 10 257:20 259:16,24 263:7 264:14 265:9

Mcclanahan's 123:2 128:1 134:15 137:15 139:2,5,16 143:18 151:20 160:6 161:10 182:24 198:11 209:6 217:11

Mcclane 125:18

Mccurry 195:11

meaning 161:8 211:15

meaningless 245:2,5



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

means 71:4 87:17 104:15 105:13 126:5 133:3

meant 36:6 112:21 210:12

media 60:18,20

medical 79:2

medication 9:5

medications 146:1,7,16

meet 12:13 13:23

meeting 12:18, 20 13:2,6,7,19, 21,22 139:19

Meiselas 62:11 63:5

member 25:18, 22 187:7

members 140:20 141:2 186:6 226:16

memorializati on 237:9

memorialize 183:8,18 184:4, 13

memorialized 72:9 73:12 237:2,6

memorializes 181:24

memorializing 183:20 235:4, 10 237:4

memory 9:6 16:21 34:11 45:25 72:21 80:21 81:7 101:3 130:6 184:14 185:1,2 236:14,20 257:15 258:10, 20

memory's 148:8

memos 56:19

men 195:14 196:8 197:10, 11,25

mention 118:11 155:17 156:6 175:13 210:4

mentioned 19:2 27:4 68:10 100:13 160:14 170:19 208:2, 19 214:21

mentioning 212:1,13

mentions 175:16 176:4 208:14 212:23 260:19

mere 212:1 235:20 244:17

Merritt 79:10

met 141:22 163:14,22

methodology 116:5 117:14 118:23 119:2, 16 120:12

metropolitan 33:1

microphone 124:23

microscope 213:21

mid-level 19:17 22:14 29:23

midnight 46:16

midway 233:6

mind 18:16 75:7 84:20 86:17,18,21 141:6 161:10 176:5 223:24

263:1

mine 227:1

Minersville 77:21 78:2,16

minimal 140:5 144:10,12,16, 24 146:4

minimum 76:8,10

minute 179:3

minutes 83:15 116:12 219:19 266:12

miscellaneous 149:10

misconduct 42:10 43:7 51:9 57:24 58:15,18, 22 59:1,6,17 60:6 78:7 87:4 186:24

misdemeanor s 49:6

misheard 27:2

mislead 241:17

missed 23:4,8 128:12 129:2 158:1 174:14 253:6

mistaken 148:6

mister 204:1 220:14

misunderstan ding 192:1 219:2

misunderstoo d 153:14

mock 53:3

moment 11:2 19:1 59:4,13 101:17 104:19 121:17 136:14 145:3 169:15 171:1 227:21

Monday 129:23

money 106:15 123:20 143:12 149:9,13 150:1, 13,24,25 151:19 152:7,9, 11 153:24 154:2,5,7,9 159:15 160:8 161:1,2,3,5,8 167:6 247:4,6 249:19 250:3

money.' 149:6

Monroe 7:13 80:17

month 90:14

monthly 90:20

months 26:13 41:8 233:22 234:12,23 236:5

morning 7:5,6, 7 14:7 244:4

motion 251:23

motions 56:22

motivation 114:14

motivations 114:15

motive 111:19, 20,21,24

mouth 205:7

move 74:8 105:1 108:14 228:23

Moving 182:10

MSNBC 63:10

multiple 18:10 27:22 98:3 170:7 182:2 192:2 244:25 249:17 250:1 256:15

municipalities 187:12,16

murder 33:11

murdered 43:22

Murph 82:2

___

**N**

named 63:5 106:8 113:9 199:10 220:2 224:17

names 59:24 60:4 93:23

narration 149:19

narrative 166:2,15,17 167:9 168:22 207:21,22 247:10

Nashville 14:5

national 61:10

Natividad 80:24 81:17 82:21,25 86:18 88:10

NBC 62:12

Neal 50:5,6

necessarily 33:15 90:20 97:1 183:24 215:13,18 232:19 245:4,6 249:8

needed 35:8, 17 36:14 139:22

negative 51:18

neighborhood 177:16

nephew 134:12,16 135:8,9 136:23 137:6,14,15 138:3,13 139:2, 5,9,13,16,19, 20,23 140:3,8,



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

nephew's 134:18 138:14

networks 61:9

news 58:10 61:6,9,10,23,25 62:14,22 63:2

newspapers 61:11 62:23

nexus 259:6

nickname 134:15 149:4

niece 99:10 123:2 135:13, 16 175:20 177:16 209:6 213:4 259:17

night 14:6 235:19

nods 7:24

non-suggestive 251:13

Northern 19:13,14,16,18 21:4,8 22:4,8, 16 23:9,14 24:8,17,23 25:9 29:22 32:15 33:7 43:20 89:11

nose 193:10 260:5

Notably 242:1

note 148:25 174:22,25 182:13 231:3

note-taking 108:18

noted 185:14 196:23

notes 93:11 97:21 98:1 113:4,23 142:3, 8,10,13 148:21 150:5 155:7,14 156:6,10,14,16,

18,22 157:4,6, 7,8,12,20 158:6,11,16 159:4 160:2,9 163:18,20 164:7,20 165:7, 10,11,15,20,23, 25 167:11,13, 15 168:3,21 170:14 171:7 172:2,18 174:6, 9,21 175:22,25 176:20 177:7, 20,22 178:2,12, 15 179:4,14,17 180:2,20 181:16,21 183:25 193:15 194:2 208:3,16, 24 211:22 212:20,22 213:7,9,17,20 227:7 228:1 230:9,14 237:3, 4,10 241:21 261:8

November 9:21 64:25 202:3

now-wife 124:17,25

number 11:3 22:18,21,24 23:8 33:9 79:19 80:16 82:1,3 84:17,18 86:17, 18 90:24 126:15 182:13 185:12 197:13, 15 202:10,11 203:8,15,25 204:24 223:22

numbers 11:22

numerous 135:11 263:3, 17,20

O

object 8:19

objectively 121:13

obligation 224:12 225:16

obligations 53:20

observation 247:3

obtained 189:2

obvious 202:9, 12 203:7

occasion 21:25 23:15 24:8 25:1,5 30:1,6 31:4 36:2 37:22 38:8 40:1,5 42:22 43:1,9

occasions 31:13

occurred 75:2 114:21 118:9 124:5,8 133:17 139:4 160:25 162:1 214:21 217:20 257:18 258:14

occurrence 32:16

occurrences 33:1

occurring 174:7

occurs 138:13, 19 218:4

October 122:3 123:9,15 124:2, 5,19 125:2,24 126:21 127:6, 11,15,24 129:8 131:20,22 142:16,18 148:3,4 151:18 164:21 166:2 167:3,9 169:3 170:14,16 182:1 211:6 220:2 221:16 223:9 224:11

225:15 263:17

oddities 74:5

offense 28:17 136:11 147:6 148:1,21,25 150:5 168:3,21

offer 65:12 85:9 162:8

offered 58:25 59:5,13,15 98:8 182:14

offering 110:4 132:2 226:7

office 20:16 48:15,22 49:1 50:17 129:15 132:9 196:2 221:24 222:12

officer 16:7,9 21:8 22:3 23:14 24:21,23 25:13 26:7,15 27:3 28:18 29:8,19 30:4 31:8,10,18 33:8 34:1 36:13 43:19 44:24 48:9,19 49:19 51:15,19 52:8 53:12 54:1 58:14,17,20 60:5 77:21 78:16,17,18 79:17 87:4 89:5,10 101:24 102:8,16 119:18 120:23 136:4 141:13 145:4,20,23 146:11 148:2, 12 159:19 162:4 166:8,11 167:3,9,17,23 168:4,6,9,12 169:4,11,21 170:1 174:5 184:7 188:9,11 189:7 199:12 211:1 212:10 216:12 236:21 239:6,8 249:9 254:22 257:5, 10,14 258:8,24

261:6 262:22 264:2 267:2,5

officer's 86:4 121:11 241:21

officers 21:11 31:5,15,25 32:9,18 33:3,5, 14,19 35:8,17 37:15,21 38:10 42:10 43:6 44:15 45:7,9 46:11,24 47:4, 10,18,19 51:8, 10 52:25 78:7, 9,11 79:6 107:2 121:20 123:25 128:3 133:2 160:22 174:7, 10 183:7 184:1 190:17 191:7 192:23 194:1 216:2,6 218:11, 18 231:25 232:16 237:20, 23 238:16 241:2 255:11, 23 256:10,19, 23

offices 49:12 50:13

oftentimes 227:14

older 258:21 262:19

Oliver 79:20

one's 155:1

online 61:11 62:23 253:20

Oops 61:2

open 95:3

opened 134:10 149:1

operate 158:23

operating 123:18 140:23 236:3 265:5,8

operations 52:8



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

opine 85:6 114:1 115:25 129:4,6 160:19 161:19 182:15 183:2 211:19, 20 212:6 215:1 248:17 250:9 265:15,21

opined 82:22 87:4

opining 110:22 111:7,9 115:9 124:4,7,8,13

opinion 58:25 59:5,15 60:5 81:18 85:8,9 86:10,24 87:2 107:16,24 108:5,7,15,20, 25 109:4 110:4, 14 111:1,18,21 112:1,4,7,9,12, 16,25 113:2 114:12,16,25 115:2,15 118:13,16 119:6 120:1 127:7,16,17,22, 25 128:14 136:22 151:12 162:8,18 170:13 173:5 177:5 178:14 179:16,21,24 180:15 185:12 186:3,4 195:15, 19,23 196:18, 20 197:5,22,23 198:6 199:3,6,8 200:15,18 206:8 207:4 209:21,24 210:9,11,13 215:3 221:22 223:20 224:4,8 230:22 232:8 233:14,15 235:1 243:1,10 262:21 263:25 264:15,25 265:13,23 266:5

