# Exhibit 28

**Eyewitness Identification Expert Report of Dr. Jennifer Dysart in**
***RICHARD HORTON v. CITY OF COLUMBUS, Columbus Division of Police Officers BRENDA K.***
***WALKER, MIEKO SIAS as personal representative of the ESTATE OF SAM SIAS, and AS-YET***
***UNKNOWN COLUMBUS POLICE OFFICERS***
**(Case No. 23-cv-3888)**

**Report Date: July 14, 2025**

**I. Overview and Credentials of Dr. Dysart**

My name is Dr. Jennifer Dysart and I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice, in New York City. I have been testifying as an Eyewitness Identification Expert since 2006. I was contacted by attorneys representing Mr. Richard Horton and asked to review materials in the above referenced case and provide my opinions regarding the eyewitness identification evidence relating to the wrongful conviction of Mr. Horton for armed robbery in 2006. I am being compensated for my time writing this report at a rate of $400/hr. My fee for testimony (deposition and trial) is $600/hr.

***Employment:*** I am a tenured Associate Professor of Psychology at John Jay College of Criminal Justice of the City University of New York. Prior to my faculty appointment at John Jay College in January of 2006, I was an Assistant Professor of Psychology at Southern Connecticut State University, New Haven, CT (2003-2006).

***Education:*** I hold a PhD in Social Psychology from Queen's University, Kingston, Ontario, a Master's degree in Psychology (Brain, Behavior and Cognitive Science) also from Queen's University, and a Bachelor of Arts degree in Psychology from St. Thomas University, Fredericton, New Brunswick.

***Teaching Experience:*** I have taught about eyewitness identification research in psychology courses at the undergraduate, Master's and doctoral levels. I have supervised more than a dozen undergraduate and Master's thesis research projects and one doctoral dissertation on the topic of eyewitness accuracy.

***Testimony & Consulting:*** I have given testimony as an eyewitness expert approximately 85 times in various pre-trial hearings, trials, post-conviction hearings, and civil cases in California, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and St. Thomas, USVI. I have also testified at a criminal jury trial in Federal court in New Jersey. I have never been deemed unqualified as an Eyewitness Identification expert in court. In addition to testifying, I have consulted in numerous other cases. Although most of my consulting has been for criminal defendants and plaintiffs in civil cases, I have also worked for prosecutors in Conviction Review Units in several states including the wrongful conviction case of Mr. Mark Denny in Kings County, New York, who was ultimately released from prison in December, 2017. A list of my testimony over the past four years is attached to this report as Appendix A.

***Publications:*** I am an author or co-author of over two dozen eyewitness publications including original research articles published in peer-reviewed scientific journals, book chapters, a law review article, and a book on eyewitness identification accuracy titled "Eyewitness Identification: Civil and Criminal, 6th Edition" published by LexisNexis.

***Presentations:*** I have given more than 180 presentations over the past 25 years on Eyewitness Identification at Psychology conferences and at conferences attended by judges, attorneys, police officers, investigators, law students, and the general public concerning the accuracy of eyewitness identification and factors that may increase or decrease its reliability.

*Curriculum Vitae:* My complete academic curriculum vitae is attached to this report as Appendix B.

## II. Materials Reviewed in this Case

As an eyewitness identification expert witness, I ask the attorney or firm who has retained me to provide me with all available relevant materials related to the eyewitness evidence in the case, including police reports, copies of all identification procedures, testimony of the victim(s) and/or witness(es), and any other documentation that is relevant to the eyewitness identification at hand. In this case, I reviewed the materials listed in Appendix C plus other materials cited in this report.

If additional materials related to the eyewitness evidence in this case are provided to me at a later time, I reserve the right to supplement and/or edit my report where I deem relevant based on this additional information.

## III. Summary of Case and Opinions

At approximately 7:30am on October 9, 2004 in Columbus, Ohio, a lone robber knocked on the door of the home of Richard McClanahan and his long-time girlfriend Rhonda Curry. Ms. Curry and Mr. McClanahan had been asleep on a fold-out sofa very close to the door when the robber knocked. Ms. Curry's sister was also in the home in a bedroom but did not exit the bedroom during the robbery and did not see the robber. When Mr. McClanahan opened the door, the robber, who was wearing a gray hooded sweatshirt with the hood pulled tightly around his face so that only his eyes (and perhaps nose) was visible, forced his way inside and almost immediately struck Mr. McClanahan on the head with his gun, causing his head to begin bleeding and Mr. McClanahan to become dizzy. When Mr. McClanahan was struck in the head, he fell onto the sofa where Ms. Curry was still laying. The robber announced that it was a robbery and yelled at the victims, asking Mr. McClanahan where the money was. Mr. McClanahan was shot in the leg by the robber very early into the robbery. Ms. Curry tried looking at the robber but he screamed at her that he would kill her if she looked at him. She covered her eyes with a pillow and ultimately got a few glances of him. The robber then drug Mr. McClanahan around, demanding money. He was given $40 and then left the home. Mr. McClanahan was taken to the hospital by ambulance and had several surgeries as a result of the gunshot wound.

At the hospital, Det. Walker interviewed Ms. Curry for the first time. She gave a limited description of the robber and did not mention that she knew who this person was or had prior familiarity with him.

Four days after the robbery, Det. Walker interviewed Mr. McClanahan for the first time. According to her handwritten notes taken during that interview, Mr. McClanahan said he could identify the robber and his name was Richard Diggs. Det. Walker never prepared a photo array with Richard Diggs as the suspect and the two victims were never shown his photograph for the purposes of identification.

From the record, it appears that Richard Horton's name was developed as a suspect in this case by Mr. McClanahan's niece who had sold "Richard" a car 8-9 years before the robbery. According to Ms. Curry, their niece consulted a middle school yearbook and came up with the name Richard Horton. (TT 60).[1] The name Richard Horton was given to Det. Walker on October 28, 2004. It appears that several weeks later, on November 18, 2004, she created a photo array with Mr. Horton and 5 fillers. On December 4, 2004, she showed the array to Mr. McClanahan and then to Ms. Curry. Both selected Mr. Horton as the robber. Both victims testified at the trial in 2006 and identified Mr. Horton in court.

---

[1] The niece, Ms. Smith, testified in this civil case that she does not recall ever searching a yearbook for Mr. Horton's name, but whether this occurred or not is in the province of the ultimate factfinder.

Mr. Horton was convicted of the robbery in 2006. His conviction vacated in 2022 and, in 2023, all charges against him relating to the robbery of Mr. McClanahan and Ms. Curry were dismissed.

Ms. Curry and Mr. McClanahan were heavy (if not daily) users of crack cocaine for years before and after the robbery. (Dep. 68-9). In her deposition, Tracy Smith, Mr. McClanahan's niece, testified that her aunt and uncle were addicted to drugs "bad" and she could not believe that Mr. Horton would be convicted based off the testimony of two drug addicts. (Dep. 82).

It is unclear from Det. Walker's handwritten notes why, when Mr. McClanahan told her four days after the robbery that the robber was Richard Diggs, she did not create a photo array with Richard (or Ricardo) Diggs.

There are multiple explanations as to why both victims selected Richard Horton from the photo array two months after the robbery. Although neither witness had a good opportunity to see the robber, it appears that – at least for Ms. Curry – she came to the conclusion that the robber had to be Mr. Horton, a person with who both she and Mr. McClanahan were previously familiar. If they came to the conclusion that Mr. Horton was the robber based on deduction rather than their observations at the time of the robbery, then it provides a partial explanation as to why they would have selected him from the array. The array, however, was biased. It included only 1 person that matched the physical description given by the victims of the perpetrator and neither witness recalled receiving the pre-identification warnings that Det. Walker testified that she read to them. Therefore, the biased identification procedure made the decision to select Mr. Horton easy. This opinion was confirmed by Ms. Curry when she testified in her deposition that the fact that Mr. Horton was the only light-skinned Black male in the photo array helped her pick him out from the procedure. (Dep. 111).

Mr. McClanahan had an interaction with a person he believes to be named Richard the evening before the robbery outside a store. Mr. McClanahan believed that this person was Richard Horton but, aside from Mr. McClanahan's belief that this person was Mr. Horton, there is no other evidence in the record to support this belief, and Mr. Horton's alibi contradicts this belief.[2]

Ms. Curry testified in her deposition that Det. Walker showed her a single photograph of Mr. Horton within days of the robbery. She later changed her testimony on this point regarding the number of photographs but remained consistent that Det. Walker showed her photographs within days of the robbery. At this point in the investigation, however, Mr. Horton's name had not been associated with the robbery (this happened on October 28, 2004). The only name that had been provided at this time in the investigation was Richard Diggs. Ms. Curry testified that she positively identified Richard from this procedure. If this procedure took place, as Ms. Curry has testified, the details and outcome were not provided in a police report. If a single photograph had been shown, regardless of whom was the suspect at that time, it would be a highly suggestive identification procedure and would be another reason Mr. Horton stood out in the photo array.

Further, the witnesses were given information by Det. Walker that has been shown to inflate witness confidence and other aspects of their recollections and testimony regarding their identification decision. Specifically, the witnesses were told by Det. Walker that Mr. Horton had been arrested. They also were informed that they had picked the same person from the photo array. Both of these suggestive practices have been shown to cause witnesses to become more confident in their decision, report that they had a better view of the perpetrator than was actually the case, and other aspects of their opportunity to perceive. All of these factors, in combination, very likely increased the probability that Mr. McClanahan and Ms. Curry would select Mr. Horton from the biased photo array, which ultimately led to his conviction in this case.

---

[2] Mr. McClanahan stated that this individual asked him for money and to use the payphone. Richard Horton had a cell phone and a job at the time of the Loew Street robbery.

**IV. Basis for Opinions in This Case**

In this section, I identify a series of factors, relevant to the current case, that have been shown through scientific peer-reviewed research to influence the reliability of eyewitness identifications. As this research relates to the selection of Mr. Horton as the shooter, I will first outline the factors known to affect eyewitness accuracy that are *not* under the control of law enforcement (known as "estimator variables"), followed by the factors that are under the control of law enforcement (known as "system variables").[3] It is critical to understand the impact of both types of variables on eyewitness accuracy so that an evaluation of an eyewitness's ability to view and perceive the events and subsequent likelihood of making an accurate identification can be made. In addition, "reflector variables" including eyewitness confidence and decision speed also will be discussed with respect to their relationship to eyewitness accuracy.[4]

As far back as 1966, the International Association of Chiefs of Police (IACP) published law enforcement training keys on the subject of eyewitness memory where they warned of the fallibility of eyewitness testimony and provided guidance on how to assess eyewitness reliability. IACP also published eyewitness training keys in 1983, 1992, and 2006. The IACP website currently has roll call training videos and additional documentation regarding eyewitness identification best practices.[5] These best practices are consistent with Ohio law on eyewitness identification procedures (passed in 2010).[6]

Based on my review of the above materials, the estimator and system variables relevant to the selection of Mr. Horton include:

**Estimator Variables:**
1) Effects of Limited Opportunity to Observe at the Time of the Event
   a) Exposure Time
   b) Lighting
   c) Weapon-focus Effect
   d) Disguise
2) Prior Familiarity
3) Stress/Arousal
4) Delay

**System Variables:**
1) Post-event Contamination
2) Description "Accuracy"
3) Showup/Single Photograph
4) Lineup Bias
5) Pre-identification Warnings/Instructions
6) Non-blind Lineup Administration
7) Repeated Identification Procedures, Unconscious Transference and Commitment Effects
8) Witness Confidence
9) Post-identification Feedback
10) Voice Identification

---

[3] Wells (1978). Applied eyewitness testimony research: System variables and estimator variables. *Journal of Personality and Social Psychology, 36,* 1546 –1557.
[4] Wells (2020). Psychological science on eyewitness identification and its impact on police practices and policies. *American Psychologist, 75(9),* 1316-1329.
[5] See: https://www.theiacp.org/resources/policy-center-resource/eyewitness-identification.
[6] https://www.innocenceproject.org/wp-content/uploads/2016/03/ohio_statute1.pdf.

**V. General Background on Eyewitness Research**

Over a period of decades, researchers have established that when we experience an important event, we do not simply record it in our memory as a video recorder would. The situation is much more complex.[7] In fact, the National Research Council Report on eyewitness identification titled "Identifying the Culprit: Assessing Eyewitness Identification"[8] concluded the following with respect to humans' ability to accurately perceive their environment (P. 55):

> *Perception does not reflect the sensory world passively, as camera film detects patterns of light.*

In fact, the prevailing theory of memory divides it into three stages. First, a witness perceives an event and some of that information is entered into the memory system. Next, some time passes before a witness tries to remember the details of the event. Finally, the witness tries to retrieve the information that was stored in memory. The National Research Council report reminds us that (P.57-58):

> *The way an observer experiences a visual scene—the setting, the people, and the actions associated with a crime —is commonly influenced as much by expectations from prior experience with the world as it is by the precise patterns of light cast upon the retina. (P. 57) In view of this inherent dependence of perception on prior experiences and context—and, importantly, the fact that the viewer is commonly none the wiser when perception differs from the "ground truth" of the external world— it appears that accurate eyewitness identification may be difficult to achieve.*

Psychologists who conduct research in this area investigate the factors that play a role and can affect memory in each of the three stages. Specifically, researchers have identified a number of ways that eyewitness evidence – a witness' recollection of events – like other forms of **trace evidence** in an investigation, can be altered and/or affected through **contamination**, especially when the witness' memory for the event is not strong to begin with. Contamination of a witness' memory can come from many sources including information learned from (or about) other witnesses, information provided by law enforcement or other individuals charged with the collection (and preservation) of eyewitness evidence, and media and social media accounts relating to the case. Regardless of the source, however, once a witness' memory has been exposed to post-event information, it is extremely difficult to ascertain the full impact of this contamination on a witness' subsequent recollection of events and people.

Numerous factors at each stage of memory affect the accuracy of an eyewitness account. Some of the factors affecting eyewitness performance include: the opportunity of the witness to see a perpetrator's face and body, and stress or fear experienced during the event. As it relates to law enforcement, research has shown that the procedures and practices police use during the retrieval stage of memory can influence the reliability of an eyewitness identification and the witness' subsequent testimony. Examples of police procedures that can affect an eyewitness' accuracy and memory include the use of pre-lineup/photo array[9] instructions, whether the identification was conducted using a double-blind administrator, and the type of post-event information provided to a witness both before and after their identification decision.

In February 2020, the American Psychology-Law Society (Division 41 of the American Psychological Association) published a revised White Paper on eyewitness identification best practices, updating their

---

[7] For a review of science of perception and witness memory, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[8] Ibid.

[9] In this report, the terms "lineup" and "photo array" will be used interchangeably except when discussing the specific procedures utilized in this case.

1998 Eyewitness White Paper.[10] The 2020 White Paper[11] maintained the original four best practice recommendations from 1998[12] and added five new best practice recommendations for the collection and preservation of eyewitness evidence.[13] The opinions in this report regarding best practices are, where relevant, consistent with these best practice recommendations as well as the eyewitness identification law in Ohio.

**Eyewitness Error Rates in Actual Cases**

According to the national Innocence Project database, there have been mistaken eyewitness identifications in nearly 70% of post-conviction DNA exonerations in the United States – which this database currently numbers as more than **375.**[14] In a 2011 analysis of the first 250 DNA exoneration cases in the United States, Duke University Law Professor Brandon Garrett found that the leading contributing factor in these wrongful convictions was erroneous eyewitness identification, which occurred in 76% of the first 250 cases.[15] In a quarter of all wrongful convictions studied by Garrett, eyewitness testimony was the *only* direct evidence against the defendant. In the 190 DNA cases where there was an erroneous eyewitness identification of the defendant, 36% included mistaken identifications from *more* than one eyewitness, such as in this case. In fact, some of the DNA cases had as many as five eyewitnesses who incorrectly testified that the defendant was the perpetrator they saw. In 31 cases, there was "prior familiarity" between the witnesses and the person wrongfully convicted. In these exoneration cases, there is no evidence that witnesses were anything more than wrong. In other words, mistaken eyewitnesses were not accused or suspected of lying about their selection of the innocent defendant. Evidence demonstrates it is common for eyewitnesses to genuinely believe they are identifying the correct person yet still be mistaken.

