# Exhibit 30



LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

# CASE NO. 23-CV-3888

# RICHARD HORTON

# V.

# CITY OF COLUMBUS, ET AL.

# DEPONENT:

# JOHN WIXTED

# DATE:

# JANUARY 19, 2026



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

CHIEF JUDGE ALGENON L. MARBLEY

MAGISTRATE JUDGE ELIZABETH P. DEAVERS

RICHARD HORTON,

    Plaintiff,

vs.                        CASE NO. 23-CV-3888

CITY OF COLUMBUS, COLUMBUS DIVISION OF POLICE OFFICERS, BRENDA K. WALKER (BADGE #1176), MIEKO SIAS AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SAM SIAS (BADGE #1871), AND AS-YET UNKNOWN COLUMBUS POLICE OFFICERS,

    Defendants.

DEPOSITION OF JOHN WIXTED

JANUARY 19, 2026

12:03 p.m.

Remote Proceeding

Madison Books, 2022-RE-856045



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES OF COUNSEL


On behalf of the Plaintiff, RICHARD HORTON:


    ALYSSA MARTINEZ, ESQ.

    LOEVY & LOEVY

    311 North Aberdeen Street

    Floor 3

    Chicago, Illinois 60607

    alyssa@loevy.com

    APPEARED VIA VIDEOCONFERENCE


On behalf of the Defendants, CITY OF COLUMBUS AND

BRENDA K. WALKER (BADGE #1176):


    ALANA V. TANOURY, ESQ.

    AARON D. EPSTEIN, ESQ.

    ASSISTANT CITY ATTORNEYS

    CITY OF COLUMBUS, DEPARTMENT OF LAW

    77 North Front Street

    Floor 4

    Columbus, Ohio 43215

    vtanoury@columbus.gov

    adepstein@columbus.gov

    APPEARED VIA VIDEOCONFERENCE

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

INDEX OF EXAMINATION

WITNESS:  JOHN WIXTED

EXAMINATION                                          PAGE

Direct By Ms. Martinez                                6


                    INDEX TO EXHIBITS

NO.                    DESCRIPTION                PAGE

1 - Case List                                      18

2 - Curriculum Vitae                               34

3 - Expert Report - November 19, 2025              39

4 - Contract for Services                          50

5 - Invoice                                        53

6 - Handwritten Notes by Detective Walker          73

7 - Informational Summary                          75

8 - Trial Testimony                                77

9 - Deposition Transcript of Officer Pamela

      Rhodeback - November 20, 2024                79

10 - Columbus Division of Police Preliminary

      Investigation - October 9, 2004              82

11 - Deposition of Detective Brenda K. Walker -

      October 11, 2024                             90

12 - Handwritten Notes of Interview -

      October 13, 2004                             120

13 - Photo Array                                   257

      (Will forward exhibits upon receipt.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The video deposition of JOHN WIXTED was taken at KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40202, via videoconference in which all participants attended remotely, on MONDAY, JANUARY 19TH, 2026, commencing at 12:03 p.m. (ET); said deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. The oath in this matter was administered remotely pursuant to 7-31-2020 administrative actions, 2020-OHIO-3861.

It is agreed that MADISON BOOKS, being a Notary Public and Court Reporter for the State of OHIO, may swear the witness.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

5

THE REPORTER:  Okay, we're now on record.  My name is Madison Books.  I'm the online video technician and court reporter today, representing Kentuckiana Court Reporters, located at 730 West Main Street, Suite 101, Louisville, Kentucky 40202. Today is the 19th day of January 2026, and the time is 12:03 p.m.  Eastern. We are convened by videoconference to take the deposition of John Wixted in the matter of Richard Horton v. City of Columbus, et al, pending in the United States District Court for the Southern District of Ohio, Case number 23-CV-3888.  And will everyone, but the witness, please state your appearance, how you're attending, and the location you're attending from, starting with Plaintiff's counsel?

MS. MARTINEZ:  Alyssa Martinez on behalf of plaintiff, Richard Horton.  And I'm appearing remotely via Zoom from Chicago.

MS. TANOURY:  Alana Tanoury, on behalf of defendants, Brenda Walker and the City of Columbus. And I am appearing remotely from Columbus.  There's also Aaron Epstein on the Zoom in -- we're in separate locations, but he's appearing remotely from Columbus.

THE REPORTER:  Thank you so much.  And then

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

sir, can I please have you state your full name for the record?

THE WITNESS:  John Wixted.

THE REPORTER:  Thank you so much.  And can I have all parties agree or stipulate that the witness is, in fact, who he says he is?

MS. MARTINEZ:  So stipulated.

MS. TANOURY:  We stipulate.

THE REPORTER:  Thank you so much.  And then sir, can I please have you raise your right hand for me?  Do you solemnly swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  Thank you so much.  You-all may begin.

DIRECT EXAMINATION

BY MS. MARTINEZ:

Q.   Good morning, sir.  How are you today?

A.   Good morning.  How are you?

Q.   I'm doing well, thank you.  Like I said --

A.   I'm sorry -- I'm -- I'm sorry your Bears lost yesterday.

Q.   Well, I'm actually a Packers fan --

A.   Oh.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

7

Q.   -- so yesterday was not that difficult for me. But some of my friends and colleagues in the office took it hard, so I appreciate that.

A.   Yeah, I can imagine.

Q.   It was a good game to watch either way.

A.   It was amazing.

Q.   Like I said, I represent Richard Horton in this case.  So can you please state and spell your name for the record?

A.   My name is John Wixted, spelled J-O-H-N, W-I-X-T-E-D.

Q.   Thank you, and I'm going to go over some quick ground rules at the outset of the deposition today. I'm sure you're familiar with them, but I just want to make sure we're on the same page, okay?

A.   Okay.

Q.   Okay.  So as you know, there's a court reporter that's taking down everything that we say.  So to the best of your ability, please try to give loud, verbal answers.  Head nods or shakes or uh-huhs don't translate very well for the record, okay?

A.   Understood.

Q.   And again, because we're trying to build out that clean transcript, I'm going to do my absolute best to not cut off an answer that you're giving.  If you



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 29, 2026

8

feel like I have, please let me know.  I want to make sure you have the opportunity to get out your answer. And I ask that you please extend me the same courtesy. Even if you know where my question is going, please let me get out the full question before you begin your response, okay?

A.   Understood.

Q.   Okay.  If a question that I ask you doesn't make sense, please let me know.  I'm more than happy to rephrase.  If you answer my question, I'm going to assume you understood my question; is that fair?

A.   Fair enough.

Q.   Okay.  From time to time, your counsel may object.  Unless you're specifically instructed not to answer a question, I ask that you please answer all of my questions, okay?

A.   Okay.

Q.   And if you need a break at any point today, I'm more than happy to take a break.  Just let me know. I only ask that it not be while a question is pending, okay?

A.   Okay.

Q.   Now, sir, are you under the influence of any medications, or do you have any conditions that affect your memory?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   No.

Q.   And is there anything that would prevent you from answering my questions today truthfully and accurately?

A.   Nothing.

Q.   Okay, and where are you currently located, sir?

A.   San Diego, California.

Q.   I bet the weather there is very nice.

A.   It is.

Q.   And do you have anything in front of you?

A.   Well, I think you might be referring to documents and such.  I have my expert report open on this other screen that I can see.  Since I assume you're going to be referring to it, I've got it.

Q.   Perfect, okay.  I think that will make it easier for us to go along.  I'm happy to share my screen at any point if you want to, you know, follow along with exactly where I'm at.  But if you have your own copy, I think that may be easier just in terms of getting through the report, okay?

A.   Sounds good.

Q.   Now, did you prepare for your deposition today, sir?

A.   A little bit, I did.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 29, 2026

Q.   Okay, and before I ask my next set of questions, I want to clarify that I don't want to know about the substance of communication that you had with Counsel, okay?

A.   Okay.

Q.   What did you do to prepare?

A.   Discussed it with Counsel, and then that was a week or two ago.  I can't remember exactly when.  And then yesterday, I went over my report again and looked at some of the original materials again just to get it all fresh in my mind, and that's about it.

Q.   Okay.  I'm going to separate those out and just ask you a few follow-up questions, okay?

A.   Okay.

Q.   For the conversation you had with your counsel a week or two ago, was that the only conversation you had in preparation for your deposition today?

A.   Yes.

Q.   And approximately how long was that conversation?

A.   I think it was about an hour long.

Q.   And did you review any documents in that hour?

A.   I don't think so.  I don't have a -- I'm not 100 percent sure of that.  I don't have a recollection of reviewing documents.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay, and you testified that yesterday, you reviewed some case materials in your report, correct?

A.   Correct.

Q.   Do you recall which specific case materials you reviewed?

A.   I just -- I also reviewed some of the scientific literature, by the way, just to -- so you know.  I reviewed the original -- the police reports from early in the investigation.  I mean, I was referring to facts, and I was just double checking to make sure that I could find those facts again, and things like that.

Q.   Okay, and again, just so I understand, you know, the full range of documents you reviewed, when you say, "the police reports from early in the investigation," is that the entirety of the investigative file, or just the typed reports from the first few days of the investigation?

A.   When you refer to the entirety, I'm not sure what you're referring to.  I mean, they're also handwritten notes and things like that.  So were you asking did I only look at the typed sections, or did I look at the handwritten sections, too?  I'm not sure what you're asking.

Q.   No, that's fair.  Approximately how many pages

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

of police reports and handwritten notes did you review in preparation for your deposition today?

A.    I don't know.  It's a long document.  I searched for words in some cases.  I paged down, I think it was pretty far down that I saw the handwritten notes. I'm not sure how many pages that was.  A lot of pages in -- in that document.

Q.    Okay.

A.    And I didn't review all of those pages by any means.

Q.    Okay, and when you say, "in that document," is that the police file?

A.    It certainly seems like it's the police file. I believe it to be, let's put it that way.

Q.    Okay, perfect.  And so then outside of -- sorry, strike that, please.  I believe you also testified that you reviewed some of the scientific literature that's cited in your report; is that right?

A.    Yeah, just double checking to make sure I characterized it correctly.

Q.    And to the best of your recollection, which sources in particular did you review?

A.    Oh.  The only one that -- let's see.  I have to glance through my report again to remind me what I was looking up.  I refer to a couple of studies by

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Eisen, et al., 2017, 2021, on show-ups.  I went back and double checked those.  And the Figure 3 in my report is my own calculations from his data.  I double checked those to make sure that was right.  I looked up -- just one second.  Okay, and then I looked up in the Known Person Identification section of my report, I cite a study by Young, Hay, and Ellis, 1985, that I had not looked at in a long time.  So I looked that up, make sure that was characterized properly.  And I think that might be it in terms of the studies that I reviewed again.

Q.  And when you conducted that review, did you find anything that you believed to be characterized improperly in your report?

A.  No, no.  Let's see.  I could have added -- let me just find it again.  From the 1985 study by Young, Hay, and Ellis, I could have been more complete in my characterization of it for -- making it clearer to the reader that it was a study only of errors.  They had -- they had 22 participants record errors.  So like, we don't know how often they correctly identified.  We can't -- can't make any determination of that.  They said, we want to just look at errors and find out about errors.  I went back to look at -- well, how often did these things -- I mean, how often were they correct that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

-- and then I remembered they didn't even have them record correct identifications. So it's not a piece of information. That would've been -- you know, I could've been more complete about that, I guess. Nothing -- I wouldn't call that an error necessarily, but --

Q. And was there anything else you noticed in your review that you perhaps could've added extra information on in your report?

A. I noticed -- so in the section, Analysis of Eyewitness Identification of Richard Horton. In my second paragraph, the first sentence ends with, "Mr. McClanahan going so far as to provide his first name, Richard." And -- and the sentence begins, "At their first report, both witnesses claim prior familiarity." Which that's true, but that second half of the sentence -- I believe he provided his first name at the second interview a few days later in the hospital. So that -- that's a -- I -- if that's correct, and I think it's correct, that I would've added that detail, if I had to do it over again. And I think that's it, that I noticed.

Q. Okay, and just to get it clean for the record, outside of the two instances you just testified to, was there anything else you noticed in either your review of your own report, or your review of the materials and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 17 of 324  PAGEID #: 12170
The Deposition of JOHN WIXTED, taken on January 9, 2026

15

scientific literature that you would now add something to your report in light of?

A.   No, those are the only things.

Q.   Okay, and so outside of your reports, the scientific literature you just testified to, and the sections of the police file that you reviewed, did you review any other documents in preparation for your deposition today?

A.   The only additional documents, I -- I only glanced at them, were -- there -- apparently there were some expert reports having to do with the forensic -- having to do with Brady violations and -- alleged Brady violations, and DNA evidence, was it contaminated or not?  Anyway, there are expert reports on those things. I just glanced through those to make sure there was nothing about eyewitness memory that I might have missed, and I didn't see anything, so -- and that's the entirety -- that completes the list of what I looked at in preparation.

Q.   Okay, perfect.  And just to make sure, again, we have the same understanding of the documents, when you're referring to those reports, are you referring to the report -- strike that, please.  Sorry.  When you say reports, are you referring to the reports of Chief Thomas Tiderington and Meghan Clement?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Pretty sure.  Let's see.  I didn't pay close attention to the names.  Let's see.  My Name is Timothy Dixon, that was one report.  And then there -- I think there was a rebuttal to that report.  I don't -- Defendant's Reply to Plaintiff's Expert report, so -- oh, that might still be Timothy Dixon.  All right.  I glanced at that document.  Doug Stead, or Stead, report. Horton-Clement Rebuttal report.  I was just glancing through these.  Horton -- looks like Tiderington Rebuttal report.  Then there's a N-O-E-D-E- L report. Those are the reports that I glanced through this morning.

**Q.   Okay, and you kind of just testified to this, but that glance was just to see if there was any information that pertained to your opinions in this case?**

A.   Yes.

**Q.   All right.  And any other documents you reviewed in preparation for your deposition?**

A.   Let me look at them all.  No, no.

**Q.   Okay, perfect.  Outside of your counsel, have you spoken with anyone about your deposition here today?**

A.   Other than to let my wife know I would be doing it, and my grad students not to bother me, no.

**Q.   Okay, and outside of everything you just**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testified to, have you done anything else to prepare for your deposition today?

A.    No.

Q.    All right.  I have a few background questions for you, sir.  How many expert reports have you authored in your career?

A.    I do not have that number at my fingertips, so I'm just going to have to estimate it.

Q.    Okay.

A.    Expert reports for any kind of case, civil, criminal, anything, exoneration.  Geez, that's -- I'm going to say 60, not 100 percent -- that -- that is an estimate.  I -- I don't keep track.  I write them a lot.

Q.    And are they all generally on the subject of memory and eyewitness identifications?

A.    They're all in the subject of memory.  Most eyewitness identifications.  Sometimes it's recollection of details, which is another way of testing memory, but always memory.

Q.    And would it generally be your practice, sir, to work on one case at a time, or may you -- strike that, please.  Is it generally your practice, sir, to work on one case at a time, or may you have multiple open cases that you're working on at the same time?

A.    Always multiple open cases.  I have, like, for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

example, five exoneration cases right now that I'm working on in addition to this case.

Q. And when you say, "five exoneration cases," do you mean that you're involved in the post-conviction proceedings, or are you an expert in the subsequent civil lawsuit like you are here?

A. Excuse me. I was -- I'm not exactly sure how you put it, but I was referring mainly to the former. I also do these civil cases. And I probably am -- have a couple of those open as well right now, just ongoing with reports due and things like that.

Q. Okay. I am going to show you, sir, what we will mark as Exhibit 1. And first, I'll share it to make sure you can see it. Are you able to see my screen, sir?

(Exhibit 1 was marked for identification.)

A. Yep, I see it.

BY MS. MARTINEZ:

Q. Okay, I'm going to try moving it off to the side. Let's see if it still goes. Can you still see it?

A. Yes, I recognize it.

Q. Okay, perfect. Just want to make sure when I move between screens that nothing weird happens. Okay,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I'll represent to you that this is a list of your previous testimony that was produced in response to a subpoena for documents that was issued to you, okay? And I'm going to scroll through it quickly so you have a chance to look at the entirety of the document.

A.   Okay.

Q.   Okay, and so sir, is this an accurate list of the cases you have been retained in from February 2012 through November of 2025?

A.   No, these are the cases that where I've testified under oath.  There are more cases where I've been, you know, hired as an expert to write a report or something where it never goes to trial or whatever. This -- these are the case -- cases where I've testified.

Q.   Okay.  Understood.  And so for the nine cases from this list where you testified on behalf of the prosecution, was that all on memory?

A.   Yes.

Q.   Okay, and for the 24 -- actually, sorry, strike that, please.  Do you see where it says, "Government," sir?

A.   Yeah, maybe that's not the best word to use.

Q.   I just want to make sure I'm understanding what you mean by that.  Is that --

A.   Yeah, okay.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   -- you are serving as an expert on behalf of municipalities who are defendants in these civil lawsuits?

A.   Yeah.  Is there a better word I should use for that?

Q.   I -- I've seen it different ways for experts. Sometimes they just say defense because they are the defendants, but --

A.   Oh.

Q.   -- you know?  I think -- I think it's clear what you mean.  I just wanted to make sure we have the same understanding.

A.   Okay.

Q.   And were each of these 24 on the subject of memory?

A.   Yes.

Q.   Okay, and then for the 14 cases where you testified on behalf of the criminal defense, primarily in California, are those also all on memory?

A.   Yes.

Q.   Okay.  Now, I will stop sharing because that's what I wanted to ask you about that.  Sir, have you ever been retained to serve as an expert for a plaintiff in a civil lawsuit?

A.   Not yet.  I'm sure that's coming.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.

A.   But not yet.

Q.   Okay, but I believe you testified that you are involved on behalf of the criminal defendant in post-conviction proceedings; is that correct?

A.   Many.

Q.   Okay, and this may just be a coincidence, but is there any particular reason most of your criminal defense work is in California?

A.   Criminal defense?  Why is it in California?  I think probably I'm on their Rolodex, so to speak, you know, more so than in other states.  You know, public -- public defender's offices tell me I'm -- you know, when they go looking -- so maybe that's a state thing. I -- I don't know why for -- you know, that's what -- that's my best guess.

Q.   And just to, I guess, circle back really quickly.  Is the reason that you've never opined as an expert for a plaintiff in a civil lawsuit merely because you haven't yet had the opportunity, or is there some kind of -- sorry, strike -- that was a very poorly-worded question.  Let me try that again.  You testified that as of yet, you have not served as an expert for a plaintiff in a civil lawsuit; is that correct?

A.   That's correct.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    Is there any particular reason that you haven't?

A.    Well, I'm not -- I can answer your question in two ways.  You're asking me why haven't I testified for the plaintiff in these civil cases, and there's two -- it's a two-part answer.  One, nobody's ever asked me to, despite my -- every time I do one of these things, I tell the other side I'd be more than happy to.  So then why?  Well, it's because in all the -- every single one of the civil cases, you -- you have to remember my -- my work has, you know, led the field to appreciate the importance of focusing on the first test of a witness's memory.  And now there's a consensus about that, very controversial to suggest that what witnesses have to say on the first test is reliable. Maximizes reliability is actually a better way to put it.  That was very controversial to suggest that witnesses are ever reliable.

But, you know, we battled it out for ten years, and the field has come around to that way of thinking.  Innocence Projects realize that on the first test, witnesses often say it's not that guy, the same guy that the witness confidently identifies at trial. That's the basis of all the exoneration cases, post-conviction, I think is the word you use.  There are many

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

men sitting in prison where on the first test, multiple witnesses say, that's not him. And then those same witnesses confidently identify him in front of a jury, so that's what happened.

And then -- but in all the civil cases, it's the opposite. You know, there's evidence in the early police investigations that the witness did identify the same person that they end up identifying at trial. So it's -- you know, I -- I can't have it both ways. I say it's reliable. It maximizes reliability whether it points in the direction of innocence or guilt on the first test. And so that's my consistent message in every single case I testify in. And -- and so far in the civil cases that I've been asked to testify, and it's always been the case that on -- you know, there's consistency, more or less, between what the witness said on the first test and, you know, what -- the later test.

And for some reason, like, I feel sure that the exoneration cases that I'm working on, the post-conviction cases, that when they get to the civil suit stage, they'll probably ask me to testify for them because my message will be helpful to -- to, you know, that side of the argument. But that's -- that's why it's just that the -- that kind of case -- those are relatively new exoneration cases. So far, there have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

been five who've been exonerated, released from prison, but it's all happened in the last year and -- I -- I mean, with the help of this new message from the science of human memory, there have been five who've been exonerated so far. I hope that number goes up a lot in the future. I don't know if those have moved to the civil lawsuit stage, and it would not surprise me, and I would be happy to testify if they ever do, because it would help, you know, their side.

Q. So it's just to -- again, make sure I'm fully understanding your testimony, it's because, one, you haven't been asked, and two, because it's fact determinant on -- actually, sorry, let me -- let me -- strike that, please. I think -- I think your answer was actually perfectly clear. I don't think I have to go back and recap it. That makes sense. Okay, and this was kind of implicit in your answer, but I still want to, you know, clearly ask it. So in your knowledge and professional experience, you recognize that eyewitness misidentifications can and do result in wrongful convictions; is that accurate?

A. That's accurate. Incomplete, but accurate.

Q. And what do you mean by, "incomplete?"

A. Usually, when people say that, what they mean is what the legal system means, the witness testifying

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

at trial under oath. And yeah, there have been hundreds of misidentifications leading to wrongful convictions. But that's how the legal system thinks you should test memory. Science says focus on the first test, not the last test. And there are not a lot of wrongful convictions. They're very few. I'm the only one who's documented them. High-confident misidentification on the initial test leading to a wrongful conviction, you almost can't find them. And if you ever do find one, please let me know. I'm -- I've been in search of such cases for years. They are very hard to find. I've documented only 18. And even them -- those 18, I'm not sure of.

And they're dwarfed by cases where, regardless of what the witness testified at trial, what they said on the first test differed. They were not confident, or they actually said it's not the guy, or they picked a filler. There's about 200 of those cases that we've documented. So that's why I say what -- what you said is incomplete. It's like, it's the -- yeah. On the test that maximizes reliability, eyewitness misidentifications leading to wrongful convictions are rare, which makes a lot of scientific sense. That's the way you'd expect it to be, because that's when memory, you know, speaks the truth, as I sometimes put it. It

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hasn't been contaminated yet.  It hasn't -- there hasn't been a lot of forgetting yet.  That's when you want to test memory.

Q.  Okay, and in that instance, is it fair to say it still occurs such that the statement I said to you is true, it's just much more rare?

A.  Yes, yes.  So just to be clear, I would never say even when it's maximally reliable that it's infallible eyewitness -- you know, it's not infallible, of course not.  It's the -- it -- there -- there can be errors.  And there have been errors, and I've documented 18 of them so far.  We've just published a paper where we -- we got them from the Michigan Exoneration Database.  I forget what that's called. National Registry of Exonerations.  We found 18 cases there.

Q.  Okay, and I guess quick housekeeping on that point, is that a published report that you issued recently?

A.  Yeah, we included that analysis in a -- in a paper that we just published.

Q.  Okay, and what is the -- just in case it's not included in your report, what's the title of that paper?

A.  The title of that paper is The Science of Human Memory Versus the Federal Rules of Evidence.

Q.  Okay.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   And the basic thesis is that science and the legal system prioritize different tests of memory. Science is --

Q.   Sure.

A.   -- it's the first test.  The legal system, it's under oath at trial.

**Q.   Okay.  Okay, and do you have any role or involvement in the national registration of -- sorry, strike that, please.  Do you have any role or involvement in the National Registry of Exonerations' actual database, like, compiling the data, figuring out which cases to include?**

A.   No, I'm -- I'm named in a few of the exonerations because I was the expert.  But the -- but in the actual compiling of information, no, not -- not at all.

**Q.   Okay.  Now, the list that we looked at that had your previous testimony that you've given in other cases -- actually, sorry, strike that, please.  You provided a list of the cases you've served as an expert in, in the last four years, separate and apart from that document that has your testimony for the last 13, 14 years; is that correct?**

A.   Let's see.  I'm not 100 percent sure.  I may have.  I don't really remember what you're -- I -- I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

think I might have a longer list of all the cases I've been involved in. And maybe I provided that for this. I'm not sure what you're referring to, that's all.

**Q.   Yeah, no, that's more than fair.  I am going to -- actually, no, I'll -- let me do it a different way.  Since submitting your report in November of 2025, have you been retained to serve as an expert in any additional cases?**

A.   I know I have been asked once or twice, and the -- and I've said, sure, I'll do that.  And they've said, okay, I'll go seek approval from my superiors. You know, and -- but I think that's where it stands.  I don't know if they then said, okay, I have approval. We're hiring you.  And I think you're asking me about, have I been hired in any other cases.  I -- I don't think so, but I think there are two cases like this one, civil cases, where I've been contacted and I've said I could do it.  And they've said, all right, we'll go through the motions and see if it's okay and we'll retain you.  I think since November, so that would basically be mostly just December that we're talking about, I think, twice.  At least once for sure, and I think twice, that has happened.

**Q.   Okay, and I'm going to ask you about two specific cases and I will preview, you're probably going**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to be seeing me a couple of times in the next few weeks for depositions in those cases. But so in the case of Daniel Rodriguez, you issued an expert report; is that correct?

A. Yes.

Q. Okay, and you have also been retained in the case of Juan and Rosendo Hernandez?

A. That also sounds right.

Q. Okay.

A. But I thought that was before November you -- I thought you were asking about after November cases that I -- additional cases that I've been retained. I may have misunderstood your earlier question. Because I thought your earlier question was about since November, has anybody hired me to do a case. And I think the cases you're now listing, I think I was on those cases before then. That's why I'm a little bit unsure if --

Q. I see, okay.

A. -- I understood your earlier question.

Q. No, that's helpful for me to know since on the list of previous testimony, they're not listed, so I didn't know what the timeline was. But that's helpful. Okay. So the one or two cases that you just testified to are not either of those?

A. Right. Right.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Understood, okay. Outside of this case, sir, have you ever before served as an expert for the City of Columbus?

A. I don't think so, but this is either the first or the second. I think they've asked me to do another one. I think it was -- that might've been one of the two that I was just thinking about. So I -- I don't track that detail. I don't focus that much on who's hiring me, you know, what city. But I think this one is the first, and I think one of the new ones, maybe both, but I'm not sure, are the second and maybe third.

Q. Okay, understood. And for those new cases, was your initial contact with the same counsel as in this case?

A. I do not think so. You're asking hard questions. I don't think so, but I'm not 100 percent sure.

Q. With the understanding that this may be an approximation, how many times have you been qualified by a court as an expert?

A. I believe -- I think it's all those cases where I've testified.

Q. And are you aware of any that are not on that list?

A. Oh, wait a second. Some of those -- well, let



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

me ask you something. So like -- I -- I take that back, because I guess I haven't been -- for this, what we're doing right now, this wouldn't count as me being qualified, right? So I would have to take off all the civil -- I've only testified in civil cases once or twice or three times at most. So if -- if it's -- if you're asking about literally a judge saying, you're an expert and you may testify at this hearing, that's probably 25-ish.

Q. And all of those, outside of the one to three instance of testimony in civil cases, the rest have all been in criminal court?

A. Is a post-conviction exoneration hearing criminal court?

Q. Yes. It's still included, or at least in my definition for my questions for --

A. Okay.

Q. -- you today, yes.

A. Then the answer is yes.

Q. Okay. To the best of your knowledge, have you ever not been qualified as an expert?

A. No.

Q. Okay, and now, sir, this is not the first time you've been disclosed in a case as rebuttal to Dr. Dysart; is that correct?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   That's correct.

Q.   To the best of your knowledge, approximately how many times have you been disclosed as a rebuttal to Dr. Jennifer Dysart?

A.   Oh, I don't know.  Again, I don't keep track of that.  I'll say five times, maybe more, even.

Q.   And to the best of your knowledge, sir, have you ever been excluded from giving certain testimony by a court?

A.   Yes.  One court in a criminal case in San Diego, during COVID, over Zoom, when judge asked me, what -- what are you going to testify about, the judge decided that my testimony about the importance of focusing on the first test would confuse the jury, and she did not let me testify.

Q.   Okay, and is that the case of The People of the State of California v. Dominic Bland?

A.   Yes, that's the case.  And then there's more hilarious things I could tell you, but I'll wait for you to ask me.

Q.   Okay, and did the judge rule that you couldn't testify at all, or that you just could not testify to the first test as the most reliable?

A.   That was the only thing I was going to testify about, so I was excluded altogether.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay.

A. And then it was appealed, and the appellate court completely misunderstood what I intended to testify about. They thought I was going to claim that the witness at trial, with her changed story, was lying. And I'm not -- I have no standing to make that, which I know I don't, and that wasn't what I was going to say. But the appellate court understood me of going outside of my bounds by, I was going to testify to the jury that -- which -- as if I was going to testify that she told the truth on the first test and she lied on the last test. But to me, that just illustrates that the legal system doesn't understand memory contamination, which is the focus of my paper that you asked me about, that was just published, called The Science of Human Memory Versus the Federal Rules of Evidence. My whole point in that paper is, there's nothing in the Federal Rules of Evidence that reflects any understanding of memory contamination. They understand forgetting, one threat to the accuracy of memory, but the other bigger threat, nothing in the Federal Rules reflects an awareness of the -- that fact, which makes perfect sense because the layperson is similarly unaware, and those rules were created by laypeople with respect to the science of memory, right? So it all kind of makes sense.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 36 of 324 PAGEID #: 12189
The Deposition of JOHN WIXTED, taken on January 9, 2026

34

Q. Okay, understood. Outside of that one instance, though, you're not aware of any other time you've been excluded from giving certain testimony by a court?

A. No. It's conceivable that it happened in the background or something, but I don't know of any other case where that happened.

Q. Okay, and just a few more background questions for you, sir. As an expert, how do you get your work?

A. My telephone rings or I get an e-mail message. More often than I'd like.

Q. Okay. Do you have any kind of advertising, or do you have your own website?

A. No, I have the opposite. I tell people I want less, not more. Are you kidding me? I would never do that.

Q. More than fair. Okay. All right, I'm going to show you what we'll mark as Exhibit 2. And this is your CV that was provided with your report. And it's quite lengthy, so I'm just going to quickly scroll through so you -- again, you have a chance to look at it, and then ask you very quick questions. So let's -- oh.

(Exhibit 2 was marked for
identification.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Good grief, I'm getting old.  Look at the length of that thing.

BY MS. MARTINEZ:

Q.   No, I mean, it's good, you know?  Okay, was this your current CV at the time you authored your report in this case?  I'll go back to the top.

A.   Yes, I'm sure it was.  It has changed since, but yeah.

Q.   Okay, predicting my next question.  Have there been any changes to the CV since you submitted it?

A.   Additional publications that -- you have to realize, that's my job.  I publish papers all the time. And so, at least I -- I -- this one, I don't think, has the paper we were talking about earlier, called The Science of Human Memory Versus the Federal Rules of Evidence.  Let's see if it has it.

Q.   Doesn't --

A.   No.

Q.   -- look like it.  Okay.

A.   Yeah, and there's several other papers that have been published since then.  Probably five more. I've been on a roll lately.

Q.   No, that's good.  Cranking them out.  Okay, other than your new publications, have -- are there any other updates to your CV?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. No.

Q. Okay, I will stop sharing. And my last few set of background questions for you, sir, that your degrees are in biology and psychology and clinical psychology; is that correct?

A. Yes.

Q. Okay. Can you briefly tell me a little bit about your background in experimental psychology?

A. So you're aware of the distinction between experimental and clinical psychology, it sounds like.

Q. Yes, sir.

A. Yeah, so -- all right. Well, I'm not sure how far back you want me to go, but in graduate school, I was an unusual graduate student, in that I entered the -- I was accepted to the clinical psychology graduate program, but I worked with an advisor. My experimental work was all -- it was -- experimental psychology all throughout graduate school.

I was the only clinical student, probably in the history of their program, and probably to this day, who did that. Usually, clinical students do clinical research, but not me. I did basic experimental research, and my dissertation was on the basic science of human memory, even though I got a clinical degree.

So that's -- my training in experimental

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

psychology started in graduate school and has, you know, continued ever since. I mean, half my life is educating myself about human memory by reading research articles that come out all the time, and I've served as editor of journals and books. That's an intense learning experience in its own right, because people are submitting chapters and papers for publication about their research, almost all of it experimental psychology, but some of it applied psychology, like eyewitness memory.

**Q. And actually, I should do this for some housekeeping. For the record, can you please explain the difference between clinical psychology and experimental psychology?**

A. Yes. Clinical psychology is about understanding and treating psychological disorders like depression and anxiety. It's -- that's what it's -- you know, in a nutshell, that's what it's about. Experimental psychology is -- is not about that. It's about understanding how the mind works, even if it has nothing to do with psychological disorders. Like memory, what are the brain mechanisms that underlie your ability to form a memory, or what cognitive models effectively guide our thinking about how memory works in, you know, all circumstances, including eyewitness

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory?  That's the basic -- it's like, trying to address psychological disorders, that's clinical -- understand and address.  And then experimental psychology is understanding, essentially, how the mind works independent of practical concerns, right?  Just, how does it work?  Curiosity-driven research, I call it. You just want to know how it works.  It may or may not benefit society in any way, and -- and may or may not address, for example, eyewitness memory, or -- or -- or clinical problems like anxiety and depression.

Q.   Thank you for that.  And now, sir, when we looked at your CV, we saw a number of publications that you have been involved in.  Approximately how many of those have you conducted a laboratory experiment of some kind in conjunction with?

A.   So there's -- I haven't actually counted, but there's roughly 150 publications over the course of my career, and I would say maybe 80 percent involved actual -- you know, an experiment conducted, data collected, analyzed, and published.  Maybe more.  It might be more than 80 percent, but I'll say 80 percent.

Q.   And so you also give a number of presentations every year; is that right?

A.   That's right.

Q.   Okay, and do those presentations have to do

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

with papers you authored, or are you asked to come in and kind of just speak to your research more generally?

A. It's both. Like -- so sometimes, you know, they've -- they've heard there's something new in the understanding of eyewitness memory, and they want to give me a talk -- want me to give them a talk, where I trace the history of thinking and the new findings that have led to sort of a change in our thinking about the reliability of eyewitness memories. So I've given several talks like that. A lot of them are just conference talks, where I talk about ongoing research that is not yet published, because I want to get critical feedback from an expert audience prior to publication. So often, I'm talking about data recently collected in my lab, things like that.

Q. And I'm going to show you now, sir, what we will mark as Exhibit 3. And do you recognize this, sir, as the report you authored and issued in this case?

(Exhibit 3 was marked for

identification.)

A. Yes. It's the same report I have open on my screen here.

BY MS. MARTINEZ:

Q. Okay, perfect. And the date issued at the top is November 19th, 2025?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Yes.   That's the exact date of this --

Q.    Okay.

A.    -- report as well.

Q.    So then I'm going to stop sharing since you have a copy in front of you.  All of the opinions you intend to offer in this case are contained within this report; is that correct?

A.    I -- I don't really have any intentions.  I mean, I'm going to answer questions that I'm asked.  So you know, I -- my intention is to answer the questions that I'm asked, and -- and if the question goes beyond what I've written about, unless a judge says, don't answer, I'm going to answer that question, too.  I -- I'm not -- I may not understand exactly what you're asking me when you say that.

Q.    Yeah, I'll -- and I'll rephrase.  You know, with the understanding that all the testimony you give today are your opinions, my question is more, when you submitted this report, did it contain all of your opinions in this case at that time?

A.    Yes.

Q.    Okay, and did you arrive at any opinions prior to issuing your report and choose to exclude them from the report?

A.    No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay, and the appendix that begins on Page 22 of your report lists the materials you reviewed in coming to your conclusions; is that correct?

A.   It is -- yes.

Q.   And are these all the material -- or -- sorry, actually, strike that, please.  Okay, are these all the materials that you relied upon in arriving at the opinions expressed in your report?

A.   Yes, and some of them, as I said earlier, I just scanned to see if they have anything relevant, and didn't see anything.  So they're listed here, but they didn't really contribute to my opinions.

Q.   Okay, and you testified earlier that you also reviewed certain expert reports to see if there was anything that pertained to your opinions; is that correct?

A.   Yes.  Yes, that's correct.

Q.   Okay.  After reviewing those documents, did you come to any additional opinions in this case?

A.   I did not.

Q.   And outside of those documents, have you reviewed any additional documents pertaining to this case since issuing your report?

A.   No.

Q.   And now some quick housekeeping on the report,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

sir.  Did you write this report?

A.    I did.

Q.    Did anyone else write parts of it for you?

A.    No.

Q.    Did anyone tell you what to write?

A.    No.

Q.    And did you, yourself, type out the report in its entirety?

A.    Yes.

Q.    Okay.  Did anyone tell you to make any assumptions in drafting this report?  That's including Counsel.

A.    No, I did make some assumptions, but nobody told me to.

Q.    And did you make any assumptions that are not contained in the report?

A.    No.  Not that I'm aware of.

Q.    Okay, and did anyone, including Counsel, provide you with any facts that are not included in the materials you reviewed, that are in that list of materials in the report?

A.    Can you repeat that question?  I didn't quite get that.

Q.    Yeah, so I think I worded it a little strangely.  So -- or, sorry, strike that as well. Did



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

anyone provide you with any fact about the case that's not included somewhere in the materials that you reviewed in making your report?

A. No.

Q. Okay, and to the best of your recollection, when were you retained in this case?

A. I have very little recollection of that. I'm going to say six months ago, or maybe even longer ago, but I really -- I've been retained in so many cases, they're all blending. The exoneration cases, the criminal cases, it's -- not sure, really, is my -- is what I should say, but something like six months ago, or even longer ago.

Q. Okay, and what discussion did you have with Counsel for the defense prior to being retained as an expert in this case?

A. Well, I don't specifically remember. They're all pretty much the same. They sort of roughly go through their understanding of the facts, and they think that I might have something useful to say. And they ask me, if the facts are like that, would you have something useful to say? And then I say, yes, but I want to see the police reports myself to see what those reports say. And I'm not that interested in, you know, testimony at trial after memory has completely changed, or deposition

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

testimony ten years later. I'm -- I -- I want to know everything about the contemporaneous record.

That's what I mainly want to know about, contemporaneous record of what they said at the very beginning of the police investigation, because that's the lesson we have learned, that's what's going wrong. Everybody thinks eyewitness memory is unreliable, and I'm like, no, the mistake is not to realize there's only one time when it's reliable. And, you know, there's lots of real-world issues, right? They might be lying and things like that, that -- that -- you know, that's totally separate. But presuming good faith, you know, that's when you want to listen to an eyewitness.

**Q. And just for the record, what was your assignment in this case?**

A. To respond to the expert report written by Dysart, and to analyze this case in light of the science of human memory.

**Q. And just to clarify, when you say, "analyze this case," are you referring to specifically the two victims being Richard McClanahan and Rhonda Curry?**

A. I'm talking -- I mean analyze the -- the eyewitness evidence in the -- in this Horton case. Those were the witnesses, yes, in this case to, what -- what are my opinions about that, or what science is relevant

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to -- to what happened or -- in this case?

Q. And now, sir, your rebuttal report includes all your criticisms of Dr. Dysart's report that you intend to offer in this case; is that correct?

A. Well, there's that word intend, again. I don't feel like I have intentions. I just -- I -- my intention is to answer all questions put to me truthfully. If you ask me to just talk about the case, that's all I would talk about. That's true. But if -- but I'm not -- when you say, intend, I'm just -- I -- I -- it makes me think, but what if I'm asked a question that, you know, goes beyond my report? I'm -- my intention is to answer that question unless a judge says, don't do that. I -- so that's why I'm a little confused by that word, intend.

Q. Yes. No, that's more than fair, and, you know, then it's my job to make sure I'm only asking you about the report. But you're the expert, so your opinions are what they are. So I -- let me rephrase that question. When you issued your rebuttal report, did it include all of your criticisms of Dr. Dysart's report at that time?

A. The way I would answer that question is, I could criticize it even more. But, you know, I drew a line, rather than going on exhaustively, and focused on



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

what I considered to be the important issues where we disagree. But, you know, like, scientists can be meticulously detailed, and I have no doubt that I could complain about a lot more, but I -- that would just be going beyond what I felt is needed. So if you're asking me, could I criticize even more of her report if I wanted to? I -- I would say, yes, I'm sure that I could. Would it be helpful to the analysis of this case? I don't think so. I think I included the essence of my disagreement with -- with her analysis of this case, not every last detail that I could criticize. I don't know if that's answering your question, but I -- it sounds like you're asking me, is that the complete and total disagreement with her report? And, like, not really. There's more I could've added, but it didn't seem useful to me to just go on and on and on, once I've gotten the essence of the disagreement down already.

Q. Okay, let me then clarify. There was nothing inhibiting you from including all of these other things if you wanted to. You just determined that you would only include certain things to, I think you said, encapsulate the essence of your disagreement. Is that an accurate statement?

A. Yes, and I -- I wouldn't include things that were just, like, beating it to death just because I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

could disagree more. I -- I don't know. Maybe -- maybe I should have, but -- but yeah, nobody stopped me from doing that, and I just made my own judgment about that.

Q. **Okay. Did Dr. Dysart have any opinions that you agreed with?**

A. Yes.

Q. **Okay, and what are some of those?**

A. That memory can be contaminated, and what a -- witnesses remember later on might not be true. Just -- I -- I definitely do agree with that.

Q. **It's just maybe some of the specifics and applications you don't agree with. Is that an accurate statement?**

A. Well, let me jump to that section in my report. I haven't looked --

Q. **And I should clarify, if you ever need to look at your report, absolutely fine. This is not a memory test of what you wrote. Please look at your report, take that time that you need. I only ask that, when you are looking at it, you just let me know, okay?**

A. Okay. I'm looking at it right now, in the section, "Comments on Dr. Dysart's Expert Report," because you're asking me about that. So -- okay. Now that I've glanced at this, can you repeat that question that you asked me, if you remember what it was?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Yes. My question was, so it's your testimony that you agree on the fact that memory can be contaminated and -- or, sorry. Strike that, please. So you agree with Dr. Dysart, generally, that memory can be contaminated. You perhaps disagree on some of the components and application. Is that a fair statement?

A. The first part was fair. The second part of your characterization of my position, I wouldn't word it exactly like that. I would say that we disagree about the science that's relevant to this case. So she -- there's a lot of science that she doesn't cover, that, to me, is highly relevant to the fact-finders, trying to understand what science has to say that might help them make a judgment call in this case. That's -- and -- and because of that, some of her claims, I would say, are incorrect and outdated, not keeping up with the modern science of what we've learned about, for example, the role of estimator variables in influencing the reliability of an initial eyewitness identification.

The way she characterizes the science is leaving out a lot of the new science that changes the previous conclusion. So I would give that more elaborate answer about -- same with known-person IDs. I -- the -- there's a -- a very large literature, mostly in the experimental psychology side of things, that is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

not included in her report, and that, in my mind, would be useful to fact-finders in making a judgment call about the reliability of the eyewitness evidence in this case. So that's how I would put the nature of our disagreement.

**Q. And we will get to those disagreements later on in the deposition. I just want to make clear that the areas that you think she's leaving out or not fully considering are what you describe in that section of your report, correct, starting on Page 13?**

A. Yes.

**Q. And at any point, were you asked to not look at certain opinions in Dr. Dysart's Report?**

A. To not look at certain of her opinions? I don't think so. Don't think I've ever been asked anything like that.

**Q. And sir, did you review Dr. Dysart's deposition testimony in this case?**

A. Not in any detail.

**Q. When you say, not in any detail, did you skim it, or did you not read it at all?**

A. I will say I'm not sure, because I -- I know I've been sent Dr. Dysart's deposition testimony, which I glanced through, and I'm just not 100 percent sure if it was this case or a different case.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay.

A.   But -- but I definitely didn't study it in any detail whether -- either way.

Q.   And now, sir, I'm going to show you a couple of documents quickly.  The first, I'll show you what we'll mark as Exhibit 4, which is a contract for your services.  And this was provided in response to a subpoena for documents that was issued to you.  I'm specifically going to go down to Page 7, but I want to scroll through so you have a chance to look at the document and acquaint yourself with it before I ask you a few quick questions.  Okay, do you recognize this document, sir?

                (Exhibit 4 was marked for
                identification.)

A.   Yes.  Can you go down to that page with the check marks?

BY MS. MARTINEZ:

Q.   Yes, of course.

A.   Okay.  Oh, yeah.  I remember being confused about some of these.  Yeah, okay, I recognize this.

Q.   Okay.  I just want to ask you about Page 7, which is titled, "Exhibit A Scope of Services," and it says, "In the matter of Horton v. City of Columbus, et al., John Wixted will review the case file, consult with

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

counsel, analyze the case, draft a report, and make any necessary court appearances in accordance with the below fee schedule, $400 an hour for all professional time (reviewing case materials, writing reports, testifying, et cetera). $200 per hour for door-to-door travel time." Did I read that correctly, sir?

A. You did.

Q. Okay. Is this your current rate?

A. Yes. I should increase it massively after looking at what other people charge, but yeah, it's my current rate.

Q. And so this is the rate that you're charging in this case?

A. It is.

Q. Okay, I will stop sharing my screen. And you've also issued an invoice in this case; is that correct?

A. Yes, I'm pretty sure I did.

Q. Okay, and I'm going to show it to you, so I'm not going to --

A. Oh --

Q. -- ask you to --

A. -- okay.

Q. -- remember hours and money. I'm going to show it to you. I just first want to ask, generally, as

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

you work on a project, how do you time-keep?

A. I take note of when I start and when I finish, like, reviewing case materials. Like, I'll sit down on a Saturday at 10:00 a.m., and I'll read through the case materials, and the expert report on the other side, and things like that for two hours, and then I'll note when I stop. I -- I don't -- I don't know if that's what you mean.

Q. Yes. I don't want -- I don't want to cut --

MS. TANOURY: Just a sec.

BY MS. MARTINEZ:

Q. -- you off. I want to make sure your counsel can hear. Yeah.

MS. TANOURY: Yeah, sorry. Just a second. I think I missed the last question, but I heard his answer. I'm assuming you were just asking --

MS. MARTINEZ: Just time-keeping, yep.

MS. TANOURY: Okay, all right. Sorry, my screen froze for a little bit, so -- I'm back, though.

MS. MARTINEZ: Okay. Perfect.

BY MS. MARTINEZ:

Q. And generally, sir, when you work on a case as an expert, how do you typically bill? Do you do it every 30 days? Do you do it upon completion of a



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

report?  What's your practice?

A.   Usually, when I complete a report, in my experience, time is going to pass until we get to this point where we are today.  So I go -- and that can be a long time.  So I submit a -- an invoice at that time, and then there'll be other invoices for preparing for the deposition, and the actual deposition down the line.  Though, I think this deposition happened a bit faster than they usually do, so I could've waited, I guess.

Q.   All right.  Now, I'm going to show you what we'll mark as Exhibit 5, which was an invoice provided in this case, again, in response to that document subpoena.  Sir, to the best of your recollection, have you only submitted one invoice in this case?

(Exhibit 5 was marked for
identification.)

A.   Yes, I have definitely submitted only this invoice.

BY MS. MARTINEZ:

Q.   And according to this invoice, you've spent ten hours reviewing documents and writing your report?

A.   Yeah, ten hours that I billed for.  I always spend more hours than that that I don't bill for, but yeah, I bill conservatively.

Q.   And when you say you bill conservatively, I



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

just want to make sure, you know, you're not spending hours working on something for free, but you may cut off a couple minutes here and there?

A.   Well, I might cut off more than a couple minutes.  I make sure I don't overcharge, is what I'm saying.  And I don't obsessively keep track, you know.  Like, I -- there are days when I've, you know, reread my expert report to think about it and things like that, where I don't bill for that.  Even though it's -- I could probably.

Q.   But does ten sound like approximately the correct amount of time you spent reviewing materials and writing your report?

A.   Yeah, you know, okay.  If -- if I had to guess how many hours I really spent, it'd probably be closer to, like, 12-ish or something like that.  But it's -- it's ballpark and lower than a -- a bit lower than reality.

Q.   Okay.  Actually, I don't believe I asked you this earlier.  Approximately how much time did you spend reviewing documents in preparation for your deposition today?

A.   About an hour yesterday.

Q.   Okay, so --

A.   But then I spent this morning looking it all

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

over again, and that's not going to show up on any invoice that I submit. Even though, like, technically if I obsessively tracked every minute, there would be another 30 minutes, let's say. Okay, just going with your question to let you know.

Q. Okay, understood. So would it be a fair approximation to say that the time you spent in this case reviewing documents and writing your reports is between 11 and 15 hours?

A. Yeah, probably something like that.

Q. Okay, stop sharing my screen. And now, sir, if you could please turn to Page 22 of your report. We're going to, kind of, start at the end, and then we'll maybe --

A. All right.

Q. -- take a little break and start from the top. But first, I'd like to direct your attention to Page 22, which is the list of materials reviewed.

A. Okay. I'm there.

Q. And you testified earlier that you did not review any documents before your report was disclosed that are not listed on this report; is that correct?

A. Well, unless I accidentally left something off, but I think this is a complete list.

Q. For the materials you did receive, did you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 58 of 324 PAGEID #: 12211
The Deposition of JOHN WIXTED, taken on January 9, 2026

56

receive them all at once, or did you receive them in batches, to the best of your recollection?

A. I -- I get so many of those things. I -- I'm not sure. I think I got them all at once.

Q. And when you were provided materials that you reviewed in this case, were they provided to you electronically, in paper, or both?

A. Electronically.

Q. And as part of your review process, do you review everything electronically or will you print out documents?

A. I review everything electronically. I never print out documents.

Q. Okay.

A. When I'm working on cases like this, I don't print out documents.

Q. And I asked you this already for the expert reports that you said you skimmed, but I want to make sure to ask for everything. Any materials you've reviewed since you issued your report, do they alter any of your disclosed opinions in any way?

A. No.

Q. Are there any materials that you specifically asked for and were not provided?

A. No.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    Are there any materials you wanted to review, but did not receive?

A.    No.

Q.    And again, you kind of touched on this earlier, but I want to make sure to ask.  For each of these documents, did you read every single page of each one?

A.    Definitely not.

Q.    Okay.  Is there any way to tell from looking at the appendix which documents you may have read in full and which documents you may have skimmed or only looked at certain sections?

A.    There's no way to tell from this list.

Q.    And as part of your process, sir, how would you determine which pages that you wanted to read in depth, which ones you might skim, and then which ones you didn't need to review?

A.    Well, so as I testified earlier, it's the police reports that are of most interest to me, and so I read those fairly carefully, but even those contain a lot of things, like the possessions of the victim that were logged by the hospital or something like that. You know, I think there's a lot in there that's not relevant.  I skim through it.  I look for what did the officers report?  Who responded to the scene that the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

witnesses said? And then what did the investigating detectives say in, like, the early days, maybe weeks of the investigation. As early as possible for all the relevant memory evidence, and I extract that. I -- I focus a lot on that and -- and get that information as best I can.

And then I will look through trial testimony because sometimes, trial testimony -- mainly not for what they remember about events at that time, because that's -- you know, to me, that's nothing. It's -- but sometimes they're, like, reading from police reports at trial. You know, said -- and I want to make sure what they say at trial maps on to what I thought the report said. You know, so I'll go through the trial transcript. Not reading the whole thing, but looking for, you know, what did detectives say about what their report said.

And also, I do search for when the witnesses testify, what do they say? Not -- not because I attach a great deal of weight to that, but, you know, in my report, I want to say my understanding of the facts I usually end with, and the witnesses testified at trial, so -- and -- and then he was convicted, and so on. So I read it for that purpose. And then, the other documents I just open up, and I don't know how to put it, you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

know, scan it.  I can tell pretty quickly there's going to be nothing in here about, you know, a contemporaneous record of what the witness said early in the police investigation and -- and then decide not to go any further looking through that.  I don't read it from start to finish in making that determination. That would be a lot of time.

I'll also look at the -- what do you call it? The -- like, the complaint.  Like, the official -- the lawyers have written up a document saying, this is our complaint.  This is what we're saying -- the reason for the civil suit, basically.  I'll read through that to see if their understanding of it -- because they go through the facts there, too.  Does their understanding of the facts differ from my understanding of the facts? And if I detect any inconsistency, I track it down by going back to the police reports and things like that. So that's essentially how I go about it.

Q.   And so just to clarify, no one is telling you what to review or what not to review, right?

A.   Correct.

Q.   At any --

A.   Well, often they do.  I don't know.  And I say, but I don't care what --

Q.   Okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. -- what you're telling me to review. This is what I want to review. You know, make -- and they -- they want to give me everything, so I -- I happily take everything, but -- but I know what I want to review, and whether or not they tell me is not super relevant. I don't think anybody told me in this case, but often, lawyers try to -- you know, especially in criminal cases when they first call me up, they try to direct my thinking, you know. And they're not familiar with the new science, and so they're talking old science. I can hear it in their voice, you know, and I'm like, stop. Stop, stop, stop, stop. Here's what I need from you. Anyway.

Q. That is fair. At any point, sir, were you provided any summaries or notes of the materials?

A. No.

Q. Okay, and did you, yourself, conduct any investigation into verifying any information in a document you received?

A. Nope. No.

Q. And you didn't conduct any independent testing pertaining to this case?

A. No.

Q. And now, sir, you are not giving any opinion in this case about police practices, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   That's correct.

Q.   And you're not giving any opinion in this case about municipal policies?

A.   Municipal policies, did you say?

Q.   Yes, sir.

A.   No, I'm not giving any opinion about that.

Q.   Okay, and you are not a DNA expert; is that correct?

A.   That is correct.

Q.   And you are not an expert in the --

A.   If you're -- if you're talking about the forensic analysis of DNA, if you're talking about the statistics relevant to the understanding of what that DNA evidence says, I -- I would classify myself as an expert because it's the same.  All the principles are exactly the same as an eyewitness memory.  They don't change.  People don't understand it, but it's true. It's the same.  I've written papers on it.  DNA -- the statistics of DNA analysis.  I have several papers on that because it's all exactly the same.  But in terms of the actual analysis of the forensic evidence, no, no expertise at all.

Q.   And for the statistics of DNA, you're not providing any opinion on that topic in this case, right?

A.   Not -- not -- I am not.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay, and you are not providing any opinion in this case about the handling of physical evidence; is that correct?

A.   That's correct.

Q.   Okay.  Okay, you are not giving opinions in your report about whether or not Richard McClanahan and Rhonda Curry accurately identified the man who robbed them, correct?

A.   I'm not giving any opinion about that.  That's -- the fact finder makes that call.

Q.   And you're not giving any opinion in your report about the motivations of any party, right?

A.   Correct.

Q.   And you're not giving any opinions in your report about whether any party in this case was acting in good faith, right?

A.   No.  I'm conditioning my analysis on the presumption of good faith, but I'm not making an assumption that they necessarily were.

Q.   And at a general level, you're not offering an opinion on ultimate legal issues reserved for the jury, correct?

A.   Correct.

Q.   And you're not giving opinions in your report about the veracity of facts in Richard Horton's case,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

correct?

A.   Correct.

Q.   And you're not giving an opinion in your report, sir, about who shot and robbed Mr. McClanahan, correct?

A.   Correct.

Q.   And you're not giving any opinion in your report, sir, about whether Richard Horton was wrongfully convicted, correct?

A.   That's correct.

Q.   And lastly, sir, I apologize if I already asked this, you're not giving any opinion in your report about whether Richard Horton is innocent or guilty, correct?

A.   Correct.

Q.   So now, I want to turn to your report, but I think this may be a good time for a break.

A.   Okay.

Q.   Does that sound good?

A.   Okay by me.  How long a break would you like?

MS. MARTINEZ:  How does ten minutes sound? Does that sound okay with everyone?

MS. TANOURY:  Okay.

THE WITNESS:  Okay by me.

THE REPORTER:  All right.  I'll get us off

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

record.

(A recess was taken.)

THE REPORTER: Back on record. Time is 1:37 p.m. Eastern.

BY MS. MARTINEZ:

Q. Now, sir, I want to ask you a couple of quick questions about your methodology.

A. Okay.

Q. What is your methodology for resolving disputes between contradicting facts when you're looking for that first test?

A. Are you talking about disputes that arise later on?

Q. Here, let me -- let me take a -- I'll take a step back. When you're reviewing the documents to issue your report, what is your methodology for resolving disputes between contradicting facts?

A. Generally, the -- the facts that would be contradictory, I assume, are facts retrieved from memory, memory-based contradictions. That's usually where my focus is, on what people are reporting from memory. And if -- if there's a contradiction between, for example, what was the witness testified to at trial and what they said initially, which is a common scenario that I deal with, I resolve it by placing higher



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

priority on the test where memory is -- tends to be more reliable. The early tests of memory. If it's an identification test, the very first identification test, compared to any later identification test. Did that address your question?

Q. Yeah, I think it addressed part of it, but let me give a specific example to maybe flesh out the rest. So I understand your testimony now for the example that you laid out. What about where, you know, you have two competing police reports and one says one thing and the other says another? When you have competing facts like that, what is your process for grappling with the contradicting facts?

A. Similar, if they're separated in time by a lot. You know, like, if one report was written the day of the crime, and -- and another police report is a year later, and it's the detective's memory of what happened. Again, I'm going to place priority on -- on the -- you know, what the police report says the witness remembered early on. That could be wrong, right? The police officer may have written it down wrong. You know, I -- I understand that it's not infallible, but -- but again, I would place priority on the early report. If they're both -- like if two police reports disagree with each other and they're both early in the police

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

investigation, you know, I -- I don't resolve it myself. It's like -- that's just like, you know, someone else is going to have to resolve that because they're both at a time when memory is pretty reliable and I'm not sure why they're disagreeing.

Sometimes, there's indications of -- of why they disagree, and I'm just going to give a -- not a hypothetical example, an example that applied to an exoneration case. And I mentioned things like this in my report. On the day -- on the night of the crime, the witness says, I did not recognize the perpetrator. And the officer double checks, you've never seen that person before? No, I did not recognize that person. It was a stranger. And then a -- a police report from the next day, again, it's early in the investigation, it's -- I have my eyes on these reports. The police report says, you know, the -- the witness's sister suggested that it was -- might be Kevin Strickland, This friend of theirs that they've known for years. And then the witness said, oh, yeah, it's Kevin Strickland. And then the witness identifies him as Kevin Strickland later in the afternoon. You know, even though those are both early on and it's contradictory facts, the first one saying, I didn't recognize him. The second one saying, I do recognize him and I've known him for years. You know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I'm going to -- if I see evidence of memory contamination like that, I'm going to, again, prioritize the first test.

Also, I guess another method, even if -- even if -- even if the contamination hadn't been documented right in the police records, it's an amazing story. The guy was in prison for, like, 44 years. But -- but even if that had not been there, if a -- if a -- there are certain scenarios that don't make scientific sense. So failure to -- let's say that contaminating event, let's just say it hadn't happened much -- and therefore -- and wasn't documented in the police report. Even without that, I would still say it's scientifically implausible to fail to recognize a -- a well-known face and then retrospectively realize that it was a known person after all. That is just -- there are no -- no scientific mechanism that makes sense out of that. So that's another way I would resolve contradictory facts, I guess you could say.

Q. And I want to, you know, make sure that we're using -- or that we're operating off the same understanding of terminology for the deposition today so that I'm really understanding your testimony. And so when you use the phrase, early on, you know, here, you defined it because there was a set timeline, but that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**can mean different things to different people. Is there, you know, any timeline that you use or that you're aware of in the literature that would qualify or classify what early on in an investigation is, or is it subjective?**

A.   It's subjective.  There's no specific guidance.  Science isn't going to define for us what early on is.  I always say earliest, no matter when that is.  Sometimes that's, you know, six months later they do the first ID test.  You know, that's the earliest. It's not as early as you'd like, you know, six months went by, but that's still the earliest. It's -- you know, I always say it's going to maximize reliability, not make it perfect, you know, and the longer that -- that time passes, the less trustworthy memory of an event is.  Episodic memory becomes decreasingly reliable with the passage of time for the same reason that a crime scene, the forensic evidence, becomes decreasingly useful due to contamination with the passage of time. Memory is a lot like that.

And I have good scientific reason for saying that, you know, if a -- if a whole year goes by, you know, by that time, I have scientific reasons for suggesting that the reliability is not far from a coin flip.  You know, by the time you get that far, a year or two years to criminal trial.  But I can't say, you know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

what exactly is early.  Focus on the first earliest -- earliest tests, but you know, there's a lot of variability in what that earliest memory test is. Sometimes, they interview witnesses right away. Sometimes, they don't find the witness for four weeks, you know, and then they interview them.  And it's still the earliest, but it's -- it's not as good as had you interviewed that -- been able to interview that witness the night of the crime.  But yeah, so there's no strict definition at all.

Q.    And I want to circle back to this before I forget.  For the record, can you please define what you mean by episodic memory?

A.    Yes, let -- to -- to explain what that means, let me tell you about another kind of memory called semantic memory.  And it's not the best name, but it's the name that we use in the business.  And semantic memories are general knowledge.  So if I asked you about the rules of evidence in your state, you probably know those reasonably well.  You know, that's -- that's referring to knowledge that you've acquired across multiple events.  You know, you learned it in law school and then, like, your first case, you know, the judge said, you're forgetting this rule.  You know, like, you've learned it over multiple -- and it's part of your

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

knowledge base now.  And we have lots of knowledge.  Our name, where we live.  We have lots of - - that is known as semantic memory, factual knowledge. Our knowledge of the world built up across multiple episodes in our lives tends to be relatively stable. Tends to be, you know, not trivially easy to contaminate, you know, because it's been built by multiple episodes.

Episodic memory is what we're often dealing with in these cases is memory for a particular happening on a particular day, a particular time, lasted for a particular duration, and then it was over, and it's now ever receding into the past.  The episode that we're talking -- that's episodic memory, and that's something you experienced only once, and that type of memory is easily contaminated, unlike semantic memory, which is harder to contaminate.  And -- and the contamination happens outside of conscious awareness, so we don't feel it.  Memory -- episodic memory, to answer your question directly, is what I said a moment ago, memory for an event.  That particular day, particular time, lasted for particular duration.

Q.  Okay, thank you for that.  And in crafting your reports, or you testified to this a few minutes ago and we're going to talk about it in a few minutes, the presumption of good faith.  But I just want to make

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

clear, are you also assuming that the police reports that you reviewed accurately describe what the witnesses told police?

A. My main assumption is that -- presumption for purposes -- conditioning my report on the presumption of they were recorded in good faith. Now, records are not infallible even when recorded in good faith, but -- but that aside, yes, I assume they were accurate. You know, allowing for some degree of error even under good faith attempt to jot the notes down.

Q. Okay, all right. I would like to turn to your report now, sir.

A. All right.

Q. So I want to start right on Page 1. At the very bottom of that very first paragraph, do you see where it says, "The materials I reviewed are listed in an appendix to this report, and my understanding of the facts of this case is based on my reading of those materials," and then, (nothing more.)" And you testified earlier, sir, that you didn't do any independent testing into this case. Did you do any independent research into this case?

A. No.

Q. And did you talk to any witnesses in connection with this case?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   No.

Q.   And did you have any conversation or communication with Detective Walker?

A.   No.

Q.   Okay, and then further down on that page, you start the case summary.  And there are a couple sections I want to look at before we get to your opinions, okay?

A.   Okay.

Q.   So first, you state that, "On the day of the crime, Ms. Curry told Detective Walker that she thought the intruder looked familiar, and she was staring at him, trying to remember how she knew him."  And then you state that, "Ms. Curry told Detective Walker that she would be able to identify the suspect if she saw him again."  Do you see that, sir, on the bottom of that first page?

A.   Looked familiar, trying to remember.  In response, she quit looking, threatened to killer her, tried the suspect.

Q.   And it goes up onto the top --

A.   Yes.

Q.   -- of the following --

A.   Yeah, yeah.  Okay, I now see it.  Yeah.  She also stated, "She would be able to identify the suspect if she saw him again."

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q. Okay, and what is your source for this specific information?

A. The police -- the early police record of -- of what the witnesses said.

Q. And specifically, did that information come from the typed police reports?

A. I guess I'm not sure. I think so, but I -- I don't know if it was written -- the written part or the typed part. I'm not sure.

Q. That is fair. So we'll look through them one at a time, okay?

A. Okay.

MS. MARTINEZ: So I'll show you first what we'll mark as -- oh, gosh. Is this 6 or 7?

THE REPORTER: It's 6.

MS. MARTINEZ: Oh, perfect. Thank you.

(Exhibit 6 was marked for identification.)

BY MS. MARTINEZ:

Q. Okay, I'll show you what we'll mark as Exhibit 6. Are you able to see my screen, sir?

A. Yes.

Q. Okay. So I'll represent to you that these are Detective Walker's handwritten notes of her conversation with Rhonda Curry on the day of the robbery, okay?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Okay.

Q.    And I will scroll through so you have a chance to read them, and then I'm going to ask you a few questions, all right?

A.    All right.

Q.    And let me know when you're ready for me to scroll down some more.

A.    Okay.  Oh, you want me to read this whole page?  Okay.  Okay, I read it.

Q.    All right, and then I'm just going to scroll down again so you have a chance to see the entirety of the notes before I ask you the questions, okay?

A.    Okay.  Okay.

Q.    All right.  And then -- oh, there's a little bit left at the bottom.

A.    Okay.

Q.    All right.  So nowhere in these contemporaneous notes does it say that Rhonda Curry told Detective Walker that she thought the intruder looked familiar, right?

A.    I suppose that's -- I didn't see it, now that you mention it.  Yeah.

Q.    And nowhere in these notes does Rhonda Curry tell Detective Walker that she was staring at the perpetrator and trying to remember how she knew him; is

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that right?

A.   I didn't see it.

Q.   Okay, and then lastly, sir, nowhere in these notes does it reflect that Rhonda Curry told Detective Walker that she would be able to identify the suspect if she saw him again, right?

A.   I didn't see that in these handwritten notes.

Q.   Okay.  Now, I'm going to show you what we'll mark as Exhibit 7.  And for the record, this is Bates stamped City 16 to 17.  And I'll represent to you, sir, and you probably reviewed this, this is the informational summary written by Detective Walker about her conversation with Rhonda Curry.  And I'm happy to let you read through the entire thing.  There are only two sections I want to show you that I'll read out for you, but if you'd like to review the entire thing, I want to make sure you have the opportunity to do so.

(Exhibit 7 was marked for

identification.)

A.   Okay, I mean, you can go straight to the section.  I don't need to read the whole thing.

BY MS. MARTINEZ:

Q.   Okay, perfect.  I just always like to make sure.

A.   Yeah.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    And I will say that there is no date on this report other than the stamp down here, which is December 30th, 2004.  Okay, so the first section I'd like to read for you, sir, is on Page 1, in this last paragraph.  It states, "Ms. Curry stated that one of the first things the robber said to her was to quit looking at him.  Numerous times throughout the incident, she was told to quit looking.  However, she thought he looked familiar and was trying to remember how she knew him." And then on the second page, at the last paragraph, it says, "Ms. Curry stated she would be able to identify the suspect if she saw him again." Did I read those two sections correctly, sir?

A.    I think you did.

Q.    Okay.  So according to this typed report, Ms. Curry did say these things during that October 9th interview, right?

A.    Yeah, that's presumably where I got that information from.

Q.    Okay, but it does not appear in any of the contemporaneous notes, right?

A.    The handwritten notes?

Q.    Yes, sir.

A.    Right.

Q.    Okay.  So I'm going to stop sharing my screen.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

And I believe you testified earlier, sir, that you reviewed the trial transcript in this case, right?

A. Yes.

Q. Okay.

A. Not all of it.

Q. Do you recall if you reviewed the testimony of Officer Pamela Rhodeback?

A. It doesn't ring a bell.

Q. Okay. I --

A. But I may have. I don't remember.

Q. I'll represent to you, sir, that Officer Rhodeback was one of the responding officers to the scene, okay?

A. Okay.

Q. And I'm going to show you what we'll mark as Exhibit 8, which is Officer Rhodeback's trial testimony from the criminal trial of Richard Horton that was held on January 30th through February 2nd, 2006. And as with the previous exhibits, I'm more than happy, sir, to give you the opportunity to read the entirety of her testimony because it's not very long. But there's just one section that I'm going to read for you before I ask you questions, okay?

(Exhibit 8 was marked for
identification.)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Okay.

BY MS. MARTINEZ:

Q.    Would you like to read the entirety, or are you okay if we go right to the section?

A.    Let's go right to the section.

Q.    Okay, so it starts on Page 108.  Okay, starting on Line 13, it says, "Question: And what did you -- what was your -- what did you do when you realized this was a crime scene?  Answer: Basically, at that point, after the house was secure, as far as there was no people inside the house, we went ahead and we left the residence, and we went outside, around the residence, to make sure that nobody could get back inside since it was, at this point, a crime scene.

Question: This is part of the process of securing the scene?  Answer: Yes, that is exact.  And then at that point in time, a female, which I listed in my report as

Victim number 2, Rhonda Curry, I believe her name is, she had shown up at the scene and began talking to me about what happened.  Question: After you spoke with Rhonda Curry, what did you do next?"  And then she goes on to discuss her next investigative steps.  Do you -- does this refresh your recollection, sir, on whether you reviewed her trial testimony?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   It seems vaguely familiar, so I'm guessing I did look at it.

Q.   Okay, and so according to this testimony, Officer Rhodeback also spoke with Rhonda Curry the morning of the robbery, right?

A.   Right.

Q.   Okay, and so I'm now going to show you what we'll mark as Exhibit 9.  I know I'm cycling through quickly, but it's just to get them all at least on the record, and then we can -- we can discuss.  And Exhibit 9 is the deposition transcript of Officer Rhodeback. And now, sir, it's my understanding that this document was not provided to you, so you did not review this document; is that accurate?

(Exhibit 9 was marked for
identification.)

A.   It could be.  I -- I would've only glanced through it even if -- this is 2024?

BY MS. MARTINEZ:

Q.   Yes, sir.

A.   I don't think it was provided, but I don't have any strong need for it, either.

Q.   Okay.  I'm just going to show you one tiny little section from it, and it's from Page 134, starting at Line 16.  And this is a string of questions that



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Officer Rhodeback is being asked about her interactions with Rhonda Curry the morning of the robbery. I'll make that representation to you. And so it says, "Question: Okay. Anything that you learned from her, you would have put in a police report, correct? Answer: "Yes."

A. Okay.

Q. Did I read that correctly, sir?

A. Looks like you did. Yes.

Q. Okay, all righty. And then you reviewed Officer Rhodeback's general offense report in this case, right?

A. I don't -- is it in that original police document that we were talking about earlier, or no?

Q. So let's -- yeah, here. I'm -- now I'm also getting confused. So I have not yet shown you the report, but Officer Rhodeback issued a general offense report, I'll represent to you, the morning that the robbery occurred. And you actually -- you referenced the report in your expert report when you detail the first statement that Richard McClanahan makes to police. It's that report, okay?

A. Okay.

Q. Okay. So I just -- right now, I want you to keep the testimony that we just looked at in your mind.

A. Okay.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

81

Q.   Because we're going to go to that report itself.   I just quickly want to bring in one more thing from your expert report.   And that is from that next page, Page 2.   You then also state the preliminary information that Richard McClanahan gave to police, and you lay out specifically it was the, "gray hoodie pulled tight over the face, light blue jeans.   Victim states he couldn't see the face, but the voice did sound familiar.   Believes he knows suspect."

A.   I see it.

Q.   And that information you got from Officer Rhodeback's report; is that correct?

A.   I'll take your word for it.   I don't remember exactly.   I was -- must be.   It's probably a direct quote from her report, so...

Q.   And that's fair.   I'll even -- the previous sentence, or I guess the first part of that sentence in your report states, "A preliminary police report dated 10-9-2004 indicates that Mr. McClanahan provided the following description, 'gray hoodie pulled tight over the face, light blue jeans.   Victim states he couldn't see the face, but the voice did sound familiar. Believes he knows suspect.'" And so if I -- actually, sorry, strike that, please.

A.   Yeah, I got that from an early police report.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 9, 2026

82

You're attaching it to an officer's name.  That's where I'm saying, I don't know for sure, myself, which officer it was who's wrote the -- the report.

Q.   Very fair.  So I will now show you the report, just so we can be on the same page and be talking about the same things, okay?

A.   Okay.

Q.   And so I will show you what we will mark as Exhibit 10.  I believe we're on 10.  Which is, for the record, City 8 through 12.  And as with the previous exhibit, sir, I'm going to scroll through so you have a chance to look at the entirety of the report before I ask you some questions, okay?

(Exhibit 10 was marked for
identification.)

A.   Okay.

BY MS. MARTINEZ:

Q.   I'm sorry, my mouse is unhappy, but -- okay. Here we go.  All right, there we go.  All right.  Have you had a chance to see the entirety of the document?

A.   Yes.

Q.   Okay.  Do you recognize this report, sir?

A.   I think so.

Q.   Okay, and when you say you think so --

A.   I didn't memorize it.  I looked for



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 85 of 324 PAGEID #: 12238
The Deposition of JOHN WIXTED, taken on January 9, 2026

83

information from the early police reports, but yeah, this is in my memory too, I think, but I'm not 100 percent sure.

Q. Okay, and this has the information that you cited in your report, right? The gray hoodie pulled tight over the face, light blue jeans. "Victim states he couldn't see the face, but the voice did sound familiar. Believes he knows suspect," right?

A. Yes, yes. I -- I actually remember those two lines right there. I definitely got -- if, you know, unless those exact lines appear in a different report, this is the report --

Q. Okay.

A. -- that I was looking at.

Q. And I will go back to that preliminary page. I apologize if there's a blue --

A. Yeah. It's okay.

Q. -- box on the screen. I don't know why it's like that, but please ignore the blue box. The report date entered is October 9th, 2004, at 9:30 a.m. by Officer Pamela Rhodeback, and then the date approved is October 9th, 2004, at 10:43 a.m., again, by Officer Rhodeback. Okay, so I first want to start with this second page here, sir, for the suspect information. Okay, and you said you recognize these last two

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

sentences?

A. Yes.

Q. Okay, but you would have reviewed the entirety of this report, right?

A. Yes.

Q. Okay. So would it be fair to say that the information here, under Suspect Notes, is not the entirety of the information that was provided to Officer Rhodeback from Mr. McClanahan?

A. Sorry, could you say that again?

Q. Sure. So in this Suspect S1 section, right -- your report incorporates the suspect notes at the bottom?

A. Yes.

Q. But would it be fair to say that there is other information in this police report that reflects information Mr. McClanahan gave to Officer Rhodeback?

A. Well, should we scroll down and see?

Q. We actually don't need to. So it's in this section, and I'll point it out. So --

A. Okay.

Q. -- there's the suspect notes description, but there's also identifying information provided a little bit higher up. Specifically, that the age of the perpetrator is 40. The sex is M, male. The race is B,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Black, ethnicity is N, non-Hispanic origin.  The height is a 6'2", the weight says, 150 pounds.  The eye color says brown, and then the hair color is U, unknown, and hairstyle, there's no information incorporated there. Did I read all of that correctly, sir?

A.   You did.

Q.   Okay, so this would be additional information that the victims have provided to Officer Rhodeback, right?

A.   It looks like it, yes.

MS. TANOURY:  Objection as to form.

BY MS. MARTINEZ:

Q.   And sir, there's no information in this report on the certainty of these descriptors outside of believes he knows suspect, the voice did sound familiar, right?

A.   There's no certainty statement, are you asking?

Q.   Yes, sir?

A.   Right.  I don't see a certainty statement.

Q.   Okay, and I will also quickly flip back to that first page, just so you have a chance to read the offense notes again for the description that was given of the crime, okay?  And let me know once you've had a chance to read it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Okay, I read it.

Q.   Okay.  Now, sir, would it be a fair statement to say that because of the language in the report, specifically the use of he and him, that this information appears to have come from Richard McClanahan?

MS. TANOURY:  Objection.  Calls for speculation.  You can answer.

THE WITNESS:  Can you repeat that question?

BY MS. MARTINEZ:

Q.   Sure, because of the language in the report, specifically the use of he and him when referring to the victim, would it be fair to say that this information likely came from Richard McClanahan?

A.   I would think that most people would draw that conclusion, if that's what you're asking me.

Q.   Okay.

A.   I have no expertise in that specific matter, but yeah, it sounds reasonable to me.

Q.   And if this information did come from Mr. McClanahan, this would be his first statement to police.  At least according to what we have in the record, right?

A.   Right.

Q.   Okay, and Officer Rhodeback did testify that she spoke with Rhonda Curry, and that she would have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 89 of 324 PAGEID #: 12242
The Deposition of JOHN WIXTED, taken on January 29, 2026

87

included anything she heard from Ms. Curry in her police report. So even if this information came from Ms. Curry, this would then be her first statement to police, right?

A. Yeah, but I think -- just to be clear, I think you just did what eyewitness experts do. And I forgive you for it, but not eyewitness experts. I think you said that she testified, but I -- I would -- you know, testified 20 years after the fact, I believe. Is that what you're referring to, that she would write down everything?

Q. No. So I'm referring to -- or I guess -- I guess a combination, right? So we looked at Officer Rhodeback's trial testimony from 2006, where she said that she spoke with Rhonda Curry on the day of the robbery. And then we --

A. Yes.

Q. -- looked at her deposition testimony where she said that it was her practice to write down information she got from witnesses. So she would have written down the information she got from Ms. Curry, right?

A. Yeah, and I would just -- when referring to testimony, to me, it's important to -- in parentheses, 20 years after the fact.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.  I see, okay.

A.  You know, like, so I -- I attach very little weight to that.  I know the legal system treats that as super important, but from a memory science perspective, like, to me, that's just, like, not information that's in any way, shape, or form, relevant.  But I understand why it is to you, and it's fine.  I just want to be clear that I'm constantly thinking about when the information came, when you -- and that sentence had a lot of different times.  That -- that's all.  I'm just being clear about that and -- and why, like, the legal world might attach more weight to things than I do. Just trying to be clear about that.

Q.  Yes.  No, ad I understand and appreciate that. Because, again, I want to make sure I'm getting your testimony, not mine, you know?  So I appreciate that. Okay, but then -- so my question is more -- taking Officer Rhodeback's testimony as true, if this information had actually come from Rhonda Curry, would this be Rhonda Curry's first statement then, to police? Her first test?

A.  Unless there's another record dated earlier in the day, let's say, then yeah, I guess it would be.

Q.  Okay.

A.  It would logically follow.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 91 of 324 PAGEID #: 12244
The Deposition of JOHN WIXTED, taken on January 29, 2026

89

Q.  Okay, and a quick bookkeeping thing.  Is there any particular reason that in your summary of facts, you included the information about the clothing and the voice, but not the physical descriptors that were given of the perpetrator on the day of the robbery?

A.  You mean, like, what are the physical descriptors that -- exactly that you have in mind that weren't in my report?  Just so I'm clear.

Q.  The ones from this police report?

A.  Like, specifically, age 40 or something different?

Q.  Yes.  The age 40, height, 6'2", weight, 150, eye color, hair color, hairstyle.  That information?

A.  You're asking me, is there a reason why I didn't list those facts?

Q.  Yes, sir?

A.  Not really.  I mean, when it comes to age, height, and weight, you know, a lot of research shows that witnesses are pretty terrible at estimating continuous variables like that.  You know, it's -- it's one -- they're good at saying race, that's categorical.  Things like gender, they're good at that.  But estimating things like distance, height, weight, age, they're pretty bad at that.  So maybe that's why I didn't include it.  I'm not sure.  I -- I don't remember

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

specifically deciding not to include that. That might be why I didn't include it.

Q. And my last question, while we're looking just at this report, sir, is on this first page where it's the offense notes and the description given by the victims of what happened, would you agree that there's no description here about any specific interaction that the victims had with the perpetrator the day before?

A. Right.

Q. Okay.

A. Nothing like that in this first report.

Q. Okay. So now I'm going to share one more document with you, sir. I know I'm throwing a lot at you from the day of, but I'm just trying to help build out the timeline so I can then ask you some questions, okay?

A. Okay.

Q. I will show you what we will mark now as Exhibit 11, which is the deposition transcript of Detective Walker from October 11th, 2024. Did you review this transcript in its entirety, sir?

(Exhibit 11 was marked for identification.)

A. Highly unlikely. I don't have any recollection of doing that, and I would also have no

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

real reason to do that because it's unlikely to inform my analysis of the case. But anyway, let's see what he said.

BY MS. MARTINEZ:

Q. Do you recall if you reviewed any part of the transcript?

A. I'm going to say I didn't. I'm not sure, but --

Q. Okay.

A. -- you know, it's not the kind of document that I would place high priority on, or even any priority on. So I -- I probably did not review it, but I'm not sure.

Q. Okay. I'm going to just -- like I have with the previous exhibits, there's a section I'm going to read out for you, and then I'm going to ask you some questions, okay?

A. Okay.

Q. I'm starting on Page 101, Line 3. It says, "Question: Okay, and so I'd like to direct your attention to the second page," and this is in reference to her typed police report, "where Ms. Curry told you that -- or strike that, please. Where Ms. Curry said, M/B, presumably meaning male/black? Answer: Uh-huh." Or actually, sorry, let me -- let me strike this and take a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

step back.  This is a line of questioning pertaining to her handwritten notes, not her typed police reports.

A.   Okay.

Q.   And it's the handwritten notes that we looked at a few minutes ago, okay?

A.   Okay.

Q.   So, "Question: Okay, and so I'd like to direct your attention to the second page where Ms. Curry told you that -- or strike that, please.  When Ms. Curry said, M/B, presumably meaning male/black?

Answer: Uh-huh.  Question: '25 to 30, 6'2" to 6'3", healthy, muscular, light skin, yellow, pullover gray hoodie tied tight, talking through string.  Eyes, nose only.  Medium blue jeans with lighter stitching. Shoes?  Gloves?  No accent.'  There's a line and then, 'Gun, five to six-barrel silver, handle black, flat.' Okay.  Do you see that?  Answer:  Uh-huh.  Question: And this -- or strike that, please."

"Question:  Would you agree this is the entirety of what Ms. Curry told you about who she thought committed the robbery during this first conversation?  Answer:  That was her description.

Question:  Okay.  That was her description? Answer: Of the robber.  Question:  Okay, and would you agree that nowhere in these notes does it say that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ms. Curry could ID the robber if she saw him again? Answer: Nowhere in the notes. Question: Okay, and would you agree that nowhere in the notes does it say that she believed she knew who the robber was? Answer: Not in the notes. Question: Okay, and if Ms. Curry had told you either of those things, you would have made sure to document it, correct? Answer: Not necessarily."

"Question: I mean -- or strike that, please. The ability of a witness -- strike that as well, please. Would you agree that it's important information if a victim believes that they know who the perpetrator is? Answer: Yes. Question: Okay, and so important information like that, you would write down if she had told it to you, correct? Answer: If she -- yeah. If she knew him, yes. Or if she said, 'I think I know him,' she -- Question: Yeah. You would have?"

"Answer: She didn't say that, no." Did I read that correctly, sir?

A. Yes.

Q. Okay, and so I'm not going to ask you to opine on which version of the story is true. I'm not going to ask that of you. My question is more that if the testimony Detective Walker gave in her deposition is true, and that in her first interview with Rhonda Curry,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Ms. Curry did not say that she recognized the perpetrator, I think I know him, would you then agree that in that first interview, that first test, Ms. Curry makes no statements about recognizing the perpetrator in any way?

MS. TANOURY: Objection. But you can answer.

THE WITNESS: So you said if the testimony is true, then would I agree that she made no statement about that in the initial interview?

BY MS. MARTINEZ:

Q. Yes, sir.

A. Well, we have to talk about what you mean by true. You mean testifying truthfully? In terms of what --

Q. Sure, yeah. That's -- no, that's fair. Let me take a step back, because I want to make my question very, very clear. All right, so we looked at the contemporaneous notes, which have no mention or reference to familiarity whatsoever, right?

A. Right.

Q. Okay, and then we also looked at Officer Rhodeback's report. And outside of the -- you know, believed voice was familiar, maybe knows him from Rick McClanahan, we don't see any expression of familiarity that seems to come from Ms. Curry, right?



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    In those notes, yes.

Q.    okay, and so now -- or strike that, please. But in the police report that we looked at, Detective Walker does say that Ms. Curry made those statements saying, I recognize him, I could ID him if I saw him again, right?  It is in the police reports that were typed up in December of 2004?

A.    Right.

Q.    So my question for you, sir -- and again, I'm not asking you to determine witness credibility and which iteration is true.  That's up for the jury. My question is just, if Detective Walker's testimony at her deposition that Rhonda Curry did not, in fact, say to her, I know the perpetrator, I think I know him, if that did not happen, would you agree then, that at no point on October 9th, 2004, does Rhonda Curry ever say to Detective Walker that she recognizes the perpetrator in any way?

MS. TANOURY:  Objection.  Mischaracterizes the evidence in the record.  You can answer.

THE WITNESS:  And I'm -- I'm just confused, but your question starts with talking about testimony. And, like, let's just leave that off for the moment and then continue with the rest of your question.  Like, if it's true that it didn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

happen, I mean -- it -- I don't understand why we're talking about testimony. You can just say, if it -- that it -- it -- if it didn't happen, then it didn't happen.  I mean, I -- I'm confused by why we're talking about the testimony.  Can you just say that question one more time?  And maybe I'm just misunderstanding.  One more time.

BY MS. MARTINEZ:

Q.   No, that's okay, and I'm happy to take the testimony part out of it.  I just wanted to show you the testimony so that it's not, okay, why am I answering, you know, these crazy hypotheticals out of nowhere when there's nothing in the record to support that?  I'm trying to show you --

A.   Well, from -- from my --

Q.   Yes, with that caveat and that understanding, yes.  Okay, so then --

A.   And from -- and -- and from my perspective, it's as if that's how it is, if you're using -- okay, Go ahead.

Q.   Sure, okay.  So if -- actually, sorry, strike that as well.  Let me think of the best way to try to word this question.  Well, actually, based on -- actually, strike that as well.  I'm going to -- I'm going to separate it out.  I'm going to separate it out.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

If Rhonda Curry, on October 9th, 2004, did not make any kind of statement to Detective Walker saying, I know the perpetrator, he's familiar, I think I know him, would you then agree that based on the handwritten notes that we reviewed, there's no evidence that she made any statement of familiarity in that first conversation with Detective Walker?

MS. TANOURY: Objection. You can answer.

THE WITNESS: And I'm going to say, like, again, the second half of your question seems to stand alone. There's no record -- there's no -- there's nothing in that record at -- so the first part of the sentence -- question, I'm not sure how -- how I -- I don't know how the question differs if you just ask the last part. That's what's confusing me about your questioning. So I mean, if you --

BY MS. MARTINEZ:

Q. No, that -- and that's fair. I'm kind of asking you to say, well, if this isn't true, is A, A? Like, if A is not B, is A, A?

A. That's how I seems to me. So I'm -- I might be missing what you're really asking.

Q. Okay, and you're not providing an opinion in this case on whether Rhonda Curry did or did not make

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

those statements of familiarity to Detective Walker, right?

A.    I'm not making any judgment about that.

Q.    Okay.  If a jury decides to hold that Detective Walker made no statement of familiarity of the perpetrator to -- or sorry, I think I said Detective Walker.  Let me strike that, please.  If a jury decides to believe that Rhonda Curry made no statement of familiarity to Detective Walker on October 9th, 2004, does that impact your opinions in any way?

A.    Well, it could.  I'd want to know when did she -- when did she first say that?  Like, if later that same day, or the next -- if we're still talking early in the police investigation, we're -- we're still keeping the focus where I think it should be.  And -- and it wouldn't be -- you know, I don't know when she first said it.  It's in the police report that, to me, is early in the police investigation.  And so I took it as early in the police investigation.  If -- and it's not a contradiction.  You know, she -- it -- like, it would be alarming to me if she had not only not said it but specifically said, like in the case I was talking about earlier, the Kevin Strickland case, specifically said, and that was a completely unfamiliar person to me.  And then it changed, that would be -- you know, a red flag

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

would go up.  I didn't see any red flag like that here.

So that's -- it could affect my analysis.  If she didn't say it right then and there, I'd want to know, well, when exactly did she say it?  How early on?  And -- and I don't see a contradiction, so it's not -- it's not a -- it wouldn't change my analysis hugely, I guess I'm saying.  The way it would change my analysis, if -- if it turns out she initially affirmatively declared that she didn't recognize the guy, that would be truly alarming to me.  And I would say keep your eyes on that statement, not the changed statement. What we're talking about is an addition, you know, and I don't know -- I guess that's all I can say.  I'd want to know when did she say it?  And -- and accounting for the fact that it's -- you know, how did he come to believe that?

If -- you know, that -- did she say it the next day and he just confused it with the earlier day, you know?  I don't know, that -- that's what I would want to be considered if -- if we accept that -- let's just say she didn't say that, and that's why it's not in the initial notes.  Let's say that's true.  I think you're sort of asking me, let's say that's true.  What then?  Well, my answer, what then is, like, he seemed to believe it, that she said it on that first test. But, you know, memory is not perfect, right?  She might have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

said it the next day, or later that day, or something like that.  I'd want to know how it came to be that it was in his memory.  Early memory, not super early, how it came to be that it's in his good-faith, early memory that she said that.  How did that happen? I'd want to -- you know, that -- that's where my analysis would -- would go, and may or may not change the substance of my analysis.

**Q.   I guess two follow-up questions.  One, when you say you need to know the source of that memory, are you referring to the detective's memory of Ms. Curry saying, oh, he's familiar to me at some point in the investigation?  You just need more information to evaluate?**

A.   Yeah, if we -- if we make the assumption that it -- like, right now, I assume it -- the simplest assumption to me is it happened, he remembers it, it wasn't in the notes, and that's one possibility.  But you're saying what if -- what if she didn't say it at all because it's not in the notes?  That's the other possibility.  That's also possible.  Then I would -- you know, if -- and you're asking me, let's accept that version as being true, how would it affect your report? Well, then I'd want to know -- I would want further information, and there may not be any further

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

information.  But I'd want to know how did it -- how did he end up remembering it on -- on that day?  And a -- a common memory mistake is source confusion.  He actually heard it the next day or a different day. That's another possible explanation.  But -- but I -- we might not have any information to help guide our thinking about that.

Q.    Okay, and then a few follow-up points on that. One, just to have a clean transcript.  When you say he, are you referring to Detective Walker?

A.    Yes, Detective Walker and --

Q.    Okay.

A.    Because it was, apparently, if we assume good faith, which I realize nobody has to do, no jury has to, but if -- I do.  If we assume good faith, might -- you know, how did it get into Mr. Walker's memory that she said that that morning?

Q.    Okay, I also -- I just want to clarify Detective Walker, her full name is Brenda Walker, so she's a woman.  Again, just so we've got that transcript --

A.    Oh, I didn't realize that.  Okay.

Q.    Totally fine.  Okay, so a couple of follow-ups.  Do you recall, from your review of the records, seeing any evidence of communications between Rhonda Curry starting that day after the robbery, so October

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

10th, 2004, through December 4th, 2004, when the photo array is shown?

A.   I don't recall seeing anything like that.

Q.   Okay.

A.   I'm not saying there's nothing like that, but I don't recall it right now.

Q.   And -- but would that information be relevant in determining whether source confusion is at play here?

A.   I -- it could be.  Yeah, if -- if there's a police record from the next day, where it indicates she did say that to Detective Walker, then that would provide a simple explanation for what is a slight mistake in that later report.

Q.   I guess I do want to clarify.  You said slight mistake.  And so there's language in your report about direct contradictions, like, very strong language and strong examples.  I think one you provide is saying it's a tall, skinny, white guy and then the next day saying, no, it's a short, chunky Hispanic.  You know, like, that would be something that's a stark contradiction.  What do you mean when you say a slight mistake?

A.   Just that there's no contradiction.  It's -- it -- and it -- and it's still very early in the investigation when memory -- when reports from memory are maximally reliable, like an omission followed by a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

more complete statement is not a red flag early on. You know, if the -- if the new detail emerges a year later at trial, well, yeah, that's -- year's worth of contamination might explain it just as easily as I, you know, I remembered a detail that I didn't mention yesterday type of thing.  That can happen, right? Like, because we're talking about recall right now. We're not talking about face recognition.

So face recognition is different.  Like, if you initially say, I don't recognize that face, well, even if the next day you do recognize it, there's a contaminating event, the first memory test.  But recall is slightly different.  Recall can fail and succeed later.  Everybody has experienced that.  You can't recall something at -- at the moment or -- or, you know, or I neglected to mention that, or things -- as long as it's all very early without a -- it still could be contamination, right?  I'm -- I wouldn't say it -- it's definitely not contamination.  Like, but it just minimizes the chances that it's contamination if it's not a contradiction, if it's an extra detail.  The research is clear.

An extra detail not mentioned early on, pretty reliable, you know?  But the more time that goes by, no, that -- that principle no longer holds.  And I -- and



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026                104

again, I can't specify an exact time frame.  You know, I just -- the principle is what I explained to fact finders.  Fact finders have to apply it to the specific case.  So what I meant by slight, you know, I don't have any scientific reason to tell you about why that would be an enormous red flag or anything -- could be, could be contamination.  And if there's documentation of contamination, then I would say, yeah, gigantic red flag right there, you know?  Anyway, I hope that answers your question.

**Q.   It did.  I mean, you know, it gives me 20 more questions, but it did answer my question.  So you kind of made, I think, an important distinction there between, you know, the omission of extra details and facial recognition.  Not recognizing someone and then suddenly recognizing someone.  That would not qualify as omission of an extra detail, right?**

A.   You mean if you fail to recognize -- you get a good look at the perpetrator's face, you're looking at a photo lineup, you fail to recognize it.  And the next day, they do another photo lineup with that same guy, and now you recognize him.  Yeah, that -- there's no scientifically plausible mechanism where that could happen other than memory contamination.  Because the face familiarity signal doesn't -- if you get a good

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

look at the face, it doesn't fail.  There's some -- I realize that with Mr. Richard McClanahan, there's some disagreement in the record about whether he got a look at the perpetrator's face.

But -- but I'm saying if you did get a good look at the perpetrator's face, don't recognize a good photo of him, do recognize a good photo of him after that, no, that's not -- that's different.  That's -- face familiarity signal doesn't work like recognize -- I draw a distinction between face recognition and recollection of details.  There's a lot of similarities between memory tested that way, but there are some important differences as well.  Both are contaminatable [sic].  But this is -- is the most important way -- in -- in the legal world, this is the most important way in which they differ.

But -- and it matters, critically, how long between -- you know, how much time went by before you hearing this first -- this new detail for the first time.  You know, if -- if it's -- if it's a year?  You know, I'm not even interested in that.  Like, because memory for events is not reliable after a year.  But if it's a day or two or a week or, you know, early on, it's less of a red flag.  Unless you've got the contaminating event documented, because it could always be

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

contamination.  I -- I saw -- I saw forensic -- you know, when I was glancing through the forensic reports, I -- I -- I was happy to see one of the experts say the same thing about forensic evidence.  You never know for sure, even if it's super early.  It could be contaminated before it gets to the lab, right?  The same with memory, but -- same principle.

Q.  Okay, I -- so you've kind of -- and we're going to get more into the difference between recognition and recollection a little later on when we get to that section in your report, but I kind of want to ask you about a middle ground.  Because if I'm understanding the testimony you just gave, you gave the example of seeing a face in good lighting, having the opportunity to again see that face in some kind of test, not recognizing the person, and then recognizing them again the second time.  So that's clear evidence of contamination.

A.  Yes.

Q.  What if, in kind of a middle ground, you don't have a good opportunity to see the person's face, but throughout the entirety of that event, there's nothing that stands out as familiar at the first test, but then at the second test, suddenly there is something that stands out as being familiar?  What would be your take

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2020                   107

on that?

A. Well, that sounds like you're describing the scenario that I talked about earlier in the case of Kevin Strickland, where the witness said, no, I've never seen that guy before in my life, and then a day later, saying, oh, it's Kevin Strickland. My analysis would be, you know, even if the contaminating event had not been documented in the police report, which incredibly it was, I would say that doesn't -- you know, that just doesn't happen. There's no scientific mechanism whereby that could occur. So that's presumptively contamination.

Q. Okay, and you just testified to one example of documentation of contamination, but you referenced it earlier, so I want to make sure to ask. Is there any other evidence or documentation that you're aware of or that you've seen that would be evidence of contamination?

A. Are you talking about the Horton case again, this case, --

Q. I'm asking about in general.

A. Okay. So --

MS. TANOURY: Objection.

THE WITNESS: -- ask the question --

MS. TANOURY: You can answer.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2020

108

THE WITNESS: -- again now.

BY MS. MARTINEZ:

**Q. Yes, I will. I'll ask it again. So during your previous answer, you alluded to documentation of contamination, and then you mentioned it again in the case of Mr. Strickland. I'm just wondering, in your experience and your knowledge of the literature, what are some other examples of documentation of contamination?**

A. There's lots. You know, a lot of it is what we've talked about. Seeing a line -- same suspect in a lineup with different fillers, that's contamination. There's a well-known case of a murder in Sweden that was observed by -- I don't know. I can't remember them, but, like, 20 witnesses and they -- it was all on videotape, so you -- so you could -- when the police interviewed those witnesses, you could check to see if what they were saying was accurate, because it's just one of those rare cases where you actually knew what was true. And there's, like -- there's five or six studies like that, I think, or three or four maybe. And they usually show that the witnesses are highly accurate early on. But in this one case, they were highly inaccurate. And it was interesting because what happened was they all got together and talked to each

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

other even though it was early on, before the police interviewed them.  And so the likely explanation for their inaccuracy was everybody contaminating everybody's memory.  And -- and even though it was early on, it was pretty unreliable.  So that's another example.

Q.    And can instances like that where witnesses are talking to each other prior to tests, can that affect both memory for recognition and for recall?

MS. TANOURY:  Objection.  You can answer.

THE WITNESS:  You know, can it?  I suppose it's unlikely to -- to affect face recognition. You know, if I saw the guy and -- and you can't talk me into a different picture in my head that -- I mean, maybe it's possible.  Like, if I got a poor look at the guy and somebody says, oh, he had a scar on his face, and -- and now you show me a face with a scar, yeah, I might say -- I might conclude that -- that's the guy I saw.  That can happen, but -- but usually, if they got a good look and have a -- have that face in their memory, that's hard to change by verbal, you know, because it's stored in a visual area of the brain, not -- and -- and it's hard to -- to change that, but I mean, it -- it can happen.  But recollection of details, that happens much more readily, you know, talking to others and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

changing that because that's already all verbal, and...

BY MS. MARTINEZ:

Q. Okay, and circling back a little bit, I kind jumped around between my follow-up questions. Circling back, you mentioned, or I guess you said a couple times today about the timeline of the investigation and how that correlates to emphasis that you put on certain things. In this case, and you referenced the typed police reports, which, as we looked at earlier, the only date that they have, or the date that they were typed, which is almost three months after the crime actually occurred. And so was it a presumption you had in creating your report that those police reports were actually written up earlier and then just typed late?

A. Not necessarily a presumption. I mean, they're just the earliest reports. And -- and so I rely on them. And, you know, the earliest handwritten notes, I presume that those are incomplete. You're presuming otherwise, and that's fine. But I presume that the handwritten notes are incomplete, and they're retrieval cues for -- that you -- that the officer relies on when typing up the report. And, yeah, the -- the longer that goes by, the more you worry about contamination. Three months -- I -- I didn't -- there -- that's a principle,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

and this is three months, and three months is not -- and it's -- it's not a year, but it's not a day either.  So it's in between, and you know, the fact finder has to make a judgment about what happened in those three months, and -- but I'm focusing on the earliest records that we have.

Q.   Okay.

A.   And -- and the -- the typed report -- the handwritten notes are retrieval cues for the officer to remember what happened, and -- and can -- it can be a more complete recollection, could also be -- the longer that goes by could also be contamination, and three months went by, and still the earliest.  So I focus on it.

Q.   **Did you review the part of Detective Walker's deposition where she talks about her note-taking process?**

A.   You're talking about a deposition 20 years after the fact?

Q.   **Yes, sir.**

A.   I didn't.

Q.   **Okay.  So when you talk about -- I'm just doing this to kind of -- again, kind of lay the foundation almost for myself.  When you talk about retrieval cues, you're operating under the presumption**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that -- that's what Detective Walker was doing for these subsequent police reports.  Is that a fair statement?

A.   I -- I guess so.  It's like it's -- it seems almost inconceivable that it wouldn't be that way, but maybe there's a scenario where it wouldn't be that way, but I'm not -- I'm not sure.  But yeah --

Q.   And did --

A.   -- I -- I presumed that.

Q.   -- and did you see anything in the handwritten notes that you believe to be some kind of retrieval cue about the witness actually being familiar with the perpetrator and having steered at him?

A.   Well, you have to remember how retrieval cues work, which is you form a complete memory, the -- the officer does of -- but the officer, contrary to what they say, does not literally write down every single detail.  That would be impossible.  So you're writing down part of what the witness said, and then that part, later on, let's say there's no contamination -- I've already said there's always the possibility of contamination.  Let's consider this scenario where there's no contamination.  The retrieval queue is part of what happened, and it completes the whole.  It's called pattern completion.  That's the way a retrieval queue works.  So the retrieval queue itself doesn't have

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to have that information.  That -- that doesn't have to have the rest of the memory.  It can just be part of the whole memory that's formed at the time. And then later on, you give that part again, and it brings back the whole memory.

It's well understood what -- the hippocampus plays a big role in pattern completion, filling out all the details from a partial retrieval queue.  That's literally how memory works.  So yeah, there's nothing -- there -- there wouldn't be -- you know, like, there's what was written, but then it brings back everything else.  So there's nothing in the queue itself, except for that retrieval queue.  That memory that you wrote down was formed at the same time that the rest of it was formed.  So they're together in your memory, so the part can bring back the whole.  That's how I think about it.

Q.   Okay.

A.   And so that's a -- that's a perfectly plausible scenario.  Even if officers testify that they write down everything, you know, like, that doesn't -- especially if they're saying that 20 years after the fact.  But even if they said that right after, I wouldn't attach a huge amount of weight to that.  You can't write down everything, you know.  That just -- you can't.  I don't think you can -- you'd -- be a novel, or

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

-- or would it be too long.  But at the same time, I keep saying contamination's also possible. These are two plausible scenarios.  The more time that goes by, the more you have to be concerned about contamination.  Even if a little bit of time goes by, if it's -- contamination's documented, you have to worry about that.  Those are the principles.

Q.    Okay, that -- thank you for the explanation. You know, we're talking a lot about possibilities and the science and, you know, the way that a lot of different things are possible.  Specifically on the point of note-taking and what was said to Detective Walker and what was not said, that is not within your purview, right?

A.    You mean making a -- an assertion about what was said beyond what I -- definitely not.

Q.    Okay, okay.  All right, I jumped ahead a little bit.  So I'm going to scooch back to now.  We've looked at the documentation and the statements from both Mr. McClanahan and Ms. Curry from October 9th, 2004, the day of the robbery, right?

A.    Right.

Q.    And there's a little bit of, you know, discord in the facts on what exactly was said when, but that's for the purview of the jury, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MS. TANOURY:  Objection.  Form.  You can answer.

THE WITNESS:  I mean, the record shows what was said on the day of the crime, and the record shows what the officer remembers more than that. But judging whether or not it actually happened on that day is for the jury.  I think that's what you're saying.  And if that's what you're saying, I'm agreeing with you.

BY MS. MARTINEZ:

Q.  Yes.

A.  Yeah.

Q.  Okay, great.  And so what we can tell from the record by -- and again, I'm placing a particular emphasis on having a clear timeline of the first day because of the opinions in your report about the importance of that first test, okay?  I'm not going to belabor every single day of the investigation.  I just really want to make this first day clear so that I can fully understand your opinions, okay?

A.  Okay.

Q.  Okay.  So by the end of October 9th, 2004, Richard McClanahan has spoken to police at least one time, right?

A.  Right.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay, and the description that he's given to the police is that the perpetrator had that gray hoodie, that it was pulled tight over his face, that he had the light blue jeans, that he had a potentially familiar voice, that he was 40 years old, that he was 6'2" and 150 pounds, right?

A.   Right.

Q.   Okay, and then Rhonda Curry --

MS. TANOURY:  And sorry, belated objection to the form, but...

BY MS. MARTINEZ:

Q.   Okay, and then we also know that same day, Rhonda Curry has at least spoken to police once.  She's potentially spoken to them twice, right?

A.   Right.

Q.   And the description that she gave, at least to Detective Walker, is that the perpetrator is 25 to 30 years old, that they're 6'2" to 6'3", that they have light black skin, kind of yellowish complexion, that there's, again, that gray hoodie tied tight, that there's no accent, and that only the eyes and part of the nose were visible, right?

A.   Right.

Q.   Okay, and some of their descriptions are similar, and some may be slightly off, but those are the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

two descriptions we've got from them from day one; is that correct?

A. That's correct.

Q. Okay, and let me -- there's some evidence in the record that Ms. Curry made a statement along the lines of, he looks familiar. Maybe I recognize his face on that day, to Detective Walker; is that right?

A. That's right.

Q. Okay, but there's nothing from Rick McClanahan from the day of the robbery saying he recognizes any of the physical features of the perpetrator, right?

A. Right.

MS. TANOURY: Objection.

BY MS. MARTINEZ:

Q. Okay.

MS. TANOURY: You can answer.

BY MS. MARTINEZ:

Q. His familiarity is based on voice on day one, right?

A. Right.

Q. Okay, and then for Rhonda Curry, if she did make this statement about familiarity, hers is based on facial features, right?

A. Yes.

Q. Okay, and neither of them are making any

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

familiarity statements based on clothing on day one; is that right?

A.   I didn't see any.

Q.   Okay, we then fast-forward to October 13th, 2004, which is four days later when Detective Walker has an interview with Mr. McClanahan.  So this is now his second interview with police.  And quickly, before I show you the notes of that conversation, did you review Rhonda Curry's deposition testimony where she talks about the conversation she had with Mr. McClanahan between October 9th, 2004 when they first talked to police and October 13th, 2004 when they next talked to police?  Your face is telling me no, but I want to ask.

A.   Well, remind me the date of that deposition testimony?

Q.   It was sometime in 2004.  I don't have the exact date in front of me.  Sorry, 2024, not 2004, 2024.

A.   So it's -- it's deposition testimony about an event 20 years after the fact.  I definitely -- even if I read attached, no way -- and I -- and I would say the message from science is, legal system can do whatever it wants to do, but from the -- the science-based messages, it -- memory's non-diagnostic of truth at -- after such a long delay, memory for events, episodic memory.  So --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

but no, I didn't -- if I read it, I didn't -- I don't even remember reading it, but it would -- it would not affect my opinion in the slightest.

Q. **And do you recall if you reviewed her trial testimony from 2006 about conversations that she and family members had with Rick McClanahan in those four days before his interview with Detective Walker?**

MS. TANOURY: Objection. Mischaracterizes the record, but you can answer.

THE WITNESS: And it -- and that's, like, a year and a half or two years after the crime also, right? About the event being remembered?

BY MS. MARTINEZ:

Q. **Yeah, give or take 13, 14 months.**

A. Yeah, I -- I'm sure I looked at it, but -- and it might be true, and it might be false. That's the best you can say about episodic memories from so long ago. Had she said that, you know, a week or two or three or -- or even a month, you know, I would -- my rule is because, like -- science-based reason for believing it, by the time you get to about a year or more, that's when episodic memories become non-diagnostic for the truth. So yeah, I wouldn't attach a lot of weight to that. It could be true. It -- it may be true -- those -- her memory of those conversations

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

may be true.

See, you have to remember, like, it seems probable that conversations happen, you know. But -- but exactly when they happened, that's what -- that's what goes with episodic memory. I mean, you just -- you blend events across time, and you think they all happened on the same day, when actually, they were spread out over months. You know, episodic memory just works that way. That's why you have to get it earlier before your brain starts blending across episodes and changing the nature of the conversations and things like that. I'm just explaining why I don't attach a lot of weight to --

Q. Yes.

A. -- episodic memories being reported --

Q. Yeah.

A. -- for the first time long after the fact.

Q. It's certainly a possibility that the four days Mr. McClanahan was in the hospital that his family members are coming to visit him and they're talking about the robbery, right? That's certainly a possibility.

A. Yes, it's also possible nobody came to visit him. Yeah, these are possibilities for sure.

Q. I am going to bring up now what we'll mark as

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Exhibit 12, which I will represent to you, sir, are the handwritten notes of the October 13th, 2004 interview of Richard McClanahan, and these are Detective Walker's notes.  I'm going to scroll through the document again so you have a chance to look at it, and then I'll ask you some few -- or a few questions, okay?

(Exhibit 12 was marked for identification.)

A.   Okay.

BY MS. MARTINEZ:

Q.   And let me know if you'd like me to slow down.

A.   Okay.

Q.   Okay.  Do you recognize these notes?

A.   Yes.

Q.   Okay, and you reviewed them in creating your report?

A.   Yes.

Q.   And did you review them in preparation for your deposition today?

A.   I glanced at the written notes, but I didn't read it carefully as I read it more carefully just now.

Q.   Okay.  So I'm going to go to the third page. Is it the second -- yeah, the third page.  Now, what we have in these notes, the description of the perpetrator is M/B, male/Black, "5'9" to 6', light skin, short nappy

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

122

hair, bushy eyebrows, just out prison, drugs, gray hoodie, hood up, tied tight."  All right, did I read that correctly, sir?

A.   Yes.

Q.   Okay.  Now, this description that's given is both similar and different to the description that was given to Officer Rhodeback, right?

A.   Right.

Q.   Okay.  So the height -- or actually, strike that, please.  The fact that it is a Black male is the same, right?

A.   Yes.

Q.   The height is two to five inches shorter now, right?

A.   Right.

Q.   The age is 12 to 13 years younger now, right?

A.   Where's the age?  I'm just missing --

Q.   Oh, you're right.  Sorry, male/Black, 27 to 28.  I didn't read in that part.  Do you see that?

A.   Okay.  Yeah.

Q.   Okay.  So the age provided now is 12 to 13 years younger than that was provided to Officer Rhodeback, right?

A.   Right.

Q.   Now, it specifically qualifies that the Black

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

123

individual had light skin, whereas her report just said Black, right?

A.   Right.

Q.   Okay.  Now, there's a description given that says, short nappy hair when the hairstyle section of her report was left blank, right?

A.   Right.

Q.   Okay, the gray hoodie is the same.

A.   Right.

Q.   And now, we also have the bushy eyebrows information, right?

A.   Right.

Q.   Okay, and, you know, so we've been talking a lot about contradictions versus extra detail omissions. When you were reviewing these two different narratives, the first being given on October 9th, 2004 and this one being given on October 13th, 2004, did you have any reason to weigh one over the other?

A.   Well, I'm not sure what you mean.  So what I'll say is -- so remember I mentioned earlier that estimating continuous variables like height, weight, distance, things like that, people are terrible about, they change all the time, they're inconsistent.  So the fact that those values change is about what you'd expect.  The additional details could be that, as we've

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

talked about before, you know, you can recall more detail.  I mean, maybe they were recalled initially and not recorded, but if you want to assume that everything would've been recorded, maybe they were recalled later.  But they're not necessary -- I don't think there's any huge contradiction.  It sounds like he's describing the same event to me.  And I don't -- you know, maybe I'm missing it.  I don't -- I don't see anything that is inconsistent with recollecting a detail that wasn't affirmatively recorded or recalled the first time.  I don't know which it is.  I don't know.  Nothing's jumping out to me.  Maybe, I'm missing something.

**Q.   No, that was just my question.  If the changes in the description were anything that made you question whether contamination had occurred, it sounds like the answer is no.**

A.   Well, yeah.  I mean, it's -- it -- it's consistent with recalling a detail that was not recalled initially or was recalled initially and not recorded.  It's also -- you know, contamination can happen in four days or however many days later this is. That could happen.  That's another possible explanation for this, some degree of memory contamination that hasn't totally dramatically changed, like, the race of the guy or anything like that, the kind of stuff that you do see

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

happening by the time of trial.  Not in this case, but not infrequently.

Q.   Okay, and I'm going to -- I'm going to ask about it because I realize I hadn't for earlier reports, but I'll start with this one.  In a lot of your literature that you author, you emphasize the importance of having early credibility statements to go along with these statements and descriptors, right?

A.   What's that early credibility statement?

Q.   Let's see.  I can -- I can just take the language directly from one of your reports, if that would be -- or one of your publications.  Let's see. In a 2017 paper that you co-authored with Gary Wells, and it's called --

A.   I know it well.

Q.   Perfect, okay.  You state that, "At the time when a witness makes an identification, the statement should be obtained from the eyewitness indicating how confident he or she is that the person identified is the offender."

A.   Yes, definitely that --

Q.   Okay.

A.   -- (inaudible) a recommendation.

Q.   Okay, and in your own words, can you explain why that's important?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.     Because remember, we used to think maybe you once thought that eyewitness memory is unreliable. Maybe, you still think so, but it turns out -- and -- and they -- one reason they thought so was because they thought that even on an initial test of uncontaminated memory, using a perfect lineup, even then, confidence tells you nothing or tells -- is limited information value.  And if that's true, eyewitness memory is unreliable across the board, but the revelation in that paper that you were just citing that took the field by storm was when the data were analyzed -- the same data that led to the incorrect conclusion were analyzed properly, led to the opposite conclusion.  Confidence on the initial test of uncontaminated memory from a fair lineup tells you almost everything.  If they're expressing low confidence, they're highly error-prone, expressing high confidence, it's highly accurate, not -- not perfect, but highly reliable.  So since contrary to what the field said for decades, which is ignore eyewitness confidence because it tells you nothing, since it turns out it tells you everything on that first test, the recommendation is you should record it, because it tells you everything, essentially.

**Q.     And would you agree that in these handwritten notes, there isn't any statement of identification**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

confidence?

A.   Well, wait a second.  Isn't this where he's saying it's a known person?

Q.   There is the language, "can ID."  Yeah, I'm going to keep it up here.  And if you want me to scroll up --

A.   Yep, "can ID."

Q.   -- and down, I'm happy to, yeah.

A.   Can ID, because he knows him.

Q.   My question is more -- or actually, let me -- let me flip it.  When you say a statement of confidence, what do you mean by that?  Like, what can that look like?

A.   I see -- I see what I'm leaving out that I think you need to know.  Those recommendations are for stranger IDs.  Those -- those recommendations are not for known person IDs.  Known person IDs are presumptively high confidence and accurate, not -- not infallible again, but -- so -- so I just want to make sure you understand that.  And -- and now, can you ask your question now that I clarified --

Q.   Well, I'm going to ask some follow-up questions then based on what you just said, but I will re-ask my question before I circle back to those.

A.   Okay.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    In the context of this report, right, we don't have any confidence statement.  We don't have someone saying 100 percent I know who it is, right?

A.    In these recollections, like that paper you were citing was for, you know, photo lineup IDs.  And so we're not talking about photo lineup IDs here, right?

Q.    Not yet.

A.    Yeah, so I -- I mean -- I'm just saying we should keep the paper that you cited and -- and what we're talking about here are separate, because there are different things.  That -- that paper isn't about, you know, recollection of details and that -- which is what's happening here.  This is recollection of details. This isn't ID from a photo lineup.  And so I guess I want to let you know that these are -- that -- that paper and what's -- this is talking about our -- not catching the relationship between the two.  They seem separate -- the later photo lineups that I think they do in this case, that's what this paper is about, our -- our paper is about.  Like, they're not -- he's not perceiving a face when -- when talking about these things.  Anyway, does that make sense, what I just explained?

Q.    It does, but I'm still going to re-ask my question because I don't think you actually answered it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Okay.

Q.    But then I will ask some follow-up more catered what you just said.

A.    Okay.

Q.    My question for you is that in these notes, right, we don't have any statement of confidence.  It doesn't say, I'm 100,000 percent confident it's this person, right?

A.    Right.

MS. TANOURY:  Objection.  You can answer.

BY MS. MARTINEZ:

Q.    What was your answer, sir?  I'm sorry.

A.    My answer is, right, there's no -- I don't see any confidence.

Q.    Okay.

A.    That's --

Q.    And then now --

A.    -- 1,000 percent or otherwise.

Q.    -- and now to the second point that you were making, kind of about the distinction in -- it almost sounded like -- and I -- that's why I want to make sure I'm getting it right.  The distinction in the relevance of having a confident statement, are you saying that in a known person identification case, the importance of having confidence statements attached to identifications

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

130

is lesser or nonexistent?

A.    Yes, it's lesser because -- because you know the person, you have prior familiarity with the person. You're -- you know, the identification test is really -- as I think I described in this report, I usually do, it's a -- it's a confirmation photo.  Is this the guy you were talking about?  So the confidence statements are essential for stranger IDs, but for a known person, if -- if you've known this guy for a long time you know, you can get a confidence statement, but it's presumptively confident.  They're telling you they know this person.  The photo, even -- so the police sometimes put it in a photo lineup, but it's really just a confirmation photo.

Yeah, that is the Richard I was talking about. That's the right guy.  So yeah, the rules are a lot different for a known person.  Like, there are -- don't get me wrong.  There are people who would say, you know, I -- you know, if you ask Gary Wells, he'd say, you know, we should do a -- a lineup even when it's a known person ID, you know, and all that stuff.  And I'm -- but I'm just saying I -- I don't -- you know, we disagree about that.  There's not a consensus scientific perspective that -- that these things are -- the way there is a consensus scientific perspective on stranger

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

IDs, yes, you want to do a photo lineup, focus on the first test, take confidence.

Q. And so in that example that you're using, about where there's a photo lineup and the person in the lineup is known to the person viewing the lineup, you would expect the confidence in that selection to be high?

A. If it's a known person, yeah -- if it's a - someone you know well --

Q. Right.

A. -- then yeah, confidence would be high, and it'd be fine to do a single photo show-up, too. Like, you don't need the fillers in that case. The fillers are kind of irrelevant because you don't know them. And often, the police do use a confirmation single photo. There are lots of cases that I've seen where they do that, and it isn't inherently problematic.

Q. And this is when the purpose of the photo array or the show-up is to confirm that this is the person we're talking about. This is the person you understand to be X, Y, Z; is that correct?

A. Yeah, and the person you're saying committed the crime, too. You know, if your mother committed a crime, it wouldn't -- to take an extreme, it wouldn't matter if her face is in a photo lineup. They go find a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

photo of who they think is your mother and you say,
yeah, that's my mother.  That's the person I told you I
saw commit the crime, just to take it to an extreme.

Q.   Yeah, I mean, I won't tell my mom you said
that, but I'm trying to think of, you know, a -- an
example that would be some kind of middle ground where,
you know -- let me -- I'm going to give you a
hypothetical just because I'm curious how the science
would apply to this.  If someone said, hey, I saw
someone shoot a guy on my street, I think I know the
person.  And then they give the name of someone or they
give a nickname, they give some kind of identifying
information.  But then, you know, the purpose -- let me
-- sorry, let me strike that, please.  I'm -- I want to
make sure I'm making this as clear as possible.  In the
circumstances where a photo array is used to make sure
we're talking about the same person, you know, if
someone said, hey, I know a John Smith and John Smith
did this.  I was, okay, which of the five billion John
Smiths did this?  In that instance, when you're trying
to identify someone who is not intimately known, would
the science still be the same on it not mattering if the
fillers match the suspect or not?

A.   Well, I think what you're saying, and
eyewitness identification researchers often -- you know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

when they start talking about known person IDs, they often start talking about, well, what's a known person? Like, you saw them for half a millisecond a year ago, versus you've seen them, you know, every week for three years, you know, there is a gradation.  There is certainly -- and -- and the closer you are to that, the end of the spectrum where the prior familiarity comes from barely any prior contact, but some, the -- the closer it is to a stranger case, you know.  And the more -- when -- when people talk about known-person IDs, it's usually, you've seen the face from multiple -- multiple times from different angles, you've formed a representation that is now resistant to the -- to lots of variables that normally complicate stranger IDs. You know, that's what I mean by a known person ID.

But if you assume it's -- like in -- in this case, these people had a familiarity signal early on, if you believe the police reports, I realize one of the witnesses, it's in a later report, but -- but from my perspective, focusing on the early reports.  Both witnesses expressed familiarity with this guy, later remembered who he was.  It's like the Mandler butcher on the bus example that I have in my report, a very well-known scenario in the field.  It could be that. It could be contamination.  It would be a weird kind of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

contamination though because -- because, you know, like one thing I've never seen is you recognize some features of this person as -- as previously known, and then contamination causes you to believe that a completely different known person is -- is the person who did the crime.

That's -- that would be -- that would be -- I have not ever seen that scenario. That's a -- that seems like it would be hard to do. You know, that's different from saying, I don't recognize a guy at all, to, oh, yeah, it was this guy. This is -- this would be harder do -- to do. It -- it seems simpler to assume that Mandler sort of -- you recognize the familiarity signal on the day of the crime and later realize who it was, if -- if that's what happened, if it -- if it came later, not on the day.

Q. Okay, just a couple of follow-up questions on that. And we're going to get more into the difference between stranger identifications and known-person identifications a little bit later. It sounds like you're familiar with the 2017 paper by Vallano and a couple other researchers about known person identifications?

A. Is that 2017? I didn't remember the year, but...

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Here, I will check.

MS. TANOURY:  And Alyssa, I --

BY MS. MARTINEZ:

Q.   2019.  Oh.

A.   Okay, that sounds more like it.

MS. MARTINEZ:  Yeah.  I'm at a -- I'm almost at a good pause point, yeah.

MS. TANOURY:  Okay.  I was going to say, I just have to use the restroom quickly whenever you have a time to break.

MS. MARTINEZ:  Yes, I will just quickly finish this line, and then we can take a little break.

BY MS. MARTINEZ:

Q.   So are you familiar with the Vallano, Slapinski, Steele, Briggs, and Pozzulo 2019 paper on familiar witness identifications?

A.   Did I cite that in my report, or -- or are you just talking about separate from my report?  I -- I don't -- I think I am --

Q.   It was cited -- it was cited in Dr. Dysart's report.

A.   Oh, I -- I think I am familiar with that. That's a -- that's a narrow, you know -- I don't -- I don't attach a lot of weight to that paper because it's -- they're, like, eyewitness ID people.  They're not

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory scientists, and -- and they wrote a whole paper about why you should not trust -- you know, if I remember correctly, the paper you're talking about, how even known person IDs can be wrong. But in that paper, if I remember it, they -- there's a huge basic science literature on known person based recognition. And, you know, that has to be factored into any discussion. That's what, you know -- it -- it's not important to Jennifer Dysart. It doesn't seem to be important because she doesn't review that literature.

That paper you're citing, I'd have to look it up, but I don't think they attach enough -- my -- in my judgment, they're -- they're like ID witness, ID researchers who don't attach enough weight to the basic science and instead want to caution the legal system, as they have always done from 1970 to this day, their -- their approach is we -- we must caution the legal system not to be too trusting of eyewitness identification. And that paper's like, even in a known person, I -- and you have other researchers, even when they're high confident, even on the first test, to this day, you still have lot -- in the narrow domain of eyewitness identification, you know, people cautioning, writing papers to caution the legal system. And I'm just saying, I, myself, I have a much broader perspective of

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

how memory works because I studied the basic science of memory for 20 years, and the basis of my disagreement is when you factor in the large literature from basic science, you know, known person IDs are a lot more reliable than authors like that want to communicate to the legal system.

That's my interpretation.  They're free to disagree, but -- and I like, why do we disagree?  To me, that looks like the reason.  These people, almost all of people that you think of eyewitness memory experts, that's their narrow domain of expertise. That's what they know.  That's what they've studied. And that's a small segment of memory research.  And -- and my perspective factor is in a much broader array of findings from basic science that -- that are also relevant, and I think that's why we disagree.  But yeah, I'm familiar with that paper.  I haven't read it recently, and so what I'm giving you is my memory of why I don't attach much weight to it.  It's the same reason I don't attach much weight to Jennifer Dysart's conclusions.  In my view, anyway, it's -- it's limited by the failure to factor in what we know about memory from the basic science literature.

Q.    Yes.  I'm going to jump in now because again, we obviously have a set amount of time.  I want to make

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

sure you have the opportunity to get your full opinion out, but I also want to make sure that you're directly answering the question that I pose to you, okay?  And so I asked if you're familiar with that paper, not, you know, for -- to really go into the merits of it.  You know, I think the paper speaks for itself and I believe it has a compendium of research on known person identifications, but I don't know off the top of my head.  Again, it speaks for itself.  My question more for you, it was actually based on something you testified to earlier before I mentioned that report. You testified that a certain level -- at a certain low level of familiarity, still known person identifications may function similarly to stranger identifications; is that right?

A.   It -- it can be sufficiently low that it's essentially still stranger identification.  It has to be a spectrum, right?  It can't be -- I can encounter somebody for a millisecond once a year ago, and that isn't what I'm talking about for known person identification.

Q.   Okay, perfect.  And that was -- well, the question I was going to ask because that paper focuses a little bit more on that proposition.  And so I just want to make sure I'm understanding.  When you use known

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

person in your report, you're referring to some base level of familiarity?

A.   Multiple exposures to that face in the past. And -- and -- and even then, the relatively recent past, not 50 years ago, you know, there's always gradations, but -- but usually when we talk about known person IDs, it's a face that you've seen multiple times in multiple settings and -- and -- and so you have an average representation of that, prototype representation of that face in your brain already at the time the crime is committed.

MS. MARTINEZ:  Okay, and I'll have more questions about that later, but I want to give counsel a chance to use the bathroom, so let's go off record.

MS. TANOURY:  Okay.

THE REPORTER:  Going off record.  Time is 3:17.

(A recess was taken.)

THE REPORTER:  Back on record.  Time is 3:48 p.m. Eastern.

BY MS. MARTINEZ:

Q.   There was one point that we were talking about before the break that I'd like to quickly follow up on, sir, before we go back into our timeline, okay?  And

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that point is, you were talking about familiarity signals, and you were talking about, you know, even in poor viewing conditions, recognizing those signals, even if you don't necessarily figure out from where later. Are you aware of any instance or any literature on -- or sorry, strike that, but let me -- let me rephrase that question.  If a witness in the first test does not recognize any familiarity signals, but then at a subsequent test says that they do, would you be concerned about contamination?

A.   You're talking about eyewitness ID?  Like, look at the face?

Q.   Yes, sir.

A.   Yes, if they affirmatively say nothing's -- none of those faces are familiar, and later say, oh, that face is familiar, that -- yep, and if it was a good photo the first time, and -- yep.

Q.   And what if in the first test, they're silent on whether they recognize or they don't, and then at a subsequent test, then they say that they recognize something.  Would you have concerns about contamination in that instance?

A.   Eyewitness ID again?  Is that -- show a photo lineup, they don't say anything about a face being familiar.  So this is a super common scenario.  They

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

say, I don't recognize anybody in the lineup.  Is that the effective equivalent to what you're talking about? They say, I don't recognize anybody in this lineup. And then on the next lineup, they say, I do recognize them or they are familiar with --

Q.    It could be.  It could be in that instance. It could also be in an interview, right?  So it doesn't have to necessarily be at a police lineup.  It could also be just in an interview with police, saying at that first one, either they didn't recognize the person, or being completely silent on whether they did or did not recognize the person, and then in that second test, that's when they affirmatively state, I did recognize the person.  Would you have any concerns in that instance about contamination?

MS. TANOURY:  Objection to form, but you can answer.

THE WITNESS:  Well, if there were -- certainly, if they affirmatively said I didn't recognize them, and then did it, for sure.  If they didn't say anything, so like in this case, and you presume they didn't because the police record doesn't show any signs of them saying that.  So if you assume that that's what happened, they didn't say it, and now they are saying it.  Contamination

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026      142

is a possible explanation, but -- and -- but there's another possible -- there are other possible explanations, like, that come up all the time in the real world.  Like the witness says, you know, I recognized him right away and I was afraid to tell you but now I'm telling you that. And -- and as long as a statement like that comes up the first time early on, I wouldn't say that's contamination.  If that comes up with the first time a year later at trial, I would say the likelihood that that's contamination is -- looms large.  So yeah, contamination is one possible explanation.  There are other possible explanations that they refrained from telling the police that on the first test, but if -- but if that's what they're going to say, you'd want to hear the explanation of why that was early on.

BY MS. MARTINEZ:

Q.   Okay, and those other possibilities that you just referenced to, that would be speculation, right?

A.   I mean, I think everything is, that we just said is speculation, contamination, no contamination. But yeah, it's all, it's -- it's speculation.

Q.   Okay, I want to turn back to -- because I think -- and it's totally my fault, we keep coming off

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the timeline and not actually getting into the meat of your opinions, so I want to quickly go back to kind of wrap that part up, and then move on, okay?

A. Okay.

Q. So we've looked at the handwritten notes and the reports from October 9th, 2004. We looked at the handwritten notes for October 13th, 2004. And quickly on that point, you state in your report that McClanahan says, that his prior familiarity with the intruder whose voice he recognized. Based on your review of the record, how many opportunities would Richard McClanahan have had to hear Richard Horton talk?

A. I don't recall.

Q. In your experience and understanding of the literature, is there any base amount of familiarity someone has to have with a voice specifically in order to be able to recognize it later?

A. No, I -- I don't know of any strong scientific guidance on that question. The guidance come from what the witness says and -- and if they recognize it -- it's presumptively, you know, take it as the case that the voice sounded familiar to them.

Q. Okay, so there isn't any kind of scientific standard that says they must have heard the person talk five times in the previous year to be able to make a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

reliable identification, nothing like that?

A.   If there is, I don't know it.

Q.   And are you familiar with any literature that compares the reliability of facial recognition with vocal recognition?

A.   I'm trying to remember.  I think some studies have attempted to get at that.  I -- I don't know if it's my imagination or true.  I mean, undoubtedly, face recognition is going to be more accurate than voice recognition.  I think it's fair to say.  It's a more complex stimulus, more -- more unique, not completely unique, but faces are more unique than voices.  And so I -- I would say it's reasonable to conclude that face recognition accuracy is going to be higher, even if both provide diagnostic information, they're not going to be equivalent.

Q.   And then lastly, sir, in that section on the case summary in your report, you state that, "Mr. McClanahan stated he would be able to identify the suspect if he saw him again.  Mr. McClanahan stated he did see the suspect's face (i.e. Richard's face), during the robbery and would be able to identify the suspect if he saw him again."  We've kind of indirectly touched on this a couple of times, but now I'm just going to ask you, the statement reflected here that he did see the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

perpetrator's face is in contradiction to the statement reflected in Officer Rhodeback's report, which says he did not see the perpetrator's face, right?

A.   Correct.

Q.   Okay.  When you were reviewing that in crafting your report -- actually, strike, let me -- let me reword that.  Strike that, please.  Did that contradiction have any weight in you reaching the opinions that you reached in this case?

A.   Not a lot of weight.  It's -- it's potentially relevant.  Like, let's take one extreme scenario that the police report is an accurate record of what he asserted on that day and that his later statement, four days later or whatever it was that he recognized the face, is memory contamination, let's say.  That's certainly plausible, and there's still the familiar -- familiar voice that makes me say that, you know, there was a -- a familiarity signal, wasn't a stranger.  He was indicating that it wasn't a stranger, was somebody familiar.  And then there are other possibilities, like I -- to me, but this isn't my call, but the reason why it didn't loom large for me is that what seems clear is that the hoodie was drawn down like that, or something like that at least.

And so that statement in the police report

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

could reflect his attempt to say, I didn't see the whole face. You know, he saw these facial features. I -- I mean, it seemed like the most likely scenario, they're both looking at the same hoodie like this, and that he did see part of the face. But that's also a plausible explanation of that's what he was trying to communicate on the first day, since -- since the other witness I think said that it was pulled tight, but for -- certain facial features were visible, it seemed plausible that that's another potential explanation. But no, had it come up for the first time that there's a familiarity signal later, that's the scenario where I would be concerned about it. But there was a -- there was a familiarity signal, at least for that witness, unambiguously, I think on the first, right from the outset. And so it's less concerning, even if that is contamination later on.

Q. And the familiarity signal that you're talking about that's consistent is the voice recognition, right?

A. Correct.

Q. Okay, the facial recognition is the part that there may be some contradiction in the record on, right?

A. Right, and I just -- it -- it seemed plausible to me that what happened to both witnesses, partial face recognition, it -- but I don't know. It could have been

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

covered when he was looking at the guy and partially covered when the other witness was looking at the guy. It seems a little weird, but that's -- I suppose that's possible, too.

Q. And Mr. McClanahan's ultimate identification of Richard Horton was in the photo array, right? Or let me -- sorry let me -- yeah, let me -- let me reword that. We have no evidence in the record that police ever performed any kind of voice recognition lineup procedure, right?

A. I didn't see any.

Q. Okay, and I know I asked you a similar question a few minutes ago about if there's any literature on, you know, a set amount of interactions that are necessary to recognize someone's voice. I kind of want to take a step back just to make it a little more broad. Are you aware of any scientific literature that tests the reliability of voice recognition?

A. Yes.

Q. Okay, and is that within the eyewitness identification context?

A. It's -- I don't know what you mean by that. It's -- it's voice recognition research, but not involving real eyewitnesses to crimes or anything like that. You just present people known voices or

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

unfamiliar voices and see if they can recognize them later on, and the literature shows clearly, that if it's a familiar voice, you're much more likely to detect that fact.

Q. Okay, but even that literature doesn't have some kind of baseline standard for what would qualify as a familiar voice?

A. No, mostly science gives general principles and those specifics, that's what you need fact finders to decide. Is that enough familiarity? Like, is it long enough that it's presumptively contaminated memory? And so, you know, the science provides the principles, fact finders have to do that, applying it to the case where there are unknowns like that.

Q. Okay, and then going ahead to December 4th, 2004, we have both of the eyewitnesses are shown a photo array, right?

A. Yes.

Q. Okay, and as you lay out in your report, when Rhonda Curry is shown the array and asked about her confidence level, she focuses on the eyes. She says she recognizes the eyes, right?

A. Right.

Q. Do you have any literature in your report about specifically the recognition of someone based on

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

specific features like eyes alone, nose alone, or anything like that?

A.    No, there is work on that.  I didn't cite it in -- in my report.  Not all facial features are equally useful in identifying somebody.  Certain facial features are particularly useful.  They're called high perceptual sensitivity features.  The eyes are definitely in that category.  Can't remember if the nose is, but the eyes certainly are.  And that research -- I didn't cite it, but that research is relevant to the question you're asking.  That's -- that's the research I -- I'm aware of that's relevant to that question.

Q.    Do you remember the names of any of those publications?

A.    An Israeli researcher -- oh, I can almost remember her name.  Female Israeli, face perception scientist.  Seems like it was around 2021.  I just can't -- I -- I know I can figure it out, but I -- I -- it's not in my fingertips.

Q.    Okay --

A.    That's amazing.  I can't remember her name.  I mean, I know her work.  I invited her to give a talk at UCSD precisely because I was impressed by her research on this exact topic.  I can't recall her name.  I'm sorry.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 2:23-cv-03888-ALM-SCS Doc #: 151-10 Filed: 03/28/26 Page: 152 of 324 PAGEID #:
12305
The Deposition of JOHN WIXTED, taken on January 19, 2026
150

Q.    That's okay.  If you remember later, just let me know.

A.    All right.

Q.    If not, I can -- I can maybe find her, based on what you've given me.  Are you aware of any other reports or studies on that same topic?

A.    No, I believe there are other studies, but this is -- this is the best one, the one I'm talking about and the one that's most cited and most definitive, I believe.

Q.    Okay.  The next line in your report then says that the detective administering the lineup interpreted those words, referring to the confidence statement given by Ms. Curry, to mean that Ms. Curry was sure of her selection.  And on this point, I just want to be clear, the motivations and understandings of Detective Walker are outside the scope of your purview as an expert, right?

A.    The motivation, for what?

Q.    And understanding of Detective Walker are outside the scope of your purview as an expert; is that correct?

A.    Yes, this is just in my understanding of the facts section of my report.  Yeah, I'm not analyzing anything.  It's just that's what I understand to be what

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the record indicates, basically.

Q.   Okay, I just want to make clear.  I just always want to be clear, okay.

A.   Yeah.

Q.   And then you detail the information that Mr. McClanahan gives in his confidence statement being voice, same eyebrows, and wearing the same pants from the night before.  Based on this information, Mr. McClanahan doesn't seem to be identifying the perpetrator based on the face he saw when the act is happening, right?  He's using different cues to connect the perpetrator to Richard Horton?

MS. TANOURY:  Objection.

BY MS. MARTINEZ:

Q.   Yeah, let me, let me reword that.  No, that's fair.  I worded it kind of strangely.  So you obviously can't tell a voice from a photo array, right?

A.   Right.

Q.   And you can't see his pants in the photo array, right?

A.   Correct.

Q.   So he's --

A.   I assume -- I assume it was just faces in the photo.  Oh, I -- think I saw the photo array, yeah.

Q.   Okay, and we're going to look at it again in a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

second, but yeah, there's no pants.  And so Mr. McClanahan is referring to things that fall outside the parameters of the photo array, but as reasons why he selected Richard Horton, right?

A.   Let's see.  Voice, same eyebrows, wearing the same pants from the night before.  Yeah, he seems -- I interpreted that to mean he's talking about the recognition that occurred during the crime, not explaining his ID here, but yeah, what -- however you interpret it, that's -- you're right, I agree with you.

Q.   And I'm curious then, are you familiar with the term match to memory?

A.   Yeah, I use it all the time.

Q.   Okay, perfect.  For the record, can you please explain what match to memory is?

A.   It's a degree to -- in a face memory context, it's the degree to which the face that you are now perceiving matches a face in memory that you previously perceive, and now stored in visual areas of your brain.

Q.   And match to memory is distinct from choosing, right?

A.   Right.

Q.   And so I'm curious if -- or strike that, please.  Specifically for Mr. McClanahan, he appears to be, based on his confidence statement, choosing instead

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

of applying match to memory.  Is that a fair statement?

A.    I would not --

MS. TANOURY:  Sorry, I just want to object to form and characterization of the record, for the record.

THE WITNESS:  Can you just repeat that question?  Maybe I didn't understand it fully.

BY MS. MARTINEZ:

Q.    Yeah, sure.  And, you know, this was articulated much more eloquently in Dr. Dysart's report, but here, Mr. McClanahan appears to be employing -- or I'm sorry, strike that, please.  Let me, let me reword it.  In matched to memory, would you expect to see an eyewitness identifying characteristics in a test that they cannot actually perceive?

A.    To me, it makes perfect sense in this scenario.  Remember, we're talking about a known person ID.  We're talking about somebody he had already named to the police, said where he lived, the interaction that they'd had, you know, he'd -- he's describing this person, he got the wrong last name first, later changed to Horton.  So he ID'd him that -- that time and -- and -- and now, they're showing him a photo of that guy and -- and I interpret that, those words, and he IDs him again confidently, I interpret those words as describing

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

-- it sounds like he's describing his original experience during the crime, because you're right, there's no pants, there's no voice.  So what is he talking about?  To me, it seems like he's talking, like, he's not hallucinate -- he could be, I guess one possibility, he's hallucinating.  But it seems like a more likely possibility is he's -- he's describing his previous experience and saying he's 100 percent certain that's the guy.

It's not a deduction or anything like that. You're not 100 percent certain typically when you deduce yourself to an ID.  But -- but the important point is that from my perspective, the ID was made long ago, and this is a confirmation test, and he's probably, it -- to me, it seems like he's describing his -- I interpreted it to mean and -- and I think -- I mean, it's either that or he's hallucinating.  It seems maybe there's a third explanation, I don't know, but to me, he's describing his original, what he remembers is his original perception of the person who committed the crime, not the -- what he's perceiving right now.

     Q.   I see, and then assuming that to be the case, right, the -- his description of voice matches up with that original familiarity description he gave, right?

     A.   Right.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   But eyebrows and same pants from the night before do not, right?

A.   You mean he didn't say those things earlier?

Q.   Right.

A.   They don't contradict what he said earlier, but that's not in the record earlier.  So left out, contamination, something, there's some other story that goes along with those words.

Q.   Okay, and I wanted to follow up quickly on something you mentioned.  You said he identified Richard earlier, but gave the wrong last name.

A.   Yes.

Q.   Do you -- or strike that --

A.   Or a different last name, I should say.  If I said wrong, forgive me, I meant different.

Q.   No.  No, that was going to be my question is --

A.   Oh, okay.

Q.   -- who do you understand Richard Diggs to be?

A.   I don't know who Richard Diggs -- there might be more than one Richard Diggs.  I -- I don't know.  He -- the -- Richard Diggs did not factor into my analysis much at all.

Q.   Okay.  So whether Richard McClanahan was attempting to refer to Richard Horton or was referring

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to Richard Diggs in that October 13th, 2004 conversation with Detective Walker, is beyond your purview in this case; is that correct?

A.    Yeah, not completely, I wouldn't say because remember, confidence is predictive of accuracy, and in that case, he did provide a confidence rating and said he's not sure.  And what not sure means is I'm at high risk of being in -- in error here, so don't take what I'm saying.  You know, usually a witness means whether it's identifying a face from a lineup, or recalling a detail.  When a witness says they're not sure, that's a way of saying this could be error prone.  And -- and so that's not to be taken -- not to be taken -- not to be given much weight because the witness just essentially told you not to attach much weight to that because it could be wrong.

Q.    So the information that we have that you just described, the him saying he wasn't sure, that information comes from Detective Walker's police reports that were typed months later, right?

A.    Right.

Q.    In the document itself of the contemporaneous notes, all it says is, "Can ID," right?

A.    Yes.

Q.    And so I understand what you're saying now, I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

think I maybe worded the question poorly. If in that instance, right, there are a couple different determinations the jury is going to have to make. And so if they determine that he was attempting to say Richard Diggs and can ID was a confident statement, and he's now saying Richard Horton, there could be contamination under those specific parameters. Is that a fair statement?

A. Just to be clear, are you saying like, let's say what happened was he confidently said it was Richard Diggs and I can ID, yeah, then a change like that would be a telltale -- what I call a telltale sign of memory contamination. It's a -- it's a confident recollection that's later changed and, you know, that just -- that -- that is such a rare outcome that -- that you have to be concerned about memory contamination.

Q. Okay.

A. But it's different in, you know, like if -- if the police record in December or whenever it was is taken as what actually happened, then it's much less of a concern because he's clearly not sure and -- and finds it out later on.

Q. Right, and that's a determination the jury's going to have to reach, right?

A. Whether he was confident of Diggs or not,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

yeah.

Q.   And you mentioned something else I want to ask quick questions on, and then I promise we're going to get back to finishing the timeline and diving into your report.  You mentioned deduction.  Is it your opinion in this case that neither witness came to the conclusion that it was Richard Horton through deduction?

A.   No, I didn't -- I don't think I said anything like that.  I --

Q.   Okay, that's why I'm asking.  I want to clarify, right?  Maybe let me try rephrasing it.  Do you have any opinion in this case as to whether or not either witness came to the conclusion it was Richard Horton through deduction?

A.   Well, I -- I brought up deduction because we were talking about Mr. McClanahan's ID where he's talking about voice and things like that.  And all -- all I meant -- all I intended to say was that doesn't look like a deduction to me.  First of all, a deduction is typically not associated with 100 percent certainty, and it -- it sounds like he's describing what he originally perceived.  To me, that's the most sensible interpretation.  That's all I said about deduction. Now, when you are asking me about deduction, are you asking me beyond this photo-lineup administration?  I was

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

talking about a deduction drawn during that. Are -- are you saying -- are you asking me if I'm saying deduction of that sort never occurred in this case?

Q. No, so let me try rephrasing again. My question for you, sir, is only, in this case, do you have any opinion whatsoever whether or not either witness came to the conclusion Richard Horton was the perpetrator through deduction rather than recognition or recall?

A. Let me think about that for a second. So are you asking me, from the record, does it seem to me that those are two equally likely explanations for what happened?

Q. I'm just asking if you have any opinion whatsoever as to whether or not either witness came to the conclusion Richard Horton was the perpetrator through deduction instead of recognition or recall?

A. I -- I don't have any -- I have reasons in the record. It follows a recall -- recognition recall pattern. I don't see anything suggestive of deduction, so I think that gives me a reason for -- and the -- the idea of deduction seems purely speculative, possible, but speculative. I don't have any -- anything I can point to as saying, this is why I'm saying it might be deduction other than a speculative possibility. But I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

have memory science to bring to bear on why this could be -- looks like reports from memory, potentially contaminated.  No evidence of contamination either, no -- no strong red flags of contamination, but I reiterate possible, just like it's possible that it was deduction. I'm not ruling that out, but that's my best answer I can give you.

Q.   Okay, and not to beat a dead horse, but did you review any of the testimony from Rhonda Curry's deposition in this case about the conclusion she reached through deduction?

A.   You're talking about --

MS. TANOURY:  Objection to form and characterization.

THE WITNESS:  You're talking about her 2024 recollections of an event that happened 20 years earlier.  I may have read it, but I'm not -- I'm not going to attach any weight to that whatsoever. That is literally the mistake that has -- in my view, that has led to all the wrongful convictions that are often blamed on the unreliability of eyewitness memory --

BY MS. MARTINEZ:

Q.   Okay.

A.   -- attaching weight to long-delayed episodic



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memories coming up for the first time.

Q. Okay, and now, sir, a last -- a last set of questions about this December 4th, 2004 photo array. There's evidence in the record that either Ms. Curry, Mr. McClanahan, or both saw a photograph of Richard Horton in a yearbook. Do you recall reviewing that?

A. Yes, I do. I don't -- I -- I can't remember exactly. Like, when there were -- when there was a search for the last name?

Q. Right.

A. Yeah, I remember that.

Q. And I'm not sure if you reviewed it, but I'll represent to you, sir, during her deposition testimony, Rhonda Curry, there was some confusion about whether she was potentially shown a single photograph of Richard Horton, or a single line of photographs that had his picture prior to being shown the photo array. Do you recall reviewing that?

A. You're talking about deposition testimony 20 years after the fact?

Q. Yes, I am.

A. I think I did look at that, and remember the most important message from memory sciences do not -- it's nondiagnostic information. If it's memory for an episode 20 years earlier, keep your eyes on the early

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory test.  Take your eyes off of later tests.  I'm going to be consistent on that.  That's the mistake.  That's what we've learned.  That's the new science of eyewitness memory.

**Q.  Okay, and we will flesh that out a little bit more.  I just want to -- I wanted to see if you had reviewed it because then potentially by the time the victims are seeing the photo array, they've now already seen Richard Horton's picture two times.  And did that play any role in the opinions you reached in this case?**

MS. TANOURY:  Objection.  Mischaracterizes the record.

THE WITNESS:  It -- it doesn't because I don't see any compelling reason to think that that happened. It might very well have happened, but -- but it doesn't move me that somebody 20 years after the fact is reporting for the first time that it happened, not at all, nondiagnostic.  And -- and remember, even if that did happen, it would only apply, I think, maybe to Ms. Curry because Mr. McClanahan's ID happened, I think, like, three or four days after when he said, it was Richard somebody who lives at this address, who goes by Adidas Boy.  You know, those were all lots -- I may have the last name wrong, but this is the person

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I'm talking about.

And -- and that is the -- that is -- it's clear he was -- I think, from my analysis of the record, that he was talking about Richard Horton because I think all those details, except for his low confidence memory of last name. I had an interaction with him five years ago selling a car or something like that. I think all those details are non -- not disputed. I could be wrong about that, but if I'm not wrong about that, it -- I would conclude that he's identifying Richard Horton on that day. And so even if he saw photos later before the photo lineup, you know, that -- the known person ID had already happened. That's how I interpret the evidence.

BY MS. MARTINEZ:

Q. Okay, so the subsequent photographs that they may have seen before the photo array, those would have no impact on your opinions in the case?

A. Not for --

MS. TANOURY: Objection. Mischaracterizes the record. You can answer.

THE WITNESS: Not for Mr. McClanahan. I mean, if that -- because he already made his ID, but -- but I don't think Ms. -- Ms. Curry had said

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

anything. So like, if Ms. Curry saw photos afterwards, I suppose before the photo lineup, where she confidently identified him, you know, that would be an issue that we could talk about.

BY MS. MARTINEZ:

Q. And when you say that would be an issue, just so I'm understanding, is the issue that it could then be suggestive in the photo array that she saw?

A. Well, it could have contaminated her -- her memory. It's -- it's -- I'm just going to interact with -- I -- I -- like, if you agree that she said his face is familiar, like, I realize you're not totally buying that because I think it was in the December report rather than the initial report. But -- but if we go with the story -- the possibility that she did find his facial features familiar and couldn't place him, it's less of a concern because, you know, she already knows who she saw. She just can't remember the name, so you can show other photos. It's going to have a hard -- harder time contaminating that memory. But if you go with a scenario that she didn't recognize the guy because it's not in the very earliest police records, now if she saw photos afterwards, that's -- that's the more concerning contamination scenario.

Q. Okay, finally, turning to the bulk of your

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

report and your opinions, we've touched on this next one quite a bit but I want to ask you a few follow-up questions.  So I'm just going to read out a section of your report on Page 3, if you'd like to follow along.

A.    Oh, Page 3, did you say?

Q.    Yep.

A.    One second.  Okay.

Q.    On Page 3, you state, "As a memory expert, I generally place little weight on what witnesses remember for the first time long after the witnessed crime.  This means that I place little weight on what the legal system places maximum weight upon, namely sworn testimony at the criminal trial, often years after the crime was committed.  I place even less weight on affidavits and depositions that are often conducted decades after the crime in question."  And so as you've said earlier today, sir, your opinions focus much more largely on the initial statements and tests and not subsequent trial testimony or deposition testimony; is that accurate?

A.    Yes, when I'm trying to get the truth of what happened based on reports from memory, my reading of the science, and now many others, is that it's early on before forgetting -- too much forgetting, and that limits the opportunity for contamination.  Doesn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

eliminate it, but limits it.  That's why.

Q.    Okay, and I'd asked you a little bit earlier about instances you're aware of in which your testimony has been limited in some way, and you referenced the California case, and I believe you said you're not currently aware of any others; is that right?

A.    Right, I'm -- I'm -- I remember hearing from people that they're going to try to get my -- I think it -- I think you guys always tried to -- I don't know. But whether -- whether it's succeeded or not, I -- I just don't know.  Might have.

Q.    Okay, and when you say you guys, are you referring to my firm, Loevy & Loevy?

A.    No -- well, yes, definitely that firm, but any firm on -- on, you know -- and I -- I assume that attorneys on both sides try to get expert testimony on the other side limited or excluded.  I think that happens all the time.  I think it does.

Q.    I can confirm that it does.  But there are two specific cases that I want to talk to you about to see if you remember them, and if not, I have the documents for you to look at.  But specifically, it's pertaining to the opinion that subsequent testimony, like at trial and depositions years later, has no value.  And so you provided an --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Has no -- has no diagnostic --

Q.   Diagnostic.

A.   There's no diagnostic information.  They attach a lot of value to it.  I mean, like, people, you know -- major decisions are based on that, so -- but from a scientific perspective, has no diagnostic information.

Q.   Yes.  Are you -- or actually, strike that, please.  You provided an opinion in the case of Lionel Rubalcava; is that correct?

A.   Well, that feels like a lot of cases ago, but that said, yeah, I did.  I -- sure, I did.

Q.   And I will represent to you that in that case, plaintiff's attorneys did move to limit your testimony, and specifically on the point we've been discussing, the diagnostic value of testimony years and years later.  Your opinions were limited.  You were barred from giving that specific testimony.  I have the document here that is the order from the judge that I'm happy to show you for your review, if you haven't seen it.

A.   I -- I don't need to see it.  That's irrelevant.  I've got science that I could show you why I have that opinion, and it's very strong evidence from the top researchers in our field.  It's fine if a judge wants to exclude that.  It doesn't affect me in the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—COURT REPORTERS—

slightest.  It is a scientifically defensible assertion. And, you know, I wish the judge had asked me to defend that claim.  I -- I now realize I should put it in my expert reports.  If a judge can come to that conclusion, the judge just doesn't know the science.  That's all it means.  So it's fine with me, and, you know, it sounds like you know more than me about when I've been excluded, so...

Q.  I was just checking if you'd heard of this one specifically.

A.  I don't recall.  You know, I think I -- I recall hearing that they're going to try to get things excluded, but I -- I couldn't -- maybe I once knew that and forgot.  I'm just not sure.  But to me, it's, like, super irrelevant because I -- I want to have that -- I want to talk about the science that underlies that -- that statement because it's -- the science is strong. It's not in my report, I now realize.  Going forward, I'm going to put it in my report rather than just saying it, what -- what the science is.  There are two separate lines of evidence that provide, in my view, compelling support for that claim.

Q.  And quickly, I'll also state that similarly, that type of testimony was also barred in Ricky Kidd's case.  Do you recognize the name Ricky Kidd?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    Vaguely.

Q.    Okay.  Were you aware that specifically that testimony was barred as infringing on the province of the jury?

A.    If I once knew that, I forgot it, and it's not.  It's a scientific message.  It's not -- it's what the science says.  The jury isn't obligated to go along with that science.  I know that.  It's not taking their place.  And I can show the science.  I usually don't, I now realize.  I appreciate you letting me know because it's going to be in my future reports so that people understand the scientific basis.  It's not -- if -- if you have chapter and verse that you can cite from science, I don't see how it's taking over the role of the jury.  The jury can reject it, can decide it's weak science, can decide that I'm not credible.  You know, it's not -- I don't see how it's -- how citable science that strongly supports that claim that it's nondiagnostic.  I would love to tell you about the best study right now if you want to hear it, but that might take us too far afield.

Q.    Yeah, I want to -- a couple more things I want to get through and we'll come back.  I just wanted to see if you were familiar with those two, and if not, give you that information.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   I appreciate it.

Q.   **Yeah.**

A.   It's useful.

Q.   **Okay.  Okay, and then again, we've touched on this one, but I have a couple more follow-up questions I want to ask you.  So you then go on in your report to say that the first test of memory is the most reliable, right?**

A.   Right.

Q.   **And actually, let me take a step back.  In your own words, can you please explain what you mean by first test and what is encompassed in a first test?**

A.   Well, that -- that argument, when we're talking about that -- that claim is usually in reference to a photo ID test, whether it's a show-up or -- or face ID test, I should say.  Whether it's show- up, single photo, live show-up, photo lineup, live lineup, that's usually what we have in mind by the first test, most reliable.  It also applies, but with additional caveats, in the case of recall, first interview, where you're recalling details.  As I said earlier, a -- a second recall test is fine, as -- as long as the new details are ones that weren't mentioned in the first test, not contradicting.  If it's contradicting, that's a red flag.  But -- but the literature is extremely clear that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

what you recall anew on a second test is fine. It becomes less fine the longer the gap between -- you know, the more time that goes by and you're recalling it for the first time. So early in the police investigation, however you want to define that, recalling some -- it -- it's not as strict a rule to focus on the first test. It's focus on the confidently recalled details from the first test and --

Q. Okay.

A. -- new things can come up on a second test. That's okay, as long as it's not -- as long as a year hasn't gone by.

Q. Okay, and I just want to, again, make clear that we're working with the same terminology. So you referenced that a lot of the time, the first test is some kind of photo procedure, but the emphasis is really on information provided. So can the first test be a statement to police?

A. That's recollection of details. Yeah, that is recalling details. The guy -- it was a white dude with shoulder-length hair. You know, that's a first statement to police, an example that I put in my report.

Q. And is one of the reasons that a first test of memory is the most reliable because later testing -- or strike that, please. Is one of the reasons the first

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

test of memory the most reliable because later memory is subject to contamination?

A. Well, even the first test is subject to -- it minimizes the role of contamination, the first test.

Q. And that's a fair point, you're right, that I don't think we've made yet. It's possible that a very first test, the memory can be contaminated at that point, right?

A. Yes, just as I mentioned earlier, the forensic DNA expert said, yeah, even that, you know, by the time it gets to the lab, it could be contaminated already. Like, that's true of all evidence, yes.

Q. Is it a fair statement to say that changes in these descriptions that are given over time is a hallmark of memory contamination?

MS. TANOURY: Objection to form. You can answer.

THE WITNESS: Changes in what?

BY MS. MARTINEZ:

Q. Changes in the descriptions that are provided about a perpetrator.

A. Well, it's -- there are nuances to that, like -- and we've talked about them already, but let me just remind you of the nuances. Like, if you confidently recall details that are -- that are highly accurate,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

race, gender, things like that, and then that changes, yeah, that's a telltale sign -- and assuming the witness was being honest and not lying to deceive the police, telltale sign of contamination. If you're talking about quantitative estimates, no, they're all over the place already. So the fact that those change, they're variable, inaccurate, not super useful, so height, weight, distance, things like that. I wouldn't say that's necessarily a telltale sign of contamination. That's just witnesses are bad at that and change that and variable on that. So that wouldn't necessarily -- because they're not accurate in the first place and --

Q. So it could be contamination, but it could also not be?

A. Exactly, yeah, unlike these other things that are reliably reported, and then they change, and --

Q. Is there -- actually, strike that, please. Is it a correct statement to say that there's no way to decontaminate someone's memory?

A. Yeah, there's some research on attempts to do that, you know. So I would say there's early-stage science trying to do that, but as a general rule, yeah, there's no way to decontaminate a witness's memory once it's contaminated. Pretty much similar with forensic evidence. You know, once it's contaminated, you can't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

put it back the way it was.  You can contaminate it back to the way it was, but that's contamination.

Q.  Yeah, then we're in a weird game of Pong.  So you then, in your report, go on to say, "But whether the eyewitness identification evidence in this case is probative of innocence or guilt or is instead inconclusive is informed by the results of a witness's first test involving a given suspect."  And I just want to ask on that point, what did you mean by a, "first test involving a given suspect?"

A.  Well, so, I -- I was talking about eyewitness identification in that sentence, and sometimes people misunderstand what I'm saying.  Like, you have a suspect.  You show them the lineup.  The witness says it's not the guy, so the witness -- the -- the police let the guy go because maybe we have the wrong guy. Then they get a new suspect and do a new test of the witness's memory, and people think I'm saying that's not okay.  That is okay because, you know, you haven't contaminated their memory for that new suspect yet, so that's why I say, "for a given suspect."

Q.  Understood.  Okay, and then we're talking a lot about, you know, photo -- or strike that, please. We're talking a lot about lineups and photo arrays which, you know, I think maybe are -- play a bigger role

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

in some other cases you've opined on.  Here, where the first tests are statements to police and then there are subsequent photo arrays with those same individuals, would those be tests involving the same suspect?

A.   Photo arrays of -- I -- I'm sorry, I thought you just described a case where it's the same suspect, and now you're asking me with the --

Q.   Sorry, yeah.  I may -- I think I worded that weirdly.  I just want to make clear, you know, to make sure I'm understanding that when you say this, the first test involving a given suspect, and like in this case, someone comes forward and they give a description of the perpetrator.  They then do a photo array of that suspect, you know, a month, two months later.  That's not two separate first tests for a given suspect, right? Like, that's the same person?

A.   So someone says it's Joe Blow, and then Joe Blow is in a lineup, that's what you're talking about, that scenario?

Q.   Yeah, or they give descriptions describing Joe Blow, and then there's Joe Blow in a lineup.

A.   No, because as a general rule, different types of tests don't necessarily contaminate each other or what you recall is not contaminating visual face recognition memory usually.  So I'm not talking about

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that as being a -- I recall it was Joe So-And-So, and it's clear he's talking about Joe Blow, and now you put Joe Blow in a lineup. That's not the kind of second test of memory. I'm saying first recognition memory test, second recognition memory test, visual features here, visual features there. That's when contamination happens.

Q. Okay.

A. That's how contamination happens.

Q. Okay.

A. In -- in multiple tests involving the same suspect -- multiple visual memory tests of the same suspect.

Q. Okay. That's helpful. And so in this case, right, the first tests are that first day, October 9, 2004, right, where they -- each of the victims separately is talking to police; is that a correct statement?

A. First recall test, yeah.

Q. Okay, and then the next interview on October 13th, 2004, just with Rick McClanahan, is that his second recall test?

A. Yeah.

Q. Okay, and then when they see the photo array in December 2004, would that be the first recognition

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

test, or is that the third recall test?

A.   It -- it's the first recognition test.  Do you recognize the guy you were talking about?  Is this the guy you were talking about?  I think of it as a confirmation photo, but yeah, that's the first recognition memory test.

Q.   Got it.  Okay, and you testified that usually, recall and recognition tests, at least the first for each, don't unduly influence the other, am I understanding that right?

A.   Yeah, I think that's right.  I mean, I'm sure I could come up with a scenario where they might, but as a general rule, that's just recalling it was a white dude with long hair and then, you know, that's not contaminating your -- if they put the white dude with -- they're going to put a white dude with long hair. They have to.  That's a rule, right?  You don't put someone in the lineup that doesn't match the witness's description.  That's not really contaminating their memory.

Q.   Okay, you did kind of predict my next question.  I was going to say, but it is possible that in certain circumstances, the first test of recall and the first test of recognition could influence the other?

A.   Well, definitely I could think of a scenario.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

I'm not sure I could think of a scenario where recall would lead to an immediate high confidence ID on the photo lineup test rather than a, you know, a deduction. It could lead to a deduction. If you said he has a scar and only one guy has a scar, that could be a deduction, but it's not going to be immediate high- confidence ID. So yeah, it's possible.

Q. Okay, and then I want to talk about where you lay out the presumption of good faith. So you say it in your report. You're presuming all parties are acting in good faith. "All the relevant research applies to witnesses acting in good faith." Let me -- I'm going to give a very quick background again, just so it doesn't seem like I'm throwing hypotheticals at you with absolutely nothing. In her deposition 20 years after the crime occurred, Rhonda Curry testifies that she'd had negative feelings toward Richard Horton before all of this because of bad drugs they had bought from him at a point in time. There was some kind of bad blood. So my question for you, sir, is if the jury decides that the witnesses in this case were not acting in good faith when they were trying to describe the perpetrator, how would that impact your opinions?

A. If the -- if they decide -- well, if they decide that they were not acting in good faith based on

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

20-year delayed first time recollections, it would be an example of the mistake that has led to all the wrongful convictions, trusting memories being diagnostic when it's not.  If they have better reasons for drawing that, then I would say my opinions -- so I would say in that scenario, my opinions remain very relevant, highly relevant.  That's what I'm writing my scientific papers about, in fact, that -- just that kind of scenario.

But if there's better reasons for believing it, if there's diagnostic evidence that what that witness said is true, not just -- not just the memory, and the memory can't tell you whether it's true or false, even if judges want to exclude me from saying stuff, it's -- that's the case.  But if there's better evidence, convincing evidence -- so you're asking me what the jury decides.  That's -- if -- if they decide based on nondiagnostic evidence, it doesn't affect my analysis.  If there's diagnostic evidence, then the more convincing it is, the less relevant my report is because my report is conditioned on that assumption of good faith.

Q.   Okay.  So that's the point I'm trying to get at.  Again, I don't want to -- you know, your testimony, sir, in both your report and your deposition today is very clear for the basis for your opinion on, you know,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the diagnostic value of the subsequent testimony.  I don't want to get hung up on that part. My question for you was, if the jury determines in this case, for whatever reason, that the witnesses were acting in bad faith in this case, how would that impact the opinions you give?

A.   I'm going to give you pretty much the same answer.  It would depend on the basis of that jury's decision.  If that's coming from long-delayed testimony, it's not going to affect my -- it -- it doesn't affect my analysis at all.  It's -- it's them making the mistake that has led to all the wrong -- it's the mistake that the legal system makes when it uses memory to try to get at the truth, if that's what it comes to.  So you'd have to tell me, based on what evidence exactly, before I can tell you how it would impact my report.  If they -- if they come to that conclusion when they have no evidence to come to that conclusion because they're making the standard mistake that the legal system makes in trying to use memory to get at the truth, I can't see why that would affect -- maybe I'm missing something, but I don't see why it should affect my analysis at all.  Maybe I'm --

Q.   I can --

A.   Maybe I'm missing something.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   No, I can ask in a different way.  Again, I think we're getting -- we're running into a bottleneck at the diagnostic and the source of the bad faith allegations.  So I'll ask it a different way.  Is any science that is included in your report -- strike that. Let me reword it.  Does any of the literature that you reference in your report deal with witnesses acting in bad faith?

A.   No, because there's no science.  You know, you don't need scientists.  If they're acting in bad faith, the science becomes irrelevant.  All the science studies people remembering in good faith.  That's the entire scientific literature.  There may be one exception out of thousands of studies.  I don't know. But the scientific literature almost exclusively is the good-faith scenario.  That's why I have to presume good faith because science becomes pretty much irrelevant if they're acting in bad faith.

Q.   And in your opinion, can bad faith by an officer affect the reliability of eyewitness identifications?

A.   Of course.  If -- if an officer is, you know, coercing witnesses and not recording it in reports, of -- and -- and no eyewitness expert is needed to -- to -- to acknowledge that reality.  You know it, the judge

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

knows it. The jury would know it. Science, again, becomes not relevant.

Q. Could bad faith by an -- or strike that, please. You gave the example of coercion. Could an officer, either intentionally or unintentionally, contaminating the memories of witnesses affect the reliability of their eyewitness identifications?

A. Any source of contamination, including from an officer, can do that. It can come from investigators hired by attorneys to go talk to witnesses. That's a major source of contamination that -- that I've seen. That's why, you know, honestly, I think of trial testimony and deposition testimony as a competition between opposing sides of who can contaminate the memory so that under oath, they will remember what -- what Side A wants them to remember versus -- I mean, that's what it looks like, from my perspective, more than they're recalling what actually happened. It's -- it's been too long. Episodic memory is not designed to be accurate after a year or two or three. It's -- it would be a serious problem for us all if episodic memories remained accurate the way the legal system needs it to.

And I say that because there are occasional dysfunctional people who have the kind of memory that would be perfect for eyewitness memory. Their episodic

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory doesn't get contempt.  It's weird.  Stays accurate for the longest time.  They don't have a job.  They don't have any functioning relationship.  It's a terrible way for memory to be.  But it would be perfect for eyewitness testimony because that's what the legal system needs, that kind of person.  There's been a few people on the planet who have memories like that and they're dysfunctional, t's maladaptive.  Like, I'm writing a paper on that right now.

**Q.   And you then talk about how memory is malleable.  And again, a lot of this we've already discussed, so I'm going to skip through it pretty quickly, but there are a few follow-up points I want to make.  Is it accurate to say that a memory may be contaminated and the witness would have no awareness of it?**

A.   I -- I would say it's almost inconceivable that a witness would have any awareness of memory contamination.  That's how memory contamination works.  Outside of conscious awareness, the memories always feel real and look real to outside observers because they can see the witness's sincerity and confidence, not realizing that those become less and less diagnostic over time.

**Q.   I apologize if I've already asked this.  I**

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

don't think I have, but are you aware of any literature on what, you know, a timeline for potential memory contamination is?

A.   It's just like forensic evidence.  It can happen ten seconds after the crime.  The DNA can get to -- on -- the principle is the more opportunity there is for contamination, the more likely it is that it's contaminated.  But you can't put a timeline on it beyond that, whether it's forensic evidence or -- or memory evidence.  You can minimize the opportunity for contamination.  That's the best you can do, whether it's forensic evidence or memory.

Q.   And I wanted to ask you, on Page 5, you state, "In recent years, the field has come to understand that contrary to what was previously believed, eyewitness memory can be highly accurate on the first properly administered test."  What do you mean by properly administered test?

A.   Tests -- well, that's how we talk about it in the science business.  We mean tests that follow consensus recommendations based on scientific research.  We don't mean within policy, which, I guess it could be interpreted that way, now that I think about it.

Q.   And then on that same page, and I think this is probably the report we've been discussing quite often

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

today, you discuss the findings of one of your reports with Gary Wells from 2017 pertaining to confidence and accuracy in mock crime lab studies.  Can you briefly explain what that study was and what your findings were?

A.   It was a review of existing scientific evidence.  Basically, people watch a mock crime either on video or live, then they take a -- what we call a proper photo lineup after some delay that either has the "perpetrator" they saw commit the crime, or is -- that photo is replaced by an innocent suspect. Everything's proper.  All the fillers and the innocent suspect and the guilty suspect, of course, match the general description of the perpetrator.  And then when they make a decision, when they make an ID, you collect an immediate confidence rating, Okay, and then you run, say, 500 subjects in that protocol, and now you have a lot of data that you can use to assess the -- whether confidence tells you anything about accuracy, and that --

Q.   And -- oh, I'm sorry I didn't mean to cut you off.

A.   For years, those data had been analyzed in a way that led to the conclusion that, well, it started off in the '70s and '80s, and even into the '90s, confidence tells you nothing, ignore confidence.  And

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

you see that in State Supreme Court decisions all the time.  Message from social science is that there's little correlation, little to no correlation between confidence and accuracy.  And it's based on the same data that you're seeing analyzed in this figure, same exact data.  It's actually true that there's no correlation between confidence and accuracy.  What the judges don't realize and what the -- because the scientists didn't realize it, is the correlation is the wrong statistic.  What you want to look at is what I have plotted.

And given that a witness expressed a certain level of confidence, how likely are they to have accurately -- when they land on a suspect, have accurately identified the guilty guy, not the innocent guy?  That's the question, and this plot answers that question.  The correlation coefficient boils it all down to one number and it's totally misleading.  That's how the field got misled.  There was never anything wrong with their studies.  There was something wrong with the way they analyzed the data.  This paper, all it was, was a reanalysis.  It was like saying, your own -- here's your own data.  What your own data really shows, it's the complete opposite of what we've been telling the legal system for decades.  I don't know if I answered

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

187

your question, but --

Q. No, you did. That was actually helpful. Okay, I understand. You were taking data from previous publications and doing different analyses, and this was the result that you've now included in your report. Okay.

A. Yes. And -- and it was shocking to the field, to say the least, because the field was pretty convinced that eyewitness memory is unreliable, even on a first test of uncontaminated memory.

Q. Okay, and you say this in your report, but that information doesn't mean that high accuracy -- or strike that, please. This data doesn't mean that high confidence is always accurate even when made on -- or, sorry, strike that as well. Let me -- let me -- I'm going to break these apart. This data and the paper that you wrote re-analyzing that data doesn't mean that high confidence, even at the first test, is always 100 percent of the time accurate, right?

A. Right, and it's -- it -- I'm laughing because we never said that, but we are often interpreted as having said that. Where the message is, there's a diagnostic memory signal on that test. You can see the diagnosticity right there in the graph and -- but never any -- would anyone ever say, even though we were often

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

heard as saying, oh, my God, we didn't even say it's that accurate. We said in these studies, high confidence is 97 percent correct. You know, there's always going to be a -- a translation factor to the real world. It's not going to be 97 percent correct. It's going to be less than that. I don't know how much less, but it'll be less. The point is that this is when there's a diagnostic memory signal contrary with the field.

Remember, the field has been saying there's -- the field has been saying there's not a diagnostic memory signal ever with eyewitness memory, including in depositions 20 years after the fact, including the first test. Eyewitness memory is unreliable. And I'm the one who came along and said, you should listen to eyewitnesses because they do have a diagnostic memory signal on the first test. And it's funny that nobody wants to hear me say that there's not a diagnostic memory signal 20 years after the fact, because the field has been saying that for 40 years. You know, like, that has been the message, but they were just including the first test too, and that's what -- that's what has changed.

Q. Okay, and this data that you and your co-publishers pulled, those were all from controlled

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

studies that had been undertaken in other papers; is that right?

A.   Right, and -- okay, I'll just say right.  I could say more, but right.

Q.   Okay, and there are no field studies that were incorporated in that specific 2017 paper, right?

A.    Well, there were.  We also -- like, my Figure 2 down below is a field study.  The only one that really assessed confidence in a field study.  Remember, the field studies almost never took confidence ratings because everyone was convinced confidence doesn't tell you anything, and so why would you even collect it in the real world?  This 2016 study, that's Figure 2, we had talked about it in our 2017 -- we said, and look, the same -- when you actually do investigate it the right way in field studies, the -- it looks almost exactly the same, the results that you've got.  And that's what Figure 2 is.

That was -- that was also talked about in the 2017 paper.  It lent credibility.  Now, whether -- whether you're looking at controlled studies or -- or real police department field studies, the same -- and -- and you analyze the data correctly, the same message emerges.  There's a diagnostic memory signal.  And that's what led us to realize, gee, then why are all

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

these wrongful convictions happening because witnesses are making confident misidentifications on the first test?  They shouldn't be.  When we go look at that, it turns out, they're not.  You know, that's another line of evidence suggesting there's a diagnostic memory signal early on.  That's not when they were making the mistake, almost always, so it all fits.

Q.    Okay.  I actually wanted to ask you about Figure 2.  Do you, as you sit here today, recall the specifics of that field study?

A.    Pretty much.  I -- I may forget some of it, yeah, but Houston Police Department.

Q.    And can you briefly explain it to me?

A.    Yeah, it was -- it was just like a -- a lab study except for is in the Robbery Division of the Houston Police Department.  And they were trained to administer, in double-blind fashion, what we call proper lineups, and -- and also to collect a -- an immediate confidence rating right after an ID of a -- a suspect or a filler.  And they were half simultaneous lineups, half sequential lineups, because one of the questions was which of those is better.  But the other question was, does confidence inform accuracy, even in the real world?

And this was Robbery Division.  So all the cases were -- mostly -- all the cases were robbery,



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

mostly armed robbery, reasonable to infer high stress. Most were cross-race, most were weapon-present, weapon-focus effect.  And yet, the data came out like this. All these things that eyewitness memory researchers have been saying you should pay attention to, all -- that's not you should pay -- you should paying attention to their confidence.  That's what tells you what you want. More than anything, confidence tells you the diagnosticity of the memory signal.

**Q.   Okay.  Now there's also, I believe, a 2020 white paper that discusses that field study by Houston PD.  Are you familiar with the white paper I'm talking about?**

A.   Yeah, I'm an author on that paper.

**Q.   Okay, perfect.  And can you please describe for me, in your own words, the takeaway of that paper?**

A.   That paper -- when you ask me what's a proper lineup, that paper is the most recent consensus statement about what science says is a proper lineup. There's nine recommendations about how to do a proper lineup.  You know, first, how to -- what questions to ask when you initially interview the witness, you know, what the fillers should be.  It should be double-blind. It should be video recorded.  There should be an immediate confidence statement.  You should do the test

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

only once because memory gets contaminated.  And I think, you know, there's nine recommendations in that paper.  And, you know, it's a -- it's a consensus. Like, I fight with those people, but -- but this is what we agree on.

So that's what makes it -- the same with Gary Wells and I, we fight all the time and -- but we agreed on that 2017 paper.  But that's what the 2020 recommend -- and -- and in my view, I think it's Recommendation 7, maybe, "Test a witness's memory of a suspect only once." To me, that's the most important recommendation in that paper, but we talked about, because memory can be contaminated and is contaminated by that first test. You don't -- you can't put the witness's memory back the way it was.  You just change their memory for that suspect. So that's what that paper's all about.

Q.   Okay, I want to come back to lab studies versus field studies.  But I first want to ask you about the confidence piece that we were discussing right before talking about the Houston PD field study. You say in your report that, "If best practices are used during the lineup procedure, an eyewitness's confidence can provide information about the eyewitness's accuracy when obtained immediately after the identification decision." I first want to ask, and I know you kind of just touched

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

on this in the 2020 white paper, but what constitutes best practices?

A.    The recommendations in the 2020 white paper. And before that paper was published, it'd be the recommendations in the 1998 white paper.

Q.    And then the very end of that sentence where it's, "when obtained immediately after the identification decision," is there any timeline in your opinion such that, you know, a confidence statement that's gotten X amount of time after the actual identification was made is less reliable?

A.    It's going to be the same story I've been telling.  You know, like, if it -- you want to get it as soon as possible, and the closer in time it is, the more useful it is.  Whether that's hours, days, weeks, I'm not sure.  Certainly not at the trial a year later, and doubly certainly not another 19 years later down the line.  But you want to get it as early as possible, just like -- because it -- it maximizes the reliability of that delay.  It's most reliable right afterwards. It starts to lose reliability because memory changes via post-event contamination.

And even without specific, you can -- in your own mind, you can change it over time.  And -- but there's no -- there's very little research.  There's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

some research.  You know, I was always surprised by -- you know, I -- I would have to double check this, but I think there's a study that has looked into that back in, like, the -- between 2000 and 2005, if I'm remembering correctly, and I'm surprised that I was still pretty good a few days, maybe a week afterwards. But, you know, as you go farther and farther, no, it gets less and less useful, like -- like all memory evidence gets less and less useful.

Q.   So in --

A.   That's an episodic memory.  How confident were you at that moment in time, you know, seven days ago? You know, episodic memories just become less reliable when they come up for the first time, the longer -- the more time that passes before they come up.

**Q.   Would you agree with a statement from the 2020 paper by Gary Wells that, "Forcing witnesses to withhold their confidence reports for as little as five minutes has been found to undermine the predictive value of confidence?"**

A.   No, I totally wouldn't agree with that. That's -- that's a vast overstatement.  That's not what the data shows.  I'm not sure what -- I would have to look at the study that he's talking about, but there are studies with longer delays than that that show that it's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

still pretty good.  You know, it's not a step function, right.  If -- if what he means by undermines is that they're less reliable than they would've been five minutes earlier, I can go along with that.  But still, it's -- it's not going to be, you know -- or if what he means is -- oh, I'll bet you I know what he means and then I will agree with him.  So if you delay it by five minutes, and in those five minutes, the officer says, you really did a good job.  You got him, you know, you got the guy.  Five minutes -- and -- and now I ask how confident they are.  We didn't ask it right away.  This is the Jennifer Thompson story. Ronald Cotton, are you familiar with that famous case?

     Q.    I'm not.

     A.    Well, you know, it's -- it's -- memory scientists know this case because it's like -- it's -- it's been seen over and over again, but this one was on 60 Minutes and they wrote a book and they became friends afterwards.  But, like, the witness -- witness points to Ronald Cotton, an innocent man, I think that's the one who raped me, after five minutes of deliberation.  He didn't ask confidence, he says, you think?  You know, like expressed dissatisfaction with that low confidence ID.  And she's like, oh, I'm sure. You know, so he should -- before saying anything, you want to get the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

196

confidence statement.  So I'm guessing Gary Wells is talking about that kind of scenario.

Yeah, even if -- just like anything else, if the contamination happens right away, well, then -- then it's unreliable right away, the information you get later.  So yeah, it can -- even five minutes can do it if -- if the officer gives feedback like that.  And Gary Wells has a famous paper in 1998 where he shows that very thing, how -- how easy it is to get people to express higher confidence with that kind of feedback.  But in the absence of that kind of event, much longer intervals, confidence remains informative.  But still, you don't want to wait because it doesn't -- it doesn't become more -- it becomes less informative, more so the longer you wait to get that information.

**Q.   All right.  Circling back to lab testing and field studies, and a lot of the stuff I have left, we'll be able to skip through because we've already touched on, but I want to spend a couple minutes talking about this.  Would you -- is it a fair statement to say that lab testing generally occurs under ideal conditions?**

A.   No.  Often, but they're -- they often use show-ups.  That's not an ideal way to test memory if -- if that's what you're asking me by ideal -- like a show-up is not -- is a non-ideal way to test eyewitness

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

memory and lots of studies use show-up.  If that's what you mean by ideal conditions.  But maybe -- maybe I should ask you, what exactly do you mean by ideal conditions?

Q.   What I mean by ideal conditions is a controlled environment.  So you control how much the witnesses can see if it pertains to eyewitness identifications.  You can control the lighting, the length of time.  You just have more control over certain variables and factors than you otherwise might in real-world conditions.  So with that understanding of the term, would it be fair to say that lab testing generally occurs under ideal conditions?

A.   Yes, with that definition, then Figure 1 would be ideal conditions and Figure 2 would be the opposite, because none of that was controlled in the real-world police department study.

Q.   Okay, and is it fair to say that in the real world, in these criminal investigations, there are many variables that cannot be controlled by police, by scientists?

A.   Yes, and those are the variables I referred to in our police department fields, examples of them, whether there's a weapon present or not, whether the witness has experienced high stress or not, whether it's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2020          198

cross-race or not.  These are -- these are things all outside control of the police.  Also, things that matter way less than we used to think once you know the witness is at immediate confidence.  Turns out, all that -- all those things tell you almost nothing once more -- once you know the witness's confidence, adding in those considerations add almost nothing.  That's why it's the complete opposite of what we used to say.  We used to say, focus on the estimator -- those are estimator variables that you were just talking about. Focus on the estimator variables, very -- you know, and -- and how bad they were in everything, and ignore confidence.  But it turns out it's the complete opposite.  You know, once you know confidence, whether it's cross-race or not, adds a tiny bit of information. Whether they got a short duration or a long duration. Look at the guy, tiny bit of information.  Weapon present or absent, almost no information.  So it's -- it's confidence.  It's a complete flip.  It's amazing, actually.

Q.    And we are going to get to that.  We are going to talk about estimator variables.  We are going to talk about system variables.  I just want to finish up on this point first.  Would it be fair to state that certain events, particularly witness stress or environmental distractions, are difficult to recreate in

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

a laboratory environment?

A.    But have been, not -- whether it's difficult or not, it has been.  There's a new study on stress that's amazing.  They stress these people like it -- you could never do it in the U.S.  It wouldn't get by the IRB, but they did it in, like, a Scandinavian country. So you -- yeah, it was a lot more trouble for them to make the people who were camping think that these were actual terrorists taking them hostage. That's a lot of trouble to do that.  They did -- I don't know how they got it through any human subjects review board, but they did.  And it -- it's super -- I'm writing a paper on what they found.  They didn't even analyze their data, it's incredible.  How many -- how -- the difficulty eyewitness memory researchers have analyzing their own data.  I've gotten this data. I've now analyzed it. It's going to be super interesting to people when I publish it.

But so, yeah, it is more difficult.  That's your question.  I'm elaborating to make the point that that doesn't mean that they don't do it sometimes and -- and there isn't very useful information coming from it. And -- and what people are going to find is stress has way less of an effect.  It tells you almost nothing, it's the same story, once you know confidence. It's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

confidence that you want to know. They know when their memories are good or bad. That's -- that's -- it's not surprising when you realize that. You know when you know, and you know when you don't know whether you were stressed or not. That's the -- that's the central finding over the last decade. That is a complete reversal of what the field thought for 30 years.

Q. **Okay, and it's not confidence in a vacuum, right? It's confidence on the first properly administered test, right?**

A. Confidence on the first test, whether or not it was properly administered. The proper -- the reason to do a proper test is because it maximizes the information that you get from confidence. You still get a lot of information from confidence, even in the worst high -- my Figure 3 is do a highly-suggestive show-up with a guy in handcuffs and the witnesses all believing it's a real crime and get confidence ratings. And you can still see a diagnostic memory state. It's just not as diagnostic as a proper lineup. That's why you should do a proper lineup. There's other reasons to do a proper lineup, but -- but the main reason is it maximizes the reliability of information. Not -- not that it's non-existent. It's the first test -- that's the first test of uncontaminated memory. That's the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

key.  Whether or not it was properly done, keep your eyes on that test.  It's the best information you have.

Q.   I do want to ask you about Figure 3.

A.   Yeah.

Q.   What was I going to say?

A.   It's a cool figure.

Q.   Oh, yes.  For that study that was performed, I see what you wrote in the report and maybe I'm missing something.  How -- what component of that test is suggestive?

A.   You're talking about the -- the show-up study that I summarized in Figure 3?

Q.   Yes.

A.   Well, first of all, it's a show-up, which is inherently suggestive because he was -- there was two uniformed police officers holding the guy in handcuffs. Half -- some of the times the guy was in handcuffs, not always, but always a show-up.  That -- it's suggestive when the police are basically suggesting to you who did the crime, and in a show-up it's a -- the whole reason for a lineup is you can't tell which guy the police think might -- if it's a fair lineup, you can't tell who the police think might have committed the crime because there are six faces in front of you.  But in a show-up, yeah, you can tell.  And -- and in this study, often the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

guy was in handcuffs.  That makes it, like, quite suggestive.  It's about as suggestive as it can get.  I don't think it gets much more suggestive than that on the first test.

Q.    And even under those circumstances, at the highest level of confidence, I see you put the figure and the statistics in.  At the highest level of confidence, one out of every five people was still wrong, right?

A.    Let's see.  Yeah, they were 80 percent correct.  Yeah, it -- it -- what I'm saying -- I'm not saying that they're not -- that -- that it's infallible. That isn't the message.  The message is there's a diagnostic signal when that provides useful information. Like, before you give the test, your -- your best guess is 50-50 guilty.  After the test, if it's a high confident ID, yeah, it's four to one likely to be guilty, but not -- that's not perfect.  It -- it provides useful diagnostic information for you to update your thinking, not proof of, this is the guy who did it, and not as -- and it doesn't update your thinking as much as it would if you get a high- confidence ID from a proper lineup.  That's why -- why you should do a proper lineup.

But it's still -- my point is, people treat it



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

like it's -- it's either a perfect lineup or it's nothing.  And that's just the wrong way to think.  Everything's continuous, you know?  It goes perfect.  A highly suggestive show-up, even then, according to the best study -- I think this is the best study.  And -- and the author of the study is not happy with me for taking his own data and showing what they -- what they actually reveal, because he always saying, don't do show-ups.  I agree, don't do show-ups, but don't pretend that your own data don't show that there's a diagnostic memory signal.  There is.  And -- and the reason why that's important is I don't show the other half.  It's also diagnostic for innocence.  And I'm using that in exoneration cases.

If on a show-up, they say, I'm 100 percent sure that's not the guy, and that same witness that shows up at trial and says, yeah, I'm 100 percent sure it is the guy, they're -- and they listen to that test, now, you have a case for exoneration.  Like, it's highly -- yeah, it was a bad test, but don't ignore the fact that they said it wasn't him with high confidence because that's also diagnostic of innocence.  I don't show it on that graph, but when I publish this result, I'm going to, that it's diagnostic both ways, just not -- you know, it's not like DNA tests, you know, that can

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

be in profoundly diagnostic.  It's not that, but it's useful information.  Stop treating it like a step function.  It's either perfect or you got nothing. That is just not -- there is no evidence anywhere that that's true, but eyewitness experts say it all the time.

Q.   And what do you mean when you say diagnostic?

A.   I mean, it updates your thinking in -- from where it was before you knew the outcome of the memory test to where it is after in a direction that's closer to the truth.  So 50-50 before the test, you don't know if the guy's innocent or guilty, you know, for -- for -- it's just a suspect.  50-50, that's your prior belief of guilt.  And then after you get 80 percent confident, I -- I mean high confidence, now it's much more likely to be guilty than innocent.  You updated your thinking. That's what reliable information is.  It doesn't leave you at 50-50.  That's unreliable.

That's like -- that's where I say, you know, whether people want me to say so or not, that's what you're getting from deposition testimony 20 years after the -- it leaves you where you were.  It doesn't update your thinking.  It's not -- just like DNA from a crime scene 20 years later isn't going to help you figure out anything.  It's too late by then.  But this, early on, even though it's a show-up, it does get you closer to

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

the truth.  Not perfectly, like -- because, as you said, one out of every five is wrong.  So it's not perfect information, but it -- it changes your belief in -- in the correct direction, just --

Q.   And again, just to clarify, when we're saying confidence here, it's again, confidence in that first test?

A.   Yes.

Q.   Okay, and in this example with this one in five, this was the very first test, right?  There's no distinction between first recall test and first recognition test.  This is just the very first test, right?

A.   Yep.  These subjects watched what they thought was a real crime, uniformed police officers.  Shortly after, half hour later, brought a suspect over, often in handcuffs, not always in all these studies, but -- and -- and asked them to make -- is this the guy who did it, yes or no?  And whether they said yes or no, how confident are you?  There's no recall test or anything like that.

Q.    I want to then ask you about confidence inflation, because on Page 9 of your report, you state, "A telltale sign of contamination is a witness's confidence increasing each time memory of the same

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

suspect is tested," and in parentheses, "(with confidence, often reaching the ceiling level of 100 percent by the time of the criminal trial.)" Now -- actually, let me -- let me take a quick step back. Confidence often increases with repeated testing, right?

A. Right.

Q. And contamination can happen both purposefully or non-intentionally, right?

A. Right.

Q. And so when you see confidence increasing over time as part of an investigation, is that a hallmark to you that contamination may have occurred here?

A. Yes.

Q. Okay, and now what about in the situation where, like here, you have a first and second recall test, and then you've got a first recognition test, and the confidence on the recognition test is very high. It's 100 percent, absolutely him, but you don't have that same confidence expressed in the recall tests?

MS. TANOURY: Objection to characterization and form, but you can answer.

THE WITNESS: Well, let me think about that. So you don't really have -- they didn't really say, on a scale of 0 to 100, how confident are you on those recall tests, right, the way they did in the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—COURT REPORTERS—

-- something like that in the photo ID test. And now -- so that's not the scenario that I'm usually talking about. When I say confidence inflation, it's the same type of test, confident in -- and you're saying, well, what if it's a different test and you see more confidence later? I'm not sure because, like, I don't -- you know, if -- if I were questioning those witnesses, I'd say, do you mean you're not sure, like, the guy's name, but you -- you know, you definitely are familiar with his face? You know, there's two confidence ratings. You know, not sure of one thing, sure of the other thing. And I would've gotten a -- a scaler metric, you know, on the first test. How sure are you that -- that that voice was familiar, and how sure are you know whose voice it is? Those -- those would be two separate confidence ratings.

I would say -- so if we did have those confidence ratings, I think -- and then you could -- then one could ask, well, what if they were low confidence on everything on that first test, and it became high confidence on the ID test? And I would say, no, that is not a telltale sign of contamination. That can be contamination, that certainly can be, but remember, you know, you're

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

getting -- at the -- at the time of the crime, you had a partial face and a voice, and maybe that's all, and at the -- now you're viewing the full face. And I don't know, there's -- let me think about it. I guess I'm -- I'm not sure. I don't have any science to cite, and so I'm having to, like, piece together what I would say if we had, let's say, documented low confidence on a 100-point scale on a recall test.

I'm not sure. It's an interesting question. I'm not sure, but you know, it's certainly something one would want to explore is that memory contamination, but, like, it's often the case that -- what's not uncommon is a witness who will say, I'm not sure if I can identify the face. And then they'll turn around and identify -- and we're doing a study of this right now. They will -- they will say, I'm not sure if I can -- I have low confidence in my ability to identify that face. But then they do identify it with high confidence when you actually give them the test. That's still highly reliable. So that first confidence statement isn't giving you a huge amount of information about the reliability. And surprisingly, it gives you almost nothing about the reliability, whether they say

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

they got a poor look, they're not sure if I can ID the guy or medium or high, whatever they say in advance, if you plot the graphs like Figure 1 and Figure 2 in this paper, they look identical. It doesn't change.

What changes is the likelihood of getting an ID in the first place. If they say they're not sure, I didn't get a good look at the guy, I'm not sure I could ID him, usually they don't make an ID just like they said. But when they do, it looks like the accuracy -- confidence accuracy is the same as the witnesses who say, I did -- I got a great look at this guy. I'm positive. And many more of those do make an ID, but the confidence, accuracy relationship, they fall right on top of each other. So it's not -- so I guess I would say if I generalize from that finding, that's -- yeah, I guess that's the kind of scenario you're asking about.

The witness says, I'm not sure if I could identify him. Well, if it is what you're asking about, this study that we're doing right now addresses that question. We haven't published it yet. The data are super interesting that -- that -- yeah, it's highly informative as to whether or

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

not they're going to make an ID in a future lineup, that information about whether they're confident or not.  It's totally uninformative about the reliability in ID that happens nonetheless, regardless of what they said.  It's still high confidence, high accuracy.  Low confidence, much lower accuracy.  Maybe that addresses your question, I'm not sure.

BY MS. MARTINEZ:

**Q.   Not exactly, but I think it's because we strayed a little too far into estimator variables, and we're not quite there yet.  My question --**

A.   Well, I wasn't -- I wasn't talking -- I wasn't talking about estimator variables.  This is just what the witness -- forget estimator variables.  Like, whatever you show witnesses, good, bad, medium conditions, some are going to say, I got a good look at the guy.  Some are saying, I got a medium look.  And some will say, I didn't get a very good look.  I don't know if I can identify him.  You're going to have different levels of confidence at -- in the recall early on.  Regardless of the estimator variables, you're going to have those three groups.  And then even when they express low confidence in their ability to identify the guy and even when they tell you they didn't get a good

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

look at him, and so you can be pretty sure they're not going to make an ID from a lineup.  If they do, it's the same confidence, accuracy relationship I showed you before.  You -- they're rarer, but when they happen, they're still reliable. That's also the story that applies to estimator variables, but here, I was applying it to the witness's initial confidence in their -- whether they can identify the guy.  That's the closest study I know that comes closest to what you're asking about.

**Q.   Okay, that was going to be my next question. I understand.  It sounds like you're working on a study. Are you aware of any other study that addresses that circumstance where you have low confidence reported at the outset, high confidence then reported at the end?**

A.   There are similar studies that have concluded that what a witness tells you about whether or not they got a good look at the perpetrator and can identify them is not very informative.  It's not -- not useful information.  So my study that I was just telling you about confirms that and goes farther and shows that the confidence-accuracy relationship is the same.  Yeah, it's not -- you know -- see, I -- I challenge that conclusion.  I say it is telling you something.  It's telling you whether or not they're going to make an ID.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

So it is providing useful information, but -- but there are other studies that have concluded that what -- the witness's confidence before a test is not very -- doesn't provide very useful information.  That -- that -- in fact, that's a state-of-the-art understanding in the field.  There's a couple of people who push back on that, but -- but it turns out that it mostly isn't telling you anything, except about the probability of them being able to make an ID.  They are right when they say, I didn't get a good look at the guy.  Almost none of them make an ID.  But what -- what you usually care about is given that they later do make an ID, how trustworthy is it, and it remains trustworthy.

Q.   Yes, I just want to -- and not -- again, not to beat a dead horse.  I want to make sure we're not conflating two separate scenarios, right?  In one -- in one, we have a witness who says, I didn't really get a good look, so I really can't, you know, make an identification or do anything like that with high confidence, and then they do.  That's one scenario. The other one is the witness does give certain information.  It's like, I did see this.  I did hear this, X, Y, Z.  And then either says, yeah, but it's still kind of low confidence, I'm not sure.  Or there's also a third world

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

where they say, yeah, high confidence.  I'm really, really positive that this person looked like this.  They said this, it was this guy.  And then they go on and they pick somebody else at a high confidence level.  My question is not focusing on witnesses who say, I just didn't really get a good look.  Because then, you know, my understanding from your testimony is that those people are not very likely to make an identification at any point, right?

A.    But some do, they might --

Q.    But some do, but some do.  My question is more on the witness who -- what's the best way to word this?  I want to make the distinction clear.  And it could -- it may be that your answer is the same.  I just want to make sure that, you know, my question is coming across.  My question is more for a witness that provides details and facts, like this is what I saw.  This is what I experienced.  You know, I think it might be this person, but all of that is at low, medium confidence. And then you have this subsequent test, whether it's another recall test or a recognition test, and they're suddenly 100 percent confident.  Is there any literature that addresses that scenario?

A.    Well, I don't think you can -- I think we have to pull that question apart because I thought we were

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

talking about what they say early on and a photo identification test later on.  But what you just said, now you don't care if that subsequent test is a photo lineup or another recall test, then that -- that -- but that's important because -- because --

Q.    You know, that's fair.  Yeah, let's say that that subsequent test later on is a recognition test.

A.    Okay, yes.  Everything I -- I know, so I just told you about the study that I've conducted, which is in some ways consistent with the past literature, except they forgot to notice that, you know, people are correct when they say they didn't get a good look because they almost never make an ID.  There's other research suggesting -- it's -- it's not exactly on point, but it -- it's the research that comes to mind to inform the answer to your question.  Like, detail with which they described the perpetrator, you know, you -- someone says, Black dude.  Someone else says, it was a white dude, you know, with a crew cut and a tattoo and, you know, bushy eyebrows, and -- that doesn't inform when they do -- like, yeah, you're less likely to make an ID if you, like, barely got to look at the guy and gave an impoverished description, but again, it doesn't predict the accuracy of IDs that do happen.

                And sorry to sound like a broken record.  It's

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

confidence at that later ID that does inform the accuracy, not all that stuff.  So I've talked about two lines of research that make me think that -- that what they're saying on that first test and the confidence that you're seeing on that first test, if I'm understanding -- this is the literature that comes to mind to try to answer your question.  Those things don't matter much.  The -- there might be a scenario where it does matter, but I don't -- I don't know of any scientific research that finds that -- that it does matter.

Q.   Yeah, let me -- let me try coming at it from a different way.  Confidence inflation is a known phenomenon, right?

A.   Yeah, we're talking about the same test, and usually an ID test repeatedly.  That's usually what we're talking about.  But it -- you know, it can happen with other tests too, don't get me wrong.  Like I said, I think it was, you know, a Hispanic dude.  And then wait a minute, I'm more confident it was a -- I'm positive it was a Hispanic dude.  That's probably contamination too, so -- and that's recall, not photo ID.

Q.   And is it fair to say that increased confidence does not necessarily reflect increased

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

accuracy?

A. It -- it -- I would take out the word, "necessarily." It doesn't reflect increased accuracy.

Q. Perfect, okay. So I'm trying to understand, you know, the line of literature you just referenced. Are there circumstances under which you can look at an investigation, see an increased confidence from subsequent testing, and determine that contamination did occur?

A. When a test is repeated, can you determine that contamination did occur when confidence goes up with each repeated test? Is that what you're asking or no?

Q. I'm -- kind of. I -- because my understanding from your testimony is that, at least for the hypothetical that we've been talking about, where there's some statements at the outset pertaining to the suspect that are low confidence, but at the end, the final test is high confidence. And it was -- my understanding is that your new study kind of addresses that concern and finds that people that initially give information with low confidence are not likely to make an ID at all, but those that do, it still kind of follows that predictive line of high confidence, high accuracy. That's my understanding; is that right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Yes.   When we're -- but we're changing the test, right?  So on a recall test, I'm not sure, I didn't get a good look, and then we get an ID test and -- I -- I don't call that confidence inflation.  That's not usually what we're talking about.  It's -- confidence inflation usually applies to the same test.  You give the same test and their confidence keeps going up.  Witness says, I didn't get a good look at the guy.  Next test, oh, I think I did get a good look at the guy.  Next test, I got a great look at the guy.  You know, that would be confidence inflation, and that would be a telltale sign of contamination.  But across tests, which is the scenario that we've been discussing, that's not -- that's not a telltale sign of contamination.

Q.   Okay, and is that also true if, let's say, for example, in the first test, it's a recall test and someone says, I think it was Joe Blow, but I'm not positive.  And then in that recognition test, Joe Blow is in the array and say, I'm 100 percent confident it was Joe Blow.  In that circumstance, would you be concerned about contamination?

A.   Well, it could be contamination, but -- but you have to realize it's less concerning in a scenario like that because, you know, I talked about the Kevin Strickland case earlier, where the witness said, you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

know -- not even so far as I think I know.  I didn't

recognize him.  And then a day later, is positive it's

Kevin Strickland.  So -- but the reason why that can

happen is that they're -- what they originally saw --

like, the guy, basic characteristics resembled Kevin

Strickland.  He wasn't a -- he wasn't a doppelganger or

anything, but you know, had roughly same age, Black

male, body type, you know, and I didn't recognize him.

And then -- and now you're contaminating it

with a known person who shares a lot of features.  You

can do that.  You -- that -- that kind of contamination

can happen, you know, because all the physical features

of this guy correspond to the memory that you had of the

guy last night that -- okay, but if last night, you saw

a skinny, Hispanic female or something commit the crime,

and the next day, someone says it was Kevin Strickland,

that's not going to contaminate your memory, right?

It's got -- it's got to match the features that you did

get in your memory.

Q.   Okay.

A.   It -- it would take -- it would take a long

time.  So -- so in this scenario, like it -- if it's

contamination, if their confident ID of Horton from the

photo ID, if that's contamination -- which it can always

be.  It's a possibility, right?  If it is, though, it

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

would almost have to be -- or it would likely be contamination with someone whose voice just happens to sound like the voice -- because you did encode the voice, you know, like -- and -- and -- like, if you happen to have an innocent guy who's -- contamination, it would have to match the features that you did encode.

So you'd be -- you would know this guy is -- if -- if you know this guy that you're picking, but it's contamination, you would know his voice.  You'd still know the voice that you heard.  Contamination happens when, as I was describing in the Kevin Strickland case, the features that you got in your memory match the features of the suggested known person when -- so that could happen.  I guess it would be kind of coincidental that the voices are similar enough that the guy could say, oh, yeah, it was -- that is the guy. That could happen, but -- but the -- the need for that extra detail makes it less likely that that was contamination.  You know what I mean?  It has to be the -- the suggested face has to match the features that you did encode initially, otherwise it's much harder to contaminate it. I -- you know, give it enough time you can contaminate it.  You know, give it 20 years, you can, but I don't know.

The -- the point I'm trying to make is that if

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that's contamination it -- it would need more than just a suggestion of a -- of -- of somebody -- a known person. It -- it has to be suggestion plus match the features that you did encode initially. That's -- like, we have a study on that too, that we're submitting for publication right now, showing that contamination doesn't -- you can't suggest a known person successfully if they don't -- if the basic features don't match what they encoded. Then it just doesn't -- you don't get any high confident errors. You can get them to make low confident errors when the features don't match because it's so suggestive, but to get the high confident errors, the -- the features of the suggested person have to match the features that you encoded initially -- the basic features that you encoded initially. So yeah, it could be contamination. This consideration makes an argument why it's, you know, not as -- it's -- it's less of a concern than it otherwise would be.

Q. Got you, okay. I want to ask you know, we've talked a little bit now about -- strike that, please. We talked about contamination and potential confidence inflation. Is it also a possibility that contamination could affect the details of a memory that a witness has? For example, in the beginning of the investigation, they say, maybe, I peeked at their face one or two times, and

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

at the end, they're saying, I stared at them the whole time.  Is that also something that could happen because of contamination?

A.    Yes.

Q.    Okay, and this is again from the Wells 2020 paper.  Mr. Wells states, "Seemingly innocuous post-decision events can contaminate witnesses' confidence reports, undermining what could have been forensically meaningful information from an eyewitness."  Do you agree with that statement?

A.    Totally.  We talked about -- this is what we were talking about before in the Ronald Cotton case. You think?  Oh, I'm sure.  You know, immediately, she turned it into a -- a confident statement recognizing how unhappy the officer was.

Q.    And from your review of the documents, we don't have any kind of -- actually, strike that, please. We kind of already touched on this, but is there any way to test for when contamination is the cause of confidence inflation?

A.    The confidence inflation is the test.  It's contamination almost -- almost certainly, assuming good faith, you know?

Q.    Okay, and witness confidence can also be -- or strike that, please.  We've talked about this a little

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

bit, but witness confidence can be inflated by feedback, right?

A. Right.

Q. For the record, can you please explain what feedback is?

A. It's -- it's like the officer signaling something after the witness makes their identification. That's feedback. When the officer said, you think? That's feedback saying, I'm not happy with your low confidence, you know? Or it could also be, as I mentioned earlier, good, you got the right guy. We knew that. We have so much evidence against that guy. You got the right guy. By the way, how confident are you? You know, they'll be supremely confident.

MS. TANOURY: Counsel, when it's a good time, can we take another quick break? I hate to be the one again, but we've been going for about two hours.

MS. MARTINEZ: No, that's -- yeah, that's -- this is a good spot to take a break.

THE REPORTER: All right. Going off record. Time is 5:46 p.m. Eastern.

(A recess was taken.)

THE REPORTER: Back on record. Time is 5:53 p.m. Eastern.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. MARTINEZ:

Q. Before the break, we were talking about post-identification feedback and the impact that it can have on confidence. Is it an accurate statement to say that post-identification feedback can also affect self-reports, such as how much time a witness -- actually, sorry, strike that. Let me -- let me rephrase that. Would you agree with the statement that post-identification feedback can affect how much time a witness self-reports they spent looking at a perpetrator?

A. That's one of many factors that contaminate a witness's memory of that, and -- and it can self-evolve and be distorted over time. If the witness was confident despite having only a short view, they'll probably, by the time at trial, remember having had a longer view because it will feel like they did because they're still so sure. You know, that's another way that can -- it doesn't have to be anybody doing anything. Memory -- memory changes and distorts, which sounds like a bad thing. It's actually a good thing. It's adaptive. It's just maladaptive for what the courtroom demands of episodic memory. It's -- it sounds like a bad thing, it's not.

Q. And I want to quickly backtrack and talk about

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Brandon Garrett's book that you reference on Pages 7 and 8 of your paper.

A. Yes.

Q. Your report, sorry. Now, I believe you testified earlier that you may have skimmed the deposition transcript of Dr. Dysart?

A. Maybe, I'm not sure.

Q. Do you recall if you reviewed her testimony on your interpretation of the findings of Mr. Garrett's book?

A. No, but I'm pretty familiar with how traditional eyewitness memory researchers have tried to attack that. So it's -- I'm probably familiar with what she said, even if I didn't read it.

Q. Yes, I do believe you have been asked about this in previous depositions taken by my firm, but -- so I'm going to ask you in this case. Now, when Mr. Garrett was writing his book, he did not have access to the police reports themselves for the cases he was writing about, right?

A. It was -- I don't know if he did or not. He was talking about eyewitness testimony and whether that involved reading from initial police reports, or witnesses' delayed memory, none of that did he talk about.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   I'll represent to you that at least in her deposition, Dr. Dysart gave testimony that she spoke with Mr. Garrett and that he said he did not have access to the police reports when he was writing his book.

A.   Do you guys call that hearsay?

Q.   Okay.

A.   Do you?

Q.   I'm representing to you what Dr. Dysart --

A.   Okay, fine, fine.

Q.   -- said.  And if that is the case that Mr. Garret did not have access to the police reports when he was writing his book, does it then flow that it would not be possible to conclude that no one misidentified an innocent person immediately without confidence?

A.   It would not be possible to make that conclusion, even with the police reports.  All you have is the data, and you make your interpretations based on data, not just on that data, but also a degree to which it fits with other independent lines of research.  So it -- it would be more diagnostic if you had the police reports, but as you are suggesting in every hour that we've been talking, even the initial police reports could be wrong.  You never know for sure, right?

Q.   That's fair.  I'm just specifically referring to the language from your report on Page 8 where you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

note that, "In zero of those cases did the witness on the first test what" -- I think there's supposed to be a do there, but it says, "Literally zero of those cases did the witness do on the first test what they would do later at trial, namely misidentify an innocent person immediately and with high confidence."

A. Okay. Can you show me where -- where I say -- what page do I say that on?

Q. Yes. At the very top of Page 8, in that first half paragraph.

A. On Page -- oh, I'm on Page 9. Okay, Page 8.

Q. Yes. And then once you've had a chance to read that section, let me know, and then I'll re-ask the question.

A. Okay. Okay, re-ask your question. I -- I've seen what I say now.

Q. Okay. If Mr. Garret did not have access to the police reports in those cases, it would not be possible to conclude that no one misidentified an innocent person immediately and without confidence, right?

A. I -- I was -- I -- I was going to be surprised if I didn't point this out, but I say, according to that testimony, the kind of testimony that you guys take very seriously. By the way, I wrote a whole paper on this

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

very point about why that testimony is likely to be accurate, even if there -- and -- and as I said, even if you had the police reports, even then, you still wouldn't know for sure. You just have more -- better evidence than you have. But I have a whole paper which details why this testimony is more reliable than what you usually get at a criminal trial. And the reason is that it -- what -- what we know about memory is it tends to be distorted in such a way that it's consistent with what you're currently saying. And all these witnesses were confidently misidentifying an innocent person.

And so the distortion, which likely happened in many other cases, is that you remember yourself as having been confident, despite not being confident in truth on the first test. That's what Jennifer Thompson and the Ronald Cotton case -- she remembers herself as being confident from day one. That's the normal distortion. And this is the opposite of that bias, which lends credibility to that testimony. And -- but the only way to know is -- a police report wouldn't do it. You'd need video recordings, untampered with video recordings of what happened, then that's the only way to know for sure. I hold this out as a line of evidence, not something that by itself is infallible and incontrovertible. It's -- it's important because nobody

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

even paid attention to that because they didn't realize that's how it should be.  It was only when we realized that on an initial test, witnesses almost don't ever make high confident errors, that we went back and looked at this and realized that this too fits with artificial lab studies, police department field studies, and what we know about DNA exoneration cases.

The point is not what we know about DNA exoneration cases is infallible, and it still wouldn't be infallible, even with police records.  It's just that it -- it fits.  We have multiple independent -- no one line of evidence is decisive.  We have multiple independent lines of evidence.  They all point in the same direction.  That's what makes it compelling, not this standing alone.  Yeah, I can complain about this. I can complain about the other two.  The police department field study, I can complain about its methodological problems.  The lab studies, I can complain about those. They all have their strengths and weaknesses.

You're pointing out a weakness of this study. We can't know for sure that the trial testimony is accurate.  Of course, we can't know that for sure. But -- but there's -- I'm, I have argued that there's reason to believe that it's more accurate than typical trial testimony because it's going against the kind of bias

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that you'd expect of memory contamination.  And it --
it's an independent line of evidence that nobody paid
attention to and happens to fit with two other
independent lines of investigation.  And fourth, fits
with what we know about the theoretical mechanisms of
memory.  All of them align and lead to this new message.
That's the only point about this.  So the criticism is,
I can't be 100 percent sure about this one line of
evidence standing alone.  Of course not.

        Q.    Okay, I think we did circle back to my
question in the end, and -- but I do want to touch on -
- you referenced that, you know, it's -- the police
reports aren't going to 100 percent let us know what the
confidence was at that time.  He didn't have those. Mr.
Garrett didn't have any kind of documentation,
videotape, anything like that about confidence during
the investigation when he was drafting his book, right?

        A.    Well, he didn't -- he had trial testimony.
Some of that trial testimony may have been officers
testifying about what their report says.  He didn't have
those reports.  That's true.  That's what you just said.
But a lot of that -- you know, often we see, maybe even
in this case, I can't remember, officers testifying at
trial about what their records -- their contemporaneous
records say.  I feel sure that a lot of it was that, but

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026
230

I don't know, and he didn't say so. No one's ever asked him, so we don't know.

Q.   And did you read that book in its entirety?

A.   Very carefully.

Q.   And so we'll recall in his book, in a quarter of all the wrongful convictions studied by Mr. Garrett, eyewitness testimony was the only direct evidence against the criminal defendant, right?

A.   That sounds familiar.  I don't remember that precise detail, but...

Q.   And in the 190 DNA cases where there was an erroneous eyewitness identification of the criminal defendant, 36 percent included mistaken identifications from more than one eyewitness, according to Mr. Garrett, right?

A.   Yeah, I remember there being statistics like that.  I don't remember that exact number.

Q.   And in 31 cases studied by Mr. Garrett, there was a prior familiarity between the witnesses and the person who was ultimately wrongfully convicted; is that right?

A.   Yeah, but I -- I love that line most of all, because everybody forgets.  At trial, yes, you can have every kind of false memory at trial, including Kevin Strickland, known person ID would be among those, went

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

to prison for 44 years for a crime he didn't commit. Yeah, you have everything at trial. I would love to know how many of those known person mistakes happened on the first test. I'd bet zero of them happened on the first test, but he didn't look at that. You know, he's --

Q. We don't have that information, right?

A. Well, he might. It might be -- you know, he has a testimony about what they said on the first test, and I already know that in every case where you do have that, they weren't confident. Some of those must have been those known person IDs. So I just -- it's just reiterating, you shouldn't listen to what a witness says at -- at trial if it's compatible with contamination. The only reason I'm listening to their -- the testimony of what they said on the first test is because it goes against contamination. And honestly, I don't even know if it was the witnesses themselves remembering what they did. It -- it could have been every single case, the officer reading his own police report from the initial ID test. I don't know. We don't know. None of us know.

Q. Now, I want to go to Page 9. So just that next page where you're discussing your 2021 paper from Psychology Science in the Public Interest. You state,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

"This paper explains why seeing the face of an innocent suspect in an initial lineup creates a memory representation of that face in the brain of the eyewitness (ensuring that the suspect's face will seem more familiar on any later test than would otherwise be the case), while at the same time associating that face with the crime," and then in parentheses again, "(because the witness is thinking about the crime when viewing the face of the innocent suspect in the lineup.)"  Did I read that correctly?

A.   You did.

Q.   And that's a true statement, right?

A.   Definitely.  There's a whole paper on that if you want to read about it.

Q.   Could that be true if someone sees a photograph of a person's face in connection with the crime, but it's not in this formal lineup?  Could it be just any interaction they have with a photograph of someone, where there's some kind of implication that this person may be the suspect?

A.   Yes, I think so.  So something that prompts them to be thinking about who may have committed the crime, they're thinking about the crime and seeing the face.  Yeah, it doesn't have to be part of a formal procedure.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

233

Q.   All right.  A lot of this next topic we've already covered, so we'll be able to go through it quickly, but there are a few more points I want to touch on and ask you about.  So we discussed earlier that it's a spectrum between stranger and known person, right?

A.   Right.

Q.   And the scientific literature, a lot of the time, does distinguish between stranger and familiar, right?

A.   Sometimes.  Not very often, but sometimes. Usually, they're focusing on the known person.  I've seen -- I've known this person -- I've seen this person multiple times, but sometimes, they distinguish between a highly known person and a familiar person.

Q.   That was actually going to be my next question.  Does the scientific literature distinguish between degrees of familiarity?  So for example, strong familiarity and weak familiarity?

A.   Sometimes, yeah.

Q.   Okay, and we discussed this a little earlier, but sounds like you're familiar with literature that posits that familiar identifications involving minimal prior exposure can resemble stranger identifications, right?

A.   Well, I'm just saying logically, if you take

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

it to an extreme, it effectively is still a stranger ID. At the same time, I point out that in studies, we eliminate -- in field studies, we eliminate eyewitnesses who claim any degree of prior familiarity precisely because it's going to be more reliable, and we don't want that contaminating our assessment of -- of stranger ID reliability.  So -- so yeah, although that's true, you know, whether it's familiar or a known person, we treat them as a separate group because they're more reliable than stranger IDs.  Even though you can imagine a scenario where it's such minimal prior encounters that's effectively the same as a stranger ID.  But there -- you'll never see anybody include -- we're doing a study of stranger IDs, and we're including these known IDs because, you know, the prior encounters were minimal.  People would -- you couldn't get your paper published.  People would go ballistic over that because that's, like, going to make stranger IDs seem more reliable than they really are.

Q.   And is there any literature that, you know, quantifies different degrees of familiarity?  Like, seeing someone ten times, they're this level of familiar.  If talking to someone 18 times, and they're this level.  Is there anything that does that?

A.   Yes, did I not talk about it in this?  Maybe I

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

didn't -- yeah, there's a -- a field study that does that from, I think, 2006.  It doesn't look like I talked about it, but now that you're bringing it up, yeah, there are -- there's at least one study that I know of that does that and basically, if I remember correctly, finds that, you know, the super high known person, virtually infallible and the -- you know, seen a few times, you know, way more reliable than stranger IDs, but not as reliable as a -- a very well-known -- as you might imagine, like your mother, again, the example. Yeah, I -- if I had known you were going to be interested in that -- I guess I should have guessed. I -- let me see.  Let me -- let me just check to see if I talk about it.  I'm kind of surprised I didn't.

**Q.   And if not, I imagine we will have at least one more break before we wrap.  So if you think of it, just let me know.  Okay.**

A.   Yeah, I'll see if I can find -- I'm -- I'm now interested.  It's been a while since I've talked about that study.  But now that you're asking, such -- there's at least one study that does that.  It's pretty interesting.  And it's a -- it's a -- it's a police department field study.  It's not a -- it's not a mock crime lab study, so it makes it even better.  I'll try to find it.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.    And based on your review of the record, what is your understanding of the level of familiarity between first Richard Horton and Richard McClanahan?

A.    Well, if I remember correctly, in that interview four days after the crime, I think he's got his first name, is clearly talking, knows his nickname, Adidas Boy, knows his address, talks about selling a car, maybe other things.  I mean, it sounds like it's -- it's not going to be this almost a stranger ID category where -- with all that information.  He got that last name wrong, so he's clearly not, like, best buddies with this guy or he'd know his last name.  But it -- it seemed clear to me that that's who he was talking about four days after the crime based on multiple prior encounters.

I would definitely put this not in the extreme of virtually a stranger ID, but much closer to what we think of as known person IDs.  Multiple prior encounters over an extended period of time, so much so that he can give you all that information.  And I -- and I thought that Mr. Horton also acknowledges a lot of prior familiarity, including -- I mean, I think that he did have a nickname, something like Adidas Boy.  I can't remember what it was, and did live at that address and did have that encounter selling the car and -- and maybe

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

even acknowledged multiple prior encounters, I think.  I mean, that's my memory of -- so it looks like they know each other much more than just a trivial once encounter in the past.

Q.  Okay, I just want to make sure I'm understanding.  Your understanding of the familiarity between Richard Horton and Richard McClanahan is based on the two interactions from the October 13th, 2004, handwritten reports, and then based on their trial testimony; is that right?

A.  Well, it's definitely based on that written document that you were just referring to, where I think he talks about -- I think that's where Adidas Boy comes up, and address and Richard, maybe Diggs.  I can't remember.  I think that's where that came up, the prior encounter selling a car or whatever it was, that's all on the written notes, right?

Q.  Yeah, in the -- yes, in the notes that we looked at, the October 13th --

A.  Yeah, that's mainly what I'm talking about.

Q.  -- 2004.  Okay.

A.  And -- and then -- and then it seemed like all that was -- it -- none of that was contested at trial, even by Mr. Horton, if I remember correctly.  In fact, it was confirmed by him as being accurate.  So it didn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of JOHN WIXTED, taken on January 19, 2020
238

-- didn't give me any reason to doubt it.  It could be wrong.  It's trial testimony after all, but didn't -- didn't give me -- you know, this -- I didn't think it was a -- I didn't think it was a disputed matter in this case, maybe I'm wrong.  It seemed like everyone -- it was, like, kind of thing that everyone would stipulate to, but I could be wrong, but that's -- I'm just saying how it seemed to me based on everything I looked at.  It didn't look like a contested issue.

Q.   Okay, and I will -- again, I want to separate the issues out so that I'm really understanding your framework.  I'll represent to you of the two instances that are referenced in the October 13th, 2004, handwritten notes, one is an interaction the previous day, and one is from -- the record goes back and forth on this, but six to eight years prior.  At trial, Mr. Horton did contest that first one, that he was the person that the witness interacted with the previous day.

A.   I remember that.  That's true.

Q.   Okay.  Okay, and so your understanding of their familiarity is rooted primarily in those two interactions Mr. McClanahan talked about on October 13th?

A.   That's not how I read it.  I'm -- I didn't

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

read that.  Let me give you an exhaustive list of my prior encounters.  Maybe that's what it was, but I -- he was describing a person he knew, knew where he lived and -- and things like that, not that I was limited necessarily to those details.  And -- and I thought -- now I can't remember for sure.  I might be mixing up cases.  I thought Mr. Horton, although he denied having seen him the night before, said -- I might be wrong, that he's seen him many times over maybe a period of years.  I'm not sure.

That's why -- I -- maybe I'm misremembering that.  That's why I thought it was kind of an uncontested issue.  I know that one incident is contested, that's true.  But -- but in terms of -- I've seen this guy multiple times in the past, not just once five years ago, I -- I think the fact that they knew each other -- I don't know.  I -- I may misreading the evidence.  My reading was that -- that was uncontested. If it's contested, so be it.  But that was -- I took it to be a known person, like, a pretty standard known person scenario.

Q.   Yeah, let me try asking you, if one individual sees another individual around the neighborhood twice a year, so approximately once every six months, would you consider that person familiar to the observer?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   And can we add in, and he knows his nickname and knows where he lives, and things like that?

Q.   No, I'm just asking you in this -- in this one instance, would that person be familiar to the observer?

A.   Well, the observer would have to tell you. Some people would not pay attention to that face.  Even seeing him twice a year, wouldn't pay any attention to him.  Maybe he's, like, a street cleaner.  And so I'm not -- you know, I see him twice a year, but I don't even look at his face.  And another person, you know, might be considering a career of street cleaning.  I might look at this guy and see how -- what his age is and things like that.  So it would depend on how much attention the person paid, but you know, it could be familiar -- I -- I would have to ask the witness, is this face, you know, familiar to you when you see it? I -- you just can't say based on that limited scenario that you described.

Q.   And what is your understanding from the record on Richard Horton's familiarity with Rhonda Curry?

A.   That only comes from -- I -- I don't have as sort of compelling a story.  She said his face is familiar.  It was like a Mandler butcher on the bus scenario.  His face is familiar.  I can't remember, I'm trying to figure out where I know him from.  That's why

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

he -- according to at least a police record later on, that's why the perpetrator was getting angry with her, and then she later recognized his face. And that's my -- that's the only information I have that that too was a known person ID.

But I don't know Mr. Horton testified. I can't recall about his prior encounters with her the way I think he did about prior encounters with Mr. McClanahan. So he may have, I don't know, but I don't remember it. So of the facts I remember, it's not as compelling a story of -- of known person, but it's still -- there's evidence in that direction, not -- not that it was a stranger ID, but not as compelling as for Mr. McClanahan, which I -- I remember being largely confirmed by Mr. Horton, but that -- you know, I have to go back and look. I'm not 100 percent sure about that.

Q. And nowhere in the record do either victims say, you know, that they spent social time with Richard Horton or that they were friends, right?

A. I don't think anything like that is in the record.

Q. Yeah. Okay, and they never worked together?

A. Not that I saw.

Q. And at no point does any of the three parties -- actually, let me -- let me -- I'll rephrase that. At

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

no point does Mr. McClanahan or Ms. Curry say that they know Richard Horton well?

A. That exact word, I -- I don't -- I don't know. I'll just have to say, I don't know. I -- I believe you that it's nowhere in the record. I don't recall it.

Q. Okay, and so now this kind of ties into your opinions on Page 9 into 10, and also your opinions on Page 14, but on Page 9, you say, "This is why factors that have been found to reduce the accuracy of stranger IDs (short exposure time, stress, weapon focus, cognitive load, et cetera) are much less relevant to known person IDs." Okay, and here, you are referring to estimator variables, right?

A. Yes, and -- and by -- I -- be clear what I mean by accuracy. You know, it's -- it's not what you think of as reliability. Estimator variable, these things don't affect reliability. They affect -- they affect your accuracy of identifying the guilty person. Even if he's in the lineup, you make the error of failing to identify him because you didn't make a good memory of them. That's what poor estimator variables do. They don't implant a false memory of an innocent person. You know, memory contamination does that. Estimator variables do something completely different, so they do reduce the accuracy, but much less so for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

known person IDs.  Reliability, though, is usually what the legal system is concerned with, not accuracy.  Well -- or -- or another way of saying reliability, accuracy of an ID when it does occur.  That's reliability.

Q.   Okay.  I guess maybe let me start with the accuracy point.  You know, obviously in your report, you go into detail about how in stranger recognition cases, you know, the person needs time to view the person and to code the information they're seeing in their brain; is that right?

A.   Yeah, during the crime, they're having to --

Q.   Right.

A.   -- make a memory of the face for the first time.

Q.   And then in a known person identification instead, it's an act of recognition, like seeing something that is familiar to them from that known person; is that right?

A.   Yeah, the -- the memory test kind of happens during the crime.

Q.   And so the estimator variables in the known person identification scenario only really affect the accuracy of whatever that recognition was; is that right?

A.   Well, the better way to say it is in a known



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

person, if we just accept it's a known person scenario, the -- that familiarity signal is going to happen whether or not the estimator variables are good, just to -- as a general principle.  Obviously, they can be bad enough, can be completely pitch black.  If it's that bad, you're not going to get a familiarity signal, face familiarity anyway.  But as a general rule, the estimator variables that can affect your ability to encode a face of a perfect stranger have virtually no effect on the familiarity signal of a known face.

Even if you see it briefly, under poor conditions while you're distracted, doing another task, that -- happens automatically in a few hundred milliseconds.  That's the way to think about that. These variables just don't -- if it is a known person scenario, the estimator variables have to be extremely bad before -- you know, like, pitch black, for example, or distance so far that you can't even make out the facial features at all.  They can't be bad enough. It's just that compared to stranger IDs, they're much more robust to poor estimator variables.

Q.   Okay, and I know you testified earlier that you have a report that's going to be coming out on that topic.  Is there any other literature you cite in your report that supports that general conclusion that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

estimator variables play less of a role on accuracy in familiar identification cases, as opposed to stranger identification cases?

A. Yes, there's -- because that's -- that's a completely non-controversial point. And I -- I quote traditional eyewitness memory researchers who don't -- generally don't see things my way, as saying that somewhere in my report -- Horry, Horry, Horry. Let me search on Horry. I'm sure -- yeah, Horry, et al., 2014 -- wait a second. So on Page 10, I say, Horry, et al., 2014 put it this way, "Laboratory studies almost always focus on a situation in which the perpetrator is completely unfamiliar to the witness. Why? Again, as they put it, including familiar perpetrator cases is problematic because it may provide an unrealistically high estimate of witness accuracy, and" -- this is the key point, "We would expect all estimator variables to have a smaller effect in any cases in which the witness's memory of the perpetrator is relatively strong due to preexisting familiarity." So the -- that's the point I'm making, that the -- the estimator variables matter less. And I would say when you factor in the basic science, a lot less in a known person case than in the stranger ID case.

Q. And I want to make sure I'm understanding this



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

right, because even the quote you just read, still seems to pertain to strength of memory.  And so if the estimator variables are such that the ability to form a clear memory or to, again, have that moment of recognition are inhibited, would they not still then play some kind of role, even if it's perhaps a diminished role?

A.    Well, yeah, because, like, just take the estimator variable far enough to complete blackness, you know, no light at all.  You -- you know, if -- if it's your mother, you're not going to be able to tell it's your mother.  So yeah, it's a diminished role for sure. I would say, you know, people are fascinated in the basic science literature with familiar face recognition because it's a much diminished role.  It's like, how do we explain this amazing ability that -- that it can be a grainy video?  And you can -- you know, you can't tell it's a stranger you've seen before, but the known person is, like, high accuracy, even under these really impoverished estimator variable conditions, you know, simulated by grainy video.

It's -- it's intriguing to scientists, what's the brain mechanism that allows that to happen?  Where does that come from?  That's not saying estimator variables are irrelevant.  You can make them bad enough,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

but there's just no doubt that it's intriguing to scientists how good it is even under poor conditions -- poor estimator variable conditions.  And there's lots of papers trying to figure out how it is that the brain does that.  So that's a indication that it's, you know -- it's not just slightly less vulnerable to estimator variables.  It's, like, considerably less vulnerable to poor estimator variable conditions.  And -- and then that raises the question, how could that be?  What are the mechanisms?  How does it happen?  How do we explain it scientifically?

Q.   And, you know, not to -- not to ask too dumb of a question, but we've -- you know, multiple times now you've given the example of an estimator variable that could be very impactful being lighting.  If there's no light --

A.   Right.

Q.   -- and you can't see their face, that's going to have an impact.  And so you know, you have to be able to at least have some opportunity to see a perpetrator's face in order to make a facial identification, right?

A.   Right.

Q.   Okay.

A.   And by the way, if they don't, almost always, they will correctly tell you that they didn't have an

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

opportunity to see the face.  Witnesses know whether they had an opportunity to see the -- what they don't know is how -- whether -- you know, if they make an ID, how -- how accurate they're going to be as a function of confidence.  They don't know that, but they -- the - - the poorer the estimator variables -- you make estimator variables poor enough, almost every one of them will tell you, I didn't -- I didn't see the face.

Q.   Is that based on -- the opinion you just gave, is that based on a lab study or field studies?

A.   Oh, it's based on -- it's -- it's based on a lab study, a -- a -- but a very good lab study conducted by Gary Wells, by the way, published just recently.  And I analyzed the data in a paper that probably isn't on my vitae because it just got published.  We show that as distance increases, they had five conditions, short distance, you know, longer, longer, longer, longer.  We have a -- we have a -- a gorgeous graph showing that accuracy -- high confidence accuracy remains high regardless of distance.  But then we have another line on the same graph showing how many witnesses make a high confidence ID.  And it goes from, like -- and each condition had, like, 1,000 participants, right?  And it goes from, like, 400 down to, like -- I don't know, 25. Like, this is just a dramatic plummet in the likelihood

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—COURT REPORTERS—

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026    249

of a witness making a high confidence ID.  They just -- they don't do it because they know they got poor viewing conditions, but -- but the very few who do, it's still pretty high accurate.

Q.    What's the name of the paper that you're citing?

A.    The paper by Wells, or my paper analyzing the data to make this point?

Q.    Both.

A.    My paper is -- the name of the paper is called Suspect Identification Accuracy from Lineups, in the Lab and in the Field, 2025, Wixted and Mickes.

Q.    And what's the name of the paper by Dr. Wells?

A.    It's -- let me look it up.  Great study, ne that finally closed the door on what was once a hugely controversial issue, which are better, simultaneous or sequential lineups?  He's the inventor of sequential lineups, but he now -- this paper, he now completely agrees with me.  I'm about to get the name.  I'm opening it.  You ready for the name?

Q.    Yes.

A.    Beyond the Confidence-Accuracy Relation: A Multiple-Reflector-Variable Approach to Postdicting Accuracy on Eyewitness Lineups.  It's 2024, I think, and the first author is Ayala, A-Y-A-L-A.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Q.    I think I'll be able to find it with that. Thank you, I appreciate it.  Just because we're -- oh, I'm sorry, I didn't mean to cut you off.  We are short on time, so I'm going to start --

A.    Okay.  I'll just mention --

Q.    -- (inaudible)  Yeah.

A.    -- it might be confusing to you when you see that study because it's -- the focus of that study is something different, but they had all the data to answer the questions we were just talking about, and that's why I analyzed it in my paper, so...

Q.    I see.  No, that's helpful.  Thank you.  Okay, all right.  On Page 10, you note that Young, Hay, and Ellis, 1985, found that misidentifications of a stranger as a familiar person tended to occur when the witness based the ID on hair, build, or clothing, not facial features, and most of the misidentifications were associated with low confidence.  This was a lab study, right?

A.    No, this was a -- remember -- remember, this was a study where they -- I said earlier, I should have mentioned that they didn't even study correct IDs.  The whole -- it was a -- it was a diary study of mistakes that 22 people made over a period of -- I -- I can't remember how long of -- it seems like it was seven weeks

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

or something.  Just record all your errors and write down what happened.  That's -- it wasn't even an experiment, it was a diary.  They kept diaries.  We don't even know how accurate, but -- but yeah.  I -- I say not facial features -- not as -- not as much facial features.  They still made ID on facial -- so I guess I would change that too, just less often on facial features.

Q.   I -- yes, I do remember you testifying to that a little earlier.  But the identification from Richard McClanahan in this case was primarily on voice and clothing, right?

A.   Well, it depends.  If the initial record was absolutely complete, it was just voice, I think.  And then -- and then later, at the photo ID procedure, he says it was eyebrows, voice, clothing.  He adds more detail.  I don't know which is correct.

Q.   That's fair.  Actually, strike that, please. And now, in this section -- and I want to make sure I'm understanding your report here.  You seem to describe how a memory search may be necessary to determine -- or let me -- sorry, let me take a step back.  And I believe the example you give is if you see someone's face on a bus, and you know they're familiar from somewhere, you just can't figure out where.  And you describe that you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of JOHN WIXTED, taken on January 19, 2026

252

may have to perform some kind of memory search to determine where that person is from, right?

A. Right, and most people have had that subjective experience of -- like that.

Q. Yes, yes. In that instance, though, the familiarity is immediate, right?

A. Correct.

Q. Okay, and again, not to beat a dead horse, but when we looked at all of the handwritten notes and reports earlier from the October 9th, 2004, conversations between Rhonda Curry and police, there's no statement of immediate familiarity, right?

A. Right, only for Mister -- I already forgot his name, it's getting so late. McClanahan, yeah.

Q. And his familiarity was on the voice, right?

A. Correct, according to the police record.

Q. Now, in your experience, is there any literature that when discussing known person IDs, talks about not having any sense of familiarity in the moment, in that episodic memory, but then later, having some kind of familiarity? Or would that be evidence of contamination?

A. That'd be evidence of contamination.

Q. Okay, and then on the bottom of Page 10, sir, you state, "The discussion above focuses on face



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

recognition, but similar considerations apply to familiar voice recognition. That is, recent work suggests that identifications of genuinely familiar voices is typically much more accurate than identifications of unfamiliar voices." I just want to ask what -- you know, in your words, what do you mean by "genuinely familiar voices?"

A. Voices that you have actually heard multiple times in the past.

Q. And is there any kind of quantification to that statement? You know, for example, multiple times in the last year, or is it just dependent on the circumstance?

A. No, each of those studies had parameters, you know, that I -- but there's no -- the scientific principle, there's no principle that you can derive from that. It's just the more genuinely familiar the voices, the more accurate the voice recognition. Again, it's that continuum that we talked about before.

Q. And then on Page 11, you discuss the difference between recognition and recall. And we've talked about that quite a bit already today, but both are subject to contamination, right?

A. Definitely.

Q. And I believe you list in your report that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

memories based on recall can be contaminated by conversations with other people, by imagining what happened, and even from leading questions by police, is that all accurate?

A. All that is accurate.

Q. And even in the instance of confidence for recall, you say, "Details initially recalled with low confidence are largely inconclusive, whereas details initially recalled with high confidence tend to be informative," right?

A. Yes, and that's relevant to him recalling the last name. I'm not sure, it's Diggs or whatever it was.

Q. And -- okay, well, I guess a couple -- we'll separate things out. For that determination, first and foremost, you need an accurate and contemporaneous accounting of the confidence level, right?

A. Yeah, with the understanding, though, that -- I mean, that's ideal, but most of what people recall when they don't express confidence is confident. It's just implicit. And then when they recall with low confidence, they let you know that they're not sure. That's usually how it is. You'd rather have a definitive confidence rating, you know? It's also suspect identifications when they happen from a photo lineup. In the real world -- you know, I forget what

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—COURT REPORTERS—

the number is, but it's something like when you -- 70 percent of those are made with high confidence. So both recall and identifications usually are made with high confidence, even when you don't have a confidence -- but they're not always. And so that's why it's better to have a confidence statement. Usually, people talk about low confidence and often leave high confidence -- not -- not so much in this Horton case, but often, they leave high confidence off the table as if it's presumptive.

Q. And I just want to clarify, the statement that I read, that's, again, true of the first test, right?

A. Yeah. Well, we're talking about recall, right?

Q. Yes.

A. So it's true of the first test for details they recall. It's also true of a second test if it's new information, not changed information, and that second test isn't too delayed. It's also true of that test.

Q. Okay. This is kind of in line with what you just said, but you state on that same page that, "The more time that elapses between the initial test and the first time recollection of a detail on a later test, the more likely it is to reflect memory contamination."

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Yeah, that's -- and -- and that includes 20 years later, if you don't mind my throwing that in there.

Q.   And I believe you testified to this earlier, but it could also be a matter of seconds after, right?

A.   It definitely could, Jennifer Thompson.  You think?  Oh, I'm certain, you know, that -- that contamination was immediate.  Same with forensic evidence.  Could be, you know, right after the crime, the DNA evidence at the crime scene.  Someone could go in there and contaminate it, unbeknownst to all.

Q.   Okay, all right.  A lot of this stuff we've already gone over, so I'm able to skip it.  And on Page 12, you begin your analysis of the eyewitness identification in this case, right?

A.   Right.

Q.   And you state, "A witness can truthfully tell the police on the night of the crime that they did not recognize the perpetrator, but after reflecting on the matter for several days and talking to others, they now realize that the crime was committed by a person familiar to them.  A scenario like that would likely reflect memory contamination, not a successful memory that initially failed.  Focusing on the initial test would help to prevent a miscarriage of justice that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2020                257

might otherwise result."  That's a true statement, right?

A.    That's definitely a true statement.  That's the Kevin Strickland 44 years in prison story.

Q.    Right, and would you agree with the statement that an innocent person going to prison for something they did not do would be a miscarriage of justice?

A.    Yes, I would agree with that.

Q.    And now, sir, you've seen the photo array that was shown to Rhonda Curry and Richard McClanahan in this case, right?

A.    Yes.

Q.    Okay, I will show you what we'll mark as Exhibit 13, which is the last exhibit I have for you. Are you able to see the photo array, sir?

(Exhibit 13 was marked for identification.)

A.    Yes.

BY MS. MARTINEZ:

Q.    Okay, and is this the array you reviewed in connection with this case?

A.    I'm pretty sure it is.  Looks familiar.

Q.    Okay, and as you note in your report, Richard Horton, who's in Box number 5, is the person with the lightest skin in this array, right?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   Right.

Q.   Okay, and light skin was a descriptor that was provided first by Ms. Curry, and then again by Mr. McClanahan prior to this array being shown, right?

A.   Right.

Q.   Okay, and when a suspect uniquely matches a descriptor, would you agree that that increases the risk of suggestion in a stranger identification case?

A.   Yes.

Q.   Would that also be true in a case where there's a low level of association between the witness and the alleged suspect?

A.   Sorry, like -- like a known person, but not very well known person, is that what you're talking about?

Q.   Yes, sir.

A.   Well, again, it's all a continuum.  The closer you get to it actually being a stranger ID, the more it's relevant.  But even in a stranger ID it wouldn't account -- a detail like that seems unlikely to account for an immediate high confidence ID.  That's a memory -- that's a face memory match signal.  Not a one detail matches, and all the other details don't match.  So yeah, in a stranger ID case, it wouldn't matter -- it seems unlikely to me that -- that it would -- it would

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

matter.  It would increase the likelihood of a false ID.

The -- the false IDs that happened would more likely be made with low confidence than high confidence. But an immediate high confidence I ID is usually a memory match, not just, this one feature matches, but everything else is -- is -- is different. But yeah, he's the guy the police want me to pick because he's the only guy with light skin or something like that.  Even if this were a stranger ID case, yeah, that'd be relevant, not particularly relevant.  You know, not like, you know, he's the only Black guy in the lineup or something like that, where it's like a flagrant standout, might matter more, but...

Q.  Okay.

A.  But, you know, you have to factor in that it was an immediate -- if you believe the police records, which I realize not everybody does, but if you believe the police record of immediate high confidence ID, even in a stranger ID case, it would be a stretch for that to be explained by this one detail.  Yeah, it would've been better to have more light-skinned guys in there, but explain the immediate high confidence ID based on that one detail.  I don't -- I don't see how the mechanisms of memory that are been worked out by science over the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

years would -- would explain that. Much more explainable in terms of memory match signal, detailed memory match signal.  And yeah, they shouldn't have had only one guy with light skin.  That's also true, because that did bump the memory match signal to some degree.

Q.   What is this -- your source for your opinion that someone who makes a rapid high confidence identification on an array where only one person matches the description of the suspect is still predictive of accuracy?

A.   It's based on my understanding of the underlying mechanisms of face recognition memory, which we spell out in detail in a paper published in 2023, and another one published in 2021, I think it is, both in top scientific journals, that the memory match signal, the -- the confidence that you were expressed is a function of the number of features that match. And it's when a whole bunch of features match that the memory signal is strong enough for you to give high confidence. Here, what we're talking about is one feature matching, you know, not shared, no -- we know it's in the witness's memory, light skin.  So that feature is matching.  And -- and by the way, earlier we talked about high perceptual sensitivity features, features that matter a lot.  Well, surprisingly, one feature that

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

doesn't matter a lot is skin tone.  So we're not even talking about a high perceptual sensitivity feature to start with.

And then we've got these two papers that I just referenced where we go -- where we model face recognition memory in terms of features that match. Features of the face that you're looking at match features of the memory that you have, and it's a lot of features matching is when you get a high confidence, strong memory match signal that we talked about earlier. Yeah, you don't want this situation.  I agree.  You don't want that.  But at the same time, it's a low perceptual sensitivity feature, and it's only that one feature.  It's not as -- you know, it's -- it's hard to explain an immediate high confidence identification based on that.  I would say no, based on everything we know that the -- you know, it -- it's got to be also that that guy happened to look a lot like the -- the face in their memory, either due to contamination or because he's the guy who committed the crime.  I don't know which, but...

Q.   So the 2021 and the 2023 paper you referenced, those would be listed in your CV, right?

A.   Right.

Q.   Okay.



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.    (Inaudible).

Q.    Okay.  Now, this photo array was not double-blind, right?

A.    It was not double-blind, I think, if --

Q.    And the administrator is Detective Walker, knew who the suspect was when she showed this array she created?

A.    Yeah, that's typical.  Not ideal, but typical.

Q.    Are you aware of any literature that affirmatively says that a suggestive array has no impact in a familiar identification case?

A.    Well, suggestive is a -- no one's going to say that because suggestive is such a broad term.  But we were talking about one feature.  And I was talking about science that studies features matching memory, that -- that seems relevant, but suggestive?  I mean, you know, we talked about a highly suggestive procedure of a guy in handcuffs, you know, presented as part of a show-up. You know, that's high suggestive and high confidence is still diagnostic of accuracy.  It still updates -- updates your thinking in the direction of guilt, not -- doesn't prove it, but -- so suggestive is too broad a term, I guess, is what I'm saying.

Q.    Okay.  So are you aware of any literature that affirmatively holds that a photo array such as this,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

where only one person matches the physical description that's given of the perpetrator, has no impact in a familiar identification case?

MS. TANOURY:  Objection to form and characterization.

THE WITNESS:  Where only one feature of multiple features that do match memory.  Black, male, roughly the right age range.  That's -- yeah. One feature that the witness described doesn't, and -- and yes, it's the two studies that I talked about.  It's the mechanisms of memory that underlie confident face recognition.  Those are the -- those are the papers that inform my conclusion that -- that a single feature is -- you know, that is just not how memory works.  A single low perceptual sensitivity feature matching memory.  Yeah, you don't want that.  It's going to -- it's going to make the memory match signal stronger than it otherwise would've been, not a lot, but why would you want any of that?  And it's -- it's not going to explain, in my opinion, an immediate high confidence ID, which comes from multiple features of memory, multiple features of a face that you're perceiving matching the features that you encoded in your memory.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

BY MS. MARTINEZ:

Q.   The study you referenced earlier about skin tone not being -- I apologize, I forgot the terminology you used?

A.   A high perceptual sensitivity feature.

Q.   High perceptual sensitivity feature.  What is the study you're referencing that states that skin tone is not a high perceptual sensitivity feature?

A.   It's the one by the Israeli researcher who I couldn't remember who it was.

Q.   Okay.

A.   Oh, so close to remembering still, again, as I'm trying.  And -- and as I said earlier, I invited her to UCSD to give a talk on her research because it was so interesting.  I'm sorry, I can't remember it right now.

Q.   No, you're fine.

A.   I know I can get it.

Q.   I am going to -- if you remember before the deposition is up, great, I'd appreciate it.  If not, no worries.  I'm going to stop sharing my screen and I'm going to ask you -- I -- we're getting to the very end. So I'm going to ask you a few questions now --

A.   You can keep going if you want.

Q.   I don't -- I don't think any of us want that. We've been --

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A. Oh, well, I do.

**Q. So I'm going to ask you a series of questions that I'd like you to respond with yes or no. If you want to extrapolate, sure, but they're very straightforward questions, so I don't imagine you'll have to. And then we'll take a break so I can see what else I have for you and how much time we have left on record. Does that sound good?**

A. Sounds good.

**Q. Okay. Do you agree in the context of a stranger identification that a short exposure time is one factor that alone or in combination with other factors, would likely make it more difficult for an eyewitness to acquire a memory trace for the subject?**

A. Without affecting reliability of a positive ID that occurs nonetheless, yes.

**Q. Okay, and do you agree that that would also be true for a low-level acquaintance?**

A. Low level of what?

**Q. Acquaintance.**

A. So what would be true of a low level of acquaintance? More -- can you be specific so I'm making sure I'm answering your question?

**Q. Sure, the question that I posited previous about a short exposure time making it more difficult for**

an eyewitness to acquire a memory trace for the subject. I asked you about in a stranger case.  Now I'm asking you about for a low-level acquaintance?

A.   But low-level acquaintance means they already have their memory trace to some extent.  And I guess you're asking additionally, a memory trace of that person committing the crime?  I guess, it seems like a vague question, I'm not sure.  I'll say tentatively, yes.

Q.   Do you agree in the context of a stranger identification that a high level of stress is one factor that alone or in combination with other factors, would likely make it more difficult for an eyewitness to acquire a memory trace for the subject?

A.   No.

Q.   Why not?

A.   Because the scientific literature's clear that it doesn't.  And so it has to be qualified.  All the recent research on that very question suggests that it -- it doesn't have an -- an impact on that surprisingly. But it -- not that surprising, because you need to talk about the level of stress.  And so stress can be optimal.  So if you're raising stress from suboptimal to optimal, it's going to actually enhance encoding.  If you go to catastrophic levels of stress, it must be true

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

that it goes down again.  But, you know, we can't do those studies.  Only one study that I know of -- well, there's two studies.  The -- the most recent study with these armed terrorists going into a camp and taking people hostage -- you know, I -- I keep focusing on reliability.  I guess I -- let me just leave it at this. Yeah, it can be -- catastrophically high stress will make it less likely that you'll encode the face of the perpetrator, so you won't even recognize the guilty guy later on.

Q.   Do you agree in the context of stranger identifications that the visual presence of a weapon is one factor that alone or in combination with other factors, would likely make it more difficult for an eyewitness to acquire a memory trace for the subject?

A.   Yes, it concerns me that that sounds like the kind of thing traditional eyewitness memory researchers have said for years.  It's misleading the legal system. We're talking about a variable that is usually not important because we're talking about IDs that did occur and these things don't matter for that.  But I just want to make sure that that's understood.  At the same time, what you said is true.  It's just not as relevant as lay people think.

Q.   Okay, and would that be true with the same

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

qualifier for a low-level acquaintance?

A.   I -- compared to high-level acquaintance, would a low-level acquaintance make it less likely that you'd encode the face?  I guess that's probably true. I don't know -- you know, I haven't looked at any science asking that question specifically, but I guess that same answer would likely apply.  Again, I'm going to give a tentative yes.  I've got to think about that one.

Q.   Okay, and do you agree in the context of stranger identification, that a disguise worn by the subject that covered the hair and face outside of their eyes and part of their nose, alone or in combination with other factors, would likely make it more difficult for an eyewitness to acquire a memory trace for the subject?

A.   Yes, with all the same caveats that that's the kind of question that can mislead judges and jurors about the reliability of an ID that occurs nonetheless. Despite the mask or whatever, all the other variables we've been talking about.  That's -- I want to add that caveat because that's been a big part of my scientific work over the past ten years.

Q.   And what about for low-level acquaintances? Is that the same answer?

A.   Yeah, with uncertainty, and I have to think

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

about that more because that's not usually a focus of investigation.

MS. TANOURY:  And I'm -- and I'm, sorry, belated objection to the -- to the form.

BY MS. MARTINEZ:

Q.   Would you agree that misidentifications tend to carry forward to subsequent identification tests?

A.   Typically, not always.  But typically, yes.

Q.   And would you agree that exposing an eyewitness to a conversation with other witnesses in which those witnesses are discussing their belief that a certain person is the perpetrator, can be suggestive?

A.   Yes.

Q.   And do you agree that showing an eyewitness a single photograph of the suspect in a stranger identification case, before showing that same person in a photo array, could be suggestive?

A.   Not could be, is.  And we have a paper on that too in the works.  It's way more suggestive than people even think.  It's amazing the impact that that has on a subsequent ID from a lineup.  You don't want to do that. You want to focus on what they said to the single photo, not with a -- in that -- in a scenario like that.  It's a big effect.

Q.   And is that paper also in your CV?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

A.   No, because it's being presented at a conference in March and being written up for publication.  My -- I've never talked so much about work I have being written up for publication as I have in this deposition.  But yeah, it's -- it's being -- I'll just leave it at that.  It's being presented soon and written up shortly after that.

**Q.   And would the statement that I made about the single photograph and the subsequent array being suggested, would that also be true for a low-level acquaintance?**

MS. TANOURY:  Objection to the form.

THE WITNESS:  Yeah, you know, low enough? Yeah, that -- as we talked -- as I said on, you can go low enough where that would still apply because it's effectively stranger ID becomes less of an issue the more you -- you've seen the face.

MS. MARTINEZ:  If it's okay with you, let's take a quick break.

THE REPORTER:  All right.  Going off record. Time is 6:58 p.m.

(A recess was taken.)

THE REPORTER:  Back on record.  Time is 7:08 p.m. Eastern.

BY MS. MARTINEZ:

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   A few last questions for you, sir.  First, we've talked about the estimator variables that you describe on Page 13 and 14.  I now want to direct your attention to about halfway down on Page 14, where you discussed Dr. Dysart's consideration of system variables.  Do you see that part?

A.   Let's see, Page 14, halfway down?  Yes, see it.

Q.   Okay, and then you discuss some of the system variables, and we've also discussed some of them today.  All of the opinions that you intend to introduce in this case on the system variables are either in your report or we've discussed them today; is that correct?

A.   Well, there's that intend again.  I intend to answer every question put to me, whether it's in my report or not.  But -- so -- so I would say no, this -- I -- not necessarily everything I -- I intend to testify --

Q.   Sure, let me take a step back.  You understand at trial, sir, you can only opine on disclosed opinions, right?

A.   I don't know that to be true.  I thought there's exceptions to that.  Like, if the other side brings up something that isn't in my report, then I -- I don't know.  So it's not an intention.  Maybe you're

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

saying you don't get to talk about anything else. Fine, if that's the rule, that's the rule. But -- but you keep asking about my intention. I'm just saying I have no such intention. But if -- but if the rule is, you can only talk about what's in this report, then I will follow that rule if that's what you're really asking me.

Q. Let me rephrase. You testified earlier that you had ample opportunity to include all of your rebuttal to Dr. Dysart's report in your report, right?

A. Yes.

Q. Okay, and so you had an opportunity to include all of your rebuttal to her consideration of system variables, right?

A. Right.

Q. Okay, and we talked about some of them today during the deposition, right?

A. Correct.

Q. Okay, and you also opine on them on Pages 14 into 15 of your report, right?

A. Yes, yes.

Q. Okay, okay. Now -- okay, sir, did you reach any opinions about Dr. Dysart's consideration of system variables that you left out of your report?

A. Let me see.

Q. And I want to be clear, I'm not asking you

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

right now to go through her report and come up with every, you know, rebuttal that you can.  My question is, did you --

A.   Did I --

Q.   -- read any opinions prior to issuing your report -- or specifically on her consideration of system variables that you chose not to include in your report?

A.   Yeah, thank you.  I did understand your question, but I'm -- I'm trying to remember now.  I -- I -- I only included -- you know, it wasn't intended to be exhaustive, and so you're now asking me, well, are there some things that you chose not to -- I -- I don't think so, but give me a second here.

Q.   Okay.

A.   Okay, I don't remember anything, but I won't go through and see.

Q.   Okay.

A.   See if I can find something.

Q.   And, you know, with the understanding that I think California criminal court can be a little wonky on this point, in federal cases, sir, do you understand that you have to disclose your opinions before you're allowed to testify about them at trial?

A.   I'm not sure if I knew that.  I accept that I have to do that.  Maybe that's why I'm asked to write a

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2020

274

report. That -- that all sounds fine to me. I just keep -- the only reason I stumble over intention is like, what if somebody asked me a question about something Dysart said in her report that I didn't talk about in my report? I -- I'll say, I'm going to answer that question even if it's not in my report. That's all -- that's the kind of scenario that comes to mind when you say, your intention, and I say, I'm going to answer the questions. And maybe I'm not allowed to, but if somebody says, oh, but there's this other system variable that Dr. Dysart talked about, and you didn't talk about it in your report, you know, I would talk about it if I'm allowed to. But I don't know if I'm --

Q. Right.

A. -- allowed to. I don't know what the rule is on --

Q. And that's for lawyers and the judge to fight and figure out. My question is just limited to your report. And my understanding is that you had opportunity to include all of the rebuttal opinions that you had for the system variables, right?

A. Right.

Q. Okay, and that you do not currently remember any that you came to and then left out on purpose?

A. Correct.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Q.   Okay, and I apologize, I may have asked you this earlier, but that's true for the entirety of the report, right?  You didn't come to any opinions that you then intentionally left out of your report, right?

A.   Right.

Q.   Okay, good.  All right, a few last questions for you, sir.  Like we've talked about quite a few times today, the first test, the recall test happens for both victims on the day of the robbery, right?

A.   Right.

Q.   And that first recognition test happens two months later, right?

A.   Yes, the -- the photo lineup, yep.  Well -- well --

Q.   Do you --

A.   -- it depends if it was a known person.  The -- the -- the active recognition may have occurred during it -- but the first ID test administered by the police, yes.  Just that clarification.

Q.   Do you, in your work, place any emphasis on earlier testing, regardless of what kind?

A.   The -- the rule's the same for any -- any kind of memory test for an event.  Earlier is better than later, if that's what you mean.  The rule applies.  The -- the -- though, with the caveat that recall is more

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
—COURT REPORTERS—

The Deposition of JOHN WIXTED, taken on January 19, 2026    276

contaminatable than face recognition.  Because what contaminates face recognition is you have to see the face itself before the lineup, you know, whereas -- and -- and -- but for recall, casual conversations is -- you know, it's much more likely -- in a -- in a typical police case, you know, the witness doesn't see the photo of some random innocent suspect who's going to end up in a lineup, you know, three months down the line.  So it's -- they're not equally likely to be contaminated.  Both can be contaminated early on. That's why whether it's recall or recognition early is better than later.  It doesn't mean they're both equally likely to be contaminated as a function of time.

Q.  I just -- yeah, I just want to make sure I caught something you just said right, or clarify for myself.  So we've talked about -- today about different ways that recall can be contaminated, right?

A.  Right.

Q.  Okay, and -- but I believe you just said for recognition, the contamination comes from seeing a photograph earlier.  Are there other forms of contamination that can occur for recognition?

A.  There can, but it's just so much more minor. The major way, like -- like for recall, you know, your memory can be contaminated by you thinking about the

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

event over and over again.  But your memory's not really going to be contaminated for a face of an innocent suspect by you thinking about it over and over again because the -- the likelihood of you conjuring up the same exact innocent face that's going to be in a police photo lineup two months down -- is so low that - - that mechanism contamination --

Q.   I see.

A.   -- isn't it.  It is -- the -- the mechanism of concern is seeing the face -- the same face that's going to end up in a photo lineup.

Q.   Okay.

A.   You know, you can come up with other scenarios, but really, that's the main one.

**Q.   Okay, understood.  And I realize that we've been referencing a 2017 paper with you and Dr. Wells, but for the record, I'm going to put the title of the paper on the record and it's The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis.  And is that correct, sir?**

A.   That's it.

**Q.   Okay, and do you stand by everything you wrote in that paper with Dr. Wells?**

A.   I -- I would have to read it start to finish.  It's been eight years or so.  I'm sure some views have -

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

- but the main message?  I totally stand by the main message, which is that on an initial test of uncontaminated memory using a proper photo lineup, confidence is highly diagnostic of the truth.  Pay attention to that.

Q.   As you sit here today, is there anything specific you can think of that's in that paper that you no longer agree with?

A.   That's a long paper with a massive amount of detail.  And no, I can't.  But, you know, I'm not going to say I agree with every word in that paper.  I agree with its most -- its important main message.  I agree with the message that was intended to communicate, the main message.  But every detail?  I don't know.

Q.   And sir, have you ever consulted with or worked for a police department?

A.   Consulted with or worked for a police department?  No.  I've given talks to police chiefs.  I collaborated on that Houston Police Department field study that we talked about earlier, Figure 2, but otherwise, no.

Q.   Okay, and have you ever conducted empirical research into how police operate lineups and photo arrays in practice?

A.   No, I haven't.  I've seen -- I've -- I've seen

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

surveys of how they do it, but I haven't participated in any research like that.

Q. And this one might be a little left field. Are you familiar with any literature or research into the impact of substances, specifically crack cocaine, on the ability for the brain to encode memories and perform recognition?

A. There's work on alcohol that I know about. But cocaine? No, I don't -- kind of -- it's intriguing. I don't know what I would predict exactly. But no, I don't. No, I don't know of such research. You make me want to search. After we're done, I might see if anything's been done.

Q. I want to shout out in the new paper if something comes from this. I -- we'll make the assumption that because of where it appears, you likely did not see testimony on it, but there is some evidence in the record that both Richard McClanahan and Rhonda Curry were daily crack cocaine users at the time of the robbery. And so that's why I ask if you're aware of any research on the impact that drugs can have on that ability. Now, to close out, sir, you cannot say with scientific certainty that the witnesses were correct here, right?

A. That's how lawyers talk. Scientists don't



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

talk in term of scientific certainty. That's how lawyers think scientists think, but that's not how scientists think. There's been -- there's been committees on that, that the legal system should stop asking scientists to opine about that because that's the legal system's misunderstanding of how scientists think. So no, since it's not how we think, I'm not saying that either way. I'm just saying that's not how we think. It's not a concept that -- that is scientifically sensible, reasonable degree of scientific certainty. So no, yeah, I'm not saying --

Q. Okay. I will --

A. -- it either way.

Q. I will take the scientific part out. You can't say with certainty that the witnesses here were correct, right?

A. Correct. You are right about that.

Q. Okay, and you can't rule out a misidentification here either, right?

A. Can't rule it in -- in or out.

Q. Okay. Did you by any chance remember the name of the female Israeli scientist?

A. No, but if you give me a minute, I'm positive I can come up with it.

Q. Okay, yeah. I only have one more question for

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

you.  So yeah, you can --

A.  It's an absolutely cool study.  Okay, I think I referenced it in this paper.  Okay, I've got the paper.

Q.  Okay.

A.  It's called --

Q.  What is it?

A.  It's called Critical Features for Face Recognition.  That's its title.  It was published in 2019 in the journal, Cognition.

Q.  Okay, thank you.  I appreciate you looking that up for me.

A.  Oh, okay.  Super cool paper.

Q.  Well, I'm definitely going to check it out, so we'll see.  But so my last question for you, sir, all of your opinions pertaining to this case are either contained in your report or in this deposition transcript, right?

A.  Yes, I suppose so.

MS. MARTINEZ:  With that, sir, I have no more questions for you.  Thank you so much for your time today.  I'm going to turn it over to Ms. Tanoury.

THE WITNESS:  Okay, thank you.  It was interesting and kind of fun.

MS. TANOURY:  I have no questions for you, Dr.

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Wixted.  You will have the opportunity to read your transcript if it's ordered and check for any errors or typos of that nature if you would like the opportunity to do that.

THE WITNESS:  All right.  Sounds good.

THE REPORTER:  Okay.  So would you like to review the transcript?

THE WITNESS:  Are -- are you asking me?

THE REPORTER:  Yes, sir.

THE WITNESS:  Hell, no.  Not in a million years.

THE REPORTER:  Okay.  So I'll put that down as a waive, and we --

MS. MARTINEZ:  That's the best answer I've ever heard of that.

THE REPORTER:  And we are still on record. I'm so sorry, to get transcript orders.  So would you like to order the transcript, anyone?

MS. MARTINEZ:  Yes.  We will take a copy at this time, but we don't need a copy of the video.

THE REPORTER:  No video.  And you usually do electronic, correct?

MS. MARTINEZ:  Yes.

THE REPORTER:  Okay.  All right.  For you, Ms. Tanoury?

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

MS. TANOURY:  We'll take a copy as well.

THE REPORTER:  And no video?

MS. TANOURY:  No video.

THE REPORTER:  No video, and electronic good for you as well?

MS. TANOURY:  Yes.

THE REPORTER:  Okay, this concludes the deposition.  We're going off record at 7:26.

(Deposition concluded at 7:26 p.m. ET)

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

CERTIFICATE OF REPORTER

STATE OF OHIO

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Stipulation page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded digitally by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.



MADISON BOOKS

COURT REPORTER/NOTARY

MY COMMISSION EXPIRES: 11/08/2027

SUBMITTED ON:  01/28/2026

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**$**

**$200** 51:5

**$400** 51:3

**0**

**0** 206:24

**1**

**1** 18:13,16 71:14 76:4 197:14 209:3

**1,000** 129:18 248:23

**10** 82:9,14 242:7 245:10 250:13 252:24

**10-9-2004** 81:19

**100** 10:24 17:12 27:24 30:16 49:24 83:2 128:3 154:8,11 158:20 187:19 203:15,17 206:2,18,24 213:22 217:19 229:8,13 241:16

**100,000** 129:7

**100-point** 208:8

**101** 5:5 91:19

**108** 78:6

**10:00** 52:4

**10:43** 83:22

**10th** 102:1

**11** 55:9 90:19, 22 253:20

**11th** 90:20

**12** 82:10 121:1, 7 122:16,21

256:14

**12-ish** 54:16

**12:03** 5:7

**13** 27:22 49:10 78:7 119:14 122:16,21 257:14,16 271:3

**134** 79:24

**13th** 118:4,12 121:2 123:17 143:7 156:1 176:21 237:8, 19 238:13,24

**14** 20:17 27:23 119:14 242:8 271:3,4,7 272:18

**15** 55:9 272:19

**150** 38:17 85:2 89:12 116:6

**16** 75:10 79:25

**17** 75:10

**18** 25:12 26:12, 15 234:23

**19** 193:17

**190** 230:11

**1970** 136:16

**1985** 13:7,16 250:14

**1998** 193:5 196:8

**19th** 5:6 39:25

**1:37** 64:4

**2**

**2** 34:18,24 78:19 81:4 189:8,13,18 190:9 197:15 209:4 278:20

**20** 87:9,25 104:11 108:15 111:18 113:21

118:20 137:2 160:16 161:20, 25 162:16 178:15 188:13, 19 204:20,23 219:23 256:2

**20-year** 179:1

**200** 25:18

**2000** 194:4

**2004** 76:3 83:20,22 95:7, 16 97:1 98:9 102:1 114:20 115:22 118:5, 11,12,16,17 121:2 123:16, 17 143:6,7 148:16 156:1 161:3 176:16, 21,25 237:8,21 238:13 252:10

**2005** 194:4

**2006** 77:18 87:14 119:5 235:2

**2012** 19:8

**2014** 245:9,11

**2016** 189:13

**2017** 13:1 125:13 134:21, 24 185:2 189:6, 14,20 192:8 277:16

**2019** 135:4,15 281:10

**2020** 191:10 192:8 193:1,3 194:16 221:5

**2021** 13:1 149:17 231:24 260:14 261:22

**2023** 260:13 261:22

**2024** 79:18 90:20 118:17, 18 160:15 249:24

**2025** 19:9 28:6 39:25 249:12

**2026** 5:6

**22** 13:20 41:1 55:12,17 250:24

**23-CV-3888** 5:12

**24** 19:19 20:14

**25** 92:11 116:17 248:24

**25-ish** 31:9

**27** 122:18

**28** 122:19

**2nd** 77:18

**3**

**3** 13:2 39:17,19 91:19 165:4,5,8 200:16 201:3, 12

**30** 52:25 55:4 92:11 116:17 200:7

**30th** 76:3 77:18

**31** 230:18

**36** 230:13

**3:17** 139:18

**3:48** 139:20

**4**

**4** 50:6,14

**40** 84:25 89:10, 12 116:5 188:20

**400** 248:24

**40202** 5:5

**44** 67:7 231:1 257:4

**4th** 102:1 148:15 161:3

**5**

**5** 53:11,15 184:13 257:24

**5'9"** 121:25

**50** 139:5

**50-50** 202:16 204:10,12,17

**500** 185:16

**5:46** 222:22

**5:53** 222:25

**6**

**6** 73:14,15,17, 21

**6'** 121:25

**6'2"** 85:2 89:12 92:11 116:5,18

**6'3"** 92:12 116:18

**60** 17:12 195:18

**6:58** 270:21

**7**

**7** 50:9,22 73:14 75:9,18 192:9 224:1

**70** 255:2

**70s** 185:24

**730** 5:4

**7:08** 270:24

**7:26** 283:8,9

**8**

**8** 77:16,24 82:10 224:2 225:25 226:9, 11

**80** 38:18,21 202:10 204:13

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

286

**80s** 185:24

**9**

**9** 79:8,11,15 176:16 205:23 226:11 231:23 242:7,8

**90s** 185:24

**97** 188:3,5

**9:30** 83:20

**9th** 76:16 83:20,22 95:16 97:1 98:9 114:20 115:22 118:11 123:16 143:6 252:10

**A**

**A-Y-A-L-A** 249:25

**a.m.** 52:4 83:20,22

**Aaron** 5:22

**ability** 7:19 37:23 93:10 208:19 210:24 244:8 246:3,16 279:6,22

**absence** 196:11

**absent** 198:17

**absolute** 7:24

**absolutely** 47:17 178:15 206:18 251:14 281:2

**accent** 116:21

**accent.'** 92:15

**accept** 99:19 100:22 244:1 273:24

**accepted** 36:15

**access** 224:18 225:3,11 226:17

**accidentally** 55:23

**accordance** 51:2

**account** 258:20

**accounting** 99:14 254:16

**accuracy** 33:20 144:14 156:5 185:3,18 186:4,7 187:12 190:23 192:23 209:11,15 210:6,7 211:3 214:24 215:2 216:1,3,25 242:9,15,18,25 243:2,3,6,23 245:1,16 246:19 248:19 249:11,24 260:10 262:20 277:19

**accurate** 19:7 24:21,22 46:23 47:12 71:8 79:14 108:18, 22 126:17 127:18 144:9 145:12 165:20 172:25 173:12 182:19,22 183:2,14 184:16 187:14, 19 188:2 223:4 227:2 228:22, 24 237:25 248:4 249:4 251:4 253:4,18 254:4,5,15

**accurately** 9:4 62:7 71:2 186:14,15

**acknowledge** 181:25

**acknowledged** 237:1

**acknowledges** 236:21

**acquaint** 50:11

**acquaintance** 265:18,20,22 266:3,4 268:1, 2,3 270:11

**acquaintances** 268:23

**acquire** 265:14 266:1,14 267:15 268:14

**acquired** 69:21

**act** 151:10 243:16

**acting** 62:15 178:10,12,21, 25 180:4 181:7, 10,18

**active** 275:17

**actual** 27:11,15 38:18 53:7 61:21 193:10 199:9

**ad** 88:14

**adaptive** 223:22

**add** 15:1 198:7 240:1 268:20

**added** 13:15 14:7,19 46:15

**adding** 198:6

**addition** 18:2 99:12

**additional** 15:9 28:8 29:12 35:11 41:19,22 85:7 123:25 170:19

**additionally** 266:6

**address** 38:2, 3,9 65:5 162:23 236:7,24 237:14

**addressed** 65:6

**addresses** 209:23 210:7 211:13 213:23 216:20

**adds** 198:15 251:16

**Adidas** 162:24 236:7,23 237:13

**administer** 190:17

**administered** 184:17,18 200:10,12 275:18

**administering** 150:12

**administration** 158:25

**administrator** 262:5

**advance** 209:3

**advertising** 34:12

**advisor** 36:16

**affect** 8:24 99:2 100:23 109:8,11 119:3 167:25 179:17 180:10,21,22 181:20 182:6 220:23 223:5,9 242:17,18 243:22 244:8

**affecting** 265:15

**affidavits** 165:15

**affirm** 6:11

**affirmatively** 99:8 124:10 140:14 141:13, 19 262:10,25

**afield** 169:21

**afraid** 142:5

**afternoon** 66:22

**age** 84:24 89:10,12,17,23 122:16,17,21 218:7 240:12 263:8

**agree** 6:5 47:10,12 48:2,4 90:6 92:19,25 93:3,11 94:2,8 95:15 97:4 126:24 152:10 164:11 192:5 194:16,21 195:7 203:9 221:10 223:8 257:5,8 258:7 261:11 265:10, 17 266:10 267:11 268:9 269:6,9,14 278:8,11,12

**agreed** 47:5 192:7

**agreeing** 115:9

**agrees** 249:19

**ahead** 78:11 96:20 114:17 148:15

**Alana** 5:19

**alarming** 98:21 99:10

**alcohol** 279:8

**align** 229:6

**allegations** 181:4

**alleged** 15:12 258:12

**allowed** 273:23 274:9, 13,15

**allowing** 71:9

**alluded** 108:4

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**alter** 56:20

**altogether** 32:25

**Alyssa** 5:16 135:2

**amazing** 7:6 67:6 149:21 198:19 199:4 246:16 269:20

**amount** 54:12 113:23 137:25 143:15 147:14 193:10 208:23 278:9

**ample** 272:8

**analyses** 187:4

**analysis** 14:9 26:19 46:8,10 61:12,19,21 62:17 91:2 99:2,6,7 100:6, 8 107:6 155:22 163:3 179:18 180:11,23 256:14

**analyze** 44:17, 19,22 51:1 189:23 199:13

**analyzed** 38:20 126:11, 12 185:22 186:5,21 199:16 248:14 250:11

**analyzing** 150:24 199:15 249:7

**anew** 171:1

**angles** 133:12

**angry** 241:2

**answering** 9:3 46:12 96:11 138:3 265:23

**answers** 7:20 104:9 186:16

**anxiety** 37:17

38:10

**anything's** 279:13

**apologize** 63:11 83:16 183:25 264:3 275:1

**apparently** 15:10 101:12

**appealed** 33:2

**appearance** 5:13

**appearances** 51:2

**appearing** 5:17,21,23

**appears** 86:5 152:24 153:11 279:16

**appellate** 33:2, 8

**appendix** 41:1 57:10 71:17

**application** 48:6

**applications** 47:12

**applied** 37:9 66:8

**applies** 170:19 178:11 211:6 217:6 275:24

**apply** 104:3 132:9 162:20 253:1 268:7 270:15

**applying** 148:13 153:1 211:6

**approach** 136:17 249:23

**approval** 28:11,13

**approved** 83:21

**approximately** 10:19 11:25 32:2 38:13 54:11,20 239:24

**approximation** 30:19 55:7

**area** 109:22

**areas** 49:8 152:19

**argued** 228:23

**argument** 23:23 170:13 220:17

**arise** 64:12

**armed** 191:1 267:4

**array** 102:2 131:19 132:16 137:14 147:6 148:17,20 151:17,20,24 152:3 161:3,17 162:8 163:18 164:8 175:13 176:24 217:19 257:9,15,20,25 258:4 260:8 262:2,6,10,25 269:17 270:9

**arrays** 174:24 175:3,5 278:24

**arrive** 40:22

**arriving** 41:7

**articles** 37:3

**articulated** 153:10

**artificial** 228:5

**asserted** 145:13

**assertion** 114:15 168:1

**assess** 185:17

**assessed** 189:9

**assessment** 234:6

**assignment** 44:15

**associating** 232:6

**association** 258:11

**assume** 8:11 9:14 64:19 71:8 100:16 101:12, 14 124:3 133:16 134:12 141:24 151:23 166:15

**assuming** 52:16 71:1 154:22 173:2 221:22

**assumption** 62:19 71:4 100:15,17 179:20 279:16

**assumptions** 42:11,13,15

**attach** 58:19 88:2,12 113:23 119:23 120:12 135:24 136:12, 14 137:19,20 156:15 160:18 167:4

**attached** 118:21 129:25

**attaching** 82:1 160:25

**attack** 224:13

**attempt** 71:10 146:1

**attempted** 144:7

**attempting** 155:25 157:4

**attempts** 173:20

**attending** 5:14

**assessment** 234:6

**attention** 16:2 55:17 91:21 92:8 191:5,6 228:1 229:3 240:6,7,14 271:4 278:5

**attorneys** 166:16 167:14 182:10

**audience** 39:13

**author** 125:6 191:14 203:6 249:25

**authored** 17:5 35:5 39:1,18

**authors** 137:5

**automatically** 244:13

**average** 139:8

**aware** 30:23 34:2 36:9 42:17 68:2 107:16 140:5 147:17 149:11 150:5 166:3,6 169:2 184:1 211:13 262:9,24 279:20

**awareness** 33:21 70:17 183:15,18,20

**Ayala** 249:25

---

**B**

**back** 13:1,24 21:17 24:16 31:1 35:6 36:13 52:19 59:17 64:3,15 69:11 78:13 83:15 85:21 92:1 94:16 110:4,6 113:4,11,16 114:18 127:24 139:20,25 142:24 143:2 147:16 158:4 169:23 170:10



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

174:1 192:14, 17 194:3 196:16 206:4 212:7 222:24 228:4 229:10 238:15 241:16 251:22 270:23 271:19

**background** 17:4 34:6,8 36:3,8 178:13

**backtrack** 223:25

**bad** 89:24 173:10 178:18, 19 180:4 181:3, 8,10,18,19 182:3 198:12 200:2 203:20 210:16 223:21, 24 244:4,6,17, 19 246:25

**ballistic** 234:17

**ballpark** 54:17

**barely** 133:8 214:22

**barred** 167:17 168:24 169:3

**base** 70:1 139:1 143:15

**based** 71:18 96:23 97:4 117:18,22 118:1 127:23 136:6 138:10 143:10 148:25 150:4 151:8,10 152:25 165:22 167:5 178:25 179:17 180:15 184:21 186:4 225:17 236:1, 14 237:7,9,11 238:8 240:17 248:9,10,11 250:16 254:1 259:23 260:11 261:16

**baseline** 148:6

**basic** 27:1 36:22,23 38:1 136:5,14 137:1, 3,15,23 218:5 220:8,15 245:23 246:14

**basically** 28:21 59:12 78:9 151:1 185:6 201:19 235:5

**basis** 22:24 137:2 169:12 179:25 180:8

**batches** 56:2

**Bates** 75:9

**bathroom** 139:14

**battled** 22:19

**bear** 160:1

**Bears** 6:22

**beat** 160:8 212:16 252:8

**beating** 46:25

**began** 78:20

**begin** 6:16 8:5 256:14

**beginning** 44:5 220:24

**begins** 14:13 41:1

**behalf** 5:16,19 19:16 20:1,18 21:4

**belabor** 115:18

**belated** 116:9 269:4

**belief** 204:12 205:3 269:11

**believed** 13:13 93:4 94:23 184:15

**believes** 81:9, 22 83:8 85:15 93:12

**believing** 119:21 179:9 200:17

**bell** 77:8

**benefit** 38:8

**bet** 9:9 195:6 231:4

**bias** 227:18 228:25

**big** 113:7 268:21 269:24

**bigger** 33:20 174:25

**bill** 52:24 53:23,24,25 54:9

**billed** 53:22

**billion** 132:19

**biology** 36:4

**bit** 9:25 29:17 36:7 52:19 53:8 54:17 74:15 84:24 110:4 114:5,18,23 134:20 138:24 162:5 165:2 166:2 198:15, 16 220:20 222:1 253:22

**black** 85:1 92:16 116:19 122:10,25 123:2 214:18 218:7 244:5,17 259:12 263:7

**blackness** 246:9

**blamed** 160:21

**Bland** 32:17

**blank** 123:6

**blend** 120:6

**blending** 43:10 120:10

**blind** 262:3

**blood** 178:19

**Blow** 175:17, 18,21 176:2,3 217:17,18,20

**blue** 81:7,21 83:6,16,19 92:14 116:4

**board** 126:9 199:11

**body** 218:8

**boils** 186:17

**book** 195:18 224:1,10,18 225:4,12 229:17 230:3,5

**bookkeeping** 89:1

**books** 5:2 37:5

**bother** 16:24

**bottleneck** 181:2

**bottom** 71:15 72:15 74:15 84:13 252:24

**bought** 178:18

**bounds** 33:9

**box** 83:18,19 257:24

**Boy** 162:24 236:7,23 237:13

**Brady** 15:12

**brain** 37:22 109:22 120:10 139:10 152:19 232:3 243:9 246:23 247:4 279:6

**Brandon** 224:1

**break** 8:18,19 55:16 63:17,20 135:10,12 139:24 187:16 222:16,20 223:2 235:16 265:6 270:19

**Brenda** 5:20 101:18

**briefly** 36:7 185:3 190:13 244:11

**Briggs** 135:15

**bring** 81:2 113:16 120:25 160:1

**bringing** 235:3

**brings** 113:4, 11 271:24

**broad** 147:17 262:13,22

**broader** 136:25 137:14

**broken** 214:25

**brought** 158:15 205:16

**brown** 85:3

**buddies** 236:11

**build** 7:23 90:14 250:16

**built** 70:4,7

**bulk** 164:25

**bump** 260:5

**bunch** 260:18

**bus** 133:23 240:23 251:24

**bushy** 122:1 123:10 214:20

**business** 69:17 184:20

**butcher** 133:22 240:23

**buying** 164:12

---

**C**

---

**calculations** 13:3

**California** 9:8

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

20:19 21:9,10 32:17 166:5 273:20

**call** 14:5 38:6 48:14 49:2 59:8 60:8 62:10 145:21 157:12 185:7 190:17 217:4 225:5

**called** 26:14 33:15 35:14 69:15 112:24 125:14 149:6 249:10 281:6,8

**Calls** 86:7

**camp** 267:4

**camping** 199:8

**car** 163:7 236:8,25 237:16

**care** 59:24 212:12 214:3

**career** 17:6 38:18 240:11

**carefully** 57:20 121:21 230:4

**carry** 269:7

**case** 5:12 7:8 11:2,4 16:16 17:10,21,23 18:2 19:14 23:13,15,24 26:21 29:2,7,15 30:1,14 31:24 32:10,16,18 34:7 35:6 39:18 40:6,20 41:19, 23 43:1,6,16 44:15,17,20,23, 24 45:1,4,8 46:9,11 48:10, 14 49:4,18,25 50:25 51:1,4, 13,16 52:3,4,23 53:12,14 55:8 56:6 60:6,22,25 61:2,24 62:2, 15,25 66:9 69:23 71:18,21, 22,25 72:6 77:2

80:10 91:2 97:25 98:22,23 104:4 107:3,19, 20 108:6,13,23 110:9 125:1 128:19 129:24 131:13 133:9, 17 141:21 143:21 144:18 145:9 148:13 154:22 156:3,6 158:6,12 159:3, 5 160:10 162:10 163:19 166:5 167:9,13 168:25 170:20 174:5 175:6,11 176:14 178:21 179:14 180:3,5 195:13,16 203:19 208:13 217:25 219:11 221:12 224:17 225:10 227:16 229:23 231:10, 19 232:6 238:5 245:23,24 251:11 255:8 256:15 257:11, 21 258:8,10,24 259:10,20 262:11 263:3 266:2 269:16 271:12 276:6 281:16

**cases** 12:4 17:24,25 18:1, 3,9 19:8,10,11, 14,15 20:17 22:5,10,24 23:5,14,19,20, 25 25:11,14,18 26:15 27:12,19, 20 28:1,8,15, 16,17,25 29:2, 11,12,16,23 30:12,21 31:5, 11 43:9,10,11 56:15 60:7 70:9 108:19 131:16 166:20 167:11 175:1 190:25 203:14 224:19 226:1,3,18 227:13 228:7,9

230:11,18 239:7 243:7 245:2,3,14,18 273:21

**casual** 276:4

**catastrophic** 266:25

**catastrophical ly** 267:7

**catching** 128:17

**categorical** 89:21

**category** 149:8 236:9

**catered** 129:3

**caught** 276:15

**caution** 136:15,17,24

**cautioning** 136:23

**caveat** 96:16 268:21 275:25

**caveats** 170:19 268:16

**ceiling** 206:2

**central** 200:5

**certainty** 85:14,17,20 158:20 279:23 280:1,10,15

**cetera** 51:5 242:11

**challenge** 211:23

**chance** 19:5 34:21 50:10 74:2,11 82:12, 20 85:22,25 121:5 139:14 226:12 280:21

**chances** 103:20

**change** 39:8 61:17 99:6,7

100:7 109:21, 23 123:23,24 157:11 173:6, 10,16 192:15 193:24 209:5 251:7

**changed** 33:5 35:7 43:25 98:25 99:11 124:24 153:21 157:14 188:23 255:18

**changing** 110:1 120:11 217:1

**chapter** 169:13

**chapters** 37:7

**characteristic s** 153:14 218:5

**characterizati on** 13:18 48:8 153:4 160:14 206:20 263:5

**characterized** 12:20 13:9,13

**characterizes** 48:20

**charge** 51:10

**charging** 51:12

**check** 50:17 108:17 135:1 194:2 235:13 281:14 282:2

**checked** 13:2, 3

**checking** 11:10 12:19 168:9

**checks** 66:12

**Chicago** 5:18

**Chief** 15:24

**chiefs** 278:18

**choose** 40:23

**choosing** 152:20,25

**chose** 273:7,12

**chunky** 102:19

**circle** 21:17 69:11 127:24 229:10

**circling** 110:4, 5 196:16

**circumstance** 211:14 217:20 253:13

**circumstance s** 37:25 132:16 177:23 202:5 216:6

**citable** 169:17

**cite** 13:6 135:17 149:3,9 169:13 208:6 244:24

**cited** 12:18 83:5 128:9 135:20 150:9

**citing** 126:10 128:5 136:11 249:6

**city** 5:9,20 30:2,9 50:24 75:10 82:10

**civil** 17:10 18:6,9 20:2,24 21:19,24 22:5, 10 23:5,14,20 24:7 28:17 31:5,11 59:12

**claim** 14:14 33:4 168:3,22 169:18 170:14 234:4

**claims** 48:15

**clarification** 275:19

**clarified** 127:21

**clarify** 10:2 44:19 46:18 47:16 59:19 101:17 102:14

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

290

158:11 205:5 255:11 276:15

**classify** 61:14 68:3

**clean** 7:24 14:22 101:8

**cleaner** 240:8

**cleaning** 240:11

**clear** 20:10 24:15 26:7 49:7 71:1 87:5 88:8, 11,13 89:8 94:17 103:22 106:17 115:15, 19 132:15 145:22 150:15 151:2,3 157:9 163:3 170:25 171:13 175:9 176:2 179:25 213:13 236:13 242:14 246:4 266:17 272:25

**clearer** 13:18

**Clement** 15:25

**clinical** 36:4, 10,15,19,21,24 37:13,15 38:2, 10

**close** 16:1 264:12 279:22

**closed** 249:15

**closer** 54:15 133:6,9 193:14 204:9,25 236:17 258:17

**closest** 211:8, 9

**clothing** 89:3 118:1 250:16 251:12,16

**co-** 188:24

**co-authored** 125:13

**cocaine** 279:5, 9,19

**code** 243:9

**coefficient** 186:17

**coercing** 181:23

**coercion** 182:4

**Cognition** 281:10

**cognitive** 37:23 242:11

**coin** 68:23

**coincidence** 21:7

**coincidental** 219:14

**collaborated** 278:19

**colleagues** 7:2

**collect** 185:14 189:12 190:18

**collected** 38:19 39:15

**color** 85:2,3 89:13

**Columbus** 5:10,20,21,24 30:3 50:24

**combination** 87:13 265:12 266:12 267:13 268:12

**Comments** 47:22

**commit** 132:3 185:9 218:15 231:1

**committed** 92:21 131:22, 23 139:11 154:20 165:14 201:23 232:22 256:21 261:20

**committees** 280:4

**committing** 266:7

**common** 64:24 101:3 140:25

**communicate** 137:5 146:6 278:13

**communication** 10:3 72:3

**communications** 101:24

**compared** 65:4 244:20 268:2

**compares** 144:4

**compatible** 231:14

**compelling** 162:14 168:21 228:14 240:22 241:11,13

**compendium** 138:7

**competing** 65:10,11

**competition** 182:13

**compiling** 27:11,15

**complain** 46:4 228:15,16,17, 18

**complaint** 59:9,11

**complete** 13:17 14:4 46:13 53:2 55:24 103:1 111:11 112:14 186:24 198:8, 13,19 200:6 246:9 251:14

**completely** 33:3 43:25 98:24 134:4 141:11 144:11

156:4 242:24 244:5 245:5,13 249:18

**completes** 15:18 112:23

**completion** 52:25 112:24 113:7

**complex** 144:11

**complexion** 116:19

**complicate** 133:14

**component** 201:9

**components** 48:6

**conceivable** 34:5

**concept** 280:9

**concern** 157:21 164:17 216:21 220:18 277:10

**concerned** 114:4 140:10 146:13 157:16 217:21 243:2

**concerns** 38:5 140:21 141:14 267:16

**conclude** 109:17 144:13 163:11 225:13 226:19

**concluded** 211:16 212:2 283:9

**concludes** 283:7

**conclusion** 48:22 86:16 126:12,13 158:6,13 159:7, 16 160:10 168:4 180:17,

18 185:23 211:24 225:16 244:25 263:13

**conclusions** 41:3 137:21

**condition** 248:23

**conditioned** 179:20

**conditioning** 62:17 71:5

**conditions** 8:24 140:3 196:21 197:2,4, 5,11,13,15 210:17 244:12 246:20 247:2,3, 8 248:16 249:3

**conduct** 60:17, 21

**conducted** 13:12 38:14,19 165:15 214:9 248:12 278:22

**conference** 39:11 270:2

**confidence** 126:6,13,16,17, 20 127:1,11,18 128:2 129:6,14, 25 130:7,10 131:2,6,11 148:21 150:13 151:6 152:25 156:5,6 163:6 178:2,6 183:22 185:2,15,18,25 186:4,7,13 187:14,18 188:3 189:9,10, 11 190:19,23 191:7,8,25 192:19,22 193:9 194:18, 20 195:22,23 196:1,10,12 198:4,6,12,14, 18 199:25 200:1,8,9,11, 14,15,18 202:6, 8,22 203:21

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

204:14 205:6, 22,25 206:2,5, 10,17,19 207:3, 6,11,17,19,21, 22 208:8,18,20, 22 209:11,14 210:6,21,24 211:3,7,14,15 212:3,21,25 213:1,4,19 215:1,4,13,25 216:7,11,18,19, 22,24 217:4,6, 7,11 220:21 221:7,20,21,24 222:1,10 223:4 225:14 226:6, 20 229:14,16 248:5,19,22 249:1 250:18 254:6,8,9,16, 19,21,23 255:2, 4,6,7,9 258:21 259:4,5,19,23 260:7,16,19 261:9,15 262:19 263:22 277:19 278:4

**confidence-accuracy** 211:22 249:22

**confident** 25:16 125:19 129:7,23 130:11 136:21 157:5,13,25 190:2 194:11 195:11 202:17 204:13 205:20 206:24 207:4 210:2 213:22 215:20 217:19 218:23 220:10, 11,12 221:14 222:13,14 223:15 227:14, 17 228:4 231:11 254:19 263:12

**confidently** 22:23 23:3 153:25 157:10 164:3 171:7 172:24 227:11

**confirm** 131:19 166:19

**confirmation** 130:6,14 131:15 154:14 177:5

**confirmed** 237:25 241:15

**confirms** 211:21

**conflating** 212:17

**confuse** 32:14

**confused** 45:15 50:20 80:15 95:21 96:4 99:17

**confusing** 97:16 250:7

**confusion** 101:3 102:8 161:14

**conjunction** 38:15

**conjuring** 277:4

**connect** 151:11

**connection** 71:25 232:16 257:21

**conscious** 70:17 183:20

**consensus** 22:13 130:23, 25 184:21 191:18 192:3

**conservatively** 53:24,25

**considerably** 247:7

**consideration** 220:16 271:5 272:12,22 273:6

**considerations** 198:7 253:1

**considered** 46:1 99:19

**consistency** 23:16

**consistent** 23:12 124:18 146:19 162:2 214:10 227:9

**constantly** 88:8

**constitutes** 193:1

**consult** 50:25

**consulted** 278:15,17

**contact** 30:13 133:8

**contacted** 28:17

**contained** 40:6 42:16 281:17

**contaminatable** 105:13 276:1

**contaminate** 70:6,16 174:1 175:23 182:14 218:17 219:21, 22 221:7 223:12 256:11

**contaminated** 15:13 26:1 47:8 48:3,5 70:15 106:6 148:11 160:3 164:9 172:7,11 173:24,25 174:20 183:15 184:8 192:1,13 254:1 276:9,10, 13,17,25 277:2

**contaminates** 276:2

**contaminating** 67:10 103:12 105:24 107:7

109:3 164:20 175:24 177:15, 19 182:6 218:9 234:6

**contamination** 33:13,19 67:2,5 68:18 70:16 103:4,18,19,20 104:7,8,24 106:1,18 107:12,14,18 108:5,9,12 110:24 111:12 112:19,21,22 114:4 124:15, 20,23 133:25 134:1,4 140:10, 21 141:15,25 142:9,11,12,22 145:15 146:17 155:7 157:7,13, 16 160:3,4 164:24 165:25 172:2,4,15 173:4,9,13 174:2 176:6,9 182:8,11 183:19 184:3,7, 11 193:22 196:4 205:24 206:7,12 207:24 208:13 215:22 216:8, 11 217:12,14, 21,22 218:11, 23,24 219:2,5, 9,10,18 220:1, 6,16,21,22 221:3,19,22 229:1 231:14, 17 242:23 252:22,23 253:23 255:25 256:8,23 261:19 276:20, 22 277:7

**contamination's** 114:2,6

**contemporaneous** 44:2,4 59:2 74:18 76:21 94:18 156:22 229:24 254:15

**contempt** 183:1

**contest** 238:17

**contested** 237:23 238:9 239:14,19

**context** 128:1 147:21 152:16 265:10 266:10 267:11 268:9

**continue** 95:24

**continued** 37:2

**continuous** 89:20 123:21 203:3

**continuum** 253:19 258:17

**contract** 50:6

**contradict** 155:5

**contradicting** 64:10,17 65:13 170:24

**contradiction** 64:22 98:20 99:5 102:20,22 103:21 124:6 145:1,8 146:22

**contradictions** 64:20 102:16 123:14

**contradictory** 64:19 66:23 67:18

**contrary** 112:15 126:18 184:15 188:8

**contribute** 41:12

**control** 197:6, 8,9 198:2

**controlled** 188:25 189:21 197:6,16,20

**controversial**

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22:14,17 249:16

**convened** 5:7

**conversation** 10:15,16,20 72:2 73:24 75:13 92:22 97:6 118:8,10 156:1 269:10

**conversations** 119:5,25 120:3, 11 252:11 254:2 276:4

**convicted** 58:23 63:9 230:20

**conviction** 21:5 22:25 23:20 25:8

**convictions** 24:21 25:2,6,22 160:20 179:3 190:1 230:6

**convinced** 187:8 189:11

**convincing** 179:15,19

**cool** 201:6 281:2,13

**copy** 9:19 40:5 282:19,20 283:1

**correct** 11:2,3 13:25 14:2,18, 19 21:5,24,25 27:23 29:4 31:25 32:1 36:5 40:7 41:3,16,17 45:4 49:10 51:17 54:12 55:22 59:21 61:1,8,9 62:3,4, 8,13,22,23 63:1,2,5,6,9,10, 14,15 80:5 81:12 93:7,15 117:2,3 131:21 145:4 146:20 150:22 151:21 156:3 167:10

173:18 176:18 188:3,5 202:11 205:4 214:11 250:22 251:17 252:7,16 271:13 272:17 274:25 277:20 279:23 280:16, 17 282:22

**correctly** 12:20 13:21 51:6 76:13 80:7 85:5 93:19 122:3 136:3 189:23 194:5 232:10 235:5 236:4 237:24 247:25

**correlates** 110:8

**correlation** 186:3,7,9,17

**correspond** 218:13

**Cotton** 195:12, 20 221:12 227:16

**could've** 14:3, 7 46:15 53:9

**counsel** 5:15 8:13 10:4,7,15 16:21 30:13 42:12,18 43:15 51:1 52:12 139:14 222:15

**count** 31:3

**counted** 38:16

**country** 199:6

**couple** 12:25 18:10 29:1 50:4 54:3,4 64:6 72:6 101:22 110:6 134:17, 22 144:24 157:2 169:22 170:5 196:19 212:6 254:13

**court** 5:3,4,11 7:17 30:20

31:12,14 32:9, 10 33:3,8 34:4 51:2 186:1 273:20

**courtesy** 8:3

**courtroom** 223:23

**cover** 48:11

**covered** 147:1, 2 233:2 268:11

**COVID** 32:11

**crack** 279:5,19

**crafting** 70:22 145:6

**Cranking** 35:23

**crazy** 96:12

**created** 33:24 262:7

**creates** 232:2

**creating** 110:14 121:15

**credibility** 95:10 125:7,9 189:20 227:19

**credible** 169:16

**crew** 214:19

**crime** 65:16 66:10 68:17 69:9 72:10 78:9,14 85:24 110:12 115:4 119:11 131:23, 24 132:3 134:6, 14 139:10 152:8 154:2,21 165:10,14,16 178:16 184:5 185:3,6,9 200:18 201:20, 23 204:22 205:15 208:1 218:15 231:1 232:7,8,17,23 235:24 236:5, 14 243:11,20

256:9,10,18,21 261:20 266:7

**crimes** 147:24

**criminal** 17:11 20:18 21:4,8,10 31:12,14 32:10 43:11 60:7 68:25 77:17 165:13 197:19 206:3 227:7 230:8,12 273:20

**critical** 39:13 281:8

**critically** 105:17

**criticism** 229:7

**criticisms** 45:3,21

**criticize** 45:24 46:6,11

**cross-race** 191:2 198:1,14

**cue** 112:10

**cues** 110:22 111:9,25 112:13 151:11

**Curiosity-driven** 38:6

**curious** 132:8 152:11,23

**current** 35:5 51:8,11

**Curry** 44:21 62:7 72:10,13 73:25 74:18,23 75:4,13 76:5, 11,16 78:19,22 79:4 80:2 86:25 87:1,3,15,21 88:19 91:22,23 92:8,9,20 93:1, 5,25 94:1,3,25 95:4,13,16 97:1,25 98:8 100:11 101:25 114:20 116:8, 13 117:5,21

148:20 150:14 161:4,14 162:20 163:25 164:1 178:16 240:20 242:1 252:11 257:10 258:3 279:19

**Curry's** 88:20 118:9 160:9

**cut** 7:25 52:9 54:2,4 185:20 214:19 250:3

**CV** 34:19 35:5, 10,25 38:12 261:23 269:25

**cycling** 79:8

---

**D**

**daily** 279:19

**Daniel** 29:3

**data** 13:3 27:11 38:19 39:14 126:11 185:17, 22 186:5,6,21, 23 187:3,13,16, 17 188:24 189:23 191:3 194:23 199:13, 16 203:7,10 209:24 225:17, 18 248:14 249:8 250:9

**database** 26:14 27:11

**date** 39:24 40:1 76:1 83:20,21 110:11 118:14, 17

**dated** 81:18 88:22

**day** 5:6 36:20 65:15 66:10,15 70:10,20 72:9 73:25 87:15 88:23 89:5 90:8,14 98:13 99:17 100:1 101:2,4,25 102:10,18

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

103:11 104:21 105:23 107:5 111:2 114:21 115:4,7,15,18, 19 116:12 117:1,7,10,18 118:1 120:7 134:14,16 136:16,21 145:13 146:7 163:12 176:15 218:2,16 227:17 238:15, 19 275:9

**days** 11:18 14:17 52:25 54:7 58:2 118:5 119:7 120:19 124:21 145:14 162:22 193:15 194:6,12 236:5, 14 256:20

**dead** 160:8 212:16 252:8

**deal** 58:20 64:25 181:7

**dealing** 70:8

**death** 46:25

**decade** 200:6

**decades** 126:19 165:16 186:25

**deceive** 173:3

**December** 28:21 76:3 95:7 102:1 148:15 157:19 161:3 164:13 176:25

**decide** 59:4 148:10 169:15, 16 178:24,25 179:16

**decided** 32:13

**decides** 98:4,7 178:20 179:16

**deciding** 90:1

**decision** 180:9 185:14 192:24

193:8 221:7

**decisions** 167:5 186:1

**decisive** 228:12

**declared** 99:9

**decontaminate** 173:19,23

**decreasingly** 68:15,17

**deduce** 154:11

**deduction** 154:10 158:5,7, 14,15,19,23,24 159:1,2,8,17, 20,22,25 160:5, 11 178:3,4,5

**defend** 168:2

**defendant** 21:4 230:8,13

**Defendant's** 16:5

**defendants** 5:20 20:2,8

**defender's** 21:13

**defense** 20:7, 18 21:9,10 43:15

**defensible** 168:1

**define** 68:6 69:12 171:5

**defined** 67:25

**definition** 31:16 69:10 197:14

**definitive** 150:9 254:23

**degree** 36:24 71:9 124:23 152:16,17 225:18 234:4 260:5 280:10

**degrees** 36:4

233:17 234:21

**delay** 118:25 185:8 193:20 195:7

**delayed** 179:1 224:24 255:19

**delays** 194:25

**deliberation** 195:21

**demands** 223:23

**denied** 239:7

**department** 189:22 190:12, 16 197:17,23 228:6,16 235:23 278:16, 18,19

**depend** 180:8 240:13

**dependent** 253:12

**depends** 251:13 275:16

**deposition** 5:8 7:13 9:23 10:17 12:2 15:8 16:19,22 17:2 43:25 49:7,18, 23 53:7,8 54:21 67:22 79:11 87:18 90:19 93:24 95:13 111:16,18 118:9,14,19 121:19 160:10 161:13,19 165:19 178:15 179:24 182:13 204:20 224:6 225:2 264:19 270:5 272:16 281:17 283:8,9

**depositions** 29:2 165:15 166:24 188:13 224:16

**depression** 37:17 38:10

**depth** 57:16

**derive** 253:16

**describe** 49:9 71:2 178:22 191:15 251:20, 25 271:3

**describing** 107:2 124:6 153:20,25 154:1,7,15,19 158:21 175:20 219:11 239:3

**description** 81:20 84:22 85:23 90:5,7 92:22,23 116:1, 16 121:24 122:5,6 123:4 124:14 154:23, 24 175:12 177:19 185:13 214:23 260:9 263:1

**descriptions** 116:24 117:1 172:14,20 175:20

**descriptor** 258:2,7

**descriptors** 85:14 89:4,7 125:8

**designed** 182:19

**detail** 14:19 30:8 46:11 49:19,20 50:3 80:19 103:2,5, 21,23 104:17 105:19 112:17 123:14 124:2,9, 18 151:5 156:11 214:16 219:17 230:10 243:7 251:17 255:24 258:20, 22 259:21,24 260:13 278:10, 14

**detailed** 46:3

260:2

**details** 17:18 104:14 105:11 109:24 113:8 123:25 128:12, 13 163:5,8 170:21,22 171:8,19,20 172:25 213:16 220:23 227:6 239:5 254:7,8 255:16 258:23

**detect** 59:16 148:3

**detective** 72:3, 10,13 73:24 74:19,24 75:4, 12 90:20 93:24 95:3,12,17 97:2,7 98:1,5,6, 9 101:9,10,18 102:11 111:15 112:1 114:12 116:17 117:7 118:5 119:7 121:3 150:12, 16,20 156:2,19 262:5

**detective's** 65:17 100:11

**detectives** 58:2,16

**determinant** 24:13

**determination** 13:22 59:6 157:23 254:14

**determinations** 157:3

**determine** 57:15 95:10 157:4 216:8,10 251:21 252:2

**determined** 46:20

**determines** 180:3

**determining** 102:8

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**diagnostic**
119:23 144:15
167:1,2,3,6,16
179:3,10,18
180:1 181:3
183:23 187:23
188:8,11,16,18
189:24 190:5
200:19,20
202:14,19
203:10,13,22,
24 204:1,6
225:20 262:20
278:4

**diagnosticity**
187:24 191:9

**diaries** 251:3

**diary** 250:23
251:3

**Diego** 9:8
32:11

**differ** 59:15
105:16

**differed** 25:16

**difference**
37:13 106:9
134:18 253:21

**differences**
105:13

**differs** 97:14

**difficult** 7:1
198:25 199:2,
19 265:13,25
266:13 267:14
268:13

**difficulty**
199:14

**Diggs** 155:19,
20,21,22 156:1
157:5,11,25
237:14 254:12

**diminished**
246:7,12,15

**direct** 6:17
55:17 60:8
81:14 91:20
92:7 102:16
230:7 271:3

**direction**
23:11 204:9
205:4 228:14
241:12 262:21

**directly** 70:19
125:11 138:2

**disagree** 46:2
47:1 48:5,9
65:24 66:7
130:22 137:8,
16

**disagreeing**
66:5

**disagreement**
46:10,14,17,22
49:5 105:3
137:2

**disagreements**
49:6

**disclose**
273:22

**disclosed**
31:24 32:3
55:21 56:21
271:20

**discord** 114:23

**discuss** 78:23
79:10 185:1
253:20 271:9

**discussed**
10:7 183:12
233:4,20 271:5,
10,13

**discusses**
191:11

**discussing**
167:15 184:25
192:19 217:13
231:24 252:18
269:11

**discussion**
43:14 136:7
252:25

**disguise**
268:10

**disorders**
37:16,21 38:2

**disputed** 163:9
238:4

**disputes**
64:10,12,17

**dissatisfaction** 195:23

**dissertation**
36:23

**distance** 89:23
123:22 173:8
244:18 248:16,
17,20

**distinct** 152:20

**distinction**
36:9 104:13
105:10 129:20,
22 205:11
213:13

**distinguish**
233:8,13,16

**distorted**
223:14 227:9

**distortion**
227:12,18

**distorts** 223:20

**distracted**
244:12

**distractions**
198:25

**District** 5:11

**diving** 158:4

**Division**
190:15,24

**Dixon** 16:3,6

**DNA** 15:13
61:7,12,14,18,
19,23 172:10
184:5 203:25
204:22 228:7,8
230:11 256:10

**document**
12:3,7,11 16:7
19:5 27:22
50:11,13 53:12
59:10 60:19
79:13,14 80:13

82:20 90:13
91:10 93:7
121:4 156:22
167:18 237:12

**documentation** 104:7 107:14,
16 108:4,8
114:19 229:15

**documented**
25:7,12,19
26:11 67:5,12
105:25 107:8
114:6 208:8

**documents**
9:13 10:22,25
11:14 15:7,9,21
16:18 19:3
41:18,21,22
50:5,8 53:21
54:21 55:8,21
56:11,13,16
57:6,10,11
58:24 64:15
166:21 221:16

**domain** 136:22
137:11

**Dominic** 32:17

**door** 249:15

**door-to-door**
51:5

**doppelganger**
218:6

**double** 11:10
12:19 13:2,3
66:12 194:2

**double-** 262:2

**double-blind**
190:17 191:23
262:4

**doubly** 193:17

**doubt** 46:3
238:1 247:1

**Doug** 16:7

**draft** 51:1

**drafting** 42:11
229:17

**dramatic**
248:25

**dramatically**
124:24

**draw** 86:15
105:10

**drawing** 179:4

**drawn** 145:23
159:1

**drew** 45:24

**drugs** 122:1
178:18 279:21

**dude** 171:20
177:14,15,16
214:18,19
215:19,21

**due** 18:11
68:18 245:20
261:19

**dumb** 247:12

**duration**
70:11,21
198:16

**dwarfed** 25:14

**Dysart** 31:25
32:4 44:17 47:4
48:4 136:9
224:6 225:2,8
274:4,11

**Dysart's** 45:3,
21 47:22 49:13,
17,23 135:20
137:20 153:10
271:5 272:9,22

**dysfunctional**
182:24 183:8

———

**E**

**e-mail** 34:10

**earlier** 29:13,
14,19 35:14
41:9,13 54:20
55:20 57:5,18
71:20 77:1
80:13 88:22
98:23 99:17



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

107:3,15
110:10,15
120:9 123:20
125:4 138:11
155:3,5,6,11
160:17 161:25
165:17 166:2
170:21 172:9
195:4 217:25
222:11 224:5
233:4,20
244:22 250:21
251:10 252:10
256:4 260:23
261:10 264:2,
13 272:7 275:2,
21,23 276:21
278:20

**earliest** 68:7,9,
11 69:1,2,3,7
110:17,18
111:5,13
164:22

**early** 11:9,15
23:6 58:2,3
59:3 65:2,20,
23,25 66:15,22
67:24 68:4,7,10
69:1 73:3 81:25
83:1 98:13,18,
19 99:4 100:3,4
102:23 103:1,
17,23 105:23
106:5 108:23
109:1,4 125:7,9
133:17,20
142:8,17
161:25 165:23
171:4 190:6
193:18 204:24
210:21 214:1
276:10,11

**early-stage**
173:21

**easier** 9:17,20

**easily** 70:15
103:4

**Eastern** 5:7
64:4 139:21
222:22,25
270:24

**easy** 70:6

196:9

**editor** 37:4

**educating**
37:2

**effect** 191:3
199:24 244:10
245:18 269:24

**effective** 141:2

**effectively**
37:24 234:1,12
270:16

**Eisen** 13:1

**elaborate**
48:23

**elaborating**
199:20

**elapses**
255:23

**electronic**
282:22 283:4

**electronically**
56:7,8,10,12

**eliminate**
166:1 234:3

**Ellis** 13:7,17
250:14

**eloquently**
153:10

**emerges** 103:2
189:24

**emphasis**
110:8 115:15
171:16 275:20

**emphasize**
125:6

**empirical**
278:22

**employing**
153:11

**encapsulate**
46:22

**encode** 219:3,
6,20 220:4
244:9 267:8
268:4 279:6

**encoded**
220:9,14,15
263:24

**encoding**
266:24

**encompassed**
170:12

**encounter**
138:18 236:25
237:3,16

**encounters**
234:11,15
236:15,18
237:1 239:2
241:7,8

**end** 23:8 55:13
58:22 101:2
115:22 133:7
193:6 211:15
216:18 221:1
229:11 264:21
276:7 277:11

**ends** 14:11

**enhance**
266:24

**enormous**
104:6

**ensuring**
232:4

**entered** 36:14
83:20

**entire** 75:14,16
181:12

**entirety** 11:16,
19 15:18 19:5
42:8 74:11
77:20 78:3
82:12,20 84:3,8
90:21 92:20
106:22 230:3
275:2

**environment**
197:6 199:1

**environmental**
198:25

**episode** 70:12
161:25

**episodes** 70:4,
7 120:10

**episodic** 68:15
69:13 70:8,13,
18 118:25
119:17,22
120:5,8,15
160:25 182:19,
21,25 194:11,
13 223:23
252:20

**Epstein** 5:22

**equally** 149:4
159:12 276:9,
12

**equivalent**
141:2 144:16

**erroneous**
230:12

**error** 14:5 71:9
156:8,12
242:19

**error-prone**
126:16

**errors** 13:19,
20,23,24 26:11
220:10,11,13
228:4 251:1
282:2

**essence** 46:9,
17,22

**essential**
130:8

**essentially**
38:4 59:18
126:23 138:17
156:14

**estimate** 17:8,
13 245:16

**estimates**
173:5

**estimating**
89:19,23
123:21

**estimator**
48:18 198:9,11,
21 210:11,14,
15,22 211:6

242:13,16,21,
24 243:21
244:3,8,16,21
245:1,17,21
246:3,9,20,24
247:3,6,8,14
248:6 271:2

**et al** 5:10 13:1
245:9,10

**ethnicity** 85:1

**evaluate**
100:14

**event** 67:10
68:15 70:20
103:12 105:25
106:22 107:7
118:20 119:12
124:7 160:16
196:11 275:23
277:1

**events** 58:9
69:22 105:22
118:25 120:6
198:24 221:7

**everybody's**
109:3

**Everything's**
185:10 203:3

**evidence**
15:13 23:6
26:24 33:16,18
35:16 44:23
49:3 58:4
61:14,21 62:2
67:1 68:17
69:19 95:20
97:5 101:24
106:4,17
107:16,17
117:4 147:8
160:3 161:4
163:15 167:23
168:21 172:12
173:25 174:5
179:10,15,17,
18 180:15,18
184:4,9,10,12
185:6 190:5
194:8 204:4
222:12 227:5,
23 228:12,13
229:2,9 230:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

239:18 241:12 252:21,23 256:9,10 279:17

**exact** 40:1 78:16 83:11 104:1 118:17 149:24 186:6 230:17 242:3 277:5

**EXAMINATION** 6:17

**examples** 102:17 108:8 197:23

**exception** 181:13

**exceptions** 271:23

**exclude** 40:23 167:25 179:13

**excluded** 32:8, 25 34:3 166:17 168:8,13

**exclusively** 181:15

**Excuse** 18:7

**exhaustive** 239:1 273:11

**exhaustively** 45:25

**exhibit** 18:13, 16 34:18,24 39:17,19 50:6, 14,23 53:11,15 73:17,21 75:9, 18 77:16,24 79:8,11,15 82:9,11,14 90:19,22 121:1, 7 257:14,16

**exhibits** 77:19 91:15

**existing** 185:5

**exonerated** 24:1,5

**exoneration**

17:11 18:1,3 22:24 23:19,25 26:13 31:13 43:10 66:9 203:14,19 228:7,9

**exonerations** 26:15 27:14

**Exonerations'** 27:10

**expect** 25:24 123:25 131:6 153:13 229:1 245:17

**experience** 24:19 37:6 53:3 108:7 143:14 154:2,8 252:4, 17

**experienced** 70:14 103:14 197:25 213:18

**experiment** 38:14,19 251:3

**experimental** 36:8,10,16,17, 22,25 37:8,14, 19 38:3 48:25

**expert** 9:13 15:11,14 16:5 17:5,10 18:5 19:12 20:1,23 21:19,23 27:14, 20 28:7 29:3 30:2,20 31:8,21 34:9 39:13 41:14 43:16 44:16 45:18 47:22 52:5,24 54:8 56:17 61:7,10,15 80:19 81:3 150:17,21 165:8 166:16 168:4 172:10 181:24

**expertise** 61:22 86:18 137:11

**experts** 20:6

87:6,7 106:3 137:10 204:5

**explain** 37:12 69:14 103:4 125:24 152:15 170:11 185:4 190:13 222:4 246:16 247:10 259:23 260:1 261:15 263:21

**explainable** 260:1

**explained** 104:2 128:23 259:21

**explaining** 120:12 152:9

**explains** 232:1

**explanation** 101:5 102:12 109:2 114:8 124:22 142:1, 13,17 146:6,10 154:18

**explanations** 142:3,13 159:12

**explore** 208:12

**exposing** 269:9

**exposure** 233:23 242:10 265:11,25

**exposures** 139:3

**express** 196:10 210:24 254:19

**expressed** 41:8 133:21 186:12 195:23 206:19 260:16

**expressing** 126:16,17

**expression** 94:24

**extend** 8:3

**extended** 236:19

**extent** 266:5

**extra** 14:7 103:21,23 104:14,17 123:14 219:17

**extract** 58:4

**extrapolate** 265:4

**extreme** 131:24 132:3 145:11 234:1 236:16

**extremely** 170:25 244:16

**eye** 85:2 89:13

**eyebrows** 122:1 123:10 151:7 152:5 155:1 214:20 251:16

**eyes** 66:16 92:13 99:10 116:21 148:21, 22 149:1,7,8 161:25 162:1 201:2 268:12

**eyewitness** 14:10 15:16 17:15,17 24:19 25:21 26:9 37:10,25 38:9 39:5,9 44:7,13, 23 48:19 49:3 61:16 87:6,7 125:18 126:2,8, 20 132:25 135:25 136:18, 22 137:10 140:11,23 147:20 153:14 160:22 162:4 174:5,11 181:20,24 182:7,25 183:5 184:15 187:9 188:12,14 191:4 196:25 197:7 199:15

204:5 221:9 224:12,22 230:7,12,14 232:4 245:6 249:24 256:14 265:14 266:1, 13 267:15,17 268:14 269:10, 14 277:19

**eyewitness's** 192:22,23

**eyewitnesses** 147:24 148:16 188:16 234:3

---

**F**

**face** 67:14 81:7,8,21,22 83:6,7 103:8,9, 10 104:19,25 105:1,4,6,9,10 106:14,15,21 109:11,16,20 116:3 117:6 118:13 128:21 131:25 133:11 139:3,7,10 140:12,16,24 144:8,13,21 145:1,3,15 146:2,5,24 149:16 151:10 152:16,17,18 156:10 164:11 170:15 175:24 207:11 208:2,4, 15,19 219:20 220:25 232:1,3, 4,6,9,16,24 240:6,10,16,22, 24 241:3 243:13 244:6,9, 10 246:14 247:18,21 248:1,8 251:23 252:25 258:22 260:12 261:5,7, 19 263:12,23 267:8 268:4,11 270:17 276:1,2, 3 277:2,5,10 281:8

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

297

faces 140:15 144:12 151:23 201:24

facial 104:15 117:23 144:4 146:2,9,21 149:4,5 164:16 244:19 247:21 250:16 251:5,6, 7

fact 6:6 24:12 33:22 43:1 48:2 62:10 87:9,25 95:13 99:14 104:2,3 111:3, 19 113:22 118:20 120:17 122:10 123:24 148:4,9,13 161:20 162:17 173:6 179:8 188:13,19 203:20 212:5 237:24 239:16

fact-finders 48:12 49:2

factor 137:3, 14,22 155:22 188:4 245:22 259:16 265:12 266:11 267:13

factored 136:7

factors 197:10 223:12 242:8 265:13 266:12 267:14 268:13

facts 11:10,11 42:19 43:19,21 58:21 59:14,15 62:25 64:10,17, 18,19 65:11,13 66:23 67:18 71:18 89:2,15 114:24 150:24 213:17 241:10

factual 70:3

fail 67:14 103:13 104:18, 20 105:1

failed 256:24

failing 242:20

failure 67:10 137:22

fair 8:11,12 11:25 26:4 28:4 34:17 45:16 48:6,7 55:6 60:14 73:10 81:16 82:4 84:6,15 86:2,13 94:15 97:19 112:2 126:14 144:10 151:16 153:1 157:8 172:5,13 196:20 197:12, 18 198:23 201:22 214:6 215:24 225:24 251:18

fairly 57:20

faith 44:12 62:16,18 70:25 71:6,7,9 101:13,14 178:9,11,12,21, 25 179:21 180:5 181:3,8, 10,12,16,18,19 182:3 221:23

fall 152:2 209:15

false 119:16 179:13 230:24 242:22 259:1,3

familiar 7:14 60:9 72:11,17 74:20 76:9 79:1 81:8,22 83:8 85:15 94:23 97:3 100:12 106:23,25 112:11 116:4 117:6 134:21 135:14,16,22 137:17 138:4 140:15,16,25 141:5 143:22 144:3 145:16, 17,20 148:3,7 152:11 164:12, 16 169:24

191:12 195:13 207:10,15 224:11,13 230:9 232:5 233:8,14,21,22 234:8,23 239:25 240:4, 15,16,23,24 243:17 245:2, 14 246:14 250:15 251:24 253:2,3,7,17 256:22 257:22 262:11 263:3 279:4

familiarity 14:15 94:19,24 97:6 98:1,5,9 104:25 105:9 117:18,22 118:1 130:3 133:7,17,21 134:13 138:13 139:2 140:1,8 143:9,15 145:18 146:11, 14,18 148:10 154:24 230:19 233:17,18 234:4,21 236:2, 22 237:6 238:22 240:20 244:2,6,7,10 245:20 252:6, 12,15,19,21

family 119:6 120:19

famous 195:13 196:8

fan 6:24

farther 194:7 211:21

fascinated 246:13

fashion 190:17

fast-forward 118:4

faster 53:8

fault 142:25

feature 259:6 260:20,22,25 261:2,13,14 262:14 263:6,9, 14,16 264:5,6,8

features 117:11,23 134:2 146:2,9 149:1,4,5,7 164:16 176:5,6 218:10,12,18 219:6,12,13,20 220:4,8,11,13, 14,15 244:19 250:17 251:5,6, 8 260:17,18,24 261:6,7,8,9 262:15 263:7, 22,23,24 281:8

February 19:8 77:18

federal 26:24 33:16,17,21 35:15 273:21

fee 51:3

feedback 39:13 196:7,10 222:1,5,8,9 223:3,5,9

feel 8:1 23:18 45:6 70:17 183:20 223:17 229:25

feelings 178:17

feels 167:11

felt 46:5

female 78:17 149:16 218:15 280:22

field 22:11,20 126:10,19 133:24 167:24 184:14 186:19 187:7,8 188:9, 10,11,19 189:5, 8,9,10,16,22 190:10 191:11 192:18,20 196:17 200:7

212:6 228:6,17 234:3 235:1,23 248:10 249:12 278:19 279:3

fields 197:23

fight 192:4,7 274:17

figure 13:2 140:4 149:18 186:5 189:7,13, 18 190:9 197:14,15 200:16 201:3,6, 12 202:6 204:23 209:3,4 240:25 247:4 251:25 274:18 278:20

figuring 27:11

file 11:17 12:12,13 15:6 50:25

filler 25:18 190:20

fillers 108:12 131:13 132:23 185:11 191:23

filling 113:7

final 216:19

finally 164:25 249:15

find 11:11 13:13,16,23 25:9,11 69:5 131:25 150:4 164:15 199:23 235:18,25 250:1 273:18

finder 62:10 111:3

finders 104:3 148:9,13

finding 200:6 209:17

findings 39:7 137:15 185:1,4 224:9

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

finds 157:21 215:10 216:21 235:6

fine 47:17 88:7 101:22 110:20 131:12 167:24 168:6 170:22 171:1,2 225:9 264:16 272:1 274:1

fingertips 17:7 149:19

finish 52:2 59:6 135:11 198:22 277:24

finishing 158:4

firm 166:13,14, 15 224:16

fit 229:3

fits 190:7 225:19 228:5, 11 229:4

flag 98:25 99:1 103:1 104:6,8 105:24 170:25

flagrant 259:13

flags 160:4

flat 92:16

flesh 65:7 162:5

flip 68:24 85:21 127:11 198:19

flow 225:12

focus 25:4 30:8 33:14 58:5 64:21 69:1 98:15 111:13 131:1 165:17 171:7 191:3 198:9,10 242:10 245:12 250:8 269:1,22

focused 45:25

focuses 138:23 148:21 252:25

focusing 22:12 32:14 111:5 133:20 213:5 233:11 256:24 267:5

follow 9:18 88:25 139:24 155:9 165:4 184:20 272:6

follow- 101:22

follow-up 10:13 100:9 101:7 110:5 127:22 129:2 134:17 165:2 170:5 183:13

Forcing 194:17

foremost 254:15

forensic 15:11 61:12,21 68:17 106:1,2,4 172:9 173:24 184:4,9, 12 256:8

forensically 221:8

forget 26:14 69:12 190:11 210:15 254:25

forgets 230:23

forgetting 26:2 33:19 69:24 165:24

forgive 87:6 155:15

forgot 168:14 169:5 214:11 252:13 264:3

form 37:23 85:11 88:6 112:14 115:1 116:10 141:16 153:4 160:13 172:16 206:21 246:3 263:4 269:4 270:12

formal 232:17, 24

formed 113:3, 14,15 133:12

forms 276:21

forward 168:18 175:12 269:7

found 26:15 194:19 199:13 242:9 250:14

foundation 111:24

fourth 229:4

frame 104:1

framework 238:12

free 54:2 137:7

fresh 10:11

friend 66:18

friends 7:2 195:18 241:19

front 9:11 23:3 40:5 118:17 201:24

froze 52:19

full 6:1 8:5 11:14 57:11 101:18 138:1 208:3

fully 24:10 49:8 115:20 153:7

fun 281:24

function 138:14 195:1 204:3 248:4 260:17 276:13

functioning 183:3

funny 188:17

future 24:6 169:11 210:1

_____

**G**

_____

game 7:5 174:3

gap 171:2

Garret 225:11 226:17

Garrett 224:18 225:3 229:15 230:6,14,18

Garrett's 224:1,9

Gary 125:13 130:19 185:2 192:6 194:17 196:1,7 248:13

gave 81:5 84:17 93:24 106:13 116:16 154:24 155:11 182:4 214:22 225:2 248:9

gee 189:25

Geez 17:11

gender 89:22 173:1

general 62:20 69:18 80:10,16 107:21 148:8 173:22 175:22 177:13 185:12 244:4,7,25

generalize 209:17

generally 17:14,20,22 39:2 48:4 51:25 52:23 64:18 165:9 196:21 197:12 245:7

genuinely 253:3,7,17

gigantic 104:8

give 6:12 7:19 38:22 39:6 40:17 48:22 60:3 65:7 66:7 77:19 113:4 119:14 132:7, 11,12 139:13 149:22 160:7 169:25 175:12,

20 178:13 180:6,7 202:15 208:21 212:22 216:21 217:7 219:22,23 236:20 238:1,3 239:1 251:23 260:19 264:14 268:7 273:13 280:23

giving 7:25 32:8 34:3 60:24 61:2,6 62:5,9, 11,14,24 63:3, 7,12 137:18 167:17 208:23

glance 12:24 16:14

glanced 15:10, 15 16:7,11 47:24 49:24 79:17 121:20

glancing 16:8 106:2

Gloves 92:15

God 188:1

good 6:19,20 7:5 9:22 35:1,4, 23 44:12 62:16, 18 63:17,19 68:20 69:7 70:25 71:6,7,9 89:21,22 101:12,14 104:19,25 105:5,6,7 106:14,21 109:19 135:7 140:16 178:9, 11,12,21,25 179:20 181:12, 16 194:6 195:1, 9 200:2 209:8 210:16,17,19, 25 211:18 212:10,19 213:6 214:12 217:3,8,9 221:22 222:11, 15,20 223:21 242:20 244:3 247:2 248:12

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

265:8,9 275:6
282:5 283:4

**good-** 181:15

**good-faith**
100:4

**gorgeous**
248:18

**gosh** 73:14

**Government**
19:21

**grad** 16:24

**gradation**
133:5

**gradations**
139:5

**graduate**
36:13,14,15,18
37:1

**grainy** 246:17,
21

**graph** 187:24
203:23 248:18,
21

**graphs** 209:3

**grappling**
65:12

**gray** 81:6,20
83:5 92:13
116:2,20 122:1
123:8

**great** 58:20
115:13 209:13
217:10 249:14
264:19

**grief** 35:1

**ground** 7:13
106:12,20
132:6

**group** 234:9

**groups** 210:23

**guess** 14:4
21:16,17 26:16
31:2 53:9 54:14
67:4,18 73:7
81:17 87:12,13

88:23 99:7,13
100:9 102:14
110:6 112:3
128:14 154:5
184:22 202:15
208:5 209:16,
18 219:14
235:12 243:5
251:6 254:13
262:23 266:5,7
267:6 268:4,6

**guessed**
235:12

**guessing** 79:1
196:1

**guidance** 68:6
143:19

**guide** 37:24
101:6

**guilt** 23:11
174:6 204:13
262:21

**guilty** 63:13
185:12 186:15
202:16,18
204:11,15
242:18 267:9

**Gun** 92:16

**guy** 22:22,23
25:17 67:7 99:9
102:18 104:21
107:5 109:12,
15,18 124:24
130:6,9,16
132:10 133:21
134:10,11
147:1,2 153:23
154:9 164:21
171:20 174:15,
16 177:3,4
178:5 186:15,
16 195:10
198:16 200:17
201:16,17,21
202:1,20
203:16,18
205:18 209:2,8,
13 210:18,25
211:8 212:11
213:3 214:22
217:8,9,10
218:5,13,14

219:5,7,8,15,16
222:11,12,13
236:12 239:15
240:12 259:8,9,
12 260:3
261:18,20
262:17 267:9

**guy's** 204:11
207:9

**guys** 166:9,12
225:5 226:24
259:22

---

**H**

**hair** 85:3 89:13
122:1 123:5
171:21 177:14,
16 250:16
268:11

**hairstyle** 85:4
89:13 123:5

**half** 14:15 37:2
97:10 119:11
133:3 190:20
201:17 203:12
205:16 226:10

**halfway** 271:4,
7

**hallmark**
172:15 206:11

**hallucinate**
154:5

**hallucinating**
154:6,17

**hand** 6:10

**handcuffs**
200:17 201:16,
17 202:1
205:17 262:18

**handle** 92:16

**handling** 62:2

**handwritten**
11:21,23 12:1,5
73:24 75:7
76:22 92:2,4
97:4 110:18,21
111:9 112:9

121:2 126:24
143:5,7 237:9
238:14 252:9

**happen** 95:15
96:1,3,4 100:5
103:6 104:24
107:10 109:18,
24 120:3
124:20,22
162:19 184:5
206:7 211:4
214:24 215:17
218:4,12 219:5,
14,17 221:2
244:2 246:23
247:10 254:24

**happened**
23:4 24:2 28:23
34:5,7 45:1
53:8 65:17
67:11 78:21
90:6 100:17
108:25 111:4,
10 112:23
115:6 120:4,7
134:15 141:24
146:24 157:10,
20 159:13
160:16 162:15,
18,21 163:14
165:22 182:18
227:12,22
231:3,4 251:2
254:3 259:3
261:18

**happening**
70:9 125:1
128:13 151:11
190:1

**happily** 60:3

**happy** 8:9,19
9:17 22:8 24:8
75:13 77:19
96:9 106:3
127:8 167:19
203:6 222:9

**hard** 7:3 25:11
30:15 109:20,
23 134:9
164:19 261:14

**harder** 70:16
134:12 164:20

219:21

**hate** 222:16

**Hay** 13:7,17
250:13

**head** 7:20
109:13 138:9

**healthy** 92:12

**hear** 52:13
60:11 142:16
143:12 169:20
188:18 212:23

**heard** 39:4
52:15 87:1
101:4 143:24
168:9 188:1
219:10 253:8
282:15

**hearing** 31:8,
13 105:19
166:7 168:12

**hearsay** 225:5

**height** 85:1
89:12,18,23
122:9,13
123:21 173:7

**held** 77:17

**Hell** 282:10

**helpful** 23:22
29:20,22 46:8
176:14 187:2
250:12

**Hernandez**
29:7

**hey** 132:9,18

**high** 91:11
126:17 127:18
131:7,11
136:20 149:6
156:7 178:2
187:12,13,18
188:2 191:1
197:25 200:16
202:16 203:21
204:14 206:17
207:22 208:20
209:2 210:5,6
211:15 212:20
213:1,4 216:19,



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

24 220:10,12
226:6 228:4
235:6 245:16
246:19 248:19,
21 249:1,4
254:9 255:2,4,
7,9 258:21
259:4,5,19,23
260:7,19,24
261:2,9,15
262:19 263:21
264:5,6,8
266:11 267:7

**high-** 178:6
202:22

**High-
confident** 25:7

**high-level**
268:2

**higher** 64:25
84:24 144:14
196:10

**highest** 202:6,
7

**highly** 48:12
90:24 108:22,
23 126:16,17,
18 172:25
179:6 184:16
203:4,19
208:21 209:25
233:14 262:17
278:4

**highly-
suggestive**
200:16

**hilarious**
32:19

**him,'** 93:17

**hippocampus**
113:6

**hired** 19:12
28:15 29:15
182:10

**hiring** 28:14
30:9

**Hispanic**
102:19 215:19,
21 218:15

**history** 36:20
39:7

**hold** 98:4
227:23

**holding** 201:16

**holds** 103:25
262:25

**honest** 173:3

**honestly**
182:12 231:17

**hood** 122:2

**hoodie** 81:6,20
83:5 92:13
116:2,20 122:2
123:8 145:23
146:4

**hope** 24:5
104:9

**Horry** 245:8,9,
10

**horse** 160:8
212:16 252:8

**Horton** 5:9,17
7:7 14:10 16:9
44:23 50:24
63:8,13 77:17
107:19 143:12
147:6 151:12
152:4 153:22
155:25 157:6
158:7,14 159:7,
16 161:6,16
163:4,11
178:17 218:23
236:3,21 237:7,
24 238:17
239:7 241:6,15,
19 242:2 255:8
257:24

**Horton's** 62:25
162:9 240:20

**Horton-
clement** 16:8

**hospital** 14:17
57:22 120:19

**hostage** 199:9
267:5

**hour** 10:21,22
51:3,5 54:23
205:16 225:21

**hours** 51:24
52:6 53:21,22,
23 54:2,15 55:9
193:15 222:18

**house** 78:10,
11

**housekeeping**
26:16 37:12
41:25

**Houston**
190:12,16
191:11 192:20
278:19

**huge** 113:23
124:6 136:5
208:23

**hugely** 99:6
249:15

**human** 24:4
26:24 33:15
35:15 36:24
37:3 44:18
199:11

**hundred**
244:13

**hundreds** 25:1

**hung** 180:2

**hypothetical**
66:8 132:8
216:16

**hypotheticals**
96:12 178:14

---

**I**

---

**i.e** 144:21

**ID** 68:9 93:1
95:5 127:4,7,9
128:14 130:21
133:15 135:25
136:13 140:11,
23 152:9
153:18 154:12,
13 156:23
157:5,11

158:16 162:21
163:14,24
170:15,16
178:2,6 185:14
190:19 195:24
202:17,22
207:1,22 209:1,
7,9,14 210:1,4
211:2,25 212:9,
11,13 214:13,
21 215:1,16,23
216:23 217:3
218:23,24
230:25 231:21
234:1,7,12
236:9,17 241:5,
13 243:4
245:24 248:3,
22 249:1
250:16 251:6,
15 258:18,19,
21,24 259:2,5,
10,19,20,23
263:22 265:15
268:18 269:21
270:16 275:18

**ID'D** 153:22

**idea** 159:22

**ideal** 196:21,
23,24 197:2,3,
5,13,15 254:18
262:8

**identical** 209:4

**identification**
13:6 14:10
18:17 34:25
39:20 48:19
50:15 53:16
65:3,4 73:18
75:19 77:25
79:16 82:15
90:23 121:8
125:17 126:25
129:24 130:4
132:25 136:18,
23 138:17,21
144:1 147:5,21
174:5,12
192:24 193:8,
11 212:20
213:8 214:2
222:7 223:3,9
230:12 243:15,

22 245:2,3
247:21 249:11
251:10 256:15
257:17 258:8
260:8 261:15
262:11 263:3
265:11 266:11
268:10 269:7,
16 277:19

**identifications**
14:2 17:15,17
129:25 134:19,
20,23 135:16
138:8,13,14
181:21 182:7
197:8 230:13
233:22,23
253:3,5 254:24
255:3 267:12

**identified**
13:21 62:7
125:19 155:10
164:3 186:15

**identifies**
22:23 66:21

**identify** 23:3,7
72:14,24 75:5
76:11 132:21
144:19,22
208:15,16,19,
20 209:21
210:20,24
211:8,18
242:20

**identifying**
23:8 84:23
132:12 149:5
151:9 153:14
156:10 163:11
242:18

**IDS** 48:23
127:16,17
128:5,6 130:8
131:1 133:1,10,
14 136:4 137:4
139:6 153:24
214:24 231:12
234:10,14,15,
18 235:8
236:18 242:10,
12 243:1
244:20 250:22
252:18 259:3

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

267:20

**ignore** 83:19 126:19 185:25 198:12 203:20

**illustrates** 33:12

**imagination** 144:8

**imagine** 7:4 234:10 235:10, 15 265:5

**imagining** 254:2

**immediately** 192:24 193:7 221:13 225:14 226:6,20

**impact** 98:10 163:19 178:23 180:5,16 223:3 247:19 262:10 263:2 266:20 269:20 279:5, 21

**impactful** 247:15

**implant** 242:22

**implausible** 67:13

**implication** 232:19

**implicit** 24:17 254:20

**importance** 22:12 32:13 115:17 125:6 129:24

**important** 46:1 87:24 88:4 93:11,13 104:13 105:13, 14,15 125:25 136:8,9 154:12 161:23 192:11 203:12 214:5 227:25 267:20 278:12

**impossible** 112:17

**impoverished** 214:23 246:20

**impressed** 149:23

**improperly** 13:14

**inaccuracy** 109:3

**inaccurate** 108:24 173:7

**inaudible** 125:23 250:6 262:1

**inches** 122:13

**incident** 76:7 239:13

**include** 27:12 45:21 46:21,24 89:25 90:1,2 234:13 272:8, 11 273:7 274:20

**included** 26:19,22 31:15 42:19 43:2 46:9 49:1 87:1 89:3 181:5 187:5 230:13 273:10

**includes** 45:2 256:1

**including** 37:25 42:11,18 46:19 182:8 188:12,13,21 230:24 234:14 236:22 245:14

**incomplete** 24:22,23 25:20 110:19,21

**inconceivable** 112:4 183:17

**inconclusive** 174:7 254:8

**inconsistency** 59:16

**inconsistent** 123:23 124:9

**incontrovertible** 227:25

**incorporated** 85:4 189:6

**incorporates** 84:12

**incorrect** 48:16 126:12

**increase** 51:9 259:1

**increased** 215:24,25 216:3,7

**increases** 206:5 248:16 258:7

**increasing** 205:25 206:10

**incredible** 199:14

**incredibly** 107:8

**independent** 38:5 60:21 71:21,22 225:19 228:11, 13 229:2,4

**indicating** 125:18 145:19

**indication** 247:5

**indications** 66:6

**indirectly** 144:23

**individual** 123:1 239:22, 23

**individuals** 175:3

**infallible** 26:9 65:22 71:7 127:19 202:12 227:24 228:9,

10 235:7

**infer** 191:1

**inflated** 222:1

**inflation** 205:23 207:3 215:13 217:4,6, 11 220:22 221:20,21

**influence** 8:23 177:9,24

**influencing** 48:18

**inform** 91:1 190:23 214:15, 20 215:1 263:13

**information** 14:3,8 16:15 27:15 58:5 60:18 73:2,5 76:19 81:5,11 83:1,4,24 84:7, 8,16,17,23 85:4,7,13 86:5, 13,20 87:2,20, 21 88:5,9,19 89:3,13 93:11, 14 100:13,25 101:1,6 102:7 113:1 123:11 126:7 132:13 144:15 151:5,8 156:17,19 161:24 167:3,7 169:25 171:17 187:12 192:23 196:5,15 198:15,17,18 199:22 200:14, 15,23 201:2 202:14,19 204:2,16 205:3 208:23 210:2 211:20 212:1,4, 22 216:22 221:9 231:7 236:10,20 241:4 243:9 255:18

**informational** 75:12

**informative** 196:12,14 209:25 211:19 254:10

**informed** 174:7

**infrequently** 125:2

**infringing** 169:3

**inherently** 131:17 201:15

**inhibited** 246:5

**inhibiting** 46:19

**initial** 25:8 30:13 48:19 94:9 99:21 126:5,14 164:14 165:18 211:7 224:23 225:22 228:3 231:20 232:2 251:13 255:23 256:24 278:2

**initially** 64:24 99:8 103:10 124:2,19 191:22 216:21 219:21 220:4, 14,15 254:7,9 256:24

**innocence** 22:21 23:11 174:6 203:13, 22

**innocent** 63:13 185:10,11 186:15 195:20 204:11,15 219:5 225:14 226:5,20 227:11 232:1,9 242:22 257:6 276:7 277:2,5

**innocuous** 221:6

**inside** 78:11,14

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

302

**instance** 26:4 31:11 34:2 132:20 140:5, 22 141:6,15 157:2 240:4 252:5 254:6

**instances** 14:23 109:6 166:3 238:12

**instructed** 8:14

**intend** 40:6 45:4,5,10,15 271:11,14,17

**intended** 33:3 158:18 273:10 278:13

**intense** 37:5

**intention** 40:10 45:7,13 271:25 272:3,4 274:2,8

**intentionally** 182:5 275:4

**intentions** 40:8 45:6

**interact** 164:10

**interacted** 238:18

**interaction** 90:7 153:19 163:7 232:18 238:14

**interactions** 80:1 147:14 237:8 238:23

**interest** 57:19 231:25

**interested** 43:24 105:21 235:12,19

**interesting** 108:24 199:17 208:10 209:24 235:22 264:15 281:24

**interpret**

152:10 153:24, 25 163:15

**interpretation** 137:7 158:23 224:9

**interpretation s** 225:17

**interpreted** 150:12 152:7 154:15 184:23 187:21

**intervals** 196:12

**interview** 14:17 69:4,6,8 76:17 93:25 94:3,9 118:6,7 119:7 121:2 141:7,9 170:20 176:20 191:22 236:5

**interviewed** 69:8 108:17 109:2

**intimately** 132:21

**intriguing** 246:22 247:1 279:9

**introduce** 271:11

**intruder** 72:11 74:19 143:9

**inventor** 249:17

**investigate** 189:15

**investigating** 58:1

**investigation** 11:9,16,18 44:5 58:3 59:4 60:18 66:1,15 68:4 98:14,18,19 100:13 102:24 110:7 115:18 171:5 206:11 216:7 220:24

229:4,17 269:2

**investigations** 23:7 197:19

**investigative** 11:17 78:23

**investigators** 182:9

**invited** 149:22 264:13

**invoice** 51:16 53:5,11,14,18, 20 55:2

**invoices** 53:6

**involved** 18:4 21:4 28:2 38:13,18 224:23

**involvement** 27:8,10

**involving** 147:24 174:8, 10 175:4,11 176:11 233:22

**IRB** 199:6

**irrelevant** 131:14 167:22 168:15 181:11, 17 246:25

**Israeli** 149:15, 16 264:9 280:22

**issue** 64:15 164:4,6,7 238:9 239:13 249:16 270:17

**issued** 19:3 26:17 29:3 39:18,24 45:20 50:8 51:16 56:20 80:16

**issues** 44:10 46:1 62:21 238:11

**issuing** 40:23 41:23 273:5

**iteration** 95:11

**J**

**J-O-H-N** 7:10

**January** 5:6 77:18

**jeans** 81:7,21 83:6 92:14 116:4

**Jennifer** 32:4 136:9 137:20 195:12 227:15 256:6

**job** 35:12 45:17 183:2 195:9

**Joe** 175:17,20, 21 176:1,2,3 217:17,18,20

**John** 5:8 6:3 7:10 50:25 132:18,19

**jot** 71:10

**journal** 281:10

**journals** 37:5 260:15

**Juan** 29:7

**judge** 31:7 32:11,12,21 40:12 45:13 69:23 167:19, 24 168:2,4,5 181:25 274:17

**judges** 179:13 186:8 268:17

**judging** 115:6

**judgment** 47:3 48:14 49:2 98:3 111:4 136:13

**jump** 47:14 137:24

**jumped** 110:5 114:17

**jumping** 124:12

**jurors** 268:17

**jury** 23:3 32:14 33:9 62:21 95:11 98:4,7 101:13 114:25 115:7 157:3 169:4,7,15 178:20 179:16 180:3 182:1

**jury's** 157:23 180:8

**justice** 256:25 257:7

**K**

**keeping** 48:16 98:14

**Kentuckiana** 5:4

**Kentucky** 5:5

**Kevin** 66:18, 20,21 98:23 107:4,6 217:24 218:3,5,16 219:11 230:24 257:4

**key** 201:1 245:17

**Kidd** 168:25

**Kidd's** 168:24

**kidding** 34:15

**killer** 72:18

**kind** 16:13 17:10 21:21 23:24 24:17 33:25 34:12 38:15 39:2 55:13 57:4 69:15 91:10 97:2,19 104:12 106:8,11,15,20 110:4 111:23 112:10 116:19 124:25 129:20 131:14 132:6, 12 133:25 143:2,23 144:23 147:9, 15 148:6

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151:16 171:16 176:3 177:21 178:19 179:8 182:24 183:6 192:25 196:2, 10,11 209:18 212:24 216:14, 20,23 218:11 219:14 221:17, 18 226:24 228:25 229:15 230:24 232:19 235:14 238:6 239:12 242:6 243:19 246:6 252:1,21 253:10 255:21 267:17 268:17 274:7 275:21, 22 279:9 281:24

**knew** 72:12 74:25 76:9 93:4,16 108:19 168:13 169:5 204:8 222:11 239:3,16 262:6 273:24

**knowledge** 24:18 31:20 32:2,7 69:18,21 70:1,3 108:7

**known-person** 48:23 133:10 134:19

———

**L**

———

**lab** 39:15 106:6 172:11 185:3 190:14 192:17 196:16,21 197:12 228:6, 18 235:24 248:10,12 249:11 250:18

**laboratory** 38:14 199:1 245:11

**laid** 65:9

**land** 186:14

**language** 86:3, 11 102:15,16 125:11 127:4 225:25

**large** 48:24 137:3 142:12 145:22

**largely** 165:18 241:14 254:8

**lasted** 70:10,20

**lastly** 63:11 75:3 144:17

**late** 110:15 204:24 252:14

**laughing** 187:20

**law** 69:22

**lawsuit** 18:6 20:24 21:19,24 24:7

**lawsuits** 20:3

**lawyers** 59:10 60:7 274:17 279:25 280:2

**lay** 81:6 111:23 148:19 178:9 267:23

**laypeople** 33:24

**layperson** 33:23

**lead** 178:2,4 229:6

**leading** 25:2,8, 22 254:3

**learned** 44:6 48:17 69:22,25 80:4 162:3

**learning** 37:5

**leave** 95:23 204:16 255:7,9 267:6 270:6

**leaves** 204:21

**leaving** 48:21 49:8 127:14

**led** 22:11 39:8 126:12,13 160:20 179:2 180:12 185:23 189:25

**left** 55:23 74:15 78:12 123:6 155:6 196:17 265:7 272:23 274:24 275:4 279:3

**legal** 24:25 25:3 27:2,5 33:12 62:21 88:3,11 105:15 118:22 136:15, 17,24 137:6 165:11 180:13, 19 182:22 183:5 186:25 243:2 267:18 280:4,6

**lends** 227:19

**length** 35:2 197:9

**lengthy** 34:20

**lent** 189:20

**lesser** 130:1,2

**lesson** 44:6

**letting** 169:10

**level** 62:20 138:12 139:2 148:21 186:13 202:6,7 206:2 213:4 234:22, 24 236:2 254:16 258:11 265:19,21 266:11,22

**levels** 210:21 266:25

**lied** 33:11

**life** 37:2 107:5

**light** 15:2 44:17 81:7,21 83:6 92:12 116:4,19 121:25 123:1 246:10 247:16

258:2 259:9 260:4,22

**light-skinned** 259:22

**lighter** 92:14

**lightest** 257:25

**lighting** 106:14 197:8 247:15

**likelihood** 142:11 209:6 248:25 259:1 277:4

**limit** 167:14

**limited** 126:7 137:21 166:4, 17 167:17 239:4 240:17 274:18

**limits** 165:25 166:1

**lines** 83:10,11 117:6 168:21 215:3 225:19 228:13 229:4

**lineup** 104:20, 21 108:12 126:6,15 128:5, 6,14 130:13,20 131:1,4,5,25 140:24 141:1,3, 4,8 147:9 150:12 156:10 163:13 164:2 170:17 174:14 175:18,21 176:3 177:18 178:3 185:8 191:18,19,21 192:22 200:20, 21,22 201:21, 22 202:23,24 203:1 210:1 211:2 214:4 232:2,10,17 242:19 254:25 259:12 269:21 275:13 276:3,8 277:6,11 278:3

**lineups** 128:18 174:24 190:18,

20,21 249:11, 17,18,24 278:23

**Lionel** 167:9

**list** 15:18 19:1, 7,16 27:17,20 28:1 29:21 30:24 42:20 55:18,24 57:13 89:15 239:1 253:25

**listed** 29:21 41:11 55:22 71:16 78:17 261:23

**listen** 44:13 188:15 203:18 231:13

**listening** 231:15

**listing** 29:16

**lists** 41:2

**literally** 31:7 112:16 113:9 160:19 226:3

**literature** 11:7 12:18 15:1,5 48:24 68:3 108:7 125:6 136:6,10 137:3, 23 140:5 143:15 144:3 147:14,17 148:2,5,24 170:25 181:6, 13,15 184:1 213:22 214:10 215:6 216:5 233:7,16,21 234:20 244:24 246:14 252:18 262:9,24 279:4

**literature's** 266:17

**live** 70:2 170:17 185:7 236:24

**lived** 153:19 239:3

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

304

lives 70:4
162:23 240:2

load 242:11

located 5:4 9:6

location 5:14

locations 5:23

Loevy 166:13

logged 57:22

logically 88:25
233:25

long 10:19,21
12:3 13:8 53:5
63:20 77:21
103:16 105:17
114:1 118:25
119:17 120:17
130:9 142:7
148:11 154:13
165:10 170:22
171:11 177:14,
16 182:19
198:16 218:21
250:25 278:9

long-delayed
160:25 180:9

longer 28:1
43:8,13 68:13
103:25 110:23
111:11 171:2
194:14,25
196:11,15
223:17 248:17
278:8

longest 183:2

looked 10:9
13:4,5,8 15:18
27:17 38:12
47:15 57:12
72:11,17 74:19
76:8 80:24
82:25 87:13,18
92:4 94:17,21
95:3 110:10
114:19 119:15
143:5,6 194:3
213:2 228:4
237:19 238:8
252:9 268:5

loom 145:22

looms 142:11

lose 193:21

lost 6:22

lot 12:6 17:13
24:5 25:5,23
26:2 39:10 46:4
48:11,21 57:21,
23 58:5 59:7
65:15 68:19
69:2 88:10
89:18 90:13
105:11 108:10
114:9,10
119:24 120:12
123:14 125:5
130:16 135:24
136:22 137:4
145:10 167:4,
11 171:15
174:23,24
183:11 185:17
196:17 199:7,9
200:15 218:10
229:22,25
233:1,7 236:21
245:23 256:12
260:25 261:1,8,
18 263:19

lots 44:10 70:1,
2 108:10
131:16 133:13
162:24 197:1
247:3

loud 7:19

Louisville 5:5

love 169:19
230:22 231:2

low 126:16
138:12,16
163:6 195:23
207:20 208:8,
18 210:6,24
211:14 212:24
213:19 216:18,
22 220:10
222:9 250:18
254:7,20 255:7
258:11 259:4
261:12 263:15
265:19,21

270:13,15
277:6

low-level
265:18 266:3,4
268:1,3,23
270:10

lower 54:17
210:7

lying 33:5
44:10 173:3

---

**M**

M/b 91:24
92:10 121:25

made 47:3 93:6
94:8 95:4 97:5
98:5,8 104:13
117:5 124:14
154:13 163:24
172:6 187:14
193:11 250:24
251:6 255:2,3
259:4 270:8

Madison 5:2

main 5:5 71:4
200:22 277:14
278:1,12,14

major 167:5
182:11 276:24

make 7:14 8:1,
9 9:16 11:11
12:19 13:4,8,22
15:15,20 18:14,
24 19:23 20:11
24:10 33:6
42:10,13,15
45:17 48:14
49:7 51:1 52:12
54:1,5 56:18
57:5 58:12 60:2
67:9,20 68:13
70:25 75:17,23
78:13 80:2
88:15 94:16
97:1,25 100:15
107:15 111:4
115:19 117:22
127:19 128:22
129:21 132:15,
16 137:25

138:2,25
143:25 147:16
151:2 157:3
171:13 175:9
183:14 185:13,
14 199:8,20
205:18 209:9,
14 210:1 211:2,
25 212:9,11,12,
16,19 213:8,13,
15 214:13,21
215:3 216:22
219:25 220:10
225:15,17
228:4 234:18
237:5 242:19,
20 243:13
244:18 245:25
246:25 247:21
248:3,6,21
249:8 251:19
263:18 265:13
266:13 267:8,
14,22 268:3,13
276:14 279:11,
15

makes 24:16
25:23 33:22,25
45:11 62:10
67:17 80:20
94:4 125:17
145:17 153:16
180:13,20
192:6 202:1
219:18 220:16
222:7 228:14
235:24 260:7

making 13:18
43:3 49:2 59:6
62:18 98:3
114:15 117:25
129:20 132:15
180:11,19
190:2,6 245:21
249:1 265:22,
25

maladaptive
183:8 223:22

male 84:25
122:10 218:8
263:8

male/black
91:24 92:10

121:25 122:18

malleable
183:11

man 62:7
195:20

Mandler
133:22 134:13
240:23

maps 58:13

March 270:2

mark 18:13
34:18 39:17
50:6 53:11
73:14,20 75:9
77:15 79:8 82:8
90:18 120:25
257:13

marked 18:16
34:24 39:19
50:14 53:15
73:17 75:18
77:24 79:15
82:14 90:22
121:7 257:16

marks 50:17

Martinez 5:16
6:7,18 18:19
35:3 39:23
50:18 52:11,17,
21,22 53:19
63:21 64:5
73:13,16,19
75:22 78:2
79:19 82:17
85:12 86:10
91:4 94:10 96:8
97:18 108:2
110:3 115:10
116:11 117:14,
17 119:13
121:10 129:11
135:3,6,11,13
139:12,22
142:18 151:14
153:8 160:23
163:16 164:5
172:19 210:9
222:19 223:1
257:19 264:1
269:5 270:18,
25 281:20

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

282:14,19,23

**mask** 268:19

**massive** 278:9

**massively** 51:9

**match** 132:23 152:12,15,20 153:1 177:18 185:12 218:18 219:6,12,20 220:3,8,11,14 258:22,23 259:6 260:2,5, 15,17,18 261:6, 7,10 263:7,18

**matched** 153:13

**matches** 152:18 154:23 258:6,23 259:6 260:8 263:1

**matching** 260:20,23 261:9 262:15 263:16,24

**material** 41:5

**materials** 10:10 11:2,4 14:25 41:2,7 42:20,21 43:2 51:4 52:3,5 54:12 55:18,25 56:5,19,23 57:1 60:15 71:16,19

**matter** 5:9 50:24 68:7 86:18 131:25 198:2 215:8,9, 11 238:4 245:22 256:5, 20 258:24 259:1,14 260:25 261:1 267:21

**mattering** 132:22

**matters** 105:17

**maximally** 26:8 102:25

**maximize** 68:12

**maximizes** 22:15 23:10 25:21 193:19 200:13,23

**maximum** 165:12

**Mcclanahan** 14:12 44:21 62:6 63:4 80:20 81:5,19 84:9,17 86:6,14,21 94:24 105:2 114:20 115:23 117:9 118:6,10 119:6 120:19 121:3 143:8,11 144:19,20 151:6,9 152:2, 24 153:11 155:24 161:5 163:23 176:21 236:3 237:7 238:23 241:9, 14 242:1 251:11 252:14 257:10 258:4 279:18

**Mcclanahan's** 147:5 158:16 162:21

**meaning** 91:24 92:10

**meaningful** 221:9

**means** 12:10 24:25 69:14 156:7,9 165:11 168:6 195:2,6 266:4

**meant** 104:4 155:15 158:18

**meat** 143:1

**mechanism** 67:17 104:23 107:10 246:23 277:7,9

**mechanisms** 37:22 229:5

247:10 259:24 260:12 263:11

**medications** 8:24

**medium** 92:14 209:2 210:16, 18 213:19

**Meghan** 15:25

**members** 119:6 120:20

**memories** 39:9 69:18 119:17,22 120:15 161:1 179:3 182:6,21 183:7,20 194:13 200:2 254:1 279:6

**memorize** 82:25

**memory** 8:25 15:16 17:15,16, 18,19 19:17 20:15,19 22:13 24:4 25:4,24 26:3,24 27:2 33:13,15,18,20, 25 35:15 36:24 37:3,10,22,23, 24 38:1,9 39:5 43:25 44:7,18 47:8,17 48:2,4 58:4 61:16 64:20,22 65:1, 2,17 66:4 67:1 68:14,15,19 69:3,13,15,16 70:3,8,9,13,14, 15,18,19 83:2 88:4 99:25 100:3,4,10,11 101:3,15 102:24 103:12 104:24 105:12, 22 106:7 109:4, 8,20 112:14 113:2,3,5,9,13, 15 118:25 119:25 120:5,8 124:23 126:2,6, 8,14 136:1 137:1,2,10,13,

18,22 145:15 148:11 152:12, 15,16,18,20 153:1,13 157:12,16 160:1,2,22 161:23,24 162:1,4 163:6 164:10,20 165:8,22 170:7 171:24 172:1,7, 15 173:19,23 174:18,20 175:25 176:4,5, 12 177:6,20 179:11,12 180:13,20 182:14,19,24, 25 183:1,4,10, 14,18,19 184:2, 9,12,16 187:9, 10,23 188:8,12, 14,16,19 189:24 190:5 191:4,9 192:1, 10,12,14,15 193:21 194:8, 11 195:15 196:23 197:1 199:15 200:19, 25 203:11 204:8 205:25 208:12 218:13, 17,19 219:12 220:23 223:13, 20,23 224:12, 24 227:8 229:1, 6 230:24 232:2 237:2 242:21, 22,23 243:13, 19 245:6,19 246:2,4 251:21 252:1,20 255:25 256:23 258:21,22 259:6,25 260:2, 5,12,15,18,22 261:6,8,10,19 262:15 263:7, 11,15,16,18,23, 25 265:14 266:1,5,6,14 267:15,17 268:14 275:23 276:25 278:3

**memory's** 118:24 277:1

**memory-based** 64:20

**men** 23:1

**mention** 74:22 94:18 103:5,16 250:5

**mentioned** 66:9 103:23 108:5 110:6 123:20 138:11 155:10 158:2,5 170:23 172:9 222:11 250:22

**merits** 138:5

**message** 23:12,22 24:3 34:10 118:22 161:23 169:6 186:2 187:22 188:21 189:23 202:13 229:6 278:1,2,12,13, 14

**messages** 118:23

**method** 67:4

**methodological** 228:17

**methodology** 64:7,9,16

**meticulously** 46:3

**metric** 207:13

**Michigan** 26:13

**Mickes** 249:12

**middle** 106:12, 20 132:6

**might've** 30:6

**million** 282:10

**millisecond** 133:3 138:19

**milliseconds** 244:14

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

mind 10:11 37:20 38:4 49:1 80:24 89:7 170:18 193:24 214:15 215:7 256:2 274:7

mine 88:16

minimal 233:22 234:11, 16

minimize 184:10

minimizes 103:20 172:4

minor 276:23

minute 55:3 215:20 280:23

minutes 54:3,5 55:4 63:21 70:23,24 92:5 147:13 194:18 195:4,8,10,18, 21 196:6,19

miscarriage 256:25 257:7

Mischaracterizes 95:19 119:8 162:11 163:21

misidentification 25:7 280:19

misidentifications 24:20 25:2, 22 190:2 250:14,17 269:6

misidentified 225:13 226:19

misidentify 226:5

misidentifying 227:11

mislead 268:17

misleading 186:18 267:18

misled 186:19

misreading 239:17

misremembering 239:11

missed 15:17 52:15

missing 97:23 122:17 124:8, 12 180:22,25 201:8

mistake 44:8 101:3 102:13, 15,21 160:19 162:2 179:2 180:12,13,19 190:7

mistaken 230:13

mistakes 231:3 250:23

Mister 252:13

misunderstand 174:13

misunderstanding 96:7 280:6

misunderstood 29:13 33:3

mixing 239:6

mock 185:3,6 235:23

model 261:5

models 37:23

modern 48:16

mom 132:4

moment 70:19 95:24 103:15 194:12 246:4 252:19

money 51:24

month 119:19 175:14

months 43:8, 12 68:8,10 110:12,25 111:1,5,13

119:14 120:8 156:20 175:14 239:24 275:12 276:8 277:6

morning 6:19, 20 16:12 54:25 79:5 80:2,17 101:16

mother 131:23 132:1,2 235:10 246:11,12

motions 28:19

motivation 150:19

motivations 62:12 150:16

mouse 82:18

move 18:25 143:3 162:16 167:14

moved 24:6

moving 18:20

multiple 17:23, 25 23:1 69:22, 25 70:4,7 133:11 139:3,7 176:11,12 228:11,12 233:13 236:14, 18 237:1 239:15 247:13 253:8,11 263:7, 22,23

Multiple-reflector-variable 249:23

municipal 61:3,4

municipalities 20:2

murder 108:13

muscular 92:12

## N

N-O-E-D-E- 16:10

named 27:13 153:18

names 16:2 149:13

nappy 121:25 123:5

narratives 123:15

narrow 135:23 136:22 137:11

national 26:14 27:8,10

nature 49:4 120:11 282:3

ne 249:14

necessarily 14:5 62:19 93:8 110:16 140:4 141:8 173:9,11 175:23 215:25 216:3 239:5 271:17

needed 46:5 181:24

negative 178:17

neglected 103:16

neighborhood 239:23

nice 9:9

nickname 132:12 236:6, 23 240:1

night 66:10 69:9 151:8 152:6 155:1 218:14 239:8 256:18

nobody's 22:6

nods 7:20

non- 119:22

non-controversial 245:5

non-diagnostic 118:24

non-existent 200:24

non-hispanic 85:1

non-ideal 196:25

non-intentionally 206:8

nondiagnostic 161:24 162:18 169:19 179:17

nonetheless 210:4 265:16 268:18

nonexistent 130:1

normal 227:17

nose 92:14 116:22 149:1,8 268:12

note 52:2,6 226:1 250:13 257:23

note-taking 111:16 114:12

notes 11:21 12:1,5 60:15 71:10 73:24 74:12,18,23 75:4,7 76:21,22 84:7,12,22 85:23 90:5 92:2,4,25 93:2, 3,5 94:18 95:1 97:4 99:21 100:18,20 110:18,21 111:9 112:10 118:8 121:2,4, 13,20,24

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606



KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

126:25 129:5 143:5,7 156:23 237:17,18 238:14 252:9

**nothing's** 124:11 140:14

**notice** 214:11

**noticed** 14:6,9, 21,24

**November** 19:9 28:6,20 29:10,11,14 39:25

**nuances** 172:22,24

**number** 5:12 17:7 24:5 38:12,22 78:19 186:18 230:17 255:1 257:24 260:17

**Numerous** 76:7

**nutshell** 37:18

**O**

**oath** 19:11 25:1 27:6 182:15

**object** 8:14 153:3

**objection** 85:11 86:7 94:6 95:19 97:8 107:23 109:9 115:1 116:9 117:13 119:8 129:10 141:16 151:13 160:13 162:11 163:21 172:16 206:20 263:4 269:4 270:12

**obligated** 169:7

**observed** 108:14

**observer**

239:25 240:4,5

**observers** 183:21

**obsessively** 54:6 55:3

**obtained** 125:18 192:24 193:7

**occasional** 182:23

**occur** 107:11 216:9,11 243:4 250:15 267:20 276:22

**occurred** 80:18 110:13 124:15 152:8 159:3 178:16 206:12 275:17

**occurs** 26:5 196:21 197:13 265:16 268:18

**October** 76:16 83:20,22 90:20 95:16 97:1 98:9 101:25 114:20 115:22 118:4, 11,12 121:2 123:16,17 143:6,7 156:1 176:16,20 237:8,19 238:13,23 252:10

**offender** 125:20

**offense** 80:10, 16 85:23 90:5

**offer** 40:6 45:4

**offering** 62:20

**office** 7:2

**officer** 65:21 66:12 77:7,11, 16 79:4,11 80:1,10,16 81:11 82:2 83:21,22 84:8, 17 85:8 86:24

87:13 88:18 94:21 110:22 111:9 112:15 115:5 122:7,22 145:2 181:20, 22 182:5,9 195:8 196:7 221:15 222:6,8 231:20

**officer's** 82:1

**officers** 57:25 77:12 113:19 201:16 205:15 229:19,23

**offices** 21:13

**official** 59:9

**Ohio** 5:11

**omission** 102:25 104:14, 17

**omissions** 123:14

**one's** 230:1 262:12

**ongoing** 18:10 39:11

**online** 5:2

**open** 9:13 17:24,25 18:10 39:21 58:25

**opening** 249:19

**operate** 278:23

**operating** 67:21 111:25

**opine** 93:21 271:20 272:18 280:5

**opined** 21:18 175:1

**opinion** 60:24 61:2,6,24 62:1, 9,11,21 63:3,7, 12 97:24 119:3 138:1 158:5,12 159:6,14 166:23 167:9,

23 179:25 181:19 193:9 248:9 260:6 263:21

**opinions** 16:15 40:5,18,20,22 41:8,12,15,19 44:25 45:19 47:4 49:13,14 56:21 62:5,14, 24 72:7 98:10 115:16,20 143:2 145:9 162:10 163:19 165:1,17 167:17 178:23 179:5,6 180:5 242:7 271:11, 20 272:22 273:5,22 274:20 275:3 281:16

**opportunities** 143:11

**opportunity** 8:2 21:20 75:17 77:20 106:15, 21 138:1 165:25 184:6, 10 247:20 248:1,2 272:8, 11 274:20 282:1,4

**opposed** 245:2

**opposing** 182:14

**opposite** 23:6 34:14 126:13 186:24 197:15 198:8,13 227:18

**optimal** 266:23,24

**order** 143:16 167:19 247:21 282:18

**ordered** 282:2

**orders** 282:17

**origin** 85:1

**original** 10:10 11:8 80:12 154:1,19,20,24

**originally** 158:22 218:4

**outcome** 157:15 204:8

**outdated** 48:16

**outset** 7:13 146:16 211:15 216:17

**overcharge** 54:5

**overstatement** 194:22

**P**

**p.m.** 5:7 64:4 139:21 222:22, 25 270:21,24 283:9

**Packers** 6:24

**paged** 12:4

**pages** 11:25 12:6,9 57:15 224:1 272:18

**paid** 228:1 229:2 240:14

**Pamela** 77:7 83:21

**pants** 151:7,19 152:1,6 154:3 155:1

**paper** 26:12, 20,22,23 33:14, 17 35:14 56:7 125:13 126:10 128:4,9,11,16, 19,20 134:21 135:15,24 136:1,3,4,11 137:17 138:4,6, 23 183:9 186:21 187:16 189:6,20 191:11,12,14,



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

16,17,18 192:3, 8,12 193:1,3,4, 5 194:17 196:8 199:12 209:4 221:6 224:2 226:25 227:5 231:24 232:1, 13 234:16 248:14 249:5,7, 10,13,18 250:11 260:13 261:22 269:18, 25 277:16,18, 23 278:7,9,11 279:14 281:3,4, 13

**paper's** 136:19 192:16

**papers** 35:12, 20 37:7 39:1 61:18,19 136:24 179:7 189:1 247:4 261:4 263:13

**paragraph** 14:11 71:15 76:5,10 226:10

**parameters** 152:3 157:7 253:14

**parentheses** 87:24 206:1 232:7

**part** 48:7 56:9 57:14 65:6 69:25 73:8,9 78:15 81:17 91:5 96:10 97:13,15 111:15 112:18, 22 113:2,4,15 116:21 122:19 143:3 146:5,21 180:2 206:11 232:24 262:18 268:12,21 271:6 280:14

**partial** 113:8 146:24 208:2

**partially** 147:1

**participants**

13:20 248:23

**participated** 279:1

**parties** 6:5 178:10 241:24

**parts** 42:3

**party** 62:12,15

**pass** 53:3

**passage** 68:16,18

**passes** 68:14 194:15

**past** 70:12 139:3,4 214:10 237:4 239:15 253:9 268:22

**pattern** 112:24 113:7 159:20

**pause** 135:7

**pay** 16:1 191:5, 6 240:6,7 278:4

**paying** 191:6

**PD** 191:12 192:20

**peeked** 220:25

**pending** 5:10 8:20

**people** 24:24 32:16 34:14 37:6 51:10 61:17 64:21 68:1 78:11 86:15 123:22 130:18 133:10, 17 135:25 136:23 137:9, 10 147:25 166:8 167:4 169:11 174:12, 18 181:12 182:24 183:7 185:6 192:4 196:9 199:4,8, 17,23 202:8,25 204:19 212:6 213:8 214:11 216:21 234:16,

17 240:6 246:13 250:24 252:3 254:2,18 255:6 267:5,24 269:19

**perceive** 152:19 153:15

**perceived** 158:22

**perceiving** 128:21 152:18 154:21 263:24

**percent** 10:24 17:12 27:24 30:16 38:18,21 49:24 83:3 128:3 129:7,18 154:8,11 158:20 187:19 188:3,5 202:10 203:15,17 204:13 206:3, 18 213:22 217:19 229:8, 13 230:13 241:16 255:2

**perception** 149:16 154:20

**perceptual** 149:6 260:24 261:2,13 263:15 264:5,6, 8

**perfect** 9:16 12:15 15:20 16:21 18:24 33:22 39:24 52:21 68:13 73:16 75:23 99:25 125:16 126:6,18 138:22 152:14 153:16 182:25 183:4 191:15 202:18 203:1,3 204:3 205:2 216:4 244:9

**perfectly** 24:15 113:18 205:1

**perform** 252:1

279:6

**performed** 147:9 201:7

**period** 236:19 239:9 250:24

**perpetrator** 66:11 74:25 84:25 89:5 90:8 93:12 94:2,4 95:14,17 97:3 98:6 112:12 116:2,17 117:11 121:24 151:10,12 159:8,16 172:21 175:13 178:22 185:9, 13 211:18 214:17 223:11 241:2 245:12, 14,19 256:19 263:2 267:9 269:12

**perpetrator's** 104:19 105:4,6 145:1,3 247:20

**person** 13:6 23:8 66:12,13 67:15 98:24 106:16 125:19 127:3,17 129:8, 24 130:3,8,12, 17,21 131:4,5, 8,20,22 132:2, 11,17 133:1,2, 15 134:3,5,22 136:4,6,19 137:4 138:7,13, 20 139:1,6 141:10,12,14 143:24 153:17, 21 154:20 162:25 163:14 175:16 183:6 213:2,18 218:10 219:13 220:3,7,13 225:14 226:5, 20 227:11 230:20,25 231:3,12 232:20 233:5, 11,12,14 234:8

235:6 236:18 238:18 239:3, 20,21,25 240:4, 10,14 241:5,11 242:12,18,23 243:1,8,15,18, 22 244:1,15 245:23 246:18 250:15 252:2, 18 256:21 257:6,24 258:13,14 260:8 263:1 266:7 269:12, 16 275:16

**person's** 106:21 232:16

**perspective** 88:4 96:18 130:24,25 133:20 136:25 137:14 154:13 167:6 182:17

**pertain** 246:2

**pertained** 16:15 41:15

**pertaining** 41:22 60:22 92:1 166:22 185:2 216:17 281:16

**pertains** 197:7

**phenomenon** 215:14

**photo** 102:1 104:20,21 105:7 128:5,6, 14,18 130:6,12, 13,14 131:1,4, 12,15,18,25 132:1,16 140:17,23 147:6 148:16 151:17,19,24 152:3 153:23 161:3,17 162:8 163:13,18 164:2,8 170:15, 17 171:16 174:23,24 175:3,5,13 176:24 177:5

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

178:3 185:8,10 207:1 214:1,3 215:22 218:24 251:15 254:24 257:9,15 262:2, 25 269:17,22 275:13 276:6 277:6,11 278:3, 23

**photo-lineup** 158:25

**photograph** 161:5,15 232:16,18 269:15 270:9 276:21

**photographs** 161:16 163:17

**photos** 163:12 164:1,19,23

**phrase** 67:24

**physical** 62:2 89:4,6 117:11 218:12 263:1

**pick** 213:4 259:8

**picked** 25:17

**picking** 219:8

**picture** 109:13 161:17 162:9

**piece** 14:2 192:19 208:7

**pitch** 244:5,17

**place** 65:18,23 91:11 164:16 165:9,11,14 169:9 173:5,12 209:7 275:20

**places** 165:12

**placing** 64:25 115:14

**plaintiff** 5:17 20:23 21:19,24 22:5

**plaintiff's** 5:15 16:5 167:14

**planet** 183:7

**plausible** 104:23 113:19 114:3 145:16 146:5,9,23

**play** 102:8 162:10 174:25 245:1 246:6

**plays** 113:7

**plot** 186:16 209:3

**plotted** 186:11

**plummet** 248:25

**point** 8:18 9:18 26:17 33:16 49:12 53:4 60:14 78:10,14, 17 84:20 95:15 100:12 114:12 129:19 135:7 139:23 140:1 143:8 150:15 154:12 159:24 167:15 172:5,8 174:9 178:19 179:22 188:7 198:23 199:20 202:25 213:9 214:14 219:25 226:23 227:1 228:8,13 229:7 234:2 241:24 242:1 243:6 245:5,17,21 249:8 273:21

**pointing** 228:20

**points** 23:11 101:7 183:13 195:19 233:3

**police** 11:8,15 12:1,12,13 15:6 23:7 43:23 44:5 57:19 58:11 59:3,17 60:25 65:10,16,19,20, 24,25 66:14,16 67:6,12 71:1,3 73:3,6 80:5,12,

20 81:5,18,25 83:1 84:16 86:21 87:1,3 88:20 89:9 91:22 92:2 95:3,6 98:14, 17,18,19 102:10 107:8 108:16 109:1 110:10,14 112:2 115:23 116:2,13 118:7, 12,13 130:12 131:15 133:18 141:8,9,22 142:14 145:12, 25 147:8 153:19 156:19 157:19 164:22 171:4,18,22 173:3 174:15 175:2 176:17 189:22 190:12, 16 197:17,20, 23 198:2 201:16,19,21, 23 205:15 224:19,23 225:4,11,16,20, 22 226:18 227:3,20 228:6, 10,16 229:12 231:20 235:22 241:1 252:11, 16 254:3 256:18 259:8, 17,19 275:18 276:6 277:5 278:16,17,18, 19,23

**policies** 61:3,4

**policy** 184:22

**Pong** 174:3

**poor** 109:14 140:3 209:1 242:21 244:11, 21 247:2,3,8 248:7 249:2

**poorer** 248:6

**poorly** 157:1

**poorly-** 21:21

**pose** 138:3

**posited** 265:24

**position** 48:8

**positive** 209:13 213:2 215:21 217:18 218:2 265:15 280:23

**posits** 233:22

**possessions** 57:21

**possibilities** 114:9 120:24 142:19 145:20

**possibility** 100:18,21 112:20 120:18, 22 154:6,7 159:25 164:15 218:25 220:22

**post-** 21:4 22:24 23:19 221:6 223:2,8

**post-conviction** 18:4 31:13

**post-event** 193:22

**post-identification** 223:5

**Postdicting** 249:23

**potential** 146:10 184:2 220:21

**potentially** 116:4,14 145:10 160:2 161:15 162:7

**pounds** 85:2 116:6

**Pozzulo** 135:15

**practical** 38:5

**practice** 17:20,

22 53:1 87:19 278:24

**practices** 60:25 192:21 193:2

**precise** 230:10

**precisely** 149:23 234:4

**predict** 177:21 214:23 279:10

**predicting** 35:9

**predictive** 156:5 194:19 216:24 260:9

**preexisting** 245:20

**preliminary** 81:4,18 83:15

**preparation** 10:17 12:2 15:7,19 16:19 54:21 121:18

**prepare** 9:23 10:6 17:1

**preparing** 53:6

**presence** 267:12

**present** 147:25 197:24 198:17

**presentations** 38:22,25

**presented** 262:18 270:1,6

**presume** 110:19,20 141:22 181:16

**presumed** 112:8

**presuming** 44:12 110:19 178:10

**presumption** 62:18 70:25 71:4,5 110:13, 16 111:25



Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

178:9

**presumptive** 255:10

**presumptively** 107:11 127:18 130:11 143:21 148:11

**pretend** 203:9

**pretty** 12:5 16:1 43:18 51:18 59:1 66:4 89:19,24 103:23 109:5 173:24 180:7 181:17 183:12 187:8 190:11 194:5 195:1 211:1 224:11 235:21 239:20 249:4 257:22

**prevent** 9:2 256:25

**preview** 28:25

**previous** 19:2 27:18 29:21 48:22 77:19 81:16 82:10 91:15 108:4 143:25 154:8 187:3 224:16 238:14,18 265:24

**previously** 134:3 152:18 184:15

**primarily** 20:18 238:22 251:11

**principle** 103:25 104:2 106:7 110:25 184:6 244:4 253:16

**principles** 61:15 114:7 148:8,12

**print** 56:10,13, 16

**prior** 14:14 39:13 40:22 43:15 109:7 130:3 133:7,8 143:9 161:17 204:12 230:19 233:23 234:4, 11,15 236:14, 18,21 237:1,15 238:16 239:2 241:7,8 258:4 273:5

**prioritize** 27:2 67:2

**priority** 65:1, 18,23 91:11,12

**prison** 23:1 24:1 67:7 122:1 231:1 257:4,6

**probability** 212:9

**probable** 120:3

**probative** 174:6

**problem** 182:21

**problematic** 131:17 245:15

**problems** 38:10 228:18

**procedure** 147:10 171:16 192:22 232:25 251:15 262:17

**proceedings** 18:5 21:5

**process** 56:9 57:14 65:12 78:15 111:17

**produced** 19:2

**professional** 24:19 51:3

**profoundly** 204:1

**program** 36:16,20

**project** 52:1

**Projects** 22:21

**promise** 158:3

**prompts** 232:21

**prone** 156:12

**proof** 202:20

**proper** 185:8, 11 190:17 191:17,19,20 200:12,13,20, 21,22 202:23 278:3

**properly** 13:9 126:13 184:16, 17 200:9,12 201:1

**proposition** 138:24

**prosecution** 19:17

**protocol** 185:16

**prototype** 139:9

**prove** 262:22

**provide** 14:12 42:19 43:1 102:12,17 144:15 156:6 168:21 192:23 212:4 245:15

**provided** 14:16 27:20 28:2 34:19 50:7 53:11 56:5,6,24 60:15 79:13,21 81:19 84:8,23 85:8 122:21,22 166:25 167:9 171:17 172:20 258:3

**providing** 61:24 62:1 97:24 212:1

**province** 169:3

**psychological** 37:16,21 38:2

**psychology** 36:4,5,8,10,15, 17 37:1,9,13, 14,15,19 38:4 48:25 231:25

**public** 21:12, 13 231:25

**publication** 37:7 39:14 220:6 270:3,4

**publications** 35:11,24 38:12, 17 125:12 149:14 187:4

**publish** 35:12 199:18 203:23

**published** 26:12,17,20 33:15 35:21 38:20 39:12 193:4 209:23 234:17 248:13, 15 260:13,14 281:9

**publishers** 188:25

**pull** 213:25

**pulled** 81:6,20 83:5 116:3 146:8 188:25

**pullover** 92:12

**purely** 159:22

**purpose** 58:24 131:18 132:13 274:24

**purposefully** 206:7

**purposes** 71:5

**purview** 114:14,25 150:17,21 156:2

**push** 212:7

**put** 12:14 18:8 22:16 25:25

45:7 49:4 58:25 80:5 110:8 130:13 168:3, 19 171:22 174:1 176:2 177:15,16,17 184:8 192:14 202:6 236:16 245:11,14 271:15 277:17 282:12

---

**Q**

**qualified** 30:19 31:4,21 266:18

**qualifier** 268:1

**qualifies** 122:25

**qualify** 68:3 104:16 148:6

**quantification** 253:10

**quantifies** 234:21

**quantitative** 173:5

**quarter** 230:5

**question** 8:4,5, 8,10,11,15,20 21:22 22:3 29:13,14,19 35:9 40:11,13, 18 42:22 45:11, 13,20,23 46:12 47:24 48:1 52:15 55:5 65:5 70:18 78:7,15, 21 80:3 86:9 88:17 90:3 91:20 92:7,11, 17,19,23,24 93:2,5,9,13,17, 23 94:16 95:9, 12,22,25 96:6, 23 97:10,13,14 104:10,12 107:24 124:13, 14 127:10,21, 24 128:25 129:5 138:3,9,

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

23 140:7 143:19 147:13 149:10,12 153:7 155:16 157:1 159:5 165:16 177:22 178:20 180:2 186:16,17 187:1 190:22 199:20 208:10 209:23 210:8, 12 211:11 213:5,11,15,16, 25 214:16 215:7 226:14, 15 229:11 233:16 247:9, 13 265:23,24 266:8,19 268:6, 17 271:15 273:2,9 274:3, 6,18 280:25 281:15

**questioning** 92:1 97:16 207:8

**questions** 8:16 9:3 10:2, 13 17:4 30:16 31:16 34:8,22 36:3 40:9,10 45:7 50:12 64:7 74:4,12 77:23 79:25 82:13 90:15 91:17 100:9 104:12 110:5 121:6 127:23 134:17 139:13 158:3 161:3 165:3 170:5 190:21 191:21 250:10 254:3 264:22 265:2,5 271:1 274:9 275:6 281:21,25

**queue** 112:22, 25 113:8,12,13

**quick** 7:12 26:16 34:22 41:25 50:12 64:6 89:1 158:3 178:13 206:4 222:16 270:19

**quickly** 19:4 21:18 34:20 50:5 59:1 79:9 81:2 85:21 118:7 135:9,11 139:24 143:2,7 155:9 168:23 183:13 223:25 233:3

**quit** 72:18 76:6, 8

**quote** 81:15 245:5 246:1

---

**R**

---

**race** 84:25 89:21 124:24 173:1

**raise** 6:10

**raises** 247:9

**raising** 266:23

**random** 276:7

**range** 11:14 263:8

**raped** 195:21

**rapid** 260:7

**rare** 25:23 26:6 108:19 157:15

**rarer** 211:4

**rate** 51:8,11,12

**rating** 156:6 185:15 190:19 254:23

**ratings** 189:10 200:18 207:11, 17,19

**re-analyzing** 187:17

**re-ask** 127:24 128:24 226:13, 15

**reach** 157:24 272:21

**reached** 145:9 160:10 162:10

**reaching** 145:8 206:2

**read** 49:21 51:6 52:4 57:6,10, 15,20 58:24 59:5,12 74:3,8, 9 75:14,15,21 76:4,12 77:20, 22 78:3 80:7 85:5,22,25 86:1 91:16 93:19 118:21 119:1 121:21 122:2, 19 137:17 160:17 165:3 224:14 226:13 230:3 232:10, 14 238:25 239:1 246:1 255:12 273:5 277:24 282:1

**reader** 13:19

**readily** 109:25

**reading** 37:3 58:11,15 71:18 119:2 165:22 224:23 231:20 239:18

**ready** 74:6 249:20

**real** 91:1 142:4 147:24 183:21 188:4 189:13, 22 190:23 197:18 200:18 205:15 254:25

**real-** 197:10

**real-world** 44:10 197:16

**reality** 54:18 181:25

**realize** 22:21 35:12 44:8 67:15 101:13, 21 105:2 125:4 133:18 134:14 164:12 168:3, 18 169:10 186:8,9 189:25 200:3 217:23

228:1 256:21 259:18 277:15

**realized** 78:9 228:2,5

**realizing** 183:23

**reanalysis** 186:22

**reason** 21:8,18 22:1 23:18 59:11 68:16,20 89:2,14 91:1 104:5 119:20 123:18 126:4 137:9,19 145:21 159:21 162:14 180:4 200:12,22 201:20 203:11 218:3 227:7 228:23 231:15 238:1 274:2

**reasonable** 86:19 144:13 191:1 280:10

**reasons** 68:22 152:3 159:18 171:23,25 179:4,9 200:21

**rebuttal** 16:4,8, 10 31:24 32:3 45:2,20 272:9, 12 273:2 274:20

**recall** 11:4 77:6 91:5 101:23 102:3,6 103:7, 12,13,15 109:8 119:4 124:1 143:13 149:24 159:9,17,19 161:6,18 168:11,12 170:20,22 171:1 172:25 175:24 176:1, 19,22 177:1,8, 23 178:1 190:9 205:11,20 206:15,19,25 208:9 210:21 213:21 214:4

215:22 217:2, 16 224:8 230:5 241:7 242:5 253:21 254:1,7, 18,20 255:3,13, 17 275:8,25 276:4,11,17,24

**recalled** 124:2, 4,10,18,19 171:8 254:7,9

**recalling** 124:18 156:10 170:21 171:3,6, 20 177:13 182:18 254:11

**recap** 24:16

**receding** 70:12

**receive** 55:25 56:1 57:2

**received** 60:19

**recent** 139:4 184:14 191:18 253:2 266:19 267:3

**recently** 26:18 39:14 137:18 248:13

**recess** 64:2 139:19 222:23 270:22

**recognition** 103:8,9 104:15 105:10 106:10 109:8,11 136:6 144:4,5,9,10,14 146:19,21,25 147:9,18,23 148:25 152:8 159:8,17,19 175:25 176:4,5, 25 177:2,6,8,24 205:12 206:16, 17 213:21 214:7 217:18 243:7,16,23 246:5,14 253:1, 2,18,21 260:12 261:6 263:12 275:11,17

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273** Phone
**502.584.0119** Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

312

276:1,2,11,20, 22 279:7 281:9

**recognize** 18:23 24:19 39:17 50:12,21 66:11,13,24,25 67:14 82:22 83:25 95:5 99:9 103:10,11 104:18,20,22 105:6,7,9 117:6 121:13 134:2, 10,13 140:8,19, 20 141:1,3,4, 10,12,13,20 143:17,20 147:15 148:1 164:21 168:25 177:3 218:2,8 256:19 267:9

**recognized** 94:1 142:5 143:10 145:14 241:3

**recognizes** 95:17 117:10 148:22

**recognizing** 94:4 104:15,16 106:16 140:3 221:14

**recollecting** 124:9

**recollection** 10:24 12:21 17:17 43:5,7 53:13 56:2 78:24 90:25 105:11 106:10 109:24 111:11 128:12,13 157:13 171:19 255:24

**recollections** 128:4 160:16 179:1

**recommend** 192:8

**recommendation** 125:23 126:22 192:9,

11

**recommendations** 127:15,16 184:21 191:20 192:2 193:3,5

**record** 5:1 6:2 7:9,21 13:20 14:2,22 37:12 44:2,4,14 59:3 64:1,3 69:12 73:3 75:9 79:10 82:10 86:22 88:22 95:20 96:13 97:11,12 102:10 105:3 115:3,4,14 117:5 119:9 126:22 139:15, 17,20 141:22 143:11 145:12 146:22 147:8 151:1 152:14 153:4,5 155:6 157:19 159:11, 19 161:4 162:12 163:4, 22 214:25 222:4,21,24 236:1 238:15 240:19 241:1, 17,21 242:5 251:1,13 252:16 259:19 265:8 270:20, 23 277:17,18 279:18 282:16 283:8

**recorded** 71:6, 7 124:3,4,10,19 191:24

**recording** 181:23

**recordings** 227:21,22

**records** 67:6 71:6 101:23 111:5 164:22 228:10 229:24, 25 259:17

**recreate** 198:25

**red** 98:25 99:1 103:1 104:6,8 105:24 160:4 170:24

**reduce** 242:9, 25

**refer** 11:19 12:25 155:25

**reference** 91:21 94:19 170:14 181:7 224:1

**referenced** 80:18 107:14 110:9 142:20 166:4 171:15 216:5 229:12 238:13 261:5, 22 264:2 281:3

**referencing** 264:7 277:16

**referred** 197:22

**referring** 9:12, 15 11:10,20 15:22,24 18:8 28:3 44:20 69:21 86:12 87:10,12,23 100:11 101:9 139:1 150:13 152:2 155:25 166:13 225:24 237:12 242:12

**reflect** 75:4 146:1 215:25 216:3 255:25 256:23

**reflected** 144:25 145:2

**reflecting** 256:19

**reflects** 33:18, 21 84:16

**refrained** 142:14

**refresh** 78:24

**registration**

27:8

**Registry** 26:15 27:10

**reiterate** 160:4

**reiterating** 231:13

**reject** 169:15

**Relation** 249:22

**relationship** 128:17 183:3 209:15 211:3, 22 277:18

**released** 24:1

**relevance** 129:22

**relevant** 41:10 44:25 48:10,12 57:24 58:4 60:5 61:13 88:6 102:7 137:16 145:11 149:10, 12 178:11 179:6,7,19 182:2 242:11 254:11 258:19 259:10,11 262:16 267:23

**reliability** 22:15 23:10 25:21 39:9 48:19 49:3 68:12,23 144:4 147:18 181:20 182:7 193:19, 21 200:23 208:24,25 210:4 234:7 242:16,17 243:1,3,4 265:15 267:6 268:18

**reliable** 22:15, 18 23:10 26:8 32:23 44:9 65:2 66:4 68:15 102:25 103:24 105:22 126:18 137:5 144:1 170:7,19

171:24 172:1 193:11,20 194:13 195:3 204:16 208:22 211:5 227:6 234:5,10,19 235:8,9

**reliably** 173:16

**relied** 41:7

**relies** 110:22

**rely** 110:17

**remain** 179:6

**remained** 182:21

**remains** 196:12 212:13 248:19

**remember** 10:8 22:10 27:25 43:17 47:9,25 50:20 51:24 58:9 72:12,17 74:25 76:9 77:10 81:13 83:9 89:25 108:14 111:10 112:13 119:2 120:2 123:20 126:1 134:24 136:3,5 144:6 149:8,13, 16,21 150:1 153:17 156:5 161:7,11,22 162:19 164:18 165:9 166:7,21 182:15,16 188:10 189:9 207:25 223:16 227:13 229:23 230:9,16,17 235:5 236:4,24 237:15,24 238:20 239:6 240:24 241:10, 14 250:20,25 251:9 264:10, 15,18 273:9,15 274:23 280:21

**remembered** 14:1 65:19

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

103:5 119:12 133:22

**remembering** 101:2 181:12 194:4 231:18 264:12

**remembers** 100:17 115:5 154:19 227:16

**remind** 12:24 118:14 172:24

**remotely** 5:18, 21,23

**repeat** 42:22 47:24 86:9 153:6

**repeated** 206:5 216:10, 12

**repeatedly** 215:16

**rephrase** 8:10 40:16 45:19 140:6 223:7 241:25 272:7

**rephrasing** 158:11 159:4

**replaced** 185:10

**Reply** 16:5

**report** 9:13,21 10:9 11:2 12:18,24 13:2, 6,14 14:8,14,25 15:2,23 16:3,4, 5,7,8,10 19:12 26:17,22 28:6 29:3 34:19 35:6 39:18,21 40:3, 7,19,23,24 41:2,8,23,25 42:1,7,11,16,21 43:3 44:16 45:2,3,12,18, 20,22 46:6,14 47:15,17,18,22 49:1,10,13 51:1 52:5 53:1,2,21 54:8,13 55:12,

21,22 56:20 57:25 58:13,17, 21 62:6,12,15, 24 63:4,8,12,16 64:16 65:15,16, 19,23 66:10,14, 16 67:12 71:5, 12,17 76:2,15 78:18 80:5,10, 16,17,19,21 81:1,3,12,15, 18,25 82:3,4, 12,22 83:5,11, 12,19 84:4,12, 16 85:13 86:3, 11 87:2 89:8,9 90:4,11 91:22 94:22 95:3 98:17 100:23 102:13,15 106:11 107:8 110:14,23 111:8 115:16 121:16 123:1,6 128:1 130:5 133:19,23 135:17,18,21 138:11 139:1 143:8 144:18 145:2,6,12,25 148:19,24 149:4 150:11, 24 153:10 158:5 164:13, 14 165:1,4 168:18,19 170:6 171:22 174:4 178:10 179:19,20,24 180:17 181:5,7 184:25 187:5, 11 192:21 201:8 205:23 224:4 225:25 227:20 229:20 231:20 243:6 244:23,25 245:8 251:20 253:25 257:23 271:12,16,24 272:5,9,19,23 273:1,6,7 274:1,4,5,6,12, 19 275:3,4 281:17

**reported** 120:15 173:16 211:14,15

**reporter** 5:1,3, 25 6:4,9,15 7:18 63:25 64:3 73:15 139:17, 20 222:21,24 270:20,23 282:6,9,12,16, 21,24 283:2,4,7

**Reporters** 5:4

**reporting** 64:21 162:17

**reports** 11:8, 15,17 12:1 15:4,11,14,22, 24 16:11 17:5, 10 18:11 41:14 43:23 51:4 55:8 56:18 57:19 58:11 59:17 65:10,24 66:16 70:23 71:1 73:6 83:1 92:2 95:6 102:24 106:2 110:10,14,17 112:2 125:4,11 133:18,20 143:6 150:6 156:19 160:2 165:22 168:4 169:11 181:23 185:1 194:18 221:8 223:6 224:19,23 225:4,11,16,21, 22 226:18 227:3 229:13, 21 237:9 252:10

**represent** 7:7 19:1 73:23 75:10 77:11 80:17 121:1 161:13 167:13 225:1 238:12

**representation** 80:3 133:13 139:9 232:3

**representing** 5:3 225:8

**reread** 54:7

**research** 36:22,23 37:3,8 38:6 39:2,11 71:22 89:18 103:22 137:13 138:7 147:23 149:9,10,11,23 173:20 178:11 184:21 193:25 194:1 214:13, 15 215:3,10 225:19 264:14 266:19 278:23 279:2,4,11,21

**researcher** 149:15 264:9

**researchers** 132:25 134:22 136:14,20 167:24 191:4 199:15 224:12 245:6 267:17

**resemble** 233:23

**resembled** 218:5

**reserved** 62:21

**residence** 78:12,13

**resistant** 133:13

**resolve** 64:25 66:1,3 67:18

**resolving** 64:9,16

**respect** 33:24

**respond** 44:16 265:3

**responded** 57:25

**responding** 77:12

**response** 8:6 19:2 50:7 53:12 72:18

**rest** 31:11 65:7 95:24 113:2,14

**restroom** 135:9

**result** 24:20 187:5 203:23 257:1

**results** 174:7 189:17

**retain** 28:20

**retained** 19:8 20:23 28:7 29:6,12 43:6,9, 15

**retrieval** 110:21 111:9, 25 112:10,13, 22,24,25 113:8, 13

**retrieved** 64:19

**retrospectivel y** 67:15

**reveal** 203:8

**revelation** 126:9

**reversal** 200:7

**review** 10:22 12:1,9,22 13:12 14:7,24,25 15:7 49:17 50:25 55:21 56:9,10, 12 57:1,17 59:20 60:1,2,4 75:16 79:13 90:21 91:12 101:23 111:15 118:8 121:18 136:10 143:10 160:9 167:20 185:5 199:11 221:16 236:1 282:7

**reviewed** 11:2, 5,6,8,14 12:17 13:10 15:6 16:19 41:2,14, 22 42:20 43:3 55:18 56:6,20

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

71:2,16 75:11 77:2,6 78:25 80:9 84:3 91:5 97:5 119:4 121:15 161:12 162:7 224:8 257:20

**reviewing** 10:25 41:18 51:4 52:3 53:21 54:12,21 55:8 64:15 123:15 145:5 161:6,18

**reword** 145:7 147:7 151:15 153:12 181:6

**Rhodeback** 77:7,12 79:4,12 80:1,16 83:21, 23 84:9,17 85:8 86:24 122:7,23

**Rhodeback's** 77:16 80:10 81:12 87:14 88:18 94:22 145:2

**Rhonda** 44:21 62:7 73:25 74:18,23 75:4, 13 78:19,22 79:4 80:2 86:25 87:15 88:19,20 93:25 95:13,16 97:1,25 98:8 101:24 116:8, 13 117:21 118:9 148:20 160:9 161:14 178:16 240:20 252:11 257:10 279:18

**Richard** 5:9,17 7:7 14:10,13 44:21 62:6,25 63:8,13 77:17 80:20 81:5 86:5,14 105:2 115:23 121:3 130:15 143:11, 12 147:6 151:12 152:4 155:10,19,20, 21,22,24,25

156:1 157:5,6, 10 158:7,13 159:7,16 161:5, 15 162:9,22 163:4,11 178:17 236:3 237:7,14 240:20 241:18 242:2 251:10 257:10,23 279:18

**Richard's** 144:21

**Rick** 94:23 117:9 119:6 176:21

**Ricky** 168:24, 25

**righty** 80:9

**ring** 77:8

**rings** 34:10

**risk** 156:8 258:7

**robbed** 62:7 63:4

**robber** 76:6 92:24 93:1,4

**robbery** 73:25 79:5 80:2,18 87:16 89:5 92:21 101:25 114:21 117:10 120:21 144:22 190:15,24,25 191:1 275:9 279:20

**robust** 244:21

**Rodriguez** 29:3

**role** 27:7,9 48:18 113:7 162:10 169:14 172:4 174:25 245:1 246:6,7, 12,15

**roll** 35:22

**Rolodex** 21:11

**Ronald** 195:12, 20 221:12 227:16

**rooted** 238:22

**Rosendo** 29:7

**roughly** 38:17 43:18 218:7 263:8

**Rubalcava** 167:10

**rule** 32:21 69:24 119:20 171:6 173:22 175:22 177:13, 17 244:7 272:2, 4,6 274:15 275:24 280:18, 20

**rule's** 275:22

**rules** 7:13 26:24 33:16,17, 21,23 35:15 69:19 130:16

**ruling** 160:6

**run** 185:15

**running** 181:2

―――――――

**S**

―――――――

**S1** 84:11

**San** 9:8 32:10

**Saturday** 52:4

**scale** 206:24 208:9

**scaler** 207:13

**scan** 59:1

**Scandinavian** 199:6

**scanned** 41:10

**scar** 109:16,17 178:4,5

**scenario** 64:24 107:3 112:5,21 113:19 133:24 134:8 140:25

145:11 146:3, 12 153:17 164:21,24 175:19 177:12, 25 178:1 179:6, 8 181:16 196:2 207:2 209:18 212:21 213:23 215:8 217:13, 23 218:22 234:11 239:21 240:17,24 243:22 244:1, 16 256:22 269:23 274:7

**scenarios** 67:9 114:3 212:17 277:14

**scene** 57:25 68:17 77:13 78:9,14,16,20 204:23 256:10

**schedule** 51:3

**school** 36:13, 18 37:1 69:22

**science** 24:3 25:4 26:23 27:1,3 33:15,24 35:15 36:23 44:17,25 48:10, 11,13,17,20,21 60:10 68:6 88:4 114:10 118:22 132:8,22 136:5, 15 137:1,4,15, 23 148:8,12 160:1 162:3 165:23 167:22 168:5,16,17,20 169:7,8,9,14, 16,17 173:22 181:5,9,11,17 182:1 184:20 186:2 191:19 208:6 231:25 245:23 246:14 259:25 262:15 268:5

**science-based** 118:23 119:20

**sciences** 161:23

**scientific** 11:7 12:17 15:1,5 25:23 67:9,16 68:20,22 104:5 107:10 130:23, 25 143:18,23 147:17 167:6 169:6,12 179:7 181:13,15 184:21 185:5 215:10 233:7, 16 253:15 260:15 266:17 268:21 279:23 280:1,10,14

**scientifically** 67:13 104:23 168:1 247:11 280:9

**scientist** 149:17 280:22

**scientists** 46:2 136:1 181:10 186:9 195:16 197:21 246:22 247:2 279:25 280:2,3,5,6

**scooch** 114:18

**scope** 50:23 150:17,21

**screen** 9:14,17 18:15 39:22 51:15 52:19 55:11 73:21 76:25 83:18 264:20

**screens** 18:25

**scroll** 19:4 34:20 50:10 74:2,7,10 82:11 84:18 121:4 127:5

**search** 25:10 58:18 161:9 245:9 251:21 252:1 279:12

**searched** 12:4

**sec** 52:10

**seconds** 184:5



**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

256:5

**section** 13:6 14:9 47:14,22 49:9 75:21 76:3 77:22 78:4,5 79:24 84:11,20 91:15 106:11 123:5 144:17 150:24 165:3 226:13 251:19

**sections** 11:22,23 15:6 57:12 72:6 75:15 76:13

**secure** 78:10

**securing** 78:16

**seek** 28:11

**Seemingly** 221:6

**sees** 232:15 239:23

**segment** 137:13

**selected** 152:4

**selection** 131:6 150:15

**self-** 223:5

**self-evolve** 223:13

**self-reports** 223:10

**selling** 163:7 236:7,25 237:16

**semantic** 69:16,17 70:3, 15

**sense** 8:9 24:16 25:23 33:22,25 67:9, 17 128:22 153:16 252:19

**sensitivity** 149:7 260:24 261:2,13 263:16 264:5,6,

8

**sentence** 14:11,13,16 81:17 88:9 97:13 174:12 193:6

**sentences** 84:1

**separate** 5:23 10:12 27:21 44:12 96:25 128:10,18 135:18 168:20 175:15 207:17 212:17 234:9 238:10 254:14

**separated** 65:14

**separately** 176:17

**sequential** 190:21 249:17

**series** 265:2

**serve** 20:23 28:7

**served** 21:23 27:20 30:2 37:4

**services** 50:7, 23

**serving** 20:1

**set** 10:1 36:3 67:25 137:25 147:14 161:2

**settings** 139:8

**sex** 84:25

**shakes** 7:20

**shape** 88:6

**share** 9:17 18:13 90:12

**shared** 260:21

**shares** 218:10

**sharing** 20:21 36:2 40:4 51:15 55:11 76:25 264:20

**she'd** 178:16

**shocking** 187:7

**Shoes** 92:15

**shoot** 132:10

**short** 102:19 121:25 123:5 198:15 223:15 242:10 248:16 250:3 265:11, 25

**shorter** 122:13

**shortly** 205:15 270:7

**shot** 63:4

**shoulder-length** 171:21

**shout** 279:14

**show** 18:12 34:18 39:16 50:4,5 51:19,25 53:10 55:1 73:13,20 75:8, 15 77:15 79:7, 23 82:4,8 90:18 96:10,14 108:22 109:16 118:8 140:23 141:23 164:19 167:19,22 169:9 174:14 194:25 203:10, 12,23 210:16 226:7 248:15 257:13

**show-** 170:16 196:24

**show-up** 131:12,19 170:15,17 197:1 200:16 201:11,14,18, 20,24 203:4,15 204:25 262:18

**show-ups** 13:1 196:23 203:9

**showed** 211:3 262:6

**showing** 153:23 203:7 220:6 248:18, 21 269:14,16

**shown** 78:20 80:15 102:2 148:16,20 161:15,17 257:10 258:4

**shows** 89:18 115:3,5 148:2 186:23 194:23 196:8 203:17 211:21

**sic** 105:14

**side** 18:21 22:8 23:23 24:9 48:25 52:5 166:17 182:15 271:23

**sides** 166:16 182:14

**sign** 157:12 173:2,4,9 205:24 207:23 217:12,14

**signal** 104:25 105:9 133:17 134:14 145:18 146:12,14,18 187:23 188:8, 12,17,19 189:24 190:6 191:9 202:14 203:11 244:2,6, 10 258:22 260:2,3,5,15,19 261:10 263:18

**signaling** 222:6

**signals** 140:2, 3,8

**signs** 141:23

**silent** 140:18 141:11

**silver** 92:16

**similar** 65:14 116:25 122:6 147:12 173:24

211:16 219:15 253:1

**similarities** 105:11

**similarly** 33:23 138:14 168:23

**simple** 102:12

**simpler** 134:12

**simplest** 100:16

**simulated** 246:21

**simultaneous** 190:20 249:16

**sincerity** 183:22

**single** 22:9 23:13 57:6 112:16 115:18 131:12,15 161:15,16 170:16 231:19 263:14,15 269:15,22 270:9

**sir** 6:1,10,19 8:23 9:7,24 17:5,20,22 18:12,15 19:7, 21 20:22 30:1 31:23 32:7 34:9 36:3,11 38:11 39:16,17 42:1 45:2 49:17 50:4,13 51:6 52:23 53:13 55:11 57:14 60:14,24 61:5 63:4,8,11 64:6 71:12,20 72:15 73:21 75:3,10 76:4,13,23 77:1,11,19 78:24 79:12,20 80:7 82:11,22 83:24 85:5,13, 19 86:2 89:16 90:4,13,21 93:19 94:11 95:9 111:20

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JOHN WIXTED, taken on January 19, 2026

316

121:1 122:3 129:12 139:25 140:13 144:17 159:5 161:2,13 165:17 178:20 179:24 252:24 257:9,15 258:16 271:1, 20 272:21 273:21 275:7 277:20 278:15 279:22 281:15, 20 282:9

**sister** 66:17

**sit** 52:3 190:9 278:6

**sitting** 23:1

**situation** 206:14 245:12 261:11

**six-barrel** 92:16

**skim** 49:20 57:16,24

**skimmed** 56:18 57:11 224:5

**skin** 92:12 116:19 121:25 123:1 257:25 258:2 259:9 260:4,22 261:1 264:2,7

**skinny** 102:18 218:15

**skip** 183:12 196:18 256:13

**Slapinski** 135:15

**slight** 102:12, 14,21 104:4

**slightest** 119:3 168:1

**slightly** 103:13 116:25 247:6

**slow** 121:11

**small** 137:13

**smaller** 245:18

**Smith** 132:18

**Smiths** 132:20

**So-and-so** 176:1

**social** 186:2 241:18

**society** 38:8

**solemnly** 6:11

**someone's** 147:15 173:19 251:23

**sort** 39:8 43:18 99:22 134:13 159:3 240:22

**sound** 54:11 63:19,21,22 81:8,22 83:7 85:15 214:25 219:3 265:8

**sounded** 129:21 143:22

**sounds** 9:22 29:8 36:10 46:13 86:19 107:2 124:6,15 134:20 135:5 154:1 158:21 168:6 211:12 223:21,23 230:9 233:21 236:8 265:9 267:16 274:1 282:5

**source** 73:1 100:10 101:3 102:8 181:3 182:8,11 260:6

**sources** 12:22

**Southern** 5:11

**speak** 21:11 39:2

**speaks** 25:25 138:6,9

**specific** 11:4 28:25 65:7 68:5 73:2 86:18 90:7

104:3 149:1 157:7 166:20 167:18 189:6 193:23 265:22 278:7

**specifically** 8:14 43:17 44:20 50:9 56:23 73:5 81:6 84:24 86:4,12 89:10 90:1 98:22,23 114:11 122:25 143:16 148:25 152:24 166:22 167:15 168:10 169:2 225:24 268:6 273:6 279:5

**specifics** 47:11 148:9 190:10

**spectrum** 133:7 138:18 233:5

**speculation** 86:8 142:20,22, 23

**speculative** 159:22,23,25

**spell** 7:8 260:13

**spelled** 7:10

**spend** 53:23 54:20 196:19

**spending** 54:1

**spent** 53:20 54:12,15,25 55:7 223:10 241:18

**spoke** 78:21 79:4 86:25 87:15 225:2

**spoken** 16:22 115:23 116:13, 14

**spot** 222:20

**spread** 120:8

**stable** 70:5

**stage** 23:21 24:7

**stamp** 76:2

**stamped** 75:10

**stand** 97:11 277:22 278:1

**standard** 143:24 148:6 180:19 239:20

**standing** 33:6 228:15 229:9

**standout** 259:13

**stands** 28:12 106:23,25

**stared** 221:1

**staring** 72:11 74:24

**stark** 102:20

**start** 52:2 55:13,16 59:6 71:14 72:6 83:23 125:5 133:1,2 243:5 250:4 261:3 277:24

**started** 37:1 185:23

**starting** 5:15 49:10 78:7 79:24 91:19 101:25

**starts** 78:6 95:22 120:10 193:21

**state** 5:13 6:1 7:8 21:14 32:17 69:19 72:9,13 81:4 125:16 141:13 143:8 144:18 165:8 168:23 184:13 186:1 198:23 200:19 205:23 231:25 252:25 255:22 256:17

**state-of-the-art** 212:5

**stated** 72:24 76:5,11 144:19, 20

**statement** 26:5 46:23 47:13 48:6 80:20 85:17,20 86:2,21 87:3 88:20 94:8 97:2,6 98:5,8 99:11 103:1 112:2 117:5,22 125:9,17 126:25 127:11 128:2 129:6,23 130:10 142:7 144:25 145:1, 13,25 150:13 151:6 152:25 153:1 157:5,8 168:17 171:18, 22 172:13 173:18 176:18 191:19,25 193:9 194:16 196:1,20 208:22 221:10, 14 223:4,8 232:12 252:12 253:11 255:6, 11 257:1,3,5 270:8

**statements** 94:4 95:4 98:1 114:19 118:1 125:7,8 129:25 130:7 165:18 175:2 216:17

**states** 5:10 21:12 76:5 81:7,18,21 83:6 221:6 264:7

**statistic** 186:10

**statistics** 61:13,19,23 202:7 230:16

**Stays** 183:1

**Stead** 16:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
—— COURT REPORTERS ——

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Steele** 135:15

**steered** 112:12

**step** 64:15 92:1 94:16 147:16 170:10 195:1 204:2 206:4 251:22 271:19

**steps** 78:23

**stimulus** 144:11

**stipulate** 6:5,8 238:6

**stipulated** 6:7

**stitching** 92:14

**stop** 20:21 36:2 40:4 51:15 52:7 55:11 60:11,12 76:25 204:2 264:20 280:4

**stopped** 47:2

**stored** 109:21 152:19

**storm** 126:11

**story** 33:5 67:6 93:22 155:7 164:15 193:12 195:12 199:25 211:5 240:22 241:11 257:4

**straight** 75:20

**straightforward** 265:5

**strangely** 42:25 151:16

**stranger** 66:14 127:16 130:8, 25 133:9,14 134:19 138:14, 17 145:18,19 233:5,8,23 234:1,6,10,12, 14,18 235:8 236:9,17 241:13 242:9 243:7 244:9,20 245:2,24 246:18 250:14

258:8,18,19,24 259:10,20 265:11 266:2, 10 267:11 268:10 269:15 270:16

**strayed** 210:11

**street** 5:5 132:10 240:8, 11

**strength** 246:2

**strengths** 228:19

**stress** 191:1 197:25 198:24 199:3,4,23 242:10 266:11, 22,23,25 267:7

**stressed** 200:5

**stretch** 259:20

**Strickland** 66:18,20,21 98:23 107:4,6 108:6 217:25 218:3,6,16 219:11 230:25 257:4

**strict** 69:9 171:6

**strike** 12:16 15:23 17:21 19:20 21:21 24:14 27:9,19 41:6 42:25 48:3 81:24 91:23,25 92:9,18 93:9,10 95:2 96:21,24 98:7 122:9 132:14 140:6 145:6,7 152:23 153:12 155:13 167:8 171:25 173:17 174:23 181:5 182:3 187:13,15 220:20 221:17, 25 223:7 251:18

**string** 79:25 92:13

**strong** 79:22 102:16,17 143:18 160:4 167:23 168:17 233:17 245:19 260:19 261:10

**stronger** 263:18

**strongly** 169:18

**student** 36:14, 19

**students** 16:24 36:21

**studied** 137:1, 12 230:6,18

**studies** 12:25 13:10 108:20 144:6 150:6,7 181:11,14 185:3 186:20 188:2 189:1,5, 10,16,21,22 192:17,18 194:25 196:17 197:1 205:17 211:16 212:2 228:6,18 234:2, 3 245:11 248:10 253:14 262:15 263:10 267:2,3

**study** 13:7,16, 19 50:2 169:20 185:4 189:8,9, 13 190:10,15 191:11 192:20 194:3,24 197:17 199:3 201:7,11,25 203:5,6 208:17 209:22 211:9, 12,13,20 214:9 216:20 220:5 228:17,20 234:14 235:1,4, 20,21,23,24 248:10,12 249:14 250:8, 18,21,22,23 264:2,7 267:2,3 278:20 281:2

**stuff** 124:25 130:21 179:14 196:17 215:2 256:12

**stumble** 274:2

**subject** 17:14, 16 20:14 172:2, 3 253:23 265:14 266:1, 14 267:15 268:11,15

**subjective** 68:4,5 252:4

**subjects** 185:16 199:11 205:14

**submit** 53:5 55:2

**submitted** 35:10 40:19 53:14,17

**submitting** 28:6 37:7 220:5

**suboptimal** 266:23

**subpoena** 19:3 50:8 53:13

**subsequent** 18:5 112:2 140:9,20 163:17 165:19 166:23 175:3 180:1 213:20 214:3,7 216:8 269:7,21 270:9

**substance** 10:3 100:7

**substances** 279:5

**succeed** 103:13

**succeeded** 166:10

**successful** 256:23

**successfully** 220:7

**suddenly** 104:16 106:24 213:21

**sufficiently** 138:16

**suggest** 22:14, 17 220:7

**suggested** 66:17 219:13, 19 220:13 270:10

**suggesting** 68:23 190:5 201:19 214:14 225:21

**suggestion** 220:2,3 258:8

**suggestive** 159:20 164:8 201:10,15,18 202:2,3 203:4 220:12 262:10, 12,13,16,17,19, 22 269:12,17, 19

**suggests** 253:3 266:19

**suit** 23:20 59:12

**Suite** 5:5

**summaries** 60:15

**summarized** 201:12

**summary** 72:6 75:12 89:2 144:18

**super** 60:5 88:4 100:3 106:5 140:25 168:15 173:7 199:12,17 209:24 235:6 281:13

**superiors** 28:11

**support** 96:13 168:22

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

supports
169:18 244:25

suppose 74:21
109:10 147:3
164:2 281:19

supposed
226:2

Supreme
186:1

supremely
222:14

surprise 24:7

surprised
194:1,5 226:22
235:14

surprising
200:3 266:21

surprisingly
208:24 260:25
266:20

surveys 279:1

suspect 72:14,
19,24 75:5
76:12 81:9
83:8,24 84:7,
11,12,22 85:15
108:11 132:23
144:20,22
174:8,10,14,17,
20,21 175:4,6,
11,14,15
176:12,13
185:10,11,12
186:14 190:19
192:10,15
204:12 205:16
206:1 216:18
232:2,9,20
249:11 254:24
258:6,12 260:9
262:6 269:15
276:7 277:3

suspect's
144:21 232:4

suspect.'
81:23

swear 6:11

Sweden

108:13

sworn 165:12

Synthesis
277:20

system 24:25
25:3 27:2,5
33:13 88:3
118:22 136:15,
17,24 137:6
165:12 180:13,
20 182:22
183:6 186:25
198:22 243:2
267:18 271:5,9,
12 272:12,22
273:6 274:10,
21 280:4

system's
280:6

_____

T

_____

table 255:9

takeaway
191:16

taking 7:18
88:17 169:8,14
187:3 199:9
203:7 267:4

talk 39:6,11
45:8,9 70:24
71:24 94:12
109:13 111:22,
24 133:10
139:6 143:12,
24 149:22
164:4 166:20
168:16 178:8
182:10 183:10
184:19 198:21
223:25 224:24
234:25 235:14
255:6 264:14
266:21 272:1,5
274:4,12
279:25 280:1

talked 107:3
108:11,25
118:11,12
124:1 172:23
189:14,19

192:12 215:2
217:24 220:20,
21 221:11,25
235:2,19
238:23 253:19,
22 260:23
261:10 262:17
263:10 270:3,
14 271:2
272:15 274:11
275:7 276:16
278:20

talking 28:21
35:14 39:14
44:22 60:10
61:11,12 64:12
70:13 78:20
80:13 82:5
92:13 95:22
96:2,5 98:13,22
99:12 103:7,8
107:19 109:7,
25 111:18
114:9 120:20
123:13 128:6,
10,16,21 130:7,
15 131:20
132:17 133:1,2
135:18 136:3
138:20 139:23
140:1,2,11
141:2 146:18
150:8 152:7
153:17,18
154:4 158:16,
17 159:1
160:12,15
161:19 163:1,4
170:14 173:4
174:11,22,24
175:18,25
176:2,17 177:3,
4 191:12
192:20 194:24
196:2,19
198:10 201:11
207:3 210:13,
14 214:1
215:15,17
216:16 217:5
221:12 223:2
224:22 225:22
234:23 236:6,
13 237:20
250:10 255:13

256:20 258:14
260:20 261:2
262:14 267:19,
20 268:20

talks 39:10,11
111:16 118:9
236:7 237:13
252:18 278:18

tall 102:18

Tanoury 5:19
6:8 52:10,14,18
63:23 85:11
86:7 94:6 95:19
97:8 107:23,25
109:9 115:1
116:9 117:13,
16 119:8
129:10 135:2,8
139:16 141:16
151:13 153:3
160:13 162:11
163:21 172:16
206:20 222:15
263:4 269:3
270:12 281:22,
25 282:25
283:1,3,6

task 244:12

tattoo 214:19

technically
55:2

technician 5:3

telephone
34:10

telling 59:19
60:1 118:13
130:11 142:6,
14 186:24
193:13 211:20,
24,25 212:8

tells 126:7,15,
20,21,23
185:18,25
191:7,8 199:24
211:17

telltale 157:12
173:2,4,9
205:24 207:23
217:12,14

ten 22:19 44:1
53:21,22 54:11
63:21 184:5
234:22 268:22

tend 254:9
269:6

tended 250:15

tentative 268:8

tentatively
266:8

term 152:12
197:12 262:13,
23 280:1

terminology
67:22 171:14
264:3

terms 9:20
13:10 61:20
94:13 239:14
260:2 261:6

terrible 89:19
123:22 183:4

terrorists
199:9 267:4

test 22:12,15,
22 23:1,12,17
25:3,4,5,8,16,
21 26:3 27:5
32:14,23 33:11,
12 47:18 64:11
65:1,3,4 67:3
68:9 69:3 88:21
94:3 99:24
103:12 106:15,
23,24 115:17
126:5,14,22
130:4 131:2
136:21 140:7,9,
18,20 141:12
142:15 153:14
154:14 162:1
170:7,12,15,16,
18,22,23 171:1,
7,8,10,15,17,23
172:1,3,4,7
174:8,10,17
175:11 176:4,5,
19,22 177:1,2,
6,23,24 178:3
184:17,18

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

187:10,18,23 188:14,17,22 190:3 191:25 192:10,13 196:23,25 200:10,11,13, 24,25 201:2,9 202:4,15,16 203:18,20 204:9,10 205:7, 10,11,12,20 206:16,17 207:1,4,5,14, 21,22 208:9,21 212:3 213:20, 21 214:2,3,4,7 215:4,5,15,16 216:10,12,19 217:2,3,6,7,9, 10,16,18 221:19,21 226:2,4 227:15 228:3 231:4,5, 9,16,21 232:5 243:19 255:12, 16,17,19,20,23, 24 256:24 275:8,11,18,23 278:2

**tested** 105:12 206:1

**testified** 11:1 12:17 14:23 15:5 16:13 17:1 19:11,14,16 20:18 21:3,22 22:4 25:15 29:23 30:22 31:5 41:13 55:20 57:18 58:22 64:23 70:23 71:20 77:1 87:8,9 107:13 138:11, 12 177:7 224:5 241:6 244:22 256:4 272:7

**testifies** 178:16

**testify** 23:13, 14,21 24:8 31:8 32:12,15,22,24 33:4,9,10 58:19 86:24 113:19

271:18 273:23

**testifying** 24:25 51:4 94:13 229:20, 23 251:9

**testimony** 6:12 19:2 24:11 27:18,22 29:21 31:11 32:8,13 34:3 40:17 43:24 44:1 48:1 49:18,23 58:7,8 65:8 67:23 77:6,16,21 78:25 79:3 80:24 87:14,18, 24 88:16,18 93:24 94:7 95:12,23 96:2, 5,10,11 106:13 118:9,15,19 119:5 160:9 161:13,19 165:13,19 166:3,16,23 167:14,16,18 168:24 169:3 179:23 180:1,9 182:13 183:5 204:20 213:7 216:15 224:8, 22 225:2 226:24 227:1,6, 19 228:21,25 229:18,19 230:7 231:9,15 237:10 238:2 279:17

**testing** 17:18 60:21 71:21 171:24 196:16, 21 197:12 206:5 216:8 275:21

**tests** 27:2 65:2 69:2 109:7 147:18 162:1 165:18 175:2,4, 15,23 176:11, 12,15 177:8 184:19,20 203:25 206:19, 25 215:18 217:12 269:7

**that'd** 252:23 259:10

**theoretical** 229:5

**there'll** 53:6

**thesis** 27:1

**thing** 21:14 32:24 35:2 58:15 65:10 75:14,16,21 81:2 89:1 103:6 106:4 134:2 196:9 207:12, 13 223:21,24 238:6 267:17

**things** 11:12, 21 13:25 15:3, 14 18:11 22:7 32:19 39:15 44:11 46:19,21, 24 48:25 52:6 54:8 56:3 57:21 59:17 66:9 68:1 76:6,16 82:6 88:12 89:22,23 93:6 103:16 110:9 114:11 120:11 123:22 128:11,22 130:24 152:2 155:3 158:17 168:12 169:22 171:10 173:1,8, 15 191:4 198:1, 2,5 215:7 236:8 239:4 240:2,13 242:17 245:7 254:14 267:21 273:12

**thinking** 22:21 30:7 37:24 39:7,8 60:9 88:8 101:6 202:20,21 204:7,15,22 232:8,22,23 262:21 276:25 277:3

**thinks** 25:3 44:7

**Thomas** 15:25

**Thompson** 195:12 227:15 256:6

**thought** 29:10, 11,14 33:4 58:13 72:10 74:19 76:8 92:21 126:2,4,5 175:5 200:7 205:14 213:25 236:20 239:5,7, 12 271:22

**thousands** 181:14

**threat** 33:19,20

**threatened** 72:18

**throwing** 90:13 178:14 256:2

**Tiderington** 15:25 16:9

**tied** 92:13 116:20 122:2

**ties** 242:6

**tight** 81:7,20 83:6 92:13 116:3,20 122:2 146:8

**time** 5:6 8:13 13:8 17:21,23, 24 22:7 31:23 34:2 35:5,12 37:4 40:20 44:9 45:22 47:19 51:3,6 53:3,5 54:12,20 55:7 58:9 59:7 63:17 64:3 65:14 66:4 68:14,16,18,22, 24 70:10,20 73:11 78:17 96:6,7 103:24 104:1 105:18, 20 106:17 113:3,14 114:1, 3,5 115:24 119:21 120:6, 17 123:23 124:10 125:1,

16 130:9 135:10 137:25 139:10,17,20 140:17 142:4,8, 10 146:11 152:13 153:22 161:1 162:7,17 164:20 165:10 166:18 171:3,4, 15 172:10,14 178:19 179:1 183:2,24 186:2 187:19 192:7 193:10,14,24 194:12,14,15 197:9 204:5 205:25 206:3, 11 208:1 218:22 219:22 221:2 222:15, 22,24 223:6,9, 14,16 229:14 232:6 233:8 234:2 236:19 241:18 242:10 243:8,14 250:4 255:23,24 261:12 265:7, 11,25 267:22 270:21,23 276:13 279:19 281:21 282:20

**time-keep** 52:1

**time-keeping** 52:17

**timeline** 29:22 67:25 68:2 90:15 110:7 115:15 139:25 143:1 158:4 184:2,8 193:8

**times** 29:1 30:19 31:6 32:3,6 76:7 88:10 110:6 133:12 139:7 143:25 144:24 162:9 201:17 220:25 233:13 234:22,23 235:8 239:9,15 247:13 253:9, 11 275:7

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Timothy** 16:2,6

**tiny** 79:23 198:15,16

**title** 26:22,23 277:17 281:9

**titled** 50:23

**today** 5:3,6 6:19 7:13 8:18 9:3,24 10:17 12:2 15:8 16:22 17:2 31:18 40:18 53:4 54:22 67:22 110:7 121:19 165:17 179:24 185:1 190:9 253:22 271:10, 13 272:15 275:8 276:16 278:6 281:22

**told** 33:10 42:14 60:6 71:3 72:10,13 74:18 75:4 76:8 91:22 92:8,20 93:6,15 132:2 156:15 214:9

**tone** 261:1 264:3,7

**top** 35:6 39:24 55:16 72:20 138:8 167:24 209:15 226:9 260:15

**topic** 61:24 149:24 150:6 233:1 244:24

**total** 46:14

**totally** 44:12 101:22 124:23 142:25 164:12 186:18 194:21 210:3 221:11 278:1

**touch** 229:11 233:3

**touched** 57:4 144:23 165:1 170:4 192:25

196:18 221:18

**trace** 39:7 265:14 266:1,5, 6,14 267:15 268:14

**track** 17:13 30:8 32:5 54:6 59:16

**tracked** 55:3

**traditional** 224:12 245:6 267:17

**trained** 190:16

**training** 36:25

**transcript** 7:24 58:15 77:2 79:11 90:19,21 91:6 101:8,20 224:6 281:18 282:2,7,17,18

**translate** 7:21

**translation** 188:4

**travel** 51:5

**treat** 202:25 234:9

**treating** 37:16 204:2

**treats** 88:3

**trial** 19:13 22:23 23:8 25:1,15 27:6 33:5 43:25 58:7,8,12,13, 14,22 64:23 68:25 77:2,16, 17 78:25 87:14 103:3 119:4 125:1 142:10 165:13,19 166:23 182:12 193:16 203:17 206:3 223:16 226:5 227:7 228:21,24 229:18,19,24 230:23,24 231:2,14 237:9,

23 238:2,16 271:20 273:23

**trivial** 237:3

**trivially** 70:6

**trouble** 199:7, 10

**true** 14:15 26:6 45:9 47:9 61:17 88:18 93:22,25 94:8,13 95:11, 25 97:20 99:21, 22 100:23 108:20 119:16, 24,25 120:1 126:8 144:8 172:12 179:11, 12 186:6 204:5 217:15 229:21 232:12,15 234:7 238:20 239:14 255:12, 16,17,19 257:1, 3 258:10 260:4 265:18,21 266:25 267:23, 25 268:4 270:10 271:22 275:2

**trust** 136:2

**trusting** 136:18 179:3

**trustworthy** 68:14 212:13, 14

**truth** 6:12,13 25:25 33:11 118:24 119:23 165:21 180:14, 21 204:10 205:1 227:15 278:4

**truthfully** 9:3 45:8 94:13 256:17

**turn** 55:12 63:16 71:11 142:24 208:16 281:22

**turned** 221:13

**turning** 164:25

**turns** 99:8 126:3,21 190:4 198:4,13 212:7

**two-part** 22:6

**type** 42:7 70:14 103:6 168:24 207:4 218:8

**typed** 11:17,22 73:6,9 76:15 91:22 92:2 95:7 110:9,11,15 111:8 156:20

**types** 175:22

**typical** 228:24 262:8 276:5

**typically** 52:24 154:11 158:20 253:4 269:8

**typing** 110:23

**typos** 282:3

———————

**U**

———————

**U.S.** 199:5

**UCSD** 149:23 264:14

**Uh-huh** 91:24 92:11,17

**uh-huhs** 7:20

**ultimate** 62:21 147:5

**ultimately** 230:20

**unambiguously** 146:15

**unaware** 33:23

**unbeknownst** 256:11

**uncertainty** 268:25

**uncommon** 208:14

**uncontaminated** 126:5,14 187:10 200:25 278:3

**uncontested** 239:13,18

**underlie** 37:22 263:11

**underlies** 168:16

**underlying** 260:12

**undermine** 194:19

**undermines** 195:2

**undermining** 221:8

**understand** 11:13 33:13,19 38:3 40:14 48:13 61:17 65:8,22 88:6,14 96:1 115:20 127:20 131:21 150:25 153:7 155:19 156:25 169:12 184:14 187:3 211:12 216:4 271:19 273:8,21

**understanding** 15:21 19:23 20:12 24:11 30:18 33:18 37:16,20 38:4 39:5 40:17 43:19 58:21 59:13,14,15 61:13 67:22,23 71:17 79:12 96:16 106:13 138:25 143:14 150:20,23 164:7 175:10 177:10 197:11 212:6 213:7 215:6 216:14, 20,25 236:2 237:6 238:11, 21 240:19

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

**KENTUCKIANA**
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

245:25 251:20 254:17 260:11 273:19 274:19

**understandings** 150:16

**understood** 7:22 8:7,11 19:15 29:19 30:1,12 33:8 34:1 55:6 113:6 174:22 267:22 277:15

**undertaken** 189:1

**undoubtedly** 144:8

**unduly** 177:9

**unfamiliar** 98:24 148:1 245:13 253:5

**unhappy** 82:18 221:15

**uniformed** 201:16 205:15

**uninformative** 210:3

**unintentionally** 182:5

**unique** 144:11, 12

**uniquely** 258:6

**United** 5:10

**unknown** 85:3

**unknowns** 148:14

**unlike** 70:15 173:15

**unrealistically** 245:15

**unreliability** 160:21

**unreliable** 44:7 109:5 126:2,9 187:9 188:14 196:5 204:17

**unsure** 29:17

**untampered** 227:21

**unusual** 36:14

**update** 202:19, 21 204:21

**updated** 204:15

**updates** 35:25 204:7 262:20, 21

**ups** 101:23

**users** 279:19

---

**V**

---

**vacuum** 200:8

**vague** 266:8

**vaguely** 79:1 169:1

**Vallano** 134:21 135:14

**values** 123:24

**variability** 69:3

**variable** 173:7, 11 242:16 246:9,20 247:3, 8,14 267:19 274:11

**variables** 48:18 89:20 123:21 133:14 197:10,20,22 198:10,11,21, 22 210:11,14, 15,22 211:6 242:13,21,24 243:21 244:3,8, 15,16,21 245:1, 17,21 246:3,25 247:7 248:6,7 268:19 271:2,6, 10,12 272:13, 23 273:7 274:21

**vast** 194:22

**veracity** 62:25

**verbal** 7:20 109:21 110:1

**verifying** 60:18

**verse** 169:13

**version** 93:22 100:23

**versus** 26:24 33:16 35:15 123:14 133:4 182:16 192:18

**victim** 57:21 78:19 81:7,21 83:6 86:13 93:12

**victims** 44:21 85:8 90:6,8 162:8 176:17 241:17 275:9

**video** 5:2 185:7 191:24 227:21 246:17,21 282:20,21 283:2,3,4

**videoconference** 5:8

**videotape** 108:16 229:16

**view** 137:21 160:20 168:21 192:9 223:15, 17 243:8

**viewing** 131:5 140:3 208:3 232:9 249:2

**views** 277:25

**violations** 15:12,13

**virtually** 235:7 236:17 244:9

**visible** 116:22 146:9

**visit** 120:20,23

**visual** 109:22 152:19 175:24

176:5,6,12 267:12

**vitae** 248:15

**vocal** 144:5

**voice** 60:11 81:8,22 83:7 85:15 89:4 94:23 116:5 117:18 143:10, 16,22 144:9 145:17 146:19 147:9,15,18,23 148:3,7 151:7, 17 152:5 154:3, 23 158:17 207:15,16 208:2 219:2,3, 4,9,10 251:11, 14,16 252:15 253:2,18

**voices** 144:12 147:25 148:1 219:15 253:4,5, 7,8,17

**vulnerable** 247:6,7

---

**W**

---

**W-I-X-T-E-D** 7:11

**wait** 30:25 32:19 127:2 196:13,15 215:20 245:10

**waited** 53:9

**waive** 282:13

**Walker** 5:20 72:3,10,13 74:19,24 75:5, 12 90:20 93:24 95:4,17 97:2,7 98:1,5,7,9 101:9,10,18 102:11 112:1 114:13 116:17 117:7 118:5 119:7 150:16, 20 156:2 262:5

**Walker's** 73:24 95:12 101:15 111:15 121:3 156:19

**wanted** 20:11, 22 46:7,20 57:1,15 96:10 155:9 162:6 169:23 184:13 190:8

**watch** 7:5 185:6

**watched** 205:14

**ways** 20:6 22:4 23:9 203:24 214:10 276:17

**weak** 169:15 233:18

**weakness** 228:20

**weaknesses** 228:19

**weapon** 197:24 198:17 242:10 267:12

**weapon-** 191:2

**weapon-present** 191:2

**wearing** 151:7 152:5

**weather** 9:9

**website** 34:13

**week** 10:8,16 105:23 119:18 133:4 194:6

**weeks** 29:1 58:2 69:5 193:15 250:25

**weigh** 123:18

**weight** 58:20 85:2 88:3,12 89:12,18,23 113:23 119:24 120:13 123:21 135:24 136:14 137:19,20

Kentuckiana Reporters
110 North Wacker Drive, Suite 2500
Chicago, IL 60606


KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

145:8,10 156:14,15 160:18,25 165:9,11,12,14 173:8

**weird** 18:25 133:25 147:3 174:3 183:1

**weirdly** 175:9

**well-** 133:23

**well-known** 67:14 108:13 235:9

**Wells** 125:13 130:19 185:2 192:7 194:17 196:1,8 221:5,6 248:13 249:7, 13 277:16,23

**West** 5:4

**whatsoever** 94:19 159:6,15 160:18

**white** 102:18 171:20 177:13, 15,16 191:11, 12 193:1,3,5 214:18

**who've** 24:1,4

**wife** 16:23

**withhold** 194:17

**witness's** 22:12 66:17 173:23 174:7, 18 177:18 183:22 192:10, 14 198:6 205:24 211:7 212:3 223:13 245:19 260:22

**witnessed** 165:10

**witnesses** 14:14 22:14,17, 22 23:2,3 44:24 47:9 58:1,18,22 69:4 71:2,24

73:4 87:20 89:19 108:15, 17,22 109:6 133:19,21 146:24 165:9 173:10 178:12, 21 180:4 181:7, 23 182:6,10 190:1 194:17 197:7 200:17 207:8 209:12 210:16 213:5 227:10 228:3 230:19 231:18 248:1,21 269:10,11 279:23 280:15

**witnesses'** 221:7 224:24

**Wixted** 5:9 6:3 7:10 50:25 249:12 282:1

**woman** 101:19

**wondering** 108:6

**wonky** 273:20

**word** 19:22 20:4 22:25 45:5,15 48:8 81:13 96:23 213:12 216:2 242:3 278:11

**worded** 21:22 42:24 151:16 157:1 175:8

**words** 12:4 125:24 150:13 153:24,25 155:8 170:11 191:16 253:6

**work** 17:21,23 21:9 22:11 34:9 36:17 38:6 52:1,23 105:9 112:14 149:3, 22 253:2 268:22 270:3 275:20 279:8

**worked** 36:16 241:22 259:25

278:16,17

**working** 17:24 18:2 23:19 54:2 56:15 171:14 211:12

**works** 37:20,24 38:5,7 112:25 113:9 120:9 137:1 183:19 263:15 269:19

**world** 70:4 88:12 105:15 142:4 188:5 189:13 190:23 197:11,19 212:25 254:25

**worn** 268:10

**worries** 264:20

**worry** 110:24 114:6

**worst** 200:15

**worth** 103:3

**would've** 14:3, 19 79:17 124:4 195:3 207:13 259:21 263:19

**wrap** 143:3 235:16

**write** 17:13 19:12 42:1,3,5 87:10,19 93:14 112:16 113:20, 24 251:1 273:25

**writing** 51:4 53:21 54:13 55:8 112:17 136:23 179:7 183:9 199:12 224:18,20 225:4,12

**written** 40:12 44:16 59:10 61:18 65:15,21 73:8 75:12 87:21 110:15 113:11 121:20 237:11,17 270:2,4,7

**wrong** 44:6 65:20,21 130:18 136:4 153:21 155:11, 15 156:16 162:25 163:9, 10 174:16 180:12 186:10, 19,20 202:9 203:2 205:2 215:18 225:23 236:11 238:2,5, 7 239:8

**wrongful** 24:20 25:2,5,8, 22 160:20 179:2 190:1 230:6

**wrongfully** 63:8 230:20

**wrote** 47:18 82:3 113:13 136:1 187:17 195:18 201:8 226:25 277:22

_____

**Y**

_____

**year** 24:2 38:23 65:16 68:21,24 103:2 105:20, 22 111:2 119:11,21 133:3 134:24 138:19 142:10 143:25 171:11 182:20 193:16 239:24 240:7,9 253:12

**year's** 103:3

**yearbook** 161:6

**years** 22:20 25:11 27:21,23 44:1 66:19,25 67:7 68:25 87:9,25 111:18 113:21 116:5, 18 118:20 119:11 122:16, 22 133:5 137:2 139:5 160:16

161:20,25 162:16 163:7 165:13 166:24 167:16 178:15 184:14 185:22 188:13,19,20 193:17 200:7 204:20,23 219:23 231:1 238:16 239:10, 16 256:2 257:4 260:1 267:18 268:22 277:25 282:11

**yellow** 92:12

**yellowish** 116:19

**yesterday** 6:23 7:1 10:9 11:1 54:23 103:6

**You-all** 6:15

**Young** 13:7,16 250:13

**younger** 122:16,22

_____

**Z**

_____

**Zoom** 5:18,22 32:11

**Kentuckiana Reporters**
110 North Wacker Drive, Suite 2500
Chicago, IL 60606

KENTUCKIANA
— COURT REPORTERS —

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com