# Exhibit 36



# MIKE DeWINE
### ★ OHIO ATTORNEY GENERAL ★

**IN THE COURT OF COMMON PLEAS OF** Franklin **COUNTY, OHIO**

**State of Ohio,**

        **Plaintiff,**          **Case No.** 05-CR-146

      **v.**

Richard Horton

**(Name)**

        **Defendant.**

## APPLICATION FOR DNA TESTING

Inmate Number  517-079.

Address where currently incarcerated  15802 State Route North 104

Chillicothe, OH 45601.

For what offense or aggravating circumstance are you requesting a DNA test?  Aggravated Burglary, Felonious Assault, Aggravated Robbery, Aggravated Robbery, and Weapon Under Disability.

Date of Conviction  December 2006.

Sentence 23 years.

If you are serving a sentence of incarceration, how much time is remaining on your sentence?  10 years.

Were you convicted as a result of a:  Jury Trial?  __X__  Judge Trial? _____  Plea of Guilty or No Contest? _____

What defense was presented in your case at the time of your plea or trial? _____

Actual innocence. See attached DNA memorandum.

1

R. HORTON 001148

What evidence should be tested for DNA? _____

Shell casings and any other biological material. See attached DNA memorandum. _____

_____

Was this DNA evidence collected? _Yes. See attached DNA memorandum._____

Where was this DNA evidence found?_At the scene of the crime._____

Was this DNA evidence used by the prosecution in your case?_No. See attached DNA memorandum._____

Did the prosecution claim it was your DNA?_N/A. See acttched DNA memorandum.____

Would testing prove that it was not your DNA?_Yes. See attached DNA memorandum._

Explain why a DNA test would have changed the outcome of your case. (Be specific):_____

See attached DNA memorandum._____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

2

R. HORTON 001149

_____

_____

_____

_____

_____

_____

_____

_____

_____

(Use Additional Sheets if Necessary.  Pursuant to Section 2953.73 of the Revised Code, you may attach supporting affidavits and/or documents.)

_____3/29/18_____                         _Richerd Horton_____

Date                                             Inmate Signature

## ACKNOWLEDGEMENT

In order for your application to be considered, you must sign this acknowledgement.  By signing the acknowledgement, you acknowledge and agree to all of the following:

(1)    That sections 2953.71 to 2953.81 of the Revised Code contemplate applications for DNA testing of eligible inmates at a stage of a prosecution or case after the inmate has been sentenced to a prison term or a sentence of death, that any exclusion or inclusion result of DNA testing rendered pursuant to those sections may be used by a party in any proceeding as described in section 2953.81 of the Revised Code, and that all requests for any DNA testing made at trial will continue to be handled by the prosecuting attorney in the case;

(2)    That the process of conducting postconviction DNA testing for an eligible inmate under sections 2953.71 to 2953.81 of the Revised Code begins when the inmate submits an application under section 2953.73 of the Revised Code and the acknowledgment described in this section;

(3)    That the eligible inmate must submit the application and acknowledgment to the court of common pleas that heard the case in which the inmate was convicted of

3

R. HORTON 001150

the offense for which the inmate is an eligible offender and is requesting the DNA testing;

(4)     That the state has established a set of criteria set forth in section 2953.74 of the Revised Code by which eligible inmate applications for DNA testing will be screened and that a judge of a court of common pleas upon receipt of a properly filed application and accompanying acknowledgment will apply those criteria to determine whether to accept or reject the application;

(5)     That the results of DNA testing conducted under sections 2953.71 to 2953.81 of the Revised Code will be provided as described in section 2953.81 of the Revised Code to all parties in the postconviction proceedings and will be reported to various courts;

(6)     That, if DNA testing is conducted with respect to an inmate under sections 2953.71 to 2953.81 of the Revised Code, the state will not offer the inmate a retest if an inclusion result is achieved relative to the testing and that, if the state were to offer a retest after an inclusion result, the policy would create an atmosphere in which endless testing could occur and in which postconviction proceedings could be stalled for many years;

(7)     That, if the court rejects an eligible inmate's application for DNA testing because the inmate does not satisfy the acceptance criteria described in paragraph (4) above, the court will not accept or consider subsequent applications;

(8)     That the acknowledgment memorializes the provisions of sections 2953.71 to 2953.81 of the Revised Code with respect to the application of postconviction DNA testing to inmates, that those provisions do not give any inmate any additional constitutional right that the inmate did not have prior to the effective date of those provisions, that the court has no duty or obligation to provide postconviction DNA testing to inmates, that the court of common pleas has the sole discretion subject to an appeal as described in this division to determine whether an inmate is an eligible inmate and whether an eligible inmate's application for DNA testing satisfies the acceptance criteria described in paragraph (4) above and whether the application should be accepted or rejected, that if the court of common pleas rejects an eligible inmate's application, the inmate may seek leave of the supreme court to appeal the rejection to that court if the inmate was sentenced to death for the offense for which the inmate is requesting the DNA testing and, if the inmate was not sentenced to death for that offense, may appeal the rejection to the court of appeals, and that no determination otherwise made by the court of common pleas in the exercise of its discretion regarding the eligibility of an inmate or regarding postconviction DNA testing under those provisions is reviewable by or appealable to any court;

(9)     That the manner in which sections 2953.71 to 2953.81 of the Revised Code with respect to the offering of postconviction DNA testing to inmates are carried out does not confer any constitutional right upon any inmate, that the state has established guidelines and procedures relative to those provisions to ensure that

4

R. HORTON 001151

they are carried out with both justice and efficiency in mind, and that an inmate who participates in any phase of the mechanism contained in those provisions, including, but not limited to, applying for DNA testing and being rejected, having an application for DNA testing accepted and not receiving the test, or having DNA testing conducted and receiving unfavorable results, does not gain as a result of the participation any constitutional right to challenge, or, except as provided in paragraph (8) above, any right to any review or appeal of, the manner in which those provisions are carried out;

(10)  That the most basic aspect of sections 2953.71 to 2953.81 of the Revised Code is that, in order for DNA testing to occur, there must be an inmate sample against which other evidence may be compared, that, if an eligible inmate's application is accepted but the inmate subsequently refuses to submit to the collection of the sample of biological material from the inmate or hinders the state from obtaining a sample of biological material from the inmate, the goal of those provisions will be frustrated, and that an inmate's refusal or hindrance shall cause the court to rescind its prior acceptance of the application for DNA testing for the inmate and deny the application;

(11)  That, if the inmate is an inmate who pleaded guilty or no contest to a felony offense and who is using the application and acknowledgment to request DNA testing under section 2953.82 of the Revised Code, all references in the acknowledgment to an "eligible inmate" are considered to be references to, and apply to, the inmate and all references in the acknowledgment to "sections 2953.71 to 2953.81 of the Revised Code" are considered to be references to "section 2953.82 of the Revised Code".