opinions 15:13 56:14 59:13

65:12,21,24 66:8 77:19 78:4,5,24,25 79:14 81:3,4 87:20 88:3 95:22 107:1,8, 12 109:10,15 110:8 111:10 112:20 115:12, 18 116:4 131:2 133:23 137:4 152:20 172:23 177:9 178:1,10, 17,25 185:6,10 198:25 200:9 204:5,7 206:24 209:15 210:17 227:1 242:18 248:7,11 250:22 262:15, 17 265:18 267:9

opportunity 8:8 12:5 33:24 100:20

opposed 28:2 95:17 148:10 180:21 191:8 208:13 214:21 237:10 257:9

opposite 178:10

order 60:12 86:10 267:25 268:1

ordering 201:16

ordinary 138:25 139:1 210:19 212:10, 11 254:22

organization 38:23

origin 261:17

original 148:7 195:18,23 196:2,4,7 198:6 204:16 261:6

outcome 131:14 182:15,

16

outset 7:17

overlapped 41:7

owners 52:4

___

**P**

___

P.C. 49:12 50:4,9

p.m. 116:16,19 163:6 269:2

pad 9:25

pager 155:2

pages 11:21 71:23,24 118:18,21,23 156:18 169:10 201:19

paid 149:5,21 150:1,12,16,21, 22,25 151:7,9, 13 152:1 153:21 159:16, 19 160:10 161:7,8 167:6

pair 128:17

palm 225:25

Pamela 101:23 148:2

paper 98:15 202:25 204:22 205:17

papers 93:5

paragraph 121:10 141:9, 22 182:11 185:10,11 186:10,14 233:6,20 243:14 247:3 251:13 252:11 254:21

parameters 37:25 85:7 113:19 114:1 162:14 212:3

part 18:22 21:23 24:14 28:2 42:14 51:12 56:20 68:12 94:2 96:11 119:16 120:15 122:21 130:21 134:1 147:18 165:22 184:24 185:23 192:21 193:10, 12 213:10,11 220:21 221:4 225:10 229:5, 20,23 248:13, 14 255:20 260:5,15

parties 6:4,17 111:22

partner 50:5,6

parts 11:18 66:22 71:11 154:25

party 98:8

past 32:24 74:6 89:23 204:10 235:2

patrol 19:14,24 20:3,5,7 21:4,8, 10 22:3 23:14 24:21,23 25:13, 21 26:7,11 29:14 31:1 33:5,8,14 34:1, 20 35:11,15 36:9,11,18 37:20 42:18 43:19 46:23 257:5

pattern 80:15 108:16,21 109:1,4

pause 189:18

pay 151:6 154:3 160:9,11 161:4

paycheck 154:1

payphone 125:1 247:7

peep 172:5

pen 10:2

pending 9:2 158:3 218:12, 19

Pennsylvania 77:21

people 22:21, 22,25 23:8 27:14,15 34:2 40:7 45:17 58:8 61:15 90:13 118:15 150:15, 20,22 151:4,7, 8,13 168:22 184:19 189:2 190:10 192:3, 12,19 196:14 197:15,18,21 217:15 224:15 225:21,22 235:18 243:17, 23 244:22,25 245:13,16,17 246:2 252:20 259:2

people's 58:1 202:7,14 205:12

perceive 217:12

percent 238:18,22

perfect 266:14 267:23 268:8, 22

perform 259:15

performed 217:8 224:9 249:1,6

performing 220:7 259:8

perimeters 85:12

period 51:14 109:5 213:3 217:16 263:21



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

periods 19:9

permits 236:4

perp 149:20
155:18 180:11

perpetrator
144:1,5 150:9
152:3 153:19
156:7 159:5
160:3 173:8
179:19,21
180:13 181:12,
18 184:22
190:24 191:4
192:8 193:8
194:5,19 195:6
244:9 249:5
262:18

perpetrator's
160:6 193:16
263:8

person 12:22
21:14 62:2
69:22 81:9
82:25 83:1
110:10,16,20
120:3 123:19
124:19 126:8,
18 128:5 129:7
138:17 139:14
142:17 143:12,
16 150:7
151:16,21
152:8,9 154:1
156:2 159:22
160:8 161:15
167:5,12,14
168:25 172:5,6,
7 173:24
175:10 177:11,
14,15 188:20
189:5,6,9,10,
11,12,14 191:1
192:11 194:12
196:12 208:4,
17 211:16
214:8,10,16,17
215:12,15,16
216:23 218:20,
21,22 219:6,7,
11,12 220:23,
25 221:1 222:2,
6 226:4,12,19
231:14 234:3

239:1,15
240:21 246:3
247:22 252:20
257:22 258:16
259:9 262:19
263:15 265:6,
10

person's
87:24 176:3
177:17 185:4
232:16 240:15,
16 247:18

personally
40:7,10

personnel
22:18 45:22
186:21,24

pertain 15:13
84:25 95:18
130:22 131:2

pertained
78:12 95:3

pertaining
62:5 72:8 87:4
156:18 190:1
267:9

pertains 108:5

pertinent
239:1

peruse 62:24,
25

Philadelphia
81:9

phone 12:22
123:21 126:21
127:6 153:25
154:9 182:13
211:7,11 259:5

photo 21:25
24:9 25:2 30:1,
6 31:4 33:9
38:9 40:6 42:22
43:1,7,20
86:14,19,21,24
87:5 115:14
188:3,7,10,21,
22,23 189:4,7,
10,15,16,20
190:1,3,10,14,

17,18,22 191:7,
8,13,15,16
192:5 193:6
194:3,22 195:9
196:9 198:4,7
199:20 200:11,
21 201:6,10
202:2,15
203:11 204:15,
16 205:10
206:9,23 221:5
250:24 251:9,
18 252:1,13,15,
20

photograph
192:2 195:17
252:19

photographs
188:25 189:2
202:25

photos 188:24
189:1 191:20
203:1 205:14

physical 93:4
109:11,16,25
188:14 190:23
191:3,4 192:8
193:15 194:3,7,
20 205:13
225:25 245:1

pick 92:9
192:11,12,19
196:12

picked 130:14

picture 46:2
86:10 197:17

pictures 203:3
205:13

piece 181:14
202:25 204:22
205:17

pin 60:14

pistol-
whipped 149:2

pivot 219:23

place 61:12
76:9 117:22
138:12 187:8
226:17 234:9

239:17 265:13

places 61:7
62:22 142:14
207:19

plain 20:2,8,13

plainclothes
37:6,15 38:12,
14 39:6 41:16,
20

plaintiff 6:8
7:10 77:1 79:21
80:2,13,18,23,
25 81:11 82:2,
10 86:2 110:19
112:6,18
122:22 139:12,
14 151:2
185:15,19
186:1 193:21
210:3,22

plaintiff's
73:18,21
210:13 221:23
223:13

plaintiffs 51:9
82:4

plans 56:23

play 222:16,24

played 128:21
143:7 173:14
223:1 251:24

playing 223:2

plays 77:9

plenty 44:13

podcasts
61:12 63:4,6

point 8:6,14,24
11:25 16:24
27:4 36:22
40:12,14 41:15
43:16 44:4
48:19 51:19
58:10 73:9
81:12 83:8,11
97:17,20 106:7,
11,22 114:24
116:14 122:7
132:10 139:18,

25 158:2
162:24 163:1
173:3 177:18
181:9,16 195:5
199:16 201:15
231:14 233:24
240:1 249:7
253:15 254:14,
20 267:6

pointing
192:17

points 151:5
250:1 251:12

police 10:24
16:7,9 17:17,19
18:11,18 19:4,
10,11 28:18
42:1 43:6
44:11,15 45:7,8
46:3,9 47:25
48:18 49:19
51:8,10,15,19
52:6 53:8,12,22
54:1 57:23
74:23 75:5,22
76:4 77:21
79:7,10,17
80:22 81:9
82:14 85:23
89:5 97:11
111:15 118:2,8
119:17 121:6
130:21 133:2
135:24 136:9
137:6,24
141:10 143:24
144:6,10
145:23 149:20
152:4 154:10,
13,15,17
160:22 162:13
163:19 166:2
174:7 175:24
177:6 178:3,11,
20 179:5
181:23 183:7
185:13 187:12,
17,19 188:8,11
189:5 191:7
192:18 207:23
208:5,23
210:20 212:5,
10,11,19 219:8,
14 223:25



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

225:9 229:21 231:25 232:16 238:10 240:23 241:1 246:1 249:4,9 250:13, 18 253:19 254:6,7,22 264:3 266:21 267:1,2,5

**Police's** 101:15 102:17

**policies** 53:3 80:5,8 99:17 107:13,16,21 108:6,8,9,10 115:17 118:1 186:5,7 187:12, 17

**policing** 27:11 53:10,24 62:17 80:1 86:1 87:22 88:7 98:16 107:2,5,9 114:13 117:21, 24 121:14,22 137:10 160:20, 22 186:6,20 199:4 205:3 207:11 218:24 223:19 230:18 231:19 234:24 235:12 236:1 243:12 245:8, 12 246:14 252:23 264:11