In addition to the wrongful conviction cases described above, archival studies of police records also show that eyewitness identifications can be unreliable. Researchers have analyzed archival records of actual eyewitness identifications and attempted identifications from police files.[16] In the 2020 White Paper

---

[10] Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. *Law and Human Behavior, 22,* 603–647.

[11] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[12] These include: how to select lineup fillers, providing witnesses with a pre-lineup warning, the use of double-blind administration, and recording a confidence statement from a witness after they have made a selection.

[13] These include: the need to conduct a pre-lineup interview with a witness, the need for evidence-based suspicion before conducting an identification procedure, video-recording the identification procedure, avoid repeated identification attempts with the same suspect, and avoid using showups and single photographs when possible.

[14] This statistic has not been updated on the Innocence Project website (www.innocenceproject.org) for at least two years and therefore this figure likely is an underestimate of the current number of DNA exonerations in the United States. For example, the National Registry of Exonerations lists **617** exonerations with DNA evidence as of June 1, 2025. Visit: https://www.law.umich.edu/special/exoneration/Pages/about.aspx.

[15] Garrett (2011). *Convicting the innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[16] Unfortunately, when using archival data and police records, it is not possible for researchers to determine when a suspect identification is correct because the ground truth about whether the suspect in a lineup or other identification procedure is guilty is not known. Despite some researchers' best efforts to

6

discussed above, Wells and colleagues summarized the filler identification data from several archival studies of actual eyewitnesses to crimes.[17] The authors examined 11 published articles with data from over 6,500 witnesses in actual cases. The results showed that nearly one quarter of all witnesses who viewed a photo array or lineup in actual cases chose an innocent filler. Of those who "identified"[18] a person from a photo array or lineup, more than one third (37%) chose an innocent filler as the perpetrator. Further, the overall eyewitness identification error rate must be higher than 37% because the data does not include erroneous selections of innocent suspects (it only includes known-innocent filler selections).

In summary, identification decisions in actual cases show that errors are common and that over one third of all "positive identifications" in actual cases are incorrect. While false identifications of innocent fillers invariably do not send those fillers to prison, these choices still constitute identification errors and provide valuable information about the reliability of eyewitnesses and the reliability of identification procedures generally.

## VI. Expert Opinions Regarding Eyewitness Reliability

Following my review of the materials listed above, I have identified the following eyewitness reliability factors as being relevant to the eyewitnesses in this case. Below, I use examples from the scientific literature to support my conclusions. The cited research is not intended to be an exhaustive list of all relevant research on each topic below, rather a sample of the scientific literature. In addition, samples of testimony and other evidence from the materials reviewed in this case will be used to support the relevance of each scientific factor to this case. Not all examples found in the materials will be repeated in this report.

**Estimator Variables**

**1. Effects of Limited Opportunity to Observe at the Time of the Event**

Common sense might suggest that even a brief opportunity to view a perpetrator's face allows us to form a mental "snapshot" of that person. But research supports a different conclusion: the opportunity a witness has to view a perpetrator's face significantly impacts the witness' later ability to describe and identify that person. Generally, when the opportunity to see a person's face is limited (due to a short observation time, the presence of a weapon or disguise, a long distance, etc.), the result will be a weak or poor memory (trace) for that individual. What is critical with respect to reliability is the amount of time that a witness has to view a person's face *at the time of the event*.

---

*estimate* the truth, actual truth about whether the suspect in the lineup or other identification procedure is truly guilty is rarely known to researchers using archival and field data. It is possible, however, to determine general error rates as reflected in the false identification of non-suspect fillers. Dr. Ruth Horry and colleagues discuss additional concerns about archival studies in their 2014 paper: Horry, Halford, Brewer, Milne, & Bull (2014). Archival analyses of eyewitness identification test outcomes: What can they tell us about eyewitness memory? *Law and Human Behavior, 38,* 94–108.

[17] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[18] Witnesses who "identify" an innocent lineup filler are obviously not making this selection because they truly recognize the filler from the crime, so the term "identify" is not the correct term. Thus, it is important to distinguish between an identification (which is presumably made based on a recognition of a person based on match-to-memory) and *choosing* behavior (selecting someone from a showup, mug-shot, photo array or lineup procedure).

a) **Exposure Time**

According to police reports, the lone robber forced his way into Mr. McClanahan's home when he answered the door around 7:30am, knocking him backwards. During the entire robbery, the robber was wearing a hoodie with the hood pulled tight around his face. Mr. McClanahan initially told police that he "couldn't see the face" of the robber but that the voice sounded familiar (City00009). Again at trial, he testified that he did not see the face of the robber. (TT 69). These statements were contradicted by Det. Walker's typed report dated December 30, 2004 where she wrote that McClanahan told her on October 13, 2004 that he did see the face of the robber. (City00020).

When the robber saw that Ms. Curry was looking at him, he told her to stop or he would kill her. She then quickly covered her eyes with a pillow. (City00005). According to Det. Walker's handwritten notes (City00044), Ms. Curry tried to peek at the robber a couple of times. Mr. McClanahan testified at trial that Ms. Curry had "got a glance of the guy". (TT 50). According to the Criminal Investigation Summary, Ms. Curry also told police that the robber had a hoodie pulled tight over his face and she could only see his eyes and nose. (City00006).[19] At trial, however, Ms. Curry testified that she "got a good opportunity" to see the robber even though she only peeked at him 2-3 times. (TT 86). In her deposition, she testified that she could see the robber's eyes and could not recall if she could see his nose (Dep. 16) and only saw him for a few seconds while also looking at the gun. (Dep. 241-2).

In research on the effects of exposure duration – the amount of time one has to view or encode something - on eyewitness accuracy, Shapiro and Penrod found a systematic relationship between exposure time and identification accuracy in their 1986 meta-analysis on this topic.[20] That is, shorter exposure time generally correlates to less accurate identifications. In the time since this comprehensive review was published, an updated meta-analysis[21] and other research[22] have replicated the positive correlation between the amount of time a witness saw the perpetrator's face and reliability.

For example, in one study by Memon, Hope and Bull, participant witnesses viewed a video of a realistic crime that lasted either one minute, forty seconds (with the perpetrator's face in view for 45s) or one minute and 7s (with the perpetrator's face in view for 12s).[23] Witnesses were then tested with a perpetrator-present or perpetrator-absent photo array 40 minutes later. As shown in the following table, the proportion of correct identifications and correct rejections increased substantially when exposure time increased from 12s to 45s. Importantly, however, mistaken identifications (false alarms) in perpetrator-absent arrays also increased substantially when exposure time was shorter vs longer.

---

[19] The Criminal Investigation Summary indicated that Ms. Curry recognized the robber and would be able to identify him (City00005).

[20] Shapiro & Penrod (1986). Meta-analysis of facial identification studies. *Psychological Bulletin, 100,* 139–156.

[21] Bornstein, Deffenbacher, Penrod, & McGorty (2012). Effects of exposure time and cognitive operations on facial identification accuracy: A meta-analysis of two variables associated with initial memory strength. *Psychology, Crime and Law, 5,* 473–490.

[22] For example, see: Longmore, Liu, & Young (2008). Learning faces from photographs. *Journal of Experimental Psychology: Human Perception and Performance, 34,* 77–100; Memon, Hope, & Bull (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354; Read, Vokey, & Hammersley (1990). Changing photos of faces: Effects of exposure duration and photo similarity on recognition and the accuracy–confidence relationship. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 16,* 870–882.

[23] Memon, A., Hope, L., & Bull, R. (2003). Exposure duration: Effects on eyewitness accuracy and confidence. *British Journal of Psychology, 94,* 339–354.

*Performance of Young Adults (ages 17-25) in the 12s and 45s Exposure Conditions with Perpetrator-Present and Perpetrator-Absent Photo Arrays (**Errors** are bolded)*

|  | 12 Seconds Exposure | | | 45 Seconds Exposure | | |
|---|---|---|---|---|---|---|
|  | Hits | False Alarm | No Choice | Hits | False Alarm | No Choice |
| Perpetrator-Present Array | 29% | **42%** | 29% | 95% | **5%** | 0% |
| Perpetrator-Absent Array | NA | **90%** | 10% | NA | **41%** | 59% |

The results of the Memon et al. study above show that in circumstances where witnesses viewed the perpetrator's face for 45s, 41% of witness made a mistake and misidentified an innocent person from a photo array in which the actual perpetrator was not shown. When the exposure time to the perpetrator's face was reduced to 12s, the false identification of innocent people rose to 90%. Given the descriptions of the shooting provided by witnesses in this case, it seems unlikely that their ability to see the portion of the face visible of the shooter was even 12 seconds. As a point of comparison, participants in the Memon et al. study were not under conditions of high stress and their memory was tested only 40 minutes after viewing the crime (not 2 months later).

**b) Lighting**

On October 9, 2004, the sunrise in Columbus, OH was at 7:36am.[24] Ms. Curry testified in her deposition that they did not have any lights on in the house at the time of the robbery (Dep. 243), which was around 7:30am.[25] 927 Loew Street also faced the east, so any light coming in from outside through the small front windows would have been at the perpetrator's back. Although all she could see was the robber's eyes, there was not enough light in the room to see the color of his eyes. (Dep. 243).

It is important to have a basic idea of how visual information gets into the brain in order to understand how lighting conditions can affect perception.[26] The answer lies in a network of millions of nerve cells. Of particular importance to the visual system are two types of receptor cells in the eye called *rods* and *cones*. Rods and cones absorb information that is eventually transmitted to the brain, telling us what we "see". Critically, rods and cones have different functions. Rods are related to *nighttime* or low-lighting visual conditions – such as the conditions the witnesses in this case would have experienced – and cones are related to daytime or good-lighting conditions. Cones are the primary mechanism for color vision and this is why we see little color by moonlight because there is not enough light to stimulate the cones. We can see shades of light and dark at night because moonlight is intense enough to stimulate the rods. Rods, however, provide a much less sharp image than do cones. That is why objects and people lit by moonlight, although visible, may appear coarse and ill-defined.[27] In this case, the poor lighting conditions could not have increased the reliability of the witnesses' observations and could only have served to reduce their ability to see clearly and in detail.

---

[24] https://www.timeanddate.com/sun/usa/columbus?month=10&year=2004.

[25] Mr. Horton's father-in-law also testified that he believes the electricity may have been cut from the home on the day of the robbery (Dep. 17-18), and the Crime Scene Processor used flash in the crime scene photographs because of the darkness of the room the crime occurred in.

[26] For a detailed review of this process, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[27] Loftus, Doyle, Dysart, & Newirth (2020). Eyewitness testimony: Civil and criminal (6th Edition). LexisNexis.

**c) Weapon-focus Effect**

The robber entered Mr. McClanahan's home by forcing his way in, and immediately struck Mr. McClanahan in the head with the gun. He testified at trial that he saw the gun – a 9mm silver gun – before he was struck. (TT 47). The robber held the gun to Mr. McClanahan's head during the robbery and pointed it in his face. (City00019).

Ms. Curry testified at trial that she saw the gun (TT 82) and told police that the gun was "flat with a five or six inch silver barrel and a black handle". (City00017). In her deposition, she testified that she saw the gun very early in the encounter when the robber entered their home. (Dep. 22). She also testified that when she peeked at the robber 2-3 times from behind a pillow, she was also looking at the gun at the same time. (Dep. 241).

The phenomenon where witnesses look at a weapon during an event is referred to as the "weapon focus effect." As the witness focuses on the weapon, their ability to adequately remember and later recall details such as characteristics of the perpetrator is lessened. Researchers have assessed the ability of eyewitnesses to recall various crime details in an attempt to establish the parameters of weapon focus effects on perception and memory. This research was first reviewed in a meta-analysis published by Steblay in 1992. The weapon focus effect was statistically significant and demonstrated an impairment of identification accuracy when a weapon was present during the event/crime. A more recent meta-analysis confirms the findings of the Steblay 1992 report.[28] In summary, although it can certainly be true that a witness pays close attention to a *weapon*, the research results indicate that attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. In addition, viewing a weapon can also cause a witness to become afraid, which also can decrease the quality of a witness' memory (see below).

**d) Disguise**

Another factor that can reduce a witness' ability to observe is the presence of disguise (e.g., hat, mask, sunglasses) worn by a perpetrator during the commission of a crime.

In this case, the robber was wearing a gray hooded sweatshirt with the hood pulled tightly around his face so that only his eyes, and possibly his nose, could be seen.

With respect to "obstructions" that limit a witness' opportunity to see a perpetrator's face clearly, research has shown that when a perpetrator is merely wearing a hat it can significantly reduce later identification accuracy.[29] More extreme obstructions, such as a mask, have an even larger impact on accuracy. Thus, the presence of a hoodie pulled tightly around the robber's face (in poor lighting conditions) likely had a negative impact on the witnesses' abilities to see the robber clearly and subsequently make an accurate identification of his face.

---

[28] Fawcett, Russell, Peace, & Christie (2013). Of guns and geese: A meta-analytic review of the "weapon focus" literature. *Psychology, Crime & Law, 19,* 35–66.

[29] E.g., Cutler & Penrod (1988). Improving the reliability of eyewitness identification: Lineup construction and presentation. *Journal of Applied Psychology, 73,* 281–290; Mansour, Beaudry, Bertrand, Kalmet, Melsom, & Lindsay (2020). Impact of disguise on identification decisions and confidence with simultaneous and sequential lineups. *Law and Human Behavior, 36,* 513–26.

**2. Prior Familiarity**

According to a police report, within hours of the robbery, Mr. McClanahan told police that he did not see the face of the robber but believed he recognized the *voice* as being someone he knows. (City00009).[30] In Det. Walker's handwritten notes taken 4 days after the robbery in an interview with Mr. McClanahan at the hospital, Mr. McClanahan told Det. Walker that the robber's name was Richard Diggs, who lived on Reynolds Ave, 1 house down from the alley.[31] (City00048). These handwritten notes are contradicted by a typed report by Det. Walker where she indicated that Mr. McClanahan initially only told her that the robber's name was "Richard". (City00005). In that same report, Det. Walker wrote that on October 28, 2004, Mr. McClanahan told her that the robber's name was "Richard Horton". (City00005).

According to Det. Walker's handwritten notes from an interview with Ms. Curry on the day of the robbery, Ms. Curry provided only a brief description of the robber and (critically) did not mention that the robber was known or familiar to her or that she would be able to recognize this person. (City00045). In a typed report, however, Det. Walker wrote that Ms. Curry recognized the robber but could not recall from where. (City00005). In her deposition, Det. Walker testified that she did not write this information in her notes but that she "obviously remembered it when I was doing the informational summary", which could have been months after the October 9, 2004 interview. (Dep. 105). She testified there wasn't a reason why she did not put this information in her handwritten notes (Dep. 105) even though she testified that it is important information to know if a witness knows who the perpetrator is. (Dep. 102). Contrary to this testimony, Det. Walker also testified to the following (Dep. 102):

> Q. Would you agree that it's important information if a victim believes that they know who the perpetrator is?
> A. Yes.
> Q. Okay. And so important information like that, you would write down if she had told it to you, correct?
> A. If she – yeah. If she knew him, yes. Or if she said, "I think I know him," she –
> Q. Yeah, you would've --
> A. She didn't say that, no.

At trial, Ms. Curry testified that she had contact with Mr. Horton when he bought a car from Mr. McClanahan's niece (about 8-9 years earlier, according to Mr. McClanahan) and she did not know him any other time (TT 99) or maybe in passing. (TT 101). In her deposition, Ms. Curry testified that she had no memory of a car sale transaction between the niece and Mr. Horton (Dep. 201, 282) but had bought drugs from Richard Horton maybe a month or two before the robbery. (Dep. 40-1). She then testified that she did *not* buy any drugs from Mr. Horton in the months before the shooting (Dep. 25) and then testified that she had bought drugs from Mr. Horton 1-2 years before the robbery. (Dep. 293).