_____3\29\18_____                        _____Richard Horton_____
Date                                     Inmate Signature


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Application for DNA Testing including Acknowledgement was mailed by regular United States mail, postage prepaid, to the Prosecutor of __Franklin__ County, at the following address: _____
__373 S. High St. Columbus, Ohio 43215__

and to Ohio Attorney General, Criminal Justice Section, 150 East Gay Street, 16th Floor, Columbus, Ohio 43215, on the ___6th___ day of __April__, 20_18_.

per authorization
_____Richard Horton_____
Inmate Signature
by Brian Howe
(0086517)
Brian How

5

R. HORTON 001152

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

STATE OF OHIO,                     :         Case No.  05 CR 146
                                   :
        Plaintiff,                 :         Hon. Judge Colleen O'Donnell
                                   :
 -v-                               :
                                   :         MEMORANDUM IN SUPPORT
RICHARD HORTON,                    :         OF DEFENDANT'S APPLICATION
                                   :         FOR DNA TESTING
        Defendant.                 :

On October 9, 2004, a man with a hood pulled over his face forced his way inside a house on Loew St. in Columbus.  The man shot one of the occupants in the leg and stole approximately $40.  Police recovered a single 9mm shell casing from the scene.  Because of limitations in forensics at the time, the shell casing was not tested for DNA or analyzed using a ballistic shell casing database.

Although both victims acknowledged that they could not see the attacker's face, one victim told police he believed the attacker was someone named "Richard."  Several weeks later, after discussing it with family members, the victims identified the attacker as Richard Horton. By trial, both victims claimed to be 100% certain that Horton was the attacker.  Despite presenting an alibi and testifying on his own behalf, Horton was convicted on multiple charges and sentenced to 23 years imprisonment.  Since his initial arrest and for the past 13 years, Richard Horton has steadfastly maintained his innocence.

Today, forensic tools are available that could definitively prove the identity of the attacker.  Modern technology can obtain a perpetrator's DNA profile from shell casings. Advanced ballistic databases like NIBIN can now match shell casings to weapons recovered

1

R. HORTON 001153

from other crimes. Finally, fingerprints from the scene that did not match Horton could now be compared against alternate suspects and reanalyzed for submission to AFIS and other databases.

This testing is especially important now, in light of new evidence that casts doubt on the State's case against Horton. In 2017, for the first time, Columbus Police disclosed the complete original interview notes with the victims. Those notes include critical information that was withheld from the defense, including the fact that at least one of the victims appears to have initially identified the attacker as a *different* Richard—Richard Diggs.

Horton has consistently maintained his innocence for over 13 years. Newly discovered police reports cast doubt on his original conviction, and technology now exists that could definitively prove the identity of the attacker. The Court should grant Horton's Application for DNA Testing, and order the remaining physical evidence sent to the testing authority for analysis.

## I.    STATEMENT OF FACTS

Around 9:00 A.M. on October 9, 2004, Columbus police responded to a reported home invasion robbery on Loew Ave in Columbus. A male victim, Richard McClanahan, had been shot in the leg and was transported to Grant Hospital for surgery. The female victim, Rhonda Curry, was questioned by detectives, and police began collecting evidence from the scene. *Columbus Div. of Police Reports Rec'd 2017* ("Police Reports"), attached as Exhibit A; *Affidavit of Jordan Blake* ("Blake Affidavit"), at ¶4.

### A.  Initial Interviews

Rhonda Curry told police that she and her boyfriend, Richard McClanahan, were asleep in their home around 7:50 A.M. when there was a knock at the side door. *Police Reports* at 6-7. McClanahan got out of bed and opened the door. When he did, a man wearing a gray hoodie

2

R. HORTON 001154

burst inside the house. *Id.* The man hit McClanahan in the head with a gun and demanded money, saying "I know you got it. I know you got paid yesterday." *Id.* at 45. When McClanahan said he had no money, the attacker shot him in the leg. The attacker also grabbed the edge of the foldout bed where Curry was still laying and slammed her inside. McClanahan gave the attacker $40.00 from a shoe, and the attacker left the apartment. *Id.*

In her first interview, Curry described the attacker as "male, black, 25 to 30 years of age, 6'2" to 6'3" tall, medium, healthy build, light skin (yellow), wearing a gray pullover hooded sweatshirt with the hood up and tied tightly, and medium-colored blue jeans with lighter stitching.)" Id. at 18. Curry admitted she could not see the attacker's full face, but she said she would be able to identify him if she saw him again. *Id.*; *Trial Transcripts* ("Tr."), at 97-98.

Four days later, Detective Walker interviewed McClanahan in the hospital. *Police Reports* at 7. McClanahan claimed that he thought he recognized the attacker as someone named "Richard." *Id.* at 19-20. According to McClanahan, the night before the robbery, "Richard" had approached him at a pay phone. When "Richard" saw McClanahan with a stack of money, he asked to borrow twenty dollars. McClanahan refused. "Richard" then asked to use the pay phone first, which McClanahan also refused. McClanahan said he recognized the attacker's voice as the same "Richard" he had seen the night before. *Id.* Tr. at 23, 48-50.

McClanahan admitted he could not see the attacker's face, and he was primarily able to identify the attacker's voice and height. According to Detective Walker's typed notes, McClanahan allegedly described the suspect as "male, black, light skin, 6'0" tall, with bushy eyebrows and short nappy hair." *Police Reports* at 21; Tr. 26, 145. The notes state that McClanahan was unable to provide a last name for "Richard," but McClanahan thought "Richard" was the same person who bought a car from his niece almost a decade earlier. *Id.* at

3

R. HORTON 001155

72. McClanahan said he would call Detective Walker back once he had determined Richard's last name.  *Id*.; *Police Reports* at 21.

### B.   Identification and Arrest

On October 28, McClanahan called Detective Walker to inform her that he had spoken to his niece.  *Police Reports* at 7.  According to McClanahan, after going through yearbook photos, the niece had determined that the person who sold her the car was Richard Horton.  This is the first time that the last name of any suspect is identified in any typed police reports.

About a month later, on December 4, Detective Walker showed a "six pack" photo array to both Curry and McClanahan.  *Trial Transcripts*, State's Exhibit 1.  Both identified Horton as the attacker, and both claimed that they were 100% certain.  On December 15, police issued an arrest warrant charging Horton with aggravated robbery.  *Police Reports* at 7.  On December 27, after learning about the warrant during a domestic relations hearing, Horton called the police station to ask why a warrant had been issued.  Tr. at 140-41.  Police informed him he was a suspect in a home invasion robbery, at which point Horton voluntarily reported to the Franklin County Jail.  *Id*.; *Police Reports* at 15.  He pleaded not guilty to all charges.