**policy** 42:9 53:3 98:22 115:14 185:14 186:20 187:4,8, 10,20,23 236:2

**politics** 62:1,6

**poorly** 13:10

**pop** 42:17 63:9

**Pope** 45:16

**Porcha** 79:19 81:16 82:20 84:17 85:4,5

**portion** 67:8 79:8 154:11 207:25 208:1

**portions** 66:18 98:21 165:13 166:16 168:4 213:17

**posed** 135:21

**position** 37:19, 21 38:13 39:2 41:18

**positions** 38:13,15

**possibilities** 244:18

**possibility** 103:14,15 104:11,14

**possibly** 63:19 214:18

**post** 18:2,8 63:1

**post-convicted** 55:19,21

**post-conviction** 56:5

**potential** 130:22 210:5 218:18

**potentially** 87:9 131:20 133:16

**pounds** 261:18 262:10,12 264:21 265:3

**practicable** 184:17

**practical** 183:22 184:5,6

**practice** 49:23 50:22,24 51:3, 22 69:21 70:1, 20 87:22 90:9 107:9 108:16, 21 109:1,5 121:1 173:6,21 183:15 205:3 245:8,13 246:5, 6

**practiced** 49:24

**practices** 74:24 75:5,23 76:4 80:1,5,9 86:1 88:7 98:16 107:2,5,13,25 111:15 117:24 118:6 121:14, 22 130:21 131:11 132:6 137:10 160:22 180:16 185:13 186:5,6,20 199:4 207:11 223:19 234:24 235:13 236:1 238:11 241:1 243:12 246:1,7, 9,15 252:23 264:11 266:22

**practicing** 249:10

**predicting** 89:8

**prefer** 93:7

**preliminary** 49:9

**premise** 170:19,21 216:8 217:9 225:17 226:6 258:19 263:11

**prep** 53:4

**preparation** 11:5 12:3,11,13 13:12,14,24 73:11 74:15 81:25 89:15 106:10

**prepare** 10:10, 13 99:22,23,25 100:8,9 101:1 102:21 103:10 116:5 117:14 184:11

**prepared** 91:6 101:8 199:14, 18

**preparing** 92:17 93:14 100:20

**present** 13:2 106:15 132:25 133:4 139:8 189:8 192:24 204:14

**presented** 189:7 198:7 200:23,24 201:3,12,23 202:15,21 203:11 248:15

**presenting** 200:25 204:8

**preservation** 256:16

**preserve** 256:5

**preserved** 258:4

**president** 45:16

**presume** 156:23

**presumption** 119:21,24

**pretty** 35:4 97:3 222:19

**prevent** 9:9 216:6

**prevention** 21:10

**previous** 59:4 126:10 144:6 150:3 154:24 160:1,13 171:9 176:7 179:3 193:20

**print** 93:10 243:16 244:11, 23 245:6 246:3

**printed** 204:22

**printout** 205:13

**printouts** 91:24

**prints** 226:1 242:4,7 243:19 244:7,8,14,18, 25 245:1,9,13, 22 246:2

**prior** 25:23,25 29:2,6 39:18 46:10 47:24 65:20,25 69:5, 13,18 70:6 73:3 83:11 92:19 99:11 177:15 194:10 200:6, 11 201:10 252:19

**prison** 221:10

**probable** 112:10,13,15, 16,17,23,24 183:11

**problem** 8:12 9:3 16:25 20:23 40:25 57:14 58:9 129:14 165:7 246:22 248:6 249:22

**procedure** 53:1 115:15 230:18 236:3 250:25

**procedures** 117:21 231:20 235:13

**proceeding** 78:6

**proceedings** 6:1 56:5

**process** 174:13 184:23 192:15,22 254:16

**processes** 254:16 259:8, 15

**produced** 204:24 259:17



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

production 109:2

professional 17:6 120:22 138:15

progress 233:21,25 234:4,13,18 235:10 236:4 237:15

prohibited 187:8,9

project 90:5

promise 16:21 40:21 43:14 46:8 74:4 116:3 213:8

promoted 20:4 28:23 29:2 30:18

Proof 182:12

properly 113:24 159:2 234:25

property 21:13 255:5

prosecute 49:3

prosecuted 48:23 49:5 114:17

prosecution 57:10 76:21 223:13 230:19 231:10,21

prosecution's 137:25 227:19

prosecutions 58:1

prosecutor 20:16 43:14 48:14,22 120:23 145:24 160:21 227:8, 10,14

prosecutor's 97:15 132:9

196:2 221:24 222:12 227:16 228:2 230:12

prosecutors 227:15 230:25 250:21

prostitution 45:14

prove 232:14

proven 241:3

provide 68:4, 23 112:20 224:24

provided 14:20 60:1 73:13 77:18 97:20 194:1

province 113:24 129:4,6

provisional 218:11,14

prudent 173:17 214:19 223:24 234:10 235:22 257:4

prudently 220:14

public 17:6 42:11 56:16 187:7 256:15

publication 98:15

publications 15:11,12 56:13, 15

publicly 118:11

pull 247:5

pulled 154:1 193:9 261:9

purely 103:24

purple 203:24

purpose 196:10 252:25 253:7,8

pursuing 62:8 224:4

purview 32:18 33:3,19 35:17 36:14 46:12,24 47:5,10,18 114:3 131:21 152:19 162:5 183:2 190:18 209:23 212:6 215:1 247:12 248:17 265:15, 20

put 19:20 60:14 66:16 67:6 70:11 73:15 74:11 76:8 99:24 103:18 136:20 159:1 162:7 167:17 172:11 174:25 176:17 181:13 188:21 190:3, 14 205:7 207:1, 8 234:3 249:25 254:2 262:23 265:2

puzzle 181:14

___

**Q**

qualification 161:19

qualifications 144:14 160:18

qualified 88:15,23

qualify 144:9 194:17 195:15 197:6,10 198:3 232:9

quality 84:11, 25 85:14 198:3

quarters 120:13

question 8:10, 11,13,16,17,21 9:1 11:25 13:9, 11,13 23:5 26:22 27:24

28:3 32:17,22 33:2 36:5,8 44:14 50:2 56:11 59:10,13 61:22 65:15,16 69:7 71:23 72:19,24 73:8 74:13 80:6 82:9,17,20 83:11 85:20,22 86:6 94:20,21 95:19 96:1,8 97:5 100:22 103:2,21,23 104:14 105:1 107:18 108:2, 11,13 109:6,22 110:13,21 113:13 123:11 124:22 128:13, 17,20 129:3,5 131:18 133:7, 10,21 135:22 137:2 138:19 142:22 143:3,4, 7 144:2 150:8 151:22 152:17 153:15,17 156:2,5,12 158:3 159:4,25 160:1,15 162:11,16 163:10 164:3 165:20 170:13, 20 171:21,23 172:10,17 173:10,12,14, 17 176:14,16, 25 177:4,25 178:8,9 179:3 181:15 183:7 185:20 186:19 187:11,15,16 192:25 193:22, 24 194:6,16 195:13 204:6 208:22 210:2 211:24 212:4 216:11 218:9 219:3 222:19, 20 223:6 224:7 225:12 228:15 229:6 230:7 231:12,13,17 234:20 235:7 238:14 240:16,

22 243:22 244:21 245:3 248:5,16 251:16,25 252:1,2,4,7 258:4,5,7

questioning 219:22

questions 8:22 9:9 10:5,8 14:18 15:17 21:1 23:7 46:9 54:8 57:7 60:15 64:3 65:17 72:2 77:15 89:8 90:13 112:21 115:19 122:6 128:15 147:15, 19 158:9 162:6, 14 203:6 221:13 230:1 237:7 238:6 246:11,20,24 267:13,21,22

quick 29:24 85:4 131:18 139:18 151:5 163:6 186:4 219:21 221:14 222:25 227:3 266:7

quickly 20:24 43:13 60:14 61:16 63:13,24 64:16,20 136:20 188:2 189:18 200:19 203:14 230:2 238:6 246:21 259:24 261:4,7

quit 172:7

quoting 247:17

___

**R**

race 188:15 261:17

radar 104:18

rails 244:12

raise 6:22

Kentuckiana Reporters
110 North Wacker Drive, Suite 1500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Raley 80:24

ramble 135:20

rambling 135:21

range 33:13 46:20 50:9,23 62:20 180:4,13

ranging 135:6

ransacking 149:9

rare 22:4

rarely 42:16 60:23,24

rate 89:14,18, 21,23 90:11 117:4

re-ask 153:11 193:22 238:14 258:4

reach 104:10 218:7,8

reached 182:17 200:10

read 61:11 62:24,25 95:8 97:1,4,8 117:18 128:17 147:19 148:23 149:17 155:1 173:12 176:24 196:23 201:4 229:21, 22,23 250:25 251:2,4 253:25 268:19,21

reading 73:5 94:25 106:18 118:17,21 123:17 150:18 157:8 254:2,8

ready 54:8 56:24 159:9 171:20 246:23

realizing 97:25

reason 112:13 123:21 130:16 131:23 135:6 138:8 139:15

153:7 168:11 184:18 193:2 215:16 221:18 222:4 225:10 247:24 264:5

reasonable 113:7 121:13 138:25 139:1 149:22 210:20 212:10,11 216:13 254:22 256:19 259:18

reasonableness 114:5 117:20 264:13 266:4

reasoning 134:21 146:25

reasons 103:11 126:7 134:24 135:1 139:11 174:12 184:12 209:20 223:22 265:18

reassigned 39:5

reassuring 157:20

rebuttal 9:21 10:17 64:22 65:8 68:8 69:2, 6,14,18 70:6, 15,21,23,24 71:5,6,13,20,24 72:3,4,7 73:3,7, 9,18 74:11,14 93:15 99:21 100:25 246:18 247:25 249:16, 25

recall 12:2,10 22:22 28:23 29:2 38:24 39:13 55:1 56:18 59:5 61:1 62:21 70:5,7,9, 17 91:5 92:21 93:17 102:19 103:4,12 104:4, 5,15,16,17 106:6,7,12 121:8 122:18