Ms. Curry testified that she told Det. Walker that the person that robbed them "had to have been" Richard Horton because she did not know any other people named Richard. (Dep. 42). She also testified that she did not "figure it all until, like I said, after I got to thinking about it and thinking about it. And I said, it had to have been Richard, because like I said, that was the only man I knew at the time that was tall and light-skinned and with them devilish eyes." (Dep. 94). She did not realize it was "Richard" when the robbery took place. It only later came to her. (Dep. 94-5). The conclusion she can come up with is that the robber

---

[30] This same report says "unknown man knocked on the front door" of the victim's home. (City00008).

[31] Det. Walker testified in her deposition that Mr. McClanahan was not sure about the last name and thought it was Diggs. There is no record in her handwritten notes regarding his uncertainty with the last name of the person named Richard (Dep. 115-6) or that he was going to ask his niece about Richard's last name. (Dep. 117).

was "Richard" that sold her drugs a few times. (Dep. 95). It was with the help of her daughter and Tracy Smith that Ms. Curry was able to piece everything together and come to the conclusion that the robber was Richard (Horton).[32] (Dep. 106). She also heard from others that Richard Horton was "on the run" and asked herself why he would be running if he knew he was innocent. (Dep. 115). When Ms. Curry was looking at the photo array, she was picking out the guy she knew to be the drug dealer because she was able to recognize the drug dealer. (Dep. 112). In her deposition, Ms. Curry stood by her selection of Mr. Horton and came up with an explanation that Richard Diggs may also go by the name Horton – Richard Diggs Horton. (Dep. 60). She believes that Richard Diggs and Richard Horton are the same person. (Dep. 61-2).

It is accurate to say that we are more likely to correctly recognize people that we are familiar with or people that we "know" than we are to recognize a stranger. Familiarity can range from a single previous observation/encounter to a family member or close friend. Although identification errors of familiar people are less likely to occur, the research on non-stranger or "familiar-other" identifications shows that even these identification circumstances are not without error.[33] However, what is critical to consider, as described above, is a witness' opportunity to view a perpetrator at the time of the crime so that a sufficient opportunity to see that person's face exists. For example, there have been multiple field studies (with witnesses in actual cases) examining the rate of suspect and filler identifications in stranger and non-stranger cases. On average, the rate of suspect identifications in these studies is 41% in stranger cases and 90% in non-stranger cases. Of particular interest, however, is the rate of misidentification of known-innocent fillers in the identification procedure. If a witness and perpetrator were previously known to each other, one might expect that the eyewitness would not make a mistake and choose an innocent lineup member. However, on average, 5% of non-stranger cases have filler identifications.

This pattern of results from field studies is consistent with a laboratory study conducted by Dr. Steblay and colleagues[34] where they found that 9% of witnesses in non-stranger situations made a filler identification. In a 2019 summary of the non-stranger literature,[35] Vallano and colleagues provide the following warning (P.133):

> Yet familiar identifications are not infallible. First, an eyewitness who states that they know who the perpetrator is does not necessarily mean that the familiar person she identified is the perpetrator. Second, familiar identifications are not all created equal. Familiar identifications involving minimal prior exposure to the perpetrator may operate similarly to stranger identifications, with similarly high error rates.

---

[32] In her deposition, Kim Curry testified that she does not know how her mother and Mr. McClanahan came up with the name Richard Horton and she does not know and has never known anyone with the nickname Adidas Boy. (Dep. 72). In Tracy Smith's deposition, she testified that there were a few people named Richard in the neighborhood in 2004. She then recalled someone named Richard who had a brother that were in and out of prison. When asked if she recalled the last name Diggs, she recalled the brothers Richard and Ricardo. (Dep. 48-9). She also recalled Richard and Ricardo pretending to be each other. (Dep. 51), something corroborated by Richard Diggs (Dep. 47-48). She also heard from the neighborhood that Richard and Ricardo Diggs were drug dealers (Dep. 55) and did not recall ever hearing the nickname Adidas Man or Adidas Boy. (Dep. 55).

[33] For a review of this research, see Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

[34] Steblay, Dietrich, Ryan, Raczynski & James (2011). Sequential lineup laps and eyewitness accuracy. *Law and Human Behavior, 35,* 262–274.

[35] Vallano, Slapinski, Steele, Briggs & Pozzulo (2019). Familiar eyewitness identifications: The current state of affairs. *Psychology, Public Policy, and Law*, 25, 128-146.

In this case, due to Ms. Curry's limited prior exposure to Mr. Horton and her limited opportunity to observe the robber at the time of the crime, it appears that she used deduction to decide that the robber was Mr. Horton rather than recognition.

**3. Stress/Arousal**

The robber entered Mr. McClanahan's home by forcing his way in, and immediately struck Mr. McClanahan in the head with the gun and then shot him in the leg. (TT 49). Mr. McClanahan was losing blood from his head and gunshot wound to the leg and was becoming weak and dizzy. (TT 49). The robber held the gun to Mr. McClanahan's head during the robbery and said "Man, I'll kill you!". (City00016). At trial, he testified that he thought he was going to die. (TT 64).

Ms. Curry testified at trial that she was in shock when the robber forced his way into their home and struck Mr. McClanahan in the head. She did not hear the gunshot (TT 82) and does not remember the gun going off. (TT 83). In her deposition, Ms. Curry consistently testified that she did not hear the gunshot and may have blacked out. (Dep. 21). The robber told Ms. Curry to stop looking at him and if she did not stop, he would kill her. (City00005). When the robber caught Ms. Curry looking at him, he put his gun to the pillow she was using to cover her eyes and said he would have to kill her because she had seen his face. (City00016, TT 85). Mr. McClanahan pleaded with the robber to not shoot Ms. Curry and to instead kill him. (TT 50, 86). Ms. Curry testified at her deposition that it was a very traumatic day. (Dep. 96).

In research related to stress and arousal, Deffenbacher and colleagues published a meta-analysis on the effects of stress/arousal on eyewitness performance.[36] This meta-analysis reviewed 27 tests of the effects of heightened stress on identification accuracy and 36 tests of its effect on recall of crime-related details. The researchers found that high levels of stress negatively impact both types of memory.  The meta-analysis revealed that the effect of stress was larger for target-present than for target-absent lineups—that is, stress particularly reduced correct identification rates.  Significantly, the effect was also considerably larger for eyewitness identification studies which simulated eyewitness conditions—e.g., staged crimes—than for studies involving simple face recognition activities.

Researchers have also found that even physical exertion – such as running – can cause increases in arousal which result in impaired eyewitness identification abilities.[37] In summary, high levels of stress and arousal, which the witnesses in this case unquestionably experienced, have been demonstrated to significantly reduce the reliability of eyewitness identifications.

**4. Delay**

The robbery took place on October 9, 2004 and the witnesses viewed the photo array on December 4, 2004, almost 2 months later. Although the witnesses had limited prior familiarity with Mr. Horton, it appears from the record that Ms. Curry used deduction to come to the conclusion that the robber was Mr. Horton. Therefore, it is possible that the delay in this case (coupled with memory contamination) could have reinforced her belief that the robber was Mr. Horton, increasing the probability that she would have selected him from the array.

---

[36] Deffenbacher, Bornstein, Penrod, & McGorty (2004). A meta-analytic review of the effects of high stress on eyewitness memory. *Law and Human Behavior, 28,* 687–706.

[37] Hope, Lewinski, Dixon, Blocksidge, & Gabbert (2012). Witnesses in action: The effect of physical exertion on recall and recognition. *Psychological Science, 4,* 386–390.

13

It is a generally accepted principle amongst memory and eyewitness researchers that memory decreases relatively quickly after an event and then continues to decrease with the passage of time. This relationship is known as the "forgetting curve". Researchers have examined delays of up to 11 months and found significant impairments on accuracy after this time period.[38] Even longer delays would likely further weaken a witness' memory and cause even greater reductions in accuracy. One of the earliest eyewitness studies to investigate long periods of delay was a study conducted by Egan and colleagues.[39] After a delay of 2 days, 21 days, or 56 days, participants were asked to make an identification of two targets that they had viewed during a live exposure. The researchers found no significant decrease in correct identifications of the target over the delay; however, the rate of false alarms of innocent people increased from 2 days (48% errors) to 21 days (62% errors) to 56 days (93% errors). Other research conducted over the past three decades has confirmed the deleterious effects of delay on identification accuracy and in particular the misidentification of innocent suspects.[40] Further, individuals with weak or poor memories of an individual (due to the presence of estimator variables that affect the strength of the memory trace) are much more likely to be influenced by suggestive procedures (e.g., non-blind administration, filler bias, post-identification feedback).

In summary, with respect to estimator variables, there is evidence that both witnesses in this case had only a short period of time to see the face of the robber if they were able to see the robber's face at all. In addition, the witnesses testified about being shot, and fearing for their lives. Together, these estimator variables likely created a scenario where it would have been difficult for any witness to have a strong memory for the perpetrator. As will be discussed below, there are significant concerns regarding eyewitness reliability in identification cases where the witness has a weak memory for the perpetrator and suggestive identification procedures are employed.

**System Variables Relevant to the Current Case**

The police reports and other documentation reveal that several system variables employed in this case, in my opinion, led to or significantly increased the likelihood of a selection of Mr. Horton as the robber.

**1. Post-Event Contamination**

Ms. Curry testified that Det. Walker either told her the name Richard Horton or the name was written on the photo that Det. Walker showed her within days of the robbery.[41] (Dep. 82). This was *before* Tracy McClanahan had given Ms. Curry the name Richard Horton. (Dep. 82). Ms. Curry also testified that Det. Walker told her that Mr. Horton was on the run and the police could not locate him. (Dep. 45-6, 115). The next thing Ms. Curry knew, "they said they had arrested Richard Horton". (Dep. 46).

Ms. Curry testified at trial that on the way to the hospital she believed the robber was someone named Richard that had gone to school with her daughter. According to Ms. Curry, her daughter told her that they called a person named Richard "Adidas Man" or something like that. (TT 90). Therefore, the nickname

---

[38] Shepherd (1983). Identification after long delays. In Lloyd-Bostock (Ed.), *Evaluating witness evidence* (pp. 173-187). New York: Wiley.

[39] Egan, Pittner, & Goldstein (1977). Eyewitness identification: Photographs vs. live models. *Law and Human Behavior, 1,* 199-206.

[40] E.g., Deffenbacher, Bornstein, McGorty, & Penrod (2008). Forgetting the once-seen face: Estimating the strength of an eyewitness's memory representation. *Journal of Experimental Psychology: Applied, 14,* 139-150; Dysart, & Lindsay (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In Lindsay, Ross, Read, & Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

[41] She later testified in her deposition that no names were written on the photographs. (Dep. 194).

Adidas Man did not come from Ms. Curry but from her daughter or another source.[42] Importantly, Ms. Curry's daughter went to school with multiple people named Richard, including Richard Diggs.

Within days of the robbery, Ms. Curry and Mr. McClanahan spoke at the hospital and discussed who they believed had robbed them. According to testimony, they believed someone named Richard was the person who robbed them. (TT 91). According to Ms. Curry, their niece Tracy then examined a middle school yearbook and this is when the name Richard Horton was produced. Tracy told Ms. Curry it's "got to be Richard Horton" and Tracy "figured it out". (Dep. 55). It is unclear whether Mr. McClanahan also examined the yearbook, looking for someone named "Richard". Both Richard Horton and Richard and Ricardo Diggs went to middle school with Curry's niece and both men likely would have been in this yearbook. At her deposition, Ms. Curry testified that Mr. McClanahan believed that the robber was named Richard but that they had to figure out the last name through Mr. McClanahan's niece, Tracy McClanahan. (Dep. 36) Tracy told the witnesses that Richard Horton sold drugs in the neighborhood at that time of the robbery and that she went to school with him. (Dep. 38). Ms. Curry then testified that she bought drugs (within a 2-3 month timeframe of the robbery, Dep. 43) and that she told Det. Walker that the person that robbed them "had to have been" Richard Horton because she didn't know any other people named Richard.[43] (Dep. 42). Det. Walker then told Ms. Curry that Richard Horton sold drugs. (Dep. 42).

It is a well-established fact in the psychological literature that our memories for events can be altered by information we learn after the original event.[44] There are many sources of post-event memory contamination that can affect a witness' memory and reporting of an event. Witnesses and victims can learn information about the crime or the perpetrators from other witnesses (aka *co-witness contamination*), law enforcement, the media, etc.

For example, in one research study that examined whether learning misinformation about a suspect could influence a person's memory and identification accuracy, Zajac and Henderson[45] found evidence that memory contamination can affect both descriptions and identifications. In this study, research participants were paired with a research confederate (who was working for the researchers) that the participants believed was another participant in the study (i.e., a co-witness). Together, they viewed a video clip of a staged theft. Then, half of the participants were misinformed by the confederate that the thief's accomplice had blue eyes when in fact they were brown. Next, individual participants described the accomplice and viewed a target-absent (the accomplice was not present) line-up comprised of blue-eyed lineup members only. Misinformed participants were eight times more likely than those who did not receive "blue-eyed" misinformation to describe the accomplice as having blue eyes, and twice as likely to falsely identify someone with blue eyes from the line-up. What is important about this study is that merely learning information from another source can influence memory, reports, and identifications made by witnesses to a crime.

In summary, the concern with post-event contamination is that it can be difficult to accurately remember the *source* of our memories and, thus, information learned from others is likely to contaminate our

---

[42] In her deposition, Kim Curry testified that she does not know how her mother and Mr. McClanahan came up with the name Richard Horton and she does not know and has never known anyone with the nickname Adidas Boy. (Dep. 72).

[43] Before Ms. Curry "put it together" and decided that the robber was Richard, her daughter was talking about a Richard, her niece (Tracy) was talking about a Richard, Mr. McClanahan was talking about a Richard, and she learned that Richard was "on the run". (Dep. 267-8).

[44] National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press.

[45] Zajac & Henderson (2009). Don't it make my brown eyes blue: Co-witness misinformation about a target's appearance can impair target-absent line-up performance. *Memory, 17,* 266-278.

"original" memory for a person or event. In many cases, the full scope and impact of post-event contamination is unknown which is why it is so important to obtain a detailed, recorded interview with a witness. In this case, the extent of the contamination is unclear but the record indicates there were multiple opportunities for the two witnesses to have learned information about the robber from others.

## 2. Description "Accuracy"

The descriptions of the robber provided by Mr. McClanahan and Ms. Curry would be considered vague in comparison to the average description provided by eyewitnesses. Four days after the robbery, Det. Walker interviewed Mr. McClanahan at the hospital. He said that the robber was a light-skinned Black male, between 5'9-6'0',[46] bushy eyebrows, and short nappy hair. (City00020; Walker TT 145). It is unclear how Mr. McClanahan was able to provide a hair description of the robber as he did not see the robber's hair because the robber was wearing a hoodie tied tightly around his face so that only his eyes (and maybe nose) was visible. Mr. McClanahan told Det. Walker in this interview that he could identify the robber as Richard Diggs.

Ms. Curry described the robber as a light-skinned Black male, 25-30 years old, 6'2"-6'3" tall with a medium build.

Richard and Ricardo Diggs also match the description provided by Mr. McClanahan. Richard Diggs is 5'11" and Riccardo Diggs is 5'9" tall. Mr. Horton is 6'1" tall. (OIP00002).

Additionally, on the day of the robbery, one of the victims described the perpetrator as a Black male, 40 years old, 6'2", 150 pounds, with brown eyes, an unknown hair color, and a thin build. (City00009). With respect to research on witness description accuracy, in Professor Garrett's (2011)[47] book studying the first 250 DNA-based exonerations, he found there was a substantial mismatch between the description provided by witnesses and the actual appearance of the innocent defendant in a full 62% of the 161 wrongful conviction cases that were based in part on misidentification. Garrett's finding is consistent with scientific research showing a correlation between the presence of incorrect descriptors and inaccurate identifications in that, as the number of incorrect descriptors of a suspect increases, identification accuracy decreases.[48]

The lack of detail and consistency in the two witnesses' descriptions of the robber as well as their description of the events should have been a concern for Det. Walker that these witnesses did not have a strong memory for the robber and therefore would not likely be reliable eyewitnesses in the investigation based on their observations at the time of the robbery.