### C.  Horton's Alibi

Six months later, at the request of Franklin County prosecutors, Detective Walker interviewed Janette Harmon, Horton's girlfriend.  *Police Reports* at 60. Janette confirmed that Horton was with her the morning of the robbery.  She remembered that October 9 of the previous year was around the time she had burned her leg.  She further confirmed that she was a light sleeper and would have noticed if Horton had gotten up.  Janette provided a signed statement confirming Horton was with her on the day of the crime: "On October 9, 2004 Richard Horton was with me (Janette Harmon) doing our normal routine on that Saturday morning.  I did not

4

R. HORTON 001156

work on that Saturday morning so we were asleep at this time and then spent the rest of the day together." Id. at 59.

### D. Forensic Evidence

The day of the robbery, Columbus police photographed the scene and began searching for physical evidence. *Police Reports* at 27-33. Police recovered a single spent Winchester 9mm shell casing from the living room where McClanahan was shot. The casing was taken to the Columbus Police Property Room and submitted under Property #04-024460. *Id*. No DNA testing was performed, and the casing does not appear to have been analyzed using either NIBIN, or its predecessor, Drugfire.[1]

Police also recovered several[2] latent fingerprints from the frame of the roll out bed, where the attacker had grabbed it during the assault. *Police Reports* at 27, 32-35. Based on the standards of the time, the prints were determined to be "of value," but not "AFIS quality prints." Id. at 34.

After he was identified by McClanahan, Horton's prints were compared to the latent prints from the scene. The results were negative. *Police Reports* at 32-35. Once Horton was eliminated as a possible source of the fingerprints, no further comparisons were made.

### E. Pretrial

---

[1] The History of the Columbus Police Crime Laboratory, available online at https://www.columbus.gov/police-crimelab-history (last accessed April 6, 2018)("During the 1990's, rapid changes in technology changed forensic analysis from a reactive support service to an active partner in investigations. In 1996, the laboratory was one of the first to obtain Drugfire, a database capable of linking firearms to crime scenes. Drugfire served as the predecessor to the NIBIN system, a national database which has resulted in over 2200 matches in Columbus alone.")

[2] Initial forensic reports state that two latent prints were processed. Detective Walker testified that four latent prints were recovered. Tr. at 143.

R. HORTON 001157

Prior to trial, the defense moved to suppress the identification of Horton, arguing it was unduly suggestive. A hearing on the motion was held on January 30, 2006.

At the hearing, Detective Walker testified at length regarding how the victims had initially identified Horton. According to Walker, Rhonda Curry had initially said the attacker "looked familiar." Tr. at 13. Det. Walker stated that she did not interview McClanahan the day of the crime.[3] *Id*. When she did interview him four days later, McClanahan was able to identify the attacker:

> A: "Originally, the victim, I spoke to him, he had given the name of Richard but he wasn't certain of the last name but stated that he would be able to obtain it.
> \*\*\*
> Q: Did you ask him if he would be able to get a last name for you?
> A: Yes.
> Q: And ultimately was he able to get a last name for you?
> A: Yes.
> Q: Specifically, on October 23rd [sic] of that year, did he call you and provide you with a last name of Horton to go with Richard?
> A: Yes.

*Id*. at 13-14.

On cross examination, the defense also questioned Detective Walker about how Horton became a suspect. To explain the delay between the crime and the photo array, Detective Walker testified "Well, number one, we didn't have the Defendant's last name. All we had was Richard."

> Q: When was the first time he [McClanahan] gave you the name?
> A: I believe it was in October as well.
> Q: What name did he give you then?
> A: Richard. First time was Richard, just Richard. He called me back and gave me Richard Horton.

---

[3] This claim is contradicted by both police reports and by McClanahan's testimony at trial.

R. HORTON 001158

*Id*. at 22. According to Walker, both victims were 100% certain of their identification by the time they viewed the photo array.

The defense pointed out that, of the six photos shown to the victims, Horton was the only light-skinned black male.[4] In response, Walker testified that the other photos in the array were selected at random by computers, after certain fields such as build and age were inputted by police. Ultimately, the motion to suppress was denied, and case proceeded to trial.

### F. Trial

At trial the State called McClanahan, Curry, and Detective Walker. Its case rested primarily on the eyewitness identifications from the victims.

When asked if he was able to describe the attacker to detectives, McClanahan said "Just his height. I described his height, his build and his skin complexion." Tr. at 77. Although he could not see the attacker's face, McClanahan said he "knew who it was through the voice, through the voice and words that was said at the phone booth, it was used again during the robbery." *Id*. at 59, 69. When asked how well he knew Horton, he denied knowing him a long time. *Id*. at 71. Instead, McClanahan confirmed he might have seen him 20 to 30 times over the past eight to nine years, about 3 times per year. *Id*. at 73. "I never been in contact with him other than seeing him in the car when my niece sold him the car. And I seen him from time to time in the service station because it's right in the neighborhood." *Id*. at 66.

McClanahan contradicted Detective Walker and said he remembered talking to her briefly the same day he was shot. *Id*. at 58. McClanahan also described how he got Horton's last name after he got out of the hospital:

---

[4] During trial, both McClanahan and Curry agreed that Horton was the only light-skinned black male in the array. Tr. at 77, 102.

7

R. HORTON 001159

Q: Did you, in fact, when you got out of the hospital, attempt to get the last name of Richard?

A: Yes I did.

Q: Who did you contact to get it?

A: My niece who sold him the car.

Q: Okay.  Was your niece able to provide you with a last name?

A: Yes, she was, though a year book.

Q: And the last name was?

A: Horton, Richard Horton.

*Id*. at 60.

Rhonda Curry admitted that she could not see the attacker except for the area around his eyes.  Tr. 97-98.  She also confirmed that she was not initially sure whether she knew the attacker, and she confirmed that she never mentioned any names during her initial interview.[5]  Id. at 96-97.  Nonetheless, she was "110%" certain Horton was the attacker.  Id.  During her testimony, she also added to her description in the original police report.  Specifically, she described how the name "Richard" became connected to Horton, and how she became more certain in her identification over time:

> I knew, you know, in my mind, on my way to the hospital, who it was.  But I just—I was so upset I just forgot.  I just didn't remember until she came to take her statement at my home, at my daughter's home.  And that is when I told her, you know, I think I know who it was.  She said, "Rhonda, you didn't tell me that morning."  I said, I know.  I just forgot.  I told my daughter on the way to the hospital, I told her I think I know who it was.  She said, "Do you?" I said "Yeah."  She went to school with him maybe a month or two when he first moved to Columbus, Ohio.[6]  And I said, "You remember a guy named Richard?"  She said, "Yes.  We used to call him Addias [sic]

---

[5] Although she ultimately denied McClanahan had a cell phone, she twice referred to it during her testimony.  Tr. at 89 (Immediately after taking McClanahan to the hospital "I had Rick's cell phone").  Neither McClanahan nor Curry explained why McClanahan would have been using the pay phone the night before the crime, or why he went to his sister's to call 9-1-1 instead of using his cell phone.