125:8 126:23 127:2,4 130:5,8 133:10,14,18 135:3 136:11 141:16 150:18 157:3,5,6 163:13 188:12 193:14 199:22, 24 200:7,8 206:18,20 209:4,8,12,16 221:15,22 223:11 249:2 254:2,8 255:15

receive 16:17 17:1,10 18:24 66:11 70:13 92:22,23 93:4, 5,16 100:3,7 101:6 102:24, 25 103:7,15,17 104:11 173:22 183:16

received 16:13 17:5,22,23 18:8,18,21 70:19 72:16 93:1 99:24 100:8,12,23 103:5,8,22,23, 25 104:17 147:24 178:16 182:6 188:7,8, 10 227:18

receiving 239:7

recess 57:3 116:17 163:7 228:17 266:17

recognition 85:7,11 248:21 249:11

recognize 131:8 147:22 155:3 233:1

recognized 94:24 134:11 141:24,25 163:15,17 164:5,6 172:6 193:19 194:10 249:5 260:2

recognizes 134:18

recognizing 134:22

recollection 91:3 93:13 102:14 105:2 106:17 123:1 209:10 253:20

recommend 195:21

reconfirms 211:12

reconstruct 236:22

reconstruction 236:15,17

record 6:3 7:12,25 8:3 30:20 31:19 57:2,4 116:15, 18 118:19,21 124:17,24 126:20 127:10 129:22 133:6, 15 139:21 140:9,25 145:9 146:19,23 163:5,8 165:16, 22 166:7 167:21 168:16 170:5,23 180:20 181:17 182:19 189:10, 15 201:15,18 217:25 219:25 220:6,19 221:9, 15 222:7,23 223:7,12 228:16 241:11 244:6,8 247:6,9 248:25 251:4 253:15 266:15, 18 267:24

recorded 208:3

recording 183:19 184:17

recordings 237:3

records 118:1 132:23 170:11 221:8,21 222:9, 11 248:14 253:19 254:6

recount 121:25 123:24 155:12 166:19 167:14 168:8 181:20

recounted 124:9 167:12 201:22

recounting 159:21 160:7

recounts 156:12 158:20

recovered 109:12,17 243:16 244:9, 11 245:9,13

recreate 184:15

recuperated 141:4

refer 59:18 60:8,12 73:17 95:24 116:9 117:16 118:11 160:16

reference 120:17 144:6 150:2,10 152:3 153:18 156:3 159:5,18 160:12 169:20 170:2 175:21 242:4 250:24 252:12,15

referenced 67:4 115:14,17 139:18 150:7 227:21

references 66:24 69:19,23, 24 98:22 106:1 150:25 166:16

referencing 228:24 260:12

Kentuckiana Reporters
110 North Wacker Drive, Suite 1500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

referred 70:10 81:5 132:11

referring 21:17,18 30:22 35:9 49:16 82:11 116:7 118:22 121:18 135:19 159:22 161:20,21 169:18,19 171:4,9,24 191:6 200:21 211:1,3 223:14 229:16 230:13 260:4

reflect 97:23

reflection 119:18

reflects 15:8

reformulate 72:24

refresh 209:9

refreshes 106:17

refused 247:7, 8

regenerated 169:24

regularly 62:22

regulations 42:11

reiterate 177:22

relate 111:16 139:13 152:15

related 143:11 152:13 153:8

relating 146:5 188:14 233:15

relationship 131:10 139:24 248:3,9,12,17

relative 22:2 108:10

relevance

109:20

relevant 10:22 15:10,12 56:12 95:13 130:19 151:9 234:17, 21 235:3,9 241:18 262:25

Reliability 259:11

reliable 238:1, 18,22,23 239:6, 10,14,18,22 240:3 257:2,24

reliably 188:17

relied 66:7 105:19

rely 98:14 102:24 103:6,9 106:4 184:14

relying 184:25

remark 172:7

remember 11:9,11,15,22 12:1,6 17:13 18:11,15 19:12 22:21,24 24:19 25:3,15,16,20 28:22 29:13 30:2 36:19,20 39:4,5 40:18 41:5,10 42:19 45:13,15,16,17, 21 46:5 52:15, 18 54:23 60:4 62:12,17,20 70:11 71:25 73:7 78:5,25 79:15 81:4 83:14 85:3 89:7,9,11 98:11,12 99:19 101:16,21 103:9 104:16, 20,23 105:5 106:3,12,18 123:4 125:14, 16,17 126:14 130:6 132:12 136:4,6,19 141:24 142:4 146:13 151:18

163:16 164:6 171:12 178:21 198:17,21 199:5,17,24 206:13,25 207:5 208:4 221:18,19 223:10 228:5, 13,15 249:8,10

remembered 189:12

remotely 6:8, 12

render 244:18 245:1 248:12

rendering 204:2

repeat 27:24 36:5,8 69:7 103:2 107:19 109:14 110:13 123:10 137:1 142:20,22 211:24 224:23 248:5 249:20

rephrase 8:15 59:11 66:21 96:4 105:17 107:20 152:18 236:19

replied 72:12 73:5

reply 71:16 72:6 73:7,15, 17,19,22

report 9:20,21 10:17 11:4,13 14:20 57:8 62:12 63:6,12 64:4,9,17,22,25 65:8,25 66:1,4, 9,12,14,15 67:4,6,8,13 68:2,6,8,9,17, 21,25 69:1,5,6, 9,13,14,18,20, 22 70:6,11,14, 15,16,21,23,25 71:4,14,19,20, 22,24 72:5,7,14 73:1,2,3,6,9,13,

18,21 74:1,10, 11,13,14 75:8, 10,15 77:14 79:1 83:17 84:13 89:16 90:15 92:9,15, 17,19 93:15 98:14,17,25 99:5,8,11,21, 22,24,25 100:8, 9,14,16,19,25 101:1,9 102:5, 21,25 103:6,9 105:14,24 106:10 107:7, 12,21,25 109:11,19 110:9,15,18 111:2 112:2,10 113:2,6 114:4, 17 115:12 116:6,7,9,21 117:13,14,16 118:23 119:19, 25 120:5 136:12,13 142:4,14 147:6 148:1,7,9,13,17 149:23 150:9 152:4,15 153:1, 4,7 154:10,12, 14,16,17 159:20 160:1 162:7 163:13, 20 164:15 166:14,15 167:18 169:19 171:3,24 172:11 174:16 176:17 177:10, 20 178:14 179:20 180:2 181:2,6,13 196:23 198:25 199:14,18 207:8 210:16 211:25 212:19, 21,25 225:3 233:3,25 234:4, 13,19,22 235:4, 10,24 236:13, 20,23 237:9,13, 15 241:22 246:18 249:4, 16 250:1 252:16 261:6

263:7 264:4 265:1,2,22

report's 101:7

reported 55:10,11

reporter 6:3, 13,16,21 7:2,21 57:1,4 116:15, 18 128:16,18, 22 129:1 142:21 143:5 163:5,8 173:11, 13,15 222:16, 18,24 223:3,4 228:9,11,16,18 266:15,18 267:20,23 268:2,5,8,11, 14,16,23 269:1

reporting 124:8 144:23 169:12,22 175:11,15 177:23 181:21 193:18 201:23

reportings 169:18

reports 9:18 10:14,16 11:1 12:8 63:6 65:13,22 69:25 71:7 74:14 81:5,6 98:7 99:6 100:16,24 115:17,19 116:1,4 118:3 119:17 142:5,6, 11 148:16 154:20 161:18 169:24 170:6 175:24 177:6, 12 178:3,5,11, 15,20 179:5,14 181:24 184:2,3, 11,20 193:14 206:16 207:24 208:6,8,23 209:1 212:5 218:5 233:21 236:5 240:23 260:10 267:10

represent 7:10



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

71:18 94:8 99:15 101:13 102:3,8 105:9 106:14 127:5, 14 130:13 132:13 147:5, 25 148:12 157:11 178:23 196:1 196:23 199:19 209:6 224:16 225:8 233:11 242:11, 16 262:7

**representation** 190:11

**represented** 51:9 55:23 57:20 158:5

**representing** 51:8

**reputation** 58:5

**request** 132:8

**requested** 128:20 143:7 173:14 223:1

**requests** 42:12

**required** 237:24 238:16

**requiring** 256:23

**resemble** 190:25 191:21 192:10,13

**resembled** 205:16

**reserved** 110:5

**reside** 245:18

**residence** 149:15

**resolve** 119:5, 7

**resolving** 119:3

**respect** 220:20 226:21

**respectfully** 88:14

**respond** 31:16 73:20 257:10

**responded** 21:9

**responding** 101:23

**response** 8:11 71:20 179:2

**responsibilitie s** 21:7 22:11 24:21,23 26:14 27:3 29:19 30:24 34:25 35:3 37:4 39:20 42:7,13,14 44:23 48:21 52:1,21 53:17