---

[46] Det. Walker's written report that was typed on December 29, 2004 – after Mr. Horton had been arrested in this case – states that Mr. McClanahan said the robber was 6'0" tall. Mr. Horton is 6'1" tall.

[47] Garrett (2011). *Convicting the Innocent: Where criminal prosecutions go wrong.* Cambridge, MA: Harvard University Press.

[48] For a thorough review of this literature, see Meissner, Sporer, & Susa (2008). A theoretical review and meta-analysis of the description-identification relationship in memory for faces. *European Journal of Cognitive Psychology, 20,* 414–455.

16

### 3. Showup/Single Photograph

Ms. Curry testified in her deposition that within a few days of the robbery, Det. Walker interviewed her and showed her a single picture of "Richard", whom Ms. Curry identified as the robber. (Dep. 80).[49] In the materials I have received, there is no indication in the police file or handwritten notes of Det. Walker that this identification procedure took place. It is unclear to me whether this photo of "Richard" was Richard Diggs (whose name had been given to Det. Walker by Mr. McClanahan) or Richard Horton or another person named Richard. Ms. Curry testified that Det. Walker either told her the name Richard Horton or the name was written on the picture. (Dep. 82).

Showup identification procedures are suggestive by their nature and are dangerous because there is no particular way for law enforcement to know when an eyewitness has made an error and identified an innocent person from a show-up because, unlike lineups, there are no known-innocent fillers.[50] A meta-analysis comparing witness performance in show-ups to six-person photo arrays indicates that mistaken identifications are significantly more likely with show-ups.[51] In addition, the Revised 2020 AP-LS White Paper recommends that showups be avoided altogether unless deemed absolutely necessary.[52]

In summary, the showup procedure described by Ms. Curry in her deposition, if it occurred, would have substantially increased the likelihood that she would select Mr. Horton again from the photo array on December 4, 2004.

### 4. Lineup Bias

Mr. McClanahan (TT 77) and Ms. Curry (TT 102) both testified at trial that the robber was a light skinned Black male and that Mr. Horton was the only light skinned Black male in the photo array.[53] In her deposition, Ms. Curry testified that the fact that Mr. Horton was the only light-skinned Black male in the photo array helped her pick him out from the procedure. (Dep. 111). Contrary to the witnesses' descriptions of the photo array containing only 1 light-skinned Black male, Det. Walker testified at trial that there were "a couple" in the array (TT 136) and in her deposition that she believed #1, #3, #4, and #6 were all light-skinned Black males. (Dep. 165-6). Det. Walker testified in her deposition that the AFIS system that she used to select the lineup fillers could generate up to a hundred photos and she would select the lineup fillers from the options provided by the system. (Dep. 148). She did not recall whether she selected the first 5 filler options that were generated to create the array for Mr. Horton. (Dep. 150). She also testified that it would be unduly suggestive and counter to her training if only one person in the photo array matched the skin tone of the perpetrator (here, light-skinned Black male). (Dep. 166). As stated above, both Ms. Curry

---

[49] She later testified that she did not say "single photo" but instead said a single line. If a single photograph of Mr. Horton was shown to Ms. Curry, then this section on Showups is relevant for my opinions in this case. Det. Walker testified in her deposition that she did not show Ms. Curry a single photograph because it was not her policy to do that. (Dep. 145). Here, I make no factual or credibility determinations as to whether Ms. Curry was shown a single photograph of Richard Horton within days of the robbery.

[50] As stated elsewhere in this report, this is why it is critical to have only one suspect per lineup so that law enforcement can better ascertain whether a witness has a reliable memory.

[51] Steblay, Dysart, Fulero, & Lindsay (2003). Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

[52] Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36.

[53] Further, when Ms. Curry was looking at the photo array, she was picking out the guy she knew to be the drug dealer (Dep. 112) not specifically the robber.

and Mr. McClanahan testified at trial (and Ms. Curry in her deposition) that there was only 1 light-skinned Black male in the photo array, a feature that was a key potion of their (limited) recollections of the robber. Det. Walker testified at the Motion to Suppress hearing that she was satisfied with the array with respect to the members having similar characteristics. (Dep. 198).

With respect to the selection of lineup fillers, a properly constructed lineup includes only one suspect (who might or might not be the actual perpetrator) and a minimum of five fillers who are known to law enforcement to be innocent of the crime. When it comes to filler selection, there are many choices law enforcement need to make when deciding who to put in a lineup including how many fillers should be used, and how similar should they be to the suspect and/or the description(s) the witness(es) provided. Regardless of the answer(s) to these questions, the overall principle in lineup construction is that no person should stand out, *especially the suspect*.[54]

When it comes to how similar the fillers should be to the suspect, researchers have some preference to use a rule where all of the features included in the witness' description of the perpetrator should be matched[55] (e.g., gender, complexion, age, height, weight, etc.). All fillers should be plausible alternatives for the suspect based on how the suspect looks and how he was described by the witnesses.[56] When some of the lineup members are implausible alternatives, the "true" lineup size will be reduced, which in turn increases the chances that the suspect (innocent or guilty) will be chosen. In this case, Ms. Curry and Mr. McClanahan described the robber as a light-skinned Black male. What is clear from their testimony and a review of the array is that none of the fillers match this portion of the two witnesses' descriptions. In fact, both Ms. Curry and Mr. McClanahan testified at trial (and Ms. Curry in her deposition) that Mr. Horton was the only light-skinned Black male in the array. At trial, Det. Walker described how she creates photo arrays. Although she testified that she considers the race of the suspect, there was no testimony elicited regarding whether she considered complexion or skin tone in her selection of lineup fillers in this case.

The photo array containing Mr. Horton as the suspect violates the basic principle of photo array construction – that the suspect does not stand out. If the overall identification procedure(s) happened the way that Ms. Curry has testified - in addition to the suggestive construction of the lineup itself - there was a very strong likelihood that the witnesses would have selected Mr. Horton from the procedure. After being selected from an unnecessarily suggestive procedure (here, possibly a showup procedure followed by a photo array where Mr. Horton was the only light-skinned Black male), the results from any subsequent procedure (e.g., in court) are relatively meaningless. That is, the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy.

---

[54] For example, see National Research Council (2014). *Identifying the culprit: Assessing eyewitness identification.* Washington, DC: The National Academies Press; Wells, Small, Penrod, Malpass, Fulero, & Brimacombe (1998). Eyewitness identification procedures: Recommendations for lineups and photospreads. Law and Human Behavior, 22, 603–647; National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

[55] For example, see Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wells, G., Rydell, & Seelau (1993). On the selection of distractors for eyewitness lineups. *Journal of Applied Psychology, 78,* 835–844.

[56] Steblay (2016). Eyewitness memory. In Cutler & Zapf (Eds.), *APA handbook of forensic psychology, Vol. 2: Criminal investigation, adjudication, and sentencing outcomes*, 187–224. APA.

## 5. Pre-identification Warnings/Instructions

The Columbus Division of Police Investigative Photo Array Procedure document (City00021-2) provides written instructions that are to be read to witnesses before an array is shown. The instructions on the form are consistent with best practices. However, there is no place on the form for a witness to acknowledge that the instructions were read and understood by them before the array was shown. In his trial testimony, Mr. McClanahan was asked if Det. Walker gave him any instructions before looking at the photo array and he responded "No". (TT 62). Ms. Curry testified at trial that Det. Walker told her before viewing the photo array to "take my time, look it over". (TT 93). At her deposition, Ms. Curry testified that she was told before viewing the array to "pick out the face that she thought it was in that hoodie". (Dep. 111).

Simply failing to tell a witness that the actual perpetrator may or may not be present in a lineup is suggestive because it implies that the perpetrator is in the identification task. Implying in any way to eyewitnesses that the perpetrator is in the identification procedure encourages witnesses to make a selection and leads to an increase in identification errors. Instead, eyewitnesses should be told explicitly that the person in question might not be in the photo array or lineup and that they should not feel compelled to make an identification. This pre-lineup warning/instruction follows from decades of empirical data showing that eyewitnesses are less likely to identify an innocent suspect when they are warned that the actual culprit might not be present.[57] Taken as a whole, the results show the power of pre-identification warnings and how, when properly issued, they can prevent mistaken identification decisions from happening to begin with.

In 1992, the International Association of Chiefs of Police issued Training Key #414 on how to conduct identification procedures and that training key included recommendations for pre-identification warnings. Later, in 1999, the Department of Justice's National Institute of Justice (NIJ) issued a report that outlined several methods for minimizing mistaken eyewitness identification when collecting evidence.[58] This law enforcement guidance recommended, among other things, that cautionary instructions be provided to the eyewitness that the culprit may not be in the lineup and that the police will continue to investigate the case even if no identification is made, so as to minimize the natural inclination to guess or to be guided by suggestion simply because the witness believes that the police suspect must be in the lineup or photo array. Consistent with these recommendations, the 2010 Ohio law requires the use of pre-identification instructions and warnings in eyewitness identification procedures.

## 6. Non-blind Lineup Administration

Det. Walker constructed the photo array with Mr. Horton and administered this photo array to Mr. McClanahan and Ms. Curry.

Contemporary police guidelines (e.g., IACP, 2006) and the law in over half of the United States, including Ohio, for conducting identification procedures advise or require that the police officer conducting the proceedings should not know who the suspect is. This procedure eliminates the possibility that the officer can influence the witness' selection. The influence by the administrator may be unintentional and it may be

---

[57] Steblay (1997). Social influence in eyewitness recall: A meta-analytic review of lineup instruction effects. *Law and Human Behavior, 21,* 283–297; Clark (2005). A re-examination of the effects of biased lineup instructions in eyewitness identification, *Law and Human Behavior, 25,* 575–604; Steblay (2013). Lineup Instructions*, in Cutler (Ed)., *Reform of eyewitness identification procedures* (65–86). American Psychological Association.

[58] National Institute of Justice Eyewitness Technical Working Group on Eyewitness Evidence. (1999). *Eyewitness evidence: A guide for law enforcement*. United States Department of Justice, Office of Justice Programs.

outside of the officer's awareness (for example, nodding and smiling), or it may be purposeful and explicit. We know that police sometimes conduct lineups in a manner that clearly shows how their knowledge of which person is the suspect can lead them to say things that focus the eyewitness on the suspect.[59] We also know that what the person administering the lineup says to the eyewitness at the time the eyewitness makes a selection has strong effects on the confidence of the witness, easily leading a "tentative identification" eyewitness to become positive in their identification, even when the identification is of an innocent person.[60] The most effective method of eliminating police bias or suggestion is to have an officer who does not know the identity of the suspect conduct the identification procedure. This was not done in this case.

The potential impact of administrator knowledge on witness behavior is illustrated in a study by Greathouse and Kovera[61] in which 234 witnesses viewed a videotaped speech that was interrupted by a man trying to take the projector and were later administered a photo array to see if they could recognize the thief. The "administrators" were an additional 234 people who viewed a lineup training video and received further instruction on how to administer the photo array to the witnesses. The administrators were given some background on the "case" and were told they would receive a $20 reward if the witness chose the suspect (but that they would not receive the reward if they blatantly led the witness). Half of the administrators knew who the suspect was (non-blind presentation) and half did not (double-blind presentation). Unbeknownst to the administrators, half of the time the suspect was the perpetrator (target-present arrays) and half the time the suspect was not the perpetrator (target-absent arrays). In the double-blind administrator/target-absent condition 8% of the witnesses chose the innocent suspect. In the non-blind target-absent condition 21% of the witnesses chose the innocent suspect – thus, the non-blind administrators were able to subtly steer a large number of witnesses to the suspect. The non-blind administrators were most successful in steering witnesses to the suspect when the witnesses were given biased instructions (see discussion below) and photos were presented simultaneously – under these conditions 33% of witnesses chose the innocent suspect.

Participants in the Greathouse and Kovera study also were asked whether they believed the administrator's behavior influenced their decision in the lineup and whether the administrator pressured them. It is clear from the data above that the administrator behavior did influence decision making but the question the researchers were asking here gets to heart of whether witnesses perceive that they have been influenced. The results demonstrated that participants did not believe that they had been influenced.[62] The researchers concluded:

> *It is important to note that both the witnesses and administrators participating in the photo spread administration reported few if any differences in administrator influence as a function of single blind versus double blind administration. This finding is particularly troubling for a number of reasons. If lineup administrators are not aware that they are exhibiting behavioral cues to the suspect's identity, they obviously will not try to inhibit them. In addition, during trial, jurors rely on the witnesses' accounts of the lineup administration procedure to judge the reliability of the identification. If witnesses*

---

[59] See Wells & Seelau (1995). Eyewitness identification: Psychological research and legal policy on lineups. *Psychology, Public Policy, and Law, 1,* 765–791.

[60] Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[61] Greathouse & Kovera (2009). Instruction bias and lineup presentation moderate the effects of administrator knowledge on eyewitness identification. *Law and Human Behavior, 33,* 70–82.

[62] Ms. Curry testified in her deposition that Det. Walker did not influence her or suggest to her whom to select from the photo array. (Dep. 206-7).

20

*are not able to convey that the administrator influenced their decision, jurors will not be able to consider this in their decision making process. (P. 80)*

In summary, though double-blind administration was not the norm in the United States in 2004, if double-blind administration had been used in this case, it would have eliminated the possibility that the administering detective influenced the witnesses to select Mr. Horton from the identification procedures. In cases where law enforcement have "steered" a witness toward a particular lineup member, the resulting selection is relatively meaningless with respect to witness reliability.

**7. Repeated Identification Procedures, Unconscious Transference and Commitment Effects**

Ms. Curry testified at her deposition that Det. Walker showed her a single photograph of "Richard" within days of the robbery and Ms. Curry identified this individual. (Dep. 80). She also testified that she believes the photograph of Richard Horton in the photo array was the same single photograph that Det. Walker had shown her a few days after the robbery. (Dep. 114). If this procedure was conducted with Mr. Horton's photograph, Ms. Curry participated in repeated identification procedures with Mr. Horton as the suspect.

Regardless of whether the showup identification procedure was conducted, the concepts of unconscious transference and commitment are relevant to this case. Unconscious transference has likely plagued most people at one time or another as evidenced in the question "where do I know that face?" Witnesses that view a person in multiple identification procedures or in multiple contexts are faced with a similar question. The correct answer is for the witness to say "I saw that face from several different contexts", but the erroneous conclusion is that the face is familiar **only** because it is the face of the perpetrator. The concern is that this sense of familiarity on the part of the witness may lead to an increased likelihood of choosing that person and a feeling of increased confidence in subsequent identification procedures. A meta-analysis on transference from viewing photographs confirms that witnesses are more likely to pick from a lineup a person previously viewed.[63] The process of unconscious transference is also relevant to the facts of this case because Mr. McClanahan and Ms. Curry had some prior familiarity with Mr. Horton *and* had a limited opportunity to view the face of the robber. Thus, it is possible that they "transferred" their memory of Mr. Horton's face and features on to those of the robber. This is especially true because Ms. Curry has testified that she had to "figure it out" that Mr. Horton was the robber. In addition, Mr. McClanahan's interaction with someone he believed to be named "Richard" the day before the robbery, if accurate, could have primed Mr. McClanahan to believe that the robber was a "Richard", not based on his observations at the time of the robbery but based on deduction (it must have been him).

Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator;[64] this is known as "commitment."[65] Thus, it is quite possible that Mr. Horton was selected by witnesses at trial because they had selected him from the photo array procedure.

---

[63] Deffenbacher, Bornstein, & Penrod (2006). Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference. *Law and Human Behavior, 30,* 287-307.

[64] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289; Wixted, Wells, Loftus & Garrett (2021). Test a witness' memory of a suspect only once. *Psychological Science in the Public Interest, 22,* 1S-18S.