[6] Richard Diggs, aka Riccardo D. Diggs, and his brother Riccardo L. Diggs both attended Everett Middle School.

R. HORTON 001160

man or something." I said, "Kim, I think that is who it was." She said, "For real, mommy?" I said, "Yeah." Well after Rick came off his medicine and stuff maybe that Sunday evening or Monday, and I was going to wash him up, he said the same name. You know, we wasn't nowhere near each other when I said it first, and then he turned around and said the same name, you know. And I said, well, I really do believe that it was him." Tr. at 90-91.

Curry also confirmed that she had no contact with Horton prior to the robbery, other than "maybe in passing" and at the car sale eight or nine years earlier. *Id*. at 99-101.

Detective Walker testified to the facts as described in her typed reports. She again stated that she had not talked to McClanahan the day of the robbery. Tr. at 116. She testified that when she did speak to McClanahan four days later, he gave her only the first name "Richard" and a general description that the attacker was "six foot" and light skinned with bushy eyebrows and "short nappy hair." *Id*. at 119, 145. According to Walker, McClanahan discussed the case with his niece, and then called her back to provide the last name:

Q: When did McClanahan get back to you about a name?
A: It was a couple weeks later, end of October.
Q: What name was provided to you at that point?
A: Richard Horton.

*Id*. at 123, 134.

At the end of Detective Walker's testimony, a member of the jury contacted the Court to ask why the fingerprints had not been compared to the victims. Tr. at 153. The Court allowed Detective Walker to address the jury's questions on the stand:

A [Det. Walker]: "We just didn't do it. I mean it is just an oversight"
Q [the Court]: "Would that normally be done?"
A: "It can be done. It is done usually. A lot of times what happens is when the crime scene guys are there and they're processing the scene the victims are a lot of times there and they will take their prints right then that day while they are there and we are interviewing them and stuff. So when we submit the prints right at the time, the latent examiners can look at them and see if they do belong to the victims. But because neither victim was there

9

R. HORTON 001161

and they were at the hospital and things, it just wasn't done. So they remained unidentified."

*Id*.

Horton testified on his own behalf and asserted his innocence. He acknowledged he had two prior convictions for drug abuse and trafficking, but he adamantly denied playing any part in the robbery. He also denied being the person who McClanahan had seen the night before, pointing out that he had a cell phone and had no reason to use a pay phone. Tr. at 192. Horton testified that he had a steady job at Popeye's Chicken, that he had over fourteen hundred dollars in his bank account at the time of the robbery, and that he had no reason to rob anyone or ask to borrow $20.00. Tr. 181-82, 190.

Horton's girlfriend, Jennette Harmon, also testified for the defense. Jennette admitted that she could not recall the exact morning of the robbery, but she remembered the general time period, and remembered clearly that she and Horton were together every Saturday morning during that time. Tr. at 166. She confirmed she had never seen Horton use drugs or possess a gun. Id. at 168.

In closing, the State told the jury that both its case and the defense's case hinged upon the accuracy of McClanahan's and Curry's identification:

> "This case is about one thing—eyewitness identification. Specifically, whether Richard McClanahan and Rhonda Curry correctly identified the Defendant as the person who committed the crimes that we will be talking about. *** The only issue the defense has, and the only issue that consequently the defense can argue about, is the eyewitness identification."

Tr. at 276-77. Prosecutors repeatedly emphasized that the identifications made by McClanahan and Curry were "consistent" and "added up." *Id*.

10

R. HORTON 001162

The defense stressed that the State had the burden of proof, but Horton's attorneys were generally unable to point to any major inconsistencies in the victims' accounts. After a full day of deliberations, the jury convicted Horton on counts including aggravated robbery, aggravated burglary, weapon under disability, felonious assault, and kidnapping. Continued Transcripts of Proceedings, at 2-4 (February 3, 2006). After the verdict was read, Horton addressed the Court: "I'm sorry your honor. I didn't do it. I swear I didn't do it." *Id*. at 11.

At sentencing, Horton asked the court to administer a polygraph test to prove he was telling the truth. Sentencing Transcripts, at 13-14. (March 1, 2006). He also continued to assert his innocence:

> "And, your honor, I'd just like for you to look in your heart and use your wisdom, sir. And, you know, I don't know how long you have been doing this, you have been doing this [sic], but I am really—I am willing to believe that you know an innocent man when you see one. *** And in my opinion, I always believed that the justice system would do its job, and that the truth would come out. And I just look for you to consider—would like for you to consider those things, your honor."

*Id*. at 16. The Court explained that it had no authority to order a polygraph test and that it had to accept the jury's findings of guilt. *Id*. at 14, 18. Based on the severity of the crime, the Court ordered that the aggravated burglary sentence run consecutive to the remaining counts, for a cumulative sentence of 23 years. Throughout his incarceration, Horton has continued to maintain his innocence.

### G. Post-Conviction Hearing Challenging Eyewitness Identification

In 2007, while the direct appeal was still pending, Horton's appellate counsel filed a Petition for Post-Conviction Relief per R.C. 2953.21. Horton's argued, *inter alia*, that his trial counsel was constitutionally ineffective for failing to call an expert on eyewitness identification.

11

R. HORTON 001163

In 2008, the Court granted an evidentiary hearing on Horton's petition, where defendant presented the testimony of Dr. John Tilley, Ph.D., a clinical and forensic psychologist.

Dr. Tilley expressed several concerns with the eyewitness identification in this case. First, he noted that witnesses are generally overconfident regarding their own identifications, and that the witness' level of confidence is completely unrelated to the actual accuracy of the identification. Second, Dr. Tilley noted that eyewitness identification can be unreliable, and may be especially suspect where the witness experiences "confidence inflation"—i.e., where the witness purports to be more confident in a memory as time goes on and the witness is further removed from the actual experience. Third, Dr. Tilley expressed concern regarding "memory transference," where an initial memory can be contaminated by information or memories of someone else. Finally, Dr. Tilley noted that simultaneous "six pack" photo arrays are inherently unreliable, insofar as they encourage witnesses to pick the photo that looks closest to their memory rather than independently assess each photo against their memory.

In 2010, the Court denied Horton's petition. Specifically, the Court found that an eyewitness expert would not have been material, because the victims allegedly knew Horton and that the "victim's testimony at trial was remarkably consistent."