**rest** 76:17 95:8 140:23 149:9 152:7 153:24 161:7 200:17 213:22 214:25

**result** 33:25 182:2 216:17

**results** 201:6 242:13,16,24, 25 244:18

**retain** 77:11 90:14

**retained** 10:7 60:2 75:5,10,16 80:4,8 81:18 83:16 84:25 86:13 87:8 133:13 182:15 248:2,8

**retainer** 90:17

**return** 52:8 163:2

**returned** 52:5, 13

**review** 12:3,9 13:5,6 69:4,16 71:23 74:16

81:6,24 84:13 89:15 92:1 93:9,12 94:15, 22 95:7,10,14, 16,18,20,22 96:11,15,21 97:11,14,18 98:1,4,6 99:1,9, 14 100:20 101:18,25 105:16,22 109:9 114:7,21 115:22 121:4 122:7 123:7,12 124:12,16,24 126:20 127:10, 18 129:19,22 130:11 132:3,6, 23 137:12 145:8 150:14 160:23 162:8 175:19 182:19 185:23 194:2 199:10 209:5 219:25 223:7 224:25 244:6,8 254:5 262:14

**reviewed** 10:14,16,19 11:5 12:11 13:11 66:4 68:5,25 69:1,9, 13 71:13,22 72:8,14,17,25 73:2,10,11,14, 20 74:10,12,18 92:16,18 93:19 95:5 96:5,10 98:7 99:19 100:1 101:11, 22 102:15 103:5,8,22,23 105:5,9,14,19 110:1 111:12 115:7 118:1,23 120:12 122:15 125:7,15,20 128:14 130:3 136:9 156:25 157:21 165:8, 10 167:23 185:22,24 198:11,13 199:15 206:4 209:10,12,16

227:11,16,18, 20 230:25 236:4 247:8

**reviewing** 13:14,19 72:21 73:5 94:23 97:24 98:12 101:3 105:2 106:4,8,12 123:1,4 130:5 131:17 136:11 199:22 200:7 221:15 236:8 253:21 255:15

**reviews** 95:24

**reword** 51:17 138:19 144:2 218:17 244:24 258:6

**Rhodeback** 101:23 102:9 136:5 141:13 145:4,20 146:11 148:2, 13 166:11 167:4,10 168:5 169:4,11,21 170:1 199:12 211:1 261:7 262:22,23 264:25

**Rhodeback's** 159:20 167:23 264:3

**Rhonda** 99:3 105:20 110:10 122:19 155:8, 10 158:7,12

**Ricardo** 115:22,25 223:8,10 224:10,17,20 225:9,11,14

**Richard** 6:8 7:10 99:10 105:20 110:9 111:2 113:3,9, 23 115:1 125:25 126:21 127:23 129:8 130:4,14 132:8, 19 136:24

137:7 174:18 175:10,13,17, 20 176:3,4 177:17,18 178:20,22,24 203:17 207:14 208:2,14,15 210:4 211:7,9, 21 212:1,23 213:10,11,25 214:5,8,16 220:2,8,16 223:11,14,21 224:9,10,16,20, 25 225:13,14 226:2,11 227:7 228:1 230:10 231:3 232:21 233:5 238:5 261:22 262:20

**Rick** 136:22

**Ricky** 158:21

**riding** 31:22

**Riggio** 78:20

**right-hand** 197:13

**rights** 51:8,10 57:21

**risk** 236:14,20

**rob** 112:3 152:10,12,22

**robbed** 110:10, 16,20 138:2,9, 15 139:14 140:6 142:18 151:16,21 239:25

**robber** 111:19 137:17 139:6 143:13 150:24 151:25 152:21 154:5 161:4 174:18

**robberies** 23:15 24:13 25:6 26:17 27:9,17 30:9 31:6,14 32:6,9, 15,19,25 33:4,6 37:23 40:2

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

298

43:10 84:20

**robbery** 28:2, 11,17 33:8,15, 18 34:1 38:3 43:20,24 75:1 80:1,14,15 84:11,18,19 85:1,15 101:24 102:16 107:3 108:23 109:3 120:18 122:3 123:25 130:1 133:17 135:25 138:13,19 139:3,9 141:19 143:11,15 145:10,21 146:24 155:9 156:3 159:5 166:1 207:15 212:12 213:6 222:3,6 244:4 263:18

**Roger** 82:3

**role** 119:4,5,7, 11

**rollout** 121:5

**room** 149:9

**rude** 32:20 264:20,23

**rule** 216:15 256:22

**rules** 7:17 42:11

**run** 242:12

**running** 149:14 226:17

**rushed** 144:19

**rushing** 254:23 255:19

---

**S**

**Sadfully** 264:4

**safety** 17:7 256:15

**Sam** 157:16

**Samantha** 6:10

**sat** 45:21 84:1 102:10

**Saturday** 145:10

**scan** 204:3

**scanned** 195:17 204:23

**scenario** 235:2

**scene** 109:12, 17 125:18 242:8 257:6,10

**Scherger** 6:10, 20 23:4,11 54:5,10 116:11 128:12,24 129:10,13 157:19,24 158:3 162:20, 23 219:18 222:9,11,22 253:6,10 266:11 267:19, 22 268:9,10,13, 18,25

**school** 15:19, 25 16:11 18:2,8 19:22 25:23 26:2 29:3 39:15 41:4,13,22 55:23 102:18

**scope** 79:25 109:8 114:7 211:18,20 223:17 248:3,7, 11 250:9,21 265:20

**screaming** 149:4,13

**screen** 14:21 120:7,8 164:17, 22 170:25 205:20 206:16 261:5

**screens** 205:22

**screenshots** 66:23 67:16,19

**scroll** 14:25 63:13,25 64:7, 24 147:12 148:20 155:2, 23 159:10,13 171:13,16,18 172:20 175:18 176:8,9,11,21, 22 177:1 229:13,24 230:5

**Sean** 101:19

**search** 87:23 109:2 137:12 221:10 224:9

**searches** 87:20

**searching** 209:8 253:18

**section** 118:22 120:11 121:24 130:18 131:24 148:23 167:7 168:3 186:3 187:4 254:4 259:10 261:8 262:14

**sections** 38:22 165:17 249:17

**sectors** 46:14 47:1

**security** 45:15

**seek** 56:1

**seeking** 31:9 32:1

**seemingly** 207:14

**seizure** 87:23 88:1,8

**seizures** 87:20 88:9

**selling** 126:10 135:13

**send** 96:19 268:24,25

**sense** 8:14 10:3 11:4 46:21

231:7

**sensitive** 255:12

**sensitivity** 256:11

**sentence** 55:25 121:10 141:9 182:11 183:12 186:16 210:18 243:15

**separate** 29:16 38:13,15 94:5 145:2 146:18, 21 161:16 190:21 224:18

**separating** 189:19

**sergeant** 20:4 28:24 29:2 30:19,25 31:13 32:5,8 33:17 34:8,15,22 35:1,10,11,12, 14 36:1,9,11, 17,25 37:1,4 38:7,14,25 39:11 40:13,15 46:11,23 47:3,8 99:15 101:4 199:10,25

**serve** 76:6

**served** 76:12, 15,25 77:3,22 79:11 83:12 84:10 85:13 87:18

**serves** 34:11 80:21 81:7 130:7

**service** 21:9 31:16,22 33:7, 16 35:19 52:10

**serving** 74:20, 23

**set** 10:5,7 46:8 158:9 221:13

**SET-FLEX** 20:1,3,8 25:19, 22,25 26:8,15

27:4,23 28:10, 20 29:8,13,14, 16,25 30:22 34:18 35:12 36:23,25 37:5 38:1,5,8,12,14 39:1,11,24 47:3

**setting** 181:1

**settle** 251:21

**settled** 181:12

**severe** 122:8

**severity** 232:15

**sex** 28:17 261:16

**shakes** 7:24

**share** 64:20 120:8 228:20 261:5

**sharing** 15:16 65:11 120:7 164:17 170:25 174:15 230:15

**she'd** 172:12

**Shelly** 244:1

**shift** 23:24 24:2 31:2 42:20 43:5 46:14,15,16,18 47:2,13

**shirking** 235:22

**shoot** 112:2 128:6 157:17

**shooting** 45:19 55:24 136:2

**shootings** 26:18 27:9

**short** 45:8 54:6 61:24 72:12 167:15 190:6 240:16

**shortly** 214:3

**shot** 28:14,16 138:9 139:15, 24 140:6



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

142:18 144:20 145:14 146:16 149:7 221:2 255:10

**should've** 180:8

**show** 14:18 30:1,6 31:4 38:8 40:5 43:7 63:11 136:15 147:3,5 154:22 164:18 194:22 199:7 202:1 222:8 252:15

**showed** 33:9 174:22

**showing** 205:25 252:13, 18,19

**shown** 194:23 195:10 196:6 200:11 202:24, 25 203:2 204:11,16 205:8,12 206:23

**shows** 167:1 247:6

**sic** 125:18 195:11 264:4

**side** 247:19

**sign** 268:21

**sign-off** 200:21 201:2

**signature** 64:11 65:5 203:15,20 204:3

**signed** 106:8 203:22 205:18, 20

**similar** 25:8 29:22 39:23,25 80:14 107:6 189:2

**simply** 81:21 88:7 194:12 213:12 215:21,

23 241:12,15

**single** 18:15 45:21 95:2,14 97:1,4 145:9 154:15 167:14 182:4 188:23 252:13,15,19

**sir** 6:22 7:5,16 9:4,13 12:18 14:14,18,21 15:3,18 16:4 19:3 22:19 23:13 30:11,24 32:5 36:1 37:11 40:8 42:14 44:20 47:24 49:16 50:19 52:12,23 53:14, 16 54:12 56:11, 17 57:8 60:18 61:5 62:10 63:11 66:14 67:2 68:8 70:23 71:18 72:15 73:9 74:13,20 75:4,25 76:6, 11,19 77:13 78:15 80:24 82:5 87:7 88:19 89:3,14 90:5,25 91:14 92:4,15 93:19 98:7,19 99:1,6,14 101:2,11 102:8 105:15,23 106:7,11,22,25 108:14 109:10 110:3,8,21 112:9,19 113:1 114:16,23 115:21 116:4,8, 21 117:12 119:16 120:15 121:14,23 122:7 123:6 124:16 125:12, 23 126:20 127:9,19 128:9 129:20 130:2 131:23 132:18 133:15,25 134:9 135:23 137:16,18 138:7 140:16 141:21 142:14