[65] Brigham & Cairns (1988). The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 18,* 1393–1410; Deffenbacher, Bornstein, & Penrod, (2006).

Results from a second, third, fourth, etc. identification procedure whereby a witness has already viewed the suspect are not independent of the previous viewings and should be treated with extreme caution because it is very likely that a witness will merely select in subsequent procedures a person they have viewed or selected in a previous procedure. It is for this reason that psychologists view in-court identifications as mere theater and not actual independent tests of a witness' memory or ability to identify perpetrators.[66] In each succeeding procedure, witnesses can become increasingly more committed to their identifications and increasingly certain of their accuracy. In fact, there are examples from post-conviction DNA exoneration cases where, after a witness had incorrectly selected an innocent suspect, they continued to identify the innocent suspect even when presented with the actual perpetrator responsible for the crime.[67]

As early as 1968, the Supreme Court provided the following guidance to police, consistent with scientific findings and best practice recommendations:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.* The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the

Mugshot exposure effects: Retroactive interference, source confusion, and unconscious transference. *Law & Human Behavior*, *30*, 287–307; Dysart, Lindsay, Hammond, & Dupuis (2001). Mugshot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280–1284; Gorenstein, & Ellsworth (1980). Effect of choosing an incorrect photograph on a later identification by an eyewitness. *Journal of Applied Psychology, 65,* 616–622; Behrman & Vayder (1994). The biasing influence of a police showup: Does the observation of a single suspect taint later identification? *Perceptual and Motor Skills, 79,* 1239–1248; Godfrey & Clark (2010). Repeated eyewitness identification procedures: Memory decision making, and probative value. *Law and Human Behavior, 34,* 241–258; Haw, Dickinson, & Meissner (2007). The phenomenology of carryover effects between show-up and line-up identifications. *Memory, 15,* 117–127.

[66] See Steblay & Dysart (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284–289. In fact, courts in MA and CT are also beginning to limit in-court identifications as they have recognized the suggestive nature of the procedure.

[67] The wrongful convictions of John Jerome White and Ronald Cotton are two such examples. See https://www.innocenceproject.org/cases/john-jerome-white/ (the rape victim incorrectly selected John White from a lineup and did *not* select James Parham from the same lineup, even though Parham was present; Parham was later identified by DNA testing as the actual rapist, and White was exonerated); Jennifer Thompson, "I Was Certain, but I Was Wrong," *N.Y. Times*, June 18, 2000 (rape victim describing her misidentification of Ronald Cotton as her assailant, and how she subsequently testified at a second trial in which the real assailant (later identified through DNA), Bobby Poole, was brought to court, at which Thompson testified, "I have never seen [Poole] in my life" and maintained she was still positive that Cotton was her assailant; DNA testing later exonerated Cotton and implicated Poole, proving that Thompson was incorrect in her identification of Cotton and her non-identification of Poole). See also: https://www.youtube.com/watch?v=u-SBTRLoPuo and https://www.youtube.com/watch?v=I4V6aoYuDcg.

photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

Simmons v. United States, 390 U.S. 377, 383–84 (1968).

In this case, witnesses were presented with repeated identification procedures with Mr. Horton as the suspect. The results from repeated identification procedures with the same suspect are not independently informative with respect to witness accuracy. That is, viewing an earlier procedure with the same suspect taints the result of any subsequent procedure.

## 8. Witness Confidence

In the police file, there is documentation regarding Ms. Curry's level of confidence in her selection of Mr. Horton as the robber. The handwritten notes on the police identification form indicate that Ms. Curry was sure of her selection of Mr. Horton. At trial, Ms. Curry testified that she was 110% certain that Mr. Horton was the robber (TT 95) and selected him again in court (TT 95-6). There was no doubt in her mind. (TT 95). In her deposition, she testified that not even DNA evidence would change her mind that it was someone else – not Richard Horton – who robbed them and shot Mr. McClanahan. (Dep. 121). Ms. Curry remains so confident in her selection of Mr. Horton that she would stake her life on the accuracy of her decision. (Dep. 123).

Research shows that there is a relatively strong relationship between the accuracy of an eyewitness's positive identification and their confidence in that identification *at the time of the first identification attempt with a suspect when certain conditions are met.*[68] Specifically, eyewitness confidence can be extremely important and meaningful when "pristine" testing conditions are used.[69] An eyewitness who expresses high confidence in their identification is expressing a strong belief that the identified person and the perpetrator are the same individual. This belief can arise out of pure memory judgments (i.e., a perception of remarkable resemblance between the identified person and the eyewitness's memory of the culprit) or for reasons other than the eyewitness's memory including suggestion, and other factors.[70] In this case, pristine conditions were not met.

An important fact to consider is that the relationship between confidence and accuracy can be significantly affected by pre- and post-identification factors.

---

[68] See, Wells, Kovera, Douglass, Brewer, Meissner, & Wixted (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44,* 3-36; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[69] These include: The first uncontaminated identification procedure with the suspect using an unbiased procedure, double-blind administration, pre-lineup warnings, and obtaining a confidence statement immediately after a selection; Wixted, & Wells (2017). The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest, 18,* 10–65.

[70] E.g., Leippe (1980). Effects of integrative memorial and cognitive processes on the correspondence of eyewitness accuracy and confidence. *Law and Human Behavior, 4,* 261–274; Luus & Wells (1994). Eyewitness identification confidence. In Ross, Read & Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (348–361). Cambridge University Press; Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688–696.

Expressions of confidence at trial, however, are relatively meaningless[71] because confidence is *malleable*, and easily affected by external sources. The lack of a meaningful relationship between confidence and accuracy at trial is concerning because there is significant evidence, going back decades, showing that witness confidence is the single most powerful determinant of whether or not triers of fact will believe that the eyewitness made an accurate identification.[72]

**9. Post-identification Feedback**

Ms. Curry testified in her deposition that the detective (Walker) told her that she and her boyfriend (Mr. McClanahan) "have the same testimony, you know, the same thing". (Dep. 33). After Ms. Curry selected Mr. Horton from the photo array, Det. Walker told her that she and Mr. McClanahan had identified the same person. (Dep. 82-3, 191).

As described above, witness confidence can be a useful factor to consider when assessing witness reliability when certain conditions are met. One of the major and primary concerns with interpreting confidence, however, is that research shows *confidence is easily changed*. Confidence malleability is the tendency for an eyewitness to become more confident in their identification as a function of events that occur after the identification decision. For example, in an early demonstration of confidence malleability, researchers found that witnesses who were questioned repeatedly grew more confident about the accuracy of details in their reports.[73] Even stronger and broader effects of confidence malleability have been shown to emerge when eyewitnesses are told or led to believe that they identified the suspect (versus being told nothing about the alleged accuracy of their decision). This is known as (confirmatory) *post-identification feedback*.[74]

Post-identification feedback is any information provided to a witness or victim that suggests whether their identification decision was accurate, such as telling the witness that they have identified the suspect/defendant or that they have been a really good witness.[75] In the first research on the post-identification feedback phenomenon, Wells and Bradfield[76] found that eyewitnesses who received confirming feedback (such as that used in this case) were not only much more confident than were witnesses who received no feedback or disconfirming feedback, the feedback witnesses also distorted their reports of their witnessing conditions by exaggerating how good their view was of the culprit, how much attention

---

[71] Ibid.

[72] E.g., Cutler, Penrod & Dexter (1990). Juror sensitivity to eyewitness evidence. *Law and Human Behavior, 14,* 185-191; Leippe & Romanczyk (1989). Reactions to child (versus adult) eyewitnesses: The influence of jurors' conceptions and witness behavior. *Law and Human Behavior, 13,* 103-132; Lindsay, Wells, & O'Connor (1989). Mock-juror belief of accurate and inaccurate eyewitnesses: A replication and extension. *Law and Human Behavior, 13,* 333-339; Wells, Ferguson, & Lindsay (1981). The tractability of eyewitness confidence and its implications for triers of fact. *Journal of Applied Psychology, 66,* 688-696; Wells, Lindsay, & Ferguson (1979). Accuracy, confidence, and juror perceptions in eyewitness identification. *Journal of Applied Psychology, 64,* 440-448.

[73] Hastie, Landsman, & Loftus (1978). Eyewitness testimony: The dangers of guessing. *Jurimetrics Journal, 19,* 1–8.

[74] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

[75] Dysart, Lawson, & Rainey (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

[76] Wells & Bradfield (1998). 'Good, you identified the suspect': Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83,* 360–376.

they paid to the culprit's face while observing the event, and so on. The results of this study have been replicated many times and also with real witnesses in real ongoing criminal investigations.[77]

One explanation that has been proposed to explain the post-identification feedback effect, and its strong and pervasive influence on eyewitness confidence, is the theory of cognitive dissonance.[78] In essence, this theory, which is a long-standing and well-supported theory in social psychology, states that people are in a state of discomfort when they have inconsistent or contradictory beliefs, or when they have beliefs and behaviors that are inconsistent. As it relates to eyewitness identification, a powerful example of cognitive dissonance is the DNA exoneration case of Dean Cage from Illinois. After Mr. Cage was exonerated in 2008, the victim refused to believe the accuracy of the DNA results and held on to her belief that Mr. Cage was guilty.[79] Thus, cognitive dissonance was so powerful in that case that it was easier for the witness to believe that the DNA testing was flawed than to accept that she had made an error and identified an innocent person. Only after she was presented with independent results of the DNA testing did she come to accept that Mr. Cage was innocent and was not the man who had raped her in 1994.

In summary, post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case and can make them more confident in their identification decision (along with a host of other effects outlined above). The impacts of feedback are some of the strongest effects that have been found in eyewitness research.[80]

## 10. Voice Identification

Mr. McClanahan told Det. Walker and testified at trial that he thought he recognized the voice of the robber. The testimony is not clear whether he was recognizing the voice from the person who asked him to borrow $20 at the store the night before the robbery or from the robbery itself. (TT 57). Mr. McClanahan testified that he told Walker that he knew who it was through the voice and the words that were said during the robbery. (TT 59).

Sometimes called "earwitness" testimony, voice identification refers to the identification of previously heard voices. It can play a critical role in a case, especially in cases involving crimes with disguises, robberies, or crimes committed in poor lighting conditions. Identification testimony based on the sound of a person's voice is admissible evidence in court[81] and can often be quite persuasive,[82] despite the extant

---

[77] Wright & Skagerberg (2007). Postidentification feedback affects real eyewitnesses. *Psychological Science, 18,* 172–178.

[78] Charman, Carlucci, Vallano & Hyman Gregory (2010). Selective Cue Integration Framework: A theory of postidentification witness confidence assessment. *Journal of Experimental Psychology: Applied, 16,* 204-218; Festinger (1957). *A theory of cognitive dissonance.* Stanford University Press; Festinger & Carlsmith (1959). Cognitive consequences of forced compliance. *Journal of Abnormal and Social Psychology, 58,* 203-210.

[79] This is a similar level of confidence that Ms. Curry testified to in her deposition when she said that not even DNA evidence would change her mind about her selection of Mr. Horton. (Dep. 121).

[80] See Steblay, Wells & Douglass (2014). The eyewitness post identification feedback effect 15 years later: Theoretical and policy implications. *Psychology, Public Policy, and Law, 20,* 1–18; Douglass & Steblay (2006). Memory distortion in eyewitnesses: A meta-analysis of the post-identification feedback effect. *Applied Cognitive Psychology, 20,* 859–869.

[81] Laud, Wylie & Bornstein (2013). *Can the courts tell an ear from an eye? Legal approaches to voice identification evidence,* Law & Psychology Review, 37, 119-159.

[82] Harvey, Bruer & Price (2022). Perceptions of familiar and unfamiliar ear- and eyewitnesses. *Psychiatry, Psychology and Law, 29(3),* 395-412.

research suggesting that earwitness accuracy is less reliable than eyewitness accuracy.[83] Recognizing a familiar voice, is similar to recognize a familiar face. That is, as familiarity increases, so does accuracy but errors can still occur.[84] However, Mr. McClanahan was never tested on his ability to recognize the robber's voice and therefore it is not possible to determine if he accurately made this determination during the robbery. Additionally, it is not clear what familiarity, if any, McClanahan would have with Richard Horton's voice.

## VII. Summary of Opinions in This Case

The evidentiary value of an eyewitness identification can be assessed by the existence or absence of factors known – empirically – to influence the strength of the witness' memory, the reliability of the identification, and the reliability of the in-court testimony. Evidentiary value of an identification is undermined when factors that have been shown to decrease reliability are present in a particular case, and the more factors present, the less probative an identification will be. In other words, when there are numerous factors present in a case that have been shown to decrease reliability, the result can easily be a misidentification of an innocent suspect.

In this case, there were many estimator and system variables present that have been shown to decrease eyewitness reliability. Given these factors, it is not difficult to arrive at a reasonable explanation as to how two witnesses came to select Mr. Horton as the robber. The combination of a weak memory for the robber coupled with suggestive identification procedures easily accounts for the selections of Mr. Horton.

## VIII. Supplemental Materials

If additional materials are provided to me in reference to this case, I reserve the right to supplement this report in the future.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 14, 2025.

_Jennifer Dysart_

Jennifer Dysart, PhD

---

[83] See Yarmey, D. A. (1995). Earwitness speaker identification. Psychology, Public Policy and Law, 4, 792–816; Yarmey, The Psychology of Speaker Identification and Earwitness Memory, in LINDSAY, ROSS, READ & TOGLIA, THE HANDBOOK OF EYEWITNESS PSYCHOLOGY, VOL. II, 101–136 (2007).
[84] Ibid.

**Appendix A**

**California:**
*Ruben Martinez and Maria Martinez v. City of Los Angeles, et al.,* Case No. 2:20-cv-10559-PA-KS (April 19, 2022)
*Lionel Rubalcava v. City of San Jose, Joseph Perez, et al.*, Case No. 20-cv-04191-BLF (July 6, 2023)
*Joaquin Ciria v. City and County of San Francisco, et al.,* Case No. 22-cv-07510-KAW (March 13, 2024)
*Maurice Hastings v. Grant Price, et al.,* Case No. 2:23-CV-09684 (May 7, 2025)

**Florida:**
*State of Florida v. Billy Joe Holton*, Case No. 87-CF-6409 (June 14, 2023)

**Georgia:**
*Erik Tramaine Heard v. White, et al.,* Case No. SUCV201900095 (Oct 24, 2023)

**Illinois:**
*Robert Bouto v. Reynaldo Guevara, et al*., Case No. 1:19-cv-02441 (Dec 12, 2022)
*Thomas Sierra v. Reynaldo Guevara, et al*., Case No. 1:18-cv-03029 (Jan18, 2023)
*Demetrius Johnson v. Reynaldo Guevara, et al.,* Case No. 20-cv-4156 (June 20, 2023)
*Geraldo Iglesias v. Reynaldo Guevara, et al.,* Case No. 1:19-cv-06508 (March 2, 2023)

**Kansas:**
*Lamonte McIntyre & Rose Lee McIntyre v. Unified Government of Wyandotte County and Kansas City, Kansas, et al.,* Case No. 2:18-cv-02545-KHV-KGG (Sept 23, 2021)

**Maryland:**
*The Estate of Malcolm J. Bryant v. Baltimore Police Department, et al.,* Case No. 1:19-cv-00384-ELH (Sept 14, 2021)

**Missouri:**
*Lamont Campbell v. State of Missouri,* Cause No. 1122-CR04130-01, Division 11; Appeal No. ED105247 (April 14, 2022)

**New York:**
*Richard Rosario v. City of New York, et al.,* Case No. 18-cv-4023 (October 17, 2019; July 26, 2022)
*Kenyatta James v. City of Newburgh, Police Chief Daniel Cameron, et al.,* Case No. 21 CV 1673 (Nov 6, 2023)
*Valentino Dixon v. City of Buffalo and County of Erie; and Detective Mark R. Stambach, et al.,* Case No. 19-cv-01678 (Nov 30, 2023)

**Pennsylvania:**
*Commonwealth of Pennsylvania v. James Pitts* (July 12, 2024)
*Commonwealth of Pennsylvania v. Anthony Reid,* Case No. CP-51-CR-0602521-1989 (Dec 3, 2024)

**Texas:**
*State of Texas v. Eric Tostado,* Ind. No. F02-55040-QU (Jan 19, 2023)

27

**Appendix B**

**Academic Curriculum Vitae of Jennifer E. Dysart**

28

**JENNIFER E. DYSART**

**Curriculum Vitae**

University Address:
Department of Psychology                                    *Email:*        jdysart@jjay.cuny.edu
John Jay College of Criminal Justice              *Phone:*       212.484.1160
524 West 59th Street, 10th Floor
New York, NY  10019

## Academic Work Experience

| | |
|---|---|
| 2006 – present | Associate Professor of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2016 – 2019 | Director, Baccalaureate/Master's (BA/MA) Degree Program, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2013 – 2016 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2011 – 2012 | Deputy Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2008 – 2010 | Associate Chair, Department of Psychology, John Jay College of Criminal Justice, CUNY, New York, NY |
| 2006 – 2008 | Deputy Chair of Undergraduate Education, Department of Psychology, John Jay College of Criminal Justice |
| 2003 – 2006 | Assistant Professor of Psychology, Southern Connecticut State University, New Haven, CT |
| 2005 | Adjunct Professor, Quinnipiac University, Hamden, CT |

## Education

| | |
|---|---|
| PhD | 2004, Queen's University, Kingston, Ontario (Social Psychology) *Dissertation Title:* Intoxicated Witnesses: Exploring the Effects of Alcohol on Identification Accuracy |
| MA | 1999, Queen's University (Brain, Behavior and Cognitive Science) |
| BA | 1998, St. Thomas University, Fredericton, New Brunswick (First Class Honors in Psychology) |

29

## Peer-Reviewed Journal Publications

Steblay, N. M., & Dysart, J. E. (2016). Repeated eyewitness identification procedures with the same suspect. *Journal of Applied Research in Memory and Cognition, 5,* 284-289.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2015). An unrepresentative sample is unrepresentative regardless of the reason: A rejoinder to Amendola and Wixted. *Journal of Experimental Criminology, 11,* 295-298.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). The flaw in Amendola and Wixted's conclusion on simultaneous versus sequential lineups. *Journal of Experimental Criminology, 11,* 285-289.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2015). Double-blind photo-lineups using actual eyewitnesses: An experimental test of a sequential versus simultaneous lineup procedure. *Law and Human Behavior, 39*, 1-14.