### H. Public Records Request

On April 10, 2017, in response to a March 2016 public records request, the Ohio Innocence Project received 61 pages of police reports from the Columbus Police Department. *Blake Affidavit*, at ¶4; *Police Reports*, attached as Exhibit A. These reports included several pages that appear to have been missing from the original discovery.

Specifically, the response contained what appear to be handwritten notes of Detective Walker's first interview with McClanahan on October 13, 2009. *Police Reports* at 48-50. The

12

R. HORTON 001164

handwritten notes differ materially from Walker's typed interview notes of that interview.  First, whereas McClanahan initially described the height of the attacker as somewhere in a range *under* six feet tall ("5'9" to 6'0" tall"), Walker's typed notes (created after Horton's arrest) state that McClanahan described the attacker as 6'0" tall.  *Id*. at 50.  None of the other documents in the discovery file report that the shooter could have been as short as 5'9".

The handwritten notes also state "Can ID" and then the following description: "M/B, 27-28, Everett Middle School.  **Richard Diggs**—Adidas boy. Reynolds Ave." *Police Reports* at 50. (emphasis added).  The fact that at least one of the victims apparently initially identified a different Richard—Richard Diggs-- does not appear in the typed version of Walker's notes or anywhere in the discovery folder or the testimony at trial.

## I.  2017-18 Investigation

After reviewing the police reports, the Ohio Innocence Project conducted a reasonably diligent investigation to determine whether the new information in the police reports had been disclosed.  Blake Affidavit at ¶¶5-8.  Horton confirmed that he "never heard the names Richard Diggs or Ricardo Diggs mentioned with anything involving my case until Summer 2017," and that if he had known that a different Richard had been named in the investigation, he would have "used this info to prove my innocence." *Affidavit of Richard Horton,* attached as Exhibit C.

Clerks with OIP also learned that Horton's original trial attorney was deceased, and that his surviving co-counsel no longer had the file.  *Affidavit of Kiley Beale*, attached as Exhibit I. Eventually, in March 2018, one of Horton's post-conviction attorneys was able to provide the original trial discovery that he had obtained during his representation of Horton in 2008. *Affidavit of Dave Thomas*, attached as Exhibit G.  Those documents included handwritten notes of the interview with Rhonda Curry, but not Detective Walker's handwritten notes of her

13

interview with McClanahan.  *State's Discovery*, attached as Exhibit D.  *Blake Affidavit* at ¶6.  The original discovery does not contain any mention of "Richard Diggs" or McClanahan's original claim that the shooter could have been as short as 5'9".  *Id*.

Although Richard Diggs has a lengthy and violent criminal history, court records are convoluted by the fact that he and/or his brother "Riccardo" appear to have used each other as aliases.  Records for Richard Diggs, Riccardo D. Diggs, and Riccardo L. Diggs all provide the same address on 4th Avenue (less than a mile from Loew St.).  Furthermore, "Riccardo D. Diggs" and "Richard D. Diggs" have several Franklin County felony convictions under the same 1977 date of birth—including multiple arrests for aggravated robbery, robbery, gang conspiracy charges,[7] and receiving stolen property.  Franklin County records also show several felony convictions for "Riccardo L. Diggs" under a 1976 date of birth.  There is at least one charge, however, where "Riccardo D. Diggs" appears with the same August 1976 date of birth that appears elsewhere for Riccardo L. Diggs.

Additionally, except for their height, Richard Diggs, Riccardo Diggs, and Richard Horton all have similar features. All three are light skinned black men, between 27-28 at the time of the crime, and all had short cropped hair.[8]

---

[7] In 2002, one of the Diggs brothers ("Riccardo D. Diggs") was charged with participation in a criminal gang, two counts of robbery, one count of aggravated robbery, one count of receiving stolen property, and one count of trafficking in drugs.  This person received a five year prison sentence and was still incarcerated when McClanahan and Curry were robbed in October 2004.  It is not entirely clear which brother this was.

[8] Full sized photos of Richard Diggs and Riccardo Diggs are attached as Exhibit E.  See also, *Blake Affidavit* at ¶8.  The photograph of Richard H. Horton is a true and accurate copy from the photo array shown to the victims.  Tr. at St. Ex. 1.

14

R. HORTON 001166

  

Ricardo Lamar Diggs           Richard H. Horton           Richard D. Diggs

An investigator retained by the Ohio Innocence Project located and interviewed "Richard D. Diggs" in April 2018. *Affidavit of Mark Rooks*, attached as Exhibit H. Richard D. Diggs informed the investigator that Riccardo L. Diggs was his brother. Richard confirmed that he and his brother looked alike and were sometimes confused for one another. He denied any involvement in the McClanahan robbery, and he claimed he was in prison at the time. Finally, although he denied knowing Richard Horton, Richard confirmed that both he and Riccardo went to Everett Middle School. *Id*.

**J.  Advancements in DNA Testing**

In the 13 years since Horton's conviction, technology has developed that can detect even trace amounts of DNA on objects touched by perpetrators. Modern DNA technology can identify profiles even on old and degraded evidence and can isolate even a tiny number of cells for testing. *Affidavit of Dr. Rick W. Staub, Ph.D.* ("Staub Affidavit"), attached as Exhibit F. Furthermore, federal and state databases contain hundreds of thousands of DNA profiles that could be compared to the sperm in the sexual assault kit. This technology is now routinely used in both criminal prosecutions and in post-conviction DNA testing. "Throughout the years,

15

CODIS has provided over 7000 hits between Columbus crime scenes and convicted offenders or arrestees and has truly revolutionized the investigation of all crimes." *The History of the Columbus Crime Laboratory*, *supra*, at fn.1.

At the time of Horton's conviction, DNA testing required a relatively large number of cells to obtain a useable profile. Today, "STR amplification kits…are more sensitive, assay more loci, are more resistant to amplification inhibitors, and are designed for amplifying degraded DNA fragments." *Staub Affidavit* at ¶8. The methods used for extraction and amplification are now powerful enough to determine a full DNA profile from a relatively small number of nucleated cells. *Staub Affidavit* at ¶8, ¶¶12-14, ¶¶17-18. This means forensic labs are now routinely able to analyze DNA left behind when a perpetrator simply *touched* an object with his or her bare skin. *See Staub Affidavit* at ¶18. The ability of forensic labs to get "touch DNA" from a crime scene has revolutionized the way modern cases are investigated. *See Staub Affidavit* ¶18.

In the very recent past, new methods have been developed that allow forensic laboratories to obtain more complete DNA profiles from fired shell casings. Dawson, *Who Loaded the Gun? Recovering DNA from Bullet Casings*, Forensics Magazine, September 2016. ("the sensitivity of DNA testing has improved steadily over the last decade, bringing cartridge casing testing to the threshold of usefulness in criminal investigations.")