143:23 145:4 147:3,8,22 149:17 150:8 151:14 153:18 154:22 155:3 162:2 164:22 171:3 172:21 173:25 174:16 177:4 183:5,13 185:16 186:7, 19 187:2,11 188:2 193:25 194:25 195:13 196:17,24 197:5 199:9 201:20 203:14 206:8,11 207:18 208:22 209:3 210:10, 23 212:4 214:11,14 215:11 216:1 219:5,25 220:10 221:13 222:7 223:6 224:8,16 225:8, 12 227:6,23 228:20 230:8, 16 231:5,18 232:24 233:3, 11,17,24 234:14 235:1,8 236:2,24 237:13,17 238:7 242:5,11 243:20,22 244:13 246:7, 19 247:1,8 248:2,8,22 249:16 250:1,6, 17,20 251:12, 20,25 252:18 253:5,13,16 254:25 258:7 259:4,10,23 261:12,20 266:20 267:1,8, 14 268:19

**sister** 139:8 141:3 243:7,25 244:1 245:19 246:13

**sister's** 149:16

**sit** 20:21 30:11

45:12 48:3 59:14,20 62:21 71:7 72:3,21 78:8 101:2 105:2 130:2 197:23 206:17 221:14

**sitting** 85:3

**situation** 189:17 210:20 212:11

**situations** 234:15

**six-pack** 188:23 189:16 191:8,15,16 192:7

**skill** 34:3

**skim** 230:2

**skin** 260:7,20

**skinned** 200:3

**skip** 83:11

**skipped** 186:2

**slamming** 149:12

**slightly** 254:20

**Slim** 134:10,15

**Slot** 198:15 199:21

**slow** 15:2 147:17

**smaller** 47:7, 11 262:20

**Smith** 99:10 123:2 209:5

**snapshot** 85:24

**sniffling** 20:19

**social** 60:18,20

**software** 92:3 101:15

**sold** 175:20 177:17

**solely** 185:1 263:12,18

**solemnly** 6:23

**solving** 239:2

**someone's** 241:10

**sort** 146:16

**sound** 261:11

**sounded** 128:15

**sounds** 138:24

**source** 156:22 243:23

**sources** 61:8, 23 62:21,23

**Southern** 20:7, 10 32:16 34:19, 20 35:10,15 36:9,11,17,21, 23 37:5 38:2, 16,18 39:3 46:23,25 47:4

**Southwest** 30:25 32:16 34:9,15 35:1 38:18 46:11

**Southwestern** 20:4,6,10

**speak** 14:6 61:15 80:4,8 83:10 101:14 132:10,17,19, 22,24 136:3 146:1 168:23 248:3,8

**speaking** 74:6 173:3 212:3 219:13

**speaks** 153:17 172:10

**special** 34:3

**specialties** 50:1 51:1

**specialty** 49:23 50:25

Kentuckiana Reporters
118 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

specific 25:3 30:2 48:3,25 59:4,8,15,21,24 62:23 63:4 71:11 74:3 85:15 94:12 108:15 130:9 153:13 154:20 170:4 180:9 194:7 201:15 206:18 234:1 235:5

specifically 8:20 10:20 11:5,11,22 13:23 17:6 22:3 45:1 58:11 60:3 74:23 87:5 88:3 96:2 107:18 109:22 121:8, 18,19 130:6 154:19 158:17 171:22 172:4 174:23 175:21 176:14,16 177:2 178:21 180:18,21 198:17,21 218:1,3

specifics 80:5

speculate 104:3,10,22 126:2,4 138:25 197:20

speculation 203:6

spell 7:11 67:23 241:13

spelling 241:10

spend 13:14 58:4 94:18

spent 13:18 90:25 97:24

spoke 114:11 125:24 127:24 135:24 136:4,6 140:24 145:4, 20 146:3,23 147:1 181:19 220:14

spoken 14:1,9 106:23 114:23 166:11 181:22

sports 62:16

spot 219:20

squad 22:22 31:1 46:13 47:1

squads 22:20 47:7,14

Sr 50:6

staffing 23:25

stamp 147:7 148:16

stamped 154:23 164:19 194:25

stamps 206:2

standard 98:15 107:2,4 183:25 236:3

standards 114:13

standing 149:6

stands 239:2

start 8:11 84:12 85:1,14 120:4,5 155:25 159:8 205:2

started 16:6 26:2,6

starting 15:18 25:23 29:3 66:14 92:15

starts 121:24 251:13

state 6:5,14 7:11 48:24 62:6 75:10 121:10 134:9 141:8,22 148:25 182:12 183:7 185:10, 14 186:4 187:4 189:12 210:2 211:25 213:23 233:17,20 242:1 243:13

247:3 253:13, 18 254:22 259:5,23

state's 20:15 48:15,22 49:1 204:14 206:1

stated 90:11 120:12,14 139:11 143:24 144:4 163:13 168:9,10 171:3, 4,25 174:18 211:4

statement 56:21 87:19 89:15 95:1 103:1,14 104:2 107:6 108:6 130:25 131:7 133:25 134:20 135:2 142:19 144:4,8 150:5 151:25 153:16 155:16 160:3 162:12 163:21 168:17,19 171:23 174:20 176:16 181:9, 10 182:5,24,25 199:2 206:19 211:1 212:9,13 213:15 216:20 217:2,23 218:10,25 225:18 231:8 240:8 244:13 259:25 266:20 267:9

statements 128:1,2 131:9 132:4 143:18 151:20 152:14 154:5 155:11 158:20 160:6 161:11,13,14, 20 162:3 166:21 170:1,6 187:6 210:21, 25 211:3,9,13 255:19 260:8

states 73:17 148:25 173:7 261:10 262:18

stating 172:12

stay 23:24 33:19,23

stayed 34:2 244:3

stealing 55:10

step 29:24 85:4 186:4

steps 216:7 226:14,16

sticker 206:1

stipulate 6:17

stipulated 221:23

stipulation 223:12 227:20, 25 230:3

Stipulations 228:21,24

stop 15:16 27:14 65:11 164:17 170:25 174:15 223:2 230:15

stopped 87:24

story 154:8 166:8,17 167:2

stranger 263:22

street 22:14 29:23 31:22 37:14 120:18 133:16 135:25 207:15

stress 58:6

strictly 104:10 180:9 196:19 197:22 215:17

strike 10:4 15:11 25:18 26:4 31:12 32:7 36:10 37:1,25 47:16 49:10,22 50:15 51:13 54:12 71:12 72:23 76:20

85:5 86:8 89:3 91:2 93:8 97:6 105:17 109:23 118:20 124:3 129:5,19 134:5 138:18 142:1 144:1 146:7 168:2 171:6 206:21 211:19 216:21 221:8 230:16 231:18 234:5,11 235:5 244:7,24 248:7 251:11 256:3,9 265:19

stroll 155:22

strong 142:14

structured 190:9

studies 16:15 17:2,6

stuff 230:2

sub-documents 94:13

sub-folders 94:14

subject 71:15 75:3 160:24

submitted 15:6 63:12 64:18 71:19 74:14

subordinates 48:8

subpoenas 42:12

subscribe 61:18 62:11,13, 15,18,24 63:7

subscription 63:8

subscriptions 61:19

subscripts 67:18

Subsection



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

247:2

**subsequent**
125:25 126:5
142:17 145:12
163:19 175:24
193:18 240:10

**substance**
14:10 123:9

**substance-use** 122:8
126:13

**substantial**
90:21

**sued** 89:4,5

**sufficient**
193:6 221:22
223:20

**suggestibility**
251:16

**suggesting**
214:7 224:14

**suggestive**
86:25 192:10,
16 251:19
252:2

**suggestiveness** 205:2,3

**suggests**
210:8

**summaries**
97:21

**summarize**
22:13 44:17
78:3,23 79:13
81:2 117:18

**summarizes**
251:6

**summary**
118:14,16
167:16 168:25
185:6,10 186:3

**super** 43:13

**supervise**
47:14,19 52:11
53:18

**supervised**

31:1 32:3 34:2
37:6 58:14

**supervising**
20:12 39:7

**supervisor**
20:5,9 31:7
37:19 38:15
40:12 41:16
44:7 52:14,17,
19 53:17
101:19 185:4
189:8 199:12
230:24 236:10
237:12