Lawson, V. Z., & Dysart, J. E. (2014). The showup identification procedure: An exploration of systematic biases. *Legal and Criminological Psychology, 19*, 54-68.

Strange, D., Dysart, J. E., & Loftus, E. F. (2014). Why errors in alibis are not necessarily evidence of guilt [Special issue]. *Zeitschrift Fur Psychologie, 222,* 82-89.

Dysart, J. E., & Strange, D. (2012). Beliefs about alibis and alibi investigations: A survey of law enforcement [Special issue]. *Psychology, Crime and Law, 18,* 11-25.

Dysart, J. E., Lawson, V. Z., & Rainey, A. (2012). Blind lineup administration as a prophylactic against the post-identification feedback effect. *Law and Human Behavior, 36,* 312-319.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2012). Eyewitness identification reforms: Are suggestiveness-induced hits and guesses true hits? *Perspectives on Psychological Science, 7,* 264-271.

Steblay, N. M., Dysart, J. E., & Wells, G. L. (2011). Seventy-two tests of the sequential superiority effect: A meta-analysis and policy discussion. *Psychology, Public Policy and Law, 17,* 99-139.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. R. (2006). Show-ups: The critical issue of clothing bias. *Applied Cognitive Psychology, 20*, 1009-1023.

Pryke, S., Lindsay, R. C. L., Dysart, J. E., & Dupuis, P. R. (2004). Multiple independent identification decisions: A method of calibrating eyewitness identifications. *Journal of Applied Psychology, 89,* 73-84.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2003).Eyewitness accuracy rates in police showup and lineup presentations: A meta-analytic comparison. *Law and Human Behavior, 27,* 523-540.

Dysart, J. E., Lindsay, R. C. L., MacDonald, T. K., & Wicke, C. (2002). The intoxicated witness: Effects of alcohol on identification accuracy. *Journal of Applied Psychology, 87,* 170-175.

Dysart, J. E. & Lindsay, R. C. L. (2001). A pre-identification questioning effect: Serendipitously increasing correct rejections. *Law and Human Behavior, 25,* 155-165.

Dysart, J. E., Lindsay, R. C. L., Hammond, R., & Dupuis, P. (2001). Mug shot exposure prior to lineup identification: Interference, transference, and commitment effects. *Journal of Applied Psychology, 86,* 1280-1284.

Smith, S. M., Lindsay, R. C. L., Pryke, S., & Dysart, J. E. (2001). Postdictors of eyewitness errors: Can false identifications be diagnosed in the cross-race situation? *Psychology, Public Policy, and Law, 7,* 153-169.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2001). Eyewitness accuracy rates in sequential and simultaneous line-up presentations: A meta-analytic comparison. *Law and Human Behavior, 25,* 459-473.

## Books

Loftus, E. F., Doyle, J. M., Dysart, J. E., & Newirth, K. (2020). *Eyewitness testimony: Civil and criminal* (6th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2013). *Eyewitness testimony: Civil and criminal* (5th Ed.). Charlottesville, VA: LexisNexis.

Loftus, E. F., Doyle, J. M., & Dysart, J. E. (2007). *Eyewitness testimony: Civil and criminal* (4th Ed.). Charlottesville, VA: LexisNexis.

## Book Chapters

Dysart, J. E. (2018). The psychology of eyewitness identification. In W. Koen & M. Bowers (Eds.), *The psychology and sociology of wrongful convictions: forensic science reform.*

Lawson, V. Z., & Dysart, J. E. (2015). Searching for suspects: Mug-shot files and showups (street identifications). In T. Valentine, & J. Davis (Eds.), *Forensic facial identification: Theory and practice of identification from eyewitnesses, composites and CCTV* (pp. 71-92)*.* Chichester, England: Wiley-Blackwell.

Dysart, J. E. & Lawson, V. Z. (2014). Eyewitness research. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of Criminology and Criminal Justice, Vol 9, Psychology of Law* (pp. 1530-1538). New York: Springer.

Dysart, J. E., & Lindsay, R. C. L. (2007). The effects of delay on eyewitness identification accuracy: Should we be concerned? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 361-376). Mahwah, NJ: Lawrence Erlbaum.

Dysart, J. E., & Lindsay, R. C. L. (2007). Show-up identifications: Suggestive technique or reliable method? In R. C. L. Lindsay, D. R. Ross, J. D. Read, & M. P. Toglia (Eds.), *The handbook of eyewitness psychology, Vol II, Memory for people* (pp. 137-154). Mahwah, NJ: Lawrence Erlbaum.

## Other Publications

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2023). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2022.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2022). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2022.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2021). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2021.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2019). A primer on the psychology of eyewitness memory. *Loyola Law Review, 64.*

Loftus, E., Doyle, J. M., Dysart, J. E., & Newirth, K. (2018). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2017.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2017). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2016.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2016). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2015.* Charlottesville, VA: LexisNexis.

Loftus, E., Doyle, J. M., & Dysart, J. E. (2015). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2014.* Charlottesville, VA: LexisNexis.

Wells, G. L., Steblay, N. M., & Dysart, J. E. (2011). A test of the simultaneous vs. sequential lineup methods: An initial report of the AJS national eyewitness identification field study.

Doyle, J. M., & Dysart, J. E. (2011). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2010.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2010). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2009.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2009). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2008.* Charlottesville, VA: LexisNexis.

Doyle, J. M., & Dysart, J. E. (2008). *Eyewitness testimony: Civil and criminal: Cumulative supplement 2007.* Charlottesville, VA: LexisNexis.

Dysart, J. E. (2007). Mugshots. *Encyclopedia of Psychology and Law, Vol 2* (pp. 551-552). Thousand Oaks, CA: Sage.

Dysart, J. E. (2007). Alcohol intoxication and eyewitness identification. *Encyclopedia of Psychology and Law, Vol. 1* (pp. 11-13). Thousand Oaks, CA: Sage.

## Peer-Reviewed Conference Presentations

Dysart, J. E. (2024, March). *Post-conviction eyewitness cases: Unique opportunities for expert witnesses.* Paper presented at the American Psychology-Law Society annual conference, Los Angeles, CA.

Jaross, M., & Dysart, J. E. (2019, March). *What U.S defense attorneys know about facial composites.* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Despodova, N., Lee, J., Khogali, M., Dysart, J. E., & Penrod, S. (2019, March). *Are perceptions of alibi credibility affected by defendant and alibi witness race, and defendant-alibi witness relationship?* Poster presented at the American Psychology-Law Society annual conference, Portland, OR.

Dysart, J. E., & Kassis, B. (2018, March). *911: What is your emergency?* Poster presented at the American Psychology-Law Society annual conference, Memphis, TN.

Dysart, J. E. (2015, June). *Showup identification procedures: Applied and methodological implications.* Symposium Discussant at the biennial meeting of the Society for Applied Research in Memory and Cognition, Victoria, BC.

Dysart, J. E. (2015, March). *NAS recommendations for expert witnesses in eyewitness identification.* Paper presented at the American Psychology-Law Society annual conference, San Diego, CA.

Dysart, J. E. (2012, March). *Eyewitness research in the courts: The Troy Davis story.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Dysart, J. E., Wells, G. L., Steblay, N. K., & Mitchell, D. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Lab – field differences.* Paper presented at the American Psychology-Law Society annual conference, San Juan, PR.

Steblay, N. K., Wells, G. L., Dysart, J. E., & Mitchell, D. R. (2012, March). *A double-blind experiment of simultaneous versus sequential lineups using actual eyewitnesses: Principal results.* Paper presented at the American Psychology-Law Society annual

conference, San Juan, PR.

Dumas, R., Dysart, J. E., Py, J., & Penrod, S. D. (2011, March). *Eyewitness identification strategies: Contribution of implicit personality theories and emotional expression.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Dysart, J. E., Lawson, V. Z., & Yang, N. (2011, March). *Weapon focus effect: Theoretical insights from eye-tracking research.* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Lawson, V. Z., Dysart, J. E., & Butera, L. (2011, March). *The clothing bias effect in lineups: What can eye-tracking research teach us?* Poster presented at the American Psychology-Law Society annual conference, Miami, FL.

Wong, Y., & Dysart, J. E. (2010, May). *Witness descriptions: Is there a cross-race effect for hair?* Poster presented at the Association for Psychological Science convention in Boston, MA.

DeCarlo, J., & Dysart, J. E. (2010, March). *Weapon-focus effect: Are police and civilians differentially affected?* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., & Strange, D. (2010, March). *A survey of police officers' beliefs about alibis and alibi investigations.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Lawson, V. Z., & Dysart, J. E. (2010, March). *The effects of race, misinformation, and feedback on eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Strange, D., Dysart, J. E., & Loftus, E. F. (2010, March). *Where were you? Alibi generation, accuracy and consistency.* Paper presented at the American Psychology-Law Society annual conference, Vancouver, BC, Canada.

Dysart, J. E., Rainey, A. M., & Penrod, S. D. (2009, May). *CSI effect: Real or not real?* Poster presented at the Association for Psychological Science convention in San Francisco, CA.

Dysart, J. E. (2009, May). *Naked truth: What to do after graduate school.* Invited panelist at the Association for Psychological Science convention in San Francisco, CA.

Chong, K., & Dysart, J. E. (2009, March). *Stranger alibis and eyewitness identification: What is the difference?* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Lawson, V. Z., Dysart, J. E., & Rainey, A. M. (2009, March). *Showups: A Cross-race investigation into the identification accuracy of eyewitnesses.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

34

Mandelbaum, J., Dysart, J. E., & Vitriol, J. A. (2009, March). *Recall of specific facial features in cross-race eyewitness descriptions.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Owens, J., Rainey, A. M., & Dysart, J. E. (2009, March). *Is three really a crowd? The effects of multiple perpetrators on eyewitness identification accuracy and confidence.* Poster presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Wallace, D. B., & Dysart, J. E. (2009, March). *The effects of framing on eyewitness believability.* Paper presented at the American Psychology-Law Society annual conference, San Antonio, TX.

Dysart, J. E., & Rainey, A. M. (2008, May). *Eyewitness identification: Testing a new method of presentation.* Poster presented at the Association for Psychological Science convention, Chicago, IL.

Mandelbaum, J., & Dysart, J. E. (2008, May). *Mug shot interference in a cross-race eyewitness identification.* Poster presented at the Association for Psychological Science convention in Chicago, IL.

Dysart, J. E., Rainey, A., Owens, J., Chong, K., & Lawson, V. (2008, March). *Lineup issues: Double-blind administration and the post-identification feedback effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Rainey, A., Dysart, J. E., (2008, March). *The intoxicated witness: Alcohol intoxication and person description accuracy.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Kopelovich, S., & Dysart, J. E. (2008, March). *Voice identification as a unique contributor to eyewitness identification: Exploring the cross-accent effect.* Paper presented at the American Psychology-Law Society annual conference, Jacksonville, FL.

Dysart, J. E., & Fugal, L. (2006, March). *Improving the sequential lineup? The effects of double-blind testing and the envelope technique on post-identification feedback.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Rainey, A., & Dysart, J. E. (2006, March). *Now you see me: The relationship between social hierarchies, social contact, and the cross-race effect.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Wallace, D. B., & Dysart, J. E. (2006, March). *The effects of show-up eyewitness testimony, alibi eyewitness testimony, and alibi language bias on alibi believability.* Paper presented at the American Psychology-Law Society annual conference, St. Petersburg, FL.

Dysart, J. E., & Lindsay, R. C. L. (2005, March). *Intoxicated witnesses: Exploring the effects of procedural bias and alcohol intoxication on identification accuracy.* Paper presented at the American Psychology-Law Society annual conference, La Jolla, CA.

35

Dysart, J. E. (2004, March). *The effects of verbal overshadowing on unconscious transference from mug-shots.* Paper presented at the American Psychology-Law Society annual conference, Scottsdale, AZ.

Dysart, J. E., Lindsay, R. C. L., & Sinclair, M. (2003, July). *Unconscious transference from mug shot searches: Does is really exist?* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Aberdeen, Scotland.

Dysart, J. E., Lindsay, R. C. L., & MacDonald, T. K. (2002, March). *The effects of alcohol intoxication on identification accuracy from show-ups: A field study.* Paper presented at the biennial meeting for the American Psychology-Law Society annual conference, Austin, TX.

Dysart, J. E., Steblay, N., Fulero, S., & Lindsay, R. C. L. (2002, March). *Eyewitness accuracy in sequential versus simultaneous lineups: A meta-analytic review.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Steblay, N., Dysart, J. E., Fulero, S., & Lindsay, R. C. L. (2002, March). *A meta-analytic comparison of showup and lineup identification accuracy.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dupuis, P. R., Lindsay, R. C. L., & Dysart, J. E. (2002, March). *Examining the use of rank combined lineups in cross-racial identification.* Paper presented at the biennial meeting for the American Psychology-Law Society, Austin, TX.

Dysart, J. E., Lindsay, R. C. L., & Dupuis, P. (2001, June). *Clothing bias and showup identifications: Does clothing type make a difference?* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Dysart, J. E., & Lindsay, R. C. L. (2001, June). *Instruction bias effects in showup identification.* Paper presented at the biennial meeting for the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dupuis, P., Lindsay, R. C. L., & Dysart, J. E. (2001, June). *Rank combined lineups: Calibrating the accuracy of individual eyewitness "identification" decisions.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Kingston, ON.

Dysart, J. E., Lindsay, R. C. L., Bala, N., & Lee, K. (2001, June). *Qualifying child witnesses to testify: A survey of Canadian judges.* Paper presented at the annual meeting for the Canadian Psychological Association, Ste-Foy, QC.