## II.　　STATUTORY FRAMEWORK

Ohio's DNA testing law has been codified at Ohio Revised Code §§ 2953.71 – 2953.83. Under the current law, the Court should first determine whether the defendant is an "eligible offender" under R.C. §2953.72(C)(1), and whether he or she has already had a prior "definitive DNA test." §§2953.74(A),(B)(2). Ineligible offenders or offenders who have already had prior

16

R. HORTON 001168

definitive DNA testing must be denied. *Id.* Assuming these threshold factors are met, the analysis turns to a multi-part test for whether DNA testing should be allowed. In order to grant testing, the Court must find all of the following:

1. Biological material from the victim or crime scene still exists and is scientifically suitable for testing. §2953.74(C)(1),(2);

2. There is no reason to believe the material has been out of state custody or tampered with or contaminated. §2953.74(C)(6);

3. The identity of the perpetrator was an issue at trial. §2953.74(C)(3); and

4. If testing were to be conducted, and considering all available admissible evidence in the matter, an exclusion result would be outcome determinative. §§2953.74(C)(4)-(5), §2953.74(B)(2).

The defendant's submission of a valid application also triggers an obligation by the State and testing authority to investigate the availability and testability of remaining biological evidence related to the case. R.C. § 2953.76. Under the law, the State must use "reasonable diligence" to determine what biological material was collected from the scene and/or victim. *State v. Price*, 845 N.E.2d 559, 561 (2006). Reasonable diligence is the "degree of diligence comparable to the diligence a reasonable person would employ in searching for information regarding an important matter in the person's own life." R.C. § 2953.71(Q).

Citing concerns over state and judicial resources, the Ohio Supreme Court has held that a court may choose to rule on whether testing would be outcome determinative before ordering the State and testing authority to conduct their investigations. *State v. Bueller,* 863 N.E. 2d 124, 129 (2007). However, where circumstances have raised doubts about the location or existence of evidence, it may be an abuse of discretion to deny an application without an evidentiary hearing.

17

R. HORTON 001169

*State v. Rawls*, 2016-Ohio-7962, ¶24 2016 WL 7074375 (8th Dist.).

### III.   ARGUMENT

Throughout his arrest, conviction, and incarceration, Richard Horton has steadfastly maintained his innocence.  Although police recovered a shell casing at the scene of the crime, forensic science in 2005 was not sophisticated enough to link the casing to a perpetrator.

Today, advanced DNA technology can identify cells left on the shell casing recovered from the scene, and testing could conclusively prove the identity of the attacker.  DNA testing is particularly important now that newly discovered police reports suggest the victims initially identified a different man as the attacker.  Horton's Application for DNA should be granted, and the shell casing should be delivered to the testing authority for analysis.

**A. Modern DNA testing could determine the identity of the attacker, and DNA testing is outcome determinative.**

In order to grant DNA testing, the Court must determine whether exculpatory results, considered in light of all available admissible evidence, would be "outcome determinative." §2953.74(C)(4)-(5), §2953.74(B)(2).  The General Assembly has repeatedly loosened this requirement in response to inmates being denied DNA testing.  See generally *State v. Ayers*, 185 Ohio App.3d 168, 2009-Ohio-6096, 923 N.E.2d 654 (8th Dist.).  Previously, in order to satisfy the "outcome determinative" test an inmate had to show that "no reasonable factfinder would have found the inmate guilty * * *."  R.C. 2953.71(L); *Ayers* at ¶ 20 (emphasis added).  Now, the inmate need to only show that there is a "strong probability" that no reasonable factfinder would have convicted.  The new standard was intentionally designed to allow greater access to post-conviction DNA testing.  *Ayers* at ¶ 18-22.

In determining whether exculpatory DNA results would be outcome determinative, the Court must consider those results in the context of "all available admissible evidence."  R.C.

18

R. HORTON 001170

2053.71(L).  In other words, where new evidence has been discovered post-conviction, that new evidence should be taken into account when considering whether exculpatory DNA testing could change the outcome at trial.  Here, newly discovered evidence not only casts doubt on the accuracy of the victim's identifications at trial, but it also points to potential alternate suspects who could be compared against DNA results from the shell casing recovered from the scene.

At trial, the State admitted its case "was about one thing—eyewitness identification."  Tr. at 276.  The State downplayed the risk of error in these identifications by arguing that the victims and Horton knew each other, and that their descriptions were consistent and "added up."

> "The victims in this case have been consistent *** Their testimony is reasonable.  It makes sense.  Why would they come in here and lie to you?  These witnesses came to their own independent conclusions that they had seen this person in the neighborhood.  They knew who this person was.  Richard was able to give the first name Richard.  Facial I.D.  Voice I.D.  Clothing I.D., words that were used, it all adds up to a good identification in this case."

Id. at 307-08.  Both McClanahan and Detective Walker repeatedly suggested that identifying Horton's last name was straightforward and consistent—first McClanahan provided the name "Richard," and then he called back when he found the last name "Horton."  This argument has been seriously undermined by newly discovered interview notes, and the identifications as they stand today would not sustain a conviction against exculpatory DNA results.

Faulty eyewitness identification is extremely common in wrongful convictions.  *Perry v. New Hampshire*, 132 S.Ct. 716, 730-31, 181 L.Ed.2d 694 (2012)(J. Sotomayor, dissenting)("This Court has long recognized that eyewitness identifications' unique confluence of features—their unreliability, susceptibility to suggestion, powerful impact on the jury, and resistance to the ordinary tests of the adversarial process—can undermine the fairness of a trial.").  In fact, faulty eyewitness identification has contributed to over two-thirds of wrongful convictions in sexual

19

R. HORTON 001171

assault cases.[9]  *See also*, *Perry* at 738-39.   The research on faulty eyewitness identification that Dr. Tilley presented in 2008 has only improved, and there is now widespread agreement regarding dangers of overreliance on eyewitness identification in criminal prosecutions. Dror, Itiel, et al. (2013), *New application of psychology to law: Improving forensic evidence and expert witness contributions*, Journal of Applied Research in Memory and Cognition, Vol. 2: Iss 1: pp. 78-81.

Furthermore, contrary to the State's arguments at trial, the identifications in this case were not particularly reliable.  Neither victim knew Horton well enough to identify him until weeks after the attack.  McClanahan claims to have seen Horton, on average, about 2-3 times per year over the course of almost a decade.  Curry says she had no interaction with Horton at all since he had purchased a car from their niece 8 or 9 years earlier.