**supervisors**
53:7 184:10,21
190:2,15

**supervisory**
38:13 41:18

**supplement**
101:9,10

**supplemental**
189:25

**support**
181:17 185:1
212:24 236:12

**supported**
213:1

**supports**
201:15

**Suppose**
258:15

**supposed**
138:13,17,21
139:3 140:3,4

**suppress**
251:23

**suppression**
20:9 26:16,20,
24 27:5,10 37:7
39:6,22

**surgeries**
145:11,14,17

**surgery**
141:11,15
144:18 145:5,9,
25

**surprised**
145:13

**suspect**
139:17 141:24
149:3,6,7,8,10,
14 152:6
163:16 164:5
171:5 172:1,12
180:6 183:11
188:14,18,19
191:5 192:11
196:13 210:5
211:5 213:25
214:18,19,23
215:11,14,18
217:18 218:20,
21,22,23 219:6,
12,14 220:24
223:22 224:5
239:2 243:17
244:15 252:19
256:16 257:8,
20 259:21
261:7,8,12,15,
16 263:20

**suspect's**
214:1,2 245:6,9

**suspected**
45:18 138:9

**suspects** 24:3
43:21 192:12
216:15 218:12,
15,19 219:10
243:9 245:20,
21,23 266:24

**swear** 6:23

**synthesized**
203:4

**system** 57:14,
23 58:1 76:13,
14,21 77:1
148:16 169:22
184:25 225:18

---

**T**

---

**T-I-M-O-T-H-Y**
7:13

**tag** 33:9

**taking** 7:22

29:24 85:4 98:1
186:4 238:15
247:18 264:9

**talk** 8:4 59:3
118:21 121:16
169:3 188:2
219:8 249:24

**talked** 19:2
23:19 82:20,21
135:16 139:19
141:12 153:22
166:6 207:22
213:4 259:17,
19 260:7

**talking** 18:4
32:24 35:25
61:25 63:15
64:8 83:2
102:23 103:4
136:21 139:19
147:4 152:23
180:9 191:12
192:2 204:10
205:2 220:16,
17 222:15
224:19 230:4
232:2 260:14

**talks** 252:16
254:5

**tall** 180:13

**target** 192:18

**task** 20:12
39:6,10,14,21
40:3,6,17 41:3,
17,21 47:9

**tasked** 131:17

**taught** 52:24
188:13 189:5

**teaching** 53:19

**technology**
62:17 63:6
85:7,10,11
121:3

**telling** 111:7,9
112:8 158:18
164:4 180:10
183:3 208:10
209:22 248:18,
19 250:9

**temporal**
254:21

**temporary**
54:19

**ten** 46:13

**tend** 53:21

**tendered**
242:17

**tension** 182:23

**tentative**
218:11,14

**tenure** 19:5
41:11 190:6

**term** 38:21
218:14,16
240:12

**terminology**
219:3

**terms** 49:23
58:7 218:24

**test** 16:22
45:25

**testified** 12:9
13:11,20 14:14
18:7 26:1
72:10,25 73:10
75:25 78:11,21
79:16,21 80:2,
7,17,23,25
81:10,12 82:10
83:4,15 88:20
92:18 96:25
102:9,17 110:3
112:19 124:10,
18,25 129:20
131:7 132:1
136:8 138:23
145:3 159:3
169:24 179:2
185:18 190:20
198:15 200:5
209:4,7 233:12
250:8 251:3

**testifies**
130:14 131:21

**testify** 81:14
99:17 113:20



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testimony
6:23 14:10 60:1
71:21 74:9
78:15 79:5,8,25
84:6 89:1,16,21
100:2 102:10
105:16 118:15
130:4,5,9,10
131:1,13,20,24
150:14 157:4
162:15 166:25
169:7,13 197:6,
7 198:12,13,14,
18,22 199:23,
25 200:16
206:5,13,18
209:23 211:19,
20 233:4 247:9
251:2,5 254:5
258:3

testing 120:14
121:6

there'd 47:1
215:16

thereabouts
21:6 26:12

thin 261:19

thing 26:21
73:19 98:6
103:13 114:9
115:7 128:13
133:5 147:13
175:19 179:7
180:5 181:4
191:23 202:6
206:15 229:22
232:20 238:20

things 10:22
12:6 21:16,21
30:15,21 44:25
45:20 51:3,12
62:15 66:16,24
67:14,16,18,24
73:16 89:18
95:25 98:3,22
104:10,22
114:13 118:3
126:3 152:19
167:17,21
174:11,14
177:20 180:1
184:17 200:14
202:8,12 203:6

205:2 210:17
211:14 215:9,
15 218:4 224:3
227:15 231:24
232:6 237:6,12
238:2 239:4,10
241:14 245:15
256:16

thinking
134:15 154:14

thinks 134:17
168:25

thirds 120:13
259:12

Thomas 78:20
79:6 102:16

thought 10:22
82:9 95:12,17
96:25 100:2,10
113:7 121:21
134:11,23
136:23,24
137:5,6 139:10
146:4 148:6,8
164:14 177:22
178:6 207:10
213:13 221:19
235:25 249:4
264:10 266:13

thoughts
196:19

thousands
169:10 201:19

Tiderington
70:10,11 71:18
248:1 252:16
254:15

Tiderington's
11:13 69:1,13,
17,25 70:14,24
71:7,13,22
72:5,13 73:2,6
74:12 98:9

tight 193:9
261:9

Tim 194:12
226:3

time 8:4,19
13:6,13,18,23

15:15 16:2,10,
11 17:2,23
19:7,9 22:17
23:10,25 24:2,7
28:10 32:8
33:17 36:9,11
38:1,7,19 39:5
40:18,24 43:10,
14 44:11 46:22
47:3,8,15,17
49:18,20 50:8,
21 51:12,14
57:2,4,18 58:4,
24 71:1,2 74:7
75:22 76:7
85:24 86:23
92:23 93:1
94:18 96:5
97:23 99:7
100:15 105:14,
24 107:16
108:8 111:15
116:16,18
117:3,20,22,25
118:7,8,11
119:22,25
120:3 123:19
129:25 130:8
131:9 135:15,
24 138:19
141:9 143:19
146:1,9 147:2
163:3,6,8
170:15,19
180:5 181:10
187:8 191:13
193:6 195:9
199:13 200:23,
24 201:4,8
203:3 204:25
206:22 207:7
212:25 217:16,
22 218:2
219:15 221:3
225:21 228:3,
16,18 230:11
234:1 235:5,11,
15,23 237:15
239:9 240:2
245:18 251:8
257:14 258:9
261:25 262:6,8
263:21 265:3
266:15,18
267:14

timeline 121:5
145:20

timelines 21:3

timely 184:11
256:5

times 12:16
42:19 63:1
75:4,10,14,16,
17,21,25 76:2
88:15,21 92:6
110:19 195:24
244:3

timing 256:20

Timothy 6:15
7:13 50:13

title 40:13
136:17

titled 118:22
120:12 247:2

today 7:19 9:9
10:11 11:5,24
12:11,14 13:15,
24 14:2,11,15
30:11 45:12
48:4 52:12
59:14,20 62:22
65:18,21 71:7
72:3,10,21,25
73:11 76:2 84:4
100:3 101:2
103:11 105:2
117:10 118:8
130:3 160:21
174:7 197:23
206:17 221:14
232:8 254:12,
16,17 255:13
267:14

token 245:5

told 14:3,5
54:20 55:11,12
89:13 119:18
137:6 141:23
149:20 154:8
160:8,10
161:22 163:15
167:2 168:4,7
208:17 214:2,3
220:22 239:23
257:21 260:4,

11

top 155:25
159:8 175:7,17
176:5 187:3
253:14

topic 148:14
228:23 253:22

topics 54:6
189:22

total 91:8

touch 86:12
109:19 249:17
250:1

touched
131:19 183:6

touches
107:21

town 77:21
78:2,16 86:3

track 90:6

Tracy 99:10
123:2 209:5

traffic 49:5

trafficking
19:17 22:14,15
29:23 45:14

trained 133:2
183:8 192:19
232:1,17
255:12

trainer 160:22
258:24

training 18:17,
22 52:25 53:19
56:23 117:25
118:1,7 185:13
188:6,8,10,12,
22 189:19
190:9,10,13
236:3 255:13,
14,15,16,20,21

trainings
99:18 190:1

transcript
99:2,10,15
101:3,12,19,23
102:15 103:5

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

303

105:3 122:19 123:2 125:21 130:11 157:1 167:23 169:7 196:24 199:10 209:5,11,13 224:25 227:12 267:11

**transcripts** 100:23 103:16, 25 105:10 118:10 137:25 267:25

**transfer** 39:9, 12

**transferred** 22:8 36:23 39:13,18 41:15, 23 43:23

**transition** 43:13

**translate** 7:24

**Transportatio n** 51:23,25

**transported** 141:10

**trauma** 58:6 255:12

**traumatized** 254:23 255:3,6, 8,22 256:23 257:3

**trespass** 255:5

**trial** 53:3,4 56:1 79:16 81:12,15 84:7 90:4 102:9 111:11 114:20, 21 118:10 119:14,15 124:10 125:20 130:4,5,8,9,11, 14 131:7,13 132:1,3 138:1 143:21 150:14 169:7,13,25 182:14 192:16 198:12,13,14, 18,21 199:2 200:5,15 204:15 228:3