Dysart, J. E., Lindsay, R. C. L. & Hammond, R. (2000, March). *Mug shot exposure prior to lineup identification: Interference, transference and commitment effects.* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Aylen, M., Lee, K., Bala, N., & Dysart, J. E. (2000, March). *The relation between children's moral understanding of lying and their lie-telling behavior: Does the*

36

*competence examination matter?* Paper presented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Lindsay, R. C. L., Smith, S., Pryke, S., & Dysart, J. E. (2000, March). *Are postdictors of eyewitness accuracy as useful for cross-race as same-race identification?* Paper resented at the biennial meeting of the American Psychology-Law Society, New Orleans, LA.

Dysart, J. E. & Lindsay, R. C. L. (1999, July). *The effects of delay on eyewitness identification accuracy.* Paper presented at the biennial meeting of the Society for Applied Research in Memory and Cognition, Boulder, CO.

Dysart, J. E. (1998, May). *The effect of verbal cues on face recognition: Implications for eyewitness testimony.* Poster presented at the annual meeting of the Atlantic Provinces Council on the Sciences, Antigonish, NS.

## Invited Judicial Presentations

Dysart, J. E. (2022, November). *The science of eyewitness memory and behavior.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2022, March). *Assessing credibility and reliability: Perception, memory and eyewitnesses identification.* Invited speaker at the National Judicial Institute of Canada "Criminal Law Seminar". Training provided via Zoom.

Dysart, J. E. (2022, February). *The science of eyewitness memory and behavior.* Invited speaker at the Pennsylvania Conference of State Trial Judges, Philadelphia, PA.

Dysart, J. E. (2020, January). *The science of eyewitness memory.* Invited speaker at the Court of Queen's Bench of Alberta Education Seminar, Edmonton, AB, Canada.

Dysart, J. E. (2019, December). *Eyewitness identification: The science of eyewitness memory.* Invited plenary speaker at *the Minnesota Judicial Branch 2019 Annual Conference of Judges, Bloomington, MN.*

Dysart, J. E. (2019, June). *Eyewitness misidentifications: How research informs policy so the judge and jury see what the witness could not.* Invited speaker at the Louisiana Judicial College and Louisiana State Bar Association joint summer school conference, Destin, FL.

Dysart, J. E. (2019, February). *The science of eyewitness identification.* Invited speaker and panelist at the "Reducing the Risk of Wrongful Convictions" session. Conference of Chief Judges Midyear Meeting, Clearwater, FL.

Dysart, J. E. (2018, October). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2017, October). *The science of memory and eyewitness identification.* Invited speaker at the Fall Circuit Judges Education Conference sponsored by the Supreme Court of Appeals of West Virginia and the West Virginia Judicial Association, Charleston, WV.

Dysart, J. E. (2017, June). *Eyewitness identification: Applied scientific research.* Invited speaker at the 2017 D.C. Circuit Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, April). *The science of eyewitness identification: Reducing wrongful convictions.* Invited speaker at the 3rd Circuit Annual Judicial Conference, Lancaster, PA.

Dysart, J. E. (2017, March). *The science of eyewitness identification.* Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Judicial Seminar, Vancouver, BC, Canada.

Dysart, J. E. (2015, July). *The science of eyewitness identification*. Invited speaker at the Pennsylvania Conference of State Trial Judges, Hershey, PA.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification*. Invited speaker at the Annual NYC Criminal Court Judges Association meeting, Montauk, NY.

Dysart, J. E. (2013, February). *The psychology of (eyewitness) memory*. Invited speaker at the 2013 Louisiana Judicial College, Evidence and Procedure Conference, New Orleans, LA.

Dysart, J. E. (2012, October). *Identification evidence and eyewitness memory*. Invited speaker at the National Conference of Metropolitan Courts, Pittsburgh, PA.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York County Lawyers Association Judicial Section CLE Symposium, New York, NY.

Dysart, J. E. (2011, June). *Eyewitness identification*. Invited speaker at the Arizona State Judicial conference, Scottsdale, AZ.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Ontario Judges Annual conference, Niagara Falls, ON, Canada.

Dysart, J. E. (2010, November). *Identification evidence: Eyewitness memory.* Invited speaker at the Philadelphia Municipal Court Judicial conference, Philadelphia, PA.

Dysart, J. E. (2010, October). *Eyewitness identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, St. John's, NL, Canada.

Dysart, J. E. (2010, June). *Eyewitness identification*. Invited speaker at the Arizona Judicial conference/State Bar Association Convention, Glendale, AZ.

Dysart, J. E. (2010, May). *Eyewitness identification*. Invited speaker at the D.C. Superior Court Judicial Training Program, Washington, DC.

38

Dysart, J. E. (2010, February). *An examination of eyewitness identification procedures: Perspectives on wrongful convictions*. Invited speaker at the Pennsylvania conference of State Trial Judges Mid-Annual Meeting, Philadelphia, PA.

Dysart, J. E. (2009, October). *Identification evidence*. Invited speaker at the Ontario Court of Justice West Regional Seminar, Toronto, ON, Canada.

Dysart, J. E. (2009, March). *Identification evidence*. Invited speaker at the National Judicial Institute "Preventing Wrongful Convictions" Seminar, Victoria, BC, Canada.

Dysart, J. E., Garcia, R., & Lieberman, S. (2008, June). *Cross-racial identification*. Invited panelist at the 2008 New York State Summer Judicial Seminar, Rye Brook, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Atlantic Courts Education Seminar sponsored by the Canadian National Judicial Institute, St. John's, NL, Canada.

Dysart, J. E. (2007, July). *"He had a mug you couldn't forget": The psychological dynamics of mistaken eyewitness testimony.* Pennsylvania conference of State Trial Judges Annual Meeting, Hershey, PA.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Magistrates, Port of Spain, Trinidad and Tobago.

Dysart, J. E. (2006, April). *Eyewitness errors.* Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Montreal, QC, Canada.

Dysart, J. E. (2005, November). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Regina, SK, Canada.

Dysart, J. E. (2005, September). *Eyewitness errors*. Invited speaker at the Canadian National Judicial Institute Judges training workshop on eyewitness identification, Charlottetown, PEI, Canada.

Dysart, J. E. (2005, June). *Eyewitness identification and testimony: A matter for the experts?* Invited speaker at the Connecticut Judges Institute conference, Quinnipiac University, Hamden, CT.

## Invited Prosecutor/Conviction Review Unit Presentations

Dysart, J. E. (2024, May). *Evaluating eyewitness evidence in post-conviction reviews.* Invited presentation for a joint meeting of the New York City District Attorney's Conviction Review Units, Brooklyn, NY.

Dysart, J. E. (2022, June). *The science of eyewitness memory and behavior.* Invited

presentation at the Middlesex County, Massachusetts District Attorney's Office webinar on "Eyewitness Identification: Scientific Best Practices." Training provided via Zoom.

Dysart, J. E. (2021, October). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 17th Judicial Circuit, Conviction Integrity Review Division & Assistant State Attorneys. Conducted under the Bureau of Justice Assistance Grant. Training provided via Zoom.

Dysart, J. E. (2021, July). *The science of eyewitness memory and behavior.* Invited presentation to the State Attorney's Office, 4th Circuit, Florida, Conviction Integrity Review Division & Assistant State Attorneys. Training provided via Zoom.

Dysart, J. E. (2021, April). *The science of eyewitness memory and behavior.* Invited presentation to the Suffolk County, MA Conviction Review Unit Team. Training provided via Zoom.

Dysart, J. E. (2013, September). *The science of eyewitness identification*. Invited speaker at the Eyewitness Identification Best Practices Seminar for law enforcement and prosecutors, Forsyth, GA.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness memory*. Invited speaker at the Pennsylvania District Attorneys Annual Conference, Pittsburgh, PA.

Dysart, J. E. (2010, October). *Eyewitness identification.* Invited speaker at the Pennsylvania District Attorneys Association meeting, College Park, PA.

## Invited Bar Association Presentations

Dysart, J. E. (2016, April). *Eyewitness identification*. Invited panelist at the annual meeting of the American Bar Association, Chicago, IL.

Dysart, J. E. (2012, October). *The science of eyewitness identification*. Invited speaker at the New York State Bar Association program on "Forensics and the Law", New York, NY.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the State Bar of Michigan Eyewitness Identification Task Force meeting, Lansing, MI.

Dysart, J. E. (2013, February). *Identification evidence and eyewitness testimony*. Invited speaker at the Kings County Bar Association meeting, Brooklyn, NY.

Dysart, J. E. (2012), June. *Eyewitness identification: A psychological perspective.* Invited keynote speaker and panelist at the Pennsylvania Bar Institute's 20th Annual Criminal Law Symposium, Harrisburg, PA.

Dysart, J. E. (2011, November). *Eyewitness identification.* Invited speaker at the Louisiana State Bar Association conference, New York, NY.

Dysart, J. E. (2011, September). *Eyewitness identification*. Invited speaker at the Montgomery County Bar Association Bench Bar conference, Hamburg, NJ.

Dysart, J. E. (2008, March). *Eyewitness identification*. Invited speaker at the Nassau County Bar Association meeting, Mineola, NY.

Dysart, J. E. (2007, November). *Eyewitness identification*. Invited speaker at the Suffolk County Bar Association CLE program "Police encounters of the first kind", Hauppauge, NY.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for the Bar Association, Port of Spain, Trinidad and Tobago.

## Invited Law Enforcement/Investigator Presentations

Dysart, J. E. (2019, April). *The science of eyewitness memory: Understanding and preventing identification errors.* Invited speaker at the National Defender Investigator Association 2019 National Meeting, San Diego, CA.

Dysart, J. E. (2017, May). *The science of eyewitness identification.* Invited speaker/trainer at the Denver Fire Investigators Conference, Denver, CO.

Dysart, J. E. (2016, September). *Eyewitness identification: A psychological perspective.* Invited speaker at the National Defender Investigator Association Regional conference, Newport Beach, CA.

Dysart, J. E. (2014, June). *Eyewitness identification: A psychological perspective.* Invited speaker at the Michigan Association of Chiefs of Police Annual Training Conference, Traverse City, MI.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Las Vegas Metropolitan Police Department, Las Vegas, NV.

Dysart, J. E. (2013, June). *The psychology of eyewitness identification.* Invited speaker at the Pennsylvania Chiefs of Police Association Annual Conference, Harrisburg, PA.

Dysart, J. E. (2013, June). *The science of eyewitness identification*. Invited speaker at the Baltimore City Police Department training seminar on Eyewitness Identification, Baltimore, MD.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the NYPD training meeting on Wrongful Convictions, New York, NY.

Dysart, J. E. (2013, March). *The psychology of eyewitness identification*. Invited speaker at the "Enhancing Law Enforcement's Ability to Ensure Accurate Convictions – Techniques & Scientific Developments" Seminar for WV Law Enforcement, Charleston, WV.

Dysart, J. E. (2012, November). *Eyewitness identification: A psychological perspective*. Invited speaker at the seminar "How Idaho Law Enforcement Can Ensure More Accurate Identifications: Practice Techniques & Scientific Developments", Boise, ID.

Dysart, J. E. (2012, April). *Eyewitness identification: A psychological perspective.* Invited speaker at the 2012 National Defender Investigator Association conference, Atlanta, GA.

Dysart, J. E. (2011, December). *Enhancing law enforcement's ability to ensure accurate convictions – Techniques & Scientific Developments: Evidence that the updates work.* Invited speaker at the Mississippi Chiefs of Police conference, Oxford, MS.

Dysart, J. E. (2011, May). *Eyewitness identification*. Invited speaker at the Committee for Public Counsel Services conference, Worcester, MA.

Dysart, J. E. (2011, April). *Eyewitness identification*: A scientific review. Invited speaker at the joint Innocence Project, The Palmetto Innocence Project & The South Carolina Law Enforcement Division conference, Columbia, SC.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Society of Professional Investigators monthly meeting, New York, NY.

Dysart, J. E. (2010, September). *Eyewitness identification procedures*. Invited speaker at the National Defender Investigator Association annual training conference, Savannah, GA.

Dysart, J. E. (2010, February). *False identifications: A scientific approach to limiting mistakes*. Invited speaker at the Texas District and County Attorneys Association Investigator School conference, Odessa, TX.

Dysart, J. E. (2008, November). *Eyewitness identification*. Invited speaker at the Royal Canadian Mounted Police's Major Crime conference, Halifax, NS, Canada.

Dysart, J. E. (2008, September). *The psychology of eyewitness identification*. Invited speaker at the Denver Fire Department's Annual Advanced Fire Investigation Seminar, Denver, CO.

Dysart, J. E. (2006, September). *Eyewitness identification*. Invited talk at the International Association of Women in Policing conference, Saskatoon, SK, Canada.

Dysart, J. E. (2006, July). *Eyewitness identification*. Invited speaker at Judicial Education Institute training conference for Senior Police Officers, Trinidad and Tobago.

**Invited Defense Attorney Presentations**

Dysart, J. E. (2016, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College third annual conference, NACDL and Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2014, November). *Eyewitness identification: A psychological perspective.* Invited keynote speaker at the Wisconsin State Public Defender's Annual Criminal Defense Conference, Milwaukee, WI.

Dysart, J. E. (2014, June). *Eyewitness memory and perception.* Invited speaker at the National Forensic College Conference, Benjamin N. Cardozo School of Law, Yeshiva University, New York, NY.

Dysart, J. E. (2013, April). *The psychology of eyewitness identification*. Invited speaker at the Ohio Association of Criminal Defense Lawyers "Eyewitness Identification" Seminar, Columbus, OH.

Dysart, J. E. (2012, December). *The science of eyewitness identification*. Invited speaker at the Delaware County Association of Criminal Defense Lawyers meeting, Media, PA.

Dysart, J. E. (2012, August). *The science of eyewitness identification*. Invited speaker at the Texas Criminal Defense Lawyers Association conference, Austin, TX.

Dysart, J. E. (2012, June). *Eyewitness identification: A psychological perspective*. Invited keynote speaker at the Public Defender Service Forensic Science conference, Washington, DC.

Dysart, J. E. (2012, April). *Eyewitness identification: Why innocent people are wrongly identified.* Invited speaker at the 2012 New York State Wrongful Convictions conference, Rochester Institute of Technology, Rochester, NY.

Dysart, J. E. (2011, August). *Eyewitness identification*. Invited speaker at the Florida Defender Summer School 2011 conference, Orlando, FL.

Dysart, J. E. (2011, February). *Eyewitness identification: A scientific review*. Invited speaker at the Manhattan Legal Aid Society training seminar, New York, NY.

Dysart, J. E. (2011, February). *Eyewitness identification*. Invited speaker at the California Capital Case Defense Seminar, Monterey, CA.

Dysart, J. E. (2010, April). *The science of eyewitness evidence*. Invited speaker at the Missouri Association of Criminal Defense Attorneys convention titled "Eyewitness Identification Litigation Training", Branson, MO.

Dysart, J. E. (2009, November). *Eyewitness identification*. Invited speaker at the Rochester Institute of Technology Public Defender CLE program, Rochester, NY.

Dysart, J. E. (2009, October). *Eyewitness identification*. Invited speaker for the Criminal Appeals Bureau CLE program, New York, NY.

Dysart, J. E. (2009, September). *The investigative process and eyewitness evidence.* Invited speaker at the Short Course in Crime Scene Analysis for Trial Lawyers in Criminal Cases, New York, NY.

Dysart, J. E. (2009, May). *Eyewitness identification*. Invited speaker at the Bronx Legal Aid Society CLE program on Eyewitness Identification, Bronx, NY.

Dysart, J. E (2009, May). *Eyewitness (mis)identification.* Invited speaker at the Nassau County Legal Aid Society CLE Program on Eyewitness Identification, Mineola, NY.

Dysart, J. E. (2009, March). *Eyewitness identification*. Invited speaker at the Brooklyn Legal Aid Society CLE Program on Eyewitness Identification, Brooklyn, NY.