And both victims appear to have only settled on Horton after getting information from other people.  In police reports taken the morning of the attack, McClanahan does not mention knowing his attacker, or mention the name "Richard" at all.  *Police Reports* at 9.  And contrary to the testimony at trial, when McClanahan did initially provide a full name, he appears to have named a different Richard—Richard Diggs.  *Id*. at 50.  It was only later, after conversations with Curry and his niece and others, that he named Richard Horton as the attacker.  Because the initial identification naming Richard Diggs was suppressed, it remains unknown how McClanahan ultimately settled on Horton as the attacker.

For her part, Curry also initially fails to mention knowing the attacker.  Tr. at 90-91. Later, she asked her daughter if she remembers someone named "Richard" who moved to Columbus and went to middle school with her.  *Her daughter* then provided her the nickname

---

[9] https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx (last accessed May 5, 2015)

R. HORTON 001172

"Adidas boy[10]," at which point Curry consults with McClanahan and says she "believes" he was the one who robbed them:

> I knew, you know, in my mind, on my way to the hospital, who it was.  But I just—I was so upset I just forgot.  I just didn't remember until she came to take her statement at my home, at my daughter's home.  And that is when I told her, you know, I think I know who it was.  She said, "Rhonda, you didn't tell me that morning."  I said, I know.  I just forgot.  I told my daughter on the way to the hospital, I told her I think I know who it was.  She said, "Do you?"  I said "Yeah."  She went to school with him maybe a month or two when he first moved to Columbus, Ohio.[11]  And I said, "You remember a guy named Richard?"  She said, "Yes.  We used to call him Addias [sic] man or something."  I said, "Kim, I think that is who it was."  She said, "For real, mommy?"  I said, "Yeah."  Well after Rick came off his medicine and stuff maybe that Sunday evening or Monday, and I was going to wash him up, he said the same name.  You know, we wasn't nowhere near each other when I said it first, and then he turned around and said the same name, you know.  And I said, well, I really do believe that it was him."

Tr. at 90-91.

This conversation appears to be the first time that the name "Richard" is linked to Horton (as "Adidas boy")—*but the original linking information came from Curry's daughter*, not Curry's independent recollection.

There is no reason to believe that Curry and her daughter were talking about the same "Richard."  Horton was not the only "Richard" at his middle school:  Richard Horton, Richard Diggs, and Riccardo Diggs all went to Everett Middle School.  Rooks Affidavit at ¶6.  All three are light-skinned black men with similar facial features.  *Booking Photos*, attached as Exhibit E.  Richard Diggs and Riccardo Diggs look similar enough that they were at times mistaken for each other, both live near Loew Avenue where the robbery occurred, and both have felony records in

---

[10] "Adidas boy" was Horton's nickname.
[11] Richard Diggs, aka Riccardo D. Diggs, and his brother Riccardo L. Diggs both attended Everett Middle School.  *Affidavit of Mark Rooks*, attached as Exhibit H.

R. HORTON 001173

Franklin County.  *Id*.  And unlike Horton, Richard Diggs has a violent criminal history, including multiple charges related to weapons and aggravated robbery

In fact, the description of the attacker from the original handwritten notes better fits the Diggs brothers than it does Horton.  At trial, when McClanahan was asked whether he described the attacker to Detective Walker, McClanahan responded, "**Just his height**.  I described his height, his build and his skin complexion." Tr. at 77 (emphasis added).  When asked what height McClanahan had initially provided, Detective Walker testified under oath that McClanahan described the attacker as "six foot." *Id*. at 145.  This description was fairly close to Horton, who is 6'1".

Recently discovered interview notes suggest that Walker's testimony and typed interview notes were false.  McClanahan initially described the shooter's height as five foot nine inches to six feet—in other words, something *less than* 6'0" and potentially as short as 5'9".  Unlike Horton, both Diggs brothers actually match this description.  *Booking Photos*, attached as Exhibit E.  Richard Diggs is 5'11" and Riccardo was 5'9"—both squarely within the range initially provided by McClanahan.

The suppressed handwritten interview notes suggest that Curry and/or McClanahan may have initially attempted to identify Richard Diggs, and then through a series of miscommunications, ended up providing police with Richard Horton's name.  If true, this would explain the mash up of confusing references in the handwritten police report, some of which point to Horton, others of which point to Diggs.  In any case, Detective Walker's handwritten notes strongly undermine the State's core argument to the jury in 1996—that the victims' identifications clearly and consistently pointed to Richard Horton.

22

R. HORTON 001174

Walker's handwritten notes undermine and contradict the State's core argument at trial, and the suppression of these notes alone could be grounds for a new trial. In that context, given all available admissible evidence, DNA testing could be definitive of Horton's guilt or innocence. No physical evidence linked Horton to the crime, and the only forensic information that was recovered—fingerprints from where the attacker held the bed frame—did not match Horton. The eyewitness identifications used against Horton at trial have been weakened by newly discovered notes suggesting that at least one of the victims initially named a *different* Richard as the attacker. At the same time, technological advancements mean that, for the first time, testing can now recover DNA from the one piece of physical evidence almost certainly touched by the perpetrator—the shell casing recovered from the scene. The initial identification of Richard Diggs not only casts doubt on the victims' subsequent identification of Horton, but it also provides a credible alternate suspect who could be compared to existing forensic evidence. Matching the DNA from the shell casing to one of the Diggs' brothers would not only provide a "strong probability" of a different outcome—it would be conclusive proof of Horton's innocence.

### B. Horton has satisfied the remaining factors under R.C. 2953.74 to permit DNA testing.

In addition to the outcome determinative analysis, the Court must make the following findings when granting DNA testing:

- The defendant is an eligible offender and the DNA testing requested was not available at trial. R.C. §§ 2953.74(A)-(B);

- Biological material from the victim or crime scene was collected and still exists, without reason to believe it has been tampered with, and the material is not so degraded or contaminated as to be scientifically unsuitable for testing. R.C. §§ 2953.74(C)(1),(2),(6); and

23

- The identity of the defendant was an issue at trial. *Id. at* (C)(3)-(4).[12]

Horton meets all of these factors, and his *Application for DNA Testing* should be allowed to proceed.

> 1. *Horton is an eligible offender and DNA testing on shell casings was not available at the time of Horton's trial.*

A defendant must pass several threshold tests before the Court can consider an application for DNA testing. R.C. 2953.74(A)-(B). First, he or she must meet the statutory definition for an "eligible offender." *Id*. Second, the applicant must show that "at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available." R.C. 2953.74(B)(1). Horton satisfies both tests.

Horton unquestionably meets the definition of an "eligible offender" under Ohio law. An "eligible offender" includes someone who has been convicted of a felony and did not plead guilty or no contest to the original charges. R.C. 2953.71(F) and 2953.72(C). R.C. 2953.71(F) and 2953.72(C). Horton was convicted of multiple felonies and is currently incarcerated in Chillicothe Correctional Institute. He pleaded not guilty at trial, and he has steadfastly maintained his innocence throughout his arrest, trial, and incarceration.