230:11 242:12, 15 247:6 251:1, 22,24

**trials** 88:20

**trier** 119:13,15

**trip** 197:9 238:9

**true** 11:25 36:15 50:11 97:3 131:12 182:18 215:10 233:13 239:17 241:3 245:10, 15 252:9 253:2 265:17

**trust** 58:2 174:13

**trustee** 55:8

**truth** 6:24,25 111:7,9 112:8 183:3 209:22 248:18,20 250:9

**truthful** 105:25 240:13,15,19

**truthfully** 9:10

**turn** 163:11 227:12 230:18 231:20 246:18 267:15

**turned** 89:12 124:23 132:20 227:8

**turning** 92:14 117:13 149:10

**turns** 239:1

**two-minute** 266:8

**two-week** 218:2

**type** 49:22 51:5 67:13,18 123:14 128:15 178:3

**typed** 67:15, 17,21,22 68:16 142:6 177:6 178:11,20

179:5,19 207:23 208:5, 23 209:2 212:24 237:3

**types** 257:10

**typical** 91:23

**typically** 61:5 90:15

**typing** 183:19

___

**U**
___

**U.S.** 16:14

**uh-huh** 16:16 17:21 43:17 50:14 67:20 69:11 132:12 140:18 159:12 180:14 189:21 196:21 227:24 250:7 259:13

**Uh-uh** 156:5

**ultimate** 110:5 113:11,13 216:17

**uncertain** 214:10 216:3 237:25 238:1

**uncertainty** 213:8,10,18 214:16 216:6

**uncle** 138:10 139:23

**unconscious** 258:15

**underestimate s** 225:18

**undergraduat e** 16:14

**undermines** 174:12

**underneath** 203:15

**understand** 13:8 16:23,25 21:22 26:22,24

36:6 40:25 44:24 59:9 66:20 71:21 74:9 80:6 85:22 86:6,11 87:16 95:19 107:18 111:5 112:20 113:1,11 122:24 123:23 127:2 131:19 140:10,11 143:3 151:5 173:10 190:3 202:22 206:3 211:23 231:11 232:17 244:11, 20 245:3 258:3 264:25

**understanding** 21:15 26:19 32:24 46:4 80:7 100:18 132:18, 21 133:9 135:23 136:1,6 141:16 152:16 156:15 166:25 183:1 190:22 196:5 201:3,13 204:13 232:7 245:24 251:23 257:18

**understanding s** 204:11

**understood** 8:16 10:1 71:9 79:9 92:14 103:20 132:16 165:11 182:10 198:11 259:22 266:6

**undue** 128:15

**unduly** 86:24

**unfair** 48:11 204:6

**uniform** 37:6 41:20

**uniformed** 37:14

**unit** 19:16,18, 23 20:13 22:8, 12,16 23:9

24:7,10,14,16 29:20 30:5 35:25 36:16 37:7 39:7 41:16 42:25 43:16,23 48:25 52:9,11

**units** 20:1,2 29:16 38:22 45:1,4 47:7,14 49:1 53:20

**universal** 256:22

**university** 15:19 16:5 18:25 78:20 79:6

**unknown** 148:25 261:16, 19

**unreasonable** 243:15

**unreliable** 237:16 238:20 239:3,7

**unsuccessful** 55:20 56:2

**unsure** 175:11 212:25 214:1,4, 23 220:22 226:13,19

**untrue** 187:5

**unusable** 244:19

**unusual** 233:22,25

**upfront** 90:17

**upper** 197:12

**usefulness** 238:25

**user** 122:9

**usual** 131:11

**utilize** 183:10

**utilized** 118:9

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

304

**V**

valid 210:14

varies 90:16

varieties 33:13

variety 45:20
53:9 61:7
103:11 134:23
226:1

vary 44:24

vehicle 177:16

vein 119:9

veracity
110:22 111:2,4
128:1 131:5,6
132:4 174:10

verbal 7:23

verbatim
168:11

verified 221:21

verify 214:2

version 167:8
196:6

versus 183:22
238:1

veteran 52:25

victim 28:18
35:23 148:25
149:1,3,4,6,7,
11 168:9 173:7
188:16,19
192:11,18
196:11 220:23,
25 221:2
226:14,18
239:25 240:18
255:6,22
256:11 257:1
261:10 262:18

victim's 134:4,
6 149:4,7
245:19

victimology
255:15,17

victims 33:9

48:24 149:15
168:13 180:3
194:19,24
196:6 198:7
201:3,10
202:23 204:12,
16 205:8
206:24 242:2,8
243:6,7 245:19
254:23 255:3,
18 256:24
257:6 259:7

video 268:7

view 31:17,20,
23 33:16 35:7,
16,20 36:13

views 180:22

violate 42:10

violated 51:10
57:21

violating 187:9

violation
192:15

violations 49:5

violent 19:21
20:12 21:13
26:16,20,23
27:5,10,12,15
37:7 39:21,22
40:2,17 41:3
47:9

visible 260:1,3,
13

visiting 45:16

voice 134:10,
11,14,18,21,24
135:1,3,4,20
136:23 137:5
248:21,25
249:5,6,10,13
260:2 261:11

voluntary
18:23

volunteered
19:18,22 24:17

vulnerable
28:18

**W**

wait 207:12
241:2,6

waited 220:14,
23

waiting 217:11
234:6,9 257:19

waits 257:14
258:8

waive 268:20

walk 19:3,6

walked 264:19

Walker 6:11
101:20 105:20
115:13 121:13,
17 124:9 132:6,
7,16,19 133:7,
12 136:5
139:16 141:22,
23 143:20
146:24 156:11,
21 157:23,24
158:7,15 159:2
161:23 162:4
163:14,15,22
164:5 165:9
166:5,9 170:15
172:24 177:12
179:9 180:6,11,
12,18 181:2,4
187:9 196:22
199:3 205:14
206:10 208:10,
18 210:3,6,21
211:15 212:4,9
213:24 214:4,
12,20 216:24
217:2,10,21
220:1,7 221:10
223:18,21
224:9,22
225:13 235:24
238:3,7 239:12
242:25 252:12
257:7,21 260:4
264:9

Walker's 108:9
111:14 113:4,7
114:5,11

115:16 117:20
137:9 142:5
155:8,13 157:1
158:12 164:20
165:11,14
171:7 172:2
177:6 185:12
201:22 206:4
207:23 208:8,
16 227:11
233:16 242:21
243:6,10
255:16 263:25
266:4

wanted 21:3
34:3 45:17
128:9 133:1
153:23 193:3
195:22 203:23,
25

wanting 149:8
152:6

warehouse
54:18

warrant 112:14

warrants
43:21

Washington
63:1

waste 237:15

watch 61:11,
14,20,23

ways 58:7
107:23 192:14

week 12:19

weeks 41:8
208:19 233:21
236:5

weigh 112:24

weight 131:16
261:18 262:10
264:6

weights 180:4

white 195:19,
21 196:5

who've 57:20

wide 45:20
50:23

widely 120:14

widespread
107:12,25

wife 14:3

witness's
253:23,24
257:15 258:10

witnesses
119:18 131:5
162:3 183:9
232:19 265:12

wondering
259:14

Woodruff
79:19 81:17
84:17 86:17

Woodruff's
82:20 85:5,6

Woodstock
9:14

word 117:19
118:17 130:9
167:14 179:6,
13,14 184:5
235:7

worded 13:10
254:11

words 57:16
67:22 174:2
177:2 191:2
192:6 205:7
219:5 249:25

work 39:23
50:16 51:8 52:3
75:11 90:5,17,
21 91:4,25
92:10 95:14
117:1 123:18
223:25 226:17
235:18,22

work-related
187:6

worked 19:14,
24 20:2,7,12,14
40:7 50:9 58:13
79:6 92:5



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

129:23 190:10

**working** 16:1,
11 27:23 37:20
39:9 48:18
49:19 50:22
51:15,19,22
54:1 90:25
216:2 217:14

**world** 62:7

**worries** 20:20
44:21

**worry** 174:10

**worse** 20:22

**would've**
13:21 25:25
26:6,9 31:7
39:17 40:9 50:9
72:17 73:14,21,
24 74:11,19
96:13,18,22
102:21 113:17
123:17 130:14
131:22 133:19,
24 134:1 139:2,
4 140:1 146:4
150:22 151:4
152:11 180:17
194:11,14
207:9 210:21
211:15 213:13,
14,24 214:19
224:1,2,12
225:16 226:2,4,
7 236:10,11
252:24 253:2
261:24 262:1,5

**write** 66:15
67:11 68:9,12,
14 93:11
172:20,25
180:18 234:22
236:23 241:16

**writing** 66:22
95:23 162:4,13
166:5 183:15,
19 235:24
236:14,20

**writings** 66:17
169:12,17

**written** 56:14,

19,22 58:2
66:19 67:8
96:18 169:23
203:21 218:5
236:2 237:1

**wrong** 29:7
126:1,6 171:2
185:11 186:13
241:19 264:6
265:1

**wrongdoing**
55:14

**wrongful**
57:13 79:23
81:8,13,19
82:1,10,22 83:5

**wrongfully**
57:22 58:4
80:3,13 81:10
88:9 185:15,19
186:1

**wrongly**
114:17

**wrote** 9:18
43:21 48:8
67:25 71:4
99:5,8 102:5
105:14,24
119:21,22,25
120:3 134:13
162:13 164:4,9
169:19 172:22,
24 181:2
241:19 252:11
265:1

---

**Y**

**year** 16:17
17:10 19:15
21:5 24:20
26:11 29:9
30:15,21 34:10
39:19 42:3,4,5
52:17 120:18
234:6,9 263:18
267:1

**yearbook**
135:17 209:8
259:18

**years** 15:19
17:13 21:21
30:19 34:10
50:18 52:18
60:3 160:20,21
198:5 215:6
218:14 249:9

**yesterday**
159:17

**York** 63:1

**young** 197:10

**younger** 89:10

**Youtube**
61:10,17,23
62:9

---

**Z**

**zoom** 6:9 8:4
12:23,24 64:22
129:16 147:7
155:21 198:10



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com