Dysart, J. E., & Perrone, A. (2008, October). *Changing strategies to change the law of identification evidence.* Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E., & Schecter, M. (2008, October). *Everything you always wanted to know but were afraid to ask about ID evidence*. Invited speaker at the New Jersey Office of the Public Defender Annual training conference, "Changing Times – Changing Strategies: Striking a New Balance, Kean University, Union, NJ.

Dysart, J. E. (2008, August). *Eyewitness identification*. Invited speaker at the Federal Defender Services of Idaho, Capital Habeas Unit's Annual Death Penalty conference, Boise, ID.

Stetler, R., Friedman, J., Garcia, R., & Dysart, J. E. (2008, March). *Developing the right facts: Investigation and discovery.* Invited panelist at the National Association of Criminal Defense Lawyers CLE conference, "A new legal architecture: Litigating eyewitness identification cases in the 21st Century", New York University, New York, NY.

Dysart, J. E. (2007, July). *Misidentification and eyewitness testimony*. Invited speaker at the Georgia Capital Public Defenders Association seminar, Atlanta, GA.

Dysart, J. E., & Carroll, P. (2006, May). *Eyewitness evidence*. Invited speaker at the Maryland Public Defender conference, Ocean City, MD.

---

**Invited Presentations for Combined Judicial, Law Enforcement, and Attorney Audiences**

Dysart, J. E. (2016, June). Moderator on '*Emerging Issues'* panel*.* Invited speaker at the National Symposium on Eyewitness Identification Reform, Yale University, New Haven, CT.

Dysart, J. E. (2014, May). *Eyewitness identification: A psychological perspective.* Invited speaker at the Eyewitness Identification Best Practices Symposium, San Francisco, CA.

Dysart, J. E. (2014, May). *The science of eyewitness identification*. Invited speaker at the Joint Eyewitness Identification Statewide Training Symposium, co-sponsored by the Connecticut State Eyewitness Identification Task Force, Hartford, CT.

Dysart, J. E. (2013, April). *Eyewitness memory and the social science research*. Invited speaker at the Annual Virginia Journal of Criminal Law Symposium at the University of Virginia School of Law, Charlottesville, VA.

Dysart, J. E. (2012, May). *Best practices in eyewitness ID: Model policy and procedures.* Invited speaker and panelist at the Best Practices in Law Enforcement Investigations Program, Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, October). *Eyewitness identification*. Invited speaker at the Newfoundland Department of Justice conference, St. Johns, NL, Canada.

Dysart, J. E. (2011, July). *Eyewitness identification*. Invited speaker at the "Eyewitness Identification and False Confession" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2011, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt August - Causes of and Solutions to Wrongful Convictions" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E. (2010, March). *Eyewitness identification – What is its value in criminal cases?* Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt" conference, sponsored by the Center for American and International Law, Plano, TX.

Dysart, J. E., & Patenaude, K. (2009, March). *Eyewitness identification*. Invited speaker at the "Actual Innocence: Establishing Innocence or Guilt. Future of Forensic Science, Eye-Witness Identification and the Impact of the NAS report" conference, sponsored by the Center for American and International Law, Austin, TX.

Dysart, J. E., & Edwards, E. (2009, January). *Eyewitness identification: New science and new litigation strategies.* Invited speaker at the Fifth National Seminar on Forensic Evidence and the Criminal Law, Philadelphia, PA.

Dysart, J. E. (2008, August). *Why eyewitnesses make mistakes*. Invited speaker at The Center for American and International Law conference, "Actual Innocence: Forensics, False Confessions, and Eyewitness Identification", Plano, TX.

## Invited Law School and University Presentations

Dysart, J. E. (2021, January). Invited speaker at the Wrongful Convictions Panel Series, Institute for Innovation in Prosecution at John Jay College of Criminal Justice. Meeting via Zoom.

Dysart, J. E. (2018, November). *The science of eyewitness identification.* Invited speaker at the

45

"Protecting the Innocent: Louisiana's Reform of Eyewitness Identification" conference, Loyola University New Orleans College of Law, New Orleans, LA.

Dysart, J. E. (2016, November). *Eyewitness identification.* Invited speaker at the Department of Psychology sponsored colloquium titled "Faculty Perceptions: Eyewitnesses, Juries, and Consequences." John Jay College of Criminal Justice, New York, NY.

Dysart, J. E. (2014, January). *The science of eyewitness identification*. Invited speaker at the Association of American Law Schools Annual Conference, New York, NY.

Dysart, J. E. (2013, August). *The science of eyewitness identification.* Invited speaker at the Social Justice Workshop Seminar, Santa Clara Law School, Santa Clara, CA.

Dysart, J. E. (2012, April). *The science of eyewitness identification.* Invited speaker at the "Eyewitness Identification Symposium" sponsored by Emory Law School, Atlanta, GA.

Dysart, J. E. (2012, February). Invited panelist at the 7th Annual H.F. Guggenheim Symposium on Crime in America session titled "Did You See That Man? The Challenge to Eyewitness ID", New York, NY.

Dysart, J. E. (2010, April). *The science of eyewitness identification*. Invited panelist speaker at the Brown University Eyewitness Identification Summit, The Taubman Center for Public Policy Brown University, Providence, RI.

Dysart, J. E. (2009, September). *The psychology, law, and ethics of eyewitness identification cases.* Invited speaker at the Innocence and Forensics CLE program, Widener Law School, Wilmington, DE.

Dysart, J. E. (2007, May). *Eyewitness identification*. Invited speaker at "Wrongful Convictions: Causing Pain, Allowing Gain", sponsored by The Arlin M. Adams Center for Law and Society at Susquehanna University, Ceremonial Courtroom, Federal District Court, Philadelphia, PA.

Dysart, J. E. (2007, February). *Understanding eyewitness identification*. Invited speaker at Susquehanna University seminar "Wrongful Convictions", Selinsgrove, PA.

Dysart, J. E. (2006, November). *Understanding the science of memory: Distinguishing eyewitness confidence from accuracy.* Invited talk at Emory Law School, Atlanta, GA.

Dysart, J. E. (2006, March). *The effects of alcohol on eyewitness identification accuracy from show-ups.* Invited talk for the Department of Psychology at Lehman College, CUNY, Bronx, NY.

**Invited Non-Profit Presentations**

Dysart, J. E. (2023, February). *The science of eyewitness memory and behavior.* Invited speaker at the Innocence Project Staff Training seminar. Training provided via Zoom.

Dysart, J. E. (2017, November). *The science of eyewitness identification.* Invited speaker at the Innocence Project 25th Anniversary Conference, Cardozo Law School, New York, NY.

Dysart, J. E. (2013, May). *The psychology of eyewitness identification.* Invited speaker at the Innocence Project Staff Training seminar, New York, NY.

Dysart, J. E. (2012, June). *Psychology of misidentification.* Invited speaker at the 2012 Innocence Policy Network conference, New Orleans, LA.

Dysart, J. E. (2011, October). *Eyewitness identification.* Invited Shea Lecturer, sponsored by the Charter Oak State College Foundation, Hartford, CT.


**Supervision of Doctoral Students at John Jay College of Criminal Justice**

2010            John DeCarlo (Criminal Justice Doctoral Student)
                     Topic: Eyewitness Identification Accuracy of Police Officers & Citizens

2009-2011    Victoria Lawson (Forensic Psychology Doctoral Student)
                     Topic: Eyewitness Identification

2006-2009    Anna Rainey (Forensic Psychology Doctoral Student)
                     Topics: Showups; Cross-race identification

2006-2009    Brian Wallace (Forensic Psychology Doctoral Student)
                     Topics: Alibi believability; Mug shot searching.


**Supervision of Masters Theses at John Jay College of Criminal Justice**

2018 – 2020   Elena Christofi
                     Topic: 911 Transcripts in Eyewitness Calls

2018 – 2019   Samantha Kosziollek
                     Topic: 911 Dispatchers

2016 – 2018   Marisa Jaross
                     Topic: Composite sketches

2016 – 2017   Brittany Kassis
                     Topic: 911 Dispatchers

2011 – 2012   Tamara Andrade
       Topic: Composite creation in cross-race identifications

2010 – 2011   Jennifer Savion
       Topic: Composite creation in cross-race identifications

2009 – 2010   Lindsey Butera
       Topic: Eye-tracking and lineup accuracy with biased lineups
       Yinglee Wong
       Topic: Cross-race description accuracy of hair/hairstyles
       Nancy Yang
       Topic: Eye-tracking and weapon focus effect

2008 – 2009   Alexander Buijsrogge
       Topic: Cross-race composite creation of famous faces
       Kristin Chong
       Topic: Stranger alibis and identification accuracy
       Victoria Lawson
       Topic: Cross-race showup and lineup accuracy
       Jessica Owens
       Topic: Multiple-perpetrator crimes and identification accuracy

2007 – 2008   Sarah Kopelovich
       Topic: Cross-race and Accent effects on identification accuracy
       Jason Mandelbaum
       Topic: Cross-race effects in mug shot searching

## Supervision of Master's Theses at Southern Connecticut State University

2005          Lisbeth Fugal
       Topic: Post-identification feedback
       Anna Rainey
       Topic: Cross-race identification and "contact" with other groups

2004          Sandra Soucie
       Topic: CSI Effect

## Supervision of Undergraduate Honor's Thesis at Southern Connecticut State University

2005          Daniel Csuka
       Topic: Multiple Independent Identification Accuracy

**Awards and Scholarships**

| | |
|---|---|
| 2017 | PSC CUNY research grant ($3,500) |
| 2008 | John Jay College Research Assistance Program Grant ($1,000) |
| 2005 | Connecticut State University Research Grant ($4,400) |
| 2005 | Junior Faculty Research Fellowship, Southern Connecticut State University (9 credits teaching release time for Fall 2005) |
| 2003-2005 | Social Sciences and Humanities Research Council of Canada (SSHRC) Post- Doctoral Fellowship ($40,000 and $35,000 annually; declined) |
| 2002 | American Psychological Foundation/Council of Graduate Departments of Psychology (APF/COGDOP) Graduate research scholarship ($1,500) |
| 2002 | American Psychology-Law Society Grants-in-Aid award ($650) |
| 2001-2003 | Social Sciences and Humanities Research Council of Canada (SSHRC) Doctoral Award ($17,900 annually) |
| 2000-2001 | Ontario Graduate Scholarship ($15,000) |
| 1999-2000 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-B scholarship ($18,900) |
| 1998-1999 | Natural Sciences and Engineering Research Council of Canada (NSERC) PGS-A scholarship ($17,300) |

**Courses Taught**

**John Jay College of Criminal Justice, New York, NY**
- Introduction to Psychology (undergraduate course)
- Psychology and Law (undergraduate course)
- Forensic Social and Experimental Psychology (undergraduate course)
- Mental Health Professionals, Social Science and the Law (Masters course)
- Eyewitness Identification (Masters course)
- Prospectus Seminar (Masters course)
- Research Methods and Design (Psychology doctoral course)
- Survey of Psychology and Criminal Justice (Criminal Justice doctoral course)

**Southern Connecticut State University, New Haven, CT**
- Experimental Methods (undergraduate course)
- Social Psychology (undergraduate course)
- Experimental Research Internship (undergraduate course)

- Psychology and Law (undergraduate course)
- Issues in Psychology, Law, and Ethics (Masters course)

**Quinnipiac University, Hamden, CT**
- Introduction to Psychology (undergraduate course)

---

## University Committee Service

| | |
|---|---|
| 2023 – 2024 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2023 – 2024 | College Council Alternate Member, John Jay College of Criminal Justice |
| 2016 – 2019 | Graduate Studies Council, John Jay College of Criminal Justice |
| 2013 – 2016 | College Council Member, John Jay College of Criminal Justice |
| 2013 – 2016 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2013 – 2014 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | College Council Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Executive Committee Member, John Jay College of Criminal Justice |
| 2010 – 2012 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2008 – 2012 | College Scholarships and Awards Committee, John Jay College of Criminal Justice |
| 2010 – 2011 | Task Force on the Year-round College, John Jay College of Criminal Justice |
| 2007 – 2010 | Department Curriculum Committee, Department of Psychology, John Jay College of Criminal Justice |
| 2007 – 2010 | College Curriculum Committee Member, John Jay College of Criminal Justice |
| 2006 – 2008 | Coordinated Undergraduate Education (CUE) Committee Member, John Jay College of Criminal Justice |

50

| 2006 – 2007 | College Council Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Faculty Senate Member, John Jay College of Criminal Justice |
| 2006 – 2007 | Major/Minor Fair Committee, John Jay College of Criminal Justice |
| 2004 – 2005 | Subject Pool Ad Hoc Committee, Department of Psychology, Southern Connecticut State University |
| 2004 – 2005 | Faculty Development Advisory Committee – Arts and Sciences Rep, Southern Connecticut State University |
| 2004 – 2005 | New Faculty Orientation Committee, Southern CT State University |
| 2004 – 2005 | New Faculty Mentor, Southern Connecticut State University |
| 2004 | New Student Orientation Committee, Southern Connecticut State University |
| 2003 – 2005 | Department of Psychology Web-site Committee, Southern Connecticut State University |
| 2003 – 2004 | Connecticut State University Psychology Day Research Conference – Organizing Committee |
| 1999 – 2003 | Graduate Student Representative at Department of Psychology Meetings, Queen's University |

## Professional Activities

| 2006 – present | Consultant, eyewitness identification expert |
| 2016 – present | Appointed Member of the 3rd Circuit Task Force on Eyewitness Identification |
| 2009 – 2021 | Research Advisory Board Member, Innocence Project, New York, NY |
| 2016 | Testified at City Council - joint hearing of the Committee on Public Safety and Committee on Courts and Legal Services on "Wrongful Convictions: Using Evidence-Based procedures and Technology to Keep Innocent People Out of Jail", New York, NY. |
| 2012 | Testified before the Maryland House and Senate Judiciary Committees, Annapolis, MD |

| | |
|---|---|
| 2011-2012 | Advisory Board member for the Houston Police Department Eyewitness Identification Experiment |
| 2011 | Testified before Connecticut Eyewitness Identification Task Force, Hartford, CT |
| 2011 | Reviewed model policy for Texas HB 215 on eyewitness identification |
| 2007 – 2012 | Member of a national field study team led by Dr. Gary Wells of Iowa State University investigating the use of simultaneous and sequential double-blind lineups in the field. |
| 2010 – 2011 | Site scientist in Austin, TX for National eyewitness field study (above) |
| 2010 – 2011 | Conference Co-Chair for the 9th biennial conference for the Society for Applied Research in Memory and Cognition, New York City, June 2011 |
| 2007 | Conference Chair and Organizer: "Off the Witness Stand: Using Psychology in the Practice of Justice", New York, NY |

**Reviewing (past and current)**

Law and Human Behavior
Psychology, Public Policy and Law
Applied Cognitive Psychology
Journal of Experimental Psychology: Applied
Psychology, Crime & Law
National Science Foundation
American Psychology-Law Society annual meetings
Society for Applied Research in Memory and Cognition meetings

**Professional Affiliations**

American Psychology–Law Society
Society for Applied Research in Memory and Cognition

**Appendix C**

**Materials Reviewed**

1. Amended Complaint (3/7/24)
2. Police File
3. Motion to Suppress Identification
4. Trial Transcript
5. Application for DNA Testing
6. Petition for Post-Conviction Relief
7. Motion for Post-Conviction Forensic Testing
8. Motion for a New Trial with Exhibits
9. Joint Stipulations of Fact
10. Reply Brief in Support of Defendant's Motion in Limine
11. Rhonda Curry Deposition with Exhibits
12. Tracy Smith Deposition with Exhibits
13. Brenda Walker Deposition with Exhibits
14. Kim Curry Deposition with Exhibits
15. Richard Diggs Deposition (Vol. I) with Exhibits
16. Alfred Harmon Deposition with Exhibits
17. Trial Exhibits Redacted
18. Ohio BCI files (10/25/2018)
19. First Amended Petition to Vacate
20. Transcript of Proceedings (8/27/2008)
21. Transcript of Proceedings (9/25/2008)
22. FCPO Response to Subpoenas Horton
23. Investigative Photo Array Procedure 02.2003 – 2010
24. Photo Array Form 3.17.2000