Second, technology available in 2005 was not capable of testing for touch-DNA on spent shell casings. Although recent advancements have greatly improved the ability of testing facilities to recover usable DNA on shell casings, this technology was not available in 2005.

---

[12] §2953.74(C)(4) requires the court find that one or more defense theories asserted at trial was such that DNA testing would be outcome determinative. Where the defendant claimed mistaken identity at trial, as Mr. Horton did here, the requirements of this section are cumulative of §§2953.74(C)(3) (identity was an issue at trial) and (C)(5) (testing would be outcome determinative).

24

*Staub Affidavit*, attached as Exhibit F. No laboratory in 2005 had ever recovered DNA from spent shell casings, and such testing was not yet available for purposes of R.C. 2953.74(B).

> 2. *Biological material was collected, the material still exists, and there is no reason to believe the material is so degraded or contaminated as to be scientifically unsuitable for testing.*

In order for testing to advance, the Court must also find that biological material was collected at the scene of the crime or from the victim, and that this evidence still exists. Furthermore, the Court must determine whether there is reason to believe that the material has been outside of the state's custody, tampered with, or contaminated. Horton satisfies each of these requirements.

A single 9mm Winchester cartridge casing was processed at the scene of the crime about an hour after the robbery. *Police Reports* at 14. The casing was delivered to Columbus Police Department Property Room and stored under #04-024460. *Id*. There is no reason to believe it has been destroyed, tampered with, or been outside the State's custody. The State can confirm this by conducting a diligent search for remaining physical evidence and providing a report to Horton and the Court, pursuant to its obligations under R.C. 2953.75

Furthermore, there is no reason to believe the shell casing is contaminated at all, much less so contaminated as to be "scientifically unsuitable" for testing. The officers who collected the shell casing were also processing the scene for fingerprints and would have been unlikely to handle evidence with their bare hands.[13] There is no indication that the victims or anyone else touched the cartridge casing. The only person *known* to have touched this evidence is the person

---

[13] As noted by Dr. Staub, even hypothetical concerns about contamination can be addressed by comparing a recovered DNA profile to officers who may have handled the evidence. Furthermore, if the profile matches a known offender in CODIS, that person can be compared to the fingerprints left on the bed frame, and to the victim's general descriptions (i.e., light skinned black male, medium build, late 20s).

25

who loaded the weapon.  DNA testing can now uncover the identity of this person, and absent definitive evidence of contamination,[14] that testing should be allowed to proceed.

The evidence is also not so degraded as to be scientifically unsuitable for testing. Although obtaining DNA from shell casings has been difficult in the past, recent developments have greatly improved the ability of a lab to recover at least a partial profile from spent shell casings.  Dawson, *Who Loaded the Gun?  Recovering DNA from Bullet Casings*, Forensics Magazine, September 2016.  ("A likely reason so little useful DNA was being recovered from cartridge casings was that the standard technique used in crime labs are not sensitive enough. It's wasn't that DNA testing is a waste of time, but the procedures needed to be updated.") New techniques have shown scientific success in recovering partial DNA profiles from spent shell casings.  Fan et al., *An evaluation of the performance of DNA recovery from fired firearms and cartridge cases using microdialysis filtration*, Forensic Science International: Genetics Supplement Series, Volume 6, December 2017, at pp. e246-e248.  And DNA testing on shell casings has been responsible for multiple convictions nationwide, including via cold hits to the CODIS database.  *Clark County Jail begins collecting DNA upon felony arrests*, WHAS11.com[15] ("Republican Sen. Erin Houchin of Salem authored the bill, which was signed into law in April 2017. She said it was inspired by a murder case in Zionsville, Ind in which an 82-year-old man was gunned down outside his home. Investigators found DNA on a shell casing at the scene and matched it to a man whose profile was in the national database because of a felony arrest in

---

[14] The *hypothetical possibility* of contamination has not stopped labs such as BCI&I from conducting testing for touch DNA, at least in criminal prosecutions.  BCI&I recently conducted DNA testing on a gun found *in a Columbus sewer*, and BCI&I analysts then testified as State's witnesses in the resulting criminal prosecution.
[15] Available online at http://www.whas11.com/article/news/local/clark-county-jail-begins-collecting-dna-upon-felony-arrests/504611158 (last accessed April 5, 2018)

26

R. HORTON 001178

Ohio, which already required DNA to be collected upon a felony arrest."). The only way to know whether any genetic material remains on this shell casing is to actually conduct scientific testing on the casing, and the Court should allow testing to proceed.

### 3. *The identity of the defendant was an issue at trial*

Finally, the DNA testing statute also requires the Court to determine whether the identity of the defendant was an issue at the original trial. DNA testing would not be useful, for example, in a case where the issue at trial was the defendant's state of mind or intent, e.g., whether a defendant was acting in self-defense. See, e.g., *People v. Urioste*, 736 N.E.2d 706, 711-712 (Ill. App. Ct. 2000) (where the identity requirement guards against "frivolous requests by limiting the remedy to those cases where identity was truly at issue, cases where the use of the new technology could test properly preserved genetic material to either confirm or decidedly negate other identification evidence that produced the conviction."). Here, the perpetrator's identity was a primary issue at the trial. Horton has consistently and adamantly denied any involvement in robbery. Because the identity of the perpetrator was the key—if not the only—issue at Horton's trial, R.C. 2953.74(C)(3) is satisfied.

### IV. CONCLUSION

Richard Horton has adamantly maintained his innocence for over 13 years, and modern DNA testing could now definitively identify the identity of the actual perpetrator. Horton is entitled to testing pursuant to R.C. 2953.71 et seq., and there is no good reason for the evidence to remain untested under these circumstances. The Court should order the State to conduct a thorough search for all biological evidence in this matter, find that testing would be outcome determinative, and grant Defendant's Application for DNA Testing.

R. HORTON 001179

Respectfully Submitted,

/s/ Brian Howe_____
Brian Howe (OSC #0086517)
Mark Godsey (OSC #0074484)
Attorneys for Defendant Richard Horton
THE OHIO INNOCENCE PROJECT
P.O. Box 210040
Cincinnati, OH  45221-0040
(513) 556-0752
(513) 556-0702 (fax)
Brian.Howe@uc.edu

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon the Franklin County Prosecutor's Office, 373 S High St., Columbus, OH 43215 via the electronic filing system; and to the Ohio Attorney General, Criminal Justice Section, 150 East Gay Street, 16th floor, Columbus, Ohio 43215, on this 6th day of April, 2018.

/s/ Brian Howe_____
Attorney for Defendant Horton

28

R. HORTON 001180